CLERKS OFFICE U.S. DIST. COURT
AT CHARLOTTESVILLE, VA
FILED
07/29/2020
JULIA C. DUDLEY, CLERK
BY: /s/ J. JONES
DEPUTY CLERK

UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
No. __CHARLOTTESVILLE__ DIVISION

| | |
|---|---|
| WILD VIRGINIA, VIRGINIA WILDERNESS COMMITTEE, UPSTATE FOREVER, SOUTH CAROLINA WILDLIFE FEDERATION, NORTH CAROLINA WILDLIFE FEDERATION, NATIONAL TRUST FOR HISTORIC PRESERVATION, MOUNTAINTRUE, HAW RIVER ASSEMBLY, HIGHLANDERS FOR RESPONSIBLE DEVELOPMENT, DEFENDERS OF WILDLIFE, COWPASTURE RIVER PRESERVATION ASSOCIATION, CONGAREE RIVERKEEPER, THE CLINCH COALITION, CLEAN AIR CAROLINA, CAPE FEAR RIVER WATCH, ALLIANCE FOR THE SHENANDOAH VALLEY, and ALABAMA RIVERS ALLIANCE, ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, ) ) ) | Civil Case No.  3:20-cv-0005 |
| v. ) ) | |
| COUNCIL ON ENVIRONMENTAL QUALITY and MARY NEUMAYR IN HER OFFICIAL CAPACITY AS CHAIR OF THE COUNCIL ON ENVIRONMENTAL QUALITY, ) ) ) ) ) ) | **COMPLAINT** |
| Defendants. | |

## INTRODUCTION

1.     In its most recent opinion on the strictures of the Administrative Procedure Act ("APA"), the Supreme Court affirmed that "'the Government should turn square corners in dealing with the people.'" *Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1909 (2020) (quoting *St. Regis Paper Co. v. United States*, 368 U. S. 208, 229 (1961)

(Black, J., dissenting)).  In other words, while the federal government can change policy, it must follow the law, not "cut corners," when it does so.  *Id.*

2.      Contrary to these strictures, in the Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43304 (2020) ("Final Rule" or "Rule"), in direct response to President Trump's call to "simplify and accelerate" the approval process for major projects like pipelines and highways, the Council on Environmental Quality ("CEQ") deleted the central provisions of regulations that have been in place for over 40 years to implement one of our nation's most fundamental "good government" laws: the National Environmental Policy Act of 1969 ("NEPA" or the "Act"), 42 U.S.C. §§ 4321-4370 (1970).

3.      Rather than make this drastic change deliberately and with the careful process the APA requires, CEQ cut every corner.  The agency disregarded clear evidence from over 40 years of past implementation; ignored the reliance interests of the citizens, businesses, and industries that depend on full and complete NEPA analyses; and turned the mandatory public engagement process into a paper exercise, rather than the meaningful inquiry the law requires.

4.      When introducing the final changes to the NEPA rule, President Trump dismissed the APA process as a "roadblock" in the way of this administration's attempts to "slash" NEPA, which the president had been attempting to do since "day one." But the APA cannot be ignored: it guards against an administration's pursuing a political agenda without adhering to legal process.  *See N. Carolina Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 772 (4th Cir. 2012).

5.      Through a set of simple rules, the APA ensures that a significant change in government policy is not made without a "measured deliberation," a reasoned justification, and a robust opportunity for public engagement.  *Id*. at 772.

6.      Under the APA, the public must be given a full opportunity to review proposed changes to regulations, the public must have a meaningful opportunity to comment, and the agencies must consider the public's comments in their rulemaking. 5 U.S.C.A. § 553 (b)-(c).

7.      The APA requires agencies to consider "serious reliance interests" on current regulations and weigh those interests against changes in policy.  *FCC v. Fox Television Stations*, 556 U.S. 502, 515-516 (2009).

8.      The APA ensures that in making policy changes, the government must have "good reasons" for the changes that are rational and based in fact.  *Id.* at 515.  The government must truthfully explain its reasons to the public so that it may be held legally and politically accountable for the changes.

9.      And the government's responsibility is even further heightened when it makes changes with great significance.  Here, where the government has completely rewritten the regulations implementing one of our nation's most significant environmental laws—a law that has been in place for over fifty years with regulations that have remained unchanged for decades—the government's responsibility to follow procedure is at its highest.

10.     NEPA is fundamentally a democratic decisionmaking law.  The law has twin aims.  By establishing transparent procedures that require federal decisionmakers to consider and account for the environmental impacts of federal projects, NEPA is meant to ensure that well-informed government will make careful decisions.  To reinforce this, the law ensures that the

public are informed about the environmental impacts of projects and alternative solutions so that they may keep government accountable and weigh in on the decisionmaking process.

11.     Often referred to as the "Magna Carta of environmental laws," NEPA was enacted in 1970 to protect human health and the environment by ensuring that "unquantified environmental amenities and values" are given "appropriate consideration in decisionmaking." 42 U.S.C. § 4332(2)(B).

12.     These protections, important across the nation, hold heightened significance in the southeastern United States.  Home to some of the nation's most significant, diverse, and valuable natural resources, the Southeast is also one of the fastest growing regions in the country.  The tensions epitomized by this region—"the profound impact of man's activity on the interrelations of all components of the natural environment" —led Congress to enact NEPA. 42 U.S.C. § 4331(a).

13.     At the heart of NEPA's statutory scheme is an action-forcing process that is intended to ensure that decisionmakers take a "hard look" at the impacts of their actions and "use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony."  *Id.*

14.     CEQ's regulations implementing NEPA have been in place for over 40 years and have remained largely unchanged.  But CEQ has abruptly abandoned the rules' longstanding central, common-sense provisions, which up until now have ensured that agencies and the public have full information about major projects to inform sound decisionmaking.  And CEQ has done so without evidence to support its changes, without considering the disruption they will cause, and without considering any less drastic measures.

15.     Despite receiving comments from over 1.1 million voices raising detailed concerns about every aspect of the regulations accompanied by mountains of evidence that the changes will cause harm and result in outcomes in opposition to its stated purpose, CEQ rushed to finalize the rulemaking less than four months after the close of the public comment period.

16.     In its haste, CEQ ignored concerns from a wide range of groups, including not just environmental stakeholders, but highway builders, solar and wind industry executives, commercial fishermen, off-road vehicle enthusiasts, business associations, and state legislators, who all noted that the changes will be counterproductive and will slow down, rather than speed up, the delivery of projects.  The commenters also noted that many of the changes will not only profoundly and illegally contradict the underlying statutory scheme, but will also, as a practical matter, lead to less reasoned, less informed, and less productive outcomes.

17.     Rather than listen to or address those concerns—as it is legally required to do— CEQ offers implausible and pretextual justifications in an attempt to avoid accountability for this extreme reversal.  The rewrite itself is an attempt to avoid accountability for future decisions that will cause environmental harms.

18.     By excluding a range of projects from any NEPA review, severely limiting the environmental effects that must be considered under NEPA, restricting which alternatives should be studied, and allowing projects to proceed before the NEPA process is complete, CEQ has eviscerated the heart of the statutory scheme.  Because CEQ has arbitrarily reversed longstanding regulations, contrary to the administrative record and the governing statute, its rulemaking violates the APA and must be vacated.

## JURISDICTION AND VENUE

19.     This action is brought pursuant to the judicial review provisions of the

Administrative Procedure Act, 5 U.S.C. §§ 701–706, which waive the defendants' sovereign

immunity regarding the Conservation Groups' claims. 5 U.S.C. § 702; *City of New York v. U.S.*

*Dep't of Def.*, 913 F.3d 423, 430 (4th Cir. 2019).  This Court has jurisdiction over the

Conservation Groups' claims under 28 U.S.C. § 1331 and may issue a declaratory judgment and

further relief requested pursuant to 5 U.S.C. § 706 and 28 U.S.C. §§ 2201–2202.

20.     Venue is proper in this District under 28 U.S.C. § 1391(e)(1)(C) because

Defendant CEQ is an agency of the United States, Defendant Mary Neumayr is an officer or

employee of the United States acting in her official capacity, no real property is involved in this

action, and Wild Virginia, Virginia Wilderness Committee, Highlanders for Responsible

Development, the Clinch Coalition, Cowpasture River Preservation Association, and the

Alliance for the Shenandoah Valley, are headquartered within the District.

## PARTIES

### Plaintiff Conservation Groups[1]

### Wild Virginia

21.     Plaintiff Wild Virginia is a not-for-profit corporation founded in 1996.[2]  Wild

Virginia has 503 members in Virginia and other states.  Its mission is to protect and connect

Virginia's wild places. Wild Virginia's programs are designed to serve this mission, by

educating the public, landowners, and other stakeholders about threats to natural resources and

ecosystems; advocating for connectivity and integrity of Virginia's forests and waters; and

---

[1] The seventeen plaintiff groups are hereinafter referred to as the "Conservation Groups."
[2] The group's original name was the Shenandoah Ecosystems Defense Group ("SEDG"). The name was changed to Wild Virginia in 2003.

influencing decision makers by mobilizing and equipping citizens to represent their own interests.

22.     Members of Wild Virginia enjoy recreating in Virginia's forests.  For example, members enjoy botany and take trips to discover what is in bloom in different areas of Shenandoah Mountain.  Members enjoy hiking in the mountains and discovering pond like habitats where they can look at frogs, salamanders, newts, and rare plants.

23.     Members of Wild Virginia get physical and mental health benefits from hiking, fishing, and viewing nature in the mountains.  Some members own property adjacent to the mountains.  Members rely on clean water from Virginia's forests for recreation and drinking, and they are concerned about the water quality that is dependent on well-managed forest habitats.

24.     Wild Virginia is based in Charlottesville Virginia and works on issues throughout the state of Virginia.

25.     Decisions made by the United States Forest Service, such as whether and where to allow oil and gas operations, grazing, clearing of rights of way, logging operations, and road construction, have the potential to degrade the habitats and water quality of Virginia's national forests, which are important to Wild Virginia's members.

26.     Any time a government decision involves potentially significant impacts on Virginia's National Forests, whether to soil, water, native species and their habitats, cultural heritage, recreation, scenery, or opportunities for solitude, it is Wild Virginia's mission to participate by assisting the Forest Service with additional information needed to identify potential harms and avoid them; by involving members and the public to oppose unnecessary harms; or both.

27.     Wild Virginia must prioritize its limited resources based on which proposals would be most harmful or benefit most from its participation.  Wild Virginia makes those choices based on the information provided in NEPA documents.

28.     Wild Virginia campaigns focus in part on protection of national forests in Virginia, through involvement in NEPA reviews ranging from broad-scale Land and Resource Management Plan ("Forest Plan") revisions for both the George Washington and Jefferson National Forests to individual project reviews, including timber sales and other site-specific actions.  During these NEPA reviews, Wild Virginia submits information from its own investigations along with detailed scientific and legal analyses, and recruits and trains citizens to participate in these processes.

29.     Wild Virginia's informed participation, along with the involvement of other members of the public, often assists the Forest Service in making decisions that better protect environmental quality.

30.     In Virginia's National Forests, between 2009 and 2019, the Forest Service used Environmental Assessments and Findings of No Significant Impact to authorize 28 vegetation management projects, which all together included 12,298 acres of commercial logging.  In seventeen of those projects (61%), the planned 9,091 acres of logging were reduced in size during the NEPA process, with a total decrease in commercial logging to 7,457 acres, or an 18% reduction.  Projects changed for a variety of reasons, including to avoid impacts to potential wilderness areas, old growth, rare species and habitats, and water and soil.

31.     The majority of changes to logging projects occur in response to public comments, and most often because of public input during the "scoping" process, which is required by current Forest Service regulations at 36 C.F.R. § 220.4(e).  Based on the Forest

Service's sample of nationwide logging projects authorized using Environmental Assessments, 63% of projects change substantively in response to public input.  Of those, 86% change because of public input during the scoping process.

32.     All logging projects in the National Forests during the 2009-2019 time period were authorized using CEs or EAs, none with Environmental Impact Statements ("EIS"s).

33.     The Final Rule will cause harm to Virginia's National Forests and to Wild Virginia's interest in protecting their species and habitats, recreational opportunities, and water and soil resources, because it eliminates the scoping process for projects authorized using an Environmental Assessment.  Without notice and opportunity to comment early during project development, Wild Virginia will lose a crucial opportunity to persuade the Forest Service to avoid unnecessary harms before the agency commits substantial time and resources to the project.

34.     For example, Wild Virginia opposed potential changes to the GWNF Forest Plan in a 2014 NEPA review that would have increased the area within the Forest that could have been used for fracking, providing information about potential water quality impacts for communities downstream from the headwaters areas in the James River and Potomac River basins where these activities could occur.  Members of Wild Virginia attended public meetings, submitted public comments and analyzed data related to plants and other wildlife to help contribute to the planning process.  The revised plan limited the areas available for fracking to those where parties already had mineral rights or where leases had previously been granted, protecting the rest of the remaining 1.1 million acres in the Forest.

35.    During the past five years, the Wild Virginia has participated in NEPA reviews for at least fifteen separate Forest Service projects.  That participation has served Wild Virginia's mission and improved resource management decisions and enhanced protections.

36.    As one example of a project review, Wild Virginia participated at every stage of the NEPA process for the Lower Cowpasture Restoration Project on the George Washington National Forest ("GWNF"), which encompassed an area of nearly 120,000 acres and proposed dozens of separate management actions.  Wild Virginia was concerned about aspects of the project and used NEPA to advocate for changes to reduce water quality degradation, spread of non-native invasive species, and impacts on old-aged timber stands, and to insist on additional and enhanced pre- and post-project monitoring.

37.    In March 2016, Wild Virginia submitted comments in the Lee Ranger District Range Management Project, opposing continued use of floodplain and sensitive areas for livestock grazing that had damaged streams and threatened continued impairments.  Wild Virginia asserted that the grazing leases must be ended to protect water quality and sensitive species, and the Forest Service decided that two of three land areas in the project would be converted to natural habitats and that livestock would no longer be allowed on these areas.

38.    In December 2016, Wild Virginia submitted comments opposing the Hearthstone Lake Dam Rehabilitation Project.  Wild Virginia pointed to evidence indicating that parties may have already taken action that could improperly limit the range of reasonable alternatives to be considered under the NEPA process.  The comments further provided published research findings and analyses of watershed data to support the need to examine dam removal as a preferable alternative.  To date, the Hearthstone Lake project remains "on hold" and Wild Virginia is prepared to pursue additional actions if a decision adverse to its interests is made.

Wild Virginia is concerned that under the Final Rule it will have less opportunity to learn about and raise issues related to this project in the future.

39.     Wild Virginia is also currently involved in active NEPA reviews for two other Forest Service projects.  Wild Virginia submitted scoping comments on April 1, 2020 on the Mt. Storm to Valley Transmission Line Replacement Project on the GWNF.  Wild Virginia asserted that the Forest Service must analyze potential water quality threats from electric power line work on steep, slip-prone mountain slopes and that it must examine whether the effects of habitat fragmentation by the powerline could be mitigated or reversed.  Both of these issues are directly related to Wild Virginia's core focuses, to protect and promote connectivity in natural habitats and to protect water quality.  Wild Virginia on behalf of its members will review and comment on a draft Environmental Assessment when it is issued.  Wild Virginia is concerned that under the Final Rule, the Environmental Assessment will be less robust, and will fail to consider all the impacts from the project including indirect and cumulative impacts.  As a result, Wild Virginia will not get information it needs to inform its advocacy, and the government will not have sufficient information to guide thoughtful decisionmaking.  Consequently, it is likely that the decisions made will result in harm to water quality, habitat, species and other environmental resources, and will result in injury to Wild Virginia and its members.

40.     Members of Wild Virginia value the water quality of Calfpasture River, whose headwaters flow from the GWNF, as well as the native brook trout habitat it provides. Members enjoy observing the native brook trout in the streams, as well as wading in the creeks looking for micro-invertebrates.  Wild Virginia is concerned that the Final Rule could result in uniformed decisions that hurt the Calfpasture River and thus injure the interests of Wild Virginia and its members.

41.     Wild Virginia also has a strong interest in future proposals; for example, the next revision of the Forest Plan for the Jefferson National Forest, which determines the level of protection for discrete areas within the National Forest.  The last revision was completed in 2004, and the plan is required by law to be revised at least every fifteen years.  In preparation, Wild Virginia is working with volunteers to develop information that can be submitted in the NEPA process to inform the revised Forest Plan and ensure more appropriate protections are utilized at the project level. Examples of such protections include the need to leave trees for shading of streams during logging projects, to prevent rising temperatures that can adversely affect coldwater species like trout, especially in light of a warming climate.  Wild Virginia is concerned that the Final Rule would not ensure full consideration of the impacts of choices made in the revised Forest Plan.  As a result, Wild Virginia will not get information it needs to inform its advocacy, and the government will not have sufficient information to guide thoughtful decisionmaking.  Consequently, it is likely that the decisions made will result in harm to streams, other habitat and the wild species that live there.  This harm would injure Wild Virginia and its members.

42.     Wild Virginia and its members have participated in regulatory processes and court cases involving resource management decisions and NEPA reviews by the U.S. Forest Service, the U.S. Fish and Wildlife Service, the U.S. Army Corps of Engineers ("Army Corps"), and the Federal Energy Regulatory Commission ("FERC"), in regard to two interstate natural gas pipelines proposed to cross parts of Virginia.  One of these pipeline projects, the Atlantic Coast Pipeline, has since been cancelled in part because of legal flaws in permitting decisions that were revealed by NEPA analyses.  The remaining project, the Mountain Valley Pipeline, remains active and in the midst of the NEPA process.

43.     Wild Virginia members are concerned about the impacts that the Mountain Valley Pipeline could have on water quality, habitat destruction, air quality, and increased levels of noise.  Members are concerned that construction of the pipeline without proper planning will impact their physical and mental health.  Members are concerned about the long-lasting impacts of the pipeline corridor, and that pipeline construction will harm their continued enjoyment of native plants and wildlife in a natural setting.

44.     Wild Virginia, on behalf of its members, was a plaintiff in two cases against the Forest Service, one for the now-cancelled Atlantic Coast Pipeline and another for the Mountain Valley Pipeline.  In both cases, the Fourth Circuit Court of Appeals rejected the Forest Service right of way approvals for the pipelines.  The Forest Service will have to produce a Supplemental EIS to address issues cited in the court's MVP opinion.  Wild Virginia and its members will be active participants in the process for this Supplemental EIS, and the organization intends to submit its own comments and help members of the public participate fully and effectively.  Wild Virginia is concerned that, because of the Final Rule, the Forest Service may decide to prepare a Supplemental EIS that takes a less robust look at environmental impacts and alternatives than required by NEPA.  As a result, Wild Virginia will not get information it needs to inform its advocacy, and the government will not have sufficient information to guide thoughtful decisionmaking.  Wild Virginia is concerned that this uniformed decisionmaking will lead to harm to the forest resources it and its members care about and thus cause them injury.

45.     Wild Virginia submitted comments on the Notice of Proposed Rulemaking for the CEQ NEPA rule raising concerns about the rulemaking process and the contents of the proposed rule.

46.     Wild Virginia intends to continue its long-followed practice of involvement in any new Forest Service project proposals that implicate its organizational and members' interests.  Wild Virginia is concerned that these opportunities will be diminished under the new rule because the Forest Service will not apply NEPA to projects that it otherwise would have applied to, and NEPA analyses will study and disclose a smaller range of environmental impacts, and compare and disclose the impacts of fewer alternatives.

47.     Wild Virginia is also concerned that the Final Rule will make it more difficult for Wild Virginia to participate in the NEPA process.  Wild Virginia is concerned that it will have to divert resources to hire expert help to perform analyses, write comments and provide critical information about impacts that would unnecessarily or unlawfully harm environmental values important to Wild Virginia's members, where in the past the Forest Service would have been responsible for providing its own analysis to inform the public and the decisionmaker.

48.     Wild Virginia is concerned that under the Final Rule it will receive less information about environmental impacts and alternatives for projects that affect areas in which it has an interest.  Wild Virginia is further concerned that learning about project impacts will require it to submit frequent requests under the Freedom of Information Act ("FOIA"), 5 U.S.C. § 552, for information it would have received through the NEPA process under the prior regulations, and devote resources to conduct surveys of proposed locations for potentially harmful activities.

49.     Wild Virginia's ability to achieve its mission would be severely lessened under the Final Rule, limiting its effective use of the NEPA process to learn about the information prompting agency proposals, critique their reasoning, and submit additional, necessary information to influence their decisions.  Wild Virginia is particularly concerned that weakening

the minimum requirements of NEPA procedures or making them more vague and discretionary will immediately result in project reviews that are less useful and informative, because the Forest Service has been ordered to do only the minimum required by law—to "ensure environmental reviews focus on analysis that is required by law and regulation." Secretarial Memorandum to the Chief of the Forest Service (June 12, 2020).  This will affect Wild Virginia's interest in fostering public involvement in governmental processes and its programs to educate the public about natural areas and values and to provide outdoor experiences.

50.     Wild Virginia has also submitted comments, data, and analysis to the Forest Service in connection with a parallel administrative rulemaking to revise that agency's separate NEPA procedures.  Among other things, the Forest Service has proposed to create new Categorical Exclusions ("CEs") for proposals to harvest timber and construct associated roads for access. The proposed CEs are broad enough to cover every single National Forest timber sale in Virginia in the past decade, with impacts that are cumulatively significant.  Wild Virginia's interest in improving National Forest projects would be adversely affected by CEQ's Final Rule because it purports to allow the Forest Service to adopt CEs with cumulatively significant impacts for actions that "normally" do not have significant impacts, eliminating the procedural safeguards of notice and comment by which projects are mitigated and by which significant impacts are avoided or mitigated.  This would injure Wild Virginia and its members.

51.     Wild Virginia relies on the NEPA process to engage in decisionmaking and to influence decisions that affect it and its members.  Wild Virginia and its members, therefore, will suffer concrete and particularized injuries to interests that are germane to its organizational mission and are imminent now that the Final Rule has taken effect.

52.     The injury to Wild Virginia and its members would be redressed by an order from this Court vacating the Final Rule.

**Virginia Wilderness Committee**

53.     Plaintiff Virginia Wilderness Committee is a not for profit corporation organized in 1969.  The mission of the Virginia Wilderness Committee is threefold: to permanently protect the best of Virginia's wild places for future generations; to foster understanding and appreciation of Wilderness; and to promote enjoyment and stewardship of the state's last remaining wildlands.

54.     The Virginia Wilderness Committee is based in Lexington Virginia and works to protect forests throughout the state.

55.     The Virginia Wilderness Committee has been instrumental in passing legislation designating all existing wilderness areas in the George Washington and Jefferson National Forests, and in Shenandoah National Park.  The organization's efforts have resulted in the designation and protection of over 215,000 acres of Wilderness.

56.     Once designated, Wilderness is available for recreation activities including hunting, fishing, bird watching, camping, hiking, and canoeing, and is protected from logging, road-building, and other development projects.

57.     Virginia Wilderness Committee works to protect the many public benefits of public lands and wilderness, including the maintenance of clean water for drinking and aquatic life. Protection of federal lands assures that clean water will remain for future generations.

58.     Virginia Wilderness Committee has members who are anglers, hikers, birders, and naturalists.  Virginia Wilderness Committee members are interested in preserving undisturbed, wild landscapes.  In particular, some members have interests in preserving high

quality wild brook trout streams associated with these landscapes.  Other members enjoy exploring protected areas and admiring the undeveloped and high quality natural resources on historic battlefields.

59.     Before an area is designated as Wilderness, and therefore permanently protected from development, it may be open to uses that are incompatible with wilderness values, such as utility rights of way, logging, and road construction.  Such uses may preclude an area from being designated as Wilderness in the future.

60.     To achieve the Virginia Wilderness Committee's mission, it is critical that the organization foster protection of Virginia federal public lands and raise awareness about the importance of federal public lands, including engaging the public to help dissuade the U.S. Forest Service from developing lands that may be suitable for inclusion in the National Wilderness Preservation System, now or in the future.

61.     In furtherance of this mission and these efforts, Virginia Wilderness Committee has been and will continue to be an active participant in the NEPA process for projects that affect such areas.

62.     In Virginia's National Forests, between 2009 and 2019, the Forest Service used Environmental Assessments and Findings of No Significant Impact to authorize 28 vegetation management projects, which all together included 12,298 acres of commercial logging. Seventeen of those projects (61%) were reduced in size during the NEPA process, with a total decrease in commercial logging from 9,091 acres to 7,457 acres, or 18%.  Projects changed for a variety of reasons, including to avoid impacts to potential wilderness areas, old growth, rare species and habitats, and water and soil.

63.     The majority of changes to logging projects occur in response to public comments, and most often because of public input during the "scoping" process, which is required by current Forest Service regulations at 36 C.F.R. § 220.4(e).  Based on the Forest Service's sample of nationwide logging projects authorized using Environmental Assessments, 63% of projects change substantively in response to public input.  Of those, 86% change because of public input during the scoping process.

64.     All logging projects in the National Forest during the 2009-2019 time period were authorized using CEs or EAs; none with EISs.

65.     The Final Rule will cause harm to Virginia's National Forests and to Virginia Wilderness Committee's interest in protecting their species and habitats, potential wilderness areas, recreational opportunities, and water and soil resources, because it eliminates the scoping process for projects authorized using an Environmental Assessment.  Without notice and opportunity to comment early during project development, Virginia Wilderness Committee will lose a crucial opportunity to persuade the Forest Service to avoid unnecessary harms before the agency commits substantial time and resources to the project.  This is likely to lead to environmental harms that injure Virginia Wilderness Committee and its members.

66.     For example, Virginia Wilderness Committee is involved in Phase II of the Eastern Divide Insect and Disease Project. Virginia Wilderness Committee is monitoring this effort by the U.S. Forest Service to conduct an environmental analysis to address forest health concerns resulting from recent gypsy moth defoliation and anticipated future expansion of gypsy moth populations.  Virginia Wilderness Committee and its members used the NEPA process to learn more about the project.  Virginia Wilderness Committee submitted comments on the project's scoping announcement and additional phases of the project.  Virginia Wilderness

Committee intends to continue to be an active participant in the NEPA process as the project moves forward.  It is currently anticipating a Draft Environmental Assessment to be published in the coming months.  Virginia Wilderness Committee and its members are concerned that under the Final Rule, the Forest Service will decide to perform a less robust NEPA analysis, and it will be more difficult for Virginia Wilderness Committee and its members to be adequately informed and fully participate in the NEPA process.  In addition, Virginia Wilderness committee is concerned that the government will not have the information it needs to engage in thoughtful decisionmaking.  As a result, Virginia Wilderness Committee is concerned there will be environmental harm to the resources it and its members care about.

67.     Virginia Wilderness Committee is involved in the Ewing Mountain Vegetation Management Project. Virginia Wilderness Committee is monitoring this effort by the U.S. Forest Service to open portions of Ewing Mountain for commercial logging.  Virginia Wilderness Committee used the NEPA process to learn more about the project, submitted comments on the project's scoping announcement, and intends to continue to be an active participant in the NEPA process as the project moves forward.  Virginia Wilderness Committee and its members are concerned that under the Final Rule the Forest Service will decide to perform a less robust NEPA analysis, and it will be more difficult for Virginia Wilderness Committee and its members to be adequately informed and fully participate in the NEPA process.  In addition, Virginia Wilderness committee is concerned that the government will not have the information it needs to engage in thoughtful decisionmaking.  As a result, Virginia Wilderness Committee is concerned there will be environmental harm to the resources it and its members care about.

68.     Virginia Wilderness Committee is involved in the Jefferson National Forest Crown Touching Release project. Virginia Wilderness Committee is monitoring a plan by the

U.S. Forest Service to remove "undesirable" trees from the project site to create increased growing space for 15-20 selected trees per acre. Virginia Wilderness Committee used the NEPA process to learn more about the project, submitted comments on the project's scoping announcement, and will continue to be an active participant in the NEPA process as the project moves forward. Virginia Wilderness Committee and its members are concerned that under the Final Rule, the Forest Service will decide to perform a less robust NEPA analysis, and it will be more difficult for Virginia Wilderness Committee and its members to be adequately informed and fully participate in the NEPA process.  In addition, Virginia Wilderness committee is concerned that the government will not have the information it needs to engage in thoughtful decisionmaking.  As a result, Virginia Wilderness Committee is concerned there will be environmental harm to the forest.

69.     Virginia Wilderness Committee is involved in the North Zone Fire Wood Sales and Road Day-lighting project.  Virginia Wilderness Committee is monitoring this effort by the U.S. Forest Service to remove trees in the project area for use as firewood.  Virginia Wilderness Committee used the NEPA process to learn more about the project and will continue to be an active participant in the NEPA process as the project moves forward.  Virginia Wilderness Committee and its members are concerned that under the Final Rule the Forest Service will decide to perform a less robust NEPA analysis, and it will be more difficult for Virginia Wilderness Committee and its members to be adequately informed and fully participate in the NEPA process.  In addition, Virginia Wilderness Committee is concerned that the government will not have the information it needs to engage in thoughtful decisionmaking.  As a result, Virginia Wilderness Committee is concerned there will be environmental harm to the resources it and its members care about in the Forest.

70.     Virginia Wilderness Committee is involved in the Piney River Vegetation project. Virginia Wilderness Committee is monitoring this effort by the U.S. Forest Service to engage in brush burning and permit commercial logging in the project area. Virginia Wilderness Committee used the NEPA process to learn more about the project, submitted comments on the project's scoping announcement, and will continue to be an active participant in the NEPA process as the project moves forward.  Virginia Wilderness Committee and its members are concerned that under the Final Rule the Forest Service will decide to perform a less robust NEPA analysis, and it will be more difficult for Virginia Wilderness Committee and its members to be adequately informed and fully participate in the NEPA process.  In addition, Virginia Wilderness committee is concerned that the government will not have the information it needs to engage in thoughtful decisionmaking.  As a result, Virginia Wilderness Committee is concerned there will be environmental harm to the resources it and its members care about.

71.     Virginia Wilderness Committee is involved in the Mt. Storm to Valley 500 kV Electric Transmission Line Replacement project.  Virginia Wilderness Committee is monitoring this effort by the U.S. Forest Service to permit Dominion Energy to replace existing transmission lines across the GWNF.  Virginia Wilderness Committee used the NEPA process to learn more about the project, and submitted comments on the project's scoping announcement and will continue to be an active participant in the NEPA process as the project moves forward.  Virginia Wilderness Committee and its members are concerned that under the Final Rule the Forest Service will decide to perform a less robust NEPA analysis, and it will be more difficult for Virginia Wilderness Committee and its members to be adequately informed and fully participate in the NEPA process.  In addition, Virginia Wilderness Committee is concerned that the government will not have the information it needs to engage in thoughtful decisionmaking.  As a

result, Virginia Wilderness Committee is concerned there will be environmental harm to the resources it and its members care about in the GWNF.

72.     Virginia Wilderness Committee is involved in the Forestwide Maintenance of Open and Semi Open Lands, Roadside Corridors, and Utility Rights-of-Way project.  Virginia Wilderness Committee is monitoring this effort by the U.S. Forest Service to engage in clearing activities across 79,500 acres of roadways, utility rights of way and designated open spaces throughout the George Washington and Jefferson National Forests.  Virginia Wilderness Committee used the NEPA process to learn more about the project, submitted comments on the project's scoping announcement, and will continue to be an active participant in the NEPA process as the project moves forward.  Virginia Wilderness Committee and its members are concerned that under the Final Rule the Forest Service will decide to perform a less robust NEPA analysis, and it will be more difficult for Virginia Wilderness Committee and its members to be adequately informed and fully participate in the NEPA process.  In addition, Virginia Wilderness Committee is concerned that the government will not have the information it needs to engage in thoughtful decisionmaking.  As a result, Virginia Wilderness Committee is concerned there will be environmental harm to the resources it and its members care about in the two Forests.

73.     Virginia Wilderness Committee plans to be involved in the Potts Creek Vegetation Management EA project.  Virginia Wilderness Committee is monitoring this effort by the U.S. Forest Service to permit commercial timber harvest and thinning and road improvements in the project area.  Virginia Wilderness Committee intends to submit comments on the project and will continue to be an active participant in the NEPA process as the project moves forward.  Virginia Wilderness Committee and its members are concerned that under the Final Rule the Forest Service will decide to perform a less robust NEPA analysis, and it will be

more difficult for Virginia Wilderness Committee and its members to be adequately informed and fully participate in the NEPA process.  In addition, Virginia Wilderness Committee is concerned that the government will not have the information it needs to engage in thoughtful decisionmaking.  As a result, Virginia Wilderness Committee is concerned there will be environmental harm to the resources it and its members care about.

