IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

No. 3:20-cv-00045-NKM

| | |
|---|---|
| WILD VIRGINIA, VIRGINIA WILDERNESS COMMITTEE, UPSTATE FOREVER, SOUTH CAROLINA WILDLIFE FEDERATION, NORTH CAROLINA WILDLIFE FEDERATION, NATIONAL TRUST FOR HISTORIC PRESERVATION, MOUNTAINTRUE, HAW RIVER ASSEMBLY, HIGHLANDERS FOR RESPONSIBLE DEVELOPMENT, DEFENDERS OF WILDLIFE, COWPASTURE RIVER PRESERVATION ASSOCIATION, CONGAREE RIVERKEEPER, THE CLINCH COALITION, CLEAN AIR CAROLINA, ALLIANCE FOR THE SHENANDOAH VALLEY, and ALABAMA RIVERS ALLIANCE, )<br><br>Plaintiffs, )<br><br>v. )<br><br>COUNCIL ON ENVIRONMENTAL QUALITY and MARY NEUMAYR IN HER OFFICIAL CAPACITY AS CHAIR OF THE COUNCIL ON ENVIRONMENTAL QUALITY, )<br><br>Defendant. ) | **MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION OR STAY** |

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................3

STATUTORY BACKGROUND.................................................................8

I.      The Administrative Procedure Act .............................................8

II.     NEPA .................................................................................9

BACKGROUND AND FACTS ..............................................................11

I.      CEQ's Previous Regulations .......................................................11

II.     CEQ's Rulemaking .................................................................14

III.    The Rule.............................................................................20

STANDARD OF REVIEW ....................................................................26

ARGUMENT ...................................................................................27

I.      The Conservation Groups Are Likely to Succeed on the Merits....................27

    A. The Rule Is Inconsistent with the NEPA Statute. .........................................28

        1.    The Rule Violates NEPA's Required Evaluation of Environmental
              Effects.........................................................................28

        2.    The Rule Violates NEPA's Required Evaluation of All Reasonable
              Alternatives. .................................................................31

        3.    The Rule Violates NEPA's Broad Coverage of Federal Actions. ......34

        4.    The Rule Unlawfully Allows Projects to Proceed During the NEPA
              Process.........................................................................36

        5.    The Rule Violates NEPA by Restricting Important Public Input. ......38

        6.    The Rule's Departures from the Requirements of NEPA, as Set Out in
              the Statute and Caselaw, Are Not Entitled to Deference. ..................39

    B. CEQ Failed to Adequately Consider Relevant Factors in the Rulemaking
       Process .............................................................................41

        1.    CEQ Ignored the Prior Regulations in Assessing the Environmental
              Impacts of the New Rule. ...................................................42

2.   CEQ Did Not Adequately Consider How the Rule Will Harm Environmental Quality. ....................................................45

3.   CEQ Failed to Consider Environmental Justice. ...............................54

C. CEQ Failed to Consider Reliance Interests in Promulgating the Rule. ........58

D. CEQ did not Offer a Plausible Explanation for its Reversal of Longstanding Policy. ...................................................................................63

E. CEQ did not Consider Less Harmful Alternatives to Rewriting the NEPA Regulations. ..............................................................................71

II.   An Injunction is Necessary to Avoid Irreparable Harm. ...............................72

A. The Conservation Groups Will Suffer Environmental Harm.......................73

B. The Conservation Groups Will Suffer Informational Harm and Will Be Forced to Divert Resources. ........................................................88

C. The Conservation Groups Have Suffered Procedural Harm. .......................94

III.   The Public Interest and Balance of the Equities Weigh in Favor of Maintaining the Status Quo. .............................................................96

A. Maintaining the Status Quo Preserves Regulations Proven to be Effective at Serving the Public Interest...............................................................96

B. Maintaining the Status Quo Preserves the Public Interest in Stable, Predictable Regulation.................................................................100

C. Federal Agency Compliance with the Law Serves the Public Interest. ......104

D. There is No Substantial Harm to the Public Interest in Delaying Implementation of the New Regulations....................................................105

IV.   Nationwide Relief is Required....................................................................105

CONCLUSION ...................................................................................108

# TABLE OF AUTHORITIES

**Cases**                                                                         **Page(s)**

*Action All. v. Heckler*,
    789 F.2d 931 (D.C. Cir. 1986) .................................................................89, 92

*Action NC v. Strach*,
    216 F. Supp. 3d 597 (M.D.N.C. 2016) .............................................................92

*Air All. Houston v. EPA*,
    906 F.3d 1049 (D.C. Cir. 2018) ........................................................................3

*Am. Equity Inv. Life Ins. Co. v. SEC*,
    613 F.3d 166 (D.C. Cir. 2010) .........................................................................44

*Am. Fed'n of Gov't Employees, AFL-CIO v. Vilsack*,
    118 F. Supp. 3d 292 (D.D.C. 2015), *aff'd*, 672 F. App'x 36 (D.C.
    Cir. 2016) ........................................................................................................91

*Am. Rivers v. Fed. Energy Regulatory Comm'n*,
    895 F.3d 32 (D.C. Cir. 2018) ...........................................................................52

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017) .........................................................................55

*Amoco Prod. Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987) ...................................................................................88, 89

*Andrus v. Sierra Club*,
    442 U.S. 347 (1979) .........................................................................................36

*Arlington Coal. on Transp. v. Volpe*,
    458 F.2d 1323 (4th Cir. 1972) .....................................................................38, 74

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of
    Transp.*,
    524 F. Supp. 2d 642 (D. Md. 2007) ..................................................................32

*Baltimore Gas & Elec. Co. v. NRDC*,
    462 U.S. 87 (1983) ...........................................................................................37

*Barr v. East Bay Sanctuary Covenant*,
   140 S. Ct. 3 (2019), *aff'd sub nom. East Bay Sanctuary Covenant
   v. Trump,* 950 F.3d 1242 (9th Cir. 2020), 2020 WL 3637585 (9th
   Cir. July 6, 2020) ................................................................................4

*Bauer v. DeVos*,
   325 F. Supp. 3d 74 (D.D.C. 2018)................................................5, 27

*Becerra v. U.S. Dep't of Interior*,
   276 F. Supp. 3d 953 (N.D. Cal. 2017) ..................................................5

*Bedford Cty. Mem'l Hosp. v. Health & Human Servs.*,
   769 F.2d 1017 (4th Cir. 1985) ............................................................68

*Califano v. Yamasaki*,
   442 U.S. 682 (1979)..........................................................................107

*California v. U.S. Dep't of Health and Human Services*,
   No. 20-cv-00682-LB, 2020 U.S. Dist. LEXIS 127490 (N.D. Cal.
   July 20, 2020)........................................................................................4

*California v. U.S. Dep't of the Interior*,
   381 F. Supp. 3d 1153 (N.D. Cal. 2019) ................................................5

*Carlson v. Postal Regulatory Comm'n*,
   938 F.3d 337 (D.C. Cir. 2019)............................................................49

*CASA de Maryland v. Trump*,
   No. 19-2222, --- F.3d ---, 2020 WL 4664820 (4th Cir. Aug. 5,
   2020) ...................................................................................................93

*Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*,
   467 U.S. 837 (1984)............................................................................39

*Coal. for Responsible Reg'l Dev. v. Brinegar*,
   518 F.2d 522 (4th Cir. 1975) ..............................................................33

*Colorado v. EPA*,
   No. 20-CV-1461-WJM-NRN, 2020 WL 3402325 (D. Colo. June
   19, 2020) (appeal pending) ...............................................................101

*Crutchfield v. U.S. Army Corps of Eng'rs*,
    175 F. Supp. 2d 835 (E.D. Va. 2001) ............................................................104

*Crutchfield v. U.S. Army Corps of Eng'rs*,
    192 F. Supp. 2d 444 (E.D. Va. 2001) ..............................................................74

*D.C. v. U.S. Dep't of Agric.*,
    --- F. Supp. 3d ---, 2020 WL 1236657 (D.D.C. Mar. 13, 2020).......................92

*D.C. v. U.S. Dep't of Agric.*,
    No. 20-119, 2020 U.S. Dist. LEXIS 43853 (D.D.C. Mar. 13, 2020)..................5

*Defenders of Wildlife v. N. Carolina Dep't of Transp.*,
    762 F.3d 374 (4th Cir. 2014) ..........................................................................13

*Dep't of Commerce v. New York*,
    139 S.Ct. 2551 (2019) ......................................................................................6

*Dep't of Transp. v. Pub. Citizen*,
    541 U.S. 752 (2004)........................................................................................10

*DHS v. Regents of the Univ. of Calif.*,
    140 S. Ct. 1891 (2020) (*Regents*) ............................................................*passim*

*East Bay Sanctuary Covenant v. Barr*,
    385 F. Supp. 3d 922 (N.D. Cal. 2019).................................................................4

*East Bay Sanctuary Covenant v. Trump*,
    354 F. Supp. 3d 1094 (N.D. Cal. 2018)............................................................94

*Encino Motorcars, LLC. v. Navarro*,
    136 S. Ct. 2117 (2016)................................................................................9, 63

*FCC v. Fox Television Stations, Inc.*,
    556 U.S. 502 (2009) (*Fox TV*) ..................................................................*passim*

*FEC v. Akins*,
    524 U.S. 11 (1998)..........................................................................................88

*Friends of Alaska v. Bernhardt*,
    381 F. Supp. 3d 1127 (D. Alaska 2019) .............................................................4

*Gerber v. Norton*,
  294 F.3d 173 (D.C. Cir. 2002) ............................................................................41

*Getty v. Fed. Savs. & Loan Ins. Corp.*,
  805 F.2d 1050 (D.C. Cir. 1986) (*Getty*) ................................................41, 49, 55

*Grace v. Barr*,
  No. 19-5013, 2020 WL 4032652 (D.C. Cir. July 17, 2020) ................................3

*Gresham v. Azar*,
  363 F. Supp. 3d 165 (D.D.C. 2019), *aff'd*, 950 F.3d 93 (D.C. Cir.
  2020) .................................................................................................................4, 55

*Guilford Coll. v. McAleenan*,
  389 F. Supp. 3d 377 (M.D.N.C. 2019) .............................................................106

*Hanly v. Kleindienst*,
  471 F.2d 823 (2d Cir. 1972) .........................................................................30, 40

*Havens Realty Corp. v. Coleman*,
  455 U.S. 363 (1982) ......................................................................................91, 93

*Healthy Teen Network v. Azar*,
  322 F. Supp. 3d 647 (D. Md. 2018) .....................................................................4

*Heartwood v. U.S. Forest Serv.*,
  73 F. Supp. 2d 962 (S.D. Ill. 1999), *aff'd*, 230 F.3d 947 (7th Cir.
  2000) .................................................................................................................45, 75

*Hughes River Watershed Conservancy v. Glickman*,
  81 F.3d 437 (4th Cir. 1996) ...............................................................................13

*Int'l Ladies' Garment Workers' Union v. Donovan*,
  722 F.2d 795 (D.C. Cir. 1983) ...........................................................................71

*Invenergy Renewables LLC v. Unites States*,
  422 F. Supp. 3d at 1255, 1294 (U.S. Ct. Int'l Trade 2019) .............................105

*Iowa League of Cities v. EPA*,
  711 F.3d 844 (8th Cir. 2013) ..............................................................................88

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) .............................................................................10, 30, 40

*League of Women Voters of U.S. v. Newby,*
  838 F.3d 1 (D.C. Cir. 2016) .................................................................. 92

*Lindeen v. SEC,*
  825 F.3d 646 (D.C. Cir. 2016) ............................................................. 41

*Maryland v. EPA,*
  958 F.3d 1185 (D.C. Cir. 2020) ............................................................ 3

*McRee et al. v. Leatherbrook Holsteins et al.,*
  1:19-cv-00118-LAG (M.D. Ga.), Docket ........................................... 56

*Md. Cons. Council v. Gilchrist,*
  808 F.2d 1039 (4th Cir. 1986) ............................................................ 74

*Merck & Co., Inc. v. U.S. Dep't of Health & Human Servs.,*
  385 F. Supp. 3d 81 (D.D.C. 2019), *aff'd,* 962 F.3d 531 (D.C. Cir.
  2020) ..................................................................................................... 4

*Minn. Pub. Interest Research Grp. v. Butz,*
  498 F.2d 1314 (8th Cir. 1974) ............................................................ 34

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins.
  Co.,*
  463 U.S. 29 (1983) (*State Farm*) ....................................... 8, 41, 63, 71

*N. Mariana Islands v. United States,*
  686 F. Supp. 2d 7 (D.D.C. 2009) ........................................................ 94

*N.C. Growers' Ass'n, Inc. v. Solis,*
  644 F. Supp. 2d 664 (M.D.N.C. 2009), *as amended* (July 1, 2009) ................ 105

*N.C. Wildlife Fed'n v. NCDOT,*
  677 F.3d 596 (4th Cir. 2012) ........................................................ 29, 61

*Nat'l Audubon Soc'y v. Dep't of Navy,*
  422 F.3d 174 (4th Cir. 2005) .................................................. 10, 13, 103

*Nat'l Fed'n of Indep. Bus. v. Perez, Civ.
  A. No. 5:16-cv-00066-C, 2016 WL 3766121 (N.D. Tex. June 27,
  2016) .................................................................................................. 106

*Nat'l Min. Ass'n v. U.S. Army Corps of Eng'rs,*
   145 F.3d 1399 (D.C. Cir. 1998) ........................................................................106

*Nat'l Shooting Sports Found., Inc. v. Jones,*
   716 F.3d 200 (D.C. Cir. 2013) ...........................................................................71

*Nat'l Venture Capital Ass'n v. Duke,*
   291 F. Supp. 3d 5 (D.D.C. 2017) .........................................................................5

*Nat'l Wildlife Fed'n v. Hodel,*
   839 F.2d 694 (D.C. Cir. 1988) ...........................................................................89

*National Cable & Telecom. Ass'n v. Brand X Internet Serv's,*
   545 U.S. 967 (2005) ...........................................................................................40

*New Jersey v. EPA,*
   626 F.2d 1038 (D.C. Cir. 1980) .........................................................................94

*New York v. DHS,*
   408 F. Supp. 3d 334 (S.D.N.Y. 2019) .................................................................4

*New York v. DHS,*
   No. 20-05439 (S.D.N.Y. July 13, 2020) ..............................................................4

*New York v. U.S. Dep't of Commerce,*
   351 F. Supp. 3d 502 (S.D.N.Y. 2019), *aff'd in part, rev'd in part*
   *on other grounds,* 139 S. Ct. 2551 (2019) .......................................................88

*New York v. U.S. Dep't of Health & Human Services,*
   414 F. Supp. 3d 475 (S.D.N.Y. 2019) .................................................................5

*New York v. U.S. Dep't of Labor,*
   363 F. Supp. 3d 109 (D.D.C. 2019), *appeal filed* (D.C. Cir. 19-
   5125) ....................................................................................................................4

*New York v. U.S. Nuclear Regulatory Comm'n,*
   824 F.3d 1012 (D.C. Cir. 2016) .........................................................................52

*Nken v. Holder,*
   556 U.S. 418 (2009) ...........................................................................................96

*NRDC v. Callaway,*
   524 F.2d 79 (2d Cir. 1975) ...........................................................................31, 52

*NRDC v. Dep't of Energy*,
   362 F. Supp. 3d 126 (S.D.N.Y. 2019) ................................................................. 5

*NRDC v. EPA*,
   438 F. Supp. 3d 220 (S.D.N.Y. 2020) ................................................................. 4

*NRDC. v. Morton*,
   458 F.2d 827 (D.C. Cir. 1972) ........................................................ 31, 32, 33, 40

*NRDC v. NHTSA*,
   894 F.3d 95 (2d Cir. 2018) ................................................................................. 4

*NRDC v. Wheeler*,
   955 F.3d 68 (D.C. Cir. 2020) .............................................................................. 3

*Oceana, Inc. v. Ross*,
   No. 17-cv-05146, 2018 U.S. Dist. LEXIS 185369 (C.D. Cal. Oct.
   24, 2018) ............................................................................................................. 4

*Open Cmtys. All. v. Carson*,
   286 F. Supp. 3d 148 (D.D.C. 2017) .................................................................... 5

*Org. Vill. of Kake v. U.S. Dep't. of Agric.*,
   795 F.3d 956 (9th Cir. 2015) .............................................................................. 8

*Ostergren v. Cuccinelli*,
   615 F.3d 263 (4th Cir. 2010) ......................................................................... 106

*Pashby v. Delia*,
   709 F.3d 307 (4th Cir. 2013) (*Pashby*) ...................................................... 26, 28

*Philbrick v. Azar*,
   397 F. Supp. 3d 11 (D.D.C. 2019) ..................................................................... 5

*Pineros y Campesinos Unidos del Noroeste v. Pruitt*,
   293 F. Supp. 3d 1062 (N.D. Cal. 2018) .............................................................. 5

*Prometheus Radio Project v. FCC*,
   939 F.3d 567 (3d Cir. 2019) ............................................................................... 3

*Ranchers Cattlemen Action Legal Fund United Stockgrowers of Am.*
   *v. U.S. Dep't of Agric.*,
   415 F.3d 1078 (9th Cir. 2005) ......................................................................... 68

*Reno v. Flores*,
  507 U.S. 292 (1993)............................................................................27

*New Mexico. ex rel. Richardson v. BLM*,
  565 F.3d 683 (10th Cir. 2009) ...........................................................11

*Roanoke River Basin Ass'n v. Hudson*,
  940 F.2d 58 (4th Cir. 1991) ...............................................................13

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989)......................................................................*passim*

*S. Envtl. Law Ctr. v. CEQ*,
  No. 3:18CV00113, 2019 WL 4417486 (W.D. Va. Sept. 16, 2019) ...................15

*S. Fork Band Council of W. Shoshone v. U.S. Dep't of Interior*,
  588 F.3d 718 (9th Cir. 2009) ..............................................................97

*S.C. Coastal Conservation League v. Pruitt*,
  318 F. Supp. 3d 959 (D.S.C. 2018) ......................................4, 27, 106

*San Luis & Delta-Mendota Water Auth. v. Jewell*,
  747 F.3d 581 (9th Cir. 2014) ..............................................................50

*SEC v. Chenery*,
  318 U.S. 80 (1943)...............................................................................8

*Sierra Club v. Bosworth*,
  510 F.3d 1016 (9th Cir. 2007) ............................................................75

*Sierra Club v. Marsh*,
  872 F.2d 497 (1st Cir. 1989).........................................................*passim*

*Sierra Club v. U.S. Dep't of the Interior*,
  899 F.3d 260 (4th Cir. 2018) .............................................................49

*Stewart v. Azar*,
  313 F. Supp. 3d 237 (D.D.C. 2018)......................................................5

*Stewart v. Azar*,
  366 F. Supp. 3d 125 (D.D.C. 2019), *appeal dismissed*, Nos. 19-
  5095, 2020 U.S. App. LEXIS 535 (D.C. Cir. Jan. 8, 2020) .................4

*Tafas v. Dudas*,
    511 F. Supp. 2d 652 (E.D. Va. 2007) ................................................................101

*Texas v. EPA*,
    829 F.3d 405 (5th Cir. 2016) ...............................................................................27

*Texas v. United States*,
    201 F. Supp. 3d 810 (N.D. Tex. 2016) ...............................................................106

*U.S. Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019).................................................................................3, 8, 63

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
    933 F.3d 728 (D.C. Cir. 2019)...........................................................4, 44, 45, 52

*United States v. South Carolina*,
    720 F.3d 518 (4th Cir. 2013) .............................................................................100

*United Steel v. Mine Safety & Health Admin.*,
    925 F.3d 1279 (D.C. Cir. 2019)..............................................................................3

*W. Watersheds Project v. Schneider*,
    417 F. Supp. 3d 1319 (D. Idaho 2019) .................................................................75

*W. Watersheds Project v. Zinke*,
    336 F. Supp. 3d 1204 (D. Idaho 2018) ............................................................4, 75

*Washington v. U.S. Dep't of State*,
    2020 U.S. Dist. LEXIS 39608 (W.D. Wash. March 6, 2020),
    *appeal filed* (9th Cir. 20-35391) ...........................................................................4

*Webster v. U.S. Dep't of Agric.*,
    685 F.3d 411 (4th Cir. 2012) .......................................................................13, 31

*WildEarth Guardians v. Salazar*,
    859 F. Supp. 2d 83 (D.D.C. 2012)........................................................................89

*Winter v. NRDC*,
    555 U.S. 7 (2008).............................................................................................72, 96

**Statutes**

5 U.S.C. § 705 ..........................................................................................................27

ix

5 U.S.C. § 706(2)(A)...................................................................................8, 28, 44

16 U.S.C. § 1531 et seq...........................................................................................50

42 U.S.C. § 4331 et seq ....................................................................................*passim*

42 U.S.C. § 4335 ....................................................................................................50

42 U.S.C. § 4342 ...........................................................................................42, 44, 45

42 U.S.C. § 4370m—to 4370m–12 .........................................................................72

42 U.S.C. §§ 7401 et seq.........................................................................................51

**Regulations**

23 C.F.R. § 771.123(k) ...........................................................................................66

36 C.F.R. § 218.25 .................................................................................................66

36 C.F.R. § 219.16(a)(2) .........................................................................................66

36 C.F.R. § 220 ......................................................................................................59

36 C.F.R. § 220.4(e).................................................................................................48

40 C.F.R. § 1500 et seq..................................................................................*passim*

1 N.C. Admin. Code 25.0402 ...........................................................................62, 63

**Other Authorities**

36 Fed. Reg. 7724 (April 23, 1971), § 5(b) .............................................................34

43 Fed. Reg. 55,978 (Nov. 29, 1978) ................................................................11, 41

51 Fed. Reg. 15,618 (April 25, 1986)......................................................................13

83 Fed. Reg. 28,591 (June 20, 2018) .......................................................................14

83 Fed. Reg. 44,846 (Sep. 4, 2018) .........................................................................72

84 Fed. Reg. 27,544 (June 13, 2019) .......................................................................48

85 Fed. Reg. 1,684 (Jan. 10, 2020).................................................................*passim*

85 Fed. Reg. 43,304 (July 16, 2020)..................................................................*passim*

COUNCIL ON ENVTL. QUALITY, THE NATIONAL ENVIRONMENTAL
    POLICY ACT: A STUDY OF ITS EFFECTIVENESS AFTER TWENTY-FIVE
    YEARS (Jan. 1997).................................................................12, 13, 70

Exec. Order No. 12291, 46 Fed. Reg. 13,193 (Feb 17, 1981).................................42

Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993)..............................42

Exec. Order No. 13927, 85 Fed. Red. 35,165 (June 4, 2020).................................72

The plaintiffs ("Conservation Groups") seek immediate relief to enjoin Defendants Council on Environmental Quality ("CEQ") and Mary Neumayr, Chair of CEQ (collectively, "CEQ" or "Defendants"), from implementing new National Environmental Policy Act ("NEPA") regulations (hereinafter, "the Rule" or "Rule") announced on July 15, 2020, that would dramatically reverse protections vital to the Conservation Groups' interests.  For over 40 years the regulations have required every federal agency in the executive branch to evaluate and disclose the impacts of its proposed actions to the public, take into account public feedback, and consider whether there are less harmful alternatives before proceeding with a decision.[1]  The Rule unlawfully weakens these basic, commonsense requirements at every turn.

The consequences of the wide-reaching rule, which President Trump characterized as a "complete[] overhaul,"[2] will be immediate and severe.  As Secretary of the Interior David Bernhardt noted when the Rule was introduced, "[the] proposal affects virtually every significant decision made by the federal government that affects the environment.  And . . . will be the most significant deregulatory proposal [the Trump Administration] ultimately implement[s]."[3] Mr. Bernhardt is correct.  The changes will apply to everything from decisions about how to build new highway infrastructure, where to log forests, and whether to open up our shores to drilling.

Absent an injunction or stay, the Rule will become mandatory for any new NEPA process begun after September 14, 2020, and the Conservation Groups will suffer  imminent irreparable harm, as upcoming projects that affect environmental resources tied to their organizational

---

[1] Alternatively, the Conservation Groups ask the Court to stay the Rule's effective date of September 14, 2020 with an order to clarify that because the effective date has been stayed it may not be applied to ongoing projects.

[2] Remarks on Proposed National Environmental Policy Act Regulations, (Jan. 9, 2020) (President Trump Remarks), *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-proposed-national-environmental-policy-act-regulations/

[3] *Id.* (Interior Secretary David Bernhardt remarks) [hereinafter "Bernhardt Remarks"].

missions will be excluded from review entirely or deprived of the "hard look" and robust opportunity for public participation that NEPA requires.  As a result, the Conservation Groups have already been forced to begin shifting organizational resources to compensate for the loss of information and participation the new Rule causes.

Even more urgently, the new Rule gives federal agencies the discretion to "apply the regulations in this subchapter to ongoing activities" begun *before* that date.  40 C.F.R. § 1506.13 (2020).  Simply put, CEQ has authorized the more than one hundred federal agencies[4] that comply with NEPA to change horses mid-stream. This threatens to disrupt the reliance interests of Conservation Groups, and others similarly situated, across the country who are already deeply invested in ongoing projects, and that have been utilizing organizational resources to comment, participate, and even litigate pursuant to the 1978 regulations.

Postponing the Rule's effect is necessary to maintain the decades-long status quo while this litigation is pending.  As discussed below, the Conservation Groups are likely to succeed on the merits of their claims that CEQ violated the Administrative Procedure Act ("APA") because it issued a Rule that is utterly at odds with the underlying NEPA statute and ignored the severe consequences of its drastic overhaul.  An injunction is in the public interest and will prevent unnecessary environmental, procedural, and informational harms to the Conservation Groups and their members, caused by the Rule's widespread disruption of project development and confusion in agency practices nationwide.

---

[4] *See* Council on Environmental Quality, *Federal Agency NEPA Contacts and Chief Environmental Review and Permitting Officers* (Dec. 6, 2019), *available at* https://ceq.doe.gov/nepa-practice/agency-nepa-contacts.html.

The Conservation Groups respectfully request that this matter proceed with expedited briefing and a hearing so that the Court may issue an injunction or stay prior to the Rule's effective date of September 14, 2020.

## INTRODUCTION

To change the law, government agencies must follow the law. Administrations come and go and so do policy preferences, but agency changes to regulations must follow the procedures set out in the APA. The APA requires that changes to policy be reasoned, responsive to evidence, thoughtful about their consequences, and consistent with the underlying laws they implement. The United States Supreme Court recently reaffirmed the importance of this process, and the need for vigorous compliance, noting that "'the Government should turn square corners in dealing with the people.'" *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891, 1909 (2020) (quoting *St. Regis Paper Co. v. United States*, 368 U. S. 208, 229 (1961) (Black, J., dissenting)).

