# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE DIVISION

| | | |
|---|---|---|
| WILD VIRGINIA, VIRGINIA WILDERNESS COMMITTEE, UPSTATE FOREVER, SOUTH CAROLINA WILDLIFE FEDERATION, NORTH CAROLINA WILDLIFE FEDERATION, NATIONAL TRUST FOR HISTORIC PRESERVATION, MOUNTAINTRUE, HAW RIVER ASSEMBLY, HIGHLANDERS FOR RESPONSIBLE DEVELOPMENT, DEFENDERS OF WILDLIFE, COWPASTURE RIVER PRESERVATION ASSOCIATION, CONGAREE RIVERKEEPER, THE CLINCH COALITION, CLEAN AIR CAROLINA, CAPE FEAR RIVER WATCH, ALLIANCE FOR THE SHENANDOAH VALLEY, and ALABAMA RIVERS ALLIANCE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 3:20-cv-00045-NKM |
| Plaintiffs, | ) ) | |
| v. | ) ) | |
| COUNCIL ON ENVIRONMENTAL QUALITY and MARY NEUMAYR IN HER OFFICIAL CAPACITY AS CHAIR OF THE COUNCIL ON ENVIRONMENTAL QUALITY, | ) ) ) ) ) ) | |
| Defendants. | | |

## DEFENDANTS' BRIEF IN SUPPORT OF MOTION TO DISMISS

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 1

BACKGROUND ................................................................................................. 4

    A.    National Environmental Policy Act ........................................................ 4

    B.    CEQ:  The 1970s Guidelines and Regulations ...................................... 4

    C.    NEPA Practice Outgrows the 1978 Regulations .................................... 5

    D.    Modernizing the NEPA Regulations ...................................................... 9

    E.    The Currant Lawsuit Spearheaded by SELC as Counsel...................... 12

STANDARD OF REVIEW ................................................................................ 12

ARGUMENT ..................................................................................................... 13

    I.    In the absence of a live dispute over the application of the regulations to a particular project or decision, Plaintiffs' challenge is not ripe. ........................... 13

        A.    A regulation is ordinarily subject to APA review only as part of a challenge to a particular application of the regulation.............................. 13

        B.    No special circumstances justify direct review of the challenged regulation as a facial matter here. ............................................................. 16

        C.    The APA and principles of equitable discretion support the conclusion that review of the 2020 Rule is available only in the context of a challenge to a specific application of the 2020 Rule. .......... 18

        D.    Immediate judicial review of the 2020 Rule would hinder the efforts of federal agencies to refine their policies. ............................................... 20

    II.    In the absence of a live dispute over the concrete, site-specific application of the 2020 Rule, Plaintiffs lack standing. ........................................................... 23

        A.    *Summers* forecloses Plaintiffs' lawsuit. .................................................... 24

        B.    Plaintiffs' rank speculation about pending and future projects and allegations of possible future injury are insufficient................................. 27

        C.    Plaintiffs' claims of amorphous "procedural" and "informational" injuries do not satisfy Article III. ............................................................. 32

            1.    Mere deprivation of an alleged procedural right without concrete harm is not justiciable under Article III. ........................ 32

2.     Plaintiffs so-called informational injuries also are not justiciable under Article III.............................................................. 33

III.    The Court has no jurisdiction to review the procedures federal agencies will use in future decisionmaking. ..................................................................... 36

CONCLUSION.................................................................................................................... 38

# TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. Gardner*,
  387 U.S. 136 (1967) ................................................................................. 14, 18-19

*Allen v. Wright*,
  468 U.S. 737 (1984) ....................................................................................... 24, 26

*Amoco Prod. Co. v. Village of Gambell*,
  480 U.S. 531 (1987) ............................................................................................... 18

*Andrus v. Sierra Club*,
  442 U.S. 347 (1979) ................................................................................................. 5

*Ass'n for Retarded Citizens v. Dallas Cnty. Mental Health & Mental
  Retardation Ctr. Bd. of Trs.*,
  19 F.3d 241 (5th Cir. 1994) ................................................................................. 35

*Baehr v. Creig Northrop Team, P.C.*,
  953 F.3d 244 (4th Cir. 2020) ............................................................................... 33

*Beck v. McDonald*,
  848 F.3d 262 (4th Cir. 2017) ......................................................................... 24, 34

*Bennett v. Spear*,
  520 U.S. 154 (1997) ....................................................................................... 27, 37

*Bishop v. Bartlett*,
  575 F.3d 419 (4th Cir. 2009) ............................................................................... 13

*Buscemi v. Bell*,
  964 F.3d 252 (4th Cir. 2020) ............................................................................... 31

*Casa de Md., Inc. v. Trump*,
  No. 19-2222, 2020 WL 4664820 (4th Cir. Aug. 5, 2020) ...................................... 35

*City of Carmel-By-The-Sea v. U.S. Dep't of Transp.*,
  123 F.3d 1142 (9th Cir. 1997) ............................................................................... 8

*City of Dallas v. Hall*,
  562 F.3d 712 (5th Cir. 2009) ................................................................................. 8

*City of New York v. U.S. Dep't of Defense*,
  913 F.3d 423 (4th Cir. 2019) ......................................................................... 16, 32

*Clapper v. Amnesty Int'l USA*,
  568 U.S. 398 (2013) ............................................................................ 13, 24, 31, 35

*Cronin v. U.S. Dep't of Agric.*,
  919 F.2d 439 (7th Cir. 1990) ................................................................................. 8

*Ctr. for Responsible Sci. v. Gottlieb*,
  346 F. Supp. 3d 29 (D. D.C. 2018) ........................................................ 26

*Dreher v. Experian Info. Sols., Inc.*,
  856 F.3d 337 (4th Cir. 2017) ................................................................ 33

*Evans v. B.F. Perkins Co.*,
  166 F.3d 642 (4th Cir. 1999) ................................................................ 12

*Fed. Election Comm'n v. Akins*,
  524 U.S. 11 (1998) ........................................................................... 33-34

*Flast v. Cohen*,
  392 U.S. 83 (1968) ............................................................................... 31

*Food & Water Watch, Inc. v. Vilsack*,
  808 F.3d 905 (D.C. Cir. 2015) .............................................................. 26

*Franks v. Ross*,
  313 F.3d 184 (4th Cir. 2002) ................................................................ 22

*Friends of Animals v. Bernhardt*,
  961 F.3d 1197 (D.C. Cir. 2020) ............................................................ 35

*Fund for Animals, Inc. v. U.S. Bureau of Land Mgmt.*,
  460 F.3d 13 (D.C. Cir. 2006) ........................................................... 15-16

*Invention Submission Corp. v. Rogan*,
  357 F.3d 452 (4th Cir. 2004) ................................................................ 27

*Jersey Heights Neighborhood Ass'n, v. Glendening*,
  174 F.3d 180 (4th Cir. 1999) ......................................................... 13, 36

*Lane v. Holder*,
  703 F.3d 668 (4th Cir. 2012) ......................................................... 26, 35

*Lee v. U.S. Citizenship & Immigration Servs.*,
  592 F.3d 612 (4th Cir. 2010) ................................................................ 19

*Lujan v. Defs. of Wildlife*,
  504 U.S. 555 (1992) .............................................................. 23, 26, 31, 33

*Lujan v. Nat'l Wildlife Fed'n*,
  497 U.S. 871 (1990) ........................................................... 1-3, 16, 19, 38

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
  460 U.S. 766 (1983) ............................................................................. 29

*Moore v. Sims*,
  442 U.S. 415 (1979) ............................................................................. 37

*Nat'l Ass'n of Home Builders v. Envtl. Prot. Agency*,
  667 F.3d 6 (D.C. Cir. 2011) .................................................................. 35

*Nat'l Park Hosp. Ass'n v. U.S. Dep't of the Interior*,
  538 U.S. 803 (2003) .................................................................................... 15

*Nat'l Taxpayers Union, Inc. v. United States*,
  68 F.3d 1428 (D.C. Cir. 1995) .................................................................... 35

*New River Valley Greens v. U.S. Dep't of Transp.*,
  161 F.3d 3 (4th Cir. 1998) ............................................................................. 8

*Norton v. S. Utah Wilderness All.*,
  542 U.S. 55 (2004) ...................................................................................... 16

*Ohio Forestry Ass'n v. Sierra Club*,
  523 U.S. 726 (1998) ........................................................................ 15, 20, 21

*Pashby v. Delia*,
  709 F.3d 307 (4th Cir. 2013) ...................................................................... 23

*Perez v. Mortg. Bankers Ass'n*,
  575 U.S. 92 (2015) ...................................................................................... 37

*Phillips v. Trans Union, LLC*,
  No. 3:16-CV-00088, 2017 WL 3911018 (W.D. Va. Sept. 6, 2017) ........................ 33

*Reg'l Mgmt. Corp. v. Legal Servs. Corp.*,
  186 F.3d 457 (4th Cir. 1999) ...................................................................... 20

*Reno v. Catholic Social Servs., Inc.*,
  509 U.S. 43 (1993) .............................................................................. 14, 18-19

*Reno v. Flores*,
  507 U.S. 292 (1993) .................................................................................... 22

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ............................................................................ 4, 5, 17

*S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at
  Broadlands, LLC*, 713 F.3d 175 (4th Cir. 2013) ...................................... 26, 35

*Sabine River Auth. v. U.S. Dep't of Interior*,
  951 F.2d 669 (5th Cir. 1992) ........................................................................ 8

*Save Our Sound OBX, Inc. v. N.C. Dep't of Transp.*,
  914 F.3d 213 (4th Cir. 2019) ...................................................................... 23

*Schlesinger v. Reservists Comm. to Stop the War*,
  418 U.S. 208 (1974) .............................................................................. 24, 31

*Scoggins v. Lee's Crossing Homeowners Ass'n*,
  718 F.3d 262 (4th Cir. 2013) ...................................................................... 22

*South Carolina v. United States*,
  912 F.3d 720 (4th Cir. 2019) ............................................................ 14, 22-24, 31

*Spokeo, Inc. v. Robins*,
  136 S. Ct. 1540 (2016) ..................................................................... 23-24, 32

*Summers v. Earth Island Inst.*,
  555 U.S. 488 (2009) ............................................................................ *passim*

*Toilet Goods Ass'n v. Gardner*,
  387 U.S. 158 (1967) ..................................................................................... 19

*U.S. Dep't of Transp. v. Pub. Citizen*,
  541 U.S. 752 (2004) ........................................................................... 4, 17, 29

