**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

|  |  |  |
|---|---|---|
| | ) | |
| WILD VIRGINIA, VIRGINIA | ) | Case No. 3:20-cv-00045-JPJ-PMS |
| WILDERNESS COMMITTEE, | ) | |
| UPSTATE FOREVER, SOUTH | ) | |
| CAROLINA WILDLIFE | ) | |
| FEDERATION, NORTH CAROLINA | ) | |
| WILDLIFE FEDERATION, | ) | |
| NATIONAL TRUST FOR HISTORIC | ) | |
| PRESERVATION, | ) | |
| MOUNTAINTRUE, HAW RIVER | ) | |
| ASSEMBLY, HIGHLANDERS FOR | ) | |
| RESPONSIBLE DEVELOPMENT, | ) | |
| DEFENDERS OF WILDLIFE, | ) | |
| COWPASTURE RIVER | ) | |
| PRESERVATION ASSOCIATION, | ) | |
| CONGAREE RIVERKEEPER, THE | ) | |
| CLINCH COALITION, CLEAN AIR | ) | |
| CAROLINA, CAPE FEAR RIVER | ) | |
| WATCH, ALLIANCE FOR THE | ) | |
| SHENANDOAH VALLEY, and | ) | |
| ALABAMA RIVERS ALLIANCE, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| COUNCIL ON ENVIRONMENTAL | ) | |
| QUALITY and MARY NEUMAYR IN | ) | |
| HER OFFICIAL CAPACITY AS | ) | |
| CHAIR OF THE COUNCIL ON | ) | |
| ENVIRONMENTAL QUALITY, | ) | |
| | | |
| Defendants. | | |

**DEFENDANTS' OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY
INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ........................................................................................................ 3

STANDARDS OF REVIEW ...................................................................................... 6

    I.      Emergency Injunctions ................................................................................... 6

    II.     Review of Agency Rulemaking ...................................................................... 7

ARGUMENT ............................................................................................................ 10

    I.      Plaintiffs Have Not Shown They Are Likely to Succeed on the Merits. .............. 11

          A.     The Court Lacks Jurisdiction Over Plaintiffs' Claims.............................. 11

          B.     Plaintiffs' Claims That the 2020 Rule Is Inconsistent with NEPA
                Are Meritless. ..................................................................................... 11

                1.     CEQ's Interpretations of NEPA Are Entitled to Deference. ........ 11

                2.     CEQ's Revised Definition of "Environmental Effects" Is a
                     Reasonable Construction of Ambiguous Statutory Terms and
                     Consistent with NEPA. ................................................................ 15

                3.     The 2020 Rule's Approach to Alternatives Analysis Is a
                     Reasonable Construction of Ambiguous Statutory Terms and
                     Is Consistent with NEPA. ............................................................ 23

    4.     The 2020 Rule's Revised Definition of "Major Federal Action ....................................... 29

                5.     The 2020 Rule Does Not Allow Projects to Proceed in
                     Violation of NEPA. ..................................................................... 33

                  6.     The 2020 Rule Promotes Public Participation Consistent
                     with NEPA. .................................................................................. 37

          C.     CEQ Complied with the APA in Promulgating the 2020 Rule. .............. 39

                1.     CEQ Properly Considered the Prior Regulations in Assessing
                     the Environmental Impacts of the 2020 Rule. ............................. 41

                2.     CEQ Properly Assessed the 2020 Rule's Potential Impacts to
                     the Environment.......................................................................... 44

                3.     CEQ Properly Considered Environmental Justice. ...................... 52

4.       CEQ Properly Considered Reliance Interests. .............................. 56

5.       CEQ Provided a Reasonable Explanation for Revising its Regulations. .................................................................................. 61

6.       CEQ Properly Considered Alternatives to Revising the NEPA Regulations. ....................................................................... 66

II.      Plaintiffs Have Not Shown They Will Suffer Irreparable Harm. ........................ 69

A.       Plaintiffs' Speculative Claim that the 2020 Rule Threatens Them with Imminent and Irreparable Environmental Harm Fails. ..................... 70

B.       Plaintiffs' Alleged Procedural Injuries Do Not Constitute Imminent and Irreparable Injury. ............................................................ 73

C.       Plaintiffs' Alleged Informational and Diversion of Resources Harms Do Not Constitute Imminent and Irreparable Injury. ............................... 74

II.      The Public Interest and Balance of Equities Weigh Against Injunctive Relief. ................................................................................................. 76

A.       Plaintiffs' Arguments Conflate the Likelihood of Success with the Equities. ................................................................................. 76

B.       The 2020 Rule Will Advance the Public Interest in Timely, Effective NEPA Review, and Enjoining the Rule Will Harm the Public and the Government. .................................................................... 79

IV.      The Injunction Requested by Plaintiffs' Is Overbroad and Must Be Narrowly Tailored to the Violations Found and the Harms Demonstrated. ......... 81

CONCLUSION .......................................................................................................... 83

# TABLE OF CONTENTS

## Cases

*Advanced Micro Devices v. Civ. Aeronautics Bd.*,
    742 F.2d 1520 (D.C. Cir. 1984) ......................................................................... 45

*Advocate Health Care Network v. Stapleton*,
    137 S. Ct. 1652 (2017) ...................................................................................... 29

*Alaska Survival v. Surface Transp. Bd.*,
    705 F.3d 1073 (9th Cir. 2013) ........................................................................... 37

*Albuquerque v. Barnhart*,
    906 F.2d 1477 (10th Cir. 1990) ......................................................................... 32

*Am. Civil Liberties Union of Colo. v. City & Cty. of Denver*,
    569 F. Supp. 2d 1142 (D. Colo. 2008) ............................................................. 65

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
    937 F.3d 559 (D.C. Cir. 2019) ......................................................................... 58

*Am. Whitewater v. Tidwell*,
    770 F.3d 1108 (4th Cir. 2014) ........................................................................... 78

*Amoco Production Co. v. Vill. of Gambell*,
    480 U.S. 531 (1987) .................................................................................... 77, 78

*Anderson v. Edwards*,
    514 U.S. 143 (1995) .................................................................................... 10, 26

*Andrus v. Sierra Club*,
    442 U.S. 347 (1979) .......................................................................................... 12

*Audubon Naturalist Soc'y of The Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
    524 F. Supp. 2d 642 (D. Md. 2007) .................................................................. 25

*Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*,
    515 U.S. 687 (1995) .......................................................................................... 10

*Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*,
    462 U.S. 87 (1983) ............................................................................................ 33

*Camp v. Pitts*,
    411 U.S. 138 (1973) ............................................................................................ 8

*Caribbean Marine Servs. Co. v. Baldridge*,
    844 F.2d 668 (9th Cir. 1988) ............................................................................. 70

*Carlson v. Postal Regulatory Comm'n*,
    938 F.3d 337 (D.C. Cir. 2019) ......................................................................... 40

*Carroll v. Logan*,
    735 F.3d 147 (4th Cir. 2013) ........................................................................... 30

*CASA de Md., Inc. v. Trump,*
  414 F. Supp. 3d 760 (D. Md. 2019) .......................................................... 7

*CASA de Md., Inc. v. Trump,*
  No. 19-2222, 2020 WL 4664820, --- F.3d ---- (4th Cir. Aug. 5, 2020)............................ passim

*Catholic Soc. Serv. v. Shalala,*
  12 F.3d 1123 (D.C. Cir. 1994) ................................................................ 83

*Chapman v. El Paso Nat. Gas Co.,*
  204 F.2d 46 (D.C. Cir. 1953) ................................................................. 59

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council,*
  467 U.S. 837 (1984) ............................................................... 8, 12, 16, 23

*Citizens Against Burlington, Inc. v. Busey,*
  938 F.2d 190 (D.C. Cir. 1991) ............................................................... 37

*Citizens Concerned About Jet Noise, Inc. v. Dalton,*
  48 F. Supp. 2d 582 (E.D. Va. 1999) ......................................................... 53

*City of Brookings Mun. Tel. Co. v. FCC,*
  822 F.2d 1153 (D.C. Cir. 1987) .............................................................. 68

*City of Dallas v. Hall,*
  562 F.3d 712 (5th Cir. 2009) ................................................................. 1

*City of Grapevine v. U.S. Dep't of Transp.,*
  17 F.3d 1502 (D.C. Cir. 1994) ............................................................... 37

*City of New York v. United States,*
  337 F. Supp. 150 (E.D.N.Y. 1972) .......................................................... 13

*Clapper v. Amnesty Int'l,*
  568 U.S. 398 (2013) ......................................................................... 75

*Cmtys. Against Runway Expansion, Inc. v. FAA,*
  355 F.3d 678 (D.C. Cir. 2004) ............................................................... 54

*Colo. Env't. Coal. v. Dombeck,*
  185 F.3d 1162 (10th Cir. 1999) .............................................................. 37

*Colo. Wild v. U.S. Forest Serv.,*
  435 F.3d 1204 (10th Cir. 2006) .............................................................. 10

*Cook Cty. v. Wolf,*
  962 F.3d 208 (7th Cir. 2020) ................................................................. 7

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.,*
  538 F.3d 1172 (9th Cir. 2008) ............................................................... 14

*Ctr. for Env't. Law & Policy v. Bureau of Reclamation,*
  655 F.3d 1000 (9th Cir. 2011) ............................................................... 37

*Ctr. for Food Safety v. Vilsack,*
  636 F.3d 1166 (9th Cir. 2011) ............................................................. 70

*Demksi v. U.S. Dep't of Labor,*
  419 F.3d 488 (6th Cir. 2005) ............................................................... 16

*Dep't of Commerce v. New York,*
  139 S. Ct. 2551 (2019) ............................................................ 8, 40, 44, 79

*Dep't of Homeland Security v. Regents of the Univ. of Cal.,*
  140 S. Ct. 1891 (2020) ..................................................................... 57, 58

*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004) ...................................................................... passim

*Di Biase v. SPX Corp.,*
  872 F.3d 224 (4th Cir. 2017) ................................................................. 7

*Direx Isr., Ltd. v. Breakthrough Med. Corp.,*
  952 F.2d 802 (4th Cir. 1992) ................................................................. 6

*Dreher v. Experian Info. Sols., Inc.,*
  856 F.3d 337 (4th Cir. 2017) .......................................................... 72, 74

*Edwardsen v. U.S. Dep't of Interior,*
  268 F.3d 781 (9th Cir. 2001) ............................................................... 67

*Encino Motorcars, LLC v. Navarro,*
  136 S. Ct. 2117 (2016) ............................................................ 56, 57, 60, 61

*Entergy Corp. v. Riverkeeper, Inc.,*
  556 U.S. 208 (2009) .............................................................................. 9

*FCC v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ...................................................................... passim

*Fed. Election Comm'n v. Akins,*
  524 U.S. 11 (1998) .............................................................................. 74

*Forest Conservation Council v. U.S. Forest Serv.,*
  No. CV-03-0054-PCT-FJM, 2003 WL 23281957 (D. Ariz. July 9, 2003) ............. 71

*Forest Guardians v. U.S. Fish & Wildlife Serv.,*
  611 F.3d 692 (10th Cir. 2010) ............................................................. 36

*Great Old Broads for Wilderness v. Kimbell,*
  709 F.3d 836 (9th Cir. 2013) ............................................................... 25

*Hanly v. Kleindienst,*
  471 F.2d 823 (2d Cir. 1972) ................................................................ 13

*Headwaters, Inc. v. Bureau of Land Mgmt.,*
  914 F.2d 1174 (9th Cir.1990) .............................................................. 25

*Home Box Office, Inc. v. FCC,*
  567 F.2d 9 (D.C. Cir. 1977) ................................................................. 40

*Idaho Sporting Cong., Inc. v. Rittenhouse,*
  305 F.3d 957 (9th Cir. 2002) ............................................................... 19

*Image of Greater San Antonio v. Brown,*
  570 F.2d 517 (5th Cir. 1978) ............................................................... 13

*Immigr. & Naturalization Serv. v. Nat'l Ctr. for Immigrants' Rights,*
  502 U.S. 183 (1991) ............................................................................ 10

*Int'l Bhd. of Teamsters v. U.S. Dep't of Transp.,*
  724 F.3d 206 (D.C. Cir. 2013) ............................................................. 28

*Jersey Heights Neighborhood Ass'n, v. Glendening,*
  174 F.3d 180 (4th Cir. 1999) ................................................................. 7

*Kiobel v. Royal Dutch Petroleum Co.,*
  569 U.S. 108 (2013) ............................................................................ 32

*Kleppe v. Sierra Club,*
  427 U.S. 390 (1976) ...................................................................... 22, 33

*Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.,*
  756 F.3d 447 (6th Cir. 2014) ............................................................... 54

*Lewis v. Casey,*
  518 U.S. 343 (1996) ............................................................................ 82

*Los Alamos Study Grp v. U.S. Dep't of Energy,*
  794 F. Supp. 2d 1216 (D.N.M. 2011) .................................................. 34

*Louisiana ex rel. Guste v. Verity,*
  853 F2d 322 (5th Cir. 1988) ................................................................ 51

*Lujan v. Defs. of Wildlife,*
  504 U.S. 555 (1992) ............................................................................ 78

*Marsh v. Or. Nat. Res. Council,*
  490 U.S. 360 (1989) ............................................................................ 52

*Metropolitan Edison Co. v. People Against Nuclear Energy,*
  460 U.S. 766 (1983) ...................................................................... 20, 28

*Mingo Logan Coal Co. v. EPA,*
  829 F.3d 710 (D.C. Cir. 2016) ............................................................. 59

*Minnesota Public Interest Research Group v. Butz,*
  498 F.2d 1314 (8th Cir. 1974) ............................................................. 31

*Monsanto Co. v. Geertson Seed Farms,*
  561 U.S. 139 (2010) ................................................................... 6, 34, 71

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ......................................................................................... passim

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
  177 F.3d 800 (9th Cir. 1999) ................................................................................ 19

*N.C. Wildlife Fed'n. v. N.C. Dep't of Transp.*,
  677 F.3d 596 (4th Cir. 2012) ................................................................................ 23

*N.J. Dep't of Envtl. Prot. v. Nuclear Regulatory Comm'n*,
  561 F.3d 132 (3d Cir. 2008) ................................................................................. 18

*Nat. Res. Def. Council v. Morton*,
  458 F.2d 827 (D.C. Cir. 1972) .............................................................................. 27

*Nat'l Ass'n of Home Builders v. EPA*,
  682 F.3d 1032 (D.C. Cir. 2012) ........................................................................... 42

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ........................................................................................ passim

*Nat'l Council for Adoption v. Jewell*,
  156 F. Supp. 3d 727 (E.D. Va. 2015) ................................................................... 67

*Nat'l Mining Ass'n v. Mine Safety & Health Admin.*,
  116 F.3d 520 (D.C. Cir. 1997) ............................................................................. 40

*Nat'l Shooting Sports Found., Inc. v. Jones*,
  716 F.3d 200 (D.C. Cir. 2013) ............................................................................. 68

*Native Ecosystems Council v. U.S. Forest Serv.*,
  428 F.3d 1233 (9th Cir. 2005) .............................................................................. 25

*Nat'l Audubon Soc'y v. U.S. Dep't of Navy*,
  422 F.3d 174 (4th Cir. 2005) .................................................................... 25, 34, 37

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
  137 F.3d 1372 (9th Cir. 1998) .............................................................................. 19

*New York v. U.S. Nuclear Regulatory Comm'n*,
  824 F.3d 1012 (D.C. Cir. 2016) ........................................................................... 50

*Nken v. Holder*,
  556 U.S. 418 (2009) ...................................................................................... 7, 77

*NLRB v. Bell Aerospace Co.*,
  416 U.S. 267 (1974) ............................................................................................. 58

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
  556 F.3d 177 (4th Cir. 2009) .................................................................. 3, 8, 52, 80

*Oregon Nat. Res. Council v. Thomas*,
  92 F.3d 792 (9th Cir. 1996) .................................................................................. 53

*Owner–Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.,*
   494 F.3d 188 (D.C. Cir. 2007) ................................................................................. 52

*Pac. Rivers Council v. U.S. Forest Serv.,*
   942 F. Supp. 2d 1014 (E.D. Cal. 2013) ................................................................... 71

*Pashby v. Delia,*
   709 F.3d 307 (4th Cir. 2013) ........................................................................ 6, 7, 77

*Perez v. Mortg. Bankers Ass'n,*
   575 U.S. 92 (2015) ............................................................................................. 51, 69

*Phillips v. Trans Union, LLC,*
   No. 3:16-CV-00088, 2017 WL 3911018 (W.D. Va. Sept. 6, 2017) ................... 74, 76

*Pit River Tribe v. U.S. Forest Serv.,*
   615 F.3d 1069 (9th Cir. 2010) ................................................................................. 36

*Portland Cement Ass'n v. Ruckelshaus,*
   486 F.2d 375 (D.C. Cir. 1973) ........................................................................... 38, 80

*Pub. Citizen, Inc. v. FAA,*
   988 F.2d 186 (D.C.Cir.1993) ................................................................................... 40

*Rattlesnake Coal. v. EPA,*
   509 F.3d 1095 (9th Cir. 2007) ................................................................................. 32

*Reno v. Flores,*
   507 U.S. 292 (1993) .................................................................................... 10, 26, 29

*Ringred v. City of Duluth,*
   828 F.2d 1305 (8th Cir. 1987) ................................................................................. 32

*Robertson v. Methow Valley Citizens Council,*
   490 U.S. 332 (1989) ...................................................................................... 3, 46, 49

*Sampson v. Murray,*
   415 U.S. 61 (1974) ..................................................................................................... 7

*San Juan Citizens All. v. U.S. Bureau of Land Mgmt.,* 326 F. Supp. 3d 1227
   (D.N.M. 2018) .......................................................................................................... 67

*San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n,*
   449 F.3d 1016 (9th Cir. 2006) ................................................................................. 18

*Save the Bay, Inc. v. U.S. Army Corps of Eng'rs,*
   610 F.2d 322 (5th Cir. 1980) ................................................................................... 32

*Schafer v. Astrue,*
   641 F.3d 49 (4th Cir. 2011) ....................................................................................... 8

*Schlesinger v. Reservists Comm. to Stop the War,*
   418 U.S. 208 (1974) ................................................................................................. 82

*Sector Coll. & Univs. v. Duncan*,
   681 F.3d 427 (D.C. Cir. 2012)..................................................... 40, 49

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011)............................................................ 10

*Sierra Forest Legacy v. Sherman*,
   951 F. Supp. 2d 1100 (E.D. Cal. 2013) ............................................. 71

*Sierra Nevada Forest Prot. Campaign v. U.S. Forest Serv.*,
   166 F. App'x 923 (9th Cir. 2006) ..................................................... 19

*Simpson v. Young*,
   854 F.2d 1429 (D.C. Cir. 1988)......................................................... 40

*Smiley v. Citibank (S.D.), N.A.*,
   517 U.S. 735 (1996).................................................................... 12, 57

*Stilwell v. Office of Thrift Supervision*,
   569 F.3d 514 (D.C. Cir.2009)...................................................... 51, 57

*Sugarloaf Citizens Ass'n v. FERC*,
   959 F.2d 508 (4th Cir. 1992) ........................................................... 32

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009).......................................................................... 74

*Thompson v. Clark*,
   741 F.2d 401 (D.C. Cir. 1984)......................................................... 51

*Trump v. Int'l Refugee Assistance Project*,
   137 S. Ct. 2080 (2017)..................................................................... 76

*United States v. Mead Corp.*,
   533 U.S. 218 (2001).......................................................................... 12

*United States v. Penn. Indus. Chem. Corp.*,
   411 U.S. 655 (1973).......................................................................... 58

*United States v. Salerno*,
   481 U.S. 739 (1987).......................................................................... 10

*Util. Air Regulatory Grp. v. EPA*,
   885 F.3d 714 (D.C. Cir. 2018)......................................................... 40

*Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*,
   435 U.S. 519 (1978)................................................................... passim

*W. Radio Servs. Co., Inc. v. Espy*,
   79 F.3d 896 (9th Cir. 1996) ............................................................. 67

*Washington v. Trump*,
   847 F.3d 1151 (9th Cir. 2017) ......................................................... 76

*Watt v. Alaska,*
    451 U.S. 259 (1981) ............................................................................. 15, 16

*Webster v. U.S. Dep't. of Agric.,*
    685 F.3d 411 (4th Cir. 2012) ......................................................................... 37

*Weinberger v. Romero-Barcelo,*
    456 U.S. 305 (1982) ................................................................................. 69, 77

*Wetlands Water Dist. v. U.S. Dep't of Interior,*
    376 F.3d 853 (9th Cir. 2004) ......................................................................... 25

*WildWest Inst. v. Bull,*
    547 F.3d 1162 (9th Cir. 2008) ....................................................................... 34

*Williams v. Taylor,*
    529 U.S. 362 (2000) ....................................................................................... 29

*Winnebago Tribe of Neb. v. Ray*,
    621 F. 2d 269 (8th Cir. 1980) ....................................................................... 32

*Winter v. Nat. Res. Def. Council,*
    555 U.S. 7 (2008) .................................................................................... passim

*Zenith Radio Corp. v. United States,*
    437 U.S. 443 (1978) ....................................................................................... 58