74.     In addition, Virginia Wilderness Committee and its members worked to oppose the expansion of Interstate 81 to 12 lanes through the Shenandoah Valley.  The Virginia Department of Transportation wanted to expand the interstate to address some congestion issues. Members of Virginia Wilderness Committee were concerned about the impact to air pollution because Shenandoah National Park is afforded the highest level of protection under the Clean Air Act as a Class I airshed.  Virginia Wilderness Committee and members were also concerned about land consumption, and generally the fact that the project was not context sensitive.

75.     Through the NEPA process, Virginia Wilderness Committee and its members were able to raise alternative solutions and now the congestion issues are being addressed through alternative solutions that better address the problem and protect the natural beauty of the Shenandoah Valley.

76.     For each of the above projects NEPA has been crucial in informing the Virginia Wilderness Committee and its members about the impacts of potential projects, and allowing the Virginia Wilderness Committee to participate in the decisionmaking process.  Virginia Wilderness Committee has come to rely on the NEPA process to guide its involvement in Forest Service projects and planning and to pursue its organizational mission.  NEPA has also been crucial in ensuring the government has access to information necessary to make considerations that take into account the natural and physical environment.

77.     Virginia Wilderness Committee, on behalf of itself and its members, has been a plaintiff in a challenge to the FERC certificate for the recently cancelled Atlantic Coast Pipeline. The Virginia Wilderness Committee opposed the Atlantic Coast Pipeline because its construction and operation would have degraded and damaged federal public lands in Virginia, including the George Washington National Forest, which Virginia Wilderness Committee has worked so hard to protect. Virginia Wilderness Committee also participated in litigation arguing that the Atlantic Coast Pipeline project failed to meet requirements for alternatives analysis under NEPA, amongst other issues. *Atlantic Coast Pipeline, LLC et al. v. Federal Energy Regulatory Commission*, USCA Case #18-1224 (D.C. Cir.).

78.     Virginia Wilderness Committee, along with other environmental groups, challenged approvals issued by the Forest Service for the Atlantic Coast Pipeline to cross through the George Washington and Monongahela National Forests in February 2018. Petitioners argued that the Forest Service failed to take a hard look under NEPA at the effects of the Atlantic Coast Pipeline on landslides, erosion, and degradation of water quality on national forests and that the Forest Service failed to evaluate alternatives.

79.     The Court found for the Petitioners on both grounds.  *Cowpasture River Pres. Ass'n v. Forest Service*, 911 F.3d 150, 172, 283 (4th Cir. 2018).  Prior to the cancellation of the pipeline project, the Forest Service had announced its intent to prepare a Supplemental EIS to address these shortcomings, 85 Fed. Reg. 35,634 (June 11, 2020).  Under the Final Rule, the outcome of this case might well have been different because the scope of mandatory NEPA review would be narrower.

80.     Virginia Wilderness Committee's ability to achieve its mission will be severely lessened under the Final Rule, limiting its effective use of the NEPA process to submit necessary information to federal agencies and influence their decisions.

81.     Because the Final Rule significantly limits where NEPA applies, and where an EIS is required, the Virginia Wilderness Committee will be injured because they will no longer get information about key projects that affect them.  Moreover, because the government will be less informed about projects and alternative solutions it is likely to make decisions that are adverse to the environmental resources Virginia Wilderness Committee cares about.

82.     Aspects of the Final Rule that limit the types of environmental effects that need be considered and disclosed by federal agencies, as well as aspects that limit the range of alternatives federal agencies need to consider will injure Virginia Wilderness Committee.  The organization will have less access to information necessary to inform its members and advocacy efforts.  Virginia Wilderness Committee may be forced to expend resources to submit additional requests for information under FOIA or State Public Records statutes in lieu of NEPA.

83.     For example, one member of Virginia Wilderness Committee notes that the change in the Final Rule that removes the consideration of climate change from NEPA analysis will negatively impact his ability to advocate for the brook trout and other species because analysis shows that brook trout will steadily disappear with increases in temperature.

84.     Further, the proposed requirements surrounding the submission of comments would require Virginia Wilderness Committee to expend organizational resources on outside experts. This will affect the Virginia Wilderness Committee's interest in fostering public involvement in governmental processes and its programs to educate the public about natural areas and values and to provide outdoor experiences.

85.     Virginia Wilderness Committee and its members are also concerned that with rollbacks to NEPA, the impacts of Virginia's weaker environmental laws will be further exacerbated.  Virginia Wilderness Committee and members believe the federal government to be the leader on broad environmental issues.  NEPA is essential to the government's ability to do that. The federal laws are stronger than the State's and without the federal backstop, Virginia Wilderness Committee may be forced to expend resources pushing for stronger State laws.

86.     Virginia Wilderness Committee is particularly concerned that weakening the minimum requirements of NEPA procedures or making them more vague and discretionary will immediately result in project reviews that are less useful and informative, because the Forest Service has been ordered to do only the minimum required by law—to "ensure environmental reviews focus on analysis that is required by law and regulation."  Secretarial Memorandum to the Chief of the Forest Service (June 12, 2020).

87.     Virginia Wilderness Committee has also submitted comments, data, and analysis to the Forest Service in connection with a parallel administrative rulemaking to revise that agency's separate NEPA procedures.  Among other things, the Forest Service has proposed to create new CEs for proposals to harvest timber and construct associated roads for access.  The proposed CEs are broad enough to cover every single National Forest timber sale in Virginia in the past decade, with impacts that are cumulatively significant.  Virginia Wilderness Committee's interest in improving National Forest projects would be adversely affected by CEQ's Final Rule because it purports to allow the Forest Service to adopt CEs with cumulatively significant impacts for actions that "normally" do not have significant impacts, eliminating the procedural safeguards of notice and comment by which projects are improved or mitigated and by which significant impacts are avoided.

88.     Virginia Wilderness Committee and its members, therefore, will suffer concrete and particularized injuries to interests that are germane to Virginia Wilderness Committee's organizational mission and are imminent now that the Final Rule has taken effect.

89.     The injury to Virginia Wilderness Committee and its members would be redressed by an order from this Court vacating the Final Rule.

**Upstate Forever**

90.     Plaintiff Upstate Forever is a non-profit land conservation and advocacy organization. Its mission is to protect lands and water resources for recreation, agriculture, health, and quality of life in the Upstate of South Carolina.

91.     Upstate Forever has offices in Greenville and Spartanburg, South Carolina and operates in the ten-county Upstate region with a focus on local, regional, and statewide issues. Upstate Forever has thousands of supporters and advocates from the ten counties who recognize that a transparent decisionmaking process is essential.  Over the past two decades, Upstate Forever has worked to protect natural resources that are significant to the Upstate—the farmlands, forests, natural areas, rivers, and clean air.  Upstate Forever and its members are committed to ensuring that the region's communities are vibrant and retain their green spaces, outdoor heritage, and unique identities in the face of rapid development and significant sprawl.

92.     Key among the areas protected by Upstate Forever are the Nantahala National Forest and the Chattooga River.

93.      The Chattooga River, which forms part of the border between South Carolina and Georgia and is the only Wild and Scenic river in South Carolina and is an area Upstate forever strives to protect.

27

94.     The Nantahala National Forest in North Carolina contains the headwaters of the Chattooga River.  Because of the high value Upstate Forever places on the pristine Chattooga River, Upstate Forever seeks to protect the Nantahala National Forest from any development that would impair the river.  Any clear-cut logging and roadbuilding within the Nantahala National Forest can increase the amount of sediment runoff into the river, decreasing water quality and harming the river.

95.     The National Forest also contains areas of old-growth forest.  Protecting these old-growth forests is critical, because they are biodiversity hotspots and once lost they cannot be replaced.  Loss of these areas would directly harm Upstate Forever's members, as they would no longer be able to derive the same amount of enjoyment from experiencing the nature there.

96.     The National Forest also protects the headwaters of multiple streams and rivers that flow south into South Carolina and serve as drinking water sources throughout the state. Any land management decision in these forests therefore can have a major impact on the quality of drinking water throughout South Carolina.

97.     Upstate Forever and its members make frequent use of NEPA.  Upstate Forever and its members rely on NEPA documents to learn about projects in the Upstate, including pipeline, transportation, and forestry management projects—all of which impact the health of the region's waters, lands, and citizens.

98.     Upstate Forever also frequently engages in the NEPA process, using the public comment opportunities as an avenue to submit information about environmental impacts and suggest alternatives for decisionmaking agencies to consider during project development.

99.     For example, in 2016, after becoming aware of the project due to NEPA's public notice requirements, Upstate Forever submitted comments on Dominion Carolina Gas

Transmission's proposed Transco to Charleston Project raising concerns about deficiencies in FERC's environmental assessment that reached a Finding of No Significant Impact ("FONSI"). Upstate Forever submitted comments noting that a FONSI was inappropriate because the project would involve 84 waterbody crossings, 10 wetland crossings, 700 acres of environmental disturbance during construction, nearly 300 acres permanently cleared for a right-of-way, and 88 acres covered by 7 new roadways. Upstate Forever further noted that FERC's alternatives analysis failed to consider all reasonable alternatives to the project. Following the submission of these comments, Upstate Forever was subsequently provided with evidence that FERC and Dominion had in fact completed a robust internal alternatives analysis for the project, which was not made clear in the FONSI. As a result of being involved in the NEPA process, Upstate Forever was able to get conditions added to the Clean Water Act Certification permit. If the Final Rule is not vacated this type of robust analysis will cease to take place which will force Upstate Forever to expend more resources to continue to challenge projects which lack consideration of reasonable alternatives, challenges which would be unnecessary if CEQ's final rule is vacated.

100.     Additionally, in 2019, Upstate Forever submitted comments related to the Forest Service's June 13, 2019 proposed revisions to the agency's regulations implementing NEPA, raising concerns that the changes would limit the scope of projects required to receive public input and environmental review. Upstate Forever also identified a number of environmental harms that would result from implementing the revisions, including the undermining of national forest and grassland management and the associated harms to ecosystems and water quality. Under CEQ's Final Rule, the Forest Service would be unable to adopt Upstate Forever's recommendations as needed to protect our forests to the fullest extent possible, including the

need to maintain a strong public process for projects authorized using EAs.  Upstate Forever plans to submit further comments once the final rule is published.  If CEQ's Final Rule is not vacated it will be much more difficult for Upstate Forever to submit these comments due to the Final Rule's requirements regarding specificity of comments.

101.     Upstate Forever continues to rely on the NEPA process for its work. Specifically, Upstate Forever is concerned about the Nantahala and Pisgah Proposed Land Management Plan. In February 2020 the U.S. Department of Agriculture published a Draft EIS for the management plan.  This DEIS contemplates the construction of multiple new roadways through the Nantahala and Pisgah National Forests.  Upstate Forever submitted comments on this EIS in June 2020, noting that this proposed construction will lead to accelerated erosion and sedimentation which will harm the delicate Upper Chattooga Watershed.  Upstate Forever intends to continue to participate in the NEPA process for this project and will submit further comments once the final project plan and final EIS are published.  If the Final Rule is not vacated it will be significantly more difficult for Upstate Forever to submit these planned comments as Upstate Forever will likely be forced to retain outside experts in order to satisfy the Final Rule's specificity requirements in order for its comments to be considered.  In addition, Upstate Forever is concerned that the government will not have studied and disclosed a full range of environmental effects and alternatives, which will lead to poor government decisionmaking and bad environmental outcomes for the Forest and for the Upstate region.

102.     Upstate Forever and its members submitted comments on the Advanced Notice of Proposed Rulemaking and the Notice of Proposed Rulemaking for the CEQ NEPA rule raising concerns about the rulemaking process and the contents of the proposed rule.

103.    Upstate Forever is concerned that the Final Rule will significantly impact its organizational mission, its interests, and the interests of its members.

104.    Upstate Forever is concerned that the new rule will negatively impact renewable energy projects, particularly solar energy projects, in the Upstate region. Part of Upstate Forever's work focuses on advocating for the development of clean energy in South Carolina, including solar power.  Upstate Forever is concerned that the new rule will lead to delays and confusion for the developers of solar projects by limiting the federal resources devoted to complying with NEPA, slowing the development of South Carolina's solar energy infrastructure and forcing the Upstate region and all of South Carolina to rely on dirtier fuel sources for longer.

105.    Upstate Forever anticipates that under the Final Rule it will be required to shift organizational resources away from activities that are important to its mission.  Currently, Upstate Forever uses the NEPA process to learn about transportation, pipeline, and forestry management projects affecting the region's lands and natural resources.  Under the Final Rule, Upstate Forever will be forced to hire experts and to submit requests for information at the local, state, and federal level to understand these impacts and educate its members.

106.    Upstate Forever and its members, therefore, will suffer concrete and particularized injuries to interests that are germane to Upstate Forever's organizational mission and are imminent now that the Final Rule has taken effect.

107.    Upstate Forever and its members would be redressed by an order from this Court vacating the Final Rule.

**South Carolina Wildlife Federation**

108.    Plaintiff South Carolina Wildlife Federation is a not for profit corporation organized in 1931.  The mission of South Carolina Wildlife Federation is to serve as the voice

for outdoor enthusiasts of every stripe. Representing hunters and birdwatchers, teachers and backpackers, boaters and farmers, gardeners and anglers, South Carolina Wildlife Federation builds partnerships to ensure everyone can enjoy South Carolina's natural heritage and recreation opportunities for generations to come.

109.     South Carolina Wildlife Federation is headquartered in Columbia, South Carolina and has 600 donor members and over 13,500 people on its email and social media lists.

110.     South Carolina Wildlife Federation is active in promoting sound stewardship of South Carolina's natural treasures. Through educational and public awareness programs along with unique partnerships, South Carolina Wildlife Federation works to establish policies that sustain, protect, and enhance the natural systems which give life to all those at home in South Carolina.

111.     South Carolina Wildlife Federation's conservation and education programs focus on protecting habitat for wildlife across the Palmetto State, from the mountains to the sea.

112.     For example: as the state affiliate of the National Wildlife Federation, South Carolina Wildlife Federation  participates in the Gardening for Wildlife Program and provides assistance to gardeners who desire to attract wildlife to backyards, parks, churches, libraries, schools, businesses, and other places throughout the community.

113.     South Carolina Wildlife Federation has also developed the Wildlife and Industry Together program, which recognizes industries managing their land for wildlife.

114.     South Carolina Wildlife Federation also works with legislators to protect precious wildlife habitat and ensure that sound scientific data is used to make decisions which affect wildlife.

115.    South Carolina Wildlife Federation provides opportunities for people of all ages to connect with nature and nurture a desire to protect South Carolina's valuable natural resources.

116.     For example: South Carolina Wildlife Federation's school outreach programs teach children to appreciate nature, understand basic ecological concepts, become aware of their impact on the environment, and take action in their communities.

117.    South Carolina Wildlife Federation trains volunteers to identify flora and fauna through its Naturalist Training Programs and the Palmetto Pro Birder program. These volunteers are equipped with the skills needed to participate in citizen science projects and gather critical scientific data.

118.    The annual Women's Outdoor Retreat provides an opportunity for more than 200 women from around the Southeast to learn outdoor skills such as kayaking, archery, fishing, and birding in a non-competitive environment.

119.    To achieve the South Carolina Wildlife Federation's mission, it is critical that the organization foster protection of South Carolina's natural resources and raise awareness about the importance of those resources.

120.    In furtherance of this mission and these efforts South Carolina Wildlife Federation has been and will continue to be an active participant in the NEPA process for a variety of projects.

121.    For example, South Carolina Wildlife Federation was involved advocacy efforts regarding the Savanah Harbor Deepening Project ("SHEP").  This project sought to widen 39 miles of the Savanah River and deepen the 18.5 mile outer harbor to accommodate future ship traffic. Under the U.S. Army Corps of Engineers' original plans, salt water would have been

pushed upstream, threatening the vitality of the Savannah National Wildlife Refuge's tidal freshwater wetlands and further endangering the shortnose sturgeon.  Studies also showed the Corps' plans would have negatively impacted local drinking water resources.

122.    Thanks to the NEPA review process, these adverse effects were identified and Corps of Engineers' final plans for SHEP included funding for wetlands protection, restoration efforts benefiting the Savannah River, established a water quality monitoring program for the Savannah River, and ensured long-term protections for the endangered shortnose sturgeon.  The Corps of Engineers also installed two dissolved oxygen injection systems upstream of Plant McIntosh and downstream of Hutchinson Island to ensure that oxygen levels remain at pre-deepening levels and will not adversely impact fish or plant life.  South Carolina Wildlife Federation fears that if the Final Rule is adopted future projects will not undergo the same robust NEPA analysis, and it will be more difficult for South Carolina Wildlife Federation and its members to be adequately informed and fully participate in the NEPA process.  In addition, South Carolina Wildlife Federation is concerned that under the Final Rule, the government will no longer have the information it needs to make informed decisions.  Consequently there is likely to be bad decisionmaking that results in environmental harm to the resources South Carolina Wildlife Federation cares about.

123.    South Carolina Wildlife Federation is currently involved in the Charleston Peninsula Seawall project.  The Corps of Engineers has proposed protecting the city of Charleston from flooding caused by storm surge by encircling the city's historic peninsula with an eight-mile seawall and building a 4,000-foot wave attenuating structure in Charleston harbor. South Carolina Wildlife Federation submitted comments on this project in June 2020. These comments highlighted the Army Corps' decision not to perform a full EIS that would require the

Corps to rigorously explore and objectively evaluate reasonable alternatives among numerous other concerns.

124.     South Carolina Wildlife Federation fears that if the Final Rule is adopted, this project will not undergo a robust NEPA analysis, and it will be more difficult for South Carolina Wildlife Federation and its members to be adequately informed and fully participate in the NEPA process.  South Carolina Wildlife Federation is concerned that when a full EIS is prepared for the project it will not include an analysis of all reasonable alternatives, and will not consider indirect and cumulative effects and South Carolina Wildlife Federation will thus lack information to inform its advocacy.  In addition, South Carolina Wildlife Federation is concerned that because the government will not study the same range of alternatives and environmental impacts, and consequently there will uninformed decisionmaking that leads to environmental harm, and harm to the resources South Carolina Wildlife Federation cares about.

125.     The South Carolina Wildlife Federation's ability to achieve its mission will be harmed by the Final Rule, limiting its effective use of the NEPA process to submit necessary information to federal agencies and influence their decisions.

126.     Because the Final Rule significantly limits where NEPA applies, and where an EIS is required, the South Carolina Wildlife Federation will be injured because they will no longer get information about key projects that affect them.

127.     Aspects of the Final Rule that limit the types of environmental effects that need be considered and disclosed by federal agencies, as well as aspects that limit the range of alternatives federal agencies need to consider will injure South Carolina Wildlife Federation. The organization will have less access to information necessary to inform its members and advocacy efforts.  South Carolina Wildlife Federation may be forced to expend resources to

submit additional requests for information under FOIA or State Public Records statutes in lieu of NEPA.

128.    For example, at least one member of South Carolina Wildlife Federation worries that the cumulative impacts of large damaging projects, like highways, and their impacts on communities of color and low wealth neighborhoods, will go unaddressed by agencies if the proposed final rule is adopted.

129.    South Carolina Wildlife Federation is also concerned that if the proposed rule is adopted that it will be unable to use the tools NEPA provides for assessing climate impacts of projects, cumulative impacts caused by multiple projects, and environmental justice concerns. Further South Carolina Wildlife Federation is concerned that if the agencies do not solicit public comments from a wide variety of stakeholders, then they will have no reason to be transparent in what they are doing, and the public will lose out on federal regulatory oversight.  Agencies will also have less access to information and less ability to make decisions that take into account environmental consequences.

130.    The proposed changes to NEPA would harm South Carolina Wildlife Federation's interests in the tributaries, wetlands, rivers, lakes, and estuarine and marine ecosystems of South Carolina by excluding consideration of indirect, cumulative, and climate change impacts.

131.    Further, the proposed requirements surrounding the submission of comments in a way that must be detailed and specific would require South Carolina Wildlife Federation to expend organizational resources on outside experts. This will affect the South Carolina Wildlife Federation's interest in fostering public involvement in governmental processes and its programs to educate the public about natural areas and values and to provide outdoor experiences.

132.    South Carolina Wildlife Federation may also be forced to shift organizational resources because the Final Rule will make less information available and will require the organization to spend time submitting state and federal requests for information, and following up on those requests.

133.    South Carolina Wildlife Federation and its members are also concerned that with rollbacks to NEPA, South Carolina's weaker environmental laws will be further exacerbated. South Carolina Wildlife Federation and members believe the federal government to be the leader on broad environmental issues. NEPA is essential to the government's ability to do that. The federal laws are stronger than the State's, and they need to stay that way.

134.    South Carolina Wildlife Federation and its members, therefore, will suffer concrete and particularized injuries to interests that are germane to South Carolina Wildlife Federation's organizational mission and are imminent now that the Final Rule has taken effect.

135.    The injury to the South Carolina Wildlife Federation and its members would be redressed by an order from this Court vacating the Final Rule

**North Carolina Wildlife Federation**

136.    Plaintiff North Carolina Wildlife Federation is North Carolina's oldest and largest statewide non-profit conservation organization.  Since 1945, North Carolina Wildlife Federation has worked with citizens, outdoor enthusiasts, hunters and anglers, government, and industry to safeguard North Carolina's natural resources.  North Carolina Wildlife Federation's mission is to protect and promote natural areas throughout the state—not only as habitats for native wildlife but also as recreational, hunting, fishing, and wildlife observation areas for its dedicated and passionate members.  North Carolina Wildlife Federation works collectively to preserve wild

places and species through policy and protection work, research, education, and direct, hands-on conservation projects.

137.     North Carolina Wildlife Federation is headquartered in Raleigh, North Carolina, and works on wildlife and habitat issues throughout the state.  North Carolina Wildlife Federation has over four dozen affiliates, thirteen chapters, and more than a quarter million hunters and anglers subscribed to its Camo Coalition.

138.     North Carolina Wildlife Federation and its members make frequent use of NEPA. North Carolina Wildlife Federation relies on NEPA documents to learn about projects in North Carolina that threaten wildlife and habitat preservation.  North Carolina Wildlife Federation actively participates in the NEPA process by submitting comments on draft documents and attending public hearings.  North Carolina Wildlife Federation also relies on the NEPA process to guide informed decisionmaking that protects wildlife.

139.     North Carolina Wildlife Federation and its members also frequently engage in the NEPA process, using the public comment opportunities as an avenue to submit information about environmental impacts and suggest alternatives for decisionmaking agencies to consider during project development.

140.     For example, in 2005 North Carolina Wildlife Federation used the NEPA process to submit comments to raise concerns U.S. Navy's decision to place an Outer Landing Field near Pocosin Lakes, North Carolina.   The project would have significantly impacted migratory birds through airstrikes.  Because the Navy did not properly comply with NEPA, North Carolina Wildlife Federation and others mounted a legal challenge, in which the groups were ultimately successful.  The Court ordered that the Navy had to take a more careful look at the impact the facility would have on birds.  In addition the court ordered the Navy not to make irretrievable

steps towards the project before fully complying with NEPA. *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174 (4th Cir. 2005). As a result of the court's decision and the public process supplied by NEPA the project was ultimately abandoned.

141.    North Carolina Wildlife Federation submitted comments on the draft and final EIS's for the Monroe Bypass in 2009 urging the North Carolina Department of Transportation and the Federal Highway Administration to consider the indirect and cumulative effects for the project pursuant to NEPA. When NCDOT failed to do so, North Carolina Wildlife Federation and other groups took NCDOT and FHWA to court where they prevailed. The Court ordered a Supplemental EIS. There was subsequently greater engagement on the issue of indirect and cumulative effects and additional mitigation was acquired for the project.

142.    In 2012, North Carolina Wildlife Federation submitted comments on the draft EIS for a shoreline management project at Figure Eight Island, North Carolina. North Carolina Wildlife Federation raised concerns that the proposed terminal groin would have significant potential for harm to wildlife, habitat destruction, decreased recreational opportunities, and exacerbation of the effects of future sea level rise. The comments resulted in the Army Corps updating the proposed location of the groin in the final EIS in 2016. Less than six months after the final EIS was released, Figure Eight Island homeowners, informed by the information in the NEPA documents, rejected a proposal for the terminal groin.

143.    In 2016, North Carolina Wildlife Federation submitted comments requesting the FHWA and the NCDOT prepare a supplemental EIS for the Mid-Currituck Bridge, a proposed 7 mile toll bridge that would connect mainland Aydlett with Corolla on North Carolina's Outer Banks across the Currituck Sound. North Carolina Wildlife Federation noted concerns about the impacts to wildlife and habitat, including the indirect and cumulative effects that will result from

Bridge construction.  North Carolina Wildlife Federation also specifically noted NCDOT's failure to consider climate change and sea level rise in its analysis of the Bridge and alternative solutions.  Through counsel, North Carolina Wildlife Federation hired an outside expert to look at alternatives to the Mid-Currituck Bridge, and presented a specific alternative solution as part of the NEPA process.

144.    In early 2019 after FHWA and NCDOT issued a final Record of Decision announcing their intent to build the Bridge without addressing any of North Carolina Wildlife Federation's concerns, North Carolina Wildlife Federation and another group filed suit in Federal Court challenging the adequacy of the NEPA documents, including the agencies' failure to study indirect and cumulative effects, to analyze reasonable alternatives, and to study and disclose the impact of sea level rise.  *N.C. Wildlife Federation v. N.C. Dep't of Transp.*, Compl. ECF No. 1, 2:19-CV-14-FL (E.D.N.C. Apr. 23, 2019).  North Carolina Wildlife Federation is concerned that under the Final Rule the remedy available to it before the court may be diminished.  If the court vacates the Record of Decision, FHWA may decide to proceed with new NEPA document that is less robust, in keeping with the more limited requirements of the Final Rule.  Specifically, FHWA may decide that it no longer needs to consider indirect and cumulative effects.  It may decide that it no longer needs to study all reasonable alternatives.  It may decide that it no longer needs to consider impacts from climate change.  It may decide that it no longer needs to use up-to-date information about sea level rise.

145.    All of these changes would harm North Carolina Wildlife Federation.  North Carolina Wildlife Federation will be harmed if the government does no engage in thoughtful decisionmaking and take a hard look at the wildlife impacts of the proposed Bridge and makes an uninformed harmful decision.  Additionally, North Carolina Wildlife Federation will be harmed

if it does not get information through the NEPA process on these topics so that it can inform its members and engage in informed advocacy efforts.

146.    In 2019, North Carolina Wildlife Federation submitted comments on the draft EIS for the Cape Fear Crossing project raising concerns about the environmental and community impacts on New Hanover and Brunswick Counties that would result from building a nearly billion-dollar bridge and highway across the two counties.  North Carolina Wildlife Federation identified severe deficiencies in the assumptions underlying the draft EIS, including that NCDOT ignored the most up-to-date sea level rise projections and misrepresented the impacts of accelerating sea level rise in relation to the project.  North Carolina Wildlife Federation raised a multiplicity of concerns with the draft EIS that informed the organization's conclusion that NCDOT failed to take a hard look at the environmental impacts: it conducted only a cursory review of the project's direct, indirect, and cumulative impacts; overlooked significant air and water quality impacts; failed to thoroughly evaluate impacts to endangered sturgeon species and the red cockaded woodpecker; and took no notice of impacts to the rare Venus flytrap.  The project has currently been placed on hold.  If it is reinitiated North Carolina Wildlife Federation will continue to engage in the NEPA process for the project.  North Carolina Wildlife Federation is concerned that if the project is reinitiated a renewed NEPA process under the Final Rule will be even less robust and it will be more difficult for North Carolina Wildlife Federation to engage in the NEPA process.

147.    In June 2020, North Carolina Wildlife Federation signed onto comments developed by a collaborative group known as the Nantahala-Pisgah Forest Partnership, which provided consensus recommendations from diverse stakeholders on the revised forest plan for the Nantahala and Pisgah National Forests.  Building consensus for good management of these

National Forests is central to North Carolina Wildlife Federation's mission, and North Carolina Wildlife Federation believes that strong collaborative processes would not be given the time and information to work appropriately without the structure provided by the prior NEPA regulations. Under the Final Rule, North Carolina Wildlife Federation's efforts to build collaborative support for good forest management would be impaired because fewer impacts will be studied, a smaller range of alternatives will be considered, and it will be more difficult for groups to engage in the NEPA process.

148.    North Carolina Wildlife Federation and its members submitted comments on the Advanced Notice of Proposed Rulemaking and the Notice of Proposed Rulemaking for the CEQ NEPA rule raising concerns about the rulemaking process and the contents of the proposed rule.

149.    North Carolina Wildlife Federation is concerned the Final Rule will significantly impact its organizational mission, its interests, and the interests of its members.

150.    North Carolina Wildlife Federation anticipates that under the Final Rule it will be required to shift organizational resources away from activities that are important to its mission. Currently, North Carolina Wildlife Federation uses the NEPA process to find out information about projects that impact North Carolina's natural areas, especially the coast in light of North Carolina Wildlife Federation's concerns about sea level rise.  Under the Final Rule, North Carolina Wildlife Federation will be forced to hire experts and to submit requests for information at the local, state, an]d federal level to understand these impacts and educate its members.

151.    Under the Final Rule, North Carolina Wildlife Federation may be forced to shift organizational resources to hire outside experts to assist with drafting of comments in order to meet the new specificity requirements.

152.     North Carolina Wildlife Federation relies on the NEPA process to engage in the decisionmaking process regarding the extent that large development projects like the Mid-Currituck Bridge adequately account for and consider future sea level rise.  Under the Final Rule, North Carolina Wildlife Federation will no longer be able to use the NEPA process to raise concerns regarding inadequate consideration of sea level rise because the effects of climate change—such as sea level rise—may no longer be considered by federal agencies in their decisionmaking process.  North Carolina Wildlife Federation, thus, will suffer injury via the lack of information and via the inability to inform its members and communicate with decisionmakers regarding the effects of sea level rise on North Carolina's natural areas.

153.     North Carolina Wildlife Federation and its members, therefore, will suffer concrete and particularized injuries to interests that are germane to North Carolina Wildlife Federation's organizational mission and are imminent now that the Final Rule has taken effect.

154.     North Carolina Wildlife Federation and its members would be redressed by an order from this Court vacating the Final Rule.

**National Trust for Historic Preservation**

155.     Plaintiff National Trust for Historic Preservation in the United States ("National Trust") is a private, charitable, educational, non-profit corporation chartered by Congress in 1949 to protect and defend America's historic resources, to further the historic preservation policy of the United States, and to facilitate public participation in the preservation of our nation's cultural heritage. *See* 54 U.S.C. § 312102.

156.     The mission of the National Trust is to provide leadership, education, and advocacy to save America's diverse historic places and revitalize our communities. The statutory powers of the National Trust include the power to bring suit in its corporate name.  *Id*. §

312105(c).  Consistent with its congressional charter and its statutory powers, the National Trust has participated in numerous actions to enforce federal laws that protect historic and cultural resources, including litigation under NEPA.

157.    The National Trust is headquartered in Washington, D.C., has several field offices, and has twenty-seven Historic Sites that are open to the public around the United States. These Historic Sites include: Belle Grove Plantation, a part of the Cedar Creek and Belle Grove National Historical Park, a unit of the National Park Service in the Shenandoah Valley; Drayton Hall in Charleston, South Carolina; and Woodlawn & Frank Lloyd Wright's Pope-Leighey House in Alexandria, Virginia.  The National Trust has more than one million members and supporters around the country.

158.    The National Trust frequently uses NEPA and relies on NEPA documents to learn about projects that would impact historic sites, districts, landmarks, and communities, including transportation projects, transmission line projects, pipelines, and other major infrastructure projects that impact historic places and contribute to the causes of climate change.

159.    The National Trust also often participates in opportunities to submit public comments, and encourages its members to submit public comments, during the NEPA process by submitting information to federal agencies about the impacts proposals have on historic resources and suggesting alternatives for agencies to consider that would avoid or minimize such impacts.  Among other projects, the National Trust has submitted comments related to the I-81 expansion, the Mountain Valley Pipeline, the Atlantic Coast Pipeline, Surry-Skiffes Creek transmission line, and the James River Water Authority's proposed pump station at Rassawek.

160.    In 2006 and 2007, the National Trust submitted written comments and participated in a public meeting about the proposed I-81 expansion raising concerns about

impacts on the Shenandoah Valley Battlefields National Historic District and Cedar Creek & Belle Grove National Historical Park, which includes the National Trust-owned Historic Site Belle Grove Plantation.  The National Trust was able to use information from the NEPA documents to develop these comments.  Ultimately, the National Trust, along with several partner organizations, filed a lawsuit against the Federal Highway Administration for violations of NEPA.  *Shenandoah Valley Network v. Capka,* 669 F.3d 194 (4th Cir. 2012).  This is an example of the National Trust using NEPA to advocate for the protection of nationally significant historic resources, including the National Trust's own Historic Sites.

161.    On December 22, 2016, the National Trust submitted comments on the DEIS prepared for the Mountain Valley Pipeline pursuant to NEPA.  The National Trust raised concerns about the purpose and need for the project, as well as the agency's incomplete documentation of historic resources along the proposed pipeline route.