The current Administration's attempt to radically rewrite NEPA cuts every "square corner" set in place by the APA, and, unfortunately, is only the latest in a long line of APA violations by this Administration.[5] Despite the immense scope of the rulemaking—NEPA is the

---

[5] *See, e.g.*, *DHS v. Regents of the Univ. of Calif.*, 140 S. Ct. 1891 (2020) (failure to consider reliance interests when reversing the policy of the Deferred Action for Childhood Arrivals); *U.S. Dep't of Commerce v. New York*, 139 S. Ct. 2551 (2019) (failure to provide a reasoned explanation for the decision to reinstate a question regarding citizenship status on the census); *Maryland v. EPA*, 958 F.3d 1185 (D.C. Cir. 2020) (failure to provide a reasoned explanation for EPA's rejection of a Maryland petition seeking tighter pollution limits on coal fired power plants in upwind states); *Grace v. Barr*, No. 19-5013, 2020 WL 4032652 (D.C. Cir. July 17, 2020) (failure to engage in reasoned decision-making for asylum interview standards); *NRDC v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020) (failure to comply with notice and comment requirements for EPA's rule eliminating restrictions on the use of hydrofluorocarbons, powerful greenhouse gases); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) (failure to provide reasoned explanation for amended rule on mine safety inspections); *Air All. Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018) (failure to provide reasoned explanation for EPA's suspension of Chemical Disaster Rule); *Prometheus Radio Project v. FCC*, 939 F.3d 567 (3d Cir. 2019) (failure to adequately analyze and consider the impact that new FCC rule would have on broadcast media ownership by women and racial minorities); *United Keetoowah Band of Cherokee Indians v. FCC*, 933 F.2d 728 (D.C. Cir. 2019) (FCC's deregulation of small cell infrastructure failed to meet the basic standard of

reasoned decision-making); *NRDC v. NHTSA*, 894 F.3d 95 (2d Cir. 2018) (failure to comply with notice and comment requirements and lack of statutory authority in delaying rule adjusting penalties for violations of fuel economy standards); *East Bay Sanctuary Covenant v. Barr,* 385 F. Supp. 3d 922 (N.D. Cal. 2019)*, stayed, Barr v. East Bay Sanctuary Covenant,* 140 S. Ct. 3 (2019), *aff'd sub nom. East Bay Sanctuary Covenant v. Trump,* 950 F.3d 1242 (9th Cir. 2020), 2020 WL 3637585 (9th Cir. July 6, 2020) (failure to comply with notice and comment requirements and failure to provide reasoned explanation of a rule denying asylum for those entering at the southern border who did not apply for asylum in another country); *Gresham v. Azar*, 363 F. Supp. 3d 165 (D.D.C. 2019), *aff'd*, 950 F.3d 93 (D.C. Cir. 2020) (failure to address lost coverage that would occur from Arkansas rollback of Medicaid expansion in the Affordable Care Act ("ACA")); *Merck & Co., Inc. v. U.S. Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81 (D.D.C. 2019), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020) (Department of Health and Human Services exceeded its statutory authority in rule requiring drug manufacturers to post drug prices in TV ads); *Washington v. U.S. Dep't of State*, 2020 U.S. Dist. LEXIS 39608 (W.D. Wash. March 6, 2020), *appeal filed* (9th Cir. 20-35391) (failure to comply with notice-and-comment requirements, failure to make a decision based on factors required by Congress, and failure to consider prior findings regarding the danger of a publication of technical data files related to 3D-printed guns); *New York v. DHS*, 408 F. Supp. 3d 334 (S.D.N.Y. 2019), *stayed* (U.S.S.C. Jan. 27, 2020), *appeal filed* (2d Cir. 19-03591) (failure to provide reasoned explanation for changing the definition of "public charge" in rule expanding DHS's ability to deny applications for lawful permanent residency by deeming immigrants likely to become "public charges," and lack of statutory authority in choosing new definition); *New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109 (D.D.C. 2019), *appeal filed* (D.C. Cir. 19-5125) (Department of Labor exceeded its statutory authority in making rule regarding association health plans designed to circumvent the healthcare market requirements imposed by the ACA); *Friends of Alaska v. Bernhardt*, 381 F. Supp. 3d 1127 (D. Alaska 2019), *appeal dropped* (9th Cir. 19-35451) (failure to provide reasoned explanation for prior decision not to build a road in a new decision to open an Alaskan refuge to road construction); *Stewart v. Azar*, 366 F. Supp. 3d 125 (D.D.C. 2019), *appeal dismissed*, Nos. 19-5095, 2020 U.S. App. LEXIS 535 (D.C. Cir. Jan. 8, 2020) (failure to address lost coverage in decision approving Kentucky's Medicaid work retirement plan, an effort to roll back Medicaid expansion in the ACA); *Oceana, Inc. v. Ross*, No. 17-cv-05146, 2018 U.S. Dist. LEXIS 185369 (C.D. Cal. Oct. 24, 2018), *appeal dropped* (9th Cir. 19-55021) (decision to withdraw a proposed regulation protecting fish species from inadvertent death or injury through gillnets was arbitrary, capricious, and in excess of defendant's statutory authority); *NRDC v. EPA*, 438 F. Supp. 3d 220 (S.D.N.Y. 2020) (failure to provide reasoned explanation of new EPA directive prohibiting grant recipients from sitting on science advisory committees); *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959 (D.S.C. 2018), *appeal dropped* (4th Cir. No. 18-1988) (failure to provide meaningful opportunity to comment and failure to provide reasoned explanation on suspension of Obama-era Clean Water Rule); *Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647 (D. Md. 2018), *appeal dropped* (4th Cir. 18-1709) (failure to address relevant statutory factors for Health and Human Services' decision to terminate a grant for teen pregnancy prevention); *New York v. DHS*, No. 20-05439 (S.D.N.Y. July 13, 2020) (failure to comply with notice and comment requirements when enacting a policy stripping international students of their U.S. visas if coursework is entirely online due to Covid-19); *California v. U.S. Dep't of Health and Human Services*, No. 20-cv-00682-LB, 2020 U.S. Dist. LEXIS 127490 (N.D. Cal. July 20, 2020) (failure to provide a reasoned explanation why separate payments were required for abortion and non-abortion services); *W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204 (D. Idaho 2018) (failure to comply with notice and comment requirements and lack of statutory authority for rule limiting environmental review and public participation in oil and gas lease sales that would threaten the sage grouse); *Pineros y Campesinos Unidos del Noroeste v. Pruitt*, 293 F. Supp. 3d 1062 (N.D. Cal. 2018) (failure to comply with

most widely employed environmental law in the nation, and the Rule runs to 66 pages of changes—CEQ rushed through the rulemaking process in the middle of the pandemic with unprecedented speed. After publishing a draft Rule in January, the agency received over 1.1 million comments at the close of the public input period in March. CEQ finalized its rulemaking a mere four months later. And despite the many alarm bells rung, it published a Rule that is mostly identical to the proposal—one that is inconsistent with the statute and is neither supported by evidence nor responsive to public need.

In its rush to issue a Rule that would meet President Trump's promise of a "complete overhaul" CEQ promulgated a Rule that is completely at odds with NEPA's statutory text. For example, the Rule eliminates the evaluation of cumulative impacts, which the Supreme Court has expressly held is required by the statute itself. The Rule expressly cuts out language stating an

---

notice and comment requirements for EPA's delay of a rule designed to limit harmful pesticide use); *Open Cmtys. All. v. Carson*, 286 F. Supp. 3d 148 (D.D.C. 2017) (failure to consider important aspects of the problem and failure to comply with notice and comment requirements for HUD's delay of a rule increasing access to housing for low-income tenants); *Nat'l Venture Capital Ass'n v. Duke*, 291 F. Supp. 3d 5 (D.D.C. 2017) (failure to comply with notice and comment requirements for delay of the Entrepreneur Rule); *Becerra v. U.S. Dep't of Interior*, 276 F. Supp. 3d 953 (N.D. Cal. 2017) (failure to seek public comment and lack of statutory authority for DOI's delay of a rule reforming the procedures governing royalties); *Philbrick v. Azar*, 397 F. Supp. 3d 11 (D.D.C. 2019) (failure to address lost coverage that would occur through decision approving New Hampshire's Medicaid work requirement plan, an effort to roll back the Medicaid expansion in the ACA); *Bauer v. DeVos*, 325 F. Supp. 3d 74 (D.D.C. 2018) (failure to provide any meaningful analysis or reason for delay of Department of Education's Borrower Defense Rule); *NRDC v. Dep't of Energy*, 362 F. Supp. 3d 126 (S.D.N.Y. 2019) (failure to provide reasoned explanation for staying efficiency rules for air conditioners and heat pumps); *D.C. v. U.S. Dep't of Agric.*, No. 20-119, 2020 U.S. Dist. LEXIS 43853, (D.D.C. Mar. 13, 2020) (failure to provide a reasoned explanation and violation of governing statute for a USDA rule that would cause approximately 700,000 people to lose access to their benefits under the Supplemental Nutrition Assistance Program); *New York v. U.S. Dep't of Health & Human Services*, 414 F. Supp. 3d 475 (S.D.N.Y. 2019) (failure to provide reasoned explanation in a Department of Health and Human Services rule that, among other things, allowed healthcare providers to refuse service based on a religious or moral objection); *California v. U.S. Dep't of the Interior*, 381 F. Supp. 3d 1153 (N.D. Cal. 2019) (failure to provide reasoned explanation for repealing the Valuation Rule reforming the procedures governing royalties); *Stewart v. Azar*, 313 F. Supp. 3d 237 (D.D.C. 2018) (failure to address lost coverage that would occur from decision approving Kentucky's Medicaid work requirement plan, an effort to roll back the Medicaid expansion in the ACA).

analysis of alternatives is the "heart of the environmental impact statement" and pushes NEPA toward being a meaningless exercise to justify decisions made behind closed doors rather than the democratic, action-forcing process the statute intended. CEQ attempts to sidestep and obfuscate the effects of its radical changes, but the administration's publicly stated goal—a sweeping deregulatory overhaul—is clear. *See Dep't of Commerce v. New York*, 139 S.Ct. 2551, 2575 (2019) (noting that courts are "'not required to exhibit a naiveté from which ordinary citizens are free'") (internal quotation omitted).

By hastily pushing through this far-reaching Rule, CEQ also disregarded the core legal requirements of rulemaking.  CEQ failed to consider the consequences of reversing longstanding NEPA regulations and the implications for environmental protection and interests that have long relied on them.  Further, CEQ did not support its rulemaking with credible evidence and ignored the mountain of expertise and past experience presented to it.  Likewise, CEQ failed entirely to look at less drastic solutions—such as expanded guidance, increasing funding to agencies implementing NEPA, and better utilizing existing tools to coordinate reviews—that might actually have achieved the stated aims of the rulemaking without eviscerating vital components of NEPA.

CEQ's numerous and fundamental violations of the APA make clear that the Conservation Groups will prevail on the merits of their claims.  An injunction or stay must issue to prevent the harm, confusion, and chaos that will result if CEQ is permitted to overturn forty years of established NEPA practice while this case is pending.

The seventeen Conservation Group plaintiffs in this case will suffer a variety of immediate and irreparable harms if the illegal Rule goes into effect.  The new process will result in irreversible environmental harm as projects move forward with fewer and weaker procedural

safeguards.  The Conservation Groups will swiftly suffer informational injury as government disclosure recedes.  And, as a result, the Conservation Groups will be forced—indeed, have already been forced—to shift limited organizational resources to try to mitigate these losses, which will hamstring their abilities to fulfil their core missions.

An injunction is in the public interest to protect against unnecessary environmental harms and meet the public's interest in stable regulation.  As noted by former CEQ Managing Director Christy Goldfuss, the chaos and uncertainty that will result from overturning decades of established practice is going to lead to both "inadequate environmental reviews and project delays."[6]  This chaos will only be further exacerbated if the Rule goes into effect for a short while and then the agencies are forced to return to the previous regulations once the merits of the case are reached and the Rule is vacated.[7]

Other experts agree: Nicholas Yost, General Counsel of CEQ when the regulations were first adopted in 1978, notes that "rapid and timely determinations of the legality of the [Rule] can serve to prevent or affect scores of agencies spending efforts to develop procedures which may turn out to have a basis which is contrary to law."[8]  And David Hayes, who administered NEPA for the Department of Interior under Presidents Clinton and Obama, explains that "[w]ith our nation reeling under the effects of the coronavirus, this is not time to throw aside decades of statutory understandings and put at risk the federal permitting and approval processes for major infrastructure investments that need to be made.  The results could be disastrous."[9]

---

[6] Goldfuss Decl. ¶ 36, attached as Ex. 52.  Christy Goldfuss was Managing Director of CEQ from 2015 to 2017.
[7] *Id.*
[8] Yost Decl. ¶ 24, attached as Ex. 53.  Nicholas Yost was General Counsel of CEQ from 1977 to 1981.
[9] Hayes Decl. ¶ 32, attached as Ex. 54. David Hayes was Deputy Secretary at the Department of Interior from 1999 to 2001 and 2009 to 2013.

By contrast, CEQ has not established any genuine public interest in these changes to the NEPA regulations.  All its proffered explanations are undercut by established facts in the record—facts which CEQ has not deigned to refute, or even address.  A preliminary injunction allowing important projects to proceed for now under the well-settled requirements that have been in place for over forty years will ensure that NEPA's important national goals can continue to be met while the Court adjudicates the merits.

## STATUTORY BACKGROUND

### I.    The Administrative Procedure Act

The APA authorizes a court to "hold unlawful and set aside agency action, findings and conclusions" it finds to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious where the agency: (1) has relied on factors which Congress has not intended it to consider; (2) failed to consider all important aspects of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or (4) is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).  Agencies may not ignore or countermand their earlier factual findings without a reasoned explanation, "even when reversing a policy after an election."  *Org. Vill. of Kake v. U.S. Dep't. of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015); *see also FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 537 (2009).

An agency's rationale for its new policy must be clearly stated in the administrative record.  *Regents*, 140 S. Ct. at 1909 ("An agency must defend its actions based on the reasons it gave when it acted."); *SEC v. Chenery*, 318 U.S. 80 (1943).  The rationale must also be genuine: an agency cannot rely on a pretextual or contrived explanation in order to avoid legal or political

accountability for its actions.  *Dep't of Commerce,* 139 S. Ct. at 2575–76 ("The reasoned

explanation requirement of administrative law, after all, is meant to ensure that agencies offer

genuine justifications for important decisions, reasons that can be scrutinized by courts and the

interested public").  Moreover, an agency issuing a rule that abandons prior policy or practice

must take into account the "serious reliance interests" engendered by its prior position.  *See*

*Encino Motorcars, LLC. v. Navarro*, 136 S. Ct. 2117, 2126 (2016).

## II.   NEPA

NEPA has long served as this nation's most fundamental environmental law and declares

that it is "the continuing responsibility of the Federal Government" to ensure the nation may:

> (1) fulfill the responsibilities of each generation as trustee of the environment for
> succeeding generations;
>
> (2) assure for all Americans safe, healthful, productive, and esthetically and
> culturally pleasing surroundings;
>
> (3) attain the widest range of beneficial uses of the environment without
> degradation, risk to health or safety, or other undesirable and unintended
> consequences;
>
> (4) preserve important historic, cultural, and natural aspects of our national
> heritage, and maintain, wherever possible, an environment which supports
> diversity and variety of individual choice;
>
> (5) achieve a balance between population and resource use which will permit high
> standards of living and a wide sharing of life's amenities; and
>
> (6) enhance the quality of renewable resources and approach the maximum
> attainable recycling of depletable resources.

42 U.S.C. § 4331.

In NEPA, Congress made it the responsibility of every federal agency "to use all

practicable means and measures . . . to create and maintain conditions under which man and

nature can exist in productive harmony."  *Id.*  While recognizing that federal agencies would

continue to take "economic and technical considerations" into account in pursuit of their respective missions, NEPA mandated that "unquantified environmental amenities and values" must be given "appropriate consideration in decisionmaking" alongside them.  *Id*. § 4332(2)(B). In order to *use* "all practicable means and measures," an agency must first *know* what its options are and how their effects will differ.  Thus, at the heart of NEPA's statutory scheme is an action-forcing process that requires decisionmakers to take a "hard look" at environmental consequences before undertaking a potentially harmful action.  *Kleppe v. Sierra Club*, 427 U.S. 390, 410 n.21 (1976); *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989); *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 187 (4th Cir. 2005) ("The hallmarks of a 'hard look' are thorough investigation into environmental impacts and forthright acknowledgements of potential environmental harms.").  NEPA also requires agencies to consider alternative solutions to the problem they are intending to fix.  42 U.S.C. § 4332(2)(C)(iii).

In other words, NEPA is predictive and deliberative: it ensures that agencies know whether their proposals will have unlawful or unnecessary impacts ahead of time, and that they actually consider that information in their decisionmaking.  In the interest of ensuring informed decisionmaking and opening the process up to the public, NEPA makes this review process transparent—ensuring democratic accountability.  *Id*. § 4332(2)(C).  While CEQ oversees the NEPA program, all federal agencies are independently obligated to comply with the mandates "to the fullest extent possible." *Id.* § 4332(2) ("all agencies of the Federal Government shall . . . .").  NEPA does not compel particular substantive results, but its "procedures are almost certain to affect the agency's substantive decision."  *Robertson*, 490 U.S. at 350.

NEPA has been long understood to have twin aims: informing the decisionmaker, and informing the public to stimulate participation and ensure accountability.  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (describing an EIS as intended to "provid[e] a springboard for public comment" (alteration in original) (quoting *Robertson*, 490 U.S. at 349)); *New Mexico. ex rel. Richardson v. BLM*, 565 F.3d 683, 703 (10th Cir. 2009) ("By focusing both agency and public attention on the environmental effects of proposed actions, NEPA facilitates informed decisionmaking by agencies and allows the political process to check those decisions.").

## BACKGROUND AND FACTS

### I.   CEQ's Previous Regulations

In 1978, CEQ promulgated regulations that implemented NEPA's requirements and established a floor for other agencies' implementing procedures.  The rulemaking process "affirmatively involv[ed] NEPA's critics as well as its friends."[10]  Indeed, President Carter directed CEQ to not only listen to all stakeholders but to respond affirmatively to each stakeholder until each one was satisfied.  CEQ also met repeatedly with all who had concerns.[11]

The regulations' familiar requirements are well established:  If an action is likely to have significant impacts, an Environmental Impact Statement ("EIS") is prepared to meet NEPA's "detailed statement" requirement.  40 C.F.R. Part 1502 (1978).  At the other end of the spectrum, actions that do not individually or cumulatively have a significant effect can be authorized using a Categorical Exclusion ("CE"), with only cursory review to determine whether there are extraordinary circumstances deserving additional review.  *Id.*  § 1508.4 (1978).  If an action is

---

[10] National Environmental Policy Act Regulations; Implementation of Procedural Provisions, 43 Fed. Reg. 55,978, 55,980 (Nov. 29, 1978).
[11] Yost Decl. ¶ 9

not categorically excluded but neither is it certain whether its impacts will be significant, agencies prepare an Environmental Assessment ("EA"), which results in either a decision to prepare an EIS (if effects are potentially significant) or a Finding of No Significant Impact ("FONSI").  *Id.* § 1508.9 (1978).  Often, an agency will commit to measures that avoid or mitigate impacts to justify a FONSI and avoid the additional expense of an EIS.[12]  The requirements for EAs are less stringent, but EAs still preserve the "heart" of environmental analysis—the comparison of alternatives.  Under the statute, any action with "unresolved conflicts" in the use of agency resources affecting the human environment must be vetted through a comparison of alternatives.  42 U.S.C. § 4332(2)(E).

Each federal agency is also separately responsible for developing its own implementing procedures, all of which use the same terminology as CEQ's regulations or explicitly incorporate them by reference. *See* 40 C.F.R. § 1507.3 (1978) (requiring that other agencies' procedures "comply with" and "not paraphrase" CEQ's regulations).  The 1978 regulations were a floor on other agencies' rules, and agencies were free to adopt "supplement[al]" procedures as needed "to ensure full compliance with the purposes and provisions of [NEPA]," but the basic process has been consistent across all agencies of the federal government.  *Id.*

CEQ's open, accessible, and responsive process created regulations with long-lasting stability.  In their forty years of operation, these regulations have repeatedly been reaffirmed by CEQ.  Proving the success of the 1978 regulations, CEQ only made one minor substantive amendment prior to the rulemaking at issue in this case, noting at that time that the regulations

---

[12] COUNCIL ON ENVTL. QUALITY, THE NATIONAL ENVIRONMENTAL POLICY ACT: A STUDY OF ITS EFFECTIVENESS AFTER TWENTY-FIVE YEARS (Jan. 1997) at 19. CEQ recommended that agencies implement the regulations better by starting NEPA earlier in the decisionmaking process, *id.* at 11–12, improving public outreach, *id.* at 18, and utilizing "scoping" as an opportunity for public engagement in preparing Environmental Assessments, *id.* at 20—all recommendations that the Rule would undermine or reject entirely.

were "working well."[13]  In 1997, CEQ took a look at twenty-five years' worth of experience and again "[o]verall … found that NEPA is a success."[14]

The prior regulations' success was due largely to the specific, concrete requirements of the 1978 regulations and the large body of caselaw that built up around them.  This extensive body of law provided clarity through numerous examples, such as defining the significance threshold, *e.g.*, *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 62-65 (4th Cir. 1991), the responsibility to address cumulative impacts, *e.g.*, *Nat'l Audubon Soc'y*, 422 F.3d at 197, the problem with segmenting larger actions into smaller, seemingly insignificant ones, *e.g.*, *Defenders of Wildlife v. N. Carolina Dep't of Transp.*, 762 F.3d 374, 396–98 (4th Cir. 2014), how to consider alternatives, *e.g.*, *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 427 (4th Cir. 2012), and when to prepare a supplemental analysis, *e.g.*, *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996).  With so many cases illustrating the application of the statute to both routine and unusual circumstances, very few NEPA questions have been left unanswered.  Courts have found such a close identity between the statute and the 1978 regulations that they often discuss these separate sources of law collectively.  *See*, *e.g.*, *Nat'l Audubon Soc'y*, 422 F.3d at 184 ("The statute and the regulations specify . . . .").

---

[13] National Environmental Policy Act Regulations; Incomplete or Unavailable Information, 51 Fed. Reg. 15,618, 15,619 (April 25, 1986).  Notably, the refinement to the regulations made in 1986 has now been discarded by CEQ.  Prior to 1986, the regulations required agencies to analyze a "worst case" scenario in the face of uncertainty.  In 1986, based on experience implementing the regulations, CEQ eliminated the worst case analysis and substituted a framework that required agencies to gather information to resolve uncertainties unless it was unobtainable or would require exorbitant cost.  40 C.F.R. § 1502.22 (1978).  Now, CEQ purports to excuse agencies from gathering new scientific or technical information. 40 C.F.R. § 1502.23 (2020).

[14] *See, e.g.*, 1997 Effectiveness Study.

## II.    CEQ's Rulemaking

On June 20, 2018, forty years after CEQ's initial promulgation of NEPA regulations, the agency issued an Advance Notice of Proposed Rulemaking ("ANPRM"), signaling its intent to completely rewrite the NEPA regulations.[15]  The ANPRM consisted of 20 questions, many of which were framed so broadly that they could have encompassed nearly any possible change and were therefore too broad for meaningful public engagement.[16]

Despite an overly brief window for public engagement and the vague questions presented, CEQ still received over 12,500 comments in response to the ANPRM—the majority of which supported leaving the existing regulations largely intact.[17]  The Conservation Groups submitted substantial comments raising a range of points, including the current efficacy—but ultimate underutilization—of the existing framework, as well as the unnecessary harms that would result from a total rewrite of the NEPA regulations.  The Conservation Groups also suggested that CEQ already had the necessary mechanisms to bring about the desired outcomes without changing the regulations, namely, by following through on the agency's own recommendations of strengthening cumulative impacts analysis and involving the public earlier in the process.

On January 10, 2020, CEQ issued a Notice of Proposed Rulemaking ("NPRM") for the new NEPA regulations, unveiling its proposal to eviscerate the longstanding NEPA

---

[15] Advance Notice of Proposed Rulemaking: Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, 83 Fed. Reg. 28,591, 28,591 (June 20, 2018) ("ANPRM").

[16] *Id.*

[17] *See* Notice of Proposed Rulemaking: Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 1,684, 1,691 (Jan. 10, 2020) ("NPRM").

regulations.[18]  CEQ's Proposed Rule failed to meaningfully engage with the range of comments it had received in response to the ANRPM—asserting vaguely that the proposed changes were responsive to supportive comments and ignoring the weight of skeptical comments.[19]

Compared to the careful and collaborative process by which the 1978 regulations were developed, the NPRM provided only *pro forma* public involvement, granting just sixty days for the public to comment on the newly rewritten regulations and refusing the requests of countless members of the public[20] and 169 members of Congress for additional time to engage on the sprawling, confusing proposal.[21]

Additionally, the Southern Environmental Law Center, counsel for the Conservation Groups, filed a motion for preliminary injunction in a lawsuit filed in this District in September 2019 after CEQ failed to fulfill a Freedom of Information Act request for records about the ANRPM.  *S. Envtl. Law Ctr. v. CEQ,* No. 3:18CV00113, 2019 WL 4417486 (W.D. Va. Sept. 16, 2019).  The motion sought to delay the close of the public comment period until CEQ provided relevant rulemaking documents that it was legally overdue to produce.  Although Judge Conrad determined the Court did not have jurisdiction to halt the rulemaking process, he berated counsel for CEQ—in the courtroom—for the agency's delayed process and ordered it to produce all documents by May 5, 2020.  When the documents were eventually produced, they were so heavily redacted that the Southern Environmental Law Center filed a motion for summary judgment requesting that CEQ prepare a *Vaughn* index to explain the redactions and to remove

---

[18] *Id.*
[19] *E.g. id.* at 1,693 ("These proposed revisions are supported by many comments submitted in response to the ANRPM requesting revisions to promote more efficient and timely reviews under NEPA.")
[20] *See, e.g.*, Letter from Kym Hunter, SELC, to Mary Neumayr, CEQ (Jan. 16, 2020) (Docket Id. CEQ-2019-0003-171879, Attachment 2); Letter from Kym Hunter to Mary Neumayr (Jan. 29, 2020) (Docket Id. CEQ-2019-0003-171879, Attachment 11).
[21] Letter from CEQ to Peter DeFazio, Raul M. Grivalva, and Thomas R. Carper, U.S. Congress (March 4, 2020) (Docket Id. CEQ-2019-0003-171879, Attachment 13).

the illegal ones.  That litigation is ongoing and the Southern Environmental Law Center still does not have the documents it requested from CEQ in 2018.

Disregarding requests from the Conservation Groups and others that CEQ provide robust opportunity for public throughout the country, CEQ provided for only two public hearings regarding the NPRM—one in Washington, D.C. and one in Denver.  Registration for these hearings filled within minutes of opening, and speakers were only given three minutes each to voice their concerns on the massive overhaul.  Members of two of the plaintiff groups, Defenders of Wildlife, which has offices in both Denver and Washington, DC, and the National Trust for Historic Preservation, which has offices in Washington, DC, were able to attend these hearings and speak briefly in opposition to the rule, but most of the fifteen other Conservation Groups, which are based in the Southeast and do not have the necessary travel budgets, could not participate.

Despite CEQ's limited opportunities for participation, the public once again responded with an overwhelming show of interest.  CEQ received more than 1.1 million comments on the proposed rulemaking from a wide array of stakeholders.  Fourteen U.S. senators raised concerns that the proposal would severely undercut NEPA's bipartisan aims.[22]

Also among the public commenters were many of the Conservation Groups and their counsel.  The groups submitted comprehensive written comments[23] noting first that the proffered

---

[22] Letter from Thomas R. Carper et al., U.S. Senator, to Mary Neumayr, Chairman, CEQ, Docket Id. CEQ-2019-0003-172664 (Feb. 27, 2020).

[23] S. Envtl. L. Ctr., Comments on CEQ's Notice of Proposed Rulemaking to Update the Regulations for Implementing NEPA, Docket Id. CEQ-2019-0003-171879 (Mar. 10, 2020) (hereinafter "Conservation Groups Comment Letter").  Several of the Conservation Groups also signed a letter submitted by former CEQ General Counsel Dinah Bear on behalf of the environmental community.  *See* Partnership Project, Comment Letter on Proposed Revisions to Regulations for Implementing the National Environmental Policy Act, Docket Id. CEQ-2019-0003-171894 (Mar. 10, 2020) (letter from 328 organizations and tribal nations) (hereinafter "Partnership Project Comment Letter").  In addition, plaintiffs Defenders of Wildlife and the National Trust for Historic Preservation submitted their own separate comment letters.  *See*

explanation for the rulemaking was bogus and that the proposed rules were likely to delay, rather than advance project development throughout the country.  The Conservation Groups carefully documented the true causes of project delays with reference to examples and evidence.

In addition, the Conservation Groups analyzed the numerous individual proposed changes to the longstanding NEPA regulations and assessed both the legality of the changes and their implications for environmental protection and community engagement.  The Conservation Groups attached 350 exhibits to illustrate and support their concerns, including NEPA documents that demonstrate the efficacy of the 1978 regulations, and scientific literature explaining the import of indirect and cumulative effects.[24]  The proffered evidence made clear that the 1978 NEPA regulations result in measurable environmental, economic, and societal improvements that would be lost under CEQ's proposal.  The Conservation Groups also suggested a series of less drastic, yet more effective, alternatives to improve the NEPA process.[25]

Other public commenters included groups of law professors,[26] states attorneys general,[27] bipartisan legislators,[28] tribes,[29] and environmental organizations.[30]  Similar sentiments echoed

---

Defenders of Wildlife, Comment Letter on Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Docket Id. CEQ-2019-0003-166314 (Mar. 9, 2020) (hereinafter "Defenders Comment Letter"); National Trust for Historic Preservation, Comment Letter on Proposed Revisions to Regulations Implementing the National Environmental Policy Act, Docket Id. CEQ-2019-0003-170862 (Mar. 10, 2020) (hereinafter "National Trust Comment Letter").)

[24] Conservation Groups Comment Letter.

[25] *Id.*

[26] David Adelman, University of Texas at Austin School of Law, et al, Comments on the Council on Environmental Quality NPRM Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, Docket Id. CEQ-2019-0003-169621 (May 9, 2020) (hereinafter "Law Professor Comment Letter") (on behalf of 95 law professors).

[27] Comments of Attorneys General on Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Docket No. Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Docket No. CEQ-2019-0003-172704 (Mar. 10, 2020) (hereinafter "AG Comment Letter").

across groups: the National Congress of American Indians "oppose[d] the[] proposed definitional changes to the categories of 'effects' because they violate NEPA's statutory mandate that agencies use 'all practicable means' and because tribal nations will be disproportionately impacted by increased environmental harms including climate change;"[31] the climate-focused groups criticized the proposed Rule for "fail[ing] to analyze climate effects influence agencies decisions in ways that increase climate costs" and "depriv[ing] the public and Congress of important and valuable information about climate effects;"[32] and the states attorneys generals commented on how "[t]he impacts of greenhouse gas (GHG) emissions and climate change illustrates the absurdity of CEQ's proposal to redefine effects and eliminate cumulative effects analysis [because f]or many federal proposals, the impacts of GHG emissions are among the most severe and most concerning for human health and the environment."[33]  Citing academic

---

[28] National Caucus of Environmental Legislators, Comment Letter on Notice of Proposed Rulemaking, Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, Docket. CEQ-2019-0003-167276, at 2 (Mar. 10, 2020) (hereinafter "Legislator Comment Letter") (on behalf of 178 state legislators).

[29] National Congress of American Indians, Comment Letter on Council on Environmental Quality's Notice of Proposed Rulemaking titled "Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act," Docket Id. CEQ-2019-0003-171910, at 9-10 (Mar. 10, 2020) (hereinafter "NCAI Comment Letter") (the oldest, largest and most representative national organization comprised of Alaska Native and American Indian tribal nations and their citizens.).

[30] Partnership Project Comment Letter (on behalf of 328 organizations and tribal nations); Environmental Defense Fund, et al, Comment Letter on Climate Analysis under Update to Regulations Implementing Procedural Provisions of the National Environmental Policy Act, Docket Id. CEQ-2019-0003-169703 (Mar. 10, 2020) (letter on behalf of 17 groups concerned about climate change) (hereinafter "EDF Comment Letter"); Oceana, et al, Comment Letter on Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Docket Id. CEQ-2019-0003-170615 (Mar. 10, 2020) (letter on behalf of 59 organizations committed to protecting oceans) (hereinafter "Oceana Comment Letter"); WE ACT for Environmental Justice, Comment Letter on Proposed Rule, "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act," Docket Id. CEQ-2019-0003-172421 (hereinafter "WE ACT Comment Letter") (on behalf of 29 groups committed to environmental justice).

[31] NCAI Comment Letter at 10.