*Utah Int'l Inc. v. Andrus*,
  488 F. Supp. 962 (D. Utah 1979) .................................................................. 8

*Valley Forge Christian Coll. v. Ams. United for Separation of
  Church & State, Inc.*, 454 U.S. 464 (1982) ................................................ 13

*Village of Bald Head Island v. U.S. Army Corps. of Eng'rs*,
  714 F.3d 186 (4th Cir. 2013) ...................................................................... 16

*Virginia ex rel. Cuccinelli v. Sebelius*,
  656 F.3d 253 (4th Cir. 2011) ...................................................................... 31

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
  435 U.S. 519 (1978) ............................................................................... 10, 37

*Webster v. U.S. Dep't of Agric.*,
  685 F.3d 411 (4th Cir. 2012) ........................................................................ 4

*Weinberger v. Romero-Barcelo*,
  456 U.S. 305 (1982) ..................................................................................... 18

*Whitman v. Am. Trucking Ass'ns*,
  531 U.S. 457 (2001) ..................................................................................... 18

*Whitmore v. Arkansas*,
  495 U.S. 149 (1990) ......................................................................... 24, 26, 31

*Wilderness Soc'y, Inc. v. Rey*,
  622 F.3d 1251 (9th Cir. 2010) ................................................................ 33, 36

**Statutes**

33 U.S.C. § 1369(b)(1)(F) .............................................................................. 37

42 U.S.C. § 4332(2)(B) .................................................................................... 4

42 U.S.C. § 4332(2)(C) ................................................................................ 4, 36

42 U.S.C. § 4332(C) ......................................................................................... 4

42 U.S.C. § 4332(I) ........................................................................................... 4

42 U.S.C. § 4342 .............................................................................................. 4

42 U.S.C. § 4344 ........................................................................................................... 4

42 U.S.C. § 7607(b)(1) .......................................................................................... 17, 37

5 U.S.C. § 551(13) ....................................................................................................... 19

5 U.S.C. § 704 ....................................................................................................... *passim*

5 U.S.C. §§ 551(6)-(9) ................................................................................................. 18

**Regulations**

23 C.F.R. Pt. 771 ........................................................................................................... 5

33 C.F.R. Pt. 230 ........................................................................................................... 5

36 C.F.R. Pt. 220 ........................................................................................................... 5

40 C.F.R § 1501.4(b) (2019) ...................................................................................... 34

40 C.F.R. § 1500 ........................................................................................................... 4

40 C.F.R. § 1501.5(e) (2020) ...................................................................................... 34

40 C.F.R. § 1502.10 (2019) ......................................................................................... 4

40 C.F.R. § 1502.7 (2019) ........................................................................................... 7

40 C.F.R. § 1507.3 ................................................................................................. 5, 21

**Other Authorities**

43 Fed. Reg. 55,978 (Nov. 29, 1978) .......................................................................... 5

44 Fed. Reg. 873 (Jan. 3, 1979) .................................................................................. 5

46 Fed. Reg. 18,026 (Mar. 23, 1981) .......................................................................... 7

83 Fed. Reg. 28,591 (June 20, 2018) ......................................................................... 10

85 Fed. Reg. 1684 (Jan. 10, 2020) ............................................................................ 10

85 Fed. Reg. 43,304 (July 16, 2020) .................................................................. *passim*

James W. Coleman, *Pipelines & Power-Lines:* BUILDING THE ENERGY TRANSPORT FUTURE,
    80 OHIO ST. L.J. 263 (2019) ................................................................................. 8

James E. Salzman and Barton H. Thompson, Jr., ENVIRONMENTAL LAW AND POLICY,
    (5th ed. 2019) .......................................................................................................... 6

Philip K. Howard, COMMON GOOD, TWO YEARS, NOT TEN:  REDISGNING INFRASTRUCTURE,
    APPROVALS (Sept. 2015) .......................................................................................... 7

## INTRODUCTION

"Under the terms of the APA, [a plaintiff] must direct its attack against some *particular* 'agency action' that *causes it* harm." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) ("*NWF*") (emphasis added).  The National Environmental Policy Act ("NEPA") is not a statute that "explicitly provides for [court] correction of the administrative process at a higher level of generality," so courts "intervene in the administration of the laws only when, and to the extent that, a specific 'final agency action' has an actual or immediately threatened effect."  *See id.* at 894 (citation omitted).  Here, Defendant Council on Environmental Quality (CEQ), acting through its Chair, has recently completed an update of its NEPA regulations.  85 Fed. Reg. 43,304 (July 16, 2020) ("2020 Rule").  Plaintiffs identify no actual or immediately threatened effect caused by this long-overdue update.  Because they can't.  CEQ's NEPA regulations apply to *internal* federal agency processes, not to the public.  Any purported harm that might be caused could only occur once another federal agency takes final agency action pursuant to a purportedly unlawful change in the 2020 Rule.  So Plaintiffs' broad facial challenge to the 2020 Rule must be dismissed for lack of jurisdiction.  *NWF*, 497 U.S. at 891.

With more than four decades having passed since the last major promulgation of CEQ's regulations, the NEPA process had become a quagmire.  Outdated procedures from the 1978 regulations were wrapped in red tape, overlaid with a myriad of complex guidance documents, made worse by conflicting case law, and shot through with confusion and intricacy.  This forced agencies to take years to complete steps that Congress thought would be simple and efficient in 1969.  Indeed, NEPA was warped in a way that only a lawyer could (and did) love.

So CEQ undertook a comprehensive re-analysis.  It hit the reset button.  Consistent with CEQ's original goals when last reforming this process in 1978, the NEPA regulations have been

reworked to reduce paperwork and delays, foster better decision making, promote consistency, and promote the kind of accountability that the current Byzantine process frustrates.  *See* 85 Fed. Reg. at 43,304.

Earlier this year in a related case that is pending before Judge Conrad, the Southern Environmental Law Center (SELC) unsuccessfully tried to halt CEQ's then-ongoing rulemaking proceedings.  It asked this Court to take the unprecedented step of enjoining CEQ from finalizing the 2020 Rule until CEQ completed SELC's expansive document production request under the Freedom of Information Act (FOIA).  But Judge Conrad properly concluded that the Court had no authority to enjoin that non-final agency action, recognizing that the Administrative Procedure Act (APA) and the Supreme Court's *Vermont Yankee* doctrine clearly prohibited him from doing so.  *See* Mem. & Opin., *SELC v. CEQ*, 2020 WL 1302517, No. 3:18-cv-00113, ECF No. 41 at 14-15 (W.D. Va. Mar. 18, 2020) ("SELC Order").

Now SELC is back—in the form of its legal counsel leading a challenge of more than a dozen other environmental group plaintiffs—to try to disrupt the normal processes for judicial review of agency actions under the APA.[1]  It is again seeking to prematurely enjoin the 2020 Rule through a broad-based, facial review—despite the fact that NEPA lacks the sort of special, private right of action permitting review "even before the concrete effects normally required for APA review are felt."  *NWF*, 497 U.S. at 891.  And this time, SELC's maneuver not only offends traditional principles of APA review, but also those of the Constitution's Article III case-or-controversy requirement.

---

[1] The docket indicates that all five of Plaintiffs' attorneys are from SELC.

As will be explained herein, SELC's current facial attack on the 2020 Rule even before it has become effective is inconsistent with a plethora of Supreme Court cases holding that federal courts lack Article III jurisdiction under both the ripeness and standing doctrines to directly review agency regulations under the APA in the absence of a challenge to a concrete application of regulations "that causes it harm." *Id.* Of course, at this early date, when the new regulations have not even become effective, SELC and its client Plaintiffs have not challenged (and logically could not be challenging) a concrete application of the 2020 Rule. And for the same reason, none of the plaintiff member organizations here could know that they even have one or more members affected by such concrete action. For these reasons, Plaintiffs cannot bring a facial challenge precisely because no federal agency has applied the 2020 Rule. Facial review can occur when a specialized statute permits pre-enforcement judicial review of a species of regulation. But, as noted above, NEPA is not such a statute.

If SELC or any of its clients someday encounter a situation where CEQ's revised regulations concretely harm their interests (measured based on the interests of actual individuals in the field), they can file a lawsuit at that time against that concrete application of the 2020 Rule. For

> a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

*Id*. But that situation has not occurred. This Court therefore lacks Article III jurisdiction and it should dismiss this case.

3

## BACKGROUND

### A.    National Environmental Policy Act

Enacted in 1969 and signed into law in 1970, NEPA is considered the first major environmental law in the United States.  Unlike many of its successor statutes, NEPA does not mandate particular results or substantive standards but rather requires federal agencies to go through an analytical process before taking a major action that will significantly affect the environment.  *See Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 418 (4th Cir. 2012) (citing *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989)).  The core element of that process is the requirement to prepare a "detailed statement," which under CEQ regulations has come to be known as an "environmental impact statement" or EIS for short, "on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."  42 U.S.C. § 4332(2)(C).  An EIS generally describes, among other items, the purpose and need for the proposed action, the alternatives to the action, the affected environment, and the environmental consequences of alternatives.  *See id.*; 40 C.F.R. § 1502.10 (2019).

### B.    CEQ:  The 1970s Guidelines and Regulations

NEPA also established CEQ—an agency within the Executive Office of the President— "with authority to issue regulations interpreting" the statute and it "has promulgated regulations to guide federal agencies in determining what actions are subject to [its] statutory requirement.'' *See Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 757 (2004) (citing 40 C.F.R. § 1500.3 (2003))); *see also* 42 U.S.C. §§ 4332(2)(B), (C), (I), 4342, 4344.  At first, CEQ issued only "guidelines" to federal agencies on how to comply with NEPA.  43 Fed. Reg. 55,978, 55,978 (Nov. 29, 1978).  But while CEQ considered the guidelines to be binding on federal agencies,

some agencies viewed them as advisory only. *Id.* The courts also differed over the weight that should be accorded the guidelines in evaluating agency compliance with NEPA. *Id.* The result was inconsistent agency practices and judicial interpretations of the law, impeding federal agency coordination and public participation and causing unnecessary paperwork, delay, and duplication of agency efforts. *Id.*

In part to cut through that tangle, CEQ issued its reform regulations implementing NEPA in 1978. The stated goal was "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further the national policy to protect and enhance the quality of the human environment." *Id.*; *see also* 44 Fed. Reg. 873 (Jan. 3, 1979) (technical corrections); 40 C.F.R. §§ 1500, *et seq*. (CEQ regulations).[2] In the years since the promulgation of the 1978 regulations, the Supreme Court has held that CEQ's interpretation of NEPA as embedded in its regulations must be given "substantial deference." *Robertson*, 490 U.S. at 355 (citing *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979)).