**Statutes**

40 U.S.C. § 4332(2)(C) ..................................................................................... 30

42 U.S.C. § 4332 ................................................................................. 14, 20, 28

42 U.S.C. § 4332(2)(C) ................................................................................ passim

42 U.S.C. § 4332(2)(E) ..................................................................................... 33

42 U.S.C. § 4332(C) .................................................................................... 28, 29

42 U.S.C. § 4332(C)(ii) ..................................................................................... 15

43 U.S.C. § 4332(C)(ii) ..................................................................................... 15

5 U.S.C. § 553 ................................................................................................... 79

5 U.S.C. § 705 ..................................................................................................... 7

5 U.S.C. § 706 ..................................................................................................... 8

5 U.S.C. § 706(2)(A) .................................................................................... 8, 39

**Regulations**

40 C.F.R, § 1506.1 (2020) .............................................................................. 35

40 C.F.R. § 1500.3(e) (2020) ......................................................................... 82

40 C.F.R. § 1500.6 (1978) ................................................................................. 14

40 C.F.R. § 1501.10 (2020) .............................................................................. 65

40 C.F.R. § 1501.4 ............................................................................................. 4

40 C.F.R. § 1501.4(b) (2019) ........................................................................... 46

40 C.F.R. § 1501.5(e) ................................................................................. 45, 48

40 C.F.R. § 1501.6 (2020) .................................................................................. 4

40 C.F.R. § 1501.7 ............................................................................................ 64

40 C.F.R. § 1501.8 (2020) .......................................................................... 27, 64

40 C.F.R. § 1501.9 ..................................................................................... 45, 80

40 C.F.R. § 1501.9(e) (2020) .......................................................................... 22

40 C.F.R. § 1501.9(e)(1) (2020) ................................................................. 28, 50

40 C.F.R. § 1502.14 .................................................................................... 28, 45

40 C.F.R. § 1502.14(a), (c) (2019) ................................................................. 24

40 C.F.R. § 1502.16 .......................................................................................... 45

40 C.F.R. § 1502.17 .......................................................................................... 45

40 C.F.R. § 1502.17 (2020) .............................................................................. 64

40 C.F.R. § 1502.17(a), (b) (2020) .................................................................. 48

40 C.F.R. § 1502.4(a) (2020) ........................................................................... 22

40 C.F.R. § 1502.7 (2019) ........................................................................... 5, 64

40 C.F.R. § 1502.9(b) (2020) ........................................................................... 26

40 C.F.R. § 1503.1 ..................................................................................... 45, 80

40 C.F.R. § 1503.1(a)(3) ................................................................................... 48

40 C.F.R. § 1503.3(a),(b) ................................................................................. 48

40 C.F.R. § 1504.4(a) ....................................................................................... 45

40 C.F.R. § 1506.1 (2019) ............................................................................... 34

40 C.F.R. § 1506.1 (2020) ............................................................................... 36

40 C.F.R. § 1506.1(d) ....................................................................................... 34

40 C.F.R. § 1506.6 ............................................................................................ 45

40 C.F.R. § 1506.6 (2020) ............................................................................... 80

40 C.F.R. § 1507.3(b)(2)(ii) ............................................................................... 4

40 C.F.R. § 1507.3(e)(2)(ii) ................................................................................ 4

40 C.F.R. § 1508.1(d) (2020) ............................................................................. 4

40 C.F.R. § 1508.1(g) ....................................................................................... 45

40 C.F.R. § 1508.1(g) (2020) ................................................................. 20, 21, 81

40 C.F.R. § 1508.1(h) (2020) ............................................................................. 4

40 C.F.R. § 1508.1(q) ...................................................................................... 83

40 C.F.R. § 1508.13 (2019) ................................................................................ 4

40 C.F.R. § 1508.18 (2019) .............................................................................. 29

40 C.F.R. 1508.4 (2019) ..................................................................................... 4

40 C.F.R. § 1508.7 (2019) ................................................................................ 18

40 C.F.R. § 1508.8 (2019) ................................................................................ 18

40 C.F.R. § 1508.9 (2019) .................................................................................. 4

40 C.F.R. §§ 1500-1599 ..................................................................................... 4

40 C.F.R. §1500.1(a) (2020) ............................................................................. 29

40 C.F.R. §1503.3 (2020) ................................................................................. 38

40 C.F.R. §1503.3(2020) .................................................................................. 38

40 C.F.R. §1506.6 (2020) ................................................................................. 72

40 C.F.R. §1508.1(q) (2020) ....................................................................... 30, 31

40 C.F.R. §1508.1(z) (2020) ....................................................................... 24, 81

7 C.F.R. § 799.32 ............................................................................................. 72

**Other Regulatory Documents**

43 Fed. Reg. 55,978 (Nov. 29, 1978) ............................................................ 4, 61

44 Fed. Reg. 873 (Jan. 3, 1979) ......................................................................... 4

46 Fed. Reg. 18,026 (Mar. 23, 1981) ............................................................ 5, 25

85 Fed. Reg. 1684 (Jan. 10, 2020) ................................................................... 47

85 Fed. Reg. 43,304 (July 16, 2020) ......................................................... passim

Exec. Order No. 12,291 46 Fed. Reg. 13,193 (Feb 17, 1981) ........................... 41

Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) ...................... 41

Exec. Order No. 12,898, 59 Fed. Reg. 7,629 (Feb. 11, 1994) .................... 53, 54

**Secondary Sources**

Todd S. Aagard, *A Functional Approach to Risks and Uncertainties Under NEPA*,
   1 Mich. J. Envtl. & Admin. L. 87, 101 (2012) ..... 78Alyson C. Flournoy et. al., *Harnessing the
   Power of Information to Protect Our Public Natural Resource Legacy*,
   86 Tex. L. Rev. 1575 (2008)................................................................................................ 78

Paul J. Culhane, *NEPA's Impacts on Federal Agencies, Anticipated and Unanticipated*,
   20 Envtl. L. 681 (1990)......................................................................................................... 78

Vice President Al Gore, COMMON SENSE GOVERNMENT: WORKS BETTER AND COSTS
   LESS (1995) .......................................................................................................................... 66

Bradley C. Karkkainen, *Toward A Smarter Nepa: Monitoring and Managing Government's
   Environmental Performance*,
   102 Colum. L. Rev. 903 (2002) ............................................................................................ 78

Laurens H. Rhinelander, *The Bubble Concept: A Pragmatic Approach to Regulation Under the
   Clean Air Act*, 1 Va. J. Nat. Res. L. 177 (1981) ...................................................................... 16

James E. Salzman and Barton H. Thompson, Jr.,
   Environmental Law and Policy (5th ed. 2019) ......................................................................... 5

**INTRODUCTION**

The National Environmental Policy Act (NEPA) is a procedural statute—intended by Congress to ensure that federal agencies consider environmental effects before committing to major federal actions, like building a highway or an airport.  But over time, the process it created has become mired in an accretion of guidance documents, inconsistent agency interpretations, conflicting case law, and litigation.  NEPA has become, in the words of one court, "the kiss of death to many a federal project."  *City of Dallas v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009) (citation omitted).  As a result, national infrastructure and other important projects have been needlessly delayed.

In July, the Council on Environmental Quality (CEQ) broke this impasse, issuing its first comprehensive revision of the NEPA implementing regulations in over forty years.  The result of a careful two-year rulemaking under the Administrative Procedure Act (APA), the new 2020 Rule clarifies and streamlines the NEPA process to reduce paperwork and delay, and to promote better decisions.  The Rule does not, however, regulate Plaintiffs or other members of the public; it simply establishes the procedures that other agencies follow as they propose and analyze future projects (and other types of final agency action).

Rather than wait to see how the 2020 Rule actually operates when applied to on-the-ground proposals—as the Constitution's Article III case-or-controversy requirement dictates, particularly when a court is conducting review under the APA—Plaintiffs demand that the Court review the Rule on its face, and indulge them in speculating about what impacts future actions planned under the Rule *might* have.  This sort of abstract facial review of a rule that has no immediate effect on litigants falls well outside of the Court's jurisdiction, and Defendants have therefore moved to dismiss Plaintiffs' complaint as unripe and for lack of standing.  *See* Defs.'

Mot. to Dismiss, ECF No. 52; Defs.' Br. in Supp. of Mot. to Dismiss, ECF No. 59.

In addition to seeking impermissible facial review, Plaintiffs also demand that the Court review *in a matter of days* a rulemaking that took two years to formulate, draft, generate comments on, and revise in light of those comments and then go on to issue an injunction barring implementation of the Rule *nationwide*.  Pls.' Mot. for Prelim. Inj., ECF No. 30.  As the Fourth Circuit recently observed, this "helter-skelter" nationwide injunction practice of "sprints to the courthouse and rushed judicial decisionmaking, often under immense time pressure, based on expedited briefing, and in the absence of a factual record" compromises the integrity of the judiciary, "transforming the non-precedential decision of a lone district judge into the law of the land, for circuits and citizens alike."  *CASA de Md., Inc. v. Trump*, No. 19-2222, --- F.3d ---, 2020 WL 4664820, at *27 (4th Cir. Aug. 5, 2020).

This Court should decline Plaintiffs' invitation to engage in "government by injunction." *Id.* at *28.  First, Plaintiffs have no likelihood of success in their challenge to the 2020 Rule.  Not only do their claims fail on ripeness and standing grounds, but their claims that CEQ violated NEPA and the APA are meritless.  The 2020 Rule is a reasonable interpretation of NEPA, carefully formulated by an agency with fifty years of experience administering the statute.  And, in developing the 2020 Rule, CEQ fully complied with its procedural obligations under the APA, drafting a Preamble dozens of pages in length and a Response to Comments document exceeding 600 pages, thereby demonstrating at every juncture a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).  Contrary to Plaintiffs' assertion, the process of NEPA reform was anything but rushed.

Plaintiffs' requested injunction must also be denied because the balance of the equities weigh in favor of letting the 2020 Rule take effect as scheduled. Doing so will cause no injury at all to Plaintiffs, let alone the irreparable injury needed to obtain an injunction, while delaying long overdue NEPA reform will harm both the public and the government.

## BACKGROUND[1]

NEPA requires federal agencies to consider the environmental consequences of proposed "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C); *see generally Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council*, 435 U.S. 519, 558 (1978). This requirement is procedural and not substantive: "NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). To oversee implementation of this procedural obligation, NEPA established the CEQ—an agency within the Executive Office of the President—"with authority to issue regulations interpreting" the statute. *See Dep't of Transp. v. Pub. Citizen,* 541 U.S. 752, 757 (2004).

Under NEPA and the CEQ regulations, federal agencies fulfill their obligation to study major federal actions in one of three ways. For a major federal action that will have significant environment effects, the agency prepares an Environmental Impact Statement (EIS). An EIS is a "detailed statement" that describes the purpose and need for the proposed action, the alternatives

---

[1] Defendants include a detailed background statement in their brief in support of their pending Motion to Dismiss. Defs.' Br. in Supp. of Mot. to Dismiss, 4-12. To avoid unnecessary duplication, Defendants incorporate that background by reference and include here only a brief overview. Defendants, however, do reserve that the presumption of regularity, *see Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 415 (1971), means that CEQ's description of the rulemaking process, its objectives, and its rationales trump any assertions made by Plaintiffs. This is a foundational point of administrative law. *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) ("Review under [the APA] is highly deferential, with a presumption in favor of finding the agency action valid.").

to the action, the affected environment, and the environmental consequences of the alternatives. 42 U.S.C. § 4332(2)(C).  Where it is not clear that the proposal will have significant effects, the agency may prepare an Environmental Assessment (EA).  An EA is a "concise" analysis intended to assist the agency in determining if the impacts of the proposed action will be significant.  40 C.F.R. § 1508.1(h) (2020); 40 C.F.R. § 1508.9 (2019).[2]  If, based on the EA, the agency concludes that the proposed action will not significantly affect the environment, it issues a Finding of No Significant Impact (FONSI) in lieu of preparing an EIS.  40 C.F.R. § 1501.6 (2020); 40 C.F.R. § 1508.13 (2019).  Finally, Categorical Exclusions (CEs) are classes of actions identified in agency NEPA implementing procedures that normally do not have significant effects on the environment and therefore require neither an EA nor EIS.  40 C.F.R. §§ 1501.4, 1507.3(e)(2)(ii), 1508.1(d) (2020); 40 C.F.R. §§ 1507.3(b)(2)(ii), 1508.4 (2019).

In 1978, CEQ issued regulations implementing NEPA with the intent "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further the national policy to protect and enhance the quality of the human environment."  43 Fed. Reg. 55,978, 55,978; (Nov. 29, 1978); *see also* 44 Fed. Reg. 873 (Jan. 3, 1979) (technical corrections); 40 C.F.R. §§ 1500-1599 (CEQ regulations).

In the nearly half-century since 1978, the complexity of the regulations, together with the accretion of conflicting judicial opinions, inconsistent agency interpretations, and over thirty CEQ guidance documents have turned NEPA into a quagmire.  *See* 85 Fed. Reg. 43,304, 43,310 (July 16, 2020).  This confusion has been a boon for lawyers; NEPA is the most litigated environmental statute in the United States.  *See* James E. Salzman and Barton H. Thompson, Jr.,

---

[2]  Defendants use the year "2020" to designate CEQ's new regulations, effective September 14, 2020, and the year "2019" to designate its old regulations.

ENVIRONMENTAL LAW AND POLICY 340 (5th ed. 2019).  Agencies, in turn, have responded to the uncertainty and litigation risk by turning NEPA documents into expansive catalogs of information that do little to promote informed decisionmaking and meaningful public input.

When it promulgated the 1978 regulations, CEQ envisioned that an EIS—the most complex form of NEPA document—would normally be less than 150 pages and take no more than 12 months to complete.  *See* 40 C.F.R. § 1502.7 (2019); Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18,026, 18,037 (Mar. 23, 1981) (Question 35).  Even an EIS for a proposal of "unusual scope or complexity" was not meant to exceed 300 pages.  *Id.*  But today the average EIS is 661 pages long, and the average time for completion of an EIS is 4.5 years.  85 Fed. Reg. at 43,309.  Litigation often follows, further "slow[ing] or prevent[ing] the development of important infrastructure and other projects that require Federal permits or approvals, as well as rulemakings and other proposed actions."  *Id*. at 43,305.  This delay has impacts in the real world, as important infrastructure and all matter of other projects and actions grind to a halt.  *Id*. at 43,306.

Against this backdrop, CEQ hit the reset button, and engaged the public in an open and transparent notice and comment rulemaking to update, revise, and clarify the NEPA regulations. On July 16, 2020, after two years of analysis, and two rounds of public comment that generated over one-million comments, CEQ published its final rule modernizing and clarifying its NEPA regulations.  *Id*. at 43,304.  Besides improvements to the readability of the regulations, the final rule clarifies regulatory requirements, codifies guidance and case law, and better reflects current technologies and practices.  *Id*. at 43,306.  The result is a modern set of NEPA regulations that provide greater clarity for federal agencies, States, Tribes, localities, and the public, while

simultaneously advancing the original goals of the 1978 CEQ regulations to reduce paperwork and delays and promote better decisions consistent with NEPA's policy objectives.

## STANDARDS OF REVIEW

### I.   Emergency Injunctions

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Pashby v. Delia*, 709 F.3d 307, 319 (4th Cir. 2013) ("[P]reliminary injunctions are 'extraordinary remed[ies] involving the exercise of very far-reaching power.'" (quoting *Direx Isr., Ltd. v. Breakthrough Med. Corp.*, 952 F.2d 802, 811 (4th Cir. 1992))).  In reviewing a preliminary injunction motion, courts apply an "exacting" standard of review.  *Pashby*, 709 F.3d at 319.  There is no presumption of awarding injunctive relief in environmental cases, as the Supreme Court has repeatedly held.  *See Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010) (holding no "thumb on the scales is warranted" when considering injunctive relief for NEPA violations); *Amoco Production Co. v. Vill. of Gambell*, 480 U.S. 531, 544-545 (1987) (holding the court erred in concluding that "[i]rreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action.") (internal citations and quotation marks omitted).

To obtain the extraordinary remedy of enjoining CEQ's 2020 Rule, Plaintiffs must establish four factors: (1) that they are likely to succeed on the merits; (2) that they are likely to suffer irreparable harm absent preliminary relief; (3) that the balance of equities tips in their favor; and (4) that an injunction is in the public interest.  *Winter*, 555 U.S. at 20.  A court may not issue a preliminary injunction unless *all* four factors are met; it cannot disregard some of the factors if other factors are satisfied.  *Pashby*, 709 F.3d at 320 (explaining that Fourth Circuit's prior "balance-of-hardship test" did not survive *Winter*).

The first factor requires a "clear showing" that Plaintiffs are "likely to succeed" on the merits. *Id.* at 321. The second factor requires Plaintiffs to demonstrate that they are "likely" to suffer irreparable harm absent relief; the mere "possibility" of harm is insufficient. *Winter*, 555 U.S. at 22 at 22. In addition, "[m]ere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of a stay are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date . . . weighs heavily against a claim of irreparable harm." *Di Biase v. SPX Corp.*, 872 F.3d 224, 230 (4th Cir. 2017) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). On the fourth factor, a likelihood of success on the merits does not automatically demonstrate that an injunction is in the public interest. *Pashby*, 709 F.3d at 329-30. Rather, a court must also weigh "other considerations" in evaluating the public interest. *Id.* at 330. A court's assessment of harm to the opposing party and its weighing of the public interest "merge" when the government is the party opposing an injunction. *Nken v. Holder*, 556 U.S. 418, 435 (2009).[3]

## II.    Review of Agency Rulemaking

NEPA does not contain its own cause of action. Hence, review of any form of NEPA action, including the regulations issued to interpret NEPA, can only occur pursuant to the APA.

---

[3]  Plaintiffs alternatively seek a "stay" of the effective date of the 2020 Rule under 5 U.S.C. § 705. Pls.' Br. 2, 27. Section 705 of the APA states: "On such conditions as may be required and to the extent necessary to prevent irreparable injury, the reviewing court, including the court to which a case may be taken on appeal from or on application for certiorari or other writ to a reviewing court, may issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings."  5 U.S.C. § 705.
But Courts apply the same four-factor test for a preliminary injunction to a request for a Section 705 stay.  *See, e.g., Cook Cty. v. Wolf*, 962 F.3d 208, 221 (7th Cir. 2020); *Casa de Md., Inc. v. Trump*, 414 F. Supp. 3d 760, 770 (D. Md. 2019), *rev'd on other grounds by* No. 19-2222, 2020 WL 4664820, at *24 (4th Cir. Aug. 5, 2020).

*Jersey Heights Neighborhood Ass'n, v. Glendening*, 174 F.3d 180, 186 (4th Cir. 1999) (Because "NEPA itself [does not provide] a private right of action, all of these claims lie under the [APA].").  CEQ's 2020 Rule is thus subject exclusively to judicial review under the APA, which provides that the rule must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).[4]  Review under this standard is "narrow."  *Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2569 (2019) (citation omitted).  A court "may not substitute [its] judgment for that of the [agency]," *id.,* and must defer to the agency's policy choices if the agency has shown a "rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192 (4th Cir. 2009) (noting that under the APA a reviewing court considers only "whether the agency considered the relevant factors and whether a clear error of judgment was made").

When an agency's regulations include interpretations of law, the Court reviews those interpretations under the two-step approach defined by the Supreme Court in *Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984).  At *Chevron* Step One the court asks "whether 'Congress has directly spoken to the precise question at issue.' If so, the agency is not free to counter Congress's command."  *Schafer v. Astrue*, 641 F.3d 49, 53–54 (4th Cir. 2011).  "But where 'a statute is silent or ambiguous with respect to the specific issue,' a

---

[4]  Review under the APA is limited to the administrative record prepared by the agency.  *Camp v. Pitts*, 411 U.S. 138, 142 (1973) (per curiam) ("[T]he focal point . . . should be the administrative record already in existence, not some new record made initially in the reviewing court.").  Because Plaintiffs seek emergency relief, the full administrative record—which will include over one million public comments—has not yet been fully compiled.  Defendants therefore are filing with this brief the Declaration of Amy Coyle, which identifies and attaches the most salient documents from the record to facilitate the Court's resolution of Plaintiffs' motion.  *See* 5 U.S.C. § 706 (2) ("[T]he court shall review the whole record or those parts of its cited by the parties").

reviewing court at *Chevron* step two asks 'whether the agency's answer is based on a permissible construction of the statute.'" *Id.* (internal citations omitted).  To be "reasonable," an interpretation need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). Interpreting ambiguous language "involves difficult policy choices"; thus judicial deference is critical as "agencies are better equipped to make [such choices] than courts." *See Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

Neither of these standards of review—*Chevron* "reasonableness" review or "arbitrary or capricious" APA review —is altered by the fact that an agency's rule includes a change in the agency's prior policy or interpretation.  *See Brand X*, 545 U.S. at 980 (applying *Chevron* to a changed agency position); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) (applying APA arbitrary and capricious review to a changed agency position).  On *Chevron* review, agencies may change interpretations, *even when those interpretations differ from court interpretations of statutory text*, unless the court interpretation at issue was specifically rendered in *Chevron* Step One terms before the agency attempted to change course.  *See Brand X,* 545 U.S. at 982 ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.").  And on APA "arbitrary and capricious" review, the agency need only acknowledge a policy change and show "that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *FCC v. Fox*, 556 U.S. at 515.

Finally, judicial review in this case is limited by Plaintiffs' decision to challenge CEQ's

2020 Rule on its face.  To prevail in such a challenge, Plaintiffs carry the heavy burden of "establish[ing] that no set of circumstances exists under which the regulation would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (citation omitted).  Plaintiffs cannot prevail by positing speculative situations where the rule might be applied in manner causing a violation of law.  *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (a facial challenge is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [rule] would be valid"); *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 709 (1995) (O'Connor, J., concurring) (noting that "there is no need to strike a regulation on a facial challenge out of concern that it is susceptible of erroneous application").[5]

## ARGUMENT

Plaintiffs' motion for a preliminary injunction should be denied.  CEQ's long-overdue revision of its NEPA regulations is legally sound; the revised regulations provide a reasonable interpretation of NEPA developed through a robust public rulemaking that met all the procedural obligations of the APA.  Plaintiffs therefore have no likelihood of success on the merits of their claims.  On the equities, Plaintiffs fare no better.  Nor does the 2020 Rule threaten them with any imminent irreparable harm.  Indeed, the public interest weighs strongly in favor of seeing the 2020 Rule's necessary reforms implemented.

---

[5] *See also Anderson v. Edwards*, 514 U.S. 143, 156 n.6 (1995) (noting plaintiffs "could not sustain their burden [of showing regulation facially invalid] even if they showed that a possible application of the rule . . . violated federal law"); *Immigr. & Naturalization Serv. v. Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183, 188 (1991) ("That the regulation may be invalid as applied in [some] cases, however, does not mean that the regulation is facially invalid because it is without statutory authority."); *Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011) (applying the "no set of circumstances" test to a facial challenge to agency regulation); *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1214 (10th Cir. 2006) (same).

I.      **Plaintiffs Have Not Shown They Are Likely to Succeed on the Merits.**

A.      **The Court Lacks Jurisdiction Over Plaintiffs' Claims**.

For the reasons detailed in Defendants' motion to dismiss, Plaintiffs' facial challenge to the 2020 Rule fails for lack of ripeness and standing, and thus Plaintiffs' have no likelihood of success on the merits of their claims.  *See* Defs.' Br. in Supp. of Mot. to Dismiss 13-37. Defendants incorporate each of those arguments here by reference.

B.      **Plaintiffs' Claims That the 2020 Rule Is Inconsistent with NEPA Are Meritless.**

Plaintiffs make a series of claims that the 2020 Rule is contrary to NEPA.  The claims all fall short.  As detailed below, Congress created CEQ to assist in implementing NEPA, and, in carrying out that duty, CEQ has promulgated regulations consistent with the text of the statute and Congress' intent.