162.    The National Trust carefully reviewed the DEIS prepared for the Atlantic Coast Pipeline pursuant to NEPA. The NEPA documents demonstrated that there were historic resources along the proposed pipeline route that were not considered in the DEIS. Most notably, the DEIS did not consider impacts to the Union Hill/Woods Corner Rural Historic District, a rural community that was established by Freedmen after Emancipation on former plantation land. On April 6, 2017, the National Trust submitted public comments urging better identification and avoidance of historic properties along the pipeline route.

163.    After learning about the threat to the historic Union Hill African American community, the National Trust also awarded a grant to support local efforts to better identify, document, and archive information about the community's history.  Granting funds to support this type of community documentation work is one of the ways that the National Trust satisfies

its congressional mandate to engage the public in historic preservation, and the NEPA process helped the National Trust identify this preservation need.

164.    The National Trust continues to rely on the NEPA process for its work. Specifically, the National Trust has members who are concerned about the Surry-Skiffes Creek transmission line project across the James River near Jamestown in Virginia.  The transmission line crosses an approximately 4-mile stretch of the James River that is part of a historic district that has been determined eligible for the National Register of Historic Places.  The transmission line is also visible from Jamestown Island and the scenic Colonial Parkway, a key feature of Colonial National Historical Park.

165.    After years of advocacy stretching back to the area's inclusion on the National Trust's annual list of America's 11 Most Endangered Historic Places in 2013, the National Trust filed suit against the Army Corps for failure to prepare an EIS when reviewing the project. Ultimately, the D.C. Circuit Court of Appeals ordered the Army Corps to prepare an EIS. *National Parks Conservation Ass'n v. Semonite,* 916 F.3d 1075 (D.C. Cir. 2019).  That EIS process is currently ongoing.  The National Trust submitted scoping comments on September 3, 2019 and intends to review all upcoming NEPA documents to learn more about the impacts of alternatives and submit comments at every review opportunity.  The National Trust and its members intend to use the public comment periods to influence the Army Corps' decisionmaking.  The Final Rule allows agencies to begin applying its provisions to projects that are currently under review.  If the Army Corps takes that approach for this project, the agency may refuse to consider the indirect and cumulative impacts of the transmission line, which would result in a lack of consideration of some of the project's major impacts to the human environment.  Additionally, one of the issues in the review of the project is whether there is

sufficient electrical demand growth to satisfy the project's stated purpose and need, which is a highly technical issue. If the Final Rule is implemented to review this project, the National Trust's comments and concerns may be disregarded if they are not sufficiently couched in scientific and technical language. This would directly harm the interests of the National Trust and its members in protecting the historic landscape of the James River at Jamestown. The National Trust is also concerned that if the Army Corps does not study or consider indirect and cumulative effects of the transmission line, it will lead to poor government decisionmaking that will harm the interests of the National Trust.

166.    On May 7, 2020, the National Trust submitted scoping comments on a proposal by the James River Water Authority to build a new pump station in Fluvanna County on the site where the Monacan Indian Nation's capital once stood. The site still contains physical evidence of previous habitation and its history is entwined with the living Monacan tribal community. The project requires a permit from the Army Corps, which requires compliance with NEPA. The National Trust intends to continue using the NEPA process to learn more information about alternatives that would avoid harm to Rassawek, while meeting the project's purpose and need, and to express concerns about the impacts of this proposal on historic resources.

167.    The National Trust and its members submitted comments on the Advanced Notice of Proposed Rulemaking on August 20, 2018, and on the Notice of Proposed Rulemaking for the CEQ NEPA rule on March 10, 2020, raising concerns about the rulemaking process and the contents of the proposed rule. The National Trust also testified in-person at the public hearing held by CEQ regarding the rulemaking in Washington, D.C., on February 25, 2020, emphasizing concerns about the rulemaking process and the removal of the language requiring agencies to consider cumulative impacts, including climate change impacts. The National Trust attended a

meeting with CEQ staff at the agency's offices on March 10, 2020 to express concerns about the rulemaking. On June 11, 2020, the National Trust participated in a meeting with the Office of Information and Regulatory Affairs within the Office of Management and Budget regarding the rulemaking and again expressed concerns about flaws in the process of developing the rule, as well as the substance of the rule.

168.    Other members of the National Trust frequently use NEPA. For example, the Chief Advocacy Officer of Historic Charleston Foundation, who is a National Trust member, uses NEPA to identify the impacts of other proposed projects that could cause negative impacts to historic resources in Charleston that she cares about, uses, and enjoys. By submitting comments, the member uses NEPA to influence government decisionmaking to help avoid harms and encourage the preservation of historic resources. For example, she is currently participating in the Army Corps' review under NEPA of a proposal to build an 8-mile long flood wall, including associated pumps, around the Charleston peninsula to protect the city from increased flooding caused by climate change.

169.    Significant time was spent by the Foundation gathering information, consulting with the community, and studying impacts of the increased flooding on historic resources and different ways to address those impacts. This information is now being used by the Army Corps in its review of the floodwall proposal. The information was included in the agency's DEIS released in April 2020. Under the prior regulations, the Army Corps was required to consider a range of alternatives and disclose their various impacts to the public, including impacts to historic resources. This member intends to continue to participate in the NEPA process to learn more about the alternatives under consideration and their impacts to Charleston's historic resources. The National Trust and its members are concerned that under the Final Rule the

Army Corps may maintain that it does not need to comply with NEPA at all, or if it does, will perform a less robust analysis that does not include a reasonable range of alternatives and does not study impacts related to climate change.  If the Army Corps decides to take a lesser course of study for the project, the National Trust's interests, and the interests of its member, will be harmed because the Army Corps may engage in decisionmaking that causes harm to the resources the National Trust cares about.  Moreover, without access to the information NEPA provides, the National Trust will have less opportunity to advocate for more protective alternatives.

170.    The Foundation has also spent years advocating for the protection of Charleston's National Historic Landmark District from a proposal to build a new, larger cruise ship terminal.  The existing cruise ships create traffic snarls that limit access to the historic downtown to non-cruise ship tourists which support local businesses, and they create pollution that harms the exteriors of historic buildings.  This new terminal project would bring increased numbers of cruise ships to the area, which would also increase traffic and pollution, among other impacts.

171.    The Army Corps must issue a permit before the terminal expansion can be constructed, which triggers the agency's responsibilities under NEPA.  Successful litigation has required the Army Corps to restart its NEPA review process for the terminal.  *Preservation Soc'y of Charleston v. U.S. Army Corps of Eng'rs*, No. 2:12-cv-2942-RMG, 2013 WL 6488282 (D.S.C. Sept. 18, 2013).  The agency has not yet posted a notice of intent to prepare an EIS, or otherwise posted notice that review under NEPA has been reinitiated for the project, but once that occurs, the National Trust and its members intend to use the NEPA process to understand, evaluate, and comment on the impacts of the proposed new terminal on Charleston's historic resources.  Because this terminal project is anticipated to be pursued without federal funding,

under the Final Rule the Army Corps may decide that preparation of an EIS under NEPA is not required.  This would directly harm the interests of the National Trust and its members in protecting Charleston's National Historic Landmark District because they would have less access to information, and because the Army Corps will have less access to information to guide decisions that are protective to the resources that National Historic Trust cares about.

172.    The Final Rule will significantly and irreparably harm the National Trust's ability to protect its interests and satisfy its organizational mission, including its Congressional mandate to facilitate public participation, in preserving historic resources, and protect the interests of its members in the preservation of America's historic places.

173.    The National Trust anticipates that under the Final Rule it will be required to shift organizational resources away from existing activities that are important to its mission. Currently the National Trust relies on the NEPA process to disclose information about projects that impact historic resources and contribute to climate change.  Under the Final Rule, the National Trust will be required to divert organizational resources to spend more time filing requests for information at the local, state, and federal level to understand these impacts and to educate its members.  This may include the need to litigate the denial of information requests. The National Trust will also be forced to use organizational resources to retain experts to assist with drafting comments for projects that include complicated technical issues that are outside of the professional expertise of existing staff in order to satisfy the new specificity requirements.

174.    The National Trust and its members, therefore, will suffer concrete and particularized injuries to interests that are germane to the National Trust's organizational mission and are imminent now that the Final Rule has taken effect.

175.    The National Trust has members who reside, visit, and recreate in areas across the United States who will be harmed by the Final Rule in the ways specified above.  The National Trust also owns properties across the United States that will be harmed by the final rule.

176.    The injuries to the National Trust and its members would be redressed by an order from this Court vacating the Final Rule.

**MountainTrue**

177.    Plaintiff MountainTrue is a not-for-profit corporation founded in 1982.[3] MountainTrue has over 10,000 members and supporters, primarily in North Carolina.  Its mission is to champion resilient forests, clean waters, and healthy communities across Western North Carolina and North Georgia.  MountainTrue's programs are designed to lead to a region with thriving communities that are connected to and help sustain a healthy natural environment. To achieve this, MountainTrue fosters and empowers advocates throughout the region to be engaged in policy and project advocacy, outreach and education, and on-the-ground projects.

178.    MountainTrue is based in Asheville, North Carolina, and works on forest, water, land use/transportation, and energy issues throughout the mountain region through offices in Hendersonville, Boone, and Murphy, NC.

179.    MountainTrue devotes significant resources to protection of the Pisgah and Nantahala National Forests in Western North Carolina through involvement in NEPA reviews, including NEPA processes for the forest plan revision, which is currently in development, along with every notable timber sale project and any other management proposals with potentially significant impacts on the forests and the natural resources therein.  MountainTrue critiques the accuracy and completeness of the information being relied on by the Forest Service, submits

---

[3] MountainTrue's original name was the Western North Carolina Alliance. The name was changed to MountainTrue in 2015.

information from its own investigations and scientific analyses, shows where projects may have unacceptable or unlawful impacts, and mobilizes, recruits, and trains its own members and other citizens to participate in these processes.

180.    Members of MountainTrue enjoy recreating in North Carolina's forests, from kayaking and rafting in the rivers to hiking in the mountains.  Its members enjoy fishing, birding, hiking, mountain biking, trail running, scenic driving, studying nature, and learning outdoor skills.

181.    MountainTrue is currently participating extensively in the NEPA process for the Revised Forest Plan for the Nantahala-Pisgah National Forest.  MountainTrue was part of two multi-interest collaborative groups—the Nantahala-Pisgah Forest Partnership and the Stakeholder's Forum—and donated thousands of hours of staff time over more than 7 years to the combined efforts of both groups in which staff served as not only members, but also on the Leadership Team and Organizing Committee.  Both collaborative groups were organized to submit information in the NEPA process about which kinds of management activities have the most and least support from community members, which is important for the Forest Service to know in order to meet its obligation to contribute to social sustainability.

182.    In addition, MountainTrue submitted over five hundred comments from its members in both hard copy and digital formats as well as a sign-on letter from a group of respected scientists, land managers, and independent biologists on the importance of protecting rare and exemplary habitats delineated by the State of North Carolina.  MountainTrue also submitted a detailed analysis of how timber harvest could be used to restore degraded ecosystems, improve the resilience of the land, meet the needs of young forest associated wildlife, and provide economic benefits.  Finally, MountainTrue submitted information in very

thorough and detailed comments together with the Southern Environmental Law Center, The Wilderness Society, and Defenders of Wildlife, which included, among other things, original scientific analyses showing the recent effects of drought, fire, pests, and disease on national forests, which show that disturbances caused by climate change are cumulative with the effects of timber harvest on the balance between young and old forests.

183.    In addition to participating in every notable project in the recent past, MountainTrue anticipates participating in many NEPA analyses for Forest Service projects in the coming years.  Many of these projects have already commenced, including the Nantahala and Pisgah National Forest Plan Revision, the Buck Project, the White Grape Bend Project, the Crossover Project, the Lover's Branch Project, the Lickstone Ridge Project, the Turkeypen Project, and the Davidson River Hatchery Project. MountainTrue is concerned that the Final Rule would result in these projects subject to less scrutiny and accountability.  Because the Final Rule will mean that these projects are either subject to a lower tier of NEPA review, or subject to more limited review under the same tier, the Final Rule will require MountainTrue to devote even more of its limited resources to learn about these projects' effects and ensure that the relevant information is available to the decisionmaker and the public, when otherwise the Forest Service would be responsible for providing such information under NEPA.

184.    In North Carolina's National Forests, between 2009 and 2019, the Forest Service used Environmental Assessments and Findings of No Significant Impact to authorize 23 vegetation management projects, which all together included 9,244 acres of commercial logging. Fifteen of those projects (65%) 7,375 acres, were reduced in size during the NEPA process, with a total decrease in commercial logging to 5,518.5 acres, or 25%. Projects changed for a variety of reasons, including to avoid impacts to unroaded areas that may be eligible for inclusion in the

National Wilderness Preservation System, old growth, rare species and habitats, and water and soil.

185.    The majority of changes to logging projects occurred in response to public comments, and most often because of public input during the "scoping" process, which is required by current Forest Service regulations at 36 C.F.R. § 220.4(e).  Based on the Forest Service's sample of nationwide logging projects authorized using EAs, 63% of projects change substantively in response to public input.  Of those, 86% change because of public input during the scoping process.

186.    All logging projects in the North Carolina National Forests during the 2009-2019 time period were authorized using CEs or EAs; none with EISs.

187.    The Final Rule will cause harm to North Carolina's National Forests and to MountainTrue's interest in protecting their species and habitats, unroaded areas, recreational opportunities, and water and soil resources, because it eliminates the scoping process for projects authorized using an EA. Without notice and opportunity to comment early during project development, MountainTrue will lose a crucial opportunity to persuade the Forest Service to avoid unnecessary harms before the agency commits substantial time and resources to the project. MountainTrue is also concerned that without access to the information previously required by NEPA, the Forest Service will engage in uninformed decisionmaking that will harm the National Forest Resources MountainTrue cares about.

188.    MountainTrue has also devoted significant resources to advocacy realted to transportation projects in Western North Carolina.  Specifically, MountainTrue has been involved in NEPA reviews of the I-26 Connector in Asheville over the last 20 years, the I-26 widenings north and south of Asheville, Corridor K in Graham County, and proposed

improvements to North Carolina Highways 105, 107, 143, and 191.  During the NEPA processes for these projects, MountainTrue has worked with impacted communities, design experts, and the North Carolina Department of Transportation to develop less impactful alternatives that are more beneficial to local communities.

189.    Members of MountainTrue live in the path planned highway projects and are concerned about how the development of transportation infrastructure will impact the history and culture of their communities as well as the wildlife and streams in the path of these highways.

190.    One example is the I-26 Connector Project in Asheville, North Carolina. Following the first public hearing on the draft EIS in late 2008, members of MountainTrue organized to advocate that the city of Asheville and Buncombe County support the addition of Alternative 4B for consideration by NCDOT for I-26, which largely spared the historic African American Burton Street Community.  NCDOT's original plan for the I-26 Connector would have involved the removal of 25 homes and a church from the Burton Street Community as well as the removal of half of a mobile home park inhabited primarily by members of the Latinx community in nearby Emma.

191.    Because of the history and makeup of these communities, NEPA required NCDOT to do an Environmental Justice analysis of the project that prompted them to reduce the impacts on the Burton Street Community and to eliminate the impacts on the Latinx community in Emma. NCDOT also hired a consultant to help members of MountainTrue develop a new Burton Street neighborhood plan that includes projects the city and NCDOT will pay for, including sidewalks, bus stops, a greenway connector, a neighborhood park, new parking facilities, etc. The reduction in impacts and the investment in the neighborhood plan and projects would not have been possible without NEPA, and would be unlikely outcomes under the Final

Rule, which is significantly less robust regarding the types of alternatives that must be considered.

192.    A second example of MountainTrue engaging in the NEPA project for a highway project is the Highway 107 expansion in Sylva.  This five lane highway connects Sylva, North Carolina to Cullowee, North Carolina.  It has a high volume traffic due to the schools located along it, including Western Carolina University.  The community pushed back on the original design because it encroached on too many businesses.  Members of MountainTrue convened a community-wide conversation about the road and pushed NCDOT and FHWA to examine alternatives that would reduce takings and constrict the footprint while preserving the multimodal infrastructure.  There was an Environmental Assessment, but the government has not yet reached a Record of Decision. The NEPA process brought all the stakeholders to the table early enough in the process that ADC was able to assist in facilitating a conversation between the impacted communities and NCDOT.

193.    MountainTrue already has or anticipates participating in the NEPA process for other highway projects in the near future as well, including the I-26 Connector Project, Corridor K, the Highway 191 widening in Asheville, the Highway 105 widening in Boone, the NC 143 Cherohala Skyway to Robbinsville, and the replacement bridge on SR 1326, Joe Brown Highway, over Hanging Dog Creek.

194.    For example, MountainTrue plans to comment in the immediate future on "Corridor K."  The North Carolina Department of Transportation recently decided to improve the existing highways instead of building the long planned "Corridor K" in Graham County, North Carolina.  This decision came after decades of environmental analysis, public meetings, and comment periods in which MountainTrue, and other non-profit organizations that are now part of

MountainTrue, participated, with the goal of limiting the impacts of the highway on residential communities and the National Forest.  An Environmental Assessment for the highway improvements is expected this summer, and MountainTrue plans to advocate for wildlife crossings to connect sections of public land across the wider highway corridor.  MountainTrue is concerned that under the Final Rule the Environmental Assessment will be less robust than it was otherwise, and the process for participating in notice and comment will be more onerous on MountainTrue and its members.

195.    MountainTrue relies on the NEPA process to engage in the decisionmaking processes and to influence decisions that affect it and its members.  MountainTrue is particularly concerned that weakening the minimum requirements of NEPA procedures or making them more vague and discretionary will immediately result in project reviews that are less useful and informative, because the Forest Service has been ordered to do only the minimum required by law—to "ensure environmental reviews focus on analysis that is required by law and regulation." Secretarial Memorandum to the Chief of the Forest Service (June 12, 2020).

196.    MountainTrue has also submitted comments, data, and analysis to the Forest Service in connection with a parallel administrative rulemaking to revise that agency's separate NEPA procedures. Among other things, the Forest Service has proposed to create new CEs for proposals to harvest timber and construct associated roads for access.  The proposed CEs are broad enough to cover every single National Forest timber sale in North Carolina in the past decade, with impacts that are cumulatively significant. MountainTrue's interest in improving National Forest projects would be adversely affected by CEQ's Final Rule because it purports to allow the Forest Service to adopt CEs with cumulatively significant impacts for actions that "normally" do not have significant impacts, eliminating the procedural safeguards of notice and

comment by which projects are improved or mitigated and by which significant impacts are avoided.

197.    MountainTrue engages in the NEPA process extensively.  Its ability to achieve its mission would be severely lessened under the Final Rule.  The Final Rule will limit its effective use of the NEPA process to submit necessary information to federal agencies and influence their decisions.  It will limit MountainTrue's ability to champion resilient forests, clean waters, and healthy communities across Western North Carolina and North Georgia by limiting scientific study, disclosure of a full range of direct, indirect and cumulative environmental impacts and by requiring consideration of fewer alternatives.  Moreover, MountainTrue is concerned that without the requirement for the government to take a detailed look at a range of alternatives, and without a requirement to study indirect and cumulative effects of a proposal, the government will engage in uniformed decisionmaking that will have negative impacts to the resources in Western North Carolina MountainTrue cares about.

198.    MountainTrue is also concerned that the level of specificity required for public comment under the new rule will make it more difficult for it to participate in the NEPA process, and that it will have to divert more resources to hire expert help to write the comments. MountainTrue also realizes that by excluding actions from review and limiting the information developed about impacts and alternatives, less information will be available to decisionmakers and the public; MountainTrue will be forced to use more of its own resources and staff time to identify and analyze those impacts and share the information with the agency and the public.

199.    MountainTrue is also concerned that it will have to divert organizational resources to fact-finding activities, including submitting requests for information under FOIA and the N.C. Public Records Act to make up for the fact that it will get less information through

the NEPA process.  MountainTrue has already had to begin making these changes, and recently submitted a request under the FOIA for information related to specific Forest Service project in the Nantahala and Pisgah National Forests.

200.    MountainTrue and its members, therefore, will suffer concrete and particularized injuries to interests that are imminent now that the Final Rule has taken effect.

201.    The injury to MountainTrue and its members would be redressed by an order from this Court vacating the Final Rule.

**Haw River Assembly**

202.    Plaintiff Haw River Assembly is a § 501(c)(3) nonprofit citizens advocate organization founded in 1982 to restore and protect the Haw River and Jordan Lake, and to build a watershed community that shares this vision.

203.    Haw River Assembly's principal place of business is in Bynum, North Carolina. It has over 1,000 individual members, most of whom live, work, and/or recreate in the vicinity of the Haw River, Robeson Creek, and Jordan Lake.

204.    Haw River Assembly's mission is to promote environmental education, conservation and pollution prevention; to speak as a voice for the river in the public arena; and to put into peoples' hands the tools and the knowledge they need to be effective guardians of the Haw River.

205.    Haw River Assembly's territory extends over the entire 110 miles of the Haw River, from its headwaters in the north-central Piedmont region of North Carolina down to where it joins the Cape Fear River in south Chatham County.  There are almost one million people living in this fast-developing 1700 square mile watershed which includes Greensboro,

Burlington, Chapel Hill, and part of Durham, as well as smaller towns and rural areas. It is one of the fastest growing parts of the state.

206.    Haw River Assembly is dedicated to protecting the water quality of the Haw River. Water quality is especially important to residents living on or near the Haw River because it is a source of drinking water. The Haw River watershed includes Jordan Lake, a 14,000 acre reservoir that provides drinking water for 300,000 residents, and recreation for 1 million visitors per years.

207.    Recreation and tourism, hydropower generation, fishing, wineries, manufacturing and agricultural production constitute the backbone of the economy around the Haw River. Each is dependent on an ample supply of clean water. As such, Haw River Assembly has an interest in preventing contamination of the Haw River, and the creeks and reservoirs that flow into the Haw River.

208.    The Haw River provides critical habitat for numerous plants and animals including threatened and endangered species of fish, mollusks, and wildflowers.  It is one of only three remaining habitats left for the federally listed endangered fish, the Cape Fear Shiner. Jordan Lake has become an important nesting site for bald eagles and is a favorite place for birders.

209.    Haw River Assembly has members who are avid fishermen, birders, hikers, gardeners, paddlers, cyclists, and naturalists. Its members raise crops and animals and families on the land surrounding the Haw River. They are concerned about the impact of the fast pace of development of this part of the state on the water quality in the region. Haw River Assembly and its members have participated in the NEPA process for many projects to express these concerns.

210.     Before the Clean Water Act was passed in 1972, the Haw River was unsafe for drinking, swimming, and fishing. As the South became increasingly industrial in the late 1800's, textile mills used the Haw River to both provide hydro-power with larger dams, and to disposal of their waste. The Haw River became significantly cleaner due to the requirements of the Clean Water Act. Members of Haw River Assembly fear that their river will once again become polluted with the decimation of NEPA, another bedrock environmental law.

211.     Haw River Assembly uses the NEPA process to inform its members and advocacy efforts, to create opportunities for political pressure, and to directly advocate to agencies to make decisions that are protective of the Haw River watershed.

212.     For example, Haw River Assembly is actively opposing the MVP Southgate pipeline that was recently approved by FERC.  This natural gas pipeline system would span approximately 75 miles from southern Virginia into central North Carolina. It would cut through Rockingham and Alamance counties, ending at a point just south and east of Graham, below I-85/I-4040, and would cross streams and tributaries that drain into the Haw River. In the construction process of pipelines, easements must be cleared of all trees and plants, exposing the disturbed land to erosion and causing sedimentation in streams. In-stream sedimentation not only carries nutrients and chemicals into the water, but the sediments themselves drown sensitive wildlife habitats in nearby streams.  The impacts would hurt the interests of Haw River Assembly and its members who recreate and enjoy this area.

213.     Members of Haw River Assembly attended public meetings and submitted public comments related water quality and wildlife as part of the NEPA process in an effort to mitigate the damage of MVP Southgate. Staff members of Haw River Assembly met with concerned

community members in the vicinity of the pipeline and helped educate them on the potential impacts, the FERC process, and how they could engage through NEPA review.

214.     Haw River Assembly and its members intend to continue to engage in the NEPA process for this project and will comment on the Supplemental EIS that is currently being prepared.  Haw River Assembly is concerned that because of the Final Rule the Supplemental EIS will not include an adequate consideration of indirect and cumulative environmental effects and will not consider a full range of reasonable alternatives.

215.     Haw River Assembly is also concerned that under the Final Rule, agencies might engage in advanced acquisition of property and other preconstruction activities prior to the NEPA process being completed, which would result in environmental harm and biased government decisionmaking.

216.     Haw River Assembly has been closely monitoring the Chatham Park development in Chatham County, North Carolina for years. This massive development is being built in Pittsboro's extra-territorial jurisdiction adjacent to the Haw River and Jordan Lake. It will be the biggest master plan development ever built in North Carolina, with more than 7000 acres eventually being developed from existing forestland. Chatham Park Investors and North Carolina DOT have applied for a 404 permit from the Army Corps that would allow over one mile of streams, and over 2 acres of wetlands to be destroyed as they build North Village and Chatham Parkway. This permit would cover all of Chatham Park's land between Pittsboro and the Haw River, as well as a new major roadway. This federal application is subject to NEPA, and HRA is actively engaged in this process and submitted written comments in May 2020.

217.     Members of Haw River Assembly are concerned about the impact that the Chatham Park development is already having on the natural environment. Members have noticed

muddy runoff and the destruction of habitat, including the disappearance of freshwater mussels and crawfish from creeks, and are concerned about the nutrient loading that will accompany the increased sediment loads that the development will bring. Haw River Assembly and its members are concerned that the final NEPA rule will exacerbate these problems by limiting up to date scientific study, disclosure of a full range of direct, indirect and cumulative environmental impacts and by requiring consideration of fewer alternatives.

218.   Haw River Assembly is concerned that under the Final Rule it will not get access to the information it needs to pursue informed advocacy for alternative solutions that will cause less environmental damage to the Haw River watershed.   Haw River Assembly is also concerned that if the government has less access to information about impacts and alternatives it is likely to lead to poor decisionmaking that hurts the Haw River watershed.

219.   Haw River Assembly is also concerned that under the Final Rule, agencies might engage in advanced acquisition of property and other preconstruction activities related to Chatham Park prior to the NEPA process being completed, which would result in environmental harm to the Haw River watershed and biased government decisionmaking that will injure Haw River Assembly and its members.

220.   Haw River Assembly was recently involved in facilitating a community group that was concerned about a Dominion Energy gas pipeline that was to be routed along a popular greenway in Durham, North Carolina. Members of Haw River Assembly are concerned that construction of the pipeline would devastate the trail's ecology and would require felling of trees that would take decades to regrow. Members are also concerned that the pipeline would damage to Northeast Creek, a tributary to Jordan Lake, which has been severely impacted by

development runoff and nutrient pollution as it has become a more important reservoir for drinking water for rapidly developing neighboring communities of Chatham, Apex and Cary.

221.    Although the energy company has withdrawn this route from consideration for now, it intends to propose alternative routes for the project later this summer, which will trigger NEPA. When that occurs, Haw River Assembly and its members fully intend to engage in the NEPA process.  Haw River Assembly is concerned that under the Final Rule the NEPA analysis will be less robust than under the previous regulations—particularly with regard to the types of alternatives that must be considered.  It is important to Haw River Assembly and its members that all alternatives be on the table so that the organization can advocate for the pipeline route that results in the least amount of sediment disruption.  In addition, it is important to Haw River Assembly that the agencies study all impacts and alternatives so that the government can make informed decisions that factor in environmental concerns such as sedimentation.

222.    Haw River Assembly also concerned that under the Final Rule, agencies might engage in advanced acquisition of property and other preconstruction activities related to this pipeline prior to the NEPA process being completed, which would result in environmental harm to the Haw River Watershed and biased government decisionmaking that will injure Haw River Assembly and its members.

223.    Haw River Assembly's ability to achieve its mission will be depleted under the Final Rule.  Haw River Assembly will have less ability to make effective use of the NEPA process to submit information to federal agencies and influence their decisions.  It will also limit Haw River Assembly's ability to provide its members with tools for protecting the river, such as information about environmental harms and alternative solutions and opportunities for meaningful public participation. To be an effective voice for the Haw River, Haw River

Assembly relies on review that considers a range of all reasonable alternatives, and that takes a hard look at cumulative impacts, climate change, and environmental justice impacts.

224.    Haw River Assembly relies on the abundance studies and records made public in the NEPA process to fully understand the impact of projects on the Haw River, and is concerned that under the Final Rule it will receive less information about environmental impacts and alternatives for projects that effect this waterbody and surrounding areas. If Haw River Assembly cannot obtain information through NEPA, it will need to use other methods to learn about proposed projects and their environmental impacts and alternatives, such as filing numerous information requests with the agencies or hiring experts, which will require Haw River Assembly to divert resources away from other activities central to its organizational mission. Without the information Haw River Assembly normally obtains through NEPA, Haw River Assembly will not be able to fully carry out its mission to restore and protect the Haw River and Jordan Lake, and may resort to more frequent litigation to protect the watershed from harm. Because of the changes in the Final Rule, Haw River Assembly recently submitted a FOIA request concerning the Chatham Park development and a 404 Clean Water Act application to the Army Corps.

225.    As an organization, Haw River Assembly is concerned that the Final NEPA rule removes consideration of climate change from the decisionmaking process. Climate change will directly impact the Haw River Watershed. Our Climate Action Campaign has researched local watershed impacts from climate change, and we expect to see increased flooding and storm events which will in turn increase wastewater and sewer overflows, more devastating and frequent droughts, and biodiversity and species extinction among other detrimental outcomes. Haw River Assembly considers the climate impact of every project in our watershed, and depends on the federal government to do the same through NEPA review. Haw River Assembly

will be harmed as an organization and as a watershed if climate change is not considered and disclosed by the government in its reviews of new projects.

226.     Haw River Assembly is dedicated to the goal of environmental justice and equality for all people in our watershed.  The organization is stronger and its work is more successful when the organization represents the full diversity of people living in the watershed.  Haw River Assembly believes that no group of people should bear a disproportionate share of negative environmental consequences resulting from industrial activities or governmental policies that situate polluting activities in their community. Haw River Assembly believes all people should have access to enjoyment of the natural world and a voice in decisions that may affect their environment and their health. NEPA is a powerful tool for communities of color and low wealth communities to participate in the process and to have their voice heard. Haw River Assembly is concerned that the Final Rule will put up barriers to participation from these communities, such as requiring public comments to be highly technical and specific, and by allowing public hearings to be conducted electronically.  Moreover, by limiting the scope of NEPA generally communities of color will have less opportunity to engage.  Outcomes are better for environmental justice communities when they have a voice in the process.

227.     Haw River Assembly is also concerned that the level of specificity required for public comment under the new rule will make it more difficult for Haw River Assembly to participate in the NEPA process, and that it will have to divert organizational resources to hire expert help to write the comments.

228.     Haw River Assembly relies on the NEPA process to engage in the decisionmaking processes and to influence decisions that affect it and its members.  Haw River Assembly and its members, therefore, will suffer concrete and particularized injuries to interests

that are germane to ASV's organizational mission and are imminent now that the Final Rule has taken effect.

229.    The injury to Haw River Assembly and its members would be redressed by an order from this Court vacating the Final Rule.

**Highlanders for Responsible Development**

230.    Highlanders for Responsible Development is a not-for-profit corporation organized in 2005.  It is headquartered in Monterey, Virginia.

231.    Highlanders for Responsible Development is a citizens' group that promotes stewardship of the unspoiled landscape, natural resources, and exceptional quality of life of the Allegheny Highlands in Virginia.  It supports policies and activities that are based upon informed community discourse, democratic decisionmaking, prudent land use, and sustainable economic development.

232.    Highland County and the Allegheny Highlands region is a unique rural community with pristine ridgelines and open, rolling valleys. The headwater sources for both the James and Potomac Rivers are located in Highland County, and the county is home to bald and golden eagles, native brook trout, many rare species of birds, and high-elevation flora and fauna. The natural environment is an important aspect of Highland County's economy.  Highland is a favorite location in Virginia for bicycling, motorcycling, hiking, hunting and fishing.  The County's famed Maple Festival draws upwards of 50,000 visitors over two weekends each March.

233.    While Highlanders for Responsible Development is not a membership organization, it is operated by a volunteer board of directors made up of members of the Highland County community, as well as the surrounding Allegheny Highlands area, dedicated to protecting Highland County's unique natural environment.  These board members function as

members of the organization.  They elect the organization's leadership, make decisions about the organization's priorities and activities, and provide funding to the organization.  Highlanders for Responsible Development regularly adds new board members to expand the organization's capacity.  Highlanders for Responsible Development is also open to anyone with an interest in Highland County and the surrounding Allegheny Highlands area, and to that end maintains a list of interested persons and holds regular meetings open to community members.