[32] EDF Comment Letter at 3.

[33] AG Comment Letter at 50.

research and reports, the law professors explained how completion times for environmental review are dictated by factors external to NEPA procedures,[34] and the National Congress of American Indians and environmental justice groups highlighted how the proposed Rule's shortened timeframes, page limits, and increased specificity requirements would "hamstring" their ability to meaningfully participate in NEPA review.[35]  The bipartisan state legislators detailed how inadequate funding and technical support are the true barriers to project completion, requiring state and local governments to "shoulder[] huge fiscal and human costs of environmental damages," and explained how the proposed Rule was "counterproductive to the state-federal partnership and dangerous to the well-being of the public."[36]

Comments from organizations with a clear interest in expedited project delivery—including the American Association of State Highway and Transportation Officials, the American Society of Civil Engineers, the Permitting and Infrastructure Coalition, the American Sustainable Business Council, the American Wind Energy Association, and the Solar Energy Industries Association[37]—pointed out that parts of the proposed regulatory overhaul would be

---

[34] Law Professor Comment Letter at 7-10.

[35] NCAI Comment Letter at 6-8; WE ACT Comment Letter at 5-10, 14-17.

[36] Legislator Comment Letter at 1-2.

[37] *See, e.g.,* American Association of State Highway and Transportation Officials, Comment Letter on Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, Docket Id. CEQ-2019-0003-84196 (Mar. 4, 2020) (hereinafter "AASHTO Comment Letter"); American Society of Civil Engineers, Comment Letter, Docket Id. CEQ-2019-0003-159991 (Mar. 10, 2020) (hereinafter "Society of Civil Engineers Comment Letter"); MJB&A Permitting and Infrastructure Coalition, Comment Letter on Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Docket Id. CEQ-2019-0003-169852 (Mar. 10, 2020) (hereinafter "Permitting and Infrastructure Coalition Comment Letter"); American Sustainable Business Council, et al, Comment Letter on Opposition to the Proposed rule to Update Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Docket Id. CEQ-2019-0003-169897 (Mar. 10, 2020) (hereinafter "Sustainable Business Council Comments"); American Wind Energy Association, Comment Letter on Council of Environmental Quality's Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, Docket Id. CEQ-2019-0003-171734 (Mar. 10, 2020) (hereinafter "AWEA Comment Letter"); Solar Energy Industries Association, Comment Letter on t on the Proposed Rule on "Update to the Regulations Implementing the

counterproductive to the stated goals of efficiency and effectiveness.  Many stressed that considering cumulative effects is important for sound decisionmaking and that considering climate change in the NEPA process is essential to good planning and business development.

## III.    The Rule

This overwhelming show of concern about many of CEQ's proposed changes did little to hinder the agency's wholesale reversal of the longstanding NEPA framework.  CEQ rushed ahead through the COVID-19 pandemic and published a final Rule just four months after the close of the comment period, on July 15, 2020.

The Rule is largely identical to the changes proposed in the NPRM, save for a few changes that actually exacerbate the problems identified by the majority of public comments.  Just as Secretary Bernhardt predicted,[38] the changes constitute the most dramatic rewrite of any environmental regulations the Trump administration has attempted, a notable achievement for an administration that has made rolling back this nation's environmental regulations a centerpiece of its agenda.[39]  Altogether, at least 23 definitions were rewritten or deleted and the redline changes to the regulatory provisions ran to 66 pages.[40]

The Rule improperly limits NEPA review in many ways, allowing decisionmakers to turn a blind eye to relevant and weighty considerations.  It does this by raising the threshold for

---

Procedural Provisions of the National Environmental Policy Act," Docket Id. CEQ-2019-0003-169977 (Mar. 10, 2020) (hereinafter "SEIA Comment Letter").
[38] *See* Bernhardt Remarks *supra* note 3.
[39] *See* Nadja Popovich *et al.*, *The Trump Administration Is Reversing 100 Environmental Rules. Here's the Full List*, N.Y. TIMES (Jul. 15, 2020), https://www.nytimes.com/interactive/2020/climate/trump-environment-rollbacks.html.
[40] Council on Environmental Quality, *Redline of Final Revisions to the National Environmental Policy Act* (July 15, 2020), *available at* https://www.whitehouse.gov/wp-content/uploads/2020/01/Final-Rule-Redline-of-1978-CEQ-Regulations.pdf

NEPA review, narrowing the scope of review, allowing private parties with a direct financial stake in an agency's decision to establish the range of alternatives to be studied and to draft analyses of their own projects, limiting what information agencies may gather and consider in the review process, placing constraints on the scope of final review documents, and prohibiting other agencies from offering additional opportunities for public engagement as needed to meet their independent obligations under NEPA.  Every safeguard of the prior NEPA process is made less effective, with implications for all current and future projects that would previously have required NEPA review.

### A)  The Rule Limits When NEPA Applies

To begin, the Rule exempts broad categories of activities from NEPA review altogether. CEQ acknowledges as much, noting that "certain federal activities [will] no longer be[] subject to NEPA."[41]  The Rule expressly exempts some categories of activities from NEPA review outright, including projects where the triggers for NEPA compliance are federal loans or loan guarantees.  40 C.F.R. § 1508.1(q)(1)(vii) (2020).  The Rule expressly exempts projects that receive "forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of such assistance."  *Id.*  The Rule generally exempts Small Business Administration and Farm Service Loans, and is expected to cover a range of federally funded grant programs, such as the Community Development Block Grant ("CDBG") program managed by the U.S. Department of Housing and Urban Development ("HUD").  *Id.*

The Rule also raises the bar more generally for which projects are subject to NEPA review, offering agencies a menu of arguments to avoid complying with NEPA's straightforward

---

[41] Council on Envtl. Quality, *Regulatory Impact Analysis for the Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, RIN: 0331-AA03, at 10 (June 30, 2020), *available at* https://www.whitehouse.gov/wp-content/uploads/2020/01/CEQ-NEPA-Regulations-RIA_Final.pdf (hereinafter "RIA") at 10.

requirements.  The Rule excludes from NEPA "non-discretionary" decisions, *id.* § 1507.3(d)(5) (2020), "activities or decisions that do not result in final agency action," *id.* § 1508.1(q)(1)(iii) (2020), and actions where there is "minimal Federal funding or minimal Federal involvement where the agency does not exercise sufficient control and responsibility over the outcome of the project."  *Id.* § 1508.1(q)(1)(vi) (2020).  These vague and ill-defined categories mean that a significant number of projects that previously required NEPA review and disclosure will now move forward while keeping the public in the dark.

The Rule also changes the threshold for what is considered a major federal action requiring preparation of an EIS.  The Rule reverses CEQ's longstanding position that if a proposed federal action significantly impacts the human environment, then it is a major federal action subject to NEPA review.  Under the Rule, however, a federal action could have a significant impact on the human environment, but not be subject to NEPA because it is not a "major federal action."  *Id.* § 1508.1(q) (2020); *see also* 85 Fed. Reg. 43,304, 43,315.  In addition, the Rule deletes the "intensity factors" that have for decades guided consideration of the significance of a project's environmental impacts with reference to a range of specific resources.  *Compare* 40 C.F.R. §1508.27 (1978) *with* 40 C.F.R. § 1501.3 (2020).

In addition, the Rule dramatically increases the number and type of actions that may be categorically excluded from detailed analysis under NEPA.  Where categorical exclusions were previously defined as actions that "do not individually or cumulatively have a significant effect," 40 C.F.R. § 1508.4 (1978), the Rule now defines them as actions that "do not *normally* have a significant effect," *id.* § 1508.1(d) (2020).  In other words, the Rule expressly allows actions that do sometimes have significant effects, alone or as part of a segmented program of work, to be categorically excluded.

## B) The Rule Limits Consideration and Disclosure of Environmental Effects

The Rule removes the requirement that agencies consider the indirect and cumulative effects of their actions.  40 C.F.R. § 1508.1(g)(3) (2020); *see also* 85 Fed. Reg. 43,304, 43,343. Relatedly, the Rule creates a strict causation requirement for environmental impacts to be considered, stating that:

> A 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA.  Effects should not be considered significant if they are remote in time, geographically remote, or the product of a lengthy causal chain.  Effects do not include effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action."  *Id.*

CEQ admits that this narrowed definition of effects may limit the scope of agencies' analyses.[42]  As many commenters pointed out, the narrowing is of particular concern with respect to climate change—undoubtedly the most pressing environmental issue of our time, and one that is affected by myriad federal actions, from carbon storage in the forests of federal public lands, to permits for fossil fuel or renewable energy producers, to the development patterns that follow decisions on transportation infrastructure.  CEQ notes halfheartedly that the impacts of climate change will still be considered as part of the "baseline" for the effects analysis,[43] but this is little more than a damning admission of what is being lost.  The Rule obliquely acknowledges climate change is happening but demands federal agencies treat it as a *fait accompli*, part of the environmental baseline with or without agency action.  CEQ simultaneously excuses agencies

---

[42] Council on Environmental Quality, *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Rule Response to Comments*, at 467 (June 30, 2020), *available at* https://www.whitehouse.gov/wp-content/uploads/2020/01/CEQ-NEPA-Regulations-Final-Rule_Response-to-Comments_Final.pdf (hereinafter "Response to Comments") ("There may be examples where the application of the new definition of effects will find some interactions not to be reasonably foreseeable or lacking in a reasonably close causal relationship to the proposed action.").

[43] Response to Comments at 480-81.

from considering how their actions and programs incrementally and cumulatively will affect the severity or pace of climate change.

The elimination of the requirement to study indirect and cumulative effects will also lead to a host of other impacts being ignored, such as how multiple individually small impacts to wildlife habitat may force a species closer to the brink of extinction, how the cumulative combination of air pollution sources can exacerbate health problems in already-burdened low-income communities, and how the indirect impacts of new development that results from the access created by a new highway may lead to air and water pollution, wetland degradation, increased traffic congestion, and more flooding.

**C)  The Rule Limits the Consideration and Disclosure of Alternative Solutions**

The Rule alters the requirements for reviewing alternatives in a number of ways, including by: (1) eliminating the requirement that agencies "rigorously explore and objectively" evaluate "all" reasonable alternatives, 40 C.F.R. § 1502.14(a) (1978); (2) eliminating the requirements that agencies "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public;" *id.* at § 1502.14 (1978); (3) eliminating the requirement that agencies "devote substantial treatment to" each alternative considered; *id.* at § 1502.14(b) (1978);  (4) eliminating the requirement that environmental impact statements "include reasonable alternatives not within the jurisdiction of the lead agency," *id.* at § 1502.14(c) (1978); and (5) adding a new definition of "reasonable alternatives" that prioritizes the goals of the applicant over the public interest.  *Id.* at § 1508.1(z) (2020).

CEQ also deliberately removed language explaining that the alternatives analysis is "the heart" of the NEPA process.  40 C.F.R. § 1508.1(z) (2020).  The Rule also allows applicants to expend resources investing in their proposed projects—including the acquisition of real

property—before completion of the NEPA process, *id.* § 1506.1(b) (2020), despite the obvious danger that such expenditures will prejudice the consideration of alternatives. *See generally Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1989).

### D) The Rule Removes Scientific Rigor

The Rule states expressly that agencies are not required to undertake new scientific and technical research to inform their analyses but may rely on old existing documents. 40 C.F.R. § 1502.23 (2020). This reversal undermines NEPA's predictive role, allows actions to proceed without information that under prior regulations would have been gathered and considered, and freezes scientific advancement and informed up-to-date decisionmaking.

### E) The Rule Creates New Bureaucratic Processes with Political Oversight

The Rule imposes arbitrary timelines and page limits that can only be exceeded if approved by a political appointee. *E.g.*, *id.* § 1502.7 (2020); § 1501.10 (2020). The Rule does not include any explanation as to how agencies are to comply with both these requirements and their legal responsibilities under NEPA, and no additional funding for agency staff has been provided or suggested by CEQ or the Trump administration.

### F) The Rule Reduces Public Participation

The Rule places demanding requirements on the specificity of comments from the public. *Id.* § 1503.3 (2020). All comments, including those from the public, must "be as specific as possible" and "provide as much detail as necessary to meaningfully participate and fully inform the agency of the commenter's position." *Id.* § 1503.3(a) (2020). In order to meet this vague command, comments "should [among other things] propose specific changes . . . where possible, and include or describe the data sources and methodologies supporting the proposed changes." *Id.* Regarding alternatives, comments "should identify any additional alternatives, information,

or analyses not included in the draft environmental impact statement, and shall be as specific as possible." *Id.* § 1503.3(b) (2020). The new regulations expect a level of sophistication and expertise from ordinary members of the public that in the past has only been required of other federal agencies. *See* 40 C.F.R. Part 1503 (1978).

Moreover—in what ultimately amounts to an (illegal) rewrite of the APA rather than NEPA—the regulations place an exhaustion requirement on comments, stating that "comments or objections of any kind not submitted . . . shall be deemed forfeited as unexhausted," *id.* § 1500.3(b)(3) (2020), and comments on alternatives "not provided within the comment period shall be considered unexhausted and forfeited . . . ." *Id.* § 1503.3(b) (2020). In response to public concerns that this would shift NEPA's information-gathering and analytical responsibilities from agencies to members of the public, CEQ glibly responded that commenters "are free to hire experts to present their comments."[44]

### G) The Rule Results in Reduced Agency Flexibility

The Rule purports to place a ceiling on other agencies' regulations, prohibiting them from offering any "additional procedures" beyond CEQ's (inadequate) minimum requirements except in narrow circumstances. *Id.* § 1507.3(b) (2020). This change will immediately overwrite other agencies' existing procedures and deprive the public of procedures on which they rely and which the record shows are responsible for significant environmental improvements.

### STANDARD OF REVIEW

The purpose of a preliminary injunction is to preserve the status quo while an action is pending. *Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013). In order to establish the right to a preliminary injunction, plaintiffs must demonstrate "(1) they are likely to succeed on the merits;

---

[44] Response to Comments at 328.

(2) they are likely to suffer irreparable harm; (3) the balance of hardships tips in their favor; and

(4) the injunction is in the public interest." *Id.* at 320 (citing *Winter v. NRDC*, 555 U.S. 7, 20

(2008)).

In the alternative, this Court can postpone the effective date of the Rule under the APA

pending judicial review.  5 U.S.C. § 705.  The standard for a stay under Section 705 is the same

as the standard for a preliminary injunction.  *See Texas v. EPA*, 829 F.3d 405, 435 (5th Cir.

2016); *Bauer v. DeVos,* 325 F. Supp. 3d 74, 104–05 (D.D.C. 2018).

## ARGUMENT

The Court should issue a preliminary injunction enjoining the Rule or stay the Rule's

effective date pending resolution of this litigation because the Conservation Groups are likely to

succeed on the merits of their claims, because they will suffer irreparable harm if the Rule goes

into effect, and because the balance of the equities and public interest overwhelmingly support

issuance of an injunction.

## I.       The Conservation Groups Are Likely to Succeed on the Merits.

"As administrations change, so do regulatory priorities.  But the requirements of the

APA remain the same."  *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959, 969

(D.S.C. 2018) (enjoining rulemaking in which agencies refused to engage in a substantive

reevaluation of prior regulation).  Here, just as in at least 38 other recent cases striking down the

current Administration's serious procedural violations, *see supra* note 5, CEQ did not adequately

justify its dramatic reversal in policy or consider important factors, critical comments, reliance

interests and alternative measures, as required by law.  Inexcusably, CEQ ignored the pre-

existing and longstanding regulations in its baseline for assessing the impact of its new rule,

unlawfully disregarding the benefits of those prior rules.  Moreover, CEQ has promulgated a

Rule that is inconsistent with the statutory language of NEPA.  This is a facial challenge to CEQ's rulemaking because no set of circumstances exists under which the regulation would be valid.  *Reno v. Flores*, 507 U.S. 292, 301 (1993).

On a motion for preliminary injunction or stay, plaintiffs need only make a "'clear showing' that they are likely to succeed," and "need not show a certainty of success."  *Pashby*, 709 F.3d at 321.  Plaintiffs set out ten separate ways in which CEQ violated the APA in their complaint. Dkt. 1 at 157-180. Representative examples of these clear-cut violations are set out below, and more than satisfy this standard.

### A.    The Rule Is Inconsistent with the NEPA Statute.

The Rule violates the APA because it is fundamentally at odds with NEPA's statutory mandates.  5 U.S.C. § 706(2)(A);  *Fox TV*, 556 U.S. at 515 (rule must be "permissible under the statute").  NEPA is clear that alternatives to a proposed project and the project's effects must be evaluated "to the fullest extent possible."  42 U.S.C. § 4332.  The prior regulations' provisions were carefully developed, stable, and certainly "possible" to implement.  In contrast, the Rule's weakened evaluation of the alternatives and impacts of a project, as well as its reductions in the types of federal actions subject to NEPA, its deference to private applicants to veto reasonable alternatives, its acceptance of conflicts of interest in allowing permittees to write their own NEPA documents, and its new limitations on public comments, all violate the statutory requirements of NEPA.

### 1.    The Rule Violates NEPA's Required Evaluation of Environmental Effects.

The Rule removes the requirement contained in the 1978 regulations that agencies consider cumulative and indirect impacts, and instructs agencies that "[e]ffects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy

causal chain," and "do not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action." 40 C.F.R. § 1508.1(g) (2020); 85 Fed. Reg. at 43,375 ("Cumulative impact, defined in 40 CFR 1508.7 (1978), is repealed."). As a result, the Rule leaves substantial impacts unaccounted for, thereby ensuring that agencies and the public will receive incomplete information on the true effects of a project. These limitations directly contradict NEPA's requirements as set out in the statutory text and confirmed by the Supreme Court.

From the beginning, Congress, CEQ, and the courts have recognized that a complete NEPA evaluation must consider not only the immediate footprint of a project, but its indirect and cumulative effects as well. As set out for the past forty years in the prior regulations, indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," and include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems." 40 C.F.R. § 1508.8(b) (1978). Cumulative effects are "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions." *Id.* § 1508.7 (1978).

The Fourth Circuit has explained that "agencies *must* measure the indirect and cumulative environmental effects of proposed actions," in order to give effect to the statute's purpose of informed, accountable decisionmaking:

> By so focusing agency attention, NEPA ensures that the agency will not act on incomplete information, only to regret its decision after it is too late to correct. Similarly, the broad dissemination of information mandated by NEPA permits the public and other government agencies to react to the effects of a proposed action at a meaningful time.

*N.C. Wildlife Fed'n*, 677 F.3d at 601–02.

The text of NEPA is clear that these effects must be evaluated and disclosed.  The evaluation of a proposed project must include a "detailed statement" on "the environmental impact of the proposed action," including "*any* adverse environmental effects which cannot be avoided should the proposal be implemented." 42 U.S.C. § 4332(2)(C)(ii) (emphasis added). And the evaluation must examine "the environmental impact of the proposed action" "*to the fullest extent possible*." *Id.* §§ 4332 (emphasis added), 4332(2)(C)(i).  The evaluating agency must also seek out other agencies' expertise regarding "*any* environmental impact involved." *Id.* § 4332(2)(C) (emphasis added).  The statute also requires agencies to "recognize the worldwide and long-range character of environmental problems."  *Id*. § 4332(2)(F).

Cumulative and indirect effects capture foreseeable impacts, such as induced development along a new highway or commuter rail line, and ensure that the combined effects of multiple projects or components of large projects are considered together.  The Supreme Court has confirmed that, consistent with NEPA's mandate that agencies use "all practicable means" to "assure consideration of the environmental impact of their actions in decisionmaking," the statute requires consideration of cumulative effects: "[W]hen several proposals for [] actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their *environmental consequences must be considered together*. Only through comprehensive consideration of pending proposals can the agency evaluate different courses of action."  *Kleppe,* 427 U.S. at 409–10 (emphasis added).

Consideration of these effects ensures that agency decisionmakers and the public have the full picture of the impacts of the agency's action(s) combined with other foreseeable consequences and harms, even if they are outside the agency's immediate control or jurisdiction. And this requirement comes from the statute itself.  As the Second Circuit explained in a case

decided six years prior to the 1978 promulgation of NEPA's implementing regulations, the NEPA statute itself requires evaluation of cumulative effects: "One more factory polluting air and water in an area zoned for industrial use may represent the straw that breaks the back of the environmental camel." *Hanly v. Kleindienst*, 471 F.2d 823, 831 (2d Cir. 1972).

Accordingly, CEQ's elimination of these effects from the required analysis is contrary to the statute.

## 2. The Rule Violates NEPA's Required Evaluation of All Reasonable Alternatives.

NEPA directs agencies to prepare a "detailed statement" evaluating the alternatives to a proposed project "to the fullest extent possible[.]" 42 U.S.C. § 4332. Regardless of whether a project's impacts will be significant, NEPA requires agencies to consider alternatives to resolve any "unresolved conflicts concerning alternative uses of available resources." *Id.* § 4332(2)(E). A complete examination of all reasonable alternatives is necessary to ensure NEPA's goals of sound decisionmaking and a thorough evaluation before the government commits tens or hundreds of millions of dollars of public funds to a project.

The alternatives analysis long has been recognized as "the linchpin of the entire impact statement," and it is "absolutely essential to the NEPA process that the decisionmaker be provided with a detailed and careful analysis of the relative environmental merits and demerits of the proposed action and possible alternatives." *NRDC v. Callaway*, 524 F.2d 79, 92 (2d Cir. 1975); *accord NRDC. v. Morton*, 458 F.2d 827, 835 (D.C. Cir. 1972) ("The impact statement is not only for the exposition of the thinking of the agency, but also for the guidance of these ultimate decision-makers, and must provide them with the environmental effects of both the proposal and the alternatives, for their consideration along with the various other elements of the public interest.").

NEPA and its regulations have never required a detailed evaluation of every conceivable alternative; instead, only reasonable alternatives must be evaluated.  *See, e.g.*, *Webster* 685 F.3d at 422 (citation omitted).  But as numerous decisions have confirmed, NEPA requires agencies to consider *all* such reasonable alternatives.  *Id.* at 427 (citing 42 U.S.C. § 4332(2)(C)(iii) and evaluating whether agency impact statement considered all reasonable alternatives).  This requirement stems from the NEPA statute itself.  Discussing the meaning of NEPA's alternatives requirement prior to the enactment of CEQ's regulations, the D.C. Circuit held that

> [a] sound construction of NEPA, which takes into account both the legislative history and contemporaneous executive construction . . . requires a presentation of the environmental risks incident to reasonable alternative courses of action. . . . [I]t is the essence and thrust of NEPA that the pertinent Statement serve to gather in one place a discussion of the relative environmental impact of alternatives.

*Morton*, 458 F.2d at 834.  As a result, as one court in the Fourth Circuit explained, "[t]he 'existence of a viable but unexamined alternative renders an environmental impact statement inadequate.'" *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 667 (D. Md. 2007) (quoting *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1994)).

Contradicting the statute and almost five decades of caselaw, the Rule removes the requirement that agencies evaluate "all" reasonable alternatives in favor of an ambiguous "reasonable range" of alternatives.  As a practical matter, this allows agencies to game the process, including alternatives at the endpoints of this "reasonable range," while ignoring nuanced alternatives that are closer to the center.  Leaving some reasonable alternatives unexamined violates NEPA's requirement that agencies evaluate "to the fullest extent possible" the reasonable alternatives available.  *See Morton*, 458 F.2d at 837 ("administrative difficulty" does not rule out alternatives from full evaluation and does not "undercut the duty of compliance

'to the fullest extent possible.'"). Perhaps seeing this problem, CEQ attempts to read the requirement that agencies comply with NEPA "to the fullest extent possible" out of the statute, replacing it with the word "practicable" 40 C.F.R. § 1502.9(b) (2020). But the statutory text is clear and CEQ's attempts to rewrite it are unlawful.

The Rule also unlawfully removes the requirement from 40 C.F.R. § 1502.14(c) (1978) that environmental impact statements "include reasonable alternatives not within the jurisdiction of the lead agency." *See* 85 Fed. Reg. at 43,330. Putting blinders on the scope of the reasonable alternatives evaluated in this manner violates NEPA's broad mandate. For example, in *Morton*, before the 1978 regulations were drafted, the D.C. Circuit held that, because

> [t]he Executive's proposed solution to a national problem, or a set of inter-related problems, may call for each of several departments or agencies to take a specific action; this cannot mean that the only discussion of alternatives required in the ensuing environmental impact statements would be the discussion by each department of the particular actions it could take as an alternative to the proposal underlying its impact statement.

*Morton*, 458 F.2d at 834–35. Likewise, because "NEPA was intended to provide a basis for consideration and choice by the decisionmakers in the legislative as well as the executive branch," alternatives dependent upon legislative action could not be dismissed on that basis. *Id.* at 837; *accord, Coal. for Responsible Reg'l Dev. v. Brinegar*, 518 F.2d 522, 527 n.4 (4th Cir. 1975) (same proposition).

The Rule also weakens the requirements for how alternatives are to be evaluated. The Rule eliminates the requirements in that agencies "rigorously explore and objectively" evaluate alternatives, and the requirement that agencies "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public," and the requirement that agencies "devote substantial treatment to" each alternative considered. 40 C.F.R. § 1502.14

33

(1978).  These changes plainly weaken the required examination of alternatives, rather than setting forth the "detailed statement" of alternatives "to the fullest extent possible" that is required by NEPA's plain text.

In sum, the Rule would transform the rigorous evaluation and disclosure of all reasonable alternatives for the benefit of decisionmakers and the public into a narrow and cursory exercise, in violation of the statute.

### 3. The Rule Violates NEPA's Broad Coverage of Federal Actions.

NEPA requires an environmental impact statement for "major federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  And for nearly five decades, NEPA has been applied to federal actions based on their potential for significant environmental effects: "The statutory clause 'major Federal actions significantly affecting the quality of the human environment' is to be construed by agencies with a view to the overall, cumulative impact of the action proposed (and of further actions contemplated) . . . . *[I]f there is potential that the environment may be significantly affected, the statement is to be prepared.*"[45]  Likewise, CEQ's regulations—until now—have consistently implemented this approach: "Major Federal action includes actions with effects that may be major and which are potentially subject to Federal control and responsibility.  *Major reinforces but does not have a meaning independent of significantly*[.]"  40 C.F.R. § 1508.18 (1978) (emphasis added).

"[I]f the action has a significant effect, it is the intent of NEPA that it should be the subject of the detailed consideration mandated by NEPA; the activities of federal agencies cannot be isolated from their impact upon the environment.  This approach is more consonant with the purpose of NEPA and is supported in [the legislative history] and the CEQ Guidelines."

---

[45] CEQ Guidelines, 36 Fed. Reg. 7724 (April 23, 1971), § 5(b) (emphasis added).

*Minn. Pub. Interest Research Grp. v. Butz*, 498 F.2d 1314, 1322 (8th Cir. 1974).  Accordingly, the analysis of whether a federal action is subject to NEPA is based on its potential for significant environmental effects.  *E.g.*, *New York*, 681 F.3d at 476–77 (finding rulemaking to be major federal action based on environmental effects later in time).

Dismissing nearly 50 years of consistent application of NEPA as a supposed "misconstruction," 85 Fed. Reg. at 43,345, the Rule puts in place a new, two-part test: an action must first be deemed "major," and only then will the significance of its environmental effects be considered.  *Id.* at 43,375 (defining "major federal action").  This approach allows federal actions significantly affecting the quality of the human environment to evade NEPA review.  Such an outcome is also directly contrary to the purpose of NEPA and fails to read the statutory provision in the context of NEPA's broad directive that the Federal government should "use all practicable means . . . to improve and coordinate Federal plans, functions, programs, and resources" to "fulfill the responsibilities of each generation as trustee of the environment for succeeding generations," "assure for all Americans safe, healthful, productive, and esthetically and culturally pleasing surroundings," and "attain the widest range of beneficial uses of the environment without degradation, risk to health or safety, or other undesirable and unintended consequences." 42 U.S.C. § 4331(b).  Turning a blind eye to federal actions with significant environmental effects is inconsistent with the statute.

Actions with significant impacts are not the only ones that will evade review under this provision.  Actions now must be "major" in order even to trigger the duty to prepare a Categorical Exclusion or Environmental Assessment.[46]  These less stringent review processes are, by definition, for minor actions, and it is incoherent to allow agencies to skip over them

---

[46] Response to Comments at 135 ("Agencies do not need to consider the applicability of CEs (or conduct analysis in EAs or EISs) for activities that do not meet the definition of a major Federal action.").

because these minor actions are not "major."  Moreover, allowing agencies to bypass NEPA for actions that are not "major" is at odds with a separate statutory requirement.  NEPA requires consideration of appropriate alternatives any time there are unresolved conflicts affecting the environment, whether major, minor, significant, or insignificant.  42 U.S.C. § 4332(2)(E).  Under the Rule, this requirement would be met only for "major" actions.  This is a serious and fatal flaw in CEQ's Rule.

> **4.    The Rule Unlawfully Allows Projects to Proceed During the NEPA Process.**

An agency must complete its NEPA evaluation before "irretrievabl[y] commit[ting]" resources to a project; NEPA is clear that this evaluation must occur for "the *proposed* action *should it be implemented*"—not for an action or commitment of resources already underway.  42 U.S.C. § 4332(2)(C)(v) (emphasis added).  Likewise, alternatives and impacts must be evaluated for a "proposed" project.  *Id.* § 4332(2)(C).

"The thrust" of this requirement "is . . . that *environmental concerns be integrated into the very process of agency decisionmaking*.  The 'detailed statement' it requires is the outward sign that environmental values and consequences have been considered *during the planning stage of agency actions*."  *Andrus v. Sierra Club*, 442 U.S. 347, 350 (1979) (emphases added).  As the Supreme Court has confirmed repeatedly, this requirement is essential to realizing the statute's action-forcing purpose:

> The statutory requirement that a federal agency contemplating a major action prepare such an environmental impact statement serves NEPA's "action-forcing" purpose in two important respects.  It ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision.