## C.    NEPA Practice Outgrows the 1978 Regulations

Since 1978, the implementation of NEPA has become increasingly complicated. Due in large part to the complexity of the regulations,[3] conflicting judicial decisions have continued to

---

[2] In addition, the 1978 regulations directed federal agencies to adopt their own implementing procedures, as necessary, in consultation with CEQ. *See* 40 C.F.R. § 1507.3. Over 85 federal agencies and their subunits have developed such procedures. *See, e.g.,* 23 C.F.R. Pt. 771. (Federal Highway Administration/Federal Transit Administration); 33 C.F.R. Pt. 230 (U.S. Army Corps of Engineers—Civil Works); 36 C.F.R. Pt. 220 (U.S. Forest Service).

[3] The complexity of the regulations has given rise to CEQ's issuance of more than 30 guidance documents to assist federal agencies in understanding and complying with NEPA. *See* 85 Fed. Reg. at 43,308-09 (describing CEQ's guidance documents and reports). In their own implementing procedures, many federal agencies have included additional processes and practices to improve their own implementation of NEPA. Presidents also have issued directives, and Congress has enacted legislation to reduce delays and expedite the implementation of NEPA and the CEQ regulations, including for transportation, water, and other types of infrastructure

hamper agencies as they try to comply with the statute.  *See* 85 Fed. Reg. at 43,310.  "A challenge for agencies is that courts have interpreted key terms and requirements differently, adding to the complexity of environmental reviews."  *Id.*  Given the diversity of judicial interpretations, *NEPA is the single most litigated environmental statute in the United States.*  *See* James E. Salzman and Barton H. Thompson, Jr., ENVIRONMENTAL LAW AND POLICY 340 (5th ed. 2019) ("Perhaps surprisingly, there have been thousands of NEPA suits. It might seem strange that NEPA's seemingly innocuous requirement of preparing an EIS has led to more lawsuits than any other environmental statute.").

Agencies have responded to the litigation risk "by generating voluminous studies analyzing impacts and alternatives well beyond the point where useful information is being produced and utilized by decision makers."  85 Fed. Reg. at 43,305.  The public is not served by a plethora of EIS and other NEPA documentation so extensive that finding particular points of environmental concern to focus on becomes the proverbial needle in the haystack.  In its most recent review, CEQ found that final EISs averaged 661 pages in length, and *the median* document was 447 pages.  *See* Council on Environmental Quality, Length of Environmental Impact Statements (2013-2018) at 1 (June 12, 2020) ("CEQ Length of EISs Report"), *available at* https://ceq.doe.gov/nepa-practice/eis-length.html (last visited Aug. 25, 2020).  One quarter were 748 pages or longer.  *Id.*  The page count and document length data do not include appendices, which can span thousands of additional pages.  Thus, the average modern EIS is

---

projects.  *See id.* at 43,310-12.  Despite these efforts, the NEPA process continues to slow or prevent the development of important infrastructure and other projects that require federal permits or approvals, as well as rulemakings and other proposed actions.  The past four decades' worth of CEQ guidance, agency practices, more recent presidential directives and statutory developments, and the body of case law related to NEPA implementation had not previously been harmonized or codified in CEQ's regulations.  The 2020 Rule fixes that interlocking set of problems, decades in the making.

more than four times as long as the already thorough, 150-page level of analysis contemplated by the 1978 regulations.  *See* 40 C.F.R. § 1502.7 (2019) (the text of an EIS "shall normally be less than 150 pages.").

With the length of documents dramatically increasing, so too are the delays brought about by the NEPA process.  *See* 85 Fed. Reg. at 43,305 ("the NEPA process has become increasingly complicated and can involve excessive paperwork and lengthy delays").  For example, CEQ has found that NEPA reviews for Federal Highway Administration projects, on average, take more than *seven years* to proceed from a notice of intent to prepare an EIS to issuance of a record of decision.  *See* Council on Environmental Quality, Environmental Impact Statement Timelines (2010-2018) at 10 (June 12, 2020) ("2020 Timelines Report"), *available at* https://ceq.doe.gov /nepa-practice/eis-timelines.html (last visited Aug. 25, 2020).  This is a dramatic departure from CEQ's prediction in 1981 that federal agencies would be able to complete most EISs, the most intensive review of a project's environmental impacts under NEPA, in 12 months or less.  *See* 46 Fed. Reg. 18,026, 18,037 (Mar. 23, 1981) (Question 35).  In its most recent review, CEQ found that, across the federal government, the average time for completion of an EIS and issuance of a decision was 4.5 years and *the median* was 3.5 years.  2020 Timelines Report at 1.  CEQ determined that one quarter of EISs took less than 2.2 years, and one quarter of the EISs took more than 6 years.  *Id.*  And these timelines do not include further delays associated with litigation.  Note as well that in the infrastructure context, even projects that Congress has fully funded have trouble moving forward.  *See* Philip K. Howard, *COMMON GOOD, TWO YEARS, NOT TEN: REDESIGNING INFRASTRUCTURE APPROVALS*, at 3 (Sept. 2015) ("Funding is obviously critical

for new infrastructure, but it's not sufficient.[4]  Even fully-funded projects have trouble moving

forward."), *available at* https://www.commongood.org/wp-content/uploads/2017/07/2YearsNot

10Years.pdf (last visited Aug. 25, 2020); *see also, e.g., City of Carmel-By-The-Sea v. U.S. Dep't*

*of Transp*., 123 F.3d 1142, 1176 (9th Cir. 1997) (Trott, J., concurring in part and dissenting in

part) ("too much of anything can be trouble, and one can only wonder if this case and the

tortured history of this traffic amelioration proposal suggest that too much process now renders

any controversial project too difficult and costly to accomplish, regardless of its merit").

Although other factors may contribute to project delays, the frequency and consistency of

multi-year review processes for EISs for projects across the federal government leaves no doubt

that NEPA implementation and related litigation is a significant factor.  These delays impact the

many projects and activities that are subject to NEPA each year, "slow[ing] or prevent[ing] the

development of important infrastructure and other projects that require Federal permits or

approvals, as well as rulemakings and other proposed actions."  *See* 85 Fed. Reg. at 43,305.  As

courts have recognized, a determination that the preparation of an EIS is necessary "has been the

kiss of death to many a federal project"—but not because of the project's environmental impacts

or lack of need—simply because EISs have become "very costly and time-consuming to

prepare."  *City of Dallas v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009) (quoting *Sabine River Auth.*

*v. U.S. Dep't of Interior*, 951 F.2d 669, 677 (5th Cir. 1992)) (quoting *Cronin v. U.S. Dep't of*

*Agric.*, 919 F.2d 439, 443 (7th Cir. 1990))); *see also New River Valley Greens v. U.S. Dep't of*

*Transp.*, 161 F.3d 3 (4th Cir. 1998) (*per curiam*) (Table) (drolly explaining that NEPA "creates a

somewhat cumbersome procedure"); *Utah Int'l Inc. v. Andrus*, 488 F. Supp. 962, 973 (D. Utah

---

[4] Philip K. Howard was an advisor to Vice President Gore's Reinventing Government Initiative,
writing the introduction to his book on streamlining government.  *See* Vice President Al Gore,
COMMON SENSE GOVERNMENT: WORKS BETTER AND COSTS LESS (1995).

1979) ("the enactment of NEPA in 1969 has materially aided the transformation of federal coal leasing into a complicated and cumbersome process.  Substantial delays pending preparation of EISs and the implementation of new regulations appear to be inherent in such a labyrinthine process.").

In our modern economy, with our highly advanced financial markets, capital is also especially liquid and mobile.  A project delayed by "analysis paralysis" can often turn into a project that evaporates as capital flows elsewhere to a place where a return on investment can be achieved sooner and with more certainty— a phenomenon that harms our country as we struggle to compete with newer and nimbler modernized infrastructure buildouts by competitor nations, such as those in the BRICS block (Brazil, Russia, India, China, and South Africa).  *Cf., e.g.,* James W. Coleman, *Pipelines & Power-Lines: Building the Energy Transport Future*, 80 Ohio St. L.J. 263, 294 (2019) ("Apart from making energy transport more expensive, on the margin, expanded reviews will also make some energy transport projects not worth pursuing.  This too has costs.  There are the economic costs to consumers who are unable to purchase cheaper power and fuel and to the producers who cannot serve them.").  Additionally, one of the paradoxes of NEPA is that it is discouraging the updating of crumbling infrastructure through use of the latest technologies and adherence adhering to the latest environmental and safety standards.  In other words, slowing down infrastructure development can and does have the counterproductive effect of worsening the environment by perpetuating older risks taken on in past eras.

E.      **Modernizing the NEPA Regulations**

Following so many decades of NEPA practice, implementation, and litigation, CEQ took its first steps towards enhancing the efficiency of the process based on its decades of experience overseeing federal agency practice, by clarifying a number of key NEPA terms and requirements

that have frequently been subject to litigation.  In June 2018, CEQ issued an advance notice of proposed rulemaking (ANPRM) requesting comment on potential updates and clarifications to the CEQ regulations.  83 Fed. Reg. 28,591 (June 20, 2018).  (ANPRMs are optional not mandatory APA processes, so CEQ's taking of that step in 2018 reflected its commitment to soliciting new ideas and not remaining mired in the old ways of looking at NEPA.)  On January 10, 2020, CEQ published a notice of proposed rulemaking proposing to update its regulations for implementing the procedural provisions of NEPA.  85 Fed. Reg. 1,684 (Jan. 10, 2020).  CEQ received approximately 1,145,571 comments on the proposed rule.  85 Fed. Reg. at 43,306.

But even before CEQ could finalize the 2020 Rule, SELC filed a motion for preliminary injunction in this Court seeking to enjoin CEQ from finalizing the 2020 Rule until CEQ completed SELC's expansive document production request under FOIA.  After a hearing on that motion, Judge Conrad issued an order finding that the Court lacked authority to enjoin the rulemaking but requiring CEQ to produce documents by May 5, 2020.  *See* SELC Order at 16. Judge Conrad recognized the unprecedented nature of SELC's motion to enjoin an ongoing agency rulemaking, finding that "no court has ever granted such an injunction."  *Id.* at 11.  As Judge Conrad ruled, no court had ever granted such an unprecedented injunction because both the APA's "final agency action" requirement for judicial review and the *Vermont Yankee* doctrine (which prohibits courts from engrafting new procedural rules onto agency rulemakings) plainly foreclosed such an injunction.  *Id.* at 14-15 (discussing *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 524 (1978)).