1.      **CEQ's Interpretations of NEPA Are Entitled to Deference.**

Before addressing the changes made by CEQ in the 2020 Rule, it is important to remember the fundamental framework that underpins the 2020 Rule—and this Court's review of it: an agency's authority to interpret a statute it administers.  Plaintiffs make much of CEQ's changed interpretations in the 2020 Rule and the differences between those changes and certain judicial opinions, but an agency's interpretation of a statute it administers is not "carved in stone," and is not limited to the confines of existing judicial opinions—lest the judiciary hijack the role of the agency merely through the passage of time and the accumulation of case law.  *See Brand X*, 545 U.S. at 982–83.  The Supreme Court has made clear that CEQ has "authority to issue regulations interpreting" NEPA, and that CEQ's interpretations of the statute are entitled to full deference under *Chevron*.  *Pub. Citizen*, 541 U.S. at 757 (CEQ, "established by NEPA *with authority to issue regulations interpreting it*, has promulgated regulations to guide federal

11

agencies. . . .") (emphasis added); *see also Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979) (CEQ's interpretation of NEPA is entitled to "substantial deference.").  *Chevron* Step One: Under *Chevron*, a court first asks "whether Congress has directly spoken to the precise question at issue."  467 U.S. at 842.  If it has, the analysis ends, and the court "must give effect to the unambiguously expressed intent of Congress."  *Id.* at 842-43.  *Chevron* Step Two:  If, however, the statute is "silent or ambiguous" regarding the question at issue, the court next asks "whether the agency's answer is based on a permissible construction of the statute."  *Id.* at 843.  Where Congress has explicitly left a gap for the agency to fill, an agency interpretation is "binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute."  *United States v. Mead Corp.*, 533 U.S. 218, 227 (2001) (citations omitted).  Where the gap is implicit, "a reviewing court . . . is obliged to accept the agency's position if Congress has not previously spoken to the point at issue and the agency's interpretation is reasonable."  *Id.* at 229.

The fact that CEQ has changed its interpretation of some aspects of NEPA from the interpretation it made forty years ago is not surprising and does not deprive its new interpretations of *Chevron* deference.  *See Brand X*, 545 U.S. at 981 ("An initial agency interpretation is not instantly carved in stone. On the contrary, the agency . . . must consider varying interpretations and the wisdom of its policy on a continuing basis"); *see also id.* ("[I]f the agency adequately explains the reasons for a reversal of policy, 'change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency.'" (quoting *Smiley v. Citibank (S.D.), N.A.*, 517 U.S. 735, 742 (1996))).

Nor does a contrary judicial interpretation of an ambiguous statute foreclose an agency from revising its own interpretation.  *Brand X,* 545 U.S. at 982.  An agency's interpretation of a statute it administers is only foreclosed by a contrary judicial interpretation if the contrary judicial interpretation was made at *Chevron* Step One *i.e.*, if the court's "construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."  *Id.*; *see also id.* ("[A]llowing a judicial precedent to foreclose an agency from interpreting an ambiguous statute, . . . , would allow a court's interpretation to override an agency's.  *Chevron's* premise is that it is for agencies, not courts, to fill statutory gaps.").

Here, Plaintiffs contend that various court opinions preclude CEQ's interpretations of NEPA in the 2020 Rule.  But NEPA is a strikingly sparse statute, often using soaringly vague aspirational language.  Unlike highly complex and reticulated environmental statutes like the Clean Air Act, NEPA is a quick read and its vague, aspirational nature is confirmed by such a read.  NEPA is certainly ambiguous enough that many of its provisions will require the application of deference under *Chevron* Step Two.  *See, e.g.*, *Image of Greater San Antonio v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978) (NEPA's "language and legislative history [] are somewhat less than clear."); *Hanly v. Kleindienst*, 471 F.2d 823, 825 (2d Cir. 1972) (NEPA's language "has been characterized as 'opaque' and 'woefully ambiguous.'" (internal citations omitted)); *City of New York v. United States*, 337 F. Supp. 150, 159 (E.D.N.Y. 1972) (NEPA's provisions are framed in "broad, yet opaque" terms).  Notably, NEPA defines none of its major terms, including what constitutes "major federal action," "environmental effects," or "alternatives."  42 U.S.C. § 4332(2)(C).

The statutory gaps Congress left for CEQ to fill are thus broad.  And while there are judicial opinions that vary from the interpretations in the 2020 Rule, they either rest directly on

CEQ's prior regulations or on ambiguous provisions contained in the statute itself.  In either event, they do not foreclose the reasonable interpretations proffered by CEQ in the 2020 Rule, and they do not deprive those interpretations of judicial deference.  Moreover, none of the changes that Plaintiffs assail based on prior case law can satisfy *Brand X*'s requirement that prior judicial decisions from the Supreme Court—or here the Fourth Circuit—have been rendered in *Chevron* Step One terms.

Plaintiffs also suggest that Congress's statement in Section 102 of NEPA (42 U.S.C. § 4332), that agencies should comply with the statute "to the fullest extent possible," operates as a substantive restriction on how CEQ interprets the statute.  Plaintiffs' approach would effectively modify the Court's review to ask not whether CEQ's regulations are reasonable interpretations (as *Chevron* requires) but to somehow ask whether the procedural rigors imposed by those regulations fall short of what is "possible."  *See, e.g.,* Mem. in Supp. of Mot. for Prelim. Inj. or Stay 28, 30, 32, 33, 39, ECF No. 30-1 (Pls.' Br.).  The phrase has no such function.  As CEQ explained in the 1978 regulations, the phrase "to the fullest extent possible" is meant to address statutory conflicts, by requiring that each federal agency comply with Section 102 of NEPA "unless existing law applicable to the agency's operations expressly prohibits or makes compliance *impossible*."  40 C.F.R. § 1500.6 (1978) (emphasis added).  *See*, *e.g.*, *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1213 (9th Cir. 2008) ("This court has recognized that NEPA's legislative history reflects Congress's concern that agencies might attempt to avoid any compliance with NEPA by narrowly construing other statutory directives to create a conflict with NEPA.  Section 102(2) of NEPA therefore requires government agencies to comply 'to the fullest extent possible.'" (citations and quotation marks omitted)).  In short, the phrase is intended to help resolve conflicts between application of NEPA

and other laws; it does not create a substantive standard that modifies the Court's review of the

CEQ regulations or alter the deference owed to CEQ's interpretation of the statute consistent

with *Chevron*/*Brand X,* or revise the arbitrary-and-capricious standard of the APA.

Thus, in considering each of the specific changes in the 2020 Rule attacked by Plaintiffs

and addressed below, the Court must defer to CEQ's reasonable interpretation of NEPA.

**2.      CEQ's Revised Definition of "Environmental Effects" Is a Reasonable Construction of Ambiguous Statutory Terms and Consistent with NEPA.**

Plaintiffs assert that CEQ's definition of "environmental effects" in the 2020 Rule is

contrary to NEPA.  This claim fails.  In NEPA, Congress did not define "environmental effects"

or "environmental impacts," leaving to CEQ the task of making the "difficult policy choices"

inherent in filling statutory gaps.  *See* 42 U.S.C. § 4332(C)(ii); *Brand X*, 545 U.S. at 980.  As

explained in the 2020 Rule, the definition CEQ adopted in its 1978 regulations proved

unworkable, generating documents that cataloged speculative effects of little use to the decision

maker and sowing confusion and inconsistent application by agencies and courts.  *See* 85 Fed.

Reg. 43, 343 (Jul. 26, 2020).  CEQ properly revisited the definition of "effects," and adopted a

straightforward approach, approved by the Supreme Court, that focuses on effects that are

reasonably foreseeable and have a reasonably close causal relationship to the proposed action or

alternatives.

The starting point for all statutory interpretation is the language of the statute itself.  *Watt*

*v. Alaska*, 451 U.S. 259, 265 (1981).  NEPA requires that when proposing a "major Federal

action[] significantly affecting the quality of the human environment" the agency must prepare a

"detailed statement" that addresses the "environmental impact of the proposed action" and any

unavoidable "adverse environmental effects" of the proposed action.  43 U.S.C. § 4332(C)(ii).

15

Despite Plaintiffs' emphasis on the fact that NEPA calls for a "detailed" statement and uses the adjective "any" before "effects" (*see* Pls.' Br. 30), the simple fact is that Congress did not define "environmental effects."  *See* 85 Fed. Reg. at 43,343.  Nor did Congress subdivide effects into those that are direct, indirect, or cumulative.  *Id.*  Rather, Congress left it to CEQ to elucidate the term.  Where Congress does not define a statutory term, courts look to "how the agency responsible for implementing the statute . . . understands the term" and determine under *Chevron* "whether such an understanding is a 'reasonable interpretation of the statute." *Demksi v. U.S. Dep't of Labor*, 419 F.3d 488 (6th Cir. 2005) (quoting *Chevron*, 467 U.S. at 843).

Note that Plaintiffs have entirely missed the lesson of *Chevron*.  In *Chevron*, the key statutory term that EPA was construing was "stationary source," which the Supreme Court read to be ambiguous.  And because that term was ambiguous, it was a permissible interpretation for EPA to construe the term to authorize use of the "bubble concept," wherein "all the pollution-emitting devices within the same industrial grouping [would be treated] as though they were encased within a single 'bubble'. . . ."[6]  467 U.S. at 840.  The Supreme Court looked to the definition of "major stationary source" in the Clean Air Act when it was applying the *Chevron* two-part test.  That definition read as follows:

> (j) Except as otherwise expressly provided, the terms 'major stationary source' and 'major emitting facility' mean *any stationary facility or source of air pollutants* which directly emits, or has the potential to emit, one hundred tons per year or more of any air pollutant (including any major emitting facility or source of fugitive emissions of any such pollutant, as determined by rule by the Administrator)."

---

[6] The "bubble" concept was an innovative interpretation of the Clean Air Act that was extolled for how it better balanced economic and environmental objectives than other readings of the Act.  *See, e.g.*, Laurens H. Rhinelander, *The Bubble Concept: A Pragmatic Approach to Regulation Under the Clean Air Act*, 1 Va. J. Nat. Res. L. 177 (1981).  Professor Rhinelander served as a law clerk to Augustus Hand and as a University of Virginia Law Professor from 1948-1980. https://libguides.law.virginia.edu/faculty/rhinelander.

42 U.S.C. § 7602(j) (Clean Air Act Section 302(j)) (emphasis added).  Plaintiffs' argument in this case that "any effect" plainly means all species of effects as that concept had been parsed in the 1978 regulations is precisely the form of argument the Supreme Court rejected in *Chevron*. "Basically  . . . the language of § 302(j) simply does not compel any given interpretation of the term 'source.'"  *Chevron*, 467 U.S. at 860.  The presence of the phrase "any stationary facility or source" was not enough to require each sub-source inside a plant's "bubble" to be regulated as its own source.  Similarly here, the term "any effect" in NEPA is not enough to dispel ambiguity. *Compare Chevron* at 861-62 ("respondents insist that each of these terms must be given a discrete meaning" but "[w]e are not persuaded that parsing of general terms in the text of the statute will reveal an actual intent of Congress ….  To the extent any congressional 'intent' can be discerned from this language, it would appear that the listing of overlapping, illustrative terms was intended to enlarge, rather than to confine, the scope of the agency's power to regulate particular sources in order to effectuate the policies of the Act.").  NEPA's vague terms similarly "enlarge, rather than confine" the scope of CEQ's powers under the NEPA statute.[7]

Not only does CEQ have the power under *Chevron* to revise the definition of effects for NEPA purposes, the history of CEQ's past interpretation of that term clarifies why it was entirely

---

[7]  As the Solicitor General explained to the Supreme Court, as a result of arguments made by Petitioner Chevron, the environmental-group respondent in *Chevron* (the NRDC) actually focused on Clean Air Act Section 302(j) relatively late.  *See* Merits Reply Br. for the EPA Administrator at 7 (Feb. 17, 1984) (explaining that citations to Section 302(j) were part of a "last minute invention [by NRDC] that ignores the Act's history and twists it into an unrecognizable shape").  In their opposition to certiorari, NRDC had cited to Clean Air Act Section 302(j) only once.  *See* Br. of Resps. in Opp. at v (Apr. 29, 1983); *contrast with* Merits Br. of Resps. at vii (Oct. 28, 1983) (citing Section 302(j) six times).  The horse that the NRDC had primarily tried to ride was Clean Air Act Section 111(a)(3), 42 U.S.C. § 7413(a)(3) (defining "stationary source" as "any building, structure, facility, or installation," etc.).  But whether relying on Section 302(j) or 111(a)(3), the word "any" in either provision was no obstacle to showing deference to EPA's interpretation of the statute at *Chevron* Step Two.

rational for CEQ to change course.  In the face of Congress's implicit delegation to CEQ to define effects, CEQ chose, in the 1978 regulations, to subdivide effects into direct, indirect and cumulative.  40 C.F.R. §§ 1508.8, 1508.7 (2019).  If the NEPA statute were not ambiguous in relevant respect, this 1978 move of providing a substantial gloss on what the term "effect" meant would have itself been unlawful.  But under *Chevron*, both the 1978 approach and the 2020 approach are both lawful, just like the "bubble" and non-"bubble" approaches spanning different EPA eras at issue in *Chevron* were lawful.

Over forty years of implementation, the 1978 definition has proven unworkable.  85 Fed. Reg. at 43,343.  In particular, CEQ found the terms "indirect effects" and "cumulative impacts" had been expansively and inconsistently interpreted, leading to protracted EAs and EISs containing reams of speculative information of little value to the decisionmakers or the public. *Id*.  And, while doing little to improve agency decisions, the attempts to catalog effects only tangentially related to a proposal led to frequent litigation and inconsistent judicial approaches. *See* CEQ Final Rule Response to Comments (RTC) at 465.  *E.g., compare San Luis Obispo Mothers for Peace v. Nuclear Regulatory Comm'n*, 449 F.3d 1016 (9th Cir. 2006) (holding that NEPA requires the NRC to consider the indirect environmental effects of a terrorist attack on a nuclear energy facility) *with N.J. Dep't of Envtl. Protection v. Nuclear Regulatory Comm'n*, 561 F.3d 132 (3d Cir. 2008) (holding that NEPA does not require the NRC to consider the indirect environmental effects of a terrorist attack on a nuclear energy facility).

Agency efforts to analyze cumulative effects have proven particularly problematic.  85 Fed. Reg. at 43,344 ("Categorizing and determining the geographic and temporal scope of [cumulative] effects has been difficult and can divert agencies from focusing their time and resources on the most significant effects.").  In 1997 CEQ issued a more than *122-page guidance*

*document* (including appendices) intended to help agencies navigate cumulative effects.[8]  (By contrast, the entire 2020 Rule fills only 73 pages in the Federal Register.)  CEQ tried again in 2005, issuing guidance on how to treat past actions in a cumulative effects analysis.[9]  But the cumulative effects obligation has remained inscrutable, with courts positing a bewildering array of approaches and interpretations.  *See, e.g., Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 974 (9th Cir. 2002) (holding the Forest Service erred in using species home range instead of the entire landscape as the scale for cumulative effects in EIS, but did not err in using species home range as the scale in an EA); *Muckleshoot Indian Tribe v. United States Forest Serv.*, 177 F.3d 800, 809-11 (9th Cir. 1999) (holding a Forest Service EIS for a proposed land exchange with timber company failed to consider the cumulative effects of other *future* land sales and the resultant *future* environmental effects caused by the future new private owners of those lands). These kinds of approaches thus strain the limits of human rationality, since no one can predict the future with certainty.[10]

    To address this problem, the 2020 Rule removes the "direct," "indirect," and "cumulative" subcategories and provides a straightforward definition of "effects" and "impacts" as "changes to the human environment" that are "reasonably foreseeable and have a reasonably

---

[8]  *See* Considering Cumulative Effects Under the National Environmental Policy Act (Jan. 1997), https://ceq.doe.gov/publications/cumulative_effects.html.

[9]  *See* Consideration of Past Actions in Cumulative Effects Analysis (June 24, 2005), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/Guidance_on_CE.pdf.

[10]  Even the approach of individual judges is sometimes inconsistent. *Compare Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) (Fletcher, J.) ("Nor is it appropriate to defer consideration of cumulative impacts to a future date.") *with Sierra Nevada Forest Prot. Campaign v. U.S. Forest Serv.*, 166 F. App'x 923, 928 (9th Cir. 2006) (Fletcher, J. concurring) ("I concur and write separately to clarify one point. The cumulative impact of the MVP and any future project will necessarily be considered in the EIS or EA of the future project; that is the appropriate time for such cumulative impact analysis to be conducted.").

close causal relationship to the proposed action or alternatives." 85 Fed. Reg. at 43,374 (40

C.F.R. § 1508.1(g) (2020)). This definition eliminates the confusion generated by the prior three

subcategories of effects, instead providing a single overarching definition that allows agencies,

courts, regulated communities, and the public to focus on NEPA's primary goal—identifying

reasonably foreseeable environmental effects—rather than on categorizing effects into different

and often overlapping conceptual buckets. It also comports with NEPA's purpose of informed

decisionmaking, as it serves no purpose to devote time and energy speculating about impacts

with only tangential and far-flung connections to the proposed action. *Id.* at 43,343 ("CEQ

intends the revisions to simplify the definition to focus agencies on consideration of effects that

are reasonably foreseeable and have a reasonably close causal relationship to the proposed

action."); *see also* RTC at 279 ("It is not practicable and useful to agency decision making to

analyze effects that are not reasonably foreseeable and do not have a reasonably close causal

relationship to the proposed action.").

      The definition in the 2020 Rule is also consistent with, and informed by, the Supreme

Court's interpretations of NEPA, which have steadfastly demanded that effects have a

reasonably close causal relationship to the proposed action. In *Metropolitan Edison Co. v.

People Against Nuclear Energy*, the Court held:

> Our understanding of the congressional concerns that led to the enactment of
> NEPA suggests that the terms "environmental effect" and "environmental impact"
> in § 102 [42 U.S.C. § 4332] be read to include a requirement of a *reasonably
> close causal relationship* between a change in the physical environment and the
> effect at issue. This requirement is like the familiar doctrine of proximate cause
> from tort law.

460 U.S. 766, 774 (1983) (emphasis added). The Court reaffirmed the analogy to the doctrine of

proximate cause under tort law in *Department of Transportation v. Public Citizen,* holding that

an agency is not required to evaluate an issue over which it has no control, and emphasizing that

requiring there to be "a reasonably close causal relationship" between the proposed action and an environmental effect provides a "manageable line" between the effects an agency should address and those it need not.  541 U.S. at 767.

Undeterred by this clear Supreme Court precedent, Plaintiffs contend that the revised definition is contrary to the intent of Congress because it will leave "substantial impacts unaccounted for," and leave climate change ignored.  Pls.' Br. 29.  But whether an impact not included in an EIS is "substantial" is a fact-specific inquiry that cannot be resolved in this facial challenge.  On the face of the 2020 Rule, the only effects excluded from an EIS are those that are not "reasonably foreseeable" or that lack a "reasonably close causal relationship to the proposed action."  85 Fed. Reg. at 43,375 (40 C.F.R. § 1508.1(g) (2020)).  That standard is purposefully— and properly—fact-dependent.  The 2020 Rule emphasized that a "reasonably close causal relationship" to an effect can exist even where the effect is "later in time or farther removed in distance from the proposed action or alternatives."  *Id*.  And, CEQ acknowledges the possibility that "there may occasionally be a circumstance where an effect that is remote in time, geographically remote, or the product of a lengthy causal chain is reasonably foreseeable and has a reasonably close causal relationship to the proposed action."  *Id.* at 43,343-44.  In other words, the Rule does not, on its face, exclude any substantial effects, and Plaintiffs' speculation that the Rule may, *in application*, lead to the exclusion of substantial impacts cannot be resolved now, in the abstract.

Plaintiffs' claim that the 2020 Rule will lead agencies to omit climate change suffers the same flaw.  The 2020 Rule does not preclude agencies from considering climate change.  As CEQ explicitly notes, the 2020 Rule "does not preclude consideration of the impacts of a proposed action on any particular aspect of the human environment, [and] the analysis of the

impacts on climate change will depend on the specific circumstances of the proposed action."  85

Fed. Reg. at 43,344.  In some instances, it may be appropriate to include climate change in the

discussion of predictable trends in the baseline analysis of the affected environment.  *Id.*  Or, if a

climate impact has a reasonably foreseeable and reasonably close causal relationship to a

particular project (note that some federal agency actions have an immense scope and others are

far less broad and more localized), then it could be addressed as an environmental effect.  Absent

specific projects, it is impossible to know whether and how climate impacts will be addressed.

Without such an application, Plaintiffs' speculative fear that the 2020 Rule will lead agencies to

ignore climate change does not constitute grounds for invalidation of the 2020 Rule on its face.

Plaintiffs err in their contention that the definition of effects in the 2020 Rule is contrary

the Supreme Court's decision in *Kleppe v. Sierra Club*, 427 U.S. 390 (1976).  In *Kleppe*, the

Court noted that a series of concurrently pending interrelated coal mining proposals could have

"cumulative or synergistic" impacts requiring consideration in a single impact statement.  427

U.S. at 410.  The 2020 Rule is not to the contrary.  The Court's analysis focused not on

cumulative impacts, but on the appropriate scope of analysis for an environmental impact

statement where the major federal action at issue was connected to other, unanalyzed federal

actions.  Consistent with the Court's reasoning, the 2020 Rule would also likely require a single

impact statement for the sort of connected actions before the Court in *Kleppe*.  *See* 85 Fed. Reg.

at 43,362 (40 C.F.R. § 1501.9(e) (2020)) (requiring connected actions to be considered in a

single EIS); *id.* at 43,364 (40 C.F.R. § 1502.4(a) (2020)) ("Agencies shall evaluate in a single

environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action.").[11]

In sum, CEQ's definition of effects is a reasonable one entirely consistent with *Chevron*—informed by the text of the statute, Supreme Court precedent, and forty years of agency and judicial experience trying to apply the prior convoluted definitions. CEQ should be upheld in this facial challenge.

> ### 3. The 2020 Rule's Approach to Alternatives Analysis Is a Reasonable Construction of Ambiguous Statutory Terms and Is Consistent with NEPA.

Plaintiffs assert that the 2020 Rule violates the statutory requirement that agencies consider alternatives to proposed actions. Pls.' Br. at 31. This argument is meritless. Again, the question under *Chevron* Step Two is whether the agency's interpretation "is based on a permissible construction of the statute." *Chevron*, 467 U.S. at 843. The 2020 Rule provides a reasonable interpretation of NEPA's ambiguous text relating to alternatives analysis and should be upheld. Plaintiffs' speculative guesses about how agencies may "game" the process under the new regulations and produce less robust NEPA analyses do not provide grounds for facial invalidation of the Rule.

Regarding the analysis of alternatives, the text of NEPA itself is sparse. The statute provides only that agencies should prepare a "detailed statement" addressing, among other things, "alternatives to the proposed action," and that agencies must "study, develop, and

---

[11] Plaintiffs' attempt to use *North Carolina Wildlife Federation v. North Carolina Department of Transportation*, 677 F.3d 596 (4th Cir. 2012), to support their argument that NEPA obligates agencies consider "indirect and cumulative effects," *see* Pls.' Br. 29, is also unavailing. The court's opinion in that case relied on the 1978 regulations, not the text of NEPA. *See* 677 F.3d at 602 (citing 40 C.F.R. § 1502.16(a)-(b) (2019)). Plaintiffs cannot transform a judicial holding based on the old regulations into a holding about the text of the underlying statute.

describe appropriate alternatives to recommended courses of action." 42 U.S.C. 4332(2)(C), (E).