234.    To achieve its mission, Highlanders for Responsible Development promotes stewardship of Highland County's unspoiled landscape, natural resources—including water resources— and exceptional quality of life. The organization supports policies and activities that are based on informed community discourse, democratic decisionmaking, low-impact tourism that takes advantage of the county's natural attributes, prudent land use, and environmentally sustainable economic development.  When necessary to protect the resources of Highland County, the organization opposes projects that threaten the environment.

235.    In furtherance of this mission, Highlanders for Responsible Development is an active participant in the NEPA process.  Board members for Highlanders for Responsible Development attend public meetings and submit public comments on behalf of the organization, and they also analyze studies and plans required by NEPA to determine proposed projects' impacts on the natural resources in Highland County.

236.    Highlanders for Responsible Development is currently monitoring and participating in the NEPA process for the proposed Underground Safety Research Program Facility in Mace, West Virginia.  The Center for Disease Control proposes to construct a new underground research laboratory at the site.  Highlanders for Responsible Development submitted comments on the project's Draft Environmental Impact Statement and plans to submit

further comments once the Final Environmental Impact Statement is available.  Highlanders for Responsible Development is concerned the Final Rule will make it significantly more difficult to submit these comments, forcing it to expend organizational resources to retain outside experts to meet the new specificity requirements.  Moreover, Highlanders for Responsible Development is concerned that under the Final Rule the scope of what will be covered in the Final EIS will be much more limited, with no consideration given to indirect and cumulative effects.  This will diminish Highlanders for Responsible Development access to information and opportunity for advocacy.  It will also mean that the government has less information available to it, which is likely to lead to poor decisionmaking that will hurt the resources Highlanders for Responsible Development cares about.

237.     Highlanders for Responsible Development is also engaged in the NEPA review process for a timbering project in the Monongahela National Forest.  This spring, the Forest Service issued a draft Environmental Assessment for the Greenbrier Southeast project for public comment.  Highlanders for Responsible Development took exception to the proposed Environmental Assessment because, among other things, the Forest Service failed to provide any information on the project's potential impacts to the candy darter and other species, and without this information, the public cannot provide meaningful public comment on the proposed project. Highlanders for Responsible Development and several other organizations urged the Forest Service provide the requested information and additional opportunity to comment.

238.     Highlanders for Responsible Development is concerned the Forest Service will proceed with the Greenbrier Southeast project under the Final Rule without taking a hard look at impacts to species.  If the Final Rule enables the Forest Service to move forward without taking a hard look at impacts to species, including cumulative impacts, Highlanders for Responsible

Development will be harmed because protecting sensitive species is a critical component of its work protecting the larger ecosystems in the Allegheny Highlands area.  Highlanders for Responsible Development will also be harmed because it relies on the studies and information made public during the NEPA process.

239.    If this information is not produced by the Forest Service, Highlanders for Responsible Development will have to incur significant expenses hiring experts to develop this information itself.  Highlanders for Responsible Development is a volunteer-run non-profit organization with limited resources, and it is concerned it will not have capacity to hire experts to perform the analyses needed to sufficiently evaluate the impacts of these projects on species like the candy darter.

240.    If the Forest Service no longer assesses impacts to species under the Final Rule, Highlanders for Responsible Development will not be able to effectively comment on the Greenbrier Southeast project or other projects in furtherance of its mission to advocate for natural resources in the Allegheny Highlands.

241.    In addition, Highlanders for Responsible Development is concerned that the Forest Service will not have all the information it needs to make informed decisions that factor in environmental issues, like the candy darter, and consequently the Forest Service will make decisions that result in environmental harm and injury to Highlanders for Responsible Development and its board members.

242.    Because the Final Rule significantly limits where NEPA applies, and where an Environmental Impact Statement is required, Highlanders for Responsible Development will be injured because its will no longer get information about key projects that affect the natural resources it works to protect.

243.     Aspects of the Final Rule that limit the types of environmental effects that need

by considered and disclosed by federal agencies, as well as aspects that limit the range of

alternatives federal agencies need to consider will injure Highlanders for Responsible

Development.

244.     For example, one board member of Highlanders for Responsible Development

has noted the change in the Final Rule that removes the consideration of climate change from

NEPA analysis will negatively impact his ability to advocate for the brook trout, candy darter,

and other endangered or sensitive species.  Research has shown that brook trout and other

species will steadily disappear with increases in temperature.  Information on climate change and

its potential to impact species it essential for Highlanders for Responsible Development and its

members to advocate for solutions that are protective of these species and their interests.

245.     Further, the new requirements in the Final Rule which require comments to be

specific and technical in order to be considered, would require Highlanders for Responsible

Development to expend organizational resources on outside experts. This will affect Highlanders

for Responsible Development's interest in fostering public involvement in governmental

processes and its programs to educate the public about natural areas and values and to provide

outdoor experiences.

246.     Highlanders for Responsible Development anticipates that under the Final Rule it

will be required to shift organizational resources away from activities that are important to its

mission.  Currently Highlanders for Responsible Development uses the NEPA process to find

information about projects that impact natural resources in Highland County, Virginia.  Under

the Final Rule, Highlanders for Responsible Development will be forced to hire experts and to

submit requests for information and documentation at the local, state, and federal level to

understand these impacts and pursue its advocacy work in furtherance of its mission to act as a steward of the environment for Highland County.

247.    Highlanders for Responsible Development is also concerned that with rollbacks to NEPA encompassed in the Final Rule, Virginia's weaker environmental laws will be further weakened, and natural resources in Virginia will suffer.  Highlanders for Responsible Development believes the federal government bears responsibility to be the leader on broad environmental issues.  NEPA is essential to the government's ability to fulfill this responsibility.

248.    Highlanders for Responsible Development, therefore, will suffer concrete and particularized injuries to interests that are germane to its organizational mission, and these injuries are imminent now that the Final Rule has taken effect.

249.    The injuries to Highlanders for Responsible Development would be redressed by an order from this Court vacating the Final Rule.

**Defenders of Wildlife**

250.    Plaintiff Defenders of Wildlife is a national nonprofit organization. Founded in 1947, Defenders of Wildlife is dedicated to the protection of all native animals and plants in their natural communities, including our country's most imperiled wildlife and habitats. For over 70 years, Defenders of Wildlife has protected and restored imperiled species throughout North America by securing and strengthening conservation policies, working on the ground, and upholding legal safeguards for wildlife and habitat in the courts.

251.    Headquartered in Washington, D.C., Defenders of Wildlife has regional and field offices across the United States, including the Southeast Program regional office in Asheville, North Carolina. Defenders of Wildlife represents more than 345,000 members nationwide, including more than 37,100 members in the southeastern states of Alabama, Georgia, North

Carolina, South Carolina, Tennessee, and Virginia. Defenders of Wildlife's program work in the

Southeast includes working to protect a wide diversity of imperiled species from the charismatic

red wolf, North Atlantic right whale, red knot, and loggerhead sea turtle to the lesser known but

no less important blackside dace, birdwing pearlymussel, hellbender salamander, and Alabama

beach mouse. Defenders of Wildlife also fights to protect the awe-inspiring variety of

southeastern habitats from the Florida Everglades to the high mountain forests of North Carolina.

252.    NEPA is fundamental to Defenders of Wildlife's advocacy work throughout the

United States. Defenders of Wildlife relies on a robust NEPA process to learn about the

environmental impacts of agency actions affecting public lands such as forest or grazing

management plans, proposed regulations such as Clean Water Act nationwide permits, and

approvals and permits for major projects such as highways, pipelines, solar arrays and wind

turbines. Defenders of Wildlife relies on the public comment opportunities afforded by the

NEPA process to submit written comments and provide oral testimony on the impacts of such

actions to ensure that federal decisionmakers consider the full array of environmental impacts

and make informed decisions on a full range of reasonable alternatives.

253.    In the Southeast, two recent examples of NEPA processes in which Defenders of

Wildlife has submitted comments on projects include the U.S. Forest Service's Draft

Environmental Impact Statement for the Nantahala-Pisgah National Forests Management Plan

and the Army Corps' consideration of a Clean Water Act section 404 permit application from

Twin Pine Minerals to mine near the Okefenokee National Wildlife Refuge in Georgia.

254.    The Nantahala and Pisgah National Forests of Western North Carolina are truly

remarkable, with a diversity of habitats ranging from cool mountain streams teeming with fish,

mussels, and salamanders to deep forests providing habitat for black bears and nearly 270

species of migratory songbirds. Many of these songbird species, known as neotropical migrants, migrate to Central and South America for the winter and rely on Forest Service land during their residence in the U.S.; the U.S. Forest Service is the largest single landowner of neotropical migrant habitat in the eastern United States. Defenders of Wildlife's involvement in the Forest Plan revision process has included over six years of collaboration among stakeholders. Defenders of Wildlife's direct involvement in this effort has helped create broad support for a framework for protecting rare species, their habitats, and the overall ecological integrity of nearly 1.1 million acres of public lands. Defenders of Wildlife's involvement in this process has also helped to forge lasting relationships with numerous partners and the U.S. Forest Service to better design projects guided by the best available science and broad public support. This successful process was given structure by the current NEPA rules, including the requirement that the Forest Service give appropriate attention to cumulative impacts, such as the impacts to rare species that would be caused by many successive logging projects and external stressors like droughts and temperature changes attributable to climate change.

255.    Defenders of Wildlife is concerned that under the Final Rule, the second portion of this process will be less successful.  Defenders of Wildlife is concerned that the Forest Service will employ the Final Rule when it conducts the Final EIS for the plan and will consider a significantly narrower range of impacts and there will be less opportunity for widespread public engagement.

256.    The Okefenokee Swamp is a unique wetland home to thousands of species, including the imperiled gopher tortoise and wood stork, as well as over 10,000 American alligators.  It is also part of the headwaters to the St. Marys River.  Endangered shortnose sturgeons use freshwater rivers such as the St. Marys to spawn and as juvenile habitat.  Twin

Pines Minerals' most recent application for a Section 404 Clean Water Act permit would harm more than 475 acres of wetlands and 412 linear feet of streams.  The company intends to submit additional applications to mine in this same area. With the Replacement Rule's restrictions on wetland and stream protections, Defenders of Wildlife is concerned that even more wetlands and streams within the mine area may be at risk, thereby increasing the harms to the Okefenokee Swamp and the species that rely on it. Defenders of Wildlife's engagement in the permitting process for Twin Pine Minerals has allowed the organization to weigh in on a project that could impact one of the most significant National Wildlife Refuges in the eastern United States.

257.    Defenders of Wildlife's involvement to date has provided a platform for public advocacy providing an opportunity for tens of thousands of concerned citizens to inform the Army Corps of the importance of the Okefenokee swamp to their values and interests ranging from ecological to the recreational. Defenders of Wildlife's role in this process has also allowed the organization to push the Army Corps to utilize an EIS to substantively evaluate the potential impacts of mining on this treasured landscape.

258.    Defenders of Wildlife is concerned that with the Final Rule in place, the Army Corps will decide that it does not, in fact, need to utilize an EIS to study the project.  If the Army Corps does employ an EIS, Defenders of Wildlife is concerned that under the Final Rule it will examine a significantly smaller range of environmental impacts and alternatives.  This will harm Defenders of Wildlife's ability to get information and advocate for solutions that are the least harmful to wildlife.  Defenders of Wildlife is also concerned that the less robust review will also lead to poor government decisionmaking and poor environmental outcomes.

259.    Defenders of Wildlife has also been long engaged through the NEPA process in advocating for a safe, long-term solution to the ongoing erosion and shoreline migration

problems that plague Highway NC-12 where it runs through the Pea Island National Wildlife

Refuge on Hatteras Island, a barrier island that forms part of North Carolina's Outer Banks.  The

transportation corridor that extends from Bodie Island to the north to the village of Rodanthe on

Hatteras Island, includes a crossing of Oregon Inlet and several high-erosion "hot spots" where

the highway is falling into the Atlantic Ocean and must be continually repaired, turning the

wildlife refuge into a perpetual construction zone.

260.    In 2014 Defenders of Wildlife obtained a ruling from the Fourth Circuit Court of

Appeals that the replacement of the Marc Basnight Bridge over Oregon Inlet is part of a single

project to secure the entire transportation corridor, whose effects and alternatives must be fully

evaluated together as part of the NEPA process.  *Defenders of Wildlife v. N.C. Dept. of Transp.*,

762 F.3d 374, 391–92 (4th Cir. 2014).

261.    Defenders of Wildlife has continued to be involved with the implementation of

each phase of this ongoing project.  As a result of Defenders of Wildlife's advocacy and public

input through the NEPA process, the federal and state agencies involved revisited their earlier

proposal and unanimously selected a new bridge route for a section of the highway in order to

avoid one of the high-erosion areas at the south end of the wildlife refuge within the project

corridor.  When a group of rental property owners challenged this bridge, Defenders intervened

to help the agencies defend their decision and NEPA process.  *Save Our Sound OBX v. N.C.*

*Dept. of Transp.*, 914 F.3d 214 (4th Cir. 2019).  Defenders of Wildlife will continue to

participate in the NEPA process for the remaining phases of this project, including an upcoming

decision about a long-term solution for another high-erosion area within the wildlife refuge that

will be subject to an updated NEPA analysis.

262.    Defenders of Wildlife is concerned that under the Final Rule, the consideration of impacts related to this project will be severely diminished, and there will be less opportunity to advocate for alternatives that cause minimal harm to the species and habitat on the Outer Banks.

263.    Defenders of Wildlife joined detailed technical coalition comment letters on the Advanced Notice of Proposed Rulemaking and the Notice of Proposed Rulemaking for the CEQ NEPA Rule. Defenders of Wildlife also submitted its own technical comment letter focusing in particular on the impacts that the Final Rule will have in undermining Defenders of Wildlife's and the public's capacity to use the NEPA process to ensure federal agencies recognize and address the twin crises of accelerating rates of extinction and biodiversity loss as well as climate change.  Defenders of Wildlife also participated in a meeting with CEQ to discuss the Final Rule and to raise these concerns.

264.    Defenders of Wildlife believes that that the Final Rule will significantly impede its organizational mission of protecting native species and their habitats and the interests of its members in protecting our nation's rich biodiversity heritage.

265.    Defenders of Wildlife believes that the Final Rule will require it to divert organizational resources away from mission-critical activities to fill in the informational gaps that the Final Rule will create by relieving federal agencies from the obligation to fully disclose the impacts, and to determine the significance of those impacts, of proposed projects on species and their habitats.

266.    For example, by eliminating the "intensity" factors, the Final Rule will no longer require federal agencies to address explicitly the significance of impacts to park lands, wetlands, wild and scenic rivers, and ecologically critical areas or the degree to which the proposed action may adversely affect endangered or threatened species and designated critical habitats protected

by the Endangered Species Act, 16 U.S.C. §§ 1531–1544. *See* previous 40 C.F.R. § 1508.27(b)(3), (9)(1978). To understand the potential impacts to habitats and to imperiled wildlife, Defenders of Wildlife will be forced to hire outside experts and to pursue open records requests to gather the types of information to inform itself and its members and to draft comprehensive comment letters and provide the information to decisionmakers and the public that the government would otherwise be obligated to disclose under the current rule.

267.   Defenders of Wildlife is particularly concerned about the Final Rule's elimination of the requirement to consider cumulative impacts. The vast majority of endangered and threatened species listed under the ESA are imperiled precisely because of the cumulative impacts of individually small, but cumulatively significant, human actions degrading and destroying habitats and overexploiting species directly or indirectly—the proverbial death by a thousand cuts. Excusing federal agencies from the responsibility for considering the cumulative impacts of federal projects on wildlife and the habitats wildlife species depend on will make it exponentially harder for Defenders of Wildlife to fulfill its mission of securing healthy and thriving wildlife species in diverse and resilient habitats.

268.   Defenders of Wildlife is also harmed by the Final Rule's elimination of the necessity of considering the contributions federal projects will have to global warming and climate change. Climate change is the single largest existential threat that species—including our own—currently faces. Climate change also exacerbates the independent threats of habitat loss and the direct and incidental take of species. Under the Final Rule, Defenders of Wildlife's ability to understand the role that federal projects may play in contributing to climate change or the role that climate change may play in magnifying the damaging impacts of a proposed action

on vulnerable species, ecosystems, and human communities. In turn, this will impair Defenders of Wildlife's ability to communicate such information to its members.

269.    Defenders of Wildlife relies on the predictive role of NEPA analysis to avoid unlawful impacts to Endangered Species Act-protected threatened and endangered species and their designated critical habitats. The Endangered Species Act forbids government actions that would jeopardize the continued existence (i.e., survival and recovery) of species or destroy or adversely modify their designated critical habitats, 16 U.S.C. § 1536(a)(2)(2020), and directs federal agencies to use their existing authorities to advance the statute's purpose to conserve listed species (i.e., recover them to the point where statutory protections are no longer necessary), *id.* § 1536(a)(1)(2020).

270.    The former 1978 NEPA regulations specifically required federal agencies to analyze the significance of impacts to ESA-listed species and their designated critical habitats above and beyond those encompassed by the no-jeopardy standard of the ESA. This regulation specifically enabled Defenders of Wildlife to analyze and pinpoint those impacts to listed species and critical habitats that might not rise to the level of ESA-prohibited jeopardy or destruction/adverse modification of critical habitat in order to inform the public and the federal agency in question of those impacts that should be avoided or mitigated to protect and recover listed species. Under NEPA, agencies must predict the effects of their actions on species persistence in light of cumulative impacts, like the stressors caused by climate change. In a time of unprecedented stresses on rare species, even a small impact can nudge a species over the extinction cliff. Defenders of Wildlife believes the Final Rule's choice to limit the scope of the effects analysis will deprive agency decisionmakers and the public of the information needed to know whether government actions are compatible with species' persistence.

271.     Defenders of Wildlife has members who reside, visit, and recreate in areas across the United States who will be harmed by the Final Rule in the ways specified above.

272.     The injury to Defenders of Wildlife and its members would be redressed by an order from the Court vacating the Final Rule.

**Congaree Riverkeeper**

273.     Plaintiff Congaree Riverkeeper is a not for profit organization founded in 2008.

274.     Congaree Riverkeeper is headquartered in Columbia, South Carolina.

275.     Congaree Riverkeeper's advocacy efforts cover three rivers in the Midlands of South Carolina: the Broad River, the Lower Saluda River and the Congaree River. These efforts also extend to the attending tributaries of these rivers.

276.     The Broad, Lower Saluda, and Congaree Rivers are a tremendous asset to the Midlands. They provide drinking water to the region, and serve as a highly valued recreational and aesthetic resource. Members of Congaree Riverkeeper recreate on the waterways protected by the organization in kayaks and other watercraft.

277.     These rivers are threatened by pollution, poor planning, mismanagement, and urbanization. Such threats have degraded the water quality, harmed recreational usage, and destroyed natural habitats. Congaree Riverkeeper works to address the threats facing these important waterways.

278.     In furtherance of this mission Congaree Riverkeeper has been and will continue to be an active participant in the NEPA process for a variety of projects.

279.     For example, Congaree Riverkeeper was involved in the Carolina Crossroads project, which aimed to reduce traffic congestion at the intersection of I-20 and I-26. One of the proposed alternatives for that project was to build new bridges over the Lower Saluda River, and

a new highway along the river, which would have had severe impacts on the waterway. Through NEPA, Congaree Riverkeeper was able to submit public comments to the South Carolina Department of Transportation ("SCDOT") and encourage public participation in the decisionmaking process. As a result, SCDOT selected a different alternative, which should both alleviate ongoing traffic concerns and prevent significant harm to the Lower Saluda River.

280.    Congaree Riverkeeper currently has members involved in the Assembly Street Railroad Relocation project. This project will impact Rocky Branch creek as well as other surrounding tributaries of the Congaree River. It will also require disturbing the brownlands industrial sites that surround the area. Further, the project will impact the local water table. Members of Congaree Riverkeepers live along Rocky Branch creek, and fear that this project will negatively impact their ability to enjoy this natural resource.

281.    Congaree Riverkeeper and its members have been involved in the project, providing feedback to SCDOT. Congaree Riverkeeper will continue to be an active participant in the NEPA process and intends to submit comments on the project's Environmental Assessment.

282.    The Final Rule makes it much more difficult for Congaree Riverkeeper to submit these comments. In order to meet the requirements of the Final Rule, Congaree Riverkeeper will likely be forced to retain an outside expert in order to submit comments which meet the requirements of the proposed rule.  In addition, Conagree Riverkeeper is concerned that the scope of the environmental document will include significantly less information.  As a result, Congaree Riverkeeper will be unable to adequately advocate for its interests and the interests of its members in protecting these waterways.

283.    Congaree Riverkeeper is also currently involved in the NEPA process for the Nuclear Regulatory Commission relicensing of the Westinghouse nuclear fuel fabrication facility

near Columbia, South Carolina. The site manufactures fuel rods and pellets for nuclear power plants that involve extremely hazardous radioactive materials. The Nuclear Regulatory Commission initially issued a FONSI for the facility, proposing to renew its license and allow it to continue to operate. Through the NEPA process, Congaree Riverkeeper was able to submit comments on this project. It was partially as a result of comments from Congaree Riverkeeper and others that the Nuclear Regulatory Commission ultimately decided to conduct a full EIS review. The Nuclear Regulatory Commission is now preparing an EIS to determine if the facility should have its license to operate renewed.

284.    The Westinghouse NEPA process is ongoing. Congaree Riverkeeper intends to continue to participate in this project and submit further comments on the EIS once it is released. As a result of the Final Rule, Congaree Riverkeeper is concerned that it will have to retain outside experts in order to submit these comments and continue its involvement in the process. Congaree Riverkeeper is also concerned that the Final Rule weakens the environmental review of such projects. Under the Final Rule it is likely that the EIS for this project will consider a smaller range of alternatives, and will not look at a wide range of environmental effects, including indirect and cumulative effects. As a result Congaree Riverkeeper will have less information to share with its members, and its ability to advocate for solutions that protect the river will be diminished. Not only that, but the less robust process will make the government decisionmaking less informed, and thus harm the interests of Congaree Riverkeeper and its members in preserving the health and safety of South Carolina waterways.

285.    In light of such concerns, Congaree Riverkeeper submitted comments on the Notice of Proposed Rulemaking for the CEQ NEPA rule, raising concerns about the rulemaking process and the contents of the proposed rule.

286.    Congaree Riverkeeper relies on the NEPA process to engage in the decisionmaking processes and to influence decisions that affect it and its members.

287.    Congaree Riverkeeper's ability to achieve its mission will be severely harmed under the Final Rule, which limits its effective use of the NEPA process to submit necessary information to federal agencies and influence their decisions. This will affect Congaree Riverkeeper's interest in fostering public involvement in governmental processes, and it will negatively impact the organization's programs to educate the public about natural areas and values and to provide outdoor experiences.

288.    Currently, Congaree Riverkeeper relies on the NEPA process to find out information about projects that impact the natural resources that the organization exists to protect. As a result of the Final Rule, Congaree Riverkeeper will not be informed of many important projects, and will be required to hire experts and submit information requests to local, state, and federal bodies in order to receive the information it requires to perform its mission and educate its members.

289.    Similarly, under the Final Rule, Congaree Riverkeeper will be forced shift organizational resources in order to hire outside experts to assist with drafting of NEPA comments in order to meet the new specificity requirements.

290.    As a result of these changes, Congaree Riverkeeper will be required to shift organizational resources away from activities that are important to its mission. This will ultimately harm Congaree Riverkeeper's ability to achieve its organization goals and inform its members and the public of projects impacting the watersheds it protects.

291.     Therefore, Congaree Riverkeeper will suffer concrete and particularized injuries to interests that are germane to its organization mission, and are imminent now that the Final Rule has taken effect.

292.     The injury to Congaree Riverkeeper and its members would be redressed by an order from this Court vacating the Final Rule.

**The Clinch Coalition**

293.     Plaintiff The Clinch Coalition is a not-for-profit organization founded in 1998. The Clinch Coalition's mission is to protect and preserve the forest, wildlife, and watersheds of the Jefferson National Forest and surrounding communities for present and future generations. The Clinch Coalition believes that appreciating, understanding, and protecting our environment is essential to improving our quality of life, health, and wellbeing.

294.     The Clinch Coalition is a community-based organization with members and supporters throughout Virginia and the United States. Members of The Clinch Coalition are hikers, students, teachers, farmers, business people, birders, and lovers of the outdoors.

295.     The Clinch Coalition is based in Wise, Virginia. Although The Clinch Coalition works on forest issues across southwestern Virginia and the Jefferson National Forest, The Clinch Coalition is particularly focused on protecting and preserving the natural heritage, unique ecosystems, and environmental integrity of the Clinch Ranger District, as well as other extraordinary areas in the region such as the Mount Rogers National Recreation Area.

296.     Members of The Clinch Coalition enjoy recreating in Virginia's forests and especially its federal public lands. For example, members enjoy hiking and observing wildlife on the Clinch Ranger District, which is world renowned for its biodiversity, especially its aquatic species and amphibians.

297.    The Clinch Coalition actively participates in the public process for making land

management decisions on the Jefferson National Forest. The Clinch Coalition has been and will

continue to be an active participant in the NEPA process for projects in its area.

298.    For example, the Clinch Coalition was involved in the NEPA process for the

Nettle Patch Vegetation Management Project ("Nettle Patch Project"). The Nettle Patch Project

was a proposed major timber sale on the Clinch Ranger District. Although the likely impacts of

the sale would have been unacceptable anywhere, they were particularly egregious because the

project area and surrounding High Knob massif are part of an extremely valuable network of

connected southern Appalachian forests that provide clean air, clean water, recreation, and

critical habitat for an incredible diversity of wildlife. Of particular concern was the Forest

Service proposal to conduct a virtual clearcutting in the rare northern hardwood forest on the

High Knob massif, which would have been a tremendous loss of an important and rare

ecosystem in this region. Through the NEPA process, The Clinch Coalition informed the Forest

Service of the unacceptable impacts of the proposed action and the inadequate analysis

supporting the agency's proposals. Based on the information and critiques generated during the

NEPA process, The Clinch Coalition persuaded the Forest Service to minimize the worst of these

impacts and commit to continued monitoring through the implementation phase of the project.

299.    The Clinch Coalition was also involved in the NEPA process for the High Knob

Viewshed and Habitat Improvement Project, which proposed to expand pollinator habitat by

clearing trees around the High Knob observation tower. In response to the Forest Service's initial

plan to categorically exclude the project from environmental analysis and documentation in an

environmental assessment, The Clinch Coalition provided comments pointing out that the project

did not qualify for that exclusion because it would involve the use of herbicides, among other

potential reasons. As a result, the Forest Service decided to prepare an Environmental

Assessment, which disclosed impacts to a locally rare plant species that were not mentioned in

the scoping notice and gave both The Clinch Coalition and the Virginia Department of

Conservation and Recreation an opportunity to urge that the plant species be protected to the

greatest extent possible.

300.    The Clinch Coalition is involved in the Eastern Divide Insect and Disease Project

Phase II project. The Clinch Coalition is monitoring this effort by the U.S. Forest Service to

conduct an environmental analysis to address forest health concerns resulting from recent gypsy

moth defoliation and anticipated future expansion of gypsy moth populations. The Clinch

Coalition and its members used the NEPA process to learn more about the project.  The Clinch

Coalition submitted comments on the project's draft environmental assessment.  The Clinch

Coalition intends to continue to be an active participant in the NEPA process as the project

moves forward.  The Clinch Coalition and its members are concerned that under the Final Rule

the Forest Service will decide to perform a less robust NEPA analysis, and it will be more

difficult for The Clinch Coalition and its members to be adequately informed and fully

participate in the NEPA process.  In addition, it is concerned that under the less robust analysis,

the Forest Service will not have adequate information to make informed decisions about

environmental resources and this will lead to harm to the resources that The Clinch Coalition and

its members value.

301.    The Clinch Coalition is involved in the proposed Clinch Ranger District Aquatic

Habitat Improvement Project. The Clinch Coalition submitted comments on the scoping notice

for the project and intends to continue to be an active participant in the NEPA process as the

project moves forward. The Clinch Coalition and its members are concerned that under the Final

Rule the Forest Service will decide to perform a less robust NEPA analysis, and it will be more difficult for The Clinch Coalition and its members to be adequately informed and fully participate in the NEPA process. For example, The Clinch Coalition is concerned that the Forest Service my no longer consider and disclose indirect and cumulative effects.  In addition, The Clinch Coalition is concerned that under the less robust analysis, the Forest Service will not have adequate information to make informed decisions about environmental resources and this will lead to harm to the resources that The Clinch Coalition and its members value.

302.    The Clinch Coalition is involved in the proposed Ewing Mountain Vegetation Management Project, in which the USFS proposed to improve wildlife habitat and forest conditions in the Ewing Mountain area of the Mount Rogers National Recreation Area The Clinch Coalition submitted comments on the scoping notice for the project and intends to continue to be an active participant in the NEPA process as the project moves forward. The Clinch Coalition and its members are concerned that under the Final Rule the Forest Service will decide to perform a less robust NEPA analysis, and it will be more difficult for The Clinch Coalition and its members to be adequately informed and fully participate in the NEPA process. In addition, it is concerned that under the less robust analysis, the Forest Service will not have adequate information to make informed decisions about environmental resources and this will lead to harm to the resources that The Clinch Coalition and its members value.

303.    The Clinch Coalition is involved in the JNF Crown Touching Release project. The Clinch Coalition is monitoring a plan by the U.S. Forest Service to remove "undesirable" trees from the project site to create increased growing space for 15-20 selected trees per acre. The Clinch Coalition used the NEPA process to learn more about the project, and submitted comments on the project's scoping announcement and will continue to be an active participant in

the NEPA process as the project moves forward. The Clinch Coalition and its members are concerned that under the Final Rule the Forest Service will decide to perform a less robust NEPA analysis, and it will be more difficult for The Clinch Coalition and its members to be adequately informed and fully participate in the NEPA process. In addition, it is concerned that under the less robust analysis, the Forest Service will not have adequate information to make informed decisions about environmental resources and this will lead to harm to the resources that The Clinch Coalition and its members value.

304.     For each of the above projects, NEPA is crucial in both informing The Clinch Coalition and its members about the impacts of potential and proposed projects, and allowing The Clinch Coalition to participate in the decisionmaking process.

305.     The Clinch Coalition's ability to achieve its mission may be severely lessened under the Final Rule, limiting its effective use of the NEPA process to submit necessary information to federal agencies and influence their decisions.   The Clinch Coalition will also be hampered in its ability to inform its members about important projects, and to advocate for less damaging solutions.  The Clinch Coalition has already had to begin making these changes, and recently submitted a request under the FOIA for information related to specific Forest Service project in the Nantahala and Pisgah National Forests.

306.     Because the Final Rule significantly limits where NEPA applies, and where an EIS is required, The Clinch Coalition and its members will be injured because they will no longer get information about key projects that affect them.

307.     Aspects of the Final Rule that limit the types of environmental effects that need by considered and disclosed by federal agencies, as well as aspects that limit the range of

alternatives federal agencies need to consider will injure The Clinch Coalition. The organization will have less access to information necessary to inform its members and advocacy efforts.

308.    The Clinch Coalition and its members are concerned that the Final Rule will exacerbate gaps in public access to government decisionmaking in southwestern Virginia. Because the Final Rule allows agencies to hold hearings electronically, many citizens in southwestern Virginia, where internet service is limited, will be locked out of the NEPA process.

309.    The Clinch Coalition and its members are also concerned that the Final Rule's authorization for agencies to impose an expensive bond if a group or individual seeks to stay an activity like a timber sale pending judicial review of the agency' compliance with NEPA will prove an insurmountable barrier to individuals, local organizations, and small towns in southwestern Virginia, including the Clinch Coalition.

310.    The Clinch Coalition is particularly concerned that weakening the minimum requirements of NEPA procedures or making them more vague and discretionary will immediately result in project reviews that are less useful and informative, because the Forest Service has been ordered to do only the minimum required by law—to "ensure environmental reviews focus on analysis that is required by law and regulation." Secretarial Memorandum to the Chief of the Forest Service (June 12, 2020).

311.    The Clinch Coalition and its members, therefore, will suffer concrete and particularized injuries to interests that are germane to its organizational mission and are imminent now that the Final Rule has taken effect.

312.    The injury to The Clinch Coalition and its members would be redressed by an order from this Court vacating the Final Rule.

**Clean Air Carolina**

313.     Plaintiff Clean Air Carolina is a not-for-profit corporation founded in 2002. Clean Air Carolina has approximately 5,000 members in North Carolina. Its mission is to ensure cleaner air quality for all by educating the community about how air quality affects health, advocating for stronger clean air policies, and partnering with other organizations committed to cleaner air and sustainable practices. Its primary goal is to improve health by achieving the cleanest air possible. One way Clean Air Carolina aims to improve North Carolina air quality by reshaping the practice of relying almost exclusively on highways for transportation needs and supports a multi-modal system, including more passenger rail, bike and pedestrian options, and consequent development patterns that will lead to less single-occupant auto travel.