*Robertson*, 490 U.S. at 349 (citing *Baltimore Gas & Elec. Co. v. NRDC,* 462 U.S. 87, 97

(1983); *Weinberger v. Catholic Action of Hawaii/Peace Education Project*, 454 U.S. 139, 143

(1981)).

      In short, NEPA requires "that the agency take a 'hard look' at the environmental

consequences *before* taking a major action." *Baltimore Gas & Elec.* 462 U.S. at 97

(quoting *Kleppe,* 427 U.S. at 410, n. 21) (emphasis added).

      The Rule flouts this requirement by allowing applicants to expend resources towards a

specific project before completing NEPA.  It introduces gaping new loopholes into the

longstanding regulatory prohibition that, prior to a record of decision, "no action concerning the

proposal shall be taken which would (1) Have an adverse environmental impact; or (2) Limit the

choice of reasonable alternatives."  40 C.F.R. § 1506.1(a).  Instead, the Rule now provides that

"[a]n agency considering a proposed action for Federal funding may authorize . . . activities,

*including but not limited to*, acquisition of interests in land (e.g., fee simple, rights-of-way, and

conservation easements), purchase of long lead-time equipment, and purchase options made by

applicants."  *See* 85 Fed. Reg. at 43,370 (§ 1506.1 (emphasis added)).  Pre-decisional

commitments of this nature inevitably bias analysis and decisionmaking by committing resources

to a particular proposed action and thereby altering the cost-benefit considerations associated

with the project—and because the Rule provides that the exception is not limited to the listed

activities, its outer limits are undefined.  Moreover, the coupling of this change with the change

that allows project applicants to define the range of alternatives to be studied is particularly

troubling and makes it all the more likely that NEPA will lose its action-forcing role.[47]

---

[47] 85 Fed. Reg. at 43,376 (defining reasonable alternatives as "a reasonable range of alternatives that are
technically and economically feasible, meet the purpose and need for the proposed action, and, where
applicable, meet the goals of the applicant").

Courts have long recognized "[t]he difficulty of stopping a bureaucratic steam roller, once started."  *Sierra Club v. Marsh*, 872 F.2d at 504 (vacating and remanding for reconsideration denial of preliminary injunction to stop activities related to building causeway where petitioner argued EIS failed to properly consider alternatives).  Allowing "investment of time, effort, or money in the proposed [alternative] would make alteration or abandonment of the [alternative] increasingly less wise and, therefore, increasingly unlikely."  *Arlington Coal. on Transp. v. Volpe*, 458 F.2d 1323, 1333 (4th Cir. 1972).  As investment increases, "the options open . . . diminish."  *Id.*

By allowing these significant commitments of resources to a particular alternative, the Rule violates NEPA's requirement of full consideration of the options before a decision is made and undermines the very essence of the statute.

### 5.    The Rule Violates NEPA by Restricting Important Public Input.

The Rule purports to impose unlawful limitations on public participation in the NEPA process.  According to the Rule, comments now

> should explain why the issues raised are important to the consideration of potential environmental impacts and alternatives to the proposed action, *as well as economic and employment impacts*, and other impacts affecting the quality of the human environment. *Comments should reference the corresponding section or page number of the draft environmental impact statement, propose specific changes to those parts of the statement, where possible, and include or describe the data sources and methodologies supporting the proposed changes.*

85 Fed. Reg. at 43,368 (discussing changes to § 1503.3) (emphases added).

These changes elevate the influence of commenters with economic, scientific, technical, or legal expertise, and diminish the influence of commenters with qualitative input or concerns. Accordingly, these changes are inconsistent with NEPA, which requires that agency procedures,

"to the fullest extent possible," ensure that "unquantified environmental amenities and values" be given "appropriate consideration in decisionmaking along with economic and technical considerations."  42 U.S.C. § 4332(2)(B).  The information that agencies must consider includes the impacts on and preferences of the humans in the human environment.  The public often has local knowledge that is not known to federal agencies or others with more generalized expertise.  By imposing artificial constraints on the form and substance of public comments that will be considered, the Rule discourages consideration of important community voices and the "unquantified environmental amenities and values" expressly emphasized by Congress in enacting NEPA.

> **6.      The Rule's Departures from the Requirements of NEPA, as Set Out in the Statute and Caselaw, Are Not Entitled to Deference.**

CEQ's unjustified rulemaking goes against the NEPA statute and caselaw from the Supreme Court and courts of appeals confirming that the statute requires the very elements of NEPA that the Rule eliminates.  CEQ claims it is shielded by *Chevron* deference to contravene these requirements,[48] but the Rule merits no such deference and as such, CEQ failed to consider one more important aspect of the problem.

The first step of the *Chevron* analysis is whether the statute's plain terms "directly addres[s] the precise question at issue."  467 U.S., at 843.  If the statute is ambiguous on the point, a reviewing court at step two defers to the agency's interpretation, if the construction is "a reasonable policy choice for the agency to make."  *Id*. at 845.

Here, the "unambiguously expressed intent of Congress," *Chevron*, 467 U.S. at 843, is clear: NEPA's statutory mandates to evaluate impacts and alternatives "to the fullest extent

---

[48] Response to Comments at 31 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842–43 (1984) for the proposition that "the Supreme Court authorizes CEQ to adopt regulations that reasonably resolve ambiguities in the statute that it is charged to administer.")

possible," 42 U.S.C. § 4332, and to include "*any* adverse environmental effects which cannot be avoided should the proposal be implemented," *id.* § 4332(2)(C)(ii) (emphasis added), unambiguously foreclose the drastic cuts to these evaluations made by the Rule.  The procedures mandating a fuller evaluation, which have been in place for over forty years, have proven to be "possible," to say the least; and the 1978 regulations' requirement to evaluate a proposal's cumulative impacts, for example, captures "adverse environmental effects" that the Rule excludes from the required evaluation, contrary to the statutory text.

Moreover, as explained above and in the administrative record, numerous courts have confirmed that NEPA requires a more robust evaluation than the one required by the Rule.  Prior to any implementing regulations, Supreme Court and Court of Appeals rulings confirmed the importance of evaluating cumulative effects and all reasonable alternatives, including those outside an agency's jurisdiction, for example.  *Kleppe*, 427 U.S. 390; *Morton*, 458 F.2d 827; *Hanly*, 471 F.2d 823.  *Chevron* deference does not trump contrary judicial constructions of a statute when they are based on the "the unambiguous terms of the statute." *National Cable & Telecom. Ass'n v. Brand X Internet Serv's,* 545 U.S. 967, 982 (2005).

Mistakenly relying on *Chevron* deference, CEQ cast aside numerous judicial decisions that foreclose the changes in the Rule.  In doing so, CEQ ignored the clear instruction of *Robertson v. Methow Valley Citizens Council*, in which the Supreme Court examined a 1986 NEPA regulation changing a prior agency position to ensure the new rule was consistent with "previously established judicial interpretation of the statute."  *Robertson*, 490 U.S. at 355.  That test is all the more applicable here because, as in *Robertson*, the regulations being replaced codified preexisting caselaw: for example, CEQ explained in codifying the 1978 provision requiring "all reasonable alternatives" that this requirement was already "firmly established in

the case law." 43 Fed. Reg. 55,978, 55,983.  By failing to address the ways in which the Rule

contravenes judicial interpretations of NEPA, CEQ failed to consider an essential factor

clarifying the requirements of NEPA—yet another reason its rulemaking was arbitrary and

capricious.

### B.    CEQ Failed to Adequately Consider Relevant Factors in the Rulemaking Process

CEQ failed to adequately consider relevant factors—including the consequences of

eliminating key provisions of the 1978 regulations, the resulting reduction in environmental

quality, and environmental justice—when it promulgated the Rule.  And CEQ improperly relied

on the (unsupported) notion of reducing "delay" in order to eliminate important aspects of

NEPA's deliberative process, contrary to Congressional intent.

Agency action is arbitrary and capricious if the agency "fail[s] to consider an important

aspect of the problem" before it.  *State Farm*, 463 U.S. at 43.  An agency's consideration of a

factor on the record must be more than an unsupported claim that the factor was assessed.

"Merely referencing a requirement is not the same as complying with that requirement.  And

stating that a factor was considered—or found—is not a substitute for considering or finding it."

*Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (internal citations omitted).  The agency

must provide more than "conclusory statements" to demonstrate it "consider[ed] [the relevant]

priorities."  *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C. Cir. 1986).

Relevant factors include any "factor the agency must consider under its organic statute."

*Lindeen v. SEC*, 825 F.3d 646, 657 (D.C. Cir. 2016) (quotation marks omitted).  NEPA lists

statutory factors for CEQ to consider in promulgating regulations.  Among other factors, NEPA

instructs CEQ to consider environmental quality[49] and environmental justice.[50]  CEQ's failure to

adequately consider these relevant factors renders the Rule arbitrary and capricious.

### 1.    CEQ Ignored the Prior Regulations in Assessing the Environmental Impacts of the New Rule.

Under the APA, CEQ was required to weigh the consequences of eliminating key

provisions of the 1978 regulations, including the evaluation of cumulative impacts, consideration

of all reasonable alternatives, and many others.  *Fox TV,* 556 U.S. at 514–15 (to support a policy

change, agency must acknowledge the change and provide "good reasons" for it).  Instead, CEQ

avoided accounting for the drastic changes in the Rule by refusing to acknowledge the changes

or dismissing them out of hand.  This refusal to consider the very provisions the new Rule

eliminates is a textbook violation of the APA.

CEQ's approach is illustrated by its official analysis of the environmental effects of the

Rule.  As part of its rulemaking, CEQ was required[51] to prepare a Regulatory Impact Analysis

("RIA") on the environmental and economic effects of the changes in the new Rule.[52]  In a

rational rulemaking, the RIA would show evidence of CEQ evaluating the effects of its reversal

of the 1978 regulations.  Yet CEQ did not consider the existing, four-decade regulatory status

quo as the baseline for evaluating the environmental effects of the new Rule.

As CEQ explained in the section of its RIA on "Environmental Impacts," "CEQ has

determined that, *using a baseline of the statutory requirements of NEPA and Supreme Court case*

---

[49] 42 U.S.C. § 4342 ("promote the improvement of the quality of the environment").

[50] *Id*. § 4331(C) (stating that the Congressional goal is that "each person should enjoy a healthful environment").  This statutory provision, among others, guides modern environmental justice concerns.

[51] *See* Exec. Order No. 12866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) (updating Exec. Order No. 12291, 46 Fed. Reg. 13,193 (Feb 17, 1981) (requiring a Regulatory Impact Analysis for major regulations)).

[52] *See generally*, RIA.

*law*, there are no adverse environmental impacts."[53]  Crucially, this statement of the baseline for CEQ's analysis of environmental impacts does not include the 1978 regulations.[54]

As this statement indicates, CEQ's analysis of those impacts consistently refuses to consider the removal of requirements that are contained in the 1978 regulations.[55]  Instead, CEQ excluded those requirements from the baseline.  For example, the new Rule removes indirect and cumulative effects from the required effects that must be evaluated, yet CEQ did not acknowledge this change or evaluate its environmental consequences, instead merely asserting that "[a]gencies will continue to analyze all of the effects that the statute requires to be analyzed."[56]  Likewise, the Rule removes the 1978 regulations' provision requiring that "all" reasonable alternatives, including those outside an agency's jurisdiction, must be considered; yet CEQ simply denied it was making this change, instead describing these provisions as if they had been merely voluntary under the prior regulations and would continue to be so.[57]  In other words, throughout its analysis, CEQ concluded there would be no environmental harm by refusing to acknowledge it was making the changes in the first place.

This approach defies logic.  For over four decades, these regulations have mandated that agencies evaluate indirect and cumulative effects as well as all reasonable alternatives, along with many other key provisions that the Rule now eliminates.  CEQ's distorted and fictional baseline makes impossible the commonsense analysis required by the APA: CEQ must evaluate

---

[53] RIA at 10 (emphasis added).
[54] CEQ does ambiguously refer to the regulations earlier in the RIA, stating "In evaluating the economic and environmental impacts, CEQ considered the NEPA statute and Supreme Court case law, and the 1978 regulations."  RIA at 8.  But CEQ's analysis of environmental impacts specifically states that the baseline used for that portion of the analysis used only the statue and Supreme Court case law.  It appears from these two statements that CEQ used the 1978 regulations as the baseline for its analysis of *economic* impacts but not *environmental* impacts.  If so, this disparity is yet another reason the analysis is arbitrary and capricious.
[55] RIA at 12–32.
[56] *Id.* at 30.
[57] *Id.* at 20.

the consequences of the Rule's dramatic changes to the 1978 regulations.  5 U.S.C. § 706(2)(A).
CEQ utterly failed to satisfy this fundamental requirement.

The agency's decision to use a baseline that excludes key requirements from the 1978
regulations also flouts the statutory requirement to "promote the improvement of the quality of
the environment."  42 U.S.C. § 4342.  And it departs from Office of Management and Budget
guidance for baseline selection in regulatory impact analyses.  Office of Mgmt. & Budget,
Circular A-4[58] (Sept. 17, 2003) at 2 (instructing agencies to identify a baseline, which will
"normally" be a no action baseline), 15 ("For review of an existing regulation, a baseline
assuming 'no change' in the regulatory program generally provides an appropriate basis for
evaluating regulatory alternatives").  There is simply no basis here to assume the existing
regulations do not exist and have not been prompting improved environmental and social
outcomes for over forty years.

CEQ's use of an inadequate baseline provides independent grounds for vacating the rule.
*See United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 744–45 (D.C.
Cir. 2019) (public interest analysis for rulemaking that eliminated existing procedures arbitrarily
and capriciously failed to consider the benefits of those procedures); *Am. Equity Inv. Life Ins.
Co. v. SEC*, 613 F.3d 166, 177-79 (D.C. Cir. 2010) (concluding that SEC's analysis was
inadequate because it did not include correct factors in baseline for evaluating rule's effects).

More fundamentally, CEQ's failure to meaningfully consider the consequences of
eliminating key provisions of the 1978 regulations in its analysis infected the entire rulemaking,
compounding CEQ's violations of a host of APA requirements set out below.  Without
considering the environmental impacts of drastically cutting back the existing regulations, CEQ

---

[58] Office of Mgmt. & Budget, Circular A-4 (Sept. 17, 2003) (Docket Id. CEQ-2019-0003-164945,
Attachment 25).

could not consider relevant factors including the Rule's true environmental effects (Section (I)(B)(2) below) and its environmental justice impacts (Section (I)(B)(3) below), the reliance interests of the people, organizations, and institutions that have used and benefitted from the process set out in the 1978 regulations, or less environmentally damaging alternatives to its rulemaking (Section (I)(C) below).  The Conservation Groups demonstrate below the additional deficiencies in CEQ's rulemaking with respect to each of these issues.

### 2.    CEQ Did Not Adequately Consider How the Rule Will Harm Environmental Quality.

The public's interest in environmental protection "must be considered as the underlying purpose" for procedural regulations promulgated under NEPA.  *Heartwood v. U.S. Forest Serv.*, 73 F. Supp. 2d 962, 979 (S.D. Ill. 1999), *aff'd*, 230 F.3d 947 (7th Cir. 2000).  NEPA therefore makes environmental quality the primary factor that should be addressed in this rulemaking and requires CEQ to place significant weight on considerations of environmental quality in its development of policies and regulations.[59]  CEQ was obligated to "adequately address the harms of deregulation or justify its portrayal of those harms as negligible."  *United Keetoowah Band*, 933 F.3d at 740.  CEQ failed to adequately consider the factor of environmental harm in the rulemaking process.  Concerned parties repeatedly raised detailed concerns about the environmental impact of the regulatory reversals and other changes made by the Rule only to have CEQ provide conclusory answers that did not address the concerns.

It is clear that CEQ failed to consider this "important aspect" because the RIA and Response to Comments ignore and disregard the myriad concerns raised about how the regulations—including limitations on which projects will get any review, the scope of review that will occur, the availability of public notice and comment opportunities, the information that

---

[59] 42 U.S.C. § 4342.

will be available and considered, and the number and completeness of alternatives—will reduce environmental quality.  Commenters raised many specific examples supported by substantial evidence.

For instance, without the disclosure role of NEPA that allows communities to weigh in on decisions early in the decisionmaking process, offshore drilling may begin off the Southeastern coast and lead to "potential harms to birds, fish, and marine mammals and their habitats, increased erosion and flood hazards, worsened saltwater intrusion, noise, air, and water pollution, large quantities of potentially contaminated and unsanitary dredged material, and raises numerous public health and safety concerns."[60]  Similarly, limiting the types of alternatives that must be considered will mean that agencies miss options that cause significantly less damage to sensitive resources—like the alternative traffic calming measures that local citizens were able to propose to improve Route 50 in Virginia, which saved the area from a more aggressive option would have negatively impacted the delicate ecosystems in the foothills of the Blue Ridge Mountains.[61]  And failing to consider the indirect and cumulative effects of a project is likely to lead to significant harms as those impacts are not taken into account in the decisionmaking process—for example the impact of a terminal groin at Sea Island, Georgia cannot be properly understood without considering how sand and erosion patterns will interact with another nearby groin—and thus the impact on sea turtles, shorebirds and their habitat may be disregarded in the planning process.[62]  Hundreds of other examples were submitted.[63]

---

[60] Conservation Groups Comment Letter at 54-55 (explaining how NEPA's "look before you leap" provision has allowed business owners, coastal communities, and wildlife advocates, among others, to mount bipartisan opposition to offshore drilling before the process has moved too far forward.)
[61] *Id.* at 58.
[62] *Id.* at 80.
[63] *See generally* Conservation Groups Comment Letter; Defenders Comment Letter; National Trust Comment Letter; Partnership Project Comment Letter; Oceana Comment Letter; Center for Biological

CEQ dismissed these examples and concerns without analysis, stating merely that the differences in analysis would depend on projects' "particular factual records" and "it is not possible to know whether a specific EIS would be analyzed differently under the final rule."[64] This response is nothing more than an admission that CEQ has not done the work it is legally required to do.  CEQ had access to the factual records relied upon by the Conservation Groups when it conducted its rulemaking, so it cannot plead ignorance.[65]  And more fundamentally, CEQ cannot hide behind the factual specifics of environmental review to avoid considering how its Rule will result in environmental harm.  Indeed, the fact that environmental review is necessarily fact-specific renders incoherent CEQ's broad assertion that the regulatory changes will not negatively "influenc[e] environmental outcomes."[66]  CEQ cannot know the extent of environmental harms of the regulatory change until it actually considers how the Rule will impact the "particular factual records" in question—just as commenters urged it to.

Moreover, CEQ dismisses not just specific examples of NEPA's benefits, but the mountain of evidence from commenters showing how existing NEPA procedures have produced measurable environmental improvements across projects in the aggregate.

---

Diversity, Comment Letter on Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Docket Id. CEQ-2019-0003-170920 (Mar. 10, 2020); National Wildlife Federation, Comment Letter on the Notice of Proposed Rulemaking Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act, Docket Id. CEQ-2019-0003-172048 (Mar. 10, 2020) (hereinafter "National Wildlife Federation Comment Letter"); Natural Resources Defense Council, Comment Letter on Proposed Revisions to Regulations Implementing the National Environmental Policy Act, Docket Id. CEQ-2019-0003-164945 (Mar. 10, 2020) (hereinafter "NRDC Comment Letter").

[64] Response to Comments at 467, 477.

[65] *See, e.g.,* Conservation Groups Comment Letter (attaching 350 different exhibits including a wide range of different environmental impact statements and other project-specific documents.)

[66] RIA at 31.

For example, a group of 95 law professors submitted comments explaining, among other things, the benefits of existing NEPA procedures for actions routinely taken by the Department of the Interior.[67]  The comments discussed two studies showing that the preparation of environmental impact statements enhanced environmental protections and reduced environmental impacts in a statistically significant way.[68]

In addition, commenters provided extensive analysis of the benefits of Forest Service NEPA procedures both nationally and in several southeastern states.  As allowed by the 1978 NEPA regulations, the Forest Service has for many years offered notice and opportunity to comment at the "scoping" stage for environmental assessments, 36 C.F.R. § 220.4(e), but changes in the Rule would eliminate this opportunity.  40 C.F.R. §§ 1501.9 (2020) (limiting scoping to EISs); 1507.3(b) (2020) (limiting agencies' ability to offer "additional procedures").  Yet, as commenters explained, because of the Forest Service's additional procedures, the agency drops about one out of every five acres proposed for logging or other management actions from its environmental assessment-level decisions.[69]  The majority of these project changes result from public input, as opposed to internal agency review.[70]  Further, as commenters showed,

---

[67] *See* Law Professor Comment Letter.
[68] *Id.* at 11 (showing that under one study, preparation of EISs under current NEPA regulations "contributed to statistically significant enhancements in surface use stipulations [protecting surface resources from the impacts of oil and gas drilling]" and under a second study "reduced all indicators of environmental impacts." Notably, these studies showed that preparation of EISs under the current rules did not cause a significant change in the number of jobs created or number of oil and gas wells drilled, in the first study, or actually increased job creation and state and local tax revenue, in the second study.)
[69] S. Envtl. L. Ctr., Comments on Proposed Rule, National Environmental Policy Act (NEPA) Compliance (84 Fed. Reg. 27,544 (June 13, 2019)), Docket Id. CEQ-2019-0003-171879, at 145 (Aug. 25, 2019) (hereinafter "SELC Comment Letter on USFS NEPA Rules"). Based on a nationwide sample of projects (sampled, in fact, by the Forest Service in a parallel rulemaking), the Forest Service dropped an average of 897 acres of harvest (17%) and 1,878 acres of all treatments (21%) from all projects.
[70] *Id.* at 145-58 and App'x 1.

"more changes happen in response to public comment at scoping than at any other time."[71]
These improvements have protected rare ecological and social values like old growth forests,
roadless areas, water quality, and rare species and habitats.[72]

Rather than grapple with any of the concerns raised, CEQ repeats the same naked
conclusion: "CEQ does not anticipate [the changes] to have environmental impacts."[73]  First of
all, this response is remarkable because it implicitly argues that the prior NEPA procedures have
not influenced agency decisions in the past—a premise belied by forty years of experience and
directly contrary to the Court's holding in *Robertson* that NEPA's "procedures are almost certain
to affect the agency's substantive decision."  490 U.S. at 350.  Moreover, conclusory statements
such as this one do not satisfy the requirement that agencies consider relevant factors on the
record.  *Getty,* 805 F.2d at 1055.  CEQ "must . . . respond to significant points raised by the
comments, especially when those comments challenge a fundamental premise" underlying the
regulatory decision.  *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 345 (D.C. Cir. 2019)
(holding Postal Service decision to raise price of stamps arbitrary and capricious because it failed
to adequately analyze three categories of public comments);  *Sierra Club v. U.S. Dep't of the
Interior*, 899 F.3d 260, 294 (4th Cir. 2018) (finding National Park Service permitting decision
arbitrary and capricious because it failed to consider key factors including whether drilling and
other risks were consistent with the agency's mission and statutory mandate).

---

[71] *Id*. at 180-81. *See also id*. at App'x 1.  Similarly, the record shows that projects in Southern
Appalachian national forests are improved in the aggregate by the Forest Service's notice and comment
procedures for Environmental Assessments. Between 2009 and 2019, the George Washington and
Jefferson National Forests in Virginia and the Nantahala and Pisgah National Forests in North Carolina
dropped 16% of all acres proposed for commercial logging and analyzed in an environmental assessment.
*Id*. at 163-70 and App'x 3.
[72] *Id*. at 167-69 and App'x 3. Notably, these Forests have not used an EIS to analyze any of their logging
projects since at least 2009, which makes the Forest Service's procedures for environmental assessments
all the more important.
[73] RIA at 31; Response to Comments at 8 ("[T]he final rule will not have adverse environmental
impacts.").

Another pervasive attempt by CEQ to elide consideration of the environmental impacts of its massive regulatory overhaul is to state that there will be no environmental harm because other substantive environmental statutes will remain unchanged.[74,75]  But this explanation ignores the clear text of the statute, which states that NEPA's policies and goals are "supplementary to those set forth in existing authorizations."  42 U.S.C. § 4335.  It also ignores the underlying purpose of NEPA: to ensure that decisionmakers have full information to assess the impacts and alternatives *before* a decision is made.  NEPA helps to ensure compliance with other laws and prevent irreparable harm.  *Sierra Club v. Marsh*, 872 F.2d at 500-01, 504.  NEPA compliance is therefore needed to effectuate the substantive protections of these other substantive statutes.  *See* 40 C.F.R. § 1508.27(b)(10) (1978).

Moreover, other statutes are simply no replacement for NEPA.[76]  The Endangered Species Act, for example, applies to protect species that are listed because they are imperiled, but NEPA has long required a broader look at wildlife impacts, including the cumulative impacts multiple projects may have on wildlife and habitat, regardless of whether they rise to the level of jeopardy.  *See generally* 16 U.S.C. § 1531 et seq; *see also, e.g.*, *San Luis & Delta-Mendota Water Auth. v. Jewell*, 747 F.3d 581, 653 n.52 (9th Cir. 2014) (noting that ESA protections are no substitute for NEPA).  Similarly, where the Clean Air Act ensures that large regions keep within certain health thresholds for air quality, NEPA takes a more local level approach.  *See*

---

[74] RIA at 10; Response to Comments at 4.

[75] The assertion that other laws will remain in place rings particularly hollow given the Administration's concurrent efforts to roll back almost every major environmental law on the books. *See supra* n.39  Nadja Popovich *et al.*, *The Trump Administration Is Reversing 100 Environmental Rules. Here's the Full List*, N.Y. TIMES (Jul. 15, 2020).

[76] In comments to CEQ, the Conservation Groups discussed the Marc Basnight Bridge—used by the President to justify the need for the Rule—as an example of a project where NEPA was used to ensure that the project would not run afoul of other environmental laws, including Section 4(f) of the Department of Transportation Act, the National Wildlife Refuge System Improvement Act, and the Endangered Species Act.  *See* Conservation Groups Comment Letter at 20.

*generally* 42 U.S.C. § 7401 et seq.  Thus, if a new highway project will combine with other infrastructure to increase mobile air toxics next to a school, that fact will be disclosed and can be considered by the community.

NEPA then comes both earlier in time—to prevent environmental harm—and applies more broadly, to ensure that all environmental impacts—even those that do not trigger other substantive statutes—are at least disclosed to the public and to decisionmakers.  NEPA exists to help prevent unlawful harms, certainly, but it also exists to help prevent harms that are unnecessary, even if they may not be unlawful.  That is the very purpose of NEPA's alternatives analysis.  42 U.S.C. § 4332 (2)(C)(iii)(E) (requiring decisionmakers to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources").

CEQ's other oft–repeated response is that jettisoning existing procedures will not cause harm because such procedures and analyses were never required under NEPA in the first place.[77] But this assertion is irrelevant for purposes of the Court's review under the APA.  These procedures and analyses are minimum requirements of NEPA, but even setting that aside, they are inarguably within CEQ's and other agencies' authority and ability to provide under NEPA. Indeed, they were successfully applied for over four decades, and the record shows they have long provided real environmental benefits that are important to the Conservation Groups that must be considered.

CEQ cannot evade consideration of the impacts of its radical policy reversal merely by stating it has the authority to make the change.  A forthright acknowledgment of the significance

---

[77] *See, e.g.*, RIA at 10; Response to Comments at 438 ("agency procedures that impose additional NEPA requirements beyond the final rule are not necessary because the final rule fully meets NEPA's purposes of fostering informed agency decision making and public disclosure."); *id.* at 467 (arguing that changing the definition of effects "does not narrow the scope of analysis relative the [sic] requirements of the Act").

of the change is one of the APA's "square corners." *Fox TV*, 556 U.S. at 514–15 (to support a

policy change, agency must acknowledge the change and provide "good reasons" for it);

*Regents*, 140 S. Ct. at 1913–14 (noting that even if DACA recipients had no legally cognizable

rights, DHS was still required to weigh their reliance interests under the APA.).  It is up to CEQ

to provide a truthful disclosure of the effect of its Rule and a reasoned explanation of its decision

to make changes to regulations that have for decades provided environmental benefits.  *See*

*United Keetoowah Band*, 933 F.3d at 744-45.  CEQ failed to do so.

The most striking example of CEQ's failure to consider the environmental impact of its

Rule comes with its failure to consider how the elimination of a required indirect and cumulative

effects analysis will impact environmental quality.  A plethora of cases note the importance of

this review for purposes of avoiding or minimizing environmental harm.  *See*, *e.g.*, *Am. Rivers v.*

*Fed. Energy Regulatory Comm'n*, 895 F.3d 32, 55 (D.C. Cir. 2018) (finding the agency's

cumulative impacts analysis "fell far short of the NEPA mark" because under NEPA, "an

agency's Environmental Assessment must give a realistic evaluation of the total impacts and

cannot isolate a proposed project, viewing it in a vacuum." (internal citations omitted)); *New*

*York v. U.S. Nuclear Regulatory Comm'n*, 824 F.3d 1012, 1020–21 (D.C. Cir. 2016) (cumulative

impacts analysis is necessary to "to prevent agencies from dividing one project into multiple

individual actions each of which has an insignificant environmental impact, but which

collectively have a substantial impact."); *Nat. Res. Defense Council v. Callaway*, 524 F.2d at 88

("NEPA was, in large measure, an attempt by Congress to instill in the environmental

decisionmaking process a more comprehensive approach so that long term and cumulative

effects of small and unrelated decisions could be recognized, evaluated and either avoided,

mitigated, or accepted as the price to be paid for the major federal action under consideration.").