On July 16, 2020, CEQ published its final rule modernizing and clarifying its regulations to facilitate more efficient, effective, and timely NEPA reviews by federal agencies.  The final rule simplified regulatory requirements, codified certain guidance and case law relevant to these

regulations, revised the regulations to reflect current technologies and agency practices, eliminated obsolete provisions, and improved the format and readability of the regulations.  85 Fed. Reg. at 43,306.  The revisions finalized in the rule advance the original objective of the 1978 regulations:  "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further the national policy to protect and enhance the quality of the human environment."  *Id.* at 43,313.

CEQ made various revisions in the 2020 Rule to align the regulations with the text of the NEPA statute, including revisions to reflect the procedural nature of the statute.  *Id.*  CEQ also revised the regulations to ensure that NEPA documents are as concise as possible and serve their purpose of informing decision makers regarding significant potential environmental effects of proposed major federal actions and informing the public of the environmental issues in the pending decision-making process.  *Id.*  CEQ made changes to ensure that the regulations reflect changes in technology, increase public participation in the process, and facilitate the use of existing studies, analyses, and environmental documents prepared by States, Tribes, and local governments.  *Id.*

In sum, in the 2020 Rule CEQ sought to provide greater clarity for federal agencies, States, Tribes, localities, and the public, and to advance the original goals of the CEQ regulations to reduce paperwork and delays and promote better decisions consistent with NEPA's policy objectives.

**F.      The Current Lawsuit Spearheaded by SELC as Counsel**

On July 29, 2020, SELC (on behalf of several client organizations) filed a 180-page

Complaint bringing a direct, facial challenge to the 2020 Rule.  Compl., ECF No. 1.[5]  The

Complaint alleges that the 2020 Rule violates NEPA and APA in various ways.  *Id.* ¶¶ 560-656.

The Complaint makes various allegations that the 2020 Rule *could* cause *other* federal agencies

to apply the 2020 Rule to *future* NEPA reviews in some way that *could* harm Plaintiffs' interests.

*Id.* ¶¶ 21-410.  But the Complaint does not tie its allegations of legal violations or harm to any

concrete, real-world application of the 2020 Rule.  And there have not been any such

applications yet.  Notwithstanding that omission, the Complaint asks the Court to vacate and set

aside the final rule and reinstate the 1978 regulations.  *Id.* ¶¶ A-G.

## STANDARD OF REVIEW

A motion to dismiss under Rule 12(b)(1) of the Federal Rules of Civil Procedure

challenges subject matter jurisdiction.  Plaintiffs bear the burden of establishing subject matter

jurisdiction.  *See Evans v. B.F. Perkins Co.*, 166 F.3d 642, 647 (4th Cir. 1999).  If the material

jurisdictional facts are not in dispute, and the moving party is entitled to judgment as a matter of

law, the Court should grant the Rule 12(b)(1) motion to dismiss.  *Id.*

---

[5] The vehemence of the suit and associated press releases would make one think that NEPA was
being abolished by regulation.  *See, e.g., Lawsuit: Government illegally 'cut corners' to ram
through NEPA changes* (Press Release) (July 29, 2020), *available at* https://www.
southernenvironment.org/news-and-press/news-feed/lawsuit-government-illegally-cut-corners-
to-ram-through-nepa-changes (last visited Aug. 25, 2020); *Feds gut cornerstone environmental
protection law* (July 15, 2020), *available at* https://www.southernenvironment.org/news-and-
press/news-feed/feds-gut-cornerstone-environmental-protection-law (last visited Aug. 25, 2020).
This is hyperbole.  EISs will continue; environmental assessments will continue.  CEQ remains
committed to enforcing NEPA.  But NEPA reviews can be accomplished faster and more cost
effectively, and with less litigation as compliance with the 2020 NEPA regulations phases in.

**ARGUMENT**

Article III of the United States Constitution limits the jurisdiction of federal courts to

"Cases" and "Controversies."  *See Bishop v. Bartlett*, 575 F.3d 419, 423 (4th Cir. 2009).

Effectuated by a cluster of overlapping doctrines—including standing and ripeness—the case-or-

controversy requirement serves both to maintain the separation of powers and to ensure that legal

issues "will be resolved, not in the rarified atmosphere of a debating society, but in a concrete

factual context conducive to a realistic appreciation of the consequences of judicial action."

*Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc.*, 454 U.S.

464, 472 (1982); *see also Clapper v. Amnesty Int'l. USA*, 569 U.S. 398, 408-09 (2013).

Here, well-established Article III principles as applied in the context of APA review—

and as articulated in a plethora of Supreme Court cases—demonstrate that Plaintiffs' facial

challenge to the 2020 Rule is not justiciable because it is not ripe and because Plaintiffs lack

standing.  As will be further explained below, Plaintiffs' challenge to the 2020 Rule is justiciable

only in the context of a challenge to a specific application of the 2020 Rule that causes actual,

concrete "real world" harm.  This is a kind of challenge Plaintiffs do not bring.

I. **In the absence of a live dispute over the application of the regulations to a particular project or decision, Plaintiffs' challenge is not ripe.**

A. **A regulation is ordinarily subject to APA review only as part of a challenge to a particular application of the regulation.**

The APA provided the basic procedures for this NEPA rulemaking.  *See* 5 U.S.C. §§ 551-

559 (especially § 553).  And it is the APA that provides the right of review for this rulemaking.

*Id.* at §§ 702, 706; *see also Jersey Heights Neighborhood Ass'n, v. Glendening*, 174 F.3d 180,

186 (4th Cir. 1999) (Because "NEPA itself [does not provide] a private right of action, all of

these claims lie under the [APA].").

To determine whether administrative action is ripe for judicial review under the APA, courts evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding review. *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967); *accord South Carolina v. United States*, 912 F.3d 720, 731 (4th Cir.), *cert. denied*, 140 S. Ct. 392 (2019) (rejecting claim based on chain of uncertain future events as unripe). In *NWF*, the Supreme Court explained that—in the absence of a private right of action

> permit[ting] broad regulations to serve as the "agency action," … a regulation is not ordinarily considered the type of agency action "ripe" for judicial review under the APA until the scope of the controversy has been reduced to more manageable proportions, and its factual components fleshed out, by some concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him.

497 U.S. at 891.

Subsequent decisions of the Supreme Court are to the same effect. In *Reno v. Catholic Social Services, Inc.*, 509 U.S. 43 (1993), the Court applied *NWF* in rejecting, as unripe, a challenge to regulations issued by the Immigration and Naturalization Service. Those regulations would be applied in individual agency adjudications to determine whether an alien was eligible for legalization, a particular form of immigration relief. The Court explained that newly promulgated regulations may be ripe for judicial review outside the context of any particular affirmative application by the agency *only* if the regulations "present[] plaintiffs with the immediate dilemma to choose between complying with newly imposed, disadvantageous restrictions and risking serious penalties for violation." *Id.* at 57 (citing, *inter alia*, *Abbott Labs.*, 387 U.S. at 152-53). The Court cited *NWF* for the proposition that, if such a dilemma is absent, "a controversy concerning a regulation is not ordinarily ripe for review under the [APA] until the regulation has been applied to the claimant's situation by some concrete action." *Id.* at 58. Noting that the regulations at issue in *Reno* "impose[d] no penalties for violating any newly

14

imposed restriction," the Court held that the plaintiffs' challenge would not be ripe until they had taken the steps necessary to cause the regulations to be applied to their own applications for legalization.  *Id.* at 58-59.  (We pause in setting forth the case law only to note that the CEQ NEPA regulations are merely about producing written analyses; they penalize no one.)

Similarly, in *National Park Hospitality Ass'n v. Department of the Interior*, 538 U.S. 803 (2003), the Court considered a facial challenge to a National Park Service regulation.  That regulation provided that its concession contracts "are not contracts within the meaning of" the Contract Disputes Act.  *Id.* at 806.  The Court concluded that the case was not ripe.  Applying the two-part *Abbott Labs* test, the Court found that there would be no undue hardship from withholding review.  The rule did not command anyone to do or refrain from doing anything, did not affect the concessioner plaintiff's primary conduct, and did not impose serious penalties for violations.  *Id.* at 809-10.  In addition, the Court held that the case was not fit for review, even though the question presented was purely legal and the rule constituted "final agency action."  The Court concluded that further factual development would "significantly advance our ability to deal with the legal issues presented."  *Id.* at 812 (citation omitted).  Accordingly, the Court held that "judicial resolution of the question presented here should await a concrete dispute about a particular concession contract."  *Id.*

Likewise, in *Ohio Forestry Ass'n v. Sierra Club,* 523 U.S. 726 (1998), the Court held that a facial challenge to a forest plan for a particular National Forest was not ripe for judicial review.  *Id.* at 732-37.  That review should instead focus on the application of the plan's provisions in agency decisions approving site-specific projects.  And in *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13 (D.C. Cir. 2006), the D.C. Circuit held that a facial challenge to the Bureau of Land Management's policies expressed in various strategy documents and a

budget request was not reviewable under the APA.  *Id.* at 18-21.  There, the challenged action

"represent[ed] the Bureau's latest plan to comply with its broad statutory mandate."  *Id.* at 21.

The D.C. Circuit found that "as a practical matter," the budget request and the policies embedded

within were not a "substantive rule" that "require[d] the parties affected to adjust their conduct as

soon as the rule is issued."  *Id.* at 20.  The D.C. Circuit thus rejected plaintiff's attack on a "broad

'programmatic' statement that [*NWF*] keeps from our review."  *Id.*; *see also City of New York v.

United States Dep't of Defense*, 913 F.3d 423, 433 (4th Cir. 2019) ("All governmental programs

are the aggregation of individual decisions, many of which are required by law. The APA

ensures that it is the individual decisions that are assessed as agency action, rather than the whole

administrative apparatus."); *Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d

186, 194 (4th Cir. 2013) ("The obvious inability for a court to function in such a day-to-day

managerial role over agency operations is precisely the reason why the APA limits judicial

review to discrete agency actions."); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 67 (2004)

("The prospect of pervasive oversight by federal courts over the manner and pace of agency

compliance with such congressional directives is not contemplated by the APA.").

> ### B.    No special circumstances justify direct review of the challenged regulation as a facial matter here.

Under *NWF*, one of two special circumstances—a special statutory provision authorizing

direct review of agency regulations within a specified period after their promulgation, or a

"substantive rule" requiring immediate adjustment of primary conduct under threat of serious

penalties—is ordinarily required in order to "permit broad regulations to serve as the 'agency

action' and thus to be the object of judicial review directly."  497 U.S. at 891.