None of these terms are defined, and NEPA's direction to develop and analyze "alternatives"

comes with no instructions on how (or how much) agencies should do so.  The statutory term is

literally satisfied if two alternatives in any given case of final agency action are considered by

the agency during the NEPA process.[12]  For this reason, Plaintiffs attempt to proceed as if the

choices made in the 1978 regulations were choices made by Congress in the 1969 NEPA statute.

They were not.  The 1978 regulatory language and the statutory NEPA language cannot be so

conflated.

The 1978 regulations implemented this statutory requirement by providing that an agency

shall consider "all reasonable alternatives," and shall "include reasonable alternatives not within

the jurisdiction of the agency."  40 C.F.R. § 1502.14(a), (c) (2019).  We must reinforce that these

were the choices of expert regulators; they were not choices made by Congress itself.  In the

2020 Rule, CEQ simply modified Section 1502.14 by eliminating "all" before "reasonable

alternatives" and by eliminating the requirement to consider alternatives outside the jurisdiction

of the agency.  85 Fed. Reg. at 43,330.  And, for the first time, CEQ defined "reasonable

alternatives," providing that "*[r]easonable alternatives* means a reasonable range of alternatives

that are technically and economically feasible, meet the purpose and need for the proposed

action, and, where applicable, meet the goals of the applicant."  85 Fed. Reg. at 43,367 (40

C.F.R. §1508.1(z) (2020)).  These changes easily meet the reasonableness requirement under

*Chevron*.

---

[12]  Indeed, it is not even clear in *Chevron* terms that the consideration of one alternative in any individual final-action situation is insufficient because if every final agency action is assessed under NEPA using at least one alternative, then agencies will, even within their own walls alone, have considered alternatives plural to their preferred courses of action.

First, CEQ explains that eliminating "all" from Section 1502.14 comports with the text of NEPA and makes clarifies that "an EIS need not include every available alternative where the consideration of a spectrum of alternatives allows for the selection of any alternative within that spectrum." 85 Fed. Reg. at 43,330. For example, the Forest Service might consider a timber harvest of 1,000, 5,000 and 10,000 acres, but need not necessarily consider every permutation in between. This change is not dramatic. CEQ has long explained that "[w]hen there are potentially a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS." 46 Fed. Reg. 18,026, 18,026-27 (Forty Questions), Question 1b. That position has been upheld by the courts. *See, e.g., Wetlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 871 (9th Cir. 2004) (rejecting claim that agency erred in considering "only two extreme endpoints" and an insufficient number of "mid-range" alternatives, concluding "NEPA does not require the EIS to have considered every conceivable permutation" between two endpoints).[13] Thus, this change simply conforms the regulations to CEQ's own long-standing policy and underscores that "the

---

[13] *See also Nat'l Audubon Soc'y v. Dep't of Navy,* 422 F.3d 174, 205–06 (4th Cir. 2005) ("To be sure, an agency's planning may focus more intently on a limited subset of all the possible alternatives available to it."); *Audubon Naturalist Soc'y of The Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 669 (D. Md. 2007) ("Undoubtedly, the range of alternatives for an agency to consider when constructing a project to fit the stated purpose and need . . . can potentially be as thick as the leaves on a very windy autumn day. However, as the Supreme Court has noted, a 'detailed statement of alternatives cannot be found wanting simply because the agency failed to include every alternative device and thought conceivable by the mind of man.'" (quoting *Vermont Yankee*, 435 U.S. at 551–52)); *Great Old Broads for Wilderness v. Kimbell*, 709 F.3d 836, 854 (9th Cir. 2013) (holding the agency did not err in adopting a new alternative 'within the spectrum' of previously analyzed alternatives."); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (9th Cir. 2005) (holding the Forest Service was not required to consider alternatives substantially similar to other alternatives); *Headwaters, Inc. v. Bureau of Land Mgmt.*, 914 F.2d 1174, 1181 (9th Cir.1990) ("[A]n agency's consideration of alternatives is sufficient if it considers an appropriate range of alternatives, even if it does not consider every available alternative.").

reasonableness of the analysis of alternatives in a final EIS is resolved not by any particular number of alternatives considered, but by the nature of the underlying agency action and by the inherent practical limitations of the decision-making process."  85 Fed. Reg. at 43,330.

Plaintiffs contend that eliminating "all" from Section 1504.12 will allow agencies to "game the process" by including in the EIS only the "endpoints" of a reasonable range of alternatives while "ignoring nuanced alternatives that are closer to the center."  Pls.' Br. 31.  But notably the range still must be *reasonable*.  Including only endpoints may be reasonable in some situations, but unreasonable in others.  Plaintiffs' speculation that an agency will "game" the regulations to violate the law provides no basis for *facial* invalidation of the regulation. Nowhere do the regulations prohibit the inclusion of a reasonable alternative, and in bringing a facial challenge, Plaintiffs voluntarily accepted the burden of showing that there is no set of circumstances under which the regulation can be valid.  *See* Pls.' Br. 28 (conceding the point by citing *Reno*, 507 U.S. at 301).  They cannot carry that burden with mere speculation about a single situation in which the regulations might be used in a manner contrary to the law.  *See*, *e.g.*, *Anderson*, 514 U.S. at 155 n.6.[14]

Plaintiffs' contention that the 2020 Rule violates NEPA by relieving agencies from considering alternatives outside their jurisdiction is also flawed.  CEQ reasonably eliminated the requirement that an agency consider alternatives not within the jurisdiction of the lead agency,

---

[14]  Plaintiffs also suggest CEQ impermissibly interpreted the NEPA alternatives requirement by "read[ing] the requirement that agencies comply with NEPA 'to the fullest extent possible' out of the statute, replacing it with the word 'practicable' 40 C.F.R. § 1502.9(b) (2020)."  Pls.' Br. 33. Putting aside the limited meaning of the "fullest extent possible" language (*see supra* at 14), this argument misrepresents the 2020 Rule.  The statement in Section 1502.9 simply says that the range of alternatives in a draft EIS must match as closely as "practicable" the range of alternatives that will ultimately be presented in the Final EIS.  In other words, it relates to the consistency between draft and final documents.  It does not purport to interpret, much less rewrite, any statutory text.

finding that "it is not efficient or reasonable to require agencies to develop detailed analyses relating to alternatives outside the jurisdiction of the lead agency." 85 Fed. Reg. at 43,330.[15] This is precisely the type of "difficult policy choice[]"—balancing reasonableness and efficiency against the value of instructing agencies to analyze alternatives beyond their control and expertise—to which judicial deference is critical because "agencies are better equipped to make [such choices] than courts." *Brand X*, 545 U.S. at 980.

Plaintiffs assert that eliminating this obligation violates NEPA because nearly fifty years ago the D.C. Circuit held that the Department of the Interior erred in excluding certain alternatives from an oil and gas leasing EIS outside the agency's jurisdiction. *Nat. Res. Def. Council v. Morton*, 458 F.2d 827 (D.C. Cir. 1972). The Court reasoned that a proposed "solution to a national problem or a set of interrelated problems, may call for several departments or agencies to take [specific actions]," and therefore each involved agency should not be limited to analyzing alternatives within its own jurisdiction. *Id.* at 834-35. There is not, however, a clear conflict between the *Morton* court's reading of NEPA and the 2020 Rule. Under the 2020 Rule, if an interrelated problem would require action by multiple agencies, those agencies could address that problem by jointly preparing or cooperating on a single NEPA document that covers alternatives within the jurisdiction of each agency. 85 Fed. Reg. at 43,361-62 (40 C.F.R. § 1501.8 (2020)).[16]

---

[15] The 2020 Rule does not prohibit the consideration of reasonable alternatives outside the agency's jurisdiction when such consideration is necessary to the decision-making process, for example "when preparing an EIS to address legislative EIS requirements pursuant to § 1506.8 and to address specific congressional directives." 85 Fed. Reg. at 43,330-31.

[16] *See also* 85 Fed. Reg. 43,374 (§ 1508.1 (e)) ("*Cooperating agency* means any Federal agency . . . other than a lead agency that has jurisdiction . . . with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal

But even if *Morton* could be read as requiring a single agency to evaluate alternatives outside of its jurisdiction—the Federal Aviation Administration proposing highway improvements so people will drive more as an alternative to a new airport, for example—that reading would be contrary to the Supreme Court's determination in *Public Citizen* that an agency is not required to evaluate an issue over which has no control.  541 U.S. at 766-69.[17]  Such a requirement would also contravene the Supreme Court's admonition that "[t]he scope of [an] agency's inquiries must remain manageable if NEPA's goal of '[insuring] a fully informed and well-considered decision' . . . is to be accomplished."  *Metro. Edison Co.,* 460 U.S. at 776 (quoting *Vt. Yankee*, 435 U.S. at 558).

Finally, Plaintiffs speculate that the language changes in the 2020 Rule, by eliminating open-ended phrases that only create ambiguity such as "rigorously explore" and "sharply define" from Section 1502.14, will weaken the analyses contained in an EIS, contravening the statutory requirement that an EIS include a "detailed statement" on "alternatives to the proposed action." Pls.' Br. 33-34 (citing 42 U.S.C. § 4332).  But again, this claim relies on speculation about how the regulations will be applied.  There is no facial conflict between the text of the new regulations and the statutory obligation to provide a "detailed statement" on "alternatives."  42 U.S.C. § 4332(C).  To the contrary, consistent with the text of the statute, the new regulations explicitly provide that an EIS must be a "detailed statement" and require that it include evaluation of alternatives.  85 Fed. Reg. at 43,358 (40 C.F.R. §1500.1(a) (2020)).  Plaintiffs'

---

action.").  Such interrelated actions might also be "connected actions" requiring consideration in a single EIS.  *See* 40 C.F.R. § 1501.9(e)(1) (2020).

[17]  *See Int'l Bhd. of Teamsters v. DOT*, 724 F.3d 206, 217 (D.C. Cir. 2013) (recognizing that *Public Citizen* precluded DOT from analyzing alternatives that the agency lacked authority to impose).

speculation that the 2020 Rule will cause weakened NEPA documents falls well short of their burden in this facial challenge.  *Reno*, 507 U.S. at 301.

The 2020 Rule provides a reasonable interpretation of the NEPA obligation to analyze alternatives because it follows NEPA's text, structure, and objectives, and is well-supported and explained.  Plaintiffs are not likely to succeed on the merits of this claim.

      **4.**      **The 2020 Rule's Revised Definition of "Major Federal Action" Is a Reasonable Construction of Ambiguous Statutory Terms and Consistent with NEPA.**

CEQ's 2020 Rule clarifies the definition of "major federal action" to restore its statutory meaning and to ensure that agencies' NEPA analyses are directed—as Congress intended— towards actions with significant effects over which the federal government exercises substantial control.  Plaintiffs are not likely to succeed on the merits of their claim that CEQ's revised definition of "major federal action" is not a permissible construction of NEPA.

NEPA states that an EIS is required when an agency proposes "*major* Federal actions *significantly* affecting the quality of the human environment."  42 U.S.C. § 4332(C) (emphasis added).  Despite Congress's use of two distinct terms, however, CEQ's 1978 regulations explicitly read the word "major" out of the statute: "[m]ajor reinforces but does not have a meaning independent of significantly (§ 1508.27)."  40 C.F.R. § 1508.18 (2019).

The 2020 Rule corrects this misstep.  In it, CEQ acknowledges that it misconstrued the statute in 1978, improperly conflating "major" and "significantly" so as to render the word "major" virtually meaningless.  85 Fed. Reg. at 43,345.  To clarify that "major" has meaning—as all words in a statute should[18]—the 2020 Rule defines "major federal action" as "an activity or

---

[18] *See Advocate Health Care Network v. Stapleton*, 137 S. Ct. 1652, 1659 (2017) ("Our practice, however, is to 'give effect, if possible, to every clause and word of a statute.'" (quoting *Williams*

decision subject to Federal control and responsibility," and removes the statement that "[m]ajor reinforces but does not have a meaning independent of significantly." 85 Fed. Reg. at 43,345; *id.* at 43,375 (40 C.F.R. §1508.1(q) (2020)). Thus, under the 2020 Rule, "major" refers to "the type of action," including whether the action is sufficiently federal, final, and discretionary to trigger NEPA, and "significance" refers the extent of the environmental impacts of the action. *Id.* at 43,345. These are two very different concepts and thus, quite apart from properly applying the anti-surplusage canon of statutory interpretation, which CEQ now does in the 2020 Rule, improperly merging these concepts only serves to obscure and confuse NEPA analysis, not to illuminate it.

In the Preamble to the 2020 Rule, CEQ forthrightly explains that its 1978 regulations, by stripping the word "major" of any meaning, were contrary to the plain text of the statute, congressional intent, and legislative history. First, as a matter of plain text, Congress's use of the two words in the statute emphasizes they have distinct meanings. In the statute, "major" occurs twice, once in 42 U.S.C. § 4332(2)(C), in the phrase "other major Federal actions significantly affecting the quality of the human environment," and again in Section 4332(2)(D), in the phrase, "any major Federal action funded under a program of grants to States." 85 Fed. Reg. at 43,345. In both instances, it modifies "Federal action." *Id.* The statute also uses "significant" or "significantly" twice. *Id.* And, in both of those cases, it does so as a modifier of "affecting" in Section 4332(2)(C) and "impacts" in Section 4332(2)(D)(iv). *Id.* CEQ also revisited the legislative history, finding that Congress clearly intended to use the terms "major" and "significantly" independently—such that the requirement to prepare an EIS would be triggered

---

*v. Taylor*, 529 U.S. 362, 404 (2000))); *Carroll v. Logan*, 735 F.3d 147, 152 (4th Cir. 2013) ("[C]ourts should give effect to every word of a statute whenever possible.").

by a major federal action that *also* has a significant impact.  85 Fed. Reg. at 43,345.  The requirements of "major Federal action" and "significan[ce]," in short, are *both/ands* (EISs are to be performed for actions that are major *and* have significant effects), not *either/ors*.  And Congress certainly did not intend to see conducted one unified analysis of what is major/significant, or they would not have used two different phrases serving different functions.

Finally, CEQ noted that, while its 1978 regulations followed the approach to major federal action taken by the Eighth Circuit in *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1321-22 (8th Cir. 1974), a host of other courts had interpreted "major" and "significantly"—prior to issuance of the 1978 regulations—as having independent meanings. *See* 85 Fed. Reg. at 43,345 (citing cases).  CEQ's interpretation gives meaning to all the words in the statutory text, meets congressional intent, and is plainly reasonable under *Chevron.*

In attacking CEQ's definition of "major federal action," Plaintiffs point to no explicit conflict with the text of NEPA.  Nor do they identify any contrary legislative history.  Instead, Plaintiffs speculate that under 2020 Rule's definition it is possible for minor "federal actions significantly affecting the quality of the human environment to evade NEPA review," in conflict, they suggest, with the general broad purposes of NEPA.  Pls.' Br. 35-36.  This claim misconstrues the 2020 Rule.  By giving independent meaning to "major federal action," CEQ is separating "activit[ies] or decision[s] subject to Federal control and responsibility" from actions that lack a meaningful federal nexus, and actions that otherwise do not trigger NEPA (because, for example, they are extraterritorial, non-final, or non-discretionary) from those that do.  85 Fed. Reg. at 43,435-50, 43,375 (40 C.F.R. §1508.1(q) (2020)).  This distinction, which reflects the words that Congress chose, is supported by a robust lines of case law providing that actions

where there is not federal control or responsibility are not major federal actions under NEPA,[19] and that certain actions such as extraterritorial actions, are exempted from NEPA.[20]  Contrary to Plaintiffs' suggestion that the definition will allow federal projects with significant effects to go unanalyzed, it principally ensures that the projects are sufficiently "federal," final, and discretionary—and have affects within the jurisdiction of the United States—to warrant NEPA analysis in the first instance.[21]

---

[19]  *See, e.g.*, *Rattlesnake Coal. v. EPA*, 509 F.3d 1095, 1101 (9th Cir. 2007) (To determine whether a project "constitutes a major federal action under NEPA, we look to the 'the nature of the federal funds used and the extent of federal involvement. . . . Federal decisionmakers must also retain power, authority, or control over" the project) (internal quotations and citations omitted); *Vill. of Los Ranchos de Albuquerque v. Barnhart,* 906 F.2d 1477, 1482 (10th Cir. 1990) (holding "the federal agency must possess actual power to control the nonfederal activity"); *Sugarloaf Citizens Ass'n v. FERC*, 959 F.2d 508, 514 (4th Cir. 1992) (holding waste disposal facility was not major federal action because federal permitting requirement did not give agency actual power to control permittee); *Winnebago Tribe of Neb. v. Ray*, 621 F. 2d 269, 272-73 (8th Cir. 1980) (finding NEPA did not attach to portions of a project outside of federal control); *Ringred v. City of Duluth*, 828 F.2d 1305, 1308 (8th Cir. 1987) (holding incidental federal permitting requirement did not make a city project a major federal action); *Save the Bay, Inc. v. U.S. Army Corps of Eng'rs*, 610 F.2d 322, 326 (5th Cir. 1980) (holding federal permitting requirement did not establish control sufficient to convert chemical plant into major federal action).

[20]  *See, e.g., Kiobel v. Royal Dutch Petroleum Co.,* 569 U.S. 108, 115–16 (2013) (setting forth presumption against extraterritorial application); *Pub. Citizen*, 541 U.S. at 768 (holding analysis of a proposed action's effects under NEPA not required where an agency has limited statutory authority and "simply lacks the power to act on whatever information might be contained in the EIS.").

[21]  Plaintiffs also make the passing assertion that that the definition of "major Federal action" violates 42 U.S.C. § 4332(2)(E), which requires agencies to "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources."  In fact, "major Federal action" appears only in Section 4332(2)(C).  Section 4332(2)(E) operates independently of Section 4332(2)(C), and thus, CEQ's interpretation of terms in the latter do not modify an agency's obligations under the former.  *See Bob Marshall All. v. Hodel*, 852 F.2d 1223, 1228-29 (9th Cir. 1988) (explaining that "[§ 4332(2)(E)] applies whenever an action involves conflicts, while [§ 4332(2)(C)(iii)] does not come into play unless the action will have significant environmental effects") *cert. denied sub nom. Kohlman v. Bob Marshall All.*, 489 U.S. 1066 (1989).

For these reasons, the 2020 Rule's revised definition of "major federal action" is a reasonable interpretation of NEPA.  It follows NEPA's text, and is informed by its legislative history, and by numerous cases affirming CEQ's interpretation.  Plaintiffs are not likely to succeed on the merits of their claim to the contrary.

> ### 5. The 2020 Rule Does Not Allow Projects to Proceed in Violation of NEPA.

Plaintiffs claim that the 2020 Rule contravenes NEPA by allowing project proponents to undertake certain activities to support a proposed project—such as buying rights-of-way where the project might take place—before the NEPA process is complete.  Pls.' Br. 37.  Contrary to Plaintiffs' depiction, this provision of the 2020 Rule simply codifies long-standing agency practice and case law regarding pre-project activities and is an entirely reasonable interpretation of the statute.

The text of NEPA is silent as to what activities related to a proposal a proponent may undertake prior to the end of the NEPA process.  Nonetheless, CEQ and the Supreme Court have long recognized that NEPA obligates agencies to give careful consideration to "environmental consequences before taking a major federal action."  *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 98 (1983) (citing *Kleppe*, 427 U.S. at 410 n.21).

To effectuate that obligation, CEQ provided in its 1978 regulations that prior to a final NEPA decision "no action concerning the proposal may be taken that would: (1) Have an

---

Additionally, Plaintiffs entirely ignore the emphasized adjective used in this phrase from 42 U.S.C. § 4332(2)(E):  "*appropriate* alternatives."  The word "appropriate" means "especially suitable or compatible." *See* Merriam-Webster's Online Dictionary, https://www.merriam-webster.com/dictionary/appropriate; s*ee also OED Online*, Oxford University Press, June 2020, (defining "appropriate" as "[s]pecially fitted or suitable"), www.oed.com/view/Entry/9870.  Telling CEQ and agencies applying NEPA to consider "appropriate alternatives" is inherently ambiguous in *Chevron* terms, as it requires a policy-based analysis of when an alternative is suitable or not suitable.

adverse environmental impact; or (2) Limit the choice of reasonable alternatives."  40 C.F.R. §

1506.1 (2019).  This prohibition did not preclude all conceivable actions on a proposal pending

completion of the NEPA analysis.  The 1978 regulations explicitly allowed "development by

applicants of plans or designs or performance of other work necessary to support an application

for Federal, State or local permits or assistance."  40 C.F.R. § 1506.1(d).  And, agency-specific

NEPA regulations further described other allowable activities.  For example, the Department of

Transportation's NEPA regulations allow project proponents to acquire rights-of-way for a

proposed road before completion of NEPA.  RTC at 357.  Judicial opinions, including binding

authority in this Circuit, recognize that NEPA imposes no strict bar on all project-related activity

prior to completion of NEPA analysis.  *Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174,

205-06 (4th Cir. 2005) (noting NEPA does not prohibit all activity pending completion of an

analysis, and holding that allowing the Navy to purchase land before completing the NEPA

process did not create a "bureaucratic steamroller" "turn[ing] its ultimate decision about where to

place the [preferred alternative] into a foregone conclusion."); *see also Monsanto Co. v.

Geertson Seed Farms*, 561 U.S. 139, 145 (2010) ("Even if a particular agency proposal requires

an EIS, applicable regulations allow the agency to take at least some action in furtherance of that

proposal while the EIS is being prepared.").[22]

    *Geertson* thus obviously makes clear, by referencing "applicable regulations," that it is

firmly within the span of CEQ's *Chevron* choices to decide how much "action in furtherance of

---

[22]  *See also WildWest Inst. v. Bull*, 547 F.3d 1162, 1169 (9th Cir. 2008) (holding Forest Service
did not violate NEPA by pre-marking trees to be cut before finishing NEPA analysis: "Although
the Forest Service undertook preparatory actions in favor of logging, it clearly retained the
authority to change course or to alter the plan it was considering implementing."); *Los Alamos
Study Grp v. U.S. Dep't of Energy*, 794 F. Supp. 2d 1216, 1228-29 (D.N.M. 2011) (finding
agency did not violate NEPA in expending $210 million over six years on project design and
analysis before completion of NEPA analysis), *aff'd* 692 F.3d 1057 (10th Cir. 2012).