314.     Clean Air Carolina is based in Charlotte, North Carolina and works on regional and statewide issues. Clean Air Carolina has members who live throughout North Carolina who care about and are impacted by poor air quality.

315.     Clean Air Carolina makes frequent use of NEPA.  Clean Air Carolina relies on NEPA documents to learn about projects in North Carolina, including transportation projects and other major projects that will affect air quality and climate change.

316.     Clean Air Carolina also frequently engages in the NEPA process, using the public comment opportunities as an avenue to submit information about environmental impacts, and suggested alternatives to decisionmaking agencies to consider during project development.

317.     For example, Clean Air Carolina has submitted comments related to the Monroe Bypass toll highway, the Garden Parkway toll highway, the I-77 High Occupancy Toll lane expansion, the Durham-Orange Light Rail Transit Program, the Complete 540 toll highway, and the Wilmington Port Expansion.

318.     In 2013, Clean Air Carolina submitted comments on the proposed I-77 Toll Highway raising concerns about air quality and induced development.  The comments led to further discussions with NCDOT, and ultimately a commitment from the agency to use low diesel equipment during construction of the project and to provide vegetative barriers to alleviate air quality concerns.

319.     In 2009 and 2011, Clean Air Carolina carefully reviewed the Environmental Impact Statements prepared for the Garden Parkway toll highway pursuant to NEPA.  The documents demonstrated that the toll highway was not expected to improve congestion on existing roadways and would actually result in fewer jobs in North Carolina than if the toll highway was not constructed.  The NEPA documents also demonstrated that other alternative solutions would provide more congestion relief on existing roadways for a lower cost. Clean Air Carolina was able to use the information in the NEPA documents to educate decisionmakers at local and state levels.  As a result, ultimately legislation was passed eliminating a state earmark for the project and the project was abandoned by NCDOT.   Recently, however, attempts have been made to revive the project.  A feasibility study for a pared down version of the project under the name of Catawba Crossings was announced in July, 2020. Clean Air Carolina is concerned that if the project advances further it will not receive adequate study under the NEPA regulations set out in the Final Rule.  As a result, Clean Air Carolina is concerned that the government will not have the information it needs to make informed decisions and will make choices that cause environmental harm.  Clean Air Carolina is also concerned that under the Final Rule agencies will no longer study the indirect and cumulative effects of the project and will no longer be forced to consider "out of the box" alternatives.  As a result, Clean Air

Carolina's ability to advocate for solutions that are more protective of air quality will be diminished.

320.    In 2015, Clean Air Carolina submitted comments on the proposed Durham-Orange Light Rail project.  Clean Air Carolina noted the need for an additional station to service an area of Durham that is home to a lower-income African American community.  As a result of the NEPA process the station was added to the project design.

321.    In 2016 and 2018, Clean Air Carolina submitted comments on the proposed completion of the 540 loop around Raleigh.  Clean Air Carolina raised concerns about a number of issues including the indirect and cumulative effects that would result from the toll highway and the consequent impacts on air quality and global climate change.  When the state and federal agencies failed to address Clean Air Carolina's concerns, the groups filed a lawsuit in the United States District Court for the Eastern District of North Carolina against NCDOT and the Federal Highway Administration.  Ultimately, the parties settled the lawsuit, and in exchange for dismissing the case NCDOT agreed to perform a number of activities including set up funding agreements to encourage more mass transit; set targets to reduce Vehicle Miles Travelled ("VMT"); perform a study on how to reduce VMT in urban and rural areas; create a VMT reduction task force; and take concrete steps to transition DOT construction equipment to low diesel vehicles.

322.    As part of the 540 settlement, NCDOT also agreed to include a quantitative analysis of Greenhouse Gas potential for all transportation projects where an EIS or EA is required.  The Final Rule harms Clean Air Carolina because fewer projects will now require an EA or EIS and thus Clean Air Carolina will get access to less data on greenhouse gas emissions.

323.     Clean Air Carolina continues to rely on the NEPA process for its work. Specifically, Clean Air Carolina has members who are concerned about the Wilmington Port Expansion, forest planning in Western North Carolina, and concentrated animal feeding operations ("CAFOs").

324.     Clean Air Carolina is concerned about the ongoing efforts by the Army Corps and the North Carolina State Ports Authority to expand the port of Wilmington. This expansion would require the dredging of sediment from the Cape Fear River. Clean Air Carolina is particularly concerned about the impact that additional traffic, particularly truck traffic, will have on air quality and climate change.  Clean Air Carolina intends to continue to participate in the NEPA process for this project and will submit comments on the EIS when one is published. Clean Air Carolina is concerned that under the Final Rule any NEPA process fr this project would be significantly less robust than it otherwise would have been because agencies are no longer required to consider: all reasonable project alternatives, indirect impacts, or cumulative impacts. Clean Air Carolina is concerned that by not considering the indirect and cumulative impact of traffic coming from the Port, the government will fail to consider and disclose important impacts to air quality.  As a result, Clean Air Carolina will have less information to inform its advocacy and the government may engage in uninformed, poor decisionmaking.

325.     Clean Air Carolina is also concerned that the Final Rule will lead to a proliferation of poorly planned Controlled Animal Feeding Operations ("CAFOs"). Under the Final Rule applications for federal loan guarantees for CAFOs will no longer require NEPA review.  This is of significant concern to Clean Air Carolina because CAFOs can result in poor quality that is not otherwise assessed or regulated.  Clean Air Carolina is concerned that if the Final Rule is not vacated new CAFOs will not be required to undergo NEPA review and will be

planned in less safe ways, with less opportunity for public review and advocacy. The result will

significantly harm Clean Air Carolina and its members.  Clean Air Carolina will have less

information to pass on to its members and less opportunity to advocate for important

environmental controls and protections at CAFOs related to air quality.

326.    Clean Air Carolina and its members intend to learn more about these projects by

reviewing NEPA documents prepared to analyze the projects to glean information.  In addition,

Clean Air Carolina and its members intend to use the public comment period to engage in the

decisionmaking process.

327.    Clean Air Carolina is concerned that under the Final Rule its ability to advocate

for solutions protective of air quality will be significantly diminished.

328.    Clean Air Carolina and its members submitted comments on the Advanced Notice

of Proposed Rulemaking and the Notice of Proposed Rulemaking for the CEQ NEPA rule raising

concerns about the rulemaking process and the contents of the proposed rule.

329.    Clean Air Carolina is concerned that the Final Rule will significantly impact its

organizational mission, its interests, and the interests of its members.

330.    Clean Air Carolina anticipates that under the Final Rule it will be required to shift

organizational resources away from activities that are important to its mission.  Currently Clean

Air Carolina uses the NEPA process to find out information about projects that impact air quality

and climate change.  Under the Final Rule, Clean Air Carolina will be forced to hire experts, and

to submit requests for information at local, state and federal level to understand these impacts

and educate its members.

331.     Under the Final Rule, Clean Air Carolina will be forced shift organizational

resource in order to hire outside experts to assist with drafting of comments in order to meet the

new specificity requirements included in the Final Rule.

332.     Clean Air Carolina relies on the NEPA process to engage in the decisionmaking

process regarding climate change.  Under the Final Rule where climate change will no longer be

considered by federal agencies in their decisionmaking process, Clean Air Carolina will suffer

injury via the lack of information and a lack of ability to inform its members, which is a key part

of its organizational mission.

333.     The injury to Clean Air Carolina and its members would be redressed by an order

from this Court vacating the Final Rule.

**Cowpasture River Preservation Association**

334.     Plaintiff Cowpasture River Preservation Association is a not for profit corporation

formed in 1972.

335.     Cowpasture River Preservation Association was formed as a result of concerned

advocates who felt large government and corporate development projects in the local region

posed an impending threat to the River.

336.     Cowpasture River is a unique, precious, irreplaceable resource and is a vital

resource in recreation, economic, and aesthetic terms. The Cowpasture River Preservation

Association seeks to protect healthy water and soil in order to ensure healthy wildlife, livestock,

and people.

337.     Since 1972, Cowpasture River Preservation Association has grown to include not

only advocacy initiatives, but also educational programs, water quality monitoring programs, and

outreach activities.

338.    Today, Cowpasture River Preservation Association includes over 300 members who volunteer their time to keep the river clean, pristine, healthy, and brimming with flora and fauna.

339.    To achieve Cowpasture River Preservation Association's mission, it is critical the organization foster protection of water quality and prevent threats posed to water quality by industrial development projects in the region.

340.    In furtherance of this mission and these efforts, Cowpasture River Preservation Association has been, and will continue to be, an active participant in the NEPA process for a variety of projects.

341.    Cowpasture River Preservation Association was the named plaintiff in a challenge to the FERC certificate for the recently cancelled Atlantic Coast Pipeline. Cowpasture River Preservation Association opposed the Atlantic Coast Pipeline because construction and operation of the pipeline would have directly conflicted with Cowpasture River Preservation Association's mission to protect and restore the Cowpasture River, and because FERC failed to meet requirements for alternatives analysis under NEPA, among other issues. *Atlantic Coast Pipeline, LLC et al. v. Federal Energy Regulatory Commission*, USCA Case #18-1224 (D.C. Cir.).

342.    Cowpasture River Preservation Association, along with other environmental groups, challenged approvals issued by the Forest Service for the Atlantic Coast Pipeline to cross through the George Washington and Monongahela National Forests in February 2018. Petitioners argued that the Forest Service failed to take a hard look, under NEPA, at the effects of the Atlantic Coast Pipeline on landslides, erosion, and degradation of water quality on national forests and that the Forest Service failed to evaluate alternatives. The Court found for the Petitioners on both grounds. *Cowpasture River Preservation Association v. Forest Service*, 911

F.3d 150, 172, 283 (4th Cir. 2018).  Prior to the cancellation of the pipeline project, the Forest Service announced its intent to prepare a Supplemental Environmental Impact Statement to address these shortcomings, 85 Fed. Reg. 35,634 (June 11, 2020).

343.    Cowpasture River Preservation Association additionally expects to be involved in the impending NEPA process that will implement the new forest plan for the George Washington National Forest. The organization worked closely with District Ranger Elizabeth McNichols for years. Now that she has retired, a new District Ranger, Theresa Tanner, has filled her role and will be putting forward project proposals for stretches of the lower Cowpasture River and the George Washington National Forest, which may include activities that could harm water quality and wildlife, fish, and plants.

344.    The Cowpasture River Preservation Association intends to be heavily involved in the NEPA reviews of these new projects, which will provide structure to allow for public engagement even with new staff with whom the organization lacks a long-term relationship. The Cowpasture River Preservation Association will rely on NEPA to stay informed and have the opportunity to provide input.

345.    Cowpasture River Preservation Association also anticipates being involved in another upcoming NEPA process involving a project on the River. Cowpasture River Preservation Association is aware that a private riparian landowner intends to timber their entire property down to the water's edge, with plans that may require a Clean Water Act Section 404 permit. In the past, government review of such a permit application would trigger NEPA review by the Army Corps. Cowpasture River Preservation Association is committed to working through the NEPA process with the Virginia Department of Environmental Quality and the U.S.

Army Corps to ensure that their interests in the quality of the River are not harmed by this project.

346.    Cowpasture River Preservation Association is concerned that under the Final Rule, the Army Corps may determine that the project no longer requires NEPA review, or requires a less robust NEPA review than it would have done in the past.   Cowpasture River Preservation Association is concerned that the Army Corps will not analyze and disclose the indirect and cumulative effects associated with the project, and will not analyze a full range of alternative solutions.  Cowpasture River Preservation Association is concerned that the diminished process will lessen its ability to advocate for solutions that are more protective of the river.  Cowpasture River Preservation Association is also concerned that if the Army Corps does not conduct a robust analysis it will make uninformed decisions that are less protective of the environment.

347.    Cowpasture River Preservation Association submitted comments on the Notice of Proposed Rulemaking for the CEQ NEPA rule raising concerns about the rulemaking process and the contents of the proposed rule.

348.    Cowpasture River Preservation Association's ability to achieve its mission may be severely lessened under the Final Rule, limiting its effective use of the NEPA process to submit necessary information to federal agencies and influence their decisions. Without NEPA, Cowpasture River Preservation Association would not be informed of many important projects. Further, the proposed requirements surrounding the submission of comments would require Cowpasture River Preservation Association to expend organizational resources on outside experts. This will affect the Cowpasture River Preservation Association's interest in fostering

public involvement in governmental processes and its programs to educate the public about natural areas and values and to provide outdoor experiences.

349.     The injury to Cowpasture River Preservation Association and its members would be redressed by an order from this Court vacating the Final Rule.

**Cape Fear River Watch**

350.     Plaintiff Cape Fear River Watch is a 501(c)(3) nonprofit public interest organization with over 1,100 members headquartered in Wilmington, North Carolina.

351.     Cape Fear River Watch was founded in 1993 and is dedicated to the improvement and preservation of the health, beauty, cleanliness, and heritage of the Cape Fear River Basin. Cape Fear River Watch pursues this goal through education, advocacy, and action.

352.     Working with its partners, Cape Fear River Watch has a history of proven success in protecting the Cape Fear watershed. It has been instrumental in requiring Duke Energy to clean up power plant coal ash. Cape Fear River Watch also dissuaded Titan America from building a potentially significant pollution source in the form of a cement plant along the banks of the Cape Fear River.

353.     Cape Fear River Watch is the region's go-to source for information, advocacy and legal action related to GenX and other per- and polyfluoroalkyl substances ("PFAS") discharged into the environment from a DuPont/Chemours facility located in Fayetteville, NC.  In February 2019, Cape Fear River Watch's lawsuits culminated in a signed Consent Order between Cape Fear River Watch, the NC Department of Environmental Quality and Chemours Company LLC which will drastically reduce the release of PFAS into the environment. *Cape Fear River Watch v. Chemours Company FC, LLC*, 7:18CV00159 (West 2020).

354.     Cape Fear River Watch also plays a key role in coordinating the Cape Fear River Partnership, which focuses on fisheries restoration in the Cape Fear River.

355.    Cape Fear River Watch offers multiple opportunities for members of the community to learn about and protect the Cape Fear River. Cape Fear River Watch conducts a citizen science Creekwatchers program, monthly seminars, river paddles, and clean-ups.  Cape Fear River Watch also provides education to both children and adults through eco-tours and summer camps.  Cape Fear River Watch also manages the Greenfield Lake boathouse at a Wilmington city park, which gives the community access to the lake on paddle boats, kayaks and canoes.

356.    Cape Fear River Watch and its members make frequent use of NEPA. Cape Fear River Watch and its members rely on NEPA documents to learn about projects in the Cape Fear River basin, including transportation and agricultural projects which impact the health of the Cape Fear River and the citizens who live along it.

357.    Cape Fear River Watch also frequently engages in the NEPA process, using the public comment opportunities as an avenue to submit information about environmental impacts and suggest alternatives for decisionmaking agencies to consider during project development.

358.    For example, after becoming aware of plans by Titan Cement to construct a large cement plant on the banks of the Cape Fear River, Cape Fear River Watch was able to utilize the NEPA comment process to submit comments onto which over 17,000 Wilmington residents signed on. These comments detailed the communities' concerns regarding the proposed plant's environmental impacts. Cape Fear River Watch also coordinated gathering comments from over 400 medical professionals which detailed the likely health impacts the community would experience if the proposed plant was constructed. As a result of this community feedback, Titan Cement reevaluated its plans to construct the cement plant and abandoned the project.

359.    If the Final Rule is allowed to take effect Cape Fear River Watch is concerned that this type of citizen input on project design will no longer be possible. The Final Rule's specificity requirements are likely to significantly restrict the ability of the average citizen to comment on NEPA projects. This restriction would harm the ability of the Cape Fear River Watch to preserve the health and beauty of the Cape Fear River and Cape Fear River Watch's ability to foster citizen engagement in protecting the Cape Fear River.

360.    Cape Fear River Watch continues to rely on the NEPA process for its work. For example, Cape Fear River Watch is concerned about the ongoing efforts by the Army Corps and the North Carolina State Ports Authority to expand the port of Wilmington. This expansion would require the dredging of sediment from the Cape Fear River. Dredging a harbor like this can result in a number of harmful impacts, including worsening sea level rise and storm surges for areas along the Cape Fear River, including the City of Wilmington, by allowing seawater to travel further upriver. It may also cause water from the harbor to infiltrate the aquifer, jeopardizing the drinking water supply for Wilmington.  And there are a host of other problems, such as impacts to the ecosystem and the health effects of dredging up sediment contaminated with organic chemicals and heavy metals.

361.    Cape Fear River Watch intends to continue to participate in the NEPA process for this project and will review and submit comments on the EIS when one is published. Cape Fear River Watch is also concerned that if the Final Rule is not vacated that it will be significantly more difficult to submit these planned comments as Cape Fear River Watch will likely be forced to retain outside experts in order to satisfy the Final Rule's specificity requirements. In addition, Cape Fear River Watch is concerned that if the Final Rule is allowed to take effect any EIS for this project would be significantly less robust than it otherwise would have been. Under the Final

Rule agencies are no longer required to consider: all reasonable project alternatives, indirect impacts, or cumulative impacts. If these factors are not considered Cape Fear River Watch fears that the ecosystem surrounding the mouth of the Cape Fear River could be irreparably damaged due to uninformed decisionmaking.

362.    Cape Fear River Watch is also concerned about the proposed Wilmington Rail Alignment project. This project would replace the existing freight rail line that runs through the City with a new line over the Cape Fear River and across Eagle Island. This project carries numerous potential harms, including the filling of the fragile wetlands ecosystem found throughout Eagle Island that supports aquatic, terrestrial, and bird species which the members of Cape Fear River Watch enjoy viewing. The new rail line would also be vulnerable to the flooding.  Eagle Island already experiences flooding that will be exacerbated by the dredging of the Cape Fear River and sea-level rise driven by climate change.  Locating city infrastructure in an area of such risk makes the project an economic and environmental gamble. Robust public input in the project is essential to protecting both Eagle Island and the economic wellbeing of the City of Wilmington, and harm to both Eagle Island and the City would injure Cape Fear River Watch and its members. Cape Fear River Watch plans to participate in the NEPA process for this project and intends to comment on the EIS once it is published. Cape Fear River Watch is concerned that if the Final Rule is not vacated the EIS and the NEPA process surrounding it will be significantly less robust than they otherwise would have been.  This will mean that Cape Fear River Watch has less information and less opportunity to advocate.  The less robust NEPA process is also likely to lead to poor, uninformed government decisionmaking and harmful environmental outcomes.

363.    Cape Fear River Watch is also concerned that the Final Rule will lead to a proliferation of poorly planned CAFOs.  Under the Final Rule applications for federal loan guarantees for CAFOs will no longer require NEPA review.  This is of significant concern to Cape Fear River Watch because CAFOs present many problems in the Cape Fear watershed in terms of both air quality and water quality.  In 2018, during Hurricane Florence more than 110 CAFOs experienced flooding which sent millions of gallons of fecal waste from industrial hog operations into the Cape Fear River.  Members of Cape Fear River Watch who depend upon the river for their livelihoods were forced out of work as the river was unsafe to traverse for over a month after the incident.  In June 2020 a lagoon breach at B&L Farms released over 3 million gallons of hog waste, some of which entered Starlins Swamp, part of the Cape Fear River Basin.

364.    Cape Fear River Watch is concerned that if the Final Rule is not vacated new CAFOs will not be required to undergo NEPA review and will be planned in less safe ways, with less opportunity for public review and advocacy.  The result will significantly harm Cape Fear River Watch and its members.  Cape Fear River Watch will have less information to pass on to its members and less opportunity to advocate for important environmental controls and protections at CAFOs.  Releases of hog fecal waste result in die offs of plant and animal species which Cape Fear River Watch seeks to protect.  Large releases into the Cape Fear River result in health impacts which force Cape Fear River Watch's members to avoid the river, resulting in both a loss of enjoyment and income.

365.    Cape Fear River Watch and its members submitted comments on the Advanced Notice of Proposed Rulemaking and the Notice of Proposed Rulemaking for the CEQ NEPA rule raising concerns about the rulemaking process and the contents of the proposed rule.

366.    Cape Fear River Watch is concerned that the Final Rule will significantly impact its organizational mission, its interests, and the interests of its members.

367.    Cape Fear River Watch anticipates that under the Final Rule it will be required to shift organizational resources away from activities that are important to its mission. Currently, Cape Fear River Watch uses the NEPA process to learn about transportation, CAFO, and industry projects affecting the Cape Fear River basin. Under the Final Rule, Cape Fear River Watch will be forced to hire experts and to submit requests for information at the local, state, and federal level to understand these impacts and educate its members.

368.    Already, Cape Fear River Watch has been forced to file a request under FOIA or state public records acts to gain access to information about upcoming CAFOs because it will no longer get notice through the NEPA process.

369.    Under the Final Rule, Cape Fear River Watch will be injured by being forced to shift organizational resources to hire outside experts to assist with drafting of comments in order to meet the new specificity requirements.  For example, Cape Fear River Watch currently conducts water quality monitoring efforts throughout the Wilmington area and posts the results of this monitoring for public viewing, informing the public which lakes, rivers, and other water bodies are safe to recreate in.  If the Final Rule is not vacated and Cape Fear River Watch is forced to shift organizational resources to hiring outside experts Cape Fear River Watch will no longer have the ability to conduct these water quality monitoring efforts.

370.    Cape Fear River Watch and its members, therefore, will suffer concrete and particularized injuries to interests that are germane to Cape Fear River Watch's organizational mission and are imminent.

371.   The injury to Cape Fear River Watch and its members would be redressed by an order from this Court vacating the Final Rule.

**Alliance for the Shenandoah Valley**

372.   Plaintiff Alliance for the Shenandoah Valley is a not-for-profit corporation founded in 2018 by four conservation organizations: The Consumer Alliance for Preservation, Augusta County Alliance, Shenandoah Forum, and Shenandoah Valley Network. It gained another partner—Scenic 340—in 2019.  Alliance for the Shenandoah Valley's mission is to maintain healthy and productive rural landscapes and communities, protect and restore natural resources, and strengthen and sustain the Shenandoah Valley region's agricultural economy.

373.   Alliance for the Shenandoah Valley is headquartered in New Market, Virginia, and it works to ensure the Shenandoah Valley's rural character, scenic beauty, clean water, and vibrant communities are protected by providing accurate and timely information to community members and decisionmakers.  Alliance for the Shenandoah Valley has members throughout the region who are interested in a Shenandoah Valley that is sustained by rural landscapes, clean streams and rivers, and thriving communities.

374.   Alliance for the Shenandoah Valley makes frequent use of NEPA.  Alliance for the Shenandoah Valley relies on NEPA documents to learn about projects in the Shenandoah Valley, including pipeline, transportation, and forestry management projects that threaten the region's land, water, and quality of life.

375.   Alliance for the Shenandoah Valley also frequently engages in the NEPA process, using the public comment opportunities as an avenue to submit information about environmental impacts and suggested alternatives for decisionmaking agencies to consider during project development.

376.   For example, Alliance for the Shenandoah Valley has submitted comments related to the Atlantic Coast Pipeline, Mountain Valley Pipeline, and Mt. Storm to Valley Electric Transmission Line Replacement—all of which concern projects that would cross the George Washington National Forest.

377.   In 2016, Alliance for the Shenandoah Valley—through the Shenandoah Valley Network—submitted comments on the proposed Mountain Valley Pipeline and was one of several environmental organizations to call for public hearings for the pipeline.  Shenandoah Valley Network and these organizations subsequently intervened in the case to challenge the Forest Service's right of way approvals for the project.The Fourth Circuit, in *Sierra Club, Inc. v. Forest Service*, 897 F.3d 582, 605–06 (4th Cir. 2018), rejected the approvals. The Forest Service will now have to produce a supplemental EIS that addresses the issues raised by the Fourth Circuit.  Alliance for the Shenandoah Valley has been and will remain an active participant in the EIS process for the Mountain Valley Pipeline.

378.   Alliance for the Shenandoah Valley is concerned that under the Final Rule the NEPA process for the Mountain Valley Pipeline will be significantly less rigorous going forward and the Forest Service may feel that it is not required to study a full range of alternatives and impacts, including indirect and cumulative effects.  As a result Alliance for the Shenandoah Valley will have less access to information to share with its members and less opportunity to advocate.  In addition, Alliance for the Shenandoah Valley is concerned that the stringent public comment requirements will make it more difficult to participate in the process.

379.   Alliance for the Shenandoah Valley is also concerned that pursuant to the Final Rule the company pursuing the Mountain Valley Pipeline will start to pursue right of way acquisition prior to the completion of the NEPA process.  This will lead to direct environmental

harm, and to biased government decisionmaking in favor of the pipeline, all of which will injure Alliance for the Shenandoah Valley and its members.

380.    In 2020, Alliance for the Shenandoah Valley submitted scoping comments on the proposed Mt. Storm to Valley Electric Transmission Line Replacement on the George Washington National Forest.  Alliance for the Shenandoah Valley's comments concerned the potential sedimentation and erosion impacts from the proposed ground clearing, as well the potential to affect rare bees discovered in the project area and the Cow Knob Salamander in the Shenandoah Mountain Crest management area.  Alliance for the Shenandoah Valley also asserted that a categorical exclusion was inappropriate and that the Forest Service needed to complete an Environmental Assessment with public input for two reasons: the project proposed permanent changes that cumulatively, at the very least, would have significant effects on the environment and could directly cause "take" of—or even jeopardy to the continued existence of—a critically endangered bee species.  Alliance for the Shenandoah Valley, moreover, will review and comment on a draft Environmental Assessment when it is issued.

381.    Alliance for the Shenandoah Valley is concerned that under the Final Rule, the NEPA process for the Transmission Line Replacement will be significantly less rigorous, and the Forest Service may feel that it is not required to study a full range of alternatives and impacts, including indirect and cumulative effects.  As a result Alliance for the Shenandoah Valley will have less access to information to share with its members and less opportunity to advocate.  In addition, Alliance for the Shenandoah Valley is concerned that the stringent public comment requirements will make it more difficult to participate in the process.

382.    Alliance for the Shenandoah Valley relies on the NEPA process to engage in the decisionmaking process regarding the indirect and cumulative impacts of transportation projects

like the upcoming I-81 improvements.  Particularly, Alliance for the Shenandoah Valley and its members rely on a full examination of the indirect and cumulative effects of highway projects to see not just the direct impact of placing pavement on the ground, but the larger issue of induced travel, induced traffic, and induced land use resulting from additional highway capacity in a larger system.  But under the Final Rule that eliminates cumulative effects and removes the express language requiring consideration of indirect effects, Alliance for the Shenandoah Valley will suffer injury via the lack of information and inability to inform community members and decisionmakers, harming interests that are germane to Alliance for the Shenandoah Valley's organizational mission.  Alliance for the Shenandoah Valley is also concerned that the changes will lead to uninformed government decisionmaking, particularly from the Forest Service, which will ultimately lead to harm to the resources Alliance for the Shenandoah Valley cares about.

383.    Alliance for the Shenandoah Valley also relies on the NEPA process to engage in the decisionmaking process regarding alternatives to a variety of projects including the Atlantic Coast and Mountain Valley Pipeline projects. Under the Final Rule that unlawfully erodes the requirements for reviewing alternatives by removing the mandates that *all* reasonable alternatives be objectively evaluated and that substantial treatment be devoted to each alternative, Alliance for the Shenandoah Valley will suffer injury via the lack of information and inability to inform community members and decisionmakers. Such injuries would be the direct result of the Final Rule's changes, which permit agencies to prepare an inadequate EIS that does not examine viable alternatives to a project threatening the land, water, or quality of life of the Shenandoah Valley region.

384.    Alliance for the Shenandoah Valley is concerned that the Final Rule will significantly impact is organizational mission, its interests, and the interests of its members.

385.    Alliance for the Shenandoah Valley anticipates that under the Final Rule it will be required to shift organizational resources away from activities that are important to its mission. Currently, Alliance for the Shenandoah Valley uses the NEPA process to find out information about projects that impact the land, water, and quality of life of the Shenandoah Valley. Under the Final Rule, Alliance for the Shenandoah Valley will be forced to hire experts and to submit requests for information at the local, state, and federal level to understand these impacts and educate its members.

386.    Under the Final Rule, Alliance for the Shenandoah Valley will be forced to shift organizational resources to hire outside experts to assist with drafting of comments in order to meet the new specificity requirements.

387.    Alliance for the Shenandoah Valley and its members, therefore, will suffer concrete and particularized injuries to interests that are germane to Alliance for the Shenandoah Valley's organizational mission and are imminent when the Final Rule takes effect.

388.    Alliance for the Shenandoah Valley and its members' injuries would be redressed by an order from this Court vacating the Final Rule.

**Alabama Rivers Alliance**

389.    Plaintiff Alabama Rivers Alliance is a nonprofit corporation founded in 1997. Alabama Rivers Alliance works to protect and restore all of Alabama's water resources through building partnerships, empowering citizens, and advocating for sound water policy and its enforcement. Its membership includes over 600 individuals and more than 50 watershed and community-based partner organizations throughout the state.

390.    Based in Birmingham, Alabama, Alabama Rivers Alliance's work touches every watershed in the state through its individual members and partner network. Alabama Rivers

Alliance has a statewide interest in protecting all of Alabama's 132,000 miles of rivers and streams, which are some of the most biodiverse waterways in the nation.

391.    Alabama Rivers Alliance's members are impacted by water pollution and the harmful effects of dams on waterways in the state.  Members care about and take active steps towards reducing water pollution and increasing water quality, protecting and restoring riverine ecosystems by advocating for dam removal and improved environmental performance of hydroelectric dams, and increasing recreation opportunities on Alabama's waterways.

392.    As part of Alabama Rivers Alliance's mission to protect Alabama's rivers and watersheds, it actively supports effective implementation of environmental laws, including NEPA.  To ensure that Alabama's rivers are protected, Alabama Rivers Alliance supports the enforcement of environmental regulations, advocates for comprehensive water planning, and seeks the mitigation of the harmful effects of dams.

393.    In order to accomplish these goals of the organization, Alabama Rivers Alliance regularly participates in the NEPA process in the context of dam relicensing. Alabama Rivers Alliance uses the NEPA process to engage in stakeholder meetings, publicly comment on dam operations and mitigation measures, and suggest alternatives to consider during the relicensing process.

394.    For example, Alabama Rivers Alliance is currently participating in the public NEPA process as the Federal Energy Regulatory Commission ("FERC") relicenses Harris Dam on the Tallapoosa River. Alabama Rivers Alliance staff and members have attended public meetings and submitted multiple comment letters as part of the Harris Dam relicensing process. Alabama Rivers Alliance has raised concerns about low flows, low water temperatures, erosion and sedimentation, and ecological harm caused by operations at Harris Dam. Alabama Rivers

Alliance continues to engage in the relicensing of Harris Dam and intends to comment upon the NEPA documents produced by FERC.

395.     Some of Alabama Rivers Alliance's members live and recreate on the Tallapoosa River downstream from Harris Dam. Some have watched the banks of their riverfront properties wash away over the years as voluminous releases from the dam surge through their back yards. Through the NEPA process, Alabama Rivers Alliance is able to represent the interests of its members by recommending operational alternatives and infrastructure upgrades. Such measures lessen the impacts of hydropeaking and improve ecological health downstream of the dam, protecting the interests and values of the organization.

396.     Alabama Rivers Alliance and its members continue to rely on the NEPA process to express their concerns about the relicensing of Harris Dam and to advocate for improvements to dam operations that benefit the Tallapoosa River and, in turn, members' use and enjoyment of their property and the riverine environment. Going forward, Alabama Rivers Alliance and its members intend to use the NEPA process to learn more about Harris Dam and the opportunities to lessen its impacts on the interests of Alabama Rivers Alliance's members. Alabama Rivers Alliance staff intend to review and comment upon the Environmental Assessment produced by FERC, using NEPA's public comment process to substantively affect federal decisionmaking by ensuring that the interests of Alabama Rivers Alliance members are adequately considered.

397.     Alabama Rivers Alliance is concerned that under the Final Rule, FERC will conduct a much less rigorous NEPA process for the Harris Dam that fails to consider a full range of environmental impacts and alternative solutions.  Alabama Rivers Alliance is concerned that it will have less information to share with its members and less opportunity to advocate for environmentally friendly outcomes than if the Final Rule was vacated and the 1978 regulations

restated.  Alabama Rivers Alliance is also concerned that the government will have less information before it under the new rule and will engage in uninformed decisionmaking that will have negative environmental consequences that will hurt Alabama Rivers Alliance and its members.