Many commenters noted that if CEQ no longer requires agencies to consider the indirect and cumulative effects of their actions, a project's true impacts will not be known or disclosed. As a result, environmental harm may occur where, for example, a number of different non-point sources pollute a stream that plays habitat to sensitive species, or where different types of toxic air pollution combine around a low income neighborhood and have health impacts on an already health-comprised community.  Real world examples are legion: for example, failure to consider cumulative impacts could prevent the Army Corps of Engineers from disclosing the groundwater impact of multiple mines on the unique habitat of Georgia's Okefenokee Swamp.[78]  Failure to consider the indirect impact of a new bridge to Corolla on North Carolina's Outer Banks will mean that the effect of increased access to the fragile barrier island—and all the associated growth, development and increased visitation that will result—will not be properly studied.[79] Failure to consider the combined effects of multiple dam relicensings on the Coosa River will mean that FERC will not consider the combined effects of the different dams on fish passageways and dissolved oxygen levels, thus disregarding the impact on the river's 147 fish species and large diversity of freshwater mollusks.[80]  And, as thousands of commenters noted, CEQ's definition of the impacts that must be studied will result in agencies no longer considering how projects contribute to climate change.[81]  The Conservation Groups also

---

[78] *Id.* at 79-80.

[79] *Id.* at 81-82. *See also* Ocean Conservancy, Comment Letter on Proposed Revisions to Regulations Implementing the National Environmental Policy Act, Docket Id. CEQ-2019-0003-159148, at 3 (Mar. 10, 2020); ("Ocean Conservancy Comment Letter"); Defenders Comment Letter at 3-11; National Trust Comment Letter at 2-3.

[80] Conservation Groups Comment Letter at 71; *see also* Stewart Decl. ¶¶ 10-15, attached as Ex. 1; Lowry Decl. ¶¶ 15-23, attached as Ex. 2; Shaddix Decl. ¶¶ 12-25, attached as Ex. 3.

[81] *See, e.g.,* SEIA Comment Letter at 2, 6; Sustainable Business Coalition Comment Letter at 2-3; Columbia Law School, Sabin Center for Climate Change Law, Comment Letter on Proposed Amendments to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Docket Id. CEQ-2019-0003-169300 (Mar. 10, 2020) (hereinafter "Sabin Comment Letter"); EDF Comment Letter; Partnership Project Comment Letter; National Trust Comment Letter at 4;

provided CEQ with an appendix of 36 scientific studies showing the import of indirect and cumulative effects.[82]

Instead of confronting the fact that the elimination of an indirect and cumulative effects analysis may result in harm, CEQ simply states: "[b]ecause the rule does not preclude consideration of the significant impacts of a proposed action on any particular aspect of the human environment, CEQ does not anticipate the changes influencing environmental outcomes."[83]   First, this response completely overlooks the fact that CEQ has also changed the definition of effects to *explicitly forbid* consideration of impacts that are geographically or temporally remote.  40 C.F.R. § 1508.1(g) ("Effects should not be considered significant if they are remote in time, geographically remote, or the product of a lengthy causal chain.)  Moreover, even where the Rule does not expressly *preclude* consideration of particular aspects it has significantly lessened the requirements that were in place before.  Indeed, nothing *prevented* agencies from considering such factors before NEPA was enacted; the statute was nevertheless essential to "insure that . . .  environmental amenities and values" are fully considered. 42 U.S.C. § 4332(2)(B).  CEQ's failure to explore the impact of this change is arbitrary and capricious.

### 3.    CEQ Failed to Consider Environmental Justice.

CEQ also failed to consider the relevant factor of environmental justice.  NEPA's statutory language provides for consideration of environmental justice by recognizing that "each

---

Defenders Comment Letter; Oceana Comment Letter; Ocean Conservancy Comment Letter; NRDC Comment Letter at 59; WE ACT Comment Letter at 21; The Pew Charitable Trusts, Comment Letter on Update to Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Docket Id. CEQ-2019-0003-166966, 20-21 (Mar. 10, 2020) (hereinafter "Pew Comment Letter"); National Wildlife Federation Comment Letter; AG Comment Letter at 50; NCAI Comment Letter at 9-10.
[82] Conservation Groups Comment Letter, Attachment 344 (Docket Id. CEQ-2019-0003-172519, CEQ-2019-0003-172512).
[83] RIA at 31.

person should enjoy a healthful environment," 42 U.S.C. § 4331(C), and requiring an

environmental impact statement for actions that "significantly affect[] the quality of the *human*

environment," *id*. § 4332(2)(C) (emphasis added).  Environmental justice is a relevant factor for

updating NEPA regulations, given the underlying purpose of NEPA and consistent executive

practice.  But despite its relevance, the record is devoid of evidence that CEQ adequately

considered this factor in promulgating the Rule.

As an illustration of its deficient approach to this issue, CEQ's RIA does not include **one**

**single mention** of environmental justice.  This absence is consistent with CEQ's treatment of

environmental justice within its Response to Comments: when considered at all, it is mere lip

service, without the level of depth and sophistication required of federal agencies actually

considering the concern.  *Gresham*, 950 F.3d 93, 103 (D.C. Cir. 2020) ("Nodding to concerns

raised by commenters only to dismiss them in a conclusory manner is not a hallmark of reasoned

decisionmaking"); *Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir.

2017) (critiquing an agency for "brush[ing] aside critical facts" and not "adequately analyz[ing]"

the consequences of a decision); *Getty*, 805 F.2d at 1055 (analyzing whether an agency actually

considered a concern rather than merely stating that it considered the concern).

Generally, commenters expressed concerns that the "proposed revisions do not propose to

enact any directives concerning environmental justice issues and will likely result in worse

environmental justice outcomes."[84]  For instance, "cumulative effects analysis under NEPA is

one of the few tools available to agencies to consider exactly how a proposed project may

contribute to past, present, and future pollution burdens" and "eliminating [it] will

---

[84] Response to Comments at 576-77.

disproportionately impact and adversely affect EJ communities."[85]  Moreover, commenters noted that the heightened requirements for public participation in the NEPA process embodied in the Rule would raise a further barrier to inclusion of under-resourced Black and Brown communities and thus exacerbate the chance that they will suffer disproportionate environmental harms.[86]

Commenters noted numerous specific examples of how the Rule would impact environmental justice communities.  For example, the Conservation Groups explained how the elimination of NEPA review for FSA loans could lead to a lack of disclosure about concentrated animal feeding operations ("CAFOs").  To support their concerns the groups cited to and attached Complaints brought under Title VI of the Civil Rights Act of 1964, as well as federal and state agency analysis showing the disproportionate way that communities of color are impacted by these facilities in North Carolina including polluted water, poor air quality, and overwhelming odor that leads to a variety of health and psychological effects.[87]  The Conservation Groups noted how communities like the Phillips Community, established in 1875, and one of the largest intact settlements of freed slaves in South Carolina is relying on the NEPA process so that it can weigh in on a proposal to widen a stretch of Highway 41 that would severely impact the community.[88]  And the Conservation Groups noted that the weakened

---

[85] Partnership Project Comment Letter at 91.
[86] Conservation Groups Comment Letter at 91-109.
[87] *See, e.g.*, Conservation Groups Comment Letter at 40-42, Attachment 58 (Complaint, *McRee et al. v. Leatherbrook Holsteins et al.*, 1:19-cv-00118-LAG (M.D. Ga.), Docket Id. CEQ-2019-0003-172003), Attachment 60 (Letter from Lilian Dorka, Director of Eternal Civil Rights Compliance with the EPA, to William Ross, Acting Sec'y of N.C. DEQ (Jan. 12, 2017), Docket Id. CEQ-2019-0003-172003); Attachment 52 (Letter from Blakely Hildebrand, SELC, et al to Jon Risgaard, N.C. Div. of Water Res. (March 4, 2019), Docket Id. CEQ-2019-0003-171989); Attachment 51 (EPA, Literature Review of Contaminants in Livestock and Poultry Manure and Implications for Water Quality, EPA 820-R-13-002, 5 (July 2013), Docket Id. CEQ-2019-0003-171989).
[88] Conservation Groups Comment Letter at 52 (attaching numerous articles and federal and state environmental documents discussing the highway widening and the Phillips community) (Attachments 92-101, Docket Id. CEQ-2019-0003-172038, CEQ-2019-0003-172157, CEQ-2019-0003-172050, CEQ-2019-0003-172079, CEQ-2019-0003-172172).

requirements that no longer require agencies to consider up to date scientific information could

lead to agencies ignoring emerging issues like per- and polyfluoroalkyl substances ("PFAS") that

disproportionately impact the health of environmental communities that are subsistence fishers.[89]

CEQ did not adequately analyze this major, relevant factor on the record.  To the extent

CEQ responded to comments on this issue at all, it failed to offer any evidence-based reasoning

or analysis or to grapple with the concerns in a meaningful way.  Instead, CEQ merely offered

unsupported conclusory statements such as:  "[t]he changes do not disadvantage or adversely

impact low-income and minority communities,"[90] and "changes in [the] final rule . . . would not

result in adverse environmental impacts."[91]  These statements have no supporting analysis in the

record and thus cannot be meaningfully evaluated.  Elsewhere, just as with environmental

effects, CEQ punted on concerns about the loss of NEPA as an informational and proactive

disclosure tool by pointing that other laws exist.[92]  In addition, CEQ failed to confirm whether it

is withdrawing the environmental justice guidance, and then asserted—without analysis or

explanation—that even if it is withdrawn "it will not . . . reduce the quality of analysis under

NEPA."[93]

Moreover, CEQ's arbitrary baseline, which did not include the protections set in place by

the 1978 regulations, further discredits the agency's assertion that it adequately considered

environmental justice.  If the loss of the previous protection associated with robust public

participation, consideration of indirect and cumulative effects, and wide-scale analysis of

---

[89] Conservation Groups Comment Letter at 107-108.
[90] Response to Comments at 34.
[91] *Id.*
[92] *See, e.g.*, Response to Comments at 533 (regarding CAFOs and ignoring concerns about environmental justice, stating blithely that States can regulate CAFOs.  Among other omissions, this response fails to respond to concerns raised about odor, which is not regulated under any statutory scheme.)
[93] Response to Comments at 576-77.

projects that impact environmental justice communities is not even *considered*, then

environmental justice certainly cannot be meaningfully evaluated.  CEQ's analysis is arbitrary

and capricious.

### C.   CEQ Failed to Consider Reliance Interests in Promulgating the Rule.

In promulgating the Rule, CEQ illegally failed to consider four decades of reliance—by,

among others, federal agencies, states, concerned citizens, and private applicants—on the stable

framework provided by the 1978 regulations.  When reversing a prior policy that "has

engendered serious reliance interests," an agency must "provide a more detailed justification

than what would suffice for a new policy created on a blank slate."  *Fox TV,* 556 U.S. at 515.

This necessitates a "reasoned explanation . . . for disregarding the facts and circumstances that

underlay or were engendered by the prior policy."  *Id.* at 516.

Agencies are "required to assess whether there were reliance interests, determine whether

they were significant, and weigh any such interests against competing policy interests."  *Regents*,

140 S. Ct. at 1915.  An agency's failure to do so, as the Supreme Court reiterated recently, is

"arbitrary and capricious in violation of the APA."  *Id.* (holding that the Department of

Homeland Security's 2017 termination of the Deferred Action for Childhood Arrivals (DACA)

program was arbitrary and capricious because the agency failed to consider and weigh the

strength of reliance interests).

Like the agency action in *Regents*, CEQ's Rule reverses prior policy.  The Rule reverses

a number of longstanding NEPA requirements, such as consideration of indirect and cumulative

impacts, the evaluation of all reasonable alternatives, the use of a well-established set of intensity

factors to determine when a project requires an EIS, the prohibition on expending resources

while NEPA reviews are pending, and numerous other changes—without adequately considering

the reliance interests engendered by the prior regulations.  And unlike the relatively recent

DACA program, the Rule upsets an unchanged regulatory framework the public has relied on for

over forty years.

The record reflects that many parties, including federal agencies, states, private

applicants, and concerned citizens, have relied on the 1978 rules and the vast and largely

consistent body of case law developed around the prior regulations in a number of different

ways.  Federal agencies tasked with conducting NEPA reviews have developed effective

practices for analyzing environmental impacts.  Federal agencies also relied on the flexibility

afforded by CEQ's prior rules (which operated as a floor, not a ceiling) to augment the CEQ

rules with additional procedures needed to meet their independent obligations to comply with

NEPA to the fullest extent possible.[94]  Private applicants, along with federal agencies, relied on

the stable interpretations of the prior rules to confidently undertake projects.[95]  States relied on

the previous regulations in crafting their own environmental policy acts—laws that are impaired

and incomplete without a federal backstop, because these state laws frequently apply only if

NEPA does not, so projects will now be subject to a watered-down NEPA review far weaker

than the otherwise-applicable state law.[96]

Vulnerable and concerned citizens, including members of the Conservation Groups, also

relied on the prior regulations to ensure government transparency, obtain a wealth of data, and

make their voices heard during the consideration of major projects.  First and foremost, the

Conservation Groups and their members rely on the longstanding requirements for robust

---

[94] *Compare* 40 C.F.R. § 1507.3 (1978) (requiring other agencies to adopt their own procedures to
"comply with" and "supplement" CEQ's regulations), *with* 40 C.F.R. § 1507.3 (2020) (generally
disallowing other agencies' "additional procedures"). *See, e.g.*, 36 C.F.R. § 220 (Forest Service's NEPA
implementing regulations including additional procedures beyond CEQ requirements).
[95] *See, e.g.*, Sustainable Business Council Comment Letter at 2.
[96] AG Comment Letter at 70-73.

implementation of NEPA to ensure that government agencies think through the consequences of their environmentally harmful actions, a process that has led to better, less-damaging outcomes, as the Groups documented in their comments on the Rule.[97]  Moreover, NEPA is the only complete, free source of information available on cumulative and indirect impacts, as well as all reasonable alternatives, for federal projects.  The Conservation Groups rely on these disclosures for such invaluable information, as well as the opportunity to respond to it through the public participation process.[98]  The Conservation Groups have relied on the current rules to structure their participation in ongoing and upcoming projects and rulemakings subject to NEPA, including projects which are not yet completed but may still be subject to the Rule under CEQ's retroactive application of the Rule.  40 C.F.R. § 1506.13 (2020).

Despite this substantial reliance, CEQ failed to assess any of these interests, or to consider the disruption produced by its abandonment of forty years of consistent policy, or to weigh such effects against competing interests.

Commenters raised numerous specific concerns about losing central features of the 1978 regulatory scheme they have long relied on, which were ignored by CEQ.[99]  For example, by cutting out more projects from NEPA review in the first place, the Conservation Groups will be deprived of vital information about projects significantly affecting the environment. Specifically, commenters raised concerns about the elimination of Farm Service Agency loan guarantees as a trigger for NEPA compliance and noted that where in the past stakeholders have relied on NEPA to provide information about facilities like concentrated animal feeding

---

[97] *See* Conservation Groups Comment Letter at 2-4, 18-19, 50-67, 76-78, 79-83, 84-88, 93-98, 104-05.
[98] *See generally* Conservation Groups Comment Letter.
[99] Response to Comments at 4-5 (responding to comments raising a variety of such concerns, not by assessing and weighing them against competing interests but by denying any problems would result, stating that "[n]othing in the final rule changes any requirements under substantive environmental laws").

operations ("CAFOs"), under the Rule such projects will no longer undergo NEPA review.[100]
Rather than weighing the reliance interests, CEQ stated in its responses to comments that, because in the contexts of loans and loan guarantees agencies don't exercise "sufficient control" of projects, CEQ concluded that "requiring NEPA analysis would provide little value because the outcome or environmental effects would remain the same."[101]  With this statement, CEQ fails to acknowledge that NEPA has twin aims and is designed not just to guide agency decisionmaking but to inform the public.  CEQ simply did not consider how the loss of this information will affect groups who rely on it.  Moreover, CEQ further brushes aside the concerns by noting that, "[r]egardless of whether a producer receives an FSA loan guarantee, the CAFO is subject to EPA and State permitting regulations and enforcement,"[102] a fact that fails to account for the reality that NEPA plays informational and action-forcing roles that cannot be and are not replaced by state permitting schemes.

The Conservation Groups have also long relied on NEPA as a way to be involved in the democratic decisionmaking process for a host of other federal decisions.  *N.C. Wildlife Fed'n v. NCDOT*, 677 F.3d 596, 603–04 (4th Cir. 2012).  The Conservation Groups thus raised concerns about the mechanisms for public participation they have long relied on.[103]  In response, CEQ simply denied that the Rule will curtail the opportunities for public input, claiming instead that the Rule "requires agencies to provide more information to and solicit input from the public earlier in the process," a statement that simply denies the many changes in the Rule that will lessen public participation.[104]

---

[100] Conservation Groups Comment Letter at 38-43.
[101] Response to Comments at 517-18.
[102] *Id.* at 533.
[103] *See, e.g.*, Conservation Groups Comment Letter, at 2-4, 7, 84-88.
[104] Response to Comments at 5.

On its face, the Rule prohibits agencies from offering notice and comment periods for decisions made using a categorical exclusion or environmental assessment, as some agencies currently do.  40 CFR §§ 1501.4, 1501.5 (1978).  It also places higher burdens on commenters to make specific technical comments and devalues comments related to public preference.  *Id.* § 1503.3 (2020).  Relatedly, the Rule attempts to limit the public's right to judicial review, *id.* § 1500.3 (2020), and moves to take public hearings out of communities and place them online. *Id.* § 1506.6 (2020). Yet CEQ merely shrugs off this concern without addressing the reliance interests affected.[105]  Certainly, an agency that fails even to acknowledge a significant change cannot evaluate its effect on reliance interests as required by the APA.

CEQ is equally blind when it comes to the reliance that state statutory schemes have on NEPA.  In several of the states where the Conservation Groups are based, the federal NEPA statute acts in conjunction with state statutes.  For example, in North Carolina when NEPA applies to a project, there is no requirement to prepare written assessments under the North Carolina Environmental Policy Act.[106]  CEQ ignores this impact entirely, claiming incorrectly that "NEPA's procedural requirements do not affect the applicability of any underlying State, Tribal or local laws."[107]  But this statement fails to note the huge gap that might be left in the regulatory landscape where federal NEPA still applies, rather than state schemes, but no longer includes the same level of review and consideration of alternatives and impact—or, where a

---

[105] Response to Comments at 326–28 (responding that revisions are "not [being] intended to limit public comment or preclude consideration of substantive comments" and recommending that "[c]ommenters are free to hire experts to present their comments").
[106] *See* 1 N.C. Admin. Code 25.0402.
[107] Response to Comments at 530.

categorical exclusion under the new Rule means projects are left without *any* environmental review at the federal or state level.[108]

Throughout its RIA and responses to comments, CEQ focuses its efforts on attempts to justify its changes as being legally consistent with the statute, without doing the harder task of looking at what the impact of the changes will be, how they will affect the interests that have long relied on more than forty years of stable regulation, and whether those effects are justified. In failing to take on this task CEQ failed to provide the heightened, detailed justification required to reverse policies of such importance.  The Rule is thus arbitrary and capricious.

**D.      CEQ did not Offer a Plausible Explanation for its Reversal of Longstanding Policy.**

CEQ has not justified its decision to overhaul the NEPA regulations with the new Rule, which creates vast uncertainly, induces delay, and severely curtails the effectiveness of the NEPA review process.  When changing or reversing existing policies, agencies must "provide a reasoned explanation for the change."  *Encino Motorcars*, 136 S. Ct. at 2125.  This explanation must be genuine, and courts "cannot ignore [a] disconnect between the decision made and the explanation given."  *Dep't of Commerce v. New York*, 139 S. Ct. at 2575.  As such, unreasoned, contrived, or pretextual justifications are insufficient to uphold agency action.  *Id.*; *State Farm*, 463 U.S. at 43 (stating that an agency rule is arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before the agency").

CEQ's oft-repeated justification for the regulatory overhaul encompassed in the Rule— "to reduce paperwork and delays"—is not a reasoned explanation sufficient to uphold this

---

[108] *See, e.g.*, 1 N.C. Admin. Code 25.0402 ("If a specific activity has been designated as categorically excluded from the provisions of NEPA, then the requirements of this Chapter shall have been met for that activity.").

rulemaking.[109]  Evidence submitted to CEQ does not support the claim that the prior NEPA

process was a significant cause of project delays.  And certainly, there is no evidence to support

the conclusory claim that the Rule will reduce delay in any meaningful way.  Instead, the Rule is

likely to *increase* project delays by injecting significant new confusion and ambiguity into the

NEPA process.

To the contrary, evidence submitted to CEQ establishes that NEPA review is not a major

cause of project delay.  According to the Treasury Department and the Congressional Research

Service, the primary causes of project delay are lack of funding, lack of consensus between

various public and private actors, and issues surrounding how to accommodate affected

stakeholders.[110]  Even when a delay is related to environmental review, the sources of delay are

generally laws other than NEPA.[111]  A wide variety of commenters other than the Conservation

Groups emphasized this point, including:

- A national, bipartisan group of state legislators who pointed out that "the overwhelming barrier to project completion is not NEPA but adequate funding and technical support from the federal government";[112]

- The American Sustainable Business Council, which criticized CEQ's "fail[ure] to address the key drivers of project delay including the capacity crisis within the government for conducting NEPA";[113]

- The American Association of State Highway and Transportation Officials ("AASHTO"), which noted the "other delay factors that are outside of NEPA . . .

---

[109] *E.g.,* NPRM, 85 Fed. Reg. 1,684, 1,685, 1,691, 1,692.

[110] Cong. Research Serv., Accelerating Highway and Transit Project Delivery: Issues and Options for Congress 1 (Aug. 3, 2011) (Conservation Groups Comment Letter, Attachment 15, Docket Id. CEQ-2019-0003-171879).

[111] Cong. Research Serv., The Role of the Environmental Review Process in Federally Funded Highway Projects: Background and Issues for Congress (April 11, 2012) ("[W]hen environmental requirements have caused project delays, requirements established under laws other than NEPA have generally been the source.") (Conservation Groups Comment Letter, Attachment 15, Docket Id. CEQ-2019-0003-171879).

[112] Legislator Comment Letter at 2.

[113] Sustainable Business Council Comment Letter at 2.

includ[ing] lack of consistent funding, public controversy, and other approvals." AASHTO went on to note that the resources of federal regulatory agencies are so limited that state DOTs will fund positions merely to assist in getting a timely response.[114]

Moreover, as noted by law professors in comments to CEQ, rather than delay agency action, NEPA provides an opportunity to identify and address issues earlier in the permitting process as well as establishing a vehicle to harmonize permitting efforts and thereby improve permitting efficiency.[115]  As a result, projects that undergo NEPA review often are completed more quickly than projects that do not.[116]  This phenomenon has been recognized by the Government Accountability Office, which notes that "discovering and addressing the potential effects of a proposal in the early design stages to avoid problems that could end up taking more time and being more costly in the long run."[117]  In addition, Conservation Groups provided data showing that, for Forest Service actions, the length of time needed to analyze the effects of treating a given number of acres is essentially identical, no matter whether the analysis is done with a categorical exclusion, an EA, or an EIS.  This data demonstrates that other factors are responsible for any delays.[118]

In the relatively few instances where delays are associated with the NEPA process, they do not result from NEPA's required procedures.  NEPA's public participation checkpoints under the 1978 regulations account for only a fraction of the time it takes to develop most projects. Even a major highway project, for example, requires a maximum of sixty days for public

---

[114] AASHTO Comment Letter at 5.
[115] Law Professor Comment Letter at 9 (discussing how NEPA review speeds up, rather than delays, project review: "A 2019 study took advantage of a circuit split on NEPA's applicability to critical habitat designations made pursuant to the Endangered Species Act. Reviewing 607 critical habitat designation rules, it found that those that underwent NEPA review were actually completed faster than those that were exempt from NEPA.").
[116] *Id.*
[117] GAO-14-370 at 16.
[118] SELC Comment Letter on USFS NEPA Rules, *supra* n.69, at App'x 5.

comment. 23 U.S.C. § 139(g)(2)(A); 23 C.F.R. § 771.123(k).  Forest Service projects typically have one or two thirty-day comment periods, with the most complex decisions allowing for a ninety-day comment period. 36 C.F.R. §§ 218.25 (30 day comment period for EAs); § 219.16(a)(2) (45 to 90 day period for EIS in forest plan revisions and amendments); §220.4(e) (scoping). Other project work may continue during these short periods for public participation and agency coordination, and they do not appreciably slow down project delivery.  The rest of the agencies' time is largely spent reviewing projects, considering options, and thinking through how projects will comply with the law—all things the agencies have to do regardless of NEPA.[119]

And indeed, CEQ made no attempt to explain how its changes would actually speed project delivery.  In the RIA, CEQ noted repeatedly it was imposing a new timeline on the NEPA process, but did not even attempt to explain how mere imposition of an arbitrary timeline would help agencies to move projects forward more quickly while also complying with law to provide decisionmakers and the public the information they are need and are legally entitled to. Nor did CEQ explain how agencies are supposed to meet the new timelines given that they are currently understaffed and underfunded.  Nothing in the record suggests CEQ gave any thought to how much additional funding will be necessary to meet these accelerated timelines, where it will come from, and what other agency functions would suffer as a result.

Likewise, CEQ took no steps to evaluate how other systems set in place around the country to speed up project delivery time were working.  Commenters noted, for example, that North Carolina's Merger process employs agency coordination similar to requirements of the

---

[119] *See generally* Fleischman Decl. at ¶ 22 (explaining the relationship between NEPA comments and other project work: "To put the matter simply, if you are going to build a bridge, you need to develop an engineering plan, regardless of whether the public disclosure of a plan is required by NEPA, and much of the time that we describe as 'NEPA analysis' consists of developing those engineering plans, or their equivalent.").

Rule, and yet the process has not resulted in faster delivery times—primarily because there is

insufficient funding available for large infrastructure projects and agencies themselves remain

under-funded.[120]  Indeed, CEQ highlighted a North Carolina project from the Merger process as

a reason for why the Rule was needed,[121] but it took no steps to evaluate why that process has not

led to faster delivery times or why essentially the same process in the Rule would lead to a

different outcome.

Furthermore, CEQ took its conclusory assertions of reducing project delay and used them

to gin up cost savings for the public, based on source material that does not warrant the weight

given to it.  CEQ's thirty-page RIA, which includes very little factual support and contains just

19 footnotes, devotes three of those footnotes to the small non-profit organization Common

Good.[122]

The primary report cited, "Common Good, Two Years, Not Ten Years: Redesigning

Infrastructure Approvals" (2015) (hereinafter "Two Years Report"),[123]is little more than a brief

think piece written by two people who have no economics training or background.[124]  Indeed, the

report does not itself pretend to be a robust economic analysis, noting: "Caveat: These estimates

---

[120]  Conservation Groups Comment Letter at 12 (explaining that "in 1997, North Carolina introduced a program that merges the NEPA and   Clean Water Act Section 404 regulatory processes, when both are required for a project.  Under this program, the  state transportation and environmental agencies, together with the Army Corps of Engineers and   the Federal Highway Administration, screen transportation projects for potential overlapping   permitting requirements; if there is overlap, this triggers a project to be placed into the Merger Process," and noting that "[y]ears of experimentation can help inform CEQ what actually works to speed up "efficiency" and what does not.")

[121]  President Donald Trump, Address at the White House Roosevelt Room (Jan. 9, 2020) (discussing the Marc Basnight Bridge).

[122]  RIA at 3 n.5, 9 n.15. referencing Common Good Updates the Cost of US Infrastructure Delays: Costs Have Risen $200 Billion Over Five Years to Nearly $3.9 Trillion, (May 2018) https://www.commongood.org/wpcontent/uploads/2018/05/Two-Years-Update.pdf.  And Common Good, Two Years, Not Ten Years: Redesigning Infrastructure Approvals (2015) *available* at https://www.commongood.org/articles-reports-and-media-appearances/two-years-not-ten-years-redesigning-infrastructure-approvals-1

[123] *Id.*

[124] *See id.*

67

are rough, and are readily adjustable with a change of assumptions."[125]  And CEQ had been

alerted to the inadequacy of the Report during the rulemaking process.  A Congressional

Research Service report submitted to CEQ provides a withering critique of the report, noting that

it "cites no data to support its assertions" and is based on "limited anecdotal evidence."[126]  The

Two Years Report does not define what it means by "avoidable delay."[127]  The Two Years

Report's musing about reducing infrastructure delivery from ten to two years is based on no

analysis of how that could actually happen—and indeed, does not even support the assertion that

projects currently take ten years to deliver.  The Two Years Report also fails entirely to consider

how local and state issues influence project delivery, despite this being a common cause for

project delay.  Because of these failures, and the arbitrary numbers used to assess the costs

associated with perceived "delay," the report's conclusion that $3.9 trillion could be saved is

completely lacking credibility.

CEQ's reliance on these reports for the cost of project delays is therefore completely

irrational.  Substantial reliance on unsupported sources in making major decisions is arbitrary

and capricious.  *See, e.g.*, *Bedford Cty. Mem'l Hosp. v. Health & Human Servs.*, 769 F.2d 1017,

1022 (4th Cir. 1985) (Agency action related to Medicare changes found arbitrary and capricious

where unreliable data was used.); *cf. Ranchers Cattlemen Action Legal Fund United*

---

[125] *Id.* at 7.

[126] Congressional Research Service Memorandum: Questions regarding the report Two Years Not Ten Years: Redesigning Infrastructure Approvals (June 7, 2017) (attached as Ex. 58); *see also* Pew Comment Letter at 2 ("CRS '…found no evidence to support an assertion that the projects identified were delayed by federal regulatory requirements (permitting) or environmental reviews.' CRS also concludes that '…no outside report or study…identified permitting, generally, or compliance with specific local, state, or federal requirements, in particular, as a primary barrier to completing various infrastructure projects.'  In addition, the report states that when delays do occur, 'local and state issues often have the most influence on whether a given project moves forward relatively quickly or takes longer than anticipated.' Overall, cutting out necessary public reviews detailing potential impacts of proposed federal actions will accomplish little to alleviate CEQ's concern on permit timing.") (quoting *id.*).