Neither of those special circumstances is present here.  The NEPA statute does not

authorize any form of private action to challenge any CEQ or other agency actions under NEPA.

*Id*. at 882.[6]  And the 2020 Rule is procedural, not substantive, as it "neither require[s] nor forbid[s] any action on the part of" Plaintiffs or their members.  *Summers v. Earth Island Inst*., 555 U.S. 488, 493 (2009).  Indeed, Plaintiffs repeatedly recognize that neither NEPA nor the 2020 Rule bind them.  *See* Compl. ¶ 13 ("At the heart of NEPA's statutory scheme is an action-forcing process that is intended to ensure that decisionmakers [*i.e.*, federal agencies] take a 'hard look' at the impacts of their actions."); *see also Pub. Citizen*, 541 U.S. at 756-57 ("NEPA imposes only procedural requirements on federal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." (citing *Robertson*, 490 U.S. at 349-50)).  Instead, CEQ's prior regulations did—and soon the 2020 Rule will—only broadly influence and guide federal agencies' implementation of NEPA's procedural requirements.  There can be therefore no legitimate dispute that the 2020 Rule does not threaten Plaintiffs with the prospect of penalties of any kind, let alone serious penalties.  A suit challenging the rules in the context of some forthcoming, site-specific action subject to NEPA would therefore provide a fully "adequate remedy" under the APA for any legal defect in CEQ's 2020 Rule.  Challenges to agencies changing the *status quo* on the ground are where NEPA review typically has and should continue to take place.  Reliance by such agencies on

---

[6] When Congress expressly authorizes judicial review of agency regulations apart from any concrete application thereof, it often imposes constraints (such as a specified appellate-court venue and a short filing period) that are not applicable to APA actions generally.  *See*, *e.g.*, 42 U.S.C. § 7607(b)(1) (petition for review of an Environmental Protection Agency regulation of nationwide applicability under the Clean Air Act must be filed in the D.C. Circuit within 60 days of publication).  As to NEPA, Congress did not opt to create such a carefully calibrated judicial review provision explicitly authorizing an exception to the ordinary rule that facial challenges to regulations are not ripe.  In the Clean Air Act context, for instance, Congress saw a special need to confirm rapidly, and on a national basis, the validity of a new set of clean air regulations through the process of judicial review.

changes in the overarching CEQ NEPA regulations will occur and can be challenged at the point in time when those agencies engage in specific final actions.

    **C.**    **The APA and principles of equitable discretion support the conclusion that review of the 2020 Rule is available only in the context of a challenge to a specific application of the 2020 Rule.**

Two mutually reinforcing sets of controlling principles under the APA support the legal framework described above. *First*, the declaratory and injunctive remedies that Plaintiffs seek are equitable in nature. As the Supreme Court explained in *Abbott Labs,* such remedies are discretionary, and "courts traditionally have been reluctant to apply them to administrative determinations unless they arise in the context of a controversy 'ripe' for judicial resolution." 387 U.S. at 148; *see Reno*, 509 U.S. at 57; *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542-543 (1987); *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 311-313 (1982). Congress may, of course, override the equitable limitations that would otherwise apply by directing that particular categories of regulations will be directly reviewable on a pre-enforcement-review basis (at the behest of a plaintiff who can establish constitutional and prudential standing) as soon as they are promulgated. *See, e.g., Whitman v. Am. Trucking Ass'ns,* 531 U.S. 457, 479-80 (2001) (citing *Ohio Forestry* and explaining that the Clean Air Act's special review provision rendered a pre-enforcement challenge to regulations justiciable, whether or not the challenge would have been cognizable under the APA). Absent such a statutory directive, however, the ripeness principles discussed above define the manner in which and extent to which a reviewing court's equitable discretion should be exercised.

*Second*, the APA does not authorize direct and immediate judicial review of every agency action—only of "[a]gency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court." *Id.* § 704; *see also Lee v. U.S. Citizenship &*

18

*Immigration Servs.*, 592 F.3d 612, 619 (4th Cir. 2010) (explaining that the "judicial review provisions of the APA" provide a "*limited* cause of action" (emphasis added)).

An agency's promulgation of a substantive rule that "as a practical matter requires the plaintiff to adjust his conduct immediately," *NWF,* 497 U.S. at 891, is the principal example of an agency regulation that is subject to pre-implementation judicial review under that grant of authority.  In *Abbott Labs,* for example, the plaintiff's only alternative avenue for challenging the newly promulgated agency regulations would have been to *violate* the regulations and subject itself to a government enforcement action.  Although the regulated party could have challenged the validity of the regulations as a defense to that enforcement suit, it would have been subject to potential "serious criminal and civil penalties" if that challenge had been unsuccessful.  *See Abbott Labs.*, 387 U.S. at 153.

If a particular mode of review carries with it the prospect of serious penalties for an unsuccessful challenge, that mode of review ordinarily would not be "adequate" within the meaning of the APA.  But where, as here, judicial review can be deferred until a concrete application of a rule arrives in the form of a later decision and where no potential challenger is forced into the Hobson's Choice-style dilemma described in *Abbott Labs*, immediate pre-enforcement review of agency regulations is unavailable under the APA.  In those circumstances, judicial review of the agency's reliance on a rule in the site-specific decision (in most circumstances an agency "adjudication" or "license" in APA terms, *see* 5 U.S.C. § 551(6)-(9)) is a fully adequate remedy for any legal defect in the regulation.  *See Reno*, 509 U.S. at 60-61; *Toilet Goods Ass'n v. Gardner*, 387 U.S. 158, 165 (1967) (where non-compliance with an agency regulation would result in only a minor sanction, which could then be challenged in

court, "[s]uch review will provide an adequate forum for testing the regulation in a concrete situation").

That conclusion is especially compelling in the context of this case.  The 2020 Rule applies to federal agencies and does not regulate the public.  So it does not, for example, prescribe substantive standards for on-the-ground activities of the sort that could cause injury to individuals, including any of Plaintiffs' members who use the areas affected by such projects.  NEPA review is not the equivalent of a grant of a Clean Water Act National Pollution Discharge Elimination System permit or a refinery emissions permit under the Clean Air Act.  Rather, the NEPA regulations simply govern the *procedures* to be followed by federal agencies in conducting environmental reviews concerning federal actions subject to NEPA, including those possible site-specific projects and planning documents that are the focus of the Complaint.  The 2020 Rule thus can have no application until a specific federal action is under consideration.  *See Summers*, 555 U.S. at 493-94 (holding that respondent lacked standing to challenge the regulation in the abstract, apart from any concrete application that threatens imminent harm to his interests).  Plaintiffs' lawsuit challenging the 2020 Rule in the absence of a concrete application of its regulations therefore must be dismissed because it is not ripe.

> **D.  Immediate judicial review of the 2020 Rule would hinder the efforts of federal agencies to refine their policies.**

Driven by separation of powers concerns as much as the strictures of the APA, the Supreme Court also has found it relevant to the ripeness consideration whether immediate judicial review of agency regulations or programs would "hinder agency efforts to refine its policies."  *Ohio Forestry*, 523 U.S. at 735; s*ee also Reg'l Mgmt. Corp. v. Legal Servs.*, 186 F.3d 457, 465 (4th Cir. 1999) ("fitness for judicial decision" turns in part on "the agency's interest in

crystallizing its policy before that policy is subject to review") (quotation omitted)).  This factor also weighs in favor of concluding that a facial challenge to the 2020 Rule is not justiciable.

Before the 2020 Rule can be applied to site-specific actions, CEQ and federal agencies must begin implementing the procedural rule.  The new CEQ rule is, in effect, a meta-rule, not a rule that governs primary conduct.  The 2020 Rule does not even become effective until September 14, 2020.  Moreover, federal agencies, in consultation with CEQ, will develop and then propose for public comment agency-specific NEPA procedures in response to the 2020 Rule.  *See* 85 Fed. Reg. at 43,373-74 (40 C.F.R. § 1507.3).  In addition to conforming revisions, the 2020 Rule instructs agencies to develop and include in their implementing procedures processes unique to each agency, as necessary.  The 2020 Rule directs agencies to develop "agency NEPA procedures to improve agency efficiency and ensure that agencies make decisions in accordance with the Act's procedural requirements."  *See* 85 Fed. Reg. at 43,373.

Under these circumstances, allowing a facial challenge to the 2020 Rule to proceed at this point would "hinder agency efforts to refine [their] policies."  *Ohio Forestry*, 523 U.S. at 735.  In these and many other ways, the 2020 Rule requires federal agencies to rethink and then revise how the CEQ regulations will be implemented in the light of their existing statutory authorities, the regulations implementing those authorities, and other administrative processes.  Many of these changes will be developed as part of public processes under the requirements of the 2020 Rule.  85 Fed. Reg. at 43,373 ("Agencies shall provide an opportunity for public review and review by the Council for conformity with the Act and the regulations in this subchapter before adopting their final procedures.").  Federal agencies will no doubt need to consider revisions to their procedures to implement the 2020 Rule and facilitate compliance for site-specific projects and planning processes subject to NEPA.  Critically, "[t]o prevail in such a facial challenge,"

21

Plaintiffs "must establish that no set of circumstances exists under which the [regulation] would be valid." *Reno v. Flores*, 507 U.S. 292, 300 (1993) (citation omitted).  With all of these further regulatory process yet to occur, it is entirely speculative for Plaintiffs to make such claims now.

In the absence of a site-specific application, Plaintiffs' challenge to the 2020 Rule is both unmanageable and relies on speculation about future applications.  Moreover, to the extent they might be harmed by some concrete application of the procedures contained in the 2020 Rule, Plaintiffs would suffer no hardship from waiting to bring their challenge until it materializes and solidifies.  At this time, Plaintiffs cannot allege a cognizable injury-in-fact.  But they are free to seek judicial review of the relevant agency action if their now-speculative alleged harms ever become concrete and particularized.  Like standing, "[a] claim is not ripe for judicial review 'if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all.'"  *South Carolina*, 912 F.3d at 730 (quoting *Scoggins v. Lee's Crossing Homeowners Ass'n*, 718 F.3d 262, 270 (4th Cir. 2013)); *see also Franks v. Ross*, 313 F.3d 184, 195 (4th Cir. 2002) (explaining that a dispute is not ripe when additional procedural steps and agency assessments remain).  Allowing for judicial review in this case—before CEQ and other federal agencies have even attempted to determine how they would apply the 2020 Rule—would interfere in numerous agencies' environmental review processes and embroil this Court in an abstract challenge to a government-wide program that does not raise any special circumstances justifying direct review.