[a] proposal" can occur while an "EIS is being prepared."  Once again, careful consideration of

the actual statutory language is critical.  The relevant statutory language does *not* say that no

action in furtherance of a proposed final course of action that will eventually be finalized can be

taken before the last jot and tittle of NEPA documentation is completed.  Quite the contrary. 42

U.S.C. § 4332(2)(C) instead provides that "all agencies of the Federal Government shall – (C)

include in in every recommendation or report on proposals for legislation and other major

Federal actions significantly affecting the quality of the human environment, a detailed statement

by the responsible official on -- …. (v) any irreversible and irretrievable commitments of

resources which would be involved in the proposed action should it be implemented."

Obviously, including a detailed statement or EIS on "any irreversible and irretrievable

commitments of resources which would be involved in the proposed action should it be

implemented" (*i.e.*, analyzing such commitments of resources in an EIS) is not the same as

creating a strict sequencing requirement that forbids "irreversible or irretrievable commitments

of resources" being made prior to EISs being completed.  The 1978 rules are again the source of

interpreting the statute to create a sequencing requirement.  But under *Chevron* and *Brand X*,

CEQ's feet are not locked in cement as to how to interpret this language in 42 U.S.C. §

4332(2)(C)(v), forever forbidding change to CEQ's regulations on this point.

      Consistent with this history, the 2020 Rule continues the prohibition on taking actions

prior to the completion of the NEPA process if those actions would have an adverse

environmental impact or limit the choice of reasonable alternatives.  85 Fed. Reg. at 43,370 (40

C.F.R, § 1506.1 (2020)).  The 2020 Rule also continues to allow for "activities necessary to

support an application for Federal, State, Tribal, or local permits or assistance."  *Id.*  Then, to

facilitate more consistent implementation among agencies, the 2020 Rule provides exemplars—

based on other agencies' regulations and the case law—of the activities an agency may authorize that would not limit the choice of alternatives or have adverse environmental impacts: "[a]n agency considering a proposed action for Federal funding may authorize such activities, including, but not limited to, acquisition of interests in land (*e.g.,* fee simple, rights-of-way, and conservation easements), purchase of long lead-time equipment, and purchase options made by applicants."  85 Fed. Reg. at 43,370 (40 C.F.R. § 1506.1 (2020)); *see also* RTC at 357 (noting need to promote uniformity in agency practice regarding pre-project activities).

Although the 2020 Rule codifies existing case law and agency practice as well, Plaintiffs baldly assert that "[p]redecisional commitments of this nature inevitably bias analysis and decisionmaking by committing resources to particular proposed action."  Pls.' Br. 37.  This presumption of *inevitable* bias cannot serve as grounds for facial invalidation of the 2020 Rule. "Bureaucratic inertia" is a creature of case law; it is not language present in the NEPA statute. By contrast, the inertia and steamroller concepts are certainly not *Chevron* Step One interpretations of NEPA but instead of interpretations of NEPA subject to change consistent with *Brand X.*  Indeed, even under the 1978 regulations, the inertia/steamroller notions are not proved to be absolutist in nature.  *See, e.g., Pit River Tribe v. U.S. Forest Serv.*, 615 F.3d 1069, 1082 (9th Cir. 2010) ("While bureaucratic inertia may be a risk, we presume that agencies will follow the law.").  To find bias in the NEPA process, a court must find that "the agency has irreversibly and irretrievably committed itself to a plan of action that is dependent upon the NEPA environmental analysis producing a certain outcome, before the agency has completed that environmental analysis."  *Forest Guardians v. U.S. Fish & Wildlife Serv.*, 611 F.3d 692, 714-15 (10th Cir. 2010).

Authorizing project applicants to undertake limited activities such as the purchase of land

or equipment *at their own risk* does not inevitably irreversibly and irretrievably commit the federal decisionmaker toward a particular outcome. *Nat'l Audubon Soc'y*, 422 F.3d at 206 (noting there was no reason the Navy could not resell the land purchased before the NEPA decision if it ultimately decided on another site); *see also Ctr. for Env't. Law & Policy v. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011) (finding agency's entry into a memorandum of understanding and procurement of water use permits before completion of NEPA did not irretrievably commit the agency to a project).[23]

For these clear reasons, Plaintiffs are not likely to succeed on their facial claim that the 2020 Rule impermissibly allows activities to proceed before completion of the NEPA process.

### 6.    The 2020 Rule Promotes Public Participation Consistent with NEPA.

To ensure effective and meaningful public participation in the NEPA process, the 2020 Rule provides that:

> comments on an environmental impact statement or on a proposed action shall be as specific as possible, . . . and shall provide as much detail as necessary to meaningfully participate and fully inform the agency of the commenter's position.

---

[23]  Plaintiffs contend the risk of bias is increased because the 2020 Rule "allows project applicants to define the range of alternatives." Pls.' Br. 37. The Rule does no such thing. The 2020 Rule provides that reasonable alternatives can consider "the applicant's goals and the agency's statutory authority." 85 Fed. Reg. at 43,376. This is little more than a codification of prevailing case law, which has long held it is "entirely appropriate for an agency to consider the applicant's needs and goals" in determining the project's purpose and need and the alternatives to meet that purpose and need. *Webster v. U.S. Dep't. of Agric.*, 685 F.3d 411, 423 (4th Cir. 2012); *see also Alaska Survival v. Surface Transp. Bd.*, 705 F.3d 1073, 1085 (9th Cir. 2013) (stating that the agency conducting NEPA analysis for a permit or license should consider statutory objectives "in light of the goals stated by the applicant"); *Colo. Env't. Coal. v. Dombeck*, 185 F.3d 1162, 1175 (10th Cir. 1999) ("Agencies . . . are precluded from completely ignoring a private applicant's objectives."); *City of Grapevine v. Dep't of Transp.*, 17 F.3d 1502, 1506 (D.C. Cir. 1994) ("[T]he Federal government's consideration of alternatives may accord substantial weight to the preferences of the applicant and/or sponsor in the siting and design of the project." (quoting *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190, 197-98 (D.C. Cir. 1991))). The fact that an alternative that does not meet the applicant's goals is not a reasonable alternative is a far-cry from Plaintiffs' assertion that the 2020 Rule allows applicants to "*define* the range of alternatives." Pls.' Br. 37 (emphasis added).

> Comments should explain why the issues raised are important to the consideration of potential environmental impacts and alternatives to the proposed action, as well as economic and employment impacts, and other impacts affecting the quality of the human environment. Comments should reference the corresponding section or page number of the draft environmental impact statement, propose specific changes to those parts of the statement, where possible, and include or describe the data sources and methodologies supporting the proposed changes.

85 Fed. Reg. at 43,368 (40 C.F.R. §1503.3 (2020)).  This revision is intended to promote informed decision-making, ensuring agencies are fully informed of commenters' positions and can readily understand how the comments relate to the proposed action.  CEQ's call for meaningful and specific public input carries out long-standing Supreme Court precedent that, while "NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon [parties] who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the [parties'] position."  *Vt. Yankee*, 435 U.S. at 553; *see also id.* ("[Comments] must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes a concern.  The comment cannot merely state that a particular mistake was made . . . ; it must show why the mistake was of possible significance in the results." (quoting *Portland Cement Ass'n v. Ruckelshaus,* 486 F.2d 375, 394 (D.C. Cir. 1973))).

Plaintiffs speculate that in application the 2020 Rule's comment requirements will unfairly "elevate the influence of commenters with economic, scientific, technical, or legal expertise."  Pls.' Br. 38.  But nothing in the 2020 Rule—much less on its face—creates such a bias.  The 2020 Rule asks that commenters provide as much detail "as possible," and propose specific changes "where possible," 85 Fed. Reg. at 43,367-68 (40 C.F.R. §1503.3 (2020)), but it does not set a one-size-fits-all facial threshold under which comments lacking detail or specific expertise will be excluded.  Indeed, CEQ explicitly indicated that "[n]othing in these revisions should be construed to limit public comment to those members of the public with scientific or

technical expertise, and agencies should continue to solicit comment from all interested and affected members of the public." 85 Fed. Reg. at 43,333. As CEQ explained in the Preamble to the new Rule, the main purpose of CEQ's revisions is "to bring relevant comments, information, and analyses to the agency's attention, as early in the process as possible, to enable the agency to make maximum use of this information." 85 Fed. Reg. 43,314. This purpose is best served if interested parties bring their concerns to the attention of the agency with as much timeliness and specificity as practically possible. CEQ's revisions do no more than squarely encourage such timeliness and specificity.

Plaintiffs offer no justification for setting aside CEQ's reasonable interpretation of NEPA as encouraging public comments that are sufficiently detailed and substantive to fully inform the agency of the commenter's position and concerns. Plaintiffs, thus, are not likely to succeed on the merits of their claim that the 2020 Rule's commenting requirements violate NEPA.

### C.   CEQ Complied with the APA in Promulgating the 2020 Rule.

Plaintiffs employ a "blunderbuss"-style strategy to challenge the 2020 Rule under the APA, tossing out a litany of issues that they believe CEQ failed to consider in the rulemaking process. In particular, Plaintiffs contend CEQ failed to give adequate consideration to: (1) the "baseline" of the prior regulations; (2) potential impacts to environmental quality; (3) environmental justice; (4) reliance interests in the prior regulations; (5) its change in position; and (6) alternatives to revising the regulations. These claims all fall short, for their own reasons and because such claims must be tied to ripe-for-review final agency action.

Under the APA, CEQ's 2020 Rule must be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. 706(2)(A). Under this "narrow" standard, a court "may not substitute [its] judgment for that of the [agency]," *Dep't of*

*Commerce v. New York*, 139 S. Ct. at 2569, and must defer to the agency's policy choices if the

has shown a "rational connection between the facts found and the choice made." *Motor Vehicle*

*Mfrs. Ass'n*, 463 U.S. at 43.  When an agency changes policy through the promulgation of new

regulations, as in this case, the same standard applies.  *FCC v. Fox*, 556 U.S. at 514.  In such

circumstances, the agency need only acknowledge the policy change and show "that the new

policy is permissible under the statute, that there are good reasons for it, and that the agency

*believes* it to be better."  *Id.* at 515.

  During the rulemaking process, agencies must "respond to comments that are 'relevant to

the agency's decision and which, if adopted, would require a change in an agency's proposed

rule [because they] cast doubt on the reasonableness of a position taken by the agency.'"  *Nat'l*

*Mining Ass'n v. Mine Safety & Health Admin.*, 116 F.3d 520, 549 (D.C. Cir. 1997) (quoting

*Home Box Office, Inc. v. FCC*, 567 F.2d 9, 35 n.58 (D.C. Cir. 1977)) (alterations in original).

This does not require agencies to consider all policy alternatives, or even to respond to every

comment.  *See Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) ("An

agency need not discuss every item of fact or opinion included in the submissions made to it."

(internal quotation marks and citation omitted)).  Rather, "[t]he agency need only state the main

reasons for its decision and indicate that it has considered the most important objections."  *Util.*

*Air Regulatory Grp. v. EPA*, 885 F.3d 714, 720 (D.C. Cir. 2018) (citing *Simpson v. Young*, 854

F.2d 1429, 1435 (D.C. Cir. 1988)); *accord Ass'n of Priv. Sector Coll. & Univs. v. Duncan*, 681

F.3d 427, 441 (D.C. Cir. 2012) ("An agency's obligation to respond, however, is not

'particularly demanding.'" (quoting *Pub. Citizen, Inc. v. Fed. Aviation Admin.*, 988 F.2d 186,

197 (D.C.Cir.1993))).

### 1.    CEQ Properly Considered the Prior Regulations in Assessing the Environmental Impacts of the 2020 Rule.

Plaintiffs contend that the rulemaking was deficient because CEQ allegedly failed to "consider the existing, four-decade regulatory status quo as the baseline for evaluating the environmental effects of the new Rule." Pls.' Br. 42. This is patently false and a simple reading of the Preamble to the 2020 Rule reveals that CEQ acknowledged repeatedly the many ways the 2020 Rule departs from the 1978 regulations. *See, e.g.*, 85 Fed. Reg. at 43,314 n.68 ("The final rule also extends the adoption process and standards, which only applies to EISs under the 1978 regulations, to EAs as well."); 85 Fed. Reg. at 43,316 ("CEQ notes that the provisions of the NEPA regulations, which the final rule comprehensively updates, should be read in their entirety to understand the requirements under the modernized regulations."); 85 Fed. Reg. at 43,323 (discussing the 1978 regulations' approach to environmental assessments before transitioning to changes in the 2020 Rule); 85 Fed. Reg. at 43,346 (acknowledging that, under "the 1978 regulations, [] the word 'major' was rendered virtually meaningless," before explaining CEQ's changes in the 2020 Rule giving the term an independent meaning).

Additionally, as required by law, CEQ completed a Regulatory Impact Analysis (RIA) for the revised regulations. *See* RIA; *see also* Exec. Order No. 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) (updating Exec. Order No. 12,291, 46 Fed. Reg. 13,193 (Feb 17, 1981) (requiring a Regulatory Impact Analysis for major regulations)). That analysis provided "a largely qualitative summary of the scope and breadth of impacts CEQ anticipates to result from the final rule," RIA at 2, and specifically evaluated the rule's expected environmental impacts, *id.* at 8. As CEQ explained, the "baseline" for its RIA was "the NEPA statute and Supreme Court case law, and the 1978 regulations." *Id.* Thus, CEQ explicitly considered the prior regulatory structure when assessing the potential environmental effects of the new rule.

41

Plaintiffs argue otherwise by cherry-picking half a sentence from the Regulatory Impact Analysis stating that "CEQ has determined that, using a baseline of the statutory requirements of NEPA and Supreme Court case law, there are no adverse environmental impacts" that will result from the final rule.  RIA at 10; *see also* Pls.' Br. 42-43.  Plaintiffs extrapolate this single statement to mean that CEQ "excluded" the 1978 regulations from its analysis and "concluded there would be no environmental harm by refusing to acknowledge it was making the changes in the first place."  *Id.* at 43.

Plaintiffs' hyperbolic claim is refuted by the full text of the very sentence they cite, which states: "Although some may view the *changes* in the final rule as reducing the number or scope of analyses, CEQ has determined that, using a baseline of the statutory requirements of NEPA and Supreme Court case law, there are no adverse environmental impacts (see Appendix)." RIA at 10 (emphasis added).  Indeed, in the Preamble to the final rule, CEQ unambiguously "display[ed] awareness that it *is* changing position," *FCC v. Fox*, 556 U.S. at 515, when it noted that the final rule "*comprehensively updates* and *substantially revises* [] prior regulations."  85 Fed. Reg. at 43,306 (emphasis added); *see also id*. at 43,304 ("This final rule comprehensively updates, modernizes, and clarifies the regulations.").  Far from "refusing to acknowledge the changes," Pls.' Br. 42, CEQ repeatedly declared that it was proposing major alterations to the prior regulations.  *See, e.g.,* 85 Fed. Reg. at 43,308-51 (explaining that a "redline version of the proposed changes to the regulations" was posted on www.regulations.gov and detailing at length changes made in the final rule from the 1978 regulations); *see also Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1038 (D.C. Cir. 2012) (holding agency "knew it was changing its position" when it discussed regulatory changes in the Federal Register).

Likewise, when evaluating the 2020 Rule's potential environmental impacts, CEQ considered those impacts not in a vacuum, but rather against the backdrop of the 1978 regulations.  The Regulatory Impact Analysis and its appendix make this plain.  As CEQ explained, the appendix contains a "summary table" that identifies the economic and environmental impacts of changes to the pre-existing regulations.  RIA at 12.  In the summary table, CEQ considered the 1978 regulations in evaluating the likely impacts of altering the definition of "effects or impacts" under Section 1508.1(g).  *Id*. at 30-31.  In particular, CEQ stated that "the changes may reduce the administrative burden relative to the 1978 regulations," but, for several reasons, CEQ did not anticipate that those changes would lead to environmental harm.  *Id*.  Further, when evaluating changes to the alternatives analysis required by Section 1502.12, CEQ explained that, relative to the 1978 regulations, it "anticipates the changes will reduce administrative burden and improve environmental outcomes through greater focus on analyzing feasible alternatives."  *Id*. at 20.  Likewise, in the Preamble to the 2020 Rule itself, CEQ again underscored that "[i]n evaluating economic and environmental impacts, CEQ [] considered the statute and Supreme Court case law, *and the 1978 regulations*." 85 Fed. Reg. at 43,352 (emphasis added).

What seems clear is that CEQ did not consider the changes to the prior regulations to Plaintiffs' satisfaction.  (Plaintiffs have repeatedly expressed their view that the NEPA regulations were copacetic, requiring no changes.)  But CEQ plainly did not "*entirely* fail[] to consider" the baseline.  *Motor Vehicle Mfrs*., 463 U.S. at 43 (emphasis added).  CEQ forthrightly and repeatedly acknowledged that it was changing course, and it used the prior regulatory structure as a baseline for evaluating the effects of the changes in the new rule.  The APA does not require more.

43

>    2.    **CEQ Properly Assessed the 2020 Rule's Potential Impacts to the Environment.**

Plaintiffs also fault CEQ for allegedly failing to adequately consider the purported environmental harm they allege will result from the 2020 Rule. Pls.' Br. 45. In particular, Plaintiffs contend that CEQ failed to consider how changes to the public involvement process, the definition of alternatives, and the definition of "environmental effects," would lead to negative impacts when the 2020 Rule is applied. To the contrary, CEQ fully met its obligation to "'examine[] the relevant data' and articulate[] 'a satisfactory explanation'" for its decision to revise the regulations and its conclusion that the revisions will not have adverse environmental effects. *Dep't of Commerce v. New York*, 139 S. Ct. at 2569 (citation omitted).

In essence, Plaintiffs contend for a position that attempts to lock in or "reify" the 1978 regulations but, according to the Supreme Court, the choices agencies make consistent with the *Chevron* Step Two are *not* to be locked in. The country is not restricted to being ruled by a "dead hand" approach constrained by the happenstance of choices made in 1978 by those who could not foresee all of the problems their NEPA interpretations would create. Adjustments in regulatory approach, including in the environmental area, are entirely permissible. Witness *Chevron* itself, which allowed greater consideration of economic trade-offs, even when the environmental group plaintiffs there were arguing loudly that pollution sources had to be regulated at the sub-plant level in order to satisfy the purposes of the Clean Air Act. The Supreme Court nonetheless firmly rejected their arguments: "We hold that the EPA's definition of the term 'source' is a permissible construction of the statute which seeks to accommodate progress in reducing air pollution with economic growth. 'The Regulations which the Administrator has adopted provide what the agency could allowably view as ... [an] effective reconciliation of these twofold ends....'" *Chevron*, 457 U.S. at 866 (quoting *United States v.*

*Shimer*, 367 U.S. [374,] 383 (1961)).  Just so as to CEQ's policy balancing in 2020 in its NEPA Rule.

To start, although CEQ's obligation under the APA is procedural, Plaintiffs' argument regarding the environmental effects of the 2020 Rule is primarily substantive, arguing that *when applied*, the Rule will drive negative environmental outcomes.  As explained in Defendants' Motion to Dismiss, Plaintiffs' claim of environmental harm stemming from the 2020 Rule is purely speculative.  *See* Br. in Supp. of Mot. to Dismiss, ECF No. 59.  The 2020 Rule reasonably effectuates the statutory requirements of NEPA, and, until the 2020 Rule is applied, neither CEQ nor the Plaintiffs can know that it will lead to decisions that are "worse" for the environment than those made under the prior regulations.  *See* RTC at 467 ("It is not possible to state affirmatively that a specific [agency action] would be analyzed differently under the final rule."). At this juncture, Plaintiffs' claims of environmental harm are pure speculation, and "the parade of horribles that the [Plaintiffs] predict will result from implementation . . . if in fact it does result" should be "dealt with in future litigation."  *Advanced Micro Devices v. Civ. Aeronautics Bd.*, 742 F.2d 1520, 1546 (D.C. Cir. 1984).[24]

Putting aside Plaintiffs' speculation about how the 2020 Rule will be applied, the issue under the APA is whether, in revising its procedural rules, CEQ "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action," *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43, and considered public comments.  Here the record shows CEQ plainly meet those obligations

---

[24]  Moreover, all of Plaintiffs' examples turn on procedures that the 2020 Rule still allows for, such as public scoping, consideration of a reasonable range of alternatives including reasonable alternatives proposed by commenters, and consideration of reasonably foreseeable impacts. *Compare* Pls.' Br. 46, 53 *with, e.g.*, 85 Fed. Reg. at 43,360 (40 C.F.R. § 1501.5(e), (1501.9, (1502.14, (1502.16, (1502.17, (1503.1, (1503.4(a) (1506.6, (1508.1(g)).

regarding the Rule's allegedly negative environmental effects, and it reasonably explained its conclusion that the 2020 Rule would have no adverse effects.[25]  RIA at 10-11; *see also id.* at 12-32 (Appendix).

Regarding public involvement in the NEPA process, Plaintiffs begin by claiming that CEQ failed to consider concerns raised by commenters that the revised regulations would have detrimental environmental effects by negatively affecting "the disclosure role of NEPA that allows communities to weigh in on decisions early in the decisionmaking process."  Pls.' Br. 46. As evidence, Plaintiffs assert that the 2020 Rule does not allow "scoping" for EAs and claim this change will cause discernable negative impacts.  *Id.* at 48-49.  But Plaintiffs are wrong.  The 2020 Rule does not eliminate scoping on EAs.

Nothing in the 1978 regulations explicitly provided for scoping of EAs.  Instead, some agencies opted to provide scoping under 40 C.F.R. § 1501.4(b) (2019), which generically provided that "[t]he agency shall involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments."  In the 2020 Rule, CEQ consolidated scattered EA provisions of the 1978 regulations into a single section. 85 Fed. Reg. at 43,323.  But nowhere does it prohibit agencies from using scoping in the EA process.  To the contrary, the 2020 Rule keeps the key involvement language—"to the extent practicable"—from the 1978

---

[25]  Plaintiffs also contend that, in concluding that the final rule will not have environmental impacts, CEQ "implicitly argues that the prior NEPA procedures have not influenced agency decisions in the past—a premise belied by forty years of experience and directly contrary to the Court's holding in *Robertson* that NEPA's 'procedures are almost certain to affect the agency's substantive decision.'"  Pls.' Br. 49 (quoting *Robertson*, 490 U.S. at 350).  This is a strawman. CEQ never claimed that the prior regulations failed to influence agency decisionmaking.  To the contrary, CEQ explained that a key goal of the 1978 regulations was to "promote better decisions," but that those regulations resulted in a process that was "increasingly complicated" and tended to "slow or prevent the development of important infrastructure." 85 Fed. Reg. at 43,305. The intent of the new rule is to address these issues, while still "promot[ing] better decisions consistent with . . . NEPA."  *Id.* at 43,306.

regulations, but *broadens* involvement in the EA process to include States, Tribes, and local governments.  85 Fed. Reg. at 43,360 (40 C.F.R. § 1501.5(e)(2020)).[26]  Thus, the amendments to the regulations in this respect should have been applauded by Plaintiffs, yet they were not.