398.    Alabama Rivers Alliance also participated in the NEPA process in FERC's Coosa River dam relicensing. When the construction of hydroelectric dams converted the Coosa River into a series of reservoirs, the river experienced the largest mass extinction event in North American modern history. As part of the NEPA process, FERC wrote an Environmental Assessment to consider the impacts of these dams, concluding that the project would not have significant impacts upon the environment. Alabama Rivers Alliance participated in the NEPA process by submitting comments on FERC's Environmental Assessment and calling for FERC to prepare a more comprehensive Environmental Impact Statement.

399.    In 2013, FERC issued a 30-year license that controlled the operation of seven dams on the Coosa River. This license did not prescribe minimum flows at many of the dams or require fish passage structures, and it allowed the dissolved oxygen in the water to drop below levels needed to support many aquatic organisms.

400.    Many of Alabama Rivers Alliance's groups and individuals regularly boat, fish, swim, and recreate on the Coosa River. As a direct result of FERC's decision to issue a license that did not fully comprehend and mitigate the serious impacts of poor water quality on wildlife and recreation opportunities, Alabama Rivers Alliance's members' use and enjoyment of the Coosa River was directly and negatively impacted.

401.    Because FERC's license relied on faulty studies and did not require adequate measures to protect water quality, Alabama Rivers Alliance challenged the issuance of that

license as violating the Endangered Species Act and NEPA. As a result of Alabama Rivers Alliance's challenge, in 2018 the U.S. Court of Appeals for the D.C. Circuit voided the license and decided that an Environmental Impact Statement must be prepared. This was because FERC failed to reasonably consider aspects of the project that could have a significant impact on the environment and would normally compel the preparation of an EIS, including the lack of fish passage and low dissolved oxygen levels.

402.    Alabama Rivers Alliance is concerned that as a consequence of the Final Rule and its application to ongoing projects, FERC will decide that it is only required to study cumulative impacts under the Endangered Species Act, and not in an EIS.  This would result in less opportunity for Alabama Rivers Alliance and its members to review the cumulative impacts and to advocate for solutions that lessen the effects of those impacts.  Unlike NEPA, the ESA analysis does not involve an opportunity for public review and comment.

403.    Alabama Rivers Alliance remains active in the ongoing Coosa River dam relicensing and intends to comment upon the EIS produced by FERC. Alabama Rivers Alliance also intends to continue its involvement in the environmental review process for ongoing and future project proposals that implicate its interests.

404.    Because of Alabama Rivers Alliance's concerns of how restricting the NEPA process would harm their organizational interests, Alabama Rivers Alliance submitted comments on CEQ's Notice of Proposed Rulemaking to update the regulations for implementing NEPA.

405.    Alabama Rivers Alliance believes that the Final Rule would hamper its ability to execute its mission of protecting the health and vitality of Alabama's water resources, thereby harming its interests and the interests of its members.

406. Alabama Rivers Alliance is concerned that the Final Rule will limit the information about the environmental impacts of projects that affect Alabama's waterways. Without this information, Alabama Rivers Alliance is concerned that its interests and the interests of its members will not receive adequate consideration by decisionmakers in the environmental review process.

407. The Final Rule's weakening of the NEPA process will require Alabama Rivers Alliance to expend more organizational resources to discover information about projects that threaten and harm Alabama's waters. Alabama Rivers Alliance will be forced to hire outside experts and to submit requests for information at the local, state, and federal levels to understand project impacts and to educate it members.

408. Under the Final Rule, Alabama Rivers Alliance will also be forced to hire experts to assist in drafting comments to meet the new rule's specificity requirements, which will be a significant financial burden to the organization.

409. Ultimately, Alabama Rivers Alliance relies on the NEPA process to meaningfully engage in the decisionmaking process for projects that impact Alabama's waterways. Alabama Rivers Alliance uses the information gained and the platform provided by the statute to effectively advocate for its interest and the interest of its members in securing clean, healthy, safe, and available water resources for the state. As a result of the Final Rule, Alabama Rivers Alliance and its members will suffer concrete and particularized injuries to interests that are germane to Alabama Rivers Alliance's organizational mission. Especially in light of Alabama Rivers Alliance's continued involvement in the Coosa River Dam and Harris Dam relicensing processes, these injuries are now imminent as a result of the Final Rule's promulgation.

410.    The injury to Alabama Rivers Alliance and its members would be redressed by an order from this Court vacating the Final Rule.

**Defendants**

411.    Defendant Council on Environmental Quality is the federal agency responsible for overseeing the implementation of the National Environmental Policy Act. CEQ was established by NEPA as an agency within the Executive Office of the President, with the duty to "develop . . . national policies to foster and promote the improvement of environmental quality to meet the conservation, social, economic, health, and other requirements and goals of the Nation." 42 U.S.C. § 4344(4). CEQ was first made responsible for promulgating NEPA regulations in 1977 by President Carter's Executive Order 11991, and the agency promulgated the first NEPA regulations in 1978 following a highly responsive and transparent process. Now, CEQ has rewritten these regulations, promulgating the Final Rule that plaintiffs challenge in this action.

412.    Defendant Mary Neumayr, Chairman of CEQ, is the highest-ranking official in CEQ. Chairman Neumayr signed the Final Rule on July 9, 2020.  Plaintiffs sue Chairman Neumayr in her official capacity.

**BACKGROUND**

**History of NEPA and CEQ's Implementing Regulations**

413.    In the 1950s and 1960s, the public became increasingly concerned about the health of the nation's environment.  Congress responded by creating "action-forcing procedures" that "directs all agencies to assure consideration of the environmental impact of their actions in decision-making." 115 Cong. Rec. 40,416 (1969).

414.    Congress passed NEPA with the explicit purpose of "promot[ing] efforts which will prevent or eliminate damage to the environment and biosphere and stimulate the health and

welfare of man. . . ." 42 U.S.C. § 4321.  At the time of its passage, NEPA was hailed as "the most important and far reaching environmental and conservation measure enacted by the Congress." 115 Cong. Rec. 17,451 (1969).  Then, as now, NEPA represents a commitment by the federal government that it "will not intentionally initiate actions which will do irreparable damage to the air, land, and water which support life on earth."  *Id.*

415.    NEPA effectuates this action-forcing purpose and commitment through procedural requirements that ensure fully informed federal decisions and provide transparency to the public regarding the federal decisionmaking process.  *See* 42 U.S.C. § 4332.  It is an information-based approach.  Thus, any action seeking to curtail these procedural requirements or reduce the information they provide guts NEPA's purpose and requires heightened judicial attention.

416.    In 1978, CEQ promulgated regulations that implemented NEPA's provisions and were binding on other agencies. Final Regulations, Implementation of Procedural Provisions, 43 Fed. Reg. 55,978, 55,978 (Nov. 29, 1978).  This was done in response to the "inconsistent agency practices and interpretations of the law" that had sprung up with the "lack of a uniform, government-wide approach to implementing NEPA."  *Id.*  There was a "broad consensus" and great "degree of unanimity" that the NEPA process needed reform.  *Id.* at 55,980.  CEQ was tasked with the development of regulations to make the NEPA process "more useful to decisionmakers and the public" and to require that impact statements be "supported by evidence that agencies have made the necessary environmental analyses."  Executive Order 11991 (May 24, 1977).

417.    Even with this "broad consensus," CEQ still recognized the importance of stakeholder involvement and the democratic necessity of public awareness.  CEQ sought the

views of nearly 12,000 stakeholders and invited testimony from a broad range of interested parties, "affirmatively involving NEPA's critics as well as its friends." *Id.* CEQ's engagement with stakeholders was more than just protection from litigation but a true public process. Indeed, CEQ "changed 74 of the 92 sections, making a total of 340 amendments" as a result of the comments received after the proposed rule. *Id.* at 55,990.

418.    Prior to the rulemaking at issue in this case, CEQ had only made one narrow amendment to the 1978 regulations to eliminate the requirement for a worst case scenario analysis. National Environmental Policy Act Regulations; Incomplete or Unavailable Information, 51 Fed. Reg. 15,618, 15,619 (April 25, 1986). As with the initial NEPA regulations, CEQ's minor amendment addressing "incomplete or unavailable information" in the EIS process was heavily influenced by public engagement. *Id.* The need for the amendment was first identified by private parties and government agencies. *Id.* Related draft guidance was withdrawn "[d]ue to suggestions received during the public comment period." Withdrawal of Proposed Guidance Memorandum, 49 Fed. Reg. 4803, 4803 (Feb. 8, 1984). In the rulemaking process for this single amendment, CEQ held two public meetings and made specific changes to the new section in response to the comments it received. National Environmental Policy Act Regulations; Incomplete or Unavailable Information, 51 Fed. Reg. at 15,620–25.

419.    CEQ's open, accessible, and responsive process created long-lasting stability. In making the single narrow change in 1986, CEQ noted that there was "no broad support for [further] amendment to the regulations." *Id.* at 15,619. Indeed, it was recommended that the regulations "receive full support" from the federal government, and CEQ further noted that "the regulations appear to be generally working well." *Id.*

420.     As CEQ describes in its preamble to this Final Rule, CEQ produced reports on NEPA's implementation in 1997 and 2003.

421.     In its 1997 Effectiveness Study, CEQ declared that "NEPA is a success" (at iii) and advocated for starting NEPA earlier in the review process (at ix), giving greater consideration to "the full range of cumulative impacts" via a place-based approach (at x), and working to facilitate greater public involvement (at x).[4]  CEQ also noted that "[p]erhaps the most significant environmental impacts result from the combination of existing stresses on the environment with the individually minor, but cumulatively major, effects of multiple actions over time," and that "when agencies forgo the alternatives analysis — making decisions first and then beginning the NEPA process — they rob NEPA of its strategic planning value."[5]

422.     In the 2003 report, a NEPA task force convened by CEQ examined the "nuts and bolts" of NEPA implementation and recommended that CEQ "[l]ead a review by the agencies of their quality control and assurance standards for NEPA analyses and documentation *to ensure conformance with CEQ regulatory requirements*".[6]

423.     The task force also recommended that CEQ provide guidance to agencies to ensure their alternatives analysis "conform[s] to the CEQ regulations requiring the *rigorous and objective evaluation of all reasonable alternatives*."[7] The task force also noted that "[i]nvolving the public and other stakeholders in the NEPA analyses and the development of NEPA documents increases the value of citizens' experience and produces better results."[8]

---

[4] CEQ, The National Environmental Policy Act: A Study of Its Effectiveness after Twenty-five Years (Jan. 1997) *available* at https://ceq.doe.gov/docs/ceq-publications/nepa25fn.pdf.  [hereinafter Effectiveness Study].
[5] *Id.* at 11, 29.
[6] NEPA Task Force: Modernizing NEPA Implementation viii, 2 (Sept. 2003) (emphasis added).
[7] *Id.* at xvii (emphasis added).
[8] *Id.* at xvii.

424.    Neither of these reports proposed changes to CEQ's regulations.  Instead, they made recommendations for better implementing the existing requirements.

425.    CEQ's regulations implementing NEPA were therefore stable for 40 years. Federal and state agencies, private actors, public interest advocacy groups, and courts came to develop heavy reliance interests on these widely-accepted provisions.

426.    Large bodies of caselaw were built around CEQ's regulations, and the analysis frequently treated the existing regulatory requirements and the statutory requirements as intertwined. *See, e.g.*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 351 (1989) ("The requirement that an EIS contain a detailed discussion of possible mitigation measures flows both from the language of the Act and, more expressly, from CEQ's implementing regulations."); *Sierra Club v. Marsh*, 976 F.2d 763, 768 (1st Cir. 1992) (discussing CEQ regulations, but citing *Kleppe v. Sierra Club*, 427 U.S. 390 (1976), which predated the relevant regulations); *Hall v. Norton*, 266 F.3d 969, 978 (9th Cir. 2001) ("NEPA requires that an agency consider cumulative impacts of an action and of foreseeable related actions. *See* 40 C.F.R. §§ 1508.7, 1508.27(b)(7).").

427.    As observed by long-serving General Counsel of CEQ, Dinah Bear,[9] NEPA caselaw has remained predictable since the 1970s, and "[f]ew new points of NEPA law have come out of recent NEPA cases."[10] Ms. Bear also noted that as a result of this legal stability, the number of NEPA lawsuits had "dropped considerably," and continues to do so.[11]

---

[9] Ms. Bear served as General Counsel from 1983–1993 and from 1995–2007. She served in this role during the administrations of Presidents Ronald Reagan, George H.W. Bush, William J. Clinton, and George W. Bush.
[10] Dinah Bear, *The National Environmental Policy Act: Its Origins and Evolutions*, 10 NATURAL RES. & ENVT. 3, 71 (Fall 1995)
[11] *Id.*

428.    The regulations governing NEPA thus stood largely unchanged for over 40 years. A body of case law developed around the country, and practices became increasingly solidified and consistent across different agencies.

429.    Other federal agencies have developed their own NEPA regulations but they must be consistent with the CEQ regulations.  Courts have held that the CEQ regulations are the ultimate and definitive interpretation.

430.    The Fourth Circuit has developed a robust body of case law interpreting CEQ's NEPA regulations and clarifying the statutory obligation for agencies to take "a hard look" at a project's environmental impacts. *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996). Since "[w]hat constitutes a 'hard look' cannot be outlined with rule-like precision," litigation was naturally required to create predictable standards. *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 197 (4th Cir. 2005). Over time, this body of case law has created a reliable and consistent framework to resolve common NEPA concerns, including: cumulative impact requirements, *see id.* at 196–98, whether a project's impacts are significant, *see Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 62-65 (4th Cir. 1991), illegal project segmentation, *see Defenders of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 396–98 (4th Cir. 2014), supplemental EIS preparation, *see Hughes River Watershed Conservancy*, 81 F.3d at 443, and the consideration of alternatives, *see Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 427 (4th Cir. 2012).

## Procedural History of the Rulemaking

**Advanced Notice of Proposed Rulemaking**

431.    Despite the statute's importance and acceptance as a key safeguard for "good government" decisionmaking, when the Trump Administration came into office it began to call

120

for major cuts to the budgets of agencies that oversee and implement NEPA.  The Administration

has taken no steps to increase funding for NEPA oversight and implementation but has

implemented multiple steps to dismantle the statute, including, most significantly, the Final Rule.

432.    On June 20, 2018, CEQ issued an Advance Notice of Proposed Rulemaking,

signaling its intent to *completely rewrite* the NEPA regulations. Advance Notice of Proposed

Rulemaking: Update to the Regulations for Implementing the Procedural Provisions of the

National Environmental Policy Act, 83 Fed. Reg. 28,591, (June 20, 2018) ("ANPRM").

433.    The ANPRM solicited comment on 20 questions, many of which were framed so

broadly that they could have encompassed nearly any possible change and were therefore too

broad for meaningful public engagement. *E.g., id.* at 28,592 ("17. Are there additional ways

CEQ's NEPA regulations should be revised to improve the efficiency and effectiveness of the

implementation of NEPA, and if so, how?").  Other questions were framed in such a way as to

indicate that CEQ had much more specific intentions to change the regulations, but which it was

not then willing to reveal. *E.g., id.* at 28,591 ("1. Should CEQ's NEPA regulations be revised to

ensure that environmental reviews and authorization decisions involving multiple agencies are

conducted in a manner that is concurrent, synchronized, timely, and efficient, and if so, how?").

As justification for this regulatory overhaul, CEQ did not cite changed circumstances, new

research, or new facts, nor did it rely on engagement with the public. Instead, the sole

justification was Executive Order 13807, described below. *Id.*

434.    CEQ initially gave the public a mere 30 days to answer the vague questions

presented in the ANPRM. *Id.* After a vocal and widespread public request for a longer comment

period, CEQ acquiesced to a 31-day extension. Extension of Comment Period: Update to the

Regulations for Implementing the Procedural Provisions of the National Environmental Policy

Act, 83 Fed. Reg. 32,071(July 11, 2018). Despite the brief window available for public

comment, CEQ still received over 12,500 comments in response to the ANPRM—the majority

of which supported leaving the existing regulations largely intact. Notice of Proposed

Rulemaking: Update to the Regulations for Implementing the Procedural Provisions of the

National Environmental Policy Act, 85 Fed. Reg. 1,684, 1,691 (Jan. 10, 2020) ("NPRM").

435.    The Conservation Groups and their counsel submitted substantial comments in

response to this ANPRM.  These comments addressed a range of concerns and engaged with

CEQ's questions (to the extent feasible, given the faulty premises and broad nature of the

questions and the inadequate window for public response).  First and foremost, the comments

noted the efficacy—but ultimate underutilization—of the existing framework and emphasized

the unnecessary harms that would result from a complete rewrite of the NEPA regulations. The

comments noted that CEQ already had the necessary mechanisms to bring about its desired

outcomes without changing the regulations—namely by following through on the agency's own

recommendations such as strengthening cumulative impacts analysis and involving the public

earlier in the process.  In light of the viable and more effective alternative of refocusing CEQ

oversight on the existing NEPA process, Plaintiffs and their counsel insisted that CEQ provide

data and analysis to justify any changes to the regulations.

436.    On July 19, 2018 counsel for the Conservation Groups, Southern Environmental

Law Center, submitted a request for information about the ANPRM, which it clarified and

expanded on September 5, 2018.  After CEQ failed to fulfill the request, the Southern

Environmental Law Center filed suit.  *S. Envtl. Law Ctr. v. Council on Envtl. Quality*, No.

3:18CV00113, 2019 WL 4417486 (W.D. Va. Sept. 16, 2019).

**Notice of Proposed Rulemaking**

437.    On January 10, 2020, CEQ issued a Notice of Proposed Rulemaking for the new NEPA regulations. 85 Fed. Reg. at 1,684.  In the NPRM, CEQ unveiled its proposal to rewrite the long-standing NEPA regulations.  *Id.* at 1,712–30.

438.    Because CEQ had still failed to provide documents related to the ANPRM at this juncture, the Southern Environmental Law Center filed a motion for preliminary injunction asking that either all records be produced before the close of the comment period or for an extension of the comment period.  The Court denied this request but ordered CEQ to produce all documents by May 5, 2020.  When CEQ produced the documents, more than half of them were entirely black pages, having been completely redacted.  The Southern Environmental Law Center subsequently filed a motion for summary judgment asking that the Court order CEQ to produce a detailed Vaughn index outlining the reasons for withholding and redacting documents and disclose all public documents improperly withheld or redacted by the Agency.

439.    CEQ asked for an extension of 45 days to respond to the motion and create the Vaughn index, which is now due on Aug. 24, 2010

440.    In the preamble to the draft regulations, CEQ failed to meaningfully address the comments that it received in response to the ANPRM. While CEQ repeatedly referenced comments that supported the agency's deregulatory agenda, the agency did not justify its proposal in light of the substantive comments submitted in opposition to a regulatory overhaul, such as those submitted by the Conservation Groups and their counsel. For example, CEQ did not respond to commenters' contention that drastic regulatory changes would cause delay and increase costs by unsettling decades worth of law and practice.  Instead, the agency selectively

responded to the comments that supported its position and failed to address the serious concerns raised.

441.    CEQ later admitted that it did not respond to comments on the ANPRM stating that it was "under no obligation to do so."[12]

442.    As with the ANPRM, the NPRM provided for inadequate public involvement in the next steps of the rulemaking process.  CEQ granted the public just 60 days to comment on the radically re-written draft regulations.  NPRM, 85 Fed. Reg. at 1,684. CEQ failed to respond to comments from the public interest community seeking an extension.  The day after the NPRM was published, 169 members of Congress asked for additional time to comment.  CEQ waited until less than a week before the close of the comment period—almost two months later—to deny this request.

443.    CEQ also provided for just two public hearings regarding the NPRM, one in Denver, Colorado, and one in Washington, DC—the same number of hearings as when the agency made a comparatively inconsequential amendment to just one provision of the existing regulations in 1986. *See* NPRM, 85 Fed. Reg. at 1684.  These public hearings required attendees to register in advance.  *Id.*  The interest in these hearings was so strong that the online registration filled within 15 minutes of opening, and speakers were given just 3 minutes to voice their concerns.  Counsel for the Conservation Groups gave testimony at the meetings, as did members of Plaintiffs Defenders of Wildlife, which has offices in Denver and Washington, DC and the National Trust for Historic Preservation, which has an office in Washington, DC.

---

[12] CEQ Responses to Comments on the NPRM at 27, *available at*  https://www.whitehouse.gov/wp-content/uploads/2020/01/CEQ-NEPA-Regulations-Final-Rule_Response-to-Comments_Final.pdf (last visited July 28, 2020).

444.    Other Conservation Groups are all based in the Southeast and with limited budgets for travel were unable to deliver testimony in person.  The groups requested that a hearing be held in the Southeast to afford them an opportunity to comment, but CEQ did not respond to this request.

**Public Comments**

445.    Once again, the public responded with an overwhelming show of interest and concern, despite CEQ's limited allowances for public participation.  In the two-month comment window, CEQ received more than 1.1 million responses from the public.  In addition to the request from 169 members of Congress for additional time to comment, 14 U.S. senators sent a letter to CEQ commenting on the substance of the NPRM.  These senators raised concerns that the proposal would severely undercut NEPA's bipartisan aims—ultimately harming the environment, human health, and the economy.  The senators also voiced the common sentiment that undertaking this regulatory overhaul would be counterproductive as it would unsettle and ignore 40 years of case law.

446.    In general, of the 1.1 million comments submitted, far more were in opposition to the Proposed Rule than supportive of it. [13]

447.    Among the public commenters on the NPRM were the Conservation Groups and their counsel who submitted two extensively detailed letters with numerous attachments. One comment letter was written by counsel for the Conservation Groups on behalf of almost 100 environmental organizations; another letter was written on behalf of 328 environmental groups

---

[13] All comments can be found at: Update to the Regulations Implementing the Procedural Provision of the National Environmental Policy Act: Comments, Dkt. No. CEQ-2019-0003, https://www.regulations.gov/docketBrowser?rpp=25&po=0&dct=PS&D=CEQ-2019-0003&refD=CEQ-2019-0003-0001 (last visited July 27, 2020).

from across the country.  Members of the Conservation Groups and their counsel signed both letters, which extensively detailed the flaws of the proposed rule, provided examples of where NEPA has been working well, discussed the ways that NEPA is currently relied upon, and proposed alternative, less extreme pathways to modernization.  Other Plaintiff groups including Defenders of Wildlife and the National Trust for Historic Preservation also submitted their own comments.

448.    These comment letters all began by emphasizing the specific importance of NEPA implementation and the unique harms that would accompany the proposed rewrite of the NEPA regulations.  The comments pointed out the many flaws with the proposed rulemaking—both procedural and substantive.  Regarding the procedural flaws, the comments specifically drew attention to the lack of public participation, especially when compared to the original consensus-building approach used by CEQ in promulgating the initial regulations. Specifically of concern were the vague questions presented by the ANPRM, the inadequate length of the comment periods, failure to respond in a timely manner to public requests for an extension of the NPRM public comment period, and ineffectual public hearings.

449.    Counsel for the Conservation Groups, the Southern Environmental Law Center, also noted that it had been made more difficult for them to comment on the proposed rule because they had not yet been provided with documents they had requested from CEQ about the rulemaking through FOIA.

450.    Further, the comments made substantive critiques, pointing to the lack of legitimate justification for the proposed rules.  As the comments explained, the proffered reasoning for the regulations—minimizing delays and improving efficiency—did not support the proposed rules: which look set to create chaos and more project delay, not less.

451.     The comments pointed to specific reports from the Congressional Research Service, which concluded that NEPA is not a primary or major cause of project delay.  Further, the comments provided extensive details on specific projects, establishing that the NEPA process worked well in those cases and any delays were not due to NEPA.  The comments explained that efficiency and timeliness would actually be hindered by the proposed rules, due in large part to the uncertainty that would inevitably follow from unsettling such a long-established legal framework.

452.     The comments further provided examples and evidence showing that the existing NEPA regulations have led to measurable environmental, economic and societal improvements, where the information produced or informed public comments received during the NEPA process have persuaded the decisionmaker to modify or abandon harmful proposals, or pick better, more resilient alternatives.

453.     Concerned about the effects that a wholesale repeal and replacement would have on the stability and efficiency of the NEPA process, the comments suggested a series of less drastic, yet more effective, alternatives. Specifically, commenters suggested that CEQ should review and effectively implement the wealth of guidance documents it had issued in the preceding decades. These existing guidance documents directly address all the concerns motivating CEQ's rulemaking. Thus, instead of promulgating entirely new regulations, commenters urged CEQ to utilize its oversight of the NEPA process by taking advantage of the existing framework.

454.     Similarly, commenters suggested that CEQ provide more updated guidance to agencies, again pointing out that updating the guidance while leaving the regulations in place would result in a more efficient and effective system.

455.    Indeed, either of these options—increasing oversight and funding to implement the existing framework and/or issuing new guidance documents—would have been entirely consistent with CEQ's justification for the rulemaking, Executive Order 13807.  All that Executive Order 13807 called for was "an initial list of actions" to "enhance and modernize" environmental review, including "issuing such regulations, *guidance*, and *directives* as CEQ may deem necessary. . . ." 82 Fed. Reg. 40,467 (Aug. 24, 2017) (emphasis added).  Thus, the Executive Order does not sufficiently justify CEQ's dismissal of non-regulatory options, and it left ample room for CEQ to adopt the more efficient and effective alternatives suggested in the comments.  Similarly, recommending that funding for NEPA staff be increased would have been consistent with CEQ's responsibility to make policy recommendations to the President. 42 U.S.C. § 4344.  CEQ, however, failed to address these suggested alternatives in any form.

456.    The comments also critiqued specific sections of the proposed rules, noting both their illegality and negative practical effects.  The comments specified how the proposed rules were inconsistent with both the plain language and intent of the underlying statute. The comments noted that the proposal attempted to limit or eliminate judicial review under the APA's judicial review provisions by advancing interpretations of those provisions—a statute that CEQ lacks authority to interpret in a manner that would bind other federal agencies or the federal judiciary.

457.    The comments noted where certain segments of the rule were vague, unclear and inconsistent.  For example, the commenters noted that for the past several decades, it has been important to analyze indirect and cumulative effects together for projects such as highways in an "Indirect and Cumulative Effects" or "ICE" analysis.  Such analysis allows highway departments and affected communities to see not just the direct impact of placing pavement on the ground,

but the larger issue of induced travel, induced traffic, and induced land use that result from additional highway capacity in a larger system.  The commenters noted that the more direct effects of a highway cannot be meaningfully considered in isolation—to have any meaning at all, they must be considered in combination with additional transportation infrastructure investments and expected land use changes.  The same is true for pipeline construction.

458.    Commenters cited myriad other instances where the consideration of indirect and cumulative effects is essential to getting a thorough look at the full impact of a proposed project: such as the effects of multiple logging projects in a forest, multiple water pollutions sources degrading streams, acres of impervious surfaces contributing to flooding, the destruction of habitat and wildlife corridors on federal lands and more. For example, Defenders of Wildlife submitted detailed comments on the detrimental effects to ESA-listed species from eliminating the necessity to consider direct, indirect, and cumulative effects, in light of the fact that many if not most imperiled species face the "death by a thousand cuts" of individually small but cumulatively significant population losses and habitat destruction and fragmentation. To prevent extinctions and recover imperiled species, these impacts must be fully accounted for, prevented wherever possible, and mitigated where impossible to avoid.

459.    In addition, the comments noted the significant harm that would be caused by ignoring the impact that federal decisionmaking has on climate change. The record is replete with evidence of such costs and burdens. Climate change poses a severe threat to our national security, and climate events have already cost the U.S. hundreds of billions of dollars in recent years.  Climate-related flooding, drought, desertification, wildfires, and extreme weather events all have a tremendous impact on the human environment.  Coastal communities across the nation are facing major challenges due to sea level rise.  All of this has a disproportionately severe

effect on marginalized communities who lack the resources to adequately prepare for and adapt to these harsher environmental conditions.  Commenters noted that the proposal to eliminate consideration of effects that are remote in time or geography likely means that agencies will feel they no longer need to consider climate change.  Commenters noted that this does the opposite of modernizing NEPA—it takes NEPA backwards.

460.    Commenters highlighted how the proposed regulations would do significant harm to the vulnerable communities who rely on NEPA to ensure government considers their disproportionate environmental burden and have an outsized effect on low-income communities and communities of color.  For example, heightened requirements for public comments would have especially disadvantageous effects on marginalized groups.  These communities often lack the resources to develop the type of technical hyper-specific comments required by the new regulations.  By elevating these specific, technical concerns, commenters noted, CEQ diminished the invaluable lived experience, common sense, and intimate local knowledge of the environmental impacts a project would have on a community so often provided by the community members themselves.  The proposed barriers set in place to limit judicial review would also hamper such groups' ability to participate in ensuring that NEPA is properly implemented.

461.    In addition, the proposal to replace all guidance documents would particularly harm vulnerable communities, which rely on existing CEQ guidance documents directly related to environmental justice to ensure that their concerns are considered in NEPA reviews. These guidance documents require federal agencies to engage in extensive outreach in marginalized communities, enhancing public participation and ensuring community involvement in the decisionmaking process.

462.    Commenters noted that CEQ's proposal to eliminate of Federal Loan guarantees as a trigger for NEPA review of CAFOs would also greatly harm low-income communities and communities of color.  These communities disproportionately border such facilities and are subjected to severe environmental degradation and health impacts as a result.  As NEPA is usually the only source of environmental review applicable to these facilities, bordering communities relied on its availability to make their voices heard.  By removing the possibility of NEPA review, CEQ removes the only consistent environmental review process that these facilities are subject to.

463.    Commenters discussed at length how changes to the alternatives analysis would result in less informed, less thoughtful decisionmaking.  The commenters provided examples of where a robust review and disclosure of different alternative options had allowed the public to advocate at different levels of government for alternatives that were less environmentally harmful.  Such alternatives were generally also less expensive and thus saved significant taxpayer money.

464.    Commenters raised concerns about provisions in the proposed rule that would essentially "put the fox in charge of the henhouse."  By allowing the project applicant to define the purpose and need of a project, limit the scope of alternatives to be studied, and draft EAs and EISs, NEPA will become nothing more than a self-fulfilling prophecy to complete whatever the project applicant wants to do.  Commenters noted that the changes would eliminate the important task long set out in NEPA, which requires agencies to think carefully about the true underlying purpose of a project, and how that purpose might be achieved in creative different ways.

465.    The Conservation Groups also specifically refuted some of the stated rationales for the proposed rulemaking.  When the rulemaking was announced, President Trump cited

North Carolina's Marc Basnight Bridge replacement as an example of a delayed project that would benefit from the rule change.  The Conservation Groups pointed out that, in fact, the Marc Basnight Bridge replacement was delayed because of lack of funding and political disputes.  The NEPA process actually worked to achieve consensus around the project, and ensured that a solution was chosen that could be legally permitted by other agencies and achieve the consensus needs of local communities and advocates.

466.    Public comments also came in from a wide variety of other groups. Hundreds of thousands of comments were received from groups and members of the public who rely on NEPA to ensure sound government decisionmaking and were opposed to the proposed changes.

467.    A group of State legislators from across the country, including both Republicans and Democrats from the Southeast, noted that the Proposed Rule would make it "difficult for states to participate effectively in NEPA processes, as it could take multiple years of data collection to understand long term impacts."  The legislators noted that, based on their experience, "the overwhelming barrier to project completion is not NEPA but adequate funding and technical support from the federal government."  The legislators suggested that "CEQ should focus its efforts on better enforcement of existing regulations and improving training for agency staff and NEPA practitioners who are unaware of available tools and expediting procedures in existing NEPA regulations."  They noted that "[w]eakening the regulations is likely to make . . . cooperation and coordination [between the Federal and State governments] less effective and less meaningful and increase the potential for conflict between state and federal agencies."

468.    By contrast, the most supportive comments came from the resource extraction industry.  The American Gas Association noted that it was "pleased many of suggestions offered in [its] comments on the ANPRM were incorporated, at least in part, into the Proposed Rule."

469.    But while the extraction industry and a few others that don't stand to benefit from any type of government regulation offered support for the Proposed Rule, the vast majority of other commenters were much less enthusiastic.  Even groups that generally supported expediting project delivery noted concerns about the proposal and explained how many aspects would do more harm than good.  These groups noted that the Proposed Rule would, in many ways, add to project delays by creating more paperwork, injecting confusion in a longstanding legal framework, and inviting litigation.  There was also broad consensus that the elimination of the study of cumulative effects and less direct effects would lead to poor government decisionmaking.

470.    For example, the American Association of State Highway and Transportation Officials ("AASHTO"), noted that while it supports the goal of faster project, it could not support many aspects of the Proposed Rule.  For example, AASHTO noted that requiring special approval to exceed page and time limits would just add an "unnecessary administrative burden and will cause project delay." AASHTO also noted that the Rule should allow discretion for substantive comments to be submitted after the formal public comment period because "late" information may be relevant or helpful to agency decision-making" and because "State DOTs maintain  important, ongoing relationships with diverse stakeholders, including local, Tribal, State, and Federal agencies, non-governmental institutions, and others."