[127] *See* Two Years Report at 6 (providing no definition of "avoidable delay").

*Stockgrowers of Am. v. U.S. Dep't of Agric.*, 415 F.3d 1078 (9th Cir. 2005), as amended (Aug. 17, 2005) (USDA rule reopening beef imports from Canada found not arbitrary and capricious because USDA had significant amounts of reliable evidence that its decision was justified).

Compounding these failures, CEQ also failed entirely to address the mountains of comments suggesting that the proposed changes will actually lead to *more* project delay, rather than less. In many places, the Rule increases administrative burdens placed on applicants. For example, in a small but unnecessary change, agencies must now include in every EIS "a summary of all alternatives, information, and analyses submitted by public commenters. . . ." 40 C.F.R. § 1502.17 (2020)—an entirely new obligation with which agencies have no experience. And agencies are now explicitly required to examine the economic consequences of their actions. *Id*. § 1502.16(a)(10) (2020). More significantly, the Rule places arbitrary page and time limits on the process that cannot be exceeded without approval from a senior agency official. *E.g. Id.* §§ 1501.10, 1502.7 (2020). Trying to condense information into fewer pages is itself time consuming. As pointed out by the American Society of Civil Engineers, the limits the Rule creates are often impracticable.[128] For example, some biological data necessary for a complete NEPA review can only be compiled at certain times of the year because of the life cycles of the species at issue. This could make a full environmental review within the tight deadlines impossible, and thus the project would be required to go through extra bureaucratic hoops to get a timeline extension. CEQ did not address these concerns.

In addition, by limiting the scope of NEPA review and restricting public comments, consensus among parties and accommodation of stakeholders will be more difficult to achieve. For example, CEQ itself has demonstrated in the past that a robust alternatives analysis

---

[128] Society of Civil Engineers Comment Letter at 3.

completed early in the planning process saves both time and money.[129]  Similarly, CEQ found

that limits on public involvement "add costs and time as projects are delayed by ensuing

controversy and legal challenges."[130]  Ignoring these findings, the Rule limits the scope of the

required impacts and alternatives analysis, allows the NEPA review to begin later in the planning

process (and, in fact, creates an incentive that agencies will initiate NEPA later in project

development in order to meet the Rule's strict and arbitrary time limits).[131]

What is more, the Rule is vague, unclear, and inconsistent—which is certain to result in

delay as agencies, contractors, project applicants and government decisionmakers sort through a

morass of new uncertainties.  The extensive definitional changes will cause particular problems,

as the Rule alters and/or removes definitions that are grounded in the statute itself.  Individual

agencies will need to promulgate their own new regulations, and in the meantime will need to

work through what rules and definitions they should and can be using.  CEQ compounds the

confusion with its stated intent to withdraw all guidance documents that have clarified and

shaped the NEPA process for the last four decades.[132]  As pointed out by numerous concerned

stakeholders with strong interests in expeditious project delivery, leaving this type of void in the

regulatory landscape will only lead to "controversy, uncertainty, and delay."[133]

Moreover, commenters explained that the massive changes will inevitably lead to an

increase in litigation.[134]  The Rule dislodges forty years of stable, established legal precedent.

---

[129] 1997 Effectiveness Study at iii.

[130] *Id.* at 19.

[131] 85 Fed. Reg. at 43,321.

[132] *Id.* at 43,338.

[133] *See* Sustainable Business Council Comment Letter at 2; *see also, e.g.,* SEIA Comment Letter at 2, 4; Permitting and Infrastructure Coalition Comments at 5-6.

[134] *See, e.g.,* Conservation Groups Comment Letter at 4, 21, 74, 78, 79; NRDC Comment Letter at 43, 51, 122-126; *see also* Compl. ¶¶ 224 (Haw River Assembly "may resort to more frequent litigation to protect the watershed from harm."), 469 (even industry groups noted "that the Proposed Rule would, in many ways, add to project delays by […] inviting litigation."), 474, 481.

The boundaries, new definitions, inconsistencies, and other changes to well-established law will take years of litigation to clarify.  CEQ "entirely failed to consider [this] important aspect of the problem," making its decision arbitrary and capricious.  *State Farm*, 463 U.S. at 43.

### E.      CEQ did not Consider Less Harmful Alternatives to Rewriting the NEPA Regulations.

CEQ failed to consider obvious alternatives to the Rule that would have achieved the agency's goals and would still have satisfied the directives of Executive Order 13807, with much less damaging consequences.  "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternatives' that are 'within the ambit of the existing policy.'"  *Regents*, 140 S. Ct. at 1913 (quoting and interpreting *State Farm*, 463 U.S. at 51); *see Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (requiring the consideration of significant, viable, and obvious alternatives).  A "failure to consider such alternatives, and to explain why such alternatives were not chosen," renders a decision arbitrary and capricious.  *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983).

Commenters presented CEQ with alternatives that would have more viably achieved the goals of the Rule, such as advocating for additional funding and oversight of NEPA implementation, utilizing existing guidance documents and promulgating new guidance when needed, and revising the regulations to account for climate change.[135]  These would have met CEQ's stated goal to "modernize" the NEPA process, but the agency disregarded them entirely.

Likewise, CEQ failed to consider alternatives that might actually have met its aim of speeding up project delivery.  Indeed, CEQ did not even appear to consider how steps already begun to better facilitate project delivery could be continues and expanded.  For example, a

---

[135] *See, e.g.*, Conservation Groups Comment Letter at 2, 5, 7; see also Conservation Groups Comment Letter Attachment 12 (letter from letter from Southern Environmental Law Center to CEQ re: ANPRM, 2, 8, 25 (Aug. 20, 2018)).

Federal Infrastructure Permitting Dashboard was codified in FAST-41, 42 U.S.C. § 4370m—to 4370m–12, to help speed up project review times and ensure better communication between agencies.[136]  The process has not been fully funded, however, and CEQ took no steps to consider how it could work as a less drastic alternative to the Rule.  In particular, CEQ cited a lack of agency resources in an attempt to justify the drastic limitations placed on the NEPA process, but never contemplated addressing resource shortages directly.  Under FAST-41, authority was granted to collect fees from project developers to support environmental review.[137]  But while the very first stages of a rulemaking were begun in 2018, the process has not moved forward.[138]  Rather than address this option, in its response to comments CEQ stated only that the FAST-41 process has not yet been in place long enough to assess its effectiveness.[139]

## II.    An Injunction is Necessary to Avoid Irreparable Harm.

The Conservation Groups are entitled to preliminary injunctive relief because the groups and their members will be injured irreparably before this Court is able to reach a decision on the merits.  *See Winter*, 555 U.S. at 22.  The Rule goes into effect for all new projects starting September 14, 2020, but federal agencies may also apply it to projects that are currently underway.  Because President Trump recently issued an Executive Order requiring federal agencies to "take all reasonable measures to speed infrastructure investments and to speed other actions in addition to such investments [including civil works, and projects on federal lands] that will strengthen the economy and return Americans to work . . ."[140] the Conservation Groups are

---

[136] *See* Goldfuss Decl. ¶¶ 4, 14; Hayes Decl. ¶¶ 13–15.
[137] *See* Goldfuss Decl. ¶ 35.
[138] 83 Fed. Reg. 44,846 (Sep. 4, 2018) (announcing a Notice of Proposed Rulemaking for FAST-41)
[139] Response to Comments at 32.
[140] Exec. Order No. 13927, Accelerating the Nation's Economic Recovery from the COVID-19 Emergency by Expediting Infrastructure Investments and Other Activities, 85 Fed. Red. 35,165 (June 4, 2020).

concerned that federal agencies will immediately begin to apply the rules to projects that are under way.  In addition, some agencies like the Forest Service have been expressly ordered to do only the minimum environmental review required by law—to "ensure environmental reviews focus on analysis that is required by law and regulation."[141]  As a result, the harm to the Conservation Groups, which have interests in hundreds of projects currently under review, will be immediate.

If not enjoined, the Rule will cause irreparable harm by removing the procedural safeguards needed to avoid unnecessary and unlawful harms to the ecological, social, and cultural resources the Conservation Groups and their members enjoy and are dedicated to protecting.  Further, the Conservation Groups and their members will be injured irreparably by being deprived of information to which they are entitled by law and which is essential to their work.  Additionally, the Conservation Groups will be injured irreparably because they would be forced to divert resources from their organizational missions in order to mitigate the harm caused by the Rule.  And, finally, the Conservation Groups and their members will be injured irreparably by Defendants' failure to engage in reasoned decisionmaking and failure to address the Conservation Groups' comments and concerns in the administrative record for this rulemaking.

### A.  The Conservation Groups Will Suffer Environmental Harm.

As explained by now-Justice Breyer, a NEPA violation is not merely "a 'procedural' harm, as if it were a harm to *procedure*."  *Sierra Club v. Marsh*, 872 F.2d at 500 (emphasis in original).  "Rather, the harm at stake is a harm to the *environment* . . . ."  *Id.*

---

[141] Press Release, Secretarial Memorandum to the Chief of the Forest Service (June 12, 2020), *available at* https://www.fs.usda.gov/news/releases/secretarial-memorandum-chief-forest-service.

[T]he harm consists of the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects of their decision upon the environment. NEPA's object is to minimize that risk, the risk of uninformed choice, a risk that arises in part from the practical fact that bureaucratic decisionmakers (when the law permits) are less likely to tear down a nearly completed project than a barely started project.

…

[T]he risk implied by a violation of NEPA is that real environmental harm will occur through inadequate foresight and deliberation. The difficulty of stopping a bureaucratic steam roller, once started, still seems to us … a perfectly proper factor for a district court to take into account in assessing that risk, on a motion for a preliminary injunction.

*Id.* at 500–01, 504.  Put succinctly, "'harm to the NEPA process'" and "'harm to the environment'" are not "separate categories." *Id.* at 505.

Accordingly, it is well established that an environmental plaintiff is irreparably harmed when a federal agency fails to comply with NEPA before taking steps that are likely to make it harder, as a practical matter, to change course based on information about environmental impacts. *E.g.*, *Arlington Coal.*, 458 F.2d at 1333-34 (holding that plaintiffs were entitled to an injunction barring highway construction until an EIS was prepared because "options . . . would diminish" and "it could be well too late to adjust the formulated plans so as to minimize adverse environmental effects"); *Md. Cons. Council v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir. 1986) (reversing denial of injunction to bar completion of highway segments pending completion of required NEPA review because "[t]he completed segments would stand like gun barrels pointing into the heartland of the park"); *Crutchfield v. U.S. Army Corps of Eng'rs*, 192 F. Supp. 2d 444, 454–59 (E.D. Va. 2001) (surveying Fourth Circuit law and enjoining further construction of a wastewater treatment facility until the agency complied with NEPA).

74

Irreparable harm is caused not only by an agency's failure to conduct a required NEPA review or improper limiting of the scope of review for a single project, but also by policy changes that would eliminate such reviews in future projects.  *See, e.g., Sierra Club v. Bosworth*, 510 F.3d 1016 (9th Cir. 2007); *W. Watersheds Project v. Zinke*, 336 F. Supp. 3d 1204 (D. Idaho 2018); *Heartwood*, 73 F. Supp. 2d at 962.

In both *Bosworth* and *Heartwood*, the Forest Service failed to engage in reasoned decisionmaking when revising its NEPA procedures to categorically exclude certain types of action from detailed analysis.  The courts found that these changes caused irreparable harm to the plaintiffs by increasing the risk of harm in future projects.  *See* 510 F.3d at 1034; 73 F. Supp. 2d at 979–80.  Similarly, in *Western Watersheds Project*, the court found irreparable harm where the Bureau of Land Management unlawfully revised its procedures to limit environmental review and public participation in future oil and gas leasing decisions.  *See* 336 F. Supp. 3d at 1240–41. *Accord*, *W. Watersheds Project v. Schneider*, 417 F. Supp. 3d 1319, 1334 (D. Idaho 2019):

> Under these weakened protections, the BLM will be approving oil and gas leases; drilling permits; rights-of-way for roads, pipelines, and powerlines; coal and phosphate mining approvals; and livestock grazing permit renewals . . . .  It is likely that these actions will cause further declines of the sage grouse under the weakened protections of the 2019 Plan Amendments.

The same is true of the projects now exempted from NEPA review under the Rule.

As discussed above, CEQ's Rule includes myriad changes that would increase the risk of environmental harm "through inadequate foresight and deliberation" for ongoing and upcoming projects in which the Conservation Groups have a demonstrated interest.  *See Sierra Club v. Marsh*, 872 F.2d at 504.  NEPA expert John Ruple notes that he has "consistently seen federal agency officials who are engaged in NEPA analysis work hard to minimize environmental harms

while allowing development to proceed."[142]  Professor Ruple adds that this is "consistent with [his] scholarship reviewing the change in anticipated impacts that occurred during the NEPA process."  Federal officials repeatedly demonstrated that they were able to "reduce environmental impacts with little or no impact on economic growth.  Congress intended NEPA to be a tool to allow development while minimizing the environmental harms development could cause, and based on [his] experience and scholarship, NEPA has generally succeeded."[143]  Prof. Ruple's scholarship demonstrates that NEPA frequently results in outcomes with significantly less environmental harm.[144]

For example, Plaintiffs whose missions include advocating for environmental values on National Forest lands have shown that Forest Service proposals are often improved by public participation[145] and analysis provided by the prior NEPA regulations,[146] that the Rule would limit public participation and analysis,[147] and that the Rule would therefore increase the risk of harm

---

[142] Ruple Decl. ¶ 63, attached as Ex. 55

[143] *Id*.

[144] *Id*. at ¶¶ 37-43.

[145] Members of Conservation Groups work to help the Forest Service understand the full impact of projects.  For example, North Carolina Wildlife Federation member Manley Fuller has participated in two stakeholder groups, the Nantahala-Pisgah Forest Partnership and the Stakeholders' Forum to help the Forest Service as it revises its Land Management Plan for the Nantahala and Pisgah National Forests.  *See* Fuller Decl. ¶ 10, attached as Ex. 5.  Jack and Mary Wilson, members of Wild Virginia, Highlanders for Responsible Development, and the Alliance for the Shenandoah Valley, emphasize the importance of public participation in decisionmaking over the most recent forest plan for the George Washington National Forest.  *See* J. Wilson Decl. ¶ 32, attached as Ex. 6; M. Wilson Decl. ¶ 35, attached as Ex. 7.

[146] Multiple Conservation Groups have participated in the former NEPA review of Forest Service projects where their participation resulted in improved outcomes for the environment and public health.  *See, e.g.* Sligh Decl. ¶ 10, attached as Ex. 8; S. Brooks Decl. ¶ 7, attached as Ex. 9; Hutchinson Decl. ¶ 8, attached as Ex. 10; Miller Decl. ¶ 11, attached as Ex. 11; Skinner Decl. ¶ 6, attached as Ex. 12; Prater Decl. ¶ 15, attached as Ex. 4; Bowlen Decl. ¶¶ 12, 15, attached as Ex. 13; J. Wilson Decl. ¶¶ 26-28, 32; M. Wilson Decl. ¶¶ 28-30, 35; Young Decl. ¶¶ 4-5, attached as Ex. 14.

[147] For example, Wild Virginia's Conservation Director stated "One of Wild Virginia's major focuses is to educate members of the public about the governmental processes that affect their resources and interests, including NEPA, and to help them be involved in an effective manner. These changes to the NEPA rules will directly damage this part of our programs."  Sligh Decl. ¶ 24; *see also* Young Decl. ¶¶ 13, 17; Prater Decl. ¶¶ 16-18, 20; J. Wilson Decl. ¶ 31; M. Wilson Decl. ¶ 34.

to old growth forests,[148] roadless areas,[149] water quality,[150] rare species and habitats,[151]

communities,[152] historic and cultural resources,[153] and recreation.[154]  These groups include

plaintiffs who are engaged in a number of current forest projects where they had intended to

comment during the scoping process or further review and are now concerned that they will no

---

[148] Upstate Forever member Doug Harper is concerned about the loss of old growth forests under the Rule.  *See* Harper Decl. ¶ 10, attached as Ex. 15 ("old-growth forest[s]…are critical biodiversity hotspots, which cannot be replaced once lost.").

[149] Bowlen Decl. ¶ 11; Young Decl. ¶ 18; J. Wilson Decl. ¶ 27.

[150] For example, Jack and Mary Wilson, who are members of Wild Virginia, Highlanders for Responsible Development, and the Alliance for the Shenandoah Valley, live within the George Washington National Forest and own and operate a diner on the edge of the Forest, which is the only restaurant in the area.  The diner is an essential source of jobs and healthy, local food in this rural community and serves as a community meeting place.  The diner and their community rely upon the Forest's pristine water quality, and the Wilsons are concerned that future Forest Service projects may degrade water quality.  *See* J. Wilson Decl. ¶¶ 8, 12, 15-22; M. Wilson Decl. ¶¶ 8, 11, 17-24; *see also* Hutchinson Decl. ¶ 13.

[151] The Clinch Coalition member Walter Smith is a biologist with expertise in the effects of land management on amphibians.  He has engaged extensively in the NEPA process to ensure that the Forest Service understands the impacts of projects on salamanders and is concerned that the Rule will "injure my ability to participate in the NEPA process."  Smith Decl. ¶¶ 5, 7, attached as Ex. 16; *see also* Young Decl. ¶¶ 13 (raising concerns about ongoing Forest Service projects on the federally-listed candy darter.), 14 (northern flying squirrel, candy darter, hellbender, brook trout); Prater Decl. ¶ 12; Bowlen ¶¶ 15, 21 (rare plant species); J. Wilson Decl. ¶¶ 9 ("Some of the lichen I have found in this area are particularly rare and include Lungwort Lichen and several fruticose lichen, some of which have yet to be classified to species. Abundant Turkey Tail and Reishi mushrooms can be used medicinally. Any activities in the forest can impact this habitat, and it is important that these impacts are taken into account."), 10 ("We are concerned that impacts from Forest Service projects near the streams in this area, such as sedimentation caused by logging, will degrade the water quality, harm aquatic insect populations, destroy the native brook trout habitat, harm the unique ecosystems that can be found in this area, and degrade the water for populations downstream in Richmond and Washington"), 34 (expressing concern about the impact of the Rule on lichen).

[152] Declarants Jack and Mary Wilson's diner, *see supra* n. 150, is a nearly-century-old community gathering place, and it depends on informed and reasoned decisionmaking by the Forest Service and other agencies to protect the natural resources of the George Washington National Forest, the surrounding community, and the local economy.  *See* J. Wilson Decl. ¶¶ 8, 12, 15-22, 29, 36; M. Wilson Decl. ¶¶ 8, 11, 17-24, 32, 38.

[153] *See* Hutchinson Decl. ¶ 13 (expressing concern over the impact of the Rule on historic resources in the Shenandoah Valley).

[154] Many of Conservation Groups' missions include protecting lands and water for recreation.  The Rule will hamper their ability to meet this part of their missions and harm members' personal enjoyment of these natural resources.  *See e.g.* Sligh Decl. ¶ 6; Chase Decl. ¶ 7, attached as Ex. 17; Gestwicki Decl. ¶ 6, attached as Ex. 18; Young Decl. ¶¶ 2, 15-16, 18; Prater Decl. ¶¶ 13, 18, 21; Parr Decl. ¶¶ 30-31, attached as Ex. 19; Bowlen Decl. ¶ 21.  Members of plaintiff groups will also be harmed by impacts to National Parks and National Wildlife Refuges.  *See* Young Decl. ¶ 19; Hunt Decl. ¶¶ 9-29, attached as Ex. 32; Aydlett Decl. ¶ 16, attached as Ex. 50; Skvarla Alligood Decl. ¶¶ 8-9, 11, attached as Ex. 28; Tate Decl. ¶¶ 23-24, attached as Ex. 22; Hendley Decl. ¶ 13, attached as Ex. 26.

longer get the opportunity to under the Rule, and indeed, may not even know if the decisionmaking process has begun.[155]

Conservation Groups and their members who engage in the NEPA process for transportation projects have shown that the former NEPA regulations were effective in ensuring that a full range of indirect and cumulative impacts are considered when planning transportation infrastructure.[156]  For example, the prior NEPA regulations allowed plaintiffs whose missions include promoting healthy communities to advocate successfully for a reduction in the damage not only to the wildlife and streams in the path of these highways,[157] but also to the neighborhoods that they bisect, by ensuring that indirect and cumulative impacts, including

---

[155] Hutchinson Decl. ¶¶ 9 (concerns about the scoping process), 15-16 (listing projects), 17 (Eastern Divide Insect and Disease Project Phase II); Young Decl. ¶¶ 7, 11 (listing projects), 13 ("I plan to participate in future public comment opportunities for these projects, however, now I am concerned that the new rule will limit NEPA review of these projects and take away my ability to express my concerns about them. I am worried that many Forest Service projects will not require NEPA review under the new rules, and there will accordingly be no opportunity for public comment."), 14-17 (Greenbrier Southeast project); Lambert Decl. ¶¶ 13-14, 17, attached as Ex. 47 (Greenbrier Southeast project); Sligh Decl. ¶ 15 (Mt. Storm to Valley Transmission Line Replacement Project); Mayfield Decl. ¶ 12, attached as Ex. 20 (listing projects); Webb Decl. ¶ 23, attached as Ex. 34 (Greenbrier Southeast), 24 (Big Rock project); Miller Decl. ¶ 15 (Eastern Divide Insect and Disease Project Phase II project), 16 (Ewing Mountain Vegetation Management Project),17 (Jefferson National Forest Crown Touching Release project), 18 (North Zone Fire Wood Sales and Road Day-lighting project), 21 (Piney River Vegetation project), 20 (Mt. Storm to Valley 500 kV Electric Transmission Line Replacement project), 21 (Forestwide Maintenance of Open and Semi Open Lands, Roadside Corridors, and Utility Rights-of-Way project), 22 (Potts Creek Vegetation Management EA project); S. Brooks Decl. ¶ 7(d) (listing projects); Smith Decl. ¶¶ 6(d) (Ewing Mountain Vegetation Management Project), 6(e) (Forestwide Maintenance of Open and Semi Open Lands, Roadside Corridors, and Utility Rights-of-Way project); Skinner Decl. ¶ 6(d) (Clinch Ranger District Aquatic Habitat Improvement Project).

[156] For example, Mountain True was able to ensure that the impacts of a highway on an historic African American community in Asheville, N.C., were minimized (Mayfield Decl. ¶ 16; Joyell Decl. ¶¶ 7-11, attached as Ex. 46; Barton Decl. ¶¶ 10-17, attached as Ex. 23) and Congaree Riverkeeper was able to advocate for a highway project addressing traffic congestion without harming the river (Stangler Decl. ¶ 9, attached as Ex. 21).

[157] Congaree Riverkeeper member John Tate used the prior NEPA process to comment on the Carolina Crossroads project in Columbia, South Carolina.  As a result of public comments, an alternative that improved the existing infrastructure to solve the traffic problems was chosen rather than an alternative that would have resulted in harm to the Saluda River.  *See* Tate Decl. ¶ 20.

impacts to communities of color, are considered.[158]  The prior NEPA regulations also required that a robust range of transportation options was considered and disclosed to the public, including options that were more context sensitive,[159] and less aggressive than new location highway projects.[160]

Conservation Groups and their members have been participating in transportation projects that are currently under NEPA review and monitoring projects that will undergo NEPA review imminently, including proposed Interstate 81 improvements,[161] Wilmington Rail Realignment Project,[162] Wilmington Port Expansion,[163] Mid-Currituck Bridge,[164] Highway N.C. 12,[165] the Catawba Crossing project,[166] Corridor K,[167] I-85 improvements,[168] and others.[169]  The Conservation Groups will be irreparably harmed by the Rule because it will not only harm the

---

[158] Because of the prior NEPA, NCDOT performed an environmental justice analysis of the I-26 project in Asheville that prompted them to reduce the impacts on the historic African American Burton Street Community and a largely Latino mobile home development.  *See* Barton Decl. ¶ 16 ("We wouldn't have gotten any of that without NEPA.").  *See also* Mayfield Decl. ¶ 16; Joyell Decl. ¶¶ 7, 11, 19.

[159] *See* Mayfield Decl. ¶ 21 (discussing changes to North Carolina's Corridor K as a result of a robust alternatives analysis).

[160] *See* Blotnick Decl. ¶ 18, attached as Ex. 31 (discussing the decision to replace a proposed $1 billion toll highway project, the Garden Parkway, with a project to widen I-85, and concerns that the project may once again resurface under the name "Catawba Crossings").

[161] *See* Hutchinson Decl. ¶ 7; Wofford Decl. ¶ 12, attached as Ex. 51.

[162] *See* Wolfe Decl. ¶ 22, attached as Ex. 25; Parr Decl. ¶¶ 28-30; Robbins Decl. ¶ 14, attached as Ex. 42.

[163] *See* Wolfe Decl. ¶ 23; Burdette Decl. ¶¶ 14-15, attached as Ex. 45; Blotnick Decl. ¶¶ 24-25; Parr Decl. ¶¶ 19-27.

[164] *See* Aydlett Decl. ¶¶ 11-15; Gestwicki Decl. ¶¶ 13-16.

[165] *See* Rylander Decl. ¶¶ 12-13, attached as Ex. 30.

[166] *See* Blotnick Decl. ¶ 18.

[167] *See* Mayfield Decl. ¶ 21; Joyell Decl. ¶¶ 16-17.

[168] *See* Chase Decl. ¶ 15.

[169] *See also* Lang Decl. ¶¶ 10-17, attached as Ex. 40 (describing concerns over how the Rule will affect review of the Federal Aviation Administration's proposed spaceport, which would launch rockets over Little Cumberland Island and Cumberland Island, Georgia); Drolet Decl. ¶ 7, attached as Ex. 44 (describing concerns over how the new Rule will affect the NEPA review of a federal permit for a cruise ship terminal in Charleston, S.C.); Hendley Decl. ¶¶ 7-9 (describing concerns over how the Rule will affect review of the Assembly Street Rail Separation Project in her Columbia, S.C. neighborhood).

environment,[170] but will also have a chilling effect on the consideration of environmental justice in decisionmaking.[171, 172]

Other Plaintiffs, whose missions include the protection of wildlife, have worked with the Federal Highway Administration through the prior NEPA regulations to ensure the consideration of sea level rise,[173] including erosion and shoreline migration and associated impacts to habitat, when planning transportation projects.[174]  The Rule will increase the risk to wildlife species and their habitats from sea level rise, as well as the risk to coastal communities,[175] and is of imminent

---

[170] Haw River Assembly member Susan Turner is depending on future NEPA review to protect the wetlands that surround her property from the impact of a major road project. "…there is a proposed major road, the Chatham Parkway, that will run over private land through the most fragile part of the area…" Turner Decl. ¶ 8, attached as Ex. 24.  Bob Parr, John Wolfe, and Riverkeeper Kemp Burdette are relying on ongoing NEPA processes to learn about and participate in decisionmaking for two major proposed projects on the Cape Fear River in Wilmington, NC: the Wilmington Port Expansion and the Wilmington Rail Realignment Project, and depend on NEPA review to protect water quality, sensitive ecosystems, and the recreational value of this area.  *See* Wolfe Decl. ¶¶ 22-23; Parr Decl. ¶¶ 19-30; Burdette Decl. ¶¶ 14-15.

[171] "Our lack of political clout means that the requirements of [the former] NEPA are the only reason I or my neighbors are ever informed of potential projects and the only reason we have any voice whatsoever in their planning."  Hendley Decl. ¶ 10.

[172] Clean Air Carolina member Ronald Ross is concerned about the absence of the consideration of cumulative impacts to communities of color under the final Rule.  "[D]ecisionmakers need to consider how the projects will cumulatively contribute to the air pollution in our area.  I am concerned that under the new rule, they won't need to take into account all the other pollution sources that already harm my community.  If those other pollution sources are not taken into account, we will not have a full picture of how a proposed project will impact the people who live near it, leading to poorly-informed decisions that will harm me and my neighbors."  Ross Decl. ¶ 13, attached as Ex. 27.

[173] North Carolina Wildlife Federation member Jennifer Skvarla Alligood is "concerned that under the Rule, NCWF and its members, like me, will no longer be able to use the NEPA process to raise concerns regarding inadequate consideration of sea level rise because the effects of climate change-such as sea level rise-will no longer be considered by federal agencies in their decisionmaking process."  Skvarla Alligood Decl. ¶ 13.

[174] "NCWF noted concerns about the impacts to wildlife and habitat, including the indirect and cumulative effects that will result from Bridge construction."  Gestwicki Decl. ¶ 13.  "Defenders is engaged through the NEPA process in advocating for a safe, long-term solution to the ongoing erosion and shoreline migration problems that plague Highway NC-12 where it runs through the Pea Island National Wildlife Refuge on Hatteras Island, a barrier island that forms part of North Carolina's Outer Banks."  Rylander Decl. ¶ 10.

[175] South Carolina Wildlife Federation Member BeBe Harrison is "concerned about removing the consideration of climate impacts when big projects are proposed. Charleston is going to dramatically change due to sea level rise."  Harrison Decl. ¶ 10, attached as Ex. 30.

concern for Community Groups participating on ongoing NEPA reviews, including for example, the Mid-Currituck Bridge[176] and a proposed seawall in Charleston, S.C., [177] for which sea level rise and climate change are critical considerations and will likely not be considered under the Rule.

Plaintiffs whose missions include air quality protection have used the NEPA process under the prior regulations to ensure that global climate change is considered for highway projects.[178] Climate change is a universal concern among the Conservation Groups and will harm the Conservation Groups and their members in a multitude of ways.[179] The Rule will exacerbate climate change by removing it from consideration in project planning, blinding agencies to its impacts and how to minimize them. For example, Plaintiff Clean Air Carolina and its members are currently engaged in the environmental review process for the Wilmington

---

[176] *See* Aydlett Decl. ¶¶ 11-15; Gestwicki Decl. ¶¶ 13-16, 23.