At this point, no one can say with any certainty if the first concrete application of the new NEPA regulations will arise in a General Services Administration building project for a new federal courthouse, a Department of Transportation case about a new off-ramp from a highway, a Federal Energy Regulatory Commission regulation involving wholesale energy markets, a Federal Communications Commission order concerning 5G networks, a Bureau of Land

Management easement for an electric transmission line for a wind or solar farm, or a new Department of Housing and Urban Development fair housing initiative—or any one of hundreds of other federal agency contexts and permutations of new rules, new adjudications, or new orders that hybridize rulemaking and adjudication procedures.  And when application of a promulgated rule presents such a black box, facial challenges to the overarching promulgated rule are surely not ripe.  *See South Carolina*, 912 F.3d. at 730 (just as standing cannot be premised on a "highly attenuated chain of possibilities," a claim is not ripe "if it rests upon contingent future events." (quotation and citation omitted)); *see, e.g., Save Our Sound OBX, Inc. v. N. Carolina Dep't of Transportation*, 914 F.3d 213, 228 (4th Cir. 2019) ("[C]hallenges to agency decisions that are yet to be made are not ripe for review." (citing *Pashby v. Delia*, 709 F.3d 307, 317 (4th Cir. 2013)).

 A suit challenging the rules in the context of some forthcoming, site-specific action subject to NEPA would therefore provide a fully "adequate remedy" under the APA for any legal defect in the rules.  Plaintiffs' lawsuit is not such a site-specific creature and thus it must be dismissed because it is not ripe.

## II.  In the absence of a live dispute over the concrete, site-specific application of the 2020 Rule, Plaintiffs lack standing.

For similar reasons, Plaintiffs lack Article III standing.  To establish Article III standing, a plaintiff must allege facts showing that (1) it suffered an injury-in-fact, (2) that it is fairly traceable to the defendant's conduct, and (3) that it is "likely," and not "merely speculative, that the injury will be redressed by a favorable decision."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992) (citation and internal quotation marks omitted).  The elements of standing must exist at the time the complaint is filed.  *Id.* at 570 n.5 ("standing is to be determined as of the commencement of suit.").  "Where, as here, a case is at the pleading stage, the plaintiff must clearly . . . allege facts demonstrating each element."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540,

1547 (2016) (citations and internal quotation marks omitted).  A straightforward application of the Supreme Court's decision in *Summers v. Earth Island Institute* demonstrates that Plaintiffs lack standing to bring a facial challenge to the 2020 Rule.

      **A.**    ***Summers* forecloses Plaintiffs' lawsuit.**

Like respondents in *Summers*, Plaintiffs challenge a rule that "neither require[s] nor forbid[s] any action" on their part.  "[W]hen the plaintiff is not [it]self the object of the government action or inaction [it] challenges, standing is not precluded, but is ordinarily 'substantially more difficult' to establish."  *Defenders of Wildlife*, 504 U.S at 562 (quoting *Allen v. Wright*, 468 U.S. 737, 758 (1984)).  Plaintiffs "can demonstrate standing only if application of the [2020 Rule] by the Government will affect" Plaintiffs in a way that threatens to impose an "'injury in fact' that is concrete and particularized."  *Summers*, 555 U.S. at 493-494.  That threat of "'concrete' injury must be '*de facto*'; that is, it must actually exist."  *Spokeo, Inc*., 136 S. Ct. at 1548.  It also "must be actual and imminent [*i.e.*, certainly impending], not conjectural or hypothetical." *Summers*, 555 U.S. at 493; *see also Whitmore v. Arkansas*, 495 U.S. 149, 158 (1990); *Beck v. McDonald*, 848 F.3d 262, 271 (4th Cir. 2017) (explaining that "certainly impending" injury cannot be premised on a "highly attenuated chain of possibilities" (citing *Clapper*, 568 U.S. at 410)).  Combined, these requirements ensure that the alleged injury is not too speculative for Article III purposes, *see South Carolina*, 912 F.3d at 727 (citing *Clapper*, 568 U.S. at 410), and "that 'there is a real need to exercise the power of judicial review in order to protect the interests of the complaining party.'"  *Summers*, 555 U.S. at 493 (quoting *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 221 (1974)).

In *Summers*, the Supreme Court applied these deep-rooted standing principles to a suit brought by environmental organizations challenging the Forest Service's adoption of regulations

setting out general procedural rules governing administrative review of some future projects

(much like NEPA).  555 U.S. at 490-91.  The organizations challenged both the procedural

regulations themselves and a particular application of the regulations to the Burnt Ridge Project.

*Id.* at 491.  By the time the case came to the Supreme Court, the parties had settled their dispute

concerning the Burnt Ridge Project, leaving only the plaintiffs' challenge to the regulations in

the abstract.  *Id.* at 491-92, 494.  The Supreme Court held that the organizations did not have

standing to challenge the regulations after the settlement because plaintiffs failed to demonstrate

that the government had applied the regulations to any other particular project that would

imminently harm one of their members.  *Id.* at 492-96.  According to the Supreme Court, there is

> no precedent for the proposition that when a plaintiff has sued to challenge the
> lawfulness of certain action or threatened action but has settled that suit, he retains
> standing to challenge the basis for that action (here, the regulation in the abstract),
> apart from any concrete application that threatens imminent harm to his interests.

*Id.* at 494.  "Such a holding," the Supreme Court continued, "would fly in the face of Article III's

injury-in-fact requirement."  *Id.*

Just as in *Summers*, Plaintiffs' challenge presents precisely the sort of review—

untethered to a concrete factual context—that flies in the face of Article III.  Plaintiffs assert

fears and concerns that the 2020 Rule will result in future project approvals premised on "less

robust" NEPA analyses, predictions of diminished access to information and public participation,

and projected resource expenditures on additional future litigation, information gathering, and

early commenting.  *See* Compl. ¶¶ 38-41, 44, 46-49, 66-73, 100-02, 122-24, 144-48, 165-66,

171, 183, 192-95, 214-22, 236-42, 254-58, 303, 305-10, 332, 343-46, 358-64, 378-83, 397, 402,

409.  But none of these hypothetical future projects have been developed under the 2020 Rule.

And Plaintiffs offer only speculation about how, when, and where the 2020 Rule will be applied.

These speculative claims are followed by further conjecture about how the 2020 Rule as applied

to possible future projects would result in injury.  But it is not sufficient to recite that they are harmed because the 2020 regulations *could* allegedly cause *other* federal agencies to apply the 2020 Rule to *future* NEPA reviews in an attenuated chain of events that *could* lead to environmental harm.[7]  Even before *Summers*, it was well established that "[a]llegations of possible future injury do not satisfy the requirements of Art[icle] III."  *Whitmore*, 495 U.S. at 158.

As the Supreme Court recognized in *Summers*, typically only concrete applications of regulations in the context of ground-disturbing actions have the potential to cause injuries in fact to a citizen's interests.  Thus, challenging a concrete application of a regulation is necessary to the Article III analysis.  In fact, even before *Summers*, the Supreme Court recognized that programmatic challenges disconnected from challenges to specific applications of the program (such as through a project approval) were "rarely if ever appropriate for federal-court adjudication."  *Defs. of Wildlife*, 504 U.S. at 568 (quoting *Allen*, 468 U.S. at 759-60).

---

[7] For the same reasons, Plaintiffs also cannot sustain the specific requirements of representational or organizational standing.  Plaintiffs mainly focus on the alleged harms to their members, rather than injuries to their own interests.  But Plaintiffs cannot establish representational standing because they failed to "make specific allegations establishing that at least *one identified member* had suffered or would suffer harm" from a concrete application of the 2020 Rule.  *S. Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC*, 713 F.3d 175, 184 (4th Cir. 2013) (emphasis added) (quoting *Summers*, 555 U.S. at 498).  For those few allegations of organizational harm, Plaintiffs have not met the minimum organizational standing requirements because the alleged facts relate only to claimed injuries to their future advocacy efforts.  *See Lane v. Holder*, 703 F.3d 668, 675 (4th Cir. 2012); *see also Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 919 (D.C. Cir. 2015) ("The court has distinguished between organizations that allege that their activities have been impeded from those that merely allege that their mission has been compromised."); *Ctr. for Responsible Sci. v. Gottlieb*, 346 F. Supp. 3d 29, 40 (D. D.C. 2018) (plaintiff organization's claim that "it ha[d] diverted its organizational resources to picking up the slack left from [the agency's] desertion of its duties" did not demonstrate standing because organization did not identify "any activity predating [the challenged action] that [wa]s made more difficult by [challenged action]").

**B.      Plaintiffs' rank speculation about pending and future projects and allegations of possible future injury are insufficient.**

For a number of reasons apart from *Summers*, Plaintiffs' allegations about pending and future projects or decisions fall far short of an injury in fact.

*First*, Plaintiffs have not brought suit against any particular site-specific application of the 2020 Rule, and thus none are before the Court. *See Summers*, 555 U.S. at 497 (holding that because the "Burnt Ridge is now off the table" and thus not before the Court, that project cannot be used as a basis for Article III standing).

*Second*, even if Plaintiffs had attempted to challenge a pending project or decision, this Court would lack jurisdiction over those pending decisions because they are not final. As Judge Conrad concluded in rejecting SELC's earlier attempt to short-circuit the then-ongoing CEQ rulemaking, only "final" agency actions are subject to judicial review under the APA. *See* SELC Order at 14-16; 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). A "final" agency action must be the "consummation of the agency's decisionmaking process . . . [and] must be [an action] by which rights or obligations have been determined, or from which legal consequences will flow." *Invention Submission Corp. v. Rogan*, 357 F.3d 452, 459 (4th Cir. 2004) (quoting *Bennett v. Spear*, 520 U.S. 154, 178 (1997)). By their very nature, pending projects or decisions do not satisfy this definition and thus are not reviewable under the APA.

*Third*, none of these pending or future projects or decisions have applied the 2020 Rule. The 2020 Rule does not even become effective until September 14, 2020. Moreover, agency-specific processes are often governed by separate substantive statutes that control agency decision-making and not just by the APA alone (the APA provides a default set of procedures that apply if Congress does not provide more specific structure for matters such as the

promulgation of regulations, the public-commenting processes, and judicial review).  How the 2020 Rule will fit into those processes is largely left to agency discretion.  Thus, the when, the where, and the how of the 2020 Rule's application to a specific project or decision is within the control of other federal agencies, not CEQ.  *See supra* § I.D.