Plaintiffs speculate that provisions of the 2020 Rule work together to eliminate scoping for EAs.  Pls.' Br. 48.  But, CEQ has explained that, like the 1978 regulations, the 2020 Rule "would continue to require that agencies reasonably involve relevant agencies, the applicant, and the public prior to completion of the EA," and that "agenc[ies] could provide adequate information through *public meetings* or by *a detailed scoping notice*, for example."  85 Fed. Reg. at 43,323 (emphasis added); *see also* RTC at 142 n.45 (quoting 85 Fed. Reg. at 1,697).  Far from prohibiting scoping on EAs, the 2020 Rule reflects CEQ's long-held view that "[t]here is no single correct approach for public involvement [on EAs]," 85 Fed. Reg. at 43,323, and provides agencies the discretion to determine how best to involve the public.  *See also* RTC at 142 n.45 ("Rather, agencies should consider the circumstances and have discretion to conduct public involvement tailored to the interested public, to available means of communications to reach the interested and affected parties, and to the particular circumstances of each proposed action." (quoting 85 Fed. Reg. at 1,697)).

Second, CEQ also gave proper consideration to comments raising concerns that revised regulations will "limit[] the types of alternatives that must be considered" and "will mean that agencies miss options that cause significantly less damage to sensitive resources."  Pls.' Br. 46.  As noted above, CEQ revised the alternatives requirement to focus agency efforts on exploring alternatives that are technically and economically feasible, meet the purpose and need for the

---

[26]  Indeed, Tribes have supported the 2020 Rule and its expansion of tribal roles. *See, e.g.,* CEQ-2019-0003-83206, Letter from Christine Sage, Southern Ute Indian Tribal Council, https://www.regulations.gov/document?D=CEQ-2019-0003-82306.

proposed action, meet the goals of the applicant, and are within the agency's jurisdiction.  *See*

*supra* at 19-23.  CEQ explained that the changes were consistent with NEPA, with prior CEQ

guidance, and the prevailing case law, and would not result in a failure to consider any

"reasonable alternatives."  Having considered the issue, CEQ reached the reasonable conclusion

that changes "will reduce administrative burden and improve environmental outcomes through

greater focus on analyzing feasible alternatives."  RIA at 20. *See also id.* at 32 ("CEQ does not

anticipate that" its revisions to the definition of "reasonable alternatives," "will have

environmental impacts since analysis of infeasible alternatives is unlikely to improve

environmental outcomes.").  Save for unsupported speculation that agencies will "game" the

2020 Rule to avoid considering reasonable alternatives, Plaintiffs identify no concerns about

alternatives that CEQ did not properly respond to during the rulemaking.  Additionally, because

the new rule calls for a robust and particularized comment process, agencies should not "miss

options that cause significantly less damage to sensitive resources," because any such options

can be brought to their attention by outside commenters.  *See* 40 C.F.R. § 1502.17(a), (b) (2020)

(requiring draft and final EISs to "identif[y] all alternatives" submitted by commenters); *id.* §

1503.1(a)(3) (requiring agency to "[i]nvite comment specifically on the submitted alternatives"

in draft EIS); *id.* § 1501.5(e) (requiring agencies to involve public "to the extent practicable in

preparing environmental assessments"); *id.* § 1503.3(a),(b) (requiring that comments be "as

specific as possible" and, if desired, address "the merits of the alternatives").

     Third, and finally, as noted above, *supra* at 13-19, CEQ exhaustively considered the

impact of revising the definition of environmental effects to remove the imprecise and often

confusing subdivision of effects into "direct," "indirect," and "cumulative," and instead to focus

the analysis on "reasonably foreseeable effects that have a reasonably close causal relationship to

the proposed action or alternatives." RIA at 30 (internal quotations marks omitted).  And CEQ

provided a reasoned explanation for its conclusion that revising the definition of environmental

effects would not lead to negative environmental impacts as it is applied.  Specifically, CEQ

noted that, while the definitional change will reduce confusion and promote consistent

implement across federal agencies, there is no support for the assumption that changing

definitions will necessarily exclude significant effects captured under the prior regulations.  *See*

RTC at 467 ("The mere fact that a referenced EIS included the analysis of indirect or cumulative

effects does not mean the analysis would exclude those same effects under the final rule.").

Rather, "[u]nder the final rule, *any* effect that is reasonably foreseeable and has a reasonably

close causal relationship to the proposed action *must be disclosed and considered*."  *Id.* at 479

(emphasis added).  In other words, while agencies will no longer have to engage in an

unnecessary effort to "characterize effects as direct, indirect, or cumulative," they must

"continue to analyze effects that fall within the scope of the statute."  *Id.* at 465; *see also id.*

(explaining that CEQ's prior guidance on "cumulative impacts" was often arbitrary, because

those impacts "could also be characterized as direct and indirect effects"); *id.* at 470 (noting it is

not "*optional* for agencies to analyze reasonably foreseeable effects that occur later in time or

farther removed in distance; such effects should be fully disclosed and considered").  In sum,

because Federal agencies will continue to meet their statutory obligation to "analyze *any adverse*

*environmental effects* that cannot be avoided should a proposal be implemented," CEQ

reasonably concluded that the changes are unlikely to "influenc[e] environmental outcomes."

RIA at 31.[27]

---

[27]  Plaintiffs also make the passing assertion that CEQ's change in the definition of
environmental effects will permit agencies to "divid[e] one project into multiple individual
actions each of which has an insignificant environmental impact, but which collectively have a

Beyond their effort to prove adverse effects, Plaintiffs also seek to undercut CEQ's analysis by claiming CEQ improperly relied on the fact that "other substantive environmental statutes will remain unchanged" in concluding that the final rule will not cause environmental harm. Pls.' Br. 50. This argument is a red herring. In response to comments alleging that the revised rule will "undermine [future generations'] ability to breathe clean air, drink clean water, and protect the Nation's public lands and natural resources," CEQ correctly noted that "[n]othing in the final rule changes any requirements under substantive environmental laws, such as the Clean Air Act, Clean Water Act, or [Endangered Species Act]." RTC at 4. CEQ made a similar statement in its Regulatory Impact Analysis. RIA at 10. But those statements were never CEQ's primary basis for concluding that the 2020 Rule will have "no adverse environmental impacts." *Id.* As discussed above, in the Appendix to the Regulatory Impact Analysis, CEQ summarized each change to the prior regulations, and fully explained why the changes are unlikely to cause environmental impacts. None of those explanations rely on the existence or continuance of other environmental laws. *Id.* at 12-32.

Finally, in criticizing the rulemaking process, Plaintiffs claim CEQ was obligated to individually analyze and discuss the "hundreds" of "particular factual records" and "real world examples" submitted by Plaintiffs and others that allegedly demonstrate how the final rule could cause environmental harm. Pls.' Br. 46-47, 53. But agencies apply NEPA every year to

_____

substantial impact[,]" thereby avoiding the need to analyze the full scope of effects attendant to that action. Pls.' Br. 52 (quoting *New York v. U.S. Nuclear Regulatory Comm'n*, 824 F.3d 1012, 1020–21 (D.C. Cir. 2016)). CEQ addressed this concern, explaining that "[t]he final rule retains the language in the 1978 regulations concerning the scoping and analysis of connected actions. Where a proposed action is a component or segment of a larger project, the final rule requires Federal agencies . . . to evaluate in a single EIS all proposals or parts of proposals that are related closely enough to be, in effect, a single course of action." RTC at 483. *See* 40 C.F.R. § 1501.9(e)(1) (2020) Thus, the revisions do not permit the kind of segmentation of projects that Plaintiffs fear.

thousands of decisions ranging from nationwide rulemakings to highways and wind farms to timber sales. As the agency tasked with administering the statute, CEQ's job is to make sure the statute can be applied coherently and effectively across a broad range of projects; it is not to engage in the type of unsupported and conclusory speculation about individual projects desired by Plaintiffs. Unquestionably, CEQ in 1978 did not have make a prediction about thousands of specific applications in advance before it issued NEPA regulations, so no analogously impossible burden should be placed upon CEQ in 2020 to complexify or block the 2020 Rule CEQ issued. The APA simply does not require CEQ to reexamine hundreds of past agency decisions to speculate about how they might have come out differently under the 2020 Rule. Nor may CEQ assume at the outset, as Plaintiffs appear to do, that agencies "will" violate the 2020 Rule by "failing" to consider reasonably foreseeable impacts and connected actions. *See id.* at 53; *see Fed. Commc'ns Comm'n v. Schreiber*, 381 U.S. 279, 296 (1965) (noting "the presumption to which administrative agencies are entitled—that they will act properly and according to law").

Under the APA, agencies must "consider and respond to significant comments received during the period for public comment." *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015). This requirement has "never been interpreted to require the agency to respond to every comment, or to analyze every issue or alternative raised by the comments." *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984). Nor does it impose an "obligation on agencies to produce empirical evidence" where qualitative discussion is sufficient. *Stilwell v. Office of Thrift Supervision,* 569 F.3d 514, 519 (D.C. Cir.2009); *see also Louisiana ex rel. Guste v. Verity*, 853 F2d 322, 327 (5th Cir. 1988) (noting that a regulatory solution "need not be [a plaintiff's] ideal, so long as it is not arbitrary or capricious, and so long as the agency gave at least minimal consideration to relevant facts contained in the record[,]" the action should be upheld). As described above, CEQ fulfilled

these obligations, providing a reasoned explanation of why its procedural rules are not expected to have negative environmental effects.  Plaintiffs should not be allowed to stymie the rulemaking process—as they attempted to do in their related FOIA case—or impose analyses beyond the requirements of the APA just by flooding the agency with negative comments. *Vt. Yankee,* 435 U.S. at 553–54 (1978) (rulemaking "should not be a game or a forum to engage in unjustified obstructionism by . . . seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented'").

Overall, Plaintiffs and their experts disagree with CEQ's conclusions regarding the potential environmental impacts of the new rule.  But that disagreement does not mean CEQ "entirely failed to consider" the relevant factor of possible environmental harm.  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43; *see also Owner–Operator Indep. Drivers Ass'n v. Fed. Motor Carrier Safety Admin.,* 494 F.3d 188, 210-11 (D.C. Cir. 2007) (noting that the agency had "acknowledged comments . . . [regarding] the burden of changes" and, while the petitioner "may disagree with this policy balance . . . it does not reflect a failure to consider relevant factors"). CEQ considered the environmental implications of the regulatory change, and reasonably concluded that no harm would result.  CEQ's conclusions rest well within its technical expertise and informed discretion and should be upheld.  *Aracoma Coal Co*., 556 F.3d at 201 ("[C]ourts must generally defer to the agency evaluation because 'an agency must have discretion to rely on the reasonable opinions of its own qualified experts even if, as an original matter, a court might find contrary views more persuasive.'" (quoting *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 378 (1989)).

### 3.    CEQ Properly Considered Environmental Justice.

Plaintiffs also argue that CEQ failed to consider environmental justice in promulgating

the 2020 Rule.  Pls.' Br. 54-58.  According to Plaintiffs, "the record is devoid of evidence" that CEQ adequately considered environmental justice concerns in updating the regulations.  *Id.* at 55.  This claim fails at the outset because it is not reviewable.  But even if it were, the record clarifies that CEQ gave reasoned consideration to environmental justice concerns.

Under Executive Order ("E.O.") 12,898, federal agencies are to "identif[y] and address[], as appropriate, disproportionately high and adverse human health or environmental effects . . . on minority populations and low-income populations in the United States."  Exec. Order No. 12,898, 59 Fed. Reg. 7,629, 7,629 (Feb. 11, 1994).  The E.O. does not, however, "create any right to judicial review involving the compliance or noncompliance of the United States, its agencies, its officers, or any other person with" the E.O.  *Id.* at 7,633.  Having identified no other basis in substantive law for requiring CEQ to consider impacts on environmental justice, Plaintiffs' claim that CEQ failed to consider environmental justice is thus not subject to judicial review.  *See Citizens Concerned About Jet Noise, Inc. v. Dalton,* 48 F. Supp. 2d 582, 604 (E.D. Va. 1999) (finding that the court lacked jurisdiction to consider environmental justice claims, because Executive Order 12,898 does not provide for judicial review, and "NEPA does not require an environmental justice analysis"), *aff'd*, 217 F.3d 838 (4th Cir. 2000); *see also Oregon Nat. Res. Council v. Thomas*, 92 F.3d 792, 798 (9th Cir. 1996) ("Whether an agency has overlooked 'an important aspect of the problem,' . . . turns on what a relevant substantive statute makes 'important.' In law, unlike religion or philosophy, there is nothing which is necessarily important or relevant.").

Even were it reviewable, Plaintiffs' environmental justice claim cannot be reconciled with the record.[28]  At the outset, CEQ makes clear that the 2020 Rule merely sets forth "implementing regulations for NEPA; it is in the agency implementation of NEPA[,] when conducting reviews of proposed agency actions[,] where agencies can consider, as needed, environmental justice issues."  85 Fed. Reg. at 43,356.  Thus, Plaintiffs' arguments with respect to environmental justice suffer from the same overarching flaw as their entire motion—their alleged harms are contingent on future application of the regulations by other agencies in future agency actions and are therefore speculative and premature, which Plaintiffs themselves recognize.  *See* Pls.' Br. 56 (arguing the revised NEPA process may "exacerbate *the chance*" that minority communities will suffer disproportionate environmental harms); *id.* (elimination of NEPA review for Farm Service Agency loan guarantees *could lead* to lack of disclosure regarding concentrated animal feeding operations); *id.* at 57 (changes in requirements relating to scientific information *could lead* agencies to ignore emerging issues such as per- and polyfluoralkyl substances) (emphases added).[29]

---

[28] Defendants acknowledge that, despite the plain text of Executive Order 12,898, some courts outside of this Circuit have reviewed the discussion of environmental justice in NEPA documents under the APA's arbitrary and capricious standard.  *See Cmtys. Against Runway Expansion, Inc. v. FAA*, 355 F.3d 678, 689 (D.C. Cir. 2004); *Latin Ams. for Soc. & Econ. Dev. v. Adm'r of Fed. Highway Admin.*, 756 F.3d 447, 477 (6th Cir. 2014).  CEQ and the United States preserves its right to contend that such decisions were incorrect.

[29] In the same vein, the status of CEQ's environmental justice guidance, and the effect of its potential withdrawal, has not been revolved, as Plaintiffs implicitly acknowledge. Pls.' Br. 57 ("CEQ failed to confirm whether it is withdrawing the environmental justice guidance").  CEQ explained in the 2020 Rule that "it will provide notice in the *Federal Register* listing withdrawn guidance[,]" and that it "will issue updated or new guidance consistent with Presidential directives."  85 Fed. Reg. at 43,351; *see also* RTC at 577 ("[T]he final rule supersedes previous CEQ guidance and CEQ intends to publish a separate notice in the *Federal Register* listing guidance it is withdrawing.  CEQ will issue new guidance, as needed, consistent with the final rule and presidential directives.").  The fact that this is an unresolved issue only underscores why this facial challenge runs afoul of ripeness requirements.

Notwithstanding the purely speculative nature of Plaintiffs' claims, the record shows CEQ properly analyzed the 2020 Rule, including by considering and responding to numerous comments relating to environmental justice concerns, and reached the reasoned conclusion that the rule "would not cause disproportionately high and adverse human health or environmental effects on minority populations and low-income populations."  85 Fed. Reg. at 43,356.  Contrary to Plaintiffs' assertion that the record is "devoid of evidence"[30] that CEQ considered environmental justice, Pls.' Br. 69, CEQ responded to numerous comments relating to environmental justice issues and incorporated some changes to its original proposals.  *See, e.g.,* RTC at 33-34; 111-12; 297; 327-28; 372-73; 395-96; 576-77; 590.  CEQ reviewed the changes in the Final Rule and determined they would not result in adverse environmental impacts.  RTC at 34 (citing RIA Appendix, which summarizes environmental impacts associated with the regulatory changes).  Having determined that the new regulations will not result in adverse environmental impacts, it follows that the regulations will not result in *disproportionate* adverse effects on environmental justice communities.  CEQ further explained that many of the changes in the new regulations are designed to "improve coordination with local communities and expand opportunities for the public to participate in the NEPA process."  RTC at 34.  Nothing more is required.  As CEQ explained, "individual [a]gencies may consider, as necessary and appropriate, environmental justice issues in connection with NEPA compliance."  *Id.*  Until a federal agency

---

[30]  Note Plaintiffs' allegation here: the record is "devoid of evidence."  Plaintiffs' must show the record is "devoid of evidence" because under *State Farm* an agency's action is arbitrary or capricious if it "*entirely* failed to consider an important aspect of the problem."  *Motor Vehicle Mfrs. Ass'n*, 463 U.S. at 43 (emphasis added).  Thus, if there is any evidence in the record that CEQ considered environmental justice (and there is ample evidence here), then a court is obliged to uphold the agency's decision under the highly deferential APA standard of review.

actually considers environmental justice issues in the context of a specific action under the new regulations, Plaintiffs' alleged injuries are purely hypothetical.

Lastly, Defendants note that Plaintiffs entirely fail to consider that the 2020 NEPA regulatory reforms will enhance economic opportunities for minority and low-income communities. Building new infrastructure, for instance, can create new construction jobs, ease commuting times including for those who take public transportation. Moreover, repairing aging infrastructure in crumbling neighborhoods could also have positive impacts on the lives of individuals in those communities.

### 4.        CEQ Properly Considered Reliance Interests.

Plaintiffs assert that CEQ violated the APA by "upset[ting] an unchanged regulatory framework the public has relied on for over forty years" without adequate consideration of these reliance interests. Pls.' Br. 59. This claim fails. First, the fact that the policy has changed, requiring Plaintiffs' conduct to change in response, cannot constitute the type of "serious reliance interest"—facing new liabilities, fines, or damages, or losing access to public benefits or the ability to remain to work and live in the United States—requiring special consideration in the rulemaking process. The holding Plaintiffs seek would ossify agency decisionmaking, preventing agencies from making beneficial policy changes simply because the public has become accustomed to the prior approach. But, even if Plaintiffs could demonstrate serious detrimental reliance on the old regulations, CEQ has provided the "more detailed" explanation required under such circumstances.

Generally, "agencies are free to change their existing policies as long as they provide a reasoned explanation for the change." *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016). The "mere fact of policy change" does not in and of itself require "further

justification."  *Id.* at 515-16; *see also Smiley*, 517 U.S. at 742  ("Of course the mere fact that an agency interpretation contradicts a prior agency position is not fatal.").  Where an agency's prior policy decision "has engendered serious reliance interests" the agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate." *FCC v. Fox*, 556 U.S. at 515; *see also Dep't of Homeland Security v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1913 (2020) (the Supreme Court's recent decision concerning the DACA program ("Deferred Action for Childhood Arrivals").  Thus, the presence of serious reliance interests does not prevent an agency from implementing a policy change, it only requires that such interests be reasonably accounted for in the agency's detailed explanation.

Although Plaintiffs correctly describe the standards applicable to consideration of serious reliance interests in the context of a regulatory change, their argument is missing one critical element—the demonstration of any *serious* reliance interest.  In fact, Plaintiffs articulate no legitimate reliance interest whatsoever, much less a serious one.  All they point to is their familiarity with an established regulatory framework.  For example, Plaintiffs state that they "relied on the prior regulations to ensure government transparency, obtain a wealth of data, and make their voices heard," as well as to "ensure that government agencies think through the consequences of their environmentally harmful actions."  Pls.' Br. 59, 61; *see also id.* at 60 (Plaintiffs "have relied on the current rules to structure their participation on-going and upcoming projects and rulemakings subject to NEPA.").  In other words, Plaintiffs have an interest in the prior regulations because they have structured their participation in the NEPA process around those regulations.

But it is not reasonable or justifiable for Plaintiffs to expect CEQ never to amend or modify its NEPA regulations.  *See Encino Motorcars*, 136 S. Ct. at 2125 ("Agencies are free to

change their existing policies as long as they provide a reasoned explanation for the change."); *see also Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 577-78 (D.C. Cir. 2019) (finding that renewable fuel producers did not have the kind of "reliance interests that merit special consideration," since "neither the [Clean Air Act] nor the EPA ever suggested that the [Renewable Fuel] Program's statutory applicable volumes would be enforced without modification").

Plaintiffs' speculative claim that the 2020 Rule could require them to make minor adjustments to their participation in future NEPA processes falls well short of the level of detrimental reliance that requires special consideration. *Compare NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 295 (1974) (finding no substantial reliance interest because NLRB's previous decisions did not seek to impose "some new liability" on individuals for past actions and did not involve "fines or damages") *with Regents*, 140 S. Ct. at 1906, 1913-15 (finding substantial reliance interests where DACA program recipients received access to public benefits such as work authorization and Social Security and Medicare benefits and "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on the program); *Zenith Radio Corp. v. United States*, 437 U.S. 443, 457 (1978) (finding substantial reliance interests where Secretary of the Treasury's interpretation of countervailing duty statute had been incorporated into the General Agreement on Tariffs and Trade (GATT), which was followed by every major trading nation in the world, and "foreign tax systems as well as private expectations thus ha[d] been built on the assumption that countervailing duties would not be imposed); *United States v. Penn. Indus. Chem. Corp.*, 411 U.S. 655, 674 (1973) (manufacturer had substantially relied to its detriment on Army Corps' interpretation where manufacturer was "affirmatively misled . . . into believing that the law did

not apply in this situation"); *Chapman v. El Paso Nat. Gas Co.*, 204 F.2d 46, 48, 54 (D.C. Cir. 1953) (pipeline company had justifiably relied to its detriment on decision granting right-of-way by building vast majority of pipeline and incurring expenditures of approximately $40,000,000). Unlike the cases above, Plaintiffs are not facing new liability, fines, or damages as a result of their reliance on the previous NEPA regime.  Nor have Plaintiffs expended "considerable funds" in reliance on CEQ's prior policy.  Rather, Plaintiffs are in the same position as every other member of the public who has participated in the NEPA process in the past—they are more familiar with the old regulations and may have to spend some time becoming proficient in the new regulatory regime.  Plaintiffs' preference not to have to become familiar with new regulations does not rise to the level of a justifiable, detrimental reliance requiring special consideration in the rulemaking process.[31]

But even if Plaintiffs have established a serious reliance interest, CEQ provided the "more detailed justification" required by law in such instances.  *FCC v. Fox*, 556 U.S. at 515; *Mingo Logan Coal Co. v. EPA*, 829 F.3d 710, 727 (D.C. Cir. 2016) (upholding agency action that withdrew approval of mining permit upon finding the agency's "explanation adequate even assuming *arguendo* that it was required to supply 'a more detailed justification' for its [challenged] decision" (citing *FCC v. Fox*, 556 U.S. at 515)).  The "more detailed justification" standard is not intended to be particularly onerous or preclude the agency from acting.  The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one."  *FCC v. Fox*, 556 U.S. at 515 (emphasis omitted).