471.    AASHTO likewise urged that "early acquisition in land and early action utility relocations should include appropriate limitations to ensure the integrity of the NEPA process." For example, AASHTO stressed that limitations should include allowing early actions to occur "only after a preferred alternative has been identified and prohibiting an early action to be

considered as a factor in approving an alternative," and that this would streamline project delivery.

472.     In addition, AASHTO reminded CEQ that other factors besides NEPA contribute to project delays including "lack of consistent funding, public controversy, and other approvals." Similarly, AASHTO noted that "regulatory agencies are commonly challenged by limited resources to the extent the state DOT's sometimes fund positions at these agencies to assist in getting a timely response."

473.     The American Society of Civil Engineers ("ASCE") also voiced concerns about the Proposed Rule, despite the group's overall desire to advance faster project delivery.  For example, ASCE noted that the time limits and deadlines proposed "are arbitrary and can weaken an EIS or EA." To illustrate this point, ACSE noted that the collection of certain biological data can only be completed at specific times of year, which may be made impossible with tight deadlines. ASCE stressed that despite wanting faster project delivery, it does not believe that analysis of climate change should be removed from the NEPA process.  ASCE stressed that other environmental tools, like the environmental rating tool Envision, could be used to help assist with the NEPA process and the stated goals of the rulemaking.

474.     The Permitting and Infrastructure Coalition, which also generally prefers faster project delivery, noted that for certain projects "a greenhouse gas (GHG) analysis will remain a consideration that is appropriate to include to ensure well-informed decision-making and to allow agencies and stakeholders to appropriately consider reasonable alternatives."  The group also warned that "simply eliminating consideration of climate impacts will lead to prolonged litigation, as well as financing and investor uncertainty—all of which leads to further project

delays and costs," and urged CEQ instead to "undertake a regulatory process to clearly define how GHG emissions can be reasonably considered in the NEPA process."

475.    The American Waterworks Association, which also generally supports faster project delivery, nonetheless raised concerns about the proposal to eliminate consideration of cumulative effects.  The group noted a number of examples where the removal of this analysis would be problematic—such as where multiple federal actions were planned in a watershed that serves as drinking water supply.  The group also noted that "infrastructure is potentially vulnerable to extreme events, climate change, and other environmental considerations that the NEPA process can help identify.  Looking at too narrow of a view (non-cumulative or short duration only) would miss . . . opportunities for improvement of the project during the design and deployment phases when it is most cost effective to make changes and leads to the least delay in project execution."

476.    The Capital Trail Vehicle Association, which was otherwise largely supportive of the Proposed Rule, also criticized the elimination of the study of cumulative effects – noting that instead of eliminating consideration of cumulative effects there should be *more* consideration given to the cumulative impact of closing areas to motorized recreation.

477.    The National Ski Areas Association stated that it did "not agree with eliminating cumulative effects analysis all together." In particular, the Association noted its support for "an analysis of climate change impacts where the project at issue results in increased carbon emissions."

478.    The American Sustainable Business Council noted that eliminating climate change risks from consideration "sets our economy and our businesses up for failure." Specifically, the Business Council noted that the National Climate Assessment forecasts that

climate-related risks will cost the U.S. economy $500 billion a year and that NEPA is needed to ensure we don't "heedlessly" make things worse.

479.    The Business Council also noted that weakening review and limiting public input, including input from businesses, will undermine accountability and encourage irresponsible development.  The group stressed that NEPA is needed to "ensure businesses and consumers are informed and have a say in projects that impact their communities and their livelihoods." Echoing other commenters, the Business Council noted that, by creating "controversy, uncertainty and delay," the Proposed Rule would make it hard for businesses to plan and will increase compliance costs.  The group noted that the complete rewrite of NEPA "will impede new projects for years as stakeholders are forced to navigate a new and uncertain terrain. NEPA efficiency is not improved by a complete upending of the NEPA process."  Further, the Business Council explained that the Proposed Rule "not only increase[s] risks but . . . fail[s] to address the key drivers of project delay including the capacity crisis within the government for conducting NEPA."  The Business Council suggested that, "[r]ather than undermining economic and environmental protections, the administration should tackle the lack of agency personnel, training, and other resources needed for effective and efficient NEPA review."

480.    The American Wind Energy Association ("AWEA") noted an interest in a more streamlined NEPA process, but noted its belief that "robust climate considerations in NEPA analyses are important." AWEA referred to CEQ's own recognition that "climate change is a fundamental environmental issue, and its effects fall squarely within NEPA's purview."  AWEA also noted a number of ambiguities in the Proposed Rule, which it stressed might actually result in project delays.

481.    The Solar Energy Industries Association ("SEIA") also expressed concerns about the elimination of climate change effects from NEPA review.  SEIA noted that the changes to effects required for environmental review as written in the Proposed Rule are inconsistent with the NEPA statute.  SEIA warned that the changes would create a litigation risk, which could delay important solar power projects.  As an alternative to the revision SEIA suggested that CEQ promulgate additional guidance, stating: "The problem is not the concept of cumulative impacts itself; the NEPA statute requires consideration of such impacts. The problem is the lack of definition in the CEQ NEPA regulations as to what constitutes a reasonably foreseeable impact."

482.    Like other industry commenters, SEIA noted concerns about increased delays caused by the Proposed Rule.  Noting that delay is one of the principal concerns for solar development, SEIA stressed that "[d]elays caused by insufficient federal staff and resources are likely to increase with the proposed revisions to the NEPA regulations . . . ."

483.    The Campaign for Family Farms and the Environment noted concern about the change that would mean Farm Service Agency ("FSA") and Small Business Administration ("SBA") loan guarantees would no longer be considered "major federal actions" and thus exempt from NEPA review.  The Campaign noted that these types of loans are frequently used to finance CAFOs which have "environmental and economic consequences for the community where that CAFO is located, as well as other farmers who must bear the economic consequences of increased production by new and expanding CAFOs."

484.    Family Farm Alliance noted its belief that, "in some circumstances, analysis and consideration of cumulative effects are necessary to make an informed decision" and that in some cases the Proposed Rule "could have a negative effect on water users."  For example, "a

project that would affect streamflow, and when added to existing uses, results in significantly reduced water availability to existing / downstream users."

**Final Rule**

485.    Despite the mountain of detailed comments and concerns offered by a wide range of groups, CEQ rushed ahead and finalized the Rule less than four months after the close of the comment period on July 15, 2020.

486.    President Trump announced the Final Rule in Atlanta which he announced as a "dramatic" "top-to-bottom overhaul."  The President stated that he was "reclaiming America's proud heritage as a nation of builders and a nation that can get things done" and getting rid of "horrible roadblocks."  Without any factual support, the President announced that the changes would cut the federal permitting timeline from "twenty years" to "two," with an ultimate aim of "one year."

487.    The Final Rule included very few changes from the proposed rule, and it was clear from both the Rule, CEQ's Regulatory Impact Analysis and CEQ's response to comments, that CEQ had failed to address, or even thoughtfully consider, the concerns raised.

488.    For example, CEQ brushed aside all concerns noting that the changes will have negative environmental effects by noting that the rule does not include changes to "substantive environmental laws, such as the Clean Air Act, Clean Water Act, or ESA" thus asserting that NEPA has no role in setting up processes and procedures that will lead government to less environmentally harmful decisions.

489.    CEQ's most frequent response to comments raising concerns about rollbacks to the scope of NEPA review was to note that NEPA is subject to a "rule of reason" and cite *Pub. Citizen, Inc. v. F.A.A.*, 988 F.2d 186 (D.C. Cir. 1993).  This response misstates what was meant

by "rule of reason" in *Public Citizen*.  Moreover, it fails to address and respond to the highlighted substantive concerns.

490.    In response to concerns that more limited NEPA application will result in less opportunity for public comment, as well as concerns that the rule will make commenting more onerous, CEQ simply stated without justification that "[t]he Final Rule substantially expands opportunities for public participation."

491.    In response to many detailed objections that the Rule will cause confusion, chaos, more litigation, and likely project delays, CEQ made only the conclusory assertion that the "Final Rule will modernize the CEQ regulations to facilitate more efficient, effective, and timely NEPA reviews by simplifying and clarifying regulatory requirements."  CEQ took no steps to address the detailed comments showing that, in fact, the reverse is true.

492.    Moreover, CEQ failed entirely to respond to comments noting, with reference to extensive studies, that NEPA is not the primary cause of project delay.  Rather than addressing the comments and considering the true causes of project delay, CEQ simply noted that some NEPA review takes a long time, and explains that the Final Rule requires adherence to a schedule.  CEQ did not address how the mere imposition of a schedule will allow agencies conducting NEPA reviews to work faster with the same level of resources.

493.    On this topic more specifically, CEQ fails to respond to comments from the Conservation Groups that urged the agency to look at North Carolina's "Merger process," which combines agency reviews in a way that is similar to the Final Rule.  In North Carolina the process has not led to faster reviews.

494.    CEQ failed to respond substantively to concerns raised about limiting what will be considered a "major federal action" for purposes of NEPA.  CEQ made no attempt

whatsoever to consider the environmental harms associated with the elimination of detailed

review for projects that will no longer qualify.

495.    CEQ provided no response to detailed concerns about changes to the longstanding

context and intensity factors that were established to assist agencies in determining when an EIS

is required; instead CEQ just made the conclusory statement that the revision provides "greater

clarity."  CEQ irrelevantly invoked *Chevron U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S.

837, 842-43 (1984) and stated that changes will "inherently build in a consideration of the impact

of current trends" without explaining what those trends are.  None of these explanations address

the implications of the changes to environmental resources, or to the confusion they are likely to

create.

496.    CEQ completely dodged all comments relating to changes that appear aimed at

eliminating consideration of climate change.  The impact of these changes on the people and the

environment of the United States is completely disregarded.

497.    CEQ brushed away comments about the concerns regarding the expansion of

CEs—categories of projects that require minimal NEPA analysis provide no opportunity for

public notice and comment—by irrelevantly noting that the public can provide comment on the

establishment of CE *categories* when promulgated.  This response fails to address the lack of

opportunity to comment on the application of individual CEs in specific circumstances.

498.    CEQ failed to respond to numerous concerns that the addition of page limits and

time limits with an extra layer of bureaucracy added will lead to additional delays and poor

analysis.  CEQ only noted, without explanation or support, that the changes will reduce delays.

499.    CEQ completely ignored concerns about allowing private project sponsors to

define the purpose and need of the project, as well as underlying objectives and the range of

alternatives.  CEQ failed to grapple with any of the conflicts of interest or improper narrowing of the NEPA process that may result.  CEQ's response includes circular reasoning that fails to account for the close connection between the "statement of purpose and need" and the "range of reasonable alternatives" and the changes that have been made to both provisions that serve to significantly limit what needs to be considered.

500.    CEQ failed to meaningfully consider concerns about its removal of the clear requirement to consider indirect and cumulative effects by noting that the removal will "streamline[] the NEPA process" and "avoid[] overextending causation analysis in a fashion inconsistent with proximate cause considerations."  CEQ then offered the conclusory statement that "it is not practicable and useful to agency decisionmaking to analyze effects that are not reasonably foreseeable and do not have a reasonably close causal relationship to the proposed action."  The agency did not address any of the substantive comments detailing why these analyses are important and are relied upon by many types of stakeholders.

501.    CEQ failed to address concerns about changes that would limit when agencies conduct research and study to determine environmental impacts of alternatives.  Despite lengthy comments from the Conservation Groups and others supported by detailed examples of where additional study has been important to the NEPA process, CEQ brushed aside the concerns by merely restating the language of the Final Rule and noting only that "nothing in th[e] section is intended to prohibit agencies from complying with the requirements of other statutes pertaining to scientific and technical research."

502.    In addition, CEQ failed to take a hard look at much of the data and analysis suggested by the Conservation Groups and others.

503.     CEQ also failed to consider alternative, less drastic solutions suggested by the Conservation Groups and others, such as increased guidance to agencies, better agency funding, increased coordination between agencies, modernization efforts to account for pressing issues like climate change proactively, and more.

504.     With comments disregarded, the Final Rule then was largely unchanged from the proposed rule and just as illegal.  The Rule will remove key NEPA protections and undercut the statutory goal of providing for informed federal decisionmakers and engaged citizens.

505.     To begin, the Final Rule exempts a whole host of activities previously covered by NEPA from review, in a way that is at odds with the statute.

506.     The Final Rule expressly exempts some categories of activities from NEPA review including projects where the trigger for NEPA compliance is federal loan and loan guarantees. 40 C.F.R. § 1508.1(q)(1)(vii)(2020).  This would exempt Controlled Animal Feeding Operations ("CAFOs") from NEPA review as generally speaking, NEPA review for such facilities is the FSA and SBA loan guarantees they receive.

507.     The Final Rule also expressly exempts from NEPA review projects that receive "forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of such assistance." *Id*. This could potentially cover a range of federally funded grant programs, such as the Community Development Block Grant ("CDBG") program managed by the U.S. Department of Housing and Urban Development ("HUD").

508.     The Final Rule also raises the bar more generally for which projects shall be subject to NEPA review.  The Final Rule categorically excludes from NEPA "non-discretionary" decisions, *Id*. § 1507.3(d)(5)(2020) "activities or decisions that do not result in final agency action," *Id*. § 1508.1(q)(1)(iii)(2020) and actions where there is "minimal Federal funding or

minimal Federal involvement where the agency does not exercise sufficient control and responsibility over the outcome of the project." *Id.* § 1508.1(q)(1)(vi)(2020). This change is likely to result in a large number of projects, previously subject to NEPA review, proceeding without study and transparency.

509.    The Final Rule also changes the threshold for what is considered a major federal action requiring preparation of an EIS. The Final Rule reverses CEQ's long-standing position that if a proposed federal action significantly impacts the human environment, then it is a major federal action subject to NEPA review. The Final Rule separates the finding of significance from the finding of a major federal action. Thus, under the Final Rule, a federal action could have a significant impact on the human environment, but not be subject to NEPA because it is not a "major federal action." *Id.* § 1508.1(q)(2020); *see also* 85 Fed. Reg. 43,304, 43,315.

510.    In addition, the Final Rule states that the cumulative effects of a project need not be considered when determining whether an action is "significant." *Id.* § 1508.1(g)(3)(2020).

511.    The Final Rule makes significant changes to the way that agencies consider environmental effects. *Id*. § 1508.1(g)(2020).

512.    The Final Rule eliminates entirely any requirement to consider the cumulative effects of an action. Previously *id.* § 1508.1(g)(3)(2020); *see also* 85 Fed. Reg. 43,304, 43,343.

513.    The Final Rule eliminates the distinction between "direct" and "indirect" effects. 85 Fed. Reg. 43,304, 43,343.

514.    Relatedly, the Final Rule creates strict causation requirements for limiting which environmental effects may be considered, stating that: "A 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should not be considered significant if they are remote in time, geographically remote, or the product of

a lengthy causal chain.  Effects do not include effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action."  85 Fed. Reg. at 43,375; 40 C.F.R. § 1508.1(g)(2)(2020).

515.    To justify this heightened causation requirement, CEQ points to caselaw interpreting the prior regulations—and states that CEQ is merely "clarifying" the prior regulations.  However, the new definition goes beyond the caselaw, not merely clarifying but adding substantive new requirements.  For example, an effect must now meet arbitrary time and place requirements in order to be considered significant.  This is not part of a proximate cause analysis in tort law, to which CEQ explicitly analogizes the standard, nor is the requirement present in caselaw.  *See* Restatement (Third) of Torts: Phys. & Emot. Harm § 29 (2010) ("An actor's tortious conduct need not be close in space or time to the plaintiff's harm to be a proximate cause.").

516.    The Final Rule alters the requirements for reviewing alternatives in a number of ways, including by: 1) Removing the requirement that agencies "rigorously explore and objectively" evaluate "all" reasonable alternatives; 2) Removing the requirements that agencies "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public;" 3) Removing the requirement that agencies "devote substantial treatment to" each alternative considered; 4) Removing the requirement that environmental impact statements "include reasonable alternatives not within the jurisdiction of the lead agency;" and 5) Adding a new definition of "reasonable alternatives" that prioritizes the goals of the applicant over the public interest. CEQ also expressly removed language that called the alternatives analysis "the heart" of the NEPA process. 40 C.F.R. § 1508.1(z)(2020); *see also* 85 Fed. Reg. 43304, 43330.

517.     The Final Rule also allows applicants to expend resources before beginning the NEPA process, despite the well-documented evidence that the NEPA process is significantly more effective the earlier it begins. *Id.* § 1506.1(b)(2020).

518.     In addition, the Final Rule places demanding requirements on the specificity of comments from the public. *Id*. § 1503.3(2020).  All comments, including those coming from the public, must "be as specific as possible" and "provide as much detail as necessary to meaningfully participate and fully inform the agency of the commenter's position." *Id.* § 1503.3(a)(2020). In order to meet this vague bar, comments "should [, among other things,] propose specific changes to [specific] parts of the [DEIS], where possible, and include or describe the data sources and methodologies supporting the proposed changes." *Id.* Regarding alternatives, comments "should identify any additional alternatives, information, or analyses not included in the draft environmental impact statement, and shall be as specific as possible." *Id.* § 1503.3(b)(2020).  Finally, the regulations place an exhaustion requirement on comments, stating that "comments or objections of any kind not submitted . . . shall be deemed forfeited as unexhausted," *id.* § 1500.3(b)(3)(2020), and comments on alternatives "not provided within the comment period shall be considered unexhausted and forfeited. . . ." *Id.* § 1503.3(b)(2020).

519.     The Final Rule imposes arbitrary time and page limits that agencies must meet to comply with NEPA.  The Federal government does not provide any additional agency funding to help meet these requirements, and CEQ has not provided any guidance as to how agency staff should complete their reviews faster and in fewer pages while continuing to comply with legal requirements.

520.     The Final Rule states expressly that agencies are not required to undertake new scientific and technical research to inform their analyses but may rely on old existing documents. *Id.* § 1502.23(2020).

521.     CEQ provided a Regulatory Impact Analysis ("RIA") alongside the Final Rule.[14] The RIA echoes CEQ's justification for the Final Rule, stating that it "facilitate[s] more efficient, effective, and timely NEPA reviews. . . ." but notes explicitly that CEQ has no actual justification for the Final Rule from a cost-benefit perspective. RIA at 2 (recognizing that "little quantifiable information exists on the costs and benefits of completing NEPA analyses").

522.     Throughout the RIA, CEQ notes that the purpose and justification for the Final Rule is to reduce the amount of time spent in NEPA review, and loosely connects the length of time spent on NEPA review to the overall cost of infrastructure projects. To support this justification, CEQ relies on an inaccurate and unsupported claim about infrastructure costs[15] and a missing report from a conservative think tank.[16]

523.     The analyses include a number of speculative, conclusory, and internally contradictory statements. Regarding the cost savings to the Federal Government, CEQ states that "[i]f CEQ's new regulations shorten the time to complete an EIS, as expected, Federal agencies should incur substantial savings." RIA at 8. Yet, in the very same paragraph, CEQ acknowledges

---

[14] Council on Environmental Quality, Regulatory Impact Analysis for the Final Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act (June 30, 2020), *available at* https://www.whitehouse.gov/wp-content/uploads/2020/01/CEQ-NEPA-Regulations-RIA_Final.pdf

[15] CEQ cites a report from the American Society of Civil Engineers for the proposition that "it will cost a total of $4.6 trillion through 2025 to modernize infrastructure nationwide." RIA at 3, n.4. However, this estimate was for the investment needed between 2016–2025. *See* American Society of Civil Engineers, Infrastructure Report Card: A Comprehensive Assessment of America's Infrastructure 8 (2017), https://www.infrastructurereportcard.org/wp-content/uploads/2016/10/2017-InfrastructureReport-Card.pdf. CEQ provides no support for its implicit claim that the total $4.59 trillion is still required and that no investment has been made in the past 4 years (almost half of the time window projected).

[16] CEQ cites a report from Common Good. The report cited appears to no longer exist—certainly not at the web address provided in CEQ's citation. RIA at 3 n.5.

that "[t]he amount of time required to prepare an EIS does not necessarily correlate with the total cost." RIA at 9.

524.    To support an assertion that the Final Rule will provide indirect benefits to the economy CEQ relies solely on "anecdotal[]" estimates for the cost of infrastructure delay. *Id.* The analysis does not explain how the new rule will eliminate such delay.  Moreover, the analysis notes "the effect of uncertainly on investment," without addressing the fact that CEQ is adding uncertainty by rewriting 40 years of established precedent and procedure. RIA at 9–10.

525.    CEQ's only analysis of the environmental impact of the proposed rule is simply to state in conclusory fashion that it has determined that, using a baseline of the statutory requirements of NEPA and Supreme Court case law, there are no adverse environmental impacts (see Appendix). RIA at 10. The referenced Appendix is equally unhelpful, as it simply repeats that "CEQ does not anticipate the changes to result in . . . environmental impacts." RIA at 12–32.

526.    To the extent CEQ addresses specific provisions in the RIA, it does so incompletely and with a number of mischaracterizations.  For example, in evaluating the impact of removing CAFOs from NEPA review, CEQ only discusses the conversion of wetlands and thus ignores the fact that the conversion of wetlands is *not* the primary environmental impact of a CAFO—the primary environmental harm is the massive amounts of air and water pollution created at these facilities.

527.    Despite the significant harm that will arise for parties that have long relied on the previous NEPA regulations, CEQ failed to acknowledge or consider them. CEQ likewise failed to consider a range of less harmful alternative solutions, or to balance the benefit that will arise from the Final Rule against the negative impacts to those who have long relied upon the 1978 regulations.

528.     Many parties rely on the vast and largely consistent body of case law that developed around the prior regulations. Federal agencies and private applicants relied on the stable interpretations created in order to confidently plan and undertake projects. Moreover, federal agencies tasked with assembling NEPA documents developed effective practices for reviewing environmental impacts based on the prior regulations. Vulnerable and concerned citizens, including members of the Conservation Groups, relied on the prior regulations to provide government transparency, a wealth of data, and an opportunity to make their voices heard. States relied on the prior regulations in crafting their own state environmental policy acts. Without the federal backstop, these state laws may be impaired and incomplete. Related analyses under other federal laws that depend on the information gathered and disclosed via NEPA will also be disrupted. CEQ did not study or consider these reliance interests.

529.     CEQ failed to consider an alternative approach to regulation that would adequately protect the climate. Instead, CEQ remained almost silent on what has been described as the defining environmental issue of our time, noting only that climate change could be considered in the baseline condition. In other words, the fact that our climate is changing can be acknowledged, but the federal government will no longer study or disclose how it is contributing to that change.

530.     CEQ also failed to consider recommending increased budgets for NEPA compliance, which could speed project delivery without doing so at the expense of gathering and considering relevant information about environmental harms.

531.     CEQ failed to address in any meaningful way the significant weight of evidence which confirms that the longstanding NEPA regulations were working well, including both information submitted as part of the public comment process, as well as previous reports from

CEQ itself, and others.[17]  For example, reports from the Congressional Research Service ("CRS") concluded that lack of funding, securing community consensus, and accommodating affected stakeholders—not NEPA—account for the vast majority of project delays.[18] As CRS pointed out, *time spent* on environmental review does not directly equate to project *delay*. *Id.* at 11–12 ("[W]hile environmental review of a project can take a long time, delays are often due to non-environmental factors. In many cases, the cause of delay in the environmental review process is a factor external to the process.").

532.     According to CRS, "there is little data available to demonstrate that NEPA currently plays a significant role in delaying federal actions," and "when environmental requirements have caused project delays, requirements established under laws other than NEPA have generally been the source."[19]

533.     CEQ also disregarded its own prior studies that demonstrate how a robust alternatives analysis started early in the planning process ultimately saves money and time. In cases where an agency engages in limited NEPA review, CEQ has previously stated that "potential cost savings are . . . lost because a full range of alternatives has not adequately been examined."[20] In addition, limits on public involvement ultimately "add costs and time as projects are delayed by ensuing controversy and legal challenges."[21]

534.     CEQ disregarded these findings as well as information submitted by the Conservation Groups and others which demonstrate that the prior regulations' alternatives

---

[17] *See, e.g.*, 51 Fed. Reg. at 15,619; 1997 EFFECTIVENESS STUDY at iii
[18] *E.g.* CONG. RESEARCH SERV., ACCELERATING HIGHWAY AND TRANSIT PROJECT DELIVERY: ISSUES AND OPTIONS FOR CONGRESS 1 (Aug. 3, 2011)
[19] CONG. RESEARCH SERV., THE NATIONAL ENVIRONMENTAL POLICY ACT: BACKGROUND AND IMPLEMENTATION 25, 26 (Jan. 10, 2011); CONG. RESEARCH SERV., THE ROLE OF THE ENVIRONMENTAL REVIEW PROCESS IN FEDERALLY FUNDED HIGHWAY PROJECTS: BACKGROUND AND ISSUES FOR CONGRESS (April 11, 2012).
[20] 1997 EFFECTIVENESS STUDY at iii.
[21] *Id.* at 19.

analysis fostered efficiency by promoting innovation, forcing a second look at outdated proposals, providing for community input, utilizing the longstanding methods agencies have developed over the decades, ensure that projects are actually needed in the first place, and thus make decisionmaking more efficient.

535.    CEQ announced that the Final Rule would officially go into effect two months after publication with an effective date of September 14, 2020.  The Final Rule also states explicitly, however, that it may be applied to ongoing activities and environmental documents that were begun *before* the regulations became effective.  40 C.F.R. § 1506.13(2020).  Thus, per the language of the Final Rule, it is operative and affecting the interests of the Conservation Groups and the public today.

## LEGAL BACKGROUND

### Administrative Procedure Act

536.    Congress enacted the APA to ensure stability in agency action by mandating reasoned decisionmaking and to guard against agencies' pursuit of a political agenda without adherence to legal process. *See N. C. Growers' Ass'n, Inc. v. United Farm Workers*, 702 F.3d 755, 772 (4th Cir. 2012) (Wilkinson, J., concurring) (noting the APA prohibits policy change based on "political winds and currents" without adherence to "law and legal process"); *U.S. v. Morton Salt Co.*, 338 U.S. 632, 644 (1950) (describing the APA as "a check upon administrators whose zeal might otherwise have carried them to excesses not contemplated in legislation creating their offices," which "create[s] safeguards even narrower than the constitutional ones [] against arbitrary" agency action).

537.    An agency's rationale for its new policy must be clearly stated in the administrative record. *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) ("An agency must defend its actions based on the reasons it gave when it acted.").

The rationale must also be genuine: an agency cannot rely on a pretextual or contrived explanation in order to avoid legal or political accountability for its actions. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575–76 (2019) ("The reasoned explanation requirement of administrative law, after all, is meant to ensure that agencies offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public.").

538.    By requiring courts to review challenged agency actions, the APA embraces the duty of the judiciary "to say what the law is." *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803).

539.    Judicial scrutiny of agency action thus protects the people by preventing the executive branch from subverting the rule of law to meet its political whims. *See N. C. Growers' Ass'n*, 702 F.3d at 772 (Wilkinson, J., concurring) ("The [APA] requires that the pivot from one administration's priorities to those of the next be accomplished with at least some fidelity to law and legal process. Otherwise, government becomes a matter of the whim and caprice of the bureaucracy . . . ."); *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959,  963 (D.S.C. 2018) (same) (quoting *id.*).

540.    Consistent with our government's checks and balances, the APA requires a court to "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; contrary to constitutional right, power, privilege, or immunity; in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] without observance of procedure required by law." 5 U.S.C. § 706(2)(A)-(D).

541.    Agency action is arbitrary and capricious, and must be set aside, where, among other things: the agency "entirely failed to consider an important aspect of the problem, offered

an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise," *Motor Vehicle Mfrs. Ass'n of U.S. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983); or where the agency's action is not based on a "reasoned analysis," *id.* at 42–43.

542.    The APA ensures that agencies do not change course based on the "whim and caprice of the bureaucracy," *N.C. Growers' Ass'n*, 702 F.3d at 772 (Wilkinson, J., concurring), and prevents agencies from subverting the rule of law by making policy based on shifting "political winds and currents." *Id.*

543.    When reversing a prior policy that "has engendered serious reliance interests," the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). This requires a "reasoned explanation . . . for disregarding the facts and circumstances that underlay or were engendered by the prior policy." *Id.*  Agencies are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy interests." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) (citations omitted).

544.    "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" *Id.* at 1913; *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) ("[A]n agency must consider and explain its rejection of 'reasonably obvious alternatives.'" (quoting *NRDC v. SEC*, 606 F.2d 1031, 1053 (D.C. Cir. 1979))).

545. The APA requires that agencies give interested persons a meaningful opportunity to participate in the rulemaking. 5 U.S.C. § 553(c). "The important purposes of this notice and comment procedure cannot be overstated." *N.C. Growers' Ass'n*, 702 F.3d at 763.

546. When, as here, a proposed regulation is aimed at eliminating protections that were previously adopted by an agency, notice and comment also "ensures that … [the] agency will not undo all that it accomplished through its rulemaking without giving all parties an opportunity to comment on the wisdom of [the removal of protections]." *Consumer Energy Council of Am. v. FERC*, 673 F.2d 425, 446 (D.C. Cir. 1982), *aff'd sub nom. Process Gas Consumers Grp. v. Consumer Energy Council of Am.*, 463 U.S. 1216 (1983).

547. The APA requires that an agency publish in its notice of proposed rulemaking "either the terms of substance of the proposed rule or a description of the subjects and issues involved." 5 U.S.C. § 553(b)(3). "The object, in short, is one of fair notice." *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 174 (2007). *See also Chocolate Mfrs. Ass'n v. Block*, 755 F.2d 1098, 1102 (4th Cir. 1985) ("The requirement of notice and a fair opportunity to be heard is basic to administrative law.").

548. The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability *and future effect* designed to implement, interpret, or prescribe law and policy[.]" 5 U.S.C. § 551(4) (emphasis added). "Retroactivity is not favored in the law. Thus, congressional enactments *and administrative rules* will not be construed to have retroactive effect unless their language requires this result. . . . By the same principle, a statutory grant of legislative rulemaking authority will not, as a general matter, be understood to encompass the power to promulgate retroactive rules unless that power is conveyed by Congress in express terms." *Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208 (1988); *see also*

*id.* at 216 (Scalia, J., concurring) ("The only plausible reading" of the future effect language of 5 U.S.C. § 551(4) is that rules have legal consequences only for the future.").

549.    The APA defines a "rule" as "the whole or a part of an agency statement of general or particular applicability *and future effect* designed to implement, interpret, or prescribe law and policy[.]" 5 U.S.C. § 551(4) (emphasis added).  An agency may not promulgate a retroactive rule absent express congressional authorization.  *Bowen v. Georgetown University Hosp.*, 488 U.S. 204, 208 (1988); *see also id.* at 216 (Scalia, J., concurring) ("The only plausible reading" of the future effect language of 5 U.S.C. § 551(4) is that rules have legal consequences only for the future."); *Georgetown Univ. Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C. Cir.1987) (retroactive application of legislative rules "is foreclosed by the express terms of the APA"). The rule against retroactive rulemaking applies just as much to amendments to rules as to the original rules themselves.  *Northeast Hosp. Corp. v. Sebelius,* 657 F. 3d 1, 13 (D.C. Cir. 2011).

### National Environmental Policy Act

550.    NEPA requires that all agencies of the federal government "utilize a systematic, interdisciplinary approach" in planning and decisionmaking in order to ensure "the integrated use of the natural and social sciences and the environmental design arts. . . ." 42 U.S.C. § 4332(2)(A).

551.    For any "major Federal actions significantly affecting the quality of the human environment," the responsible agency official must make a "detailed statement" on: "(i) the environmental impact of the proposed action; (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented; (iii) alternatives to the proposed action; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable

commitments of resources which would be involved in the proposed action should it be implemented." *Id*. § 4332(2)(C).

552.    While NEPA's action-forcing commands are "essentially procedural," *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 558 (1978), they must be applied in light of the statute's purpose of providing quality and timely information so that environmental considerations are actually taken into account rather than being considered as a mere check-box exercise. 42 U.S.C. § 4331 (defining substantive goals of NEPA). Thus, as the current rule explains, the purpose of NEPA is to "foster excellent action," not "excellent paperwork." 40 C.F.R. § 1500.1(c) (1978).

553.    Courts have interpreted NEPA's statutory commands as requiring that agencies take a "hard look" at environmental consequences before undertaking a potentially harmful action. *Kleppe*, 427 U.S. at 410 n.21 (1976); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). "The hallmarks of a 'hard look' are thorough investigation into environmental impacts and forthright acknowledgements of potential environmental harms." *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 187 (4th Cir. 2005).