[177] *See* Green Decl. ¶¶ 12-20, attached as Ex. 48; Harrison Decl. ¶¶ 10-16; Gilbert Decl. ¶¶ 12-14, attached as Ex. 43; Drolet Decl. ¶ 6.

[178] Clean Air Carolina makes frequent use of NEPA to comment on the climate impacts of transportation projects. "Transportation has a significant impact on climate change and air quality. Nationwide the transportation sector is the number one contributor to climate change." Blotnick Decl. ¶ 14.

[179] *See, e.g.,* Young Decl. ¶¶ 21-22; Parr Decl. ¶¶ 11-18, 21; Bowlen Decl. ¶ 16; Hunt Decl. ¶ 28; J. Wilson Decl. ¶¶ 33 ("These actions have a cascading impact—especially climate change. We watch climate change and the decline of species on a daily basis. When we first moved here, we could sit on our deck and see a couple dozen bats. Now we are down to two bats, and there is no hope or plan for these bats—they will be gone. We also have flooding events more often. We have had two 500-year floods in the past few years, and we have 100-year floods here regularly."), 35 ("It is critical that the Forest Service take climate change into account when it reviews projects because it is happening and impacts the forest in many ways. For example, white pines can't regenerate and move north toward cooler temperatures as quickly as the climate is warming. We're seeing changes in fungus. Brook trout are being harmed in part because hemlock provide shade over streams, and hemlock, which is a cornerstone species, is on the way out. When we lose stream cover from the trees, all sorts of species are affected, from the fish to the salamanders. These stressors are cumulative with the impacts from Forest Service projects."); M. Wilson Decl. ¶¶ 36-37 (same); Wolfe Decl. ¶¶ 25-26 (concern over sea level rise inundating Wilmington, NC where he lives, works, and recreates); Chisholm Decl. ¶¶ 4-5, 17, 19-20, attached as Ex. 33 (concern over pipeline project exacerbating climate change, which will cause water scarcity and increased wildfires in the forested areas of rural Virginia where he lives); Robbins Decl. ¶ 13 (concern over climate change causing sea level rise and stronger storms that will impact his livelihood as a kayak guide at Three Sisters Swamp in North Carolina and his interest in conserving the sensitive ecosystem at Eagle Island).

Port Expansion, which will allow for much larger ships to enter the harbor and travel up the Cape Fear River, and are concerned climate impacts will be ignored in its upcoming NEPA review.[180]

Other Plaintiffs and their members focus on water quality and wetlands and have shown the prior NEPA regulations were critical for minimizing impacts to surface water and drinking water.[181]  The new Rule will harm their ability to engage in a robust NEPA analysis for projects that require wetlands permits under section 404 of the Clean Water Act.[182]  As a result they are concerned that indirect impacts that affect wetlands will not be considered and there will be less extensive analysis of alternatives which will ultimately lead to a greater loss of wetlands than would have happened under the prior regulations.  The new Rule also harms environmental review of other types of projects that affect water quality, including water pumping stations, such as the one proposed on the James River in Virginia at the location of Rassawek, the historic capital of the Monacan Indian Nation, which is currently undergoing NEPA review.[183]

The Conservation Groups have shown that the prior NEPA regulations have worked to prevent a wide range of detrimental environmental impacts in pipeline proposals and other energy projects, including habitat destruction[184] and impacts to air and water quality, in support of their missions.[185]  The Rule will harm the Conservation Groups and their members because it

---

[180] *See* Blotnick Decl. ¶¶ 24-25; Parr Decl. ¶¶ 20-22.

[181] *See, e.g.,* Stangler Decl. ¶¶ 4-11; Tate Decl. ¶ 20; Burdette Decl. ¶ 12; Chase Decl. ¶¶ 16-19.

[182] *See* Stangler Decl. ¶¶ 4, 10; Lambert Decl. ¶ 16; Chiosso Decl. ¶¶ 16-18, attached as Ex. 38; Turner Decl. ¶¶ 8-13; Sutton Decl. ¶ 8, attached as Ex. 41; Hendley Decl. ¶¶ 7-8.

[183] *See* Nieweg Decl. ¶ 5, attached as Ex. 36; Kostelny Decl. ¶ 4, attached as Ex. 39.

[184] Cowpasture River Preservation Association, Highlanders for Responsible Development, and Virginia Wilderness Committee member Rick Webb dedicated his professional career to studying and protecting brook trout streams in the central Appalachians.  He has engaged the prior NEPA process for projects dating back to the 1970s, including for the recently abandoned Atlantic Coast Pipeline project, which would have had a devastating impact on brook trout habitat.  *See* Webb Decl. ¶¶ 8, 9, 10, 11, 13.

[185] *See, e.g.,* Sligh Decl. ¶ 20; R. Brooks Decl. ¶ 13, attached as Ex. 35; Hutchinson Decl. ¶ 14; Nieweg Decl. ¶ 5.

will increase the risk of water quality degradation through landslides, increased sedimentation,[186] erosion,[187] and damage to karst terrain,[188] as well as the risk to historic resources and communities in the path of pipelines.[189, 190]  The Rule will also limit public participation and analysis of pipeline and other energy projects by limiting public access to information.[191]  The Rule presents a particular risk for Conservation Groups and their members involved in NEPA review for ongoing projects, such as proposed transmission lines,[192] relicensing for hydroelectric dams,[193] the Mountain Valley Pipeline[194] and the relicensing of the Westinghouse nuclear fuel

---

[186] Haw River Assembly member Andrew Meeker fears impacts to the ecology of Northeast Creek, a tributary to Jordan Lake, a waterbody that has been severely impacted by development runoff and nutrient pollution, will not be adequately considered under the Rule.  *See* Meeker Decl. ¶ 8, attached as Ex. 37.

[187] *See, e.g.*, Chiosso Decl. ¶ 13; R. Brooks Decl. ¶ 11; Hutchinson Decl. ¶ 14.

[188] *See* Chisholm Decl. ¶¶ 4-5, 7, 16 ("I worry that the pipeline will contaminate our water supply, which relies on pristine underground water.  We have karst topography, which is uniquely susceptible to pollution.  If the water underground becomes contaminated, we will have to get our water somewhere else, which would be expensive—especially in our rural community.").

[189] The National Trust has participated in the NEPA process to monitor and comment on projects that would impact historic resources, including the Mountain Valley Pipeline and the Atlantic Coast Pipeline. *See* Nieweg Decl. ¶ 5.  Russell Chisholm, a member of Plaintiff Wild Virginia and chair of a community coalition opposing the Mountain Valley Pipeline in Virginia, emphasizes the risk of the proposed pipeline to his community in Newport, Virginia, where the proposed path would traverse their rural community. *See* Chisholm Decl. ¶ 5 ("Despite the absence of any public benefit, the pipeline comes through the heart of the village of Newport within a few hundred feet from our historic church and dangerously close to our community center, which is an old school that has been repurposed to serve Newport residents with public events and houses our polling station on election day.").

[190] National Trust for Historic Preservation member Elizabeth Kostelny has been actively involved in the federal permit review process for the Surry-Skiffes Creek transmission line project, which is located in Virginia within the viewshed of Jamestown Island, and is concerned that the Rule will make it more difficult for her to participate in this project and protect historic areas that are important to her and to her work.  *See* Kostelny Decl. ¶ 5.

[191] *See, e.g.*, Nieweg Decl. ¶ 10; Chase Decl. ¶ 14; Young Decl. ¶ 12; Tate Decl. ¶ 28.

[192] *See* Nieweg Decl. ¶ 7; Wofford Decl. ¶¶ 8-11; Kostelny Decl. ¶ 5.

[193] *See* Stewart Decl. ¶¶ 9-16; Lowry Decl. ¶¶ 12-28; Shaddix Decl. ¶¶ 12-25.

[194] *See* Chisholm Decl. ¶¶ 5-20 ("I am concerned that, because of the Rule, the Forest Service may decide to prepare a Supplemental EIS that takes a less robust look at environmental impacts and alternatives than required by NEPA.  As a result, we will not get information we need to inform our advocacy, and the government will not have enough information to guide thoughtful decision-making.  I am concerned that this uninformed decision-making will lead to additional harm from the Mountain Valley Pipeline—to the forests I enjoy visiting and to our water resources."); Young Decl. ¶ 12; Chiosso Decl. ¶¶ 13-15; Sligh Decl. ¶¶ 20-22; Sutton Decl. ¶ 7; *see also* Chiosso Decl. ¶¶ 19-21 (Dominion pipeline project in Durham, NC); Meeker Decl. ¶¶ 7-11 (same); Sutton Decl. ¶ 9 (same).

fabrication facility in South Carolina.[195]  In addition, Conservation Groups and their members

who champion solar energy are concerned that the chaos caused by the new rule will stymie solar

development and slow down the transition towards clean energy.[196]

The Conservation Groups and their members who engage in federal policy reforms also

use NEPA as a way to ensure that such policy reforms are undertaken with care.  For example,

groups have commented on revisions to the U.S. Forest Service NEPA rules[197] and the NEPA

process for the U.S. Fish and Wildlife Service's proposed rule regarding the removal of

protections against incidental take under the Migratory Bird Treaty Act.[198]  The Conservation

Groups intend to continue to remain engaged in policy through NEPA and will be harmed if the

Rule reduces or prevents their participation.[199]

In the Rule, CEQ is dismissive of the increased risk of environmental harms like these,

stating that the substantive requirements of "other laws" will continue to apply to future project

decisions.[200]  However, NEPA's predictive analysis provides the information needed to

determine whether a federal action would violate environmental laws *before* the harm occurs.[201]

For purposes of assessing whether a preliminary injunction is appropriate, it is no answer to

argue that environmental harms will be unlawful *after* they occur.[202]  This is particularly obvious

with regard to CAFOs—if NEPA no longer applies to applications for Farm Service

---

[195] *See* Stangler Decl. ¶¶ 13-19; Tate Decl. ¶¶ 25-26; Hendley Decl. ¶ 11.
[196] *See* Tate Decl. ¶ 29; Harper Decl. ¶ 19; Chase Decl. ¶ 21-22.
[197] *See* SELC Comment Letter on USFS NEPA Rules.
[198] *See* Rylander Decl. ¶¶ 14–18.
[199] *See* Rylander Decl. ¶¶ 14-18.
[200] RIA at 10; Response to Comments at 4.
[201] *See* Goldfuss Decl. ¶ 33.
[202] The harms the Conservation Groups and their members face from the rule are irreversible.  For example, Russell Chisholm, member of Wild Virginia, will be irreparably harmed if the Mountain Valley Pipeline contaminates the karst system and damages the underground water sources he and his community rely upon for drinking water.  "Once that damage is done, it is permanent."  Chisholm Decl. ¶ 16.

Administration ("FSA") loan guarantees, state laws will not fill the gap,[203] and the Conservation Groups face a proliferation of CAFOs on important waterways, which will contaminate the water, harm ecosystems, exacerbate air pollution, and put communities at risk.[204]  If the Conservation Groups and their members must look to "other" laws to achieve the same results as NEPA, they will be harmed because other state and federal laws are no substitute.[205]

Without a stay of the Rule while this action is pending, the Conservation Groups and their members will be irreparably harmed if projects with ongoing and imminent NEPA review are subject to the Rule, which will enable less rigorous review of proposed projects and environmental harm.  Allowing action to proceed before the completion of an adequate NEPA process undermines the purposes of NEPA.  As the Court of Appeals for the First Circuit said in *Sierra Club v. Marsh*, "[t]he way that harm arises may well have to do with the psychology of decision makers, and perhaps a more deeply rooted human psychological instinct not to tear down projects once they are built."  872 F.2d at 504.

---

[203] *See* Conservation Groups Comment Letter at 41.
[204] *See* Wolfe Decl. ¶¶ 12-19; Burdette Decl. ¶¶ 16-26; Blotnick Decl. ¶ 32; Parr Decl. ¶ 32; Robbins Decl. ¶¶ 7-11.
[205] *See* Hutchinson Decl. ¶ 18 ("[W]ith rollbacks to NEPA, Virginia's weaker environmental laws will be further exacerbated.  We need the federal government to be the leader on the broad environmental issues that we will always face. […] federal laws are stronger than the State's, and they need to stay that way.");
¶ 19 ("NEPA helps provide the information that allow us to use the other more substantive laws to ensure environmental protection."); Young Decl. ¶ 20 ("In particular, I'm concerned that the laws in Virginia and West Virginia will not be enough to make up for what has been lost with the new NEPA rule.  I've noticed that the states rely heavily on the federal system and do not have the capacity to fill the information gaps that would be left by the new rule, frustrating their ability to engage in state permitting or certification processes that are often coordinated with NEPA reviews.  Also, it is important to have a national standard because environmental impacts can be felt across state borders."); Chase Decl. ¶ 23 ("NEPA's environmental review process is particularly important in South Carolina because there is no equivalent state version of NEPA in our state.  South Carolina's environmental laws and regulations do not meet the challenges of the twenty-first century.  We depend on strong federal protections. Because of this, Upstate Forever relies on NEPA to remain informed of major projects within South Carolina and to have its voice heard."); Tate Decl. ¶ 27.

Without a stay of the Rule, the Conservation Groups and their members are concerned that under the Rule, private applicants or federal agencies may take steps that affect important environmental resources before there has been a meaningful decisionmaking process under the new provision that allows applicants to commence project activities before NEPA is complete. 40 C.F.R. § 1506.1(b)(2020).  For example, groups are concerned that the Chatham Park development might move along without careful thought, and that steps may be taken to prematurely advance the Mountain Valley Pipeline.[206]

In addition, NEPA is important for avoiding harms that may not be unlawful but are unnecessary.  For example, Prof. Ruple surveyed ten years of environmental impact statements for oil and gas drilling projects in four states and identified "NEPA-driven changes" that resulted in a 13% reduction in permanent surface disturbance and a 10% reduction in temporary surface disturbance.[207]  That is why comparison of reasonable alternatives has always been the "heart" of the NEPA process—to scrutinize whether there are less harmful ways to accomplish the same purpose.  42 U.S.C. § 4332(2)(C)(iii), (E); 40 C.F.R. § 1502.14 (1978).  Agencies often have discretion to choose between lawful alternatives with different levels of harm, but they may not do so blindly.  Other environmental laws provide no backstop to the loss of information, analysis, and transparency provided by the NEPA process.

---

[206] *See* Chisholm Decl. ¶ 13-14 ("I am concerned that under the new rules, this type of "build-first-ask-questions-later" decision making will become commonplace because the new rules do not require the agencies to fully consider impacts and alternatives.  I am concerned that the Mountain Valley Pipeline, which is already $2 billion over budget, will collapse because FERC ignored or failed to properly address the cumulative risks and harms of the project, and communities like Newport that have been disrupted by a half-built pipeline will be left to deal with the aftermath."); *see also* Chiosso Decl. ¶¶ 15, 18, 21 (concern that under the Rule, "agencies might begin to conduct advanced acquisition of property [] before the NEPA process has been completed which would cause environmental harm, and bias the decisionmaking down the line" for the Southgate line of Mountain Valley Pipeline, the massive Chatham Park master plan development in Chatham County, N.C., and the Dominion Energy pipeline proposed to be routed through Durham, N.C.).

[207] Ruple Decl. ¶ 39.

Harm to the Conservation Groups is yet further heightened when they have been, or are currently, engaged in litigation over an inadequate NEPA process.  Where Conservation Groups have been successful in the past in securing more environmentally sensitive outcomes through the courts, they now risk those gains being diminished under the Rule.[208]  Similarly, where Conservation Groups are currently engaged in litigation founded on the 1978 rules, they now face the prospect of no legal remedy or an order requiring a NEPA evaluation that is significantly less informative than what was required at the time they commenced the litigation.[209]  In these situations, the Conservation Groups not only stand to suffer significant environmental harm, but they also will suffer a loss based on their prior expenditure of litigation resources under a standard that a court may no longer apply and further harm as they expend organizational effort to attempt to achieve their goals under the changing standards.

Under the Rule, individual projects would cause unlawful and unnecessary harms because they would not be preceded by appropriate analysis and disclosure.  Indeed, many projects would proceed, or at least be initiated without NEPA review under the Rule, so the

---

[208] *See, e.g.*, Lowry  Decl. ¶¶ 16-25, noting that Alabama Rivers Alliance worked for years on a FERC relicensing seven dams along 275 miles of the Coosa River.  After years of advocacy, Alabama Rivers Alliance was successful in court and the D.C. Circuit vacated the license after holding that FERC had failed to consider the cumulative effect of the different dams.  Alabama Rivers Alliance is concerned that where under the 1978 regulations FERC would have had to consider cumulative impacts on remand, under the Rule FERC might elect not to consider the cumulative effects of the lethally-low dissolved oxygen caused by the dams, as well as the cumulative effects of no fish passage. FERC might consider these effects insignificant once again and the result would be harm to species Alabama Rivers Alliance and its members value and work to protect.  *See also* Blotnick Decl. ¶ 20, discussing gains made in settlement of litigation over the Complete 540 highway in Raleigh, which may have less value if the Rule goes into effect.

[209] *See, e.g.*, Gestwick Decl. ¶¶ 13-17 (discussing the North Carolina Wildlife Federation's ongoing litigation over the Mid-Currituck Bridge, and noting a concern that the remedy available may be less than when litigation was filed because, even if litigation is successful, under the Rule FHWA may decide that it no longer needs to consider indirect and cumulative effects or to study all reasonable alternatives, and may decide that it no longer needs to use up to date information about sea level rise.  This would lead to poor decisionmaking, environmental harm to resources such as waterfowl that North Carolina Wildlife Federation cares about.)

Conservation Groups would not even be aware of them, let alone able to challenge their lack of

environmental review.  The harm from projects would instead become known only in hindsight,

and environmental harms are often by their very nature irreparable.  *See Amoco Prod. Co. v. Vill.*

*of Gambell*, 480 U.S. 531, 545 (1987) ("Environmental injury, by its nature, can seldom be

adequately remedied by money damages and is often permanent or at least of long duration, *i.e.*,

irreparable.").

Preliminary injunctive relief barring implementation of CEQ's Rule is therefore

necessary to prevent the harms that would otherwise be caused by projects advancing before a

final decision on the merits in this case.  *See Iowa League of Cities v. EPA*, 711 F.3d 844, 867

(8th Cir. 2013) ("[P]arties [are not required] to operate beneath the sword of Damocles until the

threatened harm actually befalls them.").

### B.    The Conservation Groups Will Suffer Informational Harm and Will Be Forced to Divert Resources.

NEPA and its implementing regulations recognize that disclosing information about a

project's environmental consequences is vital to the decisionmaking process and to the public,

but the Rule allows agencies to withhold crucial information regarding impacts and alternatives

that otherwise would have been disclosed under the longstanding prior regulations.  The inability

to obtain information to which a plaintiff is entitled by law is a cognizable injury for purposes of

establishing both standing and irreparable harm in the preliminary injunction context.  *See New*

*York v. U.S. Dep't of Commerce*, 351 F. Supp. 3d 502, 611, 675 (S.D.N.Y. 2019), *aff'd in part,*

*rev'd in part on other grounds*, 139 S. Ct. 2551 (2019). *See also FEC v. Akins*, 524 U.S. 11, 21

(1998).  Such an injury is created when an agency changes its procedures so that such

information will no longer be available in connection with future projects, as is the case here.

*See Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 712 (D.C. Cir. 1988) (finding informational

injury where agency rule delegated authority to approve mining plans from the federal agency to

the state, which meant that an EIS would no longer be prepared for future approvals).  Indeed,

CEQ has even purported to authorize application of the Rule to ongoing evaluations in which the

Conservation Groups and their members are currently engaged. *See* 40 C.F.R. § 1506.13 (2020)

("An agency may apply the regulations in this subchapter to ongoing activities and

environmental documents begun before September 14, 2020.").

To show informational injury, a plaintiff must show entitlement to information,

deprivation of that information, and a particularized interest in the information, as opposed to an

abstract interest.  *Akins*, 524 U.S. at 21 (deprivation of information affecting right to vote was a

sufficiently concrete injury even though it was widely shared); *WildEarth Guardians v. Salazar*,

859 F. Supp. 2d 83, 92 (D.D.C. 2012); *Action All. v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986)

(finding informational injury where the information was "concrete and specific to the work in

which [plaintiffs] are engaged").

The Conservation Groups and their members are entitled to information under NEPA that

the Rule would exclude from public disclosure.  The statute requires that "to the fullest extent

possible," agencies must prepare a "detailed statement" of adverse environmental effects and

alternatives to the proposed action, and this information "shall be made available . . . to the

public."  42 U.S.C. § 4332.  *See Robertson,* 490 U.S. at 349 (describing an EIS as intended to

"provid[e] a springboard for public comment") (alteration in original).  Plaintiffs will be

deprived of key information under the Rule,[210] which limits the actions for which a detailed

---

[210] National Trust for Historic Preservation member Kevin Lang is concerned that under the Rule he will
not have access to information needed to advocate for the protection of the places he cares about.  *See*
Lang Decl. ¶ 17 ("These changes to the NEPA rules will directly frustrate the ability of the National Trust
and me to be informed about the risks and impacts of … project[s].").  Members and employees of other
Conservation Groups face the same challenges, including, for example, Ben Prater, member and

statement will be prepared, limits the scope of effects and alternatives that will be considered,[211]
and excuses agencies from gathering new information.[212]

The deprivation of this information will affect Plaintiffs' ability to accomplish their
organizational missions.  Plaintiffs rely on information disclosed under NEPA in order to
evaluate and oversee agency actions, collaborate with decisionmakers, advocate for protections,

---

employee of Defenders of Wildlife.  *See* Prater Decl. ¶ 11 ("We rely on the information and analysis
provided through this process to evaluate agency actions, inform our members and the public, and
evaluate the efficacy of projects and their impact to wildlife and their habitats.  Without NEPA documents
we would be unable to offer expert opinion and would also be unable to advise our members and the
public of issues affecting their lands."); *see also* Bowlen Decl. ¶ 14; Hunt Decl. ¶ 15; J. Wilson Decl. ¶
30; M. Wilson Decl. ¶ 33.  Haw Riverkeeper Emily Sutton engages frequently in permit reviews, for
which "it is critical that I have access to all relevant information on proposed projects well in advance in
order to engage the communities who would be impacted."  Sutton Decl. ¶ 10.  Wild Virginia member
Russell Chisholm relies on the NEPA process for information he uses in advocacy work he performs on
behalf of his community related to the proposed Mountain Valley Pipeline in Virginia.  "Transparency
about environmental impacts from proposed projects is essential for the preparation of informed
comments and public participation.  I work hard to make sure my neighbors have the information they
need to advocate for themselves. [...] If community groups like POWHR or Preserve Giles County and I
cannot rely on NEPA for timely and transparent information, we will not be able to do our jobs as
advocates and threats to ecosystems will likely increase and be felt for generations"  Chisholm Decl. ¶ 10.
[211] Alabama Rivers Alliance member Mary Stewart is concerned that if FERC is not required to consider
the full cumulative impacts of proposed dams on the Coosa River on wildlife and water quality, her
interests as "an avid naturalist, photographer, and boater that enjoys abundant and diverse wildlife will be
harmed."  Stewart Decl. ¶ 15.  *See also* Shaddix Decl. ¶ 25 ("I am concerned that as a consequence of the
final rule, FERC will decide that it is only required to study cumulative impacts under the Endangered
Species Act, and not in an Environmental Impact Statement. This would result in less opportunity for me
to review the cumulative impacts and to advocate for solutions that lessen the effect of those impacts.");
Bowlen Decl. ¶ 13 ("It is critical that the Forest Service consider indirect and cumulative impacts—
particularly the indirect and cumulative impacts on plants. I am concerned that if the Forest Service does
not consider these types of impacts in determining its plan, it will lead to bad, less-informed decision
making that will be harmful for the Forest ecosystem."); Chisholm Decl. ¶¶ 15-16 (expressing similar
concerns related to the expected supplemental EIS for the Mountain Valley Pipeline, which he fears will
result in forest segmentation, habitat degradation, and water quality impacts), ¶ 17 (expressing concern
about cumulative and indirect impacts arising from the fracking industry, which the pipeline supports).
[212] South Carolina Wildlife Federation member Steven Gilbert learns "a great deal by studying and
analyzing the reports and studies generated by federal agencies in the NEPA process" and is concerned
that under the Rule agencies will not produce those studies and reports, which will adversely impact his
ability to evaluate a proposal and understand how it might impact natural resources that are important to
him.  Gilbert Decl. ¶ 24.

inform their members and the public, and evaluate the efficacy of projects and their impact to the environment, natural resources, communities, and wildlife and their habitats.[213]

The Rule will also force Plaintiffs to divert their limited resources in order to gather information previously provided through NEPA documents, and instead, take other measures[214] to attempt to mitigate the harm caused by the Rule.  The necessity to reallocate scarce resources is a distinct and irreparable injury caused by CEQ's Rule.[215]  *See Havens Realty Corp. v.*

---

[213] For example, Andrew Young, a member of Plaintiff Cowpasture River Preservation Association, and employee of the Allegheny Blue Ridge Alliance, which is a coalition of groups including several plaintiffs, helped create and maintain a "Conservation Hub," an online portal that aggregates public information made available through the NEPA process and GIS data to "show the public what's at stake in these land management decisions and connect [people] with public information and comment opportunities afforded through the NEPA process."  Young Decl. ¶ 7.  He plans to use the Conservation Hub to stay informed on projects in the National Forests and participate in public comment opportunities, however he's "concerned that under the new NEPA rules, our access to information and opportunities for public participation will be limited, which will make the Conservation Hub less useful."  *Id.*  John Wolfe, a member of Cape Fear River Watch, is a boat captain and a journalist in Wilmington, NC.  As a journalist, he writes articles about environmental issues in the area, and he relies on information disclosed through the NEPA process to inform the public of upcoming projects and public comment opportunities. He will be harmed by the Rule because it reduces transparency in decisionmaking, which will make it more difficult for him to obtain the information he needs to write well-researched articles and keep his community up-to-date on projects that concern them.  *See* Wolfe Decl. ¶¶ 9, 20-21.  *See also* Young Decl. ¶¶ 4, 23; Hunt Decl. ¶¶ 15, 26; Prater Decl. ¶ 11; Parr Dec. ¶¶ 9-10; Bowlen Decl. ¶ 10.

[214] National Trust for Historic Preservation member Cashion Drolet has engaged in NEPA extensively, but is concerned that "the requirements in the new regulations that require public comments to include technical expertise will make it difficult to effectively submit comments … without spending resources to retain support from expert consultants."  Drolet Decl. ¶ 6.  These concerns are echoed across the Conservation Groups.  *See* Prater Decl. ¶ 17 ("In the absence of a robust NEPA process, our ability to offer relevant comments and necessary public feedback on future agency actions will be diminished, as will our ability to obtain from the agency itself the full range of information on the resources to be affected and the potential impacts of various alternatives being considered. We will have to divert considerable organizational resources to gather data, perform analysis, hire outside experts, file records request while providing information needed to inform our members and the public."); Chisholm Decl. ¶ 11 ("Under the new rules, however, I am concerned that it will be more difficult for us to provide our input on the [Mountain Valley P]ipeline because […] the technical requirements for comments have been heightened. We cannot afford to hire experts to help us draft our comments, and we shouldn't need experts to draft our comments."); *see also* Prater Decl. ¶ 11; Bowlen Decl. ¶ 14; Hunt Decl. ¶ 15.

[215] Like informational injury, diversion of resources is relevant to both Article III standing and irreparable harm.  The only difference in the analysis is proof: to survive a motion to dismiss for want of standing, plaintiffs need only point to allegations that their missions would be adversely affected; to establish entitlement to a preliminary injunction, those allegations must be supported by competent proof.  *See Am. Fed'n of Gov't Emps., AFL-CIO v. Vilsack*, 118 F. Supp. 3d 292, 295 (D.D.C. 2015), *aff'd*, 672 F. App'x

*Coleman*, 455 U.S. 363, 379 (1982).  Where a defendant's practices have "perceptibly impaired" a plaintiff's ability to carry out its organizational mission,

> there can be no question that the organization has suffered an injury in fact. Such concrete and demonstrable injury to the organization's activities—with the consequent drain on the organization's resources—constitutes far more than simply a setback to the organization's abstract social interests."

*Id*.  *See also League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 9 (D.C. Cir. 2016) (the plaintiff's expenditures were a "symptom" of policy changes making it more difficult to register voters); *D.C. v. U.S. Dep't of Agric.*, No. CV 20-119 (BAH), 2020 WL 1236657 (D.D.C. Mar. 13, 2020) (finding irreparable harm where organization alleged a need to divert resources to food assistance in response to rule limiting eligibility for SNAP benefits); *E. Bay Sanctuary Covenant v. Trump*, 354 F. Supp. 3d 1094, 1116 (N.D. Cal. 2018) (finding irreparable harm where the organization would have to shift its mission and geographical focus); *Action NC v. Strach*, 216 F. Supp. 3d 597, 616 (M.D.N.C. 2016); *Action All.*, 789 F.2d at 937–38 (regulations that "significantly restrict[ed]" information about services to the elderly harmed organization's interest in sharing such information and providing counseling and referral services for the elderly).

Because the Rule deprives the Conservation Groups of essential information they need to do their work, the groups have already been forced to divert resources to submit and pursue FOIA requests (potentially leading to the necessity of filing litigation on those requests).[216]  In

---

36 (D.C. Cir. 2016).  Here, Plaintiffs have provided declarations supporting their well-pled allegations of harm.
[216] Multiple Conservation Groups have filed FOIA requests seeking information that they would normally receive through the NEPA process.  *See e.g.* Sligh Decl. ¶ 28; Mayfield Decl. ¶ 27; Hutchinson Decl. ¶ 16; R. Brooks Decl. ¶ 12; Burdette Decl. ¶ 24; Chiosso Decl. ¶ 23; Stangler Decl. ¶ 7; Hunt Decl. ¶ 24.

addition, if the Rule is implemented, they will have to conduct their own investigations and site surveys,[217] and hire experts to provide analyses that the agency would otherwise have been required to produce itself.[218]  In effect, this deprivation of information means the Conservation Groups will have to attempt to perform a self-funded version of a proper NEPA analysis, only with far less access to information and fewer resources than government agencies and applicants have.