It is pure speculation for Plaintiffs to claim a fear of future injury stemming from the 2020 Rule's potential application.  For example:

- Plaintiffs speculate about the 2020 Rule's impact on pending U.S. Forest Service ("Forest Service," an agency within the U.S. Department of Agriculture) decisions.  Compl. ¶¶ 39, 44, 66-73, 79, 101, 236-38, 253-55, 300-03, 378, 380-81.  Neither Plaintiff nor CEQ know what the Forest Service will require in the next phases of its pending decision-making processes.  In spite of the new NEPA regulations, and as to anything where a member would have standing and wish to object, the Forest Service may end up making the exact same substantive decisions as it would have under the prior CEQ regulations.

- Plaintiffs express concerns that under the 2020 Rule the Forest Service will fail to consider the impacts of its proposed projects, including their indirect and cumulative impacts.  *Id.* ¶¶ 39, 44, 46, 66-73, 87, 238-41, 254-55, 300-03, 378, 381.  But the 2020 Rule replaces the concepts of indirect and cumulative impacts with a more straightforward requirement to consider "those effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action" consistent with case law, including from the Supreme Court, that bounded all effects analysis.  85 Fed. Reg. at 43,331.  The Forest Service might consider all the impacts that Plaintiffs speculate may not be considered

under that standard.  Importantly, this proximate-cause analysis approach to

NEPA was already the approach the Supreme Court has applied in cases such as

*Public Citizen*.  *See* 541 U.S. at 767 ("NEPA requires 'a reasonably close causal

relationship' between the environmental effect and the alleged cause . . . [akin] to

the 'familiar doctrine of proximate cause from tort law.") (quoting *Metropolitan

Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 (1983)).  Even

before the new reforms, NEPA analysis was not limitless.

- Plaintiffs similarly express concerns that under the 2020 Rule the Forest Service

  and other federal agencies may not consider a full range of alternatives to their

  proposed actions.   Compl. ¶¶ 39, 44, 46, 101, 123-24, 144, 169, 214, 258, 378,

  381.  But, just as the 1978 regulations had been interpreted, the 2020 Rule

  requires these agencies to consider a reasonable range of alternatives.  85 Fed.

  Reg. at 43,351.  And, just as the Supreme Court required in *Public Citizen*,

  Plaintiffs have an obligation under the 2020 Rule to alert agencies to particular

  alternatives or forfeit their challenges to the agency's alternatives analysis in a

  subsequent lawsuit.  *See Public Citizen*, 541 U.S. at 764; 85 Fed. Reg. at 43,317.

  So citizens can alert agencies to reasonable alternatives and agencies have an

  incentive to consider such alternatives to avoid litigation.  It is therefore pure

  conjecture that under the 2020 Rule the Forest Service or other agencies might not

  properly consider alternatives to their proposed actions.

- Plaintiffs speculate that the 2020 Rule "will lead to delays and confusion for the

  developers of solar projects by limiting the federal resources devoted to

  complying with NEPA, slowing the development of . . . solar energy

29

infrastructure and forcing reliance on dirtier fuel sources for longer."  Compl. ¶

104.  But it is more likely that the 2020 Rule will speed solar energy projects by

reducing confusion and improving agency coordination.  After all, the 2020

Rule's express goal is to "[t]o reduce paperwork, to reduce delays, and at the

same time to produce better decisions."  85 Fed. Reg. at 43,313.  It is not possible,

at this time, to say that the 2020 Rule will adversely impact these future projects.[8]

And certainly, as a general meta-regulation, the 2020 Rule is not targeted at the

solar industry.

- Plaintiffs speculate that they may be harmed by a future private action facilitated
  in part by Farm Service Agency (FSA) and Small Business Administration (SBA)
  loan guarantees, which the 2020 Rule exempts from NEPA because loan
  guarantees to private parties are not *major federal* actions (85 Fed. Reg. at
  43,348).  Compl. ¶¶  325, 363, 462, 483.  But, of course, Plaintiffs cannot say
  when and even if any loan guarantee will be given to a private party that will
  cause any concrete harm to their interests.  If any such concrete harm materializes
  in the future, Plaintiffs can bring an action against the FSA or SBA, respectively,
  alleging harm due to the implementation of the 2020 Rule.  And that is the kind of
  APA Section 704-compliant action Congress has required and that the
  constitutional justiciability requirements of standing and ripeness demand.

In sum, Plaintiffs' fears are premised on speculation about what these federal agencies

might do or require someday in the future, which plainly does not satisfy the requirements of

---

[8] It also should be noted that alternative energy-source providers support the 2020 Rule.  *See, e.g.,* the public statement of the American Wind Energy Association, *available at* https://www.awea.org/nepa-review-process-statement, last visited (Aug. 24, 2020).

Article III.  *See Whitmore*, 495 U.S. at 158 ("allegations of possible future injury do not satisfy the requirements of Art. III."); *Buscemi v. Bell*, 964 F.3d 252, 260 (4th Cir. 2020) (holding that plaintiff's "claim of injury fail[ed] because it depend[ed] on [a] speculative proposition").  This sort of open-ended conjecture about pending and future projects embody the very "conjectural or hypothetical" injuries that are not "concrete and particularized" and "actual or imminent" and thus do confer standing.  *See Defs. of Wildlife*, 504 U.S. at 560; *see also South Carolina*, 912 F.3d at 727 ("alleged harm is too 'speculative' to support Article III standing when the harm lies at the end of a 'highly attenuated chain of possibilities.'") (quoting *Clapper*, 568 U.S. at 410). And even when federal agencies apply the 2020 Rule, Plaintiffs would still need to show the injury "fairly traceable" to the changes of the 2020 Rule.  *See Defs. of Wildlife*, 504 U.S. at 560 ("there must be a causal connection between the injury and the conduct complained of—the injury has to be "fairly ... trace[able] to the challenged action of the defendant" (citation and internal quotation marks omitted)).

*Fourth*, Plaintiffs' speculation about pending and future projects and harms only serves to expose the generalized nature of their grievances with the 2020 Rule.  Plaintiffs' specific complaints about the 2020 Rule itself—its alleged narrowing of public comment by requiring specificity, limits on analysis and information, etc.—are common to all members of the public. But "standing to sue may not be predicated upon an interest . . . which is held in common by all members of the public, because of the necessarily abstract nature of the injury all citizens share." *Schlesinger*, 418 U.S. at 220.  "Vindicating the *public* interest (including the public interest in Government observance of the Constitution and laws) is the function of Congress and the Chief Executive," not private plaintiffs.  *Defs. of Wildlife*, 504 U.S. at 576; *see also Virginia ex rel. Cuccinelli v. Sebelius*, 656 F.3d 253, 271 (4th Cir. 2011) (rejecting state's standing argument on

31

ground that it would convert "the federal judiciary into a 'forum' for the vindication of a state's 'generalized grievances about the conduct of government' ") (quoting *Flast v. Cohen*, 392 U.S. 83, 106 (1968)).  Indeed, the Fourth Circuit has emphasized that the judiciary is "woefully ill-suited [] to adjudicate generalized grievances asking us to improve an agency's performance or operations."  *City of New York*, 913 F.3d at 431 (the resulting "obey the law" injunctions or "day-to-day oversight" of the government in response to generalized grievances are "foreclosed by the APA, and rightly so.").  The lack of concrete, particularized harms is another reason why Plaintiffs must wait for a specific application of the 2020 Rule before bringing an action in court.

In sum, because Plaintiffs fail to allege the kinds of concrete and particularized injuries that may only come from real-world applications of the 2020 Rule which they do not challenge, they lack Article III standing.

## C.   Plaintiffs' claims of amorphous "procedural" and "informational" injuries do not satisfy Article III.

Having failed to learn the lessons of *Summers*—and having shown no actual or imminent concrete harm caused by the 2020 Rule—Plaintiffs turn to dubious claims of so-called procedural and informational injuries.  But because these claims are not attached to a real-world application of the 2020 Rule, Plaintiffs' alternative theories for standing fail for the same reason as their primary theory.  For "a bare procedural violation, divorced from any concrete harm," cannot satisfy the injury-in-fact requirement.  *Spokeo, Inc.*, 136 S. Ct. at 1549.

### 1.   Mere deprivation of an alleged procedural right without concrete harm is not justiciable under Article III.

The Supreme Court also has rejected Plaintiffs' alternative theory that it has standing to redress so-called procedural harm.  *See Summers*, 555 U.S. at 496-97.  As here, the respondents in *Summers* argued that they had standing to bring their challenge because they claimed to had

suffered procedural injury, namely, that the challenged regulations would affect their ability to influence agency actions through public comment. *Id.* at 496. The Supreme Court rejected that argument, holding that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is insufficient to create Article III standing." *Id.* "Only a 'person who has been accorded a procedural right to protect *his concrete interests* can assert that right. . . .'" *Id.* (quoting *Defs. of Wildlife*, 504 U.S. at 572 n.7 (emphasis added in *Summers*)); *see also Baehr v. Creig Northrop Team, P.C.,* 953 F.3d 244, 252, 258 (4th Cir. 2020); *Wilderness Soc'y, Inc. v. Rey*, 622 F.3d 1251, 1255 (9th Cir. 2010). Because the respondents in *Summers* failed to challenge a concrete application of the regulations, the Supreme Court found that the alleged procedural violation was not justiciable. *Summers*, 555 U.S. at 497; *see also Phillips v. Trans Union, LLC*, No. 3:16-CV-00088, 2017 WL 3911018, at *2 (W.D. Va. Sept. 6, 2017) ("a mere procedural violation of [a statute] that produces no 'concrete and particular' injury will not be justiciable."). This Court should reach the same conclusion because Plaintiffs likewise do not challenge a concrete application of the 2020 Rule. Plaintiffs' allegation of "procedural" harm adds nothing to their purported standing. It, too, fails because Plaintiffs cannot show actual and imminent harm caused by the mere appearance of the 2020 Rule in the Federal Register.

### 2. Plaintiffs so-called informational injuries are also not justiciable under Article III.

Plaintiffs' attempt to reframe their procedural deprivation "in terms of informational loss," *Rey*, 622 F.3d at 1260, also fails. A plaintiff suffers a cognizable informational injury when it is (1) denied "access to information to which he is legally entitled" and (2) "the denial of that information creates a 'real' harm with an adverse effect." *Dreher v. Experian Information Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (citation omitted); *accord Fed. Election Comm'n v.*

33

*Akins*, 524 U.S. 11, 21 (1998).  Thus, Plaintiffs must identify imminent and concrete harms here

too.  For, "it would be an end-run around the qualifications for constitutional standing if any

nebulous frustration resulting from a statutory violation would suffice as an informational

injury." *Dreher*, 856 F.3d at 346.