---

[31] This is especially true here because the 2020 Rule has retained many of the procedures and structure from the prior regulations.  There are still EAs and EISs, still scoping and comment periods, and still requirements to consider reasonably foreseeable impacts and a reasonable range of alternatives.

Rather, the agency must merely give "a reasoned explanation for disregarding facts and circumstances that underlay or were engendered by the prior policy." *Id* at 516.  In other words, "reliance may spotlight the inadequacy of an agency's explanation," but it "does not overwhelm good reasons for a policy change." *Encino Motorcars,* 136 S. Ct. at 2128 (Ginsburg, J. concurring).

Assuming CEQ had to take Plaintiffs' "reliance interests" into account, the rulemaking clarifies any such interests were outweighed by the pressing need to modernize and clarify the NEPA regulations.   CEQ explained that the new regulations will improve interagency coordination, facilitate public involvement and participation, increase transparency and consistency, and reduce paperwork and delays. *See* 85 Fed. Reg. at 43,306.  In particular, CEQ explained that it has sought, over the last four decades, "to provide clarity and direction related to the implementation of the regulations and [NEPA] through the issuance of guidance." 85 Fed. Reg. at 43,308 (noting that CEQ has issued over 30 guidance documents).  Despite these efforts, CEQ recognized that the NEPA process had become lengthy, complex, and costly. *Id.*  Indeed, CEQ noted that the average time for completion of an EIS was 4.5 years, with one quarter taking over six years. *Id.* at 43,309.  CEQ also addressed judicial review of agency NEPA compliance, noting that agencies are challenged by courts' differing interpretations of key terms and requirements, which ultimately makes a complex administrative process that much more complex. *See id.* at 43,309-10.  Thus, the new regulations are intended to reduce some of this burden by codifying certain aspects of "longstanding case law," while clarifying "the meaning of regulations where there is a lack of uniformity in judicial interpretation of NEPA and the CEQ regulations." *Id.* at 43,310.  In short, CEQ has amply explained the need to revise its regulations.

Plaintiffs' reliance interests, if any, simply do not "overwhelm" these "good reasons for a policy change." *Encino Motorcars,* 136 S. Ct. at 2128 (Ginsburg, J. concurring).

### 5.   CEQ Provided a Reasonable Explanation for Revising Its Regulations.

Plaintiffs argue that CEQ has failed to adequately explain it basis for revising the NEPA regulations, contending that the record does not support CEQ's claims that the NEPA process is a source of delay or that the revisions will reduce delay.  Pls.' Br. 63-71.

CEQ has amply demonstrated that, after forty years, revision of its regulations was long overdue.  Although intended to "reduce paperwork, to reduce delays, and at the same time to produce better agency decisions, which further the national policy to protect and enhance the quality of the human environment,"  43 Fed. Reg. 55,978, 55,978 (Nov. 29, 1978), the old NEPA regulations had become needlessly complex, buried by a decades-long accretion of guidance documents, divergent agency practices, and inconsistent judicial interpretations.  Agency efforts to comply with NEPA have resulted in increasingly time-consuming and burdensome analysis documents that do little to serve NEPA's purpose of informing decision-makers.  85 Fed. Reg. at 43,305 (explaining that "agencies have responded by generating voluminous studies analyzing impacts and alternatives well beyond the point where useful information is being produced and utilized by decision makers.").  This inconsistent patchwork of regulations, guidance, and case law is hardly the stable, established legal framework that Plaintiffs claim, *see* Pls.' Br. 70, and it has real world impacts, delaying all manner of decisions including "transportation, water, and other types of infrastructure" projects.  85 Fed. Reg. at 43,305.  It cannot be seriously contended that CEQ has not shown "good reasons" for revising its regulations.  *FCC v. Fox*, 556 U.S. at 515.

Plaintiffs contend the need to reduce paperwork and delay is unsupported.  Pls.' Br. 63-

64.  But on this point the record is irrefutable.  The average EIS now take 4.5 years to

complete—more than quadruple the time CEQ predicted it would take when CEQ wrote the

1978 regulations.  85 Fed. Reg. at 43,309.  And the average EIS is now 661 pages long—again,

more than quadruple the 150 pages CEQ originally recommended.  *Id.*[32]  These lengthier

processes are generally driven by an agency's desire to "litigation-proof" the process—

attempting to meet the demands of the most recent judicial opinion—rather than improving the

quality of the agency review or otherwise advancing the purposes of NEPA itself.  85 Fed. Reg.

at 43,308.  There is little doubt the lengthy and cumbersome NEPA process causes real-world

delay and expense for project proponents.[33]

---

[32]  *See also Council on Environmental Quality, Environmental Impact Statement Timelines* (2010–2018) (June 12, 2020), https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timeline_ Report_2020-6-12.pdf; *Council on Environmental Quality, Length of Environmental Impact Statements* (2013–2018), (June 12, 2020) (''CEQ Length of EISs Report''), https://ceq.doe.gov/ nepa-practice/eis-length.html.

[33]  CEQ received many comments highlighting NEPA-related delays.  The examples below are attached to the Declaration of Amy Coyle.  *See, e.g.,* CEQ-2019-0003-104673-1, CEQ-2019-0003-118871-2, CEQ-2019-0003-129882-1, CEQ-2019-0003-139679-1, CEQ-2019-0003-157735-9, CEQ-2019-0003-157747-1, CEQ-2019-0003-158659-25, CEQ-2019-0003-166296-11, CEQ-2019-0003-167897-3.  County Managers have commented on the redundant studies required under the prior NEPA regulations.  CEQ-2019-0003-173168-2.  The County of San Bernardino characterized NEPA compliance "slow, expensive and complex" – a process that can "delay[] crucial projects for years and increase[] costs dramatically."  CEQ-2019-0003-720623.  A member of the board of directors of the American Road and Transportation Builders Association stated that NEPA's review procedures cause "extensive delay" and may completely derail some transportation improvement projects.  Feb. 11, 2020, Pub. Hr'g Tr. at 217-218; CEQ-2019-003-172656.  A representative from the Independent Petroleum Association of America stated that NEPA has delayed critical energy and infrastructure projects.  Feb. 11, 2020, Pub. Hr'g Tr. at 235; CEQ-2019-003-172656.  The President of the Colorado Springs Chamber of Commerce highlighted the need for enhanced coordination of federal agencies during the NEPA process.  Feb. 11, 2020, Pub. Hr'g Tr. at 237-40; CEQ-2019-003-172656.  The Chairman of the South Ute Indian Tribe flagged the costs of long delays of NEPA review on tribal projects.  Feb. 11, 2020, Pub. Hr'g Tr. at 242; CEQ-2019-003-172656.  A commenter on behalf of the National Association of Realtors urged CEQ to act to reduce the costs associated with NEPA related delays.  Feb. 11, 2020, Pub. Hr'g Tr. at 254-258; CEQ-2019-003-172656.

Nor is there serious doubt that CEQ's belief that the new regulations will be "better" than the old ones at reducing paperwork and delay is justified.  *FCC v. Fox*, 556 U.S. at 515.  Among other meaningful changes, CEQ has reorganized the regulations in a commonsense manner, codified case law, removed layers of guidance, created uniform procedures for other agencies, focused public participation (while expanding it as well, creating a win-win change), clarified concepts that have proven unworkable over past forty years, directed agencies to schedule and prioritize their resources in order to ensure prompt NEPA review, shortened the time-frame for, and length of, NEPA documents, and reduced duplication of efforts by agencies undertaking NEPA review.  *See* 85 Fed. Reg. at 43,313-15 (summarizing the final rule).  CEQ's conclusion, based on these changes, that the revised regulations will increase efficiency, reduce delays, decrease paperwork, reduce litigation, advance the policy of integrating NEPA with other environmental reviews, and foster excellent decision making, is well-grounded in the record.  85 Fed. Reg. at 43,306; RTC at 30; 54, RIA at 6-8.

Rather than acknowledging the body of evidence before CEQ, which in many cases comes from the parties most affected by projects subject to NEPA review, Plaintiffs point to several commenters who argue that increasing funding for NEPA reviews is the primary solution to NEPA-related delays.  Pls.' Br. 64-65.  But CEQ lacks appropriation authority, so this suggestion fails to grapple with the issue confronted by the agency and treats taxpayer dollars as a Band-Aid for flaws in the underlying regulation.  More money is not a solution for core inefficiencies in the system of 1978 NEPA regulations and, in any event, budgets are constrained, not infinite.  Plaintiffs also reference a letter from law professors arguing that NEPA can help prompt agencies to coordinate and make faster decisions.  Pls.' Br. 65 n.115.  While CEQ agrees that NEPA can play a coordinating role and streamline some aspects of agency

63

decision processes,[34] this comment fails to demonstrate that the NEPA process is not on the whole causing delay.  *See* 85 Fed. Reg. at 43,305 ("[T]he frequency and consistency of multi-year review processes for EISs for projects across the Federal Government leaves no doubt that NEPA implementation and related litigation is a significant factor.").

Plaintiffs argue that CEQ failed to address comments suggesting that the Rule would lead to more, rather than less, delay.  Pls.' Br. 69.  This is incorrect.  It is true that the 2020 Rule creates a new obligation to summarize alternatives, information and analyses.  *See* 85 Fed. Reg. at 43,366 (40 C.F.R. § 1502.17 (2020)).  But CEQ fully addressed the compatibility of this requirement with its overarching goal of increasing efficiency and reducing the length of NEPA review and determined that the requirement would improve transparency and was therefore worth the burden of adding an additional requirement.  RTC at 293-94.  CEQ also fully considered the concern that Section 1502.16(a)(10), which requires agencies to address economic considerations "where applicable," could delay, rather than speed up, NEPA review.  CEQ found the provision was consistent with NEPA's "rule of reason" and that there was no basis for concluding the additional considerations will increase project delay.  *See* RTC at 287.  Finally, CEQ considered and rejected the idea that imposing a presumptive page limit on NEPA documents would slow down the process, noting there is no reason to assume that it will take significant additional time to create *shorter* documents.  Additionally, the Rule provides flexibility to increase the page limits if warranted.  RTC at 228-30; 85 Fed. Reg. 43,364 (40

---

[34]  To that end, CEQ sought to enhance cooperation by requiring the development by the lead agency, in consultation with any applicant and all joint lead, cooperating, and participating agencies, of a joint schedule and preparation of a single EIS and joint record of decision to the extent practicable.  *See* 40 C.F.R. § 1501.7, 1501.8 (2020)

C.F.R. § 1502.7 (2020)) (page limits); 85 Fed. Reg. 43,362 (40 C.F.R. § 1501.10 (2020)) (time

limits).

Plaintiffs also critique two of the documents CEQ relied on in the Regulatory Impact

Analysis for the Rule, Common Good *Updates the Cost of US Infrastructure Delays: Costs*

*Have Risen $200 Billion Over Five Years to Nearly $3.9 Trillion,* (May 2018),[35] and Common

Good, *Two Years, Not Ten Years: Redesigning Infrastructure Approvals* (2015).[36]  Pls.' Br. 67-

68.  While these studies may be limited by the accuracy of the underlying assumptions made

during the analysis, that is the case for any predictive analysis.  *See Am. Civil Liberties Union of*

*Colo. v. City & Cty. of Denver*, 569 F. Supp. 2d 1142, 1176 (D. Colo. 2008) ("As with any

prediction, one can always find fault with its accuracy or second-guess the underlying

assumptions.").  There is no rule of review under the APA stating that the underlying

assumptions in every supporting piece of record evidence must be supported by particular types

of data.  And, while no study is perfect, the assumptions in the two studies exemplify with

CEQ's own experience,[37] CEQ's own prior guidance reflecting that the time for completing an

EIS should not exceed 1 year, *see* 85 Fed. Reg. at 43,326*,* and with numerous commenters

supporting the presumptive time limits.[38]  At base, CEQ's role in the rulemaking process is to

---

[35]  *See* Ex. xx to Declaration of Amy Coyle.

[36]  *See* Ex. xx to Declaration of Amy Coyle.

[37]  For example, under E.O. 13,807 agencies have been successfully developing two-year schedules for completing EISs for major infrastructure projects involving multiple Federal agencies.  *See* Federal Infrastructure Permitting Dashboard, available at https://www.permits.performance.gov/projects/major-infrastructure?title=&term_node_tid_depth=All&term_node_tid_depth_1=All&field_permitting_project_adpoint_administrative_area=All&field_project_status_target_id=All&field_project_category_target_id=All&page=0.

[38]  *See, e.g.,* Comment from Kane County Resource Development, https://www.regulations.gov/document?D=CEQ-2019-0003-166495, ("Kane County supports

review the balance of evidence, and the Common Good studies are just two parts of the larger record that CEQ found persuasive.[39]

In sum, CEQ has amply justified its change in policy, demonstrating "good reasons for it, and that the agency *believes* it to be better," *FCC v. Fox*, 556 U.S. at 515, and demonstrating the required "rational connection between the facts found"—the delay and burden of the process— and the "choice made" to revise the regulations.  *Motor Vehicle Mfrs Ass'n*, 463 U.S. at 43 (citation omitted).

### 6.   CEQ Properly Considered Alternatives to Revising the NEPA Regulations.

Plaintiffs argue that CEQ failed to consider "obvious alternatives" to adopting the final Rule, rendering its decision arbitrary and capricious.  Specifically, Plaintiffs argue that commenters raised several alternatives that would allegedly accomplish CEQ's stated goal of modernizing the NEPA process, including advocating for additional funding and oversight for NEPA compliance, relying on existing guidance documents, revising NEPA regulations to

---

the provision in the proposed rule that ensures that agencies would generally be required to complete EAs in 1 year and EISs in 2 years. This revision is an essential key that will greatly benefit counties that depend on completion of NEPA process before improvement projects and maintenance projects can commence); Wyoming County Commissioners, https://www.regulations.gov/document?D=CEQ-2019-0003-167180,("The proposed changes to the NEPA regulations will help streamline this process in a way that will benefit Wyoming counties."); National Cattlemen's Beef Association https://www.regulations.gov/document?D=CEQ-2019-0003-169920 ("The proposed time limits of 1 year for EAs and 2 years for EISs, absent approval by senior official, are reasonable and much-needed changes—as are the proposed page limits of 150 for EAs and 300 for EISs, absent approval by senior official.").

[39] We also note that Philip K. Howard was instrumental in producing these studies.  Mr. Howard is a protégé of former Vice President Al Gore—a politician renowned for his environmental zeal—and Mr. Howard drafted the introduction to Vice President Gore's book on streamlining government. *See* Vice President Al Gore, COMMON SENSE GOVERNMETN: WORKS BETTER AND COSTS LESS (1995). The fact that Mr. Howard is an important bipartisan voice willing to recognize NEPA's flaws and the available opportunities for reform is notable—and commendable.

account for climate change, and analyzing whether the separate statutory reforms in FAST-41 would adequately accelerate NEPA review. Pls.' Br. 71-72. The record, however, reveals that CEQ considered and responded to each of these comments, discharging its duties under the APA.

Initially, none of Plaintiffs' suggested alternatives appears related to CEQ's purpose of "enhanc[ing] the efficiency of the [NEPA] process." 85 Fed. Reg. 43,306. Additional guidance is not likely to be effective, *see id.* at 43,305-06, and would likely only result in more confusion and additional delay. *See* RTC at 573 (noting "that the 'layer cake' of guidance has grown larger than the statute itself [and] become confusing, unworkable, and inconsistent between Federal agencies."). Note as well that guidance documents are not exactly the preferred form of good government because they can be issued at will, revoked at will, and are not binding. *See Nat'l Council for Adoption v. Jewell*, 156 F. Supp. 3d 727, 736-38 (E.D. Va. 2015) (distinguishing under the APA legislative rules from interpretive rules and general policy statements and collecting cases); *W. Radio Servs. Co., Inc. v. Espy*, 79 F.3d 896 (9th Cir. 1996) (refusing to review agency action for compliance with Forest Service manual and handbook because neither document had "the force and effect of law"); *see also, e.g., Edwardsen v. U.S. Dep't of Interior*, 268 F.3d 781, 786 (9th Cir. 2001) (noting 1997 CEQ guidance on cumulative effects not legally binding); *San Juan Citizens All. v. U.S. Bureau of Land Mgmt.*, 326 F. Supp. 3d 1227, 1243 n.5 (D.N.M. 2018) (noting 2016 CEQ guidance on greenhouse gases and climate change not legally binding, not legally enforceable, and was withdrawn in 2017 by executive order). Regulations are the good and preferred form of government under the APA because they must go through notice and comment. Guidance documents are sometimes voluntarily subjected to notice-and-comment procedures but not always and certainly not as part of a statutory process superintended

by the courts.  Plaintiffs' counsel that guidance documents are a panacea for NEPA implementation problems is thus head-scratching.

Additionally, a new, stand-alone requirement to consider possible climate change impacts would only increase the already onerous NEPA burden and would not address the myriad other concerns animating the rulemaking.   Moreover, it would only add to the "duplication of paperwork" that CEQ was trying to eliminate.  85 Fed. Reg. at 43,352; RTC at 16.  Other of Plaintiffs' alternatives, such as "advocating for additional funding and oversight of NEPA implementation," Pls.' Br. 71, or studying FAST-41, *id.* at 71-72, only encourage CEQ to wait and see if someone else will step in and fix the problem, since CEQ lacks appropriation authority and FAST-41 is administered by the Federal Permitting Improvement Steering Council.  These comments—amounting to little more than a policy disagreement with CEQ—were not "significant and viable" alternatives and required no response.  *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) (quoting *City of Brookings Mun. Tel. Co. v. FCC*, 822 F.2d 1153, 1169 (D.C. Cir. 1987)).[40]

Even so, CEQ did consider and respond to Plaintiffs' proposed alternatives to NEPA reform.  *See, e.g.*, RTC at 19-20 (responding to comments that a lack of funding is a driver of

---

[40] Or as *Chevron* best put it:

> When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail.  In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do.  The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones:  "Our Constitution vests such responsibilities in the political branches*." TVA v. Hill*, 437 U.S. 153, 195 (1978).

*Chevron*, 467 U.S. at 866.

NEPA delays); *id.* at 32 (explaining that FAST-41 only applies to "covered infrastructure projects" and only a small number have been completed to date); *id.* at 427 (declining to modify rule to account for NEPA funding issues by authorizing cost recovery against private entities because "NEPA does not provide authorities for cost recovery"); *id.* at 464 (rejecting suggestion to issue more guidance documents rather than adopt the final rule because additional guidance would not achieve the goal of consistency and "guidance documents are not substitutes for regulations, since guidance documents are not themselves sources of law"); *id.* at 480-81 (discussing how final rule requires agencies to "consider predictable trends in the baseline analysis of the affected environment," including a changing climate in appropriate cases); *id.* at 573-75 (discussing how the final rule will "supersede any previous CEQ NEPA guidance").

CEQ fully met its obligation to "consider and respond to significant comments" raising alternatives to the agency's proposed revision. *Perez*, 575 U.S. at 96 (citations omitted). Plaintiffs have no likelihood of success on their arguments to the contrary.

Plaintiffs' failure to demonstrate a likelihood of success compels that their motion for a preliminary injunction be denied; there is no need for the Court to consider the remaining prongs of the injunction inquiry. *CASA de Md.*, 2020 WL 4664820, at *22 (noting without likelihood of success an injunction cannot issue).

## II.    Plaintiffs Have Not Shown They Will Suffer Irreparable Harm.

Even assuming Plaintiffs' could show a likelihood of success on the merits (and they cannot, as explained above), "the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Because Plaintiffs cannot demonstrate that will suffer a likelihood of irreparable harm absent injunctive relief, their motion for preliminary injunction must be denied

for this reason as well.

Plaintiffs attribute three species of harms to the 2020 Rule: environmental harms, procedural harms, and informational harms.  None of these putative injuries, however, establishes the injury-in-fact required to establish standing, and Defendants have therefore moved to dismiss this case.  *See* Mot. to Dismiss, ECF No. 52.  Because these three injuries are inadequate to establish standing (which requires the injuries to be concrete and particularized), they also cannot carry the heavier burden required to qualify for emergency injunctive relief— that the injuries be concrete, particularized, and *irreparable* absent an injunction.  *See Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("Of course, . . . a plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it."); *Caribbean Marine Servs. Co. v. Baldridge*, 844 F.2d 668, 674 (9th Cir. 1988) (finding that to demonstrate irreparable harm, "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing").  Defendants therefore incorporate by reference the arguments made in support of their motion to dismiss, only briefly addressing them below.

### A.    Plaintiffs' Speculative Claim That the 2020 Rule Threatens Them with Imminent and Irreparable Environmental Harm Fails.

Plaintiffs contend that the 2020 Rule will cause federal agencies to conduct "less-rigorous" environmental reviews, leading to a litany of environmental harms—from damaging old growth forests, to degrading water quality, to dividing communities with transportation projects.  Pls.' Br. 75-85.  But all of these alleged harms rest on speculation about how the 2020 Rule will be applied in yet-to-be completed future project-level decisions.  *See* Defs.' Br. in Supp. of Mot. to Dismiss 28-30.  The 2020 Rule itself only sets procedures for agencies to follow as they engage in the process of project planning.  Until those procedures are applied by federal

70

agencies to discrete factual situations, it is impossible for Plaintiffs or the Court to determine whether they will cause harm to any of myriad environmental concerns listed by Plaintiffs. Absent a challenge to a concrete final agency decision implementing the 2020 Rule, Plaintiffs lack the requisite injury to establish standing in the first instance, much less to carry the more onerous obligation of demonstrating the imminent irreparable harm needed to obtain emergency injunctive relief.

In an effort to bolster their claim of environmental injury, Plaintiffs try to lower the bar, asserting that any violation of NEPA automatically constitutes an irreparable environmental harm.  Pls.' Br. 74.  But the Supreme Court has rejected this theory, clarifying that the traditional four factor injunction analysis must be applied in NEPA cases with no "thumb on the scale," even after a NEPA violation has been proven at the summary-judgment stage.  *Monsanto*, 561 U.S. at 157.  And there is even less of a reason to put a "thumb on the scale" here in the opening stages of the litigation under the compressed timelines required by Plaintiffs' dubious claim that "emergency" relief was necessary.  Indeed, courts frequently decline to award injunctive relief even after finding a NEPA violation, which makes eminent sense, given NEPA's status as a procedural statute.  *See, e.g., Winter*, 555 U.S. at 25-26 (assuming NEPA violation and declining to issue injunction); *Sierra Forest Legacy v. Sherman*, 951 F. Supp. 2d 1100 (E.D. Cal. 2013) (denying injunctive relief, despite finding NEPA violation); *Pac. Rivers Council v. U.S. Forest Serv.*, 942 F. Supp. 2d 1014 (E.D. Cal. 2013) (same); *Forest Conservation Council v. U.S. Forest Serv.*, No. CV-03-0054-PCT-FJM, 2003 WL 23281957, at *4-5 (D. Ariz. July 9, 2003) (9th Cir. 2004) (denying injunctive relief against 19,634 acres of salvage timber harvest, despite finding NEPA violation) *aff'd*, 110 F. App'x 26.  *See also Methow Valley*, 490 U.S. at 350 ("NEPA itself does not mandate particular results, but simply prescribes the necessary process.").