554.    This "hard look" requirement is inherent in the statute, and includes a responsibility for agencies to consider a broad range of environmental impacts in their planning processes. 42 U.S.C. § 4332(2)(C).

555.    As a result, the Supreme Court has held that NEPA requires consideration of cumulative effects: "[W]hen several proposals for [] actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together. Only through comprehensive

consideration of pending proposals can the agency evaluate different courses of action." *Kleppe*, 427 U.S. at 409–10.

556.    Judicial decisions requiring agencies to analyze cumulative impacts predate CEQ's initial NEPA regulations. In 1975, the Court of Appeals for the Second Circuit found an environmental review inadequate based in part on its failure to consider cumulative impacts. *NRDC v. Callaway*, 524 F.2d 79, 90 (2d Cir. 1975). The court relied entirely on the statute and its legislative history to find that "an agency . . . may not treat[] a project as an isolated 'single-shot' venture in the face of persuasive evidence that it is but one of several substantially similar operations . . . . To ignore the prospective cumulative harm under such circumstances could be to risk ecological disaster." *Id.* at 88.

557.    NEPA also requires a robust analysis of potential alternatives to the proposed action. 42 U.S.C. §§ 4332(2)(C)(iii), (E). This requirement to consider reasonable alternatives is not limited to the measures that fall within the lead agency's or official's scope of authority. *NRDC v. Morton*, 458 F.2d 827, 834–36 (D.C. Cir. 1972).  Even alternatives requiring legislative implementation may fall within the statutorily required scope of analysis. *Id.* at 837.

558.    In placing these procedural requirements on federal decisionmakers, NEPA explicitly protects the public interest by: "assur[ing] for all Americans safe, healthful, productive, and aesthetically and culturally pleasing surrounding;" "attain[ing] the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences;" and "recogniz[ing] that each person should enjoy a healthful environment. . . ." 42 U.S.C. §§ 4331(b)(2)–(3), (c).

559.    In recognition of NEPA's clear preference for public health and environmental quality over private gain, courts have held that the NEPA process cannot be directed by the

applicant. *See Van Abbema v. Fornell*, 807 F.2d 633, 638 (7th Cir. 1986) ("[T]he evaluation of 'alternatives' mandated by NEPA is to be an evaluation of alternative means to accomplish the *general* goal of an action; it is not an evaluation of the alternative means by which a particular applicant can reach his goals.").

## CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act—Arbitrary and Capricious Policy Reversal**

560.    The allegations of the preceding paragraphs are incorporated here by reference.

561.    CEQ has reversed course by promulgating the new regulations without providing a reasoned explanation for the policy reversal in light of the facts and circumstances apparent in the administrative record. *Encino Motorcars, LLC v. Navarro*, ⸺ U.S. ⸺, 136 S. Ct. 2117, 2126, 195 L.Ed.2d 382 (2016) (While "[a]gencies are free to change their existing policies," they must "provide a reasoned explanation for the change."); *N.C. Growers' Ass'n*, 702 F.3d at 772 (Wilkinson, J., concurring) ("[T]he [Administrative Procedure Act] contemplates what is essentially a hybrid of politics and law—change yes, but only with a measure of deliberation and, hopefully, some fair grounding in statutory text and evidence.").

562.    An agency cannot jettison procedural safeguards it previously found to be important without offering reasoned consideration of the benefits of keeping those safeguards. *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 744 (D.C. Cir. 2019).

563.    An agency must ensure that the new policy is itself supported by substantial record evidence, "based upon a consideration of the relevant factors," and supported with "rational connection[s] between the facts found and the choice made," *State Farm*, 463 U.S. at 43–44 (citations and quotations omitted).

157

564.    To try to justify its policy reversal, CEQ relies on the vague, unsupported assertions that its new regulations are needed to "facilitate more efficient" NEPA reviews and "reduce . . . delays."  The record, however, demonstrates that NEPA is not a major source of project delay, and that there are other factors—unexamined by CEQ—that would better speed project delivery.

565.    CEQ similarly failed to address plentiful comments addressing concerns that the rule would result in more delay, not less, and would cause significant chaos.  Instead CEQ just summarily pointed to its new goal of faster EIS's with no explanation as to how they might be achieved.  CEQ provided no record evidence that the changes it sought would speed project delivery or facilitate more efficient review.

566.    Likewise, CEQ failed to address significant evidence showing that the NEPA process is not a primary cause of project delay.

567.    CEQ similarly ignored comments in the record detailing how processes, similar to the changes suggested by CEQ, have not improved project delivery times.

568.    CEQ has also reversed specific policies in the Final Rule without providing a reasoned explanation.

569.    For example:

    a.  CEQ failed to provide a reasoned explanation for its decision to reverse long standing policy and no longer specifically require agencies to consider indirect and cumulative effects.

    b.  CEQ failed to provide a reasoned explanation for its decision to reverse long standing policy and mandate that effects that are remote in time,

geographically remote, or the product of a lengthy causal chain should no longer be considered significant or studied.

c. CEQ failed to provide a reasoned explanation for its decision to reverse longstanding policy and no longer require agencies to consider all reasonable alternatives.

d. CEQ failed to provide a reasoned explanation for its decision to reverse course on its long-standing position that if a proposed federal action has a significant impact, including a significant cumulative impact, it is a major federal action significantly affecting the human environment that requires preparation of an EIS.

e. CEQ failed to provide a reasoned explanation for its decision to reverse longstanding policy and allow project applicants to expend resources prior to the conclusion of the NEPA process.

f. CEQ failed to provide a reasoned explanation for its decision to delete the factors by which an action's "significance" is determined, which have been applied regularly by courts creating a reliable and predictable threshold for NEPA's "detailed statement" requirement, and to replace that definition with vague concepts that cannot be applied consistently and will result in confusion, uncertainty, delay, and frequent litigation.

g. CEQ failed to provide a reasoned explanation for its decision to limit review of NEPA on projects that receive certain types of federal loans or loan guarantees, or that receive federal funding when the federal agency does not direct all details of a project.

h.  CEQ failed to provide a reasoned explanation for its decision to mandate that agencies are not required to conduct new scientific study if they determine the costs would be "unreasonable."

570.  Additionally, CEQ failed to take a hard look at the implications of the changes in the Final Rule. Rather than address the environmental impact of the rule, CEQ noted only that other substantive environmental statutes are unchanged.  This statement ignores thus both the purpose and effect of NEPA itself, as well as how it interacts and assists with the implementation and enforcement of more substantive statutes.

571.  CEQ fails to cite to any fact or other evidence in the record justifying these changes.  The reports it purports to rely on instead provide support for the reality that NEPA was working well as it was.

572.  The Final Rule is arbitrary and capricious and not in compliance with law.

**SECOND CLAIM FOR RELIEF**

**Violation of the Administrative Procedure Act—Explanation that Runs Counter to the Evidence before the Agency**

573.  The allegations of the preceding paragraphs are incorporated here by reference.

574.  Agency rulemaking is arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *State Farm*, 463 U.S. at 43. The explanation cannot be pretextual or contrived to avoid legal or political accountability. *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575–76 (2019).

575.  CEQ's explanation of the Final Rule is so incongruent with the administrative record that it reveals an intent to hide the agency's genuine reasons.

576.     CEQ explains its purpose is to reduce delay, but the Final Rule will increase delay. As just one example, CEQ deletes the factors that have been relied on by courts and agencies to define the threshold for significant impacts, replacing them with vague language that is incapable of consistent application.

577.     The record establishes that NEPA's implementation through CEQ's longstanding regulations has been a success, as documented by public comments as well as reports from CEQ itself, the Congressional Research Service, and others.  CEQ has not shown reasons to conclude that the Final Rule would speed up project delivery.  Instead, CEQ appears to have simply adopted its preferred commenters' requests—the very definition of caprice.

578.     CEQ claims that its new rule is intended to "produce better decisions [that] further the national policy to protect and enhance the quality of the human environment," 85 Fed. Reg. 43,304, 43,307.  The record, however, establishes that a Final Rule which eliminates important project effects from the scope of the analysis, limits consideration of reasonable alternatives, and imposes other arbitrary constraints on the NEPA evaluation process would produce better decisions. CEQ has failed to address this record evidence.

579.     The overall purpose and effect of the Final Rule is to remove actions from the procedural requirements of the prior regulations.  By disregarding the successful implementation of NEPA under the prior regulations for over four decades, and the public comments, reports, and other information in the record documenting that NEPA is not a major cause of project delay and that the prior regulations' requirements provide important benefits to agencies and the public, CEQ acted arbitrarily and capriciously.

580.     The Final Rule is arbitrary and capricious and not in compliance with law.

## THIRD CLAIM

### Violation of the Administrative Procedure Act—Unlawful Reliance on Factors not Intended by Congress

581.     The allegations of the preceding paragraphs are incorporated here by reference.

582.     An agency rule is arbitrary and capricious "if the agency has relied on factors which Congress has not intended it to consider. . . ." *State Farm*, 463 U.S. at 43. In NEPA, Congress dictated that CEQ "be conscious of and responsive to the scientific, economic, social, aesthetic, and cultural needs and interests of the Nation[,] and . . . formulate and recommend national policies to promote the improvement and quality of the environment." 42 U.S.C. § 4342. An agency charged with implementing a statute ordinarily lacks authority to deviate from or abdicate its statutory responsibilities.  *See Massachusetts v. EPA*, 549 U.S. 497, 532–33 (2007) (emphasizing centrality of statutory criteria in guiding agency action).

583.     Likewise, NEPA's procedural mandate must be applied in a way capable of meeting the statute's substantive goals, which include the government's responsibilities to "use all practicable means and measures . . . in a manner calculated . . . to create and maintain conditions under which man and nature can exist in productive harmony," to act as "trustee of the environment for succeeding generations," to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to avoid "undesirable or unintended consequences" from government actions, among other similar purposes. 42 U.S.C.  § 4331(b).

584.     CEQ's revised regulations are antithetical to these factors.

585.     Instead of relying on the factors provided by the statute, CEQ relies on misleading claims of the "burden" that the current NEPA process places on federal agencies. *E.g.*, 85 Fed. Reg. at 1690.  CEQ unlawfully overstates the burden caused by the current NEPA process. *See*

*United Keetoowah Band*, 933 F.3d at 744. This reliance on the procedural burden is misplaced and is not what Congress intended.

586.    On the contrary, in enacting NEPA's requirements, Congress prioritized transparency and well-informed decisionmaking in order to benefit agency decisions about major public expenditures.  The factors included in the statute show that Congress unequivocally recognized the tradeoffs between procedural burdens on decisionmaking and the responsibility to implement our national environmental policy, and it resolved those tradeoffs by requiring that agencies use "all practicable means and measures" to achieve that policy. The prior regulations' requirements certainly have proven practicable, having been in effect for over 40 years. Recasting as a supposedly onerous burden the process of informed decisionmaking that Congress established is contrary to the statute and is not a reasoned basis for rulemaking.

587.    Specifically, CEQ relied on:

a.    The goal of shortening the length of NEPA review documents at the cost of comprehensive review and public participation;

b.    The goal of reducing the amount of time spent in the NEPA process at the cost of comprehensive review and public participation;

c.    The cost of "delay," when the concern referenced is simply the time required to undertake a complete environmental review; and

d.    Exec. Order No. 13,807 and its call to "simplify and accelerate the NEPA review process," without regard for NEPA's purpose of ensuring fully informed decisionmaking. 82 Fed. Reg. 40,463 (Aug. 15, 2017).

588.    The Final Rule is arbitrary and capricious and not in compliance with law.

## FOURTH CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act—Arbitrary and Capricious Failure to Consider Relevant Factors**

589.    The allegations of the preceding paragraphs are incorporated here by reference.

590.    Agency rulemaking is arbitrary and capricious if the agency "entirely failed to consider an important aspect of the problem." *See State Farm*, 463 U.S. at 30–31; *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (citing *Citizens To Preserve Overton Park v. Volpe*, 401 U.S. 402, 416 (1971)).

591.    Throughout the promulgation of the new regulations, CEQ consistently failed to consider critical factors.

592.    Specifically CEQ failed to consider:

   a.   The immense delays, cost, and inefficiencies associated with completely unsettling 40 years of established law and practice. Especially in light of the agency's heavy reliance on "efficiency" and "timeliness," it is a clear error of judgement to disregard the fact that these regulations will lead to years of uncertainty and litigation as courts, agencies, and private actors sort through just what these regulations mean.

   b.   The body of caselaw that has developed over the past four decades on the evaluation of cumulative impacts and other issues, without considering the effects of this drastic change.  The result will be less certainty and more delay for projects going forward under the novel approach put forward in these rules.

c. The environmental impacts of eliminating review requirements for categories of federal action, which under the prior regulations would have been avoided or mitigated.

d. The environmental justice implications of the new rule, including: the disproportionate harm to communities of color occasioned by a heightened requirements for public comments to be considered; the disproportionate harm to communities of color occasioned by the elimination of the requirement to consider cumulative impacts; and the disproportionate harm to communities of color occasioned by the elimination of all guidance documents, including guidance on Environmental Justice;

e. The implications of eliminating federal loan guarantees as a trigger for NEPA review on the study and consideration of CAFOs which are usually not subject to other environmental review, and the disproportionate affect the change will have on low-income communities and communities of color which disproportionately border such facilities.

f. The reports from CEQ itself recommending more robust implementation of NEPA and confirming the importance of evaluating all reasonable alternatives and of the cumulative effects analysis.

g. The implications of exempting projects with minimal federal funding or minimal federal involvement (where the agency cannot control the outcome of the project).

h. The impact on State environmental policy acts that reference NEPA.

    i.   The impact that the deletion of the word "significantly" at 40 C.F.R.

       § 1508.27 (2020) and substitution of vague ambiguous language will have in

       spurring additional litigation and project delays.

    j.   The difficulty of collecting essential data at appropriate time periods given

       the new tight time limits and schedule requirements.

593.    These factors are all critical because they relate to the underlying purpose of the statute, as well as CEQ's stated purpose in speeding up project delivery.

594.    Under NEPA, Congress mandated that CEQ act as "trustee of the environment," to "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and to avoid "undesirable or unintended consequences" from government actions. 42 U.S.C. § 4331(b). By failing to consider these factors, CEQ ignored Congress's mandates.

595.    The Final Rule is therefore arbitrary and capricious and not in compliance with law.

## FIFTH CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act—Arbitrary and Capricious Failure to Consider Reliance Interests

596.    The allegations of the preceding paragraphs are incorporated here by reference.

597.    Where prior policy "engendered serious reliance interest[s]," agencies must address those interests and provide "more detailed justification than what would suffice for a new policy created on a blank slate." *Fox*, 556 U.S. at 515.

598.    The prior regulations engendered significant reliance interests—citizens, conservation groups, businesses, and industries that depend on full and complete NEPA analyses; yet CEQ has failed to address these facts and circumstances in any way.

599.   Federal agencies and private actors rely on the stable interpretations of NEPA that have arisen over the past 40 years. Vulnerable and concerned citizens, including members of the Conservation Groups, have relied on the prior regulations to provide a wealth of data, government transparency, and the opportunity to make their voices heard.  CEQ failed to consider these reliance interests.

600.   A vast and largely consistent body of case law has developed based on the existing regulations, and agencies, the Conservation Groups, and members of the public rely on the legal interpretation of these regulations to inform their review.  CEQ failed to consider these reliance interests.

601.   Agencies charged with assembling NEPA documents have developed effective ways of reviewing environmental impacts in reliance on the current regulations.  CEQ failed to consider these reliance interests.

602.   States crafting their own state environmental policy acts routinely rely on NEPA as a federal backstop.  Advocates working with states to craft and amend and interpret these laws likewise rely on NEPA as a federal backstop.  CEQ failed to consider these reliance interests.

603.   CEQ also failed to consider the reliance of industries, including alternative energy industries, on the consistent approach established by the current NEPA process.

604.   CEQ failed to consider the reliance interests of individuals and groups, including the Conservation Groups who have already submitted comments in ongoing NEPA processes that may now be subject to the Final Rule.

605.   CEQ failed to assess any of these reliance interests and the disruption its abandonment of 40 years of consistent policy would engender, and to appropriately weigh them

against countervailing interests.  CEQ failed to provide the heightened, detailed justification

necessary to reverse a policy of such importance to the framework of federal decisionmaking.

606.    The Final Rule is therefore arbitrary and capricious and not in compliance with

law.

### SIXTH CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act—Arbitrary and Capricious Failure to Respond to Relevant and Significant Comments

607.    The allegations of the preceding paragraphs are incorporated here by reference.

608.    "The requirement that agency action not be arbitrary or capricious includes a

requirement that the agency . . . respond to 'relevant' and 'significant' public comments." *Pub.*

*Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting *FEC v. Rose*, 806 F.2d 1081,

1088 (D.C. Cir 1986)). While an agency need not respond to every comment submitted, it must

respond "to those comments which, if true, would require a change in the agency's proposed

rule." *Am. Min. Cong. v. EPA*, 907 F.2d 1179, 1188 (D.C. Cir. 1990).

609.    CEQ provided twenty questions for the public to respond to in the ANPRM and

only responded to the comments it received that supported its agenda in the NPRM. In no way

did CEQ respond to the significant comments that called for restraint and cautioned against a

complete regulatory overhaul. CEQ stated only that "some commenters opposed any updates to

the regulations." NPRM, 85 Fed. Reg. at 43,313.

610.    CEQ received more than 1.1 million comments on the NPRM.  The agency spent

less than four months reviewing these comments and failed to consider or respond to comments

made.

611.    Rather than substantively respond to the comments opposed to its proposal, CEQ

merely noted commenters' opposition without any engagement.  CEQ did not justify its proposal

in the face of the numerous, detailed comments and reports it received during the comment periods demonstrating the success of the prior regulations, and the disruption and harmful results CEQ's new approach will cause.  As a result, CEQ's explanation for its action thus runs directly counter to the evidence before it.

612.    Specifically, CEQ failed to meaningfully respond to comments stating that:

a.   The Final Rule is likely going to lead to confusion, additional bureaucracy and more litigation, with the result that the Final Rule will slow down project delivery rather than speed it up;

b.   NEPA is not the primary cause of project delay;

c.   Aspects of the proposed rule have been tried in other settings and not sped up project delivery, for example North Carolina's Merger process;

d.   The Final Rule will result in environmental harm;

e.   The expansion of CEs will lead to less public engagement and less effective decisionmaking;

f.   The decision to eliminate consideration of climate change will lead to wasteful spending and poor decisionmaking; and

g.   The change to only require additional scientific study when not "unreasonable" will lead to poor government decisionmaking and environmental harm.

613.    For all of these comments, CEQ either failed to respond to the comment entirely, or brushed aside the concern with conclusory statements that fail to grapple with the issues raised, as the APA requires.

614.    The rulemaking is therefore arbitrary and capricious and not in compliance with law.

## SEVENTH CLAIM FOR RELIEF

**Violation of the Administrative Procedure Act—Arbitrary and Capricious Failure to Consider Obvious Alternatives**

615.    The allegations of the preceding paragraphs are incorporated here by reference.

616.    "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternative[s]' that are 'within the ambit of the existing [policy].'" *Dep't of Homeland Sec.*, 140 S. Ct. at 1913; *Nat'l Shooting Sports Found.,* 716 F.3d at 215 ("[A]n agency must consider and explain its rejection of 'reasonably obvious alternatives.'" (quoting *NRDC v. SEC*, 606 F.2d 1031, 1053 (D.C. Cir.1979))).

617.    While this requirement does not extend to every possible alternative, it does require consideration of "significant and viable" and "obvious" alternatives. *Nat'l Shooting Sports Found.,* 716 F.3d at 215; *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987).

618.    CEQ failed to consider a range of obvious alternatives to the rulemakings:

    a.    CEQ failed to consider the alternative of providing more funding to agency staff to better facilitate the existing framework. This alternative is both significant and viable, as detailed in the comments submitted by Plaintiffs and their counsel. CEQ was obligated to consider whether the current administration's priority on stripping agency funding is inconsistent with its goal of speeding project delivery transparently, but instead the agency created a false choice between project delivery and environmental quality—a false choice that Congress explicitly rejected in NEPA.

b.   CEQ failed to consider the alternative of providing more updated guidance to

agencies to further clarify how agencies should implement existing

regulatory requirements to ensure they comply with the law.  For example,

CEQ failed to consider the alternative of leaving the current definitions of

environmental effects intact and providing additional clarity and guidance

regarding how these effects apply to new environmental challenges.

c.   CEQ failed to consider the alternative of updating the NEPA regulations to

more comprehensively provide for consideration of climate change and

thereby modernize the regulations and make them more efficient.

d.   CEQ failed to consider the alternative of requiring earlier public

involvement, as CEQ itself had previously recommended, for example

through collaborative stakeholder processes.

e.   CEQ failed to consider how implementation of Exec. Order No. 13,807 could

achieve the agency's aims.

619.    The rulemaking is therefore arbitrary and capricious and not in compliance with

law.

### EIGHTH CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act—Retroactive Application of Notice and Comment Rulemaking

620.    The allegations of the preceding paragraphs are incorporated here by reference.

621.    Retroactive application of notice and comment rulemaking, including

modifications of existing rules, "is foreclosed by the express terms of the APA." *Georgetown*

*Univ. Hosp. v. Bowen*, 821 F.2d 750, 757 (D.C.Cir.1987), *aff'd on other grounds*, *Bowen v.*

*Georgetown University Hosp.*, 488 U.S. 204 (1988); *Northeast Hosp. Corp. v. Sebelius,* 657 F. 3d 1, 13 (D.C. Cir. 2011).

622.    CEQ has violated the APA by issuing a Final Rule that purports allow retroactive application to projects already under NEPA review: "an agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun *before* September 14, 2020." 40 C.F.R. § 1506.13 (emphasis added).

623.    This attempt to apply the NEPA regulations to ongoing projects and environmental documents begun prior to the Final Rule's effective date is impermissibly retroactive.  It would weaken the standards applicable to Environmental Impact Statements and Environmental Assessments, contracts, and additional reports and documentation that were already underway, or even completed, prior to the changes in regulations. Furthermore, these new regulations will disrupt the evaluation process where commenters have raised issues regarding a NEPA document under the prior regulations that may now be disregarded by the agency applying the new regulations.  These alterations to the rights and legal consequences that were in place prior to the effective date of the Final Rule are barred by the APA.

624.    CEQ's attempt to retroactively apply the Final Rule is arbitrary and capricious and not in compliance with law.

### NINTH CLAIM FOR RELIEF

### Violation of the Administrative Procedure Act – Failure to Demonstrate that the New Policy is Consistent with the Governing Statute

625.    The allegations of the preceding paragraphs are incorporated here by reference.

626.    To comply with the APA, an agency must demonstrate that the new policy it adopts is consistent with the governing statute. *Fox*, 556 U.S. at 514–15.  CEQ has violated this requirement by contradicting central requirements of NEPA.

627.    CEQ's new rule is inconsistent with the governing statute, NEPA, in at least the following ways:

A)  **Environmental Effects**

628.    The rule unlawfully alters the definition of the "effects" of a project by removing the definition of cumulative effects: "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions."  Previous 40 C.F.R. § 1508.7.[22]

629.    CEQ has also removed the definition of indirect effects: those "which are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable."  Previous 40 C.F.R. § 1508.8(b).[23]  Indirect effects include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."  *Id.*  Instead CEQ mandates that "[a] 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should not be considered significant if they are remote in time, geographically remote, or the product of a lengthy causal chain."

630.    Further, under the New Rule CEQ states that "[e]ffects do not include effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action."

631.    The plain language of NEPA takes a broad view of environmental effects, and contemplates effects that occur as a result of multiple actions.  *See, e.g.*, 42 U.S.C. §§ 4332(2)(C), 4331(b). CEQ's elimination of cumulative effects and its removal of express

---

[22] 1978 NEPA regulations
[23] 1978 NEPA regulations.

language requiring the consideration of indirect effects runs counter to the requirements of NEPA, as recognized by the Supreme Court.  *Kleppe*, 427 U.S. at 409–10.

632.    CEQ's changes to the environmental effects that must be considered are inconsistent with the governing NEPA statute and are arbitrary and capricious.

**B) Alternatives**

633.    The Final Rule unlawfully alters the requirements for reviewing alternatives in at least the following ways:

    a.    Removing the requirement that agencies "rigorously explore and objectively" evaluate "all" reasonable alternatives;

    b.    Removing the requirements that agencies "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public";

    c.    Removing the requirement that agencies "devote substantial treatment to" each alternative considered;

    d.    Removing the requirement that environmental impact statements "include reasonable alternatives not within the jurisdiction of the lead agency"; and

    e.    Adding a new definition of "reasonable alternatives" that prioritizes the goals of the applicant over the public interest.

634.    The plain language of NEPA requires a full alternatives analysis.  The statute directs agencies to prepare a "detailed statement" on alternatives "to the fullest extent possible[.]"  42 U.S.C. § 4332.  This means, as CEQ has interpreted and the courts have affirmed, agencies must consider *all* reasonable alternatives.  "The 'existence of a viable but unexamined alternative renders an environmental impact statement inadequate.'"  *Audubon*

*Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 667

(D. Md. 2007) (quoting *Res. Ltd., Inc. v. Robertson,* 35 F.3d 1300, 1307 (9th Cir. 1994)); *accord,*

*Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 427 (4th Cir. 2012) (citing 42 U.S.C. §

4332(2)(C)(iii) and evaluating whether agency impact statement considered all reasonable

alternatives).

635.    CEQ's reductions to the alternatives that must be considered are inconsistent with

the governing NEPA statute and are arbitrary and capricious.

**C) Federal Actions Requiring Review**

636.    The Final Rule unlawfully reverses course on the longstanding position that if a

proposed federal action has a significant impact, including a significant cumulative impact, it is a

federal action significantly affecting the human environment. The rule now requires that

agencies first make a determination of whether an action is a "major federal action," and then a

separate determination of the action's significance. This illegally allows "non-major" federal

actions to indiscriminately inflict significant harms on the human environment with no

opportunity for appropriate NEPA review.

637.    This "dual standard" approach is contrary to the purpose and requirements of

NEPA. Legislative history makes clear that Congress intended all actions with a significant

effect upon the quality of the human environment to be considered "major" actions and therefore

subject to NEPA review. Courts adopted this logical approach, as in *Minn. Pub. Interest*

*Research Grp. v. Butz*, 498 F. 2d 1314, 1321 (8th Cir. 1974) ("[I]f the action has a significant

effect, it is the intent of NEPA that it should be the subject of the detailed consideration

mandated by NEPA . . . . This approach is more consonant with the purpose of NEPA and is

supported in S. Rep. No. 91-296 . . . and the CEQ Guidelines.").

638.   CEQ's changes to what qualifies as a major federal action are inconsistent with the governing NEPA statute and are arbitrary and capricious.

**D) Allowing actions to proceed during the NEPA process**

639.   The Final Rule unlawfully allows a number of activities to proceed prior to the completion of the NEPA process. 40 C.F.R. § 1506.1(b) (2020). Such authorized activities include the "acquisition of interests in land (*e.g.*, fee simple, rights-of-way, and conservation easements), purchase of long lead-time equipment, and purchase options made by applicants." *Id.*

640.   Allowing a particular alternative to proceed prior to the completion of the NEPA process undermines NEPA's role as an "action-forcing" statute and forecloses the objective alternatives analysis that the statute requires for a "proposed" action, not one already underway. 42 U.S.C. § 4332(2)(C)(iii).

641.   This allows applicants to predetermine many aspects of the project, going directly against legal precedent and previous CEQ guidance. *See Sierra Club v. Marsh*, 872 F.2d 497, 504 (1st Cir. 1989) (acknowledging the harm to the environment caused by "the deeply rooted human psychological instinct not to tear down projects once they are built[, and the] difficulty of stopping a bureaucratic steam roller, once started"); Council on Envtl. Quality, 1997 Effectiveness Study 11–12 ("[T]he 'NEPA process' is often triggered too late to be fully effective. . . . It is critical for top policy leaders and managers to integrate NEPA early into their policymaking and programming if their agencies are to get the full benefit of NEPA.").

642.   CEQ's changes to allow actions to proceed prior to the completion of the NEPA process are inconsistent with the governing NEPA statute and are arbitrary and capricious.

**E) Excluding Federal Financial Assistance from NEPA Review**

643.    The Final Rule unlawfully excludes "loans, loan guarantees, or other forms of financial assistance" by the Federal government from NEPA review, specifically targeting farm ownership and operating loan guarantees. 40 C.F.R. § 1508.1(q)(1)(vii). This exclusion violates the policy and text of NEPA.

644.    NEPA's substantive policy directs the federal government to "use all practicable means" to "improve and coordinate Federal plans, functions, programs, and resources" so that the nation may achieve its environmental policy goals. Congress's inclusion of the word "resources" recognizes that a commitment of federal funding may impact the environment, thus warranting NEPA review. Moreover, the statute explicitly states that the Federal Government is "to use all practical means and measures, *including financial and technical assistance*, . . . to create and maintain conditions under which man and nature can exist in productive harmony . . . and fulfill the . . . requirements of present and future generations of Americans." 42 U.S.C. § 4331(a) (emphasis added).

645.    CEQ's exclusion of federal financial assistance from the federal actions requiring compliance with NEPA is inconsistent with the governing NEPA statute and is arbitrary and capricious.

**F)  Comment Specificity Requirements that Disregard Important Types of Impacts**

646.    The Final Rule unlawfully attempts to elevate the importance of input related to economic and employment impacts, and it requires that comments refer to specific sections or pages of the impact statement, proposing specific changes to the statement and, where possible, including or describing data sources and methodologies that support those changes. 40 C.F.R. § 1503.3 (2020).

647.     These changes elevate the influence of commenters with economic, scientific, technical, or legal expertise, and diminish the influence of commenters with qualitative input or concerns.

648.     These changes are inconsistent with NEPA, which requires that agency procedures, "to the fullest extent possible," ensure that "unquantified environmental amenities and values" be given "appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. § 4332(B).

649.     For these reasons, the Final Rule is "arbitrary," "capricious," an "abuse of discretion," and "not in accordance with law," 5 U.S.C. § 706(2)(A).

### TENTH CLAIM FOR RELIEF

### Changes that are Outside CEQ's Lawful Authority

650.     The Final Rule purports to make changes that CEQ lacks lawful authority to make.

651.     The APA is applicable to all federal agencies, and CEQ has no unique authority to amend it through rulemaking.

652.     Moreover, despite making changes to APA requirements, CEQ failed to notice that it was doing so, describing its rulemaking only as one to NEPA regulations.

653.     CEQ nonetheless makes a number of changes to its regulations which would have the impact of changing APA requirements.

654.     For example:

   a.   CEQ's changes to the definition of "final agency action" at 40 C.F.R. § 1508.1(q)(1)(iii) would have the effect of eliminating the APA cause of action for "failure to act." 5 U.S.C. § 551(13).

b. CEQ's changes which create a "presumption" that an agency has complied with NEPA's requirements by mere *ipse dixit*, and changes which presume that "minor, non-substantive errors that have no effect on agency decisionmaking shall be considered harmless and shall not invalidate an agency action," conflict with the APA requirement that an agency must "observe procedure required by law," and which grants review of that question to the courts.  5 U.S.C. § 706(2)(D).

c. CEQ's imposition of "exhaustion" requirements that must be met before an individual or entity may bring suit add prerequisites to legal action not contemplated by the APA, and in express conflict with established case law. . 40 C.F.R. § 1500.3(b).

655.    Each of these changes is outside of CEQ's lawful authority. It is the Courts' exclusive role to determine the remedy for violations of law, including withholding a remedy when the violation is harmless.

656.    For these reasons the Final Rule is outside of CEQ's lawful authority and the Final Rule is "arbitrary, capricious, and not in accordance with law." 5 U.S.C. § 706(2).

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that the Court:

A.    Declare that the Final Rule, *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, is arbitrary and capricious and note in compliance with law;

B.    Declare that CEQ acted in excess of statutory authority by issuing the Final Rule

C.    Vacate and set aside the challenged regulations

179

D.     Reinstate the 1978 NEPA regulations;

E.     Enjoin Defendants from implementing, enforcing, or relying on the Final Rule;

F.     Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, associated with this litigation; and

G.     Grant Plaintiffs such further and additional relief as the Court may deem just and proper.

Respectfully submitted, this the 29th day of July, 2020.

/s/ Kimberley Hunter (*pro hac vice pending*)
N.C. Bar No. 41333
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516

/s/Sam Evans (*pro hac vice pending*)
N.C. Bar No. 44992
48 Patton Ave
Suite 304
Asheville, NC 28801-3321

/s/ Nicholas S. Torrey (*pro hac vice pending*)
N.C. Bar No. 43382
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516

/s/Megan Kimball (*pro hac vice pending*)
N.C. Bar No. 53837
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516

/s/ Kristin Davis (*Local counsel*)
VA. Bar No. 85076
201 West Main St.
Suite 14
Charlottesville, VA 22902-5065