By drastically cutting back the information and analysis available to the Conservation Groups under NEPA, the Rule "perceptibly impair[s]" their ability to function and pursue their missions.  *Havens Realty*, 455 U.S. at 379.  Accordingly, this injury in no way resembles the shift in activities to educate members about the effects of a new rule that a panel of the Fourth Circuit recently rejected as a "unilateral and uncompelled response to the shifting needs of its members," which it deemed insufficient for organizational standing.  *CASA de Maryland v. Trump*, No. 19-2222, No. 19-2222, 2020 WL 4664820, at *9 (4th Cir. Aug. 5, 2020).  Unlike in that case, the Rule deprives the Conservation Groups of essential tools—information and expert analysis—that they need in order to continue monitoring and advocating about environmentally harmful projects; this information and analysis cannot be obtained in other ways or only at significant cost, seriously hindering their ability to carry out their missions.

For all these reasons, Plaintiffs would be irreparably harmed if CEQ's Rule were allowed to become effective before a final decision on the merits in this case.

---

[217] "Wild Virginia is further concerned that learning about project impacts will require it to … devote resources to conduct surveys of proposed locations for potentially harmful activities."  Sligh Decl. ¶ 28; *see also* Mayfield Decl. ¶ 9.

[218] Multiple Conservation Groups are concerned about the financial blow of having to hire outside experts to meaningfully participate in the NEPA process under the Rule. *See, e.g.,* Sligh Decl. ¶ 27; Hutchinson Decl. ¶ 16; Chase Decl. ¶ 12; Gestwicki Decl. ¶ 21; Nieweg Decl. ¶ 10; Chiosso Decl. ¶ 23; Lambert Decl. ¶ 13; Stangler Decl. ¶ 7; Blotnick Decl. ¶ 32; Burdette Decl. ¶ 25; Lowry Decl. ¶ 25; Green Decl. ¶ 22; Young Decl. ¶¶ 23-24; Hunt Decl. ¶¶ 15, 23.

**C.      The Conservation Groups Have Suffered Procedural Harm.**

The Conservation Groups also will be irreparably harmed by a Rule that allows

Defendants to begin implementing a new policy that is not based on a reasoned decisionmaking

process and did not respond to Plaintiffs' comments, concerns, and alternative suggestions as

required by law.

The APA is "designed to ensure that affected parties have an opportunity to participate in

and influence agency decision making at an early stage, when the agency is more likely to give

real consideration to alternative ideas." *New Jersey v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir.

1980).  Public comments must actually be considered, not merely received.  *See N. Mariana*

*Islands v. United States*, 686 F. Supp. 2d 7, 18 (D.D.C. 2009).  Accordingly, regulatory changes

that violate the APA's procedural requirements should be enjoined to prevent irreparable harm to

the public's right to influence the Rule's contents, which "cannot be fully cured by later remedial

action."  *Id.* at 18.

Here, an injunction is needed to prevent precisely such harms.  The Conservation Groups

offered numerous comments and alternative suggestions that pointed to serious problems in

CEQ's proposed rule, which were not addressed in the Rule either by changes to the proposal or

with reasoned explanations.  *See supra* Section II. A. 3.  CEQ's hollow and rote responses to

public comments demonstrate that in churning through over one million comments in just a few

months, the agency did not approach the process with an open mind.  *See New Jersey*, 626 F.2d

at 1050 (distinguishing cases in which "the Agency had been sufficiently open-minded that it had

actually made changes in its rules in response to comments received.").  Instead, as President

Trump himself stated, the changes are part of his "administration's fierce commitment to

slashing the web of needless bureaucracy" and something he had been wanting to do "from day one," notwithstanding what he described as the procedural "roadblocks" to changing the law.[219]

As discussed above, CEQ failed entirely to respond to the detailed concerns from the Conservation Groups, industry trade groups, and many others that the Rule will not effectuate its purpose and instead cause chaos, confusion, and delay,[220] stating merely that the "final rule will modernize the CEQ regulations to facilitate more efficient, effective, and timely NEPA reviews by simplifying and clarifying regulatory requirements."[221]  CEQ failed to respond substantively to concerns raised about limiting what will be considered a "major federal action" for purposes of NEPA—brushing aside the environmental harms associated with the elimination of detailed review for projects that will no longer qualify, including the CAFO projects prevalent in the Southeastern United States.  And CEQ provided no response to detailed concerns about changes to the longstanding significance factors that have been set out to determine when an EIS is required; instead CEQ just makes the conclusory statement that the revision provides "greater clarity."[222]

CEQ completely dodged the Conservation Groups' extensive comments discussing their concerns that the changes will eliminate consideration of climate change and thus result in poor government decisions that fail to factor in what many of the groups believe to be the most pressing environmental issue of our time.

---

[219]  Remarks by President Trump on the Rebuilding of America's Infrastructure: Faster, Better, Stronger (July 15, 2020) *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-rebuilding-americas-infrastructure-faster-better-stronger-atlanta-ga/.
[220]  *See, e.g.*, Conservation Groups Comment Letter at 4, 21, 74, 78, 79; NRDC Comment Letter at 43, 51, 122-126; Sabin Comment Letter at 7; National Wildlife Federation Comment Letter at 8, 45; Pew Comment Letter at 14, 15, 17, 18; Sustainable Business Council Comment Letter at 2; SEIA Comment Letter at 2, 4; Permitting and Infrastructure Coalition Comments at 5–6.
[221]  Response to Comments at 9.
[222]  Response to Comments at 86.

CEQ also completely ignored concerns about allowing private project sponsors to define the purpose and need of the project, as well as underlying objectives and the range of alternatives.  CEQ failed to grapple with any of the conflicts of interest or improper narrowing of the NEPA process that may result from these changes.

CEQ's finalization of the Rule without properly engaging the public irreparably harms the Conservation Groups who were illegally disregarded during the process.

## III.   The Public Interest and Balance of the Equities Weigh in Favor of Maintaining the Status Quo.

The public interest and balance of the equities support a preliminary injunction or stay of the Rule to maintain the well-settled and longstanding status quo.[223]  *See Winter*, 555 U.S. at 24–26.  If the Rule goes into effect before this challenge is resolved on the merits, it will damage the public interest in environmental protection, transparency, and accountability, while creating needless regulatory confusion.  If not stayed, environmental analyses initiated under these new Rules will have to be fundamentally reworked when the Conservation Groups are successful on the merits and the Rule is later permanently enjoined, causing additional delay in the completion of environmental review for these ongoing projects. On the other side of the ledger, the longstanding regulations currently in effect have been in place for over forty years, so preserving those regulations and the status quo pending a ruling on the merits would entail no meaningful burden on agencies or the public.

### A.   Maintaining the Status Quo Preserves Regulations Proven to be Effective at Serving the Public Interest.

A preliminary injunction will serve the public interest by avoiding disruption and protecting the benefits of the existing NEPA regulations, including efficient project delivery,

---

[223] The "balance of harms" and "public interest" prongs merge when the government is the opposing party.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

public transparency, thorough evaluation of a project's impacts and alternatives, and the prevention of significant, irreparable harm to the environment.  The public interest is better served by first evaluating the merits of the Rule's violations of the APA before sweeping away these important benefits.

"Congress's determination in enacting NEPA was that the public interest requires careful consideration of environmental impacts before major federal projects may go forward."  *S. Fork Band Council of W. Shoshone v. U.S. Dep't of Interior*, 588 F.3d 718, 728 (9th Cir. 2009) (approving injunction for NEPA claims).  The existing NEPA regulations are a particularly effective regulatory mechanism for protecting the public interest in the environment—one that is not otherwise met by substantive environmental law and regulation.  "[E]ven in heavily regulated areas NEPA compliance reduces [environmental] impacts . . . NEPA, in short, appears responsible for much of the impact reduction."[224]  The Rule, however, threatens the benefits of NEPA.  For instance, "the new regulations explicitly delete the requirement to examine cumulative impacts . . . [which] will lead to poor decisionmaking that is not in the public interest and cause environmental harm."[225]  As Jennifer Roberts, former mayor of Charlotte, North Carolina, explains:

> I know from my time in office that Agencies will not assess environmental and health impacts if they are not required to do so.  There is a huge gap between "may" and "will," especially in rapidly growing areas of the country like Charlotte, when agencies are under pressure to deliver large projects "on time and under budget." If agencies are not required to complete environmental assessments or look at the possible harm to neighboring communities from construction projects, agencies are not going to do it. . . . [I]ndirect and cumulative effects of infrastructure projects . . . are exactly the types of impacts that need to be carefully studied to avoid harm to vulnerable minority communities.  If these impacts are not studied then there is a much higher

---

[224] Ruple Decl. ¶ 38.
[225] Yost Decl. ¶ 16.

likelihood that projects will be planned and implemented that harm these communities.[226]

Courts view environmental injuries as particularly detrimental to the public interest due to their long duration.  *See, e.g.*, *Amoco*, 480 U.S. at 545 ("[e]nvironmental injury, by its nature, can seldom be adequately remedied by money damages and is often permanent or at least of long duration, *i.e.,* irreparable. If such injury is sufficiently likely, therefore, the balance of harms will usually favor the issuance of an injunction to protect the environment.").

Existing NEPA regulations also ensure a thorough evaluation of project alternatives. "NEPA requires, simply and forthrightly, that environmental reviews consider 'alternatives to proposed action' so that a decisionmaker isn't making an up or down decision without being aware of alternatives that may involve significantly lesser environmental impacts."[227]  But the Rule undermines this benefit to the public interest.  It removes the requirement to evaluate all reasonable alternatives, "looks to reduce the scope of environmental reviews by defining alternatives that must be evaluated through the eyes of the applicant whose project is under consideration," and "would limit the alternatives analysis to the primary reviewing agency's statutory authority—another random trick to narrow the range of alternatives to be considered." *Id.*  "By limiting the range and number of alternatives that need to be studied and disclosed, the Final rule sets in place a process that will lead to poor government decisionmaking and ultimately outcomes that are bad for the environment and bad for the public interest."[228]

For example, municipalities like Charlotte, North Carolina rely on the information disclosed by NEPA as part of their own environmental protection efforts, which will be hampered by the Rule's weakened approach to evaluating projects:

---

[226] Roberts Decl. ¶¶ 10–11, attached as Ex. 56.
[227] Hayes Decl. ¶ 26.
[228] Yost Decl. ¶ 18.

> In 2018, the Charlotte City Council passed a resolution aiming to reduce greenhouse gas emissions to less than 2 tons CO2 equivalents per person annually, for the whole city, by 2050. When we set these goals we assumed that we would get data from the NEPA process to help us with implementation and achieve our targets. *It will be much more difficult to achieve the goals without the data, assessment, and real time information provided previously by NEPA.*[229]

The existing regulations also enable a democratic process of decisionmaking that would be hampered if the Rule goes into effect.  The public engagement requirements of NEPA implemented in the current rules "increase[e] the flow of scientific information to agencies, increase[e] the involvement of citizens in government decision-making, [and] increase[e] democratic legitimacy of government decisions."[230]  However, the Rule "will result in less beneficial public involvement in agency decision-making."[231]  It will "exclude most members of the public" and "favor[] a small number of well-funded special interests," while denying access to "extremely useful feedback to agencies based on [] local knowledge."[232]

The existing NEPA regulations serve the public interest in efficient project delivery. Because they ensure that environmental review is "commensurate with [project] size and/or impact,"[233] the vast majority of projects are completed using flexible and speedy processes already.[234]  The existing rules also help avoid conflicts and roadblocks. For example, decisions "that under[go] NEPA review [are], on average, completed 3 months *faster* than those that were exempted from NEPA."[235]  And a review of Bureau of Land Management Environmental Impact Statements in the western United States found that "[m]ore protective land management requirements" informed by current NEPA regulations "did not appear to harm economic

---

[229] Roberts Decl. ¶ 13 (emphasis added).
[230] Fleischman Decl. ¶ 20, attached as Ex. 57.
[231] *Id.* at ¶ 23.
[232] *Id.* at ¶ 24.
[233] Goldfuss Decl. at ¶ 20.
[234] Ruple Decl. at ¶¶ 50-51 (explaining that fewer than 1% of NEPA analyses utilize an EIS).
[235] Ruple Decl. ¶ 36 (contrasting decisions in jurisdictions where critical habitat designation rules are subject to NEPA against those where they are not).

development," "despite strengthened environmental protections" as "[t]he number of jobs created, and wells drilled, increased by 8% and 2% respectively," because existing NEPA regulations "create[d] an opportunity to reconcile and balance competing interests and values."[236]

By contrast, the Rule cuts many of the impacts and alternatives out of the process and minimizes opportunities for public input.  And by imposing arbitrary deadlines, it will likely force agencies to rush decisionmaking processes, leading to mistakes.[237]  And to the extent that the Rule could speed delivery of a project, it will come at the cost of high-quality decisionmaking.[238]

### B.   Maintaining the Status Quo Preserves the Public Interest in Stable, Predictable Regulation.

When weighing the public interest, particular attention should be given to preserving the status quo.  *See United States v. South Carolina*, 720 F.3d 518, 524 (4th Cir. 2013).  Weighed against the disruption that would ensue if the Rule were to be implemented, preservation of the status quo serves the public interest in several ways.  It avoids the uncertainty inherent in implementing a new regulatory regime in the midst of litigation that may result in future

---

[236] Ruple Decl. ¶ 41.

[237] *See, e.g.*, Goldfuss Decl. ¶ 34 ("If anything, [the new regulations] could potentially lead to agencies taking harmful shortcuts during the review process that will ultimately end up delaying projects down the road as a result of missing information or skipping important steps in the process."); Ruple Decl. ¶ 53 ("It is my opinion that the Rule's fixation on reducing paperwork and narrowing of the NEPA review process will reduce opportunities for coordination and early problem identification. The loss of such opportunities is likely to slow, rather than speed, NEPA compliance.").

[238] *See, e.g.,* Ruple Decl. ¶ 48 ("It is my opinion that the Rule will do little to speed project delivery and that marginal gains in project delivery will come at the disproportionate expense of public engagement, careful agency decisionmaking, and environmental sustainability.); Fleischman Decl. ¶ 26 ("The arbitrary NEPA timelines imposed by the new rule will harm decision-making because in the relatively small percent of cases where current decision-making takes longer than the new required timelines, the delays are likely due to the need for the agency to carefully analyze its own decisions, not because of NEPA-specific requirements.  Rushing through these decisions in order to satisfy NEPA requirements will likely result in poorer decisions.").

enjoinment.  The status quo also benefits from a stable, enduring body of caselaw that would be thrown into question by the Rule, inviting costly and time-consuming litigation.  Finally, disrupting the status quo would cause the premature imposition of compliance costs on plaintiffs and other interested parties, which may, pending this litigation, then be unnecessary.

In the context of contested administrative rules, courts recognize regulatory uncertainty as injurious to the public interest.  *See, e.g.*, *Colorado v. EPA*, No. 20-CV-1461-WJM-NRN, 2020 WL 3402325, at *13 (D. Colo. June 19, 2020) (holding that implementation of challenged Clean Water Act regulation followed by a ruling striking down the rule on the merits "would likely create unnecessary confusion among the regulated community about what standard really applies.  The Court finds it in the public interest, therefore, to maintain the status quo—what the regulated community is already accustomed to—pending resolution on the merits.") (appeal pending); *Tafas v. Dudas*, 511 F. Supp. 2d 652, 670 (E.D. Va. 2007) (granting preliminary injunction preventing new patent rules from going into effect, noting that "[a]llowing the implementation of rules that may or may not remain in effect is likely to cause much greater uncertainty and squelching of innovation than a preliminary injunction").

In the instant case, uncertainty directly harms the public interest because it will "result[] in inadequate environmental reviews and project delays," confusion, and a waste of federal resources.[239]  As former Charlotte mayor Jennifer Roberts explained,

> I know from my time in office that if this rule is allowed to begin implementation and agencies start to revise their separate rules for consistency, the bureaucratic process will be lengthy and challenging. It is not just federal agencies that will have to adapt but state and local agencies that have relied on the prior NEPA process for more than 40 years.  The massive changes will create confusion among agencies that will persist even if the rule is vacated later in a final decision. Indeed, the uncertainty that will arise while the rule i[s] under challenge in

---

[239] Goldfuss Decl. ¶ 36.

multiple courts across the country will cause considerable confusion and important projects will likely be delayed.[240]

At the agency level there will be significant upheaval, as tens of thousands of staff who have long administered NEPA under the previous regulations have to be retrained, work through new definitions, understand new systems, and try to assess which types of impacts they should now study and what alternatives to review.  It is inevitable that "implementing agencies [will] struggle to understand and interpret the new [regulations]."[241]  Every agency's NEPA procedures will need to be revised,[242] which means that at least 86 unique sets of agency rules will need to be revised through rulemaking or other means,[243] all within twelve months.[244]  Allowing the Rule to go into effect, only to be enjoined later, will create unnecessary confusion, contrary to CEQ's stated intent to increase predictability and reduce project delays.[245]  And for "under-resourced agencies and offices" tasked with implementation, "the harm caused by trying to implement the rule and then reverting to the old rule could be significant."[246]  Allowing the Rule to go into effect will thus waste already scarce federal agency resources and be contrary to the public interest.

Likewise, the regulated community will be burdened by the requirement to (perhaps needlessly) adapt to a new regulatory regime under the Rule during the pendency of this litigation.  This will inevitably require investments by stakeholders to comply with—and

---

[240] Roberts Decl. ¶ 14.
[241] Yost Decl. ¶ 25.
[242] Goldfuss Decl. ¶ 22.
[243] CEQ, Federal Agency NEPA Implementing Procedures, *available at* https://ceq.doe.gov/docs/laws-regulations/federal-agency-nepa-implementing-procedures-2020-06-04.pdf (current through June 4, 2020).
[244] Yost Decl. ¶ 24.
[245] Goldfuss Decl. ¶ 36 ("[I]f the rule is to go into effect, the bureaucratic gears start slowly turning as agencies work to respond to this new and confusing rule, and then the rule is later enjoined on the merits, the harm caused by trying to implement the rule and then reverting to the old rule could be significant.").
[246] Goldfuss Decl. ¶ 36.

mitigate the harmful effects of—the Rule before this litigation is concluded, harming the public interest if the Rule is later struck down. As the American Sustainable Business Council noted in its public comment on the Rule, the complete rewrite of NEPA at issue here will increase compliance costs "as stakeholders are forced to navigate a new and uncertain terrain."[247] Faced with uncertainty about which set of rules apply, some agencies may postpone moving ahead with NEPA reviews for specific projects until after the resolution of litigation.[248]

The vast overhaul that includes a host of new vague definitions and regulatory schemes is also almost certain to spawn widespread litigation, further delaying projects, engendering deep uncertainty, overwhelming the court system, and burdening the public.

Currently, the litigation burden from NEPA is low: "just 0.22% of all NEPA decisions result in litigation."[249] After the passage of NEPA and its implementing regulations, the judiciary spent decades developing detailed, predictable guidance for the regulated community: since "[w]hat constitutes a 'hard look' cannot be outlined with rule-like precision," litigation was required to clarify predictable standards. *Nat'l Audubon Soc'y v*, 422 F.3d at 185. As noted above, a robust body of case law has developed across a number of NEPA provisions.

But, as highlighted in public comments on the regulatory scheme and expert testimony, the dramatic changes wrought by the Rule will necessitate a raft of new litigation to clarify ambiguities and develop new standards for stakeholders navigating the Rule's dramatically changed regulatory landscape.[250]

---

[247] Sustainable Business Council Comment Letter at 2.
[248] SEIA Comment Letter at 4.
[249] Ruple Decl. ¶ 44.
[250] *See, e.g.*, Hayes Decl. ¶ 23 ("A wave of unnecessary and resource-intensive litigation will ensue, holding up and potentially sidelining important projects."); Yost Decl. ¶ 15 ("If the Rule is allowed to go into effect there will be new litigation to address the massive changes to the law's implementing regulations as citizens, agencies, and courts struggle with new measures that discard decades of

The inevitable increase in litigation over the limits of the Rule will prove costly and time-consuming and is likely to begin as soon as agencies start to apply the Rule. And the threat of such litigation may mean that project developers will wait and see if the Rule will remain in place before taking on the risks.[251] Thus, the public interest is best served by enjoining enforcement until this matter is resolved.

Members of the public, including the Conservation Groups, as described above in Part II, are already having to divert organizational resources to evaluation and information gathering in order to compensate for the rollbacks in the Rule. Preliminarily enjoining the Rule and preserving the status quo during this litigation will prevent such wasteful expenditures by continuing the well-settled NEPA evaluation and disclosure process currently in place, serving the public interest.

### C.      Federal Agency Compliance with the Law Serves the Public Interest.

It is well-recognized that the public has an interest in federal agency compliance with the law. *See, e.g., Crutchfield v. U.S. Army Corps of Eng'rs*, 175 F. Supp. 2d 835, 849 (E.D. Va. 2001) ("[T]here is . . . a significant public interest to be served . . . by [compliance] with the federal environmental laws."). As set out above, CEQ has flouted the requirements of the APA and NEPA itself. The public interest will be served by requiring "process and fidelity to the law"

---

experience and judicial interpretation of NEPA and its implementing regulations."); Ruple Decl. ¶ 60 ("Changes included in the Rule are likely to increase the rate at which NEPA decisions are challenged in court and the rate at which NEPA decisions are reversed."); *id.* ¶ 45 (explaining that the Department of the Interior's regulations incorporate by reference the 1978 CEQ regulations, which will remain in place for DOI even as they are replaced elsewhere, creating opposing requirements that will require litigation to reconcile).

[251] SEIA Comment Letter at 4.

by postponing implementation of the Rule pending a resolution of this case on the merits.

*Invenergy Renewables v. Unites States*, 422 F. Supp. 3d 1255, 1294 (U.S. Ct. Int'l Trade 2019).

>   **D.     There is No Substantial Harm to the Public Interest in Delaying Implementation of the New Regulations.**

Finally, no credible claim can be made that there would be substantial harm to the public interest from a preliminary injunction preserving the forty-year status quo while this case is resolved.  In assessing whether to enjoin the implementation of new regulations, federal courts have repeatedly found that no significant harm accrues to the public interest in delaying the implementation of new regulations.  *See, e.g.*, *N.C. Growers' Ass'n, Inc. v. Solis*, 644 F. Supp. 2d 664, 671 (M.D.N.C. 2009), *as amended* (July 1, 2009) ("The court finds that Defendants are unlikely to suffer significant harm if Plaintiffs' motion for a preliminary injunction is granted. The government has administered the 2008 Rule since January 17, 2009. A preliminary injunction will merely maintain the status quo as it has existed since that date.").  The same rationale applies far more strongly here: after forty years under the same regulatory framework, postponing a dramatic overhaul while the Court rules on the merits of this case could hardly cause harm to CEQ or the public.

## IV.     Nationwide Relief is Required.

A nationwide injunction is needed in order to provide complete relief to the Conservation Groups and their members around the country, and to protect against the nationwide harms caused by CEQ's Rule.  The harms from this Rule apply not only to isolated projects, but may also weaken the environmental review process for other federal rulemakings currently in progress that have nationwide effects.  This situation, coupled with the fact that the Conservation Groups and their members work and are affected nationwide, means that a geographically limited injunction or stay would not provide adequate relief.

"[D]istrict courts have broad discretion when fashioning injunctive relief," *Ostergren v. Cuccinelli*, 615 F.3d 263, 288 (4th Cir. 2010), and "the scope of injunctive relief is dictated by the extent of the violation established, not by the geographical extent of the plaintiff class." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979).  "[W]hen a reviewing court determines that agency regulations are unlawful, the ordinary result is that the rules are vacated—not that their application to the individual petitioners is proscribed."  *Nat'l Mining Ass'n v. U.S. Army Corps of Eng'rs*, 145 F.3d 1399, 1409 (D.C. Cir. 1998) (quoting *Harmon v. Thornburgh*, 878 F.2d 484, 495 n.21 (D.C. Cir. 1989)).

A nationwide injunction is appropriate here for several reasons.  First, CEQ's rules are facially invalid under the APA and should not go into effect.  *See, e.g.*, *Guilford Coll. v. McAleenan*, 389 F. Supp. 3d 377, 396–98 (M.D.N.C. 2019) (finding that the promulgation of a policy memorandum likely violated the APA, and that "a nationwide injunction [is] appropriate in such cases"); *S.C. Coastal Conservation League*, 318 F. Supp. 3d at 968–70 (finding that the government failed to comply with APA requirements in implementing agency rule and therefore enjoining the rule nationwide); *Texas v. United States*, 201 F. Supp. 3d 810, 835–36 (N.D. Tex. 2016) (concluding that because plaintiffs demonstrated a likelihood of success on their claim that defendants' written directives violated APA requirements, an "injunction should apply nationwide"); *Nat'l Fed'n of Indep. Bus. v. Perez,* No. 5:16-cv-00066-C, 2016 WL 3766121, at *46 (N.D. Tex. June 27, 2016) (entering nationwide preliminary injunction and explaining that "[b]ecause the scope of the irreparable injury is national, and because the [agency's] New Rule is facially invalid, the injunction should be nationwide in scope," and "[w]here a party brings a facial challenge alleging that agency action violated APA procedures, a nationwide injunction is appropriate").

In addition, the Conservation Groups work and have members not just in one limited geographic area, but throughout the United States.  The Conservation Groups are working on projects with significant environmental impacts that are currently under NEPA review across the country.  One prominent example is the Migratory Bird Treaty Act rulemaking currently in process.  This rulemaking applies—and its harmful effects will be felt—nationwide.  Defenders of Wildlife is participating in this rulemaking and its NEPA process because its members nationwide would be harmed by the proposed changes to the rule.[252]  Likewise, Defenders is participating in the ongoing NEPA process for a Marine Mammal Protection Act rulemaking, which regulates lobster fishing gear in the right whale's foraging grounds off the coasts of Maine, Rhode Island, New Hampshire, and Massachusetts; a draft environmental impact statement is expected before November 2020.[253]  Preserving the existing NEPA requirements throughout the country is needed to ensure the cumulative effects and all reasonable alternatives to these rulemaking are considered while this challenge to the Rule is pending.

Moreover, the Conservation Groups are also working on numerous site-specific projects in multiple states and Circuits; for example, the National Trust is working on projects currently undergoing NEPA evaluations that would be subject to the Rule such as a proposed spaceport on the coast of Georgia,[254] a proposed pumping station and transmission line on the James River in Virginia,[255] and projects in South Carolina including a proposed seawall and a transmission line in Charleston;[256] meanwhile, Defenders of Wildlife is working on ongoing NEPA projects such

---

[252] Rylander Decl. ¶¶ 14–18.
[253] McClintock Decl. ¶¶ 18-19, attached as Ex. 49.
[254] Lang Decl. ¶¶ 8–15.
[255] Nieweg Decl. ¶¶ 5, 7; Kostelny Decl. ¶¶ 4–5.
[256] Drolet Decl. ¶¶ 5–7.

as revisions to the Nantahala and Pisgah National Forest plan in North Carolina,[257] revisions to the Take Reduction Plan for right whales,[258] a proposed titanium mine in Georgia.[259] Accordingly, an injunction limited to one state or one circuit would not address the effects of the Rule on the Conservation Groups and their members.  Because of the numerous projects and other federal actions affected by the Rule—including rulemakings with national and regional effects[260]—a national injunction is appropriate and necessary here.

CEQ violated the APA in promulgating the Rule—therefore making it invalid and its application anywhere inappropriate.  A nationwide injunction is therefore necessary to prevent the Rule's illegal application to projects across the nation.

### CONCLUSION

For the forgoing reasons, the Court should grant the Conservation Groups' Motion for Preliminary Injunction or Stay.

The Conservation Groups respectfully request that the Court order expedited briefing on this matter and set the case down for a prompt hearing so that a determination on the Conservation Groups' motion can be made prior to the Rule's Effective Date of September 14, 2020.

Respectfully submitted, this 18th day of August, 2020.

/s/ Kimberley Hunter
N.C. Bar No. 41333
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516

---

[257] Rylander Decl. ¶¶ 14–17.
[258] McClintock Decl. ¶¶ 17–19.
[259] Hunt Decl. ¶¶ 14–29.
[260] McClintock Decl. ¶¶ 18-19.

/s/ Sam Evans
N.C. Bar No. 44992
48 Patton Ave
Suite 304
Asheville, NC 28801-3321

/s/ Nicholas S. Torrey
N.C. Bar No. 43382
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516

/s/ Megan Kimball
N.C. Bar No. 53837
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516

/s/ Kristin Davis
VA. Bar No. 85076
201 West Main St.
Suite 14
Charlottesville, VA 22902-5065

## CERTIFICATE OF SERVICE

I hereby certify that on August 18, 2020, I electronically filed the foregoing Memorandum in Support of the Conservation Groups' Motion for Preliminary Injunction or Stay with the Clerk of Court using the CM/ECF System, which will automatically send e-mail notification of such filing to all counsel of record.

Additionally, because the Defendants have not yet entered an appearance in the CM/ECF System, I also served the foregoing Motion on all parties, by certified mail, return receipt requested at the addresses  listed below:

COUNCIL ON ENVIRONMENTAL QUALITY
Executive Office of the President
730 Jackson Place, NW
Washington, DC 20503

MARY NEUMAYR, CEQ Chair, in her official capacity
Council on Environmental Quality
Executive Office of the President
730 Jackson Place, NW
Washington, DC 20503

/s/      Kimberley Hunter