In any event, even if NEPA grants Plaintiffs a legal entitlement to information—and it

does not, *see infra* p. 36-37—Plaintiffs identify no cognizable harms resulting from a mere

denial of information.  Instead, the harms that Plaintiffs identify are purely speculative.  When

the 2020 Rule is eventually applied, they anticipate, it will result in less robust reviews that lack

information to which they are entitled.  *See, e.g.*, Compl. ¶¶ 39, 44, 66, 67, 70, 122, 169, 300,

324.  But groundless speculation about how the 2020 Rule might be applied in the future does

not carry Plaintiffs' burden to identify imminent harm now.  *See Beck v. McDonald*, 848 F.3d

262, 274 (4th Cir. 2017).

Plaintiffs' alleged informational harms are also insufficiently concrete.  Plaintiffs assert,

for example, that the preparation of less robust NEPA reviews will deprive them of information

necessary to "inform [their] advocacy," Compl. ¶ 39; will prevent them from "fully

participat[ing] in the NEPA process," *id.* ¶¶ 66-73, 122, 124, 300-03; and will eliminate their

ability to "communicate with decisionmakers," *id.* ¶ 152.[9]  But alleged harms of that sort,

---

[9] In addition to being insufficiently concrete to confer standing, Plaintiffs assertions are
misguided because the newly reformed NEPA regulations invite public comments at particularly
meaningful points in time compared to the 1978 regulations, precisely so that agencies get public
input on their actions early to allow for better NEPA analyses.  *See* 85 Fed. Reg. at 43,314
(discussing the 2020 Rule provisions that "bring relevant comments, information, and analyses to
the agency's attention, as early in the process as possible").  Communication with no one is
being shut down—Plaintiffs assertions do not accord with what the 2020 Rule actually says.
*Compare*, *e.g.*, 40 C.F.R § 1501.4(b) (2019) (the then-codified version of the 1978 regulations)
("The agency shall involve environmental agencies, applicants, and the public, to the extent
practicable in preparing assessment required by [these regulations]"), *with* 40 C.F.R. 1501.5(e)

without more, do not support standing. *Friends of Animals v. Bernhardt*, 961 F.3d 1197, 1208 (D.C. Cir. 2020) (holding that organization lacked standing where agency action affected only organization's "interests in advocacy, participating in administrative proceedings, and lobbying"); *see S. Walk,* 713 F.3d at 183 (explaining that "an injury to an organizational purpose" by itself, does not support standing).

If Plaintiffs decide in the future to spend resources submitting requests for supplemental information or collecting information on their own, *see, e.g.*, Compl. ¶¶ 48, 82, 199, 305, 368, those decisions do not amount to cognizable harms, either.  A "voluntary budgetary decision, however well-intentioned, does not constitute Article III injury, in no small part because holding otherwise would give carte blanche for any organization to 'manufacture standing by choosing to make expenditures' about its public policy of choice." *CASA de Md., Inc. v. Trump*, No. 19-2222, 2020 WL 4664820, at *9 (4th Cir. Aug. 5, 2020) (quoting *Clapper*, 568 U.S. at 402). "Resource reallocations motivated by the dictates of preference," do not support standing where "no action by the defendant has directly impaired the organization's ability to operate and to function." *Id.*; *see also Lane*, 703 F.3d at 675 (explaining that an organization's decision to spend resources educating members or undertaking litigation are not cognizable injuries).

In addition, the "fact that an organization redirects some of its resources to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization." *Ass'n for Retarded Citizens v. Dallas Cnty. Mental Health & Mental Retardation Ctr. Bd. of Trs.*, 19 F.3d 241, 244 (5th Cir. 1994).  Nor does an impact upon an organization's advocacy or educational initiatives constitute injury in fact. *Nat'l Taxpayers*

---

(2020) ("Agencies shall involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental assessments.").

*Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995); *see also Nat'l Ass'n of Home Builders v. EPA*, 667 F.3d 6, 12 (D.C. Cir. 2011).

Because Plaintiffs have not satisfied the second part of the informational standing inquiry, the Court need not consider whether they have also satisfied the first.  In any event, they have not.  Plaintiffs cite NEPA.  But the purpose of NEPA is to facilitate informed agency decisionmaking through the preparation of environmental impact statements.  42 U.S.C. § 4332(2)(C).  Unlike statutes that sustain informational standing, like FOIA, *see Rey*, 622 F.3d at 1258 (collecting cases), nothing in NEPA's texts reveals a congressional intent to confer a legally actionable right to information on the public, the violation of which amounts to Article III injury.  Again, NEPA affords no private right of action of any kind.  *See Jersey Heights*, 174 F.3d at 186.  Review of NEPA analysis takes place only consistent with the APA's strictures.

To be sure, the publication of EISs benefits members of the public interested in learning about an agency's activities.  But those benefits are *incidental* to NEPA's primary mandate of informed decisionmaking, and are therefore not enough to satisfy the first part of the informational injury test.  *See Rey*, 622 F.3d at 1259.  Plaintiffs' claims of informational injury fail for this reason too.

## III.   The Court has no jurisdiction to review the procedures federal agencies will use in future decisionmaking.

Plaintiffs also claim that "because the Rule will apply to more than one hundred federal agencies, there is significant interest in clarifying its legality prior to implementation."  *See* Reply in Support of Mot. to Expedite, at 5, ECF No. 33.  In their view, "it is imperative" the Court decide their claims "before the 'bureaucratic gears' begin to turn."  *Id.*  But courts have even less claim to Article III jurisdiction to review how these many agencies' may or may not use the procedures established in the 2020 Rule before taking final agency actions.  If anything,

the broad scope of Plaintiffs' attack counsels *against* judicial review, not in favor of it. *Cf.*
*Moore v. Sims*, 442 U.S. 415, 427 (1979) ("The breadth of a challenge to a complex state
statutory scheme has traditionally militated in *favor* of abstention, not *against* it.").

Plaintiffs' attorneys have tried this line of argument before, and failed. As Judge Conrad
ruled in rejecting SELC's motion for preliminary injunction in the FOIA suit, under the APA
"parties may only seek judicial relief from "[a]gency action made reviewable by statute and final
agency action for which there is no other adequate remedy." *See* SELC Order at 14-15 (citing 5
U.S.C. § 704); *see also Bennett*, 520 U.S. at 177-78 (discussing finality requirements). "At that
point [and only at that point], courts may examine 'preliminary, procedural, or intermediate
agency action' after 'the final agency action.'" SELC Order at 15 (quoting 5 U.S.C. § 704).

Relatedly, the APA's minimum procedural requirements, along with any additional
procedures that agencies impose on themselves, provide the "maximum procedural
requirements" governing agency proceedings. *See Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92,
102 (2015) (citing *Vt. Yankee*, 435 U.S. 549). Beyond those requirements, the Supreme Court
has said, a court generally cannot impose its views "on which procedures are 'best' or most
likely to further some vague, undefined public good." *Id.* (citing *Vt. Yankee*, 435 U.S. at 549).
"To do otherwise would violate 'the very basic tenet of administrative law that agencies should
be free to fashion their own rules of procedure.'" *Id.* (citing *Vt. Yankee*, 435 U.S. at 544).

As noted, Congress may direct that particular categories of regulations be directly
reviewable as soon as they are promulgated as it has, for example, for some rulemakings under
the Clean Air Act. *See*, *e.g.,* 42 U.S.C. § 7607(b)(1); *see also* 33 U.S.C. § 1369(b)(1)(F).
Perhaps Plaintiffs wish that Congress had enacted such a special review provision for NEPA
rulemakings. But it has not done so. And in view of Congress' choice not to enact such a

special provision for NEPA rulemakings, the clear limits that Congress placed on judicial review in the APA should be respected. *Vermont Yankee* thus provides a further basis for holding that this challenge is not ripe. Granting a preliminary injunction in this context would amount to providing, via a judicial remedy, the very kind of pre-enforcement review procedures Congress opted *not* to create in NEPA.

Thus, courts do not have jurisdiction to intervene in ongoing agency proceedings to tell those agencies which procedures should govern their deliberations or to stop a so-called bureaucratic steamroller effect (the latter being a naked policy argument that is best directed at Congress). Under the APA, as relevant, courts only have jurisdiction to review *final* agency actions after the agencies' deliberations conclude, and to set aside those actions found to be arbitrary, capricious, or contrary to law. 5 U.S.C. §§ 704, 706. (Final means final: the finality requirement is not a common-law doctrine of administrative law designed to be filled in with judicial exceptions; it is a statutory requirement.) The Supreme Court has made clear, this "is assuredly not as swift or as immediately far-reaching a corrective process as those interested in systemic improvement would desire. Until confided to [the courts], however, more sweeping actions are for the other branches." *NWF*, 497 U.S. at 894.

## CONCLUSION

For the foregoing reasons, the Court should grant the motion to dismiss.

Dated: August 25, 2020

DJ # 90-1-4-16098

Respectfully submitted

THOMAS T. CULLEN
United States Attorney

*/s/ Krista Consiglio Frith*
Assistant United States Attorney
Virginia Bar No. 89088
United States Attorney's Office
P.O. Box 1709
Roanoke, VA 24008
TEL (540) 857-2250
FAX (540) 857-2614
Krista.frith@usdoj.gov

JEFFREY BOSSERT CLARK
Assistant Attorney General
JONATHAN BRIGHTBILL
Principal Deputy Assistant Attorney General
PAUL SALAMANCA
Senior Counsel

*/s/Barclay T. Samford*
BARCLAY T. SAMFORD
NM State Bar No. 12323
Senior Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1475
E-mail: clay.samford@usdoj.gov

ALLEN M. BRABENDER
Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Appellate Section
Post Office Box 7415
Washington, D.C. 20044
Tel: (202) 514-5316
E-mail: allen.brabender@usdoj.gov

STEVEN W. BARNETT
Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Law and Policy Section
Post Office Box 7415
Washington, D.C. 20044
Tel: (202) 514-1442
E-mail: steven.barnett@usdoj.gov

MATTHEW R. OAKES
Senior Counsel
U.S. Department of Justice
Environment and Natural Resources Division
Law and Policy Section
Post Office Box 7415
Washington, D.C. 20044
Tel: (202) 514-1442
E-mail: matthew.oakes@usdoj.gov

CLARE BORONOW
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1362
clare.boronow@usdoj.gov