Plaintiffs also make a passing claim that they will be injured when the 2020 Rule takes effect because "many projects" would proceed without notice, so that Plaintiffs "would not even be aware of them, let alone able to challenge their lack of environmental review." Pls.' Br. 87. Plaintiffs' concerns over not receiving information by way of notice are not the kinds of real-world concrete harms that Article III protects. *See Dreher v. Experian Information Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (citation omitted). But, in any event, the 2020 Rule has little impact on whether Plaintiffs will receive notice of projects. Under the 2020 Rule, proposals analyzed under an EIS are subject to robust public involvement that would provide ample notice of such project. 85 Fed. Reg. at 43,371 (40 C.F.R. § 1506.6 (2020)). As discussed above, the Rule changes nothing about agency procedures related to EAs, which continue to be subject to similarly robust public involvement at an agency's discretion. *See id.* at 43,360 (40 C.F.R. § 1501.5 (2020)). Nor does the Rule change agency procedures related to public notice of projects issued under categorical exclusions ("CEs"). *Id.* at 43,373 (40 C.F.R. § 1507.3 (2020)).

To the extent Plaintiffs are concerned with notice of actions that the Rule has determined are not major federal actions, they fail to demonstrate the 2020 Rule will have a meaningful impact on their ability to learn of those actions. For example, many Farm Service Agency (FSA) loan guarantees—a category of actions over which Plaintiffs have expressed concern—were subject to categorical exclusion without any public notice *before* the 2020 Rule. 7 C.F.R. § 799.32. So, the Rule's express determination that such loan guarantees do not constitute major federal actions, would not alter the degree of notice Plaintiffs receive.[41]

---

[41]  Of course, nothing in the 2020 Rule alters the Freedom of Information Act or other mechanisms by which Plaintiffs may inform themselves of government actions.

Any harm to Plaintiffs from issuing loan guarantees by the FSA or the Small Business Administration (SBA), or from their fear of being deprived of notice of such guarantees, is certainly not imminent.  As explained in the accompanying declarations of FSA Associate Administrator Steven Peterson, and SBA Chief of Staff and Associate Administrator for the Office of Capital Access, William Manger, before changing their policies toward loan guarantees, both FSA and SBA will revise their loan guarantee policies to address the status of loan guarantees under NEPA and the 2020 Rule.  *See* Declaration of Steven Peterson, ¶¶ 18-19; Declaration of William Manger, ¶¶ 10-11.  Until FSA and SBA revise their policies toward loan guarantees and begin to issue guarantees under the new policy, the status quo with regard to loan guarantees will be maintained.  Plaintiffs thus fall well shy of the imminent and irreparable injury needed to justify preliminary injunctive relief.

To sum up this exchange of arguments, Plaintiffs' speculative fear that the 2020 Rule will be applied to future decisions in a manner that will cause harm their environmental interests does not demonstrate an imminent and irreparable injury.

**B.    Plaintiffs' Alleged Procedural Injuries Do Not Constitute Imminent and Irreparable Injury.**

Plaintiffs claim that, because CEQ allegedly violated the APA procedures when promulgating the 2020 Rule—by ignoring Plaintiffs' comments, concerns, and alternative suggestions—, they have suffered a procedural injury justifying injunctive relief.  Pls.' Br. 94.  On the merits this claim is baseless; the record makes clear CEQ properly considered Plaintiffs' comments.  *See supra* at 57.  Merits aside, this claim of procedural injury does not constitute independent grounds for the award of injunctive relief.  As fully detailed in Defendants' motion to dismiss, the Supreme Court has plainly held that "deprivation of a procedural right without some concrete interest that is affected by the deprivation—a procedural right *in vacuo*—is

insufficient to create Article III standing." *See* Defs.' Br. in Supp. of Mot. to Dismiss 32-33

(quoting *Summers v. Earth Island Inst.*, 555 U.S. 488, 496 (2009)). In other words, any

procedural injury to Plaintiffs is actionable only in the context of a challenge to a specific

application of the 2020 Rule that threatens concrete injury to Plaintiffs' interests. *Phillips v.*

*Trans Union, LLC*, No. 3:16-CV-00088, 2017 WL 3911018, at *2 (W.D. Va. Sept. 6, 2017)

("[A] mere procedural violation of [a statute] that produces no 'concrete and particular' injury

will not be justiciable." (citation omitted)). Here, there is no such concrete application.

### C. Plaintiffs' Alleged Informational and Diversion of Resources Harms Do Not Constitute Imminent and Irreparable Injury.

Plaintiffs repackage their procedural injury allegation as an "informational injury,"

asserting that, by "drastically cutting back the information and analysis available to the

Conservation Groups under NEPA, the Rule "perceptibly impair[s]" their ability to function and

pursue their missions." Pls.' Br. 93. As detailed in Defendants' motion to dismiss, Plaintiffs

have not established a cognizable informational injury. Defs.' Br. in Supp. of Mot. to Dismiss at

35.

A cognizable informational injury occurs when a plaintiff is (1) denied "access to

information to which he is legally entitled" and (2) "the denial of that information creates a 'real'

harm with an adverse effect." *Dreher v. Experian*, 856 F.3d at 345 (citation omitted); *accord*

*Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998).

Plaintiffs have not suffered an actionable informational injury. First, NEPA does not

create an actionable legal entitlement to information. *See* Defs.' Br. in Supp. of Mot. to Dismiss

34. Second, even if it did, Plaintiffs have not demonstrated a likelihood that the 2020 Rule will

deprive them of such information. *Id.* To the contrary, Plaintiffs' allegations of informational

harm—like their claims of environmental harm—rely on speculation that in analyzing proposals

under the new regulations agencies will prepare less robust analyses that deprive plaintiffs of information. Pls.' Br. 90-91. Until the Rule is applied, Plaintiffs cannot suffer any such harm, and their speculation to the contrary falls well short of establishing an injury sufficient for standing, much less the imminent irreparable harm required for emergency injunctive relief.

Plaintiffs' related allegation that as organizations they face an imminent and irreparable harm because they will have to "divert their limited resources in order to gather information previously provided through NEPA documents," Pls.' Br. 92, also fails. As explained in Defendants' motion to dismiss, the Fourth Circuit has explicitly rejected this precise assertion of injury, holding that a "voluntary budgetary decision, however well-intentioned, does not constitute Article III injury, in no small part because holding otherwise would give carte blanche for any organization to 'manufacture standing by choosing to make expenditures' about its public policy of choice." Defs.' Br. in Supp. of Mot. to Dismiss 35 (quoting *CASA de Md.,* 2020 WL 4664820, at *9 (quoting *Clapper Amnesty Int'l*, 568 U.S. 398, 402 (2013))). Plaintiffs' seek to evade this holding, suggesting that—unlike the plaintiffs in *CASA de Maryland*—the 2020 Rule is "hindering their ability to carry out their missions." Pls.' Br. 93. This distinction is illusory. Plaintiffs in *CASA de Maryland* also asserted the rule at issue there "impeded CASA's efforts to carry out its mission," and forced the organization to "reallocate resources" and "shift from an 'affirmative advocacy posture' (*i.e.*, advocating for certain policies) to a 'defensive one' (*i.e.*, advising members on the Rule's impact)." 2020 WL 4664820, at *8. While the 2020 Rule may alter the procedures followed by federal agencies, and thus could require organizations like the Plaintiffs to adjust to those procedures, those voluntary organizational changes do not constitute the type of "operational harm . . . [to] the ability of an organization to function" that is required to establish an organizational injury. *Id.* at *10.

In sum, Plaintiffs' alleged injuries are precisely the type of abstract, speculative harms that the Supreme Court has repeatedly held insufficient to justify standing, let alone the imminent, irreparable harm necessary for a preliminary injunction.

## III.   The Public Interest and Balance of Equities Weigh Against Injunctive Relief.

As CEQ has explained, "[i]t is critical to improve NEPA implementation, not just for major projects, but because tens of thousands of projects and activities are subject to NEPA every year, many of which are important to modernizing our Nation's infrastructure."  85 Fed. Reg. at 43,305.  Plaintiffs' requested relief asks this Court to delay necessary reforms and leave in place an outdated regulatory scheme that—while desirable to special interest groups like Plaintiffs who are well-served by the second guessing and inconsistencies that those familiar with the 1978 regulations can and do manipulate—is harmful to the public interest in efficient, comprehensible NEPA review.  Injunctive relief will also harm the government directly by disrupting the lawful promulgation of new regulations and frustrating the government's ability to turn CEQ's expertise towards reforming the NEPA process.  *See Washington v. Trump*, 847 F.3d 1151, 1169 (9th Cir. 2017) (acknowledging the "powerful" public interest "in the ability of an elected president to enact policies").  The equities weigh against interim relief, and no injunction should issue.

### A.   Plaintiffs' Arguments Conflate the Likelihood of Success with the Equities.

Preliminary relief involves the "exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents."  *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017) (citations omitted).  Courts, sitting in equity, "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S. at 24

(quoting *Amoco Production Co. v. Vill. of Gambell*, 480 U.S. 531, 542).  And courts must "pay particular regard for the public consequences in employing the extraordinary remedy of injunction."  *Winter*, 555 U.S. at 24 (quoting *Weinberger v. Romero–Barcelo*, 456 U.S. 305, 312 (1982)).[42]  The equities are a separate inquiry from the movant's likelihood of success on the merits.  *See Pashby*, 709 F.3d at 329-30 (holding the district court erred in concluding that "the public interest always lies with upholding the law" (citation omitted)).

Several of Plaintiffs' equities arguments are indistinct from their failed merits arguments and fail for the same reasons.  Plaintiffs argue that a preliminary injunction is necessary to prevent public harm from implementing a regulation that may later be vacated, Pls.' Br. 102-03, but this is an entirely theoretical harm premised on their hope of succeeding on the merits.  Plaintiffs also argue that an injunction furthers the public interest in ensuring that federal agencies follow the law, *id.* at 104-05, but this argument invites the Court to err in the specific manner the Fourth Circuit cautioned against in *Pashby*.  709 F.3d at 329-30 (concluding that a district court had erred by finding plaintiffs had showed a likelihood of success on the merits and conflating that holding with the public interest by holding "the public interest always lies with upholding the law.").  And Plaintiffs argue that the old regulatory scheme is "a particularly effective regulatory mechanism" threatened by the 2020 Rule, Pls.' Br. 97, but that argument is, in substance, no different from their meritless arguments that the 2020 Rule contradicts the NEPA statute, which are addressed above.[43]

---

[42]  When a plaintiff seeks an injunction against the government, the balance of harms and public interest inquiries merge.  *Nken v. Holder*, 556 U.S. 418, 435 (2009).

[43] This argument also pits Plaintiffs' evaluation of effectiveness—based on their own declarations—against that of the expert agency, whose determinations are owed deference by this Court.  *See Am. Whitewater v. Tidwell*, 770 F.3d 1108, 1115 (4th Cir. 2014) (Judicial "review is particularly deferential when, as is the case here, 'resolution of th[e] dispute involves primarily issues of fact' that implicate 'substantial agency expertise,' and the agency is tasked

Plaintiffs also reiterate their harms arguments, speculating that the final rule might, eventually, result in some unspecified environmental harm. Pls.' Br. 97-98 (quoting *Amoco*, 480 U.S. at 545). To support this contention, Plaintiffs rely on a declaration heavy on speculation and light on specifics. *Id.* As explained above and in Defendants' motion to dismiss, these allegations are not sufficiently concrete or imminent to convey standing to sue, much less to support Plaintiffs' request for injunctive relief. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 564 (1992) (rejecting "some day" injury as insufficient for standing); *Winter*, 555 U.S. at 22 ("Issuing a preliminary injunction based only on a possibility of irreparable harm is inconsistent with our characterization of injunctive relief as an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief." (citation omitted)).

What is more, these allegations of harm turn on mischaracterizations of the 2020 Rule that are, once again, tied up in the merits. For example, Plaintiffs repeatedly mischaracterize the final rule as eliminating certain categories of impacts from analysis, Pls.' Br. 97, which Plaintiffs argue is contrary to NEPA's purpose of fostering informed decision-making and could result in environmental harm. They also mischaracterize the final rule as "remov[ing] the requirement to

---

with balancing often-competing interests." (citations omitted)). Not to mention the forty years' worth of law review articles criticizing the NEPA process under the old regulations. *See, e.g.,* Alyson C. Flournoy et. al., *Harnessing the Power of Information to Protect Our Public Natural Resource Legacy*, 86 Tex. L. Rev. 1575, 1580-86 (2008) (listing criticisms); Paul J. Culhane, *NEPA's Impacts on Federal Agencies, Anticipated and Unanticipated*, 20 Envtl. L. 681, 700 (1990) ("[T]he interminable delay of EIS review and protracted NEPA litigation has contributed to the suspension or cancellation of many water projects, nuclear plants, and other locally unwanted land uses."); Bradley C. Karkkainen, *Toward A Smarter NEPA: Monitoring and Managing Government's Environmental Performance*, 102 Colum. L. Rev. 903, 917 (2002) ("CEQs implementing regulations speak in 'similar grand generalities, doing little to delimit the scope of information demanded of agencies[.]'"); Todd S. Aagard, *A Functional Approach to Risks and Uncertainties Under NEPA*, 1 Mich. J. Envtl. & Admin. L. 87, 101 (2012) (arguing case law "illustrate[s] an overall incoherence in how courts are confronting issues of risk and uncertainty in NEPA cases").

consider all reasonable alternatives." *Id.* at 98.  But both of these arguments merely rehash their merits arguments attacking the provisions of the 2020 Rule.  In any event, as Defendants have already explained, both arguments fail because the rule does not eliminate consideration of any particular impacts that would have otherwise been considered under the prior regulations, and the rule retains the requirement that agencies consider a reasonable range of alternatives.  *Supra at* 19-23.

Plaintiffs' conflation of the merits and the equities is both unhelpful to this Court's analysis under *Winter* and unavailing.  These arguments fail for the same reasons discussed above.

**B.     The 2020 Rule Will Advance the Public Interest in Timely, Effective NEPA Review, and Enjoining the Rule Will Harm the Public and the Government.**

In sharp contrast to the lack of harm to Plaintiffs, an injunction preventing implementation of new regulations would cause real harm to the public interest and the government.

There is a concrete government interest in being able to move forward with its policy prerogatives.  CEQ promulgated the final rule through the lengthy notice and comment rulemaking process required by the APA.  *See* 5 U.S.C. § 553.  CEQ, as the expert federal agency on NEPA, is entitled to a strong presumption of administrative regularity.  *Dep't of Commerce v. New York*, 139 S. Ct. at 2579 (Thomas, J. concurring in part and dissenting in part) (citing cases discussing strong presumption of regularity); *see also Aracoma Coal Co.*, 556 F.3d at 192 (explaining that review under the APA "is highly deferential, with a presumption in favor of finding the agency action valid").  An injunction preventing the 2020 Rule from going into effect would injure the government's interests in being allowed to employ CEQ's expertise to

solve the spiraling problem of over-long NEPA review, and would interject the Court into an area where it lacks expertise.

The harm to the public is even more acute. Any injunction would perpetuate the dysfunction and delay CEQ sought to remedy with the 2020 Rule. Important projects, including many that are "important to modernizing our Nation's infrastructure" will continue to be delayed by a process mired in confusion and litigation. 85 Fed. Reg. at 43,305. And, the administrative cost savings and economic benefit of reforming the process will be needlessly delayed. *See* 85 Fed. Reg. at 43,352 (OMB has determined that this final rule is an economically significant regulatory action because it may have an annual effect on the economy of $100 million or more associated with lower administrative costs and reduced paperwork and delays in the environmental review process.).

In addition to delayed projects, the public will be unable to take advantage of the 2020 Rule's expanded public outreach and participation opportunities. RTC at 394 (citing 40 C.F.R. §§ 1501.9, 1503.1, 1506.6 (2020)). While Plaintiffs discount the changes to the public comment process, the 2020 Rule creates a process that encourages meaningful public participation. RTC at 328 (explaining that the final rule "will encourage public participation by individuals with relevant information gleaned from personal experience with the potentially affected environment."); *id.* at 394 ("The final rule expands opportunities for public outreach in scoping and the development of EISs"). And, by encouraging documents to be shorter and focused on impacts that "reasonably foreseeable and have a reasonably close causal relationship to the proposed action" and "reasonable range of alternatives," the Rule will lead to documents that are more understandable and accessible to the public, again facilitating meaningful public

participation.  85 Fed. Reg. at 43,374 (40 C.F.R. § 1508.1(g) (2020)); *id.* at 43,367 (40 C.F.R. §1508.1(z) (2020)).

The balance of harms and public interest thus cuts against issuance of any preliminary relief.  This Court should deny Plaintiffs' request for a preliminary injunction.

## IV.    The Injunction Requested by Plaintiffs' Is Overbroad and Must Be Narrowly Tailored to the Violations Found and the Harms Demonstrated.

Plaintiffs are not entitled to the drastic remedy of a preliminary injunction.  Nonetheless, if the Court finds they are entitled to injunctive relief, the sweeping nationwide injunction Plaintiffs seek is inappropriate.  Any injunction issued must be narrowly tailored to the now-ripe legal errors found by the Court and to the injury demonstrated by Plaintiffs supporting their claims of standing.

First, the Fourth Circuit has recently and emphatically held that the issuance of a nationwide injunction is beyond the authority of a single district court judge.  *CASA de Md*, 2020 WL 4664820.  As the Fourth Circuit explained, a nationwide injunction transgresses the court's judicial authority in numerous ways, including by extending the court's equitable power beyond the parties to a particular lawsuit, *id.* at *24, violating the fundamental jurisdictional requirements of Article III by awarding relief to parties without standing or ripe claims, *id.* at *25-26, and precluding the beneficial "percolation" of complex issues through multiple courts, *id.* at *27.[44]  And, particularly apropos here, the Court emphasized that:

> [N]ationwide injunctions promote sprints to the courthouse and rushed judicial
> decisionmaking, often under immense time pressure, based on expedited briefing,
> and in the absence of a factual record. Nationwide injunctions are often issued

---

[44]  This latter concern is particularly relevant here, given that three other cases challenging the 2020 Rule are currently pending in other courts outside of this Circuit.  *See*; *Alaska Cmty. Action on Toxics v. CEQ*, No. 3:20-cv-5199 (N.D. Cal. filed July 29, 2020); *Environmental Justice Health Alliance v. CEQ*, No. 20-cv-6143 (S.D.N.Y. filed Aug. 6, 2020); *California v. CEQ*, No. 20-cv-06057 (N.D. Cal. filed Aug. 28, 2020).

> early in the litigative process, meaning that both the district judge's initial decision
> to grant the injunction and any subsequent appeals of that decision will take place
> without a record.  Moreover, an injunction completely blocking the
> implementation of a federal policy can wreak havoc on the executive's agenda,
> which in turn incentivizes immediate, emergency stay requests. . . . This helter-
> skelter behavior is not what our legal system was designed to encourage.

*Id.* at *27 (internal citations omitted).  Plaintiffs' request for an across-the-board nationwide injunction must be denied.

Moreover, any injunction must be narrowly tailored to legal defects found and the harms demonstrated by the plaintiff.  *See Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The [injunctive] remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."); *Schlesinger v. Reservists Comm. to Stop the War*, 418 U.S. 208, 222 (1974) (equitable relief must be crafted to be "no broader than required by the precise facts to which the court's ruling would be applied");*CASA de Md.*, 2020 WL 4664820, at *24 (injunctions must be "tailored to protect only the plaintiffs in a specific case from the defendants to that suit").

Here the Court's obligation to tailor any injunctive relief is facilitated by the provisions of the 2020 Rule being explicitly severable, so that the remainder of the rule can continue in effect even if a particular provision is temporarily enjoined.  85 Fed. Reg. at 43,358 (40 C.F.R. § 1500.3(e) (2020)) ("The sections of this subchapter are separate and severable from one another. If any section or portion therein is stayed or determined to be invalid, or the applicability of any section to any person or entity is held invalid, it is the Council's intention that the validity of the remainder of those parts shall not be affected, with the remaining sections to continue in effect.").  *See Cath. Soc. Serv. v. Shalala*, 12 F.3d 1123, 1127 (D.C. Cir. 1994) (referring to agency intent to determine if an agency order was severable).

82

Thus, for example, if the Court finds Plaintiffs have demonstrated a likelihood of success on the their claim that CEQ erred in determining that certain loan guarantees are not major federal actions (§ 1508.1(q)), *and* finds that the provision is challengeable in the context of this facial challenge to CEQ's meta-regulations as opposed to a challenge directed at the agency that actually issued the loan guarantee (*see* Motion to Dismiss at 30), it could address that harm through an injunction limited to that provision.  But it should not disturb any aspects of the 2020 Rule absent similar, provision-specific findings of likely legal error coupled with imminent harm.

## CONCLUSION

For foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction and allow the 2020 Rule to take effect, as scheduled, on September 14, 2020.

Respectfully submitted,

THOMAS T. CULLEN
United States Attorney

*/s/ Krista Consiglio Frith*
Assistant United States Attorney
Virginia Bar No. 89088
United States Attorney's Office
P.O. Box 1709
Roanoke, VA 24008
TEL (540) 857-2250
FAX (540) 857-2614
Krista.frith@usdoj.gov

JEFFREY BOSSERT CLARK
Assistant Attorney General
JONATHAN BRIGHTBILL
Principal Deputy Assistant Attorney General
PAUL SALAMANCA
Senior Counsel

*/s/Barclay T. Samford*
BARCLAY T. SAMFORD
NM State Bar No. 12323
Senior Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1475
E-mail: clay.samford@usdoj.gov

ALLEN M. BRABENDER
Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Appellate Section
Post Office Box 7415
Washington, D.C. 20044
Tel: (202) 514-5316
E-mail: allen.brabender@usdoj.gov

STEVEN W. BARNETT
Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Law and Policy Section
Post Office Box 7415
Washington, D.C. 20044
Tel: (202) 514-1442
E-mail: steven.barnett@usdoj.gov

MATTHEW R. OAKES
Senior Counsel
U.S. Department of Justice
Environment and Natural Resources Division
Law and Policy Section
Post Office Box 7415
Washington, D.C. 20044
Tel: (202) 514-1442
E-mail: matthew.oakes@usdoj.gov

CLARE BORONOW
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1362
clare.boronow@usdoj.gov