**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF VIRGINIA**
**CHARLOTTESVILLE DIVISION**

| | |
|---|---|
| WILD VIRGINIA, VIRGINIA WILDERNESS COMMITTEE, UPSTATE FOREVER, SOUTH CAROLINA WILDLIFE FEDERATION, NORTH CAROLINA WILDLIFE FEDERATION, NATIONAL TRUST FOR HISTORIC PRESERVATION, MOUNTAINTRUE, HAW RIVER ASSEMBLY, HIGHLANDERS FOR RESPONSIBLE DEVELOPMENT, DEFENDERS OF WILDLIFE, COWPASTURE RIVER PRESERVATION ASSOCIATION, CONGAREE RIVERKEEPER, THE CLINCH COALITION, CLEAN AIR CAROLINA, CAPE FEAR RIVER WATCH, ALLIANCE FOR THE SHENANDOAH VALLEY, and ALABAMA RIVERS ALLIANCE,<br><br>     Plaintiffs,<br><br>v.<br><br>COUNCIL ON ENVIRONMENTAL QUALITY and MARY NEUMAYR IN HER OFFICIAL CAPACITY AS CHAIR OF THE COUNCIL ON ENVIRONMENTAL QUALITY,<br><br>     Defendants. | Case No. 3:20-cv-00045-JPJ-PMS |

## DECLARATION OF AMY COYLE

I, Amy Coyle, do hereby declare as follows:

    1.    I am the Deputy General Counsel at the Council on Environmental Quality

(CEQ). As Deputy General Counsel, I am responsible for advising on the legal ramifications on

all actions associated with CEQ's statutory responsibility for advising the President on

environmental matters, coordinating environmental policies within the Executive Branch,

overseeing the implementation of the National Environmental Policy Act (NEPA), and

complying with various statutes including the Freedom of Information Act (FOIA). I have been

in this position since August 2, 2020. Before joining CEQ, I was employed by the U.S.

Department of Transportation Office of the Secretary as a Senior Attorney focusing on the

Department's National Environmental Policy Act (NEPA) compliance.  I came to CEQ as a

detailee in December 2018 and joined CEQ as a full-time employee on August 2, 2020.

2.      I am familiar with CEQ's authorities, regulations, policies, and activities.  I have

worked on legal issues associated with NEPA and infrastructure development for the past eleven

years.

3.      In my role as Deputy General Counsel, I have been assigned to compile the

administrative record in support of the first revision of the NEPA implementing regulations in

over 40 years.

4.      As part of its two-year rulemaking under the Administrative Procedure Act

(APA), CEQ reviewed many source documents and public comments.

5.      The purpose of this declaration is to identify core documents and materials that

CEQ considered in the course of issuing the revised regulations for purposes of the Court's

review of Plaintiffs' motion for a preliminary injunction against implementation of CEQ's new

NEPA regulations.

6.      Given the short timeframe required to respond to Plaintiffs' motion, the

documents identified and described below do not constitute the entire administrative record of

CEQ's rulemaking.  Nonetheless, by way of this declaration, I certify that CEQ considered in the

course of the preparation of the new regulations the documents attached as exhibits to this

2

declaration and listed in paragraph 7.  For the convenience of the Court and the parties, the

website locations of the documents, where available, are also included.

7.    CEQ considered all of the documents in the record, including the following:

| Document | Exhibit No. |
|---|---|
| Advance Notice of Proposed Rulemaking Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act (83 Fed. Reg. 28591, June 20, 2018), https://www.govinfo.gov/content/pkg/FR-2018-06-20/pdf/2018-13246.pdf | 1 |
| Notice of Proposed Rulemaking:  Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act (85 Fed. Reg. 1684, Jan. 10, 2020), https://www.govinfo.gov/content/pkg/FR-2020-01-10/pdf/2019-28106.pdf | 2 |
| Final Rule:  Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act (85 Fed. Reg. 43304, July 16, 2020), https://www.govinfo.gov/content/pkg/FR-2020-07-16/pdf/2020-15179.pdf | 3 |
| Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act:  Final Rule Response to Comments (ID: CEQ-2019-0003-720629), https://www.regulations.gov/document?D=CEQ-2019-0003-720629 | 4 |
| Regulatory Impact Analysis for the Final Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act (ID: CEQ-2019-0003-720628), https://www.regulations.gov/document?D=CEQ-2019-0003-720628 | 5 |
| Considering Cumulative Effects Under the National Environmental Policy Act (Jan. 1997), https://ceq.doe.gov/publications/cumulative_effects.html | 6 |
| Guidance on the Consideration of Past Actions in Cumulative Effects Analysis (June 24, 2005), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/Guidance_on_CE.pdf | 7 |
| Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 Fed. Reg. 18026 (Mar. 23, 1981), https://www.energy.gov/sites/prod/files/2018/06/f53/G-CEQ-40Questions | 8 |
| Council on Environmental Quality, Environmental Impact Statement Timelines (2010–2018) (June 12, 2020), https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timeline_Report_2020-6-12.pdf | 9 |

| | |
|---|---|
| Council on Environmental Quality, Length of Environmental Impact Statements (2013–2018), (June 12, 2020), https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Length_Report_2020-6-12.pdf | 10 |
| Selections from the Rulemaking Docket comprising comments from the public on the proposed regulation and transcripts of public hearings: | 11 |

1. CEQ-2019-0003-83206, Letter from Christine Sage, Southern Ute Indian Tribal Council, https://www.regulations.gov/document?D=CEQ-2019-0003-82306

2. CEQ-2019-0003-104673, Comment by Yeuling Li, https://www.regulations.gov/document?D=CEQ-2019-0003-104673

3. CEQ-2019-0003-118871, Letter from Sara Thorne and Debra W. Struhsacker, Women's Mining Coalition, https://www.regulations.gov/document?D=CEQ-2019-0003-118871

4. CEQ-2019-0003-139679, Letter from Norman Bickford and Rebekah Luedtke, Wisconsin Forests Association, https://www.regulations.gov/document?D=CEQ-2019-0003-139679

5. CEQ-2019-0003-157735, Letter from Kyle Isakower, American Council for Capital Formation, https://www.regulations.gov/document?D=CEQ-2019-0003-157735

6. CEQ-2019-0003-157747, Letter from Geraldine Link, National Ski Areas Association, https://www.regulations.gov/document?D=CEQ-2019-0003-157747

7. CEQ-2019-0003-158659, Letter from Jan Alexander, Eastern Oregon Mining Association, https://www.regulations.gov/document?D=CEQ-2019-0003-158659

8. CEQ-2019-0003-159300, Letter from Leah Pilconis, Associated General Contractors of America, https://www.regulations.gov/document?D=CEQ-2019-0003-159300

9. CEQ-2019-0003-166296, Letter from David Bauer, American Road & Transportation Builders Association, https://www.regulations.gov/document?D=CEQ-2019-0003-166296

10. CEQ-2019-0003-166495, Letter from Adé Nelson, et al., Kane County Resource Development, CEQ-2019-0003-166495, Comment from Kane County Resource Development, https://www.regulations.gov/document?D=CEQ-2019-0003-166495

11. CEQ-2019-0003-167180, Letter from Troy Thompson, Wyoming County Commissioners Association, https://www.regulations.gov/document?D=CEQ-2019-0003-167180

12. CEQ-2019-0003-167897, Letter from Nathan Craig, Duke Energy, https://www.regulations.gov/document?D=CEQ-2019-0003-167897

| | |
|---|---|
| 13. CEQ-2019-0003-169693, Letter from Marty Durbin, Chamber of Commerce of the United States of America, https://www.regulations.gov/document?D=CEQ-2019-0003-169693<br><br>14. CEQ-2019-0003-169920, Letter from Kaitlynn Glover, Public Lands Council & National Cattlemen's Beef Association Natural Resources, https://www.regulations.gov/document?D=CEQ-2019-0003-169920<br><br>15. CEQ-2019-0003-169921, Letter from Jeffrey Kupfer, ConservAmerica, https://www.regulations.gov/document?D=CEQ-2019-0003-169921<br><br>16. CEQ-2019-0003-170664, Letter from Jeffrey M. Harris, et al., George Mason University Antonin Scalia Law School Administrative Law Clinic, https://www.regulations.gov/document?D=CEQ-2019-0003-170664<br><br>17. CEQ-2019-0003-171666, Letter from John C. Meyer and Beau Brunson, Consumers' Research, https://www.regulations.gov/document?D=CEQ-2019-0003-171666<br><br>18. CEQ-2019-0003-172656, Transcript of Denver, CO Public Hearing, https://www.regulations.gov/document?D=CEQ-2019-0003-172656<br><br>19. CEQ-2019-0003-173168, Letter from George Recktenwald, Volusia County, Florida, https://www.regulations.gov/document?D=CEQ-2019-0003-173168<br><br>20. CEQ-2019-0003-720623, Memo to Docket, Meeting on the NPRM with representatives of San Bernardino County, CA, https://www.regulations.gov/document?D=CEQ-2019-0003-720623 | |
| Common Good *Updates the Cost of US Infrastructure Delays: Costs Have Risen $200 Billion Over Five Years to Nearly $3.9 Trillion,* (May 2018) | 12 |
| Common Good, *Two Years, Not Ten Years: Redesigning Infrastructure Approvals* (2015) https://static1.squarespace.com/static/5db4d0eacb29b173254203d2/t/5ee3a6f2072df850bd9a0aa3/1591977716039/2YearsNot10Years.pdf | 13 |

8.      During the public comment process, CEQ received numerous comments stating that projects were delayed by the NEPA process.  The following are examples of projects identified by the commenters. The cited documents are among the exhibits listed in Paragraph 7 and attached to this declaration:

   a.   *The Purple Line Transit System (MD)*. The U.S. Chamber of Commerce pointed

         to the purple line transit system, proposed in 2003 as a 16-mile light rail line that

will connect New Carrollton and Bethesda, Maryland, "providing
environmentally-friendly transit for an estimated 70,000 daily riders and leading
to a 17,000 fewer vehicles on local roads." CEQ-2019-0003-169693, Ex. 11, Tab
13 at 12 (Comment of U.S. Chamber of Commerce).  The U.S. Chamber of
Commerce quoted the Maryland Lieutenant Governor's statement that the purple
line "will bring thousands of jobs to the region." *Id.* The U.S. Chamber of
Commerce noted the project was "delay[ed] 14 years" and stated that "after years
of delays and legal challenges, a 2017 court decision rejected NEPA-based
challenges to the project. It is now under construction." *Id.*; *see also* CEQ-2019-
0003-159300, Ex. 11, Tab 8 at 12 (Comment of the Associated General
Contractors of America).

b.  *I-70 Expansion (CO).*  The U.S. Chamber of Commerce also identified the
Interstate 70 expansion project "the first safety and capacity improvements to I-70
since the highway's construction in 1964" which will "alleviate congestion and
improve safety on a 12 mile stretch of highway through Denver, Colorado" by
"adding one new Express Lane in each direction, auxiliary lanes for safe exiting,
and shoulders for accidents and breakdowns." CEQ-2019-0003-169693, Ex. 11,
Tab 13 at 9.  As U.S. Chamber explained:  "The Environmental Impact Statement
took 13 years to complete, involved hundreds of public meetings, and set a record
for length—totaling 15,951 pages."  *Id.; see also* CEQ-2019-0003-159300, Ex.
11, Tab 8 at 12 ("Rebuilding a portion of I-70 in Denver was delayed for years via
NEPA with construction finally starting in 2018.").

c.  *Bayonne Bridge Project (NY/NJ).*  Several commenters cited the Bayonne Bridge

project as an example of how "[b]ridges also fall prey to NEPA's onerous

requirements," CEQ-2019-0003-170664, Ex. 11, Tab 16 at 11 (Comment of the

Administrative Law Clinic at the Scalia Law School – George Mason University),

*see also* CEQ-2019-0003-159300, Ex. 11, Tab 8 at 12, *and* CEQ-2019-0003-

169921, Ex. 11, Tab 15  at 24. One commenter pointed out that "[r]aising the

Bayonne Bridge—which connects New York and New Jersey—by 64 feet to let

larger ships pass through took more than ten years and 20,000 pages of

environmental review." CEQ-2019-0003-170664, Ex. 11, Tab 16 at 11 (Comment

of the Administrative Law Clinic at the Scalia Law School – George Mason

University), *see also* CEQ-2019-0003-169921, Ex. 11, Tab 15 at 24.

d.  *Cape Wind Project (MA).*  Another example cited by commenters was the Cape

Wind project. According to AGCA, this renewable energy project "began in 2001

and suffered many permitting and legal challenges," which eventually led to

termination of the project's lease rights in 2017.  CEQ-2019-0003-159300, Ex.

11, Tab 8 at 12.  According to Consumers' Research:

> The principal objections to this project were esthetic and NIMBY
> (Not In My Back Yard), with relatively few real environmental
> arguments. This project would have produced enough electricity to
> reduce carbon emissions from fossil fuel electricity generation by
> an estimated 1.5 million tons a year and would also have avoided
> significant other pollution from the same electricity generation
> sources.

CEQ-2019-0003-171666, Ex. 11, Tab 17 at 6.  ConservAmerica shared similar

sentiments by highlighting that "[t]he now-dead Cape Wind renewable energy

project . . . was delayed for 16 years by pretextual claims of an inadequate NEPA

review."  CEQ-2019-0003-169921, Ex.11, Tab 15 at 24.

7

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed on this the 2nd day of September, 2020,

Amy Coyle
Deputy General Counsel
Council on Environmental Quality

Exhibit 1 to Declaration of Amy Coyle

requirements, Superfund, Water pollution control, Water supply.

**Authority:** 33 U.S.C. 1321(d); 42 U.S.C. 9601–9657; E.O. 13626, 77 FR 56749, 3 CFR, 2013 Comp., p. 306; E.O. 12777, 56 FR 54757, 3 CFR, 1991 Comp., p. 351; E.O. 12580, 52 FR 2923, 3 CFR, 1987 Comp., p. 193.

Dated: May 30, 2018.

**Cosmo Servidio,**
*Regional Administrator, U.S. Environmental Protection Agency Region 3.*

[FR Doc. 2018–12709 Filed 6–19–18; 8:45 am]

**BILLING CODE 6560–50–P**

---

**COUNCIL ON ENVIRONMENTAL QUALITY**

**40 CFR Parts 1500, 1501, 1502, 1503, 1504, 1505, 1506, 1507, and 1508**

**[Docket No. CEQ–2018–0001]**

**RIN: 0331–AA03**

**Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act**

**AGENCY:** Council on Environmental Quality (CEQ).

**ACTION:** Advance notice of proposed rulemaking.

**SUMMARY:** The Council on Environmental Quality (CEQ) is considering updating its implementing regulations for the procedural provisions of the National Environmental Policy Act (NEPA). Over the past four decades, CEQ has issued numerous guidance documents but has amended its regulations substantively only once. Given the length of time since its NEPA implementing regulations were issued, CEQ solicits public comment on potential revisions to update the regulations and ensure a more efficient, timely, and effective NEPA process consistent with the national environmental policy stated in NEPA.

**DATES:** Comments should be submitted on or before July 20, 2018.

**ADDRESSES:** Submit your comments, identified by docket identification (ID) number CEQ–2018–0001 through the Federal eRulemaking portal at *https://www.regulations.gov.* Follow the online instructions for submitting comments.

**FOR FURTHER INFORMATION CONTACT:** Edward A. Boling, Associate Director for the National Environmental Policy Act, Council on Environmental Quality, 730 Jackson Place NW, Washington, DC 20503. Telephone: (202) 395–5750.

**SUPPLEMENTARY INFORMATION:**

## I. Background

The National Environmental Policy Act (NEPA), 42 U.S.C. 4321 *et seq.,* was enacted in 1970. NEPA states that "it is the continuing policy of the Federal Government, in cooperation with State and local governments, and other concerned public and private organizations, to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. 4331(a). NEPA also established CEQ as an agency within the Executive Office of the President. 42 U.S.C. 4342.

By Executive Order (E.O.) 11514, "Protection and Enhancement of Environmental Quality" (March 5, 1970), President Nixon directed CEQ in Section 3(h) to issue "guidelines to Federal agencies for the preparation of detailed statements on proposals for legislation and other Federal actions affecting the environment, as required by section 102(2)(C) of the Act." CEQ published these guidelines in April of 1970 and revised them in 1973.

President Carter issued E.O. 11991 (May 24, 1977), "Relating to Protection and Enhancement of Environmental Quality," which amended Section 3(h) of E.O. 11514 to direct CEQ to issue regulations providing uniform standards for the implementation of NEPA, and amended Section 2 of E.O. 11514 to require agency compliance with the CEQ regulations. CEQ promulgated its "Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act" (CEQ's NEPA regulations) at 40 CFR parts 1500–1508. 43 FR 55978 (November 29, 1978). Since that time, CEQ has amended its NEPA regulations substantively only once, to eliminate the "worst case" analysis requirement of 40 CFR 1502.22. 51 FR 15618 (April 25, 1986).

On August 15, 2017, President Trump issued E.O. 13807, "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects." 82 FR 40463 (August 24, 2017). Section 5(e) of E.O. 13807 directed CEQ to develop an initial list of actions to enhance and modernize the Federal environmental review and authorization process. In response, CEQ published its initial list of actions pursuant to E.O. 13807 and stated that it intends to review its existing NEPA regulations in order to identify changes needed to update and clarify these regulations. 82 FR 43226 (September 14, 2017).

## II. Request for Comment

CEQ requests comments on potential revisions to update and clarify CEQ NEPA regulations. In particular, CEQ requests comments on the following specific aspects of these regulations, and requests that commenters include question numbers when providing responses. Where possible, please provide specific recommendations on additions, deletions, and modifications to the text of CEQ's NEPA regulations and their justifications.

*NEPA Process*

1. Should CEQ's NEPA regulations be revised to ensure that environmental reviews and authorization decisions involving multiple agencies are conducted in a manner that is concurrent, synchronized, timely, and efficient, and if so, how?
2. Should CEQ's NEPA regulations be revised to make the NEPA process more efficient by better facilitating agency use of environmental studies, analysis, and decisions conducted in earlier Federal, State, tribal or local environmental reviews or authorization decisions, and if so, how?
3. Should CEQ's NEPA regulations be revised to ensure optimal interagency coordination of environmental reviews and authorization decisions, and if so, how?

*Scope of NEPA Review*

4. Should the provisions in CEQ's NEPA regulations that relate to the format and page length of NEPA documents and time limits for completion be revised, and if so, how?
5. Should CEQ's NEPA regulations be revised to provide greater clarity to ensure NEPA documents better focus on significant issues that are relevant and useful to decisionmakers and the public, and if so, how?
6. Should the provisions in CEQ's NEPA regulations relating to public involvement be revised to be more inclusive and efficient, and if so, how?
7. Should definitions of any key NEPA terms in CEQ's NEPA regulations, such as those listed below, be revised, and if so, how?
  a. Major Federal Action;
  b. Effects;
  c. Cumulative Impact;
  d. Significantly;
  e. Scope; and
  f. Other NEPA terms.
8. Should any new definitions of key NEPA terms, such as those noted below, be added, and if so, which terms?

a. Alternatives;
b. Purpose and Need;
c. Reasonably Foreseeable;
d. Trivial Violation; and
e. Other NEPA terms.
9. Should the provisions in CEQ's NEPA regulations relating to any of the types of documents listed below be revised, and if so, how?
   a. Notice of Intent;
   b. Categorical Exclusions Documentation;
   c. Environmental Assessments;
   d. Findings of No Significant Impact;
   e. Environmental Impact Statements;
   f. Records of Decision; and
   g. Supplements.
10. Should the provisions in CEQ's NEPA regulations relating to the timing of agency action be revised, and if so, how?

11. Should the provisions in CEQ's NEPA regulations relating to agency responsibility and the preparation of NEPA documents by contractors and project applicants be revised, and if so, how?

12. Should the provisions in CEQ's NEPA regulations relating to programmatic NEPA documents and tiering be revised, and if so, how?

13. Should the provisions in CEQ's NEPA regulations relating to the appropriate range of alternatives in NEPA reviews and which alternatives may be eliminated from detailed analysis be revised, and if so, how?

*General*

14. Are any provisions of the CEQ's NEPA regulations currently obsolete? If so, please provide specific recommendations on whether they should be modified, rescinded, or replaced.

15. Which provisions of the CEQ's NEPA regulations can be updated to reflect new technologies that can be used to make the process more efficient?

16. Are there additional ways CEQ's NEPA regulations should be revised to promote coordination of environmental review and authorization decisions, such as combining NEPA analysis and other decision documents, and if so, how?

17. Are there additional ways CEQ's NEPA regulations should be revised to improve the efficiency and effectiveness of the implementation of NEPA, and if so, how?

18. Are there ways in which the role of tribal governments in the NEPA process should be clarified in CEQ's NEPA regulations, and if so, how?

19. Are there additional ways CEQ's NEPA regulations should be revised to ensure that agencies apply NEPA in a manner that reduces unnecessary

burdens and delays as much as possible, and if so, how?
20. Are there additional ways CEQ's NEPA regulations related to mitigation should be revised, and if so, how?

(Authority: 42 U.S.C. 4332, 4342, 4344 and 40 CFR parts 1500, 1501, 1502, 1503, 1505, 1506, 1507, and 1508)

**III. Statutory and Executive Order Reviews**

Under E.O. 12866, "Regulatory Planning and Review," 58 FR 51735 (October 4, 1993), this is a "significant regulatory action." Accordingly, CEQ submitted this action to the Office of Management and Budget (OMB) for review under E.O. 12866 and any changes made in response to OMB recommendations have been documented in the docket for this action. Because this action does not propose or impose any requirements, and instead seeks comments and suggestions for CEQ to consider in possibly developing a subsequent proposed rule, the various statutes and executive orders that normally apply to rulemaking do not apply in this case. If CEQ decides in the future to pursue a rulemaking, CEQ will address the statutes and executive orders applicable to that rulemaking at that time.

**Mary B. Neumayr,**
*Chief of Staff, Council on Environmental Quality.*
[FR Doc. 2018–13246 Filed 6–19–18; 8:45 am]
**BILLING CODE 3225–F8–P**

---

**GENERAL SERVICES ADMINISTRATION**

**41 CFR Part 105–60**

**[GSPMR Case 2016–105–1; Docket No. 2016–0004, Sequence No. 1]**

**RIN 3090–AJ74**

**Public Availability of Agency Records and Informational Materials**

**AGENCY:** Office of Administrative Services (OAS), General Services Administration (GSA).
**ACTION:** Proposed rule.

---

**SUMMARY:** The General Services Administration (GSA) is issuing a proposed rule to amend its regulations implementing the Freedom of Information Act (FOIA). The regulations are being revised to update and streamline the language of several procedural provisions and to incorporate certain changes brought about by the amendments to the FOIA under both statutory and nonstatutory authorities. This rule also amends the

GSA's regulations under the Freedom of Information Act (FOIA) to incorporate certain changes made to the FOIA by the FOIA Improvement Act of 2016. Additionally, the regulations are being updated to reflect developments in case law, executive guidance from the Department of Justice—Office of Information Policy, technological advancements in how the FOIA is administered, and to include current cost figures to be used in calculating and charging fees. Finally, the revisions increase the amount of information that members of the public may receive from the Agency without being charged processing fees through proactive disclosures.

**DATES:** Interested parties should submit written comments to the Regulatory Secretariat Division at one of the addresses shown below on or before August 20, 2018 to be considered in the formation of the final rule.

**ADDRESSES:** Submit comments in response to GSPMR case 2016–105–1 by any of the following methods:

• *Regulations.gov: http:// www.regulations.gov.* Submit comments via the Federal eRulemaking portal by searching for "GSPMR Case 2016–105–1". Select the link "Comment Now!" that corresponds with "GPSMR Case 2016–105–1." Follow the instructions provided on the screen. Please include your name, company name (if any), and "GSPMR Case 2016–105–1" on your attached document.

• *Mail:* General Services Administration, Regulatory Secretariat Division (MVCB), ATTN: Ms. Lois Mandell, 1800 F Street NW, 2nd Floor, Washington, DC 20405.

*Instructions:* Please submit comments only and cite GSPMR Case 2016–105–1, in all correspondence related to this case. All comments received will be posted without change to *http:// www.regulations.gov,* including any personal and/or business confidential information provided. To confirm receipt of your comment(s), please check *www.regulations.gov,* approximately two to three days after submission to verify posting (except allow 30 days for posting of comments submitted by mail).

**FOR FURTHER INFORMATION CONTACT:** Mr. Travis S. Lewis, Director of GSA, OAS, Freedom of Information Act and Records Management Division, at 202–219–3078 via email at *travis.lewis@ gsa.gov* for clarification of content. For information pertaining to status or publication schedules, contact the Regulatory Secretariat Division at 202–501–4755. Please cite GSPMR Case 2016–105–1.

Exhibit 2 to Declaration of Amy Coyle

## COUNCIL ON ENVIRONMENTAL QUALITY

**40 CFR Parts 1500, 1501, 1502, 1503, 1504, 1505, 1507, and 1508**

**[CEQ–2019–0003]**

**RIN 0331–AA03**

## Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act

**AGENCY:** Council on Environmental Quality.

**ACTION:** Notice of proposed rulemaking.

**SUMMARY:** In this action, the Council on Environmental Quality (CEQ) is proposing to update its regulations for implementing the procedural provisions of the National Environmental Policy Act (NEPA). CEQ has not comprehensively updated its regulations since their promulgation in 1978, more than four decades ago. This proposed rule would modernize and clarify the regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies in connection with proposals for agency action. The proposed amendments would advance the original goals of the CEQ regulations to reduce paperwork and delays, and promote better decisions consistent with the national environmental policy set forth in section 101 of NEPA. If finalized, the proposed rule would comprehensively update and substantially revise the 1978 regulations. CEQ invites comments on the proposed revisions.

**DATES:** CEQ must receive comments by March 10, 2020. CEQ will hold public hearings on the following dates:

1. February 11, 2020, U.S. Environmental Protection Agency Region 8, 1595 Wynkoop Street, Denver, CO.

2. February 25, 2020, U.S. Department of the Interior, Yates Auditorium, 1849 C Street NW, Washington, DC.

All attendees or speakers must register in advance. Details concerning the hearings and information on additional outreach may be found at *www.nepa.gov* and *www.whitehouse.gov/ceq.*

**ADDRESSES:** You may submit comments, identified by docket number CEQ–2019–0003, by any of the following methods:

▪ *Federal eRulemaking Portal: https://www.regulations.gov.* Follow the instructions for submitting comments.
▪ *Fax:* 202–456–6546.
▪ *Mail:* Council on Environmental Quality, 730 Jackson Place NW, Washington, DC 20503.

*Instructions:* All submissions received must include the agency name and docket number for this rulemaking. All comments received will be posted without change to *https://www.regulations.gov,* including any personal information provided. Do not submit electronically any information you consider to be private, Confidential Business Information (CBI), or other information whose disclosure is restricted by statute.

*Docket:* For access to the docket to read background documents or comments received, go to *https://www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Edward A. Boling, Associate Director for the National Environmental Policy Act, or Viktoria Z. Seale, Chief of Staff and General Counsel, 202–395–5750, *NEPA-Update@ceq.eop.gov.*

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Background
  A. National Environmental Policy Act (NEPA)
  B. Council on Environmental Quality (CEQ) Regulations, Guidance, and Reports
  1. Regulatory History
  2. CEQ Guidance and Reports
  3. Environmental Impact Statement (EIS) Timelines and Page Count Reports
  C. Judicial Review of Agency NEPA Compliance
  D. Statutory Developments
  E. Presidential Directives
  F. 2018 Advance Notice of Proposed Rulemaking Requesting Public Comment on CEQ's NEPA Regulations
II. Summary of Proposed Rule
  A. Proposed Changes Throughout Parts 1500–1508
  B. Proposed Revisions To Update the Purpose, Policy, and Mandate (Part 1500)
  C. Proposed Revisions to NEPA and Agency Planning (Part 1501)
  1. NEPA Threshold Applicability Analysis (§ 1501.1)
  2. Apply NEPA Early in the Process (§ 1501.2)
  3. Determine the Appropriate Level of NEPA Review (§ 1501.3)
  4. Categorical Exclusions (CEs) (§ 1501.4)
  5. Environmental Assessments (EAs) (§ 1501.5)
  6. Findings of No Significant Impact (FONSIs) (§ 1501.6)
  7. Lead and Cooperating Agencies (§§ 1501.7 and 1501.8)
  8. Scoping (§ 1501.9)
  9. Time Limits (§ 1501.10)
  10. Tiering and Incorporation by Reference (§§ 1501.11 and 1501.12)
  D. Proposed Revisions to Environmental Impact Statements (EISs) (Part 1502)
  1. Page Limits (§ 1502.7)
  2. Draft, Final and Supplemental Statements (§ 1502.9)
  3. EIS Format (§§ 1502.10 and 1502.11)
  4. Purpose and Need (§ 1502.13)
  5. Alternatives (§ 1502.14)
  6. Affected Environment and Environmental Consequences (§§ 1502.15 and 1502.16)
  7. Submitted Alternatives, Information, and Analyses (§§ 1502.17 and 1502.18)
  8. Other Proposed Changes to Part 1502
  E. Proposed Revisions To Commenting on Environmental Impact Statements (Part 1503)
  F. Proposed Revisions to Pre-Decisional Referrals to the Council of Proposed Federal Actions Determined To Be Environmentally Unsatisfactory (Part 1504)
  G. Proposed Revisions to NEPA and Agency Decision Making (Part 1505)
  H. Proposed Revisions to Other Requirements of NEPA (Part 1506)
  I. Proposed Revisions to Agency Compliance (Part 1507)
  J. Proposed Revisions to Definitions (Part 1508)
  K. CEQ Guidance Documents
  L. Additional Issues on Which CEQ Invites Comment
III. Rulemaking Analyses and Notices
  A. Executive Order 12866, Regulatory Planning and Review; Executive Order 13563, Improving Regulation and Regulatory Review; and Executive Order 13771, Reducing Regulation and Controlling Regulatory Costs
  B. Regulatory Flexibility Act and Executive Order 13272, Proper Consideration of Small Entities in Agency Rulemaking
  C. National Environmental Policy Act
  D. Executive Order 13132, Federalism
  E. Executive Order 13175, Consultation and Coordination With Indian Tribal Governments
  F. Executive Order 12898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
  G. Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
  H. Executive Order 12988, Civil Justice Reform
  I. Unfunded Mandate Reform Act
  J. Paperwork Reduction Act

## I. Background

The National Environmental Policy Act of 1969, 42 U.S.C. 4321 *et seq.,* (NEPA) was signed into law by President Nixon on January 1, 1970. The Council on Environmental Quality (CEQ) initially issued guidelines for implementing NEPA in 1970, revised those guidelines in 1973, and subsequently promulgated its NEPA implementing regulations in 1978. The original goals of those regulations were to reduce paperwork and delays, and promote better decisions consistent with the national environmental policy established by the Act.

Since their promulgation, however, there has been a need for clarification of the regulations, and CEQ has issued over 30 guidance documents to assist

**Federal Register** / Vol. 85, No. 7 / Friday, January 10, 2020 / Proposed Rules **1685**

Federal agencies in complying with NEPA and the CEQ regulations. Courts also have issued numerous decisions addressing appropriate implementation and interpretation of NEPA and the CEQ regulations, resulting in a large body of case law. Additionally, Presidential directives have been issued and legislation has been enacted to reduce delays and expedite the implementation of NEPA and the CEQ regulations, including for certain types of infrastructure projects. Notwithstanding the issuance of guidance, Presidential directives, and legislation, implementation of NEPA and the CEQ regulations can be challenging, and the process can be lengthy, costly, and complex. In some cases, the NEPA process and related litigation has slowed or prevented the development of new infrastructure and other projects that required Federal permits or approvals.

The background section below summarizes NEPA, the CEQ regulations, and developments since CEQ issued those regulations. Specifically, section I.A provides a brief summary of the NEPA statute. Section I.B describes the history of CEQ's regulations implementing NEPA and provides an overview of CEQ's numerous guidance documents and reports issued subsequent to the regulations. Section I.C discusses the role of the courts in interpreting NEPA. Section I.D provides a brief overview of Congress's efforts, and section I.E describes the initiatives of multiple administrations to reduce delays and improve implementation of NEPA. Finally, section I.F provides the background on this rulemaking, including the advance notice of proposed rulemaking (ANPRM).

In section II, CEQ provides a summary of the proposed rule, which, if finalized, would comprehensively update and substantially revise CEQ's current regulations. This proposed rule would modernize and clarify the CEQ regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies by simplifying regulatory requirements, codifying certain guidance and case law relevant to these proposed regulations, revising the regulations to reflect current technologies and agency practices, eliminating obsolete provisions, and improving the format and readability of the regulations. CEQ's proposed revisions include provisions intended to promote timely submission of relevant information to ensure consideration of such information by agencies. CEQ's proposed revisions also are intended to provide greater clarity for Federal agencies, States, Tribes, localities, and the public, and to advance the original goals of the CEQ regulations to reduce paperwork and delays and to promote better decisions consistent with the national environmental policy set forth in section 101 of NEPA.

## A. National Environmental Policy Act (NEPA)

Congress enacted NEPA to establish a national policy for the environment, provide for the establishment of CEQ, and for other purposes. Section 101 of NEPA sets forth a national policy "to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. 4331(a). Section 102 of NEPA establishes procedural requirements, applying that national policy to proposals for major Federal actions significantly affecting the quality of the human environment by requiring Federal agencies to prepare a detailed statement on: (1) The environmental impact of the proposed action; (2) any adverse effects that cannot be avoided; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action. 42 U.S.C. 4332(2)(C). NEPA also established CEQ as an agency within the Executive Office of the President to administer Federal agency implementation of NEPA. 42 U.S.C. 4342, 4344; *see also Dep't of Transp.* v. *Pub. Citizen,* 541 U.S. 752, 757 (2004).

NEPA does not mandate particular results or substantive outcomes. Rather, NEPA requires Federal agencies to consider environmental impacts of proposed actions as part of agencies' decision-making processes. Additionally, NEPA does not include a private right of action and specifies no remedies. Challenges to agency action alleging non-compliance with NEPA procedures are brought under the Administrative Procedure Act (APA). 5 U.S.C. 551 *et seq.* Accordingly, NEPA cases proceed as APA cases.

## B. Council on Environmental Quality (CEQ) Regulations, Guidance, and Reports

### 1. Regulatory History

In 1970, President Nixon issued Executive Order (E.O.) 11514, titled "Protection and Enhancement of Environmental Quality," which directed CEQ to "[i]ssue guidelines to Federal agencies for the preparation of detailed statements on proposals for legislation and other Federal actions affecting the environment, as required by section 102(2)(C) of the Act." [1] CEQ issued these guidelines in April of 1970 and revised them in 1973.[2]

In 1977, President Carter issued E.O. 11991, titled "Relating to Protection and Enhancement of Environmental Quality." [3] E.O. 11991 amended section 3(h) of E.O. 11514, directing CEQ to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of [NEPA] . . . to make the environmental impact statement process more useful to decision[ ]makers and the public; and to reduce paperwork and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives," and to "require [environmental] impact statements to be concise, clear, and to the point, and supported by evidence that agencies have made the necessary environmental analyses." E.O. 11991 also amended section 2 of E.O. 11514, requiring agency compliance with the regulations issued by CEQ.

In 1978, CEQ promulgated its "Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act," 40 CFR parts 1500–1508 ("CEQ regulations" or "NEPA regulations"), "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further the national policy to protect and enhance the quality of the human environment." [4] The Supreme Court has afforded the CEQ regulations "substantial deference." *Robertson* v. *Methow Valley Citizens Council,* 490 U.S. 332, 374 (1989) (citing *Andrus* v. *Sierra Club,* 442 U.S. 347, 358 (1979)); *see also Pub. Citizen,* 541 U.S. at 757 ("The [CEQ], established by NEPA with authority to issue regulations

---

[1] 35 FR 4247 (Mar. 7, 1970), § 3(h).

[2] *See* 35 FR 7391 (May 12, 1970) (interim guidelines); 36 FR 7724 (Apr. 23, 1971) (final guidelines); 38 FR 10856 (May 2, 1973) (proposed revisions to guidelines); 38 FR 20550 (Aug. 1, 1973) (revised guidelines).

[3] 42 FR 26967 (May 25, 1977).

[4] 43 FR 55978 (Nov. 29, 1978); *see also* 44 FR 873 (Jan. 3, 1979) (technical corrections), and 43 FR 25230 (June 9, 1978) (proposed rule).

interpreting it, has promulgated regulations to guide [F]ederal agencies in determining what actions are subject to that statutory requirement.'' (citing 40 CFR 1500.3)); *United States* v. *Mead Corp.,* 533 U.S. 218, 227–30 (2001) (properly promulgated agency interpretative regulations addressing ambiguities or gaps in a statute qualify for *Chevron* deference); *Nat'l Cable & Telecomm. Ass'n* v. *Brand X Internet Servs.,* 545 U.S. 967, 980–81 (2005) (applying *Chevron* deference to Federal Communications Commission regulations).

The Supreme Court has held that NEPA is a procedural statute that serves the twin aims of ensuring that agencies consider the significant environmental consequences of their proposed actions and inform the public about their decision making. *Balt. Gas & Elec. Co.* v. *Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 97 (1983) (citing *Vt. Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 553 (1978); *Weinberger* v. *Catholic Action of Haw./ Peace Educ. Project,* 454 U.S. 139, 143 (1981)). Furthermore, in describing the role of NEPA in agencies' decision- making processes, the Supreme Court has stated, ''Congress in enacting NEPA, however, did not require agencies to elevate environmental concerns over other appropriate considerations.'' [5] *Balt. Gas & Elec. Co.,* 462 U.S. at 97 (citing *Strycker's Bay Neighborhood Council v. Karlen,* 444 U.S. 223, 227 (1980) (per curiam)). Instead, NEPA requires agencies to analyze the environmental consequences before taking a major Federal action. *Id.* (citing *Kleppe* v. *Sierra Club,* 427 U.S. 390, 410 n.21 (1976)). The Supreme Court has recognized that agencies have limited time and resources and that ''[t]he scope of the agency's inquiries must remain manageable if NEPA's goal of '[insuring] a fully informed and well-considered decision,' . . . is to be accomplished.'' *Metro. Edison Co.* v. *People Against Nuclear Energy,* 460 U.S. 766, 776 (1983) (quoting *Vt. Yankee,* 435 U.S. at 558).

CEQ has substantively amended its NEPA regulations only once, at 40 CFR 1502.22, to replace the ''worst case'' analysis requirement with a provision for the consideration of incomplete or unavailable information regarding reasonably foreseeable significant

adverse effects.[6] CEQ found that the new 40 CFR 1502.22 ''will generate information and discussion on those consequences of greatest concern to the public and of greatest relevance to the agency's decision,'' [7] rather than distorting the decision-making process by overemphasizing highly speculative harms.[8] The Supreme Court found this reasoning to be a well-considered basis for the change, and that the new regulation was entitled to substantial deference. *Methow Valley,* 490 U.S. at 356.

The CEQ regulations direct Federal agencies to adopt their own implementing procedures to supplement the NEPA regulations. 40 CFR 1507.3. Under this regulation, agencies across the Federal Government have developed such procedures.[9]

2. CEQ Guidance and Reports

Over the past four decades, numerous questions have been raised regarding appropriate implementation of NEPA and the CEQ regulations. Soon after the issuance of the CEQ regulations and in response to CEQ's review of NEPA implementation and feedback from Federal, State, and local officials, including NEPA practitioners, CEQ issued the ''Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations'' [10] in 1981 (''Forty Questions''). This guidance covered a wide range of topics including alternatives, coordination among applicants, lead and cooperating agencies, and integration of NEPA documents with analysis for other environmental statutes. In addition, CEQ has periodically examined the effectiveness of the NEPA process and issued a number of reports on NEPA implementation. In some instances, these reports led to additional guidance. These documents have been intended to provide guidance and clarifications with respect to various aspects of the implementation of NEPA and the definitions in the CEQ regulations, and to increase the efficiency and effectiveness of the environmental review process.[11]

In January 1997, CEQ issued ''The National Environmental Policy Act: A

Study of Its Effectiveness After Twenty- five Years.'' [12] In that report, CEQ acknowledged that NEPA has ensured that agencies adequately analyze the potential environmental consequences of their actions and bring the public into the decision-making processes of Federal agencies. However, CEQ also identified matters of concern to participants in the study, including concerns with overly lengthy documents that may not enhance or improve decision making,[13] and concerns that agencies may seek to '' 'litigation-proof' documents, increasing costs and time but not necessarily quality.'' [14] The report further stated that ''[o]ther matters of concern to participants in the Study were the length of NEPA processes, the extensive detail of NEPA analyses, and the sometimes confusing overlay of other laws and regulations.'' [15] The participants in the study identified five elements of the NEPA process' collaborative framework (strategic planning, public information and input, interagency coordination, interdisciplinary place-based decision making, and science-based flexible management) as critical to effective and efficient NEPA implementation.

In 2002, the Chairman of CEQ established a NEPA task force, composed of Federal agency officials, to examine NEPA implementation by focusing on (1) technology and information management and security; (2) Federal and intergovernmental collaboration; (3) programmatic analyses and tiering; (4) adaptive management and monitoring; (5) categorical exclusions (CEs); and (6) environmental assessments (EAs). In 2003, the task force issued a report [16] recommending actions to improve and modernize the

---

[5] Section 101 of NEPA provides that it is the Federal Government's policy ''to use all practicable means and measures . . . to create and maintain conditions under which man and natures can exist in productive harmony, and *fulfill the social, economic, and other requirements of present and future generations of Americans.*'' 42 U.S.C. 4331(a) (emphasis added).

[6] 51 FR 15618 (Apr. 25, 1986).

[7] 50 FR 32234, 32237 (Aug. 9, 1985).

[8] 51 FR 15618, 15620 (Apr. 25, 1986).

[9] A list of agency NEPA procedures is available at *https://ceq.doe.gov/laws-regulations/agency_ implementing_procedures.html.*

[10] 46 FR 18026 (Mar. 23, 1981), *https:// www.energy.gov/nepa/downloads/forty-most-asked- questions-concerning-ceqs-national-environmental- policy-act.*

[11] *See https://ceq.doe.gov/guidance/ guidance.html.*

[12] *https://ceq.doe.gov/docs/ceq-publications/ nepa25fin.pdf.*

[13] *Id.* at iii.

[14] *Id.*

[15] *Id.* In the 50 years since the passage of NEPA, Congress has amended or enacted a number of other environmental laws that may also apply to proposed Federal agency actions, such as the Endangered Species Act, the Clean Water Act, the Clean Air Act, and other substantive statutes. *See* discussion *infra* section I.D. Consistent with 40 CFR 1502.25, longstanding agency practice has been to use the NEPA process as the umbrella procedural statute, integrating compliance with these laws into the NEPA review and discussing them in the NEPA document. However, this practice sometimes leads to confusion as to whether analysis is done to comply with NEPA or another, potentially substantive, environmental law.

[16] *See* The NEPA Task Force Report to the Council on Environmental Quality, Modernizing NEPA Implementation (Sept. 2003) (''NEPA Task Force Report''), *https://ceq.doe.gov/docs/ceq- publications/report/finalreport.pdf.*

NEPA process, leading to additional guidance documents and handbooks.

Over the past 4 decades, CEQ has issued over 30 documents to provide guidance and clarifications to assist Federal agencies to more efficiently and effectively implement NEPA. CEQ has issued guidance on such topics as CEs,[17] EAs, mitigation, and findings of no significant impact (FONSIs),[18] emergencies,[19] programmatic NEPA reviews,[20] timely environmental reviews,[21] collaboration and conflict resolution,[22] purpose and need,[23] effects,[24] lead and cooperating agencies, environmental justice,[25] and other topics.[26]

Despite CEQ guidance and regulations providing for concise, timely documents, the documentation and timelines for completing environmental reviews can be very lengthy, and the process can be complex and costly. In 2018, CEQ and the Office of Management and Budget (OMB) issued a memorandum titled "One Federal Decision Framework for the Environmental Review and Authorization Process for Major Infrastructure Projects under E.O. 13807" ("OFD Framework Guidance").[27] CEQ and OMB issued this guidance pursuant to E.O. 13807, titled "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects,"[28] to improve agency coordination for infrastructure projects requiring an environmental impact statement (EIS) and permits or other authorizations from multiple agencies and to improve the timeliness of the environmental review process. *See* E.O. 13807, *infra* I.D. Consistent with the OFD Framework Guidance, *supra* note 27, Federal agencies signed a memorandum of understanding committing to implement the One Federal Decision (OFD) policy for major infrastructure projects, including by committing to establishing a joint schedule for such projects, preparation of a single EIS and joint record of decision (ROD), elevation of delays and dispute resolution, and setting a goal of completing environmental reviews for such projects within 2 years.[29] Subsequently, CEQ and OMB issued guidance for the Secretary of Transportation regarding the applicability of the OFD policy to States under the Surface Transportation Project Delivery Program,[30] and for the Secretary of Housing and Urban Development (HUD) regarding the applicability of the OFD policy to entities assuming HUD environmental review responsibilities.[31]

### 3. Environmental Impact Statement (EIS) Timelines and Page Count Reports

CEQ also has conducted reviews and prepared reports on the length of time it takes for agencies to prepare EISs and the length of these documents. These reviews found that the process for preparing EISs is taking much longer than CEQ advised, and that the documents are far longer than the CEQ regulations and guidance recommended. In December 2018, CEQ issued a report compiling information relating to the timelines for preparing EISs during the period of 2010–2017. While CEQ's Forty Questions states that the time for an EIS, even for a complex project, should not exceed 1 year,[32] CEQ found that, across the Federal Government, the average time for completion of an EIS and issuance of a ROD was over 4.5 years and the median was 3.6 years.[33] One quarter of the EISs took less than 2.2 years, and one quarter of the EISs took more than 6 years.

As reflected in that report, the period from publication of a notice of intent (NOI) to prepare an EIS to the notice of availability of the draft EIS took, on average, 58 percent of the total time, while preparing the final EIS, including addressing comments received on the draft EIS, took, on average, 32 percent of the total time. The period from the final EIS to publication of the ROD took, on average, 10 percent of the total time. This report recognized that EIS timelines vary widely, and many factors may influence the timing of the document, including variations in the scope and complexity of the actions, variations in the extent of work done prior to issuance of the NOI, and suspension of EIS activities due to external factors.

Additionally, in July 2019, CEQ issued a report on the length, by page

---

[17] *See* Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act, 75 FR 75628 (Dec. 6, 2010) ("CE Guidance"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/NEPA_CE_Guidance_Nov232010.pdf* (clarifies the rules for establishing, applying, and revising CEs, including methods for substantiating CEs and the process to establish new CEs in agency NEPA procedures).

[18] *See* Final Guidance for Federal Departments and Agencies on the Appropriate Use of Mitigation and Monitoring and Clarifying Appropriate Use of Mitigated Findings of No Significant Impact, 76 FR 3843 (Jan. 21, 2011) ("Mitigation Guidance"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf* (explains the requirements of NEPA and the NEPA regulations on establishing, implementing, and monitoring mitigation commitments identified and analyzed in EAs, environmental impact statements (EISs), and adopted in decision documents).

[19] *See* Emergencies and the National Environmental Policy Act ("Emergencies Guidance"), *https://ceq.doe.gov/docs/nepa-practice/Emergencies_and_NEPA.pdf*.

[20] *See* Effective Use of Programmatic NEPA Reviews (Dec. 18, 2014) ("Programmatics Guidance"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Effective_Use_of_Programmatic_NEPA_Reviews_Final_Dec2014_searchable.pdf*.

[21] *See* Final Guidance on Improving the Process for Preparing Efficient and Timely Environmental Reviews Under the National Environmental Policy Act, 77 FR 14473 (Mar. 12, 2012) ("Timely Environmental Reviews Guidance"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Improving_NEPA_Efficiencies_06Mar2012.pdf* (clarifies and emphasizes tools in the NEPA regulations for preparing efficient and timely environmental reviews for both EAs and EISs).

[22] *See* Memorandum on Environmental Conflict Resolution (Nov. 28, 2005), as expanded by Memorandum on Environmental Collaboration and Conflict Resolution (Sept. 7, 2012), *https://ceq.doe.gov/nepa-practice/environmental-collaboration-and-conflict-resolution.html* (supports constructive and timely approaches to resolve conflicts over the use, conservation, and restoration of the environment, natural resources, and public lands, including under NEPA).

[23] *See* Letter from the Hon. James L. Connaughton, Chairman, Council on Environmental Quality, to the Hon. Norman Y. Mineta, Secretary, Department of Transportation (May 12, 2003) ("Connaughton Letter"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-DOT_PurposeNeed_May-2003.pdf*.

[24] *See* Considering Cumulative Effects Under the National Environmental Policy Act (Jan. 1997), *https://ceq.doe.gov/publications/cumulative_effects.html*.

[25] *See* Environmental Justice: Guidance under the National Environmental Policy Act (Dec. 10, 1997), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regj/ej/justice.pdf*.

[26] *See, e.g.,* Forty Questions, *supra* note 10; NEPA and NHPA: Handbook for Integrating NEPA and Section 106 Reviews, *https://ceq.doe.gov/publications/nepa-handbooks.html* (clarifies and emphasizes tools in the NEPA regulations for preparing efficient and timely environmental reviews for both EAs and EISs); A Citizen's Guide to the NEPA: Having Your Voice Heard, *https://ceq.doe.gov/get-involved/citizens_guide_to_nepa.html*.

[27] M–18–13 (Mar. 20, 2018), *https://www.whitehouse.gov/wp-content/uploads/2018/04/M-18-13.pdf*.

[28] 82 FR 40463 (Aug. 24, 2017).

[29] *See* Memorandum of Understanding Implementing One Federal Decision under Executive Order 13807 (2018), *https://www.whitehouse.gov/wp-content/uploads/2018/04/MOU-One-Federal-Decision-m-18–13-Part-2–1.pdf*.

[30] Guidance on the Applicability of E.O. 13807 to States with NEPA Assignment Authority Under the Surface Transportation Project Delivery Program (Feb. 26, 2019), *https://www.whitehouse.gov/wp-content/uploads/2017/11/20190226OMB-CEQ327.pdf*.

[31] Guidance on the Applicability of E.O. 13807 to Responsible Entities Assuming Department of Housing and Urban Development Environmental Review Responsibilities, M–19–20 (June 28, 2019), *https://www.whitehouse.gov/wp-content/uploads/2019/06/M-19–20.pdf*.

[32] Question 35, Forty Questions, *supra* note 10.

[33] *See* Council on Environmental Quality, Environmental Impact Statement Timelines (2010–2017), (Dec. 14, 2018), *https://ceq.doe.gov/nepa-practice/eis-timelines.html*.

count, of EISs (excluding appendices) finalized during the period of 2013–2017. While the CEQ regulations include recommended page limits for the text of final EISs of normally less than 150 pages, or normally less than 300 pages for proposals of "unusual scope or complexity," 40 CFR 1502.7, CEQ found that many EISs are significantly longer. In particular, CEQ found that across all Federal agencies, draft EISs averaged 586 pages in total, with a median document length of 403 pages.[34] One quarter of the draft EISs were 288 pages or shorter, and one quarter were 630 pages or longer. For final EISs, the mean document length was 669 pages, and the median document length was 445 pages. One quarter of the final EISs were 299 pages or shorter, and one quarter were 729 pages or longer. On average, the change in document length from draft EIS to final EIS was an additional 83 pages or a 14 percent increase.

With respect to final EISs, CEQ found that approximately 7 percent were 150 pages or shorter, and 25 percent were 300 pages or shorter. Similar to the conclusions of its EIS timelines study, CEQ noted that a number of factors may influence the length of EISs, including variation in scope and complexity of the decisions that the EIS is designed to inform, the degree to which NEPA documentation is used to document compliance with other statutes, and considerations relating to potential legal challenges. Moreover, variation in EIS length may reflect differences in management, oversight, and contracting practices among agencies that could result in longer documents.

While there can be many factors affecting the timelines and length of EISs, CEQ has concluded that revisions to the CEQ regulations to advance more timely reviews and reduce unnecessary paperwork are warranted. CEQ has determined that improvements to agency processes, such as improved coordination in the development of EISs, can achieve more useful and timely documents to support agency decision making.

## C. Judicial Review of Agency NEPA Compliance

Over the past 50 years, Federal courts have issued an extensive body of case law interpreting NEPA and the CEQ regulations. The Supreme Court has directly addressed NEPA in 17 decisions, and the U.S. district and appellate courts issue approximately 100 to 140 decisions each year interpreting NEPA. The Supreme Court has construed NEPA and the CEQ regulations in light of a "rule of reason," which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of information to the decision-making process. *See Marsh* v. *Or. Nat. Res. Council,* 490 U.S. 360, 373–74 (1989). "Although [NEPA] procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Methow Valley,* 490 U.S. at 350; *Pub. Citizen,* 541 U.S. at 756–57 ("NEPA imposes only procedural requirements on [F]ederal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." (citing *Methow Valley,* 490 U.S. at 349–50)). The extensive body of case law interpreting NEPA and the current CEQ regulations drives much of agencies' modern day practice. A challenge for agencies is that courts have interpreted key terms and requirements differently, adding to the complexity of environmental reviews. As discussed below, the proposed regulations would codify longstanding case law in some instances, and, in other instances, clarify the meaning of the regulations where there is a lack of uniformity in judicial interpretation of NEPA and the CEQ regulations.

## D. Statutory Developments

Following enactment of NEPA in 1970 and over the past four decades, Congress has amended or enacted a large number of substantive environmental statutes. These have included significant amendments to the Clean Water Act and Clean Air Act, establishment of new Federal land management standards and planning processes for National forests, public lands, and coastal zones, and statutory requirements to conserve fish, wildlife, and plant species.[35] Additionally, the consideration of the effects on historic properties under the National Historic Preservation Act is typically integrated into the NEPA review.[36] NEPA has served as the umbrella procedural statute, integrating these laws into NEPA reviews and discussing them in NEPA documents.

Over the past two decades and multiple administrations, Congress has also undertaken efforts to facilitate more efficient environmental reviews by Federal agencies, and has enacted a number of statutes aimed at improving the implementation of NEPA, including in the context of infrastructure projects. In particular, Congress enacted legislation to improve coordination among agencies, integrate NEPA with other environmental reviews, and bring more transparency to the NEPA process.

In 2005, Congress enacted 23 U.S.C. 139, "Efficient environmental reviews for project decisionmaking," a streamlined environmental review process for highway, transit, and multimodal transportation projects (the "section 139 process"), in the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA–LU), Public Law 109–59, section 6002(a), 119 Stat. 1144, 1857. Congress amended section 139 with additional provisions designed to improve the NEPA process in the 2012 Moving Ahead for Progress in the 21st Century Act (MAP–21), Public Law 112–141, sections 1305–1309, 126 Stat. 405, and the 2015 Fixing America's Surface Transportation (FAST) Act, Public Law 114–94, section 1304, 129 Stat. 1312, 1378. Section 139 provides for an environmental review process that is based on the NEPA regulations and codifies many aspects of the regulations, including provisions relating to lead and cooperating agencies, concurrent environmental reviews in a single NEPA document, coordination on the development of the purpose and need statement and reasonable alternatives, and adoption of environmental documents. Further, section 139 provides for referral to CEQ for issue resolution, similar to part 1504 of the NEPA regulations, and allows for the use of errata sheets, consistent with 40 CFR 1503.4(c).[37]

---

[34] *See* Council on Environmental Quality, Length of Environmental Impact Statements (2013–2017), (July 22, 2019), *https://ceq.doe.gov/nepa-practice/eis-length.html.*

[35] *See, e.g.,* the Clean Air Act, 42 U.S.C. 7401–7671q; Clean Water Act, 33 U.S.C. 1251–1388; Coastal Zone Management Act, 16 U.S.C. 1451–1466; Federal Land Policy and Management Act, 43 U.S.C. 1701–1787; Forest and Rangeland Renewable Resources Planning Act of 1974, 16 U.S.C. 1600–1614; Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801–1884; Endangered Species Act, 16 U.S.C. 1531–1544; Oil Pollution Act of 1990, 33 U.S.C. 2701–2762; Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. 1201, 1202, and 1211; and Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9601–9675.

[36] Similar to NEPA, section 106 (54 U.S.C. 306108) of the National Historic Preservation Act is a procedural statute.

[37] To facilitate the NEPA process for transportation projects subject to section 139, the statute specifically calls for development of a coordination plan, including development of a schedule, and publicly tracking the implementation of that schedule through use of the Permitting Dashboard. In addition, the section 139 process provides for "participating" agencies, which are any agencies invited to participate in the environmental review process. Section 139 also requires, to the maximum extent practicable, issuance of a combined final EIS and ROD.

When Congress enacted section 2045 of the Water Resources Development Act of 2007, Public Law 110–114, 121 Stat. 1041, 1103, it created a similar environmental review provision for water resources development projects by the U.S. Army Corps of Engineers. 33 U.S.C. 2348.[38] This project acceleration provision also requires a coordinated environmental review process, provides for dispute resolution, and codifies aspects of the NEPA regulations such as lead and cooperating agencies, concurrent environmental reviews, and the establishment of CEs. Section 2348(o) also directs the Corps to consult with CEQ on the development of guidance for implementing this provision.

Most recently, in 2015 Congress enacted Title 41 of the FAST Act (FAST–41), to provide for a more efficient environmental review and permitting process for "covered projects." *See* Public Law 114–94, § 41001–41014, 129 Stat. 1312, 1741 (42 U.S.C. 4370m–4370m–12). These are projects that require Federal environmental review under NEPA, are expected to exceed $200 million, and involve the construction of infrastructure for certain energy production, electricity transmission, water resource projects, broadband, pipelines, manufacturing, and other sectors. *Id.* FAST–41 codified certain roles and responsibilities required by the NEPA regulations. In particular, FAST–41 imports the concepts of lead and cooperating agencies, and the different levels of NEPA analysis—EISs, EAs, and CEs. Consistent with 40 CFR 1501.5(e) through (f), CEQ is required to resolve any dispute over designation of a facilitating or lead agency for a covered project. 42 U.S.C. 4370m–2(a)(6)(B). Section 4370m–4 codified several requirements from the CEQ regulations, including the requirement for concurrent environmental reviews, which is consistent with 40 CFR 1500.2(c), 1501.7(a)(6) and 1502.25(a), and the tools of adoption, incorporation by reference, supplementation, and use of State documents, consistent with 40 CFR 1506.3, 1502.21, 1502.9(c) and 1506.2.[39] Finally, 42 U.S.C. 4370m–4

addresses interagency coordination on key aspects of the NEPA process including scoping (40 CFR 1501.7), identification of the range of reasonable alternatives for study in an EIS (40 CFR 1502.14), and the public comment process (40 CFR part 1503).

To ensure a timely NEPA process so that important infrastructure projects can move forward, Congress has also established shorter statutes of limitations for challenges to certain types of projects. SAFETEA–LU created a 180-day statute of limitations for highway or public transportation capital projects, which MAP–21 later reduced to 150 days. 23 U.S.C. 139(*l*). The Water Resources Reform and Development Act of 2014 established a three-year statute of limitations for judicial review of any permits, licenses, or other approvals for water resources development project studies. 33 U.S.C. 2348(k). Most recently in FAST–41, Congress established a two-year statute of limitations for covered projects. 42 U.S.C. 4370m–6.

There are a number of additional instances where Congress has enacted legislation to facilitate more timely environmental reviews. For example, similar to the provisions described above, there are other statutes where Congress has called for a coordinated and concurrent environmental review. *See, e.g.,* 33 U.S.C. 408(b) (concurrent review for river and harbor permits); 49 U.S.C. 40128 (coordination on environmental reviews for air tour management plans for national parks); 49 U.S.C. 47171 (expedited and coordinated environmental review process for airport capacity enhancement projects).

Additionally, Congress has established or directed agencies to establish CEs to facilitate NEPA compliance. *See, e.g.,* 16 U.S.C. 6554(d) (applied silvicultural assessment and research treatments); 16 U.S.C. 6591d (hazardous fuels reduction projects to carry out forest restoration treatments); 16 U.S.C. 6591e (vegetation management activity in greater sage-grouse or mule deer habitat); 33 U.S.C. 2349 (actions to repair, reconstruct, or rehabilitate water resources projects in response to emergencies); 42 U.S.C. 15942 (certain activities for the purpose of exploration or development of oil or gas); 43 U.S.C. 1772(c)(5) (development and approval of vegetation management, facility inspection, and operation and maintenance plans); MAP–21, Public Law 112–141, § 1315 (actions to repair

or reconstruct roads, highways, or bridges damaged by emergencies), 1316 (projects within the operational right-of-way), and 1317 (projects with limited Federal assistance); FAA Modernization and Reform Act of 2012, Public Law 112–95, 213(c), 126 Stat. 11, 46 (navigation performance and area navigation procedures); and Omnibus Appropriations Act, 2009, Public Law 111–8, 423, 123 Stat. 524, 748 (Lake Tahoe Basin Management Unit hazardous fuel reduction projects).

Further, in the context of emergency response, Congress has directed the use or development of alternative arrangements in accordance with 40 CFR 1506.11 for reconstruction of transportation facilities damaged in an emergency (FAST Act, Pub. L. 114–94, 1432, 129 Stat. 1429) and for projects by the Departments of the Interior and Commerce to address invasive species (Water Infrastructure Improvements for the Nation Act, Pub. L. 114–322, 4010(e)(3), 130 Stat. 1628, 1877). In 2013, Congress also enacted section 429 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42 U.S.C. 5189g, which directed the President, in consultation with CEQ and the Advisory Council on Historic Preservation, to "establish an expedited and unified interagency review process to ensure compliance with environmental and historic requirements under Federal law relating to disaster recovery projects, in order to expedite the recovery process, consistent with applicable law." Sandy Recovery Improvement Act of 2013, Public Law 113–2, 1106, 127 Stat. 4, 45. This unified Federal environmental and historic preservation review (UFR) process is a framework for coordinating Federal agency environmental and historic preservation reviews for disaster recovery projects associated with Presidentially declared disasters under the Stafford Act. The goal of the UFR process is to enhance the ability of the Federal environmental review and authorization processes to inform and expedite disaster recovery decisions for grant applicants and other potential beneficiaries of disaster assistance by improving coordination and consistency across Federal agencies, and assisting agencies in better leveraging their resources and tools.[40]

These statutes demonstrate that Congress has recognized that the

---

[38] Congress significantly revised this provision in the Water Resources Reform and Development Act of 2014, Public Law 113–121, 1005(a)(1), 128 Stat. 1193, 1199.

[39] For covered projects, section 4370m–4 authorizes lead agencies to adopt or incorporate by reference existing environmental analyses and documentation prepared under State laws and procedures if the analyses and documentation meet certain requirements. 42 U.S.C. 4370m–4(b)(1)(A)(i). This provision also requires that the lead agency, in consultation with CEQ, determine that the analyses and documentation were prepared using a

process that permitted public participation and consideration of environmental consequences, alternatives, and other required analyses that are substantially equivalent to what a Federal agency would have prepared pursuant to NEPA. *Id.*

[40] *See generally* Memorandum of Understanding Establishing the Unified Federal Environmental and Historic Preservation Review Process for Disaster Recovery Projects (July 29, 2014), *https:// www.fema.gov/unified-federal-environmental-and-historic-preservation-review-presidentially-declared-disasters.*

environmental review process can be made more efficient and effective, including for infrastructure projects. Congress also has identified specific process improvements that can accelerate environmental reviews, including improved interagency coordination, concurrent reviews, and increased transparency.

### E. Presidential Directives

Over the past two decades and multiple administrations, Presidents also have recognized the need to improve the environmental review process to make it more timely and efficient, and have directed agencies, through Executive Orders and Presidential memoranda, to undertake various initiatives to address these issues. In 2002, President Bush issued E.O. 13274, titled "Environmental Stewardship and Transportation Infrastructure Project Reviews," [41] which stated that the development and implementation of transportation infrastructure projects in an efficient and environmentally sound manner is essential, and directed agencies to conduct environmental reviews for transportation projects in a timely manner.

In 2011, President Obama's memorandum titled "Speeding Infrastructure Development through More Efficient and Effective Permitting and Environmental Review" [42] directed certain agencies to identify up to three high-priority infrastructure projects for expedited environmental review and permitting decisions to be tracked publicly on a "centralized, online tool." This requirement led to the creation of what is now the Permitting Dashboard, www.permits.performance.gov.

In 2012, E.O. 13604, titled "Improving Performance of Federal Permitting and Review of Infrastructure Projects," [43] established an interagency Steering Committee on Federal Infrastructure Permitting and Review Process Improvement ("Steering Committee") to facilitate improvements in Federal permitting and review processes for infrastructure projects. The E.O. directed the Steering Committee to develop a plan "to significantly reduce the aggregate time required to make Federal permitting and review decisions on infrastructure projects while improving outcomes for communities and the environment." Similarly, E.O. 13616, titled "Accelerating Broadband

Infrastructure Deployment," [44] established an interagency working group to, among other things, avoid duplicative reviews and coordinate review processes to advance broadband deployment.

A 2013 Presidential Memorandum titled "Modernizing Federal Infrastructure Review and Permitting Regulations, Policies, and Procedures" [45] directed the Steering Committee established by E.O. 13604 to work with agencies, OMB, and CEQ to "modernize Federal infrastructure review and permitting regulations, policies, and procedures to significantly reduce the aggregate time required by the Federal Government to make decisions in the review and permitting of infrastructure projects, while improving environmental and community outcomes" and develop a plan to achieve this goal. Among other things, the memorandum directed that the plan create process efficiencies, including additional use of concurrent and integrated reviews; expand coordination with State, Tribal, and local governments; and expand the use of information technology tools. CEQ and OMB led the effort to develop a comprehensive plan to modernize the environmental review and permitting process while improving environmental and community outcomes, including budget proposals for funding and new authorities. Following the development of the plan, CEQ continued to work with agencies to improve the permitting process, including through expanded collection of timeframe metrics on the Permitting Dashboard. In late 2015, these ongoing efforts were superseded by the enactment of FAST–41, which codified the use of the Permitting Dashboard, established the Federal Permitting Improvement Steering Council (Permitting Council), and established other requirements for managing the environmental review and permitting process for covered infrastructure projects.

On August 15, 2017, President Trump issued E.O. 13807 titled, "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure." [46] Section 5(e)(i) directed CEQ to develop an initial list of actions to enhance and modernize the Federal environmental review and authorization process, including issuing such regulations as CEQ deems necessary to: (1) Ensure optimal interagency coordination of environmental review and authorization

decisions; (2) ensure that multi-agency environmental reviews and authorization decisions are conducted in a manner that is concurrent, synchronized, timely, and efficient; (3) provide for use of prior Federal, State, Tribal, and local environmental studies, analysis, and decisions; and (4) ensure that agencies apply NEPA in a manner that reduces unnecessary burdens and delays, including by using CEQ's authority to interpret NEPA to simplify and accelerate the NEPA review process. In response to E.O. 13807, CEQ published an initial list of actions and stated its intent to review its existing NEPA regulations in order to identify potential revisions to update and clarify these regulations. [47]

### F. 2018 Advance Notice of Proposed Rulemaking Requesting Public Comment on CEQ's NEPA Regulations

Consistent with E.O. 13807 and CEQ's initial list of actions, and given the length of time since CEQ issued its regulations, on June 20, 2018, CEQ published an advance notice of proposed rulemaking (ANPRM) titled "Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act." [48] The ANPRM requested public comments on how CEQ could ensure a more efficient, timely, and effective NEPA process consistent with the Act's national environmental policy and provided for a 30-day comment period. In response to comments, CEQ extended the comment period 31 additional days to August 20, 2018. [49]

The ANPRM requested comment on potential revisions to update and clarify the NEPA regulations, and included a list of questions on specific aspects of the regulations. For example, with respect to the NEPA process, the ANPRM asked whether there are provisions that CEQ could revise to ensure more efficient environmental reviews and authorization decisions, such as facilitating agency use of existing environmental studies, analyses and decisions, as well as improving interagency coordination. The ANPRM also requested comments on the scope of NEPA reviews, including whether CEQ should revise, clarify, or add definitions. The ANPRM also asked whether additional revisions relating to environmental documentation issued pursuant to NEPA, including CEs, EAs, EISs, and other documents, would be appropriate. Finally, the ANPRM requested general comments, including

---

[41] 67 FR 59449 (Sept. 23, 2002).
[42] https://www.govinfo.gov/content/pkg/DCPD-201100601/pdf/DCPD-201100601.pdf.
[43] 77 FR 18887 (Mar. 28, 2012).

[44] 77 FR 36903 (June 20, 2012).
[45] 78 FR 30733 (May 22, 2013).
[46] 82 FR 40463 (Aug. 24, 2017).

[47] 82 FR 43226 (Sept. 14, 2017).
[48] 83 FR 28591 (June 20, 2018).
[49] 83 FR 32071 (July 11, 2018).

whether there were obsolete provisions that CEQ could update to reflect new technologies or make the process more efficient, or that CEQ could revise to reduce unnecessary burdens or delays.

In response to the ANPRM, CEQ received over 12,500 comments, which are available for public review.[50] These included comments from a wide range of stakeholders, including States, Tribes, localities, environmental organizations, trade associations, NEPA practitioners, and interested members of the public. While some commenters opposed any updates to the current regulations, other commenters urged CEQ to consider potential revisions. While the approaches to the update of the NEPA regulations varied, most of the substantive comments supported some degree of updating of the current regulations. Many noted that overly lengthy documents and the time required for the NEPA process remain real and legitimate concerns despite the NEPA regulations' explicit direction with respect to reducing paperwork and delays. In general, numerous commenters requested that CEQ consider revisions to modernize its regulations, reduce unnecessary burdens and costs, and make the NEPA process more efficient, effective, and timely. Discussion of comments is provided in more detail in section II below.

## II. Summary of Proposed Rule

In this proposed rule, CEQ would revise and modernize its NEPA regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies. The proposed updates and clarifications to its regulations are based on CEQ's record evaluating the implementation of its NEPA regulations and on comments provided in response to the ANPRM. The proposed updates and clarifications seek to advance the stated objectives of the current regulations, as adopted in 1978, "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further the national policy to protect and enhance the quality of the human environment."[51]

CEQ specifically proposes various revisions to align the regulations with the text of the NEPA statute, including revisions to reflect the procedural nature of section 102(2) of NEPA. CEQ also proposes revisions to ensure that environmental documents prepared pursuant to NEPA are concise and serve their purpose of informing decision makers regarding the significant potential environmental effects of proposed major Federal actions and the public of the environmental issues in the pending decision-making process. CEQ also proposes revisions to ensure that the regulations reflect changes in technology, increase public participation in the process, and facilitate the use of existing studies, analyses and environmental documents prepared by States, Tribes, and local governments.

CEQ also proposes revisions to its regulations consistent with the One Federal Decision policy ("OFD policy") established by E.O. 13807 for multi-agency review and related permitting and other authorization decisions. The E.O. specifically instructed CEQ to take steps to ensure optimal interagency coordination, including through a concurrent, synchronized, timely, and efficient process for environmental reviews and authorization decisions. In response to the ANPRM, CEQ received many suggestions to codify key aspects of the OFD policy in the NEPA regulations, including by providing greater specificity on the roles and responsibilities of lead and cooperating agencies. Commenters also suggested that the regulations require agencies to establish and adhere to timetables for the completion of reviews, another key element of the OFD policy. In response to these comments and to promote interagency coordination and more timely and efficient reviews, CEQ proposes to codify and make generally applicable a number of key elements from expedited procedures and the OFD policy, including development by the lead agency of a joint schedule, procedures to elevate delays or disputes, preparation of a single EIS and joint ROD to the extent practicable, and a two-year goal for completion of environmental reviews. Consistent with section 104 of NEPA (42 U.S.C. 4334), codification of these policies will not limit or affect the authority or legal responsibilities of agencies under other statutory mandates that may be covered by joint schedules, and CEQ proposes language to that effect in § 1500.6.[52]

CEQ also proposes revisions to clarify the process and documentation required for complying with NEPA by amending part 1501 to add sections on threshold considerations and determining the appropriate level of review; add a section on CEs; and revise sections on EAs, FONSIs, and EISs in part 1502.

CEQ further proposes a number of revisions to promote more efficient and timely environmental reviews, including revisions to promote interagency coordination by amending sections of parts 1501, 1506, and 1507 relating to lead, cooperating agencies, timing of agency action, scoping, and agency NEPA procedures. CEQ proposes additional revisions to promote a more efficient and timely NEPA process by amending parts 1501, 1506, and 1507 relating to applying NEPA early in the process, scoping, tiering, adoption, use of current technologies, and avoiding duplication of State, Tribal, and local environmental reviews; revisions to parts 1501 and 1502 to provide for presumptive time and page limits; and revisions to clarify the definitions by amending part 1508.

CEQ also includes provisions to promote informed decision making and to inform the public about the decision-making process. In parts 1500, 1501, 1502, and 1503, CEQ proposes amendments to ensure agencies solicit and consider relevant information early in the development of the draft EIS. In particular, CEQ proposes to direct agencies in the notice of intent (NOI) to request public comment on potential alternatives and impacts, and identification of any relevant information and analyses concerning impacts affecting the quality of the human environment. Additionally, CEQ proposes to direct agencies to include a new section in the draft and final EIS summarizing all alternatives, information, and analyses submitted by the public and to request comment on the completeness of the summary included in the draft EIS.

CEQ further proposes to make revisions to part 1503 to ensure that comments are timely submitted on the draft EIS and on the completeness of the summary of information submitted by the public, and that comments are as specific as possible. Additionally, CEQ proposes a provision in § 1502.18 to require that, based on the summary of the alternatives, information, and analyses section, the decision maker for the lead agency certify that the agency has considered such information. This will advance the purposes of the directive in E.O. 11991 to ensure that EISs are supported by evidence that agencies have made the necessary environmental analyses. *See* E.O. 11991, § 1 amending E.O. 11514, § 3(h). Upon certification, the proposed provisions in §§ 1500.3 and 1502.18 would establish a conclusive presumption that the agency has considered such information. In conjunction with the certification requirement, this presumption is

---

[50] *See https://www.regulations.gov*, docket no. CEQ–2018–0001.

[51] 43 FR 55978 (Nov. 29, 1978).

[52] In the preamble, CEQ uses the section symbol (§) to refer to the proposed regulations as set forth in this NPRM and 40 CFR to refer to the current CEQ regulations as set forth in 40 CFR parts 1500–1508.

consistent with the longstanding presumption of regularity that government officials have properly discharged their official duties. *See U.S. Postal Serv.* v. *Gregory,* 534 U.S. 1, 10 (2001) ("[W]e note that a presumption of regularity attaches to the actions of government agencies." (citing *United States* v. *Chem. Found., Inc.,* 272 U.S. 1, 14–15 (1926)). This is also consistent with case law upholding regulatory presumptions. *See, e.g., Allentown Mack Sales & Serv.* v. *Nat'l Labor Relations Bd.,* 522 U.S. 359 (1998); *Fed. Commc'ns Comm'n* v. *Schreiber,* 381 U.S. 279 (1965).

Finally, CEQ proposes changes to make the regulations easier to understand and apply. This includes proposed revisions to simplify and clarify key definitions in § 1508.1. CEQ also proposes certain changes to move and consolidate operative language from the definitions to the relevant regulatory provisions, while leaving the definitional language in the definitions section. In the existing regulations, provisions on certain topics are scattered throughout, making it unnecessarily difficult to navigate the requirements. In some cases, the NEPA regulations address topics in multiple sections and sometimes multiple parts. CEQ proposes to revise the regulations to consolidate provisions and reduce duplication. Such consolidation, reordering, or reorganizing also would promote greater clarity and ease of use.

*A. Proposed Changes Throughout Parts 1500–1508*

CEQ proposes several revisions throughout parts 1500–1508 to provide consistency, improve clarity, and correct grammatical errors. CEQ proposes to make certain grammatical corrections in the regulations where it proposes other changes to the regulations to achieve the goals of this rulemaking, or where CEQ determined the changes are necessary for the reader to understand fully the meaning of the sentence. CEQ proposes to revise sentences from passive voice to active voice where it is helpful to identify the responsible parties. CEQ also proposes to replace the word "insure" with "ensure," consistent with modern usage. Finally, CEQ proposes to add paragraph letters or numbers to certain introductory paragraphs where it would improve clarity. CEQ invites comment on whether it should make these types of changes throughout the rule or if there are additional specific instances where CEQ should make these types of changes.

CEQ proposes to add "Tribal" to the phrase "State and local" throughout the rule to ensure consultation with Tribal entities and to reflect existing NEPA practice to coordinate or consult with affected Tribal governments and agencies, as necessary and appropriate for a proposed action. This proposed change is also in response to comments on the ANPRM supporting expansion of the recognition of the sovereign rights, interests, and expertise of Tribes. CEQ proposes to eliminate the provisions in the current regulations that limit Tribal interest to reservations. *See* proposed §§ 1501.8(a), 1502.16(a)(5), 1503.1(a)(2)(ii), and 1506.6(b)(3)(ii). The proposed changes are consistent with and in support of government-to-government consultation pursuant to E.O. 13175, titled "Consultation and Coordination With Indian Tribal Governments." [53]

CEQ proposes several changes for consistent use of certain terms. In particular, CEQ proposes to change "entitlements" to the defined term "authorizations" throughout the proposed regulation and added "authorizations" where appropriate to reflect the mandate in E.O. 13807 for better integration and coordination of authorization decisions and related environmental reviews. CEQ proposes conforming edits to add or change "entitlements" to "authorizations" in proposed §§ 1501.2(a), 1501.7(i), 1501.9(d)(4) and (f)(4), 1502.13, 1502.25(b), 1503.3(d), 1506.2, and the definitions of authorization and participating agency in § 1508.1(c) and (w).

CEQ proposes to use the term "decision maker" to refer to an individual responsible for making decisions on agency actions and to define the term "senior agency official" to refer to an individual with responsibilities for NEPA compliance. Under the proposed rule, the senior agency official would be an official of assistant secretary rank or higher who is responsible for agency compliance. The responsibilities of this position in the proposed regulations would be consistent with the responsibilities of senior agency officials in E.O. 13807 to whom anticipated missed or extended permitting timetable milestones are elevated. The proposed regulations would set forth a variety of responsibilities for senior agency officials, such as approval to exceed page or time limits. *See* proposed §§ 1501.5(e), 1501.7(d), 1501.8(b)(6) and (c), 1501.10, 1502.7, and 1507.2.

CEQ proposes to replace "circulate" or "circulation" with "publish" or "publication" throughout the rule and make "publish" a defined term that provides agencies with the flexibility to make environmental review and information available to the public by electronic means not available at the time of promulgation of the CEQ regulations in 1978. Historically, the practice of circulation included mailing of hard copies or providing electronic copies on disks or CDs. While it may be necessary to provide a hard copy or copy on physical media in limited circumstances, agencies now provide most documents in an electronic format by posting them online and using email or other electronic forms of communication to notify interested or affected parties. This change would help reduce paperwork and delays, and modernize the NEPA process to be more accessible to the public. CEQ proposes these changes in proposed §§ 1500.4(o), 1501.2(b)(2), 1502.9, 1502.20, 1502.21, 1503.4(c), 1506.3, and 1506.8(c)(2).

CEQ proposes to change the term "possible" to "practicable" in proposed §§ 1501.7(h)(1) and (2), 1501.9(b)(1), 1502.5, 1502.9(b), 1504.2, and 1506.2(b) and (c). "Practicable" is the more commonly used term in regulations to convey the ability for something to be done, considering the cost, including time required, technical and economic feasibility, and the purpose and need for agency action. Similarly, CEQ proposes to change "no later than immediately" to "as soon as practicable" in § 1502.5(b). Finally, CEQ proposes to refer to the procedures required in § 1507.3 using the term "agency NEPA procedures" throughout.

CEQ proposes to eliminate obsolete references and provisions in several sections of the CEQ regulations. In particular, CEQ proposes to remove references to the 102 Monitor in 40 CFR 1506.6(b)(2) and 1506.7(c) because the publication no longer exists, and OMB Circular A–95, which was revoked pursuant to section 7 of E.O. 12372 (47 FR 30959, July 16, 1982), including the requirement to use State and area-wide clearinghouses in 40 CFR 1501.4(e)(2), 1503.1(a)(2)(iii), 1505.2, and 1506.6(b)(3)(i).

Finally, CEQ proposes changes to citations and authorities. CEQ would update the authorities sections for each part to correct the format. CEQ also proposes to remove cross-references to the sections of part 1508, "Definitions," and to update or insert new cross-references throughout the rule to reflect revised or new sections.

---

[53] 65 FR 67249 (Nov. 9, 2000).

*B. Proposed Revisions To Update the Purpose, Policy, and Mandate (Part 1500)*

In part 1500, CEQ proposes several revisions to update the policy and mandate sections of the regulations to reflect statutory, judicial, policy, and other developments since the CEQ regulations were issued in 1978.

CEQ specifically proposes to retitle and revise § 1500.1, "Purpose and Policy" to align this section with the statutory text of NEPA and certain case law and reflect the procedural requirements of section 102(2) (42 U.S.C. 4332(2)). In particular, the proposed revisions would provide that NEPA is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process. The Supreme Court has made clear that NEPA is a procedural statute that does not mandate particular results; "[r]ather, NEPA imposes only procedural requirements on [F]ederal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Pub. Citizen,* 541 U.S. at 756–57 (citing *Methow Valley,* 490 U.S. at 349–50); *see also Vt. Yankee,* 435 U.S. at 558 ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.").

CEQ proposes to revise § 1500.1(a) to summarize section 101 of the Act (42 U.S.C. 4331). CEQ further proposes to revise § 1500.1(a) to reflect that section 102(2) establishes the procedural requirements to carry out the policy stated in section 101. Additionally, CEQ proposes to revise § 1500.1(a) to reflect, consistent with the case law, that the purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, that the public has been informed regarding the decision-making process, and that NEPA does not mandate particular results or substantive outcomes. These proposed revisions would revise paragraph (a) in § 1500.1 to replace the vague reference to "action-forcing" provisions ensuring that Federal agencies act "according to the letter and spirit of the Act" with a more specific reference to the consideration of environmental impacts of their actions in agency decisions. These changes would codify the Supreme Court's interpretation of section 102 as serving NEPA's "action-forcing" purpose in two important respects: Section 102 "ensures that the agency, in reaching its decision, will have available, and will carefully

consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision[-]making process and the implementation of that decision." *Methow Valley,* 490 U.S. at 349 (citing *Balt. Gas & Elec. Co.,* 462 U.S. at 97; *Weinberger,* 454 U.S. at 143); *see also Winter* v. *Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 23 (2008); *Pub. Citizen,* 541 U.S. at 756–58.

CEQ proposes to revise § 1500.1(b) to describe the regulations that follow consistent with the proposed revisions. In particular, CEQ proposes to revise this paragraph to reflect that the regulations include direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review, where applicable. The proposed revisions also reflect that the regulations are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies. The proposed revisions reflect that, consistent with E.O. 13807 and the purposes of the regulations as originally promulgated in 1978, the regulations are intended to reduce unnecessary burdens and delays. These proposed revisions are supported by many comments submitted in response to the ANPRM requesting revisions to promote more efficient and timely reviews under NEPA. These proposed amendments emphasize that the policy of integrating NEPA with other environmental reviews is to promote concurrent and timely reviews and decision making consistent with statutes, Executive Orders, and CEQ guidance. *See, e.g.,* 42 U.S.C. 5189g; 23 U.S.C. 139; 42 U.S.C. 4370m *et seq.;* E.O. 13604; E.O. 13807; Mitigation Guidance, *supra* note 18, and Timely Environmental Reviews Guidance, *supra* note 21. Finally, CEQ proposes to strike § 1500.2, "Policy," which is duplicative of subsequent sections of the regulations, in order to simplify the regulations and eliminate redundancy and repetition.

CEQ proposes to make a number of revisions and additions, to § 1500.3, "NEPA compliance," and to provide paragraph headings to improve readability. CEQ proposes to amend the discussion of paragraph (a), "Mandate," to clarify that agency NEPA procedures to implement the CEQ regulations, as provided for in § 1507.3, shall not impose additional procedures or requirements beyond those set forth in the CEQ regulations except as otherwise

provided by law or for agency efficiency. CEQ intends that this provision will prevent agencies from designing additional procedures that will result in increased costs or delays.

CEQ proposes to add a new § 1500.3(b), "Exhaustion," which would provide that agencies must request comments on potential alternatives and impacts and identification of any relevant information, studies, or analyses of any kind concerning impacts affecting the quality of the human environment in the notice of intent to prepare an EIS. It would provide that comments on draft EISs and any information on environmental impacts or alternatives to a proposed action must be timely submitted to ensure informed decision making by Federal agencies. CEQ further proposes to provide that comments not timely raised and information not provided shall be deemed unexhausted and forfeited. This reinforces that parties may not raise claims based on issues they did not raise during the public comment period.

It also would provide that agencies must include in the EIS a summary of comments received, and any objections to that summary must be submitted within 30 days of the publication of the notice of availability of the final EIS. Based on the summary, the decision maker must certify in the record of decision that the agency has considered all of the alternatives, information, and analyses submitted by public commenters.

In addition, CEQ proposes to add a new § 1500.3(c), "Actions regarding NEPA compliance," to reflect the development of case law since the promulgation of the CEQ regulations. Specifically, CEQ proposes to revise the sentence regarding timing of judicial review to strike references to the filing of an EIS or FONSI and replace it with the issuance of a signed ROD or the taking of another final agency action. Under the APA, judicial review does not occur until an agency has taken final agency action. *Bennett* v. *Spear,* 520 U.S. 154, 177–78 (1997) (the action must mark the consummation of the agency's decision-making process—it must not be of a merely tentative or interlocutory nature—and the action must be one by which rights or obligations have been determined or from which legal consequences will flow (citations omitted)). Because NEPA's procedural requirements apply to proposals for agency action, judicial review should not occur until the agency has completed its decision-making process. Final agency action for judicial review purposes is not necessarily when the agency publishes the final EIS, issues a

FONSI, or makes the determination to categorically exclude an action; however, an agency may designate any of these as its final agency action. CEQ also proposes to strike vague language and to clarify that an agency can remedy harm from the failure to comply with NEPA by complying with the Act as interpreted in these regulations.

The CEQ regulations create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm. As the Supreme Court has held, the irreparable harm requirement, as a prerequisite to the issuance of preliminary or permanent injunctive relief, is neither eliminated nor diminished in NEPA cases. A showing of a NEPA violation alone does not warrant injunctive relief and does not satisfy the irreparable harm requirement. *See Monsanto Co.* v. *Geertson Seed Farms,* 561 U.S. 139, 157 (2010) ("'[T]he statements quoted above [from prior Ninth Circuit cases] appear to presume that an injunction is the proper remedy for a NEPA violation except in unusual circumstances. No such thumb on the scales is warranted.'"); *Winter,* 555 U.S. at 21–22, 31–33; *see also Amoco Prod. Co.* v. *Vill. of Gambell,* 480 U.S. 531, 544–545 (1987) (rejecting proposition that irreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action). Moreover, a showing of irreparable harm in a NEPA case does not entitle a litigant to an injunction or a stay. *See Winter,* 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest.") (emphasis added); *Geertson Seed Farms,* 561 U.S. at 157 ("The traditional four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation. . . . An injunction should issue only if the traditional four-factor test is satisfied.").

CEQ proposes to clarify that NEPA and the APA allow agencies the flexibility to structure their decision-making processes to allow opportunities for affected parties to seek a stay of an agency's final decision from the agency pending judicial review of the decision. Such stays are authorized by the APA, are expressly contemplated by Fed. R. App. P. 18, and are analogous in key respects to stays of district court judgments available under Fed. R. Civ. P. 62(b) and (d). *See* 5 U.S.C. 705; *see also* Fed. R. App. P. 18(a)(1) and 18(a)(2)(A). In appropriate

circumstances, agencies may impose bond and security requirements or other conditions. *See, e.g.,* 5 U.S.C. 301,[54] as a prerequisite to staying their decisions, as courts do under Fed. R. App. P. 18 and other rules.[55] *See* Fed. R. App. P. 18(b); Fed. R. App. P. 8(a)(2)(E); Fed. R. Civ. P. 65(c); Fed. R. Civ. P. 62(b); Fed. R. Civ. P. 62(d). CEQ invites comment on whether there are disclosure or other transparency requirements that should be required when agencies establish bond or security requirements or other conditions.

In addition to the authority provided by 5 U.S.C. 705 and by agencies' various organic statutes, agency stays of their decisions and appropriate conditions on such stays may further the purposes of NEPA, which provides that all Federal agencies shall identify and develop methods and procedures, in consultation with CEQ, to ensure that environmental amenities and values are given appropriate consideration in decision making along with economic and technical considerations. 42 U.S.C. 4332(B). Agency procedures that allow for agencies to stay their decisions, including appropriate conditions on stays, can contribute to an orderly process whereby judicial review of agency decisions may occur, furthering NEPA's mandate to agencies to develop methods and procedures to ensure the appropriate consideration of environmental, economic, and technical factors in agency decision making. CEQ invites comment on how agencies can structure their processes to ensure appropriate consideration of these factors.

CEQ proposes to add a new § 1500.3(d), "Remedies." CEQ proposes to state explicitly that harm from the failure to comply with NEPA can be remedied by compliance with NEPA's procedural requirements, and that CEQ's regulations do not create a cause of action for violation of NEPA. The statute does not create any such cause of action, and agencies may not create

private rights of action by regulation; "[l]ike substantive [F]ederal law itself, private rights of action to enforce [F]ederal law must be created by Congress." *Alexander* v. *Sandoval,* 532 U.S. 275, 286 (2001). CEQ also proposes to state that any actions to review, enjoin, stay, or alter an agency decision on the basis of an alleged NEPA violation be raised as soon as practicable to avoid or minimize any costs to agencies, applicants, or any affected third parties. As reflected in comments received in response to the ANPRM, delays have the potential to result in substantial costs.

CEQ also proposes to state that minor, non-substantive errors that have no effect on agency decision making shall be considered harmless and shall not invalidate an agency action. This would replace and update 40 CFR 1500.3, which provides that trivial violations should not give rise to an independent cause of action. Invalidating actions due to minor errors does not advance the goals of the statute and adds delays and costs.

Finally, CEQ proposes to add a new § 1500.3(e), "Severability," to address the possibility that this rule, or portions of this rule, may be challenged in litigation. It is CEQ's intent that the individual sections of this rule be severable from each other, and that if any sections or portions of the regulations are stayed or invalidated, the validity of the remainder of the sections shall not be affected and shall continue to be operative.

CEQ proposes to reorder the paragraphs in § 1500.4, "Reducing paperwork," and § 1500.5, "Reducing delay," for a more logical ordering, consistent with the three levels of NEPA review. Finally, CEQ proposes edits to § 1500.4 and § 1500.5 for consistency with proposed edits to the cross-referenced sections.

Finally, as noted above, CEQ proposes to add a savings clause to § 1500.6, "Agency authority," to clarify that the CEQ regulations do not limit an agency's other authorities or legal responsibilities. This clarification is consistent with section 104 of NEPA (42 U.S.C. 4334) and the current regulations, but acknowledges the possibility of different statutory authorities that may set forth different requirements, such as timeframes.

CEQ invites comment on the proposed changes to part 1500, particularly proposed § 1500.3 and whether CEQ should include any additional changes or provisions to advance timely resolution of disputes related to NEPA compliance to ensure a

---

[54] 5 U.S.C. 301, titled "Department regulations," is known as the housekeeping statute and permits the head of a Department to promulgate regulations "for the government of his department, the conduct of its employees, the distribution and performance of its business, and the custody, use, and preservation of its records, papers, and property." The purpose of this statute is "simply a grant of authority to [an] agency to regulate its own affairs" through "what the APA terms 'rules of agency organization, procedure or practice' as opposed to 'substantive rules.'" *Chrysler Corp.* v. *Brown,* 441 U.S. 281, 309–10 (1979).

[55] CEQ notes that there is no "NEPA exception" that exempts litigants bringing NEPA claims from otherwise applicable bond or security requirements or other appropriate conditions, and that some courts have imposed substantial bond requirements in NEPA cases.

timely and predictable process, and avoidance of litigation.

## C. Proposed Revisions to NEPA and Agency Planning (Part 1501)

CEQ proposes significant changes to part 1501. CEQ proposes to replace the current 40 CFR 1501.1, ''Purpose,'' because it is unnecessary and duplicative, with a new section to address threshold considerations. CEQ proposes to add additional sections to address the level of NEPA review and CEs. CEQ further proposes to consolidate and clarify provisions on EAs and FONSIs, and relocate from part 1502 the provisions on tiering and incorporation by reference. CEQ also proposes to set presumptive time limits for the completion of NEPA reviews, and clarify the roles of lead and cooperating agencies to further the OFD policy and encourage more efficient and timely NEPA reviews.

### 1. NEPA Threshold Applicability Analysis (§ 1501.1)

Since the enactment of NEPA, courts have examined the applicability of NEPA based on a variety of considerations. For example, courts have found that NEPA is inapplicable where an agency is carrying out a non-discretionary duty or obligation, where an agency's statutory obligations clearly or fundamentally conflict with NEPA compliance, where Congress has established requirements under another statute that displaces NEPA compliance, and where environmental review and public participation procedures under another statute are functionally equivalent to those required by NEPA.

CEQ proposes a new § 1501.1, ''NEPA threshold applicability analysis,'' to provide a series of considerations to assist agencies in a threshold analysis for determining whether NEPA applies. CEQ also proposes related changes in § 1507.3(c) to provide that agencies may identify actions that are not subject to NEPA in their agency NEPA procedures. Paragraph (b) of § 1501.1 would clarify that agencies can also make this determination on a case-by-case basis.

### 2. Apply NEPA Early in the Process (§ 1501.2)

CEQ proposes to amend the introductory paragraph of § 1501.2, ''Apply NEPA early in the process,'' to change ''shall'' to ''should'' and ''possible'' to ''reasonable.'' Agencies need the discretion to structure the timing of their NEPA processes to align with their decision-making processes, consistent with their statutory authorities. Agencies need flexibility to determine the appropriate time to start

the NEPA process, based on the context of the particular proposed action and governed by the rule of reason, so that the NEPA analysis meaningfully informs the agency's decision. The appropriate time to begin the NEPA process is dependent on when the agency has sufficient information and how it can most effectively integrate the NEPA review into the agency's decision-making process. Further, some have viewed this provision as a legally enforceable standard, rather than an opportunity for agencies to integrate NEPA into their decision-making programs and processes. CEQ's view is that agencies should have discretion with respect to timing, consistent with its regulatory provisions for deferring NEPA analysis to appropriate points in the decision-making process. *See* 40 CFR 1508.28. This proposed amendment is consistent with CEQ guidance that agencies should ''concentrate on relevant environmental analysis'' in their EISs rather than ''produc[ing] an encyclopedia of all applicable information.'' Timely Environmental Reviews Guidance, *supra* note 21; *see also* 40 CFR 1500.4(b) and 1502.2(a). Therefore, CEQ proposes these changes to clarify that agencies have discretion to structure their NEPA processes in accordance with the rule of reason. CEQ also proposes to change ''possible'' to ''reasonable'' in paragraph (b)(4)(iii) and ''shall'' to ''should'' in the introductory paragraph of § 1502.5 for consistency.

CEQ also proposes to amend § 1501.2(b)(2) to clarify that agencies should consider economic and technical analyses along with environmental effects. Finally, CEQ proposes to amend paragraph (b)(4)(ii) to change ''agencies'' to ''governments'' consistent with and in support of government-to-government consultation pursuant to E.O. 13175 [56] and E.O. 13132, ''Federalism.'' [57] For consistency, CEQ also proposes revisions to §§ 1501.9(b) and 1503.1(a)(2)(ii).

### 3. Determine the Appropriate Level of NEPA Review (§ 1501.3)

NEPA requires a ''detailed statement'' for ''major Federal actions significantly affecting the quality of the human environment.'' 42 U.S.C. 4332(2)(C). To determine whether an action requires such a detailed statement, the CEQ regulations provide three levels of review for Federal agencies to assess proposals for agency action. Specifically, the CEQ regulations allow agencies to review expeditiously those

actions that normally do not have significant effects by using CEs or, for actions that are not likely to have significant effects, by preparing an EA. Through the use of CEs and EAs, agencies then can focus their limited resources on those actions that are likely to have significant effects and require the ''detailed statement,'' or EIS, required by NEPA.

While the existing CEQ regulations provide for these three levels of NEPA review, they do not clearly set out the decisional framework by which agencies should assess their proposed actions and select the appropriate level of review. To provide this direction and clarity, the proposed rule would add two additional sections to part 1501, renumber the remaining sections, and retitle two sections. The proposed § 1501.3, ''Determine the appropriate level of NEPA review,'' would describe the three levels of NEPA review and the basis upon which an agency makes a determination regarding the appropriate level of review for a proposed action. While this section would supplement the existing regulations, these concepts exist in the current 40 CFR 1501.4 (whether to prepare an EIS), 1508.4 (CEs), and 1508.9 (EAs).

Additionally, paragraph (b) would address the consideration of significance, which is central to determining the appropriate level of review. CEQ proposes to move and simplify the operative language from 40 CFR 1508.27, ''Significantly.'' CEQ proposes to change ''context'' to ''potentially affected environment'' and ''intensity'' to ''degree'' to provide greater clarity as to what agencies should consider in assessing potential significant effects. CEQ did not include a consideration regarding controversy (40 CFR 1508.27(b)(4)) because this has been interpreted to mean scientific controversy. Additionally, CEQ did not include a consideration regarding the reference in 40 CFR 1508.27(b)(7) to ''[s]ignificance cannot be avoided by terming an action temporary or by breaking it down into small component parts'' because this is addressed in the criteria for scope in § 1501.9(e) and § 1502.4(a), which would provide that agencies evaluate in a single EIS proposals or parts of proposals that are related closely enough to be, in effect, a single course of action.

### 4. Categorical Exclusions (CEs) (§ 1501.4)

Under the CEQ regulations, agencies can categorically exclude actions from detailed review where the agency has found in its agency NEPA procedures that the action normally would not have

---

[56] *Supra* note 53.

[57] 64 FR 43255 (Aug. 10, 1999).

significant effects. Over the past 4 decades, Federal agencies have developed and documented more than 2,000 CEs.[58] CEQ estimates that each year, Federal agencies apply CEs to approximately 100,000 Federal agency actions that typically require little or no documentation.[59] While CEs are the most common level of NEPA review, CEQ has only addressed CE development and implementation in one comprehensive guidance document, *see* CE Guidance, *supra* note 17, and does not address CEs in detail in its current regulations.

In response to the ANPRM, many commenters requested that CEQ update the NEPA regulations to provide more detailed direction on the application of CEs. To provide greater clarity, CEQ proposes to add a new section on CEs. The proposed § 1501.4, "Categorical exclusions," would address in more detail the process by which an agency considers whether a proposed action is categorically excluded under NEPA. This proposed provision is consistent with the definition of categorical exclusion in 40 CFR 1508.4, which is a category of actions that the agency has found normally do not have a significant effect and listed in its agency NEPA procedures.

The proposed CE section would provide additional clarity on the process that agencies follow in applying a CE. In particular, paragraph (a) would provide that agencies identify CEs in their NEPA procedures, consistent with the requirement to establish CEs in agency NEPA procedures currently set forth in 40 CFR 1507.3(b)(2)(ii). The proposed regulations would move the requirement that agency NEPA procedures provide for extraordinary circumstances from the current 40 CFR 1508.4 to the proposed § 1507.3(d)(2)(ii) to consolidate all the requirements for establishing CEs in that regulation, while providing in the proposed § 1501.4 the procedure for evaluation of a proposed action for extraordinary circumstances. The definition of categorical exclusion only applies to those CEs created by an administrative determination in its agency NEPA procedures and does not apply to "legislative categorical exclusions" created by Congress, which are

governed by the terms of the specific statute and statutory interpretation of the agency charged with the implementation of the statute.

Paragraph (b) of proposed § 1501.4 would set forth the requirement for consideration of extraordinary circumstances once an agency determines that a CE covers a proposed action, consistent with the current requirement in 40 CFR 1508.4. Finally, paragraph (b)(1) would provide that, when extraordinary circumstances are present, agencies may consider whether mitigating circumstances, such as the design of the proposed action to avoid effects that create extraordinary circumstances, are sufficient to allow the proposed action to be categorically excluded. The change would clarify that the mere presence of extraordinary circumstances does not preclude the application of a CE. Rather, the agency may consider whether there is a close causal relationship between a proposed action and the potential effect on the conditions identified as extraordinary circumstances, and if such a relationship exists, the potential effect of a proposed action on these conditions. Accordingly, the agency could modify the proposed action to avoid the extraordinary circumstances so that the action fits in the categorical exclusion. While this reflects current practice for some agencies,[60] this revision would assist agencies as they consider whether to categorically exclude an action that would otherwise be considered in an EA and FONSI.

CEQ invites comment on these proposed revisions and on whether there are any other aspects of CEs that CEQ should address in its regulations. Specifically, CEQ invites comment on whether it should establish government-wide CEs in its regulations to address routine administrative activities, for example, internal orders or directives regarding agency operations, procurement of office supplies and travel, and rulemakings to establish administrative processes such as those established under the Freedom of Information Act or Privacy Act. Alternatively, CEQ invites comment on whether and how CEQ should revise the definition of major Federal action to exclude these categories from the definition, and if so, suggestions on how it should be addressed.

5. Environmental Assessments (EAs) (§ 1501.5)

Under the current CEQ regulations, when an agency has not categorically excluded a proposed action, the agency can prepare an EA to document its effects analysis. If the analysis in the EA demonstrates that the action's effects would not be significant, the agency documents its reasoning in a FONSI, which completes the NEPA process; otherwise, the agency uses the EA to help prepare an EIS. *See* 40 CFR 1508.9 and 1508.13. CEQ estimates that Federal agencies prepare approximately 10,000 EAs each year.[61]

The current CEQ regulations address the requirements for EAs in a few provisions, and, in response to the ANPRM, some commenters requested that the regulations provide more detailed direction related to EAs. Currently, 40 CFR 1508.9 defines an EA as a "concise public document" that agencies may use to comply with NEPA and determine whether to prepare an EIS or a FONSI. This section also sets forth the basic requirements for an EA's contents. Current 40 CFR 1501.4(b) provides the public involvement requirements for EAs. These essential requirements of an EA would remain under the proposed regulations, but CEQ proposes to consolidate them into a single section to improve readability.

Under the current regulations, the format for an EA is flexible and responsive to agency decision-making needs and the circumstances of the particular proposal for agency action. The proposed CEQ regulations would continue to provide that an EA may be prepared by and with other agencies, applicants, and the public. Modern information technology can help facilitate this collaborative EA preparation, allowing the agency to make a coordinated but independent evaluation of the environmental issues and assume responsibility for the scope and content of the EA.

CEQ proposes to revise paragraph (a) of proposed § 1501.5 (current 40 CFR 1501.3) to clarify that an agency must prepare an EA when necessary to determine whether a proposed action would have a significant effect or the significance of the effects is unknown, unless a CE applies to the proposed action or the agency decides to prepare an EIS. CEQ proposes to move the operative language relating to an EA

---

[58] *See* Council on Environmental Quality, List of Federal Agency Categorical Exclusions (Dec. 14, 2018), *https://ceq.doe.gov/nepa-practice/categorical-exclusions.html*.

[59] *See, e.g.,* Council on Environmental Quality, The Eleventh and Final Report on the National Environmental Policy Act Status and Progress for American Recovery and Reinvestment Act of 2009 Activities and Projects (Nov. 2, 2011), *https://ceq.doe.gov/docs/ceq-reports/nov2011/CEQ_ARRA_NEPA_Report_Nov_2011.pdf*.

[60] *See, e.g.,* Forest Service categorical exclusions, 36 CFR 220.6(b)(2) and surface transportation categorical exclusions, 23 CFR 771.116–771.118.

[61] *See, e.g.,* Council on Environmental Quality, Fourth Report on Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act, Attachment A (Oct. 4, 2016), *https://ceq.doe.gov/docs/ceq-reports/Attachment-A-Fourth-Cooperating-Agency-Report_Oct2016.pdf*.

from the definition of EAs currently in 40 CFR 1508.9 to a new paragraph (c).

Under the proposed CEQ regulations, requirements for documenting the proposed action and alternatives in an EA would continue to be more limited than EIS requirements. Under the existing and proposed regulations, an agency must briefly describe the need for the proposed action. Agencies can do this by briefly describing the existing conditions, projected future conditions, and statutory obligations and authorities that may relate to the proposed agency action with cross-references to supporting documents. The proposed CEQ regulations would continue to require agencies to describe briefly the proposed action and any alternatives it is considering that would meet the need of the proposed agency action. For actions to protect or restore the environment, without unresolved conflicts concerning alternative uses of available resources, CEQ expects agencies to examine a narrower range of alternatives to the proposed action. When the project may have significant impacts, the agency should consider reasonable alternatives that would avoid those impacts or otherwise mitigate those impacts to less than significant levels.

An agency does not need to include a detailed discussion of each alternative in an EA, nor does it need to include any detailed discussion of alternatives that it eliminated from study. While agencies have discretion to include more information in their EAs than is required to determine whether to prepare an EIS or a FONSI, they should carefully consider their reasons and have a clear rationale for doing so. Agencies should focus on analyzing material effects and alternatives, rather than marginal details that may unnecessarily delay the environmental review process.

Under both the current and proposed regulations, an agency must describe the environmental impacts of its proposed action and alternatives, providing enough information to support a determination to prepare either a FONSI or an EIS. The EA should focus on whether the proposed action (including mitigation) would "significantly" affect the quality of the human environment and tailor the length of the discussion to the relevant effects. The agency may contrast the impacts of the proposed action and alternatives with the current and expected future conditions of the affected environment in the absence of the action, which constitutes consideration of a no-action alternative.

Under both the current and proposed regulations, an agency should list the "agencies, applicants, and the public" involved in preparing the EA to document agency compliance with the requirement to "involve environmental agencies, applicants, and the public, to the extent practicable, in preparing assessments." 40 CFR 1501.4(b); *see also* 1508.9(b). This may include incorporation by reference to the records related to compliance with other environmental laws such as the National Historic Preservation Act, Clean Water Act, Endangered Species Act, or Clean Air Act.

CEQ proposes to move the public involvement requirements for EAs from the current 40 CFR 1501.4(b) to proposed § 1501.5(d) and change "environmental" to "relevant" agencies to include all agencies that may contribute information that is relevant to the development of an EA. Consistent with the current CEQ regulations, the proposed rule would not specifically require publication of a draft EA for public review and comment. The proposed CEQ regulations would continue to require that agencies reasonably involve relevant agencies, the applicant, and the public prior to completion of the EA, so that they may provide meaningful input on those subject areas that the agency must consider in preparing the EA. *See also* 40 CFR 1506.6(b) and 1508.9(a). Depending on the circumstances, the agency could provide adequate information through public meetings or by a detailed scoping notice, for example. There is no single correct approach for public involvement. Rather, agencies should consider the circumstances and have discretion to conduct public involvement tailored to the interested public, to available means of communications to reach the interested and affected parties, and to the particular circumstances of each proposed action.

Paragraph (e) would establish a presumptive 75-page limit for EAs, but allow a senior agency official to approve a longer length and establish a new page limit in writing. While CEQ has stated in Question 36a of the Forty Questions, *supra* note 10, that EAs should be approximately 10 to 15 pages, in practice, such assessments are often longer to address compliance with other applicable laws, and to document the effects of mitigation to support a FONSI. To achieve the presumptive 75-page limit, agencies should write all NEPA environmental documents in plain language, follow a clear format, and emphasize important impact analyses and relevant information necessary for those analyses, rather than providing extensive background material. An EA should have clear and concise conclusions and may incorporate by reference data, survey results, inventories, and other information that support these conclusions, so long as this information is reasonably available to the public.

The proposed presumptive page limit for EAs will promote more readable documents, but also provide agencies flexibility to prepare longer documents, where necessary, to support the agency's analysis. The proposed presumptive page limit is consistent with CEQ's guidance on EAs, which advises agencies to avoid preparing lengthy EAs except in unusual cases where a proposal is so complex that a concise document cannot meet the goals of an EA and where it is extremely difficult to determine whether the proposal could cause significant effects. Question 36a and 36b, Forty Questions, *supra* note 10.

CEQ believes that page limits will encourage agencies to identify the relevant issues, focus on significant environmental impacts, and prepare concise readable documents that will inform decision makers as well as the public. Voluminous, unfocused environmental documents do not advance the goals of informed decision making or protection of the environment.

CEQ proposes conforming edits to § 1500.4(c) to broaden the paragraph to include EAs by changing "environmental impact statements" to "environmental documents" and changing "setting" to "meeting" since page limits would be required for both EAs and EISs. CEQ invites comment on the appropriate presumptive page limit for EAs, the means of managing their level of detail, and their role in agency decision making.

CEQ proposes a new paragraph (f) to clarify that agencies may also apply certain provisions in part 1502 regarding incomplete or unavailable information, methodology and scientific accuracy, and coordination of environmental review and consultation requirements to EAs. CEQ also proposes to add EAs to § 1501.11, "Tiering," to codify current agency practice of using EAs where the effects of a proposed agency action are not likely to be significant. These include program decisions that may facilitate later site-specific EISs as well as the typical use of EAs as a second-tier document tiered from an EIS.

In addition to the new § 1501.5, CEQ proposes to add EAs to other sections of the regulations to codify existing agency practice where it would make the NEPA process more efficient and effective. As

discussed in section II.C.9, CEQ also proposes to make a presumptive time limit applicable to EAs in § 1501.10. Further, for some agencies, it is a common practice to have lead and cooperating agencies coordinate in the preparation of EAs where more than one agency may have an action on a proposal; therefore, CEQ also proposes to add EAs to §§ 1501.7 and 1501.8.

CEQ invites comment on these proposed revisions and on whether there are any other aspects of EAs that CEQ should address in its regulations.

### 6. Findings of No Significant Impact (FONSIs) (§ 1501.6)

When an agency determines in its EA that an EIS is not required, it typically prepares a FONSI. The FONSI reflects that the agency has engaged in the necessary review of environmental impacts under NEPA. The FONSI shows that the agency examined the relevant data and explained the agency findings by providing a rational connection between the facts presented in the EA and the conclusions drawn in the finding. Any finding should clearly identify the facts found and the conclusions drawn by the agency based on those facts.

In response to the ANPRM, CEQ received comments requesting that CEQ update its regulations to consolidate and provide more detailed direction relating to FONSIs. CEQ proposes to consolidate the operative language of 40 CFR 1508.13, "Finding of no significant impact," with 40 CFR 1501.4, "Whether to prepare an environmental impact statement," in the proposed § 1501.6, "Findings of no significant impact." CEQ proposes to strike paragraph (a) as these requirements are addressed in § 1507.3(d)(2). As noted above, paragraph (b) would move to the proposed § 1501.5, "Environmental assessments." This proposed EA section also addresses paragraph (c), so CEQ proposes to strike it from the proposed FONSI section. Similarly, CEQ proposes to strike paragraph (d) because this requirement is addressed in § 1501.9, "Scoping" (current 40 CFR 1501.7).

CEQ proposes to make the current 40 CFR 1501.4(e) the new § 1501.6(a), and revise the language to clarify that an agency must prepare a FONSI when it determines that a proposed action will not have significant effects based on the analysis in the EA. CEQ would revise proposed paragraph (a)(2) to clarify that the circumstances listed in paragraph (i) and (ii) are the situations where the agency must make a FONSI available for public review.

CEQ proposes to move the substantive requirement that a FONSI include the

EA or a summary from the definition of FONSI (currently 40 CFR 1508.13) to a new paragraph (b). Additionally, CEQ proposes the addition of a new paragraph (c) to address mitigation. Specifically, where mitigation is required under another statute or where an agency is issuing a mitigated FONSI, it would require the agency to include the legal basis for any mitigation adopted.[62] Additionally, it would codify the practice of mitigated FONSIs, consistent with CEQ's Mitigation Guidance, by requiring agencies to document mitigation, including enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts.[63] When preparing an EA, many agencies develop, consider, and commit to mitigation measures to avoid, minimize, rectify, reduce, or compensate for potentially significant adverse environmental impacts that would otherwise require preparation of an EIS. An agency can commit to mitigation measures for a mitigated FONSI when it can ensure that the mitigation will be performed, when the agency expects that resources will be available, and when the agency has sufficient legal authorities to ensure implementation of the proposed mitigation measures. This codification of CEQ guidance is not intended to create a different standard for analysis of mitigation for a "mitigated FONSI," but to provide clarity regarding the use of FONSIs.

### 7. Lead and Cooperating Agencies (§§ 1501.7 and 1501.8)

In response to the ANPRM, CEQ received comments requesting that CEQ update its regulations to clarify the roles of lead and cooperating agencies. The 1978 CEQ regulations created the roles of lead agency and cooperating agency for NEPA reviews, which are critical for actions, such as non-Federal projects, requiring the approval or authorization of multiple agencies. Agencies need to coordinate and synchronize their NEPA processes to ensure an efficient environmental review that does not cause delays. In recent years, Congress and several administrations have

worked to establish a more synchronized procedure for multi-agency NEPA reviews and related authorizations, including through the development of expedited procedures such as the section 139 process and FAST–41.

CEQ proposes a number of modifications to § 1501.7, "Lead agencies," (current 40 CFR 1501.5), and § 1501.8, "Cooperating agencies," (current 40 CFR 1501.6), to improve interagency coordination, make development of NEPA documents more efficient, and facilitate implementation of the OFD policy. CEQ intends these modifications to improve the efficiency and outcomes of the NEPA process— including cost reduction, improved relationships, and better outcomes that avoid litigation—by promoting environmental collaboration.[64] These modifications are consistent with Questions 14a and 14c of the Forty Questions, *supra* note 10. CEQ proposes to apply §§ 1501.7 and 1501.8 to EAs as well as EISs consistent with agency practice. Consistent with the OFD policy to ensure coordinated and timely reviews, CEQ also proposes to add a § 1501.7(g) to require that Federal agencies evaluate proposals involving multiple Federal agencies in a single EIS and issue a joint ROD[65] or single EA and joint FONSI when practicable. CEQ further proposes to move language from the current cooperating agency provision, 40 CFR 1506.6(a), that addresses the lead agency's responsibilities with respect to cooperating agencies to proposed paragraph (h) in § 1501.7 so that all of the lead agency's responsibilities are in a single section. CEQ also proposes to clarify in paragraph (h)(4) that the lead agency is responsible for determining the purpose and need and alternatives in consultation with any cooperating agencies.[66]

---

[62] As discussed in sections I.B.1 and II.B, NEPA is a procedural statute and does not require adoption of mitigation. However, agencies may consider mitigation measures that would avoid, minimize, rectify, reduce, or compensate for potentially significant adverse environmental impacts and may require mitigation pursuant to substantive statutes.

[63] The Mitigation Guidance, *supra* note 18, amended and supplemented the Forty Questions, *supra* note 10, specifically withdrawing Question 39 insofar as it suggests that mitigation measures developed during scoping or in an EA "[do] not obviate the need for an EIS."

[64] *See, e.g.,* Federal Forum on Environmental Collaboration and Conflict Resolution, Environmental Collaboration and Conflict Resolution (ECCR): Enhancing Agency Efficiency and Making Government Accountable to the People (May 2, 2018), *https://ceq.doe.gov/docs/nepa-practice/ECCR_Benefits_Recommendations_Report_%205-02-018.pdf.*

[65] A "single ROD," as used in E.O. 13807, is the same as a "joint ROD," which is a ROD addressing all Federal agency actions covered in the single EIS and necessary for a proposed project. 40 CFR 1508.25(a)(3). The regulations would provide flexibility for circumstances where a joint ROD is impracticable. Examples include the statutory directive to issue a combined final EIS and ROD for transportation actions and the Federal Energy Regulatory Commission's adjudicatory process.

[66] *See* OFD Framework Guidance, *supra* note 27, § VIII.A.5 ("The lead agency is responsible for developing the Purpose and Need, identifying the range of alternatives to be analyzed, identifying the preferred alternative and determining whether to

Proposed § 1501.7(i) and (j) and § 1501.8(b)(6) and (7) also would require development and adherence to a schedule for the environmental review and any authorizations required for a proposed action, and resolution of disputes and other issues that may cause delays in the schedule. These proposed provisions are consistent with current practices at agencies that have adopted elevation procedures pursuant to various statutes and guidance, including 23 U.S.C. 139, FAST–41, and E.O. 13807.

Proposed paragraph (a) of § 1501.8 would clarify that lead agencies may invite State, Tribal, and local agencies to serve as cooperating agencies by changing "Federal agency" to "agency," and moving the operative language from the definition of cooperating agency (40 CFR 1508.5). Non-Federal agencies should participate in the environmental review process to ensure early collaboration on proposed actions where such entities have jurisdiction by law or special expertise. Paragraph (a) would also codify current practice to allow a Federal agency to appeal to CEQ a lead agency's denial of a request to serve as cooperating agency. Resolving disputes among agencies early in the process furthers the OFD policy and the goal of more efficient and timely NEPA reviews. Finally, CEQ proposes edits throughout § 1501.8 to provide further clarity.

8. Scoping (§ 1501.9)

In response to the ANPRM, CEQ received comments requesting that CEQ update its regulations related to scoping, including comments requesting that agencies have greater flexibility in how to conduct scoping. Rather than requiring publication of a NOI as a precondition to the scoping process, CEQ proposes to modify the current 40 CFR 1501.7, "Scoping," in the proposed § 1501.9 so that agencies can begin the scoping process as soon as the proposed action is sufficiently developed for meaningful agency consideration. Some agencies refer to this as pre-scoping under the existing regulations to capture scoping work done before publication of the NOI. Rather than tying the start of scoping to the agency's decision to publish an NOI to prepare an EIS, the timing and content of the NOI would instead become an important step in the scoping process itself, thereby obviating the artificial distinction between scoping and pre-scoping. However,

agencies should not unduly delay publication of the NOI.

CEQ also proposes to consolidate all the requirements for the NOI and the scoping process into the same section, reorganize it to discuss the scoping process in chronological order, and add paragraph headings to improve clarity. CEQ proposes to add "likely" to proposed paragraph (b) to capture the reality that at the scoping stage, agencies may not know the identities of all affected parties and that one of the purposes of scoping is to identify affected parties. Paragraph (c) would provide agencies additional flexibility in how to reach interested or affected parties in the scoping process. Paragraph (d) would provide a list of what agencies must include in an NOI to standardize NOI format and achieve greater consistency across agencies. This will provide the public with more transparency and ensure that agencies conduct the scoping process in a manner that facilitates implementation of the OFD policy for multi-agency actions, including by proactively soliciting comments on alternatives, impacts, and relevant information to better inform agency decision making. CEQ proposes to move the criteria for determining scope from the definition of scope, 40 CFR 1508.25, to paragraph (e) and to strike the paragraph on "cumulative actions" for consistency with the proposed revisions to the definition of "effects" discussed below. CEQ also proposes to use the term "most effective" rather than "best" in § 1501.9(e)(1)(ii) for clarity.

9. Time Limits (§ 1501.10)

In response to the ANPRM, CEQ received many comments on the lengthy timelines and costs of environmental reviews, and many suggestions for more meaningful time limits for the completion of the NEPA process. Accordingly, and to promote timely reviews, CEQ proposes to establish presumptive time limits for EAs and EISs consistent with E.O. 13807 and prior CEQ guidance. In Question 35 of the Forty Questions, *supra* note 10, CEQ stated its expectation that "even large complex energy projects would require only about 12 months for the completion of the entire EIS process" and that, for most major actions, "this period is well within the planning time that is needed in any event, apart from NEPA." CEQ also recognized that "some projects will entail difficult long-term planning and/or the acquisition of certain data which of necessity will require more time for the preparation of the EIS." *Id.* Finally, Question 35 stated that an EA "should take no more than

3 months, and in many cases substantially less as part of the normal analysis and approval process for the action."

Based on agency experience with the implementation of the regulations, CEQ is proposing in § 1501.10, "Time limits," (current 40 CFR 1501.8) to add a new paragraph (b) to establish a presumptive time limit for EAs of 1 year and a presumptive time limit for EISs of 2 years. CEQ further proposes to provide that a senior agency official may approve in writing a longer time period. These paragraphs would also define the start and end dates of the time period consistent with E.O. 13807. Consistent with CEQ and OMB guidance, agencies should begin scoping and development of a schedule for timely completion of an EIS prior to issuing an NOI and commit to cooperate, communicate, share information, and resolve conflicts that could prevent meeting milestones.[67] CEQ recognizes that agency capacity, including those of cooperating and participating agencies, may affect timing, and that agencies should schedule and prioritize their resources accordingly to ensure effective environmental analyses and public involvement. Further, agencies have flexibility in the management of their internal processes to set shorter time limits and to define the precise start and end times for measuring the completion time of an EA. Therefore, CEQ proposes to retain paragraph (c) regarding factors in determining time limits, but revise paragraph (c)(6) for clarity and strike paragraph (c)(7) because it overlaps with numerous other factors.

CEQ also proposes conforming edits to § 1500.5(g) to change "setting" to "meeting" time limits and add "environmental assessment." CEQ invites comment on these sections, including on the proposed presumptive timeframes for EAs and EISs, the provisions for management of time limits, and whether the regulations should specify shorter timeframes.

10. Tiering and Incorporation by Reference (§§ 1501.11 and 1501.12)

CEQ proposes to move 40 CFR 1502.21, "Tiering," and 40 CFR 1502.22, "Incorporation by reference," to proposed new §§ 1501.11 and 1501.12, respectively, because these provisions are generally applicable. Specifically, CEQ proposes a number of revisions in § 1501.11 and other paragraphs to clarify when agencies can use existing

[67] *See* OFD Framework Guidance, *supra* note 27 ("[w]hile the actual schedule for any given project may vary based upon the circumstances of the project and applicable law, agencies should endeavor to meet the two-year goal . . . .").

studies and environmental analyses in the NEPA process and when agencies would need to supplement such studies and analyses. These revisions include updates to the provisions on programmatic reviews (§ 1502.4(d)) and tiering (§ 1501.11) to make clear, among other things, that site-specific analyses need not be conducted prior to an irretrievable commitment of resources, which in most cases will not be until the decision at the site-specific stage. CEQ also proposes to move the operative language from the definition of tiering in 40 CFR 1508.28 to § 1501.11(b).

In addition, CEQ proposes consistency edits to change ''broad'' and ''program'' to ''programmatic'' in §§ 1500.4(k), 1502.4(b), (c), and (d), and 1506.1(c). Further revisions to § 1502.4(b), including eliminating reference to programmatic EISs that ''are sometimes required,'' are intended to focus the provision on the discretionary use of programmatic EISs in support of clearly defined decision-making purposes. As CEQ stated in its 2014 guidance, programmatic NEPA reviews ''should result in clearer and more transparent decision[ ]making, as well as provide a better defined and more expeditious path toward decisions on proposed actions.'' [68] Other statutes or regulations define circumstances under which a programmatic EIS is required. *See, e.g.,* National Forest Management Act, 16 U.S.C. 1604(g). Finally, CEQ proposes a consistency edit in § 1502.4(c)(3) to revise the mandatory language to be discretionary since the regulations do not require programmatic EISs.

*D. Proposed Revisions to Environmental Impact Statements (EISs) (Part 1502)*

The most extensive level of NEPA analysis is an EIS, which is the ''detailed statement'' required under section 102(2)(C) of NEPA. When an agency prepares an EIS, it typically issues a ROD at the conclusion of the NEPA review. 40 CFR 1505.2. Based on the Environmental Protection Agency (EPA) weekly Notices of Availability published in the **Federal Register** between 2010 and 2018, Federal agencies published approximately 170 final EISs per year. CEQ proposes to update the format, page length, and timeline to complete EISs to better achieve the purposes of NEPA. CEQ also proposes several changes to streamline, provide flexibility, and improve the preparation of EISs. CEQ includes provisions in part 1502 to promote informed decision making by agencies

and to inform the public about the decision-making process. The proposed regulations continue to encourage application of NEPA early in the process and early engagement with applicants for non-Federal projects (proposed § 1502.5(b)).

1. Page Limits (§ 1502.7)

In response to the ANPRM, CEQ received many comments on the length, complexity, and readability of environmental documents, and many suggestions for more meaningful page limits. The core purpose of page limits from the original regulations remains— documents must be a reasonable length in a readable format so that it is practicable for the decision maker to read and understand the document in a reasonable period of time. Therefore, CEQ proposes to reinforce the page limits for EISs set forth in § 1502.7, while allowing a senior agency official to approve a statement exceeding 300 pages when it is useful to the decision-making process. As captured in CEQ's report on the length of final EISs, these documents average over 600 pages. *See* Length of Environmental Impact Statements, *supra* note 34. While the length of an EIS will vary based on the complexity and significance of the proposed action and environmental effects the EIS considers, every EIS must be bounded by the practical limits of the decision maker's ability to consider detailed information. CEQ proposes this change to ensure that agencies develop EISs focused on significant effects and on the information useful to the decision makers and the public to more successfully implement NEPA.

CEQ intends for senior agency officials to take responsibility for the quantity, quality, and timelines of environmental analyses developed in support of the decisions of their agencies. Therefore, the senior agency official approving an EA or EIS in excess of the page limits should ensure that the final environmental document meets the informational needs of the agency's decision maker. For example, the agency decision makers may have varying levels of capacity to consider the information presented in the environmental document. In ensuring that the agency provides the resources necessary to implement NEPA, in accordance with 40 CFR 1507.2, senior agency officials should ensure that agency staff have the resources and competencies necessary to produce timely, concise, and effective environmental documents.

2. Draft, Final and Supplemental Statements (§ 1502.9)

CEQ proposes to include sub-headings in § 1502.9, ''Draft, final, and supplemental statements,'' to improve readability. CEQ proposes edits to paragraph (b) for clarity, replacing ''revised draft'' with ''supplemental draft.''

CEQ also received many comments requesting clarification regarding when supplemental statements are required. CEQ proposes revisions to § 1502.9(d)(1) to clarify that agencies need to update environmental documents when there is new information or a change in the proposed action only if a major Federal action remains to occur and other requirements are met. This proposed revision is consistent with Supreme Court case law holding that a supplemental EIS is required only ''[i]f there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered . . . .'' *Marsh,* 490 U.S. at 374 (quoting 42 U.S.C. 4332(2)(C)); *see also* Norton v. *S. Utah Wilderness All.,* 542 U.S. 55, 73 (2004). For example, supplementation might be triggered after an agency executes a grant agreement but before construction is complete because the agency has yet to provide all of the funds under that grant agreement. On the other hand, when an agency issues a final rule establishing a regulatory scheme, there is no remaining action to occur, and therefore supplementation is not required. If there is no further agency action after the agency's decision, supplementation does not apply because the Federal agency action is complete. *S. Utah Wilderness All.,* 542 U.S. at 73 (''although the '[*a*]*pproval* of a [land use plan]' is a 'major Federal action' requiring an EIS . . . that action is completed when the plan is approved. . . . There is no ongoing 'major Federal action' that could require supplementation (though BLM *is* required to perform additional NEPA analyses if a plan is amended or revised . . . .)'') (emphasis in original).

In order to determine whether a supplemental analysis is required, a new paragraph (c)(4) would provide that an agency may document its determination of whether a supplemental analysis is required consistent with its agency NEPA procedures or may, although it is not required, do so in an EA. This provision would codify the existing practice of several Federal agencies, such as the

---

[68] Programmatics Guidance, *supra* note 20, at 7.

Department of Transportation's reevaluation provided for highway, transit, and railroad projects (23 CFR 771.129); the Bureau of Land Management's Determination of NEPA Adequacy (Department of the Interior Departmental Manual, Part 516, Chapter 11, § 11.6); and the U.S. Army Corps of Engineers' Supplemental Information Report (section 13(d) of Engineering Regulation 200–2–2).

## 3. EIS Format (§§ 1502.10 and 1502.11)

CEQ proposes to revise § 1502.10, "Recommended format," to provide agencies with more flexibility in formatting an EIS given that most EISs are prepared and distributed electronically. Specifically, CEQ proposes to eliminate the requirement to have a list of agencies, organizations and persons to whom copies of the EIS are sent since EISs are published online, and an index, as this is no longer necessary when most documents are produced in an electronically searchable format. This section would also allow agencies to use a different format so that they may customize EISs to address the particular proposed action and better integrate environmental considerations into agency decision-making processes.

CEQ proposes to amend § 1502.11, "Cover," to remove the reference to a "sheet" since agencies prepare EISs electronically. CEQ also proposes to add a requirement to include the estimated cost of preparing the EIS to the cover in new paragraph (g) to provide transparency to the public on the costs of EIS-level NEPA reviews. To track costs, agencies must prepare an estimate of environmental review costs, including costs of the agency's full-time equivalent (FTE) personnel hours, contractor costs, and other direct costs related to the environmental review of the proposed action.[69] For integrated documents where an agency is preparing a document pursuant to multiple environmental statutory requirements, it may indicate that the estimate reflects costs associated with NEPA compliance as well as compliance with other environmental review and authorization requirements. Agencies can develop methodologies for preparing these cost estimates in their implementing procedures.

This amendment will address the concerns raised by the U.S. Government Accountability Office that agencies are

not tracking the costs of NEPA analyses, as well as the many comments CEQ received from stakeholders regarding the costs associated with development of NEPA analyses.[70] Including such costs on the cover sheet would also be consistent with current OMB direction to Federal agencies to track costs of environmental reviews and authorizations for major infrastructure projects pursuant to E.O. 13807 and would provide the public with additional information regarding EIS-level NEPA documents.

## 4. Purpose and Need (§ 1502.13)

CEQ received a number of comments in response to the ANPRM recommending that CEQ better define the requirements for purpose and need statements. The current CEQ regulations require that an EIS "briefly specify the underlying purpose and need to which the agency is responding in proposing the alternatives including the proposed action." 40 CFR 1502.13.

The focus of the purpose and need statement is the purpose and need for the proposed action, and agencies should develop it based on consideration of the relevant statutory authority for the proposed action. The purpose and need statement also provides the framework in which "reasonable alternatives" to the proposed action will be identified. CEQ has advised that this discussion of purpose and need should be concise (typically one or two paragraphs long) and that the lead agency is responsible for its definition. *See* Connaughton Letter, *supra* note 23 ("Thoughtful resolution of the purpose and need statement at the beginning of the process will contribute to a rational environmental review process and save considerable delay and frustration later in the decision[-]making process."). "In situations involving two or more agencies that have a decision to make for the same proposed action and responsibility to comply with NEPA or a similar statute, it is prudent to jointly develop a purpose and need statement that can be utilized by both agencies. An agreed-upon purpose and need

statement at this stage can prevent problems later that may delay completion of the NEPA process." *Id.* The lead agency is responsible for developing the purpose and need, and cooperating agencies should give deference to the lead agency and identify any substantive concerns early in the process to ensure swift resolution. *See* OFD Framework Guidance, § VIII.A.5 and XII, *supra* note 27, and Connaughton Letter, *supra* note 23.

Consistent with CEQ guidance and in response to comments, CEQ proposes to revise § 1502.13, "Purpose and need," to clarify that the statement should focus on the purpose and need for the proposed action. In particular, CEQ proposes to strike "to which the agency is responding in proposing the alternatives including" to focus on the proposed action. CEQ further proposes, as discussed below, to address the relationship between the proposed action and alternatives in the definition of reasonable alternatives and other sections that refer to alternatives. Additionally, CEQ proposes to add a sentence to clarify that when an agency is responsible for reviewing applications for authorizations, the agency shall base the purpose and need on the applicant's goals and the agency's statutory authority. This addition is consistent with the proposed definition of reasonable alternatives, which must meet the goals of the applicant, where applicable.

## 5. Alternatives (§ 1502.14)

CEQ also received many comments requesting clarification regarding "alternatives" under the regulations. This section of an EIS should describe the proposed action and alternatives in comparative form, including their environmental impacts, such that the decision maker and the public can understand the basis for choice. However, as explained in § 1502.16 and reinforced by Question 7 of the Forty Questions, *supra* note 10, this section of the EIS should not duplicate the affected environment and environmental consequences sections, and agencies have flexibility to combine these three sections in a manner that clearly sets forth the basis for decision making. CEQ proposes a few changes to § 1502.14, "Alternatives including the proposed action," to provide further clarity on the scope of the alternatives analysis in an EIS. CEQ proposes changes to § 1502.14 to simplify and clarify the language, and align it with the format of the related provisions of part 1502.

In paragraph (a), CEQ proposes to delete "all" before "reasonable

---

[69] *See, e.g.,* U.S. Department of the Interior, Reporting Costs Associated with Developing Environmental Impact Statements (July 23, 2018), *https://www.doi.gov/sites/doi.gov/files/uploads/ dep_sec_memo_07232018_-_reporting_costs_ associated_w_developing_environmental_impact_ statements.pdf.*

[70] In a 2014 report, the U.S. Government Accountability Office found that Federal agencies do not routinely track data on the cost of completing NEPA analyses, and that the cost can vary considerably, depending on the complexity and scope of the project. U.S. Gov't Accountability Office, GAO–14–370, NATIONAL ENVIRONMENTAL POLICY ACT: Little Information Exists on NEPA Analyses (Apr. 15, 2014), *https://www.gao.gov/products/GAO-14-370.* The report referenced the 2003 CEQ task force analysis referenced above which estimated that a typical EIS costs from $250,000 to $2 million. *See* NEPA Task Force Report, *supra* note 16, at p. 65.

alternatives'' and insert afterward ''to the proposed action.'' NEPA itself provides no specific guidance concerning the range of alternatives an agency must consider for each proposal. Section 102(2)(C), provides only that an agency shall prepare a detailed statement addressing, among other things, ''alternatives to the proposed action.'' 42 U.S.C. 4332(2)(C). Section 102(2)(E) requires only that agencies ''study, develop, and describe appropriate alternatives to recommended courses of action.'' 42 U.S.C. 4332(2)(E) Implementing this limited statutory direction, CEQ has advised that ''[w]hen there are potentially a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS.'' Question 1b, Forty Questions, *supra* note 10.

It is CEQ's view that NEPA's policy goals are satisfied when an agency analyzes reasonable alternatives, and that an EIS need not include every available alternative where the consideration of a spectrum of alternatives allows for the selection of any alternative within that spectrum. The reasonableness of the analysis of alternatives in a final EIS is resolved not by any particular number of alternatives considered, but by the nature of the underlying agency action. The discussion of environmental effects of alternatives need not be exhaustive, but must provide information sufficient to permit a reasoned choice of alternatives for the agency to evaluate available reasonable alternatives, 40 CFR 1502.14(a), including significant alternatives that are called to its attention by other agencies, organizations, communities, or a member of the public. Analysis of alternatives also may serve purposes other than NEPA compliance, such as evaluation of the least environmentally damaging practicable alternative for the discharge of dredged or fill material under section 404(b)(1) of the Clean Water Act, 33 U.S.C. 1344(b)(1).

The number of alternatives that is appropriate for an agency to consider will vary. For some actions, such as where the Federal agency's authority to consider alternatives is limited by statute, the range of alternatives may be limited to the proposed action and the no action alternative. For actions where the Federal authority to consider a range of alternatives is broad, the final EIS itself should consider a broader range of reasonable alternatives. However, a process of narrowing alternatives is in accord with NEPA's ''rule of reason'' and common sense—agencies need not

reanalyze alternatives previously rejected, particularly when an earlier analysis of numerous reasonable alternatives was incorporated into the final analysis and the agency has considered and responded to public comment favoring other alternatives.

For consistency with this change, CEQ proposes to strike ''the'' before ''reasonable alternatives'' in § 1502.1, and amend § 1502.16, ''Environmental consequences,'' to clarify in proposed paragraph (a)(1) that the discussion must include the environmental impacts of the ''proposed action and reasonable alternatives.''

In response to CEQ's ANPRM, some commenters urged that the regulations should not require agencies to account for impacts over which the agency has no control, including those resulting from alternatives outside its jurisdiction. CEQ proposes to strike paragraph (c) of 40 CFR 1502.14 as a requirement for all EISs because it is not efficient or reasonable to require agencies to develop detailed analyses relating to alternatives outside the jurisdiction of the lead agency. This change is consistent with proposed § 1501.1(a)(2). Further, the proposed definition of ''reasonable alternatives'' would preclude alternatives outside the agency's jurisdiction because they would not be technically feasible due to the agency's lack of statutory authority to implement that alternative. However, an agency may discuss reasonable alternatives not within their jurisdiction when necessary for the agency's decision-making process such as when preparing an EIS to address legislative EIS requirements pursuant to § 1506.8 and to specific Congressional directives. *See* section II.H, *infra*, for further discussion.

A concern raised by many commenters is that agencies have limited resources and that it is important that agencies use those resources effectively. Analyzing a large number of alternatives, particularly where it is clear that only a few alternatives would be economically and technically feasible and realistically implemented by the applicant, can divert limited agency resources. CEQ invites comment on whether the regulations should establish a presumptive maximum number of alternatives for evaluation of a proposed action, or alternatively for certain categories of proposed actions. CEQ seeks comment on (1) specific categories of actions, if any, that should be identified for the presumption or for exceptions to the presumption; and (2) what the presumptive number of alternatives should be (*e.g.*, a maximum

of three alternatives including the no action alternative).

## 6. Affected Environment and Environmental Consequences (§§ 1502.15 and 1502.16)

CEQ proposes in § 1502.15, ''Affected environment,'' to explicitly allow for combining of affected environment and environmental consequences sections to adopt what has become a common practice in some agencies. This revision would ensure that the description of the affected environment is focused on those aspects of the environment that are affected by the proposed action. In proposed paragraph (a)(1) of § 1502.16, ''Environmental consequences,'' CEQ proposes to consolidate into one paragraph the requirement to include a discussion of the effects of the proposed action and reasonable alternatives. The combined discussion should focus on those effects that are reasonably foreseeable and have a close causal relationship to the proposed action, consistent with the proposed revised definition of effects addressed in § 1508.1(g). To align with the statute, CEQ also proposes to add a new § 1502.16(a)(10) to provide that discussion of environmental consequences should include, where applicable, economic and technical considerations consistent with section 102(2)(B) of NEPA.

Further, CEQ proposes to move the operative language that addresses when agencies need to consider economic and social effects in EISs from the definition of human environment in 40 CFR 1508.14 to proposed § 1502.16(b). CEQ also proposes to amend the language for clarity, explain that the agency makes the determination of when consideration of economic and social effects are interrelated with natural or physical environmental effects at which point the agency should give appropriate consideration to those effects, and strike ''all of'' as unnecessary.

## 7. Submitted Alternatives, Information, and Analyses (§§ 1502.17 and 1502.18)

To ensure agencies have considered all alternatives, information, and analyses submitted by the public, including State, Tribal, and local governments as well as individuals and organizations, CEQ is proposing to add a requirement in § 1502.17 to include a new section in draft and final EISs. This section, called the ''Submitted alternatives, information and analyses'' section, would include a summary of all alternatives, information, and analyses submitted by the public for consideration by the lead and

cooperating agencies in both the draft and final EISs. In developing the summary, agencies may refer to other relevant sections of the draft or final EIS, or to appendices.

To improve the scoping process, CEQ proposes revisions to ensure agencies solicit and consider relevant information early in the development of the draft EIS. As discussed above, CEQ proposes to direct agencies to include a request for identification of alternatives, information, and analyses in the notice of intent (§ 1501.9(d)(7)) and require agencies to summarize all relevant alternatives, information, and analyses submitted by public commenters in the draft and final EIS. CEQ also proposes in § 1502.18, "Certification of alternatives, information, and analyses section," that, based on the alternatives, information, and analyses section required under § 1502.17, the decision maker for the lead agency certify that the agency has considered such information and include the certification in the ROD under § 1505.2(d). In addition, CEQ proposes a conclusive presumption that the agency has considered information summarized in that section because, where agencies have followed the process outlined above, and identified and described information submitted by the public, it is reasonable to presume the agency has considered such information.

8. Other Proposed Changes to Part 1502

CEQ proposes to eliminate the option to circulate the summary of an EIS in § 1502.21, "Publication of the environmental impact statement," given the change from circulation to publication and the reality that most EISs are produced electronically. CEQ proposes to strike the word "always" from § 1502.22(a) as unnecessarily limiting and eliminate 40 CFR 1502.22(c) addressing the applicability of the 1986 amendments to 40 CFR 1502.22, "Incomplete or unavailable information," because this paragraph is obsolete. CEQ reiterates, as it stated in the promulgation of this regulation, that the term "overall cost" as used in § 1502.22 includes "financial costs and other costs such as costs in terms of time (delay) and personnel." [71] CEQ also proposes in paragraphs (b) and (c) to replace the term "exorbitant" with "unreasonable" because "unreasonable" is more consistent with CEQ's original description of "overall cost" considerations, the common understanding of the term, and how the terminology has been interpreted in practice. CEQ invites comment on

whether the "overall costs" of obtaining incomplete of unavailable information warrants further definition to address whether certain costs are or are not "unreasonable."

A proposed revision to § 1502.24, "Methodology and scientific accuracy," would clarify that agencies should use reliable existing information and resources and are not required to undertake new scientific and technical research to inform their analyses. The phrase "new scientific and technical research" is intended to distinguish separate and additional research that extends beyond existing scientific and technical information available in the public record or in publicly available academic or professional sources. This phrase is consistent with the requirement in § 1502.22 to obtain incomplete or unavailable information regarding significant adverse effects if the means of obtaining the information is known and the cost to the decision-making process is not unreasonable. Agencies should use their experience and expertise to determine what scientific and technical information is needed to inform their analyses and decision making. CEQ also proposes to revise § 1502.24 to allow agencies to draw on any source of information (such as remote sensing and statistical modeling) that the agency finds reliable and useful to the decision-making process. These changes would promote the use of reliable data, including information gathered using current technologies. Finally, CEQ proposes to revise § 1502.25, "Environmental review and consultation requirements," to clarify that agencies must, to the fullest extent possible, integrate their NEPA analysis with all other applicable Federal environmental review laws and Executive Orders in furtherance of the OFD policy and to make the environmental review process more efficient.[72]

*E. Proposed Revisions To Commenting on Environmental Impact Statements (Part 1503)*

CEQ proposes to modernize part 1503 given the existence of current technologies not available at the time of the 1978 regulations. In particular, the proposed regulations would encourage agencies to use the current methods of electronic communication both to publish important environmental

information and to structure public participation for greater efficiency and inclusion of interested persons. CEQ proposes to revise § 1503.1, "Inviting comments and requesting information and analyses," in proposed paragraph (a)(2)(v) to give agencies flexibility in the public involvement process to solicit comments "in a manner designed to inform" parties interested or affected "by the proposed action." CEQ also proposes a new paragraph (a)(3) that requires agencies to specifically invite comment on the completeness of the submitted alternatives, information and analyses section (§ 1502.17). Because interested parties have an affirmative duty to comment during the public review period in order for the agency to consider their positions, *see Vt. Yankee,* 435 U.S. at 553, proposed paragraph (c) would require agencies to provide for commenting using electronic means while ensuring accessibility to those who may not have such access to ensure adequate notice and opportunity to comment.

CEQ also proposes a revision to § 1503.2, "Duty to comment," to clarify that when a cooperating agency with jurisdiction by law specifies measures it considers necessary for a regulatory approval, it should cite its applicable statutory authority to ensure this information is made known to the lead agency.

Further, CEQ proposes to revise paragraph (a) of § 1503.3, "Specificity of comments and information," to explain that the purposes of comments is to promote informed decision making and further clarify that comments should provide sufficient detail for the agency to consider the comment in its decision-making process. *See Pub. Citizen,* 541 U.S. at 764; *Vt. Yankee,* 435 U.S. at 553 (while "NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon [parties] who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the [parties'] position . . . ."). CEQ also proposes that comments should explain why the issue raised is significant to the consideration of potential environmental impacts and alternatives to the proposed action, as well as economic and employment impacts, and other impacts affecting the quality of the environment. *See Vt. Yankee,* 435 U.S. at 553 ("[Comments] must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes a concern. The comment cannot merely state that a particular

---

[72] The Permitting Council has compiled a list of environmental laws and Executive Orders that may apply to a proposed action. *See* Federal Environmental Review and Authorization Inventory, *https://www.permits.performance.gov/tools/federal-environmental-review-and-authorization-inventory.*

mistake was made . . . ; it must show why the mistake was of possible significance in the results . . . .'' (quoting *Portland Cement Assn.* v. *Ruckelshaus,* 486 F.2d 375, 394 (1973), cert. denied *sub nom. Portland Cement Corp.* v. *Administrator, EPA,* 417 U.S. 921 (1974))). CEQ also proposes a new § 1503.3(b) to emphasize that comments on the submitted alternatives, information and analyses section should identify any additional alternatives, information or analyses not included in the draft EIS, and should be as specific as possible.

Finally, section 102(2)(C) of NEPA requires that agencies obtain views of Federal agencies with jurisdiction by law or expertise with respect to any environmental impact, and also directs that agencies make copies of the environmental impact statement and the comments and views of appropriate Federal, State, and local agencies available to the President, CEQ and the public. 42 U.S.C. 4332(2)(C). Part 1503 of the CEQ regulations include provisions relating to inviting and responding to comments. In practice, the processing of comments can require substantial time and resources. CEQ proposes to amend § 1503.4, ''Response to comments,'' to simplify and clarify in paragraph (a) that agencies are required to consider substantive comments timely submitted during the public comment period. CEQ also proposes to clarify that an agency may respond to comments individually or collectively. Consistent with this revision, CEQ proposes additionally to clarify that in the final EIS, agencies may respond by a variety of means, and to strike the detailed language in paragraph (a)(5) relating to comments that do not warrant further agency response.

CEQ also proposes to clarify in paragraph (b) that agencies must append comment responses to EISs rather than including them in the body of the EIS, or otherwise publish them. Under current practice, some agencies include these comment responses in the EISs themselves, which can contribute to excessive length. *See* Length of Environmental Impact Statements, *supra* note 34. These changes would not preclude an agency from summarizing or discussing specific comments in the EIS as well.

*F. Proposed Revisions to Pre-Decisional Referrals to the Council on Environmental Quality of Proposed Federal Actions Determined To Be Environmentally Unsatisfactory (Part 1504)*

Section 309 of the Clean Air Act (42 U.S.C. 7609) requires the Environmental Protection Agency (EPA) to review and comment on certain proposed actions of other Federal agencies and to make those comments public. Where appropriate, EPA may exercise its authority under section 309(b) of the Clean Air Act and refer the matter to CEQ. CEQ's regulations addressing this referral process are set forth in part 1504.

CEQ proposes edits to part 1504, ''Pre-decisional Referrals to the Council of Proposed Federal Actions Determined to be Environmentally Unsatisfactory,'' to improve clarity and to add EAs. Though infrequent, CEQ has received referrals on EAs and proposes to capture this practice in the regulations.

CEQ proposes additional revisions to ensure a more timely and efficient process. Consistent with the statute, CEQ proposes to add economic and technical considerations to paragraph (g) of § 1504.2, ''Criteria for referrals.'' In § 1504.3, ''Procedure for referrals and response,'' CEQ proposes changes to simplify and modernize the process. CEQ also proposes a minor revision to the title of part 1504, striking ''Predecision'' and inserting ''Pre-decisional.''

*G. Proposed Revisions to NEPA and Agency Decision Making (Part 1505)*

CEQ proposes minor edits to part 1505 for clarity. CEQ proposes to move 40 CFR 1505.1, ''Agency decisionmaking procedures,'' to § 1507.3(b), as discussed further below. CEQ proposes to clarify in the introductory paragraph of § 1505.2, ''Record of decision in cases requiring environmental impact statements,'' in cases requiring EISs, that agencies must ''timely publish'' their RODs. This paragraph also would clarify that ''joint'' RODs by two or more Federal agencies are permitted; this change is also consistent with the OFD policy and E.O. 13807. Finally, CEQ proposes edits in paragraph (c) to change from passive to active voice for clarity.

*H. Proposed Revisions to Other Requirements of NEPA (Part 1506)*

CEQ proposes a number of edits to part 1506 to improve the NEPA process to make it more efficient and flexible, especially where actions involve third-party applicants. CEQ also proposes several edits for clarity.

In particular, CEQ proposes to add FONSIs to paragraph (a) of § 1506.1, ''Limitations on actions during NEPA process,'' to clarify existing practice and judicial determinations that the limitation on actions applies when an agency is preparing an EA as well as an EIS. CEQ proposes to consolidate paragraph (d) with paragraph (b) and revise the language to provide additional clarity on what activities are allowable during the NEPA process. Specifically, CEQ proposes to eliminate reference to a specific agency in paragraph (d), and provide in paragraph (b) that this section does not preclude certain activities by an applicant to support an application of Federal, State, Tribal or local permits or assistance. As an example of activities an applicant may undertake, CEQ proposes to add ''acquisition of interests in land,'' which would include acquisitions of rights-of-way and conservation easements. CEQ invites comment on whether it should make any additional changes to § 1506.1, including whether there are circumstances under which an agency may authorize irreversible and irretrievable commitments of resources.

A revision to § 1506.2, ''Elimination of duplication with State, Tribal, and local procedures,'' would acknowledge the increasing number of State, Tribal, and local governments conducting NEPA reviews pursuant to assignment from Federal agencies. *See, e.g.,* 23 U.S.C. 327, 25 U.S.C. 4115 and 5389(a). The revision in paragraph (a) would clarify that Federal agencies are authorized to cooperate with such State, Tribal, and local agencies and must do so to reduce duplication under paragraph (b). CEQ proposes to add examples to paragraph (b) to encourage use of prior reviews and decisions. CEQ proposes to modify paragraph (c) to give agencies flexibility to determine whether to cooperate in fulfilling State, Tribal, or local EIS or similar requirements. Finally, CEQ proposes to clarify in paragraph (d) that NEPA does not require reconciliation of inconsistencies between the proposed action and State, Tribal or local plans or laws, although the EIS should discuss the inconsistencies. These revisions would promote efficiency and reduce duplication between Federal and State, Tribal, and local requirements. Other commenters noted that this provision continues to serve an important role given the increased numbers of non-Federal agencies assuming NEPA responsibilities from a Federal agency.

Consistent with current practice by many agencies, the proposed regulations would expand § 1506.3, ''Adoption,'' to expressly cover EAs as well as EISs. CEQ also proposes edits throughout to clarify the process for documenting adoption and the subsequent decision. Finally, paragraph (f) would allow an agency to adopt another agency's determination to apply a CE to a proposed action if the adopting agency's proposed action is substantially the same action. To allow agencies to use

one another's CEs more generally, CEQ also proposes revisions to § 1507.3(e)(5), which would allow agencies to establish a process in their NEPA procedures to adopt another agency's CE.

CEQ also proposes to amend § 1506.4, "Combining documents," to encourage agencies "to the fullest extent practicable" to combine their environmental documents with other agency documents to reduce duplication and paperwork. For example, the U.S. Forest Service routinely combines EISs with forest management plans, and agencies may use their NEPA documents to satisfy compliance with section 106 of the National Historic Preservation Act under 36 CFR 800.8.

In response to the ANPRM, commenters urged CEQ to allow greater flexibility for the project sponsor (including private entities) to participate in the preparation of the NEPA documents under the supervision of the lead agency. An update to § 1506.5, "Agency responsibility for environmental documents," would give agencies more flexibility with respect to the preparation of environmental documents while continuing to require agencies to independently evaluate and take responsibility for those documents. Applicants and contractors would be able to assume a greater role in contributing information and material to the preparation of environmental documents, subject to the supervision of the agency. However, agencies would remain responsible for taking reasonable steps to ensure the accuracy of information prepared by applicants and contractors. If a contractor or applicant prepares the document, paragraph (c)(1) would require the decision-making agency official to provide guidance, participate in the preparation, independently evaluate the statement, and take responsibility for its content. These changes are intended to improve communication between proponents of a proposal for agency action and the officials tasked with evaluating the effects of the action and reasonable alternatives, to improve the quality of NEPA documents and efficiency of the NEPA process.

CEQ also proposes to update § 1506.6, "Public involvement," to give agencies greater flexibility to design and customize public involvement to best meet the specific circumstances of their proposed actions. Proposed revisions to paragraph (b)(2) would clarify that agencies may notify any organizations that have requested regular notice. Proposed paragraph (b)(3)(x) would provide for notice through electronic media, but clarify that agencies may not limit public notification to solely

electronic methods for actions occurring in whole or in part in areas without high-speed internet access, such as rural locations. CEQ also proposes to amend paragraph (f), which requires that EISs, comments received, and any underlying documents be made available to the public pursuant to the Freedom of Information Act (FOIA) by updating the reference to FOIA, which has been amended numerous times since the enactment of NEPA, mostly recently by the FOIA Improvement Act of 2016, Public Law 114–185. Further, CEQ proposes to strike the remaining text to align paragraph (f) with the text of section 102(2)(C) of NEPA, including with regard to fees. CEQ also proposes to update and modernize § 1506.7, "Further guidance," to state that CEQ may provide further guidance concerning NEPA and its procedures consistent with applicable Executive Orders.

CEQ proposes to consolidate the legislative EIS requirements from the definition of legislation in the current 40 CFR 1508.17 into § 1506.8, "Proposals for legislation," and revise the provision for clarity. Agencies prepare legislative EISs for Congress when they are proposing specific actions such as a legislative proposal for the withdrawal of public lands for military use. *See, e.g.,* Nevada Test and Training Range Military Land Withdrawal Legislative Environmental Impact Statement, Environmental Impact Statements; Notice of Availability, 83 FR 54105 (Oct. 26, 2018).

CEQ also invites comment on whether the legislative EIS requirement should be eliminated or modified because the President proposes legislation, and therefore it is inconsistent with the Recommendations Clause of the U.S. Constitution, which provides the President shall recommend for Congress' consideration "such [m]easures as he shall judge necessary and expedient . . . ." U.S. Constitution, Art. II, § 3. The President is not a Federal agency, 40 CFR 1508.12, and the proposal of legislation by the President is not an agency action. *Franklin* v. *Mass.,* 505 U.S. 788, 800–01 (1992).

CEQ also proposes to add a new § 1506.9, "Proposals for regulations," to address the analyses required for rulemakings. This section would clarify that analyses prepared pursuant to other statutory or Executive Order requirements may serve as the functional equivalent of the EIS and be sufficient to comply with NEPA. CEQ proposes in § 1507.3(b)(6) to allow agencies to identify in their agency NEPA procedures documents prepared

pursuant to other statutory requirements or Executive Orders that meet the requirements of NEPA.

For some rulemakings, agencies conduct a regulatory impact analysis (RIA), pursuant to E.O. 12866, "Regulatory Planning and Review,"[73] that assesses regulatory impacts to air and water quality, ecosystems, and animal habitat, among other environmental factors. E.O. 12866, § 6(a)(3)(C)(i)–(ii). An RIA, alone or in combination with other documents, may serve the purposes of the EIS if (1) there are substantive and procedural standards that ensure full and adequate consideration of environmental issues; (2) there is public participation before a final alternative is selected; and (3) a purpose of the review that the agency is conducting is to examine environmental issues. CEQ proposes § 1506.9 to promote efficiency and reduce duplication in the assessment of regulatory proposals.

The analyses must address the detailed statement requirements specified in section 102(2)(C) of NEPA. More specifically, when those analyses address environmental effects, alternatives, the relationship between short-term uses and long-term productivity, and any irreversible commitments of resources, these analyses may serve as functional equivalents for an EIS. Further, these analyses must balance a clear and express environmental protection purpose with any other variables under consideration, such as economic needs. Finally, that balance must anticipate the advantages and disadvantages of the preparation of a separate EIS.

CEQ invites comments on additional analyses agencies are already conducting that, in whole or when aggregated, can serve as the functional equivalent of the EIS. Aspects of the E.O. 12866 cost benefit analysis may naturally overlap with aspects of the EIS.

CEQ also proposes to update § 1506.10, "Filing requirements," to remove the obsolete process for filing paper copies of EISs with EPA and EPA's delivery of a copy to CEQ, and instead provide for electronic filing, consistent with EPA's procedures. This proposed change would provide flexibility to adapt as EPA changes its processes.

A proposed clause in paragraph (b) would acknowledge the statutory requirement of some agencies to issue a combined final EIS and ROD. *See* 23 U.S.C. 139(n)(2) and 49 U.S.C. 304a(b). Proposed paragraph (c) addresses when

---

[73] 58 FR 51735 (Oct. 4, 1993).

**1706** **Federal Register** / Vol. 85, No. 7 / Friday, January 10, 2020 / Proposed Rules

agencies may make an exception to the current rules set forth in paragraph (b) on timing for issuing a ROD.

Over the last 40 years, CEQ has developed significant experience with NEPA in the context of emergencies and disaster recoveries. Actions following Hurricanes Katrina, Harvey, and Michael, as well as catastrophic wildfires, have given CEQ the opportunity to explore a variety of circumstances where alternative arrangements for complying with NEPA are necessary. CEQ proposes to amend §1506.12, "Emergencies," to clarify that alternative arrangements are still meant to comply with section 102(2)(C)'s requirement for a "detailed statement." This amendment is consistent with CEQ's longstanding position that it has no authority to exempt Federal agencies from compliance with NEPA, but that CEQ can appropriately provide for exceptions to specific requirements of CEQ's regulations implementing the procedural provisions of NEPA to address extraordinary circumstances that are not addressed by agency implementing procedures previously approved by CEQ. *See* Emergencies Guidance, *supra* note 19. CEQ maintains a public description of all pending and completed alternative arrangements on its website.[74]

Finally, CEQ proposes to modify §1506.13, "Effective date," to clarify that this regulation would apply to all NEPA processes begun after the effective date, but agencies have the discretion to apply it to ongoing reviews. CEQ also proposes to remove the 1979 effective date of the current regulations and the reference to the 1973 guidance in the current paragraph (a) and strike the current paragraph (b) regarding actions begun before January 1, 1970 because they are obsolete.

*I. Proposed Revisions to Agency Compliance (Part 1507)*

CEQ proposes modifications to part 1507, which addresses agency compliance with NEPA. The proposed changes would consolidate provisions relating to agency procedures from elsewhere in the CEQ regulations, and add a new section to address the dissemination of information about agency NEPA programs. A proposed change to §1507.1, "Compliance," would strike the second sentence for consistency with changes to the provisions for agency NEPA procedures at §1507.3. A proposed change to paragraph (a) of §1507.2, "Agency capability to comply," would make the

senior agency official responsible for coordination, communication, and compliance with NEPA, including resolving implementation issues and representing the agency analysis of the effects of agency actions on the human environment in agency decision-making processes. The proposed §1507.2(a) would make the senior agency official responsible for addressing disputes among lead and cooperating agencies and enforcing page and time limits. The senior agency official would be responsible for ensuring all environmental documents—even exceptionally lengthy ones—are provided to Federal agency decision makers in a timely, readable, and useful format. CEQ also proposes to clarify in the introductory paragraph that in NEPA compliance an agency may use the "the resources of other agencies, applicants, and other participants in the NEPA process," for which the agency should account. CEQ proposes to amend paragraph (c) to emphasize agency cooperation, which would include commenting. Finally, CEQ proposes to add references to E.O. 11991, which amended E.O. 11514, and E.O. 13807 in paragraph (f) to codify agencies' responsibility to comply with the Order.

In developing their procedures, agencies should strive to identify and apply efficiencies, such as use of applicable CEs, adoption of prior NEPA analyses, and incorporation by reference to prior relevant Federal, State, Tribal, and local analyses, wherever practicable. To facilitate effective and efficient procedures, CEQ proposes to consolidate all of the requirements for agency NEPA procedures in §1507.3 and add a new §1507.4 to provide the means of publishing information on ongoing NEPA reviews and agency records relating to NEPA reviews. This includes moving the provisions in §1505.1, "Agency decision making procedures," to proposed §1507.3(b); moving the requirement to provide for extraordinary circumstances currently in 40 CFR 1508.4 to proposed §1507.3(d)(2)(ii); moving the requirement to adopt procedures for introducing a supplement into the agency's administrative record from 40 CFR 1502.9(d)(3) to proposed §1507.3(d)(3); and moving the allowance to combine the agency's EA process with its scoping process from 40 CFR 1501.7(b)(3) to proposed §1507.3(e)(4).

CEQ also proposes several revisions to §1507.3. Revised paragraph (a) would provide agencies the later of 1 year after publication of the final rule or 9 months after the establishment of an agency to develop or revise proposed agency

NEPA procedures, as necessary, to implement the CEQ regulations. CEQ also proposes to eliminate the limitations on paraphrasing the CEQ regulations. Agency NEPA procedures should set forth the process by which agencies will comply with NEPA and the CEQ regulations in the context of their particular programs and processes. In addition, CEQ proposes to clarify that except as otherwise provided by law or for agency efficiency, agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in the CEQ regulations.

CEQ proposes to subdivide paragraph (a) into subparagraphs (1) and (2) for additional clarity because each of these is an independent requirement. CEQ proposes to eliminate the recommendation to agencies to issue explanatory guidance and the requirement to review their policies and procedures because the responsibility to revise procedures would be addressed in paragraph (a).

Consistent with the proposed edits to §1500.1, CEQ proposes to revise paragraph (b) to clarify that agencies should ensure decisions are made in accordance with the Act's procedural requirements and policy of integrating NEPA with other environmental reviews to promote efficient and timely decision making. CEQ proposes a new paragraph (b)(6) to encourage agencies to set forth in their NEPA procedures requirements to combine their NEPA documents with other agency documents, especially where the same or similar analyses are required for compliance with other requirements. Many agencies implement statutes that call for consideration of alternatives to the agency proposal, including the no action alternative, the effects of the agencies' proposal and alternatives, and public involvement. Agencies can use their NEPA procedures to align compliance with NEPA and these other statutory authorities, including provisions for page and time limits that integrate NEPA's goals for informed decision making with agencies' specific statutory requirements. This approach is consistent with some agency practice, but more agencies could use it to achieve greater efficiency and reduce unnecessary duplication. *See, e.g.,* 36 CFR part 220 (U.S. Forest Service NEPA procedures).

Under the proposed §1507.3(b)(6), agencies may document any agency determination that compliance with the environmental review requirements of other statutes or Executive Orders serves as the functional equivalent of NEPA compliance by identifying that (1) there are substantive and procedural

[74] *https://ceq.doe.gov/nepa-practice/alternative_arrangements.html.*

standards that ensure full and adequate consideration of environmental issues; (2) there is public participation before a final alternative is selected; and (3) a purpose of the review that the agency is conducting is to examine environmental issues. While the courts have found that EPA need not conduct NEPA analyses under a number of statutes that are "functionally equivalent," including the Clean Air Act, the Ocean Dumping Act, the Federal Insecticide, Fungicide, and Rodenticide Act, the Resource Conservation and Recovery Act, and the Comprehensive Environmental Response, Compensation, and Liability Act, CEQ proposes that the concept of functional equivalency be extended to other agencies that conduct analyses to examine environmental issues.

Furthermore, CEQ proposes to add a new paragraph (c), which would provide that agencies may identify actions that are not subject to NEPA in their agency NEPA procedures, including (1) non-major Federal actions; (2) non-discretionary actions, in whole or in part; (3) actions expressly exempt from NEPA under another statute; (4) actions for which compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute; and (5) actions for which compliance with NEPA would be inconsistent with Congressional intent due to the requirements of another statute. These changes would conform to the new § 1501.1, "NEPA threshold applicability analysis," section, which provides five considerations in determining whether NEPA applies to a proposed action.

CEQ proposes to amend paragraph (d)(2)(ii) to require agencies to identify in their procedures when documentation of a CE determination is required. CEQ proposes to add language to paragraph (e)(3) to codify existing agency practice to publish notices when it pauses an EIS or withdraws an NOI. Finally, CEQ proposes to add a new paragraph (e)(5) that would allow agencies to establish a process in their agency NEPA procedures whereby the agency may apply a CE listed in another agency's NEPA procedures. Such procedure would set forth the process by which the agency would consult with the agency that listed the CE in its NEPA procedures to ensure that the application of the CE is consistent with the originating agency's intent and practice.

CEQ invites comment on whether it should specifically allow an agency to apply a categorical exclusion established in another agency's NEPA procedures to its proposed action. CEQ invites comment on any process its

regulations should include to ensure the appropriate application of an agency's CE to another agency's action.

Finally, the proposed § 1507.4, "Agency NEPA program information," would require agencies in their NEPA implementing procedures to provide for a website or other means of publishing certain information on ongoing NEPA reviews and maintaining and permitting public access to agency records relating to NEPA reviews. This provision would promote transparency and efficiency in the NEPA process, and improve interagency coordination by ensuring that information is more readily available to other agencies and the public.

Opportunities exist for agencies to combine existing geospatial data, including remotely sensed images, and analyses to streamline environmental review and better coordinate development of environmental documents for multi-agency projects, consistent with the OFD policy. One option involves creating a single NEPA application that facilitates consolidation of existing datasets and can run several relevant geographic information system (GIS) analyses to help standardize the production of robust analytical results. This application could have a public-facing component modeled along the lines of EPA's NEPAssist,[75] which would aid prospective project sponsors with site selection and project design and increase public transparency. The application could link to the Permitting Dashboard to help facilitate project tracking and flexibilities under §§ 1506.5 and 1506.6. CEQ invites comment on this proposal, including comment on whether additional regulatory changes could help facilitate streamlined GIS analysis to help agencies comply with NEPA.

### J. Proposed Revisions to Definitions (Part 1508)

CEQ proposes significant revisions to part 1508. CEQ proposes to clarify the definitions of a number of key NEPA terms in order to reduce ambiguity, both through modification of existing definitions and the addition of new definitions. CEQ also proposes to eliminate individual section numbers for each term in favor of an alphabetical list of defined terms in the revised § 1508.1. CEQ proposes conforming edits to remove citations to the specific definition sections throughout the proposed rule. Finally, CEQ proposes to

move the operative language included throughout the definitions sections to the relevant substantive sections of the regulations.

*New definition of "authorization."* CEQ proposes to define the term "authorization" to refer to the types of activities that might be required for permitting a proposed action, in particular infrastructure projects. This definition is consistent with the definition included in FAST–41 and E.O. 13807.

*Clarifying the meaning of "categorical exclusion."* CEQ proposes to revise the definition of categorical exclusion by inserting "normally" to clarify that there may be situations where an action may have significant effects on account of extraordinary circumstances. CEQ also proposes to strike "individually or cumulatively" for consistency with the proposed revisions to the definition of "effects" discussed below. CEQ proposes conforming edits in §§ 1500.4(a) and 1500.5(a). As noted in section II.I, CEQ proposes to move the requirement to provide for extraordinary circumstances in agency procedures to § 1507.3(d)(2)(ii).

*Clarifying the meaning of "cooperating agency."* CEQ proposes to amend the definition of cooperating agency to make clear that a State, Tribal, or local agency may be a cooperating agency when the lead agency agrees, and to move the corresponding operative language to proposed § 1501.8(a).

*Clarifying the meaning of "effects."* Many commenters have urged CEQ to refine the definition of effects. Commenters raised concerns that the current definition creates confusion, and that the terms "indirect" and "cumulative" have been interpreted expansively resulting in excessive documentation about speculative effects and leading to frequent litigation. Commenters also have raised concerns that this has expanded the scope of NEPA analysis without serving NEPA's purpose of informed decision making. Commenters stressed that the focus of the effects analysis should be on those effects that are reasonably foreseeable, related to the proposed action under consideration, and subject to the agency's jurisdiction and control. Commenters also noted that NEPA practitioners often struggle with describing cumulative impacts despite numerous publications on the topic.

While NEPA refers to environmental impacts and environmental effects, it does not subdivide the terms into direct, indirect, or cumulative. To address commenters' concerns and reduce confusion and unnecessary litigation,

---

[75] *https://nepassisttool.epa.gov/nepassist/ nepamap.aspx. See also* the Marine Cadastre, which provides consolidated GIS information for offshore actions, *https://marinecadastre.gov/.*

CEQ proposes to make amendments to simplify the definition of effects by consolidating the definition into a single paragraph and striking the specific references to direct, indirect, and cumulative effects.

In particular, CEQ proposes to amend the definition of effects to provide clarity on the bounds of effects consistent with the Supreme Court's holding in *Department of Transportation* v. *Public Citizen,* 541 U.S. at 767–68. Under the proposed definition, effects must be reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives; a "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. This close causal relationship is analogous to proximate cause in tort law. *Id.* at 767; *see also Metro. Edison Co.,* 460 U.S. at 774 (interpreting section 102 of NEPA to require "a reasonably close causal relationship between a change in the physical environment and the effect at issue" and stating that "[t]his requirement is like the familiar doctrine of proximate cause from tort law."). CEQ seeks comment on whether to include in the definition of effects the concept that the close causal relationship is "analogous to proximate cause in tort law," and if so, how CEQ could provide additional clarity regarding the meaning of this phrase.

CEQ proposes to strike the definition of cumulative impacts and strike the terms "direct" and "indirect" in order to focus agency time and resources on considering whether an effect is caused by the proposed action rather than on categorizing the type of effect. CEQ's proposed revisions to simplify the definition are intended to focus agencies on consideration of effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action. In practice, substantial resources have been devoted to categorizing effects as direct, indirect, and cumulative, which, as noted above, are not terms referenced in the NEPA statute.

In addition, CEQ proposes a change in position to state that analysis of cumulative effects, as defined in CEQ's current regulations, is not required under NEPA. While CEQ has issued detailed guidance on considering cumulative effects, categorizing and determining the geographic and temporal scope of such effects has been difficult and can divert agencies from focusing their time and resources on the most significant effects. Excessively lengthy documentation that does not focus on the most meaningful issues for the decision maker's consideration can lead to encyclopedic documents that include information that is irrelevant or inconsequential to the decision-making process. Instead, agencies should focus their efforts on analyzing effects that are most likely to be potentially significant and be effects that would occur as a result of the agency's decision. Agencies are not expected to conduct exhaustive research on identifying and categorizing actions beyond the agency's control. With this proposed change and the proposed elimination of the definition of cumulative impacts, it is CEQ's intent to focus agencies on analysis of effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action.

To further assist agencies in their assessment of significant effects, CEQ also proposes to clarify that effects should not be considered significant if they are remote in time, geographically remote, or the result of a lengthy causal chain. *See, e.g., Pub. Citizen,* 541 U.S. at 767–68 ("In particular, 'courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not.'" (quoting *Metro. Edison Co.,* 460 U.S. at 774 n.7)); *Metro. Edison Co.,* 460 U.S. at 774 (noting effects may not fall within section 102 of NEPA because "the causal chain is too attenuated"). To reinforce CEQ's proposed simplified definition of effects, CEQ proposes to consolidate paragraphs (a), (b), and (d) of 40 CFR 1502.16, "Environmental consequences," into a new § 1502.16(a)(1).

Further, CEQ proposes to codify a key holding of *Public Citizen* relating to the definition of effects to make clear that effects do not include effects that the agency has no authority to prevent or would happen even without the agency action, because they would not have a sufficiently close causal connection to the proposed action. This clarification will help agencies better understand what effects they need to analyze and discuss, helping to reduce delays and paperwork with unnecessary analyses.

CEQ invites comment on the proposed revisions to the definition of effects, including whether CEQ should affirmatively state that consideration of indirect effects is not required.

*Clarifying the meaning of "environmental assessment."* CEQ proposes to revise the definition of environmental assessment, describing the purpose for the document and moving all of the operative language from the definition to proposed § 1501.5.

*Clarifying the meaning of "Federal agency."* CEQ proposes to amend the definition of "Federal agency" to broaden it to include States, Tribes, and units of local government to the extent that they have assumed NEPA responsibilities from a Federal agency pursuant to statute. Since the issuance of the CEQ regulations, Congress has authorized assumption of NEPA responsibilities in other contexts besides the Housing and Community Development Act of 1974. *See, e.g.,* Surface Transportation Project Delivery Program, 23 U.S.C. 327. This change would acknowledge these programs and help clarify roles and responsibilities.

*Clarifying the meaning of "human environment."* CEQ proposes to change "people" to "present and future generations of Americans" consistent with section 101(a) of NEPA.

*Clarifying the meaning of "lead agency."* CEQ proposes to amend the definition of lead agency to clarify that this term includes joint lead agencies, which are an acceptable practice.

*Clarifying the meaning of "legislation."* CEQ proposes to move the operative language to § 1506.8 and strike the example of treaties, because, as noted in section II.H, the President is not a Federal agency, and therefore a request for ratification of a treaty would not be subject to NEPA.

*Clarifying the meaning of "major Federal action."* CEQ received many comments requesting clarification of the definition of major Federal action. For example, CEQ received comments proposing that non-Federal projects should not be considered major Federal actions based on a very minor Federal role. Commenters also recommended that CEQ clarify the definition to exclude decisions where agencies do not have discretion to consider and potentially modify their actions based on the environmental review.

CEQ proposes to amend the first sentence of the definition to clarify that an action meets the definition if it is subject to Federal control and responsibility, and it has effects that may be significant. CEQ proposes to replace "major" effects with "significant" in this sentence to align with the NEPA statute.

CEQ proposes to strike the second sentence of the definition, which provides "Major reinforces but does not have a meaning independent of significantly." This is a change in position as compared to CEQ's earlier interpretation of NEPA. In the statute, Congress refers to "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. 4332(2)(C). Under the current

interpretation, however, the word "major" is rendered virtually meaningless.

CEQ proposes to strike the sentence because all words of a statute must be given meaning consistent with longstanding principles of statutory interpretation. *See, e.g., Bennett,* 520 U.S. at 173 ("It is the '"cardinal principle of statutory construction"' . . . [that] it is our duty "to give effect, if possible, to every clause and word of a statute"' . . . rather than to emasculate an entire section.'" (quoting *United States* v. *Menasche,* 348 U.S. 528, 538 (1955))). The legislative history of NEPA also reflects that Congress used the term "major" independently of "significantly," and provided that, for major actions, agencies should make a determination as to whether the proposal would have a significant environmental impact. Specifically, the Senate Report for the National Environmental Policy Act of 1969 states, "*Each agency which proposes any major actions,* such as project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs, *shall make a determination as to whether the proposal would have a significant effect upon the quality of the human environment.*" S. Rep. No. 91–296, at 20 (1969) (emphasis added).[76] Moreover, over the past four decades, in a number of cases, courts have determined that NEPA does not require the preparation of an EIS for actions with minimal Federal involvement or funding. Under this proposed definition, these would be non-major Federal actions.

To clarify that these activities are non-major Federal actions, CEQ proposes to add two sentences to the definition to make clear that this term does not include non-Federal projects with minimal Federal funding or minimal Federal involvement such that the agency cannot control the outcome on the project. In such circumstances, there is no practical reason for an agency to conduct a NEPA analysis because the agency could not influence the outcome of its action to address the effects of the project. For example, this might include a very small percentage of Federal funding provided only to help design an infrastructure project that is otherwise funded through private or local funds. This change would help to reduce costs and delays by more clearly defining the kinds of actions that are appropriately within the scope of NEPA.

CEQ also proposes to strike the third sentence of the definition, which includes a failure to act in the definition of a major Federal action, and exclude activities that do not result in final agency action under the APA. NEPA applies when agencies are considering a proposal for decision. In the circumstance described in this sentence, there is no proposed action and therefore no alternatives that the agency may consider. *S. Utah Wilderness All.,* 542 U.S. at 70–73.

CEQ also proposes to strike the specific reference to the State and Local Fiscal Assistance Act of 1972 from paragraph (a). The proposed revisions to the definition clarify that general revenue sharing funds would not meet the definition of major Federal action. In particular, CEQ proposes to exclude as non-major Federal actions the farm ownership and operating loan guarantees provided by the Farm Service Agency (FSA) of the U.S. Department of Agriculture pursuant to 7 U.S.C. 1925 and 1941 through 1949, and the business loan guarantee programs of the Small Business Administration (SBA), 15 U.S.C. 636(a), 636(m), and 695 through 697f. Under the farm ownership and operating loan programs, FSA does not control the bank, or the borrower; the agency does not control the subsequent use of such funds and does not operate any facilities. In the event of a default, properties are sold, and FSA never takes physical possession of, operates, or manages any facility. SBA's business loan programs operate in similar fashion. Further, under those programs no Federal funds are expended unless there is a default by the borrower paying the loan.

CEQ invites comment on whether it should make any further changes to this paragraph, including changing "partly" to "predominantly" for consistency with the edits to the introductory paragraph regarding "minimal Federal funding." CEQ also invites comment whether there should be a threshold (percentage or dollar figure) for "minimal Federal funding," and if so, what would be an appropriate threshold and the basis for such a threshold. CEQ also invites comment on whether any types of financial instruments, including loans and loan guarantees, should be considered non-major Federal actions and the basis for such exclusion.

Additionally, as a general matter, CEQ invites comment on whether the definition of "major Federal action" should be further revised to exclude other *per se* categories of activities or to further address what NEPA analysts have called "the small handle problem."[77] Commenters should provide any relevant data that may assist in identifying such categories of activities. Finally, as noted in the discussion of § 1501.4, CEQ invites comment on whether and how to exclude certain categories of actions common to all Federal agencies from the definition.

CEQ also proposes to insert "implementation of" before "treaties" in paragraph (b)(1) to clarify that the major Federal action is not the treaty itself, but rather an agency's action to implement that treaty. Further, CEQ proposes to strike "guide" from paragraph (b)(2) because guidance is non-binding.

CEQ also invites comment on whether the regulations should clarify that NEPA does not apply extraterritorially, consistent with *Kiobel* v. *Royal Dutch Petroleum Co.,* 569 U.S. 108, 115–16 (2013), in light of the ordinary presumption against extraterritorial application when a statute does not clearly indicate that extraterritorial application is intended by Congress.

*Clarifying the meaning of "mitigation."* CEQ proposes to amend the definition of "mitigation" to define the term and clarify that NEPA does not require adoption of any particular mitigation measure, consistent with *Methow Valley,* 490 U.S. at 352–53. In *Methow Valley,* the Supreme Court held that NEPA and the CEQ regulations require "that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated," but do not establish "a substantive requirement that a complete mitigation plan be actually formulated and adopted" before the agency can make its decision. *Id.* at 352.

CEQ also proposes to amend the definition of "mitigation" to make clear that mitigation must have a nexus to the effects of the proposed action, is limited to those actions that have an effect on the environment, and does not include actions that do not have an effect on the environment. This would make the NEPA process more effective by clarifying that mitigation measures must actually be designed to mitigate the effects of the proposed action. This amended definition is consistent with CEQ's Mitigation Guidance, *supra* note 18.

Under that guidance, if an agency believes that the proposed action will provide net environmental benefits through use of compensatory mitigation, the agency should incorporate by

---

[76] *https://ceq.doe.gov/docs/laws-regulations/Senate-Report-on-NEPA.pdf.*

[77] *See* Daniel R. Mandelker et al., NEPA Law and Litigation, § 8:20 (2d ed. 2019) ("This problem is sometimes called the 'small handle' problem because [F]ederal action may be only be a 'small handle' on a non[-F]ederal project.").

reference the documents that demonstrate that the proposed mitigation will be new or in addition to actions that would occur under the no-action alternative, and the financial, legal, and management commitments for the mitigation. Use of well-established mitigation banks and similar compensatory mitigation legal structures should provide the necessary substantiation for the agency's findings on the effectiveness (nexus to effects of the action, proportionality, and durability) of the mitigation. Other actions may be effectively mitigated through use of environmental management systems that provide a structure of procedures and policies to systematically identify, evaluate, and manage environmental impacts of an action during its implementation.[78]

*Clarifying the meaning of "notice of intent."* CEQ proposes to revise the definition of "notice of intent" to remove the operative requirements for the NOI and add the word "public" to clarify that the NOI is a public notice.

*New definition of "page."* A new definition of "page" would provide a word count (500 words) for a more standard functional definition of "page" for page count and other NEPA purposes. This would update NEPA for modern electronic publishing and internet formatting, in which the number of words per page can vary widely depending on format. It would also ensure some uniformity in document length while allowing unrestricted use of the graphic display of quantitative information, tables, photos, maps, and other geographic information that can provide a much more effective means of conveying information about environmental effects. This change supports the original CEQ page limits as a means of ensuring that environmental documents are readable and useful to decision makers.

*New definition of "participating agency."* As discussed above, CEQ proposes to add the concept of a participating agency to the CEQ regulations. CEQ proposes to define participating agency consistent with the definition in FAST–41 and 23 U.S.C. 139. CEQ proposes to add participating agencies to § 1501.7(i) regarding the schedule and replace the term "commenting" agencies with "participating" agencies throughout.

*Clarifying the meaning of "proposal."* CEQ proposes clarifying edits and to

strike the operative language regarding timing of an EIS because it is already addressed in § 1502.5.

*New definition of "publish/publication."* CEQ proposes to define this term to provide agencies with the flexibility to make environmental reviews and information available to the public by electronic means. The 1978 regulations predate personal computers and a wide range of technologies now used by agencies such as GIS mapping tools and social media. To address environmental justice concerns and ensure that the affected public is not excluded from the NEPA process due to a lack of resources (often referred to as the "digital divide"), the definition retains a provision for printed environmental documents where necessary for effective public participation.

*New definition of "reasonable alternative."* Several commenters asked CEQ to include a new definition of "reasonable alternatives" in the regulations with emphasis on how technical and economic feasibility should be evaluated. CEQ proposes a new definition of "reasonable alternative" that would provide that reasonable alternatives must be technically and economically feasible and meet the purpose and need of the proposed action. *See, e.g., Vt. Yankee,* 435 U.S. at 551 ("alternatives must be bounded by some notion of feasibility"). CEQ also proposes to define reasonable alternatives as "a reasonable range of alternatives" to codify Questions 1a and 1b in the Forty Questions, *supra* note 10. Agencies are not required to give detailed consideration to alternatives that are unlikely to be implemented because they are infeasible, ineffective, or inconsistent with the purpose and need for agency action.

Finally, CEQ proposes to clarify that a reasonable alternative must also consider the goals of the applicant when the agency's action involves a non-Federal entity. These changes would help reduce paperwork and delays by helping to clarify the range of alternatives that agencies must consider. Where the agency action is in response to an application for permit or other authorization, the agency should consider the applicant's goals based on the agency's statutory authorization to act, as well as in other congressional directives, in defining the proposed action's purpose and need.

*New definition of "reasonably foreseeable."* CEQ received comment requesting that the regulations provide a definition of "reasonably foreseeable." CEQ proposes to define "reasonably foreseeable" consistent with the

ordinary person standard—that is what a person of ordinary prudence would consider in reaching a decision.

*New definition of "senior agency official."* As discussed in section II.A, the proposed definition of "senior agency official" would provide for agency officials that are responsible for the agency's NEPA compliance.

*Striking the definition of "significantly."* Because the entire definition of significantly is operative language, CEQ proposes to strike this definition and discuss significance in § 1501.4(b), as described above.

*Clarifying the meaning of "tiering."* CEQ would amend the definition of "tiering" to make clear that agencies may use EAs at the programmatic stage as well as the subsequent stages. This would clarify that agencies have flexibility in structuring programmatic NEPA reviews and associated tiering. CEQ would move the operative language regarding tiering from 40 CFR 1508.28 to proposed § 1501.11(b).

### K. CEQ Guidance Documents

This proposed rule, if adopted as a final rule, would supersede any previous CEQ NEPA guidance. If CEQ finalizes the proposed rule, CEQ anticipates withdrawing all of the CEQ NEPA guidance that is currently in effect and issuing new guidance as consistent with Presidential directives.

### L. Additional Issues on Which CEQ Invites Comment

Based on comments received and CEQ's experience in implementing NEPA, the final rule may include amendments to any provisions in parts 1500 to 1508 of the CEQ regulations. CEQ invites comments recommending, opposing, or providing feedback on specific changes to any provisions in parts 1500 to 1508 of the CEQ regulations, including revising or adopting as regulations existing CEQ guidance or handbooks.

Further, CEQ received comments requesting that the regulations address analysis of greenhouse gas emissions and potential climate change impacts. CEQ has proposed guidance titled "Draft National Environmental Policy Act Guidance on Consideration of Greenhouse Gas Emissions"[79] to address how NEPA analyses should address greenhouse gas (GHG) emissions. CEQ does not consider it appropriate to address a single category of impacts in the regulations. If CEQ finalizes this proposal, CEQ would review the draft GHG guidance for potential revisions consistent with the

---

[78] *See* Council on Environmental Quality, Aligning National Environmental Policy Act Processes with Environmental Management Systems (April 2007), *https://ceq.doe.gov/docs/ceq-publications/NEPA_EMS_Guide_final_Apr2007.pdf.*

[79] 84 FR 30097 (June 26, 2019).

regulations. However, CEQ invites comments on whether it should codify any aspects of its proposed GHG guidance in the regulation, and if so, how CEQ should address them in the regulations.

If proposed changes to the CEQ regulations provided in comments on the ANPRM, or on the proposed GHG guidance, are not reflected in this proposal, and the commenter would like to advance those proposals in comments to the NPRM, CEQ requests that the commenter specifically identify and reference to the prior comment.

Finally, CEQ invites comment on whether to update references to "Council" in the regulation to "CEQ" throughout the rule.

## III. Rulemaking Analyses and Notices

*A. Executive Order 12866, Regulatory Planning and Review; Executive Order 13563, Improving Regulation and Regulatory Review; and Executive Order 13771, Reducing Regulation and Controlling Regulatory Costs*

This proposed rule is a significant regulatory action that was submitted to the Office of Management and Budget (OMB) for review. The docket for this rulemaking documents any changes made in response to OMB recommendations as required by section 6 of E.O. 12866.

*B. Regulatory Flexibility Act and Executive Order 13272, Proper Consideration of Small Entities in Agency Rulemaking*

The Regulatory Flexibility Act, as amended, (RFA), 5 U.S.C. 601 *et seq.*, and E.O. 13272 [80] require agencies to assess the impacts of proposed and final rules on small entities. Under the RFA, small entities include small businesses, small organizations, and small governmental jurisdictions. An agency must prepare an Initial Regulatory Flexibility Analysis (IRFA) unless it determines and certifies that a proposed rule, if promulgated, would not have a significant economic impact on a substantial number of small entities. The proposed rule would not directly regulate small entities. Rather, the proposed rule applies to Federal agencies and sets forth the process for their compliance with NEPA. Accordingly, CEQ hereby certifies that the proposed rule, if promulgated, will not have a significant economic impact on a substantial number of small entities.

## C. National Environmental Policy Act

This proposed rule, if finalized, would assist agencies in fulfilling their responsibilities under NEPA, but would not make any final determination of what level of NEPA analysis is required for particular actions. The CEQ regulations do not require agencies to prepare a NEPA analysis before establishing or updating agency procedures for implementing NEPA. While CEQ prepared environmental assessments for its promulgation of the CEQ regulations in 1978 and its amendments to 40 CFR 1502.22 in 1986, in the development of this proposed rule, CEQ has determined that the proposed rule would not have a significant effect on the environment because it would not authorize any activity or commit resources to a project that may affect the environment. Therefore, CEQ does not intend to conduct a NEPA analysis of this proposed rule for the same reason that CEQ does not require any Federal agency to conduct NEPA analysis for the development of agency procedures for the implementation of NEPA and the CEQ regulations.

## D. Executive Order 13132, Federalism

E.O. 13132 requires agencies to develop an accountable process to ensure meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications.[81] Policies that have federalism implications include regulations that have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. CEQ does not anticipate that this proposed rule has federalism implications because it applies to Federal agencies, not States.

## E. Executive Order 13175, Consultation and Coordination With Indian Tribal Governments

E.O. 13175 requires agencies to have a process to ensure meaningful and timely input by Tribal officials in the development of policies that have Tribal implications.[82] Such policies include regulations that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. While the proposed rule is not a regulatory

policy that has Tribal implications, the proposal does, in part, respond to Tribal government comments supporting expansion of the recognition of the sovereign rights, interests, and expertise of Tribes in the NEPA process and CEQ regulations implementing NEPA.

In its ANPRM, CEQ included a specific question regarding the representation of Tribal governments in the NEPA process. *See* ANPRM Question 18 ("Are there ways in which the role of [T]ribal governments in the NEPA process should be clarified in CEQ's NEPA regulations, and if so, how?"). More generally, CEQ's ANPRM sought the views of Tribal governments and others on regulatory revisions that CEQ could propose to improve Tribal participation in Federal NEPA processes. *See* ANPRM Question 2 ("Should CEQ's NEPA regulations be revised to make the NEPA process more efficient by better facilitating agency use of environmental studies, analysis, and decisions conducted in earlier Federal, State, Tribal or local environmental reviews or authorization decisions, and if so, how?"). As discussed section II.A, CEQ now proposes to amend its regulations to further support coordination with Tribal governments and agencies and analysis of a proposed action's potential effects on Tribal lands, resources, or areas of historic significance as an important part of Federal agency decision making. In addition to these proposed revisions of the CEQ Regulations, CEQ is inviting comment on other CEQ guidance that warrants codification. *See, e.g.,* CEQ Memorandum titled "Designation of Non-Federal Agencies to be Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act" [83] (July 28, 1999) encouraging more active solicitation of Tribal entities for participation as cooperating agencies in NEPA documents.

*F. Executive Order 12898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

E.O. 12898 requires agencies to make achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations.[84] CEQ has

---

[80] 67 FR 53461 (Aug. 16, 2002).

[81] 64 FR 43255 (Aug. 10, 1999).
[82] 65 FR 67249 (Nov. 9, 2000).

[83] *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ceqcoop.pdf.*
[84] 59 FR 7629 (Feb. 16, 1994).

analyzed this proposed rule and determined that it would not cause disproportionately high and adverse human health or environmental effects on minority populations and low-income populations. This rule would set forth implementing regulations for NEPA; it is in the agency implementation of NEPA when conducting reviews of proposed agency actions where consideration of environmental justice effects typically occurs.

*G. Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

Agencies must prepare a Statement of Energy Effects for significant energy actions under E.O. 13211.[85] This proposed rule is not a "significant energy action" because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

*H. Executive Order 12988, Civil Justice Reform*

Under section 3(a) E.O. 12988,[86] agencies must review their proposed regulations to eliminate drafting errors and ambiguities, draft them to minimize litigation, and provide a clear legal standard for affected conduct. Section 3(b) provides a list of specific issues for review to conduct the reviews required by section 3(a). CEQ has conducted this review and determined that this proposed rule complies with the requirements of E.O. 12988.

*I. Unfunded Mandate Reform Act*

Section 201 of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531) requires Federal agencies to assess the effects of their regulatory actions on State, local, and Tribal governments, and the private sector to the extent that such regulations incorporate requirements specifically set forth in law. Before promulgating a rule that may result in the expenditure by a State, local, or Tribal government, in the aggregate, or by the private sector of $100 million, adjusted annually for inflation, in any 1 year, an agency must prepare a written statement that assesses the effects on State, local, and Tribal governments and the private sector. 2 U.S.C. 1532. This proposed rule applies to Federal agencies and would not result in expenditures of $100 million or more for State, local, and Tribal governments, in the aggregate, or the private sector in any 1 year. This action also does not impose any enforceable duty, contain

any unfunded mandate, or otherwise have any effect on small governments subject to the requirements of 2 U.S.C. 1531–1538.

*J. Paperwork Reduction Act*

This proposed rule does not impose any new information collection burden that would require additional review or approval by OMB under the Paperwork Reduction Act (PRA), 44 U.S.C. 3501 *et seq.*

**List of Subjects in 40 CFR Parts 1500 Through 1508**

Administrative practice and procedure; Environmental impact statements; Environmental protection; Natural resources.

Dated: December 23, 2019.

**Mary B. Neumayr,**

*Chairman.*

For the reasons discussed in the preamble, the Council on Environmental Quality proposes to amend parts 1500 through 1508 in title 40 of the Code of Federal Regulations to read as follows:

■ 1. Revise part 1500 to read as follows:

**PART 1500—PURPOSE AND POLICY**

Sec.
1500.1    Purpose and policy.
1500.2    [Reserved]
1500.3    NEPA compliance.
1500.4    Reducing paperwork.
1500.5    Reducing delay.
1500.6    Agency authority.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, Mar. 7, 1970, as amended by E.O. 11991, 42 FR 26967, May 25, 1977; and E.O. 13807, 82 FR 40463, Aug. 24, 2017.

**§ 1500.1   Purpose and policy.**

(a) The National Environmental Policy Act (NEPA) is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process. Section 101 of NEPA establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans. Section 102(2) of NEPA establishes the procedural requirements to carry out the policy stated in section 101 of NEPA. In particular, it requires Federal agencies to provide a detailed statement on proposals for major Federal actions significantly affecting the quality of the

human environment. The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information and the public has been informed regarding the decision making process. NEPA does not mandate particular results or substantive outcomes. NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action.

(b) The regulations in parts 1500 through 1508 implement section 102(2) of NEPA. They provide direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review where applicable. These regulations are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies. The regulations are also intended to ensure that Federal agencies conduct environmental reviews in a coordinated, consistent, predictable and timely manner, and to reduce unnecessary burdens and delays. Finally, the regulations promote concurrent environmental reviews to ensure timely and efficient decision making.

**§ 1500.2   [Reserved]**

**§ 1500.3   NEPA compliance.**

(a) *Mandate.* Parts 1500 through 1508 of this title are applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91–190, 42 U.S.C. 4321 *et seq.*) (NEPA or the Act), except where compliance would be inconsistent with other statutory requirements. These regulations are issued pursuant to NEPA; the Environmental Quality Improvement Act of 1970, as amended (Pub. L. 91–224, 42 U.S.C. 4371 *et seq.*); section 309 of the Clean Air Act, as amended (42 U.S.C. 7609); Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970), as amended by Executive Order 11991, Relating to the Protection and Enhancement of Environmental Quality (May 24, 1977); and Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects (August 15, 2017). These regulations apply to the whole of section 102(2) of NEPA. The provisions of the Act and of these regulations must be read together as a whole to comply with the law. Agency NEPA procedures to implement

---

[85] 66 FR 28355 (May 22, 2001).
[86] 61 FR 4729 (Feb. 7, 1996).

these regulations shall not impose additional procedures or requirements beyond those set forth in these regulations, except as otherwise provided by law or for agency efficiency.

(b) *Exhaustion.* (1) To ensure informed decision making and reduce delays, agencies shall include a request for comments on potential alternatives and impacts, and identification of any relevant information, studies, or analyses of any kind concerning impacts affecting the quality of the human environment in the notice of intent to prepare an environmental impact statement (§ 1501.9).

(2) The environmental impact statement shall include a summary of the comments received, including all alternatives, information, and analyses submitted by public commenters for consideration by the lead and cooperating agencies in developing the environmental impact statement (§ 1502.17).

(3) For consideration by the lead and cooperating agencies, comments must be submitted within the comment periods provided and shall be as specific as possible (§§ 1503.1 and 1503.3). Comments or objections not submitted shall be deemed unexhausted and forfeited. Any objections to the submitted alternatives, information, and analyses section (§ 1502.17) shall be submitted within 30 days of the notice of availability of the final environmental impact statement.

(4) Based on the summary of the submitted alternatives, information, and analyses section, the decision maker for the lead agency shall certify in the record of decision that the agency considered all of the alternatives, information, and analyses submitted by public commenters for consideration by the lead and cooperating agencies in developing the environmental impact statement (§ 1502.18).

(c) *Actions regarding NEPA compliance.* It is the Council's intention that judicial review of agency compliance with the regulations in parts 1500 through 1508 not occur before an agency has issued the record of decision or taken other final agency action. Any allegation of noncompliance with NEPA and these regulations should be resolved as expeditiously as possible. Agencies may structure their decision making to allow private parties to seek agency stays of final agency decisions pending administrative or judicial review of those decisions. Consistent with their organic statutes, agencies may structure their procedures to provide for efficient mechanisms for seeking, granting and imposing conditions on such stays, consistent with 5 U.S.C. 705. Such mechanisms may include the imposition of an appropriate bond requirement or other security requirement as a condition for a stay.

(d) *Remedies.* Harm from the failure to comply with NEPA can be remedied by compliance with NEPA's procedural requirements as interpreted in the regulations in parts 1500 through 1508. These regulations create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm. These regulations do not create a cause of action or right of action for violation of NEPA, which contains no such cause of action or right of action. It is the Council's intention that any actions to review, enjoin, stay, or alter an agency decision on the basis of an alleged NEPA violation be raised as soon as practicable to avoid or minimize any costs to agencies, applicants, or any affected third parties. It is also the Council's intention that minor, non-substantive errors that have no effect on agency decision making shall be considered harmless and shall not invalidate an agency action.

(e) *Severability.* The sections of parts 1501 through 1508 are separate and severable from one another. If any section or portion therein is stayed or determined to be invalid, or the applicability of any section to any person or entity is held invalid, it is the Council's intention that the validity of the remainder of those parts shall not be affected, with the remaining sections to continue in effect.

## § 1500.4    Reducing paperwork.

Agencies shall reduce excessive paperwork by:

(a) Using categorical exclusions to define categories of actions which do not have a significant effect on the human environment and which are therefore exempt from requirements to prepare an environmental impact statement (§ 1501.4).

(b) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment and is therefore exempt from requirements to prepare an environmental impact statement (§ 1501.6).

(c) Reducing the length of environmental documents by means such as meeting appropriate page limits (§§ 1501.5(e) and 1502.7).

(d) Preparing analytic and concise environmental impact statements (§ 1502.2).

(e) Discussing only briefly issues other than significant ones (§ 1502.2(b)).

(f) Writing environmental impact statements in plain language (§ 1502.8).

(g) Following a clear format for environmental impact statements (§ 1502.10).

(h) Emphasizing the portions of the environmental impact statement that are useful to decision makers and the public (§§ 1502.14 and 1502.15) and reducing emphasis on background material (§ 1502.16).

(i) Using the scoping process, not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues, narrowing the scope of the environmental impact statement process accordingly (§ 1501.9).

(j) Summarizing the environmental impact statement (§ 1502.12).

(k) Using programmatic, policy, or plan environmental impact statements and tiering from statements of broad scope to those of narrower scope, to eliminate repetitive discussions of the same issues (§§ 1502.4 and 1501.11).

(l) Incorporating by reference (§ 1501.12).

(m) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(n) Requiring comments to be as specific as possible (§ 1503.3).

(o) Attaching and publishing only changes to the draft environmental impact statement, rather than rewriting and publishing the entire statement when changes are minor (§ 1503.4(c)).

(p) Eliminating duplication with State, Tribal and local procedures, by providing for joint preparation of environmental documents where practicable (§ 1506.2), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3).

(q) Combining environmental documents with other documents (§ 1506.4).

## § 1500.5    Reducing delay.

Agencies shall reduce delay by:

(a) Using categorical exclusions to define categories of actions which do not have a significant effect on the human environment (§ 1501.4) and which are therefore exempt from requirements to prepare an environmental impact statement.

(b) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment (§ 1501.6) and is therefore exempt from requirements to prepare an environmental impact statement.

(c) Integrating the NEPA process into early planning (§ 1501.2).

(d) Engaging in interagency cooperation before the environmental assessment or environmental impact statement is prepared, rather than submission of comments on a completed document (§ 1501.8).

(e) Ensuring the swift and fair resolution of lead agency disputes (§ 1501.7).

(f) Using the scoping process for an early identification of what are and what are not the real issues (§ 1501.9).

(g) Meeting appropriate time limits for the environmental assessment and environmental impact statement processes (§ 1501.10).

(h) Preparing environmental impact statements early in the process (§ 1502.5).

(i) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.25).

(j) Eliminating duplication with State, Tribal, and local procedures by providing for joint preparation of environmental documents where practicable (§ 1506.2) and with other Federal procedures by providing that agencies may jointly prepare or adopt appropriate environmental documents prepared by another agency (§ 1506.3).

(k) Combining environmental documents with other documents (§ 1506.4).

(l) Using accelerated procedures for proposals for legislation (§ 1506.8).

### § 1500.6  Agency authority.

Each agency shall interpret the provisions of the Act as a supplement to its existing authority and as a mandate to view policies and missions in the light of the Act's national environmental objectives. Agencies shall review their policies, procedures, and regulations accordingly and revise them as necessary to ensure full compliance with the purposes and provisions of the Act as interpreted by the regulations in parts 1500 through 1508. The phrase "to the fullest extent possible" in section 102 of NEPA means that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible. Nothing contained in the regulations in parts 1500 through 1508 is intended or should be construed to limit an agency's other authorities or legal responsibilities.

■ 2. Revise part 1501 to read as follows:

## PART 1501—NEPA AND AGENCY PLANNING

Sec.
1501.1   NEPA threshold applicability analysis.

1501.2   Apply NEPA early in the process.
1501.3   Determine the appropriate level of NEPA review.
1501.4   Categorical exclusions.
1501.5   Environmental assessments.
1501.6   Findings of no significant impact.
1501.7   Lead agencies.
1501.8   Cooperating agencies.
1501.9   Scoping.
1501.10   Time limits.
1501.11   Tiering.
1501.12   Incorporation by reference.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, Mar. 7, 1970, as amended by E.O. 11991, 42 FR 26967, May 25, 1977; and E.O. 13807, 82 FR 40463, Aug. 24, 2017.

### § 1501.1  NEPA threshold applicability analysis.

(a) In assessing whether NEPA applies, Federal agencies should determine:

(1) Whether the proposed action is a major Federal action.

(2) Whether the proposed action, in whole or in part, is a non-discretionary action for which the agency lacks authority to consider environmental effects as part of its decision-making process.

(3) Whether the proposed action is an action for which compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute.

(4) Whether the proposed action is an action for which compliance with NEPA would be inconsistent with Congressional intent due to the requirements of another statute.

(5) Whether the proposed action is an action for which the agency has determined that other analyses or processes under other statutes serve the function of agency compliance with NEPA.

(b) Federal agencies may make these determinations in their agency NEPA procedures (§ 1507.3(c)) or on an individual basis.

### § 1501.2  Apply NEPA early in the process.

(a) Agencies should integrate the NEPA process with other planning and authorization processes at the earliest reasonable time to ensure that agencies consider environmental impacts in their planning and decisions, to avoid delays later in the process, and to head off potential conflicts.

(b) Each agency shall:

(1) Comply with the mandate of section 102(2)(A) of NEPA to "utilize a systematic, interdisciplinary approach which will [e]nsure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making which may have an impact on man's environment," as specified by § 1507.2.

(2) Identify environmental effects and values in adequate detail so they can be appropriately considered along with economic and technical analyses. Agencies shall review and publish environmental documents and appropriate analyses at the same time as other planning documents.

(3) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of NEPA.

(4) Provide for cases where actions that are subject to NEPA are planned by private applicants or other non-Federal entities before Federal involvement so that:

(i) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(ii) The Federal agency consults early with appropriate State, Tribal, and local governments and with interested private persons and organizations when its own involvement is reasonably foreseeable.

(iii) The Federal agency commences its NEPA process at the earliest reasonable time.

### § 1501.3  Determine the appropriate level of NEPA review.

(a) In assessing the appropriate level of NEPA review, Federal agencies should determine whether the proposed action:

(1) Normally does not have significant effects and is categorically excluded (§ 1501.4);

(2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§ 1501.5); or

(3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement (part 1502).

(b) In considering whether the effects of the proposed action are significant, agencies shall analyze the potentially affected environment and degree of the effects of the action.

(1) In considering the potentially affected environment, agencies may consider, as appropriate, the affected area (national, regional, or local). Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the Nation as a whole. Both short-and long-term effects are relevant.

(2) In considering the degree of the effects, agencies should consider the

following, as appropriate to the specific action:

(i) Effects may be both beneficial and adverse.

(ii) Effects on public health and safety.

(iii) Effects that would violate Federal, State, Tribal, or local law protecting the environment.

## § 1501.4 Categorical exclusions.

(a) For efficiency, agencies identify in their agency NEPA procedures (§ 1507.3(d)(2)(ii)) categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement.

(b) If an agency determines that a proposed action is covered by a categorical exclusion identified in its agency NEPA procedures, the agency shall evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect.

(1) If extraordinary circumstances are present for a proposed action, the agency should consider whether mitigating circumstances or other conditions are sufficient to avoid significant effects and therefore categorically exclude the proposed action.

(2) If the proposed action cannot be categorically excluded, the agency shall prepare an environmental assessment or environmental impact statement.

## § 1501.5 Environmental assessments.

(a) An agency shall prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown unless the agency finds that a categorical exclusion (§ 1501.4) is applicable or has decided to prepare an environmental impact statement.

(b) An agency may prepare an environmental assessment on any action in order to assist agency planning and decision making.

(c) An environmental assessment shall:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; and

(2) Briefly discuss the purpose and need for the proposed action, alternatives as required by section 102(2)(E) of NEPA, the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

(d) Agencies shall involve relevant agencies, applicants, and the public, to the extent practicable in preparing environmental assessments.

(e) The text of an environmental assessment shall be no more than 75 pages, not including appendices, unless a senior agency official approves in writing an assessment to exceed 75 pages and establishes a new page limit.

(f) Agencies may apply the following provisions to environmental assessments:

(1) Section 1502.22 Incomplete or unavailable information;

(2) Section 1502.24 Methodology and scientific accuracy; and

(3) Section 1502.25 Environmental review and consultation requirements.

## § 1501.6 Findings of no significant impact.

(a) An agency shall prepare a finding of no significant impact if the agency determines, based on the environmental assessment, not to prepare an environmental impact statement because the proposed action is not likely to have significant effects.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6.

(2) In the following circumstances, the agency shall make the finding of no significant impact available for public review for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin:

(i) The proposed action is, or is closely similar to, one which normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3, or

(ii) The nature of the proposed action is one without precedent.

(b) The finding of no significant impact shall include the environmental assessment or incorporate it by reference and shall note any other environmental documents related to it (§ 1501.9(f)(3)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

(c) The finding of no significant impact shall state the means of and authority for any mitigation that the agency has adopted, and any applicable monitoring or enforcement provisions. If the agency finds no significant impacts based on mitigation, the mitigated finding of no significant impact shall state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts.

## § 1501.7 Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement or environmental assessment if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, Tribal, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement or environmental assessment (§ 1506.2).

(c) If an action falls within the provisions of paragraph (a) of this section, the potential lead agencies shall determine, by letter or memorandum, which agency shall be the lead agency and which shall be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval/disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(d) Any Federal agency, or any State, Tribal, or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the senior agency officials of the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted within 45 days in a lead agency designation, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency. A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action.

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) A response may be filed by any potential lead agency concerned within 20 days after a request is filed with the Council. The Council shall determine as soon as possible but not later than 20 days after receiving the request and all responses to it which Federal agency shall be the lead agency and which

other Federal agencies shall be cooperating agencies.

(g) To the extent practicable, if a proposal will require action by more than one Federal agency and the lead agency determines that it requires preparation of an environmental impact statement, the lead and cooperating agencies shall evaluate the proposal in a single environmental impact statement and issue a joint record of decision. To the extent practicable, if the lead agency determines that the proposed action should be evaluated in an environmental assessment, the lead and cooperating agencies should evaluate the proposal in a single environmental assessment and, where appropriate, issue a joint finding of no significant impact.

(h) With respect to cooperating agencies, the lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest practicable time.

(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent practicable, consistent with its responsibility as lead agency.

(3) Meet with a cooperating agency at the latter's request.

(4) Determine the purpose and need, and alternatives in consultation with any cooperating agency.

(i) The lead agency shall develop a schedule, setting milestones for all environmental reviews and authorizations required for implementation of the action, in consultation with any applicant and all joint lead, cooperating, and participating agencies, as soon as practicable.

(j) If the lead agency anticipates that a milestone will be missed, it shall notify appropriate officials at the responsible agencies. The responsible agencies shall elevate, as soon as practicable, to the appropriate officials of the responsible agencies, the issue for timely resolution.

## § 1501.8 Cooperating agencies.

(a) The purpose of this section is to emphasize agency cooperation early in the NEPA process. Any Federal agency with jurisdiction by law shall be a cooperating agency upon request of the lead agency. In addition, any other Federal agency with special expertise with respect to any environmental issue may be a cooperating agency upon request of the lead agency. A State, Tribal, or local agency of similar qualifications may, by agreement with the lead agency, become a cooperating agency. An agency may request the lead agency to designate it a cooperating agency, and a Federal agency may appeal a denial of its request to the Council, in accordance with § 1501.7(e).

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest practicable time.

(2) Participate in the scoping process (described in § 1501.9).

(3) Assume, on request of the lead agency, responsibility for developing information and preparing environmental analyses, including portions of the environmental impact statement or environmental assessment concerning which the cooperating agency has special expertise.

(4) Make available staff support at the lead agency's request to enhance the latter's interdisciplinary capability.

(5) Normally use its own funds. To the extent available funds permit, the lead agency shall fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(6) Consult with the lead agency in developing the schedule (§ 1501.7(i)), meet the schedule, and elevate, as soon as practicable, to the senior agency official of the lead agency relating to purpose and need, alternatives or any other issues any issues that may affect that agency's ability to meet the schedule.

(7) Meet the lead agency's schedule for providing comments and limit its comments to those matters for which it has jurisdiction by law or special expertise with respect to any environmental issue consistent with § 1503.2.

(c) In response to a lead agency's request for assistance in preparing the environmental documents (described in paragraph (b)(3), (4), or (5) of this section), a cooperating agency may reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement or environmental assessment. The cooperating agency shall submit a copy of this reply to the Council and the senior agency official of the lead agency.

## § 1501.9 Scoping.

(a) *Generally.* Agencies shall use an early and open process to determine the scope of issues for analysis in an environmental impact statement, including identifying the significant issues and eliminating from further study non-significant issues. Scoping may begin as soon as practicable after the proposal for action is sufficiently developed for agency consideration.

Scoping may include appropriate pre-application procedures or work conducted prior to publication of the notice of intent.

(b) *Invite cooperating and participating agencies.* As part of the scoping process, the lead agency shall invite the participation of likely affected Federal, State, Tribal, and local agencies and governments, the proponent of the action, and other likely affected or interested persons (including those who might not be in accord with the action on environmental grounds), unless there is a limited exception under § 1507.3(e).

(c) *Scoping outreach.* As part of the scoping process the lead agency may hold a scoping meeting or meetings, publish scoping information, or use other means to communicate with those persons or agencies who may be interested or affected, which the agency may integrate with any other early planning meeting. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(d) *Notice of intent.* As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an environmental impact statement, the lead agency shall publish a notice of intent to prepare an environmental impact statement in the **Federal Register**, except as provided in § 1507.3(e)(3). An agency may publish notice in accordance with § 1506.6. The notice shall include, as appropriate:

(1) The purpose and need for the proposed action;

(2) A preliminary description of the proposed action and alternatives to be considered;

(3) A brief summary of expected impacts;

(4) Anticipated permits and other authorizations;

(5) A schedule for the decision-making process;

(6) A description of the public scoping process, including any scoping meeting(s);

(7) A request for comments on potential alternatives and impacts, and identification of any relevant information, studies, or analyses of any kind concerning impacts affecting the quality of the human environment (§§ 1503.1 and 1503.3); and

(8) Contact information for a person within the agency who can answer questions about the proposed action and the environmental impact statement.

(e) *Determination of scope.* As part of the scoping process, the lead agency shall determine the scope and the significant issues to be analyzed in depth in the environmental impact

statement. To determine the scope of environmental impact statements, agencies shall consider:

(1) Actions (other than unconnected single actions) that may be:

(i) Connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(A) Automatically trigger other actions that may require environmental impact statements;

(B) Cannot or will not proceed unless other actions are taken previously or simultaneously; or

(C) Are interdependent parts of a larger action and depend on the larger action for their justification.

(ii) Similar actions, which when viewed with other reasonably foreseeable or proposed agency actions, have similarities that provide a basis for evaluating their environmental consequences together, such as common timing or geography. An agency may wish to analyze these actions in the same impact statement. It should do so when the most effective way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement.

(2) Alternatives, which include the no action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action).

(3) Impacts.

(f) *Additional scoping responsibilities.* As part of the scoping process, the lead agency shall:

(1) Identify and eliminate from detailed study the issues which are not significant or which have been covered by prior environmental review (§ 1506.3), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(2) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(3) Indicate any public environmental assessments and other environmental impact statements which are being or will be prepared that are related to but are not part of the scope of the impact statement under consideration.

(4) Identify other environmental review, authorization, and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently with, and integrated with,

the environmental impact statement as provided in § 1502.25.

(5) Indicate the relationship between the timing of the preparation of environmental analyses and the agencies' tentative planning and decision-making schedule.

(g) *Revisions.* An agency shall revise the determinations made under paragraphs (b), (c), (e), and (f) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

### § 1501.10 Time limits.

(a) To ensure that agencies conduct NEPA reviews as efficiently and expeditiously as practicable, Federal agencies should set time limits appropriate to individual actions or types of actions (consistent with the time intervals required by § 1506.11). When multiple agencies are involved the reference to agency below means lead agency.

(b) To ensure timely decision making, agencies shall complete:

(1) Environmental assessments within 1 year unless a senior agency official of the lead agency approves a longer period in writing and establishes a new time limit. One year is measured from the date of decision to prepare an environmental assessment to the publication of a final environmental assessment.

(2) Environmental impact statements within 2 years unless a senior agency official of the lead agency approves a longer period in writing and establishes a new time limit. Two years is measured from the date of the issuance of the notice of intent to the date a record of decision is signed.

(c) The senior agency official may consider the following factors in determining time limits:

(1) Potential for environmental harm.

(2) Size of the proposed action.

(3) State of the art of analytic techniques.

(4) Degree of public need for the proposed action, including the consequences of delay.

(5) Number of persons and agencies affected.

(6) Availability of relevant information.

(7) Other time limits imposed on the agency by law, regulations, or Executive order.

(d) The senior agency official may set overall time limits or limits for each constituent part of the NEPA process, which may include:

(1) Decision on whether to prepare an environmental impact statement (if not already decided).

(2) Determination of the scope of the environmental impact statement.

(3) Preparation of the draft environmental impact statement.

(4) Review of any comments on the draft environmental impact statement from the public and agencies.

(5) Preparation of the final environmental impact statement.

(6) Review of any comments on the final environmental impact statement.

(7) Decision on the action based in part on the environmental impact statement.

(e) The agency may designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(f) State, Tribal, or local agencies or members of the public may request a Federal agency to set time limits.

### § 1501.11 Tiering.

(a) Agencies are encouraged to tier their environmental impact statements and environmental assessments where it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided or not yet ripe at each level of environmental review. Whenever an agency has prepared an environmental impact statement or environmental assessment for a program or policy and then prepares a subsequent statement or environmental assessment on an action included within the entire program or policy (such as a project- or site-specific action), the subsequent statement or environmental assessment need only summarize the issues discussed in the broader statement and incorporate discussions from the broader statement by reference and shall concentrate on the issues specific to the subsequent action. The subsequent document shall state where the earlier document is available. Tiering may also be appropriate for different stages of actions.

(b) Tiering is appropriate when the sequence from an environmental impact statement or environmental assessment is:

(1) From a programmatic, plan, or policy environmental impact statement or environmental assessment to a program, plan, or policy statement or assessment of lesser or narrower scope or to a site-specific statement or assessment.

(2) From an environmental impact statement or environmental assessment on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or assessment at a

later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues that are ripe for decision and exclude from consideration issues already decided or not yet ripe.

### § 1501.12    Incorporation by reference.

Agencies shall incorporate material into environmental documents by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. The incorporated material shall be cited in the document and its content briefly described. No material may be incorporated by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Material based on proprietary data which is itself not available for review and comment shall not be incorporated by reference.

■ 3. Revise part 1502 to read as follows:

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.
1502.1    Environmental impact statement purpose.
1502.2    Implementation.
1502.3    Statutory requirements for statements.
1502.4    Major Federal actions requiring the preparation of environmental impact statements.
1502.5    Timing.
1502.6    Interdisciplinary preparation.
1502.7    Page limits.
1502.8    Writing.
1502.9    Draft, final, and supplemental statements.
1502.10    Recommended format.
1502.11    Cover.
1502.12    Summary.
1502.13    Purpose and need.
1502.14    Alternatives including the proposed action.
1502.15    Affected environment.
1502.16    Environmental consequences.
1502.17    Summary of submitted alternatives, information, and analyses.
1502.18    Certification of submitted alternatives, information, and analyses section.
1502.19    List of preparers.
1502.20    Appendix.
1502.21    Publication of the environmental impact statement.
1502.22    Incomplete or unavailable information.
1502.23    Cost-benefit analysis.
1502.24    Methodology and scientific accuracy.
1502.25    Environmental review and consultation requirements.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, Mar. 7, 1970, as amended by E.O. 11991, 42 FR 26967, May 25, 1977; and E.O. 13807, 82 FR 40463, Aug. 24, 2017.

### § 1502.1    Environmental impact statement purpose.

The primary purpose of an environmental impact statement prepared pursuant to 102(2)(c) is to ensure agencies consider the environmental impacts of their actions in decision making. It shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives which would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is a document that informs. Federal agency decision making.

### § 1502.2    Implementation.

(a) Environmental impact statements shall not be encyclopedic.

(b) Impacts shall be discussed in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be analytic, concise, and no longer than necessary to comply with NEPA and with the regulations in parts 1500 through 1508. Length should be proportional to potential environmental effects and project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of NEPA and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the ultimate agency decision maker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (§ 1506.1).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

### § 1502.3    Statutory requirements for statements.

As required by section 102(2)(C) of NEPA, environmental impact statements are to be included in every Federal agency recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.

### § 1502.4    Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall define the proposal that is the subject of an environmental impact statement based on the statutory authorities for the proposed action. Agencies shall use the criteria for scope (§ 1501.9) to determine which proposal(s) shall be the subject of a particular statement. Agencies shall evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action.

(b) Environmental impact statements may be prepared for programmatic Federal actions such as the adoption of new agency programs. Agencies shall prepare statements on programmatic actions so that they are relevant to the program decision and time them to coincide with meaningful points in agency planning and decision making.

(c) When preparing statements on programmatic actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(1) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(2) Generically, including actions which have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(3) By stage of technological development including Federal or federally assisted research, development or demonstration programs for new technologies which, if applied, could significantly affect the quality of the human environment. Statements on such programs should be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(d) Agencies shall as appropriate employ scoping (§ 1501.9), tiering (§ 1501.11), and other methods listed in §§ 1500.4 and 1500.5 to relate programmatic and narrow actions and to avoid duplication and delay. Agencies may tier their environmental analyses to defer detailed analysis of environmental impacts of specific program elements until such program elements are ripe for

decisions that would involve an irreversible or irretrievable commitment of resources.

### §1502.5 Timing.

An agency should commence preparation of an environmental impact statement as close as practicable to the time the agency is developing or is presented with a proposal so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve practically as an important contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§ 1501.2 and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies the environmental impact statement shall be prepared at the feasibility analysis (go-no go) stage and may be supplemented at a later stage if necessary.

(b) For applications to the agency, appropriate environmental assessments or statements shall be commenced as soon as practicable after the application is received. Federal agencies should work with potential applicants and applicable State, Tribal, and local agencies prior to receipt of the application.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking the draft environmental impact statement shall normally accompany the proposed rule.

### §1502.6 Interdisciplinary preparation.

Environmental impact statements shall be prepared using an interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of NEPA). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1501.9).

### §1502.7 Page limits.

The text of final environmental impact statements (*e.g.*, paragraphs (a)(4) through (6) of § 1502.10) shall be 150 pages or fewer and, for proposals of unusual scope or complexity, shall be 300 pages or fewer unless a senior agency official of the lead agency approves in writing a statement to exceed 300 pages and establishes a new page limit.

### §1502.8 Writing.

Environmental impact statements shall be written in plain language and may use appropriate graphics so that decision makers and the public can readily understand them. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which will be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

### §1502.9 Draft, final, and supplemental statements.

(a) *Generally.* Except for proposals for legislation as provided in § 1506.8 environmental impact statements shall be prepared in two stages and, where necessary, shall be supplemented as provided in paragraph (d)(1) of this section.

(b) *Draft environmental impact statements.* Draft environmental impact statements shall be prepared in accordance with the scope decided upon in the scoping process. The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. The draft statement must meet, to the fullest extent practicable, the requirements established for final statements in section 102(2)(C) of NEPA. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and publish a supplemental draft of the appropriate portion. The agency shall discuss at appropriate points in the draft statement all major points of view on the environmental impacts of the alternatives including the proposed action.

(c) *Final environmental impact statements.* Final environmental impact statements shall address comments as required in part 1503 of this chapter. The agency shall discuss at appropriate points in the final statement any responsible opposing view which was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(d) *Supplemental environmental impact statements.* Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:

(i) The agency makes substantial changes in the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall prepare, publish, and file a supplement to a statement in the same fashion (exclusive of scoping) as a draft and final statement unless alternative procedures are approved by the Council.

(4) May find that changes to the proposed action or new circumstances or information relevant to environmental concerns are not significant and therefore do not require a supplement. The agency should document the finding consistent with its agency NEPA procedures (§ 1507.3), or, if necessary, in a finding of no significant impact supported by an environmental assessment.

### §1502.10 Recommended format.

(a) Agencies shall use a format for environmental impact statements which will encourage good analysis and clear presentation of the alternatives including the proposed action. Agencies should use the following standard format for environmental impact statements unless the agency determines that there is a more effective format for communication:

(1) Cover.

(2) Summary.

(3) Table of contents.

(4) Purpose of and need for action.

(5) Alternatives including proposed action (sections 102(2)(C)(iii) and 102(2)(E) of NEPA).

(6) Affected environment and environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA).

(7) Submitted, alternatives, information, and analyses.

(8) List of preparers.

(9) Appendices (if any).

(b) If an agency uses a different format, it shall include paragraphs (a), (b), (c), (d), (e), (f), (g) and (h) of this section, as further described in §§ 1502.11 through 1502.20, in any appropriate format.

### §1502.11 Cover.

The cover shall not exceed one page and include:

(a) A list of the responsible agencies, including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and, if appropriate, the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction, if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one-paragraph abstract of the statement.

(f) The date by which comments must be received (computed in cooperation with EPA under § 1506.11).

(g) The estimated total cost of preparing the environmental impact statement, including the costs of agency full-time equivalent (FTE) personnel hours, contractor costs, and other direct costs.

### § 1502.12    Summary.

Each environmental impact statement shall contain a summary which adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of disputed issues raised by agencies and the public), and the issues to be resolved (including the choice among alternatives). The summary will normally not exceed 15 pages.

### § 1502.13    Purpose and need.

The statement shall briefly specify the underlying purpose and need for the proposed action. When an agency's statutory duty is to review an application for authorization, the agency shall base the purpose and need on the goals of the applicant and the agency's authority.

### § 1502.14    Alternatives including the proposed action.

This section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the Affected Environment (§ 1502.15) and the Environmental Consequences (§ 1502.16). In this section, agencies shall:

(a) Evaluate reasonable alternatives to the proposed action, and for alternatives which were eliminated from detailed study, briefly discuss the reasons for their having been eliminated.

(b) Discuss each alternative considered in detail including the proposed action so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

### § 1502.15    Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration. The description may be combined with evaluation of the environmental consequences (§ 1502.16) and shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

### § 1502.16    Environmental consequences.

(a) This section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA which are within the scope of the statement and as much of section 102(2)(C)(iii) of NEPA as is necessary to support the comparisons. This section should not duplicate discussions in § 1502.14. The discussion shall include:

(1) The environmental impacts of the proposed action and reasonable alternatives to the proposed action and their significance. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts.

(2) Any adverse environmental effects which cannot be avoided should the proposal be implemented.

(3) The relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

(4) Any irreversible or irretrievable commitments of resources which would be involved in the proposal should it be implemented.

(5) Possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned. (§ 1506.2(d))

(6) Energy requirements and conservation potential of various alternatives and mitigation measures.

(7) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(8) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(9) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(e)).

(10) Where applicable, economic and technical considerations, including the economic benefits of the proposed action.

(b) Economic or social effects by themselves do not require preparation of an environmental impact statement. However, when the agency determines that economic or social and natural or physical environmental effects are interrelated, then the environmental impact statement will discuss and give appropriate consideration to these effects on the human environment.

### § 1502.17    Summary of submitted alternatives, information, and analyses.

The environmental impact statement shall include a summary of all alternatives, information, and analyses submitted by public commenters for consideration by the lead and cooperating agencies in developing the environmental impact statement. Consistent with § 1503.1(a)(3), the lead agency shall invite comment on the completeness of the summary in the draft environmental impact statement.

### § 1502.18    Certification of submitted alternatives, information, and analyses section.

Based on the summary of the submitted alternatives, information, and analyses section, the decision maker for the lead agency shall certify in the record of decision that the agency has considered all of the alternatives, information, and analyses submitted by public commenters for consideration by the lead and cooperating agencies in developing the environmental impact statement. Agency environmental impact statements certified in accordance with this section are entitled to a conclusive presumption that the agency has considered the information included in the submitted alternatives, information, and analyses section.

### § 1502.19    List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement (§§ 1502.6 and 1502.8). Where possible the persons who are responsible for a particular analysis,

including analyses in background papers, shall be identified. Normally the list will not exceed two pages.

### § 1502.20    Appendix.

If an agency prepares an appendix, it shall be published with the environmental impact statement and shall consist of material:

(a) Prepared in connection with an environmental impact statement (as distinct from material which is not so prepared and which is incorporated by reference (§ 1501.12)).

(b) Substantiating any analysis fundamental to the impact statement.

(c) Relevant to the decision to be made.

### § 1502.21    Publication of the environmental impact statement.

Agencies shall publish the entire draft and final environmental impact statements and unchanged statements as provided in § 1503.4(c). The agency shall transmit the entire statement electronically (or in paper copy, if so requested due to economic or other hardship) to:

(a) Any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State, Tribal, or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement any person, organization, or agency which submitted substantive comments on the draft.

### § 1502.22    Incomplete or unavailable information.

(a) When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, the agency shall make clear that such information is lacking.

(b) If the incomplete information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives and the overall costs of obtaining it are not unreasonable, the agency shall include the information in the environmental impact statement.

(c) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain

it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable;

(2) A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

(3) A summary of existing credible scientific evidence which is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and

(4) The agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

(d) For the purposes of this section, "reasonably foreseeable" includes impacts which have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

### § 1502.23    Cost-benefit analysis.

If a cost-benefit analysis relevant to the choice among environmentally different alternatives is being considered for the proposed action, it shall be incorporated by reference or appended to the statement as an aid in evaluating the environmental consequences. To assess the adequacy of compliance with section 102(2)(B) of NEPA the statement shall, when a cost-benefit analysis is prepared, discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, the weighing of the merits and drawbacks of the various alternatives need not be displayed in a monetary cost-benefit analysis and should not be when there are important qualitative considerations. In any event, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, which are likely to be relevant and important to a decision.

### § 1502.24    Methodology and scientific accuracy.

Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources and are not required to undertake new scientific and technical research to inform their analyses.

Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement. An agency may place discussion of methodology in an appendix.

### § 1502.25    Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrent and integrated with environmental impact analyses and related surveys and studies required by all other Federal environmental review laws and Executive orders applicable to the proposed action, including the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*), the National Historic Preservation Act of 1966 (16 U.S.C. 470 *et seq.*), and the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*).

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other authorizations which must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other authorization is necessary, the draft environmental impact statement shall so indicate.

■ 4. Revise part 1503 to read as follows:

## PART 1503—COMMENTING ON ENVIRONMENTAL IMPACT STATEMENTS

Sec.
1503.1    Inviting comments and requesting information and analyses.
1503.2    Duty to comment.
1503.3    Specificity of comments and information.
1503.4    Response to comments.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, Mar. 7, 1970, as amended by E.O. 11991, 42 FR 26967, May 25, 1977.

### § 1503.1    Inviting comments and requesting information and analyses.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved or which is authorized to develop and enforce environmental standards.

(2) Request the comments of:

(i) Appropriate State, Tribal, and local agencies which are authorized to develop and enforce environmental standards;

(ii) State, Tribal, or local governments that may be affected by the proposed action;

(iii) Any agency which has requested that it receive statements on actions of the kind proposed;

(iv) The applicant, if any; and

(v) The public, affirmatively soliciting comments in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed action.

(3) Invite comment specifically on the completeness of the submitted alternatives, information, and analyses section (§ 1502.17).

(b) An agency may request comments on a final environmental impact statement before the final decision. An agency shall request comments and provide a 30-day comment period on the final environmental impact statement's submitted alternatives, information, and analyses section (§ 1502.17). Other agencies or persons may make comments consistent with the time periods provided for under § 1506.11.

(c) An agency shall provide for electronic submission of public comments, with reasonable measures to ensure the comment process is accessible to affected persons.

### § 1503.2   Duty to comment.

Cooperating agencies and agencies that are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority within the time period specified for comment in § 1506.11. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should reply that it has no comment.

### § 1503.3   Specificity of comments and information.

(a) To promote informed decision making, comments on an environmental impact statement or on a proposed action shall be as specific as possible, may address either the adequacy of the statement or the merits of the alternatives discussed or both, and shall provide as much detail as necessary to meaningfully participate and fully inform the agency of the commenter's position. Comments should explain why the issue raised is significant to the consideration of potential environmental impacts and alternatives to the proposed action, as well as economic and employment impacts, and other impacts affecting the quality of the human environment. Comments should reference the corresponding section or

page number of the draft environmental impact statement, propose specific changes to those parts of the statement, where possible, and include or describe the data sources and methodologies supporting the proposed changes.

(b) Comments on the submitted alternatives, information, and analyses section (§ 1502.17) should identify any additional alternatives, information, or analyses not included in the draft environmental impact statement, and shall be as specific as possible. Comments on and objections to this section shall be raised within 30 days of the publication of the notice of availability of the final environmental impact statement. Comments not provided within 30 days shall be considered exhausted and forfeited, consistent with § 1500.3(b).

(c) When a participating agency criticizes a lead agency's predictive methodology, the participating agency should describe the alternative methodology which it prefers and why.

(d) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or authorizations.

(e) When a cooperating agency with jurisdiction by law specifies mitigation measures it considers necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences, the cooperating agency shall cite to its applicable statutory authority.

### § 1503.4   Response to comments.

(a) An agency preparing a final environmental impact statement shall consider substantive comments timely submitted during the public comment period and may respond individually and collectively. In the final environmental impact statement, the agency may:

(1) Modify alternatives including the proposed action.

(2) Develop and evaluate alternatives not previously given serious consideration by the agency.

(3) Supplement, improve, or modify its analyses.

(4) Make factual corrections.

(5) Explain why the comments do not warrant further agency response.

(b) All substantive comments received on the draft statement (or summaries

thereof where the response has been exceptionally voluminous), shall be appended to the final statement or otherwise published.

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs (a)(4) and (5) of this section, agencies may write the changes on errata sheets and attach the responses to the statement instead of rewriting the draft statement. In such cases only the comments, the responses, and the changes and not the final statement need be published (§ 1502.20). The entire document with a new cover sheet shall be filed with the Environmental Protection Agency as the final statement (§ 1506.10).

■ 5. Revise part 1504 to read as follows:

## PART 1504—PRE–DECISIONAL REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

Sec.
1504.1   Purpose.
1504.2   Criteria for referral.
1504.3   Procedure for referrals and response.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; and E.O. 11514, 35 FR 4247, Mar. 7, 1970, as amended by E.O. 11991, 42 FR 26967, May 25, 1977.

### § 1504.1   Purpose.

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.

(b) Under section 309 of the Clean Air Act (42 U.S.C. 7609), the Administrator of the Environmental Protection Agency is directed to review and comment publicly on the environmental impacts of Federal activities, including actions for which environmental impact statements are prepared. If after this review the Administrator determines that the matter is ''unsatisfactory from the standpoint of public health or welfare or environmental quality,'' section 309 directs that the matter be referred to the Council (hereafter ''environmental referrals'').

(c) Under section 102(2)(C) of NEPA (42 U.S.C. 4332(2)(C)), other Federal agencies may produce similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews must be made available to the President, the Council and the public.

## § 1504.2  Criteria for referral.

Environmental referrals should be made to the Council only after concerted, timely (as early as practicable in the process), but unsuccessful attempts to resolve differences with the lead agency. In determining what environmental objections to the matter are appropriate to refer to the Council, an agency should weigh potential adverse environmental impacts, considering:

(a) Possible violation of national environmental standards or policies.

(b) Severity.

(c) Geographical scope.

(d) Duration.

(e) Importance as precedents.

(f) Availability of environmentally preferable alternatives.

(g) Economic and technical considerations, including the economic costs of delaying or impeding the decision making of the agencies involved in the action.

## § 1504.3  Procedure for referrals and response.

(a) A Federal agency making the referral to the Council shall:

(1) Advise the lead agency at the earliest possible time that it intends to refer a matter to the Council unless a satisfactory agreement is reached.

(2) Include such advice whenever practicable in the referring agency's comments on the environmental assessment or draft environmental impact statement.

(3) Identify any essential information that is lacking and request that the lead agency make it available at the earliest possible time.

(4) Send copies of such advice to the Council.

(b) The referring agency shall deliver its referral to the Council no later than 25 days after the lead agency has made the final environmental impact statement available to the Environmental Protection Agency, participating agencies, and the public, and in the case of an environmental assessment, no later than 25 days after the lead agency makes it available. Except when the lead agency grants an extension of this period, the Council will not accept a referral after that date.

(c) The referral shall consist of:

(1) A copy of the letter signed by the head of the referring agency and delivered to the lead agency informing the lead agency of the referral and the reasons for it.

(2) A statement supported by factual evidence leading to the conclusion that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality. The statement shall:

(i) Identify any disputed material facts and incorporate (by reference if appropriate) agreed upon facts;

(ii) Identify any existing environmental requirements or policies which would be violated by the matter;

(iii) Present the reasons for the referral;

(ii) Contain a finding by the agency whether the issue raised is of national importance because of the threat to national environmental resources or policies or for some other reason;

(iii) Review the steps taken by the referring agency to bring its concerns to the attention of the lead agency at the earliest possible time; and

(iv) Give the referring agency's recommendations as to what mitigation alternative, further study, or other course of action (including abandonment of the matter) are necessary to remedy the situation.

(d) No later than 25 days after the referral to the Council, the lead agency may deliver a response to the Council and the referring agency. If the lead agency requests more time and gives assurance that the matter will not go forward in the interim, the Council may grant an extension. The response shall:

(1) Address fully the issues raised in the referral.

(2) Be supported by evidence and explanations, as appropriate.

(3) Give the lead agency's response to the referring agency's recommendations.

(e) Applicants may provide views in writing to the Council no later than the response.

(f) No later than 25 days after receipt of both the referral and any response or upon being informed that there will be no response (unless the lead agency agrees to a longer time), the Council may take one or more of the following actions:

(1) Conclude that the process of referral and response has successfully resolved the problem.

(2) Initiate discussions with the agencies with the objective of mediation with referring and lead agencies.

(3) Obtain additional views and information.

(4) Determine that the issue is not one of national importance and request the referring and lead agencies to pursue their decision process.

(5) Determine that the issue should be further negotiated by the referring and lead agencies and is not appropriate for Council consideration until one or more heads of agencies report to the Council that the agencies' disagreements are irreconcilable.

(6) Publish its findings and recommendations (including where appropriate a finding that the submitted evidence does not support the position of an agency).

(7) When appropriate, submit the referral and the response together with the Council's recommendation to the President for action.

(g) The Council shall take no longer than 60 days to complete the actions specified in paragraph (f)(2), (3), or (5) of this section.

(h) The referral process is not intended to create any private rights of action or to be judicially reviewable because any voluntary resolutions by the agency parties do not represent final agency action and instead are only provisional and dependent on later consistent action by the action agencies.

■ 6. Revise part 1505 to read as follows:

## PART 1505—NEPA AND AGENCY DECISION MAKING

Sec.
1505.1  [Reserved]
1505.2  Record of decision in cases requiring environmental impact statements.
1505.3  Implementing the decision.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, Mar. 7, 1970, as amended by E.O. 11991, 42 FR 26967, May 25, 1977; and E.O. 13807, 82 FR 40463, Aug. 24, 2017.

## § 1505.1  [Reserved]

## § 1505.2  Record of decision in cases requiring environmental impact statements.

At the time of its decision (§ 1506.11) or, if appropriate, its recommendation to Congress, each agency shall prepare and timely publish a concise public record of decision or joint record of decision. The record, which each agency may integrate into any other record it prepares, shall:

(a) State the decision.

(b) Identify all alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives which were considered to be environmentally preferable. An agency may discuss preferences among alternatives based on relevant factors including economic and technical considerations and agency statutory missions. An agency shall identify and discuss all such factors, including any essential considerations of national policy which were balanced by the agency in making its decision and state how those considerations entered into its decision.

(c) State whether the agency has adopted all practicable means to avoid or minimize environmental harm from the alternative selected, and if not, why the agency did not. The agency shall adopt and summarize, where applicable, a monitoring and enforcement program

for any enforceable mitigation requirements or commitments.

(d) Address any comments or objections received on the final environmental impact statement's submitted alternatives, information, and analyses section.

(e) Include the decision maker's certification regarding the agency's consideration of the submitted alternatives, information, and analyses submitted by public commenters (§§ 1502.17 and 1502.18).

### § 1505.3  Implementing the decision.

Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation (§ 1505.2(c)) and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency. The lead agency shall:

(a) Include appropriate conditions in grants, permits or other approvals.

(b) Condition funding of actions on mitigation.

(c) Upon request, inform cooperating or participating agencies on progress in carrying out mitigation measures which they have proposed and which were adopted by the agency making the decision.

(d) Upon request, publish the results of relevant monitoring.

■ 7. Revise part 1506 to read as follows:

## PART 1506—OTHER REQUIREMENTS OF NEPA

Sec.
1506.1   Limitations on actions during NEPA process.
1506.2   Elimination of duplication with State, Tribal, and local procedures.
1506.3   Adoption.
1506.4   Combining documents.
1506.5   Agency responsibility for environmental documents.
1506.6   Public involvement.
1506.7   Further guidance.
1506.8   Proposals for legislation.
1506.9   Proposals for regulations.
1506.10   Filing requirements.
1506.11   Timing of agency action.
1506.12   Emergencies.
1506.13   Effective date.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, Mar. 7, 1970, as amended by E.O. 11991, 42 FR 26967, May 25, 1977; and E.O. 13807, 82 FR 40463, Aug. 24, 2017.

### § 1506.1  Limitations on actions during NEPA process.

(a) Except as provided in paragraphs (b) and (c) of this section, until an agency issues a finding of no significant impact, as provided in § 1501.6, or record of decision, as provided in § 1505.2, no action concerning the proposal may be taken which would:

(1) Have an adverse environmental impact; or

(2) Limit the choice of reasonable alternatives.

(b) If any agency is considering an application from a non-Federal entity, and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to ensure that the objectives and procedures of NEPA are achieved. This section does not preclude development by applicants of plans or designs or performance of other activities necessary to support an application for Federal, State, Tribal, or local permits or assistance. An agency considering a proposed action for Federal funding may authorize such activities, including, but not limited to, acquisition of interests in land (*e.g.,* fee simple, rights-of-way, and conservation easements), purchase of long lead-time equipment, and purchase options made by applicants.

(c) While work on a required programmatic environmental impact statement or environmental assessment is in progress and the action is not covered by an existing programmatic statement, agencies shall not undertake in the interim any major Federal action covered by the program which may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental impact statement; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

### § 1506.2  Elimination of duplication with State, Tribal, and local procedures.

(a) Federal agencies are authorized to cooperate with State, Tribal, and local agencies that are responsible for preparing environmental documents, including those prepared pursuant to section 102(2)(D) of NEPA.

(b) Agencies shall cooperate with State, Tribal, and local agencies to the fullest extent practicable to reduce duplication between NEPA and State, Tribal, and local requirements, including through use of environmental studies, analysis, and decisions conducted in support of Federal, State, Tribal, or local environmental reviews or authorization decisions, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall to the fullest extent practicable include:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) Agencies shall cooperate with State, Tribal, and local agencies to the fullest extent practicable to reduce duplication between NEPA and comparable State, Tribal, and local requirements, unless the agencies are specifically barred from doing so by some other law. Except for cases covered by paragraph (a) of this section, such cooperation shall include, to the fullest extent practicable, joint environmental impact statements. In such cases one or more Federal agencies and one or more State, Tribal, or local agencies shall be joint lead agencies. Where State or Tribal laws or local ordinances have environmental impact statement or similar requirements in addition to but not in conflict with those in NEPA, Federal agencies may cooperate in fulfilling these requirements, as well as those of Federal laws, so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State, Tribal, or local planning processes, environmental impact statements shall discuss any inconsistency of a proposed action with any approved State, Tribal, or local plan or law (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law. While the statement should discuss any inconsistencies, NEPA does not require reconciliation.

### § 1506.3  Adoption.

(a) An agency may adopt a Federal environmental assessment, draft or final environmental impact statement, or portion thereof, provided that the assessment, statement, or portion thereof meets the standards for an adequate assessment or statement under the regulations in parts 1500 through 1508.

(b) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the agency adopting another agency's statement shall republish it as a final statement.

Otherwise, the adopting agency shall treat the statement as a draft and republish it (except as provided in paragraph (c) of this section), consistent with § 1506.10.

(c) A cooperating agency may adopt in its record of decision without republishing the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(d) If the actions covered by the original environmental assessment and the proposed action are substantially the same, an agency may adopt another agency's environmental assessment in its finding of no significant impact and provide notice consistent with § 1501.6.

(e) The adopting agency shall specify if one of the following circumstances are present:

(1) The agency is adopting an assessment or statement that is not final within the agency that prepared it.

(2) The action assessed in the assessment or statement is the subject of a referral under part 1504.

(3) The assessment or statement's adequacy is the subject of a judicial action that is not final.

(f) An agency may adopt another agency's determination that a categorical exclusion applies to a proposed action if the adopting agency's proposed action is substantially the same.

### § 1506.4   Combining documents.

Agencies should combine, to the fullest extent practicable, any environmental document with any other agency document to reduce duplication and paperwork.

### § 1506.5   Agency responsibility for environmental documents.

(a) *Information.* If an agency requires an applicant to submit environmental information for possible use by the agency in preparing an environmental document, then the agency should assist the applicant by outlining the types of information required. The agency shall independently evaluate the information submitted and shall be responsible for its accuracy. If the agency chooses to use the information submitted by the applicant in the environmental document, either directly or by reference, then the names of the persons responsible for the independent evaluation shall be included in the list of preparers (§ 1502.19). It is the intent of this paragraph that acceptable work not be redone, but that it be verified by the agency.

(b) *Environmental assessments.* If an agency permits an applicant to prepare an environmental assessment, the agency, besides fulfilling the requirements of paragraph (a) of this section, shall make its own evaluation of the environmental issues and take responsibility for the scope and content of the environmental assessment.

(c) *Environmental impact statements.* Except as provided in §§ 1506.2 and 1506.3, the lead agency, a contractor or applicant under the direction of the lead agency, or a cooperating agency, where appropriate (§ 1501.8(b)), may prepare an environmental impact statement pursuant to the requirements of NEPA.

(1) If a contractor or applicant prepares the document, the responsible Federal official shall provide guidance, participate in its preparation, independently evaluate it prior to its approval, and take responsibility for its scope and contents.

(2) Nothing in this section is intended to prohibit any agency from requesting any person, including the applicant, to submit information to it or to prohibit any person from submitting information to any agency for use in preparing environmental documents.

### § 1506.6   Public involvement.

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures (§ 1507.3).

(b) Provide public notice of NEPA-related hearings, public meetings, and other opportunities for public engagement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions.

(1) In all cases, the agency shall notify those who have requested notice on an individual action.

(2) In the case of an action with effects of national concern, notice shall include publication in the **Federal Register**. An agency may notify organizations that have requested regular notice. Agencies shall maintain a list of such organizations.

(3) In the case of an action with effects primarily of local concern, the notice may include:

(i) Notice to State and local agencies that may be interested or affected by the proposed action.

(ii) Notice to affected Tribal governments.

(iii) Following the affected State or Tribe's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property.

(ix) Posting of notice on and off site in the area where the action is to be located.

(x) Notice through electronic media (*e.g.,* a project or agency website, email, or social media). For actions occurring in whole or part in an area with limited access to high-speed internet, public notification may not be limited to solely electronic methods.

(c) Hold or sponsor public hearings, public meetings, or other opportunities for public engagement whenever appropriate or in accordance with statutory requirements applicable to the agency. Agencies may conduct public hearings and public meetings by means of electronic communication except where another format is required by law.

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act, as amended (5 U.S.C. 552).

### § 1506.7   Further guidance.

The Council may provide further guidance concerning NEPA and its procedures consistent with Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects (August 5, 2017), Executive Order 13891, Promoting the Rule of Law Through Improved Agency Guidance Documents (October 9, 2019), and any other applicable Executive orders.

### § 1506.8   Proposals for legislation.

(a) When developing or providing significant cooperation and support in the development of legislation, agencies shall integrate the NEPA process for proposals for legislation significantly affecting the quality of the human environment with the legislative process of the Congress. The test for significant cooperation is whether the proposal is in fact predominantly that of the agency rather than another source. Drafting

does not by itself constitute significant cooperation. Only the agency which has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

(b) A legislative environmental impact statement is the detailed statement required by law to be included in a recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days later in order to allow time for completion of an accurate statement that can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(c) Preparation of a legislative environmental impact statement shall conform to the requirements of the regulations in parts 1500 through 1508, except as follows:

(1) There need not be a scoping process.

(2) Agencies shall prepare the legislative statement in the same manner as a draft environmental impact statement and need not prepare a final statement unless any of the following conditions exist. In such cases, the agency shall prepare and publish the statements consistent with §§ 1503.1 and 1506.11:

(i) A Congressional committee with jurisdiction over the proposal has a rule requiring both draft and final environmental impact statements.

(ii) The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C. 1271 *et seq.*) and the Wilderness Act (16 U.S.C. 1131 *et seq.*)).

(iii) Legislative approval is sought for Federal or federally assisted construction or other projects which the agency recommends be located at specific geographic locations. For proposals requiring an environmental impact statement for the acquisition of space by the General Services Administration, a draft statement shall accompany the Prospectus or the 11(b) Report of Building Project Surveys to the Congress, and a final statement shall be completed before site acquisition.

(iv) The agency decides to prepare draft and final statements.

(d) Comments on the legislative statement shall be given to the lead agency which shall forward them along with its own responses to the Congressional committees with jurisdiction.

### § 1506.9  Proposals for regulations.

(a) Where the proposal for major Federal action is the promulgation of a rule or regulation, analyses prepared pursuant to other statutory or Executive order requirements may serve as the functional equivalent of the EIS and be sufficient to comply with NEPA.

(b) To determine that an analysis serves as the functional equivalent of an EIS, an agency shall find that:

(1) There are substantive and procedural standards that ensure full and adequate consideration of environmental issues;

(2) There is public participation before a final alternative is selected; and

(3) A purpose of the analysis that the agency is conducting is to examine environmental issues.

### § 1506.10  Filing requirements.

(a) Environmental impact statements together with comments and responses shall be filed with the Environmental Protection Agency, Office of Federal Activities, consistent with EPA's procedures.

(b) Statements shall be filed with the EPA no earlier than they are also transmitted to participating agencies and made available to the public. EPA may issue guidelines to agencies to implement its responsibilities under this section and § 1506.11.

### § 1506.11  Timing of agency action.

(a) The Environmental Protection Agency shall publish a notice in the **Federal Register** each week of the environmental impact statements filed since its prior notice. The minimum time periods set forth in this section shall be calculated from the date of publication of this notice.

(b) Unless otherwise provided by law, including statutory provisions for combining a final environmental impact statement and record of decision, Federal agencies may not make or issue a record of decision under § 1505.2 for the proposed action until the later of the following dates:

(1) 90 days after publication of the notice described above in paragraph (a) of this section for a draft environmental impact statement.

(2) 30 days after publication of the notice described above in paragraph (a) of this section for a final environmental impact statement.

(c) An agency may make an exception to the rule on timing set forth in paragraph (b) of this section for a proposed action in the following circumstances:

(1) Some agencies have a formally established appeal process which allows other agencies or the public to take appeals on a decision and make their views known, after publication of the final environmental impact statement. In such cases, where a real opportunity exists to alter the decision, the decision may be made and recorded at the same time the environmental impact statement is published. This means that the period for appeal of the decision and the 30-day period set forth in paragraph (b)(2) of this section may run concurrently. In such cases, the environmental impact statement shall explain the timing and the public's right of appeal and provide notification consistent with § 1506.10.

(2) An agency engaged in rulemaking under the Administrative Procedure Act or other statute for the purpose of protecting the public health or safety may waive the time period in paragraph (b)(2) of this section, publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement and provide notification consistent with § 1506.10, as described in paragraph (a) of this section.

(d) If an agency files the final environmental impact statement within 90 days of the filing of the draft environmental impact statement with the Environmental Protection Agency, the decision-making period and the 90-day period may run concurrently. However, subject to paragraph (e) of this section, agencies shall allow at least 45 days for comments on draft statements.

(e) The lead agency may extend the minimum periods in paragraph (b) of this section and provide notification consistent with § 1506.10. The Environmental Protection Agency may upon a showing by the lead agency of compelling reasons of national policy reduce the minimum periods and may upon a showing by any other Federal agency of compelling reasons of national policy also extend the minimum periods, but only after consultation with the lead agency. The lead agency may modify the minimum periods when necessary to comply with other specific statutory requirements. (§ 1507.3(e)(2)) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

**§ 1506.12   Emergencies.**

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of the regulations in parts 1500 through 1508, the Federal agency taking the action should consult with the Council about alternative arrangements for compliance with section 102(2)(C) of NEPA. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

**§ 1506.13   Effective date.**

The regulations in parts 1500 through 1508 apply to any NEPA process begun after [EFFECTIVE DATE OF FINAL RULE]. An agency may apply these regulations to ongoing activities and environmental documents begun before [EFFECTIVE DATE OF FINAL RULE].

■ 8. Revise part 1507 to read as follows:

**PART 1507—AGENCY COMPLIANCE**

Sec.
1507.1   Compliance.
1507.2   Agency capability to comply.
1507.3   Agency NEPA procedures.
1507.4   Agency NEPA program information.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, Mar. 7, 1970, as amended by E.O. 11991, 42 FR 26967, May 25, 1977; and E.O. 13807, 82 FR 40463, Aug. 24, 2017.

**§ 1507.1   Compliance.**

All agencies of the Federal Government shall comply with the regulations in parts 1500 through 1508.

**§ 1507.2   Agency capability to comply.**

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements of NEPA and the regulations in parts 1500 through 1508. Such compliance may include use of the resources of other agencies, applicants, and other participants in the NEPA process, but the using agency shall itself have sufficient capability to evaluate what others do for it and account for the contributions of others. Agencies shall:

(a) Fulfill the requirements of section 102(2)(A) of NEPA to utilize a systematic, interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making which may have an impact on the human environment. Agencies shall designate a senior agency official to be responsible for overall review of agency NEPA compliance.

(b) Identify methods and procedures required by section 102(2)(B) of NEPA to ensure that presently unquantified environmental amenities and values may be given appropriate consideration.

(c) Prepare adequate environmental impact statements pursuant to section 102(2)(C) of NEPA and cooperate on the development of statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(d) Study, develop, and describe alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources. This requirement of section 102(2)(E) of NEPA extends to all such proposals, not just the more limited scope of section 102(2)(C)(iii) of NEPA where the discussion of alternatives is confined to impact statements.

(e) Comply with the requirements of section 102(2)(H) of NEPA that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

(f) Fulfill the requirements of sections 102(2)(F), 102(2)(G), and 102(2)(I), of NEPA, Executive Order 11514, Protection and Enhancement of Environmental Quality, section 2, as amended by Executive Order 11991, Relating to Protection and Enhancement of Environmental Quality, and Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting for Infrastructure Projects.

**§ 1507.3   Agency NEPA procedures.**

(a) No more than 12 months after [PUBLICATION DATE OF FINAL RULE] in the **Federal Register**, or 9 months after the establishment of an agency, whichever comes later, each agency shall develop or revise, as necessary, proposed procedures to implement the regulations in parts 1500 through 1508, including to eliminate any inconsistencies with these regulations. When the agency is a department, major subunits are encouraged (with the consent of the department) to adopt their own procedures. Except as otherwise provided by law or for agency efficiency, agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in these regulations.

(1) Each agency shall consult with the Council while developing or revising its proposed procedures and before publishing them in the **Federal Register** for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants.

(2) Agencies shall provide an opportunity for public review and review by the Council for conformity with the Act and the regulations in parts 1500 through 1508 before adopting their final procedures. The Council shall complete its review within 30 days of the receipt of the proposed final procedures. Once in effect, the agency shall publish its NEPA procedures and ensure that they are readily available to the public.

(b) Agencies shall adopt, as necessary, agency NEPA procedures to improve agency efficiency and ensure that decisions are made in accordance with the Act's procedural requirements. Such procedures shall include, but not be limited to:

(1) Implementing procedures under section 102(2) of NEPA to achieve the requirements of sections 101 and 102(1).

(2) Designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process corresponds with them.

(3) Requiring that relevant environmental documents, comments, and responses be part of the record in formal rulemaking or adjudicatory proceedings.

(4) Requiring that relevant environmental documents, comments, and responses accompany the proposal through existing agency review processes so that decision makers use the statement in making decisions.

(5) Requiring that the alternatives considered by the decision maker are encompassed by the range of alternatives discussed in the relevant environmental documents and that the decision maker consider the alternatives described in the environmental impact statement. If another decision document accompanies the relevant environmental documents to the decision maker, agencies are encouraged to make available to the public before the decision is made any part of that document that relates to the comparison of alternatives.

(6) Requiring the combination of environmental documents with other agency documents, and may include designation of analyses or processes that shall serve the function of agency compliance with NEPA and the regulations in parts 1500 through 1508. To determine that an analysis individually or analyses in the aggregate serve as the functional equivalent of an EIS, an agency shall find that:

(i) There are substantive and procedural standards that ensure full and adequate consideration of environmental issues;

(ii) There is public participation before a final alternative is selected; and

(iii) A purpose of the analysis that the agency is conducting is to examine environmental issues.

(c) Agency procedures may include identification of actions that are not subject to NEPA, including:

(1) Non-major Federal actions;

(2) Actions that are non-discretionary actions, in whole or in part;

(3) Actions expressly exempt from NEPA under another statute;

(4) Actions for which compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute; and

(5) Actions for which compliance with NEPA would be inconsistent with Congressional intent due to the requirements of another statute.

(d) Agency procedures shall comply with the regulations in parts 1500 through 1508 except where compliance would be inconsistent with statutory requirements and shall include:

(1) Those procedures required by §§ 1501.2(b)(4) (assistance to applicants), and 1506.6(e) (status information).

(2) Specific criteria for and identification of those typical classes of action:

(i) Which normally do require environmental impact statements.

(ii) Which normally do not require either an environmental impact statement or an environmental assessment and do not have a significant effect on the human environment (categorical exclusions (§ 1501.4)). Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect. Agency NEPA procedures shall identify where documentation of a categorical exclusion determination is required.

(iii) Which normally require environmental assessments but not necessarily environmental impact statements.

(3) Procedures for introducing a supplement to an environmental assessment or environmental impact statement into its formal administrative record, if such a record exists.

(e) Agency procedures may:

(1) Include specific criteria for providing limited exceptions to the provisions of the regulations in parts 1500 through 1508 for classified proposals. These are proposed actions that are specifically authorized under criteria established by an Executive Order or statute to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive Order or statute. Agencies may safeguard and restrict from public dissemination environmental assessments and environmental impact statements that address classified proposals in accordance with agencies' own regulations applicable to classified information. Agencies should organize these documents so that classified portions are included as annexes, so that the agencies can make the unclassified portions available to the public.

(2) Provide for periods of time other than those presented in § 1506.11 when necessary to comply with other specific statutory requirements.

(3) Provide that where there is a lengthy period between the agency's decision to prepare an environmental impact statement and the time of actual preparation, the agency may publish the notice of intent required by § 1501.9 at a reasonable time in advance of preparation of the draft statement. Agency procedures shall provide for publication of supplemental notices to inform the public of a pause in its preparation of an environmental impact statement and for any agency decision to withdraw its notice of intent to prepare an environmental impact statement.

(4) Adopt procedures to combine its environmental assessment process with its scoping process.

(5) Provide for a process where the agency may consult with and apply a categorical exclusion listed in another agency's NEPA procedures to its proposed action by establishing a process that ensures application of the categorical exclusion is appropriate.

### § 1507.4  Agency NEPA program information.

(a) To allow agencies and the public to efficiently and effectively access information about NEPA reviews, agencies shall provide for agency websites or other means to make available environmental documents, relevant notices, and other relevant information for use by agencies, applicants, and interested persons. Such means of publication may include:

(1) Agency planning and environmental documents that guide agency management and provide for public involvement in agency planning processes;

(2) A directory of pending and final environmental documents;

(3) Agency policy documents, orders, terminology, and explanatory materials regarding agency decision-making processes;

(4) Agency planning program information, plans, and planning tools; and

(5) A database searchable by geographic information, document status, document type, and project type.

(b) Agencies shall provide for efficient and effective interagency coordination of their environmental program websites, including use of shared databases or application programming interface, in their implementation of NEPA and related authorities.

■ 9. Revise part 1508 to read as follows:

## PART 1508—DEFINITIONS

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, Mar. 7, 1970, as amended by E.O. 11991, 42 FR 26967, May 25, 1977; and E.O. 13807, 82 FR 40463, Aug. 24, 2017.

### § 1508.1  Definitions.

The following definitions apply to the regulations in parts 1500 through 1508. Federal agencies shall use these terms uniformly throughout the Federal Government.

(a) *Act* or *NEPA* means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*).

(b) *Affecting* means will or may have an effect on.

(c) *Authorization* means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law in order to implement a proposed action.

(d) *Categorical exclusion* means a category of actions which the agency has determined in its agency NEPA procedures (§ 1507.3) normally do not have a significant effect on the human environment.

(e) *Cooperating agency* means any Federal agency (and a State, Tribal, or local agency with agreement of the lead agency) other than a lead agency which has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action significantly affecting the quality of the human environment.

(f) *Council* means the Council on Environmental Quality established by title II of the Act.

(g) *Effects* or *impacts* means effects of the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to

the proposed action or alternatives. Effects include reasonably foreseeable effects that occur at the same time and place and may include reasonably foreseeable effects that are later in time or farther removed in distance.

(1) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. Effects may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

(2) A ''but for'' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should not be considered significant if they are remote in time, geographically remote, or the product of a lengthy causal chain. Effects do not include effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action. Analysis of cumulative effects is not required.

(h) *Environmental assessment* means a concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an environmental impact statement or finding of no significant impact, as provided in § 1501.6.

(i) *Environmental document* means an environmental assessment, environmental impact statement, finding of no significant impact, or notice of intent.

(j) *Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of NEPA.

(k) *Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. It also includes, for purposes of the regulations in parts 1500 through 1508, States, units of general local government, and Tribal governments assuming NEPA responsibilities from a Federal agency pursuant to statute.

(l) *Finding of no significant impact* means a document by a Federal agency briefly presenting the reasons why an action, not otherwise categorically excluded (§ 1501.4), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.

(m) *Human environment* means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment. (See the definition of ''effects.'')

(n) *Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

(o) *Lead agency* means the agency or agencies, in the case of joint lead agencies, preparing or having taken primary responsibility for preparing the environmental impact statement.

(p) *Legislation* means a bill or legislative proposal to Congress developed by or with the significant cooperation and support of a Federal agency, but does not include requests for appropriations or legislation recommended by the President.

(q) *Major Federal action* or *action* means an action subject to Federal control and responsibility with effects that may be significant. Major Federal action does not include non-discretionary decisions made in accordance with the agency's statutory authority or activities that do not result in final agency action under the Administrative Procedure Act. Major Federal action also does not include non-Federal projects with minimal Federal funding or minimal Federal involvement where the agency cannot control the outcome of the project.

(1) Major Federal actions may include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§ 1506.8). Actions do not include funding assistance solely in the form of general revenue sharing funds with no Federal agency control over the subsequent use of such funds. Actions do not include loans, loan guarantees, or other forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of the action. Actions do not include farm ownership and operating loan guarantees by the Farm Service Agency pursuant to 7 U.S.C. 1925 and 1941 through 1949 and business loan guarantees by the Small Business Administration pursuant to 15 U.S.C. 636(a), 636(m), and 695 through 697f. Actions do not include bringing judicial or administrative civil or criminal enforcement actions.

(2) Major Federal actions tend to fall within one of the following categories:

(i) Adoption of official policy, such as rules, regulations, and interpretations adopted pursuant to the Administrative Procedure Act, 5 U.S.C. 551 *et seq.;* implementation of treaties and international conventions or agreements; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(ii) Adoption of formal plans, such as official documents prepared or approved by Federal agencies which prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(iii) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(iv) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities.

(r) *Matter* includes for purposes of part 1504:

(1) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(2) With respect to all other agencies, any proposed major Federal action to which section 102(2)(C) of NEPA applies.

(s) *Mitigation* means measures that avoid, minimize, or compensate for reasonably foreseeable impacts to the human environment caused by a proposed action as described in an environmental document or record of decision and that have a nexus to the effects of a proposed action. While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation. Mitigation includes:

(1) Avoiding the impact altogether by not taking a certain action or parts of an action.

(2) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(3) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(4) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(5) Compensating for the impact by replacing or providing substitute resources or environments.

(t) *NEPA process* means all measures necessary for compliance with the

requirements of section 2 and title I of NEPA.

(u) *Notice of intent* means a public notice that an agency will prepare and consider an environmental impact statement.

(v) *Page* means 500 words and does not include explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information.

(w) *Participating agency* means a Federal, State, Tribal, or local agency participating in an environmental review or authorization of an action.

(x) *Proposal* means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects. A proposal may exist in fact as well as by agency declaration that one exists.

(y) *Publish* and *publication* mean methods found by the agency to efficiently and effectively make environmental documents and information available for review by interested persons, including electronic publication, and adopted by agency NEPA procedures pursuant to § 1507.3.

(z) *Reasonable alternatives* means a reasonable range of alternatives that are technically and economically feasible, meet the purpose and need for the proposed action, and, where applicable, meet the goals of the applicant.

(aa) *Reasonably foreseeable* means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

(bb) *Referring agency* means the Federal agency that has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

(cc) *Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§ 1501.11).

(dd) *Senior agency official* means an official of assistant secretary rank or higher, or equivalent, that is designated for agency NEPA compliance, including resolving implementation issues and representing the agency analysis of the effects of agency actions on the human environment in agency decision-making processes.

(ee) *Special expertise* means statutory responsibility, agency mission, or related program experience.

(ff) *Tiering* refers to the coverage of general matters in broader environmental impact statements or environmental assessments (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basin-wide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

[FR Doc. 2019–28106 Filed 1–9–20; 4:15 pm]

**BILLING CODE 3225–F0–P**

Exhibit 3 to Declaration of Amy Coyle

## COUNCIL ON ENVIRONMENTAL QUALITY

**40 CFR Parts 1500, 1501, 1502, 1503, 1504, 1505, 1506, 1507, 1508, 1515, 1516, 1517, and 1518**

[CEQ–2019–0003]

RIN 0331–AA03

## Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act

**AGENCY:** Council on Environmental Quality.

**ACTION:** Final rule.

**SUMMARY:** The Council on Environmental Quality (CEQ) issues this final rule to update its regulations for Federal agencies to implement the National Environmental Policy Act (NEPA). CEQ has not comprehensively updated its regulations since their promulgation in 1978, more than four decades ago. This final rule comprehensively updates, modernizes, and clarifies the regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies in connection with proposals for agency action. The rule will improve interagency coordination in the environmental review process, promote earlier public involvement, increase transparency, and enhance the participation of States, Tribes, and localities. The amendments will advance the original goals of the CEQ regulations to reduce paperwork and delays, and promote better decisions consistent with the national environmental policy set forth in section 101 of NEPA.

**DATES:** This is a major rule subject to congressional review. The effective date is September 14, 2020. However, if congressional review has changed the effective date, CEQ will publish a document in the **Federal Register** to establish the actual effective date or to terminate the rule.

**ADDRESSES:** CEQ has established a docket for this action under docket number CEQ–2019–0003. All documents in the docket are listed on *www.regulations.gov.*

**FOR FURTHER INFORMATION CONTACT:** Viktoria Z. Seale, Chief of Staff and General Counsel, 202–395–5750, *NEPA-Update@ceq.eop.gov.*

**SUPPLEMENTARY INFORMATION:**

## Table of Contents

I. Background
    A. National Environmental Policy Act
    B. Council on Environmental Quality Regulations, Guidance, and Reports
    1. Regulatory History
    2. CEQ Guidance and Reports
    3. Environmental Impact Statement Timelines and Page Count Reports
    C. Judicial Review of Agency NEPA Compliance
    D. Statutory Developments
    E. Presidential Directives
    F. Advance Notice of Proposed Rulemaking
    G. Notice of Proposed Rulemaking
II. Summary of Final Rule
    A. Changes Throughout Parts 1500–1508
    B. Revisions To Update the Purpose, Policy, and Mandate (Part 1500)
    1. Purpose and Policy (§ 1500.1)
    2. Remove and Reserve Policy (§ 1500.2)
    3. NEPA Compliance (§ 1500.3)
    4. Reducing Paperwork and Delay (§§ 1500.4 and 1500.5)
    5. Agency Authority (§ 1500.6)
    C. Revisions to NEPA and Agency Planning (Part 1501)
    1. NEPA Thresholds (§ 1501.1)
    2. Apply NEPA Early in the Process (§ 1501.2)
    3. Determine the Appropriate Level of NEPA Review (§ 1501.3)
    4. Categorical Exclusions (§ 1501.4)
    5. Environmental Assessments (§ 1501.5)
    6. Findings of No Significant Impact (§ 1501.6)
    7. Lead and Cooperating Agencies (§§ 1501.7 and 1501.8)
    8. Scoping (§ 1501.9)
    9. Time Limits (§ 1501.10)
    10. Tiering (§ 1501.11)
    11. Incorporation by Reference (§ 1501.12)
    D. Revisions to Environmental Impact Statements (Part 1502)
    1. Purpose of Environmental Impact Statement (§ 1502.1)
    2. Implementation (§ 1502.2)
    3. Statutory Requirements for Statements (§ 1502.3)
    4. Major Federal Actions Requiring the Preparation of Environmental Impact Statements (§ 1502.4)
    5. Timing (§ 1502.5)
    6. Interdisciplinary Preparation (§ 1502.6)
    7. Page Limits (§ 1502.7)
    8. Writing (§ 1502.8)
    9. Draft, Final and Supplemental Statements (§ 1502.9)
    10. Recommended Format (§ 1502.10)
    11. Cover (§ 1502.11)
    12. Summary (§ 1502.12)
    13. Purpose and Need (§ 1502.13)
    14. Alternatives Including the Proposed Action (§ 1502.14)
    15. Affected Environment (§ 1502.15)
    16. Environmental Consequences (§ 1502.16)
    17. Submitted Alternatives, Information, and Analyses (§ 1502.17)
    18. List of Preparers (§ 1502.18)
    19. Appendix (§ 1502.19)
    20. Publication of the Environmental Impact Statement (§ 1502.20)
    21. Incomplete or Unavailable Information (§ 1502.21)
    22. Cost-Benefit Analysis (§ 1502.22)
    23. Methodology and Scientific Accuracy (§ 1502.23)
    24. Environmental Review and Consultation Requirements (§ 1502.24)
    E. Revisions to Commenting on Environmental Impact Statements (Part 1503)
    1. Inviting Comments and Requesting Information and Analyses (§ 1503.1)
    2. Duty To Comment (§ 1503.2)
    3. Specificity of Comments and Information (§ 1503.3)
    4. Response to Comments (§ 1503.4)
    F. Revisions to Pre-Decisional Referrals to the Council of Proposed Federal Actions Determined To Be Environmentally Unsatisfactory (Part 1504)
    1. Purpose (§ 1504.1)
    2. Criterion for Referral (§ 1504.2)
    3. Procedure for Referrals and Response (§ 1504.3)
    G. Revisions to NEPA and Agency Decision Making (Part 1505)
    1. Remove and Reserve Agency Decisionmaking Procedures (§ 1505.1)
    2. Record of Decision in Cases Requiring Environmental Impact Statements (§ 1505.2)
    3. Implementing the Decision (§ 1505.3)
    H. Revisions to Other Requirements of NEPA (Part 1506)
    1. Limitations on Actions During NEPA Process (§ 1506.1)
    2. Elimination of Duplication With State, Tribal, and Local Procedures (§ 1506.2)
    3. Adoption (§ 1506.3)
    4. Combining Documents (§ 1506.4)
    5. Agency Responsibility for Environmental Documents (§ 1506.5)
    6. Public Involvement (§ 1506.6)
    7. Further Guidance (§ 1506.7)
    8. Proposals for Legislation (§ 1506.8)
    9. Proposals for Regulations (§ 1506.9)
    10. Filing Requirements (§ 1506.10)
    11. Timing of Agency Action (§ 1506.11)
    12. Emergencies (§ 1506.12)
    13. Effective Date (§ 1506.13)
    I. Revisions to Agency Compliance (Part 1507)
    1. Compliance (§ 1507.1)
    2. Agency Capability To Comply (§ 1507.2)
    3. Agency NEPA Procedures (§ 1507.3)
    4. Agency NEPA Program Information (§ 1507.4)
    J. Revisions to Definitions (Part 1508)
    1. Clarifying the Meaning of "Act"
    2. Definition of "Affecting"
    3. New Definition of "Authorization"
    4. Clarifying the Meaning of "Categorical Exclusion"
    5. Clarifying the Meaning of "Cooperating Agency"
    6. Definition of "Council"
    7. Definition of "Cumulative Impact" and Clarifying the Meaning of "Effects"
    8. Clarifying the Meaning of "Environmental Assessment"
    9. Clarifying the Meaning of "Environmental Document"
    10. Clarifying the Meaning of "Environmental Impact Statement"
    11. Clarifying the Meaning of "Federal Agency"
    12. Clarifying the Meaning of "Finding of No Significant Impact"
    13. Clarifying the Meaning of "Human Environment"
    14. Definition of "Jurisdiction by Law"
    15. Clarifying the Meaning of "Lead Agency"

16. Clarifying the Meaning of "Legislation"
17. Clarifying the Meaning of "Major Federal Action"
18. Definition of "Matter"
19. Clarifying the Meaning of "Mitigation"
20. Definition of "NEPA Process"
21. Clarifying the Meaning of "Notice of Intent"
22. New Definition of "Page"
23. New Definition of "Participating Agency"
24. Clarifying the Meaning of "Proposal"
25. New Definition of "Publish and Publication"
26. New Definition of "Reasonable Alternatives"
27. New Definition of "Reasonably Foreseeable"
28. Definition of "Referring Agency"
29. Definition of "Scope"
30. New Definition of "Senior Agency Official"
31. Definition of "Special Expertise"
32. Striking the Definition of "Significantly"
33. Clarifying the Meaning of "Tiering"
K. CEQ Guidance Documents
III. Rulemaking Analyses and Notices
A. Executive Order 12866, Regulatory Planning and Review and Executive Order 13563, Improving Regulation and Regulatory Review
B. Executive Order 13771, Reducing Regulation and Controlling Regulatory Costs
C. Regulatory Flexibility Act and Executive Order 13272, Proper Consideration of Small Entities in Agency Rulemaking
D. Congressional Review Act
E. National Environmental Policy Act
F. Endangered Species Act
G. Executive Order 13132, Federalism
H. Executive Order 13175, Consultation and Coordination With Indian Tribal Governments
I. Executive Order 12898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations
J. Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use
K. Executive Order 12988, Civil Justice Reform
L. Unfunded Mandates Reform Act
M. Paperwork Reduction Act

# I. Background

President Nixon signed the National Environmental Policy Act of 1969, 42 U.S.C. 4321 *et seq.,* (NEPA or the Act) into law on January 1, 1970. The Council on Environmental Quality (CEQ) initially issued interim guidelines for implementing NEPA in 1970, revised those guidelines in 1971 and 1973, and subsequently promulgated its regulations implementing NEPA in 1978. The original goals of those regulations were to reduce paperwork and delays, and promote better decisions consistent with the national environmental policy established by the Act.

Since the promulgation of the 1978 regulations, however, the NEPA process has become increasingly complicated and can involve excessive paperwork and lengthy delays. The regulations have been challenging to navigate with related provisions scattered throughout, and include definitions and provisions that have led to confusion and generated extensive litigation. The complexity of the regulations has given rise to CEQ's issuance of more than 30 guidance documents to assist Federal agencies in understanding and complying with NEPA. Agencies also have developed procedures and practices to improve their implementation of NEPA. Additionally, Presidents have issued directives, and Congress has enacted legislation to reduce delays and expedite the implementation of NEPA and the CEQ regulations, including for transportation, water, and other types of infrastructure projects.

Despite these efforts, the NEPA process continues to slow or prevent the development of important infrastructure and other projects that require Federal permits or approvals, as well as rulemakings and other proposed actions. Agency practice has also continued to evolve over the past four decades, but many of the most efficient and effective practices have not been incorporated into the CEQ regulations. Further, a wide range of judicial decisions, including those issued by the Supreme Court, evaluating Federal agencies' compliance with NEPA have construed and interpreted key provisions of the statute and CEQ's regulations. CEQ's guidance, agency practice, more recent presidential directives and statutory developments, and the body of case law related to NEPA implementation have not been harmonized or codified in CEQ's regulations.

As discussed further below, NEPA implementation and related litigation can be lengthy and significantly delay major infrastructure and other projects.[1] For example, CEQ has found that NEPA reviews for Federal Highway Administration projects, on average take more than seven years to proceed from a notice of intent (NOI) to prepare an environmental impact statement (EIS) to issuance of a record of decision (ROD). This is a dramatic departure from CEQ's prediction in 1981 that Federal agencies would be able to complete most EISs, the most intensive review of a project's environmental impacts under NEPA, in 12 months or less.[2] In its most recent

review, CEQ found that, across the Federal Government, the average time for completion of an EIS and issuance of a ROD was 4.5 years and the median was 3.5 years.[3] CEQ determined that one quarter of EISs took less than 2.2 years, and one quarter of the EISs took more than 6 years. And these timelines do not necessarily include further delays associated with litigation over the legal sufficiency of the NEPA process or its resulting documentation.

Although other factors may contribute to project delays, the frequency and consistency of multi-year review processes for EISs for projects across the Federal Government leaves no doubt that NEPA implementation and related litigation is a significant factor.[4] It is critical to improve NEPA implementation, not just for major projects, but because tens of thousands of projects and activities are subject to NEPA every year, many of which are important to modernizing our Nation's infrastructure.[5]

As noted above, an extensive body of case law interpreting NEPA and CEQ's implementing regulations drives much of agencies' modern day practice. Though courts have correctly recognized that NEPA requires agencies to follow certain procedures and not to reach particular substantive results, the accretion of cases has not necessarily clarified implementation of the law. In light of the litigation risk such a situation presents, agencies have responded by generating voluminous studies analyzing impacts and alternatives well beyond the point where useful information is being produced and utilized by decision makers. In its most recent review, CEQ found that final EISs averaged 661 pages in length, and the median document was 447 pages.[6] One quarter were 748 pages or longer. The page count and document length data do not include

---

[1] *See infra* sec. I.B.3 and I.C.
[2] Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations, 46 FR 18026 (Mar. 23, 1981) ("Forty Questions"), *https://www.energy.gov/nepa/downloads/forty-most-asked-questions-concerning-ceqs-national-environmental-policy-act.* "The Council has advised agencies that under the new NEPA regulations even large complex energy projects would require only about 12 months for the completion of the entire EIS process. For most major actions, this period is well within the planning time that is needed in any event, apart from NEPA." *Id.* at Question 35.
[3] *See infra* sec. I.B.3.
[4] *See also,* Philip K. Howard, Common Good, Two Years, Not Ten: Redesigning Infrastructure Approvals (Sept. 2015) ("Two Years, Not Ten"), *https://www.commongood.org/wp-content/uploads/2017/07/2YearsNot10Years.pdf.*
[5] As discussed in sections II.D and II.C.5, CEQ estimates that Federal agencies complete 176 EISs and 10,000 environmental assessments each year. In addition, CEQ estimates that agencies apply categorical exclusions to 100,000 actions annually. *See infra* sec. II.C.4.
[6] *See infra* sec. I.B.3.

appendices. The average modern EIS is more than 4 times as long as the 150 pages contemplated by the 1978 regulations.

By adopting these regulations following so many decades of NEPA practice, implementation, and litigation, CEQ is acting now to enhance the efficiency of the process based on its decades of experience overseeing Federal agency practice, and clarifying a number of key NEPA terms and requirements that have frequently been subject to litigation. The modifications and refinements reflected in the final rule will contribute to greater certainty and predictability in NEPA implementation, and thus eliminate at least in some measure the unnecessary and burdensome delays that have hampered national infrastructure and other important projects.

In June 2018, CEQ issued an advance notice of proposed rulemaking (ANPRM) requesting comment on potential updates and clarifications to the CEQ regulations.[7] On January 10, 2020, CEQ published a notice of proposed rulemaking [8] (NPRM or proposed rule) in the **Federal Register** proposing to update its regulations for implementing the procedural provisions of NEPA.

Following the publication of the NPRM, CEQ received approximately 1,145,571 comments on the proposed rule.[9] A majority of the comments (approximately 1,136,755) were the result of mass mail campaigns, which are comments with multiple signatories or groups of comments that are identical or very similar in form and content. CEQ received approximately 8,587 unique public comments of which 2,359 were substantive comments raising a variety of issues related to the rulemaking and contents of the proposed rule, including procedural, legal, and technical issues. Finally, 229 comments were duplicate or non-germane submissions, or contained only supporting materials.

The background section below summarizes NEPA, the CEQ regulations, and developments since CEQ issued those regulations. Specifically, section

I.A provides a brief summary of the NEPA statute. Section I.B describes the history of CEQ's regulations implementing NEPA and provides an overview of CEQ's numerous guidance documents and reports issued subsequent to the regulations. Section I.C discusses the role of the courts in interpreting NEPA. Section I.D provides a brief overview of Congress's efforts, and section I.E describes the initiatives of multiple administrations to reduce delays and improve implementation of NEPA. Finally, sections I.F and I.G provides the background on this rulemaking, including the ANPRM and the NPRM.

In section II, CEQ provides a summary of the final rule, including changes CEQ made from the proposed rule, which comprehensively updates and substantially revises CEQ's prior regulations. This final rule modernizes and clarifies the CEQ regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies by simplifying regulatory requirements, codifying certain guidance and case law relevant to these regulations, revising the regulations to reflect current technologies and agency practices, eliminating obsolete provisions, and improving the format and readability of the regulations. CEQ's revisions include provisions intended to promote timely submission of relevant information to ensure consideration of such information by agencies. CEQ's revisions will provide greater clarity for Federal agencies, States, Tribes, localities, and the public, and advance the original goals of the CEQ regulations to reduce paperwork and delays and promote better decisions consistent with the national environmental policy set forth in section 101 of NEPA.

CEQ provides a summary of the comments received on the proposed rule and responses in the document titled ''Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act Final Rule Response to Comments'' [10] (''Final Rule Response to Comments''). This document organizes the comments by the parts and sections of the proposed rule that the comment addresses, and includes a subsection on other general or crosscutting topics.

Ultimately, the purpose of the NEPA process is to ensure informed decision making by Federal agencies with regard to the potential environmental effects of

proposed major Federal actions and to make the public aware of the agency's decision-making process. When effective and well managed, the NEPA process results in more informative documentation, enhanced coordination, resolution of conflicts, and improved environmental outcomes. With this final rule, CEQ codifies effective agency practice and provides clarity on the requirements of the NEPA process.

*A. National Environmental Policy Act*

Congress enacted NEPA to establish a national policy for the environment, provide for the establishment of CEQ, and for other purposes. Section 101 of NEPA sets forth a national policy ''to use all practicable means and measures, including financial and technical assistance, in a manner calculated to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and [to] fulfill the social, economic, and other requirements of present and future generations of Americans.'' 42 U.S.C. 4331(a). Section 102 of NEPA establishes procedural requirements, applying that national policy to proposals for major Federal actions significantly affecting the quality of the human environment by requiring Federal agencies to prepare a detailed statement on: (1) The environmental impact of the proposed action; (2) any adverse environmental effects that cannot be avoided; (3) alternatives to the proposed action; (4) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (5) any irreversible and irretrievable commitments of resources that would be involved in the proposed action. 42 U.S.C. 4332(2)(C). NEPA also established CEQ as an agency within the Executive Office of the President to administer Federal agency implementation of NEPA. 42 U.S.C. 4332(2)(B), (C), (I), 4342, 4344; *see also Dep't of Transp.* v. *Pub. Citizen*, 541 U.S. 752, 757 (2004); *Warm Springs Dam Task Force* v. *Gribble*, 417 U.S. 1301, 1309–10 (Douglas, J. Circuit Justice 1974).

NEPA does not mandate particular results or substantive outcomes. Rather, NEPA requires Federal agencies to consider environmental impacts of proposed actions as part of agencies' decision-making processes. Additionally, NEPA does not include a private right of action and specifies no remedies. Challenges to agency action alleging noncompliance with NEPA procedures are brought under the Administrative Procedure Act (APA). 5

---

[7] 83 FR 28591 (June 20, 2018).

[8] 85 FR 1684 (Jan. 10, 2020).

[9] In the NPRM, CEQ listed several methods for members of the public to submit written comments, including submittal to the docket on *regulations.gov*, by fax, or by mail. In addition, CEQ also included an email address (*NEPA-Update@ ceq.eop.gov*) in the NPRM for further information. While the NPRM did not list this email address among the several methods for the public to provide comments, CEQ has considered comments received through this email address during the public comment period and included them in the docket on *regulations.gov*.

[10] The Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act Final Rule Response to Comments document is available under ''Supporting Documents'' in the docket on *regulations.gov* under docket ID CEQ–2019–0003.

U.S.C. 551 *et seq.* Accordingly, NEPA cases proceed as APA cases. Limitations on APA cases and remedies thus apply to the adjudication of NEPA disputes.

*B. Council on Environmental Quality Regulations, Guidance, and Reports*

1. Regulatory History

In 1970, President Nixon issued Executive Order (E.O.) 11514, titled "Protection and Enhancement of Environmental Quality," which directed CEQ to "[i]ssue guidelines to Federal agencies for the preparation of detailed statements on proposals for legislation and other Federal actions affecting the environment, as required by section 102(2)(C) of the Act." [11] CEQ issued interim guidelines in April of 1970 and revised them in 1971 and 1973.[12]

In 1977, President Carter issued E.O. 11991, titled "Relating to Protection and Enhancement of Environmental Quality." [13] E.O. 11991 amended section 3(h) of E.O. 11514, directing CEQ to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of [NEPA] . . . to make the environmental impact statement process more useful to decision[ ]makers and the public; and to reduce paperwork and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives," and to "require [environmental] impact statements to be concise, clear, and to the point, and supported by evidence that agencies have made the necessary environmental analyses." E.O. 11991 also amended section 2 of E.O. 11514, requiring agency compliance with the regulations issued by CEQ. The Executive order was based on the President's constitutional and statutory authority, including NEPA, the Environmental Quality Improvement Act, 42 U.S.C. 4371 *et seq.,* and section 309 of the Clean Air Act, 42 U.S.C. 7609. The President has a constitutional duty to ensure that the "Laws be faithfully executed," U.S. Const. art. II, sec. 3, which may be delegated to appropriate officials. 3 U.S.C. 301. In signing E.O. 11991, the President delegated this authority to CEQ.[14]

In 1978, CEQ promulgated its "National Environmental Policy Act, Regulations, Implementation of Procedural Provisions," 40 CFR parts 1500–1508 ("CEQ regulations" or "NEPA regulations"), "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further the national policy to protect and enhance the quality of the human environment." [15] The Supreme Court has explained that E.O. 11991 requires all "heads of [F]ederal agencies to comply" with the "single set of uniform, mandatory regulations" that CEQ issued to implement NEPA's provisions. *Andrus* v. *Sierra Club,* 442 U.S. 347, 357 (1979).

The Supreme Court has afforded the CEQ regulations "substantial deference." *Robertson* v. *Methow Valley Citizens Council,* 490 U.S. 332, 355 (1989) (citing *Andrus,* 442 U.S. at 358); *Pub. Citizen,* 541 U.S. at 757 ("The [CEQ], established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide [F]ederal agencies in determining what actions are subject to that statutory requirement." (citing 40 CFR 1500.3)). The new regulations are intended to embody CEQ's interpretation of NEPA for *Chevron* purposes and to operate as legislative rules.[16] *See Chevron U.S.A., Inc.* v. *Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842–43 (1984); *see also Nat'l Cable & Telecomm. Ass'n* v. *Brand X internet Servs.,* 545 U.S. 967, 980–86 (2005) (applying *Chevron* deference to Federal Communications Commission regulations); *United States* v. *Mead Corp.,* 533 U.S. 218, 227–30 (2001) (properly promulgated agency regulations addressing ambiguities or gaps in a statute qualify for *Chevron* deference when agencies possess the authority to issue regulations interpreting the statute). The Supreme

Court has held that NEPA is a procedural statute that serves the twin aims of ensuring that agencies consider the significant environmental consequences of their proposed actions and inform the public about their decision making. *Balt. Gas & Elec. Co.* v. *Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 97 (1983) (citing *Vt. Yankee Nuclear Power Corp.* v. *Nat. Res. Def. Council, Inc.,* 435 U.S. 519, 553 (1978); *Weinberger* v. *Catholic Action of Haw./ Peace Educ. Project,* 454 U.S. 139, 143 (1981)).

Furthermore, in describing the role of NEPA in agencies' decision-making processes, the Supreme Court has stated, "Congress in enacting NEPA, however, did not require agencies to elevate environmental concerns over other appropriate considerations." [17] *Balt. Gas & Elec. Co.,* 462 U.S. at 97 (citing *Strycker's Bay Neighborhood Council* v. *Karlen,* 444 U.S. 223, 227 (1980) (per curiam)). Instead, NEPA requires agencies to analyze the environmental consequences before taking a major Federal action. *Id.* (citing *Kleppe* v. *Sierra Club,* 427 U.S. 390, 410 n.21 (1976)). The Supreme Court has recognized that agencies have limited time and resources and that "[t]he scope of the agency's inquiries must remain manageable if NEPA's goal of '[insuring] a fully informed and considered decision,' . . . is to be accomplished." *Metro. Edison Co.* v. *People Against Nuclear Energy,* 460 U.S. 766, 776 (1983) (quoting *Vt. Yankee,* 435 U.S. at 558).

CEQ has substantively amended its NEPA regulations only once, at 40 CFR 1502.22, to replace the "worst case" analysis requirement with a provision for the consideration of incomplete or unavailable information regarding reasonably foreseeable significant adverse effects.[18] CEQ found that the amended 40 CFR 1502.22 would "generate information and discussion on those consequences of greatest concern to the public and of greatest relevance to the agency's decision," [19] rather than distorting the decision-making process by overemphasizing highly speculative harms.[20] The Supreme Court found this reasoning to

---

[11] 35 FR 4247 (Mar. 7, 1970), sec. 3(h).

[12] *See* 35 FR 7390 (May 12, 1970) (interim guidelines); 36 FR 7724 (Apr. 23, 1971) (final guidelines); 38 FR 10856 (May 2, 1973) (proposed revisions to guidelines); 38 FR 20550 (Aug. 1, 1973) (revised guidelines).

[13] 42 FR 26967 (May 25, 1977).

[14] The Presidential directive was consistent with the recommendation of the Commission on Federal Paperwork that the President require the development of consistent regulations and definitions and ensure coordination among agencies in the implementation of Environmental Impact

Statement preparation. *See* The Report of the Commission on Federal Paperwork, Environmental Impact Statements 16 (Feb. 25, 1977).

[15] 43 FR 55978 (Nov. 29, 1978); *see also* 44 FR 873 (Jan. 3, 1979) (technical corrections), and 43 FR 25230 (June 9, 1978) (proposed rule).

[16] Even without expressly invoking *Chevron* here and noting that CEQ intends these regulations to operate as legislative rules, *Chevron* would still apply. *See Guedes* v. *ATF,* 920 F.3d 1, 23 (D.C. Cir. 2019) ("And for this Rule in particular, another telltale sign of the agency's belief that it was promulgating a rule entitled to *Chevron* deference is the Rule's invocation of *Chevron* by name. To be sure, an agency of course need not expressly invoke the *Chevron* framework to obtain *Chevron* deference: '*Chevron* is a standard of *judicial* review, not of *agency* action.' *SoundExchange[, Inc.* v. *Copyright Royalty Bd.,]* 904 F.3d [41,] 54 [(D.C. Cir. 2018)]. Still, the Bureau's invocation of *Chevron* here is powerful evidence of its intent to engage in an exercise of interpretive authority warranting *Chevron* treatment.") (emphasis in original).

[17] Section 101 of NEPA provides that it is the Federal Government's policy "to use all practicable means and measures . . . to create and maintain conditions under which man and nature can exist in productive harmony, and [to] *fulfill the social, economic, and other requirements of present and future generations of Americans.*" 42 U.S.C. 4331(a) (emphasis added).

[18] 51 FR 15618 (Apr. 25, 1986).

[19] 50 FR 32234, 32237 (Aug. 9, 1985).

[20] 51 FR 15618, 15620 (Apr. 25, 1986).

be a well-considered basis for the change, and that the new regulation was entitled to substantial deference. *Methow Valley,* 490 U.S. at 356.

The NEPA regulations direct Federal agencies to adopt their own implementing procedures, as necessary, in consultation with CEQ. 40 CFR 1507.3. Under this regulation, over 85 Federal agencies and their subunits have developed such procedures.[21]

2. CEQ Guidance and Reports

Over the past four decades, numerous questions have been raised regarding appropriate implementation of NEPA and the CEQ regulations. Soon after the issuance of the CEQ regulations and in response to CEQ's review of NEPA implementation and input from Federal, State, and local officials, including NEPA practitioners, CEQ issued the "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations"[22] in 1981 ("Forty Questions"). This guidance covered a wide range of topics including alternatives, coordination among applicants, lead and cooperating agencies, and integration of NEPA documents with analysis for other environmental statutes. In addition, CEQ has periodically examined the effectiveness of the NEPA process and issued a number of reports on NEPA implementation. In some instances, these reports led to additional guidance. These documents have been intended to provide guidance and clarifications with respect to various aspects of the implementation of NEPA and the definitions in the CEQ regulations, and to increase the efficiency and effectiveness of the environmental review process.[23]

In January 1997, CEQ issued "The National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years."[24] In that report, CEQ acknowledged that NEPA has ensured that agencies adequately analyze the potential environmental consequences of their actions and bring the public into the decision-making processes of Federal agencies. However, CEQ also identified matters of concern to participants in the study, including concerns with overly lengthy documents that may not enhance or improve decision making,[25] and concerns that agencies may seek to "'litigation-proof' documents, increasing costs and time but not necessarily quality."[26] The report further stated that "[o]ther matters of concern to participants in the Study were the length of NEPA processes, the extensive detail of NEPA analyses, and the sometimes confusing overlay of other laws and regulations."[27] The participants in the study identified five elements of the NEPA process' collaborative framework (strategic planning, public information and input, interagency coordination, interdisciplinary place-based decision making, and science-based flexible management) as critical to effective and efficient NEPA implementation.

In 2002, the Chairman of CEQ established a NEPA task force, composed of Federal agency officials, to examine NEPA implementation by focusing on (1) technology and information management and security; (2) Federal and intergovernmental collaboration; (3) programmatic analyses and tiering; (4) adaptive management and monitoring; (5) categorical exclusions (CEs); and (6) environmental assessments (EAs). In 2003, the task force issued a report[28] recommending actions to improve and modernize the NEPA process, leading to additional guidance documents and handbooks.

Over the past 4 decades, CEQ has issued over 30 documents on a wide variety of topics to provide guidance and clarifications to assist Federal agencies in more efficiently and effectively implementing the NEPA regulations.[29] While CEQ has sought to provide clarity and direction related to implementation of the regulations and the Act through the issuance of guidance, agencies continue to face implementation challenges. Further, the documentation and timelines for completing environmental reviews can be very lengthy, and the process can be complex and costly.

In 2018, CEQ and the Office of Management and Budget (OMB) issued a memorandum titled "One Federal Decision Framework for the Environmental Review and Authorization Process for Major Infrastructure Projects under E.O. 13807" ("OFD Framework Guidance").[30] CEQ and OMB issued this guidance pursuant to E.O. 13807, titled "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects,"[31] to improve agency coordination for infrastructure

---

[21] A list of agency NEPA procedures is available at *https://ceq.doe.gov/laws-regulations/agency_ implementing_procedures.html.*

[22] Forty Questions, *supra* note 2.

[23] *See https://www.energy.gov/nepa/ceq-guidance-documents.*

[24] *https://ceq.doe.gov/docs/ceq-publications/ nepa25fn.pdf.*

[25] *Id.* at iii.

[26] *Id.*

[27] *Id.* In the 50 years since the passage of NEPA, Congress has amended or enacted a number of other environmental laws that may also apply to proposed Federal agency actions, such as the Endangered Species Act, the Clean Water Act, the Clean Air Act, and other substantive statutes. *See* discussion *infra* sec. I.D. Consistent with 40 CFR 1502.25, longstanding agency practice has been to use the NEPA process as the umbrella procedural statute, integrating compliance with these laws into the NEPA review and discussing them in the NEPA document. However, this practice sometimes leads to confusion as to whether an agency does an analysis to comply with NEPA or another, potentially substantive, environmental law.

[28] *See* The NEPA Task Force Report to the Council on Environmental Quality, Modernizing NEPA Implementation (Sept. 2003) ("NEPA Task Force Report"), *https://ceq.doe.gov/docs/ceq-publications/report/finalreport.pdf.*

[29] *See, e.g.,* Emergencies and the National Environmental Policy Act (Oct. 2016) ("Emergencies Guidance"), *https://ceq.doe.gov/ docs/nepa-practice/Emergencies_and_NEPA.pdf;* Effective Use of Programmatic NEPA Reviews (Dec. 18, 2014) ("Programmatic Guidance"), *https:// ceq.doe.gov/docs/ceq-regulations-and-guidance/ Effective_Use_of_Programmatic_NEPA_Reviews_*

*Final_Dec2014_searchable.pdf;* NEPA and NHPA: A Handbook for Integrating NEPA and Section 106 (Mar. 2013), *https://ceq.doe.gov/publications/nepa-handbooks.html;* Memorandum on Environmental Conflict Resolution (Nov. 28, 2005), as expanded by Memorandum on Environmental Collaboration and Conflict Resolution (Sept. 7, 2012), *https:// ceq.doe.gov/nepa-practice/environmental-collaboration-and-conflict-resolution.html;* Final Guidance on Improving the Process for Preparing Efficient and Timely Environmental Reviews Under the National Environmental Policy Act, 77 FR 14473 (Mar. 12, 2012) ("Timely Environmental Reviews Guidance"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Improving_NEPA_ Efficiencies_06Mar2012.pdf;* Final Guidance for Federal Departments and Agencies on the Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated Findings of No Significant Impact, 76 FR 3843 (Jan. 21, 2011) ("Mitigation Guidance"), *https:// ceq.doe.gov/docs/ceq-regulations-and-guidance/ Mitigation_and_Monitoring_Guidance_ 14Jan2011.pdf;* Council on Environmental Quality, Final Guidance for Federal Departments and Agencies on Establishing, Applying, and Revising Categorical Exclusions under the National Environmental Policy Act, 75 FR 75628 (Dec. 6, 2010) ("CE Guidance"), *https://ceq.doe.gov/docs/ ceq-regulations-and-guidance/NEPA_CE_ Guidance_Nov232010.pdf;* Letter from the Hon. James L. Connaughton, Chairman, Council on Environmental Quality, to the Hon. Norman Y. Mineta, Secretary, Department of Transportation (May 12, 2003) ("Connaughton Letter"), *https:// ceq.doe.gov/docs/ceq-regulations-and-guidance/ CEQ-DOT_PurposeNeed_May-2003.pdf;* Considering Cumulative Effects Under the National Environmental Policy Act (Jan. 1997) ("Cumulative Effects Guidance"), *https://ceq.doe.gov/ publications/cumulative_effects.html;* Environmental Justice: Guidance under the National Environmental Policy Act (Dec. 10, 1997) ("EJ Guidance"), *https://ceq.doe.gov/docs/ceq-regulations-and-guidance/regs/ej/justice.pdf;* Forty Questions, *supra* note 2. CEQ also issued a resource for the public, A Citizen's Guide to the NEPA: Having Your Voice Heard (Dec. 2007), *https:// ceq.doe.gov/get-involved/citizens_guide_to_ nepa.html.*

[30] M–18–13 (Mar. 20, 2018), *https:// www.whitehouse.gov/wp-content/uploads/2018/04/ M-18-13.pdf.*

[31] *82 FR 40463* (Aug. 24, 2017).

projects requiring an EIS and permits or other authorizations from multiple agencies and to improve the timeliness of the environmental review process. *See* E.O. 13807, *infra* sec. I.E. Consistent with the OFD Framework Guidance, *supra* note 30, Federal agencies signed a memorandum of understanding committing to implement the One Federal Decision (OFD) policy for major infrastructure projects, including by committing to establishing a joint schedule for such projects, preparation of a single EIS and joint ROD, elevation of delays and dispute resolution, and setting a goal of completing environmental reviews for such projects within two years.[32] Subsequently, CEQ and OMB issued guidance for the Secretary of Transportation regarding the applicability of the OFD policy to States under the Surface Transportation Project Delivery Program,[33] and for the Secretary of Housing and Urban Development (HUD) regarding the applicability of the OFD policy to entities assuming HUD environmental review responsibilities.[34] CEQ also has provided direction to the Federal Energy Regulatory Commission (FERC) relating to the requirement for joint RODs under the OFD policy.[35]

3. Environmental Impact Statement Timelines and Page Count Reports

CEQ also has conducted reviews and prepared reports on the length of time it takes for agencies to prepare EISs and the length of these documents. These reviews found that the process for preparing EISs is taking much longer than CEQ advised, and that the documents are far longer than the CEQ regulations and guidance recommended. In December 2018, CEQ issued a report compiling information relating to the timelines for preparing EISs during the period of 2010–2017, and the NPRM included a summary of the report. CEQ

has since updated this analysis to include EISs completed in 2018, and this section reflects the updated data.[36]

While CEQ's Forty Questions states that the time for an EIS, even for a complex project, should not exceed 1 year,[37] CEQ found that, across the Federal Government, the average time for completion of an EIS and issuance of a ROD was 4.5 years and the median was 3.5 years. One quarter of the EISs took less than 2.2 years, and one quarter of the EISs took more than 6 years.

As reflected in the timelines report, the period from publication of a NOI to prepare an EIS to the notice of availability of the draft EIS took, on average, 58.4 percent of the total time, while preparing the final EIS, including addressing comments received on the draft EIS, took, on average, 32.2 percent of the total time. The period from the final EIS to publication of the ROD took, on average, 9.4 percent of the total time. This report recognized that EIS timelines vary widely and many factors may influence the timing of the document, including variations in the scope and complexity of the actions, variations in the extent of work done prior to issuance of the NOI, and suspension of EIS activities due to external factors.

Additionally, in July 2019, CEQ issued a report on the length, by page count, of EISs (excluding appendices) finalized during the period of 2013–2017, and the NPRM included a summary of the report. CEQ has since updated this analysis to include EISs completed in 2018, and this section reflects the updated data.

While the CEQ regulations include recommended page limits for the text of final EISs of normally less than 150 pages, or normally less than 300 pages for proposals of "unusual scope or complexity," 40 CFR 1502.7, CEQ found that many EISs are significantly longer. In particular, CEQ found that across all Federal agencies, draft EISs averaged 575 pages in total, with a median document length of 397 pages.[38] One quarter of the draft EISs were 279 pages or shorter, and one quarter were 621 pages or longer. For final EISs, the average document length was 661 pages, and the median document length was 447 pages. One quarter of the final EISs were 286 pages or shorter, and one

quarter were 748 pages or longer. On average, the change in document length from draft EIS to final EIS was an additional 86 pages or a 15 percent increase.

With respect to final EISs, CEQ found that approximately 7 percent were 150 pages or shorter, and 27 percent were 300 pages or shorter.[39] Similar to the conclusions of its EIS timelines study, CEQ noted that a number of factors may influence the length of EISs, including variation in the scope and complexity of the decisions that the EIS is designed to inform, the degree to which NEPA documentation is used to document compliance with other statutes, and considerations relating to potential legal challenges. Moreover, variation in EIS length may reflect differences in management, oversight, and contracting practices among agencies that could result in longer documents.

While there can be many factors affecting the timelines and length of EISs, CEQ has concluded that revisions to the CEQ regulations to advance more timely reviews and reduce unnecessary paperwork are warranted. CEQ has determined that improvements to agency processes, such as earlier solicitation of information from States, Tribes, and local governments and the public, and improved coordination in the development of EISs, can achieve more useful and timely documents to support agency decision making.

*C. Judicial Review of Agency NEPA Compliance*

NEPA is the most litigated environmental statute in the United States.[40] Over the past 50 years, Federal courts have issued an extensive body of case law addressing appropriate implementation and interpretation of NEPA and the CEQ regulations.[41] The Supreme Court has directly addressed NEPA in 17 decisions, and the U.S. district and appellate courts issue approximately 100 to 140 decisions

---

[32] *See* Memorandum of Understanding Implementing One Federal Decision under Executive Order 13807 (2018), *https://www.whitehouse.gov/wp-content/uploads/2018/04/MOU-One-Federal-Decision-m-18-13-Part-2-1.pdf.*

[33] Guidance on the Applicability of E.O. 13807 to States with NEPA Assignment Authority Under the Surface Transportation Project Delivery Program, M–19–11 (Feb. 26, 2019), *https://www.whitehouse.gov/wp-content/uploads/2017/11/20190226OMB-CEQ327.pdf.*

[34] Guidance on the Applicability of E.O. 13807 to Responsible Entities Assuming Department of Housing and Urban Development Environmental Review Responsibilities, M–19–20 (June 28, 2019), *https://www.whitehouse.gov/wp-content/uploads/2019/06/M-19-20.pdf.*

[35] *See* Letter from the Hon. Mary B. Neumayr, Chairman, Council on Environmental Quality, to the Hon. Neil Chatterjee, Chairman, Federal Energy Regulatory Comm'n (Aug. 22, 2019), *https://www.whitehouse.gov/wp-content/uploads/2017/11/20190822FERCOFDLetter.pdf.*

[36] *See* Council on Environmental Quality, Environmental Impact Statement Timelines (2010–2018), (June 12, 2020), *https://ceq.doe.gov/nepa-practice/eis-timelines.html.*

[37] Forty Questions, *supra* note 2, at Question 35.

[38] *See* Council on Environmental Quality, Length of Environmental Impact Statements (2013–2018), (June 12, 2020) ("CEQ Length of EISs Report"), *https://ceq.doe.gov/nepa-practice/eis-length.html.*

[39] The page counts compiled for 2010–2017 include the text of the EIS as well as supporting content to which the page limit in 40 CFR 1502.7 does not apply. For 2018, CEQ analyzed the data to determine the length of the text of the EISs and found that 19 percent of the final EISs were 150 pages or shorter and 51 percent were 300 pages or shorter.

[40] James E. Salzman and Barton H. Thompson, Jr., *Environmental Law and Policy* 340 (5th ed. 2019) ("Perhaps surprisingly, there have been thousands of NEPA suits. It might seem strange that NEPA's seemingly innocuous requirement of preparing an EIS has led to more lawsuits than any other environmental statute.").

[41] The 2019 edition of NEPA Law and Litigation includes a 115–page Table of Cases decisions construing NEPA. *See* Daniel R. Mandelker et al., NEPA Law and Litigation, Table of Cases (2d ed. 2019).

**43310** Federal Register / Vol. 85, No. 137 / Thursday, July 16, 2020 / Rules and Regulations

each year interpreting NEPA. The Supreme Court has construed NEPA and the CEQ regulations in light of a "rule of reason," which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of information to the decision-making process. *See Marsh* v. *Or. Nat. Res. Council,* 490 U.S. 360, 373–74 (1989). "Although [NEPA] procedures are almost certain to affect the agency's substantive decision, it is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process." *Methow Valley,* 490 U.S. at 350 (citing *Strycker's Bay Neighborhood Council, Inc.,* 444 U.S. at 227–28; *Vt. Yankee,* 435 U.S. at 558; *see also Pub. Citizen,* 541 U.S. at 756–57 ("NEPA imposes only procedural requirements on [F]ederal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." (citing *Methow Valley,* 490 U.S. at 349–50])). The thousands of decisions interpreting NEPA and the current CEQ regulations being amended here drive much of agencies' modern-day practice. A challenge for agencies is that courts have interpreted key terms and requirements differently, adding to the complexity of environmental reviews. For example, in 2018 and 2019, the U.S. Courts of Appeals issued 56 substantive decisions on a range of topics, including assessment of impacts, sufficiency of alternatives, whether an agency's action qualified as Federal action, and purpose and need statements.[42] As discussed below, the final rule codifies longstanding case law in some instances, and, in other instances, clarifies the meaning of the regulations where there is a lack of uniformity in judicial interpretation of NEPA and the CEQ regulations.

*D. Statutory Developments*

Since the enactment of NEPA in 1970, Congress has amended or enacted a large number of substantive environmental statutes. These have included significant amendments to the Clean Water Act and Clean Air Act, establishment of new Federal land management standards and planning processes for National forests, public

lands, and coastal zones, and statutory requirements to conserve fish, wildlife, and plant species.[43] Additionally, the consideration of the effects on historic properties under the National Historic Preservation Act is typically integrated into the NEPA review.[44] NEPA has served as the umbrella procedural statute, integrating these laws into NEPA reviews and discussing them in NEPA documents.

Over the past two decades and multiple administrations, Congress has also undertaken efforts to facilitate more efficient environmental reviews by Federal agencies, and has enacted a number of statutes aimed at improving the implementation of NEPA, including in the context of infrastructure projects. In particular, Congress has enacted legislation to improve coordination among agencies, integrate NEPA with other environmental reviews, and bring more transparency to the NEPA process.

In 2005, Congress enacted 23 U.S.C. 139, "Efficient environmental reviews for project decisionmaking," a streamlined environmental review process for highway, transit, and multimodal transportation projects (the "section 139 process"), in the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA–LU), Public Law 109–59, sec. 6002(a), 119 Stat. 1144, 1857. Congress amended section 139 with additional provisions designed to improve the NEPA process in the 2012 Moving Ahead for Progress in the 21st Century Act (MAP–21), Public Law 112–141, sec. 1305–1309, 126 Stat. 405, and the 2015 Fixing America's Surface Transportation (FAST) Act, Public Law 114–94, sec. 1304, 129 Stat. 1312, 1378. Section 139 provides for an environmental review process that is based on and codifies many aspects of the NEPA regulations, including provisions relating to lead and cooperating agencies, concurrent environmental reviews in a single NEPA document, coordination on the development of the purpose and need statement and reasonable alternatives,

and adoption of environmental documents. Further, section 139 provides for referral to CEQ for issue resolution, similar to part 1504 of the NEPA regulations, and allows for the use of errata sheets, consistent with 40 CFR 1503.4(c).[45]

When Congress enacted section 2045 of the Water Resources Development Act of 2007, Public Law 110–114, 121 Stat. 1041, 1103, it created a similar environmental review provision for water resources development projects by the U.S. Army Corps of Engineers (Corps). 33 U.S.C. 2348.[46] This project acceleration provision also requires a coordinated environmental review process, provides for dispute resolution, and codifies aspects of the NEPA regulations such as lead and cooperating agencies, concurrent environmental reviews, and the establishment of CEs. Section 2348(o) also directs the Corps to consult with CEQ on the development of guidance for implementing this provision.

In 2015 Congress enacted Title 41 of the FAST Act (FAST–41), to provide for a more efficient environmental review and permitting process for "covered projects." *See* Public Law 114–94, sec. 41001–41014, 129 Stat. 1312, 1741 (42 U.S.C. 4370m—4370m–12). These are projects that require Federal environmental review under NEPA, are expected to exceed $200 million, and involve the construction of infrastructure for certain energy production, electricity transmission, water resource projects, broadband, pipelines, manufacturing, and other sectors. *Id.* FAST–41 codified certain roles and responsibilities required by the NEPA regulations. In particular, FAST–41 imports the concepts of lead and cooperating agencies, and the different levels of NEPA analysis—EISs, EAs, and CEs. Consistent with 40 CFR 1501.5(e) through (f), CEQ is required to resolve any dispute over designation of a facilitating or lead agency for a covered project. 42 U.S.C. 4370m–2(a)(6)(B). Section 4370m–4 codified several requirements from the CEQ

---

[42] National Association of Environmental Professionals, 2019 Annual NEPA Report of the National Environmental Policy Act (NEPA) Practice (2020) at 30–31, *https://naep.memberclicks.net/assets/annual-report/2019_NEPA_Annual_Report/NEPA_Annual_Report_2019.pdf*; National Association of Environmental Professionals, 2018 Annual NEPA Report of the National Environmental Policy Act (NEPA) Practice (2019) at 41–51, *https://naep.memberclicks.net/assets/documents/2019/NEPA_Annual_Report_2018.pdf.*

[43] *See, e.g.,* the Clean Air Act, 42 U.S.C. 7401–7671q; Clean Water Act, 33 U.S.C. 1251–1388; Coastal Zone Management Act, 16 U.S.C. 1451–1466; Federal Land Policy and Management Act, 43 U.S.C. 1701–1787; Forest and Rangeland Renewable Resources Planning Act of 1974, 16 U.S.C. 1600–1614; Magnuson-Stevens Fishery Conservation and Management Act, 16 U.S.C. 1801–1884; Endangered Species Act, 16 U.S.C. 1531–1544; Oil Pollution Act of 1990, 33 U.S.C. 2701–2762; Surface Mining Control and Reclamation Act of 1977, 30 U.S.C. 1201, 1202, and 1211; and Comprehensive Environmental Response, Compensation, and Liability Act, 42 U.S.C. 9601–9675.

[44] Similar to NEPA, section 106 (54 U.S.C. 306108) of the National Historic Preservation Act is a procedural statute.

[45] To facilitate the NEPA process for transportation projects subject to section 139, the statute specifically calls for development of a coordination plan, including development of a schedule, and publicly tracking the implementation of that schedule through use of the Permitting Dashboard. *See infra* sec. I.E. In addition, the section 139 process provides for "participating" agencies, which are any agencies invited to participate in the environmental review process. Section 139 also requires, to the maximum extent practicable, issuance of a combined final EIS and ROD.

[46] Congress significantly revised this provision in the Water Resources Reform and Development Act of 2014, Public Law 113–121, sec. 1005(a)(1), 128 Stat. 1193 1199.

regulations, including the requirement for concurrent environmental reviews, which is consistent with 40 CFR 1500.2(c), 1501.7(a)(6), and 1502.25(a), and the tools of adoption, incorporation by reference, supplementation, and use of State documents, consistent with 40 CFR 1506.3, 1502.21, 1502.9(c), and 1506.2.[47] Finally, 42 U.S.C. 4370m–4 addresses interagency coordination on key aspects of the NEPA process, including scoping (40 CFR 1501.7), identification of the range of reasonable alternatives for study in an EIS (40 CFR 1502.14), and the public comment process (40 CFR part 1503).

To ensure a timely NEPA process so that important infrastructure projects can move forward, Congress has also established shorter statutes of limitations for challenges to certain types of projects. SAFETEA–LU created a 180-day statute of limitations for highway or public transportation capital projects, which MAP–21 later reduced to 150 days. 23 U.S.C. 139(l). The Water Resources Reform and Development Act of 2014 established a three-year statute of limitations for judicial review of any permits, licenses, or other approvals for water resources development project studies. 33 U.S.C. 2348(k). Most recently in FAST–41, Congress established a two-year statute of limitations for covered projects. 42 U.S.C. 4370m–6.

There are a number of additional instances where Congress has enacted legislation to facilitate more timely environmental reviews. For example, similar to the provisions described above, there are other statutes where Congress has called for a coordinated and concurrent environmental review. *See, e.g.,* 33 U.S.C. 408(b) (concurrent review for river and harbor permits); 49 U.S.C. 40128 (coordination on environmental reviews for air tour management plans for national parks); 49 U.S.C. 47171 (expedited and coordinated environmental review process for airport capacity enhancement projects).

Additionally, Congress has established or directed agencies to establish CEs to facilitate NEPA compliance. *See, e.g.,* 16 U.S.C. 6554(d)

(applied silvicultural assessment and research treatments); 16 U.S.C. 6591d (hazardous fuels reduction projects to carry out forest restoration treatments); 16 U.S.C. 6591e (vegetation management activity in greater sage-grouse or mule deer habitat); 33 U.S.C. 2349 (actions to repair, reconstruct, or rehabilitate water resources projects in response to emergencies); 42 U.S.C. 15942 (certain activities for the purpose of exploration or development of oil or gas); 43 U.S.C. 1772(c)(5) (development and approval of vegetation management, facility inspection, and operation and maintenance plans); MAP–21, Public Law 112–141, sec. 1315 (actions to repair or reconstruct roads, highways, or bridges damaged by emergencies), 1316 (projects within the operational right-of-way), and 1317 (projects with limited Federal assistance); FAA Modernization and Reform Act of 2012, Public Law 112–95, sec. 213(c), 126 Stat. 11, 46 (navigation performance and area navigation procedures); and Omnibus Appropriations Act, 2009, Public Law 111–8, sec. 423, 123 Stat. 524, 748 (Lake Tahoe Basin Management Unit hazardous fuel reduction projects).

Further, in the context of emergency response, including economic crisis, Congress has enacted legislation to facilitate timely NEPA reviews or to exempt certain actions from NEPA review. Congress has directed the use or development of alternative arrangements in accordance with 40 CFR 1506.11 for reconstruction of transportation facilities damaged in an emergency (FAST Act, Pub. L. 114–94, sec. 1432, 129 Stat. 1312, 1429) and for projects by the Departments of the Interior and Commerce to address invasive species (Water Infrastructure Improvements for the Nation Act, Pub. L. 114–322, sec. 4010(e)(3), 130 Stat. 1628, 1877). Section 1609(c) of the American Recovery and Reinvestment Act of 2009 directed agencies to complete environmental reviews under NEPA on an expedited basis using the most efficient applicable process. Public Law 111–5, sec. 1609, 123 Stat. 115, 304.

In 2013, Congress also enacted section 429 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act ("Stafford Act"), 42 U.S.C. 5189g, which directed the President, in consultation with CEQ and the Advisory Council on Historic Preservation, to "establish an expedited and unified interagency review process to ensure compliance with environmental and historic requirements under Federal law relating to disaster recovery projects, in order to expedite the recovery process, consistent with applicable law." Sandy

Recovery Improvement Act of 2013, Public Law 113–2, sec. 1106, 127 Stat. 4, 45–46. This unified Federal environmental and historic preservation review (UFR) process is a framework for coordinating Federal agency environmental and historic preservation reviews for disaster recovery projects associated with presidentially declared disasters under the Stafford Act. The goal of the UFR process is to enhance the ability of Federal environmental review and authorization processes to inform and expedite disaster recovery decisions for grant applicants and other potential beneficiaries of disaster assistance by improving coordination and consistency across Federal agencies, and assisting agencies in better leveraging their resources and tools.[48]

Finally, in some instances, Congress has exempted actions from NEPA. In 1996, Congress enacted the Illegal Immigration Reform and Immigrant Responsibility Act, which authorized the waiver of NEPA for the construction of the physical barriers and roads between the United States and Mexico border when necessary to "ensure expeditious construction." Public Law 104–208, sec. 102(c), 110 Stat. 3009.[49] In 2013, Congress exempted certain disaster recovery actions or financial assistance to restore "a facility substantially to its condition prior to the disaster or emergency." 42 U.S.C. 5159. In 2020, Congress enacted the Coronavirus Aid, Relief, and Economic Security Act, which created an exemption from NEPA for the General Services Administration's acquisition of real property and interests in real property or improvements in real property in response to coronavirus in

---

[47] For covered projects, section 4370m–4 authorizes lead agencies to adopt or incorporate by reference existing environmental analyses and documentation prepared under State laws and procedures if the analyses and documentation meet certain requirements. 42 U.S.C. 4370m–4(b)(1)(A)(i). This provision also requires that the lead agency, in consultation with CEQ, determine that the analyses and documentation were prepared using a process that allowed for public participation and consideration of alternatives, environmental consequences, and other required analyses that are substantially equivalent to what a Federal agency would have prepared pursuant to NEPA. *Id.*

[48] *See generally* Memorandum of Understanding Establishing the Unified Federal Environmental and Historic Preservation Review Process for Disaster Recovery Projects (July 29, 2014), *https:// www.fema.gov/media-library-data/1414507626204-f156c4795571b85a4f8e1c1f4c4b7de1/Final_Signed_UFR_MOU_9_24_14_508_ST.PDF.*

[49] The Homeland Security Act of 2002 transferred responsibility for the construction of border barriers from the Attorney General to the Department of Homeland Security. Public Law 107–296, 116 Stat. 2135. In 2005, the REAL ID Act amended the waiver authority of section 102(c) expanding the Secretary of DHS' authority to waive "all legal requirements" that the Secretary, in his or her own discretion, determines "necessary to ensure expeditious construction" of certain "barriers and roads." Public Law 109–13, Div. B, tit. I, sec. 102, 119 Stat. 231, 302, 306. It also added a judicial review provision that limited the district court's jurisdiction to hear any causes or claims concerning the Secretary's waiver authority to solely constitutional claims. *Id.* sec. 102(c)(2)(A). Further, the provision directed that any review of the district court's decision be raised by petition for a writ of certiorari with the Supreme Court of the United States. *Id.* sec. 102(c)(2)(C). *See In re Border Infrastructure Envtl. Litig.,* 284 F. Supp. 3d 1092 (S.D. Cal. 2018).

**43312**    Federal Register / Vol. 85, No. 137 / Thursday, July 16, 2020 / Rules and Regulations

conjunction with the provision of additional funding to prevent, prepare for, and respond to the coronavirus. Public Law 116–136, Div. B.

These statutes reflect that Congress has recognized that the environmental review process can be more efficient and effective, including for infrastructure projects, and that in certain circumstances, Congress has determined it appropriate to exempt certain actions from NEPA review. Congress also has identified specific process improvements that can accelerate environmental reviews, including improved interagency coordination, concurrent reviews, and increased transparency.

## E. Presidential Directives

Over the past two decades and multiple administrations, Presidents also have recognized the need to improve the environmental review process to make it more timely and efficient, and have directed agencies, through Executive orders and Presidential memoranda, to undertake various initiatives to address these issues. In 2002, President Bush issued E.O. 13274 titled "Environmental Stewardship and Transportation Infrastructure Project Reviews," [50] which stated that the development and implementation of transportation infrastructure projects in an efficient and environmentally sound manner is essential, and directed agencies to conduct environmental reviews for transportation projects in a timely manner.

In 2011, President Obama's memorandum titled "Speeding Infrastructure Development Through More Efficient and Effective Permitting and Environmental Review" [51] directed certain agencies to identify up to three high-priority infrastructure projects for expedited environmental review and permitting decisions to be tracked publicly on a "centralized, online tool." This requirement led to the creation of what is now the Permitting Dashboard, *www.permits.performance.gov.*

In 2012, E.O. 13604, titled "Improving Performance of Federal Permitting and Review of Infrastructure Projects," [52] established an interagency Steering Committee on Federal Infrastructure Permitting and Review Process Improvement ("Steering Committee") to facilitate improvements in Federal permitting and review processes for infrastructure projects. The Executive

order directed the Steering Committee to develop a plan "to significantly reduce the aggregate time required to make Federal permitting and review decisions on infrastructure projects while improving outcomes for communities and the environment." Similarly, E.O. 13616, titled "Accelerating Broadband Infrastructure Deployment," [53] established an interagency working group to, among other things, avoid duplicative reviews and coordinate review processes to advance broadband deployment.

A 2013 Presidential Memorandum titled "Modernizing Federal Infrastructure Review and Permitting Regulations, Policies, and Procedures" [54] directed the Steering Committee established by E.O. 13604 to work with agencies, OMB, and CEQ to "modernize Federal infrastructure review and permitting regulations, policies, and procedures to significantly reduce the aggregate time required by the Federal Government to make decisions in the review and permitting of infrastructure projects, while improving environmental and community outcomes" and develop a plan to achieve this goal. Among other things, the memorandum directed that the plan create process efficiencies, including additional use of concurrent and integrated reviews; expand coordination with State, Tribal, and local governments; and expand the use of information technology tools. CEQ and OMB led the effort to develop a comprehensive plan to modernize the environmental review and permitting process while improving environmental and community outcomes, including budget proposals for funding and new authorities. Following the development of the plan, CEQ continued to work with agencies to improve the permitting process, including through expanded collection of timeframe metrics on the Permitting Dashboard. In late 2015, these ongoing efforts were superseded by the enactment of FAST–41, which codified the use of the Permitting Dashboard, established the Federal Permitting Improvement Steering Council ("Permitting Council"), and established other requirements for managing the environmental review and permitting process for covered infrastructure projects.

On August 15, 2017, President Trump issued E.O. 13807 titled "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects." [55]

Section 5(e)(i) directed CEQ to develop an initial list of actions to enhance and modernize the Federal environmental review and authorization process, including issuing such regulations as CEQ deems necessary to: (1) Ensure optimal interagency coordination of environmental review and authorization decisions; (2) ensure that multi-agency environmental reviews and authorization decisions are conducted in a manner that is concurrent, synchronized, timely, and efficient; (3) provide for use of prior Federal, State, Tribal, and local environmental studies, analysis, and decisions; and (4) ensure that agencies apply NEPA in a manner that reduces unnecessary burdens and delays, including by using CEQ's authority to interpret NEPA to simplify and accelerate the NEPA review process. In response to E.O. 13807, CEQ published an initial list of actions and stated its intent to review its existing NEPA regulations in order to identify potential revisions to update and clarify these regulations.[56]

## F. Advance Notice of Proposed Rulemaking

Consistent with E.O. 13807 and CEQ's initial list of actions, and given the length of time since CEQ issued its regulations, on June 20, 2018, CEQ published an ANPRM titled "Update to the Regulations for Implementing the Procedural Provisions of the National Environmental Policy Act." [57] The ANPRM requested public comments on how CEQ could ensure a more efficient, timely, and effective NEPA process consistent with the Act's national environmental policy and provided for a 30-day comment period.[58]

The ANPRM requested comment on potential revisions to update and clarify the NEPA regulations, and included a list of questions on specific aspects of the regulations. For example, with respect to the NEPA process, the ANPRM asked whether there are provisions that CEQ could revise to ensure more efficient environmental reviews and authorization decisions, such as facilitating agency use of existing environmental studies, analyses and decisions, as well as improving interagency coordination. The ANPRM also requested comments on the scope of NEPA reviews, including whether CEQ should revise, clarify, or add definitions. The ANPRM also asked whether additional revisions relating to

---

[50] 67 FR 59449 (Sept. 23, 2002).

[51] *https://www.govinfo.gov/content/pkg/DCPD-201100601/pdf/DCPD-201100601.pdf.*

[52] 77 FR 18887 (Mar. 28, 2012).

[53] 77 FR 36903 (June 20, 2012).

[54] 78 FR 30733 (May 22, 2013).

[55] 82 FR 40463 (Aug. 24, 2017).

[56] 82 FR 43226 (Sept. 14, 2017).

[57] 83 FR 28591 (June 20, 2018).

[58] In response to comments, CEQ extended the comment period 31 additional days to August 20, 2018. 83 FR 32071 (July 11, 2018).

environmental documentation issued pursuant to NEPA, including CEs, EAs, EISs, and other documents, would be appropriate. Finally, the ANPRM requested general comments, including whether there were obsolete provisions that CEQ could update to reflect new technologies or make the process more efficient, or that CEQ could revise to reduce unnecessary burdens or delays.

In response to the ANPRM, CEQ received over 12,500 comments, which are available for public review.[59] These included comments from a wide range of stakeholders, including States, Tribes, localities, environmental organizations, trade associations, NEPA practitioners, and interested members of the public. While some commenters opposed any updates to the regulations, other commenters urged CEQ to consider potential revisions. Though the approaches to the update of the NEPA regulations varied, most of the substantive comments supported some degree of updating of the regulations. Many noted that overly lengthy documents and the time required for the NEPA process remain real and legitimate concerns despite the NEPA regulations' explicit direction with respect to reducing paperwork and delays. In general, numerous commenters requested that CEQ consider revisions to modernize its regulations, reduce unnecessary burdens and costs, and make the NEPA process more efficient, effective, and timely.

*G. Notice of Proposed Rulemaking*

On January 9, 2020, President Trump announced the release of CEQ's NPRM titled "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act" and the rule was published in the **Federal Register** on January 10, 2020.[60] The NPRM provided a 60-day comment period, and the comment period ended on March 10, 2020.

CEQ hosted two public hearings in Denver, Colorado on February 11, 2020, and in Washington, DC on February 25, 2020.[61] CEQ also notified all federally recognized Tribes and over 400 interested groups, including State, Tribal, and local officials, environmental associations, NEPA practitioners, and interested members of the public

representing a broad range of diverse views, that CEQ had issued the proposed rule for public comment.[62] Additionally, CEQ made information to aid the public's review of the proposed rule available on its websites at *www.whitehouse.gov/ceq* and *www.nepa.gov,* including a redline version of the proposed changes to the regulations posted on *www.regulations.gov,* along with a presentation on the proposed rule and other background information.[63] CEQ also conducted additional public outreach to solicit comments, including meetings with Tribal representatives in Denver, Colorado, Anchorage, Alaska, and Washington, DC.[64]

In response to the NPRM, CEQ received comments from a broad range of stakeholders on a diversity of issues relating to the proposed rule. These included comments from members of Congress, State, Tribal, and local officials, environmental organizations, trade associations, NEPA practitioners, and interested members of the public. CEQ also received a large number of campaign comments, including comments with multiple signatories or groups of comments that were identical or very similar in form or content. The comments received on the NPRM raised a variety of issues related to the rulemaking and contents of the proposed rule, including procedural, legal, and technical issues. The Final Rule Response to Comments provides a summary of the comments and responses to those comments.

**II. Summary of Final Rule**

In this section, CEQ summarizes the NPRM proposed changes and the final rule, including any changes or additions to what CEQ proposed. CEQ makes the additions, clarifications, and updates to its regulations based on its record evaluating the implementation of the NEPA regulations, suggestions in response to the ANPRM, and comments provided in response to the NPRM. The revisions finalized in this rule advance the original objectives of the 1978 regulations[65] "[t]o reduce paperwork, to reduce delays, and at the same time to produce better decisions [that] further

the national policy to protect and enhance the quality of the human environment." [66]

In this final rule, CEQ makes various revisions to align the regulations with the text of the NEPA statute, including revisions to reflect the procedural nature of the statute, including under section 102(2). CEQ also revises the regulations to ensure that environmental documents prepared pursuant to NEPA are concise and serve their purpose of informing decision makers regarding significant potential environmental effects of proposed major Federal actions and the public of the environmental issues in the pending decision-making process. CEQ makes changes to ensure that the regulations reflect changes in technology, increase public participation in the process, and facilitate the use of existing studies, analyses, and environmental documents prepared by States, Tribes, and local governments.

CEQ also makes its regulations consistent with the OFD policy established by E.O. 13807 for multi-agency review and related permitting and other authorization decisions. The Executive order specifically instructed CEQ to take steps to ensure optimal interagency coordination, including through a concurrent, synchronized, timely, and efficient process for environmental reviews and authorization decisions. In response to the NPRM, CEQ received many comments supporting revisions to codify key aspects of the OFD policy in the NEPA regulations, including by providing greater specificity on the roles and responsibilities of lead and cooperating agencies. Commenters also suggested that the regulations require agencies to establish and adhere to timetables for the completion of reviews, another key element of the OFD policy. To promote improved interagency coordination and more timely and efficient reviews and in response to these comments, CEQ codifies and generally applies a number of key elements from the OFD policy in this final rule. These include development by the lead agency of a joint schedule, procedures to elevate delays or disputes, preparation of a single EIS and joint ROD to the extent practicable, and a two-year goal for completion of environmental reviews. Consistent with section 104 of NEPA (42 U.S.C. 4334), codification of these policies will not limit or affect the authority or legal responsibilities of agencies under other statutory mandates that may be covered by joint schedules,

---

[59] *See https://www.regulations.gov,* docket no. CEQ–2018–0001.

[60] *Supra* note 8.

[61] Transcripts of the two public hearings with copies of testimony and written comments submitted at the hearings are available in the docket on *www.regulations.gov,* docket ID CEQ–2019–0003.

[62] Notices are available under "Supporting Documents" in the docket, *www.regulations.gov,* docket ID CEQ–2019–0003, *https://www.regulations.gov/docketBrowser?rpp=25&so=DESC&sb=commentDueDate&po=0&dct=SR%2BO&D=CEQ-2019-0003.*

[63] *Id.*

[64] CEQ also includes meeting summaries under supplemental materials. *Id.*

[65] In this final rule, CEQ uses the term "1978 regulations" to refer to the regulations as they exist prior to this final rule's amendment thereof, which includes the 1986 amendment to 40 CFR 1502.22.

[66] 43 FR 55978 (Nov. 29, 1978).

and CEQ includes language to that effect in § 1500.6.[67]

CEQ also clarifies the process and documentation required for complying with NEPA by amending part 1501 to add sections on threshold considerations, determination of the appropriate level of NEPA review, and the application of CEs; and revising sections in part 1501 on EAs and findings of no significant impact (FONSIs), and EISs in part 1502. CEQ further revises the regulations to promote more efficient and timely environmental reviews, including revisions to promote interagency coordination by amending sections of parts 1501, 1506, and 1507 relating to lead, cooperating, and participating agencies, timing of agency action, scoping, and agency NEPA procedures.

To promote a more efficient and timely NEPA process, CEQ amends provisions in parts 1501, 1506, and 1507 relating to applying NEPA early in the process, scoping, tiering, adoption, use of current technologies, and avoiding duplication of State, Tribal, and local environmental reviews; revises parts 1501 and 1502 to provide for presumptive time and page limits; and amends part 1508 to clarify the definitions. For example, CEQ includes two new mechanisms to facilitate the use of CEs when appropriate. Under § 1506.3(d), an agency can adopt another agency's determination that a CE applies to a proposed action when the adopting agency's proposed action is substantially the same. This extends the adoption process and standards from EISs to CE determinations.[68] This allows agencies to "piggyback" where more than one agency is taking an action related to the same project or activity. Alternatively, to apply CEs listed in another agency's procedures (without that agency already having made a determination that a CE applies to a substantially similar action), agencies can establish a process in their agency NEPA procedures to coordinate and apply CEs listed in other agencies' procedures.

Another efficiency included in this final rule is the ability for agencies to identify other requirements that serve the function of agency compliance with NEPA. Under §§ 1501.1 and 1507.3(d)(6), agencies may determine that another statute's requirements serve the function of agency compliance with

NEPA. Alternatively, agencies may designate in their agency NEPA procedures one or more procedures or documents under other statutes or Executive orders that satisfy one or more requirements in the NEPA regulations, consistent with § 1507.3(c)(5). Finally, § 1506.9 allows agencies to substitute processes and documentation developed as part of the rulemaking process for corresponding requirements in these regulations.

As noted above, NEPA is a procedural statute that has twin aims. The first is to promote informed decision making, while the second is to inform the public about the agency's decision making. In this final rule, CEQ amends parts 1500, 1501, 1502, 1503, 1505, and 1508 to ensure that agencies solicit and consider relevant information early in the NEPA process and have the maximum opportunity to take that information into account in their decision making.

In situations where an EIS is required, this process takes place in two discrete steps. First, § 1501.9(d) directs agencies to include information on the proposed action in the NOI, including its expected impacts and alternatives, and a request for comments from interested parties on the potential alternatives, information, and analyses relevant to the proposed action. Second, § 1503.1(a) requires agencies to request comments on the analysis and conclusions of the draft EIS. The purpose of these two provisions is to bring relevant comments, information, and analyses to the agency's attention, as early in the process as possible, to enable the agency to make maximum use of this information.

To facilitate this process, § 1503.3 requires comments on the draft EIS to be submitted on a timely basis and to be as specific as possible. Similarly, § 1503.1(a)(3) requires agencies to invite interested parties to comment specifically on the alternatives, information, and analyses submitted for consideration in the development of the draft EIS. Finally, § 1503.3(b) provides that comments, information, and analyses on the draft EIS not timely received are deemed unexhausted and therefore forfeited. The intent of these amendments is two-fold: (1) To ensure that comments are timely received and at a level of specificity where they can be meaningfully taken into account, where appropriate; and (2) to prevent unnecessary delay in the decision-making process.

Consistent with this intent, § 1500.3(b)(2) also directs agencies to include a new section in both the draft and final EIS that summarizes all alternatives, information, and analyses

submitted by interested parties in response to the agency's requests for comment in the NOI and on the draft EIS. In addition, §§ 1502.17(a)(2) and 1503.1(a)(3) direct agencies to request comment on the summary in the draft EIS. The purpose of these provisions is to ensure that the agency, through outreach to the public, has identified all relevant information submitted by State, Tribal, and local governments and other public commenters. Although not a substitute for the entire record, the summary will assist agency decision makers in their consideration of the record for the proposed action. As the Supreme Court observed in *Metropolitan Edison Co.* v. *People Against Nuclear Energy,* "[t]he scope of [an] agency's inquiries must remain manageable if NEPA's goal of '[insuring] a fully informed and well-considered decision' . . . is to be accomplished." 460 U.S. at 776 (quoting *Vt. Yankee,* 435 U.S. at 558).

Finally, informed by the summary included in the final EIS pursuant to §§ 1500.3(b)(2) and 1502.17 and the response to comments pursuant to § 1503.4, together with any other material in the record that he or she determines to be relevant, the decision maker is required under § 1505.2(b) to certify in the ROD that the agency has considered the alternatives, information, analyses, and objections submitted by State, Tribal, and local governments and public commenters for consideration in the development of the final EIS. Section 1505.2(b) further provides that a decision certified in this manner is entitled to a presumption that the agency has adequately considered the submitted alternatives, information, and analyses, including the summary thereof, in reaching its decision. This presumption will advance the purposes of the directive in E.O. 11991 to ensure that EISs are supported by evidence that agencies have performed the necessary environmental analyses. *See* E.O. 11991, sec. 1 amending E.O. 11514, sec. 3(h). This presumption is also consistent with the longstanding presumption of regularity that government officials have properly discharged their official duties. *See U.S. Postal Serv.* v. *Gregory,* 534 U.S. 1, 10 (2001) ("[W]e note that a presumption of regularity attaches to the actions of government agencies." (citing *United States* v. *Chem. Found., Inc.,* 272 U.S. 1, 14–15 (1926)); *INS* v. *Miranda,* 459 U.S. 14, 18 (1982) (specific evidence required to overcome presumption that public officers have executed their responsibilities properly); *Citizens to Preserve Overton Park, Inc.* v. *Volpe,* 401 U.S. 402, 415 (1971) (Although a

[67] In the preamble, CEQ uses the section symbol (§) to refer to the final regulations as set forth in this final rule and 40 CFR to refer to the 1978 CEQ regulations as set forth in 40 CFR parts 1500–1508.

[68] The final rule also extends the adoption process and standards, which only applies to EISs under the 1978 regulations, to EAs as well.

statute prohibited Federal funds for roads through parks absent a feasible and prudent alternative, and although the Secretary of Transportation approved funds without formal findings, the Secretary's decision-making process was nevertheless entitled to a presumption of regularity.); *Fed. Commc'ns Comm'n* v. *Schreiber,* 381 U.S. 279, 296 (1965) (noting "the presumption to which administrative agencies are entitled—that they will act properly and according to law"); *Phila. & T. Ry.* v. *Stimpson,* 39 U.S. (14 Pet.) 448, 458 (1840) (Where a statute imposed certain conditions before a corrected patent could issue, the signatures of the President and the Secretary of State on a corrected patent raised a presumption that the conditions were satisfied, despite absence of recitals to that effect on face of patent.); *Martin* v. *Mott,* 25 U.S. (12 Wheat.) 19, 33 (1827) ("Every public officer is presumed to act in obedience to his duty, until the contrary is shown . . . ."); *Udall* v. *Wash., Va. & Md. Coach Co.,* 398 F.2d 765, 769 (D.C. Cir. 1968) (The Secretary of the Interior's determination that limitation of commercial bus service was required to preserve a parkway's natural beauty was entitled to presumption of validity, and the burden was on the challenger to overcome it.).

In light of this precedent and the interactive process established by these regulations, under which the agency and interested parties exchange information multiple times, the agency compiles and evaluates summaries of that information, and a public official is required to certify the agency's consideration of the record, it is CEQ's intention that this presumption may be rebutted only by clear and convincing evidence that the agency has not properly discharged its duties under the statute.

Finally, CEQ revises the regulations to make them easier to understand and apply. CEQ reorganizes the regulatory text to move topics addressed in multiple sections and sometimes multiple parts into consolidated sections. CEQ simplifies and clarifies part 1508 to focus on definitions by moving operative requirements to the relevant regulatory provisions. CEQ revises the regulations to consolidate provisions and reduce duplication. Such consolidation, reordering, and reorganization promotes greater clarity and ease of use.

*A. Changes Throughout Parts 1500–1508*

CEQ proposed several revisions throughout parts 1500–1508 to provide consistency, improve clarity, and correct grammatical errors. CEQ proposed to make certain grammatical corrections in the regulations where it proposed other changes to the regulations to achieve the goals of this rulemaking, or where CEQ determined the changes are necessary for the reader to understand fully the meaning of the sentence. CEQ proposed to revise sentences from passive voice to active voice to help identify the responsible parties. CEQ also proposed to correct the usage of the term "insure" with "ensure" consistent with modern usage. "Insure" is typically used in the context of providing or obtaining insurance, whereas "ensure" is used in the context of making something sure, certain, or safe. While NEPA uses the term "insure," the context in which it is used makes it clear that Congress meant "ensure" consistent with modern usage. Similarly, CEQ proposed to correct the use of "which" and "that" throughout the rule.

CEQ proposed to add paragraph letters to certain introductory paragraphs where it would improve clarity. Finally, CEQ invited comment on whether it should make these types of grammatical and editorial changes throughout the rule or if there are additional specific instances where CEQ should make these types of changes. In the final rule, CEQ adopts the proposed revisions to provide consistency and clarity and to correct grammatical errors and makes these types of changes throughout.

CEQ proposed to add "Tribal" to the phrase "State and local" throughout the rule to ensure consultation with Tribal entities and to reflect existing NEPA practice to coordinate or consult with affected Tribal governments and agencies, as necessary and appropriate for a proposed action. CEQ also proposed this change in response to comments on the ANPRM supporting expansion of the recognition of the sovereign rights, interests, and expertise of Tribes. CEQ proposed to eliminate the provisions in the regulations that limit Tribal interest to reservations. CEQ adopts these proposals in the final rule and makes these additions and revisions in §§ 1500.3(b)(2)–(4), 1500.4(p), 1500.5(j), 1501.2(b)(4)(ii), 1501.3(b)(2)(iv), 1501.5(e), 1501.7(b) and (d), 1501.8(a), 1501.9(b), 1501.10(f), 1502.5(b), 1502.16(a)(5), 1502.17(a) and (b), 1502.20(a), 1503.1(a)(2)(i) and (ii), 1505.2(b), and 1506.1(b), 1506.2, 1506.6(b)(3)(i)–(iii), and 1508.1(e), (k), and (w). As noted in the NPRM, these changes are consistent with and in support of government-to-government consultation pursuant to E.O. 13175, titled "Consultation and Coordination With Indian Tribal Governments."[69]

CEQ proposed several changes for consistent use of certain terms. In particular, CEQ proposed to change "entitlements" to the defined term "authorizations" proposed in § 1508.1(c) throughout the regulations and added "authorizations" where appropriate to reflect the mandate in E.O. 13807 for better integration and coordination of authorization decisions and related environmental reviews. CEQ is adopting these revisions in the final rule in §§ 1501.2(a), 1501.7(i), 1501.9(d)(4) and (f)(4), 1502.13, 1502.24(b), 1503.3(d), and 1508.1(w).

CEQ proposed to use the term "decision maker" to refer to an individual responsible for making decisions on agency actions and "senior agency official" to refer to the individual who oversees the agency's overall compliance with NEPA. CEQ adopts these changes in the final rule. There may be multiple individuals within certain departments or agencies that have these responsibilities, including where subunits have developed agency procedures or NEPA compliance programs.

CEQ proposed to replace "circulate" or "circulation" with "publish" or "publication" throughout the rule and make "publish or publication" a defined term in § 1508.1(y), which provides agencies with the flexibility to make environmental review and information available to the public by electronic means not available at the time of promulgation of the CEQ regulations in 1978. As explained in the NPRM, historically, the practice of circulation included mailing of hard copies or providing electronic copies on disks or CDs. While it may be necessary to provide a hard copy or copy on physical media in limited circumstances, agencies now provide most documents in an electronic format by posting them online and using email or other electronic forms of communication to notify interested or affected parties. This change will help reduce paperwork and delays, and modernize the NEPA process to be more accessible to the public. CEQ finalizes these changes in §§ 1500.4(o), 1501.2(b)(2), 1502.9(b) and (d)(3), 1502.20, 1503.4(b) and (c), 1506.3(b)(1) and (2), and 1506.8(c)(2).

CEQ proposed to change the term "possible" to "practicable" in the NPRM in a number of sections of the regulations. As noted in the NPRM, "practicable" is the more commonly used term in regulations to convey the ability for something to be done,

---

[69] 65 FR 67249 (Nov. 9, 2000).

considering the cost, including time required, technical and economic feasibility, and the purpose and need for agency action. The term ''practicable,'' which is in the statute (42 U.S.C. 4331(a), (b)) and used many times in the 1978 regulations,[70] is consistent with notions of feasibility, which the case law has recognized as part of the NEPA process. *See, e.g., Vt. Yankee,* 435 U.S. at 551 (''alternatives must be bounded by some notion of feasibility''); *Kleppe,* 427 U.S. at 414 (''[P]ractical considerations of feasibility might well necessitate restricting the scope'' of an agency's analysis.) CEQ makes these changes in the final rule in §§ 1501.7(h)(1) and (2), 1501.8(b)(1), 1502.5, 1502.9(b), 1504.2, and 1506.2(b) and (c).

Similarly, CEQ proposed to change ''no later than immediately'' to ''as soon as practicable'' in § 1502.5(b), and CEQ finalizes this change. Finally, CEQ proposed to refer to the procedures required in § 1507.3 using the term ''agency NEPA procedures'' throughout. CEQ makes this change in the final rule.

CEQ proposed to eliminate obsolete references and provisions in several sections of the CEQ regulations. In particular, CEQ proposed to remove references to the 102 Monitor in 40 CFR 1506.6(b)(2) and 1506.7(c) because the publication no longer exists, and OMB Circular A–95, which was revoked pursuant to section 7 of E.O. 12372 (47 FR 30959, July 16, 1982), including the requirement to use State and area-wide clearinghouses in 40 CFR 1501.4(e)(2), 1503.1(a)(2)(iii), 1505.2, and 1506.6(b)(3)(i). CEQ removes these references in the final rule.

CEQ proposed changes to citations and authorities in parts 1500 through 1508. CEQ is updating the authorities sections for each part to correct the format. CEQ also is removing cross-references to the sections of part 1508, ''Definitions,'' and updates or inserts new cross-references throughout the rule to reflect revised or new sections. CEQ makes these changes throughout the final rule.

Finally, CEQ is reorganizing chapter V of title 40 of the Code of Federal Regulations to place the NEPA regulations into a new subchapter A, ''National Environmental Policy Act Implementing Regulations,'' and organizing its other regulations into their own new subchapter B, ''Administrative Procedures and Operations.'' References to ''parts 1500 through 1508'' in the proposed rule are referenced to ''this subchapter'' in the

final rule. CEQ notes that the provisions of the NEPA regulations, which the final rule comprehensively updates, should be read in their entirety to understand the requirements under the modernized regulations.[71]

### B. Revisions To Update the Purpose, Policy, and Mandate (Part 1500)

In part 1500, CEQ proposed several revisions to update the policy and mandate sections of the regulations to reflect statutory, judicial, policy, and other developments since the CEQ regulations were issued in 1978. CEQ includes the proposed changes with some revisions in the final rule.

#### 1. Purpose and Policy (§ 1500.1)

In the NPRM, CEQ proposed to retitle and revise § 1500.1, ''Purpose and policy,'' to align this section with the statutory text of NEPA and certain case law, and reflect the procedural requirements of section 102(2) (42 U.S.C. 4332(2)). These changes also are consistent with the President's directive to CEQ to ''[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of the Act (42 U.S.C. 4332(2)).'' E.O. 11514, as amended by E.O. 11991, sec. 3(h). Many commenters supported these revisions to promote more efficient and timely reviews under NEPA, while others opposed the changes and requested that CEQ maintain the existing language. CEQ revises this section in the final rule consistent with its proposal.

Section 1500.1 provides that NEPA is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process. The Supreme Court has made clear that NEPA is a procedural statute that does not mandate particular results; ''[r]ather, NEPA imposes only procedural requirements on [F]ederal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions.'' *Pub. Citizen,* 541 U.S. at 756–57 (citing *Methow Valley,* 490 U.S. at 349–50); *see also Vt. Yankee,* 435 U.S. at 558 (''NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.'').

As proposed in the NPRM, CEQ revises § 1500.1(a) to summarize section

101 of the Act (42 U.S.C. 4331) and to reflect that section 102(2) establishes the procedural requirements to carry out the policy stated in section 101. CEQ revises § 1500.1(a) consistent with the case law to reflect that the purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information and the public has been informed regarding the decision-making process, and to reflect that NEPA does not mandate particular results or substantive outcomes. *Marsh,* 490 U.S. at 373–74; *Vt. Yankee,* 435 U.S. at 558. CEQ replaces the vague reference to ''action-forcing'' provisions ensuring that Federal agencies act ''according to the letter and spirit of the Act'' (as well as consistently with their organic and program-specific governing statutes) with a more specific reference to the consideration of environmental impacts of their actions in agency decisions. These changes codify the Supreme Court's interpretation of section 102 in two important respects: Section 102 ''ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision[-]making process and the implementation of that decision.'' *Methow Valley,* 490 U.S. at 349; *see also Winter* v. *Nat. Res. Def. Council, Inc.,* 555 U.S. 7, 23 (2008); *Pub. Citizen,* 541 U.S. at 756–58.

Consistent with CEQ's proposal in the NPRM, CEQ revises § 1500.1(b) to describe the NEPA regulations as revised in this final rule. In particular, CEQ revises this paragraph to reflect that the regulations include direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review, where applicable. The revisions also ensure that Federal agencies identify and consider relevant environmental information early in the process in order to promote informed decision making. These revisions reduce unnecessary burdens and delays consistent with E.O. 13807 and the purposes of the regulations as originally promulgated in 1978. These amendments emphasize that the policy of integrating NEPA with other environmental reviews is to promote concurrent and timely reviews and decision making consistent with statutes, Executive orders, and CEQ guidance. *See, e.g.,* 42 U.S.C. 5189g; 23 U.S.C. 139; 42 U.S.C. 4370m *et seq.;* E.O. 13604; E.O. 13807; Mitigation

---

[70] *See* 40 CFR 1500.2(f), 1501.4(b), 1501.7, 1505.2(c), 1506.6(f) and 1506.12(a).

[71] While the final rule retains, in large part, the numbering scheme used in the 1978 regulations, the final rule comprehensively updates the prior regulations. The new regulations should be consulted and reviewed to ensure application is consistent with the modernized provisions. Assumptions should not be made concerning the degree of change to, similarity to, or any interpretation of the prior version of the regulations.

Guidance, *supra* note 29, and Timely Environmental Reviews Guidance, *supra* note 29.

## 2. Remove and Reserve Policy (§ 1500.2)

CEQ proposed to remove and reserve 40 CFR 1500.2, "Policy." The section included language that is identical or similar to language in E.O. 11514, as amended. That Executive order directed CEQ to develop regulations that would make the "[EIS] process more useful to decision makers and the public; and . . . reduce paperwork and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives." *See* E.O. 11514, as amended by E.O. 11991, sec. 3(h). The Executive order also directed CEQ to require EISs to be "concise, clear and to the point, and supported by evidence that agencies have made the necessary environmental analyses." *Id.* CEQ proposed to remove this section because it is duplicative of other sections of the regulations, thereby eliminating redundancy. CEQ is making this change in the final rule.

Specifically, 40 CFR 1500.2(a) restated the statutory text in section 102 of NEPA (42 U.S.C. 4332) and is duplicative of language in § 1500.6, "Agency authority," requiring each agency to interpret the provisions of NEPA as a supplement to its existing authority and as a mandate to view policies and missions in light of the Act's national environmental objectives. Paragraph (b) required agencies to implement procedures to make the NEPA process more useful to decision makers and the public; reduce paperwork and accumulation of extraneous background data; emphasize relevant environmental issues and alternatives; and make EISs concise, clear, and to the point and supported by evidence that they have made the necessary analyses. This paragraph is duplicative of language in § 1502.1, "Purpose of environmental impact statement," and paragraphs (c) through (i) of § 1500.4, "Reducing paperwork."

Paragraph (c) of 40 CFR 1500.2, requiring agencies to integrate NEPA requirements with other planning and review procedures to run concurrently rather than consecutively, is duplicative of language in § 1502.24, "Environmental review and consultation requirements," § 1501.2, "Apply NEPA early in the process," § 1501.9, "Scoping," and § 1500.4, "Reducing paperwork." Paragraph (d) encouraging public involvement is duplicative of sections that direct agencies to provide notice and information to and seek comment from

the public regarding proposed actions and environmental documents, including provisions in § 1506.6, "Public involvement," § 1501.9, "Scoping," and § 1503.1, "Inviting comments and requesting information and analyses." [72] Paragraph (e), which required agencies to use the NEPA process to identify and assess reasonable alternatives to proposed actions that will avoid or minimize adverse effects, is duplicative of language in § 1502.1, "Purpose of environmental impact statement," and paragraph (c) of § 1505.2, "Record of decision in cases requiring environmental impact statements."

Paragraph (f) of 40 CFR 1500.2 required agencies to use all practicable means, consistent with the Act and other essential considerations of national policy, to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects of their actions upon the quality of the human environment. The rule specifically directs agencies to consider reasonable alternatives to avoid or minimize adverse environmental impacts in § 1502.1, "Purpose of environmental impact statement." The final rule also provides direction to agencies about the relevant environmental information to be considered in the decision-making process, including potential adverse effects and alternatives, and expressly directs agencies to identify alternatives considered (§§ 1502.14 and 1502.16), and to state in their RODs whether they have adopted all practicable means to avoid or minimize environmental harm from the alternative selected (§ 1505.2).

## 3. NEPA Compliance (§ 1500.3)

CEQ proposed numerous changes and additions to § 1500.3, "NEPA compliance," including the addition of paragraph headings to improve readability. In paragraph (a), "Mandate," CEQ proposed to update the authorities under which it issues the regulations. CEQ adds these references, including to E.O. 13807, in the final rule. In the NPRM, CEQ proposed to add a sentence to this paragraph regarding

agency NEPA procedures not imposing additional procedures or requirements beyond those set forth in the regulations. To address confusion expressed by some commenters, CEQ does not include this sentence in the final rule because it includes this requirement in § 1507.3, "Agency NEPA procedures."

CEQ proposed to add a new paragraph (b), "Exhaustion," to summarize public comment requirements and an exhaustion requirement. Specifically, CEQ proposed in paragraph (b)(1) to require that, in a NOI to prepare an EIS, agencies request comments from interested parties on the potential effects of and potential alternatives to proposed actions, and also request that interested parties identify any relevant information, studies, or analyses of any kind concerning such effects. CEQ includes this provision in the final rule to ensure that agencies solicit and consider relevant information early in the development of an EIS.

In paragraph (b)(2) of § 1500.3, CEQ proposed to require that the EIS include a summary of all the comments received for consideration in developing the EIS. CEQ includes this provision in the final rule with some changes. For consistency with the language in § 1502.17, the final rule specifies that the draft and final EISs must include a summary of "all alternatives, information, and analyses." Also, in response to comments requesting clarification on the meaning of "public commenters," the final rule changes this phrase in paragraphs (b)(2) and (3) of § 1500.3 and in § 1502.17 to "State, Tribal, and local governments and other public commenters" for consistency with §§ 1501.9 and 1506.6 and to clarify that public commenters includes governments as well as other commenters such as organizations, associations, and individuals.

In paragraph (b)(3) of § 1500.3, CEQ proposed to require that public commenters timely submit comments on draft EISs and any information on environmental impacts or alternatives to a proposed action to ensure informed decision making by Federal agencies. CEQ further proposed to provide that comments not timely raised and information not provided shall be deemed unexhausted and forfeited. This reinforces the principle that parties may not raise claims based on issues they themselves did not raise during the public comment period. *See, e.g., Pub. Citizen,* 541 U.S. at 764–65 (finding claims forfeited because respondents had not raised particular objections to the EA in their comments); *Karst Envtl. Educ. & Prot., Inc.* v. *Fed. Highway Admin.,* 559 Fed. Appx. 421, 426–27

---

[72] Section 1506.6 includes detailed provisions directing agencies to facilitate public involvement, including by providing the public with notice regarding actions, holding or sponsoring public hearings, and providing notice of NEPA-related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents. Section 1501.9 requires agencies to issue a public notice regarding proposed actions for which the agencies will be preparing an EIS and to include specific information for, and to solicit information from the public regarding such proposed actions. Section 1503 provides direction to agencies regarding inviting comments from the public and requesting information and analyses.

(6th Cir. 2014) (concluding that comments did not raise issue with "sufficient clarity" to alert the Federal Highway Administration to concerns); *Friends of the Norbeck* v. *U.S. Forest Serv.,* 661 F.3d 969, 974 (8th Cir. 2011) (concluding that comments were insufficient to give the Forest Service an opportunity to consider claim and that judicial review was therefore improper); *Exxon Mobil Corp.* v. *U.S. EPA,* 217 F.3d 1246, 1249 (9th Cir. 2000) (arguments not raised in comments are waived); *Ass'n of Mfrs.* v. *Dep't of the Interior,* 134 F.3d 1095, 1111 (D.C. Cir. 1998) (failure to raise argument in rulemaking constitutes failure to exhaust administrative remedies). Finally, CEQ proposed to require that the public raise any objections to the submitted alternatives, information, and analyses section within 30 days of the notice of availability of the final EIS.

The final rule includes paragraph (b)(3) with some modifications. The final rule requires State, Tribal, and local governments and other public commenters to submit comments within the comment periods provided under § 1503.1 and that comments be as specific as possible under § 1503.3. The rule specifies that comments or objections of any kind not submitted "shall be forfeited as unexhausted" to clarify any ambiguity about forfeiture and exhaustion. CEQ received comments opposing the proposal to require the public to raise objections to the submitted alternatives, information, and analyses section within 30 days of the notice of availability of the final EIS. The final rule does not include the proposed mandatory 30-day comment period. However, § 1506.11 retains from the 1978 regulations the 30-day waiting period prior to issuance of the ROD, subject to limited exceptions, and under § 1503.1(b), agencies may solicit comments on the final EIS if they so choose. Each commenter should put its own comments into the record as soon as practicable to ensure that the agency has adequate time to consider the commenter's input as part of the agency's decision-making process. Finally, to ensure commenters timely identify issues, CEQ expresses its intention that commenters rely on their own comments and not those submitted by other commenters in any subsequent litigation, except where otherwise provided by law.

CEQ also proposed in paragraph (b)(4) of § 1500.3 to require that the agency decision maker certify in the ROD that the agency has considered all of the alternatives, information, and analyses submitted by public commenters based on the summary in the EIS. CEQ

includes this section in the final rule with some modifications. The final rule requires the decision maker, informed by the final EIS (including the public comments, summary thereof, and responses thereto) and other relevant material in the record, certify that she or he considered the alternatives, information, and analyses submitted by States, Tribes, and local governments and other public commenters. Relevant material includes both the draft and final EIS as well as any supporting materials incorporated by reference or appended to the document. The final rule does not specify the decision maker "for the lead agency" to account for multiple decision makers, consistent with the OFD policy.

CEQ proposed to add a new paragraph (c), "Review of NEPA compliance," to § 1500.3 to reflect the development of case law since the promulgation of the CEQ regulations. Specifically, CEQ proposed to revise the sentence regarding timing of judicial review to strike references to the filing of an EIS or FONSI and replace them with the issuance of a signed ROD or the taking of another final agency action. CEQ includes this change in the final rule. Judicial review of NEPA compliance for agency actions can occur only under the APA, which requires finality. 5 U.S.C. 704. A private right of action to enforce NEPA, which is lacking, would be required to review non-final agency action. In addition, non-final agency action may not be fit for judicial review as a matter of prudential standing. *See Abbott Labs* v. *Gardner,* 387 U.S. 136, 148–49 (1967). Under the APA, judicial review does not occur until an agency has taken final agency action. *Bennett* v. *Spear,* 520 U.S. 154, 177–78 (1997) ("[T]he action must mark the 'consummation' of the agency's decision[-]making process—it must not be of a merely tentative or interlocutory nature. And second, the action must be one by which 'rights or obligations have been determined' or from which 'legal consequences will flow'" (citations omitted)). Because NEPA's procedural requirements apply to proposals for agency action, judicial review should not occur until the agency has completed its decision-making process, and there are "direct and appreciable legal consequences." *Id.* at 178. Final agency action for judicial review purposes is not necessarily when the agency publishes the final EIS, issues a FONSI, or makes the determination to categorically exclude an action.

CEQ also proposed in paragraph (c) to clarify that any allegation of noncompliance be resolved as expeditiously as possible, and that

agencies may structure their decision making to allow private parties to seek agency stays or provide for efficient mechanisms, such as imposition of bonds, for seeking, granting, and imposing conditions on stays. The final rule clarifies that it is CEQ's intention that any allegation of noncompliance be resolved as expeditiously as possible. The final rule also clarifies that agencies may structure their procedures consistent with their organic statutes, and as part of implementing the exhaustion provisions in paragraph (b) of § 1500.3, to include an appropriate bond or other security requirement to protect against harms associated with delays.

Consistent with their statutory authorities, agencies may impose, as appropriate, bond and security requirements or other conditions as part of their administrative processes, including administrative appeals, and a prerequisite to staying their decisions, as courts do under rule 18 of the Federal Rules of Appellate Procedure and other rules.[73] *See, e.g.,* Fed. R. App. P. 18(b); Fed. R. App. P. 8(a)(2)(E); Fed. R. Civ. P. 65(c); Fed. R. Civ. P. 62(b); Fed. R. Civ. P. 62(d). CEQ notes that there is no "NEPA exception" that exempts litigants bringing NEPA claims from otherwise applicable bond or security requirements or other appropriate conditions, and that some courts have imposed substantial bond requirements in NEPA cases. *See, e.g., Save Our Sonoran, Inc.* v. *Flowers,* 408 F.3d 1113, 1125–26 (9th Cir. 2005) (concluding that district court's imposition of a $50,000 bond was appropriate and supported by the record); *Stockslager* v. *Carroll Elec. Co-op Corp.,* 528 F.2d 949 (8th Cir. 1976) (concluding that district court's imposition of a $10,000 bond was appropriate).

CEQ proposed to add a new paragraph (d), "Remedies," to § 1500.3. CEQ proposed to state explicitly that harm from the failure to comply with NEPA can be remedied by compliance with NEPA's procedural requirements, and that CEQ's regulations do not create a cause of action for violation of NEPA. The statute does not create any cause of action, and agencies may not create private rights of action by regulation; "[l]ike substantive [F]ederal law itself, private rights of action to enforce [F]ederal law must be created by Congress." *Alexander* v. *Sandoval,* 532 U.S. 275, 286 (2001) (citing *Touche Ross*

---

[73] *See, e.g.,* 26 CFR 2.6 (Bureau of Indian Affairs' regulatory provision that allows a person that believes he or she may suffer a measurable and substantial financial loss as a result of the delay caused by an appeal to request that the official require the posting of a reasonable bond).

*& Co.* v. *Redington,* 442 U.S. 560, 578 (1979)). This is particularly relevant where, as here, the counterparty in any action to enforce NEPA would be a Federal officer or agency. *See San Carlos Apache Tribe* v. *United States,* 417 F.3d 1091, 1096–97 (9th Cir. 2005) ("[C]reating a direct private action against the federal government makes little sense in light of the administrative review scheme set out in the APA.").

The CEQ regulations create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm. As the Supreme Court has held, the irreparable harm requirement, as a prerequisite to the issuance of preliminary or permanent injunctive relief, is neither eliminated nor diminished in NEPA cases. A showing of a NEPA violation alone does not warrant injunctive relief and does not satisfy the irreparable harm requirement. *See Monsanto Co.* v. *Geertson Seed Farms,* 561 U.S. 139, 157 (2010) ("[T]he statements quoted [from prior Ninth Circuit cases] appear to presume that an injunction is the proper remedy for a NEPA violation except in unusual circumstances. No such thumb on the scales is warranted."); *Winter,* 555 U.S. at 21–22, 31–33; *see also Amoco Prod. Co.* v. *Vill. of Gambell,* 480 U.S. 531, 544–45 (1987) (rejecting proposition that irreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action). Moreover, a showing of irreparable harm in a NEPA case does not entitle a litigant to an injunction or a stay. *See Winter,* 555 U.S. at 20 ("A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, *and* that an injunction is in the public interest.") (emphasis added); *Geertson Seed Farms,* 561 U.S. at 157 ("The traditional four-factor test applies when a plaintiff seeks a permanent injunction to remedy a NEPA violation . . . . An injunction should issue only if the traditional four-factor test is satisfied.").

Consistent with the Supreme Court's analysis in *Geertson Seed Farms,* agencies (as well as applicants) should give practical consideration to measures that might serve to anticipate, reduce, or eliminate possible adverse effects from a project. To the extent such measures are incorporated into an agency's ROD, they may provide grounds upon which a court, presented with an alleged violation of NEPA, might reasonably conclude that injunctive relief is not warranted because the measures prevent any irreparable harm from occurring. *See* § 1505.3. For example, regular inspections or requirements that applicants obtain third-party insurance, for example, might constitute such measures in certain circumstances. Inspections can reveal defects before they cause harm. Third-party insurers, because of their exposure to risk, have an economic incentive to conduct thorough inspections, facilitating discovery of defects. Such measures would be relevant to whether a valid claim of irreparable harm has been established.

CEQ also proposed to state that any actions to review, enjoin, vacate, stay, or alter an agency decision on the basis of an alleged NEPA violation be raised as soon as practicable to avoid or minimize any costs to agencies, applicants, or any affected third parties. As reflected in comments received in response to the ANPRM, delays have the potential to result in substantial costs. CEQ also proposed to replace the language providing that trivial violations should not give rise to an independent cause of action with language that states that minor, non-substantive errors that have no effect on agency decision making shall be considered harmless and shall not invalidate an agency action. Invalidating actions due to minor errors does not advance the goals of the statute and adds delays and costs. CEQ includes paragraph (d) in the final rule with a change to clarify that it is CEQ's intention that the regulations create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm. As noted above, NEPA is a procedural statute and any harm is thus reparable by providing the necessary environmental documentation in accordance with the Act and these regulations. CEQ also adds "vacate, or otherwise" to the types of actions that may alter a decision to address situations where there may be a nationwide or other vacatur and "after final agency action" to clarify when the actions should be raised.

Finally, CEQ proposed to add a new paragraph (e), "Severability," to § 1500.3 to address the possibility that this rule, or portions of this rule, may be challenged in litigation. CEQ finalizes this paragraph as proposed, correcting the cross reference. As stated in the NPRM, it is CEQ's intention that the individual sections of this rule be severable from each other, and that if a court stays or invalidates any sections or portions of the regulations, this will not affect the validity of the remainder of the sections, which will continue to be operative.

## 4. Reducing Paperwork and Delay (§§ 1500.4 and 1500.5)

In the NPRM, CEQ proposed to reorder the paragraphs in § 1500.4, "Reducing paperwork," and § 1500.5, "Reducing delay," for a more logical ordering, consistent with the three levels of NEPA review. CEQ also proposed edits to §§ 1500.4 and 1500.5 for consistency with proposed edits to the cross-referenced sections. CEQ makes these proposed changes in the final rule. Additionally, the final rule revises the language in paragraphs (a) and (b) of §§ 1500.4 and 1500.5 to make the references to CEs and FONSIs consistent with the language in §§ 1501.4(a) and 1501.6(a), respectively. CEQ also proposed conforming edits to § 1500.4(c) to broaden the paragraph to include EAs by changing "environmental impact statements" to "environmental documents" and changing "setting" to "meeting" since page limits would be required for both EAs and EISs. CEQ makes these changes in the final rule and corrects the cross-reference. CEQ revises paragraph (h) of § 1500.4 to add "*e.g.*" to the citations to clarify that these are just examples of the useful portions of EISs and to correct the cross-reference to background material from § 1502.16 to § 1502.1. CEQ revises the citations in paragraph (k) of § 1500.4 to make them sequential. Finally, CEQ revises paragraph (d) of § 1500.5 for clarity.

## 5. Agency Authority (§ 1500.6)

CEQ proposed to add a savings clause to § 1500.6, "Agency authority," to clarify that the CEQ regulations do not limit an agency's other authorities or legal responsibilities. This clarification is consistent with section 104 of NEPA (42 U.S.C. 4334), section 2(g) of E.O. 11514, and the 1978 regulations, but acknowledges the possibility of different statutory authorities that may set forth different requirements, such as timeframes. In the final rule, CEQ makes the proposed changes and clarifies further that agencies interpret the provisions of the Act as a mandate to view the agency's policies and missions in the light of the Act's national environmental objectives, to the extent NEPA is consistent with the agency's existing authority. This is consistent with E.O. 11514, which provides that Federal agencies shall "[i]n carrying out their responsibilities under the Act and this Order, comply with the [CEQ regulations] except where such compliance would be inconsistent with statutory requirements." E.O. 11514, as amended by E.O. 11991, sec. 2(g). CEQ also proposed to clarify that compliance

with NEPA means the Act "as interpreted" by the CEQ regulations. CEQ makes this change in the final rule in § 1500.6, as well as in §§ 1502.2(d) and 1502.9(b), to clarify that agencies should implement the statute through the framework established in these regulations. Finally, CEQ revises the sentence explaining the meaning of the phrase "to the fullest extent possible" in section 102, to replace "unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible" with "consistent with § 1501.1." As discussed in section II.C.1, § 1501.1 sets forth threshold considerations for assessing whether NEPA applies or is otherwise fulfilled, including considerations related to other statutes with which agencies must comply.

*C. Revisions to NEPA and Agency Planning (Part 1501)*

CEQ proposed significant changes to modernize and clarify part 1501. CEQ proposed to replace the current 40 CFR 1501.1, "Purpose," because it is unnecessary and duplicative, with a new section, "NEPA threshold applicability analysis," to address threshold considerations of NEPA applicability. CEQ proposed to add additional sections to address the level of NEPA review and CEs. CEQ further proposed to consolidate and clarify provisions on EAs and FONSIs, and relocate to part 1501 from part 1502 the provisions on tiering and incorporation by reference. CEQ also proposed to set presumptive time limits for the completion of NEPA reviews, and clarify the roles of lead and cooperating agencies to further the OFD policy and encourage more efficient and timely NEPA reviews. CEQ makes many of these changes in the final rule with modifications as discussed further in this section.

1. NEPA Thresholds (§ 1501.1)

Since the enactment of NEPA, courts have examined the applicability of NEPA to proposed agency activities and decisions, based on a variety of considerations. Courts have found that NEPA is inapplicable when an agency's statutory obligations clearly or fundamentally conflict with NEPA compliance; when Congress has established requirements under another statute that displace NEPA compliance in some fashion; when an agency is carrying out a non-discretionary duty or obligation (in whole or in part); or when environmental review and public participation procedures under another statute satisfy the requirements (*i.e.*, are functionally equivalent) of NEPA.

CEQ proposed a new § 1501.1 to provide a series of considerations to assist agencies in a threshold analysis for determining whether NEPA applies to a proposed activity or whether NEPA is satisfied through another mechanism. CEQ proposed to title this section "NEPA threshold applicability analysis" in the NPRM. CEQ includes this provision in the final rule at § 1501.1, "NEPA thresholds." This section recognizes that the application of NEPA by Congress and the courts has evolved over the last four decades in light of numerous other statutory requirements implemented by Federal agencies. CEQ reorders these considerations in the final rule and adds a new consideration to paragraph (a)(1)—whether another statute expressly exempts a proposed activity or decision from NEPA. *See, e.g.*, 15 U.S.C. 793(c)(1) (exempting Environmental Protection Agency (EPA) actions under the Clean Air Act); 33 U.S.C. 1371(c)(1) (exempting certain EPA actions under the Clean Water Act); 42 U.S.C. 5159 (exempting certain actions taken or assistance provided within a Presidentially declared emergency or disaster area); and 16 U.S.C. 3636(a) (exempting regulation of Pacific salmon fishing).

The second consideration in paragraph (a)(2) is whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute. *See, e.g., Flint Ridge Dev. Co.* v. *Scenic Rivers Ass'n,* 426 U.S. 776, 791 (1976) (concluding that the Secretary of Housing and Urban Development could not comply with NEPA's EIS requirement because it conflicted with requirements of the Interstate Land Sales Full Disclosure Act). The third consideration in paragraph (a)(3) is whether compliance with NEPA would be inconsistent with congressional intent expressed in another statute. *See, e.g., Douglas County* v. *Babbitt,* 48 F.3d 1495, 1503 (9th Cir. 1995) (holding that NEPA was displaced by the Endangered Species Act's procedural requirements for designating critical habitat); and *Merrell* v. *Thomas,* 807 F.2d 776, 778–80 (9th Cir. 1986) (holding that NEPA did not apply to the EPA's registration of pesticides under the Federal Insecticide, Fungicide, and Rodenticide Act (FIFRA)).

The fourth and fifth considerations in paragraphs (a)(4) and (5) are whether the proposed activity or decision meets the definition of a major Federal action generally and whether the proposed activity or decision does not meet the definition because it is non-discretionary such that the agency lacks authority to consider environmental

effects as part of its decision-making process. *See, e.g., Pub. Citizen,* 541 U.S. at 768–70 (concluding that, because the Federal Motor Carrier Safety Administration lacked discretion to prevent the entry of Mexican trucks into the United States, the agency did not need to consider under NEPA the environmental effects of Mexican trucks' cross-border operations that the President authorized); *Nat'l Wildlife Fed'n* v. *Sec'y of the U.S. Dep't. of Transp.,* 2020 U.S. App. LEXIS 17723, at *15–18 (6th Cir. June 5, 2010) (applying *Public Citizen* and finding NEPA not applicable as EPA lacked discretion to reject Clean Water Act oil spill response plans that satisfied enumerated criteria); *Citizens Against Rails-To-Trails* v. *Surface Transp. Bd.,* 267 F.3d 1144, 1152–54 (D.C. Cir. 2001) (concluding that because the Surface Transportation Board lacked significant discretion regarding issuance of a certificate of interim trail use under the National Trails System Act, NEPA was not applicable); *South Dakota* v. *Andrus,* 614 F.2d 1190, 1193–95 (8th Cir. 1980) (concluding that the granting of a mineral patent for a mining claim was a non-discretionary, ministerial act and non-discretionary acts should be exempt from NEPA). Consistent with *Public Citizen,* 541 U.S. at 768–70, NEPA applies to the portion of an agency decision that is discretionary. In *Public Citizen,* the Supreme Court considered whether the Federal Motor Carrier Safety Administration was required to consider the effects of a non-discretionary action in its NEPA document and concluded that it was not required to do so because it had no authority to prevent the cross-border entry of Mexican motor carriers, which was the result of presidential action. *Id.*

Finally, the sixth consideration in paragraph (a)(6) is whether the proposed action is an action for which another statute's requirements serve the function of agency compliance with NEPA. *See, e.g., Envtl. Def. Fund, Inc.* v. *U.S. EPA,* 489 F.2d 1247, 1256–57 (D.C. Cir. 1973) (concluding that the substantive and procedural standards of FIFRA were functionally equivalent to NEPA and therefore formal compliance was not necessary); *W. Neb. Res. Council* v. *U.S. EPA,* 943 F.2d 867, 871–72 (8th Cir. 1991) (finding that the procedures of the Safe Drinking Water Act were functionally equivalent to those required by NEPA); *Cellular Phone Taskforce* v. *Fed. Commc'ns Comm'n,* 205 F.3d 82, 94–95 (2d Cir. 2000) (concluding that the procedures followed by the Federal Communications Commission were

functionally compliant with EA and FONSI requirements under NEPA). Paragraph (b) of § 1501.1 clarifies that agencies can make this determination in their agency NEPA procedures in accordance with § 1507.3(d) or on a case-by-case basis. The final rule adds a new paragraph (b)(1) to state that agencies may request assistance from CEQ in making a case-by-case determination under this section, and a new paragraph (b)(2) to require agencies to consult with other Federal agencies for their concurrence when making a determination where more than one Federal agency administers the statute (*e.g.,* the Endangered Species Act (ESA)). Agencies may document these consultations, as appropriate. Agencies will only apply the thresholds in this section after consideration on a case-by-case basis, or after agencies have determined whether and how to incorporate them into their own agency NEPA procedures.

Some agencies already include information related to the applicability of NEPA to their actions in their agency NEPA procedures. For example, EPA's NEPA procedures include an applicability provision that explains which EPA actions NEPA does not apply to, including actions under the Clean Air Act and certain actions under the Clean Water Act. *See* 40 CFR 6.101. The final rule codifies the agency practice of including this information in agency NEPA procedures but also provides agencies' flexibility to make case-by-case determinations as needed.

2. Apply NEPA Early in the Process (§ 1501.2)

CEQ proposed to amend § 1501.2, "Apply NEPA early in the process," designating the introductory paragraph as paragraph (a) and changing "shall" to "should" and "possible" to "reasonable." CEQ makes these changes in the final rule. Agencies need the discretion to structure the timing of their NEPA processes to align with their decision-making processes, consistent with their statutory authorities. Agencies also need flexibility to determine the appropriate time to start the NEPA process, based on the context of the particular proposed action and governed by the rule of reason, so that the NEPA analysis meaningfully informs the agency's decision. The appropriate time to begin the NEPA process is dependent on when the agency has sufficient information, and on how it can most effectively integrate the NEPA review into the agency's decision-making process. Further, some courts have viewed this provision as a legally enforceable standard, rather than

an opportunity for agencies to integrate NEPA into their decision-making programs and processes. *See, e.g., N.M. ex rel. Richardson* v. *Bureau of Land Mgmt.,* 565 F.3d 683 (10th Cir. 2009); *Metcalf* v. *Daley,* 214 F.3d 1135 (9th Cir. 2000). As discussed above, only final agency action is subject to judicial review under the APA. CEQ's view is that agencies should have discretion with respect to timing, consistent with the regulatory provisions in §§ 1501.11 and 1502.4 for deferring NEPA analysis to appropriate points in the decision-making process. As noted in the NPRM, this change is consistent with CEQ guidance that agencies should "concentrate on relevant environmental analysis" in their EISs rather than "produc[ing] an encyclopedia of all applicable information." Timely Environmental Reviews Guidance, *supra* note 29; *see also* §§ 1500.4(b), 1502.2(a). Therefore, CEQ makes these changes to clarify that agencies have discretion to structure their NEPA processes in accordance with the rule of reason. CEQ also proposed to change "possible" to "reasonable" in paragraph (b)(4)(iii) and "shall" to "should" in the introductory paragraph of § 1502.5 for consistency with the changes to § 1501.2. CEQ makes these changes in the final rule.

CEQ also proposed to change "planning and decisions reflect environmental values" to "agencies consider environmental impacts in their planning and decisions" in paragraph (a). CEQ makes this change in the final rule because "consider environmental impacts" provides more explicit direction to agencies and is more consistent with the Act and the CEQ regulations.

CEQ proposed to redesignate the remaining paragraphs in § 1501.2 to list out other general requirements for agencies. In paragraph (b)(1), the final rule removes the direct quote of NEPA consistent with the **Federal Register's** requirements for the Code of Federal Regualtions. In paragraph (b)(2), CEQ proposed to clarify that agencies should consider economic and technical analyses along with environmental effects. This change is consistent with section 102(2)(B) of NEPA, which directs agencies, in consultation with CEQ, to identify and develop methods and procedures to ensure environmental amenities and values are considered along with economic and technical considerations in decision making. CEQ makes this change in the final rule and revises the second sentence in this paragraph to qualify that agencies must review and publish environmental documents and appropriate analyses at

the same time as other planning documents "whenever practicable." CEQ recognizes that it is not always practicable to publish such documents at the same time because it can delay publication of one or the other. Finally, CEQ proposed to amend paragraph (b)(4)(ii) to change "agencies" to "governments" consistent with and in support of government-to-government consultation pursuant to E.O. 13175[74] and E.O. 13132, "Federalism."[75] CEQ makes these changes in the final rule.

3. Determine the Appropriate Level of NEPA Review (§ 1501.3)

As discussed in the NPRM, NEPA requires a "detailed statement" for "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. 4332(2)(C). To determine whether an action requires such a detailed statement, the 1978 regulations provided three levels of review for Federal agencies to assess proposals for agency action. Specifically, the CEQ regulations allow agencies to review expeditiously those actions that normally do not have significant effects by using CEs or, for actions that are not likely to have significant effects, by preparing EAs. By using CEs and EAs whenever appropriate, agencies then can focus their limited resources on those actions that are likely to have significant effects and require the "detailed statement," or EIS, required by NEPA.

While the 1978 CEQ regulations provided for these three levels of NEPA review, they do not clearly set out the decisional framework by which agencies should assess their proposed actions and select the appropriate level of review. To provide this direction and clarity, the NPRM proposed to add a new section at § 1501.3, "Determine the appropriate level of NEPA review." The proposal described the three levels of NEPA review and the basis upon which an agency makes a determination regarding the appropriate level of review for a proposed action. CEQ includes the proposal in the final rule at paragraph (a) of § 1501.3.

CEQ proposed to address the consideration of significance in paragraph (b) since it is central to determining the appropriate level of review. CEQ proposed to move the language from 40 CFR 1508.27, "Significantly," since it did not contain a definition, but rather set forth factors for considering whether an effect is significant, to paragraph (b). CEQ also proposed to eliminate most of the

---

[74] *Supra* note 69.

[75] 64 FR 43255 (Aug. 10, 1999).

factors in favor of a simpler, more flexible approach for agencies to assess significance. Specifically, CEQ proposed to change "context" to "potentially affected environment" and "intensity" to "degree" to provide greater clarity as to what agencies should consider in assessing potential significant effects. The phrase "potentially affected environment" relates more closely to physical, ecological, and socio-economic aspects than "context." The final rule reorganizes several factors formerly categorized under "intensity" to clarify further this distinction. The final rule uses the term "degree" because some effects may not necessarily be of an intense or severe nature, but nonetheless should be considered when determining significance. While 40 CFR 1508.27 used several different words to explain what was meant by "intensity," it also used "degree" numerous times. Therefore, the consistent use of "degree" throughout is clearer. In the final rule, CEQ includes these proposed changes in paragraph (b) with some additional revisions in response to comments. CEQ clarifies in paragraph (b)(1) that agencies "should" (rather than "may") consider the affected area specific to the proposed action, consistent with the construction of paragraph (b)(2), and the affected area's resources. The final rule includes one example, listed species and designated critical habitat under the Endangered Species Act, but this could include any type of resource such as historic, cultural, or park lands. The final rule also modifies the example of significance varying with the setting, because there was some misunderstanding of the proposed change from "world" to "Nation." This sentence merely serves as an example. Consistent with the NPRM, paragraph (b)(2) addresses considerations of the degree of effects. CEQ moves short- and long-term effects from "affected environment" in (b)(1) to "degree" in paragraph (b)(2)(i). CEQ proposed to exclude consideration of controversy (40 CFR 1508.27(b)(4)) because the extent to which effects may be controversial is subjective and is not dispositive of effects' significance. Further, courts have interpreted controversy to mean scientific controversy, which the final rule addresses within the definition of effects, as the strength of the science informs whether an effect is reasonably foreseeable. The controversial nature of a project is not relevant to assessing its significance.

Additionally, CEQ proposed to remove the reference in 40 CFR 1508.27(b)(7) to "[s]ignificance cannot be avoided by terming an action temporary or by breaking it down into small component parts" because this is addressed in the criteria for scope in §§ 1501.9(e) and 1502.4(a), which would provide that agencies evaluate in a single EIS proposals or parts of proposals that are related closely enough to be, in effect, a single course of action. Commenters noted that §§ 1501.9 and 1502.4 are applicable only to EISs. Therefore, in the final rule CEQ includes a sentence in paragraph (b) stating that agencies should consider connected actions when determining the significance of the effects of the proposed action.

4. Categorical Exclusions (§ 1501.4)

Under the 1978 regulations, agencies could categorically exclude actions from detailed review where the agency has found in its agency NEPA procedures that the action normally would not have significant effects. Over the past 4 decades, Federal agencies have developed more than 2,000 CEs.[76] CEQ estimates that each year, Federal agencies apply CEs to approximately 100,000 Federal agency actions that typically require little or no documentation.[77] While CEs are the most commonly used level of NEPA review, CEQ has addressed CE development and implementation in only one comprehensive guidance document, see CE Guidance, supra note 29, and the 1978 regulations did not address CEs in detail.

In response to the ANPRM, many commenters requested that CEQ update the NEPA regulations to provide more detailed direction on the application of CEs. To provide greater clarity, CEQ proposed to add a new section on CEs in proposed § 1501.4, "Categorical exclusions," to address in more detail the process by which an agency considers whether a proposed action is categorically excluded under NEPA.

Proposed paragraph (a) stated that agencies identify CEs in their NEPA procedures. CEQ adds this paragraph to the final rule, reiterating the requirement in § 1507.3(e)(2)(ii) that agencies establish CEs in their agency

NEPA procedures. The NPRM proposed in paragraph (b) to set forth the requirement to consider extraordinary circumstances once an agency determines that a CE covers a proposed action, consistent with the current requirement in 40 CFR 1508.4. CEQ includes this provision in the final rule, changing the language from passive to active voice. CEQ proposed in paragraph (b)(1) to provide that, when extraordinary circumstances are present, agencies may consider whether mitigating circumstances, such as the design of the proposed action to avoid effects that create extraordinary circumstances, are sufficient to allow the proposed action to be categorically excluded. CEQ includes this paragraph in the final rule, but revises it to address confusion over whether CEQ is creating a "mitigated CE." In the final rule, paragraph (b)(1) provides that an agency can categorically exclude a proposed action when an environmental resource or condition identified as a potential extraordinary circumstance is present if the agency determines that there are "circumstances that lessen the impacts" or other conditions sufficient to avoid significant effects. This paragraph clarifies that agencies' extraordinary circumstances criteria are not intended to necessarily preclude the application of a CE merely because a listed factor may be present or implicated. Courts have rejected a "mere presence" test for CEs. Sierra Club v. U.S. Forest Serv., 828 F.3d 402 (6th Cir. 2016); Sierra Club v. Bosworth, 510 F.3d 1016 (9th Cir. 2007); Utah Envtl. Cong. v. Bosworth, 443 F.3d 732 (10th Cir. 2006); Sw. Ctr. for Biological Diversity v. U.S. Forest Serv., 100 F.3d 1443, 1450 (9th Cir. 1996); cf. Rhodes v. Johnson, 153 F.3d 785 (7th Cir. 1998). Instead, the agency may consider in light of the extraordinary circumstances criteria, whether the proposed action would take place in such a way that it would not have significant effects, or whether the agency could modify the proposed action to avoid the extraordinary circumstances so that the action remains eligible for categorical exclusion. While this reflects current practice for some agencies,[78] this revision would assist agencies as they consider whether to categorically exclude an action that would otherwise be considered in an EA and FONSI.

Finally, CEQ proposed paragraph (b)(2) to address agencies' obligation to prepare an EA or EIS, as appropriate, if the agency cannot categorically exclude

---

[76] See Council on Environmental Quality, List of Federal Agency Categorical Exclusions (June 18, 2020), https://ceq.doe.gov/nepa-practice/categorical-exclusions.html.

[77] See, e.g., Council on Environmental Quality, The Eleventh and Final Report on the National Environmental Policy Act Status and Progress for American Recovery and Reinvestment Act of 2009 Activities and Projects (Nov. 2, 2011), https://ceq.doe.gov/docs/ceq-reports/nov2011/CEQ_ARRA_NEPA_Report_Nov_2011.pdf.

[78] See, e.g., Forest Service categorical exclusions, 36 CFR 220.6(b)(2); surface transportation categorical exclusions, 23 CFR 771.116–771.118.

**Federal Register** / Vol. 85, No. 137 / Thursday, July 16, 2020 / Rules and Regulations    **43323**

a proposed action. CEQ includes this provision in the final rule revising the language to active voice and making it consistent with the format of paragraph (b).

CEQ invited comment on the proposed revisions and asked whether it should address any other aspects of CEs in its regulations. CEQ also invited comment on whether it should establish government-wide CEs in its regulations to address routine administrative activities, for example, internal orders or directives regarding agency operations, procurement of office supplies and travel, and rulemakings to establish administrative processes such as those established under the Freedom of Information Act or Privacy Act. After considering the comments, as discussed in the Final Rule Response to Comments, CEQ is not including any additional provisions on CEs in the final rule.

5. Environmental Assessments (§ 1501.5)

Under the 1978 regulations, when an agency has not categorically excluded a proposed action, the agency can prepare an EA to document its effects analysis. If the analysis in the EA demonstrates that the action's effects would not be significant, the agency documents its reasoning in a FONSI, which completes the NEPA process; otherwise, the agency uses the EA to help prepare an EIS. CEQ estimates that Federal agencies prepare over 10,000 EAs each year.[79]

CEQ proposed to consolidate the requirements for EAs that are scattered throughout the 1978 regulations into a new § 1501.5, "Environmental assessments." CEQ proposed to revise paragraph (a) to state when agencies are required to prepare EAs. CEQ proposed minor clarifying edits to paragraph (b), which states that agencies may prepare an EA to assist in agency planning and decision making. The NPRM proposed to move the operative language regarding the requirements for an EA from the definition of EA in 40 CFR 1508.9 to paragraph (c). CEQ makes these proposed changes in the final rule.

Under the final rule, the format for an EA is flexible and responsive to agency decision-making needs and the circumstances of the particular proposal for agency action. Requirements for documenting the proposed action and alternatives in an EA continue to be more limited than EIS requirements. An agency must briefly describe the need for the proposed action by describing the existing conditions, projected future conditions, and statutory obligations and authorities that may relate to the proposed agency action with cross-references to supporting documents. The final rule continues to require agencies to describe briefly the proposed action and any alternatives it is considering that would meet the need of the proposed agency action. For actions to protect or restore the environment, without unresolved conflicts concerning alternative uses of available resources, CEQ expects agencies to examine a narrower range of alternatives to the proposed action. When the action may have significant impacts, the agency should consider reasonable alternatives that would avoid those impacts or otherwise mitigate those impacts to less than significant levels.

An agency does not need to include a detailed discussion of each alternative in an EA, nor does it need to include any detailed discussion of alternatives that it eliminated from study. While agencies have discretion to include more information in their EAs than is required to determine whether to prepare an EIS or a FONSI, they should carefully consider their reasons and have a clear rationale for doing so. Agencies should focus on analyzing material effects and alternatives, rather than marginal details that may unnecessarily delay the environmental review process.

Under the final rule, an agency must describe the environmental impacts of its proposed action and alternatives, providing enough information to support a decision to prepare either a FONSI or an EIS. The EA should focus on whether the proposed action (including mitigation) would "significantly" affect the quality of the human environment and tailor the length of the discussion to the relevant effects. The agency may contrast the impacts of the proposed action and alternatives with the current and expected future conditions of the affected environment in the absence of the action, which constitutes consideration of a no-action alternative.

Under the final rule, agencies should continue to list persons, relevant agencies, and applicants involved in preparing the EA to document agency compliance with the requirement to involve the public in preparing EAs to the extent practicable, consistent with paragraph (e). This may include incorporation by reference of records related to compliance with other environmental laws such as the National Historic Preservation Act, Clean Water Act, Endangered Species Act, or Clean Air Act.

CEQ adds a new paragraph (d) to the final rule to move the language from 40 CFR 1502.5(b) regarding when to begin preparing an EA that is required for an application to the agency.[80] Agencies may specify in their NEPA procedures when an application is complete such that it can commence the NEPA process. While the NPRM did not propose this change, the move is consistent with CEQ's proposal to consolidate EA requirements in § 1501.5.

The final rule continues to provide that agencies may prepare EAs by and with other agencies, applicants, and the public. Modern information technology can help facilitate this collaborative EA preparation, allowing the agency to make a coordinated but independent evaluation of the environmental issues and assume responsibility for the scope and content of the EA. CEQ proposed to move the public involvement requirements for EAs from the current 40 CFR 1501.4(b) to § 1501.5 and change "environmental" to "relevant" agencies to include all agencies that may contribute information that is relevant to the development of an EA. CEQ makes these changes in paragraph (e) in the final rule. CEQ also adds to and reorders the list to "the public, State, Tribal, and local governments, relevant agencies, and any applicants," to address some confusion by public commenters that interpreted relevant to modify the public and applicants. In addition, this revision acknowledges that there will not be an applicant in all instances. Consistent with the 1978 regulations, the final rule does not specifically require publication of a draft EA for public review and comment, but continues to require agencies to reasonably involve the public prior to completion of the EA, so that they may provide meaningful input on those subject areas that the agency must consider in preparing the EA. Depending on the circumstances, the agency could provide adequate information through public meetings or by a detailed scoping notice, for example. There is no single correct approach for public involvement. Rather, agencies should consider the circumstances and have discretion to conduct public involvement tailored to the interested public, to available means of communications to reach the interested and affected parties, and to

---

[79] *See, e.g.,* Council on Environmental Quality, Fourth Report on Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act, Attachment A (Oct. 4, 2016), *https://ceq.doe.gov/docs/ceq-reports/Attachment-A-Fourth-Cooperating-Agency-Report_Oct2016.pdf.*

[80] CEQ also retains the statement in § 1502.5(b), as proposed, with respect to EISs.

the particular circumstances of each proposed action.

The NPRM proposed to establish a presumptive 75-page limit for EAs, but allow a senior agency official to approve a longer length and establish a new page limit in writing. CEQ adds this new requirement at paragraph (f) in the final rule. As noted in the NPRM, while Question 36a of the Forty Questions, *supra* note 2, stated that EAs should be approximately 10 to 15 pages, in practice, such assessments are often longer to address compliance with other applicable laws, and to document the effects of mitigation to support a FONSI. To achieve the presumptive 75-page limit, agencies should write all NEPA environmental documents in plain language, follow a clear format, and emphasize important impact analyses and relevant information necessary for those analyses, rather than providing extensive background material. An EA should have clear and concise conclusions and may incorporate by reference data, survey results, inventories, and other information that support these conclusions, so long as this information is reasonably available to the public.

The presumptive EA page limit promotes more readable documents and provides agencies flexibility to prepare longer documents, where necessary, to support the agency's analysis. This presumptive page limit is consistent with CEQ's guidance on EAs, which advises agencies to avoid preparing lengthy EAs except in unusual cases where a proposal is so complex that a concise document cannot meet the goals of an EA and where it is extremely difficult to determine whether the proposal could cause significant effects. Page limits will encourage agencies to identify the relevant issues, focus on significant environmental impacts, and prepare concise readable documents that will inform decision makers as well as the public. Voluminous, unfocused environmental documents do not advance the goals of informed decision making or protection of the environment.

CEQ proposed to add a new paragraph (f) to § 1501.5 to clarify that agencies also may apply, as appropriate, certain provisions in part 1502 regarding incomplete or unavailable information, methodology and scientific accuracy, and environmental review and consultation requirements to EAs. CEQ includes this new paragraph at § 1501.5(g) in the final rule.

In addition to the new § 1501.5, CEQ incorporates reference to EAs in other sections of the regulations to codify existing agency practice where it would

make the NEPA process more efficient and effective. As discussed in section II.C.9, CEQ makes a presumptive time limit applicable to EAs in § 1501.10. Further, for some agencies, it is a common practice to have lead and cooperating agencies coordinate in the preparation of EAs where more than one agency may have an action on a proposal; therefore, CEQ adds EAs to §§ 1501.7 and 1501.8, as discussed in section II.C.7. Finally, as discussed in section II.C.10, CEQ proposed to add EAs to § 1501.11, "Tiering," to codify current agency practice of using EAs where the effects of a proposed agency action are not likely to be significant. These include program decisions that may facilitate later site-specific EISs as well as the typical use of EAs as a second-tier document tiered from an EIS. CEQ makes these changes in the final rule.

### 6. Findings of No Significant Impact (§ 1501.6)

When an agency determines in its EA that an EIS is not required, it typically prepares a FONSI. The FONSI reflects that the agency has engaged in the necessary review of environmental impacts under NEPA. The FONSI shows that the agency examined the relevant data and explained the agency findings by providing a rational connection between the facts presented in the EA and the conclusions drawn in the finding. Any finding should clearly identify the facts found and the conclusions drawn by the agency based on those facts.

In response to the ANPRM, CEQ received comments requesting that CEQ update its regulations to consolidate provisions and provide more detailed requirements for FONSIs. CEQ proposed to consolidate the operative language of 40 CFR 1508.13, "Finding of no significant impact" with 40 CFR 1501.4, "Whether to prepare an environmental impact statement," in the proposed § 1501.6, "Findings of no significant impact." CEQ proposed to strike paragraph (a) as the requirements in that paragraph are addressed in § 1507.3(d)(2) (§ 1507.3(e)(2) in the final rule). As noted in section II.C.5, CEQ proposed to move 40 CFR 1501.4(b) to § 1501.5, "Environmental assessments." Similarly, CEQ proposed to strike 40 CFR 1501.4(d), because § 1501.9, "Scoping," addresses this requirement. CEQ makes these changes in the final rule.

CEQ proposed to make 40 CFR 1501.4(e) the new § 1501.6(a), and revise the language to clarify that an agency must prepare a FONSI when it determines that a proposed action will

not have significant effects based on the analysis in the EA, consistent with the definition of FONSI. The proposed rule had erroneously included the standard for preparing an EA—"is not likely to have significant effects." CEQ proposed to clarify in paragraph (a)(2) that the circumstances listed in paragraphs (a)(2)(i) and (ii) are the situations where the agency must make a FONSI available for public review. CEQ makes these changes in the final rule.

CEQ proposed to move the operative requirement that a FONSI include the EA or a summary from the definition of FONSI in 40 CFR 1508.13 to a new paragraph (b). CEQ also proposed to change the requirement that the FONSI include a summary of the EA to "incorporate it by reference." Consistent with § 1501.12, in order to incorporate the EA by reference, the agency would need to briefly summarize it. Making this change ensures that the EA is available to the public. CEQ makes these changes in the final rule.

Finally, CEQ proposed a new paragraph (c) to address mitigation, which CEQ includes in the final rule. The first sentence addresses mitigation generally in a FONSI, requiring agencies to state the authority for any mitigation adopted and any applicable monitoring or enforcement provisions. This sentence applies to all FONSIs. CEQ omits the "means of" mitigation from the final rule because it is unnecessary and many commenters misunderstood its meaning or found it confusing. The second sentence codifies the practice of mitigated FONSIs, consistent with CEQ's Mitigation Guidance.[81] This provision requires the agency to identify the enforceable mitigation requirements and commitments, which are those mitigation requirements and commitments needed to reduce the effects below the level of significance.[82] When preparing an EA, many agencies develop, consider, and commit to mitigation measures to avoid, minimize, rectify, reduce, or compensate for potentially significant adverse environmental impacts that would otherwise require preparation of an EIS. An agency can commit to mitigation

---

[81] The Mitigation Guidance, *supra* note 29, amended and supplemented the Forty Questions, *supra* note 2, specifically withdrawing Question 39 insofar as it suggests that mitigation measures developed during scoping or in an EA "[do] not obviate the need for an EIS."

[82] As discussed in sections I.B.1 and II.B, NEPA is a procedural statute and does not require adoption of a mitigation plan. However, agencies may consider mitigation measures that would avoid, minimize, rectify, reduce, or compensate for potentially significant adverse environmental impacts and may require mitigation pursuant to substantive statutes.

measures for a mitigated FONSI when it can ensure that the mitigation will be performed, when the agency expects that resources will be available, and when the agency has sufficient legal authorities to ensure implementation of the proposed mitigation measures. CEQ does not intend this codification of CEQ guidance to create a different standard for analysis of mitigation for a "mitigated FONSI," but to provide clarity regarding the use of FONSIs.

## 7. Lead and Cooperating Agencies (§§ 1501.7 and 1501.8)

The 1978 CEQ regulations created the roles of lead agency and cooperating agencies for NEPA reviews, which are critical for actions, such as non-Federal projects, requiring the approval or authorization of multiple agencies. Agencies need to coordinate and synchronize their NEPA processes to ensure an efficient environmental review that does not cause delays. In recent years, Congress and several administrations have worked to establish a more synchronized procedure for multi-agency NEPA reviews and related authorizations, including through the development of expedited procedures such as the section 139 process and FAST–41. In response to the ANPRM, CEQ received comments requesting that CEQ update its regulations to clarify the roles of lead and cooperating agencies.

CEQ proposed a number of modifications to § 1501.7, "Lead agencies," and § 1501.8, "Cooperating agencies," (40 CFR 1501.5 and 1501.6, respectively, in the 1978 regulations) to improve interagency coordination, make development of NEPA documents more efficient, and facilitate implementation of the OFD policy. As stated in the NPRM, CEQ intends these modifications to improve the efficiency and outcomes of the NEPA process—including cost reduction, improved relationships, and better outcomes that avoid litigation—by promoting environmental collaboration.[83] These modifications are consistent with Questions 14a and 14c of the Forty Questions, *supra* note 2. CEQ proposed to apply §§ 1501.7 and 1501.8 to EAs as well as EISs consistent with agency practice. CEQ makes these changes in the final rule, but clarifies that the provisions apply to "complex" EAs and not routine EAs where

involving multiple agencies could slow down an already efficient and effective process.[84]

CEQ proposed to clarify in § 1501.7(d) that requests for lead agency designations should be sent in writing to the senior agency officials of the potential lead agencies. CEQ makes this change in the final rule. CEQ did not propose any changes to paragraphs (e) and (f) of § 1501.7, but makes clarifying edits by reorganizing phrases and changing the language to active voice in the final rule.

Consistent with the OFD policy to ensure coordinated and timely reviews, CEQ proposed to add a new paragraph (g) to § 1501.7 to require that Federal agencies evaluate proposals involving multiple Federal agencies in a single EIS and issue a joint ROD[85] or single EA and joint FONSI when practicable. CEQ adds this paragraph to the final rule with edits to the EA sentence to make the language consistent with the EIS sentence.

CEQ proposed to move language from the cooperating agency provision, 40 CFR 1501.6(a), that addresses the lead agency's responsibilities with respect to cooperating agencies to proposed paragraph (h) in § 1501.7 so that all of the lead agency's responsibilities are in a single section. CEQ also proposed to clarify in paragraph (h)(4) that the lead agency is responsible for determining the purpose and need, and alternatives in consultation with any cooperating agencies.[86] CEQ makes this move and

addition in the final rule. In response to comments, the final rule eliminates the phrase "consistent with its responsibility as lead agency" in paragraph (h)(2) because it is non-specific and could cause agencies to reject germane and informative scientific research.

CEQ proposed new paragraphs (i) and (j) in § 1501.7, and (b)(6) and (7) in § 1501.8, to require development of and adherence to a schedule for the environmental review of and any authorizations required for a proposed action, and resolution of disputes and other issues that may cause delays in the schedule. CEQ includes these provisions in the final rule with minor edits for clarity. These provisions are consistent with current practices at agencies that have adopted elevation procedures pursuant to various statutes and directives, including 23 U.S.C. 139, FAST–41, and E.O. 13807. In response to comments, CEQ includes a new paragraph (b)(8) in § 1501.8 requiring cooperating agencies to jointly issue environmental documents with the lead agency, to the maximum extent practicable. This addition is consistent with the goal of interagency cooperation and efficiency.

CEQ proposed to move the operative language that State, Tribal, and local agencies may serve as cooperating agencies from the definition of cooperating agency (40 CFR 1508.5) to paragraph (a) of § 1501.8. Upon the request of the lead agency, non-Federal agencies should participate in the environmental review process to ensure early collaboration on proposed actions where such entities have jurisdiction by law or special expertise. CEQ also proposed in paragraph (a) to codify current practice to allow a Federal agency to appeal to CEQ a lead agency's denial of a request to serve as cooperating agency. Resolving disputes among agencies early in the process furthers the OFD policy and the goal of more efficient and timely NEPA reviews. CEQ makes these changes in the final rule with minor edits for clarity. Finally, CEQ proposed clarifications and grammatical edits throughout § 1501.8. CEQ makes these changes in the final rule.

## 8. Scoping (§ 1501.9)

In response to the ANPRM, CEQ received comments requesting that CEQ update its regulations related to scoping,

---

[83] *See, e.g.,* Federal Forum on Environmental Collaboration and Conflict Resolution, Environmental Collaboration and Conflict Resolution (ECCR): Enhancing Agency Efficiency and Making Government Accountable to the People (May 2, 2018), *https://ceq.doe.gov/docs/nepa-practice/ECCR_Benefits_Recommendations_Report_%205-02-018.pdf.*

[84] This is consistent with CEQ's reports on cooperating agencies, which have shown that use of cooperating agencies for EAs has remained low. Council on Environmental Quality, Attachment A, The Fourth Report on Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (NEPA) 1 (Oct. 2016), *https://ceq.doe.gov/docs/ceq-reports/Attachment-A-Fourth-Cooperating-Agency-Report_Oct2016.pdf* (percentage of EAs with cooperating agencies was 6.8 percent for Fiscal Years 2012 through 2015); *see also* Council on Environmental Quality, Attachment A, The Second Report on Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (NEPA) 2 (May 2012), *https://ceq.doe.gov/docs/ceq-reports/Cooperating_Agency_Report_2005-11_Attachment_23May2012.pdf* (percentage of EAs with cooperating agencies was 5.9 percent for Fiscal Years 2005 through 2011).

[85] A "single ROD," as used in E.O. 13807, is the same as a "joint ROD," which is a ROD addressing all Federal agency actions covered in the single EIS and necessary for a proposed project. 40 CFR 1508.25(a)(3). The regulations would provide flexibility for circumstances where a joint ROD is impracticable. Examples include the statutory directive to issue a combined final EIS and ROD for transportation actions and the FERC's adjudicatory process.

[86] *See* OFD Framework Guidance, *supra* note 30, sec. VIII.A.5 ("The lead agency is responsible for developing the Purpose and Need, identifying the range of alternatives to be analyzed, identifying the

preferred alternative and determining whether to develop the preferred alternative to a higher level of detail."); Connaughton Letter, *supra* note 29 ("[J]oint lead or cooperating agencies should afford substantial deference to the [ ] agency's articulation of purpose and need.")

including comments requesting that agencies have greater flexibility in how to conduct scoping. CEQ proposed to reorganize in more chronological order, § 1501.9, "Scoping," (40 CFR 1501.7 in the 1978 regulations), consolidate all the requirements for the NOI and the scoping process into the same section, and add paragraph headings to improve clarity. CEQ makes these changes in the final rule with minor edits as described further in this section.

Specifically, CEQ proposed to revise paragraph (a) to state the general requirement to use scoping for EISs. Rather than requiring publication of an NOI as a precondition to the scoping process, CEQ proposed to modify paragraph (a) so that agencies can begin the scoping process as soon as the proposed action is developed sufficiently for meaningful agency consideration. Some agencies refer to this as pre-scoping under the existing regulations to capture scoping work done before publication of the NOI. Rather than tying the start of scoping to the agency's decision to publish an NOI to prepare an EIS, the timing and content of the NOI would instead become an important step in the scoping process itself, thereby obviating the artificial distinction between scoping and pre-scoping. However, agencies should not unduly delay publication of the NOI and should be transparent about any work done prior to publication of the NOI. CEQ makes the changes as proposed in the final rule.

Paragraph (b) addresses the responsibility of the lead agency to invite cooperating and participating agencies as well as other likely affected or interested persons. CEQ proposed to add "likely" to this paragraph to capture the reality that, at the scoping stage, agencies may not know the identities of all affected parties and that one of the purposes of scoping is to identify affected parties. CEQ makes this change in the final rule. In the final rule, CEQ strikes "on environmental grounds" from the parenthetical noting that likely affected or interested persons include those who might not agree with the action because the clause is unnecessarily limiting. Agencies should invite the participation of those who do not agree with the action irrespective of whether it is on environmental grounds.

The NPRM proposed to move the existing (b)(4) to paragraph (c), "Scoping outreach." CEQ proposed to broaden the types of activities agencies might hold during scoping, including meetings, publishing information, and other means of communication to provide agencies additional flexibility in how to reach interested or affected parties in the scoping process. CEQ finalizes this change as proposed.

Paragraph (d) proposed to address the NOI requirements. CEQ proposed a list of what agencies must include in an NOI to standardize NOI format, achieve greater consistency across agencies, provide the public with more information and transparency, and ensure that agencies conduct the scoping process in a manner that facilitates implementation of the OFD policy for multi-agency actions, including by proactively soliciting comments on alternatives, impacts, and relevant information to better inform agency decision making. CEQ makes these changes in the final rule with minor edits for clarity and edits to paragraph (d)(7) for consistency with §§ 1500.3 and 1502.17 and to correct the cross-reference.

CEQ proposed to move the criteria for determining scope from the definition of scope, 40 CFR 1508.25, to paragraph (e) and to strike the paragraph on "cumulative actions" for consistency with the proposed revisions to the definition of "effects" discussed below. CEQ makes this change in the final rule, but does not include the reference to "similar actions" in proposed paragraph (e)(1)(ii) because commenters expressed confusion regarding whether the determination of the scope of the environmental documentation, as discussed in proposed § 1501.9(e)(1)(i)(C) was directly related to the discussion of the "effects of the action" as effects are defined in § 1508.1(g). To eliminate this confusion, CEQ strikes the language in proposed § 1501.9(e)(1)(i)(C) (40 CFR 1508.25(a)(3)) regarding similar actions. Further, CEQ notes that, in cases where the question of the consideration of similar actions to determine the scope of the NEPA documentation was raised, courts noted the discretionary nature of the language (use of the word "may" and "should" in proposed § 1501.9(e)(1)(i)(C) (40 CFR 1508.25(a)(3)) and have held that determinations as to the scope of a NEPA document based on a consideration of similar actions was left to the agency's discretion. *See e.g., Klamath-Siskiyou Wildlands Ctr.* v. *Bureau of Land Mgmt.,* 387 F.3d 989, 1000–01 (9th Cir. 2004). CEQ also notes that the reference to "other reasonable courses of action" in paragraph (e)(2) are within the judgement of the agency. Agencies have discretion to address similar actions through a single analysis, pursuant to revised § 1502.4(b).

Finally, paragraph (f) addresses other scoping responsibilities, including identifying and eliminating from detailed study non-significant issues, allocating assignments among lead and cooperating agencies, indicating other related NEPA documents, identifying other environmental review requirements, and indicating the relationship between the environmental review and decision-making schedule. CEQ retains this paragraph in the final rule as proposed with minor grammatical edits.

9. Time Limits (§ 1501.10)

In response to the ANPRM, CEQ received many comments on the lengthy timelines and costs of environmental reviews, and many suggestions for more meaningful time limits for the completion of the NEPA process. Accordingly, and to promote timely reviews, CEQ proposed to establish presumptive time limits for EAs and EISs consistent with E.O. 13807 and prior CEQ guidance. In Question 35 of the Forty Questions, *supra* note 2, CEQ stated its expectation that "even large complex energy projects would require only about 12 months for the completion of the entire EIS process" and that, for most major actions, "this period is well within the planning time that is needed in any event, apart from NEPA." CEQ also recognized that "some projects will entail difficult long-term planning and/or the acquisition of certain data which of necessity will require more time for the preparation of the EIS." *Id.* Finally, Question 35 stated that an EA "should take no more than 3 months, and in many cases substantially less as part of the normal analysis and approval process for the action."

Based on agency experience with the implementation of the regulations, CEQ proposed in § 1501.10, "Time limits," to change the introductory text to paragraph (a) and add a new paragraph (b) to establish a presumptive time limit for EAs of one year and a presumptive time limit for EISs of two years. However, the NPRM also proposed that a senior agency official could approve in writing a longer period. CEQ proposed to define the start and end dates of the period consistent with E.O. 13807. CEQ makes these changes in the final rule. CEQ eliminates the sentence regarding lead agency from paragraph (a) because it is no longer needed given the revisions to this section changing "agency" to "senior agency official." In response to comments, the final rule also adds "FONSI" to paragraph (b)(1) to clarify that the time limit for EAs is measured from the date of decision to prepare to the publication of an EA or FONSI, since agencies may not publish

the EA separately. The final rule also clarifies that the time period is measured from the date the agency decides to prepare an EA, since applicants sometimes prepare EAs on behalf of agencies.

Consistent with CEQ and OMB guidance, agencies should begin scoping and development of a schedule for timely completion of an EIS prior to issuing an NOI and commit to cooperate, communicate, share information, and resolve conflicts that could prevent meeting milestones.[87] CEQ recognizes that agency capacity, including those of cooperating and participating agencies, may affect timing, and that agencies should schedule and prioritize their resources accordingly to ensure effective environmental analyses and public involvement. Further, agencies have flexibility in the management of their internal processes to set shorter time limits and to define the precise start and end times for measuring the completion time of an EA. Therefore, CEQ proposed to retain the factors for determining time limits in paragraph (c). CEQ proposed to revise paragraph (c)(6) for clarity and strike paragraph (c)(7) regarding controversial actions because it overlaps with numerous other factors, and because whether or not an action is controversial is not relevant to the analysis under NEPA. CEQ also proposed to retain with edits for clarity the list of parts of the NEPA process for which the senior agency official may set time limits in paragraph (d). CEQ retains paragraphs (c) and (d) in the final rule with the changes as proposed.

CEQ proposed conforming edits to § 1500.5(g) to change "establishing" to "meeting" time limits and add "environmental assessment." CEQ makes these edits in the final rule.

### 10. Tiering (§ 1501.11)

CEQ proposed to move 40 CFR 1502.20, "Tiering," to a new § 1501.11 and revise it to make clear that this provision is applicable to both EAs and EISs. CEQ proposed a number of revisions in § 1501.11 to clarify when agencies can use existing studies and environmental analyses in the NEPA process and when agencies would need to supplement such studies and analyses. The revisions clarify that agencies do not need to conduct site-specific analyses prior to an irretrievable commitment of resources, which in most cases will not be until

the decision at the site-specific stage. CEQ makes these changes with additional updates in the final rule.

Specifically, the final rule splits proposed paragraph (a) into two paragraphs. In the new paragraph (a), CEQ changes "are encouraged to" to "should" and moves to the end of this paragraph the sentence stating that tiering may also be appropriate for different stages of actions. The new paragraph (b) addresses the relationship between the different levels of tiered documents, and CEQ makes additional edits to this paragraph for clarity.

CEQ also proposed to move the operative language addressing specific examples of when tiering is appropriate from the definition of tiering in 40 CFR 1508.28 to proposed paragraph (b). CEQ moves this language to paragraph (c) in the final rule with the edits as proposed.

### 11. Incorporation by Reference (§ 1501.12)

CEQ proposed to move 40 CFR 1502.21, "Incorporation by reference," to a new § 1501.12 and change "environmental impact statements" to "environmental documents" because this provision is applicable generally, not just to EISs. CEQ makes this change in the final rule. CEQ makes additional changes in the final rule to revise sentences from passive to active voice. In response to comments, CEQ adds examples to the types of material that agencies may incorporate, including planning studies and analyses.

### D. Revisions to Environmental Impact Statements (Part 1502)

As stated in the NPRM, the most extensive level of NEPA analysis is an EIS, which is the "detailed statement" required under section 102(2)(C) of NEPA. When an agency prepares an EIS, it typically issues a ROD at the conclusion of the NEPA review. Based on the Environmental Protection Agency (EPA) weekly Notices of Availability published in the **Federal Register** between 2010 and 2019, Federal agencies published approximately 176 final EISs per year. CEQ proposed to update the format, page length, and timeline to complete EISs to better achieve the purposes of NEPA. CEQ also proposed several changes to streamline, allow for flexibility in, and improve the preparation of EISs. CEQ includes provisions in part 1502 to promote informed decision making by agencies and to inform the public about the decision-making process. The final rule continues to encourage application of NEPA early in the process and early

engagement with applicants for non-Federal projects.

### 1. Purpose of Environmental Impact Statement (§ 1502.1)

CEQ proposed to revise § 1502.1 for consistency with the statutory language of NEPA and make other non-substantive revisions for clarity. CEQ makes these changes in the final rule. The final rule also retitles this section.

### 2. Implementation (§ 1502.2)

CEQ proposed to strike the introductory text of § 1502.2 as unnecessary and revise the text in paragraphs (a) and (c) for clarity and consistency with the language in the rule and regulatory text generally. CEQ makes these changes in the final rule with minor clarifying edits. The final rule clarifies in paragraph (d) that, in preparing an EIS, agencies shall state how the alternatives considered in it and decisions based on it serve the purposes of the statute as interpreted in the CEQ regulations. The final rule strikes "ultimate agency" in paragraph (e) because there may be multiple individuals within certain departments or agencies that have decision-making responsibilities, including where subunits have developed agency procedures or NEPA compliance programs.

### 3. Statutory Requirements for Statements (§ 1502.3)

CEQ proposed to revise § 1502.3 to make it a single paragraph, remove cross-references to the definition, and make minor clarifying edits. CEQ makes these changes in the final rule.

### 4. Major Federal Actions Requiring the Preparation of Environmental Impact Statements (§ 1502.4)

CEQ proposed to revise § 1502.4 to clarify in paragraph (a) that a "properly defined" proposal is one that is based on the statutory authorities for the proposed action. CEQ proposed to change "broad" and "program" to "programmatic" in this section, as well as §§ 1500.4(k) and 1506.1(c), since "programmatic" is the term commonly used by NEPA practitioners. The NPRM proposed further revisions to paragraph (b), including eliminating reference to programmatic EISs that "are sometimes required," to focus the provision on the discretionary use of programmatic EISs in support of clearly defined decision-making purposes. For consistency, CEQ proposed to change the mandatory language to be discretionary in proposed paragraph (c)(3) (paragraph (b)(1)(iii) in the final rule). As CEQ stated in its 2014 guidance, programmatic NEPA reviews

---

[87] See OFD Framework Guidance, supra note 30 ("[w]hile the actual schedule for any given project may vary based upon the circumstances of the project and applicable law, agencies should endeavor to meet the two-year goal . . . .").

"should result in clearer and more transparent decision[ ]making, as well as provide a better defined and more expeditious path toward decisions on proposed actions." [88] Other statutes or regulations may grant discretion or otherwise identify circumstances for when to prepare a programmatic EIS. *See, e.g.,* National Forest Management Act, 16 U.S.C. 1604(g); 36 CFR 219.16. CEQ makes these changes in the final rule, and reorganizes proposed paragraphs (c) and (d) to be paragraphs (b)(1) and (2) since these paragraphs all address programmatic reviews. Finally, CEQ proposed to add a new sentence to proposed paragraph (d) (paragraph (b)(2) in the final rule) to clarify that when conducting programmatic reviews, agencies may tier their analyses to defer detailed analysis of specific program elements until they are ripe for decisions that would involve an irreversible or irretrievable commitment of resources. The final rule removes this latter clause and simplifies it to elements "ripe for final agency action" because NEPA review occurs pursuant to the APA and "final agency action," as construed in *Bennett* v. *Spear,* is the test for when judicial review can commence. *See* 520 U.S. at 177–78.

### 5. Timing (§ 1502.5)

For the reasons discussed in section II.C.2 and consistent with the edits to § 1501.2, CEQ proposed to change "shall" to "should" in the introductory text so that agencies can exercise their best judgement about when to begin the preparation of an EIS. CEQ also proposed to revise paragraph (b) to clarify that agencies should work with potential applicants and applicable agencies before applicants submit applications. CEQ makes these changes in the final rule. Also, as noted in section II.C.7, CEQ revises paragraph (b) in the final rule to only address EISs in this section and move the discussion of EAs to § 1501.5. Finally, CEQ adds "and governments" to "State, Tribal, and local agencies" to be comprehensive and consistent with similar changes made throughout the rule.

### 6. Interdisciplinary Preparation (§ 1502.6)

CEQ proposed minor edits to § 1502.6 consistent with the global changes discussed in section II.A. CEQ includes these changes in the final rule and revises this provision from passive to active voice.

### 7. Page Limits (§ 1502.7)

In response to the ANPRM, CEQ received many comments on the length, complexity, and readability of environmental documents, and many suggestions for more meaningful page limits. As the President Carter noted in 1977 regarding issuance of E.O. 11991, "to be more useful to decision[ ]makers and the public, [EISs] must be concise, readable, and based upon competent professional analysis. They must reflect a concern with quality, not quantity. We do not want [EISs] that are measured by the inch or weighed by the pound." [89] The core purpose of page limits from the original regulations remains—documents must be a reasonable length and in a readable format so that it is practicable for the decision maker to read and understand the document in a reasonable time period. If documents are unreasonable in their length or unwieldy, there is a risk that they will not inform the decision maker, thereby undermining the purposes of the Act. As the Supreme Court noted in *Metropolitan Edison Co.* v. *People Against Nuclear Energy,* "[t]he scope of the agency's inquiries must remain manageable if NEPA's goal of '[insuring] a fully informed and well-considered decision,' . . . is to be accomplished." 460 U.S. at 776 (quoting *Vt. Yankee,* 435 U.S. at 558). Therefore, CEQ proposed to reinforce the page limits for EISs set forth in § 1502.7, while allowing a senior agency official to approve a statement exceeding 300 pages when it is useful to the decision-making process. CEQ makes these changes in the final rule.

As captured in CEQ's updated report on the length of final EISs, these documents average over 600 pages. *See* CEQ Length of EISs Report, *supra* note 38. While the length of an EIS will vary based on the complexity and significance of the proposed action and environmental effects the EIS considers, every EIS must be bounded by the practical limits of the decision maker's ability to consider detailed information. CEQ proposed this change to ensure that agencies develop EISs focused on significant effects and on the information useful to decision makers and the public to more successfully implement NEPA.

CEQ intends for senior agency officials to take responsibility for the quantity, quality, and timelines of environmental analyses developed in support of the decisions of their agencies. Therefore, the senior agency official approving an EA or EIS in excess of the page limits should ensure that the final environmental document meets the informational needs of the agency's decision maker. For example, the agency decision makers may have varying levels of capacity to consider the information presented in the environmental document. In ensuring that the agency provides the resources necessary to implement NEPA, in accordance with § 1507.2, senior agency officials should ensure that agency staff have the resources and competencies necessary to produce timely, concise, and effective environmental documents. Decisions as to page length for these documents are therefore closely related to an agency's decision as to how to structure its decision-making process, and for that reason must ultimately remain within the discretion of the agency.

### 8. Writing (§ 1502.8)

CEQ did not propose any changes to § 1502.8. In the final rule, CEQ revises this provision to correct grammatical errors, including revising it from passive to active voice.

### 9. Draft, Final and Supplemental Statements (§ 1502.9)

CEQ proposed to include headings for each of the paragraphs in § 1502.9, "Draft, final, and supplemental statements," to improve readability. CEQ proposed edits to paragraph (b) for clarity, replacing "revised draft" with "supplemental draft." CEQ makes these changes in the final rule and makes additional clarifying edits in § 1502.9, including to revise the language from passive to active voice.

CEQ also received many comments in response to the ANPRM requesting clarification regarding when supplemental statements are required. CEQ proposed revisions to paragraph (d)(1) to clarify that agencies need to update environmental documents when there is new information or a change in the proposed action only if a major Federal action remains to occur and other requirements are met. CEQ makes this change in the final rule. As noted in the NPRM, this revision is consistent with Supreme Court case law holding that a supplemental EIS is required only "[i]f there remains 'major Federal actio[n]' to occur, and if the new information is sufficient to show that the remaining action will 'affec[t] the quality of the human environment' in a significant manner or to a significant extent not already considered . . . ." *Marsh,* 490 U.S. at 374 (quoting 42 U.S.C. 4332(2)(C)); *see also Norton* v. *S. Utah Wilderness All.,* 542 U.S. 55, 73 (2004). For example, supplementation

---

[88] *Programmatic Guidance, supra* note 29, at 7.

[89] The Environment—Message to the Congress, 1977 Pub. Papers 967, 985 (May 23, 1977).

may be triggered after an agency executes a grant agreement but before construction is complete because the agency has yet to provide all of the funds under that grant agreement. On the other hand, when an agency issues a final rule establishing a regulatory scheme, there is no remaining action to occur, and therefore supplementation is not required. If there is no further agency action after the agency's decision, supplementation does not apply because the Federal agency action is complete. *S. Utah Wilderness All.,* 542 U.S. at 73 ("although the '*[a]pproval* of a [land use plan]' is a 'major Federal action' requiring an EIS . . . that action is completed when the plan is approved. . . . There is no ongoing 'major Federal action' that could require supplementation (though BLM *is* required to perform additional NEPA analyses if a plan is amended or revised . . . .)") (emphasis in original).

In order to determine whether a supplemental analysis is required, CEQ proposed a new paragraph (d)(4) to provide that an agency may document its determination of whether a supplemental analysis is required consistent with its agency NEPA procedures or may, although it is not required, do so in an EA. CEQ adds this paragraph to the final rule, codifying the existing practice of several Federal agencies, such as the Department of Transportation's reevaluation provided for highway, transit, and railroad projects (23 CFR 771.129); the Bureau of Land Management's Determination of NEPA Adequacy (Department of the Interior Departmental Manual, Part 516, Chapter 11, § 11.6); and the Corps' Supplemental Information Report (section 13(d) of Engineering Regulation 200–2–2).

### 10. Recommended Format (§ 1502.10)

CEQ proposed to revise § 1502.10 to provide agencies with more flexibility in formatting an EIS given that most EISs are prepared and distributed electronically. Specifically, CEQ proposed to eliminate the requirement to have a list of agencies, organizations and persons to whom copies of the EIS are sent since EISs are published online, and an index, as this is no longer necessary when most documents are produced in an electronically searchable format. Proposed changes to this section would also allow agencies to use a different format so that they may customize EISs to address the particular proposed action and better integrate environmental considerations into agency decision-making processes. CEQ makes these changes in the final rule.

### 11. Cover (§ 1502.11)

CEQ proposed to retitle and amend § 1502.11 to remove the reference to a "sheet" since agencies prepare EISs electronically. CEQ also proposed to add a requirement to include the estimated cost of preparing the EIS to the cover in new paragraph (g) to provide transparency to the public on the costs of EIS-level NEPA reviews. To track costs, the NPRM proposed that agencies must prepare an estimate of environmental review costs, including costs of the agency's full-time equivalent (FTE) personnel hours, contractor costs, and other direct costs related to the environmental review of the proposed action.[90] CEQ also proposed this amendment to address the concerns raised by the U.S. Government Accountability Office that agencies are not tracking the costs of NEPA analyses, as well as the many comments CEQ received from stakeholders regarding the costs associated with development of NEPA analyses.[91] CEQ noted in the NPRM that including such costs on the cover sheet would also be consistent with current OMB direction to Federal agencies to track costs of environmental reviews and authorizations for major infrastructure projects pursuant to E.O. 13807 and would provide the public with additional information regarding EIS-level NEPA documents.

CEQ adds this new paragraph (g) in the final rule with additional changes to clarify that agencies should provide the estimate on the final EIS, and that it should include the costs of preparing both the draft EIS and the final EIS. The final rule also adds a sentence to clarify that agencies should include the costs of cooperating and participating agencies if practicable. If not practicable, agencies must so indicate. For integrated documents where an agency is preparing a document pursuant to multiple environmental statutory requirements, it may indicate that the estimate reflects costs associated with NEPA compliance as well as compliance with other environmental review and authorization requirements. Agencies can develop methodologies for preparing these cost estimates and include them in their implementing procedures.

### 12. Summary (§ 1502.12)

CEQ proposed to change "controversy" to "disputed" in § 1502.12. CEQ makes this and grammatical changes in the final rule. This change will better align the second clause of the sentence, "areas of disputed issues raised by agencies and the public," with the final clause of the sentence, "and the issues to be resolved (including the choice among alternatives)."

### 13. Purpose and Need (§ 1502.13)

CEQ received a number of comments in response to the ANPRM recommending that CEQ better define the requirements for purpose and need statements. The focus of a purpose and need statement is the purpose and need for the proposed action, and agencies should develop it based on consideration of the relevant statutory authority for the proposed action. The purpose and need statement also provides the framework in which the agency will identify "reasonable alternatives" to the proposed action. CEQ has advised that this discussion of purpose and need should be concise (typically one or two paragraphs long) and that the lead agency is responsible for its definition. *See* Connaughton Letter, *supra* note 29 ("Thoughtful resolution of the purpose and need statement at the beginning of the process will contribute to a rational environmental review process and save considerable delay and frustration later in the decision[-]making process."). "In situations involving two or more agencies that have a decision to make for the same proposed action and responsibility to comply with NEPA or a similar statute, it is prudent to jointly develop a purpose and need statement that can be utilized by both agencies. An agreed-upon purpose and need statement at this stage can prevent problems later that may delay completion of the NEPA process." *Id.* The lead agency is responsible for developing the purpose and need, and cooperating agencies should give deference to the lead agency and identify any substantive concerns early in the process to ensure swift resolution. *See* OFD Framework Guidance, sec. VIII.A.5 and XII, *supra* note 30; Connaughton Letter, *supra* note 29.

---

[90] *See, e.g.,* U.S. Department of the Interior, Reporting Costs Associated with Developing Environmental Impact Statements (July 23, 2018), *https://www.doi.gov/sites/doi.gov/files/uploads/dep_sec_memo_07232018_-_reporting_costs_associated_w_developing_environmental_impact_statements.pdf.*

[91] In a 2014 report, the U.S. Government Accountability Office found that Federal agencies do not routinely track data on the cost of completing NEPA analyses, and that the cost can vary considerably, depending on the complexity and scope of the project. U.S. Gov't Accountability Office, GAO–14–370, National Environmental Policy Act: Little Information Exists on NEPA Analyses (Apr. 15, 2014) ("GAO NEPA Report"), *https://www.gao.gov/products/GAO-14-370.* The report referenced the 2003 CEQ task force analysis referenced above which estimated that a typical EIS costs from $250,000 to $2 million. *See* NEPA Task Force Report, *supra* note 28, at p. 65.

**43330**    **Federal Register** / Vol. 85, No. 137 / Thursday, July 16, 2020 / Rules and Regulations

Agencies should tailor the purpose and need statement to meet the authorization requirements of both the lead and cooperating agencies.

Consistent with CEQ guidance and in response to the ANPRM comments, CEQ proposed to revise § 1502.13, "Purpose and need," to clarify that the statement should focus on the purpose and need for the proposed action. In particular, CEQ proposed to strike "to which the agency is responding in proposing the alternatives including" to focus on the proposed action. CEQ further proposed, as discussed below, to address the relationship between the proposed action and alternatives in the definition of reasonable alternatives and other sections that refer to alternatives. Additionally, CEQ proposed to add a sentence to clarify that when an agency is responsible for reviewing applications for authorizations, the agency shall base the purpose and need on the applicant's goals and the agency's statutory authority. *See, e.g., Citizens Against Burlington, Inc.* v. *Busey,* 938 F.2d 190, 196 (D.C. Cir. 1991) (agencies must consider the relevant factors including the needs and goals of the applicants and Congress' views as expressed in the agency's statutory authorization). This addition is consistent with the definition of reasonable alternatives, which must meet the goals of the applicant, where applicable. CEQ revises § 1502.13 in the final rule consistent with the NPRM proposal.

14. Alternatives Including the Proposed Action (§ 1502.14)

CEQ also received many comments on the ANPRM requesting clarification regarding "alternatives" under the regulations. This section of an EIS describes the proposed action and alternatives in comparative form, including their environmental impacts, such that the decision maker and the public can understand the basis for choice. However, as explained in § 1502.16, this section of the EIS should not duplicate the affected environment and environmental consequences sections, and agencies have flexibility to combine these three sections in a manner that clearly sets forth the basis for decision making.

CEQ proposed changes to § 1502.14, "Alternatives including the proposed action," to simplify and clarify the language and provide further clarity on the scope of the alternatives analysis in an EIS. Specifically, CEQ proposed to revise the introductory paragraph to remove the colloquial language, including "heart of" the EIS and "sharply defining," and clarify that the alternatives section of the EIS should

present the environmental impacts in comparative form. CEQ makes these changes in the final rule.

In paragraph (a), CEQ proposed to delete "all" before "reasonable alternatives" and add "to the proposed action" afterward for clarity because NEPA does not require consideration of all alternatives and does not provide specific guidance concerning the range of alternatives an agency must consider for each proposal. Section 102(2)(C) provides only that an agency shall prepare a detailed statement addressing, among other things, "alternatives to the proposed action." 42 U.S.C. 4332(2)(C). Section 102(2)(E) requires only that agencies "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. 4332(2)(E). Implementing this limited statutory direction, CEQ has long advised that "[w]hen there are potentially a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS." Forty Questions, *supra* note 2, at Question 1b. CEQ makes this change in the final rule and rephrases paragraph (a) from passive to active voice.

As stated in the NPRM, it is CEQ's view that NEPA's policy goals are satisfied when an agency analyzes reasonable alternatives, and that an EIS need not include every available alternative where the consideration of a spectrum of alternatives allows for the selection of any alternative within that spectrum. The reasonableness of the analysis of alternatives in a final EIS is resolved not by any particular number of alternatives considered, but by the nature of the underlying agency action and by the inherent practical limitations of the decision-making process. The discussion of environmental effects of alternatives need not be exhaustive, but must provide information sufficient to permit a reasoned choice of alternatives for the agency to evaluate available reasonable alternatives including significant alternatives that are called to its attention by other agencies, organizations, communities, or a member of the public.[92] As discussed in section II.C.8, to aid agencies in identification of alternatives, § 1501.9, "Scoping," requires agencies to request identification of potential alternatives in the NOI. Analysis of alternatives also

may serve purposes other than NEPA compliance, such as evaluation of the least environmentally damaging practicable alternative for the discharge of dredged or fill material under section 404(b)(1) of the Clean Water Act, 33 U.S.C. 1344(b)(1).

The number of alternatives that is appropriate for an agency to consider will vary. For some actions, such as where the Federal agency's authority to consider alternatives is limited by statute, the range of alternatives may be limited to the proposed action and the no action alternative. For actions where the Federal authority to consider a range of alternatives is broad, the final EIS itself should consider a broader range of reasonable alternatives. However, a process of narrowing alternatives is in accord with NEPA's "rule of reason" and common sense—agencies need not reanalyze alternatives previously rejected, particularly when an earlier analysis of numerous reasonable alternatives was incorporated into the final analysis and the agency has considered and responded to public comment favoring other alternatives. Furthermore, agencies should limit alternatives to those available to the decision maker at the time of decision.

For consistency with this change, CEQ proposed to strike "the" before "reasonable alternatives" in § 1502.1, and amend § 1502.16, "Environmental consequences," to clarify in proposed paragraph (a)(1) that the discussion must include the environmental impacts of the "proposed action and reasonable alternatives." CEQ makes these changes in the final rule.

In response to CEQ's ANPRM, some commenters urged that the regulations should not require agencies to account for impacts over which the agency has no control, including those resulting from alternatives outside its jurisdiction. CEQ proposed to strike 40 CFR 1502.14(c) requiring consideration of reasonable alternatives not within the jurisdiction of the lead agency for all EISs because it is not efficient or reasonable to require agencies to develop detailed analyses relating to alternatives outside the jurisdiction of the lead agency. CEQ removes this paragraph in the final rule. Further, the new definition of "reasonable alternatives" excludes alternatives outside the agency's jurisdiction when they would not be technically feasible due to the agency's lack of statutory authority to implement that alternative. However, an agency may discuss reasonable alternatives not within its jurisdiction when necessary for the agency's decision-making process such as when preparing an EIS to address

---

[92] Additionally, by crafting alternatives, agencies can "bound" different options and develop information on intermediate options that occupy the logical space in between different formal alternatives. *See, e.g.,* H.A. Simon, "Bounded Rationality," in *Utility and Probability* (J. Eatwell, M. Milgate, & P. Newman P. eds. 1990).

legislative EIS requirements pursuant to § 1506.8 and to address specific congressional directives.

A concern raised by many ANPRM commenters is that agencies have limited resources and that it is important that agencies use those resources effectively. The provisions inviting commenters to identify potential alternatives will help to inform agencies as to how many alternatives are reasonable to consider, and allow agencies to assess whether any particular submitted alternative is reasonable to consider. Analyzing a large number of alternatives, particularly where it is clear that only a few alternatives would be economically and technically feasible and could be realistically implemented by the applicant, can divert limited agency resources. CEQ invited comment on whether the regulations should establish a presumptive maximum number of alternatives for evaluation of a proposed action, or alternatively for certain categories of proposed actions. CEQ sought comment on (1) specific categories of actions, if any, that should be identified for the presumption or for exceptions to the presumption; and (2) what the presumptive number of alternatives should be (*e.g.,* a maximum of three alternatives including the no action alternative). CEQ did not receive sufficient information to establish a minimum, but adds a new paragraph (f) to the final rule to state that agencies shall limit their consideration to a reasonable number of alternatives. The revisions to the regulations to promote earlier solicitation of information and identification of alternatives, and timely submission of comments, will assist agencies in establishing how many alternatives are reasonable to consider and assessing whether any particular submitted alternative is reasonable to consider.

## 15. Affected Environment (§ 1502.15)

CEQ proposed in § 1502.15, "Affected environment," to explicitly allow for combining of affected environment and environmental consequences sections to adopt what has become a common practice in some agencies. This revision would ensure that the description of the affected environment focuses on those aspects of the environment that the proposed action affects. CEQ makes this change in the final rule. Additionally, the final rule adds a clause to emphasize that the affected environment includes reasonably foreseeable environmental trends and planned actions in the affected areas. This change responds to comments raising concerns that eliminating the definition of cumulative

impact (40 CFR 1508.7) would result in less consideration of changes in the environment. To the extent environmental trends or planned actions in the area(s) are reasonably foreseeable, the agency should include them in the discussion of the affected environment. Consistent with current agency practice, this also may include non-Federal planned activities that are reasonably foreseeable.

In response to the NPRM, commenters expressed concerns that impacts of climate change on a proposed project would no longer be taken into account. Under the final rule, agencies will consider predictable environmental trends in the area in the baseline analysis of the affected environment. Trends determined to be a consequence of climate change would be characterized in the baseline analysis of the affected environment rather than as an effect of the action. Discussion of the affected environment should be informative but should not be speculative.

## 16. Environmental Consequences (§ 1502.16)

CEQ proposed to reorganize § 1502.16, "Environmental consequences." CEQ proposed to designate the introductory paragraph as paragraph (a), move up the sentence that it should not duplicate the alternatives discussion, and create subordinate paragraphs (a)(1) through (10) for clarity. In paragraph (a)(1), CEQ proposed to consolidate into one paragraph the requirements regarding effects scattered throughout 40 CFR 1502.16, including paragraphs (a), (b), and (d), to include a discussion of the effects of the proposed action and reasonable alternatives. Also consistent with the definition of effects, CEQ proposed to strike references to direct, indirect, and cumulative effects. The combined discussion should focus on those effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action, consistent with the proposed revised definition of effects addressed in § 1508.1(g). CEQ proposed to move 40 CFR 1502.16(c) and (e) through (h) to be paragraphs (a)(5) through (9). To align with the statute, CEQ also proposed to add a new paragraph (a)(10) to provide that discussion of environmental consequences should include, where applicable, economic and technical considerations consistent with section 102(2)(B) of NEPA. CEQ makes these changes in the final rule with minor edits to clarify that "this section" in paragraph (a) refers to the "environmental consequences" section;

address the dangling modifier, "their significance," in paragraph (a)(1); correct the usage of "which" and "that" throughout; and clarify the language in paragraph (b).

Further, CEQ proposed to move the operative language that addresses when agencies need to consider economic and social effects in EISs from the definition of human environment in 40 CFR 1508.14 to proposed § 1502.16(b). CEQ also proposed to amend the language for clarity, explain that the agency makes the determination of when consideration of economic and social effects is interrelated with consideration of natural or physical environmental effects at which point the agency should give appropriate consideration to those effects, and strike "all of" as unnecessary. CEQ makes these changes in the final rule.

## 17. Submitted Alternatives, Information, and Analyses (§ 1502.17)

To ensure agencies have considered the alternatives, information, and analyses submitted by the public, including State, Tribal, and local governments as well as individuals and organizations, CEQ proposed to add a new § 1502.17 to require a new "submitted alternatives, information, and analyses" section in draft and final EISs. CEQ includes this new provision in the final rule with some modifications to separate the requirements for draft and final EISs, as discussed in this section.

To ensure agencies receive and consider relevant information as early in the process as possible, § 1501.9, "Scoping," requires agencies to specifically solicit such information in their notices of intent. Under § 1502.17, agencies must include a summary in the EIS identifying all alternatives, information, and analyses the agency received from State, Tribal, and local governments and other public commenters. In developing the summary, agencies may refer to other relevant sections of the EIS or to appendices. A new paragraph (a)(1) requires agencies to append to the draft EIS or otherwise publish the comments received during scoping and, consistent with the proposed rule, paragraph (a)(2) requires the lead agency to invite comment on the summary. Finally, paragraph (b) requires agencies to prepare a summary in the final EIS based on all comments received on the draft EIS.

CEQ proposed to require in a new § 1502.18, "Certification of alternatives, information, and analyses section," that, informed by the alternatives, information, and analyses section

required under § 1502.17, the decision maker for the lead agency certify that the agency has considered such information and include the certification in the ROD under proposed § 1505.2(e). CEQ moves this provision to § 1505.2(b) in the final rule, as discussed in further detail in section II.G.2.

### 18. List of Preparers (§ 1502.18)

CEQ proposed to move "List of preparers" from § 1502.17 to § 1502.19 to accommodate the two new sections addressing submitted alternatives, information, and analyses. The final rule moves this section to § 1502.18 and makes minor revisions to change the language from passive to active voice and remove the erroneous cross-references.

### 19. Appendix (§ 1502.19)

CEQ proposed to move "Appendix" from § 1502.18 to § 1502.20 and revise the language for clarity. The final rule moves this provision to § 1502.19 with additional clarifying revisions. The final rule also adds a new paragraph (d) to reflect the potential appendix for scoping comments on alternatives, information, and analyses pursuant to § 1502.17(a)(1) and a new paragraph (e) for the potential appendix of draft EIS comments pursuant to §§ 1503.1 and 1503.4(b).

### 20. Publication of the Environmental Impact Statement (§ 1502.20)

CEQ proposed to move "Circulation of the environmental impact statement" from § 1502.19 to § 1502.21 and retitle it "Publication of the environmental impact statement." CEQ moves this to § 1502.20 in the final rule. CEQ proposed to modernize this provision, changing circulate to publish and eliminating the option to circulate the summary of an EIS given that agencies electronically produce most EISs. CEQ proposed to require agencies to transmit the EIS electronically, but provide for paper copies by request. CEQ makes these changes in the final rule.

### 21. Incomplete or Unavailable Information (§ 1502.21)

CEQ proposed several revisions to proposed § 1502.22, "Incomplete or unavailable information," which CEQ redesignates as § 1502.21 in the final rule. Specifically, CEQ proposed to further subdivide the paragraphs for clarity and strike the word "always" from paragraph (a) as unnecessarily limiting and inconsistent with the rule of reason, and replaced the term "exorbitant" with "unreasonable" in paragraphs (b) and (c), which is

consistent with CEQ's description of "overall cost" considerations in its 1986 promulgation of amendments to this provision.[93] CEQ reiterates that the term "overall cost" as used in this section includes "financial costs and other costs such as costs in terms of time (delay) and personnel."[94] CEQ invited comment on whether the "overall costs" of obtaining incomplete of unavailable information warrants further definition to address whether certain costs are or are not "unreasonable." CEQ does not include any definition in the final rule.

For clarity and in response to comments, the final rule inserts "but available" in paragraph (b) to clarify that agencies will continue to be required to obtain available information essential to a reasoned choice between alternatives where the overall costs are not unreasonable and the means of obtaining that information are known.[95] New scientific or technical research is unavailable information and is addressed in § 1502.23. Where the overall costs are unreasonable or means of obtaining the information are not known, agencies will continue to be required to disclose in the EIS that information is incomplete or unavailable and provide additional information to assist in analyzing the reasonably foreseeable significant adverse impacts. However, § 1502.23 does not require agencies to undertake new scientific and technical research to inform their analyses.

Finally, CEQ proposed to eliminate 40 CFR 1502.22(c) addressing the applicability of the 1986 amendments to this section because this paragraph is obsolete. CEQ does not include this provision in the final rule.

### 22. Cost-Benefit Analysis (§ 1502.22)

CEQ did not propose changes to the cost-benefit analysis section other than an update to the citation. In the final rule, CEQ moves this provision from § 1502.23 to § 1502.22 and adds a parenthetical after "section 102(2)(B) of NEPA" that paraphrases the statutory text relating to considering unquantified environmental amenities and values along with economic and technical considerations. This is consistent with the policy established in section 101(a), which also refers to fulfilling the social,

economic, and other requirements of present and future generations of Americans. Finally, CEQ revises the language for clarity, including changing from passive to active voice.

### 23. Methodology and Scientific Accuracy (§ 1502.23)

CEQ proposed revisions to update proposed § 1502.24, which CEQ redesigantes § 1502.23 in the final rule. The NPRM proposed to broaden this provision to environmental documents and CEQ makes this change in the final rule. CEQ proposed to clarify that agencies must make use of reliable existing data and resources when they are available and appropriate. CEQ also proposed to revise this section to allow agencies to draw on any source of information (such as remote sensing and statistical modeling) that the agency finds reliable and useful to the decision-making process. As noted in the NPRM, these changes will promote the use of reliable data, including information gathered using modern technologies. CEQ makes these changes in the final rule with minor changes. The final rule revises the sentence regarding placing the discussion of methodology in an appendix from singular to plural for consistency with the rest of the language in this section. In response to comments, CEQ moves the proposed sentence regarding new scientific and technical research to a new sentence at the end of the section and adds a sentence clarifying that nothing in this provision is intended to prohibit agencies from compliance with the requirements of other statutes pertaining to scientific and technical research. Agencies must continue to conduct surveys and collect data where required by other statutes.

### 24. Environmental Review and Consultation Requirements (§ 1502.24)

CEQ proposed to revise this section to clarify that agencies must integrate, to the fullest extent possible, their NEPA analysis with all other applicable Federal environmental review laws and Executive orders in furtherance of the OFD policy established by E.O. 13807 and to make the environmental review process more efficient.[96] CEQ redesignates this section in the final rule to § 1502.24, updates a statutory

---

[93] 51 FR at 15622 (Apr. 25, 1986).

[94] *Id.*

[95] *See, e.g. Pub. Citizen,* 541 U.S. at 767 ("Also, inherent in NEPA and its implementing regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decision[-]making process."); *see also Marsh,* 490 U.S. at 373–74 (agencies should apply a "rule of reason").

[96] The Permitting Council has compiled a list of environmental laws and Executive orders that may apply to a proposed action. *See* Federal Environmental Review and Authorization Inventory, *https://www.permits.performance.gov/tools/federal-environmental-review-and-authorization-inventory.*

citation, and revises the text as proposed.

*E. Revisions to Commenting on Environmental Impact Statements (Part 1503)*

Section 102(2)(C) of NEPA requires that agencies obtain views of Federal agencies with jurisdiction by law or expertise with respect to any environmental impact, and also directs that agencies make copies of the EIS and the comments and views of appropriate Federal, State, and local agencies available to the President, CEQ and the public. 42 U.S.C. 4332(2)(C). Part 1503 of the CEQ regulations include provisions relating to inviting and responding to comments. CEQ proposed to modernize part 1503 given modern technologies not available at the time of the 1978 regulations. In particular, the proposed regulations encouraged agencies to use the current methods of electronic communication both to publish important environmental information and to structure public participation for greater efficiency and inclusion of interested persons. Additionally, CEQ proposed changes to encourage commenters to provide information early and to require comments to be as specific as possible to ensure agencies can consider them in their decision-making process. CEQ finalizes many of these proposed changes with modifications as this section discusses in further detail.

1. Inviting Comments and Requesting Information and Analyses (§ 1503.1)

CEQ proposed to retitle and revise § 1503.1, "Inviting comments and requesting information and analyses," to better reach interested and affected parties and ensure agencies receive the relevant information they need to complete their analyses. CEQ proposed to revise paragraphs (a)(2)(i) and (ii) to include State, Tribal and local agencies and governments to be comprehensive and consistent with the addition of "Tribal" as discussed in section II.A. CEQ proposed to eliminate the obsolete reference to OMB Circular A–95 from paragraph (a)(2)(iii) and move paragraphs (a)(3) and (4) to (a)(2)(iv) and (v), respectively, since these are additional parties from which agencies should request comments. CEQ also proposed in paragraph (a)(2)(v) to give agencies flexibility to tailor their public involvement process to more effectively reach interested and affected parties by soliciting comments "in a manner designed to inform" parties interested or affected "by the proposed action." CEQ makes these changes in the final rule.

CEQ also proposed to add a new paragraph (a)(3) that requires agencies to specifically invite comment on the completeness of the submitted alternatives, information and analyses section (§ 1502.17). CEQ includes this new paragraph in the final rule with revisions to clarify that agencies should invite comments on the submitted alternatives, information, and analyses generally as well as the summary required under § 1502.17, rather than on the completeness of the summary, as proposed. Interested parties who may seek to challenge the agency's decision have an affirmative duty to comment during the public review period in order for the agency to consider their positions. *See Vt. Yankee,* 435 U.S. at 553.

In paragraph (b), CEQ proposed to require agencies to provide a 30-day comment period on the final EIS's submitted alternatives, information and analyses section. As noted in the discussion of § 1500.3(b) in section II.B.3, CEQ does not include this requirement in the final rule. However, the final rule adds language that if an agency requests comments on a final EIS before the final decision, the agency should set a deadline for such comments. This provides agencies the flexibility to request comments on a final EIS. Agencies may use this option where it would be helpful to inform the agency's decision making process.

Finally, CEQ proposed a new paragraph (c) to require agencies to provide for commenting using electronic means while ensuring accessibility to those who may not have such access to ensure adequate notice and opportunity to comment. CEQ includes this proposed paragraph in the final rule.

2. Duty To Comment (§ 1503.2)

Section 1503.2, "Duty to comment," addresses the obligations of other agencies to comment on an EIS. CEQ proposed to clarify that this provision applies to cooperating agencies and agencies authorized to develop and enforce environmental standards. CEQ makes this change in the final rule and makes additional revisions to change the language from passive to active voice.

3. Specificity of Comments and Information (§ 1503.3)

CEQ proposed to revise paragraph (a) and retitle § 1503.3, "Specificity of comments and information," to explain that the purposes of comments is to promote informed decision making and further clarify that comments should provide sufficient detail for the agency

to consider the comment in its decision-making process. *See Pub. Citizen,* 541 U.S. at 764; *Vt. Yankee,* 435 U.S. at 553 (while "NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon [parties] who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the [parties'] position . . . ."). CEQ also proposed in this paragraph that comments should explain why the issues raised are significant to the consideration of potential environmental impacts and alternatives to the proposed action, as well as economic and employment impacts, and other impacts affecting the quality of the human environment. In addition, CEQ proposed in this paragraph that comments should reference the section or page of the draft EIS, propose specific changes to those parts of the statement, where possible, and include or describe the data sources and methodologies supporting the proposed changes. *See Vt. Yankee,* 435 U.S. at 553 ("[Comments] must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes a concern. The comment cannot merely state that a particular mistake was made . . . ; it must show why the mistake was of possible significance in the results . . . ." (quoting *Portland Cement Ass'n* v. *Ruckelshaus,* 486 F.2d 375, 394 (D.C. Cir. 1973)). CEQ includes these changes in the final rule to ensure that agencies are alerted to all interested and affected parties' concerns, but changes "significant" to "important" issues in the second sentence to avoid confusion with significant effects. Nothing in these revisions should be construed to limit public comment to those members of the public with scientific or technical expertise, and agencies should continue to solicit comment from all interested and affected members of the public. Consistent with the goal of promoting a manageable process and a meaningful focus on pertinent issues, CEQ also clarifies that commenters should submit information and raise issues as early in the process as possible, including during scoping to the extent practicable. Commenters should timely submit all comments and make their comments as specific as possible to promote informed and timely decision making.

CEQ also proposed a new paragraph (b) to emphasize that comments on the submitted alternatives, information, and analyses section should identify any additional alternatives, information, or

analyses not included in the draft EIS, and should be as specific as possible. The proposal required comments and objections to be raised within 30 days of publication of the notice of availability of the final EIS and noted that comments and objections not provided within those 30 days are considered exhausted and forfeited under § 1500.3(b). In the final rule, CEQ includes this paragraph with some changes. The final rule provides that comments should be on the submitted alternatives, information, and analyses themselves as well as the summary that § 1502.17 requires and be as specific as possible. It further provides that comments and objections on the draft EIS must be raised within the comment period provided by the agency, consistent with § 1506.11. The final rule does not include the 30-day comment period, as discussed in sections II.B.3 and II.E.1; however, it provides that if the agency requests comments on the final EIS, comments and objections must be raised within the comment period. The final rule also provides that comments and objections not provided within the relevant comment periods are considered unexhausted and forfeited under § 1500.3(b).

CEQ proposed to change "commenting" agency to "participating" agency in paragraph (c), and "entitlements" to "authorizations" in paragraph (d). CEQ makes these changes in the final rule. Finally, CEQ proposed to broaden paragraph (e) to require cooperating agencies with jurisdiction by law to specify the mitigation measures they consider necessary for permits, licenses, or related requirements, including the applicable statutory authority. CEQ includes this change in the final rule because it will provide greater transparency and clarity to the lead agency and the public when mitigation is required under another statute.

### 4. Response to Comments (§ 1503.4)

In practice, the processing of comments can require substantial time and resources. CEQ proposed to amend § 1503.4, "Response to comments," to simplify and clarify in paragraph (a) that agencies are required to consider substantive comments timely submitted during the public comment period. CEQ also proposed to clarify that an agency may respond to comments individually or collectively. Consistent with this revision, CEQ proposed to clarify that, in the final EIS, agencies may respond by a variety of means, and to strike the detailed language in paragraph (a)(5) relating to comments that do not warrant further agency response. CEQ

includes these changes with some modifications in the final rule. Specifically, CEQ changes "individually" to "individual" and "collectively" to "groups of comments" to clarify that agencies may respond to individual comments or group and respond once to a group of comments addressing the same issue. CEQ also modifies paragraph (a) introductory text to make clear that the list in paragraphs (a)(1) through (5) is how the agency may respond to comments. Finally, CEQ adds a clause to paragraph (a)(5) to reinforce that agencies do not have to respond to each comment individually. Under the 1978 regulations, agencies have had flexibility in how they structure their responses to comments, and CEQ does not consider this clarification to be a change in position.

CEQ proposed to clarify in paragraph (b) that agencies must append comments and responses to EISs rather than including them in the body of the EIS, or otherwise publish them. Under current practice, some agencies include these comment responses in the EISs themselves, which can contribute to excessive length. *See* CEQ Length of EISs Report, *supra* note 38. CEQ makes this change in the final rule. As noted in the NPRM, these changes do not preclude an agency from summarizing or discussing specific comments in the EIS as well.

Finally, CEQ proposed to amend paragraph (c) for clarity. CEQ makes the proposed changes and additional clarifying edits in the final rule.

### *F. Revisions to Pre-Decisional Referrals to the Council of Proposed Federal Actions Determined To Be Environmentally Unsatisfactory (Part 1504)*

CEQ proposed edits to part 1504, "Pre-decisional Referrals to the Council of Proposed Federal Actions Determined to be Environmentally Unsatisfactory," to improve clarity, including grammatical corrections. CEQ also proposed to reference specifically EAs in this part. Although infrequent, agencies have made referrals to CEQ on EAs. CEQ also proposed a minor revision to the title of part 1504, striking "Predecision" and inserting "Pre-decisional." CEQ makes these changes in the final rule.

### 1. Purpose (§ 1504.1)

Section 1504.1, "Purpose," addresses the purpose of part 1504, including CEQ referrals by the EPA. Section 309 of the Clean Air Act (42 U.S.C. 7609) requires EPA to review and comment on certain proposed actions of other Federal agencies and to make those comments

public. Where appropriate, EPA may exercise its authority under section 309(b) of the Clean Air Act and refer the matter to CEQ, as stated in paragraph (b). The final rule revises this paragraph for clarity, changing it from passive to active voice. Paragraph (c) provides that other Federal agencies also may prepare such reviews. In the NPRM, CEQ proposed to change "may make" to "may produce" in this paragraph. The final rule changes this phrase to "may prepare" since "prepare" is the commonly used verb in these regulations.

### 2. Criterial for Referral (§ 1504.2)

CEQ proposed to change "possible" to "practicable" in the introductory paragraph of § 1504.2, "Criteria for referral." CEQ makes this change in the final rule as discussed in section II.A. Consistent with the NEPA statute, CEQ proposed to add economic and technical considerations to paragraph (g) of § 1504.2, "Criteria for referrals." CEQ includes this change in the final rule.

### 3. Procedure for Referrals and Response (§ 1504.3)

In § 1504.3, "Procedure for referrals and response," CEQ proposed changes to simplify and modernize the referral process to ensure it is timely and efficient. CEQ proposed to change the language in this section from passive to active voice and make other clarifying edits to the language. CEQ includes these changes with some additional clarifying edits in the final rule. Specifically, in paragraphs (a)(1) and (2), CEQ changes "advise" and "such advice" to "notify" and "a notification" respectively. CEQ proposed to eliminate the exception in paragraph (a)(2) for statements that do not contain adequate information to permit an assessment of the matter's environmental acceptability. CEQ removes this clause in the final rule. The referring agency should provide the lead agency and CEQ with as much information as possible, including identification of when the information is inadequate to permit an assessment. In paragraph (a)(4), CEQ changes "such advice" to "the referring agency's views" in the final rule to clarify what the referring agency is sending to CEQ.

In paragraph (b), CEQ proposed to change "commenting agencies" to "participating agencies," a change CEQ proposed throughout the rule, and to add a timeframe for referrals of EAs. CEQ makes these changes in the final rule. CEQ proposed to strike from paragraph (c)(1) the clause requiring the referral request that no action be taken to implement the matter until CEQ takes

action. CEQ removes this clause in the final rule because it is unnecessarily limiting. Agencies should have the flexibility to determine what they are requesting of the lead agency when making a referral, which may include a request not to take any action on the matter.

CEQ proposed to change ''material facts in controversy'' to ''disputed material facts'' in paragraph (c)(2)(i) for clarity and to simplify paragraph (c)(2)(iii) to focus on the reasons for the referral, which may include that the matter is environmentally unsatisfactory. CEQ proposed to revise paragraph (d)(2) to emphasize that the lead agency's response should include both evidence and explanations, as appropriate. CEQ proposed to revise paragraph (e) to simplify the process and to provide direction to applicants regarding the submittal of their views to the CEQ. CEQ proposed to strike the reference to public meetings or hearings in paragraph (f)(3) to provide more flexibility to CEQ in how it obtains additional views and information, which could include a public meeting or hearing. However, there may be other, more effective mechanisms to collect such information, including through use of current technologies. CEQ makes these changes in the final rule.

Finally, CEQ proposed to modify paragraph (h) to clarify that the referral process is not a final agency action that is judicially reviewable and to remove the requirement that referrals be conducted consistent with the APA where a statute requires that an action be determined on the record after an opportunity for a hearing. Where other statutes govern the referral process, those statutes continue to apply, and these regulations do not need to speculate about what process might be required. Therefore, CEQ eliminates this language in the final rule and replaces it with the clarification that the referral process does not create a private right of action because, among other considerations, there is no final agency action.

*G. Revisions to NEPA and Agency Decision Making (Part 1505)*

1. Remove and Reserve Agency Decisionmaking Procedures (§ 1505.1)

In the NPRM, CEQ proposed to move the text of 40 CFR 1505.1, ''Agency decisionmaking procedures,'' to § 1507.3(b). As discussed further in section II.I.3, CEQ makes this change in the final rule and reserves § 1505.1 for future use.

2. Record of Decision in Cases Requiring Environmental Impact Statements (§ 1505.2)

CEQ proposed to redesignate the introductory paragraph of § 1505.2, ''Record of decision in cases requiring environmental impact statements,'' as paragraph (a) and revise it to require agencies to ''timely publish'' a ROD. CEQ also proposed to clarify that the CEQ regulations allow for ''joint'' RODs by two or more Federal agencies; this change is also consistent with the OFD policy and E.O. 13807. Finally, CEQ proposed to remove references to OMB Circular A–95 as noted previously in section II.A.

CEQ proposed clarifying edits to proposed paragraphs (a) and (c) (paragraphs (a)(1) and (3) in the final rule) to change from passive to active voice for clarity. The final rule makes these changes in paragraphs (a)(1), (2), and (3) in the final rule. The final rule also removes ''all'' before ''alternatives'' in paragraph (a)(2) for consistency with the same change in § 1502.14(a).

CEQ proposed to include a requirement in proposed paragraph (d) to require agencies to respond to any comments on the submitted alternatives, information, and analyses section in the final EIS. As discussed in sections II.B.3 and II.E.1, CEQ does not include the proposed 30-day comment period in the final rule; therefore, CEQ is not including proposed § 1505.2(d) in the final rule.

In the NPRM, proposed paragraph (e) would require the ROD to include the decision maker's certification regarding consideration of the submitted alternatives, information, and analyses section, which proposed § 1502.18 required. The final rule replaces what was proposed paragraph (e) with the language moved from proposed § 1502.18, ''Certification of alternatives, information, and analyses section,'' in paragraph (b). In the NPRM, § 1502.18 stated that, based on the alternatives, information, and analyses section required under § 1502.17, the decision maker for the lead agency must certify that the agency has considered such information and include the certification in the ROD under § 1505.2(d) (as proposed). This provision also proposed a conclusive presumption that the agency has considered information summarized in that section because it is reasonable to presume the agency has considered such information based on the process to request and summarize public comments on the submitted alternatives, information, and analyses.

CEQ modifies the proposed text of § 1502.18 in the final rule and in paragraph (b) of § 1505.2 to clarify that the decision maker's certification in the ROD is informed by the summary of submitted alternatives, information, and analyses in the final EIS and any other material in the record that the decision maker determines to be relevant. This includes both the draft and final EIS as well as any supporting materials incorporated by reference or appended to the document. The final rule also changes ''conclusive presumption'' to a ''presumption'' and clarifies that the agency is entitled to a presumption that it has considered the submitted alternatives, information, and analyses, including the summary thereof in the final EIS. Establishing a rebuttable presumption will give appropriate weight to the process that culminates in the certification, while also allowing some flexibility in situations where essential information may have been inadvertently overlooked. The presumption and associated exhaustion requirement also will encourage commenters to provide the agency with all available information prior to the agency's decision, rather than disclosing information after the decision is made or in subsequent litigation. This is important for the decision-making process and efficient management of agency resources.

3. Implementing the Decision (§ 1505.3)

CEQ proposed minor edits to § 1505.3, ''Implementing the decision'' to change ''commenting'' agencies to ''participating'' in paragraph (c) and ''make available to the public'' to ''publish'' in paragraph (d). CEQ makes these changes in the final rule.

*H. Revisions to Other Requirements of NEPA (Part 1506)*

CEQ proposed a number of edits to part 1506 to improve the NEPA process to make it more efficient and flexible, especially where actions involve third-party applicants. CEQ also proposed several edits for clarity. CEQ finalizes many of these proposed changes in the final rule with some additional clarifying edits.

1. Limitations on Actions During NEPA Process (§ 1506.1)

CEQ proposed to add FONSIs to paragraph (a) of § 1506.1, ''Limitations on actions during NEPA process,'' to clarify existing practice and judicial determinations that the limitation on actions applies when an agency is preparing an EA as well as an EIS. CEQ proposed to consolidate paragraph (d) with paragraph (b) and revise the

**43336**    **Federal Register** / Vol. 85, No. 137 / Thursday, July 16, 2020 / Rules and Regulations

language to provide additional clarity on what activities are allowable during the NEPA process. Specifically, CEQ proposed to eliminate reference to one specific agency, broadening the provision to all agencies and providing that this section does not preclude certain activities by an applicant to support an application of Federal, State, Tribal, or local permits or assistance. As an example of activities an applicant may undertake, CEQ proposed to add "acquisition of interests in land," which includes acquisitions of rights-of-way and conservation easements. CEQ invited comment on whether it should make any additional changes to § 1506.1, including whether there are circumstances under which an agency may authorize irreversible and irretrievable commitments of resources. CEQ finalizes this provision as proposed with minor grammatical changes, and simplifying the references in paragraphs (c) introductory text and (c)(2) from programmatic environmental impact "statement" to "review."

2. Elimination of Duplication With State, Tribal, and Local Procedures (§ 1506.2)

CEQ proposed revisions to § 1506.2, "Elimination of duplication with State, Tribal, and local procedures" to promote efficiency and reduce duplication between Federal and State, Tribal, and local requirements. These changes are consistent with the President's directive in E.O. 13807 to provide for agency use, to the maximum extent permitted by law, of environmental studies, analysis, and decisions in support of earlier Federal, State, Tribal, or local environmental reviews or authorization decisions. E.O. 13807, sec. 5(e)(i)(C). CEQ proposed to revise paragraph (a) to acknowledge the increasing number of State, Tribal, and local governments conducting NEPA reviews pursuant to assignment from Federal agencies. *See, e.g.,* 23 U.S.C. 327, and 25 U.S.C. 4115 and 5389(a). CEQ makes this change in the final rule. The revision in paragraph (a) clarifies that Federal agencies are authorized to cooperate with such State, Tribal, and local agencies, and paragraph (b) requires cooperation to reduce duplication.

CEQ proposed to add examples to paragraph (b) to encourage use of prior reviews and decisions and modify paragraph (c) to give agencies flexibility to determine whether to cooperate in fulfilling State, Tribal, or local EIS or similar requirements. CEQ includes these proposed changes in the final rule and reorders the language to provide additional clarity. Additionally, the

final rule makes further changes to paragraph (b) to remove potential impediments for agency use of studies, analysis, and decisions developed by State, Tribal, and local government agencies. Some commenters stated that CEQ proposed to limit agency use to only environmental studies, analysis, and decisions and exclude socio-economic and other information. The final rule clarifies that agencies should make broad use of studies, analysis, and decisions prepared by State, Tribal, and local agencies, as appropriate based on other requirements including § 1502.23. Finally, CEQ proposed to clarify in paragraph (d) that NEPA does not require reconciliation of inconsistencies between the proposed action and State, Tribal, or local plans or laws, although the EIS should discuss the inconsistencies. CEQ makes these revisions in the final rule.

3. Adoption (§ 1506.3)

CEQ proposed to expand adoption to EAs, consistent with current practice by many agencies, and CE determinations and clarify the process for documenting the decision to adopt. CEQ includes these proposed changes in the final rule with additional revisions to align the language for consistency in each paragraph and better organize § 1506.3 by grouping the provisions relating to EISs into paragraph (b), EAs in paragraph (c), and CE determinations in paragraph (d).

Paragraph (a) includes the general requirement for adoption, which is that any adoption must meet the standard for an adequate EIS, EA, or CE determination, as appropriate, under the CEQ regulations. CEQ proposed to reference EAs in this paragraph. The final rule includes CE determinations as well as EAs and reorders the documents for consistency with the ordering of paragraphs (b) through (d)—EISs, EAs (including portions of EISs or EAs), and CE determinations.

CEQ proposed clarifying edits in paragraph (b) and changed references from recirculation to republication consistent with this change throughout the rule. In the final rule, CEQ subdivides paragraph (b) into subordinate paragraphs (b)(1) and (2). Paragraph (b)(1) addresses EISs where the adopting agency is not a cooperating agency. CEQ moves the cooperating agency exception to republication to paragraph (b)(2). Consistent with the proposed rule, this paragraph also clarifies that the cooperating agency adopts such an EIS by issuing its own ROD.

In the NPRM, proposed paragraph (f) would allow an agency to adopt another

agency's determination that its CE applies to an action if the adopting agency's proposed action is substantially the same. CEQ includes this provision in paragraph (d) of the final rule with clarifying edits. The final rule provides agencies the flexibility to adopt another agency's determination that a CE applies to an action when the actions are substantially the same to address situations where a proposed action would result in a CE determination by one agency and an EA and FONSI by another agency. For example, this would be the case when two agencies are engaging in similar activities in similar areas like small-scale prescribed burns, ecological restoration, and small-scale land management practices. Another example is when one agency's action may be a funding decision for a proposed project, and another agency's action is to consider a permit for the same project.

To allow agencies to use one another's CEs without the agency that promulgated the CE having to take an action, CEQ also proposed a new § 1507.3(e)(5), which would allow agencies to establish a process in their NEPA procedures to apply another agency's CE. CEQ notes that there was some confusion among commenters regarding the difference between the adoption of CEs under § 1506.3 and the provision in § 1507.3(f)(5) (proposed § 1507.3(e)(5)).[97] CEQ has made clarifying edits to address this confusion.

The adoption process in § 1506.3(d) first requires that an agency has applied a CE listed in its agency NEPA procedures. Then, the adopting agency must verify that its proposed action is substantially the same as the action for which it is adopting the CE determination. CEQ adds a sentence in § 1507.3(f)(5) of the final rule to clarify that agencies may establish a separate process for using another agency's listed CE and applying the CE to its proposed actions. The final rule also requires the adopting agency to document the adoption. Agencies may publish, where appropriate, such documentation or other information relating to the adoption.

4. Combining Documents (§ 1506.4)

CEQ proposed to amend § 1506.4, "Combining documents," to encourage agencies "to the fullest extent practicable" to combine their environmental documents with other

---

[97] For a discussion of the differences between these two provisions, see section I.3 of the Final Rule Response to Comments.

agency documents to reduce duplication and paperwork. For example, the Corps routinely combines EISs with feasibility reports, and agencies may use their NEPA documents to satisfy compliance with section 106 of the National Historic Preservation Act under 36 CFR 800.8. CEQ includes the proposed revisions in the final rule with no changes.

5. Agency Responsibility for Environmental Documents (§ 1506.5)

As discussed in the NPRM, CEQ proposed to revise § 1506.5, "Agency responsibility for environmental documents," in response to ANPRM comments urging CEQ to allow greater flexibility for the project sponsor (including private entities) to participate in the preparation of NEPA documents under the supervision of the lead agency. CEQ proposed updates to give agencies more flexibility with respect to the preparation of environmental documents while continuing to require agencies to independently evaluate and take responsibility for those documents. Under the proposal, applicants and contractors would be able to assume a greater role in contributing information and material to the preparation of environmental documents, subject to the supervision of the agency. However, agencies would remain responsible for taking reasonable steps to ensure the accuracy of information prepared by applicants and contractors. If a contractor or applicant prepares the document, proposed paragraph (c)(1) would require the decision-making agency official to provide guidance, participate in the preparation, independently evaluate the statement, and take responsibility for its content.

In the final rule, CEQ retains these concepts, but reorganizes § 1506.5 to better communicate the requirements. Specifically, paragraph (a) contains a clear statement that the Federal agency is ultimately responsible for the environmental document irrespective of who prepares it. While this is consistent with the 1978 regulations, CEQ provides this direct statement at the beginning of the section to respond to comments that suggested agencies would be handing over their responsibilities to project sponsors under the proposed rule.

Paragraph (b) introductory text and its subordinate paragraphs capture the requirements when a project sponsor or contractor prepares an environmental document, consolidating requirements for EISs and EAs into one because there is no longer a distinction between the requirements for each document in this context. Paragraph (b) allows an agency to require an applicant to submit environmental information for the

agency's use in preparing an environmental document or to direct an applicant or authorize a contractor to prepare an environmental document under the agency's supervision. As noted in the NPRM, CEQ intends these changes to improve communication between proponents of a proposal for agency action and the officials tasked with evaluating the effects of the action and reasonable alternatives, to improve the quality of NEPA documents and efficiency of the NEPA process.

Paragraph (b)(1) requires agencies to provide guidance to the applicant or contractor and participate in the preparation of the NEPA document. Paragraph (b)(2) continues to require the agency to independently evaluate the information or environmental document and take responsibility for its accuracy, scope, and contents. Paragraph (b)(3) requires the agency to include the names and qualifications of the persons who prepared the environmental document. Adding "qualifications" is consistent with § 1502.18 and is important for transparency. For an EIS, this information would be included in the list of preparers as required by § 1502.18, but agencies have flexibility on where to include such information in an EA. Paragraph (b)(4) requires contractors or applicants preparing EAs or EISs to submit a disclosure statement to the lead agency specifying any financial or other interest in the outcome of the action, but it need not include privileged or confidential trade secrets or other confidential business information. In the NPRM, CEQ had proposed to remove the requirement for a disclosure statement. In response to comments, CEQ is retaining this concept in the final rule, recognizing that most applicants will have such a financial interest. However, as discussed above, CEQ finds that it is appropriate to allow applicants to prepare documents for the sake of efficiency and because agencies retain responsibility to oversee and take responsibility for the final environmental document.

6. Public Involvement (§ 1506.6)

CEQ proposed to update § 1506.6, "Public involvement," to give agencies greater flexibility to design and customize public involvement to best meet the specific circumstances of their proposed actions. The NPRM proposed revisions to paragraphs (b) and (c) to add "other opportunities for public engagement" to recognize that there are other ways to engage with interested and affected parties besides hearings and meetings. CEQ finalizes these changes in the final rule but changes "engagement" to "involvement"

consistent with the title of the section. Additionally, the final rule adds a sentence to these paragraphs to require agencies to consider interested and affected parties' access to electronic media, such as in rural locations or economically distressed areas. CEQ had proposed to state in a new paragraph (b)(3)(x) that notice may not be limited solely to electronic methods for actions occurring in an area with limited access to high-speed internet. However, CEQ is including this more general statement in paragraph (b) as it is a consideration for notice generally. In paragraph (b)(1), CEQ proposed to change the requirement to mail notice in paragraphs (b)(1) and (2) to the more general requirement to "notify" to give agencies the flexibility to use email or other mechanisms to provide such notice. CEQ makes this change in the final rule. CEQ also eliminates the requirement in paragraph (b)(2) to maintain a list of organizations reasonably expected to be interested in actions with effects of national concern because such a requirement is unnecessarily prescriptive given that agencies may collect and organize contact information for organizations that have requested regular notice in another format given advances in technology. In the proposed rule, CEQ proposed to change paragraph (b)(3)(i) to modify State clearinghouses to State and local agencies, and change paragraph (b)(3)(ii) to affected Tribal governments. In the final rule, CEQ modifies paragraph (b)(3)(i) to notice to State, Tribal, and local agencies, and paragraph (b)(3)(ii) to include notice to interested or affected State, Tribal, and local governments for consistency with § 1501.9 and part 1503. CEQ proposed a new paragraph (b)(3)(x) to allow for notice through electronic media. CEQ includes this provision in the final rule, moving the language regarding consideration of access to paragraph (b), as noted previously.

In addition to the changes described above, CEQ proposed to strike the mandatory criteria in paragraph (c) for consideration of when to hold or sponsor public hearings or meetings. CEQ is removing this language in the final rule because such criteria are unnecessarily limiting. Agencies consider many factors in determining the most appropriate mechanism for promoting public involvement, including the particular location of the proposed action (if one exists), the types of effects it may have, and the needs of interested and affected parties, and may design their outreach in a manner that

best engages with those parties. The flexibility to consider relevant factors is critical especially in light of unexpected circumstances, such as the COVID–19 pandemic, which may require agencies to adapt their outreach as required by State, Tribal, and local authorities and conditions.

Finally, CEQ proposed to simplify paragraph (f) to require agencies to make EISs, comments and underlying documents available to the public consistent with the Freedom of Information Act (FOIA), removing the provisos regarding interagency memoranda and fees. Congress has amended FOIA numerous times since the enactment of NEPA, mostly recently by the FOIA Improvement Act of 2016, Public Law 114–185, 130 Stat. 538. Additionally, the revised paragraph (f) is consistent with the text of section 102(2)(C) of NEPA, including with regard to fees. CEQ makes these changes as proposed in the final rule.

### 7. Further Guidance (§ 1506.7)

CEQ proposed to update and modernize § 1506.7, "Further guidance," to remove the specific references to handbooks, memoranda, and the 102 monitor, and replace it with a statement that CEQ may provide further guidance concerning NEPA and its procedures consistent with E.O. 13807 and E.O. 13891, "Promoting the Rule of Law Through Improved Agency Guidance Documents." [98] CEQ makes these changes in paragraph (a) in the final rule. This rule supersedes preexisting CEQ guidance and materials in many respects. CEQ intends to publish a separate notice in the **Federal Register** listing guidance it is withdrawing. CEQ will issue new guidance, as needed, consistent with the final rule and Presidential directives. In the interim, in any instances where an interpretation of the 1978 regulations is inconsistent with the new regulations or this preamble's interpretation of the new regulations, the new regulations and interpretations shall apply, and CEQ includes a new paragraph (b) in the final rule to provide this clarification. CEQ notes that guidance does not have the force and effect of law and is meant to provide clarity regarding existing law and policy.

### 8. Proposals for Legislation (§ 1506.8)

CEQ proposed to move the legislative EIS requirements from the definition of legislation in 40 CFR 1508.17 to paragraph (a) of § 1506.8, "Proposals for legislation," and revise the section for clarity. As noted in the NPRM, agencies

prepare legislative EISs for Congress when they are proposing specific actions. CEQ also invited comment on whether the legislative EIS requirement should be eliminated or modified because the President proposes legislation, and therefore it is inconsistent with the Recommendations Clause of the U.S. Constitution, which provides the President shall recommend for Congress' consideration "such [m]easures as he shall judge necessary and expedient . . . ." U.S. Const., art. II, § 3. The President is not a Federal agency, 40 CFR 1508.12, and the proposal of legislation by the President is not an agency action. *Franklin* v. *Mass.,* 505 U.S. 788, 800–01 (1992).

In the final rule, CEQ retains the provision, but removes the reference to providing "significant cooperation and support in the development" of legislation and the test for significant cooperation to more closely align this provision with the statute. The final rule clarifies that technical drafting assistance is not a legislative proposal under these regulations. Consistent with these edits, CEQ strikes the reference to the Wilderness Act. The mandate has expired. [99] Under the Wilderness Act, a study was required to make a recommendation to the President. If the President agreed with the recommendation, the President then provided "advice" to Congress about making a wilderness determination. The President is not subject to NEPA in his direct recommendations to Congress, but agencies subject to the APA are subject to NEPA, as appropriate, concerning legislative proposals they develop. This avoids the constitutional issue. *See Ashwander* v. *Tenn. Valley Auth.,* 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *Rescue Army* v. *Mun. Court of L.A.,* 331 U.S. 549, 569 (1947).

### 9. Proposals for Regulations (§ 1506.9)

CEQ proposed to add a new § 1506.9, "Proposals for regulations," to address the analyses required for rulemakings and to promote efficiency and reduce duplication in the assessment of regulatory proposals. CEQ proposed criteria for agencies to identify analyses that could serve as the functional equivalent of an EIS. In response to comments, CEQ revises this section in the final rule. This section clarifies that one or more procedures and documentation prepared pursuant to other statutory or Executive order requirements may satisfy one or more requirements of the CEQ regulations. When a procedure or document satisfies

one or more requirements of this subchapter, the agency may substitute it for the corresponding requirements in this subchapter and need not carry out duplicative procedures or documentation. Agencies must identify which corresponding requirements in this subchapter are satisfied and consult with CEQ to confirm such determinations.

CEQ invited comments on analyses agencies are already conducting that, in whole or when aggregated, can serve as the functional equivalent of the EIS. Aspects of the cost-benefit analysis prepared pursuant to E.O. 12866, "Regulatory Planning and Review," the Regulatory Flexibility Act, or the Unfunded Mandates Reform Act, may overlap with aspects of the CEQ regulations. Further, an agency may rely on the procedures implementing the requirements of a variety of statutes and Executive orders that could meet some or all of the requirements of this subchapter. CEQ does not expressly include specific analyses in the final rule that satisfy the requirements of the CEQ regulations. In all instances, agencies should clearly identify how and which specific parts of the analyses serve the purpose of NEPA compliance, including which requirements in the CEQ regulations are satisfied.

### 10. Filing Requirements (§ 1506.10)

CEQ proposed to update § 1506.10, "Filing requirements," to remove the obsolete process for filing paper copies of EISs with EPA and EPA's delivery of a copy to CEQ, and instead provide for electronic filing, consistent with EPA's procedures. CEQ proposed this change to provide flexibility to adapt as EPA changes its processes. CEQ revises this section in the final rule, making the proposed changes as well as phrasing the language in active voice.

### 11. Timing of Agency Action (§ 1506.11)

CEQ proposed to revise paragraph (a) of § 1506.11, "Timing of agency action," to clarify the timing of EPA's notices of availability of EISs. In paragraph (b), CEQ proposed to add a clause to acknowledge statutory authorities that provide for the issuance of a combined final EIS and ROD. *See* 23 U.S.C. 139(n)(2); 49 U.S.C. 304a(b). CEQ makes these changes in the final rule.

In proposed paragraph (c), CEQ proposed to add introductory text and create subordinate paragraphs to address those situations where agencies may make an exception to the time provisions in paragraph (b). Specifically, paragraph (c)(1) addresses agencies with formal appeals processes. Paragraph (c)(2) provides exceptions for

---

[98] 84 FR 55235 (Oct. 15, 2019).

[99] 16 U.S.C. 1132(b)–(c).

rulemaking to protect public health or safety. Paragraph (d) addresses timing when an agency files the final EIS within 90 days of the draft EIS. Finally, paragraph (e) addresses when agencies may extend or reduce the time periods. The proposed rule made edits to clarify the language in these paragraphs without changing the substance of the provisions. CEQ includes these changes in the final rule and makes additional clarifying revisions.

12. Emergencies (§ 1506.12)

Section 1506.12, ''Emergencies,'' addresses agency compliance with NEPA when an agency has to take an action with significant environmental effects during emergency circumstances. Over the last 40 years, CEQ has developed significant experience with NEPA in the context of emergencies and disaster recoveries. Actions following Hurricanes Katrina, Harvey, and Michael, and other natural disasters, have given CEQ the opportunity to respond to a variety of circumstances where alternative arrangements for complying with NEPA are necessary. CEQ has approved alternative arrangements to allow a wide range of proposed actions in emergency circumstances including catastrophic wildfires, threats to species and their habitat, economic crisis, infectious disease outbreaks, potential dam failures, and insect infestations.[100] CEQ proposed to amend § 1506.12, ''Emergencies,'' to clarify that alternative arrangements are still meant to comply with section 102(2)(C)'s requirement for a ''detailed statement.'' This amendment is consistent with CEQ's longstanding position that it has no authority to exempt Federal agencies from compliance with NEPA, but that CEQ can appropriately provide for exceptions to specific requirements of CEQ's regulations to address extraordinary circumstances that are not addressed by agency implementing procedures previously approved by CEQ. See Emergencies Guidance, supra note 29. CEQ maintains a public description of all pending and completed alternative arrangements on

its website.[101] CEQ makes this change in the final rule.

13. Effective Date (§ 1506.13)

Finally, CEQ proposed to modify § 1506.13, ''Effective date,'' to clarify that these regulations would apply to all NEPA processes begun after the effective date, but agencies have the discretion to apply them to ongoing NEPA processes. CEQ also proposed to remove the 1979 effective date from the introductory paragraph, and strike 40 CFR 1506.13(a) referencing the 1973 guidance and 40 CFR 1506.13(b) regarding actions begun before January 1, 1970 because they are obsolete. This final rule makes these changes.

*I. Revisions to Agency Compliance (Part 1507)*

CEQ proposed modifications to part 1507, which addresses agency compliance with NEPA, to consolidate provisions relating to agency procedures from elsewhere in the CEQ regulations, and add a new section to address the dissemination of information about agency NEPA programs. CEQ makes these changes in the final rule with some modifications to the proposed rule as discussed in the following sections.

1. Compliance (§ 1507.1)

CEQ proposed a change to § 1507.1, ''Compliance,'' to strike the second sentence regarding agency flexibility in adapting its implementing procedures to the requirements of other applicable laws for consistency with changes to paragraphs (a) and (b) of § 1507.3, ''Agency NEPA procedures.'' This change is also consistent with the direction of the President to Federal agencies to ''comply with the regulations issued by the Council except where such compliance would be inconsistent with statutory requirements.'' E.O. 11514, as amended by E.O. 11991, sec. 2(g). CEQ makes this change in the final rule. Under the final rule, § 1507.1 requires all Federal agencies to comply with the CEQ regulations as set forth in parts 1500 through 1508.

2. Agency Capability To Comply (§ 1507.2)

CEQ proposed edits to the introductory paragraph of § 1507.2, ''Agency capability to comply,'' to clarify its meaning, which is to allow agencies to use the resources (including personnel and financial resources) of other parties, including agencies and applicants, and to specifically require

agencies to account for the contributions of these other parties in complying with NEPA. This section also requires agencies to have their own capacity to comply with NEPA and the implementing regulations. This includes staff with the expertise to independently evaluate environmental documents, including those prepared by applicants and contractors. CEQ makes these clarifying edits in the final rule.

Additionally, CEQ proposed to revise paragraph (a) to make the senior agency official responsible for overall agency compliance with NEPA, including coordination, communication, and resolution of implementation issues. CEQ is finalizing this change. Under the final rule, the senior agency official is an official of assistant secretary rank or higher (or equivalent) with responsibilities consistent with the responsibilities of senior agency officials in E.O. 13807 to whom agencies elevate anticipated missed or extended permitting timetable milestones. The senior agency official is responsible for addressing disputes among lead and cooperating agencies and enforcing page and time limits. The senior agency official also is responsible for ensuring all environmental documents—even exceptionally lengthy ones—are provided to Federal agency decision makers in a timely, readable, and useful format. See §§ 1501.5(f), 1501.7(d), 1501.8(b)(6) and (c), 1501.10, 1502.7, 1507.2, 1508.1(dd).

CEQ proposed to amend paragraph (c) to emphasize agency cooperation, which includes commenting on environmental documents on which an agency is cooperating. CEQ makes this change in the final rule. CEQ revises paragraph (d) in response to comments to strike the second sentence, which created confusion regarding the reach of section 102(2)(E) of NEPA. Finally, CEQ proposed to add references to E.O. 11991, which amended E.O. 11514, and E.O. 13807 in paragraph (f) to codify agencies' responsibility to comply with the orders. CEQ makes both of these changes in the final rule.

3. Agency NEPA Procedures (§ 1507.3)

Agency NEPA procedures set forth the process by which agencies comply with NEPA and the CEQ regulations in the context of their particular programs and processes. In developing their procedures, agencies should strive to identify and apply efficiencies, such as use of applicable CEs, adoption of prior NEPA analyses, and incorporation by reference to prior relevant Federal, State, Tribal, and local analyses, wherever practicable. To facilitate effective and efficient procedures, CEQ

---

[100] In response to the economic crisis associated with the coronavirus outbreak, Executive Order 13927, titled ''Accelerating the Nation's Economic Recovery From the COVID–19 Emergency by Expediting Infrastructure Investments and Other Activities,'' was issued on June 4, 2020. 85 FR 35165. This Executive order directs agencies to identify planned or potential actions to facilitate the Nation's economic recovery, including identification of actions that may be subject to emergency treatment as alternative arrangements.

[101] *https://ceq.doe.gov/nepa-practice/alternative_ arrangements.html.*

proposed to consolidate all of the requirements for agency NEPA procedures in § 1507.3, as discussed in detail below.

In the final rule, CEQ adds a new paragraph (a) to clarify the applicability of these regulations in the interim period between the effective date of the final rule and when the agencies complete updates to their agency NEPA procedures for consistency with these regulations. Consistent with § 1506.13, "Effective date," which makes the regulations applicable to NEPA reviews begun after the effective date of the final rule, paragraph (a) of § 1507.3 requires agencies to apply these regulations to new reviews unless there is a clear and fundamental conflict with an applicable statute. For NEPA reviews in process that agencies began before the final rule's effective date, agencies may choose whether to apply the revised regulations or proceed under the 1978 regulations and their existing agency NEPA procedures. Agencies should clearly indicate to interested and affected parties which procedures it is applying for each proposed action. The final rule does not require agencies to withdraw their existing agency NEPA procedures upon the effective date, but agencies should conduct a consistency review of their procedures in order to proceed appropriately on new proposed actions.

Paragraph (a) also provides that agencies' existing CEs are consistent with the subchapter. CEQ adds this language to ensure CEs remain available for agencies' use to ensure a smooth transition period while they work to update their existing agency procedures, including their CEs, as necessary. This change allows agencies to continue to use their existing CEs for ongoing activities as well as proposed actions that begin after the effective date of the CEQ final rule, and clarifies that revisions to existing CEs are not required within 12 months of the publication date of the final rule. Agencies must still consider whether extraordinary circumstances are present and should rely upon any extraordinary circumstances listed in their agency NEPA procedures as an integral part of an agency's process for applying CEs.

In paragraph (b) (proposed paragraph (a)), CEQ proposed to provide agencies the later of one year after publication of the final rule or nine months after the establishment of an agency to develop or revise proposed agency NEPA procedures, as necessary, to implement the CEQ regulations and eliminate any inconsistencies with the revised regulations. CEQ includes this sentence in the final rule with a correction to the

deadline—the deadline is calculated from the effective date, not the publication date. CEQ notes that this provision references "proposed procedures," and agencies need not finalize them by this date. The final rule strikes a balance between minimizing the disruption to ongoing environmental reviews while also requiring agencies to revise their procedures in a timely manner to ensure future reviews are consistent with the final rule. Agencies have the flexibility to address the requirements of the CEQ regulations as they relate to their programs and need not state them verbatim in their procedures. In addition, CEQ proposed to clarify that, except as otherwise provided by law or for agency efficiency, agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in the CEQ regulations. CEQ includes this language in the final rule, changing the order of the phrases, changing "provided by law" to "required by law" to enhance clarity, and adding a cross-reference to paragraph (c), which references efficiencies. This change is consistent with the direction of the President to Federal agencies in E.O. 11514 to comply with the CEQ regulations issued except where such compliance would be inconsistent with statutory requirements. E.O. 11514, as amended by E.O. 11991, sec. 2(g). Finally, the final rule eliminates the sentence from 40 CFR 1507.3(a) prohibiting agencies from paraphrasing the CEQ regulations because it is unnecessarily limiting on agencies. Agencies have the flexibility to address the requirements of the CEQ regulations as they relate to their programs and need not state them verbatim in their procedures.

Consistent with its proposal, the final rule requires agencies to develop or revise, as necessary, proposed procedures to implement these regulations. In the NPRM, CEQ proposed to subdivide 40 CFR 1507.3(a) into subordinate paragraphs (a)(1) and (2) for additional clarity because each of these paragraphs have an independent requirement. CEQ finalizes this change as paragraphs (b)(1) and (2) in the final rule. Paragraph (b)(1) addresses the requirement for agencies to consult with CEQ when developing or revising proposed procedures. Paragraph (b)(2) requires agencies to publish proposed agency NEPA procedures for public review and comment. After agencies address these comments, CEQ must determine that the agency NEPA procedures conform to and are consistent with NEPA and the CEQ

regulations. CEQ proposed to eliminate the recommendation to agencies to issue explanatory guidance and the requirement to review their policies and procedures. CEQ makes this change in the final rule because it is redundant to the proposed language in paragraph (b) requiring agencies to update their procedures to implement the final rule.

The NPRM proposed to move the provisions in § 1505.1, "Agency decision making procedures," to proposed § 1507.3(b). The final rule moves these provisions to paragraph (c). As stated in the NPRM, consistent with the proposed edits to § 1500.1, CEQ proposed to revise this paragraph to clarify that agencies should ensure decisions are made in accordance with the Act's procedural requirements and policy of integrating NEPA with other environmental reviews to promote efficient and timely decision making. CEQ includes these edits in the final rule, along with an additional edit to change passive to active voice. CEQ does not include proposed paragraph (b)(1) (40 CFR 1505.1(a)) in the final rule because the phrase "[i]mplementing procedures under section 102(2) of NEPA to achieve the requirements of section 101 and 102(1)" could be read to suggest that agencies could interpret NEPA in a manner that would impose more burdens than the requirements of the final rule. Including this provision in the final rule would be inconsistent with the language in paragraph (b) that limits agency NEPA procedures to the requirements in these regulations unless otherwise required by law or for agency efficiency. Finally, CEQ corrects the reference in paragraph (c)(4) to EIS, changing it to "environmental documents" consistent with the rest of the paragraph.

CEQ proposed a new paragraph (b)(6) to direct agencies to set forth in their NEPA procedures requirements to combine their NEPA documents with other agency documents, especially where the same or similar analyses are required for compliance with other requirements. As stated in the NPRM, many agencies implement statutes that call for consideration of alternatives to the agency proposal, including the no action alternative, the effects of the agencies' proposal and alternatives, and public involvement. Agencies can use their NEPA procedures to align compliance with NEPA and these other statutory authorities to integrate NEPA's goals for informed decision making with agencies' specific statutory requirements. This approach is consistent with some agency practice. *See, e.g.,* 36 CFR part 220; Forest Service Handbook 1909.15 (U.S.

Department of Agriculture Forest Service NEPA procedures). More agencies could use it to achieve greater efficiency and reduce unnecessary duplication. Additionally the NPRM proposed to allow agencies to designate analyses or processes that serve as the functional equivalent of NEPA compliance.

CEQ includes this provision in the final rule at paragraph (c)(5) with revisions to clarify that agencies may designate and rely on one or more procedures or documents under other statutes or Executive orders as satisfying some or all of the requirements in the CEQ regulations. While courts have held that agencies do not need to conduct NEPA analyses under a number of statutes that are "functionally equivalent," including the Clean Air Act, the Ocean Dumping Act, the Federal Insecticide, Fungicide, and Rodenticide Act, the Resource Conservation and Recovery Act, and the Comprehensive Environmental Response, Compensation, and Liability Act,[102] the final rule recognizes that agencies may substitute processes or documentation prepared pursuant to other statutes or Executive orders to satisfy one or more requirements in the CEQ regulations to reduce duplication. Agencies must identify the respective requirements in this subchapter that are satisfied by other statutes or Executive orders.

Furthermore, CEQ proposed to add a new paragraph to allow agencies to identify activities or decisions that are not subject to NEPA, consistent with § 1501.1, in their agency NEPA procedures. CEQ adds this provision to paragraph (d) in the final rule. The final

rule uses "should" instead of "may" to encourage agencies to make these identifications in their agency NEPA procedures. The final rule also replaces "actions" with "activities or decisions" to avoid confusion with the definition of "action" in § 1508.1(q). CEQ includes this list in the final rule consistent with the changes in § 1501.1 as discussed in section II.C.1, with minor revisions to improve readability and a reordering of the provisions consistent with the reordering of the provisions in § 1501.1.

Paragraph (e) (proposed paragraph (d)) maintains much of the language from 40 CFR 1507.3(b). CEQ proposed to add parenthetical descriptions of the cross-references in proposed paragraph (d)(1), and CEQ includes these in the final rule at paragraph (e)(1). CEQ proposed to revise paragraph (d)(2)(ii), which requires agencies to identify CEs in their agency NEPA procedures, move the requirement for extraordinary circumstances from the definition of CEs in 40 CFR 1508.4, and require agencies to identify in their procedures when documentation of a CE determination is required. CEQ also proposed to add language to proposed paragraph (e) to codify existing agency practice to publish notices when an agency pauses an EIS or withdraws an NOI. CEQ includes this provision with the proposed revisions in the final rule at paragraph (f)(3). Finally, CEQ proposed to move from 40 CFR 1502.9(c)(3) to proposed paragraph (d)(3) the requirement to include procedures for introducing a supplement into its formal administrative record and clarify that this includes EAs and EISs. CEQ includes this provision in the final rule at paragraph (e)(3).

Paragraphs (f)(1) through (3) (proposed paragraphs (e)(1) through (3)) maintain much of the language from 40 CFR 1507.3(c) through (e). In proposed paragraph (e)(1), CEQ proposed to revise the language to active voice and encourage, rather than just allow, agencies to organize environmental documents in such a way as to make unclassified portions of environmental documents available to the public. CEQ makes these revisions in the final rule in paragraph (f)(1). CEQ also modifies paragraph (f)(2) to add a reference to the requirements of lead and cooperating agencies. CEQ adds this example consistent with the addition to § 1506.11(b) referencing statutory provisions for combining a final EIS and ROD. This is also consistent with CEQ's goal of improving coordination between lead and cooperating agencies and providing efficient processes to allow for integration of the NEPA review with

reviews conducted under other statutes. This allows for altering time periods to facilitate issuance of a combined FEIS and ROD. Additionally, CEQ proposed to move the language allowing agencies to adopt procedures to combine their EA process with their scoping process from 40 CFR 1501.7(b)(3) to paragraph (e)(4). CEQ makes this change in the final rule at paragraph (f)(4).

Finally, CEQ proposed in paragraph (e)(5) to allow agencies to establish a process in their agency NEPA procedures to apply the CEs of other agencies. CEQ also invited comment on whether to set forth this process in these regulations. In the final rule, CEQ includes the provision to allow agencies to establish a process in paragraph (f)(5) with some changes. CEQ includes clarifying language to address the confusion commenters had as to differences between this section and adoption of a CE determination under § 1506.3. An agency's process must provide for consultation with the agency that listed the CE in its NEPA procedures to ensure that the planned use of the CE is consistent with the originating agency's intent and practice.[103] The process should ensure documentation of the consultation and identify to the public those CEs the agency may use for its proposed actions. Consistent with § 1507.4, agencies could post such information on their websites. Then, an agency may apply the CE to its proposed actions, including proposed projects or activities or groups of proposed projects or activities.

### 4. Agency NEPA Program Information (§ 1507.4)

CEQ proposed to add a new § 1507.4, "Agency NEPA program information," to provide the means of publishing information on ongoing NEPA reviews and agency records relating to NEPA reviews. CEQ is finalizing this provision as proposed with no changes. As stated in the NPRM, this provision requires agencies in their NEPA procedures to provide for a website or other means of publishing certain information on ongoing NEPA reviews and maintaining and permitting public access to agency records relating to NEPA reviews.

Section 1507.4 promotes transparency and efficiency in the NEPA process, and improves interagency coordination by

---

[102] *See Portland Cement Ass'n,* 486 F.2d at 387 (finding an exemption from NEPA for Clean Air Act section 111); *see also Envtl. Def. Fund, Inc,* 489 F.2d at 1254–56 (concluding that the standards of FIFRA provide the functional equivalent of NEPA); *Cellular Phone Taskforce,* 205 F.3d at 94–95 (concluding that the procedures followed by the Federal Communications Commission were functionally compliant with NEPA's EA and FONSI requirements); *W. Neb. Res. Council,* 943 F.2d at 871–72 (concluding that EPA's procedures and analysis under the Safe Drinking Water Act were functionally equivalent to NEPA); *Wyo. v. Hathaway,* 525 F.2d 66, 71–72 (10th Cir. 1975) (concluding that EPA need not prepare an EIS before cancelling or suspending registrations of three chemical toxins used to control coyotes under FIFRA); *State of Ala. ex rel. Siegelman* v. *U.S. EPA,* 911 F.2d 499, 504–05 (11th Cir. 1990) (holding that EPA did not need to comply with NEPA when issuing a final operating permit under the Resource Conservation and Recovery Act); *Envtl. Def. Fund, Inc.* v. *Blum,* 458 F. Supp. 650, 661–62 (D.D.C. 1978) (EPA need not prepare an EIS before granting an emergency exemption to a state to use an unregistered pesticide); *State of Md.* v. *Train,* 415 F. Supp. 116, 121–22 (D. Md. 1976) (Ocean Dumping Act functional equivalent of NEPA). For further discussion, see section J.3 of the Final Rule Response to Comments.

[103] The use of another agency's CE under a process in the agency's NEPA procedures is an option separate from the adoption, under § 1506.3(f), of another agency's determination that its CE applies to a particular action that is substantially the same as the adopting agency's proposed action. An agency may adopt another agency's CE determination for a particular action regardless of whether its procedures provide a process for application of other agencies' CEs.

ensuring that information is more readily available to other agencies and the public. As discussed in the NPRM, opportunities exist for agencies to combine existing geospatial data, including remotely sensed images, and analyses to streamline environmental review and better coordinate development of environmental documents for multi-agency projects, consistent with the OFD policy. One option involves creating a single NEPA application that facilitates consolidation of existing datasets and can run several relevant geographic information system (GIS) analyses to help standardize the production of robust analytical results. This application could have a public-facing component modeled along the lines of EPA's NEPAssist,[104] which would aid prospective project sponsors with site selection and project design and increase public transparency. The application could link to the Permitting Dashboard to help facilitate project tracking and flexibilities under §§ 1506.5 and 1506.6. CEQ invited comment on this proposal, including comment on whether additional regulatory changes could help facilitate streamlined GIS analysis to help agencies comply with NEPA. While some commenters supported the development of a single NEPA application, others identified challenges to ensuring databases are useful, as well as privacy and security concerns. CEQ did not receive sufficient comment to lead CEQ to make additional regulatory changes to facilitate streamlined GIS analysis to help agencies comply with NEPA, and the final rule does not contain any changes from the proposal.

*J. Revisions to Definitions (Part 1508)*

NEPA does not itself include a set of definitions provided by Congress. CEQ, in the 1978 regulations, established a set of definitions for NEPA and the CEQ regulations. In this final rule, CEQ has clarified or supplemented the definitions as discussed below and further described in the Final Rule Response to Comments at section K. As noted above, *see Public Citizen,* 541 U.S. at 757; *Methow Valley,* 490 U.S. at 355 (citing *Andrus,* 442 U.S. at 358); *Brand X,* 545 U.S. at 980–86; and *Mead Corp.,* 533 U.S. at 227–30, CEQ has the authority to interpret NEPA. *See, e.g., Barnhart* v. *Walton,* 535 U.S. 212, 218 (2002) ("[S]ilence, after all, normally creates ambiguity. It does not resolve it."). Existing NEPA case law inevitably

rests directly on interpretive choices made in the 1978 regulations or on cases that themselves through some chain of prior cases also trace to the 1978 regulations. Yet consistent with *Chevron,* CEQ's NEPA regulations are subject to change. *See also Brand X,* 545 U.S. 967.

CEQ's intention to make use of its interpretive authority under *Chevron* is particularly applicable as to part 1508 where CEQ defines or revises key terms in the NEPA statute and the CEQ regulations. As a result, this confers on CEQ an even greater degree of latitude to elucidate the meaning of the statute's terms in these regulations—the same basic authority exercised by CEQ back in 1978 in the original form of the NEPA regulations. *See, e.g., Demski* v. *U.S. Dep't of Labor,* 419 F.3d 488, 491 (6th Cir. 2005) ("In the absence of a congressional definition or an explicit delegation of congressional authority to the agency, we determine how the agency responsible for implementing the statute . . . understands the term, and, under *Chevron* . . . we determine whether such an understanding is a 'reasonable interpretation' of the statute.'" (citing *Chevron,* 467 U.S. at 844)); *London* v. *Polishook,* 189 F.3d 196, 200 (2d Cir. 1999) ("[J]udicial deference does apply to the guidelines that [the] Department's Office of Labor–Management Standards Enforcement has developed and set out in its LMRDA Interpretive Manual § 030.425— guidelines to which [the D.C. Circuit in *Martoche*] deferred in the absence of a clear definition of 'political subdivision' in the Act or in its legislative history."); *Hawaii Gov't Employees Ass'n, Am. Fed'n of State, Cty. & Mun. Employees, Local 152* v. *Martoche,* 915 F.2d 718, 721 (D.C. Cir. 1990) ("With some imprecision in the statutory text [as to an undefined term] and a nearly total lack of elucidation in the legislative history, the situation is squarely one in which Congress implicitly left a gap for the agency to fill.") (internal citation and quotation marks omitted). *See also Perez* v. *Commissioner,* 144 T.C. 51, 59 (2015); *Saha Thai Steel Pipe (Pub.) Co.* v. *United States,* 33 C.I.T. 1541, 1547 (Ct. of Int'l Trade 2009).[105] In promulgating new or revised definitions and other changes to the NEPA regulations, CEQ has considered the

ordinary meaning of the terms used by Congress in the statute.

As discussed in the NPRM, CEQ proposed significant revisions to part 1508. CEQ proposed to move the operative language, which is regulatory language that provides instruction or guidance, included throughout the regulations in this section to the relevant substantive sections of the regulations. Consistent with this change, CEQ proposed to retitle part 1508 from "Terminology and Index" to "Definitions." [106] CEQ also proposed to clarify the definitions of a number of key NEPA terms in order to reduce ambiguity, both through modification of existing definitions and the addition of new definitions. CEQ proposed to eliminate individual section numbers for each term in favor of a single section of defined terms in the revised § 1508.1. Finally, CEQ proposed to remove citations to the specific definition sections throughout the rule. CEQ makes these changes in the final rule.

1. Clarifying the Meaning of "Act"

CEQ proposed in paragraph (a) to add "NEPA" as a defined term with the same meaning as "Act." CEQ makes this change in the final rule.

2. Definition of "Affecting"

CEQ did not propose to make any change to the defined term "affecting" in paragraph (b). CEQ does not make any changes to this definition in the final rule.

3. New Definition of "Authorization"

CEQ proposed to define the term "authorization" in paragraph (c) to refer to the types of activities that might be required for permitting a proposed action, in particular infrastructure projects. This definition is consistent with the definition included in FAST– 41 and E.O. 13807. CEQ proposed to replace the word "entitlement" with "authorization" throughout the rule. CEQ adds this definition and makes these changes in the final rule.

4. Clarifying the Meaning of "Categorical Exclusion"

CEQ proposed to revise the definition of "categorical exclusion" in paragraph (d) by inserting "normally" to clarify that there may be situations where an action may have significant effects on account of extraordinary circumstances.

---

[104] *https://nepassisttool.epa.gov/nepassist/ nepamap.aspx. See also* the Marine Cadastre, which provides consolidated GIS information for offshore actions, *https://marinecadastre.gov/.*

[105] "Although NEPA's statutory text specifies *when* an agency must comply with NEPA's procedural mandate; it is the Council on Environmental Quality Regulations ('CEQ') regulations which dictate the *how,* providing the framework by which all [F]ederal agencies comply with NEPA." *Dine' Citizens Against Ruining Our Environment* v. *Klein,* 747 F. Supp. 2d 1234, 1248 (D. Colo. 2010) (emphasis in original).

[106] CEQ has maintained an index in the Code of Federal Regulations, but this is not a part of the regulations. CEQ does not intend to continue to maintain such an index because it is no longer necessary given that the regulations are typically accessed electronically and the regulations' organization has been significantly improved.

CEQ also proposed to strike "individually or cumulatively" for consistency with the proposed revisions to the definition of "effects" as discussed in this section. CEQ proposed conforming edits in §§ 1500.4(a) and 1500.5(a). As noted in section II.I.3, CEQ proposed to move the requirement to provide for extraordinary circumstances in agency procedures to § 1507.3(d)(2)(ii) (§ 1507.3(e)(2)(ii) in the final rule). CEQ makes these changes in the final rule. CEQ notes that the definition of "categorical exclusion" only applies to those CEs created by an agency in its agency NEPA procedures and does not apply to "legislative" CEs created by Congress, which are governed by the terms of the specific statute and statutory interpretation of the agency charged with the implementation of the statute.

### 5. Clarifying the Meaning of "Cooperating Agency"

CEQ proposed to amend the definition of "cooperating agency" in paragraph (e) to make clear that a State, Tribal, or local agency may be a cooperating agency when the lead agency agrees, and to move the corresponding operative language allowing a State, Tribal, or local agency to become a cooperating agency with the lead agency's agreement to paragraph (a) of § 1501.8, "Cooperating agencies." CEQ also proposed to remove the sentence cross-referencing the cooperating agency section in part 1501 and stating that the selection and responsibilities of a cooperating agency are described there because it is unnecessary and does not define the term. CEQ makes these changes in the final rule.

### 6. Definition of "Council"

CEQ did not propose any changes to the definition of "Council" in paragraph (f). CEQ also invited comment on whether to update references to "Council" in the regulations to "CEQ" throughout the rule. CEQ did not receive sufficient comments on this proposal; therefore, CEQ does not make this change in the final rule.

### 7. Definition of "Cumulative Impact" and Clarifying the Meaning of "Effects"

CEQ proposed to remove the definition of "cumulative impact" and revise the definition of "effects" in paragraph (g). As noted in the NPRM, many commenters to the ANPRM urged CEQ to refine the definition based on concerns that it creates confusion, and that the terms "indirect" and "cumulative" have been interpreted expansively resulting in excessive

documentation about speculative effects and leading to frequent litigation. Commenters also raised concerns that this has expanded the scope of NEPA analysis without serving NEPA's purpose of informed decision making. Commenters stressed that the focus of the effects analysis should be on those effects that are reasonably foreseeable, related to the proposed action under consideration, and subject to the agency's jurisdiction and control. Commenters also noted that NEPA practitioners often struggle with describing cumulative impacts despite a number of publications that address the topic.

While NEPA refers to environmental impacts and environmental effects, it does not subdivide the terms into direct, indirect, or cumulative. Nor are the terms "direct," "indirect," or "cumulative" included in the text of the statute. CEQ created those concepts and included them in the 1978 regulations.

To address commenters' concerns and reduce confusion and unnecessary litigation, CEQ proposed to simplify the definition of effects by striking the specific references to direct, indirect, and cumulative effects and providing clarity on the bounds of effects consistent with the Supreme Court's holding in *Public Citizen,* 541 U.S. at 767–68. Under the proposed definition, effects must be reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives; a "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. This close causal relationship is analogous to proximate cause in tort law. *Id.* at 767; *see also Metro. Edison Co.,* 460 U.S. at 774 (interpreting section 102 of NEPA to require "a reasonably close causal relationship between a change in the physical environment and the effect at issue" and stating "[t]his requirement is like the familiar doctrine of proximate cause from tort law."). CEQ sought comment on whether to include in the definition of effects the concept that the close causal relationship is "analogous to proximate cause in tort law," and if so, how CEQ could provide additional clarity regarding the meaning of this phrase.

In the final rule, CEQ revises the definition of effects consistent with the proposal, with some additional edits. First, to eliminate the circularity in the definition, CEQ changes the beginning of the definition from "means effects of" to "means changes to the human environment from" the proposed action or alternatives. This change also associates the definition of effects with

the definition of human environment, which continues to cross-reference to the definition of effects in the final rule. It also makes clear that, when the regulations use the term "effects," it means effects on the human environment. This responds to comments suggesting CEQ add "on the human environment" after "effects" in various sections of the rule.

The final rule also consolidates the first two sentences of the definition to clarify that, for purposes of this definition, "effects that occur" at the "same time and place as the proposed action or alternatives," or that "are later in time or farther removed in distance" must nevertheless be reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives. As a separate sentence that only referenced reasonable foreseeability, there was ambiguity as to whether a reasonably close causal relationship was required. Additionally, the final rule adds a clause to clarify that the consideration of time and place or distance are relative to the proposed action or alternatives.

CEQ proposed to strike the definition of "cumulative impact" and the terms "direct" and "indirect" in order to focus agency time and resources on considering whether the proposed action causes an effect rather than on categorizing the type of effect. As stated in the NPRM, CEQ intends the revisions to simplify the definition to focus agencies on consideration of effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action. In practice, agencies have devoted substantial resources to categorizing effects as direct, indirect, or cumulative, which, as noted above, are not terms referenced in the NEPA statute. CEQ eliminates these references in the final rule.

To further assist agencies in their assessment of significant effects, CEQ also proposed to clarify that agencies should not consider effects significant if they are remote in time, geographically remote, or the result of a lengthy causal chain. *See, e.g., Pub. Citizen,* 541 U.S. at 767–68 ("In particular, 'courts must look to the underlying policies or legislative intent in order to draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not.'" (quoting *Metro. Edison Co.,* 460 U.S. at 774 n.7)); *Metro. Edison Co.,* 460 U.S. at 774 (noting effects may not fall within section 102 of NEPA because "the causal chain is too attenuated"). CEQ revises this sentence in the final rule to add "generally" to reflect the fact that there may occasionally be a

circumstance where an effect that is remote in time, geographically remote, or the product of a lengthy causal chain is reasonably foreseeable and has a reasonably close causal relationship to the proposed action.

Further, CEQ proposed to codify a key holding of *Public Citizen* relating to the definition of effects to make clear that effects do not include effects that the agency has no authority to prevent or that would happen even without the agency action, because they would not have a sufficiently close causal connection to the proposed action. For example, this would include effects that would constitute an intervening and superseding cause under familiar principles of tort law. *See, e.g., Sierra Club* v. *FERC*, 827 F.3d 36, 47–48 (D.C. Cir. 2016) (NEPA case incorporating these principles) ("[C]ritical to triggering that chain of events is the intervening action of the Department of Energy in granting an export license. The Department's independent decision to allow exports—a decision over which the Commission has no regulatory authority—breaks the NEPA causal chain and absolves the Commission of responsibility to include in its NEPA analysis considerations that it 'could not act on' and for which it cannot be 'the legally relevant cause.'" (quoting *Pub. Citizen,* 541 U.S. at 769)). As discussed in the NPRM, this clarification will help agencies better understand what effects they need to analyze and discuss, helping to reduce delays and paperwork with unnecessary analyses. CEQ includes this language in the final rule as proposed.

In addition, CEQ proposed a change in position to state that analysis of cumulative effects, as defined in the 1978 regulations, is not required under NEPA. Categorizing and determining the geographic and temporal scope of such effects has been difficult and can divert agencies from focusing their time and resources on the most significant effects. Past CEQ guidance has not been successful in dispelling ambiguity. Excessively lengthy documentation that does not focus on the most meaningful issues for the decision maker's consideration can lead to encyclopedic documents that include information that is irrelevant or inconsequential to the decision-making process. Instead, agencies should focus their efforts on analyzing effects that are most likely to be potentially significant and effects that would occur as a result of the agency's decision, rather than effects that would be the result of intervening and superseding causes. Agencies are not expected to conduct exhaustive

research on identifying and categorizing actions beyond the agency's control.

CEQ intended the proposed elimination of the definition of cumulative impact to focus agencies on analysis of effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action. Cumulative effects analysis has been interpreted so expansively as to undermine informed decision making, and led agencies to conduct analyses to include effects that are not reasonably foreseeable or do not have a reasonably close causal relationship to the proposed action or alternatives. CEQ also invited comment on whether to include an affirmative statement that consideration of indirect effects is not required; the final rule does not include additional direction to agencies specific to indirect effects.

CEQ received many comments on cumulative effects. In the final rule, to provide further clarification, CEQ includes a new provision at paragraph (g)(3) that states that the analysis of effects shall be consistent with the definition of effects, and that cumulative impact, defined in 40 CFR 1508.7 (1978), is repealed. This language explains how agencies should apply the definition of effects with respect to environmental documents and other provisions in the final rule. Specifically, analyses are bound by the definition of effects as set forth in § 1508.1(g)(1) and (2) and should not go beyond the definition of effects set forth in those two paragraphs. The final rule provides considerable flexibility to agencies to structure the analysis of effects based on the circumstances of their programs.

In response to the NPRM, commenters stated that agencies would no longer consider the impacts of a proposed action on climate change. The rule does not preclude consideration of the impacts of a proposed action on any particular aspect of the human environment. The analysis of the impacts on climate change will depend on the specific circumstances of the proposed action. As discussed above, under the final rule, agencies will consider predictable trends in the area in the baseline analysis of the affected environment.

8. Clarifying the Meaning of "Environmental Assessment"

CEQ proposed to revise the definition of "environmental assessment" in paragraph (h), describing the purpose for the document and moving all of the operative language setting forth the requirements for an EA from the

definition to proposed § 1501.5. CEQ makes this change in the final rule.

9. Clarifying the Meaning of "Environmental Document"

CEQ proposed to remove the cross-references from the definition of "environmental document" in paragraph (i). CEQ makes this change in the final rule.

10. Clarifying the Meaning of "Environmental Impact Statement"

CEQ proposed to change "the Act" to "NEPA" in the definition of "environmental impact statement" in paragraph (j). CEQ makes this change in the final rule.

11. Clarifying the Meaning of "Federal Agency"

CEQ proposed to amend the definition of "Federal agency" in paragraph (k) to broaden it to include States, Tribes, and units of local government to the extent that they have assumed NEPA responsibilities from a Federal agency pursuant to statute. As stated in the NPRM, since the issuance of the CEQ regulations, Congress has authorized assumption of NEPA responsibilities in other contexts besides the Housing and Community Development Act of 1974, Public Law 93–383, sec. 104(h), 88 Stat. 633, 640, 42 U.S.C. 5304. *See, e.g.,* Surface Transportation Project Delivery Program, 23 U.S.C. 327. This change acknowledges these programs and helps clarify roles and responsibilities. CEQ makes this change and minor clarifying edits in the final rule.

12. Clarifying the Meaning of "Finding of No Significant Impact"

CEQ proposed to revise the definition of "finding of no significant impact" in paragraph (l) to insert the word "categorically" into the phrase "not otherwise excluded," change the cross-reference to the new section addressing CEs at § 1501.4, and move the operative language requiring a FONSI to include an EA or a summary of it and allowing incorporation by reference of the EA to § 1501.6, which addresses the requirements of a FONSI. CEQ makes these revisions in the final rule.

13. Clarifying the Meaning of "Human Environment"

CEQ proposed to change "people" to "present and future generations of Americans" consistent with section 101(a) of NEPA to the definition of human environment in paragraph (m). CEQ also proposed to move the operative language stating that economic or social effects by themselves

do not require preparation of an EIS to § 1502.16(b), which is the section of the regulations that addresses when agencies should consider economic or social effects in an EIS. CEQ makes these changes in the final rule to assist agencies in understanding and implementing the statute and regulations.

### 14. Definition of "Jurisdiction by Law"

The NPRM did not propose any changes to the definition of jurisdiction by law in paragraph (n). CEQ did not revise this definition in the final rule.

### 15. Clarifying the Meaning of "Lead Agency"

CEQ proposed to amend the definition of lead agency in paragraph (o) to clarify that this term includes joint lead agencies, which are an acceptable practice. CEQ makes this change in the final rule.

### 16. Clarifying the Meaning of "Legislation"

CEQ proposed to move the operative language regarding the test for significant cooperation and the principle that only the agency with primary responsibility will prepare a legislative EIS to § 1506.8. CEQ also proposed to strike the example of treaties, because the President is not a Federal agency, and therefore a request for ratification of a treaty would not be subject to NEPA. CEQ makes these changes in the final rule, striking the references to "significant cooperation and support," in paragraph (p) to narrow the definition to comport with the NEPA statute, as discussed in section II.H.8.

### 17. Clarifying the Meaning of "Major Federal Action"

CEQ received many comments on the ANPRM requesting clarification of the definition of major Federal action. For example, CEQ received comments proposing that non-Federal projects should not be considered major Federal actions based on a very minor Federal role. Commenters also recommended that CEQ clarify the definition to exclude decisions where agencies do not have discretion to consider and potentially modify their actions based on the environmental review.

CEQ proposed to amend the first sentence of the definition in paragraph (q) to clarify that an action meets the definition if it is subject to Federal control and responsibility, and it has effects that may be significant. CEQ proposed to replace "major" effects with "significant" in this sentence to align with the NEPA statute. In the final rule,

CEQ revises the definition to remove reference to significance. CEQ also revises the definition to remove the circularity in the definition, changing "means an action" to "means an activity or decision" that is subject to Federal control and responsibility.

### i. Independent Meaning of "Major"

CEQ proposed to strike the second sentence of the definition, which provides "Major reinforces but does not have a meaning independent of significantly." CEQ makes this change in the final rule. This is a change in position as compared to CEQ's earlier interpretation of NEPA and, in finalizing this change, CEQ intends to correct this longstanding misconstruction of the NEPA statute. The statutory aim of NEPA is to focus on "major Federal actions significantly affecting the quality of the human environment," 42 U.S.C. 4332(2)(C), rather than on non-major Federal actions that simply have some degree of Federal involvement. Under the 1978 regulations, however, the word "major" was rendered virtually meaningless.

CEQ makes this change because all words of a statute must be given meaning consistent with longstanding principles of statutory interpretation. *See, e.g., Bennett,* 520 U.S. at 173 ("It is the cardinal principle of statutory construction . . . that it is our duty to give effect, if possible, to every clause and word of a statute . . . rather than to emasculate an entire section.") (internal quotations and citations omitted) (quoting *United States* v. *Menasche,* 348 U.S. 528, 538 (1955)). Although the 1978 regulations treated the terms "major" and "significantly" as interchangeable, there is an important distinction between the two terms and how they apply in the NEPA process. "Major" refers to the type of action, including the role of the Federal agency and its control over any environmental impacts. "Significant" relates to the effects stemming from the action, including consideration of the affected area, resources, and the degree of the effects. In the statute, "major" occurs twice, and in both instances is a modifier of "Federal action"—in section 102(2)(C) in the phrase "other major Federal actions significantly affecting the quality of the human environment," and section 102(2)(D) in the phrase, "any major Federal action funded under a program of grants to States." NEPA also uses "significant" or "significantly" twice as a modifier of the similar words "affecting" in section 102(2)(C) and "impacts" in section 102(2)(D)(iv).

The legislative history of NEPA also reflects that Congress used the term

"major" independent of "significantly," and provided that, for major actions, agencies should make a determination as to whether the proposal would have a significant environmental impact. Specifically, the Senate Report for the National Environmental Policy Act of 1969 (Senate Report) states, "*Each agency which proposes any major actions,* such as project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs, *shall make a determination as to whether the proposal would have a significant effect upon the quality of the human environment.*" S. Rep. No. 91–296, at 20 (1969) (emphasis added).[107] Further, the Senate Report shows that OMB's predecessor, the Bureau of the Budget, submitted comments on the legislation to provide the views of the Executive Office of the President and recommended that Congress revise the text of the bill to include two separate modifiers: "major" before Federal actions and "significantly" before affecting the quality of the human environment. *See id.* at 30 (Bureau of the Budget's markup returned to the Senate on July 7, 1969). The enacted legislation included these revisions. While CEQ followed the Eighth Circuit's approach in *Minnesota Public Interest Research Group* v. *Butz,* 498 F.2d 1314, 1321–22 (8th Cir. 1974), in the 1978 regulations, other courts had interpreted "major" and "significantly" as having independent meaning before CEQ issued its 1978 regulations. *See NAACP* v. *Med. Ctr., Inc.,* 584 F.2d 619, 629 (3d Cir. 1978) (analyzing the Secretary's ministerial approval of a capital expenditure under a framework that first considered whether there had been agency action, and then whether that action was "major"); *Hanly* v. *Mitchell,* 460 F.2d 640, 644–45 (2d Cir. 1972) ("There is no doubt that the Act contemplates some agency action that does not require an impact statement because the action is minor and has so little effect on the environment as to be insignificant." (internal citations omitted)); *Scherr* v. *Volpe,* 466 F.2d 1027, 1033 (7th Cir. 1972) (finding that a highway project qualifies as major before turning to the second step of whether the project would have a significant effect); *Julius* v. *City of Cedar Rapids,* 349 F. Supp. 88, 90 (N.D. Iowa 1972) (finding that a lane widening project was not a major Federal action); *Goose Hollow Foothills League* v. *Romney,* 334 F. Supp. 877, 879 (D. Or. 1971) (discussing whether a proposed

---

[107] *https://ceq.doe.gov/docs/laws-regulations/ Senate-Report-on-NEPA.pdf.*

building project was "major"); *SW Neighborhood Assembly* v. *Eckard,* 445 F. Supp. 1195, 1199 (D.D.C. 1978) ("The phrase 'major Federal action' has been construed by the Courts to require an inquiry into such questions as the amount of federal funds expended by the action, the number of people affected, the length of time consumed, and the extent of government planning involved." (citing *Hanly,* 460 F.2d at 644)); *Nat. Res. Def. Council* v. *Grant,* 341 F. Supp. 356, 366 (E.D.N.C. 1972) ("Certainly, an administrative agency [such] as the Soil Conservation Service may make a decision that a particular project is not major, or that it does not significantly affect the quality of the human environment, and, that, therefore, the agency is not required to file an impact statement."). Moreover, as discussed further below, over the past four decades, in a number of cases, courts have determined that NEPA does not apply to actions with minimal Federal involvement or funding. Under the revised definition, these would be non-major Federal actions.

In the final rule, CEQ reorganizes the remainder of the definition of major Federal action into subordinate paragraphs. Paragraph (q)(1) provides a list of activities or decisions that are not included within the definition.

### ii. Extraterritoriality

In the NPRM, CEQ requested comment on whether to clarify that major Federal action does not include extraterritorial actions because NEPA does not apply extraterritorially, consistent with *Kiobel* v. *Royal Dutch Petroleum Co.,* 569 U.S. 108, 115–16 (2013), in light of the ordinary presumption against extraterritorial application when a statute does not clearly indicate that extraterritorial application is intended by Congress. In the final rule, CEQ revises the definition of "Major Federal action" in a new paragraph (q)(1)(i) to exclude extraterritorial activities or decisions, which mean activities or decisions with effects located entirely outside the jurisdiction of the United States.[108]

The Supreme Court has stated that "[i]t is a longstanding principle of American law 'that legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United

States.' " *EEOC* v. *Arabian Am. Oil Co. (Aramco),* 499 U.S. 244, 248 (1991) (quoting *Foley Bros.* v. *Filardo, Inc.,* 336 U.S. 281, 285 (1949)). During the past decade, the Supreme Court has considered the application of the presumption to a variety of Federal statutes.[109] As the Supreme Court has stated, the presumption "rests on the perception that Congress ordinarily legislates with respect to domestic, not foreign matters." *Morrison,* 561 U.S. at 255 (citing *Smith* v. *United States,* 507 U.S. 197, 204 n.5 (1993)). "Thus, 'unless there is the affirmative intention of the Congress clearly expressed' to give a statute extraterritorial effect, 'we must presume it is primarily concerned with domestic conditions.' " *Morrison,* 561 U.S. at 255 (citing *Aramco,* 499 U.S. at 248). The Supreme Court has held, including in more recent decisions, that the presumption applies regardless of whether there is a risk of conflict between the U.S. statute and a foreign law. *Morrison,* 561 U.S. at 255 (citing *Sale* v. *Haitian Ctrs. Council, Inc.,* 509 U.S. 155, 173–74 (1993)); *RJR Nabisco,* 136 S. Ct. at 2100; *see also Smith,* 507 U.S. at 204 n.5.

The Supreme Court has established a two-step framework for analyzing whether the presumption against extraterritoriality applies to a Federal statute.[110] Under this framework, the first step is to ask whether the presumption against extraterritoriality has been rebutted because "the statute gives a clear, affirmative indication that it applies extraterritorially." *RJR Nabisco,* 136 S. Ct. at 2101. If the presumption has not been rebutted, the second step is to determine whether the case involves a domestic application of the statute, and courts have done this by looking to the statute's "focus." [111]

Under the two-step framework, CEQ has determined that because the legislative history and statutory text of

section 102(2)(C) gives no clear indication that it applies extraterritorially, the presumption against extraterritoriality has not been rebutted. The plain language of section 102(2)(C) does not require it to be applied to actions occurring outside the jurisdiction of the United States.[112] The only reference in the Act to international considerations is in section 102(2)(F), which refers to "international cooperation" and the "worldwide and long-range character of environmental problems," and directs agencies to "where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation" to protect the environment. 42 U.S.C. 4332(2)(F). International cooperation is inherently voluntary and not part of the mandatory analysis required under the statute, and this provision does not indicate in any way that the requirements of section 102(2)(C) to prepare detailed statements applies outside of U.S. territorial jurisdiction. The limited legislative history of section 102(2)(C) similarly does not include discussion of application of the requirements of section 102(2)(C) to extraterritorial actions.[113]

Under the two-step framework, CEQ has also considered the purpose of section 102(2)(C), which is to ensure that a Federal agency, as part of its decision making process, considers the potential environmental impacts of proposed actions. The focus of congressional concern is the proposed action and its potential environmental effects. The effects of a proposed action may occur both within U.S. territorial jurisdiction as well as outside that jurisdiction. To the extent effects of a proposed action occur entirely outside the territorial jurisdiction of the United States, the application of section 102(2)(C) would not be permissible, consistent with the Supreme Court's holding that where the conduct relevant to the statute's focus occurred in the United States, then "the case involves a

---

[108] The Restatement of Foreign Relations Law provides that the areas within the territorial jurisdiction of the United States include "its land, internal waters, territorial sea, the adjacent airspace, and other places over which the United States has sovereignty or some measure of legislative control." Restatement (Fourth) of Foreign Relations Law sec. 404 (2018).

[109] *See RJR Nabisco, Inc.* v. *European Cmty.,* 136 S. Ct. 2090 (2016) (Racketeer Influenced and Corrupt Organizations Act); *Kiobel,* 569 U.S. at 115–16 (Alien Tort Statute); *Morrison* v. *Nat'l Austl. Bank Ltd.,* 561 U.S. 247, 255 (2010) (Securities and Exchange Act of 1934); *WesternGeco LLC* v. *ION Geophysical Corp.,* 138 S. Ct. 2129 (2018) (Patent Act).

[110] *See RJR Nabisco,* 136 S. Ct. at 2101 (citing *Morrison,* 561 U.S. at 267 n.9; *Kiobel,* 569 U.S. 108); *see also WesternGeco LLC,* 138 S. Ct. 2129.

[111] *Id.* ("If the conduct relevant to the statute's focus occurred in the United States, then the case involves a permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory."). This two-step framework for analyzing extraterritoriality issues is also reflected in the Restatement of Foreign Relations Law. *See* Restatement (Fourth) of Foreign Relations Law sec. 404 (2018).

[112] Section 102(2)(C) directs Federal agencies to provide a detailed statement for major Federal actions significantly affecting the quality of the human environment, and requires the responsible official to consult with and obtain the comments of Federal agencies with jurisdiction or special expertise, as well as to make copies of the statement and comments and views of Federal, state and local agencies available to the President, CEQ and the public. 42 U.S.C. 4332(2)(C). Nothing in the text states that this section was intended to require the preparation of detailed statements for actions located outside the United States.

[113] *See also Nat. Res. Def. Council* v. *Nuclear Regulatory Comm'n,* 647 F. 2d 1345, 1367 (D.C. Cir. 1981) ("NEPA's legislative history illuminates nothing in regard to extraterritorial application.").

permissible domestic application even if other conduct occurred abroad; but if the conduct relevant to the focus occurred in a foreign country, then the case involves an impermissible extraterritorial application regardless of any other conduct that occurred in U.S. territory.'' *RJR Nabisco,* 136 S. Ct. at 2101. Therefore, CEQ provides in paragraph (q)(1)(i) of the final rule that NEPA does not apply to ''agency activities or decisions with effects located entirely outside of the jurisdiction of the United States.''

### iii. Non-Discretionary Activities or Decisions

In the NPRM, CEQ proposed to clarify that the definition does not include non-discretionary activities or decisions made in accordance with the agency's statutory authority. The Supreme Court has held that analysis of a proposed action's effects under NEPA is not required where an agency has limited statutory authority and ''simply lacks the power to act on whatever information might be contained in the EIS.'' *Pub. Citizen,* 541 U.S. at 768; *see also South Dakota,* 614 F.2d at 1193 (holding that the Department of the Interior's issuance of a mineral patent that was a ministerial act did not come within NEPA); *Milo Cmty. Hosp.* v. *Weinberger,* 525 F.2d 144, 148 (1st Cir. 1975) (NEPA analysis of impacts not required when agency was under a statutory duty to take the proposed action of terminating a hospital). CEQ includes this clarification in paragraph (q)(1)(ii).

### iv. Final Agency Action and Failure To Act

CEQ proposed to strike the statement that major Federal action includes a failure to act and instead clarify that the definition excludes activities or decisions that do not result in final agency action under the APA. The basis for including only final agency actions is the statutory text of the APA, which provides a right to judicial review of all ''final agency action[s] for which there is no other adequate remedy in a court.'' 5 U.S.C. 704. CEQ includes this clarification in paragraph (q)(1)(iii) of the final rule and includes ''or other statute that also includes a finality requirement'' because CEQ recognizes that other statutes may also contain finality requirements beyond those of the APA. As the NPRM noted, NEPA applies when agencies are considering a proposal for decision. In the case of a ''failure to act,'' there is no proposed action and therefore there are no alternatives that the agency may consider. *S. Utah Wilderness All.,* 542 U.S. at 70–73. Judicial review is available only when an agency fails to take a discrete action it is required to take. *Id.* In omitting the reference to a failure to act from the definition of ''major Federal action,'' CEQ does not contradict the definition of ''agency action'' under the APA at 5 U.S.C. 551(13), and recognizes that the APA may compel agency action that is required but has been unreasonably withheld. If an agency is compelled to take such agency action, it should prepare a NEPA analysis at that time, as appropriate.

### v. Enforcement Actions

In the final rule, CEQ moves the exclusion of judicial or administrative civil or criminal enforcement actions from 40 CFR 1508.18(a) to paragraph (q)(1)(iv) of § 1508.1. CEQ did not propose changes to this language in the NPRM. In the final rule, CEQ moves this language and revises it consistent with the format of the list in paragraph (q)(1).

### vi. General Revenue Sharing Funds

CEQ proposed to strike the specific reference to the State and Local Fiscal Assistance Act of 1972 from 40 CFR 1508.18(a) and clarify that general revenue sharing funds do not meet the definition of major Federal action because the agency has no discretion. CEQ includes this change in paragraph (q)(1)(v) in the final rule.

### vii. Minimal Federal Funding or Involvement

CEQ proposed to clarify that non-Federal projects with minimal Federal funding or minimal Federal involvement such that the agency cannot control the outcome of the project are not major Federal actions. The language in paragraph (q)(1)(vi) of the final rule is consistent with the holdings of relevant circuit court cases that have addressed this issue. *See Rattlesnake Coal.* v. *U.S. EPA,* 509 F.3d 1095, 1101 (9th Cir. 2007) (Federal funding comprising six percent of the estimated implementation budget not enough to federalize implementation of entire project); *New Jersey Dep't of Envtl. Prot. & Energy* v. *Long Island Power Auth.,* 30 F.3d 403, 417 (3d Cir. 1994) (''Federal approval of a private party's project, where that approval is not required for the project to go forward, does not constitute a major Federal action.''); *United States* v. *S. Fla. Water Mgmt. Dist.,* 28 F.3d 1563, 1572 (11th Cir. 1994) (''The touchstone of major [F]ederal activity constitutes a [F]ederal agency's authority to influence nonfederal activity. 'The [F]ederal agency must possess actual power to control the nonfederal activity.' '' (quoting *Sierra Club* v. *Hodel,* 848 F.2d 1068, 1089 (10th Cir. 1988), *overruled on other grounds by Vill. of Los Ranchos de Albuquerque* v. *Marsh,* 956 F.2d 970 (10th Cir. 1992)); *Sugarloaf Citizens Ass'n* v. *FERC,* 959 F.2d 508, 512 (4th Cir. 1992); *Save Barton Creek Ass'n* v. *Fed. Highway Admin.,* 950 F.2d 1129, 1134–35 (5th Cir. 1992); *Macht* v. *Skinner,* 916 F.2d 13, 20 (D.C. Cir. 1990) (funding for planning and studies not enough to federalize a project); *Vill. of Los Ranchos de Albuquerque* v. *Barnhart,* 906 F.2d 1477, 1482 (10th Cir. 1990); *Sierra Club* v. *Penfold,* 857 F.2d 1307, 1314 (9th Cir. 1998) (finding that the Bureau of Land Management's review of Notice mines, which do not require agency approval before commencement of mining, is ''only a marginal [F]ederal action rather than a major action''); *Winnebago Tribe of Neb.* v. *Ray,* 621 F. 2d 269, 272 (8th Cir. 1980) (''Factual or veto control, however, must be distinguished from legal control or 'enablement''' (citing *Med. Ctr., Inc.,* 584 F.2d 619)); *Atlanta Coal. on the Transp. Crisis* v. *Atlanta Reg'l Comm'n,* 599 F.2d 1333, 1347 (5th Cir. 1979); *Ctr. for Biological Diversity* v. *HUD,* 541 F. Supp. 2d 1091, 1099 (D. Ariz. 2008), *aff'd, Ctr. for Biological Diversity* v. *HUD,* No. 09–16400, 359 Fed. Appx. 781, 2009 WL 4912592 (9th Cir. Nov. 25, 2009) (unreported); *see also Touret* v. *NASA,* 485 F. Supp. 2d 38 (D.R.I. 2007).

As discussed in the NPRM, in these circumstances, there is no practical reason for an agency to conduct a NEPA analysis because the agency could not influence the outcome of its action to address the effects of the project. For example, this might include a very small percentage of Federal funding provided only to help design an infrastructure project that is otherwise funded through private or local funds. This change would help to reduce costs and delays by more clearly defining the kinds of actions that are appropriately within the scope of NEPA. The final rule includes these criteria in paragraph (q)(1)(vi) to make clear that these projects are ones where the agency does not exercise sufficient control and responsibility over the outcome of the project.

CEQ expects that agencies will further define these non-major actions, for which the agency does not exercise sufficient control and responsibility over the outcome of the project, in their agency NEPA procedures pursuant to § 1507.3(d)(4). For example, agencies that exercise trust responsibilities over activities or decisions that occur on or involve land held in trust by the United

States for the benefit of an Indian Tribe, or are held in fee subject to a restriction against alienation, may define those activities or decisions that involve minimal Federal funding or involvement. In such circumstances, the Federal Government does not exercise sufficient control and responsibility over the effects of actions on Indian lands, and a "but for" causal relationship of requiring Federal approval for such actions is insufficient to make an agency responsible for any particular effects from such actions.

In the NPRM, CEQ also invited comment on whether there should be a threshold (percentage or dollar figure) for "minimal Federal funding," and if so, what would be an appropriate threshold and the basis for such a threshold. CEQ did not receive sufficient information to establish such a threshold in the final rule.

viii. Loans and Loan Guarantees

CEQ also proposed to exclude loans, loan guarantees, and other forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of the action. CEQ includes this in the final rule in paragraph (q)(1)(vii), changing "action" to "such assistance" to remove the ambiguity with the use of the defined term in the definition. CEQ proposed to also exclude the farm ownership and operating loan guarantees provided by the Farm Service Agency (FSA) of the U.S. Department of Agriculture pursuant to 7 U.S.C. 1925 and 1941 through 1949, and the business loan guarantee programs of the Small Business Administration (SBA), 15 U.S.C. 636(a), 636(m), and 695 through 697f. CEQ includes these as examples of loan guarantees in paragraph (q)(1)(vii) and makes one correction to the citation to SBA's business loan guarantee programs, changing the final section cited from 697f to 697g.

By guaranteeing loans, FSA is not lending Federal funds; a "guaranteed loan" under FSA regulations is defined in 7 CFR 761.2(b) as a "loan made and serviced by a lender for which the Agency has entered into a Lender's Agreement and for which the Agency has issued a Loan Guarantee." The FSA loan guarantees are limited statutorily to an amount not to exceed $1.75 million (with allowance for inflation). *See* 7 U.S.C. 1925 and 1943. For fiscal year 2019, the average loan amount for a guaranteed operating loan is $289,393; and the average for a guaranteed farm ownership loan is $516,859.[114] The relatively modest amounts of these loan guarantees suggest that these are not "major" within the meaning of the NEPA statute and for that reason CEQ makes this result clear in a specific application of its definition of "major Federal action." In determining whether Federal funding federalizes a non-Federal action, courts have considered whether the proportion of Federal funds in relation to funds from other sources is "significant." *See, e.g., Ka Makani 'O Kohala Ohana Inc.* v. *Dep't of Water Supply,* 295 F.3d 955, 960 (9th Cir. 2002) ("While significant [F]ederal funding can turn what would otherwise be a [S]tate or local project into a major Federal action, consideration must be given to a great disparity in the expenditures forecast for the [S]tate [and county] and [F]ederal portions of the entire program. . . . In the present case, the sum total of all of the [F]ederal funding that was ever offered . . . is less than two percent of the estimated total project cost." (alteration in original) (internal quotation marks and citation omitted)); *Friends of the Earth, Inc.* v. *Coleman,* 518 F.2d 323, 329 (9th Cir. 1975) (holding Federal funding amounting to 10 percent of the total project cost not adequate to federalize project under NEPA); *Sancho* v. *Dep't of Energy,* 578 F. Supp. 2d 1258, 1266–68 (D. Haw. 2008) (Federal provision of less than 10 percent of project costs not sufficient to federalize project); *Landmark West!* v. *U.S. Postal Serv.,* 840 F. Supp. 994, 1009 (S.D.N.Y. 1993), *aff'd,* 41 F.3d 1500 (2d Cir. 1994) (holding U.S. Postal Service's role in private development of new skyscraper was not sufficient to federalize the project).

Furthermore, FSA loan guarantee programs do not provide any Federal funding to the participating borrower. Rather, FSA's role is limited to providing a guaranty to the private lender; no Federal funds are expended unless the borrower defaults on the private third-party loan, and the lender is unable to recover its debt through foreclosure of its collateral. In the event of default, the guarantee is paid to the lender, not to lender's borrower. FSA rarely makes guaranteed loan loss payments because delinquency rates are very low, ranging from between 0.98 and 1.87 percent from 2005 to 2019, and 1.62 percent in 2019.[115] The FSA guaranteed loan loss rates have ranged between 0.2 and 0.6 percent during the same time period.[116]

For purposes of triggering NEPA, "[t]he mere possibility of [F]ederal funding in the future is too tenuous to convert a local project into [F]ederal action." *Pres. Pittsburgh* v. *Conturo,* 2011 U.S. Dist. LEXIS 101756, at *13 (W.D. Pa. 2011). Indeed, in *Sancho,* the court observed that "analysis of the 'major Federal action' requirement in NEPA must focus upon [F]ederal funds that have already been distributed. Federal funds that have only been budgeted or allocated toward a project cannot be considered because they are not an 'irreversible and irretrievable commitment of resources.' " *Sancho,* 578 F. Supp. 2d at 1267 (internal citation omitted). The court further stated that "[t]he expectation of receiving future funds will not transform a local or state project into a federal project. . . . Regardless of the percentage, consideration of the budgeted future federal funds is not ripe for consideration in the 'major Federal action' analysis." *Id.* Other district courts have also found that, to federalize a project, the Federal funding must be more than "the passive deferral of a payment" and must be provided "primarily to directly further a policy goal of the funding agency." *Hamrick* v. *GSA,* 107 F. Supp. 3d 910, 926 (C.D. Ill. 2015) (citing *Landmark West!,* 840 F. Supp. at 1007).

FSA's role is to protect the financial interests of the United States, and its relationship is with the lender not the borrower. 7 CFR 762.103(a). FSA's involvement is primarily to ensure the financial stability of the loan and ensure proper loan servicing by the lender. Therefore, the context of these FSA regulations does not involve NEPA and is not compliance-driven but only meant to ensure that, in the event of a default, the loan proceeds are disbursed by the lender, used properly, and that the project is completed and operating so as to produce income necessary for the loan to be repaid.

If a lender violates one of FSA's regulations, FSA's only remedy is not to pay the loss claim in the event of a liquidation. FSA does not possess control or actual decision-making authority over the lender's issuance of the loan, the funded facility, or operations of the borrower. Courts have

---

[114] *See* Executive Summary for Farm Loan Programs in Fiscal Year 2019, *https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/Farm-Loan-Programs/pdfs/program-data/FY2019_Executive_Summary.pdf. See generally https://www.fsa.usda.gov/programs-and-services/farm-loan-programs/index.*

[115] *See* Guaranteed Loan Executive Summary, as of FY 2019, *https://www.fsa.usda.gov/Assets/USDA-FSA-Public/usdafiles/Farm-Loan-Programs/pdfs/program-data/FLP_Guaranteed_Loan_Servicing_Executive_Summary.pdf.*

[116] *Id.*

recognized Federal agencies do not have sufficient control over loan guarantees to trigger NEPA. *See, e.g., Ctr. for Biological Diversity,* 541 F. Supp. 2d 1091, *aff'd, Ctr. for Biological Diversity,* No. 08–16400, 359 F. Appx. 781 ("The agencies guarantee loans issued by private lenders to qualified borrowers, but do not approve or undertake any of the development projects at issue. The agencies' loan guarantees have such a remote and indirect relationship to the watershed problems allegedly stemming from the urban development that they cannot be held to be a legal cause of any effects on the protected species for purposes of either the ESA or the NEPA." *Ctr. for Biological Diversity,* No. 08–16400, 359 F. Appx. at 783). "The [F]ederal agency must possess actual power to control the nonfederal activity." *Hodel,* 848 F.2d at 1089, *overruled on other grounds by Vill. of Los Ranchos de Albuquerque* v. *Marsh,* 956 F.2d 970.

SBA's business loan programs include general business loan programs (7(a) Program), authorized by section 7(a) of the Small Business Act, 15 U.S.C. 636(a); the microloan demonstration loan program (Microloan Program), authorized by section 7(m) of the Small Business Act, 15 U.S.C. 636(m); and the development company program (504 Program), which is a jobs-creation program, authorized by Title V of the Small Business Investment Act of 1958, 15 U.S.C. 695–697g. Under all of these programs, SBA does not recruit or work with the borrower, or service the loan unless, following a default in payment, the lender has collected all that it can under the loan.

Under the 7(a) Program, SBA guarantees a percentage of the loan amount extended by a commercial lender to encourage such lenders to make loans to eligible small businesses. The lender seeks and receives the guaranty, not the applicant small business. In over 80 percent of loans stemming from the 7(a) Program, the lender approves the loan without SBA's prior review and approval through the 7(a) Program's Preferred Lender Program ("PLP program").[117] Further, SBA does not expend Federal funds unless there is a default by the borrower in paying the loan; in such cases, SBA reimburses the lender in accordance with SBA's guarantee percentage. The maximum amount for a standard loan under the 7(a) program is $5 million, while various 7(a) loans have lesser maximum amounts of $500,000 or less.[118]

Under the Microloan Program, recipient entities can obtain loans, up to $50,000, for certain, limited purposes. SBA provides funds to designated intermediary lenders, which are non-profit, community-based organizations. Each of the lenders has its own lending and credit requirements, and the lenders extend the microloan financing. Recipients only may use the funds for working capital, inventory or supplies, furniture or fixtures, or machinery or equipment. They cannot purchase real estate or pay existing debt.

Under the 504 Program, small businesses can obtain long-term, fixed-rate financing to acquire or improve capital assets. Certified Development Companies (CDCs), which are private, mostly non-profit, corporations certified by SBA to promote local and community economic development, implement the program. Typically, a 504 Program project is funded by three sources: (1) A loan, secured with a senior lien, from a private-sector lender for 50 percent of the project costs; (2) an equity contribution from the borrower of at least 10 percent of the project costs; and (3) a loan covering up to 40 percent of the total costs, which is funded by proceeds from the sale to investors of an SBA-guaranteed debenture issued by a CDC.[119] The 504's Premier Certified Lender Program ("PCLP program") provides for only limited SBA review of eligibility, and SBA delegates the responsibility to CDCs to issue an SBA guarantee of debenture for eligible loans without prior approval by SBA. 15 U.S.C. 697e.[120] Under the 504 program, the maximum loan amount is $5 million, although small manufacturers or certain energy projects, including energy efficiency or renewable generation projects, may qualify for a $5.5 million debenture.[121] SBA does not expend Federal funds unless there is a default by the borrower in paying the debenture-funded loan, in which case SBA pays the outstanding balance owed on the debenture to the investors. SBA expends Federal funds on its loan guarantee programs only when expected losses from defaults exceed expected fee collections. Section 7(a) and 504 loan program delinquency rates are 0.8 percent and 0.7 percent as of July 2019 respectively.[122]

CEQ has determined that FSA and SBA do not have sufficient control and responsibility over the underlying activities to meet the definition of major Federal action. The issuance of loan guarantees to a non-Federal lender to back a percentage of a loan that the lender decides to make to a private, third-party borrower is insufficient control or authority over the underlying project. *See Rattlesnake Coal.,* 509 F.3d at 1102 ("The United States must maintain decision making authority over the local plan in order for it to become a major [F]ederal action."); *Ka Makani,* 295 F.3d at 961 ("Because the final decision-making power remained at all times with [the State agency], we conclude that the [Federal agency] involvement was not sufficient to constitute 'major [F]ederal action.' " (quoting *Barnhart,* 906 F.2d at 1482)); *S. Fla. Water Mgmt. Dist.,* 28 F.3d at 1572 ("The [F]ederal agency must possess actual power to control the nonfederal activity." (citation omitted)).

CEQ also invited comment on whether any other types of financial instruments should be considered non-major Federal actions and the basis for such exclusion. CEQ did not receive sufficient comments to make any additional changes to the definition of major Federal action with respect to other financial instruments.

ix. Other Changes to Major Federal Action

In the final rule, paragraphs (q)(2) and (3) include the examples of activities and decisions that are in 40 CFR 1508.18(a) and (b). CEQ invited comment on whether it should change "partly" to "predominantly" in paragraph (q)(2) for consistency with the edits to the introductory text regarding "minimal Federal funding." CEQ does not make this change in the final rule. CEQ notes that "continuing" activities in paragraph (q)(2) refers to situations where a major Federal action remains to occur, consistent with § 1502.9(d) and *Norton* v. *Southern Utah Wilderness Alliance.* 542 U.S. at 73.

---

[117] Pursuant to the Small Business Act, under the PLP program, SBA delegates responsibility to experienced and qualified lenders to issue an SBA guarantee on a loan without prior approval by SBA. The PLP program is defined as a "program established by the Administrator . . . under which a written agreement between the lender and the Administration delegates to the lender . . . complete authority to make and close loans with a guarantee from the Administration without obtaining the prior specific approval of the Administration . . . ." 15 U.S.C. 636(a)(2)(C)(iii). Thus, PLP program lenders have delegated authority to make SBA-guaranteed loans without any approval from SBA.

[118] 15 U.S.C. 636(a).

[119] In the 504 program, SBA guarantees payments of debentures, which are bonds sold to investors. The proceeds from the sale of the debentures are used to fund the underlying loans to borrowers.

[120] Congress has mandated that guaranteed loans made by PCLPs shall not include SBA "review of decisions by the lender involving creditworthiness, loan closing, or compliance with legal requirements imposed by law or regulation." 15 U.S.C. 697e(e)(2).

[121] 15 U.S.C. 696(2)(A).

[122] *See* SBA Fiscal Year 2019 Agency Financial Report at 22, *available at https://www.sba.gov/ document/report--agency-financial-report.*

CEQ proposed to insert "implementation of" before "treaties" in proposed paragraph (q)(2)(i) to clarify that the major Federal action is not the treaty itself, but rather an agency's action to implement that treaty. CEQ makes this change in § 1508.1(q)(3)(i) of the final rule and clarifies that this includes an agency's action to implement a treaty pursuant to statute or regulation. CEQ also changes "pursuant to" to "under" the APA and adds a reference to "other statutes" after the APA. While agencies conduct the rulemaking process pursuant to the APA, they also may do so under the authority of the specific statutes.

CEQ proposed to strike "guide" from proposed paragraph (q)(2)(ii) because guidance is non-binding. CEQ makes this change in the final rule in § 1508.1(q)(3)(ii).

Finally, CEQ invited comment in the NPRM on whether CEQ should further revise the definition of "major Federal action" to exclude other *per se* categories of activities or to further address what NEPA analysts have called "the small handle problem." [123] CEQ did not receive sufficient information to make any additional changes.

### 18. Definition of "Matter"

The NPRM did not propose any changes to the definition of matter in paragraph (r). CEQ did not revise this definition in the final rule.

### 19. Clarifying the Meaning of "Mitigation"

CEQ proposed to amend the definition of "mitigation" to define the term and clarify that NEPA does not require adoption of any particular mitigation measure, consistent with *Methow Valley,* 490 U.S. at 352–53. In *Methow Valley,* the Supreme Court held that NEPA and the CEQ regulations require "that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated," but do not establish "a substantive requirement that a complete mitigation plan be actually formulated and adopted" before the agency can make its decision. *Id.* at 352.

CEQ also proposed to amend the definition of "mitigation" to make clear that mitigation must have a nexus to the effects of the proposed action, is limited to those actions that have an effect on the environment, and does not include actions that do not have an effect on the environment. This change will make the

NEPA process more effective by clarifying that mitigation measures must actually be designed to mitigate the effects of the proposed action. This amended definition is consistent with CEQ's Mitigation Guidance, *supra* note 29.

Under that guidance, if an agency believes that the proposed action will provide net environmental benefits through use of compensatory mitigation, the agency should incorporate by reference the documents that demonstrate that the proposed mitigation will be new or in addition to actions that would occur under the no-action alternative, and the financial, legal, and management commitments for the mitigation. Use of well-established mitigation banks and similar compensatory mitigation legal structures should provide the necessary substantiation for the agency's findings on the effectiveness (nexus to effects of the action, proportionality, and durability) of the mitigation. Other actions may be effectively mitigated through use of environmental management systems that provide a structure of procedures and policies to systematically identify, evaluate, and manage environmental impacts of an action during its implementation.[124]

CEQ makes the proposed changes in the final rule with minor edits to improve clarity. Specifically, CEQ replaces "reasonably foreseeable impacts to the human environment" with "effects" to more precisely refer to the defined term "effects." In response to comments, CEQ also adds "or alternatives" after "proposed action" to clarify that mitigation measures mean measures to avoid, minimize, or compensate for effects caused by a proposed action or its alternatives. CEQ also replaces "the effects of a proposed action" with "those effects" to reduce wordiness and provide additional clarity.

### 20. Definition of "NEPA Process"

The NPRM did not propose any changes to the definition of NEPA process in paragraph (t). CEQ did not revise this definition in the final rule.

### 21. Clarifying the Meaning of "Notice of Intent"

CEQ proposed to revise the definition of "notice of intent" in paragraph (u) to move the operative requirements for what agencies must include in the notices to § 1501.9(d) and add the word

"public" to clarify that the NOI is a public notice. CEQ makes these changes in the final rule.

### 22. New Definition of "Page"

CEQ proposed a new definition of "page" in paragraph (v) to provide a word count (500 words) for a more standard functional definition of "page" for page count and other NEPA purposes. CEQ adds this definition as proposed to the final rule. As discussed in the NPRM, this change updates NEPA for modern electronic publishing and internet formatting, in which the number of words per page can vary widely depending on format. It also ensures some uniformity in document length while allowing unrestricted use of the graphic display of quantitative information, tables, photos, maps, and other geographic information that can provide a much more effective means of conveying information about environmental effects. This change supports the original CEQ page limits as a means of ensuring that environmental documents are readable and useful to decision makers.

### 23. New Definition of "Participating Agency"

CEQ proposed to add the concept of a participating agency to the CEQ regulations in paragraph (w). CEQ proposed to define participating agency consistent with the definition in FAST–41 and 23 U.S.C. 139. CEQ proposed to add participating agencies to § 1501.7(i) regarding the schedule and replace the term "commenting" agencies with "participating" agencies throughout. CEQ adds this definition as proposed to the final rule.

### 24. Clarifying the Meaning of "Proposal"

CEQ proposed clarifying edits to the definition of proposal in paragraph (x) and to strike the operative language regarding timing of an EIS because it is already addressed in § 1502.5. CEQ makes these changes in the final rule.

### 25. New Definition of "Publish and Publication"

CEQ proposed to define publish and publication in paragraph (y) to provide agencies with the flexibility to make environmental reviews and information available to the public by electronic means. The 1978 regulations predate personal computers and a wide range of technologies now used by agencies such as the modern internet and GIS mapping tools. To ensure that agencies do not exclude the affected public from the NEPA process due to a lack of resources (often referred to as the "digital

---

[123] *See* Daniel R. Mandelker et al., NEPA Law and Litigation, sec. 8:20 (2d ed. 2019) ("This problem is sometimes called the 'small handle' problem because [F]ederal action may be only be a 'small handle' on a non[-F]ederal project.").

[124] *See* Council on Environmental Quality, Aligning National Environmental Policy Act Processes with Environmental Management Systems (Apr. 2007), *https://ceq.doe.gov/docs/ceq-publications/NEPA_EMS_Guide_final_Apr2007.pdf.*

divide"), the definition retains a provision for printed environmental documents where necessary for effective public participation. CEQ adds this definition as proposed in the final rule.

### 26. New Definition of "Reasonable Alternatives"

Several ANPRM commenters asked CEQ to include a new definition of "reasonable alternatives" in the regulations with emphasis on how technical and economic feasibility should be evaluated. CEQ proposed a new definition of "reasonable alternatives" in paragraph (z) to provide that reasonable alternatives must be technically and economically feasible and meet the purpose and need of the proposed action. *See, e.g., Vt. Yankee,* 435 U.S. at 551 ("alternatives must be bounded by some notion of feasibility"). CEQ also proposed to define reasonable alternatives as "a reasonable range of alternatives" to codify Questions 1a and 1b in the Forty Questions, *supra* note 2. Agencies are not required to give detailed consideration to alternatives that are unlikely to be implemented because they are infeasible, ineffective, or inconsistent with the purpose and need for agency action.

Finally, CEQ proposed to clarify that a reasonable alternative must also consider the goals of the applicant when the agency's action involves a non-Federal entity. These changes will help reduce paperwork and delays by helping to clarify the range of alternatives that agencies must consider. Where the agency action is in response to an application for permit or other authorization, the agency should consider the applicant's goals based on the agency's statutory authorization to act, as well as other congressional directives, in defining the proposed action's purpose and need. CEQ adds this definition as proposed in the final rule.

### 27. New Definition of "Reasonably Foreseeable"

CEQ received comments on the ANPRM requesting that the regulations provide a definition of "reasonably foreseeable." CEQ proposed to define "reasonably foreseeable" in paragraph (aa) consistent with the ordinary person standard—that is what a person of ordinary prudence in the position of the agency decision maker would consider in reaching a decision. *Sierra Club* v. *Marsh,* 976 F.2d 763, 767 (1st Cir. 1992). CEQ adds this definition as proposed in the final rule.

### 28. Definition of "Referring Agency"

CEQ proposed a grammatical edit to the definition of referring agency in paragraph (bb). CEQ makes this change in the final rule.

### 29. Definition of "Scope"

CEQ proposed to move the operative language from paragraph (cc), which tells agencies how to determine the scope of an EIS, to § 1501.9(e). CEQ makes this change in the final rule.

### 30. New Definition of "Senior Agency Official"

CEQ proposed to define the new term "senior agency official" in paragraph (dd) to provide for agency officials that are responsible for the agency's NEPA compliance. As reflected in comments, implementation of NEPA can require significant agency resources. Without senior agency official leadership and effective management of NEPA reviews, the process can be lengthy, costly, and subject to uncertainty and delays. CEQ seeks to advance efficiencies to ensure that agencies use their limited resources to effectively consider environmental impacts and support timely and informed decision making by the Federal Government. CEQ adds this definition with some changes in the final rule. Specifically, CEQ does not include the phrase "and representing agency analysis of the effects of agency actions on the human environmental in agency decision-making processes" because the duties and responsibilities of the "senior agency official," including representing the agency, are discussed in various provisions of the subchapter. *See* §§ 1501.5(f), 1501.7(d), 1501.8(b)(6) and (c), 1501.10, 1502.7, 1507.2.

### 31. Definition of "Special Expertise"

The NPRM did not propose any changes to the definition of special expertise in paragraph (ee). CEQ did not revise this definition in the final rule.

### 32. Striking the Definition of "Significantly"

Because 40 CFR 1508.27 did not define "significantly," but rather set out factors for agencies to consider in assessing whether a particular effect is significant, CEQ proposed to strike this definition and discuss significance in § 1501.3(b), as described in section II.C.3. CEQ makes this change in the final rule.

### 33. Clarifying the Meaning of "Tiering"

CEQ proposed to amend the definition of "tiering" in paragraph (ff) to make clear that agencies may use EAs at the programmatic stage as well as the subsequent stages. This clarifies that agencies have flexibility in structuring programmatic NEPA reviews and associated tiering. CEQ proposed to move the operative language describing how any agency determines when and how to tier from 40 CFR 1508.28 to § 1501.11(b). CEQ makes these changes in the final rule.

### K. CEQ Guidance Documents

In the proposed rule, CEQ stated that if the proposal was adopted as a final rule, it would supersede any previous CEQ NEPA guidance and handbooks. With this final rule, CEQ clarifies that it will provide notice in the **Federal Register** listing withdrawn guidance. CEQ will issue updated or new guidance consistent with Presidential directives. CEQ also intends to update the Citizen's Guide to NEPA.[125]

## III. Rulemaking Analyses and Notices

### A. Executive Order 12866, Regulatory Planning and Review and Executive Order 13563, Improving Regulation and Regulatory Review

E.O. 12866[126] directs agencies to assess all costs and benefits of available regulatory alternatives, and if regulation is necessary, to select regulatory approaches that maximize net benefits, including potential economic, environmental, public health and safety effects, and other advantages; distributive impacts; and equity. E.O. 13563[127] reaffirms E.O. 12866, and directs agencies to use a process that provides for public participation in developing rules; promotes coordination, simplification, and harmonization; and reduces burdens and maintains flexibility.

Section 3(f) of E.O. 12866 sets forth the four categories of regulatory action that meet the definition of a significant regulatory action. The first category includes rules that have an annual effect on the economy of $100 million or adversely affect in a material way the economy, a sector of the economy, productivity, competition, jobs, the environment, public health or safety, or State, Tribal, or local governments or communities. Some commenters stated that this rulemaking would have such an effect, and therefore CEQ should have prepared a regulatory impact statement. Commenters noted, for example, proposed changes to the definition of effects, alternatives analysis, and overall effect on the number of Federal actions subject to NEPA as examples of impacts

---

[125] *Supra* note 29.
[126] 58 FR 51735 (Oct. 4, 1993).
[127] 76 FR 3821 (Jan. 21, 2011).

contributing to an impact of over $100 million on the public.

CEQ agrees that this an economically significant action. However, many of the changes made in this rule codify long-standing practices and case law that have developed since CEQ issued the 1978 regulations. Under OMB Circular A–4, "Regulatory Analysis" (Sept. 17, 2003),[128] the "no action" baseline is "what the world will be like if the proposed rule is not adopted." Changes to the regulations based on long-standing guidance and Supreme Court case law would be included in the baseline for the rule; therefore, their codification would generate marginal cost savings. Similarly, changes that clarify or otherwise improve the ability to interpret and implement the regulations would have little to no quantifiable impact. The appendix to the Regulatory Impact Analysis for the Final Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act[129] ("RIA Appendix") provides a summary of the anticipated economic and environmental impacts associated with the changes in the final rule. In evaluating economic and environmental impacts, CEQ has considered the statute and Supreme Court case law, and the 1978 regulations. As discussed throughout Section II and the Final Rule Response to Comments, CEQ has made revisions to better align the regulations with the statute, codify Supreme Court case law and current agency practice, improve the timeliness and efficiency of the NEPA process, and make other changes to improve the clarity and readability of the regulations.

The revisions to CEQ's regulations are anticipated to significantly lower administrative costs as a result of changes to reduce unnecessary paperwork. Government-wide, the average number of pages for a final EIS is approximately 661 pages. The final rule includes numerous changes to reduce the duplication of paperwork and establishes presumptive page limits for EAs of 75 pages, and for EISs of 150 pages (or 300 pages for proposals of unusual scope or complexity).[130] However, agencies may request longer page limits with approval from a senior agency official and include additional

material as appendices. The final rule also makes numerous changes to improve the efficiency of the NEPA process and establishes presumptive time limits for EAs of one year and for EISs of two years, which may be extended with approval of a senior agency official. CEQ expects the final rule to reduce the length of EAs and EISs, and the time for completing and these analyses, and to lower administrative costs government-wide.

A total of 1,276 EISs were completed from 2010 through 2018, and the median EIS completion time was 3.5 years with only 257 EISs completed in 2 years or less.[131] Based on the efficiencies and presumptive time limit for EISs in the final rule, the length of time to complete the 1019 EISs that took longer than 2 years could be reduced by 58 percent, assuming a 2-year completion time for all of those actions. Applying this potential time savings to the total administrative cost to prepare those EISs taking in excess of 2 years could result in roughly $744 million in savings over the 9-year time period for an annualized savings of roughly $83 million (2016 adjusted dollars).[132] The amount of time required to prepare an EIS does not necessarily correlate with the total cost. However, for those EISs taking over two years to prepare, comparing the anticipated time savings with the respective administrative costs provides insight into the potential cost savings that an agency may generate under the final rule. Additionally, CEQ notes that there may be cost savings related to the preparation of EAs and application of CEs. While the cost of these actions is significantly lower, agencies conduct such reviews in much larger numbers than EISs.

Agencies have not routinely tracked costs of completing NEPA analyses.[133] With implementation of this final rule, in particular § 1502.11(g), agencies will be required to provide the estimated total cost of preparing an EIS. CEQ

expects this will begin to address the data gap that currently exists relating to the administrative costs of NEPA compliance.

CEQ expects these and other changes in the final rule to catalyze economic benefits by expediting some reviews, including through improved coordination and management and less focus on non-significant impacts. Commenters from industry on both the ANPRM and proposed rule frequently discussed that delays under the 1978 regulations resulted in higher costs; however, these costs are difficult to quantify. One estimate in 2015 found that the cost of a 6-year delay in infrastructure projects across the electricity transmission, power generation, inland waterways, roads and bridges, rail, and water (both drinking and wastewater) sectors is $3.7 trillion,[134] which was subsequently updated to $3.9 trillion in 2018.[135] There may be underlying permits and consultations (e.g., the Endangered Species Act) and other issues that contribute to a delay and therefore allocating a portion of the cost to the NEPA process would be challenging.

NEPA is a procedural statute requiring agencies to disclose and consider potential environmental effects in their decision-making processes. The final rule does not alter any substantive environmental law or regulation such as the Clean Air Act, the Clean Water Act, and the Endangered Species Act. Under the final rule, agencies will continue to consider all significant impacts to the environment. Although some may view the changes in the final rule as reducing the number or scope of analyses, CEQ has determined that, using a baseline of the statutory requirements of NEPA and Supreme Court case law, there are no adverse environmental impacts (see RIA Appendix).

OMB has determined that this final rule is an economically significant regulatory action because it may have an annual effect on the economy of $100 million or more associated with lower administrative costs and reduced paperwork and delays in the environmental review process. This rule sets forth the government-wide process for implementing NEPA in a consistent and coordinated manner. The rule will also require agencies to update their existing NEPA procedures for

---

[128] 68 FR 58366 (Oct. 10, 2003).

[129] The Regulatory Impact Analysis for the Final Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act is available under "Supporting Documents" in the docket on regulations.gov under docket ID CEQ–2019–0003.

[130] The 1978 regulations recommended the same page limits for EISs but did not include provisions requiring agencies to meet those page limits. 40 CFR 1502.7.

[131] See Council on Environmental Quality, EIS Timeline Data Excel Workbook, (June 12, 2020), https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timeline_Data_2020-6-12.xlsx.

[132] This calculation uses the mid-point ($1.125 million) of the $250,000 to $2 million cost range found in the NEPA Task Force report and assumes a 58 percent reduction in costs for those EISs taking longer than 2 years. NEPA Task Force Report, supra, note 28. This number is similar to the cost data from the Department of Energy, which found a median EIS cost of $1.4 million. GAO NEPA Report, supra, note 91.

[133] As noted above, a 2014 U.S. Government Accountability Office report found that Federal agencies do not routinely track data on the cost of completing NEPA analyses, and that the cost can vary considerably, depending on the complexity and scope of the project. GAO NEPA Report, supra note 91.

[134] Two Years, Not Ten, supra note 4.

[135] Press Release, Common Good, Common Good Updates the Cost of US Infrastructure Delays Costs Have Risen $200 Billion Over Five Years to Nearly $3.9 Trillion (May 2018), https://www.commongood.org/wp-content/uploads/2018/05/Two-Years-Update.pdf.

consistency with the changes set forth in this final rule.

*B. Executive Order 13771, Reducing Regulation and Controlling Regulatory Costs*

Under E.O. 13771,[136] agencies must identify for elimination two prior regulations for every one regulation issued, and promulgate regulations consistent with a regulatory budget. This rule is a deregulatory action under E.O. 13771 and OMB's guidance implementing E.O. 13771, titled "Reducing Regulation and Controlling Regulatory Costs" (April 5, 2017).[137] CEQ anticipates that the changes made in this rule will reduce unnecessary paperwork and expedite some reviews through improved coordination and management.

*C. Regulatory Flexibility Act and Executive Order 13272, Proper Consideration of Small Entities in Agency Rulemaking*

The Regulatory Flexibility Act, as amended, (RFA), 5 U.S.C. 601 *et seq.,* and E.O. 13272 [138] require agencies to assess the impacts of proposed and final rules on small entities. Under the RFA, small entities include small businesses, small organizations, and small governmental jurisdictions. An agency must prepare a regulatory flexibility analysis at the proposed and final rule stages unless it determines and certifies that the rule, if promulgated, would not have a significant economic impact on a substantial number of small entities. 5 U.S.C. 605(b). An agency need not perform an analysis of small entity impacts when a rule does not directly regulate small entities. *See Mid-Tex Electric Coop., Inc.* v. *FERC,* 773 F.2d 327 (D.C. Cir. 1985). This rule does not directly regulate small entities. Rather, it applies to Federal agencies and sets forth the process for their compliance with NEPA. As noted above, NEPA is a procedural statute requiring agencies to disclose and consider potential environmental effects in their decision-making processes, and does not alter any substantive environmental law or regulation. Under the final rule, agencies will continue to consider all significant impacts to the environment.

A few commenters asserted that the rule would impact small entities, including small businesses that provide services relating to the preparation of NEPA documents, outdoor recreation businesses, and other related small

businesses. To the extent that the rule may affect small entities, this rulemaking will make the NEPA process more efficient and consistent and clarify the procedural requirements, which CEQ expects to directly benefit Federal agencies and indirectly benefit all other entities engaged in the process, including applicants seeking a Federal permit and those engaged in NEPA compliance activities. In addition, CEQ expects that small businesses and farmers seeking SBA or FSA guaranteed loans will indirectly benefit from the clarifying revisions in the final rule to the definition of major Federal action. Accordingly, CEQ hereby certifies that the rule will not have a significant economic impact on a substantial number of small entities.

*D. Congressional Review Act*

Before a rule can take effect, the Congressional Review Act (CRA) requires agencies to submit to the House of Representatives, Senate, and Comptroller General a report containing a copy of the rule and a statement identifying whether it is a "major rule." 5 U.S.C. 801. OMB determines if a final rule constitutes a major rule. The CRA defines a major rule as any rule that the Administrator of OMB's Office of Information and Regulatory Affairs finds has resulted in or is likely to result in— (A) an annual effect on the economy of $100,000,000 or more; (B) a major increase in costs or prices for consumers, individual industries, Federal, State, or local government agencies, or geographic regions, or (C) significant adverse effects on competition, employment, investment, productivity, innovation, or on the ability of United States-based enterprises to compete with foreign-based enterprises in domestic and export markets. 5 U.S.C. 804(2).

OMB has determined that this final rule is a major rule for purposes of the Congressional Review Act. CEQ will submit a report, including the final rule, to both houses of Congress and the Government Accountability Office for review.

*E. National Environmental Policy Act*

Under the CEQ regulations, major Federal actions may include regulations. When CEQ issued regulations in 1978, it prepared a "special environmental assessment" for illustrative purposes pursuant to E.O. 11991. 43 FR at 25232. The NPRM for the 1978 regulations stated "the impacts of procedural regulations of this kind are not susceptible to detailed analysis beyond that set out in the assessment." *Id.* Similarly, in 1986, while CEQ stated in

the final rule that there were "substantial legal questions as to whether entities within the Executive Office of the President are required to prepare environmental assessments," it also prepared a special environmental assessment. 51 FR at 15619. The special environmental assessment issued in 1986 made a finding of no significant environmental impact, and there was no finding made for the assessment of the 1978 regulations.

Some commenters expressed the view that CEQ failed to comply with NEPA when publishing the proposed rule that precedes this final rule, and CEQ should have prepared an EA or EIS. The commenters stated that section 102(2)(C) of NEPA requires environmental review of major Federal actions. By not conducting an environmental review under NEPA, commenters stated that CEQ violated its own regulations and past practices in prior regulations. Other commenters stated that NEPA review was required if the proposed rule "created the possibility" of significant impacts on the environment. They asserted that the proposed rule was a "sweeping re-write" of the 1978 regulations that would alter Federal agencies' consideration of environmental effects of proposed projects. Aspects of the proposed rule that were referenced in this regard include expanded use of CEs, narrow definitions of significance and effects, weakened alternatives analysis, and reduced public participation and agency accountability. Commenters asserted that the consequence of these changes is truncated analysis, a less informed public, and less mitigation.

CEQ disagrees with commenters. CEQ prepared a special assessment on its prior rules for illustrative purposes. Those long-prior voluntary decisions do not forever establish that CEQ has an obligation to apply the CEQ's regulations to changes to those regulations. As noted above, CEQ has the authority to promulgate and revise its regulations consistent with *Chevron* and other applicable case law.

This rule would not authorize any activity or commit resources to a project that may affect the environment. Similar to the 1978 regulations, these regulations do not concern any particular environmental media, nor are the regulations tied to a specific environmental setting. Rather, these regulations apply generally to Federal actions affecting the environment. No action under the regulations or specific issue or problem is singled out for special consideration. *See* Council on Environmental Quality, Special

[136] 82 FR 9339 (Feb. 3, 2017).
[137] *Available at https://www.whitehouse.gov/ sites/whitehouse.gov/files/omb/memoranda/2017/ M-17-21-OMB.pdf.*
[138] 67 FR 53461 (Aug. 16, 2002).

Environmental Assessment of Regulations Proposed Under E.O. 11991 to Implement the Procedural Provisions of the National Environmental Policy Act, p. 6 (1978). Further, as stated by CEQ when it proposed the regulations in 1978, procedural rules of this kind are not susceptible to detailed analysis. 43 FR at 25232.

Even if CEQ were required to prepare an EA, it likely would result in a FONSI. CEQ has reviewed the changes made in this final rule and determined that they would not result in environmental impacts. *See* RIA Appendix. For reasons explained in the respective areas of this preamble and further summarized in the RIA Appendix, CEQ disagrees that the clarifications and changes to the processes that Federal agencies follow when relying on CEs, analyzing alternatives, and engaging the public will themselves result in any environmental impacts, let alone potentially significant impacts. This thorough review, in combination with the aforementioned circumstances of the special environmental assessments prepared for the 1978 and 1986 regulations, and the procedural nature of these regulations, reinforces CEQ's view that an EA is neither required nor necessary.

Moreover, preparing an EA for the final rule would not meaningfully inform CEQ or the public. The clarifications and changes in the final rule are entirely procedural and will help to inform the processes used by Federal agencies to evaluate the environmental effects of their proposed actions in the future.

For reasons explained in the respective areas of this preamble and further summarized in the RIA Appendix, CEQ disagrees that changes relating to CEs, analysis of alternatives, public participation, and agency responsibilities will have environmental impacts, let alone potentially significant ones.

In addition, commenters referenced several court opinions in support of their view that an agency's interpretation of a statute can be subject to NEPA review when that interpretation can lead to subsequent, significant effects on the environment, including *Citizens for Better Forestry* v. *U.S. Dep't of Agric.,* 481 F. Supp. 2d 1059 (N.D. Cal. 2007) and *Sierra Club* v. *Bosworth,* 510 F. 3d 1016 (9th Cir. 2007). Commenters stated that CEQ was required to request comment on the appropriate scope of the environmental review of the proposed rule and then prepare, and notice for public comment, an EIS before or in tandem with its publication.

The circumstances in this rule are distinctly different from the case law referenced by commenters. *Citizens for Better Forestry* pertains to the misapplication of an existing CE, where the court found that the agency improperly expanded the scope of an existing CE when applying it to a National Forest Management Act rulemaking. 481 F. Supp. at 1086. In *Sierra Club* v. *Bosworth,* the court agreed with previous cases finding that the promulgation of agency NEPA procedures, including the establishment of new CEs, did not itself require preparation of an EA or EIS, but that agencies need only comply with CEQ regulations setting forth procedural requirements, including consultation with CEQ, and **Federal Register** publication for public comment (40 CFR 1507.3). 510 F.3d at 1022. The court, however, found that the record relied on by the U.S. Forest Service to develop and justify a CE was deficient. *Id.* at 1026–30. Neither of the circumstances in those cases is comparable to the circumstances of this rule. Further, in another relevant case, *Heartwood* v. *U.S. Forest Service,* the court found that neither NEPA nor the CEQ regulations required the agency to conduct an EA or an EIS prior to the promulgation of its procedures creating a CE. 230 F.3d 947, 954–55 (7th Cir. 2000).

This rule serves as the primary regulation from which agencies develop procedures to implement the statute. To prepare an EIS, as some commenters had requested, would necessitate that CEQ apply the 1978 regulations to a rule that revises those same regulations. There is no indication that the statute contemplated such circumstances, and CEQ is not aware of other examples in law where the revisions to procedural rules were subject to the requirements of the rule that those same rules replaced. Further, the 1978 regulations do not require agencies to prepare a NEPA analysis before establishing or updating agency procedures for implementing NEPA. Since this rule would not authorize any activity or commit resources to a project that may affect the environment, preparation of an environmental review is not required.

*F. Endangered Species Act*

Under the ESA, the promulgation of regulations can be a discretionary agency action subject to section 7 of the ESA. CEQ has determined that updating its regulations implementing the procedural provisions of NEPA has "no effect" on listed species and critical habitat. Therefore, ESA section 7 consultation is not required.

Commenters stated that consultation with the Fish and Wildlife Service and the National Marine Fisheries Service is required because the rule may affect or may adversely affect species listed under the ESA. In support of this point, commenters referenced proposed changes to the definition of "effects" and "significantly," development of alternatives, and obligations for agencies to obtain information. Commenters noted that a programmatic consultation may be appropriate where an agency promulgates regulations that may affect endangered species. Other commenters believe that the rule is contrary to section 7(a)(1) of ESA, which imposes a specific obligation upon all federal agencies to carry out programs to conserve endangered and threatened species. Commenters stated that the proposed changes eliminate or otherwise weaken requirements pertaining to the assessment of impacts and, in doing so, CEQ fails to satisfy responsibilities under section 7(a)(1).

CEQ disagrees that the aforementioned regulatory changes "may affect" listed species or critical habitat. Initially, it is important to note that commenters are conflating ESA and NEPA. As courts have stated numerous times, these are two different statutes with different standards and definitions and, in fact, different underlying policies. As discussed in section II.B.1, the Supreme Court has stated that NEPA is a procedural statute. In contrast, the ESA is principally focused on imposing substantive duties on Federal agencies and the public. Regardless of how definitions or other procedures under NEPA are changed under this regulation or any other regulatory process, it will not change the requirements for Federal agencies under the ESA or its implementing regulations.

This rulemaking is procedural in nature, and therefore does not make any final determination regarding the level of NEPA analysis required for particular actions. CEQ's approach is consistent with the approach taken by other Federal agencies that similarly make determinations of no effect on listed species and critical habitat when establishing or updating agency NEPA procedures. CEQ also notes that neither the 1978 regulations nor the 1986 amendments indicate that CEQ consulted under ESA section 7(a)(2). Setting aside the procedural nature of this rule, CEQ reviewed it to determine if it "may affect" listed species or their designated critical habitat. CEQ has closely reviewed the impacts of all the changes made to the 1978 regulations, as summarized in the RIA Appendix and described in greater detail in the

respective responses to comments. None of the changes to the 1978 regulations are anticipated to have environmental impacts, including potential effects to listed species and critical habitat. For example, under § 1501.3 of the final rule, agencies should continue to consider listed species and designated habitat when making a determination of significance with respect to the level of NEPA review.

Contrary to several comments, the final rule does not ignore cumulative effects on listed species. Rather, the final rule includes a definition of effects that comports with Supreme Court case law to encompass all effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives. In general, the changes improve the timeliness and efficiency of the NEPA process while retaining requirements to analyze all activities and environmental impacts covered within the scope of the statute. To the extent the rule modifies the 1978 regulations, the changes do not diminish the quality and depth of environmental review relative to the baseline, which is defined as how NEPA is conducted under applicable Supreme Court case law.

Neither the ESA regulations nor the ESA Section 7 Consultation Handbook (1998) require the action agency to request concurrence from the Fish and Wildlife Service and National Marine Fisheries Service for determinations that an action will have no effect on listed species or their critical habitat. The final rule does not change the obligations of Federal agencies under the ESA; as noted above, importantly, all of the requirements under section 7 and associated implementing regulations and policies continue to apply regardless of whether NEPA analysis is triggered or the form of the NEPA documentation. For the aforementioned reasons, CEQ has determined that the final rule will have no effect on ESA listed species and designated critical habitat.

To the extent commenters imply that, under the authority of ESA section 7(a)(1), CEQ can regulate Federal action agencies with regard to the ESA, this is not accurate. For example, CEQ does not have the authority, under the guise of NEPA, to dictate to Federal action agencies that they may only choose an alternative that has the most conservation value for listed species or designated critical habitat.

All Federal agencies continue to be subject to the ESA and its requirements. Further, as described in detail in the RIA Appendix and in Final Rule Response to Comments on specific changes, none of the changes to the 1978 regulations are anticipated to have environmental impacts, including potential effects to listed species and critical habitat. In general, the changes improve the timeliness and efficiency of the NEPA process while retaining requirements to analyze all environmental impacts covered within the ambit of the statute. CEQ notes that the rulemaking is procedural in nature, and therefore does not make any final determination regarding the level of NEPA analysis required for particular actions.

*G. Executive Order 13132, Federalism*

E.O. 13132 requires agencies to develop an accountable process to ensure meaningful and timely input by State and local officials in the development of regulatory policies that have federalism implications.[139] Policies that have federalism implications include regulations that have substantial direct effects on the States, on the relationship between the national government and the States, or on the distribution of power and responsibilities among the various levels of government. This rule does not have federalism implications because it applies to Federal agencies, not States. However, CEQ notes that States may elect to assume NEPA responsibilities under Federal statutes. CEQ received comments in response to the NPRM from a number of States, including those that have assumed NEPA responsibilities, and considered these comments in development of the final rule.

*H. Executive Order 13175, Consultation and Coordination With Indian Tribal Governments*

E.O. 13175 requires agencies to have a process to ensure meaningful and timely input by Tribal officials in the development of policies that have Tribal implications.[140] Such policies include regulations that have substantial direct effects on one or more Indian Tribes, on the relationship between the Federal Government and Indian Tribes, or on the distribution of power and responsibilities between the Federal Government and Indian Tribes. While the rule is not a regulatory policy that has Tribal implications, the rule does, in part, respond to Tribal government comments concerning Tribal sovereign rights, interests, and the expertise of Tribes in the NEPA process and the CEQ regulations implementing NEPA.

Several commenters stated that it is inaccurate for CEQ to conclude that the rule "is not a regulatory policy that has Tribal implications," under E.O. 13175. Commenters noted that NEPA uniquely and substantially impacts Tribes, and Tribal lands are ordinarily held in Federal trust. Commenters also stated that through NEPA and its implementing regulations, Tribes often engage with the Federal agency on projects located within the Tribes' ancestral lands, including on projects that may affect cultural resources, sacred sites, and other resources. Commenters noted Tribal nations routinely participate in the NEPA process as participating, cooperating, or sometimes lead agencies. Further, the proposed regulations specifically contain provisions that explicitly reference Tribal nations.

Commenters stated that consultation is required by the Presidential Memorandum for the Heads of Executive Departments and Agencies on Tribal Consultation dated November 5, 2009,[141] which supplements E.O. 13175 and requested formal consultation and additional meetings in their region with CEQ on the proposed rule. Commenters stated that the Tribal meetings CEQ held were insufficient in number or capacity for meaningful consultation. Other commenters stated that consultation should start at the outset of the process, and some reference comments provided on the need for consultation during the ANPRM process. Some commenters stated that CEQ should withdraw the proposed rule, and others asked that CEQ postpone or extend the comment period for the rulemaking in order to engage in consultation with Tribal governments in order to make the regulatory framework more responsive to Tribal needs.

The final rule does not meet the criteria in E.O. 13175 that require government-to-government consultation. This rule does not impose substantial direct compliance costs on Tribal governments (section 5(b)) and does not preempt Tribal law (section 5(c)). However, CEQ solicited and received numerous Tribal governmental and organizational public comments during the rulemaking process. The comments received through the ANPRM informed the development of CEQ's proposed rule. For the proposed rule, CEQ provided for a 60-day public comment period, which is consistent with the length of the comment period provided by CEQ for the original 1978 proposed regulations, as well as the APA and E.O. 12866. CEQ notified all

---

[139] *Supra* note 75.
[140] *Supra* note 69.

[141] 74 FR 57881 (Nov. 9, 2009).

**43356**    Federal Register / Vol. 85, No. 137 / Thursday, July 16, 2020 / Rules and Regulations

Tribal leaders of federally recognized Tribes by email or mail of the proposed rule and invited comments. CEQ conducted additional Tribal outreach to solicit comments from Tribal leaders and members through three listening sessions held in Denver, Colorado, Anchorage, Alaska, and Washington, DC. CEQ made information to aid the Tribes and the public's review available on its websites at *www.whitehouse.gov/ ceq* and *www.nepa.gov,* including a redline version of the proposed changes, a presentation on the proposed rule, and other background information.

One commenter argued that CEQ made a "substantive" decision to forego Tribal consultation that it must support with substantial evidence in the administrative record under the APA. While compliance with E.O. 13175 is not subject to judicial review, the final rule explains how CEQ received meaningful and timely input from Tribal leaders and members.

In its ANPRM, CEQ included a specific question regarding the representation of Tribal governments in the NEPA process. *See* ANPRM Question 18 ("Are there ways in which the role of [T]ribal governments in the NEPA process should be clarified in CEQ's NEPA regulations, and if so, how?"). More generally, CEQ's ANPRM sought the views of Tribal governments and others on regulatory revisions that CEQ could propose to improve Tribal participation in Federal NEPA processes. *See* ANPRM Question 2 ("Should CEQ's NEPA regulations be revised to make the NEPA process more efficient by better facilitating agency use of environmental studies, analysis, and decisions conducted in earlier Federal, State, Tribal or local environmental reviews or authorization decisions, and if so, how?"). As discussed in section II.A, CEQ is amending its regulations in the final rule to further support coordination with Tribal governments and agencies and analysis of a proposed action's potential effects on Tribal lands, resources, or areas of historic significance as an important part of Federal agency decision making.

*I. Executive Order 12898, Federal Actions To Address Environmental Justice in Minority Populations and Low-Income Populations*

E.O. 12898 requires agencies to make achieving environmental justice part of their missions by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-

income populations.[142] CEQ has analyzed this final rule and determined that it would not cause disproportionately high and adverse human health or environmental effects on minority populations and low-income populations. This rule would set forth implementing regulations for NEPA; it is in the agency implementation of NEPA when conducting reviews of proposed agency actions where agencies can consider, as needed, environmental justice issues.

Several commenters disagreed with CEQ's determination that the proposed rule would not cause disproportionately high and adverse human health or environmental effects on minority populations and low-income populations. Commenters stated NEPA's mandate to consider environmental effects, E.O. 12898, agency guidance, and case law establish that agencies cannot ignore the impacts of their actions on low-income and minority communities, and that CEQ is relinquishing its responsibility to oversee compliance with E.O. 12898 and NEPA. Further, commenters contended that CEQ's failure to analyze how the proposed rule and its implementation would affect E.O. 12898's mandates would render the regulations arbitrary and capricious, and exceed the agency's statutory authority.

Commenters stated that CEQ provided no explanation or analysis of how the development and implementation of this rule would affect implementation of E.O. 12898 and, consequently, environmental justice communities. Commenters noted the fundamental proposed changes to nearly every step of the NEPA review process will disproportionately impact environmental justice communities and will reduce or limit opportunities for such communities to understand the effects of proposed projects and to participate in the NEPA review process.

NEPA is a procedural statute that does not presuppose any particular substantive outcomes. In addition, CEQ has reviewed the changes in this final rule and has determined that they would not result in environmental impacts. *See* RIA Appendix. CEQ disagrees that the final rule will have disproportionately high and adverse human health or environmental effects on minority populations and low-income population. Rather, the final rule modernizes and clarifies the procedures that NEPA contemplates. Among other things, this will give agencies greater flexibility to design and customize public involvement to best

address the specific circumstances of their proposed actions. The final rule expands the already wide range of tools agencies may use when providing notice to potentially affected communities and inviting public involvement. CEQ has made further changes to § 1506.6 in the final rule to clarify that agencies should consider the public's access to electronic media when selecting appropriate methods for providing public notice and involvement. The final rule also better informs the public by extending the scoping period so that it may occur prior to publication of the NOI, where appropriate, and increasing the specificity of the NOI.

Commenters also raised concerns that CEQ did not follow the E.O. 12898 directive to ensure that environmental justice communities can meaningfully participate in public processes and Federal agency decision making, including making public information and hearings "readily accessible." Commenters stated that CEQ failed to follow this directive in designing its rulemaking process, and in fact, excluded environmental justice communities from the process. Further, commenters stated that, over 20 years ago, CEQ acknowledged that traditional notice and comment procedures may be insufficient to engage environmental justice communities. These barriers may range from agency failure to provide translation of documents to the scheduling of meetings at times and in places that are not convenient to working families. Commenters stated that CEQ failed to mention environmental justice communities in its opening statement during the Washington, DC hearing.

Commenters also stated that CEQ failed to take note of the thousands of comments submitted in response to the ANPRM raising concerns about the health and environment of environmental justice communities that could come from limiting opportunities to gain access to information about projects and to comment. Commenters stated that if CEQ's rulemaking process was more inclusive and expansive it would enable some valuable clarifications in the regulations of how environmental justice impacts should be taken more definitively into account in NEPA reviews. Commenters also stated that the proposed rule changes show no particular interest in better clarifying this important aspect of environmental review, and show no evidence of interest in bettering environmental justice impact assessment.

In response to the ANPRM, CEQ received over 12,500 comments, including from those representing

---

[142] 59 FR 7629 (Feb. 16, 1994).

environmental justice organizations. The diverse range of public comments informed CEQ's development of the proposed rule to improve interagency coordination in the environmental review process, promote earlier public involvement, increase transparency, and enhance the participation of States, Tribes, and localities.

In issuing the NPRM, CEQ took a number of further actions to hear from the public and to encourage all interested stakeholders to submit comments. These actions included notifying and inviting comment from all federally recognized Tribes and over 400 interested groups, including States, localities, environmental organizations, trade associations, NEPA practitioners, and other interested members of the public, representing a broad range of diverse views. Additionally, CEQ made information to aid the public's review available on its websites at *www.whitehouse.gov/ceq* and *www.nepa.gov,* including a redline version of the proposed changes to the regulations, along with a presentation on the proposed rule and other background information.

CEQ engaged in extensive public outreach with the benefit of modern technologies and rulemaking procedures. CEQ held two public hearings each with morning, afternoon, and evening sessions, in Denver, Colorado on February 11, 2020, and in Washington, DC on February 25, 2020. Both hearings had diverse representation from stakeholders, including many speaking on behalf of environmental justice communities or about their concerns. CEQ also attended the National Environmental Justice Advisory Committee (NEJAC) meeting in Jacksonville, Florida to brief NEJAC members and the public on the proposed rule and to answer questions. CEQ also conducted additional public outreach to solicit comments and receive input, including Tribal engagement in Denver, Colorado, Anchorage, Alaska and Washington, DC.

*J. Executive Order 13211, Actions Concerning Regulations That Significantly Affect Energy Supply, Distribution, or Use*

Agencies must prepare a Statement of Energy Effects for significant energy actions under E.O. 13211.[143] This final rule is not a ''significant energy action'' because it is not likely to have a significant adverse effect on the supply, distribution, or use of energy.

*K. Executive Order 12988, Civil Justice Reform*

Under section 3(a) E.O. 12988,[144] agencies must review their proposed regulations to eliminate drafting errors and ambiguities, draft them to minimize litigation, and provide a clear legal standard for affected conduct. Section 3(b) provides a list of specific issues for review to conduct the reviews required by section 3(a). CEQ has conducted this review and determined that this final rule complies with the requirements of E.O. 12988.

*L. Unfunded Mandates Reform Act*

Section 201 of the Unfunded Mandates Reform Act of 1995 (2 U.S.C. 1531) requires Federal agencies to assess the effects of their regulatory actions on State, Tribal, and local governments, and the private sector to the extent that such regulations incorporate requirements specifically set forth in law. Before promulgating a rule that may result in the expenditure by a State, Tribal, or local government, in the aggregate, or by the private sector of $100 million, adjusted annually for inflation, in any one year, an agency must prepare a written statement that assesses the effects on State, Tribal, and local governments and the private sector. 2 U.S.C. 1532. This final rule applies to Federal agencies and would not result in expenditures of $100 million or more for State, Tribal, and local governments, in the aggregate, or the private sector in any 1 year. This action also does not impose any enforceable duty, contain any unfunded mandate, or otherwise have any effect on small governments subject to the requirements of 2 U.S.C. 1531–38.

*M. Paperwork Reduction Act*

This final rule does not impose any new information collection burden that would require additional review or approval by OMB under the Paperwork Reduction Act (PRA), 44 U.S.C. 3501 *et seq.*

**List of Subjects**

*40 CFR Parts 1500, 1501, 1502, 1503, 1504, 1505, 1506, 1507, and 1508*

Administrative practice and procedure, Environmental impact statements, Environmental protection, Natural resources.

*40 CFR Part 1515*

Freedom of information.

*40 CFR Part 1516*

Privacy.

*40 CFR Part 1517*

Sunshine Act.

*40 CFR Part 1518*

Accounting, Administrative practice and procedure, Environmental impact statements.

**Mary B. Neumayr,**
*Chairman.*

For the reasons stated in the preamble, and under the authority of 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369, the Council on Environmental Quality amends chapter V in title 40 of the Code of Federal Regulations as follows:

## PARTS 1500 THROUGH 1508 [DESIGNATED AS SUBCHAPTER A]

■ 1. Designate parts 1500 through 1508 as subchapter A and add a heading for newly designated subchapter A to read as follows:

**Subchapter A—National Environmental Policy Act Implementing Regulations**

■ 2. Revise part 1500 to read as follows:

## PART 1500—PURPOSE AND POLICY

Sec.
1500.1    Purpose and policy.
1500.2    [Reserved].
1500.3    NEPA compliance.
1500.4    Reducing paperwork.
1500.5    Reducing delay.
1500.6    Agency authority.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

**§ 1500.1   Purpose and policy.**

(a) The National Environmental Policy Act (NEPA) is a procedural statute intended to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process. Section 101 of NEPA establishes the national environmental policy of the Federal Government to use all practicable means and measures to foster and promote the general welfare, create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans. Section 102(2) of NEPA establishes the procedural requirements to carry out the policy stated in section 101 of NEPA. In

---

[143] 66 FR 28355 (May 22, 2001).

[144] 61 FR 4729 (Feb. 7, 1996).

particular, it requires Federal agencies to provide a detailed statement on proposals for major Federal actions significantly affecting the quality of the human environment. The purpose and function of NEPA is satisfied if Federal agencies have considered relevant environmental information, and the public has been informed regarding the decision-making process. NEPA does not mandate particular results or substantive outcomes. NEPA's purpose is not to generate paperwork or litigation, but to provide for informed decision making and foster excellent action.

(b) The regulations in this subchapter implement section 102(2) of NEPA. They provide direction to Federal agencies to determine what actions are subject to NEPA's procedural requirements and the level of NEPA review where applicable. The regulations in this subchapter are intended to ensure that relevant environmental information is identified and considered early in the process in order to ensure informed decision making by Federal agencies. The regulations in this subchapter are also intended to ensure that Federal agencies conduct environmental reviews in a coordinated, consistent, predictable and timely manner, and to reduce unnecessary burdens and delays. Finally, the regulations in this subchapter promote concurrent environmental reviews to ensure timely and efficient decision making.

### § 1500.2   [Reserved]

### § 1500.3   NEPA compliance.

(a) *Mandate.* This subchapter is applicable to and binding on all Federal agencies for implementing the procedural provisions of the National Environmental Policy Act of 1969, as amended (Pub. L. 91–190, 42 U.S.C. 4321 *et seq.*) (NEPA or the Act), except where compliance would be inconsistent with other statutory requirements. The regulations in this subchapter are issued pursuant to NEPA; the Environmental Quality Improvement Act of 1970, as amended (Pub. L. 91–224, 42 U.S.C. 4371 *et seq.*); section 309 of the Clean Air Act, as amended (42 U.S.C. 7609); Executive Order 11514, Protection and Enhancement of Environmental Quality (March 5, 1970), as amended by Executive Order 11991, Relating to the Protection and Enhancement of Environmental Quality (May 24, 1977); and Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects

(August 15, 2017). The regulations in this subchapter apply to the whole of section 102(2) of NEPA. The provisions of the Act and the regulations in this subchapter must be read together as a whole to comply with the law.

(b) *Exhaustion.* (1) To ensure informed decision making and reduce delays, agencies shall include a request for comments on potential alternatives and impacts, and identification of any relevant information, studies, or analyses of any kind concerning impacts affecting the quality of the human environment in the notice of intent to prepare an environmental impact statement (§ 1501.9(d)(7) of this chapter).

(2) The draft and final environmental impact statements shall include a summary of all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agencies in developing the draft and final environmental impact statements (§ 1502.17 of this chapter).

(3) For consideration by the lead and cooperating agencies, State, Tribal, and local governments and other public commenters must submit comments within the comment periods provided, and comments shall be as specific as possible (§§ 1503.1 and 1503.3 of this chapter). Comments or objections of any kind not submitted, including those based on submitted alternatives, information, and analyses, shall be forfeited as unexhausted.

(4) Informed by the submitted alternatives, information, and analyses, including the summary in the final environmental impact statement (§ 1502.17 of this chapter) and the agency's response to comments in the final environmental impact statement (§ 1503.4 of this chapter), together with any other material in the record that he or she determines relevant, the decision maker shall certify in the record of decision that the agency considered all of the alternatives, information, and analyses, and objections submitted by States, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agencies in developing the environmental impact statement (§ 1505.2(b) of this chapter).

(c) *Review of NEPA compliance.* It is the Council's intention that judicial review of agency compliance with the regulations in this subchapter not occur before an agency has issued the record of decision or taken other final agency action. It is the Council's intention that any allegation of noncompliance with NEPA and the regulations in this

subchapter should be resolved as expeditiously as possible. Consistent with their organic statutes, and as part of implementing the exhaustion provisions in paragraph (b) of this section, agencies may structure their procedures to include an appropriate bond or other security requirement.

(d) *Remedies.* Harm from the failure to comply with NEPA can be remedied by compliance with NEPA's procedural requirements as interpreted in the regulations in this subchapter. It is the Council's intention that the regulations in this subchapter create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm. The regulations in this subchapter do not create a cause of action or right of action for violation of NEPA, which contains no such cause of action or right of action. It is the Council's intention that any actions to review, enjoin, stay, vacate, or otherwise alter an agency decision on the basis of an alleged NEPA violation be raised as soon as practicable after final agency action to avoid or minimize any costs to agencies, applicants, or any affected third parties. It is also the Council's intention that minor, non-substantive errors that have no effect on agency decision making shall be considered harmless and shall not invalidate an agency action.

(e) *Severability.* The sections of this subchapter are separate and severable from one another. If any section or portion therein is stayed or determined to be invalid, or the applicability of any section to any person or entity is held invalid, it is the Council's intention that the validity of the remainder of those parts shall not be affected, with the remaining sections to continue in effect.

### § 1500.4   Reducing paperwork.

Agencies shall reduce excessive paperwork by:

(a) Using categorical exclusions to define categories of actions that normally do not have a significant effect on the human environment and therefore do not require preparation of an environmental impact statement (§ 1501.4 of this chapter).

(b) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment and therefore does not require preparation of an environmental impact statement (§ 1501.6 of this chapter).

(c) Reducing the length of environmental documents by means such as meeting appropriate page limits (§§ 1501.5(f) and 1502.7 of this chapter).

(d) Preparing analytic and concise environmental impact statements (§ 1502.2 of this chapter).

(e) Discussing only briefly issues other than significant ones (§ 1502.2(b) of this chapter).

(f) Writing environmental impact statements in plain language (§ 1502.8 of this chapter).

(g) Following a clear format for environmental impact statements (§ 1502.10 of this chapter).

(h) Emphasizing the portions of the environmental impact statement that are useful to decision makers and the public (*e.g.*, §§ 1502.14 and 1502.15 of this chapter) and reducing emphasis on background material (§ 1502.1 of this chapter).

(i) Using the scoping process, not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues, narrowing the scope of the environmental impact statement process accordingly (§ 1501.9 of this chapter).

(j) Summarizing the environmental impact statement (§ 1502.12 of this chapter).

(k) Using programmatic, policy, or plan environmental impact statements and tiering from statements of broad scope to those of narrower scope, to eliminate repetitive discussions of the same issues (§§ 1501.11 and 1502.4 of this chapter).

(l) Incorporating by reference (§ 1501.12 of this chapter).

(m) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.24 of this chapter).

(n) Requiring comments to be as specific as possible (§ 1503.3 of this chapter).

(o) Attaching and publishing only changes to the draft environmental impact statement, rather than rewriting and publishing the entire statement when changes are minor (§ 1503.4(c) of this chapter).

(p) Eliminating duplication with State, Tribal, and local procedures, by providing for joint preparation of environmental documents where practicable (§ 1506.2 of this chapter), and with other Federal procedures, by providing that an agency may adopt appropriate environmental documents prepared by another agency (§ 1506.3 of this chapter).

(q) Combining environmental documents with other documents (§ 1506.4 of this chapter).

## § 1500.5   Reducing delay.

Agencies shall reduce delay by:

(a) Using categorical exclusions to define categories of actions that normally do not have a significant effect on the human environment (§ 1501.4 of this chapter) and therefore do not require preparation of an environmental impact statement.

(b) Using a finding of no significant impact when an action not otherwise excluded will not have a significant effect on the human environment (§ 1501.6 of this chapter) and therefore does not require preparation of an environmental impact statement.

(c) Integrating the NEPA process into early planning (§ 1501.2 of this chapter).

(d) Engaging in interagency cooperation before or as the environmental assessment or environmental impact statement is prepared, rather than awaiting submission of comments on a completed document (§§ 1501.7 and 1501.8 of this chapter).

(e) Ensuring the swift and fair resolution of lead agency disputes (§ 1501.7 of this chapter).

(f) Using the scoping process for an early identification of what are and what are not the real issues (§ 1501.9 of this chapter).

(g) Meeting appropriate time limits for the environmental assessment and environmental impact statement processes (§ 1501.10 of this chapter).

(h) Preparing environmental impact statements early in the process (§ 1502.5 of this chapter).

(i) Integrating NEPA requirements with other environmental review and consultation requirements (§ 1502.24 of this chapter).

(j) Eliminating duplication with State, Tribal, and local procedures by providing for joint preparation of environmental documents where practicable (§ 1506.2 of this chapter) and with other Federal procedures by providing that agencies may jointly prepare or adopt appropriate environmental documents prepared by another agency (§ 1506.3 of this chapter).

(k) Combining environmental documents with other documents (§ 1506.4 of this chapter).

(l) Using accelerated procedures for proposals for legislation (§ 1506.8 of this chapter).

## § 1500.6   Agency authority.

Each agency shall interpret the provisions of the Act as a supplement to its existing authority and as a mandate to view policies and missions in the light of the Act's national environmental objectives, to the extent consistent with its existing authority. Agencies shall review their policies, procedures, and regulations accordingly and revise them as necessary to ensure full compliance with the purposes and provisions of the Act as interpreted by the regulations in this subchapter. The phrase ''to the fullest extent possible'' in section 102 of NEPA means that each agency of the Federal Government shall comply with that section, consistent with § 1501.1 of this chapter. Nothing contained in the regulations in this subchapter is intended or should be construed to limit an agency's other authorities or legal responsibilities.

■ 3. Revise part 1501 to read as follows:

## PART 1501—NEPA AND AGENCY PLANNING

Sec.
1501.1    NEPA thresholds.
1501.2    Apply NEPA early in the process.
1501.3    Determine the appropriate level of NEPA review.
1501.4    Categorical exclusions.
1501.5    Environmental assessments.
1501.6    Findings of no significant impact.
1501.7    Lead agencies.
1501.8    Cooperating agencies.
1501.9    Scoping.
1501.10    Time limits.
1501.11    Tiering.
1501.12    Incorporation by reference.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

## § 1501.1   NEPA thresholds.

(a) In assessing whether NEPA applies or is otherwise fulfilled, Federal agencies should determine:

(1) Whether the proposed activity or decision is expressly exempt from NEPA under another statute;

(2) Whether compliance with NEPA would clearly and fundamentally conflict with the requirements of another statute;

(3) Whether compliance with NEPA would be inconsistent with Congressional intent expressed in another statute;

(4) Whether the proposed activity or decision is a major Federal action;

(5) Whether the proposed activity or decision, in whole or in part, is a non-discretionary action for which the agency lacks authority to consider environmental effects as part of its decision-making process; and

(6) Whether the proposed action is an action for which another statute's requirements serve the function of agency compliance with the Act.

(b) Federal agencies may make determinations under this section in their agency NEPA procedures (§ 1507.3(d) of this chapter) or on an individual basis, as appropriate.

(1) Federal agencies may seek the Council's assistance in making an individual determination under this section.

(2) An agency shall consult with other Federal agencies concerning their concurrence in statutory determinations made under this section where more than one Federal agency administers the statute.

### §1501.2 Apply NEPA early in the process.

(a) Agencies should integrate the NEPA process with other planning and authorization processes at the earliest reasonable time to ensure that agencies consider environmental impacts in their planning and decisions, to avoid delays later in the process, and to head off potential conflicts.

(b) Each agency shall:

(1) Comply with the mandate of section 102(2)(A) of NEPA to utilize a systematic, interdisciplinary approach which will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making which may have an impact on man's environment, as specified by §1507.2(a) of this chapter.

(2) Identify environmental effects and values in adequate detail so the decision maker can appropriately consider such effects and values alongside economic and technical analyses. Whenever practicable, agencies shall review and publish environmental documents and appropriate analyses at the same time as other planning documents.

(3) Study, develop, and describe appropriate alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources as provided by section 102(2)(E) of NEPA.

(4) Provide for actions subject to NEPA that are planned by private applicants or other non-Federal entities before Federal involvement so that:

(i) Policies or designated staff are available to advise potential applicants of studies or other information foreseeably required for later Federal action.

(ii) The Federal agency consults early with appropriate State, Tribal, and local governments and with interested private persons and organizations when their involvement is reasonably foreseeable.

(iii) The Federal agency commences its NEPA process at the earliest reasonable time (§§ 1501.5(d) and 1502.5(b) of this chapter).

### §1501.3 Determine the appropriate level of NEPA review.

(a) In assessing the appropriate level of NEPA review, Federal agencies

should determine whether the proposed action:

(1) Normally does not have significant effects and is categorically excluded (§ 1501.4);

(2) Is not likely to have significant effects or the significance of the effects is unknown and is therefore appropriate for an environmental assessment (§ 1501.5); or

(3) Is likely to have significant effects and is therefore appropriate for an environmental impact statement (part 1502 of this chapter).

(b) In considering whether the effects of the proposed action are significant, agencies shall analyze the potentially affected environment and degree of the effects of the action. Agencies should consider connected actions consistent with § 1501.9(e)(1).

(1) In considering the potentially affected environment, agencies should consider, as appropriate to the specific action, the affected area (national, regional, or local) and its resources, such as listed species and designated critical habitat under the Endangered Species Act. Significance varies with the setting of the proposed action. For instance, in the case of a site-specific action, significance would usually depend only upon the effects in the local area.

(2) In considering the degree of the effects, agencies should consider the following, as appropriate to the specific action:

(i) Both short- and long-term effects.

(ii) Both beneficial and adverse effects.

(iii) Effects on public health and safety.

(iv) Effects that would violate Federal, State, Tribal, or local law protecting the environment.

### §1501.4 Categorical exclusions.

(a) For efficiency, agencies shall identify in their agency NEPA procedures (§ 1507.3(e)(2)(ii) of this chapter) categories of actions that normally do not have a significant effect on the human environment, and therefore do not require preparation of an environmental assessment or environmental impact statement.

(b) If an agency determines that a categorical exclusion identified in its agency NEPA procedures covers a proposed action, the agency shall evaluate the action for extraordinary circumstances in which a normally excluded action may have a significant effect.

(1) If an extraordinary circumstance is present, the agency nevertheless may categorically exclude the proposed action if the agency determines that

there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects.

(2) If the agency cannot categorically exclude the proposed action, the agency shall prepare an environmental assessment or environmental impact statement, as appropriate.

### §1501.5 Environmental assessments.

(a) An agency shall prepare an environmental assessment for a proposed action that is not likely to have significant effects or when the significance of the effects is unknown unless the agency finds that a categorical exclusion (§ 1501.4) is applicable or has decided to prepare an environmental impact statement.

(b) An agency may prepare an environmental assessment on any action in order to assist agency planning and decision making.

(c) An environmental assessment shall:

(1) Briefly provide sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact; and

(2) Briefly discuss the purpose and need for the proposed action, alternatives as required by section 102(2)(E) of NEPA, and the environmental impacts of the proposed action and alternatives, and include a listing of agencies and persons consulted.

(d) For applications to the agency requiring an environmental assessment, the agency shall commence the environmental assessment as soon as practicable after receiving the application.

(e) Agencies shall involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental assessments.

(f) The text of an environmental assessment shall be no more than 75 pages, not including appendices, unless a senior agency official approves in writing an assessment to exceed 75 pages and establishes a new page limit.

(g) Agencies may apply the following provisions to environmental assessments:

(1) Section 1502.21 of this chapter—Incomplete or unavailable information;

(2) Section 1502.23 of this chapter—Methodology and scientific accuracy; and

(3) Section 1502.24 of this chapter—Environmental review and consultation requirements.

### §1501.6 Findings of no significant impact.

(a) An agency shall prepare a finding of no significant impact if the agency

determines, based on the environmental assessment, not to prepare an environmental impact statement because the proposed action will not have significant effects.

(1) The agency shall make the finding of no significant impact available to the affected public as specified in § 1506.6(b) of this chapter.

(2) In the following circumstances, the agency shall make the finding of no significant impact available for public review for 30 days before the agency makes its final determination whether to prepare an environmental impact statement and before the action may begin:

(i) The proposed action is or is closely similar to one that normally requires the preparation of an environmental impact statement under the procedures adopted by the agency pursuant to § 1507.3 of this chapter; or

(ii) The nature of the proposed action is one without precedent.

(b) The finding of no significant impact shall include the environmental assessment or incorporate it by reference and shall note any other environmental documents related to it (§ 1501.9(f)(3)). If the assessment is included, the finding need not repeat any of the discussion in the assessment but may incorporate it by reference.

(c) The finding of no significant impact shall state the authority for any mitigation that the agency has adopted and any applicable monitoring or enforcement provisions. If the agency finds no significant impacts based on mitigation, the mitigated finding of no significant impact shall state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts.

### § 1501.7  Lead agencies.

(a) A lead agency shall supervise the preparation of an environmental impact statement or a complex environmental assessment if more than one Federal agency either:

(1) Proposes or is involved in the same action; or

(2) Is involved in a group of actions directly related to each other because of their functional interdependence or geographical proximity.

(b) Federal, State, Tribal, or local agencies, including at least one Federal agency, may act as joint lead agencies to prepare an environmental impact statement or environmental assessment (§ 1506.2 of this chapter).

(c) If an action falls within the provisions of paragraph (a) of this section, the potential lead agencies shall determine, by letter or memorandum, which agency will be the lead agency and which will be cooperating agencies. The agencies shall resolve the lead agency question so as not to cause delay. If there is disagreement among the agencies, the following factors (which are listed in order of descending importance) shall determine lead agency designation:

(1) Magnitude of agency's involvement.

(2) Project approval or disapproval authority.

(3) Expertise concerning the action's environmental effects.

(4) Duration of agency's involvement.

(5) Sequence of agency's involvement.

(d) Any Federal agency, or any State, Tribal, or local agency or private person substantially affected by the absence of lead agency designation, may make a written request to the senior agency officials of the potential lead agencies that a lead agency be designated.

(e) If Federal agencies are unable to agree on which agency will be the lead agency or if the procedure described in paragraph (c) of this section has not resulted in a lead agency designation within 45 days, any of the agencies or persons concerned may file a request with the Council asking it to determine which Federal agency shall be the lead agency. A copy of the request shall be transmitted to each potential lead agency. The request shall consist of:

(1) A precise description of the nature and extent of the proposed action; and

(2) A detailed statement of why each potential lead agency should or should not be the lead agency under the criteria specified in paragraph (c) of this section.

(f) Any potential lead agency may file a response within 20 days after a request is filed with the Council. As soon as possible, but not later than 20 days after receiving the request and all responses to it, the Council shall determine which Federal agency will be the lead agency and which other Federal agencies will be cooperating agencies.

(g) To the extent practicable, if a proposal will require action by more than one Federal agency and the lead agency determines that it requires preparation of an environmental impact statement, the lead and cooperating agencies shall evaluate the proposal in a single environmental impact statement and issue a joint record of decision. To the extent practicable, if a proposal will require action by more than one Federal agency and the lead agency determines that it requires preparation of an environmental assessment, the lead and cooperating agencies should evaluate the proposal in a single environmental assessment and, where appropriate,

issue a joint finding of no significant impact.

(h) With respect to cooperating agencies, the lead agency shall:

(1) Request the participation of each cooperating agency in the NEPA process at the earliest practicable time.

(2) Use the environmental analysis and proposals of cooperating agencies with jurisdiction by law or special expertise, to the maximum extent practicable.

(3) Meet with a cooperating agency at the latter's request.

(4) Determine the purpose and need, and alternatives in consultation with any cooperating agency.

(i) The lead agency shall develop a schedule, setting milestones for all environmental reviews and authorizations required for implementation of the action, in consultation with any applicant and all joint lead, cooperating, and participating agencies, as soon as practicable.

(j) If the lead agency anticipates that a milestone will be missed, it shall notify appropriate officials at the responsible agencies. As soon as practicable, the responsible agencies shall elevate the issue to the appropriate officials of the responsible agencies for timely resolution.

### § 1501.8  Cooperating agencies.

(a) The purpose of this section is to emphasize agency cooperation early in the NEPA process. Upon request of the lead agency, any Federal agency with jurisdiction by law shall be a cooperating agency. In addition, upon request of the lead agency, any other Federal agency with special expertise with respect to any environmental issue may be a cooperating agency. A State, Tribal, or local agency of similar qualifications may become a cooperating agency by agreement with the lead agency. An agency may request that the lead agency designate it a cooperating agency, and a Federal agency may appeal a denial of its request to the Council, in accordance with § 1501.7(e).

(b) Each cooperating agency shall:

(1) Participate in the NEPA process at the earliest practicable time.

(2) Participate in the scoping process (described in § 1501.9).

(3) On request of the lead agency, assume responsibility for developing information and preparing environmental analyses, including portions of the environmental impact statement or environmental assessment concerning which the cooperating agency has special expertise.

(4) On request of the lead agency, make available staff support to enhance

the lead agency's interdisciplinary capability.

(5) Normally use its own funds. To the extent available funds permit, the lead agency shall fund those major activities or analyses it requests from cooperating agencies. Potential lead agencies shall include such funding requirements in their budget requests.

(6) Consult with the lead agency in developing the schedule (§ 1501.7(i)), meet the schedule, and elevate, as soon as practicable, to the senior agency official of the lead agency any issues relating to purpose and need, alternatives, or other issues that may affect any agencies' ability to meet the schedule.

(7) Meet the lead agency's schedule for providing comments and limit its comments to those matters for which it has jurisdiction by law or special expertise with respect to any environmental issue consistent with § 1503.2 of this chapter.

(8) To the maximum extent practicable, jointly issue environmental documents with the lead agency.

(c) In response to a lead agency's request for assistance in preparing the environmental documents (described in paragraph (b)(3), (4), or (5) of this section), a cooperating agency may reply that other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental impact statement or environmental assessment. The cooperating agency shall submit a copy of this reply to the Council and the senior agency official of the lead agency.

§ 1501.9   Scoping.

(a) *Generally.* Agencies shall use an early and open process to determine the scope of issues for analysis in an environmental impact statement, including identifying the significant issues and eliminating from further study non-significant issues. Scoping may begin as soon as practicable after the proposal for action is sufficiently developed for agency consideration. Scoping may include appropriate pre-application procedures or work conducted prior to publication of the notice of intent.

(b) *Invite cooperating and participating agencies.* As part of the scoping process, the lead agency shall invite the participation of likely affected Federal, State, Tribal, and local agencies and governments, the proponent of the action, and other likely affected or interested persons (including those who might not be in accord with the action), unless there is a limited exception under § 1507.3(f)(1) of this chapter.

(c) *Scoping outreach.* As part of the scoping process the lead agency may hold a scoping meeting or meetings, publish scoping information, or use other means to communicate with those persons or agencies who may be interested or affected, which the agency may integrate with any other early planning meeting. Such a scoping meeting will often be appropriate when the impacts of a particular action are confined to specific sites.

(d) *Notice of intent.* As soon as practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment and requires an environmental impact statement, the lead agency shall publish a notice of intent to prepare an environmental impact statement in the **Federal Register**, except as provided in § 1507.3(f)(3) of this chapter. An agency also may publish notice in accordance with § 1506.6 of this chapter. The notice shall include, as appropriate:

(1) The purpose and need for the proposed action;

(2) A preliminary description of the proposed action and alternatives the environmental impact statement will consider;

(3) A brief summary of expected impacts;

(4) Anticipated permits and other authorizations;

(5) A schedule for the decision-making process;

(6) A description of the public scoping process, including any scoping meeting(s);

(7) A request for identification of potential alternatives, information, and analyses relevant to the proposed action (*see* § 1502.17 of this chapter); and

(8) Contact information for a person within the agency who can answer questions about the proposed action and the environmental impact statement.

(e) *Determination of scope.* As part of the scoping process, the lead agency shall determine the scope and the significant issues to be analyzed in depth in the environmental impact statement. To determine the scope of environmental impact statements, agencies shall consider:

(1) Actions (other than unconnected single actions) that may be connected actions, which means that they are closely related and therefore should be discussed in the same impact statement. Actions are connected if they:

(i) Automatically trigger other actions that may require environmental impact statements;

(ii) Cannot or will not proceed unless other actions are taken previously or simultaneously; or

(iii) Are interdependent parts of a larger action and depend on the larger action for their justification.

(2) Alternatives, which include the no action alternative; other reasonable courses of action; and mitigation measures (not in the proposed action).

(3) Impacts.

(f) *Additional scoping responsibilities.* As part of the scoping process, the lead agency shall:

(1) Identify and eliminate from detailed study the issues that are not significant or have been covered by prior environmental review(s) (§ 1506.3 of this chapter), narrowing the discussion of these issues in the statement to a brief presentation of why they will not have a significant effect on the human environment or providing a reference to their coverage elsewhere.

(2) Allocate assignments for preparation of the environmental impact statement among the lead and cooperating agencies, with the lead agency retaining responsibility for the statement.

(3) Indicate any public environmental assessments and other environmental impact statements that are being or will be prepared and are related to but are not part of the scope of the impact statement under consideration.

(4) Identify other environmental review, authorization, and consultation requirements so the lead and cooperating agencies may prepare other required analyses and studies concurrently and integrated with the environmental impact statement, as provided in § 1502.24 of this chapter.

(5) Indicate the relationship between the timing of the preparation of environmental analyses and the agencies' tentative planning and decision-making schedule.

(g) *Revisions.* An agency shall revise the determinations made under paragraphs (b), (c), (e), and (f) of this section if substantial changes are made later in the proposed action, or if significant new circumstances or information arise which bear on the proposal or its impacts.

§ 1501.10   Time limits.

(a) To ensure that agencies conduct NEPA reviews as efficiently and expeditiously as practicable, Federal agencies should set time limits appropriate to individual actions or types of actions (consistent with the time intervals required by § 1506.11 of this chapter).

(b) To ensure timely decision making, agencies shall complete:

(1) Environmental assessments within 1 year unless a senior agency official of the lead agency approves a longer

period in writing and establishes a new time limit. One year is measured from the date of agency decision to prepare an environmental assessment to the publication of an environmental assessment or a finding of no significant impact.

(2) Environmental impact statements within 2 years unless a senior agency official of the lead agency approves a longer period in writing and establishes a new time limit. Two years is measured from the date of the issuance of the notice of intent to the date a record of decision is signed.

(c) The senior agency official may consider the following factors in determining time limits:

(1) Potential for environmental harm.

(2) Size of the proposed action.

(3) State of the art of analytic techniques.

(4) Degree of public need for the proposed action, including the consequences of delay.

(5) Number of persons and agencies affected.

(6) Availability of relevant information.

(7) Other time limits imposed on the agency by law, regulations, or Executive order.

(d) The senior agency official may set overall time limits or limits for each constituent part of the NEPA process, which may include:

(1) Decision on whether to prepare an environmental impact statement (if not already decided).

(2) Determination of the scope of the environmental impact statement.

(3) Preparation of the draft environmental impact statement.

(4) Review of any comments on the draft environmental impact statement from the public and agencies.

(5) Preparation of the final environmental impact statement.

(6) Review of any comments on the final environmental impact statement.

(7) Decision on the action based in part on the environmental impact statement.

(e) The agency may designate a person (such as the project manager or a person in the agency's office with NEPA responsibilities) to expedite the NEPA process.

(f) State, Tribal, or local agencies or members of the public may request a Federal agency to set time limits.

### § 1501.11  Tiering.

(a) Agencies should tier their environmental impact statements and environmental assessments when it would eliminate repetitive discussions of the same issues, focus on the actual issues ripe for decision, and exclude from consideration issues already decided or not yet ripe at each level of environmental review. Tiering may also be appropriate for different stages of actions.

(b) When an agency has prepared an environmental impact statement or environmental assessment for a program or policy and then prepares a subsequent statement or assessment on an action included within the entire program or policy (such as a project- or site-specific action), the tiered document needs only to summarize and incorporate by reference the issues discussed in the broader document. The tiered document shall concentrate on the issues specific to the subsequent action. The tiered document shall state where the earlier document is available.

(c) Tiering is appropriate when the sequence from an environmental impact statement or environmental assessment is:

(1) From a programmatic, plan, or policy environmental impact statement or environmental assessment to a program, plan, or policy statement or assessment of lesser or narrower scope or to a site-specific statement or assessment.

(2) From an environmental impact statement or environmental assessment on a specific action at an early stage (such as need and site selection) to a supplement (which is preferred) or a subsequent statement or assessment at a later stage (such as environmental mitigation). Tiering in such cases is appropriate when it helps the lead agency to focus on the issues that are ripe for decision and exclude from consideration issues already decided or not yet ripe.

### § 1501.12  Incorporation by reference.

Agencies shall incorporate material, such as planning studies, analyses, or other relevant information, into environmental documents by reference when the effect will be to cut down on bulk without impeding agency and public review of the action. Agencies shall cite the incorporated material in the document and briefly describe its content. Agencies may not incorporate material by reference unless it is reasonably available for inspection by potentially interested persons within the time allowed for comment. Agencies shall not incorporate by reference material based on proprietary data that is not available for review and comment.

■ 4. Revise part 1502 to read as follows:

## PART 1502—ENVIRONMENTAL IMPACT STATEMENT

Sec.

1502.1  Purpose of environmental impact statement.
1502.2  Implementation.
1502.3  Statutory requirements for statements.
1502.4  Major Federal actions requiring the preparation of environmental impact statements.
1502.5  Timing.
1502.6  Interdisciplinary preparation.
1502.7  Page limits.
1502.8  Writing.
1502.9  Draft, final, and supplemental statements.
1502.10  Recommended format.
1502.11  Cover.
1502.12  Summary.
1502.13  Purpose and need.
1502.14  Alternatives including the proposed action.
1502.15  Affected environment.
1502.16  Environmental consequences.
1502.17  Summary of submitted alternatives, information, and analyses.
1502.18  List of preparers.
1502.19  Appendix.
1502.20  Publication of the environmental impact statement.
1502.21  Incomplete or unavailable information.
1502.22  Cost-benefit analysis.
1502.23  Methodology and scientific accuracy.
1502.24  Environmental review and consultation requirements.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1502.1  Purpose of environmental impact statement.

The primary purpose of an environmental impact statement prepared pursuant to section 102(2)(C) of NEPA is to ensure agencies consider the environmental impacts of their actions in decision making. It shall provide full and fair discussion of significant environmental impacts and shall inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment. Agencies shall focus on significant environmental issues and alternatives and shall reduce paperwork and the accumulation of extraneous background data. Statements shall be concise, clear, and to the point, and shall be supported by evidence that the agency has made the necessary environmental analyses. An environmental impact statement is a document that informs Federal agency decision making and the public.

## § 1502.2 Implementation.

(a) Environmental impact statements shall not be encyclopedic.

(b) Environmental impact statements shall discuss impacts in proportion to their significance. There shall be only brief discussion of other than significant issues. As in a finding of no significant impact, there should be only enough discussion to show why more study is not warranted.

(c) Environmental impact statements shall be analytic, concise, and no longer than necessary to comply with NEPA and with the regulations in this subchapter. Length should be proportional to potential environmental effects and project size.

(d) Environmental impact statements shall state how alternatives considered in it and decisions based on it will or will not achieve the requirements of sections 101 and 102(1) of NEPA as interpreted in the regulations in this subchapter and other environmental laws and policies.

(e) The range of alternatives discussed in environmental impact statements shall encompass those to be considered by the decision maker.

(f) Agencies shall not commit resources prejudicing selection of alternatives before making a final decision (*see also* § 1506.1 of this chapter).

(g) Environmental impact statements shall serve as the means of assessing the environmental impact of proposed agency actions, rather than justifying decisions already made.

## § 1502.3 Statutory requirements for statements.

As required by section 102(2)(C) of NEPA, environmental impact statements are to be included in every Federal agency recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment.

## § 1502.4 Major Federal actions requiring the preparation of environmental impact statements.

(a) Agencies shall define the proposal that is the subject of an environmental impact statement based on the statutory authorities for the proposed action. Agencies shall use the criteria for scope (§ 1501.9(e) of this chapter) to determine which proposal(s) shall be the subject of a particular statement. Agencies shall evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of action.

(b) Environmental impact statements may be prepared for programmatic

Federal actions, such as the adoption of new agency programs. When agencies prepare such statements, they should be relevant to the program decision and timed to coincide with meaningful points in agency planning and decision making.

(1) When preparing statements on programmatic actions (including proposals by more than one agency), agencies may find it useful to evaluate the proposal(s) in one of the following ways:

(i) Geographically, including actions occurring in the same general location, such as body of water, region, or metropolitan area.

(ii) Generically, including actions that have relevant similarities, such as common timing, impacts, alternatives, methods of implementation, media, or subject matter.

(iii) By stage of technological development including Federal or federally assisted research, development or demonstration programs for new technologies that, if applied, could significantly affect the quality of the human environment. Statements on such programs should be available before the program has reached a stage of investment or commitment to implementation likely to determine subsequent development or restrict later alternatives.

(2) Agencies shall as appropriate employ scoping (§ 1501.9 of this chapter), tiering (§ 1501.11 of this chapter), and other methods listed in §§ 1500.4 and 1500.5 of this chapter to relate programmatic and narrow actions and to avoid duplication and delay. Agencies may tier their environmental analyses to defer detailed analysis of environmental impacts of specific program elements until such program elements are ripe for final agency action.

## § 1502.5 Timing.

An agency should commence preparation of an environmental impact statement as close as practicable to the time the agency is developing or receives a proposal so that preparation can be completed in time for the final statement to be included in any recommendation or report on the proposal. The statement shall be prepared early enough so that it can serve as an important practical contribution to the decision-making process and will not be used to rationalize or justify decisions already made (§§ 1501.2 of this chapter and 1502.2). For instance:

(a) For projects directly undertaken by Federal agencies, the agency shall prepare the environmental impact statement at the feasibility analysis (go/

no-go) stage and may supplement it at a later stage, if necessary.

(b) For applications to the agency requiring an environmental impact statement, the agency shall commence the statement as soon as practicable after receiving the application. Federal agencies should work with potential applicants and applicable State, Tribal, and local agencies and governments prior to receipt of the application.

(c) For adjudication, the final environmental impact statement shall normally precede the final staff recommendation and that portion of the public hearing related to the impact study. In appropriate circumstances, the statement may follow preliminary hearings designed to gather information for use in the statements.

(d) For informal rulemaking, the draft environmental impact statement shall normally accompany the proposed rule.

## § 1502.6 Interdisciplinary preparation.

Agencies shall prepare environmental impact statements using an interdisciplinary approach that will ensure the integrated use of the natural and social sciences and the environmental design arts (section 102(2)(A) of NEPA). The disciplines of the preparers shall be appropriate to the scope and issues identified in the scoping process (§ 1501.9 of this chapter).

## § 1502.7 Page limits.

The text of final environmental impact statements (paragraphs (a)(4) through (6) of § 1502.10) shall be 150 pages or fewer and, for proposals of unusual scope or complexity, shall be 300 pages or fewer unless a senior agency official of the lead agency approves in writing a statement to exceed 300 pages and establishes a new page limit.

## § 1502.8 Writing.

Agencies shall write environmental impact statements in plain language and may use appropriate graphics so that decision makers and the public can readily understand such statements. Agencies should employ writers of clear prose or editors to write, review, or edit statements, which shall be based upon the analysis and supporting data from the natural and social sciences and the environmental design arts.

## § 1502.9 Draft, final, and supplemental statements.

(a) *Generally.* Except for proposals for legislation as provided in § 1506.8 of this chapter, agencies shall prepare environmental impact statements in two stages and, where necessary,

supplement them, as provided in paragraph (d)(1) of this section.

(b) *Draft environmental impact statements.* Agencies shall prepare draft environmental impact statements in accordance with the scope decided upon in the scoping process (§ 1501.9 of this chapter). The lead agency shall work with the cooperating agencies and shall obtain comments as required in part 1503 of this chapter. To the fullest extent practicable, the draft statement must meet the requirements established for final statements in section 102(2)(C) of NEPA as interpreted in the regulations in this subchapter. If a draft statement is so inadequate as to preclude meaningful analysis, the agency shall prepare and publish a supplemental draft of the appropriate portion. At appropriate points in the draft statement, the agency shall discuss all major points of view on the environmental impacts of the alternatives including the proposed action.

(c) *Final environmental impact statements.* Final environmental impact statements shall address comments as required in part 1503 of this chapter. At appropriate points in the final statement, the agency shall discuss any responsible opposing view that was not adequately discussed in the draft statement and shall indicate the agency's response to the issues raised.

(d) *Supplemental environmental impact statements.* Agencies:

(1) Shall prepare supplements to either draft or final environmental impact statements if a major Federal action remains to occur, and:

(i) The agency makes substantial changes to the proposed action that are relevant to environmental concerns; or

(ii) There are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

(2) May also prepare supplements when the agency determines that the purposes of the Act will be furthered by doing so.

(3) Shall prepare, publish, and file a supplement to a statement (exclusive of scoping (§ 1501.9 of this chapter)) as a draft and final statement, as is appropriate to the stage of the statement involved, unless the Council approves alternative procedures (§ 1506.12 of this chapter).

(4) May find that changes to the proposed action or new circumstances or information relevant to environmental concerns are not significant and therefore do not require a supplement. The agency should document the finding consistent with its agency NEPA procedures (§ 1507.3 of

this chapter), or, if necessary, in a finding of no significant impact supported by an environmental assessment.

### § 1502.10   Recommended format.

(a) Agencies shall use a format for environmental impact statements that will encourage good analysis and clear presentation of the alternatives including the proposed action. Agencies should use the following standard format for environmental impact statements unless the agency determines that there is a more effective format for communication:

(1) Cover.

(2) Summary.

(3) Table of contents.

(4) Purpose of and need for action.

(5) Alternatives including the proposed action (sections 102(2)(C)(iii) and 102(2)(E) of NEPA).

(6) Affected environment and environmental consequences (especially sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA).

(7) Submitted alternatives, information, and analyses.

(8) List of preparers.

(9) Appendices (if any).

(b) If an agency uses a different format, it shall include paragraphs (a)(1) through (8) of this section, as further described in §§ 1502.11 through 1502.19, in any appropriate format.

### § 1502.11   Cover.

The cover shall not exceed one page and include:

(a) A list of the responsible agencies, including the lead agency and any cooperating agencies.

(b) The title of the proposed action that is the subject of the statement (and, if appropriate, the titles of related cooperating agency actions), together with the State(s) and county(ies) (or other jurisdiction(s), if applicable) where the action is located.

(c) The name, address, and telephone number of the person at the agency who can supply further information.

(d) A designation of the statement as a draft, final, or draft or final supplement.

(e) A one-paragraph abstract of the statement.

(f) The date by which the agency must receive comments (computed in cooperation with EPA under § 1506.11 of this chapter).

(g) For the final environmental impact statement, the estimated total cost to prepare both the draft and final environmental impact statement, including the costs of agency full-time equivalent (FTE) personnel hours, contractor costs, and other direct costs.

If practicable and noted where not practicable, agencies also should include costs incurred by cooperating and participating agencies, applicants, and contractors.

### § 1502.12   Summary.

Each environmental impact statement shall contain a summary that adequately and accurately summarizes the statement. The summary shall stress the major conclusions, areas of disputed issues raised by agencies and the public, and the issues to be resolved (including the choice among alternatives). The summary normally will not exceed 15 pages.

### § 1502.13   Purpose and need.

The statement shall briefly specify the underlying purpose and need for the proposed action. When an agency's statutory duty is to review an application for authorization, the agency shall base the purpose and need on the goals of the applicant and the agency's authority.

### § 1502.14   Alternatives including the proposed action.

The alternatives section should present the environmental impacts of the proposed action and the alternatives in comparative form based on the information and analysis presented in the sections on the affected environment (§ 1502.15) and the environmental consequences (§ 1502.16). In this section, agencies shall:

(a) Evaluate reasonable alternatives to the proposed action, and, for alternatives that the agency eliminated from detailed study, briefly discuss the reasons for their elimination.

(b) Discuss each alternative considered in detail, including the proposed action, so that reviewers may evaluate their comparative merits.

(c) Include the no action alternative.

(d) Identify the agency's preferred alternative or alternatives, if one or more exists, in the draft statement and identify such alternative in the final statement unless another law prohibits the expression of such a preference.

(e) Include appropriate mitigation measures not already included in the proposed action or alternatives.

(f) Limit their consideration to a reasonable number of alternatives.

### § 1502.15   Affected environment.

The environmental impact statement shall succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration, including the reasonably foreseeable environmental trends and planned actions in the area(s). The environmental impact statement may

combine the description with evaluation of the environmental consequences (§ 1502.16), and it shall be no longer than is necessary to understand the effects of the alternatives. Data and analyses in a statement shall be commensurate with the importance of the impact, with less important material summarized, consolidated, or simply referenced. Agencies shall avoid useless bulk in statements and shall concentrate effort and attention on important issues. Verbose descriptions of the affected environment are themselves no measure of the adequacy of an environmental impact statement.

### § 1502.16 Environmental consequences.

(a) The environmental consequences section forms the scientific and analytic basis for the comparisons under § 1502.14. It shall consolidate the discussions of those elements required by sections 102(2)(C)(i), (ii), (iv), and (v) of NEPA that are within the scope of the statement and as much of section 102(2)(C)(iii) of NEPA as is necessary to support the comparisons. This section should not duplicate discussions in § 1502.14. The discussion shall include:

(1) The environmental impacts of the proposed action and reasonable alternatives to the proposed action and the significance of those impacts. The comparison of the proposed action and reasonable alternatives shall be based on this discussion of the impacts.

(2) Any adverse environmental effects that cannot be avoided should the proposal be implemented.

(3) The relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity.

(4) Any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented.

(5) Possible conflicts between the proposed action and the objectives of Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned. (§ 1506.2(d) of this chapter)

(6) Energy requirements and conservation potential of various alternatives and mitigation measures.

(7) Natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures.

(8) Urban quality, historic and cultural resources, and the design of the built environment, including the reuse and conservation potential of various alternatives and mitigation measures.

(9) Means to mitigate adverse environmental impacts (if not fully covered under § 1502.14(e)).

(10) Where applicable, economic and technical considerations, including the economic benefits of the proposed action.

(b) Economic or social effects by themselves do not require preparation of an environmental impact statement. However, when the agency determines that economic or social and natural or physical environmental effects are interrelated, the environmental impact statement shall discuss and give appropriate consideration to these effects on the human environment.

### § 1502.17 Summary of submitted alternatives, information, and analyses.

(a) The draft environmental impact statement shall include a summary that identifies all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters during the scoping process for consideration by the lead and cooperating agencies in developing the environmental impact statement.

(1) The agency shall append to the draft environmental impact statement or otherwise publish all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process that identified alternatives, information, and analyses for the agency's consideration.

(2) Consistent with § 1503.1(a)(3) of this chapter, the lead agency shall invite comment on the summary identifying all submitted alternatives, information, and analyses in the draft environmental impact statement.

(b) The final environmental impact statement shall include a summary that identifies all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agencies in developing the final environmental impact statement.

### § 1502.18 List of preparers.

The environmental impact statement shall list the names, together with their qualifications (expertise, experience, professional disciplines), of the persons who were primarily responsible for preparing the environmental impact statement or significant background papers, including basic components of the statement. Where possible, the environmental impact statement shall identify the persons who are responsible for a particular analysis, including analyses in background papers. Normally the list will not exceed two pages.

### § 1502.19 Appendix.

If an agency prepares an appendix, the agency shall publish it with the environmental impact statement, and it shall consist of:

(a) Material prepared in connection with an environmental impact statement (as distinct from material that is not so prepared and is incorporated by reference (§ 1501.12 of this chapter)).

(b) Material substantiating any analysis fundamental to the impact statement.

(c) Material relevant to the decision to be made.

(d) For draft environmental impact statements, all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process that identified alternatives, information, and analyses for the agency's consideration.

(e) For final environmental impact statements, the comment summaries and responses consistent with § 1503.4 of this chapter.

### § 1502.20 Publication of the environmental impact statement.

Agencies shall publish the entire draft and final environmental impact statements and unchanged statements as provided in § 1503.4(c) of this chapter. The agency shall transmit the entire statement electronically (or in paper copy, if so requested due to economic or other hardship) to:

(a) Any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved and any appropriate Federal, State, Tribal, or local agency authorized to develop and enforce environmental standards.

(b) The applicant, if any.

(c) Any person, organization, or agency requesting the entire environmental impact statement.

(d) In the case of a final environmental impact statement, any person, organization, or agency that submitted substantive comments on the draft.

### § 1502.21 Incomplete or unavailable information.

(a) When an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement, and there is incomplete or unavailable information, the agency shall make clear that such information is lacking.

(b) If the incomplete but available information relevant to reasonably foreseeable significant adverse impacts is essential to a reasoned choice among alternatives, and the overall costs of obtaining it are not unreasonable, the agency shall include the information in the environmental impact statement.

(c) If the information relevant to reasonably foreseeable significant adverse impacts cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known, the agency shall include within the environmental impact statement:

(1) A statement that such information is incomplete or unavailable;

(2) A statement of the relevance of the incomplete or unavailable information to evaluating reasonably foreseeable significant adverse impacts on the human environment;

(3) A summary of existing credible scientific evidence that is relevant to evaluating the reasonably foreseeable significant adverse impacts on the human environment; and

(4) The agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community.

(d) For the purposes of this section, "reasonably foreseeable" includes impacts that have catastrophic consequences, even if their probability of occurrence is low, provided that the analysis of the impacts is supported by credible scientific evidence, is not based on pure conjecture, and is within the rule of reason.

### § 1502.22   Cost-benefit analysis.

If the agency is considering a cost-benefit analysis for the proposed action relevant to the choice among alternatives with different environmental effects, the agency shall incorporate the cost-benefit analysis by reference or append it to the statement as an aid in evaluating the environmental consequences. In such cases, to assess the adequacy of compliance with section 102(2)(B) of NEPA (ensuring appropriate consideration of unquantified environmental amenities and values in decision making, along with economical and technical considerations), the statement shall discuss the relationship between that analysis and any analyses of unquantified environmental impacts, values, and amenities. For purposes of complying with the Act, agencies need not display the weighing of the merits and drawbacks of the various alternatives in a monetary cost-benefit analysis and should not do so when there are important qualitative considerations. However, an environmental impact statement should at least indicate those considerations, including factors not related to environmental quality, that are likely to be relevant and important to a decision.

### § 1502.23   Methodology and scientific accuracy.

Agencies shall ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents. Agencies shall make use of reliable existing data and resources. Agencies may make use of any reliable data sources, such as remotely gathered information or statistical models. They shall identify any methodologies used and shall make explicit reference to the scientific and other sources relied upon for conclusions in the statement. Agencies may place discussion of methodology in an appendix. Agencies are not required to undertake new scientific and technical research to inform their analyses. Nothing in this section is intended to prohibit agencies from compliance with the requirements of other statutes pertaining to scientific and technical research.

### § 1502.24   Environmental review and consultation requirements.

(a) To the fullest extent possible, agencies shall prepare draft environmental impact statements concurrent and integrated with environmental impact analyses and related surveys and studies required by all other Federal environmental review laws and Executive orders applicable to the proposed action, including the Fish and Wildlife Coordination Act (16 U.S.C. 661 *et seq.*), the National Historic Preservation Act of 1966 (54 U.S.C. 300101 *et seq.*), and the Endangered Species Act of 1973 (16 U.S.C. 1531 *et seq.*).

(b) The draft environmental impact statement shall list all Federal permits, licenses, and other authorizations that must be obtained in implementing the proposal. If it is uncertain whether a Federal permit, license, or other authorization is necessary, the draft environmental impact statement shall so indicate.

■ 5. Revise part 1503 to read as follows:

## PART 1503—COMMENTING ON ENVIRONMENTAL IMPACT STATEMENTS

Sec.
1503.1   Inviting comments and requesting information and analyses.
1503.2   Duty to comment.
1503.3   Specificity of comments and information.
1503.4   Response to comments.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1503.1   Inviting comments and requesting information and analyses.

(a) After preparing a draft environmental impact statement and before preparing a final environmental impact statement the agency shall:

(1) Obtain the comments of any Federal agency that has jurisdiction by law or special expertise with respect to any environmental impact involved or is authorized to develop and enforce environmental standards.

(2) Request the comments of:

(i) Appropriate State, Tribal, and local agencies that are authorized to develop and enforce environmental standards;

(ii) State, Tribal, or local governments that may be affected by the proposed action;

(iii) Any agency that has requested it receive statements on actions of the kind proposed;

(iv) The applicant, if any; and

(v) The public, affirmatively soliciting comments in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed action.

(3) Invite comment specifically on the submitted alternatives, information, and analyses and the summary thereof (§ 1502.17 of this chapter).

(b) An agency may request comments on a final environmental impact statement before the final decision and set a deadline for providing such comments. Other agencies or persons may make comments consistent with the time periods under § 1506.11 of this chapter.

(c) An agency shall provide for electronic submission of public comments, with reasonable measures to ensure the comment process is accessible to affected persons.

### § 1503.2   Duty to comment.

Cooperating agencies and agencies that are authorized to develop and enforce environmental standards shall comment on statements within their jurisdiction, expertise, or authority within the time period specified for comment in § 1506.11 of this chapter. A Federal agency may reply that it has no comment. If a cooperating agency is satisfied that the environmental impact statement adequately reflects its views, it should reply that it has no comment.

### § 1503.3   Specificity of comments and information.

(a) To promote informed decision making, comments on an environmental impact statement or on a proposed action shall be as specific as possible, may address either the adequacy of the statement or the merits of the alternatives discussed or both, and shall

provide as much detail as necessary to meaningfully participate and fully inform the agency of the commenter's position. Comments should explain why the issues raised are important to the consideration of potential environmental impacts and alternatives to the proposed action, as well as economic and employment impacts, and other impacts affecting the quality of the human environment. Comments should reference the corresponding section or page number of the draft environmental impact statement, propose specific changes to those parts of the statement, where possible, and include or describe the data sources and methodologies supporting the proposed changes.

(b) Comments on the submitted alternatives, information, and analyses and summary thereof (§ 1502.17 of this chapter) should be as specific as possible. Comments and objections of any kind shall be raised within the comment period on the draft environmental impact statement provided by the agency, consistent with § 1506.11 of this chapter. If the agency requests comments on the final environmental impact statement before the final decision, consistent with § 1503.1(b), comments and objections of any kind shall be raised within the comment period provided by the agency. Comments and objections of any kind not provided within the comment period(s) shall be considered unexhausted and forfeited, consistent with § 1500.3(b) of this chapter.

(c) When a participating agency criticizes a lead agency's predictive methodology, the participating agency should describe the alternative methodology that it prefers and why.

(d) A cooperating agency shall specify in its comments whether it needs additional information to fulfill other applicable environmental reviews or consultation requirements and what information it needs. In particular, it shall specify any additional information it needs to comment adequately on the draft statement's analysis of significant site-specific effects associated with the granting or approving by that cooperating agency of necessary Federal permits, licenses, or authorizations.

(e) When a cooperating agency with jurisdiction by law specifies mitigation measures it considers necessary to allow the agency to grant or approve applicable permit, license, or related requirements or concurrences, the cooperating agency shall cite to its applicable statutory authority.

### § 1503.4    Response to comments.

(a) An agency preparing a final environmental impact statement shall consider substantive comments timely submitted during the public comment period. The agency may respond to individual comments or groups of comments. In the final environmental impact statement, the agency may respond by:

(1) Modifying alternatives including the proposed action.

(2) Developing and evaluating alternatives not previously given serious consideration by the agency.

(3) Supplementing, improving, or modifying its analyses.

(4) Making factual corrections.

(5) Explaining why the comments do not warrant further agency response, recognizing that agencies are not required to respond to each comment.

(b) An agency shall append or otherwise publish all substantive comments received on the draft statement (or summaries thereof where the response has been exceptionally voluminous).

(c) If changes in response to comments are minor and are confined to the responses described in paragraphs (a)(4) and (5) of this section, an agency may write any changes on errata sheets and attach the responses to the statement instead of rewriting the draft statement. In such cases, only the comments, the responses, and the changes and not the final statement need be published (§ 1502.20 of this chapter). The agency shall file the entire document with a new cover sheet with the Environmental Protection Agency as the final statement (§ 1506.10 of this chapter).

■ 6. Revise part 1504 to read as follows:

## PART 1504—PRE–DECISIONAL REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY

Sec.
1504.1    Purpose.
1504.2    Criteria for referral.
1504.3    Procedure for referrals and response.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1504.1    Purpose.

(a) This part establishes procedures for referring to the Council Federal interagency disagreements concerning proposed major Federal actions that might cause unsatisfactory environmental effects. It provides means for early resolution of such disagreements.

(b) Section 309 of the Clean Air Act (42 U.S.C. 7609) directs the Administrator of the Environmental Protection Agency to review and comment publicly on the environmental impacts of Federal activities, including actions for which agencies prepare environmental impact statements. If, after this review, the Administrator determines that the matter is "unsatisfactory from the standpoint of public health or welfare or environmental quality," section 309 directs that the matter be referred to the Council (hereafter "environmental referrals").

(c) Under section 102(2)(C) of NEPA (42 U.S.C. 4332(2)(C)), other Federal agencies may prepare similar reviews of environmental impact statements, including judgments on the acceptability of anticipated environmental impacts. These reviews must be made available to the President, the Council, and the public.

### § 1504.2    Criteria for referral.

Environmental referrals should be made to the Council only after concerted, timely (as early as practicable in the process), but unsuccessful attempts to resolve differences with the lead agency. In determining what environmental objections to the matter are appropriate to refer to the Council, an agency should weigh potential adverse environmental impacts, considering:

(a) Possible violation of national environmental standards or policies;

(b) Severity;

(c) Geographical scope;

(d) Duration;

(e) Importance as precedents;

(f) Availability of environmentally preferable alternatives; and

(g) Economic and technical considerations, including the economic costs of delaying or impeding the decision making of the agencies involved in the action.

### § 1504.3    Procedure for referrals and response.

(a) A Federal agency making the referral to the Council shall:

(1) Notify the lead agency at the earliest possible time that it intends to refer a matter to the Council unless a satisfactory agreement is reached;

(2) Include such a notification whenever practicable in the referring agency's comments on the environmental assessment or draft environmental impact statement;

(3) Identify any essential information that is lacking and request that the lead agency make it available at the earliest possible time; and

(4) Send copies of the referring agency's views to the Council.

(b) The referring agency shall deliver its referral to the Council no later than 25 days after the lead agency has made the final environmental impact statement available to the Environmental Protection Agency, participating agencies, and the public, and in the case of an environmental assessment, no later than 25 days after the lead agency makes it available. Except when the lead agency grants an extension of this period, the Council will not accept a referral after that date.

(c) The referral shall consist of:

(1) A copy of the letter signed by the head of the referring agency and delivered to the lead agency informing the lead agency of the referral and the reasons for it; and

(2) A statement supported by factual evidence leading to the conclusion that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality. The statement shall:

(i) Identify any disputed material facts and incorporate (by reference if appropriate) agreed upon facts;

(ii) Identify any existing environmental requirements or policies that would be violated by the matter;

(iii) Present the reasons for the referral;

(iv) Contain a finding by the agency whether the issue raised is of national importance because of the threat to national environmental resources or policies or for some other reason;

(v) Review the steps taken by the referring agency to bring its concerns to the attention of the lead agency at the earliest possible time; and

(vi) Give the referring agency's recommendations as to what mitigation alternative, further study, or other course of action (including abandonment of the matter) are necessary to remedy the situation.

(d) No later than 25 days after the referral to the Council, the lead agency may deliver a response to the Council and the referring agency. If the lead agency requests more time and gives assurance that the matter will not go forward in the interim, the Council may grant an extension. The response shall:

(1) Address fully the issues raised in the referral;

(2) Be supported by evidence and explanations, as appropriate; and

(3) Give the lead agency's response to the referring agency's recommendations.

(e) Applicants may provide views in writing to the Council no later than the response.

(f) No later than 25 days after receipt of both the referral and any response or upon being informed that there will be no response (unless the lead agency agrees to a longer time), the Council may take one or more of the following actions:

(1) Conclude that the process of referral and response has successfully resolved the problem.

(2) Initiate discussions with the agencies with the objective of mediation with referring and lead agencies.

(3) Obtain additional views and information.

(4) Determine that the issue is not one of national importance and request the referring and lead agencies to pursue their decision process.

(5) Determine that the referring and lead agencies should further negotiate the issue, and the issue is not appropriate for Council consideration until one or more heads of agencies report to the Council that the agencies' disagreements are irreconcilable.

(6) Publish its findings and recommendations (including, where appropriate, a finding that the submitted evidence does not support the position of an agency).

(7) When appropriate, submit the referral and the response together with the Council's recommendation to the President for action.

(g) The Council shall take no longer than 60 days to complete the actions specified in paragraph (f)(2), (3), or (5) of this section.

(h) The referral process is not intended to create any private rights of action or to be judicially reviewable because any voluntary resolutions by the agency parties do not represent final agency action and instead are only provisional and dependent on later consistent action by the action agencies.

■ 7. Revise part 1505 to read as follows:

## PART 1505—NEPA AND AGENCY DECISION MAKING

Sec.
1505.1    [Reserved]
1505.2    Record of decision in cases requiring environmental impact statements.
1505.3    Implementing the decision.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1505.1    [Reserved]

### § 1505.2    Record of decision in cases requiring environmental impact statements.

(a) At the time of its decision (§ 1506.11 of this chapter) or, if appropriate, its recommendation to Congress, each agency shall prepare and timely publish a concise public record of decision or joint record of decision. The record, which each agency may integrate into any other record it prepares, shall:

(1) State the decision.

(2) Identify alternatives considered by the agency in reaching its decision, specifying the alternative or alternatives considered environmentally preferable. An agency may discuss preferences among alternatives based on relevant factors including economic and technical considerations and agency statutory missions. An agency shall identify and discuss all such factors, including any essential considerations of national policy, that the agency balanced in making its decision and state how those considerations entered into its decision.

(3) State whether the agency has adopted all practicable means to avoid or minimize environmental harm from the alternative selected, and if not, why the agency did not. The agency shall adopt and summarize, where applicable, a monitoring and enforcement program for any enforceable mitigation requirements or commitments.

(b) Informed by the summary of the submitted alternatives, information, and analyses in the final environmental impact statement (§ 1502.17(b) of this chapter), together with any other material in the record that he or she determines to be relevant, the decision maker shall certify in the record of decision that the agency has considered all of the alternatives, information, analyses, and objections submitted by State, Tribal, and local governments and public commenters for consideration by the lead and cooperating agencies in developing the environmental impact statement. Agency environmental impact statements certified in accordance with this section are entitled to a presumption that the agency has considered the submitted alternatives, information, and analyses, including the summary thereof, in the final environmental impact statement (§ 1502.17(b)).

### § 1505.3    Implementing the decision.

Agencies may provide for monitoring to assure that their decisions are carried out and should do so in important cases. Mitigation (§ 1505.2(a)(3)) and other conditions established in the environmental impact statement or during its review and committed as part of the decision shall be implemented by the lead agency or other appropriate consenting agency. The lead agency shall:

(a) Include appropriate conditions in grants, permits, or other approvals.

(b) Condition funding of actions on mitigation.

(c) Upon request, inform cooperating or participating agencies on progress in carrying out mitigation measures that they have proposed and were adopted by the agency making the decision.

(d) Upon request, publish the results of relevant monitoring.

■ 8. Revise part 1506 to read as follows:

## PART 1506—OTHER REQUIREMENTS OF NEPA

Sec.

1506.1   Limitations on actions during NEPA process.
1506.2   Elimination of duplication with State, Tribal, and local procedures.
1506.3   Adoption.
1506.4   Combining documents.
1506.5   Agency responsibility for environmental documents.
1506.6   Public involvement.
1506.7   Further guidance.
1506.8   Proposals for legislation.
1506.9   Proposals for regulations.
1506.10   Filing requirements.
1506.11   Timing of agency action.
1506.12   Emergencies.
1506.13   Effective date.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1506.1   Limitations on actions during NEPA process.

(a) Except as provided in paragraphs (b) and (c) of this section, until an agency issues a finding of no significant impact, as provided in § 1501.6 of this chapter, or record of decision, as provided in § 1505.2 of this chapter, no action concerning the proposal may be taken that would:

(1) Have an adverse environmental impact; or

(2) Limit the choice of reasonable alternatives.

(b) If any agency is considering an application from a non-Federal entity and is aware that the applicant is about to take an action within the agency's jurisdiction that would meet either of the criteria in paragraph (a) of this section, then the agency shall promptly notify the applicant that the agency will take appropriate action to ensure that the objectives and procedures of NEPA are achieved. This section does not preclude development by applicants of plans or designs or performance of other activities necessary to support an application for Federal, State, Tribal, or local permits or assistance. An agency considering a proposed action for Federal funding may authorize such activities, including, but not limited to,

acquisition of interests in land (*e.g.*, fee simple, rights-of-way, and conservation easements), purchase of long lead-time equipment, and purchase options made by applicants.

(c) While work on a required programmatic environmental review is in progress and the action is not covered by an existing programmatic review, agencies shall not undertake in the interim any major Federal action covered by the program that may significantly affect the quality of the human environment unless such action:

(1) Is justified independently of the program;

(2) Is itself accompanied by an adequate environmental review; and

(3) Will not prejudice the ultimate decision on the program. Interim action prejudices the ultimate decision on the program when it tends to determine subsequent development or limit alternatives.

### § 1506.2   Elimination of duplication with State, Tribal, and local procedures.

(a) Federal agencies are authorized to cooperate with State, Tribal, and local agencies that are responsible for preparing environmental documents, including those prepared pursuant to section 102(2)(D) of NEPA.

(b) To the fullest extent practicable unless specifically prohibited by law, agencies shall cooperate with State, Tribal, and local agencies to reduce duplication between NEPA and State, Tribal, and local requirements, including through use of studies, analysis, and decisions developed by State, Tribal, or local agencies. Except for cases covered by paragraph (a) of this section, such cooperation shall include, to the fullest extent practicable:

(1) Joint planning processes.

(2) Joint environmental research and studies.

(3) Joint public hearings (except where otherwise provided by statute).

(4) Joint environmental assessments.

(c) To the fullest extent practicable unless specifically prohibited by law, agencies shall cooperate with State, Tribal, and local agencies to reduce duplication between NEPA and comparable State, Tribal, and local requirements. Such cooperation shall include, to the fullest extent practicable, joint environmental impact statements. In such cases, one or more Federal agencies and one or more State, Tribal, or local agencies shall be joint lead agencies. Where State or Tribal laws or local ordinances have environmental impact statement or similar requirements in addition to but not in conflict with those in NEPA, Federal agencies may cooperate in fulfilling

these requirements, as well as those of Federal laws, so that one document will comply with all applicable laws.

(d) To better integrate environmental impact statements into State, Tribal, or local planning processes, environmental impact statements shall discuss any inconsistency of a proposed action with any approved State, Tribal, or local plan or law (whether or not federally sanctioned). Where an inconsistency exists, the statement should describe the extent to which the agency would reconcile its proposed action with the plan or law. While the statement should discuss any inconsistencies, NEPA does not require reconciliation.

### § 1506.3   Adoption.

(a) *Generally.* An agency may adopt a Federal draft or final environmental impact statement, environmental assessment, or portion thereof, or categorical exclusion determination provided that the statement, assessment, portion thereof, or determination meets the standards for an adequate statement, assessment, or determination under the regulations in this subchapter.

(b) *Environmental impact statements.* (1) If the actions covered by the original environmental impact statement and the proposed action are substantially the same, the adopting agency shall republish it as a final statement consistent with § 1506.10. If the actions are not substantially the same, the adopting agency shall treat the statement as a draft and republish it, consistent with § 1506.10.

(2) Notwithstanding paragraph (b)(1) of this section, a cooperating agency may adopt in its record of decision without republishing the environmental impact statement of a lead agency when, after an independent review of the statement, the cooperating agency concludes that its comments and suggestions have been satisfied.

(c) *Environmental assessments.* If the actions covered by the original environmental assessment and the proposed action are substantially the same, the adopting agency may adopt the environmental assessment in its finding of no significant impact and provide notice consistent with § 1501.6 of this chapter.

(d) *Categorical exclusions.* An agency may adopt another agency's determination that a categorical exclusion applies to a proposed action if the action covered by the original categorical exclusion determination and the adopting agency's proposed action are substantially the same. The agency shall document the adoption.

(e) *Identification of certain circumstances.* The adopting agency

shall specify if one of the following circumstances is present:

(1) The agency is adopting an assessment or statement that is not final within the agency that prepared it.

(2) The action assessed in the assessment or statement is the subject of a referral under part 1504 of this chapter.

(3) The assessment or statement's adequacy is the subject of a judicial action that is not final.

### § 1506.4  Combining documents.

Agencies should combine, to the fullest extent practicable, any environmental document with any other agency document to reduce duplication and paperwork.

### § 1506.5  Agency responsibility for environmental documents.

(a) *Responsibility.* The agency is responsible for the accuracy, scope (§ 1501.9(e) of this chapter), and content of environmental documents prepared by the agency or by an applicant or contractor under the supervision of the agency.

(b) *Information.* An agency may require an applicant to submit environmental information for possible use by the agency in preparing an environmental document. An agency also may direct an applicant or authorize a contractor to prepare an environmental document under the supervision of the agency.

(1) The agency should assist the applicant by outlining the types of information required or, for the preparation of environmental documents, shall provide guidance to the applicant or contractor and participate in their preparation.

(2) The agency shall independently evaluate the information submitted or the environmental document and shall be responsible for its accuracy, scope, and contents.

(3) The agency shall include in the environmental document the names and qualifications of the persons preparing environmental documents, and conducting the independent evaluation of any information submitted or environmental documents prepared by an applicant or contractor, such as in the list of preparers for environmental impact statements (§ 1502.18 of this chapter). It is the intent of this paragraph (b)(3) that acceptable work not be redone, but that it be verified by the agency.

(4) Contractors or applicants preparing environmental assessments or environmental impact statements shall submit a disclosure statement to the lead agency that specifies any financial or other interest in the outcome of the action. Such statement need not include privileged or confidential trade secrets or other confidential business information.

(5) Nothing in this section is intended to prohibit any agency from requesting any person, including the applicant, to submit information to it or to prohibit any person from submitting information to any agency for use in preparing environmental documents.

### § 1506.6  Public involvement.

Agencies shall:

(a) Make diligent efforts to involve the public in preparing and implementing their NEPA procedures (§ 1507.3 of this chapter).

(b) Provide public notice of NEPA-related hearings, public meetings, and other opportunities for public involvement, and the availability of environmental documents so as to inform those persons and agencies who may be interested or affected by their proposed actions. When selecting appropriate methods for providing public notice, agencies shall consider the ability of affected persons and agencies to access electronic media.

(1) In all cases, the agency shall notify those who have requested notice on an individual action.

(2) In the case of an action with effects of national concern, notice shall include publication in the **Federal Register**. An agency may notify organizations that have requested regular notice.

(3) In the case of an action with effects primarily of local concern, the notice may include:

(i) Notice to State, Tribal, and local agencies that may be interested or affected by the proposed action.

(ii) Notice to interested or affected State, Tribal, and local governments.

(iii) Following the affected State or Tribe's public notice procedures for comparable actions.

(iv) Publication in local newspapers (in papers of general circulation rather than legal papers).

(v) Notice through other local media.

(vi) Notice to potentially interested community organizations including small business associations.

(vii) Publication in newsletters that may be expected to reach potentially interested persons.

(viii) Direct mailing to owners and occupants of nearby or affected property.

(ix) Posting of notice on and off site in the area where the action is to be located.

(x) Notice through electronic media (*e.g.*, a project or agency website, email, or social media).

(c) Hold or sponsor public hearings, public meetings, or other opportunities for public involvement whenever appropriate or in accordance with statutory requirements applicable to the agency. Agencies may conduct public hearings and public meetings by means of electronic communication except where another format is required by law. When selecting appropriate methods for public involvement, agencies shall consider the ability of affected entities to access electronic media.

(d) Solicit appropriate information from the public.

(e) Explain in its procedures where interested persons can get information or status reports on environmental impact statements and other elements of the NEPA process.

(f) Make environmental impact statements, the comments received, and any underlying documents available to the public pursuant to the provisions of the Freedom of Information Act, as amended (5 U.S.C. 552).

### § 1506.7  Further guidance.

(a) The Council may provide further guidance concerning NEPA and its procedures consistent with Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects (August 5, 2017), Executive Order 13891, Promoting the Rule of Law Through Improved Agency Guidance Documents (October 9, 2019), and any other applicable Executive orders.

(b) To the extent that Council guidance issued prior to September 14, 2020 is in conflict with this subchapter, the provisions of this subchapter apply.

### § 1506.8  Proposals for legislation.

(a) When developing legislation, agencies shall integrate the NEPA process for proposals for legislation significantly affecting the quality of the human environment with the legislative process of the Congress. Technical drafting assistance does not by itself constitute a legislative proposal. Only the agency that has primary responsibility for the subject matter involved will prepare a legislative environmental impact statement.

(b) A legislative environmental impact statement is the detailed statement required by law to be included in an agency's recommendation or report on a legislative proposal to Congress. A legislative environmental impact statement shall be considered part of the formal transmittal of a legislative proposal to Congress; however, it may be transmitted to Congress up to 30 days

later in order to allow time for completion of an accurate statement that can serve as the basis for public and Congressional debate. The statement must be available in time for Congressional hearings and deliberations.

(c) Preparation of a legislative environmental impact statement shall conform to the requirements of the regulations in this subchapter, except as follows:

(1) There need not be a scoping process.

(2) Agencies shall prepare the legislative statement in the same manner as a draft environmental impact statement and need not prepare a final statement unless any of the following conditions exist. In such cases, the agency shall prepare and publish the statements consistent with §§ 1503.1 of this chapter and 1506.11:

(i) A Congressional committee with jurisdiction over the proposal has a rule requiring both draft and final environmental impact statements.

(ii) The proposal results from a study process required by statute (such as those required by the Wild and Scenic Rivers Act (16 U.S.C. 1271 *et seq.*)).

(iii) Legislative approval is sought for Federal or federally assisted construction or other projects that the agency recommends be located at specific geographic locations. For proposals requiring an environmental impact statement for the acquisition of space by the General Services Administration, a draft statement shall accompany the Prospectus or the 11(b) Report of Building Project Surveys to the Congress, and a final statement shall be completed before site acquisition.

(iv) The agency decides to prepare draft and final statements.

(d) Comments on the legislative statement shall be given to the lead agency, which shall forward them along with its own responses to the Congressional committees with jurisdiction.

### § 1506.9    Proposals for regulations.

Where the proposed action is the promulgation of a rule or regulation, procedures and documentation pursuant to other statutory or Executive order requirements may satisfy one or more requirements of this subchapter. When a procedure or document satisfies one or more requirements of this subchapter, the agency may substitute it for the corresponding requirements in this subchapter and need not carry out duplicative procedures or documentation. Agencies shall identify which corresponding requirements in this subchapter are satisfied and consult

with the Council to confirm such determinations.

### § 1506.10    Filing requirements.

(a) Agencies shall file environmental impact statements together with comments and responses with the Environmental Protection Agency (EPA), Office of Federal Activities, consistent with EPA's procedures.

(b) Agencies shall file statements with the EPA no earlier than they are also transmitted to participating agencies and made available to the public. EPA may issue guidelines to agencies to implement its responsibilities under this section and § 1506.11.

### § 1506.11    Timing of agency action.

(a) The Environmental Protection Agency shall publish a notice in the **Federal Register** each week of the environmental impact statements filed since its prior notice. The minimum time periods set forth in this section are calculated from the date of publication of this notice.

(b) Unless otherwise provided by law, including statutory provisions for combining a final environmental impact statement and record of decision, Federal agencies may not make or issue a record of decision under § 1505.2 of this chapter for the proposed action until the later of the following dates:

(1) 90 days after publication of the notice described in paragraph (a) of this section for a draft environmental impact statement.

(2) 30 days after publication of the notice described in paragraph (a) of this section for a final environmental impact statement.

(c) An agency may make an exception to the rule on timing set forth in paragraph (b) of this section for a proposed action in the following circumstances:

(1) Some agencies have a formally established appeal process after publication of the final environmental impact statement that allows other agencies or the public to take appeals on a decision and make their views known. In such cases where a real opportunity exists to alter the decision, the agency may make and record the decision at the same time it publishes the environmental impact statement. This means that the period for appeal of the decision and the 30-day period set forth in paragraph (b)(2) of this section may run concurrently. In such cases, the environmental impact statement shall explain the timing and the public's right of appeal and provide notification consistent with § 1506.10; or

(2) An agency engaged in rulemaking under the Administrative Procedure Act

or other statute for the purpose of protecting the public health or safety may waive the time period in paragraph (b)(2) of this section, publish a decision on the final rule simultaneously with publication of the notice of the availability of the final environmental impact statement, and provide notification consistent with § 1506.10, as described in paragraph (a) of this section.

(d) If an agency files the final environmental impact statement within 90 days of the filing of the draft environmental impact statement with the Environmental Protection Agency, the decision-making period and the 90-day period may run concurrently. However, subject to paragraph (e) of this section, agencies shall allow at least 45 days for comments on draft statements.

(e) The lead agency may extend the minimum periods in paragraph (b) of this section and provide notification consistent with § 1506.10. Upon a showing by the lead agency of compelling reasons of national policy, the Environmental Protection Agency may reduce the minimum periods and, upon a showing by any other Federal agency of compelling reasons of national policy, also may extend the minimum periods, but only after consultation with the lead agency. The lead agency may modify the minimum periods when necessary to comply with other specific statutory requirements. (§ 1507.3(f)(2) of this chapter) Failure to file timely comments shall not be a sufficient reason for extending a period. If the lead agency does not concur with the extension of time, EPA may not extend it for more than 30 days. When the Environmental Protection Agency reduces or extends any period of time it shall notify the Council.

### § 1506.12    Emergencies.

Where emergency circumstances make it necessary to take an action with significant environmental impact without observing the provisions of the regulations in this subchapter, the Federal agency taking the action should consult with the Council about alternative arrangements for compliance with section 102(2)(C) of NEPA. Agencies and the Council will limit such arrangements to actions necessary to control the immediate impacts of the emergency. Other actions remain subject to NEPA review.

### § 1506.13    Effective date.

The regulations in this subchapter apply to any NEPA process begun after September 14, 2020. An agency may apply the regulations in this subchapter to ongoing activities and environmental

documents begun before September 14, 2020.

■ 9. Revise part 1507 to read as follows:

## PART 1507—AGENCY COMPLIANCE

Sec.
1507.1  Compliance.
1507.2  Agency capability to comply.
1507.3  Agency NEPA procedures.
1507.4  Agency NEPA program information.

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1507.1  Compliance.

All agencies of the Federal Government shall comply with the regulations in this subchapter.

### § 1507.2  Agency capability to comply.

Each agency shall be capable (in terms of personnel and other resources) of complying with the requirements of NEPA and the regulations in this subchapter. Such compliance may include use of the resources of other agencies, applicants, and other participants in the NEPA process, but the agency using the resources shall itself have sufficient capability to evaluate what others do for it and account for the contributions of others. Agencies shall:

(a) Fulfill the requirements of section 102(2)(A) of NEPA to utilize a systematic, interdisciplinary approach that will ensure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making that may have an impact on the human environment. Agencies shall designate a senior agency official to be responsible for overall review of agency NEPA compliance, including resolving implementation issues.

(b) Identify methods and procedures required by section 102(2)(B) of NEPA to ensure that presently unquantified environmental amenities and values may be given appropriate consideration.

(c) Prepare adequate environmental impact statements pursuant to section 102(2)(C) of NEPA and cooperate on the development of statements in the areas where the agency has jurisdiction by law or special expertise or is authorized to develop and enforce environmental standards.

(d) Study, develop, and describe alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources, consistent with section 102(2)(E) of NEPA.

(e) Comply with the requirements of section 102(2)(H) of NEPA that the agency initiate and utilize ecological information in the planning and development of resource-oriented projects.

(f) Fulfill the requirements of sections 102(2)(F), 102(2)(G), and 102(2)(I), of NEPA, Executive Order 11514, Protection and Enhancement of Environmental Quality, section 2, as amended by Executive Order 11991, Relating to Protection and Enhancement of Environmental Quality, and Executive Order 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting for Infrastructure Projects.

### § 1507.3  Agency NEPA procedures.

(a) Where existing agency NEPA procedures are inconsistent with the regulations in this subchapter, the regulations in this subchapter shall apply, consistent with § 1506.13 of this chapter, unless there is a clear and fundamental conflict with the requirements of another statute. The Council has determined that the categorical exclusions contained in agency NEPA procedures as of September 14, 2020 are consistent with this subchapter.

(b) No more than 12 months after September 14, 2020, or 9 months after the establishment of an agency, whichever comes later, each agency shall develop or revise, as necessary, proposed procedures to implement the regulations in this subchapter, including to eliminate any inconsistencies with the regulations in this subchapter. When the agency is a department, it may be efficient for major subunits (with the consent of the department) to adopt their own procedures. Except for agency efficiency (see paragraph (c) of this section) or as otherwise required by law, agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in the regulations in this subchapter.

(1) Each agency shall consult with the Council while developing or revising its proposed procedures and before publishing them in the **Federal Register** for comment. Agencies with similar programs should consult with each other and the Council to coordinate their procedures, especially for programs requesting similar information from applicants.

(2) Agencies shall provide an opportunity for public review and review by the Council for conformity with the Act and the regulations in this subchapter before adopting their final procedures. The Council shall complete its review within 30 days of the receipt of the proposed final procedures. Once in effect, the agency shall publish its NEPA procedures and ensure that they are readily available to the public.

(c) Agencies shall adopt, as necessary, agency NEPA procedures to improve agency efficiency and ensure that agencies make decisions in accordance with the Act's procedural requirements. Such procedures shall include:

(1) Designating the major decision points for the agency's principal programs likely to have a significant effect on the human environment and assuring that the NEPA process begins at the earliest reasonable time, consistent with § 1501.2 of this chapter, and aligns with the corresponding decision points.

(2) Requiring that relevant environmental documents, comments, and responses be part of the record in formal rulemaking or adjudicatory proceedings.

(3) Requiring that relevant environmental documents, comments, and responses accompany the proposal through existing agency review processes so that decision makers use the statement in making decisions.

(4) Requiring that the alternatives considered by the decision maker are encompassed by the range of alternatives discussed in the relevant environmental documents and that the decision maker consider the alternatives described in the environmental documents. If another decision document accompanies the relevant environmental documents to the decision maker, agencies are encouraged to make available to the public before the decision is made any part of that document that relates to the comparison of alternatives.

(5) Requiring the combination of environmental documents with other agency documents. Agencies may designate and rely on one or more procedures or documents under other statutes or Executive orders as satisfying some or all of the requirements in this subchapter, and substitute such procedures and documentation to reduce duplication. When an agency substitutes one or more procedures or documents for the requirements in this subchapter, the agency shall identify the respective requirements that are satisfied.

(d) Agency procedures should identify those activities or decisions that are not subject to NEPA, including:

(1) Activities or decisions expressly exempt from NEPA under another statute;

(2) Activities or decisions where compliance with NEPA would clearly

and fundamentally conflict with the requirements of another statute;

(3) Activities or decisions where compliance with NEPA would be inconsistent with Congressional intent expressed in another statute;

(4) Activities or decisions that are non-major Federal actions;

(5) Activities or decisions that are non-discretionary actions, in whole or in part, for which the agency lacks authority to consider environmental effects as part of its decision-making process; and

(6) Actions where the agency has determined that another statute's requirements serve the function of agency compliance with the Act.

(e) Agency procedures shall comply with the regulations in this subchapter except where compliance would be inconsistent with statutory requirements and shall include:

(1) Those procedures required by §§ 1501.2(b)(4) (assistance to applicants) and 1506.6(e) of this chapter (status information).

(2) Specific criteria for and identification of those typical classes of action:

(i) Which normally do require environmental impact statements.

(ii) Which normally do not require either an environmental impact statement or an environmental assessment and do not have a significant effect on the human environment (categorical exclusions (§ 1501.4 of this chapter)). Any procedures under this section shall provide for extraordinary circumstances in which a normally excluded action may have a significant environmental effect. Agency NEPA procedures shall identify when documentation of a categorical exclusion determination is required.

(iii) Which normally require environmental assessments but not necessarily environmental impact statements.

(3) Procedures for introducing a supplement to an environmental assessment or environmental impact statement into its formal administrative record, if such a record exists.

(f) Agency procedures may:

(1) Include specific criteria for providing limited exceptions to the provisions of the regulations in this subchapter for classified proposals. These are proposed actions that are specifically authorized under criteria established by an Executive order or statute to be kept secret in the interest of national defense or foreign policy and are in fact properly classified pursuant to such Executive order or statute. Agencies may safeguard and restrict from public dissemination

environmental assessments and environmental impact statements that address classified proposals in accordance with agencies' own regulations applicable to classified information. Agencies should organize these documents so that classified portions are included as annexes, so that the agencies can make the unclassified portions available to the public.

(2) Provide for periods of time other than those presented in § 1506.11 of this chapter when necessary to comply with other specific statutory requirements, including requirements of lead or cooperating agencies.

(3) Provide that, where there is a lengthy period between the agency's decision to prepare an environmental impact statement and the time of actual preparation, the agency may publish the notice of intent required by § 1501.9(d) of this chapter at a reasonable time in advance of preparation of the draft statement. Agency procedures shall provide for publication of supplemental notices to inform the public of a pause in its preparation of an environmental impact statement and for any agency decision to withdraw its notice of intent to prepare an environmental impact statement.

(4) Adopt procedures to combine its environmental assessment process with its scoping process.

(5) Establish a process that allows the agency to use a categorical exclusion listed in another agency's NEPA procedures after consulting with that agency to ensure the use of the categorical exclusion is appropriate. The process should ensure documentation of the consultation and identify to the public those categorical exclusions the agency may use for its proposed actions. Then, the agency may apply the categorical exclusion to its proposed actions.

### § 1507.4 Agency NEPA program information.

(a) To allow agencies and the public to efficiently and effectively access information about NEPA reviews, agencies shall provide for agency websites or other means to make available environmental documents, relevant notices, and other relevant information for use by agencies, applicants, and interested persons. Such means of publication may include:

(1) Agency planning and environmental documents that guide agency management and provide for public involvement in agency planning processes;

(2) A directory of pending and final environmental documents;

(3) Agency policy documents, orders, terminology, and explanatory materials regarding agency decision-making processes;

(4) Agency planning program information, plans, and planning tools; and

(5) A database searchable by geographic information, document status, document type, and project type.

(b) Agencies shall provide for efficient and effective interagency coordination of their environmental program websites, including use of shared databases or application programming interface, in their implementation of NEPA and related authorities.

■ 10. Revise part 1508 to read as follows:

## PART 1508—DEFINITIONS

Sec.
1508.1    Definitions.
1508.2    [Reserved]

**Authority:** 42 U.S.C. 4321–4347; 42 U.S.C. 4371–4375; 42 U.S.C. 7609; E.O. 11514, 35 FR 4247, 3 CFR, 1966–1970, Comp., p. 902, as amended by E.O. 11991, 42 FR 26967, 3 CFR, 1977 Comp., p. 123; and E.O. 13807, 82 FR 40463, 3 CFR, 2017, Comp., p. 369.

### § 1508.1 Definitions.

The following definitions apply to the regulations in this subchapter. Federal agencies shall use these terms uniformly throughout the Federal Government.

(a) *Act* or *NEPA* means the National Environmental Policy Act, as amended (42 U.S.C. 4321, *et seq.*).

(b) *Affecting* means will or may have an effect on.

(c) *Authorization* means any license, permit, approval, finding, determination, or other administrative decision issued by an agency that is required or authorized under Federal law in order to implement a proposed action.

(d) *Categorical exclusion* means a category of actions that the agency has determined, in its agency NEPA procedures (§ 1507.3 of this chapter), normally do not have a significant effect on the human environment.

(e) *Cooperating agency* means any Federal agency (and a State, Tribal, or local agency with agreement of the lead agency) other than a lead agency that has jurisdiction by law or special expertise with respect to any environmental impact involved in a proposal (or a reasonable alternative) for legislation or other major Federal action that may significantly affect the quality of the human environment.

(f) *Council* means the Council on Environmental Quality established by title II of the Act.

(g) *Effects* or *impacts* means changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives, including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives.

(1) Effects include ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. Effects may also include those resulting from actions that may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial.

(2) A "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy causal chain. Effects do not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action.

(3) An agency's analysis of effects shall be consistent with this paragraph (g). Cumulative impact, defined in 40 CFR 1508.7 (1978), is repealed.

(h) *Environmental assessment* means a concise public document prepared by a Federal agency to aid an agency's compliance with the Act and support its determination of whether to prepare an environmental impact statement or a finding of no significant impact, as provided in § 1501.6 of this chapter.

(i) *Environmental document* means an environmental assessment, environmental impact statement, finding of no significant impact, or notice of intent.

(j) *Environmental impact statement* means a detailed written statement as required by section 102(2)(C) of NEPA.

(k) *Federal agency* means all agencies of the Federal Government. It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office. For the purposes of the regulations in this subchapter, Federal agency also includes States, units of general local government, and Tribal governments assuming NEPA responsibilities from a Federal agency pursuant to statute.

(l) *Finding of no significant impact* means a document by a Federal agency

briefly presenting the reasons why an action, not otherwise categorically excluded (§ 1501.4 of this chapter), will not have a significant effect on the human environment and for which an environmental impact statement therefore will not be prepared.

(m) *Human environment* means comprehensively the natural and physical environment and the relationship of present and future generations of Americans with that environment. (*See also* the definition of "effects" in paragraph (g) of this section.)

(n) *Jurisdiction by law* means agency authority to approve, veto, or finance all or part of the proposal.

(o) *Lead agency* means the agency or agencies, in the case of joint lead agencies, preparing or having taken primary responsibility for preparing the environmental impact statement.

(p) *Legislation* means a bill or legislative proposal to Congress developed by a Federal agency, but does not include requests for appropriations or legislation recommended by the President.

(q) *Major Federal action* or *action* means an activity or decision subject to Federal control and responsibility subject to the following:

(1) Major Federal action does not include the following activities or decisions:

(i) Extraterritorial activities or decisions, which means agency activities or decisions with effects located entirely outside of the jurisdiction of the United States;

(ii) Activities or decisions that are non-discretionary and made in accordance with the agency's statutory authority;

(iii) Activities or decisions that do not result in final agency action under the Administrative Procedure Act or other statute that also includes a finality requirement;

(iv) Judicial or administrative civil or criminal enforcement actions;

(v) Funding assistance solely in the form of general revenue sharing funds with no Federal agency control over the subsequent use of such funds;

(vi) Non-Federal projects with minimal Federal funding or minimal Federal involvement where the agency does not exercise sufficient control and responsibility over the outcome of the project; and

(vii) Loans, loan guarantees, or other forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of such assistance (for example, action does not include farm ownership and operating loan

guarantees by the Farm Service Agency pursuant to 7 U.S.C. 1925 and 1941 through 1949 and business loan guarantees by the Small Business Administration pursuant to 15 U.S.C. 636(a), 636(m), and 695 through 697g).

(2) Major Federal actions may include new and continuing activities, including projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by Federal agencies; new or revised agency rules, regulations, plans, policies, or procedures; and legislative proposals (§ 1506.8 of this chapter).

(3) Major Federal actions tend to fall within one of the following categories:

(i) Adoption of official policy, such as rules, regulations, and interpretations adopted under the Administrative Procedure Act, 5 U.S.C. 551 *et seq.* or other statutes; implementation of treaties and international conventions or agreements, including those implemented pursuant to statute or regulation; formal documents establishing an agency's policies which will result in or substantially alter agency programs.

(ii) Adoption of formal plans, such as official documents prepared or approved by Federal agencies, which prescribe alternative uses of Federal resources, upon which future agency actions will be based.

(iii) Adoption of programs, such as a group of concerted actions to implement a specific policy or plan; systematic and connected agency decisions allocating agency resources to implement a specific statutory program or executive directive.

(iv) Approval of specific projects, such as construction or management activities located in a defined geographic area. Projects include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities.

(r) *Matter* includes for purposes of part 1504 of this chapter:

(1) With respect to the Environmental Protection Agency, any proposed legislation, project, action or regulation as those terms are used in section 309(a) of the Clean Air Act (42 U.S.C. 7609).

(2) With respect to all other agencies, any proposed major Federal action to which section 102(2)(C) of NEPA applies.

(s) *Mitigation* means measures that avoid, minimize, or compensate for effects caused by a proposed action or alternatives as described in an environmental document or record of decision and that have a nexus to those effects. While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation. Mitigation includes:

(1) Avoiding the impact altogether by not taking a certain action or parts of an action.

(2) Minimizing impacts by limiting the degree or magnitude of the action and its implementation.

(3) Rectifying the impact by repairing, rehabilitating, or restoring the affected environment.

(4) Reducing or eliminating the impact over time by preservation and maintenance operations during the life of the action.

(5) Compensating for the impact by replacing or providing substitute resources or environments.

(t) *NEPA process* means all measures necessary for compliance with the requirements of section 2 and title I of NEPA.

(u) *Notice of intent* means a public notice that an agency will prepare and consider an environmental impact statement.

(v) *Page* means 500 words and does not include explanatory maps, diagrams, graphs, tables, and other means of graphically displaying quantitative or geospatial information.

(w) *Participating agency* means a Federal, State, Tribal, or local agency participating in an environmental review or authorization of an action.

(x) *Proposal* means a proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects. A proposal may exist in fact as well as by agency declaration that one exists.

(y) *Publish* and *publication* mean methods found by the agency to efficiently and effectively make environmental documents and information available for review by interested persons, including electronic publication, and adopted by agency NEPA procedures pursuant to § 1507.3 of this chapter.

(z) *Reasonable alternatives* means a reasonable range of alternatives that are technically and economically feasible, meet the purpose and need for the proposed action, and, where applicable, meet the goals of the applicant.

(aa) *Reasonably foreseeable* means sufficiently likely to occur such that a person of ordinary prudence would take it into account in reaching a decision.

(bb) *Referring agency* means the Federal agency that has referred any matter to the Council after a determination that the matter is unsatisfactory from the standpoint of public health or welfare or environmental quality.

(cc) *Scope* consists of the range of actions, alternatives, and impacts to be considered in an environmental impact statement. The scope of an individual statement may depend on its relationships to other statements (§ 1501.11 of this chapter).

(dd) *Senior agency official* means an official of assistant secretary rank or higher (or equivalent) that is designated for overall agency NEPA compliance, including resolving implementation issues.

(ee) *Special expertise* means statutory responsibility, agency mission, or related program experience.

(ff) *Tiering* refers to the coverage of general matters in broader environmental impact statements or environmental assessments (such as national program or policy statements) with subsequent narrower statements or environmental analyses (such as regional or basin-wide program statements or ultimately site-specific statements) incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.

**§ 1508.2   [Reserved]**

**PARTS 1515 THROUGH 1518 [DESIGNATED AS SUBCHAPTER B]**

■ 11. Designate parts 1515 through 1518 as subchapter B and add a heading for newly designated subchapter B to read as follows:

**Subchapter B—Administrative Procedures and Operations**

[FR Doc. 2020–15179 Filed 7–15–20; 4:15 pm]
**BILLING CODE 3225–F0–P**

Exhibit 4 to Declaration of Amy Coyle

**Update to the Regulations Implementing the Procedural Provisions**

**of the National Environmental Policy Act**

**Final Rule Response to Comments**

**RIN 0331–AA03**

**Council on Environmental Quality**

**June 30, 2020**

This "Final Rule Response to Comments" document, together with the preamble to the final rule titled, "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act," presents the responses of the Council on Environmental Quality (CEQ) to the public comments received on the January 10, 2020, notice of proposed rulemaking[1] (NPRM).  CEQ has responded to all substantive issues raised in the public comments.

Many of the comments overlap in various respects.  To avoid redundancy, CEQ incorporates by reference all of its responses below, to the extent relevant, to any individual comment response.  At certain points, CEQ incorporates by reference other specific comment responses.  The fact that a specific comment response is incorporated does not prejudice the general incorporation by reference noted in the previous sentences.

Citation of any case in these comments or in the preamble of the final rule is not intended to endorse the entirety of the analysis in any case.  Any given case may include application of the 1978 regulations in ways that the new regulations eliminate or modify.

---

[1] 85 FR 1684 (Jan. 10, 2020).

i

## Table of Contents

A.    General Comments Regarding the Proposed Rule.................................................... 1

B.    Comments Regarding Changes Throughout Parts 1500–1508.............................. 38

   1.    Addition of "Tribal" Throughout the Rule ..................................................... 40

   2.    Changes from Possible to Practicable............................................................ 45

   3.    Grammatical Changes..................................................................................... 49

   4.    Other Changes Recommended Throughout the Rules ..................................... 49

C.    Comments Regarding the Purpose, Policy, and Mandate (Part 1500)................................. 53

   1.    Purpose and Policy (§ 1500.1) ....................................................................... 53

   2.    Policy Removed and Reserved (§ 1500.2)...................................................... 65

   3.    NEPA Compliance (§ 1500.3) ....................................................................... 67

      i.    Exhaustion........................................................................................... 67

      ii.    Judicial Review ................................................................................... 78

      iii.    Severability ......................................................................................... 83

   4.    Reducing Paperwork and Delay (§§ 1500.4 and 1500.5) ............................... 84

   5.    Agency Authority (§ 1500.6) ......................................................................... 85

D.    Comments Regarding NEPA and Agency Planning (Part 1501)................................ 86

   1.    NEPA Thresholds (§ 1501.1)......................................................................... 86

   2.    Apply NEPA Early in the Process (§ 1501.2) ................................................ 99

   3.    Determine the Appropriate Level of NEPA Review (§ 1501.3)................................... 104

   4.    Categorical Exclusions (CEs) (§ 1501.4)..................................................... 126

   5.    Environmental Assessments (EAs) (§ 1501.5) ............................................ 138

   6.    Findings of No Significant Impact (FONSIs) (§ 1501.6) ............................. 151

   7.    Lead and Cooperating Agencies (§§ 1501.7 and 1501.8)............................. 158

   8.    Scoping (§ 1501.9)....................................................................................... 186

   9.    Time Limits (§ 1501.10) .............................................................................. 200

   10.    Tiering (§ 1501.11) ...................................................................................... 204

   11.    Incorporation by Reference (§ 1501.12) ...................................................... 214

E.    Comments Regarding Environmental Impact Statements (EISs) (Part 1502).................... 219

   1.    Purpose of environmental impact statement (§ 1502.1) ................................ 219

2.    Implementation (§ 1502.2)............................................................................. 221

3.    Major Federal Actions Requiring the Preparation of Environmental Impact Statements

(§ 1502.4)............................................................................................................. 222

4.    Timing (§ 1502.5) ............................................................................................. 227

5.    Page Limits (§ 1502.7)...................................................................................... 228

6.    Draft, Final and Supplemental Statements (§ 1502.9).................................... 230

7.    Recommended Format (§ 1502.10) .................................................................. 243

8.    Cover (§ 1502.11) ............................................................................................. 248

9.    Summary (§ 1502.12) ....................................................................................... 253

10.   Purpose and Need (§ 1502.13).......................................................................... 254

11.   Alternatives Including the Proposed Action (§ 1502.14) ................................. 265

12.   Affected Environment (§ 1502.15).................................................................... 274

13.   Environmental Consequences (§ 1502.16) ....................................................... 278

14.   Submitted Alternatives, Information, and Analyses (§ 1502.17) .................... 291

15.   List of Preparers (§ 1502.18) ........................................................................... 298

16.   Appendix (§ 1502.19)....................................................................................... 298

17.   Publication of the environmental impact statement (§ 1502.20) .................... 298

18.   Incomplete or Unavailable Information (§ 1502.21) ........................................ 299

19.   Cost-Benefit Analysis (§ 1502.22) ................................................................... 310

20.   Methodology and Scientific Accuracy (§ 1502.23)......................................... 312

21.   Environmental review and consultation requirements (§ 1502.24)................. 319

F.    Comments Regarding Commenting on Environmental Impact Statements (Part 1503) .... 321

1.    Inviting Comments and Requesting Information and Analyses (§ 1503.1).................... 321

2.    Duty to Comment (§ 1503.2).......................................................................... 325

3.    Specificity of Comments and Information (§ 1503.3)...................................... 326

4.    Response to Comments (§ 1503.4) .................................................................. 331

G.    Comments Regarding Pre-Decisional Referrals to the Council of Proposed Federal Actions

Determined to Be Environmentally Unsatisfactory (Part 1504)................................... 335

1.    Purpose (§ 1504.1)........................................................................................... 337

2.    Criteria for Referral (§ 1504.2)....................................................................... 338

3.  Procedure for Referrals and Response (§ 1504.3) ........................................................ 339

H.  Comments Regarding NEPA and Agency Decision Making (Part 1505) ......................... 343

1.  Remove and Reserve Agency Decisionmaking Procedures (§ 1505.1) ......................... 343

2.  Record of Decision in Cases Requiring Environmental Impact Statements (§ 1505.2). 343

3.  Implementing the Decision (§ 1505.3) ......................................................................... 350

I.  Comments Regarding Other Requirements of NEPA (Part 1506) .................................... 353

1.  Limitations on Actions during NEPA Process (§ 1506.1) ............................................. 353

2.  Elimination of Duplication with State, Tribal, and Local Procedures (§ 1506.2) .......... 363

3.  Adoption (§ 1506.3) ...................................................................................................... 366

4.  Combining Documents (§ 1506.4) ................................................................................ 379

5.  Agency Responsibility for Environmental Documents (§ 1506.5) ................................ 386

6.  Public Involvement (§ 1506.6) ..................................................................................... 393

7.  Further Guidance (§ 1506.7) ......................................................................................... 407

8.  Proposals for Legislation (§ 1506.8) ............................................................................ 407

9.  Proposals for Regulations (§ 1506.9) ........................................................................... 410

10.  Filing Requirements (§ 1506.10) .................................................................................. 413

11.  Timing of Agency Action (§ 1506.11) .......................................................................... 413

12.  Emergencies (§ 1506.12) .............................................................................................. 416

13.  Effective Date (§ 1506.13) ............................................................................................ 420

J.  Comments Regarding Agency Compliance (Part 1507) .................................................... 423

1.  Compliance (§ 1507.1) .................................................................................................. 423

2.  Agency Capability to Comply (§ 1507.2) ..................................................................... 423

3.  Agency NEPA Procedures (§ 1507.3) ........................................................................... 429

4.  Agency NEPA Program Information (§ 1507.4) ............................................................ 455

K.  Comments Regarding Definitions (Part 1508) .................................................................. 459

1.  Definition of Affecting (§ 1508.1(b)) ........................................................................... 459

2.  Definition of Authorization (§ 1508.1(c)) .................................................................... 461

3.  Definition of Categorical Exclusion (§ 1508.1(d)) ....................................................... 462

4.  Definition of Cooperating Agency (§ 1508.1(e)) .......................................................... 463

5.  Definition of Effects (§ 1508.1(g)) ............................................................................... 463

iv

i.   "But for" Causation................................................................................ 471

ii.   Indirect Effects................................................................................... 479

iii.   Climate Change.................................................................................. 480

iv.   Segmentation...................................................................................... 482

v.   Other Comments on Effects.............................................................. 483

6.   Definition of Environmental Document (§ 1508.1(i)).................................... 487

7.   Definition of Federal Agency (§ 1508.1(k)) ................................................ 488

8.   Definition of Human Environment (§ 1508.1(m))......................................... 490

9.   Definition of Jurisdiction by Law (§ 1508.1(n))........................................... 495

10.   Definition of Major Federal Action (§ 1508.1(q))....................................... 495

11.   Definition of Mitigation (§ 1508.1(s))........................................................ 556

12.   Definition of Page (§ 1508.1(v))................................................................. 561

13.   Definition of Participating Agency (§ 1508.1(w))....................................... 561

14.   Definition of Proposal (§ 1508.1(x)) .......................................................... 562

15.   Definition of Publish and Publication (§ 1508.1(y)) ................................... 563

16.   Reasonable Alternative (§ 1508.1(z))......................................................... 564

17.   Reasonably Foreseeable (§ 1508.1(aa))..................................................... 568

18.   Referring Agency (§ 1508.1(bb)) ............................................................... 572

19.   Special Expertise (§ 1508.1(ee))................................................................ 573

L.   Comments Regarding CEQ Guidance Documents ................................................. 573

M.   Comments Outside the Scope of the Rulemaking .................................................. 580

N.   Comments Regarding the Rulemaking Process ..................................................... 588

O.   Requests for Extension of the Comment Period ................................................... 594

A.      **General Comments Regarding the Proposed Rule**

*Comment*:  Many commenters expressed their support for CEQ's proposal to modernize

its National Environmental Policy Act (NEPA) regulations.  Commenters stated that the proposal

not only would provide for the first comprehensive update to the regulations in over 40 years, but

also would provide for an efficient, effective, and timely environmental review and NEPA

process.  They stated that the proposal would enhance America's economic competitiveness,

create jobs, cut red tape, improve the quality of life for Americans, and promote public health

and safety, and the environment.  They stated that, as the cost and taxpayer expense to comply

with NEPA has grown, so too has the need for building, operating, and maintaining critical

infrastructure, as well as pursuing a wide variety of other important projects for the public good.

Commenters discussed specific benefits related to the efficient deployment of an array of

projects and activities, including the following:  broadband and next-generation communications

services; water supply and delivery infrastructure, and hydropower projects; stewardship of fish

and wildlife resources, and mining minerals essential to traditional, new, and renewable energy

technologies.  They also discussed the benefits to public transit and public works projects,

investment in infrastructure, such as roads, bridges, and railroads, the development of new

renewable and cleaner sources of energy, traditional energy projects, habitat restoration projects,

forest health and management, the U.S. commercial space industry, conservation measures,

construction, manufacturing, and homebuilding.  They also discussed benefits to family farmers,

ranchers, cattle producers, timber harvesters, landowners, and small businesses.  Additionally,

commenters stated that CEQ's NEPA modernization proposal assures that environmental

concerns are thoroughly examined and addressed.  Commenters further stated that the proposal

supports economic growth and would improve quality of life.  Commenters also expressed that

the proposed changes would help reduce unnecessary NEPA-related litigation and provide more consistent outcomes.

*CEQ Response*:  CEQ acknowledges the support for its proposal.  The final rule will modernize the CEQ regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies.  The final rule will clarify regulatory requirements, codify certain guidance and case law relevant to the final regulations, revise the regulations to reflect current technologies and agency practices, eliminate obsolete provisions, and improve general readability.  A timely process that is focused on significant environmental impacts will benefit not only our economy but also our environment, resulting in less congested roadways, sustainable infrastructure, and large-scale habitat restoration.

*Comment*:  Several commenters expressed support for specific changes including CEQ's efforts to clarify terms, including provisions relating to effects, major Federal action, and reasonable alternatives, as well as clarify the application, and scope of the NEPA process; provisions enhancing coordination with States, Tribes, and localities; provisions related to the Administration's One Federal Decision (OFD) policy and Executive Order (E.O.) 13807, titled "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects;"[2] provisions on categorical exclusions (CE), environmental assessments (EA), environmental impact statements (EIS), records of decision (ROD), and findings of no significant impacts (FONSI); provisions that limit a NEPA analysis to what is within an agency's regulatory and jurisdictional authority; provisions that codify and reflect case law and agency best practices; provisions related to incorporating the expertise and perspective

---

[2] 82 FR 40463 (Aug. 24, 2017).

2

of local governments into the NEPA process; provisions establishing presumptive time limits of two years for an EIS and one year for an EA; revisions to allow for the use of functionally compliant documents and processes; updates to reflect technological changes; and provisions to ensure more concise, readable documents that enhance transparent decision making and public participation.

Some commenters also stated that the policy rationale that CEQ has articulated in connection with the proposed rule is consistent with the underlying policy rationale of the 1978 regulations. These commenters pointed to *Andrus v. Sierra Club*, 442 U.S. 347 (1979), in which the Supreme Court upheld CEQ's change in position between its 1970 advisory guidelines and 1978 regulations regarding the application of section 102(2)(C) of NEPA to appropriation requests. Commenters stated that CEQ's proposed rulemaking has involved a similar comprehensive and detailed process.

*CEQ Response*: In this final rule, CEQ revises its regulations consistent with the OFD policy established by E.O. 13807, including development by the lead agency of a joint schedule, procedures to elevate delays or disputes, preparation of a single EIS and a joint ROD, and a two-year presumptive time limit for completion of environmental reviews. In the final rule, CEQ provides direction regarding threshold considerations as to whether NEPA applies to a particular action, clarifications to the terms "effects" and "major Federal action," and adds a definition for the term "reasonable alternatives." CEQ includes provisions in its final rule to modernize, simplify, and accelerate the NEPA process, including through the establishment of presumptive time limits of two years for EISs and one year for EAs. In addition, after *Andrus*, the Supreme Court decided *Nat'l Cable & Telecomm. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967 (2005), where the Court held that changed agency interpretations control under *Chevron* even over prior

3

appellate court precedent that is not premised on step one of *Chevron*, so as to avoid the ossification of statutory law.[3]  For further discussion of the policy rationale and processes relevant to this rulemaking, see sections I and II of the final rule.[4]

*Comment*:  Many commenters were opposed to CEQ's rulemaking for a variety of reasons, stating that the rule will result in more air and water pollution, exacerbate climate change, harm public health, silence the American public, empower corporations, or jeopardize the future environment.  Further, commenters stated that the proposal would be detrimental to current and future generations of Americans because it would undermine their ability to breathe clean air, drink clean water, and protect the Nation's public lands and natural resources  A number of commenters requested that CEQ withdraw its proposal and retain the current NEPA regulations because the current regulations effectively and properly implement NEPA.  Some commenters requested that CEQ withdraw the entire proposal, with the exception of adding Tribes to references to State and local governments.

*CEQ Response*:  Nothing in the final rule changes any requirements under substantive environmental laws, such as the Clean Air Act, Clean Water Act, or ESA, which Congress has enacted as a substantive matter to protect the environment and public health in the United States.  CEQ has not comprehensively updated its NEPA regulations since their promulgation in 1978, more than four decades ago.  Notwithstanding the issuance of guidance, presidential directives,

---

[3] *Brand X.*, 545 U.S. at 982 ("A court's prior judicial construction of a statute trumps an agency construction otherwise entitled to *Chevron* deference only if the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion.  This principle follows from *Chevron* itself.")

[4] In this Final Rule Response to Comments document, CEQ refers to sections I and II when referencing sections I and II of the preamble of CEQ's final rule, "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act."

4

and legislation, the implementation of NEPA and the CEQ regulations can be challenging, lengthy, costly, and complex.  In some cases, the NEPA process and related litigation have slowed or prevented the development of new infrastructure and other important projects.  The final rule builds on past, bipartisan efforts to make the permitting process under NEPA more efficient.

The final rule substantially expands opportunities for public participation.  It requires agencies to provide more information to and solicit input from the public earlier in the process. The final rule also codifies expedited procedures and the OFD policy to promote interagency coordination and more timely and efficient reviews.  The final rule reduces unnecessary paperwork and delays, and promotes better decision making consistent with NEPA's statutory requirements, which the Supreme Court has stated are essentially procedural.  *Vt. Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 558.  The final rule reflects CEQ's consideration of the public comments received on its June 20, 2018, advanced notice of proposed rulemaking (ANPRM)[5] and the NPRM.  Many commenters noted that overly lengthy documents and the time required for the NEPA process remain legitimate concerns despite the NEPA regulations' explicit direction to reduce paperwork and delays.  The final rule will advance the original goals of NEPA and promote better decision making.

*Comment*:  Commenters stated that CEQ has not rationally justified the proposed rule because there is not sufficient data or analysis to support a comprehensive revision.  Commenters stated that CEQ incorrectly concludes that the 1997 NEPA Effectiveness Study, other reports,

---

[5] 83 FR 28591 (June 20, 2018).

and the provisions of E.O. 13807 and the subsequent 2018 OFD memorandum[6] supports the proposed rule's sweeping changes. Commenters stated that CEQ has not adequately evaluated the ability of the 1978 regulations and available tools to address concerns about NEPA's implementation.

*CEQ Response*: Existing sources of data are sufficient to support CEQ's rationale in updating the 1978 regulations. As stated in the preamble to the NPRM, in January 1997, CEQ issued a report, "The National Environmental Policy Act: A Study of Its Effectiveness After Twenty-five Years,"[7] in which CEQ identified matters of concern to participants in the study. These concerns included overly lengthy documents that may not enhance or improve decision making, the increase in costs and time but not necessarily quality when agencies seek to "litigation proof" their documents, the extensive detail of NEPA analyses, and the sometimes confusing overlay of other laws and regulations."[8] In 2003, a NEPA task force composed of Federal agency officials, which the Chairman of CEQ established, issued a report[9] and recommendations to improve and modernize the NEPA process, that led to additional guidance documents and handbooks.

Over the ensuing decades since the NEPA regulations were issued, CEQ has issued over 30 documents to provide guidance and clarifications to assist Federal agencies to implement

---

[6] Memorandum of Understanding Implementing One Federal Decision under Executive Order 13807 (2018) ("OFD MOU"), https://www.whitehouse.gov/wp-content/uploads/2018/04/MOU-One-Federal-Decision-m-18-13-Part-2-1.pdf.

[7] https://ceq.doe.gov/docs/ceq-publications/nepa25fn.pdf.

[8] *Id.*

[9] *See* The NEPA Task Force Report to the Council on Environmental Quality, Modernizing NEPA Implementation (Sept. 2003) ("NEPA Task Force Report"), https://ceq.doe.gov/docs/ceq-publications/report/finalreport.pdf.

NEPA more efficiently and effectively.  Despite CEQ guidance and regulations providing for

concise, timely documents, the documentation and timelines for completing environmental

reviews can be very lengthy, and the process can be complex and costly.  In 2018, CEQ and

Office of Management and Budget (OMB) issued a memorandum titled "One Federal Decision

Framework for the Environmental Review and Authorization Process for Major Infrastructure

Projects under Executive Order 13807" (OFD Framework Guidance).[10]  CEQ and OMB issued

this guidance pursuant to E.O. 13807 to improve agency coordination for infrastructure projects

requiring an EIS and permits or other authorizations from multiple agencies and to improve the

timeliness of the environmental review process.  Consistent with the OFD Framework Guidance,

Federal agencies signed a memorandum of understanding (MOU) committing to implement the

OFD policy for major infrastructure projects, including by committing to establishing a joint

schedule for such projects, preparation of a single EIS and joint ROD, elevation of delays and

dispute resolution, and setting a goal of completing environmental reviews for such projects

within two years.[11]

    *Comment*:  Commenters opposing CEQ's proposal stated that it negates the intent of

NEPA in that agencies will no longer have to look before they leap, undermining the very idea of

impact analysis.  Commenters also stated that the proposal removes the concept of balancing the

management of project development with the cultural and natural environment specifically as it

relates to the manner in which Federal agencies assess effects to cultural resources.  Other

commenters stated that the overall effect of the rule is the weakening of both environmental

---

[10] M–18–13 (Mar. 20, 2018), https://www.whitehouse.gov/wp-content/uploads/2018/04/M-18-13.pdf.

[11] OFD MOU, *supra* note 6.

review standards, and proper mitigation of the environmental impacts of Federal projects. Specifically, commenters suggested there will be catastrophic impacts on birds, wildlands, and marine species and their habitats and the economies that depend on them, because of eliminating indirect and cumulative effects, limiting the range of alternatives, undermining sound science and circumventing scientific analysis, and expanding CEs. Commenters also argued that weakening environmental review, which they see the NPRM as accomplishing, would have economic impacts as well, because infrastructure that is not built to be resilient to climate change results in additional costs for the taxpayer.

*CEQ Response*: For reasons including but not limited to those summarized in the appendix to the Regulatory Impact Analysis for the Final Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act[12] ("RIA Appendix"), the final rule will not have adverse environmental impacts. CEQ's final rule requires agencies to consider all reasonably foreseeable effects of a proposed action that have a reasonably close causal relationship to the proposed action. The final rule does not eliminate consideration of any particular impacts. Further, NEPA is a procedural statute, and the final rule does not change the duty of any Federal agency to comply with all of the substantive requirements that apply under laws passed by Congress to protect the environment and the American people. CEQ expects that improvements to the NEPA process made by the final rule will promote more informed decision making and the development of modern and resilient infrastructure.

---

[12] The Regulatory Impact Analysis for the Final Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act is available under "Supporting Documents" in the docket on www.regulations.gov under docket ID CEQ–2019–0003.

*Comment*:  Commenters stated that CEQ's proposed changes would not enhance the efficiency or timeliness of the NEPA process, but rather create confusion among agencies, project proponents, and the public, and lead to increased litigation, increased project costs, and delayed projects.

*CEQ Response*:  CEQ's final rule will modernize the CEQ regulations to facilitate more efficient, effective, and timely NEPA reviews by simplifying and clarifying regulatory requirements, incorporating key elements of the OFD policy, codifying certain case law and CEQ guidance, updating the regulations to reflect current technologies and agency practices, eliminating obsolete provisions, and improving the format and readability of the regulations. These revisions are expected to reduce litigation and project costs and delays.

*Comment*:  Commenters recommended that CEQ reject the majority of the proposed changes because countless countries have adopted NEPA as an international model for environmental protection and the United States would no longer be a world leader in environmental protection.

*CEQ Response*:  The United States is and will continue to be a global leader in environmental protection.  The final rule modernizes the implementation of NEPA to make the process of gathering and documenting information on environmental impacts more efficient, effective, and timely while maintaining robust analysis to inform decision making.

*Comment*:  A number of commenters suggested that CEQ's proposal undermines their States' ability to protect and preserve historic, archaeological, and cultural resources.  Some commenters stated that the final rule would threaten the interests of States in protecting their residents and environmental resources through public participation and robust, informed decision-making processes for Federal projects under NEPA.

9

*CEQ Response*:  NEPA is a procedural statute and does not affect the applicability or requirements of other Federal, State, Tribal, and local laws that relate to environmental, historic, or other matters, including the National Historic Preservation Act.  CEQ's final rule will reduce duplication by facilitating the use of documents required by other statutes or prepared by State, Tribal, and local agencies to comply with NEPA.  Additionally, under the final rule, an "effect" for purposes of NEPA review can be aesthetic, historic, or cultural provided it otherwise satisfies the applicable definition.  In this final rule, CEQ has made changes to facilitate the use of existing studies, analyses, and environmental documents prepared by States, Tribes, and local governments.

*Comment*:  Commenters asserted that CEQ did not adequately document or analyze the cause of alleged excessive permitting delays and the complexity of NEPA reviews.  Some commenters noted that, while they support the proposed changes to CEQ's regulations, it is individual agency policy and practice in conjunction with case law that has led to lengthy and costly NEPA analyses, not CEQ's regulations.  Commenters also noted that inconsistency of application of the regulations among agencies, through various handbooks, manuals, and policy decisions leads to an unpredictable process.

*CEQ Response*:  While many factors can affect the timeline and length of an EIS, CEQ has concluded that revisions to the CEQ regulations to advance more timely reviews and reduce unnecessary paperwork are warranted.  CEQ has found that the average length of a final EIS is over 600 pages, and that the average timeline for Federal agencies to conduct these reviews is 4 and a half years and some reviews take much longer.  NEPA analyses are frequently challenged in courts, and litigation can unnecessarily delay and increase costs for important projects.  The increased costs and complexity of NEPA reviews and litigation make it very challenging for

10

large and small businesses to plan, finance, and build projects in the United States. The final rule has a number of provisions that will promote consistent implementation of NEPA among Federal agencies. In particular, § 1507.3(b)[13] provides that, except for agency efficiency or as otherwise required by law, agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in the CEQ regulations. Lastly, CEQ notes that the outdated 1978 regulations, which are challenging to navigate and have confusing definitions and provisions, have resulted in inconsistencies in agency practice and have generated extensive litigation, which has been a key element in driving lengthy and costly NEPA analyses.

*Comment*: One commenter recommended that CEQ provide clear and consistent incentives for improving NEPA compliance practice. In addition, a commenter opined that many opportunities exist for CEQ and Federal agency leadership to develop guidance and training to prioritize impact avoidance and, when this is not possible, to facilitate creative consideration of broad ranges of mitigation approaches, alternatives, and practices, including off-site and compensatory mitigation. Commenters further stated that the adopted regulations, official NEPA guidance, and federally sponsored training should incorporate and build upon best available recommended practice guidance and other principles and materials, as well as the "Polluter Pays" principle, and the public trust doctrine.

*CEQ Response*: CEQ will develop guidance, as needed, and training to facilitate consistent government-wide implementation of the modernized regulations. However, modernizing the 1978 regulations should be the first step to provide additional clarity and

---

[13] In this Final Rule Response to Comments document, CEQ uses the section symbol (§) to refer to the final regulations as set forth in this final rule and 40 CFR to refer to the 1978 CEQ regulations as set forth in 40 CFR parts 1500–1508.

direction to Federal agencies, not the last.  For commenters to recommend guidance be issued rather than revisions to the over 40–year–old regulations is contrary to basic principles of administrative law.  As E.O. 13891 titled "Promoting the Rule of Law Through Improved Agency Guidance Documents" states, "Americans [should be] subject to only those binding rules imposed through duly enacted statutes or through regulations lawfully promulgated under them, and that Americans have fair notice of their obligations."[14]

Additionally, NEPA is essentially a procedural statute, and does not require impact avoidance, but decision makers can use NEPA review processes to facilitate their efforts to avoid and mitigate significant impacts of their decisions, which in some instances should have the consequence of lessening NEPA review obligations.  As described in more detail in section II.J, the final rule makes a number of changes to clarify the term "mitigation" including clarifying that mitigation measures must be designed to mitigate the effects of the proposed action or alternatives.  In addition, the final rule clarifies that NEPA does not require adoption of any particular mitigation measures, consistent with *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 352–53 (1989); however, it recognizes that different types of mitigation may be effective.  The final rule also makes clear that mitigation must have a nexus to the effects of the proposed action, is limited to those actions that have an effect on the environment, and does not include actions that do not have an effect on the environment.

The "Polluter Pays" principle and public trust doctrine are outside the scope of NEPA and this rulemaking, and therefore CEQ declines commenter's suggestion.

---

[14] 84 FR 55235 (Oct. 15, 2019).

*Comment*:  Several commenters argued that litigation under NEPA is rare.  They also

argued that NEPA is often not the sole cause of delay for important infrastructure projects.

*CEQ Response*:  While not all EAs and EISs are challenged, NEPA is the most litigated

environmental statute.[15]  Trial and appellate courts issue approximately 100 to 140 decisions

each year interpreting NEPA.  Although Federal agencies ultimately prevail, in many cases

litigation can unnecessarily delay and increase costs for important projects such as needed

transportation, water, and other important infrastructure that benefit States, Tribes, and local

communities.  Commenters have noted that the development of infrastructure depends on the

existence of predictable and reasonably expeditious schedules for review.  Additionally, as

several commenters stated, infrastructure projects that are subject to unnecessary delays include

those that could promote the development and use of safer, cleaner, and more sustainable forms

of energy.  While other factors may affect the timing of the reviews for projects, any delay

attributable to NEPA contributes to overall delays in the decision-making process.

*Comment*:  Commenters stated that CEQ lacks authority to restrict agency procedures

under NEPA or to promulgate any regulations to implement NEPA.

*CEQ Response*:  As the Supreme Court recognized in *Dep't of Transp. v. Pub. Citizen*,

541 U.S. 752, 757 (2004), "[t]he Council [on] Environmental Quality (CEQ) [was] established

by NEPA with authority to issue regulations interpreting it, [and] has promulgated regulations to

guide [F]ederal agencies in determining what actions are subject to that statutory requirement."

*See also Methow Valley*, 490 U.S. at 351 (noting that the "requirement" that an EIS include a

---

[15] James E. Salzman and Barton H. Thompson, Jr., *Environmental Law and Policy* 340 (5th ed. 2019) ("Perhaps surprisingly, there have been thousands of NEPA suits.  It might seem strange that NEPA's seemingly innocuous requirement of preparing an EIS has led to more lawsuits than any other environmental statute.").

specific discussion "flows both from the language of the Act and, more expressly, from CEQ's implementing regulations"). Since early in the statute's history, courts have recognized CEQ's authority to administer NEPA. *Warm Springs Dam Task Force v. Gribble*, 417 U.S. 1301, 1309–10 (1974) (Douglas, J. Circuit Justice 1974). The President directed CEQ in E.O. 11991, titled "Relating to Protection and Enhancement of Environmental Quality,"[16] which amended section 3(h) of E.O. 11514, titled "Protection and Enhancement of Environmental Quality,"[17] to issue regulations to Federal agencies to implement the procedural provisions of NEPA. The President further directed CEQ in E.O. 13807[18] to use its authority to interpret NEPA to simplify and accelerate the NEPA review process. E.O. 13807, sec. 5(e)(i)(D). It is illogical for commenters to take the position that CEQ possessed the authority in 1978 to issue regulations binding other agencies, but no longer retains the authority to do so and thus must leave the 1978 regulatory approach in place.

Agencies have broad authority to revise their regulations, provided that they give a sufficient justification for doing so. *See Encino Motorcars LLC v. Navarro*, 136 S. Ct. 2117, 2125–26 (2016). In 1989, the Supreme Court upheld CEQ's revision of its NEPA implementing regulations in *Methow Valley*, noting that the relevant amendment had a "well-considered basis." 490 U.S. at 356. In that same case, the Supreme Court also recognized that CEQ's regulations under NEPA are entitled to "substantial deference." *Methow Valley*, 490 U.S. at 374 (citing *Andrus*, 442 U.S. at 355).

---

[16] 42 FR 26967 (May 25, 1977).

[17] 35 FR 4247 (Mar. 7, 1970).

[18] *Supra* note 2.

In addition, CEQ's authority to require government-wide compliance with its regulations has been clear since CEQ first promulgated regulations to implement the statute. *See* 40 CFR 1507.3(b) ("Agency procedures shall comply with these regulations except where compliance would be inconsistent with statutory requirements . . . ."); E.O. 11991, sec. 2 amending E.O. 11514, sec. 2 (adding a new paragraph (g) requiring Federal agencies to comply with the regulations issued by CEQ, except where it would be inconsistent with statutory requirements).

*Comment*:  One commenter proposed a series of questions CEQ should ask itself before considering changes to its regulations, including whether or not the proposed changes would encourage productive and enjoyable harmony between people and the environment.

*CEQ Response*:  CEQ acknowledges this comment and has concluded that the proposed rule, as modified in the final rule, will advance the original goals of the NEPA regulations while providing for a more efficient, timely, and effective environmental review process.

*Comment*:  Some commenters expressed support for the rulemaking by noting that the NEPA process can be time consuming, citing to CEQ's own finding that the average EIS duration is four-and-a-half years.  Commenters noted that while most projects do not require an EIS, those that do can experience delays that result in additional costs.

*CEQ Response*:  CEQ acknowledges the support for the rulemaking and notes that it has updated its EIS Timelines Report, which originally covered EISs prepared in the period of 2010–2017, to include EISs completed in 2018.

*Comment*:  Commenters noted that duplicative environmental reviews can result in wasted time and resources, negatively affecting an agency's ability to study the most significant effects of a proposed action.  Commenters also noted that some NEPA reviews become overly expansive by incorporating information that is not truly informative of the environmental

15

impacts associated with the action.  Commenters stated that this can lead to unnecessarily lengthy and detailed analyses of all possible issues, rather than an analysis focused on the significant issues.  Some commenters strongly supported CEQ's proposal to update its procedures, noting that improved transparency and predictability to Federal approval processes is critical for many vital projects.  Commenters also described numerous examples of how CEQ's proposed rule would benefit the economy.

*CEQ Response*:  The final rule includes a number of provisions aimed at reducing duplication and ensuring NEPA documents are focused on significant environmental impacts.  CEQ also notes that the final rule assists agencies in managing limited resources by improving interagency coordination, making the development of NEPA documents more efficient, and facilitating the implementation of the OFD policy (*see, e.g.*, changes to §§ 1501.7 and 1501.8 relating to lead agencies and cooperating agencies).

*Comment*:  Commenters noted that EISs for certain types of projects can often be more than 600 pages long according to CEQ's own findings.  Commenters attributed the length of these EISs to agency drafters adding extraneous analyses and legalese in anticipation of legal challenges.  Commenters noted that the adoption of numerous environmental laws subsequent to NEPA has provided a modern regulatory regime that renders many NEPA reviews excessive.  Commenters discussed "NEPA fatigue" and the challenge of keeping up with the NEPA machine, which produces large documents and includes multiple evening public meetings in small communities.

*CEQ Response*:  CEQ acknowledges the comments and recognizes that environmental reviews and documentation can be lengthy.  CEQ notes that it has updated its report on the

length of EISs, which originally covered EISs prepared in the period of 2013–2017, to include EISs completed in 2018.

*Comment*:  Commenters noted that litigation over the sufficiency of NEPA reviews consumes public and private resources, can delay the construction, maintenance, and operation of projects, and leads to uncertainty for communities and project developers.  Commenters also noted that, in response to perceived litigation risks, agencies attempt to anticipate every possible legal objection that could be raised, however insignificant and however detached from the original intent of NEPA and its implementing regulations, rather than to inform the agency or the public of truly relevant information.  Commenters noted that Federal district and appellate courts issue an average of 100 to 140 decisions annually on NEPA-related claims.

*CEQ Response*:  CEQ acknowledges the comment.  As noted above, Federal agencies ultimately prevail in many cases; however, litigation can unnecessarily delay and increase costs for important projects such as needed transportation, water, and other important infrastructure that benefits States, Tribes, and local communities.

*Comment*:  Some commenters noted that the existing environmental review process generates disincentives for coordination among Federal agencies, resulting in limited accountability and delayed analyses.

*CEQ Response*:  CEQ acknowledges the comments and notes that the final rule updates various provisions to improve coordination among agencies.

*Comment*:  Some commenters noted that the current NEPA regulations are vague, unclear, poorly written, and create the opportunity for litigation.

*CEQ Response*:  CEQ acknowledges the commenters' concerns and notes that the final rule makes a number of revisions to improve the NEPA regulations, including revisions to clarify the process and documentation required to comply with NEPA.

*Comment*:  Commenters noted that the uncertainty and delay during the project permitting process can lead to millions of dollars in increased financing costs.  Other commenters stated the cost of delay from permitting and review is nearly $3.7 trillion, citing Howard, P.K., *Two Years Not Ten Years:  Redesigning Infrastructure Approvals* (2015).[19] Commenters also expressed their support for presumptive two-year time limits.

*CEQ Response*:  CEQ acknowledges the comments and notes that its updated regulations include a two-year presumptive time limit for EISs and a one-year presumptive time limit for EAs.

*Comment*:  Commenters stated that a major issue negatively impacting the efficiency of NEPA is the outdated nature of Executive orders governing the use of off-highway motor vehicles on public lands citing E.O. 11644[20] and E.O. 11989.[21]

*CEQ Response*:  NEPA is a procedural statute that does not address any particular area of substantive policy.  It is intended solely to facilitate gathering and documenting specific, timely, and relevant information for purposes of decision making by Federal agencies where their actions may significantly affect the quality of the human environment.  CEQ cannot revise or revoke a presidential Executive order.

---

[19] https://static1.squarespace.com/static/5db4d0eacb29b173254203d2/t/5ee3a6f2072df850bd9a0aa3/1591977716039/2YearsNot10Years.pdf.

[20] "Use of Off-Road Vehicles on the Public Lands," 37 FR 2877 (Feb. 9, 1972).

[21] "Off-road Vehicles on Public Lands," 42 FR 26959 (May 25, 1977).

*Comment*:  Some commenters disagreed with the premise that the existing CEQ NEPA
regulations are difficult to navigate, noting that they have been cited as some of the best in
government.

*CEQ Response*:  CEQ evaluated the implementation of the existing regulations and
determined that its regulations needed to be modernized and updated.  In the final rule, as
discussed in detail in section II, CEQ made a number of changes for easier navigation, including
by reorganizing regulatory text to move topics addressed in multiple parts into consolidated
sections, moving operative requirements from the definitions to the relevant regulatory
provisions, and consolidating provisions and reducing duplication.

*Comment*:  Commenters stated that factors such as inadequate agency funding, public
opposition, delays in obtaining other required (often non-Federal) permits, changes to proposals,
and competing agency priorities often dictate the duration of NEPA reviews.  These commenters
recommended that because these multiple non-NEPA factors can cause delay, CEQ should base
any regulatory reforms on empirical studies of and representative experience with NEPA
procedures.  Some commenters highlighted the fact that less than one percent of Federal actions
require an EIS; instead, most actions are addressed through CEs or EAs.

*CEQ Response*:  While there can be non-NEPA factors that influence the duration of
NEPA reviews, CEQ has provided evidence in support of its rulemaking that demonstrates the
NEPA process can be exceedingly long for those major projects with significant impacts,
averaging four-and-a-half years in duration and over 600 pages in length, with some projects
taking a decade or more to review.  This affects a wide variety of projects from important
transportation infrastructure projects to environmental restoration projects.  As discussed in this
final rule, CEQ makes a number of improvements to the NEPA process including procedures

19

governing environmental reviews involving multiple agencies.  For example, the final rule

requires the development of and adherence to a schedule for the environmental review and any

authorizations required for a proposed action involving multiple agencies.  The final rule also

includes procedures for the resolution of interagency disputes and other issues that cause delays

in the schedule.

*Comment*:  Commenters urged CEQ to consider the findings of a 2016 study[22]

commissioned by the U.S. Department of Treasury that found there were many other factors that

influence the timing of projects much more than compliance with NEPA, and any challenges that

may exist concern agency implementation of the CEQ regulations rather than the regulations

themselves.  Commenters also noted that the report found that a lack of public funding is by far

the most common factor hindering the completion of transportation and water infrastructure

projects.

*CEQ Response*:  The study prepared for the Department of Treasury examines

40 transportation and water infrastructure projects of major economic significance and identifies

4 primary challenges to completion, including extended program and project review and

permitting processes.  The study further states that while NEPA helps promote efforts to prevent

or eliminate damage to the environment, it has also extended the schedule and generally

increased the cost of implementing major infrastructure projects.  Further, the study notes that

Federal Highway Administration (FHWA) studies show that the average time to complete a

NEPA review has increased over several decades from 2.2 years in the 1970s to 6.6 years in

---

[22] AECOM *et. al.* prepared for the Dep't of Treas., 40 Proposed U.S. Transportation and Water Infrastructure Projects of Major Economic Significance (2016), https://www.treasury.gov/connect/blog/Documents/final-infrastructure-report.pdf.

2011 and states that implementing process reforms is crucial to addressing extended reviews and permitting processes.[23]  Process reforms are crucial for making the environmental review process more efficient and effective, particularly for large projects involving multiple agencies, and the final rule includes a number of provisions to improve interagency coordination and the process overall for those types of projects.

*Comment*:  Some commenters questioned whether Federal agency staffing levels are sufficient to handle the current NEPA workload.  Commenters urged CEQ to work to increase funding and training for staff across Federal agencies responsible for NEPA compliance, noting that this would result in increased efficiency and more effective NEPA reviews.

*CEQ Response*:  CEQ acknowledges the comment, but notes that CEQ does not have a formal role in the development of agency budgets.  The existing regulations contain a provision on agency capability to comply with NEPA (40 CFR 1507.2), and CEQ retains this provision with minor changes in the final rule.  Further, CEQ anticipates the final rule will lower the costs of administering agencies' NEPA programs.

*Comment*:  Commenters requested that CEQ clarify that State and local projects do not become subject to Federal laws and regulations until the project has been approved to receive Federal funds, rather than retroactive to past project phases.

*CEQ Response*:  NEPA, by its own terms, applies only to major Federal actions.

*Comment*:  Commenters stated that the proposed rule, if finalized, would likely be litigated in multiple courts, which would result in delays.  Commenters stated that in addition to substantive issues in litigation, there are likely to be disputes regarding standing, ripeness,

---

[23] *Id*. at 6–7.

deference, retroactivity, and the relationship of current agency NEPA procedures to new CEQ regulations.  Commenters who supported the proposed rule stated that the CEQ regulations should be entitled to deference and that putative litigants would have difficulty demonstrating standing.  Some commenters urged CEQ to clarify in the final rule that, for the purpose of legal standing, it cannot adversely impact or aggrieve any potential party because the rule covers NEPA procedures.

*CEQ Response*:  CEQ acknowledges that litigation on the final rule could occur and raise a variety of legal issues.  CEQ has designed the final rule to withstand scrutiny.  The Supreme Court has previously held that "CEQ's interpretation of NEPA is entitled to substantial deference."  *Andrus*, 442 U.S. at 358; *see also Pub. Citizen*, 541 U.S. at 757 ("The [CEQ], established by NEPA with authority to issue regulations interpreting it, has promulgated regulations to guide [F]ederal agencies in determining what actions are subject to that statutory requirement.") (citing 40 CFR 1500.3); *Methow Valley*, 490 U.S. at 355–56.  Commenters correctly state that NEPA is procedural in nature, as the Supreme Court has held.  *Pub. Citizen,* 541 U.S. at 756–57 (citing *Methow Valley*, 490 U.S. at 349–50); *see also Vt. Yankee*, 435 U.S. at 558.

*Comment*:  One commenter stated that NEPA is consistent with the role of government to provide for the general welfare.

*CEQ Response*:  CEQ agrees that the development of NEPA information is beneficial.

*Comment*:  One commenter questioned the authority of officials holding "acting" titles across the Federal Government and particularly at the Department of the Interior (DOI).

*CEQ Response*:  The Senate confirmed the Chairman of CEQ on January 2, 2019.  To the extent the comment raises concerns about the authority of officials outside of CEQ, it is beyond the scope of this rulemaking.

*Comment*:  One commenter stated that the proposed rule does not provide procedural fairness to the general public because of the complexity of the proposed rule.

*CEQ Response*:  CEQ conducted extensive outreach to the public, including publication of the rule in the *Federal Register,* notification of the rulemaking to all federally recognized Tribes and over 400 interested stakeholders, two public hearings and other stakeholder outreach and engagements.  In addition, CEQ made information available to aid the public's understanding of the proposed rule on its websites at www.whitehouse.gov/ceq and www.nepa.gov, including a redline version of the proposed changes, a fact sheet, a PowerPoint presentation on the proposed rule, instructions on how to comment, and other background information.

The 1978 regulations are challenging to navigate with related provisions scattered throughout, and include definitions and provisions that have led to confusion and generated extensive litigation.  The final rule modernizes and clarifies the regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies by simplifying regulatory requirements, codifying certain guidance and case law relevant to the regulations, revising the regulations to reflect current technologies and agency practices, eliminating obsolete provisions, and improving the format and readability of the regulations.

*Comment*:  Some commenters suggested adding language that requires NEPA documentation of significant noncompliance with other Federal land and resource management plans under the National Forest Management Act and how that noncompliance is resolved.

23

These commenters stated that readers of environmental documents could then assume the proposed action and alternatives comply with other Federal plans unless otherwise documented.

*CEQ Response*:  CEQ declines to adopt the requested change because compliance with the National Forest Management Act is beyond the scope of this rulemaking.  CEQ defers specific suggestions on program implementation to the respective Federal agency.

*Comment*:  Commenters disputed the authority of CEQ to issue the proposed rule because it is not currently functioning as established by NEPA, 42 U.S.C. 4342.  CEQ presently has only a single Chairman instead of three members whom the President appoints with the advice and consent of the Senate.

*CEQ Response*:  The fact that CEQ currently is comprised of and led by one member, whom the President appointed, by and with the advice and consent of the Senate, and designated as Chairman, does not limit CEQ's authority to issue the final rule.  Congress provided that the Council be comprised of three full-time Senate-confirmed Council members, one of whom the President designates as Chairman.  *See* 42 U.S.C. 4342.  Notwithstanding this statutory provision, Congress has included provisions in enacted appropriations legislation over the past two decades stating that the Council shall consist of one member, appointed by the President, by and with the advice and consent of the Senate, serving as Chairman and exercising all powers, functions, and duties of the Council.  *See, e.g.*, Further Consolidated Appropriations Act, 2020, Pub. L. 116–94; Consolidated Appropriations Act, 2019, Pub. L. 116–6, 133 Stat. 13, 252; Consolidated Appropriations Act, 2018, Pub. L. 115–141, 132 Stat. 348, 681; Consolidated Appropriations Act, 2017, 115–31, 131 Stat. 135, 488.  Prior appropriations acts have included similar provisions.  42 U.S.C. 4342, note (Council on Environmental Quality; Reduction in Members).

24

*Comment*:  Commenters stated that Congress has modified NEPA during the past 40 years through legislation, authorizing CEs that now cover most agency actions and allowing agencies to focus on the most complex projects.  Commenters stated that major revisions to NEPA such as those proposed by CEQ would be better left to Congress.  Commenters stated that CEQ's attempt to override Congress by rewriting NEPA through the regulations exceeds CEQ's statutory authority.

*CEQ Response*:  CEQ has not exceeded its statutory authority or usurped the role of Congress in its rulemaking.  NEPA established CEQ as an agency within the Executive Office of the President and assigned it duties and functions related to environmental quality and administration of Federal agency implementation of NEPA.  42 U.S.C. 4332(2) (B), (C), and (I), 4342, (I).  CEQ's final rule and, by extension, its ability to place limits on agency NEPA procedures, is grounded in the authority delegated to it by the President under E.O. 11991.  E.O. 11991 directed CEQ to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of [NEPA] . . . to make the environmental impact statement process more useful to decision[ ]makers and the public; and to reduce paperwork and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives," and to "require [environmental] impact statements to be concise, clear, and to the point, and supported by evidence that agencies have made the necessary environmental analyses."[24]  CEQ notes that most of the CEs available to agencies are established in procedures pursuant to CEQ's regulations and not the result of congressional authorization.

---

[24] *Supra* note 16.

*Comment*:  One commenter stated that the proposed rule attempts to codify numerous Supreme Court decisions, raising concerns about the separation of powers between the executive and judicial branches of government.

*CEQ Response*:  The final rule is consistent with Supreme Court case law and, in some instances, clarifies the meaning of the regulations where there is a lack of uniformity in judicial interpretation of NEPA and the CEQ regulations.  Codification of language used in judicial opinions does not violate the separation of powers between the executive and judicial branches of government.  In addition, the Supreme Court has recognized that CEQ's regulations under NEPA are entitled to "substantial deference."  *Methow Valley*, 490 U.S. at 355–56 (citing *Andrus*, 442 U.S. at 358).  This includes instances where CEQ modifies existing regulations, provided it gives a reasoned explanation for the change.  Nothing precludes CEQ from adopting a change on the basis of a sound judicial decision, just as CEQ could adopt a change on the basis of an insightful public comment.  Conversely, CEQ can adopt revised regulations notwithstanding prior judicial decisions that are not premised on *Chevron* step one reasoning.  *See Brand X*, 545 U.S. at 982–83 (citing *Chevron U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 843–44, & n.11 (1984)).

*Comment*:  One commenter asked why the proposed rule is revoking E.O. 13690.

*CEQ Response*:  The final rule does not and cannot revoke any Executive orders. E.O. 13807, issued on August 15, 2017, revoked E.O. 13690.

*Comment*:  Commenters stated that CEQ's rulemaking is not in compliance with Administrative Procedure Act (APA) requirements because CEQ has not provided sufficient factual information and legal bases to facilitate effective public comment on the proposed rule. Commenters stated that CEQ has not adequately justified changes in policy.

26

*CEQ Response*:  The APA requires CEQ to provide sufficient information in the NPRM to enable interested or affected parties to meaningfully comment on the proposed rule, and it has done so.  *See, e.g., Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1115 (D.C. Cir. 2019) ("To meet the rulemaking requirements of section 553 of the APA, an agency must provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully.").  (internal quotation marks and citation omitted).   CEQ has provided sufficient factual detail and rationale in the proposed rule.  CEQ has provided additional clarifications and made changes to the final rule in response to comments on the proposed rule.

*Comment*:  Commenters argued CEQ has acted "arbitrarily and capriciously" in issuing the proposed rule because CEQ failed to fully consider and respond to ANPRM comments. Commenters stated that CEQ should not proceed with the rulemaking without fully considering the multiple proposals submitted on the ANPRM and explain the reason any submitted proposals were not included in the NPRM.

*CEQ Response*:  While not required under the APA, in June 2018, CEQ issued an ANPRM requesting comment on potential updates to its NEPA regulations.  CEQ received over 12,500 comments in response to the ANPRM, and those comments informed the development of CEQ's proposed rule.  CEQ has not acted arbitrarily and capriciously because it did not respond to the ANPRM comments in the NPRM, as it is under no obligation to do so.  Further, in the rule CEQ has responded to all substantive issues raised in the public comments on the NPRM, including substantive proposals that CEQ declined to include in the final rule.

*Comment*:  One commenter stated that the proposed rule violates the Information Quality Act, which requires Federal agencies to ensure the quality, objectivity, utility, and integrity of information they disseminate, and asserted that CEQ does not provide sufficient background

27

information for its statements in the proposed rule.  Another commenter stated that the final rule should retain the phrase "accurate scientific information" in 40 CFR 1500.1 because it is a requirement of the Information Quality Act.

*CEQ Response*:  CEQ has provided sufficient factual detail and rationale in the proposed rule, and in response to comments on the proposed rule, CEQ has provided additional clarifications and made changes to the final rule.  The Information Quality Act is an independent statute.  Moreover, the final rule is consistent with the Information Quality Act[25] and subsequent guidance including M-19-15, Improving Implementation of the Information Quality Act (April 24, 2019)[26].  Additionally, CEQ notes that the revised NEPA regulations are procedural, rather than technical, regulations.

Further, CEQ notes that methodology and scientific accuracy are addressed in § 1502.23 of the final rule, which requires agencies to "ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents."  It also requires agencies to identify any methodologies used and make "explicit reference" to the scientific and other sources relied upon for conclusions in the statement.

*Comment*:  One commenter suggested that the proposed rule violates the duty, as articulated by the Trail Smelter Arbitral Decision, *United States v. Canada*, 3 U.N. Rep. Int'l Arb. Awards 1905 (1941), of any country not to harm the environment of another, which includes the duty to assess whether a proposed action would do so.  The commenter also stated that the proposed rule could result in trade sanctions against the United States.

---

[25] *See* Treasury and General Government Appropriations Act for Fiscal Year 2001, Pub. L. 106–554, sec. 515(a), 114 Stat. 2763A–153 (2000) (as codified at 44 U.S.C. 3516, note).

[26] https://www.whitehouse.gov/wp-content/uploads/2019/04/M-19-15.pdf.

28

*CEQ Response*:  The final rule does not direct agencies to ignore the potential impacts of proposed Federal actions on the territories of other sovereign states.  To the contrary, under the final rule, for activities or decisions with effects in the United States, agencies should analyze the reasonably foreseeable effects of such activities or decisions where there is a reasonably close causal relationship to the proposed action.  § 1508.1(g).  This may include cross-border or transboundary effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action.  Accordingly, the final rule also does not increase the risk of trade sanctions against the United States.  Moreover, section 102(2)(F) does not establish a mandatory duty; the provision refers to "appropriate" support which inherently involves a discretionary Executive branch determination.

*Comment*:  Commenters stated that CEQ cannot justify the proposed changes based on efficiency, reducing delays, decreasing paperwork, or avoiding litigation because they are non-statutory goals that cannot be elevated over the goals of the NEPA statute, citing *Gresham v. Azar*, 950 F.3d 93, 104 (D.D.C. 2020) ("While we have held that it is not arbitrary or capricious to prioritize one statutorily identified objective over another, it is an entirely different matter to prioritize non-statutory objectives to the exclusion of the statutory purpose.").  Commenters stated that the concept of efficiency cannot focus exclusively on timelines and cost, but must instead focus on outcomes of enhancing environmental quality and avoiding environmental degradation to the greatest extent possible.

*CEQ Response*:  Implementation of NEPA is governed by a rule of reason.  *Pub. Citizen*, 541 U.S. at 767–68; *Marsh v. Or. Nat. Res. Council*, 490 U.S. 360, 373–74 (1989).  Section 101 of NEPA sets forth a national policy "to use all practicable means and measures."  42 U.S.C. 4331(a).  The term "practicable" is consistent with notions of feasibility, which the case law has

29

recognized as part of the NEPA process. *See, e.g.*, *Vt. Yankee*, 435 U.S. at 551; *Kleppe v. Sierra Club*, 427 U.S. 390, 414 (1976). As CEQ has explained in section II.B.1, the final rule is consistent with the purpose of NEPA which is to ensure Federal agencies consider the environmental impacts of their actions in the decision-making process. CEQ has properly referenced efficiency, reducing delays, decreasing paperwork, avoiding litigation and fostering excellent decision making as rationales for its changes to the regulations. These goals are similar to the expressed goals of the 1978 regulations, which were "to reduce paperwork, to reduce delays, and at the same time to produce better agency decisions, which further the national policy to protect and enhance the quality of the human environment."[27] Lastly, NEPA's objectives include fulfilling the social, economic, and other requirements of present and future generations of Americans, and the Act requires that agencies ensure that the environment is given appropriate consideration along with economic and technical considerations. 42 U.S.C. 4331(a), 4332(2)(B).

*Comment*: Commenters stated that CEQ has not explained all changes in the proposed rule, which only a side-by-side comparison of the 1978 regulations and proposed rule would reveal.

*CEQ Response*: CEQ has explained the changes proposed to the 1978 regulations. In addition to the explanation of the proposed changes in the NPRM, CEQ posted a redline version of proposed changes to the 1978 regulations in the rulemaking docket to aid the public's review

---

[27] 43 FR 55978 (Nov. 29, 1978).

of the proposed rule.[28]  The final rule supplements explanations previously provided in the

NPRM for proposed changes to the 1978 regulations.  *See also* RIA Appendix.

*Comment*:  Commenters stated that CEQ is selectively relying on court decisions to

support its proposed changes without sufficient explanation.  Commenters requested that CEQ

address these specific concerns in a supplementary proposed rulemaking notice.

*CEQ Response*:  CEQ has revised the final rule in a manner that is consistent with

binding case law from the Supreme Court.  Where lower courts have reached judicial

interpretations that conflict with one another, CEQ has provided appropriate clarification in the

final rule with an accompanying explanation.  In addition, well-established precedent from the

Supreme Court authorizes CEQ to adopt regulations that reasonably resolve ambiguities in the

statute that it is charged to administer.  *See Chevron U.S.A., Inc. v. Natural Res. Def. Council,*

*Inc.*, 467 U.S. 837, 842–43 (1984); *see also Brand X*, 545 U.S. at 982–83; Section I.B.1 of the

final rule.  CEQ therefore declines to issue a supplemental NPRM to further address these

concerns.

*Comment*:  Commenters stated that CEQ should delay the rule because it has not yet

assessed the effectiveness of the FAST Act and particularly FAST–41).  Some argued FAST–41

was sufficient to address the issues raised by CEQ in the proposed rule, while others cautioned

against codifying provisions in FAST–41 before understanding the effectiveness.  Commenters

noted that congressional intent behind the FAST Act was not to alter NEPA or the 1978

regulations, so enhancing efficiency in the NEPA process need not require a comprehensive

overhaul of the current regulations.

---

[28] www.regulations.gov, docket ID CEQ–2019–0003–0012.

31

*CEQ Response*:  In 2015 Congress enacted Title 41 of the FAST Act (FAST–41), to provide for a more efficient environmental review and permitting process for "covered projects."[29]  FAST–41 was designed to improve the timeliness, predictability, and transparency of the Federal environmental review and authorization process for covered infrastructure projects.  FAST–41 established new procedures that standardize interagency consultation and coordination practices.  FAST-41 codified the use of the Permitting Dashboard to track project timelines.  Other FAST Act provisions that address the project delivery process and track environmental review and permitting milestones for transportation projects are set out in Title I and Title IX.  Project sponsor participation in FAST–41 is voluntarily.

Fewer than 50 projects have used the FAST–41 procedures, and fewer than 30 of these projects have been completed.[30]  These projects are only a subset of the largest infrastructure projects that fall within the scope of the FAST Act.  As a result, sufficient information is not available to assess the effectiveness of the FAST Act or FAST–41.[31]

Congressional enactment of FAST–41 builds on prior legislation and administrative initiatives to improve implementation of NEPA, with the intent of streamlining permitting requirements, improving interagency coordination, and other process related improvements.  *See* section I.D of the final rule.

---

[29] *See* Public Law 114–94, sec. 41001–41014, 129 Stat. 1312, 1741 (42 U.S.C. 4370m—4370m–12).

[30] *See* https://www.permits.performance.gov/projects (accessed June 26, 2020).

[31] The Annual Report to Congress for Fiscal Year 2018 included observations about best practices related to FAST–41, but did not include timeline information because it was not yet available. https://www.permits.performance.gov/documentation/fast-41-annual-report-congress-fy-2018.  The Annual Report to Congress for Fiscal Year 2019 was recently issued, and reflects a transition to a performance-based assessment of agencies' implementation of best practices.  https://www.permits.performance.gov/about/announcements/fast-41-annual-report-congress-fy-2019.

*Comment*:  One commenter stated that revisions were made to the NEPA regulations in 2015 and questioned whether additional modifications were necessary.

*CEQ Response*:  No revisions were made to the NEPA regulations in 2015.  CEQ has not comprehensively updated its regulations since their promulgation in 1978, more than four decades ago.  The final  rule will modernize and clarify the regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies in connection with proposals for agency action.

*Comment*:  Some commenters observed that NEPA reviews rely only on analyses prior to the agency decision, with no subsequent quality control mechanism to evaluate whether a NEPA review achieved its goal.

*CEQ Response*:  CEQ acknowledges the comment.  CEQ has periodically examined the effectiveness of the NEPA process and issued a number of reports on NEPA implementation.  *See* section I.B.2.

*Comment*:  Commenters stated that prior to NEPA, minority and low-income populations were disproportionately affected and will be again if these proposed regulation revisions are adopted.  Commenters stated that many key provisions in the proposed rule would disproportionately burden and adversely impact low-income and minority communities in violation of E.O. 12898, titled "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations,"[32] and NEPA, and that these communities will continue to be most affected by multiple types of pollution and natural disasters.  Commenters also stated that CEQ's proposed changes raise the threshold for when an EA or EIS is required

---

[32] 52 FR 7629 (Feb. 16, 1994).

under NEPA so that Federal agencies will not be performing an EA or EIS in many cases and

will not be obligated to take environmental justice into account.

Commenters also stated that NEPA calls on Federal agencies to take seriously their

obligation to consider the environmental justice implications of their actions.  The Civil Rights

Act, meanwhile, requires agencies to ensure that their actions do not cause disparate

environmental impacts based on race, color, or national origin.

*CEQ Response*:  As discussed in the respective sections of the final rule, the changes

made in the final rule to the 1978 regulations are consistent with the Act and applicable Supreme

Court case law.  The changes do not disadvantage or adversely impact low-income and minority

communities.  CEQ has reviewed the changes in this final rule and has determined that they

would not result in adverse environmental impacts.  *See* RIA Appendix.  In addition, many of the

changes that the final rule adopts will improve coordination with local communities and expand

opportunities for the public to participate in the NEPA process.  Agencies may consider, as

necessary and appropriate, environmental justice issues in connection with NEPA compliance.

*Comment*:  Several commenters expressed concerns that changes in the proposed rule

would adversely impact Tribes.  Specifically, commenters stated that the proposed changes

would weaken or reduce opportunities for Federal agency consultations. Some commenters

recommended that CEQ require agencies to consult with Tribal governments and involve them in

interagency consultations.  Commenters stated that the proposed changes would reduce the

information available to Tribes regarding a proposed project's environmental impacts,

potentially violating treaty law, E.O. 13175 and 40 CFR 1501(d)(2).  For example, one

commenter stated the proposal would require an agency to make a determination of a reasonably

foreseeable effect without accounting for Tribal cultural resources that cannot be known to an

34

agency without proper input from Tribes.  Commenters also stated the proposal's

implementation of a "but for" test would weaken Federal environmental review obligations,

because the causal relationship between an action and future action may not be considered.

Commenters cited to *Dine Citizens Against Ruining Our Environment v. Bernhardt*, 923 F.3d

831, 853 (10th Cir. 2019) (holding that an agency needed to consider the cumulative

environmental impacts associated with all reasonably foreseeable future actions).  Commenters

stated the overall effect of the proposed rule will lower the consideration of and protection from

impacts of a federally permitted project on Tribal lands and resources  Commenters asserted that

NEPA would no longer be a policy that Tribes can rely upon for involvement in the regulatory

process and protection of the cultural and natural environment across jurisdictions.  One

commenter stated that CEQ should withdraw the proposed rule and begin a separate, narrower

rulemaking focused exclusively on affording Tribal governments the same opportunities that

other governments have under CEQ's existing NEPA regulations.

*CEQ Response*:  The final rule will not diminish participation by Tribes in the NEPA

process or reduce consideration of impacts to Tribal resources.  As discussed in section II.A of

the final rule and in the response to comments on §§ 1501.9 and 1506.6, the final rule

substantially expands participation by Tribal governments and communities.  The final rule also

maintains requirements to analyze effects on Tribal resources, as described in the response to

comments on §§ 1501.3, 1502.16, and 1508.1(g).  The final rule does not adopt a "but for" test,

but rather provides that effects must be reasonably foreseeable and have a reasonably close

causal relationship to the proposed action.

*Comment*:  A commenter stated that any efforts to amend the regulations for the sake of

timeliness or to achieve greater efficiency should not increase confusion or burdens on Tribes or

the public to participate in the NEPA process, and that wholesale changes were unnecessary.

Another commenter stated that significant changes in Federal regulations are a burden to Tribal

governments which strive to comply with the changing regulatory framework and often seek to

ensure their own ordinances and governmental programs are consistent with Federal law.  The

commenter also stated that consideration of significant regulatory change such as this should be

measured and coordinated with Tribes, which have an unfunded obligation to revise their

programs to remain consistent with regulations.

A commenter also noted that due to their proximity on Tribal lands, the use of Federal

funding sources, or mandatory Federal permitting requirements (among other things) cause the

obligations of NEPA to disproportionately burden Tribes.  The commenter further stated that

there is greater uncertainty around project timelines and economic development on Tribal trust

lands (often subject to NEPA simply by virtue of their trust status) when compared to similarly

situated private lands (less often subject to a comparable NEPA trigger).  One commenter added

that it may be appropriate for CEQ to consider streamlining certain NEPA regulations involving

Tribes to relieve this disproportionate burden.

*CEQ Response*:  The final rule is anticipated to lower, rather than increase, NEPA's

administrative burden on Tribal communities through a more efficient and timely process.  The

final rule includes specific measures to streamline documents (§§ 1501.12 and 1507.3(c)(5)) and

expressly reduces duplication with Tribal procedures (§ 1506.2).

*Comment*:  Several commenters expressed concerns that CEQ failed to consider how the

proposed regulations will affect Indian Tribes and the requirements for agencies to comply with

section 106 of the National Historic Preservation Act (NHPA).  One commenter stated that the

proposed changes introduce confusion and delay into the integration of NEPA and section 106,

36

and would provide less protection for Tribal environments and historic properties. Another commenter stated that the adopted regulations should reaffirm the joint CEQ-Advisory Council on Historic Preservation (ACHP) guidance on integrating the NEPA and section 106 compliance processes, which clarifies Federal agency and project proponent obligations to facilitate Tribal participation at the earliest possible stage and on a continuing basis.

Commenters stated that the proposed rule fails to adequately require agencies to consider a project's impacts on Tribal cultural resources because they are not specifically mentioned. Commenters stated that the existing CEQ rules refer to "historic and cultural" resources but never define either term and generally rely on the NHPA definition of "historic resource" or "archaeological site," neither of which captures the essence of what constitutes a Tribal cultural resource and its religious, traditional, or cultural values.

*CEQ Response*: In the final rule, the interpretation of cultural resources is with the same as the 1978 regulations and already includes Tribal cultural resources under § 1502.16(a)(8) and the definition of "effects" in § 1508.1(g)(1). The addition of "Tribal" throughout the final rule supports this consideration of Tribal cultural resources. The final rule fully supports integration and coordination of NEPA reviews with required reviews under other statutes where NEPA applies. Nothing in the final rule changes the obligation to comply with other statutes.

*Comment*: Some commenters observed that there is a lack of training and agency staff with expertise in anthropology, sociology, and archaeology sufficient to support necessary Tribal consultation and consideration of Tribal information, which has implications for environmental justice.

37

*CEQ Response*:  CEQ acknowledges the comment but notes that it and the various action agencies have the ability to consult with such experts housed elsewhere inside the Federal Government.

## B.  Comments Regarding Changes Throughout Parts 1500–1508

*Comment*:  Commenters stated that CEQ provided two examples of the obsolete sections that it was referencing but did not define the determination of what is obsolete.  Commenters further stated that CEQ should not update citations and authorities without inclusion of historical context, and that CEQ must define all new terms introduced.

*CEQ Response*:  In section II, CEQ describes the changes throughout parts 1500–1508, identifies where it strikes obsolete provisions, and explains newly defined terms. In addition, CEQ describes its elimination of obsolete references to publications that no longer exist.  *See* section II.A of the final rule.

*Comment*:  Commenters suggested CEQ change the overall structure of the regulations to improve the organization and readability to make it easier to use.

*CEQ Response*:  In the final rule, CEQ has made further revisions and clarifications to improve the organization and readability of the regulations.  CEQ believes that the organization of the new regulations will assist Federal agencies in implementing NEPA more efficiently and effectively.

*Comment*:  Commenters suggested that the draft regulations are too discretionary, leaving major decisions to the discretion of the agency and encouraging agencies to do the bare minimum level of analysis.  For example, rather than "the agency shall," which constitutes a non-discretionary mandate, the draft uses the phrase "the agency may" throughout.

*CEQ Response*:  These regulations provide direction to Federal agencies regarding implementation of the procedural provisions of NEPA, which require that agencies consider the effects of major Federal actions significantly affecting the quality of the human environment. 42 U.S.C. 4332(2)(C).  NEPA applies to a wide variety of major Federal actions and the CEQ regulations recognize that agencies must apply NEPA to actions they take pursuant to their organic statutes.  A rule of reason applies, and agencies must exercise discretion and judgment in conducting their NEPA analyses.

*Comment*:  Commenters suggested using bolding, underlining, or similar revisions in the regulatory text to distinguish new sections.

*CEQ Response*:  In addition to the description in the preamble of the NPRM, CEQ provided a redline of the 1978 regulations to reflected the proposed changes as a "Supporting Document" in the docket to identify new or edited sections.  However, the formatting recommended by the commenter is inconsistent with the regulatory format prescribed by the *Federal Register*.

*Comment*:  Commenters recommended that CEQ uses the term "agency" inconsistently throughout the regulations noting that the following types of agencies are mentioned:  Federal agencies; non-Federal agencies; State, Tribal, and local agencies; lead agencies; joint lead agencies; cooperating agencies; participating agencies.  Commenters further noted that, in many cases, the regulations just use the term "agency" or "agencies" and requested CEQ better clarify the usage.

*CEQ Response*:  In the final rule, CEQ includes updates to the 1978 regulations to clarify when the term "agency" or "agencies" refers to a specific agency, such as a lead, cooperating or participating agency, adds references to "Tribal" agencies throughout the rule, and made other

revisions for clarification.  These revisions will assist all agencies participating in the NEPA

process.  Depending on the particular project or activity, agencies may have a different role, and

the terms used in the regulations clarify roles and responsibilities of agencies.

### 1.    Addition of "Tribal" Throughout the Rule

*Comment*:  Commenters expressed support for the proposed revisions to

§ 1501.2(b)(4)(ii) and elsewhere in the regulations to add "Tribal" to the phrase "State and

local," thereby inviting Tribal participation, cooperation, and consultation on par with State and

local jurisdictions and giving Tribes the opportunity to engage in the NEPA process in the same

way as their off-reservation counter parts, to the extent Tribes find this appropriate.  Commenters

supported eliminating the provisions that limited Tribal interests to reservations.  Commenters

supporting these changes stated that, in many parts of the country, there are no Indian

reservations but there are Federal or State-recognized Tribes, and their interests are important to

consider.  Commenters also supported proposed changes that allow Tribes to serve as joint lead

agencies, require consideration of effects that would violate Tribal environmental laws, and

expand notice and related obligations where a proposal may impact Tribal interests.  *See*

§§ 1501.8(a), 1502.16(a)(5), 1503.1(a)(2)(ii), and 1506.6(b)(3)(ii), and the revisions at

§ 1501.3(b)(2)(iv) (proposed § 1501.3(b)(2)(iii)).

*CEQ Response*:  CEQ acknowledges the support for the proposed changes.  The final rule

significantly expands coordination with Tribal governments and agencies, in furtherance of

informed analysis of a proposed action's potential effects on Tribal lands, resources, and areas of

historic significance.

*Comment*:  Commenters suggested the final rule list "Tribal" before "States and local"

governments" because Tribes are sovereign nations.

40

*CEQ Response*:  For consistency throughout the rule, CEQ has referenced Federal, State, Tribal, and local governments or agencies in that order.  The order of listing is merely in the nature of a convention and is not intended to take a position on relative priority.

*Comment*:  Commenters requested CEQ respect Tribal sovereignty and not apply the term "agency" to a Tribe or its government in reference to the rule's addition of "Tribal" to the phrase "State and local" throughout the NEPA regulations.

*CEQ Response*:  "Agency" is a term used throughout the regulations to refer to agency-level participants in the NEPA process.  The final rule distinguishes between government-to-government relationships and interagency participation in the NEPA process, which can include agencies of Tribal governments.  For example, paragraph (b) of § 1501.9, "Scoping," requires the lead agency to invite the participation of likely affected Federal, State, Tribal, and local "agencies and governments."

*Comment*:  Commenters stated that each Federal Government department, agency, and bureau, such as the Bureau of Indian Affairs (BIA), must implement the final rule's intention to expand "recognition of the sovereign rights, interests, and expertise of Tribes"  to achieve NEPA modernization.

*CEQ Response*:  Section 1507.3 requires agencies to develop or revise proposed procedures to implement the final rule within 12 months of its effective date.  This provision applies to the major subunits of any agencies or departments that have their own agency NEPA procedures and therefore include BIA.

*Comment*:  Commenters requested that CEQ further clarify the requirements for Tribal notice and consultation.

41

*CEQ Response*:  Consistent with the proposed rule, CEQ adds "Tribal" and changes "agencies" to "governments" consistent with and in support of government-to-government consultation pursuant to E.O. 13175, titled "Consultation and Coordination With Indian Tribal Governments."[33]

*Comment*:  Commenters requested that CEQ revise the rule to state that Tribal nations must be the final arbiter in determining the effects or impacts to Tribal resources, sacred sites, historic and cultural places, as well as the social, economic, or health effects to Tribal citizens.

*CEQ Response*:  Pursuant to the definition of effects, agencies must evaluate ecological, historic, cultural, social, economic, and health effects, as appropriate to the specific proposal for agency action.  *See* § 1508.1(g).  Tribal governments are unable to be the final arbiter as requested by the commenters because NEPA and the CEQ regulations are a mandate for Federal agencies.  Therefore, Federal agencies are responsible for compliance with NEPA and the CEQ regulations, unless a State, Tribal, or local agency is assuming NEPA responsibilities from a Federal agency pursuant to a statute.

*Comment*:  Commenters requested that the final rule clearly state that a Tribal nation's assumption of any NEPA duties does not absolve Federal agencies from fulfilling of their trust and treaty responsibilities to Tribal nations.

*CEQ Response*:  Tribal assumption of any NEPA responsibilities does not alter the existing trust and treaty responsibilities of Federal agencies.

*Comment*:  Commenters stated that the addition of the term "Tribal" throughout the proposed rule is rendered meaningless by the substance of the proposal rulemaking, which

---

[33] 65 FR 67249 (Nov. 9, 2000).

commenters assert would make environmental impact assessment under NEPA an exercise scarcely worth the investment of a Tribe's time.

*CEQ Response*:  The final rule comprehensively updates, modernizes and clarifies the regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies in connection with proposals for agency action.  The rule will improve interagency coordination in the environmental review process, promote earlier public involvement, increase transparency, and enhance the participation of States, Tribes, and localities.  The amendments will advance the original goals of the CEQ regulations to reduce paperwork and delays, and promote better decisions consistent with the national environmental policy set forth in section 101 of NEPA.  Participation in the NEPA process was and will continue to be meaningful, though, of course, entirely voluntary.

*Comment*:  Commenters recommended that the regulations should be consistent with CEQ's 2002 Memorandum on Cooperating Agencies[34] which uses the phrase "State, Tribal and/or local government," and that  using the term "agency" in some provisions of the regulations and "governments" in other provisions may lead to confusion.

*CEQ Response:*  In the final rule, CEQ replaces "agency" with "government" where appropriate and for clarity.

*Comment*:  Commenters requested that CEQ clarify whether "Tribal" or "Tribes" refers to all Native American groups or just to federally recognized entities.  Commenters also requested that the regulations include a definition for "Tribes."

---

[34] Cooperating Agencies in Implementing the Procedural Provisions of the National Environmental Policy Act (Jan. 30, 2002), https://www.energy.gov/sites/prod/files/nepapub/nepa_documents/RedDont/G-CEQ-CoopAgenciesImplem.pdf.

*CEQ Response*:  Due to the complexities of numerous statutory authorities as they pertain to the Nation's indigenous groups, CEQ declines to add a definition of "Tribal" or "Tribe." Agencies may provide further specificity concerning the application of the final rule to "Tribal" or "Tribe" in their NEPA procedures, consistent with their organic statutes.

*Comment*:  A commenter stated the adopted regulations, CEQ implementation guidance, and revisions to agencies' proposed procedures for NEPA practice should reaffirm E.O. 13175 to ensure consultation and coordination with affected Tribal governments and agencies, as necessary and appropriate for a proposed action and require the elimination from Federal agencies' procedures all provisions that limit Tribal interests to Indian lands.  Further, a commenter noted that CEQ should incorporate E.O. 13175 by reference.

*CEQ Response*:  The final rule significantly expands coordination and involvement by Tribal governments in the NEPA process and removes provisions that limit Tribal interests to reservations.  These changes in the final rule are consistent with the intent of E.O. 13175, however, the final rule does not incorporate E.O. 13175.  E.O. 13175 is intended only to improve the internal management of the executive branch, and is not intended to create any right, benefit or trust responsibility, substantive or procedural, enforceable by a party against the U.S., its agencies, or any person.

*Comment*:  A commenter stated that the proposed rule presents an incomplete picture of comments received by Tribes and Tribal organizations on the ANPRM.  Another commenter stated several Tribes and Tribal organizations submitted comments on the ANPRM that noted NEPA's importance to Tribes, expressed reluctance to support substantive amendments to the regulations, and suggested only making revisions that better reflect Tribes' sovereign status and

44

protect the unique legal interests that Tribes have in decision making regarding land to which they may not possess legal title.

*CEQ Response*:  The preamble of the proposed rule stated that it was responding in part to comments submitted by Tribal governments supporting the recognition of sovereign rights, interest, and expertise of Tribes in the NEPA process.  CEQ did not state that it had presented an overview of all Tribal comments received, but instead pointed to certain proposed changes that reflected Tribal comments.[35]

## 2.    Changes from Possible to Practicable

*Comment*:  Some commenters supported CEQ's proposed change from the term "possible" to "practicable" stating that it may factor in the cost, time, and technical and economic feasibility of a proposed action.  Other commenters opposed revising "possible" to "practicable" and stated that it conflicts with the statute which uses the term "possible" (e.g., "authorizes and directs to the fullest extent possible.").  Commenters maintained that the Supreme Court has reinforced this mandate.  Commenters opposed the revision to provide that a draft EIS "must meet, to the fullest extent practicable, the requirements established for final statements in section 102(2)(C) of NEPA" as directly contrary to the statutory language to comply with the requirements for the detailed statement now known as an EIS "to the fullest extent possible."  Commenters also maintained that courts and individuals interpreting and participating in the NEPA process have been able to successfully distinguish between the possible and practicable for 40 years, and therefore no changes are required.  Commenters also cited CEQ's interpretation of section 102 of NEPA in the 1978 regulations, which stated in 40

---

[35] 85 FR at 1692, 1711.

CFR 1500.6 that "[t]he phrase 'to the fullest extent possible' . . . means that each agency of the Federal Government shall comply with that section unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible."  Commenters also cited to *Citizens for Balanced Environment & Transp., Inc. v. Volpe*, 503 F.2d 601, 606–07 (1973) (Winter, J., dissenting) (interpreting "to the fullest extent possible" in the NEPA context).

Commenters additionally stated CEQ should not conflate the words possible and practicable as they have different definitions and different contexts, referencing dictionary definitions, including *Black's Law Dictionary* and *Ballentine's Law Dictionary*, and suggested use of the terms "practicable" and "reasonable" rather than "possible" made the regulations more vague or legally uncertain.  Commenters specifically stated that "practicable" is a more general term that could open NEPA interpretation up to varying definitions of an agency's capabilities, and that "reasonable" is even more vague, and its interpretation depends on the values of the individual or agency in question, and suggested that "possible" was more appropriate than "practicable" or "reasonable" in the regulations.  Commenters further stated that use of "possible" fit well with NEPA's original intention of representing American environmental values (even as those values change with the time), and raised concerns that the revisions would leave Federal agencies vulnerable to the type of litigation that slows down the NEPA process considerably.  Commenters also cited *Kisor v. Wilkie*, 139 S. Ct. 2400, 2415 (2019), stating that courts will evaluate agencies' interpretations of the word "practicable" by first exhausting all tools of statutory interpretation and then evaluating whether the construction is reasonable, and asserted that use of the term "practicable" rather than "possible" would invite judicial interpretation.  Finally, commenters raised concerns that CEQ has altered the text so that Federal

46

agencies must only cooperate to the fullest extent "practicable" and may choose whether to cooperate in fulfilling requirements of local governmental entities' laws.

*CEQ Response*:  The term "practicable," which is in the statute (42 U.S.C. 4331(a), (b)) was used many times in the 1978 regulations.[36] In the final rule CEQ replaces references from "possible" to "practicable" in a number of sections in the regulations for consistency and to update the regulations to reflect the more modern usage of the term "practicable."  *See* section II.A.  As commenters noted in response to the NPRM, the use of the term practicable highlights the need to avoid speculation.

CEQ notes that *Kisor* is not applicable to decisions an agency makes about how to revise its regulations, consistent with its flexibilities under *Chevron* and *Brand X*.  CEQ further notes that the phrase "to the extent possible," which is found in section 102 of NEPA (42 U.S.C. 4332(2)), was addressed in the 1978 regulations, and the final rule retains it in § 1500.6,  This section defines the phrase to mean that each agency of the Federal Government must comply with section 102 consistent with § 1501.1, addressing NEPA thresholds.[37]  Further, NEPA compliance is governed by a rule of reason.  *Pub. Citizen*, 541 U.S. at 767–68; *Marsh*, 490 U.S., at 373–74.  The change from "possible" to "practicable" is consistent with the final rule.

*Comment*:  Commenters recommended CEQ replace the term "practicable" with "reasonable" to ensure consistency with the existing case law and NEPA.  In support, commenters offer that the standard used to evaluate NEPA actions has historically been the "reasonableness" standard, which implies a balancing process.  Commenters further suggested

---

[36] *See* 40 CFR 1500.2(f), 1501.4(b), 1501.7, 1505.2(c), 1506.6(f) and 1506.12(a).

[37] To the extent commenter was referring to *Flint Ridge Dev. Co.* 426 U.S. 776 at 788, this decision relates to a clear and fundamental conflict of statutory duty with NEPA and is addressed in § 1501.1(a) of the final  rule.

47

that, while NEPA is a procedural statute, courts have interpreted the term "practicable" under the Clean Water Act to be substantive.

*CEQ Response*:  CEQ declines to use "reasonable" in place of "practicable" for the reasons set forth in section II.A and because CEQ's approach is consistent with the statute.  CEQ agrees that a rule of reason applies to the NEPA process and agencies should use their experience and expertise in carrying out their analyses.  The term "practicable" in the Clean Water Act can have substantive meaning because the Clean Water Act is a statute that requires substantive reductions or eliminations of water pollution.  NEPA is a procedural statute, and use of the term "practicable" in the NEPA context does not cause usage of the term to become substantive.

*Comment*:  Commenters raised concern over who will determine "practicability" with respect to the revisions in the regulations, asserting it is common for industrial interests to insist that measures proposed by Tribes to protect important aspects of our natural and cultural heritage are "not practicable."

*CEQ Response*:  The NEPA regulations apply to Federal agencies.  Federal agencies will make the determinations required under the regulations.  In carrying out their NEPA processes, agencies are subject to a rule of reason and should use their experience and expertise to determine what is practicable.  Agencies are familiar with assessing the strength of comments and resolving competing comments by different regulated interests.

*Comment*:  Commenters recommended that CEQ should substitute "practicable" for "possible" in § 1503.3(a), such that CEQ should allow comments to be "as specific as practicable."

*CEQ Response*:  Section 1503.3 provides guidance on how commenters, including agencies, may tailor their comments to best inform the decision-making process.  Vague

48

comments do not inform the decision-making process.  As the Supreme Court stated in *Vermont Yankee*, "administrative proceedings should not be a game or a forum to engage in unjustified obstructionism by making cryptic and obscure reference to matters that 'ought to be' considered and then, after failing to do more to bring the matter to the agency's attention, seeking to have that agency determination vacated on the ground that the agency failed to consider matters 'forcefully presented.'"  435 U.S. at 553–54.

### 3.    Grammatical Changes

*Comment*:  Commenters supported most of the grammatical changes and shifting much of the language to active voice from passive voice to enhance readability of the regulations. Commenters supported changes from "insure" to "ensure" throughout the regulations, changes that increase clarity, and changes that correct grammatical errors.  Other commenters stated that much of the language remains very bureaucratic and difficult to understand, and recommended further revisions and use of plain English.

*CEQ Response*:  In the final rule, CEQ makes the proposed changes as well as additional revisions, as appropriate, to improve the clarity and readability of the regulations.  CEQ revises language from passive to active voice where appropriate, particularly where it is helpful to identify the responsible parties.

### 4.    Other Changes Recommended Throughout the Rules

*Comment*:  Commenters suggested adding "to the human environment" when references to "impacts" or "effects" are indicated throughout the rule.

*CEQ Response*:  The words "impacts" and "effects" are generally in reference to the human environment.  In response to comments, CEQ has added "to the human environment" to

49

the definition of effects to clarify that any reference to impacts or effects in the rule refers to effects or impacts to the human environment.

*Comment*:  Commenters stated that CEQ uses the terms "final statement" and "final environmental impact statement" throughout the rule.  Commenters requested CEQ use consistent terminology arguing that the term "final statement" may result in confusion.  For example, in § 1502.5, "Timing," "final statement" could refer to "other" final reports an agency may prepare associated with a proposal such as a feasibility study.

*CEQ Response*:  The final rule uses the shorthand reference "final statement" to refer to final EISs when the section has previously used the full phrase, "final environmental impact statement."  CEQ retains this shortening in the final rule to improve readability in those sections that make multiple references to final EISs.

*Comment*:  Commenters requested that CEQ review the entire rule and substitute references to "statement" with "document" unless the intent is to exclude EAs.  Commenters noted that proposed §§ 1506.1(c) and 1506.2(d) did not include EAs, but recommended that they should include EAs.

*CEQ Response*:  Similar to the 1978 regulations, the final rule addresses EAs and EISs separately.  The level of review for an EIS differs from that of an EA, which an agency can prepare where the proposed action is not likely to have significant effects or the significance of the effects is unknown.  The final rule clarifies when provisions apply to all environmental documents and when they apply specifically to EAs or EISs.  CEQ notes that while CEQ has not added EAs to § 1506.2(d) which is a section intended to apply to EISs, CEQ proposed to add EAs to § 1506.1(c), and in the final rule simplifies the reference from "programmatic

50

environmental impact statement or environmental assessment" to "programmatic environmental review."

*Comment*:  Commenters recommended that CEQ not reference E.O. 13807[38] as authority for the regulations because it deals specifically with the procedures for permitting infrastructure and therefore is tangential to the policies established under NEPA.  Commenters requested that CEQ remove the reference from all "Authority" sections in the final rule.

*CEQ Response*:  E.O. 13807 provides direction to Federal agencies to make the Federal environmental review and permitting process for infrastructure projects more efficient and effective.  Section 5(e)(i) of E.O. 13807 provides broad direction to CEQ to enhance and modernize the Federal environmental review and authorization process, including by issuing such regulations as CEQ deems necessary to:  (1) ensure optimal interagency coordination of environmental review and authorization decisions; (2) ensure that multi-agency environmental review and authorization decisions are conducted in a manner that is concurrent, synchronized, timely, and efficient; (3) provide for use of prior Federal, State, Tribal, and local environmental studies, analysis, and decisions; and (4) ensure that agencies apply NEPA in a manner that reduces unnecessary burdens and delays, including by using CEQ's authority to interpret NEPA to simplify and accelerate the NEPA review process.  The direction given by the President to CEQ in E.O. 13807 to use its authority to interpret NEPA to simplify and accelerate the NEPA review process builds on and is consistent with the direction given by the President to CEQ in E.O. 11514, as amended by E.O. 11991, to design regulations for implementing the procedural provisions of NEPA to make the process more useful to decision makers and the public and

---

[38] *Supra* note 2.

reduce paperwork and the accumulation of background extraneous data. CEQ cites E.O. 11514, as amended by E.O. 11991, in the Authority sections for 40 CFR parts 1500–1508. Therefore, it is appropriate to update the Authority sections for each part to include the citation to E.O. 13807.

*Comment*: A commenter recommended adding a step involving mediation, arbitration, or independent review early in the process as a means of saving time for agencies, resolving issues, and avoiding costly, time consuming, and expensive legal challenges. The commenter also noted that this step should not negate later challenges because an agency may nonetheless avoid recommendations.

*CEQ Response*: The final rule includes numerous opportunities for agencies to involve the public and resolve issues, including expanding scoping to include the time before an NOI is issued. The final rule also requires that agencies request public comments on an NOI and the draft EIS, and provides that an agency may request comments after issuance of the final EIS. The final rule also provides for elevation of disputes that may lead to delays for timely resolution by appropriate officials of the responsible agencies. Additional steps, such as those recommended by the commenter, are not necessary.

*Comment*: Commenters stated that the phrase "economic and technical considerations" is used throughout the proposed regulations, and that it would be helpful to provide definitions of what this means; such as whether it refers to "economic" hardship to the agency, the applicant, or other entity.

*CEQ Response*: CEQ declines to provide definitions for economic and technical considerations. These terms are general references to feasibility on the basis of economic and technical constraints. Agencies should apply these terms based on their common meaning as

informed by their experience and expertise and the circumstances of the particular proposed
action.

## C.    Comments Regarding the Purpose, Policy, and Mandate (Part 1500)

### 1.    Purpose and Policy (§ 1500.1)

*Comment*:  Commenters supported CEQ's revisions to § 1500.1 to align the section more
closely with the statute and certain case law, and to clarify that NEPA is a procedural statute that
does not compel particular results or substantive outcomes.

*CEQ Response*:  In the final rule, CEQ finalizes its proposed revisions to § 1500.1 to
provide an overview of the purpose and policy of NEPA and the implementing regulations, and
align this section more closely with the statutory text.  CEQ revises paragraph (a) to make clear
the national environmental policy Congress established in section 101 of NEPA.  *See* 42 U.S.C.
4331(a).  To make clear the general procedural requirements set forth in section 102(2)(C) of
NEPA, CEQ also revises § 1500.1 to reference these provisions and explain that the statute
requires Federal agencies to provide a detailed statement on proposals for major Federal actions
significantly affecting the quality of the human environment.  *See* 42 U.S.C. 4332(2)(C).

Consistent with the statute and case law, and as discussed in the NPRM, CEQ finalizes its
proposed revisions in § 1500.1(a) to also include language recognizing that NEPA is a
procedural statute.  The purpose of NEPA is satisfied if a Federal agency has considered relevant
environmental information and the public has been informed regarding the decision-making
process.  In contrast to other statutes that provide agencies with authority to require particular
results or substantive outcomes, such as the ESA, Clean Air Act, and Clean Water Act, NEPA
does not provide authorization for agencies to require mitigation.  As the Supreme Court has
stated, "[o]ther statutes may impose substantive environmental obligations on [F]ederal agencies,

53

but NEPA merely prohibits uninformed—rather than unwise—agency action." *Methow Valley*,

490 U.S. at 351. Additionally, to addresses concerns raised in response to the ANPRM that

NEPA and the CEQ regulations can lead to excessive litigation, CEQ states in § 1500.1(a) that

NEPA's purpose is not to generate litigation. CEQ also retains language from the 1978

regulations stating that NEPA's purpose is not to generate paperwork but is to foster excellent

action.

To make the regulations clearer and easier to follow, CEQ also finalizes its proposed

revisions in § 1500.1(b) to summarize briefly  the regulations as updated, including by stating

that the regulations provide direction to Federal agencies to determine what actions are subject to

NEPA and the level of review. Section 1500.1(b) further states that the regulations are intended

to ensure that relevant information is identified and considered early in the process in order to

ensure informed decision making by agencies. Consistent with Executive orders, including

E.O. 11514, as amended, and E.O. 13807, CEQ explains that the regulations implement

section 102(2) of NEPA. CEQ also states that the regulations are intended to ensure agencies

conduct environmental reviews in a coordinated, consistent, predictable and timely manner, and

to reduce unnecessary paperwork and delays, and advance the policy of integrating NEPA with

other environmental reviews to promote concurrent and timely reviews and decision making

consistent with statutes, Executive orders, and CEQ guidance. *See, e.g.*, 42 U.S.C. 5189g;

23 U.S.C. 139; 42 U.S.C. 4370m *et seq.*; E.O. 11514, as amended by E.O. 11991, sec. 3(h);

E.O. 13604; E.O. 13807, sec. 5(e); Final Guidance for Federal Departments and Agencies on the

Appropriate Use of Mitigation and Monitoring and Clarifying the Appropriate Use of Mitigated

Findings of No Significant Impact[39] ("Mitigation Guidance") and Final Guidance on Improving the Process for Preparing Efficient and Timely Environmental Reviews Under the National Environmental Policy Act[40]. CEQ intends these revisions to make the regulations clearer to follow and to assist Federal agencies as they comply with NEPA.

*Comment*: Commenters opposed CEQ's revisions to § 1500.1 as inconsistent with the purpose and intent of NEPA. Other commenters argued that the revised section focused on the procedural aspects of NEPA and did not sufficiently emphasize environmental protection. Some commenters also objected to the statement in § 1500.1(a) that "the purpose and function of NEPA is satisfied if Federal agencies have considered relevant information and the public has been informed regarding the decision-making process." Other commenters stated that the purpose of NEPA was not to inform the public but to involve the public in the NEPA process. Some commenters referred to NEPA as the "Magna Carta" or "charter" of Federal environmental protection. Other commenters opposed eliminating sentences referring to NEPA as our "basic national charter" and to NEPA's "action-forcing provisions." Commenters also stated that the proposed revisions fail to meet the statute's mandate to use all practicable means to safeguard the environmental for future generations. Finally, commenters stated that NEPA was not procedural.

*CEQ Response*: The purpose of the regulations, as directed by E.O. 11514, as amended, is to give direction to Federal agencies on the implementation of the procedural provisions of the Act (42 U.S.C. 4332(2)). *See* E.O. 11514, as amended by E.O. 11991, sec. 3(h). CEQ's

---

[39] 76 FR 3843 (Jan. 21, 2011), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Mitigation_and_Monitoring_Guidance_14Jan2011.pdf.

[40] 77 FR 14473 (Mar. 12, 2012), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/Improving_NEPA_Efficiencies_06Mar2012.pdf.

revisions are consistent with and more closely track section 101 of the Act by setting forth the national environmental policy Congress established and the relevant provisions in section 102(2)(C) for carrying out that policy. *See* § 1500.1(a) and 42 U.S.C. 4331(a), 4332(2)(C).

Specifically, in paragraph (a) of § 1500.1, CEQ states that NEPA is a procedural statute intended to ensure that Federal agencies consider the environmental impacts of their actions in the decision-making process, 42 U.S.C. 4332(2)(C), replacing the reference in 40 CFR 1500.1(a) to NEPA as "our basic national charter for protection of the environment," which is not language in the statute nor is "Magna Carta." As explained in the NPRM, CEQ also revises paragraph (a) of § 1500.1 to replace the vague reference to "action-forcing" provisions ensuring that Federal agencies act "according to the letter and spirit of the Act" with a more specific reference to the consideration of environmental impacts of their actions in agency decisions. These changes codify the Supreme Court's interpretation of section 102 as serving NEPA's purpose in two important respects: section 102 "ensures that the agency, in reaching its decision, will have available, and will carefully consider, detailed information concerning significant environmental impacts; it also guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decision[-]making process and the implementation of that decision." *Methow Valley*, 490 U.S. at 349; *see Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 23 (2008); *Pub. Citizen*, 541 U.S. at 756–58. Additionally, the term "action-forcing" does not appear in the NEPA statute.

CEQ's statement that the purpose and function of NEPA is satisfied where the agency has considered relevant environmental information and informed the public of its decision-making process is consistent with the statute and case law. The Supreme Court has stated that NEPA is a

56

procedural statute that serves the twin aims of ensuring that agencies consider the significant environmental consequences of their proposed actions and inform the public about their decision making. *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council, Inc*., 462 U.S. 87, 97 (1983) (citing *Vt. Yankee*, 435 U.S. at 553; *Weinberger v. Catholic Action of Haw./ Peace Educ. Project,* 454 U.S. 139, 143 (1981)). As also explained in the NPRM, the Supreme Court has made clear that NEPA is a procedural statute that does not mandate particular results; "[r]ather, NEPA imposes only procedural requirements on [F]ederal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions." *Pub. Citizen*, 541 U.S. at 756–57 (citing *Methow Valley*, 490 U.S. at 349–50); *see also Vt. Yankee*, 435 U.S. at 558 ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural."). NEPA is a procedural statute that requires agencies to look before they leap, as specified in the CEQ regulations.

NEPA prescribes a process to ensure informed decision making but does not mandate substantive outcomes. The Supreme Court has stated that "[s]imply by focusing the agency's attention on the environmental consequences of a proposed project, NEPA ensures that important effects will not be overlooked or underestimated only to be discovered after resources have been committed or the die otherwise cast." *Methow Valley*, 490 U.S. at 349.

CEQ's revisions to § 1500.1 do not shift the emphasis away from or weaken environmental protection. Nothing in this section alters the statutory requirements of NEPA, which advance environmental protection through procedural mechanisms by mandating that agencies consider relevant environmental information as part of their decision-making process for proposed major Federal actions significantly affecting the quality of the human environment. 42 U.S.C. 4332(2)(C). Under the statute, that relevant environmental information includes (i) the

57

environmental impact of the proposed action; (ii) any adverse environmental effects that cannot be avoided should the proposal be implemented; (iii) alternatives to the proposed action; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible and irretrievable commitments of resources that would be involved in the proposal should it be implemented.  42 U.S.C. 4332(2)(C)(i)–(v).

Section 1500.1 provides an overview of NEPA's statutory requirements.  Subsequent provisions in the CEQ regulations address agency consideration of the detailed information specified above, impose limitations on actions that can be taken during the decision-making process, and require the agency to prepare a ROD discussing alternatives, the agency's decision, and whether the agency has adopted all practicable means to avoid or minimize environmental harm.  *See* §§ 1502.1, 1502.16, 1502.22, 1505.2, and 1506.  Consistent with § 1505.2, in their RODs, agencies must not only identify alternatives they considered, but also specify the environmentally preferable alternatives, discuss factors agencies considered in selecting an alternative, include any balancing of essential considerations of national policy, and state whether the agencies adopted all practicable means to avoid or minimize harm from the alternative selected, and if not, why not.

CEQ's revisions in § 1500.1 also do not improperly shift the emphasis away from analysis or advancing environmental protection to merely considering environmental data or informing the public of a decision.  To the contrary, § 1500.1 affirms that the purpose of NEPA is not to generate paperwork but to promote excellent action by Federal agencies, retaining language from the 1978 regulations.  This statement is consistent with section 101 of NEPA stating that it is the policy of the Federal Government to use all practicable means and measures

58

in order "to foster and promote the general welfare, to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  42 U.S.C. 4331(a).

*Comment*:  Commenters stated that revisions to § 1500.1 were not consistent with the case law requiring that agencies take a "hard look" at environmental impacts.

*CEQ Response*:  As noted in section II.B.1, CEQ revises § 1500.1 to align more closely with the statutory text and includes language reflecting the statutory requirements of section 102(2)(C) that relate to the analysis agencies must undertake to comply with NEPA. Neither the statute nor the 1978 regulations refer to "hard look," and CEQ does not insert a reference to that phrase in the final rule.  However, CEQ's revised regulations continue to provide detailed direction for agencies regarding the evaluation of environmental consequences of proposed actions that agencies must undertake during the NEPA process.  *See, e.g.*, §§ 1501.3, 1501.5, 1501.9, 1502.1, 1502.16, and 1505.2.  Review of agency NEPA actions, which would take place under the APA, will be based on the arbitrary and capricious standard of review.

*Comment*:  Commenters suggested striking the language stating that the purpose of NEPA is not to generate paperwork or litigation because the terms "paperwork" or "litigation" are not in the statute.

*CEQ Response*:  While these terms do not appear in the statute, prior CEQ analyses and comments in response to the ANPRM and NPRM have highlighted concerns that the NEPA process can generate lengthy documents and lead to protracted litigation and related delays. Stating that NEPA's purpose is not to generate paperwork or litigation clarifies that these are not objectives of the statute, and that the purpose is to ensure Federal agencies consider environmental impacts in order to promote informed decision making.

*Comment*:  Commenters opposing CEQ's revision to § 1500.1 stated the revisions fail to give agencies direction on how and to what end environmental information should be considered in NEPA analyses.

*CEQ Response*:  The regulations provide direction to agencies on implementing the procedural provisions of NEPA.  As discussed above, the statute enhances the quality of agency decisions that may affect the environment by mandating in section 102(2)(C) that agencies prepare detailed statements for proposed major Federal actions significantly affecting the quality of the human environment and include in those statements:  (i) the environmental impact of the proposed action; (ii) any adverse environmental effects that cannot be avoided should the proposal be implemented; (iii) alternatives to the proposed action; (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity; and (v) any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented.  42 U.S.C. 4332(2)(C)(i)–(v).  In §§ 1502.1, 1502.16, 1502.21, 1505.2, and 1506.1 , CEQ addresses how agencies should consider such information, limitations on actions during the decision-making process, and the requirement that agencies must state as part of their ROD whether they have adopted all practicable means to avoid or minimize environmental harm, and if not, why the agency did not.

As revised, the regulations provide clearer direction on the analysis required under NEPA, consistent with the statute and case law, and such direction will promote informed decision making and decisions to avoid or minimize environmental harm, consistent with statutory requirements and agency statutory authorities.  While NEPA does not provide agencies new authorities to require mitigation or take action, agencies should use the information generated by the NEPA process to consider appropriate actions allowed under their substantive

60

statutory authorities.  To the extent the updated regulations promote more timely decision making to modernize infrastructure or authorize projects that benefit the environment, this will also advance the goals of the national environmental policy set forth in NEPA.

*Comment*:  Some commenters opposed the revisions to § 1500.1 as shifting the emphasis from environmental protection to streamlining project delivery.

*CEQ Response*:  An efficient and timely NEPA process and environmental protection are not mutually exclusive.  To the contrary, efficient and timely processes are not only important but also necessary to support the development of new and more efficient infrastructure, as well as for environmentally beneficial projects, including environmental restoration projects. Ensuring an efficient NEPA process is also consistent with and builds on the actions of prior administrations to improve implementation of the NEPA process.  *See* sections I.B.1 and I.E. Further, as discussed in these sections of the preamble, both E.O. 11514, as amended, directing CEQ to promulgate the original regulations, and E.O. 13807 directing CEQ to consider revisions to modernize these regulations, focused on reducing paperwork and delay and improving the efficiency of the process.  Moreover, as noted in CEQ's NPRM and in sections I.E and I.B.2, streamlining the NEPA process has also been the subject of other presidential directives as well as CEQ guidance and analyses relating to implementation of NEPA.  Numerous commenters in response to the ANPRM and NPRM also supported increasing the efficiency of the NEPA process.

*Comment*:  Commenters stated the revisions to § 1500.1 did not appropriately emphasize public involvement in the NEPA process.

*CEQ Response*:  CEQ's revisions to § 1500.1 more closely align this section with the statute, which directs Federal agencies to inform the public, as well as the President and CEQ, of

61

the detailed statement prepared by the agency.  42 U.S.C. 4332(2)(C).  Consistent with these

provisions, § 1500.1 of the final rule expressly states that the public must be informed of the

decision-making process.

In the regulatory provisions that follow, CEQ continues to emphasize public involvement

as part of the NEPA process.  In particular, while the solicitation of comments from the public is

not expressly required under the statute, CEQ in its 1978 regulations directed Federal agencies to

engage with the public.  Provisions relating to public involvement in the final rule include

sections addressing the scoping process, notice of intent to prepare an EIS, and invitations to

comment on the draft (and where applicable final) EIS.  *See, e.g.,* §§ 1501.9(d), 1502.17, 1503.1,

and 1506.6.  In the final rule, CEQ continues to require public engagement and has included

provisions in § 1501.9(d) to require agencies to provide more information to and solicit

information from the public earlier in the process.  In §§ 1501.7(b) and (d), 1501.8(a), 1501.9(b),

1501.10(f), 1502.5(b), 1502.20, and 1503.1(a)(2), CEQ also directs Federal agencies to increase

Tribal engagement.  In §§ 1502.20, 1503.1(c), 1506.6(b)(3)(x), 1506.6(c), and 1507.4, CEQ also

emphasizes the use of current technologies to increase public engagement.  The updated

regulations also provide clearer direction on public involvement in § 1506.6, encourage the use

of more modern and current technologies to facilitate public involvement where available, and

enhance public participation in the NEPA process.

*Comment*:  Commenters also opposed elimination of language in § 1500.1 stating that

environmental information analyzed by agencies must be of high quality, and that accurate

scientific analysis, expert comments, and public scrutiny are essential to implementing NEPA.

Commenters stated that consideration of scientifically accurate information is essential to the

NEPA process.

62

*CEQ Response*:  Since promulgation of the 1978 regulations, Congress passed the Information Quality Act,[41] which ensures that agencies consider scientifically accurate information as part of their decision-making process.  The updated regulations complement the Information Quality Act.

CEQ agrees that consideration of information that is of high quality and scientifically accurate is important to the NEPA process.  In the regulations, CEQ continues to emphasize consideration of scientifically accurate information.  *See* § 1502.21.  Section 1502.23 specifically addresses methodology and scientific accuracy and directs agencies to ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents.  As noted in this section, the regulations also include detailed direction to agencies regarding commenting and public involvement including in §§ 1501.9(d), 1502.17, 1503.1, 1506.6, and 1507.4.

*Comment*:  Commenters asserted that the proposed regulations ignored section 105 of NEPA.  Commenters also maintained that section 105 authorizes the imposition of environmentally protective measures.

*CEQ Response*:  Section 105 of NEPA provides that the Act's policies and goals are supplementary to those set forth in existing authorizations of Federal agencies.  42 U.S.C. 4335. This section recognizes that NEPA did not repeal existing law.  *See* H. Rep. No. 91–765 at 10 (1969)(Conf. Rep.).  The 1978 regulations at 40 CFR 1500.6, "Agency authority," included language reflecting section 105 and the final rule retains this language in § 1500.6, with modifications, including to clarify that an agency shall interpret NEPA as a supplement to its

---

[41] Pub. L. 106–554 sec. 515, 114 Stat. 2763, 2763A–153–154 (2000)); *see also* Final Information Quality Bulletin for Peer Review, 70 FR 2664 (Jan. 15, 2005).

existing authority and as a mandate to view policies and missions in light of the Act's national

environmental objectives, consistent with its existing authorities.  To construe NEPA as an open-

ended statute that imposes substantive environmental protection requirements would not be

consistent with the text of the statute or with relevant case law.  As discussed above, the

Supreme Court has interpreted NEPA to impose procedural rather than substantive requirements.

These procedural requirements supplement any other existing statutory requirements with which

agencies must comply, and require agencies to consider the environmental consequences of their

proposed actions.  NEPA's procedural requirements, however, do not require or authorize

actions to be taken to mitigate adverse impacts of a proposed major Federal action.  *See Methow

Valley,* 490 U.S. at 353 & n.16.

While NEPA does not impose substantive requirements to take action to mitigate the

adverse effects of a proposed major Federal action, part of the process prescribed by NEPA is to

discuss possible measures to mitigate adverse environmental consequences.  In their decision-

making process, agencies should consider whether mitigation measures fall within the relevant

statutory authorities of the lead or cooperating agencies, and, if so, whether imposition of

mitigation measures would be appropriate under the circumstances.

*Comment*:  Commenters objected to the statement that the original goals of the

regulations were to reduce paperwork and delays and promote better decisions consistent with

the national environmental policy established by the Act.

*CEQ Response*:  E.O. 11514, as amended by E.O. 11991, directed CEQ to issue

regulations for the implementation of the procedural provisions of NEPA, and specifically

directed that they be designed to reduce paperwork and to provide for the early preparation of

EISs.  E.O. 11991(h).  The 1978 regulations also included provisions in 40 CFR 1500.4 and 1500.5 to reduce paperwork and to reduce delay.

### 2.    Policy Removed and Reserved (§ 1500.2)

*Comment*:  CEQ received comments both supporting removal of 40 CFR 1500.2 as duplicative of subsequent sections of the regulations and comments opposing removal of 40 CFR 1500.2.  A number of commenters specifically opposed the striking of 40 CFR 1500.2(f).  They stated that deletion was not consistent with section 101(b) of NEPA, which directs that in carrying out the national environmental policy established in section 101(a), the Federal Government "must use all practicable means, consistent with other essential considerations of national policy, to improve and coordinate Federal plans, functions, programs, and resources" to meet environmental goals.

*CEQ Response*:  CEQ removes and reserves 40 CFR 1500.2 because it is duplicative.  As discussed in detail in section II.B.2 of the final rule, this section in the 1978 regulations primarily included language identical or similar to language in E.O. 11514, as amended, which directed CEQ to develop regulations that would make the EIS more useful to decision makers and the public, and to reduce paperwork and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives.  *See* E.O. 11514, as amended by E.O. 11991, sec. 3(h).  That Executive order also directed that CEQ require agency statements to be concise, clear and to the point, and supported by evidence that agencies have made the necessary environmental analyses.  *Id*.

With respect to 40 CFR 1500.2(f), while there is no necessity to restate the statutory text in regulations, the revised regulations do include provisions that discuss the balancing referenced in section 101(b) of the statute, and also direct agencies to explain whether they have used

65

practicable means to avoid or minimize environmental harm.  In particular, § 1505.2 requires agencies in a ROD to identify all alternatives considered, specifying which were environmentally preferable, identify and discuss all factors, including any essential considerations of national policy the agency balanced in making its decision, and state how those considerations entered into its decision.  Agencies must also state whether they have adopted all practicable means to avoid or minimize environmental harm from the alternative selected.  Section 1505.2 is consistent with section 101(b), which recognizes that agencies must balance competing considerations in the decision making process.

As discussed in this document, the NEPA process advances environmental protection through a procedural mechanism by requiring agencies to consider relevant environmental information as part of their decision-making processes, including potential adverse effects and alternatives to the proposed action, and to explain whether they have taken all practicable means to avoid or minimize environmental harm.  Striking this section will improve readability of the regulations and reduce unnecessary duplication.

*Comment*:  Some commenters acknowledged that language from 40 CFR 1500.2 was found in other subsections of the regulations but opposed its deletion because the phrase "to the extent possible" was not included in those subsequent sections.  Commenters also stated that "to the fullest extent possible" in section 102 was intended to broaden the responsibilities of agencies to integrate the substantive goals of NEPA into their organic authorities.

*CEQ Response*:  NEPA establishes procedural requirements but does not mandate particular results or substantive outcomes.  The 1978 regulations addressed the phrase "to the extent possible," which is found in section 102 of NEPA.  CEQ revises the sentence explaining the meaning of the phrase "to the fullest extent possible" in section 102, replacing "unless

66

existing law applicable to the agency's operations expressly prohibits or makes compliance impossible" with "consistent with § 1501.1." As discussed elsewhere in the final rule and this document, § 1501.1 sets forth threshold considerations for assessing whether NEPA applies or is otherwise fulfilled including considerations related to other statutes with which agencies must comply. The addition of the NEPA thresholds aligns the CEQ regulations with statutory developments and legal mandates as explained in Supreme Court and other case law undergirding § 1501.1.

### 3.    NEPA Compliance (§ 1500.3)

#### i.    Exhaustion

*Comment*: Commenters noted that the proposed rule frequently used the term "public commenters," including in § 1500.3, but the meaning of the term is unclear. Commenters recommended including a definition for public commenters.

*CEQ Response*: The term "public commenters" does not have a distinct meaning. However, that terms is intended to distinguish those commenters from the public as opposed to certain governmental commenters. Thus, to clarify that the summary and certification must address all timely submitted comments regardless of the source and for consistency with §§ 1501.2(b)(4)(ii), 1501.7(d), 1501.9(b), 1502.20, and 1503.1, CEQ has revised §§ 1500.3, 1502.17, and 1505.2(b) by adding "State, Tribal, and local governments and" before "public commenters."

*Comment*: Commenters stated the proposed regulatory changes impermissibly eliminate mitigation as a Federal activity under NEPA. Specifically, commenters expressed concern with the additional language at proposed § 1500.3, "Agency NEPA procedures to implement these regulations shall not impose additional procedures or requirements beyond those set forth in

67

these regulations, except as otherwise provided by law or for agency efficiency."  A commenter stated this language would have the effect of precluding an agency from requiring a project proponent to conduct mitigation where the agency is unable to require it under a separate legal authority.  Commenters stated this language is contrary to the statute, which requires Federal agencies to use all practicable means to restore and enhance the quality of the human environment and avoid or minimize any possible adverse effects.  Commenters asserted that CEQ attempts to justify these positions by arguing that NEPA is not a "substantive" statute, but a "procedural" one and that this argument overlooks the fact that mitigation is a matter of procedure, not substance.  Commenters also stated that the lead agency's mitigation authorities should not matter at all because a Federal agency should be able to choose mitigation, regardless of authority.

*CEQ Response*:  The Supreme Court has made clear that NEPA is a procedural statute that does not mandate particular results on individual actions; "[r]ather, NEPA imposes only procedural requirements on [F]ederal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions."  *Pub. Citizen,* 541 U.S. at 756-57 (citing *Methow Valley,* 490 U.S. at 349-50); *see also Vt. Yankee,* 435 U.S. at 558 ("NEPA does set forth significant substantive goals for the Nation, but its mandate to the agencies is essentially procedural.")  Following Supreme Court case law, agencies must rely on legal authorities other than NEPA to require an applicant to conduct mitigation for a proposed action.  The claim that mitigation is a matter of procedure is incorrect.  Requiring mitigation extends beyond analyzing the proposed action and alternatives.

*Comment*:  Commenters raised concerns with the administrative burden of a new process for soliciting and incorporating alternatives, information and analysis from stakeholders in proposed §§ 1500.3(b), 1501.9(d)(7), 1502.17, 1502.18 (1505.2(b) in the final rule), and 1503.1(a)(3).  Commenters expressed concerns with the solicitation of specific information during scoping, summary of that information in the draft and final EIS and the subsequent comment on that information, coupled with the exhaustion and forfeiture provisions in the proposed changes in these sections.  Commenters stated these sections would require Federal agencies to follow new procedures for soliciting and incorporating information and analysis from stakeholders.  Some commenters suggested CEQ revise the provisions to permit agencies to use these provisions on a case-by-case basis at the agency's discretion.

*CEQ Response*:  In response to comments, CEQ has revised portions of this process including clarifying § 1503.1(a)(3) regarding what information agencies must request from the public.  CEQ proposed this process, including the invitation to comment at § 1503.1(a)(3) on the summary of all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters at § 1502.17 as a means of enhancing public involvement and the decision-making process.  The 1978 regulations required agencies to consider the information received during scoping in development of the draft EIS.  As a matter of practice, some agencies routinely summarize and publish comments received during the scoping process in a scoping report.  The final rule codifies these practices and instructs the agency to summarize information submitted by commenters in a consolidated section of the draft and final EIS.  This will enhance the NEPA process and inform decision making by distilling information in a more digestible form.  The summary complements the requirements in § 1502.14(a) that the agency evaluate reasonable alternatives and in § 1503.4 that the agency

69

consider substantive comments.  This is a new process, but when balanced against the benefits of increasing transparency, it is not an undue burden.

*Comment*:  Commenters objected to the proposed requirement in §§ 1500.3(b)(3) and 1503.3(a) that comments be "as specific as possible."  Commenters stated this would cause commenters to write unduly lengthy comments, which in turn would lead to an increase in litigation.  Commenters also stated that the proposed process for providing comments would require a level of knowledge or sophistication that some interested parties may not have.

*CEQ Response*:  The 1978 regulations stated that comments "shall be as specific as possible."  40 CFR 1503.3(a).  The final rule updates §§ 1500.3(b)(3) and 1503.3(a) to reflect that commenters must provide as much detail as necessary to meaningfully participate in the NEPA process and fully inform the agency of the commenter's position.  This is consistent with Supreme Court case law.  *See Vt. Yankee*, 435 U.S. at 553 (although "NEPA places upon an agency the obligation to consider every significant aspect of the environmental impact of a proposed action, it is still incumbent upon [parties] who wish to participate to structure their participation so that it is meaningful, so that it alerts the agency to the [parties'] position . . . .").  The final rule also states that comments should reference the section or page of the draft EIS, propose specific changes, where possible, and include or describe the data sources and methodologies supporting the proposed changes.  *Id.* at 553 ("[Comments] must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes a concern.  The comment cannot merely state that a particular mistake was made . . . ; it must show why the mistake was of possible significance in the results . . . ." (quoting *Portland Cement Assn. v. Ruckelshaus*, 486 F.2d 375, 394 (1973)).  CEQ includes these provisions to ensure that agencies are alerted to all interested and affected parties' concerns.

70

Nothing in the final rule should be construed to limit public comment to those members of the public with scientific or technical expertise, and agencies should continue to solicit comment from all interested and affected members of the public at the appropriate points in the process. Further, the final rule is similar to the 1978 regulations concerning commenting and similarly advances the goal of informed decision making.  Comments that are relevant to the agency's decision, particularized to the action the agency is evaluating, and timely submitted can meaningfully inform the agency's analysis.  Specific comments will lead to the identification and consideration of relevant issues by agencies, which is the focus of NEPA's requirements.

*Comment*:  Several commenters expressed strong support for the requirement that comments be specific and timely, as well as the provision that comments not timely raised are deemed unexhausted and forfeited.  These commenters observed that, without these requirements, parties are able to bring challenges to projects at a multiplicity of points, including "eleventh-hour" submissions, causing unnecessary uncertainty, disruption, and delay.

*CEQ Response*:  The NEPA process is best served if comments are relevant to the decision the agency is considering and are specific and timely enough to be of use to the agency in its decision-making process.

*Comment*:  Some commenters raised concerns that the proposed rule would limit the public to commenting on the completeness of the summary rather than the purpose and need of a project.  Concerning the provisions related to exhaustion, commenters requested that agencies have discretion to include all public comments.

*CEQ Response*:  In the final rule, the language relating to the completeness has been eliminated in § 1503.1(b) in response to comments.  Similar to the 1978 regulations, the final rule directs agencies to invite comment on all aspects of the draft EIS, including the purpose and

71

need, and additionally directs agencies to invite comment specifically on the submitted

alternatives, information, and analyses and the summary.  *See* § 1503.1(a).  Pursuant to

§ 1503.4(b), agencies must append or otherwise publish all substantive comments received on

the draft statement, or summaries where the responses have been exceptionally voluminous.

*Comment*:  Commenters stated that requiring interested parties to provide comments in a

timely manner could be prejudicial to parties that are not aware of a pending draft EIS, or that

may not have the resources to respond in a timely way.  Some commenters said the requirements

particularly disadvantage Tribes, which would not have a remedy in the event of not receiving

proper notice or the resources to respond during the specified periods.

*CEQ Response*:  The final rule contains many mechanisms designed to facilitate and

enhance notice to interested parties and their ability to provide meaningful input.  This begins in

the scoping process (§ 1501.9(b)), where the lead agency must invite the participation of likely

affected Federal, State, Tribal, and local agencies and governments, the proponent of the action,

and other likely affected or interested persons, including those who might not be in accord with

the action.  It continues with the publication of an NOI (§ 1501.9(d)), which must include, as

appropriate, a preliminary description of the proposed action and alternatives the EIS may

consider, a brief summary of expected impacts, a schedule for the decision-making process, a

request for identification of potential alternatives, information, and analyses relevant to the

proposed action, and contact information for a person within the agency who can answer

questions.  Similarly, after preparation of a draft EIS and before preparation a final EIS,

§ 1503.1(a) requires the lead agency to invite the comments of appropriate State, Tribal, and

local agencies that are authorized to develop and enforce environmental standards, State, Tribal,

or local governments that may be affected by the proposed action, and the public, affirmatively

72

soliciting comments in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed action.  Additionally, the final rule's public involvement provisions in § 1506.6 require that agencies make diligent efforts to involve the public and provide public-notice of NEPA-related hearings, public meetings, and other opportunities for public involvement.  Section 1506.6 also states that agencies should consider the ability of affected person and agencies to access electronic media when selecting appropriate methods for providing public notice and public involvement.  By requiring agencies to provide the public more information earlier in the process, affirmatively soliciting comments throughout the development of an EIS, and assuring public involvement opportunities, the final rule gives interested parties ample opportunity to provide timely, relevant, and specific comments.  Where appropriate, agencies may also receive input directly from Tribes pursuant to their procedures under E.O. 13175 to conduct government-to-government consultations.

*Comment*:  Commenters objected to excluding information that becomes available after the close of the comment period on the draft EIS due to exhaustion.  In further references to this point, commenters stated that an NOI is a preliminary statement that notifies the public of a pending action or construction project and that limited data and information are gathered at the time an agency issues the NOI.

*CEQ Response*:  Section 1501.9(d) requires agencies to provide more information to the public in the NOI, and to solicit more information from the public earlier in the process, than was required under the 1978 regulations.  As a result of these changes, NOIs will be more informative and, by extension, generate more constructive public input into the draft EIS. The final rule includes multiple opportunities for public involvement.  However, it is important to establish a point in the NEPA process after which an agency is no longer obligated to review

73

information not otherwise in the administrative record.  The Supreme Court has long recognized

that there would be little hope the administrative process could ever conclude if the process

could be kept open because "some new circumstance has arisen, some new trend has been

observed, or some new fact discovered . . . ."  *Vt. Yankee*, 435 U.S. at 554–55 (citing *ICC v.

Jersey City*, 322 U.S. 503, 514 (1944)).  With regard to new information, § 1502.9(d) addresses

circumstances where there is significant new information relevant to environmental concerns

bearing on the proposed action or its impacts and how agencies must address such

circumstances.

*Comment*:  Some commenters suggested that interested parties may have "unique

understandings" or "specialized knowledge" that may be pertinent to the NEPA decision-making

process, and that failure to consider those understandings is inconsistent with Congress' purposes

in enacting the statute.

*CEQ Response*:  Nothing in the rule prevents "unique understandings" or "specialized

knowledge" from being considered by an agency.  This body of knowledge may be relevant to

the NEPA decision-making process for a proposed action.  Consistent with § 1503.4, agencies

must consider substantive comments that are timely submitted during the public comment

period.  The final rule's requirements regarding comments enable agencies to obtain such

information from the public early in the decision-making process to facilitate the information

gathering process and to avoid harmful delays.

*Comment*:  A number of commenters raised concerns with the proposed requirement for

agencies to provide a 30–day comment period on the final EIS summary of submitted

alternatives, information, and analyses at §§ 1500.3(b)(3) and 1503.1(b).  Some commenters

objected that it was an unnecessary burden on agencies and would result in delays.  Commenters

74

stated that it was overly burdensome and not necessary to support the agency's certification that it has considered that information.  Some commenters suggested revising the requirement so that agencies have the discretion to request comments on the summary of submitted alternatives, information, and analyses section in the final EIS.  Commenters also stated that requiring legal challenges to be filed within 30 days following issuance of the final EIS and narrowing the ability to seek injunctions would reduce delays to critical Federal projects, such as those that seek to reduce wildland fire risk on Federal lands.

Other commenters appeared to be confused by the proposed final EIS comment period as the only public comment period in the NEPA process and stated that would disadvantage communities, particularly those with few resources

*CEQ Response*:  In response to comments, CEQ has revised the final rule to remove the requirement of a 30–day comment period on the final EIS.  Agencies may request comments on the final EIS and set a deadline for providing such comments consistent with § 1503.1(b).  CEQ anticipates that agencies will use this option when the EIS would benefit from additional public comment.  CEQ notes that under the 1978 regulations, agencies may seek comments during the 30–day period between publication of a final EIS and issuance of the ROD.

*Comment*:  Some commenters stated that CEQ lacks authority to establish rules of waiver or exhaustion.

*CEQ Response*:  Agencies have the power to establish exhaustion requirements.  *See, e.g., Woodford v. Ngo*, 548 U.S. 81, 89 (2006) ("First, exhaustion protects administrative agency authority.  Exhaustion gives an agency an opportunity to correct its own mistakes with respect to the programs it administers before it is haled into [F]ederal court, and it discourages disregard [of the agency's] procedures.") (internal quotation marks and citations omitted); *McKart v. United*

75

*States*, 395 U.S. 185, 193 (1969) ("The doctrine of exhaustion of administrative remedies is well

established in the jurisprudence of administrative law.").  The exhaustion provision in the final

rule reflects the long-standing principle that interested parties must exhaust administrative

remedies by raising issues before an agency prior to making them the basis for an action in court.

*See, e.g., Exxon Mobil Corp. v. EPA*, 217 F.3d 1246, 1249 (9th Cir. 2000) (arguments not raised

in comments waived); *Ass'n of Mfrs. v. Dep't of the Interior*, 134 F.3d 1095, 1111 (D.C. Cir.

1998) (failure to raise argument in rulemaking constitutes failure to exhaust administrative

remedies).  The NEPA process works best when interested parties provide specific, relevant, and

timely information.

    *Comment*:  Commenters stated that deeming comments "unexhausted" and "forfeited" if

not brought in a timely manner is contrary to law, because some flaws are so obvious that the

agency itself either should be or is in fact aware of them.

    *CEQ Response*:  CEQ acknowledges that an oversight in the NEPA process could be so

obvious as to be arbitrary and capricious for purposes of the APA, particularly if an agency has

awareness of it in fact.  *See Pub. Citizen*, 541 U.S. at 765.  Federal agencies have primary

responsibility for NEPA compliance.  *Id.*  However, the final rule contains mechanisms designed

to facilitate and enhance the NEPA process that will aid agencies in avoiding oversights by

identifying relevant information early in the process.  For example, § 1501.9(d)) of the final rule

requires that in the NOI, agencies include, as appropriate, a preliminary description of the

proposed action and alternatives the EIS may consider, a brief summary of expected impacts, a

schedule for the decision-making process, a request for identification of potential alternatives,

information, and analyses relevant to the proposed action, and contact information for a person

within the agency who can answer questions.  Under § 1503.1(a), after preparation of a draft EIS

and before preparation of a final EIS, the lead agency must invite the comments of appropriate

State, Tribal, and local agencies that are authorized to develop and enforce environmental

standards; State, Tribal, or local governments that may be affected by the proposed action; and

the public, affirmatively soliciting comments in a manner designed to inform those persons or

organizations who may be interested in or affected by the proposed action. These solicitations of

information should aid agencies in identifying all relevant information and thereby avoid obvious

oversights.

*Comment*: Some commenters stated that the rule would limit those who did not publicly

comment on the rule from pursuing litigation in court.

*CEQ Response*: Challenges to agency action alleging non-compliance with NEPA

procedures are brought under the APA. 5 U.S.C. 551 *et seq*. Whether a party may pursue

litigation alleging non-compliance with NEPA's procedural requirements will depend on

whether the party has standing. *See, e.g.*, *Karst Envtl. Educ. & Prot., Inc. v. EPA*, 475 F.3d

1291, 1294–95 (D.C. Cir. 2007) ("The 'irreducible constitutional minimum of standing' consists

of three elements: (1) an 'injury in fact' that is (2) 'fairly . . . trace[able] to the challenged action

of the defendant,' and (3) "likely . . . redress[able] by a favorable decision."(citing *Lujan v.

Defenders of Wildlife,* 504 U.S. 555, 560-61 (1992)).

*Comment*: Commenters stated that the proposed rule would improperly limit judicial

review of agency determinations under NEPA. Commenters specifically objected to the

provision in § 1500.3(b)(4) whereby the decision maker would certify the agency's consideration

of the record, as well as the provision that this certification would give rise to a conclusive

presumption of validity in any subsequent judicial review of the agency's determination.

77

Commenters maintained that this combination of certification and conclusive presumption improperly limits the role of the courts under the APA.

*CEQ Response*:  In the final rule, CEQ modifies the proposed text of § 1502.18(b) and moves it to § 1505.2(b) to clarify that the decision maker's certification in the ROD is informed by the summary of submitted alternatives, information, and analyses in the final EIS and any other material in the record that the decision maker determines to be relevant.  This includes both the draft and final EIS as well as any supporting materials incorporated by reference or appended to the document.  The final rule also changes "conclusive presumption" to a "presumption" and clarifies that the agency is entitled to a presumption that it has considered the submitted alternatives, information, and analyses, including the summary thereof, in the final EIS.  The presumption of regularity that supports the final rule reflects the important principle that public officials are presumed to discharge their duties in a regular manner.  *See U.S. Postal Serv. v. Gregory*, 534 U.S. 1, 10 (2001) ("[W]e note that a presumption of regularity attaches to the actions of government agencies.") (citing *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14–15 (1926)).  The presumption may be rebutted by clear and convincing evidence that the agency has not properly discharged its duties under the statute.

### ii.    Judicial Review

*Comment*:  Some commenters supported the proposed language in § 1500.3(c).  Other commenters objected to the provision in the proposed rule stating that agencies could structure their decision making to allow private parties to seek stays of their own decisions pending administrative or judicial review of those decisions.  These commenters asserted that this proposal would impose an additional and unnecessary layer of review for important projects.  Other commenters objected to the provision in the proposed rule stating that agencies would be

authorized to impose bond requirements, "[c]onsistent with their organic statutes," to further the purposes of NEPA. They specifically argue that such requirements might discourage public participation in the NEPA process.

 *CEQ Response*: In the final rule, CEQ strikes the reference to stays in § 1500.3(c). Section 1500.3(c) does not establish any bonding requirements, but rather recognizes that agencies, consistent with their organic statutes, may structure their administrative procedures to include an appropriate bond or other security requirement. Whether the agencies choose to do so is thus beyond the scope of CEQ's authority, but judicial review of any such decisions can be sought at the appropriate time using the relevant cause of action, if one is available.

 *Comment*: A commenter recommended that CEQ consider equitable means to connect bond retention by the courts to the number of issues won or lost in the resulting litigation. For example, if ten issues are litigated and the litigant prevails on only one, then the litigant would forfeit 90 percent of the bond. The commenter also recommended that the regulations require litigants to disclose how they are affected and the economic or environmental effect the litigant expects to suffer. In addition, the commenter recommended that CEQ consider requiring litigants to disclose funding sources for case preparation and courtroom representation, the amount and appropriateness of requiring a bond, and encourage agencies and courts to weigh the relative economic harms implicated by the bond.

 *CEQ Response*: Section 1500.3(c) does not establish any bonding requirements, but rather recognizes that agencies may structure their administrative procedures to include an appropriate bond or other security requirement, consistent with their organic statutes. The establishment of such requirements would depend on the agency's statutory authorities.

*Comment*:  Some commenters supported CEQ's reiteration that judicial review of an agency's determination under NEPA cannot take place until final agency action has occurred. Other commenters argued that judicial review should or must be available as soon as an agency generates any NEPA document under the auspices of the statute, to ameliorate "informational injury."

*CEQ Response*:  NEPA does not include a private right of action and specifies no remedies.  Challenges to agency action alleging non-compliance with NEPA procedures are brought under the APA.  *See* 5 U.S.C. 551 *et seq*.  Accordingly, NEPA cases proceed as APA cases.  Section 704 of the APA authorizes Federal courts to hear cases only after "final agency action" has occurred.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 882 (1990) ("When . . . review is sought not pursuant to specific authorization in the substantive statute, but only under the general review provisions of the APA, the 'agency action' in question must be 'final agency action.'").  Thus, to determine when final agency action has occurred, "[t]he core question is whether the agency has completed its decision[-]making process, and whether the result of that process is one that will directly affect the parties."  *Franklin v. Mass*., 505 U.S. 788, 797 (1992). Because NEPA's procedural requirements apply to proposals for agency action, judicial review should not occur until the agency has completed its decision-making process, and there are "direct and appreciable legal consequences."  *Bennett v. Spear*, 520 U.S. 154, 178 (1997).  Final agency action for judicial review purposes is not necessarily complete when the agency publishes an environmental document such as the final EIS, EA, or FONSI or makes the determination to categorically exclude an action; rather, final agency action occurs when the agency issues the ROD or other decision document to take or not to take a "major Federal action significantly affecting the quality of the human environment."  42 U.S.C. 4332(2)(C).  In some

80

instances, an agency may choose to combine its ROD with a final EIS.  In that case, the combined EIS/ROD would constitute "final agency action" under the APA.

*Comment*:  Several commenters supported of proposed § 1500.3(d), in which CEQ recognized and emphasized that compliance with NEPA's procedural requirements is the ordinary and sufficient remedy for identified violations of the statute.  Others disagreed, stating that injunctive relief is the presumptive remedy for identified violations of NEPA, and relying on the APA and cases construing that Act for authority.

*CEQ Response*:  "NEPA imposes only procedural requirements on [F]ederal agencies with a particular focus on requiring agencies to undertake analyses of the environmental impact of their proposals and actions."  *See Pub. Citizen*, 541 U.S. at 756–57 (citing *Methow Valley*, 490 U.S. at 349–50).  Because analyses of environmental impacts to inform agency decision making are the statute's focus, compliance with its procedures is the proper remedy.  As the Supreme Court has observed, in response to "statements [that] appear to presume that an injunction is the proper remedy for a NEPA violation except in unusual circumstances," "[n]o such thumb on the scales is warranted."  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 157 (2010); *see also Winter*, 555 U.S. at 22, 31–33 ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction.") (emphasis in the original); *Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544–45 (1987) (rejecting the proposition that irreparable damage is presumed when an agency fails to evaluate thoroughly the environmental impact of a proposed action).

Further, CEQ notes that NEPA section 102(2)(C) does not prohibit the substantive action of beginning a project that will cause an "irreversible and irretrievable commitment of resources."  Instead, consistent with NEPA's nature as a procedural statute, NEPA section

81

102(2)(C), as part of the detailed statement, requires that "all agencies of the Federal

Government shall … include in every recommendation or report on proposals for legislation and

other major Federal actions significantly affecting the quality of the human environment, a

detailed statement by the responsible official on … any irreversible and irretrievable

commitments of resources which would be involved in the proposed action should it be

implemented." Including a detailed statement of irreversible and irretrievable commitments of

resources as part of an EIS is a procedural mandate, not a substantive one aimed at avoiding any

particular results or substantive outcomes.

*Comment*: Commenters supported the provision in § 1500.3(d) that "minor, non-

substantive errors" in the NEPA process are harmless and do not affect the validity of agency

action. Commenters stated that invalidating agency action on the basis of such errors does not

serve the process that NEPA contemplates, and it causes unnecessary delay. Other commenters

stated that this provision is superfluous to the harmless error doctrine courts have developed

under the APA, and that CEQ is without authority to expand this doctrine.

*CEQ Response*: CEQ is asserting no more authority in § 1500.3(d) of the final rule than

it did in the 1978 regulations. No assertion of APA interpretive authority is indicated by the

statement that it is CEQ's intention that minor, non-substantive errors that have no effect on

agency decision making are considered harmless and will not invalidate an agency action."

Rather, CEQ is merely indicating its interpretation of the effect of its own regulations, which

courts may consider as they have this provision in the 1978 regulations.

*Comment*: Commenters expressed concern that limiting judicial review until an agency

has issued its ROD in § 1500.3(c) would enable an action to proceed further in the NEPA

process, with an increased chance of poor decision-making and legal vulnerability.

82

*CEQ Response*:  Interim steps in the NEPA process are subject to change and therefore are not, in CEQ's view, final agency actions subject to judicial review within the meaning of *Bennett*, 520 U.S. at 177-78.  Applying judicial review prior to issuing a ROD would generate unnecessary litigation and further delay the NEPA process.

### iii.    Severability

*Comment*:  Several commenters supported the proposed language in § 1500.3(e) regarding severability.  These commenters stated that the changes in the proposed rule are clearly related but not intertwined.  These commenters stated that no single provision of the proposed rule, if removed, would impair the remaining portions of the proposed regulations or render them meaningless.  Other commenters opposed the severability language in § 1500.3(e).  These commenters stated that the proposed rule contains interrelated provisions that should be read holistically.  Some commenters stated that the severability provision improperly purports to direct judicial review with respect to how a court should treat remaining portions of the rule if another provision of the rule is invalidated under NEPA and the APA.

*CEQ Response*:  The final rule merely reflects CEQ's intent regarding severability without directing judicial review.  The APA allows a court to sever a rule by setting aside only invalidated portions of the rule.  *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 351 (D.C. Cir. 2019) (citing *K Mart Corp. v. Cartier*, 486 U.S. 281, 294 (1988); *Virginia v. EPA*, 116 F.3d 499, 500–01 (D.C. Cir. 1997)).  In the event that litigation results in invalidation of a portion of the final rule, the court can address the appropriate remedy based on the particular circumstances at that time.

*Comment*:  Several commenters raised concerns regarding the implications of the severability language in § 1500.3(e) in the event litigation occurs, especially if there are different

legal outcomes in multiple jurisdictions regarding the scope of remedial relief.  Commenters stated that the severability language could result in portions of the final rule being applicable in some jurisdictions but not others, resulting in complexities for Federal agencies, States, Tribes, local governments, and project proponents.  Some commenters stated that the severability language would increase legal fees associated with litigating the final rule.

*CEQ Response*:  CEQ acknowledges that litigation on the final rule could occur and raise issues regarding remedies.  The Supreme Court has previously held that "CEQ's interpretation of NEPA is entitled to substantial deference."  *Andrus*, 442 U.S. at 358 & n.20; *see also Methow Valley*, 490 U.S. at 355–56; *Pub. Citizen*, 541 U.S. at 757.  CEQ has designed the final rule to withstand scrutiny.

*Comment*:  One commenter requested clarification regarding the meaning of the phrase, "the applicability of any section to any person or entity is held invalid."

*CEQ Response*:  This language addresses a potential as-applied challenge to the final rule.  While a facial challenge to the final rule would require a litigant to establish that no set of circumstances exists under which the rule would be valid, *Colo. Wild v. U.S. Forest Serv.*, 435 F.3d 1204, 1214 (10th Cir. 2006); *see United States v. Salerno*, 481 U.S. 739, 745 (1987), an as-applied challenge would concern how the rule has been "applied in a particular instance." *Scherer v. U.S. Forest Serv.*, 653 F.3d 1241, 1243 (10th Cir. 2011) (citing *Reno v. Flores*, 507 U.S. 292, 300 (1993) (internal quotation marks omitted)).

### 4.    Reducing Paperwork and Delay (§§ 1500.4 and 1500.5)

*Comment*:  Commenters recommended that CEQ in both §§ 1500.4(a) and 1500.5(a) should add "normally" before "do not have a significant effect" and mention the possibility of extraordinary circumstances.  Commenters supported the proposed changes in § 1500.4(i)

regarding the use of the scoping process not only to identify key relevant issues but also to dismiss irrelevant issues from analysis early in the NEPA process.  Commenters stated that CEQ should add "as appropriate" to § 1500.4(k) because high-level NEPA review is not always warranted.  Commenters recommended that CEQ should broaden § 1500.4(p) to reference additional tools for eliminating duplication beyond in addition to "adopt appropriate environmental documents," such as using a Determination of NEPA Adequacy.  Commenters recommended that § 1500.5(d) include "only" before "on a completed document."

*CEQ Response*:  In response to comments and for consistency with § 1501.4, the final rule inserts "normally" in §§ 1500.4(a) and 1500.5(a).  CEQ declines to make the other requested changes to the final rule in §§ 1500.4 and 1500.5 because they are unnecessary.  Sections 1500.4 and 1500.5 summarize other operative portions of the final rule that further the objectives of reducing paperwork and delay.  Section 1500.4(k) is not intended to suggest that higher-level NEPA review is always warranted, and § 1502.4 regarding "programmatic" reviews already contains the phrase "as appropriate."  The phrase "adopt appropriate environmental documents" in § 1500.4(p) sufficiently covers the tool of a Determination of NEPA Adequacy, which some agencies use.  The final rule makes other revisions in § 1500.5(d) for clarity.

### 5.    Agency Authority (§ 1500.6)

*Comment*:  A commenter requested that CEQ remove "as interpreted by the regulations in parts 1500 through 1508."

*CEQ Response*:  The final rule constitutes the implementing regulations for section 102(2) of NEPA.  Section 1500.6 references "as interpreted by the regulations in this subchapter." This language clarifies that agencies should ensure full compliance with the purposes and provisions of the Act as interpreted by the CEQ regulations.  This is also consistent

85

with E.O. 11514, which provides that Federal agencies shall "[i]n carrying out their responsibilities under the Act and this Order, comply with the [CEQ regulations] except where such compliance would be inconsistent with statutory requirements." E.O. 11514, as amended by E.O. 11991, sec. 2(g). For these reasons, CEQ declines to make the change.

## D.  Comments Regarding NEPA and Agency Planning (Part 1501)

### 1.  NEPA Thresholds (§ 1501.1)

*Comment*: Commenters supported adding a new section on NEPA threshold considerations, stating that it was helpful to provide direction on whether NEPA applies, recognizing that not all Federal decisions require a NEPA analysis, and expressing the view that this section would provide greater clarity for agencies and regulated entities. Commenters also stated it is appropriate to focus initially on whether a proposed Federal action triggers NEPA, and that applying a clear analytical framework early in the process can help ensure agencies allocate their resources efficiently. One commenter supported the inclusion of threshold considerations but suggested CEQ clarify that the five considerations are not an exhaustive list.

*CEQ Response*: Section 1501.1 recognizes that the application of NEPA by Congress and the courts has evolved over the last four decades in light of numerous other statutory requirements Federal agencies implement, and addresses circumstances in which NEPA has been found not to apply or to be otherwise fulfilled. *See* section II.C.1 of the final rule. CEQ includes this new provision in the final rule, but retitles, reorders and revises it from the proposed rule. The final rule also adds a sixth consideration, which is whether the proposed activity or decision is expressly exempt from NEPA under another statute. This list encompasses the legal bases that are sufficient for agencies to determine whether NEPA does not apply or is otherwise fulfilled.

86

Agencies should consider proposed actions on a case-by-case basis unless their agency NEPA procedures already address them.

*Comment*:  Other commenters opposed the addition of the thresholds section.  Some commenters asserted that the threshold factors were vague and would inject uncertainty into the process, CEQ had not provided adequate guidance of interpretation or application of the factors, and the section would lead to litigation.  Some commenters perceived the addition of a section on NEPA thresholds as narrowing the scope of projects to which NEPA applies, and expressed concerns that agencies could read it expansively to mean many Federal actions would no longer be subject to NEPA, such as pipeline construction.  Other commenters raised concerns that the number of projects subject to NEPA would decrease and that elimination would result agencies doing fewer analyses under the National Historic Preservation Act (NHPA).  Other commenters raised concerns this section would give agencies discretion to avoid NEPA review and would be inconsistent with sections 101 and 102 of NEPA or case law, including *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1213 (9th Cir. 2008) (the phrase "to the fullest extent possible" in section 102 is intended to prevent agencies from avoiding compliance with NEPA by narrowly construing statutes to create a conflict with NEPA, and further that repeals of statutes by implication are not favored (quoting *Forelaws on Board v. Johnson*, 743 F.2d 577, 683 (9th Cir. 1985))).  Finally, some commenters opposed this section, asserting that all actions are subject to a three-part test under NEPA (EIS, EA or CE), although not all require intensive environmental analysis.

*CEQ Response*:  The procedural provisions of section 102(2)(C) of NEPA apply only to proposed "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. 4332(2)(C).  Section 1501.1, which should be read in conjunction with § 1507.3

87

relating to agency NEPA procedures, will assist agencies in determining whether NEPA applies

to a proposed activity or decision.  It reduces uncertainty.  Section 1501.1 recognizes that

Congress and the courts have addressed NEPA's application under a range of statutes and

determined that there are circumstances where NEPA does not apply due to the requirements or

procedures and documentation under another statute.  *See* section II.C.1 of the final rule.  The

1978 regulations also provided that agencies may determine that certain actions are categorically

excluded or that agencies may conduct EAs to determine whether an action is likely to have

significant effects requiring preparation of an EIS.  However, the procedural provisions of NEPA

do not apply to all actions by Federal agencies, but only to "major Federal actions significantly

affecting the quality of the human environment."  42 U.S.C. 4332(2)(C).  CEQ notes that

commenters reading the thresholds as "factors" are incorrect.  Each threshold could result in

NEPA application being unnecessary.  The thresholds are not intended to be weighed against one

another, although it is conceivable that more than one threshold may rule out NEPA application.

For instance, a given action may not qualify as a "major Federal action" and the action may not

be discretionary.

In the final rule, CEQ identifies considerations upon which courts have determined that

NEPA does not apply or is otherwise fulfilled based on other statutory provisions, such as when

other statutes expressly prohibit or makes compliance impossible, or when procedures or

documentation under other statutes serve the function of compliance with NEPA.  *See* section

II.C.1 of the final rule.  Agencies should not improperly construe their statutory authorities so as

to avoid compliance with the procedural provisions of section 102(2)(C).  Under the final rule,

projects or activities that require a Federal permit or approval would generally continue to be

subject to review under NEPA.

Additionally, the requirements of all other statutes, including NHPA, will continue to apply. To the extent that NHPA requires analysis relating to historic properties, nothing in the final rule alters agency obligations to comply with those requirements.

Finally, the application of NEPA to pipeline projects in particular is beyond the scope of this general rulemaking. Individual agencies with authority over such projects will apply these regulations and their NEPA procedures to such projects. Individual facts and circumstances may also bear on how NEPA is applied to pipelines.

*Comment*: One commenter on § 1500.1 requested that the final regulations require public comment on all environmental decisions, whether done under CEs, EAs or EISs, and that CEQ increase the use of EISs, specify that grazing decisions require full NEPA analysis, and require an EIS for all land-use planning decisions.

*CEQ Response*: EAs and CEs, and public involvement and comment, are addressed in other sections of the regulations. *See* §§ 1501.4, 1501.5, 1501.6, part 1503, and 1506.6. The extent to which grazing or other land-use planning decisions require an EIS, and the extent to which EISs are used generally depends on the particular facts and circumstances of each proposed action.

*Comment*: Some commenters raised concerns that the thresholds section would eliminate the ability of the public to determine if NEPA should be applied to a project, and that currently there is public involvement with the process for CEs and EAs. They raised additional concerns that there is no process for disputing a threshold analysis determination.

*CEQ Response*: Section 1501.1 sets forth a number of threshold considerations relating to whether NEPA applies or is otherwise fulfilled, and provides that agencies may make determinations in their agency NEPA procedures or on an individual basis, as appropriate.

89

Under § 1507.3, agency determinations would be subject to public comment during the development of agency procedures.  To the extent that agencies make individual determinations regarding the applicability of NEPA, the process for challenging such determinations where a challenge is permitted is no different under the final rule than it was under the 1978 regulations. The threshold determination in *Public Citizen* was challenged and tested in that case.  The challengers lost but clearly there was a mechanism (APA review) that allowed such review to take place and that will remain the case after the final rule.

*Comment*:  One commenter stated that the thresholds section was inconsistent with NEPA's role of integrating and coordinating with other agency's responsibilities, and with NEPA's role as an umbrella statute, which creates a confusing patchwork of responsibilities.

*CEQ Response*:  The thresholds provision reflects statutory and case law developments since the CEQ regulations were issued in 1978, and in the instance of the analysis of what is a "major Federal action," a requirement of NEPA itself.  This provides clarification for agencies. Section 1501.1 reflects application of NEPA by Congress and the courts since NEPA was enacted, including identification of circumstances where NEPA does not apply or is otherwise fulfilled due to the requirements of other statutes or procedures and documentation under other statutes.  *See* sec. II.C.1 of the final rule.  The final rule supports integration and coordination of NEPA reviews with required reviews under other statutes where NEPA applies.  Where NEPA does not apply to a proposed action, nothing in the final rule changes the obligation to comply with other statutes.

*Comment*:  Some commenters objected to the provision in the proposed rule stating that agencies could make determinations regarding whether NEPA applies on an individual basis.

90

*CEQ Response*:  Agency procedures provide Federal agency staff with direction on the implementation of NEPA, and for this reason, in § 1507.3(d) of the final rule CEQ has directed that agencies should identify when NEPA does not apply in their agency procedures.  This is consistent with agency practice.  *See, e.g.*, EPA Agency Procedures, (Subpart A-General Provisions for EPA Actions Subject to NEPA, 40 CFR  6.101 (Applicability)(referencing section 511(c) of the Clean Water Act exempting most Environmental Protection Agency (EPA) actions under the Clean Water Act from the requirements of NEPA, and section 7(c) of the Energy Supply and Environmental Coordination  Act of 1974 (15 U.S.C. 793(c)(1)) exempting all actions under the Clean Air Act from the requirements of NEPA); NOAA, Policy and Procedures for Compliance with the National Environmental Policy Act, and Related Authorities, Companion Manual for NOAA Administrative Order 216-6A (Jan. 2017), 2.  Determining When NEPA Applies (stating that courts have found that NEPA does not apply to certain actions implementing ESA).  However, when agency NEPA procedures do not address specific circumstances raised, agencies should make determinations on an individual basis, based on their experience and expertise, and considering relevant statutory provisions and case law, where applicable.  In the final rule, CEQ clarifies in § 1501.1(b)(1)–(2) that agencies may make such determinations in consultation with CEQ and must consult with other Federal agencies concerning their concurrence where more than one Federal agency administers the statute.

*Comment*:  Some commenters stated CEQ lacked authority to exempt activities from NEPA.

*CEQ Response*:  As discussed elsewhere, since NEPA was enacted, Congress and the courts have exempted certain activities from NEPA.  *See* sections I.D and II.C.1 of the final rule.  Under the final rule, an agency may identify statutory exemptions in their agency procedures,

which is consistent with current agency practice.  Section 1501.1(a) does not exempt agency actions or activities from NEPA, but among other things, directs agencies to determine whether a proposed activity or decision is already statutorily exempt from NEPA.  Section 1501.1(a) reflects the case law and statutory enactments of exemptions from NEPA.  Sections 1501.1(a) does not exempt agency actions or activities from NEPA, but among other things, directs agencies to determine whether a proposed activity or decisions is already statutorily exempt from NEPA.  It is helpful to agencies to recognize these statutory exemptions in the CEQ regulations and in agency procedures, where applicable.  Caw law, such as *Public Citizen*, also reflects areas where NEPA does not apply.

*Comment*:  Some commenters opposed consideration of whether application of NEPA would clearly and fundamentally conflict with the requirements of another statute.

*CEQ Response*:  This consideration is consistent with Supreme Court case law.  *See, e.g.*, *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Oklahoma*, 426 U.S. 776, 791 (1976) (concluding that "even if the Secretary's action in this case constituted major [F]ederal action significantly affecting the quality of the human environment so that an environmental impact statement would ordinarily be required, there would be a *clear and fundamental conflict* of statutory duty.") (emphasis added).  It is helpful to agencies to recognize this case law in the CEQ regulations and in agency procedures, where applicable.  Locating the threshold considerations in a single section will assist agencies in determining whether NEPA applies and promote efficiency.

*Comment*:  One commenter requested CEQ add a new subsection directing Federal agencies to consider conflicts with existing laws, policies, and regulations when considering a major Federal action and whether NEPA applies.  The commenter further stated that such conflicts do not necessarily disqualify the agency from moving forward with the NEPA process;

92

however, all conflicts with existing laws and policies must be disclosed in the NEPA document for public review and comment.

*CEQ Response*:  CEQ declines to make the suggested addition.  Section 1501.1 focuses on circumstances where Federal statutes may render NEPA inapplicable or otherwise fulfilled. In the final rule, CEQ retains with modifications § 1506.2(d), which requires agencies to disclose in an EIS any inconsistencies with State and local requirements.  This section specifically requires agencies to discuss any inconsistency of a proposed action with any State, Tribal, or local plan or laws, including the extent to which the agency would reconcile its proposed action with the plan or law.

*Comment*:  Commenters opposed consideration of whether compliance with NEPA would be inconsistent with congressional intent and raised concerns this could lead to litigation.

*CEQ Response*:  This provision is consistent with case law finding that compliance with NEPA would be inconsistent with congressional intent expressed in another statute.  *See* sec. II.C.1 of the final rule.  It is helpful to agencies to recognize this case law in the CEQ regulations and in agency procedures, where applicable.

*Comment*:  Some commenters requested CEQ clarify that if an action is not a "major Federal action" no further analysis is required.  Other commenters recommended that CEQ distinguish major Federal actions that do not trigger NEPA from major Federal actions that have no significant effects and thus qualify for a CE or an EA.

*CEQ Response*:  The final rule clarifies that a non-major Federal action is an action to which NEPA does not apply.  In particular, § 1501.1(a)(4) includes consideration of whether the proposed activity or decision is a major Federal action.  The final rule further provides in § 1507.3(d)(4) that agencies in their NEPA procedures should identify any non-major Federal

93

actions as one of the types of activities or decisions that is not subject to NEPA.  Read together,

these provisions clarify that a non-major Federal action is an action to which NEPA does not

apply.

In the final rule, CEQ also identifies activities or decisions that are eligible for a CE or an

EA.  Specifically, the final rule addresses CEs and EAs in §§ 1501.4, 1501.5, and 1501.6 and

requires agencies to identify such activities or decisions in their agency procedures in § 1507.3.

*Comment*:  Commenters opposed consideration of "whether an action is a major Federal

action."  Commenters noted that current definition of "major Federal action" includes an action

that "may be significant" and therefore subject to preparation of an EA or eligible for a CE.

Commenters on this section also expressed concern it was unclear how this section should be

read and whether the revised definition of "major Federal action" would eliminate a number of

projects from review based on minimal Federal funding or minimal Federal involvement, and

based upon the actions being non-discretionary actions.  One commenter requested that CEQ

revise proposed § 1501.1(a) (paragraph (a)(4) in the final rule)) to add "or has a significant

environmental impact" to "Whether the proposed action is a major Federal action."

*CEQ Response*:  In the final rule, CEQ further clarifies the definition of "major Federal

action" in § 1508.1(q) to strike "may be significant" in the first sentence to reduce confusion.

CEQ also makes revisions to the definition consistent with case law to clarify in

§ 1508.1(q)(1)(vi) that it does not include non-Federal projects with minimal Federal funding or

involvement where the agency does not exercise sufficient control and responsibility over the

outcome of the projects.  With respect to actions that may require preparation of an EA or are

eligible for a CE, the revised regulations provide that agencies may identify and include in their

agency procedures such actions.  *See* §§ 1501.3, 1501.4, 1501.5, 1507.3.  In § 1507.3(e), CEQ

94

further clarifies that agencies' NEPA procedures should identify CEs as well as those actions that

normally require an EA but not necessarily an EIS.

*Comment*:  Commenters supported considering whether an action was non-discretionary,

in whole or in part.  One such commenter noted that where there is no decision to be made,

further analysis is not an efficient use of agency resources.  Another commenter requested that

CEQ further distinguish between actions that are ministerial where the agency has no discretion,

and actions where the agency has some discretion but where environmental considerations

cannot change the outcome of an agency's exercise of its discretion.  One commenter suggested

changing "lacks" to "clearly lacks."

*CEQ Response*:  As discussed in section II.C.1 of the final rule, it is well established that

non-discretionary ministerial actions are not major Federal actions.  *See, e.g.*, *Citizens Against*

*Rails-to-Trails v. Surface Transp. Bd.*, 267 F.3d 1144, 1151 (D.C. Cir 2001) (where an agency's

role is "merely ministerial, the information that NEPA provides can have no effect on the

agency's actions, and therefore NEPA is inapplicable"); *South Dakota v. Andrus*, 614 F.2d 1190,

1193–94 (8th Cir. 1980) (concluding that the granting of a mineral patent for a mining claim was

a nondiscretionary, ministerial act and nondiscretionary acts should be exempt from NEPA).

Regarding distinguishing between ministerial and other actions, the definition of major Federal

action in §§ 1508.1(q)(1)(ii) and (vi) excludes both activities and decisions that are ministerial as

well as non-Federal projects with minimal Federal funding or involvement where the agency

does not exercise sufficient control and responsibility over the outcome of the project.

Regarding insertion of "clearly" before "lacks," the case law relating to non-discretionary actions

does not use the modifier clearly before lacks and the modifier is unnecessary.

95

*Comment*:  Some commenters raised concerns that the provision relating to non-discretionary actions was vague and should be more particularly described, that there was the potential for agencies to describe such actions differently in their procedures, and that the addition of this section would lead to litigation.

*CEQ Response*:  Congress and the courts have addressed NEPA's application and determined that non-discretionary actions do not trigger NEPA.  *See* sec. II.C.1 of the final rule. The final rule recognizes these court decisions and provides in § 1507.3(d)(5) that agencies may identify such activities or decisions in their agency procedures.  The final rule also adds language in § 1501.1(b) clarifying that Federal agencies may seek CEQ's assistance in making an individual determination under the section, and that an agency must consult with other Federal agencies concerning their concurrence in statutory determinations under § 1501.1(a) where more than one agency administers the statute.

*Comment*:  One commenter raised concerns that including consideration of whether actions were non-discretionary would in practice lead to less thorough consideration of effects, potentially lead to fewer applicants seeking necessary State permits, and analytical gaps for States that currently do not have State equivalents of NEPA.

*CEQ Response*:  Congress and the courts have addressed the application of NEPA and the thresholds section reflects these developments.  Section 1501.1 does not alter or change the obligations of project applicants to comply with all applicable laws, including State laws requiring permits.  Additionally, NEPA does not regulate State permitting processes.

*Comment*:  Some commenters supported the threshold consideration relating to functional compliance where analysis from other agencies is efficient and supported avoidance of

96

duplicative efforts because additional layers of review extend the time for decision making and may unnecessarily consume the resources of agencies and applicants.

*CEQ Response*:  Under the final rule, agencies should identify those activities or decisions that are not subject to NEPA, including actions where the agency has determined that another statute's requirements serve the function of agency compliance with NEPA. § 1507.3(d)(6).  To the extent agencies make such determinations on an individual basis, CEQ revises the final rule in § 1501.1(b) to clarify that agencies may seek CEQ's assistance in making individual determinations, and must consult with other Federal agencies concerning their concurrence in statutory determinations made under § 1501.1(a) where more than one agency administers the statute.

*Comment*:  CEQ received a number of comments opposing consideration of whether other analyses or processes under other statutes would serve the function of NEPA.  Commenters stated that allowing an agency to determine that analyses and processes under other statutes serve the function of agency compliance with NEPA would amount to a delegation of substantive discretion to the agencies and would be improper.  One commenter stated that it would be very rare that two statutes are completely redundant, that NEPA is the broadest statute of its kind, and that other statutes generally cover the requirements of NEPA only partially.  Another commenter stated that, while they supported incorporating other analyses by reference, NEPA is unique and analyses under other statutes should not be considered full replacements for a NEPA document. Another commenter similarly stated that agencies can incorporate by reference other analyses, and, as proposed, there was a lack of standards for functional equivalence, which would be an invitation for agencies or affected communities to argue that NEPA no longer applied to a variety of actions such as land management, planning, permitting, fisheries management, and

97

mining claims without public participation.  Finally, one commenter stated that more guidance would be needed to ensure other analyses or processes under other statutes served as agency compliance with NEPA.

*CEQ Response*:  Existing case law recognizes that some agency documentation and procedures can serve the function of compliance with NEPA.  In response to comments, CEQ revises § 1501.1 to clarify that this section addresses circumstances in which NEPA does not apply or is otherwise fulfilled.  CEQ also does not include "the agency has determined other analyses or processes under" so that § 1501.1(a)(6) in the final rule reads "[w]hether the proposed action is an action for which another statute's requirements serve the function of agency compliance with the Act."  CEQ also includes similar language in § 1507.3(d)(6) that agencies should identify in their NEPA procedures those activities or decisions that are not subject to NEPA, including actions where the agency has determined that another statute's requirements serve the function of agency compliance with NEPA.

*Comment*:  A commenter recommended establishing a process under § 1501.1 that distinguishes "mom and pop" or "minor operations and maintenance proposals" from large proposals with major impacts on the landscape.

*CEQ Response*:  Similar to the 1978 regulations, the final rule allows different levels of review, as described in § 1501.3, based on whether the effects of the proposed action are significant.

*Comment*:  Some commenters expressed concern that there was no definition of the terms "analyses or processes" in proposed § 1501.1(a)(5) (paragraph (a)(6) in the final rule) leaving too much discretion to individual agencies to determine what analyses or processes would serve as a functional equivalent for a NEPA document.  These commenters were also concerned that the

98

regulations did not define the term "functional equivalent." Further, commenters were concerned that "other statutes" was too vague.

*CEQ Response*: In the final rule, CEQ makes several revisions to address the commenters concerns. The final rule does not use the terms "analyses or processes" in § 1501.1(a)(6). With regard to § 1501.1, paragraph (b) makes clear that agencies may consult with CEQ in making individual determinations and must consult with other Federal agencies concerning their concurrence in statutory determinations made under § 1501.1 where more than one Federal agency administers the statute. If an agency is identifying actions where it has determined that another statute's requirements serve the function of agency compliance with NEPA in its agency NEPA procedures pursuant to § 1507.3(d)(6), the agency must consult with CEQ. In § 1506.9, concerning functional compliance with NEPA where the proposed action is a proposal for regulation, the final rule clarifies that procedures and documentation pursuant to other statutory or Executive order requirements may satisfy some or all of the requirements of the CEQ regulations. It further states that agencies must identify which corresponding requirements in the CEQ regulations are satisfied, and consult with CEQ to confirm such determinations.

## 2.    Apply NEPA Early in the Process (§ 1501.2)

*Comment*: Commenters opposed changing "shall" to "should" and "possible" to "reasonable" in § 1501.2(a). Commenters stated that the proposed change could undermine consultation, consideration of alternatives, and render agencies less likely to revise the proposed action. Other commenters supported the changes stating that the appropriate time to begin the NEPA process is dependent on when the agency has sufficient information and how it can most effectively integrate the NEPA review into the agency's decision-making process. Some

99

commenters stated that the proposed change muddies the waters with terms that are unclear. Commenters stated that agency discretion is a good thing, but this proposed change provided little guidance on what CEQ intends.

*CEQ Response*:  The proposed change, adopted in the final rule, will not substantively or adversely change the NEPA process.  Typically, the onset of planning processes is not well defined and varies across agencies and types of Federal actions.  In practice, agencies initiate the NEPA process at the earliest reasonable time, including for applicant driven proposals.  The final rule provides the necessary flexibility for agencies to tailor early planning and NEPA process integration to their specific circumstances.

*Comment*:  Commenters requested CEQ add a sentence  to the end of § 1501.2(a) to direct agencies to analyze the potentially affected environment and degree of direct, indirect, and cumulative effects when considering whether the effects of a proposed action are significant.

*CEQ Response*:  CEQ declines to make the requested change to the final rule. Section 1501.3(b) addresses how agencies should consider significance and § 1508.1(g) provides a revised definition of effects.

*Comment*:  Commenters supported the consideration of economic factors in § 1501.2(b)(2), but stated that the consideration should not be limited to the economic benefits from a proposed action.  Commenters stated that agencies should also consider the economic benefit that can be realized by "no action" or the economic losses that would occur due to implementation of one or more project alternatives.

*CEQ Response*:  NEPA requires that agencies consider the no action alternative in their analyses.  Consistent with § 1502.22, when agencies conduct a cost-benefit analysis, they should consider the no action alternative along with other alternatives with differing environmental

100

effects.  The final rule does not require preparation of a cost-benefit analysis and does not require agencies to compare the various alternatives in a monetary cost-benefit analysis.  Further, agencies should not compare alternatives in that manner when there are important qualitative considerations.  CEQ provides broad guidance in § 1502.22, recognizing that agencies will apply their respective policies and procedures when developing a cost-benefit analysis.

*Comment*:  Commenters supported the proposal to include economic and technical analyses in NEPA documents, although some interpreted the change as allowing economic and technical factors to outweigh environmental concerns.

*CEQ Response*:  As a clarification, the language in § 1501.2(b)(2) states that agencies must identify environmental effects and values so they can be appropriately considered along with economic and technical analyses in other planning documents.  This is consistent with section 102(2)(B) of NEPA.  The final rule does not provide direction concerning the weighing of the factors under consideration.

*Comment*:  A commenter requested clarification on the difference between "compared," which the 1978 regulations use, and "appropriately considered," which the proposed rule used in § 1501.2(b)(2).  In the 1978 regulations, analysis is required to identify environmental effects and values in adequate detail so they can be "compared" to economic and technical analyses.  In the proposed rule, analysis is required to identify environmental effects and values so they can be "appropriately considered" with economic and technical analyses.

*CEQ Response*:  "Appropriately considered" is a more precise phrase because environmental, technical, and economic factors are considered together in the NEPA process.  This is consistent with section 102(2)(B) of NEPA.

101

*Comment*:  Commenters recommended removing the requirement that an agency publish an EA or EIS "at the same time as other planning documents" in § 1501.2(b)(2) and requested citation in NEPA that supports the proposed change.  Other commenters requested more information on the meaning of the language.

*CEQ Response*:  Section 1501.2(b)(2) is consistent with section 102(2)(B) of NEPA and intended to timely inform the public and facilitate coordination across relevant Federal, State, Tribal, and local governments. For example, when an agency releases a draft feasibility report, it should at the same time release the draft EIS.  In response to comments, CEQ has further revised the final rule so that agencies are required to concurrently review and publish environmental documents and appropriate analyses with other planning documents "whenever practicable." The additional flexibility will enable documents to be made available to the public without delay, because other documents are not yet ready for public release.

*Comment*:  Commenters recommended that CEQ further clarify "unresolved conflicts concerning alternative uses of available resources" in § 1502.1(b)(3).

*CEQ Response*:  CEQ retains the language from the 1978 regulations, which is consistent with the statute at section 102(2)(E).  CEQ declines to make changes to address the commenters' concern.

*Comment*:  Commenters requested that CEQ allow State and local governments to become cooperating agencies as soon as formal technical analyses or pre-NEPA planning begins. Some commenters suggested striking § 1501.2(b)(4)(ii), because it is ambiguous.

*CEQ Response*:  Close coordination with other Federal, State, Tribal, and local governments is essential to conduct an efficient and timely environmental review and to fulfill the requirements of section 102(2) of NEPA.  The final rule in § 1501.8 requires cooperating

102

agencies to participate in the NEPA process at the earliest practicable time. CEQ expects that pre-NEPA planning will include cooperating agencies; however, there may be circumstances when an agency may not find it practicable. For this reason, CEQ declines to provide further specificity.

*Comment*: Commenters stated that the proposed rule did not clarify the level of detail needed about a proposal to initiate and complete the environmental review.

*CEQ Response*: The planning process for applicants, where the NEPA process involves applicants, typically begins well before an agency releases an NOI to the public. The proposed rule integrates environmental considerations and early consultation with State, Tribal, and local governments into agency planning with the intention that the proposed action undergoes some degree of scrutiny for its economic, technical and environmental merits prior to publication of the NOI. For example, the agency must understand the purpose and need for a proposal and how the proposal can meet that purpose and need. The agency retains discretion as to the level of detail needed to initiate and complete analyses. This may depend on the agency's statutory authority and policies, and the complexity of the proposal.

*Comment*: Commenters stated their support for applying NEPA early in the planning process to concentrate on relevant environmental analysis rather than producing an encyclopedia of all applicable information.

*CEQ Response*: CEQ acknowledges the commenter's support for the revision.

*Comment*: Commenters recommend that CEQ amend § 1501.2(b)(4)(ii) to require agencies to notify, invite, and consult early at the earliest time practicable.

*CEQ Response*:  The use of the term "consults" is sufficient to ensure early coordination with State, Tribal, and local governments, and CEQ declines to make further changes to address the commenters' concern.

### 3.    Determine the Appropriate Level of NEPA Review (§ 1501.3)

*Comment*:  Commenters supported the proposed rule's establishment of a clearer framework for determining the appropriate level of NEPA review, whether an EIS, EA or CE. Commenters stated that ensuring that agencies use a practical and flexible decisional framework for assessing proposed actions and choosing the appropriate level of environmental review is essential for the efficiency of future projects.  Some commenters suggested emphasizing the use of the simplest and most efficient reviews possible.

*CEQ Response*:  CEQ acknowledges the support for its proposal.  The final rule retains the language of the proposed rule at § 1501.3(a).

*Comment*:  Commenters stated that, in § 1501.3(a)(2), when the significance of a proposed action is unknown, the agency should prepare an EIS.  Commenters stated that preparation of an EIS would be more in line with NEPA's precautionary principle and that the increased public participation with an EIS would better inform novel science or methodologies.

*CEQ Response*:  The level of analysis that NEPA requires is governed by a rule of reason, which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of information to the decision-making process.  *Pub. Citizen*, 541 U.S. at 767–68 ("[I]nherent in NEPA and [the CEQ] regulations is a 'rule of reason,' which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decision[-]making process.  Where the preparation of an EIS would serve 'no purpose' in light of NEPA's regulatory scheme as a whole, no rule of reason

104

worthy of that title would require an agency to prepare an EIS." (citing *Marsh,* 490 U.S. at 373-74; *Aberdeen & Rockfish R. Co. v. Students Challenging Regulatory Agency Procedures (SCRAP)*, 422 U.S. 289 (1975)). Where a risk is reasonably foreseeable, but the strength of the effect is highly uncertain or unknown, agencies should base their determinations on the specific circumstances of the proposed action. The precautionary principle is a term of art that the NEPA statute and the CEQ regulations do not use.

*Comment*: Commenters requested that CEQ add a category in § 1501.3(a) to provide that projects having beneficial environmental effects are appropriate for an EA or CE.

*CEQ Response*: The final rule in § 1501.3(b)(2)(ii) provides that agencies should consider both beneficial and adverse effects in determining significance. This language is sufficient to allow agencies the flexibility needed to make an appropriate determination of the level of NEPA review for environmental restoration projects. When developing or revising their NEPA procedures, agencies may identify environmental restoration projects as actions that are generally appropriate for an EA or CE under § 1507.3(e)(2).

*Comment*: Commenters requested that CEQ include language in the final rule that would allow an applicant to request that an agency take a harder look at particular issues and effects identified by the applicant as potentially significant in order to minimize litigation risk for the action agency and applicant. Other commenters observed that the development of EAs sometimes drags on for years as EAs become de facto EISs, in an effort to avoid administrative protest or appeal. This protracted process wastes time and limited resources for both applicants and Federal agencies.

*CEQ Response*: CEQ encourages agencies to work with project applicants to understand potentially significant effects of the proposed action. *See* §§ 1501.5(e) and 1502.5(b). However,

105

litigation risk should not be a predominant driver of an agency's actions, including the determination of significance.  The final rule's time limits in § 1501.10 and page limits in §§ 1501.5(f) and 1502.7 should reduce instances where an EA takes a lengthy amount of time to complete and becomes similar to an EIS.

*Comment*:  Commenters stated that CEQ should reconsider the need for the changes in § 1501.3(a), when the 1978 regulations already contained many of its concepts.  Alternatively, commenters stated that CEQ should provide a specific required timeframe for a decision on the level of NEPA review.

*CEQ Response*:  The final rule reorganizes language formerly located in other portions of the 1978 regulations to create a framework for agencies to use in determining the appropriate level of NEPA review that is both clear and based on informative considerations.  CEQ declines to adopt a specific timeframe for a decision on the level of NEPA review in order to allow agencies maximum flexibility in allocating their resources to meet the time limits of § 1501.10.

*Comment*:  Commenters stated that the use of the word "normally" in § 1501.3(a) introduces ambiguity, even though the 1978 regulations uses the term.

*CEQ Response*:  The final rule retains the use of the word "normally" because it describes a broad range of situations while allowing limited exceptions.  Agency practice over the past 40 years has not demonstrated a need to clarify the meaning of "normally."

*Comment*:  A commenter recommended that CEQ add language in §§ 1500.5 and 1501.3(a) that would require agencies as an initial step to ensure the proposed action meets the definition of a major Federal action.

106

*CEQ Response*:  CEQ declines to include language requiring agencies to ensure a proposed action meets the definition of major Federal action in §§ 1500.5 and 1501.3(a) because that analysis is more appropriately addressed in § 1501.1(a)(4).

*Comment*:  Commenters stated that CEQ insufficiently explained its justification for moving the definition of "significantly" to § 1501.3(b) and altering its language.

*CEQ Response*:  While listed in part 1508, "Definitions and Index," the 1978 regulations did not provide a definition of "significance," but rather provided direction for applying "significantly," pursuant to 42 U.S.C. 4332(2)(C).  Upon further review, the application of "significantly" is more readily understood in an operative framework as set forth in § 1501.3(b).  CEQ further notes that the final rule revises the proposed § 1501.3(b), as described in in section II.C.3 of the final rule, to provide further clarification.

*Comment*:  Commenters recommended that CEQ provide a concise definition of "significantly," given that the regulations also use "significance" or "significant" in § 1501.3(a) regarding the appropriate level of NEPA review, § 1501.4(b) regarding CEs, and in § 1508.1(g), which defines effects.  Commenters pointed to dictionaries and other environmental laws as sources for a definition of "significance."  Some commenters recommended that CEQ use the definition of "significant regulatory action" in E.O. 12866 titled, "Regulatory Planning and Review."[42]

*CEQ Response*:  Section 1501.3(b) functionally defines significant.  *See, e.g.*, § 1501.3(b) (referencing "degree of the effects of the action").  CEQ declines to create a definition for significantly because it is an operational concept and therefore is more clearly addressed in

---

[42] 58 FR 190 (Oct. 4, 1993).

§ 1501.3.  In response to comments, CEQ has made further changes to the definition of "effects" in § 1508.1(g) and removed the word "significant."  CEQ declines to revise § 1501.4(b) because the term "significant" is directly relevant to the considerations set forth in § 1501.3 for determining significance.  The final rule does not adopt the "significant regulatory action" definition from E.O. 12866 because that Executive order only governs regulatory actions, so its provisions are inapplicable to other Federal actions under NEPA that are not rulemakings.

*Comment*:  Some commenters were confused as to CEQ's intent with the substitution of different terms for "context" and "intensity" from 40 CFR 1508.27 in § 1503.1(b).  Commenters noted that the proposed rule replaced "intensity" with "degree" and suggested that CEQ intended this change to reduce the number of actions that are considered significant.

*CEQ Response*:  The intent of this change is to make the consideration of significance more manageable by taking a confusing provision from the 1978 regulations and moving it into a more appropriate provision and making its application straightforward.   The final rule replaces "context" and "intensity" with "potentially affected area" and "degree," to provide greater clarity as to the considerations agencies should assess in determining significance.  The phrase "potentially affected environment" relates more closely to physical, ecological, and socio-economic aspects than "context."  The final rule reorganizes several factors formerly categorized under intensity to further clarify this distinction.  The final rule uses the term "degree" because some effects may not necessarily be of an intense or severe nature, but nonetheless should be considered when determining significance.  While 40 CFR 1508.27 used several different words to explain what was meant by "intensity," it also used "degree"  numerous times.  Therefore, the consistent use of "degree" rather than "intensity" and "degree" is clearer.

108

*Comment*:  Commenters stated that by using "may" in § 1501.3(b)(1) instead of "must" as used in 40 CFR 1508.27(a), the proposed rule is too permissive and would result in confusion. Some commenters preferred "must," while others requested that CEQ clarify how agencies should consider impacts to the affected area when determining significance.

*CEQ Response*:  In response to comments, the final rule changes "may" to "should" in § 1501.3(b)(1).  With the change, both § 1501.3(b)(1) and§ 1501.3(b)(2) use "should," thereby reducing confusion and applying the two provisions in a consistent manner.  Although 40 CFR 1508.27(a) used "must," CEQ notes that 40 CFR 1508.27(b) used "should" to describe the consideration of intensity.  Agency practice under the 1978 regulations has been to consider both context and intensity in a similar manner.  CEQ notes that the final rule requires agencies to analyze both the potentially affected environment and degree of the effects, even though it uses "should" in reference to the specific considerations.

*Comment*:  Commenters stated that considering whether effects are significant based on "the potentially affected environment" and "the affected area" § 1501.3(b)(1) will narrow the scope and lead to a lower level of review for many proposed actions.  Commenters stated that removing consideration of impacts on "society as a whole," "the affected region," and "affected interests" will result in vagueness and confusion when determining significance.  Commenters stated that agencies should consider effects wherever they might occur.  Some commenters stated that the proposed changes do not further section 101 of NEPA's policy "to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans."  42 U.S.C. 4331.  Some commenters stated that the proposed changes are contrary to CEQ's statutory mandate to analyze and interpret information concerning the conditions and trends in the quality

109

of the environment for the purpose of determining whether such conditions and trends are interfering, or are likely to interfere, with the achievement of the policy set forth in title I of the Act. Other commenters supported the proposed changes because they assert that "potentially affected environment" is a clearer and more precise term than "context."

*CEQ Response*: In response to comments, CEQ further revises the final rule at § 1501.3(b) to clarify that consideration of the affected area includes "its resources, such as listed species and designated critical habitat under the Endangered Species Act." By adding "its resources," CEQ is clarifying that "affected area" not only refers to the geographic boundary of the affected area, but the resources within it, including as applicable, its historic, cultural, and ecological characteristics, where those resources are affected. Further, agencies apply § 1501.3(b) based on the definition of effects in § 1508.1(g), which includes ecological (such as the effects on natural resources and on the components, structures, and functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on employment), social, or health effects. The final rule maintains full consideration of a proposed action's environmental impact when an agency makes a determination on its significance. Section 101 of NEPA is a broad and ambiguous provision that, consistent with *Chevron*, accommodates a wide range of procedural regulations to implement NEPA as reflected in the procedural framework created by the 1978 regulations. Applying § 1501.3(b)(1) in the final rule will inherently build in a consideration of the impact of current trends.

*Comment*: Commenters requested clarification regarding CEQ's intent in proposing, "in the case of a site-specific action, significance would usually depend upon the effects in the locale rather than in the Nation as a whole." Some commenters stated that substituting "Nation as a whole" for "world as a whole," precludes consideration of extraterritorial effects. Commenters

110

stated that significant effects of a project can be local, regional, national, or global. Some commenters stated that the proposed changes would result in eliminating consideration of climate change. Other commenters stated that analyzing site-specific impacts using a national scale would only lead to a conclusion of non-significance, so only the affected area should be considered. Commenters stated that considering rural local areas with major metropolitan areas can make the economic impacts appear insignificant.

*CEQ Response*: In response to comments, the final rule revises the example replacing "locale" with "local area" to track more closely with "national, regional, local" which is used earlier in § 1501.3(b)(1). The final rule deletes the latter part of the sentence because it merely sets up a comparison by way of example, and referencing "Nation as a whole" is superfluous. The final rule also inserts "only" to clarify the intent that the local area should be the focus of a significance determination for a site-specific project. The rule does not preclude agencies from analyzing any particular effect of a proposed action on the human environment, as long as it meets the definition of "effects" set forth in § 1508.1(g).

*Comment*: Several commenters stated that removing the references to society as a whole, the affected region, and affected interests in § 1501.3(b)(1) will result in decreased consideration of environmental justice concerns. Other commenters stated that determining "significance" at an early stage of the NEPA process would limit the EISs before public participation has occurred, particularly the participation of environmental justice communities.

*CEQ Response*: Section 1501.3(b)(2) states that agencies must consider the degree of the effects when determining significance. In addition, under the scoping process in § 1501.9, in their  agencies must include information in their NOIs about a project's expected impacts and request input from the public to ensure consideration of significant effects. The definition of

111

"effects" in § 1508.1(g) continues to include effects that are relevant to environmental justice communities, including ecological, aesthetic, historic, cultural, economic, social, and health impacts.  Under the final rule, the timing of the significance determination should not disproportionately impact environmental justice communities, as agencies will consider effects relevant to environmental justice communities when analyzing the degree of the effects regardless of the timing of that analysis.

*Comment*:  Commenters stated that the proposed removal of 40 CFR 1508.27 eliminates problematic language included under the "intensity" factors.  Commenters stated that both agencies and courts at times have approached these factors as a rote checklist that requires separate written justification for each factor regardless of whether they are relevant to the action at hand.  Commenters stated that deletion of these factors simplifies the regulatory text while meeting the aims of NEPA.

*CEQ Response*:  Section 1501.3(b) sets forth considerations agencies should use in making a significance determination.  The final rule includes the phrase "as appropriate to the specific action" to indicate that these considerations are not a rote checklist if a particular consideration is not relevant to the proposed action.  The final rule eliminates language in 40 CFR 1508.27 that was extraneous and beyond the scope of the statute, while retaining the substantive elements.

*Comment*:  Commenters stated that the proposed rule's removal of seven of the ten intensity factors listed in 40 CFR 1508.27(b) for determining "significance" is contrary to congressional intent.  Commenters stated that removing the intensity factors in 40 CFR 1508.27(b)(3)–(9) would generate uncertainty in the NEPA process when determining significance.  Commenters stated that removing the definition of "significance" will result in

112

uncertainty and delay because it casts doubt on established court precedent and methodologies for determining the impacts of projects, and will likely lead to litigation.  Commenters questioned whether agencies would no longer need to evaluate impacts on resources not listed in § 1501.3(b) when determining significance.  Multiple commenters raised concerns about the omission of unique characteristics, controversy, uncertainty, precedent, cumulative effects, segmentation, historical and cultural resources, threatened and endangered species, and critical habitat.  Commenters stated that the final rule should expressly prohibit agencies from segmenting proposed projects.  Commenters stated that the sentence concerning segmentation that CEQ proposed to delete from 40 CFR 1508.27(b)(7) concerned a factor for the significance determination, while the language in §§ 1501.9(e) and 1502.4(a) addresses the scope of an EIS once it has been deemed necessary.  Commenters stated that by not including "cumulative impacts" as a criterion for significance determinations, the proposed rule diminishes the scope of significant effects.  Commenters with particular interests in historical and cultural properties asserted that deletions in the proposed rule would impact the Federal Government's ability to "preserve important historic, cultural, and natural aspect of our national heritage."  42 U.S.C. 4331(b)(4).  Some commenters stated that the proposed rule's changes would not further NEPA's mandate to "utilize a systematic, interdisciplinary approach."  42 U.S.C. 4332(2)(A).  Some commenters supported the changes in § 1501.3(b) of the proposed rule because it would be simpler and clearer.

*CEQ Response*:  Several factors formerly considered as "intensity" in 40 CFR 1508.27(b)(3), (8), and (9), are more appropriately considered as the "potentially affected environment."  The final rule uses the phrase "affected area and its resources" as a means of clarifying that agencies consider a variety of resource impacts in a given area, and uses the

113

illustrative example of listed species and designated critical habitat under the ESA.  Further,

agencies apply § 1501.3(b) based on the definition of effects § 1508.1(g), which includes

ecological (such as the effects on natural resources and on the components, structures, and

functioning of affected ecosystems), aesthetic, historic, cultural, economic (such as the effects on

employment), social, or health effects.  In this way, the final rule continues to fulfill NEPA's

direction to use a "systematic, interdisciplinary approach."  42 U.S.C. 4332(2)(A).  Moreover, as

discussed in section II.H of the final rule, the NEPA statute does not define significantly.  The

test for significantly that was created in the 1978 regulations in 40 CFR 1508.27(b) can thus be

revised by CEQ consistent with long-standing principles of administrative law.

CEQ makes further changes to the final rule in response to comments concerning 40 CFR

1508.27(b)(6) and (7).  Similar to the 1978 regulations, the final rule does not allow agencies to

avoid significance by segmentation (*i.e.*, "terming an action temporary or by breaking it down

into small component parts.").  Section 1501.3(b) directs agencies to consider connected actions

consistent with § 1501.9(e)(1).  Additionally, where a proposed action is a component or

segment of a larger project, the final rule requires Federal agencies under § 1501.9(e) and

§ 1502.4(a) to evaluate in a single EIS all proposals or parts of proposals that are related closely

enough to be, in effect, a single course of action.  To the extent future actions, which include

ongoing or connected actions, are identified in the scoping process, the final rule would require

consideration of all effects that are reasonably foreseeable and have a reasonably close causal

relationship to the related Federal actions.  Although some commenters raised concerns about the

deletion of "temporary" in 40 CFR 1508.27(7), the final rule retains the concept of short-term

effects in § 1501.3(b)(2)(i).  Thus, the final rule should not lead to segmentation of NEPA

analyses.

114

CEQ does include language in the final rule to address concerns with treatment of 40 CFR 1508.27(b)(5). Highly uncertain effects or effects that involve unique risks, bounded by the requirement that they be reasonably foreseeable and have a reasonably close causal relationship to the proposed action, will be considered under the final rule.

CEQ does not include language in the final rule to address concerns with treatment of 40 CFR 1508.27(b)(4). The extent to which an effect is highly controversial is challenging to assess objectively and not indicative as to whether a proposed action has a significant impact on the human environment.

*Comment*: Commenters who supported the proposed rule's changes to "significantly" asserted that 40 CFR 1508.27 used a vague and overbroad definition. They stated that, in some cases, the vagueness has led to an agency conflating the potential significant impacts of one action into the analysis of the potential impacts of another. One commenter used the example of a Rural Utilities Service loan or loan guarantee that would be analyzed as to the impacts of project construction before first examining whether the decision on the loan or loan guarantee was necessary for project construction. These commenters argued that the proposed rule would reduce unnecessary and duplicative environmental reviews that increase costs and delay projects.

*CEQ Response*: The final rule's changes to "significantly" should improve clarity and reduce unnecessary and duplicative environmental reviews. Agencies should base their determination of significance on an analysis of the potentially affected environment and the degree of the effects of the proposed action.

*Comment*: Some commenters stated that the reason for the proposed retention of the three former "intensity" factors from 40 CFR 1508.27(b) and deletion of others in § 1501.3(b)(2) is unclear. These commenters recommended that CEQ delete these remaining three "degree"

115

factors.  Commenters stated that their removal would not foreclose their consideration where appropriate, but the proposed inclusion of these three factors in proposed § 1501.3(b)(2) does not clarify what "degree of effects" means.  Commenters stated that there is no need to mention violation of other laws because it is already clear that agencies cannot violate other environmental laws.  Commenters stated that "beneficial" is subjective and has caused confusion in courts and recommended the phrase "agencies should consider the degree of effects in a holistic manner" to avoid any possibility of a beneficial effect alone mandating an EIS.

*CEQ Response*:  CEQ declines to make the recommended changes.  CEQ has clarified which factors are included to help ensure consistent implementation of NEPA by Federal agencies.  As to § 1501.3(b)(2)(i), the farther effects are into the future, the less important and more speculative those effects generally become.  As to § 1501.3(b)(2)(ii), the joint consideration of benefits and adverse effects could result in a different analysis of the degree of effects than focusing only on adverse effects.  As to § 1501.3(b)(iii), effects on public health and safety are paramount and part of assessing the overall degree of effects, especially in light of NEPA section 101(a)'s purpose to "fulfill the social, economic, and other requirements of present and future generations of Americans."  Finally, as to § 1501.3(b)(2)(iv), looking to all relevant sources of law to see whether environmental effects are barred by law (as opposed to permitted under law) is another relevant factor to consider in assessing the degree of effects.

*Comment*:  Some commenters stated the proposed change from "the degree to which (the proposed action affects)" as used in 40 CFR 1508.27 to "[i]n considering the degree of the effects" in § 1501.3(b) results in watering down the emphasis that decision makers must place on assessing the degree to which an impact affects the environment resource.  These commenters recommended CEQ retain the language as used in 40 CFR 1508.27.

116

*CEQ Response*:  The final retains the phrasing as proposed for clarity.

*Comment*:  Commenters stated that the language in proposed § 1501.3(b)(2)(iii) is an inadequate replacement for the intensity factor in 40 CFR 1508.27(b)(9) regarding ESA-listed species.  Commenters stated that the proposed rule would eliminate consideration of whether an action "may adversely affect" a species listed as threatened or endangered under the ESA in determining the significance of an action.  These commenters asserted that this proposed change is inconsistent with NEPA's core aims of ensuring informed decision making and detailed consideration of environmental impacts.  They further stated that this proposed change is inconsistent with NEPA's legislative history, which explains the need to counteract "the decline and extinction of fish and wildlife species" as a reason for passing NEPA.

*CEQ Response*:  In response to comments, the final rule makes further changes in § 1501.3(b)(1) to clarify that consideration of the affected area includes its resources and uses as an illustrative example "listed species and designated critical habitat under the Endangered Species Act."  CEQ notes that agencies would also consider listed species and critical habitat under the definition of effects, which includes ecological effects.  Thus, the final rule furthers the purposes of NEPA and is consistent with the statute's legislative history.

*Comment*:  Some commenters asserted that vagueness in the factor at 40 CFR 1508.27(b)(9) regarding endangered or threatened species has confused some courts, such as those holding that a finding in a biological assessment that an action is "likely to adversely affect" a listed species is sufficient to require preparation of an EIS.  These commenters asked CEQ to provide clarity that the fact an action requires a formal consultation under the ESA does not necessarily trigger preparation of an EIS.

*CEQ Response*:  As the courts have held numerous times, NEPA and the ESA are different statutes with different standards, definitions, and underlying policies.  NEPA is a procedural statute, while the ESA, at least in several respects, imposes substantive duties on Federal agencies and the public.  A proposed action that is likely to adversely affect a listed species or critical habitat may also have significant impacts; however, whether preparation of an EIS is required depends on the particular facts and circumstances of the proposed action.

*Comment*:  Commenters stated the language in proposed § 1501.3(b)(1) that "[b]oth short- and long-term effects are relevant" to the significance determination is inconsistent with the language in § 1508.1(g) that effects that are "remote in time" should not be considered significant.  Some commenters requested that CEQ delete the language regarding long-term effects in § 1501.3(b)(1) in order to reconcile the perceived inconsistency.

*CEQ Response*:  Long-term effects are not necessarily remote.  Remoteness is a question of degree—an effect that is exceedingly far out into the future.  The commenters also are mistaking the duration of an effect with the point in time at which an effect occurs.  The onset of a long-term effect may be soon after the proposed action and reasonably foreseeable, and have a reasonably close causal relationship to the proposed action.  Whereas, an effect that is remote in time is generally not reasonably foreseeable and characteristic of "but for" causation.  By further revising the definition of effects at § 1508.1(g)(2) to include "generally," CEQ accounts for the fact that there may be circumstances when an effect that is remote in time is reasonably foreseeable and has a reasonably close causal relationship to the proposed action.

*Comment*:  One commenter requested that CEQ retain the definition of "context" in 40 CFR 1508.27, which instructs the agency to consider both short- and long-term effects as

118

relevant, so that resource management plans with impacts well into the future could continue to be discussed.

*CEQ Response*:  The proposed rule stated that both short-term and long-term effects are relevant to the significance determination.  The final rule retains this operative language, while moving the reference to short- and long-term effects to § 1501.3(b)(2) because the duration of an effect is more closely associated with the degree of the effect than with the affected area.

*Comment*:  Some commenters stated that the factor regarding beneficial and adverse effects in proposed § 1501.3(b)(2)(i) was weaker than the language in 40 CFR 1508.27(b)(1), which stated that a significant impact may exist even if effects on balance were beneficial.  Some commenters welcomed the clarification regarding consideration of both beneficial and adverse effects.

*CEQ Response*:  The language in the 1978 regulations concerns the direction or nature (*i.e.*, beneficial or adverse) of individual effects, recognizing that one or more significant adverse effects may be present despite an overall beneficial impact of a proposed action.  CEQ declines to make further changes to the final rule because it is clearer to state that agencies should consider both beneficial and adverse effects.  This phrasing does not weaken consideration of those situations where beneficial impacts offset significant adverse impacts from a proposed action.  Further, the second sentence in 40 CFR 1508.27(b) is superfluous since the definition of effects in § 1508.1(g) contains similar language regarding the balancing of beneficial and detrimental effects.

*Comment*:  Some commenters stated that CEQ should strike "public" from "public health and safety" in proposed § 1501.3(b)(2)(ii) because NEPA does not distinguish between whether an action affects the nonpublic versus the public.

*CEQ Response*:  The final rule retains the language of the proposed rule in § 1501.3(b)(2)(iii).  The 1978 regulations included the word "public" at 40 CFR 1508.27(b)(2).  Because NEPA is directed at major Federal actions significantly affecting the quality of the human environment, it necessarily is concerned with "public" health.

*Comment*:  Some commenters stated that the NPRM did not sufficiently explain the proposed removal of "controversy" from the considerations for significance because the preamble did not discuss why scientific controversy would not be worth considering.  Some commenters stated that the current regulation recognized that the controversy referenced in 40 CFR 1508.27(b)(4) was about the action's effects and not the action itself.  Other commenters supported the proposed rule's removal of "controversy" because some courts had viewed any opposition to the proposed action as "controversy," and therefore a significant impact.  Some commenters observed that other independent agencies have definitions of "significant" that consider controversy.  Some commenters requested that CEQ expressly state in the regulatory text that the level of opposition to a proposed action does not create significance.

*CEQ Response*:  The final rule does not include "controversy" as a consideration for a significance determination.  The inclusion of "controversy" in 40 CFR 1508.27 has resulted in confusion that has not furthered NEPA's objectives.  As stated in the preamble to the proposed rule, courts have treated "controversy" as scientific controversy rather than political or other forms of controversy.  Scientific controversy, as applied in this context, represents the extent of disagreement in the scientific literature regarding how a proposed action changes the human environment, not mere opposition to the proposed action.  The final rule continues to consider scientific controversy within the definition of effects, as the strength of the science informs whether an effect is reasonably foreseeable.

120

*Comment*:  Some commenters stated that the proposed rule would weaken the provision at 40 CFR 1508.27(b)(10) because CEQ proposed to change "threatens a violation" to "violate" in § 1501.3(b)(2)(iii).  Some commenters stated that CEQ should clarify that violations of law include failure to comply with law and not exceedance of ambient air quality standards based on modeling when an area would not be in nonattainment of the air quality standards.

*CEQ Response*:  The final rule includes the language as proposed in § 1501.3(b)(2)(iv). The phrase "threatens a violation" is ambiguous and difficult to apply.  Further, the phrase "threatens a violation" suggests that an effect may be fully compliant with other environmental laws, yet nonetheless significant because the effect is said to be close to violating the law.  This provision does not affect the applicability of other environmental laws, and any uncertainty as to whether a proposed action violates such laws would be considered through associated permitting or other approval processes.  CEQ declines to clarify in the final rule how this provision would apply to agencies' specific statutory authorities.

*Comment*:  Commenters stated that agencies must consider Tribal laws protecting the environment in the significance determination.

*CEQ Response*:  Section 1501.3(b)(2)(iv) retains the language from the proposed rule stating that agencies should consider effects that would violate Tribal environmental laws when making a significance determination.  The use of "should" in this section remains unchanged from the 1978 regulations.  The final rule adds the reference to "Tribal" alongside Federal, State, and local law to give more consideration of Tribal law than in the 1978 regulations.

*Comment*:  Commenters recommended that CEQ strike the term "local" among the environmental laws in proposed § 1501.3(b)(2)(iii) because local laws can be particularly

121

burdensome, do not fall within the realm of Federal agency authority or expertise, and could federalize a local decision over which a project proponent has little or no control.

*CEQ Response*:  The final rule retains this consideration from the proposed rule at § 1501.3(b)(2)(iv).  CEQ declines to strike the term "local" because the purpose of this section is to set forth considerations for whether agencies should prepare an EIS rather than address substantive compliance with other environmental laws.  Under the final rule's definition of "major Federal action" in § 1508.1(q), federalizing a local decision where an agency does not have sufficient control or involvement should not occur.

*Comment*:  Some commenters stated that the intent or overall result of the proposed changes to the former definition of significantly was to avoid consideration of climate change.

*CEQ Response*:  The rule does not preclude agencies from considering any particular effect of a proposed action on the human environment as long as it meets the definition of "effect" set forth in § 1508.1(g).  Agencies should consider all effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action when determining the significance of the proposed action.  CEQ regulations are not specific to any particular type of environmental effect but rather provide a framework for analyzing broad categories such as short- and long-term effects.

*Comment*:  Commenters recommended that the final rule add a consideration in § 1501.3(b) regarding whether the action's adverse effects can be mitigated.  Commenters recommended that the final rule add a consideration in § 1501.3(b)(2) regarding the duration and permanency of adverse environmental effects, such as those effects that are subject to later reclamation.

122

*CEQ Response*:  CEQ declines to add an additional consideration regarding mitigation or the duration and permanency of effects.  The fact that a proposed action's adverse significant effects can be offset through mitigation does not mean that those same effects are no longer significant.  The ability to offset adverse significant effects through mitigation may be the basis for a mitigated FONSI in § 1501.6.  Further, § 1501.3(b)(2)(i) already addresses short- and long-term effects.

*Comment*:  Commenters recommended that the final rule add a consideration in § 1501.3(b)(2) regarding existing land uses and existing land use designations (including zoning and land management plans).

*CEQ Response*:  CEQ declines to add an additional consideration regarding land use.  Agencies should consider any relevant land uses under § 1501.3(b)(1) as part of the affected area and its resources.  Additionally, to the extent local laws such as zoning laws are violated, § 1501.3(b)(2)(iv) will consider that factor when assessing the degree of effects.

*Comment*:  Some commenters recommended that CEQ add a significance consideration for adverse long-term effects on water pollution, air pollution, and public health and safety.

*CEQ Response*:  CEQ declines to adopt this recommendation in the final rule.  The considerations in § 1501.3(b)(1)-(2) adequately cover these effects.  As noted above, devising rules that are environmental medium-specific (such as air, land, or water) is not the approach to NEPA that CEQ has chosen.

*Comment*:  Some commenters recommended that the final rule add a consideration in § 1501.3(b) for effects of other reasonably foreseeable Federal, State, Tribal, or local actions.

*CEQ Response*:  CEQ has made further changes in the final rule in § 1502.15 to clarify that the affected environment includes reasonably foreseeable environmental trends and planned

123

actions.  Reasonably foreseeable Federal, State, Tribal, or local actions that are not connected actions (§ 1501.9(e)) are appropriate to consider as an aspect of the affected environment rather than a discrete consideration in § 1501.3(b)(1).

*Comment*:  Some Tribal commenters recommended that the final rule add a consideration in § 1501.3(b) for the degree to which an action might diminish (or enhance) the Federal Government's capacity to fulfill its trust responsibility to safeguard Tribal resources and trust assets.

*CEQ Response*:  The final rule requires agencies to consider effects that would violate Tribal law in addition to Federal, State, and local law (§ 1501.3(b)(2)(iv)).  Further, the final rule continues to require consideration of the resources of the affected area, which would include Tribal resources and trust assets where applicable.  For these reasons, CEQ declines to make the requested change in the final rule.

*Comment*:  Commenters recommended that CEQ include in § 1501.3(b)(2) the following additional significance considerations:

- The degree to which an action may result in multiple different but insignificant impacts, but whose total impact could extract a substantial toll on environmental quality.

- The degree to which the intensity of a normally non-significant impact affects a large spatial or temporal domain.

- The degree to which an action is inconsistent with existing use, or with land-use policies or plans.

- The degree to which the action would degrade an environmental resource even if it would not breach a threshold of significance.

124

- The degree to which the action would contribute to the generation of hazardous, radioactive, or biological materials or waste.

- The degree to which an action would alter, degrade, or impair visual, natural landscape, cultural, or geological resources, aesthetics, or natural amenities.

- The degree to which an action would involve a commitment of irreversible or irretrievable resources.

- The degree to which the action would contribute to urban sprawl or intrusion into less developed areas.

- The degree to which adverse environmental effects or high risks to human health resulting from an action taken in response to an agency's programs, policies and activities might disproportionately affect minority and low-income populations.

- The degree to which an action would consume non-renewable energy or natural resources.

- The degree to which an action would limit the range of beneficial uses of the environment for Americans or future generations of Americans.

- The degree to which any incomplete or unavailable information, relevant to reasonably foreseeable significant adverse impacts, may affect the decision.

- Actions that have a low probability or frequency of occurrence, but which could result in large or potentially catastrophic impacts on the environment, or human health and safety.

Commenters further stated that an impact cannot necessarily be dismissed simply because it has a low probability or frequency of occurrence.

*CEQ Response*:  CEQ declines to adopt these recommendations in the final rule.  As described in section II.C.3, the considerations in § 1501.3(b)(1) and(2), which are based on the

125

definition of effects in § 1508.1(g) and description of affected environment in § 1502.15, are sufficient to consider the full range of appropriate impacts.

*Comment*:  Commenters recommended that CEQ add the word "environmental" before the word "effects" in § 1501.3(b)(2) because it is more consistent with NEPA's directive.

*CEQ Response*:  CEQ declines to insert "environmental" before "effects" in § 1501.3(b)(2).  As used in this section, "effects" relies on the definition at § 1508.1(g), which describes effects in connection with the human environment consistent with NEPA.

**4.      Categorical Exclusions (CEs) (§ 1501.4)**

*Comment*:  Commenters supported CEQ's revisions to the definition of "categorical exclusion" and the reorganization of the regulations, stating that they will provide greater clarity to agencies and promote efficient NEPA reviews.

*CEQ Response*:  CEQ acknowledges the support for the revisions.

*Comment*:  Commenters stated that the proposed rule would expand the definition of CEs unlawfully and unreasonably the by inserting "normally" and eliminating "individually or cumulatively," which modified "significant effect."

*CEQ Response*:  CEQ proposed to modify the definition to add "normally" to account for the possibility of extraordinary circumstances.  Use of this phrase is consistent with CEQ's 1978 regulations.  40 CFR 1504.4(a)(2).  CEQ proposed to remove "individually or cumulatively" because this language is unnecessary due to the revised definition of effects in § 1508.1(g).  In establishing CEs in their agency NEPA procedures, agencies will continue to demonstrate that the category of actions being considered for a CE normally do not have a significant effect on the human environment, and therefore do not require preparation of an EA or EIS.

*Comment*:  Commenters requested clarification as to what constitutes an "extraordinary circumstance."  A commenter recommended that CEQ state in § 1501.4 that extraordinary circumstances exist when a proposed action triggers compliance with a statute or Executive order that is functionally equivalent to NEPA (e.g., Section 106 of the National Historic Preservation Act, E.O. 11990, titled "Protection of wetlands"[43]).

*CEQ Response*:  An extraordinary circumstance is a situation where a normally excluded action may have a significant effect, such as potential significant effects on a species listed as endangered under the ESA or a property listed on the National Register of Historic Places.  A proposed action that triggers compliance with a statute or Executive order that is functionally equivalent to NEPA may not necessarily create a significant effect.  Further, NEPA may not apply where an agency is carrying out activities under a functionally equivalent statute.  *See* § 1501.1(a)(6).  Agency procedures include the extraordinary circumstances applicable to their CEs.  For these reasons, CEQ declines to provide further specificity in the final rule.

*Comment*:  Commenters desired greater consistency across agencies in application of extraordinary circumstances and requested that CEQ add a new paragraph to § 1501.4 requiring agencies to consider the presence of particular resources and conditions as extraordinary circumstances that agencies must evaluate before applying a CE to a proposed action. Commenters further stated that agencies may supplement these extraordinary circumstances in agency NEPA procedures (§ 1507.3(d)(2)(ii)) with additional extraordinary circumstances based on the agency's mandates and policies.  These suggestions included the following:

---

[43] 42 FR 26961 (May 25, 1977).

- Federally listed threatened or endangered species or designated critical habitat and species proposed for Federal listing or proposed critical habitat.

- Flood plains, wetlands, or municipal watersheds.

- Congressionally or presidentially designated areas, such as units of the national park system, wilderness, wilderness study areas, potential wilderness areas, wild and scenic rivers, national monuments, or national recreation areas.

- Native American, Native Alaskan, or Native Hawaiian religious or cultural sites.

- Archaeological sites, or historic properties or areas.

*CEQ Response*:  In the final rule, CEQ declines to include government-wide CEs, including government-wide extraordinary circumstances.

*Comment*:  Commenters noted that proposed § 1501.4 uses the term "extraordinary circumstances" several times, but does not define it.  Commenters suggested defining "extraordinary circumstances" in § 1508.1 to mean those factors or circumstances that help a Federal agency identify situations or environmental settings that may require an action otherwise categorically excluded to be further analyzed in an EA or an EIS.  Commenters suggested that absent a definition, the term "extraordinary circumstances" would be a subject of litigation and commenters recommended a definition such as found in Black's Law Dictionary.

*CEQ Response*:  The 1978 regulations used the term "extraordinary circumstance" without a definition, and its meaning has not been in dispute.  The final rule uses it in the same manner.  Further, § 1501.4(b) defines the term operationally as a circumstance in which a normally excluded action may have a significant effect.  CEQ declines to add any further definition in § 1508.1.

128

*Comment*:  Commenters raised concerns about the language proposed in § 1501.4(b)(1)
regarding "mitigating circumstances."  Some commenters interpreted this to be an authorization
of "mitigated CEs" similar to mitigated FONSIs.  Commenters sought clarity on how agencies
would determine when to use mitigated CEs instead of an EA.  Other commenters found this
language unclear and expressed concerns that it is likely to cause confusion.  Further,
commenters expressed concern that the proposed process did not include an opportunity for
public comment or a requirement that mitigation be incorporated in legally binding instruments
as there is for an EA and FONSI.  Commenters observed that there are no mechanisms in the
application of a CE to provide oversight or accountability for mitigation, in contrast to the formal
NEPA processes for EAs and EISs.  Commenters recommended that if mitigation is considered
appropriate where an action is normally categorically excluded, then agencies should integrate
and analyze mitigation within the proposal.  Some commenters supported the proposed changes,
observing that the proposed changes promote agency flexibility by allowing use of a CE where
there is no risk of significant environment impacts.

*CEQ Response*:  The NPRM did not propose "mitigated CEs."  Rather, it proposed to
allow agencies to consider circumstances specific to the action that would lessen the impact of an
otherwise extraordinary circumstance.  To address the confusion regarding "mitigated CEs,"
§ 1501.4(b)(1) replaces "mitigating circumstances" with "circumstances that lessen the impacts."
Specifically, when an agency's proposed action falls within a CE, but an extraordinary
circumstance is present, the agency may still apply the CE if there are action-specific
circumstances that avoid impacts that may be significant and are the basis for the extraordinary
circumstances.  For example, an action may be located in designated critical habitat for an
endangered species, but would not adversely modify the critical habitat and would have no effect

on the listed species.  It is not possible for an agency to always foresee or precisely define case-specific extraordinary circumstances, and this change is consistent with agency practice for many agencies.  The change further clarifies that the mere presence of an extraordinary circumstance does not automatically preclude the use of a CE.

*Comment*:  Commenters raised concerns about "mitigating circumstances," noting its potential impact on Tribes, minority, and low-income communities.  Commenters stated that agencies should determine if extraordinary circumstances exist that may result in further analysis of the project under an EA or EIS.  Commenters stated that archaeologists are not aware of potential impacts to sacred sites and cultural resources and an agency cannot ascertain them from literature reviews.  Thus, commenters argued, agencies must make any determination regarding an extraordinary circumstance and appropriate mitigation to address that extraordinary circumstance with consultation and input from Tribes.

*CEQ Response*:  CEQ clarifies in § 1501.4(b)(1) that agencies may categorically exclude a proposed action if the agency determines that there are circumstances that lessen the impacts or other conditions sufficient to avoid significant effects.  As discussed in section II.C.4 of the final rule, the use of "mitigation" in the NPRM caused confusion and implied that agencies could apply a CE where the project proponent offset through mitigation the significant effects created by the presence of an extraordinary circumstance.  The final rule does not change the requirement to consider extraordinary circumstances.  Agencies must identify extraordinary circumstances for consideration when applying a CE to a proposed action.  Agencies develop these extraordinary circumstances based on the specific characteristics of their individual agency NEPA procedures.

130

*Comment*:  Commenters stated that CEQ's plan to withdraw existing guidance only enhances the possibility that Federal agencies will adopt CEs without public accountability. Some commenters requested that CEQ provide additional guidance to clarify the proposed changes to use of CEs.

*CEQ Response*:  Withdrawing guidance will not have an adverse impact on the adoption and application of CEs because the final rule codifies existing agency practice, expands instruction to agencies on CEs, and organizes implementation requirements into one section for greater consistency in their application.  The revisions do not reduce existing agency public involvement practices concerning CEs as required by § 1507.3.  Further, agency procedures are subject to notice and comment under the APA.

As discussed in sections II.H.7 and II.K of the final rule, the final rule supersedes previous CEQ guidance and CEQ intends to publish a separate notice in the *Federal Register* listing guidance it is withdrawing.  CEQ will issue new guidance, as needed, consistent with the final rule and presidential directives.

*Comment*:  Commenters stated that the preamble to the proposed rule did not provide a reason for the deletion of the statement that agencies could choose to prepare EAs even if an action might potentially qualify as a CE.

*CEQ Response*:  The draft rule did not propose to and the final rule does not eliminate an agency's discretion to prepare an EA in those circumstances where an action may satisfy the criteria for a CE.  The final rule maintains the statement in § 1501.5(b) that an agency may prepare an EA on any action in order to assist agency planning and decision making.

*Comment*:  Many commenters responded to the proposed rule's request for comment on whether CEQ should establish government-wide CEs.  Many commenters noted with support

131

that CEQ historically has avoided making determinations about the level of analysis needed for specific categories of proposed actions. Other commenters supported an effort to establish government-wide CEs and discussed numerous examples that could be the basis of a government-wide CE.

*CEQ Response*: Most departments and agencies have developed CEs for administrative activities and other activities that occur government-wide. Further, under the final rule agencies may use CEs that have been developed by other agencies, where appropriate, once they establish a process in their agency NEPA procedures that also includes consultation with the originating agency (§ 1507.3(f)(5)). For these reasons, CEQ does not plan to initiate a rulemaking to establish government-wide CEs for administrative or other activities at this time. Any CEQ proposal to promulgate government-wide CEs would be the subject of a future notice of proposed rulemaking and may be appropriate to promote further efficiencies.

*Comment*: Commenters encouraged development of regional and location-specific CEs.

*CEQ Response*: The final rule supports the development of new CEs through agency NEPA procedures (§ 1507.3), which could include those designed for actions in a specific region or location. While agencies usually develop CEs for nationwide application, circumstances may occur when a geographically tailored CE is more appropriate and the applicable regulations do not inhibit such tailored CEs. The changes codify long-standing agency practice.

*Comment*: Commenters suggested imposing a time limit on agencies to determine whether a CE applies to a project application. They recommended adding a 30–day to 6–month time limit for agencies to determine applicability of CEs in § 1501.10. Commenters stated that the option to extend these limits should be at the discretion of the senior agency official and the applicant only after meeting clearly established criteria.

132

*CEQ Response*:  CEQ declines to establish a time limit for CE determinations in the final rule.  Agencies often complete CE determinations on a shorter time frame than the commenter suggested limits.

*Comment*:  Commenters asserted that the NEPA process is implemented inequitably for federally recognized Indian Tribes.  Commenters stated that Tribal projects triggering NEPA cannot qualify for a CE because of the Secretary's discretion to approve or disapprove a Tribal project, which commenters assert is, by definition, a major Federal action.  Commenters further stated that CEQ should use this update as an opportunity to consider clarifying that the regulations allow agencies to adopt CEs that apply to projects on Tribal lands.

*CEQ Response*:  NEPA does not make any distinction for major Federal actions that take place on Tribal lands.  An agency's NEPA procedures for applying a CE to actions on Tribal lands should be the same as those on non-Tribal lands.  Nothing in the CEQ regulations precludes agencies from applying CEs on Tribal lands.  However, agencies are in the best position to determine whether a CE is appropriate for any particular proposed action.

*Comment*:  Commenters stated that it is important to note that when an agency applies a CE, there is no public notice, no public comment, no consideration of alternatives, no mitigation, no monitoring, and no enforcement.

*CEQ Response*:  The public has an opportunity to participate in the development of an agency's CEs because agencies must establish CEs through their NEPA procedures, a process subject to public notice and comment.  Additionally, some agencies do provide public notice regarding CE determinations in certain circumstances.

*Comment*:  Commenters requested that the regulations require agencies to publish their policies for CEs on their websites or, preferably, in a centralized publicly available database and

133

managed by CEQ.  Commenters stated that this would facilitate the public's ability to understand

agency NEPA processes.  Other commenters expressed support for the new requirement that

agencies make CE determinations available in a publicly searchable database.

*CEQ Response*:  Consistent with § 1507.4, agencies should make their procedures for

CEs publicly available.  The NPRM did not propose requiring agencies to make CE

determinations available in a publicly searchable database, but rather noted in § 1507.4(a)(5) that

a searchable database is one of several means of making environmental documents available to

the public.  Many agencies maintain a publicly available list of their CEs, and CEQ has

developed a comprehensive list of agency CEs that is available to the public.[44]  In § 1507.4, the

final rule requires agencies to provide for efficient and effective interagency coordination of their

environmental program websites, including use of shared databases or application programming

interface, in their implementation of NEPA and related authorities.  CEQ declines to make

further changes to the final rule to address the commenters' concern.

*Comment*:  A commenter stated that in California, CEs require extensive identification,

documentation, and review of their effects, irrespective of the FHWA NEPA procedures in 23

CFR 77.117(c), as established in the NEPA Assignment (MOU) with the State of California.

The commenter recommended that CEQ should prohibit this additional burden in State MOUs,

which unnecessarily increases support costs and review time for these types of projects.

*CEQ Response*:  The MOUs between FHWA and States pursuant to 23 U.S.C. 326 are

outside the scope of this rulemaking.  However, CEQ notes that the final rule requires agencies

---

[44] Council on Environmental Quality, List of Federal Agency Categorical Exclusions (June 18, 2020) ("List of Agency CEs"), https://ceq.doe.gov/nepa-practice/categorical-exclusions.htmle.gov/nepa-practice/categorical-exclusions.html.

to propose revisions to their agency NEPA procedures in accordance with the final rule within 12 months of the effective date of the final rule.  The final rule also prohibits agency NEPA procedures that are inconsistent with the requirements in the final rule, unless they are necessary for agency efficiency or because there is a clear and fundamental conflict with the requirements of another statute.

*Comment*:  Commenters requested that the final rule require each agency to update regularly its inventory of CEs and to provide an opportunity for affected members of the public to comment on or contest the application of a CE.

*CEQ Response*:  Agencies may update CEs at any time pursuant to the requirements in the final rule.  Whenever agencies revise such procedures, they must consult with CEQ, and provide notice to the public and an opportunity to comment before finalizing the procedures.

*Comment*:  Commenters requested that CEQ clarify in the final regulations that actions that do not qualify as "major Federal actions" do not need to be the subject of a CE (or require a FONSI).  Commenters asserted that these actions are simply not subject to NEPA in the first instance, and therefore do not require an exclusion from NEPA.  Often agencies regard any action or activity, regardless of its minor scope, as being subject to NEPA.  Commenters stated that this is erroneous.

*CEQ Response*:  Agencies do not need to consider the applicability of CEs (or conduct analysis in EAs or EISs) for activities or decisions that do not meet the definition of a major Federal action.  The final rule includes a new § 1501.1, "Threshold analysis," for the consideration of the application of NEPA at the beginning of a review as a means of identifying and discouraging unnecessary analysis.  CEQ declines to make further changes to address the commenters' concern.

135

*Comment*:  Commenters recommended that CEQ require a certain level of documentation (e.g., a written statement) of an agency's determination that a categorical exclusion applies to proposed action, citing *Alaska Ctr. for the Envt. v. U.S. Forest Serv.*, 189 F.3d 851, 859 (9th Cir. 1999) as an example.  Commenters stated that this requirement could avoid costly litigation where a court must delve into an administrative record to determine whether an agency has fully considered the potentially significant environmental effects of extraordinary circumstances.  Commenters also stated that decisions to apply categorical exclusions identified by other agencies (proposed § 1507.3(e)(5)) should include a brief written explanation detailing why significant environmental impacts will not result.

*CEQ Response*:  In the final rule, § 1507.3(e)(2)(ii) requires agencies to identify in their NEPA procedures when documentation of a CE determination is required.  With respect to the process to apply another agency's CE under § 1507.3(f)(5), an agency's process must provide for consultation with the agency that listed the CE in its NEPA procedures to ensure that the use of the CE is appropriate, document the consultation, and identify for the public those CEs that the agency may use.  However, given the variability among Federal agencies with respect to both their CEs and records management, CEQ declines to require a specific level of documentation.

*Comment*:  Commenters stated that CEQ should clarify in § 1501.4 that CEs created by Congress are distinct from CEs created by agencies through the regulatory process.  Commenters noted, as an example, the CE for certain insect- and disease- treatment projects on National Forest System lands created by the Healthy Forests Restoration Act, which does not require the extraordinary circumstances analysis that would be required under an agency-created CE.

136

*CEQ Response*:  Statutorily-created CEs are distinct from and not subject to the requirements of the final rule unless the statute so specifies.  CEQ declines to clarify this point in the final rule, since it has not been a source of confusion for agencies.

*Comment*:  Commenters requested that the regulations require Federal agencies to provide summary lists of proposed CEs for interested Tribes to review on a periodic basis, such as quarterly, to help alleviate the potential for adverse effects to tribally significant cultural resources located off reservation lands.

*CEQ Response*:  Tribes have an opportunity to review and comment on all proposed CEs when agencies update their NEPA procedures to establish new CEs because the procedures must go through a public review and comment process consistent with § 1507.3.  As appropriate, agencies also may engage in consultation with Tribes pursuant to E.O. 13175 and other agency procedures.

*Comment*:  A commenter requested that CEQ require that agency action be subject to a rebuttable presumption that a CE applies to a proposed action as long as the action was subject to a NEPA analysis within five years prior to the date the action is expected to be implemented and (a) there has been no significant change to the proposed project that is relevant for purposes of environmental review of the project, and (b) no significant circumstance or new information has emerged that is relevant to the environmental review for the proposed project.

*CEQ Response*:  The circumstances described by the commenter may satisfy the requirements for the agency to adopt a previously completed EIS, EA, or determination that a CE applies to a proposed action under § 1506.3.  An agency's procedures may further address the commenter's concern by applying CEQ's requirements for CEs to the particular aspects of their programs.  Where an agency has prepared an EIS, the circumstances the commenter described

137

may also be addressed by § 1502.9(d)(4) of the final rule, which provides that agencies may find that changes to the proposed action or new circumstances or information relevant to environmental concerns are not significant and therefore do not require a supplement.  Under such circumstances, an agency may document the finding consistent with its agency procedures, or, if necessary, in a FONSI supported by an EA.

### 5.    Environmental Assessments (EAs) (§ 1501.5)

*Comment*:  Commenters asserted that the proposed changes to § 1501.5, "Environmental Assessments," prioritized speed over public input (e.g., not requiring a draft EA for public review), discussion of alternatives it eliminated, and effective consideration of environmental impacts.  Other commenters supported the proposed rule language that retains the purpose of an EA, and requested clarification that an agency need only evaluate a single action alternative and a no-action alternative.

*CEQ Response*:  In the final rule, CEQ consolidates the requirements for EAs in § 1501.5.  Similar to the 1978 regulations, the final rule does not require agencies to distribute a draft EA for comment.  The range of alternatives required remains the range of reasonable alternatives necessary to address potential environmental effects, and is not limited to a single action and a no action alternative.  Under § 1501.5(c)(1) and (2), the EA must continue to provide "sufficient evidence and analysis for determining whether to prepare an environmental impact statement or a finding of no significant impact" based on its discussion of "the environmental impacts of the proposed action and alternatives."

*Comment*:  Commenters requested further clarity concerning the proposed rule's preamble that the requirement for an EA would continue to be more limited than an EIS.

138

*CEQ Response*:  When an agency has not categorically excluded a proposed action, or a categorical exclusion is inapplicable due to extraordinary circumstances, the agency may prepare an EA to document its analysis of the effects of the proposed action.  If the analysis demonstrates that the action's effects would not be significant, the agency documents its reasoning in a FONSI, thereby completing the NEPA process.  If the analysis demonstrates that the action's effects may be significant, the agency can use the EA to facilitate preparation of an EIS.  Paragraphs (c) and (f) of § 1501.5 require agencies to "briefly" provide sufficient evidence and analysis for determining whether to prepare an EIS or a FONSI, "briefly" discuss the purpose and need for the proposed action, alternatives, and the environmental impacts of the proposed action and alternatives, include a list of agencies and persons that the agency consulted.  In addition, §§ 1501.5 and 1501.10 and set presumptive page and time limits to discourage EAs that are unnecessarily lengthy.

*Comment*:  Commenters stated that an EA must consider alternate means of accomplishing the project or activity's purpose and need while minimizing impacts.  Commenters suggested that not requiring a detailed description of alternatives considered and those eliminated from detailed study would encourage agencies to not consider alternatives that could reduce impacts.  Commenters argued that this could also provide less than complete information to the agency's decision maker and the public about a proposed project.

*CEQ Response*:  An agency may prepare an EA when a proposed action is not likely to have significant effects or when the significance of the effects is unknown.  An EA can assist agencies in determining whether they should prepare an EIS or whether a FONSI would be appropriate.  Similar to the 1978 regulations, the final rule requires agencies to briefly describe the proposed action and any alternatives it is considering that would meet the need of the

139

proposed agency action. Under the final rule, an agency must describe the environmental impacts of its proposed action and alternatives, providing enough information to support a determination to prepare either a FONSI or an EIS. The EA should focus on whether the proposed action (including mitigation) would "significantly" affect the quality of the human environment and tailor the length of the discussion to the relevant effects. The agency may contrast the impacts of the proposed action and alternatives with the current and expected future conditions of the affected environment in the absence of the action, which constitutes consideration of a no-action alternative. If the agency finds no significant impacts based on mitigation, § 1501.6(c) requires the mitigated FONSI to state any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts.

*Comment*: Commenters requested that CEQ use the word "succinctly" rather than "briefly" in § 1501.5(c)(1).

*CEQ Response*: The 1978 regulations use the word "briefly," and CEQ declines to make the requested word change.

*Comment*: Commenters suggested striking the reference in § 1501.5(c)(2) to remove the reference to section 102(2)(E) and substitute the corresponding text.

*CEQ Response*: Section 102(2)(E) was referenced in 40 CFR 1508.9(b), and CEQ moves this language to § 1501.5(c)(2) of the final rule with only minor revisions while retaining the reference to 102(2)(E). CEQ notes that the text of section 102(2)(E) is also referenced in § 1507.2(d) of the final rule which, similar to the 1978 regulations, directs that agencies study, develop and describe alternatives to recommended courses of action in any proposal that involves unresolved conflicts concerning alternative uses of available resources.

140

*Comment*:  A commenter expressed support for the changes in proposed § 1501.5(d), in particular the addition of "relevant" as a modifier to "agencies, applicants, and the public."  The commenter noted that some agencies already limit an expansive public comment process on EAs. The commenter stated that a typical EA tends to run less than 50 pages in length, and expressed the view that there was not a major informational or public benefit to unlimited comments on such shorter documents compared to EISs.  Commenters expressed that they thought the modification reflects common sense.

*CEQ Response*:  In the NPRM, CEQ proposed to change "environmental" to "relevant" to limit involvement not only to "environmental" agencies.  In the final rule, CEQ makes changes to this sentence in § 1501.5(e) to clarify that "relevant" only modifies "agencies" by reordering and adding language to read "the public, State, Tribal, and local governments, relevant agencies, and any applicants."

*Comment*:  Commenters stated that a lack of details regarding the minimal level of public involvement that is required could lead to additional confusion regarding what is adequate public involvement for the purpose of preparing an EA.  Commenters asserted the lack of clarity in the preamble to the proposed rule concerning the phrases, "tailored to the interested public," and "available means of communication" could result in litigation.  Other commenters supported proposed changes to §§ 1503.1(a)(2)(v) and 1506.6, noting increased flexibility with respect to public involvement.

*CEQ Response*:  The 1978 regulations did not specify a minimum level of public involvement for EAs.  In the proposed rule, CEQ explained that there is no single correct

141

approach to public involvement.[45]  Similar to the 1978 regulations, the final rule requires agencies to involve the public, relevant agencies, and any applicants, to the extent practicable, in preparing EAs.  When preparing an EA, agencies retain the flexibility to structure public involvement based on the specific circumstances of the proposed action.  Under the final rule, agencies also must continue to list the public, relevant agencies, and applicants, involved in preparing the EA to document agency compliance with the requirement to involve the public in preparing EAs to the extent practicable.  Given the wide range of circumstances in which agencies prepare EAs, CEQ declines to make further revisions.

*Comment*:  Commenters specifically objected to proposed § 1501.5(d) directing that agencies involve the public "to the extent practicable" in preparing EAs.  Commenters stated that regulations should require public involvement for an EA.

*CEQ Response*:  The 1978 regulations (40 CFR 1501.4(b)) used the phrase "to the extent practicable," and CEQ did not propose to change this phrase in the proposed rule.  Section 1501.5(e) of, the final rule retains this phrase and the requirement in the 1978 regulations that agencies involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable, in preparing EAs.  The final rule also adds State, Tribal, and local governments to this list.

*Comment*:  Commenters recommended that the final rule clearly state that agencies are not required to seek public review and comments on draft and final EAs and that agencies have broad discretion in deciding whether to involve the public in preparation of an EA.

---

[45] 85 FR at 1697.  ("Rather, agencies should consider the circumstances and have discretion to conduct public involvement tailored to the interested public, to available means of communications to reach the interested and affected parties, and to the particular circumstances of each proposed action.").

*CEQ Response*:  The final rule at § 1501.5(e) provides that agencies shall involve the public, State, Tribal and local governments, relevant agencies, and applicants to the extent practicable.  As discussed in section II.C.5 of the final rule, however, CEQ provides agencies with the flexibility to structure public involvement in the preparation of an EA, as practicable and similar to the 1978 regulations.  This recognizes that there are a wide variety of circumstances in which EAs are prepared by Federal agencies.

*Comment*:  Commenters requested that CEQ revise § 1501.5(d) to require that Federal agencies involve relevant non-Federal agencies, applicants, and the public, to the extent practicable in preparing an EA by affirmatively soliciting comment for no less than 30 days, and revise proposed § 1501.5(f) to substitute "shall," for "may."

*CEQ Response*:  CEQ declines to make the suggested changes.  Agencies prepare an estimated 10,000 EAs annually under a variety of circumstances necessitating some degree of flexibility in structuring both form and content.  The 1978 regulations did not apply the referenced provisions in §§ 1502.21, 1502.23, and 1502.24 to EAs.  The final rule allows for these EIS provisions to be used in EAs, but maintains flexibility in EA form and content.

*Comment*:  Commenters stated that the effort to include Tribes and local governments in the regulations is incomplete because the proposed § 1501.5(d) does not include Tribes and local governments in the list of entities.

*CEQ Response*:  In the final rule, CEQ has revised § 1501.5(e) to include "State, Tribal, and local governments" in the list of entities that agencies should be involved to the extent practicable, in preparing EAs.

*Comment*:  A commenter recommended that CEQ further revise proposed § 1501.5(d) to reference specifically participating and cooperating agencies.

*CEQ Response*:  In § 1501.5(e) of the final rule, CEQ makes clarifying revisions and reorders the sentence to provide that agencies shall involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable, in preparing EAs. This would include participating and cooperating agencies, as appropriate.

*Comment*:  Commenters questioned why proposed § 1501.5(f) does not reference proposed § 1502.23, "Cost-benefit analysis," as an EIS provision that agencies may apply to EAs.  Commenters stated that these analyses could be applicable for EAs when the lead agency deems it relevant to their decision making.

*CEQ Response*:  An EA does not require the same level of detail as an EIS because the proposed action is an action not likely to have significant effects or for which the significance of the effects is unknown.  Depending on the circumstances and other applicable statutes, agencies may nonetheless be required to prepare a cost-benefit analysis pursuant to E.O. 12866[46] for regulations or other applicable law or policy.

*Comment*:  Commenters noted that proposed § 1502.25 would require agencies to prepare draft EISs, to the fullest extent possible, concurrent and integrated with other environmental reviews and analyses.  They recommended that CEQ incorporate a similar provision into proposed § 1501.5.

*CEQ Response*:  Section 1501.5(g)(3) provides that agencies may apply to EAs § 1502.24 relating to environmental review and consultation requirements.

*Comment*:  Commenters supported presumptive page and time limits for EAs and EISs in coordination with the role of a senior agency official and the new definition of "page," stating

---

[46] *Supra* note 42.

that the proposed revisions align with agency practice and will improve timeliness and transparency.

*CEQ Response*:  CEQ acknowledges the support for the revisions.  Presumptive page and time limits will encourage agencies to identify the relevant issues, focus on significant environmental impacts, and prepare concise readable documents that will inform decision makers as well as the public, while creating a more efficient and effective NEPA process.

*Comment*:  Commenters expressed opposition to presumptive page limits for EAs stating that they are arbitrary, capricious, and unnecessary as actions requiring an EA are infrequent. Some commenters opposing the revisions believed that the new page limits would set a "one size fits all" approach, rush the process causing declines in the public's ability to participate (including Tribal, State, and local governments) and the quality of the analyses.  Commenters also raised concerns over challenges in meeting the proposed page limits due to project complexity and ability to complete needed studies within a small field season window.

*CEQ Response*:  CEQ finalized a presumptive limit of 75 pages for EAs, which is half of the existing 150–page limit for EISs.  This proposed presumptive page limit is consistent with CEQ's past guidance on EAs, which advises agencies to avoid preparing lengthy EAs except in unusual cases where a proposal is so complex that a concise document cannot meet the goals of an EA, and where it is extremely difficult to determine whether the proposal could cause significant effects.[47]  CEQ previously recommended that EAs be approximately 10 to 15 pages; however, in practice, such assessments are often longer.  CEQ notes that the page limit is

---

[47] "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," 46 FR 18026 (Mar. 23, 1981) ("Forty Questions") at Questions 36a and 36b, https://www.energy.gov/nepa/downloads/forty-most-asked-questions-concerning-ceqs-national-environmental-policy-act.

presumptive, so agencies may extend the 75–page limit if a senior agency official approves in writing and establishes a new limit.  To create a more efficient process, Federal agencies have begun establishing procedures consistent with previous EA guidance and E.O. 13807.  For example, in August 2018 DOI issued a memorandum titled, "Additional Direction for Implementing Secretary's Order 3355 Regarding Environmental Assessments."[48]  It states that DOI bureaus should strive to produce EAs consistent with CEQ guidance of 10 to 15 pages and DOI's normal practice of 30 to 40 pages, and that in certain circumstances, EAs may need to exceed these amounts.  In such cases, the memorandum instructs that DOI bureaus should strive to complete EAs in 75 pages or less.  Similarly, the U.S. Department of Transportation (DOT) issued an interim policy for public comment, Page Limits for NEPA Documents and Focused Analyses ("DOT Page Limits Guidance"), which states that the text of an EA should generally be no more than 75 pages.[49]  This additional flexibility ensures that the page limit does not preclude an agency from otherwise complying with the requirements of NEPA and the final rule.

*Comment*:  Commenters opposed CEQ's proposal to add a new paragraph to clarify that agencies may apply certain provisions in part 1502 to EAs.  Commenters stated that if an agency finds itself needing those provisions that the analysis should be an EIS rather than an EA.

*CEQ Response*:  The provisions in part 1502 relating to incomplete or unavailable information (§ 1502.21), methodology and scientific accuracy (§ 1502.23), and coordination of environmental review and consultation requirements (§ 1502.24) may be useful to agencies as they prepare an EA and determine whether to prepare an EIS or a FONSI.  Agencies prepare EAs

---

[48] https://www.doi.gov/sites/doi.gov/files/uploads/so_3355_additional_direction_on_eas_08.06.2018.pdf.

[49] https://www.transportation.gov/sites/dot.gov/files/docs/mission/transportation-policy/permittingcenter/345206/nepa-page-limits-policy-081919.pdf.

146

under a variety of circumstances, and the final rule provides that agencies at their discretion may apply these specific subsections to an EA where appropriate to the circumstances.

*Comment:*  Commenters stated that CEQ should revise the proposed § 1501.5 to clarify that agencies can scope an EA to cover multiple similar actions.

*CEQ Response*:  The final rule amends the provisions relating to  "tiering" in § 1501.11 to make clear that agencies may use EAs at the programmatic stage for decisions on a program, plan, or policy covering multiple actions, allowing narrower or site-specific decisions to tier from a programmatic EA, as well as from an EA on a specific action at an early stage to a supplement or a subsequent assessment at a later stage.

*Comment*:  Commenters recommended that it would be helpful to note that an agency can identify actions that would normally be subject to an EA or EIS.  Similarly, commenters stated it would be helpful to clarify that an agency can use an EA if there are no known significant effects, to determine whether an EIS is needed or not.

*CEQ Response*:  Section 1507.3(e)(2) directs agencies to identify in their NEPA procedures typical classes of action that normally require an EA or EIS.  Section 1501.3(a)(2) and (3) provides direction for agencies on determining the appropriate level of NEPA review, including consideration of whether a proposed action is not likely to have significant effects or the significance of the effects is unknown and an EA is therefore appropriate.  Finally, § 1507.4 requires agencies to provide NEPA program information, including information on actions that normally require an EA or EIS, by website and other means to allow agencies and the public to efficiently and effectively access information about NEPA reviews.

*Comment*:  Commenters recommended that CEQ encourage agencies to scale down proposed actions to align with expected project execution timelines and expected budget

147

availability.  Commenters stated that ideally project implementation would begin immediately after environmental analysis is completed.

*CEQ Response*:  The final rule provides flexibility for agencies to structure proposed actions to meet the purpose and need based on their time and budget circumstances, with exceptions to page and time limits subject to oversight by a senior agency official acting under authority of § 1501.10, "Time limits."  CEQ declines to make further changes to the process of preparing EAs based on the specific aspects of project execution.

*Comment*:  Commenters asked who should determine the meaning of "marginal details" referenced in the NPRM preamble.

*CEQ Response*:  In its proposed rule, CEQ explained that agencies preparing an EA should focus on analyzing "material effects and alternatives," rather than "marginal details that may unnecessarily delay the environmental review process."  This is similar to the emphasis in the 1978 regulations on reducing excessive paperwork by discouraging the analysis of insignificant issues.  40 CFR 1500.4(g).  When implementing NEPA, agencies should apply a rule of reason and should use their experience and expertise in conducting their analyses.

*Comment*:  Commenters noted that the NPRM preamble states that the agency may compare the action alternative to current and expected future conditions of the affected environment in the absence of the action.  Commenters supported use of this standard as the "no action" baseline against which the effects of the proposed action and alternatives are compared. They recommended including this language in the regulations themselves, such as in §§ 1501.5 and 1502.16 to create an explicit, consistent baseline for use in EAs and EISs.  They also recommended that CEQ change the wording in the preamble from "agencies may" to "agencies

148

must" contrast the impacts of the proposed action with this baseline, to make clear the effects of the action and the scope of the no-action alternative.

*CEQ Response*: In the final rule, CEQ revises § 1502.15, which addresses the affected environment, to provide that agencies should describe the environment of the area(s) to be affected or created by the alternatives under consideration, including reasonably foreseeable environmental trends and planned actions in the area(s). The preamble to the final rule clarifies that agencies will consider predictable trends in the area in the baseline analysis of the affected environment. CEQ declines to further revise the final rule as commenters requested because it is not necessary. Requiring agencies to use the no-action alternative as the baseline may not be appropriate in every circumstance and the word "may" allows agencies flexibility. While neither the 1978 regulations nor the final rule require a specific no-action alternative in every EA, the preamble to the final rule explains that an agency may contrast the impacts of the proposed action and alternatives with the current and expected future conditions of the affected environment in the absence of the action, which constitutes consideration of a no-action alternative.

*Comment*: Commenters asked why § 1501.5 of the proposed rule did not require EAs to include a summary and response to any public comments.

*CEQ Response*: An EA is appropriate to prepare when a proposed action is not likely to have significant effects or the significance of the effects is unknown. While agencies may include a summary and any public comments received, agencies have flexibility in preparing an EA, which is a concise document that briefly discusses the proposed action and provides sufficient evidence or analysis for the agency to determine whether to prepare a FONSI or to proceed with an EIS.

149

*Comment*:  Commenters suggested CEQ add a new paragraph to § 1501.5 to require agencies to develop a monitoring and mitigation implementation plan for any mitigation measures that are adopted to mitigate potentially significant effects to the point of insignificance.

*CEQ Response*:  Section 1501.6(c) addresses mitigation and monitoring, and provides that the FONSI state the authority for any mitigation that the agency has adopted and any applicable monitoring and enforcement provisions.  This section further provides that if the agency finds no significant impacts based on mitigation, the mitigated FONSI must include in the FONSI any enforceable mitigation requirements or commitments that will be undertaken to avoid significant impacts.

*Comment*:  Commenters requested that CEQ include information on how agencies proceed when conditions have changed after an agency completes an EA.  They referenced proposed § 1502.9(d)(4), which discusses the procedures when changes are not significant and do not require a supplemental EIS.  Commenters recommended CEQ include similar language for EAs requiring an agency to document its review of the FONSI when it finds changes to the proposed action or new circumstances or information relevant to environmental concerns are not significant.  Commenters also suggested adding information about the longevity of an EA, acknowledging that EAs should not have a discreet lifespan, but rather it should be up to the deciding official to determine when decisions can be implemented without further NEPA analysis.

*CEQ Response*:  After an agency completes an EA and issues a FONSI, the Federal review is generally complete.  When an agency determines that a major Federal action remains to occur and changes to the remaining action or new circumstances or information relevant to

150

environmental concerns are not significant, the agency may make a finding that supplementation is unnecessary consistent with § 1502.9(d)(4).

*Comment*:  Commenters recommended that CEQ also require agencies to report the cost to prepare EAs similar to that of EISs.

*CEQ Response*:  CEQ declines to make the suggested revision.  Because EAs should be a brief and succinct analysis of the relevant environmental issues, typically leading to a FONSI, CEQ expects agency expenditures in most cases to reach such a conclusion to be substantially less in comparison to preparation of EISs.

### 6.        Findings of No Significant Impact (FONSIs) (§ 1501.6)

*Comment*:  Commenters noted a discrepancy between the language in proposed § 1501.6(a) that describes a FONSI as being appropriate when the proposed action is "not likely to have significant effects" and the definition of a FONSI in proposed § 1508.1(*l*), that a FONSI "will not have a significant effect."  Commenters stated that there is no rationale or justification for using different standards.

*CEQ Response*:  The proposed rule's language at § 1501.6(a) and § 1508.1(*l*) were not aligned.  Paragraph (a) of § 1501.6 used an incorrect standard for preparing an EA.  In the final rule, CEQ has revised "not likely to" to "will not" in § 1501.6(a) for consistency with the definition of a FONSI in § 1508.1(*l*).

*Comment*:  Commenters recommended that CEQ revise § 1501.6(a)(2) to state that the agency should provide the draft EA and the draft FONSI for public review before making any formal determination of whether an EIS is necessary.  Commenters also stated that providing only the FONSI for review will not provide the public with sufficient information to evaluate its conclusions, and suggested the agency must also provide the EA.

151

*CEQ Response*:  The final rule requires that an agency make the FONSI available to the public for a 30–day review period before a final determination is made in certain circumstances as noted in § 1501.6(a)(2), including where the proposed action is closely similar to one that normally requires the preparation of an EIS under the agency's procedures or the nature of the proposed action is without precedent.  This approach is similar to the 1978 regulations.  Under paragraph (b), agencies "shall" include the EA or incorporate it by reference in the FONSI.  Therefore, an agency must provide both the EA and the FONSI as requested by the commenters.

*Comment*:  Commenters recommended that CEQ add "as determined by the agency" to paragraph (a)(2) to better reflect the discretionary nature of those circumstances when an agency must make a FONSI available for public review.  They also suggested narrowing paragraph (a)(2)(ii) to ensure "without precedent" only encompasses truly novel proposed actions whose environmental impacts are not well understood.

*CEQ Response*:  CEQ declines to make the requested revisions to § 1501.6(a)(2) in the final rule.  The language "as determined by the agency," is superfluous because agencies are responsible for making such determinations.  Proposed actions "without precedent" are similar to "novel proposed actions," so further clarification is unnecessary.

*Comment*:  Commenters stated that the proposed revisions to § 1501.6(a)(2) only allow for public review of a FONSI in the event that a project is without precedent or if a FONSI is issued on a project where EISs are typically prepared.  Commenters stated that this eliminates public participation in all other circumstances, preventing the public from overseeing agency decision making and challenging agency decisions to issue a FONSI when a project may have significant impacts.  Some commenters requested that CEQ add conditions that require the lead Federal agency to make a FONSI available for public review.  Other commenters stated that

requiring a 30–day review of a FONSI would be unnecessary if agencies afforded review during the EA development.  Further, they stated that it is late in the process for the public to raise concerns.

*CEQ Response*:  The 1978 regulations established limited circumstances where an agency must make a FONSI available for the public to review.  CEQ retains this approach in the final rule in § 1501.6(a)(2), and CEQ declines to revise the conditions.

*Comment*:  A commenter suggested striking § 1501.6(a)(2)(ii), stating that precedent should not be a determining factor, but rather a lack of significant environmental impact.

*CEQ Response*:  Section 1501.6 (a)(2)(ii) was included in the 1978 regulations, and CEQ did not propose to revise this provision.  Sections 1501.6 (a)(2)(i) and (ii) address factors for determining whether a FONSI should be made available for 30 days for public review before making a determination whether to prepare an EIS and before the action may begin.  The time for public review under such circumstances may inform agency decision making, and CEQ has not revised this provision in the final rule.

*Comment*:  Commenters recommended that the final rule include an additional criterion in § 1506.6(a)(2) to require release of a FONSI for public review if there is any missing information.

*CEQ Response*:  A FONSI is appropriate where an agency has determined a proposed action will not have significant effects.  Under the final rule, agencies will continue to be required to make a FONSI available where the proposed action is, or is closely similar to, one which normally requires the preparation of an EIS under the agency's procedure or the proposed action is one without precedent.  For proposed actions that do not normally require preparation of an EIS or are actions that the agency has previously analyzed through an EA, public review and a

153

30–day waiting period is not necessary or appropriate because the action has been determined
not to have significant effects. To the extent that information is incomplete or unavailable, the
agency may apply the provision of § 1502.21.

*Comment*: Commenters requested that CEQ clarify § 1501.6(b) to identify the
consequences if a FONSI does not list a "related" document. Commenters also stated that this
section's relationship to proposed § 1501.9(f)(3) is not clear.

*CEQ Response*: Related documents are described in further detail in § 1501.9(f)(3) of the
final rule. Both §§ 1501.6(b) and 1501.9(f)(3) are similar to the 1978 regulations at 40 CFR
1501.7(a)(5) and 1508.13, and further clarification is not necessary.

*Comment*: Commenters supported codifying in § 1501.6(c) the long-standing practice of
a mitigated FONSI. Commenters noted there is uncertainty in some agencies regarding whether
mitigated FONSIs are acceptable. Some commenters expressed concern that the proposed
changes to the regulations precluded the use of a mitigated FONSI.

*CEQ Response*: The term mitigated FONSI is not in the 1978 regulations. CEQ issued
its Mitigation Guidance[50] "which is consistent with previous court rulings (*e.g., Cabinet
Mountains Wilderness/Scotchman's Peak Grizzly Bears v. Peterson*, 685 F.2d 678, 682 (D.C.
Cir. 1982), and *Pres. Coal.*, *Inc. v. Pierce*, 667 F.2d 851, 860 (9th Cir. 1982)). As the
commenters note, some agencies implemented the practice of applying mitigated FONSIs many
years before to CEQ's 2011 guidance. Incorporating the concept into the final rule should
eliminate any remaining confusion about use of mitigated FONSIs. Nothing in the final rule

---

[50] *Supra* note 44.

precludes a project proponent from voluntarily conducting mitigation in order to receive a

FONSI or for other purposes.

*Comment*:  Commenters requested clarification of proposed § 1501.6(c), which would

require agencies to state the "means of and authority for" included mitigation measures.

Commenters sought clarification, including examples, of whether "means of" referred to a list of

the particular mitigation measures, and "authority for" refers to the statute requiring the

particular mitigation measure.  Commenters asked whether NEPA is a statute agencies will cite.

While some commenters expressed support for the change, others conveyed concerns that

requiring citations to specific statutes may discourage agencies from including mitigation

measures.  They also recommended that CEQ clarify that NEPA does not prohibit mitigation and

that the rule does not limit a project proponent from voluntarily proposing and accepting

mitigation measures.

*CEQ Response*:  In response to comments, CEQ has revised the final rule to remove the

phrase, "means of" to reduce confusion.  When preparing an EA, many agencies develop,

consider, and commit to mitigation measures to avoid, minimize, rectify, reduce, or compensate

for potentially significant adverse environmental impacts that would otherwise require

preparation of an EIS.  An agency can commit to mitigation measures for a mitigated FONSI

when it can ensure that the mitigation will be performed, when the agency expects that resources

will be available, and when the agency has sufficient legal authorities to ensure implementation

of the proposed mitigation measures.  The phrase, "authority for" refers to the authority for

requiring the mitigation, including any applicable legal authorities and requirements, recognizing

that NEPA does not mandate the form or adoption of any mitigation.  The requirement to

identify the authority for mitigation does not preclude project applicants from voluntarily

155

including mitigation as part of the project for the purpose of receiving a FONSI or other purposes.

*Comment*:  Commenters expressed concern with the requirement in proposed § 1501.6(c) for FONSIs to include the "means of and authority for mitigation, as well as monitoring or enforcement."  Commenters stated that the required information is often not available at the time of FONSI approval because agencies often issue the FONSI before a permit decision, while mitigation is often determined through the permitting process.  Commenters argue that requiring this new information in a FONSI adds unnecessary requirements and runs contrary to streamlining efforts because the list of mitigation measures in the FONSI may not be complete.

*CEQ Response*:  In response to comments the final rule requires agencies to state the authority for any mitigation adopted and any applicable monitoring or enforcement provisions. CEQ does not include "means of and" in § 1501.6(c) of the final rule, which created confusion. The final rule is sufficient to ensure that mitigation upon which a FONSI has been prepared will be performed, recognizing that mitigation activities may be conducted over a period of time.

*Comment*:  Commenters recommended that CEQ revise the language in § 1501.6 to clarify that mitigation would never be required by NEPA consistent with the Supreme Court's holding in *Methow Valley*.

*CEQ Response*:  In the final rule, CEQ clarifies in the definition of "mitigation" at § 1508.1(s) that, while NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation.

*Comment*:  Commenters stated that the efficiency of EAs would be much improved if agencies could include FONSIs in EAs themselves rather than requiring separate documentation.

*CEQ Response*:  The final rule codifies current agency practice with respect to EAs and FONSIs.

*Comment*:  A commenter requested the regulations state that a Tribe may adopt an EA and FONSI as well as an EIS if the Tribe has a Tribal Integrated Resource Management Plan (TIRMP) or similar Tribal environmental standards and mechanism for adopting EAs prepared by other agencies in place.

*CEQ Response*:  These regulations apply to Federal agencies, and this request is outside the scope of this rulemaking.  Therefore, CEQ declines to make the requested change to the final rule.

*Comment*:  To eliminate duplication with State, Tribal, and local procedures, commenters requested that the final rule authorize agencies to accept FONSIs prepared by Tribal governments.

*CEQ Response*:  CEQ declines to make the requested changes to the final rule.  Absent separate statutory authority, Federal agencies may not delegate their responsibilities under NEPA for FONSIs.  The final rule includes a number of changes to improve coordination with Tribal governments, including the incorporation of environmental documents that have been prepared for other purposes (e.g., §§ 1501.12, 1506.3).  Similar to the 1978 regulations, to the final rule allows  an applicant to prepare an EA under the supervision of an agency.  *See* § 1506.5.  The agency must independently evaluate all environmental documents prepared by an applicant or contractor, and the agency must take responsibility for the accuracy, scope and contents of the environmental documents.

*Comment*:  A commenter recommended limiting a FONSI to 300 words.

157

*CEQ Response*:  In the final rule, an EA that supports a FONSI should not be more than 75 pages unless a senior agency official approves an extension and establishes a new page limit. CEQ declines to provide for a word count for a FONSI, as agencies should have flexibility in the preparation of this document.

### 7.    Lead and Cooperating Agencies (§§ 1501.7 and 1501.8)

*Comment*:  Some commenters did not support the designation of cooperating agencies in the EA process as too great a burden on lead and cooperating agencies.

*CEQ Response*:  In response to comments, the final rule authorizes the designation of a lead agency in the development of a complex EA.  The additional administrative process associated with establishing lead and cooperating agencies is not needed for many EAs, which are completed within several months.  Approximately four to eight percent of EAs have cooperating agencies,[51] which is a rough estimate of the proportion of complex EAs where designation of a lead agency may be warranted.

*Comment*:  Commenters did not believe the concept of "joint lead agencies" as referenced in § 1501.7(b) was effective or efficient, since this would lead to confusion and make dispute resolution more challenging.  Commenters stated that it is not difficult to imagine a project with several "joint lead" agencies and the challenges such a situation engenders—in many instances, this would be the status quo.

*CEQ Response*:  The provision to allow the designation of joint lead agencies has been a part of the CEQ NEPA regulations since 1978, is intended to facilitate coordination between

---

[51] Council on Environmental Quality, "The Fourth Report on Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act," (Oct. 2016), https://ceq.doe.gov/ceq-reports/cooperating_agencies.html.

Federal agencies and one or more State, Tribal, or local agencies, and has not resulted in the inefficiencies of concern to the commenters.  Where two Federal agencies could potentially function as the lead agency, the Federal agencies may develop an efficient and effective means to manage a joint lead relationship or resolve the issue of the lead agency designation using the dispute resolution process established pursuant to § 1501.7(c), (d), (e), and (f).

*Comment*:  Commenters recommended that CEQ add a subparagraph to § 1501.7(b) to prohibit sharing of information discussed at cooperating agency meetings and preliminary draft documents with agencies not designated as cooperating agencies until the lead agency allows such information to be distributed to the public for review.

*CEQ Response*:  The final rule leaves the management of meetings and preliminary draft document review to the discretion of the lead and cooperating agencies and applicable law regarding public disclosure.

*Comment*:  A commenter requested clarification regarding the reference in § 1501.7(c) to a letter or memorandum.

*CEQ Response*:  If there is more than one potential lead agency for a proposed action, then the agencies will determine which agency will be the lead agency and which will be cooperating agencies.  Such determination will be made in a written agreement, *i.e.*, a letter or memorandum, which could include an email, MOU, or memorandum of agreement (MOA), that states which agency will be the lead agency and which will be cooperating agencies.

*Comment*:  A commenter requested clarification regarding when a request to CEQ to determine a lead agency under § 1501.7 (e), including clarification regarding when the 45–day clock starts under the regulations.

159

*CEQ Response*:  The final rule provides at § 1501.7(d) that any Federal agency, or any State, Tribal, or local agency or private person substantially affected by the absence of lead agency designation may make a written request to the senior agency officials of the potential lead agencies that a lead agency be designated.  The 45 days would begin from date the request is made under paragraph (d).  If the potential lead agencies have not resolved the issues of lead and cooperating relationships within 45 days of that request, then it may be appropriate to request resolution by CEQ.

*Comment*:  Commenters expressed support for provisions authorizing and encouraging agencies to issue a single EIS and ROD in § 1501.7(g).  Commenters requested early, thorough, and reliable coordination with eligible cooperating agencies.  Commenters also requested that lead agencies send invitations to eligible cooperating agencies as early as possible in the process and include States, Tribes, and local entities.

*CEQ Response*:  CEQ declines to make further changes to the rule to address the commenters' suggestions because the rule adequately addresses these issues.  The final rule emphasizes coordination with cooperating agencies early in the NEPA process in § 1501.7(h)(1) by requiring the lead agency to request the participation of cooperating agencies at the earliest practicable time.  This focus on what is practicable, rather than simply possible, provides lead and cooperating agencies sufficient flexibility to coordinate efficiently.

*Comment*:  Commenters stated that the proposed changes to § 1501.7(g) are less stringent than the 1978 regulations and recommended revising § 1501.7(g), (h)(4), (i), and (j) and striking § 1501.10(b)(2) (setting a 2–year timeframe for EISs).  Commenters recommended that if any of the cooperating or participating agencies decide that an EIS is required under their program, and

not an EA, then the lead agency will defer and pursue an EIS. Commenters also requested that CEQ strike the requirement to develop a schedule for the EIS. *See* § 1501.8(b)(6) and (7).

*CEQ Response*: The referenced proposed changes improve coordination of agencies involved in the NEPA process and do not make the regulations less stringent. Each Federal agency remains responsible for the scope, accuracy, and content of the environmental documents used in their respective decision-making processes, and cannot defer their decision on the level of required environmental review to another agency. In the uncommon situation where two Federal agencies have different levels of review (*i.e.*, an EA versus an EIS), for their respective decisions, then the agency that must prepare an EIS would serve as the lead agency. Striking language at § 1501.7(h)(4), (i), and (j) and § 1501.10(b)(2) from the final rule would not improve the implementation of NEPA.

*Comment*: Commenters acknowledged that Federal agencies are implementing elements of the OFD policy, including preparing a single EIS and issuing a joint ROD, but objected to the implementation of the OFD policy stating that it curtails the environmental review process. Furthermore, commenters objected to codifying provisions related to the OFD policy before Federal agencies had an opportunity to study the impacts of the OFD policy.

*CEQ Response*: The OFD policy does not curtail environmental reviews. Rather, it increases interagency coordination, which will improve the efficiency and effectiveness of the environmental review process. The final rule includes changes to align with the OFD policy established by E.O. 13807 to improve interagency coordination. E.O. 13807 specifically instructed CEQ to take steps to ensure optimal interagency coordination, including through a concurrent, synchronized, timely, and efficient process for environmental reviews and authorization decisions.

161

*Comment*:  Commenters objected to the process described in § 1501.7(g) for lead and cooperating agencies to prepare a single EIS and issue a joint ROD, or prepare single EA and issue joint FONSI, including highlighting the possibility that a cooperating agency's mission may not necessarily align with the lead agency's objective in preparing a single EIS or EA.

*CEQ Response*:  To promote improved interagency coordination and more timely and efficient reviews and in response to these comments, CEQ codifies and generally applies a number of key elements from the OFD policy in this final rule, including preparation of a single EIS and joint ROD to the extent practicable.

*Comment*:  Commenters sought additional clarification regarding the term "practicable" as used in § 1501.7(g), including clarification that Federal agencies should consider efficacy, efficiency, and the potential for delays in determining whether to prepare a single EIS and issue a joint ROD, or prepare single EA and issue joint FONSI.

*CEQ Response*:  The term "practicable" includes considerations for effectiveness and efficiency.

*Comment*:  Commenters stated, with regard to § 1501.7(g), that Federal agencies should avoid combining a final EIS and a ROD, except in very limited circumstances.

*CEQ Response*:  Pursuant to § 1506.11, agencies may issue the final EIS with a ROD where provided by law or in agency procedures to meet statutory requirements.

*Comment*:  Commenters supported CEQ's proposal to clarify in §§ 1501.7, 1501.8, and 1508.1(e) and (o) the responsibility of lead agencies to determine the purpose and need as well as the alternatives in consultation with cooperating agencies.  They also suggested the regulations require written concurrence points for defining the purpose and need, alternatives, and identification of the preferred alternative.

162

*CEQ Response*:  The final rule clarifies the responsibilities of lead agencies and ensures that the lead agency will consult cooperating agencies during their development of the purpose and need statement.  The final rule ensures that the lead agency plays a leading role in the final determination of purpose and need, providing direction on the range of reasonable alternatives and focus of the analysis.  The final rule does not require specific concurrence points, as required by the OFD Framework Guidance for major infrastructure projects.[52]  Instead, § 1501.7(i) of the final rule requires the lead agency to develop a schedule, setting milestones for all environmental reviews, that may include specific concurrence points for consultation with cooperating agencies.

*Comment*:  Commenters recommended that CEQ revise the proposed regulations to incorporate a specific trigger point for the timelines in order to reduce any confusion as to when such timelines begin.  Commenters recommended that CEQ should add a provision to state that if cooperating agencies do not meet the schedule agreed upon by the lead and cooperating agencies in accordance with § 1501.7(i), the lead agency need not delay the EIS schedule if the lead agency does not receive timely comments on the EIS from the cooperating agencies.

*CEQ Response*:  Section 1501.10 of the final rule establishes time limits and includes direction on EAs and EISs.  Additionally, § 1503.2 requires cooperating agencies to comment during specified time periods.  Consistent with the use of the NEPA process as the umbrella environmental review process for decisions by each jurisdictional agency, the final rule respects the jurisdiction of cooperating agencies while requiring their participation in the development of a schedule and milestones to implement the schedule.  If the lead agency anticipates that a milestone will be missed, § 1501.7(j) requires the responsible agencies elevate the issue to the

---

[52] *Supra* note 10.

163

appropriate officials of the responsible agencies for timely resolution.  Each multi-agency action and schedule is fact-specific, and therefore CEQ declines to establish specific trigger points.

*Comment*:  Commenters requested that CEQ modify § 1501.7(j) to state that where a lead agency anticipates that a milestone will be missed, "immediately elevate the issue within the agency, address the cause of the delay, and establish, if necessary, a new milestone date in consultation with the lead agency.

*CEQ Response*:  CEQ finalizes § 1501.7(j) as proposed with minor modifications for clarity.  This section directs agencies to elevate the issue as soon as practicable to the appropriate officials of responsible agencies for timely resolution.  CEQ declines to incorporate the commenters proposed changes because they are unnecessarily limiting.

*Comment*:  Commenters requested that CEQ clarify in the final rule how the coordination should occur to ensure that study requirements are not needlessly extended and the relevance of an applicant funded study "times out" before a ROD is signed.  Commenters asked CEQ to address in its response to comments and in future guidance, how the final rule might impact lead agency designation of cooperating agencies and time limits.

*CEQ Response*:  The final rule encourages early coordination and requires that during scoping, lead agencies invite likely affected Federal, State, Tribal, and local agencies and governments to participate in the development of a schedule and milestones to implement the schedule.  If the lead agency anticipates that a milestone will be missed, § 1501.7(j) requires the responsible agencies to elevate the issue to the appropriate officials of the responsible agencies for timely resolution.

*Comment*:  Commenters recommended that § 1501.7 should apply to CEs as well.

164

*CEQ Response*:  CEQ declines to make the commenters suggested change because designating lead and cooperating agencies for proposed actions to which a CE may apply is unnecessary.  It typically takes only several days for an agency to review and apply a CE.

*Comment*:  Commenter suggested requiring cooperation between agencies by combining § 1500.5(d) and § 1501.7(g) and (h) into § 1501.8.

*CEQ Response*:  CEQ declines to consolidate the recommended provisions into § 1501.8 because § 1500.5(d) serves only as a cross-reference and § 1501.7(g) and (h) are provisions that are specifically applicable to lead agencies.

*Comment*:  Commenters stated that the final rule should specify that State, Tribal, and local entities can participate as cooperating agencies when a proposed action impacts an area or activity over which such entities have jurisdiction.  Commenters suggested such a standard would ensure that only the parties with decision-making authority are elevated to the status of a cooperating agency.  Commenters also recommended striking the reference to "similar qualifications" and replacing it with "jurisdiction by law or special expertise with respect to environmental, social, or economic impacts associated with a proposed action or reasonable alternative."

*CEQ Response*:  Section 1501.8(a) states that a State, Tribal, or local agency of similar qualifications may become a cooperating agency by agreement with the lead agency.  The use of "similar qualifications" refers to jurisdiction by law or special expertise in the preceding sentences, which are appropriate limits.

*Comment*:  Commenters stated that proposed § 1501.8(a) is inconsistent with the definition of "cooperating agency" in proposed § 1508.1(e).  Commenters suggested revising

165

§ 1501.8(a) to change "environmental issue" to "environmental impact" and requiring any

potential cooperating agency demonstrate why it meets the definition thereof.

*CEQ Response*:  CEQ disagrees that § 1501.8(a) and the definition of cooperating agency

in § 1508.1(e) are inconsistent.  CEQ declines to make the recommended changes to § 1501.8(a)

because lead agencies have the discretion to invite cooperating agencies, and the proposed

changes are unnecessarily limiting.

*Comment*:  Commenters questioned the change in § 1501.8(a) from "Federal agency" to

"agency."  Commenters stated that CEQ added confusion to the scope of the regulation, given

that the definition of "Federal agency" in § 1508.1(k) includes "States, units of general local

government, and Tribal governments."  Commenters recommended that CEQ revert to "Federal

agency" or clarify the meaning of "agency."  Commenters further stated that this term seems to

contradict section 102(2)(D) of NEPA, which only allows incorporation of findings of State

agencies, and only when certain important conditions are met.

*CEQ Response*:  The final rule at § 1501.8(a) continues to use the term "Federal agency"

and does not change the term to "agency."  In the final rule, "Federal agency" only includes

those States and units of local or Tribal governments that have "assum[ed] NEPA responsibilities

from a Federal agency pursuant to statute."  Therefore, the final rule provisions at § 1501.8(a) for

an "agency" are consistent with the definition of "Federal agency" in § 1508.1(k).

*Comment*:  Commenters suggest revising § 1501.8 to add that a lead agency "shall"

request all Federal agencies with jurisdiction by law to participate as a cooperating agency, and

those agencies shall be a cooperating agency.  They also suggest revising §§ 1501.8(b)(7) or

1503.2 to clarify that the lead agency is not required to consider cooperating agencies' comments

that are received after the deadline for providing comments.

166

*CEQ Response*:  The final rule requires participation by Federal agencies with jurisdiction by law when requested by the lead agency, though the degree of participation as a cooperating agency may be subject to resource limitations.  The lead agency is responsible for managing issues regarding the schedule it develops, in consultation with cooperating agencies, by elevation of issues up to senior agency officials.  The final rule at § 1501.8(b)(7) requires cooperating agencies to meet the lead agency's schedule for providing comments, and § 1503.2 of the final rule also requires that cooperating agencies must provide their comments with the time period specified for comments.

*Comment*:  Commenters recommended that CEQ revise the proposed regulations to require lead agencies to invite and designate as "cooperating agencies" State, local, and Tribal agencies that have jurisdiction by law or special expertise with respect to any environmental impact of a proposal and who request such designation.  Commenters noted that Federal agencies may challenge a denial to a request to serve as a cooperating agency, and commenters requested that non-Federal agencies, including local agencies, and Tribes receive the same right to appeal to the CEQ if denied by a lead agency.

*CEQ Response*:  CEQ declines to make this change in § 1501.8(a).  As part of the scoping process, § 1501.9(b) requires the lead agency to invite the participation of likely affected Federal, State, Tribal, and local agencies and governments, the proponent of the action, and other likely affected or interested persons (including those who might not be in accord with the action).  However, the final rule does not require non-Federal agencies or Tribes to become cooperating agencies.  Accordingly, the right to appeal to CEQ if the lead agency fails to allow an agency to serve as a cooperating agency is limited to Federal agencies.

167

*Comment*:  In § 1501.8(a), a commenter suggested replacing "agency" with "interagency and intergovernmental" in the first sentence to reflect partnership with Federal, State, and local governments.  A commenter also proposed to revise language in § 1500.5(d) to refer to intergovernmental cooperation.

*CEQ Response*:  The 1978 regulations do not use the term "intergovernmental" and the referenced language has not been a source of confusion.

*Comment*:  Commenters recommended that CEQ revise § 1501.8(b)(3) by striking "on the request of the lead agency" and require a cooperating agency to assume, "unless otherwise requested pursuant § 1501.8(c)," responsibility for developing information and preparing environmental analyses, including portions of the EIS or EA concerning which the cooperating agency has special expertise.

*CEQ Response*:  Section 1501.8(c) requires the cooperating agency, on request of the lead agency, to assume responsibility for developing information and preparing environmental analyses, including portions of the EIS or EA concerning which the cooperating agency has special expertise.  It is the lead agency's responsibility to request the participation of cooperating agencies and coordinate the development of the relevant portions of the EIS or EA with that cooperating agency.  Further, the language in the final rule is similar to the 1978 regulations.

*Comment*:  Commenters stated that the proposed rule would complicate the process for State and Federal agencies to prepare joint environmental documents.  Commenters also stated that § 1501.8(b)(4) should be clarified if the intent was for cooperating agencies to make support staff available.

168

*CEQ Response*:  In the final rule, CEQ's revisions are finalized as proposed to clarify that the lead agency is authorized to request cooperating agency staff support for the development of an environmental document.

Comment:  Commenters requested that language in § 1501.8(b)(5) be adjusted to support the continued use of cooperation funding agreements that most States have with agencies to expedite the review and processing of environmental actions.

*CEQ Response*:  The final rule supports cooperation funding agreements and other means of improved Federal coordination with State agencies, as provided for in § 1501.8(b)(5) and § 1506.2.

*Comment*:  Commenters stated that many Tribes would like to, but lack resources to, fully engage in the NEPA process.  Commenters stated that the proposed rulemaking would exacerbate these concerns in several areas.  First, proposed § 1501.8(b)(5), "Cooperating agencies," says that cooperating agencies will "normally" use their own funds.  Commenters stated that if funding consideration to support Tribal participation in NEPA process are not addressed in the rulemaking, it will create an unfunded mandate for Tribes.

*CEQ Response*:  The final rule does not mandate Tribal participation, but recognizes the value of Tribal participation.  The resource limitations that may limit effective Tribal participation should be addressed by the lead and cooperating agencies in accordance with § 1501.8(b)(5) and § 1506.6.

*Comment*:  Commenter proposed revising  § 1501.8(b)(7) to strike "environmental" at the end of the sentence.  Commenter also suggested inserting "environmental, economic, or social" before "special expertise."

169

*CEQ Response*: CEQ declines to make the requested revisions. In the final rule, CEQ retains § 1501.8(b)(7) as proposed for consistency with § 1503.2, which requires cooperating agencies and agencies that are authorized to develop and enforce environmental standards to comment on statements within their jurisdiction, expertise, or authority.

*Comment*: Commenters recommended that § 1501.8(b)(7) be revised to provide for a mutually agreed upon schedule rather than the lead agency's schedule for providing comments. Commenters stated that lead agency timelines need to be realistic and based on input in order to provide adequate review and communications between organizations.

*CEQ Response*: The final rule establishes presumptive timelines for environmental documents, provides for mutually agreed coordination and requires that during scoping, lead agencies invite likely affected Federal, State, Tribal, and local agencies and governments to participate in the development of a schedule and milestones to implement the schedule. If the lead agency anticipates that an agreed milestone will be missed, § 1501.7(j) requires the responsible agencies to elevate the issue to the appropriate officials of the responsible agencies for timely resolution.

*Comment*: Commenter requested clarification regarding § 1501.8(c) allowing agencies to "opt out" as a cooperating agency, and stated that it appears to conflict with § 1503.2, which identified a duty to comment by cooperating agencies. Commenter also stated that the consequences of an agency "opting out" are not clear and requested guidance on the steps, decision, or consequences if such a determination to "opt out" is made and how it conforms with proposed language at § 1503.2.

*CEQ Response*: The final rule, at § 1501.8(c), recognizes resource limitations may require cooperating agencies to decline the substantial level of participation that may be

170

requested by the lead agency under at § 1501.8(b)(3), (4), or (5). In such cases, the final rule still requires the cooperation of such agencies that have jurisdiction or special expertise with regard to the proposed action in accordance with the other aspects of § 1501.8 and related requirements such as § 1503.2.

*Comment*: Commenters requested guidance for potential cooperating agencies pursuant to § 1501.8(c). Commenters stated that if a cooperating agency has competing programmatic obligations or other constraints that preclude involvement in supporting an environmental review as requested by the lead agency, then that cooperating agency should be precluded from commenting (pursuant to § 1503.3), referring a dispute to the Council (e.g., pursuant to 1504), or otherwise challenging the findings and conclusions of the environmental review.

*CEQ Response*: There may be resource limitations that cause cooperating agencies to decline to participate. *See* § 1501.8(c). In such cases, the NEPA process would not benefit from excluding the participation of such agencies that have jurisdiction or special expertise with regard to the proposed action or denying them other procedural rights such as commenting or referring disputes to CEQ.

*Comment*: Commenter asked whether § 1508.1(e) should be revised to reference a cooperating agency's role in preparing the EIS, or to add that the cooperating agency has a role in evaluating the impacts of the action or in preparing the EIS.

*CEQ Response*: CEQ has drafted the final rule to avoid placing language that provides particular instructions in definitions. Therefore, the roles of the cooperating agency are described in § 1501.8.

*Comment*: Commenter proposed the following revised language for § 1508.1(e): "Cooperating agency means either: 1) By agreement with the lead agency, a Federal agency

171

with jurisdiction by law or special expertise with respect to any environmental impact associated with a proposed action or reasonable alternative under NEPA review, or;

2) By agreement with the lead agency, a State, Tribal, or local government agency with jurisdiction by law or special expertise with respect to any environmental, economic, or social impact associated with a proposed action or reasonable alternative under NEPA review."

*CEQ Response*:  The roles of the cooperating agency are described in § 1501.8 and the precise contours of the role of each cooperating agency are provided by letter or memorandum from the lead agency pursuant to § 1501.7(c).

*Comment*:  A commenter requested clarification of proposed § 1501.7(f), which states that CEQ shall determine which agency will act as lead agency not later than 20 days after receiving request but gives the potential lead agency a 20–day response time after they receive the request.  The commenter specifically asked when the 20 days starts for the responding lead agency.

*CEQ Response*:  The final rule provides that CEQ must make the determination as soon as possible, but not later than 20 days after receiving the request and all responses to it.  This process of resolution starts with a written referral to CEQ and requires CEQ to resolve the referral within 20 days of its receipt, meaning the referral may be resolved on the twentieth day if no responses are received within 20 days of the date of CEQ's receipt of the request.

*Comment*:  Commenters requested CEQ add the following sentence to the end of § 1508.1(h)(2):  "When cooperating agency analysis or proposals are incorporated into a lead agency's environmental document, the source agency for such information shall be disclosed in the document."

172

*CEQ Response*:  In the final rule, the disclosure of participants in the development of an environmental document is provided for in § 1506.5(b)(3) and § 1502.18.

*Comment*:  Commenters recommended that CEQ provide for a more pronounced role for cooperating agencies, particularly early on in the NEPA process to develop roles and realistic scheduling.  Commenters stated that local governments must be given the opportunity to participate in regularly scheduled cooperating agency meetings throughout the NEPA process in order to develop effective NEPA documents.

*CEQ Response*:  The final rule gives flexibility to the lead agency and its cooperating agencies to arrange the details of their cooperative agreements.  Managing coordination with cooperating agencies on a case-specific basis facilitates the efficient use of Federal resources.

*Comment*:  Commenters recommended that CEQ incorporate the following concepts into proposed § 1506.5(c) to ensure that the lead agency on an applicant or contractor prepared EIS follows the same coordination and cooperation requirements as when the lead agency prepares the EIS:

- A requirement that the lead agency adhere to EA and EIS preparation timeframes of one year and two years, respectively (proposed § 1501.10), even when the applicant prepares its own EIS.

- A timeline on both lead and cooperating agency review and input during the NEPA process of no more than 60 days to review and provide input.

- A deadline for the lead agency to issue a final decision document within 60 days of completion of an EA or EIS.

*CEQ Response*:  CEQ declines to add the recommended concepts.  Under the final rule, the lead agency must coordinate the overall time period with any cooperating agencies as part of

planning consistent with § 1501.7(i) and (j).  The involvement of cooperating agencies in that

planning and determining cooperating agency review periods is left to the discretion of the lead

agency.  The two-year timeframe for completing an EIS includes all cooperating agency review

and the ROD.  For the EA timeframe, the final result may not include a FONSI, but rather a

decision to prepare an EIS.

*Comment*:  Tribes supported the proposed revision in § 1501.8 that would allow Tribes to

serve as cooperating agencies.  However, they asserted that when Tribes participate as a

cooperating agency, agencies must afford them the same privileges as provided to non-Tribal

entities including financial compensation.

*CEQ Response*:  Similar to the 1978 regulations, § 1501.8(b)(5) states that a cooperating

agency normally use its own funds, and that the lead agency fund those major activities or

analyses it requests from cooperating agencies to the extent there are available funds.  This

provision facilitates coordination regarding the sharing of resources necessary to obtain a timely

environmental review.

*Comment*:  Commenters commended CEQ for providing further clarity for the lead and

cooperating agencies.  However, they suggested further clarification to address the need for a

lead agency to oversee efficient coordination and to balance vying agency missions.

Commenters also requested that CEQ incorporate a provision into § 1501.8 encouraging

agencies to execute MOUs with cooperating agencies with some commenters desiring mandatory

MOUs.

174

*CEQ Response*:  The final rule does not require the specific concurrence mechanism of an MOU, as provided by the OFD Framework Guidance for major infrastructure projects.[53] However, § 1501.7(i) of the final rule requires the lead agency to develop a schedule, setting milestones for all environmental reviews and authorizations, that cooperating agencies require for their agency policies and regulatory requirements.  While agencies may elect to use an MOU, requiring one for all environmental reviews would elevate the form of coordination over its function, possibly requiring more work than is necessary for simple coordination under NEPA.

*Comment*:  Commenters stated that CEQ should amend § 1501.8(a) to allow Tribes, not just Federal agencies, to appeal any denial of participation as a cooperating agency by the lead agency.

*CEQ Response*:  CEQ declines to extend this provision beyond Federal agencies as the mandate of CEQ regulations applies only to Federal agencies.

*Comment*:  Comments recommended that CEQ should explicitly incorporate a provision into § 1501.8(b) requiring agencies to consult with project proponents.  Often project proponents can identify a variety of factors that will affect proposed actions and their effects.  Federal agencies should engage with project proponents to ensure alternatives are technically and economically feasible and to ensure that effects are reasonably foreseeable.

*CEQ Response*:  The final rule requires the lead agency to invite project proponents to participate in scoping, and it strengthens the provisions for communication with applicants in a number of respects.  In particular, § 1501.7(i) requires lead agencies to set the schedule in

---

[53] *Supra* note 10.

consultation with any applicant and § 1501.2(b)(4) requires agencies to advise and consult with applicants early in the NEPA process.

*Comment*:  Commenters recommended adding language in § 1501.8 to clarify the relationship between agencies when NEPA serves as an umbrella process.  Commenters stated that they do not recommend that the regulations require an agency with other statutory jurisdiction (e.g., U.S. Fish and Wildlife Service for ESA consultation) to be a cooperating agency in order to use NEPA as an umbrella process, because doing so would add procedural burdens without changing the outcomes already required by law.  However, commenters recommended adding language to this section or issuing guidance on how the agency with jurisdiction over other regulatory requirements typically will be procedurally involved with NEPA to ensure any NEPA document meets other regulatory needs.

*CEQ Response*:  The final rule expands upon the use of NEPA as an umbrella process for coordination of environmental review with required consultations and other authorizations.  An agency with jurisdiction over a proposed action must be a cooperating agency if the lead agency so requests, but § 1501.8(c) continues to allow cooperating agencies to decline to assume responsibility for part of the preparation of an environmental document with a notice to CEQ and the supervisory senior agency official.

*Comment*:  Commenters stated that CEQ should include language emphasizing that agencies will respect and support the protection of private property rights to the maximum extent allowed by law, regulations, policies, directives when conducting NEPA.  In addition, commenters asked that the regulations require agencies to reach out to affected landowners and allow them maximum opportunities to participate in the NEPA process should they be directly affected by a project or agency decisions.

176

*CEQ Response*:  The final rule requires that the lead agency make diligent efforts to involve the public and provide notice to affected persons, which would include affected landowners and holders of affected private property rights in the NEPA process.  Public involvement may occur through the scoping process, opportunity to comment on environmental documents, and by providing for direct notice to owners and occupants of nearby or affected property under § 1506.6(b).  The "takings" Executive order also remains in effect.[54]

*Comment*:  Commenters recommended that CEQ require or encourage a lead agency to consider including at least one representative from a cooperating agency county or local government to participate on the interdisciplinary team in preparation of EISs.  Commenters stated that the regulations should authorize Federal agencies to allow State or local governments to draft portions or all of the EAs or CEs to ensure timeliness and cost efficiencies for the implementation of the project proposal.  Commenters also stated that CEQ should clarify under what circumstances it is permissible and appropriate for non-Federal agencies to assume such responsibilities.

*CEQ Response*:  As part of the scoping process for an EIS under the final rule, § 1501.9(b) requires the lead agency to invite the participation of likely affected State and local agencies and governments, which may include participation as a cooperating agency by mutual agreement.  As part of the EA process, non-Federal agencies may prepare EAs under the supervision of the agency under the 1978 regulations, which may also involve State and local governments.  Finally, under the final rule agencies will develop CEs in their agency procedures,

---

[54] *See* E.O. 12630, Governmental Actions and Interference With Constitutionally Protected Property Rights, 53 FR 8859 (Mar. 15, 1988).

and this process would involve invitations to the public to comment, including State and local governments.

*Comment*: Commenters expressed support for the expansion of joint lead status to local governmental agencies.  Commenters stated that coordination with local government agencies is not optional, and the regulations should recognize as such.  Commenters requested that CEQ revise the regulations in a way that uses consistency requirements in the Federal Land Policy and Management Act for local resource management plans and other laws, plans, and policies. Commenters stated that the Bureau of Land Management (BLM) includes a provision for consistency review between the State Director and Governor of the State prior to approval of a proposed resource management plan or amendment to a resource management plan. Commenters stated that CEQ should consider a provision that would allow Federal agencies to implement a similar and more formalized consistency review process with the States in which the project is authorized.

*CEQ Response*: The BLM provision for consistency review by the Governor of a proposed resource management plan or plan amendment is an example of the integration of the NEPA process into agency implementation of the procedural requirements of other statutes, such as the requirement for consistency review under the Federal Land Policy and Management Act, 43 CFR 1610.3-2(e).  The final rule in § 1507.3 provides for such integration of consistency review and similar procedural requirements in the development of agency NEPA procedures to implement the final rule.

*Comment*:  Commenters stated that changes to § 1501.8 may conflict with other proposed provisions, particularly § 1501.10 on time limits and § 1502.7 on page limits.  Commenters stated that these limits may result in incomplete or insufficient environmental reviews,

178

particularly if cooperating agencies are not afforded enough time for their concurrent review or cannot include sufficient information in the EA or EIS. Commenters stated that CEQ must ensure that the responsibility for implementing NEPA lies with the Federal agency with jurisdiction, and lead Federal agencies assume full responsibility for the process. Commenters urged CEQ to continue encouraging agency collaboration and coordination, while requiring that agencies with specific, in-depth expertise maintain strong roles in the NEPA process.

*CEQ Response*: Similar to the 1978 regulations, pursuant to § 1506.5 of the final rule the agency is responsible for the accuracy, scope (§ 1501.9(e)), and content of environmental documents prepared by the agency or by others working under the supervision of the agency. The requirements concerning the role of cooperating agencies, time limits, and page limits, all serve the purpose of an informed decision-making process.

*Comment*: Commenters stated that the new provisions, which refer to "State" and "local" agencies, do not clearly define what constitutes a "State" or "local" agency. Commenters recommended that CEQ clarify that a "State" or "local" agency includes political subdivisions of a State.

*CEQ Response*: In practice, State, Tribal, and local agencies are considered to include all political subdivisions of a State or Tribe. The final rule does not limit this practice.

*Comment*: Commenters requested that CEQ develop guidance to assist agencies in implementing the OFD collaborative processes. Commenters stated that guidance should explain how disagreements among agencies should be transparently addressed.

*CEQ Response*: CEQ has issued a number of guidance documents relating to implementation of the OFD policy. CEQ will issue new guidance, as needed, consistent with the final rule and presidential directives.

*Comment*:  While commenters supported Tribal governments participating as cooperating agencies, they opposed expanding the purview of Tribes outside of reservations.  Other commenters supported Tribal involvement as cooperators outside reservation boundaries.

*CEQ Response*:  The final rule recognizes the existing sovereign rights, interests, and expertise of Tribes by expanding the provisions for Tribal participation in the NEPA process.  As discussed in the preamble to the final rule, this is consistent with and in support of government-to-government consultations.

*Comment*:  Commenters recommended that the regulations require Federal agencies to provide weekly updates to cooperating agencies through the development of a NEPA document and regularly explain to cooperating agencies how they are incorporating cooperating agency input into the NEPA document.

*CEQ Response*:  The final rule requires the lead agency to develop a schedule for preparation of the environmental document in consultation with cooperating agencies, but leaves the details of scheduling and identification of milestones on that schedule to the discretion of those agencies.

*Comment*:  Commenters recommended that CEQ clarify that "local agency" includes county governments; an "agency" does not necessarily need to be a division within a State, Tribal, or local government, but could be the governmental entity as a whole; and cooperating agency status is limited to governmental entities.

*CEQ Response*:  A cooperating agency must be a government agency.  The references to Federal, State, Tribal or local agency in the final rule are sufficiently clear, and CEQ declines to make further changes.

*Comment*:  Commenters stated that CEQ should encourage Federal agencies to develop a clearinghouse or other mechanism to store their active NEPA work and make it available to cooperating agencies.

*CEQ Response*:  Section 1507.4 provides for online resources and clearinghouse mechanisms to facilitate interagency coordination of their NEPA processes.

*Comment*:  Commenters recommended that CEQ expand the role of cooperating agencies early in the NEPA process and allow them to contract services where needed.  Other commenters requested adding enforceable regulations that would restrict the ability of cooperating agencies to hand over their responsibility to an outside consultant.

*CEQ Response*:  Under § 1506.5, lead and cooperating agencies are responsible for the accuracy, scope, and content of environmental documents prepared by the agency or by an applicant or contractor under the supervision of the agency.  The agency may require an applicant to submit environmental information for possible use by the agency or authorize a contractor to prepare an environmental document under the supervision of the agency.

*Comment*:  Commenters stated that local government consultation and involvement should begin early in the NEPA process.

*CEQ Response*:  The final rule at § 1501.9 provides for an expanded scoping process that begins before the issuance of the NOI, allowing Federal agencies to engage earlier with local governments on planning that may affect local interests.

*Comment*:  Commenters recommended that the final rule define "interagency cooperation" in § 1500.5, and CEQ clarify whether the definition includes State, Tribal and local governments.  Commenters stated that cooperation also should include individuals that have permits, leases and private land owners within the study areas.

181

*CEQ Response*:  In the final rule, the "interagency cooperation" is provided for in § 1500.5(d) and is more specifically addressed in §§ 1501.7, 1501.8, and 1501.9, relating to lead and cooperating agencies and scoping.

*Comment*:  Commenters recommended that the final rule limit cooperating agencies to those State, Tribal, or local agencies with the jurisdiction to approve, veto, or finance all or part of the proposed action or alternatives.  Commenters stated that this would ensure that cooperating agencies are providing Federal decision makers with pertinent information and constructive recommendations related to their own authorities.

*CEQ Response*:  Under the commenter's proposal, cooperating agency status could be limited for non-Federal agencies to those agencies that have jurisdiction over the proposed action.  Because involving agencies with special expertise at the discretion of the lead agency can improve the NEPA process in terms of efficiency and quality of the NEPA review, CEQ declines the recommended change.

*Comment*:  Commenters supported the changes to allow Alaska Native corporations (ANCs) to participate in the EIS process as joint lead and cooperating agencies.  Commenters stated that ANCs are some of the largest landowners in Alaska and should be at the table concerning NEPA evaluations affecting their lands.  Commenters further stated that the Alaska Native Claims Settlement Act (ANCSA) changed the landscape of Federal Indian law in Alaska by congressionally mandating the creation of regional and village Native corporations to own and manage, for the benefit of their Native shareholders, a portion of the aboriginal lands in Alaska.

*CEQ Response*:  Federal agencies must consult with ANCs on the same basis as Indian Tribes under E.O. 13175.[55]  As part of the scoping process under § 1501.9(b), the lead agency must invite the participation of likely affected Federal, State, Tribal, and local agencies and governments, the proponent of the action, and other likely affected or interested persons. Accordingly, the lead agency must invite the participation of ANCs in any scoping process that would likely affect the interests of their shareholders.

*Comment*:  Commenters recommended that CEQ revise §§ 1500.5(d), 1501.8, and 1500.5(e) to promote interagency coordination and resolution of agency disputes.

*CEQ Response*:  The provisions for interagency cooperation and resolution of issues are in § 1501.7 and § 1501.8.  Therefore, CEQ declines to make further revisions and additional detail in the cross-references in § 1500.5 are unnecessary.

*Comment*:  A commenter stated that there is a memorandum of agreement (MOA) between DOI and DOT from 1983 that states that DOI must be the lead on environmental actions.  The commenter asked whether the updated NEPA regulations would supersede this MOA so that DOI can use DOT CEs to eliminate the need for DOI to elevate an action to an EA when a DOT CE exists to cover the action.

*CEQ Response*:  In the final rule, § 1506.3(d) provides that an agency may adopt another agency's determination that a CE applies to a proposed action if the action covered by the original CE determination and the adopting agency's proposed action are substantially the same. Under § 1507.3(f)(5), agencies may include a process in their agency procedures to use a CE listed in another agency's NEPA procedures following consultation with that other agency.

---

[55] Consolidated Appropriations Act, 2005, Pub. L. 108–447, Div. H., Title V. sec. 518, 118 Stat. 2809, 3267 (2004).

*Comment*:  A commenter suggested revising § 1501.8 to add a reference to a "participating agency" and provide that where the agency does not have the resources to participate as a cooperating agency, it would still be able to see internal drafts and have interagency discussions with the lead and cooperating agencies, as appropriate.  The commenter noted that "participating agency" is already defined in § 1508.1.

*CEQ Response*:  The final rule uses the term "participating agency" consistent with its use in Title 41 of the FAST Act, to identify other agencies that participate in the NEPA process.  CEQ declines to distinguish the responsibilities of a participating agency as the commenter suggests because it is unnecessarily limiting on agencies.

*Comment*:  A commenter requested that CEQ further define interagency cooperation and include local governments.

*CEQ Response*:  Interagency cooperation includes cooperation with Federal, State, Tribal, and local agencies.  The final rule provides direction throughout to encourage better interagency cooperation, including with local governments as appropriate.

*Comment*:  A commenter recommended that CEQ create a "one NEPA handbook," to align different Federal agency requirements.  The commenter stated that cooperating agencies do not defer to the lead agency's regulations, and therefore the project proponent must satisfy each cooperating agency's requirements.

*CEQ Response*:  The final rule includes several changes to improve coordination among lead and cooperating agencies.  It codifies relevant provisions in E.O. 13807 to strengthen the OFD policy framework (§§ 1501.7 and 1501.8).  The final rule in § 1507.3(b) also prohibits agencies from imposing additional procedures or requirements beyond those set forth in the regulations except for agency efficiency or as otherwise required by law.

184

As discussed in sections II.H.7 and II.K of the final rule, the final rule supersedes previous CEQ guidance and CEQ intends to publish a separate notice in the *Federal Register* listing guidance it is withdrawing.  CEQ will issue new guidance, as needed, consistent with the final rule and presidential directives.

*Comment*:  A commenter noted there may be situations when an applicant will find it beneficial to sequence rather than combine the timing of Federal approvals, and environmental review for a project.

*CEQ Response*:  Section 1501.7(g) provides agencies and applicants the flexibility, when necessary, to sequence rather than combine Federal of Federal approvals, and environmental review for a project.

*Comment*:  Commenters requested clarification by CEQ that when Tribal nations participate as cooperating agencies, they will be provided with equitable and fair reimbursement as are other agencies.  Commenters also requested explanation regarding how and to what extent a lead agency's decision-making process will incorporate information that Tribes provide. Lastly, commenters requested that CEQ amend the proposed rule to include the requirement that if Tribal comments are not included, the lead agency will provide a full and complete explanation of why Tribes' submitted information was not considered as part of a final EIS.

*CEQ Response*:  As stated in § 1501.8(b)(5) of the final rule, a cooperating agency will normally use its own funds.  To the extent available funds permit, the lead agency must fund those major activities or analyses it requests from cooperating agencies and must include such funding requirements in their budget requests.  The lead agency determines the extent to which it will incorporate provided information into the decision-making process.  Agencies must consider all substantive comments timely submitted during the public comment period (§ 1503.4).  In

185

addition, § 1505.2(b) requires that the decision maker must certify in the ROD that the agency has considered all submitted alternatives, information, and analyses including those submitted by Tribal governments.

### 8.    Scoping (§ 1501.9)

*Comment*:  Commenters note the proposed changes to §§ 1501.9 and § 1503.1, and proposed §§ 1502.17 and 1502.18 would maintain extensive opportunity for the public to comment during the NEPA process.

*CEQ Response*:  CEQ acknowledges the support for these revisions.  These revisions will require agencies to provide more information to the public and to solicit more information from the public earlier in the process.

*Comment*:  Commenters stated that under current regulations, some agencies conduct "pre-scoping" prior to the publication of a NOI. They agree that clarification to allow scoping to start prior to the publication of a NOI would obviate the need for agencies to engage in "pre-scoping" work.  Commenters also stated that because the two-year timespan for completing an EIS begins with the publication of the NOI, more extensive pre-NOI planning activities will be required for many proposed actions so analysis can be conducted in a reasonable and timely manner.

*CEQ Response*:  The final rule recommends that agencies employ scoping at the earliest reasonable time to ensure agencies consider environmental impacts in their planning and decisions, and to avoid delays later in the process.  Early scoping will help agencies to meet the time limits.  The early scoping may involve lead agency experts, cooperating agencies, other Federal, State, and local agencies, Tribes, and the public at the discretion of the lead agency.

186

*Comment*:  Commenters requested that, to encourage the NEPA scoping process to move as quickly as practicable, the regulations establish a 30–day time limit from the date of submission of an application until commencing preparation of an EA or publishing a NOI to prepare an EIS.  Commenters further stated that a time limit for this portion of the NEPA process would be consistent with the intent of § 1502.5 that EAs or EISs shall be commenced as soon as practicable after receiving the application.

*CEQ Response*:  CEQ declines to make the requested change to the final rule.  Agencies require flexibility, including where an application may be incomplete.  Further, the goal of early engagement is to improve the overall predictability and timeliness of the NEPA process, a goal that could be undermined if agencies are limited to a specific time period for commencing environmental documents.  In § 1501.9(d) of the final rule, however, CEQ does direct that agencies should publish an NOI as soon as practicable after determining that a proposal is sufficiently developed for meaningful public comment and that an EIS is required.

*Comment*:  Commenters asked whether the term "sufficiently developed" as used in § 1501.9 includes a determination of a reasonable availability of funds to complete a proposal.

*CEQ Response*:  The term "sufficiently developed" generally means that there is sufficient information about the proposal itself, such as objective, purpose and need, and preliminary design elements, for example project location, in order to begin the NEPA process. In some instances, this may include reasonable availability of funding.

*Comment*:  Commenters supported the addition of "likely" to include "affected Federal, State, and Tribal, and local agencies and governments" in section 1501.9(b) and encouraged lead agencies to always consider local conservation districts when scoping a proposed action's potential agricultural impacts.

187

*CEQ Response*:  CEQ acknowledges the support for the proposed change and notes that the final rule encourages lead agencies to involve all agencies with jurisdiction by law or special expertise at the earliest practicable time to help scope the proposal and plan necessary analyses and thus may include local conservation districts, as appropriate.

*Comment*:  Commenters requested that CEQ clarify what constitutes adequate information to be a brief presentation of why the proposed action will not have a significant effect on the human environment or providing a reference to environmental review of the proposal in prior documentation.

*CEQ Response*:  CEQ declines to make further changes to the rule.  The content of a brief presentation is highly dependent on the circumstances of the particular proposed action. Agencies should apply their discretion in determining the most appropriate means of summarizing those issues that are not significant or have been covered by a prior environmental review.

*Comment*:  Commenters requested that CEQ include a requirement, potentially in § 1501.9, that all comments on issues be raised during scoping and that failure do so is subject to the exhaustion provisions included in the proposed regulations.

*CEQ Response*:  CEQ declines to make further changes to the rule to apply the principle of exhaustion as requested by the commenters.  CEQ does not apply exhaustion at the scoping stage because a fuller understanding of a proposal and its potential impacts may not occur until after the publication of the draft EIS.

*Comment*:  Commenters requested that Federal agencies tailor the scope of the NEPA review to the Federal agency's involvement in the project.

188

*CEQ Response*:  Aspects of an activity that are beyond a Federal agency's involvement are not subject to NEPA and the final rule clarifies the definition of major Federal action in § 1508.1(q) with regard to this point.  *See also* § 1501.1(a)(4).  CEQ also clarifies the definition of effects in § 1508.1(g), which do not include effects that the agency has no ability to prevent due to limited statutory authority.  CEQ adds that there may be instances where a lead agency chooses to include actions beyond its control and responsibility for the purposes of agency efficiency such as to address legal obligations of cooperating agencies.

*Comment*:  Commenters stated that excluding some issues from the scope of impacts considered under NEPA could greatly reduce the information generated by an environmental review.

*CEQ Response*:  Excluding non-significant issues will improve the quality of environmental review, by ensuring the agency is concentrating on significant issues.  The final rule focuses the scoping process on identifying the scope of issues for analysis in the EIS, including by requiring the agency to provide more information at the NOI stage and to request comment on potential alternatives, information, and analyses relevant to the proposed action. § 1501.9(d)(1)-(7).  Earlier identification of significant issues and elimination of non-significant issues well improve the efficiency of the process.

*Comment*:  Commenters stated that the rule should be clarified to not allow agencies to characterize communications between an agency and an applicant as scoping unless the public has received notice and has the opportunity to participate.

*CEQ Response*:  CEQ declines to make further changes to the rule in response to the comment.  The scoping process varies based on the circumstances of the particular proposed action and may include communication between the applicant and lead agency, between the lead

189

agency and cooperating agencies, between the lead agency and other agencies, and between agencies and State, Tribal, and local agencies and governments, and the public.  Pre-application meetings between an agency and an applicant can be a beneficial and productive way to scope and often redesign a proposal to avoid potential significant impacts.  Relevant statutory authorities, facts, and circumstances vary widely and the lead agency should retain the flexibility and discretion to decide how to involve cooperating agencies and the public in its scoping efforts.

*Comment*:  Commenters stated that the proposed changes in § 1501.9 would limit the scope of a NEPA study, further rubber-stamp the process, and significantly limit the ability for stakeholders to meaningfully participate in the NEPA process.  Commenters also stated that the changes, along with the reduced timelines, would limit the time for the public and key stakeholders to prepare comments and responses to the proposed project.  Other commenters stated that the proposed changes render the NOI as the primary device by which an agency notifies the public of its plan to draft an EIS in the early stages of its development.  Without a timing requirement, however, the proposed changes invite agencies to invest substantial resources in selecting a course of action before providing other stakeholders an opportunity to voice their perspective.

*CEQ Response*:  The final rule expands, rather than reduces, public participation in the scoping process.  Section 1501.9(b) directs agencies to invite participation of interested stakeholders including interested persons that may be opposed to the proposed action on environmental grounds.  Participation may occur both prior to and after publication of the NOI. Public scoping participation constitutes an integral part of the process in addition to agencies soliciting public comments on the draft EIS.

190

*Comment*:  Commenters stated that § 1501.9(d) requires NOIs to include a summary of the expected environmental impacts.  They asserted that any such summary should state that it is speculative and subject to revision based on the results of additional analyses.

*CEQ Response*:  The intent of the summary of expected environmental impacts is to provide the public with information known to the agency at that time, and in doing so provide a more informed starting point for involvement by Federal agencies, States, Tribes, localities, and the public.  CEQ anticipates that future NOIs will be more informative than what was prepared under the 1978 regulations because the final rule expands the amount of scoping an agency may conduct prior to publication of the NOI, and the information to be included in the NOI.

*Comment*:  Commenters recommended that CEQ revise the rule in § 1501.9 to clarify that scoping may be started and completed prior to the NOI.

*CEQ Response*:  The scoping process should be tailored to the circumstances of the proposed action, and the final rule provides flexibility to agencies to structure scoping accordingly.  The lead agency may start scoping prior to NOI publication and conclude after publication of the NOI publication, or start and conclude scoping after NOI publication.  It does not include the option to start and conclude scoping prior to publication of the NOI because engagement with stakeholders through the NOI process is necessary to develop a well-informed draft EIS.

*Comment*:  Commenters indicated that § 1501.9(d) appears to mandate certain information in the NOI.  Some commenters do not support the enhanced level of information and detail proposed for a NOI.  They noted that pre-NOI scoping activities are not a requirement.  Further, to comply with all listed items in § 1501.9(d) the activities would have to occur prior to the NOI, effectively negating the flexibility allowed in § 1501.9(a).  While § 1501.9(d) states

191

that the NOI shall include this information as appropriate, further clarification would ensure agencies continue to retain flexibility.

*CEQ Response*:  The final rule provides discretion for agencies to implement scoping activities prior to publication of an NOI, which allows agencies to tailor scoping to the specific circumstances of a proposed action.  CEQ declines to make further changes as requested by the commenters.

*Comment*:  Commenters proposed adding "or are particularly controversial, unusual, or extensive in nature" to the example of circumstances where CEQ encourages scoping meetings in § 1501.9(c).

*CEQ Response*:  The final rule requires agencies to use an early and open process to determine the scope of issues for analysis, which applies broadly to EISs.  The illustrative example in § 1501.9(c) is not intended to suggest that proposed actions that are controversial, unusual, or extensive may not also be suitable for scoping outreach.  CEQ declines to make the requested revision to the final rule.

*Comment*:  Commenters expressed concern regarding the proposed definition of "similar actions" in § 1501.9(e)(1)(ii).  They stated that the definition seemed too vague, particularly the last sentence of the proposed definition:  "It should do so when the most effective way to assess adequately the combined impacts of similar actions or reasonable alternatives to such actions is to treat them in a single impact statement."  Commenters recommended removing this definition, or substantially revising it.  Other commenters found the word "effective" to be unclear because maximizing effectiveness is a subjective determination.  They suggested clarification or a return to the original language of "best," which they stated is in line with the statute's direction to use "all practicable means" to accomplish the statute's goals in section 101(b).

*CEQ Response*:  In the NPRM, CEQ proposed to move the criteria for determining scope from the definition of scope, 40 CFR 1508.25, to § 1501.9(e).  In response to comments, CEQ has further revised scope in the final rule to strike the reference to "similar actions" in proposed § 1501.9(e)(1)(ii).  In cases where the question of the consideration of similar actions to determine the scope of the NEPA documentation was raised, courts noted the discretionary nature of the language (use of the word "may" and "should" in 40 CFR 1508.25(a)(3)) and have held that determinations as to the scope of a NEPA document based on a consideration of similar actions were left to the agency's discretion.  *See e.g.*, *Klamath-Siskyou Wildlands Center v. Bureau of Land Management*, 387 F.3d 989, 1000–01 (9th Cir. 2004).  CEQ also notes that the reference to "other reasonable courses of action" in § 1501.9(e)(2) are within the judgement of the agency.

*Comment*:  Commenters recommended insertion of clarifying language in § 1501.9(f)(1), "or which have been covered by prior environmental review" to affirm an obligation to demonstrate that circumstances have not materially changed since the time of prior review, to arrive at a  determination that those issues are not necessary to inform decision makers.

*CEQ Response*:  If there is a material change in an issue, an agency may determine that the referenced language in § 1501.9(f)(1) does not apply.  A material change could constitute a significant new circumstance or information pursuant to § 1501.9(g) and necessitate the agency to revise a determination under § 1501.9(f).  The commenters' concern has been sufficiently addressed in the final rule and CEQ declines to make further changes.

*Comment*:  Commenters found that the statement in proposed § 1501.9(f)(3) "other EISs which are being or will be prepared that are related to but not part of the scope of the impact statement under consideration" was unclear.  They requested clarification as to what was meant

193

by an action that is related to the proposed action, when actions cannot be divided into

constituent parts, and EISs must address interrelated or interdependent actions.

*CEQ Response*:  In the final rule, CEQ makes minor changes to the language at

§ 1501.9(f)(3) for clarity.  It has not been a source of confusion for agencies and, therefore, CEQ

declines to make further changes to the final rule.

*Comment*:  Commenters requested that the final rule requires agencies, during the

scoping process, to explicitly consider and seek input on whether visual versus text presentation

of specific information and issues would better allow the public and other audiences to

understand better the issue and its significance, and how presentation affects comprehension and

understanding of the totality of the analysis.

*CEQ Response*:  Although agencies may be interested in studying the effectiveness of

various forms of public communication, such as visual versus text presentations, such analyses

are beyond the scope of this rulemaking.

*Comment*:  Commenters recommended early identification of deficiencies or lack of

detail in the description of the proposed action that would prevent commenters from fully

addressing potential impacts or alternatives or mitigation when a NOI publishes.  Further,

commenters stated that it is important that the public and others be asked during scoping how

they currently use resources that might be impacted by a proposed action.

*CEQ Response*:  The final rule extends scoping so that it also can occur before

publication of the NOI, and CEQ clarifies in § 1501.9(d) that the NOI should be published "[a]s

soon as practicable after determining that a proposal is sufficiently developed to allow for

meaningful public comment."  The public should be asked how they currently use resources that

might be impacted by a proposed action. These concepts constitute environmental consequences of the proposed action and are addressed in §§ 1502.15 and 1502.16.

*Comment*: Commenters recommended that CEQ address the topic of "connected actions" in the preamble to the final rule and clarify that actions can be considered connected actions under the CEQ regulations only if both actions are Federal actions (or actions requiring Federal approval). Actions that do not require Federal approval and are not subject to Federal control should not qualify as connected actions. Other commenters asked for clarification that § 1501.9(e)(1)(i) on connected actions will not affect FHWA's regulations regarding logical termini and independent utility and all the case law on this language.

*CEQ Response*: Actions that do not require Federal approval and are not subject to Federal control are not connected actions. Agencies should apply the criteria at § 1501.9(e)(1) in their agency procedures to the specific circumstances of their programs.

*Comment*: Commenters suggested eliminating the words "significant" (and "non-significant") from proposed §§ 1501.9(a) and 1501.9(f)(1), and substituting different terms to indicate that an issue does not require detailed analysis during the NEPA process. Commenters stated that language such as "not material" or "not worthy of further study" could be used. Commenters also suggested CEQ could also explain that the determination during scoping that a particular issue merits detailed review does not mean that the proposed action will have a significant effect on the human environment.

*CEQ Response*: An EIS is prepared when a proposed action has significant impacts on the human environment. Using different terms may cause confusion, precisely because § 1501.9 pertains to the scoping of those issues of importance to analyzing the proposed action.

195

*Comment*:  Commenters requested applying the requirements for scoping at § 1501.9(a) to the preparation of an EA.  One commenter recommended that the scoping requirements for EAs shall be consistent with those for EISs.  Commenters also requested that scoping for an EA include issuance of a public scoping notice and a minimum of a 30–day comment period.

*CEQ Response*:  An EA is prepared when a proposed action is not likely to have significant effects or the significance of the effects is unknown.  Therefore, requiring the same level of detail in terms of scoping is unnecessary and does not meet the purpose of NEPA.  Agencies should not pre-determine the preferred alternative.

*Comment*:  Commenters requested that the new language added to section § 1501.9(a) beginning with "eliminating" to the end of the first sentence should be stricken, and § 1501.9(g) should apply to all other subsections of § 1501.9.

*CEQ Response*:  Eliminating non-significant issues is important to ensure that resources are efficiently used. It is not necessary to apply § 1501.9(g) to (a) and (d) in the subpart because neither (a) nor (d) pertain to determinations made by the agency.

*Comment*:  Commenters expressed concern that, without public notice of a proposed action, all interested parties may not be aware of the project or ongoing scoping process, leading to duplicative effort.  Although proposed § 1501.9(b) requires agencies to invite participation of agencies and governments that are "likely affected," commenters stated that the lead agency may not identify all interested entities.  Commenters further stated that if additional entities learn about the project after the NOI is issued, then the lead agency must redo its prior work by holding additional meetings and, potentially, adjusting the preliminary alternatives.  To avoid both of these concerns, commenters stated that CEQ should revise proposed § 1501.9 so that the

196

scoping process follows the procedure currently outlined in 40 CFR 1501.7, whereby publication of the notice of intent initiates the scoping process.

*CEQ Response*:  As discussed in the NPRM, CEQ proposed changes in § 1501.9 so that agencies can begin the scoping process as soon as the proposed action is sufficiently developed for meaningful agency consideration.  Some agencies refer to this as pre-scoping under the existing regulations to capture scoping work done before publication of the NOI.  Rather than tying the start of scoping to the agency's decision to publish an NOI to prepare an EIS, the timing and content of the NOI is an important step in the scoping process itself, thereby obviating the artificial distinction between scoping and pre-scoping.  Further, paragraph (c) provides agencies with additional flexibility in how to reach interested or affected parties in the scoping process.

*Comment*:  Commenters expressed confusion and requested clarification on § 1501.9(b).  Specifically, commenters wanted to understand whether both proponents and affected and interested persons classified as cooperating or participating agencies should be invited to provide scoping comments.  Commenters stated that project proponents are not agencies and should not be afforded participation equivalent to cooperating and participating agencies.

*CEQ Response*:  Project proponents are not equivalent to cooperating agencies with respect to overall participation in the NEPA process.  Section 1501.9(b) refers specifically to an agency's obligation to invite various governments, the project proponent, and other likely affected or interest persons to participate in scoping.

*Comment*:  Commenters noted that there can be a disconnect between the NEPA process and the permitting processes.  Commenters further stated that significant problems and conflicts

197

can occur when an applicant revises a permit application without the Federal agency making parallel changes in the EIS document.

*CEQ Response*:  The final rule at § 1501.9(g) requires an agency to revise its determinations if there are substantial changes made in the proposed action or if significant new circumstances or information arise which bear on the proposal or its impacts.

*Comment*:  Commenters recommended striking "interested persons" in § 1501.9(b) and that CEQ eliminate "including those who might not be in accord with the action on environmental grounds."

*CEQ Response*:  In § 1501.9(b) of the final rule, CEQ has eliminated "on environmental grounds."  It is important to invite interested persons that may not be in accord with the action to participate in scoping, irrespective of whether it is on environmental grounds.  Accordingly, CEQ declines to make the requested revisions.

*Comment*:  A commenter recommended that CEQ change the phrase "the lead agency shall invite" to "the lead agency shall make a concerted effort to identify, notify, and invite."

*CEQ Response*:  CEQ finds the additional language recommended by the commenter is superfluous and declines to make the requested change.

*Comment*:  Commenters requested to replace "interested persons" with "interested persons and organizations" at § 1501.9((b) because organizations, and not simply "interested persons," need to be allowed to provide input.

*CEQ Response*:  The regulations at 40 CFR 1509.7(a) (1978) included the language "interested persons," and agency practice has been to include organizations.  The requested change is not necessary to ensure interested groups are included in scoping.

*Comment*:  Commenters requested that CEQ clarify its use of "issues" throughout the regulations.  The term "issues" is used in the proposed regulations in several forms: at § 1500.4 (e) and (i) the regulations use the term "issues" and "significant environmental issues."  In § 1500.5 (f) the regulations refer to "real issues."  In § 1501.9 the regulations State agencies should identify the "significant issues" and eliminate from further study "non-significant issues."  Also, § 1501.9 (e) states the lead agency shall determine the scope and the "significant issues" to be analyzed in depth in the EIS.  Further, some agencies do not use the term in their procedures and practices.  Commenters recommended simplifying the regulations by referring to only significant effects and nonsignificant effects.

*CEQ Response*:  The various references to "issues" in CEQ regulations is pursuant to E.O. 11991, which required CEQ to develop regulations that, among other things, would "emphasize the need to focus on real environmental issues and alternatives."  The language in the final rule has been retained from the 1978 regulations.

*Comment*:  A commenter requested that CEQ retain the current definition of NOI because it was helpful.

*CEQ Response*:  As explained in the NPRM, CEQ moved the language that provides instruction regarding the requirements of the NOI to § 1509.1.

*Comment*:  Commenters requested that CEQ require an NOI to include NEPA's purpose, the purpose for preparing an EA/EIS, and the national goals outlined in section 101 of NEPA because many members of the public are completely unacquainted with NEPA and its purpose, let alone the purpose of an EA/EIS.

*CEQ Response*:  The NOI is prepared as part of the procedural requirements pursuant to section 102(2) of NEPA.  Referencing section 101 is unnecessary as the NOI is focused on a proposed action and notifying the public of the agency's plans to prepare an EIS.

*Comment*:  Commenters requested that CEQ define and enhance the role of affected parties, including those with long-term contractual agreements or preference grazing rights, and adjacent landowners.

*CEQ Response*:  Section 1501.9(b) requires agencies to notify "likely affected or interested persons" to participate in the scoping process.  This language is sufficient to address the commenters' concern.

**9.      Time Limits (§ 1501.10)**

*Comment*:  Commenters expressed opposition to presumptive time limits for EAs or EISs stating that they are arbitrary, capricious, and unnecessary as actions requiring an EA or EIS are infrequent.  Some commenters opposing the revisions stated that the new time limits would rush the process causing the public's ability to participate, including Tribal, State, and local governments, and the quality of analyses to decline.  Commenters also raised concerns over challenges in meeting the proposed time limits due to project complexity and ability to complete needed studies within a small field season window.  Other commenters recommended even shorter time limits than the proposed one year to complete an EA or two years to complete an EIS.

*CEQ Response*:  CEQ is finalizing a presumptive limit of one year for EAs and a presumptive limit of two years for EISs.  The time limits are consistent with past CEQ guidance and E.O. 13807.  CEQ notes that the Forty Questions stated that an EA should take no more than three months, and in many cases substantially less as part of the normal analysis and approval

process for the action.  E.O. 13807 established a policy to make timely decisions with the goal of

completing all Federal environmental reviews and authorization decisions for major

infrastructure projects within two years.  CEQ notes that the time limits are presumptive, so

agencies may extend the time limits upon approval of a senior agency official.  This additional

flexibility will ensure that the time limits do not preclude an agency from otherwise complying

with the requirements of NEPA and the final rule.

*Comment*:  Commenters expressed opposition to the role of a senior agency official

stating that the proposed revision will further delay the NEPA process and not hold the senior

agency official responsible for that delay.  Some commenters also stated that the inclusion of this

new role would add confusion to the NEPA process and discourage groups, like Tribes, from

requesting an extension.  Other commenters recommended that senior agency officials include a

written statement of reasons in the administrative record explaining why they granted an

extension request.  Other commenters stated that if a senior agency official may approve in

writing a longer time limit, then time frames exceeding the year will become the norm.

*CEQ Response*:  CEQ finds that it is important to make a senior agency official

responsible for enforcing page and time limits and, if useful to the decision-making process, to

approve in writing an extension to ensure that agencies follow an efficient and effective process.

Though this addition will require internal agency deliberations, CEQ's experience is that direct

involvement from senior agency officials can reduce unnecessary delays through improved

management and attention to unresolved issues.

*Comment*:  Commenters expressed opposition to the role of a senior agency official

stating that because the senior agency official may be a political appointee, the process may

reduce the credibility of the document with the public.

201

*CEQ Response*:  CEQ notes that senior agency officials, including appointed officials, oftentimes participate in the NEPA process, and that ultimately most decision makers are delegated their authority from an appointed position such as a Secretary or agency administrator. CEQ acknowledges while this addition will require internal agency deliberations, it has been CEQ's experience that direct involvement from senior agency officials can reduce unnecessary delays through improved management and attention to unresolved issues.

*Comment*:  Commenters stated that Tribal consultation and cultural resource fieldwork should not be rushed to meet arbitrary completion dates.  Commenters stated that inadequate scientific and cultural analysis can lead to litigation, project delays and cancellations of projects in the millions of dollars. Adequate time needs to be provided for archaeological inventories and Tribal consultation in order to yield the findings for sufficient and legally defensible decision making while being cognizant of project delivery.

*CEQ Response*:  The final rule contains several changes to strengthen cooperation between Federal agencies and Tribal governments.  These changes include identifying Tribal governments alongside State governments and removing references to reservation boundaries in recognition that Tribal interests often extend beyond reservation boundaries.  Additionally, the final rule improves the scoping process by requiring agencies to invite State, Tribal, and local governments and the public to identify potential alternatives, information, and analysis relevant to the proposed action. These changes in the final rule will facilitate timely Tribal consultation and involvement as well as timely identification of potential archeological and/or cultural resources.  In addition, the timelines contained in § 1501.10 of the final rule allow agencies to approve additional time on a case-by-case basis when appropriate.  When determining if

202

additional time is appropriate, agencies may consider the potential for environmental harm, including harm to archeological and cultural resources.

*Comment*:  Commenters raised concerns that the time limits established in § 1501.10 would constrain commenting time frames and limit the capacity of State, Tribal, and local governments to provide meaningful comments.  Commenters stated that State, Tribal, and local governments have limited resources and internal review processes that render providing substantive comments within the timeframes difficult if not impossible.

*CEQ Response*:  The final rule includes a number of revisions which clarify Federal agencies duty to inform and cooperate with State, Tribal, and local governments in a timely manner.  For example, § 1501.9 requires agencies to invite the participation of likely affected Federal, State, Tribal, and local agencies and governments during the scoping process.  Section 1503.1 requires agencies to request the comments of appropriate State, Tribal, and local agencies.  Section 1506.6 establishes requirements for public involvement.  Additionally, while § 1501.10 sets presumptive time limits for agency compliance with NEPA, a senior agency official may extend the time limit and the minimum of a 45–day comment period on the draft EIS is unchanged from the 1978 regulations.

Comment:  Commenters stated that programmatic EISs should be exempt from the 2–year time limit.

*CEQ Response*:  CEQ has included time limits for all EISs which promotes consistency and predictability in the NEPA process.  Under the final rule, the time limits may be extended where approved by a senior agency official.

203

10.    Tiering (§ 1501.11)

*Comment*:  Commenters supported the revisions to clarify when agencies can use existing studies and environmental analysis in the NEPA process, stating NEPA decision making should be based on full recognition of the amount of analysis that has already taken place (e.g., by incorporating by reference previous EISs and EAs) which will reduce duplication, better direct scarce resources and ultimately result in better decision making.  Commenters further supported the clarifications that an agency may tier EAs.  Commenters indicated that tiering is an important regulatory tool for land planning agencies, and that it is important for CEQ to promote its use and remove existing ambiguities.

*CEQ Response*:  The final rule includes proposed revisions in § 1501.11, "Tiering," to clarify when agencies can use existing studies and environmental analyses in the NEPA process and when agencies would need to supplement such studies and analyses (consistent with § 1502.23 that agencies are not required to undertake new scientific and technical research to inform their analyses).  These revisions will avoid unnecessary duplication, better direct agency resources, and ultimately improve decision making by clarifying that agencies do not need to conduct site-specific analyses at a program level that are not relevant until the decision at the site-specific stage.

*Comment*:  Commenters objected to revisions related to tiering in § 1501.11(a) and revisions in § 1506.4, "Combining documents" that allow combining documents stating current regulations address these matters.

*CEQ Response*:  The final rule includes proposed revisions in § 1501.11 and § 1506.4 that clarify the difference between these provisions.  Tiering allows the use of programmatic, policy, or plan EISs to relate statements of broad scope to those of narrower scope, eliminating

204

repetitive discussions of the same issues while providing for staged decisions.  The staged

decision-making qualities of tiering distinguish this provision from the simple combination of

documents to avoid redundancy.

*Comment*:  Commenters recommended  that the regulations should require agencies to

indicate how and when they will incorporate new or better information into tiered project- or

site-specific EAs or EISs when there is an existing programmatic NEPA document.

*CEQ Response*:  In their EA or EIS and decision documents based on tiering, agencies

should indicate how and when they will incorporate additional information into tiered project- or

site-specific EAs or EISs and their relationship to existing programmatic NEPA documents.

Section 1501.11 provides that tiered environmental documents focus on the actual issues ripe for

decision and exclude from consideration issues already decided or not yet ripe at each level of

environmental review.

*Comment*:  Commenters stated planning products developed by the lead agency should

have a reasonable way to be adopted for purposes of NEPA review, so that the substance of the

planning process product(s) does not have to be revisited in the NEPA process.

*CEQ Response*:  In the context of tiered decisions, the final rule at § 1501.11(b) requires

the environmental document to state where the earlier document is available and at § 1507.4 the

final rule provides for agency websites that maintain planning and environmental documents that

are available for tiering.

*Comment*:  Commenters supported the proposed changes in §§ 1501.11 and 1500.4

regarding the use and clarification of tiering to avoid duplicative analysis and specific

authorization of this efficient process for use with an EA as well as an EIS.

*CEQ Response*:  CEQ acknowledges the support for the proposed changes.

*Comment*:  Commenters objected to revisions to proposed §§ 1501.11 and 1502.4(d) stating they appear to be in conflict with the NEPA statute.  Commenters specifically stated CEQ's revisions provide that agencies need not conduct site-specific analyses prior to an irretrievable commitment of resources, and that in most cases this will not be until the decision is at the site-specific stage.

*CEQ Response*:  Tiering is a well-established practice from the 1978 regulations.  The tiering provisions in the final rule are generally consistent with long-standing case law regarding tiering.  *See, e.g., Pac. Rivers Council v. United States Forest Serv.*, 689 F.3d 1012, 1033 (9th Cir. 2012) ("we are satisfied that the Forest Service's analysis was sufficient, at this stage of the process, given that the EIS provides significant analysis of the environmental effects on amphibians, and that site-specific projects are not yet at issue.").  The final rule's changes to tiering provisions—moving 40 CFR 1502.20 to § 1501.11 and adding descriptive text in § 1502.4(b)(2)—do not have any effect on the regulations' application of the "irreversible or irretrievable commitments of resources" requirement of section 102(2)(C)(v) of NEPA.  Section 1502.16(a)(4) retains the required EIS discussion of any irreversible or irretrievable commitments of resources that would be involved in the proposal should it be implemented.

*Comment*:  Commenters did not support the statement in proposed § 1501.11 to "eliminate repetitive discussions of the same issues" stating repetitive discussions of important issues can have benefits, such as supporting interagency cooperation, ensuring decision makers consider such information, and increasing public transparency and ease of understanding.

*CEQ Response*:  Neither the 1978 regulations nor the final rule support repetitive discussion of the same issues as it increases time and paperwork and does not lead to better decisions.  Improved rule revisions for incorporation by reference and tiered environmental

206

documents will assist agencies in reducing unnecessary paperwork and delay, while promoting informed decision making.

*Comment*:  Commenters supported revisions to clarify that site-specific EAs and EISs may tier to programmatic EAs and EISs, even when implementation of a program without significant effects at a national level may have a significant impact at a local or project scale.

*CEQ Response*:  The final rule at § 1501.11 and the definition of "tiering" at § 1508.1(ff) add programmatic EAs to make clear that agencies may use EAs at the programmatic stage, when decisions are made without significant effects at the program level, though subsequent decisions may have a significant effect at subsequent local- or project-level stages.  This clarifies that agencies have flexibility in structuring programmatic NEPA reviews and associated tiering.

*Comment*:  Commenters objected to the proposed revision to § 1501.11(a) to "focus on the actual issues ripe for decision," stating that entirely banning those issues from consideration (without consideration of unique circumstances or exceptions) seems unnecessarily restrictive, and contrary to the goal of informed decision making under NEPA.

*CEQ Response*:  The language referenced by the commenter is unchanged from the 1978 regulation at 40 CFR 1502.20 and does not exclude subsequent issues from any consideration. On the contrary, the provision to "focus" the analysis indicates that those issues that are "ripe" for decision should be discussed in the context of the tiered decision-making process.

*Comment*:  Commenters recommended that CEQ consider providing additional guidance on how to appropriately tier from a previous study as well as creating a "library" or repository of earlier studies that would be available to Federal agencies and interested parties.  Commenters stated a repository of studies would allow project proponents and agencies to quickly and efficiently find relevant material that can be used during the review process.

207

*CEQ Response*:  CEQ may provide guidance on implementation of these regulations. Similar to the 1978 regulations, the final rule requires an environmental document to state where the earlier document is available.  *See* § 1501.11(b).  The final rule also directs agencies to host websites that provide planning and environmental documents, including those necessary for tiering.  *See* § 1507.4.

*Comment*:  Commenters recommended that decisions based on an EA used for tiering ensure that public participation is not foreclosed.  A commenter also stated that excluding an issue from review because it is considered not yet ripe would have to include a commitment that it be thoroughly considered at a subsequent stage of review.

*CEQ Response*:  Tiering does not foreclose public involvement during subsequent NEPA processes.  The final rule does not provide for tiering from or to a determination to apply a CE. Agencies are required to involve the public, relevant agencies, and any applicants to the extent practicable when preparing EAs (§ 1501.5(e)), and therefore a programmatic EA would be subject to public review both at the time of its use in a FONSI and its incorporation into a subsequent tiered environmental document.  CEQ declines to require agencies to commit to review unripe issues at a later time because inherent in the nature of an unripe issue is that it may never fully ripen.

*Comment*:  Commenters requested that an agency's use of prior determinations be contingent on those decisions being final and effective (*i.e.*, not under appeal or subject to appeal).

*CEQ Response*:  Similar to the 1978 regulations at § 1506.3(d), CEQ has found it to be appropriate, when an agency adopts an EIS or EA prepared by another agency, that the adopting agency specify if the EIS or EA is not final within the agency that prepared it, the action is the

subject of a referral under part 1504, or the EIS or EA is the subject of a judicial action that is not final.  § 1506.3(e).  Tiering refers to the coverage of general matters in broader EISs or EAs with subsequent narrower EISs or EAS incorporating by reference the general discussions and concentrating solely on the issues specific to the statement subsequently prepared.  CEQ therefore declines to make the requested revisions.

*Comment*:  Commenters opposed changes to proposed §§ 1501.11(a), 1501.11(b), and 1502.4(d) stating there are many possible scenarios where review under NEPA could omit important effects because they are not considered "ripe."  This could result in accepting a project without full consideration of its potential operational effects, particularly because of its indirect and/or cumulative effects.  Commenters also suggested CEQ eliminate this term because there is no clear definition of "ripe" and it is unclear and undefined.

*CEQ Response*:  If there are significant effects that ripen at a later time in connection with a more specific action that relates to NEPA analysis performed at an earlier and more general stage, then those effects will be considered in the tiered analysis.  Effects are addressed in § 1508.1(g) of the final rule.  As discussed in the final rule, NEPA actions are reviewable only under the APA and related administrative case law (*e.g.*, *Bennett v. Spear*), and judicial review does not occur until an agency has taken final agency action.

*Comment*:  Commenters requested that CEQ establish a baseline standard for the "adequacy" of a NEPA document (e.g., an EIS) to serve as the foundation document for tiering and recommended that CEQ add a sub-section (b)(3) which would state that:  tiering is appropriate when an EIS or EA is both current (not more than 10 years old) and relevant to the proposed action.

209

*CEQ Response*:  The language requested by the commenter is not necessary to include to address the concern because any tiered environmental document must ensure that the preceding document to which it is tiered contains sufficient analysis for purposes of tiering and is relevant to the proposed action.  If an EIS is no longer valid, due to change in the action or changed circumstances that are relevant to the environmental effects of the action, tiering does not eliminate the need to supplement the prior environmental document.

*Comment*:  Commenter stated site-specific analyses not only provide information about individual sites, which are always unique to some degree, but also put actions in context. Commenters stated the impact of actions and the best decisions change based on the community that lives next to the affected area, what other actions are ongoing nearby, and the condition of infrastructure needed to access the action location.  Commenters further stated that releasing that information late in the process deprives agencies of valuable feedback on the proposed actions and constricts alternative development.

*CEQ Response*:  Rather than release information late in the NEPA process, tiering allows for programmatic decisions that help structure the collection of information for future decisions. Tiering can also assist public and community involvement by structuring decision-making processes and identification of the information needed for subsequent environmental documents prior to final agency action.

*Comment*:  A Commenter recommended CEQ strengthen language to strongly encourage or even require agencies to make use of tiering and adoption where circumstances allow it as noted in current and proposed regulations.  Additional commenters stated regulations should specifically direct agencies to tier their environmental documents or incorporate by reference other existing environmental studies and analyses.

210

*CEQ Response*:  Tiering is an efficiency agencies should consider, as appropriate to their statutory authorities and decision-making processes.  Therefore, it is identified with § 1501.9, "Scoping" and other methods listed in §§ 1500.4 and 1500.5 to relate programmatic and narrow actions and to avoid duplication and delay.  Agency updates to their NEPA procedures should consider maximum use of tiering in accordance with § 1507.3.

*Comment*:  Commenter stated CEQ should broadly support programmatic reviews where the agency is approving several similar actions or projects in a region or nationwide (e.g., a large-scale utility corridor project) or a suite of ongoing, proposed or reasonably foreseeable actions that share a common geography or timing.  Commenter supported that a biological assessment or biological evaluation analysis can and should be incorporated into the NEPA documents stating biological assessments may be completed prior to the release of the EA or EIS and may legitimately inform its outcome or, at the least, prevent needless redundancy and expense.

*CEQ Response*:  Tiering, combined with integration of other environmental review and consultation requirements according § 1502.24 of the final rule, has been used successfully for land management planning actions that need a coordinated approach to their common, incremental environmental impacts.

*Comment*:  A commenter recommended that § 1501.11 explicitly recognize the use of "generic" EISs, or GEISs, which may provide the basis for generic conclusions that are codified in agency regulations.  CEQ should expressly acknowledge the value and importance of GEISs in the NEPA review process.

*CEQ Response*:  In the final rule at §§ 1500.4(k), 1502.11(c), 1502.4(b) and 1506.1(c), references to "program" EISs are replaced with "programmatic" environmental documents to

211

align with common terms in NEPA practice.  "Generic" EIS is a term that is particular to a few agencies and should be replaced with terms used in the final rule.

*Comment*:  Commenters stated that use of tiering in EAs could result in the elimination of detailed analysis at stages in agency decision making and necessary site-specific analyses if an agency decides that additional analysis is not necessary in a site-specific EA because of analysis in a programmatic EA.  By allowing EAs to tier without detailed review at any stage, it is possible that important issues will be overlooked, and thus valuable and necessary analyses will not be conducted.  Commenter recommended agencies should have to consider whether new information is available, or whether circumstances have changed to a degree sufficient to warrant additional analysis.

*CEQ Response*:  Concerns that environmental issues will be overlooked can arise in any NEPA process, and are best addressed through a transparent public process in which the agency assumes responsibility for the accuracy, scope, and content of its environmental documents in accordance with § 1506.5 of the final rule.  Tiering further addresses such concerns by ensuring that issues that are not ripe for review early in a tiered decision-making process are identified for subsequent review in a subsequent, transparent decision.

*Comment*:  Commenters stated the standards in this rulemaking appear to conflict with recent actions by the Bureau of Land Management to eliminate preparation of EISs for land use actions and asks for clarification.

*CEQ Response*:  In § 1501.11 of the final rule, CEQ makes clear that agencies may use EAs at the programmatic stage, such as land management planning decisions by the BLM, as well as the subsequent stages.  The final rule also amends the definition of "tiering" in paragraph (ff) to refer to an EIS or an EA.  Under the final rule, agencies have flexibility in structuring

212

programmatic NEPA reviews and associated tiering in accordance with their statutory authorities.

*Comment*:  Concerning proposed § 1501.11(c)(2), a commenter objected to replacing "analysis" with "assessment" and stated assessment is a subjective action and applies under the previous addition of the term "environmental assessment."  Analysis refers to an evaluation of the proposed actions and impacts prior to initiating or executing the action.

*CEQ Response*:  The final rule changes "analysis" in § 1501.11(c)(2) to "assessment" to refer to the reference to an EA preceding the term.  No less rigor in analysis is implied by this change.

*Comment*:  Commenter requested clarification on whether a site-specific or project-level EIS can tier to a programmatic EA.  If the answers to both questions is "yes," how then does tiering differ from incorporation by reference?

*CEQ Response*:  Tiering differs from incorporation by reference because tiering is a means of staged decision making with a structured relationship between the relevant environmental documents.

*Comment*:  Commenters recommended that CEQ use language found in 43 CFR 46.120 to clarify adoption of analysis through agency developed environmental review procedures and incorporate and use language from 43 CFR 46.140 to clarify that an agency may find a FONSI or, for an EA tiered to an EIS that adequately analyzed a proposal's significant effects, a "Finding of No New Significant Impact."

*CEQ Response*:  Tiering differs from a FONSI because the former provides for subsequent analysis to address environmental issues that are expected to become ripe for analysis and decision making at a later stage, while the latter is a means of confirming that subsequent

213

changes in an action or environmental circumstances do not require supplementation of a prior environmental document.  Findings of no new significant impacts are provided for in the final rule at § 1502.9(d)(4).

*Comment*:  A commenter stated that only § 1502.4(a) applies to the preparation of all EISs.  Commenters stated that proposed § 1502.4 (b), (c), and (d) pertain exclusively to programmatic EISs and suggests that sub-sections (b), (c), and (d) be moved into a section devoted to programmatic EISs (P-EIS) stating P-EISs provide an ideal tiering platform, and recommending that these subsections be combined with § 1501.11.

*CEQ Response*:  In the final rule, § 1502.4(a) applies generally to the preparation of EISs while subsequent sections refer to programmatic EISs as examples.  CEQ moved the tiering provision at 40 CFR 1502.20 (1978) to § 1501.11 to underscore its utility for EAs, but division of § 1502.4 into general and programmatic sections would not clarify its provisions.

**11.    Incorporation by Reference (§ 1501.12)**

*Comment*:  Commenters recommended that CEQ add language to § 1501.12, "Incorporation by Reference," to clarify that there is no need to attach material that is incorporated by reference to the EIS as an appendix.

*CEQ Response*:  CEQ declines to make the suggested change.  Incorporation by reference obviates the need to attach material to the EIS.  Rather, agencies may include links or other references to access the incorporated material.

*Comment*:  Some commenters expressed concern that incorporated documents would not be reasonably available during the public comment period, suggesting this requirement could be thwarted by concerns over proprietary information or the redaction of information.  Some commenters requested that CEQ modify § 1501.12 to specify that the material incorporated by

214

reference be made available at the beginning of the comment period, not simply "within the time allowed for comment."

*CEQ Response*:  CEQ declines to make the requested modifications to the provision.  The final rule fully addresses the commenters' concerns, including the requirements at § 1501.12 that incorporated material be "available for inspection by potentially interested persons within the time allowed for comment" and the prohibition on incorporating material "based on proprietary data that is not available for review and comment."  CEQ notes that § 1501.12 allows incorporation by reference when the effect will be to cut down on bulk without impeding agency and public review of the action.

*Comment*:  Some commenters recommended that CEQ provide guidance to agencies on proper summarization of incorporated information to ensure readable environmental documents and a sufficiently detailed description of the incorporated information.  Other commenters recommended that CEQ allow for incorporation by reference without the need to summarize.  Some commenters asked CEQ to clarify that agencies may incorporate information into their environmental documents for purposes other than satisfying the requirements of NEPA.  Commenters also requested that CEQ include a requirement that environmental documents state the specific sections and paragraphs where the incorporated material can be found to avoid having to sift through voluminous documents.

*CEQ Response*:  Summarization can assist readers by potentially eliminating the need to review all incorporated material.  Additionally, CEQ declines to micromanage the agencies' summarization and description of material incorporated by reference.  CEQ notes that information incorporated by reference should be relevant to the decision before the agency.

However, agencies may incorporate other materials for non-NEPA purposes, including where agencies may be using the NEPA review to meet the requirements of multiple statutes.

*Comment*:  Some commenters asked that CEQ clarify the term "proprietary data" and whether that term includes confidential natural and cultural resource information.

*CEQ Response*:  CEQ notes that proprietary data is data in which the owner holds a property interest.  *See, e.g.*, *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986 (1984).  The principal Federal laws that can protect sensitive information about historic properties and archaeological resources are section 304 of the National Historic Preservation Act, 16 U.S.C. 4702-3 (NHPA) and section 9 of the Archeological Resources Protection Act, 16 U.S.C. 470hh.  For example, section 304 of the NHPA restricts the disclosure of certain information that may harm historic properties, as the NHPA has declared the preservation of historic properties to be in the public interest.  The Freedom of Information Act may protect natural and cultural resource information from disclosure.   It provides that an agency may withhold records "specifically exempted from disclosure by statute" and therefore may not be appropriate for incorporation by reference.

*Comment*:  Some commenters observed the proposed deletion of 40 CFR 1502.21 and questioned whether it had the effect of eliminating the practice of incorporation by reference.

*CEQ Response*:  The final rule moves the provision in 40 CFR 1502.21 to § 1501.12 in the final rule.  Incorporation by reference remains available.  *See* § 1501.12.

*Comment*:  Some commenters recommended that incorporation by reference apply to public input provided on previous actions and that these comments be incorporated from prior public records.

*CEQ Response*:  CEQ notes that agencies may incorporate by reference publicly available information relevant to the decision, including prior public comments.

216

*Comment*:  Some commenters recommended that CEQ allow for greater flexibility so that agencies can incorporate by reference content that is similar to the particular action or impacts being assessed in the agency's environmental document.

*CEQ Response*:  CEQ declines to modify the regulations.  Decisions on what studies are appropriately incorporated by reference are fact-based decisions made by the agency conducting the NEPA review.

*Comment*:  Commenters recommended that CEQ require agencies to make incorporated material, including referenced tiered documents, as accessible as possible; for example, CEQ could require inclusion of a website link to the material.  Other commenters pointed to existing EISs that used incorporation by reference,  where the referenced material was not reasonably available as required by the existing regulations.

*CEQ Response*:  CEQ notes that the 1978 regulations require agencies to make any incorporated material reasonably available for inspection by potentially interested persons within the time allowed for comment, and this requirement remains in the final rule in § 1502.12.  CEQ declines to specify how agencies make such information accessible but notes that under § 1507.4, linking directly to the relevant text, for purposes of incorporation by reference or tiering, is appropriate and warrants support through the design of environmental documents and the information systems that support their accessibility.

*Comment*:  Some commenters requested CEQ modify the regulations to state that participating agencies and the public may comment on the suitability of existing data, including the age of the information and applicability of newer analyses, methodologies, techniques and technology, while allowing the lead agency to make the determination on the appropriateness of the information.

*CEQ Response*:  CEQ declines to make the requested revision because it is unnecessary. Agencies and the public have the opportunity to comment on the draft EIS, including any aspects of material that is incorporated by reference within the draft EIS.

*Comment*:  Commenters expressed support for incorporating material by reference into NEPA documents.  Commenters recommended including a summary of the incorporated material in a technical appendix so that the public may understand the material without having to access the source materials.

*CEQ Response*:  Both § 1501.12 and § 1502.19, "Appendix," allow for the practice recommended by the commenters.

*Comment*:  Commenters recommended that CEQ allow Federal agencies preparing NEPA analyses to incorporate by reference those analyses prepared by State and Tribal governments when those analyses meet or exceed Federal standards of a NEPA review.

*CEQ Response*:  Under the 1978 regulations and § 1501.12, agencies may incorporate by references analyses prepared by State and Tribal governments so long as they meet applicable requirements in the rule (e.g., § 1506.2).  CEQ has made further changes in the final rule to reduce duplication of effort with respect to analyses prepared by State and Tribal governments in § 1501.12 and § 1506.2, "Elimination of duplication with State, Tribal, and local procedures." For any proposed action, Federal agencies may cooperate with non-Federal entities to conduct environmental analyses that meet the requirements of both NEPA and NEPA-like authorities at the State, Tribal, and local level.  Federal agencies may also incorporate planning studies, analyses, and other information into environmental documents by reference, rather than reproducing the entire analysis.

218

*Comment*:  Some commenters opposed the incorporation by reference provision, noting that use of the practice can reduce the accuracy and clarity of NEPA analyses.  Some commenters expressed concern that use of incorporation by reference could result in the use of old outdated studies, especially for cultural resources.  They requested that CEQ strengthen the rules for the use of incorporated or referenced material to ensure that the referenced material is timely, accurate, relevant, and uncontested.  Other commenters recommended that CEQ require agencies include a statement demonstrating the continuing relevance and applicability of the earlier document to the current review process.

*CEQ Response*:  CEQ notes that incorporation by reference was part of the 1978 regulations and has been a useful practice.  All of the information in environmental documents, including information incorporated by reference, is subject to § 1502.23 and the requirement to be reliable.

*Comment*:  Some commenters requested that CEQ should require, whenever possible, that agencies include material in the EIS rather than incorporate it by reference.

*CEQ Response*:  CEQ notes that the purpose of incorporation by reference is to cut down on the bulk of environmental documents while allowing agency and public review of the actions.

**E.    Comments Regarding Environmental Impact Statements (EISs) (Part 1502)**

**1.    Purpose of environmental impact statement (§ 1502.1)**

*Comment*:  Commenters opposed the proposed changes to § 1502.1, "Purpose of environmental impact statement," and requested CEQ reinstate the phrase that an EIS is "an action-forcing device."  Commenters stated that the proposed changes make EISs purely informational documents, disconnected from any direction on what decisions agencies should make after considering significant effects of various alternatives.  Commenters stated the

219

proposed rule re-characterizes the "primary purpose" of an EIS as ensuring the agencies consider the environmental impacts of their actions in decision making. Commenters stated the proposed rule fails to acknowledge Congress' stated purpose in NEPA, to infuse the goal of acting as a steward of the environment into all activities of the Federal Government. Commenters stated this is a significant shift in agency's obligations and undermines NEPA.

*CEQ Response*: The final rule revises § 1502.1 consistent with changes to § 1500.1 to align these sections more closely with the statutory text. As explained in section II.B, NEPA is a procedural statute, and the purpose of NEPA is satisfied if a Federal agency has considered relevant environmental information and the public has been informed regarding the decision-making process. In contrast to other statutes that provide agencies with authority to require particular results or substantive outcomes, such as the ESA, Clean Air Act, and Clean Water Act, NEPA does not require mitigation. As the Supreme Court has stated, "[o]ther statutes may impose substantive environmental obligations on [F]ederal agencies, [citation omitted] but NEPA merely prohibits uninformed—rather than unwise—agency action." *Methow Valley*, 490 U.S. at 351. The EIS ensures agencies consider the environmental impacts of their actions in decision making.

*Comment*: Commenters requested CEQ define the phrase "necessary environmental analyses" in § 1502.1.

*CEQ Response*: CEQ declines to define the phrase "necessary environmental analyses." The phrase appears once in the rule and the relevant sentence remains unchanged from the 1978 regulations.

*Comment*: Commenters requested CEQ add "and the public" to the last sentence in § 1502.1 for clarity.

220

*CEQ Response*:  The final rule incorporates the requested revision to § 1502.1.

**2.      Implementation (§ 1502.2)**

*Comment*:  Commenters expressed opposition to the proposed changes to § 1502.2 and requested CEQ reinstate the statement that an EIS "shall be analytic rather than encyclopedic." Commenters stated the proposed changes serve no clear purpose except to infer that analysis is not preferred, and encyclopedic treatment is definitely not preferred.  Commenters also stated the proposed rule language implies that agencies can selectively omit information and data if the agency deems it not very significant.

*CEQ Response*:  CEQ makes the proposed changes in the final rule because encyclopedic and analytic are separate issues.  This does not change the meaning of either requirement as the commenter suggests.  Rather, the change clarifies that EISs must be analytic.  Additionally, EISs must be a reasonable length and written in a readable format so that it is practicable for the decision maker and the public to read and understand the issues and alternatives for decision rather than a compendium of available information (*i.e.*, not encyclopedic).

*Comment*:  Commenters requested CEQ clarify or remove the last sentence in § 1502.2(b) that states in pertinent part "there should be only enough discussion to show why more study is not warranted."  Commenters stated a brief discussion of non-significant issues may lead to inadequate analysis of their significance.  Commenters also stated reducing discussion may result in reduction of evaluation of issues which in turn may lead to errors in decision making.

*CEQ Response*:  CEQ retains this sentence from the 1978 regulations in the final rule. Consistent with long-standing practice under NEPA, agencies should focus on significant issues and only briefly discuss non-significant issues.

221

*Comment*:  Commenters requested CEQ amend § 1502.2(d) to remove "to achieve the requirements of sections 101 and 102(1) [of NEPA]," or change "requirements" to "policies." Commenters stated NEPA's only "requirements" are procedural.

*CEQ Response*:  CEQ retains this language from the 1978 regulations in the final rule, but clarifies that the regulations interpret the referenced sections of the Act.

### 3.    Major Federal Actions Requiring the Preparation of Environmental Impact Statements (§ 1502.4)

*Comment*:  Commenters supported revisions to further encourage discretion and practicality in the use of "tiering" and "programmatic" NEPA documents that, where appropriate, analyze environmental impacts and mitigation measures for similar projects at a broad policy level.  Commenters supported CEQ's addition to use tiering and other methods to address programmatic or narrower actions and avoid duplication and delay, and further clarify that agencies may defer detailed analysis until elements are ripe for final agency action.

*CEQ Response*:  CEQ acknowledges the support for the proposed changes. Programmatic analyses may be used as a foundation for subsequent analyses and can promote efficiency in appropriate circumstances.

*Comment*:  Commenters objected to language in the preamble interpreting § 1502.4(d), that "site-specific analyses need not be conducted prior to an irretrievable commitment of resources."  Commenters maintained that the NEPA process must be complete and a ROD must be issued before any resources (e.g., the acquisition of land) are committed for an applicable project.  Commenters also maintained that the replacement of "shall" with "should" in § 1502.4(b)(iii) inappropriately allows for agencies to authorize irreversible and irretrievable commitment of resources prior to making a programmatic EIS available.

222

*CEQ Response*:  In the final rule, CEQ has simplified this subsection to provide that agencies may tier their environmental analyses to defer detailed analysis of impacts of specific program elements until such program elements are ripe for final agency action.  CEQ removed the clause referencing irretrievable commitment of resources because NEPA review occurs pursuant to the APA and "final agency action," as construed in *Bennett v. Spear*, is the test for when judicial review can commence.  *See* 520 U.S. 154, 177–78 (1997).  The replacement of "shall" with "should" is consistent with the discretionary nature of programmatic EISs that provide an efficient means of considering environmental effects in common across a broad program of actions.

*Comment*:  Commenters stated that CEQ should remove the second sentence in § 1502.4(d) in the proposed rule contending that it allows agencies to avoid offering details on subsequent actions that may have additional impacts.

*CEQ Response*:  Section 1502.4(d) recognizes that agencies may prepare programmatic or tiered EISs.  Agencies may also prepare site-specific NEPA analysis and defer more detailed analysis of environmental impacts of specific program elements until such program elements are ripe for final agency action.  This promotes efficient use of agency resources.

*Comment*:  Commenters objected to the removal of the word "shall" from § 1502.4(b) stating that it would eliminate the requirement for programmatic environmental analysis for Federal or federally assisted research or development demonstration programs for new technology.  Commenters maintained CEQ provides no justification for the change noting that NEPA itself identifies "new and expanding technological advances" as one of man's actions that have profound influences on the environment.

223

*CEQ Response*:  NEPA does not prescribe any particular framework or procedure for an EIS.  Nor does it address the practice of a programmatic EIS.  The final rule supports the development of programmatic EISs for new or developing technology, where appropriate.  As revised, CEQ has clarified that agencies have the flexibility to conduct NEPA analyses in the most efficient manner as practicable, which involve a programmatic EIS, or otherwise action-specific NEPA analysis.  Moreover, CEQ has removed the ambiguous language "are sometimes required," and substituted in its place, "may be prepared."  This final rule is not specific to federally assisted research or development demonstration programs for new technology.

*Comment*:  Commenters stated that CEQ should more explicitly define in the regulations the types of actions that are appropriately subject to preparation of a programmatic EIS or otherwise provide greater guidance to Federal agencies on when a programmatic EIS should be conducted.

*CEQ Response*:  NEPA analysis is subject to a rule of reason and agencies should use their experience and expertise in conducting NEPA analyses.  Decisions on when to select a programmatic EIS are appropriately made at the agency level considering the specific program or policy and availability of agency time and resources.

*Comment*:  Commenters stated that changes in the rule making programmatic EISs discretionary are inconsistent with existing case law stating that in some cases, programmatic EISs are required, citing *Ass'n of Pub. Agency Customer, Inc. v. Bonneville Power Admin.*, 126 F.3d 1158, 1184 (9th Cir. 1997).

*CEQ Response*:  In some cases, preparation of a programmatic EIS may be the most efficient and cost-effective way to review for agencies to assess certain Federal actions, particularly repetitive ones.  Agencies have been afforded considerable deference in whether to

prepare a programmatic review, absent a finding that the agency acted arbitrarily and capriciously in choosing not to conduct a programmatic review. *Kleppe*, 427 U.S. at 409–15. "So long as the above described NEPA analysis of the overall program is prepared, we think it of little moment whether that analysis is issued as a separate NEPA statement or whether it is included within a NEPA statement on a particular facility." *Scientists' Inst. for Pub. Info., Inc., v. Atomic Energy Comm'n et al.*, 481 F.2d 1079 (D.C. Cir. 1973). As such, the decision to prepare a programmatic review under NEPA is not a compulsory one.

*Comment*: Commenters stated that CEQ's proposed rulemaking does not sufficiently encourage "grouping" similarly situated projects under § 1502.4. Commenters argued CEQ should more explicitly revise its regulations to further facilitate agency consideration of related proposed actions in a single impact statement.

*CEQ Response*: The regulations sufficiently identify the relevant ways agencies may evaluate proposals in § 1502.4(b)(1)(i)-(iii).

*Comment*: Commenters stated that CEQ's changes to proposed § 1502.4(d) would encourage agencies to justify improper segmentation of projects referencing: "Agencies may tier their environmental analyses to defer detailed analysis of environmental impacts of specific program elements until such program elements are ripe for decisions."

*CEQ Response*: Section 1502.4(b)(2) of the final rule does not encourage or allow segmentation of Federal actions, in contravention of relevant conditions in § 1501.9(e)(1). Section 1502.4(b)(2) (proposed § 1502.4(d)) allows agencies to prepare programmatic documents as appropriate and tier subsequent analysis as necessary. Any improper segmentation is reviewable under the judicial review standards of the APA. 5 U.S.C. 706(2)(A).

225

*Comment*:  Commenters recommended that CEQ explicitly include a life expectancy for programmatic NEPA documents and ensure that programmatic plans be revisited periodically to ensure they remain valid or determine whether they need revision.

*CEQ Response*:  Programmatic EISs, as a matter of agency discretion, are not required to be reconsidered by the agency.  A programmatic analysis, should however, appropriately describe the proposed action and the expected duration for the action is to be implemented or otherwise operate.  Federal agencies should use their expertise to determine when and if to revise programmatic EISs, or provide supplementary materials for an analysis that tiers from a prior review.

*Comment*:  Commenters noted that only § 1502.4(a) applies to the preparation of all EISs while § 1502.4 (b), (c), and (d) pertain to programmatic EISs.  Commenters suggested subsections (b), (c), and (d) should be moved into a section devoted to programmatic EISs and could otherwise be combined with section 1501.11, "Tiering."

*CEQ Response*:  While the two sections are related, CEQ has renumbered but retained the sections as proposed because § 1502.4 relates to EISs while § 1501.11 relates to tiering that may involve both EISs and EAs.

*Comment*:  Commenters objected to the requirement that agencies define a proposal "based on the statutory authorities for the proposed action."  (§ 1502.4(a)).  Commenters asserted the language bounds consideration of the proposal and its alternatives by the applicable authorities, risking under characterization of some actions.

*CEQ Response*:  The proposed change properly clarifies that agencies should define the proposal that is the subject of the EIS based on the applicable statutory authorities.  This revision reflects that in considering a proposed action, agencies must consider their relevant statutory

226

authorities.  Contrary to the commenters concern, a proposal defined based on the applicable statutory authorities is not under characterized.  In § 1501.1 of the final rule, CEQ clarifies that the presence and extent of statutory discretion is relevant to NEPA analysis.

### 4.    Timing (§ 1502.5)

*Comment*:  In the first sentence of § 1502.5, commenters requested that CEQ retain the word "shall" rather than replacing it with "should," as proposed, so that agencies are required to prepare a NEPA analysis as soon as practicable.

*CEQ Response*:  Consistent with the discussion in section II.C.2, the final rule revises § 1502.5 to provide agencies with an appropriate degree of flexibility to determine the timing for initiating an EIS.

*Comment*:  Commenters requested that CEQ amend § 1502.5(a) to apply the requirements concerning timing to tiered assessments and programmatic EISs.

*CEQ Response*:  CEQ declines to add tiered assessments and programmatic EISs to this paragraph because §§ 1501.11 and 1502.4, respectively, address the consideration for their timing.

*Comment*:  Commenters requested that CEQ strike the word "normally" from § 1502.5(d), stating that CEQ's regulations should require a draft EIS to accompany a proposed rule to inform the decisions associated with the proposed rule.

*CEQ Response*:  CEQ declines to remove "normally" from § 1502.5(d).  While under current practices a draft EIS accompanies a proposed rule in most instances, the 1978 regulations are flexible on this point.

*Comment*:  Commenters stated that CEQ's proposal to change "no later than immediately" to "as soon as practicable" in § 1502.5(b) is unclear regarding whether CEQ intends to change the timing of EIS preparation.

*CEQ Response*:  The revision of "no later than immediately" to "as soon as practicable" in § 1502.5(b) is consistent with other revisions throughout the final rule to change the term "possible" to "practicable" as the more commonly used term in regulations.  *See* section II.A. With respect to EIS preparation, CEQ also directs in § 1501.9(d) that agencies should publish an NOI as soon practicable after determining that a proposal is sufficiently developed to allow for meaningful public comment.  CEQ addresses time limits for EISs in § 1501.10.

*Comment*:  Commenters requested CEQ replace the word "shall" with "may" in § 1502.5(a) to allow agencies flexibility to decide when to initiate an EIS for a project and when to supplement.

*CEQ Response*:  CEQ declines to make this revision because it is inconsistent with section 102(2)(C) of NEPA and § 1501.2.  CEQ notes the timing mandate in § 1502.5(a) remains unchanged from the 1978 regulations and provides agencies with clear direction when to prepare an EIS.

## 5.        Page Limits (§ 1502.7)

*Comment*:  Commenters expressed opposition to presumptive page limits for EISs stating that they are arbitrary, capricious, and unnecessary as actions requiring an EIS are infrequent. Some commenters opposing the revisions believed that the new page limits would set a "one size fits all" approach, rush the process causing the public's ability to participate, including Tribal, State, and local governments, and cause the quality of the analyses to decline.  Commenters also

raised concerns over challenges in meeting the proposed page limits due to project complexity and ability to complete needed studies within a small field season window.

*CEQ Response*:  The core purpose of page limits from the original regulations remains in the final rule.  Documents must be a reasonable length and in a readable format so that it is practicable for the decision maker to read and understand the document in a reasonable period of time.  Therefore, CEQ is finalizing a presumptive limit of 150 pages for EISs (or 300 pages for proposals of unusual scope or complexity) to reinforce the page limits set forth in the 1978 regulations, while also allowing a senior agency official to approve a statement exceeding 300 pages when it is useful to or necessary for the decision-making process.  In an effort to create a more efficient process, Federal agencies have been updating their procedures and policies to reflect the practical utility of page limits.  For example, in August 2017, DOI issued Secretarial Order 3355,[56] which requires that EISs shall not be more than 150 pages or more than 300 pages for projects of unusual scope or complexity.  Similarly, in August 2019, DOT issued Page Limits Guidance, which states that Operating Administrations should limit the text of EISs to no more than 150 pages and 300 pages for proposed actions of unusual scope or complexity.[57]  CEQ found that the average length of final EISs across the Federal Government is over 600 pages, which far exceeds the expectation in the 1978 regulations that normally EISs should not exceed 150 pages.  Reinforcing the original page limits will encourage agencies to identify relevant

---

[56] Streamlining National Environmental Policy Act Reviews and Implementation of Executive Order 13807, "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects," https://www.doi.gov/sites/doi.gov/files/elips/documents/3355_-_streamlining_national_environmental_policy_reviews_and_implementation_of_executive_order_13807_establishing_discipline_and_accountability_in_the_environmental_review_and_permitting_process_for.pdf.

[57] DOT Page Limits Guidance, *supra* note 50.

issues, focus on significant environmental impacts, and prepare concise, readable documents that will inform decision makers as well as the public.

*Comment*:  Commenters requested that the final rule clarify whether the page limits (§ 1502.7) include the summary (§ 1502.12) and the list of preparers (§ 1502.18).  Commenters stated the EIS page limits should exclude the summary and the list of preparers.

*CEQ Response*:  The final rule excludes the summary and list of preparers sections from the page limits.  Similar to the 1978 regulations, page limits apply to the purpose and need, alternatives, affected environment, and environmental consequences sections.

*Comment*:  Commenters suggested appendices should receive the same page limits as the EA or EIS.

*CEQ Response:*  CEQ determined that the length of appendices should remain flexible, to preserve their essential function of providing a means of inclusion of necessary supporting information without adding unnecessary bulk to the EA provided for the decision maker's consideration.  The page length limitations for EISs similarly do not include appendices, 40 CFR 1502.7, for the same reason.  Therefore, in establishing a presumptive page length for EAs, CEQ applied the same principle while authorizing a senior agency official to approve in writing an EA to exceed 75 pages.

### 6.    Draft, Final and Supplemental Statements (§ 1502.9)

*Comment*:  Commenters objected to the change in § 1502.9(b) regarding EISs from "The draft statement must fulfill and satisfy to the fullest extent possible the requirements established for final statements …," to "The draft statement must meet, to the fullest extent practicable, the requirements established for final statements…."  Commenters stated that the change allows agencies to avoid developing robust analysis citing that the replacement with "practicable" gives

agencies an out by emphasizing things that are "reasonably capable" of being accomplished,

while possible, by contrast, contains no such limitation.  Commenters cited the comparison of

*Black's Law Dictionary, Practicable (11th ed. 2019)* ("(Of a thing) reasonably capable of being

accomplished; feasible in a particular situation"), with *Ballentine's Law Dictionary, Possible

(2010 ed.)* ("Liable to happen or come to pass; capable of existing or of being conceived or

thought of; capable of being done; not contrary to the nature of things.") because it was

determined that something was not "reasonably capable" of being included.

   *CEQ Response*:  CEQ has replaced references from "possible" to "practicable"

throughout the regulations for consistency and to update the usage to reflect the more modern

usage of the term "practicable."  *See* section II.A.

   *Comment*:  Commenters supported the clarification in § 1502.9(d)(1) that supplemental

statements only need to be prepared if a major Federal action remains to occur.  Commenters

also supported clarification in § 1502.9(d)(4) that an agency may find new information or

circumstances are "not significant" and therefore does not require the preparation of a

supplemental EIS.  They also supported continued use of and proposed clarifications for

applying a Determination of NEPA Adequacy in order to codify the existing practice by some

agencies and open opportunities for other agencies.

   *CEQ Response*:  CEQ acknowledges the support for the proposed changes.  In

accordance with revised § 1502.9(d)(1), agencies are required to prepare supplements to either a

draft or final EIS if a major Federal action remains to occur, and (i) the agency makes substantial

changes to the proposed action that are relevant to environmental concerns, or (ii) there are

significant new circumstances.  This revision is consistent with Supreme Court case law holding

that a supplemental EIS is required only "[i]f there remains 'major Federal actio[n]' to occur, and

if the new information is sufficient to show that the remaining action will 'affec[t] the quality of

the human environment' in a significant manner or to a significant extent not already considered

. . . ." *Marsh,* 490 U.S. at 374 (quoting 42 U.S.C. 4332(2)(C)); *see also S. Utah Wilderness*

*Alliance*, 542 U.S. at 73 (2004).  The final rule, codifying agency practice, further provides that

supplemental EISs are only required when a major Federal action remains to occur.  If an agency

determines that new information or circumstances are not significant, a supplemental EIS is not

required, and the agency may document such determinations for the administrative record.

§ 1502.9(d)(4).

*Comment*:  Commenters requested that CEQ clarify the meaning of the phrase "a major

Federal action remains to occur."  Commenters expressed concern that as drafted, this phrase

could have a range of meanings.

*CEQ Response*:  The summary in section II.D.9 of the final rule provides examples of

when a "major Federal action remains to occur."

*Comment*:  Commenters stated that the reference to "responsible opposing view" is

unclear and should be defined or otherwise explained in the regulations or guidance.

*CEQ Response*:  The phrase "responsible opposing view" is unchanged from the 1978

regulations.  The draft EIS should discuss all major points of view on the environmental impacts

of the alternatives including the proposed action.  *See* § 1502.9(b).  The reference to "any

responsible opposing view" in § 1502.9(c) is self-explanatory.

*Comment*:  Commenters stated that it is unclear in § 1502.9(b) how agencies will know

"all major points of view on the environmental impacts of the alternatives" at the time the draft is

published.  Commenters suggested revising the text to read:  "the major points of view on the

environmental impacts of the alternatives, including the proposed action, known at the time the

232

draft EIS is prepared."  Other commenters requested CEQ further elaborate or define "all major points of view" in section § 1502.9(b).

*CEQ Response*:  The phrase "all major points of view on the environmental impacts of the alternatives" is unchanged from the 1978 regulation.  The regulations specify that major points of view relates to the environmental impacts of the proposed action and alternatives.  *See* § 1502.9(b).  In preparing environmental documents, agencies should base such documentation on existing information, and in the final rule, CEQ has clarified that "[a]gencies shall make use of reliable existing data and resources."  *See* § 1502.23.  The final rule provides for an expanded scoping process and a summary identifying all submitted alternatives, information, and analyses in the draft EIS.  *See* §§ 1501.9, 1502.17.

*Comment*:  Commenters recommended that when an agency prepares a supplemental information report (such as under § 1502.9(d)(4)), CEQ clarify that the agency need not circulate the report to the public.

*CEQ Response*:  Under the final rule, CEQ has provided that agencies should document their findings regarding supplementation consistent with their agency NEPA procedures (§ 1507.3), or, if necessary, in a FONSI supported by an EA.  Documentation of a FONSI must be made available to the affected public as specified in § 1506.6.  CEQ replaced "circulate" with "publish" a supplement to a statement.  *See* § 1502.9(d)(3).  Elsewhere in the regulations, CEQ has defined "publish" to mean methods found by the agency to be efficient and effective for making environmental documents and information available, including electronic means.  *See* § 1508.1(y).

233

*Comment*:  Commenters recommended that in § 1502.9(b) that CEQ retain "revised draft" stating that a revised draft EIS following a public comment period is different from a supplemental EIS.

*CEQ Response*:  In the final rule, CEQ has eliminated "revised draft" and replaced it with "supplemental draft" for clarity and consistency with the title of the section and other provisions in the regulations referring to supplemental statements.  The term "revised draft" is not found elsewhere in the regulations and these revisions are intended for clarity and consistency.

*Comment*:  Commenters requested CEQ further revise § 1502.9(d)(4) to provide that agencies "may" rather than "should" prepare documentation finding the changes or new circumstances or information relevant to environmental concerns is not significant, and that that the documentation may be "in any other manner deemed appropriate by the agency in its discretion."

*CEQ Response*:  As discussed in section II.D.9, CEQ added § 1502.9(d)(4), which codifies existing practice of several Federal agencies, while providing that agencies may specify the form of documentation in its agency NEPA procedures (§ 1507.3).  Requiring agencies to document determinations under § 1502.9 in accordance with their procedures aligns with agency practice and will promote consistency in agency NEPA documentation.

*Comment*:  Commenters asked CEQ to clarify whether the provisions for a supplemental EIS require a full supplemental EIS when applicants make minor changes and project optimizations during the agency's NEPA review.

*CEQ Response*:  The final rule provides agencies with flexibility to determine that project changes relevant to environmental concerns are not significant and therefore do not require a supplement.  *See* § 1509(d)(4).  Where changes are minor and are not significant, agencies may

234

document the finding consistent with their agency procedures, or if necessary, in a FONSI

supported by an EA.  *See* § 1509(d)(4).

*Comment*:  Commenters requested CEQ clarify that supplemental information reports

such as those prepared under § 1502.9(d)(4) need not necessarily be circulated for public

comment in the same fashion as a draft or final statement.

*CEQ Response*:  Under the final rule, agencies have discretion to determine in agency

NEPA procedures (§ 1507.3) whether to circulate a finding developed pursuant to

§ 1502.9(d)(4).

*Comment*:  Commenters requested that CEQ revise § 1502.9(d)(1)(i) to state that:  "The

agency makes changes in the proposed action that substantially increases the environmental

impacts compared to the Draft or Final environmental impact statements."  Commenters

suggested the change would allow shifts in alignments for linear projects such as highways to

address comments raised by the public or agencies without requiring a supplemental NEPA

document if the overall impacts do not increase, thus making the NEPA process more efficient.

*CEQ Response*:  CEQ supports revisions to make the NEPA process more efficient.

However, CEQ has not proposed to change the threshold standards for supplementation.  Instead,

the provisions of the final rule adequately allow for agencies to determine that changes to a

proposed action or new circumstances or information relevant to environmental concerns are not

significant.  *See* § 1502.9(d)(4).

*Comment*:  Commenters suggested CEQ eliminate references to a "supplemental Draft

EIS" and eliminate the language that states that "If a draft statement is so inadequate as to

preclude meaningful analysis, the agency shall prepare and publish a supplemental draft of the

appropriate portion."  Commenters stated that it is a difficult standard for agencies to implement,

235

particularly when evaluating their own NEPA documents and further note that courts have also struggled with interpreting this provision. *See e.g., Nat'l Comm. of the New River v. FERC*, 373 F. 3d 1323, 1328-29 (D.C. Cir. 2004). Commenters requested clarification of whether the standard was enforceable.

*CEQ Response*: The phrase "so inadequate as to preclude meaningful analysis" was included in the 1978 regulations and CEQ did not propose to revise the phrase in the NPRM. The purpose of this provision is to ensure meaningful opportunity for comment on the draft EIS. Regarding enforceability of this provision, consistent with challenges to agencies' implementation of NEPA generally, as a procedural statute, it is reviewable under the judicial review standards of the APA. 5 U.S.C. 706(2)(A).

*Comment*: Commenters suggested the proposed rule add social and economic information to what could be considered when preparing a supplement. Commenters stated that explicit considerations will substantiate agency decisions to consider, or not consider, new information and will streamline the NEPA process.

*CEQ Response*: In the final rule CEQ has revised the regulations to require consideration of economic information, where applicable, when considering environmental consequences, and has also revised the definition of effects, which includes economic effects, to clarify this may include effects on employment. *See* §§ 1502.16(a)(10) and 1508.1(g)(1). In considering whether to prepare a supplement, agencies should make such a determination in accordance with section § 1502.9(d)(1).

*Comment*: Commenters stated that subsection (b) should expressly prohibit agencies from omitting the analysis of impact(s) from a draft EIS and postponing that analysis until the

236

agency releases its final EIS.  Commenters stated that this has become a common practice by certain agencies, including for example the Federal Energy Regulatory Commission (FERC).

*CEQ Response*:  Under the CEQ regulations, an EIS must discuss the significant environmental impacts of a proposed action and inform decision makers and the public of reasonable alternatives that would avoid or minimize adverse impacts or enhance the quality of the human environment.  *See* § 1502.1.  Agencies should prepare draft EISs that present a meaningful assessment of the reasonably foreseeable effects of a proposed action, consistent with the relevant provisions of the regulations.

*Comment*:  Commenters requested that § 1502.9(d)(4) be revised to require agencies to expressly respond to requests from the public for the preparation of a supplemental EIS, instead of allowing decisions based on an agency's discretion and procedures.  Other commenters requested clarification that agencies retain discretion in determining whether to prepare a supplemental EIS.

*CEQ Response*:  Agencies should use their experience and expertise in preparing environmental documents, including a supplemental EIS.  The final rule requires agencies, where applicable, to publish a supplemental statement for public comment and to document their findings.  *See* §§ 1502.9(d)(3) and 1502.9(d)(4).

*Comment*:  Commenters requested the following addition to § 1502.9(d)(4):  "If developing procedures for EIS supplementation, agencies should survey the host of guidance documents and assessment 'keys' that have been used to determine the need for supplementation (e.g., the BLM OR/WA and Forest Service Region 6 Key for *Assessing 'Significant New Information' Under NEPA and 'New Information Not Previously Considered' Under ESA for Ongoing Actions* (2008))."

237

*CEQ Response*:  Agencies should, where applicable, consult their agency procedures and guidance relevant to supplementation when revising their agency NEPA procedures (§ 1507.3) and making determinations pursuant to § 1502.9(d)(4).  The CEQ regulations are not specific to particular agencies, and CEQ has not made the requested revision which relates to guidance for particular agencies.  Further, any such existing guidance may need to be withdrawn or revised to comport with revisions to the agency's NEPA procedures.

*Comment*:  Commenters requested guidance on how much change to the proposed action constitutes "substantial" change in relation to § 1502.9 (d)(1)(i).  Specifically, commenters stated that supplementation should be required when the agency makes "substantial" changes to any action alternative not just the proposed action.

*CEQ Response*:  Under the final rule, agencies are required to supplement a draft EIS or final EIS if a major Federal action remains to occur and the agency makes substantial changes to the proposed action that are relevant to environmental concerns or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.  § 1502.9(d)(1).  As discussed elsewhere, NEPA analysis is subject to a rule of reason and agencies should use their experience and expertise in determining whether there is a need to supplement.

*Comment*:  Commenters stated that if a draft EIS is fundamentally inadequate, the entire EIS needs to be revised and republished rather than only one particular section of the supplemental EIS.

*CEQ Response*:  Similar to the 1978 regulations, where an agency's draft statement is so inadequate as to preclude meaningful analysis, an agency is required to prepare a supplemental draft of the appropriate portion.  *See* § 1502.9(b).  Agencies have discretion and should use their

238

experience and expertise in making a determination regarding the appropriate portion required to be supplemented.

*Comment*: *C*ommenters stated that the proposed rule related to supplements is contradictory, and that it is inherently contradictory that "significant new circumstances relevant to environmental concerns" could also be "not significant" (therefore not requiring a supplement).

*CEQ Response*: In the final rule, § 1502.9(d) recognizes that there may be changes to the proposed action or new circumstances or information that are significant and some that are not significant. Where an agency determines they are not significant, § 1502.9(d)(4) provides that an agency may document such a finding consistent with their agency procedures or in a FONSI supported by an EA.

*Comment*: Commenters objected to use of documentation such as the BLM's Determination of NEPA adequacy. Commenters stated that where agencies have mechanisms such as programmatic EISs, tiering, incorporation by reference, and CEs that allow them to appropriately streamline multi-tiered decision-making, mechanisms such as Determinations of NEPA Adequacy are unlawful. Commenters specifically opposed Determinations of NEPA Adequacy for specific actions, such as wild horse and burro actions or oil and gas leases on Federal lands.

*CEQ Response*: As discussed elsewhere, such determinations are well established existing practice at Federal agencies and allow agencies to document their determinations regarding whether a supplemental analysis is required. Mechanisms for tiered decision making (including programmatic EISs, tiering, incorporation by reference, and CEs) do not address the issues of supplementation that arise between publication of a draft EIS and a ROD.

239

Determinations of NEPA Adequacy for any particular action is beyond the scope of this rulemaking and appropriately addressed by agencies in their agency procedures.

*Comment*:  For proposals of smaller scope, commenters recommended that agencies use simple checklists in lieu of preparing an EA or other determination of NEPA adequacy.

*CEQ Response*:  Under § 1502.9(d)(4), agencies have flexibility to create checklists or forms to determine if supplementation is required.  Additionally, some agencies use checklists to evaluate whether a proposed action may be categorically excluded.

*Comment*:  Commenters asked CEQ to clarify whether the provisions for a supplemental EIS require a full supplemental EIS when applicants make minor changes and project optimizations during the agency's NEPA review.

*CEQ Response*:  The final rule provides agencies with flexibility to determine that project changes relevant to environmental concerns are not significant and therefore do not require a supplement in § 1509(d)(4).  Where changes are minor and are not significant, agencies may document the finding consistent with their agency procedures, or if necessary, in a FONSI supported by an EA.

*Comment*:  Commenters objected to the elimination of "circulate" in § 1502.9(b) with respect to circulating the draft EIS, stating it is inconsistent with NEPA's public transparency requirements and would allow for agencies to avoid circulating draft EISs based on economic feasibility.

*CEQ Response*:  Under the final rule, CEQ has replaced "circulate" with "publish" a supplement to a statement.  § 1502.9(d)(3).  Elsewhere in the regulations, CEQ has defined "publish" to mean methods found by the agency to be efficient and effective for making environmental documents and information available, including electronic means.  § 1508.1(y).

This revision provides flexibility to agencies to use electronic means and to make environmental documents more accessible to the public, increasing public transparency.

*Comment*:  Commenters objected to the change in § 1502.9(b) from "possible" to "practicable," stating that it is more consistent with NEPA to require the draft EIS to meet the Act's requirements to the fullest extent "possible."

*CEQ Response*:  As discussed in section II.A, the term "practicable" is the more commonly used term in regulations and consistent with notions of feasibility, which the case law has recognized as part of the "rule of reason" governing the NEPA process.  The phrase "to the extent possible" is found in section 102 of NEPA, and was used in the 1978 regulations.  This provision is addressed in § 1500.6 of the final rule which states that:  "The phrase 'to the fullest extent possible' in section 102 of NEPA means that each agency of the Federal Government shall comply with that section, consistent with § 1501 [NEPA thresholds]."  § 1500.6.

*Comment*:  In relation to § 1502.9(d)(4), commenters seek clarity on what party makes the determination on significance of changes to a proposal.

*CEQ Response*:  Lead agencies should make this decision in consultation with any cooperating agency with jurisdiction by law with respect to determinations relating to supplements.

*Comment*:  One commenter suggested adding to § 1502.9(d)(4) the following at the beginning of the subsection:  "If new information or circumstances that are not significant come to light after completion of a draft environmental impact statement, the agency should prepare a final environmental impact statement and disclose this information and the agency's findings.  If such information comes to light after completion of a final environmental impact statement, the

agency should document the finding consistent with its agency NEPA procedures (§ 1507.3), or, if necessary, in a finding of no significant impact supported by an environmental assessment."

*CEQ Response*: The final rule in § 1502.9(d)(4) clarifies that agencies may find that new circumstances or information relevant to environmental concerns are not significant and therefore do not require a supplement, and document such findings consistent with their agency procedures, or if necessary in a FONSI supported by an EA. The proposed revision would not provide additional clarification.

*Comment*: Commenters stated that § 1502.9 (d) (1) and (4) appear to contradict each other, that requiring that a "major Federal action" remains to occur goes against case law on supplementing EISs, and this provision could mean that changes to the proposed action that are small but would have a significant impact on the environment would no longer be evaluated.

*CEQ Response*: The revisions to § 1502.9(d)(1) in the final rule addressing supplementation of a draft or final EIS and the revisions to § 1502.9(d)(4) clarify that there may be circumstances when there are changes to the proposed action or new circumstances or information relevant to environmental concerns that are not significant and therefore do not require a supplement. Under the revisions, supplements would be required where a major Federal action remains to occur and the agency makes substantial changes to the proposed action that are relevant to environmental concerns or there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.

*Comment*: Commenters stated with respect to § 1502.9 (b) that NEPA did not require analysis of "all major points of view on the analysis of impacts," and suggesting this subsection should be revised to simply state a "major point of view" (*i.e.*, strike "all") or otherwise discuss

242

why a view was not analyzed. Another commenter suggested striking any reference to major points of view.

*CEQ Response*: The reference to all major points of view on the environmental impacts of the alternatives including the proposed action was included in the 1978 regulations and CEQ did not propose to revise this text. CEQ has declined to make the revision as requested, but elsewhere in the regulations proposed and has finalized provisions requiring agencies to summarize all alternatives, as well as other information and analyses, submitted by public commenters. *See, e.g.*, §§ 1500.3(b)(2), 1502.17

*Comment*: Commenters stated that § 1502.9(d)(4) must specify a formal process as to how an agency evaluates the material and reaches its supplementation determination, and that there should be a mechanism for alerting the public to the process, obtaining public input, and notifying the public about the final determination.

*CEQ Response*: The revisions to § 1502.9(c) specify the process for agencies to publish a supplement to a draft or final EIS, which would be subject to public review and comment, as well as provide that agencies, where they determine that changes to the proposed action or new circumstances or information relevant to environmental concerns are not significant and do not require a supplement, shall document the finding consistent with their agency procedures, or if necessary in a FONSI.

### 7.    Recommended Format (§ 1502.10)

*Comment*: Commenters supported the changes to reflect electronic preparation and distribution of documents such as the elimination of the keyword index.

243

*CEQ Response*:  CEQ acknowledges the support for the proposed changes.  A keyword index no longer offers a significant reference to readers with the flexibility and utility of computer-assisted searching of electronic documents.

*Comment*:  Commenters supported the ability to use different formats for an EIS as a means of improving the integration of environmental considerations into an agency's decision-making process.

*CEQ Response*:  Similar to the 1978 regulations, the final rule allows an agency to use an alternative format for the EIS if the agency determines it is more effective for communication, consistent with § 1502.10(b).

*Comment*:  Commenters supported the elimination of the distribution list from EISs, which may be incomplete because they only reflect the initial distribution and do not include many who access the EISs online.

*CEQ Response*:  CEQ acknowledges the support for the proposed change.  The distribution list is no longer necessary given widely available electronic distribution of NEPA documents.

*Comment*:  Commenters stated that with the elimination of the distribution list, agencies may neglect to notify agencies and organizations that would otherwise have been on the list and routinely receive distribution notifications.  They also stated that for administrative record purposes, agencies should be required to maintain a list of agencies, organizations, and individuals that the agency notified during public scoping and on the availability of the draft and final EISs, and post the list on the agency's project webpage or otherwise make the like readily available without requiring a FOIA request.  Commenters further objected to the elimination of the distribution list stating that it may be helpful to reviewers to know the other parties that may

244

be reviewing the document, particularly if the EIS was sent to a party or agency with specific expertise.

*CEQ Response*:  Agencies currently use modern technologies, including electronic communications, to make an EIS available to all interested members of the public rather than sending by hard copy through the mail.  The 1978 regulations requiring a list of agencies, organizations and persons to whom the agency sent copies of an EIS is not consistent with agency's current use of modern technologies and CEQ declines to make the requested changes to the final rule.

*Comment*:  Commenters objected to the elimination of the index which may affect stakeholders who are less technologically skilled and requested that CEQ require agencies to include in electronic EISs brief instructions on how to search electronic documents. Commenters stated the change is inconsistent with NEPA's public participation purposes, and that for those that need paper copies, finding key information within the EIS or its appendices becomes very difficult without an index.

*CEQ Response*:  Agencies and the public continue to move away from hard copy and to transition towards greater acceptance of electronic documentation.  For example, on October 21, 1998, the Government Paperwork Elimination Act was signed into law allowing individuals the option to submit information or transact with agencies electronically, when practicable, and to maintain records electronically, when practicable.  Since that time, agencies have transitioned to electronic or "paperless" government.[58]

---

[58] *See* Memorandum for Heads of Executive Departments and Agencies, Transition to Electronic Records (2019), https://www.whitehouse.gov/wp-content/uploads/2019/06/M-19-21.pdf.

Elimination in the final rule of the requirement for an EIS index improves agency

efficiencies in preparation of documents.  CEQ notes that even when substantial resources are

dedicated, indexes may not be fully exhaustive of every keyword a stakeholder may wish to

search.  Should a member of the public require additional assistance with searching a hardcopy

document, § 1502.11(c) continues to require agencies to provide the public with the name and

telephone number of a knowledgeable individual at the agency who may be available to assist

the stakeholders and provide further information.

*Comment*:  Commenters requested that CEQ direct agencies to use visual and interactive

materials in place of text and clearly articulate that CEQ finds it acceptable to replace textual

descriptions with visual aids and interactive materials.  Additionally commenters requested CEQ

encourage the use of hyperlinks in text and the use of supplementary materials such as audio or

video recordings of decision makers or expert staff.  Finally commenters requested limits on

plain language writing (*i.e.*, at a 10th grade reading level).  A commenter requested CEQ direct

agencies in § 1502.8 to include maps using State cadastral survey to convey information visually.

*CEQ Response*:  While visual aids or interactive measures may be useful to communicate

information to the public or decision makers where appropriate, the Act and the regulations

require that agencies prepare a detailed statement on the environmental impact of a proposed

major Federal action.  The final rule does not prohibit the use of visual representations such as

charts, graphs, pictures, maps, or other audio or video aids.  When appropriate, hyperlinks to

supplementary materials may assist the reader of electronic documents quickly locate other

electronic materials and primary documents.  The final rule provides agencies with discretion to

determine the appropriate timing and use of such visual aids.  CEQ encourages agencies to use

246

plain language such that the public and decision makers can reasonably understand the environmental effects of a proposal and its alternatives.

*Comment*:  Commenters requested that CEQ develop an exemption process in which agencies can deviate from the format described in § 1502.10 including consideration of where visual and interactive materials offer a better approach to conveying information.

*CEQ Response*:  Section 1502.10 expressly allows agencies to use an alternate format, providing that "[a]gencies should use the following standard format for environmental impact statements unless the agency determines that there is a more effective format for communication."

*Comment*:  Commenters requested that CEQ provide additional regulatory text or guidance for what is necessary to meet the requirements under §§ 1502.10(a)(1)–(9) relating to the format of the EIS.

*CEQ Response*:  CEQ has made only minimal revisions to §§ 1502.10(a)(1)-(9), and is not aware of any limitations that would prevent compliance with this section.  Should agencies have further questions or difficulty complying with these long-standing provisions, agencies can consult with CEQ.

*Comment*:  Commenters requested that CEQ simplify the requirements for the EIS format.  Commenters stated that the recommended format in § 1502.10 has more requirements than the statute, which does not have requirements such as a cover; summary; table of contents; purpose and need; affected environment; submitted alternatives, information, and analyses; and list of preparers.  All of these sections should be optional (suggestive) rather than required.

247

*CEQ* Response:  The long-standing format of an EIS is well established and use of a standard format promotes consistency across Federal agencies.  In the final rule, however, CEQ has provided that an agency may utilize an alternate format in accordance with § 1502.10.

*Comment*:  Commenters requested that § 1502.10 be revised to explicitly recognize the option of preparing "issue based" NEPA documents as a way of streamlining the documentation.  An issue-based NEPA analysis would concentrate on issues that are most germane to the decision maker—namely those that are central to the proposed decision or are of material interest to the public, rather than automatically addressing the list of standard resources as is done in the vast majority of EISs.

*CEQ Response*:  The final rule includes several ways for agencies to reduce duplication of effort in preparing environmental documents.  Agencies may adopt documents where the proposed action is substantially similar (§ 1506.3), incorporate by reference (§ 1501.12), combine documents (§ 1506.4), and substitute other documents that satisfy their obligations under the final rule (§ 1507.3(c)(5)).

**8.    Cover (§ 1502.11)**

*Comment*:  Commenters stated that § 1502.11 requires more information than can be reasonably placed on an EIS cover and suggested keeping this information on one page will be too difficult, especially if a larger font size is required to meet Americans with Disabilities Act requirements.  Commenters further recommended that the cover page be renamed as a "Title" page or otherwise split into a "cover" page and a "title" page dispersing the information required under § 1502.11 between the two pages.

248

*CEQ Response*:  CEQ has made minimal changes to § 1502.11 and is unaware of any impediments to compliance.  If an agency is unable to present the information required on the cover, it may use an alternate format in accordance with § 1502.10.

*Comment*:  Commenters supported the requirement to provide total costs of preparing the NEPA document, stating that it would provide transparency on the costs incurred by the agency.

*CEQ Response*:  CEQ acknowledges the support for this revision.  The addition to include cost estimates on the cover of an EIS provides transparency to the public on the costs of EIS-level NEPA reviews.

*Comment*:  Commenters suggested the following revision after the first sentence:  "The estimated total cost of preparing the environmental impact statement, including the costs of agency full-time equivalent (FTE) personnel hours, contractor costs, and other direct costs.  The agency may include in an appendix any explanation to give perspective to those costs.  Such explanation shall be provided for work that has to be redone due to the failure to consider all reasonably foreseeable environmental effects/impacts, failure to consider all reasonable alternatives, or both.  If, pursuant to § 1506.13, an agency decides to apply the regulations on or after the effective date of the final rule to ongoing activities and environmental documents begun before the effective date of the final rule, the agency shall set forth the costs incurred prior to the effective date of the final rule, new costs incurred as a result of changing processes because of changes to the regulations in parts 1500 through 1508, and the remainder of the costs in completing the NEPA process."

*CEQ* Response:  The final rule in § 1502.11(g) requires, as CEQ had proposed, that agencies provide the estimated total cost of preparing both the draft and final EIS, including the costs of agency full-time equivalent (FTE) personnel hours, contractor costs, and other direct

249

costs.  The final rule also clarifies that if practicable, and noted where not practicable, agencies should also include costs incurred by cooperating and participating agencies, applicants, and contractors.  Where appropriate, an agency may provide context or breakdowns of the costs incurred for a specific review.

*Comment*:  Commenters requested clarity on which costs should be included as part of the agency's estimate.  Specifically, commenters asked if an agency's cost estimate includes those activities performed through release of the draft EIS, the interim period from the draft EIS to final EIS, the total cost through completion of the ROD, the total cost incurred through completion of the final EIS, or some other metric.  Commenters also asked whether survey coverage, preliminary engineering, right-of-way, utility, and final design, be included in this estimate as well, particularly in cases where the agency is sponsoring the proposed action.  Other commenters stated that costs listed on the cover should be broken down by cooperating agency participating in the review of the EIS rather than one lump sum.

*CEQ Response*:  In the final rule CEQ has clarified that the estimated costs should include the costs of both the draft and final EIS and include costs of agency full-time equivalent (FTE) personnel hours, contractor costs, and other direct costs.  The final rule also adds a sentence to clarify that agencies should include the costs of cooperating and participating agencies if practicable.  If not practicable, agencies must so indicate.  For integrated documents where an agency is preparing a document pursuant to multiple environmental statutory requirements, it may indicate that the estimate reflects costs associated with NEPA compliance as well as compliance with other environmental review and authorization requirements.  Agencies can develop methodologies for preparing these cost estimates in their implementing

250

procedures.  Finally, if the agency is sponsoring the action, it should report all costs incurred to comply with the NEPA process including costs to complete necessary environmental surveys.

*Comment*:  Commenters stated that in the total cost estimate, agencies should include costs borne by the applicant to prepare application materials.

*CEQ Response*:  The final rule clarifies that if practicable, and noted where not practicable, agencies should also include costs incurred by cooperating and participating agencies, applicants, and contractors.

*Comment*:  Commenters expressed concerns regarding the requirement to include a cost estimate, stating that it is unreasonably time consuming and has no bearing on NEPA's "informed decision-making" purpose.  Furthermore, commenters stated the requirement is contrary to CEQ's stated goals to simplify and accelerate the NEPA review process, and falls outside of the intent of the Act.

*CEQ Response*:  Preparing a cost estimate is responsive to concerns raised by the U.S. Government Accountability Office (National Environmental Policy Act:  Little Information Exists on NEPA Analyses; <u>GAO-14-370</u>:  Published:  April 15, 2014) that agencies are not tracking and generally unaware of the costs associated with development of NEPA analyses.  Additionally, OMB has directed Federal agencies to calculate the cost of environmental reviews and authorizations for major infrastructure projects pursuant to E.O. 13807.[59]  As discussed in section II.D.11, agencies can develop methodologies for preparing their cost estimates in their agency procedures.  Cost estimates will help better inform the public, as well as the Congress

---

[59] M–18–25, Modernize Infrastructure Permitting Cross-Agency Priority Goal Performance Accountability System (Sept. 26, 2018), <u>https://www.whitehouse.gov/wp-content/uploads/2018/09/M-18-25.pdf</u>.

and the Executive branch, about the taxpayer resources being utilized in the development of NEPA documents.

*Comment*:  Commenters suggested revisions to §1502.10 to briefly provide direction for preparing the Table of Contents.

*CEQ Response*:  The provision regarding table of contents remains unchanged from the 1978 regulations.  CEQ is unaware of any challenges in preparing adequate tables of contents and accordingly declines to provide more detail regarding tables of contents.

*Comment*:  Commenters recommend consistently titling the proposed outline in Section 1502.10(a)(7)):  "Submitted, alternatives, information, and analyses." With the corresponding description section in Section 1502.17:  "Summary of Submitted, Alternatives, Information, and Analyses."

*CEQ Response*:  In the final rule, CEQ has corrected the title to eliminate the comma after "Submitted."

*Comment*:  Commenters stated that EIS costs are not likely to be representative and to be misleading, particularly for large infrastructure projects where applicants may change the project design necessitating re-evaluation, and optically inflating agency costs.

*CEQ Response*:  The final rule clarifies that if practicable, and noted where not practicable, agencies should include costs incurred by cooperating and participating agencies, applicants, and contractors.  To ensure estimates are representative of the costs, agencies can develop methodologies for preparing cost estimates in their agency procedures.  If project design changes and additional NEPA analysis is required, that is a cost of interest to CEQ and the public.

252

*Comment*:  Commenters stated that agencies should incorporate or otherwise estimate any mitigation costs or environmental compliance and inspection costs that would be borne by the agency into the cost estimate required on the cover.

*Comment*:  Commenters state that agencies should incorporate or otherwise estimate any mitigation costs or environmental compliance and inspection costs that would be borne by the agency into the cost estimate required on the cover.

*CEQ Response*:  CEQ declines the requested revisions because the purpose of 1502.11(g) is to ensure that the document reflects the costs of complying with NEPA's procedural requirements, and not the costs associated with agency's compliance with other legal requirements.

9.    **Summary (§ 1502.12)**

*Comment*:  Commenters objected to the proposed replacement of "areas of controversy (including issues raised by agencies and the public)," with "areas of disputed issues raised by agencies and the public)" in § 1502.12.  Commenters stated that the revision would not make the text more concise, and CEQ did not explain what "areas of disputed issues" may be.

*CEQ Response*:  CEQ has replaced the word "controversy" in § 1502.12 consistent with other sections to improve readability and provide greater clarity for Federal agencies, States, Tribes, localities, and the public and eliminate misconceptions related to proposed actions that may be "controversial" and generate numerous views of support or opposition.  Areas of disputed issues are those related to scientific analysis of the environmental effects of a proposed action and alternatives.

*Comment*:  Commenters stated that the summary section of the EIS should clearly identify both the agency's preferred alternative and the environmentally preferable alternative(s) in the draft EIS.

*CEQ Response*:  Section 1502.12 requires that EISs shall contain a summary of the major conclusions, which would include the preferred alternative and the environmentally preferable alternative(s), if known, and any issues to be resolved, including the preferred alternative and the environmentally preferable alternative(s), if unknown (including the choice among all reasonable alternatives).  Therefore, CEQ does not need to make any revisions to this section in the final rule.

### 10.    Purpose and Need (§ 1502.13)

*Comment*:  Commenters expressed support for CEQ's proposed addition to § 1502.13 clarifying that agencies must base purpose and need statements on the applicant's goals and the agency's statutory authority.  They stated that the revision will result in more consistent and predictable reviews.

*CEQ Response*:  For an applicant-proposed project, it is important for the purpose and need statement to be based on the applicant's goals and the agency's statutory authorities for consideration of that application.  If it were not for the proposed project and agency authority to consider the proposal, there would be no permit application and no need for NEPA review in the first place.  This interpretation is consistent with case law holding that "[a]gencies may not define a project's objectives so narrowly as to exclude all alternatives" but "[w]here a private party's proposal triggers a project, the agency may 'give substantial weight to the goals and objectives of that private actor.'" *Biodiversity Conservation Alliance v. Bureau of Land Mgmt.*, 608 F.3d 709, 715 (10th Cir. 2010); *Citizens Against Burlington, Inc. v. Busey*, 938 F.2d 190,

196 (D.C. Cir. 1991), *cert. denied*, 502 U.S. 994 (1991) ("When an agency is asked to sanction a specific plan, see 40 CFR 1508.18(b)(4), the agency should take into account the needs and goals of the parties involved in the application . . . .  Perhaps more importantly, an agency should always consider the views of Congress, expressed, to the extent that the agency can determine them, in the agency's statutory authorization to act, as well as in other congressional directives"). Accordingly, where the agency action is in response to an application for permit or other authorization, 40 CFR 1508.1(q)(3)(iv), the agency should consider the applicant's goals based on the agency's statutory authorization to act, as well as in other congressional directives, in defining the proposed action's purpose and need.

*Comment*:  Commenters supported revisions that limit consideration to alternatives that are within the control and jurisdiction of the lead agency and can be implemented by the applicant.  Commenters noted that the no action alternative may serve as an environmental baseline but in some circumstances may not be a legal option or a selectable alternative.

*CEQ Response*:  CEQ acknowledges the support for the proposed revisions.

*Comment*:  Commenters requested that CEQ clarify that an EIS should have a single, integrated purpose and need statement.

*CEQ Response*:  An EIS should have a single, integrated purpose and need statement. The purpose and need statement should briefly set forth the underlying goals and or objectives of a proposal.  Where a proposal has more than one objective it should be stated as such, including whether multiple aspects are critical objectives to the proposal, or merely secondary, such that the agency can appropriately evaluate alternatives that meet each of the stated objectives.

When more than one agency is involved and has a NEPA component, the lead agency should coordinate with its cooperating agencies to ensure that the purpose and need statement

255

may accommodate the requirements of each subject agency, such that the EIS may have a single discussion of purpose and need.

*Comment*:  Commenters note that "purpose and need" have long been described in NEPA documents as either a single concept or separate concepts and ask that CEQ clarify this ambiguity.  Most references to purpose and need in the proposed rulemaking treat it as a single concept, *i.e.*, "the purpose and need."  It is unclear whether this is the intent in the proposed rulemaking.  Commenters recommend that CEQ replace "purpose and need" with "need" or otherwise, CEQ should explain the differences between the "purpose" and the "need" for a proposed action.

*CEQ Response*:  For the purposes of describing the underlying project objectives in an EIS, purpose and need are generally considered as a single concept.  Purpose and need are often described as the means for accomplishing the objectives for the proposal.  However, because of the broad range of Federal actions and applicable authorities, purpose and need may be described differently depending on individual agency authority and the type of proposal.  Often times, equating "need" is misconstrued with ensuring that a proposal is in the "public interest."  While some agencies may be required to make public interest assessments, NEPA requires no such determination.  For the aforementioned reasons, CEQ declines to replace "purpose and need" with "need."

*Comment*:  Commenters recommended that CEQ include a statement that agencies should presume an applicant's stated purpose and need is genuine and legitimate, absent information to the contrary.

*CEQ Response*:  It is unnecessary to include a statement of presumption that an applicant's stated goals are legitimate.  The requirements of § 1502.13 clearly state that the

256

purpose and need statement shall be based upon an applicant's stated goals, when applicable.

CEQ expects that agencies will need to coordinate closely with applicants to gain a clear

understanding of the underlying objectives of a proposal to develop an appropriate purpose and

need statement.  As with any application materials submitted to an agency, they may be subject

to reasonable and appropriate verification and review, and as such, statements of project objects

may be similarly subject to reasonable scrutiny.

*Comment*:  Commenters requested that CEQ revise proposed § 1502.13 to state that "the

agency shall base the purpose and need on the goals of the applicant and the agency's authority,

but not define the purpose and need so narrowly as to define only the applicant's proposal to the

preclusion of reasonable alternatives."

*CEQ Response*:  CEQ declines to make the requested changes in the final rule.  As CEQ

has explained elsewhere, agencies must not narrow purpose and need statements to foreclose

consideration of alternatives to the proposed action.  CEQ finds it unnecessary to clarify that it is

not appropriate to narrow a statement impermissibly, or to write statements so broad that a

universe of potential alternatives may not satisfy the action's objectives.

*Comment*:  Commenters stated that, when defining purpose and need, the proposed action

should be the agency's action and not that of the applicant or project sponsor (which in cases of a

private application commenters stated is simply financial gain) and therefore inappropriate to

require basing purpose and need on applicant goals.  Some commenters suggested the following

text replace the last sentence of § 1502.13:  "When an agency's statutory duty is to review an

application for authorization, the purpose and need for action is to respond to an applicant's

proposal.  The applicant's need for the project should be disclosed in the environmental impact

257

statement along with a reasonable range of alternatives to meet the agency's purpose, need and objectives."

*CEQ Response*:  The purpose and need refers to the purpose and need of the proposed action and not the act of the agency responding to the proposed action.  Because the purpose and need statement is used to evaluate alternatives, it must also be based on the proposal itself; basing the analysis of alternatives solely on the agency's statutory authorities may not produce an informed assessment of reasonable alternatives.  Section 1502.13 recognizes that NEPA does not only apply to applicants requesting permission to take some action and in other situations the agency fully defines the purpose and need of the underlying action.

For the purposes of simplicity and better organization, CEQ has removed the references to "alternatives," from § 1502.13 and consolidated the discussion of alternatives fully within § 1502.14.  Therefore, further discussion of alternatives are not included in § 1502.13.

*Comment*:  Commenters suggested the following text be incorporated into § 1502.13: "The statement shall briefly specify the underlying purpose and need for the proposed action. When the agency's statutory or regulatory duty is to review an application for authorization, the agency shall base the purpose and need on the goals of the applicant and the agency's authority statement shall:

(a) Specify that the underlying need to which the agency is responding is the need to make a decision, in response to the application, of whether or under what conditions to grant the authorization; and

(b) Describe the specific purpose(s) or goal(s) that the applicant would achieve if the authorization is granted and other objectives that the proposed action is intended to achieve."

*CEQ Response*:  As revised, the final rule requires agencies to base purpose and need, where applicants are involved, upon applicant goals and the authorizing agency's authorities.  As explained elsewhere, the purpose and need refers to the underlying goals that would be achieved pursuant to the proposed action, as opposed to the act of an agency reviewing a proposed action.

*Comment*:  Commenters requested improved guidance on the key elements to include in a purpose and need statement.

*CEQ Response*:  CEQ acknowledges the comment.  CEQ will consider the need for additional guidance at a later date.

*Comment*:  Commenters objected to basing the purpose and need statement upon the goals of the applicant, stating that it violates NEPA, exceeds CEQ's authority, and preordains project approval.  Commenters stated that the purpose of the Act is not to benefit private developers but rather the public interest and that it is inconsistent with NEPA's intent to require decision makers across the government to "attain the widest range of beneficial uses of the environment without degradation."

*CEQ Response*:  The revisions to § 1502.13 are not contrary to the Act nor would they preordain approval of a proposed action.  The final rule requires agencies to evaluate reasonable alternatives, including the no-action alternative, and agency decision makers are responsible for making a decision to authorize an action as proposed, deny it, or select a reasonable alternative.  When an applicant proposal is involved, basing the purpose and need statement upon the goals of the applicant merely ensures that an agency considers the underlying objectives of a proposal to which they are responding.  Finally, relevant case law supports consideration of applicant objectives, "In deciding on the purposes and needs for a project, it is entirely appropriate for an

259

agency to consider the applicant's needs and goals." *Webster v. United States Dep't of Agriculture*, 685 F.3d 411, 423 (4th Cir. 2012).

*Comment*:  Commenters stated that the proposed changes to "purpose and need" would limit the alternatives analysis in future NEPA documents, and allow private project sponsors the ability to strategically define the purpose and need very narrowly, thereby limiting the number of reasonable alternatives that exist.  Commenters also stated that the narrowing of purpose and need skew the environmental review to focus on how likely and at what cost a project sponsor can complete the project, while ignoring environmental impacts.  Commenters expressed specific concerns with respect to the proposed changes preventing Federal land managing agencies from taking a "hard look" at the myriad impacts of proposals for development on public lands.

*CEQ Response*:  As CEQ has explained elsewhere, and consistent with case law, agencies must not narrow purpose and need statements to foreclose the consideration of reasonable alternatives to the proposed action.  However, failure to fully consider the goals of the project sponsor may produce alternatives that are not implementable and thus unreasonable.  Agencies are ultimately responsible for ensuring that the purpose and need statement is appropriately defined.

*Comment*:  Commenters stated that CEQ's proposed change to require agencies' to consider the purpose and need exclusively "based on" the project sponsor's stated goals and objective is prohibited by existing case law citing *Simmons v. U.S. Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997) ("An agency cannot restrict its analysis to those alternative means by which a particular applicant can reach his goals.").  *See also Nat'l Parks & Conservation Ass'n v. Bureau of Land Mgmt.,* 606 F.3d 1058 (9th Cir. 2010).

*CEQ Response*:  The final rule does not base the purpose and need exclusively on an applicant's objectives but rather the "needs and goals of the applicant and the agency's authority."  Further, the final rule does not allow agencies to narrow the purpose and need statements to the point that they foreclose consideration of reasonable alternatives to the proposed action.  For this reason, the final rule is not in conflict with the court's holding in *Simmons v. U.S. Army Corps of Eng'rs*.

*Comment*:  Commenters argued that the statement of purpose and need is inextricably linked to alternatives and therefore the language should not have been stricken from § 1502.13. In support, commenters argued that case law supports their position, citing *Webster v. US. Dep't of Agric.*, 685 F.3d 411, 422 (4th Cir. 2012), and stating that "Only alternatives that accomplish the purpose of the proposed action are considered reasonable, and only reasonable alternatives require detailed study.  So how the agency defines the purpose of the proposed action sets the contours for its exploration of available alternatives."

*CEQ Response*:  Purpose and need is closely linked to the development of reasonable alternatives.  The purpose and need statement is an essential component that, under the final rule, continues to set the framework upon which the agency evaluates alternatives.  However, the agency must first define the purpose and need before developing and considering alternatives. The final rule addresses alternatives in § 1502.14.

*Comment*:  Commenters stated that CEQ's reliance on its previous Connaughton Letter[60] is insufficient to justify the revision to the purpose and need statement.   The specific quotation

_____

[60] Letter from the Hon. James L. Connaughton, Chairman, Council on Environmental Quality, to the Hon. Norman Y. Mineta, Secretary, Department of Transportation (May 12, 2003) ("Connaughton Letter"), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/CEQ-DOT_PurposeNeed_May-2013.pdf.

from that letter is that, "Thoughtful resolution of the purpose and need statement at the beginning of the process will contribute to a rational environmental review process and save considerable delay and frustration later in the decision[-]making process."  Commenters argued that the entire letter is in the context of transportation projects where local and State governments have specific statutory roles in the planning process and that it does not address purpose and need in the context of an applicant from the private sector.  Commenters further noted that the Connaughton Letter cautions that agencies must not "put forward a purpose and need statement that is so narrow as to 'define competing "reasonable alternatives" out of consideration (and even out of existence),"

*CEQ Response*:  CEQ has not based the changes to § 1502.13 on the Connaughton Letter but rather referenced it in the NPRM to illustrate the need for brevity with respect to purpose and need statements, and the coordination required between lead and cooperating agencies in developing them.

*Comment*:  Commenters stated that the purpose and need for a project (for example airport projects) cannot be articulated in a meaningful way to the public in just one or two paragraphs, noting that purpose and need is the root of much NEPA litigation as it drives the alternatives analysis.

*CEQ Response*:  For purposes of informing the decision maker and stakeholders, that purpose and need can be sufficiently described in one to two paragraphs.  This provision, unchanged as part of the 1978 regulations remains in the final rule, "The statement shall briefly specify the underlying purpose and need…"  Should an agency require, subject to its own regulations, additional information to determine need, such as traffic studies, it may conduct them, and summarize the relevant information in the purpose and need statement in the EIS.

262

Exhaustive discussions of the merits of a proposal are not necessary and overly complex statements of purpose and need do not contribute to better development of reasonable alternatives.

*Comment*:  Commenters stated that with the revisions to § 1502.13 in conjunction with § 1506.5(c) applicants will be able to draft the statement of purpose and need.  Thus, a potential alternative will only be deemed reasonable if the applicant approves of it.

*CEQ Response*:  The lead agency continues to be responsible for developing and drafting the purpose and need statement in conjunction with any cooperating agencies.  In situations where an entity is seeking an authorization from an agency, the lead agency shall give weight to an applicant's stated goals and objective in developing the purpose and need statement for the EIS.  Agencies should not develop purpose and need statements that are inconsistent with an applicant's objectives.  In cases where an applicant is preparing a draft environmental document, the agency should ensure that it provides guidance and technical support so that an appropriate purpose and need statement may be used by the agency.  § 1506.5.  The final rule provides no regulatory authority to applicants to approve of or disapprove of an agency's purpose and need statement.

*Comment*:  Commenters stated that in cases where project proponents are applying for permits, the underlying purpose and need for the project itself ("a metal mine, a transmission line, a port expansion") are sometimes not able to be based on the permitting agency's authority.

*CEQ Response*:  The goals of a specific project may not necessarily align with the "mission statement" of a particular regulatory or permitting agency, however, activities associated with the proposal can still fall within the agency's regulatory authority.  The purpose and need statement should be based on the goals and objectives of the project sponsor, while also

263

being consistent with the jurisdiction of the authorizing agency. If a project sponsor seeks a permit or authorization from an agency, the project should be consistent with the regulatory authority provided by the permit or authorization.

*Comment*: Commenters stated that CEQ's revisions to purpose and need redirect the attention of reviewing agencies from the particular issue the project is trying to solve, to the analysis of solely technical alternatives to the project and focus on the proposed action specifically.

*CEQ Response*: The commenters' interpretation of the impact of the regulations is incorrect. Agencies are still required to assess alternatives to the proposed action. The purpose and need statement must still address the underlying objective of a proposal, *i.e.*, the goals that would be accomplished. The changes do not redirect agency resources to only the proposed action.

*Comment*: Commenters stated that by listing the goals articulated by an applicant prior to that of the agency's authority, CEQ is attempting to subjugate an agency's authority to the outcome sought by an applicant. Accordingly, commenters stated the change should be revoked.

*CEQ Response*: The order in which the phrases appear within § 1502.13 bear no consequence on the priority of each element. Moreover, § 1502.13 clearly recognizes that the purpose and need statement must be consistent with the agency's authority.

*Comment*: Commenters stated that CEQ should reorder the title of § 1502.13 to state "Need and Purpose" to emphasize commenters stated position that Federal agencies should prioritize evaluation of need over project purpose.

*CEQ Response*: Reordering "purpose" and "need" in the title is not necessary and would not change how the section is implemented.

264

*Comment*:  Commenters requested that CEQ revise the regulatory text as follows:  "The statement shall briefly specify the underlying societal need for the proposed action, and state each potential alternative's purpose in meeting that underlying need.  When the agency's statutory duty is to review an application for authorization, the statement shall briefly specify the underlying societal need addressed by the agency's review authority for the proposed action, and state each potential alternative's purpose in meeting that underlying need along with consideration of the applicant's goals for the action."

*CEQ Response*:  The commenters misunderstand the meaning of "need," which is the need of the proposed action and not society's needs for the proposed action.  CEQ declines to make the requested revision.

*Comment*:  Commenters stated that a new subsection needs to be added to the purpose and need section stating that many people affected by the action are unaware of NEPA and have little or no experience with EISs.  Commenters stated that the new section should define (i) NEPA's purpose; (ii) the national environmental goals established in section 101 of NEPA; and (iii) the purpose and use of an EIS.

*CEQ Response*:  The purpose and need section is prepared as part of the procedural requirements pursuant to section 102(2) of NEPA.  While agencies need not restate statutory provisions in their regulations, the policy and purpose of the Act are addressed in § 1500.1 of the final rule.

### 11.    Alternatives Including the Proposed Action (§ 1502.14)

*Comment*:  Commenters supported CEQ's proposed modifications to § 1502.14 removing the word "all" before "reasonable alternatives" to reflect NEPA's "rule of reason" that agencies

analyze an appropriate range of alternatives, not every alternative imaginable nor alternatives that were previously considered and rejected.

*CEQ Response*:  CEQ acknowledges the support for the proposed revisions and makes these changes in the final rule.

*Comment*:  Commenters objected to the removal of the word "all" from the evaluations of reasonable alternatives to the proposed action.  Commenters stated that CEQ has not justified the change and CEQ has not cited instances where an agency or project was subject to an unreasonable number of alternatives.  Other commenters raised concerns that it would lead to poor decision making.

*CEQ Response*:  As discussed in section II.D.14 of the final rule, it is CEQ's view that NEPA's policy goals are satisfied when an agency analyzes reasonable alternatives, and that an EIS need not include every available alternative where the consideration of a spectrum of alternatives allows for the selection of any alternative within that spectrum.  The reasonableness of the analysis of alternatives in a final EIS is resolved not by any particular number of alternatives considered, but by the nature of the underlying agency action.  The discussion of environmental effects of alternatives need not be exhaustive, but must provide information sufficient to inform agency evaluation of available reasonable alternatives, 40 CFR 1502.14(a), including significant alternatives that are called to its attention by other agencies, organizations, communities, or a member of the public.

As discussed in section II.C.9 of the final rule, to aid agencies in identification of alternatives, § 1501.9, "Scoping," requires agencies to request identification of potential alternatives in the NOI.  Analysis of alternatives also may serve purposes other than NEPA compliance, such as evaluation of the least environmentally damaging practicable alternative for

266

the discharge of dredged or fill material under section 404(b)(1) of the Clean Water Act,

33 U.S.C. 1344(b)(1).

*Comment*:  Commenters objected to removal of the phrase "rigorously explore and

objectively evaluate" from § 1502.14(a) claiming that it would downgrade the importance of the

alternatives analysis.  Commenters cited CEQ's direction to agencies to rigorously explore and

objectively evaluate alternatives since at least April 1970.

*CEQ Response*:  All analysis under NEPA, including analysis of alternatives, is subject to

a rule of reason.  To avoid confusion, CEQ eliminates this language from the final rule.

Sections 1502.21 and § 1502.23 address the obligations for agencies where information is

incomplete or unavailable, and methodology and scientific accuracy.

*Comment*:  Commenters stated that CEQ should not eliminate § 1502.14(c) of the 1978

rules, which required agencies to "include reasonable alternatives not within the jurisdiction of

the lead agency."  Commenters stated that jurisdictional limits on the alternatives considered in

environmental reviews would violate Congress' intent in enacting NEPA to change agency

culture and to make the Federal decision-making process more democratic.  Further, commenters

argued that the change is inconsistent with case law stating that agencies cannot dismiss

evaluation of alternatives outside their jurisdiction.  *See Natural Res. Def. Council, Inc. v.

Morton*, 458 F.2d 827, 837 (D.C. Cir. 1972).

*CEQ Response*:  As discussed in section II.D.14 of the final rule, in response to CEQ's

ANPRM, some commenters urged that the regulations should not require agencies to account for

impacts over which the agency has no control, including those resulting from alternatives outside

its jurisdiction.  CEQ proposed and in the final rule is striking 40 CFR 1502.14(c) requiring

consideration of reasonable alternatives not within the jurisdiction of the lead agency for all EISs

267

because it is not efficient or reasonable to require agencies to develop detailed analyses relating

to alternatives outside the jurisdiction of the lead agency.  Nor is it efficient to require agencies

to consider alternatives outside their jurisdiction regardless of whether those alternatives also

meet the purpose and need of the proponent.  Agencies should evaluate alternatives that

reasonably serve the identified purpose and need, as well as the alternative of no action, for their

effect on the environment.  This goal is not met by evaluating alternatives outside of an agency's

authority, because the agency has no means by which to address the impacts of those

alternatives.  This is particularly clear for proposals that are narrow, small in scope, or defined to

meet a discrete objective.  Furthermore, alternatives should be limited to those available to the

decision maker at the time the decision is made.

      The approach CEQ adopts in the final rule is consistent with the Supreme Court's

recognition in such cases as *Public Citizen*, 541 U.S. at 770, that agencies have no duty under

NEPA to evaluate tasks that they have no choice but to perform.  By similar analysis, an agency

has no duty to evaluate an alternative that could only be feasible at the instance of an

independent third entity.  The approach CEQ adopts is also consistent with the Supreme Court's

observation in *Metropolitan Edison Co.* that "[t]he scope of [an] agency's inquiries must remain

manageable if NEPA's goal of '[insuring] a fully informed and well-considered decision' . . . is

to be accomplished."  460 U.S. 766, 776 (1983) (quoting *Vt. Yankee*, 435 U.S. at 558).

      *NRDC v. Morton* predated *Public Citizen* by more than three decades and predated

*Metropolitan Edison* by over a decade.  In addition, the *NRDC v. Morton* court itself recognized

that "the requirement in NEPA of discussion as to reasonable alternatives does not require

'crystal ball' inquiry."  458 F.2d at 837.  *See id.* at 841 (MacKinnon, J., concurring in part and

dissenting in part) ("I see no evidence in the statute that Congress intended to require a

discussion of remote or speculative alternatives, or alternatives that were not presently available.").

*Comment*:  Commenters stated that under the proposed rule, the range and scope of alternatives would be controlled by the applicant, based on the applicant's own purpose, need, and goals, and determined by what is technically and economically feasible.  Commenters stated that Federal agencies should not delegate their statutory responsibilities to private entities with interest in projects.

*CEQ Response*:  Under the final rule, the scope and content of an EIS (including the determinations of the reasonable range of alternatives) remains solely the responsibility of the Federal agency or agencies preparing it.  CEQ recognizes that the changes finalized in the final rule will reduce the resources invested in analyzing alternatives that do not meet the goals of the project applicant and are technically or economically infeasible.  These changes, however, do not constitute a delegation of statutory responsibilities to private entities.  Rather, the changes ensure a more efficient, productive, and timely NEPA process that focuses on analyzing alternatives that are capable of being implemented.

*Comment*:  Commenters stated that while every alternative need not be considered, it is not administratively burdensome to consider "all reasonable" alternatives.  Commenters recommended CEQ not make this change in the final rule and clarify that if an alternative is not feasible, it is unreasonable.

*CEQ Response*:  Agencies should devote their resources to analyzing the reasonableness of alternatives based on each alternative's technical and economic feasibility, the range of alternatives in terms of project design and environmental effects, and the total number of alternatives.  When numerous reasonable alternatives may be proposed, the agency should screen

269

the alternatives and evaluate the most appropriate alternatives for consideration in detail.  As noted above, agencies may also use bounding alternatives that allow for the consideration of a spectrum of intermediate outcomes as an inherent outgrowth of that approach.  For those excluded from detailed analysis, the agency should describe its reasons for their elimination.

CEQ declines to make the commenter's recommended change because it is unnecessary and redundant.  With the revisions to the definition of "reasonable alternatives" at § 1508.1(z), any alternative that is technologically or economically infeasible is not practical to evaluate and therefore need not be considered by the agency.  Permitting agencies the discretion to determine the most appropriate alternatives for consideration in detail recognizes that infinite analysis is neither available nor a prudent use of agency resources.

*Comment*:  Commenters stated that GAO-06-15[61] encourages Federal agencies to collaborate to achieve important national outcomes, such as environmental restoration, and that acting collaboratively may open up reasonable alternatives so that the purpose and policy of NEPA can be better satisfied.  Commenters asserted that such an approach is also consistent with section 102(2)(A) of NEPA ("all agencies of the Federal Government shall — utilize a systematic, interdisciplinary approach which will insure the integrated use of the natural and social sciences and the environmental design arts in planning and in decision making which may have an impact on man's environment").  Commenters recommended revising § 1502.14 to state that nothing in the section would preclude an agency from proposing alternatives outside the lead agency's jurisdiction with the agency who has such jurisdiction to see if collaboration with the other agency presents a reasonable alternative.

---

[61] U.S. Gov't Accountability Office, GAO–06–15, Results-Oriented Government:  Practices That Can Help Enhance and Sustain Collaboration among Federal Agencies (Oct. 21, 2005), https://www.gao.gov/products/GAO-06-15.

*CEQ Response*:  CEQ declines to make the proposed revision because it is unnecessary and duplicative, and the commenters' recommendations are substantively addressed under §§ 1503.1 and 1503.2, as well as under §§ 1501.8 and 1501.9.  The final rule encourages interagency collaboration and coordination at the earliest stages of a proposed action.  The most meaningful engagement is typically early in the process where beneficial changes to a proposal can be more easily incorporated.  Under the final rule, any agency or stakeholder may propose an alternative for the consideration of the lead agency.  However, the lead agency is only required to devote detailed analysis to those alternatives within its jurisdiction.  Nothing in the final rule prohibits a sponsor from revising their proposal to satisfy the jurisdictional authority of another agency.  Elsewhere in this Final Rule Response to Comments document, CEQ provides further response on the issue of alternatives outside of agency jurisdiction, which is incorporated here by reference.

*Comment*:  Commenters stated that the regulations already enable Federal agencies to limit detailed analyses to alternatives within the jurisdiction of the lead agency and dismiss those alternatives from detailed analysis that are outside the lead agency's jurisdiction.

*CEQ Response*:  In the 1978 regulations, 40 CFR 1502.14(c) explicitly requires that agencies include reasonable alternatives not within the jurisdiction of the lead agency.  CEQ eliminates this paragraph in the final rule.

*Comment*:  While some commenters did not oppose CEQ's changes in § 1502.14, they expressed concern that limiting the number of alternatives that agencies analyze would limit the opportunities to mitigate impacts to communities, Tribal entities, and natural and cultural resources.

271

*CEQ Response*:  Under the final rule, agencies must consider mitigation associated with the proposed action and the reasonable range of alternatives selected for analysis.

*Comment*:  A commenter recommended that CEQ add a paragraph (f) to § 1502.14 requiring a summary of the opposing scientific evidence or views.

*CEQ Response*:  CEQ declines to make the proposed addition because discussion of opposing scientific evidence or views are addressed in other sections of the final regulations, including § 1502.9, "Draft, final and supplemental statements" and § 1502.23, "Incomplete and unavailable information."

*Comment*:  A commenter requested that, for projects sponsored by a Tribe on its own reservation, CEQ limit the scope of "reasonable alternatives" to only those alternatives that are supported by the affected Tribe.

*CEQ Response*:  In the final rule, a reasonable alternative is defined as one that is technically and economically feasible, meets the purpose and need for the proposed action, and, where applicable, meets the goals of the applicant.  This definition is sufficient to address the commenter's concern.

*Comment*:  Commenters objected to setting a maximum number of alternatives.  Some commenters stated it would be shortsighted and could arbitrarily limit the analysis of environmental impacts.  Other commenters stated that CEQ should allow agencies the flexibility to include the appropriate number of alternatives in the analysis.  Other commenters noted that, for projects with few or no logical alternatives, a maximum limit could have the unintended consequence of agencies analyzing more alternatives than necessary such that the "maximum" becomes the new "norm."  As an example, commenters pointed to proposals with few or no impacts, and stated that in such cases, agencies may still feel compelled to analyze "strawman"

272

alternatives to "prove" that the proposed action is superior, even when no objections or issues are raised. Commenters recommended that CEQ state that agencies evaluate the number of alternatives sufficient to analyze of significant environmental impacts. Additionally, commenters suggested that limiting the number of alternatives would be inconsistent with case law or would undermine judicial review of agency decision making.

*CEQ Response*: In response to comments, the final rule does not set a maximum number of alternatives. However, it is important that agencies take a reasonable approach to evaluating both the total number of proposed alternatives they will analyze and the technical and economic feasibility of those alternatives. Agencies should consider both aspects when developing alternatives. For this reason, CEQ adds the new § 1502.14(f) requiring agencies to limit consideration of alternatives to a reasonable number. To comply, agencies should focus on a range of alternatives that is appropriate to evaluate the proposed action. Where many alternatives are proposed by stakeholders, agencies should consider the alternatives to determine which are the most appropriate, and briefly describe why alternatives have been eliminated from detailed analysis in accordance with § 1502.14(a). Emphasis should be placed upon alternatives that address significant issues or attempt to resolve clearly identified significant environmental effects. As discussed elsewhere, detailed analysis of every alternative is not necessary, and agencies should devote their resources to evaluating those alternatives that are the most appropriate.

*Comment*: Some commenters suggested that a maximum of four to five alternatives represents a reasonable maximum for large and complex projects requiring the preparation of an EIS. Specifically, commenters stated that for most complex projects, a reasonable range of alternatives would include an analysis of the proposed action, two optional action alternatives,

and the no Action (status quo) alternative.  Other commenters stated that most EISs can sufficiently analyze the purpose and need of a proposed action through a range of alternatives including the no action and two additional alternatives, and that anything beyond this range would only increase time and costs and would not add significant value.

*CEQ Response*:  In response to comments, the final rule does not set a maximum number of alternatives, but provides in § 1502.14(f) that agencies should limit their consideration to a reasonable number of alternatives.

*Comment*:  Commenters objected to the elimination of "this section is the heart of the EIS," from the description of alternatives and stated that its removal weakens agencies' treatment and consideration of alternatives.

*CEQ Response*:  In the NPRM, CEQ proposed to revise the introductory paragraph to remove colloquial language, including "heart of" the EIS.  As revised, § 1502.14 of the final rule requires agencies to present the proposed action and alternatives to it in comparative form.  For example, an agency may use tables to compare quantitative and qualitative impacts among the proposed action and alternatives.  Presentation in a comparative format highlights the important information that the decision maker must consider.  CEQ intends to provide agencies with clear direction on how to develop their assessments and make a reasoned choice among alternatives.

## 12. Affected Environment (§ 1502.15)

*Comment*:  Commenters objected to CEQ's proposal to allow the combination of §§ 1502.15 and 1502.16.  In support, commenters argued that conflation of an EIS's description of baseline conditions and its analysis of environmental consequences would obfuscate rather than clarify analyses.  Further, commenters stated that, without establishing the baseline conditions, there is no way to determine what effect the proposed action will have on the

environment.  Commenters also stated that, while this approach sounds reasonable for the simplest of projects, it is not appropriate for more complex, large-scale projects with various resource issues than cannot be encapsulated in a paragraph.

*CEQ Response*:  The final rule codifies a NEPA best practice at § 1502.15 by allowing for the combination of affected environment and environmental consequences sections to ensure that the description of the affected environment is focused on those aspects of the environment that the proposed action will affect.  This "affected environment" focus will improve the comparison of the impacts of the proposed action and alternatives to the current and expected future conditions of the affected environment in the absence of the action.  The "no action" alternative remains a foundational element of the consideration of baseline conditions and the comparison of that evolving baseline to the effects of the proposed action and other alternatives. *See* OMB Circular A–4.[62]

*Comment*:  Commenters stated that CEQ's proposal to combine the description of the environment and environmental consequences sections in an EIS is practical and sensible, and allows the description of the affected environment to be combined with the evaluation of the environmental consequences required by § 1502.16.  Commenters stated that the U.S. Bureau of Land Management has taken this approach with recent EISs for Alaska oil and gas-leasing related actions, and the Alaska Oil and Gas Association ("AOGA") has generally found the format to be effective.  *See, e.g.*, Bureau of Land Mgmt., Coastal Plain Oil and Gas Leasing Program Environmental Impact Statement (2019).[63]

---

[62] 68 FR 58366 (Oct. 10, 2003).

[63] https://eplanning.blm.gov/eplanning-ui/project/102555/570.

275

*CEQ Response*:  This revision improves the NEPA process by allowing agencies to eliminate duplicative discussions and prompt agencies to focus on the proposed action's effects in the context of the relevant environment.

*Comment*:  Commenters recommended CEQ revise the first sentence of § 1502.15 to clarify the appropriate extent of the affected environment.  Specifically, commenters recommended the EIS succinctly describe the environment of the area(s) to be affected or created by the alternatives under consideration, based, if applicable, on information identified in an applicant's studies or reports.

*CEQ Response*:  CEQ declines to adopt the recommended language.  CEQ provides for consideration of information submitted by applicants throughout the final rule.  In particular, under § 1506.5 applicants and contractors will be able to assume a greater role in contributing information and material to the preparation of environmental documents, subject to the supervision of the agency.

*Comment*:  Commenters stated that § 1502.15 should clarify that the action areas must be consistent with the proposed definition of effects in § 1508.1(g).  Commenters stated that the "affected environment" should capture the area with effects that are reasonably foreseeable and have a close causal relationship with the proposed action or alternatives.

*CEQ Response*:  The "affected environment" should describe the area of effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives.  The final rule at § 1502.15 allows for the combination of the affected environment and environmental consequences sections to ensure that the description of the affected environment is focused on those aspects of the environment that the proposed action affects. This "affected environment" focus should improve the comparison of the impacts of the

276

proposed action and alternatives with the current and expected future conditions of the affected environment in the absence of the action.

*Comment*:  Commenters stated that there needs to be more clarity in § 1502.15. Specifically, commenters requested clarification of the environment being referenced:  *i.e.,* whether it is the natural and physical environment, the human environment, or the natural and physical environment and the human environment.

*CEQ Response*:  The final rule requires analysis of the "affected" environment based on the comprehensive definition of "effects" § 1508.1(g) and the definition of "human environment" cross-references to the definition of "effects or impacts."  *See* § 1508.1(m).  The final rule includes the reasonably foreseeable environmental trends and planned actions in the area(s) to ensure that the affected environment section of an EIS captures the changing aspects of the environment that are relevant to consideration of the environmental consequences of the proposed action and alternatives.

*Comment*:  A commenter stated that CEQ should reconsider what was meant by "useless bulk" and consider if separate direction is needed for land use plans as compared to project plans when Federal land management agencies may need to provide additional background context on the existing environment.

*CEQ Response*:  The final rule does not elaborate on the phrase "useless bulk" because the regulation explains the term by reference to descriptions of the affected environment. Instead, the final rule requires senior agency official supervision of any exceedance of the page limits.  The consideration of the need to integrate NEPA analysis with Federal land management planning requirements should be addressed by land management agencies on an action-specific

basis and in updating their NEPA procedures to provide for efficient integration of environmental documents with land use planning documents under § 1507.3(c) of the final rule.

*Comment*:  A commenter suggested replacing "important issues" with "significant issues" in § 1502.15 to avoid confusion.

*CEQ Response*:  Section 1501.3 discusses the criteria for determining significant effects. The use of "important issues" in § 1502.15 is unchanged from the 1978 regulations and has not been a source of confusion, CEQ declines to make the requested revision.

*Comment*:  A commenter recommended that CEQ replace "environmental impact statement" with "environmental document" so that the requirements for an EIS are also applicable to an EA.

*CEQ Response*:  The requirements of § 1502.15 only pertain to an EIS. Agencies prepare an EA when there likely is no significant effect; therefore EAs do not have the same level of detail as an EIS.  After completing an EA, if an agency determines there are significant effects, then it would prepare an EIS and comply with the requirements at § 1502.15.

### 13.  Environmental Consequences (§ 1502.16)

*Comment*:  Commenters requested that §§ 1502.16 and 1501.5 include the "no action" baseline as the metric against which agencies compare the effects of the proposed action and alternatives.  Commenters stated that inclusion in both places would create an explicit, consistent baseline for use in both EAs and EISs.

*CEQ Response*:  The affected environment and environmental consequences sections form the scientific and analytic basis for the comparisons of alternatives including the "no action" alternative under § 1502.14(c).  An EA must document consideration of the

278

environmental impacts of the proposed action and alternatives as required by section 102(2)(E) of NEPA, which serve the analytical function of the "no action" alternative in an EIS.

*Comment*:  Commenters objected to the proposed elimination of 40 CFR 1502.16 (a) and (b) and stated that direct and indirect effects are critical elements of the evaluation of potential environmental effects.  Commenters stated that such consideration is important under the statutory language of NEPA.  Commenters also stated that the final rule should add "cumulative effects" and should preserve direct and indirect effects.

*CEQ Response*:  As explained in CEQ's NPRM, NEPA refers to environmental impacts and environmental effects but does not subdivide those terms into direct, indirect, or cumulative. In the final rule, the definition of effects in § 1508.1(g) requires agencies to focus on changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives, including those effects that occur at the same time and place as the proposed action or alternatives and may include effects that are later in time or farther removed in distance from the proposed action or alternatives.  Consistent with proximate cause analysis, agencies generally do not need to analyze effects if they are remote in time, geographically remote, or to the product of a lengthy causal chain.  The removal of the references to direct, indirect, and cumulative effects, and repeal of cumulative impact, streamlines the NEPA process and avoids overextending causation analysis in a fashion inconsistent with proximate cause considerations.  It is not practicable and useful to agency decision making to analyze effects that are not reasonably foreseeable and do not have a reasonably close causal relationship to the proposed action.

*Comment*:  In § 1502.16, commenters suggested adding "as appropriate" after "The discussion shall include," because a number of the considerations in § 1502.16 (a)(1)–(8) do not

279

apply to many actions.  Commenters stated that agencies typically either do not include discussion about "the relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity" or "natural or depletable resource requirements and conservation potential of various alternatives and mitigation measures."

*CEQ Response*:  The 1978 regulations required the analysis of the factors referenced by the commenter at 40 CFR 1502.23, and CEQ has added, as applicable, considerations of economic and technical feasibility, consistent with 102(2)(B).  CEQ declines to make the requested revision.

*Comment*:  Commenters supported the inclusion of the term "Tribal" in § 1502.16(a)(5) and further requested clarification that "plans, policies, and controls" also includes Tribal laws, policies, and regulations.

*CEQ Response*:  The final rule at § 1502.16(a)(5) applies to possible conflicts between the proposed action and the objectives of "Tribal . . . plans, policies and controls" that are based on Tribal laws, policies, and regulations for the area concerned.


*Comment*:  Commenters stated that there is no statutory authorization to allow for the inclusion of "Tribal" in § 1502.16(a)(5), and that E.O. 13175, as cited in the preamble of the proposed rule, deal only with the development of Federal policies that have direct Tribal implications, *i.e.*, that impact activities on the reservation.  Accordingly, commenters requested the addition of "environmental" protection objectives further stating that is not appropriate to expand the jurisdiction of Tribes beyond reservation boundaries in the NEPA context.

*CEQ Response*:  NEPA imposes a procedural requirement that ensures that Federal agency decisions makers consider the environmental impact of their proposed actions according

280

to a national policy of cooperation with State and local governments, and other concerned public and private organizations, as stated in section 101 of NEPA.  As stated in CEQ's NPRM, the addition of "Tribal" to the phrase "State and local" is based on the recognition that Federal policies include regulations that have substantial direct effects on Tribes, on the relationship between the Federal Government and Tribes, or on the distribution of power and responsibilities between the Federal Government and Tribes.  While the final rule is not a regulatory policy that has Tribal implications, the rule supports E.O. 13175's expansion of the recognition of the sovereign rights, interests, and expertise of Tribes in the NEPA process.  Consideration of potential conflicts with Tribal plans, policies, and controls supports coordination between Tribal governments and agencies and improves the analysis of a proposed action's potential effects on Tribal lands, resources, or areas of historic significance as an important part of Federal agency decision making.

*Comment*:  Commenters recommended revising § 1502.16(a)(5) to add "environmental protection" before "objectives of Federal, regional, State, Tribal, and local land use plans, policies and controls for the area concerned."

*CEQ Response*:  The addition of "environmental protection" would unnecessarily constrain the analysis of conflicts with other land use plans, policies, and controls for the area concerned.  Further, it would create an inconsistency with the cross-reference to § 1506.2(d), which requires discussion in the EIS of "any consistency of a proposed action with any approved State, Tribal, or local plan or law (whether or not federally sanctioned)."  Moreover, the purpose of § 1506.16 is to ensure agencies consider environmental consequences.  Adding a reference in § 1502.16(a)(5) to "environmental protection" is unnecessary.

*Comment*:  Commenters stated that the proposed rule did not further define the generic term "cultural," referenced in paragraph (a)(5) to make it clear that a Tribal cultural resource can be a "cultural resource" under NEPA.  While the proposed rule parenthetically clarifies the term "economic" (to refer to effects on "employment"), the proposed rule does not do the same for the term "cultural."

*CEQ Response*:  As stated in CEQ's NPRM, the addition of "Tribal" to the phrase "State and local" is based on potential effects of Federal agency actions on Tribal lands, resources, or areas of historic significance as an important part of Federal agency decision making.  Cultural resources under § 1502.16(a)(8) includes Tribal cultural resources and cultural effects are referenced in the definition of "effects" in § 1508.1(g)(1).  The addition of "Tribal" throughout the final rule supports this consideration of Tribal cultural resources.

*Comment*:  A commenter requested further clarification in § 1502.15(a)(5) concerning how local land use plans are considered in a NEPA document.  The commenter requested further changes to expressly require consultation with local governments to determine whether there is a possible conflict with land use plans, policies, and controls for the area concerned.

*CEQ Response*:  The final rule provides numerous opportunities for coordination and consultation with State, Tribal, and local governments.  *See* § 1501.9.  An express requirement to consult under § 1502.16(a)(5) is not necessary to ensure close coordination with non-Federal governments.

*Comment*:  Commenters recommended the final rule revise § 1502.16(a)(6) to add "energy" before "conservation" to remove any confusion or ambiguity.

*CEQ Response*:  CEQ did not propose to limit the consideration of the conservation potential of alternatives and mitigation measures to energy conservation, and the proposed

282

addition of a second reference to "energy" would be unnecessarily limiting. Energy conservation is necessarily included in the consideration of energy requirements and conservation potential, so the proposed addition of "energy" would only exclude other aspects of conservation that are necessarily included in the definitions of reasonable alternatives and mitigation.

*Comment*: A commenter requested that CEQ further clarify and define the use of "energy" at § 1502.16(a)(6) and whether the reference was specific to the sources of oil and gas.

*CEQ Response*: CEQ did not propose revisions to this subsection. The final rule refers to energy generally and includes all energy sources.

*Comment*: A commenter requested to revise § 1502.16(a)(6) to require quantification of greenhouse gas (GHG) emissions and analysis of potential global warming and climate change.

*CEQ Response*: As discussed in the NPRM, CEQ's view is that it is not appropriate to address a single category of impacts in the regulations. CEQ declines to make the requested revision.

*Comment*: Commenters stated that CEQ should define what is meant by "natural or depletable resources" in paragraph (a)(7) which is not defined in § 1508.1.

*CEQ Response*: In the responses to the ANPRM, commenters did not identify the term "natural or depletable resources" as a significant ambiguity that required further definition. The term appears to be generally understood to reference "depletable resources," equating them with finite resources and thus to involve an implicit contrast with renewable sources. Some natural resources are renewable.

*Comment*: Commenters requested that § 1502.16(a)(8) be revised to add "and rural" after "urban", explaining that it is necessary to shift the focus from primarily urban settings to one

283

where the relationship between urban centers and their surrounding rural settings are considered together.

*CEQ Response*:  CEQ acknowledges the need to consider the effects of proposed Federal agency actions on the quality of the rural environment, and the final rule updates § 1506.6, "Public involvement," to clarify that agencies should consider the ability of affected persons and agencies to access electronic media, such as in rural locations.  However, the "environment" is commonly considered to include rural areas.  CEQ did not propose to change § 1502.16(a)(8) and declines to make revisions in the final rule.

*Comment*:  Commenters stated that NEPA regulations must explicitly mandate in § 1502.15(a)(8) that use of sacred sites and ceremonial lands receive due consideration even when the land does not qualify as a historic property under the NHPA or other Federal protections.

*CEQ Response*:  Cultural resources under § 1502.16(a)(8) includes Tribal cultural resources and cultural effects are referenced in the definition of "effects" in § 1508.1(g)(1).  As stated in the proposed rule, the addition of "Tribal" throughout the rule facilitates full consideration of Tribal cultural resources and potential effects of Federal agency actions on Tribal lands, cultural resources, and areas of religious or ceremonial significance.

*Comment*:  A commenter stated that the reference to mitigation in proposed § 1502.16(a)(9) was too limited because it does not allow for mitigation measures that may be needed for economic and social impacts.  The commenter stated that the scope of the definition forecloses possible economic or social mitigation measures when decisions negatively impact the local economy and social values.  The commenter recommended expressly mentioning economic and social impacts.

284

*CEQ Response*:  The referenced language does not preclude consideration of economic or social mitigation measures.  Section 1502.16(a)(9) cross-references § 1502.14(e) of the final rule, which requires agencies to "include appropriate mitigation measures not already included in the proposed action or alternatives."  The intent of § 1502.16(a)(9) is to require agencies to discuss which mitigation could offset adverse environmental impacts if not fully addressed in the discussion of alternatives.

*Comment*:  Commenters supported the requirement to consider economic benefits of a proposed action as proposed in § 1502.16(a)(10) and requested that the provision consider economic impacts or costs associated with a proposed action.  Commenters stated that the provision is important for the agency to discuss and give appropriate consideration to economic impacts of a decision when the natural and economic impacts are interrelated.  Commenters noted that economic benefits of a proposal are a critical part of the "human environment" and must be considered.

*CEQ Response*:  The final rule codifies the consideration of economic effects as proposed in § 1502.16(a)(10), requiring that EISs give appropriate consideration to interrelated economic and environmental effects on the "human environment."  Moreover, the final rule at § 1508.1(g) defines "effects or impacts" as "changes to the human environment" from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternative.  Likewise, the final rule definition of "human environment" cross-references to the definition of "effects or impacts."  *See* § 1508.1(m).

*Comment*:  Commenters stated that additional guidance will be needed about consideration of "economic and social effects" under § 1502.16(a)(10).

285

*CEQ Response*:  The phrase "economic and social effects" is not used in § 1502.16(a)(10).  This subsection references consideration of economic and technical considerations, including economic benefits of a proposed action.  The phrase "economic or social effects" used in § 1502.16(b) was used in the 1978 regulations and has not been a source of confusion.

*Comment*:  Commenters requested that the final rule rephrase § 1502.16(a)(10) to add "costs" and "alternatives."  Other commenters recommended that analysis be given to economic consequences and benefits.  Other commenters asserted economic benefits are beyond the scope of the Act, and therefore, the final rule should not include them.

*CEQ Response*:  The final rule does not exclude considerations of cost as part of economic considerations, nor does it support giving greater weight to benefits over costs of a proposed action.  In the final rule, § 1502.22 addresses cost-benefit analysis.

*Comment*:  Commenters objected to proposed § 1502.16(a)(10) suggesting that it violates NEPA because it subordinates science to economics.  Commenters further stated that CEQ failed to sufficiently justify in the preamble of the proposed rule how section 102(2)(B) of NEPA supports the addition of this requirement.

*CEQ Response*:  In the final rule, CEQ adds § 1502.16 (a)(10) to include economic and technical considerations only where applicable.  Section 102(2)(B) of NEPA, as applied in § 1502.22 of the final rule, provides for this consideration of the interrelationship between environmental and economic considerations.  Section 102(2)(B)'s reference to "along with economic and technical considerations" makes clear that agency decision making includes economic and technical considerations and the change better aligns the regulations with the Act.  Judicial decisions that overlooked this point misapprehended the statute.

286

*Comment*:  Commenters objected to proposed § 1502.16(a)(10) and stated that it would be contrary to CEQ's policy goals of improving and streamlining the NEPA process. Specifically, commenters stated that it could add an additional avenue for legal challenges for insufficient analysis of employment or other non-environmental impacts (*i.e.*, only economic and social impacts).  Accordingly, commenters requested that the final rule not include it or, at a minimum, delete the phrase "give appropriate consideration to" from the sentence.

*CEQ Response*:  In the final rule, CEQ adds economic considerations where "applicable," in § 1502.16(a)(10), and "appropriate" in § 1502.16(b).  These considerations are made explicit in § 1502.16 (a)(10) and (b) but were already included in section 102(2)(B) of NEPA, as applied in 40 CFR 1502.23, (§ 1502.22 in the final rule) and the definition of the "human environment" under 40 CFR 1508.14.  The addition of "applicable" and "appropriate" limitations is consistent with the statute, NEPA's "rule of reason," and does not increase litigations risk.

*Comment*:  Commenters objected to proposed § 1502.16(a)(10) stating that the requirement to discuss "economic and technical considerations" along with environmental impacts is aimed solely at diluting the environmental analysis and eliminating less environmentally impactful alternatives.

*CEQ Response*:  CEQ's addition of economic and technical considerations in § 1502.16 (a)(10) makes explicit what was already included in section 102(2)(B) of NEPA, as applied in 40 CFR 1502.23(§ 1502.22 in the final rule). In the final rule, agencies only need apply these considerations to the extent that they are applicable.

*Comment*:  Commenters objected to proposed § 1502.16(a)(10) stating that technical considerations are not really "effects," but would normally be part of an agency's assessment as to whether an alternative was a reasonable alternative.  Accordingly, commenters stated that the

287

final rule should limit consideration in the discussion of alternatives.  Commenters also noted

that the discussion under this provision may be duplicative of the alternatives section of an EIS.

*CEQ Response*:  As with the 1978 regulations, § 1502.14 of the final rule recognizes the

interrelationship between the alternatives analysis "based on the information and analysis

presented in the sections on the affected environment (§ 1502.15) and the environmental

consequences (§ 1502.16)" and the specific discussion of factors listed in § 1502.16(a).

Therefore, § 1502.16(a) retains the statement in the 1978 regulations that this section should not

duplicate discussions in § 1502.14.  To the extent that a technical consideration is more

appropriately addressed as a factor in alternatives analysis rather than in environmental

consequences, it should be addressed in that section with appropriate cross-reference in the

discussion of environmental consequences.

*Comment*:  Commenters stated that it is unclear which part of NEPA CEQ has drawn

upon to propose the addition of economic impacts under § 1502.16(a)(10) and commenters

requested CEQ' justification.

*CEQ Response*:  Section 102(2)(B) of NEPA, as applied in § 1502.22, provides for

consideration of the interrelationship between environmental and economic considerations.  In

the final rule, § 1502.16(a)(10) includes economic and technical considerations only where

applicable, with the applicability of those considerations governed by their interrelationship to

environmental considerations.

*Comment*:  A commenter requested that § 1502.16(a)(10) be revised to expressly include

the cost of mitigation

*CEQ Response*:  Mitigation is addressed in § 1502.16(a)(9).  As proposed § 1502.16(a)(10) requires economic and technical considerations generally, as applicable.  In the final rule, CEQ declines to make further revisions, as additional specification is not necessary.

*Comment*:  Commenters requested that in the final rule, § 1502.16(a)(10) and (b) require the analysis of economic impacts in every EIS.  Specifically, a commenter requested the final rule revise § 1502.16(a)(10) to state "unless not applicable," rather than "where applicable" and "economic consequences" rather than "economic benefits" as proposed.  Some commenters were specifically interested in impacts to State or local economies and recommended that CEQ revise § 1502.16(b) to require consultation with State and local governments and cooperating agencies.

*CEQ Response*:  The final rule requires agencies to consider economic and technical considerations whenever applicable.  This requirement encompasses impacts to State and local economies.  Further, the final rule provides numerous opportunities for coordination and consultation with State, Tribal, and local governments.  *See* § 1501.9.  An express requirement to consult under § 1502.16(b) is not necessary to ensure close coordination with non-Federal governments.

*Comment*:  Commenters supported the requirements of § 1502.16(b) stating that actions that take place on public lands are often very impactful to local communities and citizens, and should be clearly identified in the NEPA analysis.

*CEQ Response*:  CEQ expects that § 1502.16(b) will ensure that public land management agencies give appropriate consideration of interrelated economic or social and natural or physical environmental effects.

*Comment*:  Commenters stated that § 1502.16(b) could support a false equivalency between long-term or permanent environmental damages and short-term economic impacts.

289

*CEQ Response*:  The final rule brings text into § 1502.16(b) that had been located in the definition of the "human environment," 40 CFR 1508.14, that required that EISs give appropriate consideration to interrelated economic and environmental effects on the "human environment." This change brings operative language into § 1502.16(b) while the final rule definition of "human environment" cross-references to the definition of "effects or impacts."  *See* § 1508.1(m).  The consideration of the "relationship between short-term uses of man's environment and the maintenance and enhancement of long-term productivity" remains an essential consideration under § 1502.16(a)(3), in accordance with NEPA section 102(2)(C)(iv).

*Comment*:  Commenters requested further clarification of § 1502.16 and specifically at which point the agency must give "appropriate consideration" to the interrelation of economic and social effects with the natural or physical environment.  A commenter requested that CEQ provide case studies or specific instances in which economic and social effects are not related to natural environment effects.

*CEQ Response*:  Section 102(2)(B) of NEPA, as applied in 40 CFR 1502.23, requires consideration of economic and social effects when interrelated with the natural or physical environment.  When and how such effects are interrelated is specific to the circumstances of the proposed action, and the final rule continues to provide agencies with considerable flexibility in applying the requirement.  One example where it would be inappropriate to consider economic impacts is where Congress has prohibited use of economic considerations in agency decision making.  CEQ declines to provide further specificity in the final rule.

*Comment*:  Commenters expressed concern that the proposed § 1502.16(a)(10) would require a point-by-point analysis of economic and technical considerations and require overwhelming additional resources in terms of expertise, training, and assessment time.

290

Commenters stated that such considerations were already included in the development of "practicable" alternatives.

*CEQ Response*:  Economic and technical considerations are expressly referred to in section 102(2)(B) of NEPA.  The reasonableness of an alternative is informed by economic and technical considerations.  Since it has been a long-standing requirement to evaluate economic and technical considerations, when applicable, the new requirement at § 1502.16(a)(10) will not require additional resources.

*Comment*:  Commenters requested that CEQ require agencies give equal weight to socioeconomic and environmental analysis in § 1502.16(b).

*CEQ Response*:  The final rule directs agencies to give "appropriate consideration" to the interrelation of economic and social effects and natural or physical environmental effects.  Consideration depends on the particular facts and circumstances of the proposed action.  CEQ declines to provide further specificity to agencies in the final rule.

### 14.    Submitted Alternatives, Information, and Analyses (§ 1502.17)

*Comment*:  Commenters expressed support for the new § 1502.17, "Summary of submitted alternatives, information, and analyses," which locates in one place a summary of, and response to, issues that are of particular concern to public commenters.  Many commenters expressed that the NEPA review process needs to solicit more thoughtful public participation and comments and stated the proposed changes would encourage and improve the effectiveness of public participation.  Commenters noted the new summary section ensures that the agency carefully reviewed comments from the public.

*CEQ Response*:  Section 1502.17 in the final rule ensures agencies have considered all alternatives, information, and analysis submitted by State, Tribal, and local governments and

291

other public commenters during the scoping process for consideration by the lead and

cooperating agencies in developing the EIS by including a summary of the submitted

information in the EIS.  CEQ notes that § 1501.9(d)(7) requires agencies to request identification

of potential alternatives, information, and analyses relevant to the proposed action during the

scoping process.  The final rule in § 1502.17(a) requires an agency to include a summary that

identifies the alternatives, information, and analyses received during the scoping process and

publish all comments.  The final rule in § 1502.17(a)(2) along with § 1503.1(a)(3) invite

comment on the summary of submitted alternatives, information, and analyses, as part of the

draft EIS comment period.  Those comments will be considered and responded to in the final EIS

pursuant to § 1503.4 (or "otherwise publish," in § 1503.4(b)).  Finally, § 1505.2(b) requires the

decision maker to certify the agency has considered the information.

   *Comment*:  Commenters opposed the proposed new EIS section, summary of submitted

alternatives, information, and analysis, in § 1502.17 and stated this is a new EIS requirement that

seems to conflict with the goal of limiting pages and reducing cost and time.  Other commenters

questioned the utility of the summary, and noted it is duplicative of the requirements of

§ 1502.14 (alternatives including the proposed action) and § 1503.4 (response to comments).

Commenters also argued the summary is a new EIS requirement that is not required by NEPA.

   *CEQ Response*:  The consideration of opposing viewpoints and presenting that

information in an EIS is central to NEPA.  The 1978 regulations required agencies to consider

the information received during scoping in development of the draft EIS.  Some agencies

routinely summarize and publish comments received during the scoping process in a scoping

report.  The final rule codifies these practices in § 1502.17 and instructs the agency to identify

and summarize specific information submitted by commenters in a consolidated section of the

292

EIS.  The EIS alternatives section required by § 1502.14 is distinct from the § 1502.17 summary because the purpose of § 1502.14 is to analyze reasonable alternatives to the proposed action. Some of the submitted alternatives may not be reasonable or necessary to analyze since agencies need only consider a range of reasonable alternatives.  However, including them in the § 1502.17 summary will provide notice that the agency considered all of the submitted alternatives.  This will improve transparency in the EIS preparation process because the public will see that the agency received and considered the submitted alternatives, information, and analysis.  This is a new requirement, but when balanced against the benefits of increasing transparency, CEQ does not consider it to be an undue burden.

*Comment*:  Commenters objected to the proposed new EIS section § 1502.17, stating that it would diminish agencies' duty to fully consider information submitted by the public, in particular the consideration and discussion of opposing viewpoints in an EIS, citing to *California v. Block*, 690 F.2d 753, 770–71 (9th Cir. 1982).  Additionally, commenters raised concerns that agencies or applicants preparing an EIS would improperly summarize comments by intentionally diluting or distorting comments to make them less impactful.  Commenters stated that the absence of a summarized discussion showing how the agency considered the submitted information would result in decreased transparency.  Commenters also disputed the appropriateness of presuming an agency has considered all submitted information without a discussion of the submitted information providing evidence that the agency took a "hard look."

*CEQ Response*:  The consideration of opposing viewpoints is a part of the NEPA process and remains a core requirement of an EIS.  *See* § 1502.9(b) and (c).  The final rule in § 1502.17 ensures agencies have considered all alternatives, information, and analysis submitted by State, Tribal, and local governments and other public commenters during the scoping process for

293

consideration by the lead and cooperating agencies in developing the EIS by including a

summary of the submitted information in the EIS.  A summary by its nature is designed to

improve the readability and usefulness to the decision maker of a document, but would not form

the entire basis of agency decision making.  Agencies must base their decisions on the entire

administrative record.  The final rule § 1505.2(b) adds the requirement that the decision maker

for the lead agency certify in the ROD that the agency has considered all submitted alternatives,

information, analyses, and objections.

It is the agency that must comply with NEPA and ensure the ROD reflects a

consideration of the entire administrative record.  The final rule in § 1502.17 instructs the

preparer to identify and summarize specific information submitted by commenters during the

scoping period in one section of the EIS.  The comments received during scoping will be

published as an appendix to the draft EIS.  The § 1502.17 summary complements the

requirement in § 1503.4, that agencies consider substantive comments timely submitted during

the public comment period in an appendix to the final EIS.  Additionally, § 1503.1(a)(3) now

requires agencies to invite public comment on the summary.  These changes improve

transparency in the EIS preparation process by allowing the public to see that their submitted

alternatives, information, and analysis were considered by the agency.

*Comment*:  Commenters expressed concerns with § 1502.17 as written and requested

CEQ clarify if the § 1502.17 summary needs to summarize each comment or provide a thematic

summary of the submitted alternatives, information, and analysis.  Other commenters requested

CEQ amend § 1502.17 to limit the summarization to "relevant" alternatives, information, and

analysis submitted by the public.  Other commenters requested CEQ amend § 1502.17 to limit

the summarization to those alternatives, information, and analysis "that have influenced or persuaded agency decision-making."

Commenters argued that § 1502.17 appears to be inconsistent with proposed changes to §§ 1502.14(a) and 1503.4(a), because § 1502.17 requires a summary of "all alternatives, information, and analyses submitted."  Whereas, in § 1502.14(a), CEQ proposed to remove the word "all" before "reasonable alternatives" so that section in pertinent part now requires agencies to "[e]valuate reasonable alternatives to the proposed action . . . ."  In § 1503.4(a), CEQ proposed to add the word "substantive" before the word "comments" so that section in pertinent part now requires agencies to "consider substantive comments."  Commenters noted § 1502.17 as written requires the agency to summarize all submitted alternatives, information, and analysis regardless of their feasibility, scientific accuracy, or impact on the decision-making process.  Commenters stated without some limitation to the reasonableness or substance of the summarized information pursuant to § 1502.17, that summary would be unnecessary, inefficient, and confusing to the public.

*CEQ Response*:  CEQ acknowledges the commenters' suggestion.  The final rule contains revisions to § 1502.17 clarifying that the summary must identify all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agency.  These changes provide agencies with the flexibility to summarize groups of comments that identify the same alternative, information, or analyses.  The summary is distinct from, and complements, the alternatives section (§ 1502.14) and the response to comments (§ 1503.4) resulting in distinct requirements that should be applied in a complementary manner.

295

*Comment*:  Commenters requested CEQ clarify if the EIS page limits located in § 1502.7 include the § 1502.17 summary.  Other commenters requested CEQ amend the final rule so that the § 1502.17 summary is included as an appendix, not within the EIS due to concerns over page limits and readability of the EIS.

*CEQ Response*:  CEQ notes that the § 1502.7 page limit is restricted to sections identified paragraphs (4) through (6) of § 1502.10(a).  Those sections are:  (a)(4) purpose of and need for action; (a)(5) alternatives including proposed action; and, (a)(6) affected environment and environmental consequences.  The § 1502.7 page limit excludes (a)(7) summary of submitted alternatives, information, and analyses (§ 1502.17).  Additionally, § 1502.10 provides a recommended format of an EIS and allows an agency to use a different format when appropriate.

*Comment*:  Commenters expressed concerns with § 1502.17 as written and suggested CEQ revise § 1502.17 to clarify if the summary must be included in both the draft EIS and the final EIS or just the draft EIS.

*CEQ Response*:  CEQ acknowledges the commenters' suggestion.  The final rule contains revisions to § 1502.17 clarifying the summary of submitted alternatives, information, and analyses must be included in both the draft EIS (§ 1502.17(a)) and final EIS (§ 1502.17(b)).

*Comment*:  Commenters expressed concerns with § 1502.17 as written and suggested CEQ revise § 1502.17 to clarify the agency must summarize all alternatives, information, and analysis submitted for consideration including comments from other Federal agencies, State, Tribal, and local governments and the public.

*CEQ Response*:  CEQ acknowledges the commenters' suggestion.  The final rule contains revisions to § 1502.17 clarifying the summary must identify all alternatives, information, and

analyses submitted by State, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agency.

*Comment*:  Commenters expressed concerns with § 1502.17 as written and suggested CEQ require publication of the comments summarized pursuant to § 1502.17.  Commenters stated that unless the comments received during scoping are published as part of the draft EIS, the § 1502.17 summary will leave the public without sufficient evidence that the lead agency took into consideration its concerns, including environmental justice concerns.

*CEQ Response*:  The final rule has further revised § 1502.17(a)(1) to require agencies to publish all comments (or summaries thereof where the response has been exceptionally voluminous) received during the scoping process that identified alternatives, information, and analyses for the agency's consideration.  This requirement improves transparency by ensuring the public can view a summary of the submitted information in addition to the information as it was submitted.  In situations where an agency has received exceptionally voluminous responses, for example a letter-writing campaign utilizing a form letter or a set of form comments, the agency may publish a representative comment with summary of the campaign.

*Comment*:  Commenters requested CEQ extend the requirement of § 1502.17 to EAs.

*CEQ Response*:  An EA is a brief discussion of the proposed action, alternatives, and the environmental impacts of the proposed action and alternatives.  The purpose of an EA is to briefly provide sufficient evidence and analysis for determining whether to prepare and EIS or a FONSI.  An EA does not trigger the scoping requirements of § 1501.9 therefore the requirement to summarize that information in § 1502.17 would not be applicable in an EA.

297

### 15.    List of Preparers (§ 1502.18)

*Comment*:  Commenters stated that the regulations should not require a list of preparers, and agencies should only provide it if specifically requested by the public.  Commenters stated that the lead Federal agency is responsible for the content of NEPA documents and any resulting decisions made.

*CEQ Response*:  The final rule retains the requirement from the 1978 regulations to include a list of preparers in EISs.  The final rule indicates that the list should normally not exceed two pages, and CEQ is unaware of any impediment or burden for agencies to comply with this requirement.  The list of preparers continues to serve important transparency goals and informs the public that agencies have selected qualified personnel to prepare NEPA documents.

### 16.    Appendix (§ 1502.19)

*Comment*:  Commenters stated that normally EISs contain multiple appendices, and therefore CEQ should retitle § 1502.19 (proposed § 1502.20) as "Appendices" and use the plural term throughout.

*CEQ Response*:  CEQ acknowledges that sometimes agencies use multiple appendices but do not find it necessary to retitle this section.

### 17.    Publication of the environmental impact statement (§ 1502.20)

*Comment*:  Commenters requested CEQ revise § 1502.20 (proposed § 1502.21) to require agencies to share administrative draft versions of draft and final EISs with applicants prior to publication to assist in reduction of factual errors.

*CEQ Response*:  CEQ declines to add this requirement.  Like other public commenters, applicants may provide factual clarifications and corrections during the comment period(s) provided under § 1503.1.

298

*Comment*:  Commenters asked CEQ to clarify whether the phrase "shall transmit the entire statement electronically" in § 1502.20 (proposed § 1502.21), allows agencies to distribute links to documents posted online because some documents may be too voluminous to email. Commenters also asked CEQ to clarify whether "transmit" means that agencies must compile distribution lists of interested parties' emails and notify these parties or whether publication on agency websites satisfy this requirement.

*CEQ Response*:  CEQ defines publish and publication in a technology neutral way to accommodate electronic distribution, including email links to documents published online. Section 1506.6(b)(1) provides that agencies must inform interested or affected parties, which agencies may do through one or more mechanisms provided in § 1506.6(b).  Agencies should make reasonable efforts to ensure that they inform such parties, which may include an email that links to documents published online.

### 18.    Incomplete or Unavailable Information (§ 1502.21)

*Comment*:  CEQ received comments supporting the revisions to § 1502.21 (proposed § 1502.22), "Incomplete or unavailable information."  Commenters specifically supported replacing "exorbitant" with "unreasonable" in the provisions relating to when agencies must obtain such information.  Some commenters supporting the revisions noted that the costs of obtaining information can outweigh the value of the data to the decision-making process.

*CEQ Response*:  Section 1502.21 (proposed § 1502.22) addresses the duties of agencies when necessary information is incomplete or unavailable.  In the 1978 regulations, CEQ directed that agencies would be required to undertake a "worst case analysis" of the risk and severity of

possible adverse environmental impacts where necessary information was unavailable.[64]  In 1986, CEQ finalized revisions to this section of the regulations to eliminate the requirement to prepare a worst case analysis where information was incomplete or unavailable.[65]

In the final rule, CEQ makes several additional revisions to clarify this section for Federal agencies, including revising § 1502.21(a) (proposed § 1502.22(a)) to strike the word "always," replacing the term "exorbitant" with "unreasonable" in paragraphs (b) and (c), and eliminating 40 CFR 1502.22(c) because this paragraph is obsolete.  In the final rule, CEQ has also clarified that unavailable information is different than incomplete information by adding that the latter information is "incomplete, but available."

The revisions are intended to promote clarity in the regulations and consistency with the "rule of reason" that bounds NEPA analyses.  Under § 1502.21(b) (proposed § 1502.22(b)) as revised, agencies will continue to be required to obtain essential, available information where the overall costs are not unreasonable and the means of obtaining that information are known. Where the overall cost is unreasonable or means are unavailable, agencies will continue to be required pursuant to paragraph (c) to disclose that information is incomplete or unavailable and explain the relevance of the incomplete or unavailable information to the evaluation of reasonably foreseeable significant adverse impacts to the human environment, summarize existing credible scientific evidence relevant to the evaluation of such impacts, and include the agency's evaluation of the impacts based on theoretical approaches or generally accepted research methods.

---

[64] 43 FR at 55984.

[65] 51 FR 15618 (Apr 25, 1986).

*Comment*:  A commenter supporting the revisions requested that § 1502.21 (proposed § 1502.22) be further amended to provide a process for entities to bring information to an agency's attention during the NEPA process, including a process that requires a statement of the availability of more complete information, the relevance of such information, and a summary of existing credible scientific evidence relevant to evaluating reasonably foreseeable significant adverse impacts.

*CEQ Response*:  No additional process is needed because in the final rule CEQ already requires agencies to solicit information and analyses from State, Tribal, and local governments as well as the public.  The solicitation and the submittal of such information is addressed in various sections of the regulations, including provisions relating to the NOI and draft EIS and the request for comments and provisions relating to commenting generally.  *See, e.g.*, §§ 1501.9, 1503.1, and 1503.3.

*Comment*:  Commenters stated that § 1502.21 (proposed § 1502.22) should not apply to EAs.

*CEQ Response*:  As CEQ stated in its 1986 amendment to proposed § 1502.22, Federal agencies are only required to implement this section when preparing an EIS.[66]  In the final rule, however, CEQ states that agencies may apply these provisions to an EA.  *See* § 1501.5(g)(1).  This would allow agencies to use the standards of § 1502.21 (proposed § 1502.22), including

---

[66] In 1986, in response to comment CEQ stated, "Section 1502.22 is part of the set of regulations which govern the EIS process, as opposed to the preparation of an environmental assessment.  *It is only appropriate to require this level of analysis when an agency is preparing an EIS.*  The type of analysis is called for in § 1502.22 is clearly much more sophisticated and detailed than the scope of an environmental assessment.  Environmental assessments should be concise public documents which *briefly* provide sufficient analysis for determining whether to prepare an EIS and aid in an agency's compliance with NEPA when no EIS is necessary."  *See* 51 FR 15618, 15625 (Apr. 25, 1986) (emphasis in the original).

whether to obtain incomplete or unavailable information, to evaluate potentially significant adverse impacts and compare alternatives.

*Comment*:  One commenter suggested § 1502.21 (proposed § 1502.22) be removed and included in the definition of effects at § 1508.1(g).

*CEQ Response*:  CEQ declines to move it to the definition section because § 1502.21 (proposed § 1502.22) is text that provides particular instructions.

*Comment*:  Some commenters opposed striking "always" in § 1502.21(a) (proposed § 1502.22(a)), stating that CEQ had failed to explain when and why an agency should not be required to "always" disclose that there is unavailable or incomplete information.  Commenters stated that "always" is prescriptive and eliminating the term will lead to ambiguity over when disclosure is required and provide agencies with unreasonable discretion to withhold information to the public regarding gaps in information.

*CEQ Response*:  The word "always" is unnecessary because § 1502.21(a) states that agencies "shall make clear that such information is lacking."  Striking "always" is consistent with other revisions throughout the regulations to modernize and improve readability and consistency and reduce unnecessary language.  Striking "always" will not create any uncertainty because under the regulations agencies are required, without exception, to disclose the fact of incomplete or unavailable information when an agency is evaluating reasonably foreseeable significant adverse effects on the human environment and information is lacking.

*Comment*:  One commenter requested that CEQ revise § 1502.21(a) (proposed § 1502.22(a)) as follows:  "When a lead agency is evaluating reasonably significant adverse effects on the human environment in an environmental impact statement and determines(in

302

consultation with any cooperating agencies, if applicable) that there is incomplete or unavailable information, the lead agency shall make clear that such information is lacking."

*CEQ Response*:  CEQ has not made the requested revision because it is duplicative of provisions in Part 1501 that address the respective roles of lead and cooperating agencies. Regarding § 1502.21 (proposed § 1502.22), it is the responsibility of the lead agency to make the required determinations in consultation with cooperating agencies, where appropriate.

*Comment*:  Some commenters opposed replacing "exorbitant" with "unreasonable" in § 1502.21(b) and (c) (proposed § 1502.22(b) and (c)) when considering the "overall costs" of obtaining information relevant to reasonably foreseeable significant adverse impacts that is essential to a reasoned choice among alternatives.  Some commenters contended CEQ had not adequately explained how it was consistent with its original description of "overall cost" considerations, the common understanding of the term, and how that term is regularly interpreted in practice.  Other commenters stated that "exorbitant" was more stringent, or that it is more objectively evaluated than "unreasonable," or raised concerns that agencies would use cost as the justification to limit their analyses and consideration of environmental impacts.  Other commenters stated that a delay in project approval should never be used to justify evasion of agencies' NEPA duty to gather essential information.

*CEQ Response*:  The term "exorbitant" is not used in the NEPA statute and is not defined in the regulations.  As stated in the proposed rule, replacing "exorbitant" with "unreasonable" is consistent with how CEQ described "overall costs" in the 1986 amendments relating to § 1502.21 (proposed § 1502.22).   CEQ stated that "overall costs" encompass "financial costs

303

and other costs such as costs in terms of time (delay) and personnel."[67]  CEQ further stated that it intended "that the agency interpret 'overall costs' in light of overall program needs."[68]  The requirement to determine if the 'overall costs' of obtaining information is exorbitant should not be interpreted as a requirement to weigh the cost of obtaining the information against the severity of the effects, or to perform a cost-benefit analysis.  Rather, the agency must assess overall costs in light of agency environmental program needs.")  Replacing "exorbitant" with "unreasonable" is consistent with how "overall costs" are to be interpreted, as well as with the "rule of reason" that bounds NEPA analyses.  *See, e.g.*, *Pub. Citizen,* 541 U.S. at 767 ("Also, inherent in NEPA and its implementing regulations is a 'rule of reason," which ensures that agencies determine whether and to what extent to prepare an EIS based on the usefulness of any new potential information to the decisionmaking process"); *see also Marsh,* 490 U.S. at 373–74 (agencies should apply a "rule of reason").

Pursuant to § 1502.21(b) as revised, agencies will continue to be required to obtain available information that is essential to the reasoned choice between alternatives where the costs are not unreasonable or the means are unavailable.  Further, where the overall costs are unreasonable or the means of obtaining the information are not known, agencies will continue to be required pursuant to paragraph (c) to disclose in the EIS that information is incomplete or unavailable, and provide additional information to assist in analyzing the reasonably foreseeable significant adverse impacts.

---

[67] 51 FR at 15622.

[68] *Id.  See also* Connaughton Letter, *supra* note 61, at p. 4 ("The term 'overall costs' encompasses financial costs and other costs such as costs in terms of time (delay), program and personnel commitments.).

*Comment*:  Some commenters requested that CEQ provide further guidance on determining whether costs are "unreasonable."  Other commenters requested CEQ direct agencies to take into account not only monetary cost but also the goals of the applicant, and weigh the value of obtaining additional information against the complexity of or difficulty in obtaining information.  One commenter stated that relevant costs are discussed in the preamble of the proposed rule[69] and requested they be included in the body of the regulations.

*CEQ Response*:  CEQ has not further revised the regulations because whether the overall costs of obtaining available information are unreasonable is case-specific and will depend on the agency's program needs.  CEQ has previously stated that it intends that the term "overall costs" as used in § 1502.21 (proposed § 1502.22) encompasses "financial costs and other costs such as costs in terms of time (delay) and personnel."[70]  CEQ has also previously stated that it intends that an agency interpret "overall costs" in light of overall program needs.  *Id.*  As discussed in the proposed rule, agencies should use their experience and expertise to determine what scientific and technical information is appropriate to inform their analyses and decision-making.

*Comment*:  Regarding the collection of field data, commenters stated that agencies should focus on gathering meaningful information, and avoid lengthy or costly information-gathering processes focused on information that is not essential.  Some commenters stated that while it is always possible to gather more field data through additional studies, monetary costs and costs associated with delays may outweigh the value of such information.  One commenter stated that the term "exorbitant" has led to agencies requiring large, time-consuming and generally

---

[69] *See* 85 FR at 1703 (Jan. 10, 2020).

[70] 51 FR at 15622.

unnecessary data-collection efforts, or to seek "perfect" science that is not necessary to inform agency decision making.

*CEQ Response*:  Pursuant to § 1502.1 of the final rule, agencies should focus on significant environmental issues and alternatives and should reduce paperwork and the accumulation of extraneous background data.  An agency that lacks information relevant to evaluating reasonably foreseeable significant adverse effects should focus on whether the available information is essential to the reasoned choice between alternatives.  Agencies should also consider reliable existing data and resources, including remotely gathered information or statistical models that may inform the agency's analysis, according to § 1502.23 (proposed § 1502.24).  NEPA analysis is bound by a "rule of reason" and agencies should conduct timely and efficient NEPA reviews.  *See* §§ 1500.1(b), 1501.10.

*Comment*:  Commenters requested that CEQ further revise the regulations to encourage agencies to use desktop evaluations, remote sensing data, and other reliable data.  One commenter requested that CEQ address that the gathering of some information may be seasonal and not fall within the initial proposed schedule, and expressed the view that the schedule should be revised under such circumstances.

*CEQ Response*:  CEQ has finalized its proposed revisions to § 1502.23 (proposed § 1502.24) to state that agencies should rely on existing data and resources, and to clarify that agencies may make use of any reliable data sources, such as remotely gathered information or statistical models.  As noted above, agencies should use their experience and expertise in identifying available information that is essential to a reasoned choice among alternatives, and determining whether the overall costs of obtaining it are not unreasonable.

306

*Comment*:  Commenters asserted that the direction pursuant to § 1502.23 (proposed § 1502.24) that "[a]gencies are not required to undertake new scientific and technical research to inform their NEPA analyses" is inconsistent with the requirement in § 1502.21 (proposed § 1502.22) for agencies to obtain information regarding significant adverse effects if the means of obtaining the information is known and the overall costs is not unreasonable.  They stated that this revision would allow agencies to forego additional field and analytical studies necessary to evaluate impacts and alternatives.  Commenters provided examples (e.g., forest plans) of environmental reviews where new research was important to make an informed decision.  One commenter suggested that CEQ add a sentence to § 1502.21(b) (proposed § 1502.22(b)) stating, "This information can be provided by new research when appropriate."

*CEQ Response*:  The 1978 regulations applied the requirement to include "information relevant to reasonably foreseeable significant adverse impacts essential to a reasoned choice among alternatives" to only incomplete information and not also to unavailable information.  In response to comments requesting clarification with respect to § 1502.23 (proposed § 1502.24), CEQ has interpreted this distinction to mean that agencies are not required to generate new scientific and technical research.  CEQ declines to set forth conditions where the conduct of new research is appropriate, as requested by the commenter.

Irrespective of whether or not information is available, CEQ has retained the requirement from the 1978 regulations at § 1502.21(c) (proposed § 1502.22(c)) to report within the EIS "the information relevant to reasonably foreseeable significant adverse impacts [that] cannot be obtained because the overall costs of obtaining it are unreasonable or the means to obtain it are not known."  In § 1502.23 of the final rule, CEQ clarifies that nothing in that section is intended

to prohibit agencies from complying with the requirements of other statutes pertaining to scientific and technical research.

*Comment*:  A commenter recommended that CEQ revise § 1502.23 (proposed § 1502.24) to acknowledge responsible opposing views and requested a new subsection be added requiring that agencies disclosing when there is incomplete or unavailable information also include in the EIS "[a] summary of any responsible opposing scientific data that run counter to that cited in section 1502.22(c)(4)."

*CEQ Response*:  Agencies are required to summarize credible scientific evidence relevant to evaluating the reasonably foreseeable significant adverse impacts.  It is CEQ's intent that agencies summarize relevant data, including information that may represent a minority or dissenting perspective.

*Comment*:  One commenter asserted that section 102(2)(E) implies an obligation to develop new information not already available in public sources.

*CEQ Response*:  Section 102(2)(E) of NEPA does not direct agencies to undertake new research in connection the preparation of detailed analyses required under section 102(2)(C). Section 102(2)(E) requires only that agencies "study, develop, and describe appropriate alternatives to recommended courses of action."  42 U.S.C. 4332(2)(E).  An EA can satisfy the requirements of section 102(2)(E) under both the 1978 regulations, at 40 CFR 1501.4(b), and the final regulations at § 1501.5(c)(2) ("Briefly discuss the purpose and need for the proposed action, alternatives as required by section 102(2)(E) of NEPA, the environmental impacts of the proposed action and alternatives, and include a listing of agencies and persons consulted."). Additionally, the term "study" in section 102(2)(E) of NEPA is not defined in the statute, and thus is subject to reasonable interpretation by CEQ.

308

*Comment*:  Commenters raised concerns that "reasonably foreseeable" is defined differently in § 1502.21(d) (proposed § 1502.22(d)) than in § 1508.1(z), and that the discrepancy could give rise to litigation.

*CEQ Response*:  CEQ did not propose to revise the language in § 1502.21(d) (proposed § 1502.22(d)), which was revised in 1986.  The 1986 rule clarified that "reasonably foreseeable," as used in this paragraph, applies only to this subsection.

*Comment*:  Commenters suggested that the regulations provide guidance or address when impacts may have "catastrophic consequences."  One commenter stated that there was no basis for limiting reasonably foreseeable impacts to those with "catastrophic consequences" and that the use of the term "significant" rather than "catastrophic" is more appropriate.  One commenter requested that CEQ clarify that "impacts which have catastrophic consequences" do not equate to a "worst case scenario" consistent with *Robertson v. Methow Valley Citizens,* 490 U.S. 332 (1989).

*CEQ Response*:  CEQ did not propose to revise § 1502.21(d) (proposed § 1502.22(d)), which was revised in 1986 to eliminate the requirement to prepare a "worst case analysis" and to make other revisions.  The final rule makes a minor revision to change "which" to "that."  Based on implementation of this provision since 1986, there is not a need for further clarification of this section at this time.

*Comment*:  In the definition of reasonably foreseeable, a commenter requested adding "environmental" before "consequences."

*CEQ Response*:  CEQ declines to make the requested revision because "consequences" refers to any catastrophic impact to the human environment including socio-economic impacts.

309

*Comment*:  One commenter opposed eliminating 40 CFR 1502.22(c).  The commenter contended this would further narrow Federal agencies' duties by eliminating the requirement that Federal agencies inform the public of "catastrophic consequences" if information is difficult to find or costly.

*CEQ Response*:  The commenter may have misunderstood the proposed change.  The final rule eliminated 40 CFR 1502.22(c) because it is obsolete.  The provision clarified that the 1986 rule applied to all EISs for which an NOI was published after May 27, 1986, and that agencies had discretion whether to comply with the requirements of the original or amended regulation for EISs under development.  Under the revised § 1502.21(c) (proposed § 1502.22(c)), CEQ has retained the provisions from the 1986 amendment requiring agencies to disclose the lack of information and provide additional information relevant to the analysis of reasonably foreseeable significant adverse effects.

### 19.    Cost-Benefit Analysis (§ 1502.22)

*Comment*:  Some commenters encouraged CEQ to require cost-benefit analyses for all major projects.  Other commenters suggested CEQ should require agencies to determine whether a cost-benefit analysis is relevant to the choice among alternatives and document it in the draft EIS.  Other commenters recommended that CEQ require cost-benefit analyses when a project impacts threatened or endangered species and ecosystems, or relevant to issues such as global warming.  Other commenters recommended that CEQ require agencies to weigh economic benefits of a project against the impacts of the project on human health and the environment.

*CEQ Response*:  As stated in § 1502.22 (proposed § 1502.23) of the final rule, and similar to the 1978 regulations, agencies need not display the weighing of the merits and drawbacks of the various alternatives in a monetary cost-benefit analysis and should not do so

310

when there are important qualitative considerations.  Pursuant to § 1502.22 generally, and

consistent with the final sentence of that provision, agencies may set out cost-benefit analysis as

to quantitative considerations and otherwise set out non-quantitative consideration in qualitative

terms.  In the final rule, CEQ has made revisions for clarity, including changing from passive to

active voice, and declines to make further revisions.  Additionally, applications of NEPA to

particular policy areas is beyond the scope of this rulemaking.

*Comment*:  Some commenters suggested CEQ should add the phrases "to the human

environment" and "relevant to the human environment" at the end of the first and second

sentences respectively.

*CEQ Response*:  CEQ has not revised this subsection.  However, in the final rule, CEQ

clarifies the definitions of effects to reference "the human environment" specifically.  In the final

rule, § 1508.1(g) defines "effects or impacts" as changes to the human environment from the

proposed action or alternatives that are reasonably foreseeable and have a reasonably close

causal relationship to the proposed action or alternatives.  The final rule definition of "human

environment" also cross-references to the definition of "effects or impacts."  *See* § 1508.1(m).

*Comment*:  Some commenters stated that the cost-benefit provision was confusing,

especially when a project has a mix of monetized and un-monetized resource values.

*CEQ Response*:  CEQ expects that the changes to this provision in the final rule,

including changing the language from the passive to active voice and clarifying the reference to

compliance with section 102(2)(B) of NEPA as ensuring consideration of unquantified

environmental amenities and values in decision making, along with economical and technical

considerations, will resolve the confusion.

311

*Comment*:  Some commenters expressed general approval of the provision on cost-benefit analysis.

*CEQ Response*:  CEQ acknowledges the commenters' approval.

### 20.    Methodology and Scientific Accuracy (§ 1502.23)

*Comment*:  CEQ received comments supporting the revisions to § 1502.23 (proposed § 1502.24).  Commenters supported the use of modern technologies, including clarification that agencies may make use of remotely gathered information or statistical models, and reliance on reliable existing data and resources to promote efficiency and reduce duplication between Federal and State, Tribal and local requirements.

*CEQ Response*:  In § 1502.23 (proposed § 1502.24), CEQ has revised the section to clarify that agencies should use reliable existing information and resources.  CEQ has revised this section to allow agencies to draw on any source of information (such as remote sensing and statistical modeling) that the agency finds reliable and useful to the decision-making process. These changes promote the use of reliable data, including information gathered using current technologies.  CEQ further notes that in addition to this section relating to methodology and scientific accuracy, other policies also apply including the Information Quality Act[71] and the OMB Peer Review Bulletin.[72]

*Comment*:  One commenter suggested that the statement "[a]gencies are not required to undertake new scientific and technical research to inform their analyses" conflicted with the

---

[71] Treasury and General Government Appropriations Act for Fiscal Year 2001, Public Law 106–554 sec. 515.

[72] OMB Final Information Quality Bulletin for Peer Review, M–05–03 (Dec. 16, 2004), https://www.whitehouse.gov/sites/whitehouse.gov/files/omb/memoranda/2005/m05-03.pdf.

requirements of § 1502.21(proposed § 1502.22), and suggested the language in § 1502.21

(proposed § 1502.22) be included in § 1502.23 (proposed § 1502.24) for consistency.

*CEQ Response*:  In the final rule at § 1502.21, CEQ has clarified the difference between

incomplete versus unavailable information.  *See* §§ 1502.21.  Unavailable information may

require new scientific and technical research, and therefore is not required pursuant to § 1502.23

of the final rule nor, as described above, section 102(2)(E) of NEPA.

*Comment*:  Commenters opposed the inclusion of language stating, "[a]gencies are not

required to undertake new scientific and technical research to inform their analyses."  Some

commenters asserted that it is often necessary for agencies to conduct additional surveys, studies,

or new research, to inform their analysis.  Other commenters stated that new research may be

needed to understand the implications of choices, particularly with respect to new technologies

and challenges, and particularly risky or unprecedented activities.  Commenters stated that new

research is often essential to designing the proposed action or complying with other

environmental laws.  Finally, some commenters stated that the inclusion of the new language

would lead to uninformed decision making, or adverse effects, including for environmental

justice communities.  Other commenters stated that CEQ should clarify that environmental

review should only entail gathering existing scientific research and data.

*CEQ Response*:  CEQ has further clarified § 1502.23 (proposed § 1502.24) to state that

"[n]othing in this provision is intended to prohibit agencies from compliance with the

requirements of other statutes pertaining to scientific and technical research."  The language

concerning new research is interpreted in the context of § 1502.21(b) (proposed § 1502.22(b)),

which requires agencies to obtain available information essential to a reasoned choice between

alternatives where the overall costs are not unreasonable and the means of obtaining that

information are known.  Where the overall costs of either incomplete or unavailable information are unreasonable or means of obtaining the information are not known, agencies will continue to be required to disclose in the EIS and provide additional information to assist in analyzing the reasonably foreseeable significant adverse impacts.  *See* § 1502.21(c).

In addition to other statutes, there may be regulations or Executive orders that require agencies to undertake scientific or technical research and would continue to apply under the final rule.  As commenters have noted, new research may be required for complying with many of the environmental laws and regulations other than NEPA, such as monitoring and modeling for Clean Air Act compliance, wetland delineation for Clean Water Act compliance, or field surveys or assessments for ESA or National Historic Preservation Act compliance.  Nothing in the final rule, including the revisions in § 1502.21 (proposed § 1502.22) and § 1502.23 (proposed § 1502.24), change the substantive requirements of those statutes that may require agencies to undertake new scientific or technical research.

*Comment*:  Commenters recommended that agencies be allowed to conduct new research but limited in geographic scope and duration, and encourage agencies to share data and research.

*CEQ Response*:  The final rule does not prohibit agencies from conducting new research nor does it set parameters such as those recommended by the commenters.  Rather, the final rule clarifies that "unavailable information" includes new research.  Agencies may be required to conduct new research under other statutory authorities.

*Comment*:  Commenters stated that explicit authorization of remote sensing and statistical modeling was not necessary because it is already understood that such methods may be used.  Some commenters requested clarifying that remote sensing and modeling do not substitute for

314

site-specific surveys.  Other commenters requested that CEQ provide examples of statistical

modeling that would be appropriate.

*CEQ Response*:  Explicit authorization of remote sensing and statistical modeling will

improve implementation of NEPA.  Agencies should use their experience and expertise when

assessing the reliability in determining what scientific and technical information is appropriate.

*Comment*:  One commenter recommended that CEQ strike "reliable" before "existing

data and resources."

*CEQ Response*:  CEQ declines to make the proposed revision.  Inclusion of the term

"reliable," recognizes that the agency has discretion in determining what scientific and technical

information is appropriate to inform the analyses and decision making.

*Comment*:  Commenters recommended that CEQ clarify that the age of data is not

necessarily determinative as long as it remains reliable.  One commenter recommended that CEQ

clarify that areas not accessible should be surveyed using aerial photography, remote sensing and

mapping.

*CEQ Response*:  CEQ has revised § 1502.23 (proposed § 1502.24) to clarify that agencies

should use reliable existing data and resources.  To the extent that information is unavailable,

agencies are not required to conduct new scientific and technical research to obtain it.  *See*

§ 1502.21.  Agencies should use their experience and expertise when assessing the reliability in

determining what scientific and technical information is appropriate to inform the analyses and

decision making.

*Comment*:  One commenter requested that CEQ indicate whether proposed revisions to

§ 1502.23 (proposed § 1502.24) would preclude agencies from conducting new surveys relating

to specific species or habitats, whether the senior agency officials could extend the time limits

315

for such surveys, how agencies would comply with State protocols relating to multi-year
surveys, and how agencies would comply with Federal statutes other than NEPA (e.g., ESA).

*CEQ Response*:  CEQ has clarified in § 1502.23 of the final rule that nothing in this
provision is intended to prohibit agency compliance with the regulations or other statutes.  CEQ
acknowledges that application of the final rule to proposed actions depends upon specific facts
and analysis that is necessary for a particular proposed action in addition to compliance with
other Federal statutes, protocols, or policies.

In the final rule, CEQ establishes presumptive time limits for environmental documents
in § 1501.10.  Under that section, senior agency officials of the lead agency may approve a
longer period in writing and establish a new time limit.  *See* § 1501.10(b).  The senior agency
official may consider, inter alia, state of the art of analytic techniques, the availability of relevant
information, other time limits imposed on the agency by law, regulations or Executive order, as
well as other factors.  *See* § 1501.10(c).

*Comment*:  One commenter recommended that CEQ provide guidance on reliable data
sources, such as considerations related to completeness and accuracy, technical protocols or
purposes and policies underlying data.

*CEQ Response*:  The revisions in § 1502.23 (proposed § 1502.24) reinforce that agencies
should make use of reliable existing data and resources.  Because of the variety of proposed
actions that may be subject to environmental reviews under NEPA, CEQ has not provided
further direction as requested by the commenter; however, other Federal policies may apply.  *See
supra* note 26.  As noted above, agencies should use their experience and expertise in evaluating
data.

316

*Comment*:  One commenter was concerned that agencies may discount the reliability of a study when disclosure of the underlying data would violate other laws and recommended adding "Agencies may not discount the reliability of scientific conclusions when the disclosure of underlying data is specifically barred by Federal law" to § 1502.23 (proposed § 1502.24).

*CEQ Response*:  Pursuant to §1502.23 (proposed § 1502.24) as revised, agencies must ensure the professional integrity, including scientific integrity, of the discussion and analyses in environmental documents including making use of reliable existing data and resources. Agencies may not ignore or discount information for the purposes of NEPA simply because public dissemination may be restricted. Federal policies address the use influential information that is subject to "compelling interests such as privacy, trade secrets, intellectual property, and other confidentiality protections."[73] Agencies should refer to these policies where applicable. *See, e.g., supra* note 26.

*Comment*:  One commenter recommended that CEQ include language in § 1502.23 (proposed § 1502.24) stating that analysis of an impact is sufficient for NEPA purposes if analyzed pursuant to a Federal statutory scheme designed to regulate that impact.

*CEQ Response*:  In the final rule, CEQ has addressed circumstances where the proposed action is an action for which other statutes serve the function of agency compliance with NEPA. *See* §§ 1501.1(a)(6), 1507.3(c)(5).

---

[73] Guidelines for Ensuring and Maximizing the Quality, Objectivity, Utility and Integrity of Information Disseminated by Federal Agencies, 67 FR 8452 (Feb. 22, 2002), sec. V(3)(b)(ii)(B).

*Comment*:  One commenter suggested that in addition to stating the agencies were not required to undertake new scientific and technical research, that quantification of impacts is not required and that qualitative impact analysis is often a more accurate analytical approach.

*CEQ Response*:  Under both the 1978 regulations and the final rule, agencies must ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents.  The use of quantitative or qualitative information remains a matter of application of agency expertise using generally accepted professional standards.

*Comment*:  A commenter recommended that the NEPA regulations be more transparent in explaining how an agency will use information submitted by the applicant in the environmental review process.  The commenter stated that, as proposed, the draft regulations require extensive consideration of materials submitted by "public commenters," but it is less clear how the agency will use and/or respond to information provided by the applicant.  The commenter raised concerns that in their experience the lead agency has ignored information provided by the applicant and instead redoes the analysis at significant cost, and that this is not efficient and contrary to the goals of NEPA.

*CEQ Response*:  Section 1502.23 requires agencies to ensure the professional integrity, including scientific integrity, of the discussion and analyses in environmental documents.  Implicit in this requirement is that agencies will include and consider in the analysis all reliable information submitted by an applicant..  In addition, the final rule directs agencies to agencies to incorporate material by reference, including planning studies, analyses or other relevant information.  § 1501.12.

*Comment*:  A commenter stated that technical and field study should end at the ROD or agency decision, and that concurrence, approvals, and permits be based on data available at the stage of the ROD.

*CEQ Response*:  The final rule requires agencies to consider all of the alternatives, information, analyses and objections submitted pursuant to relevant provisions.  *See, e.g.,* §§ 1501.9(d)(7), 1502.17, 1503.1 and 1503.3.  The final opportunity to submit studies will typically be during the public comment period on the draft EIS, unless there is significant new information relevant to environmental concerns bearing on the proposed action or its impacts.  *See* § 1502.9(d).  To inform decision making, it is important for comments to be timely submitted so that the NEPA process is both predictable and completed within the applicable time limit.

**21.    Environmental review and consultation requirements (§ 1502.24)**

*Comment*:  Commenters requested CEQ eliminate "to the fullest extent possible," from § 1502.24(a) (proposed § 1502.25(a)) arguing that many agencies fail to comply with this directive and routinely wait to complete other required consultations until after NEPA documents are finalized and all opportunity for public comment has passed.

*CEQ Response*:  CEQ declines to strike the phrase "to the fullest extent possible" from § 1502.24(a) (proposed § 1502.25(a)) because there may be occasional instances where it is not feasible to fully document compliance with other Federal laws until after the agency completes its NEPA review, for example phased or tiered actions.

*Comment*:  Commenters recommended that adding the Clean Water Act to the list of example statutes in § 1502.24(a) (proposed § 1502.25(a)).

*CEQ Response*:  There are numerous examples that CEQ could include in this section. Therefore, CEQ retains the existing examples, but agrees that the Clean Water Act is one of the

319

statutes compliance with agencies should integrate into their EIS.  To the fullest extent possible

agencies shall prepare draft EISs concurrently with requirements of applicable Federal laws,

including the Clean Water Act, where applicable.  It is unnecessary to list all Federal laws or

Executive orders that may be integrated with the NEPA process under § 1502.24 (proposed

§ 1502.25).

*Comment*:  Commenters stated that the final rule should broaden § 1502.24(b) (proposed

§ 1502.25(b)) to include, State, Tribal, and local permits, licenses, and other authorizations or

requirements to appropriately identify future hurdles and streamline project implementation.

*CEQ Response*:  This provision does not preclude agencies from incorporating

compliance with State, Tribal, and local requirements, and § 1506.2 provides that agencies

should coordinate with State, Tribal, and local governments to the fullest extent practicable.  For

NEPA documents prepared by a State or by a Tribe under delegated authority from a Federal

agency, it would be appropriate to include such authorizations.

*Comment*:  Commenters stated that the current regulations do not require NEPA

documents to include a list of applicable Tribal laws and regulations.  Such a listing would help

ensure compliance with Tribal legal requirements.

*CEQ Response*:  Agencies may include a list of applicable Tribal laws and regulations,

particularly in those instances where Tribes are cooperating agencies.  However, it may not

always be practicable for an agency to do so and therefore CEQ declines to make the requested

change.

320

**F.      Comments Regarding Commenting on Environmental Impact Statements (Part**

**1503)**

*Comment*:  Commenters requested that CEQ extend the provisions in part 1503 to EAs.

The commenters noted that EAs are one of the most common forms of NEPA compliance

documents and argued formal comment requirements for EAs is essential for informing the

public about proposed Federal actions.

*CEQ Response*:  As discussed in section II.C.5, the final rule retains the approach in the

1978 regulations for agencies to have significant flexibility to structure public involvement in

EAs to the extent practicable.  CEQ declines to apply the provisions in part 1503 to EAs.

**1.      Inviting Comments and Requesting Information and Analyses (§ 1503.1)**

*Comment*:  Commenters opposed the requirement at § 1503.1(a)(3) and stated that the

invitation to comment on the completeness of the summary is unnecessary because agencies

must invite comment on the entire draft EIS in § 1503.1(a)(2).  Commenters further stated that

§ 1503.1(a)(3) creates a new litigation risk for project opponents to challenge an EIS.

*CEQ Response*:  CEQ has revised § 1503.1(a)(3) in the final rule to clarify what

information agencies are seeking comment on and has not included language relating to

completeness.  The invitation to comment on the submitted alternatives, information, and

analysis and the summary thereof (§ 1502.17) supports the presumption of consideration under

§ 1505.2(b) and exhaustion provisions under § 1500.3(b).  Therefore § 1503.1(a)(3), will reduce

unnecessary litigation.

*Comment*:  Commenters requested that CEQ revise the final rule to limit comments on

the § 1502.17 summary to those that were:  (a) not previously submitted; (b) not previously

321

available or could not have reasonably been available; or (c) in response to new positions or information not included in the draft EIS.

*CEQ Response*:  The draft EIS comment period invites comments generally and § 1503.1(a)(3) invites "comment[s] specifically on the submitted alternatives, information, and analyses and the summary thereof (§ 1502.17)."  To ensure information can be considered by the agencies in developing the draft EIS, commenters should identify all relevant alternatives, information, and analyses during scoping as soon as practicable.

*Comment*:  Commenters raised concerns that § 1503.1(a)(3) limits public comment on the draft EIS to only the completeness of the summary of the submitted alternatives, information, and analyses section (§ 1502.17) thereby excluding comment on the proposed action and the draft EIS as a whole.

*CEQ Response*:  In response to comments, CEQ has revised portions of this process including revisions to § 1503.1(a)(3) to clarify what information agencies must request from the public and has not included language on completeness.  The information requested pursuant to § 1503.1(a)(3) is in addition to the information requested pursuant to § 1503.1(a)(2) which continues to require the agency to request the comments of the public.  The final rule revises § 1503.1(a)(2)(v) to clarify that agencies should affirmatively solicit comments in a manner designed to inform those persons or organizations who may be interested in or affected by the proposed action.

*Comment*:  Commenters supported the proposed changes at § 1503.1(c) for agencies to accommodate the electronic submission of public comments, provided the comment process is accessible to affected persons.  Commenters stated that this requirement would improve the public's ability to participate in the NEPA process.

322

*CEQ Response*:  CEQ acknowledges the comment.

*Comment*:  Commenters requested that CEQ revise the final rule to include "timely" before "comments" in §§ 1503.1(a)(1) and (a)(2), and 1503.2 for consistency with agencies' duty under § 1503.4 to "consider substantive comments timely submitted during the public comment period."

*CEQ Response*:  The language as drafted is clear, and the requested revision is not necessary.

*Comment*:  Some commenters expressed concern that they would be restricted from participating in public processes later in the development of an EIS if they did not participate initially.

*CEQ Response*:  There are no provisions in the final rule that would limit participation later in the process to only individuals and entities that participated earlier. Any member of the public can participate in scoping and public commenting.

*Comment*:  Commenters expressed concern that striking the reference to Office of Management and Budget (OMB) Circular A–95 in 1503.1(2)(iii) removes the President's statutory responsibility to use OMB as a tool for communication between the lead Federal agency and State, Tribal, and local agencies.  Commenters stated that this would leave it up to the lead agency alone to complete this task in a manner that is considered thorough and complete, that the burden of communication falls directly on the lead agency, and that removal of this specialized task force will provide more work for the lead agency, which is already having a hard time keeping up with the workload.

*Response*:  CEQ proposed to eliminate the reference because it was obsolete. OMB

Circular A–95 no longer exists because it was revoked pursuant to section 7 of E.O. 12372.[74]

*Comment*:  A commenter expressed concern that the proposed rule appears to conflict

with existing regulations under 36 CFR part 218, which identifies an administrative review

process for the U.S. Forest Service including a 45–day time period for filing of pre-decisional

objections to final analyses and draft decision documents at 36 CFR 218.26(a).  A commenter

requested further changes to explicitly allow for existing agency-specific objection regulations or

include a clear statement that if agency regulations require longer timeframes, the timeframes at

§ 1500.3(b)(3) would apply instead.  In addition, the references to an EIS comment period (as

per §§ 1503.1 and 1503.3) only refer to one period, when the Forest Service has two public

involvement periods—one called "comment" and one called "objection."  To elaborate on the

response directly above, the Forest Service releases a draft EIS and has a 45–day comment

period. Then, it uses the comments to adjust the document—producing a final EIS and a draft

ROD, in which the Forest Service has a 45–day objection period.  Although it is standard for the

Forest Service to have a 45–day objection period under 36 CFR part 218 regulations, the Forest

Service can require a 90–day objection period under 36 CFR part 219 Plan Amendment

regulations.  The commenter requested that CEQ make changes to reconcile § 1506.11 with U.S.

Forest Service procedures.

*CEQ Response*:  The final rule does not require a 30–day comment period on the final

EIS summary of alternatives, information, and analysis, and therefore addresses the commenters

concern regarding conflict with § 1500.3(b)(3). The flexibility requested by the commenter is

---

[74] 47 FR 30959, July 16, 1982.

reflected in § 1506.11(c), which establishes the circumstances for an exception to the time periods in § 1506.11(b). As to the extensive references to Forest Service regulations, those are beyond the scope of this rulemaking but § 1507.3 requires agencies to update their specific NEPA procedures to conform to the final rule.

### 2.    Duty to Comment (§ 1503.2)

*Comment*:  Commenters requested that CEQ revise §§ 1503.2 and 1503.3(d) in the final rule to clarify the scope of an agencies duty to comment and request or require mitigation.  Some commenters stated that agencies should limit their comments and mitigation requirements to those issues within their jurisdiction by law or special.  Other commenters stated that agencies with a duty to comment should be able to comment on the entire EIS and request or require mitigation regardless of their statutory authority to approve or grant a permit or license.  Other commenters requested CEQ reinstate § 1503.3(d) without the proposed revisions.

*CEQ Response*:  The final rule clarifies that any mitigation measures specified by a cooperating agency must cite its applicable statutory authority. § 1503.3(e).  The final rule at § 1508.1(s) also clarifies that NEPA does not mandate the form or adoption of any mitigation.  CEQ declines to make further changes to address the commenters' concern.

*Comment*:  A commenter expressed concern with the proposed changes to § 1503.2 requiring comment from Federal agencies with jurisdiction to simply cooperating agencies.  The commenter expressed concern that the proposal could remove the duty of commenting from the Federal agencies, which means there will be less scrutiny on the project and less work for the Federal agencies to complete.

*CEQ Response*:  The proposed change does not affect the duty to comment by Federal agencies with jurisdiction by law or special expertise.  Any Federal agency with jurisdiction by

325

law is required to be a cooperating agency, and any Federal agency with special expertise may be

a cooperating agency upon request of the lead agency (§ 1501.8(a)).  A Federal agency with

special expertise may only deny a request for cooperation in preparing an environmental

document with notice to CEQ and the senior agency of the lead agency.  § 1501.8(c).  The

proposed change to § 1503.2, which CEQ is finalizing, would only remove the duty to comment

from agencies with special expertise that are not cooperating agencies.  Such agencies may

nonetheless submit comments as a participating agency.

3.    **Specificity of Comments and Information (§ 1503.3)**

*Comment*:  Commenters supported proposed revisions to § 1503.3(a) that clarify the

types of information contained in comments that promote informed decision making and the

provision of supporting data and methodology.  Commenters noted that these clarifications

would guide the public on what information to provide in their comments. Commenters noted

that these clarifications encourage agencies and professional organizations to submit comments

that identify data sources that support their position on a given issue, and that increased

specificity in comments would improve the quality of a final NEPA document.

*CEQ Response*:  CEQ acknowledges commenters' support for the proposed revisions.

*Comment*:  Commenters raised concerns with the use of the word "shall" in § 1503.3(a)

and requested that CEQ use the word "should."  Commenters also raised concerns with the level

of detail, specificity, and sophistication required in comments by § 1503.3(a).  Commenters

noted the use of the word "shall" in § 1503.3 effectively requires the public to submit comments

that are "as specific as possible" and "provide as much detail as necessary."  Commenters also

stated that these requirements place members of the public in a Catch-22, either risking an

agency dismissing their comment as not being specific enough or risking being charged for

326

violating professional State board standards, for example, practicing engineering without a
license, if their comments are too specific.  Other commenters suggested the proposed changes
would create a "pay-to-play" system in which interested commenters must hire experts, in order
to have their comment considered.  Commenters also stated that these requirements place
members of the public in a Catch-22, either risking an agency dismissing their comment as not
being specific enough or risking being charged for violating professional State board standards,
for example, practicing engineering without a license, if their comments are too specific.  Other
commenters suggested the proposed changes would create a "pay-to-play" system in which
interested commenters must hire experts, in order to have their comment considered.

Other commenters stated that the proposed changes would discourage and possibly
preclude public comment particularly from laypersons or environmental justice communities,
including Tribal communities.  Commenters noted these commenters often have relevant
information gleaned from personal experience with the potentially impacted environment but
may hesitate to share their knowledge with Federal agencies particular when faced with a
perception that their comments need to satisfy a level of detail, specificity, and sophistication.

*CEQ Response*:  CEQ declines to amend § 1503.3(a) in the final rule by replacing the
word "shall" with the word "should."  The 1978 regulations used the phrase "shall be as specific
as possible" and this language is unchanged in the final rule.  The intent of the additional
language is to guide commenters in providing information in a manner that is most useful for
informed decision making, and not intended to limit public comment or preclude consideration
of substantive comments.  This guidance is consistent with legal precedent ("NEPA places upon
an agency the obligation to consider every significant aspect of the environmental impact of a
proposed action, it is still incumbent upon [parties] who wish to participate to structure their

327

participation so that it is meaningful, so that it alerts the agency to the [parties'] position … [t]his is especially true when the [parties] are requesting the agency to embark upon an exploration of uncharted territory…" *See Pub. Citizen*, 541 U.S. at 764, quoting *Vt. Yankee*, 435 U.S. at 553).

Commenters are free to hire experts to present their comments and agencies must consider all substantive comments timely submitted pursuant to § 1503.4(a). But the proposed changes do not necessitate the public to hire experts to prepare comments on their behalf. Further, the final rule includes a number of changes to improve public notification and involvement in the NEPA process. The final rule clarifies that agencies should select appropriate methods for public involvement and provides agencies with the flexibility to determine which methods of public involvement are appropriate. The changes in the final rule allow agencies to consider the most effective and efficient methods to involve potentially affected communities, and will encourage public participation by individuals with relevant information gleaned from personal experience with the potentially affected environment.

*Comment*: Commenters stated that the proposed rule increases burdens on public commenters while decreasing agencies' obligation to consider and respond to comments. Commenters raised concerns that changes to §§ 1501.9 and 1503.3(b) shifts responsibility for analyzing a project's impacts and evaluating alternatives from the lead agency and applicant to the public. Commenters stated that these changes, and the inclusion of "economic and employment impacts" prioritize the interest of private companies and project proponents over the public's right to comment.

*CEQ Response*: The final rule, including §§ 1501.9 and 1503.3, does not shift responsibility for analyzing a project's impacts and evaluating alternatives from the lead agency and applicant to the public. Under the final rule, as revised, agencies must solicit public

328

comment earlier in the process and to affirmatively invite commenters to suggest alternatives to
the proposed action and submit information and analyses the agency has not considered.  The
final rule reinforces the agency's responsibility for the accuracy, scope, and content of the EIS
(§ 1506.5).  The final rule also requires the agency to summarize and publish this information
(§ 1502.17) and requires the decision maker to certify that the agency has considered all of the
alternatives, information, analyses, and objections submitted by State, Tribal, and local
governments and public commenters (§ 1505.2(b)).  These changes invite State, Tribal, and local
governments, and the public to engage in the NEPA process in a more a meaningful way but do
not shift responsibility from the agency.  Furthermore, the Act recognizes that economic and
technical considerations are part of the decision making process.  *See* 42 U.S.C. 4331(a) and
4332(2)(B).  Inclusion of economic and employment impacts benefits the public and aids the
decision making process.

   *Comment*:  Commenters raised concerns that the proposed language in § 1503.3(b)
prohibits the consideration of new and substantive information submission by the public or other
commenters outside of the comment periods.  Commenters stated that there are instances when
interested stakeholders may not be able to comment during the comment period due to seasonal
workloads or other time constraints.  Commenters suggested longer public comment periods
(60 days) would provide the public sufficient time to provide substantive comments.
Commenters requested that CEQ revise § 1503.3(b) to allow agencies to extend public comment
periods when necessary.  Other commenters requested CEQ revise § 1503.3(b) to allow agencies
to consider new and substantive information submitted outside of the comment periods.

   *CEQ Response*:  In response to comments, CEQ has revised the final rule to remove the
requirement of a 30–day comment period on the final EIS; however, agencies may request

329

comments on the final EIS and set a deadline for providing such comments.  Additionally, the public has multiple opportunities to provide information to the agency during the NEPA process as the analysis on the proposed action is refined including scoping and in response to the draft EIS.  To inform decision making, it is important for comments to be timely submitted so that the NEPA process is both predictable and completed within the applicable time limit. CEQ revised the relevant language in § 1503.3(b) to clarify that comments and objections must be submitted within the deadline for submitting comments on the draft EIS, and where not submitted are unexhausted and forfeited.  The comment periods are sufficient to provide commenters a meaningful opportunity to provide public comment.  CEQ recognizes that commenters may have different circumstances and workloads.  CEQ notes that § 1506.11 provides flexibility to agencies to set the relevant comment period on the draft EIS.

*Comment*:  Commenters requested that the phrase "exhausted and forfeited" be eliminated from §§ 1500.3(b) relating to exhaustion and 1503.3(b) and replaced with the following:  "Comments on the final environmental impact statement are most helpful prior to release of the record of decision.  The public may object to the final decision in the record of decision through an agency's objection process, or judicial review."

*CEQ Response*:  CEQ declines to remove the phrase "unexhausted and forfeited" from §§ 1500.3 and 1503.3 in the final rule.  The exhaustion provisions in §§ 1500.3(b) and 1503.3(b) help to establish a predictable and timely NEPA process with substantive comments and information timely submitted during comment periods.

*Comment*:  Commenters requested that CEQ explain and provide legal support for the inclusion in § 1503.3(e) the requirement that cooperating agencies, including Tribal nations, "shall cite to its applicable authority" when it specifies mitigation measures it considers

330

necessary to grant or approve applicable permit, license, or related requirements or concurrences. Commenters stated that CEQ did not provide an explanation or definition of "applicable authority" as used in this clause.

*CEQ Response*: CEQ added the requirement in § 1503.3(e) that cooperating agencies cite to their own organic statutes when requiring a mitigation measure it considers necessary to grant or approve an applicable permit in order to clearly reflect the enforcement authority for required mitigation. For State, Tribal, or local agencies that are cooperating agencies their applicable authority would be their relevant State, Tribal, or local law that would authorize mitigation in connection with the proposed project. CEQ included this requirement because NEPA is a procedural statute and does not require mitigation.

*Comment*: A commenter recommended clarifying § 1503.3(a) to encourage specificity and detail in comments submitted on a proposed action during the scoping process.

*CEQ Response*: It is helpful for commenters to provide detailed comments during scoping. In the final regulations in § 1501.9(d), CEQ directs agencies to include more detailed information in the NOI to prepare an EIS, and expressly directs agencies to invite public comment on potential alternatives, information and analyses relevant to the proposed action. However, given that scoping occurs early in the process with more limited information available, CEQ declines to provide a similar level of specificity on commenting as for the draft EIS.

**4.      Response to Comments (§ 1503.4)**

*Comment*: Commenters requested CEQ define "substantive." Other commenters requested CEQ clarify that the lead agency has the flexibility to determine that comments are substantive even if the comments do not "explain why the issue raised is significant to the consideration of potential environmental impacts and alternatives to the proposed action, as well

331

as economic and employment impacts…"  This flexibility is needed because despite the phrasing

of the comments, the information in the comments may be relevant or helpful to agency decision

making.

*CEQ Response*:  CEQ declines to define "substantive" and agrees that agencies should

have the flexibility to determine comments that are substantive.  Section 1503.3(a) of the final

rule recommends comments explain why the issue raised is important to the consideration of

potential environmental impacts and alternatives to the proposed action, as well as economic and

employment impacts.  This recommendation guides commenters to provide information in their

comment that would aid the agency in understanding and addressing a commenter's concern.

*Comment*:  Commenters noted proposed § 1503.4(a) states that "[a]n agency preparing a

final environmental impact statement shall consider substantive comments timely submitted

during the public comment period…"  Commenters stated that this implies that agencies are

prohibited from considering substantive comments submitted outside of formal comment

periods.  Commenters observed those comments can contain useful information and ignoring

such comments would also discourage stakeholder participation in the NEPA process.

*CEQ Response*:  CEQ has made revisions to § 1503.4 in the final rule for clarity.  The

public has multiple opportunities to provide information to the lead agency during the NEPA

process, including during scoping and in response to the draft EIS.  It is important for substantive

information to be timely submitted so that the NEPA process is both predictable and completed

within the applicable time limit.  Section 1502.9 of the final rule addresses the situation when

new circumstances or information relevant to environmental concerns arises after issuance of a

draft EIS.

332

*Comment*:  Commenters objected to changes in proposed § 1503.4(a) and stated that it reduces agencies' duties to respond to comments by changing "shall respond" to "may respond." Commenters noted § 1503.4(a) states in pertinent part that "[a]n agency preparing a final environmental impact statement shall consider … and may respond …"  Commenters requested CEQ reinstate the requirement that agencies must respond to comments.

*CEQ Response*:  CEQ has revised § 1503.4(a) in the final rule to clarify that agencies may respond to individual comments or groups of comments.  The revised language is not a change in agency position.  Under the 1978 regulations, Federal agencies had the flexibility in terms of structuring their responses to public comments.  Further, under the APA agencies have a duty to respond to significant public comments.  The final rule lists several ways in § 1503.4(a)(1)–(5) in which an agency may respond to comments and information received on the draft EIS, and CEQ has clarified in the final rule that agencies need not respond to each individual comment.

*Comment*:  Commenters objected to proposed changes to § 1503.4(a)(5) and stated that the changes erode an agency's duty explain why comments do not warrant further agency response by removing requirements to cite sources and information which support the agency's position.  Commenters noted that proposed changes to § 1503.3 require the public to cite sources and reference corresponding sections or page numbers, but proposed changes to § 1503.4 remove a requirement for a similar level of citation from agencies when responding to comments. Commenters stated that agencies may abuse the removal of the citation requirements by refusing to consider comments that address issues that the agency or a project proponent does not wish to consider or does not recognize for the important issues they may raise.

333

*CEQ Response*:  CEQ disagrees with the characterization of the proposed changes. Under the regulations as revised, agencies must consider substantive comments and its APA duty is to consider significant comments, and neither statute requires an agency to explain the reason a particular comment does not warrant further response under the governing legal standards.  The final rule includes revisions to § 1503.4 to clarify agencies' duties to consider and respond to comments.  The citation requirement in 40 CFR 1503.4(a)(5) was duplicative of writing and citation requirements in other sections of the regulations.  The final regulations continue to require that agencies ensure the professional integrity, including scientific integrity, of the discussions and analyses in environmental documents, and to require agencies to identify any methods used and make explicit reference to the scientific and other sources relied upon for conclusions in the statement.  § 1502.24.

*Comment*:  Commenters expressed support for the proposed revisions to § 1503.4 to clarify agencies may respond to comments collectively and stated that form letters should be treated as a single comment regardless of the number of submitters or the volume of submissions.

*CEQ Response*:  CEQ acknowledges commenters support for the clarification.

*Comment*:  Commenters requested CEQ amend § 1503.4 by including a requirement that an agency consult with any applicant regarding changes made as a result of comments received. Commenters stated that applicants should be provided with a formal opportunity to submit additional information responsive to public comments and discuss with the agency any proposed changes to the proposed action or alternatives prior to the agency's development of a Final EIS. Commenters explained applicants have particular knowledge about the proposed activities and

334

can provide detailed information regarding technical issues or the feasibility of a proposed

modification.

 *CEQ Response*:  CEQ declines to add the requested requirement to § 1503.4.  The final

rule includes several changes that improve coordination between agencies and applicants,

including allowing applicants to prepare environmental documents under the supervision of the

agency.  § 1506.5.  Agencies may include in their implementing procedures criteria for

consultation with an applicant or project proponent prior to responding to comments and

development of the final EIS.

 *Comment*:  Commenters stated that § 1503.4(c) is not clear and requested CEQ clarify

what the agency should do if the changes to the EIS are not minor.  Commenters asked if the

agency needs to rewrite the entire final EIS, or utilize a supplemental EIS.  Other commenters

requested CEQ revise § 1503.4(c) to require the agency to publish the final EIS in its entirety

incorporating any changes in response to comments on the draft EIS.

 *CEQ Response*:  CEQ proposed minor changes to the 1978 regulations to clarify

§ 1503.4(c).  The existing language has not been a source of confusion for agencies, and CEQ

declines to make further changes to address the commenters' requests.

## G. Comments Regarding Pre-Decisional Referrals to the Council of Proposed Federal Actions Determined to Be Environmentally Unsatisfactory (Part 1504)

 *Comment*:  Commenters requested that the final rule add a process for resolving concerns

earlier in the NEPA process at the draft EIS stage or sooner, so that referrals are not deferred

until after the final EIS.  Commenters requested that the final rule adjust the time period for

delivering referrals to CEQ because delivering referrals 25 days after the lead agency has

published the final EIS is too late in the process to be useful.  Commenters requested the final

335

rule limit the right to invoke a referral unless the agency requesting a referral raised its concern

with the lead agency earlier in the environmental review process, preferably no later than during

the comment period for the draft EIS.

*CEQ Response*:  The final rule in § 1504.3(b) retains the operative language from the

proposed rule and 1978 regulations regarding the timing of referrals.  Under § 1504.3(a), the

referring agency must advise CEQ at the earliest possible time that it intends to make a referral

and include its advice on the draft EA or EIS when it is practicable to do so.  CEQ declines to

make the requested changes to require the referral process to begin earlier or to place

prerequisites on the right to seek a referral.

*Comment*:  Commenters stated that the final rule should clarify the referral process as to

how it may affect the applicability of the time limits to the final decision.  Commenters requested

that the regulations clearly state that an agency would not sign a final decision until CEQ

completes its actions and the recommendations of the referring agency are addressed.

*CEQ Response*:  The time limits in § 1501.10 do not include the time that would be

needed for CEQ to review a pre-decisional referral.  CEQ notes that a senior agency official

could consider a pre-decisional referral when extending the time limits.

*Comment*:  Some commenters requested expanding the pre-decisional referral process to

include EAs.  Other commenters opposed such an expansion because it could undercut the

authority of the lead agency to determine significance, especially when the lead agency is

preparing an EA in order to determine whether it should prepare an EIS.

*CEQ Response*:  The final rule expands the pre-decisional referral process to EAs.  The

pre-decisional referral process allows for continued discussion with the lead agency regarding a

336

significance determination.  CEQ expects that the pre-decisional referral of EAs will arise infrequently because effects analyzed in EAs typically do not rise to the level of significance.

*Comment*:  A commenter recommended the addition of the phrase "the human environment" where "effects," "impacts," "resources," and "environmental quality" are used in §§ 1504.1, 1504.2, 1504.3.

*CEQ Response*: CEQ declines to adopt this recommendation in the final rule.  The definition of "effects" or "impacts" in § 1508.1(g) already associates those words with "the human environment."  Adding the recommended language in connection with "resources" and "environmental quality" is not necessary.

## 1.    Purpose (§ 1504.1)

*Comment*:  Commenters expressed concern regarding the lack of transparency with EPA's review and comment process under section 309 of the Clean Air Act and requested additional disclosures and ratings.  Commenters stated that agencies should be required to make EPA's comments and all records regarding the referral process publicly available.

*CEQ Response*:  EPA's procedures under section 309 of the Clean Air Act are outside the scope of this rulemaking.  CEQ declines to require additional disclosures regarding the referral process in the final rule.

*Comment*:  Commenters asked whether the EPA has a time limit for its review and comment on EISs under section 309 of the Clean Air Act (42 U.S.C. 7609).

*CEQ Response*:  While section 309 of the Clean Air Act does not specify a timeframe for EPA's review and comments, § 1504.3(b) of the final rule requires that any pre-decisional referral to CEQ occur no later than 25 days after the final EIS has been made available to EPA.

337

## 2.    Criteria for Referral (§ 1504.2)

*Comment*:  Some commenters recommended that CEQ include in § 1504.2(g)

consideration of the benefits as well as the costs of delaying or impeding the decision making of

the agencies involved in the action.  Some commenters recommended that the final rule delete

§ 1504.2(g) because the proposed addition of economic and technical considerations is contrary

to the intent of section 102(2)(B) of NEPA.  Commenters pointed to the Senate Report

accompanying NEPA, which explains that, in the past, agencies have ignored or omitted from

consideration environmental factors because they are difficult to compare with economic and

technical factors.  Commenters also noted that the Senate Report refers to the "full costs" of

Federal actions, which include the costs of environmental attributes such as natural barriers to

flooding that could be adversely affected by Federal actions.  Some commenters stated that the

economic costs of the delay should not be relevant when the project has not begun.  Commenters

stated that purely economic interests do not fall within NEPA's zone of interest, so economic and

technical considerations should not be part of pre-decisional referrals.  Some commenters stated

that the inclusion of economic and technical considerations gives undue weight to industry

economic interests and impedes industry innovation.  Some commenters requested a public

accounting of economic damages from Federal permitting or land management planning where

agency decision makers are balancing impacts.  Some commenters suggested the use of a

category for extraordinary or unusual circumstances.  Other commenters supported the addition

of economic and technical considerations as a criterion for referral.

*CEQ Response*:  CEQ declines to make further changes in response to the comments and

includes § 1504.2(g) in the final rule.  NEPA does not require consideration of costs and benefits

for pre-decisional referrals to CEQ.  The inclusion of economic and technical considerations is

338

grounded in section 102(2)(B) of NEPA.  The economic costs of delaying or impeding the

agency decision making on the action are only one of the seven considerations for the referring

agency in § 1504.2, to be balanced with possible violation of national environmental standards or

policies.  The other five are, severity, geographical scope, duration, importance as precedents,

and availability of environmentally preferable alternatives.

### 3.        Procedure for Referrals and Response (§ 1504.3)

*Comment*:  Commenters requested clarification on who determines what is "practicable"

as used in § 1504.3(a)(2).

*CEQ Response*:  As stated in section II.A of the final rule, the term "practicable" conveys

the ability for something to be done, considering the cost, including time required, technical and

economic feasibility, and the purpose and need for agency action.  As used in § 1504.3(a)(2), the

referring agency will determine what is "practicable."

*Comment*:  Commenters stated that CEQ did not explain in the NPRM the proposed

change in § 1504.3(c)(1) striking language from the 1978 regulations requiring the referral letter

to request that no action be taken during the referral process.

*CEQ Response*:  CEQ strikes this language from the 1978 regulations because it overly

constrained the request from the referring agency.  The referring agency has multiple options

when submitting a referral, and a request for no action to be taken during the referral process is

only one potential option.  Further, the lead agency can make a determination on whether and to

what extent such a delay is appropriate.  CEQ notes that because the pre-decisional referral

process necessarily occurs before a final agency decision, no irreversible or irretrievable

commitment of resources can be made.

339

*Comment*:  Commenters stated that the NPRM did not adequately explain the proposed change from "in controversy" to "disputed" in § 1504.3(c)(2)(ii).

*CEQ Response*:  CEQ changes this language for clarity.  "Disputed material facts" is a phrase that is commonly used in fact finding proceedings.

*Comment*:  Commenters requested clarification regarding § 1504.3(d)(2), and whether explanations would replace evidence, or if evidence would be required along with explanations.

*CEQ Response*:  The final rule retains the phrase "evidence and explanations, as appropriate," to allow for flexibility in providing supporting bases for the referral.

*Comment*:  Commenters stated that CEQ did not explain the proposed change in § 1504.3(e) that would narrow the reference from "interested persons" to the "applicant."

*CEQ Response*:  CEQ makes the proposed change in the final rule.  The inquiry for the pre-decisional referral process is focused on the applicant as the most directly affected person or entity.  It provides further clarity and emphasizes the importance of the applicant articulating its views about the referral within the allotted time period.  Interested agencies or persons may continue to submit their views to CEQ for consideration outside of the pre-decisional referral process in § 1504.3(e).

*Comment*:  Commenters stated that CEQ did not explain the change in § 1504.3(f)(3) that would eliminate the reference to public meetings or hearings as a means of obtaining additional views and information.

*CEQ Response*:  CEQ strikes this language from the 1978 regulations because there are a variety of effective means, including public meetings and hearings, for CEQ to obtain views from the public.  Although no longer expressly mentioned in § 1504.3(f)(3), public meetings and hearings are neither discouraged nor precluded.

340

*Comment*:  Some commenters requested that the final rule define the term "President" as used in § 1504.3(f)(7).

*CEQ Response*:  The term "President" in § 1504.3(f)(7) refers to the President of the United States.

*Comment*:  Some commenters requested that the final rule change the language "25 days after receipt" in § 1504.3(f) to "60 days after receipt," and change the "60 days" CEQ has to complete its actions to "120 days" in § 1504.3(g).

*CEQ Response*:  CEQ declines to adopt the recommended changes.  Based on past experience with pre-decisional referrals, it is not necessary to extend the referenced time periods.

*Comment*:  Commenters stated that pre-decisional referrals to CEQ increase project costs and delays, and requested that the applicant's position be included as a consideration for and during the referral process.

*CEQ Response*:  CEQ declines to make the requested changes to add the applicant's position as a criterion for referral.  Section 1504.2(g) sufficiently encompasses economic considerations.  The final rule in § 1504.3(e) retains the language from the proposed rule that allows applicants to submit their views during the pre-decisional referral process.

*Comment*:  Commenters stated that CEQ had not explained the changes in § 1504.3(h) regarding judicial review, no private right of action, final agency action, and the deletion of the language of the 1978 regulations regarding an agency hearing under the APA.  Commenters suggested that removal of the existing language would permit agencies and CEQ to circumvent the APA and is otherwise inconsistent with NEPA's goals.  Some commenters supported the proposed change because it could streamline the NEPA process and avoid time spent in litigation.

341

*CEQ Response*:  The final rule includes this proposed change.  As the preamble to the 1978 regulations explains, CEQ adopted 40 CFR 1504.3(h) at that time after some commenters noted that several agency statutes require determinations to be made on the record after an opportunity for a public hearing.  Thus, the purpose of 40 CFR 1504.3(h) was to restate the prohibition on ex parte communications with agency decision makers that may be applicable in various contexts under the relevant statutes.  The language in 40 CFR 1504.3(h) was duplicative of existing law.

By deleting the sentence in the final rule, CEQ does not change agency obligations under 5 U.S.C. 557(d) when participating in the CEQ referral process.  Instead, CEQ's replacement language in § 1504.3(h) more accurately reflects the legal requirements of the APA and correctly notes that the outcome of a referral is "dependent on later consistent action by the action agencies."  As CEQ explained in the preamble to the proposed rule, the language in § 1504.3(h) will simplify and modernize referrals to CEQ and ensure that it is a more timely and efficient process.  CEQ achieves this purpose by updating § 1504.3(h) to reflect that voluntary resolutions under the referral process are not final agency actions subject to judicial review.  Moreover, it does not deprive stakeholders of judicial review that would otherwise be available under the APA or the relevant agency statutes that bar ex parte communications.  The final rule simply restates the law and clarifies the role of the referral process in agency adjudication.  Judicial review and APA or statutory restrictions on ex parte communications were and remain dependent on the underlying agency statutes governing the relevant action at issue in a referral.

**H.      Comments Regarding NEPA and Agency Decision Making (Part 1505)**

**1.      Remove and Reserve Agency Decisionmaking Procedures (§ 1505.1)**

*Comment*:  Commenters opposed striking § 1505.1 because it includes useful information that NEPA practitioners use all the time and are not fully recognized in the revisions.

*CEQ Response*:  In the final rule, CEQ incorporates the text of 40 CFR 1505.1, "Agency decisionmaking procedures," to § 1507.3(c).  CEQ also adds a requirement for certification by the decision maker in § 1505.2(b) as a more transparent method to document the decision-making process.

*Comment*:  Commenters expressed support for moving § 1505.1 to part 1507 on agency compliance.  Commenters also supported the proposed clarifications to § 1505.2.

*CEQ Response*:  CEQ acknowledges the support for the changes.

**2.      Record of Decision in Cases Requiring Environmental Impact Statements (§ 1505.2)**

*Comment*:  Commenters stated that proposed § 1501.7(g), which would require that Federal agencies issue a joint ROD when practicable, has yet to be successfully demonstrated.  Commenters stated that interagency conflicts have caused considerably more delay than if the respective agencies had prepared environmental reviews.

*CEQ Response*:  The final rule integrates the expectations for timing and efficiency of FAST-41 and E.O. 13807.  Joint RODs have been issued and provide greater certainty in the decision-making process.  They allow the Federal Government to speak with a coordinated voice when conducting environmental reviews and making authorization decisions.  Agencies retain the flexibility to forgo a joint ROD where they determine that it will be more efficient to issue separate RODs.

343

*Comment*:  Commenters requested CEQ clarify that the decision maker is not obliged to select any alternative in its entirety, but may select elements of one or more alternatives when arriving at a final action.  As long as the agency considers and discloses the effects of each part of the final action, explicitly preserving the flexibility for a decision maker to select parts of different alternatives, this also preserves agencies' ability to create the best possible action.

*CEQ Response*:  Consistent with long-standing practice, agencies may select a final action that falls within the range of environmental analysis, even if elements are contained in multiple alternatives.  Section 1505.2 allows flexibility for an agency decision maker to select elements of one or more alternatives when arriving at a final action.

*Comment*:  Commenters expressed support for proposed § 1502.18, "Certification of submitted alternatives, information, and analyses," and noted the new certification requirement ensures that the agency carefully reviews comments from the public.

*CEQ Response*:  CEQ acknowledges the support for the proposed changes and notes that the final rule includes this provision in § 1505.2(b)).

*Comment*:  Commenters objected to proposed § 1502.18 and stated that the certification of submitted alternatives, information, and analyses section is a new EIS requirement that is not required by NEPA.

*CEQ Response*:  The consideration of submitted alternatives, information, and analyses is central to the NEPA process.  Certification by the decision maker as provided in § 1505.2(b) will ensure the agency considered all alternatives, information, and analysis submitted by State, Tribal, and local governments as well as the public.  This step will improve the NEPA process and help achieve the Act's twin aims of ensuring informed decision making and informing the public regarding the decision making process.

344

*Comment*:  Commenters objected to and expressed concerns regarding the requirement at proposed § 1502.18 for a senior agency official to certify in the ROD that the agency has considered the information contained in the § 1502.17 summary of the EIS.  Commenters stated that the certification is unnecessary because the publication of a final EIS represents the agency's certification of the EIS.  Further, commenters stated that § 1503.4 already requires an agency to consider substantive comments submitted during the public comment period.  Similarly, the ROD represents the decision of the agency and should not need additional certification by a senior agency official.

*CEQ Response*:  The final rule in § 1505.2(b) requires certification by the decision maker who is signing the ROD.  While the senior agency official may also be the decision maker for some agencies, the identification of who in the agency is the decision maker for particular actions is governed by applicable law and agency procedures (including delegation of authority).  This certification supports the presumption under § 1505.2(b).

*Comment*:  Commenters objected to proposed § 1502.18 and stated it would reduce an agency's obligation to respond to comments because § 1502.18 requires a certification that the agency has considered this information without evidence to support the certification.  Commenters requested CEQ revise proposed § 1502.18 to require agencies to consider and discuss in the final EIS or ROD all timely and relevant comments and include all comments received and agency responses to them.  Other commenters requested CEQ revise proposed § 1502.18 to require the decision maker to verify that the agency provided a "hard look" consideration prior to certifying that the agency considered the submitted information.

*CEQ Response*:  Agency decision makers must base their decisions on the entire decision file, and the ROD must reflect that consideration.  The final rule in § 1505.2(b) adds the

requirement that the decision maker certify in the ROD that the agency has considered submitted alternatives, information, analyses, and objections. This certification requirement supplements the requirement in § 1503.4 that agencies consider substantive comments timely submitted during the public comment period.

*Comment*: Commenters expressed concern that the "certification" requirement in proposed § 1502.18 is based solely on the EIS "summary" described in § 1502.12. Commenters stated that, compared to the level of information and analysis provided in the entire EIS, the summary is an inadequate basis to make such a certification. Commenters requested the final rule change the wording to say the "certification" will "based on the findings of the environmental impact statement."

*CEQ Response*: In response to comments, the final rule in § 1505.2(b) clarifies that the decision maker must certify the EIS based on the summary of submitted alternatives, information, and analyses in the final EIS "together with any other material in the record that he or she determines to be relevant." The additional language encompasses any findings, alternatives, information, and analyses that the decision maker deems relevant. *See also* § 1505.2(b) ("Agency environmental impact statements certified in accordance with this section are entitled to a presumption that the agency has considered the submitted alternatives, information, and analyses, including the summary thereof, in the final environmental impact statement.").

*Comment*: Commenters requested revisions to proposed § 1505.2(e) providing for an agency's certification in the ROD to strike "submitted" in the first occurrence of this word and to add that the decision maker has reviewed the final EIS, and fully understands the issues,

346

alternatives, and impacts, and to specify the decision maker's experience and technical qualifications.

*CEQ Response*:  CEQ declines to make the requested revisions.  Section 1505.2(b) of the final rule focuses on the new certification requirement.  In response to comments, CEQ revises § 1505.2(b) of the final rule to clarify that it requires the decision maker to certify in the ROD that the agency has considered all of the alternatives, information, analyses, and objections submitted by State, Tribal, and local governments and public commenters for consideration by the lead and cooperating agencies in developing the EIS.  Decision makers exercising authority on behalf of the agency and as part of the decision-making process rely on the experience and expertise of their staff who have prepared the EIS.  The final rule continues to require in § 1502.18 that the EIS list the names and qualifications of persons primarily responsible for preparing the EIS or significant background papers, including basic components of the statement.

*Comment*:  Commenters disputed that CEQ has the authority to create a "conclusive presumption" standard for judicial review under the APA in relation to whether an agency adequately reviewed the information included in the submitted alternatives, information, and analyses.  Commenters stated that it would be illegal to replace the "hard look" standard established by the Supreme Court in *Kleppe*, 427 U.S. at 390, with a "hard certification" standard.  Commenters stated only Congress can replace the "hard look" standard under the APA and *Kleppe* with a "conclusive presumption" standard and its adoption by CEQ.

*CEQ Response*:  The certification satisfactorily serves as documentation that the decision maker has considered all of the alternatives, information, analyses, and objections submitted by commenters in the development of the EIS.  In response to comments, § 1505.2(b) of the final rule establishes that agencies are entitled to a "presumption" but not a "conclusive presumption"

347

that the agency has considered such materials.  As section II and II.G.2 of the final rule explains, agencies are entitled to such a presumption of regularity.

*Comment*:  Commenters supported the requirement in proposed § 1505.2(e) for the decision maker to certify that the agency considered "the submitted alternatives, information, and analyses submitted by public commenters."

*CEQ Response*:  CEQ acknowledges the support for the change, which is included in § 1505.2(b) of the final rule with modifications.

*Comment*:  Commenters opposed the addition of "enforceable" and "requirements or commitments" in proposed § 1505.2(c) as ambiguous.

*CEQ Response*:  The final rule adds enforceable to § 1505.2(a)(3).   For a mitigation requirement or commitment to be reliable in a ROD, it must be enforceable by the agency.  The intent of "enforceable" in this provision is to clarify that any monitoring and enforcement program is tailored to the enforceable mitigation requirements or commitments.  Agencies are not required to adopt an accompanying monitoring and enforcement program for voluntary or otherwise non-enforceable mitigation requirements or commitments.

*Comment*:  Commenters stated that in proposed § 1505.2 (c) adding the term "enforceable" before mitigation will lead to agency confusion on what is an enforceable mitigation requirement or commitment.  Commenters stated that agencies may seek only measures that need to be implemented in accordance with regulatory permits or local or regional ordinances (which typically should not be considered as mitigation measures, as they are permit conditions), and recommended deleting the term "enforceable" to allow agencies flexibility in reviewing, evaluating, and developing mitigation measures.

348

*CEQ Response*:  CEQ declines the requested revisions.  In the final rule, however, CEQ clarifies in the definition of "mitigation" in § 1508.1(s) that while agencies must consider mitigation in their analyses, NEPA does not mandate the form or adoption of any mitigation.

*Comment*:  Commenters expressed support for the proposed requirement to verify in the ROD that "the agency has adopted all practicable means to avoid or minimize environmental harm from the alternative selected, and if not, why the agency did not."  This provision is in keeping with section 101 of NEPA.

*CEQ Response*:  CEQ acknowledges the support for this provision, which is retained from the 1978 regulations with minor modifications for clarity.

*Comment*:  Commenters stated that CEQ should allow the lead agency to combine the final EIS and the ROD at § 1505.2, as is currently allowable under FHWA authority.

*CEQ Response*:  The final rule retains the requirements in the 1978 regulations for a 30–day period after publication of a final EIS, consistent with the exceptions in § 1506.11.  Section 1506.11(b) provides that the 30–day period does not apply where otherwise provided for by law, such as a combined final EIS and ROD authorized for FHWA projects under 23 U.S.C. 139(n)(2) and 49 U.S.C. 304a(b).  Section 1507.3(f)(2) provides that agencies NEPA procedures may modify this time period when necessary to comply with other specific statutory requirements, including requirements of lead and cooperating agencies.

*Comment*:  Commenters requested clarification regarding funding for mitigation and monitoring activities, which are often critical after a completed NEPA review to ensure compliance with the ROD.

*CEQ Response*:  Where applicable, the project proponent should have sufficient funding to carry out any required mitigation (§ 1505.3(b)).

349

### 3.    Implementing the Decision (§ 1505.3)

*Comment*:  Commenters supported clarifying the application of mitigation to reflect the non-obligatory nature of NEPA's mitigation provisions.  A commenter noted that, in the past, some agencies ignored the procedural nature of NEPA and imposed mandatory mitigation, sometimes with a goal of a net conservation gain.  A commenter noted that the proposed change is consistent with the BLM Instruction Memorandum 2019-018.

*CEQ Response*:  In the final rule, CEQ clarifies that NEPA is procedural in nature and not a supplemental authority under which agencies can require mitigation for all impacts.

*Comment*:  While commenters agreed that an EIS or EA cannot mandate mitigation, they requested that NEPA documents demonstrate that the agency considered mitigation by providing information on options, costs, and effectiveness of potential mitigation to environmental harms associated with the proposed action.

*CEQ Response*:  The EIS or EA should discuss mitigation options, costs, and effectiveness in order to inform the agency decision maker.  As stated in § 1508.1(s), while NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation.  As reflected in § 1505.2(a), agencies must identify in the ROD the alternatives considered and must state whether they have adopted all practicable means to avoid or minimize environmental harm from the alternative selected, and if not, why the agency did not.  The extent of the mitigation evaluated is subject to the agency's discretion, as consistent with current practice.

*Comment*:  Commenters stated that the current NEPA process provides a tool for Tribes to provide input and seek effective mitigation measures and the proposed amendments would severely impair that process.  Commenters requested clarification in the rule because they

350

asserted that the proposed changes would make it more difficult to coordinate mitigation for adverse effects to historic properties of religious and cultural significance to Tribes.

*CEQ Response*:  The NPRM specifically provided for enhanced Tribal involvement in comparison to the 1978 regulations.  Under the final rule, CEQ adopts these changes.

*Comment*:  Commenters asked that, if adoption of mitigation is not required in the NEPA analyses, where appropriate mitigation would be identified or addressed.  Commenters noted that mitigation may be required by State law, and the proposed CEQ changes appear to contradict State requirements for mitigation.

*CEQ Response*:  Mitigation may be adopted in a FONSI or ROD (§§ 1501.6 and 1505.2), or it may be included as a permit condition (§ 1505.3(a)).  As reflected in § 1505.2(a), agencies must identify in the ROD the alternatives considered and must state whether they have adopted all practicable means to avoid or minimize environmental harm from the alternative selected, and if not, why the agency did not.  For the purposes of agency efficiency, an agency may wish to include mitigation pursuant to State authorities where it is combining the EIS with State documents.

*Comment*:  Commenters requested that CEQ further clarify how agencies communicate mitigation measures to the project proponent asserting that good communication was lacking.

*CEQ Response*:  The final rule includes several changes regarding mitigation, including clarifying that it must have a nexus to the effects of the proposed action and that, while NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation.  These changes will improve the project proponent's understanding of any requirements to mitigate the effects of the proposal.

351

*Comment*:  Commenters stated that, where the environmental analysis is based on the inclusion of mitigation, all mitigation discussed as part of the selected action must be considered a part of the approved action, and therefore subject only to minor changes when implemented. Commenters stated CEQ's statement in proposed § 1505.2(c) requires disclosure only of enforceable mitigation, and is inconsistent with proposed § 1505.3 where mitigation committed to as part of the project description "shall" be implemented.  Commenters stated all mitigation must be enforceable by the action agency because it is the public's and decision makers' understanding of the Federal action in question.

*CEQ Response*:  The proposed revisions to §§ 1505.2(c) and 1505.3, finalized with revisions for clarity, are consistent with one another.  Mitigation that an agency has committed to conduct as part of the project description (*i.e.*, not discretionary) is required and therefore is enforceable.

*Comment*:  Commenters requested that CEQ modify part 1505 to require decision documents for actions covered by FONSIs to be similar to a ROD, require agencies to ensure that mitigation and monitoring commitments appear in legally binding documents, and amend proposed §§ 1505.3(c) and (d) to provide that reports on progress in carrying out relevant mitigation and monitoring are made systematically available to the public.  Other commenters recommended that CEQ provide detailed instructions to the lead agencies on how a project proponent should report on progress and completion of mitigation and monitoring to the Federal agency or appropriate cooperating agency.

*CEQ Response*:  CEQ declines to make the recommended changes in the final rule. Section 1501.6 of the final rule covers FONSI procedures.  A ROD and FONSI are legally binding documents.  Given the diversity of agency programs, agencies should have full

352

flexibility in how project proponents and lead agencies report on mitigation and monitoring to cooperating agencies and interested stakeholders.

*Comment*:  Commenters requested that CEQ modify § 1505.3 by stating that an agency must undertake the mandatory duties of § 1505.3 while the action is being carried out, and such duties must be completed before the authorized agency action is completed.  Commenters stated that the final rule should revise § 1505.3 to clarify that any failures to perform the mandatory provisions of § 1505.3 (*i.e.,* all provisions prefaced by the word "shall") are enforceable as illegal failures to act under 5 U.S.C. 706(1).

*CEQ Response*:  CEQ declines to make the recommended changes to the final rule. While NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation or the timeline for implementing any mitigation measures.  The use of the word "shall" in § 1503.3 denotes  the nature of the relevant legal duties.

*Comment*:  Commenters requested clarification in § 1505.3(d) as to whether "publish" also means "make available to the public."

*CEQ Response*:  Pursuant to the definition of publish and publication at § 1508.1(y), publish means making information available to interested persons, including by electronic publication.  This would include the public.

## I.    Comments Regarding Other Requirements of NEPA (Part 1506)

### 1.    Limitations on Actions during NEPA Process (§ 1506.1)

*Comment*:  Commenters expressed support for clarifying allowable activities, including property acquisition, stating that these actions are taken at the applicant's sole risk and do not prejudice the NEPA review or final decision.  Additionally, commenters noted that the proposed

353

change is consistent with DOT's current practice.  Commenters also believed these proposed

changes would prevent costly delays.

CEQ Response:  CEQ acknowledges the support for the proposed changes.

Comment:  Commenters expressed general concern that the proposed changes undermine

NEPA because they allow an agency to authorize irreversible and irretrievable commitments of

resources before an EIS is prepared and that this is in direct violation of section 102 of NEPA.

Specifically, allowing land interest acquisitions, purchases of equipment, fee simple, rights-of-

way, conservation easements, and site preparations to occur during pendency of review would

undermine and limit the range of alternatives, potential mitigation, and predetermine the outcome

with the overall effect of reducing the effectiveness of public involvement.  A commenter noted

that courts have consistently refused to allow projects to proceed when violations of NEPA have

occurred, specifically as it relates to the actions allowed before the NEPA process is complete.

CEQ Response:  It has been long-standing practice under the 1978 regulations for

applicants to perform certain types of work in support of their Federal application.  For example,

the 1978 regulations authorize the Rural Electrification Administration to approve minimal

expenditures not affecting the environment by non-governmental entities seeking loan

guarantees.  40 CFR 1506.1(d).  CEQ proposed to eliminate this agency-specific reference and

provide further clarity on the types of activities that support an application for Federal, State,

Tribal or local permits or assistance.  As an example of activities an applicant may undertake,

CEQ proposed to add "acquisition of interests in land," which includes acquisitions of rights-of-

way and conservation easements, to the existing list of actions that can proceed.  CEQ's

clarifications to § 1506.1(b) do not undermine the statutory requirement to analyze significant

impacts and alternatives.  Further, it is not correct to interpret section 102(2)(C)(v) of NEPA,

which requires an EIS to include "any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented," to prohibit any activity related to a proposed action.  NEPA is a procedural statute.

Comment:  Commenters expressed concern that purchases of land and site preparations by agencies and applicants both before and during the formal NEPA process has influenced the range of alternatives analyzed.

CEQ Response:  Allowing the acquisition of certain land interests during the pendency of an environmental review does not prejudice an outcome.  *See Nat'l Audubon Soc'y v. Dep't of the Navy*, 422 F.3d 174, 206 (4th Cir. 2005) ("Further environmental studies and land surveys do not pre-commit the Navy to building [the preferred alternative].  The CEQ regulations expressly allow design and other work necessary for permit applications . . . . Nor will the Navy's purchase of land from willing sellers turn its ultimate decision about where to place the [preferred alternative] into a foregone conclusion."); *see also, Maryland Conservation Council, Inc. v. Gilchrist*, 808 F.2d 1039, 1042 (4th Cir. 1986).  Under the statute, activities are permissible where the agency retains sufficient authority to select alternative outcomes during its environmental review.  *Nat'l Audubon Soc'y* at 206.

Comment:  Commenters stated that the proposed changes to relax certain restrictions on commitments on resources during the NEPA process would increase the perception that the formal scoping process is perfunctory and any public scoping comments are after-the-fact.  Commenters also stated that these changes would allow applicants to begin projects before an environmental analysis is complete.

CEQ Response:  Public scoping participation constitutes an integral part of the process and the proposed changes concerning commitments of resources will not adversely affect it.  The

355

final rule expands, rather than reduces, public participation in the scoping process. Through the scoping process in § 1501.9 an agency may seek public comment or other forms of public involvement prior to publication of the NOI in addition to scoping after publication of an NOI. The final rule allows certain activities that neither have an adverse environmental impact nor limit the choice of reasonable alternatives.

*Comment*: Commenters requested that CEQ further clarify the types of activities that are allowed to proceed under section § 1506.1. Specifically, commenters recommended the addition of "utility relocation," "minor ground disturbance associated with materials testing and investigations in furtherance of project planning or design does not constitute a pre-decisional commitment of resources that may limit the choice of alternatives," as well as considering an "application from a non-Federal entity." Commenters cited planning for water infrastructure projects as a potential benefactor of the revision. Commenters requested that CEQ provide guidance to Federal agencies on actions that constitute irreversible and irretrievable commitments of resources.

*CEQ Response*: A minor ground disturbance related to project planning or design would generally not have an adverse environmental impact or limit the choice of reasonable alternatives. However, this and other examples provided by commenters are typically evaluated by agencies based on the particular facts and circumstances. CEQ declines to include this level of specificity in the final rule. Additionally, § 1506.1(b) of the final rule clarifies the activities that are allowed to proceed, such as, but not limited to, acquisition of interests in land (e.g., fee simple, rights of way, and conservation easements), purchase of long lead-time equipment, and purchase options made by the applicant.

The application of these general standards are best left to the judgment of implementing agencies based on the particular facts and circumstances of their proposed actions. Agencies may provide further details in their procedures based on the specific circumstances of their programs.

*Comment*: Commenters asserted that CEQ did not justify its proposed changes to § 1506.1, cited no case law to support the revisions, and as a result the proposed changes would be arbitrary and capricious. Additionally, commenters stated that allowing certain actions to occur prior to the conclusion of an environmental review is inconsistent with case law and violates NEPA.

*CEQ Response*: CEQ may reinterpret NEPA, consistent with *Chevron,* unless the Supreme Court has interpreted the statute in a particular way to be clear as a matter of *Chevron* step one. *See Brand X*, 545 U.S. at 982–83. In response to comments on the ANPRM and CEQ's experience implementing the 1978 regulations, CEQ proposed changes for the purpose of further clarifying those types of activities that may proceed during pendency of a NEPA review.

The changes that CEQ includes in the final rule are not inconsistent with NEPA. The types of actions include development by applicants of plans or designs or performance of other activities necessary to support State, Tribal, or local permits or assistance. The final rule clarifies that an agency may authorize such activities including but not limited to acquisitions of interests in land, purchases of long lead time equipment, and purchase options made by applicants. Some agencies, such as DOT, presently allow project proponents to acquire land during pendency of the NEPA review. Further, many agencies have categorically excluded various types of land

357

interest acquisitions for a myriad of purposes.[75]  CEQ's changes to § 1506.1(b) facilitate

consistent implementation among Federal agencies for these purposes but do not undermine the

statutory requirement to analyze any irreversible and irretrievable commitments of resources that

would be involved in the proposed action.  While the location and legal control of certain lands

may be a prerequisite for many Federal authorizations, allowing the acquisition of certain land

interests during the pendency of an environmental review does not necessarily determine an

outcome such that the agency no longer retains discretion under NEPA.

*Comment*:  Some commenters suggested that CEQ's proposed changes in § 1506.1 will

disproportionately and adversely harm African American landowners.

*CEQ Response*:  The changes in § 1506.1 allow an agency to authorize acquisition of

interests in land, based on the particular facts and circumstances regarding the proposed action, if

that activity is necessary to support an application for Federal funding.

*Comment*:  A commenter recommended that CEQ revise its regulations to allow for the

acquisition of rights-of-way prior to completion of Federal NEPA requirements for projects that

can demonstrate no significant adverse impact.

*CEQ Response*:  The final rule expressly states in § 1506.1(b) that an agency considering

a proposed action for Federal funding may authorize such activities, including but not limited to,

acquisition of interests in land (e.g., fee simple, rights-of-way, and conservation easements),

purchase of long lead-time equipment, and purchase options made by applicants.

*Comment*:  Commenters recommended that the limitations of actions for EISs be

extended to EAs and CEs by revising § 1506.1(a) to read, "until an agency completes the NEPA

---

[75] *See generally,* List of Agency CEs, *supra* note 44.

process." Other commenters expressed concern that expanding the "Limitation on actions during NEPA process" provisions to EAs would unnecessarily slow projects that do not require the preparation of an EIS.

*CEQ Response*: CEQ added FONSIs to § 1506.1(a) to codify existing practice and judicial determinations that the limitation on actions applies when an agency is preparing an EA as well as an EIS. CEQ declines to apply the limitation on actions to CEs because CE actions do not have adverse environmental effects or require alternatives analysis unless there are extraordinary circumstances. If extraordinary circumstances may prevent the application of a CE, the agency would prepare an EA or EIS subject the requirements of § 1506.1(a).

*Comment*: Commenters requested that CEQ delete or further revise § 1506.1 to clarify that applicants implementing private projects be able to conduct activities outside of the permitting agency's statutory jurisdiction and activities with little or insignificant environmental impact during a NEPA review. A commenter requested that CEQ clarify that an applicant may take actions that are otherwise legal, do not require authorization, or do not trigger a major Federal action significantly impacting the environment.

*CEQ Response*: Activities that are outside of the proposal are not covered by the limitation on actions in § 1506.1(a). Further, an action outside of the permitting agency's statutory jurisdiction would generally not meet the definition of major Federal action at § 1508.1(q)(1)(vi) and therefore not be covered by the restrictions in § 1506.1. CEQ declines to provide further clarification in the final rule.

*Comment*: A commenter stated their concern with replacing the word "non-governmental entities" with" applicant" in § 1506.1(b).

359

*CEQ Response*:  The term "applicant" is more consistent with its use throughout the final rule.

*Comment*:  One commenter recommended that CEQ strike § 1506.1(b), in its entirety as they believe non-Federal entities should be able to take actions when doing so is otherwise legal and no authorizations are needed for that specific action.

*CEQ Response*:  CEQ declines this recommendation, because § 1506.1(b) provides important flexibility and clarification of the scope of § 1506.1(a).  CEQ properly interprets NEPA in § 1506.1(a) to impose a procedural requirement that limits actions during the NEPA process.

*Comment*:  Commenters stated that § 1506.1(a)(2) and (b) were ambiguous and failed to clarify the universe of what activities could occur pre-ROD.  Commenters recommended that CEQ clarify what is meant by an agency "taking appropriate action to ensure that the objective and procedures of NEPA are achieved."

*CEQ Response*:  CEQ did not propose changes to the above-quoted language (except to revise "insure" to "ensure") and declines to make changes in the final rule because the application of these general standards are best left to the judgment of implementing agencies based on the particular facts and circumstances of a proposed action.  The quoted language referenced by the commenters has been retained from the 1978 regulations.  The intent is to require agencies to ensure that FONSIs and RODs are completed before activities covered by the proposed action are undertaken that would have an adverse environmental impact or limit the choice of reasonable alternatives.  This language has been clearly understood and CEQ declines to make further changes to the final rule.

360

*Comment*:  One commenter recommended that CEQ add an additional limitation in §§ 1506.1(a)(2) and (c)(3) to prohibit actions that could limit mitigation measures available to the agency.

*CEQ Response*:  The final rule requires FONSIs or RODs be issued before activities can be undertaken that would limit the choice of reasonable alternatives, and these may include appropriate mitigation measures not already included in the proposed action or alternatives, during the pendency of the NEPA review.  Foreclosing mitigation measures too early would violate the sequencing requirement.  CEQ declines to make further changes to the final rule to address the comment.

*Comment*:  A commenter recommended that CEQ replace the word "equipment" in § 1506.1(b) with the word "materials," so it would read "purchase of long-lead time materials."

*CEQ Response*:  CEQ acknowledges the suggestion and notes that the language is sufficiently broad to include long-lead time materials that are not equipment.  In particular, the list of "acquisition of interests in land … purchase of long lead-time equipment, and purchase options" is introduced by the phrase "including, but not limited to."

*Comment*:  One commenter recommended that CEQ make various changes to § 1506.1(c), including changing the phrase "or environmental assessment" to "or programmatic environmental assessment," and change "interim action" to "an interim action" in § 1506.1(c)(3).

*CEQ Response*:  In the final rule, CEQ finalizes the provisions from the NPRM, with minor grammatical changes, and simplifies the reference to "programmatic environmental impact statement or environmental assessment" to "programmatic environmental review."

*Comment*:  Commenters requested that CEQ add EAs and CEs to § 1506.1(c)(2).

361

*CEQ Response*:  CEQ declines because the second clause of § 1506.1(c) refers to major Federal actions that may significantly affect the quality of the human environment.  As such, it only applies to an EIS, not an EA or CE.

*Comment*:  One commenter suggested CEQ change § 1506.1(a)(1) to "impact to the human environment."

*CEQ Response*:  CEQ notes that it has elsewhere explained how the definition provisions work and thus declines to add the word "human."  CEQ also notes that it has revised the definition of "effects" in § 1508.1(g) of the final rule to reference "changes to the human environment."

*Comment*:  In responding to CEQ's question as to whether there are circumstances under which an agency may authorize irreversible and irretrievable commitments (§ 1506.1), some commenters suggested that there are no circumstances under which an agency may authorize irreversible and irretrievable commitments of resources, because that would undermine NEPA, and result in uncertainty and legal liability.

*CEQ Response*:  In its final rule, CEQ finalizes § 1506.1 as proposed, with minor grammatical changes, and simplified the reference to "programmatic environmental impact statement or environmental assessment" to "programmatic environmental review."  CEQ did not make any further changes as to whether there are circumstances under which an agency may authorize irreversible and irretrievable commitment of resources.  Further, under case law concerning the 1978 regulations as amended, an agency is not precluded from taking actions prior to or without completing the analysis required by NEPA unless that action would have adverse environmental effects or limit the range of alternatives and determine the outcome of the agency decision.  *See, e.g., Nat'l Audubon Soc'y*, 422 F.3d at 202 ("allowing an agency to

362

continue work on a project while its environmental study is pending does not necessarily create the type of option-limiting harm that NEPA seeks to prevent.")

*Comment*:  A commenter stated that livestock grazing should not be considered as an irreversible or irretrievable commitment of resources by a Federal agency because the impacted natural resource is renewable.

*CEQ Response*:  The application of this provision depends on the particular facts and circumstances regarding the proposed action.  CEQ declines to make further changes to address the commenter's concern.

## 2.    Elimination of Duplication with State, Tribal, and Local Procedures (§ 1506.2)

*Comment*:  Some commenters were supportive of changes to this provision, noting that it encourages Federal agencies to use State, Tribal, and local planning documents to avoid duplication.

*CEQ Response*:  CEQ acknowledges support for the proposed changes.

*Comment*:  Some commenters stated that proposed §§ 1501.7(h)(2) and 1506.2(b) were too restrictive concerning Federal agency use of studies, analysis, and decisions developed by State, Tribal, and local governments.  Concerning § 1501.7(h)(2), a commenter stated that the phrase, "consistent with its responsibility as a lead agency," is vague and has been used by lead agencies as a basis for refusing to use scientific studies and analyses prepared by State, Tribal, and local governments.  Concerning § 1506.2(b), the commenter felt the reference to "environmental studies, analysis, and decisions" could have the consequence of excluding lead agencies from using relevant socio-economic information prepared by State, Tribal, and local governments.  Commenters also recommended striking the reference to "jurisdiction by law or

363

special expertise" and require use of cooperating agencies' analyses to be consistent with proposed § 1502.24.

*CEQ Response*:  CEQ has made additional changes in the final rule to remove potential impediments for Federal agency use of studies, analysis, and decisions developed by State, Tribal, and local government agencies.  The final rule does not include the phrase, "consistent with its responsibility as lead agency" in § 1501.7(h)(2) because it was non-specific and caused confusion regarding the use of germane and informative scientific research.  CEQ has also revised § 1506.2(b) so that cooperation with State, Tribal, and local governments includes the use of studies, analysis, and decisions developed by State, Tribal, and local governments.  The revised language better reflects the intent of CEQ's proposal, which is to encourage broad use of studies, analysis, and decisions prepared by State, Tribal, and local agencies, as appropriate.  The requirements at § 1502.23 apply to the use of analyses under § 1501.7(h)(2).  However, CEQ has declined to add a cross-reference to § 1502.23 because it could be construed to not apply the provisions elsewhere in the rule.  CEQ declines to strike "jurisdiction by law or special expertise" because the language was retained from the 1978 regulations and has not been a source of confusion.

*Comment*:  Some commenters opposed the change to § 1506.2(c), which replaces the word "shall" with the word "may" in reference to preparation of one document when Federal agencies are cooperating in fulfilling the requirements of applicable State, Tribal, and local ordinances that have environmental impact statement or similar requirements that are in addition to, but not in conflict with, NEPA.

*CEQ Response*:  CEQ has finalized the change as proposed.  Under the final rule at § 1506.2(c), Federal agencies cooperating with State, Tribal or local agencies are required to the

364

extent practicable to prepare joint EISs, and Federal agencies have flexibility but are not required to prepare one document with such agencies for the purpose of complying with State, Tribal or local ordinances with environmental impact statement or similar requirements.

*Comment*:  Some commenters expressed concern with the new language in § 1506.2(d), which specifies that agencies should discuss, but need not reconcile, any inconsistencies between the EIS and State, Tribal, or local planning documents.  Some commenters suggested CEQ modify the language at § 1506.2(d) to direct agencies to seek to reconcile any inconsistencies between the proposed action as discussed in the EIS with the proposed action as discussed in the State, Tribal, or local planning document.  One commenter noted that the Federal Land Policy and Management Act (43 U.S.C 1701 *et seq*.) and the National Forest Management Act (16 U.S.C. 1600) require coordination and consistency with State and local plans.  Some commenters expressed concern that inconsistencies could frustrate the purposes of project sponsors.  Other commenters suggested that absent a requirement to resolve inconsistencies, Federal agencies would miss an important opportunity for collaboration, which could improve the quality of EISs.  Some commenters recommended that CEQ incorporate a formal consistency review into § 1506.2 where State, Tribal, and local governments would be afforded an opportunity to review and petition CEQ concerning proposed Federal decisions that may be inconsistent with their own plans and policies.

*CEQ Response*:  The 1978 regulations did not require reconciliation, and the final rule continues, consistent with those regulations to require a Federal agency to describe the extent to which it would reconcile its proposed action with a State, Tribal or local plan.  NEPA does not dictate a substantive outcome, while non-Federal planning documents may be based on authorities that are not strictly procedural.  The final rule encourages agencies to reduce

365

duplication to the fullest extent practicable and expressly references use of environmental studies, analyses, and decisions to support of Federal, State, Tribal, or local environmental reviews or authorization decisions as potential ways to meet the requirement. Furthermore, interested State, Tribal, and local governments have the opportunity to provide input on any inconsistencies during the comment period on Federal agency EISs. For these reasons, CEQ declines to provide further direction to Federal agencies concerning reconciliation or a formal consistency review.

*Comment*: Some commenters recommended that CEQ allow State, Tribal, or local environmental reviews to substitute for some or all of the NEPA review required for a Federal action. Other commenters suggested a similar approach, but only when the State, Tribal, or local NEPA-like law is at least as stringent as NEPA.

*CEQ Response*: Agencies may incorporate by reference non-Federal environmental reviews; however, CEQ declines to modify § 1506.2 to allow non-Federal environmental reviews to fully satisfy NEPA. CEQ notes that Federal agencies may avoid duplicative documentation by cooperating with State, Tribal, or local agencies to conduct joint reviews that satisfy the requirements of both laws or through incorporation by reference of relevant material. Federal environmental reviews that are prepared under authorities other than NEPA may satisfy the CEQ regulations, pursuant to §§ 1506.9 and 1507.3(c)(5).

### 3.    Adoption (§ 1506.3)

*Comment*: Commenters expressed support for the proposed revisions to § 1506.3 that would allow a Federal agency to adopt another agency's EA, draft or final EIS, or CE determination if the proposed action is substantially the same. Commenters stated these changes

would formally allow for consistency and clarity across agency decision making and will prevent

unnecessary duplication of NEPA review.

*CEQ Response*:  CEQ acknowledges the support for the changes, which CEQ includes in

the final rule.

*Comment*:  Commenters expressed support for proposed revisions to § 1506.3 and

requested that CEQ revise § 1506.3 to encourage or require, rather than merely allow, adoption

of environmental documents, or portions of environmental documents, on the conditions that the

actions covered by the original document and the proposed action are substantially the same and

doing so would not jeopardize the integrity of environmental review.  Other commenters

recommended that CEQ require adoption unless an agency determined that it was inappropriate

to do so.  Other commenters requested that CEQ revise § 1506.3 to encourage the adoption of

prior reviews and decisions within the same agency, not just other agencies.  Commenters stated

that CEQ should specifically allow reliance on previous NEPA analysis for renewal of grazing

permits or similar routine authorizations that have previously undergone a NEPA review on the

condition that there is no material change in the management of the project.  Commenters

suggested these changes would further CEQ's stated goal of "facilitating efficient, effective, and

timely NEPA reviews by Federal agencies."

*CEQ Response*:  Section 1506.3 allows agencies the flexibility to adopt a Federal

environmental document if the actions covered by the original environmental document and the

proposed action are substantially the same.  Given the importance of timeliness and specified

time limits in the final rule, CEQ expects agencies to adopt documents where appropriate, and

therefore, an affirmative requirement is not necessary.  CEQ notes that agencies could use

§ 1506.3 to adopt a document prepared by another Federal agency, or a State or Tribal

367

government exercising delegated Federal authority.  CEQ encourages agencies to reduce

duplication through programmatic environmental documents, joint environmental documents for

actions involving multiple agencies, incorporation by reference, tiering, and adoption.  These

provisions provide Federal agencies with the flexibility to use available information in the most

efficient manner for the agency while maintaining robust public review of the proposed Federal

action.

CEQ declines to address grazing permits or similar routine authorizations in the

regulations, because these types of actions are best addressed in the NEPA procedures of the

relevant Federal agencies.

*Comment*:  Commenters expressed support for proposed revisions to § 1506.3 and

requested that CEQ revise § 1506.3 to allow adoption of environmental documents prepared by

State or Tribal governments in compliance with State or Tribal law, in particular the State or

Tribal equivalent of an EA.  Commenters suggested if a State or Tribe has a sufficiently strong

process, a Federal agency should be able to adopt the State or Tribe environmental documents

under § 1506.3, in the same manner as environmental documents prepared by other Federal

agencies.  Commenters stated that allowing existing State or Tribal environmental documents to

satisfy the procedural requirements of NEPA is consistent with existing Federal agency practices

and provides opportunities to meaningfully inform the public and agency officials of the

environmental impacts of major actions without duplicating work or unnecessarily expending tax

dollars.

*CEQ Response*:  CEQ acknowledges that State and Tribal environmental laws may

consider a proposed action that is substantially the same as a proposed Federal action.  While

§ 1506.2(b) requires Federal agencies to cooperate with State, Tribal, and local agencies to the

368

fullest extent practicable to reduce duplication between NEPA and State, Tribal, and local

requirements, NEPA does not allow for substitution of a non-Federal review. This is distinct

from situations where State, Tribal, and local governments are conducting NEPA reviews

pursuant to assignment from Federal agencies. In those situations the State, Tribal, or local

government is conducting a Federal NEPA review on behalf and under the authority of the

assigning Federal agency. Revisions to § 1506.2 acknowledge the increasing number of State,

Tribal, and local governments conducting NEPA reviews pursuant to assignment from Federal

agencies. A NEPA document prepared pursuant to assignment from a Federal agency is a

Federal environmental document eligible for adoption pursuant to § 1506.3.

CEQ acknowledges that Federal agencies cooperate with State, Tribal, and local

governments on a wide range of shared actions that are subject to NEPA review. CEQ

encourages Federal agencies to cooperate with State and Tribal governments on such actions to

develop a single environmental document that satisfies all environmental review requirements.

Further, CEQ encourages agencies, pursuant to § 1501.12, to incorporate by reference relevant

material, which may include prior analyses conducted pursuant to State and Tribal environmental

laws. These provisions allow Federal agencies the flexibility to use available information in the

most efficient manner while maintaining robust review processes for proposed Federal actions.

*Comment*: Commenters requested that CEQ revise § 1506.3 to allow agencies to adopt

environmental documents regardless of whether the proposal is the same or substantially the

same as the original proposal. Commenters recommended that CEQ allow the use of adoption

with an addendum or supplement that addresses the differences. Commenters noted the

important standard is that the agency has independently evaluated the adopted document (and

369

any addition to it) to be sure the document and the interagency and public review process are adequate.

*CEQ Response*: CEQ has not made any further changes to § 1506.3 in the final rule in response to this suggestion. CEQ notes that the commenters appear to have misunderstood the standard for adoption as requiring the action analyzed in the adopted document and the adopting agencies proposed action to be the same. Under the 1978 regulations and the final rule, agencies may adopt NEPA documents when the proposal is substantially the same. Additionally, agencies may adopt all or a portion of an EIS relevant to their proposal when the actions are not substantially the same, but the agency must republish it for public comment as a draft EIS. As part of this republication, agencies may add to the analysis and address any differences or changes to the proposal. Additionally, agencies may incorporate by reference portions of a prior environmental document that are relevant to a new proposal. The final rule continues to provide Federal agencies with the flexibility to use available information in the most efficient manner while maintaining robust analysis and public review of proposed Federal actions.

*Comment*: Commenters requested that CEQ revise § 1506.3 to allow an adopting agency to adopt another agency's EIS covering an action that is substantially the same by issuing its own ROD subject to a public comment period, rather than republishing the adopted EIS.

*CEQ Response*: CEQ declines to add a mandatory comment period for RODs that adopt an EIS in § 1506.3 of the final rule because the ROD is intended to document final agency action. The final rule clarifies that an adopting agency must republish an adopted EIS as a final EIS if the actions covered by the original EIS and the proposed action are substantially the same. If the actions covered by the original EIS and the proposed action are not substantially the same, the adopting agency must republish the EIS as a draft EIS. However, if the adopting agency was

370

a cooperating agency for the EIS, the agency may adopt the final EIS in its ROD without

republishing the EIS.  The final rule extends the provisions for adoption to EAs and CE

determinations, provided the actions covered by the original EA or CE determination and the

proposed action are substantially the same.

*Comment*:  Commenters expressed concern with § 1506.3 and requested that CEQ revise

§ 1506.3 to provide clear guidance to agencies on what criteria an agency must meet to properly

adopt another agency's environmental document.  Commenters noted Federal agencies have

widely different NEPA regulations and standards, and expanding adoption to include EAs and

CEs would allow an agency with stricter NEPA requirements to rely on environmental

documents prepared under much looser regulations, resulting in documents that lack important

details.  Commenters requested that CEQ define the phrase "substantially the same," or provide

clarifying guidance.  Commenters observed that the regulations emphasize similarity between the

action considered in the adopted document and the adopting agency's proposed action but do not

articulate a standard for similarities in the affected environment.

*CEQ Response*:  In order to adopt an EIS, EA, or CE determination, the adopting agency

must assess whether the document meets the standards of an adequate EIS, EA, or CE

determination under the agency's procedures and the CEQ regulations.  Additionally, both the

1978 regulations and the final rule require agencies to develop or revise, as necessary,

procedures to implement CEQ's revised regulations.  The requirements for preparing agency

procedures under § 1507.3(a), including consultation with CEQ, will have the effect of

standardizing environmental documents and facilitating the practice of adoption where

appropriate.

*Comment*:  Commenters objected to § 1506.3 and requested that CEQ revise § 1506.3 to prohibit adoption of environmental documents that rely on outdated or obsolete information or analyses.  Commenters stated older environmental documents frequently consider different environmental circumstances and rely on older scientific knowledge and technology.  Further, changes in the environmental circumstances, and advances in scientific knowledge and technology may make a new assessment necessary.  Commenters recommended that CEQ require agencies to ensure that no new or updated information or analyses exist that warrant the preparation of a new EA or EIS or prevent the use of a CE determination.

*9.3.0-7 Response*:  CEQ does not find any changes to § 1506.3 in the final rule are necessary to address the concern.  The final rule requires an adopted document meet the standards of an adequate EIS, EA, or CE determination under the regulations.  Under the final rule, for an agency to adopt another agency's environmental document, the adopting agency must verify that the adopted document satisfies the regulations as if the document were evaluating the adopting agency's proposed action.  As a result, an adopting agency would need to verify that the document they are adopting relies on information and analyses that accurately describes the affected environment and the environmental impacts of the proposed action and reasonable alternatives.  Consistent with § 1502.9(d)(4), the agency may assess whether changes to the proposed action or new circumstances or information relevant to environmental concerns are significant and document the determination with the adoption.

*Comment*:  Commenters objected to § 1506.3, because adoption encourages the use of existing EAs and EISs in place of a specific one for a proposed project.  Commenters stated there is no requirement that the adopted documents be directly relevant to the new proposal.  Commenters stated § 1506.3 provides no criteria for agencies to use when determining whether

372

to adopt an existing environmental document, or to prepare an environmental document that is tailored to the proposed project and site. Commenters noted ecosystems and human communities have unique histories that determine their structures, functioning, and vulnerabilities to disturbance. Commenters stated expanding adoption without establishing clear and appropriate adoption criteria would result in projects causing significant effects particularly to environmental justice communities that are not properly considered or documented.

*CEQ Response*: The regulations require the adopted documents to be directly relevant to the new proposed action. The final rule's standard for adoption requires the proposed action and the analyzed action to be substantially the same and a document that meets the standards of an adequate NEPA document under the regulations. The final rule expands the standard to include EAs. For an agency to adopt another agency's environmental document, the adopting agency must verify that the actions considered in the adopted document are substantially the same as the proposed action, and that the adopted document satisfies the regulations as if the document was evaluating the adopting agency's proposed action. As a result, an adopting agency would need to verify that the document it is adopting relies on information and analyses that accurately describe the affected environment and the environmental impacts of the proposed action. This approach does not preclude considering a community's cultural or socio-economic history and thus has no adverse effect on any particular community.

*Comment*: Commenters requested that CEQ revise § 1506.3 to require publication of the adopting document and the underlying environmental document being adopted. Commenters observed that adoption under the 1978 regulations required republication of a final EIS. Commenters noted the proposed rule preserved the republication requirement for an adopted final EIS but did not extend that requirement to EAs or CE determinations. Commenters

373

asserted that extending adoption to EAs and CE determinations without requiring publication of the adoption would transform the adoption process from a relatively transparent one, into a process shielded from public scrutiny.

*CEQ Response*:  In response to comments, CEQ  revises § 1506.3(d) (proposed § 1506.3(f)) to require documentation, but not publication, of an adoption of a CE determination. This is appropriate given that some agencies do not find it practicable to publish individual CE determinations.  The final rule at § 1506.3(c) requires public notification of the adoption of an EA via the requirement to publish the FONSI and cross-reference § 1501.6.

*Comment*:  A commenter requested that CEQ revise its regulations to include the "Determination of NEPA Adequacy" (DNA) concept for use by all agencies.  A DNA is a determination that an existing NEPA document adequately analyzes an action and conforms to the approved land use plan.  A DNA is a means by which the agency can use existing NEPA analyses to cover an action without performing an additional environmental study.  Currently, the Bureau of Land Management is the only agency using this concept.  The commenter stated that a DNA is a powerful agency tool for streamlining and expediting an action that has already been adequately analyzed in an existing environmental study.

*CEQ Response*:  Section 1502.9(d)(4) codifies agency practice, including DNAs, providing that agencies can make a finding that changes to a proposed action or new circumstances or information relevant to environmental concerns are not significant and therefore do not require a supplement.  Additionally, the final rule makes several changes that facilitate the practice of a DNA, such as expanding the practice of adoption, where an agency may use an existing NEPA document if it meets the standards for adequacy without additional environmental review of the proposed action.  Agencies may also reduce duplication by

374

incorporating documents by reference and using documents that functionally comply with CEQ's regulations.

*Comment*:  Commenters expressed support for § 1506.3(d) (proposed § 1506.3(f)) because it clarifies that agencies may adopt another agency's determination that a CE applies to a proposed action, provided the adopting agency's proposed action is substantially the same. Commenters noted that the 1978 regulations allowed for adoption of EIS where the actions covered by the EIS and the agency's proposed action are substantially the same.  Commenters noted some agencies' implementing regulations have extended adoption to EAs provided the agency meets the same criterion.  Commenters noted that § 1506.3(d) (proposed § 1506.3(f)) extends the same adoption criteria to a determination that a CE applies.  Commenters noted multiple Federal agencies are engaged in similar activities like small-scale prescribed burns, ecological restoration, some biological research, and a handful of small-scale land management practices, which are examples of practices that adopted CE determinations could cover. Commenters recommended CEQ clarify that that adoption of another agency's determination of CE does not require lengthy process.

*CEQ Response*:  CEQ acknowledges the support of the changes to § 1506.3(d) (proposed § 1506.3(f)).  In response to comments, the final rule requires agencies to document, but not publish, adoption of another agency's determination that a CE applies to a proposed action that is substantially the same.  This change may reduce the length of the process to adopt a CE.  CEQ has made additional changes in the final rule to § 1507.3(f)(5) to facilitate an agency using another agency's CE.

*Comment*:  Commenters requested that CEQ revise § 1506.3(d) (proposed § 1506.3(f)) to limit adoption of another agency's determination that a CE applies if the adopting agency's

375

proposed action is substantially the same and the action is covered by the adopting agency's list of CEs. Commenters asserted that one agency's determination that a CE applies could conflict with another agency's list of CEs, mission, or statutory requirements.

*CEQ Response*: CEQ acknowledges the commenters' suggestion, but does not make further changes to § 1506.3 in the final rule in response to the comment. Section 1506.3(d) of the final rule (proposed § 1506.3(f)) allows agencies the discretion to adopt another agency's determination that a CE applies to a proposed action if the adopting agency's proposed action is substantially the same. Therefore, limiting adoption of another agency's CE determination would be of limited value to the adopting agency if it had its own CE to apply. If the proposed action is covered by the adopting agency's list of CEs, the adopting agency likely would rely on its own CE rather than adopting another agency's CE determination. Section 1506.3(d) (proposed § 1506.3(f)) provides agencies the flexibility to adopt another agency's determination that a CE applies when the actions are substantially the same to address situations when a proposed action would result in a CE determination by one agency and an EA and FONSI by another agency. An adoption would be inappropriate if the adoption conflicts with the adopting agency's statutory requirements, but the adopting agency must make such a determination on a case-by-case basis.

*Comment*: Commenters requested that CEQ revise § 1506.3(d) (proposed § 1506.3(f)) to limit adoption of CE determinations to actions that are the same, not substantially the same. Commenters suggested the term "substantially the same" leaves too much room for interpretation and abuse. Commenters stated agency mandates and responsibilities widely vary and a CE determination that is suitable for one agency may not be appropriate for another agency. For example, commenters suggested one easily could foresee an agency adopting a CE determination

376

from another agency where the activity might be similar, but the location, expertise of staff implementing the action, and breadth of the activity is markedly different. Similarly, what qualifies as a CE can differ greatly between agencies, such as whether or how many acres of forest thinning qualifies for a CE, creating confusion for the public.

*CEQ Response*: CEQ established the standard for adoption of an EIS or portion thereof in the 1978 regulations, requiring the proposed action and the analyzed action to be substantially the same. That standard remains unchanged in the final rule, and is also applied to determinations concerning EAs and CEs. For an agency to adopt another agency's determination that a CE applies to a proposed action, the adopting agency must verify that the action considered in the adopted CE determination is substantially the same as the adopting agency's proposed action and that there are no extraordinary circumstances that may have a significant environmental effect (§ 1507.3(e)(2)(ii) (proposed § 1507.3(d)(2)(ii)). This standard recognizes that agencies may have different statutory authorities and therefore review different actions under NEPA for the same project. For example, one agency may fund a project, while another agency considers a permit for the same project—in this instance, the proposed action is the same as are its effects.

*Comment*: Commenters raised concerns that § 1506.3(d) (proposed §1506.3(f)) would allow the expanded use of CEs without the careful consideration that occurs when an agency establishes a CE. Commenters stated that allowing agencies to adopt another agency's CE is completely unwarranted and contrary to NEPA. The commenters argued that the CEQ regulations require each agency to establish its own CEs, based on each agency's own experiences regarding the environmental impacts of actions. Commenters raised concerns that § 1506.3(d) (proposed § 1506.3(f)) allows agencies to avoid the CE rulemaking process.

377

Commenters also stated § 1506.3(d) (proposed § 1506.3(f)) would provide more opportunities for agencies to claim that proposed actions fit within CEs. Commenters stated this provision would provide agencies another discretionary opportunity to claim that a proposed action does not need environmental review because it is substantially the same as a prior project.

*CEQ Response*: These comments reflect a misunderstanding of § 1506.3 in the final rule. Section 1506.3(d) (proposed § 1506.3(f)) provides agencies the flexibility to adopt another agency's determination that a CE applies when the actions are substantially the same to address situations such as when a proposed action would result in a CE determination by one agency and an EA and FONSI by another agency. CEQ established the standard for adoption for EISs and components thereof in the 1978 regulations, requiring the proposed action and the EIS-analyzed action to be substantially the same. That standard remains unchanged in the final rule, and is also applied to EAs and CE determinations. For an agency to adopt another agency's determination that a CE applies to a proposed action, the adopting agency must verify that the action considered in the adopted CE determination is substantially the same as the adopting agency's proposed action and that there are no extraordinary circumstances that may have a significant environmental effect (§ 1507.3(e)(2)(ii)) (proposed § 1507.3(d)(2)(ii)).

CEQ notes that the adoption process in § 1506.3(d) (proposed § 1506.3(f)) is distinct from the process described in § 1507.3(f)(5) (proposed § 1507.3(e)(5)) which would allow agencies to apply CEs established in another agency's NEPA procedures to a proposed action by establishing a process to do so in their agency NEPA procedures. Once established, this will allow agencies to use another agency's list of CEs when appropriate.

*Comment*: Commenters supported modifying § 1506.3(b) to encourage the use of prior reviews and decisions within the same agency, not just other agencies. Any renewal of permits,

378

or similar routine authorizations which have previously completed NEPA analysis should also be allowed to rely upon the previous NEPA analysis so long as there is no material change in the management of the project. This is consistent with the provisions of proposed § 1501.9(f)(1).

*CEQ Response*: Agencies can and should use previously completed environmental documents provided the documents meet the standards for an adequate statement. Section 1506.3 permits agencies to use their own previously completed environmental documents and no further changes are required.

### 4.    Combining Documents (§ 1506.4)

*Comment*: Commenters supported the proposed changes to § 1506.4 and stated the proposed change from "may" to "should" would reduce duplicative documents in agency records. Commenters noted the proposed changes to § 1506.4 are consistent with other proposed changes to § 1506.2, "Elimination of duplication with State, Tribal and local procedures," and § 1506.3, "Adoption," that will reduce duplication of efforts and documents and improve the decision-making process. Some commenters suggested CEQ use even firmer language, such as "shall" combine documents whenever feasible.

*CEQ Response*: CEQ acknowledges the support for the proposed changes and, does not make any further changes to § 1506.4 in the final rule. Section 1506.4, finalized as proposed, clarifies that agencies should combine, to the fullest extent practicable, any environmental document with any other agency document to reduce duplication and paperwork.

*Comment*: Commenters objected to the proposed changes to § 1506.4 and requested CEQ leave the section unchanged. Some commenters stated CEQ justify removing the phrase "in compliance with NEPA" from § 1506.4. Other commenters stated the current regulations are sufficient because they allow for the combination of documents.

379

*CEQ Response*:  The final rule contains clarifying revisions to § 1506.4 to improve readability by changing from passive to active voice.  The phrase "in compliance with NEPA" was superfluous because § 1506.4 uses the term, "environmental document," which by definition refers to a document prepared in compliance with NEPA (§ 1508.1(i)).

*Comment*:  Commenters stated agencies may combine documents to avoid properly addressing their obligations under other laws, for example NHPA section 106 requirements resulting in adverse effects to historic properties.

*CEQ Response*:  Section 1506.4 does not allow agencies to avoid their obligations under other laws.  The combination of documents recognizes that agencies considering a proposed action in compliance with NEPA may also need to comply with other statutory requirements including their organic statutes and implementing procedures.  The combination of documents under § 1506.4 furthers the statement in § 1500.1 that NEPA's purpose is not to generate paperwork, but rather to provide for informed decision making and foster excellent action.  To that end, agencies should not generate a unique environmental document when that document would duplicate information in other agency documents.  Rather, the agency should combine the other agency documents with the environmental document so that the environmental document can satisfy the requirements of NEPA and other statutory requirements.  The combination of documents does not change an agency's duty to comply with other statutory requirements.

*Comment*:  Some commenters perceived § 1506.4 to be a new requirement and objected to the combination of environmental documents and other documents.  Commenters stated the combination of documents would result in the intermingling of agency decision records and obscure important information.

*CEQ Response*:  The final rule maintains the long-standing agency practice of combining environmental documents with other agency documents to reduce redundancies in agencies' administrative records.  The combination of documents under § 1506.4 furthers the statement in § 1500.1 that NEPA's purpose is not to generate paperwork, but rather to provide for informed decision making and foster excellent action.  The combination of documents recognizes that agencies considering a proposed action in compliance with NEPA may also need to comply with other statutory requirements including their organic statutes and implementing procedures.  To that end, the agency should combine other agency documents with the environmental document so that the environmental document can satisfy the requirements of NEPA and other statutory requirements.

*Comment*:  Commenters suggested revising § 1500.4(q) to state "[t]o the extent practical, coordinating and combining with other agency documents and processes with environmental documents."  Commenters further suggested revising § 1500.5(k) to state "[a]s appropriate, coordinate and combine other agency documents and processes with environmental documents."  Both revisions were suggested because, according to commenters, it may not be practical or possible to combine documents and because agencies should coordinate and combine processes and documents.

*CEQ Response*:  CEQ declines to make changes to the respective sections in the final rule.  Section 1506.4, which is cross-referenced in both §§ 1500.4(q) and 1500.5(k), states that agencies should combine environmental documents with other agency documents, to the fullest extent practicable, so revisions to the respective sections to address whether it is practical to combine documents is not necessary.  In addition, agency coordination is addressed elsewhere in the rule.

381

*Comment*:  Commenter requested clarification as to whether the reference to "agencies" in § 1506.4 referred to Federal agencies.

*CEQ Response*:  Consistent with the definition of "Federal agency" in § 1508.1(k), agency in § 1506.4 means all agencies of the Federal government as well as States, units of general local government, and Tribal governments assuming NEPA responsibilities from a Federal agency pursuant to statute.  It does not mean the Congress, the Judiciary, or the President, including the performance of staff functions for the President in his Executive Office.

*Comment*:  Commenters stated that they supported the proposed changes to §§ 1501.1(a)(6), 1507.3(c)(5), and 1506.9 (proposed §§ 1501.1(a)(5), 1507.3(b)(6)) regarding the use of functionally equivalent documents and processes.  Commenters stated the goal of NEPA is not to simply produce additional paperwork but to ensure decision makers are fully informed of the effects of a decision and foster good decision making.  These commenters also supported the use of functionally equivalent documents to avoid unnecessary duplication, delays and costs of decision-making processes.  Because many statutes include a requirement for full consideration of environmental issues in agency decision-making processes and many Federal agencies have completed robust and comprehensive environmental programs that require thorough planning and evaluation of environmental effects, many commenters supported the agency's ability to use those efforts to reduce duplication analyses.

*CEQ Response*:  Utilizing documents and procedures prepared under other statutes that are functionally compliant with NEPA and its procedural requirements and the revisions will reduce duplicative procedures and documentation.  Reducing duplicative analyses will result in more efficient and effective implementation of NEPA.

382

*Comment*:  One commenter requested that CEQ issue guidance to explain to permittees on public lands how to submit information to Federal agencies showing that compliance with other statutes is functionally equivalent to NEPA.

*CEQ Response*:  CEQ expects that agencies will consider opportunities to use functionally compliant processes and documents in their procedures.

*Comment*:  Some commenters stated that allowing agencies to consider functionally equivalent documents or analyses would promote "less rigorous" environmental analysis and create a perverse incentive for the agencies.  Commenters also stated that courts have narrowly applied the functional equivalence doctrine to situations where an agency is engaged primarily in an examination of environmental questions and where substantive and procedural standards ensure full and adequate consideration of environmental issues.  Further, commenters stated that courts have rejected attempts by other agencies to extend functional equivalence such as the Forest Service, U.S. Fish and Wildlife Service, and National Marine Fisheries Service, and that CEQ does not have the authority or power to extend functional equivalence to other agencies. Some commenters expressed concern that an agency's decision to codify the ability to consider functional equivalent documents as part of their procedures would "repeal" NEPA as a procedural statute.

*CEQ Response*:  As discussed in section II of the final rule, courts have long recognized that agency compliance with statutes requiring consideration of environmental issues through procedures analogous to NEPA serve as the "functional equivalent" to compliance with NEPA's procedural requirements.  In considering whether a statute is the functional equivalent to NEPA, courts have generally focused on whether the agency is primarily engaged in examining environmental questions and whether the substantive and procedural standards under the statute

383

ensure full and adequate consideration of environmental issues.[76]  Courts have also considered whether the documentation and action the agency has taken under another statute "substantially compl[y]" with the requirements of section 102(2)(C) of NEPA.[77]  While the courts have generally limited application of functional equivalence to statutes administered by EPA, the United States Court of Appeals for the Second Circuit held that the Federal Communications Commission's procedures for a rulemaking related to health and safety standards of radio frequency radiation were functionally compliant with NEPA and CEQ's regulatory requirements for EAs and FONSIs.[78]

NEPA does not require agencies to prepare duplicative documentation and utilize duplicative procedures to comply with NEPA's procedural requirements and ensure the Act's twin aims of considering relevant environmental impacts of proposed actions and informing the public of about agency decision-making are fulfilled.  As discussed above, the requirements related to functional compliance in the final rule are consistent with cases where courts have considered whether the documents prepared and procedures used under other statutes are

---

[76] *See, e.g., Envtl. Def. Fund, Inc.*, 489 F.2d at 1256; *State of Ala. ex rel. Siegelman*, 911 F.2d at 504–05; *W. Neb. Res. Council*, 943 F.2d at 871–872; *see also Tex. Comm. on Natural Res. v. Bergland*, 573 F.2d 201, 208 (5th Cir. 1978) (applying factors but concluding that the National Forest Management Act was not functionally equivalent to NEPA because the Forest Service is required to balance environmental and economic needs).  CEQ notes that the rationale in *Tex. Comm. on Natural Res.* is inconsistent with NEPA because it also involves consideration of economic variables.  *See* NEPA section 101(a) (discussing "fulfill[ing] the social, economic, and other requirements of present and future generations of Americans"); section 102(2)(B) ("Federal Government shall … identify and develop methods and procedures, in consultation with the Council on Environmental Quality established by title II of this Act, which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations").

[77] *Hathaway*, 525 F.2d at 72 ("NEPA does not call for any particular framework or procedure and so long as the impact statement is relevant and thorough it need not be extensive."); *Blum*, 458 F. Supp. at 661-62 (concluding that EPA Deputy Administrator's final order demonstrated careful consideration of the "'five core NEPA issues'", environmental impacts, adverse environmental effects, alternatives, the relationship between long- and short-term uses and maintenance and enhancement, and any irreversible and irretrievable commitments of resources).

[78] *Cellular Phone Taskforce*, 205 F.3d at 94–95.

384

functionally equivalent to those required under NEPA and will ensure functional compliance with NEPA and its procedural requirements.

Further, as it relates to CEQ's authority, the Supreme Court recognized in *Public Citizen*, 541 U.S. at 757, that "[t]he Council [on] Environmental Quality (CEQ) [was] established by NEPA with authority to issue regulations interpreting it, [and] has promulgated regulations to guide Federal agencies in determining what actions are subject to that statutory requirement." *See also Methow Valley*, 490 U.S. at 351 (noting that the "requirement" that an EIS include a specific discussion "flows both from the language of the Act and, more expressly, from CEQ's implementing regulations"). Since early in the statute's history, CEQ's authority to administer NEPA has been recognized. *Warm Springs Dam Task Force*, 417 U.S. at 1309–10.

*Comment*: Commenters referenced instances where utilizing functional equivalence under other statutes, such as CERCLA, led to disputes that could have been managed better had the agency applied the process under NEPA.

*CEQ Response*: It is speculative whether a process under another statute that led to disputes could have been better managed under NEPA's procedures.

*Comment*: Commenters stated that CEQ's solicitation for comment on additional analyses that would be functionally equivalent to an EIS is too vague to allow for meaningful public input and therefore CEQ should solicit further comment on any subsequently identified alternative analysis.

*CEQ Response*: CEQ did not receive public comments providing sufficient support to expressly include additional analyses that may prove to be functionally equivalent to an EIS. CEQ has made no further changes with respect to this question in the final rule.

385

5.    **Agency Responsibility for Environmental Documents (§ 1506.5)**

*Comment*:  Commenters stated that if an applicant can successfully prepare an EA for an agency, it should also be able to prepare an EIS, and supported the revision.  Other commenters expressed support for allowing applicants and contractors to assume a greater role in the preparation of an EIS under the supervision of a Federal agency, and noted that it would promote efficient use of agency resources.

*CEQ Response*:  Federal agencies have worked successfully with applicant-prepared EAs for many years under 40 CFR 1506.5(b), which required agencies to independently evaluate, revise appropriately, and take responsibility for the content of such EAs.  Based on its experience, CEQ finds it is appropriate to allow this approach to be applied to EISs.  As revised, agencies will still be required to independently evaluate, and revise as appropriate a preliminary environmental document and take responsibility for the content of any the document upon its publication by the agency.  For purposes of these regulations, CEQ does not see a distinction between an applicant and the contractors working for it.

*Comment*:  Commenters disagreed with CEQ's justification that allowing increased use of applicant-prepared NEPA documents would increase communication with the applicant, stating that similarly close coordination can occur through public comment and review procedures, or activities such as "pre-NOI" activities.  Commenters further stated that CEQ identified no barriers to communication with applicants that the proposed change would resolve, and noted that the regulations already require agencies to assist the applicant by outlining the types of information required.

*CEQ Response*:  Improved communication and coordination with the applicant is one of several anticipated benefits of the proposed changes to § 1506.5(c).  Importantly, the changes

386

will also provide agencies with more flexibility to select the most efficient means of completing

an EIS.  Some commenters emphasized that contractors may possess significant environmental

and technical resources that could enable more efficient and timely preparation and evaluation of

environmental reviews.  The 1978 regulations allowed agencies to use applicant-prepared

preliminary environmental documents for EAs and, upon review of this practice, CEQ has

expanded to its EISs in the final rule.

To facilitate an efficient process, the final rule requires agencies to provide guidance to

applicants preparing NEPA documents, and participate in the preparation, while also requiring

agencies to independently evaluate documents prior to approval, and to take responsibility for the

scope and contents

*Comment*:  Commenters stated that the proposed changes to § 1506.5(c)would allow for

bias in environmental documents, would allow for incomplete documents and conflicts of

interest, and would result in environmental reviews that prejudice the analysis toward a private

entity's preferred course of action.  Commenters stated that CEQ should ensure that members of

the public feel confident that their comments during NEPA reviews are taken seriously and

allowing private applicants to prepare the NEPA documents will undermine such confidence.

*CEQ Response*:  CEQ affirms that it is important to maintain the public's faith in the

integrity of the EIS process, and has included safeguards to ensure bias is not introduced into

NEPA documents.  The final rule retains many of the procedures of the 1978 regulations for

public comment and review of the agency's administrative record.  Upon consideration of the

long-standing practice of allowing applicants to assist with the preparation of EAs, CEQ has not

identified evidence of bias in NEPA documents.[79]  To the extent that an applicant prepares

biased or otherwise deficient documents, the final rule requires that agencies exercise

independent review, which ensures such issues are corrected.

Section 1503.4 reinforces the agencies' duty to consider substantive public comments,

including comments on the underlying environmental documents.  Further, pursuant to §

1502.24, agencies must ensure the professional integrity, including the scientific integrity, of the

discussions and analyses in environmental documents.

*Comment*:  Commenters stated that removing the requirement for an agency to choose a

contractor that avoids any conflict of interest is a reversal of position from CEQ's previously

issued guidance, CEQ Memorandum Re: Guidance Regarding NEPA Regulations (July 22,

1983); commenters stated that CEQ should include this requirement in the final rule.

Commenters cited the text from CEQ's 1983 guidance stating:

"…if any delegation of work is to occur, it should be arranged to be performed in as

objective a manner as possible.  Preparation of environmental impact statements by parties who

would suffer financial losses if, for example, a 'no action' alternative were selected, could easily

lead to a public perception of bias.  It is important to maintain the public's faith in the integrity of

the EIS process, and avoidance of conflicts in the preparation of environmental impact

statements is an important means of achieving this goal."[80]

*CEQ Response*:  CEQ has made further changes to § 1506.5(b)(4) to require that

contractors and applicants preparing preliminary environmental documents for agencies provide

---

[79] Project proponents have no incentive to perform inadequate NEPA work only to see the project delayed in the courts.

[80] 48 FR 34263, 34266 (July 28, 1983).

388

a financial disclosure statement to the agency. While independent agency review will ensure that environmental documents adhere to appropriate standards, disclosing the financial interests of applicants and project sponsors will allow the public and stakeholders to understand whether a firm or a project sponsor has a financial interest in the outcome of a project. CEQ clarifies that any firm or applicant need not provide any privileged or confidential business information to satisfy this requirement, nor does an interest in the outcome of a proposal foreclose such an entity from preparing preliminary environmental documents for the agency.

*Comment*: Some commenters preferred to maintain the current process of allowing only independent contractors to prepare environmental reviews. They asserted that it would expedite document preparation without compromising the integrity of the NEPA process. Moreover, several Federal agencies already use similar procedures for agency-directed contractors. Commenters recommended that agencies develop rosters of approved contractors based on technical competency or historical work products. Commenters stated the proposed change would lead to a less efficient NEPA process, requiring agencies to expend more of their limited time and resources reviewing applicant-authored materials, responding to public comments, and resolving administrative challenges to environmental reviews and NEPA procedures. Other commenters expressed concern with industry being allowed to select their own contractors.

*CEQ Response*: Under the final rule, independent contractors may continue to be used by Federal agencies; however, limiting agencies to using pre-approved rosters of contractors will lead to less timely NEPA documents. The final rule retains the long-standing practice of agencies directly preparing NEPA document using its own staff, hiring a contractor, or entering into a "third-party" arrangement with an applicant to hire a contractor. As revised, the final rule

389

provides agencies with additional flexibility to conduct the reviews.  Contracting details may be
addressed in agency implementing procedures and related materials.

*Comment*:  Commenters stated that applicants should adhere to Federal ethics standards
and guidelines when providing services to the government on behalf of the public and should be
held to the same standards as public officials who must file public financial disclosure
statements, which are broadly interpreted by the Office of Government Ethics to identify
potential conflicts of interests.

*CEQ Response*:  The commenters are correct that certain senior level employees must file
various financial disclosure reports depending on the position or status of the employee.
Importantly, covered Federal employees perform decision-making responsibilities within their
respective Federal agencies.  In drafting an applicant-prepared EA or EIS, the applicant or its
contractor exercises no decision-making authority.  The agency must review and revise the
materials as necessary and, for those officials, financial disclosures may be appropriate.  Finally,
the ultimate decision on whether to authorize a particular action still lies with the agency
decision-maker.  As outlined in § 1505.2 the agency must still identify all alternatives
considered, state whether the agency has adopted all practicable means to avoid or minimize
environmental harm from the alternative selected, and address any comments or objections
received on the final EISs submitted alternatives, information, and analyses section.  Finally,
CEQ expects that the agency's decision-making document is still to be prepared independently
from any applicant or its contractors.

*Comment*:  A commenter requested CEQ add language to proposed § 1506.5(a) and (b)
stating that the costs of this independent evaluation shall be borne by the contractor and/or
applicant.

390

*CEQ Response*:  The administration of contracts by Federal agencies is subject to statutory and regulatory requirements and is outside the scope of this rulemaking.

*Comment*:  Commenters expressed concern that the proposed revisions would limit the input of States, Tribes, and the public in oversight of environmental documents.

*CEQ Response*:  Nothing in § 1506.5 changes the provisions in the regulations that allow for the participation by State, Tribal or local governments in the NEPA process, or for State, Tribal, and local governments and the public to comment on environmental documents.

*Comment*:  A commenter suggested adding after "applicant" a reference to "or a third party paid for by an applicant" in § 1506.5(b) (proposed § 1506.5(a)).

*CEQ Response*:  In the final rule, CEQ has reorganized and revised § 1506.5 to better communicate the requirements allowing applicants and contractors to assume a greater role in the preparation of EAs and EISs.  The rule as revised references both applicants and contractors.

*Comment*:  A commenter recommended that CEQ broaden proposed § 1506.5(c) to allow others to prepare EISs including students, agency volunteers, and Tribal partners.

*CEQ Response:*  The final rule refers to applicants and contractors generally.  Section 1506.5(b)(3) requires that the environmental documents include the names and qualifications of persons preparing environmental documents and conducing the independent evaluation of any information submitted or environmental documents prepared by an applicant or contractor.

*Comment*:  A commenter stated that the case law is clear and that EISs and EAs are to be prepared by the agency undertaking the action.

*CEQ Response*:  The 1978 regulations expressly allowed for the preparation of EAs by applicants under the supervision of the agency.  In the final rule, § 1506.5 allows greater flexibility for the project sponsor (including private entities) to participate in the preparation of

391

EAs and EISs under the supervision of the lead agency, while continuing to require agencies to independently evaluate and take responsibility for those documents.

*Comment*:  One commenter expressed concern that the proposed revisions to § 1501.8(q) exempting loans, loan guarantees, and other forms of financial assistance in combination with the proposed revisions to § 1506.5 to allow contractors to prepare NEPA documents would allow Federal agencies to push projects through the process without doing the work or having the agency's name on the NEPA document.

*CEQ Response*:  Under the final rule, agencies have responsibility for determining whether a proposed action constitutes a major Federal action.  Further, the final rule makes clear in § 1506.5(a) that the agency is responsible for the accuracy, scope, and content of environmental documents prepared by an applicant or contractor under the supervision of the agency.  The final rule further requires in § 1506.5(b) that agencies provide guidance to the applicant and contractor, and participate in the preparation of environmental documents, and that the agencies include in the environment documents the names and qualifications of the persons that have prepared them, and independently evaluate the information submitted or the environmental document.  As discussed above, CEQ finds that it is appropriate to allow applicants to prepare documents to provide efficiency and because agencies retain their responsibility to oversee and take responsibility for the environmental document.

*Comment*:  Commenters requested that CEQ provide additional details on presumptive time limits for instances where applicants are preparing draft EAs or EISs for the lead agency. More specifically, commenters ask that CEQ provide a time limitation on the length of time available to a reviewing agency for review of draft environmental documents prepared by an applicant.  For example, if an agency provides guidance and participates as required in § 1506.5,

392

the agency should be well prepared to issue a project approval within a short timeframe.

Commenters also noted that CEQ proposed additional guardrails for potential "loopholes" where

applicants are preparing draft NEPA documents such that a private sponsor may be able to avoid

early public engagement and avoid applying NEPA early in the process.

*CEQ Response*:  The final rule requires presumptive time limits for completion of EISs

and EAs.  When an applicant is preparing a draft NEPA document for a Federal agency, the

agency must participate early and provide technical guidance and assistance to the agency to

eliminate duplicative work and ensure that the draft NEPA document will meet the needs of the

agency and comply with NEPA.  CEQ declines to place additional restrictions on the time

agencies have to review draft NEPA documents and agencies may set appropriate timeframes for

review in their implementing procedures.  With respect to applying NEPA early in the process,

in accordance with § 1501.2, agencies should still integrate the NEPA process at the earliest

reasonable time, even in situations where an applicant may be preparing a draft NEPA document

for the agency.

### 6.    Public Involvement (§ 1506.6)

*Comment*:  Some commenters expressed support for the proposed revisions to § 1506.6,

observing that modernizing this section to allow for public involvement, including public

comment and public meetings, through electronic media would result in greater outreach and

public participation.  Commenters recommended that the various forms of electronic

communication must be designed in a readily understandable and intuitive manner with user-

friendly and ADA-accessible interfaces.  Commenters noted that some electronic systems

currently used by agencies are not user-friendly or intuitive.  Commenters also observed that

utilizing the internet for soliciting feedback and improving awareness of a particular review

would create a more inclusive process for involving the public in the review while reducing unnecessary costs.

*CEQ Response*:  CEQ has further revised § 1506.6 in the final rule to clarify that agencies should consider the public's access to electronic media when selecting appropriate methods for public notice and involvement.  CEQ proposed changes to § 1506.6 to modernize the regulations and allow agencies greater flexibility to design and customize public involvement to best meet the specific circumstances of their proposed actions and the potentially affected communities. The final rule expands the already wide range of methods that agencies may use when providing notice to and involving potentially affected communities.

*Comment*:  Commenters stated that E.O. 12898 and its accompanying Presidential Memorandum direct Federal agencies reviewing and preparing EISs to ensure hearings, documents, and notice related to a proposed project are made available and accessible to the general public.  Commenters stated that the proposed changes would not require agencies to publish a draft EIS for public review before a public hearing, or make documents available to the public free of charge or at a very low cost.

*CEQ Response*:  The final rule expands opportunities for public outreach in scoping and the development of EISs (§§ 1501.9, 1503.1, 1506.6) and requires agencies to make information on NEPA reviews publicly available such as environmental documents, notices, and other relevant information.  The final rule also contains language in §§ 1502.20, 1503.1, and 1506.6 to ensure agencies consider the ability of impacted communities to access electronic media.  The final rule also directs agencies to provide for agency websites or other means to make available environmental documents, relevant notices and other relevant information to allow agencies and the public to efficiently and effectively access information about NEPA reviews.  § 1507.4.

394

*Comment*:  Commenters expressed concerns with the proposed changes to § 1506.6(c) which allow agencies to use electronic communication to hold public hearings or public meetings.  Commenters stated that agencies or applicants may abuse this provision by not holding physical public meetings and instead rely fully on electronic communication.

Commenters asserted that provisions allowing agencies to use electronic means to conduct public hearings and meetings and publish documents threaten to disenfranchise individuals with limited English proficiency, disabilities, or limited financial means and violate the spirit of NEPA.

Commenters requested specific guidance to agencies for appropriately involving environmental justice communities, noting that historically environmental justice communities have been disproportionately affected by the adverse environmental impacts of Federal actions. Commenters observed that the proposed rule does not incorporate recommendations from the Federal Interagency Working Group on Environmental Justice, which focused on increasing outreach to vulnerable communities.  Commenters explained many environmental justice communities have limited access to high-speed internet and other infrastructure necessary for electronic communication.  Other commenters noted the proposed rule does not require agencies to utilize adaptive or innovative approaches to involve minority, low-income, and Tribal populations in the NEPA process.  Commenters argue that proposed amendments to § 1506.6 will in effect erect an "electronic barrier" to public participation by environmental justice communities.

Commenters also stated agencies must consider the public's ability to readily participate in the NEPA process and ensure a process that provides reliable access.  Commenters stated that agencies must continue to increase efforts to fully involve all of the affected public in the NEPA

395

process.  Commenters further noted that electronic media should not be the sole method of public notification and participation for any proposed actions, but rather should be an additional strategy or tool to capture a broader audience than traditional means alone.  Other commenters requested that CEQ require Federal agencies to provide the public an opportunity to be heard at in-person meetings, stating that CEQ must ensure public meetings and public commenting are in fact public by providing means for all interested parties to attend and participate consistent with NEPA and the APA.

*CEQ Response*:  CEQ has made further changes to § 1506.6 in the final rule to clarify that agencies should consider the public's access to electronic media when selecting appropriate methods for providing public notice and involvement.  The intent of the final rule is to modernize the regulations and provide agencies with greater flexibility to design and customize public involvement to best meet the specific circumstances of their proposed actions.  The *Federal Register* is the primary means by which regulatory developments in the Federal government are communicated to the public, and the final rule expands the already wide range of tools agencies may use when providing notice to potentially affected communities and inviting public involvement.

*Comment*:  Commenters requested that CEQ revise § 1506.6(a) to establish a government-wide minimum standard for public involvement by adding:  "This shall include: (1) Soliciting public comments for not less than 30 days on environmental assessments; (2) Soliciting public comments for not less than 30 days during scoping for environmental assessments and environmental impact statements; and (3) Soliciting public comments for not less than 60 days on draft environmental impact statements."

396

*CEQ Response*:  Agencies have historically had considerable flexibility in structuring public involvement for EAs and scoping, with a required minimum 45–day comment period on a draft EIS consistent with § 1506.11.  Agencies continue to be well served by this approach so CEQ has retained it in the final rule.

*Comment*:  Commenters requested that CEQ revise § 1506.6(b) to clarify that agencies must provide notice to State, Tribal, and local agencies and governments that may be interested or affected by the proposed action.  Commenters noted that other provisions in § 1506.6 require specific forms of notice; however, § 1506.6(b)(3) utilizes the word "may" indicating agencies have the discretion to provide notice to State, Tribal, and local governments.  Commenters requested to revise § 1506.6(b)(1) to state "[i]n all cases, the agency shall notify State, Tribal, and local governments that may be interested or affected by the proposed action, and those who have requested notice on an individual action."

*CEQ Response*:  CEQ declines to make any further changes to § 1506.6(b)(1) in the final rule.  The final rule establishes a duty of Federal agencies to inform and cooperate with State, Tribal, and local governments.  Agencies are encouraged to consult early in the process with State, Tribal, and local governments (§ 1501.2), required to invite the participation of likely affected Federal, State, Tribal, and local agencies and governments during the scoping process (§ 1501.9), and required to request comments from appropriate State, Tribal, and local agencies (§ 1503.1).

*Comment*: Commenters requested that CEQ revise § 1506.6 to require publication in the *Federal Register* notification for all actions, not just actions of national concern.  Commenters also requested CEQ clarify § 1506.6 publication is required at the start of the NEPA process for EAs and EISs.  Commenters suggested § 1506.6(b)(2) should read:  "A notice in the *Federal*

*Register* is required for the notice of intent and notice of availability for the draft and final environmental impact statement and for publication of the ROD.  In addition to the *Federal Register* notices, the agency may choose other methods of communication with the public including …"

*CEQ Response*:  CEQ declines to make further revisions in § 1506.6(b)(2) of the final rule.  Section 1501.9(d) of the final rule includes a requirement that NOIs be published in the *Federal Register,* and § 1506.11 of the final rule requires that the Environmental Protection Agency publish a notice each week in the *Federal Register* of availability of each EIS filed by agencies, which includes each draft, final and supplemental EIS filed with EPA.   The final rule also requires that agencies make available on their agency websites or other means environmental documents, which may include RODs, as well as relevant notices and other relevant information for use by agencies, applicants, and interested persons.  *See* § 1507.4.  Additionally, when developing implementing procedures, agencies may establish a process to publish notifications in the *Federal Register* that are beyond those of a "national concern."

*Comment*:  Commenters objected to changing "shall notify" to "may notify" in § 1506.6(b)(2) on the basis that it would erode public participation by changing the standard for notification of national organizations about pending projects.  Commenters expressed concern that CEQ intends to minimize participation of national organizations.  Commenters also stated that the process for notifying communities regarding actions of potentially local concern has not changed and requires notification of potentially interested community organizations.  Commenters noted, however, that local organizations with interest in proposed projects often have limited ability to address them and may rely on national organizations with aligned interests

to help them participate. Commenters requested that CEQ reinstate the requirement for agencies

to notify national organizations about actions with effects of national concern.

*CEQ Response*: Section 1506.6 requires agencies to provide public notice of NEPA-

related hearings, public meetings, and other opportunities for public involvement, and the

availability of environmental documents so as to inform those persons and agencies who may be

interested or affected by their proposed actions. When selecting appropriate methods for

providing public notice, agencies should consider the ability of affected persons and agencies to

access electronic media. Agencies must provide notice to those who have requested notice on a

specific action and may notify organizations, both national and local, that have requested regular

notice. The final rule recognizes the use of modern technologies and expands the range of

methods agencies may use when providing notice to the public and clarifies that agencies are

expected to consider which methods would effectively and efficiently inform the public about

the proposed action.

*Comment*: Commenters objected to the proposal to remove the requirement to hold

public meetings on projects of substantial controversy in § 1506.6(c). Commenters stated that

projects of "substantial environmental controversy" are frequently the projects in which the

public is most interested. Commenters requested CEQ reinstate the requirement.

*CEQ Response*: CEQ declines to include the suggested revision to § 1506.6(c) in the

final rule. The final rule requires agencies to hold or sponsor public hearings, public meetings,

or other opportunities for public involvement whenever appropriate or in accordance with

statutory requirements applicable to the agency. CEQ removed the term "substantial

environmental controversy" because that term was not defined, difficult to consistently interpret

and apply, and located only in § 1506.6(c).

399

*Comment*:  Commenters objected to the proposed changes at § 1506.6(c) to remove the requirement that an agency publish a draft EIS at least 15 days before holding a public hearing on the draft EIS.  Commenters stated the 15–day waiting period allows the public the opportunity to review a draft EIS before attending a meeting which allows for informed public comment. Commenters requested CEQ reinstate the 15–day period in the final rule.

*CEQ Response*:  CEQ declines to include the suggested revision to § 1506.6(c) in the final rule.  The 1978 regulations recommended, but did not require, a 15–day period between publication of a draft EIS and holding a hearing on the draft EIS, and this recommended period did not apply when the purpose of the hearing was to provide information on the draft EIS.  CEQ encourages agencies to make the draft EIS available prior to public hearings, public meetings or other opportunities for public involvement.

*Comment*:  Commenters objected to the proposed changes that remove the provisions that recommended agencies release environmental documents to the public at no charge and without invoking the deliberative process privilege § 1506.6(f).  Commenters noted this change appears to conflict with section 5.5(c) of E.O. 12898, which requires that "[e]ach Federal agency shall work to ensure that public documents, notices, and hearings relating to human health or the environment are concise, understandable, and readily accessible to the public."  Commenters raised concerns that these changes will act as a barrier to public participation by increasing the cost of seeking relevant documents and limiting what documents an agency is required or encouraged to provide.  Commenters requested CEQ reinstate the provisions regarding FOIA fees and the deliberative process privilege.

*CEQ Response*:  CEQ does not make any further changes to § 1506.6(f) in the final rule. The requirements referenced by the commenters are duplicative of other publication

requirements in the final regulations and agencies' FOIA regulations.  The final rule clarifies that agencies should publish on an agency website environmental documents and other relevant information.  CEQ notes that agencies routinely release materials under FOIA to the public without charge to the extent practicable, or charge only the cost of reproducing the material.

*Comment*:  Commenters requested CEQ revise § 1506.6 to require agencies to respond to requests from the public for the technical and analytical records underlying the analysis in NEPA documents before the agencies close public comment periods.  Commenters stated that agencies are failing to respond to requests for information, submitted via FOIA, and requests to an agency's NEPA coordinators in a timely fashion.  This practice is forcing the public to comment without such specifically requested information.  Commenters stated that CEQ is insisting on more detailed and technically or scientifically supported comments from the public without requiring agencies to provide the public with necessary and specifically requested information and agency records.  Commenters stated that these proposed changes collectively indicate that CEQ is interested in undermining meaningful public participation.

*CEQ Response*:  The final rule simplifies this paragraph to require agencies to make EISs, comments and underlying documents available to the public consistent with FOIA, which Congress has amended numerous times since the enactment of NEPA, mostly recently by the FOIA Improvement Act of 2016, Public Law 114–185.  Whenever practicable, agencies must publish environmental documents and appropriate analyses at the same time as other planning documents (§ 1501.2(b)(2)), and are prohibited from incorporating material by reference that is not reasonably available for inspection by interested persons within the time allowed for comment (§ 1501.12).  The final rule at § 1502.23 (proposed § 1502.24) also requires agencies to

401

identify any methodologies used and to make explicit reference to scientific and other sources relied upon for conclusions in an EIS.

The final rule, moreover, includes provisions to promote access to information through current technologies, and encourages agencies to publish information using methods that efficiently and effectively make environmental documents and information available for review by interested persons, including electronic publication. § 1508.1(y). Section 1507.4 of the final rule, finalized as proposed, also directs agencies to provide for agency websites or other means to make available environmental documents, relevant notices, and other relevant information for use by interested persons.

*Comment*: Commenters requested that CEQ revise § 1506.6(f) to clarify that certain documents provided or created during the NEPA review process are not releasable under FOIA. For example, Tribal governments frequently provide comments that may contain information about sensitive historic sites or culturally sensitive information.

*CEQ Response*: CEQ acknowledges the commenters' suggestions but declines to make the requested revision to § 1506.6(f) in the final rule. CEQ notes that some environmental information is routinely withheld because that information is protected from disclosure under a FOIA exemption or other Federal law. CEQ encourages Federal agencies to work closely with State, Tribal, and local agencies and governments to ensure that sensitive information is appropriately handled by the lead agency and protected from disclosure where that is warranted under the law.

*Comment*: Commenters requested that CEQ revise § 1506.6(b)(3)(vi) to remove "small business associations." Commenters asserted that referencing only "community organizations" is sufficiently inclusive and singling out a specific organization type is unfair to other

402

organizations.  Other commenters requested CEQ amend § 1506.6(b)(3)(vi) to add

environmental organizations.

*CEQ Response*:  CEQ acknowledges the commenters' suggestions, but declines to

include the suggested revision to §§ 1506.6(b)(vi) in the final rule.  The language was used in the

1978 regulations and included in the proposed rule, without change.  CEQ believes it is helpful

to provide that interested community organizations, which would include environmental

organizations, may also include small business associations.

*Comment:* Commenters requested that CEQ revise § 1506.6(f) to expressly require that

all environmental documents are made available to the public under the Freedom of Information

Act (FOIA).

*CEQ Response:* Section 102(2)(C) of NEPA expressly requires agencies to make the EIS

available to the public pursuant to FOIA; however, the EIS would be subject to FOIA regardless

of the requirement at § 1506.6(f).  Expanding the reference at 1506.6(f) to include all

environmental documents is unnecessary since they already are subject to FOIA.

*Comment:*  A commenter requested that CEQ revise its regulations to prescribe a highly

standardized approach to public involvement, and expressed the view that the proposed

regulations would deny the public a consistent and reliable opportunity to participate in the

NEPA process, and thereby deprive agencies of all opportunities to improve their decision-

making activities. Further, a commenter stated that agencies should not be granted the authority

to restrict the level of public involvement based on vague notions of "project circumstances."

Instead, the commenter stated that CEQ should allow for this kind of restricted public

involvement only in cases of compartmentalized information or other legitimate security

concerns.

*CEQ Response:* CEQ disagrees that a highly standardized approach would improve public involvement in the NEPA process. Similar to the 1978 regulations, the final rule provides flexibility for agencies to structure public involvement based on the specific circumstances of the proposed action. Further, the final rule expands opportunities for public involvement in scoping before issuance of the NOI, and expanded use of electronic communication.

*Comment*: A commenter requested that CEQ limit participation by non-Tribal, non-neighbor public for projects on Tribal land. The commenter stated that the public comment process slows the environmental review process and requires significant Federal resources to respond to public comments. Commenter further stated that for any proposed Federal action on Indian lands that requires an EIS, the EIS should be made available for review and comment by "(i) Indian tribes in the affected area and individual members of those tribes wherever they reside; (ii) Other individuals who reside in the affected area; and (iii) State and local governments within the affected area." This limitation on the availability of an EIS for review and comment would not apply if the proposed Federal action regards an activity "related to gaming under the Indian Gaming Regulatory Act." Other than this exception, the limitation would apply to any proposed Federal action regarding an activity on Indian lands.

*CEQ Response*: The statute does not allow for selective participation among the public based on the characteristics of the proposed action. However, as described elsewhere, the final rule contains a number of changes to strengthen cooperation between Federal agencies and Tribal governments.

*Comment*: Commenters supported proposed changes to § 1506.6 that clarify and expand Tribal involvement. Commenters suggested CEQ further revise § 1506.6 to require, when relevant, specific Tribal notice, posting in public places within Tribal communities, and having

404

on reservation public meetings to increase Tribal member and Tribal community input.

Commenters explained that Tribal members have extensive knowledge based on centuries of

traditional uses of the lands, and continue to exercise traditional activities on public lands.

However, Federal agencies often do not reach out to impacted Tribal communities during public

comment periods.  Commenters stated that the collective changes to the proposed rule have the

overall effect of rendering Tribes and the public as passive bystanders, occasionally providing

comments for the lead agency to ignore.

*CEQ Response*:  CEQ acknowledges the commenters' suggestion but declines to include

the suggested revision to § 1506.6 in the final rule.  The final rule including § 1506.6 contains a

number of changes to strengthen cooperation between Federal agencies and Tribal governments.

These changes include treating Tribal and State governments similarly with respect to public

involvement and removing references to reservation boundaries as recognition that Tribal

interests often extend beyond reservation boundaries.  Additionally, the final rule improves the

scoping process by requiring agencies to invite State, Tribal, and local governments and the

public to identify potential alternatives, information, and analysis relevant to the proposed action.

Section 1502.17 of the final rule requires agencies to summarize and publish comments received

during scoping.  Section 1503.1(a)(3) requires agencies to invite comments specifically on the

submitted alternatives, information, and analyses and the summary thereof.  Section 1506.6

expands the suite of methods agencies may use when notifying and involving State, Tribal, and

local governments and the public.  The final rule clarifies that agencies should select appropriate

methods for public involvement and allows agencies the flexibility to determine which methods

of public involvement are appropriate.  Finally, § 1505.2 requires the decision maker to certify in

the ROD that the agency has considered all of the alternatives, information, analyses, and

objections submitted by State, Tribal, and local governments and public commenters.  For these reasons, adding further notice requirements for Tribal communities is not necessary to ensure their full participation.

*Comment*:  One commenter was concerned that there would not be an opportunity for public participation if an agency were allowed to substitute a functionally equivalent process or documentation.

*CEQ Response*:  Courts have determined that certain statutes are functionally equivalent to NEPA, reflected by the changes at §§ 1501.1(a)(6) and 1507.3(d)(6), and therefore satisfy NEPA's requirements concerning public participation.  The changes to §§ 1506.1 and 1507.3(c)(5) allow an agency to substitute one or more procedures or documents under other statutes or Executive orders for the requirements in the final rule; however, these changes would not allow an agency to forego public involvement as asserted by the commenter.  The changes regarding functional equivalence and compliance maintain NEPA's twin aims of considering relevant environmental impacts of proposed actions and informing the public of about agency decision-making are fulfilled, while reducing duplicative procedures and documentation.

*Comment*:  Some commenters stated that the proposed changes would limit the ability of the public, especially environmental justice communities, to provide public comment on projects. Tribal commenters stated that the proposed changes would limit Tribal involvement.

*CEQ Response*:  CEQ acknowledges the comment, however, to the extent the proposed changes would affect projects that are currently subject to categorical exclusions, no public comment would have been required under the 1978 regulations.

406

### 7.      Further Guidance (§ 1506.7)

*Comment*:  A commenter asked that CEQ include E.O. 13790, "Promoting Agriculture and Rural Prosperity in America," and E.O. 13817, "Federal Strategy to Ensure Secure and Reliable Supplies of Critical Minerals," to the list of Executive orders in § 1506.7.

*CEQ Response*:  The Executive orders referenced in § 1506.7 in the final rule directly relate to implementation of NEPA and agency guidance documents.  In § 1506.7, CEQ declines to reference any Executive orders not directly related to implementation of NEPA and issuance of agency guidance documents.  To the extent an Executive order bears on a particular NEPA review, the public may submit comments to further their points.

### 8.      Proposals for Legislation (§ 1506.8)

*Comment*:  A commenter expressed support for CEQ's proposal to consolidate and revise for clarity the requirements for legislative EISs currently described in 40 CFR 1508.17 and the requirements found in the definition of legislation, as they remain mostly intact.

CEQ *Response*:  CEQ acknowledges support for the proposed changes and has finalized those changes with additional revisions for clarity.

*Comment*:  A commenter opposed the proposed revision of the definition of legislation, arguing that substituting the word "means" for "includes" would narrow the definition.  The commenter stated there are potentially other instruments that a department may send to Congress besides a bill or legislation, such as a report (*NRDC v. Lujan)*.

*CEQ Response*:  NEPA requires agencies to "include in every recommendation or report on proposals for legislation" a "detailed statement," provided certain other conditions are met. 42 U.S.C. 4432(2)(C).  The definition of "legislation" does not modify the phrase "recommendation or report."  Rather, CEQ clarifies that NEPA only applies to

407

"recommendation[s] and report[s]" about "bills and legislative proposals," assuming those other conditions are met.  In making this clarification, CEQ is mindful that there must be a meaningful threshold to NEPA's applicability, which this definition of "legislation" provides.  CEQ is also mindful that the interactions between administrative agencies and congressional offices are continuous, of infinite variety, going well beyond the category of "bills and legislative proposals," and largely informal.

*Comment*:  Some commenters opposed the proposed revision of the definition of legislation as it would create a harmful precedent that the Federal Government can essentially avoid NEPA compliance on any or all projects "proposed" by the President in conflict with the intent, if not the letter, of the law.  Similarly, some commenters argued that CEQ must classify the President as analogous to a Federal agency because the President implements policy through Federal agencies and because "Congress's Declaration of National Policy" in section 101 of NEPA makes clear that the statute applies to the entire Federal Government, including the President as chief executive.  Relatedly, commenters stated that eliminating legislative EISs would conflict with Article II, Section 3, of the Constitution, which states that the President "shall take care that the Laws be faithfully executed."

*CEQ Response*:  Formulating and transmitting recommendations to adopt "bills and legislative proposals" is not part of taking care that the laws be faithfully executed; it is inherently about the prospect of creating new laws.  The Constitution gives plenary authority to the President to recommend legislation: "He shall from time to time give to the Congress Information of the State of the Union, and recommend to their Consideration such Measures *as he shall judge necessary and expedient . . . .*"  Art. II, § 3 (emphasis added).  Congress may not impose conditions or limitations on this authority.  *Cf. Zivotovsky v. Kerry*, 135 S. Ct. 2076, 2094

408

(2015) (finding an exclusive presidential power to recognize or refuse to recognize foreign governments as legitimate). Because this is a plenary authority that the Constitution confers upon the President, Congress may not impose conditions on its exercise. By construing NEPA not to apply to "requests for appropriations or legislation recommended by the President" from the definition of "legislation" under the statute, *see* § 1508.1(p), CEQ avoids a constitutional difficulty. *See Ashwander v. Tennessee Valley Auth.*, 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *Rescue Army v. Municipal Court of L.A.*, 331 U.S. 549, 569 (1947).

*Comment*: Commenters stated the legislative EIS requirement should not be changed as it is statutory and obligatory, requiring "agencies" that "recommend or report" on legislation to undertake an EIS. Commenters noted changes to the requirement would be outside of CEQ's authority and in conflict with the law unless an exemption is specifically provided under the statute.

*CEQ Response*: In the final rule, CEQ merely provides a threshold as to what constitutes "legislation" for purposes of NEPA's applicability, bearing in mind that interactions between agencies and congressional offices are continuous, of infinite variety, going further than the category of "bills and legislative proposals," and largely informal. The Supreme Court has expressly recognized that CEQ's implementation of NEPA is entitled to deference. *See Andrus*, 442 U.S. at 357.

*Comment*: A commenter recommended further consultation with CEQ's attorneys to increase certainty as to the source of Executive branch agency authority and further amending of this section's language to ensure that processes for agencies proposing legislation and for cooperation and support of legislation brought forward by other entities are clearly delineated. The commenter recommended that agencies' proposals for legislation are presented for review

409

by the Executive Office of the President for a finding of whether those proposals are considered necessary and expedient by the President prior to those legislative proposals being offered to the Congress for consideration.

*CEQ Response*:  As noted in section II.H.8 of the final rule, the President is not subject to NEPA in his direct recommendations to Congress, but agencies subject to the APA are subject to NEPA, as appropriate, concerning legislative proposals that they develop.  This avoids the concern with constitutionality of the statutory requirement.  *See Ashwander v. Tennessee Valley Auth.,* 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *Rescue Army v. Municipal Court of L.A.*, 331 U.S. 549, 569 (1947).

### 9.    Proposals for Regulations (§ 1506.9)

*Comment*:  Commenters stated that CEQ's three-part test for determining functional equivalence at §§ 1506.9(b) and 1507.3(b)(6) was vague and unenforceable, and amounts to a lower standard such that it does not ensure the actual functional equivalence of the alternative analyses.  Commenters questioned whether "full and adequate consideration" is synonymous with the "detailed statement" required under section 102 of NEPA, whether agencies must analyze and consider the "five core NEPA issues," the adequacy of the requirements on timing of public involvement, and whether the focus on analyzing environmental issues would be lost if other issues are analyzed simultaneously.  Commenters stated that the overall effect of the proposed changes was to open the door to the type of perfunctory analysis that fails to take a "hard look" at the environmental consequences of a Federal action.  Further, commenters expressed concern that substitution of other procedures, such as those related to regulatory impact analyses (RIAs), may lead to an absence of scoping and opportunities to identify alternatives and issues for analysis.

410

*9.4.2-1 Response*:  CEQ does not include the proposed three-part test in the final rule. Instead, under § 1506.9, agencies must identify the provision(s) in the CEQ's regulations that are satisfied by procedures and documentation pursuant to other statutory or Executive order requirements.  Such an approach does not allow for a perfunctory analysis, as asserted by the commenters.  The final rule's requirements are consistent with cases where courts have considered whether the documents prepared and procedures used under other statutes are functionally equivalent to those required under NEPA and will ensure functional compliance with NEPA and its procedural requirements.  This will also ensure that NEPA's twin aims of considering relevant environmental impacts of proposed actions and informing the public of about agency decision-making are fulfilled, while reducing duplicative procedures and documentation.

*Comment*:  Commenters stated that RIAs are not functionally equivalent to a detailed statement under NEPA.  Commenters stated that the purpose of an RIA is to consider the costs and benefits of proposed regulations, noting that E.O. 12866 does not mention environmental concerns in section 1(b), *The Principles of Regulation*.

*CEQ Response*:  In the final rule, CEQ revises § 1506.9 to clarify that procedures and documentation pursuant to other statutory or Executive order requirements may satisfy some or all of the requirements of the CEQ regulations.  When a procedure or document satisfies some or all of the requirements of the CEQ regulations, the agency may substitute it for the corresponding requirements in the CEQ regulations and need not carry out duplicative procedures or documentation.  Agencies must identify which corresponding requirements in the CEQ regulations are satisfied and consult with CEQ to confirm such determinations.  As noted in section II.H.9 of the final rule, for some rulemakings, agencies prepare an RIA, pursuant to

411

E.O. 12866.  While section 1(b) of E.O. 12866 does not mention environmental concerns, other sections of E.O. 12866 reference the environment and the "natural environment", including sections 1(a), 2(f), 6(a)(3)(C)(i)-(ii).  Also, agencies may assesses regulatory impacts to air and water quality, ecosystems, and animal habitat, among other environmental factors in an RIA. Adverse environmental impacts are treated as a cost or foregone benefit, as appropriate, under OMB Circular A–4, "Regulatory Analysis" (Sept. 17, 2003).[81]  An RIA itself or in combination with other documents may satisfy some or all of the requirements of these regulations.

*Comment*:  A commenter stated that the requirements and provisions of the Magnuson-Stevens Fishery Conservation and Management Act (MSA), 16 U.S.C. 1801 *et seq.*, combined with E.O. 12866, the Regulatory Flexibility Act, 5 U.S.C. 601 *et seq.*, and other applicable laws, as well as the National Oceanic and Atmospheric Administration (NOAA) Fisheries procedural directives regarding substantive and procedural standards for analysis, provides a full and adequate consideration of environmental and socio-economic impacts.  The commenter stated that MSA section 303(a)(9) requires preparation of a fishery impact statement that must specify and analyze the likely effects including cumulative conservation, economic, and social impacts. The commenter also stated that the Regional Fishery Management Council process offers multiple opportunities for the public to provide oral and written comments at all stages of analytical development prior to selecting a preferred alternative, and that additional opportunities for public comment are provided during the rulemaking process.

*CEQ Response*:  The final rule provides agencies with the ability to determine that another statute serves the function of agency compliance with NEPA (§§ 1501.1(a)(6) and

---

[81] *Supra* note 63.

1507.3(d)(6)) and the ability to designate and rely on one or more procedures or documents prepared under other statutes or Executive orders as satisfying some or all of the requirements in the CEQ regulations and substitute such procedures to reduce duplication (§§ 1506.9 and 1507.3(c)(5)).  With respect to the MSA, the authorizing agency, NOAA, would be responsible for applying the relevant provisions in the final rule to the particular facts and circumstances described by the commenter.

### 10.    Filing Requirements (§ 1506.10)

*Comment*:  Commenters appreciated the proposed changes to § 1506.10 to remove the requirement to file paper copies of EISs with the EPA.

*CEQ Response*:  CEQ acknowledges the support for the proposed changes, which have been finalized in the rule.

### 11.    Timing of Agency Action (§ 1506.11)

*Comment*:  Commenters requested that CEQ revise § 1506.11 to reflect that the issuance of a ROD should not be delayed pending final promulgation of proposed new National Ambient Air Quality Standards ("NAAQS") under the Clean Air Act. If new standards are proposed but not finalized, conditional NEPA approval should be given upon a commitment by project sponsors that they will demonstrate compliance later in the development cycle.

*CEQ Response*:  The EIS can analyze an alternative that includes future possible regulatory conditions, but decisions should be based on legal and regulatory conditions at the time of the decision.  Permits can be conditioned to account for the possibility of regulatory changes.  This final rule is media neutral and CEQ declines to specify how NAAQS decisions should interact with NEPA here.

*Comment*:  Commenters requested that CEQ revise § 1506.11(b) to require Federal agencies to obtain State concurrence for Coastal Zone Management Act (CZMA) consistency declarations and to coordinate with states under the Fish and Wildlife Coordination Act (FWCA) for Federal agency activities, prior to making or issuing a ROD.  Alternatively, commenters requested that specific language be developed and included in the final NEPA regulations to provide for the CZMA consistency process and the FWCA process as required by Federal statute.

*CEQ Response*:  The final rule does not supersede other statutory requirements such as the CZMA or FWCA.  While most agency procedures are designed to satisfy other environmental legal requirements during the NEPA process, it is not always feasible to do so.  Therefore, CEQ declines to make the requested change to the final rule.

*Comment*:  Commenters requested clarification concerning the requirement in § 1506.11(a) that the EPA publish a notice in the *Federal Register* of the EISs filed since its prior notice.  Commenters asked whether EPA would be required to publish instances where there were no EISs filed in a given week.

*CEQ Response*:  While, to CEQ's knowledge, no instance has occurred where there have been no EISs filed in a given week, EPA has informed CEQ that it would provide notice of that fact on their website should the circumstance occur.

*Comment*:  Commenters supported the proposed changes to clarify that agencies may use other agency procedures for the appeal times or wait period between final EIS and ROD (*i.e.* the BLM Protest, the FS Objection procedures).

*CEQ Response*:  CEQ acknowledges the comment and has retained 1506.11(c)(1) from the 1978 regulations with minor revisions for clarity.

414

*Comment*:  Commenters stated that the minimum time period for comments on the draft EIS is "unreasonably short."

*CEQ Response*:  The final rule's requirement that agencies allow at least 45 days for public comment after publication of a draft EIS is similar to the 1978 regulations.  *See* 40 CFR 1506.11(d).

*Comment*:  Commenters stated that the proposed 30–day comment period for objections to the summary after publication of the final EIS, would be unlikely to influence agency decisions.  Some commenters also viewed the 30–day window as too short.  Other commenters objected to the 30–day window on the ground that it would create uncertainty for certain statutory processes that require the final EIS and ROD to be the same document.

*CEQ Response*:  CEQ received many comments on this provision and agrees that a mandatory 30–day comment period after the final EIS does not serve a sufficiently useful purpose to justify its retention.  In the final rule, however, agencies do retain authority to solicit comments on the final EIS if they so choose.  *See* § 1503.1(b).  In addition, the final rule retains the minimum 30–day period after publication of the final EIS and before an agency may make or issue a ROD subject to limited exceptions including where statutory authorities provide for combining a final EIS and ROD.  *See* § 1506.11(b)–(c).

*Comment*:  Commenters questioned the utility of the 30–day "cooling off" period associated with § 1506.11(b)(2) and supported accommodating the statutory processes that require the final EIS and ROD to be the same document.

*CEQ Response*:  The final rule does not make further revisions to § 1506.11(b) except for clarity or to change from passive to active voice; however, in response to comments, CEQ added "including requirements of lead or cooperating agencies" to § 1507.3(f)(2).  The intent of the

415

language is to improve coordination between lead and cooperating agencies and to facilitate the integration of NEPA review with reviews conducted pursuant to other statutes. The additional language clarifies that agencies, in their NEPA procedures, may alter certain time periods to facilitate issuance of a combined final EIS and ROD.

*Comment*: Commenters stated that with the transition to electronic distribution of environmental documents, those members of the public reviewing hardcopy documents would receive less time than other members of the public reviewing environmental documents electronically.

*CEQ Response*: The final rule does not change the minimum amount of time allowed for public comments on a draft EIS, which is at least 45 days. Further, § 1506.11 ensures that agencies transmit EISs to the public concurrently with their submissions to the EPA. Agencies should make diligent efforts to ensure that they deliver or otherwise make accessible any hard copies transmitted to the public in a timely manner. Electronic distribution, whether by CD, online posting on agency websites, or other means will ensure that the reviewing public can most efficiently take advantage of established comment periods.

### 12.    Emergencies (§ 1506.12)

*Comment*: Commenters recommended that CEQ strike "environmental impact" and replace it with "impacts to the human environment" in the first sentence of § 1506.12.

*CEQ Response*: In the final rule, CEQ clarifies that "effects" are changes to the human environment. *See* § 1508.1(g). Like the proposed rule, the final rule definition of "human environment" cross-references to the definition of effects. *See* § 1508.1(m).

416

*Comment*:  Commenters expressed concerns with CEQ's proposed changes suggesting that they would exempt a broad range of projects from NEPA on the premise of being an emergency when, in fact, the "emergency" is a naturally occurring and foreseeable events.

*CEQ Response*:  CEQ has developed significant experience with NEPA in the context of emergencies and disasters over the past 40 years.  Over this time, CEQ has developed 47 alternative arrangements for compliance with NEPA in this context.[82]  As noted in the final rule, CEQ has approved alternative arrangements to allow a wide range of proposed actions in emergency circumstances including catastrophic wildfires, threats to species and their habitat, economic crisis, infectious disease outbreaks, potential dam failures, and insect infestations. CEQ's proposal clarifies that alternative arrangements are still meant to comply with section 102(2)(C) of NEPA's requirement for a "detailed statement."  The change is consistent with CEQ's long-standing position that it has no authority to exempt Federal agencies from compliance with NEPA, but that CEQ can appropriately provide conditions and alternate pathways for complying with NEPA where appropriate and consistent with applicable law.

*Comment*:  One commenter recommended that CEQ provide a definition of "emergency" within the CEQ regulations.

*CEQ Response*:  CEQ declines to include a definition of "emergency."  Emergencies are often unique and fact-specific, and therefore do not necessarily lend themselves to a universal definition.  Additionally, CEQ has consulted successfully with Federal agencies and developed alternative arrangements in 47 instances without a specific definition.  Based on this experience, a specific definition is unnecessary.

---

[82] *See* https://ceq.doe.gov/nepa-practice/alternative_arrangements.html.

*Comment*:  One commenter recommended that CEQ strike the reference to section 102(2)(C) of NEPA in the proposal.  The commenter recommended that compliance be with the entire NEPA statute, not one particular section, even in the event of "emergency circumstances."

*CEQ Response*:  CEQ has no authority to issue an exemption from NEPA or exempt Federal agencies from compliance with NEPA.  However, CEQ can provide for exceptions to specific requirements of the CEQ regulations implementing the procedural provisions of NEPA to address emergencies that are not addressed by agency implementing procedures previously approved by CEQ.  A Federal agency taking an action should consult with CEQ about alternative arrangements for compliance with section 102(2)(C) of NEPA.  Such arrangements are limited to actions necessary to control the immediate impact of the emergency.  All other actions remain subject to NEPA review.

*Comment*:  Commenters recommended that CEQ add the term "timely remediate" after "control" and strike "the immediate" in the second sentence of § 1506.12.  The commenters note the importance of quickly implementing remediation measures to avoid further harm to the environment.  Commenters urged CEQ to clarify that agencies should coordinate and develop plans for expedited environmental reviews for disaster recovery projects.

*CEQ Response*:  Section 1506.12 of the final rule provides direction to agencies seeking alternative arrangements for compliance under section 102(2)(C) of NEPA, which may include remediation of the impacts of the emergency.  For example, in 2015, CEQ approved the USDA Forest Service's request for alternative arrangements for the Rim Fire Recovery project in the Stanislaus National Forest, recognizing that immediate action was required to restore the affected lands and mitigate future risks of wildfire.

*Comment*:  A commenter proposed a revision to the second to last sentence of § 1506.12 to read, "Agencies and CEQ will limit such arrangements to actions necessary to control the immediate impact of the emergency to protect life and improved properties. Projects conducted to protect life and improved properties are statutory [*sic*] excluded from EIS."

*CEQ Response*:  The commenter's proposed changes would unnecessarily narrow the application of emergency procedures.  NEPA does not authorize CEQ to exclude projects conducted to protect life and improve properties.  Generally, NEPA does not exclude projects designed to protect life and improve properties, and although they are statutorily excluded under certain circumstances.  For example, section 316 of the Stafford Act (42 U.S.C. 5159) waives NEPA procedures for certain Federal actions taken or carried out within a presidentially declared emergency or disaster area.  However, many infrastructure projects are designed to protect lives and improve properties.   Depending upon particular facts and circumstances, those infrastructure projects are subject to, and their design may benefit from, analysis under NEPA.

*Comment*:  A commenter suggested CEQ should pre-approve NEPA documents for typical situations, e.g., hurricanes, tornadoes, earthquakes, sea level rise, and then apply a corresponding CE for such activities.

*CEQ Response*:  CEQ has developed significant experience with NEPA in the context of emergencies and disaster recoveries over the past 40 years.  Over this time, CEQ has developed 47 alternative arrangements for compliance with NEPA in this context.[83]  CEQ's final rule clarifies that alternative arrangements are still meant to comply with section 102(2)(C) of

---

[83] *Supra* note 83.

NEPA's requirement for a "detailed statement." The change is consistent with CEQ's long-standing position that it has no authority to exempt Federal agencies from compliance with NEPA, but that CEQ can appropriately provide conditions for complying with NEPA where appropriate and consistent with applicable law.

### 13.    Effective Date (§ 1506.13)

*Comment*: Some commenters requested clarification as to whether agencies must comply with the revised final regulations upon their publication or whether agencies' compliance may be delayed until agencies revise their respective NEPA procedures. Commenters requested clarification as to whether agencies must withdraw their existing NEPA procedures immediately upon promulgation of the final rule or whether the allotted time frame of 12 months will allow agencies to continue operating under their existing procedures during that period. Additionally, commenters recommended that agency procedures remain in effect for a reasonable length of time to provide agencies time to conform their own procedures to the new rule. Some commenters requested CEQ clarify that the final rule will take precedence over any agency NEPA procedures that are inconsistent with the final rule. Some commenters raised questions regarding agencies that have ongoing regulatory reform efforts that involve NEPA procedures, in light of the language directing agencies to revise existing agency NEPA procedures to eliminate any inconsistencies with the final rule within 12 months. Some commenters stated that the final rule should not impede these ongoing agency rulemakings. Some commenters stated that CEQ should require an agency with a revision currently underway to incorporate as many of the new CEQ requirements at the earliest possible date, even if a more comprehensive subsequent revision occurs later.

*CEQ Response*:  The final rule clarifies that these regulations would apply to all NEPA processes begun after the effective date, but agencies have the discretion to apply it to ongoing NEPA processes.  The final rule allows agencies 12 months after the effective date, or 9 months after the establishment of a new agency, whichever comes first, to propose agency NEPA procedures or revisions, as necessary.  The final rule clarifies in § 1507.3(a) that to the extent existing agency NEPA procedures are inconsistent with the final rule, the final rule shall apply, consistent with § 1506.13, unless there is a clear and fundamental conflict with the requirements of another statute.  Further, CEQ determines in § 1507.3 (a) of the final rule that CEs contained in agency NEPA procedures as of the effective date of the final rule are consistent with the final rule.  Agencies are not required to withdraw their existing agency NEPA procedures immediately upon the effective date of the final rule, but agencies are advised to conduct a consistency review of their existing agency NEPA procedures in order to proceed appropriately for new proposed actions.  An agency that is in the process of revising its procedures is required to make any necessary changes to be consistent with the final rule.  The final rule provides agencies with flexibility to address other transitional issues consistent with §§ 1506.13 and 1507.3(a).

*Comment*:  Commenters stated that the proposed changes would alter the rules of the game in the middle of an environmental review process, creating confusion for the public and agency decision makers, which potential legal challenges would exacerbate.  Commenters stated that retroactive rulemakings are not favored in the law and agencies do not have retroactive authority unless explicitly granted by Congress, citing *Bowen v. Georgetown Univ. Hosp.,* 488 U.S. 204 (1988).  Some commenters stated there should be no option to complete ongoing environmental documents under the final rule, while others stated that if an NOI has been published before the final rule, the EIS or EA should be processed under the existing rules.

421

Other commenters supported providing agencies with the discretion to apply the proposed regulations to NEPA processes begun before the effective date. Some commenters requested clarification that completed environmental documents do not need to be redone. Some commenters recommended that agencies apply the new regulations only to NEPA reviews initiated after the effective date of the rule, or alternatively, apply the new regulations to ongoing reviews only when applicants make a request. Commenters recommended clarifying that agencies should limit application of the final rule to ongoing reviews only in instances where no further delay will result. Some commenters stated that CEQ could consider how to enable a "reset" of an ongoing review under the final rule with full credit and incorporation of work already performed. Some commenters suggested revisions to the second sentence of § 1506.13 to accelerate the implementation of the final rule "to the maximum extent practicable."

*CEQ Response*: The final rule requires agencies to comply with the final rule for proposed actions begun after the final rule's effective date. For ongoing activities and environmental documents begun before the final rule's effective date, agencies may choose whether to apply the final rule or existing agency NEPA procedures. This choice is intended merely to provide a flexibility necessary to transitioning to the new NEPA regulations. The final rule is flexible in its application to ongoing reviews because agencies are better positioned to assess whether applying the final rule to ongoing reviews is appropriate. This approach does not create any retroactivity concerns. As to any agency action that is not yet complete, CEQ could have specified that the new NEPA regulations govern. By providing additional flexibility, even if retroactivity were a concern as to non-final agency action (and it is not), CEQ's chosen approach is entirely rational and consistent with the law.

422

*Comment*:  Commenters requested clarification as to whether the final rule would apply

to an EIS or EA that is being developed while litigation on the final rule is ongoing.

*CEQ Response*:  As discussed above, after its effective date, the final rule shall control to

the extent there is any inconsistency with existing NEPA procedures.  The impact of litigation on

the final rule will be case-specific.  CEQ notes for those interacting with the NEPA process of

the provision concerning severability.  *See* § 1500.3(e).

**J.      Comments Regarding Agency Compliance (Part 1507)**

**1.      Compliance (§ 1507.1)**

*Comment*:  Commenters stated that the deletion of the second sentence in 40 CFR 1507.1

does not provide consistency with § 1507.3.  Rather, commenters stated that § 1507.1 should

briefly mention the supplementary policy of section 105 of NEPA, 42 U.S.C. 4335, that NEPA

requirements are supplemental to existing authorizations of Federal agencies under other statutes.

*CEQ Response*:  CEQ declines to make the requested change.  As stated in the preamble

to the NPRM, CEQ strikes this sentence to conform to the language of § 1507.3.  The final rule

in § 1507.3(b) contains language that allows agencies to revise or develop their agency

procedures in a manner that takes into consideration requirements of other statutes.

**2.      Agency Capability to Comply (§ 1507.2)**

*Comment*:  Commenters stated that § 1507.2 involves substantial budgetary and

procedural implications because of the personnel and resources needed to comply with the final

rule, such as the time limits for environmental analyses.  Some commenters supported the

reiteration of the requirement that each agency shall have adequate personnel and other resources

necessary to fully comply with NEPA because of the proposed changes in § 1506.5 that will

encourage project sponsors to prepare NEPA documents and the time limits imposed in

423

§ 1501.10 that will constrain agencies' consideration of applicant-prepared NEPA documents. Commenters observed that some agencies do not presently have adequate resources to oversee the preparation of such documents and conduct an informed evaluation of their accuracy.

*CEQ Response*:  CEQ expects agencies will allocate appropriate personnel and resources needed to comply with the final rule.  Further, the final rule includes numerous procedures that are anticipated to lower the overall administrative cost to implement NEPA, including the use of other environmental documents that may be incorporated by reference, adopted, or determined to be functionally compliant (*see* RIA Appendix).

*Comment*:  Commenters stated that § 1507.2(d) is ambiguous as written and should be revised to clarify that the requirement of section 102(2)(E) of NEPA extends to all such proposals contained in an EA or EIS.

*CEQ Response*:  In response to comments, the final rule uses the phrase, "consistent with section 102(2)(E) of NEPA," while striking language said to create confusion regarding the reach of Section 102(2)(E) of NEPA.

*Comment*:  Some commenters who agreed with the changes in § 1507.2 requested further revisions to require early and active participation throughout the process, as needed, based on the degree of interest.

*CEQ Response*:  Throughout the final rule, CEQ requires agencies to identify and consider relevant environmental information early in the process in order to ensure informed decision making.  §§ 1500.5, 1501.2, 1501.9, and 1502.5. Further revisions to § 1507.2 regarding early and active participation are not needed.

*Comment*:  Commenters stated that the regulatory text in § 1507.2 regarding the senior agency official does not track with the specific responsibilities described in the preamble to the

424

NPRM regarding dispute resolution among lead and cooperating agencies and enforcing page limits.  Commenters stated that CEQ should provide clarification regarding the qualifications of the senior agency official.

*CEQ Response*:  The final rule sets forth the responsibilities of the senior agency official in §§ 1501.5, 1501.7, 1501.8, 1501.10, 1502.7, and 1507.2.  In response to comments, the final rule clarifies the responsibilities of the senior agency official.  Section 1507.2 provides that the senior agency official shall be responsible for overall review of agency NEPA compliance, including resolving implementation issues.  Section 1508.1(dd) provides that a senior agency official should have the rank of assistant secretary or higher, or equivalent.  Section II.J.30 of the final rule describes these changes accordingly.

*Comment*:  Commenters stated that senior agency officials often do not give necessary time to the NEPA process among competing priorities, and the people in these positions often change which results in delays.  Commenters recommended adding text that permits delegation of NEPA authority to enhance efficiency in NEPA practice.  Other commenters stated that political appointees and responsible agency officials should be prevented from corrupting the NEPA process.

*CEQ Response*:  Without senior agency official leadership and effective management of NEPA reviews, the process can be lengthy, costly, and subject to uncertainty and delays.  CEQ seeks to advance efficiencies to ensure that agencies use their limited resources to effectively consider environmental impacts and make timely and informed decisions.  While there may be a number of staff at an agency involved in NEPA implementation, designating a senior agency official ensures that an individual at the agency is responsible and accountable for overall agency NEPA compliance including for the quantity, quality, and timelines of environmental analyses

425

developed in support of agency decision making.  This is also consistent with the Constitution

and the design of the Executive branch.  The Constitution's Appointments Clause, *see* U.S.

const., art. II, § 2, contemplates that the President "shall appoint . . . all other Officers of the

United States" as Congress establishes with the "Advice and Consent of the Senate."  The

involvement of these officials in agency decision making is a vital component of ensuring the

Executive branch functions properly.

*Comment*:  Commenters requested the deletion of the phrase "and other participants in

the NEPA process" because it allows agencies to use the applicant or project proponent's staff to

comply with the final rule when they may have a conflict of interest.

*CEQ Response*:  The final rule retains the language from the proposed rule in § 1507.2.

Agencies are to have sufficient capacity to evaluate the work that an applicant or project

proponent may provide before the agency makes a final decision.  As addressed elsewhere in

connection with § 1506.5, an agency must independently evaluate the quality of draft NEPA

documents submitted to it.

*Comment*:  Commenters stated that requiring agencies to fulfill the requirements of

Executive orders in § 1507.2(f) gives the cited Executive orders the force and effect of law.

Commenters requested that the regulation provide the full text of E.O. 11514, E.O. 11991 and

E.O. 13807.

*CEQ Response*:  E.O. 11991 amended section 3(h) to require CEQ to issue regulations to

implement the procedural provisions of NEPA and section 2 of E.O. 11514, requiring agency

compliance with the regulations issued by CEQ.  E.O. 11991 was based on the President's

Constitutional and statutory authority, including NEPA, the Environmental Quality Improvement

Act, 42 U.S.C. 4371 *et seq*., and section 309 of the Clean Air Act, 42 U.S.C. 7609.  The

426

President has a constitutional duty to ensure that the laws are faithfully executed, U.S. Const. art II, § 3, which may be delegated to appropriate officials.  3 U.S.C. 301.  The text of the E.O. 11514, as amended by 1991, is found in the United States Code in the note to 42 U.S.C. 4321, and the text of E.O. 13807 is found in the note to 42 U.S.C. 4370m.  *See* 42 U.S.C. 4321 note (E.O. 11514, Protection and Enhancement of Environmental Quality); 42 U.S.C. 4370m note (E.O. 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects), which can be accessed on the U.S. Government Publishing Office (GPO) website, www.gpo.gov.  The Executive orders also are published and made available to the public in the *Federal Register*, which is also accessible on the GPO website.

*Comment*:  Some commenters recommended the addition of language in § 1507.2 to provide that non-Federal applicants who request a Federal action or Federal funding should be responsible for the lead agency's costs of NEPA compliance.

*CEQ Response*:  CEQ declines this suggested revision.  Agencies may have separate statutory authorities to charge fees to defray their administrative costs; however, NEPA does not provide authorities for cost recovery.

*Comment*:  Multiple commenters noted the importance of sufficient funding in agency's budgets and adequate staffing to accomplish the objectives of NEPA.  Commenters recommended training for agency staff and encouraged agencies to devote more funding to NEPA overall.

*CEQ Response*:  CEQ acknowledges the comment.

*Comment*:  Commenters stated that proposed § 1507.2(d) would seemingly require the development and consideration of alternatives for CEs, which is not currently required.

427

Commenters requested clarification as to the applicability of this language to CE projects, as well as the meaning of "unresolved conflict."

*CEQ Response*:  Section 1507.2(d) does not require agencies to develop alternatives as they develop CEs, however, use of § 1507.2(d) may be helpful to agencies in identifying or developing extraordinary circumstances for CEs.  The referenced language has been retained from the 1978 regulations and in CEQ's experience has not been a source for confusion with the development or application of CEs.

*Comment*:  Commenters stated that in § 1507.2(f), all words after the phrase "Environmental Quality" should be deleted because they believe the purpose of E.O. 13807 is contrary to section 102 of NEPA.

*CEQ Response*:  As discussed elsewhere, E.O. 13807 provided direction to CEQ to enhance and modernize the Federal environmental review and authorization process, including issuing such regulations as may be necessary to make the NEPA process efficient and effective. Therefore, E.O. 13807 is an appropriate authority to cite.  E.O. 13807 is not contrary to section 102 of NEPA, and builds on prior efforts to modernize and improve the environmental review process.  *See* section I.E of the of the final rule.

*Comment*:  Commenters stated that "environmental design arts," which appears in §§ 1501.2 1502.6, 1502.8, 1507.2, is not an appropriate description of the environmental sciences.  Commenters stated that the appropriate term is "Environmental Science."

*CEQ Response*:  Section 102(2)(A) uses the terminology "environmental design arts," therefore CEQ declines the suggested terminology change.

*Comment*:  Commenters recommended revising § 1507.2 to add at the end "shall so evaluate and shall account for and give attribution to the contributions of others."

428

*CEQ Response*:  CEQ declines to adopt the recommendation in the final rule as it is not necessary.  Section 1507.2 concerns agency capability in terms personnel and resources rather than giving attribution to the particular contributions of agencies.

### 3.      Agency NEPA Procedures (§ 1507.3)

*Comment*:  Some commenters generally opposed the use of functional equivalence because agencies cannot substitute processes under other laws for NEPA compliance and stated that the relevant proposed revisions should be eliminated.  Commenters were concerned the proposal was not sufficiently justified and violated the congressional requirement to comply with NEPA to the "fullest extent possible" to complete a "detailed environmental statement," and opposed any revisions that give agencies more or new latitude to develop or use "functional equivalent" documents.  Commenters view NEPA section 101 as a substantive mandate to ensure protection of the environment and stated that only statutes that required protection of the environment could serve as a functional equivalent to a NEPA document.  Commenters were also concerned that allowing agencies to determine that a process could be the functional equivalent of a NEPA process would undercut the goal of NEPA to ensure informed agency decision making and public involvement.  Commenters were specifically concerned that allowing consideration of a functional equivalent process could subvert the environmental review and public participation requirements of NEPA.

*CEQ Response*:  Courts have long recognized that agency compliance with statutes requiring consideration of environmental issues through procedures analogous to NEPA serve as the "functional equivalent" to compliance with NEPA's procedural requirements.  *See Portland Cement Ass'n v. Ruckelshaus*, 486 F.2d 375, 387 (D.C. Cir. 1973) (finding an exemption from

429

NEPA for Clean Air Act section 111);[84] *see also Envtl. Def. Fund, Inc. v. U.S. EPA*, 489 F.2d

1247, 1254–56 (D.C. Cir. 1973) (concluding that the standards of FIFRA provide the functional

equivalent of NEPA); *Cellular Phone Taskforce v. Fed. Commc'ns Comm'n*, 205 F.3d at 94–95

(concluding that the procedures followed by the Federal Communications Commission were

functionally compliant with NEPA's EA and FONSI requirements); *W. Neb. Res. Council v. U.S.

EPA*, 943 F.2d 867, 871–872 (8th Cir. 1991) (concluding that EPA's procedures and analysis

under the Safe Drinking Water Act were functionally equivalent to NEPA); *Wyoming v.

Hathaway*, 525 F.2d 66, 71–72 (10th Cir. 1975) (concluding that EPA need not prepare an EIS

before cancelling or suspending registrations of three chemical toxins used to control coyotes

under FIFRA); *State of Ala. ex rel. Siegelman v. U.S. EPA*, 911 F.2d 499, 504–05 (11th Cir.

1990) (holding that EPA did not need to comply with NEPA when issuing a final operating

permit under the Resource Conservation and Recovery Act); *Envtl. Def. Fund, Inc. v. Blum*, 458

F. Supp. 650, 661-62 (D.D.C. 1978) (EPA need not prepare an EIS before granting an

emergency exemption to a state to use an unregistered pesticide); *State of Md. v. Train*, 415 F.

Supp. 116, 121 (D. Md. 1976) (Ocean Dumping Act functional equivalent of NEPA).

     The Supreme Court has stated, "It is now well settled that NEPA itself does not mandate

particular results, but simply prescribes the necessary process."  *Methow Valley*, 490 U.S. at 350;

*see also Pub. Citizen*, 541 U.S. at 76 ("NEPA imposes only procedural requirements on Federal

agencies with a particular focus on requiring agencies to undertake analyses of the environment

impact of their proposals and actions.").  The purpose of NEPA is to ensure that agencies

consider the relevant environmental impacts of their proposed actions and inform the public of

---

[84] Congress subsequently provided a statutory exemption from NEPA for actions taken under the Clean Air Act.  *See* 15 U.S.C. 793(c)(1).

about their decision-making.  In considering whether a statute is the functional equivalent to

NEPA, courts have generally focused on the whether the agency is primarily engaged in

examining environmental questions and whether the substantive and procedural standards under

the statute ensure full and adequate consideration of environmental issues.  Courts have also

considered whether the documentation and action the agency has taken under another statute

"substantially compl[y]" with the requirements of section 102(2)(C) of NEPA and noted that

while section 102(2)(C) calls for a "detailed statement" to address five key issues, it does not

prescribe any particular framework or procedure.[85]  While the courts have generally limited

application of functional equivalence to statutes administered by EPA, the United States Court of

Appeals for the Second Circuit held that the Federal Communications Commission's procedures

for a rulemaking related to health and safety standards of radio frequency radiation were

functionally compliant with NEPA and CEQ's regulatory requirements for EAs and FONSIs.[86]

The 1978 regulations prescribe the framework and procedure to be used to comply with

section 102(2)(C) and the final rule updates those procedures.  As discussed elsewhere in the

final rule, CEQ revises §§ 1501.1(a)(5), 1506.9, and 1507.3 in response to comments.  In the

final rule, § 1501.1(a)(6), proposed as § 1501.1(a)(5), states that in determining whether NEPA

applies or is other fulfilled, agencies should consider whether the proposed action is an action for

which another statute's requirements serves the function of agency compliance with NEPA.  In

relation to proposals for regulations, § 1506.9 clarifies that procedures and documentation

pursuant to other statutory or Executive order requirements may satisfy some or all of the

---

[85] *Supra* note 78.

[86] *Supra* note 79.

requirements of the CEQ regulations.  When a procedure or document satisfies some or all of the requirements of the CEQ regulations, the agency may substitute it for the corresponding requirements in the CEQ regulations and need not carry out duplicative procedures or documentation.  Agencies must identify which corresponding requirements in the CEQ regulations are satisfied and consult with CEQ to confirm such determinations.

In the final rule, § 1507.3(b)(5) states that agency NEPA procedures shall require the combining of environmental documents with other agency documents, especially where the same or similar analyses are required for compliance with other requirements.  Agencies may designate one or more procedures or documents under other statutes or Executive orders as satisfying some or all of the requirements of the CEQ regulations, and substitute such procedures and documentation to reduce duplication.  When an agency substitutes one or more procedures or documents for the requirements in the CEQ regulations, the agency shall identify the respective requirements that are satisfied.  Section 1507.3(d)(6) also states that in the agency NEPA procedures, agencies should identify those actions or decisions that are not subject to NEPA, including actions where the agency has determined that another statute's requirements serve the function of agency compliance with the Act.  These requirements are consistent with cases where courts have considered whether the documents prepared and procedures used under other statutes are functionally equivalent to those required under NEPA and will ensure functional compliance with NEPA and its procedural requirements.  This will assure that NEPA's twin aims of considering relevant environmental impacts of proposed actions and informing the public of about agency decision-making are fulfilled, while reducing the duplicative procedures and documentation that lead to unnecessary delay.

432

*Comment*:  Some commenters were concerned that the CEQ regulations references to consideration of functionally equivalent documents would expand the doctrine of functional equivalence and conflict with NEPA's requirement to mitigate or prevent environmental damage.

*CEQ Response*:  The Supreme Court has stated, "It is now well settled that NEPA itself does not mandate particular results, but simply prescribes the necessary process."  *Methow Valley*, 490 U.S. at 350; *see also Pub. Citizen*, 541 U.S. at 756-757 ("NEPA imposes only procedural requirements on [F]ederal agencies with a particular focus on requiring agencies to undertake analyses of the environment impact of their proposals and actions.").  NEPA and the CEQ regulations require "that mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated," but NEPA and the regulations do not establish "a substantive requirement that a complete mitigation plan be actually formulated and adopted" before the agency can make its decision.  *Methow Valley*, 490 U.S. at 352.  The final rule's requirements are consistent with cases where courts have considered whether the documents prepared and procedures used under other statutes are functionally equivalent to those required under NEPA and will ensure functional compliance with NEPA and its procedural requirements.  This will assure that NEPA's twin aims of considering relevant environmental impacts of proposed actions and informing the public of about agency decision-making are fulfilled, while reducing duplicative procedures and documentation.

*Comment*:  Commenters stated that the proposed revisions to § 1507.3(c)(5) (proposed § 1507.3(b)(6)) are broader than those proposed for § 1501.1.

*CEQ Response*:  The context for considering functional compliance differs between applying the NEPA thresholds pursuant to § 1501.1(a)(6) (proposed § 1501(a)(5)) and developing agency procedures pursuant to § 1507.3(c)(5) (proposed § 1507.3(b)(6)).  Section

433

1501.1 addresses circumstances when NEPA does not apply or is otherwise fulfilled.  When making determinations on the NEPA thresholds pursuant to § 1501.1(a)(6), the agency is reviewing the applicability of the entire NEPA process and not merely use of a specific document or procedural step.

Section 1507.3(c)(5) provides flexibility for agencies to combine environmental documents with other agency documents to satisfy compliance with one or more of the requirements of the CEQ regulations, which agencies must include in their agency NEPA procedures.  Agencies may utilize this flexibility to designate procedures or documents under other statutes or Executive orders that satisfy the requirements of the CEQ regulations to improve agency efficiency.  In this context, NEPA applies and the regulatory provisions at §§ 1506.9 and 1507.3(c)(5) concern the process agencies must follow when designating procedures or documents under other statutes and Executive orders that satisfy some or all of the requirements of the CEQ regulations, and substituting such procedures and documentation to reduce duplication.

*Comment*:  Multiple commenters opposed the proposed rule's language in § 1507.3 that would make the CEQ NEPA regulations a "ceiling" rather than a "floor" for agency NEPA procedures that implement the final rule.  Some commenters stated that this approach will not further NEPA's objectives of informed agency decision making and public disclosure.  Commenters stated that NEPA places responsibility for complying with NEPA on Federal agencies, not only on CEQ.  Other commenters asserted that the proposed rule is ultra vires or beyond CEQ's authority to the extent it requires Federal agencies to include certain requirements such as limitations on public participation in their agency NEPA procedures.  Commenters stated that Congress recognized a role for CEQ in implementing NEPA, but did not provide CEQ with

434

regulatory authority.  For these reasons, commenters stated that agencies should be free to implement whatever procedures or requirements they believe will implement NEPA "to the fullest extent possible," 42 U.S.C. 4332, which may vary according to agency resources, the details of the project, and the particularities of potential sites.  Commenters stated that allowing agencies to impose additional requirements when implementing NEPA could allow agencies and CEQ to learn from one another and better implement NEPA.  Commenters stated that the preamble to the NPRM did not provide evidence that taking away agencies' flexibility to include additional procedures has increased costs or delays.  Some commenters stated that this section is vague and unclear, which will make it difficult for agencies to meet the spirit and intent of this provision when their regulations undergo review by the Office of Management and Budget. Other commenters supported CEQ's clarification that agency NEPA procedures should not contain additional requirements beyond the CEQ regulations.  Some of these commenters encouraged CEQ to consider stating in the final rule or its preamble that CEQ is the only agency that may issue formal interpretations of the NEPA statute and CEQ regulations.  Commenters also stated that allowing agencies flexibility to impose tailored NEPA procedures regarding public comment periods has diminished the risk of later delays.

*CEQ Response*:  Successful implementation of NEPA across the Federal government depends on agencies having review processes that can be integrated and are under the direction of CEQ.  The statute requires all agencies of the Federal Government to "identify and develop methods and procedures, in consultation with the Council on Environmental Quality . . . which will insure that presently unquantified environmental amenities and values may be given appropriate consideration in decisionmaking along with economic and technical considerations." 42 U.S.C. 4332(2)(B).  The need for integration was recognized in Title 41 of Fixing America's

435

Surface Transportation (FAST-41), which established new procedures to standardize interagency consultation and coordination practices.  42 U.S.C. 4370m.  The integration of NEPA implementation was further strengthened under E.O. 13807, including the creation of the OFD policy.  For these reasons, it is important that agencies do not revise their procedures in a way that will impede integration or otherwise result in heightened costs or delays.

NEPA established CEQ and assigned to it duties and functions related to environmental quality, including "review[ing] and apprais[ing] the various programs and activities of the Federal Government in light of the policy set forth in title I of [NEPA]."  42 U.S.C. 4344(3).  CEQ's final rule and, by extension, its ability to place limits on agency procedures, is grounded in its authority under E.O. 11991.[87]  E.O. 11991 directed CEQ to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of [NEPA] . . . to make the environmental impact statement process more useful to decision[ ]makers and the public; and to reduce paperwork and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives," and to "require [environmental] impact statements to be concise, clear, and to the point, and supported by evidence that agencies have made the necessary environmental analyses."  E.O. 11991 also amended section 2 of E.O. 11514, requiring agency compliance with the regulations issued by CEQ.

The Supreme Court has cited approvingly to CEQ's regulations and stated that "CEQ's interpretation of NEPA is entitled to substantial deference."  *Andrus*, 442 U.S. at 358 & n.20, 23; *see also Methow Valley*, 490 U.S. at 355–56; *Pub. Citizen*, 541 U.S. at 757 ("The [CEQ], established by NEPA with authority to issue regulations interpreting it, has promulgated

---

[87] *Supra* note 16.

436

regulations to guide [F]ederal agencies in determining what actions are subject to that statutory

requirement.") (citing 40 CFR 1500.3); *Warm Springs Dam Task Force*, 417 U.S. at 1310

(stating that CEQ is "ultimately responsible for administration of the NEPA and most familiar

with its requirements for Environmental Impact Statements," and its agency determination "is

entitled to great weight").  The D.C. Circuit has noted that CEQ was empowered through

E.O. 11991 to promulgate binding regulations.  *See City of Alexandria v. Slater,* 198 F.3d 862,

866 n.3 (D.C. Cir. 1999); *see also TOMAC v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006).  The

Supreme Court has further explained that E.O. 11991, 3 CFR 124 (1978), requires all "heads of

Federal agencies to comply" with the "single set of uniform, mandatory regulations" that CEQ

issued to implement NEPA's provisions.  *Andrus*, 442 U.S. at 357.  The final rule does not

purport to override an agency's interpretation of its obligations under a statute that agency is

charged with administering.  The regulatory mandate in § 1500.3 that makes the CEQ regulations

binding on all Federal agencies is not changed from the prior version of these regulations.  In

addition, the final rule makes clear that, consistent with Section 104 of NEPA, the CEQ

regulations should not be construed "to limit an agency's other authorities or legal

responsibilities."

Courts have affirmed CEQ's authority to issue regulations, and E.O. 11911 directs

Federal agencies to comply with such regulations.  In addition, under E.O. 13807, CEQ was

directed to enhance and modernize the Federal environmental review and authorization process,

by developing a list of actions including issuing such regulations as CEQ seems necessary to:

(1) ensure optimal interagency coordination of environmental review and authorization

decisions; (2) ensure that multi-agency environmental review and authorization decisions are

conducted in a manner that is concurrent, synchronized, timely, and efficient; (3) provide for use

437

of prior Federal, State, Tribal, and local environmental studies, analysis, and decisions; and (4)

ensure that agencies apply NEPA in a manner that reduces unnecessary burdens and delays,

including by using CEQ's authority to interpret NEPA to simplify and accelerate the NEPA

review process.  E.O. 13807, sec. 5(e)(i).  To meet the requirements of FAST-41 and

E.O. 13807, it is essential for agency procedures to allow for integrated processes.

For these reasons, the final rule requires agency procedures to be fully consistent with the

CEQ regulations, unless for reasons of agency efficiency or where there is a clear and

fundamental conflict with another statute.  Further, agency procedures that impose additional

NEPA requirements beyond the final rule are not necessary because the final rule fully meets

NEPA's purposes of fostering informed agency decision making and public disclosure.

*Comment*:  Commenters stated that CEQ would exceed its statutory authority if it restricts

an individual agency's reasonable, though perhaps different, interpretation of its NEPA

obligations.  This is especially true if an agency's interpretation would result in added

protections for the environment, which is one of the underlying goals of NEPA.  CEQ cannot

override statutory direction in NEPA or other sources, and lacks authority to place limits on

agencies' environmental consideration.

*CEQ Response*:  CEQ has not proposed to alter the basic framework for NEPA

implementation established by E.O. 11514, as amended by E.O. 11991, which mandated that

CEQ issue regulations that make the NEPA process more useful to decision makers at Federal

agencies and to the public and required Federal agencies to comply with the CEQ regulations.

E.O. 11991, Sec. 2(g), 3(h). Under the CEQ implementing regulations, agencies have been

tasked with developing agency-specific NEPA procedures that adapt the government-wide

provisions of the CEQ regulations to the specific authorities and decision-making processes,

438

subject to CEQ review for "conformity" with NEPA.  § 1507.3(b)-(c).  The final rule provides

for updates to agency NEPA procedures for a higher degree of uniformity in agency

implementation of NEPA, but still allows for agency-specific variations where necessary to

achieve efficient implementation or accommodate statutory requirements.  The specific

requirements of § 1507.3(c) to adopt, as necessary, agency NEPA procedures to improve agency

efficiency and ensure that agencies make decisions in accordance with the Act's procedural

requirements are largely a restatement of the 1978 rule requirements at 40 CFR 1505.1.

*Comment*:  Commenters stated that some existing agency NEPA procedures have

requirements more stringent than the final rule because the agency procedures are also used for

compliance with substantive statutes or organic acts.  Commenters stated that CEQ has no

authority to direct agencies to ignore the requirements of other laws or to limit those agencies'

discretion.  All Federal agencies are charged with implementing their own statutory

responsibilities in a manner consistent with NEPA's purposes and directives, whether CEQ's

regulations encompasses the other statutes' requirements or not.

*CEQ Response*:  CEQ recognizes that its authority and expertise is generally limited to

the NEPA statute and that certain agencies may be constrained by other statutory mandates.  The

phrase, "[e]xcept . . . as otherwise required by law," in § 1507.3(b) provides agencies the

flexibility to implement both NEPA and their respective statutory mandates in combined

regulations serving to comply with NEPA and other sources of law.  Any agency NEPA

procedures that go beyond the CEQ final rule, however, must be grounded in other substantive

statutes or organic acts.  In developing or revising agency NEPA procedures to conform to the

final rule, agencies should reference the statute(s) that requires procedures beyond the CEQ final

rule.

439

*Comment*:  Commenters stated that CEQ should not remove the requirement in 40 CFR 1507.3(a) for agencies to continue to review their own NEPA regulations to ensure full compliance with the purposes of the Act.  Commenters stated that CEQ should make clear that an agency needs CEQ to approve of its NEPA procedures before they are finalized.

*CEQ Response*:  The final rule in § 1507.3(b)(1) requires agencies to consult with CEQ when developing or revising their procedures to implement the final rule.  CEQ intends that the use of the term "develop or revise" will encompass future updates to agency procedures after the initial conformity with the final rule.  Including further regulatory language regarding continued review of agency NEPA procedures is not necessary.

*Comment*:  Some commenters were concerned about the lengthy amount of time that would be needed for agencies to revise their procedures.  Commenters expressed support for an outer time limit for agencies to complete their revised regulations.

*CEQ Response*:  The final rule provides time frames for developing or revising agency proposed procedures that are comparable to the amount of time the 1978 regulations allowed in 40 CFR 1507.3 for agencies to adopt procedures.  To ensure efficient implementation of NEPA, it is important for agencies to expeditiously revise their procedures to conform to the changes made in the final rule.

*Comment*:  Some commenters asserted that the 12-month time frame for revising agency NEPA procedures is not feasible because the CEQ final rule creates uncertainty and given likely litigation over the CEQ rulemaking.  Some Tribal commenters stated that reviewing many individual agencies' NEPA procedures within 12 months would be burdensome, especially when the interplay with State laws and regulations are also considered.

440

*CEQ Response*:  The final rule contains critical improvements to the NEPA process, and

each agency should expeditiously review and propose revisions to their procedures to eliminate

inconsistencies in the implementation of the final rule.  The final rule allows agencies 12 months

after the effective date, or 9 months after the establishment of a new agency, whichever comes

first, to propose agency NEPA procedures or revisions, as necessary.  CEQ acknowledges that

there may be litigation relating to the final rule, and that litigation could result in uncertainty

depending on the ultimate outcome.

*Comment*:  Some commenters believed the 12-month time frame would not be feasible

because departmental NEPA procedures would need to first be revised before agency-level

NEPA procedures could be finalized.  Some commenters raised the question of what would

happen if an agency takes more than 12 months to update its agency NEPA procedures.

Commenters stated that it will be challenging for CEQ to review and approve NEPA procedures

for 80 Federal agencies within the 12-month time period.

*CEQ Response*:  Consistent with § 1507.2, CEQ expects that agencies will allocate the

necessary resources to propose agency NEPA procedures or revisions, as necessary, before the

applicable deadline in the final rule.  The final rule at § 1507.3(b) clarifies that agencies may

consider agency efficiency when addressing the adoption of agency NEPA procedures at the

departmental and major subunit levels.  CEQ notes that the final rule requires agencies to

propose, not finalize, their revised procedures within 12 months.

*Comment*:  Commenters requested clarification on whether agency NEPA procedures

would be required to proceed through formal notice and comment rulemaking under E.O. 13891.

*CEQ Response*:  The final rule requires public review and review by CEQ before an

agency adopts its NEPA procedures.  § 1507.3(b)(2).  Public review typically occurs through

441

notice and comment rulemaking, but may sometimes be issued as a guidance document. E.O. 13891 contains a requirement that significant guidance documents, as determined by OMB's Office of Information and Regulatory Affairs, must receive 30 days of public notice and comment before issuance. OMB's Office of Information and Regulatory Affairs will determine the appropriate application of E.O. 13891's requirements to agency NEPA procedures.

*Comment*: Commenters stated that requiring agencies to issue their own agency NEPA procedures is duplicative and will cause delay. Commenters recommended that the CEQ regulations be made effective immediately and that agency roles be limited to supplementation and clarification.

*CEQ Response*: The final rule directs that agency procedures should address certain topics that are better suited for an individual agency to determine based on its particular programs and expertise. The final rule will be effective in the shortest period of time allowed under applicable laws. Section 1507.3(b) does not make agency-specific NEPA procedures mandatory, directing only that agencies should develop or revise such procedures "as necessary." CEQ expects that agency NEPA procedures will be tailored to the final rule and specific agency programs and circumstances, and focused on adding efficiencies, including CEs, where appropriate.

*Comment*: Some commenters asserted that the proposed rule's exception for procedures or requirements "otherwise provided by law or for agency efficiency," does not sufficiently address situations where a procedure or requirement may not accelerate the production of NEPA documents, but does in fact streamline the process as a whole by protecting against potential drawn-out litigation.

442

*CEQ Response*:  The final rule includes several provisions that establish a clearer and more consistent process.  Agencies should not engage in unnecessary analysis and procedures.  As stated in § 1500.1(a), NEPA's purpose is not to generate paperwork or litigation.  Agencies may consider, when designing their NEPA procedures, whether there are practices that can avoid unnecessary litigation.

*Comment*:  Commenters observed that the proposed rule could impede coordination with States.  Some States have State laws that track with the Federal NEPA requirements.  Prohibiting Federal agencies from adopting NEPA regulations that integrate with State review processes with more stringent requirements and procedures than those set out in the proposed rule will create uncertainty, delays, and more paperwork.  Some Tribal commenters raised the issue of Tribal consultations and coordinating among a number of substantive statutes, which requires more than mere consideration of agency efficiency.

*CEQ Response*:  Under the final rule, agencies will retain the discretion to consult with State, Tribal, and local agencies to reduce duplication between NEPA and State, Tribal, and local requirements.  *See* § 1506.2.

*Comment*:  Commenters stated that the proposed changes would require Federal agencies, State or local governments to update existing guidance and procedures to conform to new language in the final rule.  Commenters stated that the need to update existing procedures would lead to inefficiency, delay, and litigation.

*CEQ Response*:  CEQ acknowledges that changes in the final rule will likely require conforming changes in agency NEPA procedures and may require corresponding updates in various sources of law and in guidance documents issued by non-Federal entities.  CEQ believes

that despite an initial adjustment period, the changes in the final rule will ultimately lead to more clarity and efficiency and better coordination.

*Comment*:  Some commenters recommended that CEQ use stronger, more limiting language in connection with "agency efficiency" to ensure that agencies do not interpret "efficiency" in connection with agency operations generally.  These commenters recommended that CEQ add language stating that any inconsistencies with the final rule should be "necessary to achieve additional efficiency in connection with NEPA reviews."  Other commenters were concerned that the proposed exception for "agency efficiency" would be inadequate to prevent the wiping away of certain standards the Federal Aviation Administration has used to provide certainty and upon which industry has come to rely.  Some commenters asked CEQ to codify the language in the preamble to the NPRM that clarified that proposed § 1507.3(a) would "prevent agencies from designing additional procedures that will result in increased costs or delays."

*CEQ Response*:  CEQ declines to make the requested changes in the final rule.  Agencies may interpret "agency efficiency" broadly to help carry out the requirements of NEPA in a cost-effective and timely manner.  CEQ notes its formal role to consult with agencies on updates to their procedures to ensure conformity and work with agencies on any potential misapplication of agency efficiency.

*Comment*:  Commenters stated that allowing agencies to identify actions that are not subject to NEPA in § 1507.3(c) of the proposed rule allows agencies too much free will, which could lead to mistakes.  Commenters requested further clarification on this section to avoid confusion.  Some commenters asked for clarification on who would have oversight of the agency's actions and what recourse is available if any decisions are made incorrectly.

444

*CEQ Response*:  Under the final rule, agencies have the flexibility to make a determination in their NEPA procedures that certain agency actions do not fit within the definition of major Federal action or are otherwise exempt from the application of NEPA.  As discussed elsewhere, requiring a NEPA analysis for an action that is not a major Federal action fails to advance the goals of the statute.  The development or revision of agency NEPA procedures through rulemaking would undergo public notice and comment.  Agencies must consult with CEQ on their procedures while developing or revising their proposed procedures and before publishing them in the *Federal Register* for public comment.  The final rule also requires CEQ to review an agency's procedures for conformity with NEPA and the CEQ regulations before the procedures are finalized.

*Comment*:  Commenters recommended that CEQ revise the last sentence of § 1507.3(a) of the proposed rule to read:  "To the extent practicable and not inconsistent with applicable law, agency NEPA procedures shall be used in the evaluation of compliance with other substantive law provisions.  For example, unless explicitly prohibited by other law, procedures regarding reliance on existing reliable data shall be used in the evaluation of compliance with other substantive law provisions if such evaluation is undertaken during the NEPA process."  Commenters stated this revision would significantly improve permit streamlining in the context of Clean Water Act compliance because it would address issues of requiring new research.

*CEQ Response*:  CEQ declines to add this language in the final rule because the language pertains to compliance with other substantive laws besides NEPA.  The final rule already directs agencies to implement and follow NEPA "[e]xcept . . . as otherwise required by law." § 1507.3(b).  The language proposed by the comment is unnecessary.

445

*Comment*:  Commenters recommended that CEQ add a paragraph (b) to § 1507.3(a) of the proposed rule to require that the statutory authorities for a proposed action be read together with NEPA and the CEQ regulations to guide decision-making for the NEPA process on the individual project.

*CEQ Response*:  CEQ declines to add this language in the final rule because how agencies meet requirements in other substantive laws besides NEPA is beyond the purview of CEQ's statutory authority.

*Comment*:  Commenters stated that CEQ should require agencies in their agency NEPA procedures to describe any additional procedures associated with implementation of § 1506.5 of the final rule regarding the preparation of NEPA documents by applicants or project sponsors.

*CEQ Response*:  CEQ declines to make further changes to the final rule to require agencies in their agency NEPA procedures to provide additional procedures associated with implementation of § 1506.5.  To the extent such procedures may further agency efficiency or implementation of another statute, agencies may identify such procedures in their regulations. Agencies should consider referencing the appropriate statutory authority for those additional procedures.

*Comment*:  Some commenters requested clarification on the agency "decision maker" referenced in § 1507.3(b)(4), and whether "agency official" should be used instead.

*CEQ Response*:  The final rule retains the use of "decision maker" in § 1507.3(c)(4).  An agency decision maker may have delegated authority to authorize a final agency decision, but may not be the senior agency official defined in § 1508.1(dd) who has overall responsibility for NEPA compliance.

446

*Comment*:  Commenters stated that the § 1507.3(b)(5) of the proposed rule should reference both EAs and EISs.

*CEQ Response*:  In response to comments, the final rule in § 1507.3(c)(4) replaces "environmental impact statement" with "environmental documents," which pursuant to the definition in § 1508.1(i) now encompasses EAs and EISs, among other documents.

*Comment*:  Some commenters objected to the language in § 1507.3(e)(1) of the proposed rule that allows agencies to make special exceptions to their NEPA procedures for "classified proposals."  Commenters stated that the subsection's references to Executive orders should be eliminated because the President is not authorized to carve out exceptions to NEPA's public disclosure requirements via Executive order.

*CEQ Response*:  The operative language at § 1507.3(e)(1) of the proposed rule was in the 1978 regulations.  The final rule simply moves the subsection to § 1507.3(f)(1) without making any substantive change.  Agencies should follow applicable authorities and requirements regarding public disclosure and classified information in developing or revising their agency procedures.  Exemption 1 of FOIA authorizes the withholding of classified information. *Weinberger v. Catholic Action of Hawaii/ Peace Educ. Project,* 454 U.S. 139, 144-45 (1981).

*Comment*:  Commenters stated that § 1507.3(e)(1) of the proposed rule fails to provide any means for public interest review.  One commenter stated the proposed changes preclude the U.S. Army's practice of allowing personnel with appropriate security clearances at other agencies to review classified material.

*CEQ Response*:  This comment appears to be based on a mistaken understanding of § 1507.3(e)(1) of the proposed rule, which expressly states that agency procedures may provide specific criteria for the handling of classified information.  The final rule retains this language at

447

§ 1507.3(f)(1).  The final rule does not preclude the practice of agencies to allow the review of

classified information in NEPA documents by personnel with proper security clearances.

*Comment*:  Commenters supported the proposed statement in § 1507.3(e)(3) that agency

procedures shall provide for publication of supplemental notices to inform the public of any

pause in the agency's preparation of an EIS.

*CEQ Response*:  The final rule at § 1507.3(f)(3) retains this change from the proposed

rule.

*Comment*:  Commenters stated that the language in § 1507.3(f)(3) regarding supplemental

notices to inform the public of a pause in an agency's preparation of an EIS and for any agency

decision to withdraw its notice should apply to EAs as well.

*CEQ Response*:  The final rule retains the language of the proposed rule in this

subsection.  EISs require more public involvement than EAs, and no initial NOI is issued for an

EA.  Accordingly, a supplemental notice in the context of EAs is not necessary.

*Comment*:  Commenters stated that allowing agencies to combine their scoping and EA

processes is problematic because the proposed rule does not require public comment on draft

EAs (§ 1507.3(e)(4)).  Some commenters observed that because CEQ regulations serve as a

ceiling in terms of administrative burden, any agency NEPA procedures that require public

comment on a draft EA would be called into question and undermine the overall goal of agency

efficiency.  Some commenters stated that combining the EA process with scoping would result in

less informed agency decision making.  Other commenters stated that the proposed language in

§ 1507.3(e)(4) should be a useful step toward focusing analysis and decision-making.

*CEQ Response*:  The final rule at § 1507.3(f)(4) includes language which is similar to the

1978 regulations in 40 CFR 1501.7(b)(3).  Scoping has never been required for an EA under

448

CEQ's NEPA regulations, although agencies had the discretion to circulate an EA for public comment. The final rule retains this flexible approach. Agencies may adopt procedures to combine scoping and NEPA processes when it is efficient to do so.

*Comment*: Some commenters stated that it is important that agency procedures allow local governments an opportunity to review agency analyses. These commenters stated that agencies could structure their processes to allow government-to-government coordination with affected local governments regarding the on-the-ground impacts of decisions.

*CEQ Response*: Section 1506.2 of the final rule authorizes Federal agencies to cooperate with local agencies.

*Comment*: Commenters stated that CEQ should make clear that State agencies that have been delegated NEPA responsibilities from Federal agencies shall have flexibility to implement the regulations in a way that streamlines the NEPA process.

*CEQ Response*: The definition of "Federal agency" in § 1508.1(k) includes States, units of general local government, and Tribal governments assuming NEPA responsibilities from a Federal agency pursuant to statute. States and other entities with delegated NEPA authority from a Federal agency may exercise the same flexibilities and streamlining benefits provided in the final rule.

*Comment*: Some commenters sought transparency on where agencies' lists of CEs are located, and the process for submitting public comments on CEs. Commenters recommended that CEQ publish a comprehensive list of CEs so that agencies did not need to promulgate their own lists.

*CEQ Response*: CEQ maintains a list of CEs. List of Agency CEs, *supra* note 44. CEQ endeavors to keep the list of currently available CEs up to date. Federal agencies and

449

stakeholders should also review the relevant agency's NEPA procedures for applicable

extraordinary circumstances and for confirmation that a particular CE is currently available.

Under § 1507.3, an agency's revision of its procedures, including establishing or revising any

CEs, would be subject to public review and comment.  Congress has also established or directed

agencies to establish CEs in statute as discussed in section I.D of the of the final rule.

*Comment*:  Commenters stated that CEQ should consider when and how MOUs or policy

agreements between Federal agencies may be useful in efficiently carrying out NEPA

requirements.

*CEQ Response*:  CEQ declines to address MOUs or other policy agreements in the final

rule.  Many MOUs or policy agreements are entered into for reasons other than NEPA, and thus

beyond the scope of this rulemaking.

*Comment*:  Commenters stated that CEQ should not delete the sentence in 40 CFR

1507.3(a) stating that agency NEPA procedures shall not paraphrase the CEQ regulations.

Commenters stated that paraphrasing leads to confusion and inconsistency.

*CEQ Response*:  The final rule retains the deletion of this sentence in § 1507.3 because it

is unnecessarily limiting on agencies.  Agencies have the flexibility to address the requirements

of the CEQ regulations as they relate to their programs and need not engage in restatement.

*Comment*:  A commenter recommended the implementation of a common structure for

producing EAs and EISs across Federal agencies to ensure that pertinent information is easily

found within the documents regardless of which agency was the preparer.

*CEQ Response*:  Agencies administer a variety of statutes for which NEPA reviews are

conducted.  With the update to these regulations, CEQ has included revisions to promote greater

alignment and consistency in the development of EAs and EISs.

450

*Comment*:  Tribal commenters recommended that CEQ also require agencies to consult with Tribal governments and that Tribal governments be involved in interagency consultations on the development or revision of agency NEPA procedures.

*Response*:  CEQ declines to adopt the recommended change in the final rule.  Section 1507.3(b)(2) of the final rule requires public review and review by CEQ before an agency adopts its NEPA procedures.  As part of this process, agencies will consider whether it is appropriate to consult with Tribes under E.O. 13175.

*Comment*:  Commenters stated that § 1507.3(e)(2)(ii) (proposed § 1507.3(d)(2)(ii)) should be clarified with respect to whether agencies may provide notifications of agency CEs through means other than publication in the *Federal Register*.

*CEQ Response*:  CEQ addresses publication in § 1508.1(y) and provides that publication includes methods found by the agency to efficiently and effectively make environmental documents available for review by interested persons, including electronic publication. Publication is not limited to the *Federal Register*.

*Comment*:  Commenters recommended that proposed § 1507.3(b)(6) be applicable to EAs.

*CEQ Response*:  The final rule in § 1507.3(c)(5) no longer references an EIS but refers to environmental documents.

*Comment*:  Commenters stated that proposed § 1507.3(e)(3) should be revised to replace "decision" with "scoping" because certain agencies do not make a formal decision as to whether to prepare an EIS.  Commenters also stated that "decision" in the context of withdrawing an NOI is also not the proper use of the word.

451

*CEQ Response*:  The NOI, published in the *Federal Register*, as well as notices to withdraw an NOI, also published in the *Federal Register*, reflect the agency's decision with respect to proceeding with an EIS or pausing activity.

*Comment*:  Commenters stated that moving 40 CFR 1505.1 to § 1507.3 aligns similar sections and reduces redundancy, which maintains clarity for NEPA practitioners.

*CEQ Response*:  CEQ acknowledges the comment.

*Comment*:  Commenters requested clarification regarding proposed § 1507.3(b)(5), which encourages agencies to make decision documents that relate to the comparison of alternatives available to the public before a NEPA decision is made.  Because it is unclear as to when a CE decision becomes final, commenters were unsure if these other decision documents would be made available to the public prior to the final agency decision.

*CEQ Response*:  The final rule retains the language of proposed § 1507.3(b)(5) in § 1507.4(c)(4).  Agencies may exercise their discretion to make documents available to the public prior to the final agency decisions, consistent with any statutory disclosure requirements.

*Comment*:  Commenters stated that language in § 1507.3 that prohibits agencies from imposing additional procedures or requirements beyond those in the final rule will prevent agencies who carry out Tribal trust responsibilities from creating more protections when considering Tribal interests.

*CEQ Response*:  Tribal trust responsibilities are a substantive duty that may have independent requirements that go beyond the scope of this rulemaking.

*Comment*:  Commenters stated CEQ should encourage agencies to adopt a uniform process for scoping, comments, drafts, and resolving objections to the extent practicable.

452

*CEQ Response*:  CEQ acknowledges the comment.  Specific advice that CEQ may provide to agencies as they consult with CEQ on their NEPA procedures is beyond the scope of this rulemaking.

*Comment*:  A commenter requested that CEQ afford Tribes the opportunity to "638" contract agency NEPA functions.  Regulations should be reformed, consistent with Congress policy favoring Tribal self-determination, to eliminate regulatory obstacles preventing Tribes from entering into self-determination contracts under the 1975 Indian Self-Determination and Education Assistance Act (ISDEAA) (25 U.S.C. 5301 *et. seq.*) for performing an agency's NEPA responsibilities.  For example, CEQ should interpret broadly the "programs or services which are otherwise provided to Indian tribes and their members pursuant to Federal law" as including DOI and Department of Health and Human Services' NEPA functions.  A broad interpretation would enable Tribes to contract with the agency under the ISDEAA for administration of those functions.  At a minimum, CEQ should encourage those agencies, as the agencies subject to the ISDEAA, and consistent with the Federal policy encouraging Tribal self-determination, to consider interpreting the ISDEAA broadly to allow Tribes to contract those agencies' NEPA functions.

*CEQ Response*:  The final rule allows agencies to satisfy CEQ's regulatory requirements where another statute serves the function of NEPA, or where one or more processes or documents prepared under another statute or Executive order also satisfies these regulations.  Agencies that administer self-determination contracts may apply these flexibilities to the extent applicable.  For proposed actions sponsored by a Tribe, the Tribe may at the request of and under the supervision of an agency also prepare environmental documents pursuant to § 1506.5 to assist the agency in its review of the proposed action.  Agencies should review their authorities

453

to identify any further actions that may be taken to facilitate self-determination contracts and incorporate into their procedures, as appropriate.

*Comment*:  Asserting that agencies already misuse CEs, commenters expressed concern about the proposed changes to allow agencies to use another agency's CE in their NEPA procedures.  Some commenters expressed concern that the proposal would enable an agency to use a CE without public notice.  Other commenters stated that CEs are an important tool that many agencies are underutilizing including using another agency's CE, a common-sense approach to reducing time and effort (and uncertainty) associated with relatively routine projects where there is unlikely to be significant impact.  Some commenters that were supportive of these changes recommended explicit language noting that public involvement is not a requirement to determine CEs.

*CEQ Response*:  All existing CEs meet the requirements of the final rule and therefore agencies may continue their use.  In the future, agencies would develop new CEs in their agency NEPA procedures, which must comport with this final rule.  When an agency is interested in applying a CE listed in another agency's NEPA procedures, it may include a process for doing so in its agency procedures.  *See* § 1507.3(f)(5).  The process must include consultation with the agency that had originated the CE, and should ensure documentation of the consultation and the identification to the public of the CEs the agency may use for its proposed actions.  The final rule continues to require public review before adopting new agency NEPA procedures.  This general process for relying on another agency's CEs, which may be established in agency NEPA procedures, is distinct from the procedure set forth in the regulations by which an agency adopts another agency's determination that a CE applies to a particular proposed action, which is addressed in § 1506.3(d).  For further discussion, see sections II.H.3 and II.I.3 of the final rule.

454

*Comment*:  Commenters referenced proposed § 1507.3, where Federal agencies can develop a procedure in which a Federal agency can consult with and adopt another agency's CE. Commenters recommend that the proposed changes also include a requirement to coordinate with affected State fish and wildlife agencies.

*CEQ Response*:  State fish and wildlife agencies are an important resource for Federal agencies to consult in the development of CEs, including adoption of another Federal agency's CE.  In the final rule, Federal agencies can consult with State governments prior to and during development of the agency's NEPA procedures.  CEQ declines to make further changes in the final rule to establish an affirmative requirement to consult.

*Comment*:  Commenters objected to establishing a process in the agency NEPA procedures to adopt another agency's CE in § 1507.3(e)(5) stating this may weaken Tribal consultation.

*CEQ Response:*  Agencies are required to consult, as appropriate, on their NEPA procedures.  During Tribal consultation on agency procedures, Tribal governments have the opportunity to discuss the process used by an agency for adopting another agency's CE. Circumstances specific to Tribal interests can be addressed at that time and incorporated into the agency's procedures.

**4.    Agency NEPA Program Information (§ 1507.4)**

*Comment*:  CEQ requested comment on the creation of a single NEPA application that facilitates consolidation of existing datasets and can run several relevant geographic information system (GIS) analyses to help standardize the production of robust analytical results.  Most commenters supported the development of a single NEPA application because it would streamline the NEPA process and increase coordination, transparency, and accountability.  Some

455

commenters observed that databases are only useful when frequently updated and maintained for underlying data quality, and may require adequate training for their use.  Some commenters who supported this development expressed concerns about privacy and security of the application in the event of a data breach, which could impact the protection of confidential information regarding cultural sites or burial sites for Tribes, or the private data of public land users.

*CEQ Response*:  CEQ notes the commenters' concerns.  CEQ invited comment on this proposal of a single NEPA application, including comment on whether additional regulatory changes could help facilitate streamlined GIS analysis to help agencies comply with NEPA.  CEQ did not receive sufficient comment to lead CEQ to make additional regulatory changes to facilitate streamlined GIS analysis to help agencies comply with NEPA, and the final rule does not contain any changes from the proposal.

*Comment*:  Most commenters supported the proposed update in § 1507.4 to include publishing information on agency websites regarding NEPA reviews and maintaining public access to agency records of NEPA reviews.  Some commenters stated that the CEQ regulations should not specify types of technology to allow for flexible use of new technologies as they become available.  Commenters stated that the websites should be user-friendly and not require a complex docket search.  Some commenters noted that producing and maintaining a website could be costly and burdensome for smaller agencies.  Some commenters stated that publishing documents electronically, coupled with online public meetings, could limit access for individuals with limited English proficiency or limited financial means.  Commenters recommended that in addition to making documents available electronically, they should be provided as hard copy, jump drive, or other format that allows them to be accessible to communities with low

456

Case 3:20-cv-00045-JPJ-PMS    Document 75-1    Filed 09/02/20    Page 597 of 1754
Pageid#: 2182

bandwidth, as these are frequently areas with substantial Tribal and/or rural populations that are often the most impacted by development.

*CEQ Response*:  The final rule requires agencies to make available on their websites information on NEPA reviews.  Smaller agencies are able to cooperate with larger agencies to reduce administrative burden.  The final rule contains language to ensure that use of electronic media does not adversely impact communities that lack adequate access to high-speed internet.

*Comment*:  Commenters requested that searchable databases be made available to the public, not only agencies.  Commenters recommended that the background documents that agencies rely on also be made available to the public for independent review of supporting documents.

*CEQ Response*:  The final rule requires agencies to make publicly available environmental documents, relevant notices, and other relevant information.  Such information may include background documents and a publicly searchable database.

*Comment*:  Commenters urged CEQ and the Office of Management and Budget to take a leadership role in coordinating agency investments in information architecture to provide an integrated by decentralized platform for public and agency access.  Commenters recognized that a Federal budget infusion would be needed for such an effort.

*CEQ Response*:  CEQ acknowledges the comment, but it goes beyond the scope of this rulemaking.

*Comment*:  Commenters requested that CEQ require agencies to update applicants on a regular basis of the status of completing reviews.  Commenters stated these progress reports could be included on the CEQ website along with relevant documentation and records.  Commenters also requested that the website include a centralized database with prior reviews

and decisions to better facilitate the use of past research and promote more consistent decision making. Some commenters stated that specifying the details of a NEPA application could be challenging for CEQ to cover within its regulations.

*CEQ Response*: Due to the potential administrative burden on some agencies, CEQ declines to require the posting of regular status updates or to specify the extent to which the database should include information on prior reviews and decisions.

*Comment*: Commenters asked for clarification on whether § 1507.4 applies to CEs in addition to EISs and EAs.

*CEQ Response*: The requirements at § 1507.4 encompass agencies' overall NEPA program including CEs.

*Comment*: Commenters recommended that a new section be added requiring the appointment of a liaison officer to coordinate NEPA implementation between different agencies and facilitate dissemination of information. Commenters stated that this liaison role could facilitate implementation of the requirements of § 1507.4, especially in smaller agencies. Commenters recommended that the process to request needed expertise from cooperating agencies should be clarified.

*CEQ Response*: Under the final rule in §§ 1508.1(dd) and 1507.2(a), agencies are required to designate a senior agency official for overall review of agency NEPA compliance, including resolving implementation issues. The process for requesting needed expertise from cooperating agencies is addressed §§ 1501.7(h) and 1501.8(a). Given the broad purview of the senior agency official, it is unnecessary to designate any additional liaison officer.

458

**K.**      **Comments Regarding Definitions (Part 1508)**

**1.**      **Definition of Affecting (§ 1508.1(b))**

*Comment*:  CEQ received general comments of support and opposition to the proposed changes to part 1508.  Some commenters noted that reducing ambiguity could also reduce the need for litigation, whereas others suggested revisions to existing definitions will lead to further litigation.  Some commenters disagreed with moving language from the definitions section to other sections of the regulations.  A commenter was critical of changing the heading of this section from "Terminology" to "Definitions."

*CEQ Response*:  CEQ is simplifying many of the definitions in the final rule that may have caused confusion in interpretation and led to unnecessary litigation.  In an effort to reduce duplication and improve clarity, the final rule moves and consolidates much of the operative language, which is language that provides specific direction rather than defining a term, from the definitions to the relevant regulatory provisions.  In the 1978 regulations, provisions on certain topics are scattered throughout, making it unnecessarily difficult to navigate the requirements.

*Comment*:  Commenters recommended that CEQ add new definitions for  "marginal details," "unnecessarily delay," "reasonably available," "substantive," "interagency," "programmatic," "applicants," "management agency," "record of environmental consideration," "regulatory agency," "inter-disciplinary preparation," "proposal," "significant issue," "State and local agency," "environmental analysis," "irreversible or irretrievable commitments of resources," "record of decision," "short-term uses of (the human) environment and the maintenance and enhancement of long-term productivity," "affected interest," "extraordinary circumstances," "public commenter," and "stakeholder."

459

*CEQ Response*:  Several of the terms, including "marginal details," "unnecessarily delay," "record of environmental consideration," "management agency," "regulatory agency," "affected interest," "stakeholder," and "short-term uses of (the human) environment and the maintenance and enhancement of long-term productivity," are not used in the regulatory text and therefore do not require a definition.  "Inter-disciplinary preparation" is used as a header and does not have independent meaning in the regulatory text.  Some terms, including "environmental analysis" and "reasonably available," appear only once in the regulations.  Both "record of decision" and "irreversible or irretrievable commitments of resources" have dedicated sections to describe their application in § 1505.2 and § 1506.1, respectively.  Other terms remain unchanged from the 1978 regulations and have not been a source of confusion.  For these reasons, CEQ declines to add the requested definitions.

*Comment*:  Some commenters suggested CEQ should retain the individual section numbers for each definition in part 1508 rather than consolidating definitions into a single section and using paragraph letters.

*CEQ Response*:  Because CEQ would have to renumber the sections in part 1508 to keep the terms in alphabetical order and consistent with the recommendations of the *Federal Register*, CEQ consolidates the definitions into a single section.  Rather than just an alphabetical list, CEQ includes paragraph letters to facilitate citation to the specific defined terms.

*Comment*:  Commenters recommended that the definition of "Affecting" in § 1508.1(b) be changed to parallel § 1508.1(g)'s definition of "effects or impacts."

*CEQ Response*:  CEQ did not propose any changes to this definition and has not included any revisions in the final rule.  Each term has a distinct meaning in the regulations and the definition of "affecting" includes a reference to "effect."  CEQ does not find a change from the

460

1978 regulations is necessary.  The definition of "affecting" inherently parallels the changes to the definition in "effects" because § 1508.1(b) uses the phrase "effect on."

### 2.    Definition of Authorization (§ 1508.1(c))

*Comment*:  Commenters recommended adding "funding" to the definition of "authorization" in § 1508.1(c).

*CEQ Response*:  CEQ declines to make the change because "funding" has a different meaning than "authorization."  As discussed in the proposed rule, the definition of "authorization" is consistent with the definition in FAST-41, 42 U.S.C. 4370m(3), and E.O. 13807, and was added to refer to the types of authorizations that may be required for siting, constructing, reconstructing or commencing operations for a proposed action, including infrastructure projects.  While an approval for funding may require an authority, funding itself is not an authorization and is not included in the definition of "authorization" in either FAST-41 or E.O. 13807.

*Comment*:  Some commenters recommended that CEQ modify the term "Authorization" to remove findings and determinations from the definition as these may be interim steps in agency decision-making, not the conclusion of the authorization process.

*CEQ Response*:  This definition is consistent with the definition included in FAST–41 and E.O. 13807.  Findings and determinations may be either interim or final agency actions.  The use of "authorization" does not imply that any such action constitutes a final agency action for the purposes of APA or other statutes.  CEQ prefers to have a more inclusive list and declines to make the recommended change.

461

### 3.      Definition of Categorical Exclusion (§ 1508.1(d))

*Comment*:  Commenters stated that the proposed changes to the definition of "categorical

exclusion" render it unclear because CE now refers to actions, instead of the process used to treat

a category of actions.  Further, the changes are inappropriate because there may be situations

where an action of a type that is typically categorically excluded instead has significant effects

that would require preparation of an EA or EIS  Commenters recommended changing the

definition so CE refers to the process for a category of actions, rather than the category of actions

themselves.  In addition to being clearer, commenters stated these changes would also better

parallel the definition of CE and the proposed definition of FONSI in § 1508.1(*l*).

*CEQ Response*:  The 1978 regulations use the phrase "categories of actions" to describe

the development of CEs and it has not been a source of confusion for Federal agencies.  The

process for evaluating the applicability of a CE to a particular action is described in § 1501.4.

*Comment*:  Commenters requested that CEQ retain the original definition of a CE

because the new definition does not differentiate between what would constitute a CE and an

EA.  Commenters stated that actions with significant impacts is the only category mentioned that

would result in an agency going from a CE to an EIS.

*CEQ Response*:  A CE applies to "categories of actions," which is distinct from an EA.

Neither a CE nor an EA have significant effects; however, agencies would use an EA where a

proposed action does not fall under a category of actions for which the agency has determined a

CE is appropriate and established that CE in its agency NEPA procedures.  The process for

applying a CE is explained in § 1501.4.

462

### 4. Definition of Cooperating Agency (§ 1508.1(e))

*Comment*:  Commenters suggest revising the definition of cooperating agency in § 1508.1 so that it applies to EISs and EAs by removing the final phrase significantly affecting the quality of the human environment.

*CEQ Response*:  In response to comments, CEQ has made further changes to expand the practice of using cooperating agencies to the preparation of complex EAs.  CEQ has also made a conforming revision to the definition of cooperating agency to include major Federal actions that "may" significantly affect the quality of the human environment.

### 5. Definition of Effects (§ 1508.1(g))

*Comment:*  Commenters expressed support for substituting the standard of reasonably foreseeable and reasonably close causal relationship to the proposed action.  Commenters stated that Federal agencies' implementation of the cumulative effects analysis has been confusing, leads to frequent litigation, and lacks consistency across Federal agencies, and there is uncertainty as to the extent of the effects that must be considered.  Commenters further noted that there is no independent textual source in NEPA requiring agencies to assess cumulative effects, and agreed that the definition appropriately adopted Supreme Court case law. Commenters stated that the revised definition would improve the quality of analysis by focusing agency resources on meaningful effects of proposed actions.

*CEQ Response*:  CEQ finalizes the definition of "effects" to mean changes that are "reasonably foreseeable and have a reasonably close causal relationship" to the proposed action or alternatives.  The language is consistent with the Supreme Court's holding in *Public Citizen*, 541 U.S. at 767–68.  This close causal relationship is analogous to proximate cause in tort law. *Id.* at 767; *see also Metro. Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774

463

(1983) (interpreting section 102 of NEPA to require "a reasonably close causal relationship between a change in the physical environment and the effect at issue" and stating that "[t]his requirement is like the familiar doctrine of proximate cause from tort law.").

*Comment*:  Commenters stated that, to the extent there continues to be confusion regarding the interpretation of direct, indirect, and cumulative effects, CEQ should issue further guidance rather than eliminate the definitions.

*CEQ Response*:  Since issuing the regulations in 1978, CEQ has issued over 30 separate guidance documents to aid implementation of NEPA, including guidance entirely focused on implementation of the cumulative effects analysis.[88]  Retaining the definitions from the 1978 regulations and issuing further guidance would not achieve the desired goal, which is to apply NEPA effects analyses consistently while adhering to all legal requirements.  Moreover, guidance documents are not substitutes for regulations, since guidance documents are not themselves sources of law.

*Comment*:  Commenters expressed support for the definition of "effects" in the 1978 regulations, emphasizing that the definition has been in use for 40 years and supporting separate categories in the definition of direct, indirect, and cumulative effects.  Commenters also stated that changing the definition of effects is not sufficiently justified.  In support of these points, commenters referenced previous CEQ guidance and regulations extending back to its 1971 guidance.

*CEQ Response*:  Over time, Federal agencies independently developed procedures and methods to analyze what was referenced as cumulative effects with "mixed results," prompting

---

[88] *See* Considering Cumulative Effects Under the National Environmental Policy Act (Jan. 1997), https://ceq.doe.gov/publications/cumulative_effects.html.

CEQ to issue the Cumulative Effects Guidance in 1997. CEQ's extensive guidance categorized cumulative effects as four distinct types and provided several different examples, including time crowding, time lags, space crowding, cross-boundary, fragmentation, compounding effects, indirect effects, and triggers and thresholds. The examples of cumulative effects could also be characterized as direct and indirect effects interacting with variable baseline conditions in the affected area, as noted by several commenters. It is not clear how classifying such types of interactions as cumulative effects is necessary or improves implementation of effects analyses. Despite over 20 years of experience with Federal agencies implementing the, public comments on the ANPRM and proposed rule noted inconsistent interpretation by the courts and Federal agencies, further demonstrating that CEQ has not successfully addressed the concerns regarding consistent and clear interpretation and application of the concept. Additionally, the terms direct and indirect effects, and cumulative impact do not appear in the statute and thus their use is not required by NEPA. Consistent with *Chevron* and related cases, those concepts can be changed in new regulations.

The final rule incorporates the Supreme Court's holding in *Public Citizen*, 541 U.S. 752, and establishes a revised approach for Federal agencies to analyze those effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives. Under this standard, agencies will continue to analyze effects that fall within the scope of the statute, but will no longer be required to unnecessarily characterize effects as direct, indirect, or cumulative.

Further, even the 1978 regulatory definitions for direct and indirect effects are inconsistent with those used in other disciplines including the field of ecology. In ecology, an indirect effect is commonly referred to as the impact of one organism or species on another that

465

is mediated or transmitted by a third.  A direct effect is where one organism or species impacts another, and the impact is not mediated through a third individual.  Differences between commonly used definitions of direct and indirect effects in environmental science, and the definitions in the 1978 regulations, reinforce the need for a revised approach bounded by proximate cause and its principles.

*Comment*:  Commenters stated that the proposed changes to the definition of effects, and specifically precluding consideration of cumulative effects, narrows the scope of analysis. Commenters discussed numerous examples and stated that the proposed changes would omit certain environmental impacts from the analysis, leading to a less-informed public and decision makers.  Commenters stated that agencies would fail to consider effects that are individually insignificant but significant when combined.  The result of the proposed changes would include adverse impacts to public health, environmental justice communities, and the environment (especially climate change).  Commenters also discussed whether specific actions would be analyzed differently as a result of the proposed changes (e.g., forest and other road construction, mineral leasing and development, electricity transmission and production, dredging and marine infrastructure, renewable energy), as well as the analysis of particular impacts (e.g., greenhouse gas emissions and climate change, ESA listed species and critical habitat).  Commenters stated that the proposed changes would benefit certain industries (e.g., fossil fuels).  Commenters stated that the narrow definition would constrain the scope of judicial review.  Commenters stated that the proposed changes were inconsistent with the statute, legislative history, and applicable case law (*e.g.*, *Kleppe*, 427 U.S. at 390; *Dine Citizens Against Ruining Our Env't v. Bernhardt*, 923 F.3d 831 (10th Cir. 2019); *NRDC v. Callaway,* 524 F.2d 79 (2d Cir. 1975); *City of Davis v. Coleman,* 521 F.2d 661 (9th Cir. 1975); *Minnesota Public Interest Research Group v. Butz,* 498

466

F.2d 1314 (8th Cir. 1974); and *Hanley v. Kleindienst,* 471 F.2d 823 (2d Cir. 1972)).

Commenters referenced inconsistencies with specific parts of NEPA sections 101(a),

"recognizing the profound impact of man's activity on the interrelations of all components of the

natural environment" and 102(2)(A), "utilize a systematic, interdisciplinary approach."

*CEQ Response*:  Defining effects as those that are reasonably foreseeable and have a

reasonably close causal relationship does not narrow the scope of analysis relative the

requirements of the Act because the Supreme Court has already recognized that the statute itself

must embed the parameters of proximate cause.  Moreover, the text of the Act requires analysis

of only the environmental impact of the proposed action; it does not require that the analysis be

further differentiated as direct, indirect, or cumulative.  The requirement that agencies consider

effects (which could include interrelated effects) that are reasonably foreseeable and have a

reasonably close causal relationship to the proposed action is consistent with the language and

intent of the statute and binding precedent of the Supreme Court.  This standard reduces

confusion and can be more consistently implemented across Federal agencies.  Under this

definition, Federal agencies will continue to analyze any adverse environmental effects that

cannot be avoided should a proposal be implemented.  42 U.S.C. 4332(C).

How examples provided by commenters would be analyzed under the final rule will

depend on the particular factual records.  The mere fact that a referenced EIS included the

analysis of indirect or cumulative effects does not mean the analysis would exclude those same

effects under the final rule.  There may be examples where the application of the new definition

of effects will find some interactions not to be reasonably foreseeable or lacking in a reasonably

close causal relationship to the proposed action.  It is not possible to state affirmatively that a

specific example would be analyzed differently under the final rule.

To avoid further confusion with cumulative effects, the final rule does not include the language, "Analysis of cumulative effects is not required" and instead revises § 1508.1(g)(3) to state, "An agency's analysis of effects shall be consistent with this definition. Cumulative impact, defined in 40 CFR 1508.7 (1978), is repealed." Based on the final rule's requirements, agencies will analyze all effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action. *See* related discussion on connected actions (§ 1501.3) and reasonably foreseeable environmental trends and planned actions (§ 1502.15). *See also* sections II.C.3 and II.D.15 of the final rule.

*Comment*: Commenters stated that the standard, "reasonably foreseeable and reasonably close causal relationship," is an impermissible standard for reviewing effects, and that the circumstances underpinning the Supreme Court case law cited in the proposed rule cannot be extrapolated to all NEPA projects. Some commenters supported expressly codifying a proximate causation standard while other commenters objected to it. Some commenters discussed that application of proximate causation is often confusing and inconsistent, and some commenters requested that CEQ provide examples and a detailed explanation of the tort law model. One commenter requested that CEQ further clarify "close causal relationship" and recommended adding to the definition, "A reasonably close causal relationship requires a manageable line between the proposed agency action and alleged environmental effect."

*CEQ Response*: The Supreme Court has adopted the "reasonably foreseeable" and "reasonably close causal relationship" standard for effects. The Supreme Court held in *Metropolitan Edison Co.*, 460 U.S. at 774, that "a reasonably close causal relationship" is the appropriate standard under NEPA and "is like the familiar doctrine of proximate cause from tort law." The Supreme Court reinforced the suitability of that standard in *Public Citizen*, 541 U.S.

at 767.  Moreover, when CEQ amended its NEPA regulations to replace the "worst case"

analysis requirement with a provision for the consideration of incomplete or unavailable

information regarding reasonably foreseeable significant adverse effects, the Supreme Court

found this reasoning to be a well-considered basis for the change, and held that the new

regulation was entitled to substantial deference.  *Methow Valley*, 490 U.S. at 356.

There is no indication that the Supreme Court intended to narrow the scope of its holding

in either *Metropolitan Edison Co.* or *Public Citizen* to a subset of NEPA actions, thereby

applying a standard akin to proximate cause to some NEPA actions and a "but for" standard to

other NEPA actions.  Applying two different standards of causation would make the

implementation of NEPA unnecessarily complex.

A "manageable line" is a useful concept to understand whether a "close causal

relationship" exists.  *See Metro. Edison Co.,* 460 U.S. at 776 ("courts must look to the underlying

policies or legislative intent in order to draw a manageable line between those causal changes

that may make an actor responsible for an effect and those that do not.").  CEQ has determined

that its approach in the final rule will ensure that agencies implement a manageable line in

assessing effects.

*Comment*:  Some commenters requested that CEQ revise the rule to include cumulative

impact but make further revisions to align with the standard of reasonable foreseeability.  For

example, a commenter recommended revising the definition of "cumulative effects" in the final

rule to state that cumulative effects are those significant effects on the environment that are

reasonably foreseeable and result from the incremental impact of the action when added to other

past, present, and reasonably foreseeable future actions regardless of what agency (Federal or

non-Federal) or person undertakes such other actions.  The commenter further recommended

stating that significant cumulative impacts can result from individually minor but collectively significant actions taking place over a period of time.  Other commenters similarly supported retaining a definition of cumulative impact while applying a causation connection such as cumulative effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action.  A commenter suggested limiting cumulative effects analysis to large-scale or unique projects to protect the public, safeguard public interests, protect funding and reduce foreseeable risks.

*CEQ Response*:  Agencies should only consider effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action, consistent with applicable Supreme Court case law.  Adding "reasonably foreseeable" and other language to a revised definition of "cumulative impact" as suggested by commenters, would lead to further confusion.

*Comment*:  Commenters recommended that CEQ delete "may include" from the sentence "Effects include reasonably foreseeable effects that occur at the same time and place and may include reasonably foreseeable effects that are later in time or father removed in distance." Given that such effects are reasonably foreseeable, they should be disclosed and considered consistent with the first part of the definition.  Some commenters expressed concern that use of "may include" suggests that it is optional to analyze effects later in time and farther removed in distance.

*CEQ Response*:  The use of "may include" does not mean that it is optional for agencies to analyze reasonably foreseeable effects that occur later in time or farther removed in distance; such effects should be fully disclosed and considered.  The intent of "may include" is to clarify that elements of time and distance are important for the purposes of establishing reasonable foreseeability.  For these reasons, CEQ declines to remove or make further changes to "may

470

include." The overall approach of the "effects" definition is to allow a causal chain that excludes remote effects while also avoiding an overly narrow focus.

*Comment*: A commenter recommended adding "astronomical (such as the effects on human enjoyment of the observable dark sky, optical astronomy, radio astronomy, and space debris)" to the definition of effects.

*CEQ Response*: CEQ declines to make the requested revision to the final rule. The specific activity of astronomical observations would be reflected in several other types of impacts mentioned in the definition (e.g., aesthetic, economic) where such impacts are reasonably foreseeable and have a reasonably close causal relationship to the proposed action.

### i.    "But for" Causation

*Comment*: Commenters supported clarifying that a "but for" causation standard is insufficient to make an agency responsible for a particular effect under NEPA. Commenters also stated that expressly requiring analysis of cumulative effects leads agencies to analyze potential impacts that exceed the requirements of NEPA, and discussed numerous examples where this has occurred such as permits under section 404 of the Clean Water Act. Commenters cited supporting case law, noting that although courts have "struggle[d] . . . to articulate a precise definition of the concept of 'proximate cause,'" it is "impossible to announce a black-letter rule that will dictate the result in every case." *Assoc. Gen. Contractors of Cal. v. Cal. State Council of Carpenters,* 459 U.S. 519, 535–36 (1983). Commenters supported the general view that "proximate cause" refers to a set of "tools used to limit a person's responsibility for the consequences of that person's own acts." *Holmes v. Sec. Inv'r Prot. Corp.*, 503 U.S. 258, 268 (1992).

471

*CEQ Response*:  A lack of clarity in the previous regulations allowed for inappropriate application of a "but for" causal relationship to the proposed action, whereby an agency analyzed nearly all potential modifications to the human environment, regardless of their proximity to the proposed action.  The comparative benefit of a test akin to proximate cause is that it is rationally bounded and therefore can be more consistently implemented.  Causation does not stretch out without limit in the fashion of "This is the House That Jack Built."  *See, e.g., BCS Servs., Inc. v. Heartwood 88, LLC*, 637 F.3d 750, 755 (7th Cir. 2011) (citations omitted) (For instance, "a creditor who suffers a default because his debtor was injured by a tort cannot sue the tortfeasor for the damages resulting from the default.  If the creditor could sue, why not the creditor's son who had to borrow for his tuition because his father could no longer afford to pay it?  Or the college, if the son was turned down for a loan and had to withdraw?  Or the bookstore at which the son would have bought the books for his courses had he remained a student?  Or the publisher of the books sold by the bookstore?  Or the companies that sold paper to the publishers?  Or the authors?") (internal citations omitted).  Causation lines must be drawn somewhere and drawn rationally.[89]

A "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA.  *See Pub. Citizen*, 541 U.S. at 767.  The final rule establishes that effects must be reasonably foreseeable and have a reasonably close causal relationship to the

---

[89] *See Holmes*., 503 U.S. at 287 (1992) (Scalia, J., concurring) ("Life is too short to pursue every human act to its most remote consequences; 'for want of a nail, a kingdom was lost' is a commentary on fate, not the statement of a major cause of action ….").  Causation stopping points are commonplace in the law.  *See, e.g., United States v. Comstock*, 560 U.S. 126, 150 (2010) (Kennedy, J., concurring) ("The inferences must be controlled by some limitations lest, as Thomas Jefferson warned, congressional powers become completely unbounded by linking one power to another *ad infinitum* in a veritable game of 'this is the house that Jack built.'") (citing Letter from Thomas Jefferson to Edward Livingston (Apr. 30, 1800), 31 The Papers of Thomas Jefferson 547 (B. Oberg ed. 2004); *United States v. Patton*, 451 F.3d 615, 628 (10th Cir. 2006)).

472

proposed action or alternatives.  This close causal relationship is analogous to proximate cause in

tort law.  *See Metro. Edison Co.*, 460 U.S. at 774 (interpreting section 102 of NEPA to require "a

reasonably close causal relationship between a change in the physical environment and the effect

at issue" and stating "[t]his requirement is like the familiar doctrine of proximate cause from tort

law").

Statutes other than NEPA may require agencies to apply a different standard of causation

or definition of effects (e.g., the ESA) than what is required under NEPA.  The final rule does

not alter any other environmental statutes or regulations, including how a Federal action is

evaluated in terms of its environmental effects.  Where agencies apply a different standard of

causation or definition of effects, they should state clearly the standard that is being applied and

the resources and analyses to which it applies, as well as the statute that requires the use of a

different causation test.

*Comment*:  Commenters stated that, in proposing changes to the definition of effects,

CEQ has misapplied the case law in *Public Citizen* and *Metropolitan Edison Co.*  Concerning

effects that the agency has no ability to prevent due to its limited statutory authority, commenters

stated that even where an agency cannot consider the environmental consequences for the sole

purpose of adopting alternatives that would avoid or mitigate them, it can perform the vital

function of informing the public.  Commenters discussed how agencies with jurisdiction may be

prompted to take actions to avoid or mitigate adverse environmental effects and the potential

benefit of prompting Congress to expand an agency's authority.  Commenters cited case law that

is purportedly inconsistent with the proposed changes to the definition of effects at

§ 1508.1(g)(2) (*e.g.*, *White Tank Concerned Citizens, Inc. v. Strock,* 563 F.3d 1033 (9th Cir.

2009); *Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017)).  Some commenters stated that

limiting analysis to those effects that fall under an agency's jurisdiction is contrary to

congressional intent as expressed in section 102(2)(C) ("[T]he responsible Federal official shall

consult with and obtain the comments of any Federal agency which has jurisdiction by law or

special expertise with respect to any environmental impact involved.") to change agency culture

and democratize Federal decision-making processes.  Such jurisdictional limits are inconsistent

with an agency taking a "hard look."  Commenters discussed examples where such impacts

would occur, such as a project that requires a permit under the Clean Water Act section 404 and

also impacts air emissions.

*CEQ Response*:  The purpose of NEPA is not to analyze effects that are beyond an

agency's ability to prevent due to its limited statutory authority, and is not served when agencies

analyze resulting effects that the agency has "no ability to prevent due to its limited statutory

authority."  § 1508.1(g)(2).  Further, CEQ's extensive experience administering NEPA indicates

that Federal agencies sometimes improperly analyze such impacts as effects and therefore added

this clarification in its regulations.  The Supreme Court expressly used this as an example of "but

for" causation, finding that NEPA does not require it.  CEQ notes that environmental impacts

that would occur regardless of the proposed action are more appropriately analyzed as part of the

affected environment rather than as an effect of the proposed action.  Further, the final rule

requires extensive coordination with any cooperating Federal agencies with jurisdiction or

special expertise, as well as State, Tribal, or local agencies of similar qualifications.  CEQ's

changes are important because information-acquisition based on "but for" causation has no end

and diverts limited resources from analyzing more relevant effects.  "The boundlessness of but-

for causation is well-illustrated by the following rhyme: 'For want of a nail the shoe was lost.

For want of a shoe the horse was lost.  For want of a horse the rider was lost.  For want of a rider

474

the battle was lost. For want of a battle the kingdom was lost. And all for the want of a horseshoe nail.'" *United States v. Maali*, 358 F. Supp. 2d 1154, 1159 n.3 (M.D. Fla. 2005), (quoting Benjamin Franklin, Poor Richard's Almanac, Preface: Courteous Reader (1758)), *aff'd sub nom. United States v. Khanani*, 502 F.3d 1281 (11th Cir. 2007). As the Supreme Court has stated, "no legislation pursues its purposes at all costs." *Rodriguez v. United States*, 480 U.S. 522, 525–526 (1987) (per curiam).

*Comment*: As a consequence of eliminating consideration of cumulative effects, commenters stated that agencies would no longer consider long-term effects of projects.

*CEQ Response*: Under the final rule, agencies will continue to consider long-term effects, to the extent they are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives. CEQ notes that a long-term effect is different than an effect that is remote in time.

*Comment*: Commenters objected to excluding from the definition of effects those impacts that are remote in time, geographically remote, or the product of a lengthy causal chain. Commenters stated that excluding such effects had no legal basis and may nonetheless be reasonably foreseeable. Commenters cited examples of Federal actions (e.g., licenses or permits) that have a long duration and expressed concern that the proposed changes would preclude consideration of effects over the duration of the action. Some commenters requested further clarification of the terms. Commenters cited various case law to support the view that agencies must analyze effects that are remote in time (*e.g.*, *Scientists' Inst. for Pub. Info., Inc. v. Atomic Energy Comm'n,* 481 F.2d 1079 (D.C. Cir 1973)), geographically remote (*Sierra Club v Coleman*, 405 F. Supp. 53 (D.D.C. 1975)), or the product of a lengthy causal chain. One commenter recommended revising the definition of effects to include those that are "later in time

475

or farther removed in distance, but reasonably foreseeable and susceptible of quantification."
The commenter noted that the effects of an action, particularly an ongoing action, may occur
over a period of years and the effects of the action on a particular resource may intensify over
that period.  The addition of clarifying language would ensure that effects more distant in the
future would be fully analyzed in the NEPA document.

*CEQ Response*:  CEQ notes that some commenters confused a long-term effect with an
effect that is remote in time.  A long-term effect is a change to the human environment that has
an extended duration.  Whereas, an effect that is remote in time is a change to the human
environment that does not occur until a distant point in the future.  Agencies should apply the
definition of effects in the context of the proposed action.  In the example of a major
infrastructure project, an agency should analyze the project's effects into the future to the extent
the effects continue to be reasonably foreseeable.

The Supreme Court has endorsed use of proximate cause doctrine for purposes of
interpreting and implementing NEPA.  *Pub. Citizen,* 541 U.S. at 767; *see also Metro. Edison
Co.* 460 U.S. at 774 (interpreting section 102 of NEPA to require "a reasonably close causal
relationship between a change in the physical environment and the effect at issue" and stating
that "[t]his requirement is like the familiar doctrine of proximate cause from tort law.").  In
applying proximate cause, the Supreme Court examines remoteness.  *See, e.g., Bank of Am.
Corp. v. City of Miami, Fla.,* 137 S. Ct. 1296, 1305 (2017) ("It is a 'well established principle of
[the common] law that in all cases of loss, we are to attribute it to the proximate cause, and not to
any remote cause.'  We assume Congress 'is familiar with the common-law rule and does not
mean to displace it *sub silentio* ....'") (additional internal quotation marks and citation omitted);
*Lexmark Int'l, Inc. v. Static Control Components, Inc*., 572 U.S. 118, 132 (2014) ("That

476

venerable principle reflects the reality that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged wrongdoing.") (internal quotation marks and citation omitted); *Babbitt v. Sweet Home Chapter of Cmtys. for a Great Or.*, 515 U.S. 687, 712 (1995) (O'Connor, J., concurring) (citing "*Benefiel v. Exxon Corp.*, 959 F.2d 805, 807–08 (9th Cir. 1992) (in enacting the Trans–Alaska Pipeline Authorization Act, which provides for strict liability for damages that are the result of discharges, Congress did not intend to abrogate common-law principles of proximate cause to reach 'remote and derivative' consequences).").

*Comment*:  Commenters stated that CEQ misapplied the Supreme Court's opinion in *Public Citizen*, 541 U.S. 752 and that it stands for the proposition that effects that are remote in time need to be examined to be sure that the requisite causation is present.  Commenters stated that consideration of the distant future is particularly important when assessing certain types of actions such as climate change and geologic repositories for the disposal of radioactive wastes. Some commenters provided examples and asserted or inquired as to whether those examples would be analyzed differently under the final rule (e.g., mineral leasing).

*CEQ Response*:  The analysis of effects is bound by a rule of reason.  *Metro. Edison Co.*, 460 U.S. at 776 ("The scope of the agency's inquiries must remain manageable if NEPA's goal of '[insuring] a fully informed and well-considered decision' . . . is to be accomplished.") (citing *Vt. Yankee*, 435 U.S. at 558).  When interpreting what constitutes "remote in time," agencies should consider the context of the specific action under consideration.  Certain proposed actions, such as the disposal of radioactive waste, may have effects in the distant future that should be analyzed.  For this reason, it is not possible to know whether a specific EIS would be analyzed differently under the final rule without an extensive review of the particular facts and

477

circumstances.  Beyond that observation, CEQ declines to address unripe situations as to how the final rule will be applied in particular factual settings.

*Comment*:  Commenters stated that a joint EIS must assess the impacts of all of the agencies' actions and should include effects within the lead agency's and cooperating agencies' statutory authorities.  Commenters requested clarification that agencies developing a joint EIS cannot rely on the proposed definition of effects to avoid addressing relevant impacts.

*CEQ Response*:  The definition of effects applies to all agencies involved in preparing a joint EIS.  CEQ has further revised the definition of effects at § 1508.1(g)(2) to clarify that effects do not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action.

*Comment*:  Commenters stated, "effects should not be considered significant if they are remote in time, geographically remote, or the product of a lengthy causal chain" is incorrect and confusing.  Some commenters recommended CEQ delete "significant" or, alternatively, replace "significant" with "relevant."  Other commenters stated that "significant" is used elsewhere in definitions, creating potential inconsistencies in its interpretation.

*CEQ Response*:  In response to comments, CEQ has revised § 1508.1(g)(2) to state, effects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy causal chain.  The word "significant" was removed because it caused confusion with respect to its use in § 1501.3, and the word "generally" was added to capture the fact that there may be some limited instances where an effect that is remote in time, geographically remote, or the product of a lengthy causal chain is reasonably foreseeable and has a reasonably close causal relationship to the proposed action.

478

*Comment*:  A commenter requested further clarification of the "ability to prevent" in § 1508.1(g)(2) and expressed concern that, as written, the definition could cause a long-range study of "effects" and be done differently across agencies.

*CEQ Response:*  The phrase "ability to prevent" is further clarified by "due to its limited statutory authority or would occur regardless of the proposed action."  This language is sufficient to understand the phrase.

### ii.    Indirect Effects

*Comment*:  Some commenters expressed support for affirmatively stating that consideration of indirect effects is not required.  Commenters stated that indirect effects is an ambiguous term and creates opportunities for litigation.  These commenters further noted that there is no text in the NEPA statute requiring agencies to assess indirect effects.  Other commenters opposed including an affirmative statement that consideration of indirect effects is not required and stated that such a change is inconsistent with the statute and legislative history, as well as CEQ guidance, long-standing practice, and case law.  Commenters noted that indirect effects fall within the statutory requirement to submit a detailed statement on "any adverse environmental impact," and related case law.  Furthermore, an affirmative statement that analysis of indirect effects is not required would significantly curtail the scope of impacts considered under NEPA and harm the environment and affected communities.

*CEQ Response*:  Under the final rule, any effect that is reasonably foreseeable and has a reasonably close causal relationship to the proposed action must be disclosed and considered. The final rule follows the Supreme Court's holding in *Public Citizen*, 541 U.S. at 767-68, which is to analyze effects that are "reasonably foreseeable and have a reasonably close causal relationship" to the proposed action or alternatives regardless of the type of effect.  Under this

standard, agencies will continue to analyze indirect effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action, but agencies will not have to categorize effects. CEQ does not anticipate that the change will reduce the completeness of environmental review. Categorizing effects as direct, indirect, and cumulative was unnecessary and led to confusion and inconsistency in implementation despite extensive attempts to clarify in guidance and training. To better inform agency decision making, CEQ has revised the definition of effects to align with Supreme Court decisions and provide an approach that can be applied consistently across agencies.

### iii.    Climate Change

*Comment*: Commenters expressed concerns that the impacts of climate change *on a proposed project* would no longer be taken into account. Commenters emphasized the importance of climate change and discussed various actions being undertaken both domestically and internationally. Commenters discussed the National Climate Assessment and other references with information on changes to the Earth's climate and impacts to its ecosystems and many aspects of society. Commenters also cited numerous examples of case law where courts found that agencies failed to fully consider effects from climate change (*e.g.*, *Sierra Club v. FERC*, 867 F.3d. 1357). Commenters emphasized that failing to consider climate change could result in the Federal funding of major infrastructure projects that are inadequately designed for future environmental conditions and associated misallocation of taxpayer dollars and public harm.

*CEQ Response*: Under the final rule, agencies will consider predictable trends in the baseline analysis of the affected environment. Trends associated with a changing climate would in appropriate cases be characterized in the baseline analysis of the affected environment. CEQ

480

has further revised the final rule to require that agencies describe the environment of the area(s) to be affected or created by the alternatives under consideration, including the reasonably foreseeable environmental trends and planned actions in the area(s). Agencies should project predictable trends in the baseline analysis into the reasonably foreseeable future in order fully to understand the proposed action. Reasonably foreseeable environmental trends in the affected environment should not be treated as an effect of the proposed action.

*Comment*: Commenters stated agencies would no longer consider the impact of a *proposed action on climate change,* including greenhouse gas emissions, and its associated environmental and social impacts. Commenters emphasized the impacts of actions involving fossil fuel and agriculture production. Commenters provided numerous examples of how climate change and ocean acidification are causing global change. Other commenters expressed concerns with various climate research and stated that effects on climate change are not a proper subject of NEPA review.

*CEQ Response*: The final rule applies broadly to all types of proposed actions and effects on the environment. The precise way in which a given proposed action should be reviewed under the final rule will be based on the particular circumstances. The analysis would depend on whether the purported effects of the action are reasonably foreseeable and have a reasonably close causal relationship to the proposed action, or are remote because of the length of the causal chain and the distance into the future at which effects would be manifested.

*Comment*: Most commenters opposed codification of CEQ's draft greenhouse gas guidance, Draft National Environmental Policy Act Guidance on Consideration of Greenhouse

481

Gas Emissions ("Draft GHG Guidance").[90]  Some commenters asserted that the draft guidance is deficient and codifying it would reinforce the deficiencies.  Other commenters agreed with the reasoning in the proposed rule that greenhouse gas emissions are a single category of impacts and therefore not in need of special treatment.  Some commenters preferred that CEQ either reinstate the 2016 guidance, or revise the current draft before codifying any portion of it in regulations.  Some commenters requested adding a section in the rule that is specific to climate-related impacts.

*CEQ Response*:  In the proposed rule, CEQ stated that it would be inappropriate to address any impact category in the regulations.  CEQ has anticipated the need to review the Draft GHG Guidance for potential revisions consistent with the final rule.  Based on the public's comments, the final rule does not codify any portion of the Draft GHG Guidance.  Nothing in this response prejudges any issue concerning that guidance which was premised on the 1978 NEPA regulations.

*Comment*:  CEQ received many comments on aspects of the Draft GHG Guidance, including recommended methods for calculating emissions and global warming potential, ecological, economic, and social impacts (e.g., social cost of carbon and methane); comparing alternatives, and mitigation strategies.

*CEQ Response*:  CEQ acknowledges the comments on the Draft GHG Guidance.  The final rule does not codify any aspects of the Draft GHG Guidance.

iv.    **Segmentation**

---

[90] 85 FR 30097 (June 26, 2019), https://ceq.doe.gov/guidance/ceq_guidance_nepa-ghg.html.

482

*Comment*:  Commenters stated that agencies will no longer consider the effects of future projects, and that project proponents would be able to segment a single project into multiple actions to avoid triggering an EIS.  Commenters asserted that ignoring cumulative effects and segmenting projects is inconsistent with the Supreme Court's holding in *Kleppe*, 427 U.S. 390, and other case law.  Some commenters recommended that CEQ require analysis of the effects of the proposed action in combination with reasonably foreseeable future projects or programs on resources within the action area.  The effects of future projects must be quantifiable (based on the best available science) and must have a reasonably close causal relationship to the proposed action.

*CEQ Response*:  The final rule retains the language in the 1978 regulations concerning the scoping and analysis of connected actions.  Where a proposed action is a component or segment of a larger project, the final rule requires Federal agencies under §§ 1501.3(b), 1501.9(e), and 1502.4(a) to evaluate in a single EIS all proposals or parts of proposals that are related closely enough to be, in effect, a single course of action.  To the extent future actions, which include ongoing or connected actions, are identified in the scoping process, the final rule would require consideration of all effects that are reasonably foreseeable and have a reasonably close causal relationship to the related Federal actions.  In response to comments, the final rule also requires agencies to consider reasonably foreseeable environmental trends and planned actions in the area(s).  § 1502.15.  A separate requirement for agencies to identify "cumulative effects" is not necessary to be consistent with the Supreme Court's holding in *Kleppe* and subsequent case law.

### v.    Other Comments on Effects

*Comment*:  A commenter stated that the term "effects" appears twice in the NEPA statute and "impacts" three times.  In particular, Congress asked for a detailed statement on "the environmental impact" of proposed actions and "any adverse environmental effects which cannot be avoided."  Commenters requested that CEQ amend the regulations to explain the distinction between the two concepts.

*CEQ Response*:  "Effects" and "impacts" are used throughout the NEPA statute.  In addition to the reference at section 102(2)(C)(ii), there were two references to "effect" and "effects" in section 201, which pertained to an annual  reporting requirement that Congress subsequently terminated.  Public Law 104-66, § 3003, 109 Stat. 707, 734–36 (as amended, set out as a note under 3 U.S.C. 113).  There are seven references to "impact" or "impacts" within Title I, including the provision cited by the commenter.

CEQ has interpreted the terms to have the same meaning.  The 1978 regulations defined "effects" and stated that effects and impacts as used in the regulations are synonymous.  The proposed rule followed the same interpretation.  CEQ declines to create separate definitions in the final rule.

*Comment*:  A commenter recommended that CEQ require agencies to create standards around the development and reuse of cumulative effects analyses.

*CEQ Response*:  A factor contributing to CEQ's decision to eliminate the requirement to identify and discuss cumulative effects specifically is the lack of consistency in the cumulative effects analysis among Federal agencies.  Commenters raising concerns with the cumulative effects analysis often cited variability among Federal agencies regarding its elements and structure.  Such variability would make it difficult to reuse an analysis in multiple EISs or EAs.

*Comment*:  A commenter stated that CEQ should develop technical standards and quantification protocols for the cumulative effects analysis for individual resources like sequestered carbon stock, greenhouse gas emissions, and water quality, noting that quantitative standards exist for many of these resources.

*CEQ Response*:  CEQ has revised the definition of effects as described above.  In implementing the CEQ regulations, Federal agencies should use their experience and expertise in examining resource issues and base their analyses on the particular facts and circumstances.  The commenter's request for technical standards or quantification protocols is outside the scope of this rulemaking, which is also not medium-specific.

*Comment*:  A commenter stated that if one is unable to discern the difference in direct, indirect, and cumulative effects then it is not possible to know how much of a project should be curtailed or the level of mitigation to be applied.

*CEQ Response*:  It is not necessary to categorize the types of effects in order to inform the public and decision makers about the environmental impacts of a proposed action and potential means of mitigating adverse impacts.

*Comment*:  Commenters requested that CEQ add or remove specific types of effects in the definition of effects.  Commenters requested to remove "aesthetic, historical, cultural, economic, and social" impacts from the rule because it opens the door to litigation contrary to existing case law and the intended purpose of NEPA.  Commenters wanted to add "welfare" to the definition because it is vital to the economy.

*CEQ Response*:  CEQ declines to make the requested changes to the final rule.  The human environment as defined at § 1508.1(m) includes all of the suggested considerations.  In

485

the final rule, CEQ expressly mentions changes to the human environment in the definition of effects.

*Comment*:  One commenter recommended using the definition of "effect" from the Merriam-Webster Dictionary, "something that inevitably follows an antecedent (such as a cause or agent)."

*CEQ Response*:  CEQ has revised the definition of effects to retain the full scope of types of effects "ecological, aesthetic, historic, cultural, economic, social, and health," while also including important clarifying language regarding the applicable standard of causation.  CEQ finds the definition recommended by the commenter lacks the necessary specificity and declines to make the recommended revision.

*Comment*:  A commenter expressed concern that many of the proposed changes, and specifically changes to the definition of effects, could hamper the ability to use the NEPA process to facilitate compliance with the requirements of the Coastal Zone Management Act (CZMA) by diminishing the ability of Federal agencies to identify and obtain data and information necessary for completing the consistency review process in a timely manner.

*CEQ Response*:  The final rule does not supersede other statutory requirements such as the requirements under the CZMA.  NEPA serves as an umbrella procedural statute, and agencies may integrate analysis under other environmental laws into NEPA documents.  Similar to the 1978 regulations, in the final rule CEQ directs agencies to integrate the NEPA process with other planning and authorization processes.  *See* §§ 1501.2(a), 1501.9(c), 1502.24, 1505.2(a).

*Comment*:  A commenter recommended that CEQ revise the proposed definition of "effects or impacts" in § 1508.1 to more closely mirror the joint Fish and Wildlife Service and

486

National Marine Fisheries Service regulations implementing the ESA. The ESA regulations include a two-part test for effects caused by a proposed action: (1) "it would not occur but for the proposed action" and (2) "it is reasonably certain to occur." 50 CFR 402.02, 402.17. The commenter stated that requiring agencies to meet different standards under NEPA and ESA causes needless confusion and delay.

*CEQ Response*: As described elsewhere, a "but for" causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. NEPA and ESA are two different statutes with different standards, definitions, and underlying policies. Where agencies are considering the effects of a proposed action on listed species and critical habitat, they are required to apply the causation standards associated with 50 CFR part 402. However, other environmental effects are subject to NEPA's causation standard, unless another statute applies. Additionally, the ESA regulatory test requires not just "but for" causation but also requires effects to be "reasonably certain to occur." The ESA regulatory test is similar to the test included in the NEPA final rule defining "effects."

### 6.    Definition of Environmental Document (§ 1508.1(i))

*Comment*: Commenters suggested the definition of "environmental document" in § 1508.1(i) be expanded to include the ROD. One commenter also suggested expanding the definition of "environmental document" to include any written record, letter, email or permit supporting compliance with the NEPA process. One commenter suggested that this definition could be confusing if alternative documents can serve the function of NEPA.

*CEQ Response*: CEQ is finalizing the definition of "environmental document" as proposed. The definition is limited to an EA, EIS, FONSI or NOI. These documents are

487

analytical environmental documents that are developed by a Federal agency to inform decision making.

CEQ has not expanded the definition to include a ROD because that is a formal decision document containing any relevant factors rather than the underlying environmental analysis developed to inform decision making. The ROD, addressed in § 1505.2, may be combined with other documents, and is not the type of documentation that CEQ is referring to when it uses the term "environmental document" in the regulations.

CEQ also has not expanded the definition to apply to supporting documentation because such a revision would not be consistent with how the term "environmental document" is used in the relevant provisions of the regulations. In the regulations, "environmental document" refers to the analytical environmental documents that the agency prepares to comply with NEPA, namely the EA, EIS, FONSI, and NOI, rather than documentation prepared or submitted to support those analyses.

The provisions relating to a finding by the agency that another statute may serve the function of agency compliance with NEPA will not make this definition confusing. The definition of "environmental document" in the final rule identifies four specific types of documents. CEQ addresses functional equivalence, and the designation of documents that individually or in the aggregate may satisfy the requirements in CEQ's regulations in §§ 1506.9 and 1507.3(c)(5).

### 7.    Definition of Federal Agency (§ 1508.1(k))

*Comment*:  Some commenters supported the proposed changes to the definition of "Federal agency" to include States, Tribes, and units of local government to the extent that they have assumed NEPA responsibilities.

488

*CEQ Response*:  In response to comments, CEQ has further revised the definition of "Federal agency" to clarify that "Federal agency" includes States, Tribes and units of local government that assume NEPA responsibilities from a Federal agency pursuant to a statute.  The definition is similar to the 1978 regulations, which included in the definition agencies that assumed NEPA responsibilities and specifically referenced the Housing and Community Development Act of 1974.  Since 1978, Congress has enacted additional legislation authorizing non-Federal agencies to assume NEPA responsibilities.  *See, e.g.*, Surface Transportation Project Delivery Program, 23 U.S.C. 327.  The revised definition referencing assumption generally updates the definition to reflect that there are additional statutes under which States, Tribes and units of local government may assume NEPA responsibilities.

*Comment*:  Some commenters opposed the revisions to the definition of "Federal agency."  They raised concerns that the change could lead to confusion, and that even where State, Tribal or local governments assume lead NEPA responsibilities, non-Federal agencies should not be referred to as Federal agencies given the importance of Federal, State, Tribal and local distinctions throughout the NEPA regulations.  One commenter recommended that the term "lead agency" be used to denote the agency, whether Federal, State, Tribal or local, having responsibility for preparing a given NEPA document instead of using "Federal agency" as a catch-all for all such agencies in the lead agency role.

*CEQ Response*:  The definition of "Federal agency" expands the term to include a State, Tribal or local government only in those limited circumstances in which State, Tribal or local agencies are by statute assuming NEPA responsibilities.  The 1978 regulations included such entities when they were assuming NEPA responsibilities under section 104(h) of the Housing and Community Development Act of 1974.  CEQ's revision to the definition updates the 1978

489

regulations to refer to such entities generally because of the enactment of additional NEPA

assignment statutes since 1978, including assumption under the Surface Transportation Project

Delivery Program, 23 U.S.C. 327.  This clarification is helpful to entities assuming NEPA

responsibilities under such statutes and will assist them in carrying out their role in the place of

the Federal agencies.

CEQ declines to adopt the recommendation in the comment that State, Tribal and local

agencies assuming NEPA responsibilities should be included under the term "lead agency."  The

term "lead agency" is a different term, which relates to roles and responsibilities an agency will

serve as the lead for an environmental document when its preparation involves multiple agencies.

While a State, Tribal or local agency assuming responsibilities under the statutes referenced

above typically will serve as the "lead agency," that is a separate concept from the assumption of

NEPA responsibilities.

### 8.      Definition of Human Environment (§ 1508.1(m))

*Comment*:  CEQ received comments supporting the revisions to the definition of "human

environment" in §1508.1(m).

*CEQ Response*:  CEQ's revisions to the definition of "human environment" more closely

align to section 101(a) of NEPA and move operative text to the relevant section of the

regulations.  CEQ has replaced the term "people" with "present and future generations of

Americans" to reflect the express language in section 101(a) of the statute, which clarifies that

the term "human environment" refers to the natural and physical environment and the

relationship of both present and future generations of Americans with that natural and physical

environment.  CEQ has also moved the operative text that states that economic or social effects

by themselves do not require preparation of an EIS to § 1502.16(b), which is the section of the

490

regulations that addresses when agencies should consider economic or social effects in an EIS. These revisions will assist agencies in understanding and implementing the statute and regulations.

*Comment*:  CEQ also received comments opposing the revisions to the definition of "human environment."  Some commenters objected to the revisions in the first sentence revising "people" to "Americans" and raised concerns that this would lead to factoring in nationality or citizenship of a population.  Other commenters stated that the revisions to this definition are not consistent with E.O. 12898 relating to environmental justice.  Other commenters stated that the revisions would limit analysis to national rather than global effects, preclude consideration of transboundary impacts, or that the revisions were inconsistent with section 102(2)(F) which "recognizes the worldwide and long-range character of environmental problems."  One commenter contended referencing future generations would introduce unnecessary ambiguity, and that the revisions to the definition may narrow the purposes and policies of NEPA in 42 U.S.C 4321 and 42 U.S.C 4331(a).  Finally, other commenters opposed the revised definition as unnecessary because as revised the definition restates the statutory text.

*CEQ Response*:  As discussed in the proposed rule, CEQ's intent in replacing "people" with "current and future generations of Americans" is to align the CEQ regulations with the express text of the statute, and the revision to move operative language to the relevant section of the regulations will assist agencies in implementing that section.  These changes will not limit analysis as represented by commenters.  Rather, they will better conform the regulations to the statute and move operative text to a relevant section of the regulations, in order to assist agencies in understanding and complying with NEPA.

491

It is necessary to include a definition of "human environment" because it is a term that appears in the statute and throughout the regulations. It also more closely aligns the definition with the statutory text (including by referring to future generations) and will provide greater clarity and consistency with the statute. To the extent commenters maintain the revisions to the definition of "human environment" are not consistent with section 102(2)(F), that section is a separate provision in the statute that relates not to an agency's consideration of major Federal actions under section 102(2)(C), but rather to participation by Federal agencies in international initiatives, resolutions and environmental programs where consistent with U.S. foreign policy.[91]

The revisions to § 1508.1(m) are not intended to exclude any segment of the population of the United States or to create issues of racial injustice. The revisions are consistent with the clarifications that NEPA does not apply extraterritorially. There is thus nothing improper in interpreting NEPA as focused on the residents of this country and not the residents of other countries.

*Comment*: Commenters also requested CEQ further revise the definition to provide that "human environment" and "environment" are interchangeable.

*CEQ Response*: CEQ has not revised the definition to provide that the terms are interchangeable because there are limited instances in the rule where the term "environment" is used for a more specific purpose. In particular, the final rule references the term "environment" where it used for the more specific purpose of referencing the "affected environment" (*see* § 1502.15) or the "built environment." *See* § 1502.16(a)(8).

---

[91] Section 102(2)(F) provides that the Federal Government shall "recognize the worldwide and long-range character of environmental problems and, where consistent with the foreign policy of the United States, lend appropriate support to initiatives, resolutions and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment." 42 U.S.C. 4332(2)(F).

492

*Comment*:  Commenters also requested further revisions to incorporate or reference the economic or social relationship of humans with the physical environment, or to include revisions to state that the human environment includes the cultural, social and economic aspects of society. Other commenters requested revisions to ensure that agencies conduct more balanced analyses that allow for productive use of resources.  Some commenters raised concern that removing the terms "social and economic" from the definition would effectively allow agencies to ignore the impact of their decisions on small businesses, communities and local governments.  One commenter requested that everywhere the term "human environment" is used that CEQ include "human and ecological environment."  Another commenter recommended removing "human" from any sentence that uses the term "human environment."

*CEQ Response*:  CEQ has retained the definition of "human environment" as proposed, and it is appropriate to continue to use that term in the regulations because it is consistent with its use in section 102(2)(C) of NEPA.  As noted above, the second sentence of the definition in the 1978 regulations directing that "economic or social effects" themselves to not require the preparation of an EIS has been moved to § 1502.16(b) because it is operative text.  While CEQ has not referenced economic or social effects in the definition of "human environment," CEQ has continued to include a cross-reference to the definition of "effects," which includes ecological, social, economic, cultural and other effects, and which CEQ has revised to clarify that economic effects may include effects on employment.  *See* § 1508.1(g).  CEQ has also made a number of other revisions to clarify that economic and social effects are relevant, including expressly referencing that the policy established by NEPA is to "fulfill the social, economic, and other requirements of present and future generations of Americans," consistent with section 101(a) of NEPA.  *See* § 1500.1(a).  CEQ has also amended the regulations to include direction to

493

agencies to consider, where applicable, economic and technical considerations, including the economic benefits of the proposed action. *See* § 1502.16(a)(10). CEQ anticipates these revisions will help ensure agencies include social and economic, as well as other appropriate considerations, in their NEPA analyses.

*Comment*: Commenters requested making reference to Earth's orbital space in the definitions of "human environment" and "effects." Another commenter requested that the definition of "human environment" be limited to "on U.S. soil" based on the commenter's view that the regulations do not apply extraterritorially.

*CEQ Response*: In the 1978 regulations, CEQ did not include a reference to jurisdictional boundaries in the definition of "human environment," and in the final rule CEQ has continued not to include such a reference in the definition. Both the requested revision to reference Earth's orbital space in the definition of "human environment," and the requested revision to limit the definition of "human environment" to "on U.S. soil," raise issues relating to jurisdictional boundaries and extraterritorial actions. The definition of major Federal action, including the treatment of extraterritorial actions, is addressed elsewhere in the regulations. *See* § 1508.1(q). Under those provisions, a major Federal action does not include agency actions or decisions with effects located entirely outside of the jurisdiction of the United States. § 1508.1(q)(1)(i). The Restatement of Foreign Relations Law provides that the areas within the territorial jurisdiction of the United States include "its land, internal waters, territorial sea, the adjacent airspace, and other places over which the United States has sovereignty or some

494

measure of legislative control."[92]  Determinations of territorial jurisdiction are appropriately analyzed by the relevant agencies based on the specific proposed action.  It is appropriate to address extraterritorial actions through the definition of major Federal actions, rather than further revising the definition of "human environment" or "effects."

### 9.    Definition of Jurisdiction by Law (§ 1508.1(n))

*Comment*:  Commenters stated the proposed rule did not contain a definition for the term "jurisdiction by law" and inquired as to whether another definition was intended to include "jurisdiction by law."

*CEQ Response*:  The final rule retains the definition from 40 CFR 1508.15 as the "agency authority to approve, veto, or finance all or part of the proposal."  *See* § 1508.1(n).

*Comment*:  A commenter recommended adding "projects carried out" to definition for the term "jurisdiction by law."

*CEQ Response*:  The definition of "jurisdiction by law" has not been a source of confusion and the change recommended by the commenter is not necessary to ensure projects carried out by the agency are covered by the definition.

### 10.    Definition of Major Federal Action (§ 1508.1(q))

*Comment*:  Commenters stated that the definition of "action" as synonymous with "major Federal action" creates confusion and uncertainty because other sections of the regulations use "action" in a manner that does not mean "major Federal action."  Commenters recommended that the definition in § 1508.1(q) be limited to "major Federal action."

---

[92] Restatement (Fourth) of Foreign Relations Law sec. 404 (2018).  In considering whether the presumption applies, courts look to see whether there is any indication of Congressional intent to apply it to "places over which the United States has sovereignty or some measure of legislative control."  *EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248 (1991) (citing *Foley Bros., Inc. v. Filardo,* 336 U.S. 281, 285 (1949)).

*CEQ Response*:  In response to comments and upon further consideration, the final rule revises the definition in § 1508.1(q) to provide that major Federal action or action means an activity or decision subject to Federal control and responsibility subject to the following.  This change will alleviate confusion that arose from inclusion of the term "action" in the definition.

*Comment*:  Some commenters opposed the proposed rule's change to the definition of "major Federal action" which would heighten the degree of Federal control required for an action to be considered major by striking the word "potentially," which the 1978 regulations had included.  Commenters asserted that at the beginning of the NEPA process, it may be hard to know the extent of Federal control over a proposed action.  Other commenters supported the deletion of the word "potentially" because at the beginning of the NEPA process before the agency has done its environmental analysis, it may be difficult to know whether there will be aspects of Federal control.

*CEQ Response*:  Under the final rule, agencies must determine whether an activity or decision is subject to Federal control and responsibility as part of its determination as to whether there is a major Federal action.  If there is a potential for an action to be subject to Federal control and responsibility, then the agency should evaluate that potential and make a determination whether it is subject to Federal control and responsibility.  Including "potentially" in the definition is confusing and may lead to inconsistent application when, in fact, Federal control and responsibility should be clearly established.  For these reasons, the final rule does not include the word "potentially" when discussing the degree of Federal control or involvement.

## i.    Independent Meaning of Major

*Comment*:  Several commenters stated that deleting the sentence, "Major reinforces but does not have a meaning independent of significantly" (40 CFR 1508.27), is contrary to CEQ's

prior interpretation of the statute and legislative history. Commenters stated that no court has used the principles of statutory construction to disagree with CEQ's interpretation since CEQ issued the 1978 regulations. One commenter also suggested striking the word "major" from the definition of "major Federal action." Another commenter opposed the proposed revision and cited the use of "other" before "major Federal action" in section 102(2)(C) as a meaningful word in the statute.

*CEQ Response*: The final rule deletes the sentence, "Major reinforces but does not have a meaning independent of significantly," which the 1978 regulations included at 40 CFR 1508.27. Although the 1978 regulations treated the terms "major" and "significantly" as interchangeable, there is an important distinction between the two terms and how they apply in the NEPA process. "Major" refers to the type of action, including the role of the Federal agency and its control over any environmental impacts. "Significant" relates to the effects stemming from the action, including consideration of the affected area, resources, and the degree of the effects. In the NEPA statute, "major" appears twice, and in both instances is a modifier of "Federal action." It is used in section 102(2)(C) as part of the phrase "other major Federal actions significantly affecting the quality of the human environment," and again in section 102(2)(D) as part of the phrase, "any major Federal action funded under a program of grants to States." "Significantly" is also used twice, and in both instances is a modifier of the similar words "affecting" in section 102(2)(C) and "impacts" in section 102(2)(D)(iv).

By making a distinction between "major" and "significantly," the final rule is intended to establish a more transparent and efficient process, and one that is more aligned with the statutory text. As CEQ stated in the preamble to the proposed rule, this is a change in position as compared to CEQ's 1978 interpretation of NEPA. Under the 1978 interpretation, however, the

497

word "major" was rendered virtually meaningless.  In the final rule, interpretation of "major" as a term separate from "significantly" is more consistent with long-standing principles of statutory interpretation, as it assigns meaning to each of the individual words and their placement in the text.  *See, e.g.*, *Bennett*, 520 U.S. at 173 ("It is the cardinal principle of statutory construction . . . that it is our duty to give effect, if possible, to every clause and word of a statute . . . rather than to emasculate an entire section.") (internal quotations and citations omitted) (quoting *United States v. Menasche*, 348 U.S. 528, 538 (1955)).

The legislative history of NEPA reflects that Congress used the term "major" independently of "significantly," and provided that, for major actions, agencies should make a determination as to whether the proposal would have a significant environmental impact.  Specifically, the Senate Report for the National Environmental Policy Act of 1969 (Senate Report) states, "*Each agency which proposes any major actions*, such as project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs, *shall make a determination as to whether the proposal would have a significant effect upon the quality of the human environment*."  S. Rep. No. 91–296, at 20 (1969) (emphasis added).[93]  Although some commenters pointed to another location in the legislative history that appeared to use "major" and "significant" interchangeably, that legislative history in fact supports the interpretation in the final rule.  Further, the Senate Report shows that OMB's predecessor, the Bureau of the Budget, submitted comments on the legislation to provide the views of the Executive Office of the President and recommended that Congress revise the text of the bill to include two separate modifiers: "major" before Federal actions and "significantly"

---

[93] https://ceq.doe.gov/docs/laws-regulations/Senate-Report-on-NEPA.pdf.

before affecting the quality of the human environment.  *See id.* at 30 (Bureau of the Budget's markup returned to the Senate on July 7, 1969).  The enacted legislation included these revisions.  Although the terms "major and "significant" can be synonyms in other contexts, here they modify separate phrases and thus should be given independent meaning and effect.

The use of the word "other" in the phrase "include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment" does not indicate that "major" does not have independent meaning.  "Other" is used as an adjective in the text of section 102(2)(C) to modify "major Federal actions," and its use simply distinguishes recommendations or reports on legislative proposals from "other major Federal actions."

CEQ acknowledges that in the 1978 regulations, CEQ followed the Eight Circuit's approach in *Minnesota Public Interest Research Group v. Butz*, 498 F.2d 1314, 1321–22 (8th Cir. 1974).  In that case, the court required an EIS on Forest Service contracts for the Boundary Waters canoe area stating, "[t]o separate the consideration of the magnitude of Federal action from its impact on the environment does little to foster the purposes of the Act, i.e., to 'attain the widest range of beneficial uses of the environment without degradation, risk to health and safety, or other undesirable or unintended consequences.'  By bifurcating the statutory language, it would be possible to speak of a 'minor Federal action significantly affecting the quality of the human environment,' and to hold NEPA inapplicable to such an action."  *Id*.  However, other courts interpreted "major" and "significantly" as having independent meaning before CEQ issued its 1978 regulations.  *NAACP v. Med. Ctr., Inc.*, 584 F.2d 619, 629 (3d Cir. 1978) (analyzing the Secretary of Health, Education, and Welfare's ministerial approval of a capital expenditure under a framework that first considered whether there had been agency action, and

499

then whether that action was "major"); *Hanly v. Mitchell*, 460 F.2d 640, 644–45 (2d Cir. 1972)

("There is no doubt that the Act contemplates some agency action that does not require an impact

statement because the action is minor and has so little effect on the environment as to be

insignificant."); *Scherr v. Volpe*, 466 F.2d 1027, 1033 (7th Cir. 1972) (finding that a highway

project qualifies as major before turning to the second step of whether the project would have a

significant effect); *Julius v. City of Cedar Rapids*, 349 F. Supp. 88, 90 (N.D. Ind. 1972); *Goose

Hollow Foothills League v. Romney*, 334 F. Supp. 877, 879 (D. Or. 1971) (discussing whether a

proposed building project was "major"); *S.W. Neighborhood Assembly v. Eckard*, 1978 U.S.

Dist. LEXIS 19994, *12 (D.D.C. 1978) ("The phrase 'major Federal action' has been construed

by the Courts to require an inquiry into such questions as the amount of [F]ederal funds

expended by the action, the number of people affected, the length of time consumed, and the

extent of government planning involved."); *Natural Res. Def. Council v. Grant,* 341 F. Supp.

356, 366-67 (E.D.N.C. 1972) ("Certainly, an administrative agency as the Soil Conservation

Service may make a decision that a particular project is not major, or that it does not significantly

affect the quality of the human environment, and, that, therefore, the agency is not required to

file an impact statement.").

Over the past four decades, a number of courts have recognized that NEPA does not

apply in circumstances where the Federal agency's role involves minimal Federal funding or

control, and by extension such actions do not rise to the level of "major Federal action." *See

Rattlesnake Coal. v. U.S. EPA*, 509 F.3d 1095 (9th Cir. 2007) (Federal funding comprising 6

percent of the estimated implementation budget not enough to federalize implementation of

entire project); *Macht v. Skinner*, 916 F.2d 13 (D.C. Cir. 1990) (funding for planning and studies

not enough to federalize a project); *Dep't of Envtl. Prot. & Energy v. Long Island Power Auth.*,

30 F.3d 403, 417 (3rd Cir. 1994) (Federal approval of a private party's project, where that

approval is not required for the project to go forward, does not constitute a major Federal action);

*United States v. S. Fla. Water Mgmt. Dist.*, 28 F.3d 1563, 1572 (11th Cir. 1994) ("The

touchstone of major [F]ederal activity constitutes a [F]ederal agency's authority to influence

nonfederal activity.  '[T]he [F]ederal agency must possess actual power to control the nonfederal

activity.'"  (quoting *Sierra Club v. Hodel*, 848 F.2d 1068, 1089 (10th Cir. 1988)); *Sugarloaf

Citizens Ass'n v. FERC*, 959 F.2d 508, 512 (4th Cir. 1992); *Save Barton Creek Ass'n v. Fed.

Highway Admin.*, 950 F.2d 1129, 1134–35 (5th Cir. 1992); *Vill. of Los Ranchos de Albuquerque

v. Barnhart*, 906 F.2d 1477, 1482 (10th Cir. 1990); *Sierra Club v. Penfold*, 857 F.2d 1307, 1314

(9th Cir. 1998) (finding that the Bureau of Land Management's review of Notice mines is "only a

marginal [F]ederal action rather than a major action"); *Winnebago Tribe of Neb. v. Ray*, 621 F.

2d 269, 272 (8th Cir. 1980) ("Factual or veto control, however, must be distinguished from legal

control or 'enablement'"); *Atlanta Coal. on the Transp. Crisis v. Atlanta Reg'l Comm'n*, 599

F.2d 1333, 1347 (5th Cir. 1979); *Ctr. for Biological Diversity v. HUD*, 541 F. Supp. 2d 1091,

1099 (D. Ariz. 2008), *aff'd*, 395 Fed. Appx. 781, 783, 2009 WL 4912592 (9th Cir. Nov. 25,

2009) (unpublished); *Touret v. NASA*, 485 F. Supp. 2d 38 (D.R.I. 2007).  These holdings that

weigh the Federal role with respect to NEPA take an approach that distinguishes the concept of

"major Federal action" from an analysis of the degree of environmental effects.  This line of

cases implicitly acknowledges a category of Federal actions that are not major, and thus do not

require any consideration of the significance of effects before determining that NEPA does not

apply in contrast to *Minnesota Public Interest Research Group v. Butz*, which wrongly focuses

only on the latter term concerning the significance of effects.  498 F.2d at 1322.  In revising the

NEPA regulations after 40 years and recognizing the subsequent case law, CEQ has determined

501

that it is appropriate to align the definition of "major Federal action" with the statute and give independent meaning to the two terms.

*Comment*:  Some commenters recommended that CEQ make a distinction between minor proposals with no or minimal effects and large projects with major impacts on the landscape.

*CEQ Response*:  As discussed in this section, the final rule acknowledges a category of Federal actions that are not major, and thus do not require any consideration of the significance of effects before determining that NEPA does not apply.  Sections 1501.1, 1501.3, and 1507.3 provide a framework for making NEPA threshold determinations and determining the appropriate level of NEPA review.

*Comment*:  Commenters stated that the proposed rule's changes to the definition of "major Federal action" to remove certain types of projects based on the portion of Federal funding and Federal agency control are inconsistent with NEPA's legislative history, which lists "project proposals, proposals for new legislation, regulations, policy statements, or expansion or revision of ongoing programs."  S. Rep. No. 91-296, at 20 (1969).

*CEQ Response*:  The final rule reflects the text of the statute, which would control if there was a material distinction between NEPA's text and its legislative history.  In any case, the Senate Report included the language quoted in the comment for illustrative purposes only.  This snippet of legislative history, moreover, is essentially recognizing that project and legislative proposals, regulations, policy statements, or changes in the scope of a program could be major Federal actions.  CEQ has not taken the position that any of these categories of actions necessarily falls outside of what is major Federal action.  The final rule establishes criteria for when an activity will meet the definition of major Federal action.

*Comment*:  Commenters recommended that for projects that have minimal Federal funding, approval, or involvement, but may warrant some level of analysis above a CE, CEQ could allow for a review via an EA Form, similar to what is used under the New York State Environmental Quality Review Act.  This document includes standard questions that a project applicant can easily answer to help an agency determine if a project has significant impacts, and requires less time to prepare than an EA or EIS.

*CEQ Response*:  CEQ declines to adopt the recommendation in the final rule because it could create confusion.  As discussed elsewhere, NEPA is not applicable to Federal financial assistance programs that do not fit the definition of major Federal action.

*Comment*:  Some commenters requested that CEQ exclude "non-Federal projects with only a minor Federal funding component" and "non-Federal projects completed by a nonprofit organization that receives minor Federal funding."  These commenters would define "minor" as an amount that if withheld, would not prevent the project from moving forward in general.

*CEQ Response*:  CEQ declines to adopt the recommended language because § 1508.1(q)(1)(vi) of the final rule sufficiently addresses these categories.

*Comment*:  Commenters discussed specific actions that purportedly would not be covered under the revised definition of major Federal action.  Commenters emphasized the language in the definition that excludes activities that have minimal Federal involvement or funding, as particularly problematic.

*CEQ Response*:  Applying the definition of major Federal action as recommended by the commenters would fail to distinguish any Federal action from a "major Federal action."  The final rule gives meaning to all words in the statute, consistent with principles of statutory construction.  *Bennett*, 520 U.S. at 173.  The final rule gives meaning to "major" in the phrase

503

"major Federal action" by excluding from the definition activities where there is minimal Federal funding or minimal Federal involvement and where the agency does not exercise sufficient control and responsibility over the outcome of the project.  As explained elsewhere, this approach is consistent with a number of cases that have found certain Federal actions insufficient to federalize a project because of the minimal Federal funding or control.

*Comment*:  Multiple commenters supported the proposed rule's definition of major Federal action to exclude non-discretionary agency decisions and some suggested broadening non-discretionary actions to include actions where environmental concerns are not part of an agency's "legal responsibility."  Other commenters were opposed to this change because mandatory activities could still have significant effects.  Some commenters noted that agencies often proffer a modest view of their discretion when considering NEPA's applicability, even though they retain discretion over aspects of a proposed action.  Some commenters observed that the language regarding non-discretionary actions would result in less disclosure to the public regarding environmental effects.

*CEQ Response*:  The final rule continues to state that major Federal action does not include non-discretionary decisions made in accordance with the agency's statutory authority. The Supreme Court held that analysis of a proposed action's effects under NEPA was not required where an agency has limited statutory authority and "simply lacks the power to act on whatever information might be contained in the EIS."  *Pub. Citizen*, 541 U.S. at 768; *see, e.g.*, *South Dakota*, 614 F.2d at 1193 (holding that the DOI's issuance of a mineral patent was a ministerial act did not come within NEPA); *Milo Cmty. Hosp. v. Weinberger*, 525 F.2d 144, 148 (1st Cir. 1975) (NEPA analysis of impacts not required when agency was under a statutory duty to take the proposed action of terminating a hospital).

504

*Comment*:  Some commenters who opposed the proposed rule's definition of major

Federal action were concerned that the non-discretionary language could be used to exempt

mining leasing, exploration, and development activities from NEPA analysis.  Other commenters

asked CEQ to expressly state in the final rule that an action with respect to any mining NOI shall

not be a "major Federal action."  Some commenters recommended that CEQ consider applying a

minimum percentage for Federal ownership of the mineral interest in a project, below which the

project would not be subject to NEPA reviews.  Other commenters were concerned that allowing

privately funded mining projects on public lands to operate outside of the NEPA process would

preclude public comment and prevent State agencies from participating in project planning and

analysis.

*CEQ Response*:  The final rule does not expressly address mining activities.  The

definition of major Federal action recognizes that there may be other statutory authorities that

constrain agency discretion.  Regarding mining activities, various courts have addressed whether

certain mining activities are non-discretionary.  *See, e.g.*, *Voyageur Outward Bound Sch. v.

United States*, 2020 U.S. Dist. LEXIS 45876, *44 (D.D.C. Mar. 17, 2020) (upholding DOI

Solicitor's M-opinion that found no agency discretion to deny a mineral lease renewal); *Sierra

Club v. Penfold*, 857 F.2d 1307, 1314 (9th Cir. 1998) (finding that Bureau of Land

Management's review of Notice mines is "only a marginal [F]ederal action rather than a major

action" and that "approval of Notice mines without an EA does not constitute major Federal

action within the scope of NEPA"); *South Dakota*, 614 F.2d at 1193 (holding that the DOI's

issuance of a mineral patent that was a ministerial act did not come within NEPA); *see also

Karuk Tribe of Cal. v. U.S. Forest Serv.*, 681 F.3d 1006, 1027 (9th Cir. 2012) (distinguishing

*Penfold* as a NEPA case addressing "major Federal action" and holding that Forest Service

505

approval of a Notice of Intent to conduct mining activities was discretionary "agency action" under the ESA). In their NEPA procedures, relevant agencies would apply their interpretation of statutory authorities to the definition of major Federal action.

*Comment*: Some commenters supported the proposed rule's statement that the definition of major Federal action does not include activities that are not a final agency action. One commenter recommended that CEQ clarify that the proposed definition of major Federal action does not include the Forest Service's acceptance of a master development plan submitted pursuant to a ski area special use permit under the Ski Area Permit Act of 1986, as amended. Other commenters opposed the proposed rule's statement regarding activities that are not a final agency action, asserting that this language could call into question the continued validity of programmatic EAs and EISs.

*CEQ Response*: The final rule continues to state that major Federal action does not include activities that do not result in a final agency action. The basis for including only final agency actions is the statutory text of the APA, which provides a right to judicial review only of all "final agency action[s] for which there is no other adequate remedy in a court." 5 U.S.C. 704. This interpretation is in accord with Supreme Court cases that have held that reports making recommendations that required presidential decision were not final agency actions subject to challenge. *Dalton v. Specter*, 511 U.S. 462, 476–77 (1994); *Franklin*, 505 U.S. at 796–801. The final rule adds the language, "or other statute that also includes a finality requirement" to acknowledge that other statutes may include their own in the course of providing a cause of action outside of the APA (the APA provides a default cause of action and set of remedies that can be superseded by other statutes. 5 U.S.C. 559. CEQ declines to address the specific instance of ski areas in the final rule. The reference to final agency action in the definition of "major

506

Federal action" does not alter of the procedures for preparing programmatic EAs and EISs in accordance with §§ 1501.3(a), 1502.4, 1506.1.

*Comment*:  Commenters stated that striking the word "guide" in § 1508.1(q)(2)(ii) of the proposed rule could lead to the conclusion that land and resource management plans do not constitution a "major Federal action."

*CEQ Response*:  The final rule retains the language of the proposed rule at § 1508.1(q)(3)(ii).  The deletion of the word "guide" was not intended to mean that land and resource management plans would not constitute major Federal actions.

*Comment*:  Commenters stated that the language "Projects include actions approved by permit or other regulatory decision as well as Federal and federally assisted activities" in § 1508.1(q)(2)(iv) of the proposed rule could be construed to contradict the language in § 1508.1(q) that requires more than "minimal" Federal funding and involvement.  Some commenters stated that § 1508.1(q)(2)(iv) of the proposed rule should be clarified to recognize that certain mining permits do not constitute "major Federal action."  Some commenters requested that CEQ retain the categories as written in 40 CFR 1508.18(b).

*CEQ Response*:  The final rule retains the language of the proposed rule at § 1508.1(q)(3)(iv).  The language in § 1508.1(q)(3) providing that "Major Federal actions tend to fall within one of the following categories" sufficiently indicates that there are exceptions to the general categories listed.  As a result, specific clarification regarding mining permits is not needed in the final rule.  CEQ clarifies that the language in § 1508.1(q)(3) does not contradict the definition in § 1508.1(q)(1) because the listed categories are merely examples.

*Comment*:  Some Tribal commenters suggested adding language to exclude from the definition of "major Federal action" in § 1508.1(q) "any Federal action taken as the trustee for

507

land or resources the Federal government holds in trust for the sole and beneficial interest of an American Indian or Alaska Native Tribe or one or more individual members thereof." Some Tribal commenters stated that the definition of CEQ should consider whether NEPA should apply to Indian lands at all because Congress did not specifically apply NEPA to Indian lands and the legislative history is silent, although case law and regulations have determined that NEPA applies to major Federal actions on Indian lands. These commenters stated that Federal involvement for projects on Tribal lands is often limited to ministerial Secretarial approvals which nonetheless receive full NEPA review to the detriment of Indian Tribes. Another commenter suggested expanding the definition of "major Federal action" to include Tribal traditional use lands of spiritual significance.

*CEQ Response*: The final rule declines to adopt these changes in the definition of "major Federal action." Federal actions taken in the capacity as the trustee for Tribes or members of Tribes may involve activities or decisions that involve minimal Federal funding or involvement, and agencies exercising trust responsibilities may address that in their agency NEPA procedures. NEPA does not distinguish actions taken by a Federal agency when it is acting in a trustee capacity. Although CEQ declines to make this change in the final rule, other sections of the final rule provide avenues for Tribal self-determination and involvement in the NEPA process. *See* §§ 1501.7, 1501.8, 1501.9, 1502.16, 1503.1, 1506.2, 1506.6. Section 1506.2 provides for cooperation with Tribal governments to the fullest extent practicable unless specifically prohibited by law in order to reduce duplication with Tribal requirements. Under the definition of "Federal agency" in § 1508.1(k), Tribal governments may assume NEPA responsibilities from a Federal agency pursuant to statute. In addition, the final rule allows for agencies to determine that another statute's requirements serve the function of agency compliance with NEPA and may

508

designate procedures or documents under other statutes as satisfying NEPA requirements.

§§ 1501.1(a)(6), 1507.3(c)(5), 1507.3(d)(6).  Tribal traditional use lands of spiritual significance

are not a Federal activity or decision and therefore are not appropriate for inclusion in the

definition of "major Federal action,"

> *Comment 11.9-12:*  Some commenters stated that the proposed changes would limit the
>
> ability of the public, especially environmental justice communities, to provide public comment
>
> on projects.  Tribal commenters stated that the proposed changes would limit Tribal
>
> involvement.

> *CEQ Response 11.9-12:*  CEQ acknowledges the comment, however, to the extent the
>
> proposed changes would affect projects that are currently subject to categorical exclusions, no
>
> public comment would have been required under the 1978 regulations.

> *Comment*:  Commenters stated that the use of the word "outcome" in § 1508.1(q) is
>
> confusing because it is unclear whether it refers to the ability to commence a project or to
>
> successfully complete it.  These commenters recommended that CEQ use the phrase "where the
>
> agency cannot preclude project completion."

> *CEQ Response*:  The final rule retains the use of the word "outcome" in
>
> § 1508.1(q)(1)(vi) and (vii).  The word is used in the context of control over the environmental
>
> effects of the project, which could occur during project implementation and continue after its
>
> completion.

> *Comment*:  Commenters stated that major Federal actions should not include
>
> individualized adjudications, such as the issuance of individual permits under the ESA.

> *CEQ Response*:  Under the final rule, a Federal agency that issues individual permits may
>
> determine that such actions do not trigger NEPA as a threshold matter under § 1501.1 and

509

§ 1507.3(c).  The final rule will not further revise the definition of "major Federal action" to address specific ESA permitting matters.

*Comment*:  Commenters stated that the proposed changes in § 1508.1(q) will lead to fewer actions with a Federal nexus and therefore push more projects into section 10 consultation under the ESA.  Commenters stated that section 10 consultations take significantly longer than consultations under section 7, thereby reducing efficiencies for project applicants.  For efficiency, some commenters recommended aligning the triggers for NEPA as closely as possible for the ESA.

*CEQ Response*:  In revising the definition of major Federal action, CEQ has incorporated long-standing practice and applicable case law and therefore does not anticipate significantly fewer actions being exempt from NEPA.  CEQ declines to make further changes to align the applicability of NEPA with other environmental statutes, since the applicability of other environmental statutes is based on the language of the particular legislative authority.

*Comment*:  Commenters stated that NEPA documents associated with the issuance of incidental take permits (ITP) under the ESA frequently examine the impacts of the broader, underlying non-Federal activity, even where issuance of an ITP is not critical for the project to proceed.  Commenters requested that CEQ make further changes to the definition of major Federal action to clarify that, where the only Federal nexus for a non-Federal project is an ITP under the ESA, the analysis under NEPA is circumscribed by the Federal action of issuing an ITP.

*CEQ Response*:  Agencies should not engage in analysis that goes beyond the purpose and need of the proposed action.  An application for an ITP should be based on its purpose and need.  The final rule clarifies that the agency shall base the purpose and need on the goals of the

510

applicant and the agency's authority.  § 1502.13.  CEQ declines to revise the definition of major

Federal action to address the comment.

*Comment*:  Commenters stated that, based on Congress's definition of "major rule" in

the Congressional Review Act, the definition of "major Federal action" should be clarified by adding

a new subparagraph stating that a Federal action shall not be considered major unless it is likely

to result in:  (i) an annual effect on the economy of $100,000,000 or more; (ii) a major increase

in costs or prices for consumers, individual industries, Federal, State, or local government

agencies, or geographic regions; or (iii) significant adverse effects on competition, employment,

investment, productivity, innovation, or on the ability of United States-based enterprises to

compete with foreign-based enterprises in domestic and export markets.

*CEQ Response*:  CEQ declines to adopt language from the definition of "major rule" into

the Congressional Review Act into the final rule's definition of "major Federal action" because

the Congressional Review Act is a different statute.

*Comment*:  Some commenters stated that the changes in the definition of major Federal

action will be used by agencies to argue that a supplemental analysis is not needed even when

environmental impacts were not adequately analyzed.

*CEQ Response*:  Whether a supplemental NEPA analysis is needed depends on whether

the conditions in § 1502.9(d) are met.  Among other requirements, supplementation is necessary

only when major Federal action remains to occur.  This is consistent with Supreme Court case

law as discussed elsewhere.

*Comment*:  Some commenters recommended that CEQ revise the definition of "major

Federal action" to limit it to "new" activities rather than "new and continuing activities."  These

commenters requested that CEQ clarify that a "major Federal action" does not include proposed

511

operational changes to ongoing activities unless the change itself has independent effects that will be major and which are subject to Federal control and responsibility. Another commenter stated that "continuing activities" must be removed from the definition of "major Federal action" in § 1508.1(q)(1) as it is inconsistent with *S. Utah Wilderness Alliance.*

*CEQ Response*: CEQ declines to adopt these recommendations in the final rule. CEQ clarifies that the reference to "continuing activities" in the definition of "major Federal action" should be read in conjunction with § 1502.9(d) of the final rule. Section 1502.9(d) provides that agencies shall prepare supplemental EISs only if a major Federal action remains to occur which is consistent with *Southern Utah Wilderness Alliance.* 542 U.S. at 73 ("As we noted in *Marsh,* supplementation is necessary only if 'there remains "major Federal action[n]" to occur,' as that term is used in § 4332(2)(C).") (quoting *Marsh,* 490 U.S. at 374).

*Comment*: Commenters stated that the proposed insertion of "implementation of" before "treaties and international conventions or agreements" in § 1508.1(q)(2)(i) of the proposed rule will delay NEPA compliance until a treaty, international convention, or agreement has already been negotiated and ratified or executed. Some commenters also objected that the definition of "legislation" in § 1508.1(p) would not include requests for ratification of treaties. These commenters stated that this change would preclude NEPA from applying before a treaty has been ratified. They also asserted that this change is contrary to past practice.

*CEQ Response*: The final rule retains the language of the proposed rule in § 1508.1(q)(3)(i) and clarifies that this includes an agency's action to implement a treaty pursuant to statute or regulation. In addition, the final rule retains the change to § 1508.1(p) and strikes the reference to "significant cooperation and support" to more closely align the provision with the statute. The President is not a Federal agency, and therefore a request for ratification of

512

a treaty would not be subject to NEPA.  The "major Federal action" is not the treaty itself, but rather an agency's action to implement that treaty pursuant to domestic legislation.

Under the Constitution, the President has "Power, by and with the Advice and Consent of the Senate, to make Treaties . . . ."  Art. II, § 2, cl. 2.  The Constitution also provides that the President "may require the Opinion, in writing, of the principal Officer in each of the executive Departments, upon any Subject relating to the Duties of their respective Offices . . . ."  *Id.*, cl. 1.  Congress may not impose conditions on the President's exercise of these two powers, which would be the case, for example, if NEPA were construed to require the Secretary of State, before advising the President on whether to approve a treaty, to first undertake an EA or EIS.  By construing NEPA not to impose conditions on the President's exercise of these two powers, CEQ avoids a constitutional difficulty.  *See Ashwander v. Tenn. Valley Auth*., 297 U.S. 288, 347 (1936) (Brandeis, J., concurring); *Rescue Army v. Mun. Court of L.A*., 331 U.S. 549, 569 (1947).

One or more commenters noted that agencies prepared environmental analyses in the past on certain proposed treaties, although there has been no uniform practice.  Examples given include State Department NEPA work on proposed ratification of the Convention on the Prevention of Marine Pollution by Dumping of Wastes and Other Matters and the NOAA's NEPA work concerning the proposed Interim Convention on Conservation of North Pacific Fur Seals prior to its submission to the Senate.  Considering the constitutional constraints, CEQ concludes that this analysis was done as a matter of agency discretion rather than as a requirement of NEPA.  An important caveat, however, is that agencies are free to prepare a variety of documents concerning the adoption of treaties by the Senate, including environmental analysis as they determine appropriate.  The final rule's revisions to the NEPA regulations in

513

§§ 1508.1(p) and 1508.1(q)(3)(i) make clear that such NEPA documentation is not mandatory and avoids serious constitutional questions that are raised by reading NEPA to the contrary.

*Comment*:  Commenters requested clarity as to how the proposed changes to the definition of "major Federal action" would be applied by the Federal Aviation Administration (FAA) in the context of airports.

*CEQ Response*:  The final rule does not generally address the specific application of the new definition of "major Federal action" to specific agency programs.  Agencies such as the FAA may provide further clarity in the context of specific programs in their agency NEPA procedures.

*Comment*:  Some commenters opposed the proposed rule's changes to the definition of "major Federal action" that would exclude circumstances when the agency failed to act.  Some commenters noted that the preamble to the proposed rule did not fully explain the reason for this omission.  Some commenters stated that the removal of this provision is inconsistent with *Southern Utah Wilderness Alliance*, 542 U.S. at 70–73, and the APA.  Some commenters stated that including the reference to a failure to act would promote transparency and accountability. Other commenters supported the deletion of a reference to an agency's failure to act because it would enhance efficiency.

*CEQ Response*:  The final rule retains the proposed rule's deletion of the sentence stating that "Actions include the circumstance where the responsible agency officials fail to act and that failure to act is reviewable by courts or administrative tribunals," which was formerly included in 40 CFR 1508.18.  The Supreme Court clearly established in *Southern Utah Wilderness Alliance*, 542 U.S. at 70–73, that judicial review is available only when an agency fails to take a discrete action it is required to take.  As the preamble to the NPRM stated, in situations when

514

there is a failure to act, there is no proposed action and therefore no alternatives that the agency may consider. In omitting the reference to a failure to act from the definition of "major Federal action," CEQ does not contradict the definition of "agency action" under the APA at 5 U.S.C. 551(13), and recognizes that the APA may compel agency action that is required but has been unreasonably withheld. If and when an agency is compelled to take such agency action, it should prepare a NEPA analysis at that time as appropriate.

*Comment*: In response to CEQ's invitation for comment on whether the definition of "major Federal action" should be further revised to exclude other *per se* categories of activities common to agencies, several commenters were opposed to adding more categories that would be exempt from NEPA. Some commenters stated that a categorical approach is contrary to case law stating that NEPA requires individualized consideration and balancing of environmental factors. Commenters stated that "major Federal action" should not include a variety of types of projects, including grazing permit renewals, oil and gas leasing and permit renewals, mining projects or other linear infrastructure projects that are located on a minimal amount of Federal land or resources. Other commenters requested excluding flood control or erosion control projects, as well as excluding non-Federal actions on leased Federal lands from the definition of "major Federal action." Some commenters recommended excluding maintenance and operation of existing facilities, structures, or sites in the manner originally intended. Some commenters recommended excluding permits for short-term uses of existing facilities, structures, or sites in the manner originally intended. Some commenters further support including in the NEPA database a list of actions that have been found not to meet the definition of "major Federal action."

515

*CEQ Response*:  In response to comments, the final rule will not identify *per se* categories of activities that should be considered a non-major Federal action.  Several of the suggested types of categories were not common across agencies.  Agencies may identify types of activities that should be considered a non-major Federal action in their respective NEPA procedures.

*Comment*:  Commenters stated that CEQ's proposed exclusion of loans, loan guarantees or financial assistance from NEPA where the Federal agency does not exercise sufficient control and responsibility over the effects of the action is contrary to the underlying policy of NEPA at 42 USC 4331(a) and statute in general.  Some commenters objected to the proposed removal of Federal loan guarantees from the definition of "major Federal action" on the grounds that, in the absence of the extension of such financial assistance by a Federal agency, some private projects which might significantly affect the quality of the human environment would not otherwise proceed.  Such commenters, either explicitly or impliedly, maintained that the definition of "major Federal action" should be sufficiently comprehensive such that it encompasses any Federal action about which it can be determined that but for its occurrence the project at issue would not have moved forward.  Some commenters stated that a Federal agency could control the outcome of a non-Federal project by saying no, such as by declining to extend a loan guarantee or other financial assistance in the first place, or by placing conditions on a commitment of financial assistance.

Some commenters stated that whether an action is "Federal" for purposes of NEPA does not turn on whether the agency exercises "sufficient control and responsibility" but whether the agency has the ability to influence the outcome of the project.  Commenters stated that the agency need not actually exercise "sufficient control" to render a private or State action

516

"Federal," so long as the agency has the authority to exercise such control.  Some commenters

stated the relevant inquiry depends on whether the agency has the ability to influence the

outcome of the project, whether the agency has the authority to exercise sufficient control, and

whether Federal funds are provided.  Some commenters recommended the phrase "subject to

Federal jurisdiction," rather than language about Federal control and responsibility.  Commenters

stated that the proposed rule's use of the phrase "sufficient control" was vague and required

further clarity.  Other commenters suggested CEs would be more appropriate for loan programs.

*CEQ Response*:  The final rule in § 1508.1(q)(1)(vi) excludes non-Federal projects with

minimal Federal funding or minimal Federal involvement where the agency does not exercise

sufficient control and responsibility over the outcome of the project.  The final rule in

§ 1508.1(q)(1)(vii) excludes loans, loan guarantees, or other forms of financial assistance where

the Federal agency does not exercise sufficient control and responsibility over the effects of the

assistance, and references, as illustrative examples, certain loan guarantees issued by the Farm

Service Agency and the Small Business Administration.  The language in these subsections was

included in § 1508.1(q) and § 1508.1(q)(1) of the proposed rule, and has been retained in the

final rule with minor word changes and reorganization for clarity.  The purpose and function of

NEPA is satisfied if Federal agencies have considered relevant environmental information and

informed the public regarding the decision-making process.  *See Marsh*, 490 U.S. at 373–74; *Vt.*

*Yankee*, 435 U.S. at 558.  NEPA's requirement to prepare an analysis of environmental impacts

is intended to "ensure[] that the agency, in reaching its decision, will have available, and will

carefully consider, detailed information concerning significant environmental impacts."  *Pub.*

*Citizen*, 541 U.S. at 768.  Whether an agency is required to prepare a NEPA document before

taking an action depends in part on "the usefulness of any new potential information to the

517

decisionmaking process." *Id*. at 767.  In the context of loans, loan guarantees or other financial assistance when there is minimal Federal funding or minimal Federal involvement or where the agency does not exercise sufficient control and responsibility over the outcome of the assistance, requiring NEPA analysis would provide little value because the outcome or environmental effects would remain the same.

Prior court decisions have recognized that a minimal amount of Federal funding for a project is not a "major Federal action" subject to NEPA.  *See Rattlesnake Coal.*, 509 F.3d 1095 (Federal funding comprising 6 percent of the estimated implementation budget not enough to federalize implementation of entire project); *Macht*, 916 F.2d 13 (funding for planning and studies not enough to federalize a project); *NAACP*, 584 F.2d 619; *Hanly*, 460 F.2d 640; *Touret*, 485 F. Supp. 2d 38.  The examples identified in the final rule for certain FSA and SBA loan guarantee programs illustrate Federal agency programs that have been determined by CEQ in the final rule to lack sufficient control and responsibility to warrant NEPA review.  By excluding programs where Federal agencies do not exercise sufficient control and responsibility from the definition of major Federal action, Federal agencies will be able to focus environmental reviews where they are needed most, namely on major Federal actions that will significantly affect the human environment.

Where an action, such as FSA loan guarantees, involves non-Federal entities, courts have found an action is not federalized—and therefore does not trigger NEPA—where there is neither (1) "'significant Federal funding'" nor (2) Federal "'power, authority, or control'" over the project.  *See, e.g.*, *Rattlesnake Coal.*, 509 F.3d 1095 at 1101 (quoting *Ka Makani 'O Kohala Ohana Inc. v. Water Supply*, 295 F.3d 955, 960 (9th Cir. 2002)); *Atlanta Coal.*, 599 F.2d at 1347. The issuance of a loan guarantee by a Federal agency to a private lender to back a percentage of

518

a loan that the lender decides to make to a borrower falls short of federalizing the activity and

requiring that it be treated as a major Federal action under both inquiries.  In determining

whether Federal funding federalizes a non-Federal action, courts have considered the proportion

of Federal funds in relation to funds from other sources must be "significant."  *See, e.g.*, *Ka*

*Makani*, 295 F.3d at 960 ("While significant [F]ederal funding can turn what would otherwise be

a [S]tate or local project into a major Federal action, consideration must be given to a great

disparity in the expenditures forecast for the [S]tate [and county] and [F]ederal portions of the

entire program. . . . In the present case, the sum total of all of the [F]ederal funding that was ever

offered . . . is less than two percent of the estimated total project cost.") (internal quotation marks

and citation omitted); *Friends of the Earth, Inc. v. Coleman*, 518 F.2d 323, 329 (9th Cir. 1975)

(holding Federal funding amounting to 10 percent of the total project cost not adequate to

federalize project under NEPA); *Sancho v. DOE*, 578 F. Supp. 2d 1258, 1266 (D. Haw. 2008)

(Federal provision of less than 10 percent of project costs not sufficient to federalize project);

*Landmark West! v. U.S. Postal Serv.*, 840 F. Supp. 994, 1009 (S.D.N.Y. 1993), *aff'd*, 41 F.3d

1500 (2d Cir. 1994) (holding U.S. Postal Service's role in private development of new

skyscraper was not sufficient to federalize the project).

   In the context of guaranteed loans, FSA does not provide any Federal funding to the

borrower.  FSA's guaranteed loan regulations concern the lender, not the borrower.  Under the

farm ownership and operating loan programs at 7 U.S.C. 1925 and 1941 through 1949, FSA does

not control the lender or borrower.  FSA's participation in guaranteed loans is limited to

providing a guarantee to the private lender.  No Federal money will be expended unless the

borrower defaults on the private third-party loan and the lender is unable to recover its debt

through foreclosure.  Only then would the lender invoke the guarantee for that portion of the loan

519

not recovered.  And, in the event of default, the guarantee is paid to the lender, not to lender's borrower.

The SBA business loan programs under 15 U.S.C. 636(a), 636(m), and 695 through 697g, operate in similar fashion.  The overwhelming preponderance of SBA business loans (*i.e.*, SBA-guaranteed loans made pursuant to SBA's 7(a), 504, and Microloan programs) are extended not by SBA itself, but, rather, by private lenders, under authority granted to them in connection with SBA's Preferred Lender Program or Premier Certified Lender Program, or by the provisions of SBA's Microloan program, without SBA's prior review and approval.  Under SBA's business loan guarantee programs, SBA does not recruit or work with the borrower, or service the loan unless, following a default in payment, the lender has collected all that it can under the loan. Under the 7(a) Program, SBA guarantees a percentage of the loan amount extended by a commercial lender to encourage such lenders to make loans to eligible small businesses.  The lender seeks and receives the guarantee, not the applicant small business.  In over 80 percent of loans stemming from the 7(a) Program, the lender approves the loan without SBA's prior review and approval through the 7(a) Program's Preferred Lender Program ("PLP program").  15 U.S.C. 636(a)(2)(C)(iii).  Further, SBA does not expend Federal funds unless there is a default by the borrower in paying the loan; in such cases, SBA reimburses the lender in accordance with SBA's guarantee percentage.  Under the 504 Program, the Premier Certified Lender Program ("PCLP program") provides for only limited SBA review of eligibility, and SBA delegates the responsibility to private entities to issue an SBA guarantee of debenture for eligible loans without prior approval by SBA.  15 U.S.C. 697e.  SBA's role in the 504 Loan Program is generally limited to issuing a guarantee that is less than a majority of the overall financing of a standard section 504 project.  SBA does not expend Federal funds unless there is a default by the

520

borrower in paying the debenture-funded loan, in which case SBA pays the outstanding balance owed on the debenture to the investors.

Based on the factual support that FSA and SBA have provided, CEQ finds that the FSA and SBA guarantees of private loans lack the requisite Federal funding to constitute a major Federal action. Under these FSA and SBA loan guarantee programs, no Federal funds are expended and provided to the lender unless there is a default by the borrower paying the loan. In the event of a default that cannot be cured, properties are sold in an attempt to recover value for the lender, and the Federal agency never takes physical possession of, operates, or manages any facility. The Federal agency never controls the use of the underlying loan funds. As the court in *Center for Biological Diversity v. HUD* explained in holding that HUD and SBA loan guarantees were not major Federal actions subject to NEPA, "Defendants do not directly fund the various projects that are at issue in this case. Rather the Defendants guarantee loans, dispersed to various recipients by private lenders. Therefore, the actual funding by Defendants is negligible or non-existent." 541 F. Supp. 2d at 1098.

The final rule's "sufficient control" test is consistent with cases that found an action does not trigger NEPA when there is not Federal "'power, authority, or control'" over the action. *Rattlesnake Coal.*, 509 F.3d at 1101*; see also id.* at 1102 ("The United States must maintain decision-making authority over the local plan in order for it to become a major Federal action."); *Ka Makani*, 295 F.3d at 961 ("Because the final decision-making power remained at all times with [the State agency], we conclude that the [Federal agency] involvement was not sufficient to constitute 'major Federal action.'") (citation omitted); *Ringsred v. Duluth*, 828 F.2d 1305, 1338 (8th Cir. 1987) (finding construction of a parking ramp was not a major Federal action when agency had no input in the design or construction of the ramp); *Winnebago Tribe*, 621 F. 2d at

521

272 ("Factual or veto control, however, must be distinguished from legal control or 'enablement'").  Regardless of the amount of Federal money involved, the key test for determining whether NEPA is triggered for such an action is whether there is a significant degree of Federal involvement with, and control over, the subject project.  *Ctr. for Biological Diversity*, 541 F. Supp. 2d at 1099 (noting the agencies issuing loan guarantees did not exercise "discretionary authority over development.").  Under NEPA and its regulations, the Supreme Court has concluded that "but for" causation is not sufficient to make a Federal agency responsible for the effects of an action.  *Pub. Citizen*, 541 U.S. at 767.  Instead, the Federal agency must "possess actual power to control the nonfederal activity."  *Vill. of Los Ranchos,* 906 F.2d at 1482 (quotation omitted).  This requirement of actual Federal authority ensures proper effectuation of NEPA, which "applies only when there is [F]ederal decision-making and not merely [F]ederal involvement in nonfederal decision-making."  *S. Fla. Water Mgmt.,* 28 F.3d at 1573.  In light of these cases, the final rule's use of the language "where the Federal agency does not exercise sufficient control and responsibility over the effects of the assistance" is an appropriate articulation of the relevant inquiry.

Based on the factual support that FSA and SBA have provided, CEQ finds that in the context of loan guarantees, FSA and SBA do not possess the degree of control or actual decision-making authority over the loan or the facility to be funded.  In extending loan guarantees to private lenders, FSA and SBA do not control the lender or the borrower; do not control the subsequent use of loan proceeds; are not statutorily empowered to issue permits for a project or otherwise provide prior approval regarding any technical aspect relating to its undertaking; and do not manage or operate the borrower's facilities.  Because no action by either FSA or SBA constitutes a legal condition precedent enabling the commencement or operation of the private

522

party's project, such loan guarantees do not fall within the definition of "major Federal action" as that term has generally come to be understood within the bulk of the relevant case law.

Finally, CEQ notes that a CE may be appropriate for loans, loan guarantees, or other forms of financial assistance where the Federal agency does exercise sufficient control and responsibility over the effects of the assistance but the assistance does not normally have significant effects on the human environment. Any CE would need to be developed by the agency, in consultation with CEQ, as part of their agency NEPA procedures which must be proposed and published in the *Federal Register* for public comment consistent with § 1507.3.

*Comment*: Commenters stated that Federal agencies exercise sufficient control and responsibility over loans and other forms of financial assistance such that they meet the definition for a major Federal action under NEPA. Commenters noted that the court in *Buffalo River Watershed Alliance v. Dep't of Agric.*, No. 4:13-cf-450-DPM, 2014 WL 6837005, 2014 U.S. Dist. LEXIS 168750 (E.D. Ark. Dec. 2, 2014), found that FSA had ongoing involvement with the farm and lender after FSA issued a loan guarantee because FSA provided notification of scheduled inspections. Commenters stated that, although FSA may not control the lender or borrower, the agencies have discretion over granting a loan guarantee, which impacts the borrower's ability to obtain a loan. FSA also has discretion to place conditions on loan guarantees, including conditions to mitigate environmental impacts, and can revoke its guarantee if those conditions are violated. Commenters also discussed *Food & Water Watch v. U.S. Dep't of Agriculture*, 325 F. Supp. 3d 39 (D.D.C. 2018), noting that a condition for eligibility for these loan guarantees was that the borrower could not obtain financing on reasonable terms from other institutions. Commenters also noted that courts required USDA's Rural Utilities Service to

523

prepare an EIS for debt forgiveness and consent to a lien subordination, as well as approvals relating to the expansion of the Sunflower Electric Power Corporation's coal-fired power plant.

*CEQ Response*:  Commenters both supporting and opposing the proposed definition of "major Federal action" cited *Buffalo River* and *Food & Water Watch*.  These cases demonstrate the confusion and regulatory overreach resulting from a lack of clarity in the current definition. The *Buffalo River* and *Food & Water Watch* decisions that commenters referenced, as well as the subsequent merits decision in *Food & Water Watch v. U.S. Dep't of Agric.*, No. 17-1717, 2020 U.S. Dist. LEXIS 52544 (D.D.C. Mar. 26, 2020), involved challenges to EAs FSA completed. FSA had issued a Federal loan guarantee to construct and operate, respectively, hog and poultry CAFOs owned and operated by third parties.  In the *Buffalo River* case, SBA was also a defendant.  But neither case assesses whether such loan guarantees constitute a "major Federal action," for purposes of NEPA.  The *Buffalo River* case applied a "but for" test in assessing whether plaintiffs have standing to litigate.  The court in *Buffalo River* found FSA's EA did not adequately address certain environmental impacts.  The *Food & Water Watch* court in addressing standing followed *Buffalo River* to find that causation and redressability were satisfied because FSA retains the ability to require further environmental analysis or impose mitigation measures in connection with the loan guarantee.  The court also found that FSA continued to have some degree of oversight over the operations.  However, on the merits, the *Food & Water Watch* court found that FSA's EA satisfied NEPA.  Neither of these cases held that effects from the CAFOs reached the level of significance.

The two cases reach inconsistent outcomes when reviewing FSA's EAs for strikingly similar circumstances.  They both involved:  (1) application of the same program regulations for NEPA compliance (7 CFR Part 1940, 1940.301-350); (2) "Class II" agency EA (7 CFR

524

1940.312) needed for "financial assistance for livestock-holding facility or feedlot located in a sparely populated farming area having a capacity as large or larger than," *inter alia,* "2,500 swine or 100,000 laying hens or broilers when [the] facility has unlimited continuous flow watering systems," 7 CFR 1940.312(c)(9); and (3) "financial assistance for a livestock-holding facility or feedlot, which either could potentially violate a State water quality standard or is located near a town or collection of rural homes which could be impacted by the facility," 7 CFR 1940.312(c)(10).  Both EAs relied on review and permitting by the applicable State regulatory agency's rules, regulations, review, and permitting as part of the analysis.  Furthermore, both the Arkansas Department of Environmental Quality and the Maryland Department of Agriculture found the proposed actions complied with the State rules and regulations for these CAFOs and issued State permits for their operation.

And yet, these two cases reach different conclusions about whether FSA properly relied on the expertise of State regulatory and environmental reviews during FSA's assessment of whether preparation of an EIS was required.  NEPA and CEQ's regulations strongly support avoidance of duplicative State and Federal reviews.  An agency may "reference [another agency's] standards as a component of its [NEPA] review" and consider [another agency's] regulations in an appropriate fashion…."  *City of Oberlin v. FERC*, 937 F.3d 599, 610–11 (D.C. Cir. 2019); *see also Sierra Club v. FERC*, 867 F.3d 1357 (D.C. Cir. 2017).  In CEQ's view, the cases that commenters cite highlight the continuing risk for inconsistent judicial rulings if the CEQ regulations are not further clarified.  Based on factual support from USDA and SBA, and in light of these cases, CEQ determines in the final rule that the role of FSA and SBA in their respective loan guarantee programs is insufficient to constitute a major Federal action.

525

Moreover, FSA guaranteed loan programs are intended to assist family farms, including beginning and historically underserved farmers, as well as those who have suffered financial setbacks due to disasters or other circumstances out of their control, who are unable to obtain other credit at reasonable rates and terms. *See* 7 CFR 762.120(h)(1). Contrary to some commenters' assertions, that a borrower receives a guaranteed loan does not necessarily mean the borrower might not otherwise be able to obtain any loan from a lender. Instead, it means that the otherwise commercially available loan terms would undermine access to credit by family farmers, beginning farmers, and those in historically underrepresented groups. *See* 7 CFR 762.120(h)(1). By guaranteeing loans, FSA is not lending Federal funds; a "guaranteed loan" under FSA regulations is defined in 7 CFR 762.2(b) as a "loan made and serviced by a lender for which the Agency has entered into a Lender's Agreement and for which the Agency has issued a Loan Guarantee."

FSA regulations provide for FSA's involvement to the extent necessary to protect the financial interests of the United States after a guarantee is issued because "the loan guarantee constitutes an obligation supported by the full faith and credit of the United States. The Agency may contest the payment of a guarantee in cases of fraud or misrepresentation by a lender ...." 7 CFR 762.103(a). To protect the financial interests of the government, FSA requires the lender to submit a lender's certification attesting to the lender's compliance with the conditions necessary for FSA to issue its guarantee. FSA's interactions are with the lender to ensure the financial stability of the loan and ensure proper loan servicing. Although FSA reserves the right to attend inspections of the farming operation during the term of the guarantee (7 CFR 762.130(b)(2)), FSA's participation in inspections "[are] solely for the benefit of the Agency" and are designed to minimize a potential financial loss on the guarantee. Therefore, FSA's regulations are not

526

guided by environmental compliance but are meant only to ensure that loan proceeds are disbursed by the lender, used properly, and that the project is completed and is operating to produce income for the loan to be repaid. Furthermore, Federal monitoring of private activities to assure that operations comply with the requirements of a legal instrument does not rise to the level of federalizing the activity. *See Hodel*, 848 F.2d 1068 (holding Federal monitoring activities to prevent a non-Federal party from operating outside a right-of-way did not amount to authority to regulate or approve the activity).

Issuance of an FSA loan guarantee loan does require adherence to certain environmental statutes independent of NEPA. These impose restrictions on the use of highly erodible land and wetlands for the term of the loan guarantee. *See* Food Security Act of 1985, as amended, and section 363 of the Consolidated Farm and Rural Development Act (16 U.S.C. 3811 and 3821 and 7 U.S.C. 2006e). FSA sets out these statutory requirements in its loan guarantee regulations by stating: "[l]oans may not be made for any purpose which contributes to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity." *See* 7 CFR 762.121(d). Moreover, it is the private lender's responsibility in servicing the loan to monitor the borrower's compliance with the environmental requirements of the Food Security Act of 1985 and section 363 of the Consolidated Farm and Rural Development Act. 7 CFR 762.140(b)(3). If the lender discovers a potential violation, the USDA Natural Resources Conservation Service reviews compliance with 7 CFR 12 regarding highly erodible land and wetlands – not FSA. FSA's remedy in the event of a violation is only to refuse payment of the loan guarantee. If the borrower defaults, the collateral is liquidated, and the lender has a loss. In this respect, FSA is in a position no different from any commercial guarantor and does not have

527

the ability to affirmatively require the borrower to take or refrain from any particular action.  As one commenter notes, FSA also does not control the lender.

Additionally, under the existing legal framework, EPA regulates medium and large CAFOs, and delegates primary authority to the states that, in turn, add permit regulations to keep these operations beneath the threshold of having a significant impact on water quality, air quality, and nutrient load.  Regardless of whether a producer received an FSA loan guarantee, the CAFO is subject to EPA and State permitting regulations and enforcement.

*Comment*:  Commenters asserted, in connection with Federal loan guarantees, that it is not relevant that Federal funds are expended only upon a default.  These commenters stated that many Federal actions, such as the issuance of Federal permits, may trigger the need for a NEPA review even though no funds are expended by the Federal government.

*CEQ Response*:  The extension of a Federal guarantee to a lender to encourage that lender to provide a loan to a non-Federal borrower is not analogous to the issuance of a Federal permit that may constitute a legal condition precedent for the authorized undertaking of specific non-Federal actions.  Further, the amount of Federal funding – along with the degree of Federal decision-making power, authority, or control – is to be considered in determining whether a non-Federal action has been "federalized."  Courts have found that, "[t]he possibility that [F]ederal funding will be provided in the future is not sufficient to federalize a [S]tate project, even when such funding is likely."  *Rattlesnake Coal.*, 509 F.3d at 1104 (quotation marks and citation omitted); *Atlanta Coal.*, 599 F.2d at 1347; *S. Fla. Water Mgmt. Dist.*, 28 F.3d at 1573; *Pres. Pittsburgh v. Conturo*, 2011 U.S. Dist. LEXIS 101756, at *13 (W.D. Pa. 2011) (stating that for purposes of triggering NEPA, "The mere possibility of [F]ederal funding in the future is too tenuous to convert a local project into [F]ederal action").  Indeed, in *Sancho*, 578 F. Supp. 2d at

528

1267, the court observed that "analysis of the 'major Federal action' requirement in NEPA must focus upon [F]ederal funds that have already been distributed.  Federal funds that have only been budgeted or allocated toward a project cannot be considered because they are not an 'irreversible and irretrievable commitment of resources.'"  The court further stated that "[t]he expectation of receiving future funds will not transform a local or [S]tate project into a [F]ederal project.…Regardless of the percentage, consideration of the budgeted future [F]ederal funds is not ripe for consideration in the 'major Federal action' analysis."  *Id.*  Other district courts have also found that, to federalize a project, the Federal funding must be more than "the passive deferral of a payment" and must be provided "primarily to directly further a policy goal of the funding agency."  *Hamrick v. GSA*, 107 F. Supp. 3d 910, 926 (C.D. Ill. 2015); *Landmark West!*, 840 F. Supp. at 1007).  An FSA or SBA loan guarantee received by a lender does not constitute a present distribution of Federal funds or an active funding of the borrower's project.  It is, at most, a representation that Federal funds would be paid out in the future if the lender's borrower should default, and if requirements otherwise pertaining to the guarantee are met.  As noted in *Center for Biological Diversity*, 541 F. Supp. 2d at 1095, "All of the above [loan guarantee] programs share one thing in common, there is no initial investment made by the Federal agencies [including SBA].  The agencies merely provide a guarantee should the borrower default on the loan."  In the context of FSA and SBA loan guarantees, the Federal agencies do not exercise Federal control, authority, or responsibility over the non-Federal actor and project, and they do not expend Federal funds in the present moment.  Thus, these loan guarantee programs are insufficient to constitute major Federal action.

*Comment*:  Commenters stated that CEQ's proposed changes would confuse courts, Federal agencies, States, Tribal entities, and private parties seeking financial assistance as these stakeholders scramble to adjust to new expectations.

*CEQ Response*:  CEQ acknowledges that the proposed changes would result in certain new expectations among impacted stakeholders.  However, CEQ intends that the changes will significantly expedite the process of extending financial assistance to borrowers and allow Federal agencies to prioritize limited resources to administer the programs.  These improvements outweigh any initial transition costs regarding implementation of the final rule.

*Comment*:  One State commenter asserted that the proposed change would result in fewer Federal projects subject to environmental considerations under NEPA, resulting in increased adverse impacts to the environment and State-owned resources that are ecologically connected to Federal lands.  Another State commenter noted that, if a de minimis threshold was applied to all projects, the small efficiencies gained by removing small and simple projects from NEPA review would be overwhelmed by the lack of scrutiny for small, yet highly impactful projects.  One State commenter asserted that any project with a Federal nexus should require Federal environmental review, even if there is minimal Federal funding or involvement.  Otherwise, States with their own environmental review processes would bear a heavier burden to perform environmental review if Federal agencies do not.  Without NEPA analysis, States may lack information necessary to coordinate State programs and resources impacted by these Federal decisions.

*CEQ Response*:  Realigning CEQ's regulations with the plain language of the statute will not necessarily result in adverse impacts to State or any other lands.  NEPA's procedural requirements do not affect the applicability of any underlying State, Tribal or local laws.  As

530

discussed elsewhere, NEPA does not focus solely upon the impact of a Federal action. The 1978 regulations also addressed whether actions were "potentially subject to Federal control and responsibility." Some previously reviewed private projects involving minimal Federal funding and involvement may, under the new final rule, not be subject to NEPA reviews. However, such actions are commonly categorically excluded because any impacts are not normally significant.

Some commenters asserted that any nexus with Federal funding or involvement should trigger a NEPA review, or alternately, that excusing small actions with a de minimis Federal involvement might allow actions with significant environmental effects. This is incorrect. NEPA was never intended to apply to or regulate private actions, large or small. Absent major Federal action, NEPA is not the appropriate tool to seek to oversee or regulate private activities. NEPA does not "require agencies to elevate environmental concerns over other appropriate considerations." *Balt. Gas & Elec. Co.*, 462 U.S.at 97.

*Comment*: One commenter stated that with regard to minimal Federal involvement, CEQ must clearly state that this language is only for projects that are not located in the National Forest System and other Federal lands.

*CEQ Response*: CEQ declines in the final rule to apply the definition of major Federal action differently to projects on National Forest System and other Federal lands. Such an interpretation would cause confusion and decrease administrative efficiency in agency NEPA programs.

*Comment*: Commenters discussed the large role that FSA-guaranteed loans play in North Carolina agriculture, which is home to thousands of CAFOs. These commenters stated that as of 2019, 1,037 distinct borrowers in that State had loans under FSA programs. The commenters stated that 518 loans were made with FSA guarantees during the 2018-19 fiscal year alone, with

531

a value of $115,750,000.  Between 2016 and 2018, more than 120 poultry CAFOs were established in North Carolina per year, many of which relied on FSA-guaranteed loans. Commenters stated that NEPA review is often the only method to assess the impacts of CAFOs on human health and the environment when some states do not evaluate the environmental impact of these operations.

*CEQ Response*:  The commenters improperly conflate statistics in an attempt to inflate the significance of FSA guaranteed loans for CAFOs in North Carolina, when the relevant question for determining the applicability of NEPA is whether an individual proposed action meets the criteria to be a major Federal action.  The commenters first noted the total number of *all* borrowers in the State holding FSA guaranteed loans – regardless of the purpose for which the loans were ultimately used.  The commenters then noted the total number and value of loan guarantees FSA issued for one fiscal year in North Carolina and juxtaposed that with the number of CAFOs established in North Carolina over a different two-year period before concluding summarily that "many" of those must have relied on FSA loan guarantees.  Although the comments asserted many poultry CAFOs are established each year (120), they recognized that not all of these received an FSA-guaranteed loan.  Nationally, however, FSA's loan guarantees are a small portion of all agricultural credit in the United States.  As reflected in the Congressional Research Service report titled, *Agricultural Credit:  Institutions and Issues* (March 26, 2018), of about $374 billion in total farm debt, FSA only provides about 4 to percent through its guaranteed loan program.[94]

---

[94] *See* https://fas.org/sgp/crs/misc/RS21977.pdf.

By contrast, the Farm Credit System accounts for 41 percent, and commercial lenders and other primary agricultural lenders account for 42 percent of total farm debt. The Farm Credit System is the largest lender for the purchase of agricultural real estate at 46 percent. The commenters cite no data to support the notion that FSA's share of CAFO loans or loan guarantees is unreasonably out of line with the normal distribution of agricultural credit.

Moreover, CAFOs, including those in North Carolina, remain subject to regulation. EPA regulates CAFOs, including medium and large CAFOs, and delegates primary authority to the States that, in turn, add permit regulations to keep these operations beneath the threshold of having a significant impact on water quality, air quality, and nutrient load. Regardless of whether a producer receives an FSA loan guarantee, the CAFO is subject to EPA and State permitting regulations and enforcement.

*Comment*: Commenters stated that small communities tend to have smaller projects given the size of the community, while the challenges of NEPA compliance loom large. These commenters supported excluding non-Federal projects, particularly those with minimal Federal funding or involvement, from the NEPA process.

*CEQ Response*: CEQ acknowledges that commenters noted that "[s]maller loans by their nature have less likelihood for any significant adverse environmental impacts and therefore should not need to undergo environmental assessments and/or studies." The final rule's change in the definition of "major Federal action" recognizes that not all Federal actions are subject to NEPA and reinforces the practical concept that Federal involvement must be sufficient enough to warrant invoking NEPA's procedural requirements. The language of the final rule is grounded in NEPA's intended distinction between major and non-major activities, as well as recognizing some commenters' concerns that the imposition of the statute's requirements can result in

533

substantial delays or costs that are relevant to NEPA's goal of fostering both environmental protection and fulfillment of the social, economic, and other requirements of present and future generations of Americans.  42 U.S.C. 4331.

*Comment*:  Some commenters recommended that CEQ incorporate into the exclusion for loans, loan guarantees, and other forms of financial assistance an assessment of whether an applicant has other potential options to fund a project without the involvement of the Federal agency.

*CEQ Response*:  CEQ declines to adopt the recommendation in the final rule.  These comments are outside the scope of this rulemaking as they involve requirements of an individual Federal agency's program, such as USDA's eligibility requirements in 7 CFR 762.120(h).  CEQ defers specific suggestions on program implementation to the respective Federal agency.

*Comment*:  Commenters who supported the proposed changes recommended that, if there is a very large loan for a particular project, if deemed necessary based on the potential for major environmental impacts, lenders or borrowers could submit a one-page "low doc" form certifying their confidence the loan purposes will not have a major detrimental impact on the environment. The low doc form would substitute for any required environmental analysis or studies under NEPA.

*CEQ Response*:  CEQ declines to adopt the recommendation in the final rule as it is outside the scope of this rulemaking.  As discussed elsewhere, NEPA is not applicable to Federal financial assistance programs that do not fit the definition of major Federal action.  CEQ defers specific suggestions on program implementation to the respective Federal agency.

*Comment*:  Commenters raised concerns about the rule's impact on independent family farms in the context of vertical integration of livestock and poultry production, as well as the

534

policy choices regarding the use of taxpayer dollars for federally guaranteed loans for factory farms.

    *CEQ Response*:  These comments are outside the scope of this rulemaking.

    *Comment*:  In response to CEQ's invitation for comments on whether any specific types of financial instruments should be considered a non-major Federal action, one commenter requested that CEQ exempt "pass through monies" for local projects such as Wildland Urban Interface funds (WUI).  One commenter stated that loan guarantees issued by the USDA Rural Utilities Service should be treated the same way as the FSA and SBA loan guarantees.  Some commenters requested specifically that the following USDA loan guarantee programs be added to the exclusion in the proposed rule:  USDA Rural Development Business and Industry Guaranteed Loan Programs, USDA Rural Development Rural Energy for America Guaranteed Loan Program, USDA Rural Development Community Facilities Guaranteed Loan Program, USDA Rural Development Water and Wastewater Guaranteed Loans, and USDA Biorefinery Renewable Chemicals and Biobased Product Manufacturing Assistance Program.  Another commenter stated that CEQ should clarify that, among other forms of financial assistance, re-financings for a loan guarantee should be treated the same way as an originating loan guarantee. Other commenters who opposed the exclusion of specific types of financial instruments stated that courts have long-recognized that Federal action triggering NEPA includes commitments of Federal financing to private parties that enables a private party to act.  *See Save Barton Creek Ass'n*, 950 F.2d at 1134; *Scientists' Inst. for Pub. Info. v. Atomic Energy Comm'n*, 481 F.2d 1079, 1088 (D.C. Cir. 1973) ("there is 'Federal action' within the meaning of the statute not only when an agency [acts], but also whenever an agency makes a decision which permits action by other parties which will affect the quality of the environment"); *Named Individual Members of*

535

*San Antonio Conservation Soc'y v. Texas Highway Dep't*, 446 F.2d 1013, 1027 (5th Cir. 1971) (Federal funding "triggered the advertisement for contract bids, the letting of contracts, and the commencement of construction," thus implicating NEPA).

*CEQ Response*:  Under the final rule, any form of financial assistance where the agency does not exercise sufficient control would not be a major Federal action.  CEQ has expressly identified FSA and SBA guaranteed loans as examples to address past confusion by courts and agencies.  Financial instruments similar to the FSA and SBA loan guarantee programs where the Federal agency does not exercise sufficient control and responsibility over the effects of the assistance will not trigger the need for a NEPA analysis.  Agencies may identify types of financial instruments that should be considered a non-major Federal action in their respective implementing procedures.

*Comment*:  Commenters requested clarification on whether Federal funding for the planning and design work for a transportation infrastructure project is excluded from the definition of "major Federal action."  Courts have found the planning and design phases of transportation projects have independent utility from the construction of the project, and have upheld the use of CEs for such Federal action.

*CEQ Response*:  The final rule does not specifically exclude Federal funding for the planning and design phases of infrastructure projects from the definition of "major Federal action."  As discussed elsewhere, CEQ has favorably cited *Macht*, 916 F.2d 13, where the court found that funding for planning and studies not enough to federalize a DOT project.  Consistent with §§ 1501.1 and 1507.3(d)-(e), an agency may determine in its NEPA procedures or on an individual basis types of Federal actions that do not trigger NEPA as a threshold matter, or may develop a CE.

536

*Comment*:  One commenter opposed any revisions to the types of projects which quality as major Federal actions asserting that the resource savings from the proposed 12 month environmental reviews makes it unnecessary to revise the definition of "major Federal action."

*CEQ Response*:  While more efficient reviews will result in resource savings for agencies, revisions to the definition of major Federal action are necessary to provide various clarifications as described elsewhere.

*Comment*:  In response to CEQ's invitation for comments on a suggested threshold for "minimal Federal funding," commenters who opposed a monetary threshold stated that any determination of "minimal Federal funding" should be made in the context of a particular project.  Commenters also stated that the absence of Federal funding is not conclusive of whether an action constitutes a major Federal action.  Some commenters stated that establishing a quantified threshold for minimal Federal funding would be at odds with other statutory triggers such as the ESA.  Some commenters stated that if a project could not otherwise be completed without the use of Federal funds (regardless of the amount), then NEPA applies.  Commenters were concerned that a defined minimal amount would result in segmentation. Some commenters stated that CEs are the appropriate way to treat actions that do not have significant impacts. Other commenters expressed support for the proposal to conditionally exempt certain forms of financial assistance, but few provided information that would enable CEQ to specify a monetary threshold.  Some commenters proposed a dollar threshold for Federal funding of less than $1,000,000 or less than 20 percent or 25 percent of total project costs.  Other commenters raised concerns about calculating Federal funding asserting that cost overruns could potentially turn a "minor" project into a "major" one.

*CEQ Response*:  CEQ did not receive many suggestions regarding specific figures to establish a threshold amount.  The final rule does not include a specific monetary threshold for minimal Federal funding.  Agencies may identify a minimal financial threshold and other categories of actions that do not meet the threshold of "major Federal action" in their agency NEPA procedures.  While calculating an overall project's costs may be challenging, once an applicant submits an application for Federal funding, the agency should use its experience and expertise to evaluate whether there is sufficient information and documentation that allows it determine whether the proposed action is a major or non-major action.

*Comment*:  Commenters stated concern that the number of Federal projects subjected to NEPA review will decrease if the proposed threshold analysis model is accepted, as Tribes coordinate their NEPA review and section 106 of the NHPA responsibilities concurrently.  The threshold analysis standard will therefore result in fewer section 106 undertakings being completed as a by-product of this new threshold analysis.  Commenters also stated the proposed amendments would allow Federal agencies to decide on a project-by-project basis whether NEPA compliance is required.  Commenters stated if Federal funding or permitting is involved in a proposed action, even on a limited basis, some form of environmental review is needed in order to ensure that Federal resources are not used in connection with unnecessary and uninformed destruction of Tribal or cultural resources.  An increase in the loss of non-renewable cultural and historical sites and information is unacceptable especially when it will be primarily based on arbitrary decisions such as the amount of Federal involvement or money.

*CEQ Response*:  The obligations under NEPA and NHPA are separate.  As noted elsewhere, nothing in the final rule affects the requirements under other statutes including NHPA.

538

*Comment*:  Some commenters recommended that if the final rule makes the propose changes, CEQ define "minimal" and "control" within the definition and context of "major Federal action" to reduce confusion.  A commenter recommended that more oversight on the definition's applicability to a project and the ability to dispute a threshold analysis determination be included.

*CEQ Response*:  CEQ declines to make the requested revision.  The particular facts and circumstances of each project or program are relevant to determining whether the project involves minimal Federal funding or involvement.  The agency's statutory authorities are also relevant to considering whether the agency exercises sufficient control and responsibility over the outcome of the project.  Where an agency has questions concerning the interpretation of § 1501.1, agencies may consult with CEQ on a case-by-case basis.

*Comment*:  In response to CEQ's request for comment on whether the definition of "major Federal action" should be further revised to address scenarios where a Federal permit or other Federal action is a small portion of a larger non-Federal action, some commenters opposed such changes while others supported such changes.  Commenters who opposed further revisions stated that there is no correlation between the magnitude of Federal involvement and the magnitude of potentially adverse impacts of a project.  These commenters also noted that bypassing NEPA review for small Federal handle actions would deprive the public, including environmental justice communities, of transparency and the ability to comment.  Some commenters were concerned that without NEPA analysis, in States that do not have comparable statutes, less informed decision-making would occur.  Some commenters were particularly concerned with an exemption to NEPA analysis for major linear projects such as transmission lines, pipelines, and roads.  Multiple commenters cited the example of a wetlands permit from

the Army Corps of Engineers that is required for only a small part of a larger project.

Commenters who supported further revisions asserted that federalizing an entire project over

which an agency lacks legal authority or jurisdiction is contrary to the procedural nature of

NEPA, and expands Federal jurisdiction over non-Federal actions.  Commenters on both sides of

the issue pointed CEQ to various cases including *Winnebago Tribe*, 621 F.2d at 273; *Save the*

*Bay, Inc. v. U.S. Army Corps of Eng'rs*, 610 F.2d 322 (5th Cir. 1980); *White Tanks Concerned*

*Citizens v. Strock*, 563 F.3d 1033, 1040-43 (9th Cir. 2009)*; Ohio Valley Envtl. Coal. v. Aracoma*

*Coal Co.*, 556 F.3d 177, 196-97 (4th Cir. 2009); *Save Our Sonoran Inc., v. Flowers*, 403 F.3d

1113, 1122 (9th Cir. 2005); *Pye v. United States*, 269 F.3d 459, 469 (4th Cir. 2001); *Macht*, 916

F.2d at 18–20; and *Sierra Club v. U.S. Army Corps of Eng'rs*, 990 F. Supp. 2d 9, 33 (D.D.C.

2013).  Some commenters stated that case law provided sufficient direction so further CEQ

rulemaking is not needed on this issue.  Some commenters encouraged CEQ to provide

additional examples and clarification in the final rule that minimal Federal involvement or

funding would not require review of the environmental impacts of the entire project.  Some

commenters stated that CEQ should clarify that "minimal Federal involvement" and "minimal

Federal funding" should be assessed in relation to the scale and scope of the overall project.

Commenters requested that CEQ clarify that where an agency has regulatory authority over a

relatively small area or element of a project, even where that area or element has broader

consequences for the project as a whole, the agency's scope of review does not extend to the

entire project.  One commenter suggested that the proposed NEPA threshold applicability

analysis in § 1501.1 and revisions to the definition of major Federal action in § 1508.1(q) limit

much of CEQ's oversight by not applying NEPA to the actions of private citizens or private

industry that are obtaining permits.

540

*CEQ Response*:  The final rule does not further revise the definition of "major Federal action" to address the small Federal handle problem.  The final rule's definition of "major Federal action" is adequate to address scenarios where a Federal permit or other Federal action is a small portion of a larger non-Federal project.  The definition specifically excludes non-discretionary decisions and non-Federal projects covered under § 1508.1(q)(1)(ii) and (vi).  Courts that have addressed the small Federal handle question have taken a fact-intensive approach to determine whether a Federal permit or other Federal action is sufficient to federalize the entirety of a proposed action.  Courts have considered facts such as the relationship between the location of the areas that require a Federal permit and the remaining non-Federal portions of the proposed action, whether the proposed action could avoid the areas where a Federal permit would be required, and the degree of the Federal agency's control and responsibility over the broader project.

*Comment*:  In response to CEQ's invitation for comment on whether "partly" should be changed to "predominantly" in § 1508.1(q)(1) for consistency with the revisions in the introductory paragraph regarding "minimal Federal funding," few commenters expressed an opinion on the question.  Some commenters opposed the suggested change from "partly" to "predominantly" because they believed it would result in less disclosure of impacts.  Other commenters welcomed the proposed change because they believed it would increase clarity and certainty regarding when Federal financing should rise to a level necessitating a NEPA review.

*CEQ Response*:  Predominantly means "for the most part" and would imply that projects and programs would be major Federal actions only if more than 50 percent were financed, assisted, conducted, regulated, or approved by Federal agencies.  Such an interpretation would be inconsistent with language elsewhere in the definition that excludes non-Federal projects with

541

minimal Federal funding or involvement where the agency does not exercise sufficient control

and responsibility over the effects of the assistance.  For these reasons, the final rule does not

change "partly" to "predominantly."  However, CEQ notes that the proportion of Federal funding

versus non-Federal funding is certainly a relevant consideration for agencies.

### ii.    Extraterritoriality

*Comment*:  Commenters supported revisions to clarify that NEPA does not apply

extraterritorially.  Some commenters requested that CEQ revise the regulations to state that

NEPA should not apply extraterritorially to projects outside the jurisdiction of the United States.

Other commenters stated that NEPA should not require assessment of extraterritorial effects of

domestic actions.

*CEQ Response*:  In the final rule, CEQ clarifies that section 102(2)(C) of NEPA does not

apply to activities or decisions with effects located entirely outside the jurisdiction of the United

States.  § 1508.1(q))(1).  This clarification is consistent with decisions of the Supreme Court

addressing the application of the presumption against extraterritoriality to Federal statutes.  In the

final rule, CEQ has revised the definition of "Major Federal action" to provide that a major

Federal action does not include agency activities or decisions with effects located entirely

outside of the jurisdiction of the United States.  § 1508.1(q)(1)(i).  The Restatement of Foreign

Relations Law provides that the areas within the territorial jurisdiction of the United States

include "its land, internal waters, territorial sea, the adjacent airspace, and other places over

which the United States has sovereignty or some measure of legislative control."[95]  Under the

final rule, for activities or decisions with effects in the United States, agencies should analyze the

---

[95] Restatement, *supra* note 93, sec. 404.

reasonably foreseeable effects of such activities or decisions where there is a reasonably close

causal relationship to the proposed action. § 1508.1(g). This may include transboundary effects

that are reasonably foreseeable and have a reasonably close causal relationship to the proposed

action. § 1508.1(g).

    *Comment*: CEQ also received comments opposing application of the presumption against

extraterritoriality to NEPA. Commenters stated that CEQ should not prohibit applying NEPA to

all extraterritorial projects, and that doing so would be inconsistent with the plain text of the

statute. Some commenters contended that NEPA applies extraterritorially on its face, and that

applying the presumption would not be consistent with the text of the statute which references

"human environment" without geographic limitation, and which commenters maintained is not

limited to the domestic environment. Other commenters cited the text of section 102(2)(F) of the

Act which directs that "all agencies of the [F]ederal [G]overnment shall . . . recognize the

worldwide and long range character of environmental problems" and "lend support to initiatives,

resolutions, and programs designed to maximize international cooperation in anticipating and

preventing a decline in the quality of the mankind's world environment."

    *CEQ Response*: The plain language of section 102(2)(C) of the Act does not indicate it

was intended to be applied to actions occurring outside the United States. 42 U.S.C. 4332(2)(C).

The provision directs Federal agencies to provide a detailed statement for major Federal actions

significantly affecting the quality of the human environment, and requires the responsible official

to consult with and obtain the comments of Federal agencies with jurisdiction or special

expertise, as well as to make copies of the statement and comments and views of Federal, State

and local agencies available to the President, CEQ and the public. 42 U.S.C. 4332(2)(C).

Nothing in the text of the Act states that this section was intended to require the preparation of

543

detailed statements for actions located outside the United States. Nor does the definition of

"human environment" make clear that the section was intended to be applied extraterritorially.

The statute establishes a "national policy" of the "Federal Government, in cooperation with State

and local governments, and other public and private organizations," and directs the Federal

Government to use practicable means and measures to "fulfill the social, economic, and other

requirements of present and future generations of Americans." 42 U.S.C. 4331(a). Further, the

statute directs the use of practicable means "consistent with other essential considerations of

national policy" to "assure for all Americans safe . . . surroundings." 42 U.S.C. 4331(b). The

only reference in the Act to international considerations is in section 102(2)(F) which directs

agencies to "where consistent with foreign policy of the United States, lend appropriate support

to initiatives, resolutions, and programs designed to maximize international cooperation" to

protect the environment. 42 U.S.C. 4332(2)(F). This provision also does not clearly indicate

that the requirements of section 102(2)(C) to prepare detailed statements applies outside U.S.

territorial jurisdiction. Rather, it indicates agencies should seek to cooperate internationally on

environmental issues, where consistent with U.S. foreign policy.

*Comment*: Commenters opposing application of the presumption against

extraterritoriality to NEPA stated that it would not be consistent with the statute's legislative

history. Commenters reference the language "to the fullest extent possible" in section 102(2),

and cite the Conference Report (H.R. Rep. No. 91-765, at 9-10 (1969)), as well as the Senate

Report (S. Rep. No. 91-296, at 9 (1969) and the House Report (H.R. Rep. No. 91-378, at 121

(July 11, 1969)). Commenters also referenced post-enactment reports comments or statements

before Congress.

544

*CEQ Response*:  The legislative history of section 102(2)(C), which is very limited, does

not discuss applying the requirements of section 102(2)(C) to extraterritorial actions.  Consistent

with this conclusion, the Court of Appeals for the District of Columbia has held that NEPA's

legislative history did not support rebutting the presumption against extraterritorial application of

the statutes.  *Nat. Res. Def. Council v. Nuclear Regulatory Comm'n*, 647 F.2d 1345, 1367 (D.C.

Cir. 1981) ("NEPA's legislative history illuminates nothing in regard to extraterritorial

application").  To the extent commenters cite post-enactment congressional comments or

statements, CEQ notes that these are not part of the legislative history of the Act.

*Comment*:  Commenters opposing clarification that NEPA does not apply

extraterritorially contended that restricting NEPA's extraterritorial application would contravene

case law.  Some commenters specifically referenced *Envtl. Def. Fund v. Massey,* 986 F.2d. 528,

533 (D.C. Cir. 1993), or other cases.  Other commenters stated that a rule barring consideration

of transnational effects would undermine the long-standing practice of courts of considering the

presumption against extraterritoriality on a case-by-case basis.

*CEQ Response*:  Since NEPA was enacted a number of district and appellate courts have

found that NEPA applied extraterritorially,[96] while other district and appellate courts have held

---

[96] *See, e.g.*, *Sierra Club v. Adams*, 578 F.2d 389 (D.C. Cir. 1978) (assuming NEPA to be applicable to South American highway funded by Department of Transportation); *People of Entewatak v. Laird*, 353 F. Supp. 811 (D. Haw. 1973) (concluding NEPA applicable to action in the Trust Territory of the Pacific Islands); *Ctr. for Biological Diversity v. Nat'l Science Found.*, 2002 U.S. Dist. LEXIS 22315 *1, *10–11 (N.D. Cal. 2002) (applying NEPA within the Mexican Exclusive Economic Zone and stating that imposing the requirements of NEPA would not impinge on the sovereignty of Mexico); *Nat. Res. Def. Council v. Navy*, 2002 U.S. Dist. LEXIS 26360 *1, *41–42 (C.D. Cal. 2002) (applying NEPA within the U.S. Exclusive Economic Zone and stating that applying NEPA would not implicate foreign policy interests).  Commenters also cited *Friends of the Earth v. Mosbacher*, 488 F. Supp. 2d 889, 908 (N.D. Cal. 2007) (finding presumption against extraterritoriality did not apply to Overseas Private Investment Corporation or Export-Import Bank fossil fuel projects, which plaintiff asserted had domestic effects); *Hirt v. Richardson*, 127 F. Supp. 2d 833, 844 (W.D. Mich. 1999) (finding NEPA applied to decision related to shipments of plutonium from New Mexico to Canada and parallel shipment from Russia to Canada).

that the presumption against extraterritoriality precluded NEPA's application to activities abroad.[97]  In 1993, in a case involving the National Science Foundation (NSF) and incineration of food waste in Antarctica, the Court of Appeals for the District of Columbia held that the presumption against extraterritoriality did not apply because NSF's decision making under the NEPA process occurred in the United States.  *Massey*, 986 F.2d. at 533 ("[S]ince NEPA is designed to regulate conduct occurring within the territory of the United States and imposes no substantive requirements which could be interpreted to govern conduct abroad, the presumption . . . does not apply to this case").  In its decision, the court also stated that Antarctica was an area without a sovereign and an area over which the United States had "a great measure of legislative control."  *Id.* (stating that "where the U.S. has some real measure of legislative control over the region at issue, the presumption against extraterritoriality is much weaker").  The court further stated that "where there is no potential for conflict 'between our laws and those of other nations,' the purpose behind the presumption is eviscerated, and the presumption against extraterritoriality applies with significantly less force."  *Id.*

To the extent that the *Massey* court and other courts have found that NEPA applied extraterritorially to actions occurring outside the territorial jurisdiction of the United States, these

---

[97] *See, e.g.*, *Nat. Res. Def. Council v. Nuclear Regulatory Comm'n*, 647 F.2d 1345 (D.C. Cir. 1981) (holding NEPA did not apply to nuclear export licensing decisions relating to the export of a nuclear reactor to the Philippines); *NEPA Coal. of Japan v. Aspin*, 837 F. Supp. 466, 467 (D.D.C. 1993) (applying presumption to preclude application of NEPA to Department of Defense actions on military installations in Japan; *Greenpeace USA v. Stone*, 748 F. Supp. 749, 760 (D. Haw. 1990) (applying presumption to actions in Germany).  Courts have also applied the presumption of extraterritoriality to find that agencies were not required to analyze the impacts of activities occurring in the U.S. EEZ or the high seas.  *See Basel Action Network v. Maritime Admin.*, 370 F. Supp. 2d 57, 71–75 (D.D.C. 2005) (upholding EA and FONSI that analyzed towing activities that encompassed the towing of ships in U.S. territorial waters but finding that the Maritime Administration (MARAD) was not required to consider the effects of the towing of ships across the high seas).

decisions are not consistent with more recent holdings of the Supreme Court.  These Supreme Court decisions have reinforced that the presumption against extraterritoriality applies absent a clear showing that Congress intended extraterritorial application, and considering the focus of the concerns Congress seeks to address through the statute.  *See, e.g.*, *RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2100 (2016); *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 255 (2010).  The Supreme Court has stated:  "Rather than guess anew in each case, we apply the presumption [against extraterritorially] in all cases, preserving a stable background against which Congress can legislate with predictable effects."  *Morrison*, 561 U.S. at 261.

To the extent the *Massey* court maintained that the presumption against extraterritoriality did not apply because Federal decision making occurred in the United States, the Supreme Court has clarified that the occurrence of some activity in the United States is not determinative when applying the presumption.  *Morrison*, 561 U.S. at 266.  The Supreme Court has stated that it "is a rare case of prohibited extraterritorial application that lacks *all* contact with United States territory."  *Id.*  Here, section 102(2)(C) applies to Federal agencies and requires that they consider the environmental impacts of major Federal actions significantly affecting the quality of the human environment.  42 U.S.C. 4332(2)(C).  The purpose of section 102(2)(C) is to ensure that a Federal agency, as part of its decision-making process considers the potential environmental impacts of proposed actions.  The focus of congressional concern under this provision is not the location of the decision, but the proposed action at the location it will occur and its potential environmental effects.  For this reason, CEQ has defined extraterritorial actions in terms of the location of the effects of an activity or decision, rather than the location of the decision making.  § 1508.1(q).

*Comment*:  One commenter stated that whether NEPA applies to agency actions occurring outside the United States is a red herring.  The commenter asserted that the purpose of the presumption against extraterritoriality is to protect against clashes between U.S. laws and those of other nations that could result in international discord.  The commenter stated that where courts have found that NEPA would have serious foreign policy implications they have excused agencies from compliance, citing *Nuclear Regulatory Comm'n*, 647 F.2d at 1366.

*CEQ Response*:  As discussed above, the Supreme Court has issued a number of decisions over the past decade holding that the presumption applies absent clear congressional intent to apply statutory provisions extraterritorially.  In its decision in *Massey*, the D.C. Circuit stated that "the primary purpose of th[e] presumption against extraterritoriality is 'to protect against unintended clashes between our laws and those of other nations which could result in international discord.'"  986 F.2d. at 530 (quoting *Arabian Am. Oil Co.*, 499 U.S. at 248).  The Supreme Court, however, has held that while this may be a reason for applying the presumption, the presumption is based on a broader foundation.  For example, shortly after the *Massey* decision, later that same year, the Supreme Court in a case also involving Antarctica rejected the rationale of avoidance of conflict as the primary purpose, stating "the presumption is rooted in a number of considerations, not the least of which is the commonsense notion that Congress generally legislates with domestic concerns in mind."  *Smith v. United States*, 507 U.S. 197, 204 n.5 (1993); *see RJR Nabisco, Inc.*, 136 S. Ct. at 2100 ("We therefore apply the presumption across the board, 'regardless of whether there is a risk of conflict between the American statute and a foreign law.'") (citing *Morrison*, 561 U.S. at 255); *see also Morrison*, 561 U.S. at 255 ("The canon or presumption applies regardless of whether there is a risk of conflict between the American statute and a foreign law"); *Sale v. Haitian Ctrs. Council*, 509 U.S. 155, 174 (1993)

548

("[T]he presumption has a foundation broader than the desire to avoid conflict with the laws of other nations."); *Aspin*, 837 F. Supp. at 467 n.3 (stating that "two post-Massey Supreme Court cases hold that the choice of law dilemma is not the only justification for the presumption").

*Comment*:  Commenters contended that a finding the NEPA does not apply extraterritorially would be inconsistent with CEQ's 1997 transboundary guidance.

*CEQ Response*:  The guidance on transboundary impacts issued by CEQ in 1997 did not apply NEPA to extraterritorial actions.  This guidance expressly stated that CEQ was not intending to "apply NEPA to so-called 'extraterritorial actions'; that is, U.S. actions that take place in another country or otherwise outside the jurisdiction of the United States."[98]  As such, it is not inconsistent with the final rule clarifying that section 102(2)(C) does not apply to extraterritorial actions.

*Comment*:  Commenters stated that agency practice has demonstrated that NEPA is successfully applied to extraterritorial activities, and that agencies regularly prepare EISs or other NEPA documents for certain overseas activities.  Some commenters stated that it was well established that NEPA applies to transboundary impacts as well as the global commons and impacts that affect the U.S. environment, and requested that revisions reflect the provisions of E.O. 12114.  Some commenters stated that this Executive order has strong extraterritoriality implications.  One commenter also noted that courts have found NEPA to apply where the proposed action has effects in the United States.

---

[98] Council on Environmental Quality Guidance on NEPA Analyses for Transboundary Impacts (July 1, 1997), https://ceq.doe.gov/docs/ceq-regulations-and-guidance/memorandum-transboundary-impacts-070197.pdf.

549

*CEQ Response*:  As noted above, the 1978 regulations did not address the issue of application of NEPA to environmental effects occurring outside the United States.  In 1979, President Carter issued E.O. 12114, Environmental Effects Abroad of Major Federal Actions,[99] which serves as a guide to agencies.  This Executive order provided that, "[w]hile based on independent authority, this Order furthers the purpose of the National Environmental Policy Act and the Marine Protection Research and Sanctuaries Act and the Deepwater Port Act consistent with the foreign policy and national security policy of the United States, and represents the United States government's exclusive and complete determination of the procedural and other actions to be taken by Federal agencies to further the purpose of the National Environmental Policy Act, with respect to the environment outside the United States, its territories and possessions."  E.O. 12114, § 1.

Under section 2 of the Executive order, agencies were required to develop procedures, in consultation with the Department of State and CEQ, for developing documents relating to major Federal actions significantly affecting the environment of the global commons outside the jurisdiction of any nation, the environment of a foreign nation not participating with the U.S. and not otherwise involved in the action, affecting the environment of a foreign nation, or affecting natural or ecological resources of global importance designated for protection under this subsection by the President or Secretary of State.  The Executive order also exempted various actions from the order.  Because E.O. 12114 is based on independent authority, the final rule does not alter the requirements of that Executive order.  Critically, however, section 3 of this Executive Order provides that it "is solely for the purpose of establishing internal procedures for

---

[99] 44 FR 1957 (Jan. 4, 1979).

Federal agencies to consider the significant effects of their actions on the environment outside

the United States, its territories and possessions, and nothing in this Order shall be construed to

create a cause of action."  NEPA, by contrast, is a statute enforceable pursuant to the APA in

appropriate circumstances.  Hence, E.O. 12114 does not extend the reach of NEPA and CEQ is

free to align NEPA with the presumption against extraterritoriality.

Under the final rule, a "Major Federal action" does not include activities or decisions for

which the effects are entirely outside the territorial jurisdiction of the United States.  § 1508.1(q).

For actions with effects occurring in the United States, under the regulations as revised agencies

should consider all effects that are reasonably foreseeable and have a reasonably close causal

relationship to the proposed action.  § 1508.1(g).  This may include reasonably foreseeable

transboundary effects where they have a reasonably close causal relationship to the proposed

action taken in the United States.

*Comment*:  Commenters stated that long-standing practice demonstrates that NEPA is

successfully applied extraterritorially, including NEPA documents for overseas activities such as

Navy training exercises.  They contended eliminating the extraterritorial application of NEPA

would disrupt agency practice.

*CEQ Response*:  The final rule does not alter E.O. 12114 which directs agencies to

prepare environmental analyses of certain actions occurring outside the United States territories

or possessions under specified circumstances.  For actions located outside U.S. territorial

jurisdiction, agencies should consider any applicable statutes, international agreements, or

Executive orders, including E.O. 12114.  The purpose of this regulatory reform is to clarify that

NEPA does not require analysis of extraterritorial action.

*Comment*:  Commenters raised concerns that it was not clear whether transboundary impacts would be considered if the presumption against extraterritoriality applies to NEPA.

*CEQ Response*:  As CEQ discussed above, the case law applying NEPA extraterritorially is limited and predates more recent holdings of the Supreme Court reinforcing that application of the presumption against extraterritoriality absent express congressional intent to apply Federal statutes extraterritorially.  Under the final rule, where an activity or decision has effects that are located within the United States, agencies should consider reasonably foreseeable effects for which there is a reasonably close causal relation to the proposed action.  § 1508.1(g).  This would include cross-border or transboundary effects to the extent they are reasonably foreseeable and have a reasonably close relationship to the proposed action.

*Comment*:  Commenters stated that NEPA governs Federal decision making and not conduct of individuals or corporations, that Federal decision making occurs in the United States, and that extraterritorial application of NEPA does not present a conflict between U.S. and foreign law, and for this reason the presumption against territoriality should not apply.

*CEQ Response*:  Section 102(2)(C) applies to Federal agencies and requires that they consider the environmental impacts of major Federal actions significantly affecting the quality of the human environment.  The purpose of section 102(2)(C) is to ensure that a Federal agency, as part of its decision-making process, considers the potential environmental impacts of the proposed action.  The focus of congressional concern under this provision is not the location of the decision, but the proposed action and potential environmental effects.  For this reason, CEQ has defined extraterritorial actions in terms of the location of the effects of an activity or decision, rather than the location of the decision making.

552

To the extent commenters have stated that Federal decision making occurs in the United States, and the presumption against extraterritoriality does not apply to NEPA, the Supreme Court has clarified that the occurrence of some activity in the United States is not determinative when applying the presumption. *Morrison*, 561 U.S. at 266. The Supreme Court has stated that "it is a rare case of prohibited extraterritorial application that lacks *all* contact with the territory of the United States." *Id.* In the *Morrison* case, the Supreme Court, considering the application of § 10(b) of the Securities and Exchange Act, found that only transactions in securities listed on domestic exchanges, and domestic transactions in other securities, were the focus of the statute. *Id.* at 267.

*Comment*: Commenters asked whether an extraterritorial action would be characterized differently if effects were felt within the United States.

*CEQ Response*: In the final rule, CEQ clarifies that a major Federal action does not include extraterritorial actions that are defined to be activities or decisions with effects located entirely outside U.S. territorial jurisdiction. To the extent actions have effects located within the United States, they would not be excluded from the definition of "Major Federal action" under the regulations as revised.

*Comment*: Some commenters asked whether NEPA requires consideration of transboundary environmental impacts across borders. Other commenters stated that NEPA should not apply to the extraterritorial effects of domestic projects.

*CEQ Response*: Under the final rule, a "Major Federal action" does not include activities or decisions for which the effects fall entirely outside the jurisdiction of the United States. § 1508.1(q). For actions with effects occurring in the United States, under the regulations as revised agencies should consider all effects that are reasonably foreseeable and have a

553

reasonably close causal relationship to the proposed action.  *See* § 1508.1(g).  This may include reasonably foreseeable transboundary effects where they have a reasonably close causal relationship to the proposed action taken in the United States.  *Id.*

*Comment*:  One commenter asked whether implementation of treaties includes extraterritorial actions.

*CEQ Response*:  In the final rule, CEQ states that major Federal actions may include the implementation of treaties.  *See* § 1508(q).  Consistent with the final rule, this would include activities or decisions with effects that occur within the territorial jurisdiction of the United States.  *Id.*

*Comment*:  Commenters recommended that the regulations be revised to provide that NEPA applies in the Exclusive Economic Zone (EEZ).

*CEQ Response*:  President Reagan established the U.S. EEZ on March 10, 1983 with the issuance of Proclamation 5030—Exclusive Economic Zone of the United States of America.[100] As discussed above, the Supreme Court has reinforced that the presumption against extraterritoriality applies absent a clear showing that Congress intended extraterritorial application, considering the focus of the concerns Congress seeks to address through the statute, and regardless of whether or not there is a potential for conflicts of law.  The Supreme Court has also stated that "legislation of Congress, unless a contrary intent appears, is meant to apply only within the territorial jurisdiction of the United States . . . ." *Foley Bros. v. Filardo*, 336 U.S. 281, 285 (1949) (citing *Blackmer v. United States*, 284 U.S. 421, 437 (1932)); *see Arg. Repub. v.*

---

[100] 48 FR 10605 (Mar. 14, 1983).  *See* Proclamation 5030—Exclusive Economic Zone of the United States of America, https://www.archives.gov/federal-register/codification/proclamations/05030.html.

*Armerada Hess Shipping Corp.*, 488 U.S. 428, 440 (1989) (stating that "[w]hen it desires to do so, Congress knows how to place the high seas within the jurisdictional reach of a statute.")

Under customary international law, the territorial jurisdiction of the United States does not include the U.S. EEZ which falls outside U.S. territorial waters.  *See* United Nations Convention on the Law of the Sea, Dec. 10, 1982, 1833 U.N.T.S. 397 at Art. 55  (defining EEZ as "beyond and adjacent to the territorial sea").  The Supreme Court, however, has stated that Federal statutes apply to areas where the U.S. has sovereignty or "some measure of legislative control."  *See Arabian Am. Oil Co.*, 499 U.S. at 248 (citing *Foley Bros., Inc.*, 336 U.S. at 285. The Restatement of Foreign Relations Law provides that the areas within the territorial jurisdiction of the United States include "its land, internal waters, territorial sea, the adjacent airspace, and other places over which the United States has sovereignty or some measure of legislative control."[101]

With respect to the U.S. EEZ, the Proclamation establishing it states that "[w]ithin the Exclusive Economic Zone, the United States has, to the extent permitted by international law, (a) sovereign rights for the purpose of exploring, exploiting, conserving and managing natural resources, both living and non-living, of the seabed and subsoil and the superjacent waters and with regard to other activities for the economic exploitation and exploration of the zone, such as the production of energy from the water, currents and winds; and (b) jurisdiction with regard to the establishment and use of artificial islands, and installations and structures having economic purposes, and the protection and preservation of the marine environment."  Over the past two

---

[101] Restatement, *supra* note 93, sec. 404.

decades, courts have both applied and declined to apply the presumption against extraterritoriality to the U.S. EEZ.[102]

Whether NEPA may apply to a proposed action with effects exclusively in the U.S. EEZ will depend upon the nature of the action, the relevant statutes, and other factors specific to the proposed action. Regardless of whether NEPA applies, E.O. 12114, Environmental Effects Abroad of Major Federal Actions,[103] which is based on independent authority, serves as a guide to agencies.[104] Under section 2 of the Executive order, agencies have developed procedures, in consultation with the Department of State and CEQ, for developing documents relating, *inter alia,* to "major Federal actions significantly affecting the environment of the global commons outside the jurisdiction of any nation (e.g., the oceans or Antarctica)." E.O. 12114, sec. 2.

### 11.    Definition of Mitigation (§ 1508.1(s))

*Comment*: Some commenters expressed concerns that the requirement that mitigation measures have a nexus to the effects of the proposed action would discourage compensatory mitigation. Other commenters supported the requirement, stating it would make the NEPA

---

[102] In 2002, a Federal District Court applied NEPA to the U.S. EEZ. *See Nat. Res. Def. Council v. Navy*, 2002 U.S. Dist. LEXIS at *1, *41–42 (applying NEPA within the U.S. EEZ, and stating that applying NEPA would not implicate foreign policy interests). The district court held that "[b]ecause the United States exercises substantial legislative control of the EEZ in the area of the environment stemming from its 'sovereign rights' for the purpose of conserving and managing natural resources, the Court finds that NEPA applies to [F]ederal actions which may affect the environment in the EEZ."). *Id.* at 41. In 2005, a Federal District Court reached a contrary result, applying the presumption against extraterritoriality to find that agencies were not required to analyze the impacts of activities occurring in the U.S. EEZ or the high seas. *Basel Action Network*, 370 F. Supp. 2d at 72 (upholding EA and FONSI that analyzed towing activities that encompassed the towing of ships in U.S. territorial waters but finding that MARAD was not required to consider the effects of the towing of ships across the high seas).

[103] 44 FR 1957 (Jan 4, 1979).

[104] This Executive Order provided that, "[w]hile based on independent authority, this Order furthers the purpose of the National Environmental Policy Act and the Marine Protection Research and Sanctuaries Act and the Deepwater Port Act consistent with the foreign policy and national security policy of the United States, and represents the United States government's exclusive and complete determination of the procedural and other actions to be taken by Federal agencies to further the purpose of the National Environmental Policy Act, with respect to the environment outside the United States, its territories and possessions." E.O. 12114, sec. 1.

process more effective by clarifying that mitigation measures must be designed to mitigate the effects of the proposed action.

*CEQ Response*:  CEQ supports agencies using compensatory mitigation where appropriate and consistent with their respective legal authorities.  The requirement that mitigation have a nexus to the proposed action means that compensatory mitigation must bear a relation to the nature of the impact from the proposed action.  This will not discourage the appropriate use of compensatory mitigation.

*Comment*:  Commenters expressed concern that the definition for "mitigation" is inconsistent because it is limited to "measures that avoid, minimize, or compensate" in its first sentence, but then includes "avoiding…minimizing… rectifying…reducing… [and] compensating" in the numbered paragraphs.  They recommended that all five terms are included in the first sentence.  Other commenters recommended simplifying the definition of mitigation because Federal agencies, including CEQ, or State agencies do not use the terms "rectify" or "reduce" in practice.

*CEQ Response*:  CEQ finds that "avoidance," "minimization," and "compensation" are the primary components of mitigation, and agrees that the terms "rectifying" and "reducing" are not as widely used.  However, CEQ has retained both rectifying and reducing in the definition to minimize any uncertainty all of the aspects of mitigation in the 1978 regulations continue to be available to agencies.

*Comment*:  Commenters requested that CEQ establish a mitigation hierarchy in its regulations, prioritizing avoidance and minimization over compensatory mitigation and remediation.  Some commenters requested CEQ to require that the mitigation of a project's adverse impacts improve the baseline environmental conditions.

557

*CEQ Response*:  Certain statutes may require that agencies follow a hierarchy where project proponents must avoid and minimize environmental impacts before offsetting remaining impacts through compensatory mitigation; however, NEPA does not provide similar authorities. Furthermore, there may be circumstances where compensatory mitigation achieves more practicable and favorable environmental outcomes than actions to avoid and minimize impacts. Section 1508.1(s) of the final rule states that while NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation.  Therefore, CEQ declines to require that mitigation improve the baseline environmental conditions.

*Comment*:  Commenters stated that, by narrowing the scope of effects at § 1508.1(g), the rule also limits the assessment of mitigation measures.

*CEQ Response*:  The final rule would continue to require analysis of all effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives, consistent with Supreme Court case law.  By extension, the assessment of mitigation measures would be similarly consistent with applicable Supreme Court case law.  The implementation of NEPA is bounded by a rule of reason, and it is inefficient for agencies to evaluate the mitigation of impacts that are remote or otherwise inconsistent with the revised definition.

*Comment*:  Commenters requested that CEQ further revise the definition of mitigation § 1508. l(s) to include the language concerning mitigation from *Robertson v. Methow Valley*, 490 U.S. 332, 352 (1989), requiring that "mitigation be discussed in sufficient detail to ensure that environmental consequences have been fairly evaluated," but does not establish "a substantive requirement that a complete mitigation plan be actually formulated and adopted" before the agency can make its decision.

558

*CEQ Response*:  CEQ declines to make the requested change as the final rule already adopts the Supreme Court opinion and its language.

*Comment*:  Commenters stated that the proposed changes to the definition of "mitigation" are too broad and that CEQ should define "human environment" in this context.  For example, it is unclear whether human environment includes an individual's experience, such as the use of noise-cancelling windows or other construction noise mitigation measures.

*CEQ Response*:  CEQ declines to make further changes to the definition of mitigation in the final rule.  Mitigation may include a broad range of potential activities to offset the adverse impacts of a proposed action.  Agencies should consider the particular facts and circumstances of a proposed action when considering effective mitigation strategies.

*Comment*:  Commenters requested that CEQ clarify whether the definition of mitigation in § 1508.1(s) precludes consideration of out-of- kind or offsite mitigation.

*CEQ Response*:  The final rule is sufficiently broad to allow for offsite mitigation provided that the mitigation measures have a nexus to the effects of the proposed action. CEQ notes that it may be difficult to demonstrate a nexus for out-of-kind mitigation or off-site mitigation, and that any determination by the agency would depend on the specific circumstances of the proposed action.

*Comment*:  Commenters expressed concern that applicants may not be able to receive credit for certain types of mitigation measures that are not directly tied to the "on the ground impacts" of the proposed project, such as educational programs, that nevertheless provide significant environmental benefits.

*CEQ Response*:  The final rule does not preclude any particular form of mitigation; however, it does require that the agency demonstrate a nexus any proposed mitigation and an

559

impact from the proposed action.  Any proposed mitigation would also need to either avoid, minimize or compensate for impacts caused by the proposed action that satisfy the definition of "effects" set forth in § 1508.1(g).

*Comment*:  Commenters requested that CEQ remove the term "nexus" from the definition and replace it with "reasonable proximity."

*CEQ Response*:  CEQ declines to make the requested change to the final rule.  The word "nexus" is analogous to "tie" or "link," which makes clear that the proposed mitigation must have an adequate relationship to the effects of the proposed action.  "Proximity" is not the right word as it is typically and primarily applied to concepts of relative distance.  The concept of "nexus" is about a degree of conceptual relationship.

*Comment*:  Proposed § 1508.1(s) should clarify that mitigation would be required for a mitigated FONSI.

*CEQ Response*:  The final rule establishes the requirements for a mitigated FONSI in § 1501.6(c).

*Comment*:  Commenters requested adding another provision to the definition of mitigation (1508.1(s)), whereby an agency could "monitor the impact and take appropriate corrective measures, including adaptive management."

*CEQ Response*:  The obligations to monitor mitigation are addressed in §§ 1501.6(c) and 1505.2(a)(3).  CEQ declines to make the requested change.

*Comment*:  A commenter stated that the definition of "mitigation" incorrectly restricts the meaning to apply only to the proposed action, and not the alternatives.

*CEQ Response*:  In response to comments, CEQ has added "or alternatives" to § 1508.l(s).

560

### 12.    Definition of Page (§ 1508.1(v))

*Comment:*  Some commenters expressed opposition to the new definition of "page" stating that it will cause confusion to agencies that follow CEQ's guidance to use a large number of charts, graphs, and figures that will occupy more pages but use fewer words.  One commenter suggested adding "list of commenters and summary of comments" to the definition, while another commenter suggested adding "as it applies to § 1502.7." Another commenter suggested requiring a uniform font size rather than word count for readability purposes.

*CEQ Response*:  CEQ finds that the recommended changes are necessary to achieve the stated goals of the 1978 regulations:  reduce paperwork, to reduce delays, and to produce better decisions.  The definition facilitates  uniformity in document length while allowing unrestricted use of graphs, tables, photos, and other geographic information that can provide a much more effective means of conveying information.  The changes also update NEPA for modern electronic publishing and internet formatting, in which the number of words per page can vary widely depending on format.

### 13.    Definition of Participating Agency (§ 1508.1(w))

*Comment*:  Commenters supported adding a definition of "participating agency" and replacing the term "commenting" with "participating" agencies throughout the regulations.  One commenter asked whether the term applied to CEs and EAs.

*CEQ Response*:  CEQ has updated the regulations to reflect agency practice and the statutes enacted since 1978 that establish a definition of "participating agency."  CEQ has defined "participating agency" consistent with the definition in FAST-41 and 23 U.S.C. 139.  Under the statutes referenced above, the term applies where agencies are preparing an EIS or an EA.

561

*Comment*:  One commenter opposed the addition of a new category of agency and raised concerns that having "cooperating agencies" and "participating agencies" causes confusion for the lead agency and misconceptions about the role of the involved agencies.

*CEQ Response*:  It is useful to update the regulation to add this definition because of the enactment of the statutes referenced above and because the term "participating agency" is used in agency practice and in legislation.  CEQ acknowledges that this definition is different from and in addition to the definition of "cooperating agency," and refers to an agency that is participating in the NEPA process rather than in the role of a "cooperating agency."

### 14.    Definition of Proposal (§ 1508.1(x))

*Comment*:  One commenter opposed striking the second sentence with operative text. The commenter maintained that the reason for striking the text was not provided in the preamble for the proposed rule, except to indicate that it was already addressed in § 1502.5.  The commenter stated that the change at best was confusing, as the required time of preparation is well established through Supreme Court precedent, or at worst was an attempt to overturn practice and precedent, and was arbitrary and capricious.

*CEQ Response*:  CEQ's revisions to the definition are designed to clarify the definition by revising the text from passive to active voice and by striking operative language that is already referenced in § 1502.5 which states the agency should schedule the preparation of an EIS so it can be completed in time for the final statement to be included in any recommendation or report on the proposal.  Elimination of the second sentence is consistent with CEQ's revisions elsewhere to move operative text from the definitions to relevant regulatory sections and to assist agencies in understanding and implementing those sections of the regulations.

562

*Comment*:  One commenter suggested adding to the definition of proposal that "proposal" and "proposed action" are the same, that the proposed action is one alternative, and that the "proposal" is not a restatement of the purpose and need.

*CEQ Response*:  In the definition of "proposal" in the final rule, CEQ has simplified the definition to state that "proposal" means "proposed action at a stage when an agency has a goal, is actively preparing to make a decision on one or more alternative means of accomplishing that goal, and can meaningfully evaluate its effects."  It is not necessary to state that the proposed action is one alternative because that is addressed elsewhere in the regulations.  *See* § 1502.14. Nor is it necessary to state that it is different from the "purpose and need" because that phrase is defined as the purpose and need for the proposed action.  *See* § 1502.13.

### 15. Definition of Publish and Publication (§ 1508.1(y))

*Comment*:  Commenters supported the replacement of the words "circulate" or "circulation" with "publish" or "publication" and defining the term to provide agencies with the flexibility to make environmental documents and information available to the public by electronic means.  Commenters cautioned that agencies should not rely exclusively on electronic means to publish documents and requested that CEQ require publication of physical copies located in local libraries to facilitate access for those with limited or no internet access.

*CEQ Response*:  CEQ declines to include the suggested requirement.  The 1978 regulations did not require agencies to provide physical copies of documents at local libraries and the continued rapid evolvement of digital communication and media may render such a requirement obsolete.  As explained in the Public Involvement section, CEQ has revised § 1506.6 in the final rule to clarify that agencies should consider the public's access to electronic media when selecting appropriate methods for providing public notice and involvement.  The

final rule expands on the range of methods agencies may use when providing notice and publishing documents, including a requirement to publish information on an agency website. *See* § 1507.4.

### 16.    Reasonable Alternative (§ 1508.1(z))

*Comment*:  Commenters objected to the phrase "technically and economically feasible" in the definition of reasonable alternative (§ 1508.1(z)) because it is contrary to the purpose of NEPA.

*CEQ Response*:  Establishing standards for reasonable alternatives based on feasibility is appropriate and meets the purposes of NEPA.  One of the stated purposes in E.O. 11991 when directing CEQ to issue regulations to Federal agencies for the implementation of NEPA was to "emphasize the need to focus on real environmental issues and alternatives."[105]  Consideration of alternatives that are neither technically nor economically feasible is not an effective use of agency time and resources, nor do such alternatives pose a logical choice for agency decision makers.  In considering a proposed action, the agency decision maker must decide whether to approve, disapprove, or approve it with conditions or modifications pursuant to its specific authorities.  Analyzing alternatives that have no means of implementations informs none of these choices before the decision maker.  If after reviewing the record and determining an action's effects to be unacceptable, the decision maker may choose the no action alternative.  Similarly, alternatives that are impossible to implement because of a lack of funding, or that is not technically feasible, are nothing more than strawman alternatives and resources devoted to their analysis are wasted, as they do not present a reasonable choice to the decision maker.

---

[105] *Supra* note 16.

*Comment*:  Commenters stated that CEQ provides no information as to how agencies should decide on the range of alternatives that are technically or economically feasible. Commenters requested that CEQ address this issue, noting that project sponsors may claim that only the proposed action is economically feasible, yet still make their projects economically viable even if the agency requires the implementation of an alternative to the sponsor's preferred action.

*CEQ Response*:  For an alternative to be technically feasible, its implementation must be possible based on existing technology, knowledge, or science at the time the proposal is submitted.  Alternatively, if a project sponsor is developing new technologies in conjunction with a proposal, these technologies must be reasonably certain to be developed within the time frame the proposal is to be implemented.  Agencies should not engage in speculation to predict the future of technological advances as they relate to the proposals before them.

Similarly, for an alternative to be economically feasible, the agency must consider a variety of factors.  For example where an agency is sponsoring a proposal, it must consider whether funding or grants have been appropriated or are reasonably certain to be available at the time the proposal is to move forward, and whether they are sufficient to support the alternative in question.  Where a project is developed by a private sponsor, alternatives that result in changes to project design, technology, or location must not render the project economically non-viable.  In these cases, agencies should work closely with sponsors, particularly during scoping, and the early coordination stages, to develop and understand the project sponsor's objective and to carefully consider alternatives with respect to economically feasibility.

*Comment*: One commenter stated that the definition of reasonable alternatives should not include the requirement to "meet the goals of the applicant," because this requirement would allow agencies to inappropriately narrow the range of alternatives to only the proposed action.

*CEQ Response*: Ensuring that reasonable alternatives meet the goals of an applicant is consistent with the changes made to § 1502.13 regarding purpose and need. Requiring alternatives to meet the goals of an applicant will allow agencies to appropriately focus analysis on reasonable and logical alternatives that fall within their jurisdiction. In situations where a private project sponsor is proposing an action, there would be no environmental review but for the proposal in the first place. It is therefore appropriate for agencies responding to requests for permits or authorizations to ensure that the alternatives under consideration reasonably meet the objective of the applicant instead of some other objective designed by the agency. Agencies should coordinate with applicants in the earliest stages of a proposal to ensure that a project objective is defined by an appropriate rule of reason, and should not be unduly narrow such that it would bias conclusions toward the no-action alternative. In short, agencies should conduct an objective inquiry.

*Comment*: Commenters questioned how agencies would weigh economic feasibility and environmental protection, expressing concern that there would be fewer environmental safeguards for alternatives with greater economically feasibility.

*CEQ Response*: An agency need not categorize alternatives in terms of technical or economic feasibility or rank the alternatives by degrees of feasibility. In considering the economics of alternatives, the agency must only determine whether an alternative is economically feasible. If an alternative is not economically feasible, it may be discounted from further analysis. For those alternatives that are economically feasible, and meet other criteria the

566

agency has deemed pertinent, an agency may use its discretion and technical expertise in analyzing the environmental effects of such alternatives consistent with § 1502.14.

*Comment*:  Commenters argued that requiring alternatives to be technically and economically feasible will preclude an EIS from considering technical solutions as they become available.  Commenters also noted that, the economics of a project may change within the time period of the EIS.

*CEQ Response*:  CEQ recognizes that technical and economic feasibility may change during the up to two-year process of preparing an EIS.  However, the goal of including such information must be balanced against the need to improve regulatory certainty in the NEPA process.  The public comment period on the draft EIS is an important step in the process for new information, including information on technical and economic feasibility, to be incorporated into the analysis of proposed alternatives.  The best approach in balancing the goals of using existing data and a predictable process is to consider technical and economic feasibility in developing alternatives based on information submitted in response to the NOI, with the flexibility to incorporate new information submitted through public comments on the draft EIS.  Agencies should not engage in speculation on the future of technological advancements in a given field.

*Comment*:  Commenters stated that there should be a less environmentally significant impact alternative, the no action alternative, an environmentally superior alternative, and a change of location alternative.

*CEQ Response*:  Proposals may have numerous alternatives and such characterization may not be possible.  Further, not every proposal may lend itself to alternative locations (*i.e.*, such as renovating a historic, Federal building), or a clearly environmentally superior option (e.g., without triggering trade-offs among impacted natural resources).  Agencies must only

567

identify their preferred alternative, and otherwise may use their discretion to categorize other alternatives as appears prudent in light of the facts.

*Comment*:  Commenters recommended that the definition of "reasonable alternatives" § 1508.1(z) more explicitly exclude consideration of alternatives outside the jurisdiction of an agency.

*CEQ Response*:  CEQ declines to make the requested edit because the NPRM proposed to eliminate the requirement for agencies to evaluate alternatives outside of their jurisdiction.  *See* 40 CFR 1502.14(c).  The definition of reasonable alternatives in the final rule does not include alternatives outside of an agency's jurisdiction.

### 17.    Reasonably Foreseeable (§ 1508.1(aa))

*Comment*:  Commenters supported the new definition of reasonably foreseeable, stating that the term previously lacked a definition, and that this reform would help to focus the analysis by eliminating consideration of strictly speculative effects.

*CEQ Response*:  CEQ acknowledges the support for the new definition, which is included in the final rule as proposed.

*Comment*:  Commenters objected to the definition of reasonably foreseeable, stating that it is inconsistent with NEPA's statutory requirements.  Commenters stated that tort law is a system of determining liability for harm that has already occurred.  By contrast, the fundamental purpose of NEPA and the NEPA process is to predict and prevent harm.  Given those differences, NEPA requires a broader analysis of potential impacts than tort law's post-event analysis of causation.  Imposing tort concepts into NEPA law narrows the agencies' responsibilities and ultimately is likely to lead to the harm to the environment.

*CEQ Response*:  Applying tort law concepts to NEPA is not novel.  The Supreme Court applied tort law concepts in its holdings in *Metropolitan Edison Co.,* 460 U.S. 766 and *Public Citizen*, 541 U.S. 752.

*Comment*:  Commenters stated that the proposed rule sows confusion and fails to discuss what qualifies as a "reasonably foreseeable" effect.  Other commenters supported using the term as applied but requested that it be further clarified because it may produce determinations that are inconsistent or have the appearance of being too subjective. Some commenters recommended specific changes or clarifications, including defining "prudence."

*CEQ Response*:  CEQ declines to make further changes to the definition of reasonably foreseeable.  The term "reasonably foreseeable" is consistent with the ordinary person standard—that is, what a person of ordinary prudence would consider in reaching a decision.

The concept of a person of ordinary prudence is well-established in law and, with respect to NEPA, applied based on the particular facts and circumstances of a proposed action.  *See United States v. Boyle,* 469 U.S. 241, 243 n.1 (1985) ("'A cause for delinquency which appears to a person of ordinary prudence and intelligence as a reasonable cause for delay in filing a return and which clearly negatives willful neglect will be accepted as reasonable.'") (referring to Internal Revenue Manual) (citation omitted); *Watt. v. W. Nuclear, Inc.,* 462 U.S. 36, 58 n.18 (1983) ("a [mineral] deposit is locatable if it is 'of such a character that a person of ordinary prudence would be justified in the further expenditure of his labor and means, with a reasonable prospect of success, in developing a valuable mine.' *Castle v. Womble*, 19 Pub. Lands Dec. 455, 457 (1894).").  Inherent in the application of reasonably foreseeable is the concept that Federal agencies are not required to "foresee the unforeseeable" or "engage in speculative analysis."

Agencies are required to forecast to the extent they can do so either quantitatively or qualitatively within a reasonable range.

*Comment*:  Commenters stated that in the context of tort law the appropriate definition for reasonably foreseeable would specifically reference a "reasonably prudent decision maker" and not an "ordinary person."  In the context of NEPA compliance, the decision maker is an actor with a high level of skills, which would be taken into account when determining whether the duty to discuss impacts is present.  Other commenters stated that utilizing an "ordinary person standard" may be too vague for highly specialized industries and would likely lead to increased litigation risk and requested more deference to agency expertise.  Some commenters felt that, where knowledge is specialized (e.g., Tribal and traditional knowledge), the definition allowed Federal agencies to dismiss it from consideration.

*CEQ Response*:  CEQ acknowledges that prior courts have described the duty of the agency as it pertains to NEPA as determined from the perspective of "a person of ordinary prudence in the position of the decision maker at the time the decision is made."  *Sierra Club v. Marsh,* 769 F.2d 868 (1st Cir. 1985).  However, implicit in the application of this final rule is that agencies would apply their expertise and that decisions would be made in this context.  For that reason, it is not necessary to create a specialized person standard.  CEQ notes as well that in the modern administrative state, agency decision makers have the ability to consult with experts within their agencies.  Further, the final rule directs lead agencies to consult or seek comment from other agencies with special expertise.  *See* §§ 1501.8(a) and 1503.1(a)(1).

*Comment*:  A commenter requested that CEQ incorporate the concept of the precautionary principle into the definition of reasonably foreseeable as a means of handling reasonably foreseeable but uncertain effects.

570

*CEQ Response*:  CEQ declines to make the requested change to the final rule.  There is no legal basis for ascribing a precautionary principle to a person of ordinary prudence.  Further, NEPA is a procedural statute bound by the "rule of reason"; the weighing of the risk of adverse environmental impacts is governed by the applicable legal requirements of a particular proposed action.

*Comment*:  Some commenters requested that CEQ set a limit for what is reasonably foreseeable based on the quality of the data, while others suggested setting a specific time period (e.g., 40 years) for determining what is reasonably foreseeable.

*CEQ Response*:  CEQ declines to make the requested change.  As discussed elsewhere, the application of reasonably foreseeable is influenced by the context of the proposed action.  Certain actions may have reasonably foreseeable impacts that are more distant in time (e.g., disposal of radioactive waste), and therefore would exceed the time limit recommended by the commenter.

*Comment*:  Commenters requested that CEQ incorporate the concept of "reasonable forecasting" and "speculation" into the proposed definition of reasonably foreseeable.  Specifically, commenters requested that CEQ add, "Unreasonable forecasting and speculation is not required."  Other commenters recommended adding "scientifically proven or documented causal relationships."

*CEQ Response*:  CEQ declines to make the requested revisions because they are confusing and potentially inconsistent with the proposed definition.  In stating that "unreasonable forecasting and speculation is not required," the definition could be interpreted to imply that there may be circumstances where unreasonable forecasting and speculation is appropriate.  As

571

noted above, agencies' specialized expertise should inform their determination as to what is "reasonably foreseeable."

*Comment*:  A commenter recommended adding a definition of "reasonably foreseeable action" as an action that:  (i) an entity proposes to take within 1 year of the proposed action's completion date; (ii) has been developed to a level that would enable a reviewing agency to meaningfully describe the action's environmental effects; and (iii) would likely affect the same environmental resources the proposed action would affect.  The commenter further recommended that the definition state that typically, a reasonably foreseeable action is the subject of a NEPA document, or a Federal, State, local or Tribal government permit application.

*CEQ Response*:  CEQ declines to make the recommended changes, in part because actions that are reasonably foreseeable may extend beyond one year into the future.  Under the final rule, agencies have the flexibility to determine actions that are reasonably foreseeable based on the specific circumstances of the proposed action at issue.

### 18.    Referring Agency (§ 1508.1(bb))

*Comment*:  Some commenters recommended that CEQ expand the definition of "referring agency" to include State, Tribal, and local governments.  Some commenters stated that agencies other than the EPA should not be allowed to refer matters to CEQ.

*CEQ Response*:  The final rule does not allow State, Tribal, or local governments to submit pre-decisional referrals to CEQ because there is no statutory basis for doing so.  The pre-decisional referral authority is rooted in section 309 of the Clean Air Act, 42 U.S.C. 7609, which is directed to the EPA.  Other Federal agencies may also submit pre-decisional referrals to CEQ consistent with section 102(2) of NEPA, 42 U.S.C. 4332, which requires the responsible Federal official to consult with and obtain comments from any Federal agency which has jurisdiction by

law or special expertise with respect to any environmental impact involved. States, Tribes, and local governments may continue to submit their views to CEQ as interested agencies or persons for consideration outside of the pre-decisional referral process.

*Comment*: Some commenters recommended that CEQ clarify the definition of "referring agency" to also include "or quality of the human environment."

*CEQ Response*: CEQ declines to adopt this recommendation in the final rule because the phrase is superfluous. The language "public health or welfare or environmental quality" mirrors the language in section 309 of the Clean Air Act, 42 U.S.C. 7609, and sufficiently covers the bases for a pre-decisional referral to CEQ.

### 19.     Special Expertise (§ 1508.1(ee))

*Comment*: Some commenters objected to the definition for the term "special expertise." Other commenters recommended adding "local government" and "economic and social" statutory responsibility.

*CEQ Response*: CEQ declines to make the requested changes because the definition of "special expertise" in 40 CFR 1508.26 has not been a source of confusion for Federal agencies. Further, the changes recommended by the commenters are not necessary to encompass the expertise of local governments and matters pertaining to economic and social issues.

### L.     Comments Regarding CEQ Guidance Documents

*Comment*: Commenters expressed support for provisions to supersede and withdraw previous CEQ NEPA guidance, stating that the "layer cake" of guidance has grown larger than the statute itself to become confusing, unworkable, and inconsistent between Federal agencies.

*CEQ Response*: In the proposed rule, CEQ stated that if adopted as a final rule, it would supersede any previous CEQ NEPA guidance. As discussed in sections II.H.7 and II.K of the

573

final rule, the final rule supersedes previous CEQ guidance and CEQ intends to publish a separate notice in the *Federal Register* listing guidance it is withdrawing. CEQ will issue new guidance, as needed, consistent with the final rule and presidential directives. The final rule also provides that, "[t]o the extent that Council guidance issued prior to [the effective date of the final rule] is in conflict with the [final rule], the provisions of [the final rule] apply." § 1506.7(b).

*Comment*: Commenters objected to the withdrawal of CEQ's guidance documents. Specifically, commenters stated that eliminating all the guidance in one fell swoop, as proposed, would create uncertainty through inefficient implementation across agencies and extensive, costly, and time-consuming litigation. Some commenters recommended that CEQ issue any revised guidance documents or new guidance before agencies revise their NEPA procedures. Other commenters expressed concern with how long it would take to issue new guidance and whether or not CEQ has the staff and capability to do so in a timely manner.

*CEQ Response*: Since issuing its regulations in 1978, CEQ has issued over 30 separate guidance documents to assist agencies in complying with NEPA. While CEQ has sought to provide clarity and direction related to implementation of the regulations and the Act through the issuance of guidance, agencies continue to face implementation challenges. Further, the documentation and timelines for completing environmental reviews can be very lengthy, and the process can be complex and costly.

In the proposed rule, CEQ stated that if adopted as a final rule, it would supersede any previous CEQ NEPA guidance. As discussed in sections II.H.7 and II.K of the final rule, the final rule supersedes previous CEQ guidance and CEQ intends to publish a separate notice in the *Federal Register* listing guidance it is withdrawing. CEQ will issue new guidance, as needed, consistent with the final rule and presidential directives. The final rule also provides that, "[t]o

574

the extent that Council guidance issued prior to [the effective date of the final rule] is in conflict with the [final rule], the provisions of [the final rule] apply." § 1506.7(b). Section 1507.3(a) of the final rule requires agencies to develop or revise proposed agency NEPA procedures to implement the rule no later than one year after the publication of the final rule or nine months after the establishment of an agency.

*Comment*: Commenters recommended that if CEQ promulgated a final rule, CEQ retain some or all of its existing guidance for reference until it can issue updated guidance. Commenters proposed that CEQ retain its Mitigation Guidance and Cumulative Effects Guidance until CEQ establishes new guidance.

*CEQ Response*: It would be confusing and inefficient for agencies to continue to follow guidance that is inconsistent with the final rule based on a different and superseded version of the NEPA regulations. As discussed in sections II.H.7 and II.K of the final rule, the final rule supersedes previous CEQ guidance and CEQ intends to publish a separate notice in the *Federal Register* listing guidance it is withdrawing. CEQ will issue new guidance, as needed, consistent with the final rule and presidential directives. The final rule also provides that, "[t]o the extent that Council guidance issued prior to [the effective date of the final rule] is in conflict with the [final rule], the provisions of [the final rule] apply." § 1506.7(b).

*Comment*: Commenters questioned whether CEQ would revise its Forty Questions, *supra* note 47, noting that scores of NEPA professionals and practitioners rely on it. Other commenters asked what would become of the Forty Questions document generally.

*CEQ Response*: As discussed in sections II.H.7 and II.K of the final rule, the final rule supersedes previous CEQ guidance and CEQ intends to publish a separate notice in the *Federal Register* listing guidance it is withdrawing. CEQ will issue new guidance, as needed, consistent

575

with the final rule and presidential directives.  The final rule also provides that, "[t]o the extent that Council guidance issued prior to [the effective date of the final rule] is in conflict with the [final rule], the provisions of the [final rule] apply."  § 1506.7(b).

*Comment*:  Commenters recommended that existing guidance and agency procedures remain in effect for a reasonable length of time to provide agencies time to conform their own guidance and procedures to the new rule.

*CEQ Response*:  CEQ has addressed the withdrawal of existing guidance in previous responses to comments.  The final rule does not have the effect of withdrawing agency procedures.  Rather, to facilitate needed projects and improvements, agencies must expeditiously review and revise their procedures to conform to the changes made in the final rule. Section 1507.3(a) provides agencies the later of one year after publication of the final rule or nine months after the establishment of an agency to develop or revise proposed agency NEPA procedures to implement the final rule.  This is similar to the amount of time provided under the 1978 regulations.  Additionally, because agency NEPA procedures cannot impose additional procedures or requirements beyond those set forth in the CEQ regulations, it may facilitate a timely revision.

*Comment*:  Commenters expressed their concern with CEQ withdrawing its Environmental Justice (EJ) Guidance and believe that the lack of guidance will create confusion within agencies about whether or how to disclose environmental justice impacts.  Commenters stated that the proposed revisions do not propose to enact any directives concerning environmental justice issues and will likely result in worse environmental justice outcomes should CEQ rescind any guidance assisting agencies with understanding how to disclose

environmental justice impacts.  A commenter stated that, instead of undermining NEPA's analysis of environmental justice, CEQ should codify its environmental justice guidance.

*CEQ Response*:  As discussed in sections II.H.7 and II.K of the final rule, the final rule supersedes previous CEQ guidance and CEQ intends to publish a separate notice in the *Federal Register* listing guidance it is withdrawing.  CEQ will issue new guidance, as needed, consistent with the final rule and presidential directives.  If the EJ Guidance is withdrawn, however, it will not create confusion within the agencies or reduce the quality of analysis under NEPA.  Rather, the final rule continues to ensure review of the major Federal actions that significantly affect the human environment and includes several improvements to facilitate public involvement.  *See, e.g.*, §§ 1501.9, 1503.1, 1503.3, and 1506.6.  Further, the final rule continues to require analysis of significant ecological, aesthetic, historic, cultural, economic, social, and health effects.

*Comment*:  Commenters stated that the elimination of CEQ's Cumulative Effects Guidance is not justified and contrary to years of practice that have been upheld by Federal courts.

*CEQ Response*:  As discussed in sections II.H.7 and II.K of the final rule, the final rule supersedes previous CEQ guidance and CEQ intends to publish a separate notice in the *Federal Register* listing guidance it is withdrawing.  CEQ will issue new guidance, as needed, consistent with the final rule and presidential directives.  It is necessary to withdraw guidance documents that are superseded by the final rule to reduce confusion that could be generated by having guidance documents in effect that conflict with the provisions of the final rule.  As discussed elsewhere, the final rule eliminates the definition of cumulative impact.  Agencies are instead required to analyze all effects that are reasonably foreseeable and that have a reasonably close causal relationship to the proposed action, as per § 1508.1(g).  The final rule also provides that,

577

"[t]o the extent that Council guidance issued prior to [the effective date of the final rule] is in conflict with the [final rule], the provisions of [the final rule] apply."  § 1506.7(b).

*Comment*:  A commenter expressed concern that withdrawing CEQ's guidance on biodiversity will have an adverse impact on species and habitats.

*CEQ Response*:  CEQ will be withdrawing guidance documents that are no longer necessary, and are superseded by the final rule.  It is necessary to withdraw the majority of CEQ's guidance documents to reduce confusion that could be generated by having guidance documents in effect that conflict with the provisions of the final rule.  As described elsewhere, the final rule continues to fully consider ecological impacts including impacts to species and their habitats, provided they satisfy the definition of "effects."  *See* §§ 1501.3(b)(1) and 1508.1(g).  Furthermore, nothing in the final rule alters substantive environmental protections afforded species and their habitats by such laws as the ESA.

*Comment*:  Commenters expressed their support for withdrawing all current CEQ guidance and requested that the public be consulted on what guidance should be reissued or revised.  Some commenters also recommended that any new guidance CEQ issues should be subject to public review and comment.  Some commenters urged that, after final adoption of these revised regulations, CEQ prepare a handbook providing clear guidance to all agencies regarding appropriate implementation.

*CEQ Response*:  CEQ may issue new guidance, as needed, consistent with presidential directives, including E.O. 13891, "Promoting the Rule of Law Through Improved Agency Guidance Documents" which requires a 30–day period of notice and comment for "significant

guidance documents."[106]  The final rule also provides that "[t]o the extent that Council guidance issued prior to [the effective date of the final rule] is in conflict with the [final rule], the provisions of [the final rule] apply."  § 1506.7(b).

*Comment*:  A commenter expressed concern with the withdrawal of CEQ's CE Guidance.

*CEQ Response*:  As discussed in sections II.H.7 and II.K of the final rule, the final rule supersedes previous CEQ guidance and CEQ intends to publish a separate notice in the *Federal Register* listing guidance it is withdrawing.  CEQ will issue new guidance, as needed, consistent with the final rule and presidential directives.  The final rule also provides that, "[t]o the extent that Council guidance issued prior to [the effective date of the final rule] is in conflict with the [final rule], the provisions of [the final rule] apply."  § 1506.7(b).

*Comment*:  One commenter expressed concern with withdrawing all of the guidance and agencies having to train their staff on the new rules.  This commenter also asked what resources the government would provide to offset this unanticipated budgetary cost.

*CEQ Response*:  CEQ acknowledges that agencies and NEPA practitioners will experience near-term administrative costs to train staff on the final rule.  CEQ believes that these near-term costs will be fully offset by an overall lowering of administrative costs as a result of the changes made in the final rule.  Administration budget priorities and congressional budget decision making are beyond the scope of this final rule.

*Comment*:  One commenter expressed their concern that the withdrawal of CEQ's Citizen's Guide would deliberately obstruct the public from providing input.

---

[106] 84 FR 55235, 55237 (Oct. 9, 2019).

*CEQ Response*:  CEQ' Citizen's Guide is not an official guidance document.  CEQ plans

to revise the document to conform to the final rule.  CEQ notes that the final rule enhances

public involvement in several ways, and these improvements would be incorporated into the

revised guide.  *See, e.g.*, §§ 1501.9, 1503.1, 1503.3, and 1506.6.

**M.      Comments Outside the Scope of the Rulemaking**

*Comment*:  Some commenters raised questions about how previously completed NEPA

analyses for specific actions would be conducted differently under the updated CEQ NEPA

regulations.

*CEQ Response*:  CEQ will not speculate on what, if any, different outcomes would have

resulted from agencies applying these updated regulations to the facts of previously completed

NEPA analyses.  Such analyses were conducted by agencies using their experience and expertise

and involve particular facts and circumstances.  In the final rule and this response to comments,

CEQ has provided a detailed discussion of the changes to the prior regulations.

*Comment*:  Commenters requested that CEQ work with Federal agencies and Congress to

modernize several environmental laws including the ESA, Clean Water Act, and Clean Air Act,

suggesting that these laws are the source of delays during NEPA reviews.  A commenter

provided recommendations to reform the Marine Mammal Protection Act to reduce burdens.

*CEQ Response*:  CEQ acknowledges the comments, which are outside the scope of this

rulemaking.  NEPA is a procedural statute and is not an authority through which implementation

of other environmental laws can be modified.

*Comment*:  Commenters referenced several provisions under the 1978 regulations that

CEQ should modify to increase the analysis of immigration activities.  Specifically, commenters

requested that CEQ modify § 1502.4 to specify that Federal actions that result in entry and

580

settlement of foreign nationals in the United States are per se "major Federal actions" subject to programmatic review; amend the definition of "effects" in § 1508.1(g) to include entry and settlement of foreign nationals into the United States; amend the definition of "significantly" in 40 CFR 1508.27 to include actions that result in entry and settlement of foreign nationals in the United States; and amend the tiering requirement in 40 CFR 1508.28 to include entry and settlement of foreign nationals in the United States as requiring a programmatic EIS. Additionally, other commenters recommended that CEQ use NEPA to pressure government agencies to set a sustainable numbers for immigration as well as denying all Federal funds to any State that becomes a "sanctuary" State.

*CEQ Response*:  NEPA is a procedural statute and does not prescribe a specialized process or outcome based on the specific activity that is implicated.  For this reason, CEQ declines to make further changes to address the commenters' concerns.

*Comment*:  Commenters stated that Congress should undertake an initiative to amend NEPA, which would allow for fuller consideration of several issues including changing the definition of environmental "effects" that agencies need to consider and would exclude effects that are remote in time, geographically remote, or the product of a lengthy causal chain. Commenters further stated that such a revision should be considered further in light of the compelling evidence of climate change.  Commenters also stated that while remote effects should probably not be considered in most small or local projects, perhaps they should be considered for major ones.  Another commenter expressed support for the enactment of legislation to reduce the statute of limitations for NEPA actions from six years to two years.

*CEQ Response*:  Recommendations to amend NEPA are outside of the scope of this rulemaking.  The final rule provides that "[e]ffects should generally not be considered if they are

581

remote in time, geographically remote, or the product of a lengthy causal chain." § 1508.1(g)(2).
The remoteness analysis does not change based on the size of the project and whether it is only
local in scope.

*Comment*:  In reference to § 1506.1 commenters stated that, before a NEPA document in
Baker County is produced, the agency should read the Baker County Natural Resources Plan.  If
it is a mining project, the section on mining is quite complete.

*CEQ Response*:  CEQ acknowledges the comment, which is outside of the scope of this
rulemaking.

*Comment*:  Commenters expressed concerns about various Federal agencies and their
management of certain activities under NEPA.  Some commenters stated that Federal agencies
have allowed projects to proceed without performing adequate environmental review or while
environmental reviews are pending.  Examples cited include the wall being constructed along
sections of the United States and Mexico border, exemptions for gathering lines for energy-
related projects, and the Piñon Canyon Maneuver Site.

*CEQ Response:* These comments pertain to past and ongoing reviews of specific Federal
actions and therefore are outside the scope of this rulemaking.  Elsewhere in this Final Rule
Response to Comments document, CEQ has discussed certain statutory exemptions from NEPA,
however, and incorporates those responses here by reference.

*Comment:*  Commenters expressed support for making conforming changes to agency
procedures by BLM and USFS within 12 months of adoption of the final rulemaking, and
requested to participate in the development of agency procedures.

*CEQ Response*:  CEQ notes that updates to agency NEPA procedures are subject to public review and comment under § 1507.3(b).  When BLM and USFS revise their NEPA procedures, that process will entail notice and comment rulemaking pursuant to the APA.

*Comment*:  Commenters stated that CEQ should compile research databases and develop procedures to guide analysis of the most pervasive environmental effects such as climate change and loss of biodiversity.

*CEQ Response*:  CEQ acknowledges the comment.  CEQ may consider compiling additional research relevant to the implementation of NEPA separate from this rulemaking.

*Comment*:  Commenters requested that CEQ provide a detailed discussion of the proposed changes to CEQ's regulations on hunting, trapping, and fishing on Federal lands.

*CEQ Response*:  The final rule, including this Final Rule Response to Comments, explains in considerable detail the changes to the NEPA process and implications for the analysis of environmental impacts.  Further detail will be provided in the NEPA procedures for those agencies with regulatory authority over hunting, trapping, and fishing.

*Comment*:  A commenter expressed support for integrating into the final rule the changes made to the treatment of Federal lands by the John D. Dingell, Jr. Conservation, Management and Recreation Act, Public Law 116-9 (Dingell Act).

*CEQ Response*:  CEQ acknowledges the commenter's support but NEPA is a procedural statute and does not mandate substantive outcomes such as those authorized pursuant to the Dingell Act.

*Comment*:  Commenters recommended that CEQ re-evaluate the changes in the proposed rule after five years to determine if the changes have helped or hindered the NEPA process. Commenters recommended that CEQ establish metrics that can be used to measure

583

improvement.  Commenters stated the data should be comparable across time and agencies and made publicly available.  Recommended metrics included the number and types of NEPA reviews, cost, completion times and document length.  Further, commenters suggested CEQ should work with the EPA to expand the EIS database to include EAs.  Expanding the database could aid long-term analysis of trends.

*CEQ Response*:  CEQ acknowledges that a retrospective review of the final rule would be beneficial.  In § 1502.11(g), the final rule directs agencies to publish the estimated total cost of preparing an EIS, and includes time and page limits that could also be used in future evaluations of the NEPA process.  In the final rule, CEQ also includes a new section (§ 1507.4) directing agencies to make available through agency websites, or by other means, environmental documents, relevant notices, and other relevant information for use by agencies, applicants and interested persons.

*Comment*:  A commenter recommended that CEQ conduct a study to evaluate the interaction between NEPA and other environmental laws and how to eliminate or minimize this duplication.  The commenter also recommended that CEQ take steps to become a clearinghouse for monitoring court decisions that affect procedural aspects of preparing NEPA documents.  Another recommendation was for CEQ to study the interaction between NEPA and similar State laws.  CEQ should take additional steps to reduce costs and clarify its regulations based on the results of the studies.

*CEQ Response*:  CEQ acknowledges the interest in studying and further coordinating authorities across Federal and State environmental laws.  The final rule includes numerous changes to improve coordination and reduce duplication among Federal, State, Tribal, and local laws.

584

*Comment*:  A commenter noted that adaptive management may be well suited for decisions that occur at a large enough scale that flexible future management is possible.  The commenter recommended that CEQ allow for an adaptive management protocol, noting the potential for streamlining the up-front assessment process in exchange for the agency's commitment to establish and monitor for specific metrics sufficient to allow the agency to learn from the implementation of the action and adapt the decision to reflect what is learned.

*CEQ Response*:  CEQ acknowledges the comment and observes that certain proposed actions may be well-suited for adaptive management.  The long-standing practice of tiering enables agencies to streamline the review of certain types of similar actions, and would enable some degree of adaptive management across the similar actions.  Other aspects of adaptive management are more difficult to implement because of the need for regulatory certainty and a predictable process.

*Comment*:  Commenters appreciated the use of a document with tracked changes, which makes reviewing and understanding the proposed changes much easier than prior rulemakings.  Commenters recommended the continued use of the track change approach for all documents amended at the Federal level.

*CEQ Response*:  CEQ acknowledges the comments.

*Comment*:  A commenter recommended that CEQ encourage contemporaneous and efficient preparation and maintenance of administrative records during the NEPA process and associated decision-making for covered actions.  The commenter stated that Federal agencies scramble to compile an administrative record only at the very end of the process or in direct response to oversight or litigation, rather than maintaining a "decision file" throughout the NEPA process.  This reactive approach can result in delayed final decisions, inefficient deployment of

585

agency resources, errors or omissions in the administrative record, and longer litigation.  While some agencies have issued guidance on maintaining a decision file and preparing an administrative record, such guidance is limited, dated, non-uniform, non-binding, and most salient once litigation already exists.  If CEQ is disinclined to prescribe uniform procedures for all Federal agencies, CEQ should consider including, at a minimum, express direction for Federal agencies to:  (1) actively maintain a project file during the NEPA process, rather than only afterward; (2) memorialize key steps and decision points (e.g., in meeting minutes or a memorandum to file); and (3) work with project proponents and cooperating agencies to ensure the completeness of the record.

*CEQ Response*:  CEQ supports the practices recommended by the commenter.  Most agencies have procedures for maintaining administrative records under separate authorities.  CEQ declines to establish additional procedures in the final rule.

*Comment*:  A commenter recommended that the regulations recognize advances in information technology and the potential to address workflows in the NEPA process using tools such as sentiment analysis, text analytics, location intelligence, and cognitive search.  These tools allow agencies to perform tasks they were unable to do efficiently beforehand, such as comment analysis from a wide variety of stakeholders, formulation of alternatives, and monitoring of results.

*CEQ Response*:  CEQ strongly supports the use of information technology, where practicable, to advance the purposes of NEPA.  The final rule in § 1506.6 enhances public involvement by explicitly allowing agencies to use electronic communication to satisfy certain requirements.  In § 1502.23, it also allows agencies to make use of any reliable data sources, such as remotely gathered information or statistical models.

586

*Comment*:  A commenter stated that delays in the NEPA process are often related to data and that improvements in this area would have multiple benefits.  The proposed rule failed to grasp the significance of "data democratization," as exemplified by citizen science.  The commenter stated that agencies should create more efficient methods to import and leverage all external information, including during the NEPA process.

*CEQ Response*:  The final rule includes changes to §§ 1502.21 and 1502.23 concerning the use of information and research, and encourages the use of any reliable data sources in addition to continuing the long-standing requirement to ensure the scientific integrity of environmental documents.

*Comment*:  A commenter recommended that CEQ direct agencies to evaluate the full costs of a proposed action including the diminution of ecosystem services and costs saved as the result of the NEPA process.

*CEQ Response*:  This recommended change is outside the scope of the rulemaking.

*Comment*:  Commenters recommended that CEQ require all baseline assessments of the affected environment to consider the success and status of compensatory mitigation commitments and projects.  One commenter expressed interested in the automated tracking of environmental impacts that incorporates modern geospatial technologies, with information that is discoverable and accessible to all stakeholders.

*CEQ Response*:  Tracking the effectiveness of past mitigation projects and a greater use of technology can assist agencies in understanding environmental impacts.  However, the proposed revision is beyond the scope of this rulemaking.  Where there is available information on the effectiveness of mitigation projects relevant to the proposed action, the agency may consider such information in the analysis of reasonable alternatives.

587

N.      **Comments Regarding the Rulemaking Process**

*Comment*:  A commenter described the process for drafting the 1978 regulations and the praise received by CEQ at that time from participating organizations.  For CEQ's proposed changes, however, the commenter stated that CEQ only went through the motions and had no aim, let alone determination, to secure the buy-in of all affected elements of American society. The commenter stated there was universal opposition of the environmental community and other citizen groups to the proposed rule.  The commenter stated that CEQ only went through pro forma steps of listening and did not hear and act on what has been heard.  The commenter stated that CEQ has contaminated the entire process.

*CEQ Response*:  The process in developing the final rule was not pro forma and involved many more people than the 1978 rulemaking.  For the 1978 rulemaking, CEQ sought the views of 12,000 private organizations, individuals, State and local agencies, and Federal agencies.  In June 1977, CEQ held 3 days of public hearings and heard from 50 witnesses.[107]  Following the hearings, CEQ received 300 completed questionnaires from participating Federal agencies, State governments, and hearing participants.  The proposed rule was published in June 1978 with an approximately 60–day comment period, and CEQ received almost 500 written comments.[108]

For this rulemaking, CEQ conducted a similar but modernized process that reached a far larger number of interested parties and organizations.  In June 2018, CEQ issued an ANPRM requesting comments on potential updates to its NEPA regulations.  CEQ received over 12,500 comments in response to the ANPRM, and those comments informed the development of CEQ's

---

[107] NEPA, EIS Reform, Notice of Request for Views, 42 FR 40756 (Aug. 11, 1977).

[108] 43 FR at 55980.

proposed rule.  Through the benefit of modern technologies, CEQ was able to reach many more

people than in 1978.  The NPRM was informed by the input received on the ANPRM, and

CEQ's experience overseeing implementation of NEPA and working with agencies for more

than 40 years on implementing the regulations.  CEQ published its proposed rule in the *Federal

Register* on January 10, 2020 and provided for a 60–day public comment period.  CEQ circulated

the proposed rule and invitations to comment to all federally recognized Tribes, and over 400

interested parties and groups, including States, localities, environmental organizations, trade

associations, NEPA practitioners, and other members of the public representing a broad range of

diverse views.  CEQ held two public hearings, one in Denver, Colorado, and one in Washington,

DC, each complete with morning, afternoon, and evening sessions.  Approximately 230

individuals representing a wide range of views spoke at the hearings and additional participants

submitted written comments.  In addition to the two public hearings, CEQ also conducted

additional public outreach including meetings with Tribal representatives in Denver, Colorado,

Anchorage, Alaska, and Washington, DC and a meeting with the environmental justice

community as part of a National Environmental Justice Advisory Council meeting in

Jacksonville, Florida.

> In addition, CEQ made information to aid the public's review available on its websites at

www.whitehouse.gov/ceq and www.nepa.gov, including a redline version of the proposed

changes, a presentation on the proposed rule, and other background information.  CEQ received

over 1.1 million comments on the proposed rule.  These comments have been analyzed and CEQ

has responded to all substantive issued raised in the public comments.  In contrast, the 1978

regulations had 11 pages of justification in the final rule.  Further, CEQ has coordinated with all

Federal agencies on both the proposed and final rule under E.O. 12866.  The mere fact

589

commenters disagree with the changes in the final rule is not indicative that CEQ's process was not inclusive.

*Comment*:  Commenters stated that the public process was undermined because CEQ has failed to respond to requests for information pursuant to FOIA.  Commenters stated they were unable to submit fully informed comments.

*CEQ Response*:  The APA requires CEQ to provide sufficient information in the NPRM to enable interested or affected parties to meaningfully comment on the proposed rule, and it has done so.  *See, e.g.*, *Nat'l Lifeline Ass'n v. Fed. Commc'ns Comm'n*, 921 F.3d 1102, 1115 (D.C. Cir. 2019) ("To meet the rulemaking requirements of section 553 of the APA, an agency must provide sufficient factual detail and rationale for the rule to permit interested parties to comment meaningfully.").  CEQ provided sufficient factual detail and rationale in the proposed rule, and, in response to comments on the proposed rule, CEQ has provided additional clarifications and made changes to the final rule.

*Comment*:  Commenters requested that CEQ work with environmental justice communities to host additional public hearings.

*CEQ Response:*  CEQ circulated the proposal and invitations to comment to over 400 interested groups, including States, localities, environmental organizations, trade associations, NEPA practitioners, and other members of the public representing a broad range of diverse views.  Additionally, CEQ staff briefed and received feedback from environmental justice groups at EPA's National Environmental Justice Advisory Council meeting in Jacksonville, Florida on February 27, 2020.

*Comment*:  Commenters stated that CEQ did not explain how the comments received as part of the advance notice of proposed rulemaking were considered, and how and what

comments informed the rulemaking process and came to be part of the NPRM.  Some

commenters stated that CEQ should have conducted a more thorough review process and

meaningfully engaged with the States, other stakeholders, and the public before issuing the

NPRM for public comment.

*CEQ Response*:  In response to the ANPRM, CEQ received over 12,500 comments,

which are available for public review.  Those comments helped inform CEQ's proposal and were

discussed in more detail in section II of the final rule and in section II of the NPRM's preamble.

While some commenters opposed any updates to the current regulations, other commenters

urged CEQ to consider potential revisions.  While the approaches to the update of the NEPA

regulations varied, most of the substantive comments supported some degree of updating of the

current regulations.  Many noted that overly lengthy documents and the time required for the

NEPA process remain real and legitimate concerns despite the NEPA regulations' explicit

direction with respect to reducing paperwork and delays.  In general, numerous commenters

requested that CEQ consider revisions to modernize its regulations, reduce unnecessary burdens

and costs, and make the NEPA process more efficient, effective, and timely.  CEQ did not refer

to the comments in general terms to favor any given perspective on NEPA reform.

*Comment*:  Commenters were concerned with CEQ asserting that the rulemaking was

responding to "commenter requests," yet did not reveal the name(s) of the commenters.  They

feel their comments were being ignored while project proponents and corporate comments were

pursued.

*CEQ Response*:  While some commenters opposed any updates to the current regulations,

other commenters urged CEQ to consider potential revisions.  While the approaches to the

update of the NEPA regulations varied, most of the substantive comments supported some

degree of updating of the current regulations.  Many noted that overly lengthy documents and the

time required for the NEPA process remain real and legitimate concerns, despite the NEPA

regulations' explicit direction with respect to reducing paperwork and delays.  In general,

numerous commenters requested that CEQ consider revisions to modernize its regulations,

reduce unnecessary burdens and costs, and make the NEPA process more efficient, effective, and

timely.  CEQ referred to various commenters without more detail for the purpose of assembling

similar comments together and responding to them as a group for efficiency reasons.

*Comment*:  A commenter recommended that CEQ disregard identical comments that are

the result of highly coordinated internet campaigns.

*CEQ Response*:  CEQ has included all of the comments it has received in response to the

NPRM in the docket on www.regulations.gov.  CEQ has reviewed and responded to all

substantive issues raised in the public comments.  All substantive points made in public

comments have either been responded to individually or, where substantive points were similar

in theme, summarized and responded to as a group of comments.

*Comment*:  Some commenters stated that, if CEQ makes further changes before the final

rule, CEQ should provide a supplemental notice of proposed rulemaking and supplemental

opportunity to comment.

*CEQ Response*:  The changes in the final rule are a logical outgrowth of the proposed

changes in the NPRM.  The 60–day comment period on the NPRM has fully satisfied CEQ's

obligations with respect to the APA.

*Comment*:  Some commenters stated that CEQ should first mail printed letters to all U.S.

citizens, not just to a few national or local media outlets, before announcing the changes in the

final rule.

592

*CEQ Response*:  CEQ declines to mail printed letters to all U.S. citizens, as it is not required by law.  CEQ is publishing the final rule in the *Federal Register* and, with this response to comments, provides a comprehensive explanation of all changes to the 1978 regulations.

*Comment*:  Some commenters stated that the proposed NEPA regulations should meet the requirements of the United Nations Declaration on the Rights of Indigenous Peoples Article 19 which requires States to "consult and cooperate in good faith with the indigenous peoples concerned through their own representative institutions in order to obtain their free, prior and informed consent before adopting and implementing legislative or administrative measures that may affect them."

*CEQ Response*:  CEQ solicited and received extensive input in response to both the ANPRM and NPRM from Tribal governments and organizations and, as explained throughout the final rule, made numerous changes to expand coordination between Federal agencies and Tribes on major Federal actions.

*Comment*:  Commenters stated that Tribes operate as sovereign nations outside of the United States and requested explicit consent or agreement from all federally recognized Tribes. Commenters stated that although the proposed changes have elevated Tribes to the status of cooperating agencies along with State and local governments, their unique status as sovereign nations requiring direct government-to-government consultation is not addressed and the proposed rule fails to reference Tribal sovereignty, self-determination, and Federal agency trust responsibility.

Commenters stated the changes should not be finalized until Tribes have been fully consulted on how the rule will impact Tribal sovereignty and until CEQ considers the full impact the changes will have on Tribal participation and the fiduciary duty to Tribes.  Commenters

593

further stated concern that the proposed changes concerning Tribes may be in violation of

existing treaty law and could have significant impacts to sovereign authority and treaty

resources, and that CEQ is obligated by its general trust duty to refrain from any rulemaking that

would harm or diminish the Tribe's treaty rights, interests, or resources.

*CEQ Response*:  CEQ has expanded consideration of Tribal laws relative to the 1978

regulations by making explicit references throughout the final rule.  The final rule recognizes the

existing sovereign rights, interests, and expertise of Tribes in the provisions for Tribal

participation in the NEPA process.

Further, the final rule continues to require consideration of the impacts to Tribal

resources and trust assets, where applicable.  *See* the response to comments on §§ 1501.3,

1501.8, 1502.16, and 1508.1(g).  As explained elsewhere, CEQ has received meaningful and

timely input from Tribal officials and is in full compliance with E.O. 13175.

## O.    Requests for Extension of the Comment Period

*Comment*:  Commenters suggested that, given the scope and complexity of the regulatory

changes, CEQ did not provide a robust opportunity for public comment and involvement, and the

public input process did not match the scope of the rule.  Commenters requested an extension of

the comment period of varying lengths (e.g., 180 days) in order to more fully evaluate the

impacts of the NPRM.  Some commenters requested that CEQ cease all work on the proposal

and instead engage with States and Tribes, including through government-to-government

consultation, on processes to improve and streamline NEPA in a manner that does not put

environmental protections or species at risk.  A commenter requested that CEQ conduct meetings

and hearings in each of the 10 EPA regions, while another commenter requested that CEQ hold a

594

series of listening sessions or workshops in 8 to 12 geographically distinct locations across the country.

*CEQ Response*:  While not required, in June 2018, CEQ issued an ANPRM requesting comment on potential updates to its NEPA regulations.  CEQ received 12,500 comments as part of the ANPRM, and those comments informed the development of CEQ's proposed rule. Additionally, CEQ published its proposal in the *Federal Register* on January 10, 2020 and provided for a 60–day public comment period, which is consistent with the length of time provided by CEQ when developing the 1978 regulations.  CEQ also held two public hearings, in Denver, Colorado and Washington, DC, each complete with morning, afternoon, and evening sessions.  CEQ also circulated the proposal and invitations to comment to all federally recognized Tribes, and over 400 interested groups, including States, localities, environmental organizations, trade associations, NEPA practitioners, and other members of the public representing a broad range of diverse views.  CEQ made information to aid the public's review available on its websites at www.whitehouse.gov/ceq and www.nepa.gov, including a redline version of the proposed changes, a presentation on the proposed rule, and other background information.

*Comment*:  Commenters stated that CEQ should extend the comment period by 60 days because it created an "alternative comment portal" that was not available to all members of the public.

*CEQ Response*:  CEQ did not offer a private email address or alternative comment portal. The NPRM provided three methods for members of the public to provide comments on the proposed rule—online via www.regulations.gov, by fax, and by mail. The NPRM also included an email address as a contact for further information.  While the NPRM did not list this email

595

address among the methods for the public to provide comments, CEQ received comments through the email address.  CEQ has posted all comments received through the email address to the docket on www.regulations.gov.

*Comment*:  Some commenters expressed their support for the 60–day comment period on the NPRM.

*CEQ Response*:  CEQ acknowledges the support for CEQ's process in developing the final rule.

*Comment*:  To comply with the APA's notice and comment requirements, commenters requested that CEQ extend the comment period by at least 90 days and provide additional public hearings.

*CEQ Response*:  The APA does not specify a minimum time period for public comment on proposed rulemakings.  Section 6(a) of E.O. 12866 provides that most rulemakings "should include a comment period of not less than 60 days."  The 60–day comment period on the NPRM has fully satisfied CEQ's obligations with respect to the APA and E.O. 12866.  *See also*, *Southern Environmental Law Center v. Council on Environmental Quality*, No. 3:18cv113 (W.D. Va. Mar. 19, 2020) (declining to extend the comment period).

*Comment*:  Commenters stated that two public hearings were not sufficient and the speaking opportunities were severely limited at both public hearings and a 60–day comment period on highly technical changes was inadequate.

*CEQ Response*:  To facilitate a professional, structured, and efficient hearing, CEQ made a number of tickets available for both speaking and listening for each of the morning, afternoon, and evening sessions at both public hearings.  CEQ also worked with those wishing to speak and attend on a first-come, first serve basis the day of its hearings.  CEQ also provided comment

596

cards, which were included as part of the docket, at each of the hearings for participants whom

did not have an opportunity to speak.  Additionally, CEQ encouraged interested organizations,

individuals, State, Tribal, and local governments to comment via www.regulations.gov, by mail,

or by fax.  In comparison, in the development of the 1978 regulations, CEQ held three days of

hearings during which it received testimony from 50 witnesses.  CEQ received over 1.1 million

public comments on the proposed rule, suggesting that CEQ's process was more than adequate.

Exhibit 5 to Declaration of Amy Coyle

**Regulatory Impact Analysis for the Final Rule, Update to the Regulations Implementing**

**the Procedural Provisions of the National Environmental Policy Act**

**RIN: 0331-AA03**

**June 30, 2020**

The purpose of the National Environmental Policy Act, 42 U.S.C. 4321 et seq., (NEPA) is to ensure informed decision making by Federal agencies with regard to the potential environmental effects of proposed major Federal actions, and make the public aware of the agency's decision-making process. When effective and well managed, the NEPA process results in more informative documentation, enhanced coordination, resolution of conflicts, and improved environmental outcomes.

Over the past 40 years, the Council on Environmental Quality (CEQ) has issued more than 30 guidance documents to assist Federal agencies in understanding and complying with NEPA and its implementing regulations, 40 CFR parts 1500–1508 ("CEQ regulations" or "NEPA regulations"). Courts also have issued thousands of decisions addressing appropriate implementation and interpretation of NEPA and the CEQ regulations, resulting in a large body of case law interpreting NEPA and the 1978 regulations.[1] Additionally, Presidents have issued directives, and Congress has enacted legislation to reduce delays and expedite the implementation of NEPA and the CEQ regulations, including for transportation, water, and other types of infrastructure projects. Notwithstanding the issuance of guidance, Presidential directives, and legislation, implementation of NEPA and the CEQ regulations can be challenging, and the process can be lengthy, complex, and costly.

The final rule is the first comprehensive update to CEQ's NEPA regulations in over 40 years. It updates, modernizes, and clarifies the regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies in connection with proposals for agency action. The rule will improve interagency coordination in the environmental review process,

---

[1] References to the "1978 regulations" refers to the regulations in 40 CFR parts 1500 through 1508 as they exist before amendment by the final rule.

promote earlier public involvement, increase transparency, and enhance the participation of States, Tribes, and localities.

CEQ expects the impacts of these regulations to be economically significant, given potential cost savings to the Federal government as well as economy-wide impacts that will be catalyzed by this final rule. However, little quantifiable information exists on the costs and benefits of completing NEPA analyses. Agencies do not routinely track the cost of completing NEPA analyses, although the final rule establishes a government-wide requirement to do so for environmental impact statements (EISs). The following provides a largely qualitative summary of the scope and breadth of impacts CEQ anticipates to result from the final rule.

**Time and page lengths**

NEPA requires Federal agencies to evaluate the potential significant environmental effects of major actions they propose to carry out, fund, or approve (*e.g.*, by permit). Agencies prepare an EIS for proposed major Federal actions that would have significant effects on the environment. Based on the Environmental Protection Agency (EPA) weekly Notices of Availability published in the Federal Register between 2010 and 2019, Federal agencies published approximately 176 final EISs per year. For proposals unlikely to have significant effects, the CEQ regulations require a less comprehensive review and agencies prepare an environmental assessment (EA), unless the action is subject to a categorical exclusion (CE) under the agency's NEPA procedures. Agencies do not routinely track the number of EAs or CEs. CEQ has estimated that agencies apply CEs to approximately 100,000 Federal agency actions per year,[2] and prepare over 10,000 EAs per year.[3]

Actions requiring an EIS are a small proportion of all actions, but are typically the most complex and provide the greatest economic benefit and impact to affected communities.

---

[2] *See* Council on Environmental Quality, *The Eleventh and Final Report on the National Environmental Policy Act Status and Progress for American Recovery and Reinvestment Act of 2009 Activities and Projects*, (Nov. 2, 2011), https://ceq.doe.gov/docs/ceq-reports/nov2011/CEQ_ARRA_NEPA_Report_Nov_2011.pdf).
[3] *See* Council on Environmental Quality, *Report on Cooperating Agencies in Implementing the Procedural Requirements of the National Environmental Policy Act (NEPA)*, (Oct. 4, 2016), https://ceq.doe.gov/docs/ceq-reports/Attachment-A-Fourth-Cooperating-Agency-Report_Oct2016.pdf.

According to some estimates, it will cost a total of $4.6 trillion through 2025 to modernize infrastructure nationwide.[4]  Large infrastructure projects frequently require preparation of an EIS, and one estimate found that the cost of a 6–year delay in starting construction on public projects costs the nation over $3.9 trillion, including the cost of prolonged inefficiencies and avoidable pollution.[5]

According to the most recent data,[6] the average (*i.e.*, mean) time to complete an EIS, from notice of intent (NOI) to record of decision (ROD), was 4.5 years and the median was 3.5 years (Figure 1).   One quarter of the EISs took less than 2.2 years, and one quarter took more than 6 years.  The period from publication of an NOI to the notice of availability of the draft EIS took on average 58 percent of the total time.  Preparing the final EIS, including addressing comments received on the draft EIS, took on average 32 percent of the total time.  The period from the final EIS to publication of the ROD took on average 9 percent of the total time (Figure 2).

---

[4] *See* American Society of Civil Engineers, *Infrastructure Report Card: A Comprehensive Assessment of America's Infrastructure*, (2017), https://www.infrastructurereportcard.org/wp-content/uploads/2016/10/2017-Infrastructure-Report-Card.pdf.
[5] *See* Common Good, *Common Good Updates the Cost of US Infrastructure Delays: Costs Have Risen $200 Billion Over Five Years to Nearly $3.9 Trillion*, (May 2018), https://www.commongood.org/wp-content/uploads/2018/05/Two-Years-Update.pdf.
[6] CEQ identified 1,276 EISs completed between 2010 and 2018.  *See* Council on Environmental Quality, *Environmental Impact Statement Timelines (2010–2018)*, (June 12, 2020) ("CEQ EIS Timelines Report"), https://ceq.doe.gov/nepa-practice/eis-timelines.html.



Figure 1. Distribution of EIS completion time (2010–2018).



Figure 2. Average EIS process completion time (2010–2018).

4

The average length of final EISs was 661 pages and the median document length was 447 pages (Figure 3).[7]  One quarter of the final EISs were 286 pages or shorter (*i.e.*, the 25th percentile) and one quarter were 748 pages or longer (*i.e.*, the 75th percentile).  Average page length across all Federal agencies varies considerably by year.



Figure 3. Distribution of final EIS page counts.

---

[7] *See* Council on Environmental Quality, *Length of Environmental Impact Statements (2013-2018),* (2020) ("CEQ Length of EISs Report"), https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Length_Report_2020-6-12.pdf.

| Year | Average FEIS Page Length |
|------|--------------------------|
| 2013 | 563 |
| 2014 | 541 |
| 2015 | 722 |
| 2016 | 694 |
| 2017 | 821 |
| 2018 | 667 |
| Average | 661 |

Table 1. Average final EIS page length (2013–2018)

EAs are generally fewer pages and can cost significantly less to prepare than EISs.  A previous study including the Departments of Agriculture, Energy, and the Interior found the average completion time within each agency for EAs ranged from 1 to 18 months.[8]  Analysis for the application of CEs generally takes only a few days to complete, and CEQ does not require agencies to prepare documentation.  However, some agencies have been reported to create substantial documentation to support a CE determination and take up to six months because of associated consultations, reviews, and other determinations.[9]

**Provision-by-provision analysis of the new regulations**

In the final rule, CEQ makes various revisions to align the regulations with the text of the NEPA statute, including revisions to reflect the procedural nature of NEPA (See Appendix).[10]

---

[8] U.S. Government Accountability Office, *National Environmental Policy Act: Little Information Exists on NEPA Analyses,* GAO-14-370, (Apr. 15, 2014), https://www.gao.gov/assets/670/662543.pdf.
[9] *Id*. at 16.
[10] CEQ does not intend this Regulatory Impact Analysis ("RIA") or the Appendix that follows to affect the meaning of the final rule as adopted.  To the extent there is any inconsistency between the meaning of this RIA or the Appendix and the final rule, the final rule controls.

CEQ also revises the regulations to ensure that environmental documents prepared pursuant to NEPA are concise and serve the purpose of informing decision makers regarding the significant potential environmental effects of proposed major Federal actions and informing the public regarding the agency's pending decision-making process. CEQ makes changes to ensure that the regulations reflect improvements in technology, to increase public participation in the process, and to facilitate the use of existing studies, analyses, and environmental documents prepared by States, Tribes, and local governments and agencies.

CEQ also makes its regulations consistent with the One Federal Decision policy ("OFD policy") established by E.O. 13807, Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects, for multi-agency review and related permitting and other authorization decisions. The E.O. specifically instructed CEQ to take steps to ensure optimal interagency coordination, including through a concurrent, synchronized, timely, and efficient process for environmental reviews and authorization decisions. To promote improved interagency coordination and more timely and efficient reviews, CEQ codifies and generally applies a number of key elements from the OFD policy in the final rule. These include development by the lead agency of a joint schedule, procedures to resolve delays or disputes, preparation of a single EIS and joint ROD to the extent practicable, and a two-year goal for completion of environmental reviews. Consistent with section 104 of NEPA (42 U.S.C. 4334), codification of these policies will not limit or affect the authority or legal responsibilities of agencies under other statutory mandates that may be covered by joint schedules, and CEQ includes language to that effect in § 1500.6 of the final rule.

CEQ also clarifies the process and documentation required for complying with NEPA by amending part 1501 to add sections on threshold considerations, determination of the appropriate level of NEPA review, and the application of CEs; revising sections in part 1501 on EAs and findings of no significant impacts (FONSI), and EISs in part 1502. CEQ further revises the regulations to promote more efficient and timely environmental reviews, including revisions to promote interagency coordination by amending sections of parts 1500, 1501, 1506, and 1507 including their relation to exhaustion, lead, cooperating, and participating agencies, timing of agency action, scoping, and agency NEPA procedures. To promote a more efficient and timely NEPA process, CEQ amends provisions in parts 1501, 1506, and 1507 relating to applying

NEPA early in the process, scoping, tiering, adoption, use of current technologies, and avoiding duplication of State, Tribal, and local environmental reviews. It also revises parts 1501 and 1502 to provide for presumptive time and page limits, and amends part 1508 to clarify the definitions.

**Baseline for the analysis**

Several of the changes made in the final rule codify long-standing agency practices and case law that have developed since CEQ issued the 1978 regulations. Practices based on long-standing guidance and case law would be included in the baseline for the rule; therefore, their codification would have marginal cost savings. Similarly, changes that clarify or otherwise improve the ability to interpret and implement the regulations would have little to no quantifiable impact. In evaluating the economic and environmental impacts, CEQ considered the NEPA statute and Supreme Court case law, and the 1978 regulations.

**Administrative cost savings for the Federal Government**

The revisions to CEQ's regulations are anticipated to significantly lower administrative costs because of changes to reduce unnecessary paperwork, improve coordination and management, and focus less on non-significant impacts. The cost of an EIS is highly variable and may be skewed by expensive outliers. In 2003, a CEQ Task Force found that EISs typically cost between $250,000 and $2 million.[11] If CEQ's new regulations shorten the time to complete an EIS, as expected, Federal agencies should incur substantial cost savings. The final rule establishes presumptive time and page limits to complete an EIS within 2 years and 150 pages, in most cases, including numerous efficiencies to achieve those limits. For example, of the 1,276 EISs completed from 2010 through 2018, the median EIS completion time was 3.5 years and only 257 EISs were completed in 2 years or less.[12] Based on the efficiencies and presumptive time limit for EISs in the final rule, the length of time to complete the 1019 EISs that took longer than 2 years could be reduced by 58 percent, assuming a 2–year completion time for all of those actions. Applying this potential time savings to the total administrative cost to

---

[11] *See* The NEPA Task Force, *Report to The Council on Environmental Quality, Modernizing NEPA Implementation* (Sept. 2003), https://ceq.doe.gov/docs/ceq-publications/report/finalreport.pdf.
[12] *See* Council on Environmental Quality, *EIS Timeline Data Excel Workbook*, (June 12, 2020), https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timeline_Data_2020-6-12.xlsx.

prepare those EISs taking in excess of 2 years could result in roughly $744 million over the 9–year time period for an annualized savings of roughly $83 million (2016 adjusted dollars).[13] The amount of time required to prepare an EIS does not necessarily correlate with the total cost. However, for those EISs taking over two years to prepare, comparing the anticipated time savings with the respective administrative costs provides insight into the potential cost savings that an agency may generate under the final rule.

## Indirect benefits to the economy

Time savings resulting from a more efficient and predictable NEPA process is expected to generate cost savings for non-Federal project sponsors. Delays will require additional resources to sustain projects and are especially impactful to those that are capital intensive with high upfront costs. Uncertainties will likely compound the effects of delays as well as create doubts on the expected returns from projects. Severe uncertainties may even result in reduction in future projects that will likely require EISs. Estimating the cost of delay requires analyses that can account for the diverse nature of projects, and detailed case studies may not be widely applicable. Building representative models may also be difficult due to the heterogeneous nature of capital projects. Delays may result in higher planning and design costs, changes in the option value of the project as well as higher construction costs. Anecdotally, one estimate found that the cost of a six-year delay in infrastructure projects across the electricity transmission, power generation, inland waterways, roads and bridges, rail, and water (both drinking and wastewater) sectors is $3.7 trillion,[14] which was subsequently updated to $3.9 trillion in 2018.[15]

The economics literature has spent a considerable time examining the effect of uncertainty on investment. If investment is highly irreversible, regulatory uncertainties would negatively affect investment. Conversely, if investment is largely reversible, regulatory

---

[13] This calculation uses the mid-point of the $250,000 to $2 million cost range found in the NEPA Task Force report adjusted to 2016 dollars ($1.26 million) and assumes a 58 percent reduction in costs for those EISs taking longer than 2 years. The NEPA Task Force, *supra*, note 11. This number is consistent with the cost data from the Department of Energy, which found a median EIS cost of $1.4 million. U.S. Government Accountability Office, *supra*, note 8.

[14] Philip K. Howard, Common Good, *Two Years Not Ten Years: Redesigning Infrastructure Approvals,* (2017), https://www.commongood.org/wp-content/uploads/2017/07/2YearsNot10Years.pdf.

[15] Common Good, *supra*, note 5.

uncertainties may not have significant effect.[16]  Investments that may require extensive environmental impact assessment may be skewed towards ones that are more irreversible than reversible.  Bloom et al. state "uncertainty increases real option values making firms more cautious when investing or disinvesting."[17]  They find that reducing uncertainty from the 75th percentile to the 25th percentile doubles the increase in investment.

**Environmental impacts**

NEPA is a procedural statute requiring agencies to disclose and consider potential environmental effects in their decision-making processes and inform the public.  The final rule does not alter any substantive environmental law or regulation such as the Clean Air Act, the Clean Water Act, or the Endangered Species Act.  Although some may view the changes in the final rule as reducing the number or scope of analyses, CEQ has determined that, using a baseline of the statutory requirements of NEPA and Supreme Court case law, there are no adverse environmental impacts (see Appendix).  The summary table identifies a small number of changes that result in certain Federal activities no longer being subject to NEPA.  CEQ has determined in the final rule that neither farm ownership and operating loan guarantees by the Farm Service Agency (FSA) pursuant to 7 U.S.C. 1925 and 1941 through 1949 and business loan guarantees by the Small Business Administration (SBA) pursuant to 15 U.S.C. 636(a), 636(m), and 695 through 697g meet the criteria for being a major Federal action.  Under current practice, FSA prepares an EA before approving a loan guarantee.  However, FSA loan guarantees require adherence to certain environmental statutes independent of NEPA.  These impose restrictions on the use of highly erodible land and wetlands for the term of the loan guarantee.  *See* Food Security Act of 1985, as amended, and section 363 of the Consolidated Farm and Rural Development Act (16 U.S.C. 3811 and 3821 and 7 U.S.C. 2006e).  FSA sets out these statutory requirements in its loan guarantee regulations by stating:  "[l]oans may not be made for any purpose which contributes to excessive erosion of highly erodible land or to the conversion of wetlands to produce an agricultural commodity."  *See* 7 CFR 762.121(d).  These conditions are part of the baseline for determining impacts under E.O. 12866 and, because their application is

_____

[16] Dixit, Avinash K., and Robert S. Pindyck, *Investment under Uncertainty* (1994).
[17] Bloom, Nick, Stephen Bond, and John van Reenen, *Uncertainty and Investment Dynamics*, 74 Review of Econ. Stud. 391-415. (Apr. 2007).

not affected by NEPA, the changes in the final rule are not anticipated to have environmental impacts.

SBA has developed a categorical exclusion for its business loans and guarantees program for loans of less than $300,000, reflecting the fact that SBA has determined the entire category of actions does not have a significant effect on the environment.[18]  Given that SBA's business loan guarantee program does not have a significant environmental effect, CEQ's determination to exclude these programs is not anticipated to have an environmental impact under E.O. 12866.

A small number of activities may no longer be reviewed under NEPA by incorporating the Supreme Court presumption against extraterritorial actions.  Whether NEPA may apply to a proposed action with effects exclusively in the U.S. Exclusive Economic Zone will depend upon the nature of the action, the relevant statutes, and other factors specific to the proposed action. Regardless of whether NEPA applies, E.O. 12114, Environmental Effects Abroad of Major Federal Actions, 44 FR 1957 (Jan. 4, 1979), which is based on independent authority, continues to apply and is part of the baseline under E.O. 12866.

Further, CEQ anticipates that a better coordinated NEPA process will improve environmental collaboration and conflict resolution (ECCR). ECCR has been demonstrated to produce more creative and durable solutions, while lowering the frequency of litigation and attendant costs.[19]

---

[18] SBA, SOP 90 57, National Environmental Policy Act (1980), https://www.sba.gov/document/sop-90-57-national-environmental-policy-act.

[19] Environmental Collaboration and Conflict Resolution (ECCR):  Enhancing Agency Efficiency and Making Government Accountable to the People. Federal Forum on Environmental Collaboration and Conflict Resolution. May 2, 2018.

**Appendix: Summary of Economic and Environmental Impacts**

| Section Number | Section Name | Description of Changes in Final Rule | Impact of Changes |
|---|---|---|---|
| | | **PART 1500—PURPOSE AND POLICY** | |
| 1500.1 | Purpose and policy | Clarifies that NEPA is a procedural statute and generally describes the intent of the regulations. | Supreme Court case law has established that NEPA is a procedural statute and does not mandate particular results or substantive outcomes. CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1500.2 | [Reserved] | Deletes this section, formerly titled "Policy," as duplicative of subsequent sections. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1500.3 | NEPA compliance | Adds language related to judicial review on matters including exhaustion, timing of judicial review on final agency decisions, legal remedies for failure to comply, and severability. | The changes clarify CEQ's intention regarding application of judicial review. The courts will determine their economic or environmental impacts in many respects. CEQ expects the exhaustion requirement to reduce the litigation costs that NEPA generates. |
| 1500.4 | Reducing paperwork | Technical changes, including conforming edits to cross-referenced sections. | Reduced paperwork will catalyze economic benefits. CEQ does not anticipate the changes to result in environmental impacts. |
| 1500.5 | Reducing delay | Technical changes, including conforming edits to cross-referenced sections. | Reduced delay will catalyze economic benefits. CEQ does not anticipate the changes to result in environmental impacts. |
| 1500.6 | Agency authority | Adds a savings clause to clarify that the CEQ regulations do not limit an agency's other authorities or legal responsibilities, and cross-references § 1501.1. | The changes are clarifying in nature and therefore CEQ does not anticipate them to result in either economic or environmental impacts. |

| PART 1501—NEPA AND AGENCY PLANNING | | | |
|---|---|---|---|
| 1501.1 | NEPA thresholds | Establishes the determinations an agency should make in assessing whether NEPA applies or is otherwise fulfilled, including whether the proposed activity or decision is expressly exempt from NEPA; whether compliance with NEPA clearly and fundamentally conflicts with the requirements of another statute or is inconsistent with Congressional intent; whether the proposed activity or decision is a major Federal action; whether the proposed activity or decision is, in whole or in part, non-discretionary where the agency lacks authority to consider environmental effects; and whether the proposed activity or decision is an action for which another statute's requirements serve the function of compliance with NEPA. | The changes follow case law and current practice, and therefore CEQ does not anticipate them to have economic or environmental impacts. See related changes at § 1507.3 for impacts related to agency procedures that address threshold NEPA determinations and at § 1508.1(q) for impacts related to the definition of a major Federal action. |
| 1501.2 | Apply NEPA early in the process | Changes "shall integrate" to "should integrate" and "possible" to "reasonable." CEQ proposes these changes to clarify that agencies have discretion to structure their NEPA processes in accordance with the rule of reason. Clarifies that agencies should consider economic and technical analyses along with environmental effects. Changes "State and local agencies and Indian tribes" to "State, Tribal, and local governments" consistent with applicable Executive orders. | Applying NEPA earlier in the process or otherwise in a manner more aligned with agency processes will improve the timeliness of analyses and thus catalyze associated economic benefits. CEQ does not anticipate the changes to result in environmental impacts. |
| 1501.3 | Determine the appropriate level of NEPA review | Clarifies the decisional framework by which agencies should assess the proposed actions and select the appropriate level of review. Simplifies | The new section captures all of the proper and efficient elements from the former definition of "significantly." The final rule |

| | | and clarifies the operative language in the former definition of "significantly." Changes "context" to "potentially affected environment" and "intensity" to "degree" to provide greater clarity as to what agencies should consider in assessing potential significant effects. Significance would consider proposed actions that violate Federal, State, Tribal, or local environmental laws but not merely actions that "threaten a violation." Compared to the 1978 regulations, the section omits those effects that are highly controversial; highly uncertain or involve unique or unknown risks; or may establish a precedent for future actions with significant effects or represents a decision in principle about a future consideration. | includes consideration of connected actions, the affected area including its resources, and applies the definition of effects (i.e., ecological, aesthetic, historic, cultural, economic, social, and health impacts). None of the omitted elements are informative. Agencies will consider effects that are highly uncertain or involve unique or unknown risks to the extent they fall within the definition of effects. Effects that "threaten a violation" may be more inclusive than effects that violate environmental laws, potentially changing the level of review under NEPA but not the applicability of any of the environmental laws. CEQ anticipates the changes in the final rule to be easier for agencies to implement in a consistent manner, and thus carry economic benefits, but does not anticipate them to result in environmental impacts. See § 1508.1(g) for impacts concerning the definition of effects. |
|---|---|---|---|

| 1501.4 | Categorical exclusions | Clarifies the process that agencies follow in applying a CE, including consolidating and reordering existing requirements. Retains the requirement for consideration of extraordinary circumstances once an agency determines that a CE covers a proposed action. Provides that, when extraordinary circumstances are present, agencies may consider whether circumstances that lessen the impact are sufficient to allow the proposed action to be categorically excluded. Strikes "individually or cumulatively." | The language is largely consistent with the requirements previously at 40 CFR 1508.4. By clarifying that agencies may consider circumstances that lessen the impact of an extraordinary circumstance, there could be greater use of CEs in those agencies where this is not already standard practice. Increased use of CEs would lower administrative costs and accelerate the review of proposed actions and thus provide economic benefits. CEQ anticipates that it will be easier for agencies to implement the changes in a consistent manner, and does not anticipate them to result in environmental impacts. See § 1501.8(g) for information related to the definition of effects or impacts. |
| --- | --- | --- | --- |
| 1501.5 | Environmental assessments | Consolidates requirements to improve readability. Establishes a presumptive 75–page limit for EAs, but allows a senior agency official to approve a higher page limit. Clarifies that agencies may also apply to EAs certain provisions in part 1502 regarding incomplete or unavailable information, methodology and scientific accuracy, and coordination of environmental review and consultation requirements. | A presumptive page limit may improve the timeliness of EAs and reduce associated administrative burden and the project proponent's costs. CEQ notes that the limit of 75 pages is longer than CEQ's prior guidance on length of EAs of 10 to 15 pages; however, agencies have frequently exceeded that guidance. CEQ does not expect the changes to have environmental impacts. See §§ 1502.21, 1502.23, and 1502.24 for corresponding impacts. |

| 1501.6 | Findings of no significant impact | Consolidates requirements to improve readability, clarifies that an agency must include the authorities for any mitigation adopted and any monitoring or enforcement, and codifies the practice of mitigated FONSIs. | The mitigated FONSI is consistent with agency guidance and practice.  Consistent with the 1978 regulations, mitigation may be adopted to achieve a finding of no significant impact where there are means and legal authority.  CEQ does not anticipate the changes to result in either economic or environmental impacts. |
|--------|------------------|-----------------------------------------------------------------------|-----------------------------------------------------------------|
| 1501.7 | Lead agencies | Clarifies the roles of lead and cooperating agencies to improve the efficiency and outcomes of the NEPA process for EISs and complex EAs.  Adds a requirement that Federal agencies evaluate proposals involving multiple Federal agencies in a single EIS and issue a joint ROD or single EA and joint FONSI when practicable.  Clarifies that the lead agency is responsible for determining the purpose and need and alternatives in consultation with any cooperating agencies.  Requires development and adherence to a schedule for the environmental reviews and any authorizations required for a proposed action, and resolution of any disputes and other issues that may cause delays in the schedule.  In paragraph (h)(2), deletes "consistent with its responsibility as lead agency." | CEQ expects the changes to improve coordination and environmental outcomes, thereby reducing administrative cost and litigation.  The provisions are consistent with current practices that agencies have adopted pursuant to various statutes and guidance, including 23 U.S.C. 139, FAST–41, and E.O. 13807.  The clarification to paragraph (h)(2) may increase use of environmental analyses from cooperating agencies.  CEQ does not anticipate the changes to result in environmental impacts. |
| 1501.8 | Cooperating agencies | Codifies practice that lead agencies may invite Tribal agencies to serve as cooperating agencies.  Allows a Federal agency to appeal to CEQ when a lead agency denies a request to serve as cooperating agency.  Directs cooperating agencies to jointly issue environmental documents with the lead agency to the maximum | CEQ expects the changes to improve interagency coordination, thereby reducing administrative cost and catalyzing both economic and environmental benefits. |

| | | extent practicable. Makes additional technical clarifications. | |
|---|---|---|---|
| 1501.9 | Scoping | Allows agencies to begin the scoping process as soon as the proposed action is sufficiently developed for meaningful agency consideration. Consolidates, reorganizes, and clarifies all of the requirements for the NOI and the scoping process. Provides agencies additional flexibility in how to reach interested or affected parties in the scoping process. Provides a list of what agencies must include in a NOI to standardize the NOI format. Strikes the paragraphs on "similar actions" and "cumulative actions." | CEQ expects the changes to produce more timely reviews and thereby reduce administrative costs by proactively soliciting comments on alternatives, impacts, and relevant information. The requirements to review connected actions, include in the baseline reasonably foreseeable environmental trends and planned actions (§ 1502.15), and the definition of effects § 1508.1(g) will provide adequate guidance on scoping. CEQ does not anticipate environmental impacts. |
| 1501.10 | Time limits | Establishes presumptive time limits of 1 year for an EA and 2 years for an EIS, with any extensions conditioned on approval by a senior agency official, who may consider a number of factors in determining time limits, and who may set time limits for certain constituent parts of the NEPA process. | CEQ expects the changes to produce more timely reviews and thereby reduce administrative costs. The flexibility for a senior agency official to extend the deadline will ensure that agencies comply with all other requirements. CEQ does not anticipate environmental impacts. |
| 1501.11 | Tiering | Technical edits to clarify the process for tiering EISs and EAs. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1501.12 | Incorporation by reference | Technical changes. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| | **PART 1502—ENVIRONMENTAL IMPACT STATEMENT** | | |
| 1502.1 | Purpose of environmental impact statement | Clarifies that the purpose of an EIS is to inform agency decision making and the public. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |

| 1502.2 | Implementation | Technical changes. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
|---|---|---|---|
| 1502.3 | Statutory requirements for statements | Technical changes. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1502.4 | Major Federal actions requiring the preparation of environmental impact statements | Clarifies that agencies must evaluate related proposals or parts of proposals in a single EIS. Reinforces that agencies may tier their analyses such that specific program elements are analyzed when ripe for final agency action. | To the extent the language increases the efficiency of tiering, it may reduce administrative costs. CEQ does not anticipate environmental impacts. |
| 1502.5 | Timing | Increases flexibility for agencies regarding when to commence preparation of an EIS. | CEQ does not anticipate the changes to result in environmental impacts or more than incidental economic benefits. |
| 1502.6 | Interdisciplinary preparation | Technical changes. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1502.7 | Page limits | Establishes page limits of 150 pages for an EIS and 300 pages if the EIS is of unusual scope or complexity, unless a senior agency official approves a higher page limit. | CEQ anticipates the change to reduce administrative costs. The flexibility for a senior agency official to extend the page limit is intended to ensure that agencies have flexibility where necessary due to the unusual scope or complexity, or need flexibility to comply with all other requirements. CEQ does not anticipate environmental impacts. |
| 1502.8 | Writing | No change | N/A |
| 1502.9 | Draft, final, and supplemental statements | Clarifications to improve readability. Clarifies that agencies may determine that supplemental analysis is not necessary when the changes to the proposed action or new circumstances or information are not significant, and that agencies should document such finding. | To the extent that the number of unnecessary supplemental analyses is reduced, the changes will lower administrative costs. CEQ does not anticipate environmental impacts. |

| 1502.10 | Recommended format | Increases flexibility in formatting an EIS given that most EISs are prepared and distributed electronically. Eliminates the requirement to have a list of agencies, organizations and persons to whom copies of the EIS are sent since EISs are published online. | Minor reduction in administrative costs. CEQ does not anticipate environmental impacts. |
|---|---|---|---|
| 1502.11 | Cover | Removes the requirement to reference a "sheet" and adds a requirement to include the estimated cost of preparing the draft and final EIS, including the costs of agency full-time equivalent personnel hours, contractor costs, and other direct costs. In addition, agencies should include costs incurred by cooperating and participating agencies, applicants, and contractors as practicable or noted where not practicable. | CEQ anticipates providing information on costs will increase transparency concerning the cost of the NEPA process to the Federal Government. CEQ does not expect environmental impacts. |
| 1502.12 | Summary | Technical changes. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1502.13 | Purpose and need | Clarifies that agencies should base the purpose and need of the EIS on consideration of the relevant statutory authority and the goals of the applicant, where applicable. It strikes "to which the agency is responding in proposing the alternatives including" in order to clarify this section and focus on the proposed action. | Increased focus on the purpose and need of the proposed action and reasonable alternatives may improve the quality of analysis and timeliness of review, both reducing administrative costs while improving environmental outcomes. |

19

| 1502.14 | Alternatives including the proposed action | Simplifies and clarifies the language, and aligns with the format of related provisions at part 1502. Deletes "all" before "reasonable alternatives." Strikes the requirement to include alternatives not within the jurisdiction of the lead agency. Directs agencies to limit consideration to a reasonable number of alternatives. | Agencies may continue to apply the rule of reason in determining the number of reasonable alternatives it analyzes, as well as alternatives under other agencies' authorities where necessary for the decision-making process. CEQ anticipates the changes will reduce administrative burden and improve environmental outcomes through greater focus on analyzing feasible alternatives. |
|---|---|---|---|
| 1502.15 | Affected environment | Explicitly allows combination of the sections on affected environment and environmental consequences. Clarifies that the affected environment includes reasonably foreseeable environmental trends and planned actions in the area(s). | Some agencies currently combine these two sections. To the extent more agencies adopt this change, it may reduce administrative burden. Inclusion of the reasonably foreseeable environmental trends and planned actions ensures that agencies consider predictable, underlying socio-economic and environmental trends when evaluating effects. CEQ does not anticipate environmental impacts as a result of the change. |
| 1502.16 | Environmental consequences | Adds a discussion of economic and technical considerations, including economic benefits, of the proposed action, as applicable. Removes references to direct and indirect effects. Moves the operative language that addresses when agencies need to consider economic and social effects from the definition of human environment to this section. | Agencies will continue to consider economic and social effects when interrelated with the environmental effects of the proposed action, consistent with current practice. See § 1501.8(g) for information related to the definition of effects or impacts. |

| 1502.17 | Summary of submitted alternatives, information, and analyses | Adds a summary of all alternatives, information, and analyses submitted by State, Tribal, and local governments and other public commenters for consideration by the lead and cooperating agencies in both the draft and final EIS. Requires agencies to append to the draft EIS or otherwise publish all comments or summaries thereof received during the scoping process and invites comment on the summary of all alternatives, information, and analyses. | CEQ anticipates the addition of a summary will result in a small increase in administrative burden. Publishing comments received is consistent with current agency practice. CEQ does not anticipate environmental impacts. |
|---|---|---|---|
| 1502.18 | List of preparers | Technical changes. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1502.19 | Appendix | Requires agencies to append to the draft EIS or publish all comments or summaries thereof received during the scoping process. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1502.20 | Publication of the environmental impact statement | Eliminates the option to circulate a summary of the EIS to reflect current practice of publishing EISs electronically. Removes an obsolete requirement to extend the deadline by 15 days if the agency circulates the summary. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |

21

| 1502.21 | Incomplete or unavailable information | Adds "but available" to paragraph (b) to distinguish incomplete information, which is the subject of the paragraph, from unavailable information. Replaces "exorbitant" with "unreasonable," in reference to the overall costs of obtaining information that is essential to a reasoned choice among alternatives. | The word "unreasonable" is more consistent with how agencies have interpreted the terminology in practice. Agencies were never required to obtain unavailable information, so the clarification of adding "but available," does not change how agencies have been implementing the provision. For this reason, any impacts on a specific environmental review are uncertain, and CEQ does not anticipate the changes to have environmental impacts. See § 1502.23. |
| --- | --- | --- | --- |
| 1502.22 | Cost-benefit analysis | Technical changes. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1502.23 | Methodology and scientific accuracy | Directs agencies to use reliable existing data and resources. States that agencies are not required to undertake new research to inform analyses, and clarifies that the language is not intended to prohibit compliance with other statutes pertaining to scientific and technical research. | Section 1502.21 maintains the requirement from the 1978 regulations to include certain information that is essential, with a minor change eliminating reference to costs not being "unreasonable." The requirement at 40 CFR 1502.22(a) did not apply to unavailable information, which would necessitate the conduct of new research. Agencies may nonetheless conduct new research under other authorities and at their own discretion. For these reasons, the clarifying language regarding new research is not anticipated to result in either economic or environmental impacts. See § 1502.21. |
| 1502.24 | Environmental review and consultation requirements | Technical changes. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |

| PART 1503—COMMENTING ON ENVIRONMENTAL IMPACT STATEMENTS | | | |
|---|---|---|---|
| 1503.1 | Inviting comments and requesting information and analyses | Encourages agencies to use electronic communication to publish documents and structure public participation and make the comment process accessible to affected persons. | CEQ anticipates increased usage of electronic communication to reduce administrative burden and increase public participation. CEQ does not anticipate the changes to have environmental impacts. |
| 1503.2 | Duty to comment | Technical changes. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1503.3 | Specificity of comments and information | Adds direction for public comments to ensure they promote informed decision making.  Adds requirement that all comments and objections to § 1502.17 must be raised within the comment period on the draft EIS, consistent with § 1506.11 or § 1503.1(b) (if applicable). Adds the requirement that, should an agency request comments on the final EIS, all comments and objections must be raised within the comment period, consistent with § 1503.1(b). Comments not provided within the comment period(s) are considered unexhausted and forfeited, consistent with § 1500.3(b). | To the extent the changes improve the specificity of public comments, it may improve environmental outcomes.  See § 1500.3(b) for impacts related to NEPA compliance. |

| 1503.4 | Response to comments | Simplifies and clarifies that agencies must consider substantive comments that are timely submitted during the public comment period, and that agencies may respond to comments either individually or collectively.  Clarifies that agencies must append substantive comments or summaries thereof to the EIS. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
|---|---|---|---|
| **PART 1504—PRE-DECISIONAL REFERRALS TO THE COUNCIL OF PROPOSED FEDERAL ACTIONS DETERMINED TO BE ENVIRONMENTALLY UNSATISFACTORY** | | | |
| 1504.1 | Purpose | Technical changes. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1504.2 | Criteria for referral | Changes the timing of referrals to CEQ from "possible" to "practicable."  Adds economic and technical considerations to the list of factors that an agency should weigh.  Though infrequent, adds a referral process for EAs. | CEQ does not anticipate the changes to result in either economic or environmental impacts. As a matter of practice, agency referrals to CEQ are rare.  Consideration of economic and technical factors is consistent with the statute. |
| 1504.3 | Procedure for referrals and response | Makes technical clarifications to the referral process.  Eliminates the requirement that the referral letter request no action on implementation until the CEQ acts.  Clarifies that the referral process is not intended to create any private rights of action or to be judicially reviewable because any resolutions do not represent final agency action. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| **PART 1505—NEPA AND AGENCY DECISION MAKING** | | | |
| 1505.1 | [Reserved] | Section moved to § 1507.3(b). | See § 1507.3(b) for information on impacts. |

| 1505.2 | Record of decision in cases requiring environmental impact statements | Requires that agencies "timely publish" the ROD or joint ROD. Adds a requirement for the decision maker to certify he or she has considered all submitted alternatives, information, and analyses. States that this certification is entitled to a presumption that all such information was considered. | The certification is anticipated to result in a minor increase in administrative burden. CEQ does not anticipate any of the changes to result in environmental impacts. |
| --- | --- | --- | --- |
| 1505.3 | Implementing the decision | Technical changes. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| **PART 1506—OTHER REQUIREMENTS OF NEPA** | | | |
| 1506.1 | Limitations on actions during NEPA process | Codifies the limitation on the types of actions that may be undertaken before completion of EAs, in addition to EISs. Expressly mentions several activities (e.g., acquisition of interests in land) that an agency may authorize an applicant to undertake to support an application for Federal, State, Tribal or local permits or assistance. | The planning for certain proposed projects may be accelerated, thereby producing economic benefits. However, certain limitations from the 1978 regulations remain. For this reason, CEQ does not anticipate environmental impacts. |
| 1506.2 | Elimination of duplication with State, Tribal, and local procedures | Adds "Tribal" throughout the section. Replaces "possible" with "practicable" throughout the section. Replaces "shall" with "may," providing Federal agencies with the discretion to cooperate in fulfilling State, Tribal, and local government requirements while also allowing broad use of studies, analyses, and decisions developed by non-Federal agencies. Clarifies that agencies are not required to reconcile any inconsistences with any approved State, Tribal, or local plan or law. | Any elimination of duplication produces at least ancillary economic benefits. However, as a matter of practice, agencies already cooperate with State, Tribal, and local governmental on non-Federal environmental documents to the fullest extent practicable. CEQ does not anticipate the changes to result in environmental impacts. |
| 1506.3 | Adoption | Expands adoption to EAs, or portions thereof, and CE determinations. Technical changes to | CEQ anticipates the changes to reduce administrative cost through shared use of EAs |

| | | substitute "publish" for "circulate" to reflect use of electronic communication. Adoption may occur when the proposed action is substantially the same and the environmental effects will also be similar. | and CE determinations among agencies where the proposed action is substantially the same. When the proposed action is substantially the same, the environmental effects will also be similar. Therefore, CEQ does not anticipate environmental impacts as a result of the changes. |
|---|---|---|---|
| 1506.4 | Combining documents | Directs agencies to combine any environmental document with any other agency document to the fullest extent practicable. | Combining documents, where appropriate and practicable, should reduce administrative costs. CEQ does not anticipate environmental impacts. |
| 1506.5 | Agency responsibility for environmental documents | Authorizes agencies to allow a contractor or applicant to prepare an EIS, under the direction of the lead agency or cooperating agency. Establishes the agency as responsible for the accuracy, scope, and content of environmental documents prepared by the agency or by an applicant or contractor. Requires contractors or applicants that prepare EAs or EISs to submit a disclosure statement to the lead agency that specifies any financial or other interest in the outcome of the action but that need not include privileged or confidential trade secrets or other confidential business information. | In some circumstances, applicants and contractors may prepare NEPA documents more cost-effectively, thereby lowering administrative costs. CEQ anticipates that agencies will use their discretion to approve applicant-prepared documents where doing so will improve the overall NEPA process. The final rule retains requirements from the 1978 regulations that the responsible Federal official supervising a contractor document provide guidance, participate in its preparation, independently evaluate it prior to its approval, and take responsibility for its scope and contents, thereby minimizing adverse impacts to the analysis. CEQ does not anticipate environmental impacts. |

| 1506.6 | Public involvement | Removes the requirement to mail certain NEPA documents, reflecting near universal use of electronic communications.  Authorizes agencies to use other opportunities for public engagement where appropriate.  Updates the reference to the Freedom of Information Act and aligns the text with section 102(2)(C) of NEPA, including with regard to fees. | CEQ anticipates the changes that remove the requirement to mail documents, but consider whether access to electronic media is limited, will reduce administrative costs.  Additional flexibility regarding public outreach may also lead to greater efficiency and public participation at lower administrative costs.  CEQ does not anticipate environmental impacts. |
| --- | --- | --- | --- |
| 1506.7 | Further guidance | Updates the references to include recent Executive orders and removes outdated means of providing agency guidance.  Clarifies that the provisions in the final rule apply where in conflict with pre-existing guidance. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1506.8 | Proposals for legislation | Clarifies that technical drafting assistance does not by itself constitute a legislative proposal.  Removes "or providing significant cooperation or support," which narrows the language to only include legislative proposals. | The changes are consistent with current practice and are not anticipated to result in either economic or environmental impacts. |
| 1506.9 | Proposals for regulations | Adds a new section concerning the promulgation of regulations that allow an agency to substitute other procedures and documents to satisfy CEQ's regulations.  Agencies must identify the corresponding requirement(s) and consult with CEQ to confirm the determination. | CEQ anticipates the greater use of functionally equivalent documents will reduce administrative cost.  The section requires the agency to ensure that such documents satisfy CEQ's regulations, thereby ensuring there are no environmental impacts as a result of the change. |
| 1506.10 | Filing requirements | Removes the obsolete process for filing paper copies of EISs with EPA, and EPA's delivery of a copy to CEQ. | The changes will reduce administrative costs and will not have environmental impacts. |

| 1506.11 | Timing of agency action | Makes technical changes and clarifications, including an acknowledgement of the statutory requirement of some agencies to issue a combined final EIS and ROD. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
|---|---|---|---|
| 1506.12 | Emergencies | Clarifies that alternative arrangements are still meant to comply with the statutory requirement at section 102(2)(C) to issue a detailed statement. | The change is consistent with CEQ's long-standing practice and therefore not anticipated to result in either economic or environmental impacts. |
| 1506.13 | Effective date | Applies this rule to all NEPA processes begun after the effective date, and gives agency the discretion to apply to ongoing activities. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| **PART 1507—AGENCY COMPLIANCE** | | | |
| 1507.1 | Compliance | Strikes the second sentence for consistency with the changes to the provisions for agency NEPA procedures at § 1507.3. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1507.2 | Agency capability to comply | Requires agencies to designate a senior agency official to be responsible for overall review of agency NEPA compliance, including resolving implementation issues.  Adds references to E.O. 11991 and E.O. 13807 to codify agencies' responsibility to comply with the orders. | Increasing utilization of a senior agency official to supervise implementing procedures, as well as other aspects of this rule, may improve overall administration of NEPA, thereby catalyzing ancillary economic benefits.  There are no environmental impacts. |
| 1507.3 | Agency NEPA procedures | Makes numerous technical changes and consolidates all of the requirements for agency NEPA procedures in this section to improve readability.  Paragraph (a) states that these regulations supersede all conflicting provisions in agency procedures, except for CEs, which CEQ has determined to be consistent with these | Revision of each agency's NEPA procedures will impose a one-time cost to the Federal Government to implement the rule.  Allowing agencies to identify in their NEPA procedures activities or decisions that are not subject to NEPA as a threshold matter rather than on a case-by-case basis may lower administrative |

| | | regulations. Paragraph (b) directs agencies to develop or revise procedures that implement these regulations within 12 months of the effective date or 9 months after establishment of an agency, whichever comes later, including to eliminate any inconsistencies with the final rule. Consistent with § 1500.1, clarifies that NEPA procedures must not impose additional requirements beyond what is set forth in these regulations, except as otherwise required by law or for agency efficiency. Paragraph (c) requires agencies' implementing procedures to require combination of relevant environmental documents. Allows for the substitution of one or more procedures or documents under other authorities, contingent on the agency identifying the corresponding CEQ requirement(s). Consistent with § 1501.1, paragraph (d) adds to agency procedures the identification of actions that are not subject to NEPA or otherwise satisfied. Paragraph (f)(2) clarifies that agencies may alter time periods when necessary to comply with the statutory requirements of lead or cooperating agencies. Paragraph (f)(3) codifies the existing agency practice to publish notices when there is a pause in an EIS or withdrawal of an NOI. Paragraph (f)(5) authorizes agency procedures to include a process to use a CE listed in another agency's NEPA procedures after consultation with the respective agency to ensure the use of the CE is appropriate, documentation of the consultation, and identification of those CEs that may be used. | costs, but does not change the applicability of NEPA. CEQ anticipates combining environmental documents and making greater use of functionally equivalent documents will reduce administrative costs for those agencies that have the opportunity but not presently doing so. Greater use of CEs developed by other agencies may also lower administrative costs for agencies that would otherwise need to develop their own CE or prepare an EA, and may accelerate the NEPA process for some applicants. The flexibility to use another agency's CE includes a requirement to consult with the respective agency to ensure use of the CE is appropriate and publishing documentation. All agency procedures require consultation with CEQ to ensure conformity with CEQ's regulations. CEQ does not anticipate environmental impacts. |

| | | | |
|---|---|---|---|
| | | Eliminates the limitation on paraphrasing the CEQ regulations.  Eliminates the recommendation to issue explanatory guidance. | |
| 1507.4 | Agency NEPA program information | Requires agencies in their implementing procedures to provide for a website or other means of publishing certain information on ongoing NEPA reviews and permitting and maintaining agency and public access to agency records relating to NEPA reviews. | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| | | **PART 1508—DEFINITIONS** | |
| 1508.1 | Definitions | The section makes numerous changes to the 1978 regulations, many of which are technical or clarifying in nature.  Substantive changes are discussed below.  New definitions added for clarity include "authorization," "publish and publication," and "senior agency official." | See each amended definition below for the summary of economic and environmental impacts. |
| 1508.1(d) | Categorical exclusion | Adds "normally" to clarify that there may be situations where an action may have significant effects on account of extraordinary circumstances.  Strikes "individually or cumulatively" for consistency with the revisions to the definition of effects or impacts.  Moves text to consolidate with § 1507.3. | Deleting "individually or cumulatively" does not change that the determination of a significant effect would continue to apply to a "category of actions" and include all effects that are covered under the definition.  CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1508.1(g) | Effects or impacts | Replaces "direct," "indirect," and "cumulative" with the description "reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives."  Clarifies certain types of effects that are insufficient to make an agency responsible for a particular effect under NEPA, including those based on a "but for" causal relationship, remote in time, | Agencies will continue to analyze all of the effects that the statute requires to be analyzed.  The changes may reduce administrative burden relative to the 1978 regulations by reducing those circumstances where agencies previously analyzed effects that were not reasonably foreseeable or did not have a reasonably close causal |

| | | geographically remote, the product of a lengthy causal chain, and effects that would occur regardless of the proposed action. States that an agency's analysis of effects must be consistent with the definition and repeals cumulative impact, defined at 40 CFR 1508.7 (1978). | relationship to the proposed action or alternatives. Because the rule does not preclude consideration of the significant impacts of a proposed action on any particular aspect of the human environment, CEQ does not anticipate the changes influencing environmental outcomes. Further, it is unlikely that analyzing effects that are not reasonably foreseeable and do not have a reasonably close causal relationship to the proposed action would have a meaningful impact on the overall analysis. A clear definition that follows Supreme Court case law may lower the amount of litigation under NEPA. |
|---|---|---|---|
| 1508.1(q) | Major Federal action or action | Clarifies that a major Federal action is "subject to Federal control and responsibility," and gives separate meaning to the term "significant." Excludes extraterritorial activities or decisions. Excludes non-discretionary activities or decisions made in accordance with an agency's statutory authority. Excludes activities or decisions that do not result in a final agency action. Eliminates failure to act from the definition. Further clarifies actions subject to Federal control and responsibility by excluding "non-Federal projects with minimal Federal funding or minimal Federal involvement where the agency does not exercise sufficient control and responsibility over the outcome of the project" and "loans, loan guarantees, or other forms of financial assistance where the Federal agency does not exercise sufficient control and | Several courts have held that non-Federal projects with minimal Federal funding or involvement where the agency cannot control the outcome of the project are not major Federal actions. Despite these decisions, agencies have developed CEs for such activities. Therefore, the changes may lower administrative costs, and CEQ does not anticipate them to have environmental impacts. A small number of activities may no longer be reviewed under NEPA by incorporating the Supreme Court presumption against extraterritorial actions. Note that activities or decisions originating in areas within U.S. jurisdiction that create effects in area with U.S. jurisdiction but also have transboundary effects are not extraterritorial actions. |

| | | responsibility over the effects of the assistance." References examples of certain loan guarantee programs administered by the Farm Service Agency and Small Business Administration. | |
|---|---|---|---|
| 1508.1(s) | Mitigation | Specifies that mitigation must have a nexus to the effects of the proposed action. Clarifies that NEPA does not mandate the form or adoption of any mitigation. | CEQ does not anticipate the changes to result in either economic or environmental impacts. Current practices for mitigation under various authorities require that it have a nexus to the impacts. Therefore, CEQ does not anticipate the change to have an environmental impact. |
| 1508.1(z) | Reasonable alternatives | Adds new definition that specifies that "reasonable alternatives" means a "reasonable range" that are "technically and economically feasible, meet the purpose and need for the proposed action," and "where applicable, meet the goals of the applicant." | The changes may reduce administrative costs and accelerate the timeliness of review by focusing on feasible alternatives. CEQ does not anticipate that it will have environmental impacts since analysis of infeasible alternatives is unlikely to improve environmental outcomes. |
| 1508.1(aa) | Reasonably foreseeable | Adds definition based on what "a person of ordinary prudence" would take into account. | The language follows established Supreme Court case law. CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1508.1(cc) | Scope | Operative language moved to § 1501.9 | CEQ does not anticipate the changes to result in either economic or environmental impacts. |
| 1508.1(ff) | Tiering | Clarifies that agencies may use EAs at the programmatic stage as well as subsequent stages. | By allowing for the administrative advantages of tiering, ancillary economic benefits are expected. CEQ does not anticipate the changes to result in environmental impacts. |
| Deleted 1508.27 | Significantly | Deletes definition and significance is discussed in § 1501.3(b) | See § 1501.3(b) for information on impacts. |

32

Exhibit 6 to Declaration of Amy Coyle

# Considering
# Cumulative
# Effects

## Under the National Environmental Policy Act



Council on Environmental Quality
Executive Office of the President

# Considering Cumulative Effects
# Under the National Environmental Policy Act

Council on Environmental Quality

January 1997

# TABLE OF CONTENTS

**EXECUTIVE SUMMARY**

**1  INTRODUCTION TO CUMULATIVE EFFECTS ANALYSIS** ........................... 1
  Purpose of Cumulative Effects Analysis ...................................... 2
  Agency Experience with Cumulative Effects Analysis .......................... 3
  Principles of Cumulative Effects Analysis ................................... 7
  How Environmental Effects Accumulate ...................................... 7
  Roadmap to the Handbook .................................................. 10

**2  SCOPING FOR CUMULATIVE EFFECTS** ....................................... 11
  Identifying Cumulative Effects Issues ...................................... 11
  Bounding Cumulative Effects Analysis ...................................... 12
    Identifying Geographical Boundaries ................................... 12
    Identifying Time Frames .............................................. 16
  Identifying Past, Present, and Reasonably Foreseeable Future Actions .......... 16
  Agency Coordination ...................................................... 20
  Scoping Summary .......................................................... 21

**3  DESCRIBING THE AFFECTED ENVIRONMENT** .................................. 23
  Components of the Affected Environment .................................... 24
    Status of Resources, Ecosystems, and Human Communities .............. 26
    Characterization of Stress Factors .................................... 27
    Regulations, Administrative Standards, and Regional Plans .............. 29
    Trends ............................................................... 31
  Obtaining Data for Cumulative Effects Analysis ............................. 31
  Affected Environment Summary ............................................. 34

**4  DETERMINING THE ENVIRONMENTAL CONSEQUENCES OF CUMULATIVE
  EFFECTS** ............................................................... 37
  Confirming the Resources and Actions to be Included in the Cumulative
    Effects Analysis ....................................................... 37
  Identifying and Describing Cause-and-Effect Relationships for Resources,
    Ecosystems, and Human Communities ................................... 38
    Determining the Environmental Changes that Affect Resources .......... 38
    Determining the Response of the Resource to Environmental Change ...... 40
  Determining the Magnitude and Significance of Cumulative Effects ............. 41
    Determining Magnitude ............................................... 42
    Determining Significance ............................................. 44
  Avoiding, Minimizing, and Mitigating Significant Cumulative Effects ........... 45
  Addressing Uncertainty Through Monitoring and Adaptive Management ........ 46

5  **METHODS, TECHNIQUES, AND TOOLS FOR ANALYZING CUMULATIVE EFFECTS**  49
    Literature on Cumulative Effects Analysis Methods ........................... 49
    Implementing a Cumulative Effects Analysis Methodology ..................... 50

**REFERENCES** .................................................................. 59

**APPENDICES:**

Appendix A.  Summaries of Cumulative Effects Analysis Methods
Appendix B.  Acknowledgements

# Considering Cumulative Effects
# Under the National Environmental Policy Act

Council on Environmental Quality

January 1997

# PREFACE

This handbook presents the results of research and consultations by the Council on Environmental Quality (CEQ) concerning the consideration of cumulative effects in analyses prepared under the National Environmental Policy Act (NEPA). It introduces the NEPA practitioner and other interested parties to the complex issue of cumulative effects, outlines general principles, presents useful steps, and provides information on methods of cumulative effects analysis and data sources. The handbook does not establish new requirements for such analyses. It is not and should not be viewed as formal CEQ guidance on this matter, nor are the recommendations in the handbook intended to be legally binding.

# EXECUTIVE SUMMARY

The Council on Environmental Quality's (CEQ) regulations (40 CFR §§ 1500 - 1508) implementing the procedural provisions of the National Environmental Policy Act (NEPA) of 1969, as amended (42 U.S.C. §§ 4321 *et seq.*), define cumulative effects as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions (40 CFR § 1508.7).

Although the regulations touch on every aspect of environmental impact analysis, very little has been said about cumulative effects. As a result, federal agencies have independently developed procedures and methods to analyze the cumulative effects of their actions on environmental resources, with mixed results.

The CEQ's "Considering Cumulative Effects Under the National Environmental Policy Act" provides a framework for advancing environmental impact analysis by addressing cumulative effects in either an environmental assessment (EA) or an environmental impact statement (EIS). The handbook presents practical methods for addressing coincident effects (adverse or beneficial) on specific resources, ecosystems, and human communities of all related activities, not just the proposed project or alternatives that initiate the assessment process.

In their environmental analyses, federal agencies routinely address the direct and (to a lesser extent) indirect effects of the proposed action on the environment. Analyzing cumulative effects is more challenging, primarily because of the difficulty of defining the geographic (spatial) and time (temporal) boundaries. For example, if the boundaries are defined too broadly, the analysis becomes unwieldy; if they are defined too narrowly, significant issues may be missed, and decision makers will be incompletely informed about the consequences of their actions.

The process of analyzing cumulative effects can be thought of as enhancing the traditional components of an environmental impact assessment: (1) scoping, (2) describing the affected environment, and (3) determining the environmental consequences. Generally it is also critical to incorporate cumulative effects analysis into the development of alternatives for an EA or EIS. Only by reevaluating and modifying alternatives in light of the projected cumulative effects can adverse consequences be effectively avoided or minimized. Considering cumulative effects is also essential to developing appropriate mitigation and monitoring its effectiveness.

In many ways, scoping is the key to analyzing cumulative effects; it provides the best opportunity for identifying important cumulative effects issues, setting appropriate boundaries for analysis, and identifying relevant past, present, and future actions. Scoping allows the NEPA practitioner to "count what counts." By evaluating resource impact zones and the life cycle of effects rather than projects, the analyst can properly bound the cumulative effects analysis. Scoping can also facilitate the interagency cooperation needed to identify agency plans and other

actions whose effects might overlap those of the proposed action.

When the analyst describes the affected environment, he or she is setting the environmental baseline and thresholds of environmental change that are important for analyzing cumulative effects. Recently developed indicators of ecological integrity (e.g., index of biotic integrity for fish) and landscape condition (e.g., fragmentation of habitat patches) can be used as benchmarks of accumulated change over time. In addition, remote sensing and geographic information system (GIS) technologies provide improved means to analyze historical change in indicators of the condition of resources, ecosystems, and human communities, as well as the relevant stress factors. Many dispersed local information sources and emerging regional data collection programs are now available to describe the cumulative effects of a proposed action.

Determining the cumulative environmental consequences of an action requires delineating the cause-and-effect relationships between the multiple actions and the resources, ecosystems, and human communities of concern. Analysts must tease from the complex networks of possible interactions those that substantially affect the resources. Then, they must describe the response of the resource to this environmental change using modeling, trends analysis, and scenario building when uncertainties are great. The significance of cumulative effects depend on how they compare with the environmental baseline and relevant resource thresholds (such as regulatory standards). Most often, the historical context surrounding the resource is critical to developing these baselines and thresholds and to supporting both imminent and future decision-making.

Undoubtedly, the consequences of human activities will vary from those that were predicted and mitigated. This will be even more problematic because of cumulative effects; therefore, monitoring the accuracy of predictions and the success of mitigation measures is critical. Adaptive management provides the opportunity to combine monitoring and decision making in a way that will better ensure protection of the environment and attainment of societal goals.

Successfully analyzing cumulative effects ultimately depends on the careful application of individual methods, techniques, and tools to the environmental impact assessment at hand. There is a close relationship between impact assessment and environmental planning, and many of the methods developed for each are applicable to cumulative effects analysis. The unique requirements of cumulative effects analysis (i.e., the focus on resource sustainability and the expanded geographic and time boundaries) must be addressed by developing an appropriate conceptual model. To do this, a suite of primary methods can be used: questionnaires, interviews, and panels; checklists; matrices; networks and system diagrams; modeling; trends analysis; and overlay mapping and GIS. As with project-specific effects, tables and matrices can be used to evaluate cumulative effects (and have been modified specifically to do so). Special methods are also available to address the unique aspects of cumulative effects, including carrying capacity analysis, ecosystem analysis, economic impact analysis, and social impact analysis.

This handbook was developed by reviewing the literature and interviewing practitioners of environmental impact assessment. Most agencies that have recently developed their own guidelines for analyzing cumulative effects recognize cumulative effects analysis as an integral part of the NEPA process, not a separate effort. This handbook is not formal guidance nor is it exhaustive or definitive; it should assist practitioners in developing their own study-specific approaches. CEQ expects that the handbook (and similar agency guidelines) will be updated periodically to reflect additional experience and new methods, thereby, constantly improving the state of cumulative effects analysis.

new methods, thereby, constantly improving the state of cumulative effects analysis.

The handbook begins with an introduction to the cumulative effects problem and its relevance to the NEPA process. The introduction defines eight general principles of cumulative effects analysis and lays out ten specific steps that the NEPA practitioner can use to analyze cumulative effects. The next three chapters parallel the environmental impact assessment process and discuss analyzing cumulative effects while (1) scoping, (2) describing the affected environment, and (3) determining environmental consequences. Each component in the NEPA process is the logical place to complete necessary steps in cumulative effects analysis, but practitioners should remember that analyzing for cumulative effects is an iterative process. Specifically, the results of cumulative effects analysis can and should contribute to refining alternatives and

designing mitigation. Table E-1 illustrates how the principles of cumulative effects analysis can be the focus of each component of the NEPA process. Chapter 5 discusses the methods, techniques, and tools needed to develop a study-specific methodology and actually implement cumulative effects analysis. Appendix A provides summaries of 11 of these methods.

Cumulative effects analysis is an emerging discipline in which the NEPA practitioner can be overwhelmed by the details of the scoping and analytical phases. The continuing challenge of cumulative effects analysis is to focus on important cumulative issues, recognizing that a better decision, rather than a perfect cumulative effects analysis, is the goal of NEPA and environmental impact assessment professionals.

| Table E-1. Incorporating principles of cumulative effects analysis (CEA) into the components of environmental impact assessment (EIA) | |
|---|---|
| **EIA Components** | **CEA Principles** |
| Scoping | • Include past, present, and future actions.<br>• Include all federal, nonfederal, and private actions.<br>• Focus on each affected resource, ecosystem, and human community.<br>• Focus on truly meaningful effects. |
| Describing the Affected Environment | • Focus on each affected resource, ecosystem, and human community.<br>• Use natural boundaries. |
| Determining the Environmental Consequences | • Address additive, countervailing, and synergistic effects.<br>• Look beyond the life of the action.<br>• Address the sustainability of resources, ecosystems, and human communities. |

# 1
# INTRODUCTION TO CUMULATIVE EFFECTS ANALYSIS

Evidence is increasing that the most devastating environmental effects may result not from the direct effects of a particular action, but from the combination of individually minor effects of multiple actions over time.

Some authorities contend that most environmental effects can be seen as cumulative because almost all systems have already been modified, even degraded, by humans. According to the report of the National Performance Review (1994), the heavily modified condition of the San Francisco Bay estuary is a result of activities regulated by a wide variety of government agencies. The report notes that one mile of the delta of the San Francisco Bay may be affected by the decisions of more than 400 agencies (federal, state, and local). William Odum (1982) succinctly described environmental degradation from cumulative effects as "the tyranny of small decisions."

The Council on Environmental Quality's (CEQ) regulations for implementing the National Environmental Policy Act (NEPA) define cumulative effects as

> the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-federal) or person undertakes such other actions (40 CFR § 1508.7).

The fact that the human environment continues to change in unintended and unwanted ways in spite of improved federal decisionmaking resulting from the implementation of NEPA is largely attributable to this incremental (cumulative) impact. Although past environmental impact analyses have focused primarily on project-specific impacts, NEPA provides the context and carries the mandate to analyze the cumulative effects of federal actions.

NEPA and CEQ's regulations define the cumulative problem in the context of the action, alternatives, and effects. By definition, cumulative effects must be evaluated along with the direct effects and indirect effects (those that occur later in time or farther removed in distance) of each alternative. The range of alternatives considered must include the no-action alternative as a baseline against which to evaluate cumulative effects. The range of actions that must be considered includes not only the project proposal but all connected and similar actions that could contribute to cumulative effects. Specifically, NEPA requires that all related actions be addressed in the same analysis. For example, the expansion of an airport runway that will increase the number of passengers traveling must address not only the effects of the runway itself, but also the expansion of the terminal and the extension of roadways to provide access to the expanded terminal. If there are similar actions planned

in the area that will also add traffic or require roadway extensions (even though they are nonfederal), they must be addressed in the same analysis.

The selection of actions to include in the cumulative effects analysis, like any environmental impact assessment, depends on whether they affect the human environment. Throughout this handbook discussion of the environment will focus on resources (entities such as air quality or a trout fishery), ecosystems (local or landscape-level units where nature and humans interact), and human communities (sociocultural settings that affect the quality of life). The term resources will sometimes be used to refer to all three entities. Table 1-1 lists some of the common cumulative

effects situations faced by federal agencies (see Chapter 3 for a list of common cumulative effects issues affecting various resources, ecosystems, and human communities).

## PURPOSE OF CUMULATIVE EFFECTS ANALYSIS

Congressional testimony on behalf of the passage of NEPA stated that

> ...as a result of the failure to formulate a comprehensive national environmental policy... environmental problems are only dealt with when they reach crisis proportions..... Important decisions concerning the use and shape of man's environment continue to be made in small but steady increments which perpetuate requirements.

**Table 1-1. Examples of cumulative effects situations faced by federal agencies including both multiple agency actions and other actions affecting the same resource**

| Federal Agency | Cumulative Effects Situations |
|---|---|
| Army Corps of Engineers | ■ incremental loss of wetlands under the national permit to dredge and fill and from land subsidence |
| Bureau of Land Management | ■ degradation of rangeland from multiple grazing allotments and the invasion of exotic weeds |
| Department of Defense | ■ population declines in nesting birds from multiple training missions and commercial tree harvests within the same land unit |
| Department of Energy | ■ increased regional acidic deposition from emissions trading policies and changing climate patterns |
| Federal Energy Regulatory Commission | ■ blocking of fish passage by multiple hydropower dams and Corps of Engineers reservoirs in the same river basin |
| Federal Highway Administration | ■ cumulative commercial and residential development and highway construction associated with suburban sprawl |
| Forest Service | ■ increased soil erosion and stream sedimentation from multiple timber permits and private logging operations in the same watershed |
| General Services Administration | ■ change in neighborhood sociocultural character resulting from ongoing local development including new federal office construction |
| National Park Service | ■ degraded recreational experience from overcrowding and reduced visibility |

Interim guidelines issued in 1970 stated that the effects of many federal decisions about a project or complex of projects can be "individually limited but cumulatively considerable" (35 *Federal Register* 7391, May 12, 1970).

The passage of time has only increased the conviction that cumulative effects analysis is essential to effectively managing the consequences of human activities on the environment. The purpose of cumulative effects analysis, therefore, is to ensure that federal decisions consider the full range of consequences of actions. Without incorporating cumulative effects into environmental planning and management, it will be impossible to move towards sustainable development, i.e., development that meets the needs of the present without compromising the ability of future generations to meet their own needs (World Commission on Environment and Development 1987; President's Council on Sustainable Development 1996). To a large extent, the goal of cumulative effects analysis, like that of NEPA itself, is to inject environmental considerations into the planning process as early as needed to improve decisions. If cumulative effects become apparent as agency programs are being planned or as larger strategies and policies are developed then potential cumulative effects should be analyzed at that time.

Cumulative effects analysis necessarily involves assumptions and uncertainties, but useful information can be put on the decision-making table now. Decisions must be supported by the best analysis based on the best data we have or are able to collect. Important research and monitoring programs can be identified that will improve analyses in the future, but their absence should not be used as a reason for not analyzing cumulative effects to the extent possible now. Where substantial uncertainties remain or multiple resource objectives exist, adaptive management provisions for flexible project implementation can be incorporated into the selected alternative.

## Sustainable America

President Clinton's Council on Sustainable Development was charged with recommending a national action strategy for sustainable development at a time when Americans are confronted with new challenges that have global ramifications. The Council adopted the Brundtland Commission's definition of sustainable development and articulated the following vision:

> Our vision is of a life-sustaining Earth. We are committed to the achievement of a dignified, peaceful, and equitable existence. A sustainable United States will have a growing economy that provides equitable opportunities for satisfying livelihoods and a safe, healthy, high quality of life for current and future generations. Our nation will protect its environment, its natural resource base, and the functions and viability of natural systems on which all life depends.

The Council concluded that in order to meet the needs of the present while ensuring that future generations have the same opportunities, the United States must change by moving from conflict to collaboration and adopting stewardship and individual responsibility as tenets by which to live. This vision is similar to the first environmental policy listed in NEPA— that each generation should fulfill its responsibilities as trustee of the environment for succeeding generations. Analyzing for cumulative effects on the full range of resources, ecosystems, and human communities under NEPA provides a mechanism for addressing sustainable development.

## AGENCY EXPERIENCE WITH CUMULATIVE EFFECTS ANALYSIS

Federal agencies make hundreds, perhaps thousands, of small decisions annually. Sometimes a single agency makes decisions on

3

similar projects; other times project decisions by many different authorities are interrelated. The Federal Energy Regulatory Commission must make licensing decisions on many individual hydropower facilities within the same river basin (Figure 1-1). The Federal Highway Administration and state transportation agencies frequently make decisions on highway projects that may not have significant direct environmental effects, but that may induce indirect and cumulative effects by permitting other development activities that have significant effects on air and water resources at a regional or national scale. The highway and the other development activities can reasonably be foreseen as "connected actions" (40 CFR § 1508.25).

Many times there is a mismatch between the scale at which environmental effects occur and the level at which decisions are made. Such mismatches present an obstacle to cumulative effects analysis. For example, while broad scale decisions are made at the program or policy level (e.g., National Energy Strategy, National Transportation Plan, Base Realignment and Closure Initiative), the environmental effects are generally assessed at the project level (e.g., coal-fired power plant, interstate highway connector, disposal of installation land). Cumulative effects analysis should be the tool for federal agencies to evaluate the implications of even project-level environmental assessments (EAs) on regional resources.

Federal agencies have struggled with preparing cumulative effects analyses since CEQ issued its regulations in 1978. They continue to find themselves in costly and time-consuming administrative proceedings and litigation over the proper scope of the analysis. Court cases throughout the years have affirmed CEQ's requirement to assess cumulative effects of projects but have added little in the way of guidance and direction. To date, there has not been a single, universally accepted conceptual approach, nor even general principles accepted by all scientists and managers. States and other countries with "little NEPA" laws have experienced similar implementation problems.

A General Accounting Office (GAO) report on coastal pollution noted that state coastal managers raised concerns about the quality of cumulative effects analysis in environmental reviews for proposed federal activities (GAO 1991). In one case study, state coastal managers told GAO that the Environmental Impact Statement (EIS) for rerouting and expanding a highway did not consider that the project as proposed would have a significant growth-inducing effect that would exceed state planning limitations by 100 percent. The Department of Commerce acknowledged the need to provide additional guidance on how to assess the indirect and cumulative effects of proposed actions in the coastal zone and recently published a cumulative impacts assessment protocol for managing cumulative coastal environmental impacts (Vestal et al. 1995).

The increased use of EAs rather than EISs in recent years could exacerbate the cumulative effects problem. Agencies today prepare substantially more EAs than EISs; in a typical year 45,000 EAs are prepared compared to 450 EISs. An agency's decision to prepare an EIS is important because an EIS tends to contain more rigorous analysis and more public involvement than an EA. EAs tend to save time and money because an EA generally takes less time to prepare. They are a cost-effective way to determine whether potentially significant effects are likely and whether a project can mitigate these effects. At the same time, because EAs focus on whether effects are significant, they tend to underestimate the cumulative effects of their projects. Given that so many more EAs are prepared than EISs, adequate consideration of cumulative effects requires that EAs address them fully. One study analyzed 89 EAs announced in the *Federal Register* between January 1, 1992, and June 30, 1992, to determine the extent to which treatment of cumulative effects met CEQ's requirements (Figure 1-2). Only 35 EAs (39%) mentioned cumulative

4



Figure 1-1. River basins and associated FERC related hydroelectric projects in Maine (undated)



Figure 1-2. Consideration of cumulative effects in environmental assessments (McCold and Holman 1995)

effects. Nearly half of those failed to present evidence to support their conclusions concerning cumulative effects (McCold and Holman 1995).

## PRINCIPLES OF CUMULATIVE EFFECTS ANALYSIS

Increasingly, decisionmakers are recognizing the importance of looking at their projects in the context of other development in the community or region (i.e., of analyzing the cumulative effects). Direct effects continue to be most important to decisionmakers, in part because they are more certain. Nonetheless, the importance of acid rain, climate change, and other cumulative effects problems has resulted in many efforts to undertake and improve the analysis of cumulative effects. Although no universally accepted framework for cumulative effects analysis exists, general principles have gained acceptance (Table 1-2).

Each of these eight principles illustrates a property of cumulative effects analysis that differentiates it from traditional environmental impact assessment. By applying these principles to environmental analysis of all kinds, cumulative effects will be better considered, and the analysis will be complete. A critical principle states that cumulative effects analysis should be conducted within the context of resource, ecosystem, and human community thresholds–levels of stress beyond which the desired condition degrades. The magnitude and extent of the effect on a resource depends on whether the cumulative effects exceed the capacity of the resource to sustain itself and remain productive. Similarly, the natural ecosystem and the human community have maximum levels of cumulative effects that they can

withstand before the desired conditions of ecological functioning and human quality of life deteriorate.

Determining the threshold beyond which cumulative effects significantly degrade a resource, ecosystem, and human community is often problematic. Without a definitive threshold, the NEPA practitioner should compare the cumulative effects of multiple actions with appropriate national, regional, state, or community goals to determine whether the total effect is significant. These thresholds and desired conditions can best be defined by the cooperative efforts of agency officials, project proponents, environmental analysts, nongovernmental organizations, and the public through the NEPA process. Ultimately, cumulative effects analysis under NEPA should be incorporated into the agency's overall environmental planning and the regional planning of other federal agencies and stakeholders.

## HOW ENVIRONMENTAL EFFECTS ACCUMULATE

Cumulative effects result from spatial (geographic) and temporal (time) crowding of environmental perturbations. The effects of human activities will accumulate when a second perturbation occurs at a site before the ecosystem can fully rebound from the effect of the first perturbation. Many researchers have used observations or environmental change theory to categorize cumulative effects into different types. The diversity of sources, processes, and effects involved has prevented the research and assessment communities from agreeing on a standard typology. Nonetheless, it is useful to review the eight scenarios for accumulating effects shown in Table 1-3.

7

**Table 1-2.  Principles of cumulative effects analysis**

1. **Cumulative effects are caused by the aggregate of past, present, and reasonably foreseeable future actions.**

   The effects of a proposed action on a given resource, ecosystem, and human community include the present and future effects added to the effects that have taken place in the past.  Such cumulative effects must also be added to effects (past, present, and future) caused by all other actions that affect the same resource.

2. **Cumulative effects are the total effect, including both direct and indirect effects, on a given resource, ecosystem, and human community of all actions taken, no matter who (federal, nonfederal, or private) has taken the actions.**

   Individual effects from disparate activities may add up or interact to cause additional effects not apparent when looking at the individual effects one at a time.  The additional effects contributed by actions unrelated to the proposed action must be included in the analysis of cumulative effects.

3. **Cumulative effects need to be analyzed in terms of the specific resource, ecosystem, and human community being affected.**

   Environmental effects are often evaluated from the perspective of the proposed action.  Analyzing cumulative effects requires focusing on the resource, ecosystem, and human community that may be affected and developing an adequate understanding of how the resources are susceptible to effects.

4. **It is not practical to analyze the cumulative effects of an action on the universe; the list of environmental effects must focus on those that are truly meaningful.**

   For cumulative effects analysis to help the decisionmaker and inform interested parties, it must be limited through scoping to effects that can be evaluated meaningfully.  The boundaries for evaluating cumulative effects should be expanded to the point at which the resource is no longer affected significantly or the effects are no longer of interest to affected parties.

5. **Cumulative effects on a given resource, ecosystem, and human community are rarely aligned with political or administrative boundaries.**

   Resources typically are demarcated according to agency responsibilities, county lines, grazing allotments, or other administrative boundaries.  Because natural and sociocultural resources are not usually so aligned, each political entity actually manages only a piece of the affected resource or ecosystem.  Cumulative effects analysis on natural systems must use natural ecological boundaries and analysis of human communities must use actual sociocultural boundaries to ensure including all effects.

6. **Cumulative effects may result from the accumulation of similar effects or the synergistic interaction of different effects.**

   Repeated actions may cause effects to build up through simple addition (more and more of the same type of effect), and the same or different actions may produce effects that interact to produce cumulative effects greater than the sum of the effects.

7. **Cumulative effects may last for many years beyond the life of the action that caused the effects.**

   Some actions cause damage lasting far longer than the life of the action itself (e.g., acid mine drainage, radioactive waste contamination, species extinctions).  Cumulative effects analysis needs to apply the best science and forecasting techniques to assess potential catastrophic consequences in the future.

8. **Each affected resource, ecosystem, and human community must be analyzed in terms of its capacity to accommodate additional effects, based on its own time and space parameters.**

   Analysts tend to think in terms of how the resource, ecosystem, and human community will be modified given the action's development needs.  The most effective cumulative effects analysis focuses on what is needed to ensure long-term productivity or sustainability of the resource.

8

## Table 1-3. Examples of cumulative effects (modified from NRC 1986 and Spaling 1995)

| Type | Main characteristics | Example |
|---|---|---|
| 1. Time crowding | Frequent and repetitive effects on an environmental system | Forest harvesting rate exceeds regrowth |
| 2. Time lags | Delayed effects | Exposure to carcinogens |
| 3. Space crowding | High spatial density of effects on an environmental system | Pollution discharges into streams from nonpoint sources |
| 4. Cross-boundary | Effects occur away from the source | Acidic precipitation |
| 5. Fragmentation | Change in landscape pattern | Fragmentation of historic district |
| 6. Compounding effects | Effects arising from multiple sources or pathways | Synergism among pesticides |
| 7. Indirect effects | Secondary effects | Commercial development following highway construction |
| 8. Triggers and thresholds | Fundamental changes in system behavior or structure | Global climate change |

In simplest terms, cumulative effects may arise from single or multiple actions and may result in additive or interactive effects. Interactive effects may be either countervailing—where the net adverse cumulative effect is less than the sum of the individual effects—or synergistic—where the net adverse cumulative effect is greater than the sum of the individual effects. This combination of two kinds of actions with two kinds of processes leads to four basic types of cumulative effects (Table 1-3; see Peterson et al. 1987 for a similar typology).

## Table 1-4. Types of cumulative effects

| | Additive Process | Interactive Process |
|---|---|---|
| Single Action | Type 1 — Repeated "additive" effects from a single proposed project.<br><br>Example: Construction of a new road through a national park, resulting in continual draining of road salt onto nearby vegetation. | Type 2 — Stressors from a single source that interact with receiving biota to have an "interactive" (nonlinear) net effect.<br><br>Example: Organic compounds, including PCBs, that biomagnify up food chains and exert disproportionate toxicity on raptors and large mammals. |
| Multiple Actions | Type 3 — Effects arising from multiple sources (projects, point sources, or general effects associated with development) that affect environmental resources additively.<br><br>Example: Agricultural irrigation, domestic consumption, and industrial cooling activities that all contribute to drawing down a groundwater aquifer. | Type 4 — Effects arising from multiple sources that affect environmental resources in an interactive (i.e., countervailing or synergistic) fashion.<br><br>Example: Discharges of nutrients and heated water to a river that combine to cause an algal bloom and subsequent loss of dissolved oxygen that is greater than the additive effects of each pollutant. |

9

## ROADMAP TO THE HANDBOOK

The chapters that follow discuss the incorporation of cumulative effects analysis into the components of environmental impact assessment: scoping (Chapter 2), describing the affected environment (Chapter 3), and determining the environmental consequences (Chapter 4). Although cumulative effects analysis is an iterative process, basic steps that

to be accomplished can be identified in each component of the NEPA process; each chapter focuses on its constituent steps (Table 1-4). The last chapter of this report discusses developing a cumulative effects analysis methodology that draws upon existing methods, techniques, and tools to analyze cumulative effects. Appendix A provides brief descriptions of 11 cumulative effects analysis methods.

| Table 1-5. Steps in cumulative effects analysis (CEA) to be addressed in each component of environmental impact assessment (EIA) | |
|---|---|
| **EIA Components** | **CEA Steps** |
| **Scoping** | 1. Identify the significant cumulative effects issues associated with the proposed action and define the assessment goals. |
| | 2. Establish the geographic scope for the analysis. |
| | 3. Establish the time frame for the analysis. |
| | 4. Identify other actions affecting the resources, ecosystems, and human communities of concern. |
| **Describing the Affected Environment** | 5. Characterize the resources, ecosystems, and human communities identified in scoping in terms of their response to change and capacity to withstand stresses. |
| | 6. Characterize the stresses affecting these resources, ecosystems, and human communities and their relation to regulatory thresholds. |
| | 7. Define a baseline condition for the resources, ecosystems, and human communities. |
| **Determining the Environmental Consequences** | 8. Identify the important cause-and-effect relationships between human activities and resources, ecosystems, and human communities. |
| | 9. Determine the magnitude and significance of cumulative effects. |
| | 10. Modify or add alternatives to avoid, minimize, or mitigate significant cumulative effects. |
| | 11. Monitor the cumulative effects of the selected alternative and adapt management. |

10

# 2

# SCOPING FOR CUMULATIVE EFFECTS

## PRINCIPLES

- Include past, present, and future actions.
- Include all federal, nonfederal, and private actions.
- Focus on each affected resource, ecosystem, and human community.
- Focus on truly meaningful effects.

Expanding environmental impact assessment to incorporate cumulative effects can only be accomplished by the enlightened use of the scoping process. The purpose of scoping for cumulative effects is to determine (1) whether the resources, ecosystems, and human communities of concern have already been affected by past or present activities and (2) whether other agencies or the public have plans that may affect the resources in the future. This is best accomplished as an iterative process, one that goes beyond formal scoping meetings and consultations to include creative interactions with all the stakeholders. Scoping should be used in both the planning and project development stage (i.e., whenever information on cumulative effects will contribute to a better decision).

Scoping information may come from agency consultations, public comments, the analyst's own knowledge and experience, planning activities, the proponent's statements of purpose and need, underlying studies in support of the project proposal, expert opinion,

or other NEPA analyses. This information supports all the steps in cumulative effects analysis, including identifying data for establishing the environmental baseline (see Chapter 3) and identifying information related to impact significance (see Chapter 4). Most importantly, however, scoping for cumulative effects should include the following steps:

| Step 1 | Identify the significant cumulative effects issues associated with the proposed action and define the assessment goals. |
| Step 2 | Establish the geographic scope for the analysis. |
| Step 3 | Establish the time frame for the analysis. |
| Step 4 | Identify other actions affecting the resources, ecosystems, and human communities of concern. |

## IDENTIFYING CUMULATIVE EFFECTS ISSUES

Identifying the major cumulative effects issues of a project involves defining the following:

- the direct and indirect effects of the proposed action,
- which resources, ecosystems, and human communities, are affected, and
- which effects on these resources are important from a cumulative effects perspective.

11

The proposed action may affect several resources either directly or indirectly. Resources can be elements of the physical environment, species, habitats, ecosystem parameters and functions, cultural resources, recreational opportunities, human community structure, traffic patterns, or other economic and social conditions. In a broad sense, all the impacts on affected resources are probably cumulative; however, the role of the analyst is to narrow the focus of the cumulative effects analysis to important issues of national, regional, or local significance. This narrowing can occur only after thorough scoping. The analyst should ask basic questions such as whether the proposed action will have effects similar to other actions in the area and whether the resources have been historically affected by cumulative actions (Table 2-1). Many significant cumulative effects issues are well known. Public interest groups, natural resource and land management agencies, and regulatory agencies regularly deal with cumulative effects. Newspapers and scientific journals frequently publish letters and comments dealing with these issues.

Not all potential cumulative effects issues identified during scoping need to be included in an EA or an EIS. Some may be irrelevant or inconsequential to decisions about the proposed action and alternatives. Cumulative effects analysis should "count what counts", not produce superficial analyses of a long laundry list of issues that have little relevance to the effects of the proposed action or the eventual decisions. Because cumulative effects can result from the activities of other agencies or persons, they may have already been analyzed by others and the importance of the issue determined. For instance, an agency proposing an action with minor effects on wetlands should not unilaterally decide that cumulative effects on wetlands is not an important issue. Cumulative effects analysis should consider the concerns of agencies managing and regulating  wetlands, as well as the regional history of cumulative wetland losses and degradation, and the presence of other proposals that would produce future wetland losses or degradation.

## BOUNDING CUMULATIVE EFFECTS ANALYSIS

Once the study goals of the cumulative effects analysis are established, the analyst must decide on the specific content of the study that will meet those requirements. Analyzing cumulative effects differs from the traditional approach to environmental impact assessment because it requires the analyst to expand the geographic boundaries and extend the time frame to encompass additional effects on the resources, ecosystems, and human communities of concern.

### Identifying Geographic Boundaries

For a project-specific analysis, it is often sufficient to analyze effects within the immediate area of the proposed action. When analyzing the contribution of this proposed action to cumulative effects, however, the geographic boundaries of the analysis almost always should be expanded. These expanded boundaries can be thought of as differences in hierarchy or scale. Project-specific analyses are usually conducted on the scale of  counties, forest management units, or installation boundaries, whereas cumulative effects analysis should be conducted on the scale of human communities, landscapes, watersheds, or airsheds. Choosing the appropriate scale to use is critical and will depend on the resource or system. Figure 2-1 illustrates the utility of using the ecologically relevant watershed boundary of the Anacostia River basin rather than the political boundaries of local governments to develop restoration plans.

A useful concept in determining appropriate geographic boundaries for a cumulative effects analysis is the **project impact zone**.

---

**Table 2-1. Identifying potential cumulative effects issues related to a proposed action**

1.  What is the value of the affected resource or ecosystem? Is it:

    - protected by legislation or planning goals?
    - ecologically important?
    - culturally important?
    - economically important?
    - important to the well-being of a human community?

2.  Is the proposed action one of several similar past, present, or future actions in the same geographic area? (Regions may be land management units, watersheds, regulatory regions, states, ecoregions, etc.) *Examples: timber sales in a national forest; hydropower development on a river; incinerators in a community.*

3.  Do other activities (whether governmental or private) in the region have environmental effects similar to those of the proposed action? *Example: release of oxidizing pollutants to a river by a municipality, an industry, or individual septic systems.*

4.  Will the proposed action (in combination with other planned activities) affect any natural resources; cultural resources; social or economic units; or ecosystems of regional, national, or global public concern? *Examples: release of chlorofluorocarbons to the atmosphere; conversion of wetland habitat to farmland located in a migratory waterfowl flyway.*

5.  Have any recent or ongoing NEPA analyses of similar actions or nearby actions identified important adverse or beneficial cumulative effect issues? *Examples: National Forest Plan EIS; Federal Energy Regulatory Commission Basinwide EIS or EA.*

6.  Has the impact been historically significant, such that the importance of the resource is defined by past loss, past gain, or investments to restore resources? *Example: mudflat and salt-marsh habitats in San Francisco Bay.*

7.  Might the proposed action involve any of the following cumulative effects issues?

    - long range transport of air pollutants resulting in ecosystem acidification or eutrophication
    - air emissions resulting in degradation of regional air quality
    - release of greenhouse gases resulting in climate modification
    - loading large water bodies with discharges of sediment, thermal, and toxic pollutants
    - reduction or contamination of groundwater supplies
    - changes in hydrological regimes of major rivers and estuaries
    - long-term containment and disposal of hazardous wastes
    - mobilization of persistent or bioaccumulated substances through the food chain
    - decreases in the quantity and quality of soils
    - loss of natural habitats or historic character through residential, commercial, and industrial development
    - social, economic, or cultural effects on low-income or minority communities resulting from ongoing development
    - habitat fragmentation from infrastructure construction or changes in land use
    - habitat degradation from grazing, timber harvesting, and other consumptive uses
    - disruption of migrating fish and wildlife populations
    - loss of biological diversity



Figure 2-1.  Juxtaposition of natural and political boundaries surrounding the Anacostia River

For a proposed action or reasonable alternative, the analysts should

- Determine the area that will be affected by that action. That area is the project impact zone.

- Make a list of the resources within that zone that could be affected by the proposed action.

- Determine the geographic areas occupied by those resources outside of the project impact zone. In most cases, the largest of these areas will be the appropriate area for the analysis of cumulative effects.

- Determine the affected institutional jurisdictions, both for the proposing agency and other agencies or groups.

Project impact zones for a proposed action are likely to vary for different resources and environmental media. For water, the project impact zone would be limited to the hydrologic system that would be affected by the proposed action. For air, the zone may be the physiographic basin in which the proposed action would be located. Land-based effects may occur within some set distance from the proposed action. In addition, the boundaries for an individual resource should be related to the resource's dependence on different environmental media. Table 2-2 provides some possible geographic boundaries for different resources. This list is *not* inclusive. The applicable geographic scope needs to be defined case by case.

| Table 2-2. Geographic areas that could be used in a cumulative effects analysis | |
|---|---|
| **Resource** | **Possible Geographic Areas for Analysis** |
| Air quality | Metropolitan area, airshed, or global atmosphere |
| Water quality | Stream, watershed, river basin, estuary, aquifer, or parts thereof |
| Vegetative resources | Watershed, forest, range, or ecosystem |
| Resident wildlife | Species habitat or ecosystem |
| Migratory wildlife | Breeding grounds, migration route, wintering areas, or total range of affected population units |
| Fishery resources | Stream, river basin, estuary, or parts thereof; spawning area and migration route |
| Historic resources | Neighborhood, rural community, city, state, tribal territory, known or possible historic district |
| Sociocultural resources | Neighborhood, community, distribution of low-income or minority population, or culturally valued landscape |
| Land use | Community, metropolitan area, county, state, or region |
| Coastal zone | Coastal region or watershed |
| Recreation | River, lake, geographic area, or land management unit |
| Socioeconomics | Community, metropolitan area, county, state, or country |

One way to evaluate geographic boundaries is to consider the distance an effect can travel. For instance, air emissions can travel substantial distances and are an important part of regional air quality. Air quality regions are defined by the EPA, and these regions are an appropriate boundary for assessment of the cumulative effects of releases of pollutants to the atmosphere. For water resources, an appropriate regional boundary may be a river basin or parts thereof. Watershed boundaries are useful for cumulative effects analysis because (1) pollutants and material released in the watershed may travel downstream to be mingled with other pollutants and materials; (2) migratory fish may travel up and down the river system during their life cycle; and (3) resource agencies may have basin-wide management and planning goals. For land-based effects, an appropriate regional boundary may be a "forest or range," a watershed, an ecological region (ecoregion), or socioeconomic region (for evaluating effects on human communities). Which boundary is the most appropriate depends both on the accumulation characteristics of the effects being assessed and an evaluation of the management or regulatory interests of the agencies involved.

**Identifying Time Frames**

The time frame of the project-specific analysis should also be evaluated to determine its applicability to the cumulative effects analysis. This aspect of the cumulative effects analysis may at first seem the most troublesome to define. CEQ's regulations define cumulative effects as the "incremental effect of the action when added to other past, present, and reasonably foreseeable future actions" (40 CFR § 1508.7). In determining how far into the future to analyze cumulative effects, the analyst should first consider the time frame of the project-specific analysis. If the effects of the proposed action are projected to last five years, this time frame may be the most appropriate for

the cumulative effects analysis. The analyst should attempt to identify actions that could reasonably be expected to occur within that period.

There may be instances when the time frame of the project-specific analysis will need to be expanded to encompass cumulative effects occurring further into the future (Figure 2-2). For instance, even though the effects of a proposed action may linger or decrease slowly through time, the time frame for the project-specific analysis usually does not extend beyond the time when project-specific effects drop below a level determined to be significant. These project-specific effects, however, may combine with the effects of other actions beyond the time frame of the proposed action and result in significant cumulative effects that must be considered.

## IDENTIFYING PAST, PRESENT, AND REASONABLY FORESEEABLE FUTURE ACTIONS

As described above, identifying past, present, and future actions is critical to establishing the appropriate geographic and time boundaries for the cumulative effects analysis. Identifying boundaries and actions should be iterative within the scoping process.

A schematic diagram showing the area in which the proposed action is located, the location of resources, and the location of other facilities (existing or planned), human communities, and disturbed areas can be useful for identifying actions to be included in the cumulative effects analysis (Figure 2-3). A geographic information system (GIS) or a manual map overlay system can be used to depict this information (see Appendix A for a description of map overlays and GIS). Such a diagram is useful for determining project-specific impact zones and their overlap with areas affected by other nonproject actions.

16



Figure 2-2.  Time frames for project-specific and cumulative effects analyses

By examining the overlap of impact zones on the areas occupied by resources, it should be possible to refine the list of projects or activities (past, present, or future) to be included in the analysis.  Proximity of actions may not be sufficient justification to include them in the analysis.  In the example shown in Figure 2-3, the cumulative effects analysis for trout should consider the effects of the existing mine and the planned logging activity, because these activities would have either present or future effects on the trout spawning area below the proposed power plant facility. Although an agricultural area is nearby, it can be excluded from the analysis because its sediment loading effects occur downstream of the trout spawning area. Proximity of other actions to the proposed action is not the decisive factor for including these actions in an analysis; these actions must have some influence on the resources affected by the proposed action.  In other words, these other actions should be included in analysis when their impact zones overlap areas occupied by resources affected by the proposed action.

Completing the geographic or schematic diagram depending on applying cause-and-effect models that link human actions and the resources or ecosystems.  This too is an iterative process.  Identifying other activities contributing to cumulative effects could result in the addition of new effect pathways to the cause-and-effect model.  In the example, addition of an existing mine to the cumulative effects analysis could require adding a pathway for the effects of chemical pollution on trout.  Chapters 4 and 5 and Appendix A discuss cause-and-effect modeling and network analysis.

The availability of data often determines how far back past effects are examined. Although certain types of data (e.g., forest cover) may be available for extensive periods in the past (i.e., several decades), other data (e.g., water quality data) may be available only for

17



Figure 2-3.  Impact zones of proposed and existing development relative to a trout population

much shorter periods. Because the data describing past conditions are usually scarce, the analysis of past effects is often qualitative.

Identifying similar actions presently underway is easier than identifying past or future actions, but it is by no means simple. Because most of the analytical effort in an environmental impact assessment deals with the proposed action, the actions of other agencies and private parties are usually less well known. Effective cumulative effects analysis requires close coordination among agencies to ensure that even all present actions, much less past and future actions, are considered.

The first step in identifying future actions is to investigate the plans of the proponent agency and other agencies in the area. Commonly, analysts only include those plans for actions which are funded or for which other NEPA analysis is being prepared. This approach does not meet the letter or intent of CEQ's regulations. It underestimates the number of future projects, because many viable actions may be in the early planning stage. On the other hand, some actions in the planning, budgeting, or execution phase may not go forward. To include all proposals ever considered as other actions would most likely overestimate the future effects of cumulative effects on the resources, ecosystems, and human communities; therefore, the analyst should develop guidelines as to what constitutes "reasonably foreseeable future actions" based on the planning process within each agency. Specifically, the analyst should use the best available information to develop scenarios that predict which future actions might reasonably be expected as a result of the proposal. Such scenarios are generally based on experience obtained from similar projects located elsewhere in the region. Including future actions in the study is much easier if an agency has already developed a planning document that identifies proposed future actions and has commutilated these plans to other federal agencies and governmental bodies in the affected region.

When identifying future actions to include in the cumulative effects analysis, reasonably foreseeable actions by private organizations or individuals are usually more difficult to identify than those of federal or other governmental entities. In many cases, local government planning agencies can provide useful information on the likely future development of the region, such as master plans. Local zoning requirements, water supply plans, economic development plans, and various permitting records will help in identifying reasonably foreseeable private actions (see Chapter 3 for other sources of information). In addition, some private landowners or organizations may be willing to share their plans for future development or land use. These plans can be considered in the analysis, but it is important to indicate in the NEPA analysis whether these plans were presented by the private party responsible for originating the action. Whenever speculative projections of future development are used, the analyst should provide an explicit description of the assumptions involved. If the analyst is uncertain whether to include future actions, it may be appropriate to bound the problem by developing several scenarios with different assumptions about future actions.

In general, future actions can be excluded from the analysis of cumulative effects if

- the action is outside the geographic boundaries or time frame established for the cumulative effects analysis;

- the action will not affect resources that are the subject of the cumulative effects analysis; or

- including of the action would be arbitrary.

At the same time, NEPA litigation [*Scientists' Institute for Public Information, Inc., v. Atomic Energy Commission* (481 F.2d 1079 D.C. Cir.1073)] has made it clear that "reasonable forecasting" is implicit in NEPA and that it is the responsibility of federal agencies to predict the environmental effects of proposed actions before they are fully known. CEQ's regulations provide for including these uncertainties in the environmental impact assessment where the

foreseeable future action is not planned in suffi-cient detail to permit complete analysis. Specif-ically, CEQ's regulations state

> [w]hen an agency is evaluating reasonably foreseeable significant adverse effects on the human environment in an environmental impact statement and there is incomplete or unavailable information, ... [that] cannot be obtained because the overall costs of obtaining it are exorbitant or the means to obtain it are not known,... the agency shall include... the agency's evaluation of such impacts based upon theoretical approaches or research methods generally accepted in the scientific community (40 CFR § 1502.22).

Even when the decisionmaker does not select the environmentally preferable alterna-tive, including the cumulative effects of future actions in the analysis serves the important NEPA function of informing the public and potentially influencing future decisions.

## AGENCY COORDINATION

Because the actions of other agencies are part of cumulative effects analysis, greater emphasis should be placed on consulting with other agencies than is commonly practiced. Fortunately, when federal agencies adopt the ecosystem approach to management (espoused by the Interagency Ecosystem Management Task Force) such consultation probably will be enhanced (see box). During scoping, periodic coordination with other agencies may enhance the cumulative effects analysis process. As described above, a cumulative effects analysis might

- include an assessment of another agen-cy's proposed action,

- include an assessment of the effects of another agency's completed actions,

- evaluate another agency's resource man-agement practices and goals, or

- evaluate another agency's future plans.

### Ecosystem Management

Vice President Gore's National Performance Review called for the agencies of the federal government to adopt "a proactive approach to ensuring a sustainable economy and a sus-tainable environment through ecosystem management." The Interagency Ecosystem Management Task Force (IEMTF 1995) was established to carry out this mandate. The ecosystem approach espoused by IEMTF and a wide range of government, industry, and private interest groups is a method for sustain-ing or restoring natural systems in the face of the cumulative effects of many human actions. In addition to using the best science, the ecosystem approach to management is based on a collaboratively developed vision of desired future conditions that integrates ecological, economic, and social factors. Achieving this shared vision requires devel-oping partnerships with nonfederal stake-holders and improving communication between federal agencies and the public. Many ecosystem management initiatives are underway across the United States. The lessons learned from these experiences should be incorporated into the scoping process under NEPA to address cumulative effects more effectively. The IEMTF specifically recommends that agencies develop regional ecosystem plans to coordinate their review activities under NEPA. These ecosystem plans can provide a framework for evaluating the environmental status quo and the combined cumulative effects of individual projects.

The success of any of these activities is enhanced by coordination with the affected agency. At a minimum, the analyst should establish an ongoing process of periodic consultation and coordination with other agencies early in the scoping process whenever there are significant cumulative effects issues. Where appropriate, the lead agency should pursue cooperating agency status for affected agencies to facilitate reviewing drafts, supplying information, writing sections of the document, and using the

20

document to support more than one agency's programs.

## SCOPING SUMMARY

Scoping for cumulative effects analysis is a proactive and iterative process. It involves a thorough evaluation of the proposed action and its environmental context. During the scoping process, the analyst should

- consult with agencies and other interested persons concerning cumulative effects issues;

- evaluate the agency's planning as well as the proposed action and reasonable alternatives (including the no-action alternative) to identify potential cumulative effects;

- evaluate the importance of the cumulative effects issues associated with a proposed action to identify additional resources, ecosystems, and human communities that should be included in the EA or EIS;

- identify the geographic boundaries for analysis of the cumulative effects on each resource, ecosystem, and human community;

- identify a time frame for the analysis of the cumulative effects on each resource, ecosystem, and human community; and

- determine which other actions should be included in the analysis and agree among interested parties on the scope of the data to be gathered, the methods to be used, the way the process will be documented, and how the results will be reviewed.

At the end of the scoping process, there should be a list of cumulative effects issues to be assessed, a geographic boundary and time frame assigned for each resource analysis, and a list of other actions contributing to each cumulative effects issue. In addition, during scoping the analyst should obtain information and identify data needs related to the affected environment (Chapter 3) and environmental consequences (Chapter 4) of cumulative effects, including resource capabilities, thresholds, standards, guidelines, and planning goals.

21

# 3
# DESCRIBING THE AFFECTED ENVIRONMENT

> ### PRINCIPLES
>
> • **Use natural boundaries.**
>
> • **Focus on each affected resource, ecosystem, and human community.**

Characterizing the affected environment in a NEPA analysis that addresses cumulative effects requires special attention to defining baseline conditions. These baseline conditions provide the context for evaluating environmental consequences and should include historical cumulative effects to the extent feasible. The description of the affected environment relies heavily on information obtained through the scoping process (Chapter 2) and should include all potentially affected resources, ecosystems, and human communities. Determining the cumulative environmental consequences based on the baseline conditions will be discussed in Chapter 4. The affected environment section serves as a "bridge" between the identification during scoping of cumulative effects that are likely to be important and the analysis of the magnitude and significance of these cumulative effects. Specifically, describing the environment potentially affected by

cumulative effects should include the following steps:

| | |
|---|---|
| **Step 5** | Characterize the resources, ecosystems, and human communities identified during scoping in terms of their response to change and capacity to withstand stresses. |
| **Step 6** | Characterize the stresses affecting these resources, ecosystems, and human communities and their relation to regulatory thresholds. |
| **Step 7** | Define a baseline condition for the resources, ecosystems, and human communities. |

Describing the affected environment when considering cumulative effects does not differ greatly from describing the affected environment as part of project-specific analyses; however, analyses and supporting data should be extended in terms of geography, time, and the potential for resource or system interactions. In project-specific NEPA analysis, the description of the affected environment is based on a list of resources that may be directly or indirectly affected by the proposed project. In cumulative effects analysis, the analyst must attempt to identify and characterize effects of other actions on these same resources. The affected environment for a cumulative effects analysis,

23

therefore, may require wider geographic boundaries and a broader time frame to consider these actions (see the discussion on bounding cumulative effects analysis in Chapter 2).

## COMPONENTS OF THE AFFECTED ENVIRONMENT

To address cumulative effects adequately, the description of the affected environment should contain four types of information:

- data on the **status** of important natural, cultural, social, or economic **resources and systems**;

- data that characterize important environmental or social **stress factors**;

- a description of pertinent **regulations, administrative standards, and development plans**; and

- data on environmental and socioeconomic **trends**.

The analyst should begin by evaluating the existing resources likely to be cumulatively affected, including one or more of the following: soils, geology and geomorphology, climate and rainfall, vegetative cover, fish and wildlife water quality and quantity, recreational uses, cultural resources, and human community structure within the area of expected project effects. The analyst should also review social and economic data (including past and present land uses) closely associated with the status of the resources, ecosystems, and human communities of concern. The description of the affected environment should focus on how the existing conditions of key resources, ecosystems, and human communities have been altered by human activities. This historical context should include important human stress factors and pertinent environmental regulations and standards. Where possible, trends in the condition of resources, ecosystems, and human communities should be identified. The

description of the affected environment will not only provide the baseline needed to evaluate environmental consequences, but also it will help identify other actions contributing to cumulative effects. While describing the affected environment, the analyst should pay special attention to common natural resource and socioeconomic issues that arise as a result of cumulative effects. The following list describes many issues but is by no means exhaustive:

### Air

- Human health hazards and poor visibility from the cumulative effects of emissions that lower ambient air quality by elevating levels of ozone, particulates, and other pollutants.

- Regional and global atmospheric alterations from cumulative additions of pollutants that contribute to global warming, acidic precipitation, and reduced ultraviolet radiation absorption following stratospheric ozone depletion.

### Surface Water

- Water quality degradation from multiple point-source discharges.

- Water quality degradation from land uses that result in nonpoint-source pollution within the watershed.

- Sediment delivery to a stream or estuary from multiple sources of soil erosion caused by road construction, forestry practices, and agriculture.

- Water shortages from unmanaged or unmonitored allocations of the water supply that exceed the capacity of the resource.

- Deterioration of recreational uses from nonpoint-source pollution, competing uses for the water body, and overcrowding.

24

### Ground Water

- Water quality degradation from nonpoint- and multiple-point sources of pollution that infiltrate aquifers.

- Aquifer depletion or salt water intrusion following the overdraught of groundwater for numerous uncoordinated uses.

### Lands and Soils

- Diminished land fertility and productivity through chemical leaching and salinization resulting from nonsustainable agricultural practices.

- Soil loss from multiple, uncoordinated activities such as agriculture on excessive gradients, overharvesting in forestry, and highway construction.

### Wetlands

- Habitat loss and diminished flood control capacity resulting from dredging and filling individual tracts of wetlands.

- Toxic sediment contamination and reduced wetlands functioning resulting from irrigation and urban runoff.

### Ecological Systems

- Habitat fragmentation from the cumulative effects of multiple land clearing activities, including logging, agriculture, and urban development.

- Degradation of sensitive ecosystems (e.g., old growth forests) from incremental stresses of resource extraction, recreation, and second-home development.

- Loss of fish and wildlife populations from the creation of multiple barriers to migration (e.g., dams and highways).

### Historic and Archaeological Resources

- Cultural site degradation resulting from streambank erosion, construction, plowing and land leveling, and vandalism.

- Fragmentation of historic districts as a result of uncoordinated development and poor zoning.

### Socioeconomics

- Over-burdened social services due to sudden, unplanned population changes as a secondary effect of multiple projects and activities.

- Unstable labor markets resulting from changes in the pool of eligible workers during "boom" and "bust" phases of development.

### Human Community Structure

- Disruption of community mobility and access as a result of infrastructure development.

- Change in community dynamics by incremental displacement of critical community members as part of unplanned commercial development projects.

- Loss of neighborhoods or community character, particularly those valued by low-income and minority populations, through incremental development.

The cumulative effects analyst should determine if the resources, ecosystems, and human communities identified during scoping include all that could potentially be affected when cumulative effects are considered. This means reviewing the list of selected resources in terms of their expanded geographic boundaries and time frames. It also requires evaluating the system interactions that may identify additional resources subject to potential cumulative effects. If scoping addresses a limited set of resources and fails to consider those with which they interact, the analyst should evaluate the need to consider additional resources. The analyst should return to the list of resources frequently and be willing to modify it as necessary; furthermore, the analyst should be able to identify and discuss conflicts between

25

the resources (such as competition for regulated instream flows between fishery interests and the whitewater boating community).

## Status of Resources, Ecosystems, and Human Communities

Determining the status of the affected environment depends on obtaining data about the resources, ecosystems, and human communities of concern. The availability of information continues to vary, but the number of useful indicators of ecological condition has increased greatly in recent years. In particular, indicators of the health or integrity of biological communities are in widespread use by water resource management agencies (Southerland and Stribling 1995). The concept of "indices of biotic integrity" (Karr et al. 1986; Karr 1991) is a powerful tool for evaluating the cumulative effects on natural systems, because biological communities act as integrators of multiple stresses over time. By using biological indicators in conjunction with reference or minimally affected sites, investigators have described the baseline conditions of entire regions. This approach has been applied to many freshwater and estuarine environments. Figure 3-1 describes the status of benthic communities of estuarine organisms in the Chesapeake Bay (Ranasinghe et al. 1994). This kind of information can be used to describe the baseline conditions at both the site and regional scales.

A second major innovation in indicators of resource or ecosystem condition is the development of landscape metrics. The discipline of landscape ecology recognizes that critical ecological processes such as habitat fragmentation require a set of indicators (e.g., habitat pattern shape, dominance, connectivity, configuration) at the landscape scale (Forman and Godron 1986; Risser et al. 1984). Investigators at the Oak Ridge National Laboratory and elsewhere have developed several indicators that can be used in conjunction with remote sensing and GIS technologies to describe the environmental baseline for sites or regions (O'Neill et al. 1988, 1994). The comprehensive spatial coverage and

multiple characterizations over time available from remote sensing make linking these measures to known environmental conditions one of the most promising approaches for assessing status and trends in resources and ecosystems.



Figure 3-1.   Status of benthic communities as a baseline of ecological conditions in the Chesapeake Bay (Ranasinghe et al. 1994)

Indicators have also been developed to gauge the well-being of human communities. Concern about human health and environmental conditions in minority and low-income communities has resulted in directives and guidelines for addressing environmental justice (see box). The structure, or societal setting, of human communities is analogous to the

structure of a natural ecosystem. Human communities are integrated entities with characteristic compositions, structures, and functioning. The community profile draws upon indicators of these aspects to describe the integrity of the community (FHWA 1996). Community indicators can range from general variables such as "social service provision" to specific indicators such as "distance to nearest hospital." Indicators can also be composites of different factors. For example, the familiar "quality of life" indicator is an attempt to merge key economic,

cultural, and environmental factors into an overall characterization of community well-being.

## Characterization of Stress Factors

Environmental impact assessment is an attempt to characterize the relationship between human activities and the resultant environmental and social effects; therefore, the next step in describing the affected environment is to compile data on stress factors pertaining to each resource, ecosystem, and human community. Table 3-1 lists 26 activities (both existing and proposed), in addition to the proposed action, that may cumulatively affect resources of concern for the Castle Mountain Mining Project (U.S. BLM 1990). For each activity in this example, anticipated cumulative effects are identified for each of 12 resource issues. The primary locations of expected effects are also listed. The analyst should use this kind of stress information to summarize the overall adverse effect on the environment. Analogously, other activities that benefit the environment (e.g., restoration projects) should be included to determine the overall net (adverse or beneficial) effect on the environment. Where activities contributing to cumulative effects are less well defined, a general stress level can be described. For instance, the affected environment discussion need not address every farm in the watershed, but it should note the presence of substantial agricultural activity.

Two types of information should be used to describe stress factors contributing to cumulative effects. First, the analyst should identify the types, distribution, and intensity of key social and economic activities within the region. Data on these socioeconomic "driving variables" can identify cumulative effects problems in the project area (McCabe et al. 1991). For example, population growth is strongly associated with habitat loss. A federal proposal that would contribute to substantial population growth in a specific region (e.g., a highway project traversing a remote area) should be viewed as a likely driving variable for environmental effects.

### Environmental Justice

In 1994, President Clinton issued Executive Order 12898, "Federal Actions to Address Environmental Justice in Minority Populations and Low-Income Populations," requiring federal agencies to adopt strategies to address environmental justice concerns within the context of agency operations. In an accompanying memorandum, the President emphasizes that existing laws, including NEPA, provide opportunities for federal agencies to address this issue. The U.S. EPA has stated that addressing environmental justice concerns is entirely consistent with NEPA and that disproportionately high and adverse human health or environmental effects on minority or low-income populations should be analyzed with the same tools currently intrinsic to the NEPA process. Specifically, the analysis should focus on smaller areas or communities within the affected area to identify significant effects that may otherwise have been diluted by an examination of a larger population or area. Demographic, geographic, economic, and human health and risk factors all contribute to whether the populations of concern face disproportionately high and adverse effects. Public involvement is particularly important for identifying the aspects of minority and low-income communities that need to be addressed. Early and sustained communications with the affected community throughout the NEPA process is an essential aspect of environmental justice.

## Table 3-1. Other activities (existing and proposed) that may cumulatively affect resources of concern for the Castle Mountain Mining Project (U.S. BLM 1990)

| Description/Responsible Agency | Status | Anticipated Environmental Issues That Could Be Cumulative | Primary Impact Location |
|---|---|---|---|
| **Utilities/Services** | | | |
| 1  AT&T Communication cable upgrading (BLMN) | E,P | 4,1 | IV |
| 2  PacBell microwave sites (BLMN) | E,P | 4,1 | IV |
| 3  Bio Gen power plant (SBC) | E | 2 | IV |
| 4  Additional utility lines  (1-15 corridor) (BLMN) | P | 4,4 | IV |
| 5  Whiskey Pete's airstrip/waterline (BLMN) | P | 4 | IV |
| 6  Solid waste landfill (UP Tracks near state line) (BLMN) | P | 4,12 | IV |
| 7  Waste water ponds (Ivanpah Lake) (BLMN) | E | 4,9 | IV |
| 8  Nipton waste site (BLMN) | P | 4,9 | IV |
| 9  LA-Las Vegas bullet train (BLMN) | P | 4,9,10 | IV |
| **Commercial and Residential** | | | |
| 10  Nipton land exchange (BLMN) | P | 4,6,12 | IV |
| 11  Scattered residential units (BLMN) | E,P | -- | LV |
| **Recreation** | | | |
| 12  Ivanpah Lake landsailing (BLMN) | E | 4,5,10 | IV |
| 13  Barstow to Vegas ORV race (BLMN) | E | 4,5,10 | IV |
| 14  East Mojave Heritage Trail use (BLMN) | E | 4,5,10 | IV,LV,PV |
| 15  Mojave Road use (BLMN) | E | 4,5,10 | IV,LV,PV |
| 16  Clark Country Road A68P use (BLMS,CC) | E | 4,5,10 | PV |
| **Mining** | | | |
| 17  Proposed Action/Alternative - precious metals (BLMN) | P | 3,4,5,8,9 | LV |
| 18  Colosseum Mine - precious metals (BLMN) | E | 3,4,5,8,9 | IV |
| 19  Caltrans borrow pits - aggregates (BLMN) | E | 4,5 | IV |
| 20  Morning Star Mine - precious metals (BLMN) | E | 3,4,5,8,9 | IV |
| 21  Vanderbilt - precious metals mill site (BLMN) | E | 3,4,5,8,9 | IV |
| 22  Golden Quail Mine - precious metals (BLMN) | E | 3,4,5,8,9 | LV |
| 23  Hart District Clay Pits (BLMN) | E | 4,9 | LV |
| 24  Mountain Pass Mine - rare earth materials (BLMN) | E | 3,4,5,8,9 | IV |
| 25  Exploratory activities (BLMN, BLMS) | E,P | 4,5,9 | LV,PV |
| **Grazing** | | | |
| 26  Grazing leases (BLMN, BLMS) | E | 4,5 | IV,V,PV |

| Source of Information<br>BLMN: BLM Needles<br>BLMS:  BLM Stateline<br>SBC: San Bernardino County. Planning Department<br>CC:  Clark County. Planning Department | Status<br>E: Existing<br>P: Proposed | Issues<br>1  Earth<br>2  Air<br>3  Water<br>4  Wildlife<br>5  Vegetation<br>6  Transportation<br>7  Public Service/Utilities<br>8  Health/Safety<br>9  Visual Resources<br>10 Recreation<br>11 Cultural Resources<br>12 Land Use | Location<br>PV:  Piute Valley<br>IV:  Ivanpah Valley<br>LV:  Lanfair Valley |

28

Second, the analyst should look for individual indicators of stress on specific resources, ecosystems, and human communities. Like the familiar "canary in the coal mine," changes in certain resources can serve as an early warning of impending environmental or social degradation (Reid et al. 1991). Indicators of environmental stress can be either exposure-oriented (e.g., contamination levels) or effects-oriented (e.g., loss or degradation of a fishery). High sediment loads and the loss of stable stream banks are both common indicators of cumulative effects from urbanization.

The goal of characterizing stresses is to determine whether the resources, ecosystems, and human communities of concern are approaching conditions where additional stresses will have an important cumulative effect. Simple maps (Figure 3-2) of existing and planned activities can indicate likely cumulative effects, as in the example of Seattle's Southwest Harbor (USACE et al. 1994). Regulatory, administrative, and planning information can also help define the condition of the region and the development pressures occurring within it. Lastly, trends analysis of change in the extent and magnitude of stresses is critical for projecting the future cumulative effect.

### Regulations, Administrative Standards, and Regional Plans

Government regulations and administrative standards (e.g., air and water quality criteria) can play an important role in characterizing the regional landscape. They often influence developmental activity and the resultant cumulative stress on resources, ecosystems, and human communities. They also shape the manner in which a project may be operated, the amount of air or water emissions that can be released, and the limits on resource harvesting or extraction. For example, designation of a "Class I" air quality area can restrict some types of development in a region because the Prevention of Significant Deterioration (PSD) requirement establishes a threshold of cumulative air quality degradation.

In the United States, agencies at many different levels of government share responsibilities for resource use and environmental protection. In general, the federal government is charged with functions such as national standard-setting, whereas state governments manage implementation by issuing permits and monitoring compliance with regulatory standards. Each of the states handles environmental regulation and resource management in its own way. Most states have chartered specific agencies for environmental protection, resource management, or both. This information, along with contact names, can be obtained from the Council of State Governments (Brown and Marshall 1993). States usually have discretion under federal law to set standards more stringent than national ones. Land-use decisions are usually made by local governments. Local control may take the form of authority to adopt comprehensive land use plans; to enact zoning ordinances and subdivision regulations; or to restrict shoreline, floodplain, and wetland development. Data on local government issues and programs can be obtained through relevant local government agencies.

The affected environment section of a NEPA analysis should include as many regulations, criteria, and plans as are relevant to the cumulative effects problems at hand. Federal, state, and local resource and comprehensive plans guiding development activities should be reviewed and, where relevant, used to complete characterization of the affected environment. Agencies' future actions and plans pertaining to the identified resources of concern should be included if they are based on authorized plans or permits issued by a federal, state, or other governmental agency; highly speculative actions should not be included. Agency or regional planning documents can provide the analyst with a reasonable projection of future activities and their modes of operation. How project effects fit within the goals of governmental regulations and planning is an important measure of cumulative effects on the resources, ecosystems, and human communities of the region.

29



Figure 3-2. Regional map of projects and activities contributing to cumulative effects in Seattle's Southwest Harbor (USACE et al. 1994)

### Trends

Cumulative effects occur through the accumulation of effects over varying periods of time. For this reason, an understanding of the historical context of effects is critical to assessing the direct, indirect, and cumulative effects of proposed actions. Trends data can be used in three ways: (1) to establish the baseline for the affected environment more accurately (i.e., by incorporating variation over time), (2) to evaluate the significance of effects relative to historical degradation (i.e., by helping to estimate how close the resource is to a threshold of degradation), and (3) to predict the effects of the action (i.e., by using the model of cause and effects established by past actions).

The ability to identify trends in conditions of resources or in human activities depends on available data. Although data on existing conditions can sometimes be obtained for cumulative effects analysis, analysts can rarely go back in time to collect data (in some cases, lake sediment cores or archaeological excavations can reconstruct relevant historical conditions). Improved technologies for cost-effectively accessing and analyzing data that have been collected in the recent past , however, have been developed. Historical photographs and remotely sensed satellite information can be efficiently analyzed on geographic information systems to reveal trends. The analyst may use these tools to characterize the condition of a resource before contemporary human influences, or the condition at the period when resource degradation was first identified. As shown in Figure 3-3, remote sensing imagery was used to record the change in the condition of the Jemez Mountains, New Mexico (Allen 1994). The 1935 map (left) shows the location of railroads, dirt roads, and primitive roads in the landscape surrounding the Bandelier National Monument. By 1981 (right) the increase in roads and the appearance of several townsites is striking.

This 12-fold increase in total road length is an effective measure of cumulative environmental degradation resulting from the accompanying fire suppression, motorized disturbance of wildlife, creation of habitat edge in forest interiors, and introduction of weedy species along road corridors. The U.S. Forest Service has been using this landscape-scale GIS and remotely sensed information in planning efforts for the Bandelier's headwaters area to ensure that desired forest conditions are maintained (e.g., area and distribution of old growth and densities of snags).

## OBTAINING DATA FOR CUMULATIVE EFFECTS ANALYSIS

Obtaining information on cumulative effects issues is often the biggest challenge for the analyst. Gathering data can be expensive and time consuming. Analysts should identify which data are needed for their specific purpose and which are readily available. In some cases, federal agencies or the project proponent will have adequate data; in other cases, local or regional planning agencies may be the best source of information. Public involvement can often direct the analyst to useful information or, itself, serve as an invaluable source of information, especially about the societal setting, which is critical for evaluating effects on human communities. In any case, when information is not available from traditional sources, analysts must be resourceful in seeking alternative sources. Table 3-2 lists some of the possible types and sources of information that may be of use for cumulative effects analysis.

Although most information needed to describe the affected environment must be obtained from regional and local sources, several national data centers are important. Census Bureau publications and statistical abstracts are commonly used for addressing demographic, housing, and general socioeconomic issues, as are several commercial business databases. Currently, an extensive inventory of environmental data coordinated by

31

The Nature Conservancy through state Natural Heritage Programs (NHPs) and Conservation Data Centers (CDCs) provides the most comprehensive information available about the abundance and distribution of rare species and communities (Jenkins 1988). NHPs and CDCs are continually updated, computer-assisted inventories of the biological and ecological features (i.e., biodiversity elements) of the region in which they are located. These data centers are designed to assist in conservation planning, natural resource management, and environmental impact assessment. Another promising source of data is the U.S. Geological Survey's Biological Resources Division, created by the consolidation of biological research, inventory and monitoring, and information transfer programs of seven Department of Interior bureaus. The mission of the Division is to gather, analyze, and disseminate the biological information necessary to support sound management of the nation's resources. The U.S. Geological Survey itself was originally created in response to the demands of industry and conservationists for accurate baseline data. Although substantial information can already be obtained from USGS, the implementation of the National Biodiversity Information Infrastructure (NAS 1993) may provide even greater access to comprehensive biological data.



Figure 3-3. Remote sensing imagery illustrating the cumulative increase in roads between 1935 and 1981 across the same 187,858 ha of the Jemez Mountains, New Mexico. The crosshatched line is a railroad; the solid lines are dirt roads; the thin dashed lines are primitive roads' and dotted lines show the current boundary of Bandelier National Monument (Allen 1994).

32

| Table 3-2. Possible sources of existing data for cumulative effects analysis | |
|---|---|
| Individuals | ▪ former and present landholders<br>▪ long-time residents<br>▪ long-time resource users<br>▪ long-time resource managers |
| Historical societies | Local, state, and regional societies provide:<br>▪ personal journals<br>▪ photos<br>▪ newspapers<br>▪ individual contacts |
| Schools and universities | ▪ central libraries<br>▪ natural history or cultural resources collections or museums<br>▪ field stations<br>▪ faculty in history and natural and social sciences |
| Other collections | Private, city, state, or federal collections in :<br>▪ archaeology<br>▪ botany<br>▪ zoology<br>▪ natural history |
| Natural history surveys | ▪ private<br>▪ state<br>▪ national |
| Private organizations | ▪ land preservation<br>▪ habitat preservation<br>▪ conservation<br>▪ cultural resources history<br>▪ religious institutions<br>▪ chambers of commerce<br>▪ voluntary neighborhood organizations |
| Government agencies | ▪ local park districts<br>▪ local planning agencies<br>▪ local records-keeping agencies<br>▪ state and federal land management agencies<br>▪ state and federal fish, wildlife, and conservation agencies<br>▪ state and federal regulatory agencies<br>▪ state planning agencies<br>▪ state and federal records-keeping agencies<br>▪ state and federal surveys<br>▪ state and federal agricultural and forestry agencies<br>▪ state historic preservation offices<br>▪ Indian tribal government planning, natural resource, and cultural resource offices |
| Project proponent | ▪ project plans and supporting environmental documentation |

Although federal data sources are critical for compiling baseline data, they have substantial limitations. For the most part, federal environmental data programs have evolved to support a specific agency's missions. They are not designed to capture the interconnections among environmental variables or generate information needed for analyses that cut across sectorial and disciplinary lines. The fact that federal databases are often generated by monitoring programs designed to track progress in meeting regulatory goals further inhibits integration of data (Irwin and Rodes 1992). The only comprehensive effort to develop estimates of baseline ecological conditions across the United States has been the Environmental Monitoring and Assessment Program (EMAP). EMAP has successfully developed indicators for many resources and has applied them in regional demonstration programs to provide statistically rigorous estimates of the condition of ecosystems. Fully implemented, this program would be invaluable for analyzing cumulative effects (see box).

## Defining Baseline Ecological Conditions Through EMAP

Over the last decade, EPA has led a multiagency effort to assess the condition of the nation's ecological resources (Messer et al. 1991). The Environmental Monitoring and Assessment Program (EMAP)'s goal is to identify the extent and magnitude of environmental problems on regional and national scales and to provide information that policy makers, scientists, and the public need to evaluate the success of environmental policies and programs (Thornton et al. 1994). EMAP has developed a scientifically rigorous monitoring design (Overton et al. 1990) within which appropriate indicators (Barber 1994) can be sampled to provide the types of information required to address these questions. EMAP has successfully field tested many of the indicators, sampling protocols, and assessment methods required to evaluate the condition of individual ecological resources (Larsen and Christie 1993; Summers et al. 1993; Weisberg et al. 1993; Lewis and Conkling 1994). Although estimates of the condition of certain resources have been developed for certain regions, EMAP has not yet been implemented on a large scale.

EMAP differs from other monitoring programs in the following ways:

- EMAP focuses on assessing ecological condition by measuring biological indicators. Biological indicators provide integrated measures of response to natural and human-induced stress that cannot be obtained from traditional chemical and physical indicators of environmental stresses such as pollutants and habitat modification. The program maintains a core set of indicators that are implemented nationally with uniform methodology and quality control.

- EMAP uses a statistically rigorous sampling design. By measuring indicators within a network of probability samples rather than from sites selected using subjective criteria, EMAP produces unbiased estimates of the status of and changes in indicators of ecological condition with known confidence.

- EMAP takes an ecosystem-oriented approach to monitoring by sampling several ecological resources. EMAP maintains monitoring efforts in agricultural lands, rangelands, forests, estuaries, and surface waters (i.e., lakes and streams). It also maintains cross-cutting activities in landscape characterization, indicator development, and atmospheric deposition.

These attributes make EMAP uniquely suited to addressing cumulative effects. Where regional estimates of ecological condition have been developed, they can be used as baseline conditions for evaluating the effects of new projects. Although EMAP monitoring is currently limited to a few regions of the country, the EMAP approach is being applied to state monitoring efforts that will establish baseline conditions (see Southerland and Weisberg 1995 for application to Maryland streams).

## AFFECTED ENVIRONMENT SUMMARY

The description of the affected environment helps the decisionmaker understand the current conditions and the historical context of the important resources, ecosystems, and human communities. The analyst uses this phase of the NEPA process to characterize the region and determine the methodological complexity required to adequately address cumulative effects. In describing the affected environment, the cumulative effects analyst should

- identify common cumulative effects issues within the region;
- characterize the current status of the resources, ecosystems, and human communities identified during scoping;
- identify socioeconomic driving variables and indicators of stress on these resources;

34

- characterize the regional landscape in terms of historical and planned development and the constraints of governmental regulations and standards; and

- define a baseline condition for the resources using historical trends.

The affected environment section should include data on resources, ecosystems, and human communities; environmental and socioeconomic stress factors; governmental regulations, standards, and plans; and environmental and social trends. This information will provide the analyst with the baseline and historical context needed to evaluate the environmental consequences of cumulative effects (Chapter 4).

# 4

# DETERMINING THE ENVIRONMENTAL CONSEQUENCES OF CUMULATIVE EFFECTS

---

**PRINCIPLES**

- Address additive, countervailing, and synergistic effects.
- Look beyond the life of the action.
- Address the sustainability of resources, ecosystems, and human communities.

---

The diversity of proposed federal actions and the environments in which they occur make it difficult to develop or recommend a single method or approach to cumulative effects analysis. In this chapter, we attempt to provide insight into and general guidelines for performing analyses needed to determine the environmental consequences of cumulative effects. We assume the analysis has already been scoped, including stipulating geographic and time boundaries (see Chapter 2), and that appropriate data have been gathered for the resources, ecosystems, and human communities of concern (see Chapter 3). Reference is made, when appropriate, to specific cumulative effects analysis methods described in Chapter 5 and Appendix A.

The analyst must ensure that the resources identified during scoping encompass all those needed for an analysis of cumulative effects. The analyst must also ensure that the relevant past, present, and reasonably foreseeable future actions have been identified. As an iterative process, cumulative effects analysis often identifies additional resources or actions involved in cumulative effects during the analysis phase. In addition to confirming the resources and actions to be considered, the analyst should complete the following specific steps to determine the environmental consequences of the cumulative effects:

**Step 8** — Identify the important cause-and-effect relationships between human activities and resources, ecosystems, and human communities.

**Step 9** — Determine the magnitude and significance of cumulative effects.

**Step 10** — Modify or add alternatives to avoid, minimize, or mitigate significant cumulative effects.

**Step 11** — Monitor the cumulative effects of the selected alternative and adapt management.

## CONFIRMING THE RESOURCES AND ACTIONS TO BE INCLUDED IN THE CUMULATIVE EFFECTS ANALYSIS

Even though scoping has identified likely important cumulative effects, the analyst should include other important cumulative effects that arise from more detailed consider-

37

ation of environmental consequences. In addition, as the proposed action is modified or other alternatives are developed (usually to avoid or minimize adverse effects), additional or different cumulative effects issues may arise. Specifically, the proposed action and reasonable alternatives (including the no-action alternative) could affect different resources and could affect them in different ways. For instance, hydroelectric facilities primarily affect aquatic resources by blocking fish migration routes, altering thermal regimes, and eroding stream channels as releases fluctuate. Reasonable alternatives for proposed hydroelectric facilities often include various types of power generating facilities that affect the environment in different ways. For example, the effects of coal-fired electric plants are most often related to coal-mining activities, the release of heated water to nearby water bodies in the cooling process, and the release of a variety of pollutants (including greenhouse gases) to the air during combustion. Nuclear plants also release heated water but they release radioactive materials to the air instead of greenhouse gases. Other past, present, or future actions also should be included in the analysis if evaluation of the cause-and-effect relationships identifies additional stresses affecting resources, ecosystems, and human communities of concern.

## IDENTIFYING AND DESCRIBING CAUSE-AND-EFFECT RELATIONSHIPS FOR RESOURCES, ECOSYSTEMS, AND HUMAN COMMUNITIES

In preparing any assessment, the analyst should gather information about the cause-and-effect relationships between stresses and resources. The relationship between the percent of fine sediment in a stream bed and the emergence of salmon fry (Figure 4-1) is an example of a model of cause and effect that can be useful for identifying the cumulative effects on a selected resource. Such a model describes the response of the resource to a change in its environment. To determine the consequences of

the proposed action on the resource, the analyst must determine which cumulative environmental changes (e.g., higher sediment load) will result from the proposed action and other actions.



Figure 4-1. Empirical cause and effect relationship between emergence of salmon fry and percent of fine sediment in the stream bottom (Stowell et al. 1983)

### Determining the Environmental Changes that Affect Resources

Using information gathered to describe the affected environment, the factors that affect resources (i.e., the causes in the cause-and-effect relationships) can be identified and a conceptual model of cause and effect developed. Networks and system diagrams are the preferred methods of conceptualizing cause-and-effect relationships (see Appendix A). The analyst can develop this model without knowing precisely how the resource responds to environmental change (i.e., the mechanism of the cause-and-effect relationship). If all pathways are identified, the model will be quite complex (Figure 4-2). Such a complex model can seldom be fully analyzed because sufficient data usually are not available to quantify each pathway. Because of this, the model should be simplified to include only important relationships that can be supported by information (Figure 4-3).



Figure 4-2.  Example of a complex model of cause and effect

Figure 4-3.  Example of a simplied model of cause and effect

The cause-and-effect model can aid in the identification of past, present, and future actions that should be considered in the analysis. In the example shown in Figure 4-3, the analyst should determine if there are other projects in the area that would affect any of the cause-and-effect pathways. The cause-and-effect model for the cumulative effects analysis will often include pathways that would not be needed for a project-specific analysis. Thus, as in defining boundaries, analyzing the consequences of cumulative effects requires broader thinking about the interactions among the activities and resources that affect environmental change.

## Determining the Response of the Resource to Environmental Change

Once all of the important cause-and-effect pathways are identified, the analyst should determine how the resource responds to environmental change (i.e., what the effect is). The cause-and-effect relationships for each resource are used to determine the magnitude of the cumulative effect resulting from all actions included in the analysis.

Cause-and-effect relationships can be simple or complex. The magnitude of an effect on a species may depend simply on the amount of habitat that is disturbed. Similarly, effects on archaeological sites may be quantified by enumerating the sites that are disturbed. Other responses may be more complex. The example shown in Figure 4-1 demonstrated that the successful hatching of salmon eggs depends on the percentage of fine particles in the stream bottom in a complex but predictable fashion. Socioeconomic models can be applied in a similar way to determine the effects of changes in immigration and emigration rates on the financial condition of a human community.

A wide variety of cause-and-effect evaluation techniques have been described in the literature (see Chapter 5). Techniques for evaluating ecological resources include the set of Habitat Suitability Index Models (HSI;

Schamberger et al. 1982; Hayes 1989) developed by the U.S. Fish and Wildlife Service for its Habitat Evaluation Procedures (HEP; U.S. Fish and Wildlife Service 1980). These models use cause-and-effect relationships for several key environmental variables to determine the suitability of different habitats for a variety of species. The change in number of habitat units (i.e., the ability of an area to support a species) as a result of multiple actions is a useful measure of cumulative effects. Species habitat models also drive the Habitat Evaluation System of the U.S. Army Corps of Engineers (1980). For wetland habitat designations, the Wetland Evaluation Technique is often used (Adamus et al. 1987). Other methods for linking measures of environmental change to effects on resources include developing relationships between loss in wetland area and functions such as flood storage, water quality, and life support (Preston and Bedford 1988; Leibowitz et al. 1992) and linking hydrology first to vegetation and then to wildlife habitat (Nestler 1992).

Nonlinear cause-and-effect relationships among several environmental changes pose an additional challenge for the analyst. A common example is the synergistic effect on fish populations that results from the combination of direct mortality losses to hydropower turbines and increased predation losses that occur as predators are attracted to dead and stunned fish. The analyst may also have to predict additional fish mortality from disease as a result of reductions in immune responses caused by toxic contamination. A third example of a common cumulative cause-and-effect problem is the combined effect on dissolved oxygen levels of excessive algal growth resulting from both increased nutrient loading and higher temperatures.

One of the most useful approaches for determining the likely response of the resource, ecosystem, and human community to environmental change is to evaluate the historical effects of activities similar to those under consideration. In the case of road construction through a

40

forest, the effects of similar past actions such as the construction of pipelines and power lines may provide a basis for predicting the likely effects of the proposed road construction. The residual effects of constructing and operating these linear facilities include fragmentation of forest tracts and the creation of homogeneous vegetation in the rights-of-way. Trends analysis (see Appendix A) can be used to model the effects of linear facilities over time and extrapolate the effects of a road construction project into the future.

If cause-and-effect relationships cannot be quantified, or if quantification is not needed to adequately characterize the consequences of each alternative, qualitative evaluation procedures can be used. The analyst may categorize the magnitude of effects into a set number of classes (e.g., high, medium, or low) or provide a descriptive narrative of the types of effects that may occur. Often, the analyst will be limited to qualitative evaluations of effects because cause-and-effect relationships are poorly understood or because few site-specific data are available. Even when the analyst cannot quantify cumulative effects, a useful comparison of relative effects can enable a decisionmaker to choose among alternatives.

## DETERMINING THE MAGNITUDE AND SIGNIFICANCE OF CUMULATIVE EFFECTS

The analyst's primary goal is to determine the magnitude and significance of the environmental consequences of the proposed action in the context of the cumulative effects of other past, present, and future actions. To accomplish this, the analyst must use a conceptual model of the important resources, actions, and their cause-and-effect relationships. The critical element in this conceptual model is defining an appropriate baseline or threshold condition of the resource, ecosystem, and human community beyond which adverse or beneficial change would cause significant degradation or enhancement of the resource, respectively.

The concept of a baseline against which to compare predictions of the effects of the proposed action and reasonable alternatives is critical to the NEPA process. The no-action alternative is an effective construct for this purpose, but its characterization is often inadequate for analyzing cumulative effects. Much of the environment has been greatly modified by human activities, and most resources, ecosystems, and human communities are in the process of change as a result of cumulative effects. The analyst must determine the realistic potential for the resource to sustain itself in the future and whether the proposed action will affect this potential; therefore, the baseline condition of the resource of concern should include a description of how conditions have changed over time and how they are likely to change in the future without the proposed action.

The potential for a resource, ecosystem, and human community to sustain its structure and function depends on its resistance to stress and its ability to recover (i.e., its resilience). Determining whether the condition of the resource is within the range of natural variability or is vulnerable to rapid degradation is frequently problematic. Ideally, the analyst can identify a threshold beyond which change in the resource condition is detrimental. More often, the analyst must review the history of that resource and evaluate whether past degradation may place it near such a threshold. For example, the loss of 50% of historical wetlands within a watershed may indicate that further losses would significantly affect the capacity of the watershed to withstand floods. It is often the case that when a large proportion of a resource is lost, the system nears collapse as the surviving portion is pressed into service to perform more functions.

The baseline condition should also include other present (ongoing) actions. For example, the National Ambient Air Quality Standards (NAAQS) inventory represents the universe of

41

present actions used in air quality analyses to determine whether new emission sources will exceed air quality standards. The NAAQS inventory includes all existing emission sources, sources with Prevention of Significant Deterioration (PSD) permits that have not yet begun to operate, and applicants for whom a PSD permit has not yet been issued. The NAAQS analysis requires explicitly modeling all existing nearby sources (as far away as 50 kilometers) be for air quality effects. In the analysis of the cause-and-effect relationships related to the anticipated impacts, each source represents a cause, and their combined emissions create an effect on air quality, the significance of which can be determined by comparing the concentration of pollutants emitted to threshold concentrations specified in the NAAQS. The NAAQS thresholds are concentrations known to cause significant human health or other environmental effects.

The historical context and full suite of ongoing actions are not only critical for evaluating cumulative effects, but also for developing potential restoration as well. The first step in developing a river restoration plan is to understand how past actions (e.g., contributions of contaminants to the watershed) have contributed to the current condition of the water body. The historical trends in resource condition and its current potential for sustained structure and function are an essential frame of reference for developing mitigation and enhancement measures.

### Determining Magnitude

Initially, the analyst will usually determine the separate effects of past actions, present actions, the proposed action (and reasonable alternatives), and other future actions. Once each group of effects is determined, cumulative effects can be calculated. The cumulative effects on a specific resource, however, will not necessarily be the sum of the effects of all

actions. Knowing how a particular resource responds to environmental change (i.e., the cause-and-effect relationship) is essential for determining the cumulative effect of multiple actions. Will the effects of two or more actions be additive, i.e., if one project would result in the death of 25% of a trout population (within a given level of uncertainty) and another the death of 10% of the trout, would the two projects together result in the loss of 35% of the trout? Although this is sometimes the case, there are often instances where the cause-and-effect relationship is more complex, i.e., the cumulative effect of two projects may be greater than the sum of the effects of each (in the trout example, more than 35% of the trout would die) or less than their sum (less than 35% of the trout would die). In some cases, the resource may better withstand additional adverse effects as stress increases, while in others, the resource may crash once a threshold is reached.

Once effects are identified using one of the methodologies described in Chapter 5, a table can be used to itemize effects into categories of past, present, proposed, and future actions. Tables 4-1, 4-2, and 4-3 show how these tables can be constructed using the results from different types of analyses. Regardless of the degree of quantification used, such tables are useful tools for putting the effects of the proposed action and alternatives into proper context. Table 4-1 illustrates the net cumulative effects of combining fish population increases from the proposed action with population losses from past and future actions. The table could be expanded to include the countervailing effect of sulfate aerosols on global warming (because they compensate for greenhouse gases) at the same time they are degrading ambient air quality. A series of such tables (one for each alternative) enables the analyst to compare alternatives meaningfully.

| Table 4-1. Example table using quantitative description of effects (within a given level of uncertainty) on various resources | | | | | |
|---|---|---|---|---|---|
| Resource | Past Actions | Present Actions | Proposed Action | Future Actions | Cumulative Effect |
| Air Quality | No effect on $SO_2$ | 20% increase in $SO_2$ | 10% increase in $SO_2$ | 5% increase in $SO_2$ | 35% increase in $SO_2$ |
| Fish | 50% of 1950 population lost | 2% of fish population lost | 5% increase in fish population | 1% of fish population lost | 48% of 1950 fish population lost |
| Wetlands | 78% of presettlement wetlands lost | 1% of existing wetlands lost annually for 5 years | 0.5% of existing wetlands lost | 1.5% of existing wetlands lost annually for 10 years | 95% of preset-tlement wetlands lost in 10 years |

The separation of effects into those attributable to the proposed action or a reasonable alternative versus those attributable to past and future actions also allows the analyst to determine the incremental contribution of each alternative. Situations can arise where an incremental effect that exceeds the threshold of concern for cumulative effects results, not from the proposed action, but from reasonably foreseeable but still uncertain future actions. Although this situation is generally unexplored, the decisionmaker is faced with determining whether to forgo or modify the proposed action to permit other future actions. Identifying incremental effects, therefore, is an important part of informing the decisionmaker.

Most cumulative effects analyses will identify varying levels of beneficial and adverse effects depending on the resource and the individual action. Aquatic species will experience entirely different effects from terrestrial ones. A warm water fishery (e.g., largemouth bass) may benefit from a change that is detrimental to a cold water fishery (e.g., trout), and effects that are beneficial to the well being of a human community (e.g., provision of social services) may be detrimental to natural systems (e.g., wetlands lost during construction of a hospital).

Because of this mixture of beneficial and adverse effects, the decisionmaker is often hard pressed to determine which alternative is environmentally preferred. To overcome this problem, indices of overall cumulative effect can be developed. Some of the matrix methods used in cumulative effects analysis were developed specifically to address this need. These methods use unitless measures of effect (e.g., scales or ranks) to get around the problem of combining results from a variety of resources.

Presentation of overall cumulative effects can be controversial. Intentional or unintentional manipulation of assumptions can dramatically alter the results of aggregated indices (Bisset 1983), and experience indicates that complex quantitative methods for evaluating cumulative effects make it more difficult for the public to understand and accept the results. Effects on resources are usually presented separately, and professional judgment is used in determining the reasonable alternative with the greatest net positive cumulative effect. The U.S. EPA has developed guidelines for addressing specific kinds of risks (including cancer risks and the risks posed by chemical mixtures) and for comparing disparate kinds of risks (U.S. EPA 1993).

43

| Table 4-2. Example table using qualitative description of effects on various resources, with impact ranks assigned a value from 1 to 5 (least to greatest) | | | | | |
|---|---|---|---|---|---|
| Resource | Past Actions | Present Actions | Proposed Action | Future Actions | Cumulative Effect |
| Air Quality | 1 | 2 | 1 | 1 | 2 |
| Fish | 3 | 2 | 1 | 1 | 4 |
| Wetlands | 4 | 1 | 1 | 1 | 4 |

| Table 4-3.  Example table using narrative description of effects on various resources | | | | | |
|---|---|---|---|---|---|
| Resource | Past Actions | Present Actions | Proposed Action | Future Actions | Cumulative Effect |
| Air Quality | Impacts dissipated | Noticeable deterioration in visibility during summer, but standards met | Visibility affected during operations, but standards met | Increase in auto emissions expected | Standards possibly violated |
| Fish | Decrease in numbers and species diversity | Occasional documented fish kills | Increase in number of fish kills | Loss of cold-water species due to change in temperature | Significant decline in numbers and species diversity |
| Wetlands | Large reduction in acreage of wetlands | Loss of small amount of wetland annually | Disturbance of a 5 acre wetland | Continued loss of wetlands | Significant cumulative loss of wetlands |

## Determining Significance

The significance of effects should be determined based on context and intensity. In its implementing regulations for NEPA, CEQ states that "the significance of an action must be analyzed in several contexts such as society as a whole (human, national), the affected region, the affected interests, and the locality" (40 CFR § 1508.27). Significance may vary with the setting of the proposed action.

Intensity refers to the severity of effect (40 CFR § 1508.27). Factors that have been used to define the intensity of effects include the magnitude, geographic extent, duration, and frequency of the effects. As discussed above, the **magnitude** of an effect reflects relative size or amount of an effect. **Geographic extent** considers how widespread the effect might be. **Duration and frequency** refers to whether the effect is a one-time event, intermittent, or chronic. Where a quantitative evaluation is possible, specific criteria for significance should be explicitly identified and described. These criteria should reflect the resilience of the resource, ecosystem, and human community to the effects that are likely to occur.

44

Thresholds and criteria (i.e., levels of acceptable change) used to determine the significance of effects will vary depending on the type of resource being analyzed, the condition of the resource, and the importance of the resource as an issue (as identified through scoping). Criteria can be quantitative units of measure such as those used to determine threshold values in economic impact modeling, or qualitative units of measure such as the perceptions of visitors to a recreational area. No matter how the criteria are derived, they should be directly related to the relevant cause-and-effect relationships. The criteria used, including quantitative thresholds if appropriate, should be clearly stated in the assessment document.

Determinations of significance in an EA or an EIS are the focus of analysis because they lead to additional (more costly) analysis or to inclusion of additional mitigation (or a detailed justification for not implementing mitigation). The significance of adverse cumulative effects is a sensitive issue because the means to modify contributing actions are often outside the purview of the proponent agency. Currently, agencies are attempting to deal with this difficult issue by improving their analysis of historical trends in resource and ecosystem condition. Even where cumulative effects are not deemed to be significant, better characterization of historical changes in the resource can lead to improved designs for resource enhancement. Where projected adverse effects remain highly uncertain, agencies can implement adaptive management—flexible project implementation that increases or decreases mitigation based on monitoring results.

## AVOIDING, MINIMIZING, AND MITIGATING SIGNIFICANT CUMULATIVE EFFECTS

If it is determined that significant cumulative effects would occur as a result of a proposed action, the project proponent should avoid, minimize, or mitigate adverse effects by modifying or adding alternatives. The proponent should not overlook opportunities to enhance resources when adverse cumulative effects are not significant. The separation of responsibilities for actions contributing to cumulative effects makes designing appropriate mitigation especially difficult. In the case of the Lackawanna Industrial Highway, the Federal Highway Administration and Pennsylvania Department of Transportation sponsored development of a comprehensive plan for the valley that provides a mechanism for ensuring that secondary development accompanying construction of the highway would protect valued resources, ecosystems, and human communities (see box).

By analyzing the cause-and-effect relationships resulting in cumulative effects, strategies to mitigate effects or enhance resources can be developed. For each resource, ecosystem, and human community of concern, the key to developing constructive mitigation strategies is determining which of the cause-and-effect pathways results in the greatest effect. Mitigation and enhancement strategies that focus on those pathways will be the most effective for reducing cumulative effects.

It is sometimes more cost-effective to mitigate significant effects after they occur. This might involve containing and cleaning up a spill, or restoring a wetland after it has been degraded. In most cases, however, avoidance or minimization are more effective than remediating unwanted effects. For example, attempting to remove contaminants from air or water is much less effective than preventing pollution discharges into an airshed or watershed. Although such preventative approaches can be the most (or only) effective means of controlling cumulative effects, they may require extensive coordination at the regional or national scale (e.g., federal pollution control statutes).

45

## Mitigating the Secondary and Cumulative Effects of the Lackawanna Valley Industrial Highway

Cumulative effects analysis conducted as part of the EIS for construction of a 16-mile-long, multi-lane, limited access highway in the Lackawanna Valley of Pennsylvania predicted substantial secondary environmental consequences from the expected (and desired) economic development in the valley. Specifically, additional industrial, commercial, and housing development would accompany the economic activity, producing higher demands on the valley's circulation system as well as on central water and sewer services and on other types of community services as well. To ensure that the development occurring as a result of the highway's construction would take place in an environmentally-sensitive manner, the Lackawanna Valley Corridor Plan was developed. This plan was a cooperative study sponsored by the Federal Highway Administration, Pennsylvania Department of Transportation, Pennsylvania Department of Community Affairs, and Lackawanna County through the Lackawanna County Regional Planning Commission (1996). The study produced an overall framework for the future development of the valley, including a Land Use Plan and a Circulation Plan, and a series of land development regulations that may be implemented by valley municipalities to ensure that new development protects community values and environmental resources. By undertaking the Lackawanna Valley Corridor Plan as part of the environmental decisionmaking process for the Lackawanna Valley Industrial Highway, the responsible federal and state agencies provided a concrete mechanism to avoid, minimize, and mitigate potentially adverse cumulative effects from secondary actions beyond their direct control.

## ADDRESSING UNCERTAINTY THROUGH MONITORING AND ADAPTIVE MANAGEMENT

The complexity of cumulative effects problems ensures that even rigorous analyses will contain substantial uncertainties about predicted environmental consequences (Carpenter 1995a). Risk assessment methods offer effective ways of presenting the uncertainties to decisionmakers (Carpenter 1995b), and increased scientific knowledge and improved analytical capabilities using modern computers and GIS can help reduce this uncertainty. Nonetheless, both researchers and practitioners generally agree that monitoring is critical to assess the accuracy of predictions of effects and ensure the success of mitigations (Canter 1993). Monitoring provides the means to identify the need for modifying (increasing or decreasing) mitigation, and adaptive management provides the flexible program for achieving these changes. An efficient, cost-effective approach to adaptive management is to sequentially implement mitigation measures so that the measures can be changed as needed (Carpenter 1995c).

It is important to remember that the goal of the NEPA process is to reduce adverse environmental effects (or maximize the net beneficial effect), including cumulative effects. Cumulative effects analysis, therefore, should be an iterative process in which consequences are assessed repeatedly following incorporation of avoidance, minimization, and mitigation measures into the alternatives. In this way, monitoring is the last step in determining the cumulative effects that ultimately result from the action. Important components of a monitoring program for assessing cumulative effects include the following:

- measurable indicators of the magnitude and direction of ecological and social change,

- appropriate timeframe,

46

- appropriate spatial scale,
- means of assessing causality,
- means of measuring mitigation efficacy, and
- provisions for adaptive management.

## ENVIRONMENTAL CONSEQUENCES SUMMARY

Although cumulative effects analysis is similar in many ways to the analysis of project-specific effects, there are key differences. To determine the environmental, social, and economic consequences of cumulative effects, the analyst should

- Select the resources, ecosystems, and human communities considered in the project-specific analysis to be those that could be affected cumulatively.

- Identify the important cause-and-effect relationships between human activities and resources of concern using a network or systems diagram that focuses on the important cumulative effects pathways.

- Adjust the geographic and time boundaries of the analysis based on cumulative cause-and-effect relationships.

- Incorporate additional past, present, and reasonably foreseeable actions into the analysis as indicated by the cumulative cause-and-effect relationships.

- Determine the magnitude and significance of cumulative effects based on context and intensity and present tables comparing the effects of the proposed action and alternatives to facilitate decisionmaking.

- Modify or add alternatives to avoid, minimize, or mitigate cumulative effects based on the cause-and-effect pathways that contribute most to the cumulative effect on a resource.

- Determine cumulative effects of the selected alternative with mitigation and enhancement measures.

- Explicitly address uncertainty in communicating predictions to decisionmakers and the public, and reduce uncertainty as much as possible through monitoring and adaptive management.

Determining the environmental consequences entails describing the cause-and-effect relationships producing cumulative effects and summarizing the total effect of each alternative. These activities require developing a cumulative effects analysis methodology (Chapter 5) from available methods, techniques, and tools of analysis (Appendix A).

47

# 5
# METHODS, TECHNIQUES, AND TOOLS FOR ANALYZING CUMULATIVE EFFECTS

Analyzing cumulative effects under NEPA is conceptually straightforward but practically difficult. Fortunately, the methods, techniques, and tools available for environmental impact assessment can be used in cumulative effects analysis. These methods are valuable in all phases of analysis and can be used to develop the conceptual framework for evaluating the cumulative environmental consequences, designing appropriate mitigations or enhancements, and presenting the results to the decisionmaker.

This chapter introduces the reader to the literature on cumulative effects analysis and discusses the incorporation of individual methods into an analytical methodology. Appendix A provides summaries of 11 methods for analyzing cumulative effects. The research and environmental impact assessment communities continue to make important contributions to the field. In addition to methods developed explicitly for environmental impact assessment, valuable new approaches to solving cumulative effects problems are being put forth by practitioners of ecological risk assessment (Suter 1993; U.S. EPA 1992; U.S. EPA 1996), regional risk assessment (Hunsaker et al. 1990), and environmental planning (Williamson 1993; Vestal et al. 1995). Analysts should use this chapter and Appendix A as a starting point for further research into methods, techniques, and tools that can be applied to their projects.

## LITERATURE ON CUMULATIVE EFFECTS ANALYSIS METHODS

Several authors have reviewed the wide variety of methods for analyzing cumulative effects that have been developed over the last 25 years (see Horak et al. 1983; Witmer et al. 1985; Granholm et al. 1987; Lane and Wallace 1988; Williamson and Hamilton 1989; Irwin and Rodes 1992; Leibowitz et al. 1992; Hochberg et al. 1993; Burris 1994; Canter and Kamath 1995; Cooper 1995; Vestal et al. 1995). In a review of 90 individual methods, Granholm et al. (1987) determined that none of even the 12 most promising methods met all of the criteria for cumulative effects analysis. Most of the methods were good at describing or defining the problem, but they were poor at quantifying cumulative effects. No one method was deemed appropriate for all types or all phases of cumulative effects analysis. In general, these authors grouped existing cumulative effects analysis methods into the following categories:

- those that describe or model the cause-and-effect relationships of interest, often through matrices or flow diagrams (see Bain et al. 1986; Armour and Williamson 1988; Emery 1986; Patterson and Whillans 1984);

- those that analyze the trends in effects or resource change over time (see Contant and Ortolano 1985; Gosselink et al. 1990); and
- those that overlay landscape features to identify areas of sensitivity, value, or past losses (see McHarg 1969; Bastedo et al. 1984; Radbruch-Hall et al. 1987; Canters et al. 1991).

These methods address important aspects of considering multiple actions and multiple effects on resources of concern, but they do not constitute a complete approach to cumulative effects analysis. General analytical frameworks for analysis have been developed for the U.S. Army Corp of Engineers (Stakhiv 1991), U.S. Fish and Wildlife Service (Horak et al. 1983), Department of Energy (Stull et al. 1987), U.S. Environmental Protection Agency (Bedford and Preston 1988), and the Canadian Government (Lane and Wallace 1988). In addition, the U.S. EPA and the National Oceanic and Atmospheric Administration have developed two specific approaches to address the problems of cumulative wetlands loss (Leibowitz et al. 1992; Vestal et al. 1995).

These methods usually take one of two basic approaches to addressing cumulative effects (Spaling and Smit 1993; Canter 1994):

- **Impact assessment approach**, which analytically evaluates the cumulative effects of combined actions relative to thresholds of concern for resources or ecosystems.

- **Planning approach**, which optimizes the allocation of cumulative stresses on the resources or ecosystems within a region.

The first approach views cumulative effects analysis as an extension of environmental impact assessment (e.g., Bronson et al. 1991; Conover et al. 1985); the second approach regards cumulative effects analysis as a correlate of regional or comprehensive planning

(e.g., Bardecki 1990; Hubbard 1990; Stakhiv 1988; 1991). Although the impact assessment approach more closely parallels current NEPA practice, an optimizing approach based on a community-derived vision of future conditions may be preferable in the absence of reliable thresholds for the resources, ecosystems, and human communities of concern. In fact, the planning approach to cumulative effects analysis is becoming more common within agencies and intergovernmental bodies as they embrace the principles of ecosystem management (IEMTF 1995) and sustainable development. These two approaches are complementary and together constitute a more complete cumulative effects analysis methodology, one that satisfies the NEPA mandate to merge environmental impact assessment with the planning process.

## IMPLEMENTING A CUMULATIVE EFFECTS ANALYSIS METHODOLOGY

Although the NEPA practitioner must draw from the available methods, techniques, and tools it is important to understand that a study-specific methodology is necessary. Designing a study-specific methodology entails using a variety of methods to develop a conceptual framework for the analysis. The conceptual framework should constitute a general causal model of cumulative effects that incorporates information on the causes, processes, and effects involved. A set of primary methods can be used to describe the cumulative effects study in terms of multiple causation, interactive processes, and temporally and spatially variable effects.

The **primary methods** for developing the conceptual causal model for a cumulative effects study are

**1** **Questionnaires, interviews, and panels** to gather information about the wide range of actions and effects needed for a cumulative effects analysis.

**2** **Checklists** to identify potential cumulative effects by reviewing important human activities and potentially affected resources.

50

**3** **Matrices** to determine the cumulative effects on resources, ecosystems, and human communities by combining individual effects from different actions.

**4** **Networks and system diagrams** to trace the multiple, subsidiary effects of various actions that accumulate upon resources, ecosystems, and human communities.

**5** **Modeling** to quantify the cause-and-effect relationships leading to cumulative effects.

**6** **Trends analysis** to assess the status of resources, ecosystems, and human communities over time and identify cumulative effects problems, establish appropriate environmental baselines, or project future cumulative effects.

**7** **Overlay mapping and GIS** to incorporate locational information into cumulative effects analysis and help set the boundaries of the analysis, analyze landscape parameters, and identify areas where effects will be the greatest.

After developing the conceptual framework, the analyst must choose a method to determine and evaluate the cumulative effects of project actions. This method must provide a procedure for aggregating information across multiple resources and projects in order to draw conclusions or recommendations. The simplest method is the comparison of project (or program) alternatives qualitatively or quantitatively in tabular form.

**Tables and matrices** use columns and rows to organize effects and link activities (or alternatives) with resources, ecosystems, and human communities of concern. The relative effects of various activities can be determined by comparing the values in the cells of a table. The attributes of each cell can be descriptive or numerical. Tables are commonly used to present proposed actions and reasonable alternatives (including no-action) and their respective effects on resources of concern. Tables can be used to organize the full range of environmental, economic, and social effects. Depending on how the table is constructed, a cell may represent a combination of activities and, therefore, be cumulative, or it may include a separate column for cumulative effects.

Cumulative effects are increasingly appearing as a separate column in EISs. In the case of the cumulative mining effects in the Yukon-Charley Rivers National Preserve, Alaska (National Park Service 1990), the estimated effect of the proposed mining actions on each resource (e.g., riparian wildlife habitat) was evaluated both as a direct effect and as a cumulative effect in combination with past mining losses. Quantitative short-term and long-term effects (in acres) were calculated (Table 5-1). In the case of the Pacific yew (U.S. Forest Service 1993), the potential direct, indirect, and cumulative effects on the genetic resource of the Pacific yew were summarized qualitatively (e.g., risk of genetic erosion at edge of range; Table 5-2).

Some tables are designed explicitly to aggregate effects across resources (including weighting different effects). Grand indices that combine effects include the Environmental Evaluation System (Dee et al. 1973) and ecological rating systems for wildlife habitat and other natural areas (e.g., Helliwell 1969, 1973). Such approaches have been relatively unsuccessful because intentional or unintentional manipulation of assumptions can dramatically alter the results of aggregated indices (Bisset 1983), and because complex quantitative methods for evaluating cumulative effects make it more difficult for the public to understand and accept the results. Westman (1985) concluded that aggregation and weighting of effects should be rejected in favor of providing information in a qualitative, disaggregated form. Although it may not be possible to combine highly disparate resource effects, different resource effects that cumulatively affect interconnected systems must be addressed in combination. In any case, greater efforts need to be made to present the full suite of adverse and beneficial effects to the decisionmaker so that comparisons are clear and understandable.

**Table 5-1. Cumulative effects of mining on riparian habitat in Yukon-Charley National Preserve, Alaska (National Park Service 1990)**

| Study Area Drainage | Habitat (acres) | | Long-Term Impacts (acres) | | | Short-Term Impacts (acres) | |
|---|---|---|---|---|---|---|---|
| | Premining | Existing (% Premining) | Past Mining Loss | Alternative A Loss | Cumulative Loss | Alternative A Loss | Cumulative Loss |
| Wood chopper | 1,227 | 1,101(89.7) | 126 | 30 | 156 | 26 | 182 |
| Coal | 2,081 | 1,376 (66.1) | 705 | 20 | 725 | 14 | 739 |
| Sam | 1,158 | 1,148 (99.1) | 10 | 20 | 30 | 11 | 41 |
| TOTAL | 4,446 | 3,615 (81.2) | 841 | 70 | 911 | 51 | 962 |
| Fourth of July | 833 | 777 (93.3) | 56 | 20 | 76 | 16 | 92 |
| GRAND TOTAL | 5,299 | 4,402 (83.1) | 897 | 90 | 987 | 67 | 1,054 |

**Table 5-2. Cumulative effects on the genetic resources of the Pacific yew (U.S. Forest Service 1993)**

| Alternative | Direct Effects on Existing Levels of Genetic Variation | Indirect Effects on Levels of Genetic Variation in Future Generations | Cumulative Effects |
|---|---|---|---|
| A | Risk of losing small populations at edge of range, thereby reducing existing levels. | Risk of losing small populations at edge of range, thereby reducing future levels. | Risk of genetic erosion at edge of range. |
| B | None. | None. | Would negate risk to small populations and halt genetic erosion. |
| C | Risk of slightly reducing levels within population for some populations. No effect on overall variation. | Risk of slightly reducing some populations. No effect on overall variation or values. | Would enhance gene variation. |
| D | Within population levels could be reduced more than in Alt. C. No effect on overall genetic variation. | Could be reduced more than in Alt. C. for some populations. No overall effect. | Same as Alt. C. |
| F | Within population levels could be reduced more than in Alt. D. Overall levels of variation would be reduced slightly. | Could be reduced more than in Alt D. Potential significant reduction in adaptability of some populations and some reduction in values. | Same as Alt. C. |
| G 1 | Same as Alt. D. | Same as Alt. D. | Same as Alt. C |
| G 2 | Same as Alt. D. | Same as Alt. D. | Gene conservation would not be well served because of fewer reserves. |

Although tables and matrices are the most common method for evaluating the cumulative effect of alternatives, map overlays and modeling can be used to summarize and evaluate cumulative effects.

In general, the standard environmental impact assessment methods described above can be combined effectively to address cumulative effects (Figure 5-1). Two aspects of cumulative effects analysis, however, warrant special analysis methods: (1) the need to address resource sustainability, and (2) the need to focus on integrated ecosystems and human communities. By definition, cumulative effects analysis involves comparing the combined effect with the capacity of the resource, ecosystem, and human community to withstand stress. **Carrying capacity analysis** has been applied to a wide range of resources to address cumulative effects. Cumulative effects are a more complex problem for whole ecosystems, because ecosystems are subject to the widest possible range of direct and indirect effects. Analyzing the cumulative effects on ecosystems requires a better understanding of the interworkings of ecological systems and a more holistic perspective. Specifically, **ecosystem analysis** entails new indicators of ecological conditions including landscape-scale measures. In addition to these two special methods, analyzing cumulative effects on human communities requires specific **economic impact analysis** and **social impact analysis methods.**



Figure 5-1. Conceptual model for combining primary methods into a cumulative effects analysis

In addition to the primary and special methods discussed above, there are several **tools** that can be used to conduct or illustrate cumulative effects analysis. The most important are modern computers with capabilities for storing, manipulating, and displaying large amounts of data. Although simple tables, graphs, and hand-drawn maps are adequate for many analyses, powerful computers can facilitate the use of multidimensional matrices and sophisticated models that require solving complex equations or conducting simulations. General tools for illustrating cumulative effects include dose-response curves, cumulative frequency distributions, maps, and videography. Video simulation, wherein an existing site is captured through imagery and electronically altered to show how the site will look after a proposed action is implemented, is a promising new technology for analyzing effects and communicating them to the public (Marlatt et al. 1993).

Most importantly, **geographic information systems (GIS)** can manipulate and display the location-specific data needed for cumulative effects analysis. GIS can be used to manage large data sets, overlay data and analyze development and natural resource patterns, analyze trends, use mathematical models of effect with locational data, perform habitat analysis, perform aesthetic analysis, and improve public consultation (Eedy 1995). GIS can incorporate a statistically reliable locational component into virtually any cumulative effects analysis. Unlike manual mapping systems, the scale can be adjusted and the data layers easily updated. Once a GIS has been developed, it can drastically reduce the effort needed to analyze the effects of future projects, i.e., each new development proposal can be readily overlain on existing data layers to evaluate cumulative effects (Johnston et al. 1988).

Effective use of the increased analytical and presentation capabilities of computers and GIS requires large amounts of data. Fortunately, available **remote sensing** technologies can provide locational information at varying levels of resolution for virtually all parts of the United States. Remote sensing applications (both photographic and satellite imagery) can help the analyst reveal the past status of environmental resources or ecological processes, determine existing environmental conditions, and quantitatively or qualitatively assess possible future trends in the environment. Although remote sensing is a relatively recent technological development, aerial photography available for most areas of the United States since the 1930s or 1940s, and space-based photographs and satellite imagery have been collected since the 1960s. For example, aerial photography from 1960, 1981, and 1990 (Figure 5-2) show change in the condition of small mountainous tributary streams to the North Fork Hoh River in the Olympic Peninsula. The photo taken in 1960 shows undisturbed old growth Sitka spruce-hemlock forest. The photos of the same location taken in 1981 and 1990 show extensive timber harvest and soil erosion. Each patch of harvested timber was approved under individual logging permits over a 30-year period. As a result of the cumulative timber harvest, the area has experienced severe landsliding and erosion, causing sedimentation in salmon spawning and rearing areas in the Hoh River and in lower portions of the tributary streams.

The combination of remote sensing and GIS has facilitated the development of a suite of landscape-scale indicators of ecosystem status that hold promise for quantifying ecological variables and improving the measurement of cumulative effects (Hunsaker and Carpenter 1990; Noss 1990; O'Neill et al. 1988, 1994).



Figure 5-2. Deteriorating trend in watershed condition of the North Fork Hoh River, Washington as illustrated by a time-series of aerial photographs depicting cumulative loss of forest from individual timber sales (Dave Somers, The Tulalip Tribes, personal communication)

Table 5-3 summarizes the 11 important cumulative effects analysis methods discussed above. Appendix A provides standardized descriptions of these methods. Many cumulative effects analysis methods can be adapted for environmental or social impact assessment; the basic analytical frameworks and mathematical operations are often applicable to both social and environmental variables. Each of the 11 methods represents a general category that may contain more specific methods. When and where each method is appropriate for cumulative effects analysis depends on the following criteria:

**1** Whether the method can assess

- effects of same and different nature
- temporal change
- spatial characteristics
- structural/functional relationships
- physical/biological/human
    interactions

- additive and synergistic interactions
- delayed effects
- persistence of impacts

**2** Whether the method can

- quantify effects
- synthesize effects
- suggest alternatives
- serve as a planning or decision-making tool
- link with other methods, and

**3** Whether the method is

- validated
- flexible
- reliable and repeatable.

55

## Table 5-3.  Primary and special methods for analyzing cumulative effects

| Primary Methods | Description | Strengths | Weaknesses |
|---|---|---|---|
| 1. Questionnaires, Interviews, and Panels | Questionnaires, interviews, and panels are useful for gathering the wide range of information on multiple actions and resources needed to address cumulative effects.  Brainstorming sessions, interviews with knowledgeable individuals, and group consensus building activities can help identify the important cumulative effects issues in the region. | ■ Flexible<br>■ Can deal with subjective information | ■ Cannot quantify<br>■ Comparison of alternatives is subjective |
| 2. Checklists | Checklists help identify potential cumulative effects by providing a list of common or likely effects and juxtaposing multiple actions and resources; - potentially dangerous for the analyst that uses them as a shortcut to thorough scoping and conceptualization of cumulative effects problems. | ■ Systematic<br>■ Concise | ■ Can be inflexible<br>■ Do not address interactions or cause-effect relationships |
| 3. Matrices | Matrices use the familiar tabular format to organize and quantify the interactions between human activities and resources of concern.  Once even relatively complex numerical data are obtained, matrices are well-suited to combining the values in individual cells of the matrix (through matrix algebra) to evaluate the cumulative effects of multiple actions on individual resources, ecosystems, and human communities. | ■ Comprehensive presentation<br>■ Comparison of alternatives<br>■ Address multiple projects | ■ Do not address space or time<br>■ Can be cumbersome<br>■ Do not address cause-effect relationships |
| 4. Networks and System Diagrams | Networks and system diagrams are an excellent method for delineating the cause-and-effect relationships resulting in cumulative effects; they allow the user to analyze the multiple, subsidiary effects of various actions and trace indirect effects to resources that accumulate from direct effects on other resources. | ■ Facilitate conceptualization<br>■ Address cause-effect relationships<br>■ Identify indirect effects | ■ No likelihood for secondary effects<br>■ Problem of comparable units<br>■ Do not address space or time |
| 5. Modeling | Modeling is a powerful technique for quantifying the cause-and-effect relationships leading to cumulative effects, can take the form of mathematical equations describing cumulative processes such as soil erosion, or may constitute an expert system that computes the effect of various project scenarios based on a program of logical decisions. | ■ Can give unequivocal results<br>■ Addresses cause-effect relationships<br>■ Quantification<br>■ Can integrate time and space | ■ Need a lot of data<br>■ Can be expensive<br>■ Intractable with many interactions |
| 6. Trends Analysis | Trends analysis assesses the status of a resource, ecosystem, and human community over time and usually results in a graphical projection of past or future conditions.  Changes in the occurrence or intensity of stressors over the same time period can also be determined.  Trends can help the analyst identify cumulative effects problems, establish appropriate environmental baselines, or project future cumulative effects. | ■ Addresses accumulation over time<br>■ Problem identification<br>■ Baseline determination | ■ Need a lot of data in relevant system<br>■ Extrapolation of system thresholds is still largely subjective |
| 7. Overlay Mapping and GIS | Overlay mapping and geographic information systems (GIS) incorporate locational information into cumulative effects analysis and help set the boundaries of the analysis, analyze landscape parameters, and identify areas where effects will be the greatest. Map overlays can be based on either the accumulation of stresses in certain areas or on the suitability of each land unit for development. | ■ Addresses spatial pattern and proximity of effects<br>■ Effective visual presentation<br>■ Can optimize development options | ■ Limited to effects based on location<br>■ Do not explicitly address indirect effects<br>■ Difficult to address magnitude of effects |

| Table 5-3. Continued | | | |
|---|---|---|---|
| **Special Methods** | **Description** | **Strengths** | **Weaknesses** |
| 8. **Carrying Capacity Analysis** | Carrying capacity analysis identifies thresholds (as constraints on development) and provides mechanisms to monitor the incremental use of unused capacity. Carrying capacity in the ecological context is defined as the threshold of stress below which populations and ecosystem functions can be sustained. In the social context, the carrying capacity of a region is measured by the level of services (including ecological services) desired by the populace. | ▪ True measure of cumulative effects against threshold<br>▪ Addresses effects in system context<br>▪ Addresses time factors | ▪ Rarely can measure capacity directly<br>▪ May be multiple thresholds<br>▪ Requisite regional data are often absent |
| 9. **Ecosystem Analysis** | Ecosystem analysis explicitly addresses biodiversity and ecosystem sustainability. The ecosystem approach uses natural boundaries (such as watersheds and ecoregions) and applies new ecological indicators (such as indices of biotic integrity and landscape pattern). Ecosystem analysis entails the broad regional perspective and holistic thinking that are required for successful cumulative effects analysis. | ▪ Uses regional scale and full range of components and interactions<br>▪ Addresses space and time<br>▪ Addresses ecosystem sustainability | ▪ Limited to natural systems<br>▪ Often requires species surrogates for system<br>▪ Data intensive<br>▪ Landscape indicators still under development |
| 10. **Economic Impact Analysis** | Economic impact analysis is an important component of analyzing cumulative effects because the economic well-being of a local community depends on many different actions. The three primary steps in conducting an economic impact analysis are (1) establishing the region of influence, (2) modeling the economic effects, and (3) determining the significance of the effects. Economic models play an important role in these impact assessments and range from simple to sophisticated. | ▪ Addresses economic issues<br>▪ Models provide definitive, quantified results | ▪ Utility and accuracy of results dependent on data quality and model assumptions<br>▪ Usually do not address nonmarket values |
| 11. **Social Impact Analysis** | Social impact analysis addresses cumulative effects related to the sustainability of human communities by (1) focusing on key social variables such as population characteristics, community and institutional structures, political and social resources, individual and family changes, and community resources; and (2) projecting future effects using social analysis techniques such as linear trend projections, population multiplier methods, scenarios, expert testimony, and simulation modeling. | ▪ Addresses social issues<br>▪ Models provide definitive, quantified results | ▪ Utility and accuracy of results dependent on data quality and model assumptions<br>▪ Social values are highly variable |

57

# REFERENCES

**Adamus, P.R., E.J. Clairain, Jr., R.D. Smith, and R.E. Young.** 1987. Wetland Evaluation Technique (WET). Vol. II. Methodology. U.S. Army Corps of Engineers Waterways Experiment Station, Vicksburg, MS. 178 pp.

**Allen, C.D.** 1994. Ecological perspective: Linking ecology, GIS, and remote sensing to ecosystem management. In Sample, V.A., ed. *Remote Sensing and GIS in Ecosystem Management.* Island Press, Washington, DC. pp. 111-139.

**Armour, C.L. and S.C. Williamson.** 1988. Guidance for Modeling Causes and Effects in Environmental Problem Solving. Biological Report 89(4). U.S. Fish and Wildlife Service, Fort Collins, CO.

**Bain, M.B., J.S. Irving, R.D. Olsen, E.A. Stull, and G.W. Witmer.** 1986. Cumulative Impact Assessment: Evaluating the Environmental Effects of Multiple Human Developments. Argonne National Laboratory, Argonne, IL. ANL/EES-TM-309

**Barber, M.C.** ed. 1994. Environmental Monitoring and Assessment Program: Indicator Development Strategy. U.S. Environmental Protection Agency, Washington, DC. EPA/620/R-94/022.

**Bardecki, M.J.** 1990. Coping with cumulative impacts: An assessment of legislative and administrative mechanisms. *Impact Assessment Bulletin* 8:319-344.

**Bastedo, J.D., J.G. Nelson, and J.B. Theberge.** 1984. Ecological approach to resource survey and planning for environmentally significant areas: The ABC methods. *Environmental Management* 8:125-134.

**Bedford, B.L. and E.M. Preston.** 1988. Developing the scientific basis for assessing cumulative effects of wetland loss and degradation on landscape functions: Status, perspectives, and prospects. *Environmental Management* 12:755.

**Bisset, R.** 1983. Methods for environmental impact analysis: Recent trends and future prospects. *Journal of Environmental Management* 11:27-43.

**Bronson, E.S., K. Sears, and W.M. Paterson.** 1991. A Perspective on Cumulative Effects Assessment. Report No. 91016 Environmental Studies and Assessments Department, Ontario Hydro, Toronto, Ontario. 32 pp.

**Brown, R.S. and K. Marshall.** 1993. Resource Guide to State Environmental Management. The Council of State Governments, Lexington, KY.

**Burris, R.K.** 1994. Cumulative Impact Assessment in the Environmental Impact Assessment Process. Masters Thesis, University of Oklahoma, Norman.

**Canter, L.W.** 1993. The role of environmental monitoring in responsible project management. *The Environmental Professional* 15:76-87.

**Canter, L.W.** 1994. Draft. Methods for Cumulative Effects Assessment. Environmental and Ground Water Institute, University of Oklahoma, Norman, OK.

**Canter, L.W. and J. Kamath.** 1995.
Questionnaire checklist for cumulative impacts.
*Environmental Impact Assessment Review* 15:311-339.

**Canters, K.J., C.P. den Herder, A.A. de Veer, P.W.M. Veelenturf, and R.W. de Waal.** 1991.
Landscape-ecological mapping of the Netherlands.
*Landscape Ecology* 5:145-162.

**Carpenter, R.A.** 1995a. Communicating environmental science uncertainties. *The Environmental Professional* 17:127-136.

**Carpenter, R.A.** 1995b. Risk assessment.
*Impact Assessment* 13:153-187.

**Carpenter, R.A.** 1995c. Monitoring for adaptive management. Presented to DOE/CEQ Conference Commemorating the 25th Anniversary of NEPA. March 21-22, Tysons Corner, VA.

**Conover, S.K., W. Strong, T.E. Hickey, and F. Sander.** 1985. An envolving (sic) framework for environmental impact analysis. I. Methods.
*Journal of Environmental Management* 21:343-358.

**Contant, C.K. and L. Ortolano.** 1985.
Evaluating a cumulative impact assessment approach. *Water Resources Research* 21:1313-1318.

**Cooper, T.A.** 1995. Cumulative Impact Assessment Practice in the United States. Masters Thesis, University of Oklahoma, Norman.

**Dee, N., J.K. Baker, N.L. Drobny, K.M. Duke, I. Whitman, and D.C. Fahringer.** 1973.
Environmental evaluation system for water resource planning. *Water Resources Research* 9:523-535.

**Eedy, W.** 1995. The use of GIS in environmental assessment. *Impact Assessment* 13:199-206.

**Emery, R.M.** 1986. Impact interaction potential: A basin-wide algorithm for assessing cumulative impacts from hydropower projects. *Journal of Environmental Management* 23:341-360.

**Federal Highway Administration (FHWA).**
1996. Community Impact Assessment: A Quick Reference for Transportation. FHWA, Office of Environmental and Planning, Washington, DC. FHWA-PD-96, HEP-30.

**Forman, R.T.T. and M. Godron.** 1986.
*Landscape Ecology.* John Wiley & Sons, New York. 619 pp.

**Gosselink, J.G., G.P. Shafer, L.C. Lee, D.M. Burdick, D.L. Childers, N.C. Leibowitz, S.C. Hamilton, R. Boumans, D. Cushman, S. Fields, M. Koch, and J.M. Visser.** 1990.
Landscape conservation in a forested wetland watershed: Can we manage cumulative impacts?
*Bioscience* 40:588-600.

**General Accounting Office.** 1991. Coastal Pollution Environmental Impacts of Federal Activities Can Be Better Managed. Washington, D.C. RCED-91-85.

**Granholm, S.L., E. Gerstler, R.R. Everitt, D.P. Bernard, and E.C. Vlachos.** 1987. Issues, Methods, and Institutional Processes for Assessing Cumulative Biological Impacts. Prepared for Pacific Gas and Electric Company, San Ramon, CA. Report 009.5-87.5.

**Hayes, R.L.** 1989. Micro-HSI Master Model Library, Cover Type List and Variable Lexicon. Reference Manual v 2.1. U.S. Fish and Wildlife Service, Fort Collins, CO.

**Helliwell, D.R.** 1969. Valuation of wildlife resources. *Regional Studies* 3:41-47.

**Helliwell, D.R.** 1973. Priorities and values in nature conservation. *Journal of Environmental Management* 1:85-127.

**Hochberg, R.J., M.A. Friday, and C.F. Stroup.**
1993. Review of Technical Approaches for Cumulative Ecological Impact Assessment. Maryland Department of Natural Resources, Annapolis. PPRP-109.

60

**Horak, G.C., E.C. Vlachos, and E.W. Cline.** 1983. Methodological Guidance for Assessing Cumulative Impacts on Fish and Wildlife. Report to U.S. Fish and Wildlife Service. Dynamac Corporation, Fort Collins, CO.

**Hubbard, P.** 1990. Cumulative Effects Assessment and Regional Planning in Southern Ontario. Canadian Environmental Assessment Research Council, Hull, Quebec. 45 pp.

**Hunsaker, C.T. and D.E. Carpenter.** 1990. Environmental Monitoring and Assessment Program —Ecological Indicators. U. S. Environmental Protection Agency, Research Triangle Park, NC. EPA 600/3/-89/060.

**Hunsaker, C.T., R.L. Graham, G.W. Suter II, R.V. O'Neill, L.W. Barnthouse, and R.H. Gardner.** 1990. Assessing ecological risk on a regional scale. *Environmental Management* 14:325-332.

**Interagency Ecosystem Management Task Force (IEMTF).** 1995. The Ecosystem Approach: Healthy Ecosystems and Sustainable Economies, Vol. I Overview. Washington, DC.

**Irwin, F. and B. Rodes.** 1992. Making Decisions on Cumulative Environmental Impacts: A Conceptual Framework. World Wildlife Fund, Washington, DC. 54 pp.

**Jenkins, R.E.** 1988. Information management for the conservation of biodiversity. In Wilson, E.O., ed. *Biodiversity.* National Academy Press, Washington, D.C. pp 231-239.

**Johnston, C.A., N.E. Detenbeck, J.P. Bonde, and G.J. Niemi.** 1988. Geographic information systems for cumulative impact assessment. *American Society of Photogrammetry and Remote Sensing* 54(11):1609-1615.

**Karr, J.R.** 1991. Biological integrity: A long-neglected aspect of water resource management. *Ecological Applications* 1:66-84.

**Karr, J.R., K.D. Fausch, P.L. Angermeier, P.R. Yant, and I.J. Schlosser.** 1986. Assessing Biological Integrity in Running Waters: A Method and Its Rationale. Illinois Natural History Survey Special Publication 5, Champaign, IL.

**Lackawanna County Regional Planning Commission.** 1996. Lackawanna Valley Corridor Plan. Scranton, PA.

**Lane, P.A. and R.R. Wallace.** 1988. A User's Guide to Cumulative Effects Assessment in Canada. Canadian Environmental Assessment Research Council, Ottawa, Ontario.

**Larsen, D.P. and S.J. Christie.** 1993. EMAP-Surface Waters 1991 Pilot Report. U.S. Environmental Protection Agency, Corvallis, OR. EPA/620/R-93/003.

**Leibowitz, S.G., B. Abbruzzese, P. Adamus, L. Hughes, and J. Irish.** 1992. A Synoptic Approach to Cumulative Impact Assessment—A Proposed Methodology. U.S. Environmental Protection Agency, Corvallis, OR. EPA/600/R-92/167.

**Lewis, T.E. and B.L. Conkling,** eds. 1994. Forest Health Monitoring Southeast Loblolly/Shortleaf Pine Demonstration Interim Report. U.S. Environmental Protection Agency, Washington, DC. EPA/620/R-94/006.

**Marlatt, R.M., T.A. Hale, and R.G. Sullivan.** 1993. Video simulation as a part of Army environmental decision-making: Observations from Camp Shelby, Mississippi. *Environmental Impact Assessment Review* 13:75-88.

**McCabe, G., C. Orians, C. Clavate, and K. Branch.** 1991. Driving variables that impact environmental quality. Battelle Pacific Northwest National Laboratory, Richland, WA.

**McCold, L. and J. Holman.** 1995. Cumulative impacts in environmental assessments: How well are they considered. *The Environmental Professional* 17:2-8

**McHarg. I.** 1969. *Design with Nature*. Natural History Press, New York, NY. 197 pp.

**Messer, J.J., R.A. Linthurst, and W.S. Overton.** 1991. An EPA program for monitoring ecological status and trends. *Environmental Management* 17:67-78.

**National Academy of Sciences.** 1993. *A Biological Survey for the Nation*. National Academy Press, Washington, DC.

**National Park Service.** 1990. Final Environmental Impact Statement. Mining in Yukon-Charley Rivers National Preserve, Alaska. Cumulative Impacts of Mining. Volume 1. Anchorage, AK.

**National Performance Review.** 1994. Creating a Government that Works Better and Costs Less. Washington, D.C. September.

**National Research Council (NRC).** 1986. The special problem of cumulative effects. In Committee on the Applications of Ecological Theory to Environmental Problems. *Ecological Knowledge and Problem Solving: Concepts are Case Studies*. National Academy Press, Washington, D.C. pp. 93-103.

**Nestler, J.** 1992. Cumulative impact assessment in wetlands. *Wetlands Research Program Bulletin* 1:1-8. U.S. Army Corps of Engineers, Vicksburg, MS.

**Noss, R.F** 1990. Indicators for monitoring biodiversity: A hierarchical approach. *Conservation Biology* 4:355-364.

**Odum, W.E.** 1982. Environmental degradation and the tyranny of small decisions. *Bioscience* 33:728-729.

**O'Neill, R.V., J.R. Krummel, R.H. Gardner, G. Sugihara, B. Jackson, D.L. DeAngellis, B.T. Milne, M.G. Turner, B. Zygmunt, S.W. Christensen, V.H. Dale, and R.I. Graham.** 1988. Indices of landscape pattern. *Landscape Ecology* 1:153-162.

**O'Neill, R.V., K.B. Jones, K.H. Riiters, J.D. Wickham, and I.A. Goodman.** 1994. Landscape Monitoring and Assessment Research Plan. U.S. Environmental Protection Agency, Las Vegas, NV. EPA/620/R-94/009.

**Overton, W.S., D. White, and D.L. Stevens.** 1990. Design Report for EMAP (Environmental Monitoring and Assessment Program). U.S. Environmental Protection Agency, Corvallis, OR. EPA/600/391/053.

**Patterson, N.J. and T.H. Whillans.** 1984. Human interference with natural water level regimes in the context of other cultural stresses on Great Lakes wetlands. In H.H. Prince and F.M. D'Itri, eds. *Coastal Wetlands*. Lewis Publishers, Inc., Chelsea, MI.

**Peterson, E.B., Y.H. Chan, N.M. Peterson, G.A. Constable, R.B. Caton, C.S. Davis, R.R. Wallace, and G.A. Yarranton.** 1987. Cumulative Effects Assessment in Canada: An Agenda for Action and Research. Canadian Environmental Assessment Research Council, Hull, Quebec.

**President's Council on Sustainable Development.** 1996. Sustainable America: A New Consensus for Prosperity, Opportunity, and a Healthy Environment in the Future, Washington, DC. 186 pp.

**Preston, E.M., and B.L. Bedford.** 1988. Evaluating cumulative effects on wetland functions: A conceptual overview and generic framework. *Environmental Management* 12:565-583.

**Radbruch-Hall, D.H., K. Edwards, and R.M. Batson.** 1987. Experimental Engineering-Geologic and Environmental-geologic Maps of the Conterminous United States. Bulletin 1610. U.S. Geological Survey, Reston, VA.

**Ranasinghe, J.A., S.B. Weisberg, J. Gerritsen, and D.M. Dauer.** 1994. Assessment of Chesapeake Bay Benthic Macroinvertebrate Resource Condition in Relation to Water Quality and Watershed Stressors. Prepared for The Governor's Council on Chesapeake Bay Research Fund and Maryland Department of Natural Resources, Annapolis, MD.

**Reid, W.V., J.A. McNeely, D.B. Tunstall, and D. Bryant.** 1991. Indicators of Biodiversity Conservation. World Resources Institute, Washington, D.C.

**Risser, P., J.R. Karr, and R.T.T. Forman.** 1984. Landscape Ecology: Directions and Approaches. Champaign: Illinois Natural History Survey, Special Publication 2.

**Schamberger, M., A.H. Farmer, and J.W. Terrell.** 1982. Habitat Suitability Index Models: Introduction. U.S. Fish and Wildlife Service, Washington, D.C.

**Southerland, M.T. and J.B. Stribling.** 1995. Status of biological criteria development and implementation. In Davis, W. and T. Simon, eds. *Biological Assessment and Criteria: Tools for Water Resources Planning and Decision Making.* Lewis Publishers, Inc, Chelsea, MI. pp. 79-94.

**Southerland, M.T. and S.B. Weisberg.** 1995. Maryland Biological Stream Survey: The 1995 Workshop Summary. Chesapeake Bay Research and Monitoring Division, Maryland Department of Natural Resources, Annapolis. CBRM-BA-95-2.

**Spaling, H.** 1995. Cumulative effects assessment. *Impact Assessment* 12:231-251.

**Spaling, H. and B. Smit.** 1993. Cumulative environmental change: conceptual frameworks, evaluation approaches, and institutional Perspectives. *Environmental Management* 17:587-600.

**Stakhiv. E.Z.** 1988. An evaluation paradigm for cumulative impact analysis. *Environmental Management* 12:725-748.

**Stakhiv, E.Z.** 1991. A cumulative impact analysis framework for the US Army Corps of Engineers regulatory program. Draft report (February 1991). Institute for Water Resources, US Army Corps of Engineers, Fort Belvoir, VA. 282 pp.

**Stowell, R., Espinosa, T.C. Bjornn, W.S. Platts, D.C. Burns, and J.S. Irving.** 1983. Guide for Predicting Salmonid Response to Sediment Yields in Idaho Batholith Wwatersheds. U.S. Forest Service, Northern and Intermountain Regions.

**Stull, E.A., K.E. LaGory, and W.S. Vinikour.** 1987. Methodologies for Assessing the Cumulative Environmental Effects of Hydroelectric Development on Fish and Wildlife in the Columbia River Basin Volume 1: Recommendations. Final report to Bonneville Power Administration, Portland, OR. DOE/BP-19461-3.

**Summers, J.K., J.M. Macauley, V.D. Engle, G.T. Brooks, P.T. Heitmuller, A.M. Adams.** 1993. Louisianan Province Demonstration Report: EMAP —Estuaries,1991. U.S. Environmental Protection Agency, Gulf Breeze, FL. EPA/620/R-94/001

**Suter, G.W. II.** 1993. *Ecological Risk Assessment.* Lewis Publishers, Boca Raton, FL.

**Thornton, K. W., G. E. Saul, and D. E. Hyatt.** 1994. Environmental Monitoring and Assessment Program Assessment Framework. U.S. Environmental Protection Agency, Research Triangle Park, NC. EPA/620/R-94/016.

**U.S. Army Corps of Engineers (USACE).** 1980. A Habitat Evaluation System for Water Resource Planning. U.S. Army Corps of Engineers, Vicksburg, MS. 88 pp.

**U.S. Army Corps of Engineers (USACE),** Washington Department of Ecology, and Port of Seattle. 1994. Southwest Harbor Cleanup and Redevelopment Project: Joint Federal/state Draft Environmental Impact Statement. Seattle, WA.

**U.S. Bureau of Land Management ( BLM).** 1990. Final Environmental Impact Statement. Castle Mountain Project, San Bernadino County, California. Needles, CA.

**U.S. Environmental Protection Agency.** 1992. Framework for Ecological Risk Assessment. Risk Assessment Forum, Washington, DC. EPA 630/R-92-001.

**U.S. Environmental Protection Agency.** 1993. A Guidebook to Comparing Risks and Setting Environmental Priorities. Washington, DC. EPA 230-B-93-003.

**U.S. Forest Service.** 1993. Pacific Yew Final Environmental Impact Statement. USDA, Forest Service, Pacific Northwest Regional Office, Portland, OR.

**U.S. Fish and Wildlife Service.** 1980. *Habitat Evaluation Procedures*. ESM 102. US Fish and Wildlife Service, Division of Ecological Services. Washington, D.C.

**Vestal, B., A. Rieser M. Ludwig, J. Kurland, C. Collins, and J. Ortiz.** 1995. Methodologies and Mechanisms for Management of Cumulative Coastal Environmental Impacts. Part I— Synthesis, with Annotated Bibliography; Part II— Development and Application of a Cumulative Impacts Assessment Protocol. NOAA Coastal Ocean Program Decision Analysis Series No. 6. NOAA Coastal Ocean Office, Silver Spring, MD.

**Weisberg, S.B., J.B. Frithsen, A.F. Holland, J.F. Paul, K.J. Scott, J.K. Summers, H.T. Wilson, R. Valente, D.G. Heimbuch, J. Gerritsen, S. C Schimmel, and R.W. Latimer.** 1993. EMAP-Estuaries Virginian Province 1990 Demonstration Project Report. USEPA, Environmental Research Laboratory, Narragansett, RI. EPA 600/R-92/100.

**Westman, W.E.** 1985. *Ecology, Impact Assessment, and Environmental Planning*. Wiley-Interscience, New York, NY.

**Williamson, S.C.** 1993. Cumulative impacts assessment and management planning: Lessons learned to date. In Hildebrand, S.G. and J.B. Cannon, eds. *Environmental Analysis: The NEPA Experience.* Lewis Publishers, Boca Raton, FL. pp 391-407.

**Williamson, S.C. and K. Hamilton.** 1989. Annotated Bibliography of Ecological Cumulative Impacts Assessment. U.S. Fish and Wildlife Service Biological Report 89(11). National Ecology Research Center, Fort Collins, CO.

**Witmer, G., J.S. Irving, and M. Bain.** 1985. A Review and Evaluation of Cumulative Impact Assessment Techniques and Methodologies. Prepared by Argonne National Laboratory for Bonneville Power Administration.

**World Commission on Environment and Development.** 1987. *Our Common Future.* Oxford University Press, UK.

# APPENDIX A

## SUMMARIES OF
## CUMULATIVE EFFECTS ANALYSIS METHODS

# METHODS

# 1

## QUESTIONS, INTERVIEWS, AND PANELS

**Questionnaires, interviews, and panels** are important information gathering techniques for analyzing cumulative effects. Such techniques are especially valuable to the analyst, because they *collect information on the wide range of actions and effects needed to address cumulative problems.* The analyst will often use brainstorming sessions, interviews with knowledgeable individuals, and group consensus building activities to identify the important cumulative effects issues in the region.

Questionnaires, interviews, and panels are applicable to both social and environmental effects and are used primarily in the scoping process. They are often the principal method for identifying potential efforts and can be used to help characterize spatial and cause-and-effect relationships. Rather than simply collecting data, these techniques can be used for "strategizing" (i.e., prioritizing issues and defining the scope of the study).

The choice of information gathering techniques draws upon the experience and professional judgement of the analysts. Simple brainstorming of experts and other interested parties can be an effective technique for identifying potential cumulative effects problems. Information gathering can be expanded to include structured interviews with key opinion leaders, indigenous peoples, and technical experts. These activities are essential components of the scoping process and, in many cases, are sufficient for qualitative analysis.

A common feature of information gathering and strategizing is the use of a multi-disciplinary panel of experts. These panels can bring consensus to subjective judgements and are useful for designing the assessment method, evaluating the significance of effects, and comparing alternatives. The Delphi method (Linstone and Turoff 1975) provides a structured process for producing expert consensus and is applicable to groups of various compositions. Fuzzy set models provide another means of structuring subjective evaluations of cumulative effects issues (Harris et al. 1994; Wegner and Reng 1987). Panels or other group-decision methods often use evaluative techniques to score or rank effects during the decisionmaking process. In this way, panels can be used to estimate the importance of cumulative effects even though they are necessarily subjective and qualitative (Stull et al. 1987).

# METHODS

## 1
## EXAMPLES:

Information gathering is essential to all environmental impact assessment and can become especially involved when scoping for cumulative effects in an EIS. Primarily, the analyst will use questionnaires, interviews, and panels to build a comprehensive list of environmental problems that could accumulate. During preparation of an EIS on the Castle Mountain open heap leach gold mine project, the U.S. Bureau of Land Management (1990) compiled a wide range of information into a list of activities that, combined with the proposed action, might produce cumulative effects (Chapter 3, Table 3-1). For each of 26 individual activities, anticipated cumulative effects were identified for each of 12 resource issues. The status (existing or proposed) of these additional activities and the primary geographical location of effects were also listed.

The analyst will also use these information gathering techniques to help develop a community vision for the region when the cumulative effect of a suite of actions will restore resources. The Restoration Plan for the Exxon Valdez Oil Spill in Alaska involved identifying many individual restoration options that, when combined as an alternative, would have the cumulative beneficial effect of mitigating natural resource damages resulting from the spill. The Restoration Plan required an extremely high level of coordination among federal and state agencies, as well as commercial fishermen, local businesses, and Native American communities. The Restoration Team had the formidable task of determining whether the cumulative effect of a set of restoration

options (an alternative) would meet the public's expectations for restoration of resources. To accomplish this, a scientific conference and many public meetings were held, producing a "Restoration Framework" that served as a scoping document under NEPA (EVOS Trustee Council 1992, 1993). In addition, a questionnaire was distributed to the public along with a summary of the draft Restoration Plan (EVOS Restoration Office 1993) as a means of soliciting public comment on the critical issues addressed by the Restoration Plan.

## References

Exxon Valdez Oil Spill (EVOS) Restoration Office. 1993. Exxon Valdez Oil Spill Restoration Plan. Summary of Alternatives for Public Comment. Anchorage, AK. April.

Exxon Valdez Oil Spill (EVOS) Trustee Council. 1992. Exxon Valdez Oil Spill Restoration, Volume I: Restoration Framework. Anchorage, AK. April.

Exxon Valdez Oil Spill (EVOS) Trustee Council. 1993. Exxon Valdez Oil Spill Symposium. Anchorage, AK. February.

Harris, H.J., R.D. Wenger, V.A. Harris, and D.S. DeValut. 1994. A method for assessing environmental risks: A case study of Green Bay, Lake Michigan. *Environmental Management* 18(2):295-306.

Linstone, H.A. and M. Turoff, eds. 1975. *The Delphi Methods: Techniques and Applications*. Addison-Wesley Publishing Co., Reading, MA.

# METHODS

Stull, E.A., K.E. LaGory, and W.S. Vinikour. 1987.  Methodologies for assessing the cumulative environmental effects of hydroelectric development on fish and wildlife in the Columbia River Basin - Volume 1: Recommendations. DOE/BP-19461-3.  Final report to Bonneville Power Administration, Portland, OR.

U.S. Bureau of Land Management. 1990. Final Environmental Impact Statement. Castle Mountain Project, San Bernadino County, California. Needles, CA.

Wenger R. and Y. Reng. 1987. Two fuzzy set models for comprehensive environmental decisionmaking. *Journal of Environmental Management* 25:167-180.

# METHODS

# 2

# CHECKLISTS

**Checklists** can help the analyst identify potential environmental effects by providing a list of common or likely effects. Checklists are especially valuable for analyzing cumulative effects because they *provide a format for juxtaposing multiple actions and resources in a way that highlights potential cumulative effects.* Checklists are potentially dangerous for the analyst who uses them as a shortcut to thorough scoping.

The strength of checklists is that they structure the analysis and reduce the likelihood that major effects will be overlooked; however, checklists are incomplete, they may cause important effects to be omitted. Because of the standard checklist format, checklists are more repeatable than ad hoc methods. They also provide a means of concisely presenting effects. At the same time, the simplicity of the checklist format has disadvantages. A checklist may be either an incomplete compilation of effects or a huge, unwieldy list with many irrelevant effects. In an attempt to be comprehensive, the checklist may also lead to "double counting" the same effect under different headings.

Many of these disadvantages are avoided by developing checklists for specific kinds of projects. Checklists can also be simplified by organizing potential effects into separate lists or hierarchical categories for each resource, ecosystem, and human community of concern. To address cumulative effects, checklists need to incorporate all of the activities associated with the proposed action and other past, present, and future actions affecting the resources. A promising approach is to use project-specific checklists (for each relevant past, present, and future action) to identify and quantify effects on resources and then transfer these effects to a cumulative checklist or interaction matrix (see Method 3). Two or more effects on a single resource indicate a potential cumulative effect; weighted effects can be summed to indicate the magnitude of the effect.

# METHODS

## 2
## EXAMPLES:

Specific checklists have been developed for many different classes of actions (e.g., housing projects, sewage treatment facilities, power plants, highways, airports). Several federal agencies have standard checklists for preparing EISs or EAs (e.g., U.S. DOE 1994). The California Department of Transportation (1993) has developed a checklist of 56 questions that must be answered for each state highway project. Question 55 specifically addresses cumulative effects:

> Does the project have environmental effects which are individually limited, but cumulatively considerable? Cumulatively considerable means that the incremental effects of an individual project are considerable when viewed in connection with the effects of past projects, the effects of other current projects, and the effects of probable future projects. It includes the effects of other projects which interact with this project and, together, are considerable.

This kind of "simple" questionnaire checklist acts merely as a reminder to the analyst and does not include supplemental information about the likely kinds of effects that may arise. Canter and Kamath (1995) have developed a comprehensive, yet generic, questionnaire checklist that addresses the cumulative effects of projects. "Descriptive" checklists expand on the checklist concept by including information on measuring and predicting effects (Canter 1996). A more elaborate descriptive checklist is the environmental impact computer system developed by the U.S. Army Construction Engineering Laboratory (Lee et al. 1974). This system identifies potential environmental effects from 9 functional areas of Army activities on 11 broad environmental categories (Jain and Kumar 1973). This computer system can produce checklists of potential effects arising from up to 2,000 Army activities on 1,000 environmental factors. The organization of activities and resources in the same table constitutes an interaction matrix as originally devised by Leopold and others (1971).

Checklists can also be modified to include qualitative terms for each identified effect, such as "adverse" or "beneficial," "short-term" or "long-term," and "no effect" or "significant effect." The hypothetical cumulative checklist in Table A-1 uses a qualitative symbol in place of the usual checkmark next to each potential effect on the list. In this example, the cumulative effects column reflects the number or magnitude of cumulative effects identified for that resource row. More sophisticated uses of this tabular approach are discussed in the matrices section that follows.

# METHODS

| Table A-1.  Hypothetical checklist for identifying potential cumulative effects of a highway project | | | | | | | |
|---|---|---|---|---|---|---|---|
| Potential Impact Area | Proposed Action | | | Past Actions | Other Present Actions | Future Actions | Cumulative Impact |
| | Construction | Operation | Mitigation | | | | |
| Topography and Soils | ** | | | * | | | ** |
| Water Quality | ** | * | + | * | * | * | *** |
| Air Quality | | ** | | * | | | ** |
| Aquatic Resources | ** | ** | + | * | | * | ** |
| Terrestrial Resources | * | * | | * | | | ** |
| Land Use | * | *** | | * | | * | *** |
| Aesthetics | ** | *** | + | * | | | ** |
| Public Services | * | + | | | | + | + |
| Community Structure | | * | | | * | | * |
| Others | | | | | | | |
| KEY:    *    low adverse effect        **   moderate adverse effect        ***   high adverse effect    +   beneficial effect         □   no effect | | | | | | | |

# References

California Department of Transportation (Caltrans).  1993.  Environmental Significance Checklist, Caltrans Contract No. 08E425. Project Report and Environmental Document for Interstate 215 from I-10 to SR 30.  9 pp.

Canter, L.W.  1996.  *Environmental Impact Assessment. Second Edition.*  McGraw-Hill, New York.

Canter, L.W. and J. Kamath.  1995.  Question-naire checklist for cumulative impacts. *Environmental Impact Assessment Review.* 15:311-339.

Jain, R.K. and R. Kumar.  1973.  Environmental impact assessment study for Army military programs. Technical Report. D-13, U.S. Army Construction Engineering Laboratory, Champaign, IL.

Lee, E.Y.S., et al.  1974.  Environmental impact assessment computer system.  Technical Report. E-37, U.S. Army Construction Engineering Laboratory, Champaign, IL.

Leopold, L.B., F.E. Clarke, B.B. Hanshaw, and J.R. Balsley.  1971.  A Procedure for Evaluating Environmental Impact.  Circular 645. U.S. Geological Survey.  13 pp.

U.S. Department of Energy (DOE).  1994. Environmental Assessment Checklist. Office of NEPA Oversight, U.S. DOE, Washington, DC.

# METHODS

# 3

# MATRICES

**Matrices** are two-dimensional checklists that attempt to quantify the interactions between human activities and resources or ecosystems of concern. They were designed to assess the magnitude and importance of individual interactions between activities and resources (Leopold et al. 1971) but have been extended to consider the cumulative effects of multiple actions on resources (Bain et al. 1986; Stull et al. 1987; LaGory et al. 1993).

Matrices alone cannot quantify effects, but they are a useful means of presenting and manipulating quantitative results of modeling, mapping, and subjective techniques. Once even relatively complex numerical data are obtained, matrices are well-suited to *combining the values in individual cells in the matrix (through matrix algebra) to evaluate the cumulative effects of multiple actions on individual resources, ecosystems, and human communities.* Matrices have the advantage of being mathematically straightforward and readily amenable to interpretation because of their familiar tabular format. Matrices are commonly used in social science research and have the potential for increased application in social and economic analyses.

The values entered in a matrix can take one of several forms. The analyst may elect to simply note the presence or absence of an effect (i.e., a binary entry). This has the benefit of being straightforward and readily understandable; however, it fails to note the magnitude of effects on various resources and does not allow the user to value resources differentially (e.g., through the use of numeric weights). Thus, a binary approach does not facilitate analyzing the cumulative effects on a resource, where the activities have consequences of varying degrees.

Analysts may instead choose to score effects based on factors such as magnitude, importance, duration, probability of occurrence, or feasibility of mitigation. The value entered may reflect some measurable value (e.g., soil loss may be expressed in tons/acre/ year), or it may reflect some relative ranking of the effect. Although complex weighting schemes allow the user to rank resource effects, the results may be difficult for others to understand, and the weighting schemes can be highly subjective. When using weighting schemes, analysts should enunciate the ranking criteria and consider whether it is scientifically reasonable to attempt a numeric comparison of cumulative effects on different resources.

The matrix concept can be extended to include stepped matrices that display resources against other resources (Canter 1996). Stepped matrices address secondary and tertiary effects of initiating actions and facilitate tracing effects through the environment. For example, action 1 causes changes in resource A which causes further changes in resource B. Stepped matrices are an intermediate method between simple matrices and networks and system diagrams (see Method 4).

# METHODS

## 3
## EXAMPLES:

Matrices were first formally proposed for environmental impact assessment by the U.S. Geological Survey (Leopold et al. 1971). Since that time a number of matrix methods have been proposed for analyzing cumulative effects. One such methodology is the Cluster Impact Assessment Procedure (CIAP) developed by the Federal Energy Regulatory Commission in the mid-1980s (FERC 1985, 1986a; Russo 1985). The methodology was developed specifically for use in assessing the cumulative effects of small hydroelectric facilities within single watersheds. The CIAP uses a matrix for each resource (e.g., salmon) consisting of relative effect ratings (on a scale from 1 to 5) arranged by project and resource components (e.g., for salmon, spawning habitat, migration). Each resource matrix table contains a summary column that represents the sum of effect ratings across components for each project (Figure A-1). An overall summary table is then developed that presents the effects of each project on all resources analyzed.

The CIAP does not incorporate or consider the possibility of synergistic interactions among projects that could result in nonadditive effects on resources; the effects of individual projects are simply added together to determine cumulative effects. This short-coming led to modification of the methodology to include interaction effects. With these modifications, cumulative effects are viewed as being equivalent to the sum of the effects of individual projects plus any interaction between pairs of projects. Modified CIAP procedures include the approach used in the Salmon River and Snohomish River EISs for hydroelectric development in those basins (FERC 1986b, 1987; Irving and Bain 1993). Other matrix methodologies that incorporate interaction effects have been proposed (Bain et al. 1986; Stull et al. 1987; LaGory et al. 1993). Each represents a further development of the approach with an attempt to more accurately quantify cumulative impacts; consequently, each succeeding methodology attains additional complexity.

The Integrated Tabular Methodology (Stull et al. 1987; LaGory et al. 1993) uses the same matrix approach as Bain et al. (1986) but involves a systematic (albeit relatively complex) method of quantifying and developing interaction coefficients. To determine interaction coefficients, this method requires identification of the impact zones for all projects being evaluated as well as knowledge of the response of resources to environmental change. The methodology is designed to be flexible and can use a wide variety of data and models. For example, the methodology can use evaluative criteria such as effect ratings, habitat suitability indices (USFWS 1980; Bovee 1982), or quantitative population models.

# METHODS



Figure A-1.    Example of cumulative impact computations for a target resource with three resource components and two projects (FERC 1987).

## References

Bain, M.B., J.S. Irving, R.D. Olsen, E.A. Stull, and G.W. Witmer.  1986.  Cumulative impact assessment: evaluating the environmental effects of multiple human developments. ANL/EES-TM-309.  Argonne National Laboratory, Argonne, IL.

Bovee, K.D. 1982. A guide to stream habitat analysis using the instream flow incremental methodology.  Instream Flow Information Paper 12. FWS/OBS-82/26. U.S. Fish and Wildlife Service, Western Energy and Land Use Team, Fort Collins, CO.

Canter, L.W.  1996.  *Environmental Impact Assessment, Second Edition*.  McGraw-Hill, New York.

Federal Energy Regulatory Commission (FERC). 1985. Procedures for assessing hydropower projects clustered in river basins: request for comments.  *Federal Register* 50:3385-3403.

Federal Energy Regulatory Commission (FERC). 1986a. Owens River Basin, seven hydroelectric projects, California.  Federal Energy Regulatory Commission, Washington, D.C.  FERC/DEIS-0041.

# METHODS

Federal Energy Regulatory Commission (FERC). 1986b. Snohomish River Basin, seven hydroelectric projects, Washington.  Federal Energy Regulatory Commission, Washington, D.C.  FERC/FEIS-0042.

Federal Energy Regulatory Commission (FERC). 1987. Salmon River Basin, fifteen hydroelectric projects, Idaho.  Federal Energy Regulatory Commission, Washington, D.C.  FERC/FEIS-0044.

Irving, J.S. and M.B. Bain. 1993. Assessing Cumulative Impact on Fish and Wildlife in the Salmon River Basin, Idaho. In S.G. Hildebrand and J.B. Cannon. eds. *Environmental Analysis: The NEPA Experience*. Lewis Publishers, Boca Raton, FL. pp. 357-372.

LaGory, K.E., E.A. Stull, and W.S. Vinikour. 1993.  Proposed methodology to assess cumulative impacts of hydroelectric development in the Columbia River Basin.   Pp. 408-423 in S.G. Hildebrand and J.B. Cannon, eds. *Environmental Analysis: the NEPA Experience*. Lewis Publishers, Boca Raton, FL.

Leopold, L.B., F.E. Clarke, B.B. Hanshaw, and J.R. Balsley. 1971. A Procedure for Evaluating Environmental Impact. Circular 645. U.S. Geological Survey. 13 pp.

Russo, T.N. 1985. Perspectives on analyzing impacts related to multiple hydroelectric development.  Pp 346-350 in F.W. Olson, R.G. White, and R.H. Hamre (eds), Proceedings of the Symposium on Small Hydropower and Fisheries, American Fisheries Society, Bethesda, MD.

Stull, E.A., K.E. LaGory, and W.S. Vinikour. 1987.  Methodologies for assessing the cumulative environmental effects of hydroelectric development on fish and wildlife in the Columbia River Basin – Volume 2: Example and procedural guidelines.  Final report to Bonneville Power Administration, Portland, OR. DOE/BP-19461-4.

U.S. Fish and Wildlife Service. 1980.  Habitat evaluation procedures.  ESM 102.  U.S. Fish and Wildlife Service, Division of Ecological Services, Washington, D.C.

# METHODS

# 4
# NETWORKS AND SYSTEM DIAGRAMS

**Networks and system diagrams** relate the components of an environmental or social system in a chain (network) or web (loop or system diagram) of causality and allow the user to trace cause and effect through a series of potential links. They allow the user to analyze the multiple, subsidiary effects of various actions and trace indirect effects on resources stemming from direct effects on other resources. In this way, the accumulation of multiple effects on individual resources, ecosystems, and human communities can be determined. Networks and system diagrams *are often the analyst's best method for identifying the cause-and-effect relationships that result in cumulative effects.*

Networks, loops, and system diagrams improve on the stepped matrix approach to illustrating the relationship among actions, effects, and environmental or socioeconomic conditions by using component boxes (or symbols) and linkage arrows (denoting processes). Networks and system diagrams concisely illustrate interactions among variables and secondary effects. Cumulative effects are identified whenever multiple sources affect the same resource, or when multiple effects of the same source affect a resource (via indirect pathways through other resource components). When quantitative measures are included, effects and their interactions can be evaluated using a common unit of measurement (usually energy flow). The use of a common scale distinguishes networks and system diagrams from other cumulative effects analysis methods but requires evaluating different classes of effects separately (e.g., ecological versus social impacts).

By definition, network analysis proceeds in only one direction (forward), whereas loops or system diagrams allow feedback of information output by one part of the system to any other part of the system. Networks also assume a strict hierarchical linkage among system variables and are thus not capable of showing all relationships among variables. In contrast, system diagrams are specifically designed to illustrate the interrelationships (and process pathways) among all components and thus are more realistic. The lack of an appropriate unit of measure for all system compartments can limit the analyst's ability to quantify system diagrams, but some success has been obtained by using the flow of water or energy flow as common units of measure (Gilliland and Risser 1977).

Expert systems can be used to implement network analysis. Expert systems are simply sets of logical rules that mirror the analysis process of an expert in some field. To identify cumulative effects, an expert system would (1) query the analyst about additional activities that might affect the resource in question and (2) carry the predicted effects through known causal links to reveal additional secondary effects on each resource. The line of questioning will take different courses, depending on the user's answers to questions along the way. The program used to work its way through the questions and answers is called an inference engine.

# METHODS

## 4
## EXAMPLES:

Since the introduction of network analysis for impact assessment by Sorensen (1971), networks and systems diagrams have been useful for describing cause-and-effect relationships in both natural and human-dominated systems. Figure A-2 illustrates how cumulative effects on socioeconomic conditions can be identified. The figure (modified from Rau and Wooten 1985) shows how the removal of both homes and businesses (following freeway construction) cumulatively results in an increase in property tax rate at the tetrary level of effects. A comprehensive network (Figure A-3) illustrating all causes, perturbations, primary effects, and secondary effects related to coastal zone development was prepared for the

Australian (Commonwealth) Environmental Protection Agency (1994).

An example of the case of a single activity resulting in cumulative effects on a single resource through indirect effects is illustrated in Figure A-4 (Bisset 1983). This system diagram shows damage to fish spawning resulting from aerial application of herbicides through five different pathways resulting in low dissolved oxygen and high sediment stress. Low dissolved oxygen is caused by decreased plankton growth and increased oxygen consumption from debris pollution and erosion; increased sediment is also caused by debris pollution and increased erosion following the loss of riparian vegetation.



Figure A-2.  Example of an "impact tree" for new freeway construction in an established downtown business district (modified from Rau and Wooten 1985)

A-14

# METHODS



Figure A-3.    A specific cause-and-effect network for coastal zone development cumulative impacts in Australia [Austrailian (Commonwealth) Environmental Protection Agency 1994]

# METHODS



Figure A-4.    System diagram showing cumulative indirect effects of aerial application of herbicide on an aquatic system (Bisset 1983).

As part of the Chesapeake Bay Restoration Plan, a cause-and-effect network analysis was conducted during a workshop charged with analyzing cumulative effects on the Bay (Williamson et al. 1987).  This approach led the workshop away from focusing on development actions (near the start of the causal chains) or fish and wildlife species (near the end of the effect chains) to focusing on habitats as the hub of the cause-and-effect relationships contributing to cumulative effects on the Bay's living resources. This network analysis was instrumental in focusing the cumulative effects analysis on the appropriate ecological goals and remedial actions needed (Williamson 1993).

# References

Australian (Commonwealth) Environmental Protection Agency. 1994. Assessment of Cumulative Impacts and Strategic Assessment in Environmental Impact Assessment. Consultancy Report. May.

Bisset, R. 1983. Methods for environmental impact analysis: recent trends and future prospects. *Journal of Environmental Management* 11:27-43.

Gilliland, M.W. and P.G. Risser. 1977. The use of systems diagrams for environmental impact assessment. *Ecological Modelling* 3:188-209.

Rau, J.G. and D.C. Wooten, eds. 1985. *Environmental Impact Analysis Handbook*. McGraw-Hill, New York.

# METHODS

Sorensen, J.C. 1971. *A Framework of Identification and Control of Resource Degradation and Conflict in the Multiple Use of the Coastal Zone*. University of California, Berkeley, CA.

Williamson, S.C. 1993. Cumulative impacts assessment and management planning: Lessons Learned to Date. In: S.G. Hildebrand and J.B. Cannon (eds). *Environmental Analysis: the NEPA Experience*. Lewis Publishers, Boca Raton, FL. pp. 391-407.

Williamson, S.C., C.L. Armour, G.W. Kinser, S.L. Funderburk, and T.N. Hall. 1987. Cumulative impacts assessment: An application to Chesapeake Bay. *Transactions of the North American Wildlife and Natural Resources Conference* 52:377-388.

# METHODS

# 5

# MODELING

**Modeling** is a powerful technique for *quantifying the cause-and-effect relationships leading to cumulative effects.* Modeling can take the form of mathematical equations describing cumulative processes such as soil erosion, or it may constitute an expert system that computes the effect of various project scenarios based on a program of logical decisions. Modeling is also used in socioeconomic analyses, ranging from macroeconomic models to community-level demographics (see Methods 10 and 11).

Developing project-specific models requires substantial resources and time. For this reason, cumulative effects analysis will most often use or modify existing models. The lack of baseline data or project-specific data can also limit the use of sophisticated models. Nonetheless, modeling holds considerable promise for analyzing cumulative effects. In general, the use of models requires that an agency invest in (1) developing a given model or technique, or (2) obtaining baseline data for use in an existing model. The short-term investment usually reaps long-term benefits in analyzing cumulative effects. In some cases, the analyst may find a direct match between the model and the application to existing data. Examples where cumulative effects are routinely modeled include the following:

- Air dispersion models
- Hydrologic regime models
- Oxygen sag models
- Soil erosion models
- Sediment transport models
- Species habitat models
- Regional economic models.

Models that are easily defended and generally recognized in the scientific community should be used. Thus, general models form the basis for most practical work under NEPA, whereas more sophisticated models are often used on a case-by-case basis. Rarely are models used to combine and evaluate cumulative effects of the proposed and other actions. Tables and matrices provide a more straightforward means of displaying alternatives and their cumulative effects on individual resources. Nonetheless, it is possible to develop an evaluative model that assigns resources to compartments and quantifies effects and relationships mathematically. Generally, the assumptions required by this approach are many, and the likelihood of public understanding and acceptance is low.

# METHODS

## 5
## EXAMPLES:

Concern for air quality has produced sophisticated air models that track local and regional emissions and estimate ambient (cumulative) pollutant concentrations. The original bubble concept in air pollution control was predicated on limiting the cumulative emissions at a site or region while allowing flexibility in the amount released by individual sources. Figure A-5 displays projected $NO_2$ concentration isopleths for the cumulative effects of an existing power plant and the proposed addition of a second generating unit in Healy, Alaska. This kind of model output can be combined with map overlay techniques to reveal potential adverse effects on mapped resources.



Figure A-5.    Projected $NO_2$ concentration isopleths for combined HCCP and Unit 1 emissions, Healy, AK (Department of Energy 1993)

Water quality-based modeling is another approach to addressing cumulative effects of multiple discharges. Specifically, the cumulative effect of pollutant discharges into a waterbody can be determined through the wasteload allocation procedure under the National Pollution Discharge Elimination System (NPDES) permit process. The wasteload allocation uses a simple equation to incorporate receiving water dilution, background concentrations of pollutants, numeric water quality criteria or whole effluent toxicity information, and effluent volume for discharges into the stream of concern.

waste load allocation =
$$[WQC (Q_s + Q_e) - (Q_s C_s)]/Q_e$$

| | | |
|---|---|---|
| WQC | = | water quality criteria |
| $Q_s$ | = | upstream flow |
| $Q_e$ | = | effluent flow |
| $C_s$ | = | upstream concentration in toxic units |

This wasteload allocation model sets the discharge limit so that the cumulative effect does not result in chronic toxicity to the aquatic biota of the stream. The most commonly used schemes for allocating waste loads among discharges are equal percent removal, equal effluent concentrations, and a hybrid method (where the criteria for waste reduction may not be the same for each point source).

Concerns over potential cumulative effects on aquatic resources resulting from decreases in dissolved oxygen (DO) concentrations prompted the Federal Energy Regulatory Commission (FERC) to model the DO in river reaches encompassing 19 potential hydroelectric generation sites in the Upper Ohio River Basin (FERC 1988). Although it is well known that introducing hydropower projects will affect DO

# METHODS

concentrations by changing the amount of aeration that takes place at existing dams (from spillage over the dam), the cumulative effect on individual river reaches could only be determined by developing a simulation model (Figure A-6). This model first determined the amount of aeration provided by the dams, and then determined the change in DO caused by installing hydropower facilities. The amount of DO provided by dams was quantified by fitting field data to a statistical model. Then a mathematical model based on known biochemical oxygen demand (BOD) and hydraulic characteristics was developed to determine how changes in aeration at each dam where hydropower was proposed would affect DO concentrations over the entire study area. Ultimately, the effects of proposed hydropower projects on DO concentrations were analyzed under appropriate flow conditions, and the cumulative effects of different alternatives (combinations of projects) on target resources were defined.

The cumulative effects on species of concern can be modeled by quantifying specific mortality factors (e.g., entrainment of migrating species in the turbines of multiple hydropower facilities) or loss of suitable habitat. The cumulative effects of micro-hydro development on the fisheries of the Swan River drainage in Montana was modeled using the bull trout as the primary species of concern (Leathe and Enk 1985). A land-type-based watershed model was used to estimate future cumulative sediment loads resulting from a combination of forest management and micro-hydro development scenarios. The relationship of sediment load to substrate quality was determined and the substrate quality score was correlated with the number of bull trout. Based on these models, the cumulative effect on fisheries from scenarios containing 4 to 20 micro-hydro projects was estimated. Within the drainage, a 7% reduction in juvenile bull trout abundance was attributed to forest road construction; 13% to 24% losses were predicted for micro-hydro project development.

Truett et al. (1994) concluded that the best approach for assessing the cumulative effects on wildlife is to focus on the habitat factors that control the distributions and abundances of



Figure A-6. Cumulative effects on dissolved oxygen caused by hydroelectric development, reduced spillages, and reduced aeration at dams (FERC 1988)

wildlife populations. The most commonly used models of resource-habitat relationships are the Habitat Evaluation Procedures (HEP; U.S. Fish and Wildlife Service 1980) and Instream Flow Incremental Methodology (IFIM; Armour et al. 1984) developed by the U.S. Fish and Wildlife Service. HEP uses Habitat Suitability Index (HSI) models to provide estimates of habitat quality (Schamberger et al. 1982; Hayes 1989). An HSI is developed for each species by aggregating functional values for specific habitat parameters known to support the species of interest. HSI models have also been developed for a few animal communities such as those found in shelterbelts (Schroeder 1986). The cumulative effect of multiple activities on a species can be determined by estimating the number of habitat units (combined HSIs for each habitat available to the species) affected in the area. HEP and IFIM models provide a common currency (habitat suitability) that can be debited by a wide variety of cumulative effects.

# METHODS

Models are routinely used to assess regional economic effects. When the need to include socioeconomic considerations in NEPA analyses arose, the U.S. Army developed the Economic Impact Forecast System (EIFS) as a model that (1) was based in sound theory, (2) was accepted by the scientific community, and (3) could use readily available data. EIFS is discussed in more detail in the section on Economic Impact Analysis (Method 10).

Although the primary use of models in cumulative effects analysis is to quantify cause-and-effect relationships, optimization and simulation modeling can be used to evaluate among alternatives or against a predefined set of goals. Optimization methods (such as linear programming) address cumulative effects by explicitly incorporating multiple resources and seeking an optimum level for each resource relative to project objectives. Methods range from simple algebraic equations that are solved for variables of set ranges to complex versions including nonlinear functions, layers of optimizations, probabilities, and stochastic variables (Stull et al. 1987). Grygier and Stedinger (1985) used this technique to optimize energy production under the constraints of other goals including water supply, minimum flows, and reservoir levels. Simulation enables the practitioner to model an environmental or socioeconomic system, and simulate the effects of various actions on the system (as described by functional interactions among system components) over time and space. This is the most difficult of cumulative effects analysis methods, yet potentially most rewarding because it is capable of producing most nearly what a practitioner would want—a decisionmaking tool.

## References

Armour, C.L., R.J. Fisher, and J.W. Terrell. 1984 Comparison of the Use of the Habitat Evaluation Procedures (HEP) and the Instream Flow Incremental Methodology (IFIM) in Aquatic Analyses. U.S. Fish and Wildlife Service, Western Energy and Land Use Team, Fort Collins, CO. FWS/OBS-84/11.

Federal Energy Regulatory Commission (FERC). 1988. Final Environmental Impact Statement. Hydroelectric Development in the Upper Ohio River Basin. Ohio, Pennsylvania, West Virginia. FERC Docket No. EL85-19-114. Federal Energy Regulatory Commission, Office of Hydropower Licensing. Washington, DC. September. FERC/FEIS-0051.

Grygier, J.C. and J.R. Stedinger. 1985. Algorithms for optimizing hydropower development. *Water Resources Research* 16:14-20.

Hayes, R.L. 1989. Micro-HSI master model library., cover type list and variable lexicon. Reference Manual v 2.1. U.S. Fish and Wildlife Service, Fort Collins, CO.

Leathe, S.A. and M.D. Enk. 1985. Cumulative Effects of Micro-Hydro Development on the Fisheries of the Swan River Drainage, Montana. I: Summary Report. Prepared for the Bonneville Power Administration., Portland, OR. 114 pp. + appendices.

Schamberger, M., A.H. Farmer, and J.W. Terrell. 1982. Habitat Suitability Index Models: Introduction. U.S. Fish and Wildlife Service, Washington, DC.

Schroeder, R.L. 1986. Habitat Suitability Index Models: Wildlife Species Richness in Shelterbelts. Biological Report 82(10.128). U.S. Fish and Wildlife Service, Washington, DC. 17 pp.

# METHODS

Stull, E.A., K.E. LaGory, and W.S. Vinikour. 1987. Methodologies for assessing the cumulative environmental effects of hydroelectric development on fish and wildlife in the Columbia River Basin – Volume 2: Example and procedural guidelines. Final report to Bonneville Power Administration, Portland, OR. DOE/BP-19461-4.

Truett, J.C., H.L. Short, and S.C. Williamson. 1994. Ecological impact assessment. In: T.A. Bookhout, ed. *Research and Management Techniques For Wildlife and Habitats*. The Wildlife Society, Bethesda, MD pp. 607-622.

U.S. Department of Energy. 1993. Final Environmental Impact Statement for the Proposed Healy Clean Coal Project. DOE/EIS-0186.

U.S. Fish and Wildlife Service. 1980. Habitat Evaluation Procedures. ESM 102. U.S. Fish and Wildlife Service, Division of Ecological Services, Washington, DC.

# METHODS

# 6
## TRENDS ANALYSIS

**Trends analysis** assesses the status of resources, ecosystems, and human communities over time and usually results in the graphical projection of past or future conditions. Changes in the occurrence or intensity of stress over time can also be determined. Trends analysis *provides the historical context that is critical to assessing the cumulative effects of proposed actions.* Specifically, trends analysis can assist the cumulative effects analyst by

- **Identifying cumulative effects problems.** When trends analysis demonstrates that a substantial amount of a resource has been lost, it usually reveals a cumulative effects problem that may be exacerbated by additional actions. For example, historical declines in a fishery resource may indicate that the fishery is near the threshold of population collapse.

- **Establishing appropriate environmental baselines.** When data on the current state of a resource are lacking (or too variable), trends data can be used to describe the existing condition. Trends information can also be used to develop historical baselines or regional goals against which to evaluate restoration efforts.

- **Projecting future cumulative effects.** Trends analysis can identify historical cause-and-effect relationships between stresses and resources or ecosystems. Common cumulative effects relationships can be used to predict future effects whenever the environmental conditions are similar. Historical trends may also reveal threshold points where cumulative effects become significant or qualitatively different.

By documenting the cumulative effects on the condition of resources over time, trends analyses have been used as planners to assist with the orderly development of communities (by charting the course of economic development), and by wildlife managers to develop appropriate harvest guidelines (by recording populations trends in species). Changes in the condition of resources or ecosystems can be illustrated in both simple and complex forms. A simple trends analysis might produce a line graph showing decreasing numbers of animals from annual surveys. Changes in habitat pattern might be illustrated with a series of figures, or in a 3-dimensional graphic where the amount of change is portrayed on the vertical axis. Video simulations can be used to show complex changes in geographic or aesthetic resources. Time-series information from aerial photographs or satellite imagery are increasingly available for trends analysis across the United States.

# METHODS

## 6
## EXAMPLES:

Trends identified from long-term data sets greatly enhance the evaluation of cumulative effects analyses on individual species. For example, the U.S. Fish and Wildlife Service's Breeding Bird Survey (BBS) has identified declining bird populations that may be at greater risk from future cumulative effects (Robbins et al. 1986). As is the case with most long-term records, data gaps in the BBS require using advanced statistical methods to ensure accurate interpretation of trends. In this case, proportional trends for each survey route were estimated and then weighted to account for areal and data influences (Figure A-7). Trends analyses of bird surveys have identified a number of species with substantial declines in numbers, including many migratory songbirds (Atkins et al. 1990; Terborgh 1992).



Figure A-7.    Common flicker population trends (Robbins et al. 1986)

# METHODS

Trends in the abundance and distribution of habitats are one of the most important indicators of cumulative effects problems. Figure A-8 dramatically illustrates the trend toward fragmentation of forested areas in Wisconsin (Curtis 1956 cited in Terborgh 1989). A recent study by the U.S. Army Corps of Engineers, in cooperation with U.S. EPA, Fish and Wildlife Service, and NOAA (1993), addressed historical trends in special aquatic habitats of Commencement Bay, WA, resulting from numerous dredge and fill activities since 1877. To address changes over 140 years, the trends analysis study combined historical literature with the photographic record. The use of remotely sensed photographic imagery allowed analysts to combine measures of the areal extent of spoil disposal with written information on the volume of material dredged, and produced a dramatic illustration of downward trends in the area of both intertidal mudflats and marshes (Table A-2).

Many other examples of historical losses of wetlands have been reported by the U.S. Fish and Wildlife Service's National Wetlands Inventory (NWI; Dahl et al. 1991). In addition to identifying (and quantifying) this cumulative effects problem, the NWI trends analysis has produced statistics (such as the remaining acreage of different wetlands types) that can be used to predict thresholds where future wetlands losses will likely affect watershed functioning. The "synoptic approach" to cumulative effects analysis developed by the U.S. EPA Environmental Research Laboratory in Corvallis (Leibowitz et al. 1992) proposes to use this information as a quantitative means of comparing wetlands losses among watersheds and determining where future wetland losses will have the greatest effect.

Trends analysis can also be used to construct the environmental baseline for cumulative effects analysis when adequate data on the state of a resource are lacking or are too variable. For example, sediment cores drawn from lakes or estuaries can often be used to obtain a more accurate picture of the state of contamination than can standard sediment samples. Landings of commercial fish species are notoriously variable, but historical trends can identify appropriate baseline population levels as targets for restoration efforts.

Trends analysis in land disturbance have also been used to estimate future cumulative effects based on the causal relationship between land use and resource degradation. Time-series data and aerial photos illustrating trends in land disturbance in Elkhorn Slough, CA, over a 50-year period were used to predict the effect of future residential development (Dickert and Tuttle 1985). In addition, the trends analysis produced a historical trends target that was deemed acceptable for final buildout of the area.



Figure A-8.  Cadiz township forest fragmentation (Curtis 1956 cited in Terborgh 1989)

# METHODS

<table>
<tr><td colspan="5"><strong>Table A-2.  Habitat loss by historic period in Commencement Bay, WA<br>(modified from USACE 1993)</strong></td></tr>
<tr><th>Historic Period</th><th>Habitat Type</th><th>Historical Records of Lost Habitat</th><th>Total Lost Habitat (includes historical records and photographic evidence)</th><th>Acres Remaining</th></tr>
<tr><td>1877 - 1894</td><td>mudflat<br>marsh</td><td>11<br>20</td><td>0<br>0</td><td>2,074<br>3,874</td></tr>
<tr><td>1894 - 1907</td><td>mudflat<br>marsh</td><td>208<br>41</td><td>605<br>415</td><td>1,469<br>3,459</td></tr>
<tr><td>1907 - 1917</td><td>mudflat<br>marsh</td><td>51<br>35</td><td>542<br>64</td><td>927<br>3,395</td></tr>
<tr><td>1917 - 1927</td><td>mudflat<br>marsh</td><td>48<br>0</td><td>162<br>72</td><td>765<br>3,320</td></tr>
<tr><td>1927 - 1941</td><td>mudflat<br>marsh</td><td>143<br>399</td><td>133<br>1,676</td><td>632<br>1,44</td></tr>
<tr><td>1941 - Present</td><td>mudflat<br>marsh</td><td>105<br>1,557</td><td>412<br>1,587</td><td>187<br>57</td></tr>
<tr><td>TOTALS</td><td>mudflat<br>marsh</td><td>566<br>1,052</td><td>1,54<br>3,814</td><td></td></tr>
</table>

## References

Askins, R.A., J.F. Lynch, and R. Greenberg. 1990.  Population declines in migratory birds in eastern North America.  *Current Ornithology* 7:1-57.

Curtis, J.T. 1956. The modification of mid-latitude grasslands and forests by man. In *Man's Role in Changing the Face of the Earth,* edited by W.L. Thomas, 721-736. University of Chicago Press, IL.

Dahl, T.E., C.E. Johnson, and W.E. Frayer. 1991. Wetlands: Status and Trends in the Conterminous United States Mid-1970's to Mid-1980's.  U.S. Department of the Interior, Fish and Wildlife Service, Washington, DC. 28 pp.

Dickert, T.G. and A.E. Tuttle. 1985. Cumulative impact assessment in environmental planning: A coastal wetland watershed example. *Environmental Impact Assessment Review* 5:37-64.

Leibowitz, S.G., B. Abbruzzese, P. Adamus, L. Hughes, and J. Irish.  1992.  A Synoptic Approach to Cumulative Impact Assessment—A Proposed Methodology. U.S. Environmental Protection Agency, Environmental Research Laboratory, Corvallis, OR. EPA/600/R-92/167.

Robbins, C.S., D. Bystrak, P.H. Geissler. 1986. The Breeding Bird Survey: Its First Fifteen Years, 1965-1979. USDOI, Fish and Wildlife Service, Resource Publication 157. Washington, DC.

Terborgh, J. 1989. *Where Have All the Birds Gone?* Princeton University Press, NJ. 207 pp.

Terborgh, J. 1992. Why American Songbirds are Vanishing. *Scientific American* 266(5):98-104.

U.S. Army Corps of Engineers (USACE)A, U.S. Fish and Wildlife Service, and NOAA. 1993. Commencement Bay Cumulative Impact Study. Vol. I Assessment of Impacts. U.S. Army Corps of Engineers, Seattle, WA. May/June.

# METHODS

# 7
# OVERLAY MAPPING AND GIS

**Overlay mapping and geographic information systems (GIS)** incorporate locational information into cumulative effects analysis. Simple mapping characterizes the spatial aspects of resources, ecosystems, and human communities and helps set the boundaries of the analysis. Overlay mapping can directly evaluate cumulative effects by identifying areas where effects will be the greatest. Mapping and GIS can also address concerns, such as landscape connectivity, that are difficult, if not impossible, to address with other methods. Map overlays *are extremely useful for any form of visual representation.*

The most direct use of overlay mapping for analyzing cumulative effects is "impact-oriented," wherein a composite cumulative effects map is produced by overlaying individual effects from different actions. Examples include the combined effects of both air deposition and water discharge of contaminants to a river, as well as the cumulative effects of multiple land uses in a forested watershed. The more common map overlay approach, however, combines thematic maps of different landscape features to rate areas or resources as to their suitability for development or risk from degradation. In this "resource-oriented" approach, cumulative effects in specific areas can be compared to land suitability determinations (resource or ecosystem thresholds) for those areas. The result is a suitability map that combines development opportunities and environmental and socioeconomic constraints (e.g., both endangered species habitats and public transportation routes) to

disturbance or the areas where disturbance will have the greatest consequences (e.g., those that

identify parcels suited to each activity type (McHarg 1969).

Resource-oriented overlay mapping supports the planning approach to cumulative effects analysis and is often called resource capability analysis. Resource capability analysis can be used to optimize the integration of a site's natural and cultural features with various site design elements (Rubenstein 1987), or to minimize wastefulness in resource utilization (McKenzie 1975). Resource capability analysis uses opportunity, constraint, and suitability maps (Rubenstein 1987). Opportunity maps generally depict conditions related to factors such as soil types or topographic slopes that are suitable for development; constraint maps depict areas that for various reasons, such as the presence of wetlands, floodplains, or cultural resources, are not conducive to development. The land suitability map combines the information in the opportunity and constraints maps to identify those areas best suited for the activities planned.

Suitability ratings can be used to express the responses of resources, ecosystems, and human communities in the absence of more sophisticated quantitative cause-and-effect models (Contant and Wiggins 1993). Where these suitability ratings are based on thresholds above which effects he capacity of the affected resources to sustain themselves, the evaluation is equivalent to carrying capacity analysis. Resource-oriented overlay mapping usually identifies the areas m o s t        s e n s i t i v e        t o

are most valued or have endured the greatest past losses).

# METHODS

Overlay maps and land suitability maps have rapidly evolved from handmade transparencies to GIS-based computer overlays (for potential problems see Bailey 1988). In the simplest case, map layers are hand drawn on transparent sheets and then overlain. Each sheet represents a single map layer containing a certain type of information. Within each sheet (or overlay), the importance (or weight) assigned to different data categories is represented by the degree of shading used. The shading seen when all map overlays are stacked atop each other reveals graphically the overall suitability of different areas within the mapped region for the user-defined purpose. In the effect-oriented approach, darker shading may be used to identify areas subject to the greatest cumulative effects (from multiple actions).

Using a GIS to implement overlay mapping allows the analyst to electronically overlay natural and cultural features and produce composite maps quickly (Johnson et al. 1988). In some cases, GIS maps are derived directly from satellite images using land cover interpretation algorithms. Like the user of the manual transparent map overlay technique, the GIS user can develop weighted functions to assign numeric weights to each map area (or groupings of grid cells) within a map layer. Such weights might be determined by an expert in the field, or based on a statistical classification drawn from field measurements.

# METHODS

# 7
# EXAMPLES:

Examples of the use of overlay mapping and GIS to analyze cumulative effects include both the effect-oriented approach (e.g., where two or more contaminant sources are mapped over a single resource) and the resource-oriented approach (e.g., where the map overlays are used to characterize land areas in terms of their suitability for development). The former approach is typified by GIS-based groundwater analyses where multiple plumes of contaminated water are overlain on the aquifer of interest to determine the cumulative effects. Many other resources and ecosystems have important geographical characteristics that must be considered in analyzing cumulative effects. For example, overlay mapping can reveal the cumulative fragmentation of a spatially contiguous forest (critical to many migratory songbirds) from activities such as road and building construction. In the Corridor Selection Supplemental Draft EIS for the construction of the Appalachian Corridor H highway near Elkins, West Virginia (West Virginia DOT 1992), GIS map overlays produced estimates of the amount of forest fragmentation, reduction in core forest area, and spatial contact of construction with remote habitat areas.

The resource-oriented overlay mapping approach is commonly used to select the preferred development option (e.g., the right-of-way route that minimizes cumulative effects on resources, ecosystems, and human communities. In his classic *Design With Nature,* Ian McHarg (1969) described the use of map overlays for planning coastal island development, highways, open space in Philadelphia, suburban growth near Baltimore, land use on Staten Island, and regional development around metropolitan Washington, D.C. In the highway development example, he used overlay mapping to determine a "minimum-social-cost alignment" to replace the originally proposed highway corridor.

Master plans often use resource capability analysis to address the cumulative effects of multiple actions. The resources to be included in the capability analysis depend on the activities being undertaken, and analyses range from comprehensive assessments of all physical, biological, and socioeconomic factors in a regional planning area to limited analyses of the potential for sediment runoff related to the slope, soil, and permeability of a given plot of land. For example, overlays of a site's topographic features (e.g., geology, soils, slope, and vegetation) can be used to designate areas where construction will not contribute to cumulative runoff problems (i.e., soils with low erosion potential). Overlay mapping is also critical to planning conflicting land uses, such as combat training activities and natural resource conservation on military installations. The intersection of impact areas (e.g., aircraft flight corridors, tank maneuvers, large weapon firing areas, ordinance impact areas) and sensitive environments (e.g., wildlife refuges and endangered species habitats) can be determined through overlay mapping as illustrated in Figure A-9 (produced from map archives, Department of the Navy, Naval Air Station Patuxent River, MD, 1996).

Overlay mapping and GIS can also be used to document past cumulative effects and help predict future effects. Walker et al. (1987) used remote sensing data and GIS to evaluate the indirect effects of oil field development in the Prudhoe Bay Oil Field, Alaska. Aerial photographs revealed surface disturbance (flooding

# METHODS

and thermokarst) extending beyond the areas directly affected by construction. These unanticipated effects on frozen arctic soils and thaw-lake wetlands constitute an important cumulative effects problem for oil field activities. Overlay mapping of the spatial properties of areas (e.g., vegetation, amount of open water, land and surface form types, and soil type) where these indirect effects were more pronounced can be used to predict future cumulative effects and better plan resource extraction in this fragile ecosystem.

The promise of GIS as a tool for solving cumulative effects problems is evidenced by the rapidly increasing applications of GIS to land management of forests (Sample 1994) and wetlands (Lyon and McCarthy 1995). Jerry Franklin (1994) states that GIS may be the most important technology resource managers have acquired in recent memory. He predicts that GIS will be invaluable in (1) inventory and monitoring, (2) management planning, (3) policy setting, (4) research, and (5) consensual decisionmaking. In a much publicized example, the



Figure A-9.    Hypothetical intersection between aviation flight corridors and environmental resources near a typical U.S. military installation (Department of the Navy 1996)

A-31

# METHODS

resolution of the Pacific Northwest forest controversy would have been impossible without GIS. Only when GIS was combined with remote sensing information was the actual extent (or lack) of old growth forest determined. Perhaps more importantly, various scientific panels were charged with developing and evaluating alternatives for protecting late-successional forest ecosystems and associated species (e.g., northern spotted owl). Only when an effective GIS capability was developed, was it possible to display and modify the alternatives before decision-makers (including Congressional delegations) so that reasonable consensus could be achieved.

## References

Bailey, R.G. 1988. Problems with overlay mapping for planning and their implications for geographic information systems. *Environmental Management* 12:11-17.

Contant, C.K. and L.L. Wiggins. 1993. Toward Defining and Assessing Cumulative Impacts: Practical and Theoretical Considerations. In: S.G. Hildebrand and J.B. Cannon. eds. *Environmental Analysis: The NEPA Experience*. Lewis Publishers, Boca Raton, FL. pp. 336-356.

Department of the Navy. 1996. Hypothetical intersection between aviation flight corridors and environmental resources near a typical U.S. military installation. Map created by the Joint Innovative Interdisciplinary Solutions Team (JIIST) Program Office, Naval Air Station Patuxent River, MD.

Franklin, J.F. 1994. Developing information essential to policy, planning, and management decision-making: The promise of GIS. In: V.A. Sample, ed. *Remote Sensing and GIS in Ecosystem Management*. Island Press, Washington, DC. pp. 18-24.

Johnson, C.A., N.E. Detenbeck, J.P. Bonde and G.J. Niemi. 1988. Geographic Information Systems for Cumulative Impact Assessment. *American Society of Photogrammetry and Remote Sensing*. 54(11):1609-1615.

Lyon, J.G. and J. McCarthy. 1995. *Wetland and Environmental Applications of GIS*. Lewis Publishers, Boca Raton, FL. 368 pp.

McHarg. I. 1969. *Design with Nature*. Natural History Press, New York, NY. 197 pp.

McKenzie, G.D. 1975. Physical Environment in Regional Planning. In *Regional Environmental Management*, L E. Coate and P.A. Bonner eds. John Wiley & Sons, New York, New York, pp 235-244.

Rubenstein, H.M. 1987. *A Guide to Site and Environmental Planning*. John Wiley & Sons, New York, New York, pp. 7-53.

Sample, V.A., ed. 1994. *Remote Sensing and GIS in Ecosystem Management*. Island Press, Washington, DC. 369 pp.

Walker, D.A., P.J. Webber, E.F. Binnian, K.R. Everett, N.D. Lederer, E.A. Nordstrand, and M.D. Walker. 1987. Cumulative impacts of oil fields on northern Alaskan landscapes. *Science* 238:757-761.

West Virginia Department of Transportation (DOT). 1992. Corridor Selection Supplemental Draft Environmental Impact Statement (SDEIS): Appalachian Corridor H Elkins to Interstate 81. West Virginia DOT, Division of Highways, Charleston, WV.

# METHODS

# 8
# CARRYING CAPACITY ANALYSIS

**Carrying capacity analysis** derives from the fact that inherent limits, or thresholds, exist for many environmental and socioeconomic systems. Carrying capacity in the ecological context *is defined as the threshold of stress below which populations and ecosystem functions can be sustained*. In the social context, the carrying capacity of a region is the sum of human activities that can be maintained while providing the level of services (including ecological services) desired by the populace. When cumulative effects exceed the carrying capacity of a resource, ecosystem, and human community, the consequences are significant.

As a method for evaluating cumulative effects, carrying capacity analysis serves to identify thresholds for the resources and systems of concern (as constraints on development) and provide mechanisms to monitor the incremental use of unused capacity. Carrying capacity analysis begins with the identification of potentially limiting factors (e.g., the supply of water in a desert riparian ecosystem). Mathematical equations are then developed to describe the capacity of the resource or system in terms of numerical limits (thresholds) imposed by each limiting factor. In this way, projects can be systematically evaluated in terms of their effect on the remaining capacity of limiting factors (Contant and Wiggins 1993).

Carrying capacity analysis can be especially useful for assessing cumulative effects in the following situations:

- Infrastructure and public facilities
- Air and water quality
- Wildlife populations
- Recreational use of natural areas
- Land use planning

The determination of carrying capacity is straightforward for public facilities such as water supply systems, sewage treatment systems, and traffic systems. A reservoir can only supply water to a finite number of consumptive users. In the case of air and water quality control programs, statutory limits (or standards) are regulatory thresholds of the carrying capacity of air or water in the region of interest. Cumulative effects can be estimated through physical and mathematical models and then compared with these standards. Unlike engineered systems, thresholds involving subjective human uses must be based on goal-oriented statements of public opinion and can only be obtained through opinion survey information or the scoping process. Such thresholds include the degree of enjoyment obtained from a recreational experience. In natural systems, the carrying capacity of well-studied populations (usually game species) can be adequately modeled, but the capacity of whole ecosystems to withstand and recover from stress (i.e., their resilience) has yet to be modeled precisely and at best is expressed in gross probabilistic terms (i.e., the likelihood of a set of events occurring).

# METHODS

## 8
## EXAMPLES:

The air and water quality criteria provisions of the Clean Air Act and Clean Water Act, respectively, represent carrying capacity approaches to dealing with cumulative effects (as opposed to best available technology approaches). Under the Clean Air Act Amendments of 1990, states measure the cumulative effect of all sources on the concentration of air pollutants in specified attainment areas using regional models. New stationary sources are not permitted if they are determined to cause, in the aggregate, the concentration of a pollutant of concern to exceed its standard (the presumed carrying capacity of the area). Similarly, total maximum daily loads (TMDLs) are calculated for water bodies receiving point and nonpoint discharges as part of the NPDES permit process to ensure that the cumulative effects on water quality do not exceed the assimilation capacity of the receiving waters. If the cumulative effect remains below standards, capacities are not exceeded, and new proposals can be authorized (Contant and Wiggins 1993).

Wildlife and fisheries managers have been conducting carrying capacity analyses for many years (Smith 1974). Specifically, managers have used the maximum-sustained-yield concept to determine the amount of harvest of fish or game populations that will not result in deterioration of the population (i.e., not exceed the capacity of the population to renew itself). The U.S. Forest Service developed *Management Recommendations for the Northern Goshawk in the Southwestern United States* based on the concern that the goshawk, a forest habitat generalist, may be experiencing declining populations and reproduction associated with tree harvests and other factors affecting the carrying capacity of western forests (Reynolds et al. 1992). These guidelines will be used to develop national forest plans in the Southwestern Region that will maintain the forest carrying capacity (i.e., specific habitat attributes and important prey species) needed to sustain goshawk populations despite the cumulative effects of human influences and natural perturbations, including loss of an herbaceous and shrubby understory, reduction in the amount of older forests, and increased areas of dense tree regeneration.

Managers of natural areas also employ the carrying capacity concept to prevent parks and other recreation areas from becoming overused. Techniques used to evaluate the cumulative effects of recreation applications involve use thresholds (i.e., standards) based on social values (e.g., opportunities for solitude) and ecological factors (e.g., presence of rare and endangered species). The recreational carrying capacity concept is explicitly linked to the notion of nondegradation, where current conditions set a baseline or standard for environmental quality. For example, Forest Service researchers have devised the Limits of Acceptable Change process for setting and monitoring recreational carrying capacity in a wilderness area (Stankey et al. 1985). The U.S. Army Corps of Engineers (1993) addressed both the social carrying capacity and the resource carrying capacity of the Fox waterway in Illinois as it developed permitting policy guidelines for the area. Based on a definition of when people feel crowded, the social carrying capacity was determined to be approximately 854 boats and 236 jet skis on the open areas of the waterway. Based on a water quality definition that used a threshold of water clarity needed for vegetation growth, the resource carrying capacity was determined to be 350 cruising boats (i.e., the number that could use the deeper water areas that did not support sensitive vegetation).

# METHODS

Carrying capacity analysis is a critical part of land use planning for sustainable development. Ideally, knowledge of the carrying capacity of an area provides the basis for developing suitability maps to guide future growth (including proposed federal projects). When applied to human communities, carrying capacity can be defined as "the ability of a natural or man-made system to absorb population growth or physical development without significant degradation or breakdown" (Schneider et al. 1978). As part of comprehensive planning for Sanibel Island, Florida, land capability analysis was conducted to determine the cumulative effects of development actions on the structure and functions of the ecological zones of the island (Clark 1976). This analysis led to a comprehensive set of management guidelines based on the carrying capacity of these natural systems for sustaining human development. Figure A-10 illustrates the combinations of population numbers and population density that are possible without exceeding the carrying capacity of interior wetlands to assimilate runoff from developed areas.



Figure A-10. Sanibel Island, Florida population versus runoff assimilation capacity (Clark 1976)

# METHODS

## References

Clark, J. 1976. The Sanibel Island Report: Formulation of a Comprehensive Plan Based on Natural Systems. Conservation Foundation, Washington, DC.

Contant, C.K. and Wiggins, L.L. 1993. Toward defining and assessing cumulative impacts: Practical and theoretical considerations. in Hildebrand, S.G. and Cannon, J.B., eds. *Environmental Analysis: the NEPA Experience*. Lewis Publishers, Boca Raton, Florida.

Reynolds, R.T., R.T. Graham, M.H. Reiser, R.L. Bassett, P.L. Kennedy, D.A. Boyce, Jr., G. Goodwin, R. Smith, and E.L. Fisher. 1992. Management Recommendations for the Northern Goshawk in the Southwestern United States. USDA Forest Service, General Technical Report RM-217, Fort Collins, CO.

Schneider, D.M., Godschalk, D.B., and Axler, N. 1978. The Carrying Capacity Concept As a Planning Tool. Planning Advisory Service Report Number 338. The American Planning Association, Chicago, Illinois.

Smith, R.L. 1974. *Ecology and Field Biology*, Second Edition. Harper and Row, Publishers. New York, NY.

Stankey, G.H., Cole, D.N., Lucas, R.C., Petersen, M.E. and Frissell, Sidney S. 1985. The Limits of Acceptable Change (LAC) System for Wilderness Planning. United States Department of Agriculture, Forest Service. General Technical Report INT-176.

U.S. Army Corps of Engineers. 1993. Draft Environmental Impact Statement. Cumulative Impacts of Recreational Boating on the Fox River and Chain O' Lakes Area in Lake and McHenry Counties, Illinois. USA Corps of Engineers, Chicago District.

# METHODS

# 9
# ECOSYSTEM ANALYSIS

Ecosystem analysis involves considering the full range of ecological resources and their interactions with the environment. This approach can improve cumulative effects analysis by *providing the broad regional perspective and holistic thinking needed to address the following cumulative effects principles*:

- **Focus on the resource or ecosystem.** Ecosystem analysis specifically addresses biodiversity and uses the full range of indicators of ecological conditions ranging from the genetic to species to local ecosystem to regional ecosystem levels.

- **Use natural boundaries.** Ecosystem analysis uses ecological regions, such as watersheds and ecoregions, to encompass ecosystem functioning and landscape-scale phenomena such as habitat fragmentation.

- **Address resource or ecosystem sustainability**. The ecosystem approach to management explicitly addresses the ecological interactions and processes necessary to sustain ecosystem composition, structure, and function (Ad Hoc Committee on Ecosystem Management 1995).

Traditionally, environmental impact assessment has considered air quality, water resources, wildlife, and human communities as separate entities for analysis. This separation of resources has obscured many cumulative effects. Recognition of the interconnectedness of land, water, and human resources has driven many federal and state agencies to undertake eco-system or watershed approaches to environmental protection. Since 1991, the U.S. EPA (1996) has embraced the watershed approach as the major mechanism for addressing cumulative nonpoint-source pollution. Specific applications include watershed-based TMDLs (U.S. EPA 1994) and the "watershed analysis" approach to addressing cumulative effects and improving resource management on timber land (Washington State Department of Natural Resources 1992; Regional Interagency Executive Committee 1995).

By its nature, biodiversity conservation is a cumulative effects issue. Because it encompasses all the structural and functional components of the biological environment (and its interactions with the physical world), biodiversity is constantly affected by a wide range of stresses. For this reason, the goals of biodiversity and ecosystem protection are usually coincident with those of cumulative effects analysis; therefore, the analyst should employ an ecosystem approach whenever biodiversity is an issue.

Principles of the ecosystem approach are included in CEQ's (1993) report, *Incorporating Biodiversity Considerations Into Environmental Impact Analysis Under the National Environmental Policy Act* (see box) and the Interagency Ecosystem Management Task Force's (1995) report, *The Ecosystem Approach: Healthy Ecosystems and Sustainable Economics*. These principles involve three basic concepts: (1) taking a "big picture" or landscape-level view of ecosystems, (2) using a diverse suite of indicators including community-level and ecosystem-level

# METHODS

indices, and (3) addressing the myriad interactions among ecological components that are needed to sustain ecosystem functioning. Applying the ecosystem approach to cumulative effects analysis entails using biological indicators (e.g., indices of biotic integrity for surface waters; Karr 1991; U.S. EPA 1990) as integrators of cumulative effects and landscape indices (e.g., patch distribution of wetlands; Preston and Bedford 1988; Leibowitz et al. 1992) as measures of the cumulative diminution of ecosystem functioning. Natural resource agencies may soon be able to provide guidance on assessing and mitigating environmental effects at the ecosystem level (Truett et al. 1994).

---

**PRINCIPLES OF BIODIVERSITY CONSERVATION
(CEQ 1993)**

1. Take a "big picture" or ecosystem view.

2. Protect communities and ecosystems.

3. Minimize fragmentation.
   Promote the natural pattern and connectivity of habitats.

4. Promote native species.
   Avoid introducing non-native species.

5. Protect rare and ecologically important species.

6. Protect unique or sensitive environments.

7. Maintain or mimic natural ecosystem processes.

8. Maintain or mimic naturally occurring structural diversity.

9. Protect genetic diversity.

10. Restore ecosystems, communities, and species.

11. Monitor for biodiversity impacts.
    Acknowledge uncertainty.
    Be flexible.

---

# METHODS

## 9
## EXAMPLES:

Constructing precise models of ecosystem structure and function sometimes exceeds the capabilities of NEPA practitioners. Considerable progress, however, has been made in applying the principles of ecosystem analysis to analyzing cumulative effects by extending considerations beyond species to the ecosystem and by looking at landscape-scale processes such as habitat fragmentation.

The most celebrated example where ecosystem analysis was used to extend the analysis of cumulative effects beyond a single species is the *Supplemental Environmental Impact Statement on Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl* (U.S. Forest Service and Bureau of Land Management 1993). Expert panels were convened to determine the likelihood of maintaining viable populations of a comprehensive suite of species and groups of species based on available habitat. Addressing the entire ecosystem involved considering terrestrial forest ecosystems (i.e., amounts of late-successional and old-growth forests and the viability of species ranging from fungi to bats), aquatic ecosystems (habitat conditions, riparian ecosystem processes), and aquatic and riparian dependent organisms (e.g., anadromous salmonids, resident fish species and subspecies, and other aquatic, riparian, and wetland organisms). The U.S. Forest Service (in conjunction with the U.S. Bureau of Land Management and Food and Drug Administration) also incorporated ecosystem analysis into the *Pacific Yew Final Environmental Impact Statement* by defining the role of the Pacific yew in the forest ecosystem (Figure A-11; U.S. Forest Service 1993). The cumulative effects of harvesting Pacific yew

on federal lands in the Pacific northwest for taxol production (for use as a cancer treatment) were analyzed in three different contexts: the Pacific yew itself (including its genetic diversity), the forest ecosystem that supports yew populations, and the relationship of the yew and human communities.

The ecosystem analysis approach implemented by the Forest Ecosystem Assessment Team (FEMAT) in the spotted owl EIS also considered ecosystem processes affected by the cumulative actions on lands owned and managed by states, tribes, corporations, individuals, and other nonfederal agencies. The analysis included an aquatic conservation strategy based on the designation of key watersheds and the use of watershed analysis. The Washington State Department of Natural Resources (1992) recently published a watershed analysis manual including a set of technically rigorous procedures that can be used to determine what processes are active in a watershed, how these processes are distributed in time and space, what the current upland and riparian conditions are, and how all of these factors influence ecosystem services or other beneficial uses. Watershed analysis is being expanded to encompass other aspects of the ecosystem approach to management (Montgomery et al. 1995; Regional Interagency Executive Committee 1995). In the **synoptic landscape approach** to cumulative effects analysis developed by the U.S. EPA Environmental Research Laboratory in Corvallis, OR, the landscape is the unit of analysis (Leibowitz et al. 1992). Synoptic indices are chosen from the following landscape-level measures: function value, functional loss, and replacement potential. Subsequently, landscape indicators are chosen as

# METHODS



Figure A-11. Roles of the Pacific Yew in the Ecosystem (U.S. Forest Service 1993)

# METHODS

first-order approximations of the synoptic indices. This approach provides a framework for comparing the cumulative effects of actions on landscape processes such as flood storage and wildlife support.

Habitat fragmentation is one of the most important ecosystem-level processes to address in cumulative effects analysis. Concerns about potential cumulative effects of habitat fragmentation on biodiversity prompted a supplemental information report to the FEIS and Record of Decision (ROD) of the Trail Creek Timber Sale, Beaverhead National Forest, Montana (U.S. Forest Service 1991). The report assessed habitat loss effects, edge effects, patch size effects, insularity effects (on genetics of populations linked by habitat corridors), and effects on rare elements. Specifically, the report evaluated the importance of the area as a biological corridor between the large wildland areas of the Northern Continental Divide, Selway-Bitterroot, and Greater Yellowstone areas. Similar concerns have been raised in other areas (e.g., Klamath National Forest; Pace 1990) and have prompted considerable research into landscape-level indicators such as abundance or density of habitats, habitat proportion, patch size and perimeter-to-area ratio, fractal dimension (amount of edge), and contagion or habitat patchiness (Hunsaker and Carpenter 1990; Noss 1990; O'Neill et al. 1994).

## References

Ad Hoc Committee on Ecosystem Management. 1995. The Scientific Basis for Ecosystem Management. Ecological Society of America, Washington, DC.

Council on Environmental Quality (CEQ). 1993. Incorporating Biodiversity Considerations Into Environmental Impact Analysis Under the National Environmental Policy Act. Council on Environmental Quality, Executive Office of the President, Washington, DC. 29 pp.

Hunsaker, C.T. and D.E. Carpenter. 1990. Environmental Monitoring and Assessment Program—Ecological Indicators. U.S. Environmental Protection Agency, Research Triangle Park, NC. EPA 600/3-90/060.

Interagency Ecosystem Management Task Force. 1995. The Ecosystem Approach: Healthy Ecosystems and Sustainable Economies, Vol. I Overview. Washington, DC.

Karr, J.R. 1991. Biological Integrity: A Long-Neglected Aspect of Water Resource Management. *Ecological Applications* 1:66-84.

Leibowitz, S.G., B. Abbruzzese, P. Adamus, L. Hughes, and J. Irish. 1992. A Synoptic Approach to Cumulative Impact Assessment—A Proposed Methodology. U.S. Environmental Protection Agency, Environmental Research Laboratory, Corvallis, OR. EPA/600/R-92/167.

Montgomery, D.R., G.E. Grant, and K. Sullivan. 1995. Watershed analysis as a framework for implementing ecosystem management. *Water Resources Bulletin* 31(3):369-386.

Noss, R.F. 1990. Indicators for monitoring biodiversity: a hierarchical approach. *Conservation Biology* 4:355-364.

O'Neill, R.V., K.B. Jones, K.H. Riitters, J.D. Wickham, and I.A. Goodman. 1994. Landscape Monitoring and Assessment Plan. U.S. Environmental Protection Agency, Las Vegas, NV. EPA/620/R-94/009.

Pace, F. 1990. The Klamath Corridors: Preserving biodiversity in the Klamath National Forest. In: Hudson, W.E., ed. *Landscape Linkages and Biodiversity*. Island Press, Washington, DC, pp. 105-106.

Preston, E.M. and B.L. Bedford. 1988. Evaluating cumulative effects on wetland functions: A conceptual overview and generic framework. *Environmental Management* 12:565-583.

# METHODS

Regional Interagency Executive Committee. 1995. Ecosystem Analysis of the watershed scale: Federal guide for watershed analysis - Version 2.2. Regional Ecosystem Office, Portland, OR. 26 pp.

Truett, J.C., H.L. Short, and S.C. Williamson. 1994. Ecological impact assessment. In: T.A. Bookhout, ed. *Research and Management Techniques For Wildlife and Habitats.* The Wildlife Society, Bethesda, MD pp. 607-622.

U.S. Environmental Protection Agency (EPA). 1990. Biological Criteria: National Program Guidance for Surface Waters. U.S. EPA, Office of Water Regulations and Standards, Washington, DC. EPA-440/5-90-004.

U.S. Environmental Protection Agency. 1994. Moving the NPDES Program to a Watershed Approach. Office of Wastewater Management, Washington, D.C. EPA 833-R-96-001.

U.S. Environmental Protection Agency (EPA). 1996. Watershed Events: A Bulletin on Sustaining Aquatic Ecosystems. Spring. U.S. EPA, Office of Water, Washington, DC. EPA 840-N-96-002.

U.S. Forest Service. 1991. Supplemental information report, Trail Creek Timber Sale, Wisdom Ranger District, Beaverhead National Forest. USDA, Forest Service, Northern Region. April 2.

U.S. Forest Service. 1993. Pacific Yew Final Environmental Impact Statement. USDA, Forest Service, Pacific Northwest Regional Office, Portland, OR.

U.S. Forest Service and Bureau of Land Management. 1993. *Draft Supplemental Environmental Impact Statement on Management of Habitat for Late-Successional and Old-Growth Forest Related Species Within the Range of the Northern Spotted Owl.* Portland, OR. July.

Washington State Department of Natural Resources. 1992. Watershed Analysis Manual. Version 1.0. Timber, Fish, and Wildlife, Olympia, WA. TFW-CEI-92-002.

# METHODS

# 10
## ECONOMIC IMPACT ANALYSIS

**Economic impact analysis** satisfies the mandate under NEPA to "...fulfill the social, economic and other requirements of present and future generations of Americans" [National Environmental Policy Act, Title I Sec. 101 (a)]. *It is an important component of analyzing cumulative effects, because the economic well-being of a local community depends on many different actions.* The following effects are the minimum that an economic impact analysis should determine:

- change in business activity
- change in employment
- change in income
- changes in population.

The three primary steps in conducting an economic impact analysis are (1) establishing the region of influence, (2) modeling the economic effects, and (3) determining the significance of the effects.

The definition of the geographic region of influence (ROI) is often controversial. Most regional and urban analysts prefer to use a functional area concept for defining study regions (Fox and Kuman 1965). Regions defined in this way explicitly consider the economic linkages between the residential population and the businesses in the geographic area. Specifically, the affected region should include all of the self-sustaining ingredients of region-local businesses, local government, and local population (Chalmers and Anderson 1977). Although no standard methodology exists, the definition of a ROI should consider residence patterns of the a f f e c t e d     p o p u l a c e ,

availability of local shopping opportunities, "journey-to-work" time for employees, and local customs and culture.

Economic models are invaluable for analyzing cumulative effects. The suite of economic models can vary from simple to complex (Richardson 1985; Treyz 1993). As a rule, economic models are sets of mathematical equations that represent the interactions among the integral components of the regional economy; the modeled relationships are based upon economic principals that have a long history of accuracy and use. Data to "drive" the models are critical to performing an impact analysis and acquiring data is often the limiting factor for the analyst. Although they are focused on economic relationships, economic models can incorporate demographics. Ultimately, economic models are used to project effects under each alternative.

Once model effects projections are obtained, additional tools, such as the rational threshold value (RTV) and the forecast significance of impacts (FSI) approaches, can provide timely and cost-effective evaluations of the significance of the effect (Huppertz and Bloomquist 1993). These analytical tools review the historical trends for the defined region and develop measures of historical fluctuations in sales activity, employment, income, and population. This use of time-series data provides the analyst with a historical context in which to evaluate significance. The use of economic impact models in combination with the RTV and FSI techniques has proven successful in addressing cumulative economic impacts.

# METHODS

## 10
## EXAMPLES:

Three kinds of models are most often used in economic impact analysis: economic base models, input-output models, and econometric models. The underlying assumption of an economic base model is that changes in a regional economy occur as a result of changes in the amounts of goods and services that are sold outside the region. The economic base model is based on the bifurcation of the regional economy into "basic" and "non-basic" sectors. Defined simply, basic sectors produce goods and services that are generally consumed outside the region and non-basic sectors produce goods and services that are consumed within the region. Basic sectors can be identified by surveying local firms and households to determine where they purchase their goods and services or by the "location-quotient" technique (Isserman 1977), which measures the extent to which a sector is more concentrated within the region than within the nation as a whole. The location-quotient assumes this excess production is exported outside the region.

Input-output models (Miller and Blair 1985) explicitly consider the interrelationships between different sectors of a regional economy and how these interactions affect the process of economic changes within the region. Input-output models provide more information on economic transactions by sector within a local economy than economic base models, but they require more data. Regional econometric models (Glickman 1977; Treyz 1993) represent a compromise between economic base and input-output analysis in terms of data requirements and information produced. Econometric models are usually statistically derived and draw upon survey-based data, traditional regression techniques, and other statistical tools. fluctuations in the subject regional economies, respectively. The total aggregate changes in business volume, employment, income, and population (four of the model outputs) are then used

Econometric models use time-series data to show the pattern of effects due to outside influences over a period of years. As a result, regional econometric models are better suited for predictions of long-run effects. Unfortunately, local-time series data are often not available for the region of concern.

The Economic Impact Forecast System (EIFS) is perhaps the most commonly used method for assessing regional economic effects; it is the specified model of choice for all environmental analyses associated with Army Base Realignment and Closure (BRAC). EIFS was developed as a simple model based upon three major criteria: (1) basis in sound theory, (2) acceptance by the scientific community, and (3) availability of data to drive the model. By entering county names to designate the Region of Economic Influence (ROI), Bureau of Economic Analysis (BEA) and other data are readily available for use. After six variables associated with the action [i.e., number of military and civilian employees being transferred, the average salary of both categories, the percent of military personnel living on base, and the anticipated change in local (or total) procurements] are added to the thousands of BEA data elements, EIFS automatically performs the needed trends analysis, multiplier calculations, and other computations. EIFS has provided a consistent methodology for all BRAC studies and has allowed the Army to "rank-order impacts" among alternatives as required by NEPA.

The significance of BRAC actions is determined by adding two evaluative components to EIFS. As described previously, RTV and FSI techniques measure historical and statistical

to assess the significance of regional economic effect. As analysts begin to address the cumulative effects of more and more actions,

# METHODS

other models that lead directly from available data to conclusions of significance will be needed.

## References

Chalmers, J.A. and E.J. Anderson. 1977. Economic/Demographic Assessment Manual: Current Practices, Procedural Recommendations, and a Test Case. U.S. Bureau of Reclamation. Denver, Colorado.

Fox, K.A. and T.K. Kuman. 1965. The functional economic area: Delineation and implications for economic analysis and policy. *Papers and Proceedings, Regional Science Association* 15: 57-85.

Glickman, N.J. 1977. *Econometric Analysis of Regional Systems.* New York: Academic Press.

Huppertz, C.E. and K. M. Bloomquist. 1993. Economic Impact Forecast System (EIFS): Guide to Economic Models and Software Version 4.1, Draft CERL Technical Report. Department of the Army, Construction Engineering Research Laboratories, Champaign, Illinois.

Isserman, A.M. 1977. The location quotient approach to estimating regional economic impact. *Journal of American Institute of Planners*, January 1977, 33-41.

Miller, R.E. and P.D. Blair. 1985. *Input-Output Analysis: Foundations and Extensions.* Prentice-Hall, Inc. Englewood Cliffs, New Jersey.

Richardson, H.W. 1985. Input-output and economic base multipliers: Looking backward and forward. *Journal of Regional Science* 25: 607-661.

Treyz, G.I. 1993. *Regional Economic Modeling: A Systematic Approach to Economic Forecasting and Policy Analysis.* Kluwer Academic Publishers, Boston, Massachusetts.

METHODS
_____

# 11
# SOCIAL IMPACT ANALYSIS

**Social impact analysis** fulfills the mandate under CEQ's regulations that the "human environment" in NEPA be "interpreted comprehensively" to include "the natural and physical environment and the relationship of people with the environment" (40 CFR§ 1508.14). The social sciences have *made considerable progress in addressing cumulative effects related to environmental stewardship by focusing on key social impact variables.* The Interorganizational Committee on Guidelines and Principles (1994) has identified five basic categories of social impact variables:

1. <u>Population characteristics</u> such as its size and expected size, ethnic and racial diversity, and the influx and outflux of temporary (e.g., seasonal or leisure) residents.

2. <u>Community and institutional structures</u> including the size, structure, and linkages of local government; the historical and present patterns of employment and industrial diversification; and the size, activity, and interactions of voluntary associations, religious organizations, and interest groups.

3. <u>Political and social resources</u> such as the distribution of power and authority, the identification of interested and affected parties, and the leadership capacity within the community or region.

4. <u>Individual and family changes</u> including factors that influence the daily life of individuals and families (and indigenous and religious subcultures) in the community or region such as attitudes toward the proposed policy, alterations in family and community networks, and perceptions of risk, health, and safety.

5. <u>Community resources</u> such as patterns of natural resource and land use; the availability of housing; and community services including health, police, fire protection, and sanitation facilities.

The key to analyzing the cumulative effects on these social impact variables is incorporating multiple actions into projections of future social conditions. The following general categories describe the range of methods used to predict future social effects:

- linear trend projections (identifying taking an existing trend and projecting the same rate of change into the future);

- population multiplier methods (a specified increase in population implies designated multiples of some other variable);

- scenarios (characterization of hypothetical futures through a process of mathematically or schematically modeling the assumptions about the variables in question);

- expert testimony (experts can be asked to develop scenarios and assess their implications);

- simulation modeling (mathematical formulation of premises and a process of quantitatively weighing variables).

# METHODS

## 11 EXAMPLES:

Social impact analysis differs from other analyses of cumulative effects because it must deal with the subjective perception of effects. Social effects appraisal and social well-being accounts are examples of methods for analyzing subjective social variables.

Social effects appraisal determines the social meaning and significance of the objective changes produced by cumulative actions. The social analyst assesses the social meaning of the changes from the different perspectives of the affected groups. One way to measure the meaning of a change is to tap the knowledge of opinion leaders (formally or informally) within the affected groups to determine the values they assign to each change. For example, an influx of 200 construction workers and their families might be viewed positively by families suffering from a stagnant economy but negatively by retirees looking for a quiet neighborhood. The social analyst needs to acknowledge that while some negative social effects can be remedied materially (perhaps by economic growth), others are qualitative and defy mitigation.

The social well-being account is a display that summarizes findings by cross tabulating levels of analysis, evaluation categories, and effect factors with a social effects evaluation of the present condition and each of the alternatives (including no-action). It provides either a quantitative (numerical) or qualitative rating of each alternative's overall social effect and a description of the rating scale. The Multi-Attribute Tradeoff System (MATS) and other computer programs assist in producing a systematic numerical evaluation of social effects. The result is an overall quantitative ranking for each alternative, reflecting the alternative's relative social benefit to the affected group.

The Federal Highway Administration (FHWA) frequently deals with social impact issues related to its transportation projects. FHWA (1996) recently prepared a primer for analysts who assess the effects of proposed transportation actions on human communities. FHWA states that community impact studies must include secondary effects and influences from outside developmental pressures to determine the ability of an area to survive removal of housing, businesses, and community services. Also, such studies must describe a community's ability to absorb relocated residents and businesses in terms of social and economic disturbance (e.g., available housing, public services affected, areas zoned for business use). The primer describes nine impact categories to be analyzed, including social and psychological aspects, physical aspects, visual environment, land use, economic conditions, mobility and access, provision of public services, safety, and displacement. Considering these effects naturally includes environmental justice issues. Community impact analysis is analogous to ecosystem analysis in that the human community should be thought of as an integral unit with a characteristic social setting and operation. Decisions about avoiding and mitigating effects should be based on consensus visions of the desired condition of the community. Lastly, if community effects are to receive attention comparable to that given the natural environment, special effort to ensure public involvement must be employed (e.g., using nontraditional and informal approaches).

## References

# METHODS

Federal Highway Administration (FHWA). 1996. Community Impact Assessment: A Quick Reference for Transportation. FHWA, Office of Environmental and Planning, Washington, DC. FHWA-PD-96, HEP-30.

Interorganizational Committee on Guidelines and Principles. 1994. Guidelines and principles for social impact assessment. *Impact Assessment* 12(2):107-152.

# METHODS

# APPENDIX B

# ACKNOWLEDGEMENTS

# ACKNOWLEDGEMENTS

Many people contributed to this handbook. Members of an interdisciplinary team, each with experience in the art and science of environmental impact assessment and the National Environmental Policy Act, provided input to the process, contributing ideas, examples, and energy. The project was directed by Ray Clark, Director of NEPA Oversight, Council on Environmental Quality. The Federal Highway Administration, Federal Energy Regulatory Commission, Department of the Army, U.S. Forest Service, National Park Service, and U.S. Environmental Protection Agency provided funding for this interagency effort. As the primary authors, the following individuals invested the greatest amount of time and effort in producing this handbook – Mark Southerland, Patti Leppert-Slack, Elizabeth Ann Stull, Kirk LaGory, Matt McMillen, Chuck Herrick, Margo Burnham, Gene Cleckley, Allison Cook, Bill Cork, Tom Russo, Dave Somers, Wendell Stills, Ron Webster, and Bob Wheeler. The addresses of these and other contributors are listed below. The handbook was peer-reviewed in draft by a group of academicians and practitioners coordinated by Richard Carpenter (listed on the last page). Their comments and those of many others provided valuable input into the handbook. We thank all who contributed to this effort.

## Contributors

Gene Cleckley
Fred Skaer
Wendell Stills
Bob Wheeler
Federal Highway Administration
400 7th Street, SW, Room 3301
Washington, D.C. 20590
(202) 366-2029

Allison Cook
1305 East Capitol Street, SE Apt. #2
Washington, DC 20003

William V. Cork
ICF Kaiser International, Inc.
21515 Great Mills Road
Lexington Park, MD 20653
(301) 866-2020

Robert Cunningham
Office of Polar Programs
National Science Foundation
4201 Wilson Blvd., Suite 755
Arlington, VA 22230
(703) 306-1031

Peggy Currid
Robert Eltzholtz
Coe-Truman Technologies
206 Burwash Avenue
Savoy, IL 61874
(217) 398-8594

William Dickerson
Pat Haman
Anne Miller
Jim Serfis
U.S. Environmental Protection Agency
401 M Street, SW, MC-2252
Washington, D.C. 20460
(202) 564-2410

John Farrell, Retired
Office of Environmental Affairs
U.S. Department of the Interior
1849 C Street N.W.
Washington, D.C. 20240
(202) 208-7116

Horst Greczmiel
U.S. Coast Guard
2100 Second Street, SW
Washington, D.C. 20593
(202) 267-0053

Charles Herrick, Ph.D.
Margo Burnham
Meridian Corporation
4300 King Street, Suite 400
Alexandria, VA 22308-1508
(703) 998-3600

# ACKNOWLEDGEMENTS

Jake Hoogland
Environmental Compliance Division
Planning and Development
National Parks Service
U.S. Department of the Interior
Main Interior Building, Room 1210
1849 C Street, N.W.
Washington, D.C. 20240
(202) 208-3163

David Ketcham
Environmental Coordination Division
U.S. Department of Agriculture, Forest Service
291 14th Street S.W., 5th Floor, South Wing
Washington, D.C. 20250
(202) 205-1708

Kirk LaGory, Ph.D.
Elisabeth Ann Stull
Argonne National Laboratory
9700 South Cass Avenue
Argonne, IL 60439
(630) 252-3169
(603) 252-7169

Patrice "Pat" LeBlanc
Carmen Drouin
Federal Environmental Assessment Review Office
Government of Canada
13th Floor, Fontaine Building
Hull, Quebec, Canada K1A OH3
(819) 953-2530

Phil Mattson
Planning and Environmental Affairs
USDA Forest Service
333 Southwest First Avenue
P.O. Box 3623
Portland, OR 97802-3865
(503) 326-3865

Matt McMillen
Energetics Corporation
501 School Street, SW
Suite 440
Washington, D.C. 22024
(202) 479-2747

Paul Petty
Bureau of Land Management
2850 Youngfield Street
Lakewood, CO 80215
(303) 239-3736

Dennis Robinson, Ph.D.
Department of the Army,
 Corps of Engineers
Water Resources Support Center
7701 Telegraph Road
Casey Building
Alexandria, VA 22310-3868
(703) 355-3092

Thomas N. Russo
Patti Leppert-Slack
Federal Energy Regulatory Commission
888 First Street, NE
Washington, D.C. 20426
(202) 219-2792
(202) 219-2767

Dave Somers
The Tulalip Tribes
3901 Totem Beach Road
Marysville, WA 98270-9694
(206) 653-0220

Mark Southerland, Ph.D.
Versar, Inc.
9200 Rumsey Road
Columbia, MD 21045-1934
(410) 964-9200

Ron Webster
Robert Lozar
Department of the Army -
 CERL
2902 Newmark Drive
Champaign, IL 61821-1706
1-800-872-2375

Dick Wilderman
Branch of Environmental Projects Coordination
Minerals Management Service
381 Eldon Street, Mail Stop 4320
Herndon, VA 22070
(703) 787-1670

Gary Williams, Ph.D.
Argonne National Laboratory
955 L'Enfant Plaza North, S.W.
Suite 6000
Washington, D.C. 20024
(202) 488-2418

# ACKNOWLEDGEMENTS

**Peer Review Panel**

Richard Carpenter
Rt. 5, Box 277
Charlottesville, VA 22901

Mark Bain, Ph.D.
Cornell University
Department of Natural Resources
208A Fernow Hall
Ithaca, NY 14853

Larry W. Canter, Ph.D.
University of Oklahoma
Environmental and Groundwater Institute
200 Felgar Street, Room 127
Norman, OK 73019-0470

Cheryl Contant, Ph.D.
University of Iowa
Department of Urban and Regional Planning
347 Jefferson Hall
Iowa City, IA 52242-1316

Alex Hoar
U.S. Fish and Wildlife Service
300 Westgate Center Drive
Hadley, MA 01035-9589

Lance McCold
Oak Ridge National Laboratory
P.O. Box 2008
Oak Ridge, TN 37831-6206

B.J. Quinn
North Carolina Department of Transportation
Planning and Environmental Branch
P.O. Box 25201
Raleigh, NC 27611-2501

Michael V. Stimac
HDR Engineering
500 108th Avenue, Suite 1200
Bellevue, WA 98004

Exhibit 7 to Declaration of Amy Coyle



EXECUTIVE OFFICE OF THE PRESIDENT
COUNCIL ON ENVIRONMENTAL QUALITY
WASHINGTON, D.C. 20503

June 24, 2005

MEMORANDUM

FROM:      JAMES L. CONNAUGHTON
           CHAIRMAN

TO:        HEADS OF FEDERAL AGENCIES

RE:        GUIDANCE ON THE CONSIDERATION OF PAST
           ACTIONS IN CUMULATIVE EFFECTS ANALYSIS

I. Introduction

In this Memorandum, the Council on Environmental Quality (CEQ) provides guidance on the extent to which agencies of the Federal government are required to analyze the environmental effects of past actions when they describe the cumulative environmental effect of a proposed action in accordance with Section 102 of the National Environmental Policy Act (NEPA), 42 U.S.C. § 4332, and the CEQ Regulations for Implementing the Procedural Provisions of NEPA, 40 C.F.R. parts 1500-1508. CEQ's interpretation of NEPA is entitled to deference. *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979).

II. Guidance

The environmental analysis required under NEPA is forward-looking, in that it focuses on the potential impacts of the proposed action that an agency is considering. Thus, review of past actions is required to the extent that this review informs agency decisionmaking regarding the proposed action. This can occur in two ways:

First, the effects of past actions may warrant consideration in the analysis of the cumulative effects of a proposal for agency action. CEQ interprets NEPA and CEQ's NEPA regulations on cumulative effects as requiring analysis and a concise description of the identifiable present effects of past actions to the extent that they are relevant and useful in analyzing whether the reasonably foreseeable effects of the agency proposal for action and its alternatives may have a continuing, additive and significant relationship to those effects. In determining what information is necessary for a cumulative effects analysis, agencies should use scoping to focus on the extent to which information is "relevant to reasonably foreseeable significant adverse impacts," is "essential to a reasoned choice among alternatives," and can be obtained without exorbitant cost. 40 CFR 1502.22. Based on scoping, agencies have discretion to determine whether, and to what extent, information about the specific nature, design, or present effects of a past action is useful for the agency's analysis of the effects of a proposal for agency action and its reasonable alternatives.

1

Agencies are not required to list or analyze the effects of individual past actions unless such information is necessary to describe the cumulative effect of all past actions combined. Agencies retain substantial discretion as to the extent of such inquiry and the appropriate level of explanation. *Marsh v. Oregon Natural Resources Council*, 490 U.S. 360, 376-77 (1989). Generally, agencies can conduct an adequate cumulative effects analysis by focusing on the current aggregate effects of past actions without delving into the historical details of individual past actions.

Second, experience with and information about past direct and indirect effects of individual past actions may also be useful in illuminating or predicting the direct and indirect effects of a proposed action. However, these effects of past actions may have no cumulative relationship to the effects of the proposed action. Therefore, agencies should clearly distinguish analysis of direct and indirect effects based on information about past actions from a cumulative effects analysis of past actions.

III. Discussion

The CEQ regulations for the implementation of NEPA define cumulative effects consistent with the Supreme Court's reading of NEPA in *Kleppe v. Sierra Club*, 427 U.S. 390, 413-414 (1976). "Cumulative impact" is defined in CEQ's NEPA regulations as the "impact on the environment that results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions . . ." 40 CFR 1508.7. CEQ interprets this regulation as referring only to the cumulative impact of the direct and indirect effects of the proposed action and its alternatives when added to the aggregate effects of past, present, and reasonably foreseeable future actions.

Agencies should be guided in their cumulative effects analysis by the scoping process, in which agencies identify the scope and "significant" issues to be addressed in an environmental impact statement. 40 CFR 1500.1(b), 1500.4(g), 1501.7, 1508.25. In the context of scoping, agencies typically decide the extent to which "it is reasonable to anticipate a cumulatively significant impact on the environment." 40 CFR 1508.27(b)(7). Agencies should ensure that their NEPA process produces environmental information that is useful to decisionmakers and the public by reducing the "accumulation of extraneous background data" and by "emphasiz[ing] real environmental issues and alternatives." 40 CFR 1500.2(b). Accordingly, the NEPA process requires agencies to identify "the significant environmental issues deserving study and deemphasizing insignificant issues, narrowing the scope of the environmental impact statement" at an early stage of agency planning. 40 CFR 15001.1(d). The Supreme Court has also emphasized that agencies may properly limit the scope of their cumulative effects analysis based on practical considerations. *Kleppe*, 427 U.S at 414. The CEQ regulations provide for explicit documentation of such practical considerations when there is incomplete or unavailable information that is relevant to reasonably foreseeable significant adverse impacts. 40 CFR 1502.22. The extent and form of the information needed to analyze appropriately the cumulative effects of a proposed action and alternatives under NEPA varies widely and must be determined by the federal agency proposing the action on a case-by-case basis.

The analysis of cumulative effects begins with consideration of the direct and indirect effects on the environment that are expected or likely to result from the alternative proposals for

agency action.  Agencies then look for present effects of past actions that are, in the judgment of the agency, relevant and useful because they have a significant cause-and-effect relationship with the direct and indirect effects of the proposal for agency action and its alternatives.  CEQ regulations do not require the consideration of the individual effects of all past actions to determine the present effects of past actions.  Once the agency has identified those present effects of past actions that warrant consideration, the agency assesses the extent that the effects of the proposal for agency action or its alternatives will add to, modify, or mitigate those effects.  The final analysis documents an agency assessment of the cumulative effects of the actions considered (including past, present, and reasonably foreseeable future actions) on the affected environment.

With respect to past actions, during the scoping process and subsequent preparation of the analysis, the agency must determine what information regarding past actions is useful and relevant to the required analysis of cumulative effects.  Cataloging past actions and specific information about the direct and indirect effects of their design and implementation could in some contexts be useful to predict the cumulative effects of the proposal.  The CEQ regulations, however, do not require agencies to catalogue or exhaustively list and analyze all individual past actions.  Simply because information about past actions may be available or obtained with reasonable effort does not mean that it is relevant and necessary to inform decisionmaking.

IV. Tools for NEPA Practitioners

a. Scoping:

It is not practical to analyze how the cumulative effects of an action interact with the universe; the analysis of environmental effects must focus on the aggregate effects of past, present and reasonably foreseeable future actions that are truly meaningful.  Thus, analysts must narrow the focus of the cumulative effects analysis to effects of significance to the proposal for agency action and its alternatives, based on thorough scoping.  A specific objective of scoping is to save time in the overall process by helping to ensure that draft statements adequately address the effects of the proposed action and alternatives that should be addressed. See Scoping Guidance (CEQ 1981) (http://ceq.eh.doe.gov/nepa/regs/guidance.html).  Scoping provides the agency the opportunity to focus in on those cumulative effects that may be significant.  The scope of the cumulative impact analysis is related to the magnitude of the environmental impacts of the proposed action.  Proposed actions of limited scope typically do not require as comprehensive an assessment of cumulative impacts as proposed actions that have significant environmental impacts over a large area.  Proposed actions that are typically finalized with a finding of no significant impact usually involve only a limited cumulative impact assessment to confirm that the effects of the proposed action do not reach a point of significant environmental impacts.  Except in extraordinary circumstances, proposed actions that are categorically excluded from NEPA analysis do not involve cumulative impact analyses.

b. Incomplete and Unavailable Information:

The purpose of 40 CFR 1502.22 is to disclose the fact of incomplete or unavailable information, to acquire information if it is "relevant to reasonably foreseeable significant adverse impacts" and "essential to a reasoned choice among alternatives," and to advance decision-making

even in the absence of all information regarding reasonably foreseeable effects. The focus of this provision is, first and foremost, on "significant adverse impacts." The agency must find that the incomplete information is relevant to a "reasonably foreseeable" and "significant" impact before the agency is required to comply with 40 CFR 1502.22. If the incomplete cumulative effects information meets that threshold, the agency must consider the "overall costs" of obtaining the information. 40 CFR 1502.22(a). The term "overall costs" encompasses financial costs and other costs such as costs in terms of time (delay), program and personnel commitments. The requirement to determine if the "overall costs" of obtaining information is exorbitant should not be interpreted as a requirement to weigh the cost of obtaining the information against the severity of the effects, or to perform a cost-benefit analysis. Rather, the agency must assess overall costs in light of agency environmental program needs.

c. Programmatic Evaluations

In geographic settings where several Federal actions are likely to have effects on the same environmental resources it may be advisable for the lead Federal agencies to cooperate to provide historical or other baseline information relating to the resources. This can be done either through a programmatic NEPA analysis or can be done separately, such as through a joint inventory or planning study. The results can then be incorporated by reference into NEPA documents prepared for specific Federal actions so long as the programmatic analysis or study is reasonably available to the interested public.

d. Environmental Management Systems:

Agencies are encouraged at their discretion to consider whether programmatic coordination of cumulative effects analysis can be assisted through implementation of environmental management systems (EMS). See Executive Order 13148, 65 Fed. Reg. 24,595 (April 21, 2000); Memorandum from the Chairman of CEQ and the Director of the Office of Management and Budget to heads of all Federal agencies (http://www.whitehouse.gov/ceq/memoranda01.html). Pursuant to Executive Order 13148, agencies that choose to use an EMS to improve their cumulative analysis may find that the EMS can be designed and implemented to more efficiently meet NEPA requirements, improve public participation in the NEPA process, and provide a framework for cumulative effects analysis and adaptive management. By managing information collection on an ongoing basis, an EMS can provide a more systematic approach to agencies' identification and management of environmental conditions and obligations. Agencies can use an EMS to confirm assumptions, track performance, and increase confidence in their assessment of cumulative environmental effects.

d. Direct and Indirect Effects:

In some cases, based on scoping, information about the effects of past actions that were similar to the proposed action may be useful in describing the possible effects of the proposed action. In these circumstances, agencies should consider using available information about the effects of individual past actions that help illuminate or predict the direct or indirect effects of the proposed action and its alternatives. Agencies should clearly distinguish their use of past experience in direct and indirect effects analysis from their cumulative effects analysis.

Exhibit 8 to Declaration of Amy Coyle

46 Fed. Reg. 18026 (March 23, 1981)
As amended (1986)

# COUNCIL ON ENVIRONMENTAL QUALITY
## Executive Office of the President

### Memorandum to Agencies:

### Forty Most Asked Questions Concerning
### CEQ's National Environmental Policy Act Regulations

**SUMMARY:** The Council on Environmental Quality, as part of its oversight of implementation of the National Environmental Policy Act, held meetings in the ten Federal regions with Federal, State, and local officials to discuss administration of the implementing regulations. The forty most asked questions were compiled in a memorandum to agencies for the information of relevant officials. In order efficiently to respond to public inquiries this memorandum is reprinted in this issue of the Federal Register.

**Ref:** 40 CFR Parts 1500 - 1508 (1987).

**FOR FURTHER INFORMATION CONTACT:**

> General Counsel,
> Council on Environmental Quality,
> 722 Jackson Place NW,
> Washington, D.C. 20006;
> (202)-395-5754.

March 16, 1981

## MEMORANDUM FOR FEDERAL NEPA LIAISONS, FEDERAL, STATE, AND LOCAL OFFICIALS AND OTHER PERSONS INVOLVED IN THE NEPA PROCESS

**Subject:** Questions and Answers About the NEPA Regulations

During June and July of 1980 the Council on Environmental Quality, with the assistance and cooperation of EPA's EIS Coordinators from the ten EPA regions, held one-day meetings with federal, state and local officials in the ten EPA regional offices around the country. In addition, on July 10, 1980, CEQ conducted a similar meeting for the Washington, D.C. NEPA liaisons and persons involved in the NEPA process. At these meetings CEQ discussed (a) the results of its 1980 review of Draft EISs issued since the July 30, 1979 effective date of the NEPA regulations, (b) agency compliance with the Record of Decision requirements in Section 1505 of the NEPA regulations, and (c) CEQ's preliminary findings on how the scoping process is working. Participants at these meetings received copies of materials prepared by CEQ summarizing its oversight and findings.

These meetings also provided NEPA liaisons and other participants with an opportunity to ask questions about NEPA and the practical application of the NEPA regulations. A number of these questions were answered by CEQ representatives at the regional meetings. In response to the many requests from the agencies and other participants, CEQ has compiled forty of the most important or most frequently asked questions and their answers and reduced them to writing. The answers were prepared by the General Counsel of CEQ in consultation with the Office of Federal Activities of EPA. These answers, of course, do not impose any additional requirements beyond those of the NEPA regulations. This document does not represent new guidance under the NEPA regulations, but rather makes generally available to concerned agencies and private individuals the answers which CEQ has already given at the 1980 regional meetings. The answers also reflect the advice which the Council has given over the past two years to aid agency staff and consultants in their day-to-day application of NEPA and the regulations.

CEQ has also received numerous inquiries regarding the scoping process. CEQ hopes to issue written guidance on scoping later this year on the basis of its special study of scoping, which is nearing completion.

NICHOLAS C. YOST<br>
General Counsel

## Table of Contents

1. Range of Alternatives.
2. Alternatives Outside the Capability of Applicant or Jurisdiction of Agency.
3. No-Action Alternative.
4. Agency's Preferred Alternative.
5. Proposed Action v. Preferred Alternative.
6. Environmentally Preferable Alternative.
7. Difference Between Sections of EIS on Alternatives and Environmental Consequences.
8. Early Application of NEPA.
9. Applicant Who Needs Other Permits.
10. Limitations on Action During 30-Day Review Period for Final EIS.
11. Limitations on Actions by an Applicant During EIS Process.
12. Effective Date and Enforceability of the Regulations.
13. Use of Scoping Before Notice of Intent to Prepare EIS.
14. Rights and Responsibilities of Lead and Cooperating Agencies.
15. Commenting Responsibilities of EPA.
16. Third Party Contracts.
17. Disclosure Statement to Avoid Conflict of Interest.
18. Uncertainties About Indirect Effects of A Proposal.
19. Mitigation Measures.
20. Worst Case Analysis. [Withdrawn.]
21. Combining Environmental and Planning Documents.
22. State and Federal Agencies as Joint Lead Agencies.
23. Conflicts of Federal Proposal With Land Use Plans, Policies or Controls.

24. Environmental Impact Statements on Policies, Plans or Programs.
25. Appendices and Incorporation by Reference.
26. Index and Keyword Index in EISs.
27. List of Preparers.
28. Advance or Xerox Copies of EIS.
29. Responses to Comments.
30. Adoption of EISs.
31. Application of Regulations to Independent Regulatory Agencies.
32. Supplements to Old EISs.
33. Referrals.
34. Records of Decision.
35. Time Required for the NEPA Process.
36. Environmental Assessments (EA).
37. Findings of No Significant Impact (FONSI).
38. Public Availability of EAs v. FONSIs.
39. Mitigation Measures Imposed in EAs and FONSIs.
40. Propriety of Issuing EA When Mitigation Reduces Impacts.

END NOTES

1a. **Range of Alternatives.** What is meant by "range of alternatives" as referred to in Sec. 1505.1(e)?

A. The phrase "range of alternatives" refers to the alternatives discussed in environmental documents. It includes all reasonable alternatives, which must be rigorously explored and objectively evaluated, as well as those other alternatives, which are eliminated from detailed study with a brief discussion of the reasons for eliminating them. *Section 1502.14.* A decisionmaker must not consider alternatives beyond the range of alternatives discussed in the relevant environmental documents. Moreover, a decisionmaker must, in fact, consider all the alternatives discussed in an EIS. *Section 1505.1(e).*

1b. **How many alternatives** have to be discussed when there is an infinite number of possible alternatives?

A. For some proposals there may exist a very large or even an infinite number of possible reasonable alternatives. For example, a proposal to designate wilderness areas within a National Forest could be said to involve an infinite number of alternatives from 0 to 100 percent of the forest. When there are potentially a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS. An appropriate series of alternatives might include dedicating 0, 10, 30, 50, 70, 90, or 100 percent of the Forest to wilderness. What constitutes a reasonable range of alternatives depends on the nature of the proposal and the facts in each case.

2a. **Alternatives Outside the Capability of Applicant or Jurisdiction of Agency.** If an EIS is prepared in connection with an application for a permit or other federal approval, must the EIS

rigorously analyze and discuss alternatives that are outside the capability of the applicant or can it be limited to reasonable alternatives that can be carried out by the applicant?

A. Section 1502.14 requires the EIS to examine all reasonable alternatives to the proposal. In determining the scope of alternatives to be considered, the emphasis is on what is "reasonable" rather than on whether the proponent or applicant likes or is itself capable of carrying out a particular alternative. Reasonable alternatives include those that are practical or feasible from the technical and economic standpoint and using common sense, rather than simply desirable from the standpoint of the applicant.

2b. Must the EIS analyze **alternatives outside the jurisdiction** or capability of the agency or beyond what Congress has authorized?

A. An alternative that is outside the legal jurisdiction of the lead agency must still be analyzed in the EIS if it is reasonable. A potential conflict with local or federal law does not necessarily render an alternative unreasonable, although such conflicts must be considered. *Section 1506.2(d)*. Alternatives that are outside the scope of what Congress has approved or funded must still be evaluated in the EIS if they are reasonable, because the EIS may serve as the basis for modifying the Congressional approval or funding in light of NEPA's goals and policies. *Section 1500.1(a)*.

3. **No-Action Alternative.** What does the "no action" alternative include? If an agency is under a court order or legislative command to act, must the EIS address the "no action" alternative?

A. Section 1502.14(d) requires the alternatives analysis in the EIS to "include the alternative of no action." There are two distinct interpretations of "no action" that must be considered, depending on the nature of the proposal being evaluated. The first situation might involve an action such as updating a land management plan where ongoing programs initiated under existing legislation and regulations will continue, even as new plans are developed. In these cases "no action" is "no change" from current management direction or level of management intensity. To construct an alternative that is based on no management at all would be a useless academic exercise. Therefore, the "no action" alternative may be thought of in terms of continuing with the present course of action until that action is changed. Consequently, projected impacts of alternative management schemes would be compared in the EIS to those impacts projected for the existing plan. In this case, alternatives would include management plans of both greater and lesser intensity, especially greater and lesser levels of resource development.

The second interpretation of "no action" is illustrated in instances involving federal decisions on proposals for projects. "No action" in such cases would mean the proposed activity would not take place, and the resulting environmental effects from taking no action would be compared with the effects of permitting the proposed activity or an alternative activity to go forward.

Where a choice of "no action" by the agency would result in predictable actions by others, this consequence of the "no action" alternative should be included in the analysis. For example, if

denial of permission to build a railroad to a facility would lead to construction of a road and increased truck traffic, the EIS should analyze this consequence of the "no action" alternative.

In light of the above, it is difficult to think of a situation where it would not be appropriate to address a "no action" alternative. Accordingly, the regulations require the analysis of the no action alternative even if the agency is under a court order or legislative command to act. This analysis provides a benchmark, enabling decisionmakers to compare the magnitude of environmental effects of the action alternatives. It is also an example of a reasonable alternative outside the jurisdiction of the agency which must be analyzed. *Section 1502.14(c).* See Question 2 above. Inclusion of such an analysis in the EIS is necessary to inform the Congress, the public, and the President as intended by NEPA. *Section 1500.1(a).*

4a. **Agency's Preferred Alternative.** What is the "agency's preferred alternative"?

A. The "agency's preferred alternative" is the alternative which the agency believes would fulfill its statutory mission and responsibilities, giving consideration to economic, environmental, technical and other factors. The concept of the "agency's preferred alternative" is different from the "environmentally preferable alternative," although in some cases one alternative may be both. See Question 6 below. It is identified so that agencies and the public can understand the lead agency's orientation.

4b. Does the **"preferred alternative"** have to be identified in the Draft EIS **and** the Final EIS or just in the Final EIS?

A. Section 1502.14(e) requires the section of the EIS on alternatives to "identify the agency's preferred alternative if one or more exists, in the draft statement, and identify such alternative in the final statement . . ." This means that if the agency has a preferred alternative at the Draft EIS stage, that alternative must be labeled or identified as such in the Draft EIS. If the responsible federal official in fact has no preferred alternative at the Draft EIS stage, a preferred alternative need not be identified there. By the time the Final EIS is filed, Section 1502.14(e) presumes the existence of a preferred alternative and requires its identification in the Final EIS "unless another law prohibits the expression of such a preference."

4c. Who recommends or determines the **"preferred alternative?"**

A. The lead agency's official with line responsibility for preparing the EIS and assuring its adequacy is responsible for identifying the agency's preferred alternative(s). The NEPA regulations do not dictate which official in an agency shall be responsible for preparation of EISs, but agencies can identify this official in their implementing procedures, pursuant to Section 1507.3.

Even though the agency's preferred alternative is identified by the EIS preparer in the EIS, the statement must be objectively prepared and not slanted to support the choice of the agency's preferred alternative over the other reasonable and feasible alternatives.

5a. **Proposed Action v. Preferred Alternative.** Is the "proposed action" the same thing as the "preferred alternative"?

A. The "proposed action" may be, but is not necessarily, the agency's "preferred alternative." The proposed action may be a proposal in its initial form before undergoing analysis in the EIS process. If the proposed action is [46 FR 18028] internally generated, such as preparing a land management plan, the proposed action might end up as the agency's preferred alternative. On the other hand the proposed action may be granting an application to a non- federal entity for a permit. The agency may or may not have a "preferred alternative" at the Draft EIS stage (see Question 4 above). In that case the agency may decide at the Final EIS stage, on the basis of the Draft EIS and the public and agency comments, that an alternative other than the proposed action is the agency's "preferred alternative."

5b. Is the analysis of the **"proposed action"** in an EIS to be treated differently from the analysis of alternatives?

A. The degree of analysis devoted to each alternative in the EIS is to be substantially similar to that devoted to the "proposed action." Section 1502.14 is titled "Alternatives including the proposed action" to reflect such comparable treatment. Section 1502.14(b) specifically requires "substantial treatment" in the EIS of each alternative including the proposed action. This regulation does not dictate an amount of information to be provided, but rather, prescribes a level of treatment, which may in turn require varying amounts of information, to enable a reviewer to evaluate and compare alternatives.

6a. **Environmentally Preferable Alternative.** What is the meaning of the term "environmentally preferable alternative" as used in the regulations with reference to Records of Decision? How is the term "environment" used in the phrase?

A. Section 1505.2(b) requires that, in cases where an EIS has been prepared, the Record of Decision (ROD) must identify all alternatives that were considered, ". . . specifying the alternative or alternatives which were considered to be environmentally preferable." The environmentally preferable alternative is the alternative that will promote the national environmental policy as expressed in NEPA's Section 101. Ordinarily, this means the alternative that causes the least damage to the biological and physical environment; it also means the alternative which best protects, preserves, and enhances historic, cultural, and natural resources.

The Council recognizes that the identification of the environmentally preferable alternative may involve difficult judgments, particularly when one environmental value must be balanced against another. The public and other agencies reviewing a Draft EIS can assist the lead agency to develop and determine environmentally preferable alternatives by providing their views in comments on the Draft EIS. Through the identification of the environmentally preferable alternative, the decisionmaker is clearly faced with a choice between that alternative and others, and must consider whether the decision accords with the Congressionally declared policies of the Act.

6b. **Who recommends or determines** what is environmentally preferable?

A. The agency EIS staff is encouraged to make recommendations of the environmentally preferable alternative(s) during EIS preparation. In any event the lead agency official responsible for the EIS is encouraged to identify the environmentally preferable alternative(s) in the EIS. In all cases, commentors from other agencies and the public are also encouraged to address this question. The agency must identify the environmentally preferable alternative in the ROD.

7. **Difference Between Sections of EIS on Alternatives and Environmental Consequences.** What is the difference between the sections in the EIS on "alternatives" and "environmental consequences"? How do you avoid duplicating the discussion of alternatives in preparing these two sections?

A. The "alternatives" section is the heart of the EIS. This section rigorously explores and objectively evaluates all reasonable alternatives including the proposed action. *Section 1502.14*. It should include relevant comparisons on environmental and other grounds. The "environmental consequences" section of the EIS discusses the specific environmental impacts or effects of each of the alternatives including the proposed action. *Section 1502.16*. In order to avoid duplication between these two sections, most of the "alternatives" section should be devoted to describing and comparing the alternatives. Discussion of the environmental impacts of these alternatives should be limited to a concise descriptive summary of such impacts in a comparative form, including charts or tables, thus sharply defining the issues and providing a clear basis for choice among options. *Section 1502.14*. The "environmental consequences" section should be devoted largely to a scientific analysis of the direct and indirect environmental effects of the proposed action and of each of the alternatives. It forms the analytic basis for the concise comparison in the "alternatives" section.

8. **Early Application of NEPA.** Section 1501.2(d) of the NEPA regulations requires agencies to provide for the early application of NEPA to cases where actions are planned by **private applicants** or **non-Federal entities** and are, at some stage, subject to federal approval of permits, loans, loan guarantees, insurance or other actions. What must and can agencies do to apply NEPA early in these cases?

A. Section 1501.2(d) requires federal agencies to take steps toward ensuring that private parties and state and local entities initiate environmental studies as soon as federal involvement in their proposals can be foreseen. This section is intended to ensure that environmental factors are considered at an early stage in the planning process and to avoid the situation where the applicant for a federal permit or approval has completed planning and eliminated all alternatives to the proposed action by the time the EIS process commences or before the EIS process has been completed.

Through early consultation, business applicants and approving agencies may gain better appreciation of each other's needs and foster a decisionmaking process which avoids later unexpected confrontations.

Federal agencies are required by Section 1507.3(b) to develop procedures to carry out Section 1501.2(d). The procedures should include an "outreach program", such as a means for

prospective applicants to conduct pre-application consultations with the lead and cooperating agencies. Applicants need to find out, in advance of project planning, what environmental studies or other information will be required, and what mitigation requirements are likely, in connection with the later federal NEPA process. Agencies should designate staff to advise potential applicants of the agency's NEPA information requirements and should publicize their pre-application procedures and information requirements in newsletters or other media used by potential applicants.

Complementing Section 1501.2(d), Section 1506.5(a) requires agencies to assist applicants by outlining the types of information required in those cases where the agency requires the applicant to submit environmental data for possible use by the agency in preparing an EIS.

Section 1506.5(b) allows agencies to authorize preparation of environmental assessments by applicants. Thus, the procedures should also include a means for anticipating and utilizing applicants' environmental studies or "early corporate environmental assessments" to fulfill some of the federal agency's NEPA obligations. However, in such cases the agency must still evaluate independently the environmental issues [46 FR 18029] and take responsibility for the environmental assessment.

These provisions are intended to encourage and enable private and other non-federal entities to build environmental considerations into their own planning processes in a way that facilitates the application of NEPA and avoids delay.

9. **Applicant Who Needs Other Permits.** To what extent must an agency inquire into whether an applicant for a federal permit, funding or other approval of a proposal will also need approval from another agency for the same proposal or some other related aspect of it?

A. Agencies must integrate the NEPA process into other planning at the earliest possible time to insure that planning and decisions reflect environmental values, to avoid delays later in the process, and to head off potential conflicts. Specifically, the agency must "provide for cases where actions are planned by . . . applicants," so that designated staff are available to advise potential applicants of studies or other information that will foreseeably be required for the later federal action; the agency shall consult with the applicant if the agency foresees its own involvement in the proposal; and it shall insure that the NEPA process commences at the earliest possible time. *Section 1501.2(d).* (See Question 8.)

The regulations emphasize agency cooperation early in the NEPA process. *Section 1501.6.* Section 1501.7 on "scoping" also provides that all affected Federal agencies are to be invited to participate in scoping the environmental issues and to identify the various environmental review and consultation requirements that may apply to the proposed action. Further, Section 1502.25(b) requires that the draft EIS list all the federal permits, licenses and other entitlements that are needed to implement the proposal.

These provisions create an affirmative obligation on federal agencies to inquire early, and to the maximum degree possible, to ascertain whether an applicant is or will be seeking other federal assistance or approval, or whether the applicant is waiting until a proposal has been substantially developed before requesting federal aid or approval.

Thus, a federal agency receiving a request for approval or assistance should determine whether the applicant has filed separate requests for federal approval or assistance with other federal agencies. Other federal agencies that are likely to become involved should then be contacted, and the NEPA process coordinated, to insure an early and comprehensive analysis of the direct and indirect effects of the proposal and any related actions. The agency should inform the applicant that action on its application may be delayed unless it submits all other federal applications (where feasible to do so), so that all the relevant agencies can work together on the scoping process and preparation of the EIS.

10a. **Limitations on Action During 30-Day Review Period for Final EIS.** What actions by agencies and/or applicants are allowed during EIS preparation and during the 30-day review period after publication of a final EIS?

A. No federal decision on the proposed action shall be made or recorded until at least 30 days after the publication by EPA of notice that the particular EIS has been filed with EPA. *Sections 1505.2 and 1506.10*. Section 1505.2 requires this decision to be stated in a public Record of Decision.

Until the agency issues its Record of Decision, no action by an agency or an applicant concerning the proposal shall be taken which would have an adverse environmental impact or limit the choice of reasonable alternatives. *Section 1506.1(a)*. But this does not preclude preliminary planning or design work which is needed to support an application for permits or assistance. *Section 1506.1(d)*.

When the impact statement in question is a program EIS, no major action concerning the program may be taken which may significantly affect the quality of the human environment, unless the particular action is justified independently of the program, is accompanied by its own adequate environmental impact statement and will not prejudice the ultimate decision on the program. *Section 1506.1(c)*.

10b. Do these **limitations on action** (described in Question 10a) apply to **state or local agencies** that have statutorily delegated responsibility for preparation of environmental documents required by NEPA, for example, under the HUD Block Grant program?

A. Yes, these limitations do apply, without any variation from their application to federal agencies.

11. **Limitations on Actions by an Applicant During EIS Process.** What actions must a lead agency take during the NEPA process when it becomes aware that a non-federal applicant is about to take an action within the agency's jurisdiction that would either have an adverse environmental impact or limit the choice of reasonable alternatives (e.g., prematurely commit money or other resources towards the completion of the proposal)?

A. The federal agency must notify the applicant that the agency will take strong affirmative steps to insure that the objectives and procedures of NEPA are fulfilled. *Section 1506.1(b)*. These steps could include seeking injunctive measures under NEPA, or the use of sanctions

available under either the agency's permitting authority or statutes setting forth the agency's statutory mission. For example, the agency might advise an applicant that if it takes such action the agency will not process its application.

12a. **Effective Date and Enforceability of the Regulations.** What actions are subject to the Council's new regulations, and what actions are grandfathered under the old guidelines?

A. The effective date of the Council's regulations was July 30, 1979 (except for certain HUD programs under the Housing and Community Development Act, 42 U.S.C. 5304(h), and certain state highway programs that qualify under Section 102(2)(D) of NEPA for which the regulations became effective on November 30, 1979). All the provisions of the regulations are binding as of that date, including those covering decisionmaking, public participation, referrals, limitations on actions, EIS supplements, etc. For example, a Record of Decision would be prepared even for decisions where the draft EIS was filed before July 30, 1979.

But in determining whether or not the new regulations apply to the preparation of a particular environmental document, the relevant factor is the date of filing of the draft of that document. Thus, the new regulations do not require the redrafting of an EIS or supplement if the draft EIS or supplement was filed before July 30, 1979. However, a supplement prepared after the effective date of the regulations for an EIS issued in final before the effective date of the regulations would be controlled by the regulations.

Even though agencies are not required to apply the regulations to an EIS or other document for which the draft was filed prior to July 30, 1979, the regulations encourage agencies to follow the regulations "to the fullest extent practicable," i.e., if it is feasible to do so, in preparing the final document. *Section 1506.12(a)*.

12b. Are **projects authorized by Congress before** the effective date of the Council's regulations grandfathered?

A. No. The date of Congressional authorization for a project is not determinative of whether the Council's regulations or former Guidelines apply to the particular proposal. No incomplete projects or proposals of any kind are grandfathered in whole or in part. Only certain environmental documents, for which the draft was issued before the effective date of the regulations, are grandfathered and [46 FR 18030] subject to the Council's former Guidelines.

12c. **Can a violation of the regulations give rise to a cause of action?**

A. While a trivial violation of the regulations would not give rise to an independent cause of action, such a cause of action would arise from a substantial violation of the regulations. *Section 1500.3*.

13. **Use of Scoping Before Notice of Intent to Prepare EIS.** Can the scoping process be used in connection with preparation of an **environmental assessment,** i.e., before both the decision to proceed with an EIS and publication of a notice of intent?

A. Yes. Scoping can be a useful tool for discovering alternatives to a proposal, or significant

impacts that may have been overlooked. In cases where an environmental assessment is being prepared to help an agency decide whether to prepare an EIS, useful information might result from early participation by other agencies and the public in a scoping process.

The regulations state that the scoping process is to be preceded by a Notice of Intent (NOI) to prepare an EIS. But that is only the minimum requirement. Scoping may be initiated earlier, as long as there is appropriate public notice and enough information available on the proposal so that the public and relevant agencies can participate effectively.

However, scoping that is done before the assessment, and in aid of its preparation, cannot substitute for the normal scoping process after publication of the NOI, unless the earlier public notice stated clearly that this possibility was under consideration, and the NOI expressly provides that written comments on the scope of alternatives and impacts will still be considered.

14a. **Rights and Responsibilities of Lead and Cooperating Agencies.** What are the respective rights and responsibilities of lead and cooperating agencies? What letters and memoranda must be prepared?

A. After a lead agency has been designated (Sec. 1501.5), that agency has the responsibility to solicit cooperation from other federal agencies that have jurisdiction by law or special expertise on any environmental issue that should be addressed in the EIS being prepared. Where appropriate, the lead agency should seek the cooperation of state or local agencies of similar qualifications. When the proposal may affect an Indian reservation, the agency should consult with the Indian tribe. *Section 1508.5.* The request for cooperation should come at the earliest possible time in the NEPA process.

After discussions with the candidate cooperating agencies, the lead agency and the cooperating agencies are to determine by letter or by memorandum which agencies will undertake cooperating responsibilities. To the extent possible at this stage, responsibilities for specific issues should be assigned. The allocation of responsibilities will be completed during scoping. *Section 1501.7(a)(4).*

Cooperating agencies must assume responsibility for the development of information and the preparation of environmental analyses at the request of the lead agency. *Section 1501.6(b)(3).* Cooperating agencies are now required by Section 1501.6 to devote staff resources that were normally primarily used to critique or comment on the Draft EIS after its preparation, much earlier in the NEPA process -- primarily at the scoping and Draft EIS preparation stages. If a cooperating agency determines that its resource limitations preclude any involvement, or the degree of involvement (amount of work) requested by the lead agency, it must so inform the lead agency in writing and submit a copy of this correspondence to the Council. *Section 1501.6(c).*

In other words, the potential cooperating agency must decide early if it is able to devote any of its resources to a particular proposal. For this reason the regulation states that an agency may reply to a request for cooperation that "other program commitments preclude any involvement or the degree of involvement requested in the action that is the subject of the environmental

impact statement." (Emphasis added). The regulation refers to the "action," rather than to the EIS, to clarify that the agency is taking itself out of all phases of the federal action, not just draft EIS preparation. This means that the agency has determined that it cannot be involved in the later stages of EIS review and comment, as well as decisionmaking on the proposed action. For this reason, cooperating agencies with jurisdiction by law (those which have permitting or other approval authority) cannot opt out entirely of the duty to cooperate on the EIS. See also Question 15, relating specifically to the responsibility of EPA.

14b. How are **disputes resolved between lead and cooperating agencies** concerning the scope and level of detail of analysis and the quality of data in impact statements?

A. Such disputes are resolved by the agencies themselves. A lead agency, of course, has the ultimate responsibility for the content of an EIS. But it is supposed to use the environmental analysis and recommendations of cooperating agencies with jurisdiction by law or special expertise to the maximum extent possible, consistent with its own responsibilities as lead agency. *Section 1501.6(a)(2).*

If the lead agency leaves out a significant issue or ignores the advice and expertise of the cooperating agency, the EIS may be found later to be inadequate. Similarly, where cooperating agencies have their own decisions to make and they intend to adopt the environmental impact statement and base their decisions on it, one document should include all of the information necessary for the decisions by the cooperating agencies. Otherwise they may be forced to duplicate the EIS process by issuing a new, more complete EIS or Supplemental EIS, even though the original EIS could have sufficed if it had been properly done at the outset. Thus, both lead and cooperating agencies have a stake in producing a document of good quality. Cooperating agencies also have a duty to participate fully in the scoping process to ensure that the appropriate range of issues is determined early in the EIS process.

Because the EIS is not the Record of Decision, but instead constitutes the information and analysis on which to base a decision, disagreements about conclusions to be drawn from the EIS need not inhibit agencies from issuing a joint document, or adopting another agency's EIS, if the analysis is adequate. Thus, if each agency has its own "preferred alternative," both can be identified in the EIS. Similarly, a cooperating agency with jurisdiction by law may determine in its own ROD that alternative A is the environmentally preferable action, even though the lead agency has decided in its separate ROD that Alternative B is environmentally preferable.

14c. What are the specific responsibilities of federal and state **cooperating agencies to review draft EISs**?

A. Cooperating agencies (i.e., agencies with jurisdiction by law or special expertise) and agencies that are authorized to develop or enforce environmental standards, must comment on environmental impact statements within their jurisdiction, expertise or authority. *Sections 1503.2, 1508.5.* If a cooperating agency is satisfied that its views are adequately reflected in the environmental impact statement, it should simply comment accordingly. Conversely, if the cooperating agency determines that a draft EIS is incomplete, inadequate or inaccurate, or it has other comments, it should promptly make such comments, conforming to the requirements

of specificity in section 1503.3.

14d. How is the lead agency to treat the comments of another agency with jurisdiction by law or special expertise which has **failed or refused to cooperate or participate in scoping or EIS preparation**?

A. A lead agency has the responsibility to respond to all substantive comments raising significant issues regarding a draft EIS. *Section 1503.4*. However, cooperating agencies are generally under an obligation to raise issues or otherwise participate in the EIS process during scoping and EIS preparation if they reasonably can do so. In practical terms, if a cooperating agency fails to cooperate at the outset, such as during scoping, it will find that its comments at a later stage will not be as persuasive to the lead agency.

15. **Commenting Responsibilities of EPA.** Are EPA's responsibilities to review and comment on the environmental effects of agency proposals under **Section 309 of the Clean Air Act** independent of its responsibility as a cooperating agency?

A. Yes. EPA has an obligation under Section 309 of the Clean Air Act to review and comment in writing on the environmental impact of any matter relating to the authority of the Administrator contained in proposed legislation, federal construction projects, other federal actions requiring EISs, and new regulations. *42 U.S.C. Sec. 7609.* This obligation is independent of its role as a cooperating agency under the NEPA regulations.

16. **Third Party Contracts.** What is meant by the term "third party contracts" in connection with the preparation of an EIS? See Section 1506.5(c). When can "third party contracts" be used?

A. As used by EPA and other agencies, the term "third party contract" refers to the preparation of EISs by contractors paid by the applicant. In the case of an EIS for a National Pollution Discharge Elimination System (NPDES) permit, the applicant, aware in the early planning stages of the proposed project of the need for an EIS, contracts directly with a consulting firm for its preparation. See 40 C.F.R. 6.604(g). The "third party" is EPA which, under Section 1506.5(c), must select the consulting firm, even though the applicant pays for the cost of preparing the EIS. The consulting firm is responsible to EPA for preparing an EIS that meets the requirements of the NEPA regulations and EPA's NEPA procedures. It is in the applicant's interest that the EIS comply with the law so that EPA can take prompt action on the NPDES permit application. The "third party contract" method under EPA's NEPA procedures is purely voluntary, though most applicants have found it helpful in expediting compliance with NEPA.

If a federal agency uses "third party contracting," the applicant may undertake the necessary paperwork for the solicitation of a field of candidates under the agency's direction, so long as the agency complies with Section 1506.5(c). Federal procurement requirements do not apply to the agency because it incurs no obligations or costs under the contract, nor does the agency procure anything under the contract.

17a. **Disclosure Statement to Avoid Conflict of Interest.** If an EIS is prepared with the assistance of a consulting firm, the firm must execute a disclosure statement. What criteria

must the firm follow in determining whether it has any "financial or other interest in the outcome of the project" which would cause a conflict of interest?

A. Section 1506.5(c), which specifies that a consulting firm preparing an EIS must execute a disclosure statement, does not define "financial or other interest in the outcome of the project." The Council interprets this term broadly to cover any known benefits other than general enhancement of professional reputation. This includes any financial benefit such as a promise of future construction or design work on the project, as well as indirect benefits the consultant is aware of (e.g., if the project would aid proposals sponsored by the firm's other clients). For example, completion of a highway project may encourage construction of a shopping center or industrial park from which the consultant stands to benefit. If a consulting firm is aware that it has such an interest in the decision on the proposal, it should be disqualified from preparing the EIS, to preserve the objectivity and integrity of the NEPA process.

When a consulting firm has been involved in developing initial data and plans for the project, but does not have any financial or other interest in the outcome of the decision, it need not be disqualified from preparing the EIS. However, a disclosure statement in the draft EIS should clearly state the scope and extent of the firm's prior involvement to expose any potential conflicts of interest that may exist.

17b. If the firm in fact has no promise of future work or other interest in the outcome of the proposal, **may the firm later bid** in competition with others for future work on the project if the proposed action is approved?

A. Yes.

18. **Uncertainties About Indirect Effects of A Proposal.** How should uncertainties about indirect effects of a proposal be addressed, for example, in cases of disposal of federal lands, when the identity or plans of future landowners is unknown?

A. The EIS must identify all the indirect effects that are known, and make a good faith effort to explain the effects that are not known but are "reasonably foreseeable." *Section 1508.8(b).* In the example, if there is total uncertainty about the identity of future land owners or the nature of future land uses, then of course, the agency is not required to engage in speculation or contemplation about their future plans. But, in the ordinary course of business, people do make judgments based upon reasonably foreseeable occurrences. It will often be possible to consider the likely purchasers and the development trends in that area or similar areas in recent years; or the likelihood that the land will be used for an energy project, shopping center, subdivision, farm or factory. The agency has the responsibility to make an informed judgment, and to estimate future impacts on that basis, especially if trends are ascertainable or potential purchasers have made themselves known. The agency cannot ignore these uncertain, but probable, effects of its decisions.

19a. **Mitigation Measures.** What is the scope of mitigation measures that must be discussed?
A. The mitigation measures discussed in an EIS must cover the range of impacts of the proposal. The measures must include such things as design alternatives that would decrease

pollution emissions, construction impacts, esthetic intrusion, as well as relocation assistance, possible land use controls that could be enacted, and other possible efforts. Mitigation measures must be considered even for impacts that by themselves would not be considered "significant." Once the proposal itself is considered as a whole to have significant effects, all of its specific effects on the environment (whether or not "significant") must be considered, and mitigation measures must be developed where it is feasible to do so. *Sections 1502.14(f), 1502.16(h), 1508.14.*

19b. How should an EIS treat the subject of available mitigation measures that are (1) **outside the jurisdiction** of the lead or cooperating agencies, or (2) **unlikely** to be adopted or enforced by the responsible agency?

A. All relevant, reasonable mitigation measures that could improve the project are to be identified, even if they are outside the jurisdiction of the lead agency or the cooperating agencies, and thus would not be committed as part of the RODs of these agencies. *Sections 1502.16(h), 1505.2(c).* This will serve to [46 FR 18032] alert agencies or officials who can implement these extra measures, and will encourage them to do so. Because the EIS is the most comprehensive environmental document, it is an ideal vehicle in which to lay out not only the full range of environmental impacts but also the full spectrum of appropriate mitigation.

However, to ensure that environmental effects of a proposed action are fairly assessed, the probability of the mitigation measures being implemented must also be discussed. Thus the EIS and the Record of Decision should indicate the likelihood that such measures will be adopted or enforced by the responsible agencies. *Sections 1502.16(h), 1505.2.* If there is a history of nonenforcement or opposition to such measures, the EIS and Record of Decision should acknowledge such opposition or nonenforcement. If the necessary mitigation measures will not be ready for a long period of time, this fact, of course, should also be recognized.

20. **Worst Case Analysis**. [Withdrawn.]

21. **Combining Environmental and Planning Documents.** Where an EIS or an EA is combined with another project planning document (sometimes called **"piggybacking"**), to what degree may the EIS or EA refer to and rely upon information in the project document to satisfy NEPA's requirements?

A. Section 1502.25 of the regulations requires that draft EISs be prepared concurrently and integrated with environmental analyses and related surveys and studies required by other federal statutes. In addition, Section 1506.4 allows any environmental document prepared in compliance with NEPA to be combined with any other agency document to reduce duplication and paperwork. However, these provisions were not intended to authorize the preparation of a short summary or outline EIS, attached to a detailed project report or land use plan containing the required environmental impact data. In such circumstances, the reader would have to refer constantly to the detailed report to understand the environmental impacts and alternatives which should have been found in the EIS itself.

The EIS must stand on its own as an analytical document which fully informs decisionmakers and the public of the environmental effects of the proposal and those of the reasonable alternatives. *Section 1502.1*. But, as long as the EIS is clearly identified and is self-supporting, it can be physically included in or attached to the project report or land use plan, and may use attached report material as technical backup.

Forest Service environmental impact statements for forest management plans are handled in this manner. The EIS identifies the agency's preferred alternative, which is developed in detail as the proposed management plan. The detailed proposed plan accompanies the EIS through the review process, and the documents are appropriately cross-referenced. The proposed plan is useful for EIS readers as an example, to show how one choice of management options translates into effects on natural resources. This procedure permits initiation of the 90-day public review of proposed forest plans, which is required by the National Forest Management Act.

All the alternatives are discussed in the EIS, which can be read as an independent document. The details of the management plan are not repeated in the EIS, and vice versa. This is a reasonable functional separation of the documents: the EIS contains information relevant to the choice among alternatives; the plan is a detailed description of proposed management activities suitable for use by the land managers. This procedure provides for concurrent compliance with the public review requirements of both NEPA and the National Forest Management Act.

Under some circumstances, a project report or management plan may be totally merged with the EIS, and the one document labeled as both "EIS" and "management plan" or "project report." This may be reasonable where the documents are short, or where the EIS format and the regulations for clear, analytical EISs also satisfy the requirements for a project report.

22. **State and Federal Agencies as Joint Lead Agencies.** May state and federal agencies serve as joint lead agencies? If so, how do they resolve law, policy and resource conflicts under NEPA and the relevant state environmental policy act? How do they resolve differences in perspective where, for example, national and local needs may differ?

A. Under Section 1501.5(b), federal, state or local agencies, as long as they include at least one federal agency, may act as joint lead agencies to prepare an EIS. Section 1506.2 also strongly urges state and local agencies and the relevant federal agencies to cooperate fully with each other. This should cover joint research and studies, planning activities, public hearings, environmental assessments and the preparation of joint EISs under NEPA and the relevant "little NEPA" state laws, so that one document will satisfy both laws.

The regulations also recognize that certain inconsistencies may exist between the proposed federal action and any approved state or local plan or law. The joint document should discuss the extent to which the federal agency would reconcile its proposed action with such plan or law. *Section 1506.2(d).* (See Question 23).

Because there may be differences in perspective as well as conflicts among [46 FR 18033] federal, state and local goals for resources management, the Council has advised participating

agencies to adopt a flexible, cooperative approach. The joint EIS should reflect all of their interests and missions, clearly identified as such. The final document would then indicate how state and local interests have been accommodated, or would identify conflicts in goals (e.g., how a hydroelectric project, which might induce second home development, would require new land use controls). The EIS must contain a complete discussion of scope and purpose of the proposal, alternatives, and impacts so that the discussion is adequate to meet the needs of local, state and federal decisionmakers.

23a. **Conflicts of Federal Proposal With Land Use Plans, Policies or Controls.** How should an agency handle potential **conflicts** between a proposal and the objectives of Federal, state or local land use plans, policies and controls for the area concerned? See Sec. 1502.16(c).

A. The agency should first inquire of other agencies whether there are any potential conflicts. If there would be immediate conflicts, or if conflicts could arise in the future when the plans are finished (see Question 23(b) below), the EIS must acknowledge and describe the extent of those conflicts. If there are any possibilities of resolving the conflicts, these should be explained as well. The EIS should also evaluate the seriousness of the impact of the proposal on the land use plans and policies, and whether, or how much, the proposal will impair the effectiveness of land use control mechanisms for the area. Comments from officials of the affected area should be solicited early and should be carefully acknowledged and answered in the EIS.

23b. What constitutes a **"land use plan or policy"** for purposes of this discussion?

A. The term "land use plans," includes all types of formally adopted documents for land use planning, zoning and related regulatory requirements. Local general plans are included, even though they are subject to future change. Proposed plans should also be addressed if they have been formally proposed by the appropriate government body in a written form, and are being actively pursued by officials of the jurisdiction. Staged plans, which must go through phases of development such as the Water Resources Council's Level A, B and C planning process should also be included even though they are incomplete.

The term "policies" includes formally adopted statements of land use policy as embodied in laws or regulations. It also includes proposals for action such as the initiation of a planning process, or a formally adopted policy statement of the local, regional or state executive branch, even if it has not yet been formally adopted by the local, regional or state legislative body.

23c. What options are available for the decisionmaker when **conflicts with such plans** or policies are identified?

A. After identifying any potential land use conflicts, the decisionmaker must weigh the significance of the conflicts, among all the other environmental and non-environmental factors that must be considered in reaching a rational and balanced decision. Unless precluded by other law from causing or contributing to any inconsistency with the land use plans, policies or controls, the decisionmaker retains the authority to go forward with

the proposal, despite the potential conflict. In the Record of Decision, the decisionmaker must explain what the decision was, how it was made, and what mitigation measures are being imposed to lessen adverse environmental impacts of the proposal, among the other requirements of Section 1505.2. This provision would require the decisionmaker to explain any decision to override land use plans, policies or controls for the area.

24a. **Environmental Impact Statements on Policies, Plans or Programs.** When are EISs required on policies, plans or programs?

A. An EIS must be prepared if an agency proposes to implement a specific policy, to adopt a plan for a group of related actions, or to implement a specific statutory program or executive directive. *Section 1508.18*. In addition, the adoption of official policy in the form of rules, regulations and interpretations pursuant to the Administrative Procedure Act, treaties, conventions, or other formal documents establishing governmental or agency policy which will substantially alter agency programs, could require an EIS. *Section 1508.18*. In all cases, the policy, plan, or program must have the potential for significantly affecting the quality of the human environment in order to require an EIS. It should be noted that a proposal "may exist in fact as well as by agency declaration that one exists." *Section 1508.23*.

24b. When is an **area-wide or overview EIS** appropriate?

A. The preparation of an area-wide or overview EIS may be particularly useful when similar actions, viewed with other reasonably foreseeable or proposed agency actions, share common timing or geography. For example, when a variety of energy projects may be located in a single watershed, or when a series of new energy technologies may be developed through federal funding, the overview or area-wide EIS would serve as a valuable and necessary analysis of the affected environment and the potential cumulative impacts of the reasonably foreseeable actions under that program or within that geographical area.

24c. What is the function of **tiering** in such cases?

A. Tiering is a procedure which allows an agency to avoid duplication of paperwork through the incorporation by reference of the general discussions and relevant specific discussions from an environmental impact statement of broader scope into one of lesser scope or vice versa. In the example given in Question 24b, this would mean that an overview EIS would be prepared for all of the energy activities reasonably foreseeable in a particular geographic area or resulting from a particular development program. This impact statement would be followed by site-specific or project-specific EISs. The tiering process would make each EIS of greater use and meaning to the public as the plan or program develops, without duplication of the analysis prepared for the previous impact statement.

25a. **Appendices and Incorporation by Reference.** When is it appropriate to use appendices instead of including information in the body of an EIS?

A. The body of the EIS should be a succinct statement of all the information on environmental impacts and alternatives that the decisionmaker and the public need, in order to make the decision and to ascertain that every significant factor has been examined. The EIS must

explain or summarize methodologies of research and modeling, and the results of research that may have been conducted to analyze impacts and alternatives.

Lengthy technical discussions of modeling methodology, baseline studies, or other work are best reserved for the appendix. In other words, if only technically trained individuals are likely to understand a particular discussion then it should go in the appendix, and a plain language summary of the analysis and conclusions of that technical discussion should go in the text of the EIS.

The final statement must also contain the agency's responses to comments on the draft EIS. These responses will be primarily in the form of changes in the document itself, but specific answers to each significant comment should also be included. These specific responses may be placed in an appendix. If the comments are especially voluminous, summaries of the comments and responses will suffice. (See Question 29 regarding the level of detail required for responses to comments.)

25b. How does an **appendix** differ from **incorporation by reference?**

A. First, if at all possible, the appendix accompanies the EIS, whereas the material which is incorporated by reference does not accompany the EIS. Thus the appendix should contain information that reviewers will be likely to want to examine. The appendix should include material that pertains to preparation of a particular EIS. Research papers directly relevant to the proposal, lists of affected species, discussion of the methodology of models used in the analysis of impacts, extremely detailed responses to comments, or other information, would be placed in the appendix.

The appendix must be complete and available at the time the EIS is filed. Five copies of the appendix must be sent to EPA with five copies of the EIS for filing. If the appendix is too bulky to be circulated, it instead must be placed in conveniently accessible locations or furnished directly to commentors upon request. If it is not circulated with the EIS, the Notice of Availability published by EPA must so state, giving a telephone number to enable potential commentors to locate or request copies of the appendix promptly.

Material that is not directly related to preparation of the EIS should be incorporated by reference. This would include other EISs, research papers in the general literature, technical background papers or other material that someone with technical training could use to evaluate the analysis of the proposal. These must be made available, either by citing the literature, furnishing copies to central locations, or sending copies directly to commenters upon request.

Care must be taken in all cases to ensure that material incorporated by reference, and the occasional appendix that does not accompany the EIS, are in fact available for the full minimum public comment period.

26a. **Index and Keyword Index in EISs.** How detailed must an EIS index be?

A. The EIS index should have a level of detail sufficient to focus on areas of the EIS of

reasonable interest to any reader. It cannot be restricted to the most important topics. On the other hand, it need not identify every conceivable term or phrase in the EIS. If an agency believes that the reader is reasonably likely to be interested in a topic, it should be included.

26b. Is a **keyword index** required?

A. No. A keyword index is a relatively short list of descriptive terms that identifies the key concepts or subject areas in a document. For example it could consist of 20 terms which describe the most significant aspects of an EIS that a future researcher would need: type of proposal, type of impacts, type of environment, geographical area, sampling or modeling methodologies used. This technique permits the compilation of EIS data banks, by facilitating quick and inexpensive access to stored materials. While a keyword index is not required by the regulations, it could be a useful addition for several reasons. First, it can be useful as a quick index for reviewers of the EIS, helping to focus on areas of interest. Second, if an agency keeps a listing of the keyword indexes of the EISs it produces, the EIS preparers themselves will have quick access to similar research data and methodologies to aid their future EIS work. Third, a keyword index will be needed to make an EIS available to future researchers using EIS data banks that are being developed. Preparation of such an index now when the document is produced will save a later effort when the data banks become operational.

27a. **List of Preparers.** If a consultant is used in preparing an EIS, must the list of preparers identify members of the consulting firm as well as the agency NEPA staff who were primarily responsible?

A. Section 1502.17 requires identification of the names and qualifications of persons who were primarily responsible for preparing the EIS or significant background papers, including basic components of the statement. This means that members of a consulting firm preparing material that is to become part of the EIS must be identified. The EIS should identify these individuals even though the consultant's contribution may have been modified by the agency.

27b. Should agency staff involved in reviewing and editing the EIS also be included in the **list of preparers?**

A. Agency personnel who wrote basic components of the EIS or significant background papers must, of course, be identified. The EIS should also list the technical editors who reviewed or edited the statements.

27c. How much information should be included on each person listed?

A. The list of preparers should normally not exceed two pages. Therefore, agencies must determine which individuals had primary responsibility and need not identify individuals with minor involvement. The list of preparers should include a very brief identification of the individuals involved, their qualifications (expertise, professional disciplines) and the specific portion of the EIS for which they are responsible. This may be done in tabular form to cut down on length. A line or two for each person's qualifications should be sufficient.

28. **Advance or Xerox Copies of EIS.** May an agency file xerox copies of an EIS with EPA pending the completion of printing the document?

A. Xerox copies of an EIS may be filed with EPA prior to printing only if the xerox copies are simultaneously made available to other agencies and the public. Section 1506.9 of the regulations, which governs EIS filing, specifically requires Federal agencies to file EISs with EPA no earlier than the EIS is distributed to the public. However, this section does not prohibit xeroxing as a form of reproduction and distribution. When an agency chooses xeroxing as the reproduction method, the EIS must be clear and legible to permit ease of reading and ultimate microfiching of the EIS. Where color graphs are important to the EIS, they should be reproduced and circulated with the xeroxed copy.

29a. **Responses to Comments.** What response must an agency provide to a comment on a draft EIS which states that the EIS's methodology is inadequate or inadequately explained? For example, what level of detail must an agency include in its response to a simple postcard comment making such an allegation?

A. Appropriate responses to comments are described in Section 1503.4. Normally the responses should result in changes in the text of the EIS, not simply a separate answer at the back of the document. But, in addition, the agency must state what its response was, and if the agency decides that no substantive response to a comment is necessary, it must explain briefly why.

An agency is not under an obligation to issue a lengthy reiteration of its methodology for any portion of an EIS if the only comment addressing the methodology is a simple complaint that the EIS methodology is inadequate. But agencies must respond to comments, however brief, which are specific in their criticism of agency methodology. For example, if a commentor on an EIS said that an agency's air quality dispersion analysis or methodology was inadequate, and the agency had included a discussion of that analysis in the EIS, little if anything need be added in response to such a comment. However, if the commenter said that the dispersion analysis was inadequate because of its use of a certain computational technique, or that a dispersion analysis was inadequately explained because computational techniques were not included or referenced, then the agency would have to respond in a substantive and meaningful way to such a comment. If a number of comments are identical or very similar, agencies may group the comments and prepare a single answer for each group. Comments may be summarized if they are especially voluminous. The comments or summaries must be attached to the EIS regardless of whether the agency believes they merit individual discussion in the body of the final EIS.

29b. How must an agency respond to a comment on a draft EIS that raises a **new alternative not previously considered** in the draft EIS?

A. This question might arise in several possible situations. First, a commenter on a draft EIS may indicate that there is a possible alternative which, in the agency's view, is not a reasonable alternative. *Section 1502.14(a).* If that is the case, the agency must explain why the comment does not warrant further agency response, citing authorities or reasons that support the agency's position and, if appropriate, indicate those circumstances which would trigger agency

reappraisal or further response. *Section 1503.4(a).* For example, a commentor on a draft EIS on a coal fired power plant may suggest the alternative of using synthetic fuel. The agency may reject the alternative with a brief discussion (with authorities) of the unavailability of synthetic fuel within the time frame necessary to meet the need and purpose of the proposed facility.

A second possibility is that an agency may receive a comment indicating that a particular alternative, while reasonable, should be modified somewhat, for example, to achieve certain mitigation benefits, or for other reasons. If the modification is reasonable, the agency should include a discussion of it in the final EIS. For example, a commenter on a draft EIS on a proposal for a pumped storage power facility might suggest that the applicant's proposed alternative should be enhanced by the addition of certain reasonable mitigation measures, including the purchase and setaside of a wildlife preserve to substitute for the tract to be destroyed by the project. The modified alternative including the additional mitigation measures should be discussed by the agency in the final EIS.

A third slightly different possibility is that a comment on a draft EIS will raise an alternative which is a minor variation of one of the alternatives discussed in the draft EIS, but this variation was not given any consideration by the agency. In such a case, the agency should develop and evaluate the new alternative, if it is reasonable, in the final EIS. If it is qualitatively within the spectrum of alternatives that were discussed in the draft, a supplemental draft will not be needed. For example, a commenter on a draft EIS to designate a wilderness area within a National Forest might reasonably identify a specific tract of the forest, and urge that it be considered for designation. If the draft EIS considered designation of a range of alternative tracts which encompassed forest area of similar quality and quantity, no supplemental EIS would have to be prepared. The agency could fulfill its obligation by addressing that specific alternative in the final EIS.

As another example, an EIS on an urban housing project may analyze the alternatives of constructing 2,000, 4,000, or 6,000 units. A commentor on the draft EIS might urge the consideration of constructing 5,000 units utilizing a different configuration of buildings. This alternative is within the spectrum of alternatives already considered, and, therefore, could be addressed in the final EIS.

A fourth possibility is that a commenter points out an alternative which is not a variation of the proposal or of any alternative discussed in the draft impact statement, and is a reasonable alternative that warrants serious agency response. In such a case, the agency must issue a supplement to the draft EIS that discusses this new alternative. For example, a commenter on a draft EIS on a nuclear power plant might suggest that a reasonable alternative for meeting the projected need for power would be through peak load management and energy conservation programs. If the permitting agency has failed to consider that approach in the Draft EIS, and the approach cannot be dismissed by the agency as unreasonable, a supplement to the Draft EIS, which discusses that alternative, must be prepared. (If necessary, the same supplement should also discuss substantial changes in the proposed action or significant new circumstances or information, as required by Section 1502.9(c)(1) of the Council's regulations.)

If the new alternative was not raised by the commentor during scoping, but could have been,

commenters may find that they are unpersuasive in their efforts to have their suggested alternative analyzed in detail by the agency. However, if the new alternative is discovered or developed later, and it could not reasonably have been raised during the scoping process, then the agency must address it in a supplemental draft EIS. The agency is, in any case, ultimately responsible for preparing an adequate EIS that considers all alternatives.

30. **Adoption of EISs.** When a cooperating agency with jurisdiction by law intends to adopt a lead agency's EIS and it is not satisfied with the adequacy of the document, may the cooperating agency adopt only the part of the EIS with which it is satisfied? If so, would a cooperating agency with jurisdiction by law have to prepare a separate EIS or EIS supplement covering the areas of disagreement with the lead agency?

A. Generally, a cooperating agency may adopt a lead agency's EIS without recirculating it if it concludes that its NEPA requirements and its comments and suggestions have been satisfied. *Section 1506.3(a), (c).* If necessary, a cooperating agency may adopt only a portion of the lead agency's EIS and may reject that part of the EIS with which it disagrees, stating publicly why it did so. *Section 1506.3(a).*

A cooperating agency with jurisdiction by law (e.g., an agency with independent legal responsibilities with respect to the proposal) has an independent legal obligation to comply with NEPA. Therefore, if the cooperating agency determines that the EIS is wrong or inadequate, it must prepare a supplement to the EIS, replacing or adding any needed information, and must circulate the supplement as a draft for public and agency review and comment. A final supplemental EIS would be required before the agency could take action. The adopted portions of the lead agency EIS should be circulated with the supplement. *Section 1506.3(b).* A cooperating agency with jurisdiction by law will have to prepare its own Record of Decision for its action, in which it must explain how it reached its conclusions. Each agency should explain how and why its conclusions differ, if that is the case, from those of other agencies which issued their Records of Decision earlier. An agency that did not cooperate in preparation of an EIS may also adopt an EIS or portion thereof. But this would arise only in rare instances, because an agency adopting an EIS for use in its own decision normally would have been a cooperating agency. If the proposed action for which the EIS was prepared is substantially the same as the proposed action of the adopting agency, the EIS may be adopted as long as it is recirculated as a final EIS and the agency announces what it is doing. This would be followed by the 30-day review period and issuance of a Record of Decision by the adopting agency. If the proposed action by the adopting agency is not substantially the same as that in [46 FR 18036] the EIS (i.e., if an EIS on one action is being adapted for use in a decision on another action), the EIS would be treated as a draft and circulated for the normal public comment period and other procedures. *Section 1506.3(b).*

31a. **Application of Regulations to Independent Regulatory Agencies.** Do the Council's NEPA regulations apply to independent regulatory agencies like the Federal Energy Regulatory Commission (FERC) and the Nuclear Regulatory Commission?

A. The statutory requirements of NEPA's Section 102 apply to "all agencies of the federal government." The NEPA regulations implement the procedural provisions of NEPA as set

forth in NEPA's Section 102(2) for all agencies of the federal government. The NEPA regulations apply to independent regulatory agencies, however, they do not direct independent regulatory agencies or other agencies to make decisions in any particular way or in a way inconsistent with an agency's statutory charter. *Sections 1500.3, 1500.6, 1507.1, and 1507.3.*

31b. Can an Executive Branch agency like the Department of the Interior **adopt an EIS** prepared by an independent regulatory agency such as FERC?

A. If an independent regulatory agency such as FERC has prepared an EIS in connection with its approval of a proposed project, an Executive Branch agency (e.g., the Bureau of Land Management in the Department of the Interior) may, in accordance with Section 1506.3, adopt the EIS or a portion thereof for its use in considering the same proposal. In such a case the EIS must, to the satisfaction of the adopting agency, meet the standards for an adequate statement under the NEPA regulations (including scope and quality of analysis of alternatives) and must satisfy the adopting agency's comments and suggestions. If the independent regulatory agency fails to comply with the NEPA regulations, the cooperating or adopting agency may find that it is unable to adopt the EIS, thus forcing the preparation of a new EIS or EIS Supplement for the same action. The NEPA regulations were made applicable to all federal agencies in order to avoid this result, and to achieve uniform application and efficiency of the NEPA process.

32. **Supplements to Old EISs.** Under what circumstances do old EISs have to be supplemented before taking action on a proposal?

A. As a rule of thumb, if the proposal has not yet been implemented, or if the EIS concerns an ongoing program, EISs that are more than 5 years old should be carefully reexamined to determine if the criteria in Section 1502.9 compel preparation of an EIS supplement.

If an agency has made a substantial change in a proposed action that is relevant to environmental concerns, or if there are significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts, a supplemental EIS must be prepared for an old EIS so that the agency has the best possible information to make any necessary substantive changes in its decisions regarding the proposal. *Section 1502.9(c).*

33a. **Referrals.** When must a referral of an interagency disagreement be made to the Council?

A. The Council's referral procedure is a pre-decision referral process for interagency disagreements. Hence, Section 1504.3 requires that a referring agency must deliver its referral to the Council not later than 25 days after publication by EPA of notice that the final EIS is available (unless the lead agency grants an extension of time under Section 1504.3(b)).

33b. May a **referral** be made after this issuance of a Record of Decision?

A. No, except for cases where agencies provide an internal appeal procedure which permits simultaneous filing of the final EIS and the record of decision (ROD). *Section 1506.10(b)(2).* Otherwise, as stated above, the process is a pre-decision referral process. Referrals must be

made within 25 days after the notice of availability of the final EIS, whereas the final decision (ROD) may not be made or filed until after 30 days from the notice of availability of the EIS. *Sections 1504.3(b), 1506.10(b).* If a lead agency has granted an extension of time for another agency to take action on a referral, the ROD may not be issued until the extension has expired.

34a. **Records of Decision.** Must Records of Decision (RODs) be made public? How should they be made available?

A. Under the regulations, agencies must prepare a "concise public record of decision," which contains the elements specified in Section 1505.2. This public record may be integrated into any other decision record prepared by the agency, or it may be separate if decision documents are not normally made public. The Record of Decision is intended by the Council to be an environmental document (even though it is not explicitly mentioned in the definition of "environmental document" in Section 1508.10). Therefore, it must be made available to the public through appropriate public notice as required by Section 1506.6(b). However, there is no specific requirement for publication of the ROD itself, either in the Federal Register or elsewhere.

34b. May the **summary section** in the final Environmental Impact Statement substitute for or constitute an agency's Record of Decision?

A. No. An environmental impact statement is supposed to inform the decisionmaker before the decision is made. *Sections 1502.1, 1505.2.* The Council's regulations provide for a 30-day period after notice is published that the final EIS has been filed with EPA before the agency may take final action. During that period, in addition to the agency's own internal final review, the public and other agencies can comment on the final EIS prior to the agency's final action on the proposal. In addition, the Council's regulations make clear that the requirements for the summary in an EIS are not the same as the requirements for a ROD. *Sections 1502.12 and 1505.2.*

34c. What provisions should **Records of Decision** contain pertaining to **mitigation and monitoring**?

A. Lead agencies "shall include appropriate conditions [including mitigation measures and monitoring and enforcement programs] in grants, permits or other approvals" and shall "condition funding of actions on mitigation." *Section 1505.3.* Any such measures that are adopted must be explained and committed in the ROD.

The reasonable alternative mitigation measures and monitoring programs should have been addressed in the draft and final EIS. The discussion of mitigation and monitoring in a Record of Decision must be more detailed than a general statement that mitigation is being required, but not so detailed as to duplicate discussion of mitigation in the EIS. The Record of Decision should contain a concise summary identification of the mitigation measures which the agency has committed itself to adopt.

The Record of Decision must also state whether all practicable mitigation measures have

been adopted, and if not, why not. *Section 1505.2(c).* The Record of Decision must identify the mitigation measures and monitoring and enforcement programs that have been selected and plainly indicate that they are adopted as part of the agency's decision. If the proposed action is the issuance of a permit or other approval, the specific details of the mitigation measures shall then be included as appropriate conditions in whatever grants, permits, funding or other approvals are being made by the federal agency. *Section 1505.3 (a), (b).* If the proposal is to be carried out by the [46 FR 18037] federal agency itself, the Record of Decision should delineate the mitigation and monitoring measures in sufficient detail to constitute an enforceable commitment, or incorporate by reference the portions of the EIS that do so.

34d. What is the **enforceability of a Record of Decision?**

A. Pursuant to generally recognized principles of federal administrative law, agencies will be held accountable for preparing Records of Decision that conform to the decisions actually made and for carrying out the actions set forth in the Records of Decision. This is based on the principle that an agency must comply with its own decisions and regulations once they are adopted. Thus, the terms of a Record of Decision are enforceable by agencies and private parties. A Record of Decision can be used to compel compliance with or execution of the mitigation measures identified therein.

35. **Time Required for the NEPA Process.** How long should the NEPA process take to complete?

A. When an EIS is required, the process obviously will take longer than when an EA is the only document prepared. But the Council's NEPA regulations encourage streamlined review, adoption of deadlines, elimination of duplicative work, eliciting suggested alternatives and other comments early through scoping, cooperation among agencies, and consultation with applicants during project planning. The Council has advised agencies that under the new NEPA regulations even large complex energy projects would require only about 12 months for the completion of the entire EIS process. For most major actions, this period is well within the planning time that is needed in any event, apart from NEPA.

The time required for the preparation of program EISs may be greater. The Council also recognizes that some projects will entail difficult long-term planning and/or the acquisition of certain data which of necessity will require more time for the preparation of the EIS. Indeed, some proposals should be given more time for the thoughtful preparation of an EIS and development of a decision which fulfills NEPA's substantive goals.

For cases in which only an environmental assessment will be prepared, the NEPA process should take no more than 3 months, and in many cases substantially less, as part of the normal analysis and approval process for the action.

36a. **Environmental Assessments (EA).** How long and detailed must an environmental assessment (EA) be?

A. The environmental assessment is a concise public document which has three defined

functions. (1) It briefly provides sufficient evidence and analysis for determining whether to prepare an EIS; (2) it aids an agency's compliance with NEPA when no EIS is necessary, i.e., it helps to identify better alternatives and mitigation measures; and (3) it facilitates preparation of an EIS when one is necessary. *Section 1508.9(a)*.

Since the EA is a concise document, it should not contain long descriptions or detailed data which the agency may have gathered. Rather, it should contain a brief discussion of the need for the proposal, alternatives to the proposal, the environmental impacts of the proposed action and alternatives, and a list of agencies and persons consulted. *Section 1508.9(b)*.

While the regulations do not contain page limits for EA's, the Council has generally advised agencies to keep the length of EAs to not more than approximately 10-15 pages. Some agencies expressly provide page guidelines (e.g., 10-15 pages in the case of the Army Corps). To avoid undue length, the EA may incorporate by reference background data to support its concise discussion of the proposal and relevant issues.

36b. Under what circumstances is a **lengthy EA** appropriate?

A. Agencies should avoid preparing lengthy EAs except in unusual cases, where a proposal is so complex that a concise document cannot meet the goals of Section 1508.9 and where it is extremely difficult to determine whether the proposal could have significant environmental effects. In most cases, however, a lengthy EA indicates that an EIS is needed.

37a. **Findings of No Significant Impact (FONSI).** What is the level of detail of information that must be included in a finding of no significant impact (FONSI)?

A. The FONSI is a document in which the agency briefly explains the reasons why an action will not have a significant effect on the human environment and, therefore, why an EIS will not be prepared. *Section 1508.13*. The finding itself need not be detailed, but must succinctly state the reasons for deciding that the action will have no significant environmental effects, and, if relevant, must show which factors were weighted most heavily in the determination. In addition to this statement, the FONSI must include, summarize, or attach and incorporate by reference, the environmental assessment.

37b. What are the criteria for deciding whether a **FONSI** should be made available for **public review** for 30 days before the agency's final determination whether to prepare an EIS?

A. Public review is necessary, for example, (a) if the proposal is a borderline case, i.e., when there is a reasonable argument for preparation of an EIS; (b) if it is an unusual case, a new kind of action, or a precedent setting case such as a first intrusion of even a minor development into a pristine area; (c) when there is either scientific or public controversy over the proposal; or (d) when it involves a proposal which is or is closely similar to one which normally requires preparation of an EIS. *Sections 1501.4(e)(2), 1508.27*. Agencies also must allow a period of public review of the FONSI if the proposed action would be located in a floodplain or wetland. E.O. 11988, Sec. 2(a)(4); E.O. 11990, Sec. 2(b).

38. **Public Availability of EAs v. FONSIs.** Must (EAs) and FONSIs be made public? If so,

how should this be done?

A. Yes, they must be available to the public. Section 1506.6 requires agencies to involve the public in implementing their NEPA procedures, and this includes public involvement in the preparation of EAs and FONSIs. These are public "environmental documents" under Section 1506.6(b), and, therefore, agencies must give public notice of their availability. A combination of methods may be used to give notice, and the methods should be tailored to the needs of particular cases. Thus, a Federal Register notice of availability of the documents, coupled with notices in national publications and mailed to interested national groups might be appropriate for proposals that are national in scope. Local newspaper notices may be more appropriate for regional or site-specific proposals.

The objective, however, is to notify all interested or affected parties. If this is not being achieved, then the methods should be reevaluated and changed. Repeated failure to reach the interested or affected public would be interpreted as a violation of the regulations.

39. **Mitigation Measures Imposed in EAs and FONSIs.** Can an EA and FONSI be used to impose enforceable mitigation measures, monitoring programs, or other requirements, even though there is no requirement in the regulations in such cases for a formal Record of Decision?

A. Yes. In cases where an environmental assessment is the appropriate environmental document, there still may be mitigation measures or alternatives that would be desirable to consider and adopt even though the impacts of the proposal will not be "significant." In such cases, the EA should include a discussion of these measures or alternatives to "assist [46 FR 18038] agency planning and decisionmaking" and to "aid an agency's compliance with [NEPA] when no environmental impact statement is necessary." *Section 1501.3(b), 1508.9(a)(2).* The appropriate mitigation measures can be imposed as enforceable permit conditions, or adopted as part of the agency final decision in the same manner mitigation measures are adopted in the formal Record of Decision that is required in EIS cases.

40. **Propriety of Issuing EA When Mitigation Reduces Impacts.** If an environmental assessment indicates that the environmental effects of a proposal are significant but that, with mitigation, those effects may be reduced to less than significant levels, may the agency make a finding of no significant impact rather than prepare an EIS? Is that a legitimate function of an EA and scoping?

[**N.B.:** Courts have disagreed with CEQ's position in Question 40. The 1987-88 CEQ Annual Report stated that CEQ intended to issue additional guidance on this topic. Ed. note.]

A. Mitigation measures may be relied upon to make a finding of no significant impact only if they are imposed by statute or regulation, or submitted by an applicant or agency as part of the original proposal. As a general rule, the regulations contemplate that agencies should use a broad approach in defining significance and should not rely on the possibility of mitigation as an excuse to avoid the EIS requirement. *Sections 1508.8, 1508.27.*

If a proposal appears to have adverse effects which would be significant, and certain

mitigation measures are then developed during the scoping or EA stages, the existence of such possible mitigation does not obviate the need for an EIS. Therefore, if scoping or the EA identifies certain mitigation possibilities without altering the nature of the overall proposal itself, the agency should continue the EIS process and submit the proposal, and the potential mitigation, for public and agency review and comment. This is essential to ensure that the final decision is based on all the relevant factors and that the full NEPA process will result in enforceable mitigation measures through the Record of Decision.

In some instances, where the proposal itself so integrates mitigation from the beginning that it is impossible to define the proposal without including the mitigation, the agency may then rely on the mitigation measures in determining that the overall effects would not be significant (e.g., where an application for a permit for a small hydro dam is based on a binding commitment to build fish ladders, to permit adequate down stream flow, and to replace any lost wetlands, wildlife habitat and recreational potential). In those instances, agencies should make the FONSI and EA available for 30 days of public comment before taking action. *Section 1501.4(e)(2).*

Similarly, scoping may result in a redefinition of the entire project, as a result of mitigation proposals. In that case, the agency may alter its previous decision to do an EIS, as long as the agency or applicant resubmits the entire proposal and the EA and FONSI are available for 30 days of review and comment. One example of this would be where the size and location of a proposed industrial park are changed to avoid affecting a nearby wetland area.

## ENDNOTES

The first endnote appeared in the original Federal Register. The other endnotes are for information only.

1. References throughout the document are to the Council on Environmental Quality's Regulations For Implementing The Procedural Provisions of the National Environmental Policy Act. 40 CFR Parts 1500-1508.
2. [46 FR 18027] indicates that the subsequent text may be cited to 48 Fed. Reg. 18027 (1981). Ed Note.
3. Q20 Worst Case Analysis was withdrawn by final rule issued at 51 Fed. Reg. 15618 (Apr. 25. 1986); textual errors corrected 51 F.R. p. 16,846 (May 7, 1986). The preamble to this rule is published at ELR Admin. Mat. 35055.

Exhibit 9 to Declaration of Amy Coyle



EXECUTIVE OFFICE OF THE PRESIDENT

COUNCIL ON ENVIRONMENTAL QUALITY

WASHINGTON, D.C. 20503

June 12, 2020

**ENVIRONMENTAL IMPACT STATEMENT TIMELINES (2010-2018)**

This document presents information on the time that Federal agencies took to complete environmental impact statements (EISs) pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4347, and related records of decision (RODs) between 2010 and 2018. This report serves as an update to the December 2018 CEQ report on the timelines of EISs that were issued from 2010 – 2017.[i] The information provided below includes figures reflecting the length of time from issuance of a notice of intent (NOI) to prepare an EIS through publication of a draft and final EIS and publication of a ROD, as well as a summary of well-known factors that may affect the timelines presented.

## <u>OVERVIEW</u>

To determine the time required for Federal agencies to complete EISs prepared pursuant to NEPA, the Council on Environmental Quality (CEQ) reviewed data from the following publicly available sources: (1) the Environmental Protection Agency's EIS Database;[ii] (2) the Federal Register;[iii] and (3) agency and project websites. The information provided in this document is based on 1,276 EISs for which a notice of availability of a final EIS was published between January 1, 2010, and December 31, 2018, and a ROD was issued by June 18, 2019.[iv] This represents 115 additional EISs with RODs compared to the 2018 Report. The data presented does not include final EISs published during the 2010-2018 period for which a ROD was still in preparation, on hold, or not planned as of June 18, 2019. To access the underlying data for this report, click here.

Based on its review, CEQ found that across all Federal agencies, the average (*i.e.,* mean) EIS completion time (from NOI to ROD) was 4.5 years, unchanged from the 2018 report, and the median was 3.5 years, a decrease of .1 years compared to the 2018 report.[v] One quarter of the EISs took less than 2.2 years (*i.e.*, the 25th percentile), and one quarter took more than 6.0 years (*i.e.*, the 75th percentile); both figures are unchanged from the 2018 report.[vi] The period from publication of an NOI to the notice of availability of the draft EIS took on average 58.4 percent of the total time. Preparing the final EIS, including addressing comments received on the draft EIS, took on average 32.2 percent of the total time. The period from the final EIS to publication of the ROD took on average 9.4 percent of the total time.

CEQ's findings are provided in Figures 1 through 6 below. The findings regarding the length of time for completion of the EIS and issuance of the ROD do not include the additional time that may have been required for pre-NOI activities, or the additional time required for completing a supplemental EIS where one was required. CEQ did not examine all factors specific to individual projects.[vii] In general, the time may depend on the following factors:

- **Variation in scope and complexity:** Even within an agency, EISs may vary widely in technical complexity and other factors that influence the length and timing of the

document. These other factors may include changes in the proposed action, funding, and community concerns. Similarly, EIS processes for large infrastructure projects vary considerably from those associated with rulemakings or land management planning processes that are largely within the control of the lead agency. This document presents Federal Government-wide and agency-specific data but does not subdivide EISs by sector or type. The distribution of EIS completion times in Figure 1 indicates that there may be factors that cause some reviews to take much longer than is typical. This report does not attempt to identify those factors or to measure their effect on review times.

- **Pre-NOI activity:** Use of the NOI publication date as the starting point of the EIS timeline may not accurately represent the beginning of the environmental review process. The CEQ NEPA regulations state that an agency shall publish an NOI "[a]s soon as practicable" after its decision to prepare an EIS.[viii] The extent of preparatory work done before issuing an NOI varies significantly among agencies and even among EISs within agencies. Some agencies publish an NOI only after considerable internal scoping, initial consultations with key participants in the NEPA process, gathering of needed environmental data, and pre-application procedures. Some NEPA reviews also take place under procedures that require an applicant to supply considerable environmental information or to obtain other agency approvals before formally starting the EIS process and issuing an NOI.[ix] Substantial pre-NOI activity may decrease the NOI to ROD timeline reflected in this document. However, this document does not provide the length of time associated with pre-NOI activity nor does it consider the effect of that time and preparatory work on the rest of the review.

- **Delays or Suspensions in EIS Activity:** For some EISs, the timeline does not represent continuous activity. Delays may be attributable to the agency, the applicant, Congress, the needs of cooperating agencies, States, Tribes, and local interests, or public controversy. Delays may occur during the preparation of the EIS or in the issuance of a ROD, and while agencies may announce a suspension and restart, they do not consistently announce that work on an EIS has been suspended. Consequently, CEQ did not adjust timeframes to account for delays or suspensions. This document does not identify the causes of delay for any EISs included in the data or adjust the timelines where the delay is attributable to circumstances beyond the control of the agency (e.g., changes in priority, resources, or project funding).

- **Cooperating and Co-Lead Agencies:** The data presented here identify each EIS and its timeline with a single lead agency. While the EIS may also involve other cooperating or co-lead agencies participating in the EIS process, for purposes of this data collection effort, only one agency is listed. This does not affect the government-wide characterization of EIS timelines, but could increase or decrease the average and median times reported for individual agencies to complete the EIS process since the time to complete a particular EIS is only attributed to the lead agency.

- **FEISs with No ROD:** The NEPA process is intended to inform agency decision-making. However, in some cases, an agency prepares an EIS but does not issue a decision, or had not yet issued a decision at the time data for the report was collected. This occurred for

118 EISs within the data reviewed in this report. Based on the data collected, these 118 EISs took an average of 4.5 years from NOI to FEIS. EISs that have not resulted in a ROD, including legislative EISs prepared pursuant to 40 C.F.R. 1506.8, are not further discussed.

- **Revised EISs:** Agencies occasionally prepare what they describe as revised versions of a draft EIS or a final EIS. This occurred 70 times at the draft EIS stage and 6 times at the final EIS stage. For purposes of the data presented here, the initial EIS dates were used.

- **Supplemental EISs:** The timelines presented here do not include the time required to develop supplemental EISs. From 2010 to 2018, supplemental final EISs were issued for 173 actions. Supplemental EISs sometimes lacked NOIs, making timeline calculation difficult, and these supplements were prepared for a broad range of purposes across departments and agencies.

- **Adoptions:** Agencies may adopt another agency's EIS pursuant to 40 C.F.R. 1506.3. This was done 67 times from 2010 to 2018. The timelines presented here do not include adoptions.

**Figure 1**



**Figure 2**



The number of Final EISs published each year, for which a ROD has been issued, is shown at the top of each bar.

**Figure 3**



The number of Final EISs published, for which a ROD has been issued, is shown at the top of each bar.

**Figure 4**



**Figure 5: Agency Average Completion Times 2010 – 2018 (in years)[x]**

| Agency | EISs Completed | Average NOI to Draft | Average Draft to Final | Average Final to ROD | Average NOI to ROD |
|---|---|---|---|---|---|
| **Department of Agriculture (USDA)** | 1 | 2.80 | 0.38 | 0.09 | 3.27 |
| Agricultural Research Service (ARS) | 1 | 0.57 | 5.98 | 0.95 | 7.5 |
| Animal and Plant Health Inspection Service (APHIS) | 9 | 1.41 | 1 | 0.18 | 2.59 |
| Farm Service Agency (FSA) | 2 | 0.96 | 0.68 | 0.17 | 1.81 |
| Natural Resources Conservation Service (NRCS) | 3 | 0.96 | 0.68 | 0.17 | 1.81 |
| Rural Utilities Service (RUS) | 4 | 1.77 | 0.82 | 0.60 | 3.18 |
| United States Forest Service (USFS) | 299 | 1.80 | 1.28 | 0.24 | 3.31 |

| | | | | | |
|---|---|---|---|---|---|
| **Department of Commerce (DOC)** | | | | | |
| First Responder Network Authority (FirstNet) | 5 | 1.66 | 1.13 | 0.15 | 2.94 |
| National Oceanic and Atmospheric Administration (NOAA) | 54 | 2.11 | 1.22 | 0.26 | 3.59 |

| | | | | | |
|---|---|---|---|---|---|
| **Department of Defense (DOD)** | | | | | |
| National Geospatial-Intelligence Agency (NGA) | 1 | 0.91 | 0.48 | 0.17 | 1.56 |
| National Security Agency (NSA) | 2 | 1.27 | 0.46 | 0.17 | 1.90 |
| United States Air Force (USAF) | 22 | 1.26 | 1.49 | 0.29 | 3.04 |
| United States Army (USA) | 18 | 1.33 | 1.16 | 0.43 | 2.92 |
| United States Army Corps of Engineers (USACE) | 111 | 4.08 | 1.31 | 0.65 | 6.04 |
| United States Marine Corps (USMC) | 10 | 2.46 | 1.09 | 0.25 | 3.80 |
| United States Navy (USN) | 27 | 2.28 | 1.46 | 0.33 | 4.07 |

| | | | | | |
|---|---|---|---|---|---|
| **Department of Energy (DOE)** | 16 | 1.98 | 1.80 | 0.37 | 4.16 |
| Bonneville Power Administration (BPA) | 8 | 1.54 | 1.22 | 0.66 | 3.41 |
| Western Area Power Administration (WAPA) | 11 | 1.95 | 1.23 | 0.35 | 3.53 |

| Agency | EISs Completed | Average NOI to Draft | Average Draft to Final | Average Final to ROD | Average NOI to ROD |
|---|---|---|---|---|---|
| National Nuclear Security Administration (NNSA) | 2 | 2.97 | 1.46 | 1.12 | 5.54 |

| Agency | EISs Completed | Average NOI to Draft | Average Draft to Final | Average Final to ROD | Average NOI to ROD |
|---|---|---|---|---|---|
| **Department of Health and Human Services (HHS)** | | | | | |
| Centers for Disease Control and Prevention (CDC) | 2 | 0.84 | 0.53 | 0.19 | 1.55 |
| Food and Drug Administration (FDA) | 1 | 1.41 | 0.86 | 0.00 | 2.27 |
| National Institutes of Health (NIH) | 4 | 1.16 | 0.71 | 0.16 | 2.04 |

| Agency | EISs Completed | Average NOI to Draft | Average Draft to Final | Average Final to ROD | Average NOI to ROD |
|---|---|---|---|---|---|
| **Department of Homeland Security (DHS)** | | | | | |
| Customs and Border Protection (CBP) | 1 | 0.94 | 0.86 | 0.71 | 2.51 |
| Federal Emergency Management Agency (FEMA) | 3 | 2.95 | 0.86 | 0.30 | 4.11 |
| United States Coast Guard (USCG) | 5 | 3.23 | 1.15 | 0.29 | 4.67 |

| Agency | EISs Completed | Average NOI to Draft | Average Draft to Final | Average Final to ROD | Average NOI to ROD |
|---|---|---|---|---|---|
| **Department of Housing and Urban Development (HUD)** | 9 | 1.38 | 0.58 | 0.38 | 2.34 |

| Agency | EISs Completed | Average NOI to Draft | Average Draft to Final | Average Final to ROD | Average NOI to ROD |
|---|---|---|---|---|---|
| **Department of the Interior (DOI)** | 2 | 2.24 | 0.83 | 0.19 | 3.26 |
| Bureau of Indian Affairs (BIA) | 15 | 1.95 | 2.16 | 1.26 | 5.36 |
| Bureau of Land Management (BLM) | 143 | 2.42 | 1.45 | 0.50 | 4.36 |
| Bureau of Ocean Energy Management (BOEM) | 16 | 0.98 | 0.67 | 0.36 | 2.01 |
| Bureau of Reclamation (BR) | 35 | 3.20 | 1.20 | 0.92 | 5.32 |
| National Park Service (NPS) | 88 | 4.58 | 1.67 | 0.39 | 6.64 |
| Office of Surface Mining Reclamation and Enforcement (OSMRE) | 4 | 4 | 1.05 | 0.24 | 5.29 |
| United States Fish and Wildlife Service (USFWS) | 49 | 3.10 | 1.22 | 0.43 | 4.75 |

| Agency | EISs Completed | Average NOI to Draft | Average Draft to Final | Average Final to ROD | Average NOI to ROD |
|---|---|---|---|---|---|
| **Department of Justice (DOJ)** | | | | | |
| Federal Bureau of Prisons (BOP) | 2 | 0.44 | 0.25 | 0.13 | 0.82 |
| **Department of State (DOS)** | 1 | 1.52 | 0.29 | 0.61 | 2.42 |
| **Department of Transportation (DOT)** | | | | | |
| Federal Aviation Administration (FAA) | 9 | 5.09 | 1.69 | 0.34 | 7.12 |
| Federal Highway Administration (FHWA) | 124 | 4.16 | 2.79 | 0.42 | 7.37 |
| Federal Railroad Administration (FRA) | 14 | 3.16 | 1.57 | 0.43 | 5.16 |
| Federal Transit Administration (FTA) | 31 | 3.12 | 1.90 | 0.27 | 5.29 |
| National Highway Traffic Safety Administration (NHTSA) | 4 | 0.59 | 0.72 | 0.08 | 1.39 |
| Surface Transportation Board (STB) [xi] | 3 | 2.48 | 3.41 | 0.47 | 6.36 |
| **Department of Veterans Affairs (VA)** | 3 | 1.30 | 1.46 | 0.30 | 3.06 |
| **Environmental Protection Agency (EPA)** | 3 | 1.83 | 1.12 | 0.55 | 3.50 |
| **Federal Energy Regulatory Commission (FERC)** | 34 | 1.45 | 0.68 | 0.54 | 2.67 |
| **General Services Administration (GSA)** | 6 | 1.65 | 1.31 | 0.18 | 3.14 |
| **U.S. International Boundary & Water Commission (USIBWC)** | 1 | 0.75 | 0.25 | 0.09 | 1.09 |

| Agency | EISs Completed | Average NOI to Draft | Average Draft to Final | Average Final to ROD | Average NOI to ROD |
|---|---|---|---|---|---|
| National Aeronautics and Space Administration (NASA) | 3 | 1.61 | 0.69 | 0.14 | 2.45 |
| National Capital Planning Commission | 1 | 1.82 | 0.42 | 0.13 | 2.38 |
| National Science Foundation (NSF) | 3 | 2.36 | 0.75 | 0.50 | 3.62 |
| Nuclear Regulatory Commission (NRC) | 40 | 1.68 | 0.91 | 1.04 | 3.64 |
| Tennessee Valley Authority (TVA) | 11 | 1.17 | 0.52 | 0.30 | 2.00 |

**Figure 6: Agency Median Completion Times 2010 – 2018 (in years)**

| Agency | EISs Completed | Median NOI to Draft | Median Draft to Final | Median Final to ROD | Median NOI to ROD |
|---|---|---|---|---|---|
| **Department of Agriculture (USDA)** | 1 | 2.80 | 0.38 | 0.09 | 3.27 |
| Agricultural Research Service | 1 | 0.57 | 5.98 | 0.95 | 7.50 |
| Animal and Plant Health Inspection Service (APHIS) | 9 | 1.57 | 0.5 | 0.11 | 2.25 |
| Farm Service Agency (FSA) | 2 | 0.96 | 0.68 | 0.17 | 1.81 |
| Natural Resources Conservation Service (NRCS) | 3 | 0.78 | 0.29 | 0.1 | 1.81 |
| Rural Utilities Service (RUS) | 4 | 1.72 | 0.62 | 0.40 | 3.26 |
| United States Forest Service (USFS) | 299 | 1.41 | 0.92 | 0.11 | 2.88 |
| | | | | | |
| **Department of Commerce (DOC)** | | | | | |
| First Responder Network Authority (FirstNet) | 5 | 1.75 | 1.05 | 0.13 | 2.93 |
| National Oceanic and Atmospheric Administration (NOAA) | 54 | 1.65 | 0.63 | 0.17 | 2.79 |
| | | | | | |
| **Department of Defense (DOD)** | | | | | |
| National Geospatial-Intelligence Agency (NGA) | 1 | 0.91 | 0.48 | 0.17 | 1.56 |
| National Security Agency (NSA) | 2 | 1.27 | 0.46 | 0.17 | 1.90 |
| United States Air Force (USAF) | 22 | 0.85 | 0.80 | 0.19 | 2.43 |
| United States Army (USA) | 18 | 1.05 | 0.90 | 0.27 | 2.32 |
| United States Army Corps of Engineers (USACE) | 111 | 3.16 | 0.98 | 0.48 | 5.30 |
| United States Marine Corps (USMC) | 10 | 1.63 | 0.71 | 0.14 | 2.98 |
| United States Navy (USN) | 27 | 1.84 | 1.27 | 0.19 | 3.47 |
| | | | | | |
| **Department of Energy (DOE)** | 16 | 1.65 | 0.84 | 0.22 | 2.69 |
| Bonneville Power Administration (BPA) | 8 | 1.43 | 0.70 | 0.19 | 2.70 |
| Western Area Power Administration (WAPA) | 11 | 1.65 | 0.82 | 0.28 | 3.03 |
| National Nuclear Security Administration (NNSA) | 2 | 2.97 | 1.46 | 1.12 | 5.54 |
| | | | | | |
| **Department of Health and Human Services (HHS)** | | | | | |
| Centers for Disease Control and Prevention (CDC) | 2 | 0.84 | 0.53 | 0.19 | 1.55 |

12

| Agency | EISs Completed | Median NOI to Draft | Median Draft to Final | Median Final to ROD | Median NOI to ROD |
|---|---|---|---|---|---|
| Food and Drug Administration (FDA) | 1 | 1.41 | 0.86 | 0.00 | 2.27 |
| National Institutes of Health (NIH) | 4 | 0.96 | 0.78 | 0.16 | 2.04 |

| **Department of Homeland Security (DHS)** | | | | | |
|---|---|---|---|---|---|
| Customs and Border Protection (CBP) | 1 | 0.94 | 0.86 | 0.71 | 2.51 |
| Federal Emergency Management Agency (FEMA) | 3 | 2.90 | 0.58 | 0.23 | 4.72 |
| United States Coast Guard (USCG) | 5 | 2.99 | 0.84 | 0.33 | 4.11 |

| **Department of Housing and Urban Development (HUD)** | 9 | 1.48 | 0.48 | 0.15 | 2.50 |
|---|---|---|---|---|---|

| **Department of the Interior (DOI)** | 2 | 2.24 | 0.83 | 0.19 | 3.26 |
|---|---|---|---|---|---|
| Bureau of Indian Affairs (BIA) | 15 | 2.07 | 1.34 | 1.47 | 5.82 |
| Bureau of Land Management (BLM) | 143 | 1.98 | 1.05 | 0.29 | 3.79 |
| Bureau of Ocean Energy Management (BOEM) | 16 | 0.69 | 0.56 | 0.36 | 1.65 |
| Bureau of Reclamation (BR) | 35 | 2.91 | 1.04 | 0.52 | 4.62 |
| National Park Service (NPS) | 88 | 4.06 | 1.35 | 0.22 | 6.15 |
| Office of Surface Mining Reclamation and Enforcement (OSMRE) | 4 | 4.60 | 1.00 | 0.16 | 5.82 |
| United States Fish and Wildlife Service (USFWS) | 49 | 2.65 | 0.97 | 0.23 | 4.51 |

| **Department of Justice (DOJ)** | | | | | |
|---|---|---|---|---|---|
| Federal Bureau of Prisons (BOP) | 2 | 0.44 | 0.25 | 0.13 | 0.82 |

| **Department of State (DOS)** | 1 | 1.52 | 0.29 | 0.61 | 2.42 |
|---|---|---|---|---|---|

| **Department of Transportation (DOT)** | | | | | |
|---|---|---|---|---|---|
| Federal Aviation Administration (FAA) | 9 | 5.16 | 1.13 | 0.22 | 6.58 |
| Federal Highway Administration (FHWA) | 124 | 3.52 | 1.90 | 0.23 | 6.69 |
| Federal Railroad Administration (FRA) | 14 | 2.58 | 1.06 | 0.22 | 4.83 |
| Federal Transit Administration (FTA) | 31 | 2.21 | 1.55 | 0.23 | 4.18 |
| National Highway Traffic Safety Administration (NHTSA) | 4 | 0.52 | 0.64 | 0.10 | 1.23 |

13

| Agency | EISs Completed | Median NOI to Draft | Median Draft to Final | Median Final to ROD | Median NOI to ROD |
|---|---|---|---|---|---|
| Surface Transportation Board (STB) | 3 | 2.12 | 1.32 | 0.49 | 3.76 |
| Department of Veterans Affairs (VA) | 3 | 1.42 | 1.01 | 0.28 | 2.66 |
| Environmental Protection Agency (EPA) | 3 | 1.88 | 0.71 | 0.40 | 2.78 |
| Federal Energy Regulatory Commission (FERC) | 34 | 1.27 | 0.50 | 0.34 | 2.29 |
| General Services Administration (GSA) | 6 | 1.16 | 1.08 | 0.16 | 3.08 |
| U.S. International Boundary & Water Commission (USIBWC) | 1 | 0.75 | 0.25 | 0.09 | 1.09 |
| National Aeronautics and Space Administration (NASA) | 3 | 1.83 | 0.67 | 0.12 | 2.81 |
| National Capital Planning Commission (NCPC) | 1 | 1.82 | 0.42 | 0.13 | 2.38 |
| Nuclear Regulatory Commission (NRC) | 40 | 1.39 | 0.81 | 0.32 | 2.61 |
| Tennessee Valley Authority (TVA) | 11 | 1.28 | 0.48 | 0.15 | 1.86 |

_____

[i] The 2018 Report can be found here: https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timelines_Report_2018-12-14.pdf.  In updating this report, CEQ has reclassified a small number of projects (between FEIS with RODs, FEIS with no RODs, Supplements, and Adoptions).

[ii] Federal agencies are required to file EISs with the U.S. Environmental Protection Agency (EPA).  40 CFR 1506.9. The EPA database is available at https://cdxnodengn.epa.gov/cdx-enepa-II/public/action/eis/search and includes records of all EISs received by EPA since 1987. The EPA database includes the dates of EPA's publication of a notice of availability of a draft or final EIS, which officially starts a public review period (pursuant to CEQ regulations, a minimum of 45 days for draft and 30 days for final EISs). 40 CFR 1506.10. Under certain authorities, States, Tribes, and units of local government have been granted the authority to conduct NEPA reviews on behalf of Federal agencies (e.g. The Department of Transportation's Surface Transportation Project Delivery Program under 23 U.S.C. § 327 and the Department of Housing and Urban Development's Community Development Block Grant Program under 42 U.S.C. §5304(g)). EISs conducted by non-Federal agencies are included in this report if the Federal agency on whose behalf the EIS was being conducted filed the EIS with the Environmental Protection Agency (EPA).

[iii] Every Federal agency is required to publish an NOI in the Federal Register (FR) to initiate preparation of an EIS. 40 CFR 1501.7. An agency may also announce modification or withdrawal of an NOI through a FR notice, and may publish a ROD (or its notice of availability) in the FR.

[iv] CEQ has compiled these data in a spreadsheet which is available here: https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timelines_2020-6-12.xlsx. CEQ anticipates updating this compilation periodically.

[v] The median is the middle value; half of the measurements are above this value and half are below. The average is the sum of the values divided by the number of values. The 25th percentile means 25 percent of the measurements are below this value and 75 percent are above. The 75th percentile means 75 percent of the measurements are below this value and 25 percent are above.

[vi] The average is affected by "outliers," including two EISs that took, respectively, 21 and 25 years.

[vii] Individual agencies may have more detailed data on their own EIS schedules.

[viii] 40 C.F.R. 1501.7.

[ix] "…agency activities under NEPA are hard to separate from other required environmental analyses under federal laws such as the Endangered Species Act and the Clean Water Act; executive orders; agency guidance; and state and local laws." U.S. Gov't Accountability Office, GAO-14-369, National Environmental Policy Act: Little Information Exists on NEPA Analyses (2014), at 10, https://www.gao.gov/assets/670/662543.pdf.

[x] EISs attributed to Departments in Figures 5 and 6 are conducted at the Departmental level or are otherwise not attributed to a particular bureau, office, or agency within the Department. Figure 3 provides aggregated data for all agencies within a particular Department.

[xi] The Surface Transportation Board Reauthorization Act of 2015 (P.L. 114-110) established the STB as a wholly independent federal agency.  Prior to the Act, the STB was administratively aligned with the U.S. Department of Transportation, although it had been decisionally independent since its establishment in 1996. The projects listed here were completed when the Surface Transportation Board was still administratively aligned with Department of Transportation.

Exhibit 10 to Declaration of Amy Coyle



EXECUTIVE OFFICE OF THE PRESIDENT
COUNCIL ON ENVIRONMENTAL QUALITY
WASHINGTON, DC  20503

June 12, 2020

**LENGTH OF ENVIRONMENTAL IMPACT STATEMENTS (2013-2018)**

This document presents information and statistical analysis on the length, by page count, of environmental impact statements (EISs) prepared by Federal agencies between 2013 and 2018 pursuant to the National Environmental Policy Act (NEPA), 42 U.S.C. §§ 4321-4347. This report serves as an update to the July 2019 CEQ report on the length of EISs that were issued between 2013 – 2017.[i] Based on the available information and analysis, this report summarizes several factors that may influence the page length of EISs.

<u>**OVERVIEW**</u>

To conduct this analysis, the Council on Environmental Quality (CEQ) compiled information on draft and final EISs available on the U.S. Environmental Protection Agency's (EPA) public EIS database, as well as Federal agency and project websites.[ii] CEQ identified 761 actions for which EPA published a notice of availability for a final EIS between January 1, 2013, and December 31, 2018, and for which a record of decision (ROD) was issued by June 18, 2019. For these 761 actions, CEQ was able to obtain the draft and final EISs for 656 actions. This represents 88 additional EISs compared to the 2019 report.

From each of these 656 EISs, CEQ compiled the following information: number of pages in the draft EIS, number of pages in the draft EIS appendices, number of pages in the final EIS, and number of pages in the final EIS appendices.[iii] EIS page count and document length data in this report do not include appendices. To access the underlying data for this report, click here.

Based on its review, CEQ found, across all Federal agencies, that for draft EISs, the average (*i.e.*, mean) document length in this sample was 575 pages, a decrease of 11 pages compared to the 2019 Report, and the median document length was 397 pages, a decrease of 6 pages compared to the 2019 Report. One quarter of the draft EISs were 279 pages or shorter (*i.e.*, the 25th percentile), a decrease of 9 pages from the 2019 report, and one quarter were 621 pages or longer (*i.e.*, the 75th percentile), a decrease of 9 pages from the 2019 Report.

CEQ also found that, for final EISs, the average document length was 661 pages, a decrease of 8 pages compared to the 2019 Report, and the median document length was 447 pages, an increase of 2 pages compared to the 2019 Report. One quarter of the final EISs were 286 pages or shorter (*i.e.*, the 25th percentile), a decrease of 13 pages compared to the 2019 Report, and one quarter were 748 pages or longer (*i.e.*, the 75th percentile), an increase of 19 pages compared to the 2019 Report.

CEQ found that, on average, the change in document length from draft EIS to final EIS was an addition of 86 pages or a 15 percent increase (shown in Figure 3). The median change in document length from draft to final EIS was an addition of 33 pages. One quarter of EISs

increased by up to 6 pages between draft and final EIS (*i.e.*, the 25th percentile), and one quarter increased by 108 pages or more between draft and final EIS (*i.e.*, the 75th percentile).

CEQ's findings are provided in Figures 1 through 4 below. CEQ's NEPA regulations at 40 CFR 1502.7 state that the text of final EISs "shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages."[iv] Of the final EISs in this sample, approximately 7 percent were 150 pages or shorter, and 27 percent were 300 pages or shorter. The skewed distribution of some EIS page counts (shown in Figures 1 and 2) indicates that there may be factors that cause some EISs to be much longer than is typical (*i.e.*, deviation from the average is much greater for the longest documents than the shortest). This report does not attempt to measure the effect of these factors on document length. The page counts compiled for this report include both the text of the EIS and supporting content to which the page limit at 40 CFR 1502.7 does not apply.[v]

In order to better understand actual compliance with the recommended page limits in the CEQ regulations, CEQ analyzed the calendar year 2018 data further. CEQ calculated the page count of the EIS text separately from the supporting content. CEQ found that the average 2018 final EIS text length was 489 pages, and the supporting content averaged 178 pages. For 2018, CEQ found that approximately 19 percent of the EISs were 150 pages or shorter and 51 percent were 300 pages or shorter.

Factors that may affect the length of an EIS are:

- **Variation in Scope and Complexity:** Even within an agency, EISs may vary widely in technical complexity, the number of alternatives studied, the level of detail needed to address potentially significant environmental impacts, and other factors that may influence the length of the document. Examples of such factors include need for information to satisfy non-NEPA requirements,[vi] unprecedented or unique actions for which existing analysis is unavailable for incorporation by reference, and the extent of community and stakeholder interest in a project. This document presents Federal government-wide and agency-specific data, but does not subdivide EISs by sector or project type. This report does not attempt to identify particular factors or to measure their possible effect on EIS length.

- **Variation among Agencies:** CEQ found variation among Federal agencies in draft EIS and final EIS average page count, as shown in Figure 3. This variation may reflect differences in management, oversight, and contracting practices among agencies that could result in lengthier documents. This also reflects whether agencies include responses to comments received on the draft EIS in an appendix to the final EIS (rather than in the text of the final EIS),[vii] whether they include summary comment response documents in the text of the EIS, whether they attach copies of substantive comments to the final EIS,[viii] or whether they use errata sheets for the final EIS (as an alternative to rewriting the draft EIS).[ix] For purposes of this report, CEQ counted the length of comments or comment response documents as part of the final EIS unless they were identified as an appendix.[x] Agency practice may also vary within an agency; however, CEQ did not analyze EIS page length variation within agencies.

- **Multi-agency EISs:** The CEQ NEPA regulations direct agencies to cooperate on the preparation of EISs.[xi] When multiple agencies are involved in the preparation of an EIS, as either co-lead or lead and cooperating agencies, the EIS prepared must satisfy the information needs of each agency's decision-making process. In these cases, the length of the EIS may increase in order to accommodate the level of detail required by each agency's underlying jurisdiction.

- **Potential Legal Challenges:** Agency decisions supported by EISs can be subject to legal challenges under the Administrative Procedure Act. In some instances, the length of EISs may be affected by agency considerations relating to potential future legal challenges.

- **Appendices to Draft and Final EISs:** CEQ's recommended page limits apply only to the text of the final EIS and do not apply to the appendices to the EIS.[xii] Examples of information that agencies may include in an appendix to an EIS are: i) information prepared in connection with an EIS, ii) material that substantiates analysis in the EIS, iii) descriptions of methodologies used in the EIS, and iv) comments received on a draft EIS.[xiii] CEQ found that draft EIS appendices averaged 584 pages in length, with a median of 180 pages. Final EIS appendices averaged 1042 pages in length, with a median of 423 pages. The increase between draft and final appendices for some EISs is attributable to the inclusion of comments on the draft EIS in the final EIS appendices. The large difference between the average and median values for the length of appendices (both draft and final) is the result of a number of unusually long appendix documents.

**Figure 1**



**Figure 2**



**Figure 3**



**Figure 4: Agency Page Counts for Draft and Final EISs (n = 656)**
2013 – 2018

| Agency | EISs Completed | Average Draft EIS Page Count | Median Draft EIS Page Count | Average Final EIS Page Count | Median Final EIS Page Count |
|---|---|---|---|---|---|
| **Department of Agriculture (USDA)** | | | | | |
| Agricultural Research Service | 1 | 232 | 232 | 264 | 264 |
| Animal and Plant Health Inspection Service (APHIS) | 6 | 241 | 254 | 232 | 223 |
| Natural Resources Conservation Service (NRCS) | 1 | 160 | 160 | 166 | 166 |
| Rural Utilities Service (RUS) | 1 | 390 | 390 | 463 | 463 |
| United States Forest Service (USFS) | 161 | 426 | 327 | 486 | 365 |

| Agency | EISs Completed | Average Draft EIS Page Count | Median Draft EIS Page Count | Average Final EIS Page Count | Median Final EIS Page Count |
|---|---|---|---|---|---|
| **Department of Commerce (DOC)** | | | | | |
| First Responder Network Authority (FirstNet) | 4 | 5442 | 5577 | 5654 | 5886 |
| National Oceanic and Atmospheric Administration (NOAA) | 24 | 452 | 333 | 537 | 393 |

| Agency | EISs Completed | Average Draft EIS Page Count | Median Draft EIS Page Count | Average Final EIS Page Count | Median Final EIS Page Count |
|---|---|---|---|---|---|
| **Department of Defense (DOD)** | | | | | |
| National Geospatial-Intelligence Agency (NGA) | 1 | 468 | 468 | 491 | 491 |
| National Security Agency (NSA) | 1 | 262 | 262 | 252 | 252 |

7

| Agency | EISs Completed | Average Draft EIS Page Count | Median Draft EIS Page Count | Average Final EIS Page Count | Median Final EIS Page Count |
|---|---|---|---|---|---|
| United States Air Force (USAF) | 11 | 501 | 464 | 530 | 535 |
| United States Army (USA) | 9 | 389 | 350 | 380 | 374 |
| United States Army Corps of Engineers (USACE) | 61 | 623 | 405 | 740 | 544 |
| United States Marine Corps (USMC) | 3 | 367 | 328 | 389 | 370 |
| United States Navy (USN) | 16 | 944 | 628 | 1069 | 808 |

| **Department of Energy (DOE)** | 10 | 741 | 645 | 803 | 690 |
|---|---|---|---|---|---|
| Bonneville Power Administration (BPA) | 3 | 280 | 224 | 225 | 237 |
| Western Area Power Administration (WAPA) | 5 | 469 | 422 | 516 | 462 |
| National Nuclear Security Administration (NNSA) | 1 | 1111 | 1111 | 1619 | 1619 |

| **Department of Health and Human Services (HHS)** | | | | | |
|---|---|---|---|---|---|
| Centers for Disease Control and Prevention (CDC) | 2 | 502 | 502 | 512 | 512 |
| Food and Drug Administration (FDA) | 1 | 489 | 489 | 538 | 538 |
| National Institutes of Health (NIH) | 2 | 295 | 295 | 296 | 296 |

| Agency | EISs Completed | Average Draft EIS Page Count | Median Draft EIS Page Count | Average Final EIS Page Count | Median Final EIS Page Count |
|---|---|---|---|---|---|
| **Department of Homeland Security (DHS)** | | | | | |
| Federal Emergency Management Agency (FEMA) | 3 | 551 | 620 | 584 | 654 |
| United States Coast Guard (USCG) | 3 | 448 | 491 | 485 | 549 |
| **Department of Housing and Urban Development (HUD)** | 5 | 1134 | 928 | 1513 | 1014 |
| **Department of the Interior (DOI)** | 2 | 1436 | 1436 | 1719 | 1719 |
| Bureau of Indian Affairs (BIA) | 5 | 413 | 361 | 538 | 380 |
| Bureau of Land Management (BLM) | 72 | 764 | 599 | 935 | 840 |
| Bureau of Ocean Energy Management (BOEM) | 12 | 480 | 386 | 614 | 517 |
| Bureau of Reclamation (BR) | 16 | 845 | 555 | 1075 | 628 |
| National Park Service (NPS) | 47 | 440 | 328 | 419 | 330 |
| Office of Surface Mining Reclamation and Enforcement (OSMRE) | 4 | 946 | 930 | 983 | 942 |
| United States Fish and Wildlife Service (USFWS) | 26 | 406 | 342 | 478 | 364 |

| Agency | EISs Completed | Average Draft EIS Page Count | Median Draft EIS Page Count | Average Final EIS Page Count | Median Final EIS Page Count |
|---|---|---|---|---|---|
| **Department of Transportation (DOT)** | | | | | |
| Federal Aviation Administration (FAA) | 4 | 489 | 430 | 589 | 582 |
| Federal Highway Administration (FHWA) | 52 | 494 | 381 | 742 | 437 |
| Federal Railroad Administration (FRA) | 9 | 506 | 416 | 517 | 403 |
| Federal Transit Administration (FTA) | 12 | 1097 | 576 | 557 | 585 |
| National Highway Traffic Safety Administration (NHTSA) | 1 | 694 | 694 | 2497 | 2497 |
| Surface Transportation Board (STB) [xiv] | 1 | 359 | 359 | 127 | 127 |

| | | | | | |
|---|---|---|---|---|---|
| **Department of Veterans Affairs (VA)** | 1 | 320 | 320 | 354 | 354 |

| | | | | | |
|---|---|---|---|---|---|
| **Environmental Protection Agency (EPA)** | 2 | 235 | 235 | 246 | 246 |

| | | | | | |
|---|---|---|---|---|---|
| **Federal Energy Regulatory Commission (FERC)** | 25 | 495 | 450 | 560 | 479 |

| | | | | | |
|---|---|---|---|---|---|
| **General Services Administration (GSA)** | 3 | 276 | 256 | 340 | 342 |

| Agency | EISs Completed | Average Draft EIS Page Count | Median Draft EIS Page Count | Average Final EIS Page Count | Median Final EIS Page Count |
|---|---|---|---|---|---|
| **National Aeronautics and Space Administration (NASA)** | 2 | 241 | 241 | 256 | 256 |
| **National Capital Planning Commission** | 1 | 358 | 358 | 472 | 472 |
| **National Science Foundation (NSF)** | 2 | 271 | 271 | 294 | 294 |
| **Nuclear Regulatory Commission (NRC)** | 17 | 456 | 369 | 479 | 368 |
| **Tennessee Valley Authority (TVA)** | 5 | 700 | 443 | 749 | 570 |

---

i The 2019 Report can be found here: https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Length_Report_2019-7-22.pdf. In updating this report, CEQ has reclassified a small number of projects (between FEIS with RODs, FEIS with no RODs, Supplements, and Adoptions).

ii Federal agencies are required to file EISs with the U.S. Environmental Protection Agency (EPA). 40 CFR 1506.9. The EPA database is available at https://cdxnodengn.epa.gov/cdx-enepa-II/public/action/eis/search and includes records of all EISs received by EPA since 1987. The EPA database includes the dates of EPA's publication of a notice of availability of a draft or final EIS. 40 CFR 1506.10. Under certain authorities, States, Tribes, and units of local government have been granted the authority to conduct NEPA reviews on behalf of Federal agencies (e.g., the Department of Transportation's Surface Transportation Project Delivery Program under 23 U.S.C. § 327 and the Department of Housing and Urban Development's Community Development Block Grant Program under 42 U.S.C. §5304(g)). EISs conducted by non-Federal agencies are included in this report if the Federal agency on whose behalf the EIS was being conducted filed the EIS with the EPA.

iii CEQ's regulation on page limits applies only to certain sections of the final EIS (purpose and need, alternatives, affected environment, and environmental consequences). 40 CFR 1502.7. For the analysis in this report, CEQ calculated the aggregate page counts of the publicly available electronic versions of draft and final EISs, which also include supporting content of the EIS (cover sheet, summary, table of contents, list of preparers, list of agencies, organizations and persons to whom the EIS was sent. 40 CFR 1502.10(a)-(c) and (h)-(j)). In this report, for EISs issued in calendar year 2018, CEQ has calculated page length excluding the supporting content of the EIS, which composes an average of 27% of the total EIS length. CEQ calculated appendices to EISs separately and discusses them later in this report. 40 CFR 1502.10(k).

iv A final EIS includes comments received on the draft EIS and the agency responses to those comments. These comments and responses typically constitute most of the change in page length from draft to final EIS. 40 CFR 1502.10 does not identify where comments and responses should be included in the EIS, and 40 CFR 1502.7 does not count comments and responses against EIS page limits. Agencies typically use one of three approaches for incorporating comments and responses in a final EIS: include them as a chapter in the main volume of the EIS, include them as an appendix, or place them in a separate volume of the EIS (often referred to as a comment-response document).

v As noted above in endnote iii, CEQ's regulations on page limits apply only to the purpose and need, alternatives, affected environment, and environmental consequences sections of an EIS. 40 CFR 1502.7.

vi Consistent with 40 CFR 1502.25 and 1505.1, agencies integrate some EISs with other documents necessary for agency decision-making, such as resource management plans. The practice of integrating EISs with other decision-making documents is intended to improve overall efficiencies, though it may increase the length of those EISs. For instance, NOAA routinely prepares integrated documents under the authority of the Magnuson-Stevens Fishery Conservation and Management Act (e.g., Omnibus Essential Fish Habitat Amendment 2), the Oil Pollution Act (e.g., Deepwater Horizon Oil Spill: Final Programmatic Damage Assessment and Restoration Plan and Final Programmatic Environmental Impact Statement), and the National Marine Sanctuaries Act (e.g., Fagatele Bay National Marine Sanctuary Management Plan and EIS).

vii 40 CFR 1503.4(a).

viii 40 CFR 1503.4(b).

ix Between 2010 and 2017, CEQ identified 107 final EISs or approximately 19 percent that were of equal length or shorter than the preceding draft EIS. Of those, 20 used errata sheets as an alternative to rewriting the draft EIS. CEQ's NEPA regulations state that agencies can attach errata sheets to the draft EIS, in place of rewriting the draft EIS, when changes in response to comments are minor (i.e., factual corrections). 40 CFR 1503.4(c). These 20 errata sheet documents have an average length of 152 pages. (CEQ used the page length of the errata sheet document as the total for the final EIS, and did not add the length of the draft EIS.) CEQ found that errata sheet documents often included copies of stakeholder comments, as well as the agency's response to these comments, in the body of the errata sheet document increasing the length of those documents compared to including those items in an appendix. CEQ did not continue to track errata sheets for calendar year 2018.

x CEQ found that the number of pages between draft and final increased by more than 1,000 pages for 18 EISs and by more than 500 pages for 43 EISs. Many of these large increases are due to comments on the draft EIS and agency responses to those comments being counted as part of the final EIS.

xi 40 CFR 1501.5 and 1501.6.

xii 40 CFR 1502.7.

xiii 40 CFR 1502.18 and 1502.24.

xiv The Surface Transportation Board Reauthorization Act of 2015 (P.L. 114-110) established the STB as a wholly independent federal agency.  Prior to the Act, the STB was administratively aligned with the U.S. Department of Transportation, although it had been decisionally independent since its establishment in 1996. The projects listed here were completed when the Surface Transportation Board was still administratively aligned with Department of Transportation.

Exhibit 11 to Declaration of Amy Coyle

Tab 1, Exhibit 11 to Declaration of Amy Coyle



# SOUTHERN UTE INDIAN TRIBE

February 25, 2020

> Submitted electronically via the *Federal eRulemaking Portal*:
> https://www.regulations.gov

Council on Environmental Quality
730 Jackson Place NW
Washington, D.C. 20503

**Re:** **Docket No. CEQ—2019—0003**
*Update to the Regulations Implementing the Procedural Provisions of the*
*National Environmental Policy Act – Notice of proposed rulemaking*

Dear Sir or Madam:

Thank you for inviting comments on the Council on Environmental Quality's proposal to update its regulations for implementing the procedural provisions of the National Environmental Policy Act. I am submitting these comments on behalf of the Southern Ute Indian Tribe ("Tribe"). As explained below, the Tribe supports CEQ's proposed rulemaking. However, we respectfully urge CEQ to consider refining some aspects of its proposed regulations. In recognition that Indian lands are not public lands, we respectfully ask CEQ to consider adopting separate regulations applicable to federal agency actions on Indian lands. To avoid having to satisfy inconsistent federal agency NEPA requirements in the context of linear projects requiring approval by multiple federal agencies, we also ask that CEQ consider mandating that all federal agencies follow one NEPA handbook or at least clarifying that only the lead agency's requirements must be satisfied.

**The Tribe strongly supports CEQ's proposed rulemaking**

The Tribe strongly supports CEQ's proposed rulemaking. Specifically, the Tribe supports these proposed changes:

1.  Allowing tribal agencies to serve as joint lead agencies to prepare an EA or EIS.

2.  Authorizing and requiring federal agencies to cooperate with tribal agencies to reduce duplication, including through use of joint environmental review documents.

3.  Ensuring consultation with tribes by adding the word "tribal" to the phrase "State and local" throughout the regulations.

4.  Allowing project proponents and consultants to prepare both EAs and EISs, under the direction of an agency.

5.  Requiring agencies to coordinate and prioritizing a single NEPA review consistent with the One Federal Decision policy.

6.  Setting presumptive time limits and page limits.

7.  Streamlining NEPA review by expanding the allowable use of categorical exclusions.

**Changes the Tribe previously recommended and would respectfully ask CEQ to consider again**

On August 20, 2018, the Tribe submitted comments on CEQ's advance notice of proposed rulemaking ("ANPRM"). In its comments on CEQ's ANPRM, the Tribe made six recommendations for improving CEQ's regulations and responded to CEQ's 20 questions. We were pleased to see two of our recommendations and several of our suggestions reflected in CEQ's proposed rulemaking. For your convenience, I am attaching a copy of the Tribe's prior comment letter from Christine Sage (Chairman, Southern Ute Indian Tribal Council) to the Council on Environmental Quality (Aug. 20, 2018) ("Letter").

Below are changes the Tribe recommended in its Letter addressing CEQ's ANPRM, which the Tribe would respectfully ask CEQ to consider before finalizing its proposed rulemaking:

1.  Adopt separate regulations for Indian lands reflecting the fact that Indian tribal lands are not public lands. Letter p. 5.

2.  Limit comment by non-tribal, non-neighbor public. Letter p. 7-8.

3.  Limit the scope of "reasonable alternatives" that must be considered on tribal projects. Letter p. 8.

4.  Afford tribes the opportunity to "638" contract agency NEPA functions. Letter p. 8.

**Other changes the Tribe previously suggested in response to CEQ's 20 questions that the Tribe would respectfully ask CEQ to consider again**

The following are changes not reflected in CEQ's proposed rulemaking that the Tribe previously suggested and that the Tribe respectfully asks CEQ to consider again:

1. Require "Determination of NEPA Adequacy" review process by all agencies. Letter p. 11.

2. Create one NEPA handbook. Letter p. 11-12. As a supplement to this request, the illustration below highlights how allowing federal agencies room to adopt different requirements, albeit within the boundaries of CEQ's rules, increases the time and cost of NEPA compliance for projects that require approval from more than one federal agency. On projects involving multiple agencies, like many of the projects on the Southern Ute Indian Reservation, different federal agency requirements cause confusion and delay, and increase the costs of compliance. For example, the Forest Service, BLM, and BIA all have different requirements regarding the content of environmental assessments, the protocol for archeological surveys, and the public involvement process. The Tribe has found that encouraging agency coordination is not enough. When cooperating agencies are asked to work together in completing the NEPA process, they do not defer to the lead agency's regulations. Instead, the project proponent most often is forced to satisfy each cooperating agency's requirements. For this reason, we respectfully ask CEQ to establish one set of consistent NEPA requirements applicable to all agencies.



3. Use of a CE will apply if the action was subject to a NEPA analysis within 5 years. Letter p. 12.

4. Standardize the public participation process among federal agencies. Letter p. 13-14.

5.  Clarify that the only alternatives an agency must consider are the tribal supported action and the no action alternative. Letter p. 16.

6.  Clarify there is no requirement to identify and evaluate impacts to fee land portions of linear projects. Letter p. 18-19.

7.  Clarify how agencies must communicate mitigation measures to the project proponent. Letter p. 19.

**Potential Concerns with Aspects of CEQ's proposed rulemaking**

Although the Tribe strongly supports CEQ's proposed rulemaking, the Tribe is also aware of potential concerns that may arise regarding the proposed rulemaking:

1.  If finalized, CEQ's time limits will put more time pressure on federal employees. In the Tribe's experience, the Bureau of Indian Affairs already lacks the resources to fulfill its NEPA compliance obligations. In the absence of increases in the budget or staffing local BIA agencies and regional offices, the BIA will be hard pressed to review project proponents' environmental assessments in one year and environmental impact statements in two years.

2.  Some federal agencies may lack the personnel with the experience and knowledge needed to review and take responsibility for EAs and EISs that are prepared by project proponents. If the federal agency lacks the necessary experience and expertise and, if tribes lack the staffing or expertise to be involved in the NEPA process and to develop appropriate mitigation measures, allowing applicants and contractors to prepare environmental documents could negatively impact tribal resources.

3.  CEQ's proposal to clarify that agencies should use reliable existing information and resources and are not required to undertake new scientific and technical research to inform their analyses could be problematic in some areas of Indian country. Sometimes, when there is little existing information about tribal resources, new scientific studies might be advisable to determine the extent of a proposed action's potential impacts.

4.  In many instances, thirty days, as set forth in proposed § 1503.1(b), is too short of a window for reviewing and commenting on an EIS.

5.  Revising the definition of "effects" leads to a less rigorous analysis. "Indirect," "direct," and "cumulative" are useful terms in evaluating effects. Removing those terms would likely lead to poorer, less thoughtful, analyses. For example, eliminating the requirement to consider cumulative impacts could be especially problematic in the energy industry, as individual projects never have a "significant impact" but, cumulatively, energy development can have a significant impact. Flying over an oil and gas field, it is easy to see that,

although an individual well pad might not have a significant impact, several thousand wells in a developed field, cumulatively, have an impact.

Indian tribes share many resources with their neighbors, such as water, air, and wildlife. Tribes are always upstream or downstream of proposed federal actions. The interconnectedness of the resources makes an evaluation of cumulative impacts especially important.

6.    Indian tribes are greatly impacted by climate change, as they have limited lands and resources. Removing the requirement to study Green House Gas emissions and climate change, therefore, could disadvantage tribes.

**Conclusion**

The Tribe has long advocated for many of the changes that CEQ is proposing to its regulations. The Tribe appreciates CEQ's efforts to modernize and clarify the regulations to facilitate more efficient, effective, and timely NEPA reviews by federal agencies in connection with proposals for agency action. If finalized, we believe CEQ's proposed changes will accomplish those objectives.

Sincerely,

Christine Sage, Chairman
Southern Ute Indian Tribal Council

Tab 2, Exhibit 11 to Declaration of Amy Coyle



## Comment from Yueling Li,

The is a Comment on the **Council on Environmental Quality** (CEQ) Proposed Rule: <u>Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act</u>

For related information, <u>Open Docket Folder</u> 🔃

---

### Comment

Overall, I'd like to see that updating.

One of my friends who major in commercial told me, if even young high school students are crowded into the stock market, then the bubble is too much. Similarly, when sophisticated consultants/planners are complaining about NEPA requires too much paperwork that leads to project delays, it's the right time to update it. The Supreme Court has made clear that NEPA is a procedural statute, which means that it requires agencies to undertake analyses of the environmental impact of their proposals and actions rather than mandate specific results. If we focus on the inherent goal of the regulation updating, as well as the main complaining aspect of the current regulation, it's obvious to conclude that people need efficiency. The framework in my mind tells me that there are two ways to reach that goal.

Firstly, to reduce unnecessary delays, unusual scope, and complexity. The regulation updating aims at modernizing, simplifying and accelerating the NEPA process by setting page limits as well as time limits. Besides, it requires joint schedules when it's appropriate. In case it takes too much time for multiple agencies to get involved, strengthening the role of the lead agency is necessary.

Secondly, to improve efficiency. No matter when I'm doing errands, presentation or literature reviews, I always get a long list at first, but then decide to focus on the most important five points in case that the audience or myself get bored easily. Less is more. If terms, application and scope of NEPA review are clarified within the page or time limit, then it is reasonably effective. However, I think that agencies still should try their best to summarize all alternatives, analyses and information rather than deliberately or unintentionally ignoring some options. Personally, a parallel effort would be far more helpful than just wait. I am super supportive for that certain activities should be able to proceed while environmental reviews are pending even though there is a chance those activities might be subject to the reviews later. Public outreach can be one way to expand information sharing and enhance involvement to educate the public to show cares about environment planning. Allowing agencies to use flexible public participation techniques is necessary or the public participation might become a "have to do".

---

**ID:** CEQ-2019-0003-104673

**Tracking Number:** 1k4-9fe2-c1xu

### Document Information

**Date Posted:**
Mar 10, 2020

**RIN:**
0331-AA03

**Show More Details** 🗗

### Submitter Information

**Submitter Name:**
Yueling Li

Tab 3, Exhibit 11 to Declaration of Amy Coyle



Submitted Electronically to Federal eRulemaking Portal at:

*https://www.regulations.gov*
**Docket ID: CEQ-2019-0003-0001**

March 5, 2020

Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

ATTN:      Mr. Edward A. Boling, Associate Director for the National Environmental Policy
                Act and Ms. Viktoria Z. Seale, Chief of Staff and General Counsel

**RE:    Docket ID: CEQ-2019-0003-0001: Council on Environmental Quality's Proposed
        Update to the Regulations Implementing the Procedural Provisions of the National
        Environmental Policy Act**

Dear Mr. Boling and Ms. Seale:

**I.      Introduction**

The Women's Mining Coalition (WMC) strongly supports the Council on Environmental
Quality's (CEQ's) proposed rule[1] to update the regulations implementing the procedural
provisions of the National Environmental Policy Act (NEPA) at 40 CFR Parts 1500 – 1508. We
applaud the CEQ for recognizing the urgent need to update these regulations, which were
promulgated over 40 years ago.

In August 2018, WMC provided extensive comments on CEQ's Advance Notice of Proposed
Rulemaking (ANPR), Federal Register Vol. 83, Number 119, Pages 28591 – 28592 seeking
comments to update NEPA implementation procedures. We are pleased that the updated
regulations address some of the issues we raised in our comments on the ANPR.

The comments offered herein are based on WMC members' extensive NEPA experience starting
in the 1980s in conjunction with mineral exploration and development projects on public lands
administered by the U.S. Bureau of Land Management (BLM) and the U.S. Forest Service (USFS).
WMC members also have experience with NEPA documents prepared by the U.S. Army Corps of

---

[1]Federal Register, Volume 85, Number 7 (FR 1684 – 1730), January 10, 2020

Engineers (Corps) to evaluate 404 permit applications under the Clean Water Act at coal mining operations in various locations on and off of public lands. Based on this experience, WMC members have firsthand knowledge of the costs, complexities, delays, and uncertainties associated with the NEPA process and preparing NEPA documents.

Enacted in 1969, NEPA was one of the nation's first federal environmental laws. At that time, NEPA provided an important and unique opportunity for the public to review and comment upon projects that had the potential to affect the environment. In the 51 years since NEPA's enactment, Congress and state legislatures have passed and amended numerous environmental protection statutes. CEQ's proposed changes to its NEPA regulations appropriately reflect that today's environmental protection laws and regulations fill the environmental review and protection gap that NEPA sought to fill in 1969. Consequently, CEQ's proposed changes to its NEPA regulations are a much-needed and long overdue update in light of the many post-NEPA federal and state environmental protection and environmental review statutes.

When they were promulgated in 1978, the laudable goals of the CEQ regulations implementing NEPA were to reduce paperwork and delays and promote better federal decisions. Unfortunately, over four decades of administrative practices and judicial decisions have transformed these well-meaning regulations into a significant barrier that thwarts responsible development and chills investment. Consequently, the current regulations make the U.S. uncompetitive compared to countries like Canada that have more streamlined and predictable permitting processes.

Over the course of our experience with the NEPA process, WMC members have seen NEPA documents balloon in size and complexity, take much more time to complete, and cost much more to prepare. This is the exact opposite of the trend that should have occurred given the enactment of numerous federal and state environmental protection and review statutes since 1970.

WMC is specifically concerned about the way in which the currently unwieldy NEPA process chills investment in the U.S. mineral sector and creates a serious barrier to exploration and development of the nation's domestic mineral resources. We have witnessed the delays, costs, and uncertainties associated with the NEPA process and believe they are a contributing factor in the country's problematic reliance on foreign sources of minerals.

The proposed changes to the CEQ rules will help minimize permitting delays and uncertainties, reduce permitting costs, and remove some of the investment deterrents that currently stand in the way of responsible and timely development of the domestic minerals that are essential to America's economy, technology, infrastructure, and defense. CEQ's proposed changes to its NEPA regulations will be an important step in fulfilling the permit streamlining directive in President Trump's December 2017 Critical Minerals Executive Order ("EO") No. 13817, "Federal Strategy to Ensure Secure and Reliable Supplies of Critical Minerals."

WMC broadly supports all aspects of the CEQ's proposed rule. In the interest of brevity, our comments focus on three elements of the proposed rule: 1) the revised definition of effects at 40 CFR § 1508.1(g); 2) the revised definition of reasonable alternatives at CFR § 1508.1(z); and 3)

the clarification of agency responsibilities and applicant involvement in preparing NEPA documents at CFR § 1506(c).

## II.    Definition of Effects and Impacts

One of the many important proposed changes to the CEQ rules is the revised definition of effects and impacts at 40 CFR § 1508.1(g). The proposed rule simplifies the definition of effects or impacts by eliminating classification of impacts as "indirect," "direct," and "cumulative." WMC strongly supports this simplification, which will greatly improve the clarity and relevance of future NEPA documents by focusing on the actual project impacts that decisionmakers need to consider in their analyses.

Because NEPA does not mention "indirect, direct, or cumulative" impacts, there is no statutory basis for the CEQ rules to require NEPA documents to discuss indirect or cumulative impacts or to classify impacts as direct, indirect, or cumulative. Under the current CEQ regulations, NEPA documents typically include many pages of complex and confusing text discussing indirect and cumulative impacts, which adds little if any meaningful information that federal decisionmakers need to make informed decisions or that the public finds useful. These discussions are one of the reasons that NEPA documents, especially Environmental Impact Statements (EIS), are hundreds and sometimes thousands of pages long. Cumulative impact analyses are also a common focus of NEPA litigation.

The proposed elimination of the requirements to classify impacts and to discuss indirect and cumulative impacts will greatly improve the usefulness, germaneness, and readability of future NEPA documents. In preparing future NEPA documents, federal agencies will be able to devote more time and attention focusing on how a project will directly impact the environment and ways in which to minimize those impacts without expending the time and energy to evaluate abstract, speculative, and extraneous indirect and cumulative impacts. Similarly, the public will benefit by having NEPA documents that focus on how a proposed project may directly impact a specific project area or environmental resources without the lengthy and often theoretical discussions of indirect and cumulative impacts.

This change will appropriately focus NEPA analyses on the actual cause and effects of a proposed project's impact on the environment and will eliminate what are typically long and conjectural discussions that attempt to categorize effects as direct, indirect or cumulative. Discussions of cumulative impacts involving distal projects that are outside of the agency's jurisdiction add no value to NEPA documents. CEQ is therefore justified in its proposal to eliminate the requirements to classify and disclose cumulative impacts.

The clarification at 40 CFR § 1508.1(g)(2) that effects should not be considered significant if they are remote in time, geographically remote, or have a long causal chain is another important provision that will improve the relevance and usefulness of NEPA documents because it will minimize speculative impact analyses. For example, EIS documents for mining projects involving post-mining pit lakes typically include impact analyses that project 100 years or more into the

3

future based on complex groundwater and pit lake water quality models that become inherently uncertain as they are projected far into the future.

It is unrealistic to require federal regulators to examine potential impacts so far into the future or to assume any project stakeholder to predict what the environmental, societal, or economic conditions will be 100 years or more from now. Looking at this issue in the rearview mirror provides some useful perspective. No one living in 1920 could have predicted the many important developments since then such as World War II, the nuclear bomb, landing on the Moon, HIV Aids, society's environmental concerns, or the Internet – just to name a few.

NEPA should not require Federal decisionmakers to be clairvoyants forced to predict impacts that may happen a century or more from now. Therefore, the clarification at 40 CFR § 1508.1(g)(2) to eliminate the requirement to evaluate impacts that may occur in the distant future is a significant and logical change.

## III.    Definition of Reasonable Alternatives

Another proposed change that is especially important to WMC members is the definition of reasonable alternatives at 40 CFR § 1508.1(z) that states a reasonable alternative must be "technically and economically feasible,…, and, where applicable, meet the goals of the applicant." CEQ's statement: "Analyzing a large number of alternatives, particularly where it is clear that only a few alternatives would be economically and technically feasible and realistically implemented by the applicant, can divert limited agency resources[2]," is especially applicable to mining projects. Unlike many projects that involve siting studies and selection of preferred development sites, mineral deposits have fixed locations created by geologic processes and must be mined where they are discovered because mineral deposits cannot be moved. Therefore, the number of alternatives for a mining operation that are technically and economically feasible is typically very limited.

Additionally, at many mineral projects, the range of technically and economically feasible alternative locations for project components such as tailings and waste rock management facilities or processing plants is typically constrained by topography, land ownership patterns, economic and statutory factors.[3] For many mineral projects, alternative mining or processing methods or different locations for project facilities are discussed briefly as alternatives eliminated from detailed analysis. The only alternatives that merit detailed analysis for many mining projects are the project applicant's Proposed Action and the No Action alternative to preserve the *status quo*.

Thus, the requirement to evaluate project alternatives at most mining projects becomes a *pro forma* exercise that adds very little value to the NEPA document and does not meaningfully influence the decisionmaker's ability to make a reasoned choice between alternatives when none or few exist. The proposed clarification to the reasonable alternatives definition will streamline NEPA

---

[2] FR Vol 85 No. 7 at 1702.
[3] Such as the U.S. Mining Law (30 U.S.C. §§ 21a *et seq*), which grants U.S. citizens the right to enter and use public lands for mineral exploration and development.

documents for mineral projects that have few if any viable alternatives without compromising federal agencies' environmental analysis of the project applicant's proposed project and will conserve the agencies' time and resources. It may also help reduce the frequency of NEPA lawsuits that assert the document does not evaluate a sufficient range of project alternatives.

## IV.    Applicant Involvement in the NEPA Process

Finally, WMC wishes to voice our support for the proposed clarifications in the CEQ rules regarding the agency's responsibilities for preparing NEPA documents and an applicant's/project proponent's role in the NEPA process. It is entirely appropriate for applicants and their contractors to prepare EIS documents under the agency's supervision as stated at 40 CFR § 1506(c).

Permit applicants already provide environmental documents that some federal agencies use as the basis for their NEPA documents. For example, the Federal Energy Regulatory Commission (FERC) encourages sponsors of natural gas projects to prepare an Environmental Report.[4] Similarly, permittees seeking a 404 Permit typically submit Environmental Information Documents that the Corps uses to prepare the NEPA document required to evaluate the 404 Permit application. Consequently, clarifying that all federal agencies can authorize an applicant-prepared EIS is consistent with the procedures already in place at some federal agencies.

This clarification accomplishes a number of objectives that are important to both the agency and the applicant. First and foremost, having the applicant or its contractor prepare the NEPA document under the agency's direct supervision ensures that the entity that knows the most about a proposed project can efficiently and accurately contribute its knowledge about the project and the environmental characteristics of the project area. This will result in more accurate NEPA documents. Secondly, applicant-prepared NEPA documents are efficient for both the applicant and the agency and will help conserve agency time and resources.

Because agencies are fully responsible for the scope, content, and environmental analysis in the document, agency decisionmakers retain total control over the outcome of the NEPA environmental analysis and decision-making process because they are the sole decisionmakers. However, applicant-prepared NEPA documents may allow agencies to make NEPA decisions more efficiently and quickly, which will address the pressing problem of protracted NEPA processes that are currently creating substantial delays that increase the country's reliance on foreign minerals, chill investment in the nation's natural resources, prevent timely repairs and improvements to our aging infrastructure, and make the U.S. less competitive compared to other countries.

## V.    Conclusions

As currently administered, NEPA renders the concept of "a shovel-ready project" meaningless because the NEPA analysis required for many projects may take years – even decades – and costs millions of dollars. The CEQ's proposed changes to the regulations implementing NEPA are a

---

[4] https://www.ferc.gov/industries/gas/enviro/guidelines/guidance-manual-volume-1.pdf

long overdue and practical solution to the unintended consequences associated with protracted and expensive NEPA analyses.

The proposed regulatory changes will eliminate much of the unnecessary and counter-productive complexity and length of NEPA documents and achieve the important goal of making NEPA documents easier for the public to read and understand. The updated regulations will help the public and federal decisionmakers focus on key project issues. Most importantly, more focused and concise environmental impact analyses will become the standard for future NEPA documents and will result in better federal decisions and better-informed stakeholders.

WMC supports CEQ's thoughtful and much needed changes to NEPA's implementing regulations at 40 CFR §§ 1500 – 1508. We encourage CEQ to issue a final rule as soon as possible.


Respectfully submitted:


Sara Thorne
WMC President
sthorne@coeur.com

Debra W. Struhsacker
WMC Co-Founder and Director
debra@struhsacker.com


About WMC

*WMC is a grassroots organization with over 200 members nationwide. Our members work in all sectors of the mining industry including hardrock and industrial minerals, coal, energy generation, manufacturing, transportation, and service industries. We hold annual Washington, D.C. Fly-Ins to meet with members of Congress and their staff, and federal land management and regulatory agencies to discuss issues of importance to both the hardrock and coal mining sectors.*

Tab 4, Exhibit 11 to Declaration of Amy Coyle

# Wisconsin County Forests Association

Norman Bickford
President
Burnett County

Joe Waichulis
Vice President
Clark County

Greg Sekela
Treasurer
Oconto County

Al Mans
Director
Marinette County

Myron Brooks
Director
Taylor County

Ed Kelley
Director
Florence County

Bill Schradle
Director
Barron County

Phil Schneider
Director
Rusk County

Romaine Quinn
Director
Washburn County

William Bialecki
Director
Lincoln County

Arnold Schlei
Director
Marathon County

Ed Wafle
Director
Juneau County

Alan VanRaalte
Director
Oneida County

Michael Luedeke
Director-at-Large
Spooner, WI

Henry Schienebeck
Director-at-Large
Rhinelander, WI

Rebekah Luedtke
Executive Director

Gary Zimmer
Asst. Executive Director

March 3, 2020

Council on Environmental Quality
730 Jackson Place NW
Washington, D.C. 20503

Docket #: CEQ-2019-0003

To Whom It May Concern;

The Wisconsin County Forests Association (WCFA) appreciates the opportunity to
provide comments to the Council of Environmental Quality's (CEQ) proposal to update
regulations for implementing the procedural provisions of the National Environmental
Policy Act (NEPA). WCFA represents the forestry interests of 29 counties with lands
enrolled under Wisconsin's County Forest Law (state statutes §28.10 and §28.11).
Collectively our member counties manage over 2.4 million acres of forest lands, the
largest public ownership in the state.  Management activities on the National Forests are
of critical economic and environmental importance to local communities in this region.
Staff from many of our member counties work closely with staff on the nearby
Chequamegon-Nicolet National Forest to continuously address forest management issues
in the Upper Great Lakes Region.

WCFA strongly supports this long overdue review of NEPA regulations including the
proposed changes being made to increase organizational efficiency while still addressing
environmental impacts of proposed actions.  We have been perplexed in the past when
environmental analysis processes on federal forests have taken many years in order to
implement very basic and scientifically sound activities, projects that routinely take very
short times to conduct on neighboring lands.   These unnecessary delays have actually
further exacerbated forest health concerns that should have, and could have, been
addressed quite quickly.  Proposed changes to the regulations, hopefully, will move
management forward at a more effective level.

WCFA also supports reducing the general page lengths of Environmental Impact
Statements and Environmental Assessments, as well as expanding the use of Categorical
Exclusions to conduct restoration activities at a larger scale than previously allowed.  A
true evaluation of any project's impact, especially following sound, scientifically proven
methods, should not require many hundreds if not thousands of pages of documentation.
Federal agencies have well-trained, well-educated, experienced staff very capable of
conducting management activities.  There is little evidence that the size of the NEPA
documentation has truly improved the management occurring on our public lands.

Sincerely,

Norman K. Bickford, President          Rebekah Luedtke, Executive Director

Tab 5, Exhibit 11 to Declaration of Amy Coyle

**ACCF**

AMERICAN COUNCIL FOR CAPITAL FORMATION

Chairman Mary Neumayr

Council on Environmental Quality

730 Jackson Place, NW

Washington, DC  20503

March 9, 2020


Re: CEQ NEPA Regulations, Docket No. **CEQ-2019-0003**

Dear Chairman Neumayr:


The American Council for Capital Formation (ACCF) is a nonprofit, nonpartisan economic policy organization dedicated to the advocacy of pro-growth tax, energy, environmental, regulatory, trade and economic policies that encourage saving and investment. ACCF appreciates the opportunity to provide comment to the Council on Environmental Quality (CEQ) on its proposed modernization of the National Environmental Policy Act (NEPA).


When NEPA was enacted in 1970, it was intended to ensure that federal projects would be evaluated to ensure compliance with existing environmental laws. While NEPA provides important safeguards to ensure federal agencies carefully consider environmental impacts, the process as it stands has become a tangle of bureaucratic red tape for many industries wishing to deliver on new, modernized infrastructure projects. Overly burdensome analytical requirements, broad definitions of reasonable effects or impacts, excessive levels of review and endless opportunities for review and comment have led to significant uncertainty in planning major projects.


Consider that NEPA reviews can so prolong a project that by the time permits have been approved, the project itself may no longer be of sufficient scope to meet its intended needs. The I-70 East expansion project in Denver is a good example. According to Matt Gerard of the Plenary Group, an investment company, "[t]he permit process for that project took over 13 years and it ended up with a document that was almost 16,000 pages in length."[1] As Ed Mortimer of the U.S. Chamber of Commerce said of the project: "If it takes 20 years to get a permit, by the time that project is in construction, the capacity it was meant to handle has already

---

[1] *Denver takes center stage in a national debate over updating environmental policies.* The Denver Channel, February 11, 2020. https://www.thedenverchannel.com/news/360/denver-takes-center-stage-in-a-national-debate-over-updating-environmental-policies

exceeded it."[2] Furthermore, and of great concern to ACCF, long NEPA-related permitting times may exceed financial cycles, meaning that by the time permits are granted for needed infrastructure, the funds – be they public or private – may no longer be available. Consider the potential impact on highway projects, where CEQ notes that 60% of federal highway projects take more than 6 years to complete environmental review.[3]

ACCF is keenly aware that major projects like developing the infrastructure so desperately needed in the U.S. rely on reasonable, fixed schedules and financial predictability to attract the capital needed to bring these projects to fruition. Infrastructure development will have the additional economic benefit of creating millions of jobs and accelerating economic growth and productivity. As such, we support the Administration's proposal to modernize NEPA, which will allow for increased infrastructure investment, while streamlining the permitting process and assuring sound, fact-based environmental reviews, consistently applied across agencies. Further, we offer the following specific comments.

**Time and Page Limits**

Population and economic growth has led to an increased demand for new and updated infrastructure projects to transport goods and people, and enable necessary services in our 21st Century economy, but long wait times and high costs currently associated with permitting often deter businesses from making the capital investments needed to develop modernized infrastructure. Under NEPA, the current average time to complete a review is 4.5 years.[4] Costs can range widely, but in 2003 the Government Accounting Office estimated that environmental impact studies (EIS) alone typically cost as much as $2 million.[5] Costs today will likely be much higher. In fact, in 2016 the Department of Energy estimated that NEPA-related analyses averaged $4.2 million per project.[6] CEQ's proposal would help address these investment-killing delays and costs in part by establishing time and page limits to reports developed in compliance with NEPA requirements.

ACCF supports CEQ's proposal to limit Environmental Assessment reports to 75 pages, to be completed in one year's time, and the proposed 300-page, 2-year limits on Environmental Impact Statements. These time and page limits will be sufficient to complete the technical assessments necessary to make informed decisions

---

[2] *Ibid.*
[3] *Fact Sheet: CEQ's Proposal to Modernize its NEPA Implementing Regulations*. Council on Environmental Quality, January 2020. https://www.whitehouse.gov/wp-content/uploads/2020/01/20200109FINAL-FACT-SHEET-v3-1.pdf
[4] *Fact Sheet: CEQ Report on Environmental Impact Statement Timelines*. Council on Environmental Quality, December 2018. https://ceq.doe.gov/docs/nepa-practice/CEQ_EIS_Timelines_Fact_Sheet_2018-12-14.pdf
[5] *National Environmental Policy Act: Little Information Exists on NEPA Analyses*. GAO, April 2014. https://www.gao.gov/assets/670/662543.pdf
[6] *NEPA Lessons Learned*, US Dept. of Energy, March 1, 2016. https://www.energy.gov/sites/prod/files/2016/03/f30/LLQR-March-2016.pdf

about federal projects going forward with plenty of time and more than adequate detail. These are common-sense measures that will reduce uncertainty for investors and spur infrastructure projects of all types to move forward.

**Scope of NEPA-related Analyses**

When passed, NEPA ensured that existing key environmental standards would be considered prior to approving federal projects. However, as other enforcement statues, like the Clean Water Act and Clean Air Act were passed and updated, NEPA implementation has become more and more complex, adding considerable uncertainty and creating opportunities for misuse. As it stands today, NEPA analyses incorporate an extremely wide scope that leads to inefficiencies and, worse yet, often enable opponents of a project with an easy tool to block new infrastructure projects, even without significant, tangible environmental concerns. NEPA's scope should focus on information essential to the project in question, rather than the theoretical causation chain analysis that we often see now.

Under the current requirements, NEPA analyses are currently overly complex, with the anticipation of litigation in virtually every instance. Analyses therefore must evaluate every possible scenario, regardless of how remote an environmental harm may be. Incorporation of these low-probability, low-impact scenarios in NEPA-related analyses instead provide fodder for project opponents to tie up projects for years over perceived insignificant environmental impacts.

Of particular concern is NEPA's current inclusion of "cumulative" and "indirect" impacts. Inclusion of these overly broad terms leave the appropriate scope of NEPA-related analyses open to interpretation and can breed endless legal challenges. Often these impacts are far outside the agency authority to address and would occur regardless of intervention (i.e., global effects). Inclusion of "cumulative" effects leads to illegitimate opposition to projects that may make de minimis contributions to environmental concerns. "Indirect" effects often must be considered even though they are insignificant, as they are extremely remote or the product of a lengthy causal chain.

Take the Southeast Market Pipelines Project as an example. When fully complete, the Sabal Trail pipeline, the main pipeline in the project, will bring approximately 1 billion cubic feet per day of natural gas from Alabama to Florida, enabling Florida utilities to replace coal plants with cleaner-burning natural gas plants. Although the Federal Energy Regulatory Commission (FERC) approved the project in 2015, the U.S. Court of Appeals remanded the decision back to FERC in 2017 for not considering the downstream emissions from burning of

3

the natural gas that would be transmitted by the pipeline, thus establishing a new precedent under NEPA.[7] This ruling was handed down despite the fact that replacing coal-fired power plants with natural gas could have a net environmental *benefit*, reducing CO2 emissions per kWh of power production by half! FERC commissioners re-approved the project in 2018 along party lines, and construction was resumed, but the precedent to consider downstream impacts – even those not directly associated with the project itself – in NEPA reviews has been established.

Removing these terms as proposed and including straightforward language with clear definitions and procedures will create a higher threshold for NEPA-based challenges and avoid unnecessary litigation, restoring NEPA to its original intent: collecting relevant information to inform federal decision-makers of the direct consequences of proposed actions. By removing the uncertainty of needless litigation, the Administration could again incentivize capital investment in critical infrastructure projects.

 **Definition of a "Major Federal Action"**

Thorough NEPA reviews apply to "major federal actions." That is, proposed projects on federal lands or with at least partial federal funding. This leads to projects that have minimal federal funding or involvement being pulled into the time-consuming NEPA process unnecessarily.

For example, in September 2018, after years of effort to permit drilling operations on private land, two parcels of land in the Wayne National Forest had auctions for their oil and gas leases suspended following a protest by environmental groups, claiming it had not yet complied with NEPA requirements. The affected area included 90% private land, with just 10% federal Forest Service land.[8] Becky Clutter, a volunteer board member of the National Association of Royalty Owners and a property owner in the affected area said "[a]ll of the lease sales had parcel-specific environmental assessments done which stipulated that no surface disruption from drilling be allowed to occur. All drilling will be done on private property. To date, not a single permit to drill has been issued after these lease sales … The situation gets even more convoluted as private landowners are now being told that simply because their private property gets included into a drilling unit that contains federal parcels,

[7] "*How Trump's NEPA overhaul could affect 3 projects*," Climatewire. https://www.eenews.net/stories/1062092145
[8] "*Feds cancel drilling lease auction for Wayne Forest, reigniting fracking debate*," The Athens News. https://www.athensnews.com/news/local/feds-cancel-drilling-lease-auction-for-wayne-forest-reigniting-fracking/article_94914a6a-b45e-11e8-8548-fba1d1b6d1d7.html

4

their private parcels may now be subject to full NEPA (National Environmental Policy Act) review including archeological surveys. We don't think it's right for the government to come in to our private property."[9]

CEQ's proposal would modify the "major federal action" definition to exclude "non-federal projects with minimal federal funding or minimal federal involvement." ACCF supports this common-sense definition that will focus efforts on those projects that are truly significant federal undertakings, and not add uncertainty to projects that are better evaluated outside the scope of NEPA.

**Categorical Exclusions**

The proposal suggests that agencies should have greater authority to provide categorical exclusions for types of projects that "normally do not have a significant effect on the environment." Further, it is proposed that agencies should have the ability to rely upon another agency's categorical exclusion. These again are common-sense approaches to reducing time and effort (and uncertainty) associated with relatively routine projects where there is unlikely to be significant impact

**Deadlines for Comment and Judicial Review**

While not required to do so, agencies will often consider all comments submitted to them regarding a proposed federal action under NEPA – even when they are submitted after a specified deadline. This can lead to unnecessary delays in evaluating projects and uncertainties for project developers. CEQ proposes – and ACCF supports – a firm deadline by which all comments must be received. Comments and objections that are not submitted in a timely fashion would not be considered. This firm deadline will help assure adherence to a reasonable schedule for review and add certainty to the NEPA review process.

Lastly, CEQ proposes limiting judicial review to a Record of Decision (ROD) or other final agency actions. ACCF supports this proposal as another means to streamline the NEPA process and provide greater certainty to project investors.

In conclusion, the changes proposed by CEQ noted above will streamline the NEPA review process, speeding up reviews and reducing uncertainty associated with "major federal actions." As ACCF supporters know quite

---

[9] "*Residents take Wayne National Forest mineral rights fight to D.C.*," The Parkersburg News and Sentinel. https://www.athensnews.com/news/local/feds-cancel-drilling-lease-auction-for-wayne-forest-reigniting-fracking/article_94914a6a-b45e-11e8-8548-fba1d1b6d1d7.html

well, delays regarding schedule, regulatory approvals and judicial reviews are crippling to attracting and maintaining capital investment, which is key to developing the infrastructure our nation so desperately needs, especially energy infrastructure. We therefore urge adoption of the proposed modernization of the NEPA process. Should you have questions or comments regarding ACCF comments, please contact me at (202) 293-5811, or kisakower@accf.org. Sincerely,

Kyle Isakower

Senior Vice President, Regulatory and Energy Policy

American Council for Capital Formation

Tab 6, Exhibit 11 to Declaration of Amy Coyle



March 10, 2020

*Submitted via regulations.gov*
*https://www.regulations.gov*

Council of Environmental Quality
730 Jackson Place NW
Washington, DC 20503

RE:    Comments of National Ski Areas Association on CEQ Notice of Proposed
       Rulemaking

Dear Council on Environmental Quality:

The National Ski Areas Association ("NSAA") submits these comments in response to the
Council on Environmental Quality's January 10, 2020 Notice of Proposed Rulemaking to
modernize and clarify regulations to facilitate a more efficient, effective, and timely NEPA review
process. Please add these comments to the administrative record for the rulemaking.

Interest of NSAA in the Rulemaking

NSAA is the national trade association for ski area owners and operators.  NSAA has 320 ski
area members, accounting for over 90 percent of the skier and snowboarder visits nationwide.
One hundred and twenty-two (122) of these ski area members are located on National Forest
System (NFS) lands and operate under permit pursuant to Ski Area Permit Act of 1986.  These
public land resorts work in partnership with the U.S. Forest Service to deliver an outdoor
recreation experience unmatched in the world. Our longstanding partnership—dating back to
the 1940s, is a model public-private partnership that greatly benefits the American public. The
recreation opportunities provided at public land ski areas provide a boost to rural economies,
improve the health and fitness of millions of Americans of all ages, promote appreciation for the
natural environment, and deliver a return to the U.S. government through fees paid for use of the
land.

NSAA's member resorts have considerable experience as applicants in the NEPA process, and
with the CEQ's implementing regulations.  Actions proposed and implemented at NSAA's
member resorts located on National Forest System lands are frequently the subject of NEPA
documents prepared by or for the Forest Service.  NSAA's member resorts are often the private
proponent of an action on public lands that triggers NEPA and, thus, will be directly affected by
the CEQ's proposal to improve the efficiency of its NEPA implementing regulations.

NSAA filed comments on the ANPR in 2018 in support of CEQ's efforts to ensure a more
efficient, timely, and effective NEPA process consistent with the Act's national environmental
policy.

<u>Comments</u>

<u>Support for an Efficient, Effective and Timely NEPA Process</u>

CEQ's purpose in this NEPA rulemaking proceeding is to revise and modernize its NEPA regulations to facilitate more efficient, effective, and timely NEPA reviews by Federal agencies. NSAA supports increased efficiency in the NEPA process, including greater use of existing studies, analyses and environmental documents, better use of technology, reductions in paperwork, and reductions in delays.  Efficiency becomes even more of a priority in the face of declining agency budgets and staffing.  The combination of underfunded and understaffed agencies and the complexity and expense of the NEPA process and related litigation has made it difficult for businesses of all sizes to plan, finance and develop needed infrastructure.

<u>Tiering and the Use of Existing Studies and Analysis</u>

CEQ proposes a number of revisions in § 1501.11 and other paragraphs to clarify when agencies can use existing studies and environmental analyses in the NEPA process and when agencies would need to supplement such studies and analyses. NSAA supports revisions to CEQ's NEPA regulations that would facilitate increased agency use of environmental studies, analysis, and decisions conducted in earlier environmental reviews or authorization decisions. Such use would make the NEPA process more efficient for all stakeholders and eliminate repetitive discussions of the same issues. NEPA decision making should be based on full recognition of the amount of analysis that has already taken place, and the impacts that have already occurred, on the land at issue. For example, at ski areas, countless studies have been conducted over many decades on the same acres of land. Increased use of existing studies and analyses will reduce duplication, better direct scarce resources, and ultimately result in better decision making.

<u>Support for Page Limits</u>

Environmental documents that are concise can very well serve the purpose of informing decision makers and the public about the significant potential environmental effects of proposed major Federal actions. Although the current regulations define an EA as a (40 CFR 1508.9) as a "concise public document," in reality EAs can be anything but concise.  The newly proposed § 1501.5 (e) would establish a presumptive 75-page limit for EAs, but allow a senior agency official to approve a longer length and establish a new page limit in writing. We agree with this proposed limit, as it will encourage agencies to identify the relevant issues, focus on significant environmental impacts, and prepare concise readable documents that will inform decision makers as well as the public. Simply put, environmental documents that are too long and too complex do not advance the goals of informed decision making or protection of the environment.

We also support CEQ's proposal to reinforce the page limits for EISs set forth in § 1502.7 (150 pages -- or 300 pages for an unusually complex EIS), while allowing a senior agency official to approve a statement exceeding 300 pages when it is useful to the decision-making process. While the length of an EIS will vary based on the complexity and significance of the proposed action and environmental effects, every EIS should be bounded by these practical limits, as doing so will ensure that agencies develop EISs focused on significant effects and useful information, thereby resulting in better decision making.

Support for Time Limits

CEQ is proposing in § 1501.10 (b) to establish a presumptive time limit for EAs of 1 year and a presumptive time limit for EISs of 2 years. CEQ further proposes that a senior agency official may approve in writing a longer time period. These provisions would define the start and end dates of the time period consistent with E.O. 13807, which is helpful. The proposed rule also directs agencies to begin scoping and development of a schedule for timely completion of an EIS *prior* to issuing an NOI and commit to cooperate, communicate, share information, and resolve conflicts that could prevent meeting milestones.  NSAA supports these changes. Because agency capacity, including that of cooperating and participating agencies, is limited, agencies will need to schedule and prioritize their resources accordingly to ensure that these targets are met. Exceptions to both time and page limits should be available, as the proposed rule suggests, given varying circumstances.  However, these exceptions should be rare, as otherwise the limits set in the rule will have no meaning.

Purpose and Need Must Meet Proponent's Goals

NSAA supports CEQ's proposed changes regarding the purpose and need statement, which is itself critical to framing the "reasonable alternatives" to the proposed action to be analyzed. Consistent with CEQ guidance, CEQ is proposing to revise § 1502.13, "Purpose and need," to clarify that the statement should focus on the purpose and need for the proposed action.  CEQ is also advising that this discussion of purpose and need should be concise (typically one or two paragraphs long) *and* that the lead agency is responsible for its definition. Additionally, CEQ proposes to add a sentence to clarify that when an agency is responsible for reviewing applications for authorizations, the agency shall base the purpose and need on the *applicant's goals* and the agency's statutory authority. NSAA wholeheartedly supports these changes.  The framing of the purpose and need statement is critical, as it has an important connection to the development of reasonable alternatives. It is essential that the purpose and need statement meets the project proponent's goals, and that the reasonable alternatives also meet the goals of the applicant, which is addressed further below.

Clarification of Reasonable Alternatives

In § 1502.14 (a), CEQ proposes to delete "all" before "reasonable alternatives" and insert afterward "to the proposed action" to provide clarity on, and narrow down, the alternatives that should be considered in the NEPA process. CEQ has also invited comment on whether the regulations should establish a presumptive maximum number of alternatives for evaluation of a proposed action, or alternatively for certain categories of proposed actions. NSAA supports the direction of these proposed changes.  NEPA itself provides no specific guidance concerning the range of alternatives an agency must consider for each proposal. Section 102(2)(C), provides only that an agency should prepare a detailed statement addressing, among other things, "alternatives to the proposed action." 42 U.S.C. 4332(2)(C).  In our view, NEPA's policy goals are satisfied when an agency analyzes *reasonable* alternatives. The discussion of environmental effects of alternatives need not be exhaustive, and it should be directly tied to the project applicant's goals. This is critical. Only then will the information be sufficient to permit a reasoned choice of alternatives for the agency to evaluate. NSAA is not inclined to pick a presumptive number for the alternatives to be discussed, but instead emphasizes that the limiting factor should be including reasonable alternatives that are directly tied to the project applicant's goals.

3

<u>Greater Role for Project Applicants and Third Party Contractors</u>

NSAA supports CEQ's proposed update to § 1506.5, "Agency responsibility for environmental documents," which would give agencies more flexibility with respect to the preparation of environmental documents, while continuing to require agencies to independently evaluate and take responsibility for those documents.  Allowing applicants and contractors to assume a greater role in contributing information and material to the preparation of environmental documents, subject to the supervision of the agency of course, is a positive improvement to the NEPA process. NSAA member resorts operating on federal government lands often engage third-party contractors to prepare NEPA documents for the federal land manager. As the project proponent, the ski area is the party most knowledgeable about the proposed project and, often, the environment to be affected.  Increasing the role of the proponent and contractor will improve communication between the proponent of a proposal and the officials tasked with evaluating the effects of the action and reasonable alternatives. It will also relieve agencies from some of the burden involved in the NEPA process, improve the quality of NEPA documents, and improve efficiency of the NEPA process.

<u>Consideration of Mitigation of Extraordinary Circumstances with CEs</u>

CEQ is proposing a change through new § 1501.4(b)(1) that would allow agencies to consider whether mitigating circumstances,  such as the design of the proposed action to avoid effects that create extraordinary circumstances, are sufficient to allow a proposed action to still be categorically excluded. The change would clarify that the mere presence of extraordinary circumstances does not preclude the application of a CE. Rather, the agency may consider whether there is a close *causal relationship* between a proposed action and the potential effect on the conditions identified as extraordinary circumstances, and if such a relationship exists, the potential effect of a proposed action on these conditions. This is an improvement to the regulations, as it would allow the proponent and the agency to modify the proposed action to avoid the extraordinary circumstances, so that the action can remain categorically excluded.

<u>Changes to Reduce Delays and Costs of Process</u>

CEQ's proposed rule provides that minor, non-substantive errors that have no effect on agency decision making shall be considered harmless and shall not invalidate an agency action. We support this change, as invalidating actions due to minor errors does not advance the goals of the statute, and only adds to delays and costs in the NEPA process. The proposed rule also would add a new § 1500.3(d), "Remedies," providing that harm from the failure to comply with NEPA can be remedied by compliance with NEPA's procedural requirements, and that CEQ's regulations do not create a cause of action for violation of NEPA.  Finally, the CEQ proposal provides that any actions to review, enjoin, stay, or alter an agency decision on the basis of an alleged NEPA violation be raised as soon as practicable to avoid or minimize any costs to agencies, applicants, or any affected third parties. We support all of these changes, as delays often result in substantial costs to the proponent and the agency.

4

Elimination of Cumulative Effects Analysis

CEQ proposes to strike the definition of cumulative impacts in the new rule and strike the terms "direct" and "indirect" as well in order to focus agency time and resources on considering whether an effect is caused by the proposed action, rather than on categorizing the type of effect.  CEQ is also proposing that the analysis of cumulative effects, as defined in CEQ's current regulations, is simply not required under NEPA.  While we agree that an agency should focus on effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action, we do not agree with eliminating cumulative effects analysis all together. In particular, we support the analysis of climate change impacts where the project at issue results in increased carbon emissions. The effects of such projects should trigger a cumulative effects analysis.  As climate change is a threat not only to winter sports but the entire planet, it is appropriate that the NEPA regulations address head on the analysis of greenhouse gas emissions and potential climate change impacts.

                    *                    *                    *

NSAA appreciates the CEQ's efforts to modernize and improve its NEPA implementing regulations.  Thank you for this opportunity to comment.

                                        Respectfully submitted,

                                        Geraldine Link

                                        Geraldine Link
                                        Director of Public Policy
                                        National Ski Areas Association

Tab 7, Exhibit 11 to Declaration of Amy Coyle

Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503
Attn: Dockett No. CEQ-2019-0003

Electronically submitted: https://www.regulations.gov

March 8, 2020

PROPOSAL TO MODERNIZE NEPA REGULATIONS-EOMA
Eastern Oregon Mining Association (EOMA) is most appreciative of this proposal. Finally, something positive for miners. NEPA, today, is broken. Reforming the NEPA process is critical to the domestic mining industry, job creation, and decreasing our reliance on foreign sources of minerals.

"*More efficient, effective and timely reviews by Federal agencies*" of small-scale operations would be great. We have many members who waited over ten years to have small scale exploration and mining operations approved. One EOMA member submitted his Plan of Operation in 1998, he finally died, and his son is still trying to get a small-scale placer operation approved.

Promoting clarity, reducing the length of EAs and EISs and using language the public can read and understand are all commendable changes. EOMA recommends that CEQ still provide paper copies of documents for those who want them. As Minerals Policy Director for EOMA, this is my preference (I am reading through the 39 pages of my printed copy of the Federal Register) as I write my comments. If EAs are 75 pages, instead of many hundreds of pages, the cost of printing these documents for those who want this format, should be minimal.

1500.3 (c) is a needed change, so that a complaint of a NEPA violation alone does not warrant injunctive relief and does not satisfy the irreparable harm requirement. Frivolous lawsuits have held up most of our recent EISs. The Forest Service would rather cave, then fight a court battle. Requiring a bond or other security condition should also help to relieve some of the frivolous lawsuits.

Under 1501.11, mining on Federal lands is a non-discretionary action. The Government cannot say "no" to a reasonable proposal. On BLM lands, small scale mining exploration under a Notice is exempt from NEPA under the 43CFR3809 regulations. These proposals are authorized within 30 days of submittal; on the National Forest, these proposals take 10 years or longer to approve. Threshold analysis should provide clarification to the agencies to decide whether or not NEPA applies.

1

Where NEPA is warranted, the analysis in the NEPA document should be directed at describing the effects of the mining operation and helping the mine operator mitigate effects when practicable, and reclaim the ground after mining terminates.

Under 1501.2, 1501.3, 1501.4, the increased use of Categorical Exclusions for projects that do not leave significant effects would be helpful. EOMA supports clarity in regards to Categorical Exclusions and encourages agencies to use them whenever possible to reduce the time it takes to get exploration projects authorized. However, a change in the Forest Service 36CFR228 regulations to parallel the BLM 43CFR3809 would eliminate even the need for CEs for mining exploration.

Under 1501.5, EOMA **opposes** the proposed change whereby no draft would be published. Miners on the Wallowa-Whitman submitted Plans of Operation 10 years or more ago, clarified their operations with the Forest Service, then years went by with no contact with the operators. The Forest Service decided during this time period to lump a lot of exploration and small-scale placer operations into an EIS, instead of doing EAs. When the draft came out, miners were surprised to see their project areas had been reduced in size without the miners' knowledge. Projects were listed near the wrong streams and in the wrong subwatersheds. Our guess is this happened primarily because during the ten years of writing the EIS, personnel changed at the Forest Service and no one thought to contact the mine operators for the correct information. District Rangers came and went, and no one was responsible for the accuracy of the document.

Coordination with local government from the pre-scoping phase to the decision on NEPA documents is important. Mine operators rely on the County and EOMA to help them understand what is in the NEPA document. The miners themselves, have abundant information on the history of their claims. They should be involved in the EA process.

Under 1501.10, a **one-year <u>or less</u> time-frame** for completion of a mining Plan of Operation EA would be appreciated. BLM in our area is working to approve two Plans of Operation this year, however, the Forest Service is not working on any mining NEPA documents (SOPA shows all Mining NEPA documents On Hold). Unfortunately, if a "*senior agency official may approve in writing a longer time period*", time fames exceeding the year will become the norm. Right now, non-discretionary mining plans of operation, take ten years or more to approve. I am talking about simple, small scale operations where reclamation is ongoing, effects are all similar, and reclamation bonding is required. Discretionary NEPA projects, such as prescribed burning, thinning, riparian enhancement and bridge replacements, adjacent to proposed mining operations are approved, while the miners wait. More sharing of ID Teams and tiering to these adjacent EAs should be required, so mining NEPA documents could also be completed.

But there is even more to this injustice. The Forest Service "expires" Mining Plans of Operation after ten years of operation.  We have long cold winters when mining cannot take place, so mining operations are limited to the summer months. Some operations are also limited because of seasonal water shortages. The miner needs to decide the length of the operation, not the Forest

2

Service. If agency personnel can delay approval of projects they do not like, such as mining, and limit the Plans to only ten years duration, they will continue to do this. CEQ must not allow senior agency officials to simply "*approve in writing a longer time period*". Failure to perform must be tied to performance evaluations and promotions.

Under 1502.7, EOMA agrees that there should be page limits to these documents. Unfortunately, as with EAs, a senior agency official will simply approve any statements exceeding 300 pages. This page limit will become a "nice to do" but will not be mandatory.

Under 1502.10 and 1502.11, the estimated cost of preparation of an EIS would have to appear on the cover of the document. It would be interesting to see the cost of a 10 year EIS, where half of the operations were dropped because of ill health or death of the operator over the long waiting period, when the Forest Service was "diligently working" on the document. Seeing a Purpose and Need paragraph based on the applicants' goals and the agency's statutory authority (with mining this is a non-discretionary decision) would be quite refreshing.

Under 1502.14, even though the "no action alternative" is not legal in a mining proposal decision, this alternative represents the base-line and must be presented, even though it cannot be chosen. EOMA is opposed to having a maximum number of alternatives. The complexities of the project should dictate the number of alternatives. Alternatives must be goal-based, be reasonable, justifiable, economically and technically feasible.

Under 1502, Other Changes include use of existing information instead of delaying the project while new scientific and technical research is performed. More sharing of ID Teams and tiering to analysis conducted on areas adjacent to mining proposals should take place.

Under 1503, comment responses must be appended to the document and be easy to find. EOMA is opposed to the agency having flexibility in involving the public in the EA/EIS process. In the past, mining operations have been analyzed, projects changed and NEPA documents written without involving the miners who made the proposals. Guidelines must be set for agencies to follow, and there must be consequences if they do not follow these guidelines.

Under 1506.1 before a NEPA document in Baker County is produced, the agency should read the Baker County Natural Resources Plan. If it is a mining project, the section on mining is quite complete.

Under 1506, it states, "*Finally paragraph f would allow an agency (i.e. Forest Service) to adopt another agency's (i.e. BLM) determination to apply CEs to a proposed action (i.e. exploration) if the adopting agency's proposed action is substantially the same*". Authorizing minerals exploration projects in a timely manner, will facilitate development of complete Mining Plans of Operation.

3

Also, the Public Involvement section must mandate that agencies use all methods practicable in putting out notices. This includes websites as well as newspapers located in the County of the project. Do Not limit notifications to those that have their names on an interested parties list.

Under 1507.3(b)(6), a new paragraph would be added which would provide that agencies identify actions that are not subject to NEPA. This would allow the Forest Service to list non-discretionary small-scale exploration projects as not being subject to NEPA, and thus, pave the way to making the change in the mining regulations to parallel the BLM mining regulations.

Under 1508, EOMA commends CEQ for taking on the direct, indirect and cumulative impacts problem, which has led to excessive documentation about speculative effects, often leading to litigation. A single paragraph on effects, without referencing direct, indirect and cumulative effects, would be greatly appreciated.

Under 1502.16. no one seems to have a grasp of what indirect effects are. EOMA suggests deleting indirect effects from the requirements of NEPA. The bottom line is, whether an effect will be caused by the proposed action.

Clarifying what a major Federal Action is, and subsequently deleting "major", will help agencies decide when to prepare an EIS. For instance, *"NEPA does not require the preparation of an EIS for actions with minimal Federal involvement or funding"*. Lumping a lot of little exploration and mining projects together, all with the same well-known effects to the land, and saying they had to write an EIS because of cumulative effects, is ridiculous. All this was nothing but a stalling tactic, so miners could not even conduct exploration ahead of mining for a ten-year period while the agency was "diligently working" on the NEPA document.

CEQ should not base NEPA decisions on climate change. It is not appropriate for CEQ to address a single category of possible impacts in the regulations. This is especially important as the science behind climate is not solid and is changing almost daily.

EOMA appreciates the opportunity to provide meaningful input into the proposed NEPA changes. We encourage CEQ to increase the pressure on federal agencies to gather input of local governments, the public and the stakeholders. We ask that senior officials from agencies be held to the NEPA timeframes, making meeting NEPA time frames a part of their annual performance evaluations. NEPA has been used as a tool, over the last 10-15 years, to delay approval of mining operations on the National Forest. After implementation of these proposed changes, the NEPA process should be faster and more efficient and facilitate approval of mining Plans of Operation.

Sincerely,

Jan Alexander
EOMA Minerals Policy Director
541-446-3413

4

Tab 8, Exhibit 11 to Declaration of Amy Coyle



Dirk Elsperman, President
Robert C. Lanham, Jr, Senior Vice President
Dan K. Fordice, III, Vice President
Jorge Fuentes, Treasurer
Stephen E. Sandherr, Chief Executive Officer
Jeffrey D. Shoaf, Chief Operating Officer

*Filed electronically at www.regulations.gov*

March 9, 2020

Mr. Edward A. Boling
Associate Director for the National Environmental Policy Act
Council on Environmental Quality
730 Jackson Place, NW
Washington, DC  20503

RE:    Update to the Regulations for Implementing the Procedural Provisions of the National
       Environmental Policy Act, Proposed Rulemaking, 85 Fed. Reg. 1684 (January 10, 2020) - **Docket
       No. CEQ-2019-0003**

Dear Mr. Boling:

The Associated General Contractors of America (AGC) appreciates this opportunity to provide the White House Council on Environmental Quality (CEQ) with comments on potential revisions to its implementing regulations for the procedural provisions of the National Environmental Policy Act (NEPA).[1]

AGC represents more than 27,000 construction contractors, suppliers and service providers across the nation, through a nationwide network AGC Chapters. AGC contractors are involved in all aspects of nonresidential construction and are building the nation's public and private buildings, highways, bridges, water and wastewater facilities, locks, dams, levees and more.

NEPA comes into play on a significant number of critical construction projects that service the public and the environment. Right now, NEPA is triggered at the outset of projects that require a federal permit or authorization, a federal land management decision, or federal funding.  Federal agencies are then to take a "hard look" at the significant potential environmental effects of proposed major federal actions and then to place their data and conclusions before the public prior to making a go/no-go decision.

The environmental review process for these federal actions should provide accurate and helpful summaries of how the projects could affect the environment.  Unfortunately, things have gotten out of hand.  Today, on average, it can take federal agencies six to seven years to evaluate the effects of public-works projects, for example, aimed at repairing our crumbling infrastructure, including highways, ports and inland waterways. This includes looking at the cumulative impact of a particular action and evaluating how it may contribute to climate change and other long-term, indirect environmental issues.  Environmental Impact Statements (EIS)

---

[1] AGC previously submitted comments on CEQ's Advanced Notice of Proposed Rulemaking, 83 Fed. Reg. 28591 (June 20, 2018) - Docket No. CEQ–2018–0001.  AGC seeks to incorporate those comments herein by reference, available online here: https://www.regulations.gov/document?D=CEQ-2018-0001-12433.  In addition, AGC gave a statement at CEQ's public hearing Feb. 25, 2020, on the need to streamline the environmental review process for projects that require federal approval in order to unlock American investment in modern, efficient infrastructure while advancing good environmental stewardship – *see Attachment 1 to this letter*.  AGC also incorporates by reference the U.S. Chamber of Commerce comments submitted to this docket dated March 10, 2020.

for these types of projects generally run more than 600 pages and there are often lawsuits after the fact, which the statements' drafters anticipate by padding the documents with legalese and extraneous analyses.

## AGC SUPPORTS THESE TOP FIVE (5) OPPORTUNITIES TO IMPROVE THE NEPA PROCESS

AGC has identified five categories in the CEQ proposal that provide ripe, high-level opportunities to improve the efficiency of the environmental review and permitting processes – particularly on projects that require an EIS – while maintaining the integrity of NEPA.

1. **Clarify the Boundaries of NEPA.** AGC supports codifying a clearer boundary around types of agency decisions that <u>do not</u> benefit from NEPA analysis; namely, those that have a minimal federal nexus. AGC agrees with CEQ's statement in the proposal: "[T]here is no practical reason for an agency to conduct a NEPA analysis because the agency could not influence the outcome of its actions to address the effects of the project" (e.g., small portion of federal funding for infrastructure project that is otherwise funded privately).

Currently, NEPA applies to "major federal actions"— those with effects that *may* be major and that are *potentially* subject to federal control and responsibility. This includes an agency's failure to act. The proposal would narrow the definition to cover only affirmative actions that are clearly subject to federal control and responsibility, by striking the word "potentially" as well as the portion of the definition that relates to "a failure to act."  Further, the proposed definition would clarify that loans, loan guarantees, or other forms of financial assistance in cases where the federal agency does not have sufficient control and responsibility over the effects of the action, are not within the scope of the definition.

In addition, the proposal sets out a framework for agencies to consider in determining whether a project requires evaluation (or is exempt) and what level of NEPA review is appropriate, i.e., EIS, Environmental Assessment (EA), and Categorical Exclusion. This framework would assist agencies in the early planning stages and encourage the use of Categorical Exclusions where possible. It also codifies existing case law.[2]  For these reasons, AGC strongly supports CEQ's effort to clarify that agencies should ask the threshold question of whether NEPA applies to the proposed federal action at issue.

Other revisions to the definition of a "major federal action" would exclude "non-Federal projects with minimal Federal funding or minimal Federal involvement where the agency cannot control the outcome of the project." For example, CEQ notes that this revision might exclude a NEPA review of the entirety of a project for which a small amount of federal funding is provided to help design an infrastructure project that is otherwise funded through private or local funds.  These changes would improve focus on the purpose and limits of a federal agency's decision-making authority under NEPA.  AGC suggests that CEQ provide additional guidance in the Final Rule to clarify how agencies should determine whether an action includes only "minimal Federal involvement" or "minimal Federal funding."  In making this determination, the agency should consider the scope of the government approval or authorization in relation to the project as a whole.

### *Address the Small Federal Handle Problem as Part of the 'Major Federal Action' Definition*

In the preamble, CEQ asks whether the definition of "major federal action" should be revised to address the "small handle problem," which arises when a federal agency has control over one small part of a larger

---

[2] Explicitly specifying these thresholds, coupled with the deference CEQ regulations are afforded, could lead to greater consistency by the courts in applying these thresholds.

project.  AGC contractors have been the recipient of inconsistent interpretation on this issue from federal regulators and encourages CEQ to address this issue.  AGC recommends that CEQ follow the interpretation from the D.C. Circuit Court in *Macht v. Skinner*,[3] limiting federal control where the federal agency was permitting only a part of the action.

To this end, AGC recommends that CEQ modify proposed Section 1508.1(q) to better address projects that have both federal and non-federal elements. For example, where a private action requires a federal Clean Water Act (CWA) Section 404 individual permit that covers only a part of the larger project, the scope of the action subject to NEPA analysis, and thus the scope of the NEPA document, has been the source of considerable controversy and continues to raise important issues. AGC seeks to prevent agencies from "federalizing" portions of a project outside their legal jurisdiction by reason of a lengthy causal chain or remote link to significant effects.  CEQ should revise proposed Section 1508.1(q) as follows: "Major Federal action also does not include non-Federal projects with minimal Federal funding or minimal Federal involvement where the federal agency ~~cannot control the outcome of the project~~ does not have sufficient control and responsibility over the project as a whole and the effects of the action" and also add reference to Section 1508.1(g) for the definition of "effects" (stating that effects "are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives … effects should not be considered significant if they are remote in time, geographically remote, or the product of a lengthy causal chain…").

2.  **Simplify the Range of Effects Considered During NEPA Review.** AGC strongly supports a more precise definition for the term "effects" to solve the problem of federal agencies, private applicants, and courts not being able to draw reasonable and predictable lines.  Under the proposal, effects must be considered only if they are both reasonably foreseeable and they "have a close causal relationship" to the proposed action or alternatives.  AGC maintains that it is both necessary and appropriate to focus/limit this analysis to effects within the agency's control. Notably, the proposal specifies that effects do not need to be considered if an agency has no authority to prevent them due to its limited statutory authority or they would happen regardless of the proposed action.  NEPA does not expand the agency's statutory basis for decision-making, and NEPA is supposed to inform the decision that is within the agency's authority.

Currently, the CEQ regulations require agencies to consider three types of effects—direct, indirect, and cumulative. CEQ is proposing to remove the terms "direct" and "indirect," though the concepts arguably remain. In addition, CEQ is proposing to no longer require consideration of cumulative effects.

Under the proposal, agencies need only evaluate the "effects" of the action, which are defined to include only those impacts "that are reasonably foreseeable and have a reasonably close causal relationship[4] to the proposed action or the alternatives." According to CEQ, the proposed definition would codify the Supreme Court's holdings in *Department of Transportation v. Public Citizen*[5] and *Metropolitan Edison Co. v. People Against Nuclear Energy*.[6]

Under the newly proposed definition:

---

[3] 916 F.2d 13 (D.C. Cir. 1990).
[4] The phrase "reasonably close causal relationship" is intended to eliminate effects that are remote in time, geographically remote or the product of an attenuated causal chain, as well as those effects which an agency has no authority to prevent or which would happen regardless of the agency action.
[5] 541 U.S. at 767–68.  *See* 85 Fed. Reg. at 1708 (citing the Supreme Court's *Public Citizen* ruling for the proposition that remote effects are not "significant" effects under NEPA).
[6] 460 U.S. at 774 (interpreting section 102 of NEPA to require "a reasonably close causal relationship between a change in the physical environment and the effect at issue" and stating that "[t]his requirement is like the familiar doctrine of proximate cause from tort law").

AGC of America to the White House Council on Environmental Quality
Docket No. CEQ-2019-003
March 9, 2020
Page 4

- Effects include those that "occur at the same time and place" (i.e., "direct effects," as currently defined) and "are later in time or farther removed in distance" (i.e., "indirect effects," as currently defined).
- Effects do not include those that the agency has no authority to prevent.
- A "but for" causal relationship "is insufficient to make an agency responsible for a particular effect under NEPA."
- Similarly, effects "should not be considered significant if they are remote in time, geographically remote, or the product of a lengthy causal chain."
- Lastly, an "[a]nalysis of cumulative effects is not required." (Proposed Section 1508.1(g), (aa))

These changes to the definition of "effects" would set workable boundaries that, if promulgated, will help avoid delays driven by agencies struggling with issues that are not amenable to efficient analysis. Rather than attempting to fill each of the current three buckets with a long list of items that may not be meaningful in the context of the action at issue, the proposed changes would help the government and project proponents engaged in NEPA focus more productively on identifying meaningful environmental impacts.

3. **Refine the Range of Reasonable Alternatives**. AGC supports CEQ's proposal to clarify the scope of the alternatives analysis and to tailor the analysis to the purpose and need of the proposal before the agency. CEQ's proposal would appropriately tailor the purpose and need of federal action to the agency's relevant statutory authority and, where a non-federal project proponent is seeking an approval or authorization, to the goals of the applicant.[7] Analyzing a large number of alternatives that are outside of the lead agency's jurisdiction, particularly where it is clear that only a few alternatives would be economically and technically feasible and realistically implemented by the applicant, can divert limited agency resources. AGC further supports CEQ's proposed revisions to clarify the scope of the alternatives analysis, including clarification that agencies must only consider reasonable alternatives that are sufficient to inform the agency's reasoned decision-making and need not be exhaustive of all potentially reasonable alternatives.

Over the last four decades, there has been a significant amount of confusion regarding what exactly constitutes a legally-compliant alternatives analysis. This is evidenced by the increasing amount of litigation over the alternatives analysis in NEPA documents. The most common challenge was that federal agencies had not included a full, reasonable range of alternatives. Under the current regulations, an agency must analyze all reasonable alternatives, including those not within the jurisdiction of the lead agency.

The proposal would resolve conflicting case law arising from the phrase "all reasonable alternatives" and the lack of definition of "reasonable alternatives." CEQ proposes to strike the term "all" from this requirement as it applies to an EIS, allowing an agency to provide a reasonable number of examples that are technically and economically feasible. In addition, CEQ proposes to remove the requirement that an agency analyze alternatives outside of its jurisdiction. Agencies would no longer be required to consider alternatives that are infeasible, ineffective, or inconsistent with the purpose and need for agency action. And for non-federal projects, the proposal would eliminate the need to consider alternatives that do not meet the goals of the project applicant. AGC strongly supports this shift toward procedural efficiency and predictability. AGC recognizes that agencies have limited resources and that it is important that agencies use those resources effectively.

*Application of 'Least Environmentally Damaging Practicable Alternative' (LEDPA) Guidelines Under Clean Water Act (CWA) Section 404(B)(1))*

---

[7] *See* proposed Section 1502.13.

CEQ is specifically asking whether it should establish a "maximum number of alternatives" such as limiting the analysis to three alternatives. AGC agrees with CEQ that the discussion of environmental effects of alternatives does not have to be exhaustive. However, AGC does not believe that CEQ should establish a presumptive maximum number of alternatives for evaluation in an EIS. Limiting the number of alternatives could make it difficult to consistently include an alternative that satisfies the LEDPA CWA Guidelines, where applicable.

For any project that involves a Section 404 permit application to discharge dredged or fill material into waters of the U.S. (WOTUS), including wetlands, the U.S. Army Corps of Engineers (USACE) is required to analyze alternatives to the proposed project that meet the LEDPA Guidelines.[8] Whether or not the NEPA alternatives analysis incorporates these principles and details, can have substantial effects on the amount of time necessary for the USACE to evaluate a permit application.

President Trump's Executive Order 13807[9] and the concept of "One Federal Decision" (as well as the succeeding interagency streamlining Memorandum of Understanding and the USACE's related guidance) are helping to integrate CWA 404 regulatory requirements into the NEPA process and to streamline environmental reviews by using NEPA documents for multiple permitting processes. A critical step will be the effective use of the "concurrence points" (the project's Purpose and Need; the Range of Alternatives; and the Preferred Alternative that is selected) as opportunities for lead and cooperating agencies to assess mutual understanding and agreement on fundamental elements of an EIS.

4. **Consolidate Processes and Reduce Duplication of Efforts.** AGC applauds CEQ for recognizing that **time and money are being wasted on redoing project analyses and reviews and on collecting duplicate information** from permit applicants. AGC supports key provisions in the proposal that would ensure that the monitoring, mitigation, and other environmental planning work performed during the NEPA process, and included in the final Record of Decision (ROD) would satisfy the related reviews required by the Historic Preservation Act, the Endangered Species Act, etc. that constrain the federal environmental permitting process. AGC supports clarification that agencies do not need to conduct new scientific research and that reliance on existing data and research is appropriate.

Specifically, CEQ proposes to promote interagency coordination and more efficient review (and to codify and make broadly applicable expedited procedures in recent streamlining laws and Executive Orders and the One Federal Decision policy), including:

- Clarifying that agencies must, to the "fullest extent possible … prepare draft environmental impact statements concurrent and integrated with environmental impact analyses and related surveys and studies required by all other Federal environmental review laws and Executive Orders applicable to the proposed action…"[10]

---

[8] Under 40 CFR 230.10(a), a permit cannot be issued if a practicable alternative exists that would have less adverse impact on the aquatic ecosystem (known as the Least Environmentally Damaging Practicable Alternative [LEDPA]), provided that the LEDPA does not have other significant adverse environmental consequences to other natural ecosystem components.

[9] The EO defines "major infrastructure projects" as those requiring a full environmental impact statement (EIS) under NEPA and multiple permits, approvals, or other authorizations from federal agencies (collectively, "authorizations"), and for which sufficient and reasonably available funding has been identified.

[10] *See* proposed Section 1502.25 - Environmental review and consultation requirements. Under proposed Section 1502.25, project proponents who must comply with NEPA and Clean Water Act (CWA) Section 404 permitting can integrate the steps involved in complying with the 404 regulations and permit requirements into the NEPA process. To reduce duplication, for any project that involves a Section 404 permit application to discharge dredged or fill

- Authorizing and requiring federal agencies to cooperate with State, Tribal, and local agencies to reduce duplication, including through the use of prior and joint environmental review documents and decisions.[11]
- Requiring the lead agency to develop a joint schedule setting milestone for all environmental reviews and permit approvals/authorizations required for a project.[12]
- Requiring the lead and cooperating agencies (for proposals requiring action by multiple federal agencies) "to the extent practicable" to prepare a single EIS and issue a joint ROD or prepare a single EA and issue a joint Finding of No Significant Impact (FONSI).

In addition, AGC supports the proposed Section 1502.24 on methodology and scientific accuracy, which would clarify that agencies "shall make use of reliable existing data and resources and are not required to undertake new scientific and technical research to inform their analyses." AGC has previously recommended a mandate on the use of previously completed environmental review and study information to avoid duplicative reviews. The phrase "new scientific and technical research" is intended to distinguish separate and additional research that extends beyond existing scientific and technical information available in the public record or in publicly available academic or professional sources. The proposal would allow agencies to make use of "remotely gathered information or statistical models" with proper attribution.[13] AGC supports these

---

material into waters of the U.S. (WOTUS), including wetlands, the U.S. Army Corps of Engineers (USACE or Corps) should ensure that the monitoring, wetlands delineation, mitigation planning and other environmental consultation work performed during the NEPA review (and included in the final EIS and Record of Decision documents) is sufficient to meet the 404 permit authorization requirements, without delaying NEPA schedules and without the need to re-do processes, unless there is a material change in the project. While this will require more focus and involvement on the front end, it will streamline the entire process and ultimately reduce costs and get these important projects underway faster.

[11] See proposed Section 1506.2 Elimination of duplication with State, Tribal, and local procedures. Many CWA Section 404 (individual) permit delays stem from delays in other federal environmental permissions, authorizations, certifications, etc., required before a District Engineer will sign off on the permit application. Key examples include delays and repetition with assessments/analyses under the Endangered Species Act (ESA) Section 7 consults, the National Historic Preservation Act (NHPA) Section 106 authorizations, and the Coastal Zone Management Act (CZMA) consistency determinations, for example, which are a part of the NEPA process. This procedural problem can take many forms: the Corps is not fully participating in the NEPA process; the Corps is imposing different requirements to satisfy the same environmental requirements that were looked at during NEPA planning (likely stemming from each agency's unique determination of key benchmark issues such as LEDPA); or the Corps is requiring a do-over because of minor modifications to project footprint or construction means and methods. See supra footnote 10 stating that the Corps should assume the responsibility for ensuring that the above-referenced consultation requirements are completed during the NEPA review and such consults are sufficient for the 404 federal permit authorizations.

[12] If a milestone is missed, the matter must be elevated within the responsible agencies "for timely resolution." (proposed Sections 1501.7(j), 1501.8(b)(6)). Cooperating agencies are charged with meeting the lead agency's schedule and must limit their comments on the lead agency's NEPA review to those matters where they have jurisdiction by law or special expertise concerning the environmental issues. (proposed Section 1501.8(b)(7)).

[13] AGC members have observed that USACE generally will not accept wetland delineations that were developed during the NEPA process for Section 404 permitting. But rather, some districts have required a project sponsor perform ground surveys on most or all the right-of-way before deeming a Section 404 permit application complete. The USACE's insistence on better delineation data is holding up the permit issuance process on many linear projects because the project sponsor does not have access to the entire project area to perform field studies until right-of-way acquisition. As a result, in the pursuit phase of a design build project, it is impossible or the contractor to manage cost/risk due to the unknowns regarding project schedule and mitigation responsibilities. AGC has recommended that Corps Headquarters clarify that applicants may provide NEPA-level wetlands delineation data from geographic information systems, Lidar, aerial surveys, etc. if it is reliable and reasonably accurate. AGC members have reported many instances where they are subject to commitments in NEPA documents that obligate further field

important reforms that would promote efficiency and reduce duplication between Federal and State, Tribal, and local requirements.

To this end, AGC members have reported many instances where they are subject to commitments in NEPA documents that obligate further field studies post-ROW (right-of-way) acquisition -- such as wetland, threatened and endangered species and archeological surveys in areas, for example on a highway project, where entry was not provided by the landowner. These pickup surveys and additional coordination can slow or stall post-NEPA project procurement and implementation. To avoid this pitfall, and in furtherance of the changes proposed to Section 1502.24, AGC recommends that CEQ clarify that technical and field study should end at the ROD or agency decision. Any areas not accessible would be surveyed using "reliable existing and resources" such as aerial photography, remote sensing, and mapping during the NEPA study. Agency concurrence, approvals and permits would be based on the data available at the ROD.

This above-referenced section and AGC's recommended changes are consistent with the proposed requirement in §1502.22 to obtain incomplete or unavailable information regarding significant adverse effects if the means of obtaining the information is known and the cost to the decision-making process is "not unreasonable" (compare to current requirement that the overall costs of obtaining it "are not exorbitant").

5.  **Limit Needless Construction Delays.** AGC strongly supports many of the proposed changes to the NEPA regulations that are motivated by the administration's "One Federal Decision" policy to ensure coordinated and timely reviews. Unfortunately, project delays and costs do not stop when an agency completes its procedural NEPA review. Once an agency prepares an EIS or EA, stakeholders can initiate litigation under NEPA to challenge the adequacy of the agency's review. Accordingly, AGC supports CEQ's goal of resolving allegations of NEPA noncompliance as expeditiously as possible and strongly supports proposed revisions to this end.

NEPA lawsuits are often filed not for the purpose of integrating environmental protection into the construction process, but rather to simply delay the project with the hope of killing it entirely. A recent CEQ litigation report shows an average of 115 new NEPA cases were filed each year between 2001 and 2013. Furthermore, an average of 20 Temporary Restraining Orders (TRO) and preliminary and permanent injunctions halting projects were issued each year between 2001 and 2013.[14] Generally, NEPA plaintiffs have six years after a final agency action to initiate litigation challenging the project, per the Administrative Procedure Acts (APA) statute of limitations.[15]

Project delays (1) cause further deterioration of infrastructure increasing the investment needs even more and (2) deprive local communities of improved safety and quality of life, as well as corresponding environmental benefits that are acquired from improved infrastructure.

---

studies post-ROW acquisition -- such as wetland, threatened and endangered species and archeological surveys in areas, for example on a highway project, where entry was not provided by the landowner. These pickup surveys and additional coordination can slow or stall post-NEPA project procurement and implementation.

[14] NEPA Litigation Surveys: 2001-2013 (available on CEQ's website at https://ceq.doe.gov/ceq-reports/litigation.html).

[15] To ensure a timely NEPA process so that important infrastructure projects can move forward, Congress—in a bipartisan manner—has also established shorter statutes of limitations for challenges to certain types of projects. SAFETEA-LU created a 180-day statute of limitations for highway or public transportation capital projects, which MAP-21 later reduced to 150 days. 23 U.S.C. 139(l). The Water Resources Reform and Development Act of 2014 established a three-year statute of limitations for judicial review of any permits, licenses, or other approvals for water resources development project studies. 33 U.S.C. 2348(k). Most recently in FAST-41, Congress established a two-year statute of limitations for covered projects. 42 U.S.C. 4370m-6.

AGC of America to the White House Council on Environmental Quality
Docket No. CEQ-2019-003
March 9, 2020
Page 8

The proposed revisions explicitly incorporate several key elements of the "One Federal Decision" policy outlined in EO 13807 that are aimed at improving interagency coordination and efficiency. AGC supports CEQ's proposal to set presumptive page and time limits for EA and EIS documents. AGC also supports the proposal to allow for a senior agency official to approve in writing a longer time or page limit for NEPA documents. CEQ should clarify, however, that agencies should retain the ability to delegate the responsibilities of the "senior agency official" to an appropriate member of the agency if necessary.

Per the proposal, cooperating agencies are charged with meeting the lead agency's schedule and must limit their comments on the lead agency's NEPA review to those matters where they have jurisdiction by law or special expertise concerning the environmental issues.[16] The proposal also provides conflict resolution procedures to elevate issues to the appropriate officials of the agency for "timely resolution."[17] AGC maintains that a more efficient environmental review process, to achieve a decision within the two-year goal, will provide opportunities to accelerate project delivery, potentially decreasing overall project costs and accelerating the delivery of project benefits to the public.

AGC members have expressed great concern that the current environmental review process long ago stopped being about evaluating the environmental impacts of a proposed project and has become a way for special interest groups to further their agenda by holding needed infrastructure and development projects hostage to countless lawsuits and delays – *see Attachment 2 to this letter* for a list of critical infrastructure projects that have faced years of delay due to NEPA-related challenges and public opposition. As such, AGC supports the following important provisions that would set reasonable parameters and protections on the opportunities for litigation to slow or stop an important project:

- The proposal would require that public comments be "specific" and "timely submitted"; CEQ notes that it intends to prohibit parties from challenging analyses based on issues they did not raise during the public comment period. Currently, stakeholders will raise challenges at various points in a project's review and construction.[18] To reduce the impact of these inevitable, ongoing hurdles, the proposal would limit the opportunity for judicial review (against the lead agency) to the issuance of a signed ROD or other final agency action.
- The proposal would disclaim any presumption that a violation of NEPA will result in irreparable harm or it provides a basis for injunctive relief. Furthermore, it would provide that harm arising from an agency's failure to comply with NEPA can be remedied by the agency complying with the requirements in the proposed regulations.
- In addition, the proposal would allow the imposition of conditions, including a bond, before a plaintiff could seek a stay to block an agency action.

**ADDITIONAL PROPOSED CHANGES THAT AGC SUPPORTS**

- **Demonstrate Accountability and Transparency in Tracking Costs.** AGC supports the proposal to include on the cover of the EIS, the estimated total cost of preparing the EIS, including the costs of agency personnel hours, contractor costs, and other direct costs.[19] This addresses concerns raised by the U.S. Government Accountability Office that agencies are not tracking the costs of NEPA and

---

[16] *See* proposed Section 1501.8(b)(7).
[17] *See* proposed Section 1501.7(j).
[18] AGC strongly supports CEQ's proposal to provide clear parameters for public comment (and for cooperating agency comment); and to deem forfeited and waived any comments not submitted in the available time periods.
[19] *See* proposed Section 1502.11(g).

AGC of America to the White House Council on Environmental Quality
Docket No. CEQ-2019-003
March 9, 2020
Page 9

provides transparency to the public regarding EIS-level NEPA costs. Federal agencies should already be tracking how much it costs for contractors to assist them with developing EISs and all hours spent by federal employees should be tracked and reported. The public should be informed of the cost and time spent to complete NEPA reviews. AGC encourages CEQ to provide direction on how to define costs such that the focus is not limited to monetary cost, but also weighs the value of the information to the agency's decision under its action statute against factors such as the complexity of or difficulty in obtaining the information and the impacts of delays to achieving the purpose of the proposed action.

- **Expand the Use of Tiering**. The rule also encourages agencies to apply the concept of tiering. AGC supports proposed revisions that would allow for previous EAs and EISs to be incorporated by reference in newly prepared NEPA review documents. The proposal would eliminate language that is more restrictive of the use of tiering.

- **Set Ceiling on Federal Environmental Review.** AGC supports efforts to provide more consistency among the federal agencies involved in the NEPA process, reducing potential conflicts between dueling agency procedures and fostering improved inter-agency cooperation. The proposal would expressly preempt existing and future agency NEPA requirements, thus effectively setting a ceiling on federal environmental review. Agencies currently have the flexibility to add procedures to the process established in the CEQ NEPA regulations by, for example, requiring enhanced public involvement. CEQ proposes to restrict agencies from imposing "additional procedures or requirements beyond those set forth in the CEQ regulations" unless they are otherwise required by law or facilitate efficiency. These changes will have to be made within a year of when CEQ finalizes its regulations.

## PROPOSED NEW PROCEDURAL REQUIREMENTS RAISE AGC CONCERNS

In contrast to the reforms discussed elsewhere in this letter that would reduce paperwork and bureaucracy, AGC members are concerned about the following proposed additions (to the NEPA regulations) that would add brand-new procedural requirements. The provisions reference below would likely lengthen the review process and/or put more pressure on the time limit for completion of an EIS.

- **New Section in Draft and Final EIS: Summary of All Alternatives, Information and Analyses Submitted by Public.** The proposal would add a new section to the draft and final EIS that is to "include a summary of all alternatives, information, and analyses submitted by public commenters…"[20] AGC views this new requirement as conflicting with the stated intent of the proposal (i.e., to facilitate more efficient NEPA reviews), as it would add more work to the production of the draft and final EISs. What is more, the scope and breadth of the discussion required by this new section is unclear. Summarizing all information submitted by the public could be extensive on an EIS-level project and it is uncertain how this requirement is different than the public involvement summarized elsewhere in the EIS. Additionally, this new provision asks for public comment on the "completeness of the summary" in the new section.[21] If an agency is already inviting comment on a draft EIS, why also invite comment on a particular section of the EIS? The invitation to comment on the completeness of the summary only creates a new opportunity in an already target-rich environment for project opponents to challenge the EIS. AGC opposes the additional requirements in proposed Section 1502.17; 1503.1(a)(3).

---

[20] *See* proposed Section 1502.17.
[21] *See* proposed Section 1503.1(a)(3).

- **New 30-day Comment Period After Publication of Final EIS and New Requirement to Address Public Comments on Final EIS in ROD.** CEQ's existing regulations require a 30-day period between the publication of the notice of availability of a final EIS and issuance of the ROD. (The purpose of this 30-day waiting period has never been clear, as the existing regulations do not require the federal agency to request public comments on the final EIS.) CEQ's proposal would add new requirements for the federal agency - in the notice of availability of the final EIS - to request public comments on the newly required "submitted alternatives, information, and analyses" section,[22] and then in the ROD, to address the public comments received on that section of the final EIS.[23] This would establish an entire new round of public comment on the project. It is not clear to AGC what purpose these requirements would serve. At this point in the process, the agency has completed its analysis and has issued a final EIS. CEQ's proposed rules would extend the process, which is counter to the stated purpose of the NPRM to facilitate more efficient and timelier NEPA reviews. AGC opposes the additional requirements as proposed in Sections 1503.1(b), 1503.3(b), and proposed Section 1505.2(d).

**CONCLUSION**

AGC appreciates CEQ's efforts to modernize its NEPA-implementing regulations, and the opportunity to participate in this rulemaking process by submitting these comments. Our association and its 27,000 member firms are committed to working with the Trump Administration to help ensure that the final rule reflects the same commitment to streamlining the federal environmental review process while maintaining rigorous environmental protections. If you have any questions or require additional information, please contact me, Leah Pilconis, at 703-837-5332 or leah.pilconis@agc.org.

Respectfully submitted,

Leah Pilconis

Leah Pilconis
Associate Counsel, Construction and Environmental Risk Management
AGC of America

---

[22] *See* proposed Sections 1503.1(b) & 1503.3(b).
[23] *See* proposed Section 1505.2(d).

**Attachment 1 – Three-Minute Oral Statement Delivered on February 25, 2020, Public Hearing on CEQ's Update to its NEPA Regulations (Docket ID: CEQ-2019-0003)**

My name is Leah Pilconis and I am here on behalf of the Associated General Contractors of America representing the commercial construction industry. Our members build everything but single-family homes. Many of their projects require a federal review before they can get to work.

Reforming the NEPA process is an essential first step to providing the American people with cleaner water, safer roads and bridges, and a more reliable energy system.

Let's be clear, under CEQ's proposal, AGC contractors would still have to comply with every substantive environmental requirement currently in place.

AGC supports these five important ways the proposal would improve the overly complex review process:

    **ONE: It Would Clarify the Boundaries of NEPA.** Projects with minimal federal funding or involvement, especially where the agency cannot influence the outcome in a way that would change the project's environmental effects, would not warrant a NEPA analysis – under the proposal. This makes sense.

    **TWO: It Would Simplify the Range of Effects Considered During NEPA Reviews.** We need to stop the excessive speculation. The proposal codifies Supreme Court case law and simplifies the definition of effects to those that are both reasonably foreseeable and that have a close causal relationship to the proposed action or alternatives. Again, this makes sense.

    **THREE: It Would Refine the Range of Reasonable Alternatives.** NEPA's goals are satisfied when an agency analyzes reasonable alternatives. The proposal would exclude alternatives outside of the lead agency's jurisdiction or statutory authority. It's a waste of agency resources to analyze alternatives that are not economically and technically feasible.

    **FOUR: It Would Reduce Duplication.** The proposal would ensure that the environmental documentation collected during the NEPA process would satisfy the related federal environmental permits and approvals. It would stop wasting time and money redoing the analysis or recreating existing data.

    **FIVE: It Would Limit Needless Construction Delays.** In addition to process efficiencies, the proposed revisions seek to resolve allegations of NEPA noncompliance or deficiencies as expeditiously as possible to prevent delays and stop work orders.

We can't build a better and greener future if projects designed to make our economy more efficient and resilient are stuck in never-ending federal reviews.

*Statement by:*
    Leah Pilconis
    Associate General Counsel, Construction &
    Environmental Risk Management
    The Associated General Contractors of America
    2300 Wilson Blvd Ste 300, Arlington, VA 22201
    leah.pilconis@agc.org

**Attachment 2 – Examples of Delayed Projects Under NEPA**

The listing below is not exhaustive and offers only a glimpse of projects delayed under NEPA. AGC identified these projects through a brief literature and news search conducted on February 21, 2020. Currently, neither a means to track NEPA projects nor a listing of projects exist.

- Just raising the roadway of the **Bayonne Bridge** took a five-year approval process due to challenges with its environmental assessment.

- The **Cape Wind project** began in 2001 and suffered many permitting and legal challenges, lease rights for the site were terminated in 2017.

- The $5.6 billion **Purple Line rail project in Maryland** was sued over its NEPA review. The judge refused to halt construction, determining that no supplemental EIS was required.

- Planning began in 2012 on a **light-rail expansion in Federal Way** in Seattle WA, citizen issues delayed the project and construction just started in 2019.

- The **Regional Connector (subway) in Los Angeles** was envisioned in 1984, the environmental reviews completed in 2010, construction was delayed by lawsuits. After prevailing, the project is expected to be complete in 2022.

- In Denver a **new water storage facility** began its process in 2003. The EIS took almost 10 years. The permit was signed in 2017.

- The permitting process for a **desalination plant** in San Diego lasted almost 10 years and suffered 14 legal challenges.

- The **Hudbay Rosemont Copper Mine** in southern Arizona was delayed by about 15 years by lawsuits and suspension of permits. It's now on hold waiting for appeal.

- The Illinois Tollroad Authority, **I 355, Southern Extension**, 12.5 miles of four lane tollroad, was delayed for years because of lawsuits.

- The **US 99 Grand Parkway Segments E, F and G**, 55 miles of four lane toll road on new location in northwest Houston took 15 years to complete NEPA which included an EIS, Supplemental EIS, FEIS Revaluation and was litigated and enjoined.

- Rebuilding a portion of **I-70 in Denver** was delayed for years via NEPA with construction finally starting in 2018.

- Reconstruction of the **Wisconsin Zoo Interchange** near Milwaukee began in the early 2000s but was held up for new bus routes finally resolving in 2014. Completion is expected in 2022.

- In **Little Rock, work on I 630** was able to proceed after a challenge to its environmental review because it would not extend outside of the existing right-of-way. Injunction was denied.

- Another project in **Little Rock, I 30 Crossing Project**, is also threatened by an environmental lawsuit.

Tab 9, Exhibit 11 to Declaration of Amy Coyle



**American Road
& Transportation
Builders Association**

2__ E Street, S.W.
Suite 900
Washington D.C. 20024

P  202.289.4434
F  202.289.4435
W  artba.org



March 10, 2020

The Council on Environmental Quality
722 Jackson Place, NW
Washington, DC 20503

## Re: Docket No. CEQ-2019-0003, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act

On behalf of the more than 8,000 members of the American Road & Transportation Builders Association (ARTBA), I respectfully offer our support for the Council on Environmental Quality's (CEQ) recent proposed rulemaking on updating the regulations for implementing the National Environmental Policy Act (NEPA).

ARTBA's membership includes private and public-sector members that are involved in the planning, designing, construction and maintenance of the nation's roadways, waterways, bridges, ports, airports, rail and transit systems. Our industry generates more than $380 billion annually in U.S. economic activity and sustains more than 3.3 million American jobs.

ARTBA members seek to build transportation improvement projects as safely, efficiently and cost-effectively as possible. In doing so, they can provide first-hand, real-world knowledge about how NEPA shapes the process of project planning and delivery.

### Introduction

**ARTBA supports CEQ's proposed NEPA modernization**. These reforms would focus NEPA on its original intent – assessing environmental impacts of major projects and actions supported by the federal government – instead of being used as a mechanism for causing delays and uncertainty in planning and building projects, including those in the transportation sector.

The NEPA law first took effect 50 years ago. A major purpose of NEPA, then as now, was facilitating public awareness of and feedback on the potential environmental impacts of federally-supported projects. In 1970, communications, technology and public participation were in the virtual Stone Age compared to the present day. By contrast, in less than a minute today, a citizen-activist can locate and download informative publications such as CEQ's *A Citizen's Guide to the NEPA: Having Your Voice Heard*. A modernized NEPA rule should reflect the current ubiquity of information and ease of public participation in the policymaking process, which should contribute to a much more efficient review process.

While NEPA is an essential tool for protecting the environment and ensuring meaningful feedback about projects, it has not been fundamentally improved in over three decades. Adversaries have weaponized NEPA's outdated review procedures to delay – often for years –

or to completely derail transportation improvement projects. Needless delays and uncertainties can add significant costs to these important projects, at a time when funding is constrained nationwide.

The proposed changes to NEPA will result in a more expeditious, while still thorough, review process, without impacting existing environmental standards. The revisions to NEPA will not undermine environmental stewardship in planning transportation projects, which will still need to comply with the federal Clean Air Act, Clean Water Act, Endangered Species Act and other statutes. Moreover, NEPA modernization will not—and should not—guarantee favorable decisions on projects, but will greatly improve the NEPA process' reliability and timeline, which is critical to ARTBA members and their work.

### The Need for NEPA Modernization

The rationale for the NEPA statute remains sound. As it relates to projects planned and built by ARTBA members, NEPA is intended to ensure a balance between meeting our nation's transportation needs and protecting vital natural resources. These objectives do not have to conflict. As described below, Congress has enacted numerous streamlining provisions for transportation projects, enabling fulfillment of regulatory requirements in a smarter and more efficient manner. Moreover, many projects incorporate significant and meaningful environmental mitigation features. In short, this rulemaking and ARTBA's comments are not intended to undermine or otherwise question the purpose of NEPA itself.

In reality, though, the application of NEPA is often a major burden for those planning and building transportation improvements. According to a report by the U.S. Government Accountability Office prior to the enactment of the Moving Ahead for Progress in the 21st Century (MAP-21) Act of 2012, as many as 200 major steps were involved in developing a transportation project, from the identification of the project need to the start of construction. The same report also shows it typically takes between nine and 19 years to plan, secure approval of, and construct a new major federal-aid highway project. This process involves dozens of overlapping state and federal laws, including NEPA, state NEPA equivalents, wetland permits, endangered species implementation, and clean air conformity.

Project delays resulting from the current NEPA process will often lead to demonstrable and significant costs to the taxpayers. This is simply common sense, based on continuing increases in labor and materials costs, among other factors. According to a 2016 report by the Texas A&M Transportation Institute based on example projects, delays were estimated to cost $87,000 per month for a small project (e.g., reconstruction of a rural road), $420,000 per month for a medium-sized project (e.g., widening of a semi-rural highway) and $1.3 million per month for a large project (e.g. reconstruction of a highway in a large metro area)[1].

---

[1] "Assessing the Costs Attributed to Project Delay During Project Pre-Construction Stages," Texas A&M Transportation Institute, March 2016, available at: https://static.tti.tamu.edu/tti.tamu.edu/documents/0-6806-FY15-WR3.pdf.

The current NEPA process can also increase the price tag for projects in a different way.  In considering larger, complex projects for which the NEPA timeline is uncertain, potential bidders may incorporate the potential cost of NEPA delays into their bids (a form of "pricing risk"), or choose to forego the project entirely, thus limiting competition.

Currently, it takes an average of five to seven years to complete the environmental review process for a new federal-aid project.  While that is unacceptable enough, there are also multiple examples of projects with significantly longer delays.

In Denver, the I-70 widening project – a $1.2 billion effort to alleviate severe traffic congestion through the expansion of 12 miles of highway – has become an infamous illustration of the need for NEPA reforms.  The NEPA process for this stretch of highway took over 13 years to complete, involved over 200 hundred public meetings, and set a record for length—almost 16,000 pages.  During this extended NEPA period, the Colorado Department of Transportation (CDOT) spent $40 million on studies, and over $30 million on viaduct repairs that should have been spent on new construction.  At the end of the NEPA process, despite CDOT's publicly making 148 different environmental mitigation commitments at an additional taxpayer cost of $50 million, the project was still the subject of five separate legal actions.  This I-70 story provides the very definition of a broken NEPA process.

In the Washington, D.C. area, the Purple Line light-rail project, which was formally proposed in 2003, was delayed for 14 years because of NEPA-related issues.  This environmentally-beneficial project will provide transit service for an estimated 70,000 daily riders while removing 17,000 vehicles from local roads.

Finally, the St. Croix River Crossing project – connecting Houlton, Wisconsin, and Stillwater, Minnesota – required a 2012 act of Congress to proceed after being delayed for 40 years.  The replacement of the congested, accident-prone and deteriorating two-lane Stillwater Lift Bridge had been identified as a regional priority since the 1970s.

### Congress Wants Transportation Projects Delivered More Efficiently

On a bipartisan basis, Congress has made significant progress in streamlining the permitting and approval process for transportation improvement projects.  These have included key provisions in the past four federal surface transportation reauthorization laws: the Transportation Equity Act for the 21st Century (TEA-21) of 1998; the Safe, Accountable, Flexible Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU) of 2005; MAP-21; and, most recently, the Fixing America's Surface Transportation (FAST) Act of 2015.  Each of these measures shows Congress' intent to reduce delay in the delivery of transportation projects without sacrificing regulatory safeguards.

Congress first addressed this issue in 1998 with the passage of TEA-21, focusing on establishing concurrent project reviews by different federal agencies.  The concept was that multiple reviews done at the same time, as opposed to one after the other, would reduce the amount of overall time it took to get a project approved.  While this improvement was a step in the right

3

direction, it had limited impact, as concurrent reviews were discretionary, rather than mandatory. Thus, it was up to the federal agencies involved in a project whether or not to take advantage of this new benefit.

In 2005, SAFETEA-LU sought to further reform the project delivery process by establishing a wider range of new ways to deliver transportation improvements. Specifically, SAFETEA-LU gave greater authority to the U.S. Department of Transportation (U.S. DOT) as "lead agency" during the project delivery process, limited the window during which lawsuits could be filed against projects, and reformed the process for determining impacts on historical sites and wildlife refuges.

The clear lesson between the 1998 and 2005 surface transportation bills was that simply giving federal agencies the ability to complete regulatory reviews in a more efficient manner in no way guarantees that authority would be utilized. As such, SAFETEA-LU took more aggressive steps to influence non-transportation agencies into making transportation project reviews a higher priority.

While SAFETEA-LU's environmental streamlining provisions were a significant improvement from those enacted in TEA-21, the transportation project delivery process remained at an unacceptable pace. As such, both MAP-21 and the FAST Act took project delivery reform even further, with more tools for reducing delay. In addition to building upon the concept of "lead agency" begun in SAFETEA-LU, the two most recent laws included specific deadlines for permitting decisions as well as a scheduling mechanism to ensure environmental impact statements (EISs) do not take longer than four years.

In short, over more than two decades, Congress' intent has been clear. However, while Congress has provided potentially-useful tools to streamline the review of projects, NEPA and other administrative processes remain barriers to efficient project planning and delivery. This underscores the need for CEQ's reform proposal.

### "One Federal Decision"

One of the priorities of CEQ's NEPA proposal is implementation of President Trump's Executive Order 13807, "Establishing Discipline and Accountability in the Environmental Review and Permitting Process for Infrastructure Projects," also referred to as "One Federal Decision" (OFD). Building OFD into the CEQ proposal will reduce unnecessary delay by aligning federal environmental reviews among multiple agencies and mandating a two-year average for completion of the environmental review and approval process. It should also be noted that OFD is a part of "America's Transportation Infrastructure Act" (ATIA), a surface transportation reauthorization measure unanimously passed by the Senate Environment and Public Works Committee last year.

Currently, there is no set time limit for NEPA decisions. When project planners begin a NEPA review, they have no sense of when the process is going to be completed. Implementation of

4

OFD would add predictability to the NEPA process and allow project planners to more accurately establish schedules for environmental review.

Perhaps as important as the two-year time limit, OFD would also require a lead agency for every infrastructure project and allows it to set schedules for other participating agencies during the project delivery process.

Designating a lead agency for each infrastructure project addresses one of the basic problems in the project delivery process— multiple agencies evaluating the impacts of the project as required by NEPA, each according to its own schedule. While it would seem that the NEPA process would establish a uniform set of regulations and submittal documents nationwide, this has not been the case. For example, the United States Environmental Protection Agency (EPA), Army Corps of Engineers (Corps), Fish and Wildlife Service (FWS) and their companion state agencies each require an independent review and approval process, forcing separate reviews of separate regulations, and unique determinations of key benchmark issues—such as the purpose and needs of a project— and requiring planners to answer multiple requests for additional information. Also, each of these agencies issues approvals according to independent schedules.

Designation of a lead agency in accordance with OFD would allow U.S. DOT to serve as the focal point of the review process, as opposed to being a peer on equal footing with non-transportation agencies. Further, setting a mandatory schedule for companion agencies will add a needed sense of predictability to the project review and approval process.

### Page Limits on NEPA Documents

ARTBA supports CEQ's proposed page limit thresholds on the length of EISs and environmental assessments (EAs). Setting page limits would compel authors of these documents to write in clear and more concise terms, for the benefit of related government agencies and the community. Additionally, it would reduce the delay associated with new transportation construction projects by dramatically cutting down the time needed to complete the final document.

Currently, the EIS process for a new highway project is a multi-year endeavor. A major reason for this is the length of the EIS itself, which can literally span multiple volumes totaling thousands of pages under the current NEPA regulations.

The EIS is meant as a resource for affected members of the community to gain information about the proposed project. In practice, an overly-voluminous EIS can be impossible for many lawyers to understand, much less community members without any prior training in the fields of law or environmental consulting. One factor behind lengthy EISs is the fear of litigation on the part of project developers. In an effort to anticipate issues which could be used to delay a project through litigation, project developers have reportedly attempted to "bulletproof' their EISs. This results in a document which attempts to address every possible contingency or scenario to arise in connection with a proposed project, no matter the relevance or how likely it

5

is to be a factor in environmental decision making. The end product of this process is an EIS which is completely unwieldy and does not serve its intended purpose.

CEQ's recommendation would help alleviate these concerns. ARTBA also appreciates CEQ's allowing flexibility for more complex projects by adding the option for EISs of "unusual scope or complexity." Such flexibility allows for the fact that every transportation construction project is unique, and some are, inevitably, more complicated than others.

### Allowing the Use of Existing Agency Documents to Satisfy NEPA

ARTBA supports CEQ's proposal to allow existing agency documents to serve as a "functional equivalent" to NEPA requirements if the data is sufficient.

For transportation projects, an extensive amount of information is gathered during the planning process, which often occurs prior to the actual triggering of NEPA requirements. Allowing information gathered during the planning process, to the extent it is still current and relevant, to satisfy NEPA requirements would limit duplicative reviews and reduce the amount of delay in the NEPA process. If current information is already available as the result of compliance with transportation planning requirements, that information should satisfy NEPA regulations as well. This would increase efficiency and maintain environmental protection. Duplicative reviews serve no redeeming purpose as part of the NEPA process, and should be eliminated wherever possible.

### NEPA and Greenhouse Gas (GHG) Emissions

CEQ has asked commenters to address "whether it should codify any aspects of its proposed GHG guidance in the regulation and, if so, how it should address them in the regulation."

NEPA was designed to address the direct impacts of federal actions. For transportation projects, this means tangible effects on the environment, such as removal of wetlands and impacts to wildlife. Congress enacted NEPA in 1969—long before GHGs and climate change were contemplated from a regulatory perspective. The statute does not contain the proper regulatory mechanism for assessing GHGs and climate change. Moreover, climate change impacts are distinct from the impacts traditionally addressed by NEPA analyses. They are more speculative, harder to quantify, and may not be realized until long after a project is completed.

Expanding the scope of NEPA to cover GHGs and the effects of climate change could counteract all of the aforementioned efforts to reduce the amount of time for the review and approval process. With this in mind, ARTBA is supportive of the approach taken by the CEQ guidance, which states "[a]gencies are not required to quantify effects where information necessary for quantification is unavailable, not of high quality, or the complexity of identifying emissions would make quantification overly speculative." ARTBA also agrees with CEQ that "[a]gencies preparing NEPA analyses need not give greater consideration to potential effects from GHG emissions than to other potential effects on the human environment."

6

As agencies do consider greenhouse gas emissions for transportation projects, ARTBA recommends these analyses take into account both the potential benefits and adverse impacts of the project in question. For example, a complete analysis should consider a reduction in GHGs resulting from the extent to which a transportation improvement alleviates traffic congestion. Emissions from vehicles stuck in traffic are much greater than those on roads where traffic is free flowing.

Additionally, any proposed NEPA GHG and climate change analysis should be limited to the project itself. NEPA was not meant to ascertain the impacts of what may or may not happen once a project is completed. Thus, if a transportation improvement is reviewed under NEPA for GHG and climate change impacts, the analysis should focus only on the actual project and not attempt to include subsequent development which may or may not occur once the project is complete.

### Conclusion

ARTBA commends the CEQ for advancing a comprehensive and thoughtful NEPA modernization proposal. The nation's transportation infrastructure needs are too pressing, and funding is too constrained, to continue wasting time and taxpayer dollars on unnecessary project delays resulting from the current NEPA process. Everyone involved in this process can continue to serve as good environmental stewards while achieving the efficiencies envisioned in CEQ's proposal. NEPA modernization is welcome and long overdue.

ARTBA looks forward to continuing to work with CEQ on these efforts.

Sincerely,

David Bauer

David Bauer
President & CEO

7

Tab 10, Exhibit 11 to Declaration of Amy Coyle



# Kane County Resource Development

76 North Main Street ▪ Kanab, UT 84741
Adé Nelson, Resource Planner ▪ anelson@kane.utah.gov
435-644-4964 ▪ 702-588-1444

Mary Neumayr
Chairman
Council on Environmental Quality
730 Jackson Place, NW
Washington, D.C. 20503

March 5, 2020

Re:  Update to the Regulations Implementing the Procedural Provisions of the
National Environmental Policy Act (Docket: CEQ-2019-0003)

*Submitted via Federal eRulemaking Portal: www.regulations.gov*

Dear Chairman Neumayr:

Kane County, Utah, would like to thank the Council of Environmental Quality
(CEQ) for the opportunity to respectfully submit comments regarding the proposed
update to the Regulations Implementing the Procedural Provisions of the National
Environmental Policy Act (NEPA), Docket Number CEQ-2019-003. Kane County
is located in southern Utah and encompasses approximately 2.6 million acres. 85.5%
of those acres are controlled by the federal government, thus the way NEPA is
implemented has a significant impact on our County.

Because of the lack of private land base, Kane County's economy is extremely
dependent on the multiple use of public lands. The primary uses include livestock
grazing, outdoor recreation, hunting, mining and mineral extraction. Existing NEPA
regulations generate a cumbersome process placing unnecessary time restraints and
financial burdens on applicants looking to complete necessary developments and
improvements on federal lands. A more efficient, streamlined NEPA process will
enhance economic growth, quality of life, and environmental stewardship and allow
for an accelerated review process for critical infrastructure projects. Kane County
appreciates the CEQ for recent efforts to improve the NEPA process and supports
the current rulemaking efforts to modernize NEPA. Kane County requests that the
CEQ carefully take into consideration the comments submitted by Kane County and
all other local and State governments in the West. Comments received by those who

are directly affected should be recognized and valued for their on the ground experience.

## § 1501.8 – Cooperating Agencies

Kane County appreciates the CEQ's recognition of the essential role that State, Tribal, and local governments have in public land planning and strongly supports the CEQ's proposal to standardize the qualifications for cooperating agencies. Kane County has and will continue to assert its right to participate in NEPA processes at the earliest practicable time. The Bureau of Land Management (BLM), U.S. Forest Service (USFS), National Park Service (NPS), and other federal agencies have all developed and implemented very different standards for State, Tribal, and local governments to qualify as cooperating agencies. This trend causes confusion and often creates significant difficulties for counties. Standardization across all federal agencies would create a familiarity with the cooperating agency process among State, Tribal, and local governments and allow them the opportunity to participate more effectively.

Kane County also supports the amended definition of "cooperating agency" in the draft rule as it provides opportunity for greater involvement for counties in the NEPA process. Currently cooperating agency status for local governments is left at the discretion of the lead agency. Kane County strongly suggests that in addition to amending the definition of cooperating agency, the CEQ redefine "cooperating agency" to exclude non-governmental entities and non-profits organizations.

In addition to revising the definition of cooperating agency, Kane County suggests the CEQ include regulation that allows local government involvement that better reflects coordination as directed in NEPA based on the criteria as outlined in the Federal Land Management and Policy Act of 1976 (FLPMA). Congress has mandated through federal statutes such as NEPA that federal agencies shall coordinate their federal planning process and management activities with local governments.

Kane County believes that when land use planning and management decisions affect lands within the jurisdiction of the local government, it is imperative that local government involvement is not left to the discretion of the lead agency. It is the responsibility of local governments to protect the health, safety and welfare of the people they serve. In recent years Kane County has been fortunate enough to build and maintain a positive, practical, and mutually beneficial working relationship with local land managers at the BLM and the USFS. Because of this relationship, local

managers and their staff have proactively involved Kane County in planning efforts allowing us to participate and contribute throughout land planning processes; ranging from standard Environmental Assessments (EA) to Land Management Plans. This type of relationship between federal agencies and local governments is not typical, but has proven to be very productive and cost-efficient in Kane County. Prior to its current productive relationship with local land managers, Kane County experienced interactions with local agencies that insisted "cooperating agency" status was the only way local governments could have input in the planning process. Current NEPA regulations define cooperating agency in a way that extremely limits local government involvement and provides no assurance that the agency will take the local governments position into account, merely using cooperating agency "status" as a procedural checkmark to meet cooperation requirements as required by the CEQs NEPA Regulation. Kane County will continue to assert its right to have a more meaningful and contributory role in the planning processes by asserting its coordination authority as set forth and mandated by Congress through Federal Statutes.

The CEQ should consider amending the proposed rule to provide State, Tribal, and local governments the opportunity to participate in NEPA planning with a more pronounced role without having to assert coordination authority; a role that conforms to the original intent, purpose, and procedure for involving State and local governments as set forth by Congress through NEPA. Congress has granted local governments the right to ensure that the local position is taken into account before actions that may negatively impact the cultural and economic wellness of the county and the people who live there. Coordination is not optional and should be recognized and defined in regulations that are consistent with the policy they regulate.

## § 1501.10 – Time Limits

Kane County supports the provision in the proposed rule that ensures that agencies would generally be required to complete EAs in 1 year and EISs in 2 years. This revision is an essential key that will greatly benefit counties that depend on completion of NEPA process before improvement projects and maintenance projects can commence. Kane County has been in a position where necessary improvements to extremely damaged roads posing unsafe passage have been delayed because NEPA lacks time restraints. Long delays in the completion of NEPA projects can create unsafe situations and cause unnecessary burdens on counties and land users that can harm the effectiveness of the project. The proposed time limits will help encourage meaningful participation from affected parties including local

governments and help to facilitate the completion of essential infrastructure improvement projects and necessary landscape-improvement projects.

## § 1508.1(g) – Definition of "Effects"

Kane County is supportive of the CEQ's amended definition of "effects" or "impacts", and its proposal to clarify that a "but for" causal relationship does not provide a sufficient reason to make an agency responsible for a particular effect under NEPA. We agree that effects should not be considered significant if they are remote in time, geographically remote, or the product of a lengthy causal change. The NEPA analysis of such remote and speculative effects under existing rules can be extremely burdensome on federal agencies and does not comply with the original intent of NEPA. If an agency cannot prevent or mitigate certain effects due to its limited statutory authority, the agency should not be required to analyze those downstream effects in its NEPA analysis.

Federal agencies in Utah, particularly land management agencies such as the BLM, USFS, and NPS, operate with very limited resources. Existing policies and practices that require analysis of speculative downstream or cumulative effects distracts staff time and resources from other important projects. Ultimately federal land and resources are neglected when agency personnel are forced to utilize hours analyzing effects that are remote in time or geography. The CEQ's proposed rule will free up more agency staff time to analyze actual, real-world effects of federal actions surrounding resources. This proposal should provide federal personnel with more time to interact with the resources they manage and the people who depend on or enjoy using those resources.

The proposed definition of "effects" would not prohibit a federal agency from analyzing the effects or impacts of a proposed project on anthropomorphic climate change. Some federal NEPA projects may be deemed to have a reasonably close causal relationship to climate change that warrants analysis. But it is simply a misuse of federal resources to require analysis of a project's effects on the global climate if those effects are remote in time, geographically remote, or the product of a lengthy causal change. The proposed rule would empower federal agencies to use a greater degree of common sense when analyzing impacts to global climate.

## § 1501.7(b) - Joint Lead Status

Kane County appreciates the CEQ's attempt to expand joint lead status to local governmental agencies as it is a step in the right direction towards securing a

meaningful seat at the table throughout NEPA projects for all State, Tribal, and local governments effected. But as stated above, it is Kane County's stance that all State, Tribal, and local governments have been granted coordination rights as mandated by Congress. Kane County requests that the revised regulation be written in a way that it is consistent with coordination requirements as outlined in NEPA and more specifically described and defined in FLPMA.

### § 1506.2(c) - Reconciliation with State, Tribal or Local Planning Processes

In 2017, Kane County adopted the Kane County Resource Management Plan. This County Resource Management Plan is an environmental document that should regularly be used by federal agencies as they perform NEPA analysis for projects within Kane County. The proposed rule directs federal agencies to "cooperate with State, Tribal, and local agencies to the fullest extent practicable to reduce duplication between NEPA and comparable State, Tribal, and local requirements…" Kane County supports this provision of the proposed rule and encourages federal agencies to utilize county resource management plans to produce efficient plans.

Kane County does not support the proposed revision that states that "federal agencies <u>may</u> cooperate in fulfilling these requirements, as well as those of Federal laws, so that one document will comply with all applicable laws." The proposed revision should be left as is written "federal agencies <u>shall</u> cooperate in fulfilling these requirements…." using the language from the current rule. Federal agencies should cooperate in fulfilling requirements where State, Tribal, or local ordinances have environmental requirements in addition to those in NEPA.

### § 1506.2(d) - Reconciliation with State, Tribal or Local Planning Processes

The proposed rule also tasks federal agencies with "discuss[ing] any inconsistency of a proposed action with any approved State, Tribal, or local plan or law".   The proposed rule further states that "while the statement should discuss inconsistencies, NEPA does not require reconciliation".  The County encourages the CEQ to amend this provision – federal agencies should seek to reconcile EISs (and EAs) with State, Tribal, and local plans or laws, including county resource management plans.  The County proposes that the CEQ delete the final sentence of proposed § 1506.2(d) and include the following language in the proposed rule:

"To better integrate environmental impact statements and environmental assessments into State, Tribal, or local planning processes, environmental impact statements and environmental assessments shall be consistent with State, Tribal, or

local planning processes to the maximum extent, consistent with federal law.  Where an inconsistency exists, the Federal agency shall seek to reconcile the environmental impact statement or environmental assessment with the State, Tribal, or local plans or law."

The language proposed above would be consistent with requirements for federal land use plans developed under FLPMA. FLPMA states federal land use plans "shall be consistent with State and local plans to the maximum extent the Secretary finds consistent with Federal law and the purpose of FLPMA."  Kane County believes that EISs and EAs developed under NEPA should follow suit.  County governments have expertise and jurisdiction over lands within their borders, including federal lands. County resource management plans and other laws, plans, and policies impacting federal lands are developed by county governments using that expertise and jurisdiction.  Federal agencies have a responsibility to be responsive to local governments and local elected officials, and NEPA documents shall be consistent with local laws, plans and policies that allow NEPA projects to benefit from the expertise encompassed in local governments.  The CEQ should use the consistency requirements in the text of FLPMA as the model for regulatory requirements for NEPA.

## § 1502.16(a)(10) – Environmental Consequences

§1502.16(a)(10) requires federal agencies to consider the economic benefits of a proposed action (where applicable).  The County supports this provision and requests that the CEQ amend this provision to require federal agencies to also consider "economic costs" of the proposed actions. Many proposed federal actions have the potential to impose significant economic costs on local communities and residents who depend on the utilization of resources on public lands. Congress declared through NEPA that it is the national environmental policy "to create and maintain conditions under which man and nature can exist in productive harmony, and fulfill the social, economic, and other requirements of present and future generations of Americans." The intent of NEPA was not written to be a one-sided environmental analysis. It was meant to produce an analysis that considers both the human and natural environment. Kane County supports the proposed requirement in §1502.16(b) to consider impacts of a proposed project to the human environment.

## § 1506.7 - Further Guidance

The CEQ should add to its list of executive orders under which further guidance may be provided, Executive Order # 13790 – Presidential Executive Order Promoting

Agriculture and Rural Prosperity in America, issued by President Donald J. Trump on April 25, 2017.

## Conclusion

Kane County appreciates the opportunity to comment on the CEQ's proposed updates to the procedural regulations of NEPA and would like to thank the CEQ for its proactive attempt to modernize the NEPA process to better suit current issues and needs. The NEPA process will function much better as a whole if documents are developed with the help of local governments who possess valuable expertise and local perspective that will assist land managers to make decisions that will improve the health and productivity of federal lands.

Sincerely,

Adé Nelson, Kane County Resource Planner

Lamont Smith, Kane County Commission, Chair

Andy Gant, Kane County Commission

Brent Chamberlain, Kane County Commission

Tab 11, Exhibit 11 to Declaration of Amy Coyle



# Wyoming County Commissioners Association

P.O. Box 86 • 408 W 23rd Street • Cheyenne, WY • 82003
(307) 632-5409 • www.wyo-wcca.org

March 10, 2020

The Honorable Mary Neumayr
Chairman
Council on Environmental Quality
730 Jackson Pl, NW
Washington, D.C. 20503

Re: Update to the Regulations Implementing the Procedural Provisions of the National Environmental
Policy Act (Docket: CEQ-2019-0003)

Dear Chairwoman Neumayr,

On behalf of the Wyoming County Commissioners Association ("WCCA"), an organization representing
the boards of county commissioners for all twenty-three of Wyoming's counties, I am writing with
comments regarding the Council on Environmental Quality's ("CEQ") proposed update to the
Regulations Implementing the Procedural Provisions of the National Environmental Policy Act ("NEPA").

WCCA applauds CEQ's efforts to modernize NEPA's implementing regulations. NEPA and its required
analyses play an outsized role in Wyoming, where nearly half of the state is managed by the federal
government along with much of the mineral estate. NEPA analyses for these resources take years—
sometimes decades—to complete. In the meantime, projects and associated benefits languish. The
proposed changes to the NEPA regulations will help streamline this process in a way that will benefit
Wyoming counties. WCCA supports the proposed changes and makes the following recommendations.

I.    **Ensure agencies consistently and regularly review state, tribal and local plans and policies to
avoid duplication.**

a.    **Retain revisions intended to avoid duplication of state, tribal and local environmental
reviews.**

WCCA appreciates the emphasis included in 40 C.F.R. § 1506.1 on avoiding duplication of State, Tribal
and local environmental reviews.[1] While regulations already require this, Wyoming counties often find
that federal agencies conduct limited reviews of local plans and policies, if these consistency reviews are
conducted at all. Moreover, approaches to conducting these kinds of consistency reviews vary agency to
agency. The proposed revisions should provide additional clarity and instruction to agencies that
consistency reviews—not just at the state level—are important and mandatory.

b.    **Formalize the consistency review process.**

While the existing and proposed regulations require federal agencies to reduce duplication between
federal and state, local and tribal requirements and planning processes, they do not provide any process
by which any agency, be it federal, state, local or tribal, would review and identify inconsistencies. The

---

[1] 85 Fed. Reg. 1704; 1724.



# Wyoming County Commissioners Association

P.O. Box 86 • 408 W 23rd Street • Cheyenne, WY • 82003
(307) 632-5409 • www.wyo-wcca.org

CEQ should consider providing such a process by regulation. For example, Bureau of Land Management, as part of developing its resource management plans, provides for what it calls a "consistency review."[2] Pursuant to this consistency review, BLM provides the governor of the state in which the plan is proposed the opportunity to identify inconsistencies and provide recommendations to the BLM state director.[3] The state director, after providing the public an opportunity to comment on the recommendations, may either accept or reject them along with an explanation of their determination.[4]

CEQ should consider requiring a similar process by which state, tribes and local government would be afforded an opportunity to review a proposed decision for inconsistencies with their own plans and policies.

## II.    Cooperating agencies revisions.

### a.    Cooperating agencies should be included in EA and EIS development.

WCCA supports CEQ's proposal to expand cooperating agency provisions to both EISs and EAs as is often done in practice. The special expertise Wyoming counties provide to the NEPA process will be just as valuable when developing an EA as it is in preparing an EIS. Moreover, as CEQ indicates, this is common practice among federal agencies conducting NEPA analyses. Updating the NEPA regulations to codify this process is appropriate.

### b.    Allow non-federal cooperating agencies to appeal a denial of its request to serve as cooperating agency to the CEQ.

WCCA requests the right granted to federal agencies to appeal a denial of its request to serve as a cooperating agency to the CEQ be extended to state, local and tribal agencies. Under the existing and proposed regulations, the lead agency has the discretion to grant cooperating agency status to a federal agency with special expertise just as it does a non-federal agency. There is no rational reason to deny similarly situated agencies—be they federal or not—the same right to appeal to the CEQ. WCCA asks that the proposed revisions be changed to allow non-federal agencies the opportunity to seek a second opinion from CEQ regarding a lead agency's decision to deny cooperator status.

### c.    Provide uniform guidance and clarity across agencies on the role of cooperating agencies.

BLM should consider including in its final regulations uniform and clear guidance on the role cooperating agencies play regardless of the lead agency. From commissioner experiences, each agency treats cooperating agencies differently, with the Bureau of Land Management and the Forest Service providing a more involved role (some decision-making opportunity), whereas the National Park Service involve cooperators very little, if at all. Moreover, the process can be inconsistent within each agency. The CEQ regulations should require a presumptive process and involvement for cooperating agencies that any

---

[2] 43 C.F.R. § 1610.3-2(e).
[3] *Id.*
[4] *Id.*





# Wyoming County Commissioners Association

P.O. Box 86 • 408 W 23rd Street • Cheyenne, WY • 82003
(307) 632-5409 • www.wyo-wcca.org

lead agency must follow unless it provides a reasonable justification for deviation. Involvement should be meaningful and substantive, providing cooperating agencies an opportunity to share special expertise and capacity.

### III.    Clarify under what circumstances a non-federal agency may assume NEPA responsibilities.

The proposed regulations make reference to non-federal agencies assuming NEPA responsibilities from a federal agency.[5] WCCA asks that the CEQ regulations be revised to clarify under what circumstances it is permissible and appropriate for non-federal agencies to assume such responsibilities if a non-federal agency so chooses, beyond just the Housing and Urban Development and Surface Transportation Project Delivery Program contexts.

Federal agencies may rely on detailed statements issued by states under certain circumstances[6] and may cooperate with state, tribal and local agencies to reduce duplication of analyses. Under the proposed regulations, non-federal agencies may serve as joint lead agencies where joint environmental impact statements are appropriate.[7] Moreover, NEPA and its implementing regulations contemplate broad cooperation among federal, state, tribal and local governments. Considering all of this, when it is appropriate for a federal agency to delegate responsibilities for part or all of a NEPA analysis to a non-federal agency?

On this point, WCCA echoes a comment provided by the National Association of Counties:

> The Administration should vest the greatest possible authority in local and regional offices of the various federal agencies to enter into formal agreements with state and local partners, including allowing state and local governments to conduct portions of the NEPA analysis or provide critical data used in the NEPA analysis. Counties believe the opportunities afforded to serve as co-lead agencies in CEQ's proposed rulemaking are a positive step to ensure early, consistent cooperation and coordination with state, local and tribal governments.

Non-federal agencies, including county governments, provide valuable expertise, knowledge and information to a NEPA process. Moreover, counties can add capacity and increase efficiencies when federal agencies ask it of them. WCCA requests that the NEPA regulations be revised to provide for and encourage these opportunities.

### IV.    Include clarity on the process for considering and applying categorical exclusions.

WCCA supports CEQ's proposal to broaden the use of categorical exclusions (CE) to efficiently satisfy NEPA requirements.[8] NEPA processes are expensive, cumbersome and time-consuming. To address

---

[5] *Id*. at 1704.
[6] 42 U.S.C. § 4332(D).
[7] 85 Fed. Reg. 1724.
[8] *Id*. at 1696.



# Wyoming County Commissioners Association

P.O. Box 86 • 408 W 23rd Street • Cheyenne, WY • 82003
(307) 632-5409 • www.wyo-wcca.org

these inefficiencies, WCCA supports the use of CEs to address threats to communities or watersheds, reduce the risk of catastrophic wildfire and ensure the timely construction and maintenance of critical transportation and water infrastructure. Not all federal projects require a NEPA analysis.  Federal agencies should make use of CEs where appropriate.

## V.    Require page and time limits for EISs and EAs.

WCCA applauds CEQ for including in its proposed revisions time and page limits for EAs and EISs.  Often, in Wyoming, EISs number in the hundreds of pages and take years to complete. The administrative burdens that accompany such lengthy documents and process can be overwhelming for Wyoming counties whose resources are limited.  The proposed presumptive page and time limitations for EAs and EISs will ensure projects are appropriately studied within a reasonable timeframe.  Additional requirements for federal agencies to formally request comments from all impacted county governments, rather than just county or other local environmental agencies, before an EIS is finalized will help to guarantee that local input remains an essential component of the NEPA process.

## VI.    Presumptive number of alternatives.

WCCA suggests that CEQ consider including in its revised regulations a presumptive limit on the number of alternatives an agency may consider in an EIS.[9]  This limit might be three or four, including a no action alternative.  Providing a limit would narrow the scope of the agency when appropriate and consistent with NEPA itself, while still considering a reasonable range of alternatives.  On more complex projects, where consideration of more alternatives is necessary to satisfy statutory requirements, an agency could exercise its discretion and include more that three or four.  Limiting alternatives considered would increase efficiency, conserve lead and cooperating agency resources and reduce the time it takes to complete a NEPA analysis.

Again, thank you for the opportunity to comment on the CEQ's proposed revisions to its NEPA regulations.  Please do not hesitate to reach out with any questions.

Sincerely,

Dr. Troy Thompson
President, Wyoming County Commissioners Association
Laramie County Commissioner

---

[9] *Id*. at 1702.

4

Tab 12, Exhibit 11 to Declaration of Amy Coyle



**Nathan Craig**
Director
Energy and Environmental Policy
526 S. Church Street
Charlotte, NC  28202
Tel: 704.382.9622
nathan.craig@duke-energy.com\

March 10, 2020

**VIA www.regulations.gov**

**Re:** Proposed Rule *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act. 85 Fed. Reg.* 1,684 (January 10, 2020), Docket ID No. CEQ–2019–0003

Duke Energy Business Services LLC, on behalf of Duke Energy Carolinas LLC, Duke Energy Florida LLC, Duke Energy Indiana LLC and Duke Energy Kentucky Inc., Duke Energy Ohio Inc., Duke Energy Progress LLC, Duke Energy Renewables and Piedmont Natural Gas Company Inc. (collectively Duke Energy), provides the following comments on the Council on Environmental Quality's (CEQ) proposed rule titled *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*. Duke Energy is one of the largest energy holding companies in the United States with a large diversified portfolio of energy services. We provide electricity to 7.8 million customers in six states, natural gas to 1.6 million customers in five states and operate a growing renewable energy portfolio across 19 states. The company owns approximately 51,000 megawatts of regulated generating capacity and owns and maintains 31,312 miles of electric transmission lines, 280,100 miles of electrical distribution lines and 33,700 miles of natural gas transmission and distribution pipelines. The non-regulated commercial segment owns and operates utility-scale wind and solar generation assets, distributed solar generation assets, distributed fuel cell assets and a battery storage project, which total 2,282 megawatts from 22 wind facilities, 126 solar projects, 11 fuel cell locations and one battery storage facility.

Duke Energy is fundamentally changing the way we generate and deliver the electricity our customers depend on. This includes a commitment to reduce carbon emissions at least 50 percent by 2030 from 2005 levels, and to achieve net-zero $CO_2$ emissions by 2050. We plan to accelerate the transition to cleaner energy by at least doubling our portfolio of solar, wind and other renewables by 2025, deploying low-cost natural gas, and continuing to operate our existing carbon-free technologies, including nuclear and hydroelectric stations. Expanding and modernizing the electric grid and advancing new technologies, such as advanced nuclear

reactors, carbon capture and storage, and long-duration energy storage, will be vital in this transition. These projects, including research and development efforts, often trigger review under the National Environmental Policy Act (NEPA). While NEPA's goals are laudable, reviews required thereunder have historically added significant delays, unnecessary costs and uncertainty to projects requiring federal approval.

To help foster the clean energy transformation, Duke Energy supports the efforts by the CEQ to modernize the implementing regulations to facilitate more efficient, effective and timely NEPA reviews. Over the 50-year history of NEPA, environmental reviews have become longer and more resource intensive and litigious, resulting in significant uncertainty and project delays. This has not only increased costs to customers, but also has deterred investments in much-needed infrastructure projects. The costs and complexity of NEPA reviews and litigation make it very challenging for businesses both large and small to plan, finance and build projects in the United States. Electricity infrastructure projects require extensive planning and coordination to ensure that the environment is protected, and that we provide reliable and affordable electricity to our customers who depend upon it. An efficient and practical environmental-review process is essential to modernizing and transforming the electric energy sector.

Overall, improvements to the NEPA regulations that will facilitate more efficient, effective and timely NEPA reviews by federal agencies are necessary and appropriate, and CEQ should codify these practices in the final regulations. We welcome the opportunity to work with you on this important issue. Please feel to contact me any time at nathan.craig@duke-energy.com.

Sincerely,

Nathan Craig

Tab 13, Exhibit 11 to Declaration of Amy Coyle

# CHAMBER OF COMMERCE
### OF THE
## UNITED STATES OF AMERICA

**MARTY DURBIN**
PRESIDENT
GLOBAL ENERGY INSTITUTE

1615 H STREET, N.W.
WASHINGTON, D.C.  20062
202/463-5399

March 10, 2020

**VIA ELECTRONIC FILING**

The Honorable Mary B. Neumayr
Chair of the Council on Environmental Quality (CEQ)
730 Jackson Place, NW
Washington, DC 20506

**RE:    Update to the Regulations Implementing the Procedural Provisions of the National
Environmental Policy Act, 85 Fed. Reg. 1,684 (January 10, 2020); Docket No. CEQ-2019-
0003**

Dear Chair Neumayr:

The U.S. Chamber of Commerce ("the Chamber") appreciates the opportunity to comment on the
Council on Environmental Quality's (CEQ) proposed revisions to National Environmental Policy
Act (NEPA) implementing regulations.

The Chamber and its members are strong supporters of NEPA, and recognize its critical role in
facilitating a process to consider potentially significant environmental impacts of projects related
to federal permits and approvals. However, the decision-making process under NEPA is widely
regarded as broken and in need of reforms that can enhance infrastructure as well as
environmental stewardship.

In the more than 40 years since CEQ promulgated its initial NEPA regulations, the length,
complexity and delays associated with project reviews has steadily grown. These delays are
affecting economic growth, public safety and welfare, national security, and the environment.
The Chamber supports CEQ's interest in revising the NEPA regulations to ensure a more efficient,
timely, and effective process consistent with NEPA's important purpose and mission.

In today's increasingly competitive and globalized economy, the need for efficient development
of American infrastructure is paramount. Investments in transportation, energy, communications,
and other projects would improve the quality of our infrastructure to help move goods in a
faster, more reliable, and more resilient manner, providing both immediate and long-term
economic benefits to communities across the country.

**I.      We Support CEQ's Revisions that Restore Agency Focus to Analysis of Information that is Meaningful and Significant**

Such direction will help restore NEPA reviews to the original intent of the statute to provide meaningful insight to agencies and the public on those environmental impacts that are truly significant.  CEQ's final regulations from 1978 state that "NEPA documents must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."[1]

NEPA's purpose is to establish a framework by which federal agencies can understand the environmental impacts of their decisions, allowing them to consider actions that might mitigate such impacts.  Agencies can only achieve this purpose if the information considered meaningfully informs the agency's action. An analysis is only meaningful if the information is relevant to the agency's decision-making discretion within the bounds of the action statute. The action statute authorizes the major federal action that triggers the NEPA review.

The action statute prescribes the parameters for agency decision-making and thus limits the agency's discretion to act. NEPA "imposes only procedural requirements" to ensure that agencies are well informed under the action statute.[2] NEPA does not expand the parameters of the agency's decision-making beyond consideration of information the agency has the discretion to act on.

**II.      We Support CEQ's Presumptive Page Limit Proposal to Restore the Original Intent of NEPA Analyses to be "Concise, Clear and to the Point"**

NEPA provides important safeguards to ensure that major federal actions and approvals carefully consider environmental impacts.  However, the scope of NEPA analysis should be focused on information specifically related or consequential to the federal action at hand, as opposed to an overly broad and exhaustive analysis of all issues, without regard to significance.

CEQ's final regulations promulgated in 1978 stated that "Environmental Impact Statements shall be concise, clear, and to the point…"[3]  Those regulations go on further to say that "NEPA's purpose is not to generate paperwork—even excellent paperwork—but to foster excellent action."[4]  Moreover, they direct agencies to "us[e] the scoping process, not only to identify significant environmental issues deserving of study, but also to deemphasize insignificant issues, narrowing the scope of the EIS process accordingly."[5] Unfortunately, over time, agencies have increasingly failed to adhere to these foundational NEPA principles.

---

[1] 40 C.F.R. § 1500.1(b)

[2] Dep't of Transp. v. Pub. Citizen, 541 U.S. 756 (2004) (citing 42 U.S.C.§ 4321) (NEPA "was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States.'").

[3] 40 C.F.R. § 1500.2(b)

[4] 40 C.F.R. § 1500.1(c)

[5] 40 C.F.R. § 1500.4(g)

To support CEQ's original intent, a CEQ question and answer guidance document originally issued in 1981 and then amended in 1986 stated that "the Council has generally advised agencies to keep the length of EAs to not more than approximately 10-15 pages. Some agencies expressly provide page guidelines (e.g., 10-15 pages in the case of the Army Corps)."[6]  These page count goals envisioned fifteen years after NEPA was signed into law focused on limiting the analysis to what was necessary for Federal decision-making.  The 1986 guidance's page count limit make CEQ's proposal for agencies to limit their EAs to 75 pages seem expansive.

In 2019, a CEQ 2019 report that examined over 500 projects requiring EISs from 2013 to 2017 and found the average length of analysis was over 1,200 pages per EIS including the appendices.[7]  For these same 500 projects, the federal government amassed almost a million pages of NEPA documentation.

These voluminous analyses not only incur significant cost burdens on project developers and reviewing agencies, they lead to incalculable costs due to delayed private and public benefits of the projects.  For three NEPA reviews approved in 2015 by DOE, the estimated cost for preparing the NEPA reviews was about $7,500 dollars per page of analysis.[8] The cost burden of these analyses on taxpayers is high.  In 2017, the American Action Forum assessed 148 projects and estimated that the review process costs were almost $230 billion.[9]

For these reasons, we support CEQ's effort to modernize NEPA implementing regulations and ensure a more efficient, predictable, and effective approach to environmental permitting of infrastructure and development projects.

### III.    We Support CEQ's Presumptive Time Limit Proposal to Restore the Intent of Not Delaying NEPA Decision-making

Since NEPA was last comprehensively updated in the late 1970s, the time it takes to complete environmental reviews has increased significantly.  When it takes longer to go through the federal approval process than it does to actually build a project, it is an indication that the NEPA process is broken.

According to CEQ, of the 170 projects that were reviewed by the U.S. Department of Transportation from 2010 to 2017 that required an environmental impact statement (EIS), half took more than six years to complete.  The length of these environmental reviews take up the entire transportation funding cycle, which is typically six years, making it difficult for states and private sector investors to plan large-scale transportation projects.  These permitting process delays directly translate to delays constructing important transportation projects and realizing

---

[6] "Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations," Council on Environmental Quality Memorandum to Agencies, 1986, https://www.energy.gov/sites/prod/files/2018/06/f53/G-CEQ-40Questions.pdf
[7] Length of Environmental Impact Statements (2013-2017), Council on Environmental Quality, July 22, 2019, https://ceq.doe.gov/nepa-practice/eis-length.html
[8] National Environmental Policy Act Lessons Learned, U.S. Department of Energy, NEPA Quarterly Newsletter, March 1, 2016, Issue No. 86, https://www.energy.gov/sites/prod/files/2016/03/f30/LLQR-March-2016.pdf
[9] Regulatory Burdens and the Supply of Infrastructure Projects, Curtis Arndt, American Action Forum, https://www.americanactionforum.org/research/infrastructure-regulatory-burdens/

3

the associated environmental and safety benefits as well as the reduced congestion that more efficient infrastructure can deliver.

The Basnight Bridge in North Carolina connecting Hatteras Island and Bodie Island is a good example of the unreasonable delay of an important infrastructure project due to NEPA. The environmental review took 25 years to complete under NEPA, but only three years to build the 2.8 mile bridge. The need for the bridge was unquestioned as it was going to replace a 56 year old, crumbling bridge that moved an estimated 2 million tourists a year between the islands. The new design was also safer for travelers and more resilient to the corrosive sea environment and severe storms.

In addition to bridges, railways, airways and waterways, our energy and industrial facilities, telecommunications networks, and other public assets are equally vital to economic activity. The failure to secure timely approval for projects and land management decisions is also hampering economic growth. All too often, investment and development in these sectors is negatively affected by NEPA reviews.

Reducing costs and uncertainties associated with infrastructure investment and related projects has the potential to support more and better-paying jobs throughout the country. Various private and public organizations estimate the creation of up to 13,000 jobs for every $1 billion spent on infrastructure. In addition to providing jobs, these projects also provide more local tax revenue supporting local communities.

We support the proposed NEPA updates to increase transparency and predictability as well as improved coordination between federal agencies to eliminate unnecessary barriers that prevent or delay the implementation of critical projects. Improved regulatory predictability would allow businesses to plan and invest with confidence while enhancing economic productivity and efficiency. Such process improvements would also encourage many states and localities to follow federal leadership on approving infrastructure projects and land management activities.

**IV.    Examples of the Economic and Environmental Challenges Posed by NEPA for a Few Sample Sectors**

The following sections detail numerous examples illustrating the economic and environmental challenges that these process improvements would address.

**a.   Streamlining NEPA Permitting Would Help Unlock Investment in Telecommunication Infrastructure**

In a U.S. Chamber of Commerce 2019 report, "Unlocking the Digital Potential of Rural America," our research showed that nearly 20% of rural small businesses in America generate the vast majority of their revenue by selling their products online.[10]  About half of rural small businesses sell their products and services online on their own website or through a third party website.

---

[10] Unlocking the Digital Potential of Rural America, U.S. Chamber Technology Engagement Center (C_TEC), March 2019, https://americaninnovators.com/rural-report/

Better infrastructure would allow for greater use of these digital tools and technology in rural small businesses across the country.  We estimate that if given access to digital tools, rural small businesses could innovate and add nearly $47 billion to U.S. GDP.

The economic opportunity is there; however, many rural areas of the country lack the necessary infrastructure to bring about this potential.   A recent article posed several scenarios that may play out in the lives of rural Americans.  In one, "a sixth grader, who is trying to finish an online project, can only complete this assignment while sitting in her parent's car in the parking lot of her school."  In another, "a physician, whose patient lives more than an hour away, wants to utilize remote patient monitoring technology, but is unable to do so."

These types of scenarios could be addressed and more opportunities given in rural areas, by streamlining the permitting process for rural broadband, whether wireline connections on poles or underground equipment, as well as emerging 5G wireless technologies. The wireless communications industry that is building out new 5G networks has described the permitting obstacles it faces in part due to NEPA: "It can take about an hour or two to install a small cell that's roughly the size of a pizza box on a streetlight or utility pole, but it can take a year or more to get the necessary permits."[11] With the industry aiming to install 800,000 such cells in the coming years to make 5G a reality, it is not difficult to understand how NEPA permitting delays could slow the rollout of this beneficial new technology."

We support CEQ's updates, which are aimed at restoring the original intent of the program.  CEQ's original implementing regulations from 1978 tells federal agencies to "reduce paperwork and the accumulation of extraneous background data" and that NEPA documents" must concentrate on the issues that are truly significant to the action in question, rather than amassing needless detail."[12]

Streamlining NEPA's procedures will help America meet the demand for highly efficient communications infrastructure.  The cloud has transformed the telecommunications industry sparking an enormous need for faster internet and 5G networks.  This has spurred the development of innovative technologies that demand higher rates of data transfer to perform speech recognition, navigate, enable digital assistants, use virtual reality, to name a few.

The federal government owns or administers close to 30 percent of all land in the U.S. as well as thousands of buildings, and funds state and local transportation infrastructure.  Improved processes for broadband deployment would increase broadband facilities servicing rural communities, improve services in urban areas, enhance public safety by providing improved emergency communications, spur competition between broadband providers, and multiply the public benefits of existing federal infrastructure investments.

---

[11] FCC Infrastructure Reform Jumpstarts 5G Deployment, CTIA, March 22, 2018, https://www.ctia.org/news/fcc-infrastructure-reform-jumpstarts-5g-deployment
[12]  40 C.F.R. § 1500.2(b)

**b. Restoring NEPA to Its Original Intent will Increase Transportation Efficiency Including the Distribution of Goods and Services**

For the last three years, the U.S. Chamber of Commerce has led the charge in support of a comprehensive infrastructure bill. While we have actively engaged with White House and Congressional leaders on infrastructure legislation, reforming our outdated permitting process is just as essential. As U.S. Chamber CEO Tom Donohue has said repeatedly: "It shouldn't take longer to approve a project than to build it…You can line up all the cash you need, but if the permitting process is slow or broken—there's no point in doing an infrastructure deal. And any proposal that fails to reform the permitting system won't have the Chamber's support."

NEPA has become unacceptably burdensome, delaying infrastructure projects that would benefit Americans every single day with faster commutes, reduced vehicle maintenance due to upgraded roadways, and more efficient delivery of goods and services. In addition, a modern, efficient highway system would deliver environmental benefits with reduced emissions associated with less idling in congestion and more infrastructure resiliency.

For instance, the I-70 expansion project in Colorado was delayed more than 13 years. The 10-mile stretch of road to be upgraded is home to 1,200 businesses and carries up to 200,000 vehicles per day connecting Denver International Airport to the surrounding region. The $1.2 billion project will not only provide immediate construction jobs, but also will improve public safety with a widened shoulder, reduce congestion to cut down on delivery delays, and feature a four-acre park to connect communities separated by a viaduct built in the 1960s.

It can take longer to get government approvals under NEPA than it takes to construct a project. As referenced above, the NEPA review of the Basnight Bridge project in the Outer Banks of NC took 25 years to be approved while the bridge itself was built in three years. The Basnight Bridge that replaced the 56 year old Bonner Bridge.[13] For this bridge, advanced engineering and construction techniques employed the use of precast concrete structural elements that allowed for rapid construction, while still maintaining the quality and durability of the new bridge.

**V.  Reducing NEPA Delays will More Quickly Deliver Environmental Benefits to the Public**

Further, delays caused by current NEPA regulations hinder the development of more efficient roadways, airways, and waterways that would help reduce emissions. The American Trucking Association stated in their February 25, 2020 testimony at CEQ's NEPA public hearing that, "[e]very minute that a truck sits in traffic adds $1.20 to the cost of that truck's operation. Industry-wide, that adds up to $75 billion a year. And that wasted time sitting in traffic has environmental consequences as well. Congestion caused the trucking industry to consume an additional 7 billion gallons of fuel in 2016, representing 13% of the industry's fuel consumption, and resulting in 67 million metric tons of excess carbon dioxide emissions."

---

[13] The Bonner Bridge Replacement Timeline: A Look at the Many Obstacles Along the Way, Joy Crist, Island Free Press, February 11, 2019, https://islandfreepress.org/hatteras-island-features/the-bonner-bridge-replacement-timeline-a-look-at-the-many-obstacles-along-the-way/

Modern roads and bridges will deliver environmental benefits from their new designs, but environmental benefits can also be obtain from reducing NEPA delays for mass transit projects. The purple line transit system in Maryland was formally proposed in 2003 and not approved for 14 years.  The light rail line is a 16-mile project would connect New Carrollton and Bethesda, Maryland, providing environmentally-friendly transit for an estimated 70,000 daily riders and leading to a 17,000 fewer vehicles on local roads.  Not only would it help reduce emissions associated with fewer cars and reduce congestion, it will also bring thousands of jobs to the region.[14]

Since the release of CEQ's proposed regulations in January 2020, numerous stakeholders have detailed the importance of NEPA reforms to addressing important environmental challenges. For example, the American Wind Energy Association released a statement saying, "[r]educing permitting delays and uncertainties associated with responsible wind energy infrastructure development will create jobs, increase deployment of clean, reliable American-made domestic power…"[15]   The Special Initiative on Offshore Wind's (SIOW) whitepaper from 2019 estimates that nearly $70 billion of capital investment is expected for America's coasts for offshore wind in the next 10 years.[16]

This level of investment in infrastructure would provide reliable energy in places like New England and New York where infrastructure development onshore is famously difficult; however, these projects are also facing delays under NEPA.  For example, the Vineyard Wind Project is an offshore wind farm that has been delayed under NEPA for the last two years.  This project is a $2.8 billion investment and part of the $70 billion in potential offshore wind that could be deployed to the northeastern part of the U.S.  The Vineyard Wind Project would provide enough capacity to power 400,000 homes.

In the Bipartisan Policy Center's blog regarding the CEQ proposed rulemaking, they stated, "[w]e must reconcile the imperative for a massive clean energy transition with an inefficient environmental review and permitting process—one regularly used to gin up public opposition, lay down bureaucratic roadblocks, and litigate everything from bike lanes to powerlines. These same hurdles await first-of-a-kind facilities that sequester carbon underground, store massive amounts of clean power or employ advanced nuclear technologies…"  They went on further to say that "…[e]veryone that appreciates the essential steps that must be taken to transition to a low carbon economy should champion any effort to review NEPA regulations and seek to make the process work better."

Reducing the delays of critical infrastructure projects in the transportation and energy sectors, as well as in other sectors, will benefit both the environment and the economy by delivering these benefits sooner.

---

[14] Governor O'Malley Announces Purple Line Receives Federal Environmental Approval, Maryland Transit Administration, March 20, 2014, https://www.purplelinemd.com/component/jdownloads/send/20-record-of-decision/69-record-of-decision-press-release
[15] American Wind Energy Association Statement on National Environmental Policy Act (NEPA) Review Process, January 8, 2020, https://www.awea.org/nepa-review-process-statement
[16] Supply Chain Contracting Forecast for U.S. Offshore Wind Power: White Paper, Stephanie McClellan, March 2019https://cpb-us-w2.wpmucdn.com/sites.udel.edu/dist/e/10028/files/2020/01/SIOW-White-Paper-Supply-Chain-Contracting-Forecast-for-US-Offshore-Wind-Power-FINAL.pdf

## VI.    Multiple Administrations Have Recognized the Importance of Timely NEPA Decisions

Multiple Administrations have recognized the importance of timely federal permitting decisions for critical infrastructure projects by issuing executive orders, presidential memorandums, and Congress has authorized legislation to expedite federal decision-making.  President Obama's 2012 executive order recognized the need to improve the performance of federal permitting and the review of infrastructure projects.  He also signed the FAST Act into law, which created a permitting dashboard to accelerate project reviews.  In 2001, President Bush issued an executive order to expedite the review of energy-related permits while emphasizing the need to maintain safety, public health, and environmental protection.

Consistent with its environmental mission, modernizing NEPA will accelerate projects that deliver benefits across a wide array of sectors.  For example, updated roadways and bridges will improve the efficiency of our transportation and distribution systems, thereby reducing traffic congestion and associated emissions.

Streamlined permitting will also spur investment in renewable energy sources and electric transmission infrastructure, which are also subject to delays by current NEPA procedures. And timelier decisions on forest and water resources will help mitigate environmental impacts, such as damaging floods and wildfires.

NEPA updates will also serve to promote public safety through new highway, railway, and airway designs.  Accelerating broadband infrastructure to more rural communities will increase the operability of emergency communications vital to public safety.

These are just a few of the potential benefits of modernizing NEPA's implementing regulations. Increasing investor certainty for these projects will unlock investment in America infrastructure across the economy and put more Americans to work.

## VII.    Examples of Projects Delayed by NEPA

### a.   I-70 Expansion | Colorado



A $1.2 billion project to alleviate severe traffic congestion through the expansion of 12 miles of highway near Denver, the I-70 widening project has become an infamous illustration of the need for NEPA reforms. The project[17] will provide the first safety and capacity improvements to I-70 since the highway's construction in 1964 adding one new Express Lane in each direction, auxiliary lanes for safe exiting, and shoulders for accidents and breakdowns." The Environmental Impact Statement for this stretch of highway took 13 years to complete, involved hundreds of public meetings, and set a record for length—totaling 15,951 pages.

- Lead agency: Federal Highway Administration
- Project delay: 13+ years
- Status: final NEPA permit approved in 2017, now under construction

"This is an affirmation that we've double-checked and tripled-checked everything that had to be done from the federal perspective," said Doug Hecox, a spokesman for the Federal Highway Administration. "They have more than met the requirements."

"If you are flying into DIA and needing to move across the state, an I-70 that flows, that does not break down every day, is going to be a big benefit to tourism, for commerce…If you're a company — and there are a lot of factories and warehouses in this area — your goods are not sitting in traffic. That's going to be a big improvement. For a lot of different reasons, this project makes sense." — Shailen Bhatt, Colorado Department of Transportation[18]

---

[17] I-70 East EIS FAQ, 2017,  http://www.i-70east.com/faqs.html#willwillnot
[18] Feds approve I-70 rebuild, setting the stage for five years and $1.2B of construction in North Denver
Erica Meltzer- Jan. 19, 2017, https://denverite.com/2017/01/19/feds-approve-70-rebuild-setting-stage-years-construction-north-denver/

### b. **Allison Creek Hydroelectric Project | Alaska**



In 2007, the Copper Valley Electric Association elected to add more hydroelectric power to its portfolio, with a fish-friendly "run of river" development near Valdez, Alaska. The project was expected to eliminate the use of 700,000 gallons of diesel fuel used for electricity generation each year, eliminating 12,000 tons of carbon dioxide annually—the equivalent of taking approximately 2,600 cars off of the roads.

- Lead agency: Federal Energy Regulatory Commission
- Status: began operations in October 2016

"The Federal Energy Regulatory Commission (FERC) issued a preliminary permit for the project in 2008, with a three-year deadline for submittal of a formal license application. Despite the co-op's submission of a timely and complete license application in 2011, FERC did not meet project review milestones. The project did not receive final approvals until late 2013, a delay that cost the co-op millions of dollars—including the cost to purchase nearly a million gallons of diesel fuel. More than $700,000 was passed on to the co-op's members due to these delays." – National Rural Electric Cooperative Association[19]

### c. **Project Icebreaker | Ohio**



Originally expected to begin construction in 2021, Project Icebreaker is poised to become the first fresh water windfarm in North America. A 21 megawatt clean energy project located on Lake Erie 13 miles offshore from Cleveland, the project would create thousands of jobs for Northeast Ohio. Despite agreeing to 33 project stipulations sought by environmental interests, a lawsuit has been filed under NEPA that threatens to delay the project.

- Lead agencies: Department of Energy and Army Corps of Engineers
- Project Delay: TBD
- Status: Litigation filed in December 2019 is challenging the adequacy of the federal government's environmental assessment

under NEPA

---

[19] Electric Co-ops Support Proposed NEPA Reforms, Media Relations- Jan 9, 2020, https://www.electric.coop/electric-co-ops-support-proposed-nepa-reforms/

"The clean energy that these turbines will generate is an important step toward reducing emissions and pollution, and combating climate change, which will provide great benefits to birds and other wildlife as well as all Ohioans…"[Project Icebreaker's NEPA] process included consultation with the USFWS and other federal and state agencies. As required by NEPA, the agencies prepared an Environmental Assessment that was exceptionally detailed and thorough. On the basis of that assessment they determined that Icebreaker would have no significant impact to birds, and no significant impact on the environment. Therefore, in accordance with NEPA, preparation of an Environmental Impact Statement is not warranted and would not add to the analysis beyond additional expense and delay." – Lake Erie Energy Development Corporation[20]

### d. Upper Fryingpan Vegetation Management Project | Colorado

 A vegetation treatment plan of 1,631 acres to improve forest resiliency and animal habitat in Colorado is being delayed due to lawsuits claiming the Forest Service failed to follow proper NEPA regulations.

- Agency: Forest Service
- Project Delay: 3+ years
- Status: Project halted; NEPA litigation ongoing

"*This project will provide forest products to local and regional industry while also improving forest resilience and habitat for snowshoe hare, a species that is a key food source for Canadian lynx,*" District Ranger Karen Schroyer said. "*It is part of the mission of the Forest Service to responsibly manage National Forests for multiple uses. Through the NEPA (National Environmental Policy Act) process and productive dialogue, I believe we have struck a balance to achieve the purpose of this project.*"

The Forest Service said the project is being done in the interest of the Upper Fryingpan Valley's health, and that it "*does not authorize any deforestation, which is the conversion of land from a forest to a non-forest use … but instead authorizes treatment that will accomplish an improved forested condition in harvest units.*" [Additionally,] improved health conditions will make the

---

[20] Bird groups file lawsuit over Icebreaker, Dec 12, 2019, https://renews.biz/56960/bird-groups-file-lawsuit-over-icebreaker/

*forest more resistant "to disturbances, such as future bark beetle outbreaks, fires, and other climate-related mortality events."[21]*

### e. Northern Integrated Supply Project | Colorado



The Northern Integrated Supply Project will bring critically needed water reservoirs to Northern Colorado, supplying 15 Northern Colorado municipalities and water districts with 40,000 acre-feet of new, reliable water supplies. NEPA reviews for the project were initiated in 2004 and remain on-going.

- Agency: Army Corps of Engineers
- Project Delay: 15+ years
- Status: Awaiting final NEPA approval from Army Corps of Engineers, as well as state water permit
- Delayed Investment: $1.2B

*"Northern Water – and the Front Range water providers who would benefit from the additional water – say that this project is an absolute necessity. They argue that Colorado is growing in population. That those growing cities will need more water. And that these reservoirs aren't just adding redundancy to municipal water supplies… they're filling a gap, between the demand for water in the state and the available supply…These are places that want to grow, but if you project out into the future they don't have the water secured to make that growth possible."[22]*

### f. Purple Line Transit System | Maryland



Formally proposed in 2003, the 16-mile light rail transit project would connect New Carrollton and Bethesda, Maryland, providing environmentally-friendly transit for an estimated 70,000 daily riders and leading to a 17,000 fewer vehicles on local roads.

- Agency: Federal Transit Administration
- Project Delay: 14 years
- Status: after years of delays and legal challenges, a 2017 court decision rejected NEPA-based challenges to the project. It is now under construction.

---

[21] Forest Service says Fryingpan logging project meets environmental muster, Rick Carroll, Dec 24, 2019, *https://www.aspentimes.com/news/local/forest-service-says-fryingpan-logging-project-meets-environmental-muster/*
[22]What Is The Northern Integrated Supply Project, And Why Is It Controversial?, Luke Runyon, Oct 9, 2019 *https://www.kunc.org/post/what-northern-integrated-supply-project-and-why-it-controversial#stream/0*

"*If plaintiffs or courts can upend the culmination of the onerous NEPA process for economic or policy reasons having nothing to do with the environment, the ensuing uncertainty and delay would discourage public and private investment needed to rebuild and improve the country's transportation infrastructure.*" – American Road and Transportation Builders[23]

"The Purple Line will bring thousands of jobs to the region, attract new residents and businesses to Prince George's and Montgomery counties and help meet the demand for high-quality, reliable east-west transit service inside the Capital Beltway." – Maryland Lt. Governor Anthony G. Brown.[24]

### g. Taos Regional Airport Improvements | New Mexico



An expansion project that would increase planes based in Taos by 75 percent and improve runway accessibility for pilots by 5 percent to improve safety and pilot confidence.

- Delayed: 20.4 Years
- Investment: $25 million

"*Work on the expansion of the Taos Regional Airport has begun, but opponents are continuing their fight to have the project halted…The work follows nearly 30 years of disagreement over the purpose and need of the $24 million project, which is being funded almost entirely by the Federal Aviation Administration.*"[25]

### h. Vineyard Wind Project | Massachusetts



An offshore wind farm, part of larger project to spur $70B in the wind energy sector with enough capacity to power 400,000 homes.

- Delayed: 2 Years and Ongoing
- Potential Investment: $2.8B

"*The decision of the U.S. Bureau of Ocean Energy Management to launch a "cumulative impacts analysis" and hold up the approval of a key permit for Vineyard Wind until that analysis is complete will likely upend the supply chain, financing and construction timeline for the project*

---

[23] Association Argued Project Opponents Were Abusing NEPA, https://www.artba.org/2017/12/19/artba-helps-secure-purple-line-victory-federal-court/
[24]Purple Line MD Record of Decision, *https://www.purplelinemd.com/component/jdownloads/send/20-record-of-decision/69-record-of-decision-press-release*
[25] Taos County planning commission to hear airport appeal March 4, J.R. Logan- Feb 28, 2017, *https://www.taosnews.com/stories/taos-county-planning-commission-to-hear-airport-appeal-march-4,33482*

*chosen by the Baker administration and state utility companies to fulfill part of a 2016 clean energy law."*[26]

### i. Grand Haven Traffic Congestion Improvement | Michigan



A two-lane roadway and bridge project that will mitigate traffic build-up by providing a route for an additional 15,000 to 20,000 vehicles daily.

- Delayed: 16 Years
- Investment: $170 Million

*"After close to two decades of debate, the final hurdle has been cleared for $170 million in improvements to the U.S. 31 corridor… Discussions on the bypass date back to 1993, with the project having been scaled back in recent years. Instead of a new freeway along 120th Avenue through the center of a largely rural area — originally proposed more than a decade ago — the project calls for building the M-231 bypass from M-45 (Lake Michigan Drive) to the interchange at I-96 and M-104 near Nunica."*[27]

---

[26] Federal Review Will Further Delay Vineyard Wind, Colin Young- Aug 9, 2019,
*https://www.wbur.org/earthwhile/2019/08/09/vineyard-wind-project-delayed*
[27]Final hurdle passed for buying M-231 bypass in western Ottawa County, Greg Chandler- Apr 24, 2010,
*https://www.mlive.com/news/grand-rapids/2010/04/final_hurdle_passed_for_buying.html*

**VI. Statements from Organizations and Public Officials Supportive of CEQ's Proposed Updates**

<u>Business Organizations</u>

**U.S. Chamber of Commerce**
 "That's why the Chamber strongly supports the Administration's efforts to streamline permitting processes, and why we are leading a broad coalition representing the business community and workers to support the new rule.  We support NEPA's requirement for environmental reviews and public input.  But too often, the current rules are used as a tool to obstruct important projects, such as highways, bridges, public transit and even renewable energy projects.  Reducing delays and uncertainties associated with infrastructure investment and related projects will allow businesses to plan and invest with confidence while enhancing economic productivity and supporting more and better-paying jobs throughout the country."  Thomas J. Donohue, CEO, U.S. Chamber of Commerce

**American Council of Engineering Companies**
 "America's engineering industry believes we can improve our infrastructure while being good stewards of the environment. The expectation of our public and private project owners is that NEPA should be implemented with a better balance of timelines and reviewing agency accountability to provide more certainty for investments.  For this reason, the American Council of Engineering Companies supports commonsense NEPA reforms to eliminate unnecessary delays in project delivery and reduce the regulatory burdens that stifle innovation."

**American Exploration & Production Council**
Today, the American Exploration & Production Council (AXPC), a group of America's largest independent operators, applauded the proposal from the Council on Environmental Quality (CEQ) to modernize the National Environmental Policy Act (NEPA), which will create a more efficient permitting process, increase consistency across federal agencies, and clarify longstanding regulations.

"Our country is at a pivotal time for American energy; all phases of energy production need efficient, effective and streamlined processes to ensure that we can meet our growing energy demands and protect our national security interests. The Administration's modernization of NEPA removes bureaucratic barriers that were stifling construction of key infrastructure projects needed for U.S. producers to deliver energy in a safe and environmentally protective way," said AXPC CEO Anne Bradbury.

NEPA has not seen any meaningful changes since 1978. Since that time, the U.S. has become a net exporter of energy; demand for domestic natural gas grown dramatically; and, innovation and efficiency gains delivered by American energy producers have positioned our nation as an energy leader.

Under the current NEPA guidelines, the U.S. Department of the Interior disbursed $11.69 billion from revenue generated by energy production on federal and tribal lands for the fiscal year of 2019. These funds were distributed to states, conservation funds, and the U.S. Treasury. Updated

15

guidelines will allow for more timely permitting decisions for production on federal lands – leading to more funding for our states, communities, and national preservation efforts. "Updating NEPA will expedite projects for all sources of energy – pipelines, power lines, wind turbines and oil and gas wells – and will provide the energy needed to continue moving our economy forward," said Bradbury.

**American Farm Bureau Federation**
"Farmers and ranchers rely on the land, some directly on federal forests and rangelands, so keeping them healthy and productive is critical to us. But current NEPA regulations have become an obstacle instead of an instrument for responsible management," said American Farm Bureau Federation President Zippy Duvall. "The government has reached a point of analysis paralysis, which serves no one well, least of all the environment. Updating these 40-year-old regulations is smart government."

**American Gas Association**
"This proposed rule from the White House Council on Environmental Quality is an important step to greater transparency and efficiency in the NEPA process and will help America's natural gas utilities continue to provide timely, safe, reliable and affordable service to the 179 million Americans that enjoy the benefits of natural gas and the millions more that want it," said AGA President and CEO Karen Harbert. "It is promising to see the CEQ take feedback and concerns from all stakeholders, including our industry, into account during this review. We are hopeful that this rule will result in a federal environmental review and permitting process that increases infrastructure development while growing the economy and enhancing environmental stewardship."

**American Highway Users Alliances**
"Streamlining the long and costly NEPA review process is important to expedite critically needed infrastructure improvements.  The Highway Users has been an advocate for streamlining federal reviews for highway projects for more than two decades because bureaucratic delays increase project costs and create uncertainty over the viability of important projects – even those projects that save lives.  Improving the review process is fully consistent with environmental protection because a streamlined process still requires a very careful review and significant public involvement."  Laura Perrotta, American Highway Users Alliance President and CEO

**American Petroleum Institute**
"Reforming the broken NEPA process is a critical step toward meeting growing demand for cleaner energy and unlocking job-creating projects. Endless and repetitive reviews for infrastructure, renewable energy, natural gas and oil projects have been misused to delay and prevent development and undermine job creation, tax revenues and investments in communities across the country. "  API President and CEO Mike Sommers

**American Road & Transportation Builders Association**
"It can take up to seven years to complete the environmental review process for a new federal-aid project. That's too long. The Trump administration's commonsense reforms will help speed up the delivery of U.S. transportation infrastructure projects. Streamlining the NEPA process is

essential to assuring that the government is making every transportation dollar go as far as possible while preserving a commitment to our environment."

"The best next step is for Congress to approve a robust, multi-year transportation infrastructure investment bill that Republicans, Democrats and the president have been calling for since the 2016 elections."  ARTBA President Dave Bauer

**American Sheep Industry Association**

On Thursday, the Council on Environmental Quality released a notice of proposed rulemaking to update the National Environmental Policy Act. Signed into law in 1970, NEPA requires federal agencies to assess the environmental impacts of proposed major federal actions.

Since that time, NEPA analysis has grown, with the average environmental impact statement ballooning to more than 600 pages and taking four and half years to complete. ASI President Benny Cox said this modernization represents a tremendous step in the right direction.

"Those operating on federal grazing permits and those who rely on USDA Wildlife Services predator management are familiar with the cumbersome and prolonged NEPA process, which has become an all too frequent toehold for frivolous litigation," said Cox. "ASI has long had policy urging federal land management agencies to reduce unnecessary burdens and delays through the use of categorical exclusions, and that is a key element of this proposed rule."

In addition to the use of efficient reviews using categorical exclusions and environmental assessments where appropriate, the proposed rule sets a presumptive timeline of two years for the completion of an environmental impact statement. Through these actions, the goal is to reduce paperwork and delays, promoting better decision making by federal agencies.

**American Trucking Associations**

 "The National Environmental Policy Act was not designed to freeze all progress on major projects and give veto power to every neighborhood. The degradation of our nation's aging highway infrastructure contributes to the more than $70 billion in congestion costs borne by the trucking industry alone and poses serious safety consequences for all motorists, including truckers.

"In Louisiana for example, the Interstate 10 Calcasieu River Bridge replacement project has been delayed for two decades by a creaking, outdated NEPA process. The bridge, designed to handle 37,000 vehicles per day when it was opened in 1952, now carries 90,000 vehicles, including more than 5,000 trucks. The FHWA rates the span a 6.6 out of 100, and its steep grades and lack of shoulders makes for a harrowing and dangerous drive. Although state officials have known since the 1980s that the bridge is in critical need of replacement, like many other similar projects nationwide the current review process has prevented states from moving forward in a timely manner.

"We applaud President Trump and his administration for their efforts to Streamline the project approval process – injecting much-needed sanity into efforts to modernize our infrastructure while also reducing project delivery time and costs, insuring that precious resources aren't frittered away on bureaucratic box-checking when they could be going to pay for U.S.-made steel, asphalt and concrete."

17

**American Wind Energy Association**

"The American Wind Energy Association supports improving the National Environmental Policy Act review process, said Amy Farrell, Senior Vice President of Government and Public Affairs for AWEA. "While America's wind energy industry supports the fundamental goals of NEPA to appropriately consider potential environmental and climate impacts, the NEPA process has not been revised in decades. As a result, infrastructure projects, including land-based and offshore wind energy and transmission development, have encountered unreasonable and unnecessary costs and long project delays. It is time to update and modernize the permitting process, which would both strengthen our economy and enhance environmental stewardship.  We look forward to reviewing the proposed rule and working with the Administration to advance infrastructure permitting reform.

Reducing permitting delays and uncertainties associated with responsible wind energy infrastructure development will create jobs, increase deployment of clean, reliable American-made domestic power; expand manufacturing opportunities for workers in local communities (especially in rural and coastal areas); add to local tax revenue; and support broader infrastructure development, such as port revitalization from the development of offshore wind facilities."

**The Association of American Railroads**

"The freight rail industry believes that the federal government should do more to speed up the permitting process of infrastructure projects. More can be done to fast-track routine maintenance and replacement construction projects without sacrificing environmental or historical preservation concerns. This includes a modernized approach to NEPA, such as categorical exclusions for rail projects."

**Associated Builders and Contractors**

"ABC supports the modernization of these critical regulations and believes that these enhancements will go a long way towards eliminating unnecessary delays that cause budget overruns in construction. Creating a coordinated, predictable and transparent process to streamline permitting will enable the industry to plan and execute even the most complex projects while safeguarding our communities, maintaining a healthy environment and being good stewards of public funds."

**Associated General Contractors of America**

"The problem with the current environmental review process is that it long stopped being about evaluating the environmental impacts of a proposed project and has become a way for special interest groups to further their agenda by holding needed infrastructure and development projects hostage to countless lawsuits and delays," said Stephen E. Sandherr, the chief executive officer of the Associated General Contractors of America. "The administration is right to seek to make the review process more efficient and cost effective without sacrificing environmental protections, thereby allowing the public to receive and benefit from cleaner water, safer roads and bridges, and a more reliable energy system in a timelier fashion."

18

**Federal Forest Resource Coalition**
 "For too long, the National Environmental Policy Act has been misused to slow down and stymie needed forest management on our public lands. As a result, Federal forests have been left in an unhealthy, overstocked condition that has made them vulnerable to insects, disease, and wildfire. By streamlining NEPA, the Administration is working to protect our environment and our economy while reducing unnecessary delays and redundant analysis. We look forward to supporting this important set of reforms."  Bill Imbergamo, Federal Forest Resource Coalition

**The Fertilizer Institute**
 "The Fertilizer Institute supports the Council for Environmental Quality's efforts to revise the National Environmental Policy Act regulations to restore the original Congressional intent of the law to "help public officials make decision that are based on understanding of environmental consequences, and to take actions that protect, restore, and enhance the environment."

However, over the past 50 years, the regulations have evolved into a legal framework which has unnecessarily stalled or prevented phosphate and potash mining projects in the United States. These process-based delay tactics do not reflect environmental impacts and only serve to increase project costs and permitting delays. One TFI member company has committed over $20 Million to a permit with an approval process of over 11 years.  TFI believes the revisions to NEPA will ensure federal regulations continue to protect the environment without causing unnecessary negative impact to the business community.

**Independent Petroleum Association of America**
 "IPAA is pleased that the Administration continues to tackle substantial projects, such as their effort to return the NEPA process to the original intent and scope of the law. Although IPAA and our members recognize the important role NEPA plays in public land policy, for many years we have seen the law being abused by environmentalists with extreme agendas to delay and halt various multiple-use activities on federal lands, including oil and gas production.

The NEPA process was established over forty years ago to ensure an appropriate level of environmental protection is achieved, however, there are many projects that can move forward with the flexibility granted through an Environmental Assessment (EA) and Environmental Impact Statement (EIS) process. Just as the geology, hydrology, and topography of our federal lands differ from state to state, so too should the NEPA process become more project-based rather than one-size-fits-all."  Dan Naatz, Senior Vice President Of  IPAA

**National Association of Home Builders**
 "The plan to reform the National Environmental Policy Act (NEPA) is the most recent example of the Trump administration's ongoing efforts to reduce harmful regulations that hurt small businesses and impede economic growth. Updating NEPA will streamline the federal permitting process and allow badly needed transportation and infrastructure projects to move forward. In turn, this will build strong communities and support a thriving housing market."  Greg Ugalde, Chairman, National Association of Home Builders

19

**National Cattlemen's Beef Association**

"Whether on public lands or private, ranchers provide critical improvements to rangelands and infrastructure. This includes maintaining fences, water structures, and roads, and reducing fuel loads that cause catastrophic wildfires. Approachable and implementable NEPA rules are necessary for all cattle producers to ensure that they have access to important USDA programs. When NEPA stands in the way of progress, both ranchers and rural communities suffer. Wildlife that depend on water sources, individuals who utilize roadways, and even communities at risk of wildfire are impacted. We need to ensure those common-sense practices that benefit our rangelands are not the subject of unnecessary federal regulation." Ethan Lane, Vice President of Government Affairs, National Cattlemen's Beef Association

**National Stone, Sand and Gravel Association**

Years-long delays in permitting infrastructure projects, often caused by duplicative agency actions and unnecessary lawsuits harm many communities ability to construct roads, bridges, highways, airports, and all types of public works projects. That is why the National Stone, Sand and Gravel Association (NSSGA) is pleased with the Administration's ongoing work to streamline unnecessary permitting process and supports this draft rule which brings much needed modernization and clarity to the NEPA process– while still maintaining strong environmental protections. Today's action is a critical step in ensuring our nation rebuilds our infrastructure in a more timely manner," said Michele Stanley, NSSGA Vice President of Government and Regulatory Affairs.

**North America's Building Trades Unions**

"NABTU supports reforms to NEPA that provide regulatory certainty through the permitting process while maintaining the integrity of underlying regulations that protect the health and safety of our members on the jobsite as well as the environmental and human impacts of projects in communities throughout the country. Endless delays, limited transparency and agency ambiguity far too often prevent project sponsors, our hard working members, and the public from realizing the benefits of impactful investments in all manner of projects. Common sense reforms and interagency accountability are long overdue."

**Portland Cement Association**

"NEPA reform is critical to maintaining a modern, sustainable, and globally competitive US manufacturing base," said Sean O'Neill, Senior Vice President, Government Affairs at the Portland Cement Association. "Federal permitting requirements should advance our nation's environmental, energy, and economic goals, not establish procedural roadblocks that prevent access to affordable clean energy, better roads, and resilient critical infrastructure."

**Public Officials**

**Governor Greg Abbot (TX)**

"The review process as required by NEPA has historically lacked efficiency and clarity, and its burdensome system stifles economic development and opportunity. I applaud the Trump administration's efforts and welcome an update and much-needed reforms to NEPA regulations. I

am confident that this overhaul will lead to even greater prosperity throughout the United States
— and especially here in the Lone Star State."

**Representative Ralph Abraham (LA-05)**
"This is big news for the hard-working men and women who grow our food, manage our forests,
build our infrastructure, and produce our energy. NEPA is important for protecting the
environment, but its approval process has become a bureaucratic nightmare over the years –
even for the smallest projects. These steps by President Trump to streamline the NEPA process
will ensure that we continue to protect the environment without hamstringing projects which
benefit the American people."

**Representative Kelly Armstrong (ND-At Large)**
"It's beyond frustrating to see important infrastructure projects delayed due to the federal
bureaucracy. Every delay costs jobs and has a ripple effect throughout the economy. This
overhaul will streamline the federal permitting process and will help our country expand, update,
and rebuild our infrastructure for the 21st century."

**Senator John Barrasso (WY)**
"The Trump administration is taking common sense steps to make the National Environmental
Policy Act work better for the American people. Too often, important projects are slowed down
because of lengthy permitting processes and litigation. President Trump has set a goal of
completing environmental reviews for construction projects within two years. This proposal
establishes that standard. These updates will reduce red tape so important infrastructure
projects get done better, faster, cheaper, and smarter. Road and bridge safety projects that take
months to build should not take years to permit. These regulatory updates promote safety and
still protect America's air, water, and communities. "I included similar provisions in America's
Transportation Infrastructure Act, which passed the Environment and Public Works Committee
unanimously, last year. I will continue to work with the White House to advance policies that
protect our environment and allow our economy to grow."

**State Representative Susan Beckman (CO-38)**
"This is good news. As an Arapahoe County Commissioner, I saw firsthand the layers of
bureaucracy and red tape added to transportation projects. One intersection, I-25 and Arapahoe
Road, was bogged down for years with redundant, expensive and inefficient NEPA requirements.
These requirements did nothing to protect the environment and only added time and massive
expense to the project. I am so pleased with this Administration for streamlining the process for
needed transportation projects without jeopardizing our environment. This will save time, money
and allow local and state elected officials to focus on real environmental concerns."

**Representative Andy Biggs (AZ-05)**
"I applaud the Council on Environmental Quality's imminent plans to reform the broken National
Environmental Policy Act.  By preparing to take this action, the Trump administration is making
life easier for Americans by streamlining unnecessary and costly regulations.  This overhaul will
maintain public transparency and better fulfill the needs of western states."

21

**Representative Rob Bishop (UT-01)**

"There has been nothing more detrimental to the development of transportation, clean water, and energy infrastructure than America's broken environmental review and permitting process. Today, the Administration took another step forward in bringing logic and rationality to the federal bureaucracy. Reducing redundancies, enhancing coordination with states and tribes, clarifying ambiguous terms, and establishing time frames for the completion of paperwork is the 20/20 vision we needed. Fringe-left special interest groups will continue to scream bloody murder, but these actions by President Trump will ensure the government works better for all."

**Commissioner Joel Bousman (WY-Sublette County)**

"In Wyoming we have had mixed experiences with NEPA analyses. It took the U.S. Forest Service over 14 years to complete the NEPA process to renew grazing on the Upper Green River Grazing Allotment. This process took far too long. On the flipside, last year Sublette County and the Sublette County Conservation District did a NEPA analysis for the Bureau of Land Management to provide our field manager the authority to issue temporary nonrenewable animal unit months. The process took only two weeks, withstood scrutiny and is now authorized. As a county commissioner, I know firsthand how cumbersome and inefficient NEPA analyses can be, which prevents important work from being done on our nation's public lands. The new NEPA streamlining provisions unveiled today will help Sublette County and the federal government to achieve those land management goals while ensuring we have the best scientific data available to guide our decisions."

**County Engineer Brian Bremmer (UT-Garfield County)**

"In December 2011, as a result ofthe Dixie Motorized Travel Plan that closed 75 percent of existing forest roads to public travel, Garfield County, Utah filed a Data Quality and Regulatory Flexibility Act Challenge to overturn the decision. The U.S. Forest Service responded by agreeing to conduct what they called a "Need for Change NEPA" action if the county would withdraw/suspend the challenge.  The new NEPA process began in spring of 2012 and has been a fiasco ever since. In spite of overwhelming public input asking for roads to be re-opened, the Forest Services has thrown up road blocks every step of the way. Now, in January 2020 – nearly eight years after the initiation of the NEPA process – the Forest Service has yet to produce a viable alternative or a draft alternative and has completely failed in its commitment.  In fact, we hear that it is likely the Forest Supervisor is cancelling the NEPA project altogether, leaving us exactly where we were eight years ago with a completely inadequate transportation plan. It is a classic example of a federal agency's inability to complete NEPA in a timely manner."

**Governor Doug Burgum (ND)**

"No one cares more about North Dakota's environment than the people who live here, but the 40-year-old NEPA process has become increasingly complex, cumbersome and time-consuming, resulting in unnecessary, multi-year delays and cost increases for key infrastructure projects including highways, pipelines and critical flood protection. We thank CEQ and the Trump administration for proposing common-sense reforms to modernize and streamline NEPA."

**Representative Ken Calvert (CA-42)**
"I am pleased that the Council on Environmental Quality is updating NEPA's outdated implementing guidance. For too long these vague directives have resulted in unnecessary project delays, frivolous litigation and job-killing federal overreach. I applaud CEQ's work to establish strict timeframes and certainty for permittees that will help advance infrastructure projects vital to our nation's economic growth."

**Representative Liz Cheney (WY-At Large)**
"I applaud the Trump Administration's decision to overhaul burdensome NEPA requirements, which for too long have delayed or restricted everything from energy development and grazing to broadband deployment in Wyoming. While originally established as a streamlined process meant to protect air and water, NEPA has devolved into a litigation tool abused by far-left environmental extremists to delay countless projects across the country. President Trump is continuing to make good on his promise to get the government off the backs of hardworking Americans by decreasing overreach and regulation."

**Commissioner Greg Chilcott (MT-Ravalli County)**
"These reforms are a step forward for Ravalli County. We will be able to protect our environment into the future while enhancing our infrastructure and our economy while increasing the resiliency of our national forests."

**Representative Paul Cook (CA-08)**
"NEPA was initially a well-intended policy, but it's long past due for an overhaul. Too many beneficial infrastructure projects are being needlessly held up by overly bureaucratic regulations, costing taxpayers money and deferring jobs for American workers. This change would improve the environmental review process while also cutting through the red tape to ensure timely and safe construction of necessary projects like roads, bridges, and water storage facilities. I strongly support this action."

**Representative Jeff Duncan (SC-03)**
"The Trump Administration should be commended for modernizing the National Environmental Policy Act regulations, a move that has been long overdue. These regulations haven't seen a comprehensive update in over 40 years, so I'm pleased to see President Trump deliver on his promise to streamline outdated processes, eliminate red-tape, and create efficient standards in order to properly evaluate environmental impacts in the 21st century."

**Governor Mike Dunleavy (AK)**
"I thank the Trump Administration for working to modernize and clarify the 40-year-old NEPA regulations. All Alaskans will benefit from an update to NEPA as it impacts many facets of our state, from construction of roads and highways, to energy projects, to land and forest management. We look forward to seeing this process unfold and the impact it will have on furthering Alaska's opportunity for business and resource development projects within our state."

23

**Assemblyman Chris Edwards (NV-19)**
"Interstate 11 (I-11) will connect Phoenix to Las Vegas, the two largest cities in America not linked by a federal interstate highway. The first portion of I-11 opened a year ago in my district and we are extremely optimistic about this important infrastructure project. The future Intermountain West Corridor will use I-11 to connect the shipping ports in Southern Arizona to Nevada and existing interstates in the Northwest. An economic analysis found the I-11 corridor will create 250,000 permanent jobs and generate more than $20 billion for the U.S. economy. While the final route is still being determined, much of the project involves linking and expanding existing highways and interstates. The excessive costs of redundant NEPA analysis has slowed construction of this critical transportation corridor and ones like it across the country. The environmental analysis in Nevada alone is expected to take three years and cost $5 million. I applaud the Trump administration for taking action to reform the broken NEPA process and create a more efficient permitting system. This is long overdue! The President's actions today are another common sense reform that will allow vital infrastructure projects to move forward safely and expeditiously in Nevada, Arizona and across America."

**Representative Greg Gianforte (MT-At Large)**
"I applaud the efforts of the Trump Administration to ensure that NEPA is returned to a process that ensures infrastructure projects are mindful of the environment and not a tool of serial litigants to block all development."

**Representative Bob Gibbs (0H-07)**
"The Trump Administration's regulatory reform agenda continues to move in the right direction. I hear from countless local governments, public utility operators, and other stakeholders who run into the same problems of red tape and bureaucratic delays. In 2014, I worked to streamline the permitting process for Army Corps of Engineer projects, a bipartisan success that makes it easier to complete water resource projects in a timely manner. Today's announcement of reforming the NEPA process continues the great work we started in 2014 to ensure infrastructure projects are completed on-time, on-budget, and most importantly, safely."

**Representative Paul Gosar (AZ-04)**
"Enacted with the best intentions in mind, NEPA has been hijacked by serial litigants to halt construction on critical infrastructure projects. Under the guise of environmental protection, special interest groups have stopped new roads and bridges, transmission lines, pipelines, and even offshore wind projects dead in their tracks. Today's announcement shows the Trump administration's commitment to ensuring the government works better for the people. Streamlining NEPA will create a more efficient and certain time line for new projects, while ensuring we safeguard our environment for the future."

**Governor Mark Gordon (WY)**
"Uncertainty is never good for proper development and it has been particularly problematic in Wyoming, especially in light of recent court rulings regarding NEPA-related greenhouse gas emission analyses. States like Wyoming need assurance that projects will be properly analyzed the first time around so that decisions on the ground can be made in a timely manner. I support CEQ's efforts to streamline federal agency guidance under this proposed rule."

**Representative Sam Graves (MO-06)**
"The President is a builder. He knows firsthand how slow, inefficient, and costly the federal review and permitting processes can be for projects both large and small.  I applaud the Administration for its efforts to modernize the NEPA process and inject some common sense into environmental reviews. Streamlining the review of proposed roads, bridges, and other critical infrastructure projects will save the taxpayers money while maintaining necessary protections for the environment, public safety, and human health.  I look forward to seeing this long overdue modernization of the NEPA regulations move forward."

**Representative Mike Johnson (LA-04)**
"Since his first day in office, President Trump has pledged to cut bureaucratic red tape, and this overhaul of NEPA is another promise kept. While originally well-intentioned, NEPA has morphed into a vehicle for perpetual litigation, and it is just another illustration of government-imposed regulations continuing to burden hardworking Americans and the economy. In our region specifically, excessive delays have stalled critical infrastructure projects like the I-49 Inner City Connector, which has been held up in the NEPA process for nearly eight years. I applaud the Trump administration for putting the American people first by streamlining these crippling policies."

**Representative Doug LaMalfa (CA-01)**
"Californians can afford to wait no longer for the government to do the forest management on its lands and the infrastructure overhauls needed to protect them from wildfires and droughts. The recent fires and power shut offs underline these needs as our constituents have suffered enough NEPA reform is a much-needed change from the current delays that prohibit forestry, water management, power line clearing and upgrades and wildfire prevention projects in my district from getting done. I applaud the Trump administration for once again cutting the red tape to protect rural communities in the West from future catastrophic disasters."

**Commissioner Christian Leinbach (PA-Berks County)**
"NEPA is exemplary of a law (and accompanying regulations promulgated by the executive agencies that must implement the law's intent) that no one could argue with at face value. It is only when enmeshed in the details of the process that it becomes apparent how overreaching the law is. Reform of the process must include consideration of the reasonableness of costs of compliance, the tangible/physical existence of the potential impacts, and the need for expediency in completion of public projects that benefit the common good."

**Commissioner Randy Maluchnik (MN-Carver County)**
"Streamlining the permitting process is a win for the Carver County economy. We welcome the reforms offered by the administration, which will allow us to create and sustain our infrastructure, grow our economy and continue to protect our environment."

**Representative Roger Marshall (KS-01)**
"For far too long burdensome and lengthy permitting and regulatory processes have slowed and even destroyed infrastructure and energy projects across Kansas. Government regulations are one of the top concerns for businesses in my district and unnecessary delays in projects hurt

business owners, communities and local economies. These studies and permits are necessary for proper development, but they need to be timely and economically feasible. I applaud President Trump's Council on Environmental Quality for its efforts to overhaul and streamline the environmental permitting process."

### Representative Markwayne Mullin (OK-02)
"NEPA regulations affect a wide range of projects from construction of roads to land and forest management. Current NEPA regulations have become overbearing and difficult for people to navigate. The Trump Administration's proposal to modernize the regulations and cut red tape just makes sense. This new rule will allow us to move faster on construction projects while still ensuring we are keeping our environment safe and clean."

### Commissioner Todd Nash (OR-Wallowa County)
"Federal staff has been overburdened with the ever-increasing length and detail of NEPA documents with fewer successes to show for their efforts. Timber, grazing, recreation, and mining management on U.S. Forest Service and BLM lands have suffered at the hands of more regulation, litigation, and stagnation. As a county commissioner in a county with over 50% of its land base managed by federal agencies these new policies are exactly what is needed. The emphasis on the social and economic needs of our communities has been overshadowed by regulatory agencies that have single-minded priorities. I'm looking forward to healthier forests and communities."

### Representative Dan Newhouse (WA-04)
"Rural communities across the West cannot afford to wait years for critical economic and infrastructure development. Streamlining NEPA permitting processes will ensure swift, thorough, and complete analysis of the environmental impacts of the renewable energy and transportation projects we need in Central Washington. I applaud the Trump Administration for taking this important step to ensure these permitting reviews are completed in a timely manner and not falling victim to bureaucratic red tape or politically-motivated litigation."

### Commissioner Leland Pollock (UT-Garfield County)
"In the Dixie National Forest, issues with the NEPA process led to the eventual shutdown of our local timber mill, costing 400 good-paying jobs in our community. Special interest groups were able to sue over minor NEPA technicalities, harming our local economy. This also led to massive fuel build ups that made it possible for the Brian Head Fire to burn more than 71,000 acres of forestland, destroying 13 homes. It also decimated the drinking water supply for Panguitch, Utah, which was supplied by a spring system that functioned flawlessly for over 100 years before the fire. It is imperative that the NEPA process be streamlined to prevent these tragedies moving forward and to improve the health of our landscapes."

### Governor Pete Ricketts (NE)
"Thank you to President Trump for his continued focus on cutting red tape and empowering states. Simplifying the NEPA process and making it more transparent will help states deliver the infrastructure we need to grow our communities in a more effective and more efficient manner."

**Representative Cathy McMorris Rodgers (WA-05)**
"When I was first elected to Congress, I chaired a bipartisan task force with now Senator Tom Udall that made recommendations to update and improve NEPA. In any proposed project, we should involve stakeholders and interested parties early on and seek a more collaborative approach. The current process often results in years of delay, additional costs, and litigation. What started as a single paragraph statute in 1969 has turned into pages and pages of rules and regulations—and thousands of court cases—that slow and obstruct important projects. Thank you to the Trump administration for leading in addressing the NEPA process so we can move forward on projects that improve our forest health, develop our clean energy resources, and rebuild our aging infrastructure."

**Representative Steve Scalise (LA-01)**
"I applaud the Trump Administration's update to the NEPA review process, which will cut down on bureaucratic red-tape hindering national and local projects. Through a more efficient and less complex permitting process, we can more efficiently construct energy infrastructure, coastal restoration, and flood protection projects in Louisiana and across the country while still protecting our environment. While Democrats propose new job killing legislative proposals, this announcement is a strong step in the right direction and will result in more shovels in the ground on projects that improve Americans' everyday lives."

**State Senator Ray Scott (CO-7)**
"Revamping of NEPA has been needed for a decade or more as the requirements have slowed down much needed infrastructure for broadband expansion, roads and natural resource development. President Trump kept his promise to reduce regulations and these changes will certainly put more Americans to work. Colorado needs all the help we can get to advance new infrastructure projects to support our fast paced growth."

**Representative Pete Stauber (MN-08)**
"Overhaul of NEPA is absolutely necessary. I stand with the Trump Administration in ensuring commonsense regulations protect our environment without needlessly providing ammunition to the most extreme environmentalist groups that seek to undermine any project for the sake of litigating. Timely reviews will provide certainty to companies and will expedite putting our hardworking unions to work in northern Minnesota."

**Governor Kevin Stitt (OK)**
"I applaud President Trump's willingness to modernize and clarify the NEPA process. For far too long this framework has been used to create obstacles and cause unnecessary delays to important projects that are necessary to grow our economies, create jobs, and improve our quality of life. The Trump Administration's effort to reform the NEPA process is consistent with our goals for the Great State of Oklahoma of promoting a prosperous economy and protecting our precious natural resources with a predictable, consistent and reasonable regulatory framework."

27

**Representative Greg Walden (OR-02)**

"I applaud CEQ for continuing the Trump Administration's efforts to implement needed streamlining to the NEPA planning processes across federal agencies. These efforts will help ensure we can implement forest management projects to reduce the threat of wildfire on our communities and improve our nation's transportation and energy infrastructure to meet our needs into the future. Modernizing this process is long overdue and is welcome news for rural Oregon."

**Representative Bruce Westerman (AR-04)**

"If there's one word to describe government approval processes, it's inefficient. That's why this plan to cut back on red tape and streamline a time-consuming process is so important. While some groups have tried to weaponize NEPA and use it as a delay tactic, that was never the intended goal. Hardworking Americans are asking for quicker, easier approvals for their projects, and these proposed changes would do just that, while maintaining the highest standards of environmental stewardship. I applaud CEQ for this plan and hope to continue working to make NEPA as efficient and workable as possible."

We appreciate the opportunity to comment on this important matter and look forward to working with you as the regulatory process continues.

Sincerely,

Marty Durbin

Tab 14, Exhibit 11 to Declaration of Amy Coyle

  

March 10, 2020

Mr. Edward A. Boling
Associate Director for the National Environmental Policy Act
Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

Livestock Industry Comments on Notice of Proposed Rulemaking (NOPR) to Update the Procedural
Provisions of the National Environmental Policy Act (NEPA) (85 Fed. Reg. 1,684 (Jan. 10, 2020)

Docket No.: CEQ-2019-0003

Submitted via online portal (https://www.regulations.gov/comment?D=CEQ-2019-0003)

Dear Mr. Boling:

The American ranching industry plays a pivotal role in the management of hundreds of millions of
acres of both private and public lands throughout the United States. As such, the relationship
between our industry and the federal government, particularly as it relates to permitting and land
management decision-making, is one of the most critical to ensuring the health and resiliency of the
county's remaining open spaces and pastureland. The National Environmental Policy Act (NEPA)
and its various applications throughout the federal government play a pivotal role in the success of
that partnership. Unfortunately, it has also become one of the biggest opportunities for opponents
of responsible land management to grind progress to a halt, derail otherwise common-sense
decision-making, and delay federal action indefinitely across a range of issues.

The Public Lands Council (PLC), consisting of state and national cattle and sheep affiliates
throughout the West representing approximately 22,000 federal grazing permit holders; the
National Cattlemen's Beef Association (NCBA), the nation's oldest and largest trade association
representing cattle producers; and the American Sheep Industry Association (ASI), which is the
national organization representing the interests of more than 88,000 sheep producers located
throughout the United States, wish to provide our collective responses to your Notice of Proposed
Rulemaking (NOPR) as well as provide additional input regarding the key areas of NEPA in need of
reform in order to restore this process to functioning condition and ensure its proper application in
the future.

PLC, NCBA, and ASI (together, the "Livestock Associations") applaud the Council on Environmental
Quality's efforts to streamline and modernize NEPA and generally support the regulatory updates
in the NOPR. The Livestock Associations previously submitted comments on CEQ's Advanced Notice
of Preliminary Rulemaking (ANPR) on August 20, 2018, via the online portal and incorporate those
comments by reference here. Below, the Livestock Associations offer a few specific comments and
additional recommendations to further enhance CEQ's proposals.

In summary, the Livestock Associations would emphasize the following as key areas for CEQ to continue to improve:

- Define and enhance the use of Categorical Exclusions, where appropriate.
- Enhance and define the role of affected parties, including those with long-term contractual agreements or preference grazing rights, and adjacent landowners.
- Enhance the role of state and local governments in the NEPA process, ensuring they are brought into the process early to assist with determining the issues to be addressed and are allowed adequate time to prepare substantive comments during the administrative review period.
- Improve formulation of alternatives and establishment of baseline for analysis, including clarification of terms "continuing use" and "no action alternative."
- Ensure that socioeconomic analysis is given equal weight to environmental analysis.
- Recognize the limited expertise and resources of the agency to complete socio-economic analysis and encourage agencies to seek credible information available from state and local governments and local affected interests.

## Background

The National Environmental Policy Act (NEPA) has, since its creation, evolved into both the most impactful federal environmental process to the ranching industry and the most effective weapon in the arsenal of radical environmental activists. Through relentless, process-based litigation across the range, these groups have transformed NEPA from its original purpose – analysis of potential impacts stemming from a major federal action – into a black hole of endless fear-driven processes initiated by federal agencies in the hope that such analysis might prevent legal challenge to otherwise proper and appropriate science-based decision-making. The reality is that no amount of NEPA will satisfy these groups. Rather, they have mastered the use of litigation to force their way into the process as a stakeholder – often with a much more influential voice than that of ranchers or others with an actual interest/impact.

The result is that these processes are postponed or extended years beyond their original schedule, or in some cases derailed all together. Obviously, this pattern runs counter to the multiple-use mission of agencies such as the Bureau of Land Management (BLM) and U.S. Forest Service (USFS). Additionally, it serves as a deterrent to responsible land management decision-making both in those multiple-use agencies as well the larger goals of the Department of the Interior, Department of Agriculture, and strictly regulatory agencies such as the Environmental Protection Agency (EPA) to name a few.

## Comments

The Livestock Associations support the CEQ's efforts to streamline and modernize NEPA. The changes to the procedural regulations take important steps toward modernizing the Act and recognizing NEPA as a procedural, not a substantive or action-forcing, statute.

In order to simplify our industry's input on a very complicated subject, we offer comments on only the following essential issues as the Council proceeds with its review and potential reform efforts:

1.    **Procedural Nature of NEPA—Purpose and Policy (Part 1500).**

NEPA is a procedural statute, the purpose of which is not to generate paperwork or litigation, but to ensure appropriate consideration of environmental effects based on major federal actions. The changes to Part 1500 are consistent with current case law interpreting NEPA and appropriately refocus the emphasis on timely and efficient decision making, reducing excessive paperwork, and avoiding lengthy delays.

In particular, the changes made to reduce excessive paperwork and long delays are essential to the modernization of NEPA and to ensure timely and easy-to-understand documents are released to stakeholders and the interested public. The proposed time limits of 1 year for EAs and 2 years for EISs, absent approval by senior official, are reasonable and much-needed changes—as are the proposed page limits of 150 for EAs and 300 for EISs, absent approval by senior official.

2.    **NEPA Threshold Applicability Analysis – § 1501.1**

As discussed further below, long-term special uses and permitted activities on public lands that are part of multiple-use objectives have become part of the baseline condition for these public lands. In many cases, these uses have been ongoing and authorized by statute for a century, or more.

The Livestock Associations support revisions by CEQ to recognize that many federal actions should not qualify as a "major Federal action" pursuant to NEPA. For instance, those categories of actions that have a de minimis impact on the environment, are non-discretionary, or which have already been subject to comparable analysis pursuant to other statutory or regulatory processes should not be considered a "major Federal action."

3.    **Judicial Review, Remedies, and Exhaustion – § 1500.3**

The Livestock Associations support the adoption of a hard 30-day comment window on all final environmental impact statements, along with a waiver of claims not submitted to the agency during that time. However, CEQ should recognize that parties with business relationships, contractual agreements, or preference grazing rights impacted by federal agency actions are direct stakeholders with critical knowledge and expertise of on-the-ground conditions. As such, they should be included early and often in NEPA planning processes and recognized as the stakeholders they are. CEQ and agencies undertaking permitting processes should seek constructive, meaningful engagement with direct stakeholders impacted by the implementation, or failure to implement, a proposed action as early as possible in the process. There are ample opportunities for public comment and constructive engagement of direct stakeholders early in the planning process prior to, during, and after publication of a final environmental impact statement that mitigate the need for lengthy final comment periods.

Furthermore, CEQ should consider modifying § 1500.3(c) not just to allow for, but to encourage agencies to impose bond requirements as a condition for stays of appealed NEPA decisions; however, in considering both the amount and appropriateness of requiring a bond, agencies must weigh the relative economic harms implicated by the bond.

4.    **Role of States and Local Governments.**

The Livestock Associations support revisions to Section 1501 to provide a more substantively defined role for state and local governments as cooperating agencies. Direct involvement of local

governments is essential to NEPA's charge to involve stakeholders in the decision-making process early and often. The revised process for engaging cooperating agencies in § 1501.8(h) takes an important step in that direction by improving local governments' opportunities to share their knowledge and expertise, and the knowledge and expertise of individuals in their communities who are also direct stakeholders, for major federal decisions "at the earliest practicable time."

In addition to involving local governments early in the process, CEQ must also ensure they and other stakeholders are allowed adequate time for evaluation and comment preparation, and that lead agencies provide substantive answers to substantive questions posed by local governments during the administrative review period.

As currently written, § 1501.8(a) does not appear to provide a mechanism for local governments to appeal a denial of a request for cooperating agency status. CEQ should revise the regulation to provide such an appeal mechanism for local governments commensurate with the role that would be afforded to them as a cooperating agency relative to their engagement with Federal agencies.

### 5.    Revised Process Must Be Uniform and Easy to Understand

#### a.    Early Involvement of Direct Stakeholders

Similar to early involvement of cooperating agencies, direct stakeholders should receive direct notice and a reasonable opportunity to provide feedback regarding decisions that may impact them. As discussed above, eligible permitted entities—those parties with business relationships, contractual agreements, or preference grazing rights to operate on federal lands—have vested and immediate interests in the federal agency decisions that affect them. In particular, they possess irreplaceable substantive first-hand knowledge of the cultural history, current conditions, and other aspects of the public lands.

It is imperative that these eligible permitted entities be recognized as direct stakeholders.  This is not, and should not, be to the detriment of rightful general public input into the NEPA process, but CEQ should allow agencies to appropriately weigh the quality and basis for comments based on years of experience and engagement by these direct stakeholders.

#### b.    Uniform NEPA Process

CEQ should encourage agencies to adopt a uniform process for scoping, comments, drafts, and resolving objections to the extent practicable. As currently implemented, NEPA comment processes vary considerably and may be unclear even to direct stakeholders.

#### c.    Categorical Exclusions (CE) and Extraordinary Circumstances (EC) Analysis – § 1501.4, § 1507.3(e)(5), § 1506.3(f)

CEQ should encourage agencies to expand the number and types of decisions, including grazing decisions by the Bureau of Land Management and U.S. Forest Service, that will qualify for a categorical exclusion (CE).[1] Clear, enhanced use of CEs will focus resources to projects truly in need

---

[1] For example, we would encourage greater use of the trailing and crossing CE pursuant to 42 U.S.C. § 1752(h)(2). The practice of trailing and crossing is essential when considering accessibility of the vast and remote areas of public lands used for livestock grazing across the West. This and many other CE authorities should be used as Congress intended, where practicable.

of robust analysis, while also curbing opportunities for litigation abuse. To that end, the Livestock Associations also support the ability of agencies to adopt a CE of another agency, as provided in § 1506.3(f).

Additionally, CEQ should amend language in § 1501.4 to clarify that CEs created by Congress are distinct from CEs created by agencies through the regulatory process. For example, the Healthy Forests Restoration Act created a CE for certain insect- and disease-treatment projects on National Forest System lands that does not obligate analysis under the extraordinary circumstances framework. *See* 16 U.S.C. § 6591b.

In order to comply with Congressional intent, CEQ should amend § 1501.4(a)(b) to recognize the distinction between a statutory and an agency-created CE as follows (additions in **bold red**):

> (b) If an agency determines that a proposed action is covered by a **regulatory, as opposed to a statutory,** categorical exclusion identified in its agency NEPA procedures, the agency shall evaluate the action for extraordinary circumstances, **unless otherwise provided by statute.** ~~in which a normally excluded action may have significant effect.~~ **Where a statutory CE exists, the agency shall implement the CE process as directed by the authorizing statute. If there is a conflict between the process to implement a regulatory CE and a statutory CE, the statutory CE shall govern. Unless explicitly stated in a statutory CE, analysis of extraordinary circumstances is not required.**

Utilizing the framework outlined in the NOPR that suggests use of CEs unless circumstances obligate a lengthier analysis, the Livestock Associations suggest the adoption of other CEs to address routine agency considerations, particularly those that add value to the landscape.

### d.  Findings of No Significant Impact (FONSI) – § 1501.6

We strongly support the clarification recognizing the concept of mitigated findings of no significant impact (FONSIs) in Section 1501.6(c). This much-needed clarification allows non-significant proposed actions to be analyzed in an EA instead of the more cumbersome EIS. Oftentimes projects have been unduly delayed due to narrow seasonal windows for wildlife species inventories or other environmental concerns. The mitigated FONSI allows for important habitat inventories to still occur within the proper window without unduly delaying the project.

However, it should be further clarified that while NEPA allows for discussion of mitigation, the Supreme Court has explicitly recognized that NEPA does not require mitigation. *Robertson v. Methow Valley Citizens*, 490 U.S. 332 (1989). CEQ should revise the language in § 1501.6 to clarify that mitigation is never required by NEPA.

### 6.  Definitions

#### a.  "Effects" – § 1508.1(g)

The Livestock Associations support CEQ's recognition that economic and social effects, including effects on employment, must be considered alongside environmental effects. *See also* § 1502.16(a)(10); § 1502.16(b). All too often, economic impacts to stakeholders and affected communities are given less weight than environmental impacts. This is a glaring oversight, which

erases the "human" portion of NEPA's directive to consider the impact of federal actions on the "human environment."

The "but for" causal relationship discussed in the CEQ's revised definition of "effects" takes an important step in recognizing that there must be a reasonable limit on what effects can be considered related to a proposed action. The Livestock Associations support the language in § 1508.1(g) excluding consideration of those effects that are too remote in time, geographically remote, or otherwise uncertain. It has been our experience that agencies often err on the side of overinclusion of all potential effects—even those bearing little or no relationship to the proposed action—for the sake of precluding litigation. However, that practice has not been successful nor is it the prerogative of the lead agency to consider the post-analysis legal outcomes.

The Livestock Associations also strongly support CEQ's related clarification that agencies should not consider those effects over which it "has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action." § 1508.1(g)(2). These sorts of impacts are more appropriately considered as part of the baseline for analysis in a "no action alternative."

### b. "Major federal action" – § 1508.1(q)

Like the revised definition of "effects," CEQ has made some important revisions to the definition of "Major federal action" that help bring the meaning more in line with NEPA's explicit goals and intent. In particular, the Livestock Associations support the clarifications that federal agencies should undertake NEPA analysis only for those actions within direct Federal control and responsibility. NEPA should not apply where federal agencies take non-discretionary actions dictated by statute, or where an agency action involves only de minimis agency engagement or funding.

The Livestock Associations also recommend CEQ clarify that federal funding, when it is the only component of Federal involvement in a project, does not qualify as a major federal action, as in the case of issuance of loans or loan guarantees by the Farm Service Agency, Small Business Administration, or other Federal lender. A "major federal action" must have effects that are potentially subject to federal control. Any project that satisfies this requirement will, in its own right, be subject to separate and distinct NEPA processes prior to implementation. Requiring additional NEPA analysis to distribute funding only delays implementation with no additional environmental benefit. Asserting NEPA involvement in the process and administration of a loan does not, and should not, meet the underlying intent of the Act and should therefore be clarified by CEQ.

### c. "Mitigation" – § 1508.1(s)

NOTE: For the purposes of this section, the term "mitigation" refers to actions intended to moderate the reasonably-foreseeable potential effects of a proposed action, and should not be confused with compensatory mitigation as provided for in various agency policies.

As discussed above, NEPA allows for discussion of mitigation but does allow an agency to require such mitigation of a project applicant. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332 (1989). Consistent with *Methow Valley*, the Livestock Associations support CEQ's revised language

providing that "[w]hile NEPA requires consideration of mitigation, it does not mandate the form or adoption of any mitigation."

The Livestock Associations also support the requirement that any mitigation discussed in a NEPA document have a demonstrable nexus to the proven effects of the proposed action.

### d.   "Reasonable alternatives" – § 1508.1(z), 1502.14(c)

CEQ should issue clear guidance to explain the development of reasonable alternatives to be analyzed, the establishment of appropriate baselines for assessing impacts, and identification of "no action" alternatives that are reflective of on-the-ground realities.

As discussed above, agencies should not consider those effects that it "has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action." § 1508.1(g)(2). For example, the baseline for consideration of impacts in the public lands grazing context must take into consideration the long historical use and multiple-use mandates as a baseline consideration for NEPA analysis. In many cases, livestock grazing on public lands has taken place since the late 1800s or early 1900s—often since before the agencies that now manage those lands were created. The baseline for analysis in a "no action alternative" would be to continue those practices.

The revisions to § 1502.14 make clear that alternatives not within the jurisdiction of the lead agency should not be considered, which would include the elimination of grazing from public lands contrary to statute.

### 7.   Scientific Methodology and Accuracy – § 1502.24

The Livestock Associations agree with CEQ's revised language in § 1502.24 explaining that agencies must make use of reliable data and resources, but are not be required to undertake new scientific and technical research to inform their analyses. As a procedural statute, NEPA is not action-forcing and this understanding extends to the creation of new data and research. However, as currently written, it is unclear what "reliable and existing data sources" means. In many industries, including grazing, there are often dozens or hundreds of studies in various stages of completion—whether ongoing, recently completed but not peer reviewed, or finalized and peer reviewed, but not yet published. CEQ should clarify what constitutes "reliable existing data and research." Agencies should be able to reference data and research that is ongoing, or has been subject to peer review, but which has not yet been published and give appropriate weight to that research.

### 8.   Functional Equivalence – § 1507.3

The Livestock Associations strongly support CEQ's proposed revisions addressing "functional equivalence" to NEPA analysis. Agency permitting processes that are functionally equivalent to a NEPA analysis—even if they are not described as such—should satisfy the requirements of the law. *See, e.g.*, *Envtl. Def. Fund v. EPA*, 489 F.2d 1247, 1256-57 (D.C. Cir. 1973). For example, our members routinely engage in permitting processes under the Federal Land Management and Policy Act, the National Forest Management Act, and other statutes and regulations that provide the functional equivalent of a NEPA review for public lands grazing activities. These laws already ensure full and thorough consideration of environmental impacts and meet the "substantive and procedural" requirements identified by CEQ in § 1507.3(b)(6).

If functional equivalence continues to be part of CEQ's proposed revisions to the procedural NEPA regulations, CEQ should also consider issuing guidance that would explain to public lands permittees how to submit information to federal agencies showing that compliance with other federal statutes is functionally equivalent to an EA or EIS.

**CEQ's Request for Additional Input**

In addition to the substantial set of changes reflected in its proposed revisions to the existing regulations, CEQ has requested comments by March 10, 2020, on a host of issues related to the procedural NEPA regulation revisions.

- Whether to eliminate the current requirement that an agency prepare an EIS when it proposes legislation to Congress, and the proposed legislation would cause significant environmental impacts (such as proposed legislation to withdraw public lands from military use for civilian reuse).

    *Yes.*

- Whether non-NEPA studies that one or more agencies already are conducting in relation to a proposed action can be used, "in whole or when aggregated," as a "functional equivalent" to an EIS for purposes of NEPA compliance.

    *Yes.*

- Whether to include in CEQ's proposed definition of "effects" the concept that the requisite close causal relationship is "analogous to proximate cause in tort law," and, if so, how CEQ could provide additional clarity regarding the meaning of this phrase.

    *CEQ should not use the phrase "proximate cause" to define which "effects" are appropriately considered pursuant to NEPA, as it is employs a legal term of art implying a conflicting body of legal interpretations. CEQ's proposed definition of "effects" under § 1508.1(g)(2) is a more clear and appropriate way to exclude those effects that are outside an agency's authority to consider, would occur regardless of the proposed action, or are otherwise remote from the proposed action.*

- Whether existing CEQ guidance or handbooks should be adopted as part of the revised regulations.

    *No. CEQ guidance and handbooks should not be adopted wholesale as part of the revised regulations. In general, guidance and handbooks offer a single place-in-time recommendation or suite of recommendations for how agencies should implement regulatory tools. Adoption of these recommendations does not further CEQ's goal of simplifying and streamlining the NEPA process.*

- How greenhouse gas emissions should be addressed in the new regulations, and specifically, whether CEQ should codify any aspects of its Draft NEPA Guidance on Consideration of Greenhouse Gas Emissions, issued June 2019.

*The Livestock Associations support elements of the CEQ's draft guidance on addressing greenhouse gas emissions in NEPA documentation. As CEQ moves forward with developing its proposed NEPA regulations, we would support including aspects of the guidance in the underlying procedural regulations, where appropriate. If CEQ proceeds down this path, language in the draft guidance should be updated to be made consistent with CEQ's revised NEPA regulations, such as the revised definition of "effects."*

- Whether the regulations should clarify that NEPA does not apply extraterritorially, in light of the ordinary presumption against extraterritorial application when a statute does not clearly indicate that such application is intended by Congress.

   *Yes.*

- Whether there are circumstances under which an agency may authorize irreversible and irretrievable commitments of resources.

   *Livestock grazing authorizations do not generally involve the irreversible and irretrievable commitment of resources by a federal agency. As a renewable natural resource, forage allocated to livestock grows back each season and is thus a reversible commitment of resources. CEQ should allow for certain categories of activities to be classified as exempt from this provision and should make clear that as written, 42 U.S.C. § 4332(C)(v) and 40 C.F.R. § 1502.16 do not preclude actions that authorize an irreversible and irretrievable commitment of resources. Rather, as with all of NEPA, disclosure of potential impacts is the primary goal.*

- Whether there should be a threshold (percentage or dollar figure) for the level of "minimal Federal funding" below which a project would not be considered a "major Federal action" subject to NEPA, and whether certain types of financial instruments or other per se categories of federal activities also should be considered exempt.

   *The Livestock Associations do not take a position on this issue.*

- Whether and subject to what procedures CEQ should specifically allow an agency to apply a CE established in another agency's NEPA procedures to its proposed action.

   *Yes. CEQ should allow for the automatic use CEs developed by other agencies.*

- Whether the revised regulations should establish government-wide CEs to exempt certain types of activities from additional NEPA review across the board.

   *Yes.*

- Whether the revised regulations should establish a presumptive maximum number of alternatives for evaluation of a proposed action (or for certain categories of proposed actions).

*The number of alternatives considered must be reasonable under the circumstances and limited to only those alternatives that meet the purpose and need for the project, as defined by the agency, its organic statute(s), and applicable regulations. Those alternatives that do not meet the purpose and need for the project, or which are outside the control, scope, or jurisdiction of the permitting agency, must be eliminated. Additionally, the number of alternatives considered is informed by CEQ's proposed definition of "reasonable alternatives" under § 1508.1(z), in that alternatives must all be "technically and economically feasible" and, where applicable, meet the goals of the applicant.*

- Whether the "overall costs" to an agency of obtaining incomplete or unavailable information warrants further definition to address whether certain costs are or are not "unreasonable."

  *Yes. CEQ should adopt some form of cost parameter on its consideration of the best available information, data, and science. Whether in the form of a dollar amount or other qualitative definition, it is imperative that CEQ impose a rule of reason and/or encourage agencies to limit overall costs associated with obtaining available information and science.*

- Opportunities for agencies to combine data to streamline environmental review, such as a new single NEPA application that facilitates consolidation of datasets and can run several GIS analyses to help standardize analysis. CEQ envisions this application having a public-facing component to aid prospective project sponsors with site selection and project design and increase public transparency.

  *Yes. CEQ should take steps to combine and share data wherever possible, reduce duplicative processes, and streamline environmental reviews. However, CEQ must very seriously consider the potential for privacy violations and/or data breaches whenever storing, processing, or evaluating private data for public lands projects and permits. While increased public transparency is a laudable and important goal, it must not come at the expense of increased risk to the private data of public land users.*

**Conclusion**

PLC, NCBA, and ASI appreciate the opportunity to provide comments on behalf of our members – the nation's food and fiber producers. Please do not hesitate to reach out to me at kglover@beef.org if you have any additional questions or concerns.

Respectfully,

Kaitlynn Glover
Executive Director
Public Lands Council & National Cattlemen's Beef Association Natural Resources

Tab 15, Exhibit 11 to Declaration of Amy Coyle



March 10, 2020


The Honorable Mary Neumayr, Chairman
White House Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

Subject: Docket ID Number:  CEQ-2019-0003

ConservAmerica, a non-profit organization that develops and advocates for market-based solutions to the United States' environmental, conservation, and energy challenges, supports the Council on Environmental Quality's (CEQ) efforts to update the NEPA regulations.  During the 40 plus years since CEQ's regulations have been revised, the NEPA environmental review and permitting process has become increasingly complex and time-consuming.  It now extends far beyond what Congress originally intended – which was a procedural statute to require federal agencies to assess the environmental, social and economic impacts of proposed major federal actions.

ConservAmercia believes that NEPA serves an important purpose and that there should be an efficient and comprehensive review of project impacts.  But the current process fails on both economic and environmental grounds.  The lengthy submissions and almost certain litigation impose unnecessary delays and costs that often result in the cancellation of projects that, in many cases, would advance the very environmental improvements that NEPA sought to achieve.   We have witnessed this over and over again with the delays and derailing of natural gas pipelines, electricity transmission lines, and wind farms, as well as with other major infrastructure projects.  The timing of this proposal is particularly poignant given the compelling need to modernize the U.S. energy system and transition to a lower carbon energy future.

Toward this end, ConservAmerica engaged Richard Epstein, a New York University law professor and Hoover Institution senior fellow, to provide comments on the NEPA proposal.  The following submission is the comprehensive paper prepared by Professor Epstein.

We appreciate the opportunity to provide these comments and look forward to participating in this critical effort to make NEPA more efficient and effective.


Sincerely,

Jeffrey Kupfer, President


1455 Pennsylvania Avenue NW, Suite 400, Washington, DC 20001

EVALUATION OF THE PROPOSED CEQ RULE UPDATING NEPA

COMMENTS BY PROFESSOR RICHARD EPSTEIN
PREPARED ON BEHALF OF

CONSERVAMERICA

# TABLE OF CONTENTS

EXECUTIVE SUMMARY …………………………………………………………… 3

INTRODUCTION: NEPA AT FIFTY ………………………………………....……… 7

THE STATE OF THE ENVIRONMENTAL HEALTH 1970-2020 …………..………............. 15

THE COSTS AND BENEFIT OF DELAY ……………………………………….……… 22

A "PROCEDURAL" STATUTE—WITH INJUNCTIVE RELIEF ……………….…............... 39

CHOOSING THE RIGHT STANDARD OF REVIEW …………………………………….... 45

CUMULATIVE IMPACTS AND CLIMATE CHANGE …………………………………… 52

VALIDITY OF THE NEPA PROPOSAL …………………………………………… 61

## EXECUTIVE SUMMARY

On January 10, 2020, the White House Council on Environmental Quality (CEQ) issued a Notice of Proposed Rulemaking (85 Fed. Reg. 1684) announcing proposed revisions to the regulations implementing the National Environmental Policy Act (NEPA).  This submission to CEQ examines its proposed update to NEPA and defends the CEQ proposal against its critics who wrongly complain any alteration or streamlining of the NEPA rules is an invitation to the degradation of America's environmental quality.

NEPA has an important place among the nation's foundational environmental laws.  Still, it has at times been misused by opponents of development, including those whose sole motivation is to eliminate the use of fossil fuels or to delay and derail infrastructure projects critical to America's economic and environmental advancement.  At a time when the country faces a backlog of critical infrastructure projects and the need to update our energy system for the 21st century, it's critical that the environmental review process is effective and reflects the most current environmental practices.

NEPA, after fifty years, needs to be updated to account for the vast improvements in environmental risk management that lowers both the frequency and severity of losses, for which the CEQ rules provide.  The chief lessons gathered from this review can be summarized as follows:

- Delays from excessive permit reviews not only damage economic growth and critical infrastructure projects but also expose nation to unreasonable environmental risks as aging, often dangerous facilities cannot be replaced with newer, safer ones.

- The use of NEPA's "procedural" system of injunctive relief (or vacatur) to stop major projects for minor faults should be replaced with one that allows projects to go forward on condition that environmental risks be mitigated, and that systems for inspection, monitoring, insurance and liability are put into place.

- Judicial review of projects should not use a dual standard that lets administrative agencies stop major projects for trivial reasons, imposing a "hard-look" for tiny defects on projects that have passed exacting administrative review.

- It is normally unwise to insist that any given project be examined for cumulative effects and climate change when these reviews yield little value, and bring into any one project

3

issues that are better examined with either parallel or downstream facilities, and are better addressed in a system-wide approach.

- The CEQ recommendation, when challenged in court should be upheld not just because they are entitled to deference under current law, but because they offer a well-thought out and systematic improvement over current environmental policies.

The first section of this analysis documents the rate of progress in environmental quality in the 50 years since NEPA went into effect. These improvements include a large reduction in risk-creation from environmental projects and major advances in risk-control and abatement activities after any environmental harm takes place. In addition, transformative technical advances in virtually every area of life since 1970 have led to a vast improvement in overall life expectancy, health, and living standards both in the United States and throughout the world. Those changes have been in part powered by the dramatic reduction in the material and human resources needed to sustain and expand industrial and agricultural output. These positive changes should overcome the crisis mentality that drives the defenders of the NEPA status quo. These same advances caution against thinking that NEPA proceedings, which in significant cases have grown to unpardonable length, should be immune from serious revisions that are consistent with both a safer environment and a high level of national growth and progress.

NEPA has its highest value in dealing with new projects that pose immediate and irreparable harm on sensitive ecosystems, such as wetlands, critical species habitat or other environmental assets, that are necessary to support biodiversity and species protection. But the controversial applications of NEPA arise not with these cases, but with the endless delays and procedural tie-ups of major projects that, once approved, will replace, for example, coal with cleaner-burning natural gas, wind, and solar.

In such cases it is unwise to block work until each and every detail of a project has been exhaustively examined. The preliminary review should govern major issues, coupled with the binding expectation that the ongoing project development efforts will be subject to continuous private and public inspections, backed by tort liability, and covered by third-party insurance. In cases that involve a controlled and measured loss of wetlands, species habitat, or grasslands, projects agree to full replacement through mitigation. The timing of remedies is critical to avoid

4

unnecessary delay. Legal challenges that are only designed to delay a project create unnecessary bottlenecks that keep safer infrastructure projects from displacing older ones.

The risks on constant delays are most significant with linear projects like pipelines and electrical transmission lines, where the need to procure multiple permits expands opportunities for obstructive litigation. Whenever possible, permits for linear projects should be brought together in a single comprehensive review process and not parceled out among separate government agencies. The CEQ rightly calls for greater consolidation of decision-making authority to avoid the spectacle where a small segment of a 200-mile pipeline is subject to a separate NEPA review.

The current situation, therefore, is ripe for most of the reforms proposed by the CEQ. Environmental impact statements and environmental assessments should focus on the resource impacts that truly matter. Agency decisions should be made on a more timely basis so that both the public and project developers can better understand the process and its requirements. In addition, whenever judicial review is sought, the CEQ should reverse today's presumptive remedy of *vacatur*, whereby a permit is presumptively revoked for a single defect in its NEPA application. Instead *vacatur* should only be reserved in rare cases of major defects that lead to irreparable injuries—an uncommon situation for projects that have made it through the administrative review process before being challenged in court.

In addition, when a project is subject to judicial review, courts should not apply the double standard of deferring to any agency determination that blocks development while also providing additional scrutiny under the "hard-look" doctrine to any project with agency approval. Curable defects should not lead to the overused vacatur remedy. Indeed, NEPA reviews are often heavily skewed because only strong objectors to agency decisions are likely to initiate a judicial challenge, even for projects that have obtained widespread public support. The CEQ is right to reject *vacatur* as the presumptive remedy in NEPA cases, most of which do not involve irreparable injury.

Unique difficulties arise in cases of cumulative impact, especially in case of climate change, where the CEQ correctly proposes that the review of any given project be largely separated from the approval process for other new projects. It becomes an impossible task, for example, to

subject the construction of a pipeline for review that takes into account all the downstream uses of fossil fuels.  It is not that these issues should escape review, but the appropriate review should take place at the facility where the emissions ultimately occur.

While the high level of opposition to the CEQ proposed changes make a judicial challenge highly likely, the proposal is consistent with the original intent of the law.  It will, if fully implemented, result in significant economic and environmental benefits to the country.

## INTRODUCTION:  NEPA AT FIFTY

My name is Richard A. Epstein, and I am the Inaugural Laurence A. Tisch Professor of Law at the New York University School of Law, the Peter and Kirsten Bedford Senior Fellow at the Hoover Institution at Stanford University, and the James Parker Hall Distinguished Service Professor Emeritus and senior lecturer at the University of Chicago.  Since I entered the teaching of law in 1968, I have written and taught in a large number of areas relating to the intersection of civil procedure, administrative law, environmental law and tort law, all of which pertain to the soundness of the January 10, 2020 proposal to the Council of Environmental Quality to engage in the first reexamination of key regulations under the National Environmental Policy Act of 1969, which has been an essential component of American environmental law for the past 50 years.  The Trump administration's position is contained in the CEQ's "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act."[1] (The "Proposal").

On this occasion, I shall provide—on behalf of ConservAmerica, non-profit organization that develops and advocates for market based solutions to the United States' environmental, conservation, and energy challenges – a statement of my views as to the strength and weaknesses of those proposed regulations.[2]  As part of this evaluation, I shall look not only at the CEQ's major recommendations about the NEPA regulations, but undertake two additional tasks. The first is to explain how the various provisions of NEPA fit into the larger system of environmental laws.  The second is to examine some of the key criticisms that are made against the new proposals by major environmental groups, which I think to be unsound as a matter of wise policy and statutory interpretation.

NEPA begins by creating an extensive mandate for government to deal proactively with a wide range of complex environmental issues.  Accordingly, it contains an explicit requirement that the interpretation and implementation of "the policies regulations, and public laws of the United States shall be interpreted to

---

[1]     85 FED. REG. 1684 (Jan. 10, 2020), available at https://www.govinfo.gov/content/pkg/FR-2020-01-10/pdf/2019-28106.pdf.

[2]     See https://www.conservamerica.org/.

**(C)** include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on--

    **(i)** the environmental impact of the proposed action,

    **(ii)** any adverse environmental effects which cannot be avoided should the proposal be implemented,

    **(iii)** alternatives to the proposed action,

    **(iv)** the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

    **(v)** any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented."[3]

NEPA itself has multiple laudable objectives. It hopes to collect information to allow for the making of sound decisions on public projects of great import. It has an important democratic function by allowing the various groups in the public at large to have input at an earlier stage of project development, which, if properly executed, can both improve the final projects and secure for them a greater sense of public legitimacy, by taking into account a wide range of views. It is beyond dispute that a strong and accurate enforcement of the environmental laws is essential to the operation of our complex ecosystem. What also matters is the conceptual approach that is taken towards these issues.

Without question, the concern with environmental issues is as old as civilization itself. The origins of modern environmental law go back a very long way to the early Roman and English laws dealing with a garden variety of nuisances which include: stench, filth, and the releases of all sorts of dangerous substances into either public lands or water, or onto private lands of neighbors. One common formulation is that the law of nuisance covers a substantial non-trespassory invasion of another's interest in the use and enjoyment of land.[4] There has never been a time where these types of actions have been regarded as beneficial to society as a whole. The private law of nuisance

---

[3]    42 U.S.C § 4332.

[4]    Restatement (Second) of Torts § 822 (1979).

has been relatively constant for a long period of time.[5]  The simple logic of this position explains the persistence of some form of nuisance law from the earliest times.

As a theoretical matter, that result is best understood by seeing how a system of nuisance law emerges in the organization of planned unit developments that are organized by a single developer.  Those plans always contain prohibitions against major nuisances because it is understood by the contracting parties that the benefits of these prohibitions are greater than their costs so it pays to include them in some common plan, even at some positive administrative costs. But at the same time, it is well understood that certain low-level nuisances, like clearing weeds, should be allowed because the harms that stem from these constrained losses are less than the gains that come from the greater freedom of action that allow people to mow lawns and use their barbeques.  The nature of this exception for low-level reciprocal harms was well articulated as long ago as 1862 in *Bamford v. Turnley*[6] where Baron George Bramwell wrote:

> There is an obvious necessity for such a principle as I have mentioned. It is as much for the advantage of one owner as of another for the very nuisance the one complains of, as the result of the ordinary use of his neighbour's land, he himself will create in the ordinary use of his own, and the reciprocal nuisances are of a comparatively trifling character. The convenience of such a rule may be indicated by calling it a rule of give and take, live and let live. . . .

That principle remains good law today,[7] and it illustrates one of the central challenges in this area which remains when common law nuisance is transformed into a larger statutory system of which NEPA is an essential part.  Environmental regulation, like other forms of regulation, is subject to the principle that all comparisons are made at the margin, so that there comes a point when additional units of environmental protection cost more than they are worth, taking into account the positive and negative consequences of these regulations. The challenge in all these highly variegated environmental cases is to design a set of rules that seek to reach that correct point when the net costs start to exceed net benefits.  As the live-and-let-live rule makes clear, there are

---

[5]      Joel F. Brenner, *Nuisance Law and the Industrial Revolution*, 3 J. LEGAL STUD. 403 (1974); Richard A. Epstein, *Nuisance Law: Corrective Justice and Its Utilitarian Constraints,* 8 J. LEGAL STUD. 49 (1979).

[6]      122 Eng. Rep. 27, 32-33 (Ex. 1862).

[7]      Restatement (Second) Torts, § 822, comment g (1979).

risks that enforcement of nuisance laws can go too far, just as there are cases when they do not go far enough.

What is true about ordinary private disputes between two parties is also true about large-scale administrative initiatives within the purview of NEPA. It is troublesome that virtually all of the criticisms of the proposed regulations from full-time environmentalist groups are keenly alert to the risk that environmental protections will not be sufficient to protect the vital interests in clean air and water, for example, but they are strangely silent on the converse risk. That risk is namely that the needed protections will not go far enough to deal with the basic problem and may in fact be counterproductive in one of two ways. First, the regulations could result in a net increase in environmental damage as various parties plan their own strategies to minimize the impact of the regulation. That outcome often arises from the delay in introducing new technologies. Second, the environmental benefits of these regulatory initiatives are often so small that they are not worth the economic dislocations thereby induced. That situation often arises whenever a new major project is either blocked or delayed because of the overestimation of the risks.

The question of how to steer the middle course is the major challenge, and the difficulties with NEPA do not stem from the statement of its general purposes, but with their implementation in concrete settings. In this context, it is important not to adopt a reflexive attitude that rejects all Environmental Impact Statements. At present, I represent Protect our Parks on appeal in their lawsuit brought under the public trust doctrine against the City of Chicago in an effort to stop the decision of the City to transfer to the Obama Foundation—at the behest of former President Obama—some 19.3 acres of Jackson Park, located near Lake Michigan and designed in the nineteenth century by the great landscape architect Frederick Law Olmsted, which has been on the National Register of Historic Places since 1972.[8] The proposed project envisions a large campus highlighted by the Obama Presidential Center (OPC), which will be 235 feet high located next to the Museum of Science and Industry. Building the OPC will require the cutting of at least 400 old

---

[8]    For a summary of the decision below for the City on public trust grounds *see*, *Protect our Parks v. Park District of Chicago*, 385 F Supp.3d 662 (N.D. Ill. 2019); for my commentary on the case, *see* Richard A. Epstein, *Chicago Betrays the Public Trust for Obama*, WALL STREET JOURNAL, July 25, 2019, available at https://www.wsj.com/articles/chicago-betrays-the-public-trust-for-obama-11564094571. While I am counsel for POP in that suit, the opinions set forth herein are my own, and not being made on behalf of my clients or other counsel in that matter.

growth trees, the ripping out of four major thoroughfares that go through Jackson Park—which will disrupt current traffic flows—and will require expanding other thoroughfares onto park land, such as Lake Shore Drive to the east, and Stony Island Avenue on the west.  The public subsidies, direct and indirect, for these various expenses could easily reach $500 million, taking into account the gift of the land, the cost of rerouting traffic, the public delays, and the loss of old growth trees.

The project is now going through review under the Historic Preservation Act of 1966 and will have to face a NEPA review.  All of the massive transformations are effective immediately, and they are an affront to both historical and environmental concerns.  The construction of the new mega-facility will not replace any obsolete or dangerous facilities, and there are many locations on the South Side of Chicago on park, city owned and private land that could accommodate some version of the OPC with a tiny fraction of the historical affronts and environmental damages.  It is inconceivable that this project should pass muster under any environmental statute, let alone avoid the necessity of an environmental impact statement.  Indeed, in addition to NEPA there is Section 4(f) of the Department of Transportation Act of 1966 which operates not as a disclosure statute but as a substantive control which requires that the Secretary of the Department of Transportation "may approve" a project that involves "land of an historic site of national, State or local significance"—which Jackson Park is— "only if (1) there is no prudent and feasible alternative to using that land,"[9] a section which was invoked to stop the construction of Interstate 40 in *Citizens to Preserve Overton Park v. Volpe*,[10] which reversed a summary judgment for the government, and remanded a case for full trial on facts that were far more favorable to the government that those pertaining to Jackson Park: it is far easier to relocate a presidential center than to reroute an interstate highway.

Apart from special situations, cases like the OPC never are even in contention for government approval.  Indeed, the cases that I will discuss here all deviate from the OPC in every relevant respect.  The harms are future, speculative, or nonexistent.  The alternatives to the project have been well vetted.  The effort to respect environmental concerns are uppermost at every stage of the development processes.  The objections raised to implementation are trivial compared to the

---

[9]     Department of Transportation Act, Pub. Law. 89-670, 82 Stat. 824, 49 U. S. C. § 1653 (f) (1966).
[10]     401 U.S. 402 (1971).

11

potential threat of the OPC in Jackson Park.  Nonetheless, the opposition to these undertakings has reached a fever pitch.   Yet nothing in the broad mandate under NEPA requires that the relevant reports and studies only consider the risks from introducing new projects.

If a proposed action will remove some greater hazard, that positive element should count as a (favorable) environmental impact.  The status quo could be riskier than the proposed alternative.  The "maintenance and enhancement of long-term productivity" could be a positive consequence of government action, not government inaction.   All of this is not to say that a review should ignore what the statute requires to be considered, namely, unavoidable adverse consequences.  But any comprehensive review that ignores the positive consequences of new action will systematically underestimate the gains from innovation.  These benefits should not be narrowly defined.  Any gain in productivity makes it easier to protect wetlands and rare habitats. Indeed, these tasks are made even easier because additional public wealth allows for government and private parties to purchase, as through mitigation and conservation easements, just these kinds of situations.

In this dynamic world, it is unwise to think of NEPA solely as a mechanism for the status quo, or even the best mechanism for the protection of the status quo.  The common reading of NEPA thinks of it as a defense of the status quo.  The correct analysis of the situation may often create a presumption in that direction, but it is one that can, and should be, overridden when the evidence establishes clear social gains from innovation, including the elimination of current hazards through the implementation of new technologies.

With these principles in mind, it is appropriate to examine both the theory and the particulars of the proposed regulations.  First, I shall consider briefly the state of environmental progress since the adoption of NEPA in 1970, where the bottom line is that by virtually any measure of human welfare conditions today are far better off than they were then.  Our current policy should reflect these massive technological improvements, which in turn have necessarily reduced the environmental risks of any given project.

Part I sets the stage for the larger inquiry by outlining the remarkable rate of technological progress made in the past 50 years, all of which has contributed to a more efficient utilization of

resources with lower rates of pollution damages.  These advances are common throughout every field of endeavor.  Yet the defenders of the status quo under NEPA show little awareness that this technological revolution fundamentally alters the risk/reward calculation for all new projects. Whereas environmental protections were in total disarray at the passage of NEPA in 1970, the opposite is true today for enormous progress has been made on all frontiers.  The studies referred to in this part are in no sense original to me.  But they offer incontrovertible proof of the huge advantages, the recognition of which is key to evaluating NEPA.

Part II then looks at the dangers of delay that are required under NEPA's current permitting process, which have become far more elaborate than was originally intended, even as the environmental risks from modern projects have become systematically smaller.  As the Proposal indicates, the key reason to modify the existing NEPA procedures is to cope with the inordinate delays that slow down or block the most important new projects that have the great promise to implement the technological gains outlined in Part I.  Yet the critics of NEPA reform tend to overstate the need for the exhaustive valuations of all projects, while understating the losses from keeping new projects off-line.  Their implicit mindset is that the alternative state of the world is always one of no environmental risk or degradation.  The more accurate account is often precisely the opposite.  The delays extend the life of preexisting projects whose operation is more dangerous in every respect than the projects that are slated to replace them.  This response holds, not only if the trade-offs are seen as those between economic growth and environmental protection.  In truth, some of the strongest objections to delay come from the simple point that the continuation of older inefficient projects causes higher levels of environmental pollution, such that the maintenance of the status quo ante undermines *both* economic growth *and* environmental protection.

Part III next addresses one of the critical conceits of NEPA, namely that it is simply a "procedural statute" that prudently requires an application for a new project to be issued only after all the relevant information is gathered.  Under this regime, no project work can be done until these procedural hoops are fully negotiated, which gives all opponents of a new project ample ammunition to seek to block new construction by finding some or any flaw in the application.  That dangerous stance forces applicants to prepare extensive environmental impact statements to deal with remote contingencies that are better handled during the construction process through a series of devices that include interim inspections, both public and private insurance and tort liability.  The

13

proposal takes the correct position that every violation of NEPA need not vacate the permit by invoking the older principle of equity courts that denies injunctions when the harm in question is not "irreparable." It thus sets the presumption against injunctive relief, and relies on the alternative methods of supervision while the project is ongoing. Unfortunately, the current law sets the presumption in favor of vacating permits, and has only a limited safety valve to deny injunctions in cases of hardship. These presumptions matter, and the current law favors delay, which turns out to be especially costly in cases of pipeline construction, whose completion often depends on obtainable multiple permits. It is possible to neutralize a 1,000 mile pipeline by blocking a one-mile portion for use—a tactic that has already been used with some success.[11]

Part IV then examines the critical question of what standard of review should be used by courts in passing on the decisions that various agencies make on NEPA applications. The key question in all these cases is the extent of deference that should be shown to agencies. There is a general statement in the law that deference on matters of fact is the preferred approach. But the implementation of that standard has not been uniform. Two sorts of cases are relevant: those in which the permit is granted, and those in which it has been denied. As a matter of first principle, the standard of review should be lower when the permit is granted than when it is denied. Grant the permit and it is possible to avoid initial delay and to issue corrective orders when the project is underway. But when the permit is denied at the outset the project just sits, and no corrective action is available. Hence the first kind of error is more costly, especially in an age when technological prowess reduces greatly the risk of any major mistake once construction begins. Nonetheless, the case law exhibits a strong anti-development bias by reversing the presumptions, so that courts tend to show inordinate deference to laborious orders that seek the production of information that has little or no value in the ultimate decision. Once again, the disclosure program of NEPA runs the serious danger of being converted through institutionalized delay into a *de facto* ban of certain activities, especially with pipeline construction which is so vulnerable to multi-prong attacks.

---

[11]     *See infra* p. 25 for a discussion of the Dakota Access Pipeline, and infra at p. 32 for a discussion of the Atlantic Coast Pipeline.

Part V then deals with the problem of cumulative effects and global warming.  The present approach that requires these effects to be examined in all cases is wrong for multiple reasons.  First, there is no cumulative effects between individual projects that influence any level of climate change.  These issues depend on the global level of production of which any new project contributes at most a miniscule effect.  The carbon dioxide from any one location has the same effect on temperature conditions as that emitted from any other location, so that there are zero synergies that exist between nearby projects.  The issue here should not be understood as one of "but-for" causation or foreseeability.  Both are always present, but only in a trivial sense.  The important point is that for problems of this sort, the unit of analysis is not the project, but the entire system of regulation, whether done through taxation, cross-border permits, or tradable emissions policies.  The overall changes in these levels on an annual level dwarf the potential emissions from any given project.

## THE STATE OF THE ENVIRONMENTAL HEALTH 1970-2020

The passage of 50 years has made an enormous difference in environmental quality both in the United States and world-wide. One powerful explication of these trends has been summarized by Johan Norberg, most notably in his book PROGRESS: TEN REASONS TO LOOK FORWARD TO THE FUTURE,[12] which expresses the enormous progress on a wide range of issues from food, sanitation, life expectancy, poverty, violence, the environment, literacy freedom, equality, and the next generation.  All these measures were positive when Norberg published his book in 2016, and as his recent writing has suggested, the trends have continued strongly in the same direction until the present time.[13]

Ironically, none of this progress was anticipated in 1970 when the public mood on human environmental protection was profoundly gloomy.  The huge four-day London fog of December 1952 was by all accounts horrific, and by some estimates resulted in the death of some 12,000

---

[12]    Johan Norberg, *Progress: Ten Reasons to Look Forward to the Future* (2016).
[13]    Johan Norberg, *The 2010s Have Been Amazing: Health, wealth and the environment are all better than ever*, THE WALL STREET JOURNAL, December 16, 2019, available at https://www.wsj.com/articles/the-2010s-have-been-amazing-11576540377.

15

people.[14]  Fortunately, we have never seen its like since, as a combination of technical advances and sensible environmental regulation turned the tide.  The massive Santa Barbara Oil Spill of 1969 proved to be a major catalyst for the environmental movement in general and for the passage of NEPA in particular.[15]  That spill is estimated to have released some three million gallons of oil that spread along the Pacific Coast from North of Santa Barbara to the North of Los Angeles.  The spill resulted in devastating losses to marine life and massive pollution to the area.  It was brought about by two key errors.  The first was a lax permitting policy toward Union Oil, which allowed them to dispense with certain minimum federal safety requirements.  The second was the primitive techniques then available to stop pollution, which continued to pour forth from the broken well at a rate of 1,000 gallons per hour for a month before it could be successfully contained.  A 2015 oil spill in the same region leaked only 105,000 gallons, which was contained in an area less than one percent of that of Santa Barbara. These differences in probability and severity should never be ignored in setting policies for dealing with future uncertain harms. Paul Ehrlich's book THE POPULATION BOMB,[16] published in 1968, predicted that world-wide famine would result from overpopulation in the 1970s and 1980s in light of the inability of food production to keep up with population growth.

> The battle to feed all of humanity is over. In the 1970s and 1980s hundreds of millions of people will starve to death in spite of any crash programs embarked upon now. At this late date nothing can prevent a substantial increase in the world death rate, although many lives could be saved through dramatic programs to "stretch" the carrying capacity of the earth by increasing food production and providing for more equitable distribution of whatever food is available. But these programs will only provide a stay of execution unless they are accompanied by determined and successful efforts at population control. Population

---

[14]    Michelle L. Bell, et al, *A retrospective assessment of mortality from the London smog episode of 1952: the role of influenza and pollution*, 112 ENVIRONMENTAL HEALTH PERSPECTIVES 1, 6-8 (2004).

[15]    Christine Mai-Duc, *The 1969 Santa Barbara oil spill that changed oil and gas exploration forever*, LOS ANGELES TIMES, May 20, 2015, available at https://www.latimes.com/local/lanow/la-me-ln-santa-barbara-oil-spill-1969-20150520-htmlstory.html.

[16]    PAUL EHRLICH, THE POPULATION BOMB (1968).  Ehrlich remains unrepentant, *see* Paul Ehrlich, *The Population Bomb, 50 years later: A conversation with Paul Ehrlich*, CLIMATE ONE, available    at    https://climateone.org/audio/population-bomb-50-years-later-conversation-paul-ehrlich.

16

control is the conscious regulation of the numbers of human beings to meet the needs not just of individual families, but of society as a whole.[17]

His voice was not alone. Shortly thereafter, the Club of Rome in its famously inaccurate projections claimed that pollution levels would increase and that devastating commodities shortages would take place.[18] The doomsayers were all wrong. Nothing of the sort ever happened. All of these writers despaired of modern technology as the weapons that would bring nature to its knees. But in fact the opposite happened: massive improvements in technology led to an unprecedented increase in food supply, which in turn has resulted in a huge decrease in the level of malnutrition worldwide that continues to this present day, even as population has doubled in 50 years to 7 billion people. That same technology produced advance after advance in other fields that has made the position of mankind today, by any and all measure, better than it has ever been. The error of the prophets of doom was powerfully exposed by, among others, the environmental scientist Jesse Ausubel who attributes much of this progress to "dematerialization," a trend that started, not coincidentally, in 1970:

> by about 1970 a great reversal had begun in America's use of resources. Contrary to the expectations of many professors and preachers, America began to spare more resources for the rest of nature — first relatively, and then more recently in absolute amounts. A series of "decouplings" is occurring, so that our economy no longer advances in tandem with exploitation of land, forests, water, and minerals. American use of almost everything except information seems to be peaking. This is not because the resources are exhausted, but because consumers have changed consumption, and because producers changed production. These changes in behavior and technology are today liberating the environment.[19]

Ausubel's notion of "peaking" posits, correctly, that as new technologies and insights occur, it becomes possible to produce more with less, resulting in vast efficiencies. That theme that has been echoed most recently by an MIT economist Andrew McAfee in his book MORE FROM LESS[20] which uses the same terminology to express the same basic point:

---

[17]    Ehrlich, *supra* n. 16 at xi.
[18]    Donella H. Meadows, et al., *The Limits of Growth* (1972).
[19]    Jesse Ausubel, *The Return of Nature: Now Technology Liberates the Environment*, THE BREAKTHROUGH INSTITUTE, May 12, 2015, available at https://thebreakthrough.org/index.php/journal/issue-5/the-return-of-nature.
[20]    Andrew McAfee, *More From Less* (2019).

> In America—a large, rich country that accounts for about 25 percent of the global economy—we're now using less of most resources year after year, even as our economy and population continues to grow. What's more, we are also polluting the air and water less, emitting fewer greenhouse gases, and seeing population increase in many animals that had almost vanished. America, in short, is post-peak in its exploitation of the earth.[21]

That notion of peak-exploitation has real bite. In order to explain "peak farmland," Ausubel offers this graph which shows how decoupling works in agriculture, where again it pays to compare the situation in 1970 with that in 2010. (More recent comparison is more striking):



Ausubel then concludes that taking into account all variables, peak farmland occurred in about 2010, so that, notwithstanding increased population, we should expect a steady decline in the amount of farmland, which in turn allows the return to nature of the land not so required. These advances have done more than any environmental regulation to improve all of the relevant indices. Many of these innovations were attributable to the legendary work of Norman Borlaug, whose persistence and ingenuity accounted for massive increases in farm output, which have saved or improved lives everywhere.[22] Borlaug has in turn launched his own angry attack on modern environmentalists whom he describes as "elitists" who "do their lobbying from comfortable office suites in Washington or Brussels."[23]

The dynamism of markets is also reflected in the radical change in the mix of energy sources that has taken place over the past ten years. As reported by InsideClimate News, there has been in the United States a downward trend in greenhouse gas emissions since 2005, notwithstanding the growth in both population and industrial output. The numbers are not quite those set forward in

---

[21]    *Id*. Introduction.
[22]    His contributions are suitably praised by Norberg, *supra* note 10 at 17-25.
[23]    Quoted in *id.*, at 23-24.

the Paris Agreement, but they are better than those posted by the various signatories to that Agreement. The table looks like this[24]:




As InsideClimate News notes, "[t]he story of the emissions decline has largely been one of market forces—rather than policies—that have made utilities close coal plants in favor of cheaper natural gas and renewable energy." This transformation is driven chiefly by the rapid fall in the reliance upon coal, especially in the last decade, and the concomitant rise in natural gas and renewables. The increase in the latter should be qualified given the wide mix of renewables (which include hydroelectric power) and the large subsidies that have routinely provided for wind and solar, whose contributions would have been lower in their absence. It is also the case that virtually all of the gains are concentrated in the power sector, as it is difficult to power transportation with either natural gas or renewables. With these qualifications, the information looks as follows:[25]



The central economic challenge is to give an explanation for the changes in question, given that as a matter of basic economic theory, it is commonly said that no self-interested individual has the incentive to produce public goods. Mancur Olson, in his classic book THE LOGIC OF COLLECTIVE

---

[24]    Nicholas Kusnetz, *U.S. Emissions Dropped in 2019: Here's Why in 6 Charts*, Insideclimatenews,    January    7,    2020,    available    at https://insideclimatenews.org/news/07012020/infographic-united-states-emissions-2019-climate-change-greenhouse-gas-coal-transportation

[25]    *Id.*

19

ACTION,[26] makes the powerful assumption that no individual will bear the cost of producing public goods from which they only get a tiny fraction of the gain.  That argument, however, only points to some level of underproduction.    But what has happened with these environmental improvements, is that they produce not only external benefits, but private benefits of product improvement that can be captured in the marketplace through lower costs and higher profits.  The incentives may not be perfect, but lest the best become the enemy of the good, the staggering rate of progress that has been observed is driven in part just by this partial internalization.  In addition, funding efforts for these public goods have been made, partly in reliance on Olson's great achievement. The funding of basic research through the National Science Foundation and the National Institute of Health have also yielded high rates of return.  None of these mechanisms are perfect, for there is little doubt that even more rapid progress could have been made on all fronts if there were a perfect alignment between public and private incentives. But the proof of the pudding is in the eating the statistical evidence shows that this complex system has generated continuous benefits. As Norberg wrote in 2016:

> According to the United States Environmental Protection Agency, total emissions of six leading air pollutants were reduced by more than two-thirds from 1980 to 2014. Volatile organic compounds were reduced by fifty-three per cent, nitrogen dioxide by fifty-five per cent, direct particulate matter by fifty-eight per cent, carbon monoxide by sixty-nine per cent, sulphur dioxide by eight-one per cent and lead by ninety-nine percent."[27]

> The trend has continued without abatement until the present.  Norberg writes in December 2019:

> The World Bank reports that the world-wide rate of extreme poverty fell more than half, from 18.2% to 8.6%, between 2008 and 2018.

> The incidence of malaria in Africa declined almost 60% from 2007 to 2017, and antiretroviral therapy reduced HIV/AIDS deaths more than half.

>  According to the U.N., the global mortality rate for children under 5 declined from 5.6% in 2008 to 3.9% in 2018

---

[26]    Mancur Olson, *The Logic of Collective Action: Public Goods and the Theory of Groups* (1965).

[27]    Norberg, *Progress*, at 110.

Rich countries use less aluminum, nickel, copper, steel, stone, cement, sand, wood, paper, fertilizer, water, crop acreage and fossil fuel every year.

Annual deaths from climate-related disasters declined by one-third between 2000-09 and 2010-15, to 0.35 per 100,000 people, according to the International Database of Disasters—a 95% reduction since the 1960s.

It should be apparent from this study that technology, not law, is the major driver of the continuous path of improvement over the past 50 years. Indeed, as will become clear, in many ways regulation has reduced the rate of innovation and slowed the process of substitution from less to more efficient energy sources. The hard question to ask is what role regulation and litigation play in the current environment. This is a complex question, for it is quite clear that some forms of regulation that attack pollution outputs directly will give both the regulated parties, both public and private, the incentive to reduce emissions output. [28] Thus the general legal system works best when it uses an enforcement mechanism that imitates the private law of nuisance with its mix of damages and injunctions. And it works the worst when it tries to specify the various kinds of equipment that should be used to achieve a given goal, such as by designating the best form of an emission control system, where the government is not in a position to know just what level of improvement justifies what given level of expenses.[29] As I have written elsewhere:

> There is much to dislike about the CAA's [Clean Air Act] approach, which makes the fundamental structural mistake of looking at the *inputs* that generate pollution emissions, such as the type of catalytic converters or scrubbers. But the better measure of social harms is the level of pollution *outputs* from these sources, like how much of a pollutant is emitted by the particular power plant. By measuring outputs, all the technical decisions on plant design would fall to the owners, who know that they will face taxes or injunctions for exceeding the pollution guidelines and other environmental safety standards. Operators of old and inefficient power plants may well shut such plants down, especially if they can erect new state-of-the-art facilities that emit far fewer pollutants without running a

---

[28]    *See, e.g.,* for my views on the endangered species Act, Richard A. Epstein, *Babbitt v. Sweet Home Chapters of Oregon: The Law and Economics of Habitat Preservation* 5 SUPREME COURT ECONOMIC REVIEW 1 (1996); Richard A. Epstein, *California's Forest Fire Tragedy*, DEFINING IDEAS, November 9, 2018, available at https://www.hoover.org/research/californias-forest-fire-tragedy; Environmental Law Without Property Rights, DEFINING IDEAS, October 22, 2018, available at, https://www.hoover.org/research/environmental-law-without-property-rights.

[29]    *See*, for an example of the wrong approach, the Clean Power Plan of the Obama Administration, *Carbon Pollution Emission Guidelines for Existing Stationary Sources: Electric Utility Generating Units;* 40 CFR Part 60, 80 Fed. Register No. 205, October 23, 2015, available at https://www.govinfo.gov/content/pkg/FR-2015-10-23/pdf/2015-22842.pdf.

regulatory gauntlet. Unfortunately, the current system creates huge incentives for facilities owners to make endless costly modifications of existing facilities, given the enormous permitting obstacles to putting into service newer facilities that are far safer and more efficient than the older, displaced plants.[30]

For these purposes, however, I shall concentrate on NEPA, which throughout this period has slowed down the rate of technological progress. There is no question that it is possible to think of improvements upon the Proposal. But by the same token, there is no doubt that the Proposal is a vast improvement over the current sclerotic system—whose prime output is unwanted delay.

### THE COSTS AND BENEFITS OF DELAY

In his statement in support of the new NEPA guidelines, President Donald J. Trump stressed the risks of delay that have become endemic under the current interpretation of NEPA. "America is a nation of builders. But it takes too long to get a permit, and that's big government at its absolute worst."[31] The approach taken in the Proposal seeks to use the only technique that has any chance of success. It marries a time limitation of two years from the date that the notice of intent is issued, subject to limited exceptions that must meet the approval of the senior agency official who is free to establish a new limit.[32] Similarly, the long Environmental Impact Statements

---

[30]  Richard A. Epstein, *Junk Obama's Clean Power Plan*, DEFINING IDEAS, October 30, 2017, available at, https://www.hoover.org/research/junk-obamas-clean-power-plan.

[31]  Kelsey Brugger, *Trump unveils landmark rewrite of NEPA rules*, E&E NEWS, January 9, 2020, available at https://www.eenews.net/stories/1062036913.

[32]  Proposal at 1717:

(2) Environmental impact statements within 2 years unless a senior agency official of the lead agency approves a longer period in writing and establishes a new time limit. Two years is measured from the date of the issuance of the notice of intent to the date a record of decision is signed.
(c) The senior agency official may consider the following factors in determining time limits:
    (1) Potential for environmental harm.
    (2) Size of the proposed action.
    (3) State of the art of analytic techniques.
    (4) Degree of public need for the proposed action, including the consequences of delay
    (5) Number of persons and agencies affected.
    (6) Availability of relevant information.
    (7) Other time limits imposed on the agency by law, regulations, or Executive order.

22

(EISs) required in serious cases, would be set at 300 pages.[33]    The shorter Environmental Assessments, EAs, would be limited to 75-pages, both subject to similar exceptions.[34] There is some question whether the loopholes created in the new regulations are too broad, because it is quite clear that a pro-NEPA official will find opportunities to demand more information in all cases, and it would defeat the purpose of expediting cases to review these initial determinations in court.  To tamp down on this potential for delay, I would like to see the presumption in favor of these limitations be strengthened so as to weaken that chance.

There is good reason to do so, for the President's lamentation about delay is not an idle statement for there are many particular instances of delay that cry out for some explanation.  There are many particular instances that come to mind. The now-dead Cape Wind renewable energy project slated for the Nantucket Sound was delayed for 16 years by pretextual claims of an inadequate NEPA review. The Bayonne Bridge that connects New York and New Jersey took over ten years to complete, in part because of extensive NEPA review.  The proposed renovations of the Seattle-Tacoma International Airport was subject to 15 years of environmental reviews before it was constructed. Four years ago, Senator Dan Sullivan of Alaska reminded us that the "Pentagon was built in 16 months. The 1,500-mile Alaska-Canadian Highway, which passes through some of the world's most rugged terrain, took about eight months. It took Shell seven years and $7 billion to get White House permission to drill a single oil-exploration well off the coast of Alaska."[35] The situation has not materially improved since then. There was extensive litigation over the completion of the Dakota Access Pipeline that went into operation in June 2018. The Keystone XL pipeline is still mired in litigation after years of delay.

It is critical to stress the costs associated with these delays.  Any government agency or private firm that wishes to put a plan into effect must incur heavy front-end costs before the program is in a condition that renders it ready for government review.  Yet these costs can only be recouped years later, and then only if the project receives the necessary approval.  It is therefore

---

[33]    Proposal at 1700.
[34]    Proposal at 1697.
[35]    Dan Sullivan, *How to Put Building Permits on a Fast Track*, WALL STREET JOURNAL December 4, 2016, https://www.wsj.com/articles/how-to-put-building-permits-on-a-fast-track-1480886263Wall Street Journal.

necessary to secure interim financing these long-term proposals.  There are two ways in which to fund projects. The first is to commit equity capital to the venture.  The second is to borrow funds on the market.  Most projects may well involve a mix of the two methods.  But either way, the total cost of this project will have to reflect the risks incurred to secure its completion.  Yet these opportunity costs are outside the NEPA calculus, which in turn distorts choices.  One naïve assumption is that these other costs count for less. But in fact these other costs also include a different set of environmental risks, like those from projects that continue past their useful lives. Their potential to cause mischief rises with age, as is surely the case with the forty-year old nuclear plants that need constant repair.  Projects of this sort thus suffers because NEPA downplays costs such as large front-end expenditures for design and land acquisition, and interim financing expenses.  They also suffer because NEPA downplays other environmental costs, which fall outside its purview under the current form of analysis.

In dealing with these and other delays, the National Resource Defense Council, through its new head Gina McCarthy, makes two arguments in support of the status quo ante, neither of which address the systematic shortfalls of the current NEPA system.  Her first point is that only a small fraction of the actions undertaken by the Council of Environmental Quality (CEQ) result in actions under NEPA, so that only 500 draft environmental impact statements are prepared each year, and these are completed on average in 4½ years.  But these numbers elide all the serious questions. The relevant inquiry here is not the fraction of cases that require EA and EIS, but the value of the cases that are subject to this requirement.  These projects vary enormously in size and value. The completion of a major road or pipeline could require billions of dollars to complete, and while many small projects involve projects in the million dollar range, it is quite probable that the majority of the total dollars involved are located in the projects—e.g. pipelines and airports—that are subject to the most substantial delays in, for example,  the slow moving O'Hare Modernization Program, which started in 2005 and has yet to be completed.[36]  Overseas the construction of a third runway for London's busy Heathrow Airport has been blocked on NEPA like grounds.[37]  By way

---

[36]     *See*, Village of Niles,    O'Hare Modernization Program, available at https://www.vniles.com/1135/OHare-Modernization-Program (giving ways for Niles residents to submit complaints by phone).
[37]     *See*, R. (on the application of Plan B Earth v. Secretary of State for Transport, February 27, 2020,    available    https://www.judiciary.uk/wp-content/uploads/2020/02/Heathrow-judgment-on-

of contrast, the Incheon International Airport in Korea, was able to build a new terminal with rail connections in five years.[38]

Even these figures do not capture the full social costs of the delays.  Virtually all of these projects are linked together with other projects which cannot realize their full potential so long as the particular project is delayed under NEPA.  Any full reckoning of the cost of these delays has to take into account these system-wide consequential damages.  Thus, the delays in a pipeline could result in lost production of crude oil or natural gas that raises prices and blocks other developments downstream.  The delay of a new airport could foul up transportation systems for years.[39]  The NEPA process wholly ignores costs and thus understates the social dislocations that stem from these projects.

Ms. McCarthy also makes a second mistake elsewhere in her remarks when she implicitly assumes that NEPA reviews are an error-free process that produce only net social goods.

> We live in a democracy, not a dictatorship.  Americans deserve to have their voices heard before their families' health and well-being are put at risk by projects that bring unwanted and unnecessary pollution and disruption into their communities.  While our world is burning, President Trump is adding fuel to the fire by taking away our right to be informed and to protect ourselves from irreparable harm.

Every element in her statement is incorrect.  The first of these points is that the world is not burning up, as the level of forest fires today is far lower than it was one-hundred years ago.  And where, as in California and Australia, fires have burned out of control, the vast bulk of the responsibility lies with environmental regulators  and not the regulated parties.[40]  Dead wood is

---

planning-issues-27-February-2020.pdf.  For my views, see Richard A. Epstein, *Revenge of the Paris Agreement*, HOOVER, DEFINING IDEAS,  March 2, 2020,  available at https://www.hoover.org/research/revenge-paris-agreement.

[38]  *See*, INCHEON INTERNATIONAL AIRPORT: SMART, ART& GREEN (2018), available at https://www.airport.kr/co_file/en/file01/2018_brochure_en.pdf.

[39]  *See*, Damian Carrington, *Heathrow third runway ruled illegal over climate change,* THE GUARDIAN,  February  27,  2020,  available  at https://www.theguardian.com/environment/2020/feb/27/heathrow-third-runway-ruled-illegal-over-climate-change.

[40]  For the California fires, see Jim Carlton, *Facing Deadlier Fires, California Tries Something New: More Logging*, WALL STREET JOURNAL, Nov. 18, 2018, available at https://www.wsj.com/articles/facing-deadlier-fires-california-tries-something-new-more-logging-

allowed to remain; forests are not thinned; all the practices done by private owners are disregarded so that a large tinder box counts for far more than changed global temperatures, which have actually gone down in 2018. The regulators are remote. They have little knowledge of local conditions, and they often have a condescending attitude to farmers and ranchers who have an intimate connection with their local environment, and who often supply the most informed opposition to parties who wish to convert environmentally sensitive lands into developed property. Indeed, owners of property in these lands should be more willing to engage in environmentally appropriate development if they were promised compensation for their preserving critical habitat, rather than suffering a loss of all development rights when the government seizes that habitat by fiat. This short-sighted government policy unfortunately results in the private rule of conduct of "shoot, shovel, and shut up," which can increase and accelerate damage to the environment.[41] Nothing is more dangerous that the assumption that parties who have no financial stake in getting things right will outperform people on the ground whose livelihood depends on making the correct adjustments to various environmental provisions.

The seriousness of the leaks of the Animas River gives some measure of the mayhem that unwise regulatory actions can cause. On August 5, 2015, a botched damage control operation run by EPA resulted in the leakage of some 3 million gallons of wastewater in the Animas River, where it caused massive amounts of damage. The losses took place because the EPA disregarded the advice of local experts who knew something of the risk in dealing with abandoned mine sites that contain high levels of pollutants. Ms. McCarthy announced that the EPA accepted "full responsibility" for the incident, which were hollow words, for on January 13, 2017, just one week before the Obama administration left office, the EPA announced that it was legally protected from liability for $1.3 billion in the 73 private claims that were filed.[42] Indeed, they are protected

---

1542390642?mod=article_inline. For Australia, see Ramesh Thakur, *Why Australia in Burning*, PROJECT SYNDICATE, Jan. 9 2020, available at https://www.project-syndicate.org/commentary/australia-bushfires-2020-by-ramesh-thakur-2020-01, pointing to earlier fires in 1896 and 1939 of comparable magnitude and urging a reformation of forest management practices, including low-level controlled burns.

[41]    Dean Lueck and Jeffrey Michael, *Preemptive Habitat Destruction Under the Endangered Species Act*, 46 JOURNAL OF LAW AND ECONOMICS 27 (2003).

[42]    Jonathan Romeo, *Will losses from the Gold King Mine spill ever be covered?*, THE DURANGO HERALD, January 21, 2018, available at https://durangoherald.com/articles/204643.

because the key provision of the Federal Torts Claims Act, under which all suits for money damages must be filed, creates an exception for certain "discretionary functions," for which governments are not liable.[43]   From the outset, this provision put government in a preferred position against private actors engaged in similar conduct.  In *Dalehite v. United States*,[44] the Supreme Court in a most unwise decision held that the United States was not responsible for the massive loss of life and property damage in Texas City that followed when government officials mismanaged the loading of explosive fertilizers on ships bound for France, as part of the relief effort after World War II. At the same time, the tort rule for private defenders held *strictly* liable any person involved in the operation of any ultrahazardous activity.[45]   Who is likely to perform

---

[43]     Federal Tort Claims Act, 28 U.S.C. §2674. LIABILITY OF THE UNITED STATES.

The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances, but shall not be liable for interest prior to judgment or for punitive damages. . . .

§2680. Exceptions.

The provisions of this chapter and section 1346(b) of this title shall not apply to —

(a) Any claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

[44] *Dalehite v. United States*, 346 U.S. 15, 35–36 (1953).

It is unnecessary to define, apart from this case, precisely where discretion ends. It is enough to hold, as we do, that the "discretionary function or duty" that cannot form a basis for suit under the Tort Claims Act includes more than the initiation of programs and activities. It also includes determinations made by executives or administrators in establishing plans, specifications or schedules of operations. Where there is room for policy judgment and decision there is discretion. It necessarily follows that acts of subordinates in carrying out the operations of government in accordance with official directions cannot be actionable.

[45]     RESTATEMENT TORTS, ULTRAHAZARDOUS ACTIVITIES, §515(1), (2) (1938);  The Rule is carried over in Restatement (Second) of Torts, §519, 520 (1977); Restatement (Third) Torts, § 20 (2009).

27

better: a private firm with profit and loss responsibility, subject to exacting liability, or a remote government agency whose budget and whose officers are wholly insulated from any financial sanctions?  It was not for the Proposal to address the embedded difficulties of tort liability, but it certainly can take steps to try to rationalize the system of government control, which at present is subject to all too few restraints.

Ms. McCarthy also errs in her claim that this administration's revaluation of the NEPA process is intended to address the systematic shortfalls introduced in previous administrations. There are many disputes over the extent to which any administration has power to deviate from the statutory command.  In in this instance, the proposed reforms are within the statutory domain, and the operation of a review process by this administration is just as much a part of the democratic process as similar reviews, often with different objectives, in previous administrations. Administrative agencies form an essential part of the democratic process in any democratic society,[46] and it is no more dictatorial to reverse earlier decisions than to expand NEPA authority without any authorization from Congress.  So long as the regulations fall within the permissible scope of the CEQ, the administrative process is not an affront to democratic values.   More importantly, this statement assumes without argument that the new projects are likely to "bring unwanted and unnecessary pollution and disruption into their communities."  But while that claim is true in some instances, it is surely false in others, especially in communities that already face serious environmental risks under the status quo.  Thus, a new road is usually intended to replace an aging road that is the source of much environmental risk.  Bad road design can cause delays that increase the risks of pollution.  That older facility itself may pose a serious risk of collapse. A new pipeline will likely replace an old pipeline that carries with it a far higher rate of failure, with devastating consequences from leakage.  Or it could replace the dangerous shipment of crude oil and natural gas by rail or truck by building a pipeline that is far safer in its operation.

Major showdowns of pipelines, which can spill over beyond the legal system have happened.  For several years, I worked with MAIN (Midwest Alliance for Infrastructure Now) (and then GAIN (Grow American's Infrastructure NOW)) Coalition, a coalition of supporters for

---

[46]     For my extensive views on this entire topic, see Richard A. Epstein, THE DUBIOUS MORALITY OF MODERN ADMINISTRATIVE LAW (2020).

pipeline construction in the United States.  These pipeline cases constitute a small fraction of the total number of projects that need government approval under NEPA, but they are an exceedingly important subset of the overall cases that typically span multiple jurisdictions, both federal and state.  The NEPA process does not only attach to the many safety and health issues associated with pipeline construction, but also to issues that arise in connection with The National Historic Preservation Act of 1966, whose own elaborate review process requires extensive consultation with various interested parties before any permit can be issued,[47] and the additional permits that often needed under the Mineral Leasing Act of 1920.[48]  In addition, many state permits have to be obtained from various public utility commissions, all of which follow somewhat different procedures and adhere to somewhat different substantive standards.  At the federal level, moreover, it is not always clear how many NEPA hearings have to take place for any complete pipeline approval process.

One way to block pipelines is to increase the number of needed permits, given that the denial of a single missing permit on an integrated project can halt all further construction.  The problem for the pipeline builder is especially difficult because all of these permits are not obtained simultaneously, so that work completed pursuant to any given number of valid permits can be held captive if just one other permit is denied along the process.  In these cases, it is futile for a developer to hold off on construction until all the permits are issued, because that strategy allows opponents to focus in on one permit pressure point, knowing that the convoy can only move as rapidly as its slowest boat.  Many permits are valid only for a limited time, so that there is be no single given time when all permits are go.  And it is surely not possible to begin work in pipeline construction in multiple places at that time.  Attacking pipelines is a powerful tactic for any interested in banning fossil fuels via NEPA, because the entire energy balance will be thrown off if the connective tissue in the petroleum industry is vulnerable to powerful rearguard litigation.

There is no secret that many environmental activists echo the sentiment of Ms. McCarthy when she writes:  "There is still, I think, a continued need to keep our eye on the prize, and our eye on the prize is that we need to reduce fossil fuels.  We need to go to clean energy, not cleaner

---

[47]    National Historic Preservation Act, 80 Stat. 915, 16 U.S.C. §§ 470 *et seq.*
[48]    Mineral Leasing Act, 41 Stat. 449, 30 U.S.C. §185.

energy."[49]  Her assertion badly misstates the social challenge.  The right question to ask is not how to wean the nation from fossil fuels; it is how to optimize the energy production in ways consistent with minimizing environmental harm, so that at the margin any gains from increased fossil fuel use are equal to environmental losses.  The more efficient the modes of energy production, the higher levels of output, consistent with that objective.  Working toward that goal should begin now.  Thus if environmental activists  block or slow down the efficient deployment of clean fossil fuel energy from natural gas and crude oil, rest assured there will be no long term environmental gain to compensate for the short-term losses, given that the inherent limitations on wind—no wind, no energy—and solar energy—no sun, no energy—power.  Neither resource can, in either the short or medium run, become the dominant source of energy. Banning fracking—as opposed to making continuous improvements in its application—is the sure road to energy insufficiency and a major recession.  As Mark P. Mills writes:[50]

> There is no way renewables could offset that quantity of energy lost to the world, at any price, regardless of bans or subsidies. Recent history shows why that's true. Consider that, over the past decade, America's energy supply from increased shale production rose by some 1000% — more than the growth of energy supplied by solar and wind combined.
>
> The energy transition to solar and wind is happening in slow motion. It's true that wind and solar have become far less expensive, but those sources together still provide less than 3% of global energy even after two decades of massive subsidies.  And in the four years since the Paris Accord, global petroleum use is up over 4 million barrels per day.  Natural gas use has seen even greater growth in energy-equivalent amounts.
>
> As for the future, the share of global energy supplied by oil and gas is indeed declining, but very slowly.  The Energy Information Agency forecasts that the 54% contribution from oil and gas today will drop to 50% by 2040. That's not much of a decline.

In the face of all this difficulty it is especially disheartening to see that the environmental movement has increasingly turned to NEPA in order to stop the construction of new pipelines.

---

[49]    Kevin Bogardus, *Gina McCarthy on clean energy, climate and 2020 elections*, E&E NEWS, January 17, 2020, available at https://www.eenews.net/stories/1062106809.

[50]    Mark P. Mills, *Many of the Democrats Want to Ban Fracking.  That Would Trigger a Global Recession*, MANHATTAN INSTITUTE, February 7, 2020, available at https://www.manhattan-institute.org/fracking-ban-trigger-recession.

One bold strategy is an effort to increase the number of independent federal reviews under NEPA in order to slow down pipeline deployment. Thus, one case now pending before the Supreme Court is *United States Forest Service v. Cowpasture River Preservation Association*,[51] which involves the Atlantic Coast Pipeline's ongoing effort to build an $8 billion, 42-inch diameter natural gas pipeline, capable of transporting 1.5 billion cubic feet of natural gas each day, along a 604.5-mile route from West Virginia to eastern portions of Virginia and North Carolina. That pipeline must be routed underneath the Appalachian Trail that runs some 2,000 miles from Mount Katahdin, Maine, to Springer Mountain, Georgia. The ACP is designed to pass about 450 to 600 feet below the Appalachian Trail, and its proposed entry and exit points, both located on private lands, are about 1,400 and 3,400 feet from the trail, respectively. The traditional practice was that the sole review for the entire pipeline was conducted by the U.S. Forest Service, an agency of the Department of Agriculture, which exercises its power, under the authority of the Mineral Leasing Act (MLA) of 1920. The objectors to the Forest Service claimed that jurisdiction for that portion of the pipeline that went under the trail resides with the National Park Service, located in the Department of Interior to cover that 0.1 mile of pipeline. The National Trails System Act[52] (NTSA) provides that the Appalachian Trail "shall be administered primarily as a footpath by the Secretary of the Interior."[53] A 604.5-mile pipeline necessarily crosses many national trails. The Court of Appeals for the Fourth Circuit held that the Park Service had jurisdiction over that tiny portion of the pipeline,[54] and in so doing set up the ludicrous situation that any agency with jurisdiction over trails could control in 0.1 mile increments the construction of pipelines far below its trail. The Fourth Circuit ruling also called into question countless pipeline issued under the older practice. That decision is a perverse effort to invent the most inefficient NEPA review structure possible.

---

[51]    911 F.3d 150 (4th Cir. 2018).

[52]    82 Stat. 919, 16 U.S.C. §§ 1241 et seq.

[53]    16 U.S.C. §1244(a)(1).

[54]    *Cowpasture River Preservation Ass'n, v. Forest Service*, 911 F.3d 150 (4th Cir. 2018), certiorari for certiorari granted, October 4, 2019, https://www.scotusblog.com/case-files/cases/united-states-forest-service-v-cowpasture-river-preservation-association/. For my more detailed analysis of the case, see Richard A. Epstein, *Our Precarious Pipeline Infrastructure,* DEFINING IDEAS, December 2, 2019, available at https://www.hoover.org/research/our-precarious-pipeline-infrastructure.

The recent oral argument before a skeptical Supreme Court should undo most of the damage in the Fourth Circuit,[55] but the entire incident shows the extent to which unprincipled tactics, often abetted by federal courts, can seize on NEPA to introduce a regime of delay solely for the sake of delay.  In *Cowpasture*, the Fourth Circuit, in an issue that did not reach the Supreme Court, wanted that the developer look at alternative routes that did not cross under National Trails, and review the level of damage that will necessarily take place during construction.  Thus, the Fourth Circuit held that the Forest Service's failure to consider alternative construction plans was arbitrary and capricious.  Nonetheless, at no point in the course of its opinion did it ask the central question, which is whether the supposed improvement of pipeline construction was worth the serious costs in time and money needed to make alternative evaluations that look implausible on their face: all pipelines necessarily cause some damage to terrain, and all long routes will necessarily pass over some portions of terrain that are harder to build on than others.  The social gains from imposing damages to private, as opposed to public, lands are hard to detect, but that decision on the merits will slow down the ACP for years, no matter how the jurisdictional battle between the Park Service and the Forest Service plays out.  And it is not possible to lay down pipelines except by clearing out the surface, much of which can be replaced when the pipeline is completed.

The endemic problem of delay in long and skinny projects, from start to finish, which include highways, railroads, trails, and most distinctively pipelines.  I choose to discuss this last class of cases in some detail because, as their facts will reveal the projects typically require expenditures of billions of dollars in direct cost. That figure gives, moreover, only a lower bound on total costs, because the breakdown of any network system produces huge dislocations in the activities the locale that produces the crude oil or natural gas that runs through the system, as well as equally large dislocations after those products reach, or at least are supposed to reach, their final

---

[55]    Noah Sachs, *Argument analysis:  The Trail, the pipeline and a journey to the center of the earth*, SCOTUS Blog, February 25, 2020, available at https://www.scotusblog.com/2020/02/argument-analysis-cowpasture/ ("Environmental groups faced a skeptical bench during Monday's argument in [*Cowpastures*] as they fought to preserve a 2018 decision from the U.S. Court of Appeals for the 4th Circuit that had halted an $8 billion, 600-mile natural gas pipeline.").

destination.  These activities were not foremost in the minds of those who drafted NEPA, but they have vaulted to the fore in recent years.

*Dakota Access Pipeline.*  The first illustration of the difficulties is well illustrated by the extensive litigation over the completion of the Dakota Access Pipeline (DAPL), which is a joint project of Energy Transfer Partners and Sunoco Logistics Partners. DAPL 30 inches in diameter and it runs about 1172 miles from the Bakken and Three Forks production areas in North Dakota, South Dakota and Iowa, ending up in Illinois.  It delivers between 470,000 and 570,000 barrels of crude oil each day.  Ninety-nine percent of the pipeline runs across private lands, for which it is not necessary to obtain federal approval, but hundreds of short stretches involve construction activities across federal waters, for which government approvals are essential. In order to avoid the holdout problem that later arose in *Cowpastures*, the government issued a comprehensive permit, Nationwide Permit 12, which treats all of these small holdings as a piece.  But for one stretch of about 1,100 feet that runs within one-half mile of the Standing Rock Sioux Tribe (SRST), the Tribe claimed that the proposed path of the pipeline was in violation of both the NHPA and NEPA. Accordingly, it sought a preliminary injunction, which precipitated prolonged litigation beginning at the latest the summer of 2014.  DAPL was also subject to numerous hearings and oversight both from state public utility commissions and from the Army Corps of Engineers.  After numerous contentious and protracted hearings and intermediate skirmishes DAPL obtained approval from all these bodies to commence construction.[56] At the federal level, an EA concluded that both the route selected and the construction techniques adopted met all applicable federal standards dealing both with safety and with the multiple requirements of the National Historical Preservation Act of 1966.[57]   The EA also covered key issues of route determination, colocation, construction techniques and much more.

---

[56]        For the early history, see *Standing Rock Sioux Tribe v. U.S. Corps of Engineers*, 205 F. Supp. 3d 4, 13 (D.D.C. 2016). For further rounds of litigation, see *Standing Rock Sioux Tribe v. U.S. Corps of Engineers*, 239 F. Supp. 3d 77 (D.D.C. 2017); *Standing Rock Sioux Tribe v. U.S. Corps of Engineers*, 255 F. Supp. 3d 101 (D.D.C. 2017); *Standing Rock Sioux Tribe v. U.S. Corps of Engineers*, 282 F. Supp.3d 91 (D.D.C. 2017).

[57]        FINAL ENVIRONMENTAL ASSESSMENT: DAKOTA ACCESS PIPELINE PROJECT, SECTION 408—CONSENT FOR CROSSING FEDERALLY AUTHORIZED PROJECTS AND FEDERAL FLOWAGE EASEMENTS,                                available                                at

The DAPL took the shortest path, and add the added advantage of being co-located with existing pipelines to avoid unnecessary environmental damages.  The new pipeline was built far deeper under the ground than six older pipelines that were closer to the surface, and thus of greater risk. The diagram below (which shows a design feature similar to that in *Cowpastures*) shows the extent of the difference.

Lake Oahe (which was constructed by the Army Corps in 1958) had obtained the status of a religious site for the SRST.   The initial attack on DAPL was based on its interference with historic preservation, and in a careful opinion, Judge James Boasberg noted that the Army Corps



had engaged in extensive consultation with the Tribes about historical preservation, which were consistently stonewalled by the Tribes throughout the proceedings. Yet the moment Judge James Boasberg issued his exhaustive opinion on September 9, 2016, allowing the work to go forward, the Assistant Secretary of the Army, the Attorney General, and the Department of Interior issued a joint statement urging the pipeline companies to "pause voluntarily" even though DAPL was at the time 60 percent complete, because about 1,100 feet of it came within a quarter of a mile of tribal lands occupied by the SRST.[58]    Their joint announcement recognized that there had been nothing legally incorrect about his decision, so that the entire enterprise was an effort to use extrajudicial conduct to influence the outcome.  This appeal, which required the coordination of three separate branches of the Obama administration,

---

https://www.mvs.usace.army.mil/Portals/54/docs/pm/Reports/EA/DAPL/DAPLSTLFINALEAandSIGNEDFONSI%203Aug2016.pdf?ver=2016-08-22-164859-507.

[58]    Recounted in Richard A. Epstein, *Why The DOJ Order To Shut Down Construction On The DAPL Pipeline is Legally Indefensible*, FORBES, September 14, 2016, available at https://www.forbes.com/sites/richardepstein/2016/09/14/why-the-doj-order-to-shut-down-construction-on-the-dapl-pipeline-is-legally-indefensible/#633bd9654d27.

had to have been prepared in anticipation that Judge James Boasberg would rule in favor of the Army Corps of Engineers which had approved the pipeline.

The next major legal maneuver took place on December 4, 2016 after Trump won the 2016 election.  Once again, the Obama administration continued its opposition to the completion of the pipeline.  Jo-Ellen Darcy, the Assistant Secretary of the Army for Civil Works, announced that that the Army would not approve an easement that would allow DAPL to cross under Lake Oahe in North Dakota.  Instead she insisted on a full EIS, complete with full public input and analysis, which could take years to complete.[59]  "The best way to complete that work responsibly and expeditiously is to explore alternate routes for the pipeline crossing."[60]  The stated rationales for the Department of Army decision were contained in a short memorandum that rehashed the earlier objections to the choice of route, and which stressed the need to maintain good relations with the Tribe, which, as detailed by Judge Boasberg, had engaged in repeated efforts to stonewall the administrative proceedings every step of the way.  By this time the pipeline was 90 percent complete at a cost of $3.8 billion, all of which would be stranded if the SRST, as the lone holdout, had been allowed to force a rerouting of the entire pipeline.  At this point, the question was less about historic preservation and more about environmental issues.  The huge deference given to administrative agencies would have made it difficult to overturn that decision judicially—showing yet another weakness in the overall structure of current administrative law.  The threat to the pipeline was only removed after the Trump administration withdrew the December 4, 2016 order, and allowed the easement to be presented to Congress where it received a quick approval in January 2017, allowing the work to be finished.

Yet even as late as 2017, there were still residual issues that had to be resolved.  Thus, Judge Boasberg wondered whether the Corps must "disclose and assess the suite of risks from the Lake Oahe crossing and the effect on the full range of the Tribe's Treaty rights, in the context of the

---

[59]    U.S. ARMY, ARMY WILL NOT GRANT EASEMENT FOR DAKOTA ACCESS PIPELINE CROSSING, December 4, 2016, available at https://www.army.mil/article/179095/army_will_not_grant_easement_for_dakota_access_pipeline_crossing.

[60]    *Id.*

Corps' heightened trust responsibilities."[61]   But the DAPL crossing is far below that of other pipelines, so that these supposed risks are negligible.  And if any particular response is needed, surely something could be worked out by updating mitigation strategies after the pipeline is competed.  Similarly, any concerns with environmental justice are utterly misplaced.[62]  Pipelines run through all sorts of different terrains. It is just not credible to think that the specifications work everywhere else will fail in these locations. It would be downright foolish to stop the construction on a pipeline to make sure that social and political relationships with the SRST worked well.  If bad relationships were able to get the SRST delays through the Obama administration, continued truculence might yield the Tribe an even higher rate of return.  NEPA cannot work well if so many issues unrelated to safety and health are larded into the approval process, where they slow down deliberations and give opposition groups the opening to put forward additional grounds for delay.

It would be a serious mistake to assume that the only battles over DAPL occurred in the courtroom and legislature.  From September 2016 to March 2017, there were multiple physical confrontations between the large groups of protestors that had gathered at the site and the Morton County Sheriff's Office, charged with maintaining order.   There have been charges and countercharges as to who started the violence, but what is undisputable is that the Morton County office, aided by reinforcements from outside the count, incurred major costs to keep the violence under control.[63]   Thereafter, the entire dispute spilled over into the international arena, with extensive discussion of claims that DAPL trampled on the principles embodied in the UN Rights of Indigenous Peoples, and on the Equator Principles that are said to guide bank decisions of lending to projects that may have an adverse impact on indigenous peoples.[64]  When the occupation

---

[61]      *SRST*, 255 F.Supp.3d at 130.

[62]      *SRST*, 255 F.Supp.3d at 130; *SRST*, 282 F. Supp.3d at 100.

[63]      See, for one such account, Sam Levin, *Over 70 arrested at Standing Rock as Dakota Access aims to finish pipeline*, February 1, 2017, THE GUARDIAN, https://www.theguardian.com/us-news/2017/feb/01/standing-rock-arrests-dakota-access-pipeline-construction.    For   the   local response see, *Morton County Sheriff's Department releases DAPL protests "By the Numbers" Report*, January 10, 2017, https://www.valleynewslive.com/content/news/Morton-County-Sheriffs-Department-releases-DAPL-protests-by-the-numbers-report-410199055.html. The report detailed that over 180,000 hours of response time was required at a cost of $22.3 million, with 556 protesters, 95 percent of whom were from out of state, many with a history of violence and criminal records.

[64]      I have given a detailed analysis of both these claims in Richard A. Epstein, *The Indigenous Peoples   War   Against   Pipelines*, FORBES,   April   8,   2019,   available   at

36

ended in March 2017, the U.S. Army Corps of Engineers spent some $1.1 million in clean-up costs, using 835 dumpsters to remove the trash and debris that the protestors left behind.[65]  The DAPL case shows how legal controversy feeds into political and protest movements.  The longer NEPA proceedings go unresolved, the greater the collateral consequences outside the legislature and courtroom.

*Bayou Bridge*. A similar story of unwarranted NEPA scrutiny, without the huge political and protest overlay, applies as well to the Bayou Bridge Pipeline (BBP), whose construction was enjoined on February 27, 2018 by Louisiana District Court Judge Shelly Dick in *Atchafalaya Basinkeeper v. United States Corps of Engineers*,[66] temporarily blocking the completion of an extension of the BBP.[67]  That 24-inch buried pipeline was designed to transport up to 480,000 barrels per day of various grades of crude oil over about 162 miles from Lake Charles Louisiana to terminal facilities in St. James Louisiana.[68]  The objectors claimed that the Corps of Engineers' earlier review did not contain full information about the process of mitigation in the event of a catastrophic release—itself a low-probability event.[69]  They further argued that the application did not specify which new wetlands would be acquired in the Basin to mitigate wetlands lost through the construction and maintenance of the pipeline.[70]  Finally, the objectors argued, it did not deal systematically with the cumulative impacts of the new changes in connection with spoil banks that had been created by earlier projects—a familiar objection to which I shall turn later.[71]  All of these elements are at best second-order considerations that have little or no relationship to the probability

---

https://www.forbes.com/sites/richardepstein/2019/04/08/the-indigenous-peoples-war-against-pipelines/#3b0eaaf63781.

[65]    Valerie Richardson, *Dakota Access protest camps cleared after $1.1 million federal cleanup; four more dogs rescued*, WASHINGTON TIMES, available at https://www.washingtontimes.com/news/2017/mar/13/dakota-access-case-army-finishes-11-million-cleanu/ . ("8,170 cubic yards of debris was removed from the three camps — Sacred Stone, Oceti Sakowin and Rosebud — all within the flood plain on federally managed land.")

[66]    310 F. Supp. 3d 707 (M.D. La. 2018).

[67]    Liz Hampton, *2-Permit revoked for energy Transfer Partners' Louisiana pipeline*, REUTERS, February 24, 2018, available at https://in.reuters.com/article/energy-transf-pipeline-court-ruling/update-2-permit-revoked-for-energy-transfer-partners-louisiana-pipeline-idINL2N1QE0EP.

[68]    *Id.*

[69]    *Atchafalaya Basinkeeper*, 310 F. Supp. 3d. at 727–28.

[70]    *Id.* at 732–35.

[71]    *Id.* at 735–39.

37

that the pipeline will fail, which in this case was—in light of the advanced state of engineering—negligible. Nor did the District Court decision make any effort to compare the risks created by a new pipeline with environmental risks from the operation of existing systems. Fortunately, this decision was reversed in the Fifth Circuit (albeit by a divided vote) on the ground that it was an abuse of discretion.[72]

> On their face, the 200+ pages in both EAs here acknowledged potential environmental impacts from the project, discussed third parties' concerns about those impacts, referenced in detail the hydrological, horticultural and wildlife environment in the affected acreage of the Basin, and explained how and where mitigation bank credits and construction protocols would be adopted to render the watershed impact not "significant."[73]

Again, any defender of NEPA's present practices has to explain: what information from any further inquiry could justify the enormous expense of further review and the attendant delays?

The problems in question are not just pipeline cases. One way to expand this inquiry is to ask just would happen if one started to run highway construction projects through with the speed of earlier times. These highway examples all highlight the excessive caution that permeates NEPA deliberations. Consider the repair work done to the Santa Monica freeway after the Northridge earthquake collapsed two major bridges on January 17, 1994, snarling traffic throughout West Los Angeles.[74] About 341,000 vehicles used that road daily.[75] Then-governor Pete Wilson waived all environmental safeguards and cut a deal with C.C. Myers & Co. for a base price (in 1994 dollars) of $14.9 million, with a bonus of $200,000 for each day the work came in ahead of the stipulated June 24, 1994 deadline and a penalty of $205,000 for each day they fell behind.[76] The smart money thought that with these incentives in place, it would take 140 days to complete the project.[77]

---

[72]     894 F.3d 692 (5th Cir. 2018).

[73]     *Id.* at 698.

[74]     Michael Lepage, *Construction Project Acceleration Won Them Millions: How They Did It*. PLANACADEMY, June 1, 2015, available at https://www.planacademy.com/construction-project-acceleration-won-millions/; Nora Zamichow & Virginia Ellis, *Santa Monica Freeway to Reopen on Tuesday : Recovery: The contractor will get a $14.5-million bonus for finishing earthquake repairs 74 days early*, LOS ANGELES TIMES, April 6, 1994, available at https://www.latimes.com/archives/la-xpm-1994-04-06-mn-42778-story.html.

[75]     Lepage, *supra* note 74.

[76]     *Id.*

[77]     *Id.*

It took only 66 days, earning Myers a $14.5 million bonus.[78] The project would have taken two years to complete under standard practices, and probably more under NEPA procedures.[79] But without the regulation, private ingenuity took over. Myers earned its $14.5 million bonus by working its crews around-the-clock seven days a week, paying overtime along the way. He rented a train to assure the timely delivery of materials.

Officially, the extra incentives allowed Los Angeles to avoid losses estimated at $1 million per day (or $74 million in total) from traffic dislocation, additional tailpipe emissions, and constant inconvenience caused to businesses and residents alike. That figure is probably low by an order of magnitude, for it values the inconvenience to each vehicle at only $3 per day and does not include any further losses. Add 15 minutes to each trip in or out of the city, with two cars, which at $20 per car, puts the total losses for 341,000 vehicles at about $6.82 million per day. Throw in inconvenience for other vehicles that don't use the Santa Monica freeway, and that number probably close to doubles. Take into account the extra pollution and noise, and the number lurches up again. A per day total of $20 million is probably a conservative estimate, for a total of close to $1.5 billion. But what were the downsides of this rapid approach? At no time did anyone point to any nuisance or similar harms that required ex post remediation. Then-mayor of Los Angeles Richard Riordan observed when the project was done: "This is the way government should be carried out all the time, not just in emergencies." And why is he wrong? And why are not the costs of delay of similar, or even greater, magnitude for projects whose development has languished for years?

### A "PROCEDURAL" STATUTE—WITH INJUNCTIVE RELIEF

One common, fundamental misconception about NEPA is the claim that it only operates as a "procedural" statute whose objectives are to make sure that government agencies do not proceed with their proposed actions without taking into account their environmental consequences, or without giving the public full and accurate information about any proposed undertaking. Furthermore, the Court has written that "Congress in enacting NEPA, however, did not require

---

[78]     *Id.*
[79]     Zamichow & Ellis, *supra* note 74.

agencies to elevate environmental concerns over other appropriate considerations."[80]  Thus, once the environmental costs have been identified and analyzed, any agency is thereafter free to approve a project.

In the District of Columbia Circuit, where a large percentage of NEPA cases are brought, the rule runs as follows: "If an appellant has standing—which is undeniable here—and prevails on its APA [Administrative Procedure Act]  claim, it is entitled to relief under that statute, which normally will be a vacatur of the agency's order."[81] That rule, which applies to all cases that are brought under the APA, also covers NEPA such that "vacating a rule or action promulgated in violation of NEPA is the standard remedy"— a proposition that was announced in connection with an effort to "preliminarily enjoin . . . [a] fee-for-service ante-mortem [horse] inspection program" which has of course none of the scale effects of a pipeline case. [82] The same approach was taken in *Reed v. Salazar,*[83] which involved an annual funding agreement that the Fish and Wildlife Service had entered into with consolidated Indian tribes for operating and managing the National Bison Range Complex, again a situation with no long-term network effects. In sum, the current law provides that vacatur is a "presumptively appropriate remedy."[84]

That presumptive use of injunctions in NEPA cases should be contrasted with their use in other litigation contexts, which typically reserves injunctions for situations that pose some imminent peril that requires prompt action to avoid irreparable harm.  Such peril is are involved for example, with the Obama Presidential Center's the cutting down of trees and filling in of wetlands at the outset of the project.  Yet even here, a note of caution is needed, for in some of these cases the harm done to, say, a wetland is, by plan and design, limited at the outset and there are plans to restore the project at the outset of adding in other lands to replace those that are lost. Irreparable harm is therefore often a contextual process, but there is no reason why any violation under NEPA should necessarily trigger the irreparable harm standard.  As the Proposal provides:

---

[80]     *See, e.g.*, *Balt. Gas & Elec. Co.* v. *Nat. Res. Def. Council, Inc.,* 462 U.S. 87, 97 (1983).
[81]     *Am. Bioscience, Inc. v. Thompson,* 269 F.3d. 1077, 1084 (D.C. Cir. 2001) (FDA dispute on an abbreviated drug application for generic form of patented drug).
[82]     *Humane Soc. Of U. S. v. Johanns*, 520 F. Supp. 2d 8, 13 (D.D.C. 2007).
[83]     744 F. Supp.2d 98 (D.D.C 2010).
[84]     *Sierra Club v. Van Antwerp*, 719 F. Supp. 2d 77, 78 (D.D.C. 2010).

> The CEQ regulations create no presumption that violation of NEPA is a basis for injunctive relief or for a finding of irreparable harm. As the Supreme Court has held, the irreparable harm requirement, as a prerequisite to the issuance of preliminary or permanent injunctive relief, is neither eliminated nor diminished in NEPA cases. A showing of a NEPA violation alone does not warrant injunctive relief and does not satisfy the irreparable harm requirement.[85]

In support of this proposition, the Proposal cited the Supreme Court in *Monsanto Co. v. Geertson Seed Farms,*[86] which rejected the view that an automatic injunction should be applied, regardless of the level of harm.  In that particular case, Geertson sought the injunction because of its fear that Monsanto's Genetically Modified Organisms (GMOs) could contaminate Geertson's own non-GMO stock.[87]  Monsanto had sought and obtained approval, from the Animal and Plant Health Inspection Service (APHIS) of the Department of Agriculture, for the limited use of its Roundup Ready Alfalfa (RRA), which is a GMO.[88]  The District Court had issued a blanket injunction in light of the contamination risk.  The Supreme Court overturned this blanket injunction on the ground that the agency in the first instance had the discretion to act as it did: to issue a conditional injunction which could, among other things, impose "mandatory isolation" rules to separate the two kinds of crops, and to impose precautions to make sure that any planting and harvesting equipment used with GMOs had to be cleaned before it could be used with conventional crops.[89]  The issue in this case was *not* whether GMOs were safe.  The fear was that other producers who advertised that they did not sell GMO crops had to be protected against the risk of gene bleeding that could undermine their own warranties.[90]  The Court also stressed that it was always possible, down the road, for the claimant to obtain a second injunction should the risk of genetic bleeding turn out to be larger than anticipated.[91]  In effect, the approach does not front-load all relevant determinations into the initial stages.  That approach should work well in the pipeline cases like *DAPL* and *Atchafalaya Basinkeeper*, although it was not cited at any time in either of these cases.  *Monsanto* does not, however, address whether a court should undo a

---

[85]   Proposal at 1694.
[86]   561 U.S. 139 (2010).
[87]   *Id.* at 166–67 (Stevens, J., dissenting).
[88]   *Id.* at 144.
[89]   *Id.* at 148.
[90]   *Monsanto*, 561 U.S. at 153–54.
[91]   *Id.* at 162.

categorical injunction ordered by an agency. That is what was done *Atchafalaya Basinkeeper*, but the Proposal offers a useful clarification on this point.

*Monsanto* is instructive for yet another reason, for in it Supreme Court explicitly relied on its 2006 decision in *eBay Inc. v. MercExchange, L.L.C.*[92] to stiffen the requirements for issuing an injunction. *eBay* concluded that injunctive relief could offer too potent a remedy even in the case of deliberate infringement, given the bargaining leverage that a patent holder has against an infringer. Accordingly, the Court adopted a four-part test to determine whether an injunction ought to be issued:

> [A] plaintiff seeking a permanent injunction must satisfy a four-factor test before a court may grant such relief. A plaintiff must demonstrate: (1) that it has suffered an irreparable injury; (2) that remedies available at law, such as monetary damages, are inadequate to compensate for that injury; (3) that, considering the balance of hardships between the plaintiff and defendant, a remedy in equity is warranted; and (4) that the public interest would not be disserved by a permanent injunction.[93]

In the patent context, there is much reason to believe that prior to *eBay* injunctive relief was awarded routinely, especially in nuisance cases, to control known and deliberate harms, without going through the four-part *eBay* test for a deliberate act of patent infringement. There are, admittedly, strong reasons to think that *eBay* is too favorable to defendants in that narrow patent context.[94] But in current NEPA cases, injunctions are not issued for actual invasions of the rights of others, but whenever there is a failure to meet all the disclosure requirements under NEPA, wholly apart from any actual or imminent harm. In this context, the play in the joints allowed under *eBay* surely makes sense, and the Supreme Court was correct in *Winter v. National Resources Defense Council, Inc.*[95] to apply eBay's four-part test whenever a plaintiff sought to obtain a preliminary injunction for a NEPA violation. It is also the case that some flexibility is introduced into the joints of NEPA enforcement where the burdens of the automatic injunction are

---

[92]    547 U.S. 388 (2006), cited in *Monsanto* at 561 U.S. at 156-157.
[93]    *eBay*, 547 U.S. at 391.
[94]    *See* Mark P. Gergen, John M. Golden & Henry E. Smith, *The Supreme Court's Accidental Revolution? The Test for Permanent Injunctions*, 112 COLUM. L. REV. 203 (2012).
[95]    555 U.S. 7 (2008).

thought to be too great relative to the gains which are obtained.[96]  The point makes eminently good sense because, as noted in *Monsanto*, an initial decision to deny an injunction can be qualified when new evidence justifies additional restrictions.  Letting the project go forward is also consistent with allowing for damage actions or even criminal fines for future environmental damages.  Denying the injunction, therefore, does not eliminate all deterrent effect.  But the errors running in the opposite direction are far more serious, because there is no corrective action for past errors if a project is not allowed to go forward.

In these cases, therefore, using vacatur as the presumptive remedy gets the matter exactly backward.  The presumption should be set in the opposite direction, so that special reasons should be required in order to vacate a particular permit and wholly enjoin the requested activity.  To be sure, NEPA does allow for an uncertain safety valve under the well-established rule of *Allied-Signal v. U.S. Nuclear Regulatory Commission*,[97] which applies the following test: "[t]he decision whether to vacate depends on 'the seriousness of the order's deficiencies (and thus the extent of doubt whether the agency chose correctly) and the disruptive consequences of an interim change that may itself be changed.'"[98]  *Allied-Signal* allows for some play in the joints, but it is ad hoc, not systematic. As such it leads to spotty application even when environmental risks are overestimated in terms of immediacy, frequency and severity.  Thus *Allied Signal* was invoked with respect to the DAPL by Judge Boasberg.[99] But in the Bayou Bridge Pipeline decision *Allied Signal* was ignored by the trial judge, only to be invoked at the eleventh hour by the Fifth Circuit.[100]

The Proposal is correct, therefore, in providing that a NEPA injunction should only be allowed in cases of irreparable harm, which does not result simply because of some substantive violation under any one of the large panoply of environmental statutes.  In working through these

---

[96]    For a more complete discussion of the pipeline cases, see Richard A. Epstein, *The Many Sins of NEPA*, 6 TEX. A&M L. REV. 1 (2018).

[97]    988 F.2d 146 (D.C. Cir. 1993).

[98]    *Id.* at 150–51 (quoting *International Union, UMV v. FMSHA*, 921 F.2d 960, 967 (D.C. Cir. 1990).

[99]    *Standing Rock Sioux Tribe*, 255 F. Supp. 3d 101, 147 (D.D.C. 2017).

[100]    *Atchafalaya Basinkeeper v. U.S. Army Corps of Eng'rs*, 310 F. Supp. 3d 707, 740–41 (M.D. La. 2018), *rev'd* 894 F.3d 692 (5th Cir. 2018).

calculations, the correct approach first asks, as most NEPA inquiries do not, what other institutional safeguards have already been put into place. Thus, wholly apart from NEPA, the management of complex construction projects never relies solely on a once-and-for-all positive decision to issue a building permit. Instead, that permit, once issued, it is backed up by a variety of oversight arrangements, both public and private, that carry through the entire project. These contain at least three salient features: first, periodic inspections to pick up project weaknesses before they occur; second, liability and casualty insurance, which adds another layer of supervision from insurers anxious to reduce their own exposure; and third, liability for those harms that do occur, coupled with criminal sanctions for conscious deviation from the accepted construction practices.

In practice, NEPA does not uniformly integrate these other safeguards into its analysis. Thus, it gives inordinate weight to the "merely procedural" remedy of an injunction to slow up activities until a final judgment is reached. That decision in turn tends to increase the levels of delay endemic to the system. The lengths of the delays, moreover, are expanded because any and all private individuals and groups are now routinely allowed to challenge any agency approval of a given project. Unfortunately, the only parties likely to initiate that challenge are those that are most displeased with the agency findings. These self-selected parties drive the law relentlessly in the direction of more studies and more delay. In contrast, pro-agency groups are not likely to appear in the litigation. Put otherwise, an administrative procedure that is not followed by litigation from disaffected parties is more likely to be reach outcomes targeted to the median voter. The recognition of open standing in litigation gives more weight to groups at the tail, and these groups systematically underrate the environmental risks that stem from the failure to replace dangerous facilities and operations with safer ones.

This drive to the extreme tail of the distribution came through judicial innovation, barely more than a year after NEPA went into effect. Thus in *Calvert Cliffs' Coordinating Committee, Inc. v. United States Atomic Energy Commission*,[101] an aggressive decision written by Judge J. Skelly Wright openly welcomed private challenges to government approvals, thereby rating the risk of going too quickly as far greater than the risk of going too slowly. There was no explicit

---

[101]    449 F.2d 1109 (D.C. Cir. 1971).

44

provision in NEPA that allowed for these actions to be brought. Nonetheless, Wright happily announced that the cases before him "are only the beginning of what promises to become a flood of new litigation—litigation seeking judicial assistance in protecting our natural environment" from what he termed the "destructive engine of material progress."[102]   This decision came down two years after the 1969 Santa Barbara oil spills, which, given the primitive technology of the time, took a long period to fix.  The technologies to both prevent and control spills (and indeed every other kind of environmental peril) are far stronger today than they 50 years ago.  In principle, the advances should move the NEPA needle away from a permanent injunction because the risk of some future harm is both less likely to occur and easier to remediate.  Nonetheless, the legal system does not respond to these changed circumstances, so the period of injunctive relief now runs, at the very least, through the administrative hearing and the litigation that takes place thereafter.  In a sense, these lawsuits cut against the democratic ideals of NEPA because the extreme tail that is active in litigation is able to negate a consensus view that pushes for an interim solution.

### CHOOSING THE RIGHT STANDARD OF REVIEW

The next critical stage in dealing with applications under NEPA is to determine the standard of review for agency decisions.  The underlying administrative law standard is derived from the Administrative Procedure Act, whose key provision instructs that courts "hold unlawful and set aside agency action, findings, and conclusions" that are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[103]   In dealing with this provision, the confusion starts with this Delphic passage in *Motor Vehicle Manufacturers Association v. State Farm Mutual Insurance Co*:[104]

> The scope of review under the "arbitrary and capricious" standard is narrow and a court is not to substitute its judgment for that of the agency. Nevertheless, the agency must examine the relevant data and articulate a satisfactory explanation for its action including a "rational

---

[102]     *Id.* at 1111.

[103]     5 U.S.C. § 706(2)(A). For my extensive review of this standard, see Richard A. Epstein, THE DUBIOUS MORALITY OF MODERN ADMINISTRATIVE LAW Part 5, 185-92 (2020), followed by a discussion of the pipeline cases at 192-205.

[104]     463 U.S. 29 (1983).

connection between the facts found and the choice made." In reviewing that explanation, we must "consider whether the decision was based on a consideration of the relevant factors and whether there has been a clear error of judgment. Normally, an agency rule would be arbitrary and capricious if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. The reviewing court should not attempt itself to make up for such deficiencies: "We may not supply a reasoned basis for the agency's action that the agency itself has not given."[105]

Read in one way, *State Farm* affords abundant judicial deference to agencies. Review under the arbitrary-and-capricious standard "is extremely limited and highly deferential."[106] Except when it is not. Read in another way, this standard embodies the now ubiquitous hard-look doctrine, which is captured in these words from *State Farm*: "if the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, . . ."

Those words had clout because in *State Farm*, Justice White concluded that under the National Traffic and Motor Vehicle Safety Act of 1966[107] the National Highway Traffic Safety Administration (NHTSA) acted arbitrarily and capriciously when it revoked a previous standard that all new cars as of September 1982 had to be equipped with passive restraints—a regulatory question of immense difficulty on which it was easy to come out both ways.[108] In effect, *State Farm* thus allows any lower court to pick either a high or low standard for the test, creating a jumble of unreconcilable cases. But it is possible in theory to identify the two major types of environmental cases that raise this issue. In the first, the agency has given *approval* to the project, which is now attacked by environmental groups in court. In the second, the proposal has been *rejected* by the relevant agency, and, typically, the private applicant wishes to mount a challenge

---

[105]    *Id* at 43. (All citations and internal punctuation removed).

[106]    *See, e.g.*, *Gulf Restoration Network v. McCarthy*, 783 F.3d 227, 243 (5th Cir. 2015) (internal quotation marks omitted).

[107]    80 Stat. 718, as amended, 15 U. S. C. § 1381 *et seq.* (1976 ed. and Supp. V).

[108]    *State Farm*, 463 U.S. at 46.

to what has happened. Consistent with what was argued above, the standard of review should differ in the two cases. In those instances where the approval is granted, the reviewing court should resolve all ambiguities in favor of the applicant because of the additional safeguards that are routinely available to deal with any errant project down the road. In those instances where the permit has been denied, a closer look should be taken because there is no subsequent proceeding that can revive a stillborn project downstream.

Unfortunately, this two-part test for arbitrary and capricious agency action survives in administrative law, but the distinction is drawn in exactly the wrong direction. The operative words suggest that a relatively relaxed standard of review be applied. There are many cases in which a reviewing court could disagree with a decision and still hold that it was not "arbitrary, capricious, [or] an abuse of discretion,"[109] and still find that it came within the purview of the agency, given the complexity of the trade-offs necessary to reach a final decision. The plusses and minuses of complex projects are difficult to tally. Some of these factors are likely to be quantitative but difficult to measure. In addition, many factors raise subjective issues that are not easily subject to quantification, such as claims about environmental justice[110] or the importance of not injecting controversial elements into community relations.[111] It is first necessary to identify the full range

---

[109]    5 U.S.C § 706(2)(A).

[110]    *See* Exec. Order No. 12,898, 59 Fed. Reg. 32 (Feb. 11, 1994), whose purpose was to ensure that the EPA made "achieving environmental justice part of its mission by identifying and addressing, as appropriate, disproportionately high and adverse human health or environmental effects of its programs, policies, and activities on minority populations and low-income populations in the United States." 59 Fed. Reg. 32. The Proposal briefly addresses this issue and concludes that it is not in tension with the Executive Order. Proposal at 1711-12. I agree. For my critique, see Epstein, *supra* note 81 at 21-23.

[111]    40 C.F.R. § 1508.27 Significantly. *Significantly* as used in NEPA requires considerations of both context and intensity: . . .

**(b) *Intensity.*** This refers to the severity of impact. . . .

**(4)** The degree to which the effects on the quality of the human environment are likely to be highly controversial.

For its application in connection with DAPL, *see Standing Rock Sioux Tribe*, 255 F. Supp. 3d at 127-30 (struggling with issue) & 147-48 (rejecting vacatur under *Allied Signal).* For my critique,

of relevant variables.  Then, the agency must attach a level of significance to each factor.  Next, it must provide a score, positive or negative, for each factor.  Finally, it must figure out which of the many proposals yield the highest score.

There are multiple steps even in this stick-figure simplification of project evaluation, and the statutory words seem clearly to give the nod to the agency, even as a court is required to apply a higher standard of review to questions of law under Section 706,[112] which raises the same kinds of issues whether they are raised in an administrative proceeding or an ordinary trial.  So the correct view in my opinion is to tolerate much disagreement on factual issues, less on ultimate questions of fact (e.g. is this plant safe?), and de novo review (i.e., no deference at all) on questions of law.

Unfortunately, the situation on the ground is this: if the agency approves the project, the so-called hard-look doctrine applies at every stage of the inquiry.  Thus, one key junction asks whether an agency decided not to issue a Finding of No Significant Impact (FONSI).  At this point the exacting standard of the reviewing court is whether the agency:

(1) has accurately identified the relevant environmental concern,

(2) has taken a hard look at the problem in preparing its [FONSI or Environmental Assessment],

(3) is able to make a convincing case for its finding of no significant impact, and

(4) has shown that even if there is an impact of true significance, an EIS is unnecessary because changes or safeguards in the project sufficiently reduce the impact to a minimum.[113]

In effect, this formulation translates the low arbitrary and capricious standard into one that verges on strict scrutiny, so that virtually any slip in the chain of inference is sufficient to derail the entire operation.  Given the number of stages and intricate trade-offs that are involved, it is

---

see Epstein, Many Sins, 6 Texas A. & M. L. Rev. at 23-27. The central difficulty is to control the tendency of outsiders to make extravagant claims to render an issue controversial.

[112]    "To the extent necessary to decision and when presented, the reviewing court shall decide all relevant questions of law, interpret constitutional and statutory provisions, and determine the meaning or applicability of the terms of an agency action." 5 U.S.C. § 706.

[113]    *Tomac v. Norton*, 433 F.3d 852, 861 (D.C. Cir. 2006) (permit upheld) (internal citation and quotations omitted).

virtually certain that any court that harbors an anti-development orientation will be able to find at least one chink in the armor.  The subsequent order of an EIS could easily take several years, but there is no guarantee that a longer document, when subject to the same scrutiny, will at long last pass muster under the same exacting standard.  It was just this hard look standard that was brought to bear in the three pipeline cases, DAPL, BBP, and ACP discussed above, and it is applied in many other contexts as well, including the location of casinos[114] and dredge and fill permits[115].

Yet the analysis takes on a different coloration when the agency in question denies the pipeline application.  Just that is a common occurrence in New York State, where the task of reviewing pipeline applications is turned over to the New York State Department of Environmental Justice, which takes an implacable stance against both pipeline development and fracking inside the state, resulting in severe shortages of natural gas, which in turn has resulted in a dual difficulty: riskier modes of transportation are now coupled with the use of less efficient energy sources, such as electric heating and oil.[116] In dealing with the decisions of this body, courts adopt a far more deferential approach on the question of whether such harms are arbitrary and capricious.  This tendency is much in evidence in *Constitution Pipeline Co. v. New York State Department of Environmental Conservation*,[117] in which the Second Circuit upheld the refusal of the Department to find that Constitution's proposed 121-mile interstate natural gas pipeline, of which about 98 miles would be located in New York, met the appropriate standards for water quality.  As is typical in these cases, there was no imminent threat of any spillage at the inception of the project, and minimal danger of some accident or discharge during the construction period.

In *Constitution Pipeline*, the Department peppered Constitution with requests for detailed information about the way in which the pipeline would traverse small streams throughout the state—a question reminiscent of that raised in *Cowpastures*.  In dealing with these streams, it is

---

[114]    *Id*.

[115]    *Sierra Club v. Van Antwerp*, 661 F.3d 1147 (D.C. 2011) (permit upheld with limited exceptions).

[116]    Marie J. French, *Con Edison Imposes Gas Moratorium in Westchester County,* Politico (Jan. 18, 2019), *available at* https://www.politico.com/states/new-york/albany/story/2019/01/18/con-edison-imposes-gas-moratorium-in-westchester-county-802490.

[117]    868 F.3d 87 (2d Cir. 2017).

possible to use one of two methods. The more expensive method is trenching. That procedure is expensive because it requires the diversion of a stream out of its natural bed. Next, the needed section of pipeline is laid, after which the stream is restored to its original channel. The alternative is known as horizontal directional drilling (HDD)—the technique that is commonly used for fracking—which does not require the costly diversion of any stream. The practice is cheaper in most cases, and is generally appropriate for use with small streams. Constitution presented a study that indicated the general conditions where each of the two techniques were appropriate.[118] Its effort to generate broad standards is consistent with the best environmental practices, because it reduces the costs of management, and allows for a uniform application of a single set of standards across multiple cases. Nonetheless, the Department demanded an individualized assessment for each site, noting that "Constitution's Project 'would disturb a total of 251 streams ..., 87 of which support trout or trout spawning,' and that '[c]umulatively, construction would disturb a total of 3,161 linear feet of streams and result in a combined total of 5.09 acres of temporary stream disturbance impacts.'"[119] But the upper bound of any possible harm was for 3/5s of a mile of contested pipeline over a 98-mile run, where the 5.09 acres was a tiny amount as well. But the court did not give any probability estimate that either it or the Department made of the expected cost of the damages in question; nor did it demand that these estimates be supplied, which is surely required with any kind of hard look. These facts seem to cry out for a decision to allow the construction to take place on the terms proposed by Constitution, subject to further review. The massive dislocation of natural gas supplies outweighs by orders of magnitude the supposed defects in the application. Without explaining why a set of standards was not the preferred way to go, Constitution refused to undertake this costly endeavor, but lost when the court held that "deference is due an agency's determination that it should not grant a permit application where it has already determined that additional information is needed, and the applicant refuses to supply it."[120]

The Trump administration Proposal hints at all these problems when it notes that there is no ineluctable connection between a NEPA or other statutory violation and the irreparable harm standard that it champions. The term "irreparable" was not mentioned in the analysis in

---

[118]    *Id*. at 91-92.
[119]    *Id*. at 96.
[120]    *Id*. at 103.

*Constitution Pipeline.*  What is needed, therefore, is a far better appreciation of the balance of equities test in situations that do not require either damage or an injunction but often allow for the two remedies to be used in tandem in the sound discretion of the trial court.  I have recently written about this problem in a more general form, but the basic conclusion applies to NEPA as well.

> The injunctive side of the equation allows for conditional injunctions, bound by levels and time of emissions. The damage side picks up the slack where the injunctive relief backs off. By starting with the former and moving cautiously to the latter, the total level of dislocations is far lower than moving to a corner position in which one of these remedies is adopted to the exclusion of the other. The exact remedial mix is not easy to determine, but the traditional locality rule in nuisance cases suggests where levels of interference from similar activities are reciprocal, higher levels of pollution are allowable, so long as the emissions are confined to a particular area. But for lower-level nuisances, a more universal live-and-let-live rule takes over, so that *neither* damages nor injunctive relief is allowed, given the freedom of action that arises from allowing these low-level nuisances is universally beneficial, especially since everyone saves on administrative costs.[121]

It is imperative to restore some sense of balance in this area, so that these trivial objections do not lead to endless demands for further information that will not lead to better decisions on what should be done. The various methods of post-approval should work well with these modest risks. Indeed, what was really at stake in *Constitution Pipeline* was a de facto rear-guard effort to ban the pipeline in order to impose limits on fossil fuels, which is a decision outside the ambit of these proceedings.  The United States cannot deal with these issues on a pipeline-by-pipeline basis. It should retake, as it has started to do, control over the program to ensure that a less biased set of judgments are made on these critical issues.[122]

---

[121]    Epstein, *Positive and Negative Externalities in Real Estate Development*, 102 MINN. L. REV. 1493, 1509 (2018).

[122]    Daniel Markind, *Fed Regulators Push Back Against Gov Cuomo's Gas Pipeline Stonewalling*, FORBES, September 9, 2019, available at https://www.forbes.com/sites/danielmarkind/2019/09/09/ferc-pushes-back-against-state-governors-interfering-with-interstate-pipelines/#2e5d44347e0f.

CUMULATIVE IMPACTS AND CLIMATE CHANGE

One of the most difficult challenges in applying NEPA is the scope of its general application. As originally drafted, NEPA looked at the impacts of new projects largely as self-contained projects—a nuclear plant here, a waste disposal site there. Clearly every project has at least some consequences outside of its intended area, but for the most part these were regarded to be second-order considerations.  But more recently, the question of cumulative effects has surged to the fore.  The current regulations address the question as follows:

> Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions.[123]

The Trump Proposal addresses concerns about how this principle has been applied in NEPA cases, which it then addresses as follows:

> (g) *Effects* or *impacts* means effects of the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives. Effects include reasonably foreseeable effects that occur at the same time and place and may include reasonably foreseeable effects that are later in time or farther removed in distance.
>
> (5) A ''but for'' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA. Effects should not be considered significant if they are remote in time, geographically remote, or the product of a lengthy causal chain. Effects do not include effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action. Analysis of cumulative effects is not required. [124]

This approach to cumulative effects has attracted a large amount of criticism. Environmental groups insist that the Proposal is "undermining a bedrock environmental protection law that established government's duty as 'trustee of the environment for succeeding generations.'"[125] Vickie Patton, general counsel of the Environmental Defense Fund, asserts the

---

[123]    40 C.F.R. § 1508.7.

[124]    Proposal at 1728-29.

[125]    Marianne Lavelle, *Trump Moves to Limit Environmental Reviews, Erase Climate Change from NEPA Considerations,* INSIDE CLIMATE CHANGE, January 9, 2020, available at

proposal would "punch loopholes into long-standing protections under the National Environmental Policy Act and would put communities at risk and worsen climate change."[126] Gene Karpinski, president of the League of Conservation Voters, denounces this proposal as "one of the most egregious actions the Trump administration has taken to limit the federal government's response to climate change yet."[127] Ms. McCarthy of the NRDC claims that the "new rules [ ]would rubberstamp major projects that could harm people's health and exacerbate climate change—from massive oil and gas operations, to new highways—without requiring a substantive environmental review process."[128]

These one-line criticisms show no awareness of how to analyze cumulative effects. To be sure, I do not think that the verbal formulations that are adopted in the Proposal are the best way to capture the difficulties involved. It is always the case that low-level interactions that follow standard scientific laws are in some sense foreseeable—indeed they are commonplace. It is also the case that we could always have arcane disputes about the length and complexity of any given causal chain. Nonetheless, there is no reason why the scope of NEPA review should be determined by whether the risks of global warming are part of a short or a long causal chain.

Instead, the basic instinct for this problem is much more powerful. As noted earlier, NEPA review always carries with it the risks and cost of delays, and these should only be borne in those cases where the dangers involved meet two conditions. First, the negative effects are likely to be substantial, and second, the response that can be taken in connection with the design and construction of the project or facility under review is large enough to make a difference on the matter of global warming. Neither of these conditions are satisfied in the case of climate change. Any efforts to regulate pipelines, for instance, are a tiny portion of the overall scheme of emissions regulation. These have to be relatively small because pipelines are not refineries and their direct

---

https://insideclimatenews.org/news/09012020/trump-nepa-environmental-review-changes-climate-change-infrastructure-pipelines.

[126]     *Id*.
[127]     *Id*.
[128]     Gina McCarthy, *Trump's Plan to Gut NEPA*, INSIDE CLIMATE NEWS January 9, 2020, available at https://www.nrdc.org/media/2020/200109.

emissions are relatively small.  To get a sense of its relative importance, it is best to start with some estimate of the total level of temperature reduction if the entire plan is implemented throughout all sectors of society.

In 2014, the Obama administration released its proposed regulation for reducing carbon dioxide emissions from power plants.[129] The key question is to determine the anticipated benefits from that program in terms of temperature reduction, which was a number that the Obama EPA did not supply.  The EPA fact sheet addressed the putative benefits from the elimination of other pollutants, but the figures in its fact sheet dealt chiefly with the reduction of particulate matter and ozone, which are distinct issues.[130]  What the EPA did not do is give an explicit statement of the anticipated temperature reductions from the decline in carbon dioxide emissions.[131]  To remedy that gap, Knapperberger and Michaels ran the numbers through a standard climate model emulator, MAGICC, to determine the net temperature reduction: "The answer? Less than two one-hundredths of a degree Celsius by the year 2100. . . . 0.018°C to be exact."[132]  A look at the various sources of pollution offered shows that the dominant sources of emissions are power generation and transportation.  In comparison to those outputs, the carbon dioxide emissions from the operation of pipelines proper has to be negligible.  Any effort, therefore, to estimate or control carbon dioxide emissions by the design and operation of pipelines will provide nothing of benefit, even as it imposes high costs everywhere else.

There is precedent for this approach. In dealing with global warming in the torts system, the courts have rightly concluded that a piecemeal judicial attack through the law of public nuisance does not work with such issues as sea-level rise, even if it turns out that the concerns in

---

[129]    EPA, Clean Power Plan Final Rule, 80 Federal Register 205, October 23, 2015, available at https://www.govinfo.gov/content/pkg/FR-2015-10-23/pdf/2015-22842.pdf.

[130]    EPA FACT SHEET: Clean Power Plan: By the Numbers, available at https://www.epa.gov/sites/production/files/2014-06/documents/20140602fs-important-numbers-clean-power-plan.pdf.

[131]    *Id*.

[132]    Paul C. "Chip" Knappenberger and Patrick J. Michaels, *EPA Leaves out the most vital number in their fact sheet*, WATTS UP WITH THAT?, June 12, 2014, available at https://wattsupwiththat.com/2014/06/12/epa-leaves-out-the-most-vital-number-in-their-fact-sheet/.

question are fully valid.[133]  What is needed in all cases is an integrated view that looks at all sources of global warming, including carbon dioxide and other greenhouse gases (GHGs), instead of taking a piecemeal approach to the overall question.  Thus, in 2011 the United States Supreme Court in *American Electric Power Co. v. Connecticut*[134] rejected a federal public nuisance claim against emitters, on the ground that the matter was better handled by a unified regulatory approach.[135]  The same result was reached more recently by two district court judges in San Francisco and New York City, who refused to allow plaintiffs to go forward, not against emitters, but against a small number of oil companies that sold and distributed a fraction of the petroleum products alleged to contribute to global warming.[136]  Lawsuits of this sort presuppose that one can follow the path from sale to damages.  But these products are put to a myriad of end uses in a myriad of different ways, thereby adding the extra link to the causal chain that creates (consistent with the position in the Proposal) a gratuitous set of complications that would impose enormous burdens on trial judges.  The downstream emitter is a far better focal point, and if a public nuisance action fails against that party under *American Electric Power*, the correct approach is to think of what form of direct regulation might address the perceived ill from that downstream vantage, not to add in fanciful public nuisances against upstream suppliers, which include many more groups than a few major oil refineries.

One obvious rejoinder to this objection to public nuisance is to insist that NEPA represents the kind of regulatory approach to replace the failed public nuisance claim.  But that approach misunderstands the basic problem.  The only systems of administration that might be considered are those that do not look at individual projects or facilities, but take a far broader perspective consistent with the perceived dimensions of the environmental problem.  The obvious candidates

---

[133]      Richard A. Epstein, *When Courts Play Public Nuisance,* HOOVER DEFINING IDEAS, July 30, 2018, available https://www.hoover.org/research/when-courts-play-public-nuisance;  Richard A. Epstein, *Is Global Warming A Public Nuisance,* HOOVER DEFINING IDEAS, January 15, 2018; Richard A. Epstein,  *Beware of Prods and Pleas: A Defense of the Conventional Views on Tort and Administrative Law in the Context of Global Warming*, 121 YALE L. J. ON LINE 317 (2011), available at http://yalelawjournal.org/2011/12/06/epstein.html.
[134]      564 U.S. 410 (2011).
[135]      *Id.* at 424–25.
[136]      *City of Oakland v. BP P.L.C.* 325 F. Supp. 3d 1017 (N.D. Cal. 2018); *City of New York v. BP P.L.C.*, 325 F. Supp. 3d 466, 471-72 (S.D.N.Y. 2018).

for these major changes include a set of comprehensive carbon taxes and a comprehensive system of tradable carbon permits, coupled with various restrictions on cross-border transactions. These systems are fraught with measurement and enforcement difficulties: do the level of emissions justify the heavy burdens of these control system today? Does the balance of convenience change in light of the powerful tendencies toward dematerialization (including decarbonization) documented earlier by Johan Norberg, Jesse Ausubel, and Andrew McAfee? It is not enough to show that increased levels of carbon dioxide lead to increases of temperature. It is also critical to ask just how large those increases are, and just what consequences—positive or negative—flow from them in making, for example, an assessment of the cost of carbon.

To make that inquiry work, it is critical to identify any sources of carbon that are taken off-line once the new sources are introduced, which should result in some net figure. That result will at best be tentative because the applicable inquiry here is global; GHGs that enter the atmosphere from any one location have the same effects as those released anywhere in the world. It follows first that if any other country decides to increase its emissions because the U.S. has reduced its, the entire evaluation founders from the outset.[137] Nor, even if our attention is exclusively local, is there any reason to think that the emissions from any two projects (whether as complements or as substitutes) can have more than a negligible effect on any climate issue. Carbon dioxide emissions do not present any obvious problems of negative synergies, which can arise, for example, when two different chemicals released into the same river combine to create a third, more dangerous, compound. Carbon dioxide interacts equally in the environment regardless of the point of its release. That judgment, moreover, can be made at the wholesale level, so that the efforts to find cumulative effects at the retail level do not matter. What does matter are the delay costs that impact the entire distribution system, and delay the substitution of superior technology for inferior ones. As with other forms of review, these cumulative impacts studies are just another attempt to shut down the distribution system with NEPA requests because the political system—rightly in my view—regards the elimination of fracking and fossil fuels a mistake that, if it were to be introduced at all, should never be done through the back door. In sum, this entire misguided quest for

---

[137]    Richard A. Epstein, *Carbon Dioxide: Our Newest Pollutant*, 43 SUFFOLK L. REV. 797 (2010).

cumulative effects can be disregarded on generic grounds that apply to all such disputes. The point becomes still more evident by looking at several of the cases that have sought to extend NEPA review to address these issues.

*Sierra Club v. Federal Energy Regulatory Commission*[138] involved a challenge led by the Sierra Club in the Circuit Court for the District of Columbia to a proposed 500-mile network of three pipelines—the Sabal Trail, the Hillabee Expansion, and the Florida Southeast Connection—that ran through Alabama, Georgia, and Florida. The proposed pipelines would supply natural gas to the rapidly growing South Florida market, currently served in large measure by old coal plants. A majority of the  court delayed the completion of the pipelines on the ground that its EIS was inadequate because "FERC's environmental impact statement did not contain enough information on the greenhouse-gas emissions that will result from burning the gas that the pipelines will carry."[139] The consequence of the decision was to postpone the completion of the pipelines until a more complete statement is provided.

The decision commits two serious errors. First, it was well established at the time that the fresh supply of natural gas—all of which had been sold in advance—"will make it possible for utilities to retire older, dirtier coal-fired plants."[140] It seems hardly credible to believe that clean natural gas would ever pose a greater risk than dirty coal with the same energy content, so the simple question becomes, why delay the substitution for several years when any perceived risk of global warming (or all sorts of other effects of pollution) will be reduced by the prompt replacement of the dirty with the clean?  The court misunderstood the dimensions of the relative trade-offs when it suggested that "the emissions in question might be partially offset by reductions elsewhere."[141] Why the "partially"? The relevant information is all generic, and the results read as follows:

---

[138]    867 F.3d 1357 (D.C. Cir. 2017).
[139]    *Id*. at 1363.
[140]    *Id*. at 1364.
[141]    *Id*. at 1375.

**U.S. electric utility and independent power electricity generation and resulting CO2 emissions by fuel in 2018[142]**

| | Electricity generation | CO2 emissions | | |
|---|---|---|---|---|
| | million kWh | million metric tons | million short tons | pounds per kWh |
| Coal | 1,124,638 | 1,127 | 1,240 | 2.21 |
| Natural gas | 1,246,847 | 523 | 575 | 0.92 |
| Petroleum | 21,860 | 21 | 23 | 2.11 |

The verdict is ambiguous: natural gas produces just over 40 percent of the carbon dioxide than coal per kilowatt hour, and is safer in other regards as well. It takes ten minutes to locate this information, so why would any court slow down a project for two or more years to examine the issue anew? The Circuit Court cites a Federal Regulation that states that the relevant effects for an EIS "include those resulting from actions which may have both beneficial and detrimental effects, even if on balance the agency believes that the effect will be beneficial."[143] That position makes sense where the plusses and minuses are evenly balanced in some particularized setting, but one sign of a sensible regulatory system is that it uses "generic" or standardized results when there is no likelihood of significant variation in individual cases. In *Baltimore Gas & Electric Co. v. National Resources Defense Council*,[144] the Supreme Court wrote, in examining the environmental impact of the nuclear fuel cycle," "[t]he generic method chosen by the agency is clearly an appropriate method of conducting the hard look required by NEPA."[145] That result applies here as

---

[142]    U.S. Energy Information Administration, Frequently Asked Questions, available at https://www.eia.gov/tools/faqs/faq.php?id=74&t=11.

[143]    40 C.F.R. § 1508.8, cited in *Sierra Club*, 867 F.3d at 1371.

[144]    462 U.S. 87 (1983).

[145]    *Id.* at 101.

well. There is no reason to remand a case to examine at great length information that is already publicly known and applies as much to the one pipeline as the next.

*Sierra Club* also misses the scope of the NEPA review.  It is undisputed that all of the downstream facilities are subject to direct regulation of their emissions by state and federal authorities.  It is equally true that nothing done in the course of pipeline construction can, or should, alter the way in which those independent downstream inspections are conducted.  Why then take these into account under NEPA?  In her powerful dissent, Judge Janis Rogers Brown cited the well-established proposition that whenever an agency "has no  ability to prevent a certain effect due to its limited statutory authority over the relevant action then that action cannot be considered a legally relevant cause of an indirect environmental effect under the National Environmental Policy Act."[146] The sensible division of labor should not require duplicative and pointless efforts in this regard. The proposal therefore is on sound ground when it articulates these principles.

The second relevant case involves the Keystone XL pipeline running from Canada to the United States, which has been held up in politics for years.  The latest episode in this saga comes in *Indigenous Environmental Network v. U.S. Department of State*,[147] where Judge Brian Morris upheld the claim of the Indigenous Environmental Network that the State Department violated NEPA, the Administrative Procedure Act, and the Endangered Species Act when it issued its Supplemental Environmental Impact Statement (SEIS) approving completion of Keystone. The District Court applied the "hard look" standard to address questions about alternative pipeline routes, and indeed on whether there was any need for the pipeline at all.

The State Department had prepared a 140 page analysis that explained why the construction of the Keystone pipeline would not significantly affect the rate of extraction from Canadian oil sands as of 2014 when the report was issued.[148] But the District Court held that the SEIS was insufficient because NEPA imposes a "continuing duty" to take into account new information

---

[146]    *Id*. at 1380. (cleaned up).  *See* also *Department of Transportation v. Public Citizen*, 541 U.S. 752, 770 (2004)("We hold that where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect.").

[147]    347 F. Supp. 3d 561 (D. Mont. 2018).

[148]    *Id.* at 566-67.

about relative prices and pipeline capacity since the initial EIS was prepared. Clearly this duty cannot be imposed in every case. So stiff a requirement would mean that no agency could ever get off the merry-go-round, for each delay would then require not only fixing the broken part, but also redoing and updating the rest of the application. But, as with the FONSI determination, there is no hard line between the minor changes that do not trigger the obligation for a further EIS, and the "substantial changes" or "significant new circumstances" that do. In this instance, the District Court accepted that a further SEIS was needed because of the drop in oil prices. It considered, but rejected, a determination that an SEIS was required to deal with the amount of oil and gas that could be shipped by rail; and it then accepted the position that:

> NEPA requires that an EIS consider the cumulative impacts of the proposed action. 40 C.F.R. § 1508.7. "Cumulative impact is the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (federal or non-Federal) or person undertakes such other actions." *Id.* The cumulative impacts analysis must do more than merely catalogue relevant projects in the area.[149]

Yet once again this incremental standard makes no sense in global warming where there are no local synergies. Nonetheless, the court was troubled because the State Department did not make the correct analysis of the interaction of emissions from both Keystone and the Alberta Clipper expansion which it approved in 2017.[150] It held that this omission constituted a material failure because the " Department similarly should have analyzed the Alberta Clipper pipeline's emissions in the Keystone SEIS."[151] But again the question is what new information could be acquired that was not already available, even assuming (falsely) that these two pipelines constituted a relevant universe for analysis when carbon dioxide emissions operate on the global, not local, level. In effect, *Indigenous Environmental* demands the production of information that is either known or irrelevant. Yet there was no discussion in the case of whether the permit should issue on the ground that the omitted information did not create a material distortion of the overall analysis, and thus did not constitute any, let alone irreparable, harm. It seems clear that this case would, and should, come out the other way if the changes in the Proposal are eventually

---

149   *Id.* at 578.
150   *Id.*
151   *Id.*

incorporated into the law. And that is the right result. Why the combination of high expenditures and dangerous delay when the relevant information is already at hand?

## VALIDITY OF THE REGULATIONS

Given the fierce level of opposition to the Proposal, it is virtually certain that the opposition groups will mount a full scale judicial challenge to all of its moving parts. It is very difficult to make any claim that reform proposals of this length and complexity will survive that challenge in its entirety. But there is good reason to believe that all of the specific provisions that I have critiqued should and will survive. In many cases, there are strong arguments to be made that the current practice in the lower federal courts are in tension with Supreme Court cases and with the text and purpose of the statute. Delay itself is an evil unless it can be shown to be a good, which is not the case when superior technologies are shut out from common use on the most threadbare of grounds.

The overuse of injunctions, without any safety valve, in those cases in which the supposed incompleteness either an Environmental Assessment or Environmental Impact Statement represents an abuse of power that entrenches delay when it is most dangerous. The constant use of a "hard look" standard to derail projects that have obtained agency approval, but a highly deferential standard to allow agencies to block projects when there is no hint of irreparable harm, counts as a dangerous and inconsistent use of agency power. And the effort to claim that issues of global warming can be sensibly addressed at the project level represents a mistaken acceptance of the project as the unit of analysis, when a far more comprehensive approach involving either taxation or trading programs is needed.

I think that the current readings of NEPA have gone so far astray that these reforms should be adopted even if the courts review major changes in regulatory focus under a strict scrutiny standard. But, in fact, there is a uniform line of Supreme Court cases that indicates that the relevant burdens are far less exacting. In *Andrus v. Sierra Club*[152] the issue was whether Section 102(2)(C)

---

[152]    442 U.S. 347 (1979) (holding that CEQ's NEPA regulations are entitled to substantial deference).

of NEPA required all federal agencies to include EIS's in their recommendations or reports on "proposals for legislation and other major Federal actions significantly affecting the quality of the human environment."[153]  The Supreme Court held that these applications were entitled to "substantial deference."  That position was followed in *Robertson v. Methow Valley Citizens Council*,[154] where the question was whether a given study of a ski resort on national forest land was to be accepted when it had done a thorough investigation of the many objections to that program.  Justice Stevens concluded that "[i]n light of this well-considered basis for the change, the new regulation is entitled to substantial deference.  Accordingly, the Court of Appeals erred in concluding that the Early Winters Study [in dispute] is inadequate because it failed to include a 'worst case analysis.'"[155]  The last three words say it all.  NEPA is intended to supply needed information. But the problem of too-much information that plagues many regulatory investigations is not a necessary feature of the program.  The excessive attention to the "worst case analysis" detracts from making a balanced assessment in the first place.  Just that trend has occurred under NEPA over the past 50 years.  The Proposal is intended to correct that misapplication of the current law.

It may well be that in some particular detail it is not perfect.  But in dealing with regulation, the best should never be the enemy of the good. And owing to the sad state of disrepair of the NEPA framework in this case, the Proposal will advance the best of both worlds:  greater growth and greater environmental protection.

---

153    *Id.* at 348-49.
154    490 U.S. 332 (1989).
155    *Id.* at 356.

Tab 16, Exhibit 11 to Declaration of Amy Coyle



**Antonin Scalia Law School**
**Administrative Law Clinic**
**3301 Fairfax Drive, Arlington, Virginia 22201**

March 10, 2020

<u>**VIA ELECTRONIC SUBMISSION**</u>

Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503
Attn: Docket ID No. CEQ-2019-0003

     Re:    **Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act; Docket ID No. CEQ-2019-0003**

The Administrative Law Clinic at the Antonin Scalia Law School has taken interest in the Notice of Proposed Rulemaking that the Council on Environmental Quality posted on January 10, 2020. The Clinic consists of law students who are studying the practice of administrative law under the supervision and direction of law-school faculty. The Clinic participates in rulemakings and other agency proceedings to promote best regulatory practices and ensure that agency actions are consistent with the agency's organic legislation and the Administrative Procedure Act. After studying the NPRM, the Clinic supports its proposed reforms to the regulations implementing the National Environmental Policy Act ("NEPA").

Congress enacted NEPA to better account for environmental harms and to "restor[e] and maintain[] environmental quality to the overall welfare and development of man." 42 U.S.C. § 4331(a). Yet despite this admirable goal, NEPA has

1

often been invoked in a counterproductive manner to stifle important infrastructure projects by imposing onerous, costly, and time-consuming requirements. "[A]ntiquated federal regulations" can "often stand in the way of critical infrastructure and other important projects that can create jobs, improve [the] standard of living and energy security." Statement of Sen. Lisa Murkowski (R-AK), bit.ly/2TLlmD5. NEPA has often been construed in this manner. Having not received a major update in decades, the proposed reforms would modernize the regulations implementing NEPA and reduce red tape while preserving the statute's original objectives. In the words of President Richard Nixon when he signed NEPA into law, it is "now or never" to implement these badly needed reforms. Richard Nixon, *Remarks on the Signing of NEPA* (Jan 1, 1970), bit.ly/2IsnWsz.

## I.  Enacted to minimize environmental impact and promote human flourishing, NEPA has been applied to impose burdensome requirements that can severely delay important projects.

Recognizing that "population growth, high-density urbanization, industrial expansion, resource exploitation, and new and expanding technological advances" "profound[ly] impact" the "natural environment," Congress enacted NEPA to "restor[e] and maintain[] environmental quality to the overall welfare and development of man." 42 U.S.C. § 4331(a). NEPA garnered broad bipartisan support, passing unanimously in the Senate and facing a mere 15 opponents in the House. On January 1, 1970, President Richard Nixon signed NEPA into law, declaring that "the 1970s absolutely must be the years when America pays its debt to the past by reclaiming the purity of its air, its waters, and our living environment." Nixon

2

Remarks, *supra*. Many viewed the landmark legislation as the key to addressing the "pressing problems of pollution control, airport location, wilderness preservation, highway construction, and population trends." *Id.* Indeed, D.C. Circuit Judge J. Skelly Wright called NEPA "the broadest and perhaps most important" of the environmental statutes. *Calvert Cliffs' Coordinating Comm., Inc. v. United States Atomic Energy Comm'n*, 449 F.2d 1109, 1111 (D.C. Cir. 1971).

NEPA obligates the federal government "to use all practicable means and measures, including financial and technical assistance … to create conditions under which man and nature can exist in productive harmony." 42 U.S.C. § 4331(a). It directs federal agencies to assess the environmental effects of all "major Federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C). Specifically, NEPA requires the government to prepare environment impact statements discussing (1) the "environmental impact of the proposed action;" (2) any unavoidable adverse environmental effects of the project; (3) "alternatives to the proposed action;" (4) the relationship between the short-term and the "maintenance and enhancement of long-term" use of the area; and (5) any "irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented." *Id.* Ultimately, NEPA ensures that the federal government considers environmental effects in its decision-making process.

NEPA also established the Council on Environmental Quality (CEQ)—the chief administrative entity that implements NEPA's statutory goals. *See The Council on Environmental Quality*, Dep't of Energy, ceq.doe.gov/. Housed within the

Executive Office of the President, CEQ issues regulations and guidance that govern agencies' compliance with NEPA. *See What is the National Environmental Policy Act?* EPA, bit.ly/2Iwh4Kw. CEQ also performs an internal adjudicative function when disagreements arise between agencies over NEPA. *Id.*

The CEQ has recently acknowledged that since NEPA's enactment more than half a century ago, the "environmental review and permitting process has become unnecessarily complex and time consuming, and extends far beyond what Congress originally intended." Mary B. Neumayr, *Proposed rule would streamline NEPA reviews*, Daily Sentinel (Feb 7, 2020), bit.ly/2W3tvpw. Indeed, the process can "impact a wide variety of projects affecting Americans' everyday lives from the construction of roads, bridges, highways, and airports to water infrastructure, conventional and renewable energy projects, and land, forest, and fishery management activities." *Id.* In the end, this "unpredictable and costly process" for individuals and government alike, "hinders the development of modern, resilient infrastructure and makes federally-funded projects more expensive for hardworking American taxpayers." *Id.*

While NEPA's aims are laudable, its enforcement has drawn serious and justified critiques. Most prominently, critics complain that NEPA has been construed in a manner that requires overly burdensome, time-consuming, and lengthy environmental impact statements (EIS). Originally, most EIS "were less than ten typewritten pages in length." Daniel A. Dreyfus, *NEPA: The Original Intent of the Law*, 4 J. of Prof. Issues in Engineering Ed. & Practice 109, 252-53 (1983). Current regulations, however, provide that EIS "shall normally be less than 150 pages and for

proposals of unusual scope or complexity shall normally be less than 300 pages." 40 C.F.R. § 1502.7. But in practice, 150-300 pages is on the low end of the spectrum. A mere seven percent of EIS are shorter than 150 pages and only 25 percent are shorter than 300 pages. *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 1684, 1688 (Jan. 10, 2020). Today, according to the CEQ, EIS average over 600 pages. *See Press Release: CEQ Issues Proposed Rule to Modernize its NEPA Regulations*, bit.ly/39ykkRN. Indeed, scholars have pointed out that some EIS "run a thousand pages or more." Philip K. Howard, *Two Years Not Ten Years: Redesigning Infrastructure Approvals* 13 (Sept. 2015), bit.ly/39F4rsR. Those requirements, in turn, stifle innovation, construction, and completion of important projects, especially infrastructure projects.

As the length of EIS has increased, so too has the time it takes to research and draft an EIS. Today, "environmental review often consumes five to ten years, and for controversial projects, even longer." *Id.* The extended time it takes to draft and complete lengthy environmental reviews increases the cost of projects while also delaying projects' start dates. *See id.*

A primary reason for the increased drafting time is fear of litigation. *Id.* Although NEPA does not contemplate a private right of action, *see Noe v. Metropolitan Atlanta Rapid Transit Authority*, 644 F.2d 434, 436-38 (5th Cir. 1981), or provide specific remedies, individual or groups can challenge an agency's non-compliance with NEPA under the Administrative Procedure Act. 85 Fed. Reg., *supra*,

at 1685; *see e.g.*, *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 345-46 (1989) (challenge by environmental organizations alleging that the Forest Service's study "did not satisfy the requirements of NEPA"). And agencies regularly face NEPA challenges in the courts. Scholars and the Government Accountability Office have pointed out that "the mere filing of a lawsuit and the project delays that result are often as important to plaintiffs as whether they ultimately prevail in court." Diane Katz, *Time to Repeal the Obsolete National Environmental Policy Act (NEPA)*, Heritage Found., at 6 (Mar. 14, 2018), herit.ag/3cJ3Zvj; GAO, *National Environmental Policy Act: Little Information Exists on NEPA Analyses* (2014), bit.ly/2Q14DdR. Indeed, "NEPA has morphed into a vehicle for perpetual litigation." Statement of Congressman Mike Johnson (LA-04), bit.ly/38ypID8.

According to the former General Counsel of the EPA, E. Donald Elliott, about "90 percent of the detail in environmental review statements is prompted by a desire to cover any issue anyone may complain about." Howard, *supra*, at 13. In other words, drafters of EIS constantly worry that any individual, entity, or interest group will sue them for neglecting or failing to fully consider an environmental issue in the EIS. Drafters therefore take extra time and precautions to exhaustively address every conceivable environmental issue in the EIS—no matter how inconsequential or minute. They "attempt to prepare a 'litigation-proof' EIS," an incredibly costly and time-consuming endeavor. *Id.* at 14.

Cost and time, however, are far from the only flaws of the NEPA regulatory regime. University of Minnesota Law School Professor Bradley Karkkainen, for

instance, has noted that NEPA reviews rely "exclusively" on ex-ante analysis, with little consideration of whether agencies' predictions actually prove accurate. *See* Bradley C. Karkkainen, *Whither NEPA?* 12 N.Y.U. Envtl. L.J. 333, 349 (2004). In other words, there is no ex-post analysis or quality control mechanism to determine whether a NEPA review achieved its goal. *See id.* Without this type of review, the government is unable to determine whether NEPA is being applied in an effective way that fulfills its stated statutory purpose.

Other scholars have suggested that NEPA may actually hurt the environment in the long run. Professor Daniel Mandelker has observed that a "constant complaint" is that NEPA reviews are blunt, overly simplistic instruments for effectuating environmental goals. *See* Daniel R. Mandelker, *The National Environmental Policy Act: A Review of Its Experience and Problems*, 32 Wash. U. J. L. & Pol'y 293, 299 (2010). Rather than considering "the larger environment in which agency actions occur," NEPA operates in a vacuum on an action-by-action basis. *See id.* Thus, NEPA fails to look at the totality of environmental effects of various projects. Professor Richard Epstein has also asserted that NEPA may in fact work against its own efforts to promote environmental sustainability. *See* Richard A. Epstein, *The Many Sins of NEPA*, 6 Tex. A&M L. Rev. 1, 11 (2018). For example, in the course of studying the DAPL pipeline—a pipeline that runs through five states—a NEPA analysis focused on issues that were irrelevant in the long run to the exclusion of issues that could have a substantial environmental impact. *See id.* at 22. Part of the DAPL analysis focused on ensuring that the pipeline did not have a greater effect on poor and

minority communities than on other communities. But, as Professor Epstein points out, "the basic structure of DAPL obviates the concern" because it has "uniform safety and soundness standards at all locations" along the way, giving "poor and minority neighbors the same protection as private property owned by rich or which persons." *Id.* While the NEPA analysis focused on that issue, it omitted any consideration of damage that could be caused by alternatives to the pipeline like trucks and trains. *See id.* at 22-23. After all, the "serious risks of damages from wayward trucks and derailed trains" dwarf all other collateral issues, and such a study could have ultimately "encourage[d] new pipeline construction that would allow the other modes of surface transportation to be put out of business." *Id.* at 23.

Moreover, Epstein critiques NEPA for "rest[ing] on a fatal assumption about how to organize the public enforcement of environmental protection, by thinking that all contingencies have to be resolved before any work is begun." Richard Epstein, *The NEPA Stranglehold*, Hoover Inst. (Jan. 13, 2020), hvr.co/3cR7f8i. Epstein argues that NEPA's requirement that agencies perform comprehensive reviews before any major action is a "one-sided approach" that completely ignores that idea that "each additional unit of information should provide greater benefits than the costs of its acquisition." Epstein, 6 Tex. A&M L. Rev. at 11-12. In other words, one of the "perils of searching for complete information" is that complete information is sometimes unduly difficult to obtain. *Id.* at 11. On one hand, the search for complete information can lead agencies to commit an absurd amount of resources to an impossible task. On the other hand, it can force agencies to "rel[y] on hunch and intuition not backed by

8

any theoretical insight or experiential data, which could resemble a random guess." *Id.* at 12. Both options leave NEPA "highly counterproductive in its mode of implementation." *Id.* at 2. These concerns should not be overlooked.

## II. NEPA has been used by opponents of development to needlessly stifle many important infrastructure projects.

While NEPA's aims are admirable, its implementation often goes far beyond the original goals of the statute. Today, NEPA's high compliance costs overshadow its benefits by stalling or even halting major projects that make life better for Americans. After all, NEPA's larger purpose is not to conserve the environment for its own sake, but to do so in service "to the overall welfare and development of man." 42 U.S.C. § 4331(a). Moreover, "[m]ore lawsuits have been brought under NEPA than under any other environmental statute," causing even more delays. Mary B. Neumayr, *A Needed Update to the Nation's Environmental Rules*, Wash. Examiner (Jan. 9, 2020), washex.am/2UYI259. We highlight here a few of the major projects that have been derailed and delayed by aggressive applications of NEPA.

***Potomac Yard Metrorail Station, Virginia.*** Since 1968, developers have sought to build a Metrorail station in Alexandria's Potomac Yard neighborhood.[1] *See* Luz Lazo, *Metro and Virginia Kick Off Major Construction on Potomac Yard Metro Station*, Wash. Post (Dec. 19, 2019), wapo.st/37C57gF. The station's construction, which "has been in the works for a quarter of a century," finally began last year. *Id.* Despite being "Alexandria's largest economic development and transportation

---

[1] The station would be an infill station on the Blue and Yellows lines between National Airport and Braddock Road station.

initiative"—one "expected to generate billions in new development in coming years, supporting 26,000 new jobs and 13,000 new residents"—the project has faced countless delays. *Id.*

These delays are due, at least in part, to NEPA's burdensome requirements. For this single, above-ground train station along an existing rail line, the EIS was 4,631 pages long, Fed. Transit Admin., *supra.*, and although the station's EIS study began in 2011, it took nearly six years to complete. Neumayr, *supra.* Indeed, the city did not break ground until December 2019, nearly a decade after the study began. *Id.*

***Keystone XL Pipeline***. The Keystone XL pipeline—a proposed expansion to oil infrastructure that would add to existing pipelines connecting oil sands fields in Canada to refineries near the Gulf of Mexico—has also faced massive delays due to NEPA-based litigation. Emily Sullivan, *In A Setback For Trump, Judge Blocks Keystone XL Pipeline Construction*, NPR (Nov. 9, 2018, 3:54 AM), n.pr/38vjEv7. The State Department approved the cross-border pipeline, but environmental groups challenged that approval as violating NEPA. *See Indigenous Envtl. Network v. Dep't. of State*, 347 F.Supp.3d 561, 571 (D. Mont. 2018). Specifically, the challengers alleged that the project's EIS failed to provide an appropriate basis for approving the pipeline. And in November 2018, a federal district judge enjoined the pipeline's construction, concluding that the Department failed to analyze the project's "cumulative effects," its greenhouse gas emissions in relation to the nearby Alberta Clipper pipeline expansion, or its impact on "cultural sites," among other things. *Id.* at 580.

After more than a decade of environmental analysis, President Trump moved to circumvent additional delays by issuing a permit directly via an executive order in 2019. *See* Delilah Friedler, *Thanks to Trump, Keystone XL is back. The anti-pipeline movement is ready.*, Grist (Feb. 8, 2020), bit.ly/2VZjmKt; *Indigenous Envtl. Network v. Trump*, 2019 WL 7421955, at *5. Yet the litigation under NEPA is ongoing. Lisa Friedman, *Trump Rule Would Exclude Climate Change in Infrastructure Planning*, N.Y. Times (Jan. 30, 2020), nyti.ms/2v4j0XE. And "see[ing] too much uncertainty to commit immediately to the long-delayed" project, TC Energy—the Canadian company that owns the Keystone pipeline—is unprepared to commit to the Keystone XL expansion. Rod Nickel & Shanti Nair, *TC Energy Eyes Further Hurdles, Not Ready to Commit to Keystone XL Pipeline*, U.S. News & World Report (Feb. 13, 2020), bit.ly/2It5W1i.

***Bayonne Bridge.*** Bridges also fall prey to NEPA's onerous requirements. Raising the Bayonne Bridge—which connects New York and New Jersey—by 64 feet to let larger ships pass through took more than ten years and 20,000 pages of environmental review. API, *Modernizing NEPA for the 21st Century*, Am. Petroleum Inst., bit.ly/2xkh3XZ. And litigation under NEPA additionally prolonged the project. The Natural Resources Defense Council alone sued over the project twice, challenging the environmental harm from construction, and faulting the U.S. Coast Guard for "failing to take a 'hard look'" at the project's "environmental justice[] and cumulative effects," among other things. *Coal. for Healthy Ports v. United States Coast Guard*, No. 13-CV-5347 (RA), 2015 WL 7460018, at *1 (S.D.N.Y. Nov. 24, 2015); *see also* Sara

Imperiale, *Civil Rights of North Shore Residents Violated by Bayonne Bridge Project Construction*, NRDC (Feb. 3, 2014), on.nrdc.org/2PWecuD; Melissa Perrella, *Bayonne Bridge Expansion Project Must Not Threaten the Health of Neighboring Communities*, NRDC (Aug. 1, 2013), on.nrdc.org/39zxo9p. Despite the Coast Guard's 20,000 pages of environmental assessment, the challengers also demanded that the Coast Guard conduct a more detailed EIS. *Coal. for Healthy Ports,* 2015 WL 7460018, at *1. After more than two years of litigation, the U.S. District Court for the Southern District of New York ruled against the challengers, concluding that the Coast Guard "did all that … NEPA[] requires." *Id.* at 27. Nearly four years after the litigation ended, the bridge has now been raised. *See* Brenda Flanagan, *Port Authority announces completion of Bayonne Bridge lane expansion*, NJTV News (Feb. 8, 2019), bit.ly/39D79Pt.

**Pebble Mine, Alaska.** Finally, NEPA has also imposed major burdens on important mining projects. In 1987, color anomalies in Southwest Alaska's Bristol Bay prompted surface testing which led to the discovery of a massive undeveloped copper reserve, as well as gold and molybdenum deposits. *History Timeline*, PebbleWatch, bit.ly/2TMIiBT. Thirty years later, however, Pebble Mine is still facing environmental impact assessments.

In 2001, major mining corporations jointly secured rights to mine the area. *Id.* Preliminary environmental assessments were completed in 2011, and the EPA began an additional three-year assessment later that year. *Id.* The EIS process, which began in 2017 is currently underway, boasting an optimistic target completion date of 2021.

12

*Id.* Two years into the process, however, Northern Dynasty Minerals—the company with mining rights—was forced to raise $15.5 million to fund their regulatory compliance and complete the EIS process. *Id.*

These projects are just the tip of the iceberg. On average, projects spend 4.5 years in the NEPA review process. *See* 85 Fed. Reg., *supra*, at 1687. Strikingly, the Golden Gate Bridge, the Hoover Dam, and the Empire State Building were all built in less time than is currently spent in NEPA review, taking, four, five, and one year respectively. Neumayr, *supra*.

### III.    The proposed reforms will streamline NEPA reviews, reduce red tape, and better serve NEPA's original purpose.

The costly delays from the projects discussed above show that NEPA's enforcement and regulatory framework are in need of significant reforms. Mary Neumayr, Chairman of the CEQ, recently stated that without altering any substantive environmental protections, the proposed reforms will "modernize … NEPA regulations for the 21st century and make the process more timely, effective, and predictable." Neumayr, *supra*. Such modernization is desperately needed.

The proposed reforms promise to "facilitate more efficient, effective, and timely NEPA reviews by simplifying and clarifying regulatory requirements," as well as to "update[e] the regulations to reflect current technologies and agency practices, eliminat[e] obsolete provisions, and improv[e] the format and readability of the regulations." Press Release, *supra*. Specifically, the proposed rules will require EIS to be completed within two years, will impose page limits on EIS, and will eliminate the cumulative effects analysis requirement. Each of these reforms will help

13

streamline the NEPA process and help ensure that important infrastructure projects are not stymied by burdensome procedural mechanisms. Moreover, these proposed reforms would impact projects like those discussed above.

First, the proposed rule would impose page limits on EIS. *See* 85 Fed. Reg., *supra*, at 1719. Instead of changing the current recommended limits, however, the proposed rule would "reinforce the page limits for EISs set forth" in the current regulation. *Id.* at 1700. That regulation provides that EIS "shall normally be less than 150 pages and for proposals of unusual scope or complexity shall normally be less than 300 pages." 40 C.F.R. § 1502.7. Since agencies have, for the most part, ignored this regulation, the CEQ should consider striking the term "normally" from the regulation. As currently worded, agencies apparently feel free to take the regulation as a mere suggestion. Current practices demonstrate this is true since only seven percent of EIS fall below 150 pages and only 25 percent fall below 300 pages. *See* 85 Fed. Reg., *supra*, at 1688.

The proposed rule would also limit the time that an agency can spend on an EIS to two years, unless a senior agency official grants an exception. *Id.* at 1717. This is eminently reasonable. By imposing time and page limit requirements, the proposed rule makes it less likely projects will face an excessive review process that takes multiple years and produces thousands of pages of often burdensome, duplicative, or unnecessary documents. Combined with the two-year time frame for EIS completion, the proposed rule would help bring the benefits of important projects to citizens in a

timelier fashion. Indeed, these changes could have greatly affected all of the projects discussed above.

Next, the proposed rule would remove the required cumulative effects analysis and clarify the ambiguity that currently exists around the meaning of cumulative effects. Currently, "NEPA requires that an EIS consider the cumulative impacts of the proposed action." *Indigenous Envtl. Network*, 347 F.Supp.3d at 578. The existing regulation defines cumulative impact as "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions." 40 C.F.R. § 1508.7. Moreover, the regulation states that "[c]umulative impacts can result from individually minor but collectively significant actions taking place over a period of time." *Id.* The proposed rule would eliminate this extraordinarily burdensome requirement, stating that "analysis of cumulative effects, as defined in CEQ's current regulations, is not required under NEPA." 85 Fed. Reg., *supra*, at 1708. Such a change would "focus agencies" to consider only "effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action." *Id.*

That change would allow agencies to narrow their focus to a more appropriate scope and would also aid in reducing excessive litigation. Going forward, courts could no longer hold an action invalid under NEPA for failing engaging in a cumulative effects analysis. Indeed, that change could affect the Keystone XL Pipeline litigation directly. A major issue in that ongoing litigation is over the agencies' failure to

consider the cumulative effects of other pipeline projects. *See Indigenous Envtl. Network*, 347 F.Supp.3d at 577. Commentators have already recognized that the change could "sharply reduce obstacles to the Keystone XL oil pipeline and other fossil fuel projects that have been stymied when courts" hold that agencies must consider the cumulative effects of new infrastructure. Friedman, *supra*.

In sum, the proposed rule will help ensure NEPA documents are "concise and serve their purpose of informing decision makers [and the public] regarding the significant potential environmental effects of proposed major Federal actions." 85 Fed. Reg., *supra*, at 1691. The proposed changes to the regulation will reduce delays and "promote better decisions consistent with the national environmental policy set forth" in NEPA. *Id.* at 1684. These reforms will benefit the public and better conform to NEPA's goal of "encourag[ing] productive and enjoyable harmony between man and his environment." 42 U.S.C. § 4321.

\*   \*   \*   \*

As Secretary of the Interior David Bernhardt has stated, "The purpose of NEPA is noble; its application, however, has gone off the rails." Press Release, *supra*. Scholars and government officials alike have identified the many flaws of the current NEPA regulatory regime, including time-consuming and onerous compliance costs. And it has stifled many important projects. The proposed rule offers common sense reforms that will help alleviate many of these problems without changing the underlying substantive environmental law. Importantly, the proposed reforms will "simplify[] and streamlin[e] environmental reviews [and] will accelerate the

construction of much needed roads, bridges, transit, railroad, and port projects to alleviate congestion and improve the quality of life for communities across the country." Press Release, *supra* (statement of Transportation Secretary Elaine L. Chao).

For all these reasons, the Antonin Scalia Law School Administrative Law Clinic urges the CEQ to adopt the proposed reforms.

Sincerely,

*/s/ Jeffrey M. Harris*
Jeffrey M. Harris
Tiffany H. Bates
CONSOVOY McCARTHY PLLC
ANTONIN SCALIA LAW SCHOOL
  ADMINISTRATIVE LAW CLINIC
3301 Fairfax Dr.
Arlington, VA 22201
(703) 243-9423
jeff@consovoymccarthy.com
tiffany@consovoymccarthy.com

Tab 17, Exhibit 11 to Declaration of Amy Coyle



John Meyer and Beau Brunson
Consumers' Research
1801 F Street, NW, Suite 304
Washington, DC 20006
(202) 898-0542
bbrunson@consumersresearch.org

March 10, 2020

By electronic delivery to:
http://regulations.gov

Edward A. Boling
Associate Director for the National Environmental Policy Act
Council on Environmental Quality
730 Jackson Place, NW
Washington, DC 20503

**Proposed Rule: Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act CEQ-2019-0003**

'Consumers' Research[1] is a 501(c)(3) educational non-profit advocating for the general interests of consumers. This comment does not represent the views of any affected party or special interest group. This comment intends to present a consumer-oriented discussion of the issues relating to the proposed streamlining of the NEPA environmental review process as proposed in the Council for Environmental Quality (CEQ) Notice of Proposed Rulemaking (NPR or Proposed Rule).

**The Length and Complexity of the Existing NEPA Process Is contrary to 'Consumers' Interests**

The NEPA Environmental Impact Statement (EIS) process is far too lengthy and complex. It delays both public and private projects. In many cases, these delays lead to project abandonment despite a highly likely eventual approval. Even when projects complete the NEPA process successfully, the flawed process significantly increases the project's cost. Even when projects require no extensive additional requirements, these delays significantly increase the financing and construction costs. Such delays are detrimental to 'consumers' interests. For public projects, consumers face a delay in receiving the benefits of these projects and pay higher taxes to fund increased project costs. For private projects, these delays increase development costs, slow the availability of whatever goods or services those projects produce, and usually result in increased cost to consumers.

The Proposed Rule includes two specific regulatory requirements to reduce the length and burdens of the process. For most projects, the proposed rule limits the EIS process to one year. Projects needing a more complex EIS review are limited to a maximum of two years. With minimal exceptions, the rule limits the length of most EISs to 150 pages with sophisticated EIS reviews limited to 300 pages[2]. These limitations are already the expressed

---

[1] Founded in 1929, Consumers' Research is the nation's oldest consumer affairs organization. Consumers' Research aims to increase the knowledge and understanding of issues, policies, products, and services of concern to consumers and to promote the freedom to act on that knowledge and understanding.

[2] Note that a "page" is defined as 500 words, not including appendices or charts (See 40CFR 1508.1 subsection (v).



intent of the current regulatory system.[3] However, the goal of reasonably quick reviews has dramatically diverged from actual practice over many years. Expeditious EIS reviews and issuance of a ROD (Record of Decision) have instead become overwhelmingly lengthy, detrimentally impacting the completion of projects both public and private. Lengthy EIS processes hit infrastructure projects especially hard, and projects that complete the EIS process are then often followed by litigation. The CEQ issued a report in December 2018 that found across the Federal Government, the average time for completion of an EIS and issuance of a ROD was over 4.5 years and the median was 3.6 years. One-quarter of the EISs took less than 2.2 years, and one-quarter of the EISs took more than six years.[4]

### The Value of Explicit Limits on the Length of the EIS Process and the Length of the EIS Document

The Proposed Rule contains an explicit time limit of one year for simple Environmental Assessments (EA) and two years for EISs unless a senior agency of the lead agency approves an extension in writing and sets a new time limit.[5] Including such explicit regulatory language in the text of the Proposed Rule is an urgently needed action to rein in the excessive and damaging delays that are now routine. Accordingly, the explicit time limits in proposed §1501.10(b) should be adopted.

The Proposed Rule also contains an explicit limitation of ' 'EA's to 75 pages, and EISs to 150 pages, with extension to 300 pages for unusually complex projects, unless the lead 'agency's senior official formally approves a longer page limit in writing and sets a new page limit.[6] This explicit regulatory limitation on the length of EISs will contribute to the completion of the process in a reasonable time. Forcing the agency to make EISs concise and to concentrate on the primary issues will contribute to public understanding of EISs for a project. Current

---

[3] 46 FR 18026 (Mar. 23, 1981), https://www.energy.gov/nepa/downloads/forty-most-asked-questions-concerning-ceqs-national-environmental-policy-act.

[4] See Proposed Rule, I Background, Section B (3) , first paragraph and See Council on Environmental Quality, Environmental Impact Statement Timelines (2010-2017), (Dec. 14, 2018), https://ceq.doe.gov/nepa-practice/eis-timelines.html.

[5] See 40 CFR §1501.10(b) Time Limits

To ensure timely decision making, agencies shall complete:

(1) Environmental assessments within 1 year unless a senior agency official of the lead agency approves a longer period in writing and establishes a new time limit. One year is measured from the date of decision to prepare an environmental assessment to the publication of a final environmental assessment.

(2) Environmental impact statements within 2 years unless a senior agency official of the lead agency approves a longer period in writing and establishes a new time limit. Two years is measured from the date of the issuance of the notice of intent to the date a record of decision is signed. (Further criteria for setting time limits are included in subsections (3)-(7).

[6] See 40 CFR §1502.7 Page Limits which reads:

The text of final environmental impact statements (e.g., paragraphs (a)(4) through (6) of §1502.10) shall be 150 pages or fewer and, for proposals of unusual scope or complexity, shall be 300 pages or fewer unless a senior agency official of the lead agency approves in writing a statement to exceed 300 pages and establishes a new page limit.



practice has dramatically exceeded the EIS guideline page limits, and accordingly, the explicit page limits in proposed §1502.7 should be adopted.

**The Proposed Rule Addresses Extensive Delays Caused by Routine Procedural Litigation against Major Projects**

A large portion of the excessive delays in projects, especially needed infrastructure projects, are caused by litigation. Litigation usually occurs after the approval of an EIS and the 'agency's ROD, although it can sometimes happen during the EIS process. While the CEQ cannot directly control litigation, the Proposed Rule includes numerous clarifications in the EIS process that reduce the opportunities for procedural litigation. Through regulatory codification of existing court cases and a reduction in the range of issues currently permitted for consideration in an EIS, the CEQ substantially simplifies the process and reduces the opportunities for delaying litigation.

**Changes specifically directed toward streamlining the process and controlling excessive litigation**

1)  In §1500.3(b) (3), the Proposed Rule requires timely submission of project concerns, eliminating the current practice of bringing project objections late in the EIS process (and sometimes after that process is complete). The rule requires the submission of comments and objections within the comment period. Comments and objections not submitted during the comment period shall be forfeited. It further provides that submissions of any alternative proposals to the final EIS occur within 30 days of the issuance of the Final EIS and that any such comments not submitted within this timeline shall be forfeited.[7] Such requirements are reasonable and are highly conducive to the timely and orderly resolution of issues. The requirements will have the effect of establishing that any comments not submitted during the comment period are not part of the record relating to the EIS, and, consequently, should not be able to be raised in any subsequent litigation. Accordingly, §1500.3(b) (3) should be adopted as proposed.

2)  In §1500.3(c), the CEQ specifically states its intention that judicial review of agency compliance should not occur before final agency action. This subsection provides for a quick internal review of any allegation of noncompliance with NEPA. It also provides for agencies to permit private parties to seek stays of final agency action pending administrative of judicial review and allows agencies to set appropriate conditions for such stays, including the imposition of an appropriate bond requirement as a condition for a stay.[8] This proposed provision restores a balance between the interests of the public or private parties seeking approval for a project and opponents who may want to litigate issues before the completion of the entire EIS process, by requiring the

---

[7] See 40 CFR 1500.3(b)(3)

[8] See 40 CFR 1500.3(c) Actions regarding NEPA compliance



opponents to meet such conditions before they are allowed to proceed. Accordingly, §1500.3(c) should be approved as proposed.

3) In §1500.3(d), the CEQ provides that harm from a failure to comply with ' 'NEPA's procedural requirements can be remedied by subsequent compliance within the regulatory process. It specifically provides that there is no presumption that such a NEPA procedural violation be a basis for injunctive relief or a finding of irreparable harm, that it does not give rise to a cause of action for violation of NEPA, and that minor, non-substantive errors shall be considered harmless and not invalidate agency action.[9] The intention of this provision is to have the effect of precluding many lawsuits over easily remedied minor or procedural errors within the regulatory process. The rules design aims to prevent the issuance of injunctions based on such violations, including minor violations that are not remedied but have no substantive effect on the EIS or NEPA process. Of particular importance and merit is the portion of this subsection relating to "irreparable harm." This subsection returns "irreparable harm" to its usual and traditional meaning by removing all procedural issues from the category of "irreparable harm." This provision is badly needed to reduce the prevalence of excessive litigation not critical to the merits of an EIS or ROD and to avoid undue delays based on procedural issues. Accordingly, §1500.3(d) should be adopted as proposed.

### Clarification of the definition of "effects" in NEPA analysis (§1508.1(g))

The Proposed Rule contains a crucial and much-needed proposal to establish a more explicit definition of the "effects" of a proposed project for NEPA analysis. Currently, an extensive and undefined range of "effects" can be brought up in the NEPA analysis of a ' 'project's environmental risks. The CEQ proposes to require effects for NEPA purposes to be reasonably foreseeable and to have a reasonably close causal relationship to the proposed project, consistent with the Supreme Court's holding in *Department of Transportation* v. *Public Citizen,* 541 U.S. at 767-68.

The CEQ requests comment as to whether to explicitly include the analogy to "proximate cause" in the Proposed Rule's discussion of the definition of "effects. " The incorporation of this familiar and very extensively used and analyzed legal concept would clarify and define the range of effects that must be considered in EIS analysis, providing much clearer guidance and greater certainty for project applicants. It would also increase consistency in such analyses and reduce the incidence of litigation over whether all required effects were considered. As this change would provide more fairness and certainty in the EIS process, it should be included in the definition of "effects. " If not included in the regulatory text, it should be included in the Supplementary Information published with the Final Rule.

---

[9] See 40 CFR 1500.3(d) Remedies



The CEQ also requests comments on whether it should eliminate the consideration of a ''project's "cumulative effects" combined with other projects and activities. This analysis is undefined and nearly impossible to carry out accurately. Consistent with the thrust of the Proposed Rule to provide more precise and more feasible criteria for EIS analysis, the analysis of cumulative effects should be eliminated from the EIS process. Such broad and uncertain effects are more appropriately the provinces of policy and political decision-making. They are not a usable element in the analysis of any particular project. Accordingly, the CEQ should eliminate the consideration of cumulative effects from the EIS process.

The CEQ requests comment on whether the NEPA process should continue to require the analysis of "indirect effects." Although not as pronounced as "cumulative effects," the analysis of indirect effects suffers from the same similar infirmities of uncertain scope and vagueness. Requiring the analysis of indirect effects as a separate category is inconsistent with the thrust of the Proposed Rule to focus the EIS process on a more precise and more manageable set of issues. It also runs counter to the purpose of the adoption of a definition of effects that is limited to reasonably foreseeable and has a reasonably close causal relationship to the proposed action. Accordingly, the elimination of the requirement for analysis of indirect effects should be adopted.

The CEQ also proposes to make clear that the agency EIS process should not include a review of the effects that the agency has no authority to prevent or that would happen even without the approval of the project under consideration, including actions that are primarily under the authority of another jurisdiction. This clarification eliminates the consideration of issues over which the agency has no legal authority, thereby streamlining the EIS process.[10] This proposal is an explicit, commonsense provision that should be adopted.

Ultimately, the entire proposed definition of "effects" should be adopted as proposed, including eliminating the requirements for "cumulative effects" analysis and the "indirect effects" analysis.[11] Furthermore, the language of the Proposed Rule should be strengthened by the explicit inclusion of the "proximate cause" analogy.

**The EIS process should include consideration of environmental benefits of proposed projects, weighing them against environmental risks**

Both the EIS and EA process should include consideration of the environmental benefits of a project along with its environmental risks. When a project substitutes existing activity that also has environmental risks, the environmental benefits of displacing that other activity should be weighed against the environmental risks of the proposed project in determining its

---

[10] This clarification is supported by DOT v. Public Citizen, 541 U.S. 752 (2004) : ("We hold that where an agency has no ability to prevent a certain effect due to its limited statutory authority over the relevant actions, the agency cannot be considered a legally relevant 'cause' of the effect.)

[11] See Definitions §1508.1 (g)



net environmental risks. Such risk/benefit analysis does not involve balancing economic against environmental interests but balances clearly foreseeable environmental gains against the environmental risks of a project.

For example, the EIS process for oil and gas pipelines should consider the environmental benefits of removing less safe methods transporting oil, gasoline, or natural gas, like tanker trucks, tanker rail cars, or sea-going oil tankers, from the transportation process. All these methods of transport are more likely to result in accidents and spills than pipeline transportation, so the permitting of a pipeline may often result in a net environmental benefit.

Similarly, inaction also often carries environmental risks when the status quo is environmentally dangerous or destructive. In such instances, the environmental benefits of a project eliminating or mitigating existing environmental risks should be weighed against the environmental risks of that project.

For example, consider proposals for forest management to prevent or minimize extensive economically and environmentally disastrous wildfires in forest areas. Proposals for forest management are often slowed for years over environmental objections to forest thinning, the establishment of fire breaks, and other forest health and fire prevention measures, especially if the proposal is for management of forests in National Parks. In this case, the environmental risks associated with forest management should weigh the environmental benefits of having well-maintained forest land that is less prone to wildfires.

**Examples of Net Environmentally Beneficial Projects Excessively Delayed or Killed by NEPA Reviews and Litigation**

The examples of unduly delayed net environmentally beneficial projects that are far too numerous to list. However, below are a few prominent examples:

1) The Purple Line in the Maryland suburbs of D.C. was delayed 14 years by NEPA reviews and associated litigation. It is a net environmentally beneficial project, because of the significant reduction in emissions from the car trips, often in rush hour traffic jams, that could be replaced by Metro trips upon completion of the Purple Line.[12]

2) The Cape Wind Energy Project off Nantucket Sound began in 2001, and the NEPA process began in 2010; it was delayed and ultimately canceled in 2017 because of delays caused by NEPA issues and litigation.[13] The principal objections to this project

---

[12] The Hill 1-9-20 NEPA Update needed to unlock investment, further environmental progress
https://thehill.com/blogs/congress-blog/politics/477473-national-environmental-policy-act-update-needed-to-unlock
[13] Martha's Vineyard Gazette 12-2-17. Cape Wind Pulls Out of Nantucket Sound Wind Farm Project
https://vineyardgazette.com/news/2017/12/02/cape-wind-pulls-out-nantucket-sound-wind-farm-project



were esthetic and NIMBY (Not In My Back Yard), with relatively few real environmental arguments. This project would have produced enough electricity to reduce carbon emissions from fossil fuel electricity generation by an estimated 1.5 million tons a year and would also have avoided significant other pollution from the same electricity generation sources.

3)  A $1.2 billion Denver area highway modernization project to reconstruct and widen a 10-mile stretch of I-70 stalled in a 13-year EIS process, ultimately generating a document almost 16,000 pages long.[14] This process did not include consideration of the environmental benefits of the project, which will eventually ease traffic congestion and lead to a significant reduction in automobile pollution from cars in rush hour traffic jams. Had there been a process in effect to require consideration of the ' 'project's likely environmental benefits, it might have tipped the balance toward much more expeditious approval of this highway project.  Note that the streamlining provisions of the Proposed Rule would have gone far to reduce the delays in this net environmentally beneficial project.

**Recommended Language of a Regulatory Provision for Consideration of Environmental Benefits of a Proposed Project**

When the goals of a project are to eliminate or mitigate existing environmental damage and risks, the environmental benefits of carrying out the proposed project should weigh against the environmental risks of the project. Such environmental risks include both natural risks, such as forest fires or floods, and the environmental risks of current human activities that would be less harmful after the completion of the project. Many projects intended to replace or refurbish older, more environmentally damaging and risky facilities stall out in the NEPA process for many years.

No clear requirement for consideration of such countervailing environmental benefits exists in the existing NEPA regulations. While it is otherwise a significant improvement, the Proposed Rule also does not include procedural language mandating such consideration of clear and proximate environmental benefits. The addition of such a procedural provision to the proposed NEPA regulations is especially desirable as, irrespective of economic considerations, it will frequently facilitate the timely approval of projects that have net environmental benefits. Even when the inclusion of an analysis of environmental benefits does not show net environmental benefits, it will produce a more realistic estimate of the net environmental costs and risks of a project. A better assessment will thereby better inform the

---

[14] Valerie Richardson - The Washington Times - Wednesday, February 12, 2020
https://www.washingtontimes.com/news/2020/feb/12/trumps-move-streamline-nepa-infrastructure-permits/



final decision on a project's overall costs and benefits. Accordingly, the CEQ should consider language similar to the following for inclusion in the Final Rule:

*Consideration of likely and clearly foreseeable environmental benefits of a project shall be included in the NEPA review process, and these benefits analyzed in the EIS or EA for any project under review. The environmental benefits to be considered shall include, but shall not be limited to:*

1) *Any displacement or replacement of more polluting or environmentally risky industrial, transportation, or other commercial activities and/or processes by the new project;*

2) *Any environmental benefits of a new project resulting from the replacement of older and less environmentally safe or desirable facility(ies) or system(s);*

3) *Any reduction of the damaging environmental effects of human activities through making them less polluting or more efficient, such as infrastructure projects that shorten distances traveled and/or reduce traffic congestion;*

4) *Any abatement of naturally-occurring environmental risks, such as extensive forest fires or floods.*

Conclusion

The Proposed Rule is urgently needed and should be adopted. Current NEPA procedures too often lead to interminable delays. Just as justice delayed is justice denied, so a NEPA decision sufficiently delayed is often a NEPA decision denied, even if the project is ultimately found to be meritorious. The Proposed Rule is well-crafted to focus attention on the central issues in EIS reviews and promote the issuance of timely and understandable EISs. By eliminating agency responsibility for effects not under an 'agency's control and limiting review to reasonably foreseeable issues, it focuses attention on a more limited set of issues that are more suitable for effective analysis. Thus, the Proposed Rule promotes timely NEPA analysis that is much more relevant to the decision to grant, require modifications of, or deny permission for a project. ''America's consumers will see manifold benefits from such focused, timely NEPA reviews that allow meritorious projects to go forward without extensive and, often ruinously expensive, delays.

Sincerely,

John C. Meyer

John C. Meyer, Senior Researcher



Beau Brunson, Director of Policy and Regulatory Affairs

Tab 18, Exhibit 11 to Declaration of Amy Coyle

*This is an unedited transcript. The Council on Environmental Quality has not edited, proofread, or corrected this transcript.*

```
1        BEFORE THE COUNCIL ON ENVIRONMENTAL QUALITY

2    ----------------------x

3    In re:                 :

4    PROPOSAL TO UPDATE     :

5    NATIONAL ENVIRONMENTAL :

6    POLICY ACT (NEPA)      :

7    REGULATIONS            :

8    ----------------------x

9

10                   PUBLIC HEARING

11                  Denver, Colorado

12           Tuesday, February 11th, 2010

13                    8:30 a.m.

14

15

16

17

18

19

20   Job No.:  287905

21   Pages:  1 - 421

22   Transcribed by:  Debra McCostlin
```

Transcript of Public Hearing
Conducted on February 11, 2020                          2

1   Public Hearing, held at the location of:

2

3

4

5        EPA REGION 8 HEADQUARTERS

6        1595 Wynkoop Street

7        Denver, Colorado 80202

8        (303) 312-6312

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of Public Hearing
Conducted on February 11, 2020                    3

1                    C O N T E N T S

2                                                    PAGE

3    First Session                                   4

4    Second Session                                  132

5    Third Session                                   286

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

Transcript of Public Hearing
Conducted on February 11, 2020                    4

1              P R O C E E D I N G S

2              MR. LEVENBACH:  Welcome to the public

3    hearing on the Council of Environmental Quality's

4    proposed rule to update the regulations

5    implementing the National Environmental Policy

6    Act, NEPA.  This is the first proposed

7    comprehensive -- this is the first proposed

8    comprehensive update to NEPA's regulations in over

9    40 years.  So, my name is Stuart Levenbach.  I'm a

10   senior advisor at CEQ, and on behalf of CEQ

11   Chairman Mary Neumayr, thank you for coming today.

12             So, this event is part of a concerted

13   effort by CEQ to seek the public's views on this

14   important proposal.  So, we're going to begin with

15   a session with a short presentation on the

16   proposed rule by my colleague, Ted Boling.  Ted is

17   the associate director for NEPA at CEQ.  This

18   presentation is also available online at

19   whitehouse.gov/ceq as well as nepa.gov.  The

20   website has a fact sheet and additional

21   information on the proposed rule and there are

22   also hard copies of some background material in

Transcript of Public Hearing
Conducted on February 11, 2020                                    5

1    the back of the room.  So, joining Mr. Boling on

2    the panel today is Michael Drummond.  Michael is

3    the deputy associate director for NEPA at CEQ.

4           And I want to mention just a couple of

5    housekeeping items.  So, one is just please

6    silence your cell phones.  The restrooms, if you

7    go out these doors make a left then a right, left

8    then right on the first hallway.  And emergency

9    exits, you can look for the signs but also the

10   atrium is right here so you can go out these doors

11   and just make a right and then you are in the

12   atrium.

13          So, I want to go through a couple of

14   details for those speaking to ensure that all your

15   voices are heard.  So, if you haven't done so,

16   please check in at the registration desk.  If

17   you're preregistered and signed up to speak but

18   haven't told us please step out and register so

19   the staff know you've arrived.  You have a total

20   of three minutes for your remarks and please keep

21   to your time limit so that all of today's speakers

22   can be heard.

Transcript of Public Hearing
Conducted on February 11, 2020                    6

```
 1              So, all the speakers were assigned a

 2    number at the registration table so you should

 3    have a number on your desk.  We're going to call

 4    people up in that order.  And when you speak,

 5    please state your name and spell it for the court

 6    reporter because we're transcribing this event and

 7    it's going to be entered into the record.  So

 8    please state your name and spell it when you come

 9    up to speak.

10              So also Mr. Boling here is going to be

11    keeping time.  He's going to hold up a sign that

12    says one minute remaining and then another one at

13    15 seconds and then you are out of time to let you

14    know how much time you have left.  And when he

15    holds up the sign and it's time to stop and I'll

16    have to interrupt you once you're over your

17    allotted time.

18              Once again, we have exactly the number

19    of speakers for the time allotted for the session

20    so please be courteous for the upcoming speakers

21    so that they can also speak.

22              So, if you've brought a written copy of
```

Transcript of Public Hearing
Conducted on February 11, 2020                    7

1    your statement or supplemental information that

2    you'd like incorporated into the record, please

3    leave it in the docket box located in the back of

4    the room.  So, there's a little box in the back

5    and you can just put any written comments there.

6    There's also comments, if you want to write

7    comments you can submit it there and Phil thank

8    you for holding it up.  So, you can deposit them

9    there.  We also have comment cards at the

10   registration desk if you would like to submit

11   comments there.  And if you want to submit

12   comments in writing later you can submit them to

13   regulations.gov.  The deadline is March 10th.

14          So, let me assure you that CEQ will

15   consider all public comments received whether

16   they're submitted in writing or provided at events

17   like this one.  And if you have any questions

18   during the day you can see the CEQ staff or EPA

19   staff, so we have name cards.  And then Phil, if

20   you could just raise your hand.  So, he's got some

21   staff in the back.  You can ask any of us if you

22   have any questions.

Transcript of Public Hearing
Conducted on February 11, 2020                    8

1           So, this session is scheduled to end at

2    noon.  And a couple things, if we end before noon

3    there may be a few of you who are on the waitlist

4    to speak and so if we do have a little time at the

5    end we'll call up the people on the waitlist to

6    speak.  So, you should have a letter on your card.

7    Does anyone have on the waitlist to speak by

8    chance?  Okay.  So, we'll call you up in order,

9    yeah, ABC, if we have time.  If you're leaving

10   early please let us know at the registration desk

11   or in the back of the room so that we can assign

12   any open seats for people that are on the waitlist

13   to come in and listen.

14          And then -- so if that's -- yeah, so

15   we're going to get started here.  The first two

16   people who are numbers one and two to speak, if

17   you can come here and sit down and I'm going to

18   hand it over to my colleague Mr. Boling who is

19   going to provide a brief overview of the proposed

20   rule.  Thanks again.

21          MR. BOLING:  Okay.  Thank you, Stu.  As

22   you said, I'm going to provide you with a little

Transcript of Public Hearing
Conducted on February 11, 2020                    9

```
1    bit of an overview and, again, here we go -- and

2    again, this presentation is also available on

3    nepa.gov and whitehouse.gov/ceq.

4              So, the -- in order of the presentation

5    I'm going to start with a brief background on

6    implementation of the current CEQ NEPA

7    regulations and Executive Order 13807 which

8    directed CEQ to take actions to enhance and

9    modernize the federal environmental review and

10   authorization process.  We're going to discuss

11   the goals of the rulemaking and public input

12   process to date.  The majority of this

13   presentation is going to summarize the proposed

14   rule and I will conclude with information on how

15   to provide comments to CEQ on the proposed rule

16   and additional public engagement opportunities

17   that we're planning.

18             So first of all, you know, as most of

19   you know and the foundation of the National

20   Environmental Policy Act is Section 101 which

21   sets forth a national policy to use all practical

22   means and measures including financial and
```

Transcript of Public Hearing
Conducted on February 11, 2020                    10

 1   technical assistance in a manner calculated to

 2   foster and promote the general welfare, to create

 3   and maintain conditions under which man and

 4   nature can exist in productive harmony, to

 5   fulfill the social, economic, and other

 6   requirements for present and future generations

 7   of Americans.

 8           Section 102 of NEPA requires federal

 9   agencies to consider the environmental impacts of

10   their proposed actions as part of their decision-

11   making process.  NEPA and the CEQ regulations

12   implementing it are construed in light of a rule

13   of reason according to the Supreme Court which

14   ensures that agencies determine whether and to

15   what extent to prepare environmental impact

16   statement based on the usefulness of that

17   information to their decision-making process.

18           Now CEQ was created by Title II of NEPA

19   and initially implemented NEPA with guidelines

20   that they issued in April of 1970 by executive

21   order in the Carter Administration.  They were

22   directed to promulgate regulations which they did

Transcript of Public Hearing
Conducted on February 11, 2020                    11

1    in 1978.  And CEQ has amended those regulations

2    substantively only once and that was for

3    replacing the worst case analysis regulation in

4    consideration of incomplete and unavailable

5    information, 1502.22.

6              Just very basically, you know, the CEQ

7    regulations provide the framework that we know of

8    for NEPA with categorical exclusions,

9    environmental assessments, and of course

10   environmental impact statements to meet the

11   purpose of the statute.  Agencies can exclude

12   categories of actions that normally do not have

13   significant effects which allows them to

14   expeditiously review actions to ensure that the

15   action fits the categorical exclusion.  And then

16   so actions that are not covered by a categorical

17   exclusion, the agencies can prepare a concise

18   environmental assessment if they believe that

19   it's not likely to have significant effects.

20             And then through the use of categorical

21   exclusions and environmental assessments agencies

22   can then focus their limited resources on the

Transcript of Public Hearing
Conducted on February 11, 2020                              12

1    actions that do have significant effects to

2    prepare the detailed statement required by the

3    statute, the environmental impact statement or

4    EIS.

5              So, over the -- CEQ has analyzed the

6    length of environmental impact statements and the

7    duration of the EIS process.  The information I'm

8    going to describe here is reflected in two

9    reports issued by CEQ, an EIS timeline report

10   that we issued in December of 2018 and an EIS

11   length report that we issued in June of 2019.

12             So, of course the current regulations

13   recommend environmental impact statement be

14   limited to normally less than 150 pages or 300

15   pages for proposals of, quote, "unusual scope or

16   complexity".  However, CEQ has found that most

17   EISs are significantly longer and they take a

18   long time to produce.  For example, the average

19   EIS length for the Department of Transportation's

20   Federal Highway Administration takes 645 pages

21   and average time to complete that EIS is -- go

22   from notice of intent to record of decision is

Transcript of Public Hearing
Conducted on February 11, 2020                              13

1    roughly seven years.

2           In the report you'll see a great deal

3    of detailed data with regard to all the federal

4    agencies, their timeline that they took for

5    preparing EISs and to issue their record of

6    decision or ROD.  This is based on data from 2010

7    to 2017.  So, this information in this chart

8    represents 1,161 EISs for which a notice of

9    availability of a final EIS was published between

10   January 1st, 2010 and December 31st, 2017 and for

11   which a ROD was issued by June of 2018.  CEQ

12   found that across all the federal agencies the

13   average completion time from notice of intent to

14   record of decision was four-and-a-half years and

15   the median was three-and-a-half years.

16          Now of course the CEQ report notes that

17   even within an agency an EIS timeline may very

18   widely in technical complexity and other factors

19   that influence the length and timing.  These

20   factors may include changes in the proposed

21   action, funding limitations, community concerns.

22   The EIS process for large infrastructure projects

Transcript of Public Hearing
Conducted on February 11, 2020                          14

1    varies considerably from those associated with

2    rulemakings or land management planning actions

3    which are largely within the control of the lead

4    agency.  And while CEQ has published federal

5    governmentwide agency specific data, we haven't

6    subdivided EISs by infrastructure, sector, or

7    type of project.  Though approximately half of

8    these EISs are infrastructure projects.

9              So here and in that report we break it

10   out by agency.  So, the data on this slide

11   represents the average completion time in years

12   for EISs conducted by the Department of

13   Transportation.  While many -- while the EIS may

14   involve other cooperating or co-lead agencies,

15   we've displayed this information by only the lead

16   agency.

17             So Executive Order 13807 was issued by

18   the president in 2017 and established the One

19   Federal Decision, or what we refer to as the OFD

20   process, to expedite environmental reviews and

21   improve interagency coordination for

22   infrastructure projects that require an EIS.

Transcript of Public Hearing
Conducted on February 11, 2020                    15

1   EO13807 also directed CEQ to enhance and

2   modernize the federal environmental review and

3   authorization process including updating its

4   regulations as necessary.

5          So, what you have here is a model

6   timeline for the two-year goal for the completion

7   of the NEPA process under Executive Order 13807.

8   While projects processed under the OFD policy

9   must comply with the two-year goal for completion

10  of EIS, the goal is an agencywide average.

11  Agencies must prepare project level schedules

12  that are consistent with achieving the agencywide

13  average and senior agency official direction.

14         Agency progress towards this goal and

15  other goals get tracked through an accountability

16  system that's managed by the Office of Management

17  and Budget.  So, this is the recommended timeline

18  for the two-year goal.  Under this schedule at

19  the time it publishes its notice of intent to

20  start the public scoping of an EIS the lead

21  agency should have a plan to prepare and publish

22  a draft environmental impact statement within 14

Transcript of Public Hearing
Conducted on February 11, 2020                    16

1    months or have a senior agency official approve a

2    different schedule.

3            And at the time it published its draft

4    EIS for public comment the lead agency should

5    have a plan to respond to public comments and

6    publish its final EIS within eight months or,

7    again, have a senior agency official approve a

8    different schedule.

9            And then at the time it publishes the

10   final EIS the lead agency should have a plan to

11   publish its record of decision in coordination

12   with all the other federal agencies that will use

13   the EIS in their decision-making processes within

14   two months or have a senior agency official

15   approve a different schedule.

16            So, in response to Executive Order

17   13807 and given the length of time since CEQ

18   issued its regulations in 1978, CEQ published an

19   advanced notice of proposed rulemaking, or ANPRM,

20   requesting public comment on how CEQ should

21   ensure a more efficient, timely, and effective

22   NEPA process.  CEQ received over 12,500 comments

Transcript of Public Hearing
Conducted on February 11, 2020                    17

1    from a wide variety of stakeholders including

2    states, tribes, localities, environmental

3    organizations, trade associations, NEPA

4    practitioners, and interested members of the

5    public.

6              Most substantive comments supported

7    some degree of updating of the current

8    regulations.  Many noted that overly lengthy

9    documents and the time required for the NEPA

10   process remained real and legitimate concerns

11   despite the current regulations explicit

12   direction on reducing paperwork and delays.

13             So, the proposed rule is proposed to

14   modernize and clarify the CEQ regulations to

15   facilitate more effective, efficient, and timely

16   NEPA reviews by federal agencies.  The revisions

17   are intended to make the regulations easier to

18   read, understand and follow.  The proposed

19   changes would codify certain CEQ guidance issued

20   over the past 40 years and Supreme Court case

21   law.  Much of this is reflected in modern agency

22   NEPA practice but is not captured in the existing

Transcript of Public Hearing
Conducted on February 11, 2020                    18

1    CEQ regulations.

2            The proposed regulations are consistent

3    with the original goals of the 1978 regulations

4    to reduce paperwork and delays and to promote

5    better decisions.  The goals are also consistent

6    with the National Environmental Policy Act which

7    is established by Section 101.

8            So, to go through the proposed changes.

9    As the Supreme Court has recognized that agencies

10   have limited time and resources and has held that

11   the scope of an agency's inquiries must remain

12   manageable if NEPA's goal of ensuring fully

13   informed and well considered decision is to be

14   accomplished.  CEQ proposes a number of changes

15   to modernize, simplify, and accelerate the NEPA

16   process.

17           For example, the proposed rule would

18   direct agencies to complete EISs within two years

19   and EAs within one year unless a senior agency

20   official at the lead agency approves a longer

21   period in writing and establishes a new timeline.

22   The EIS time frame would be measured from the

1    issuance of a notice of intent to the date of the

2    record of decision.  The EA time frame would be

3    measured from the date of the agency's decision

4    to prepare an EA to the publication of the final

5    EA.

6            The proposed rule would make the

7    current page limits for EISs mandatory and would

8    establish page limits for EAs, again, unless a

9    senior agency official establishes a new page

10   limit.  Specifically, the length of the final EIS

11   must be 150 pages or fewer and 300 pages or fewer

12   for proposals of unusual scope or complexity.

13   The presumptive page limit for EAs would be 75

14   pages.

15           The proposal would codify aspects of

16   the One Federal Decision policy to ensure

17   coordinated and timely reviews.  Lead agencies

18   would be responsible for developing a joint

19   schedule for the environmental review in

20   consultation with cooperating agencies and

21   resolving disputes or other issues that may cause

22   delays in the schedule.

Transcript of Public Hearing
Conducted on February 11, 2020                    20

1           The regulations would clarify that the

2    lead agency is responsible for determining the

3    purpose and need and alternatives in consultation

4    with cooperating agencies.  Federal agencies

5    would be required to evaluate proposals involving

6    multiple federal agencies in a single EIS in a

7    joint record of decision or a single EA in a

8    joint finding of no significant impact when

9    practical.

10          CEQ proposes to add a new section that

11   would provide for an agency determination of

12   whether NEPA applies to a particular activity

13   consistent with court decisions finding that NEPA

14   is inapplicable.  This would include when an

15   agency is carrying out a non-discretionary duty

16   or its statutory obligations clearly

17   fundamentally conflict with NEPA compliance.

18          The regulations would begin the scoping

19   process before the agency publishes a notice of

20   intent to prepare an EIS.  This would expand the

21   process for agencies to request and the public to

22   submit all relevant information and analysis

Transcript of Public Hearing
Conducted on February 11, 2020                    21

1    early in the process so that the agencies can

2    consider that information in their decision

3    making.

4              Under the proposed rule agencies would

5    be required to provide more information in the

6    notice of intent, to summarize public input in

7    the EIS and seek commentary on that summary in

8    the draft EIS and again in the final EIS.  And

9    that decision makers must certify their

10   consideration of this information in the record

11   of decision.

12             So, turning to some of the definitions

13   in the regulations.  CEQ proposes to define the

14   term "reasonable alternatives" as alternatives

15   that are technically and economically feasible.

16   This is consistent with longstanding CEQ guidance

17   and Supreme Court decisions including in Vermont

18   Yankee where the Supreme Court found that

19   alternatives must be bounded by some notion of

20   feasibility.

21             CEQ also proposes to define reasonable

22   alternatives as a reasonable range of

Transcript of Public Hearing
Conducted on February 11, 2020                    22

1   alternatives which would codify CEQ's 1981

2   guidance commonly known as the 40 questions.

3           Consistent with the Supreme Court's

4   decision in Department of Transportation v.

5   Public Citizen, CEQ proposes to clarify the

6   definition of effects to focus on effects that

7   are reasonably foreseeable and have a reasonably

8   close causal relationship to the proposed action.

9   CEQ proposes to strike the terms "direct" and

10  "indirect" and the separate definition of

11  cumulative impacts in order to focus agency time

12  and resources on considering whether an effect is

13  caused by the proposed action rather than on

14  categorizing that particular type of effect.

15          CEQ proposes a change in position to

16  state that the analysis of cumulative effects as

17  currently stated in the current CEQ regulations

18  is not required.

19          CEQ also proposes to clarify that

20  effects should not be considered significant if

21  they are remote in time, geographically remote,

22  or the result of a lengthy causal chain.  This

Transcript of Public Hearing
Conducted on February 11, 2020                    23

1    would codify the Supreme Court's rulings in

2    Public Citizen where the Supreme Court held that

3    courts must look at the underlying policies and

4    legislative intent in order to draw a manageable

5    line between causal changes that may make an

6    actor responsible for the effects and those that

7    do not.

8              Further, CEQ proposes to codify a key

9    holding in the Public Citizen case to make clear

10   that effects do not include effects that the

11   agency has no authority to prevent or would

12   happen even without agency action because they

13   would not have a sufficiently close causal

14   connection to the proposed action.

15             CEQ did not propose to add any

16   particular category of effects to the definition

17   of effects, however CEQ does invite comment on

18   whether it should codify any aspect of CEQ's

19   draft guidance on how NEPA analysis should

20   address greenhouse gas emissions into the final

21   regulations, and if so, how.

22             CEQ proposes a number of changes to the

Transcript of Public Hearing
Conducted on February 11, 2020                    24

1    definition of major federal action.  These

2    include clarifying that an action meets the

3    definition if it is subject to federal control

4    and responsibility and it has effects that may be

5    significant.  Consistent with case law over the

6    past four decades the definition would clarify

7    that the term does not include non-federal

8    projects with minimal federal involvement or

9    federal funding where the federal agency cannot

10   control the outcome of the project.

11          For example, this could apply where a

12   very small amount of federal funding is provided

13   only to help with the design phase of an

14   infrastructure project that otherwise is funded

15   through private or local funds.

16          So consistent with longstanding agency

17   practice, CEQ proposes to expand its provision

18   for the adoption of environmental impact

19   statements by other agencies to include

20   environmental assessments and to allow the

21   adoption of categorical exclusion determinations

22   by other agencies.

Transcript of Public Hearing
Conducted on February 11, 2020                              25

1            CEQ also proposes to allow agencies to

2    establish a process in their agency NEPA

3    procedures to adopt another agency's categorical

4    exclusion.  Agency's would have more flexibility

5    to allow project sponsors to participate in the

6    preparation of environmental documents,

7    particularly environmental impact statements.

8    The regulations would required the decision-

9    making official to provide guidance, to

10   participate in the preparation of the EIS, to

11   independently evaluate the environmental

12   document, and to take responsibility for its

13   content.

14            With respect to limitations on

15   activities that can occur before the completion

16   of environmental review, CEQ proposes to clarify

17   that certain activities by an applicant can

18   proceed where that activity is to support an

19   application for federal, state, tribal, or local

20   permits or assistance.  This could include

21   acquisitions of interest in land such as rights

22   of way or conversation easements.

Transcript of Public Hearing
Conducted on February 11, 2020                    26

1          With regard to measures to enhance

2    public participation, as I noted earlier the

3    regulations would require agencies to

4    specifically solicit comments in their notice of

5    intent so that agencies can consider relevant

6    information early in their development of a draft

7    environmental impact statement.

8          CEQ proposes to revise its regulation

9    on specificity of comments and information to

10   explain that the purpose of public comments is to

11   promote informed decision making and further

12   clarify that comments should provide sufficient

13   detail for the agency to consider the comment in

14   its decision-making process.  This would codify

15   the Supreme Court rulings in Public Citizen and

16   Vermont Yankee.

17         CEQ also proposes that comments should

18   explain why the issue raised is significant to

19   the consideration of the potential environmental

20   impacts and alternatives to the proposed action

21   and other impacts affecting the quality of the

22   human environment.

Transcript of Public Hearing
Conducted on February 11, 2020                    27

1              Agencies would have greater flexibility

2     to design and customize public involvement to

3     meet the specific circumstances of their proposed

4     actions including using electronic media, but

5     agencies may not limit themselves to electronic

6     communications when actions take place in areas

7     or affect people without high speed internet

8     access such as the digital divide in rural

9     locations.

10             The proposed regulations would

11    encourage agencies to use modern methods of

12    electronic communication to publish important

13    environmental information and to structure public

14    participation for greater efficiency and greater

15    inclusion of interested persons and to include

16    soliciting comments in a manner designed to

17    inform parties interested or affected by the

18    proposed action.

19             Consistent with those changes and

20    throughout the rule CEQ proposes to change the

21    term "circulate" or "circulation" which is sort

22    of a paper-based term to a term "publish" or

Transcript of Public Hearing
Conducted on February 11, 2020                        28

1    "publication" which is stated in technology

2    neutral terms.

3              Finally, a new section would require

4    agencies to provide NEPA program information,

5    information on ongoing NEPA reviews, and public

6    access to agency records relating to NEPA

7    reviews.  This provision would promote

8    transparency and efficiency in the NEPA process.

9    It would improve interagency coordination to

10   streamline environmental review and better

11   coordinate the development of environmental

12   documents for multi-agency projects.

13             Last in the proposed changes, the CEQ

14   is proposing changes to enhance coordination with

15   states, tribes, and localities.  In particular,

16   CEQ proposes to update the provisions on state,

17   tribal, and local environmental reviews to

18   encourage greater cooperation and reduce

19   duplicative reviews.

20             The current regulations limit the

21   interest of tribes to reservations.  In response

22   to comments on the ANPRM supporting expansion of

Transcript of Public Hearing
Conducted on February 11, 2020                    29

1    the recognition of the sovereign rights interest

2    and expertise of tribes, CEQ proposes to add

3    tribal to the phrase state and local throughout

4    the rule.  This is intended to ensure

5    consultation with tribal governments reflecting

6    current NEPA practice, to coordinate or consult

7    with affected tribal governments and agencies as

8    necessary and appropriate to the proposed action.

9            So, we have many ways to participate in

10   the development of the final rule and this is our

11   first of public hearings.  We are going to be

12   doing a public hearing on February 25th in

13   Washington, D.C. and we are going to have other

14   opportunities noticed on nepa.gov and

15   whitehouse.gov as Stu Levenbach said at the

16   outset.

17           So, we are excited to get your comments

18   here today.  Of course, oral comments will be

19   transcribed.  Written comments, they will all be

20   considered equally.  And comments following up on

21   this must be received by March 10th.  Preferred

22   method is to upload them to regulations.gov.

Transcript of Public Hearing
Conducted on February 11, 2020                    30

1            So, with that I think we're ready to

2   start calling people up.  Come on up.

3            MR. MORTIMER:  Sure.

4            MR. BOLING:  Don't forget to spell your

5   -- say and spell your name.

6            MR. MORTIMER:  Great.  Good morning.

7   My name is Ed Mortimer.  It's E-D and it's

8   M-O-R-T-I-M-E-R.  I am vice president of

9   Transportation and Infrastructure at the U.S.

10  Chamber of Commerce.  I also serve as

11  representing a coalition called Unlock America's

12  Investment which is a coalition of 44 national

13  organizations that are very supportive of this

14  administration and the CEQ looking to modernize

15  the rulemakings that go into place when we use

16  NEPA law.

17            Again, I want to thank this

18  administration CEQ for this proposed rule to

19  update the procedural provisions of the National

20  Environmental Policy Act.  From the business

21  community perspective, modernizing our

22  infrastructure, which a lot if it was built -- or

Transcript of Public Hearing
Conducted on February 11, 2020                    31

1    interstate highway systems were built in the 50s

2    and 60s.  We have water systems that are a

3    hundred years old.  And we really believe now is

4    the time to modernize our infrastructure and so

5    we applaud the administration as we're

6    modernizing and creating new infrastructures that

7    are more environmentally sensitive, that we also

8    modernize the way that we use environmental law

9    to move these projects from permitting into

10   construction.

11           Unfortunately, it's becoming

12   increasingly difficult to unlock federal

13   decisions on critical infrastructure projects.

14   The investors can be lined up, the architectural

15   design and engineering can be readily completed,

16   the construction equipment and labor made

17   available, but those plans may be mothballed for

18   years and sometimes decades due to the ever

19   thickening layer of process that is amassed on

20   project applicants who seek federal approvals or

21   permits under NEPA.

22           The Chamber fundamentally supports the

1    goals of NEPA but believes it is critical for

2    environmental protection and economic growth that

3    the review process be streamlined.  The time

4    needed to complete an environmental impact

5    statement has become progressively longer now

6    taking over four-and-a-half years on average to

7    complete.  Such delays affect important business

8    decisions that can prevent or delay the

9    maintenance, rebuilding, and expanding of

10   infrastructure and can be an unnecessary drain on

11   the economy while forestalling the economic

12   benefits due to these projects would often

13   provide.

14          Since NEPA was last comprehensively

15   updated in the late 1970s the time it takes to

16   complete environmental reviews has substantially

17   increased.  When it takes longer to go through

18   the federal approval process than it does to

19   actually build a project it's an indication that

20   this process is broken.

21          And again, our infrastructure,

22   transportation, waterways, energy all needs to be

Transcript of Public Hearing
Conducted on February 11, 2020                    33

1    modernized and this is a very important move to

2    improve not just our environment but the quality

3    of life of every American.  Again, reducing the

4    costs and uncertainties associated with

5    infrastructure investment and related projects

6    has a potential for more and better paying jobs

7    throughout this country.

8            We support these proposed NEPA updates

9    to increase transparency and predictability as

10   well as improved coordination between federal

11   agencies to eliminate unnecessary barriers that

12   prevent or delay the implementation of critical

13   projects.

14           So again, we thank you for this

15   opportunity to participate in this process and

16   look forward to it moving forward.  Thank you.

17           MR. HANSEN:  I'd like to thank you for

18   this opportunity.  My name is Niels Hansen,

19   N-I-E-L-S H-A-N-S-E-N.  I'm a multi-generational

20   rancher from Rawlins, Wyoming and we operate

21   inside the federal land grant to the Union

22   Pacific Railroad, so our ranch is all

Transcript of Public Hearing
Conducted on February 11, 2020                        34

1    checkerboard, so the federal rules and

2    regulations are critical to our operation.

3           Streamlining the environmental process

4    for renewing grazing permits and permitting range

5    improvement projects is critical.  Too many times

6    the grazing permits are tied up for years over

7    issues that may or may not be related to the

8    utilization of the forage.  Often these renewals

9    are slowed down not be of a serious problem

10   that's on the range or in the permitting but

11   because the documents have gotten so big that too

12   often there's mistakes made, and it ties

13   everything up and reduces the efficiency of the

14   government and slows the process for the

15   operations.

16           We see these projects -- to often the

17   projects for range improvement habitat and fire

18   prevention is tied up for many years.  We need to

19   see this streamlined so that the range

20   professionals are allowed to use their

21   professional expertise, use the categorical

22   exclusion, and be able to reference the

Transcript of Public Hearing
Conducted on February 11, 2020                                    35

1    monitoring data that's been collected over years

2    in the area.

3          By focusing the analysis on the

4    existing environmental documents will reduce the

5    risk and challenges from the obstructions groups.

6    Too often we see them take on something just

7    because there's a snafu in the paperwork or a

8    minor error, nothing to do with the value of the

9    project.

10         It's extremely frustrating as an

11   operator in the Red Desert trying to put water

12   out on the land that's going to benefit wildlife

13   and livestock alike.  In our case we have a --

14   developing a project that is majority on private

15   property, totally paid for by private money, but

16   because it intersected a few feet of agency land

17   we were tied up and had to go through the full

18   process.

19         It's just wrong when we have to -- the

20   federal agencies will have that much authority to

21   slow a project down and effectively terminated it

22   by putting so many provisions on it that it's

Transcript of Public Hearing
Conducted on February 11, 2020                    36

1    just untellable to do.  In the interest of time I

2    will submit a written comment for the balance of

3    my comments.  Thank you.

4            MR. BOLING:  Thank you, sir.

5            MR. HOLLORAN:  Yeah.  Hi.  I'm Matt

6    Holloran, H-O-L-L-O-R-A-N.  I'm a research

7    ecologist with over 20 years experience studying

8    wildlife in the western U.S. with an emphasis on

9    studying the response of sagebrush dependent

10   species, especially sage-grouse, to human related

11   changes to their habitats.  I have extensive

12   experience with NEPA, most specifically writing

13   EISs and assessing a scientific rigor of many

14   kinds of NEPA documents.

15           In my experience the heart of NEPA is

16   accurate and transparent scientific assessment of

17   development alternatives.  Scientifically sound

18   assessments contribute to sound decision making,

19   informed management alternatives and best

20   management practices, and provide a foundation

21   for adaptive management.  I caution against

22   inserting subjective non-informative descriptors

Transcript of Public Hearing
Conducted on February 11, 2020                    37

1    into especially the methodological sections of

2    NEPA.

3            These sorts of descriptors I can only

4    assume given current efforts to discredit science

5    are being added to generate loopholes to be used

6    to disregard certain data and information that

7    those developing NEPA documents decide don't

8    support their desired outcomes or don't conform

9    to predisposed expectations.

10           For example, the addition of the word

11   reliable to define data sources in Section

12   1502.24, that's the methodology and scientific

13   accuracy section.  Reliable is a subjective term

14   that in no way clarifies the kinds of data

15   suitable for use in NEPA.  I don't have a problem

16   with vetting data, but I suggest that those

17   revising NEPA choose wording that better

18   describes their desired outcomes.

19           I additionally caution against adding

20   language to NEPA that can be interpreted as

21   curtaining original analyses.  As an example of

22   original analyses assisting in the decision

Transcript of Public Hearing
Conducted on February 11, 2020          38

1   making, in 2015 the White River field office of

2   the BLM in western Colorado developed a threshold

3   and temporal analysis to assess the potential

4   impacts of gas and oil development on big game

5   and included the results of that analysis in the

6   relevant EIS.  This analysis provided forecasts

7   that benefited the decisions made and were not

8   available to BLM staff without that original

9   analysis.

10          The federal government has more than

11  enough expertise in-house to rigorously assess

12  the potential implications of giving decisions

13  quickly.  I would suggest explicitly maintaining

14  the option to do so in the NEPA process.

15          As I mentioned, I have quite a bit of

16  experience assessing scientific rigor of NEPA

17  documents and in many instances the analyses in

18  the documents I have reviewed, especially those

19  investigating the indirect and cumulative impacts

20  for proposed alternative, are inadequate and

21  don't provide the information required of federal

22  managers to make sound decisions.  Robust

Transcript of Public Hearing
Conducted on February 11, 2020                39

1    evaluations of direct, indirect, and cumulative

2    effects of proposed actions are absolutely

3    critical to make sound transparent decisions

4    however one chooses to describe those impacts,

5    and these decisions in turn are critical to

6    helping to sustain our communities, our

7    environments, and our ways of life.

8              Unfortunately, the revisions proposed

9    to NEPA do nothing to address these shortcomings

10   in the law in many instances.  In fact, some of

11   the changes proposed will further exacerbate

12   current issues with NEPA.  Thank you.

13             MR. BOLING:  Thank you, Dr. Holloran.

14   The next four are Lyla June Johnston followed by

15   Jeanne Crumly and R.J. Harrington.

16             MS. JOHNSTON:  My name is Lyla June

17   Johnston, L-Y-L-A J-U-N-E J-O-H-N-S-T-O-N, and I

18   am of the Dene Nation.  I want to begin by saying

19   that we are standing on land that was brutally,

20   violently, and barbarically stolen by the

21   Arapahoe, Cheyenne, Sioux, and Ute Indigenous

22   Nations.

Transcript of Public Hearing
Conducted on February 11, 2020                          40

1            I want to come here -- and asking me to

2    speak here today is like asking to speak at the

3    proposal of killing my own mother, so it's very

4    hard to speak calmly, but I think that the

5    proposed changes are a slap in the face to our

6    democracy, a slap in the face to the integrity of

7    our Mother Earth.

8            And I want to point out that the

9    policies of Trump tend to favor business, however

10   they are willing to expedite business at the

11   expense of the health of our water, our ecology,

12   and future generations.  And although that may

13   seem smart from a business perspective, from a

14   global and long-term perspective it is very

15   primitive and unintelligent.

16           Why is this?  Because our societies

17   here in this land lived for thousands and

18   thousands and thousands of years without ever

19   collapsing or dying out.  Now there were some

20   societies that collapsed here, but many of them

21   were sustainable for thousands upon thousands of

22   years.

Transcript of Public Hearing
Conducted on February 11, 2020                    41

1          Now look at the United States of
2    America.  We are not even 250 years old.  We're a
3    very, very young nation, a very primitive nation,
4    and a very short-sighted and, with all due
5    respect, unintelligent nation.  And so, within
6    this 250 years we have self-destructed not only
7    our own country in terms of ecological integrity
8    but also the entire world.  We sit on the
9    precipice of global, environmental, and
10   ecological collapse and that is due to an ethic
11   that prioritizes the efficiency of business over
12   the integrity of ecological systems.
13         And so, I wholeheartedly disagree with
14   the proposed changes to the NEPA process and I
15   believe that the reason these NEPA processes take
16   so long is because that many of these projects
17   are in fact environmentally unsound.
18         I had the great pleasure of working
19   with the Winnemem Wintu Tribe in northern
20   California where the Bureau of Reclamation
21   proposed the enlargement of the Shasta Reservoir.
22   This would have flooded or otherwise affected

Transcript of Public Hearing
Conducted on February 11, 2020                              42

1    over 50 sacred sites of this sovereign Indigenous

2    nation and they are still trying to push this

3    project through.

4              And so, we are in a situation where,

5    yes, these processes do take a long time because

6    they are ultimately not environmentally sound.  I

7    want to honor the gentleman who spoke regarding

8    the ranches and the other gentleman who spoke

9    regarding the businesses, but I must say these

10   environmental integrities are much more important

11   than the success of our businesses because we

12   cannot have an economy on a dead planet.  So,

13   thank you very much for your time.

14             MR. BOLING:  Thank you very much.

15             MS. CRUMLY:  My name is Jeanne Crumly,

16   J-E-A-N-N-E C-R-U-M-L-Y.  I'm here today to

17   express grave concerns about proposed changes to

18   the current NEPA regulations.  I'm a retired

19   schoolteacher, a partner with my husband in a

20   third generation farming/ranching operation in

21   Holt County, Nebraska.

22             We are able to be here today because we

Transcript of Public Hearing
Conducted on February 11, 2020                    43

1    have a son home running the operation.  We have

2    grandsons to follow, a fourth and fifth

3    generation equivalent to over 100 years of our

4    family serving as stewards for this land, land

5    comprised of fragile sandhill soil, land which

6    runs over the precious Ogallala Aquifer, land

7    which runs over the Ponca Trail of Tears, land

8    endangered by the KXL Pipeline.

9              We are also landowners fighting that

10   proposed pipeline which is intent on taking our

11   land by the abuse of imminent domain for private

12   gain.  It is for these generations that we are

13   opposing a project that is unwise and

14   unnecessary.  It is for our children, our

15   grandchildren and yours as well that I beg

16   caution in any attempt to weaken protections of

17   our vital land and resources.

18             The proposed updates as you call them

19   would eliminate consider -- could eliminate

20   considerations of effects which are remote in

21   time.  I suggest that our actions today must work

22   for generations to come.  We take seriously that

Transcript of Public Hearing
Conducted on February 11, 2020                               44

1    50 years from now when our grandchildren are

2    running this very farm KXL would have an

3    abandoned, toxic, leaky 36-inch pipeline in our

4    field leaving our grandson with all liability.

5    We take it seriously that a toxic pipeline with a

6    record of leaks depresses land value, that

7    assessors lower tax obligations decreasing state

8    revenue by the millions over a 50-year timeline.

9    This revenue is the very revenue that supports

10   our endangered rural communities.  Effects that

11   are remote in time, using your language, do

12   matter.

13            One tool that concerned citizens have

14   long had is the invitation to voice decision

15   making.  In my ten years on this opposition I've

16   found that capacity to participate increasingly

17   difficult.  Take today for example, I believe the

18   slots sold out in two minutes as opposed to 2013

19   when we spoke for nine hours.  Every person that

20   wanted to speak was allowed.  What could possibly

21   be the benefit of suppressing the vote or the

22   voice of people that best know the areas?

1          The updates which change -- these

2    updates could change who serves as gatekeepers.

3    The proposed changes could put foreign

4    corporations like TransCanada in charge of their

5    own environmental reviews encouraging blatant

6    conflict of interest.

7          These NEPA updates strive to disconnect

8    the construction process itself from the profound

9    environmental impacts all along the line.  Beyond

10   the simple process of construction one must

11   consider the loss of Canadian burial forests

12   where the tar sands are extracted, the toxic

13   tailings ponds polluted the water of first nation

14   communities, the air and water pollution along

15   the line where leaks have already compromised

16   soil in South Dakota and North Dakota, air and

17   water pollution at Gulf Coast Saudi owned

18   refineries where KXL products would stop before

19   being exported and burned producing greenhouse

20   gas emissions that could go unaccounted for.

21          This project includes every one of

22   these issues and must be seen as a whole.  The

Transcript of Public Hearing
Conducted on February 11, 2020                    46

1   Obama Administration saw this whole and they

2   rejected the Keystone XL as not in the U.S.

3   national interest citing among the reasons the

4   project would significantly exacerbate climate

5   crisis.  Under Trump's proposed changes to NEPA

6   the federal government might not be required to

7   even consider KXL's climate impact.

8            NEPA language from its onset requires

9   federal government to use all practicable means

10  to create and maintain conditions under which man

11  and nature can live in harmony.  As I've

12  illustrated, this requires cumulative

13  considerations of effects including remote in

14  time, remote geographically, and those affecting

15  citizens involved.  Diminishing these

16  considerations endangers the very protections

17  vital both now and for generations to come.

18            MR. BOLING:  Thank you.

19            MR. HARRINGTON:  Good day.  My name is

20  R.J. Harrington, H-A-R-R-I-N-G-T-O-N.  I'm the

21  president and chief executive officer of

22  Sustainable Action Consulting, a public benefit

Transcript of Public Hearing
Conducted on February 11, 2020                    47

1    corporation meaning that our business is in

2    service to the planet and people.  We do business

3    as National Car Charging, LLC and I serve as the

4    VP of business development.  I'm also a member of

5    E2, a national non-partisan group of business

6    leaders, investors and others who advocate for

7    smart policies that are good for the economy and

8    good for the environment.

9            As business leaders and investors who

10   face national environmental policy act review and

11   need approval for solar wind energy efficiency,

12   grid modernization, electric vehicle charging

13   infrastructure and countless other important

14   projects, E2 members can relate to the urgency of

15   getting projects approved in a timely fashion.

16   At the same time the viability of our businesses

17   and our communities depends on the government

18   making environmentally and economically sound

19   decisions.  NEPA is the law that helps ensure

20   that can happen.

21           Unfortunately, instead of improving

22   NEPA implementation which we would all support,

Transcript of Public Hearing
Conducted on February 11, 2020                48

1    the proposed rule merely undermines NEPA and it

2    does far more to increase business risk and

3    threaten the safety of the environment and the

4    economy than it does to help.  As such I am here

5    today to oppose this proposed rule and its

6    weakening of NEPA and to detail some of the many

7    concerning real world business implications of

8    the rule.

9            For example, the proposed rule would

10   eliminate the requirement for government to

11   consider cumulative and indirect impacts of its

12   decisions which translates into eliminating

13   consideration of the climate crisis.  Ignoring

14   climate risks is not good policy and harms

15   businesses.

16           Businesses already face substantial

17   losses due to the climate crisis.  Droughts,

18   floods, wildfires, and other climate related

19   impacts drive economic losses.  These events

20   don't just impact business revenue but supply

21   chain integrity, investor confidence, market

22   access and competitiveness.  These risks are

Transcript of Public Hearing
Conducted on February 11, 2020                    49

1    increasing, and the costs are mounting.

2            Decision making that is blind to

3    climate realities will make things worse.  By

4    ignoring the climate implications of projects and

5    decisions it proves the government will in fact

6    be tilting decisions in favor of harmful projects

7    that cannot withstand a climate review.  The

8    resulting increase in projects to pollute the

9    climate and exacerbate extreme weather puts far

10   more businesses at risk than it will help.  As

11   business leaders recognize, climate risk is

12   business risk.  By ignoring climate risks, the

13   government is also ignoring risks to business.

14           I will request to enter into the record

15   today's letter to the editor to the Baton Rouge

16   Advocate from a local business owner who points

17   to the impacts to his business regionally due to

18   the exclusion of the Deepwater Horizon from NEPA

19   review.  I have additional comments that I will

20   submit into the written record.  Good day.

21           MR. BOLING:  You too.  Deposit written

22   comments in the back of the room.  Thank you.

Transcript of Public Hearing
Conducted on February 11, 2020                    50

```
1    Okay.  Number seven is Stan Dempsey followed by

2    the great Benjamin Rhodd and, number nine, Lisa

3    DeVille.

4              MR. DEMPSEY:  Good morning.  My name is

5    Stan Dempsey.  My last name is spelled

6    D-E-M-P-S-E-Y.  I am the president of the

7    Colorado Mining Association.  I'm here today to

8    speak in favor of the Trump Administration's

9    proposal to comprehensively update its National

10   Environmental Policy Act regulations.

11             Let me begin by thanking the Council on

12   Environmental Quality for holding this public

13   hearing.  Today you will hear from a diverse

14   coalition of businesses, labor, transportation,

15   agricultural and mining groups all in favor of

16   this necessary proposal.

17             As you know, NEPA underwent its last

18   major update in 1978 and it's well past time for

19   a modernization of the law to help spur economic

20   development, innovation, and improved

21   environmental protections.  The Colorado Mining

22   Association supports the proposed rule that
```

Transcript of Public Hearing
Conducted on February 11, 2020                      51

1    would, as the head of the CEQ described in the

2    Grand Junction Sentinel over the weekend,

3    modernize NEPA regulations for the 21st Century

4    and make the process more timely, effective, and

5    predictable, set a two-year time limit for

6    completing environmental impact statements,

7    promotes better coordination and communication

8    between federal agencies, and that the proposal

9    expands public participation in the NEPA process

10   and includes provisions to ensure NEPA documents

11   are concise and clear and serve their purpose of

12   informing decision makers and the public

13   regarding the environmental review of proposed

14   major federal actions.

15          I believe former Secretary of the

16   Interior Gale Norton put it best when she said at

17   an event yesterday that it was the first time --

18   the first time she was involved in preparing and

19   environmental impact statement back in the 1980s

20   the final result was less than an inch thick.

21   Today when we work out environmental impact

22   statements we're talking about bookshelves.  The

Transcript of Public Hearing
Conducted on February 11, 2020                           52

1    analysis that's really important that gets to the

2    critical issues for making decisions doesn't have

3    to be encumbered by delay and papering of the

4    process in order to withstand litigation.

5              Secretary Norton is absolutely correct.

6    Our support of this proposal is to ensure that

7    the process is designed to work for everyone

8    involved.  We must address environmental

9    priorities while also making sure projects are

10   considered on a timely basis.  Thank you for your

11   time.

12             MR. BOLING:  Thank you.

13             Okay.  And the next speakers can come

14   sit up here in position ready to go.

15             MR. RHODD:  Good morning to you.  My

16   name is Ben Rhodd.  I am the THPO for the Rosebud

17   Sioux Tribe.  You spell my name R-H-O-D-D.  And

18   as the THPO I am responsible for the historic and

19   culturally attributable resources of the Si.há..u

20   Oyáte.  It means the burnt thigh people of the

21   northern plains.  And I am here to represent the

22   Northern Plains Native Peoples' interest and

Transcript of Public Hearing
Conducted on February 11, 2020                    53

1    concerns regarding the proposed rule changes to

2    NEPA.

3              As THPOs we have additional legacy of

4    mandates culturally, customarily that we must

5    adhere to beyond just the NEPA and/or NHPA.  As

6    such when we -- as we look to our historic and

7    heritage use of resources they are intrinsically

8    and intricately interwoven with the intangible

9    and tangible resources of our lands.  Therefore,

10   in these tangible resources they are the

11   collective commons of intergenerational

12   stewardship and/or of individuals.

13             The allied interests of the northern

14   groups of the northern plains foresee a return to

15   unmitigated rampant abuses of finite resources

16   such as water, forest and timber, subsurface or

17   surface minerals including but not limited to

18   coal, uranium, natural gas, rare minerals.

19   Unless there is an equitable standard of

20   determination of direct, indirect, and cumulative

21   effects then remediation and recovery of

22   landscapes will prove injurious to the

Transcript of Public Hearing
Conducted on February 11, 2020                    54

1    generations unborn.

2              Expedience and parlance, contrivance of

3    rulemaking are not truly an option here, but

4    should the rules be implemented they will set the

5    stage again for burning rivers, which I have in

6    my memory of watching, and undrinkable water as

7    history has shown to us before.

8              Currently on the upper plains, Great

9    Plains, we have 133 superfund sites.  Of those we

10   have five in South Dakota that are either

11   bordering, in proximity to, or being affected

12   cumulatively by actions of the past and they

13   border our reservations.

14             So, if we implement the rule changes we

15   will essentially become an area of national

16   sacrifice.  The proposed rule changes we consider

17   to be a direct effrontery to the sovereignty of

18   Native nations as no government-to-government

19   mandated consultation was conducted prior to

20   these changes being proposed.  The disregard for

21   trust relationship status between the federal

22   government and Native nations leaves the Native

Transcript of Public Hearing
Conducted on February 11, 2020                    55

1   Peoples' historic and present day estates in

2   jeopardy of eradication.

3           Broadly speaking, unifying consultation

4   geared toward environmental justice is urged at

5   this time and further hearing and testimony needs

6   to be instigated between the Native nations

7   leaderships and the CEQ.

8           I am making a submittal here today from

9   the Great Plains Tribal Chairmen's Association on

10  their behalf and they asked me to bring it to

11  this forum and they are asking for an additional

12  consultation beyond what will happen in D.C. on

13  February 25th.  It must be between the nations,

14  nation-to-nation.  But we are the stewards of

15  this land generationally and we will yet be here

16  in the future barring implementation of these

17  rules.  Thank you.

18          MR. BOLING:  Thank you, Mr. Rhodd.

19  Submit your statement and the records in the

20  back.  Thank you for your public service as a

21  THPO.

22          MS. DEVILLE:  Hello.  My name is Lisa

Transcript of Public Hearing
Conducted on February 11, 2020                                56

1    Deville.  I'm an enrolled member of the Mandan

2    Hidatsa and Arikara Nation, also known as the

3    Three Affiliated Tribes.  I'm a leader of the

4    grassroots groups Fort Berthold Protectors of

5    Water and Earth Rights and the North Dakota

6    Native Vote.  I live with my husband and five

7    children and five grandchildren.  I'm here today

8    because I oppose the proposed National

9    Environmental Policy Act rollbacks.

10           Native communities have very few

11   opportunities to voice our concern about major

12   projects such as drilling, highways, pipelines,

13   right-of-ways, and industrial waste sites in our

14   backyards, yet the Trump Administration is trying

15   to remove the few opportunities we do have by

16   gutting the NEPA.

17           I stand in strong opposition in the

18   proposed changes which will without a doubt add

19   poison to our air, dirty our water, and impact

20   our health for generations.  Gutting the 40 year

21   old NEPA regulations will result in less public

22   comment, companies writing their own

Transcript of Public Hearing
Conducted on February 11, 2020                    57

1    environmental reviews, and bulldozing burial

2    sites.  We cannot afford to lose our voice in

3    what happens on Fort Berthold and beyond.

4            For tribal communities like Fort

5    Berthold which share the brunt of health problems

6    such as heart disease and asthma from poorly

7    planned federal projects, NEPA's adjusted

8    environmental protection law is a critical tool

9    for ensuring our voice.  We cannot afford to lose

10   it.

11           Any law that provides broad

12   opportunities for public participation in

13   government decisions that affect the environment

14   and local communities shouldn't be rolled back.

15   Rather, laws like NEPA should be embraced and

16   strengthened.  NEPA is one of the only avenues

17   for tribal people to have any formal input on

18   federal actions.  Tribal communities need to

19   protect NEPA.

20           NEPA is the main law which gives

21   citizens on Fort Berthold protections from the

22   widespread negative impacts from energy

Transcript of Public Hearing
Conducted on February 11, 2020                           58

1    development.  This is because NEPA gives

2    communities like Fort Berthold a voice in a

3    decision-making process surrounding energy

4    development.

5              In addition to giving us a voice, NEPA

6    protects Indigenous and significant historical

7    and culture sites, burial sites, endangered

8    species, and water.  Our Indigenous beliefs are

9    unique.  That is, we came from Mother Earth.  Our

10   creation stories come from Mother Earth.  For

11   centuries our ancestors warned of environmental

12   genocides.  You destroy Mother Earth you destroy

13   yourself.

14             So, I wanted to end with a quote from

15   nepa.gov.  The ultimate goal of the NEPA process

16   is to foster excellent action that protects,

17   restores, enhances our environment.  This is

18   achieved through the utilization of environmental

19   assessments, environmental impact statements

20   which provides public officials the relevant

21   information and allow a hard look at potential

22   environmental consequences of proposed projects.

Transcript of Public Hearing
Conducted on February 11, 2020                    59

1           I also want to encourage United States

2    delegations to reconsider their public support

3    for the wholesale rollback of NEPA.  Thank you.

4           MR. BOLING:  Thank you, Ms. DeVille.

5    Our next speaker is Tracy Coppola and I'm afraid

6    I don't have written down the persons who

7    received numbers 11 or 12, but you can come up

8    and sit at the table if you care to speak.

9           MS. COPPOLA:  Hi.  My name is Tracy

10   Coppola.  That's C-O-P-P-O-L-A.  And I'm the

11   Colorado program manager for the National Parks

12   Conservation Association.

13          In 1916 Congress passed the Organic Act

14   which formally established the National Park

15   Service.  This foundational law recognized that

16   the scenery, wildlife, and cultural history

17   distinctive to the public lands of the U.S. are

18   worth preserving.  Moreover, that these lands and

19   resources should be managed in such a manner that

20   they will remained unimpaired for the enjoyment

21   of future generations.

22          While national parks had existed for

Transcript of Public Hearing
Conducted on February 11, 2020                     60

1   decades before the Organic Act, the passing of

2   that legislation codified the directive of the

3   National Park Service to always conserve and

4   protect our national and cultural resources with

5   an eye to the future.  This is the only federal

6   agency with such a unique and protective

7   directive.

8         For over 100 years the National Park

9   Service has upheld that mandate to the highest

10  degree possible whether navigating massive budget

11  shortfalls, recovering from devastating natural

12  disasters, or even combating encroaching invasive

13  species.  The Park Service has consistently

14  overcome obstacles to ensure that our iconic and

15  historic parks are a gift to the world in

16  perpetuity.

17        Yet the National Park Service has been

18  presented one of the gravest threats to upholding

19  its mission with the introduction of these

20  revisions to NEPA.  These changes undermine one

21  of the best federal planning processes utilized

22  by the Park Service and jeopardize the future of

Transcript of Public Hearing
Conducted on February 11, 2020                    61

1    our natural and cultural resources.

2            Comprehensive environmental analysis of

3    proposed federal actions through NEPA has given

4    the Park Service the tools it needs to look years

5    into the future while considering how a proposed

6    project will affect the surrounding landscape.

7    These planning tools allow our best federal

8    experts to consider how a site can be affected by

9    future changes to the land and, conversely, how a

10   site can change the future of a landscape and

11   resources for which it is a part.

12           If the proposed changes are implemented

13   any one of them could cripple the Park Service's

14   ability to fulfill its mandate under the Organic

15   Act to be habitually preparing for the future.

16   Altogether they forecast a future where our most

17   cherished public spaces are vulnerable to short-

18   sighted management.

19           I hope that the CEQ not only

20   reconsiders but can also answer how these

21   proposed changes could possibly bring the Park

22   Service any certainty about being able to uphold

Transcript of Public Hearing
Conducted on February 11, 2020                     62

1    its founding mission.  Thank you.  I'll submit my

2    comments.

3                MR. BOLING:  Thank you.

4                Okay.  Speaker 11, would you please

5    identify yourself?

6                MS. LACHELT:  Thank you.  My name is

7    Gwen Lachelt.  That's G-W-E-N L-A-C-H-E-L-T.  I

8    appreciate the opportunity to be here today.  I'm

9    a county commissioner and I'm here today

10   representing La Plata County, Colorado.

11               For 50 years NEPA has ensured that

12   local governments and the public have a say in

13   federal projects that directly affect our

14   constituents and communities.  It is in our best

15   interest to make sure that any proposals for

16   resource development or infrastructure projects

17   are done with due consideration of potential

18   environmental and public health impacts and with

19   the input of multiple stakeholders including

20   local governments and our constituents.

21               This proposal not only narrows the

22   scope of action to which NEPA applies and

Transcript of Public Hearing
Conducted on February 11, 2020                    63

1    restricts alternatives to proposed actions but

2    also it limits the opportunity for public

3    participation in the decision-making process.

4    The proposal imposes stricter time limits for

5    public input effectively lessening our ability to

6    meaningfully engage with federal agencies as they

7    make decisions that affect our lands, resources,

8    and services.

9              Additionally, the proposed revisions

10   would exclude climate change considerations on

11   federal projects.  Western communities are

12   disproportionately impacted by climate change.

13   Shorter winters, decreased snowpack, longer and

14   more severe wildfire seasons and drought are just

15   a few of the realities we're dealing with now

16   which have an effect on our outdoor recreation

17   and tourism industries, wildlife, agricultural,

18   public health, and all around quality of life.

19   It's more important than ever that we make

20   responsible decisions about the management and

21   use of our lands to mitigate and counteract the

22   impacts of climate change which aren't going away

Transcript of Public Hearing
Conducted on February 11, 2020                    64

1    anytime soon.

2              NEPA requires federal agencies to

3    consider the direct, indirect, and cumulative

4    impacts to our public health and environment

5    before decisions are made and keep local leaders

6    in the public informed and included throughout

7    the decision-making process.  These stipulations

8    are fundamental and ensure that decisions are

9    made as collaboratively and responsibility as

10   possible.

11             Our constituents expect and deserve

12   transparency and accountability.  NEPA's

13   implementation rules are critical to good

14   governments.  NEPA is not just a tool to reduce

15   impacts to the environment, it's a basic tool of

16   democracy.  CEQ's proposed rules would undercut

17   transparency and accountability increasing the

18   risk that federal agencies could steamroll local

19   communities with federal projects.

20             And I'll just wrap up.  We believe that

21   the National Environmental Policy Act is an

22   essential law that ensures transparency when

Transcript of Public Hearing
Conducted on February 11, 2020                    65

1    federal projects are proposed.  To roll it back

2    is to undermine the voice of the public at the

3    expense of our local economies, wildlife, habitat

4    and air and water quality.  NEPA is one of our

5    bedrock environmental laws and one of the first

6    laws to give our citizens a voice in federal

7    projects.  These proposed revisions take that

8    voice away.  Please keep this foundational law

9    intact.  Thank you.

10            MR. BOLING:  Thank you.

11            MR. TOOR:  Hello.  My name is Will

12   Toor, W-I-L-L T-O-O-R.  I'm the executive

13   director of the Colorado Energy Office and I'm

14   one of four state agency leaders who will be

15   speaking during the day including the executive

16   directors of our Department of Transportation and

17   Department of Natural Resources and the director

18   of Environmental Programs for the Department of

19   Public Health and Environment.

20            The reason we have so many senior

21   officials here is because of the state's deep

22   concern with the negative impacts on Colorado and

Transcript of Public Hearing
Conducted on February 11, 2020                          66

1    the national environment that we believe these

2    proposed rule changes would lead it.

3              Colorado is a state that is on the

4    front lines of climate change with impacts that

5    could dramatically affect public health, our

6    economy, our quality of life, and our natural

7    beauty.  Projected impacts include major threats

8    to our ski industry, our agricultural, the

9    snowpack that is crucial to our water supply,

10   many more days over 100 degree temperatures in

11   our population centers, greater risk of

12   catastrophic wildfires, and damage to our iconic

13   alpine environments.

14             That's why the Colorado legislature and

15   governor have adopted science-based emissions

16   targets designed to align our state with the

17   scale and peaks of emissions reductions that are

18   needed to mitigate the worst of these impacts.

19             And while we are working with

20   businesses and communities across the state to

21   reduce emissions while seizing the economic

22   benefits and consumer cost savings that come from

Transcript of Public Hearing
Conducted on February 11, 2020                                    67

1    expensive legacy fossil fuel power plants to

2    inexpensive zero emission renewables and

3    magnifying these benefits by accelerating the

4    transition to electrification of transportation

5    and buildings while also working to reduce

6    emissions of methane from oil and gas drilling in

7    the state, unfortunately the administration's

8    proposed changes to NEPA go in the opposite

9    direction by effectively removing any requirement

10   for federal agencies to consider the impacts of

11   their decisions on emissions of greenhouse gases.

12          The proposed changes would eliminate

13   the requirement to study indirect and cumulative

14   effects and directs that effects should not be

15   considered significant if they remote in time,

16   geographically remote, or the product of a

17   lengthy causal chain.  This language appears to

18   be surgically designed to eliminate consideration

19   of climate impacts since these are precisely

20   caused by the cumulative impact of emissions of

21   greenhouse gases.  Unlike other pollutants where

22   impacts are primarily local and vary depending on

Transcript of Public Hearing
Conducted on February 11, 2020                    68

1    ambient concentration, greenhouse gases are long-

2    lived and globally well mixed and what matters is

3    cumulative emissions.

4              In the Colorado context our agency is

5    particularly concerned about decisions the

6    federal government may make about energy and

7    transportation infrastructure or about fossil

8    fuel development on federal public lands in

9    Colorado that could undermine state policy goals

10   and harm the residents of Colorado.

11             There have been multiple court rulings

12   that have required federal agencies considering

13   new fossil fuel development in Colorado to

14   consider the impacts of their decisions on

15   climate change.  For example, there have been

16   cases involving federal approvals for expansion

17   of coal mines in which the courts have rejected

18   environmental analysis that did not consider the

19   social cost of greenhouse gas emissions from the

20   greater level of combustion of coal and did not

21   consider approaches to reducing emissions of

22   methane, a potent shorter lifetime greenhouse

Transcript of Public Hearing
Conducted on February 11, 2020                      69

1    gas.

2            This is very important to Colorado.

3    Last year our legislature adopted SB236 directing

4    the use of the full social cost of carbon for

5    regulatory purposes in multiple decisions and

6    other legislation requiring greenhouse gas

7    emissions reports for legislation that may impact

8    emissions.  Our state Air Quality Control

9    Commission has adopted multiple measures designed

10   to reduce methane emissions from oil and gas

11   operations and Senate Bill 181 requires a phase

12   in of continuous emissions monitoring to

13   facilitate further reductions.

14           Having major federal decisions go

15   forward that do not consider these issues is

16   incompatible with our state policy goals and will

17   put our residents at risk for greater harm to our

18   health, economy, quality of life and iconic

19   landscapes.

20           We urge the administration to

21   strengthen the analysis of cumulative and

22   indirect impacts and require greater attention to

Transcript of Public Hearing
Conducted on February 11, 2020                    70

1    the impacts of federal decisions on climate

2    change rather than the current proposal to

3    essentially eliminate all consideration of

4    climate impacts and decision making.  Thank you

5    very much.

6              MR. BOLING:  Thank you, Mr. Toor.  Our

7    last three speakers, I don't know the order in

8    which they were assigned the numbers, but Greg

9    Fulton, Daniel Tso, and Antha Williams.  I

10   apologize for the mispronunciation, if any.  If

11   you're in the audience would you please come

12   forward to speak and sit at the table.  If not,

13   some of you may have given a -- yes?

14             UNIDENTIFIED SPEAKER:  (Inaudible).

15             MR. BOLING:  Right.  If you've got 13,

16   14 or 15.  Okay.  Okay.  Go ahead.  State your

17   name for the record please.

18             MR. GIBBS:  Great.  Good morning.  My

19   name is Dan Gibbs, the executive director of the

20   Colorado Department of Natural Resources.  It's

21   really wonderful to follow Will Toor, fellow

22   cabinet member and a great champion for our

Transcript of Public Hearing
Conducted on February 11, 2020                    71

1    environment in Colorado.  Thanks Will for your

2    testimony.

3            I appreciate the opportunity to testify

4    today on the administration's proposed changes to

5    the National Environmental Policy Act or NEPA.

6    I'm concerned that a number of the modifications

7    proposed by CEQ will undermine fundamental

8    aspects of the law that have made it so

9    successful and result in significant native

10   impacts to our state's environment and

11   communities.

12           First, I'm concerned that the agency

13   proposes to remove the terms "indirect" and

14   "cumulative" in referring to the scope of

15   relevant environmental reviews under the

16   definition of effects in part 1508.

17           Second, I'm concerned about the

18   proposed modifications to Section 1502 which

19   impose time and page limitations on environmental

20   reviews.  In my experience the plans and

21   decisions we make as land and natural resource

22   managers are best informed when they consider a

Transcript of Public Hearing
Conducted on February 11, 2020                          72

1    great number of influences even if outside the

2    project's immediate scope.

3              By of illustration, Colorado's arid

4    forests and other ecosystems have evolved to

5    depend upon a healthy winter snowpack as a

6    reserve in the drier months.  The persistent

7    burning of fossil fuels both within and outside

8    our state has altered the climate and disrupted

9    this previously reliable seasonal cycle.

10             Climate change also impacts wildlife

11   habitat including big horn sheep, mule deer, elk,

12   and prong horn which migrate to lower elevations

13   to graze during the winter months.  These big

14   game are important to the ecosystems they inhabit

15   and to the communities whose local recreation

16   economies have grown upon them.

17             Nearly 68 percent of the lands in

18   Colorado are federal jurisdiction and provide

19   critical important wildlife habitat.  Wildlife

20   management can only be successful if land use

21   decision makers takes into account the long-term

22   effects of proposed activity such as logging,

Transcript of Public Hearing
Conducted on February 11, 2020                    73

1    drilling, mining, and even recreation in climate

2    change under the health of our forest and other

3    ecosystems.

4              Thanks to NEPA's current requirements

5    to examine how a project or plan could contribute

6    to environmental conditions outside of its

7    immediate scope the public and decision makers

8    can weigh the benefits of particular decisions

9    against their comprehensive long-term impacts.

10             Imposing time limitations on

11   environmental reviews under Section 1502, the

12   proposed changes would shift the public's role to

13   later stage and review process potentially

14   enforcing significant aspects of analysis to take

15   place outside the public view.  Likewise,

16   arbitrary page limitations could reduce more in-

17   depth analysis and review on the complicated

18   projects or initiatives.  For these reasons I do

19   not support the proposed document length or

20   decision time frame limitations on the

21   environmental assessments and environmental

22   impact statements.

Transcript of Public Hearing
Conducted on February 11, 2020                    74

1           Colorado's communities, ecosystems, and

2    wildlife have enormous stakes in decisions made

3    by federal agencies operating in our state.  I

4    urge the CEQ to uphold NEPA's fundamental tenants

5    and reject the sweeping changes put forth in the

6    current proposal.  Thank you.

7           MR. BOLING:  Thank you.  Number 14,

8    please state your name for the record.  Or 15.

9    Okay.  If we don't have 14 or 15 then we will go

10   to letter A on the waitlist.  The holder of

11   letter A come on down.  It's your lucky day.

12          MS. GOTTESMAN:  Good morning.  Good

13   morning everyone.  Thank you for the opportunity

14   to speak and for offering a waiting list for this

15   session.  My name is Jill Gottesman, J-I-L-L

16   G-O-T-T-E-S-M-A-N.  I work for the Wilderness

17   Society but I'm also coming here from the

18   southern Appalachian region.  I live in rural

19   western North Carolina and I'm very grateful for

20   the opportunity to speak for the southeast and

21   other rural regions of the country that are far

22   away, and folks were not able to be here today.

Transcript of Public Hearing
Conducted on February 11, 2020                    75

1          It's been very inspiring hearing the

2    stories of people who are able to speak about

3    what's happening in their backyards, to their

4    friends and neighbors, to the wildlife and the

5    water quality around them, and how wonderful it

6    is to be able to meaningfully participate in a

7    public process and to contribute local and long

8    rooted knowledge of what's happening in a place.

9          The southern Appalachians is a region

10   that's really blessed with endemic species,

11   biodiversity, outstanding water resources, and a

12   long and diverse human history in connection to

13   that place.  Personally, my relationship with

14   NEPA and being able to involve myself in projects

15   is with our local U.S. Forest Service and project

16   management decisions, land management decisions

17   on the ground.  We're seeing in our region words

18   like efficiency, streamlining, landscape scale

19   projects, and to me that's very worrying

20   especially coming from a place where we have tiny

21   pockets, we have microclimates, we have endemic

22   species, we have places where a CE could actually

Transcript of Public Hearing
Conducted on February 11, 2020                    76

1    affect multiple watersheds that may be hundreds

2    or thousands of acres in size.  And so, we're

3    feeling disproportionate impacts to these

4    proposed NEPA rule changes.

5            The proposed NEPA rulemaking will

6    affect 80 federal agencies, and while I do know

7    that there are knowledgeable professionals that

8    work across the country for federal agencies in

9    natural resources and land management planning,

10   we see a revolving door of these professionals.

11   We're not seeing that longstanding local embedded

12   knowledge of a place that can be represented by a

13   streamlined or an efficient process, and NEPA is

14   the way that we can get people on the ground who

15   can point out a tiny pocket of old-growth forest

16   that may be overlooked.  These are the people

17   that can talk about the watershed and the

18   direction of the water flow and who will really

19   be impacted by these decisions.  These are the

20   people that know the exact location of the

21   endemic plants and animals that could live in a

22   place that could be disproportionately affected

Transcript of Public Hearing
Conducted on February 11, 2020                    77

1    by a NEPA affected decision.

2           I do hope that these proposed changes

3    will be reconsidered by CEQ.  I hope that

4    projects can move forward with due consideration

5    of a full range of alternatives.  That's very

6    important for this process.

7           And I do want to react to something

8    that our first speaker said this morning, that it

9    may take longer to plan a project through the

10   NEPA process than it does to actually implement

11   it.  And I'd like to counter that by saying that

12   that doesn't mean that our system is broken.  It

13   means that we're practicing our democracy, that

14   we're carefully considering the environmental

15   impacts, we're considering our community impacts,

16   we're being inclusive, and these are land

17   management and infrastructure decisions that will

18   affect decades or centuries of the future of this

19   country and I think that this is time very well

20   spent.

21          This is not federal overreach of

22   authority by CEQ or our federal agencies.  This

Transcript of Public Hearing
Conducted on February 11, 2020                    78

1    is an obligation to follow through with

2    transparency, with public involvement, and the

3    analysis of a full range of alternatives.  These

4    proposed NEPA changes don't serve to improve this

5    process.  They'll limit the scope of our vision.

6    They'll disclude those with deep knowledge of

7    their own homelands and those who are the front

8    lines of seeing the impacts of climate change and

9    of past environmental actions in their own

10   hometowns.

11          So, I do hope that CEQ considers

12   embracing NEPA and utilizing it to its most

13   inclusive capacity.  So, thank you very much for

14   including my comments in the record.

15          MR. BOLING:  Thank you Ms. Gottesman.

16          We're scheduled now to take a break.

17   Maybe we'll resume at 10:35 and we'll need to

18   identify the first, second, and third speakers

19   for that time.

20          (Break.)

21          MR. BOLING:  Okay.  Folks, we'd like to

22   get back on the record and -- so of course we're

Transcript of Public Hearing
Conducted on February 11, 2020                    79

1    calling people in order and so I'm looking for a

2    person who has a pink card with the number 14 on

3    it.  Number 14.  Okay.  Do we have number 15?  15

4    going once, 15 going twice.  Do we have the

5    number 16.  Here we are.  But of course, it's

6    Katie Schroder.

7            MS. SCHRODER:  Good morning.  Is this

8    on?  Thank you.

9            MR. BOLING:  It's on now.

10           MS. SCHRODER:  Good morning.  My name

11   is Kathleen Schroder, K-A-T-H-L-E-E-N

12   S-C-H-R-O-D-E-R.  I'm an attorney here in Denver

13   and I offer these comments based on my personal

14   experience representing proponents of energy

15   projects on public lands.  In general, I applaud

16   the CEQ's efforts to update the NEPA regulations

17   which are more than 40 years old.  It's amazing

18   that so little has been done to modify these

19   regulations in the time they've been in effect.

20           CEQ cites an average of about four-and-

21   a-half years to complete an environmental impact

22   statement but EISs for energy projects often

Transcript of Public Hearing
Conducted on February 11, 2020                    80

1    exceed this time frame fairly dramatically.

2    They're more akin to federal highway projects.

3    They easily last six to eight years if not

4    longer.  And these long preparation times create

5    inefficiencies that do not inform public decision

6    -- or government decision making.

7              These inefficiencies include, first,

8    that environmental and regulatory conditions may

9    change.  For example, you may have an area where

10   the air quality designation will change during

11   the preparation of an EIS.  Sometimes technology

12   changes where an applicant's project proponent or

13   applicant's desired method of developing a

14   resource may change and therefore affect the

15   project that's being analyzed.  Sometimes market

16   conditions change where projects no longer become

17   viable.  And then finally the analysis itself can

18   be stale -- become stale and need to be updated.

19   All of these factors and changes do not actually

20   inform the decision making in the long-term.

21   They just generate uncertainty and expense for

22   project proponents.

Transcript of Public Hearing
Conducted on February 11, 2020                    81

1            Second, I support changes to recognize

2     the role of project proponents and particularly

3     those changes to -- the proposed changes that

4     recognize an applicant's purpose and need in

5     developing a project.  An applicant's purpose and

6     need is particularly important when a proponent

7     seeks an agency authorization to exercise a valid

8     existing right that they hold from the federal

9     government such as an oil and gas lease.

10           Currently, agencies often view an

11    applicant's purpose and need as subordinate to

12    the agency's purpose and need and they're not

13    always aligned, but an applicant's purpose and

14    need is particularly important because it shapes

15    the alternatives that the agency must analyze.  I

16    also support changes that explicitly recognize

17    that alternatives must be technically and

18    economically feasible.

19           Further -- thank you very much.

20           MR. BOLING:  Thank you.  And I have

21    next up Alma Sanchez.

22           MS. SANCHEZ:  My name is Alma Sanchez.

Transcript of Public Hearing
Conducted on February 11, 2020                          82

1    A-L-M-A, Sanchez, S-A-N-C-H-E-Z, and I am the

2    conservation coordinator for the Rocky Mountains

3    and Great Plains Program of Defenders of

4    Wildlife.  I'm a 28 year old Mexicana (inaudible)

5    who cares deeply about the environment, wildlife,

6    our nation's public lands and the health of all

7    of our communities.  While I am only 28 I am wise

8    enough to understand and old enough to have

9    witnessed that it is communities of color and

10   economically disadvantaged communities that

11   disproportionately are the victims of

12   environmental contamination and pollution.

13   Highways, refineries, power plants and toxic

14   waste are more likely to end up in my community.

15   Our children are more likely to have asthma.

16          NEPA is fundamental to protecting the

17   health and rights of minorities in marginalized

18   communities.  NEPA enforces the federal

19   government to daylight its actions along with an

20   accounting of the environmental effects.  It

21   gives the public a voice in the decision making.

22   That won't be the case under these proposed new

Transcript of Public Hearing
Conducted on February 11, 2020                                83

1    rules.  The government will not be obligated to

2    consider and disclose the full array of

3    environmental effects.  Worst still, especially

4    to my generation that has inherited the

5    consequences and burdens of climate change, the

6    government won't have to tell us how its actions

7    like leasing land for oil and gas development

8    will affect climate change.

9             This is unacceptable to me.  We all

10   have a right to know what the government is doing

11   and what the environmental fallout will be.  This

12   rulemaking is yet another gift to polluters and

13   yet another blow to a clean environment and

14   healthy communities.  The Trump Administration

15   must withdraw this harmful proposal and stop

16   harming communities like mine.  Thank you.

17            MR. BOLING:  Thank you.  I have next up

18   Mark Fix followed by Walter Deville and then 19

19   and then whoever has number 20.  You're welcome

20   to come sit up at the table here.

21            MR. FIX:  I'm Mark Fix.  That's F-I-X.

22   My address is 584 Tongue River Road, Miles City,

Transcript of Public Hearing
Conducted on February 11, 2020                    84

1    Montana.  I'm a rancher and irrigator on the

2    Tongue River in southeastern Montana.  I'm a

3    member of the Western Organization of Resource

4    Councils.

5              NEPA was passed in 1969 to ensure that

6    federal agency decision makers take environmental

7    factors into account when considering projects on

8    public lands.  NEPA is a process agencies use to

9    make decisions and to ensure that the public

10   benefits from a federal action outweigh their

11   environmental costs.  Equally important, NEPA

12   mandates that the public can be involved in this

13   process and agency decisions must consider the

14   public's substantive comments.

15             In the past 25 years I personally have

16   been involved in many of these NEPA processes for

17   many projects that would affect my family, my

18   ranch, and my economic livelihood.  Shortly after

19   moving to our ranch I discovered that there was a

20   proposed railroad, the Tongue River Railroad,

21   which would go from the Montana-Wyoming border to

22   Miles City and would cross three miles of our

Transcript of Public Hearing
Conducted on February 11, 2020                    85

1    ranch.  This proposed project would have had

2    irreparable consequences to the land and waters

3    that I rely on to raise my cattle and support my

4    family.

5            I discovered that the railroad had the

6    right of imminent domain meaning the company

7    could condemn my property to build this railroad

8    that would only haul coal from a proposed new

9    mine.  I participated in several scoping hearings

10   and commented on two draft environmental impact

11   statements for the Tongue River Railroad as well

12   as participating in Montana's state environmental

13   process for analyzing the consequences of the

14   proposed coal mine.  I submitted numerous

15   substantive comments, worked with others to

16   provide expert testimony on water quality, soils,

17   wildlife, and the agriculture economy of the

18   area.

19           This ill conceived proposed railroad

20   project finally ended when the proposed coal mine

21   south of my ranch on Otter Creek failed to

22   materialize.  The proposed mine was siting an

Transcript of Public Hearing
Conducted on February 11, 2020                           86

1    alluvial valley floor which state and federal law

2    prohibit from being disturbed due to significant

3    impacts to water quality.  Arch Coal, the company

4    that wanted to build the mine, went bankrupt and

5    gave up trying to develop the Otter Creek mine.

6             Thanks to NEPA landowners and

7    irrigators who live along the Tongue River are

8    safe from having the railroad condemn their

9    property.  However, if NEPA is changed the

10   railroads and coal companies could literally

11   force their way across our property and our

12   public lands and develop a railroad and a coal

13   mine that are not needed.

14            We must protect the land and water for

15   future generations.  Without NEPA there will be

16   little hope that citizens can protect the land

17   and water that we need to survive.  The blue

18   skies and clean water that we love in Montana

19   could be forfeited for big company greed and

20   profits.  We must protect the public's right to

21   have a say in what goes on in their neighborhood.

22            The changes proposed to the NEPA

Transcript of Public Hearing
Conducted on February 11, 2020                    87

1    process should be dismissed as they appear to be

2    designed to eliminate the public's involvement in

3    decisions that affect their lives.  It appears

4    that the new procedures would essentially make

5    NEPA a checkoff box that industry could use to

6    say they went through the process.  Thank you.

7             MR. BOLING:  Thank you, Mr. Fix.

8             Mr. Deville?

9             MR. DEVILLE:  Oh, yeah?

10            MR. BOLING:  Yeah.

11            MR. DEVILLE:  Good morning.  My name is

12   Walter Deville.  I'm an enrolled member of the

13   Three Affiliated Tribes known as Mandan, Hidatsa,

14   and Arikara Nation on Fort Berthold Reservation

15   in North Dakota.  I am also a member of a

16   grassroots group, Fort Berthold Power -- Fort

17   Berthold Protectors of Water and Earth Rights for

18   Fort Berthold Power.

19            I'm here today to oppose the proposed

20   NEPA rollback.  The Trump Administration changes

21   to NEPA is a sellout to corporate polluters at

22   the expense of me and my family clean air and

Transcript of Public Hearing
Conducted on February 11, 2020                    88

1    water and health.

2            We have been dealing with impact of oil

3    and gas since 2009.  We were not given the option

4    to decline the federal drilling program as tribal

5    citizens.  Now we have been surrounded by well

6    pads, flares, pipelines, venting, leaking methane

7    VOCs for more than two decades.

8            NEPA was passed by Congress in order to

9    give the public the right to know and comment on

10   how infrastructure projects may impact their

11   communities or how they are currently affecting

12   their lives.  NEPA is already failing tribal

13   communities like mine.  Making it weaker is a

14   breach of their trust responsibility to Native

15   People in this country.

16           Oil and gas development has changed how

17   we live, our lives day to day.  I'm an avid

18   hunter and fisherman and have spent days hunting

19   wild game for food source for my family.  NEPA is

20   one of the only laws allowing for public input in

21   decisions that affects the health and safety of

22   our home on the reservation and it should be

Transcript of Public Hearing
Conducted on February 11, 2020                    89

1    strengthened, not gutted.

2            The federal government has a duty to

3    uphold the trust responsibility to the people in

4    tribal nations.  Our government has abused the

5    trust of the Native People so many times that we

6    need federal protection in place to start

7    safeguarding our interests in air, water, land,

8    animals, and people.  NEPA is a law that can do

9    that as it is implemented now.

10           NEPA is our advocate to counter that

11   abuse by letting Mandan, Hidatsa, and Arikara

12   people have their voice in the decision-making

13   process surrounding energy development.  The

14   proposed gutting of NEPA is an effort to affront

15   to our environment, our way of life, and our

16   citizens, and our civil rights.

17           But I would like to end in a quote from

18   a Cree chief.  When the last tree is cut down,

19   the fish is eaten, the last stream is poisoned

20   you will realize that you cannot eat money.

21   Thank you.

22           MR. BOLING:  Thank you.

Transcript of Public Hearing
Conducted on February 11, 2020                    90

1            MS. GRANGER:  Good morning.  My name is

2    Lynn Grainger, L-Y-N-N G-R-A-N-G-E-R.  I'm the

3    executive director for API Colorado which is a

4    division of the American Petroleum Institute.  We

5    represent all facets of the oil and natural gas

6    industry in Colorado.  API and its member

7    companies are committed to ensuring a strong

8    viable oil and natural gas industry capable of

9    meeting our nation's energy needs in a safe and

10   environmentally responsible manner.

11           I am here this morning to testify in

12   support of CEQ's proposed rule.  We would like to

13   commend CEQ for its efforts to date on NEPA

14   reform which is long overdue and has been a major

15   priority for both democratic and republican

16   administrations.  In Colorado alone NEPA delays

17   and litigation have postponed a wide variety of

18   needed projects from highways to grazing to new

19   ski lifts and trails.  This in turn deprives

20   Coloradoans of new jobs, tax revenues, and public

21   services, and we are pleased to see that CEQ's

22   proposal tackles these challenges head on.

Transcript of Public Hearing
Conducted on February 11, 2020                91

1          We understand that there are many

2    misconceptions about the proposed rule, and I'd

3    like to take a moment to address those.  First,

4    we do not believe the proposed rule eliminates

5    requirements for agencies to consider greenhouse

6    gas emissions in permitting.  What the rule does

7    is provide a consistent standard across federal

8    agencies that the impact of each project should

9    be considered on a case-by-case basis which was

10   exactly the intent of NEPA when it was enacted 50

11   years ago.

12          The proposal eliminates the uncertainty

13   created by a handful of recent judicial decisions

14   including decisions affecting land use here in

15   Colorado which will further incentivize new

16   development and investment.  It will also

17   conserve taxpayer resources and focus NEPA

18   reviews on addressing the most significant

19   environmental impacts of individual projects.

20          Second, and as it relates specifically

21   to our industry, the proposed rule creates no new

22   exceptions for pipelines or other oil and gas

Transcript of Public Hearing
Conducted on February 11, 2020                    92

1    projects.  These will undergo the same kinds of

2    reviews they always have albeit with common sense

3    deadlines and page limits which we view and

4    others should view as good governance measures.

5            While the rule does permit agencies to

6    rely on categorical exclusions used by other

7    agencies, this is also a good governance measure.

8    It allows agencies to avoid having to reinvent

9    the wheel when another agency has already

10   conducted an analysis and typically gone through

11   a full public rulemaking process when it assessed

12   a similar project.

13           But NEPA is so much more than just our

14   industry.  These reforms are also needed to site

15   and construct more wind, solar, and other

16   renewable capacity on federal lands, built out

17   associated long-haul transmission lines and

18   battery storage facilities, and improve other no

19   and low carbon energy production including

20   hydropower and geothermal as well as natural gas

21   which is clean burning, uniquely able to ramp up

22   and down in response to renewable resources, and

Transcript of Public Hearing
Conducted on February 11, 2020                          93

1    best of all, abundantly and affordably produced

2    right here in Colorado.

3              We strongly urge CEQ to finalize this

4    rule as soon as possible and help put Coloradans

5    to work building our energy economy of the

6    future.  Thanks so much for the opportunity to

7    testify this morning.

8              MR. BOLING:  Thank you.

9              Okay.  So, I need number 21.  Number 22

10   and 23 are welcome to sit at the table on deck.

11             MR. LUNEAU:  Hello and thank you for

12   the opportunity to offer comment today.  My name

13   is Taylor Luneau and I'm the policy manager of

14   the American Alpine Club, a non-profit based in

15   Golden, Colorado with 25,000 members nationally.

16   Since our founding 1902 the American Alpine Club

17   has worked hard to protect cherished mountain

18   ecosystems and to share our passion for climbing

19   and outdoor recreation.  Alongside our partners

20   at the Outdoor Alliance, a coalition dedicated to

21   protecting public lands and waters for human-

22   powered recreation, we unite the voices of

Transcript of Public Hearing
Conducted on February 11, 2020                    94

1    outdoor enthusiasts to protect and restore

2    recreation landscapes across the country.

3           I'm here today to speak in opposition

4    to the Trump Administration and the Council for

5    Environmental Quality's proposed changes to the

6    regulations for implementing the National

7    Environmental Policy Act.

8           NEPA is an essential pathway for the

9    outdoor recreation community to engage in federal

10   actions that affect public lands and waters and

11   the proposed CEQ regulation changes would

12   adversely affect the outdoor communities ability

13   to do just that.

14          At its core NEPA mandates informed

15   decision making based on sound science and

16   requires that to the fullest extent possible all

17   agencies of the federal government take a hard

18   look at environmental consequences prior to

19   issuing a decision.  NEPA declares a broad

20   national commitment to protecting and promoting

21   environmental quality and the CEQ rules are

22   influential in shaping agency implementation of

Transcript of Public Hearing
Conducted on February 11, 2020                    95

1    the statute.

2              As climbers, skiers, mountain bikers,

3    and boaters we observe climate impacts firsthand

4    and are particularly concerned with a proposal to

5    eliminate the cumulative impacts analysis.  In a

6    time of climate crisis, the outdoor recreation

7    industry, which accounts for 2.2 percent of the

8    nation's GDP, cannot afford such a rollback in

9    environmental analysis.

10             Additionally, we are concerned by the

11   arbitrary deadlines and page limits for

12   environmental reviews.  While we are not adverse

13   to thinking creatively around increasing NEPA's

14   efficiency, we believe that science and the

15   complexity of the proposed action must dictate

16   the term of environmental review otherwise

17   important recreation destinations and the voice

18   of the outdoor community are at risk of being

19   left out of the analysis.

20             Among other items contained in this

21   proposal, we oppose the redefining of the

22   terminology "major federal action" as it will

Transcript of Public Hearing
Conducted on February 11, 2020                         96

1    limit the scope of NEPA and place the important

2    recreation destinations at risk of unreasonable

3    development, and we oppose the proposal to allow

4    industry to conduct their own environmental

5    reviews and to find the purpose and need of a

6    project which will introduce serious conflicts of

7    interest and biases when considering alternatives

8    to proposed actions.

9           While I understand the CEQ's wishes to

10   modernize the need for regulations and commend

11   the enhanced consultation and recognition of

12   tribal governments, this proposal has gone too

13   far.  I strongly encourage CEQ to protect the

14   National Environmental Policy Act and abandon the

15   proposal as issued.  Thank you.

16          MR. BOLING:  Thank you.  And Taylor,

17   could you just spell your name for the record?

18          MR. LUNEAU:  T-A-Y-L-O-R L-U-N-E-A-U.

19          MR. BOLING:  Thank you.  Okay.

20          MS. BRANSOM:  Good morning.  My name is

21   Sarah Bransom and that's Sarah with an H and

22   Bransom is spelled B-R-A-N-S-O-M.  I'm presenting

Transcript of Public Hearing
Conducted on February 11, 2020                    97

1    this testimony on behalf of the Coalition to

2    Protect America's National Parks.  Our group is

3    comprised of over 1700 members who have worked

4    for the National Park Service.  Collectively, we

5    represent more than 40,000 years of experience

6    managing and protecting America's most precious

7    and important natural historic resources.

8            I serve on the coalition's executive

9    council.  Prior to my retirement I served 32

10   years as a NEPA practitioner.  22 years of that

11   service was with the National Park Service.  I

12   managed countless highly controversial and

13   complex NEPA projects including the Yellowstone

14   Bison EIS, the removal of the Elwha dams at

15   Olympic, and the restoration of fisheries, native

16   fisheries in north Cascades.

17           Current NEPA procedures have long

18   provided a critical mechanism for ensuring that

19   the Park Service fulfills its mission to, quote,

20   "conserve parks unimpaired for the enjoyment of

21   future generations", unquote.  A key factor in

22   making good decisions that protect parks has been

Transcript of Public Hearing
Conducted on February 11, 2020                    98

1    strong citizen involvement.  The Act states,

2    quote, "Congress recognizes that each citizen has

3    a responsibility to contribute to the

4    preservation and enhancement of the environment".

5              There is nothing more critical than --

6    that is more central to a citizen's expression of

7    this responsibility than having the opportunity

8    to comment on proposed federal actions.  And

9    example of reducing or eliminating public

10   comments is the BLM's 2018 revised NEPA policies

11   to make public comment on EAs a "may do" rather

12   than a "shall do".  As a result, some BLM offices

13   have severely reduced or eliminated public

14   comment on oil and gas leasing near national

15   parks and the EAs give little to no consideration

16   to impacts on the adjacent parks.  We are

17   concerned that this will become the norm if the

18   proposed rule is implemented.

19             While there are arbitrary time and page

20   limits, we are concerned about the process to get

21   an extension.  It is troublesome that extensions

22   to time and page limits may only be granted by a

Transcript of Public Hearing
Conducted on February 11, 2020                    99

1    senior agency official at the assistant secretary

2    level equivalent or higher.  We can assume this

3    will be a political appointee which may

4    inevitably suggest motivations beyond the NEPA

5    process.

6             We will submit additional comments in

7    written form.  Thank you.

8             MR. BOLING:  Thank you.

9             MR. REED:  Good morning.  My name is

10   Matt Reed, R-E-E-D.  I grew up and work in rural

11   Gunnison County on Colorado's western slope.  I'm

12   here today to voice my opposition to your

13   proposed dismantling of NEPA.

14            Gunnison County, like much of Colorado,

15   is in transition.  The population is booming.

16   Coal is declining.  The climate is changing.  Old

17   jobs are transitioning out and new jobs and

18   technologies are emerging.  Over 80 percent of

19   Gunnison County consists of federal public lands.

20   These lands are the backbone of the community

21   providing jobs, clean water, recreation,

22   wildlife, and countless other benefits.

Transcript of Public Hearing
Conducted on February 11, 2020                    100

1              NEPA is the critical mechanism to

2    ensure that our community is able to plan for the

3    future.  NEPA fosters our consideration of

4    evolving pressures to local public lands and the

5    environment resulting in better informed decision

6    making and management of these shared public

7    resources.

8              There are many recent examples of NEPA

9    proving its value to our community.  NEPA has

10   ensured that proposed trail expansions at Signal

11   Peak don't decimate the threatened Gunnison sage

12   grouse.  NEPA is ensuring that a 15,000 acre

13   logging project in Taylor Park doesn't add over

14   100 miles of new road construction to a landscape

15   already struggling with travel management

16   problems.

17             NEPA ensures that big game populations

18   in our hunting economy are considered in

19   proposals for natural gas development in the

20   Upper North Fork.  NEPA ensured that skier

21   expansion at Crested Butte took into account

22   trout populations and impacts to fishing and our

Transcript of Public Hearing
Conducted on February 11, 2020                    101

1    angling economy, and on and on and on.

2            In Gunnison County, like in many rural

3    western counties with significant amounts of

4    federal lands, the public looks to NEPA,

5    participates in NEPA, and is thankful for NEPA.

6    We see NEPA as a roadmap to better decision

7    making for a shared public resource, not as a

8    roadblock.

9            CEQ's proposed rulemaking undercuts

10   this law just at the time when it is most

11   necessary.  Minimizing public review and input is

12   the exact opposite of what is needed for

13   communities working hard to balance population

14   growth, job diversification, climate change, and

15   the environment.

16           I care deeply about the future of

17   Gunnison County and its public lands.  As such, I

18   ask you to abandon your effort to dismantle the

19   law that helps our community to understand and

20   plan for the future.  Thank you.

21           MR. BOLING:  Thank you, sir.  Now we'll

22   receive numbers 24.  25 and 26, you're welcome to

Transcript of Public Hearing
Conducted on February 11, 2020                    102

1    sit at the table.

2          MS. WAGNER:  Good morning.  Thank you

3    for the opportunity to comment today on CEQ's

4    proposed changes to its NEPA regulations.  My

5    name is Esther Wagner.  I am vice president of

6    public lands at the Petroleum Association of

7    Wyoming.  My name is spelled E-S-T-H-E-R

8    W-A-G-N-E-R.  I advocate for the oil and gas

9    industry primarily on public lands and wildlife

10   issues and I reside in Casper, Wyoming.

11         PAW is the voice of Wyoming's oil and

12   gas industry which is the state's primary

13   economic driver.  Collectively, our members

14   produce over 90 percent of the state's oil and

15   gas, generate more than $5 billion in economic

16   activity, and directly employ more than 18,000 of

17   Wyoming's hardworking men and women.

18         PAW supports the National Environmental

19   Policy Act and the important analysis and

20   disclosure elements of this history environmental

21   law.  We also strongly support the changes

22   outlined in the draft rules issued on January

Transcript of Public Hearing
Conducted on February 11, 2020                              103

```
1    10th of this year.
2              Over the last 15 years large scale NEPA
3    analyses for energy products have become ever
4    more complicated, costly, and difficult to
5    complete.  In fact, the time to complete the NEPA
6    process can outlast a project's initial purpose
7    and economic viability.
8              Natural gas projects have been
9    withdrawn in Wyoming because it's taking too long
10   to work through the NEPA process.  The Moxa Arch
11   Infill and LaBarge Platform projects are a couple
12   of examples of this.  Additionally, the
13   Continental Divide Creston Infill Natural Gas
14   project in south central Wyoming took nearly 10
15   years to complete.  The NPL Natural Gas
16   Development project in southwest Wyoming took
17   over seven years to complete.
18              The NEPA process for these projects
19   took so long that it resulted in an exponential
20   loss of capital investment, much needed jobs and
21   tax revenue to the state and the federal
22   government.  Had these projects been approved
```

Transcript of Public Hearing
Conducted on February 11, 2020                    104

1    within two to three years they would have been

2    approved during a higher price environment and

3    the market loss we are now realizing would not

4    have been as severe.

5             We are currently awaiting approval of

6    the Converse County Oil and Gas project which is

7    an important project to the oil and gas industry

8    and the state of Wyoming.  The NEPA process is

9    nearing completion and will have taken over six

10   years and $3.5 million to complete as long as the

11   record of decision is issued later this summer as

12   expected.

13            Oil and gas projects in Wyoming are

14   incredibly important for the state particularly

15   since nearly 70 percent of Wyoming's education

16   funding comes from oil and gas taxes.  Oil and

17   gas projects provide energy for the country, a

18   way of life for thousands of Americans, and a

19   means of education for Wyoming's children.  In

20   other words, these proposed rules are not just

21   esoteric concepts within a code of federal

22   regulations but the means by which the economy of

Transcript of Public Hearing
Conducted on February 11, 2020                    105

1    the west is often grounded.  Thank you.

2              MR. BOLING:  Thank you.

3              MR. WOLF:  Good morning.  Tim Wolf is

4    my name.  I'm just a plumber that takes a great

5    interest in our environment, our wildlife, and

6    just the way things should be.  I thank the NEPA

7    people for showing up here and I agree some

8    changes should be made, but are they the right

9    changes?

10             And I'd like to start with a little

11   quote by Teddy Roosevelt in honor of our wildlife

12   and conservation and it states, "We have fallen

13   heirs to the most glorious heritage a people have

14   ever received.  Each one of us must do his part

15   if we wish to show that the nation is worthy of

16   its good fortune."  Teddy Roosevelt did a lot of

17   good things for us.  He enabled conservation, he

18   enabled hunting, and left us heirs to a great

19   nation in that respect.

20             I'm here on behalf of the Vail Valley

21   that is opposing a development called Berlaimont

22   north of Edwards.  It's an inholding of 680

Transcript of Public Hearing
Conducted on February 11, 2020                    106

1    acres.  The developer is asking to have the

2    Forest Service allow them to build a two-lane

3    paved highway to service 19 luxury mansion home

4    sites.

5            The problem with this is it will go

6    straight through critical deer and elk habitat

7    for their winter survival.  Not to the side of

8    it, right through the middle of it.  It's

9    deplorable.  It's disgusting.  There's outrage

10   within our community over this.

11           The developer has come up with a phrase

12   out of the (inaudible) law stating reasonable

13   use.  We're left with the feeling that the Forest

14   Service has no moral conscious.  They're citing

15   one little law that they may have to go with.  To

16   hell with the elk.  To hell with the environment.

17   And thank God for NEPA that they have to go

18   through all of the environmental impact statement

19   stuff.  And there's been huge pressure with the

20   community on the Forest Service.

21           We don't want that taken away.  We have

22   a voice.  The animals have a voice through us.

Transcript of Public Hearing
Conducted on February 11, 2020                    107

1    If some of these things are changed then we do

2    not have the opportunity to speak as we are today

3    to speak to you folks about this stuff.  What

4    direction will it go?  Is it the right move just

5    to perpetuate a nation that may be the demise in

6    the end?

7              You know, our foundation was our

8    environment, our conservation, our wildlife.  Do

9    we want to give that up for prosperity?  Are

10   there other avenues to prosper with?  Of course,

11   there are.  Let's put it together.  We're smarter

12   than that that we have to gut our nation over

13   that.

14             Anyway, thank you for the opportunity.

15   I have a truck across the street with some signs

16   on it.  Stop by and check it out.  Maybe sign our

17   petition.  That would be great.  Thank you.

18             MR. BOLING:  Thank you.  Numbers 27,

19   28, and 29.  You can move up front.  Please, go

20   ahead.

21             MR. PARKS:  Good morning.  My name is

22   Tripp Parks, T-R-I-P-P P-A-R-K-S.  I am a vice

Transcript of Public Hearing
Conducted on February 11, 2020                           108

1    president at Western Energy Alliance.  Alliance

2    members engage in environmentally responsible oil

3    and natural gas development here in the west.

4           Of course, given the predominance of

5    federal landownership in the west most, if not

6    all, oil and gas projects require federal

7    approvals.  Through the NEPA process companies

8    work with federal agencies to document the

9    environmental impacts of those projects and we

10   support the goals of NEPA as intended.  We also

11   strongly support the revisions proposed by CEQ

12   and urge CEQ to finalize those.

13          NEPA analyses as currently conducted

14   take years, if not more than a decade, to

15   complete.  This as been spoken earlier today can

16   result in projects either not going through

17   because the cost associated with the NEPA process

18   are too expensive, or just the length of time

19   that is required to complete the NEPA process,

20   companies move on.  We've also heard about how

21   technology changes over the length of a NEPA

22   analysis and the economy and the price

Transcript of Public Hearing
Conducted on February 11, 2020                    109

1    environment changes can result in companies

2    moving on from a federal project.

3            NEPA was intended to inform decision

4    makers about the environmental impacts of the

5    project but too often is used by groups who are

6    totally opposed to projects going forward at all.

7    They use the process either through NEPA itself

8    or through the court system by suing on NEPA

9    documents.  They use that process to delay or

10   cancel a project.  The benefits of that project

11   then don't go forward.  The local communities who

12   would benefit from the project don't receive the

13   economic benefits and the country does not

14   receive the oil and gas that would have been

15   developed under those NEPA projects.

16           We support the proposals to limit the

17   time frames associated with NEPA analyses and the

18   scope of those decision documents to only those

19   impacts that are foreseeable and that are

20   directly related to the proposed projects.

21   Analyses that are too speculative in nature, that

22   look too far into the future, or impacts that are

Transcript of Public Hearing
Conducted on February 11, 2020                    110

1    beyond the scope of the federal agency's

2    decision-making ability simply end up being

3    challenged in court for being too speculative.

4            There is an ever growing movement to do

5    more finely tuned analysis that is once again

6    very speculative in nature and does not actually

7    inform the decision makers of the true

8    environmental impacts and inform them of whether

9    a project should proceed.

10           Once again, we strongly support the

11   proposed provisions and we urge CEQ to finalize

12   them as soon as possible.  Thank you.

13           MR. BOLING:  Thank you.  Go ahead.

14   Next.

15           MR. BYK:  Hello.  I'm Jacob Byk,

16   J-A-C-O-B B-Y-K, and I'm a resident of Denver,

17   Colorado.  On the morning of my 27th birthday I

18   woke up to a chilly sunrise at 12,000 feet in one

19   of Colorado's many spectacular wilderness areas.

20   I left my tent and walked down to a naturally

21   flowing freezing creek and splashed mountain

22   water on my toes.

Transcript of Public Hearing
Conducted on February 11, 2020                    111

1          Later in the day I saw an endangered

2    species that was only recently discovered, the

3    Uncompahgre butterfly.  I watched clouds shroud

4    peaks from the north and ran through snow fields

5    which still exist in July here to the protection

6    of my tent.  I listened to the sound of rain

7    pound the ground and rejoiced when it stopped,

8    sunning myself like a lizard.  I will hold onto

9    these memories for the rest of my life.

10          I am here today to stand up for what

11   has stood up for me countless times.  I am here

12   today to ask that you not significantly weaken

13   the National Environmental Policy Act.  As an

14   avid hiker, climber, runner, and lover of natural

15   places this country has to offer, I employ you to

16   think of the vital pull public participation

17   plays in making sure the government considers

18   potential impacts to these pristine areas.

19          Public participation under NEPA allows

20   me to comment on potential impacts to the stream

21   that I drink from, the trail that I run, or the

22   route that I follow to the summit of my

Transcript of Public Hearing
Conducted on February 11, 2020                    112

1    mountains.  NEPA allows me to have a voice in

2    decisions made about my and our public lands.

3           Under the NEPA revisions being proposed

4    here today my voice will be diminished.  The full

5    power and insight and intimate knowledge of my

6    lands will not be recognized.  As a recreational

7    hiker and climber, I spend a lot of times

8    outdoors.  I have hiked and climbed in almost

9    national forest in Colorado.  I have pitched

10   tents on Bureau of Land Management land across

11   the country and the state.

12          I truly believe that one of the things

13   that makes me an American is my chance to

14   participate in government decision-making

15   process, and further, it's my chance to better my

16   community through direct democracy.  NEPA

17   represents the clearest way for me to do this for

18   the things I care about most which is my public

19   lands.

20          I am testifying here today to ask you

21   not to silence me.  Do not allow the

22   administration to take or mute my voice.  Without

Transcript of Public Hearing
Conducted on February 11, 2020                    113

1    public oversight communities and individuals

2    impacted by government decisions that harm the

3    environment have the potential to lose their

4    voice.  Thank you.

5              MR. BOLING:  Thank you.  Number 28 go

6    ahead.

7              MS. HOUSTON:  Good morning.  My name is

8    Liz Houston, H-O-U-S-T-O-N, and I work for the

9    National Wildlife Federation.  I'm here today

10   representing a program called ECHO or Early

11   Childhood Health Outdoors.  Our vision is that

12   every young child experiences nature on a daily

13   basis.  We do this for the health of our kids,

14   our communities, and our planet.  Our team works

15   with childcare centers, preschools, family

16   childcare homes, parks, library systems, and

17   other entities to improve and activate their

18   outdoor spaces to benefit the health and well-

19   being of young children.

20             I have come here today to express our

21   organizations grave concerns about the proposed

22   changes to NEPA and the implications these

Transcript of Public Hearing
Conducted on February 11, 2020                                    114

1    changes may have for future generations of

2    Americans.  A central tenant of NEPA is the

3    obligation of this nation and this government to

4    consider future generations in its decision-

5    making processes.  These proposed changes ignore

6    this fundamental duty.

7              Our children must have clean air and

8    clean water in order to live, grow, learn, and

9    thrive.  This proposal may deny our children this

10   fundamental right.  The proposal as written

11   drastically reduces the impacts the government

12   must analyze when undertaking a major federal

13   action, exempts projects from NEPA review that

14   may have significant environmental impacts and

15   limits the government's obligation to listen to

16   and respond to the public.  As a result of these

17   changes agencies will be able to overlook the

18   impacts that certain projects will have on the

19   environment including air, water, and climate.

20             In the NEPA statute Congress clearly

21   states that it is the goal of this nation, quote,

22   "to fulfill the responsibilities of each

Transcript of Public Hearing
Conducted on February 11, 2020                    115

1    generation as trustee of the environment for

2    succeeding generations".  The proposed changes

3    focus only on benefiting those currently in

4    power, failing totally to recognize their

5    obligation as trustees for future citizens who

6    will follow them.

7              I am here today because I know that

8    children, especially young children, and their

9    families need access to healthy, dynamic nature-

10   based playgrounds, parks, and other outdoor

11   spaces in order to learn, grow, and thrive.

12   Research shows that when young children have

13   access to healthy, natural outdoor spaces they

14   and their caregivers spend and enjoy much more

15   time outside.

16             Children in nature behave in ways that

17   make them stronger and more physically active,

18   improve their cognition, and teach them social

19   and emotional skills.  Time spent outside

20   engaging with nature helps children explore,

21   learn, and be creative.  It can also reduce

22   stress and challenging behaviors, and it helps

Transcript of Public Hearing
Conducted on February 11, 2020                    116

1    them sleep better.

2                Clean healthy outdoor spaces that every

3    child and every family need are threatened by the

4    changes in this proposal.  I ask that you reject

5    these changes because they will put our

6    communities and our children at risk.  Thank you.

7                MR. BOLING:  Thank you.  Next up is

8    number 29, and numbers 30, 31, you can come on

9    up.

10               MS. ANDERSON:  Good afternoon.  My name

11   is Laurie Anderson.  It's L-A-U-R-I-E

12   A-N-D-E-R-S-O-N.  I live in Broomfield, Colorado

13   and I am a mom of five school age kids and a

14   Colorado field consultant for Moms Clean Air

15   Force.  Our mission is to protect children from

16   air pollution and climate change, and we envision

17   a safe stable future where all children breathe

18   clean air.  I oppose the proposed rollbacks to

19   the National Environmental Policy Act.

20               Our families rely on NEPA to ensure

21   major projects do not have significant

22   environmental, economic, social, or adverse

Transcript of Public Hearing
Conducted on February 11, 2020                    117

1   health impacts on our communities.  Rolling back

2   NEPA rules would make it easier for polluting

3   projects to get the green light regardless of the

4   impact they may have on the air our children

5   breathe or the climate impacts our children will

6   inherit.

7            As parents we deserve to know the

8   impacts of proposed projects to our children's

9   health, our communities, and the climate.  These

10  federal projects should not be rushed through to

11  meet an arbitrary deadline that benefits

12  industry.

13           In addition, NEPA is an important law

14  that provides local communities the ability to

15  weigh in on federal projects impacting their

16  health and safety while giving the affected

17  community the opportunity to offer alternatives.

18  It is crucial that we have a voice in the review

19  process.

20           Communities like mine are already

21  burdened by the proliferation of oil and gas

22  wells and the supporting infrastructure.  This

Transcript of Public Hearing
Conducted on February 11, 2020                                118

1    has taken a toll on our community with 24/7 large

2    scale industrial operations that have resulted in

3    increased emissions of toxic chemicals, loud

4    noise that disrupts sleep, and heavy truck

5    traffic on our residential roads.

6              It is crucial that NEPA takes into

7    account the cumulative, direct, and indirect

8    impacts that federal projects could have on our

9    communities.  After all, is it our communities

10   that will pay the price with our health.  We are

11   facing a climate crisis and seen the negative

12   impacts of climate change here in Colorado.

13   Decreasing air quality including serious

14   nonattainment for ground level ozone which

15   impacts our public health.  Snowpack is melting

16   sooner and more quickly.  Erratic weather is

17   becoming more common.  And wildfires are igniting

18   with greater frequency and burning more acreage.

19   With over 100 ozone action alert days last year

20   it has become necessary to keep my children

21   indoors on an otherwise beautiful day.

22              Now is no time to remove key

Transcript of Public Hearing
Conducted on February 11, 2020                    119

1    considerations around pollution and environmental

2    impacts from proposed infrastructure projects.

3    These rules have served to help protect our

4    children for the last 50 years and was created

5    originally with bipartisan support.  We cannot

6    abandon them now when our children need them the

7    most.  Please withdraw the proposal to rollback

8    NEPA and commit to protecting America's children

9    from dangerous pollution.  Our children are

10   counting on you.  Thank you for the opportunity

11   to testify.

12           MR. BOLING:  Thank you.  Number 30.

13   All right.  All right.  This doesn't count

14   against your time.

15           MS. MIDDLETON:  Thank you.

16           MR. BOLING:  Sorry.

17           MS. MIDDLETON:  Good morning.  My name

18   is Joeana Middleton, District Director for

19   Congresswoman Diana Degette.  The spelling is

20   J-O-E-A-N-A, Middleton is M-I-D-D-L-E-T-O-N.

21           I'm happy to be with you today and so

22   many constituents and concerned citizens from

Transcript of Public Hearing
Conducted on February 11, 2020                                120

1   across the west.  In January Congresswoman

2   Degette led a bipartisan letter signed by 140

3   members of Congress opposing the proposed changes

4   to the National Environmental Policy Act or NEPA.

5   Today I am here on her behalf to once again

6   express alarm over the proposed changes which

7   limit environmental reviews of federally

8   permitted infrastructure projects and do not

9   require agencies to consider cumulative

10  environmental impacts.

11         NEPA, which was passed on an

12  overwhelmingly bipartisan basis, has often been

13  referred to as the Magna Carta of environmental

14  policy.  Critically, NEPA is one of the only

15  statutes that empowers the public to challenge

16  proposed federal actions.  As climate change

17  continues to threaten our communities it is

18  especially important for the public to have a say

19  in proposed federal actions that may be based on

20  inadequate or wrong information, or that skirt

21  the government's legal obligations to is people.

22         One of the most dangerous aspects of

Transcript of Public Hearing
Conducted on February 11, 2020                    121

1    these proposed revisions to NEPA is the removal

2    of the requirement that agencies analyze

3    cumulative impacts.  The new guidance specifies

4    that agencies are only required to analyze the

5    immediate local and direct impacts of their

6    actions.  This effectively removes any analysis

7    of climate impacts.

8             Our climate system is deeply

9    interconnected.  None of our actions happen in a

10   vacuum.  Climate change in all of its

11   complexities is exactly the kind of environmental

12   problem NEPA is intended to address.  Turning a

13   blind eye towards climate change at this point is

14   exactly the wrong direction for federal policy to

15   take.

16            There are billions of dollars in damage

17   already being inflicted on our homes, businesses,

18   and infrastructure from storms, floods, and

19   wildfires.  We are experiencing serious health

20   impacts from increased heat waves, pollution, and

21   disease vectors.  Threats to our national

22   security are already been amplified by climate

Transcript of Public Hearing
Conducted on February 11, 2020                    122

1    impacts in other countries.

2            Now is not the time to stick our heads

3    in the sand and abandon any recognition of the

4    threat of climate change.  Climate change is a

5    serious concern that falls squarely within the

6    requirements that NEPA sets out which asks us to

7    consider our larger environmental impacts.  Now

8    more than ever we must hold ourselves to those

9    forward thinking standards.

10           Congresswoman Degette opposes this

11   administration's misguided efforts to overhaul

12   NEPA which will hurt communities like ours in the

13   name of a climate first, excuse me, energy first,

14   climate last agenda.  Thank you.

15           MR. BOLING:  Thank you.  Number 31 will

16   be followed by 32 and 33.  You can come on up.

17           MR. CARPENTER:  My name is Lew

18   Carpenter, L-E-W C-A-R-P-E-N-T-E-R.  Thank you

19   for allowing this testimony.  I'm a Colorado

20   native born and raised in Greeley, Colorado.  I'm

21   a hunter and angler, a kayaker, and a

22   conservationist, and for most of my career I

Transcript of Public Hearing
Conducted on February 11, 2020                    123

1    worked as an outdoor writer and editor of hunting

2    and fishing publications.  The work allowed me to

3    dive deeply into the outdoor opportunities our

4    country provides from Alaska to Arizona, Michigan

5    to Louisiana, but it all started here in

6    Colorado.

7            I own a family cabin my father built in

8    1959 near a place called Eleven Mile Canyon

9    through which the South Platte River flows, and I

10   think it's one of the prettiest places on earth.

11   Abundant in trout, deer, and other wildlife

12   between its high walls of granite, and I think

13   you guys should visit sometime.

14           Eleven Mile is in the South Park area

15   of Colorado where the headwaters of the South

16   Platte gather before making the long journey to

17   the Platte River in Nebraska and then onto the

18   Missouri and Mississippi Rivers before dumping

19   into the Gulf of Mexico.  South Park offers some

20   of the best hunting and fishing in the country

21   and is part of a sporting environment critical to

22   western culture, values, and economy.

Transcript of Public Hearing
Conducted on February 11, 2020                    124

1            The National Environmental Policy Act

2      has allowed local voices influence on our land

3      and waters as well as the land and waters

4      downstream impacted by our use.  In South Park

5      through NEPA community members were able to come

6      together to tell the Department of the Interior

7      to craft a better master plan for the area so it

8      wouldn't get destroyed by oil and gas leasing.

9            From states, tribes, and private

10     property owners to businesses, groups,

11     scientists, and sportsmen like me NEPA provides

12     the kind of voice this nation was built upon,

13     transparent decision making, and real evaluation

14     of impacts locally and downstream.  NEPA requires

15     federal agencies to take a hard look at the

16     environmental and public health impacts of major

17     projects and actions and consider input from the

18     public before it proceeds.

19            The current proposal, as I understand,

20     will eliminate the requirement to rigorously

21     explore and objectively evaluate all reasonable

22     alternatives.  This undermines NEPA's fundamental

Transcript of Public Hearing
Conducted on February 11, 2020                    125

1    purpose of exploring less environmentally

2    damaging approaches to achieving the project's

3    outcome.  It also creates loopholes that could

4    allow federal agencies to ignore public comment.

5    NEPA is the only law that gives the public a

6    voice in federal decision making so any attempt

7    to limit public comment silences communities that

8    could be harmed the most by federal actions.

9           The proposal would allow agencies to

10   ignore comments that are not specific to the

11   project at hand or timely.  The proposal also

12   places the burden on the public to list and all

13   possible impacts of a proposed project and it

14   creates a number of requirements that would make

15   it much harder to challenge a flawed

16   environmental review.

17          NEPA was the first major environmental

18   law in the United States and one that has served

19   America well.  Much of the beauty we enjoy in

20   this country has been served by the tenants of

21   NEPA and the democratic public participation the

22   Act requires.  My biggest fear is that something

Transcript of Public Hearing
Conducted on February 11, 2020                    126

1    will happen to Eleven Mile Canyon and places like

2    it from an unknown industry driven action I had

3    no opportunity to comment on that would have a

4    direct impact on this beautiful area and the

5    robust wildlife that helps define who we are as

6    Coloradoans.  The dangers and risks to the places

7    I love and have yet to love land squarely on

8    strong laws like NEPA and the powerful actions of

9    this council.  Thank you for your time.

10           MR. BOLING:  Thank you.

11           MR. MANCIAS:  Good morning.

12   (Inaudible).  My name is Juan Benito Mancias,

13   J-U-A-N, B, and then Mancias, M-A-N-C-I-A-S, and

14   I am the head man for the Carrizo/Comecrudo Tribe

15   of Texas.  I'm here because I'm concerned about

16   the blankets that are being handed out that are

17   infected with smallpox.  And the reason I say

18   that is because every one of the things when you

19   try to ban or lift a ban on crude oil, you know,

20   that affects everyone in what is happening with

21   our nation and our tribal people in Texas.

22           When you want to put up three LNGs and

Transcript of Public Hearing
Conducted on February 11, 2020                                    127

1    the EISs are ignored, I don't think you need to

2    do away or weaken NEPA.  You need to strengthen

3    it to make sure that people realize that you are

4    committing genocide and ethnic cleansing by

5    taking away the identities of the people and not

6    recognizing the fact that a national registered

7    historic site called Garcia Pasture has over 200

8    sites in the area where they're proposing these

9    things.

10            And I suggest that you visit, you know,

11   Padre Island and Port Isabel before it gets

12   ruined because it's pristine area and it's

13   affecting a lot of the things that are there.

14   Some of the plants that are there are being

15   affected with the need to build these LNGs in the

16   area which are not necessarily going to be

17   effective to anybody but more infective to

18   everything that's there.

19            And we are talking about future

20   generations.  In an administration that's

21   concerned about, you know, the abortion acts and

22   future generations are being killed before they

Transcript of Public Hearing
Conducted on February 11, 2020                    128

1    even come here because of all the benzine and

2    stuff that's being put into the air, we're

3    concerned about it.  We're concerned for our

4    tribal children and their children and their

5    grandchildren.

6              So, I say it the best way I can tell

7    you because that's what you're handing out to

8    every citizen of this country is an infected

9    blanket of a lot of sickness.  Thank you.

10             MR. BOLING:  Thank you.  Number 33.

11   Numbers 34 and 35, you can come up to the table.

12             MS. KURTH:  Hello.  My name is Andrea

13   Kurth, A-N-D-R-E-A K-U-R-T-H, and I'm from

14   Leadville, Colorado.  I'm here representing the

15   Continental Divide Trail Coalition, a non-profit

16   organization working to complete, promote, and

17   protect the congressionally designated

18   Continental Divide Trail.  Thank you for this

19   opportunity to offer comment.  I'm here today to

20   speak out in opposition to the CEQ's proposed

21   changes to the National Environmental Policy Act.

22             As a critical environmental and Civil

Transcript of Public Hearing
Conducted on February 11, 2020                    129

1    Rights law NEPA outlines a process that ensures

2    that the impacts of proposed federal actions are

3    thoroughly analyzed, fully disclosed for public

4    comment, and appropriately addressed prior to

5    these actions.

6              As the only law that provides local

7    communities the opportunity to comment on major

8    federal projects, NEPA is the principle vehicle

9    for public input, protecting communities from

10   rushed or poorly planned projects that will

11   affect them for generations to come.

12             Many federal projects have wide-ranging

13   impacts that one person or even an entire

14   planning team simply couldn't predict making

15   public input vital to ensure that unintended

16   consequences don't harm wildlife, neighborhoods,

17   or even entire communities.

18             For example, the U.S. Air Force is

19   currently using NEPA to investigate the impacts

20   of expanding the air space used for tests out of

21   Holloman Air Force Base in southern New Mexico.

22   A government planner may not immediately consider

Transcript of Public Hearing
Conducted on February 11, 2020                     130

1    the potential impacts to a trail several hundred

2    miles away from the base, however the

3    alternatives proposed during the NEPA process

4    could negatively impact the Continental Divide

5    Trail and the Gila wilderness by disturbing

6    wildlife and altering the scenic qualities of

7    this remote section of trail thus producing

8    unintended negative consequences on the people of

9    Silver City who depend on these resources to

10   support their local economy through a burgeoning

11   outdoor recreation industry.

12            Under current NEPA regulations the

13   people of Silver City had ample time to share

14   their concerns with the Air Force.  The proposed

15   limitations on public comments would severely

16   diminish the involvement of communities like

17   Silver City and would restrict the federal

18   government's ability to consider consequences

19   like the impacts to the Continental Divide Trail,

20   impacts that a government planner may not have

21   foreseen, but a resident of Silver City easily

22   could.

Transcript of Public Hearing
Conducted on February 11, 2020                    131

1           Proposed time limits would fail to

2    ensure the execution of thorough environmental

3    analysis by limiting federal agencies abilities

4    to fully investigate a myriad of potential

5    consequences of their actions.  As a partner to

6    federal land management agencies including the

7    U.S. Forest Service, National Park Service, and

8    Bureau of Land Management we find that project

9    delays are often proposed by a lack of funding

10   and the resulting understaffing, not by the

11   requirements of NEPA.  As such we feel that the

12   proposed changes to time limits would in fact

13   impose even more hardships on our federal agency

14   partners.  Thank you.

15           MR. BOLING:  Thank you.  Okay.  So, do

16   we have a number 34?  Number 34 in the audience?

17   Okay.  Then in order to make use of the time well

18   we have waiting room for somebody with a letter

19   B.  Is there a waitlisted commenter?  No.  No

20   letter B?  Well, I guess does anyone else want to

21   come and comment?  I'm going to offer three

22   minutes extemporaneous.  Okay.  Does anyone wish

Transcript of Public Hearing
Conducted on February 11, 2020                    132

1    to revise and extend their remarks as they say in

2    the Congress?  We've got transcription here.

3    We're here to hear them.  So, if anyone -- come

4    on up if you would like to expand on your --

5              UNIDENTIFIED SPEAKER:  Right here.

6              MR. BOLING:  I've got you, yes.  Okay.

7              MR. LEVENBACH:  I guess we'll break

8    early.

9              MR. BOLING:  Okay.  We can break early.

10   We've got a full raft of speakers for next -- for

11   this afternoon.  So, thank you all for showing

12   up, for your participation.

13              (Break.)

14              MR. LEVENBACH:  Good afternoon

15   everybody.  So welcome to the public hearing on

16   the Council of Environmental Quality's proposed

17   rule to update the regulations implementing the

18   National Environmental Policy Act or NEPA.  This

19   is the first proposed comprehensive update to

20   NEPA's regulation in over 40 years.  My name is

21   Stuart Levenbach.  I'm a senior advisor at CEQ

22   and on behalf of CEQ Chairman Mary Neumayr, thank

Transcript of Public Hearing
Conducted on February 11, 2020                              133

1    you for coming today.

2              So, this event is part of a concerted

3    effort by CEQ to seek the public's views on this

4    important proposal.  We're going to begin the

5    session with a short presentation on the proposed

6    rule by my colleague, Ted Boling.  Mr. Boling is

7    the associate director for NEPA at CEQ and this

8    presentation is also available online at two

9    websites, whitehouse.gov/ceq as well as nepa.gov.

10   The website has a fact sheet and additional

11   information on the proposed rule and there are

12   also some hard copies of this literature in the

13   back of the room.

14             Joining Mr. Boling on the panel today

15   is Amy Coil who is senior counsel at CEQ.  And I

16   just want to mention a couple of housekeeping

17   items.  First, please silence your cell phones if

18   you could.  The restrooms, if you need them you

19   go out, make a left and make a right at the first

20   hallway.  Emergency exit, you just follow the

21   signs but also to the right here once you go out

22   is the atrium and so if we need emergency exits

Transcript of Public Hearing
Conducted on February 11, 2020                    134

1    please be mindful of that.

2              And I just want to go through a few

3    details for those of you who are speaking so that

4    all your voices are heard.  If you haven't please

5    check in at the registration desk and if you're

6    preregistered and signed up to speak but haven't

7    told us you're here please step out and make sure

8    you inform them that you're here.  You're

9    allotted a total of three minutes for your

10   remarks.  Please keep to that time limit so that

11   all of today's speakers can be heard.

12             All the speakers were assigned a number

13   at the registration table which is the order in

14   which you are speaking.  We'll call those numbers

15   up.  Please state your name and spell it when you

16   come up.  So, state your name and spell it

17   because we have a court reporter here that's

18   transcribing the comments for the record and we

19   want to make sure we capture your name.

20             So, Mr. Boling here will be keeping

21   time.  He's going to display a sign when you have

22   one minute left, then 15 seconds.  One minute you

Transcript of Public Hearing
Conducted on February 11, 2020                    135

1    have the sign.  You've got one minute 15 seconds

2    then he'll hold up "end" when it's time to stop

3    and I'll have to interrupt you once you're over

4    your allotted time.  So once again, we have

5    exactly the number of speakers for the time

6    allotted for this session so please courteous to

7    the upcoming speakers and end your remarks within

8    three minutes so that others can speak.

9              When you're finished speaking if you

10   brought a written copy of your statement or

11   supplemental information that you would like

12   incorporated into the record please leave it in

13   the docket box located in the back of the room.

14   So, there's a little box back there you can put

15   any comments you have and any written literature

16   and my colleague Dan is holding it up and so

17   please deposit it there.

18              And like I said, we also have comment

19   cards.  There are also comment cards located at

20   the registration desk and you should feel free to

21   avail yourself of submitting written comments.

22   And let me assure you that CEQ will consider all

Transcript of Public Hearing
Conducted on February 11, 2020                              136

1    public comments received whether they're

2    submitted in writing or provided orally at events

3    like this one.

4             And if you have any questions during

5    the day there is both CEQ and EPA staff.  You can

6    look for our name cards and we're happy to answer

7    any questions that you have.  So, this session

8    ends at 4:00.  If we end early, we go through the

9    speakers early, some of you may have a letter

10   like if you're on a waitlist to speak.  Do any of

11   you have a letter?  Okay.  Perfect.  So, we had

12   time at the end of the morning session and so we

13   will call you up in order of, you know, ABCD to

14   speak and, like I said, we had additional time.

15   So, if you would like to speak then you may be

16   invited to come up here and provide it if you so

17   choose if we have, you know, time permitting.

18            Also, if you leave early if you could

19   just notify the registration desk in case we do

20   have a waitlist to come in.  I mean we have some

21   extra seats here but, in any event, it did sort

22   of fill up in the morning session.  So, if you

Transcript of Public Hearing
Conducted on February 11, 2020                    137

1    could just notify people that you are going and

2    then if people want to come in they can.

3            So, before I turn it over to Mr. Boling

4    here I also want to than EPA Region 8 for just a

5    spectacular job of helping us out.  Thanks so

6    much.

7            So, with that I'll hand it over for an

8    overview of the proposed rule.

9            MR. BOLING:  Okay.  Thank you, sir.

10   So, I'm going to provide an overview of the

11   National -- there we go.  Okay.  So, I'm going to

12   provide an overview of the National Environmental

13   Policy Act, NEPA, and the rulemaking process to

14   date, and explanation of some of the proposed

15   changes in the rule and next steps for the public

16   comment period.

17           So, to get us started in a little bit

18   more detail we're going to start with a brief

19   background on implementation of the current CEQ

20   NEPA regulations and of Executive Order 13807

21   which directed CEQ to take actions to enhance and

22   modernize the federal environmental review and

Transcript of Public Hearing
Conducted on February 11, 2020                        138

1    authorization processes.

2              We will discuss the goals of this

3    rulemaking and public input process to date, but

4    the majority of the presentation will summarize

5    the proposed rule and it will conclude with

6    information on how to provide comments to CEQ on

7    the proposed rule and additional public

8    engagement opportunities and additional resources

9    on the NEPA process.

10             So first of all, as many of you already

11   know Section 101 of NEPA sets forth a national

12   policy to use all practical means and measures

13   including financial and technical assistance in a

14   manner calculated to foster and promote the

15   general welfare, to create and maintain

16   conditions under which man and nature can live in

17   productive harmony, and fulfill the social,

18   economic, and other requirements of present and

19   future generations of Americans.

20             Section 102 of NEPA requires federal

21   agencies to consider the environmental impacts of

22   their proposed actions as part of their decision-

Transcript of Public Hearing
Conducted on February 11, 2020                                    139

1    making processes pursuant to Section 101.

2              NEPA and the CEQ regulations are

3    construed in light of what's known as a rule of

4    reason as the Supreme Court has held which

5    ensures that agencies determine whether and to

6    what extent to prepare an environmental impact

7    statement based on the usefulness of the

8    environmental information in their decision-

9    making process.

10             CEQ initially issued guidelines shortly

11   after the creation of CEQ in Title II of NEPA.

12   That was in April of 1970 and CEQ promulgated its

13   current regulations in 1978.  CEQ has only

14   amended those regulations substantively once and

15   that was for replacing the worst case analysis

16   regulation with a current provision on

17   considering incomplete or unavailable

18   information.

19             The CEQ regulations create the basic

20   NEPA framework in which federal agency decisions

21   are considered.  First at the broadest level

22   agencies can categorically exclude actions that

Transcript of Public Hearing
Conducted on February 11, 2020                    140

1    normally do not have significant effects which

2    allows agencies to review individual actions

3    expeditiously and to ensure that the action fits

4    within the categorical exclusion.

5           Actions that are not covered by

6    categorical exclusion or CE but are not likely to

7    have significant effects are typically reviewed

8    in a concise environmental assessment or EA.  And

9    through the use of CEs and EAs agencies can then

10   focus their limited resources on those actions

11   that are likely to have significant environmental

12   effects and require the detailed statement or

13   environmental impact statement required by NEPA.

14          So CEQ has analyzed the length of

15   environmental impact statements and the duration

16   of the EIS process.  The information I'm going to

17   describe here was reflected in two reports that

18   CEQ issued.  First the EIS timeline report, which

19   was issued in December of 2018, and then an EIS

20   length report issued last summer in June.

21          While the current CEQ regulations

22   recommend that EIS page limits -- pages be

Transcript of Public Hearing
Conducted on February 11, 2020                    141

1    limited to normally less than 150 pages or 300

2    pages for proposals of, quote, "unusual scope or

3    complexity", CEQ has found that most EISs are

4    significantly longer and that they take a long

5    time to produce.

6              For example, the average EIS length for

7    the Department of Transportation's Federal

8    Highway Administration is 645 pages, and the

9    average time to complete an EIS from notice of

10   intent to record of decision is over seven years.

11             So, this is just a table taken from the

12   EIS timeline report.  This slide shows the

13   average time by cabinet department that federal

14   agencies took to complete.  Department of

15   Transportation is on the right-hand side of the

16   table there.  And this information in this chart

17   represents 1,161 EISs for which a notice of

18   availability and a final EIS was published

19   between January 1st of 2010 and December 31st of

20   2017 and for which a ROD was issued by June 7th

21   of 2018.

22             CEQ found that across all federal

Transcript of Public Hearing
Conducted on February 11, 2020                    142

1    agencies the average EIS completion time from

2    notice of intent to record of decision was four-

3    and-a-half years and the median was three-and-a-

4    half years.  The CEQ report notes even within an

5    agency an EIS timeline may vary widely in

6    technical complexity and other factors that

7    influence the length and timing of the document.

8    These factors may include changes in the proposed

9    action, funding concerns, community concerns.

10           The EIS process for large

11   infrastructure projects varies considerably from

12   those associated with rulemakings and land

13   management agency processes that are largely

14   within the control of the lead agency.  While CEQ

15   has published federal governmentwide agency

16   specific data, we have not subdivided EISs by

17   sector or type though approximately half of the

18   EISs reviewed would be considered infrastructure

19   projects.

20           And so, this is just a further

21   depiction by cabinet department.  The data on

22   this slide represents the average completion time

Transcript of Public Hearing
Conducted on February 11, 2020                                    143

1    for EISs conducted by the Department of

2    Transportation.  While the EISs may also involve

3    other cooperating or co-lead agencies

4    participating in the NEPA process, for purposes

5    of this data collection only the one lead agency

6    was listed.

7              So, in 2017 President Trump issued

8    Executive Order 13807 which established the One

9    Federal Decision or what we refer to as OFD

10   process to expedite environmental reviews and

11   improve interagency coordination for

12   infrastructure projects that require an EIS.

13   EO13807 also directed CEQ to enhance and

14   modernize the federal environmental review and

15   authorization process including updating its

16   regulations.

17             The projects processed under the FOD

18   policy must comply with a two-year goal for

19   completion of the EIS.  While the executive order

20   goal is an agencywide average, agencies must

21   prepare project level schedules that are

22   consistent with achieving the agencywide goal and

Transcript of Public Hearing
Conducted on February 11, 2020                          144

1    consistent with senior agency official direction.

2    Agency progress towards this goal and other goals

3    are tracked through an accountability system

4    managed by the Office of Management and Budget.

5             This is recommended timeline for

6    achieving the two-year goal and under this

7    recommended timeline at the time that an agency

8    publishes its notice of intent to start the

9    public scoping for an EIS the lead agency should

10   have a plan to prepare and publish a draft

11   environmental impact statement within 14 months

12   or have a senior agency official approve a

13   different schedule.

14            And then at the time it publishes its

15   draft EIS for public comment the lead agency

16   should have a plan to respond to public comments

17   and publish its final EIS within eight months.

18   And at the time that the lead agency publishes

19   its final EIS it should have a plan to publish

20   its record of decision in coordination with all

21   the other agencies that will use the EIS in their

22   decision-making process within two months or of

Transcript of Public Hearing
Conducted on February 11, 2020                    145

1    course have a senior agency official approve a

2    different timeline.

3              Given the length of time since CEQ

4    issued its regulations in 1978 and pursuant to

5    the executive order CEQ published an advanced

6    notice of proposed rulemaking, or AMPRM,

7    requesting public comments on how CEQ should

8    ensure a more efficient, timely, and effective

9    NEPA process.

10             CEQ received over 12,500 comments from

11   a wide variety of stakeholders including states,

12   tribes, localities, environmental organizations,

13   trade associations, NEPA practitioners, and

14   interested members of the public.  Most

15   substantive comments supported some degree of

16   updating of the current regulations.  Many noted

17   that overly lengthy documents and the time

18   required for the NEPA process remained real and

19   legitimate concerns despite the current

20   regulation's explicit direction on reducing

21   paperwork and delays.

22             So, to summarize the rule, the proposed

1    rule would modernize and clarify the CEQ

2    regulations to facilitate more efficient,

3    effective, and timely NEPA reviews by federal

4    agencies.  The revisions are intended to make the

5    regulations easier to read, understand, and

6    follow.  The proposed changes would codify

7    certain CEQ guidance and Supreme Court case law.

8    Much of this guidance and case law is reflected

9    in modern agency NEPA practice but not captured

10   in the existing regulations.

11            The proposed regulations are intended

12   to be consistent with the original goals of the

13   1978 regulations to reduce paperwork and delays

14   and to promote better decisions.  These goals are

15   consistent with of course the National

16   Environmental Policy established by Section 101

17   of NEPA.

18            So, to summarize the efforts to

19   modernize, simplify, and accelerate the NEPA

20   process the Supreme Court has recognized that

21   agencies have limited time and resources and has

22   held that the scope of agencies inquiries must

Transcript of Public Hearing
Conducted on February 11, 2020                    147

1    remain manageable if NEPA's goal of ensuring a

2    fully informed and well considered decision is to

3    be accomplished.  That's roughly a quote from the

4    Metropolitan Edison case back in 1983 but

5    building on prior Supreme Court precedent.

6            CEQ proposes a number of changes to

7    modernize, simplify, and accelerate the NEPA

8    process.  I'm going to give you a little overview

9    of that.  For example, the proposed rule would

10   direct the agencies to complete EISs within two

11   years and EAs within one year unless a senior

12   agency official at the lead agency approves a

13   longer period in writing and establishes a new

14   timeline.  The EIS time frame would be measured

15   from the issuance of a notice of intent to the

16   date of the record of decision.  The EA timeline

17   would be measured from the date of the agency's

18   decision to prepare an EA to the date of the

19   publication of a final EA.

20           The proposed rule would make the

21   current page limits for EISs mandatory and would

22   establish page limits for EAs unless a senior

Transcript of Public Hearing
Conducted on February 11, 2020                    148

1    agency official establishes a new page limit.

2    Specifically, the length of a final EIS must be

3    150 pages or fewer and 300 pages or fewer for

4    proposals of unusual scope or complexity.  The

5    presumptive page limit for EAs would be 75 pages.

6            The proposal would codify aspects of

7    the One Federal Decision policy to ensure

8    coordinated and timely environmental reviews.

9    Lead agencies would be responsible for developing

10   a joint schedule for the development of the

11   environmental review in consultation with all the

12   cooperating agencies and resolving disputes or

13   other issues that may cause delays in the

14   schedule.

15           The regulations would clarify that the

16   lead agency is responsible for determining the

17   purpose and need and alternatives in consultation

18   with cooperating agencies.  Federal agencies

19   would be required to evaluate proposals involving

20   multiple federal agencies in a single EIS and

21   issue a joint record of decision or a single EA

22   and joint finding of no significant impact when

Transcript of Public Hearing
Conducted on February 11, 2020                     149

1    practicable.

2              CEQ proposes a number of changes to

3    clarify the meaning of terms in the application

4    of the scope of NEPA reviews.  First CEQ proposes

5    to add a new section that would provide for an

6    agency determination of whether NEPA applies to a

7    particular activity consistent with court

8    decisions finding where inapplicable.  This

9    includes when an agency is carrying out a

10   nondiscretionary duty or its statutory

11   obligations clearly or fundamentally conflict

12   with NEPA compliance.

13             The regulations would begin the scoping

14   process before the agency publishes its notice of

15   intent to prepare an EIS.  The regulations would

16   expand the process for agencies to request and

17   the public to submit all relevant information and

18   analysis early in the process so that agencies

19   can consider that information in their decision

20   making.

21             Under the proposed rule agencies would

22   be required to provide more information in the

Transcript of Public Hearing
Conducted on February 11, 2020                     150

1     notice of intent, to summarize public input in

2     the EIS, and to seek comment on that summary in

3     their draft EIS and again in their final EIS, and

4     decision makers must certify their consideration

5     of that information in the record of decision.

6              Turning to definitions, CEQ proposes to

7     define the term "reasonable alternatives" as

8     alternatives that are technically and

9     economically feasible.  This is consistent with

10    longstanding CEQ guidance and the Supreme Court

11    decisions including Vermont Yankee back in 1978.

12    CEQ also proposes to define reasonable

13    alternatives as a range of reasonable

14    alternatives to codify CEQ's 1981 guidance known

15    as the 40 questions.

16             Consistent with the Supreme Court's

17    decision in Department of Transportation v.

18    Public Citizen, CEQ proposes to clarify the

19    definition of effects to focus on effects that

20    are reasonably foreseeable and have a reasonably

21    close causal relationship to the proposed action.

22    CEQ proposes to strike the terms "direct" and

Transcript of Public Hearing
Conducted on February 11, 2020                              151

1    "indirect" and the separate definition of

2    cumulative impacts in order to focus agency time

3    and resources on considering whether an effect is

4    caused by the proposed action rather than

5    categorizing the type of effect.

6             The proposed change in position -- CEQ

7    proposes to change its position to state that

8    analysis of cumulative effects as defined in the

9    current CEQ regulations is not required under

10   NEPA.

11            CEQ also proposes to clarify that

12   effects should not be considered significant if

13   they are remote in time, geographically remote,

14   or the result of a lengthy causal chain.  This

15   would codify the Supreme Court rulings in Public

16   Citizen where the Supreme Court held that courts

17   must look at the underlying policies or

18   legislative intent in order to draw a manageable

19   line between those causal changes that may make

20   an actor responsible for the effects and those do

21   not.  As well as also in Metropolitan Edison

22   where the Supreme Court noted that effects may

Transcript of Public Hearing
Conducted on February 11, 2020                                 152

1    not fall within Section 102 of NEPA if the causal

2    chain is too attenuated.

3              Further, CEQ proposes to codify a key

4    holding in Public Citizen to make clear that

5    effects do not include effects that the agency

6    has no authority to prevent or would happen even

7    without the agency action because they would not

8    have a sufficiently close causal connection to

9    the proposed action,.

10             CEQ did not propose to add any

11   particular category of effects to the definition

12   of effects, however CEQ does invite comment on

13   whether it should codify any aspect of CEQ's

14   draft guidance on how NEPA analysis should

15   address greenhouse gas emissions into the final

16   regulations, and if so, how?

17             CEQ proposes a number of changes to the

18   definition of major federal action.  These

19   include clarifying that an action meets the

20   definition if it is subject to federal control

21   and responsibility and it has effects that may be

22   significant.  Consistent with case law over the

Transcript of Public Hearing
Conducted on February 11, 2020                              153

1    past four decades the definition would clarify

2    that the term does not include non-federal

3    projects with minimal federal involvement or

4    federal funding where the agency cannot control

5    the outcome of the project.

6            For example, this could apply where a

7    federal agency provides a small amount of federal

8    funding at the design phase of an infrastructure

9    project that is ultimately entirely funded by

10   private or state funds.

11           Consistent with longstanding agency

12   practice CEQ proposes to expand its provisions

13   for the adoption of EISs by the cooperating

14   agencies to include EAs and also to allow the

15   adoption of categorical exclusion determinations.

16   CEQ also proposes to allow agencies to establish

17   a process in their NEPA procedures to adopt

18   another agency's categorical exclusion.

19           Agency's would have more flexibility to

20   allow project sponsors to participate in the

21   preparation of environmental documents,

22   particularly environmental impact statements.

Transcript of Public Hearing
Conducted on February 11, 2020                                    154

1    The regulations would require the decision-making

2    official to provide guidance, participate in the

3    preparation of the EIS, independently evaluate

4    the environmental document and take

5    responsibility for its contents.

6              With respect to limitations on

7    activities that can occur before the completion

8    of environmental review, CEQ proposes to clarify

9    that certain activities by an applicant can

10   proceed where the activity is to support an

11   application for federal, state, tribal, or local

12   assistance.  This could include acquisitions of

13   interests in lands such as rights-of-way or

14   conservations easements.

15             With regard to public participation,

16   well, as I noted earlier the regulations would

17   require agencies to specifically solicit comments

18   in their notice of intent so that agencies can

19   consider relevant information early in the

20   development of a draft EIS.  CEQ proposes to

21   revise its regulations on specificity of comments

22   and information to explain that the purpose of

Transcript of Public Hearing
Conducted on February 11, 2020                          155

1    public comments is to promote informed decision

2    making and further clarify that comments should

3    provide sufficient detail for the agency to

4    consider the comment in the decision-making

5    process.  This would codify the Supreme Court

6    ruling in Public Citizen and Vermont Yankee.

7              CEQ also proposes that comments should

8    explain why the issue raised was significant to

9    the consideration of potential environmental

10   impacts and alternatives to the proposed action

11   and other impacts affecting the quality of the

12   human environment.

13             Agencies would have greater flexibility

14   to design and customize their public involvement

15   to best meet the specific circumstances of their

16   proposed actions including using electronic

17   media.  However, agencies may not limit

18   themselves to electronic communications when

19   their actions take place in areas or affect

20   people without high speed internet access such as

21   the digital divide in rural locations.

22             The proposed regulations would

Transcript of Public Hearing
Conducted on February 11, 2020                    156

1    encourage agencies to use modern methods of

2    electronic communication both to publish

3    important environmental information and to

4    structure public participation for greater

5    efficiency and greater inclusion of interested

6    persons and to include soliciting comments in a

7    manner designed to inform parties interested or

8    affected by the proposed action.

9            Consistent with those changes,

10   throughout the rule CEQ proposes to replace terms

11   like "circulate" or "circulation" which tend to

12   be paper-based terms with publish or publication

13   which are defined in technology neutral terms.

14           Finally, a new section would require

15   agencies to provide NEPA program information,

16   information on ongoing NEPA reviews, and public

17   access to agency records relating to NEPA reviews

18   on their websites.  This provision would promote

19   transparency and efficiency in the NEPA process,

20   improve interagency coordination to streamline

21   environmental review, and better coordinate the

22   development of environmental documents for multi-

Transcript of Public Hearing
Conducted on February 11, 2020                    157

1    agency projects.

2            Finally, CEQ is also proposing changes

3    to enhance coordination with states, tribes, and

4    localities.  CEQ proposes to update the

5    provisions on state, tribal, and local

6    environmental reviews to encourage greater

7    cooperation and reduce duplicative reviews.

8            The current regulations also limit the

9    interest of tribes to reservations.  In response

10   to comments on the AMPRM, supporting expansion on

11   the recognition of sovereign rights, interest,

12   and expertise of tribes CEQ proposes to add

13   tribal to the phrase state and local throughout

14   the rule.  This is intended to ensure

15   consultation with tribal governments reflecting

16   current NEPA practice to coordinate or consult

17   with affected tribal governments and agencies as

18   necessary and appropriate for the proposed

19   action.

20           So, with regard to public engagement,

21   this is the first of two public hearings and the

22   next one will be on February 25th at the

Transcript of Public Hearing
Conducted on February 11, 2020                    158

1    Department of the Interior in Washington, D.C.,

2    and we've got other opportunities for public

3    engagement.  We're going to be keeping our

4    websites at nepa.gov and whitehouse.gov/ceq up-

5    to-date.

6              The preferred method of comment for

7    receiving comments is going to be through

8    regulations.gov, however we're transcribing

9    today's comments.  We're going to be reading all

10   oral/written comments equally.  We can also

11   receive comments by fax and by regular mail but

12   uploading them to regulations.gov is easiest for

13   all concerned.

14             So, with that I think we will begin and

15   our first speaker I believe is Greg Fulton.

16             MR. FULTON:  Thank you.  My name is

17   Greg Fulton, G-R-E-G F-U-L-T-O-N.  I'm the

18   president of the Colorado Motor Carrier

19   Association and I'm here on behalf of our 650

20   member companies that are either involved or

21   associated with trucking in our state where we

22   have 110,000 people working in the trucking

Transcript of Public Hearing
Conducted on February 11, 2020                         159

1    industry today.

2            Let me note that infrastructure on a

3    national and state basis has been in decline for

4    a number of years.  Improvements are critical for

5    our industry and others if we are to remain

6    competitive in terms of what other states and our

7    businesses are to be successful in the world

8    marketplace.

9            Let me note that saying that our

10   association is concerned about the environment.

11   We've been a partner with EPA and the SmartWay

12   program since 2007.  We've made many strides.  As

13   an industry we particularly have made strides in

14   reductions in diesel emissions from trucks.  In

15   fact, in the 30 years actually that we've had

16   from 1990 to 2020 we now have a situation where

17   we have reduced emissions by 98 percent in those

18   vehicles.

19           On our part we continue to look for

20   improvements and we will strive to end up making

21   future improvements.  Let me note we also

22   recognize the importance of the NEPA process and

Transcript of Public Hearing
Conducted on February 11, 2020                           160

1    do not seek to do away with it but rather we

2    support CEQ's proposal to improve, streamline,

3    and expedite this process.

4             The current NEPA process is confusing,

5    cumbersome, time consuming, and costly.  Rather

6    than measuring the NEPA in process in years where

7    I think it was noted that the average process for

8    a highway construction project is seven years, we

9    now actually have seen it go beyond ten years and

10   instead of just measuring it in years in some

11   cases we measure it in decades.

12            Relative to other industrialized

13   nations in the world who share the same concerns

14   as we do as a nation for our environment the

15   process takes a fraction of the time, sometimes

16   as little as half or one-third the time as the

17   U.S. for the same project.

18            We commend the CEQ for bringing forward

19   this proposal and beginning this dialogue to

20   improve a process that hasn't been addressed for

21   over 40 years.  We believe that the environment

22   in terms of this process can be improved and

Transcript of Public Hearing
Conducted on February 11, 2020                    161

1    streamlined and made more efficient and effective

2    without actually translating into something that

3    is less protective of the environment.

4            The extended process and delays that

5    we're seeing out there don't come without

6    consequences and costs.  Congestion on our

7    nation's highways now cost the trucking industry

8    $70 billion in additional costs annually.  That

9    doesn't -- okay.  That doesn't include the

10   additional costs because of the poor

11   infrastructure as well as actually the billions

12   for additional maintenance.

13           Let me note in some cases our projects

14   starting from the beginning point to the ending

15   point have doubled in terms of highway

16   construction.  And let me conclude in saying that

17   we are supportive of the CEQ process.  We believe

18   it offers some commonsense reform to simplify and

19   streamline a very complex and difficult process

20   and we look forward to the rulemaking process.

21   Thank you for your time.

22           MR. BOLING:  Thank you.  And next up is

Transcript of Public Hearing
Conducted on February 11, 2020                        162

1    Brent Mathieu and --

2            MR. MATHIEU:  Thank you for that

3    testimony.

4            MR. BOLING:  Yes.

5            MR. MATHIEU:  Are you ready?

6            MR. BOLING:  Please go ahead.

7            MR. MATHIEU:  Thank you for the

8    opportunity.  My name is Dr. Brent Mathieu,

9    B-R-E-N-T M-A-T-H-I-E-U.  It's a French spelling.

10   I am a naturopathic doctor with a degree in human

11   biology.  I've been in practice over 40 years and

12   I'm a member of the Idaho Organization of

13   Resource Council.  I reside in Boise, Idaho.

14           I am familiar with the rulemaking

15   process.  For instance, I have reviewed the

16   Region 10 EPA's application for a Class II

17   injection well in southwest Idaho that could

18   affect the aquifer for many generations to come.

19   That said, I would like to start with a personal

20   story that I was a child in the 1960s and as a

21   child in my hometown of Sidney, Montana there

22   were a lot of mosquitoes because the federal

Transcript of Public Hearing
Conducted on February 11, 2020                              163

1    government had created a diversion dam to

2    irrigate the farm land so it could raise sugar

3    beets, corn, and irrigated crops.  There were a

4    lot of mosquitos.

5              So, the county acting in conjunction

6    with the federal government began to spray

7    pesticides in my neighborhood and they would go

8    down the streets fogging and we children,

9    including myself, would run out and play in the

10   poison fog.

11             And I've spoken to four other adults

12   here who are present.  By synchronicity they had

13   the same experience and out of those five of us

14   three of us have cancer and one has a serious

15   autoimmune disease and the other declined to talk

16   about health.  That's what happened to a

17   generation of children before NEPA, before EPA.

18             So, the adults didn't stop us because

19   they believed that the government would protect

20   their children.  No one knew it was harmful, but

21   my lungs burned, my eyes burned.

22             And so that was before Silent Spring in

Transcript of Public Hearing
Conducted on February 11, 2020                           164

1     the beginning of all this environmental action.

2     We look to the federal government to protect we

3     the people.  Your rules need to protect the

4     public health and welfare.  And I could speak at

5     great lengths with that but really I want to

6     share that I'm fatigued.  I'm trembling.  I'm

7     suffering.  I've had a good life.  But my concern

8     is for the future for the -- for grandchildren

9     for seven generations to come.  Please, it's a

10    good thing to clarify rules.  It's a good thing

11    to update rules.  Please protect us.  Thank you.

12         MR. BOLING:  Thank you, sir.  Next up

13    will be Shannon Ansley.

14         MS. ANSLEY:  My name is Shannon Ansley,

15    S-H-A-N-N-O-N A-N-S-L-E-Y.  I'm here representing

16    the Portneuf Resource Council of Pocatello,

17    Idaho.  I'm a licensed professional geologist

18    with over 30 years experience implementing NEPA

19    and superfund regulations on federal, state, and

20    sovereign nation lands.  Specifically, I'm an

21    environmental hydrogeologist working to protect

22    water resources from contamination by hard rock

Transcript of Public Hearing
Conducted on February 11, 2020                                    165

1    open pit mines in southeast Idaho.

2             I oppose the changes to NEPA proposed

3    by CEQ.  Inadequate environmental assessment and

4    mitigation endangers the lives of my family,

5    friends, my community, and degrades our cherished

6    public lands.  NEPA is not an outdated law.  I

7    personally work with ten different abandoned

8    phosphate mine projects, seven that predate NEPA

9    and three new mines that adhered to the current

10   NEPA process.

11            In southeast Idaho there are over 17

12   pre-NEPA phosphate mines that are essentially

13   superfund sites being cleaned up under the circle

14   of regulations.  There are three -- the three new

15   phosphate mines that are proposed have been

16   assessed under the current NEPA law and their

17   operation should limit or eliminate the

18   environmental harm caused by pre-NEPA mining.

19            I specifically oppose the CEQ change

20   that shortens the timeline of environmental

21   assessments.  Abbreviating the preparation of an

22   EIS only allows time for a literature review of

Transcript of Public Hearing
Conducted on February 11, 2020                        166

1    existing regional environmental data with no time

2    to gather, analyze, or model site specific data.

3              For example, in Pocatello the BLM

4    issued a draft EIS allowing the expansion of

5    toxic and radioactive waste from an ore

6    processing facility and superfund site by trading

7    BLM land for industry owned private land.  The

8    draft EIS assessment that I've reviewed for this

9    action was completed in less than six months and

10   it contains inadequate and outdated science,

11   obsolete data, and model predictions of impacts

12   that do not match the alternatives presented.

13             I also oppose the CEQ change requiring

14   public comments to be linked to specific pages,

15   section, sentences within a draft EIS.  NEPA was

16   created to give voice to all people; low-income,

17   rural, tribal, working class, and other people of

18   color in America.  But many in these communities

19   lack the training and access to scientific,

20   political, and legal resources to provide line-

21   by-line technical critiques.

22             If CEQ approves the opposed changes to

Transcript of Public Hearing
Conducted on February 11, 2020                    167

1    NEPA federal and industry actions will degrade

2    the environment and the voice of the public will

3    be silenced.  This will lead to increased

4    litigation effectively slowing instead of

5    speeding up the process of reviews and approvals.

6    Fast tracking the NEPA process on behalf of

7    industry is unacceptable.  Thank you.

8            MR. BOLING:  Thank you, Ms. Ansley.

9            Now Peter Morgan to be followed by

10   Carol Campbell.

11           MR. MORGAN:  Good afternoon.  Sorry.

12   Good afternoon.  My name is Peter Morgan.  I'm a

13   senior attorney with the Sierra Club and I'm

14   speaking today in opposition to the proposed

15   rulemaking.

16           NEPA is a critical rule that impacts

17   every American.  Currently, NEPA benefits the

18   public by facilitating informed decision making

19   and by empowering communities to learn about and

20   be heard on projects that will impact them.  NEPA

21   promotes justice and equity because low-income,

22   minority, and rural communities are

Transcript of Public Hearing
Conducted on February 11, 2020                        168

1    disproportionately exposed to pollution and other

2    environmental harms.  The proposed rule threatens

3    these fundamental purposes.

4              I'd like to begin though by noting that

5    CEQ's process for finalizing the rule change is

6    deeply flawed and CEQ must provide additional

7    public participation opportunities.  Such a

8    monumental change to a bedrock rule demands

9    robust public debate.  CEQ's process denies the

10   public this leaving the unmistakable impression

11   that the administration's intent is to stifle

12   meaningful discussion.  At a minimum CEQ must add

13   additional public forums in more parts of the

14   country and extend the public comment period by

15   at least 120 days.

16             The proposed rule change contains major

17   flaws.  First, the revised rule would no longer

18   consider effects significant if they are remote

19   in time, geographically remote, or the result of

20   a lengthy causal chain.  This change is clearly

21   aimed at eliminating consideration of climate

22   impacts.

Transcript of Public Hearing
Conducted on February 11, 2020                    169

1            In Colorado current NEPA rules were

2    recently found to require consideration of the

3    potential for a coal mine to release potent

4    greenhouse gases into the atmosphere.

5    Coloradoans and all Americans deserve this

6    information.  The proposed change would prohibit

7    this type of analysis.  The proposal therefore

8    demonstrates a willful blindness to the

9    scientific understanding of the global effects of

10   greenhouse gas emissions.

11           Next, the revised rule would remove the

12   requirement to consider the cumulative effects

13   and indirect effects of a project.  The proposal

14   would allow approval of an individual project

15   that would push cumulative impacts over dangerous

16   thresholds and invite segmentation which masks

17   the full impacts of a project.  Without the

18   requirement to consider cumulative impacts an

19   agency is looking at a project in a vacuum,

20   defeating the purpose of NEPA.

21           CEQ cannot hide behind the claim that

22   agencies are not prohibited from considering

Transcript of Public Hearing
Conducted on February 11, 2020                    170

1    cumulative effects because taken together with

2    other proposed changes such as the imposition of

3    artificial time limits this amounts to a

4    prohibition on consideration of cumulative

5    effects.

6              Finally, additional concerns include

7    that the proposal would allow applicants to frame

8    the purpose of the proposed action to eliminate

9    otherwise reasonable alternatives, would modify

10   the definition of major federal action, and

11   thereby significantly narrow what projects

12   qualify for NEPA review.  It would make it more

13   difficult for an agency to engage in meaningful

14   analysis by imposing tight deadlines, page

15   limits, and reduced opportunities for agency

16   input.  And finally, would allow project

17   applicants to draft EIS documents introducing

18   obvious conflicts of interest.  Thank you.

19             MR. BOLING:  Thank you.  Okay.  Carol.

20             MS. CAMPBELL:  Hi.  My name is Carol

21   Campbell.  I'm a 33 year retired EPA employee.  I

22   retired in 2011.  I have 16 years of NEPA review

Transcript of Public Hearing
Conducted on February 11, 2020                            171

1    experience both direct -- we actually implemented

2    the Three Affiliated tribal refinery EIS as a

3    lead agency, and I was also lead reviewer in a

4    number of situations.  As I retired I was the

5    senior executive in charge of the ecosystem

6    protection and remediation, and I was very

7    involved in NEPA throughout 16 years of my

8    career.

9            This new rule is purposed to increase

10   efficiency, effectiveness, and timeliness is a

11   good one, but it does not have good effects.  The

12   agencies already have rules, regulations,

13   policies, case law, executive orders that they

14   need to perform this activity effectively.  In my

15   experience the biggest reason for the delays is

16   lack of resources including dollars, FTEs or

17   people and expertise, poor or lacking information

18   from the project proponents, and lack of

19   coordination communication across agencies.

20   These rule changes that are proposed will not

21   help these underlying problems and I have many

22   significant concerns which I have put on the back

Transcript of Public Hearing
Conducted on February 11, 2020                                        172

1    table for your review, but I want to highlight

2    two that really concern me.

3              The first is this proposal limits the

4    scope of NEPA applicability.  This allows all

5    agencies to potentially use functional

6    equivalency to avoid NEPA compliance.  Only EPA

7    at this point has that process.  This rule allows

8    the scope to be narrowed from major federal

9    actions eliminating many actions that require

10   NEPA that could have significant environmental

11   impacts and also probably huge litigation issues

12   while everybody runs around trying to figure out

13   what major means.  It allows agencies to adopt

14   other agencies categorical exclusions.

15   Categorical exclusions were specific agencies

16   missions and expertise, and this could cause

17   significant misuse of this provision.

18             Secondly, it decreases the scope of

19   analysis, specifically cumulative impact

20   analysis.  My experience shows that these impact

21   analysis are extremely critical as a project

22   could be a tipping point or a contributor to

Transcript of Public Hearing
Conducted on February 11, 2020                    173

1    environmental noncompliance.  Examples are air

2    quality and water quality standard exceedances.

3    For example, the Pinedale Anticline Project, the

4    Jonah II Project in Wyoming both affected the air

5    quality in a negative way where we had

6    exceedances of ozone in Pine Dale.

7            Lastly, this eliminates the

8    requirements for agencies to analyze the effects

9    where the agency has no ability to prevent or

10   would occur regardless of the proposed action.

11   This is specifically about climate change in my

12   opinion.  All sources of greenhouse gases -- if

13   they use this same argument we would never be

14   able to minimize climate change, mitigate, or

15   plan for its effects, and for infrastructure

16   projects this would be extremely critical.  Thank

17   you.

18           MR. BOLING:  Thank you.

19           MS. LEGER:  Good afternoon.  My name is

20   Natasha Leger, L-E-G-E-R, Executive Director of

21   Citizens for a Healthy Community, a grassroots

22   non-profit in the North Fork Valley of southwest

Transcript of Public Hearing
Conducted on February 11, 2020                           174

1    Colorado.  We represent 1500 impacted citizens

2    including farmers, vintners, ranchers,

3    businesses, artists, water rights holders, and

4    landowners.

5              The North Fork Valley is home to the

6    largest concentration of organic farms in the

7    state, the highest altitude vineyards in the

8    world, unique biodiversity, West Elk Scenic

9    Highway, the most popular big game unit in the

10   state.  It's surrounded by public lands upon

11   which our watershed originates and supplies both

12   irrigation and drinking water.

13             In short, the north fork of the

14   Gunnison River is the lifeblood of this valley

15   and has been designated by the Wilderness Society

16   as one of 15 rare and irreplaceable ecosystems in

17   the United States.  It is also an area built upon

18   landslide material making it one of the most

19   geologically unstable areas in the state.

20             Yet despite its rarity and fragility it

21   is being targeted for industrial scale oil and

22   gas development that would destroy it all,

Transcript of Public Hearing
Conducted on February 11, 2020                    175

1    pollute the air and water, disrupt the fragile

2    ecosystem having a ripple effect on fauna and

3    flora, destabilize the geology, exacerbate

4    climate change leading to a hotter and drier

5    climate that affects water availability and

6    increases wildfire risk.

7            NEPA, while imperfect, combined with

8    other environmental laws and regulations is what

9    has allowed us to protect our ecosystem which our

10   local economy and others depend on.  The Ninth

11   Circuit Court of Appeals decision in Juliana v.

12   United States found federal government actions

13   responsible for climate change.

14           The majority opinion held a substantial

15   evidentiary record documents that the federal

16   government has long promoted fossil fuel use

17   despite knowing that it can cause catastrophic

18   climate change and that failure to change

19   existing policy may hasten an environmental

20   apocalypse.

21           The record also establishes that the

22   government's contribution to climate change is

Transcript of Public Hearing
Conducted on February 11, 2020                    176

1    not simply the result of inaction.  The

2    government affirmatively promotes fossil fuel use

3    in a host of ways including beneficial tax

4    provisions, permits for imports and exports,

5    subsidies for domestic and overseas projects, and

6    leases for fossil fuel extraction.

7            The proposed draft rule changes which

8    seek to cripple an already imperfect law by

9    eliminating cumulative impacts in climate

10   analysis, redefining what triggers and

11   constitutes a NEPA analysis, preventing judicial

12   review and public accountability by declaring

13   that a violation of the Act itself is not a cause

14   of judicial action, and silencing the public by

15   limiting or eliminating public participation is

16   not only unconscionable under Juliana v. U.S. but

17   a smoking gun.  The draft rules effectively work

18   to accelerate climate and environmental

19   degradation by expediting the rate at which

20   detrimental projects are approved.

21           We call upon you to abandon this

22   rulemaking effort and focus on solving the

Transcript of Public Hearing
Conducted on February 11, 2020                              177

1    climate and environmental crisis of our time, not

2    perpetuating or accelerating it.  Thank you.

3                MR. BOLING:  Thank you, Natasha.

4                Next up we have Jennifer Clanahan

5    followed by Maggie Coulter and Marisa Sandoval.

6                MS. CLANAHAN:  Good afternoon.  My name

7    is Jen Clanahan, C-L-A-N-A-H-A-N, and I'm with a

8    statewide network of parents called Colorado Moms

9    Know Best.  We advocate for -- sorry.  Did this

10   go out?  We advocate for our kids' future by

11   protecting our outdoor quality of life,

12   especially our clean air.

13               I personally am a mom to a ten-year-old

14   daughter, and I need to be here today to speak up

15   for her because she needs to be in school instead

16   of trying to bring common sense to the federal

17   government and because as her mom I am -- it is

18   my number one job to protect her.  She has, I

19   hope, a bright future ahead.  It's what every

20   parent wants for their kids.  We want them to

21   grow up happy and healthy and that means they

22   need clean air to breathe, they need clean water

Transcript of Public Hearing
Conducted on February 11, 2020                        178

1    to drink, and it's not just physical health but

2    also strong mental health, and of course this

3    goes along with all of the other things like a

4    good education and those things that keep parents

5    up at night.

6            This proposal effectively limits the

7    public input.  You're cutting the requirement to

8    analyze cumulative effects.  You're excluding

9    climate considerations from federal action and I

10   would argue that climate is not a distant effect.

11   More carbon will lead to -- more carbon pollution

12   will lead to out of control climate change, a

13   future of more and more destructive wildfires,

14   more insect borne disease, devastating extreme

15   storms and food insecurity is not the future any

16   parent wants for their kids.

17            Air pollution causes numerous and

18   serious problems to everyone's health, but

19   children are especially vulnerable to them.  It

20   causes terrifying asthma attacks.  It can

21   permanently damage young, still developing lungs

22   causing health problems that last a lifetime.  It

Transcript of Public Hearing
Conducted on February 11, 2020                    179

1    damages cardiovascular systems, causes

2    developmental problems and even early death.

3    Recent studies have also found a causal

4    relationship to autism.

5            That's why moms and parents, not just

6    corporate lobbyists, need to have a say in review

7    processes that could damage our air, water, and

8    public lands.  Please do not cut us out.  The

9    public has a change -- sorry.  The public has a

10   chance to provide input on things that can affect

11   the public.  This is why NEPA was designed.  And

12   there needs to be sufficient time to fully study

13   and understand what impacts could take place.

14           The federal government should be

15   working for all of us and we deserve a seat at

16   the table when decisions are made, but what

17   you're proposing does exactly the opposite.  I

18   guarantee that there are moms and dads at home

19   with their kids today that want to protect their

20   children's health, safety, and opportunities but

21   they don't even know what you're proposing today.

22           And it appears that you've already

Transcript of Public Hearing
Conducted on February 11, 2020                    180

1     started to cut public input out by only having

2     two sessions across the entire country.  And

3     what's more, I'm told tickets to testify today

4     were gone in a couple minutes.  They're harder to

5     come by than tickets to the upcoming Billie

6     Eilish concert.

7              It's hard to overstate the impact your

8     proposed changes will have on my kid and her

9     kids.  She loves to play in our mountain streams,

10    go camping, and enjoy our local open spaces.

11    It's good for her physical and mental health that

12    she have these opportunities and I feel that I am

13    shouldering the burden of all parents by being

14    here today and even across the country since

15    there are only two comment sessions.

16             And I'm feeling the heavy weight of

17    future generations today, but you should too.

18    It's your job to protect and include the public

19    and with this proposal the administration is

20    abdicating their duty to protect our kids and all

21    future generations.  Thank you.

22             MR. BOLING:  Thank you, Ms. Clanahan.

Transcript of Public Hearing
Conducted on February 11, 2020                              181

1    Maggie Coulter.  There you go.

2            MS. COULTER:  Good afternoon.  My name

3    is Margaret Coulter.  That's C-O-U-L-T-E-R.  And

4    I'm an environmental attorney with Defenders of

5    Wildlife, a national non-profit organization

6    dedicated to protecting and restoring native

7    species and habitats.  I'm here to express

8    Defenders of Wildlife's strong opposition to the

9    proposed rule and to stand up for the public's

10   right to know and participate in federal decision

11   making and right to a healthy environment.

12           Defenders of Wildlife has 1.8 million

13   members and supporters who care about the

14   National Environmental Policy Act or NEPA, and

15   the democratic and environmental values it

16   espouses.  They understand that the future of

17   this nation's wildlife depends on sound and

18   informed federal decision making.  This includes

19   the future of the endangered black footed ferret,

20   the threatened Gunnison sage-grouse, the

21   endangered southwestern Willow flycatcher, and

22   the threatened Canada lynx, all imperiled

Transcript of Public Hearing
Conducted on February 11, 2020                    182

1    wildlife who live within Colorado's federal lands

2    and depend on strong and conscientious

3    implementation of NEPA.

4         NEPA and its regulations which CEQ is

5    now proposing to overhaul and undercut prescribe

6    an open and specific process for federal decision

7    making and specifically require the government to

8    evaluate the environmental impacts of its

9    decisions before it makes them.

10        Under the current NEPA regulations the

11   federal government must explore alternatives to

12   its proposed projects and disclose and compare

13   the environmental effects of the alternatives, an

14   exercise that often leads to better project

15   designs and environmental outcomes.

16        In contrast, the proposed regulations

17   would rip the heart out of the alternatives

18   analysis by limiting the scope of the analysis,

19   limiting the number of alternatives that need to

20   be considered, and allowing those with a conflict

21   of interest to conduct the analysis.

22        Particularly concerning is that the

Transcript of Public Hearing
Conducted on February 11, 2020                    183

1    proposed regulations eliminate the cumulative

2    effects analysis.  For too many species the story

3    of their decline is one of death by a thousand

4    cuts.  The loss of a population here, an

5    important habitat over there, and the importance

6    of looking at the effects of an action not in

7    isolation but in the context of the additive

8    impacts of other actions that could impact a

9    species has been a core concept of NEPA analysis

10   for its entire history.  The new regulations toss

11   it out the window allowing agencies to ignore the

12   big picture of cumulative harm to species and

13   habitats.

14          On top of that the new NEPA regulations

15   empower agencies to ignore climate change in

16   their environmental analyses which is both

17   irresponsible and unconscionable given the

18   climate crisis our planet faces.  Detractors of

19   NEPA claim that it is broken and needs to be

20   updated and we heartily disagree.  NEPA might

21   seem broken to those who would prefer free reign

22   to develop our federal lands under a cloak of

Transcript of Public Hearing
Conducted on February 11, 2020                    184

1    secrecy, but it can be a lifesaver for

2    communities and wildlife alike.  We urge the

3    administration to halt this rulemaking and thank

4    you for considering these comments.

5              MR. BOLING:  Okay.  Thank you.

6              Okay.  Marisa Sandoval.  That will be

7    followed by Bob Comer and Edward Zukoski.

8              MS. SANDOVAL:  Good afternoon.  My name

9    is Marisa Sandoval and I would like to thank you

10   all for this opportunity to offer my comments and

11   concerns over the proposed rollbacks of our most

12   important bedrock environmental policy.

13             I come before you today as a proud

14   Coloradoan who has grown up enjoying the many

15   benefits of having safe, accessible, and

16   protected lands in the outdoors to call home and

17   find solace.

18             I'm here as a concerned citizen who

19   knows civic engagement and the opportunity to

20   communicate with our federal decision makers is a

21   fundamental principle of democratic governments.

22             I come to you as a neighbor who values

Transcript of Public Hearing
Conducted on February 11, 2020                    185

1    every person around me and the right to live,

2    work, learn, and play in healthy communities

3    where the air is safe to breathe, and the water

4    is safe to drink.

5              And most importantly I come to you as

6    an American who believes deeply in our democracy

7    and the crucial element that all of our voices

8    matter and should have a say in shaping our

9    future.

10              With the proposed rollbacks of the

11   National Environmental Policy Act the very core

12   of who I am, and these values are under attack.

13   The very places I love become an afterthought in

14   the implementation of federal projects.  The

15   communities most impacted by these projects are

16   disregarded.  The people who wish to stand up for

17   this environmental injustice are silenced and the

18   plan for our sustainable future is deemed

19   unimportant.

20              And for what?  We are talking about

21   rolling back a critical environmental and civil

22   rights law that requires federal agencies to

Transcript of Public Hearing
Conducted on February 11, 2020                              186

1   review the environmental and public health

2   impacts of major projects and consider input from

3   the public before they decide to proceed.

4            In many cases NEPA provides the only

5   forum for the public to engage in the decision-

6   making process.  NEPA also gives a voice to

7   vulnerable communities that often bear the brunt

8   of a project's adverse impacts.  Because of this

9   NEPA has given millions of people a voice in

10  federal government decisions.

11           The proposed NEPA rollbacks ultimately

12  take away our community power to become informed

13  and to weigh in on decisions that impact our

14  health and our environment.  This is a tragedy

15  and it's against American values as NEPA and the

16  ability it allows for public input is democracy

17  in action.  It further strengthens our

18  communities by showing that individual citizens

19  affected by these proposed actions are valued and

20  can be an important source and information of

21  their own communities.  This is why our ability

22  to weigh in is so very important.

Transcript of Public Hearing
Conducted on February 11, 2020                          187

1          NEPA serves as a foundation of

2    reasonable balance and transparent protections

3    for the environment, the public, our health, and

4    our future.  Our chances to weigh in on the water

5    we drink, the expansion of highways or pipelines

6    around the places we call home, the climate we

7    inherit or the use of our public lands that we

8    own cannot be lost.

9          It is our civic duty to make sure our

10   commodities are cared for eternally and shared

11   equitably.  I stand before you today to ask that

12   you do not diminish our voices as Americans and

13   our chance to have a say in our future.  I urge

14   the CEQ to protect NEPA and abandon these anti-

15   public interest changes.  Thank you.

16         MR. BOLING:  Thank you, Ms. Sandoval.

17   Mr. Comer.

18         MR. COMER:  Good afternoon.  My name is

19   Bob Comer, C-O, M as in major, E-R.  I'm here on

20   behalf of the American Exploration Mining

21   Association.  I've been involved in the NEPA

22   process for over 40 years as a federal employee

Transcript of Public Hearing
Conducted on February 11, 2020                    188

1    in the private sector as well as an ecologist and

2    as a lawyer.

3            AMA applauds CEQ for this long overdue

4    NEPA evaluation and implementation, process

5    evaluation.  NEPA is a tremendous tool of great

6    value in federal decision making and we believe

7    it's important to continue that.  It provides an

8    on ramp for public input to federal decisions and

9    ensures consideration of environmental issues in

10   the decision process.  But NEPA informs the

11   decision.  It's a substantive law that guides the

12   decision.

13           Yet rather than using NEPA as a tool to

14   shape better decisions it has become a tool to

15   stop decisions by having morphed into a

16   cumbersome process, and too often we hear we just

17   need to do more NEPA and as a result we think

18   it's important and we applaud CEQ's efforts to

19   reform the NEPA process so that better NEPA may

20   be conducted.

21           The decision makers who are the target

22   of the NEPA documents as distinguished from the

Transcript of Public Hearing
Conducted on February 11, 2020                    189

1   process do not have the time to read thousands of

2   pages of technical and marginal information.

3   Federal employees have full plates.  NEPA

4   documents must assist the manager in making wise

5   resource management decisions.  Some practices

6   have resulted from judicial interpretation which

7   can be guided through this regulatory process

8   especially given the thin statutory language of

9   NEPA, and other improvements will result from an

10  agency process that provides -- and regulation

11  that provides management and regulatory clarity

12  for those who prepare the NEPA documents.

13          Based on my 40 years of experience and

14  AMA's experience with many projects we believe

15  certain things will help the NEPA process.

16  Perhaps most importantly is more robust proponent

17  participation.  Proponent knows the project

18  better than anyone and to lock the proponent out

19  of the process takes more time and results in

20  lesser quality NEPA documents.

21          Encourage the agencies to produce their

22  own regulations and guidance to advance the NEPA

Transcript of Public Hearing
Conducted on February 11, 2020                    190

1    process given the substantive rules and statutory

2    provisions they're implementing.

3            Enforce the strict timelines and page

4    limits.  The two years should not be the

5    standard.  It should be a less than two year

6    goal.  And recognize that an EA can functionally

7    morph into an EIS that should not require

8    preparation of an additional NEPA document.

9            Tools to look at the lack of

10   significance are important.  Not every major

11   federal action exists where there's only a

12   modicum of federal discretion.  So, the

13   nondiscretionary action exemption should be

14   considered.

15           AMA will be writing additional

16   comments.  Thank you for your time and

17   consideration.

18           MR. BOLING:  Okay.  Thank you.

19           Mr. Zukoski.

20           MR. ZUKOSKI:  My name is Ted Zukoski

21   spelled Z-U-K-O-S-K-I.  I'm an attorney at the

22   Center for Biological Diversity.  The Center

Transcript of Public Hearing
Conducted on February 11, 2020                              191

1    opposes this rulemaking in part because it would

2    eliminate consideration of cumulative impacts and

3    would apparently make optional the consideration

4    of indirect impacts.

5              Let me give you an example for why

6    considering such impacts is critical.  Federal

7    lands around the Grand Canyon but outside the

8    natural park contain rich uranium deposits.  In

9    2007 the price of uranium went up and mining

10   companies staked over 10,000 mining claims on

11   these federal public lands.  Concerned about the

12   mining boom the Interior Department started a

13   NEPA process to consider protecting the Grand

14   Canyon region by placing a million acres there

15   off limits to new mining claims.

16             Now uranium mining has many damaging

17   impacts including destruction of wildlife habitat

18   for mine sites and road construction, but it

19   would also have another major impact.  Water

20   seeping into the mines could move toxic uranium

21   into the aquifer that is the only source of water

22   for seeps, springs, and Havasu Creek inside Grand

Transcript of Public Hearing
Conducted on February 11, 2020                          192

1    Canyon National Park and the Havasupai homeland.

2    Impacts to surface water could take decades to

3    occur as water moves slowly through the aquifer,

4    but the impacts would be devastating.

5              Uranium pollution could poison water

6    for wildlife as well as the only source of

7    drinking water for the Havasupai Tribe who take

8    their name from and rely on the blue green waters

9    of Havasu Creek.  So, allowing uranium to be

10   mined around the Grand Canyon presents an

11   existential threat to the Havasupai and their

12   culture.

13             Under the existing NEPA regs the

14   Interior Department carefully analyzed mining's

15   potential impacts to ground water and concluded

16   that, quote, "the likelihood of a serious impact

17   from groundwater pollution may be low but should

18   such an event occur significant".  And based in

19   part on this finding the Secretary of Interior

20   barred new uranium mining claims around the

21   canyon for 20 years.

22             Now that's a happy ending but one that

Transcript of Public Hearing
Conducted on February 11, 2020                                    193

1    might not have happened under CEQ's proposal.

2    That's because the potentially devastating impact

3    to groundwater was one Interior concluded was an

4    indirect impact, and under the proposed rules the

5    Interior Department could decide it didn't need

6    to disclose these indirect effects to wildlife

7    and to a people and a culture because they

8    weren't proximate enough.  That's an utter

9    subversion of the NEPA process.

10           Putting on blinders to key

11   environmental harms is the opposite of what the

12   law and common sense require.  We therefore urge

13   CEQ to ensure that all impacts, direct, indirect,

14   and cumulative are disclosed by abandoning this

15   rulemaking otherwise entire communities and

16   landscapes like the Grand Canyon will be at risk.

17   Thank you.

18           MR. BOLING:  Thank you.

19           State your name and spell it for the

20   record.

21           MR. HARDEE:  I'm Alex Hardee,

22   H-A-R-D-E-E, and I'm an attorney at the Denver

Transcript of Public Hearing
Conducted on February 11, 2020                           194

1    office of Earth Justice where I've worked on a

2    variety of NEPA cases.

3            NEPA is often described as a procedural

4    statute but what that really means is that

5    Congress intended NEPA's procedural provisions to

6    implement its substantive mandate.  It knew

7    agencies blind to the negative consequences of

8    their actions couldn't take steps to avoid them

9    whereas taking a hard look at a first choice as

10   well as several alternatives provides the

11   information necessary to make a better decision.

12           Of course, under NEPA the agency may

13   still choose its original proposal, but it's

14   clear that Congress intended NEPA to actually

15   improve federal decision making.  After all, one

16   of the statutes goals is nothing short of making

17   each generation a trustee of the environment for

18   future generations.

19           And even if NEPA doesn't lead an agency

20   to change its decision, it still requires it to

21   publish its analysis and accept public comment

22   making an otherwise obscure bureaucratic process

Transcript of Public Hearing
Conducted on February 11, 2020                                    195

1    more democratic.  The critical point is that the

2    process exists to fulfill the statutes

3    substantive mandate.

4           CEQ now says it wants to modernize the

5    NEPA process to make the regulations more

6    efficient, but the proposed changes show that CEQ

7    really wants to make NEPA analysis more

8    constrained, less democratic, and insulted from

9    judicial review.  This would transform a process

10   Congress envisioned as opening public official's

11   eyes into one where it's acceptable or even

12   encouraged to bury their heads in the sand.

13          To give just a few examples of what the

14   proposal would do.  First it attempts to make

15   projects with minimal federal funding or

16   involvement not subject to NEPA.  This could

17   preclude NEPA analysis in cases where federal

18   approval is a linchpin to a large non-federal

19   project like a pipeline or housing development

20   while encouraging the responsible agency to

21   contend that its involvement is minimal.

22          Second, the proposal all but eliminates

Transcript of Public Hearing
Conducted on February 11, 2020                                    196

1    consideration of indirect and cumulative effects.

2    This would avoid considering any effects that

3    occur later in time for a proposal such as the

4    emissions a pipeline would facilitate, the risk

5    of a spill from an oil drilling proposal, or the

6    likelihood of water contamination and cleanup

7    costs from a mine approval.

8            While all these environmental

9    consequences are significant they would occur

10   over time rather than as a proposal goes into

11   place and by this fact alone the CEQ now wants to

12   allow all federal agencies to simply ignore them.

13           Third, the proposal allows a proponent

14   to define its purpose and need so narrowly as to

15   eliminate anything but the proposed alternative.

16   So, if a company proposing oil and gas drilling

17   on public land is doing its own NEPA analysis,

18   which is also allowed under the rules, it can

19   preclude consideration of any alternative that

20   prohibits drilling in sensitive areas or near

21   landmarks such as national parks and monuments.

22   And this is just a small subset of the problems

Transcript of Public Hearing
Conducted on February 11, 2020                    197

1    with the proposed changes.

2            In closing, I emphasize that NEPA's

3    purpose is to ensure that important consequences

4    are known before a decision is made rather than

5    after when it's too late to change course.  CEQ's

6    proposal would weaken NEPA to the point of it

7    being an after thought in federal approvals.  The

8    proposal is arbitrary, capricious, and contrary

9    to statute.

10            Also, because this proposal will result

11   in significant impacts to the environment CEQ

12   must prepare an environmental impact statement on

13   its proposal which it has not done.  Thank you.

14            MR. BOLING:  Thank you, Alex.

15            All right.  Next up is -- state your

16   name for the record.

17            MR. CROWGHOST:  Good afternoon.  Doug

18   Crowghost, C-R-O-W-G-H-O-S-T, Standing Rock Sioux

19   Tribe, Department of Water Resources for east

20   North Dakota.  Thank you.

21            I'm just going to talk about a few

22   points of the proposed revised NEPA regulations.

Transcript of Public Hearing
Conducted on February 11, 2020                          198

1    Thank you for allowing me to be here.  Tribes use

2    the current NEPA process for protecting treaty

3    rights and the environment.  The Trump

4    Administration's proposed rules will violate the

5    treaty rights and jeopardize the environment in

6    Indian country.  Current CEQ regulations require

7    federal projects to evaluate for their impacts on

8    Indian lands and CEQ guidelines require

9    consideration of Indian treaty rights.

10           Today environmental justice is an

11   essential part of the environmental review of

12   major projects.  Many tribes utilize the current

13   NEPA regulations to ensure impacts on treaty land

14   and water are to be protected.  The CEQ proposed

15   rule jeopardizes Indian treaty land and water for

16   future development.  The proposed rule must not

17   go through.

18           The second thing is the proposed rule

19   will result in destruction of cultural resources

20   and sacred sites on Indian lands.  Today

21   government agencies reviewing infrastructure

22   projects must coordinate environmental review

Transcript of Public Hearing
Conducted on February 11, 2020                        199

1    with cultural resource consultations.  The

2    proposed rule jeopardizes protections to Native

3    American cultural resources in addition to our

4    culture and our environment.

5              Third, the NEPA process is needed for

6    tribal consultation.  The Standing Rock Sioux

7    Tribe experience with the Dakota Access Pipeline

8    shows how massive environmental destructive

9    infrastructure can approve without -- be approved

10   without tribal consultation.  NEPA provides a

11   framework for consultation and now the

12   administration is trying to undo that framework.

13   Significantly, under federal law there should be

14   consultations with tribes for proposed rule and

15   there has been no consultation whatsoever.

16             The Dakota Access Pipeline needs a

17   strong environmental review of infrastructure

18   projects.  The Standing Rock Sioux Tribe

19   experienced firsthand the need for strong

20   environmental review under NEPA.  The Dakota

21   Access Pipeline was not properly evaluated the

22   federal judge ruled in that case.  Agencies

Transcript of Public Hearing
Conducted on February 11, 2020                              200

1    conduct more stringent environmental impact

2    statements.  Bottom line, the rule should not be

3    put into place.  Thank you.

4              MR. BOLING:  Thank you.  Okay.  I have

5    a couple people that I hadn't checked in before

6    we got started here.  I have Jeff Cummings.  Is

7    he in the audience to speak?  No.  Steve Shadow.

8    I haven't seen Steve.  Okay.  Pinu Estep

9    (phonetic).  No.  Okay.  Then we're going to go

10   into our reserve speakers.  We have Ed, letter A.

11   Jean Tate.  Followed by Jolena Pang, letter B,

12   and letter C is Sally Anderson.  So, Jean and

13   Joanna and Sally can sit at the table.

14             MS. TATE:  Thank you much for this

15   opportunity.  My name is Jean Tate,

16   J-E-A-N, T as in tango, A-T-E.  I am an applied

17   ecologist with a Ph.D. and 33 plus years in

18   consulting and working with NEPA documents

19   primarily.

20             I oppose your proposed rule change in

21   its entirety.  I think there are a few things

22   mentioned that might be good; increased

Transcript of Public Hearing
Conducted on February 11, 2020                    201

1    collaboration, using modern technology, but I

2    think all of the things that are good in what you

3    have proposed can already be accomplished under

4    the existing purview of the current NEPA law.

5            I particularly oppose the presence of

6    time and page limits beyond what is currently in

7    the law.  There must be adequate time for public

8    input and for data collection.  As an ecologist

9    particularly working with wildlife, plants, it

10   takes time to collect data if you're not just

11   going to rely on previous data.  You need new

12   data that requires seasonal appropriate

13   collection.

14           Cumulative impacts are critical.  If

15   you remove critical impacts and direct impacts

16   that take a long time you are absolutely gutting

17   the NEPA process.  The process must play out and

18   allow time for due consideration.  There's been a

19   lot of talk about transportation projects taking

20   a particularly long amount of time.  Those

21   projects cover all kinds of different lands,

22   different ownership, et cetera.  It just makes

Transcript of Public Hearing
Conducted on February 11, 2020                           202

1    sense that they do because they're more complex.

2          So, can NEPA be messy?  Yes.  Can it

3    take a long time?  Yes.  But I would remind

4    everyone that so does democracy.  This is not an

5    efficient form of government but it's one that

6    lets us all have a voice.

7          And I am also greatly concerned about

8    opening the NEPA process for any changes in the

9    current political climate.  Thank you.

10         MR. BOLING:  Thank you.

11         MS. PANG:  Hi.  My name is Jolena Pang.

12   Thank you for listening today.  I'm a resident of

13   Denver County, an organizer, and a recent

14   graduate from Washington University in St. Louis

15   with a bachelor's in environmental biology.  I'm

16   22.  I moved here five months ago.  I oppose the

17   proposed revisions to the National Environmental

18   Policy Act.

19         I didn't plan on speaking today so I'm

20   sorry if this is choppy, but I'm compelled to

21   speak because, frankly, I'm always concerned

22   about our environment and for good reason.  I'll

Transcript of Public Hearing
Conducted on February 11, 2020                              203

1    talk soon about my family but in my own personal

2    experience I just moved from St. Louis to one of

3    the most polluted cities in the United States.

4    I've seen the science come to life in families in

5    80216, one of the most polluted zip codes in

6    America.  These families suffering from asthma,

7    lung cancer, endocrine disorders, and birth

8    defects.

9            And why do you think that is?  Maybe

10   it's because there isn't enough enforcement of

11   environmental law.  Maybe we don't spend enough

12   time thinking about these low-income mostly

13   minority communities of color.

14           And yet here we are taking more of

15   their voice away and shortening the time of

16   environmental consideration on behalf of the

17   industries that are killing our people with

18   chemical spills, oil spills, and climate change.

19   Climate change which will now not even be

20   considered if these changes take place as basic

21   earth science tells us that climate change is

22   inherently geographically remote.  Convenient for

Transcript of Public Hearing
Conducted on February 11, 2020                          204

1    industry but not as much for the whole of youth

2    that will be here for, fingers crossed, a long

3    time.

4            I know personally the harms and

5    destruction that weaker environmental laws bring.

6    Look at China where most of my family lives.

7    According to an article from the New York Law

8    Journal Chinese environmental law is similar to

9    NEPA, modeled off of U.S. law, but the difference

10   is it's less strict and public access is

11   restricted compared to the current state of NEPA.

12           The USA is regressing its environmental

13   policy to be like China's where the air quality

14   index is double our already poor status in Denver

15   where 16 of the most polluted cities, where my

16   dad's side of the family lives and where he got

17   diagnosed with asthma and sleep apnea, where two

18   of my uncles died before the age of 60 due to

19   environmental hazards.

20           I want to live in a country where I

21   don't breathe air thinking about how it's keeping

22   me alive and killing me at the same time.  I want

Transcript of Public Hearing
Conducted on February 11, 2020                              205

1    the decision makers of today to consider the

2    future generations and see me and my peers as

3    people worthy of living past the age of 60 or 50

4    or 40.  Instead I'm spending my twenties fighting

5    policies like these that threaten the world,

6    eliminating climate considerations, and who will

7    have to bear that burden.  Let's start to

8    consider the future when making the decisions of

9    today.  Thank you.

10              MR. BOLING:  Thank you.  Sally, you

11   will be our last speaker before we take a break.

12              MS. ANDERSON:  Okay.  My name is Sally

13   Anderson.  I'm here to make a statement on behalf

14   of Congressman Joe Neguse, N-E-G-U-S-E.  The

15   Congressman's comment is, I comment today as I

16   did last month in a letter to CEQ with my

17   congressional colleagues with strong opposition

18   to the administration's proposal to ignore the

19   full extent of the climate crisis in implementing

20   the National Environmental Policy Act or NEPA.

21              Human caused climate change is exactly

22   the kind of complex environmental problem NEPA

Transcript of Public Hearing
Conducted on February 11, 2020                    206

1    was intended to address.  On January 9th of this

2    year the Trump Administration proposed a broad

3    weakening of the regulations promulgated under

4    NEPA.  One of the most critical aspects of the

5    proposed revisions is the removal of the

6    requirement that agencies analyze cumulative

7    impacts under NEPA which would have the effects

8    of removing any analysis of climate impacts.

9          The very nature of the climate crisis

10   of course is that climate change impacts such as

11   sea level rise can be quite remote in time and

12   geography from the human causes of climate change

13   including the combustion of natural gas, oil, and

14   coal, and the clearcutting of forests.  The

15   proposal ignores the reality of climate change

16   and the critical role NEPA plays in addressing

17   it.

18          Those here in Denver are no stranger to

19   what is known as the brown cloud, a layer of smog

20   over the city caused by weather patterns and

21   local sources of pollution including

22   transportation.  In fact, last March Denver's air

Transcript of Public Hearing
Conducted on February 11, 2020                                207

1    quality index was at a level three times worse

2    than Beijing.

3            Now is not the time to be loosening

4    environmental regulations that not only protect

5    treasured landscapes and fragile ecosystems but

6    also contribute to clean air and water for our

7    communities.  The crisis is too serious to be

8    rolling back the very protections that defend

9    against bad actors.

10            I urge the administration to not move

11   forward with the revisions that have been

12   proposed.  Thank you.

13            MR. BOLING:  Thank you very much.

14            We're going to try to get to the other

15   speakers at the end.  Okay.  We'll try to get to

16   the rest of the alphabet speakers by the end, but

17   we'll take a quick break now resuming in about

18   five minutes and hopefully we can get everybody.

19   Thank you.

20            (Break.)

21            MR. BOLING:  17 is up, 18 and 19 can

22   have a seat.  Thank you very much.

Transcript of Public Hearing
Conducted on February 11, 2020                    208

1           MS. CUTHBERT-MILLETT:  Oh, to be 17

2    again.  Hello.  My name is Liza Cuthbert Millett.

3    Is that good?  Liza.  Oh, wow.  Yeah.  Liza

4    Cuthbert-Millett.  I'm sorry.  It's hyphenated.

5    C-U-T-H-B-E-R-T, dash, M-I-L-L-E-T-T.  So good

6    afternoon everybody.  My name is Liza Cuthbert-

7    Millett.  I live in Laramie, Wyoming.  And I also

8    live and work up at my family cow/calf operation

9    in the northeastern part of the state.  So, I'm

10   coming to you today with the perspective of a

11   citizen who has been involved many times with the

12   NEPA process to protect my quality of life, my

13   livelihood, my family, my community.

14           NEPA was enacted in the 70s to require

15   agencies to essentially look before you leap, to

16   study the environmental, public health, and

17   economic consequences of a decision, and to

18   consider the alternatives that will reduce those

19   impacts.  And while NEPA does not mandate the

20   result, it's the process that matters especially

21   as a mechanism to allow those most impacted by an

22   agency decision to weigh in and comment.

Transcript of Public Hearing
Conducted on February 11, 2020                     209

1          The right of citizens to meaningfully

2    weigh in on federal decisions impacting their

3    communities is the most important guarantee of

4    the current NEPA regulation in my opinion.  NEPA

5    recognizes that the public can make important

6    contributions by providing information,

7    perspective, and in some cases unique expertise

8    to assist the many public servants and experts

9    who ultimately make the decisions affecting the

10   environment.

11          I oppose any limits on the public's

12   ability to participate in federal decision

13   making.  This is especially important for

14   landowners and others who are directly impacted

15   by decisions related to oil and gas development,

16   powerline construction, pipeline rights-of-ways,

17   and other federal actions that are proposed by

18   private corporations.

19          NEPA is the process by which those of

20   us impacted by these kinds of decisions get to

21   submit comments to the agency.  In many cases

22   public comments result in a better decision.

Transcript of Public Hearing
Conducted on February 11, 2020                           210

1   Comments can help mitigate impacts, often force

2   the agency to look at alternatives and other

3   options that it would not have considered but for

4   the public involvement in the process.

5                One part of the rule that's

6   particularly concerning to me is the time limits

7   that are being proposed.  Citizens like me

8   without vast technical backgrounds need adequate

9   time to participate in the process.  The

10  documents are long and complex, and I worry that

11  a rushed review will become a really bad review

12  and will cut off all meaningful opportunity for

13  public participation.

14               I'm also very concerned that the

15  proposed changes to how agencies will consider

16  cumulative impacts.  Living in a state like

17  Wyoming I know decisions have a land scale

18  impact.  We have to consider impacts and

19  corresponding protections to a large scale to

20  better protect habitat necessary for vibrant

21  wildlife populations, our land, air, water.

22               I hope you consider the comments of

Transcript of Public Hearing
Conducted on February 11, 2020                        211

1    people like me.  I oppose the current proposed

2    amendments to NEPA, and we require and we -- my

3    family ranch, my community, and the citizens of

4    Wyoming depend on it so please protect us.  Thank

5    you.

6              MR. BOLING:  Thank you.

7              MS. ANDERSON:  Hi.  Shannon Anderson.

8    Shannon, S-H-A-N-N-O-N.  Anderson with an O-N,

9    A-N-D-E-R-S-O-N.  Good afternoon.  I'm a staff

10   attorney at Powder River Basin Resource Council.

11   Our organization works with landowners, family

12   farmers and ranchers, and other concerned

13   citizens in Wyoming to protect our state's

14   quality of life and our air, land, wildlife, and

15   water resources.  A core component of our mission

16   if the empowerment of citizens to make a

17   difference in decisions that impact their lives.

18              To that end the National Environmental

19   Policy Act is an important tool that promotes

20   democracy and citizen involvement.  Personally, I

21   have read and commented on probably over 100 NEPA

22   documents.  The first environmental impact

Transcript of Public Hearing
Conducted on February 11, 2020                                    212

1    statement I ever commented on was back in college

2    20 years ago and through that project I learned

3    that NEPA facilitates coordination, consultation,

4    and good science.  The process matters.  And

5    decades later it still matters.

6              In my work today I regularly review and

7    comment on NEPA documents related to fossil fuel

8    development in Wyoming.  I work with our members

9    to weigh in and provide information to the

10   agencies undergoing NEPA review.  I have learned

11   over the years that agencies make better

12   decisions when the public is involved.

13             This is especially true for public

14   comments coming from split estate landowners who

15   have a unique and personal knowledge about the

16   resources on and near their property.  And it is

17   equally true for citizen groups who submit

18   detailed technical comments and scientific

19   resources to the agencies.

20             The case law refers to NEPA's twin

21   purposes.  First NEPA places upon an agency the

22   obligation to consider every significant aspect

Transcript of Public Hearing
Conducted on February 11, 2020                          213

1    of the environmental impact of a proposed action

2    before that action is taken.  Second, the

3    agency's NEPA document informs the public of

4    those environmental consequences and concerns.

5           Our organization is deeply concerned

6    that the proposed rules you are considering today

7    will forever thwart and obscure those twin

8    purposes.  The amendments you are seeking to push

9    forward are not simple changes.  They are

10   fundamental changes to how the public will

11   participate in the NEPA process.

12          NEPA and it's regulations have stood

13   the test of time.  The law and regulations are

14   certainly not perfect.  No agency process is.

15   But the changes you are proposing are unnecessary

16   and dangerous.  The changes will create worse

17   agency decisions and instead of making the

18   process easier and better your changes will have

19   the opposite effect by inserting uncertainty and

20   confusion into the NEPA process.

21          On behalf of our over 115 members in

22   Wyoming I urge you to abandon your proposal and

Transcript of Public Hearing
Conducted on February 11, 2020                    214

1    keep the current set of regulations in place.

2    Thank you.

3            MR. BOLING:  Thank you.  Okay.

4            MS. O'BRIEN:  Mary O'Brien, O

5    apostrophe B-R-I-E-N.  NEPA is famously known as

6    the "look before you leap" law.  One of the

7    regulations that describes how to look before you

8    leap is Section 1502.24 regarding methodology and

9    scientific accuracy.  The first sentence of that

10   regulation is almost but not the same in both the

11   current and proposed versions.

12           The current version says, "Agencies

13   shall insure the professional integrity including

14   scientific integrity of the discussions and

15   analyses in environmental documents."  The

16   proposed version replaces insure with an I to

17   ensure with an E.  Merriam-Webster notes that

18   both words mean to make certain but that insure

19   has the additional meaning to provide or obtain

20   insurance on or for, which is not shared by

21   ensure.

22           So, the CEQ explains this in the next

Transcript of Public Hearing
Conducted on February 11, 2020                          215

1    sentence.  Quote, "Agencies shall make use of

2    reliable existing data and resources and are not

3    required to undertake new scientific and

4    technical research to inform their analyses."  In

5    other words, if you're lacking key information

6    about what might go wrong with leaping, leap

7    anyway.

8             Yes, agencies or project proponents

9    should undertake scientific and technical

10   research to ensure the scientific integrity of

11   their analyses.  The knee jerk response may be

12   that obtaining the information might be too

13   expensive, but the current Section 1502.22 about

14   incomplete or unavailable information states that

15   an agency is not required to obtain scientific or

16   technical information if the overall costs of

17   obtaining it are exorbitant.  Here, the CEQ

18   proposes to replace exorbitant costs with

19   unreasonable costs.  Unreasonable to whom?  The

20   drilling proponent?  The nearby community?

21             An example, the Manti La Sal National

22   Forest has rejected designating the western

Transcript of Public Hearing
Conducted on February 11, 2020                    216

1    bumblebee as a species of conservation concern

2    while revising its 40 year old forest plan.  The

3    forest noted that, yes, the western bumblebee has

4    undergone a drastic decline in population and is

5    native to the forest but stated that western

6    bumblebee hadn't been known to occur on the

7    forest in the past 20 years without noting

8    whether anyone had looked for the bumblebee in 20

9    years.  Instead the agency concluded that the

10   best available scientific information about this

11   specie is too limited to protect the species.

12          But last summer a local librarian who

13   is also an entomologist walked around on the

14   Manti La Sal National Forest on his days off and

15   captured two western bumblebees a few miles from

16   the library.  It's a small example but it speaks

17   to the large CEQ proposal that would say an

18   agency does not have to ensure the scientific

19   integrity of its analyses and discussions.  Thank

20   you.

21          MR. BOLING:  Thank you.

22          MR. GIRARD:  Good afternoon.  My name

Transcript of Public Hearing
Conducted on February 11, 2020                    217

1    is Matt Girard spelled G-I-R-A-R-D.  I'm civil

2    division group head for Plenary Group, a long-

3    term investor, developer, and manager of public

4    infrastructure.  I'm here today in my capacity as

5    a member of the board of directors for the

6    American Road and Transportation Builders

7    Association, commonly known as ARTBA.

8              ARTBA, a 118 year old national

9    organization with 8,000 entity members and based

10   in the nation's capitol represents all sectors of

11   the U.S. transportation construction industry

12   which generates over $500 billion in U.S.

13   economic activity and helps sustain more than

14   four million permanent American construction

15   jobs.

16             Let me start by stating that ARTBA

17   supports NEPA as an essential tool for protecting

18   the environment and ensuring meaningful feedback

19   from the public and all stakeholders about

20   projects, but it has not been fundamentally

21   improved in over three decades.  Adversaries have

22   weaponized NEPA's outdated review procedures to

Transcript of Public Hearing
Conducted on February 11, 2020                    218

1    cause extensive delay or even derail completely

2    much needed transportation improvement projects.

3    NEPA's delays and uncertainties can add

4    significant costs to these important projects at

5    a time when funding is already constrained

6    nationwide.  These delays also keep the traveling

7    public from seeing these improvements in a timely

8    manner further impacting travel times and quality

9    of life.

10            Specifically, for the public private

11   partnerships I work with every day across this

12   country the current uncertainties in the NEPA

13   process cause bidders to either increase project

14   bids, a cost increase which ultimately is passed

15   on to the public or forego bidding altogether.

16   Currently it takes an average of five to seven

17   years to complete the environmental review

18   process for a new federal aid project.  That's

19   simply too long.

20            In fact, right here in Denver the I-70

21   wide project, a $1.2 billion project to alleviate

22   severe traffic congestion through the expansion

Transcript of Public Hearing
Conducted on February 11, 2020                    219

1   of 12 miles of highway has become an infamous

2   illustration of the need for NEPA reforms.  The

3   project will provide the first safety and

4   capacity improvements to I-70 since the highways

5   construction in 1964 and adding both capacity as

6   well as shoulders for breakdowns.  The NEPA

7   process for this stretch of highway took over 13

8   years to complete, involved over 200 meetings,

9   and set a record for length, almost 16,000 pages

10  in this document.

11          During this extended NEPA period the

12  DOT spent $40 million on studies and over $30

13  million on viaduct repairs that theoretically

14  should have been spent on the new construction

15  instead.  At the end of the NEPA process with 140

16  different individual mitigation commitments made

17  to the public at a cost to the DOT and the

18  taxpayers of another 50 million the project was

19  the recipient of five separate legal actions.

20  The I-70 story is the definition of a broken NEPA

21  process.

22          The reforms proposed by CEQ such as

Transcript of Public Hearing
Conducted on February 11, 2020                          220

1    both time and page limits for the review process

2    and strengthening lead agencies ability to set

3    schedules will add predictability to the NEPA

4    process.

5              NEPA modernization will not and should

6    not guarantee favorable decisions on projects but

7    will greatly improve the NEPA processes for

8    liability and timeline by resulting in a more

9    expeditious while still thorough review process

10   without impacting environmental standards.

11             NEPA was never meant to be a statute

12   enabling delay but rather a vehicle to promote

13   balance.  Modernizing the NEPA process for our

14   nation's infrastructure is essential if we want

15   to fix our nation's infrastructure efficiently

16   and timely while not sacrificing necessary

17   regulatory safeguards.  Thank you.

18             MR. BOLING:  Thank you.

19             All right.  Next up Nada Culver to be

20   followed by Mary Jo Brooks and Michael Saul.

21   Michael Saul and Mary Jo Brooks you can take

22   seats at the table.

Transcript of Public Hearing
Conducted on February 11, 2020                    221

1           MS. CULVER:  My name is Nada Culver,

2     N-A-D-A C-U-L-V-E-R.  I'm the vice president of

3     Public Lands and Senior Policy Council for the

4     National Audubon Society here in Denver.  Our

5     mission is to protect birds in the places they

6     need today and tomorrow.  Public lands are key

7     for our mission since more than 1,000 bird

8     species, more than 250 of conversation concern

9     are found on public lands.

10          Thanks to the National Environmental

11    Policy Act our more than 1.7 million members and

12    so many others that care about birds know they'll

13    get a chance to weigh in on how public lands are

14    managed and that federal agencies will have to

15    consider the effects of their decisions before

16    committing to them.

17          This is common sense not only because

18    we know public input and information lead to

19    better decision making but also because federal

20    agencies act as stewards for all the users and

21    resources of the public lands.  Unfortunately,

22    the changes proposed to the NEPA regulations no

Transcript of Public Hearing
Conducted on February 11, 2020                                    222

1    longer follow the overarching direction of the

2    statute which sets out an unquestionable

3    commitment to protecting the environment as a

4    part of decision making.

5              NEPA sets out a national policy to

6    fulfill the responsibilities of each generation

7    as trustee of the environment for succeeding

8    generations and to attain the widest range of

9    beneficial uses of the environment without

10   degradation or other undesirable and unintended

11   consequences.

12             The proposed revisions include removing

13   requirements to take into account indirect and

14   cumulative effects, limiting the range of

15   alternatives, and narrowing the definition of

16   effects an agency can even consider.  This could

17   not be more inconsistent with NEPA.  Without

18   looking at the full extent of the effects of a

19   proposed action and other approaches we obviously

20   cannot avoid degradation and undesirable and

21   unintended consequences.

22             A recent Audubon report found that two-

Transcript of Public Hearing
Conducted on February 11, 2020                    223

1    thirds of North American birds are at an

2    increasing risk of extinction from climate change

3    and a Cornell study found that three billion

4    birds, nearly one in three, has vanished in the

5    last half century.  This is no time to be

6    ignoring new science as is likely based on the

7    revisions to Section 1502.24 or to ignore the

8    direct, indirect, and cumulative effects of

9    climate change as would result from the revisions

10   to Section 1508.1 and other proposed allegiance.

11          These concepts: considering likely

12   environmental consequences, evaluating

13   alternatives, and seeking to avoid harm to the

14   environment are not just words on a page.  They

15   have real meaning for birds, for our environment,

16   and for all of us.

17          NEPA has allowed us to improve and

18   support how renewable energy projects can be

19   responsibility sited through the Desert Renewable

20   Energy Conservative Plan and to craft solutions

21   protecting the greater sage-grouse including a

22   range-wide management plan and mitigation

Transcript of Public Hearing
Conducted on February 11, 2020                    224

1    measures for both wind and oil and gas projects.

2            As CEQ notes, the basic structure of

3    these regulations has been in place for decades.

4    Agencies have developed implementation procedures

5    and a common language for meeting the statute's

6    goals.  Removing these most basic terms and

7    requirements that have ensured proposals are

8    appropriately vetted will neither modernize nor

9    clarify the regulations.  It will sow confusion

10   and ultimately undermine NEPA.  CEQ can update

11   regulations without removing the core that drives

12   NEPA and CEQ's obligation to implement in a

13   manner that protects our environment.  Thanks.

14           MR. BOLING:  Thank you.

15           MS. BROOKS:  I'm Mary Jo Brooks.  Mary

16   Jo is two words, just J-O, and Brooks is

17   B-R-O-O-K-S.  I'm with the National Wildlife

18   Federation.

19           NEPA is an essential framework for

20   protecting public safety, wildlife, and the

21   environment.  It is based on a very simple idea,

22   before deciding how to proceed with a major

Transcript of Public Hearing
Conducted on February 11, 2020                    225

1    federal project planners must analyze the

2    potential environmental and public health impacts

3    and gather input from members of the public.  It

4    is the foundation of reasonable, balanced, and

5    transparent protections for the environment.

6    That is why the National Wildlife Federation is

7    so distressed at the proposal put forth to change

8    this bedrock law.

9           I'd like to focus my remarks on five

10   major policy implications of the administration's

11   flawed proposal.  One, exempting certain types of

12   projects from environmental review.  The proposal

13   creates new tests for whether or not NEPA applies

14   and narrows the scope of projects that require

15   environmental review.

16          Two, severely limiting the types of

17   impacts that are reviewed.  The proposal

18   explicitly states that analysis of cumulative

19   effects is not required.  It also eliminates all

20   references to indirect effects which could

21   include such things as downstream water pollution

22   and diverting flood waters onto downstream

Transcript of Public Hearing
Conducted on February 11, 2020                    226

1   communities.  And the proposal explicitly states

2   that agencies are not required to undertake new

3   scientific and technical research to inform their

4   analysis eliminating the current requirement to

5   obtain needed scientific information.

6            Three, significantly weakening the

7   review of alternatives.  The proposal eliminates

8   the requirement to rigorously explore and

9   objectively evaluate all reasonable alternatives.

10  This undermines NEPA's fundamental purpose of

11  exploring less environmental damaging approaches

12  to achieving the project's purpose.

13           Four, creating loopholes to ignore

14  public comment.  The proposal creates loopholes

15  that could allow federal agencies to ignore

16  public comment.  NEPA is the only law that gives

17  the public a voice in federal decision making so

18  any attempt to limit public comment silences

19  communities that could be harmed the most by

20  federal actions.

21           And five, blurring the lines on

22  conflicts of interest.  The proposal would allow

Transcript of Public Hearing
Conducted on February 11, 2020                    227

1    companies to conduct their own environmental

2    reviews.  The current regulations ensure that any

3    conflicts of interest for companies are avoided

4    by requiring financial and interest disclosures.

5    The new proposal would blur the lines on these

6    requirements allowing the companies to assume a

7    greater role in contributing information and

8    material to the preparation of environmental

9    documents.

10            One of the clearly stated purposes of

11   NEPA is to attain the widest range of beneficial

12   uses of the environment without degradation, risk

13   to health or safety.  The new proposal to change

14   NEPA would mean the government is failing to meet

15   this motion basic obligation under NEPA.

16            I urge you to reject the

17   administration's proposal to fundamentally

18   dismantle the law that has served our country so

19   well for the past 50 years.  Thank you.

20            MR. BOLING:  Thank you.

21            MR. SAUL:  Good afternoon.  Thanks for

22   the opportunity to speak.  My name is Michael

Transcript of Public Hearing
Conducted on February 11, 2020                    228

1    Saul, S-A-U-L.  I'm an environmental attorney

2    with the Center for Biological Diversity here in

3    Denver and I have spent basically the past two

4    decades of my career practicing in large part

5    under the National Environmental Policy Act.

6              I spent years reading, studying, and

7    commenting on environmental impact statements,

8    environmental assessments and other NEPA

9    documents, and helping community groups, local

10   residents, students, wildlife enthusiasts

11   exercise their right to understand and weigh in

12   on governmental decisions being made in our name

13   and with our money.  In that time I've come to

14   value and admire the National Environmental

15   Policy Act as an exceptional tool not just for

16   environmental protection but for effective

17   democratic government and well informed decision

18   making.

19              Nearly 40 years of NEPA law under the

20   existing CEQ regulations have built fairly clear

21   rules and processes to give the public a window

22   into what federal agencies are doing and a voice

Transcript of Public Hearing
Conducted on February 11, 2020                        229

1    in improving those federal agency decisions.  The

2    proposed CEQ rule changes before you today as a

3    whole are contrary, not just to Congress' intent

4    and language in passing the National

5    Environmental Policy Act, but to the transparency

6    building and democracy building functions of the

7    Act as it's been implemented over the past

8    decades.

9            In the highly unlikely event that these

10   proposed changes somehow survive judicial review,

11   Americans would be left not only with lands and

12   waters that are unnecessarily polluted, but with

13   a government that is less transparent, less

14   accountable, and less just.

15           Because three minutes is grossly too

16   short a time to catalogue all of the legal and

17   policy deficiencies in the proposed rule I want

18   to focus on one key issue that others have

19   mentioned, the proposed changes to Section 1508.8

20   and elsewhere which would reduce or eliminate

21   federal agencies current duty to disclose and

22   analyze indirect and cumulative impacts from

Transcript of Public Hearing
Conducted on February 11, 2020                    230

1    proposed actions.  Those are environmental harms

2    which may be later in time or removed in space

3    from a narrowly defined federal action, or which

4    may result from the combination of many smaller

5    actions, both federal and non-federal.

6            In my decades of NEPA work I have seen

7    countless examples where disclosure of these

8    indirect and cumulative impacts has led federal

9    agencies to disclose and the public to object to

10   public land management decisions that would have

11   indirectly or cumulatively destroyed important

12   habitat for at-risk wildlife like the desert

13   tortoise, the greater in Gunnison sage-grouse or

14   the ancient pallid sturgeon.

15           Disclosure of indirect and cumulative

16   impacts to these wildlife has ultimately resulted

17   in federal agencies deciding to spare habitat

18   from unnecessary destruction, avoiding needless

19   harm and needless conflict.  The proposed rule

20   changes would pointlessly reduce or eliminate the

21   disclosure of such impacts resulting in

22   unnecessary environmental harm, reduced

Transcript of Public Hearing
Conducted on February 11, 2020                    231

1    transparency and accountability and less trust

2    between communities and government agencies.

3              The Center for Biological Diversity

4    urges CEQ to scrap these proposed changes in

5    their entirety.

6              MR. BOLING:  Thank you, Michael.

7              Next we have number 24, Diane Schwenke.

8    And I don't know who number 25 is, but if you and

9    number 26, Dirk Draper, could come up to the

10   table we'll be ready for you.

11             MS. SCHWENKE:  Good afternoon.  My name

12   is Diane, D-I-A-N-E, Schwenke, S-C-H-W-E-N-K-E,

13   and I want to thank you for the opportunity to

14   comment on this proposal to modernize the

15   National Environmental Policy Act.  I represent

16   the Grand Junction Area Chamber of Commerce in

17   Colorado, an organization of 900 mostly small

18   businesses that employ over 37,000 people in Mesa

19   County, and we support NEPA and we support the

20   proposal to modernize this process.

21             Mesa County, my home, lies on the

22   western border of Colorado 250 miles from here.

Transcript of Public Hearing
Conducted on February 11, 2020                    232

1    The county is composed of 3300 square miles, 72

2    percent of which is publicly owned.  The BLM and

3    Forest Service alone manage over 1.3 million

4    acres in my backyard.  Needless to say, we need

5    federal permitting for many of our local economic

6    drivers on this land from agricultural grazing to

7    mineral extraction to mountain biking trails for

8    our tourism efforts to placement of community

9    solar gardens and expansion of our water

10   reservoirs.  We also need environmental

11   assessments for our local road and bridge

12   projects.

13           We value this environment.  It is our

14   lifeblood and we too breathe the air and drink

15   the water.  My business community supports NEPA

16   and this effort to be more efficient and

17   streamlined in performing the environmental

18   assessments necessary for federal permitting

19   while not affecting the actual protections

20   afforded our natural environment.

21           Our businesses understand the need to

22   modernize.  Even our smallest employer does not

Transcript of Public Hearing
Conducted on February 11, 2020                                    233

1    currently do their bookkeeping by handwritten

2    ledgers as they may have done back in 1970.  Now

3    we're all using QuickBooks.  We liken it to --

4    never mind.

5           So anyway, when we have tools like GPS

6    mapping, other resources and research available

7    with a few clicks of the computer and drone

8    technology that can track and count wildlife more

9    efficiently there is no need for this process to

10   take as long as it has, even in my own county and

11   community.

12          A couple of examples.  Earlier it was

13   alluded to the I-70 project took 13 years.  We

14   have an example in my community where we wanted

15   to extend our runway so that we could access more

16   commercial air traffic from our geographically

17   isolated area.  It took 13 years.

18          We also have an infrastructure project

19   that was a bypass around our downtown that would

20   improve the livability, walkability of our

21   central core that cost millions of dollars and so

22   we believe that we need to move forward now with

Transcript of Public Hearing
Conducted on February 11, 2020                    234

1    the modernization that still allows for public

2    comment and participation, it just actually is

3    more efficient because it comes in sooner in the

4    process rather than later.  And limiting the

5    review process to the two years with assessment

6    documents of 150 to 300 pages.

7          We do need to move forward and we think

8    that we can and should abide by all of the

9    environmental assessment rules that are in place

10   with a streamlined process and we believe that we

11   can have both with this proposal.  We would urge

12   you to move forward with it.  Thank you.

13         MR. BOLING:  Okay.  Mr. Twenty-five,

14   would you state your name for the record?

15         MR. ALLISON:  William Alison,

16   W-I-L-L-I-A-M A-L-L-I-S-O-N.  And good afternoon.

17   I'm here representing the Independent Petroleum

18   Association of America.  Thank you to the Council

19   on Environmental Quality for holding this public

20   hearing.  The thousands of oil and gas operators

21   represented by the IPAA commend the Trump

22   Administration for proposing this much needed

Transcript of Public Hearing
Conducted on February 11, 2020                      235

1    reform to the National Environmental Policy Act.

2              NEPA underwent its last major update in

3    1978 and it's well past time for a modernization

4    of the law to help spur economic growth,

5    innovation, and improved environmental

6    protections.  Unfortunately, opponents of this

7    proposed reform say its only intention is to

8    weaken environmental protections, but the reality

9    is that NEPA has become so outdated and

10   burdensome that it actually makes environmental

11   outcomes worse.

12             Directives from past presidents and

13   regulatory modifications have made NEPA far more

14   complicated than the original intent of the law.

15   It has now become so unworkable that critical

16   energy and infrastructure projects are being

17   delayed and that's stalling the environmental

18   benefits that they will bring.

19             Through modernization of NEPA we can

20   cut emissions through more efficient energy

21   production and transmission and the construction

22   of new roads and bridges that will reduce traffic

Transcript of Public Hearing
Conducted on February 11, 2020                              236

1    congestion.  Additionally, this proposal will not

2    alter the protections in the Clean Air Act or the

3    Clean Water Act.

4              Under the current NEPA policy the

5    average environmental impact statement takes five

6    years to complete.  Some NEPA reviews take even

7    longer.  Under the proposed reform the goal is to

8    shorten that process to two years and that can be

9    accomplished in several ways including cutting

10   down on abuses of the appeal system.

11             Federal agencies are dealing with a

12   relentless onslaught of NEPA court challenges

13   that aren't intended to better protect the

14   environment but only meant to block new projects.

15   It's a terribly inefficient process that leads to

16   federal land managers seeking to create appeal

17   proof NEPA documents instead of working with

18   stakeholders to implement reasonable

19   environmental and conservation efforts.

20             Furthermore, a lack of coordination

21   among federal agencies leads to delays and

22   confusion.  While agencies such as the BLM and

Transcript of Public Hearing
Conducted on February 11, 2020                    237

1    the U.S. Forest Service claim to engage in

2    collaborative decision-making process, the lack

3    of coordination among federal land management

4    agencies when dealing with NEPA causes

5    significant delays and confusion.  Rather than

6    achieving successful outcomes these schemes

7    prevent the agencies from making timely

8    decisions.

9            The Trump Administration's proposal to

10   streamline the review process and designate a

11   lead agency for NEPA review is a positive step

12   forward.  The IPAA welcomes these proposed

13   changes and is ready to work with the federal

14   government to find solutions that improve our

15   infrastructure and better protect the

16   environment.  Thank you.

17           MR. BOLING:  Thank you.

18           All right.  Mr. Draper.

19           MR. DRAPER:  My name is Dirk Draper,

20   D-I-R-K D-R-A-P-E-R.  I'm the president and CEO

21   of the Colorado Springs Chamber of Commerce and

22   Economic Development Corporation.  For 20 years

Transcript of Public Hearing
Conducted on February 11, 2020                          238

1    prior to joining the staff at the Chamber and EDC

2    I was an environmental planner first with the

3    U.S. Fish and Wildlife Service and then with

4    private engineering and planning firms as well.

5              I worked in -- during that period of

6    time I was the principle investigator or provided

7    support to categorical exclusions, environmental

8    assessments, and environmental impact statements

9    for a handful of federal agencies ranging from

10   the U.S. Fish and Wildlife Service to the Federal

11   Highway Administration across seven western

12   states.

13             During those 20 years I personally and

14   professionally experienced the delays that have

15   come about from the increased duration and

16   increased cost of conducting those environmental

17   assessments.  The first highway EA I did was here

18   in Denver at the Alameda and I-225 and I would

19   guess some in the audience have used that

20   interchange.  It was a 65-page document of length

21   and it was a duration of project that's

22   unthinkably short today and yet it was conducted

Transcript of Public Hearing
Conducted on February 11, 2020                          239

1   with appropriate mitigation and improved the

2   infrastructure.

3          Colorado's rapid population growth

4   drives the need for additional infrastructure

5   improvement, and we've shown the ability here in

6   Colorado that a speedier process can be done

7   successfully.  Just south of us between Denver

8   and Colorado Springs, the I-25 gap, is a 20-mile

9   stretch of interstate that connects our two

10  largest cities by, before construction began, two

11  lanes with inadequate shoulders.

12         It was a corridor that experienced

13  unacceptably high crash rates both human and

14  wildlife caused, frequent congestion that

15  prevented reliable movement of goods and people.

16  The environmental reviews were completed in less

17  than two years thanks to a team of consultants

18  and federal and state agencies that were

19  committed to cooperation and an aggressive

20  schedule.

21         The Federal Highway Administration in

22  Colorado, the administrator was propelled by the

Transcript of Public Hearing
Conducted on February 11, 2020                                    240

1    One Federal Decision and the entire team worked

2    cooperatively in concurrent preparation of the

3    environmental reviews.  Thanks to their work a

4    third lane in each direction is under

5    construction now along with numerous safety

6    improvements, wildlife crossings, and stormwater

7    containment systems.  The project is on time, on

8    budget, and citizens will soon benefit from safer

9    and more efficient movement in the corridor.

10           We support the proposal to modernize

11   regulations.  Joint schedules, a clear lead

12   agency, coordination among agencies, time limits,

13   clear definitions, and reduced duplicative

14   reviews are all steps that will improve

15   efficiency of the project -- of the process.

16   Excuse me.  The proposed changes improve

17   environmental process but do not alone undermine

18   environmental protection.  Thank you very much.

19           MR. BOLING:  All right.  Thank you.

20           Okay.  So now I'm looking for 27

21   followed by 28 and 29.  So number 27.  Okay.

22   Thank you.  And 28 and 29, you're welcome to take

Transcript of Public Hearing
Conducted on February 11, 2020                    241

1    your seats at the table.

2              MS. SAGE:  Good afternoon.  My name is

3    Christine Sage.  I am the chairman of the

4    Southern Ute Indian Tribe.  On behalf of the

5    tribe I'm here to state the tribe's support of

6    CEQ's proposed changes to its NEPA regulations.

7              We appreciate the CEQ's efforts to make

8    the federal environmental permitting system more

9    efficient and timely.  We think CEQ should go

10   further by recognizing that Indian lands are not

11   public lands and consider adopting separate NEPA

12   regulations for Indian lands to eliminate the

13   inevitable inconsistency with agency rules.  We

14   also respectfully ask CEQ to consider mandating

15   that agencies follow one NEPA handbook.

16             We use the revenues that we do generate

17   by our businesses to fund governmental services

18   like drinking water and natural gas utilities,

19   law enforcement, and natural resource management.

20   The tribe also provides benefits to our tribal

21   members including educational assistance,

22   healthcare, job opportunities, and elder

Transcript of Public Hearing
Conducted on February 11, 2020                    242

1    retirement benefits.

2          My tribe has a substantial interest in

3    seeing that federal agencies prepare, review, and

4    approve environmental documents in an effective

5    and efficient manner.  Almost 400 projects per

6    year on the tribe's land require NEPA analysis.

7    That's because our reservation is a checkerboard

8    of landownership including tribal trust lands,

9    individual Indian allotments, and fee parcels

10   throughout the reservation.  There is almost no

11   project on our reservation that does not require

12   an approval by a federal agency.  Therefore,

13   there is almost no project on our reservation

14   that does not require NEPA review.

15         NEPA compliance costs our tribe

16   millions of dollars in consultant fees and cause

17   long delay.  Because of the time needed for

18   federal agencies to comply with NEPA our tribe is

19   at a competitive disadvantage in using our

20   mineral resources to build and sustain a via

21   reservation economy.

22         For example, NEPA review is not

Transcript of Public Hearing
Conducted on February 11, 2020                           243

1    required for projects neighboring private fee

2    land.  For these reasons our tribe has long

3    advocated for reforming NEPA and its implementing

4    regulations to reduce delays and costs and to

5    increase deference to tribal decision making.

6              We support CEQ's proposed changes, that

7    we urge CEQ to do more.  CEQ should change its

8    regulations to reflect an updated concept of

9    trust responsibility, treat Indian lands

10   differently than public lands, and support

11   greater tribal self-determination and self-

12   government.

13             We appreciate that CEQ has proposed

14   changes aimed at streamlining the NEPA process,

15   however allowing the agencies room to adopt

16   different requirements albeit within the

17   boundaries of CEQ's rules results in

18   inconsistencies among the agencies.

19             In conclusion, thank you for the

20   opportunity to speak today and I hope you

21   carefully consider my tribe's comments and

22   requests.  Thank you.

Transcript of Public Hearing
Conducted on February 11, 2020                    244

1          MR. BOLING:  Thank you, Ms. Sage.

2    Number 28.

3          MS. O'NEILL:  This is 29.  I don't see

4    28 up here.

5          MR. BOLING:  28 calling once, 28

6    calling twice, okay, 29.

7          MS. O'NEILL:  My name is Suzanne

8    O'Neil, S-U-Z-A-N-N-E, O, apostrophe, N-E-I-L-L.

9    Colorado Wildlife Federation.  We comment to the

10   extent the public may during Bureau of Management

11   -- Land Management processes and Forest Service

12   processes, planning processes, and our focus is

13   always to conserve important wildlife habitat on

14   our federally managed public lands.

15          If the requirement that cumulative

16   impacts not be considered anymore as a

17   requirement coupled with not requiring new

18   scientific research to be undertaken and added to

19   making consideration of indirect impacts optional

20   that will greatly, greatly be detrimental to

21   conservation of wildlife habitat on our public

22   lands.

Transcript of Public Hearing
Conducted on February 11, 2020                        245

1          And as an example, you know, in the BLM

2     processes the resource management plans often

3     last -- have a duration of two decades.  Whether

4     intended or not that is -- as a practical matter

5     that's what happens.  So, can you imagine with

6     new resource management planning processes if

7     cumulative impacts are no longer required to be

8     taken into account with indirect impacts and new

9     scientific information and studies?  I can't even

10    imagine the projects that will be spawned under

11    these RMPs without this kind of analysis so that

12    we can continue to conserve our really important

13    wildlife habitats, maintain a balance.

14          You know, Colorado's population is

15    expected to double by the year 2050 adding even

16    untold pressures onto what we're facing now.  So,

17    we really urge you to rethink those proposals and

18    eliminate them.  Thanks very much.

19          MR. BOLING:  Thank you so much.  Okay.

20    Let's see.  Do we have 30, 31 or 32?  Okay.

21          MS. BUSHMAN:  Hello.  My name is Parker

22    McMullen Bushman and I am the CEO and founder of

Transcript of Public Hearing
Conducted on February 11, 2020                          246

1  Ecoinclusive, and I am also the vice president of

2  Community Engagement Education and Inclusion for

3  Butterfly Pavilion.  Both are conservation minded

4  organizations that believe in the power of people

5  and community to solve the complex environmental

6  issues that we face as a society.

7          NEPA is one of the only laws that gives

8  communities a right to weigh in on government

9  decisions that affect their health and

10  environment.  It was passed during an era when

11  highway interchanges were bulldozed through

12  disadvantaged neighborhoods and chemical plants

13  dumped toxic materials into drinking water

14  sources all without the public knowing or having

15  a chance to weigh in on it until it was too late.

16          NEPA gives the public the right to know

17  and comment on how infrastructure projects may

18  impact their communities.  So, what's most

19  disturbing about this proposal and this kind of

20  sweeping rollback to this bedrock law is that it

21  will prioritize the goals of private corporations

22  over the voices of those affected communities.

Transcript of Public Hearing
Conducted on February 11, 2020                    247

1          The rigid timelines for completing

2    environmental reviews will unnecessarily harm

3    communities of working individuals whose

4    availabilities to review proposals, organize, and

5    attend hearings, and write comments is already

6    severely limited.  And the invitation to ignore

7    public comments deemed not specific enough or

8    that do not reference data sources and scientific

9    methodologies is an affront to NEPA's promise

10   that all people in communities will have a voice.

11          The possibilities that communities may

12   need to pay a bond also to ensure that the

13   project doesn't proceed while they challenge it

14   in court will compound the inequities that many

15   communities already face.

16          I have such hope for the inclusive

17   future of the conservation and outdoor movements

18   and with such huge environmental problems facing

19   us we need buy-in from our whole communities and

20   we need our communities to have voices that are

21   heard in these processes.  I urge CEQ to protect

22   our community voices and allow us to continue to

Transcript of Public Hearing
Conducted on February 11, 2020                    248

1    comment on these type of things.  Thank you.

2              MR. BOLING:  Thank you.

3              MR. ORTIZ:  Good afternoon.  My name is

4    Tyrone Ortiz, O-R-T-I-Z.  I am a councilman from

5    the Pueblo of San Felipe and the Native American

6    Tribe in New Mexico.

7              Pueblo culture remembers that we come

8    from the earth and we treat the land as sacred.

9    There are limits placed on what we can do and

10   cannot do.  This limit preserves the land and our

11   value.  For American culture it seems that money

12   is of value the most and there is no limit on

13   what government, corporation, and individuals

14   will do for a quick money.

15             In the 1970s there was so much

16   environmental pollution that the eagle, our

17   nation's symbol, was in danger of extinction.

18   Congress through EPA recognized each person has

19   the right to enjoy a good environment and that

20   each person has the responsibility to preserve

21   the environment for future generations.  Today

22   our federal leadership is one-by-one destroying

Transcript of Public Hearing
Conducted on February 11, 2020                    249

1    protection of clean water and clean air and now

2    NEPA.

3              In 2004 this body, the CEQ, published a

4    mission statement to ensure Native American

5    tribes have stronger roles in NEPA.  Before you

6    dismantle NEPA we ask that you preserve previous

7    be accomplished.  Environmental justice has been

8    disregarded.  Native American and people of color

9    bear the burden of wealth, energy, and defense of

10   the nation.  We see the injustice daily when our

11   voices are not heard, and our people suffer

12   diseases at disrupting rates.  One day we will

13   all return to earth and we must consider what we

14   leave behind for our future generations.

15             We ask that the CEQ and the White House

16   remember the longstanding responsibility to

17   tribes and to place that responsibility before

18   corporate interest.  The Pueblo of San Felipe

19   strongly protest against to weaken NEPA.  We are

20   requesting formal government-to-government

21   consultation with the Pueblo of San Felipe and

22   the proposed changes for the tribes to have a

Transcript of Public Hearing
Conducted on February 11, 2020                    250

1    stronger role in NEPA.  Thank you.

2              MR. BOLING:  Thank you.

3              MS. LEW:  Shoshana Lew,

4    S-H-O-S-H-A-N-A, last name L-E-W.  Good

5    afternoon.  I'm the executive director of the

6    Colorado Department of Transportation and as one

7    of the few agency representatives able to secure

8    a slot today I'm here to speak broadly and

9    categorically in defense of NEPA as it was

10   envisioned in law at a time when citizens across

11   the country lacked a structured way to ensure

12   that their voices were heard when government

13   contemplated major changes to their communities

14   and landscapes.

15             When we look at the history of

16   transportation in America there are so many

17   examples across the country of places where

18   transportation infrastructure fundamentally

19   changed the shape of communities be it through

20   roads that connected or disconnected, arterials

21   that bifurcated or circulated urban cores, or

22   mountain highways that put vacation destinations

Transcript of Public Hearing
Conducted on February 11, 2020                        251

1  on the map.  Transportation infrastructure can

2  grow our economy and connect people lives, but it

3  can also carry costs to the natural landscape, to

4  the footprint of a neighborhood, or to the

5  quality of the air that we breathe.

6          For half a century NEPA has provided a

7  vital framework for assessing those tradeoffs,

8  and as we mark its 50th anniversary this should

9  be a moment to reflect on what it has achieved.

10 However, we are here today to consider a proposed

11 rulemaking that threatens to compromise some of

12 the core values of NEPA.

13         This is not to say that NEPA should

14 never be subject to improvement, clarification,

15 or new efficiencies.  Indeed, for many years now

16 federal agencies and legislators have implemented

17 a range of streamlining measures including to

18 simplify processes for transportation projects.

19 We've welcomed many of these changes including

20 the 2017 One Federal Decision framework.

21         However, this particular rule creates

22 dangerous risks in the form of shortcuts to

Transcript of Public Hearing
Conducted on February 11, 2020                           252

1    environmental review and public engagement in the

2    name of streamlining.  And as the leader of an

3    agency that depends on NEPA to inform some of our

4    most important project decisions here are the

5    changes that concern me the most.

6           First, this rulemaking seeks to lead

7    states away from considering indirect and

8    cumulative impacts.  We must understand how a

9    transportation project incrementally adds to the

10   larger problem.

11          For example, transportation is one of

12   the largest sources of GHG emissions in Colorado

13   and is on trajectory to become the most dominate

14   GHG emission source.  However, the AMPRM would

15   have us and our neighbors ignore a projects

16   contribution to emissions under the premise that

17   we should disregard the reach across

18   geographically remote areas or those that are as

19   a result of a chain of events outside the

20   projects immediate control.

21          It is also important to note that

22   looking holistically at impacts actually

Transcript of Public Hearing
Conducted on February 11, 2020                     253

1    contributes to one of the greatest efficiencies

2    of NEPA which is that it serves as an umbrella

3    for complying with a variety of important

4    environmental laws like the Clean Water Act, the

5    Clean Air Act, and historic preservation

6    requirements.

7              By using one process instead of

8    documentation, NEPA, as the template for

9    complying with all of these laws it saves us a

10   scatterplot of uncoordinated processes that would

11   likely take longer and make it harder for

12   citizens to engage.

13             Second, the proposal weakens

14   opportunities for public involvement.  We applaud

15   the goal of timeliness, but in order to reach the

16   short time frames set for environmental reviews

17   agencies will likely push critical analysis work

18   outside of the formal NEPA time frame.  Further,

19   the presumptive one-size-fits-all has not

20   factored in the realities of agency staffing and

21   funding and the differences between large and

22   small projects.

Transcript of Public Hearing
Conducted on February 11, 2020                    254

1           Finally, the ANPRM proposes to change

2    the threshold of when NEPA applies to an agency

3    action.  There are situations in transportation

4    when a change like that might make sense.  For

5    example, we've seen small projects be encumbered

6    by NEPA, however a simple de minimis threshold

7    across the board could encompass projects that

8    are larger and with more significant impact than

9    ought to be taken out of this process.  Thank

10   you.

11           MR. BOLING:  All right.  Thank you.

12           Okay.  Now I'm looking for number 33 to

13   be followed by 34 and 35.

14           MR. LUCERO:  Good afternoon.  My name

15   is John Lucero, L-U-C-E-R-O.  I'm here on behalf

16   of the National Association of Realtors.  I've

17   been involved with NEPA processes having worked

18   on water storage and water treatment projects as

19   (inaudible) water commissioner here in Denver and

20   I also worked on infrastructure projects while

21   working as deputy director of Economic

22   Development serving under three consecutive

Transcript of Public Hearing
Conducted on February 11, 2020                                  255

1    mayors.

2              This NEPA process -- sorry.  I was also

3    senior advisor for public private partnerships

4    and the city liaison to public utilities.  I'm

5    now back in the private practice with a focus on

6    workforce housing projects.  In every chapter I

7    know too well how burdensome the current

8    processes are and how they have negative impacts

9    on the communities we intend to serve.  I've been

10   a realtor member for nearly 30 years and I'm here

11   today on behalf of 1.4 million members of the

12   National Association of Realtors.

13             NEPA requires federal agencies to

14   access the environmental effects of proposed

15   major federal actions prior to making decisions.

16   For example, the Department of Transportation

17   must fulfill requirements of NEPA when

18   determining whether or not to build a new section

19   of an interstate highway.

20             The NEPA processes can have critical

21   indirect impacts on real estate by, for example,

22   determining if and where infrastructure projects

Transcript of Public Hearing
Conducted on February 11, 2020                    256

1    and housing developments are built.  NEPA

2    requires federal agencies to analyze the impact

3    their actions may have on the environment and on

4    the economy.  These actions could include issuing

5    regulations, providing permits for private

6    actions, funding private actions, and many other

7    types of actions all of which can have an impact

8    on housing cost and availability.

9              Why is the real estate industry urging

10   NEPA reform?  NEPA has not been updated in nearly

11   four decades.  During this time the cost and time

12   for securing approval for infrastructure projects

13   and land management decisions has gone up.

14   Delays impact important business decisions and

15   economic growth that can prevent or delay the

16   maintenance or rebuilding of expanding and

17   deteriorating infrastructure and can be a drain

18   on the economy by forestalling the economic

19   benefits these projects provide.

20              NAR supports reforms to NEPA that,

21   number one, streamline and modernize the

22   environmental review process and facilitate the

1   development of infrastructure projects without

2   compromising environmental protections.

3           Number two, ensure more efficient,

4   predictable, and effective approach to

5   environmental permitting of infrastructure and

6   development projects.

7           And number three, are in sync with

8   NAR's current policy to reduce regulatory burdens

9   and encourage economic development and retain

10  high levels of environmental quality, all factors

11  that maintain and improve housing, neighborhood -

12  - housing affordability and neighborhood

13  improvements.

14          These kinds of infrastructure projects

15  stimulate economic growth, create jobs, improved

16  infrastructure of roads, bridges, and waterways

17  to energy industrial facilities,

18  telecommunication networks and other public

19  assets.  All are an investment in future economic

20  activity, trade, and commerce.

21          For realtors in the real estate sector

22  this activity results in economic confidence and

Transcript of Public Hearing
Conducted on February 11, 2020                                    258

1    people wanting to purchase property for

2    residential investment purposes.  We support and

3    urge CEQ to proceed with the revisions to

4    modernize NEPA, implementing regulations, and

5    ensuring more efficient, predictable, and

6    effective approach to environmental permitting

7    and infrastructure development projects.  Thank

8    you.

9              MR. BOLING:  Thank you.

10             MR. SHAWCROFT:  Yes.  Don Shawcroft.

11   D-O-N, last name S-H-A-W-C-R-O-F-T.  I am

12   president of the Colorado Farm Bureau

13   representing over 23,000 farm and ranch families.

14   I am a fourth generation rancher from the very

15   rural and very agricultural-based southern

16   Colorado Conejos County, south of the town of

17   Alamosa.  You may have heard of Alamosa.  Often

18   mentioned in whether reports as the overnight low

19   in the United States.  Yeah, it does get cold

20   there.

21             I am here to share my support for the

22   new updates and modernization of the National

Transcript of Public Hearing
Conducted on February 11, 2020                              259

1    Environmental Policy Act.  Those that live in the

2    city get frustrated sitting in traffic or angry

3    whenever in a coffee shop and the Wi-Fi is too

4    slow.  They hate when the electricity goes out

5    and traffic lights don't work or when they see

6    massive cranes obstructing their view without any

7    progress.  What those living in urban areas often

8    forget is that these kind of infrastructure

9    inconveniences are not just annoying to them but

10   also to rural parts of America.  Sometimes

11   they're even critical.

12          Rural roads are incredibly dangerous.

13   Mountain passes require a lot of maintenance.

14   High speed internet isn't a given in rural areas

15   and power outages don't just affect traffic

16   lights.  They mean no heat in incredibly isolated

17   homes and no power for rural businesses.

18          Completing and expanding infrastructure

19   projects that transit federal land is vital for

20   the survival of rural residents.  Delays caused

21   by bureaucratic red tape is not just an

22   inconvenience.  That is why it is so important

Transcript of Public Hearing
Conducted on February 11, 2020                                    260

1    that the approval process of federal projects be

2    completed in a timely and efficient manner.

3              NEPA has failed to keep up with modern

4    times.  The Act has been used to stall important

5    infrastructure projects that provide resources

6    and support for rural and urban communities

7    across the country.  The current processes are

8    easily commandeered by extreme environmental

9    groups who work their way into the system and

10   block progress on necessary projects.

11             We need new, clear, concise rules to

12   ensure that infrastructure projects are approved

13   and completed in a timely and successful manner.

14   These proposed new elements will support

15   collaboration between agencies, empower agency

16   employees to resolve issues, and make meaningful

17   determinations, and they will cut down on the

18   unnecessary duplication of work ultimately

19   resulting in fewer delays.

20             A more streamlined process will allow

21   these projects to greatly help local communities

22   receive the resources and support they need for

Transcript of Public Hearing
Conducted on February 11, 2020                    261

1    economic growth and the well-being of their

2    residents.  Thank you for this opportunity to

3    show my support of these improvements that will

4    greatly benefit rural Colorado communities and

5    the rest of our country.  Thank you.

6            MR. BOLING:  Thank you, Mr. Shawcroft.

7            MS. HAMBURGER:  Good afternoon.  My

8    name is Johanna Hamburger spelled just like the

9    food, H-A-M-B-U-R-G-E-R.  I'm a wildlife attorney

10   with the Animal Welfare Institute and I began

11   working on NEPA matters in 2011.

12            I would first like to register my

13   organization's broad concern that the majority of

14   the proposed changes would undermine informed

15   agency decision making, reduce transparency, and

16   limit public involvement in the NEPA process.  We

17   are also concerned that the public was provided

18   with only two hearings in a mere 60 days to

19   comment on regulations that would drastically

20   alter the implementation of one of our country's

21   most essential environmental laws.  The remainder

22   of my comments will focus on our opposition to

Transcript of Public Hearing
Conducted on February 11, 2020                              262

1    the proposed changes to the alternatives

2    analysis.

3              And agency's duty to consider

4    alternatives to the proposed action has been

5    described as the heart of the NEPA process.  It

6    is essential that an EIS contain detailed and

7    careful analysis of the merits and demerits of

8    the proposed action and the proposed alternatives

9    which courts have characterized as the linchpin

10   of an EIS.

11             The courts have held that the purpose

12   of NEPA's alternatives analysis is to ensure

13   agencies do not undertake projects without

14   intense consideration of other ecologically sound

15   courses of action including shelving the entire

16   project or of accomplishing the same result by

17   entirely different means.

18             CEQ has specifically invited comments

19   on establishing a presumptive number of

20   alternatives.  We oppose the establishment of a

21   presumptive number.  Such an arbitrary limitation

22   is unwarranted and has the potential to unduly

Transcript of Public Hearing
Conducted on February 11, 2020                              263

1    restrict agency decision making on complex

2    matters of critical importance to communities.

3             The courts have required agencies to

4    identify multiple viable alternatives so that

5    they can make a real informed choice between a

6    spectrum of reasonable options.  The courts have

7    consistently held that an agency's failure to

8    consider a reasonable alternative is fatal to the

9    NEPA analysis.

10            The notice of proposed rulemaking

11   entirely fails to mention nearly 50 years of

12   judicial precedent on this subject.  Furthermore,

13   the current regulations state that if the action

14   agencies reject an alternative they must explain

15   why the alternative is not feasible and was

16   eliminated.  The courts will scrutinize this

17   explanation to ensure that the reasons given are

18   adequately supported by the report.

19            Limiting the number of alternatives

20   undercuts the ability of the judicial branch to

21   review agency decision making.  It also increases

22   the likelihood of litigation because limiting the

1    number of alternatives increases the likelihood

2    that an agency will fail to examine a reasonable

3    alternative which makes a successful legal

4    challenge more likely.  This is counterproductive

5    to the rationale CEQ has given for the proposed

6    regulatory changes.  Thank you for your

7    consideration of these comments.

8              MR. BOLING:  Thank you.  Now I'm

9    looking for number 36 to be followed by 37 and of

10   course 38.  36?  37 and 38, you can come up to

11   the table so you're in position for --

12             MS. OLIVER:  All right.  I just want to

13   do a quick shout out.  If anyone has seen an ID

14   and it looks like me, I lost it in security, but

15   if you happen to have it by some miraculous

16   reason I would like to have it back.

17             MR. BOLING:  Okay.  And for the record

18   the name on that ID Is?

19             MS. OLIVER:  Shana Oliver.

20             MR. BOLING:  Okay.  Thank you, Shana.

21             MS. OLIVER:  All right.  I'm Shana

22   Oliver.  I'm a resident of Denver, Colorado.

Transcript of Public Hearing
Conducted on February 11, 2020                    265

1    Mother of four.  I'm an organizer for Moms Clean

2    Air Force.  I'm a descendent of the genocide

3    known as the Long Walk of the Navajo.

4              As an Indigenous woman of the Navajo

5    nation I demand the protections of our clean

6    waters, air, and lands, and I oppose the -- I

7    oppose any rollbacks or weakening of the National

8    Environmental Policy Act.  The proposed rollbacks

9    to the rule could have devastating impacts on

10   economic well-being of communities regarding the

11   environment, public health, and climate.

12             The Navajo nation has seen the impacts

13   of industrial projects on the health of our

14   people.  I for one was born on the reservation

15   where many people were exposed to pollution from

16   coal plants, oil drillings, and uranium mines.

17   Like other children on the reservation I was born

18   with a birth defect, low birth weight, and

19   premature.  As an infant I was diagnosed with

20   asthma and struggled to breathe when the air

21   quality was poor.  Indigenous people, we have

22   higher rates of asthma, heart disease, cancers,

Transcript of Public Hearing
Conducted on February 11, 2020                          266

1   mental illness, adverse birth outcomes, and

2   premature deaths than any other general

3   population.

4         When my family moved away from the

5   reservation it wasn't because of the pollution

6   but it was because of the lack of economic

7   growth, the lack of good paying jobs, lack of

8   stability which made my mother depressed and turn

9   to alcohol.  My father had to work far away

10  because industries like coal mining and the coal

11  plants, oil and gas, and uranium mining have

12  never been able to supply enough jobs nor sustain

13  economic growth for the community.

14        Many live under the poverty level on

15  the reservation but we are striving in our old

16  ways and our traditional ways.  And poorly

17  planned polluting projects add insult to injury

18  for families like mine who have struggled with

19  economic inequities.

20        NEPA has been a crucial tool for public

21  engagement in industrial projects providing a

22  voice for the community in places where our

Transcript of Public Hearing
Conducted on February 11, 2020                    267

```
1   voices go ignored most of the time.  So now is

2   not the time to remove these considerations.

3           And I really would -- if I had to share

4   something, as a parent you change your

5   perspective and these children, they rely on us,

6   and the children of the future are relying on us

7   today for this policy to be enacted and stay in

8   place with no rollbacks because we can't be there

9   for them.  This policy will at least be able to

10  be there when all of us are gone.  So, it's

11  important to think of our children's future and

12  their economic well-being as well as their health

13  in their community.

14          And let's not think of today, let's

15  think of the future.  These industries, it's been

16  a long, long time since they've been investing

17  into our children's future and it's time to make

18  sure that our voices are heard, and you do not go

19  with these rollbacks and you -- we need community

20  engagement in order to be a strong nation.  So,

21  thank you for being here and taking our comments.

22          MR. BOLING:  Thank you Ms. Oliver.
```

Transcript of Public Hearing
Conducted on February 11, 2020                    268

1          MR. KURZEL:  Good afternoon.  My name

2    is Brian Kurzel, K-U-R-Z-E-L, and I'm a resident

3    of Denver and a father of two children and I

4    currently work in the non-profit arena as well,

5    but today I wanted to speak to you with my

6    perspective as the former supervisor of Policy

7    and Planning for Colorado Parks and Wildlife, a

8    state agency that oversees regulatory enactments

9    as well as making sure that the public is

10   involved in decision making.

11         Having previously worked for the

12   government in this regulatory role I understand

13   firsthand the critical responsibility that

14   agencies have to make sure that their decisions

15   not only seek to benefit the public but also make

16   sure to avoid any unintended consequences and

17   harm that may be done by your decisions.  Seeking

18   benefit while doing no harm is a fundamental and

19   critical role of government regulatory agencies

20   whether that be Colorado Parks and Wildlife, or

21   whether that be the EPA, and that cannot be taken

22   lightly.

Transcript of Public Hearing
Conducted on February 11, 2020                    269

1              I've learned that the only way for a

2    government agency to avoid unintended

3    consequences and harm to the public is by

4    actively taking steps to hear from those parties

5    that may be affected by the proposed actions and

6    by looking at the big picture to ensure that no

7    harm is done.

8              When an agency is overly restricted or

9    limited in who it can hear from and when the

10   agency puts artificial limits on a project and

11   defines its scope too narrowly affected people

12   are left out, unintended impacts arise, and the

13   government will hear about it either through

14   lawsuits or pushback from those affected

15   communities.

16             The proposed rule changes to NEPA will

17   do just this; reduce public participation in

18   government decisions and narrow the scope of

19   projects to avoid looking at the big picture.

20   This is a recipe that erodes the democracy in our

21   government's decision making and it makes the

22   statement that government knows best without

Transcript of Public Hearing
Conducted on February 11, 2020                    270

1   input from affected parties.  It also undermines

2   the fundamental purpose of NEPA as clearly laid

3   out in the statute which is to fully understand

4   the impacts of government actions before deciding

5   how to proceed.

6            I know from working in a regulatory

7   agency that there may be a tendency to want to

8   streamline regulatory review and public

9   involvement for the sake of efficiencies, but I

10  also know firsthand that for complex decisions

11  that have far reaching consequences streamlining

12  and shortcutting the process will challenge the

13  agency's ability to fulfill your mission and it

14  will make life harder for the agency in the long

15  run by picking winners and losers rather than

16  finding solutions to projects that benefit all or

17  at least do as little harm as possible.

18           I'd like to finish by reminding you

19  that Congress clearly stated that the purpose of

20  NEPA is the continuing policy of the federal

21  government in cooperation with state and local

22  government and other concerned public and private

Transcript of Public Hearing
Conducted on February 11, 2020                                    271

1    organizations to use all practicable means and

2    measures to create and maintain conditions under

3    which humans and nature can exist in productive

4    harmony and fulfill the social, economic, and

5    other requirements of present and future

6    generations of America.

7              I oppose the proposals that you are

8    considering as it not only ignores the

9    government's obligation to work cooperatively

10   with affected parties, it ignores its obligation

11   to future generations of Americans.  Thank you.

12             MR. BOLING:  Thank you, sir.

13             And Brian, are you number 37?

14             UNIDENTIFIED SPEAKER:  Yes.

15             MR. BOLING:  Okay.  So, I'm looking for

16   number 38.  38, 39.  Do we have number 39?  Or a

17   40?  If we don't have 37 -- or 38, 39, and 40

18   then I will go to the alpha list, the standby

19   participants.  Okay.  Letter D?  That would be

20   Mary Jo Lorenz.  Is she still here?  No.  Yeah.

21   Okay.  Go ahead.  Okay.  Mary Jo, the floor is

22   yours.

Transcript of Public Hearing
Conducted on February 11, 2020                    272

1              MS. LORENZ:  Hello.  I'm Mary -- hello?

2    Can you hear me?

3              MR. BOLING:  Yes.

4              MS. LORENZ:  Hello.  I'm Mary Jo Lorenz

5    and I did not plan to speak today.  I did not

6    hear about this until today.  I saw it in the

7    newspaper and so I'm wondering how many other

8    people did not know about this which makes me

9    concerned about the number of public hearings for

10   this conversation.  How many other voices are not

11   being heard?

12             Mary Jo Lorenz, J-O, and Lorenz,

13   L-O-R-E-N-Z.  I taught seventh graders for 42

14   years and lived to tell the tale.  I retired last

15   year and for the first time I can be in things

16   like this, so when I figured this out today I got

17   in my car, I rode to the Park & Ride, I came

18   downtown, I went to the assembly across the

19   street and they said, There might be a space that

20   you could talk.  And I said, Well, I'll walk

21   across the street.

22             15 years ago I came with a bus load of

Transcript of Public Hearing
Conducted on February 11, 2020                    273

1    students to the EPA.  I assured my students that

2    the Environmental Protection Agency would always

3    be there to help them take care of their planet.

4    I speak for my children and the grandchildren I

5    may never have because my daughter has told

6    because of climate change she doesn't see how she

7    could do that to a child in the future.  I speak

8    for common citizens who don't know this is going

9    on or are at work today and can't be here.

10            I don't really represent a group.  I

11   don't carry the weight of a large organization,

12   but my voice matters and it is that voice which

13   changes to NEPA will squelch.  When I was growing

14   up my mother taught me that -- I grew up in

15   Nebraska above the Ogallala Aquifer which would

16   be affected.  My mother taught me to leave a

17   place cleaner than when I came, and I have a

18   saying on my wall in my kitchen which is by a

19   Native American.  It says, "We do not inherit the

20   earth from our ancestors.  We borrow it from our

21   children."

22            I read the National Environmental

Transcript of Public Hearing
Conducted on February 11, 2020                        274

1    Policy Protection Act this morning and one of the

2    lines that jumped out at me was, and I'm

3    paraphrasing, "Every citizen deserves a healthy

4    environment and every citizen is responsible for

5    it."  And so, when you take away the voice of

6    citizens to speak up for themselves and for the

7    land that they love you take away a right.

8    Please see the right in the wrong you propose.

9    Thank you.

10            MR. BOLING:  Thank you.  Okay.  Joseph

11   Salazar.

12            MR. SALAZAR:  Yeah.

13            MR. BOLING:  Letter E.  Thank you.

14            MR. SALAZAR:  Thank you very much.

15   Joseph Salazar, S-A-L-A-Z-A-R, former state

16   representative here in the state of Colorado,

17   current executive director of Colorado Rising

18   which is environmental protection non-profit

19   organization, and we are in opposition to these

20   changes to NEPA and I also want to say that I

21   find it tragically ironic that the Council on

22   Environmental Quality is offering a proposed

Transcript of Public Hearing
Conducted on February 11, 2020                                    275

1    change to NEPA that actually denigrates our

2    environment.

3           I want to take it from a perspective of

4    the state that let me tell you what happens if

5    you decide to adopt these proposed rules.  What

6    happens is that what has happened here in the

7    state of Colorado for a good period of time where

8    we have seen environmental degradation happening

9    all along the front range where our air quality

10   has gotten worse, our water quality has gotten

11   worse, the land has been fouled because we didn't

12   have protections in state law that we find in

13   NEPA.

14          And rolling back these protections, and

15   mark my words on this, will result in children

16   being sick and our families having their blood

17   contaminated by carcinogens and other harmful

18   pollutants.  That's what's going to happen if you

19   roll these back.

20          And how do I know this?  Because it's

21   happening right now.  And as a matter of fact, it

22   has happened at such a massive level that the

Transcript of Public Hearing
Conducted on February 11, 2020                    276

1   state of Colorado just last year had to pass a

2   law that was similar to NEPA, Senate Bill 19181.

3   And in Senate Bill 19181 we have now cumulative

4   impacts analysis and now we also have more public

5   participation in oil and gas production.

6            When you say that you're modernizing

7   you're actually not modernizing.  You're going

8   back to wagon wheels.  We finally caught up to

9   you because we have seen the degradation of our

10  communities because we didn't have NEPA

11  protections, and that should be the miner's

12  canary for you that if you roll this back you're

13  going to have communities suffering.

14            What's really interesting is that

15  communities rose up.  Communities of

16  republications and unaffiliated voters and

17  democrats, they all rose up together to fight

18  against the pollution that's happening in their

19  communities.  They have taken over city councils

20  and they have been elected to office because

21  there was no environmental protection and their

22  children were getting sick.  And that's what's

Transcript of Public Hearing
Conducted on February 11, 2020                277

1    going to happen here is that communities are

2    going to rise up and they're going to fight for

3    themselves.

4            I want to say one last thing about the

5    I-70 project.  Having family who has grown up in

6    the Globeville Swansea area project it's usually

7    those who come and gripe over here about how slow

8    things are taking are the very individuals who

9    don't live in those projects, in those

10   communities and those neighborhoods.  Maybe

11   instead of griping about how long it's taking,

12   why don't you go live over there and let's see if

13   you like those projects being in your back door.

14   Thank you very much.

15           MR. BOLING:  Thank you, Mr. Salazar.

16           All right.  Last person I have, letter

17   F, Deborah Fialca (phonetic).  I apologize if I

18   mispronounced your last name.  Is Deborah here?

19   Okay.  Well, then I believe I've got somebody

20   else.  So, I don't have them on my list, but

21   you've identified yourself, sir, so go ahead.  We

22   have Eric Molvar.

Transcript of Public Hearing
Conducted on February 11, 2020                    278

```
 1          MR. MOLVAR:  My name is Eric Molvar.

 2   It's E-R-I-C M-O-L, V as in Victor, A-R.  I'm the

 3   executive director for Western Watersheds

 4   Project, the non-profit conservation group that

 5   works to protect and restore watersheds and

 6   wildlife across the American west with a special

 7   emphasis on public lands.

 8          I have been working on NEPA projects

 9   for the past two decades.  I have written three

10   comprehensive science-based alternatives for

11   large scale forest plans and BLM resource

12   management plans, some of which have been

13   included as alternatives in federal EISs, some

14   parts of which have been finally included in

15   those federal plans that resulted.  So, I really

16   appreciate the role of federal public comment and

17   the need for a wide range of alternatives and a

18   full expression -- a full investigation of those

19   alternatives.

20          Now the CEQ is revising the NEPA

21   regulations and I appreciate the opportunity to

22   speak before you today, but there are several
```

Transcript of Public Hearing
Conducted on February 11, 2020                    279

1    hundred people across the street that didn't get

2    that opportunity and these hearings are only held

3    in two cities in the whole United States.  Every

4    United States citizen has an interest in our

5    federal public lands and every individual in the

6    United States should have a voice in how those

7    public lands are managed.  It should not be the

8    case that we should open this Pandora's Box of

9    shortcuts, of loopholes, of back room deals that

10   cut the public out of the public lands management

11   process.  This should not stand.

12            Now if the -- we've heard several

13   speakers talk about and I think the NEPA

14   regulations talk about the need to avoid

15   litigation and lawsuits.  The CEQ's direct

16   supervisor is President Donald J. Trump.  Your

17   boss could direct federal agencies to obey the

18   law and then they wouldn't be losing lawsuits.

19   Based on what's happening out there right now I

20   would say he's not doing that.  But that's a

21   better option than rewriting the NEPA regulations

22   in my view.

Transcript of Public Hearing
Conducted on February 11, 2020                    280

1           Now a couple of things that need

2    detailed coverage which haven't been covered yet

3    in comments.  First of all, it is inappropriate

4    to make optional public comments on environmental

5    assessments and relegate the public to only

6    commenting on scoping notices.  Scoping notices

7    may only be one or two pages in length.  They

8    often don't detail the environmental impacts.

9    They don't often detail the resources that are

10   going to be affected and so the public has no way

11   of determining the magnitude of the impact and

12   whether their interests are at stake.  Therefore,

13   it is absolutely essential that environmental

14   assessments be left open for public comment.

15           Second, it is absolutely essential that

16   cumulative impacts be -- continue to be evaluated

17   in-depth.  Imagine if you will a 3,500 well oil

18   and gas project in which each individual well is

19   going to be approved under a single application

20   for permit to drill with no environmental

21   assessment, with no consideration of the impacts

22   of the full 3500 wells, with no consideration of

Transcript of Public Hearing
Conducted on February 11, 2020                    281

1    the hundreds of thousands of acres that will be

2    essentially industrialized and destroyed.  This

3    is a violation of NEPA's core principles.

4              Please back off on your attempt to gut

5    this environmental law because if you overstep

6    your legal bounds there will be organizations

7    that will be calling you to account and will be

8    willing to step forward and challenge these

9    regulations under NEPA itself and also under the

10   Constitution's separation of powers.  Thank you.

11             MR. BOLING:  All right.  Okay.  I

12   believe we've got one other person.  Come on up.

13             MS. BEN:  Greetings my nation.  I come

14   from Shiprock, New Mexico speaking for the future

15   and Indigenous Dene (phonetic).  As a parent

16   advisory committee student representative,

17   student council representative, and junior class

18   president for Central Consolidated School

19   District at Shiprock High, I am also attending

20   (inaudible) college for my Associate's of Science

21   in Mathematics.  I am one of the many Dene people

22   who are affected by environmental consequences of

Transcript of Public Hearing
Conducted on February 11, 2020                    282

1    infrastructures.  We have strived off what's left

2    of the land, water, and air, persevering.  I'm

3    sorry.

4            MR. BOLING:  That's okay.  Go ahead.

5            MS. BEN:  Now I speak the same words of

6    the Great Chief Black Hawk at the Sauk Nation

7    Tribe in 1832.  Though he has said farewell my

8    nation, I say greetings my nation.  It is just

9    the beginning.  I see the sunrise and we now and

10   will rise.  Greetings my nation.

11           The Trump Administration carries false

12   looks, deals in false actions, and they smile on

13   their faces of the poor then act to cheat us.

14   They shake up by the hand to gain our confidence

15   to deceive us again and again.  How smooth must

16   be the language of the whites when they make

17   right look like wrong and wrong like right?

18           Trump Administration wants us to

19   streamline the environmental processes required

20   under NEPA for major infrastructure projects.

21   They want to destroy the foundational and

22   environmental laws that protect natural habitats,

Transcript of Public Hearing
Conducted on February 11, 2020                                    283

1    clean air, and water, and quality of life for

2    local communities.

3              I grew up knowing it's wrong to have

4    more than you need.  That means you are not

5    taking care of your people.  (Inaudible) Mother

6    Earth and Father Sky and all that, they're earned

7    with respect.  NEPA contributes a community

8    environment and democratic decision making.  It

9    recognizes impacts on habitats, fragmentation,

10   species loss, economics, health, and cultural

11   effects on low-income communities of color.  We

12   will no longer have such vital information

13   necessary to be informed for mitigation of our

14   community's environmental impacts.

15             I am no coward.  I am an Indigenous

16   Dene.  We do not care for only ourselves.  We

17   care the prosperity of our nation and Indigenous

18   Dene People.  The teachings of (inaudible) are

19   embedded into the holy female deity (inaudible)

20   and the Dene holy people.  (Inaudible) philosophy

21   emphasizes that humans have the ability to be

22   self-destructive and, most importantly, self-

Transcript of Public Hearing
Conducted on February 11, 2020                    284

1    empowering.

2              I will tell you now the Trump

3    Administration will be known forever by the

4    tracks they leave.  They have a responsibility,

5    not power.  Don't tell me what you will do.  I'll

6    forget.  Show me and I may not remember.  Involve

7    me and I'll understand.

8              Many of you talk about farming and I

9    come from the major farming community in the

10   whole Navajo nation.  The Gold King Mine has

11   stopped 99 percent of Navajos.  We couldn't farm.

12   We still -- a lot of people don't want to farm

13   and it's hard to even sell our crops now because

14   a lot of people are afraid of our water now.

15             This is wrong what I'm doing right now.

16   This shouldn't be happening.  We shouldn't be

17   talking about this.  We should be implementing

18   plans for the future and this is not for the

19   future.  This is for profit.  This is not for the

20   people, this elective comment.  I should not be

21   representing everybody that should be speaking

22   right now.  Every single one of you should have a

Transcript of Public Hearing
Conducted on February 11, 2020                                    285

1    voice whether you're on the opposite side or on

2    our side.

3              There's no sides.  We are one people.

4    We are on the same earth.  And this earth, we

5    will not have it.  This earth will not ever be

6    here.  Ten million years from now we aren't going

7    to be here.  So, we should focus on now.  We have

8    ten years to decrease our emissions.  And I feel

9    you guys' pain because it's not just us.

10             Another example, the Navajo nation and

11   EPA, I've never heard about it before.  This is

12   because in the Navajo nation we do not get

13   something like this.  We have never applied to

14   EPA in the Navajo Nation.  If you don't want the

15   United States to look like the Navajo Nation and

16   contamination that we have, pollution, our

17   skyrocketed emissions -- the Navajo generating

18   station has already had 9,000 air quality

19   violations.

20             We need to do something.  We need not

21   to do what we are doing now.  We need to talk

22   about the future.  We need to help everybody

Transcript of Public Hearing
Conducted on February 11, 2020                                286

1    within the United States and globally.  Thank you

2    for listening to me.

3             MR. BOLING:  Thank you for coming.

4             And could I please -- did we get her

5    name for the record?

6             UNIDENTIFIED SPEAKER:  She didn't say

7    it.

8             MR. BOLING:  Okay.  Okay.  Thank you.

9    All right.  Thank you all.  We'll be adjourned

10   until 5:00 and we'll resume at 5:00 and go until

11   8:00 or the last speaker.  Thank you.

12            (Break.)

13            MR. LEVENBACH:  Good evening everybody.

14   We're ready for round three.  So welcome to the

15   public hearing on the Council on Environmental

16   Quality's proposed rule to update the regulations

17   implementing the National Environmental Policy

18   Act or NEPA.  This is the first proposed

19   comprehensive update to NEPA's regulation in over

20   40 years.

21            So, my name is Stuart Levenbach.  I'm a

22   senior advisor at CEQ and on behalf of CEQ

Transcript of Public Hearing
Conducted on February 11, 2020                    287

1    Chairman Mary Neumayr I thank you for coming

2    today.  So, this event is part of a concerted

3    effort by CEQ to seek the public's views on this

4    important proposal.

5            So, we're not going to have a

6    presentation on the overview of the rule in this

7    third session.  This is really targeted at trying

8    to just get as many people in to share their

9    remarks as possible, but I am joined on the panel

10   by Michael Drummond who is the deputy associate

11   director for NEPA at CEQ and Amy Coyle who is

12   senior counsel at CEQ and we're here to listen to

13   your comments.

14           In addition, I want to mention a few

15   housekeeping items.  So please just silence your

16   cellphones if you could.  There are restrooms if

17   you need them.  You just go to the left in this

18   hall and you make a right in the first hallway

19   and they are located right there.  There are

20   emergency exits, there are signs, but also the

21   atrium is right here.  So, you can go out these

22   doors, make a right into the atrium should you

Transcript of Public Hearing
Conducted on February 11, 2020                    288

1    need to use emergency exits.

2            In addition, I just want to share a few

3    details for those who are speaking.  So just

4    please check into the registration desk if you

5    haven't already so that we know you're here.  And

6    also, just -- you're allotted three minutes for

7    your remarks.  Please keep to the three minutes

8    so that we have -- it looks like we have most of

9    the people here that are scheduled.  I think

10   we'll have a few minutes for a few people who are

11   waitlisted.

12           So, if you do have a letter when you

13   checked in, a letter for the waitlist for

14   speakers -- do you have them?  Just raise your

15   hand if you know you have a letter and you're

16   waitlisted for the speakers.  I think we have A

17   and B.  So, we should have time hopefully and

18   you'll have time to speak.  So, everyone please

19   keep to three minutes though.

20           Please make sure when you come up to

21   speak that you state your name and you spell it

22   because we have someone who is transcribing this.

Transcript of Public Hearing
Conducted on February 11, 2020                    289

1    So, the record for the comments is being

2    transcribed and it's going to be entered into the

3    record for comments.  So please speak clearly,

4    spell your name, and speak into the microphone so

5    that we can capture everything that you're

6    saying.

7              So, we're going to have -- Michael is

8    going to be holding up the signs I believe, and

9    he has a one minute sign and then a 15 second

10   sign and then an end so you know how much time

11   you have to speak.  And then -- and so once again

12   we have the numbers allotted for this so please

13   be courteous to the upcoming speakers and keep to

14   the three minute limit.

15             We also have some literature in the

16   back, a fact sheet and some other materials.

17   They're also posted to two websites.  You have

18   whitehouse.gov/ceq and then also nepa.gov and

19   there's some literature on the proposed rule, and

20   then comment cards should you want to submit

21   those.

22             And then if you have any literature,

Transcript of Public Hearing
Conducted on February 11, 2020                    290

1    written comments, you can put them -- there's a

2    box in the back.  You can put them there.  And

3    then those comments are going to be submitted

4    into the record into regulations.gov and they'll

5    be reviewed by us and others and responded to.

6          So, let me assure that you CEQ will

7    consider all public comments received whether

8    submitted in writing or proposed at events like

9    this one.  And if you have any questions, many of

10   us have little name cards from CEQ and please

11   feel free to come up to any of us if you have any

12   questions.

13         So, this session is scheduled to end at

14   8:00 and then we have to vacate fairly quickly so

15   please be mindful of that when the session is

16   over so that we can exit the room.  And I just

17   want to thank the EPA Region 8 who has been very,

18   very supportive of our small office putting this

19   event on.

20         So, a couple of other things.  If we do

21   end early we're going to try to accommodate the

22   people who are waitlisted to speak and then in

Transcript of Public Hearing
Conducted on February 11, 2020                           291

1    addition to that -- I think that's it.  So, we

2    will turn it over -- so if the first person,

3    number one, can come up here and then two and

4    there can sit there and what we'll do is we'll

5    just rotate as your numbers come up.  Just come

6    in.  You can sit in these seats and that will

7    just help shorten the amount of time that we wait

8    between speakers.  So, thanks again and we look

9    forward to hearing your comments.

10           MR. LEVALLEY:  Good evening and thank

11   you for taking this time.  My name is Robbie

12   LeValley.  That's R-O-B-B-I-E, last name L-E,

13   capital V as in Victor, A-L-L-E-Y.

14           I have worked with the Gunnison sage-

15   grouse for over 25 years and I have worked on the

16   landscape with this bird that is now threatened.

17   We have put our land in a conservation easement.

18   We have provided water for this bird across

19   private and public land.  I have worked with the

20   Colorado Parks and Wildlife, the BLM, the U.S.

21   Fish and Wildlife Service, and have been

22   instrumental in developing the Gunnison Sage-

Transcript of Public Hearing
Conducted on February 11, 2020                        292

1    grouse Range-wide Conservation Plan, the species

2    science assessment, as well as the current

3    recovery plan.

4           In all of these documents, all of them

5    address the need for additional reliability of

6    water sources for the Gunnison sage-grouse

7    especially during the chick rearing stages of the

8    life cycle.  This redundancy and resiliency is

9    what provides for this animal's ability to

10   survive and that primarily revolves around the

11   additional forest but also the critical water.

12          And I start this hearing with this very

13   specific example of why the proposed language

14   that is here is critical for the endangered

15   species that we're talking about and the

16   landscape.  Specifically, when we have a hearing

17   we are to look at the proposal and look at the

18   different sections.

19          So specifically, I support the clarity

20   that is proposed for the categorical exclusions

21   and the reason I support the clarity for the

22   categorical exclusions is for the same reasons

Transcript of Public Hearing
Conducted on February 11, 2020                    293

1    that I started out this presentation.  We have

2    literally waited years to provide additional

3    water sources, to provide additional water

4    reliability for the redundancy and resilience of

5    the Gunnison sage-grouse waiting on NEPA.  We do

6    need the clarity for the categorical exclusions.

7    The agencies, the NEPA practitioners need that

8    clarity.  And so, I encourage you to move forward

9    with that.

10           In addition, I support 1501.1 where we

11   talk about the threshold or the applicability.

12   Where is that applicability and the five, one

13   through five, that are the questions to be

14   answered?  Again, these are the specifics when it

15   comes to the proposal that I think warrant moving

16   forward.

17           The clarity for the NEPA practitioners

18   and those individuals that are on the ground so

19   that we are not waiting the years for simple

20   water structures to improve species, for fence

21   construction, and at times even electric fence

22   construction.  So, I encourage you those two

Transcript of Public Hearing
Conducted on February 11, 2020                    294

1    specific sections to move forward with at this

2    time.  Thank you very much.

3              MR. SAGE:  Good evening.  My name is

4    Samuel Sage.  I'm from Counselor, New Mexico,

5    Navajo Nation.  First I'm going to tell you a

6    little story about NEPA.

7              When I was about eight or seven years

8    old my grandmother and my cousins, we were headed

9    to the trading post, about a monthly visit to get

10   supplies and check mail.  As we were going down

11   the dirt road we saw a dust cloud off to the left

12   of the road.  We thought it was either a

13   whirlwind or some antelopes running, but it come

14   out to be two large yellow bulldozers, very large

15   one.  In between them was a chain link fence that

16   was pretty big.  They were dragging it along,

17   clearing its way, scraping everything from the

18   ground.

19             After that was done no vegetation grew

20   in those areas again.  We lost a herd of

21   antelopes that our community members used to

22   hunt.  They plowed over some sacred sites and

Transcript of Public Hearing
Conducted on February 11, 2020                                    295

1    different things like that.  About two, three,

2    four years later my father, Andy Sage, a U.S.

3    Marine Corporal, War World II, (inaudible), told

4    us that the government had implemented a new law

5    to where there's some guidelines to where they

6    can't destroy the environment like they used to.

7            So, from there on that's how we were

8    able to rely on NEPA.  BIA was especially -- they

9    were very strict on it.  A lot of industries, a

10   lot of entities complained about the hold ups on

11   projects because of NEPA and we were glad of

12   that.

13           Today I'm speaking on behalf of

14   Counselor Chapter and Counselor Chapter community

15   members.  We oppose the NEPA rollbacks.

16   Counselor community today are very heavily

17   impacted by oil and gas development.  Because of

18   NEPA we have been able to work with BLM and BIA

19   and to try to hold the industry accountable in

20   certain things.

21           If you rollback a lot of the

22   regulations our homelands will be the dumping

Transcript of Public Hearing
Conducted on February 11, 2020                          296

1    grounds for a lot of the wastewater that is

2    currently being used in the fracking areas

3    because right now there are certain areas on BLM

4    land to where the industry is completely clearing

5    out everything from underground.  To our

6    understanding those are some of the sites that

7    have been nominated to become injection wells and

8    we don't want that.

9           So, we're urging and we're pleading

10   with NEPA to enhance the current regulations,

11   work with the local people throughout the United

12   States to make the regulations stronger to where

13   it works for everybody, not just the industry.

14   Thank you very much.

15           MR. BAUMGARTEN:  Good evening.  I am

16   David Baumgarten, B-A-U-M-G-A-R-T-E-N, County

17   Attorney for Gunnison County representing the

18   Board of County Commissioners of Gunnison County,

19   Colorado.

20           Gunnison County states tonight as it

21   will in our written comments that the proposal of

22   the CEQ regarding NEPA is a significant departure

Transcript of Public Hearing
Conducted on February 11, 2020                          297

1     from CEQ's prior interpretation of NEPA as well

2     as agency practice, case law, and guidance

3     consistent with that interpretation.

4              Rather than promoting transparency,

5     public engagement, and public decision making,

6     the proposal has the intent and will have the

7     consequences to curtail environmental analyses,

8     limit disclosure to the public, and expedite

9     federal approval for major projects without the

10    corresponding and necessary consideration of

11    potential environmental impacts.

12             Gunnison County has a significant

13    interest in this matter.  We are a rural county

14    in southwest Colorado, the fifth largest county

15    by land mass in Colorado by the total area of

16    3260 miles, approximately two-and-a-half times

17    the size of the entire state of Rhode Island.

18    Federal lands comprise almost 80 percent of the

19    land area in Gunnison County.  Lands of the

20    Forest Service alone are 60 percent, lands of the

21    BLM are another 15 percent.  We are headwaters of

22    the Colorado River Basin so impacts created in

1   our county may be experienced all the way to

2   Baja, California and the Sea of Cortez.

3              Federal agencies with whom historically

4   have undertaken major actions in Gunnison County

5   and for whose actions Gunnison County has relied

6   upon NEPA include the U.S. Forest Service, the

7   BLM, the Bureau of Reclamation, the National Park

8   Service, the Federal Aviation Agency, the Federal

9   Highway Administration, Fish and Wildlife

10  Service, the Department of Energy, Western Area

11  Power Administration, and the U.S. Armed Forces.

12             Please consider, as Gunnison County

13  will address more fully in our written comments,

14  that the rationales for the CEQ are not based in

15  fact, would significantly narrow the core of the

16  projects reviewed, will limit the NEPA

17  requirements to take a hard look at significant

18  environmental impacts, the new definition of

19  effect or impact will limit disclosure and

20  analysis of indirect impacts.

21             The CEQ proposal will limit or even

22  eliminate analysis of climate change issues, will

Transcript of Public Hearing
Conducted on February 11, 2020                            299

1    eliminate requirements for consideration of new

2    information and supplementary analysis, and

3    encourage a type of analysis that eliminates

4    necessary on-site (inaudible) of risks.  And if

5    the proposal were to be adopted, advocating a

6    well functioning federal obligation, federal

7    agencies and those activities that it's

8    overseeing are more likely to be sued for

9    inadequate analysis leading to longer time for

10   approvals than if a proper analysis had been

11   conducted in the first place.  Thank you.

12         MR. DRUMMOND:  We can have speakers

13   four and five come up to the table.  Make that

14   five and six.  Thanks.

15         MS. HAGGSTROM:  All right.

16         MR. DRUMMOND:  Go ahead.

17         MS. HAGGSTROM:  My name is Emily

18   Haggstrom, E-M-I-L-Y H-A-G-G-S-T-R-O-M.  I'm the

19   vice president of communications for Consumer

20   Energy Alliance, the leading consumer energy

21   advocate in the nation.  I want to thank the

22   committee for the opportunity to testify today.

Transcript of Public Hearing
Conducted on February 11, 2020                              300

1            Over the last ten years the state has

2     grown at an exponential rate extending suburban

3     development into the Plains and skyrocketing the

4     cost of living leaving the average Denver

5     resident with a little more than $450 in

6     disposable income after paying for living

7     expenses.  Nearly a million people have moved

8     here over the last decade.  Our state's growth

9     has far exceeded the infrastructure needed to

10    support these new residents.

11           Under the 40 year old regulations much

12    needed infrastructure and energy projects have

13    been stalled.  The American Society of Civil

14    Engineers gave U.S. infrastructure a D plus

15    showing the inherent inadequacies to our roads,

16    bridges, and energy delivery infrastructure, yet

17    projects are still slow to come online due to

18    regulatory burdens.

19           Due to its onerous nature and lack of

20    transparency NEPA regulations have been

21    weaponized by anti-development groups in the form

22    of a litigious gun pointed at project developers

Transcript of Public Hearing
Conducted on February 11, 2020                    301

1    to create an endless cycle of delays making

2    projects uneconomical and ultimately increasing

3    the cost to energy consumers.

4           These commonsense reforms to the NEPA

5    regulations will help to return our regulatory

6    approval structure to what it was intended.

7    These reforms will create greater certainty and

8    efficiency for families and businesses without

9    sacrificing environmental protections.

10           As a country we need to be able to

11   count on the federal government as a partner to

12   move our communities forward.  The proposed rules

13   also ensure that the government is more proactive

14   by frontloading community input and

15   organizational guidance through early scoping so

16   that the reviewing agency can consider scientific

17   information, alternatives, and other useful

18   information brought forth by the public in the

19   early part of the formal procedure and not after

20   a decision process has already been initiated.

21   By doing so it will alleviate project paralysis,

22   litigious outcomes, and will get people back to

Transcript of Public Hearing
Conducted on February 11, 2020                          302

1    work.

2             By instituting rules that are

3    transparent and easily understood these reforms

4    provide a clear timeline for environmental review

5    that is expeditious and efficient.  It does not

6    disincentivize a thorough analysis.  It simply

7    requires experts to conduct concurrent

8    environmental reviews.

9             The government does not owe project

10   developers a yes, but it does owe them an answer.

11   It brings clarity to the subjective meanings of

12   what cumulative and reasonable impacts are to

13   address climate change by defining a standard

14   that allows the government to partner with

15   companies to efficiently conduct in earnest

16   environmental reviews that prevent litigious

17   action later at the expense of taxpayers.

18             The people who will benefit most from

19   these streamlined regulations will not only be

20   traditional energy organizations, it will be wind

21   and solar developers who rely on the speed of

22   deployment to meet the renewable integration

Transcript of Public Hearing
Conducted on February 11, 2020                    303

1    targets that our communities here in Colorado

2    demand.  By creating regulatory certainty this

3    new NEPA framework can get individuals, families,

4    and businesses back to work.  Thank you.

5          MR. BRAY:  My name is Zandon Bray,

6    Z-A-N-D-O-N B-R-A-Y.  Hello.  My name is Zandon

7    Bray and I am a third generation cattle rancher

8    from western Colorado.  In addition to the family

9    cattle ranch, I help manage a big game hunting

10   business on the same ranch.

11         Growing up my family raised sheep that

12   were grazed on federally managed lands in western

13   Colorado and today we graze our cattle on some of

14   the same federally managed lands.  I grew up in

15   those mountains.  I love those mountains.  I

16   respect them.

17         As a current user of federal lands, I

18   know that limiting options and abilities for use

19   on federally managed lands risks my family's

20   future successes.  That is why I am here in

21   support of the updates and improvements of the

22   National Environmental Policy Act proposed by the

Transcript of Public Hearing
Conducted on February 11, 2020                    304

1    CEQ.

2              This Act was originally intended to

3    reduce paperwork and delays and promote better

4    management decisions consistent with national

5    environmental policy established by the Act.

6    Unfortunately, today these studies are being

7    bogged down in so much paperwork and red tape

8    that the process inhibits the efficient,

9    effective, and timely review of best land

10   management practices.

11             The endless paperwork, vast scope, and

12   confusing language set forth in previous NEPA

13   processes makes it nearly impossible for

14   individuals to navigate on their own.  It

15   shouldn't be that hard.

16             Utilizing public lands to support local

17   economies is incredibly powerful in communities

18   like mine.  We live in a remote area with limited

19   ability for economic growth.  Federal lands

20   support tourism and agriculture, both of which

21   contribute to our rural economy.  If the lands

22   are not productive and managed effectively there

Transcript of Public Hearing
Conducted on February 11, 2020                                      305

1    is a distinct negative impact on my community.

2            It is critical to implement modern

3    practices in the Act so that both federal lands

4    and small communities can continue to benefit

5    each other for years to come.  Clarifying the

6    boundaries and guidelines of the current

7    processes will no doubt enable all stakeholders

8    to better complete projects and properly manage

9    natural resources so that both the environment

10   and local communities flourish.

11           I believe that simplifying the rules,

12   definitions, and timelines of environmental

13   impact statements and assessments will result in

14   timely reviews, an invaluable protection to the

15   west's most precious resources.  These updates

16   will provide stability of the environment,

17   agriculture, tourism, and local communities.

18           Thank you for allowing me to share my

19   support of the CEQ's proposed updates and

20   modernizations of the National Environmental

21   Policy.

22           MR. DRUMMOND:  Thank you.  We can have

Transcript of Public Hearing
Conducted on February 11, 2020                    306

1    speakers seven and eight come up to the table.

2              MR. CURRIER:  Thank you.  My name is

3    Carlyle Currier.  That's C-A-R-L-Y-L-E

4    C-U-R-R-I-E-R.  I'm here today to testify in

5    favor of an updated modernized National

6    Environmental Policy Act.

7              The Act was created to provide

8    understanding as to what are the environmental

9    impacts of large federal projects, not to keep

10   those projects from happening, yet that is

11   exactly what's occurring in the new American

12   reality.  The population of the United States is

13   growing, and Americans are more mobile than ever

14   increasing the need for new and updated

15   infrastructure projects to support our changing

16   economy and changing country.  NEPA has not been

17   updated for more than 40 years and needs to

18   reflect this new reality and allow federal

19   projects to keep up with growing demand.

20             As a Colorado rancher and farmer, I

21   know we are facing stark realities about future

22   water availability for our growing population.

Transcript of Public Hearing
Conducted on February 11, 2020                    307

1    We have a Colorado water plan which was developed

2    through a stakeholder process involving

3    conservation and environmental interests, farmers

4    and rancher, municipalities, industry, and

5    recreational representatives.  It was enacted by

6    former Governor John Hickenlooper.  It calls for

7    a 400,000 acre feed of new water storage in our

8    state by the year 2050.

9              Without these vital water storage

10   projects we will not be able to meet the demands

11   being placed on our water supply by agriculture,

12   population growth, and environmental and

13   recreational needs, and also meet the compact

14   requirements we have with downstream states.

15             NEPA is currently hindering our ability

16   to build such water storage.  If I had more time

17   I could go into a number of specific examples of

18   the large costs and time delays caused by NEPA in

19   building new water projects or even in

20   rehabilitating existing reservoirs.  The

21   alternative of building these new projects is to

22   dry up irrigated farmland.  That not only hurts

Transcript of Public Hearing
Conducted on February 11, 2020                    308

1    agricultural production but also harms wildlife

2    and fish habitat and reduces recreational

3    opportunities.

4            The Council on Environmental Quality

5    has found that it takes an average of four-and-a-

6    half years to complete these NEPA reviews.  Those

7    reliant on Colorado water can't wait that long

8    for projects to get up and moving.  We support

9    the efforts to accelerate the NEPA process and

10   bring down that four-and-a-half year average to

11   two years.

12           A clearer, more concise process will

13   ensure that NEPA continues to do what it was set

14   out to do, but still allows the growth and

15   innovation to create infrastructure projects that

16   are needed in our new America.  Thank you.

17           MR. DRUMMOND:  Thank you.

18           MS. ROBINSON:  Leslie Robinson,

19   L-E-S-L-I-E R-O-B-I-N-S-O-N.  I'm chairman of the

20   Grand Valley Citizens Alliance.  I live west over

21   the mountains in rural town of Rifle, Colorado.

22   Secretary David Bernhardt's hometown.  I'm here

Transcript of Public Hearing
Conducted on February 11, 2020                      309

1    to say stop taking our voices away.

2            Colorado's western slope is over 60

3    percent public owned lands.  It has shaped our

4    history.  While the energy industry comes and

5    goes, tourism and agriculture has been our staple

6    economies.  In decades past we were inundated by

7    mining of uranium, silver, and coal, but those

8    industries came and went.  The taxpayer was left

9    having to clean up the superfund sites because

10   these industries were pre-NEPA regulations.

11           Rifle sits on a vast reserve of oil

12   shale and when Secretary Bernhardt was growing up

13   that industry doubled our population.  Had it not

14   been for NEPA required studies that foretold the

15   environmental and social impacts our area would

16   not have had the safety net to navigate the boom

17   and bust that followed.

18           Recently fracking opened up reservoirs

19   of natural gas in the Rifle area.  We have over

20   11,000 wells.  Again, Rifle went through another

21   boom, but it seemed like NEPA regulations have

22   already been weakened from the oil shale days.

Transcript of Public Hearing
Conducted on February 11, 2020                    310

```
 1    Cumulative impact concerns for local governments,
 2    not the feds, not the industry, to deal with
 3    health impact studies and air testing as drilling
 4    encroached just 1,000 feet from neighborhoods.
 5            The burden of dealing with drilling and
 6    fracking should have fallen upon the industry
 7    causing the impacts.  Instead the
 8    responsibilities of helping local citizens with
 9    the boom fell upon the shoulders of local
10    taxpayers, citizen organizations like mine, and
11    local governments.  Now with natural gas prices
12    at rock bottom we are experiencing yet another
13    energy bust in Rifle.
14            The federal government safety nets are
15    already lacking.  More NEPA planning and
16    protections are needed, not less.  In the west we
17    are stewards of our nation's greatest gift to the
18    future, our public lands.  No wonder the Ute
19    tribes fought so hard to stay.  We have
20    wilderness, clean air, clean water, abundant
21    wildlife, and yet with a rash political decision
22    you are going to take that away.
```

Transcript of Public Hearing
Conducted on February 11, 2020                          311

1            The oil and gas industry gets enough

2     tax breaks, subsidies, and special federal

3     government favors.  I'm here to tell you to do

4     the right thing for we the people.  Stop it.

5     Don't change NEPA.  Thank you.

6            MR. RAMEY:  Good evening.  My name is

7     Jim Ramey, J-I-M R-A, M as in Mary, E-Y, and I'm

8     the Colorado state director for the Wilderness

9     Society.  Our mission is to protect wilderness

10    and inspire Americans to care for our wild

11    places.

12            The public process and environmental

13    review mandated by NEPA are critical to the

14    Wilderness Society's work.  It guarantees our

15    ability to ensure that decisions about where

16    private companies can drill, mine, and log on our

17    shared public lands are informed by sound

18    science, by the substantive laws and policies

19    designed to protect the drinking water, air,

20    wildlife habitat, and numerous other benefits

21    that our public lands provide, and the voices of

22    our members, our partners, and the tribes and

Transcript of Public Hearing
Conducted on February 11, 2020                          312

1    communities that would be affected.

2               I've personally experienced the power

3    of NEPA requiring agencies to consider a

4    reasonable range of alternatives.  Might not

5    sound exciting or important, but it is.  Prior to

6    joining the Wilderness Society, I worked on a

7    collaborative proposal that was submitted to the

8    Bureau of Land Management as an alternative for

9    consideration as the resource management plan for

10   the Western Colorado Uncompahgre Field Office

11   went through NEPA analysis and that included the

12   areas North Fork Valley.

13              This proposal drew upon community

14   expertise for managing oil and gas development in

15   the area in a way that would protect important

16   resources like the water supply that feeds the

17   valleys, orchards and ranches, wildlife habitat,

18   and scenic view sheds.

19              This is exactly how NEPA is supposed to

20   work, but sadly this likely would not have been

21   possible under CEQ's proposal which creates a

22   series of reckless loopholes for extractive

Transcript of Public Hearing
Conducted on February 11, 2020                    313

1    industries to direct the outcome of federal

2    decision making under NEPA and raises needless

3    barriers for communities like the North Fork

4    Valley to have a voice in the process.

5              For example, proposals to log, drill,

6    or mine on our public lands would be prejudiced

7    from the get-go with all options on the table

8    being driven by the industry's agenda and what

9    would be considered economically and

10   technologically feasible for the company to

11   achieve its goals.

12             With all roads leading to development

13   the government could ignore alternative courses

14   of action proposed by members of the public who

15   depend on healthy forests and wildlife habitat,

16   clean air and water, and the recreational

17   benefits that our public lands provide.

18             In short, this proposal is a blank

19   check for the fossil fuel industry that will make

20   it difficult, if not impossible, for affected

21   communities and tribes to have a say in decisions

22   impacting their health and the environment.  If

Transcript of Public Hearing
Conducted on February 11, 2020                         314

1    CEQ is genuinely interested in improving the NEPA

2    process then it should do so with a scalpel

3    rather than a chainsaw and with a level of public

4    engagement and process commensurate with the

5    importance of this law in the scope of any

6    proposed changes.  CEQ's current proposal and

7    public process falls woefully short of that

8    standard and should be abandoned.  Thank you.

9              MR. GILCHRIST:  Hi.  My name is Sam

10   Gilchrist.  That's S-A-M G-I-L-C-H-R-I-S-T.  And

11   I'm the Western Campaign's director for the

12   Natural Resources Defense Council.  I live here

13   in Denver.  I come to you to voice our strong

14   opposition to the proposed changes to NEPA.

15             These changes are unnecessary and

16   should be rejected.  We've heard a lot about how

17   NEPA delays federal projects.  Federal financing

18   is ultimately the culprit in those instances.

19             But the biggest problem is removing the

20   public's input.  Removing that input and their

21   ability to weigh in on projects that could change

22   our communities forever and threaten our ability

Transcript of Public Hearing
Conducted on February 11, 2020                    315

1    to mitigate climate change are irresponsible and

2    ultimately put us all in danger.

3           I have grave concerns with the

4    administration's process for reviewing these

5    changes.  In particular, not allowing adequate

6    input from the public.  Only two public hearings

7    and a single hearing reserved for our Indigenous

8    community to decide the fate of a landmark

9    environmental policy that impacts hundreds of

10   millions of lives is far from enough.

11          The vast majority of Americans do not

12   live in Denver or D.C. where the only other

13   hearings plan to take place.  The fact that the

14   Denver sessions filled up within minutes

15   highlights the overwhelming interest in

16   protecting NEPA and a clear need to create more

17   opportunities for public engagement.

18          I'm here because our mission in life is

19   to leave our world better for future generations

20   and I've been thinking about that a lot lately as

21   an expecting father.  I question that future when

22   so many in our federal government seek to

Transcript of Public Hearing
Conducted on February 11, 2020                    316

1    dismantle laws and regulations that protect our

2    children and our grandchildren from the

3    devastating effects of climate change.  I want a

4    voice in projects that affect my life and my

5    family, and my community and I know people all

6    across the country want the same.

7             Through the NEPA review process

8    Coloradoans have voiced their opinions on a wide

9    range of projects in our state.  They ask

10   critical questions about impacts on air

11   pollution, outdoor recreation, the Colorado

12   River, cultural artifacts, and more.  There are

13   lots of examples that you've already heard today

14   and the ones that come to mind for me are

15   blasting through Glenwood Canyon as a proposal,

16   to make sure I-70 ran faster, oil and gas work in

17   the North Fork Valley that you've heard about

18   that would have clear cut groves of Aspen.

19           Preserving these wild places and

20   cultural artifacts and keeping our air and water

21   clean are critical.  NEPA reviews also save

22   taxpayer dollars.  These changes will cause us to

Transcript of Public Hearing
Conducted on February 11, 2020                    317

1    no longer be able to require agencies to consider

2    the impact our changing environment will have on

3    long-term infrastructure projects.  If we build a

4    bridge or a road that will be overtaken by

5    flooding or sea level rise we're essentially

6    throwing away taxpayer money.  I urge you to

7    reject these changes.  Thank you.

8             MS. BEUG:  Good evening.  My name is

9    Susann Beug, S-U-S-A-N-N B-E-U-G.  I have come

10   here from Red Lodge, Montana.  I'm also part

11   owner of our family farm here in Weld County,

12   Colorado.  I'm a member of the Northern Plains

13   Resource Council which is headquartered in

14   Billings, Montana, and I'm here to voice my

15   opposition to the revisions to the NEPA

16   regulations.

17            As a property owner and concerned

18   citizen I have participated in public comment

19   periods on various issues on numerous occasions

20   including BLM methane rules.  Being familiar with

21   this process I see numerous ways in which these

22   revisions interfere with the public's ability to

Transcript of Public Hearing
Conducted on February 11, 2020                              318

1   exercise their right to be heard on proposed

2   actions and affect changes when needed.

3          While an EIS currently must evaluate

4   all reasonable alternatives, the proposed rules

5   eliminate the requirement to examine all

6   alternatives or alternatives outside the

7   jurisdiction of the lead agency.  The

8   effectiveness of citizens alternatives would be

9   severely restricted by this change and they are

10  often much better than what was originally

11  proposed.

12         The revisions would also allow agencies

13  to conduct public hearings and meetings by means

14  of electronic communications.  In a rural area

15  where I'm from like Montana many areas have no or

16  limited access to electronic communications.  How

17  does that allow our citizens living in those

18  areas to be able to participate?  It doesn't.

19         One of the most egregious proposed

20  changes is allowing project applicants directly

21  prepare an EIS, the agency's guidance and review,

22  thus removing conflict of interest rules for

Transcript of Public Hearing
Conducted on February 11, 2020                    319

1    contractors preparing reviews.  This would be

2    like letting the fox guard the hen house.  How

3    much guidance would actually take place and how

4    much review would there be?  It seems it would be

5    very easy to just rubberstamp the proposed

6    actions especially if the agency is short staffed

7    and underfunded as many are today.  This leaves

8    the process wide open to corruption on many

9    levels.

10           In addition, narrowing the effects to

11   be considered in an EIS is not only irrational

12   but is also detrimental to the public interest

13   and a flagrant violation of EPA's policy.

14   Eliminating the requirement to use indirect and

15   cumulative effects ignores the fact that most of

16   the environmental challenges we face today are

17   cumulative and interconnected.

18           In particular, the effects of

19   greenhouse gases on climate disruption could be

20   ignored because they are cumulative.  The impact

21   of ignoring these effects will have detrimental

22   consequences to our environment now and in the

Transcript of Public Hearing
Conducted on February 11, 2020                         320

1    future.   These are only three areas of major

2    concern to me but there are many more which will

3    be addressed and corrected before these revisions

4    are allowed to go into effect.   Thank you.

5               MR. DRUMMOND:   Thank you.

6               MS. MOWRY:   Good afternoon.   My name is

7    Amy Mowry.   A-M-Y M-O-W-R-Y.   I am senior counsel

8    with Jost Energy Law, an energy law firm in

9    Denver serving oil and gas operators throughout

10   the Rocky Mountain region.

11              Our clients, among other stakeholders

12   in projects located on public lands, are keenly

13   interested in CEQ's proposed revisions to NEPA's

14   review process, and invariably are encouraged by

15   the reasons, transparent, and forward thinking

16   changes to what has become sadly outdated and

17   often counterproductive.   My testimony today in

18   support of CEQ's rule will focus on its positive

19   and inclusive approach to bringing NEPA into the

20   21st Century.

21              As many have noted, NEPA has been

22   essentially static for over 40 years.   In that

Transcript of Public Hearing
Conducted on February 11, 2020                    321

1    time, we as citizens have enjoyed sweeping

2    evolutions in technology and communication that

3    have enlightened and empowered us.  These changes

4    have also provided invaluable tools for us to

5    protect our economic security and at the same

6    time care for our lands and environment better

7    than ever before.  CEQ's rule acknowledges these

8    tools and incorporates them into a process that

9    at present may actually undermine our environment

10   and even threaten our health, safety, and

11   security.

12            Improving NEPA benefits countless

13   public lands projects, not just for oil and gas,

14   but for solar, wind, geothermal and other

15   renewables so vital to the expansion of our

16   energy supply and our imminent green energy

17   economy.  It goes without saying CEQ's rule will

18   facilitate crucial improvements to our highways

19   and even help create new recreation opportunities

20   for all of us to enjoy.

21            CEQ's rule importantly updates NEPA by

22   correcting outdated citations to authorities,

Transcript of Public Hearing
Conducted on February 11, 2020                      322

1   modernizing terms, and improving formatting, all

2   of which enhance the clarity and precision of the

3   review process and better ensure its best

4   outcomes.  CEQ's rule also promotes inclusivity,

5   encouraging greater participation by concerned

6   citizens as well as by tribal stakeholders who

7   will enjoy expanded opportunities to comment on

8   projects on any public lands, not just on tribal

9   or reservation lands, if those projects impact

10  their interests.

11           Importantly, CEQ's rule establishes

12  both time limits for completion and page limits

13  for documents, both of which guide participants

14  to focus their input on a project's real impacts,

15  not on remote possibilities and imagined perils.

16  In past years NEPA submissions have been bloated

17  with vast amounts of distracting and unrelated

18  information that did nothing to help distinguish

19  a viable project from one that should fail.

20  CEQ's incorporation of a single record of

21  decision and the consolidation of multiple

22  agencies efforts further recognizes the

Transcript of Public Hearing
Conducted on February 11, 2020                                323

1    importance of making reviews easier, not harder.

2              In another major improvement CEQ's rule

3    incorporates the use of online platforms to bring

4    NEPA into our modern era.  Our rapidly evolving

5    population and economy on the heels of the

6    digital revolution demand that our government's

7    processes respond in kind.  CEQ's allowance for

8    online options in facilitating both public

9    comment and information delivery recognizes the

10   importance of making critical public

11   participation easier, not harder.  And this helps

12   ensure we arrive through the review process at

13   the correct decisions about large projects.

14             We at Jost Energy Law enthusiastically

15   support CEQ's proposed changes to the NEPA review

16   process and we encourage this new rule to be

17   approved and finalized quickly, helping us move

18   together into the new frontiers of our ever

19   changing modernity.  Thank you very much for the

20   opportunity to testify today.

21             MS. MURDOCH:  Hello.  My name is Estee

22   Rivera Murdoch, E-S-T-E-E R-I-V-E-R-A, and I'm

Transcript of Public Hearing
Conducted on February 11, 2020                      324

1    the executive director of the Rocky Mountain

2    Conservancy based in Estes Park, Colorado.  Thank

3    you for this opportunity to offer comment.  I am

4    here today to speak out in opposition to most of

5    the proposed changes to the implementation of the

6    National Environmental Policy Act.

7            In 2019 Rocky Mountain National Park

8    had over 4.6 million visitors making it the third

9    most visited national park in the United States.

10   It's a special place both for the important

11   natural and cultural resources that it protects

12   as well as the important role that it plays in

13   the local, regional, and national economy as a

14   premier destination.

15            I do appreciate the proposal including

16   more consultation with tribal governments during

17   the course of NEPA analysis, but no the whole the

18   proposal falls short by not considering the

19   traditional, cultural, natural, and recreation

20   values that make Rocky Mountain National Park a

21   marquee destination and natural space.

22            In my time living and working in

Transcript of Public Hearing
Conducted on February 11, 2020                    325

1   national parks first as a national park ranger

2   and now as a non-profit partner I've seen

3   unprecedented changes brought on by measurable

4   changes in our seasonable temperatures.  Climate

5   change is the greatest threat our national park

6   system has ever faced and Colorado's high

7   elevation landscapes experience those threats

8   more directly than perhaps anywhere else.

9             Rocky Mountain National Park provides

10  critical habitat for creatures like pikas who are

11  very sensitive to changing environments and loss

12  of habitat due to climate change will most likely

13  create genetically isolated populations

14  threatening the existence of the species in the

15  park.

16            In addition to my professional title

17  which I've already stated I'm also the mom to an

18  eight year old.  We've been fortunate to spot

19  pikas on many of our backpacking trips into

20  Rocky's wilderness over the past few summers and

21  it's always a delight for our family to spot one

22  of these wonderful creatures gathering hay piles

Transcript of Public Hearing
Conducted on February 11, 2020                              326

1    or hear the squeaky call of one of these tiny

2    creatures in the wild.  Yet current research

3    predicts that there will no longer be pikas by

4    the end of the century, so most likely in

5    lifetime and certainly in my daughter's visitors

6    to Rocky will no longer experience the delight of

7    seeing these animals in the park.

8              The proposed NEPA regulations would not

9    require agencies to consider impacts that are

10   remote in time, geographically remote, or the

11   product of lengthy causal chain, unnecessarily

12   accepting the demise of and tolling the death

13   knoll for countless species like the pikas within

14   our very lifetimes.

15             In Rocky Mountain National Park studies

16   show that the impacts of climate change include

17   causing the harmful algae blooms in alpine lakes

18   and epidemics of Mountain pine beetles.  The

19   proposed regulations lack considerations for the

20   impacts of pollution originating outside of the

21   park even though those impacts will be felt

22   inside of the park and by those of us that live

Transcript of Public Hearing
Conducted on February 11, 2020                    327

1    in the gateway communities.

2          That is why I am opposed to most of the

3    revisions to the NEPA regulations that CEQ has

4    proposed.  Analyzing how a federal project could

5    incrementally degrade the environment has long

6    been a hallmark.  Recognizing that these

7    cumulative impact considerations have been

8    stripped in the new regulations means that the

9    latent effects of these actions could pose

10   serious threats to the environment.  And the

11   public deserves to comment on these projects both

12   as individuals, families, and communities

13   affected and on behalf of the treasured public

14   lands that we are charged with stewarding.  Thank

15   you for allowing me to make comments.

16          MR. DRUMMOND:  Thank you.  And if we

17   can ask speakers 14 and 15 to come up to the

18   table that would be great.

19          UNIDENTIFIED SPEAKER:  14 and 15?

20          MS. PERRY:  I am 14.

21          MR. DRUMMOND:  Oh, yeah.

22          MS. PERRY:  Unless I miscounted.

Transcript of Public Hearing
Conducted on February 11, 2020                                    328

```
1              MR. DRUMMOND:  So, 13 I think will roll
2    with it.  So --
3              UNIDENTIFIED SPEAKER:  Yeah.  Please.
4    Go ahead.
5              MS. PERRY:  Thanks.
6              MR. DRUMMOND:  Yeah.
7              MS. PERRY:  Hi.  My name is Jean Perry,
8    J-E-A-N P-E-R-R-Y.  I live in Carbondale,
9    Colorado, and I'm on the board of Colorado Wild
10   Public Lands.  We are a grassroots organization
11   with the mission to protect the integrity, size,
12   and quality of our public lands in Colorado.  We
13   encourage all people to share their perspectives
14   and make their voices heard in our public lands
15   decisions.
16             My grandfather was a rancher in
17   Carbondale for over 50 years.  He and my
18   grandmother used to say they raised horses,
19   cattle, and seven children, in that order.  As
20   such a large family we pretty much cover the
21   spectrum politically, socially, et cetera.
22   Conversations around the dining room table at the
```

Transcript of Public Hearing
Conducted on February 11, 2020                    329

1    ranch could and did get pretty heated, but as

2    conservative as my grandfather was and as liberal

3    as some of his grandkids became he still took

4    time to listen and provide a platform for us to

5    speak our minds.

6              NEPA gives everyone a voice.  Ensuring

7    our representatives hear from engaged citizens

8    and providing a process to study the benefits and

9    impacts of a range of alternatives in order to

10   make informed and therefore better decisions.

11   Taking the public out of the process would

12   severely limit our potential.

13             In the future as we introduce and

14   change environmental policy our strength lies in

15   access to pertinent information.  Facts that are

16   only brought to light through studying

17   alternatives in a public process.  By protecting

18   the opportunity to participate in policy making

19   that affects us all, NEPA represents a

20   fundamental pillar of our commitment to the

21   health and prosperity of future generations.

22             On a working ranch everybody pitches in

Transcript of Public Hearing
Conducted on February 11, 2020                          330

1    and if we, like my grandfather, hear everyone's

2    input, consider all the possibilities, and agree

3    that we're in it for the long haul then the ranch

4    and our nation will thrive for many generations.

5    Thank you.

6              MR. NICHOLS:  All set?  Great.  Good

7    evening.  My name is Jeremy Nichols and I'm the

8    climate and energy program director for Wild

9    Earth Guardians.  Wild Earth Guardians is a west-

10   wide non-profit environmental advocacy

11   organization that works to protect and restore

12   wildlife, wild places, wild rivers, and health in

13   the American west.

14             I'm here today to object to the

15   proposed revisions to the NEPA regulations.  I

16   first want to start with kind of echoing the

17   sentiment that has come up a lot today.  I've

18   actually sat through the first two sessions, the

19   morning and afternoon hearings, and heard a lot

20   from people, and universally there is great

21   concern over the lack of public engagement in

22   this process.

Transcript of Public Hearing
Conducted on February 11, 2020                        331

1           The fact that there were only two

2    hearings held on a rule of national scope for

3    this process is not affording an adequate

4    opportunity for the American public to be

5    engaged.  The fact that the tickets for this

6    hearing went so fast that there was very limited

7    registration just speaks volumes to what we see

8    as the administration's and Council on

9    Environmental Quality's seeming distain for the

10   public's role in the National Environmental

11   Policy Act.

12           But what I think it really emphasizes

13   is the true motivation behind these rollbacks.

14   These are not about trying to make NEPA work

15   better for the American public.  This is about

16   trying to make NEPA work better for polluters.

17           In testimony throughout today we heard

18   from people supportive of the rollbacks.  They

19   want to be able to do what they want to do where

20   they want to do it.  Well, you know what, in come

21   cases you don't get to do what you want to do

22   where you want to do it because there's people's

Transcript of Public Hearing
Conducted on February 11, 2020                    332

1    lives at stake.  There's irreplaceable

2    environmental values at stake.  There's clean

3    water and there's clean air.

4            And we have a law in place right now

5    that says we're going to take those values under

6    consideration and if we can't assure protection

7    of the environment, the protection of the values

8    that we care about then we're going to say no.

9    So, I'm sorry but under the National

10   Environmental Policy Act sometimes we say no.

11           And there's been a lot of criticism

12   around delay.  There is no delay.  There is

13   deliberation.  There's thoughtfulness.  There's

14   federal agencies that are being diligent about

15   ensuring that they are not steamrolling

16   communities, steamrolling tribes, steamrolling

17   our public lands.

18           There is no delay.  I don't see that as

19   a problem.  We don't see that as a problem.  I

20   think that's a farce.  It's made up.  That is not

21   an issue.  To the extent that people can't get

22   projects done it's because they're too

Transcript of Public Hearing
Conducted on February 11, 2020                    333

```
1    destructive.  They aren't supposed to get done.

2    They should find other ways to get their projects

3    done, to make money, and to help our society

4    thrive.

5              As a society we've decided we're going

6    to protect people.  We're going to put people

7    first.  That's what a National Environmental

8    Policy Act is all about.  These regulations,

9    they're a scam.  They're a sham.  We hope you

10   abandon them.  We will be submitting detailed

11   comments to CEQ closer to the deadline.

12             I also just want to flag too that we

13   are delivering today petition signatures from

14   over 15,000 Americans who oppose the rollbacks

15   and who are calling on you to abandon your

16   proposed rulemaking.  So, I hope that you might

17   reconsider and take the American public to heart.

18   Thank you.

19             MR. FIGUEROA:  Hello.  My name is Jorge

20   Figueroa.  I'm a cofounder and director of

21   Laboratorio.  We are a group of professionals who

22   develop solutions to adapt to climate change.
```

Transcript of Public Hearing
Conducted on February 11, 2020                                    334

1   We're based in Denver.  I have a law degree from

2   Elizabeth Haub School of Law, and a forestry

3   degree from Yale School of Forestry.  I've been a

4   Fulbright scholar and I've been advisor for more

5   than 15 governors in the U.S. and internationally

6   and have done projects with three governor's

7   offices in the west developing market

8   transformation solutions and policies.

9           On behalf of Laboratorio and on behalf

10  of the sacred landscapes of the west I want to

11  vigorously oppose this dismantling of the

12  powerful tool of NEPA.  NEPA is quintessentially

13  American.  It is an innovation developed by the

14  United States that if not for NEPA our children

15  might not have tigers, elephants, dolphins.

16  Everybody loves dolphins, tigers, elephants

17  regardless of party affiliation.  It is our

18  sacred duty as environmental practitioners to

19  honestly if we are working for the people to

20  improve NEPA.

21          At a moment in which we have

22  unprecedented rates of extinction.  At a moment

Transcript of Public Hearing
Conducted on February 11, 2020                              335

1    in which our rivers are over allocated, and that

2    we have, according to NASA, an 80 percent chance

3    of having catastrophic multi-decade droughts

4    starting in 2050 to 2099 of more intensity and

5    frequency than the peak of the medieval period,

6    dismantling NEPA in order to let unscrupulous

7    project developers devastate our sacred

8    landscapes is, borrowing from E.O. Wilson,

9    analogous to letting folks build a fire to cook a

10   meal with Michael Angelo paintings, with Leonardo

11   DaVinci paintings, with Raphael paintings, to

12   build a fire to cook your meal.

13          I've worked for the past ten years

14   developing solutions and alternatives to NEPA

15   projects that have consistently shown that there

16   are much cheaper ways for us to serve our people.

17   Both provide energy and provide water in ways

18   that make our communities safer and make our

19   communities thriving economies.

20          Without NEPA and without cumulative

21   impacts and without public input we would have

22   less secure communities, less resiliency in our

Transcript of Public Hearing
Conducted on February 11, 2020                    336

1    systems, more extinctions of species, and a

2    destruction of our sacred land.  Thank you for

3    giving me the ability to share my remarks.

4              MR. DRUMMOND:  Thank you.

5              MR. GORDON:  Good evening.  My name is

6    Joel Gordon, J-O-E-L G-O-R-D-O-N.  I'm here

7    tonight as a private citizen concerned about the

8    future of our national parks and public lands.

9              The National Environmental Policy Act

10   or NEPA has for 50 years guaranteed communities a

11   voice in federal decision making.  The public's

12   right to communicate directly with the federal

13   government as I am now is indeed a cornerstone of

14   democratic representation.

15             Actions taken by federal agencies

16   routinely impact the air we breathe, the water we

17   drink, and the public lands that surround our

18   communities.  These impacts and the need for

19   ongoing public involvement in federal rulemaking

20   are exemplified excellently by our national

21   parks.

22             The requirements under NEPA to consider

Transcript of Public Hearing
Conducted on February 11, 2020                          337

1   environmental impacts and seek public input

2   applies to over 80 agencies in the federal

3   government.  The proposal by CEQ threatens to

4   institutionalize climate denial into government

5   decision making by blocking comprehensive

6   analysis of not only the impacts of federal

7   projects on climate change but also the impacts

8   of the climate crisis on federal projects.

9           By ignoring the reality of climate

10  change this proposal threatens to waste billions

11  of taxpayer dollars on infrastructure that is not

12  built to withstand increased flooding, rising

13  seas, and more severe weather.

14          NEPA is often the only opportunity

15  communities have to meaningfully weigh in on

16  federal decisions.  The administration's proposal

17  not only guts required consideration of the

18  environment and health impacts of government

19  decisions, it silences the voice of frontline

20  communities by severely restricting the number

21  and types of projects subject to thorough review.

22          Hailed by some as America's best ideas,

1   our national park system is owned by every

2   citizen of the United States.  In many ways our

3   parks represent a grand physical manifestation of

4   our democracy.  They are preserved by and made

5   for the people.

6        Here in Colorado, whether it's hiking

7   in Rocky Mountain National Park, marveling at the

8   sheer wonder of the Black Canyon of the Gunnison

9   National Park, understanding the cliff dwellings

10  in Mesa Verde National Park, or imaging the great

11  ocean that once occupied the land where the Great

12  Sand Dunes National Park now sits, our park

13  system preserves uniquely American experiences

14  and stories for generations before us and all

15  those to come.

16        Abundant and representative public

17  involvement has ensured sound decision making in

18  our national parks for decades.  This

19  participation is what American people deserve in

20  all federal actions but especially in the

21  backyards of our communities and national parks.

22  Thank you.

Transcript of Public Hearing
Conducted on February 11, 2020                    339

1            MS. SMITH:  My name is Kassi Smith,

2    K-A-S-S-I S-M-I-T-H.  I'm grateful to be here

3    today and I'm grateful for the opportunity to

4    speak on the incredibly impactful proposed

5    changes to NEPA and I'm grateful for this chance

6    because, as you know, the public, the entire

7    country was given two public forums to express

8    our concerns and I have no doubt that the period

9    for public input has been kept short on purpose.

10   Once the sign-ups for this hearing opened up to

11   the public every slot was filled within two

12   minutes.

13           A sweeping overhaul with

14   incomprehensible consequences and the public

15   hearings are being crammed into two days,

16   blocking virtually any thorough participation

17   from the public.  This alone should be a major

18   red flag to everyone regardless of the side of

19   the aisle you sit on.

20           The proposed changes to NEPA can

21   fundamentally change how every single agency in

22   the federal government considers the impacts of

Transcript of Public Hearing
Conducted on February 11, 2020                    340

1    their decisions, and yet the government of the

2    people, by the people seems to have disregard for

3    the people.  Now I'm a research scientist.  I

4    hold the process of data analysis and process

5    optimization in very high regards, but in order

6    to make sweeping changes to NEPA sound practical

7    the administration is touting the overhaul as a

8    modernization.

9            I don't see anything modern about the

10   sentiment of denying climate change and

11   environmental impact and removing public input

12   for the sake of padding the pockets the

13   corporations and stakeholders.  We will all pay

14   for the consequences of these actions, and as Dr.

15   Santiago Ali from NWF put it, the National

16   Wildlife Federation, the highest cost will be

17   born by the most vulnerable communities.  They'll

18   pay with their lives and their health as they

19   always have.

20           Now I was given the chance to speak

21   here today because of the National Wildlife

22   Federation which is a conservation group that

Transcript of Public Hearing
Conducted on February 11, 2020                                341

1    represents six million hunters, anglers, and

2    outdoor enthusiasts.  I volunteer for NWF and

3    other conservation groups because I am passionate

4    about the outdoors.  I want to ensure that the

5    opportunities I have now are around for future

6    generations.  I hunt.  I fish.  I hike.  I

7    explore our country.

8            And in our fast paced way of life it's

9    really easy to take our natural role fore granted

10   sometimes, but this proposed overhaul, it will

11   damage marine mammals habitat, it will lead to

12   increased ocean acidification, and global

13   warming.  Our public lands will be opened up for

14   resource extraction without regards to

15   environmental impact.  And people living in

16   industrial communities will be exposed to some

17   serious risks.

18           At the end of the day the proposed

19   changes to NEPA are meant to bind and gag.  They

20   would take away our right to participate in

21   important conversations that impact our

22   communities, our states, country, but we can't

Transcript of Public Hearing
Conducted on February 11, 2020                              342

1    roll over and let it happen.  As individuals, as

2    communities, as organizations in steward of our

3    land we need to fight to protect our voice.

4    Thank you.

5              MS. HARDIN:  Hello.  I'm Jenna Hardin

6    and I'm with 350 Colorado.  350 Colorado is a

7    grassroots organization that tries to mitigate

8    climate change and we have 19,000 -- over 19,000

9    supporters in Colorado as well as seven local

10   groups on the front range and on the western

11   slope.

12             Last May the Intergovernmental -- the

13   U.N. Intergovernmental Science Policy Platform on

14   Biodiversity and Ecosystem Services released the

15   most comprehensive report on biodiversity and

16   ecosystems ever completed.  Compiled by 145

17   expert authors from 50 countries with input from

18   310 more authors, the report concludes that,

19   quote, "Nature is declining globally at rates

20   unprecedented in human history, and the rate of

21   species extinctions is accelerating with grave

22   impacts on people around the world now likely."

Transcript of Public Hearing
Conducted on February 11, 2020                                    343

1            According to the chair, quote, "The

2    health of ecosystems on which we and all other

3    species depend is deteriorating more rapidly than

4    ever.  We are eroding the very foundations of our

5    economies, livelihoods, food security, health,

6    and quality of life worldwide."  For example, the

7    report finds that about a million animal and

8    plant species are threatened with extinction,

9    many within decades, more than ever before in

10   human history.

11           The report contends that we can still

12   make a difference, but transformative changes are

13   necessary.  While the administration claims that

14   the proposed changes to NEPA would modernize the

15   law, instead the changes are anachronistic, more

16   appropriate to the middle ages, prior to the age

17   of science and what we know now is a planetary

18   crisis for life on earth.  The drivers of the

19   crisis are the very factors that NEPA's current

20   law seeks to force us to consider and which the

21   proposed changes would undermine.

22           Our founders created a democracy which

Transcript of Public Hearing
Conducted on February 11, 2020                        344

1    is inherently messy.  Autocracies are much more

2    efficient.  350 Colorado urges CEQ to halt the

3    assault on earth's life supporting systems

4    through its attacks on environmental laws such as

5    NEPA and put its energy into strengthening these

6    systems and the laws that protect them instead.

7              We urge you to reject the proposed

8    changes that weaken the depth and breadth of the

9    NEPA analysis and limit public participation.

10             And I have -- I wanted to submit this

11   into the record.  Where do I do that?

12             MR. DRUMMOND:  There's a box in the

13   back.

14             MS. HARDIN:  Thank you.

15             MR. CARROLL:  I'm not going to make the

16   joke about Viagra but listen to the story.  Thank

17   you.  My name is Cory Carroll,

18   C-O-R-Y first name, C-A-R-R-O-L-L last name.  I'm

19   a family physician in Fort Collins, Colorado.  I

20   speak on myself and as the chairman of PSR

21   Colorado.  PSR is for Physicians for Social

22   Responsibility.  My and PSR Colorado's position

Transcript of Public Hearing
Conducted on February 11, 2020                     345

1   is in opposition to the CEO's [sic] rulemaking

2   changes.

3          I was working this morning in Fort

4   Collins talking -- looking at a little guy, a six

5   year old, had a ruptured tympanic membrane, was

6   checking that out because he wants to go swimming

7   tomorrow.  He's doing great.  But I got the

8   opportunity to talk to his dad who is in his

9   forties, cholesterol is kind of high, he's

10  overweight, fortunately he's not a smoker.

11         But my emphasis as a doctor is to focus

12  on prevention, not waiting until the disease

13  occurs and then say, okay, let's send you to the

14  cath lab.  They'll fix that artery that's plugged

15  up and hopefully you'll make it and hopefully

16  you'll be able to take your kid or see your kid

17  graduate high school.

18         The NEPA rules are allowing our system

19  to think about what's going to happen in the

20  future.  What we do now matters, and that's my

21  job as a doctor, really to educate my patients on

22  their health choices, on what they're doing.  And

Transcript of Public Hearing
Conducted on February 11, 2020                    346

1    personal choices are great, but you don't have a

2    choice in the air you breathe.  You don't have a

3    choice in the water you drink.  Those are all

4    mandated by our environment, and it really is

5    critical to understand that if we don't do a good

6    job of keeping our environment healthy, forget

7    the health of our population.

8            If you want to talk about costs, you

9    know, the healthcare system -- I actually call it

10   a disease management system -- but the costs are

11   incredible.  And you start making the changes

12   that we know are going to happen with climate

13   change, the problems with the environment, the

14   problems with water, you bring that into the

15   equation our population is going to get sicker

16   and those costs are going to be borne by our

17   country and it's unsustainable.

18           If you told a bank or real estate

19   company don't think about the future, just kind

20   of invest, they'd laugh you out of the room.

21   Thinking about what's going to happen down the

22   road.  What are the changes we think are going to

Transcript of Public Hearing
Conducted on February 11, 2020                    347

1    happen, we suspect are going to happen are

2    critical.

3              So, my approach to this would be the

4    same or to ask you to take the same approach as I

5    do as trying to keep my patients from having a

6    terrible outcome.  Think about the future.

7    Mitigate the changes you can mitigate.  And

8    hopefully have a system that's working together

9    for the health of our country rather than for the

10   profits and the benefits of a few.  Thank you

11   very much.

12             MR. DRUMMOND:  All right.  Do we have a

13   speaker 18, 19, or -- or 19, 20 or 21?

14             UNIDENTIFIED SPEAKER:  I was 19.

15             MR. DRUMMOND:  You were 19.  Okay.  If

16   we don't have 20 or 21 then we have room in this

17   first speaker session for a couple of our

18   waitlist speakers.  I know we have -- oh, are you

19   on waitlist?  As I know we have an A and B out

20   there.  So, the two of you please come up.  And

21   since we don't have you on our list if you would

22   make sure that you spell your name for the

Transcript of Public Hearing
Conducted on February 11, 2020                    348

1    transcript.  Thank you.

2              MS. SALLEE:  Hi.  I'm Kasie Sallee,

3    K-A-S-I-E S-A-L-L-E-E.  I grew up on a ranch in

4    western Colorado where we run on a 97,000 acre

5    federal grazing allotment on both BLM and

6    national forest.  I am here today in support of

7    the proposed updates and improvements to the

8    National Environmental Policy Act.

9              The ability for ranchers in the west to

10   utilize federal grazing allotments is paramount

11   to the health of the forests, viability of our

12   businesses, and conservation of our national

13   resources that are so important in states like

14   Colorado.

15             My family has worked our allotment for

16   over 30 years, and we have worked hard to improve

17   the health of the natural resources so that our

18   livestock thrive and our business is successful.

19   We have worked this way for so long and yet we

20   know that managing this land and securing our

21   permit is never a given.

22             This uncertainty makes it incredibly

Transcript of Public Hearing
Conducted on February 11, 2020                    349

1    difficult for ranchers to run their business.  In

2    its current form NEPA is often used as a tool by

3    extreme environmental groups to stall ranchers

4    from performing necessary updates and

5    improvements to their land that will help

6    conserve and protect the resources that our

7    cattle and communities rely on.

8              Simple maintenance such as fixing

9    existing infrastructure, such as maintaining a

10   pond, or constructing a new fence can be dragged

11   into court and bureaucratic processes that last

12   years.  In fact, review of these processes show

13   average length of time for review is four-and-a-

14   half years.  No one can operate a business with

15   that kind of uncertainty, especially a business

16   like ours that has live animals relying on us to

17   feed and protect them.

18             Like any business planning for the

19   future is key to its success.  NEPA processes

20   have become so burdensome that we often don't

21   know if we can count on grazing permits being

22   renewed.  We live in an area where land prices

Transcript of Public Hearing
Conducted on February 11, 2020                    350

1   are at a premium and if we were to lose this

2   grazing allotment the future of our ranch is

3   unclear.

4            The land we graze our cattle on is

5   rough terrain and it's unfit for any other kind

6   of production.  By allowing agriculture to

7   utilize permits we are able to protect our

8   natural resources while boosting our local

9   economies.

10           Those that live locally understand the

11  unique circumstances that each permittee faces.

12  I support the new revisions that enhance

13  coordination with states, tribes, and localities

14  as it will reduce duplication and allow for local

15  input to ensure that those that actually work the

16  land and care for its resources have a say in the

17  process.  Thank you for your time and I again

18  give my support of the new updates to NEPA and a

19  more expedient process.

20           MR. ATENCIO:  I come to you as a

21  stakeholder and a spokesperson for my mother and

22  father's estate.  I'm also here as a board member

Transcript of Public Hearing
Conducted on February 11, 2020                    351

1    of the Dene Citizens Against Ruining Our

2    Environment.  My name is Mario Atencio,

3    M-A-R-I-O A-T-E-N-C-I-O, a Navajo from Thoreau,

4    New Mexico -- Thoreau and Counselor, New Mexico.

5           My mother and father are individual

6    Navajo allotment holders in the Eastern Agency o

7    the Navajo Nation which lies in northwest New

8    Mexico.  The individual Indian allotments are

9    held in trust by the Department of Interior and

10   managed by United States Bureau of Indian

11   Affairs.  This land is also referred to as the

12   Greater Chaco Landscape.

13          My organization is plaintiff in the

14   Dynacare v. Bernhardt case that ruled that the

15   U.S. Bureau of Land Management needed to have

16   considered the cumulative impacts when approving

17   and planning unconventional horizontal drilling,

18   fracking in the Greater Chaco Landscape.

19          The communities of Counselors, Encino,

20   and Thoreau lie on the far east border of the

21   Navajo Nation and have consistently written

22   protest comments that request the BLM to do a

Transcript of Public Hearing
Conducted on February 11, 2020                                352

1    more thorough environmental justice review of the

2    Bureau of Land Management's environmental

3    assessment when considering impacts of approving

4    application permits to drill within the exterior

5    boundaries of the Eastern Navajo Agency.

6            My organization stands with these

7    frontline communities and demands that the

8    Environmental Protection Agency reconsider the

9    move to rollback implementing procedure of NEPA.

10   The impact that will allow corporations to

11   generate -- the impact that will corporations to

12   generate their own EISs is almost criminal.  The

13   fallout from horizontally drilled frack wells in

14   the Greater Chaco Landscape are the radioactive

15   (inaudible) wastes and hazardous air pollutants,

16   HAPs.  The impact of these or the fallout has yet

17   to be fully studied.  And having corporations,

18   the ability to develop their own EISs is a deep

19   conflict of interest.

20           The proposed action by EPA needs to

21   have proper consultation with individual Indian

22   allotment landholders and local Navajo chapters

Transcript of Public Hearing
Conducted on February 11, 2020                    353

```
1    of government.  The trust relationship the United

2    States Government has with the allotment holders

3    is not a fiduciary trust relationship but is

4    comprehensive and must have a public health

5    perspective when agencies like the EPA make deep

6    impactful actions.

7              In closing, I feel that these

8    implementation changes to NEPA is a direct attack

9    on the ruling in our case versus the BLM.  We

10   will not stand in silence when our families and

11   communities are attacked.  We stand in vigorous

12   opposition to this federal action and call this

13   whole process racist.  Thank you.

14             MR. DRUMMOND:  Do we have any other C,

15   E, D waitlist speakers?  And then I -- I believe

16   I see on the list that there was a number 20, Ean

17   Thomas Tafoya.

18             MR. TAFOYA:  That's me.

19             MR. DRUMMOND:  Yeah.  Okay.  Please.

20             MR. TAFOYA:  Do I need to spell my name

21   or anything?

22             MR. DRUMMOND:  If you could for the
```

Transcript of Public Hearing
Conducted on February 11, 2020                    354

1    transcript.

2            MR. TAFOYA:  Sure.

3            MR. DRUMMOND:  Thanks.

4            MR. TAFOYA:  Okay.  My name is Ean

5    Thomas Tafoya, E-A-N T-H-O-M-A-S T-A-F-O-Y-A.  I

6    am from Denver, Colorado and I am here today with

7    the Colorado Latino Forum, a organization that

8    organizes Latinos and Indigenous people around

9    the state of Colorado for our public health and

10   economic prosperity.

11           I stand with my ancestors and the

12   billions of people who are seeking public health

13   and environmental justice.  I stand with those in

14   the street that see a green new deal on the

15   horizon and what we want is more, not less.  Are

16   we so blinded by greed that we would chose to

17   support rolling back environmental protections

18   and opportunities for communities to participate?

19           Allowing the polluters to do their own

20   analysis will not result in anything good but the

21   government holding the hand for remediation and

22   sick diseases of people in the community who have

Transcript of Public Hearing
Conducted on February 11, 2020                           355

1   now become dependent on the government because of

2   illness.

3           To remove the cumulative climate impact

4   to me is completely absurd.  Are we trying to

5   drive off a cliff at 100 miles an hour?  Do you

6   have children?  Do you want to see something

7   seven generations from now?  Because I do.

8           Now I have a question for you.  Is the

9   CEQ going to allow public comment for more than

10  60 days which is what hundreds of local and state

11  governments, hundreds of members of Congress as

12  well as non-profits have requested an extension

13  and period of 100 days, but you have refused to

14  respond.

15          Will you pledge right now to extend the

16  comment period for us?  If not, tell us why.

17  When will we know?  Two opportunities to take a

18  look at a law that is 50 years old and has worked

19  across this country is fucking ridiculous.

20          MR. DRUMMOND:  So, we'll take our ten

21  minute break now at the conclusion of Speaker

22  Session 5 and we'll pick back up at 6:30 for

Transcript of Public Hearing
Conducted on February 11, 2020                          356

1    Speaker Session 6.  Thank you.

2             (Break.)

3             MR. DRUMMOND:  25 and 26, if you don't

4    mind coming up to the speaker table.  Thank you.

5             MR. SIKORSKI:  My name is Wade

6    Sikorski, W-A-D-E S-I-K-O-R-S-K-I.  I live on my

7    family's farm in Phillips County, Montana near

8    where the Keystone Pipeline will pass.  I've been

9    involved in various efforts over the years to

10   oppose a pipeline and I'm alarmed that the

11   rollback in NEPA rules will harm any effort to

12   stop the climate crisis.

13            My problem as a farmer is that nothing

14   is normal anymore, not temperatures, not

15   rainfall, not even the direction of the wind.  To

16   develop best practices for their farms, farmers

17   depend upon each year being like the last.

18   Whenever variations from year-to-year -- whatever

19   the variations from year-to-year so long as the

20   climate reverts to a norm the next farmers can

21   continue farming as they have, knowing when to

22   plant, what to plant, and how.  But if the

Transcript of Public Hearing
Conducted on February 11, 2020                                    357

1    climate starts changing and each year is nothing

2    like the last past experience is no guide to

3    future success.

4              I used to think that climate change

5    would happen slowly, perhaps not even

6    perceptively, but that is not what I have been

7    seeing at home.  Instead extreme weather events,

8    things like droughts, floods, heatwaves,

9    hailstorms, and tornados have been becoming more

10   frequent and severe across Montana.

11             A couple of years ago, for example, a

12   hailstorm hit our farm completing wiping out our

13   crops close to home sparing only a few winter

14   wheat fields miles away.  It was the worst

15   hailstorm ever for us.  I know this because my

16   great grandfather built a Quonset back in the

17   1930s.  It was made of heavier steel than is

18   common now and before the storm there were only a

19   few dents in it that had accumulated over the

20   decades.  The pings were perhaps on average an

21   arms length apart, but after the storm the pings

22   were within inches of each other.  Our Quonset

Transcript of Public Hearing
Conducted on February 11, 2020                    358

1    looked like a golf ball, as did our pickups.

2              When I was a child we occasionally

3    heard of tornados in North Dakota, but we never

4    had them where we lived.  Now almost every other

5    year we are getting tornados that are far more

6    powerful than anything before.  One of them

7    recently (inaudible) the town near my family's

8    farm a few years ago, filling the lake in the

9    center of town with debris, costing the taxpayer

10   millions of dollars to dredge.

11             In economic terms these -- the harm

12   these tornados are causing might be the least of

13   it.  A couple of years ago a drought caused the

14   worst hail of my life.  Before I've usually

15   (inaudible) almost every hay field on our place,

16   but this time most of our hay fields didn't even

17   grow enough to even bother trying to hay it.

18             The climate crisis, in short, is making

19   our weather too erratic and extreme to farm.

20   Given what has happened I shudder at what could

21   occur if carbon continues to accumulate in our

22   atmosphere, and so I am here to oppose this

Transcript of Public Hearing
Conducted on February 11, 2020                    359

1    proposed rollback of the NEPA rules.  It will

2    threaten food security, undermine efforts to

3    confront the climate crisis, and reduce my rights

4    as a citizen to participate in decisions that

5    affect my life.  Thank you.

6            MR. DRUMMOND:  Thank you.

7            MR. RILEY:  Good evening.  My name is

8    Zach Riley, Z-A-C-H R-I-L-E-Y.  I'm here today

9    representing Colorado Farm Bureau, a 100-year-

10   old, 23,000 member strong organization that

11   represents farming and ranching families from all

12   across the great state of Colorado and rural

13   Colorado.  Thank you to the Council on

14   Environmental Quality for holding this public

15   comment period today unless the previous

16   administrations.

17           NEPA is an important law that governs

18   the construction of new infrastructure projects

19   and helps protect the environment.  However, the

20   sky isn't falling today, but the law is long

21   overdue for reform.  It has been misused to block

22   new infrastructure projects, water projects that

Transcript of Public Hearing
Conducted on February 11, 2020                              360

1    would bring numerous economic and environmental

2    benefits to our public.

3            The last meaningful NEPA update was

4    done in 1978.  Ironically, just four short years

5    after Time Magazine hailed global cooling.  Our

6    economy, our infrastructure needs, and our

7    technology and knowledge of the environment have

8    greatly progressed in the past 40 years.  It's

9    time for NEPA to catch up.

10           Here in Colorado we face a growing

11   population.  We need new and improved roads and

12   bridges.  We need more water delivery and we need

13   cleaner and more efficient ways to generate and

14   transmit energy.  However, NEPA in its current

15   form is only making these jobs harder and harder.

16   Right now, it takes nearly five years to complete

17   an average EIS.  This time frame causes

18   unnecessary delays for projects and postpones any

19   environmental benefits associated with certain

20   projects like new roads to reduce traffic and

21   congestion that produces pollution.

22           The proposed reform would set a goal of

Transcript of Public Hearing
Conducted on February 11, 2020                     361

1    reducing project time frames down by two years

2    and we thank the NEPA for this.  This change

3    would untangle the delays that hinder

4    infrastructure development and provide new

5    meaningful benefit to environmental outcomes.

6              Opponents of this reform say that it

7    will hurt the environment but protecting the

8    environment has long been a bipartisan priority

9    to farming and ranching families.  Why should our

10   laws and regulations stay stuck in the 70s while

11   our knowledge of the environment and how to

12   protect it have advanced?

13             Modernizing NEPA regulations, cleaning

14   up wording and limiting page numbers do not alter

15   protections in the Clean Air Act or the Clean

16   Water Act in Colorado.  We know growing the

17   economy and protecting the environment go hand-

18   in-hand.  Many projects that are currently

19   delayed by an outdated NEPA would make our energy

20   grid more efficient and address critical

21   transportation issues here in Colorado.

22             We support your proposal to modernize

Transcript of Public Hearing
Conducted on February 11, 2020                              362

1    the National Environmental Policy Act.  Necessary

2    infrastructure across all sectors of the economy

3    from agriculture, energy, forestry, to

4    manufacturing transportation and commercial

5    development rely on these changes to reduce the

6    costs and time required to complete the

7    permitting process, allow our economy and our

8    society to advance while protecting the

9    environment we rely upon.  Thank you.

10            MR. DRUMMOND:  If we could have 27 and

11   28 come up to the table.

12            MR. NORRIS:  Good evening.  My name is

13   Ben Norris, N-O-R-R-I-S, and I am senior legal

14   counsel for the American Petroleum Institute

15   which represents all segments of America's

16   natural gas and oil industry including many

17   businesses here in Colorado.

18            API was formed in 1919 as a standard

19   setting organization and in its first 100 years

20   API has developed more than 700 standards to

21   enhance operational and environmental safety,

22   efficiency, and sustainability.  API and its

Transcript of Public Hearing
Conducted on February 11, 2020                          363

1    member companies are committed to operating in a

2    safe and environmentally responsible manner.  I'm

3    here tonight to testify in support of CEQ's

4    proposed rule.

5              We would like to commend CEQ for its

6    efforts to date to modernize NEPA which is long

7    overdue and is critical to site and construct

8    more wind, solar, and other renewable energy

9    capacity as well as natural gas which is clean

10   burning, uniquely able to ramp up and down to

11   complement renewable sources, and abundantly and

12   affordably produced right here in Colorado.

13             In this state alone NEPA delays and

14   litigation have postponed a wide variety of

15   needed projects which deprive Coloradoans of new

16   jobs, tax revenues, and public services.  With

17   over 12 years of experience advising both

18   renewable and fossil energy companies on NEPA

19   issues including litigating and arguing some of

20   the recent landmark cases before federal courts

21   of appeals it's my observation that the original

22   intent of NEPA has been stretched to a breaking

Transcript of Public Hearing
Conducted on February 11, 2020                    364

1    point.

2           Thanks to endless litigation in over a

3    dozen venues, decisions that point in different

4    directions, and novel interpretations of the

5    scope of key statutory language NEPA has become a

6    nearly insurmountable hurdle for project sponsors

7    who risk billions of dollars and their

8    marketplace reputations to build badly needed

9    infrastructure only to have it potentially halted

10   years after a final investment decision has been

11   made.

12          There's simply no way to responsibility

13   plan for agency and judicial review of major

14   infrastructure in this current state of flex, and

15   this uncertainty significantly chills or even

16   stops investment, an outcome never conceived of

17   by Congress when NEPA was drafted over 50 years

18   ago.

19          For these and other reasons API has

20   long supported programmatic NEPA reform at the

21   CEQ and individual agency levels and the proposed

22   rule is a vital next step in that ongoing

Transcript of Public Hearing
Conducted on February 11, 2020                    365

1  process.   From my perspective the most critical

2  reforms proposed by CEQ are those that give

3  needed guidance to reviewing courts that have

4  been left without direction from the expert

5  agency for too long.  Briefly stated, CEQ's

6  proposed changes to the definition of effects and

7  new requirements related to agency alternatives

8  will help clear up some of the most confusing

9  NEPA questions being litigated today and in years

10  to come.

11         We strongly urge CEQ to finalize this

12  rule as soon as possible and help put Coloradoans

13  to work building our energy economy of the

14  future.  Thanks very much for the opportunity to

15  testify tonight.

16         MR. DRUMMOND:  Thank you.

17         MR. PUTNAM:  Thank you.  Good evening.

18  My name is John Putnam, J-O-H-N P-U-T-N-A-M.  I'm

19  the director of environmental programs for the

20  Colorado Department of Public Health and the

21  Environment.  The Department of Public Health and

22  the Environment frequently acts as a cooperating

Transcript of Public Hearing
Conducted on February 11, 2020                          366

1    agency on NEPA reviews under the CEQ regulations

2    as an agency with specialized experience on

3    Colorado's air and water quality, hazardous

4    material requirements, and public health.  Our

5    ability to protect Colorado's air, water, land,

6    and public health will be damaged by the proposed

7    rules.

8              When President Nixon signed the

9    National Environmental Policy Act in 1970 he

10   stated that it would contribute to a period when,

11   quote, "America pays its debt to the past by

12   reclaiming the purity of its air, its water, and

13   our living environment", unquote.  CEQ now

14   proposes to reverse this legacy by going back

15   into environmental debt.

16             The proposed changes seek to replace

17   transparency and inform decision making with a

18   policy of willful blindness to the full

19   environmental and public health consequences of

20   federal decisions.  The proposed changes are

21   inconsistent with both the letter and the intent

22   of NEPA and must be scraped in their entirety.

Transcript of Public Hearing
Conducted on February 11, 2020                              367

1            Many of our pressing and challenging

2    environmental challenges are one that the

3    proposed rules would deliberately ignore under

4    the proposed willful blindness rules.  These

5    include attainment of federal standards for

6    ground level ozone, climate change, regional haze

7    and particulate matter, and watershed impairment.

8    These challenges to our health and environment

9    are driven by indirect and cumulative actions.

10            Given the shortness of time and the

11    comments from my colleagues in the state of

12    Colorado regarding climate change and wildlife,

13    I'll focus on the potent threat to public health

14    from ground level ozone.  The Denver Metro North

15    Front Range Ozone Non-attainment Area was

16    recently reclassified to serious for failure to

17    obtain the 2008 Ozone National Ambient Air

18    Quality Standard.

19            Other parts of the state including the

20    Colorado Springs area and portions of the western

21    slope hover just below these standards and are at

22    risk of violation depending on cross border

Transcript of Public Hearing
Conducted on February 11, 2020                                    368

1    emissions.  Ozone is the ultimate cumulative or

2    indirect impact because it is formed from

3    secondary reaction to the atmosphere on a

4    regional scale.  It is not directly emitted with

5    just one or two causal links but the product of

6    cumulative emissions in the vicinity of an area

7    and upwind.

8          Indeed, modeling studies of the highest

9    ozone days here in the Denver area show that 65

10   to 75 percent of the ozone results from

11   interstate transport that we cannot control.

12   This includes decisions related to oil and gas

13   development, coal, transportation, and other

14   projects approved by federal agencies.

15         While Colorado has taken significant

16   steps to minimize emissions from sources within

17   the state and is in the process of taking more,

18   our efforts would be undercut by federal

19   decisions that do not consider the cumulative and

20   indirect effects of their actions including

21   alternatives and mitigation to reduce these

22   effects.

Transcript of Public Hearing
Conducted on February 11, 2020                                    369

1           The result is impaired public health,

2    disproportionate effects on environmental justice

3    communities, increased healthcare costs and loss

4    of economic productivity, and increased cost for

5    Colorado businesses.  The same analysis that the

6    effects of the proposed rule apply to our

7    protection of water under Clean Water Act Section

8    401, regional haze, particulate matter,

9    restoration of impaired waters to name just a few

10   environmental challenges.

11          Good public policy, the letter of NEPA,

12   and 50 years of successful protection since

13   President Nixon's signing of NEPA require full

14   and transparent assessment of all of the

15   environmental consequences of a proposed

16   decision.

17          The proposed rule would provide the

18   opposite.  A policy of deliberate imposition of

19   undisclosed consequences.  It will impair human

20   health and the environment, impose costs on

21   states like Colorado, and usher a new era of

22   litigation and project delays.

Transcript of Public Hearing
Conducted on February 11, 2020                    370

1          The Department urges CEQ to withdraw

2     this unsalvageable proposed rule and establish an

3     appropriate dialogue with all stakeholders.

4     Thank you.

5          MR. DRUMMOND:  Thank you.  If we can

6     get speakers 29 and 30 to come up.  Thanks.

7          MS. GEDEON:  Hi.  My name is Emily

8     Gedeon.  That's E-M-I-L-Y G-E-D-E-O-N.  I'm the

9     acting chapter director of the Colorado Sierra

10    Club.  Thank you for your time tonight.  I'm

11    honored to have the opportunity to voice our

12    concerns with the proposed changes to NEPA as

13    many across the country wish they had the

14    opportunity to do today.

15          NEPA is the foundation for reasonable,

16    balanced, and transparent protections for our

17    environment and public health.  It is the law

18    that has made informed decision making about

19    public health and the environment a key component

20    of every federal action.  A few of my colleagues

21    have outlined Sierra Club's positions on the

22    proposed rollbacks to NEPA but I wanted to

Transcript of Public Hearing
Conducted on February 11, 2020                    371

1    highlight two changes that particularly concern

2    me as a Coloradoan.

3              First, the proposed changes remove the

4    requirement to consider the cumulative effects of

5    a project and would change the definition of

6    effects to eliminate reference to both indirect

7    and direct effects.  Cumulative impact analysis

8    is how an agency looks at a project in context

9    and considers what will happen around that

10   project in the near future.  Without that you

11   look at a project in a vacuum.  This change will

12   allow project proponents to push impacts over

13   dangerous thresholds and invite segmentation

14   which will mask the full impacts of a project.

15             Finally, like many others I'm troubled

16   by the fact that the proposed changes to NEPA

17   deprioritize public input.  By simply requiring

18   that our public agencies take the public's input

19   into consideration NEPA has helped us avoid a few

20   major environmental catastrophes here in

21   Colorado.

22             It was the public's input that

Transcript of Public Hearing
Conducted on February 11, 2020                              372

1    convinced the Forest Service to stop the clear

2    cutting of Aspen groves in the Gunnison National

3    Forest and it was public input that helped to

4    stop 300 -- or 30,000 acres of drilling in our

5    beautiful North Fork Valley.  Communities in

6    Colorado understand how to best protect their

7    lands and water and they deserve to be able to

8    give input.

9              I strongly urge you to protect NEPA,

10   not roll it back.  It is a basic common sense

11   protection that protects all of us and ensures

12   that everyone including the most vulnerable

13   communities have a say when it comes to projects

14   that could affect the health and safety of their

15   families.  Thanks so much for your time.

16             MR. DRUMMOND:  Thank you.

17             MR. WARDRIP:  My name is Jason Wardrip,

18   W-A-R-D-R-I-P.  I am the business manager for the

19   Colorado Building and Construction Trades Council

20   and I'm here on behalf of the council as well as

21   the North American Building Trades Union.

22             North American Building Trades Union

Transcript of Public Hearing
Conducted on February 11, 2020                                373

1    supports reforms to NEPA that provide regulatory

2    certainty through the permitting process while

3    maintaining the integrity of underlying

4    regulations that protect the health and safety of

5    our members on job sites as well as the

6    environmental and human impacts of projects in

7    communities throughout our country.

8            We support the reforms that reign in

9    legal challenges while thoughtfully protecting

10   the environment, the public, and worker safety on

11   the job.  We hope the added certainty will assist

12   in private development and finally spur robust

13   public investment and remain hopeful that

14   Congress and this administration now can set

15   their focus on massive infrastructure build to

16   rebuild the United States of America and create

17   millions of jobs.  Our training facilities are

18   built, our workers -- our training facilities are

19   built, our workers are standing by and we want to

20   go to work.

21           Let me be clear.  When lawsuits are

22   aimed squarely at killing projects, projects are

Transcript of Public Hearing
Conducted on February 11, 2020                     374

1    brought forth for political motivation reasons --

2    politically motivated reasons it hinders the

3    ability to create jobs and prepare the next

4    generation of construction workers.  President

5    Obama recognizes the need for reducing

6    infrastructure permit delays in citing the 2012

7    infrastructure executive order that need to

8    maintain the nation's competitive edge and ensure

9    the economy built to last as we compete for world

10   investment based on the quality of our

11   infrastructure.

12          Similarly, President George W. Bush

13   issued an executive order in 2002 to promote

14   environmental stewardship while expediting review

15   due to the importance of infrastructure to the

16   well being of American people in a strong

17   American economy.

18          The Clean Water Act Section 401

19   permitting process has resulted in needless

20   uncertainty.  This can stymie approval for years,

21   or worse, halt a half completed construction

22   project in its tracks.  By some estimates a six-

Transcript of Public Hearing
Conducted on February 11, 2020                    375

1    year delay on starting construction on public

2    works including the effects of unnecessary

3    pollution and prolonged inefficiency cost the

4    nation over $3.7 trillion.  These unnecessary

5    delays thwart needed infrastructure improvements

6    and progress and impede the national building

7    trades members from working and earning a

8    paycheck.  Thank you for your time.

9              MR. DRUMMOND:  Thank you.

10             MR. ALLISON:  Hello.  My name is Robert

11   Allison, R-O-B-E-R-T A-L-L-I-S-O-N.  I am a

12   member of the Southwest Regional Council of the

13   National Parks Conservation Association.  NPCA is

14   a national organization with 1.4 million members

15   working to protect and preserve our nation's most

16   iconic and inspirational places for present and

17   future generations.  We do this through using our

18   voices and encouraging others to do the same

19   often relying on the guarantees under NEPA that

20   our voices will be heard.

21             I'm not an expert in environmental or

22   legal matters.  After 23 years as an investment

Transcript of Public Hearing
Conducted on February 11, 2020                      376

1    banker though I am an expert in topics like

2    disclosure and conflict of interest.  The

3    National Environmental Policy Act helps ensure

4    that federal decision makers abide by clear

5    guidelines to see that infrastructure and

6    commercial development projects are completed in

7    a manner that best serves the common good and the

8    public at large.

9            This process has been largely

10   transparent and equitable since NEPA was passed

11   into law five decades ago.  This transparency

12   legitimizes policy outcomes by providing the

13   public a clear view of the decision-making

14   process.  However, the proposed changes to NEPA

15   are an affront to ethical decision making and

16   risk delegitimizing the governmental decision-

17   making process.

18           While these proposed changes could

19   damage public trust in a variety of ways, there

20   are two specific problems with the proposal that

21   I'd like to highlight.  Both concern potential

22   conflicts of interest.  Under current regulations

Transcript of Public Hearing
Conducted on February 11, 2020                          377

1    conflicts of interest can be mitigated through a

2    variety of avenues.  Both environmental

3    assessments and impact statements are prepared by

4    federal agencies.  Any additional assistance

5    needed from an outside expert or contractor

6    requires those parties to disclose in detail any

7    potential conflicts of interest with respect to

8    the study.  This is designed to limit bias and

9    encourage transparency when studying the

10   potential outcomes of a project.

11           The NEPA rule changes under

12   consideration are specifically designed to ease

13   these requirements for disclosure and

14   transparency.  Doing so would significantly

15   undermine the legitimacy of the decision-making

16   process.

17           In addition, the new regulation would

18   permit applicants to prepare their own studies on

19   potential environmental impacts.  Someone said

20   this would be like asking a student to grade

21   their own take-home exam.  I think of it as

22   letting the fox determine if, when, and how they

Transcript of Public Hearing
Conducted on February 11, 2020                    378

1    can enter the hen house.  This idea would remove

2    from the process federal experts who have the

3    experience and credibility needed to ensure these

4    studies are done in the public interest.

5             These changes clearly allow for

6    potential abuses of power that could easily tip

7    the scale in favor of private interest while

8    irrevocably harming our communities and public

9    lands.  I urge you to abandon these proposed rule

10   changes.  Thank you.

11            MS. MCCAIN:  Hi there.  My name is

12   Lauren McCain, L-A-U-R-E-N M-C-C-A-I-N.  I'm a

13   citizen.  I live in Denver though I was born in

14   Cleveland, Ohio.

15            When the Cuyahoga River famously caught

16   fire on June 22nd, 1969 I was a baby and living

17   just a few miles away.  The Cuyahoga had become

18   dangerously polluted with industrial chemicals

19   and could not support aquatic life.  This is not

20   the first time the river burned, and the Cuyahoga

21   was not the only river in the country to be

22   catching fire, but this was the time the American

Transcript of Public Hearing
Conducted on February 11, 2020                    379

1    people said never again, and just a few months

2    later Congress passed the National Environmental

3    Policy Act, NEPA.

4              When I graduated from high school the

5    banks of the Cuyahoga in downtown Cleveland were

6    lined with restaurants and nightclubs.  The river

7    was clean, and the city was vibrant.  There are

8    now around 60 fish species that have been

9    identified and its become a place where people

10   paddleboard.

11             It was a basket of municipal, state,

12   and federal laws and regulations including the

13   Clean Water Act of course and also NEPA that

14   brought the Cuyahoga River back to life and

15   helped revive Cleveland and that's no

16   exaggeration.

17             I urge the Council on Environmental

18   Quality to please not sell NEPA's vital

19   regulations down a burning river.  While we've

20   made some great strides since the 1960s in

21   cleaning up our environment we have so much more

22   to do.

Transcript of Public Hearing
Conducted on February 11, 2020                     380

1          Today, I love animals.  My husband is a

2     wildlife biologist.  Through our work and travels

3     we're seeing firsthand the effects of the

4     (inaudible) extinction crisis and climate change

5     where species populations are declining at an

6     unprecedented rate due to our human actions.

7     Birds are migrating at the wrong times, plants

8     are flowering at the wrong times, pollinating

9     insect populations are plummeting which will have

10    detrimental impacts to our own food supply.

11          My husband also has asthma and watching

12    him, a lifelong athlete, increasingly struggle to

13    breath as Denver's air quality is worsening is

14    quite alarming.  He's far from alone in this

15    struggle.  Now is certainly not the time to be

16    rolling back NEPA's regulations.

17          Among the problems I see, I'm concerned

18    with the proposed changes to not distinguish

19    between direct and indirect effects during

20    environmental review.  I'm concerned that

21    cumulative effects will no longer be analyzed.

22    For too many wildlife species the story of

Transcript of Public Hearing
Conducted on February 11, 2020                               381

1    decline is one of death by 1,000 cuts.  The

2    importance of looking at the effects of an action

3    not in isolation but in the context of additive

4    impacts of other actions that could impact a

5    species has been a core concept of NEPA analysis

6    for its entire history.

7              The new regulations will allow agencies

8    to ignore the big picture of cumulative harm to

9    species and habitats.  The proposed changes would

10   undermine transparency, public involvement, and

11   civil rights to the citizens most likely to be

12   affected by actions that would have a significant

13   effect on the human environment.  Instead of a

14   blueprint for democratic science-based decision

15   making I worry that the proposed changes provide

16   a game plan for corruption by giving polluting

17   corporations the power to write their own

18   environmental reviews.

19             I worry the changes will lead to a

20   diminished quality of our lands, waters, air, and

21   harm wildlife.  And I worry about increased

22   environmental catastrophes like the Cuyahoga

Transcript of Public Hearing
Conducted on February 11, 2020                                382

1    River fire and acceleration of climate change if

2    the proposals become reality.  Thank you very

3    much.

4              MR. DRUMMOND:  Thank you.  If speakers

5    33 and 34 could come up to the table that would

6    be great.

7              MR. RATLIFF:  My name is Dale Ratliff.

8    I'm an environmental and public lands attorney at

9    Lewis, Bess, Williams & Weese in Denver,

10   Colorado, and I'm here providing these comments

11   on my own behalf.

12             I support the CEQ's proposal to

13   modernize its NEPA regulations.  Many of the

14   proposals are common sense efforts that will

15   codify existing practices and help create needed

16   efficiencies for project proponents.  The

17   proposed rule revisions will benefit a large

18   cross set of projects subject to federal approval

19   and NEPA review including renewable energy

20   development, transmission infrastructure, water

21   supply infrastructure, mineral development, and

22   ski areas and other recreation facilities.

Transcript of Public Hearing
Conducted on February 11, 2020                    383

1            A few examples of CEQ's proposals that

2    represent important and reasonable updates to the

3    rules include administrative exhaustion.  CEQ's

4    proposal to codify certain administrative

5    exhaustion requirements will help commenters know

6    how to preserve litigation rights and will help

7    the agency remedy potential issues before

8    litigation by requiring that all issues be raised

9    during the comment period.

10           Mitigated fonsi, the mitigated fonsi

11   has become an important component of the NEPA

12   toolbox over the past decade.  It's a sensible

13   solution that reduces paperwork and processing

14   time and results in environmental protection

15   through required mitigation measures.  The CEQ

16   endorsed the mitigated fonsi in guidance in 2011.

17   Codifying it as an improved NEPA tool makes

18   sense.

19           Categorical exclusions.  Categorial

20   exclusions are an essential component of every

21   agencies implementing regulations under NEPA.

22   The CEQ's proposed regulations will help promote

Transcript of Public Hearing
Conducted on February 11, 2020                          384

1    the use of categorical exclusions and make their

2    use more consistent by providing agencies with

3    concrete regulatory guidance on how to develop

4    and apply categorical exclusions.

5              Tiering.  The CEQ proposes to revise

6    the tiering regulations to clarify that agencies

7    may produce a programmatic environmental

8    assessment and tier subsequent site specific

9    decisions to that document.  The ability for

10   agencies to tier is not inherently limited to

11   situations where the agency has produced an

12   environmental impact statement.  Tiering is an

13   important regulatory tool for land planning

14   agencies.  It is important for CEQ to promote its

15   use and remove existing ambiguities.

16             The preceding are just a few examples

17   of proposed revisions that will help streamline

18   the NEPA process.  The CEQ should carry these

19   proposals forward.

20             I would also like to briefly address

21   what this rule does not do.  Specifically, the

22   rule as drafted does not eliminate the need for

Transcript of Public Hearing
Conducted on February 11, 2020                    385

1    agencies to review the climate change impacts of

2    proposed projects.  As both a practitioner and

3    scholar I have closely followed the evolution of

4    the law in regard to climate change and NEPA.

5    CEQ's proposal to remove analysis of cumulative

6    impacts does not remove the need to analyze

7    climate change impacts.  To date the requirement

8    to consider climate change impacts does not stem

9    from the requirement to consider cumulative

10   impacts.  It has been found to derive from the

11   requirement to analyze the direct and indirect

12   impacts of GHG emitting projects.

13          The CEQ's proposal to codify the

14   Supreme Court's holding in Public Citizen will

15   also not change the current state of the law on

16   climate change.  The court's holding in Public

17   Citizen is existing, binding case law regardless

18   of whether it is put into regulation.  Arguments

19   based on Public Citizen have been consistently

20   raised an analyzed in climate change cases and

21   are woven into the existing state of the law on

22   the issue.

Transcript of Public Hearing
Conducted on February 11, 2020                            386

1              I think it is important that all sides

2    speak with candor on this issue so that the

3    public and all stakeholders involved can make

4    informed decisions about the proposed rule.

5    Thank you.

6              MS. SHENDO:  Good evening.  My name is

7    Eileen Shendo (phonetic).  I'm Pueblo so I'm

8    really small.  I'm from New Mexico.  Journeyed

9    here with fellow friends, sisters also

10   representing some of the Pueblo Nations that we

11   represent and come from.  My lineage is in

12   particular to the sovereign nations of Jemez and

13   Cochiti.  I speak to you as a sovereign woman

14   from these two nations, a dual citizen to the

15   United States of America, and as a fellow human.

16             I really hope that, as I've heard

17   people talk about rushing, we are really going to

18   wait to be very intentional and patient.  NEPA,

19   as you've all explained it and know quite well,

20   is not something that my fellow grandpas, uncles,

21   ranchers, water quality specialists by nature,

22   you know, they don't know it in and out.  They

Transcript of Public Hearing
Conducted on February 11, 2020                        387

1    don't know the intricacies.

2              Many of us choose to speak my language

3    which is an oral language passed from many

4    generations.  Never written because of the value

5    we hold in things.  And so, when people say that

6    we need to expedite the process I come back and I

7    remind you we need to begin the rightful process.

8    The due process that's long overdue for every

9    citizen of this nation, but for my particular

10   people which are Indigenous People have been too

11   far left out.

12             Companies come into our state and they

13   have learned the intricacies of each 19 tribal

14   governments that we have.  They know they're

15   particular and they know that there are some that

16   are more advanced and left others to the wayside

17   to truly be shepherded in the wrong way, pinned

18   against whether or not profit is going to give

19   them something that they've never even seen.

20             If you know your history you know Nixon

21   regulated our area as a sacrifice zone.  Who is

22   not smart to know the intentions, right.  We

Transcript of Public Hearing
Conducted on February 11, 2020                    388

1    still live that.  These are the homes to the

2    (inaudible) and we talk about honoring our

3    nation.  They have died of cancer.  All of them.

4    Maybe two, five, a handful are left.  Not even to

5    see their own people thrive and yet they fought

6    for all of us.

7              We're honorable but it doesn't mean

8    we're not smart.  I'm not a person that's meant

9    to give a life of our legacy in three minutes and

10   neither were my people.  What people call too

11   slow and too uncivilized was the words, whatever

12   we've been termed in all these generations, this

13   was honor for all of us.  They took hours to

14   delegate and deliberate these issues because it

15   impacted all of us.  They didn't look at us by

16   color.  They didn't look at us by race.  They

17   didn't look at us by nations.  Even at that we

18   were a human.

19             So, I speak for those that can't even -

20   - and that's our water.  That's your water.

21   That's the only thing we have as a legacy to

22   humanity in this world.  And so, every scientist

Transcript of Public Hearing
Conducted on February 11, 2020                    389

1    can tell you our government pumps tons of money

2    into universities all the time.  I'm a graduate

3    of CU Boulder.  Thank you for helping me be great

4    at bringing great people together.  And not

5    because it wasn't that what the university taught

6    me.  It was what my grandpa taught me.  And when

7    I graduate from that university I told him thank

8    you.  I'm strong.  I know what to do.  And all I

9    did was learn something that you already taught

10   me on the field, but in a different language.

11           We all come from that humanity.  Please

12   be patient.  You've done your service.  You've

13   learned your path.  We saw what the rest of them

14   did in our government.  Don't let the rest of us

15   down.  We still have beliefs.  We still have

16   hope.  I'm a gardener.  I have three young boys.

17   Jemez Pueblo alone has -- I don't want to tell

18   you my acreage, U.S. Government, sometimes

19   because we got a lot and it's ours and we have a

20   right to it before any of these companies, any of

21   these law, anyone else.  We, Indigenous People,

22   have a right first.

Transcript of Public Hearing
Conducted on February 11, 2020                    390

1          And you've left us out all this time.

2   In Cochiti my grandpa said go speak because when

3   -- the reason -- as Cochiti People we found out

4   about the Cochiti Lake and the whole Cochiti

5   Central Park was because my grandpa got asked to

6   line the new or to be developed airport.  He had

7   no clue.  Our people would have never had a clue.

8   And if it wasn't for someone who was up at

9   Cochiti Lake who cared about the environment like

10  many of you do, color aside, race aside, he

11  cared, and he stepped in and he helped our

12  leaders find a way to pull out.

13         We're stuck in 100 year lease for that

14  property, but we don't have an airport and

15  whatever else they dreamed of in that time.  But

16  that's what they do.  Those are the tactics,

17  United States Government.  They point at pieces

18  of paper and they say it's just this much, but

19  you guys know the truth.  It's our lands.

20  Thousand of acres.  It's our water.  It's our

21  babies.  You've heard from Navajo women.  They

22  can't even have kids.  The United States

Transcript of Public Hearing
Conducted on February 11, 2020                    391

1    Government, they gave us things to sterilize our

2    babies.  Because why?  We're powerful.  But not

3    for ourselves.  Never for ourselves.  For this

4    world.

5              And so, I ask you listen.  You've

6    overlooked all of us.  I'm one person.  I'm the

7    daughter of a senator and we did that by the help

8    of the people.  We won that race by the people.

9    And I just remind all of us, we have a bigger

10   place in this.

11             Please don't expedite.  Do it right.

12   For the first time in this nation's history, do

13   it right.  We're ready.  Each of you.  All of us.

14   We're prophesized.  Not for the white race, not

15   for the black race, not for the brown race, any

16   of that.  For the human race.  We're all meant to

17   be where we're at.

18             Thank you for my time.  There's nothing

19   much more I can say.  You have it in your hands.

20   But please do the right thing on behalf of these

21   people, our people, us as a people.  We only got

22   that one life link and that's our water and we're

Transcript of Public Hearing
Conducted on February 11, 2020                    392

1    selling it fast.  Fast.  Thank you.

2             MR. FANKHAUSER:  My name is Terry

3    Fankhauser.  T-E-R-R-Y, last name Fankhauser,

4    F-A-N-K-H-A-U-S-E-R.  I'm employed by the

5    Colorado Cattlemen's Association.  It's a 153

6    year old organization, predates Colorado

7    statehood.  It's an organization that represents

8    all sizes, types, races, ethnicity, religions,

9    backgrounds.  That organization has worked a

10   great deal around NEPA on various levels which

11   I'll talk about in a little bit.

12            I'd like to start by saying I think

13   NEPA is actually a good law and you've got a

14   tremendous challenge ahead of you.  NEPA as with

15   many federal major policy acts have a very noble

16   and intentional creation and they often get side

17   barred and detailed in many ways and that's

18   happened through issues such as litigation,

19   politization, and just unintended changes that

20   happen throughout time.  So, modernization of

21   acts like this is -- was intended by those who

22   created those laws and is necessary for those

Transcript of Public Hearing
Conducted on February 11, 2020                          393

1    laws to continue to function.

2              Our organization does support in

3    concept the changes that are being offered by the

4    administration and actually supported many of the

5    changes that prior administrations attempted to

6    bring forward for NEPA.  Many probably don't

7    realize but it's been a very bipartisan history

8    to attempt to modernize NEPA but there hasn't

9    been tremendous success in putting that forward

10   at the level that we're seeing today.  So, for

11   that we appreciate your due diligence and the

12   effort that you're applying.

13             NEPA unfortunately is one of those

14   issues that has been overly weaponized.  We

15   believe in the courts.  We've not seen it work at

16   a level that's very efficient.  It gets litigated

17   repeatedly and it does need that level of

18   modernization.  In fact, this country lacks in

19   many of our infrastructure modernization compared

20   to other modern countries because NEPA has

21   withheld those opportunities from moving forward.

22             Dollars should be implemented at the

Transcript of Public Hearing
Conducted on February 11, 2020                                    394

1    ground level to protect the environment, not

2    actually work your way through the arduous

3    litigation that NEPA often delivers.  Let me give

4    you some examples.  I do have the opportunity as

5    a multi-generational ranching family -- my

6    daughter is in the audience tonight.  She doesn't

7    understand a thing we're talking about here but

8    she's here patiently in the back of the room.

9           But we've worked heavily on species

10   reintroductions and care.  We've worked on

11   reservoirs in Colorado at a large level where the

12   actual dirt work of the reservoir pales in

13   comparison to the litigation that takes place

14   around NEPA.  Grazing, I think you've heard

15   plenty about grazing earlier.

16          But one of the things I think NEPA is a

17   classic example of that isn't working today is

18   around wildfire and many of the things we need to

19   do to prevent catastrophic wildfire in places

20   like Colorado and throughout the west are stymied

21   by the fact that NEPA can't come to bear to do

22   those infrastructure enhancements that are

Transcript of Public Hearing
Conducted on February 11, 2020                    395

1    necessary to curb wildfire or to mitigate

2    wildfire.

3            So, we come to you with great

4    expectation.  Actually, I'm a part of the

5    development of the water plan in Colorado as are

6    some of my colleagues in the room.  The one thing

7    we all universally agree upon for the health of

8    the environment in Colorado and to keep that

9    health moving forward in a positive fashion --

10   and this is environmental community, this is all

11   political backgrounds, we all agreed on one

12   salient point that capitalized in that water

13   plant, we need NEPA modernization.

14           And we also would support actually

15   bringing some of that implementation in NEPA to a

16   delegated state level.  That's probably something

17   that you know NEPA allows for but it's something

18   NEPA doesn't often have the opportunity to do.

19           So, with that I thank you for your time

20   and all your consideration for myself and those

21   in the room.  Thank you.

22           MR. DRUMMOND:  Thank you.  Could we

Transcript of Public Hearing
Conducted on February 11, 2020                              396

1   have speakers 35 and 36?

2           MR. LAUDY:  Good evening.  My name is

3   Ted Laudy.  I'm here on behalf of the Colorado

4   Association of Homebuilders or CHB.  We're an

5   affiliate of the National Association of

6   Homebuilders.  CHB's membership is over 2,000

7   member firms and individuals, men and women, all

8   ethnicities, all races.  We represent about

9   40,000 jobs and add about $11.5 billion annually

10  to the state's economy.  We play a crucial role

11  in providing housing for all Coloradoans.

12          On behalf of CHB I'd like to thank you

13  for this public hearing and the proposals set

14  forth by the White House Council on Environmental

15  Quality to update and modernize the National

16  Environmental Policy Act.

17          NEPA applies to a broad range of

18  government activities including activities

19  conducted by non-federal entities like

20  residential developers and builders.  We require

21  a federal permit or undertake an action

22  authorized by a federal program or for the

1    project that receives federal funds.

2             Importantly, the NEPA review process is

3    not intended to dictate a specific outcome but

4    rather to ensure federal agencies evaluate the

5    potential adverse effects of their actions before

6    proceeding.

7             For the homebuilding industry a myriad

8    of federal environmental protections and

9    permitting programs -- sorry.  For the

10   homebuilding industry a myriad of federal

11   environmental permitting programs as well as

12   federal housing programs do trigger some level of

13   NEPA review.  While most activities by

14   homebuilders do trigger a NEPA review, do not

15   result in the preparation of complex EIS

16   statements.  Even projects triggering an

17   environmental assessment can experience

18   significant delays.

19            Therefore, there are a number of NEPA

20   proposed reforms by CEQ that would provide a

21   benefit for providing more housing in Colorado

22   which is critically important to Colorado's

Transcript of Public Hearing
Conducted on February 11, 2020                    398

```
1    affordability challenges.

2              Activities such as clarifying the scope

3    of NEPA review to exclude non-federal projects

4    with minimal federal funding or involvement,

5    establishing presumptive time limits for

6    completing NEPA required reviews, and encouraging

7    federal agencies to use the existing NEPA

8    categorical exclusions process to reduce delays

9    during the permitting process.  However, we

10   support NEPA reforms not only for our own

11   members' activities but also desperately needed

12   transportation infrastructure projects that

13   support future development.

14             Here the NEPA review process has

15   important indirect impacts on the housing market

16   by delaying the federal approval and permitting

17   processes for transportation infrastructure

18   projects that help determine where future housing

19   units are built.  Infrastructure projects

20   stimulate economic growth, they create jobs, and

21   they facilitate housing supply and demand.

22             Improved infrastructure from bridges,
```

Transcript of Public Hearing
Conducted on February 11, 2020                              399

1    highways, and public transit is an investment in

2    our communities future economic growth.  It also

3    indirectly supports housing.  Therefore, we

4    support CEQ's proposed revisions to modern EPA

5    implementing regulations and ensure a more

6    predictable, efficient, and effective approach to

7    environmental permitting of transportation

8    infrastructure and residential projects moving

9    forward.  Thank you for your time this evening.

10           MR. DRUMMOND:  Thank you.  So, speakers

11   36, 37, 38.  Thank you.

12           MS. ALKIRE:  Hello.  My name is Hilary

13   Alkire, H-I-L-A-R-Y A-L-K-I-R-E.  I don't want to

14   make my testimony too repetitive, however I have

15   heard a lot of testimony outside of this room

16   that wasn't allowed in this building from many

17   people ranging from different ages, from

18   different cities, from different states.

19           I've met people today from Nebraska,

20   North Dakota, South Dakota, New Mexico, Utah that

21   weren't allowed to access into this building due

22   to how hard it was to even get into this hearing.

Transcript of Public Hearing
Conducted on February 11, 2020                          400

1    It was a lot and I appreciate the time to come

2    forth, however I'm a little offended at not

3    having the proper say whenever it comes to who

4    gets to demand who gets to walk in these doors.

5              I watched two 15, 16 year old girls

6    come from New Mexico and cry their eyes out

7    because they didn't get to tell you about the

8    stories of their hometown or where they come from

9    and they need to be represented in this room as

10   well.

11             I was very happy to hear what the other

12   woman had to say earlier because she made it very

13   clear that this isn't a race issue, this is a --

14   or a, you know, community, marginalized

15   community, anything like that.  It's a humanity

16   concept.

17             If you're building a house wouldn't you

18   care about -- would you care if those workers

19   were cutting corners because you needed that

20   house right then and there but once you moved in

21   with your family it collapses on you?  We're not

22   talking about a house.  We're talking about

Transcript of Public Hearing
Conducted on February 11, 2020                              401

1    everybody's environment.

2            We all make up this earth.  Every one

3    of us.  And it's not -- we can't call ourselves -

4    - I cannot call myself an American with how

5    ignorant we're being.  We're being blissfully

6    ignorant when all the data and the facts and the

7    statistics are here for us.  And we are not

8    stupid.  We are very smart people and we have the

9    intention to do well, but whose benefitting from

10   it?  I'm not a one percent benefiting from

11   anything where these construction sites go up,

12   where there's constant gentrification, pushing

13   good people out of Denver so we're having to

14   develop more and more of our land.

15           And we have companies like SunCor that

16   people have to see and subject themselves to

17   every day.  We have children here who live in

18   Globeville with asthma.  We have people in North

19   Dakota on reservations being affected by

20   pipelines, by the influx of people and workers

21   that come to the community.  It's not just the

22   earth we're polluting, it's the environment we're

Transcript of Public Hearing
Conducted on February 11, 2020                        402

1    creating.

2              We are doing this to ourselves.  And

3    I'm in this with everyone else.  I'm here to

4    stand for what I stand on.  I'm not -- as a

5    person who was deemed at one time in the

6    Constitution a merciless savage.  I am a

7    traditional being and that's what my people and

8    my ancestors stand for.  And we are peaceful

9    people.  We're not here to professionally agitate

10   you although sometimes that's what we have to do

11   to get our voice heard to make sure that our

12   voice is in this room.

13             And I just want everybody here to know

14   that it is our responsibility to our children, to

15   the birds in the sky, and the fish in the sea,

16   it's our obligation to keep this earth going and

17   unfortunately it's very offensive that we only

18   have two of these hearings here in Denver and

19   these people had to come from Montana and New

20   Mexico and yet the next hearing is going to be in

21   Washington, D.C.

22             It's hard enough that I had to take

Transcript of Public Hearing
Conducted on February 11, 2020                                403

1    time out of my school and schedule and being a

2    mom and every other role that I play to do this,

3    but it's important to me.  It's important to me

4    to make sure that I did everything that I could

5    to wake us up, to make sure that we have to

6    follow up with this type of stuff because it's

7    true, as an Indigenous person I'm not an

8    environmental scientist.  I study psychology and

9    neuroscience.  But it's pretty hand-in-hand to me

10   like how everything is directly correlated,

11   everything is connected.

12           So, I ask you to please take all of our

13   -- everything that we've had to say in

14   consideration and listen to us when we tell you

15   to wake up and do the right thing for not just us

16   but our children, your grandchildren, your next

17   seven generations to come.  Thank you.

18           MS. RUBIN:  Hello.  My name is Luana

19   Rubin, L-U-A-N-A R-U-B-I-N.  I thank you for the

20   opportunity to speak about NEPA.  And nobody is

21   paying me to speak here tonight.  I'm here as a

22   mother, as a business owner, and an employer in

Transcript of Public Hearing
Conducted on February 11, 2020                    404

1    Boulder County.

2         I'm here for all the people who have

3    told me their stories about climate change

4    related disasters and illness over the years.

5    I'm here for the Indigenous People who have told

6    me stories about their waters being poisoned and

7    their family members being sickened as was

8    mentioned earlier, and their sacred lands being

9    ripped apart for the sake of so-called progress.

10        I'm here for my daughter's three

11   friends in school who have cancer, high school

12   age kids.  And for my own friends who are

13   fighting cancer who have lost their battles with

14   cancer at too young of an age recently after the

15   air they breathe, and the water supplies have

16   been poisoned.

17        NEPA was put in place 50 years ago to

18   protect us from these horrors.  It needs to be

19   strengthened now, not weakened.  I'm sure we can

20   work together to find a balance.  We have to.

21   This is not a political issue.  This is a ethical

22   moral issue.

Transcript of Public Hearing
Conducted on February 11, 2020                405

1          My parents were farm and ranch real
2     estate brokers and they eventually grew into
3     being development real estate brokers.  They were
4     involved in much of the relocation of rural
5     properties when DIA was built for instance, the
6     Denver International Airport.  But they also
7     witnessed eastern Colorado wells being poisoned
8     and their neighbors having their tap water catch
9     on fire.  So, I've been witness to the ways that
10    developers can get around regulations and laws if
11    they have enough money here in Colorado but of
12    course it happens everywhere.
13          I've met people who work for government
14    agencies who admit that corruption is rampant.
15    That there are still plenty who get paid to look
16    the other way when big money demands their
17    objective.  I've visited Navajo Pueblos
18    downstream from superfund sites and disasters
19    like the Gold King Mine spill on the Animas River
20    that flows through Indigenous lands to the
21    Colorado River and the thirsty populations of
22    southern California.

Transcript of Public Hearing
Conducted on February 11, 2020                    406

1          I've met oncology surgeons, pediatric

2    oncology doctors who have been told by their

3    administrators to tell distraught parents, gosh,

4    we just don't know what's caused this cancer for

5    your child when they do know what's causing it,

6    that it's due to contamination from local

7    extractive industries.  These industries have

8    donated tens of millions to build hospitals but

9    have managed to skirt NEPA regulations.

10          We need to strengthen NEPA and work

11   together, not weaken the laws.  NEPA is our way

12   of standing up together to protect our children,

13   our communities, our water supplies, the air we

14   breathe, our food supply, our wilderness, and its

15   precious inhabitants.  As the layers of our

16   democracy have eroded and peeled away NEPA has

17   been a foundation for sanity, a (inaudible) to

18   protect our health, our environment, and our

19   right to breathe clean air and our right to clean

20   water.  Thank you for considering my comments.

21          MR. RESS:  Good evening.  My name is

22   Dan Ress.  I'm a legal intern with the

Transcript of Public Hearing
Conducted on February 11, 2020                                   407

1    Environmental Defense Fund in Boulder and whose

2    behalf I am speaking today.

3            NEPA is America's environmental Magna

4    Carta and the existing regulations have served

5    our nation's interests well in requiring federal

6    agencies to pause to consider the environmental

7    impacts of their actions, possible alternatives

8    and mitigation strategies, and input from

9    impacted communities.

10           The notice of proposed rulemaking

11   proposed sweeping changes to the entire set of

12   NEPA's implementing regulations which are

13   applicable to more than 100,000 federal actions

14   each year ranging from energy development

15   decisions on our public lands and waters to the

16   construction of industrial facilities and major

17   transportation infrastructure that releases vast

18   quantities of air and water pollution that will

19   affect our planet's future.

20           The public has a strong interest in

21   ensuring NEPA continues to serve these important

22   values and we urge CEQ to ensure the public has a

Transcript of Public Hearing
Conducted on February 11, 2020                          408

1    meaningful opportunity to provide comment on

2    these consequential proposed changes both by

3    extending the period for written public comments

4    and by providing additional opportunities for

5    public testimony given that within minutes after

6    they became available there were no remaining

7    speaking slots at either hearing.

8          Substantively, the proposal will have

9    many adverse consequences on agency decision

10   making though I would like to focus on climate

11   change related impacts.  First, the proposal

12   would eliminate requirements to evaluate

13   cumulative effects and possibly indirect effects

14   as well.  Cumulative and indirect effects have

15   played a major role in requiring agencies to

16   consider climate impacts of their actions, so

17   this change will facilitate more emissions and

18   intensity climate change.

19          Second, the proposal redefines the

20   statutory term significantly and may prohibit

21   consideration of indirect effects in agency

22   determination of whether to conduct environmental

Transcript of Public Hearing
Conducted on February 11, 2020                          409

1    review at all.  NEPA requires agencies to prepare

2    a comprehensive environmental impact statement

3    only for proposals that may significantly affect

4    the environment.

5            And striking without replacement a

6    fulsome ten point analysis of significance.  The

7    proposal greatly expands agencies already

8    considerable discretion, but at the same time it

9    requires that, quote, "effects should not be

10   considered significant if they are remote in

11   time, geographically remote, or the product of a

12   lengthy causal chain."  Climate change will often

13   have its most serious effects further in the

14   future globally and through complex causal change

15   so paradoxically contributions to the global

16   climate crisis would be marginalized as

17   insignificant.

18           Third, CEQ is considering limiting the

19   consideration of alternatives.  Under NEPA

20   agencies must consider less environmentally

21   damaging alternatives to proposed action, but the

22   proposal request comment on limiting the number

Transcript of Public Hearing
Conducted on February 11, 2020                    410

1    of alternatives an agency considers to for

2    example three which would significantly curtail

3    sound decision making by foreclosing other

4    options.

5            Furthermore, the alternatives would

6    have to be based on achieving the applicant's

7    goals even when the applicant's are non-federal

8    and private actors whose goals may be at odds

9    with the broader public interest.

10           Taken together these proposed changes

11   would potentially allow agencies to approve major

12   federal projects without adequate consideration

13   or disclosure of greenhouse gas emissions and

14   climate change impacts.  They would also

15   frustrate public access to this important

16   information.  Fundamentally, such a result would

17   undermine the environmental policy set forth in

18   NEPA.  For these reasons the Environmental

19   Defense Fund opposes the proposed rule.

20           MS. CHACON:  Good evening.  My name is

21   Renee Millard Chacon.  I am a woman, daughter,

22   wife, writer, educator of K through 12, Danza

Transcript of Public Hearing
Conducted on February 11, 2020                                411

1    Azteca, woman that holds the smoke, Chicano

2    activist, and most importantly, the mother of two

3    sons.  I'm Indigenous mother of Navajo Azteca

4    decent fighting for future generations and I'm

5    committed to relating climate justice to social

6    justice.  My family has long ties to Colorado as

7    a community, a sacred home for generations.  And

8    my young family has served for eight years in the

9    U.S. Navy.  I was an ombudsman the entire time.

10          I move by the love of the land and the

11   people of this entire continent and I honor

12   myself that way every day by how I live and the

13   spirituality that humbly requires me to clean and

14   protect my family, our community, and our earth.

15   I'm here to address where communities have been

16   targeted and isolated with pollution and

17   corruption which is critical in addressing the

18   climate crisis and any less protections to the

19   lack of people will be catastrophic, and the

20   land.

21          Issues of environmental racism and

22   exploitation of resources and land have

Transcript of Public Hearing
Conducted on February 11, 2020                                    412

1    notoriously left local Indigenous women and

2    children at risk to exploitation or worse.  Last

3    fall I worked with 350 Colorado to address how

4    women and children are often trafficked in these

5    same areas affected by exploitative practices

6    such as fossil fuel development.

7              In a collective effort with the

8    International Indigenous Youth Council we

9    presented an art installation on 16th Street Mall

10   in Denver to highlight missing and murdered

11   Indigenous women, black women, migrant women, and

12   hanging red and black dresses individually

13   dedicated to women missing or deceased.

14             During the strike of Greta Thunberg, we

15   painted handprints over our mouths in black and

16   red to continue to bring attention to these

17   silenced individuals.

18             This year I'm committing to expanding

19   the campaign to protect local Indigenous

20   communities and their families in legal

21   protection and representation by expanding

22   climate crisis art installations nationally.  The

Transcript of Public Hearing
Conducted on February 11, 2020                           413

1    narrative I support of missing and murdered

2    Indigenous women, girls, and people is the direct

3    example of the first human victims of

4    exploitative effects of overconsumption of

5    environmental resources spilling over to social

6    injustice of marginalized and impoverished

7    communities not able to legally protect

8    themselves from it.

9           The long legacy of this suffering has

10   led to a dramatic breakdown of social and

11   cultural infrastructures sometimes.  Maintaining

12   inequity, inequality, and no clean protection or

13   enforcement.  Most of all, accountability to

14   protect the children, women, men, and earth being

15   destroyed to outdated wasteful industries not

16   committed to renewable and sustainable progress

17   for society and our next seven generations.

18           Any less protections to the EPA I fear

19   will expand this degradation and corruption.  It

20   should never be okay to hurt local poor and rural

21   communities who cannot legally represent and

22   protect themselves from corporation's

Transcript of Public Hearing
Conducted on February 11, 2020                    414

1    overconsumption and wasteful methods of raw

2    materials.  If it's not okay to harm your

3    community it shouldn't be okay to harm any

4    community which means it should not be done to

5    our earth.  Thank you.

6              MR. DRUMMOND:  Do we have speaker 40

7    and 41?  All right.

8              MR. GRAVATT:  41.

9              MR. DRUMMOND:  Oh, 41.  Okay.  Thank

10   you.

11             MR. GRAVATT:  Good evening.  My name is

12   Matthew Gravatt.  That's M-A-T-T-H-E-W G-R-A, V

13   like Victor, A-T-T.  I'm the deputy director of

14   Federal and Administrative Advocacy at Sierra

15   Club.  I appreciate this opportunity to comment.

16             On behalf of our more than 3.8 million

17   members and supporters I'm here today to state

18   Sierra Club's strong opposition to President

19   Donald Trump and CEQ's proposed rollbacks to the

20   implementing rules for the National Environmental

21   Policy Act.

22             NEPA is a bedrock environmental and

Transcript of Public Hearing
Conducted on February 11, 2020                                415

1    public interest law.  At its core NEPA protects

2    communities and our environment from polluting,

3    dangerous, rushed, or poorly planned projects.

4    It helps communities to get information on

5    proposed projects and to make their voices heard.

6    It's helped communities to raise concerns,

7    protect their way of life and their families, and

8    to avoid the effects of environmental

9    degradation, pollution, and harm to livelihood

10   and health.

11          NEPA gives us an opportunity to

12   consider impacts.  It helps us to avoid

13   boondoggles and costly mistakes.  And in many

14   cases it's the only law that provides us -- the

15   only process that provides local communities with

16   this opportunity.  Simply put, NEPA helps us to

17   look before we leap.

18          CEQ's proposal would gut NEPA,

19   abandoning protections and safeguards that

20   protect communities, our environment, and our

21   health.  The proposal is a solution in search of

22   a problem.  The vast majority of the time major

Transcript of Public Hearing
Conducted on February 11, 2020                                    416

1    projects reviewed under the NEPA process move

2    forward without much scrutiny or delay, and in

3    the rare cases where they don't it's because they

4    pose an unacceptable risk to the environment and

5    to the public or public health or because of a

6    lack of financing.

7              The proposal would marginalize the

8    public's voice, putting the interest of polluting

9    corporations above the public's interest.  To try

10   and weaken these protections is a handout to

11   corporate polluters who want to build dirty

12   fossil fuel projects or other projects without

13   regard for the environment or public health and

14   safety.  This administration wants to make it

15   easier for corporate polluters to get their

16   pipelines and drill pads built or to give them an

17   end run around consideration of the impacts of

18   proposed projects.

19             Countless communities all across the

20   country, many of members, chapters, our members

21   and supporters rely on this process to make their

22   voices heard.  They rely on the process to ensure

1    that boondoggles are avoided, that impacts are

2    considered adequately, and so that landscapes,

3    waterways, treasured places, and ways of life

4    might be protected.  Attempts to cut the

5    essential protections of NEPA pose a grave

6    threats to our communities, our air, our water,

7    and our climate.  CEQ should abandon this

8    misguided and reckless proposal.

9              CEQ must also take note of the

10   unacceptable public engagement process on this

11   proposal, the short duration of the comment

12   period, the minimal number of public hearings of

13   this being the only field hearing which are

14   inaccessible to the many millions of impacted

15   people all across this country and the extremely

16   limited availability of public testimony, and a

17   practically nonexistent outreach and consultation

18   with tribes and Indigenous communities and

19   environmental justice communities, and the

20   variety of other stakeholders.  It is simply

21   unacceptable.  Thank you.

22             MR. DRUMMOND:  Unless we have any

Transcript of Public Hearing
Conducted on February 11, 2020                          418

1    waitlist speakers then I believe that was our

2    last speaker for the evening.  So, I'd like to

3    thank everyone for coming out to the hearing

4    today and speaking and with that we'll conclude

5    the evening session.  Thank you.

6            UNIDENTIFIED SPEAKER:  Mike, can you

7    hear from one person or -- I believe we have some

8    time left.

9            MR. DRUMMOND:  Sure.  Yeah.

10           Yeah, if you would come up to the

11   podium and provide your name and the spelling of

12   your name for the transcript.  Thank you.

13           MR. HERSCH:  My name is Jeff Hersch,

14   H-E-R-S-C-H.  This might be a tiny bit rambling

15   because actually I wasn't expecting to speak and

16   have nothing prepared but I still wanted to say

17   something, a couple of different things.

18           When I hear the word modernize I sort

19   of get a bit suspicious.  It reminds me of urban

20   renewal of the 60s when we knocked down beautiful

21   old buildings all over the country for parking

22   lots and ugly buildings.  And the word streamline

Transcript of Public Hearing
Conducted on February 11, 2020                              419

1    also sort of raises some doubts with me,

2    especially I guess streamline as applied to this

3    meeting means that out of a country of 50 states

4    and 300 and some million people you chose one

5    city to a have a meeting and that's sufficient,

6    and if that's streamlining I have a real problem

7    with it.

8              I just wanted to point out one example

9    of an article that was in the Denver Post a

10   couple of days ago as an example of the old and

11   new NEPA.  It was written by an environmental

12   writer named Bruce Finley.  It's about a parcel

13   of land in La Valle Valley.  I think about 600

14   hundred acres on which they want to build 35 I

15   think or so very large houses for the very

16   wealthy.  And they are trying and insisting on a

17   road to make that project possible.  The road

18   would go through an elk migration route.  The elk

19   have been diminishing in number now for some

20   years.  Under the old NEPA it's possible that

21   they would get that road on some kind of laws or

22   provisions that I'm not sure of.  Under the new

Transcript of Public Hearing
Conducted on February 11, 2020                              420

1    NEPA there would be far less things to stand in

2    their way to have that road put through to their

3    project and through the elk migration route.

4             I mean it's quite apparent that the

5    forces of development such as these two guys --

6    and they're Czech guys that live in Florida --

7    the forces of development already have more than

8    enough power and connection to hand them the keys

9    with the new NEPA and say, here, make your own

10   environmental statement.  It just sounds horrible

11   to me.

12            I guess I'm down to one minute.  I wish

13   those elk that are in danger of having a road put

14   through their migration route were here right now

15   to speak, a whole herd of them, and their voices

16   should be heard just as well as mine and the

17   other people I've heard.  Thank you.

18            MR. DRUMMOND:  Thank you.  All right.

19   Do we have anyone else who would like to speak

20   this evening?  Okay.  Thank you all again for

21   coming out and speaking tonight.

22            (End of audio.)

Transcript of Public Hearing
Conducted on February 11, 2020                                    421

```
 1                  CERTIFICATE OF TRANSCRIBER

 2              I, DEBRA MCCOSTLIN, do hereby certify

 3    that the foregoing transcript is a true and

 4    correct record of the recorded proceedings; that

 5    said proceedings were transcribed to the best of

 6    my ability from the audio recording and

 7    supporting information; and that I am neither

 8    counsel for, related to, nor employed by any of

 9    the parties to this case and have no interest,

10    financial or otherwise, in its outcome.

11

12

13    Debra C McCostlin

14

15    DEBRA MCCOSTLIN

16    FEBRUARY 28, 2020

17

18

19

20

21

22
```

Transcript of Public Hearing
Conducted on February 11, 2020

422

**A**

a-half
79:21
a-l-k-i-r-e
399:13
a-l-l-e-y
291:13
a-l-l-i-s-o-n
234:16, 375:11
a-l-m-a
82:1
a-m-y
320:7
a-n-d-e-r-s-o-n
116:12, 211:9
a-n-d-r-e-a
128:13
a-n-s-l-e-y
164:15
a-r
278:2
a-t-e
200:16
a-t-e-n-c-i-o
351:3
a-t-t
414:13
abandon
96:14, 101:18,
119:6, 122:3,
176:21, 187:14,
213:22, 333:10,
333:15, 378:9,
417:7
abandoned
44:3, 165:7,
314:8
abandoning
193:14, 415:19
abbreviating
165:21
abc
8:9
abcd
136:13
abdicating
180:20

abide
234:8, 376:4
abilities
131:3, 303:18
ability
61:14, 63:5,
94:12, 110:2,
117:14, 130:18,
173:9, 186:16,
186:21, 209:12,
220:2, 239:5,
263:20, 270:13,
283:21, 292:9,
304:19, 307:15,
311:15, 314:21,
314:22, 317:22,
336:3, 348:9,
352:18, 366:5,
374:3, 384:9,
421:6
able
34:22, 42:22,
61:22, 74:22,
75:2, 75:6,
75:14, 92:21,
100:2, 114:17,
124:5, 173:14,
250:7, 266:12,
267:9, 295:8,
295:18, 301:10,
307:10, 317:1,
318:18, 331:19,
345:16, 350:7,
363:10, 372:7,
413:7
abortion
127:21
above
273:15, 416:9
absolutely
39:2, 52:5,
201:16, 280:13,
280:15
absurd
355:4
abundant
123:11, 310:20,
338:16

abundantly
93:1, 363:11
abuse
43:11, 89:11
abused
89:4
abuses
53:15, 236:10,
378:6
accelerate
18:15, 146:19,
147:7, 176:18,
308:9
accelerating
67:3, 177:2,
342:21
acceleration
382:1
accept
194:21
acceptable
195:11
accepting
326:12
access
27:8, 28:6,
48:22, 115:9,
115:13, 155:20,
156:17, 166:19,
199:7, 199:16,
199:21, 204:10,
233:15, 255:14,
318:16, 329:15,
399:21, 410:15
accessible
184:15
accommodate
290:21
accomplished
18:14, 147:3,
201:3, 236:9,
249:7
accomplishing
262:16
according
10:13, 204:7,
335:2, 343:1
account
72:21, 84:7,

100:21, 118:7,
222:13, 245:8,
281:7
accountability
15:15, 64:12,
64:17, 144:3,
176:12, 231:1,
413:13
accountable
229:14, 295:19
accounting
82:20
accounts
95:7
accumulate
358:21
accumulated
357:19
accuracy
37:13, 214:9
accurate
36:16
achieve
313:11
achieved
58:18, 251:9
achieving
15:12, 125:2,
143:22, 144:6,
226:12, 237:6,
410:6
acidification
341:12
acknowledges
321:7
acquisitions
25:21, 154:12
acre
100:12, 307:7,
348:4
acreage
118:18, 389:18
acres
76:2, 106:1,
191:14, 232:4,
281:1, 372:4,
390:20, 419:14
across
13:12, 66:20,

Transcript of Public Hearing
Conducted on February 11, 2020                    423

76:8, 86:11,
91:7, 94:2,
107:15, 112:10,
120:1, 141:22,
171:19, 180:2,
180:14, 218:11,
238:11, 250:10,
250:17, 252:17,
254:7, 260:7,
272:18, 272:21,
278:6, 279:1,
291:18, 316:6,
355:19, 357:10,
359:12, 362:2,
370:13, 416:19,
417:15
**act**
1:6, 4:6, 9:20,
18:6, 30:20,
47:10, 50:10,
56:9, 59:13,
60:1, 61:15,
64:21, 71:5,
94:7, 96:14,
98:1, 102:19,
111:13, 116:19,
120:4, 124:1,
125:22, 128:21,
132:18, 137:13,
176:13, 181:14,
185:11, 202:18,
205:20, 211:19,
221:11, 221:20,
228:5, 228:15,
229:5, 229:7,
231:15, 235:1,
236:2, 236:3,
253:4, 253:5,
259:1, 260:4,
265:8, 274:1,
282:13, 286:18,
303:22, 304:2,
304:5, 305:3,
306:6, 306:7,
324:6, 331:11,
332:10, 333:8,
336:9, 348:8,
361:15, 361:16,

362:1, 366:9,
369:7, 374:18,
376:3, 379:3,
379:13, 396:16,
414:21
**acting**
163:5, 370:9
**action**
11:15, 13:21,
22:8, 22:13,
23:12, 23:14,
24:1, 24:2,
26:20, 27:18,
29:8, 46:22,
58:16, 62:22,
84:10, 95:15,
95:22, 114:13,
118:19, 126:2,
140:3, 142:9,
150:21, 151:4,
152:7, 152:9,
152:18, 152:19,
155:10, 156:8,
157:19, 164:1,
166:9, 170:8,
170:10, 173:10,
176:14, 178:9,
183:6, 186:17,
190:11, 190:13,
213:1, 213:2,
222:19, 230:3,
254:3, 262:4,
262:8, 262:15,
263:13, 302:17,
313:14, 352:20,
353:12, 370:20,
381:2, 396:21,
409:21
**actions**
9:8, 10:10,
11:12, 11:14,
11:16, 12:1,
14:2, 27:4,
27:6, 39:2,
43:21, 51:14,
54:12, 57:18,
61:3, 63:1,
78:9, 82:19,

83:6, 94:10,
96:8, 98:8,
120:16, 120:19,
121:6, 121:9,
124:17, 125:8,
126:8, 129:2,
129:5, 131:5,
137:21, 138:22,
139:22, 140:2,
140:5, 140:10,
155:16, 155:19,
167:1, 172:9,
175:12, 183:8,
186:19, 194:8,
209:17, 219:19,
226:20, 230:1,
230:5, 255:15,
256:3, 256:4,
256:6, 256:7,
269:5, 270:4,
282:12, 298:4,
298:5, 318:2,
319:6, 327:9,
336:15, 338:20,
340:14, 353:6,
367:9, 368:20,
380:6, 381:4,
381:12, 397:5,
407:7, 407:13,
408:16
**activate**
113:17
**active**
115:17
**actively**
269:4
**activist**
411:2
**activities**
25:15, 25:17,
154:7, 154:9,
299:7, 396:18,
397:13, 398:2,
398:11
**activity**
20:12, 25:18,
72:22, 102:16,
149:7, 154:10,

171:14, 217:13,
257:20, 257:22
**actor**
23:6, 151:20
**actors**
207:9, 410:8
**acts**
127:21, 365:22,
392:15, 392:21
**actual**
232:19, 394:12
**actually**
32:19, 75:22,
77:10, 80:19,
110:6, 159:15,
160:9, 161:2,
161:11, 171:1,
194:14, 234:2,
235:10, 252:22,
275:1, 276:7,
319:3, 321:9,
330:18, 346:9,
350:15, 392:13,
393:4, 394:2,
395:4, 395:14,
418:15
**adapt**
333:22
**adaptive**
36:21
**add**
20:10, 23:15,
29:2, 56:18,
100:13, 149:5,
152:10, 157:12,
168:12, 218:3,
220:3, 266:17,
396:9
**added**
37:5, 244:18,
373:11
**adding**
37:19, 219:5,
245:15
**addition**
37:10, 58:5,
117:13, 199:3,
287:14, 288:2,

Transcript of Public Hearing
Conducted on February 11, 2020

424

291:1, 293:10,
303:8, 319:10,
325:16, 377:17
**additional**
4:20, 9:16,
49:19, 53:3,
55:11, 99:6,
133:10, 136:14,
138:7, 138:8,
161:8, 161:10,
161:12, 168:6,
168:13, 170:6,
190:8, 190:15,
214:19, 239:4,
292:5, 292:11,
293:2, 293:3,
377:4, 408:4
**additionally**
37:19, 63:9,
95:10, 103:12,
236:1
**additive**
183:7, 381:3
**address**
23:20, 39:9,
52:8, 83:22,
91:3, 121:12,
152:15, 206:1,
292:5, 298:13,
302:13, 361:20,
384:20, 411:15,
412:3
**addressed**
129:4, 160:20,
320:3
**addressing**
91:18, 206:16,
411:17
**adds**
252:9
**adequate**
201:7, 210:8,
315:5, 331:3,
410:12
**adequately**
263:18, 417:2
**adhere**
53:5

**adhered**
165:9
**adjacent**
98:16
**adjourned**
286:9
**adjusted**
57:7
**administration**
10:21, 12:20,
30:14, 30:18,
31:5, 46:1,
56:14, 69:20,
83:14, 87:20,
94:4, 112:22,
127:20, 141:8,
180:19, 184:3,
199:12, 206:2,
207:10, 234:22,
238:11, 239:21,
282:11, 282:18,
284:3, 298:9,
298:11, 340:7,
343:13, 373:14,
393:4, 416:14
**administration's**
50:8, 67:7,
71:4, 122:11,
168:11, 198:4,
205:18, 225:10,
227:17, 237:9,
315:4, 331:8,
337:16
**administrations**
90:16, 359:16,
393:5
**administrative**
383:3, 383:4,
414:14
**administrator**
239:22
**administrators**
406:3
**admire**
228:14
**admit**
405:14
**adopt**
25:3, 153:17,

172:13, 243:15,
275:5
**adopted**
66:15, 69:3,
69:9, 299:5
**adopting**
241:11
**adoption**
24:18, 24:21,
153:13, 153:15
**adults**
163:11, 163:18
**advance**
189:22, 362:8
**advanced**
16:19, 145:5,
361:12, 387:16
**adversaries**
217:21
**adverse**
95:12, 116:22,
186:8, 266:1,
397:5, 408:9
**adversely**
94:12
**advising**
363:17
**advisor**
4:10, 132:21,
255:3, 286:22,
334:4
**advisory**
281:12
**advocacy**
330:10, 414:14
**advocate**
47:6, 49:16,
89:10, 102:8,
177:9, 177:10,
299:21
**advocated**
243:3
**advocating**
299:5
**affairs**
351:11
**affect**
27:7, 32:7,

57:13, 61:6,
62:13, 63:7,
66:5, 76:1,
76:6, 77:18,
80:14, 83:8,
84:17, 87:3,
94:10, 94:12,
129:11, 155:19,
162:18, 179:10,
246:9, 259:15,
316:4, 318:2,
359:5, 372:14,
407:19, 409:3
**affected**
27:17, 29:7,
41:22, 54:11,
61:8, 76:22,
77:1, 117:16,
127:15, 156:8,
157:17, 173:4,
186:19, 246:22,
269:5, 269:11,
269:14, 270:1,
271:10, 273:16,
280:10, 281:22,
312:1, 313:20,
327:13, 381:12,
401:19, 412:5
**affecting**
26:21, 46:14,
88:11, 91:14,
127:13, 155:11,
209:9, 232:19
**affects**
88:21, 126:20,
175:5, 329:19
**affiliate**
396:5
**affiliated**
56:3, 87:13,
171:2
**affiliation**
334:17
**affirmatively**
176:2
**afford**
57:2, 57:9,
95:8

Transcript of Public Hearing
Conducted on February 11, 2020

425

**affordability**
257:12, 398:1
**affordably**
93:1, 363:12
**afforded**
232:20
**affording**
331:3
**affront**
89:14, 247:9,
376:15
**afraid**
59:5, 284:14
**after**
84:18, 118:9,
139:11, 194:15,
197:5, 197:7,
294:19, 300:6,
301:19, 357:21,
360:5, 364:10,
375:22, 404:14,
408:5
**afternoon**
116:10, 132:11,
132:14, 167:11,
167:12, 173:19,
177:6, 181:2,
184:8, 187:18,
197:17, 208:6,
211:9, 216:22,
227:21, 231:11,
234:16, 241:2,
248:3, 250:5,
254:14, 261:7,
268:1, 320:6,
330:19
**afterthought**
185:13
**again**
6:18, 8:20,
9:1, 9:2, 16:7,
19:8, 21:8,
30:17, 32:21,
33:3, 33:14,
54:5, 110:5,
110:10, 120:5,
135:4, 150:3,
208:2, 282:15,

289:11, 291:8,
293:14, 294:20,
309:20, 350:17,
379:1, 420:20
**against**
36:21, 37:19,
73:9, 119:14,
186:15, 207:9,
249:19, 276:18,
351:1, 387:18
**age**
116:13, 204:18,
205:3, 343:16,
404:12, 404:14
**agency's**
18:11, 19:3,
25:3, 25:4,
81:12, 110:1,
147:17, 153:18,
153:19, 213:3,
262:3, 263:7,
270:13, 318:21
**agencywide**
15:10, 15:12,
143:20, 143:22
**agenda**
122:14, 313:8
**ages**
343:16, 399:17
**aggressive**
239:19
**agitate**
402:9
**ago**
91:11, 202:16,
212:2, 272:22,
357:11, 358:8,
358:13, 364:18,
376:11, 404:17,
419:10
**agree**
105:7, 330:2,
395:7
**agreed**
395:11
**agricultural**
50:15, 63:17,
66:8, 232:6,

308:1
**agricultural-bas-**
**ed**
258:15
**agriculture**
85:17, 304:20,
305:17, 307:11,
309:5, 350:6,
362:3
**ahead**
70:16, 107:20,
110:13, 113:6,
162:6, 177:19,
271:21, 277:21,
282:4, 299:16,
328:4, 392:14
**aid**
218:18
**aimed**
168:21, 243:14,
373:22
**air**
45:14, 45:16,
56:19, 65:4,
69:8, 80:10,
87:22, 89:7,
114:7, 114:19,
116:14, 116:16,
116:18, 117:4,
118:13, 128:2,
129:18, 129:20,
129:21, 130:14,
173:1, 173:4,
175:1, 177:12,
177:22, 178:17,
179:7, 185:3,
204:13, 204:21,
206:22, 207:6,
210:21, 211:14,
232:14, 233:16,
236:2, 249:1,
251:5, 253:5,
265:2, 265:6,
265:20, 275:9,
282:2, 283:1,
285:18, 310:3,
310:20, 311:19,
313:16, 316:10,

316:20, 332:3,
336:16, 346:2,
352:15, 361:15,
366:3, 366:5,
366:12, 367:17,
380:13, 381:20,
404:15, 406:13,
406:19, 407:18,
417:6
**airport**
390:6, 390:14,
405:6
**aisle**
339:19
**akin**
80:2
**alameda**
238:18
**alamosa**
258:17
**alarm**
120:6
**alarmed**
356:10
**alarming**
380:14
**alaska**
123:4
**albeit**
92:2, 243:16
**alcohol**
266:9
**alert**
118:19
**alex**
193:21, 197:14
**algae**
326:17
**ali**
340:15
**align**
66:16
**aligned**
81:13
**alike**
35:13, 184:2
**alison**
234:15

Transcript of Public Hearing
Conducted on February 11, 2020                                    426

| | | | |
|---|---|---|---|
| **alive** | **allowance** | 275:9, 294:16 | 150:7, 150:8, |
| 204:22 | 323:7 | **alongside** | 150:13, 150:14, |
| **alkire** | **allowed** | 93:19 | 155:10, 166:12, |
| 399:12, 399:13 | 34:20, 44:20, | **alpha** | 170:9, 182:11, |
| **allegiance** | 123:2, 124:2, | 271:18 | 182:13, 182:17, |
| 223:10 | 175:9, 196:18, | **alphabet** | 182:19, 194:10, |
| **alleviate** | 223:17, 320:4, | 207:16 | 208:18, 210:2, |
| 218:21, 301:21 | 399:16, 399:21 | **alpine** | 222:15, 223:13, |
| **alliance** | **allowing** | 66:13, 93:14, | 226:7, 226:9, |
| 93:20, 108:1, | 88:20, 122:19, | 93:16, 326:17 | 262:1, 262:4, |
| 299:20, 308:20 | 166:4, 182:20, | **already** | 262:8, 262:12, |
| **allied** | 183:11, 192:9, | 45:15, 48:16, | 262:20, 263:4, |
| 53:13 | 198:1, 227:6, | 88:12, 92:9, | 263:19, 264:1, |
| **allison** | 243:15, 305:18, | 100:15, 117:20, | 278:10, 278:13, |
| 234:15, 375:10, | 315:5, 318:20, | 121:17, 121:22, | 278:17, 278:19, |
| 375:11 | 327:15, 345:18, | 138:10, 171:12, | 301:17, 312:4, |
| **allocated** | 350:6, 354:19 | 176:8, 179:22, | 318:4, 318:6, |
| 335:1 | **allows** | 201:3, 204:14, | 318:8, 329:9, |
| **allotment** | 11:13, 92:8, | 218:5, 247:5, | 329:17, 335:14, |
| 348:5, 348:15, | 111:19, 112:1, | 247:15, 285:18, | 365:7, 368:21, |
| 350:2, 351:6, | 140:2, 165:22, | 288:5, 301:20, | 407:7, 409:19, |
| 352:22, 353:2 | 172:4, 172:7, | 309:22, 310:15, | 409:21, 410:1, |
| **allotments** | 172:13, 186:16, | 316:13, 325:17, | 410:5 |
| 242:9, 348:10, | 196:13, 234:1, | 389:9, 409:7, | **although** |
| 351:8 | 302:14, 308:14, | 420:7 | 40:12, 402:10 |
| **allotted** | 395:17 | **alter** | **altitude** |
| 6:17, 6:19, | **alluded** | 236:2, 261:20, | 174:7 |
| 134:9, 135:4, | 233:13 | 361:14 | **altogether** |
| 135:6, 288:6, | **alluvial** | **altered** | 61:16, 218:15 |
| 289:12 | 86:1 | 72:8 | **always** |
| **allow** | **alma** | **altering** | 60:3, 81:13, |
| 24:20, 25:1, | 81:21, 81:22 | 130:6 | 92:2, 202:21, |
| 25:5, 58:21, | **almost** | **alternative** | 244:13, 273:2, |
| 61:7, 96:3, | 112:8, 214:10, | 38:20, 196:15, | 325:21, 340:19 |
| 106:2, 112:21, | 219:9, 242:5, | 196:19, 263:8, | **ama** |
| 125:4, 125:9, | 242:10, 242:13, | 263:14, 263:15, | 188:3, 190:15 |
| 153:14, 153:16, | 297:18, 352:12, | 264:3, 307:21, | **ama's** |
| 153:20, 169:14, | 358:4, 358:15 | 312:8, 313:13 | 189:14 |
| 170:7, 170:16, | **alone** | **alternatives** | **amassed** |
| 196:12, 201:18, | 90:16, 196:11, | 20:3, 21:14, | 31:19 |
| 208:21, 226:15, | 232:3, 240:17, | 21:19, 21:22, | **amazing** |
| 226:22, 247:22, | 297:20, 339:17, | 22:1, 26:20, | 79:17 |
| 260:20, 306:18, | 363:13, 380:14, | 36:17, 36:19, | **ambient** |
| 318:12, 318:17, | 389:17 | 63:1, 77:5, | 68:1, 367:17 |
| 350:14, 352:10, | **along** | 78:3, 81:15, | **ambiguities** |
| 355:9, 362:7, | 45:9, 45:14, | 81:17, 96:7, | 384:15 |
| 371:12, 378:5, | 82:19, 86:7, | 117:17, 124:22, | **amended** |
| 381:7, 410:11 | 178:3, 240:5, | 130:3, 148:17, | 11:1, 139:14 |

Transcript of Public Hearing
Conducted on February 11, 2020                                      427

| | | | |
|---|---|---|---|
| amendments | amounts | 196:17, 206:8, | angler |
| 211:2, 213:8 | 101:3, 170:3, | 225:18, 226:4, | 122:21 |
| america | 322:17 | 242:6, 245:11, | anglers |
| 41:2, 125:19, | ample | 253:17, 262:2, | 341:1 |
| 166:18, 203:6, | 130:13 | 262:7, 262:12, | angling |
| 234:18, 250:16, | amplified | 263:9, 276:4, | 101:1 |
| 259:10, 271:6, | 121:22 | 298:20, 298:22, | angry |
| 308:16, 366:11, | amprm | 299:2, 299:3, | 259:2 |
| 373:16, 386:15 | 145:6, 157:10, | 299:9, 299:10, | animal |
| america's | 252:14 | 302:6, 312:11, | 261:10, 343:7 |
| 30:11, 97:2, | amy | 324:17, 337:6, | animal's |
| 97:6, 119:8, | 133:15, 287:11, | 340:4, 344:9, | 292:9 |
| 337:22, 362:15, | 320:7 | 354:20, 369:5, | animals |
| 407:3 | anachronistic | 371:7, 381:5, | 76:21, 89:8, |
| american | 343:15 | 385:5, 409:6 | 106:22, 326:7, |
| 33:3, 90:4, | analogous | analyze | 349:16, 380:1 |
| 93:14, 93:16, | 335:9 | 81:15, 114:12, | animas |
| 112:13, 167:17, | analyses | 121:2, 121:4, | 405:19 |
| 185:6, 186:15, | 37:21, 37:22, | 166:2, 173:8, | anniversary |
| 187:20, 199:3, | 38:17, 103:3, | 178:8, 206:6, | 251:8 |
| 217:6, 217:14, | 108:13, 109:17, | 225:1, 229:22, | annoying |
| 223:1, 248:5, | 109:21, 183:16, | 256:2, 385:6, | 259:9 |
| 248:11, 249:4, | 214:15, 215:4, | 385:11 | annually |
| 249:8, 273:19, | 215:11, 216:19, | analyzed | 161:8, 396:9 |
| 278:6, 300:13, | 297:7 | 12:5, 80:15, | another |
| 306:11, 330:13, | analysis | 129:3, 140:14, | 6:12, 25:3, |
| 331:4, 331:15, | 11:3, 20:22, | 192:14, 380:21, | 83:12, 83:13, |
| 333:17, 334:13, | 22:16, 23:19, | 385:20 | 92:9, 153:18, |
| 338:13, 338:19, | 35:3, 38:3, | analyzing | 191:19, 219:18, |
| 362:14, 372:21, | 38:5, 38:6, | 85:13, 327:4 | 285:10, 297:21, |
| 372:22, 374:16, | 38:9, 52:1, | ancestors | 309:20, 310:12, |
| 374:17, 378:22, | 61:2, 68:18, | 58:11, 273:20, | 323:2 |
| 401:4 | 69:21, 73:14, | 354:11, 402:8 | anprm |
| americans | 73:17, 78:3, | ancient | 16:19, 28:22, |
| 10:7, 104:18, | 80:17, 92:10, | 230:14 | 254:1 |
| 114:2, 138:19, | 95:5, 95:9, | and-a-half | ansley |
| 169:5, 187:12, | 95:19, 102:19, | 142:3 | 164:13, 164:14, |
| 229:11, 271:11, | 108:22, 110:5, | anderson | 167:8 |
| 306:13, 311:10, | 121:6, 131:3, | 116:10, 116:11, | answer |
| 315:11, 333:14 | 139:15, 149:18, | 200:12, 205:12, | 61:20, 136:6, |
| among | 151:8, 152:14, | 205:13, 211:7, | 302:10 |
| 46:3, 95:20, | 169:7, 170:14, | 211:8 | answered |
| 236:21, 237:3, | 172:19, 172:20, | andrea | 293:14 |
| 240:12, 243:18, | 172:21, 176:10, | 128:12 | antelopes |
| 320:11, 380:17 | 176:11, 182:18, | andy | 294:13, 294:21 |
| amount | 182:21, 183:2, | 295:2 | antha |
| 24:12, 153:7, | 183:9, 194:21, | angelo | 70:9 |
| 201:20, 291:7 | 195:7, 195:17, | 335:10 | anti |
| | | | 187:14 |

Transcript of Public Hearing
Conducted on February 11, 2020

428

anti-development
300:21
anticline
173:3
any
7:5, 7:17,
7:21, 7:22,
8:12, 23:15,
23:18, 43:16,
57:11, 57:17,
61:13, 61:22,
62:15, 67:9,
70:10, 121:6,
122:3, 125:6,
135:15, 136:4,
136:7, 136:10,
136:21, 152:10,
152:13, 178:15,
196:2, 196:19,
202:8, 206:8,
209:11, 226:18,
227:2, 259:6,
265:7, 266:2,
268:16, 289:22,
290:9, 290:11,
314:5, 322:8,
339:16, 349:18,
350:5, 353:14,
356:11, 360:18,
377:4, 377:6,
389:20, 391:15,
411:18, 413:18,
414:3, 417:22,
421:8
anybody
127:17
anymore
244:16, 356:14
anyone
8:7, 131:20,
131:22, 132:3,
189:18, 216:8,
264:13, 389:21,
420:19
anything
196:15, 340:9,
353:21, 354:20,
358:6, 400:15,

401:11
anytime
64:1
anyway
107:14, 215:7,
233:5
anywhere
325:8
apart
357:21, 404:9
api
90:3, 90:6,
362:18, 362:20,
362:22, 364:19
apnea
204:17
apocalypse
175:20
apologize
70:10, 277:17
apostrophe
214:5, 244:8
appalachian
74:18
appalachians
75:9
apparent
420:4
apparently
191:3
appeal
236:10, 236:16
appeals
175:11, 363:21
appear
87:1
appears
67:17, 87:3,
179:22
applaud
31:5, 79:15,
188:18, 253:14
applauds
188:3
applicability
172:4, 293:11,
293:12
applicable
407:13

applicant
25:17, 154:9
applicant's
80:12, 80:13,
81:4, 81:5,
81:11, 81:13,
410:6, 410:7
applicants
31:20, 170:7,
170:17, 318:20,
377:18
application
25:19, 149:3,
154:11, 162:16,
280:19, 352:4
applied
200:16, 285:13,
419:2
applies
20:12, 62:22,
149:6, 225:13,
254:2, 337:2,
396:17
apply
24:11, 153:6,
369:6, 384:4
applying
393:12
appointee
99:3
appreciate
62:8, 71:3,
241:7, 243:13,
278:16, 278:21,
324:15, 393:11,
400:1, 414:15
approach
257:4, 258:6,
320:19, 347:3,
347:4, 399:6
approaches
68:21, 125:2,
222:19, 226:11
appropriate
29:8, 157:18,
201:12, 239:1,
343:16, 370:3
appropriately
129:4, 224:8

approval
32:18, 47:11,
104:5, 169:14,
195:18, 196:7,
242:12, 256:12,
260:1, 297:9,
301:6, 374:20,
382:18, 398:16
approvals
31:20, 68:16,
108:7, 167:5,
197:7, 299:10
approve
16:1, 16:7,
16:15, 144:12,
145:1, 199:9,
242:4, 410:11
approved
47:15, 103:22,
104:2, 176:20,
199:9, 260:12,
280:19, 323:17,
368:14
approves
18:20, 147:12,
166:22
approving
351:16, 352:3
approximately
14:7, 142:17,
297:16
april
10:20, 139:12
aquatic
378:19
aquifer
43:6, 162:18,
191:21, 192:3,
273:15
arapahoe
39:21
arbitrary
73:16, 95:11,
98:19, 117:11,
197:8, 262:21
arch
86:3, 103:10
architectural
31:14

Transcript of Public Hearing
Conducted on February 11, 2020                    429

| | | | |
|---|---|---|---|
| arduous | arizona | 55:11, 106:1, | 134:12 |
| 394:2 | 123:4 | 377:20 | assist |
| area | armed | asks | 189:4, 209:8, |
| 35:2, 54:15, | 298:11 | 122:6 | 373:11 |
| 80:9, 85:18, | arms | aspect | assistance |
| 123:14, 124:7, | 357:21 | 23:18, 152:13, | 10:1, 25:20, |
| 126:4, 127:8, | around | 212:22 | 138:13, 154:12, |
| 127:12, 127:16, | 63:18, 75:5, | aspects | 241:21, 377:4 |
| 174:17, 231:16, | 95:13, 119:1, | 19:15, 71:8, | assistant |
| 233:17, 277:6, | 172:12, 185:1, | 73:14, 120:22, | 99:1 |
| 297:15, 297:19, | 187:6, 191:7, | 148:6, 206:4 | assisting |
| 298:10, 304:18, | 192:10, 192:20, | aspen | 37:22 |
| 309:15, 309:19, | 216:13, 233:19, | 316:18, 372:2 | associate |
| 312:15, 318:14, | 292:10, 328:22, | assault | 4:17, 5:3, |
| 349:22, 367:15, | 332:12, 341:5, | 344:3 | 133:7, 287:10 |
| 367:20, 368:6, | 342:22, 354:8, | assembly | associate's |
| 368:9, 387:21 | 371:9, 379:8, | 272:18 | 281:20 |
| areas | 392:10, 394:14, | assess | associated |
| 27:6, 44:22, | 394:18, 405:10, | 38:3, 38:11 | 14:1, 33:4, |
| 110:19, 111:18, | 416:17 | assessed | 92:17, 108:17, |
| 155:19, 174:19, | array | 92:11, 165:16 | 109:17, 142:12, |
| 196:20, 252:18, | 83:2 | assessing | 158:21, 360:19 |
| 259:7, 259:14, | arrive | 36:13, 38:16, | association |
| 294:20, 296:2, | 323:12 | 251:7 | 50:7, 50:22, |
| 296:3, 312:12, | arrived | assessment | 55:9, 59:12, |
| 318:15, 318:18, | 5:19 | 11:18, 36:16, | 102:6, 158:19, |
| 320:1, 382:22, | art | 140:8, 165:3, | 159:10, 187:21, |
| 412:5 | 412:9, 412:22 | 166:8, 234:5, | 217:7, 234:18, |
| aren't | artba | 234:9, 280:21, | 254:16, 255:12, |
| 63:22, 236:13, | 217:7, 217:8, | 292:2, 352:3, | 375:13, 392:5, |
| 285:6, 333:1 | 217:16 | 369:14, 384:8, | 396:4, 396:5 |
| arena | arterials | 397:17 | associations |
| 268:4 | 250:20 | assessments | 17:3, 145:13 |
| argue | artery | 11:9, 11:21, | assume |
| 178:10 | 345:14 | 24:20, 36:18, | 37:4, 99:2, |
| arguing | article | 58:19, 73:21, | 227:6 |
| 363:19 | 204:7, 419:9 | 165:21, 228:8, | assure |
| argument | artifacts | 232:11, 232:18, | 7:14, 135:22, |
| 173:13 | 316:12, 316:20 | 238:8, 238:17, | 290:6, 332:6 |
| arguments | artificial | 280:5, 280:14, | assured |
| 385:18 | 170:3, 269:10 | 305:13, 377:3 | 273:1 |
| arid | artists | assessors | asthma |
| 72:3 | 174:3 | 44:7 | 57:6, 82:15, |
| arikara | aside | assets | 178:20, 203:6, |
| 56:2, 87:14, | 390:10 | 257:19 | 204:17, 265:20, |
| 89:11 | asked | assign | 265:22, 380:11, |
| arise | 55:10, 390:5 | 8:11 | 401:18 |
| 269:12 | asking | assigned | at-risk |
| | 40:1, 40:2, | 6:1, 70:8, | 230:12 |

Transcript of Public Hearing
Conducted on February 11, 2020

430

atencio
350:20, 351:2
athlete
380:12
atmosphere
169:4, 358:22,
368:3
atrium
5:10, 5:12,
133:22, 287:21,
287:22
attack
185:12, 353:8
attacked
353:11
attacks
178:20, 344:4
attain
222:8, 227:11
attainment
367:5
attempt
43:16, 125:6,
226:18, 281:4,
393:8
attempted
393:5
attempts
195:14, 417:4
attend
247:5
attending
281:19
attention
69:22, 412:16
attenuated
152:2
attorney
79:12, 167:13,
181:4, 190:21,
193:22, 211:10,
228:1, 261:9,
296:17, 382:8
attributable
52:19
audience
70:11, 131:16,
200:7, 238:19,

394:6
audio
420:22, 421:6
audubon
221:4, 222:22
authorities
321:22
authority
23:11, 35:20,
77:22, 152:6
authorization
9:10, 15:3,
81:7, 138:1,
143:15
authorized
396:22
authors
342:17, 342:18
autism
179:4
autocracies
344:1
autoimmune
163:15
avail
135:21
availabilities
247:4
availability
13:9, 141:18,
175:5, 256:8,
306:22, 417:16
available
4:18, 9:2,
31:17, 38:8,
133:8, 216:10,
233:6, 408:6
avenues
57:16, 107:10,
377:2
average
12:18, 12:21,
13:13, 14:11,
15:10, 15:13,
32:6, 79:20,
141:6, 141:9,
141:13, 142:1,
142:22, 143:20,

160:7, 218:16,
236:5, 300:4,
308:5, 308:10,
349:13, 357:20,
360:17
aviation
298:8
avid
88:17, 111:14
avoid
92:8, 172:6,
194:8, 196:2,
222:20, 223:13,
268:16, 269:2,
269:19, 279:14,
371:19, 415:8,
415:12
avoided
227:3, 417:1
avoiding
230:18
awaiting
104:5
away
63:22, 65:8,
74:22, 106:21,
127:2, 127:5,
130:2, 160:1,
186:12, 203:15,
252:7, 266:4,
266:9, 274:5,
274:7, 309:1,
310:22, 317:6,
341:20, 357:14,
378:17, 406:16
azteca
411:1, 411:3

**B**

b-a-u-m-g-a-r-t--
e-n
296:16
b-e-u-g
317:9
b-r-a-n-s-o-m
96:22
b-r-a-y
303:6

b-r-e-n-t
162:9
b-r-i-e-n
214:5
b-r-o-o-k-s
224:17
b-y-k
110:16
babies
390:21, 391:2
baby
378:16
bachelor's
202:15
back
5:1, 7:3, 7:4,
7:21, 8:11,
49:22, 51:19,
55:20, 57:14,
65:1, 78:22,
117:1, 133:13,
135:13, 135:14,
147:4, 150:11,
171:22, 185:21,
207:8, 212:1,
233:2, 255:5,
264:16, 275:14,
275:19, 276:8,
276:12, 277:13,
279:9, 281:4,
289:16, 290:2,
301:22, 303:4,
344:13, 354:17,
355:22, 357:16,
366:14, 372:10,
379:14, 380:16,
387:6, 394:8
backbone
99:20
background
4:22, 9:5,
137:19
backgrounds
210:8, 392:9,
395:11
backpacking
325:19
backyard
232:4

Transcript of Public Hearing
Conducted on February 11, 2020

431

**backyards**
56:14, 75:3,
338:21
**bad**
207:9, 210:11
**badly**
364:8
**baja**
298:2
**balance**
36:2, 101:13,
187:2, 220:13,
245:13, 404:20
**balanced**
225:4, 370:16
**ball**
358:1
**ban**
126:19
**bank**
346:18
**banker**
376:1
**bankrupt**
86:4
**banks**
379:5
**barbarically**
39:20
**barred**
192:20, 392:17
**barriers**
33:11, 313:3
**barring**
55:16
**base**
129:21, 130:2
**based**
10:16, 13:6,
79:13, 93:14,
94:15, 115:10,
120:19, 139:7,
189:13, 192:18,
217:9, 223:6,
224:21, 279:19,
298:14, 324:2,
334:1, 374:10,
385:19, 410:6

**basic**
64:15, 139:19,
203:20, 224:2,
224:6, 227:15,
372:10
**basically**
11:6, 228:3
**basin**
211:10, 297:22
**basis**
52:10, 91:9,
113:13, 120:12,
159:3
**basket**
379:11
**baton**
49:15
**battery**
92:18
**battles**
404:13
**baumgarten**
296:15, 296:16
**bear**
186:7, 205:7,
249:9, 394:21
**beautiful**
118:21, 126:4,
372:5, 418:20
**beauty**
66:7, 125:19
**became**
329:3, 408:6
**because**
6:6, 23:12,
34:11, 35:7,
35:16, 40:16,
41:16, 42:5,
42:11, 42:22,
56:8, 58:1,
65:21, 81:14,
103:9, 108:17,
115:7, 116:5,
126:15, 126:18,
127:12, 128:1,
128:7, 134:17,
152:7, 161:10,
162:22, 163:18,

167:21, 170:1,
177:15, 177:17,
186:8, 191:1,
193:2, 193:7,
197:10, 202:1,
202:21, 203:10,
221:17, 221:19,
229:15, 234:3,
242:7, 242:17,
263:22, 266:5,
266:6, 266:10,
267:8, 273:5,
273:6, 275:11,
275:20, 276:9,
276:10, 276:20,
281:5, 284:13,
285:9, 285:12,
288:22, 295:11,
295:17, 296:3,
309:9, 315:18,
319:20, 331:22,
332:22, 339:6,
340:21, 341:3,
345:6, 355:1,
355:7, 357:15,
368:2, 387:4,
388:14, 389:5,
389:19, 390:2,
390:5, 391:2,
393:20, 400:7,
400:12, 400:19,
403:6, 416:3,
416:5, 418:15
**become**
32:5, 54:15,
80:16, 80:18,
98:17, 103:3,
118:20, 185:13,
186:12, 188:14,
210:11, 219:1,
235:9, 235:15,
252:13, 296:7,
320:16, 349:20,
355:1, 364:5,
378:17, 379:9,
382:2, 383:11
**becoming**
31:11, 118:17,

357:9
**bedrock**
65:5, 168:8,
184:12, 225:8,
246:20, 414:22
**beetles**
326:18
**beets**
163:3
**before**
1:1, 8:2,
20:19, 25:15,
45:18, 54:7,
60:1, 64:5,
123:16, 123:18,
124:18, 127:11,
127:22, 137:3,
149:14, 154:7,
163:17, 163:22,
182:9, 184:13,
186:3, 187:11,
197:4, 200:5,
204:18, 205:11,
208:15, 213:2,
214:6, 214:7,
221:15, 224:22,
229:2, 239:10,
249:5, 249:17,
270:4, 278:22,
285:11, 320:3,
321:7, 338:14,
343:9, 357:18,
358:6, 358:14,
363:20, 383:7,
389:20, 397:5,
415:17
**beg**
43:15
**began**
163:6, 239:10,
261:10
**begin**
4:14, 20:18,
39:18, 50:11,
133:4, 149:13,
158:14, 168:4,
387:7
**beginning**
160:19, 161:14,

Transcript of Public Hearing
Conducted on February 11, 2020

432

164:1, 282:9
**behalf**
4:10, 55:10,
97:1, 105:20,
120:5, 132:22,
158:19, 167:6,
187:20, 203:16,
205:13, 213:21,
241:4, 254:15,
255:11, 286:22,
295:13, 327:13,
334:9, 372:20,
382:11, 391:20,
396:3, 396:12,
407:2, 414:16
**behave**
115:16
**behaviors**
115:22
**behind**
169:21, 249:14,
331:13
**beijing**
207:2
**being**
37:5, 45:19,
54:11, 54:20,
61:22, 75:14,
77:16, 80:15,
86:2, 95:18,
110:2, 110:3,
112:3, 113:19,
121:17, 126:16,
127:14, 127:22,
128:2, 165:13,
174:21, 180:13,
197:7, 210:7,
228:12, 235:16,
267:21, 272:11,
275:16, 277:13,
289:1, 296:2,
304:6, 307:11,
313:8, 317:20,
332:14, 339:15,
349:21, 356:17,
365:9, 374:16,
393:3, 401:5,
401:19, 402:7,

403:1, 404:6,
404:7, 404:8,
405:3, 405:7,
413:14, 417:13
**beliefs**
58:8, 389:15
**believe**
11:18, 31:3,
41:15, 44:17,
51:15, 64:20,
66:1, 91:4,
95:14, 112:12,
158:15, 160:21,
161:17, 188:6,
189:14, 233:22,
234:10, 246:4,
277:19, 281:12,
289:8, 305:11,
353:15, 393:15,
418:1, 418:7
**believed**
163:19
**believes**
32:1, 185:6
**below**
367:21
**ben**
52:16, 281:13,
282:5, 362:13
**beneficial**
176:3, 222:9,
227:11
**benefit**
35:12, 44:21,
46:22, 109:12,
113:18, 240:8,
261:4, 268:15,
268:18, 270:16,
302:18, 305:4,
361:5, 382:17,
397:21
**benefited**
38:7
**benefiting**
115:3, 401:10
**benefits**
32:12, 66:22,
67:3, 73:8,

84:10, 99:22,
109:10, 109:13,
117:11, 167:17,
184:15, 235:18,
241:20, 242:1,
256:19, 311:20,
313:17, 321:12,
329:8, 347:10,
360:2, 360:19
**benefitting**
401:9
**benito**
126:12
**benjamin**
50:2
**benzine**
128:1
**berlaimont**
105:21
**bernhardt**
309:12, 351:14
**bernhardt's**
308:22
**berthold**
56:4, 57:3,
57:5, 57:21,
58:2, 87:14,
87:16, 87:17,
87:18
**bess**
382:9
**best**
36:19, 44:22,
51:16, 60:21,
61:7, 62:14,
71:22, 93:1,
123:20, 128:6,
155:15, 177:9,
216:10, 269:22,
304:9, 322:3,
337:22, 356:16,
372:6, 376:7,
421:5
**better**
18:5, 28:10,
33:6, 37:17,
51:7, 100:5,
101:6, 112:15,

116:1, 124:7,
146:14, 156:21,
182:14, 188:14,
188:19, 189:18,
194:11, 209:22,
210:20, 212:11,
213:18, 221:19,
236:13, 237:15,
279:21, 304:3,
305:8, 315:19,
318:10, 321:6,
322:3, 329:10,
331:15, 331:16
**between**
13:9, 23:5,
33:10, 51:8,
54:21, 55:6,
55:13, 123:12,
141:19, 151:19,
231:2, 239:7,
253:21, 260:15,
263:5, 291:8,
294:15, 380:19
**beug**
317:8, 317:9
**beyond**
45:9, 53:5,
55:12, 57:3,
99:4, 110:1,
160:9, 201:6
**bia**
295:8, 295:18
**bias**
377:8
**biases**
96:7
**bidders**
218:13
**bidding**
218:15
**bids**
218:14
**bifurcated**
250:21
**big**
34:11, 38:4,
72:11, 72:13,
86:19, 100:17,

Transcript of Public Hearing
Conducted on February 11, 2020

433

174:9, 183:12,
269:6, 269:19,
294:16, 303:9,
381:8, 405:16
**bigger**
391:9
**biggest**
125:22, 171:15,
314:19
**bikers**
95:2
**biking**
232:7
**bill**
69:11, 276:2,
276:3
**billie**
180:5
**billings**
317:14
**billion**
102:15, 161:8,
217:12, 218:21,
223:3, 396:9
**billions**
121:16, 161:11,
337:10, 354:12,
364:7
**bind**
341:19
**binding**
385:17
**biodiversity**
75:11, 174:8,
342:14, 342:15
**biological**
190:22, 228:2,
231:3
**biologist**
380:2
**biology**
162:11, 202:15
**bipartisan**
119:5, 120:2,
120:12, 361:8,
393:7
**bird**
221:7, 291:16,

291:18
**birds**
221:5, 221:12,
223:1, 223:4,
223:15, 380:7,
402:15
**birth**
203:7, 265:18,
266:1
**birthday**
110:17
**bison**
97:14
**bit**
9:1, 38:15,
137:17, 392:11,
418:14, 418:19
**black**
181:19, 282:6,
338:8, 391:15,
412:11, 412:12,
412:15
**blank**
313:18
**blanket**
128:9
**blankets**
126:16
**blasting**
316:15
**blatant**
45:5
**blessed**
75:10
**blind**
49:2, 121:13,
194:7
**blinded**
354:16
**blinders**
193:10
**blindness**
169:8, 366:18,
367:4
**blissfully**
401:5
**blm**
38:2, 38:8,

98:12, 166:3,
166:7, 232:2,
236:22, 245:1,
278:11, 291:20,
295:18, 296:3,
297:21, 298:7,
317:20, 348:5,
351:22, 353:9
**blm's**
98:10
**bloated**
322:16
**block**
236:14, 260:10,
359:21
**blocking**
337:5, 339:16
**blood**
275:16
**blooms**
326:17
**blow**
83:13
**blue**
86:17, 192:8
**blueprint**
381:14
**blur**
227:5
**blurring**
226:21
**board**
217:5, 254:7,
296:18, 328:9,
350:22
**boaters**
95:3
**bob**
184:7, 187:19
**body**
249:3
**bogged**
304:7
**boise**
162:13
**bond**
247:12
**bookkeeping**
233:1

**bookshelves**
51:22
**boom**
191:12, 309:16,
309:21, 310:9
**booming**
99:15
**boondoggles**
415:13, 417:1
**boosting**
350:8
**border**
54:13, 84:21,
231:22, 351:20,
367:22
**bordering**
54:11
**born**
122:20, 265:14,
265:17, 340:17,
378:13
**borne**
178:14, 346:16
**borrow**
273:20
**borrowing**
335:8
**boss**
279:17
**both**
46:17, 72:7,
90:15, 136:5,
156:2, 171:1,
173:4, 174:11,
183:16, 214:10,
214:18, 219:5,
220:1, 224:1,
230:5, 234:11,
239:13, 246:3,
304:20, 305:3,
305:9, 322:12,
322:13, 323:8,
324:10, 327:11,
335:17, 348:5,
363:17, 366:21,
371:6, 376:21,
377:2, 385:2,
408:2

Transcript of Public Hearing
Conducted on February 11, 2020

434

| | | | |
|---|---|---|---|
| **bother** | **breathe** | 183:19, 183:21, | 92:16, 123:7, |
| 358:17 | 116:17, 117:5, | 219:20 | 124:12, 174:17, |
| **bottom** | 177:22, 185:3, | **brokers** | 228:20, 256:1, |
| 200:2, 310:12 | 204:21, 232:14, | 405:2, 405:3 | 337:12, 357:16, |
| **boulder** | 251:5, 265:20, | **brooks** | 373:18, 373:19, |
| 389:3, 404:1, | 336:16, 346:2, | 220:20, 220:21, | 374:9, 398:19, |
| 407:1 | 404:15, 406:14, | 224:15, 224:16 | 405:5, 416:16 |
| **boundaries** | 406:19 | **broomfield** | **bulldozed** |
| 243:17, 305:6, | **brent** | 116:12 | 246:11 |
| 352:5 | 162:1, 162:8 | **brought** | **bulldozers** |
| **bounded** | **brian** | 6:22, 135:10, | 294:14 |
| 21:19 | 268:2, 271:13 | 301:18, 325:3, | **bulldozing** |
| **bounds** | **bridge** | 329:16, 374:1, | 57:1 |
| 281:6 | 232:11, 317:4 | 379:14 | **bumblebee** |
| **box** | **bridges** | **brown** | 216:1, 216:3, |
| 7:3, 7:4, 87:5, | 235:22, 257:16, | 206:19, 391:15 | 216:6, 216:8 |
| 135:13, 135:14, | 300:16, 360:12, | **bruce** | **bumblebees** |
| 279:8, 290:2, | 398:22 | 419:12 | 216:15 |
| 344:12 | **brief** | **brunt** | **burden** |
| **boys** | 8:19, 9:5, | 57:5, 186:7 | 125:12, 180:13, |
| 389:16 | 137:18 | **brutally** | 205:7, 249:9, |
| **branch** | **briefly** | 39:19 | 310:5 |
| 263:20 | 365:5, 384:20 | **budget** | **burdened** |
| **bransom** | **bright** | 15:17, 60:10, | 117:21 |
| 96:20, 96:21, | 177:19 | 144:4, 240:8 | **burdens** |
| 96:22 | **bring** | **build** | 83:5, 257:8, |
| **bray** | 55:10, 61:21, | 32:19, 85:7, | 300:18 |
| 303:5, 303:7 | 177:16, 204:5, | 86:4, 106:2, | **burdensome** |
| **breach** | 235:18, 308:10, | 127:15, 242:20, | 235:10, 255:7, |
| 88:14 | 323:3, 346:14, | 255:18, 307:16, | 349:20 |
| **breadth** | 360:1, 393:6, | 317:3, 335:9, | **bureau** |
| 344:8 | 412:16 | 335:12, 364:8, | 41:20, 112:10, |
| **break** | **bringing** | 373:15, 406:8, | 131:8, 244:10, |
| 14:9, 78:16, | 160:18, 320:19, | 416:11, 419:14 | 258:12, 298:7, |
| 78:20, 132:7, | 389:4, 395:15 | **builders** | 312:8, 351:10, |
| 132:9, 132:13, | **brings** | 217:6, 396:20 | 351:15, 352:2, |
| 205:11, 207:17, | 302:11 | **building** | 359:9 |
| 207:20, 286:12, | **broad** | 93:5, 147:5, | **bureaucratic** |
| 355:21, 356:2 | 57:11, 94:19, | 229:6, 307:19, | 194:22, 259:21, |
| **breakdown** | 206:2, 261:13, | 307:21, 365:13, | 349:11 |
| 413:10 | 396:17 | 372:19, 372:21, | **burgeoning** |
| **breakdowns** | **broader** | 372:22, 375:6, | 130:10 |
| 219:6 | 410:9 | 399:16, 399:21, | **burial** |
| **breaking** | **broadest** | 400:17 | 45:11, 57:1, |
| 363:22 | 139:21 | **buildings** | 58:7 |
| **breaks** | **broadly** | 67:5, 418:21, | **burned** |
| 311:2 | 55:3, 250:8 | 418:22 | 45:19, 163:21, |
| **breath** | **broken** | **built** | 378:20 |
| 380:13 | 32:20, 77:12, | 30:22, 31:1, | |

Transcript of Public Hearing
Conducted on February 11, 2020

435

**burning**
54:5, 72:7,
92:21, 118:18,
363:10, 379:19
**burnt**
52:20
**bury**
195:12
**bus**
272:22
**bush**
374:12
**bushman**
245:21, 245:22
**business**
30:20, 32:7,
40:9, 40:10,
40:13, 41:11,
47:1, 47:2,
47:4, 47:5,
47:9, 48:2,
48:7, 48:20,
49:11, 49:12,
49:13, 49:16,
49:17, 232:15,
256:14, 303:10,
348:18, 349:1,
349:14, 349:15,
349:18, 372:18,
403:22
**businesses**
42:9, 42:11,
47:16, 48:15,
48:16, 49:10,
50:14, 66:20,
121:17, 124:10,
159:7, 174:3,
231:18, 232:21,
241:17, 259:17,
301:8, 303:4,
348:12, 362:17,
369:5
**bust**
309:17, 310:13
**butte**
100:21
**butterfly**
111:3, 246:3

**buy-in**
247:19
**by-line**
166:21
**byk**
110:15
**bypass**
233:19

---
**C**
---

**c-a-r-l-y-l-e**
306:3
**c-a-r-p-e-n-t-e-r**
122:18
**c-a-r-r-o-l-l**
344:18
**c-l-a-n-a-h-a-n**
177:7
**c-o**
187:19
**c-o-p-p-o-l-a**
59:10
**c-o-r-y**
344:18
**c-o-u-l-t-e-r**
181:3
**c-r-o-w-g-h-o-s-t**
197:18
**c-r-u-m-l-y**
42:16
**c-u-l-v-e-r**
221:2
**c-u-r-r-i-e-r**
306:4
**c-u-t-h-b-e-r-t**
208:5
**cabin**
123:7
**cabinet**
70:22, 141:13,
142:21
**calculated**
10:1, 138:14
**calf**
208:8
**california**
41:20, 298:2,
405:22

**call**
6:3, 8:5, 8:8,
43:18, 134:14,
136:13, 176:21,
184:16, 187:6,
326:1, 346:9,
353:12, 388:10,
401:3, 401:4
**called**
30:11, 105:21,
113:10, 123:8,
127:7, 177:8
**calling**
30:2, 79:1,
244:5, 244:6,
281:7, 333:15
**calls**
307:6
**calmly**
40:4
**came**
58:9, 272:17,
272:22, 273:17,
309:8
**campaign**
412:19
**campaign's**
314:11
**campbell**
167:10, 170:20,
170:21
**camping**
180:10
**can't**
245:9, 267:8,
273:9, 295:6,
308:7, 332:6,
332:21, 341:22,
388:19, 390:22,
394:21, 401:3
**canada**
181:22
**canadian**
45:11
**canary**
276:12
**cancel**
109:10

**cancer**
163:14, 203:7,
388:3, 404:11,
404:13, 404:14,
406:4
**cancers**
265:22
**candor**
386:2
**cannot**
24:9, 42:12,
49:7, 57:2,
57:9, 89:20,
95:8, 119:5,
153:4, 169:21,
187:8, 222:20,
248:10, 268:21,
368:11, 401:4,
413:21
**canyon**
123:8, 126:1,
191:7, 191:14,
192:1, 192:10,
192:21, 193:16,
316:15, 338:8
**capable**
90:8
**capacity**
44:16, 78:13,
92:16, 217:4,
219:4, 219:5,
363:9
**capital**
103:20, 291:13
**capitalized**
395:12
**capitol**
217:10
**capricious**
197:8
**capture**
134:19, 289:5
**captured**
17:22, 146:9,
216:15
**car**
47:3, 272:17
**carbon**
69:4, 92:19,

Transcript of Public Hearing
Conducted on February 11, 2020

436

178:11, 358:21
**carbondale**
328:8, 328:17
**carcinogens**
275:17
**card**
8:6, 79:2
**cardiovascular**
179:1
**cards**
7:9, 7:19,
135:19, 136:6,
289:20, 290:10
**care**
59:8, 101:16,
112:18, 181:13,
221:12, 273:3,
283:5, 283:16,
283:17, 311:10,
321:6, 332:8,
350:16, 394:10,
400:18
**cared**
187:10, 390:9,
390:11
**career**
122:22, 171:8,
228:4
**careful**
262:7
**carefully**
77:14, 192:14,
243:21
**caregivers**
115:14
**cares**
82:5
**carlyle**
306:3
**carol**
167:10, 170:19,
170:20
**carolina**
74:19
**carpenter**
122:17, 122:18
**carrier**
158:18

**carries**
282:11
**carrizo**
126:14
**carroll**
344:15, 344:17
**carry**
251:3, 273:11,
384:18
**carrying**
20:15, 149:9
**carta**
120:13, 407:4
**carter**
10:21
**cascades**
97:16
**case**
11:3, 17:20,
23:9, 24:5,
35:13, 82:22,
136:19, 139:15,
146:7, 146:8,
147:4, 152:22,
171:13, 199:22,
212:20, 279:8,
297:2, 351:14,
353:9, 385:17,
421:9
**case-by-case**
91:9
**cases**
68:16, 160:11,
161:13, 186:4,
194:2, 195:17,
209:7, 209:21,
331:21, 363:20,
385:20, 415:14,
416:3
**casper**
102:10
**catalogue**
229:16
**catastrophes**
371:20, 381:22
**catastrophic**
66:12, 175:17,
335:3, 394:19,

411:19
**catch**
360:9, 405:8
**catching**
378:22
**categorial**
383:19
**categorical**
11:8, 11:15,
11:16, 11:20,
24:21, 25:3,
34:21, 92:6,
140:4, 140:6,
153:15, 153:18,
172:14, 172:15,
238:7, 292:20,
292:22, 293:6,
383:19, 384:1,
384:4, 398:8
**categorically**
139:22, 250:9
**categories**
11:12
**categorizing**
22:14, 151:5
**category**
23:16, 152:11
**cath**
345:14
**cattle**
85:3, 303:7,
303:9, 303:13,
328:19, 349:7,
350:4
**cattlemen's**
392:5
**caught**
276:8, 378:15
**causal**
22:8, 22:22,
23:5, 23:13,
67:17, 150:21,
151:14, 151:19,
152:1, 152:8,
168:20, 179:3,
326:11, 368:5,
409:12, 409:14
**cause**
19:21, 148:13,

172:16, 175:17,
176:13, 218:1,
218:13, 242:16,
316:22
**caused**
22:13, 67:20,
151:4, 165:18,
205:21, 206:20,
239:14, 259:20,
307:18, 358:13,
406:4
**causes**
178:17, 178:20,
179:1, 206:12,
237:4, 360:17
**causing**
178:22, 310:7,
326:17, 358:12,
406:5
**caution**
36:21, 37:19,
43:16
**ce**
75:22, 140:6
**cell**
5:6, 133:17
**cellphones**
287:16
**center**
190:22, 228:2,
231:3, 358:9
**centers**
66:11, 113:15
**central**
98:6, 103:14,
114:2, 233:21,
281:18, 390:5
**centuries**
58:11, 77:18
**century**
51:3, 223:5,
251:6, 320:20,
326:4
**ceo**
237:20, 245:22
**ceo's**
345:1
**ceq's**
22:1, 23:18,

Transcript of Public Hearing
Conducted on February 11, 2020                                    437

| | | | |
|---|---|---|---|
| 64:16, 79:16, 90:12, 90:21, 96:9, 101:9, 102:3, 128:20, 150:14, 152:13, 160:2, 168:5, 168:9, 188:18, 193:1, 197:5, 224:12, 241:6, 241:7, 243:6, 243:17, 279:15, 297:1, 305:19, 312:21, 314:6, 320:13, 320:18, 321:7, 321:17, 321:21, 322:4, 322:11, 322:20, 323:2, 323:7, 323:15, 363:3, 365:5, 382:12, 383:1, 383:3, 383:22, 385:5, 385:13, 399:4, 414:19, 415:18 | chaco 351:12, 351:18, 352:14 chacon 410:20, 410:21 chain 22:22, 48:21, 67:17, 151:14, 152:2, 168:20, 252:19, 294:15, 326:11, 409:12 chainsaw 314:3 chair 343:1 chairman 4:11, 132:22, 241:3, 287:1, 308:19, 344:20 | chances 187:4 changed 86:9, 88:16, 107:1, 250:19 changing 99:16, 306:15, 306:16, 317:2, 323:19, 325:11, 357:1 chapter 255:6, 295:14, 370:9 chapters 352:22, 416:20 characterized 262:9 charge 45:4, 171:5 | cherished 61:17, 93:17, 165:5 cheyenne 39:21 chicano 411:1 chick 292:7 chief 46:21, 89:18, 282:6 child 113:12, 116:3, 162:20, 162:21, 273:7, 358:2, 406:5 childcare 113:15, 113:16 childhood 113:11 |
| certain 17:19, 25:17, 37:6, 114:18, 146:7, 154:9, 189:15, 214:18, 225:11, 295:20, 296:3, 360:19, 383:4 | chairmen's 55:9 challenge 120:15, 125:15, 247:13, 264:4, 270:12, 281:8, 392:14 | charged 327:14 charging 47:3, 47:12 chart 13:7, 141:16 chb 396:4, 396:12 | children 43:14, 56:7, 82:15, 104:19, 113:19, 114:7, 114:9, 115:8, 115:12, 115:16, 115:20, 116:6, 116:15, 116:17, 117:4, 117:5, 118:20, 119:4, 119:6, 119:8, 119:9, 128:4, 163:8, 163:17, 163:20, 178:19, 265:17, 267:5, 267:6, 268:3, 273:4, 273:21, 275:15, 276:22, 316:2, 328:19, 334:14, 355:6, 401:17, 402:14, 403:16, 406:12, 412:2, 412:4, 413:14 |
| certainly 213:14, 326:5, 380:15 | challenged 110:3 challenges 35:5, 90:22, 236:12, 319:16, 367:2, 367:8, 369:10, 373:9, 398:1 | chb's 396:6 cheaper 335:16 cheat 282:13 check 5:16, 107:16, 134:5, 288:4, 294:10, 313:19 | |
| certainty 61:22, 301:7, 303:2, 373:2, 373:11 | | | |
| certificate 421:1 | challenging 115:22, 367:1 | checked 200:5, 288:13 | |
| certify 21:9, 150:4, 421:2 | chamber 30:10, 31:22, 231:16, 237:21, 238:1 | checkerboard 34:1, 242:7 | |
| ces 140:9 | champion 70:22 | checking 345:6 | |
| cetera 201:22, 328:21 | chance 8:8, 112:13, 112:15, 179:10, 187:13, 221:13, 246:15, 335:2, 339:5, 340:20 | checkoff 87:5 | |
| | | chemical 203:18, 246:12 | children's 117:8, 179:20, 267:11, 267:17 |
| | | chemicals 118:3, 378:18 | |

Transcript of Public Hearing
Conducted on February 11, 2020

438

chills
364:15
chilly
110:18
china
204:6
china's
204:13
chinese
204:8
choice
194:9, 263:5,
346:2, 346:3
choices
345:22, 346:1
cholesterol
345:9
choose
37:17, 136:17,
194:13, 387:2
chooses
39:4
choppy
202:20
chose
354:16, 419:4
christine
241:3
circle
165:13
circuit
175:11
circulate
27:21, 156:11
circulated
250:21
circulation
27:21, 156:11
circumstances
27:3, 155:15,
350:11
citations
321:22
cites
79:20
cities
203:3, 204:15,
239:10, 279:3,

399:18
citing
46:3, 106:14,
374:6
citizen
22:5, 23:2,
23:9, 26:15,
98:1, 98:2,
128:8, 150:18,
151:16, 152:4,
155:6, 184:18,
208:11, 211:20,
212:17, 274:3,
274:4, 279:4,
310:10, 317:18,
336:7, 338:2,
359:4, 378:13,
385:14, 385:17,
385:19, 386:14,
387:9
citizen's
98:6
citizens
44:13, 46:15,
57:21, 65:6,
86:16, 88:5,
89:16, 115:5,
119:22, 173:21,
174:1, 186:18,
209:1, 210:7,
211:3, 211:13,
211:16, 240:8,
250:10, 253:12,
273:8, 274:6,
308:20, 310:8,
318:8, 318:17,
321:1, 322:6,
329:7, 351:1,
381:11
city
83:22, 84:22,
130:9, 130:13,
130:17, 130:21,
206:20, 255:4,
259:2, 276:19,
379:7, 419:5
civic
184:19, 187:9

civil
89:16, 128:22,
185:21, 217:1,
300:13, 381:11
claim
169:21, 183:19,
237:1
claims
191:10, 191:15,
192:20, 343:13
clanahan
177:4, 177:6,
177:7, 180:22
clarification
251:14
clarifies
37:14
clarify
17:14, 20:1,
22:5, 22:19,
24:6, 25:16,
26:12, 146:1,
148:15, 149:3,
150:18, 151:11,
153:1, 154:8,
155:2, 164:10,
224:9, 384:6
clarifying
24:2, 152:19,
305:5, 398:2
clarity
189:11, 292:19,
292:21, 293:6,
293:8, 293:17,
302:11, 322:2
class
162:16, 166:17,
281:17
classic
394:17
clean
83:13, 86:18,
87:22, 92:21,
99:21, 114:7,
114:8, 116:2,
116:14, 116:18,
177:12, 177:22,
207:6, 236:2,

236:3, 249:1,
253:4, 253:5,
265:1, 265:5,
283:1, 309:9,
310:20, 313:16,
316:21, 332:2,
332:3, 361:15,
363:9, 369:7,
374:18, 379:7,
379:13, 406:19,
411:13, 413:12
cleaned
165:13
cleaner
273:17, 360:13
cleaning
361:13, 379:21
cleansing
127:4
cleanup
196:6
clear
23:9, 51:11,
152:4, 194:14,
228:20, 240:11,
240:13, 260:11,
302:4, 315:16,
316:18, 365:8,
372:1, 373:21,
376:4, 376:13,
400:13
clearcutting
206:14
clearer
308:12
clearest
112:17
clearing
294:17, 296:4
clearly
20:16, 114:20,
149:11, 168:20,
227:10, 270:2,
270:19, 289:3,
378:5
cleveland
378:14, 379:5,
379:15

Transcript of Public Hearing
Conducted on February 11, 2020                                    439

| | | | |
|---|---|---|---|
| clicks<br>233:7<br>clients<br>320:11<br>cliff<br>338:9, 355:5<br>climbed<br>112:8<br>climber<br>111:14, 112:7<br>climbers<br>95:2<br>climbing<br>93:18<br>cloak<br>183:22<br>close<br>22:8, 23:13,<br>150:21, 152:8,<br>357:13<br>closely<br>385:3<br>closer<br>333:11<br>closing<br>197:2, 353:7<br>cloud<br>206:19, 294:11<br>clouds<br>111:3<br>club<br>93:14, 93:16,<br>167:13, 370:10,<br>414:15<br>club's<br>370:21, 414:18<br>clue<br>390:7<br>co-lead<br>14:14, 143:3<br>coal<br>53:18, 68:17,<br>68:20, 85:8,<br>85:14, 85:20,<br>86:3, 86:10,<br>86:12, 99:16,<br>169:3, 206:14,<br>265:16, 266:10, | 309:7, 368:13<br>coalition<br>30:11, 30:12,<br>50:14, 93:20,<br>97:1, 128:15<br>coalition's<br>97:8<br>coast<br>45:17<br>cochiti<br>386:13, 390:2,<br>390:3, 390:4,<br>390:9<br>code<br>104:21<br>codes<br>203:5<br>codified<br>60:2<br>codify<br>17:19, 19:15,<br>22:1, 23:1,<br>23:8, 23:18,<br>26:14, 146:6,<br>148:6, 150:14,<br>151:15, 152:3,<br>152:13, 155:5,<br>382:15, 383:4,<br>385:13<br>codifying<br>383:17<br>coffee<br>259:3<br>cofounder<br>333:20<br>cognition<br>115:18<br>coil<br>133:15<br>cold<br>258:19<br>collaboration<br>201:1, 260:15<br>collaborative<br>237:2, 312:7<br>collaboratively<br>64:9<br>collapse<br>41:10 | collapsed<br>40:20<br>collapses<br>400:21<br>collapsing<br>40:19<br>colleague<br>4:16, 8:18,<br>133:6, 135:16<br>colleagues<br>205:17, 367:11,<br>370:20, 395:6<br>collect<br>201:10<br>collected<br>35:1<br>collection<br>143:5, 201:8,<br>201:13<br>collective<br>53:11, 412:7<br>collectively<br>97:4, 102:13<br>college<br>212:1, 281:20<br>collins<br>344:19, 345:4<br>color<br>82:9, 166:18,<br>203:13, 249:8,<br>283:11, 388:16,<br>390:10<br>coloradans<br>93:4<br>colorado's<br>72:3, 74:1,<br>99:11, 110:19,<br>182:1, 239:3,<br>245:14, 309:2,<br>325:6, 344:22,<br>366:3, 366:5,<br>397:22<br>coloradoan<br>184:14, 371:2<br>coloradoans<br>90:20, 126:6,<br>169:5, 316:8,<br>363:15, 365:12, | 396:11<br>combating<br>60:12<br>combination<br>230:4<br>combined<br>175:7<br>combustion<br>68:20, 206:13<br>come<br>6:8, 8:13,<br>8:17, 30:2,<br>40:1, 43:22,<br>46:17, 52:13,<br>58:10, 59:7,<br>66:22, 70:11,<br>74:11, 83:20,<br>106:11, 113:20,<br>116:8, 122:16,<br>124:5, 128:1,<br>128:11, 129:11,<br>131:21, 132:3,<br>134:16, 136:16,<br>136:20, 137:2,<br>161:5, 162:18,<br>164:9, 180:5,<br>184:13, 184:22,<br>185:5, 203:4,<br>228:13, 231:9,<br>238:15, 248:7,<br>264:10, 277:7,<br>281:12, 281:13,<br>284:9, 288:20,<br>290:11, 291:3,<br>291:5, 294:13,<br>299:13, 300:17,<br>305:5, 306:1,<br>314:13, 316:14,<br>317:9, 327:17,<br>330:17, 331:20,<br>338:15, 347:20,<br>350:20, 362:11,<br>365:10, 370:6,<br>382:5, 386:11,<br>387:6, 387:12,<br>389:11, 394:21,<br>395:3, 400:1,<br>400:6, 400:8, |

Transcript of Public Hearing
Conducted on February 11, 2020                    440

401:21, 402:19,
403:17, 418:10
**comecrudo**
126:14
**comer**
184:7, 187:17,
187:18, 187:19
**comes**
104:16, 234:3,
293:15, 309:4,
372:13, 400:3
**coming**
4:11, 74:17,
75:20, 133:1,
208:10, 212:14,
286:3, 287:1,
356:4, 418:3,
420:21
**commandeered**
260:8
**commend**
90:13, 96:10,
160:18, 234:21,
363:5
**commensurate**
314:4
**comment**
7:9, 16:4,
16:20, 23:17,
26:13, 36:2,
56:22, 88:9,
93:12, 98:8,
98:11, 98:14,
102:3, 111:20,
125:4, 125:7,
126:3, 128:19,
129:4, 129:7,
131:21, 135:18,
135:19, 137:16,
144:15, 150:2,
152:12, 155:4,
158:6, 168:14,
180:15, 194:21,
205:15, 208:22,
212:7, 226:14,
226:16, 226:18,
231:14, 234:2,
244:9, 246:17,

248:1, 261:19,
278:16, 280:14,
284:20, 289:20,
317:18, 322:7,
323:9, 324:3,
327:11, 355:9,
355:16, 359:15,
383:9, 408:1,
409:22, 414:15,
417:11
**commentary**
21:7
**commented**
85:10, 211:21,
212:1
**commenter**
131:19
**commenters**
383:5
**commenting**
228:7, 280:6
**comments**
7:5, 7:6, 7:7,
7:11, 7:12,
7:15, 9:15,
16:5, 16:22,
17:6, 26:4,
26:9, 26:10,
26:12, 26:17,
27:16, 28:22,
29:17, 29:18,
29:19, 29:20,
36:3, 49:19,
49:22, 62:2,
78:14, 79:13,
84:14, 85:15,
98:10, 99:6,
125:10, 130:15,
134:18, 135:15,
135:21, 136:1,
138:6, 144:16,
145:7, 145:10,
145:15, 154:17,
154:21, 155:1,
155:2, 155:7,
156:6, 157:10,
158:7, 158:9,
158:10, 158:11,

166:14, 184:4,
184:10, 190:16,
209:21, 209:22,
210:1, 210:22,
212:14, 212:18,
243:21, 247:5,
247:7, 261:22,
262:18, 264:7,
267:21, 280:3,
280:4, 287:13,
289:1, 289:3,
290:1, 290:3,
290:7, 291:9,
296:21, 298:13,
327:15, 333:11,
351:22, 367:11,
382:10, 406:20,
408:3
**commerce**
30:10, 231:16,
237:21, 257:20
**commercial**
233:16, 362:4,
376:6
**commission**
69:9
**commissioner**
62:9, 254:19
**commissioners**
296:18
**commit**
119:8
**commitment**
94:20, 222:3,
329:20
**commitments**
219:16
**committed**
90:7, 239:19,
363:1, 411:5,
413:16
**committee**
281:16, 299:22
**committing**
127:4, 221:16,
412:18
**commodities**
187:10

**common**
92:2, 118:17,
177:16, 193:12,
221:17, 224:5,
273:8, 357:18,
372:10, 376:7,
382:14
**commonly**
22:2, 217:7
**commons**
53:11
**commonsense**
161:18, 301:4
**communicate**
184:20, 336:12
**communication**
27:12, 51:7,
156:2, 171:19,
321:2
**communications**
27:6, 155:18,
299:19, 318:14,
318:16
**community**
13:21, 30:21,
77:15, 82:14,
94:9, 95:18,
99:20, 100:2,
100:9, 101:19,
106:10, 106:20,
112:16, 117:17,
118:1, 124:5,
142:9, 165:5,
173:21, 186:12,
208:13, 211:3,
215:20, 228:9,
232:8, 232:15,
233:11, 233:14,
246:2, 246:5,
247:22, 266:13,
266:22, 267:13,
267:19, 283:7,
284:9, 294:21,
295:14, 295:16,
301:14, 305:1,
312:13, 315:8,
316:5, 354:22,
395:10, 400:14,

Transcript of Public Hearing
Conducted on February 11, 2020                                                    441

400:15, 401:21,
411:7, 411:14,
414:3, 414:4
**community's**
283:14
**compact**
307:13
**companies**
56:22, 86:10,
90:7, 108:7,
108:20, 109:1,
158:20, 191:10,
227:1, 227:3,
227:6, 302:15,
311:16, 363:1,
363:18, 387:12,
389:20, 401:15
**company**
85:6, 86:3,
86:19, 196:16,
313:10, 346:19
**compare**
182:12
**compared**
204:11, 393:19
**comparison**
394:13
**compelled**
202:20
**compete**
374:9
**competitive**
159:6, 242:19,
374:8
**competitiveness**
48:22
**compiled**
342:16
**complained**
295:10
**complement**
363:11
**complete**
12:21, 18:18,
32:4, 32:7,
32:16, 79:21,
103:5, 103:15,
103:17, 104:10,

108:15, 108:19,
128:16, 141:9,
141:14, 147:10,
218:17, 219:8,
236:6, 305:8,
308:6, 360:16,
362:6
**completed**
31:15, 166:9,
239:16, 260:2,
260:13, 342:16,
374:21, 376:6
**completely**
218:1, 296:4,
355:4
**completing**
51:6, 247:1,
259:18, 357:12,
398:6
**completion**
13:13, 14:11,
15:6, 15:9,
25:15, 104:9,
142:1, 142:22,
143:19, 154:7,
322:12
**complex**
97:13, 161:19,
202:1, 205:22,
210:10, 246:5,
263:1, 270:10,
397:15, 409:14
**complexities**
121:11
**complexity**
12:16, 13:18,
19:12, 95:15,
141:3, 142:6,
148:4
**compliance**
20:17, 149:12,
172:6, 242:15
**complicated**
73:17, 103:4,
235:14
**comply**
15:9, 143:18,
242:18

**complying**
253:3, 253:9
**component**
211:15, 370:19,
383:11, 383:20
**composed**
232:1
**compound**
247:14
**comprehensive**
4:7, 4:8, 61:2,
73:9, 132:19,
278:10, 286:19,
337:5, 342:15,
353:4, 409:2
**comprehensively**
32:14, 50:9
**comprise**
297:18
**comprised**
43:5, 97:3
**compromise**
251:11
**compromised**
45:15
**compromising**
257:2
**computer**
233:7
**conceived**
85:19, 364:16
**concentration**
68:1, 174:6
**concept**
183:9, 243:8,
381:5, 393:3,
400:16
**concepts**
104:21, 223:11
**concern**
56:11, 65:22,
122:5, 164:7,
172:2, 216:1,
221:8, 252:5,
261:13, 320:2,
330:21, 371:1,
376:21
**concerned**
44:13, 68:5,

71:6, 71:12,
71:17, 95:4,
95:10, 98:17,
98:20, 119:22,
126:15, 127:21,
128:3, 158:13,
159:10, 184:18,
191:11, 202:7,
202:21, 210:14,
211:12, 213:5,
261:17, 270:22,
272:9, 317:17,
322:5, 336:7,
380:17, 380:20
**concerning**
48:7, 182:22,
210:6
**concerns**
13:21, 17:10,
42:17, 53:1,
113:21, 130:14,
142:9, 145:19,
160:13, 170:6,
171:22, 184:11,
213:4, 310:1,
315:3, 339:8,
370:12, 415:6
**concert**
180:6
**concerted**
4:12, 133:2,
287:2
**concise**
11:17, 51:11,
140:8, 260:11,
308:12
**conclude**
9:14, 138:5,
161:16, 418:4
**concluded**
192:15, 193:3,
216:9
**concludes**
342:18
**conclusion**
243:19, 355:21
**concrete**
384:3

Transcript of Public Hearing
Conducted on February 11, 2020                                              442

concurrent
240:2, 302:7
condemn
85:7, 86:8
conditions
10:3, 46:10,
73:6, 80:8,
80:16, 138:16,
271:2
conduct
96:4, 182:21,
200:1, 227:1,
302:7, 302:15,
318:13, 408:22
conducted
14:12, 54:19,
92:10, 108:13,
143:1, 188:20,
238:22, 299:11,
396:19
conducting
238:16
conejos
258:16
confidence
48:21, 257:22,
282:14
conflict
20:17, 45:6,
149:11, 182:20,
230:19, 318:22,
352:19, 376:2
conflicts
96:6, 170:18,
226:22, 227:3,
376:22, 377:1,
377:7
conform
37:8
confront
359:3
confusing
160:4, 304:12,
365:8
confusion
213:20, 224:9,
236:22, 237:5
congestion
161:6, 218:22,

236:1, 239:14,
360:21
congress
59:13, 88:8,
98:2, 114:20,
120:3, 132:2,
194:5, 194:14,
195:10, 229:3,
248:18, 270:19,
355:11, 364:17,
373:14, 379:2
congressional
205:17
congressionally
128:17
congressman
205:14
congressman's
205:15
congresswoman
119:19, 120:1,
122:10
conjunction
163:5
connect
251:2
connected
250:20, 403:11
connection
23:14, 75:12,
152:8, 420:8
connects
239:9
conscientious
182:2
conscious
106:14
consecutive
254:22
consequences
58:22, 83:5,
85:2, 85:13,
94:18, 129:16,
130:8, 130:18,
131:5, 161:6,
194:7, 196:9,
197:3, 208:17,
213:4, 222:11,

222:21, 223:12,
268:16, 269:3,
270:11, 281:22,
297:7, 319:22,
339:14, 340:14,
366:19, 369:15,
369:19, 408:9
consequential
408:2
conservancy
324:2
conservation
59:12, 82:2,
105:12, 105:17,
107:8, 216:1,
236:19, 244:21,
246:3, 247:17,
278:4, 291:17,
292:1, 307:3,
340:22, 341:3,
348:12, 375:13
conservationist
122:22
conservations
154:14
conservative
223:20, 329:2
conserve
60:3, 91:17,
97:20, 244:13,
245:12, 349:6
consider
7:15, 10:9,
21:2, 26:5,
26:13, 43:19,
45:11, 46:7,
48:11, 54:16,
61:8, 64:3,
67:10, 68:14,
68:18, 68:21,
69:15, 71:22,
83:2, 84:13,
91:5, 114:4,
120:9, 122:7,
124:17, 129:22,
130:18, 135:22,
138:21, 149:19,
154:19, 155:4,

168:18, 169:12,
169:18, 186:2,
191:13, 205:1,
205:8, 208:18,
210:15, 210:18,
210:22, 212:22,
221:15, 222:16,
241:11, 241:14,
243:21, 249:13,
251:10, 262:3,
263:8, 290:7,
298:12, 301:16,
312:3, 317:1,
326:9, 330:2,
336:22, 343:20,
368:19, 371:4,
385:8, 385:9,
407:6, 408:16,
409:20, 415:12
considerable
409:8
considerably
14:1, 142:11
consideration
11:4, 21:10,
26:19, 48:13,
62:17, 67:18,
70:3, 77:4,
98:15, 100:3,
150:4, 155:9,
168:21, 169:2,
170:4, 188:9,
190:17, 191:2,
191:3, 196:1,
196:19, 198:9,
201:18, 203:16,
244:19, 262:14,
264:7, 280:21,
280:22, 297:10,
299:1, 312:9,
332:6, 337:17,
371:19, 377:12,
395:20, 403:14,
408:21, 409:19,
410:12, 416:17
considerations
43:20, 46:13,
46:16, 63:10,

Transcript of Public Hearing
Conducted on February 11, 2020                                443

119:1, 178:9,
205:6, 267:2,
326:19, 327:7
**considered**
18:13, 22:20,
29:20, 52:10,
67:15, 91:9,
100:18, 139:21,
142:18, 147:2,
151:12, 182:20,
190:14, 203:20,
210:3, 244:16,
313:9, 319:11,
351:16, 409:10,
417:2
**considering**
22:12, 61:5,
68:12, 77:14,
77:15, 84:7,
96:7, 139:17,
151:3, 169:22,
184:4, 191:6,
196:2, 213:6,
223:11, 252:7,
271:8, 324:18,
352:3, 406:20,
409:18
**considers**
78:11, 111:17,
339:22, 371:9,
410:1
**consistent**
15:12, 18:2,
18:5, 20:13,
21:16, 22:3,
24:5, 24:16,
27:19, 91:7,
143:22, 144:1,
146:12, 146:15,
149:7, 150:9,
150:16, 152:22,
153:11, 156:9,
297:3, 304:4,
384:2
**consistently**
60:13, 263:7,
335:15, 351:21,
385:19

**consists**
99:19
**consolidated**
281:18
**consolidation**
322:21
**constant**
401:12
**constituents**
62:14, 62:20,
64:11, 119:22
**constitutes**
176:11
**constitution**
402:6
**constitution's**
281:10
**constrained**
195:8, 218:5
**construct**
92:15, 363:7
**constructing**
349:10
**construction**
31:10, 31:16,
45:8, 45:10,
100:14, 160:8,
161:16, 191:18,
209:16, 217:11,
217:14, 219:5,
219:14, 235:21,
239:10, 240:5,
293:21, 293:22,
359:18, 372:19,
374:4, 374:21,
375:1, 401:11,
407:16
**construed**
10:12, 139:3
**consult**
29:6, 157:16
**consultant**
116:14, 242:16
**consultants**
239:17
**consultation**
19:20, 20:3,
29:5, 54:19,

55:3, 55:12,
96:11, 148:11,
148:17, 157:15,
199:6, 199:10,
199:11, 199:15,
212:3, 249:21,
324:16, 352:21,
417:17
**consultations**
199:1, 199:14
**consulting**
46:22, 200:18
**consumer**
66:22, 299:19,
299:20
**consumers**
301:3
**consuming**
160:5
**contain**
191:8, 262:6
**contained**
95:20
**containment**
240:7
**contains**
166:10, 168:16
**contaminated**
275:17
**contamination**
82:12, 164:22,
196:6, 285:16,
406:6
**contemplated**
250:13
**contend**
195:21
**contends**
343:11
**content**
25:13
**contents**
154:5
**context**
68:4, 183:7,
371:8, 381:3
**continent**
411:11

**continental**
103:13, 128:15,
128:18, 130:4,
130:19
**continue**
159:19, 188:7,
245:12, 247:22,
280:16, 305:4,
356:21, 393:1,
412:16
**continues**
120:17, 308:13,
358:21, 407:21
**continuing**
270:20
**continuous**
69:12
**contractor**
377:5
**contractors**
319:1
**contrary**
197:8, 229:3
**contrast**
182:16
**contribute**
36:18, 73:5,
75:7, 98:3,
207:6, 304:21,
366:10
**contributes**
253:1, 283:7
**contributing**
227:7
**contribution**
175:22, 252:16
**contributions**
209:6, 409:15
**contributor**
172:22
**contrivance**
54:2
**control**
14:3, 24:3,
24:10, 69:8,
142:14, 152:20,
153:4, 178:12,
252:20, 368:11

Transcript of Public Hearing
Conducted on February 11, 2020                                                      444

controversial
97:12
convenient
203:22
conversation
25:22, 221:8,
272:10
conversations
328:22, 341:21
converse
104:6
conversely
61:9
convinced
372:1
cook
335:9, 335:12
cooling
360:5
cooperating
14:14, 19:20,
20:4, 143:3,
148:12, 148:18,
153:13, 365:22
cooperation
28:18, 157:7,
239:19, 270:21
cooperatively
240:2, 271:9
coordinate
28:11, 29:6,
156:21, 157:16,
198:22
coordinated
19:17, 148:8
coordination
14:21, 16:11,
28:9, 28:14,
33:10, 51:7,
143:11, 144:20,
156:20, 157:3,
171:19, 212:3,
236:20, 237:3,
240:12, 350:13
coordinator
82:2
copies
4:22, 133:12

coppola
59:5, 59:9,
59:10
copy
6:22, 135:10
core
94:14, 183:9,
185:11, 211:15,
224:11, 233:21,
251:12, 281:3,
298:15, 381:5,
415:1
cores
250:21
corn
163:3
cornell
223:3
corners
400:19
cornerstone
336:13
corporal
295:3
corporate
87:21, 179:6,
249:18, 416:11,
416:15
corporation
47:1, 237:22,
248:13
corporation's
413:22
corporations
45:4, 209:18,
246:21, 340:13,
352:10, 352:11,
352:17, 381:17,
416:9
correct
52:5, 323:13,
421:4
corrected
320:3
correcting
321:22
correlated
403:10

corresponding
210:19, 297:10
corridor
239:12, 240:9
corruption
319:8, 381:16,
405:14, 411:17,
413:19
cortez
298:2
cory
344:17
cost
66:22, 68:19,
69:4, 108:17,
161:7, 218:14,
219:17, 233:21,
238:16, 256:8,
256:11, 300:4,
301:3, 340:16,
369:4, 375:3
costing
358:9
costly
103:4, 160:5,
415:13
costs
33:4, 49:1,
84:11, 161:6,
161:8, 161:10,
196:7, 215:16,
215:18, 215:19,
218:4, 242:15,
243:4, 251:3,
307:18, 346:8,
346:10, 346:16,
362:6, 369:3,
369:20
could
7:20, 24:11,
25:20, 43:19,
44:20, 45:2,
45:3, 45:20,
61:13, 61:21,
64:18, 66:5,
68:9, 73:5,
73:16, 75:22,
76:21, 76:22,

85:7, 86:10,
86:19, 87:5,
96:17, 118:8,
125:3, 125:8,
130:4, 130:22,
133:18, 136:18,
137:1, 153:6,
154:12, 162:17,
163:2, 164:4,
172:10, 172:16,
172:22, 179:7,
179:13, 183:8,
191:20, 192:2,
192:5, 193:5,
195:16, 222:16,
225:20, 226:15,
226:19, 231:9,
233:15, 254:7,
256:4, 265:9,
272:20, 273:7,
279:17, 286:4,
287:16, 307:17,
313:13, 314:21,
319:19, 327:4,
327:9, 329:1,
353:22, 358:20,
362:10, 372:14,
376:18, 378:6,
378:19, 381:4,
382:5, 395:22,
403:4
couldn't
129:14, 194:8,
284:11
coulter
177:5, 181:1,
181:2, 181:3
council
1:1, 4:3,
50:11, 94:4,
97:9, 126:9,
132:16, 162:13,
164:16, 211:10,
221:3, 234:18,
274:21, 281:17,
286:15, 308:4,
314:12, 317:13,
331:8, 359:13,

Transcript of Public Hearing
Conducted on February 11, 2020

445

372:19, 372:20,
375:12, 379:17,
396:14, 412:8
**councilman**
248:4
**councils**
84:4, 276:19
**counsel**
133:15, 287:12,
320:7, 362:14,
421:8
**counselor**
294:4, 295:14,
295:16, 351:4
**counselors**
351:19
**count**
119:13, 233:8,
301:11, 349:21
**counter**
77:11, 89:10
**counteract**
63:21
**counterproductive**
264:4, 320:17
**counties**
101:3
**counting**
119:10
**countless**
47:13, 97:12,
99:22, 111:11,
230:7, 321:12,
326:13, 416:19
**countries**
122:1, 342:17,
393:20
**country**
33:7, 41:7,
74:21, 76:8,
77:19, 88:15,
94:2, 104:17,
109:13, 111:15,
112:11, 123:4,
123:20, 125:20,
128:8, 168:14,
180:2, 180:14,
198:6, 204:20,

218:12, 227:18,
250:11, 250:17,
260:7, 261:5,
301:10, 306:16,
316:6, 339:7,
341:7, 341:22,
346:17, 347:9,
355:19, 370:13,
373:7, 378:21,
393:18, 416:20,
417:15, 418:21,
419:3
**country's**
261:20
**county**
42:21, 62:9,
62:10, 99:11,
99:14, 99:19,
101:2, 101:17,
104:6, 163:5,
202:13, 231:19,
231:21, 232:1,
233:10, 258:16,
296:16, 296:17,
296:18, 296:20,
297:12, 297:13,
297:14, 297:19,
298:1, 298:4,
298:5, 298:12,
317:11, 356:7,
404:1
**couple**
5:4, 5:13, 8:2,
103:11, 133:16,
180:4, 200:5,
233:12, 280:1,
290:20, 347:17,
357:11, 358:13,
418:17, 419:10
**coupled**
244:17
**course**
11:9, 12:12,
13:16, 29:18,
78:22, 79:5,
107:10, 108:4,
145:1, 146:15,
178:2, 194:12,

197:5, 206:10,
264:10, 324:17,
379:13, 405:12
**courses**
262:15, 313:13
**court**
6:5, 10:13,
17:20, 18:9,
20:13, 21:17,
21:18, 23:2,
26:15, 68:11,
109:8, 110:3,
134:17, 139:4,
146:7, 146:20,
147:5, 149:7,
150:10, 151:15,
151:16, 151:22,
155:5, 175:11,
236:12, 247:14,
349:11
**court's**
22:3, 23:1,
150:16, 385:14,
385:16
**courteous**
6:20, 135:6,
289:13
**courts**
23:3, 68:17,
151:16, 262:9,
262:11, 263:3,
263:6, 263:16,
363:20, 365:3,
393:15
**cousins**
294:8
**cover**
201:21, 328:20
**coverage**
280:2
**covered**
11:16, 140:5,
280:2
**cow**
208:8
**coward**
283:15
**coyle**
287:11

**craft**
124:7, 223:20
**crammed**
339:15
**cranes**
259:6
**crash**
239:13
**create**
10:2, 46:10,
80:4, 138:15,
139:19, 213:16,
236:16, 257:15,
271:2, 301:1,
301:7, 308:15,
315:16, 321:19,
325:13, 373:16,
374:3, 382:15,
398:20
**created**
10:18, 91:13,
119:4, 163:1,
166:16, 297:22,
306:7, 343:22,
392:22
**creates**
91:21, 125:3,
125:14, 225:13,
226:14, 251:21,
312:21
**creating**
31:6, 226:13,
303:2, 402:1
**creation**
58:10, 139:11,
392:16
**creative**
115:21
**creatively**
95:13
**creatures**
325:10, 325:22,
326:2
**credibility**
378:3
**cree**
89:18
**creek**
85:21, 86:5,

Transcript of Public Hearing
Conducted on February 11, 2020

446

110:21, 191:22,
192:9
**crested**
100:21
**creston**
103:13
**criminal**
352:12
**cripple**
61:13, 176:8
**crisis**
46:5, 48:13,
48:17, 95:6,
118:11, 177:1,
183:18, 205:19,
206:9, 207:7,
337:8, 343:18,
343:19, 356:12,
358:18, 359:3,
380:4, 409:16,
411:18, 412:22
**critical**
31:13, 32:1,
33:12, 34:2,
34:5, 39:3,
39:5, 52:2,
57:8, 64:13,
72:19, 97:18,
98:5, 100:1,
106:6, 123:21,
128:22, 159:4,
167:16, 172:21,
173:16, 185:21,
191:6, 195:1,
201:14, 201:15,
206:4, 206:16,
235:15, 253:17,
255:20, 259:11,
263:2, 268:13,
268:19, 292:11,
292:14, 305:2,
311:13, 316:10,
316:21, 323:10,
325:10, 346:5,
347:2, 361:20,
363:7, 365:1,
411:17
**critically**
120:14, 397:22

**criticism**
332:11
**critiques**
166:21
**crops**
163:3, 284:13,
357:13
**cross**
84:22, 367:22,
382:18
**crossed**
204:2
**crossings**
240:6
**crowghost**
197:17, 197:18
**crucial**
66:9, 117:18,
118:6, 185:7,
266:20, 321:18,
396:10
**crude**
126:19
**crumly**
39:15, 42:15
**cry**
400:6
**cu**
389:3
**culprit**
314:18
**cultural**
59:16, 60:4,
61:1, 198:19,
199:1, 199:3,
283:10, 316:12,
316:20, 324:11,
324:19, 413:11
**culturally**
52:19, 53:4
**culture**
58:7, 123:22,
192:12, 193:7,
199:4, 248:7,
248:11
**culver**
220:19, 221:1
**cumbersome**
160:5, 188:16

**cummings**
200:6
**cumulative**
22:11, 22:16,
38:19, 39:1,
46:12, 48:11,
53:20, 64:3,
67:13, 67:20,
68:3, 69:21,
71:14, 95:5,
118:7, 120:9,
121:3, 151:2,
151:8, 169:12,
169:15, 169:18,
170:1, 170:4,
172:19, 176:9,
178:8, 183:1,
183:12, 191:2,
193:14, 196:1,
201:14, 206:6,
210:16, 222:14,
223:8, 225:18,
229:22, 230:8,
230:15, 244:15,
245:7, 252:8,
276:3, 280:16,
302:12, 310:1,
319:15, 319:17,
319:20, 327:7,
335:20, 351:16,
355:3, 367:9,
368:1, 368:6,
368:19, 371:4,
371:7, 380:21,
381:8, 385:5,
385:9, 408:13,
408:14
**cumulatively**
54:12, 230:11
**curb**
395:1
**current**
9:6, 12:12,
17:7, 17:11,
19:7, 22:17,
28:20, 29:6,
37:4, 39:12,
42:18, 70:2,

73:4, 74:6,
97:17, 124:19,
130:12, 137:19,
139:13, 139:16,
140:21, 145:16,
145:19, 147:21,
151:9, 157:8,
157:16, 160:4,
165:9, 165:16,
169:1, 182:10,
198:2, 198:6,
198:12, 201:4,
202:9, 204:11,
209:4, 211:1,
214:1, 214:11,
214:12, 215:13,
218:12, 226:4,
227:2, 229:21,
236:4, 255:7,
257:8, 260:7,
263:13, 274:17,
292:2, 296:10,
303:17, 305:6,
314:6, 326:2,
343:19, 349:2,
360:14, 364:14,
376:22, 385:15
**currently**
22:17, 54:8,
81:10, 88:11,
104:5, 108:13,
115:3, 129:19,
167:17, 201:6,
218:16, 233:1,
268:4, 296:2,
307:15, 318:3,
361:18
**currier**
306:2, 306:3
**curtail**
297:7, 410:2
**curtaining**
37:21
**customarily**
53:4
**customize**
27:2, 155:14
**cut**
89:18, 179:8,

Transcript of Public Hearing
Conducted on February 11, 2020

447

180:1, 210:12,
235:20, 260:17,
279:10, 316:18,
417:4
**cuthbert**
208:2, 208:6
**cuthbert-millett**
208:1, 208:4
**cuts**
183:4, 381:1
**cutting**
178:7, 236:9,
372:2, 400:19
**cuyahoga**
378:15, 378:17,
378:20, 379:5,
379:14, 381:22
**cycle**
72:9, 292:8,
301:1
**czech**
420:6

**D**

**d-e-m-p-s-e-y**
50:6
**d-i-a-n-e**
231:12
**d-i-r-k**
237:20
**d-o-n**
258:11
**d-r-a-p-e-r**
237:20
**dad**
345:8
**dad's**
204:16
**dads**
179:18
**daily**
113:12, 249:10
**dakota**
45:16, 54:10,
56:5, 87:15,
197:20, 199:7,
199:16, 199:20,
358:3, 399:20,

401:19
**dale**
173:6, 382:7
**dam**
163:1
**damage**
66:12, 121:16,
178:21, 179:7,
341:11, 376:19
**damaged**
366:6
**damages**
179:1
**damaging**
125:2, 191:16,
226:11, 409:21
**dams**
97:14
**dan**
70:19, 135:16,
406:22
**danger**
248:17, 315:2,
420:13
**dangerous**
119:9, 120:22,
169:15, 213:16,
251:22, 259:12,
371:13, 415:3
**dangerously**
378:18
**dangers**
126:6
**daniel**
70:9
**danza**
410:22
**dash**
208:5
**data**
13:3, 13:6,
14:5, 14:10,
35:1, 37:6,
37:11, 37:14,
37:16, 142:16,
142:21, 143:5,
166:1, 166:2,
166:11, 201:8,

201:10, 201:11,
201:12, 215:2,
247:8, 340:4,
401:6
**date**
9:12, 19:1,
19:3, 90:13,
137:14, 138:3,
147:16, 147:17,
147:18, 363:6,
385:7
**daughter**
177:14, 273:5,
391:7, 394:6,
410:21
**daughter's**
326:5, 404:10
**david**
296:16, 308:22
**davinci**
335:11
**day**
7:18, 46:19,
49:20, 55:1,
65:15, 74:11,
88:17, 111:1,
118:21, 136:5,
218:11, 249:12,
341:18, 401:17,
411:12
**daylight**
82:19
**days**
66:10, 88:18,
118:19, 168:15,
216:14, 261:18,
309:22, 339:15,
355:10, 355:13,
368:9, 419:10
**de**
254:6
**dead**
42:12
**deadline**
7:13, 117:11,
333:11
**deadlines**
92:3, 95:11,

170:14
**deal**
13:2, 310:2,
354:14, 392:10
**dealing**
63:15, 88:2,
236:11, 237:4,
310:5
**deals**
279:9, 282:12
**death**
179:2, 183:3,
326:12, 381:1
**deaths**
266:2
**debate**
168:9
**deborah**
277:17, 277:18
**debra**
1:22, 421:2,
421:15
**debris**
358:9
**debt**
366:11, 366:15
**decade**
108:14, 300:8,
383:12
**decades**
24:6, 31:18,
60:1, 77:18,
88:7, 153:1,
160:11, 192:2,
212:5, 217:21,
224:3, 228:4,
229:8, 230:6,
245:3, 256:11,
278:9, 309:6,
338:18, 343:9,
357:20, 376:11
**deceased**
412:13
**deceive**
282:15
**december**
12:10, 13:10,
140:19, 141:19

Transcript of Public Hearing
Conducted on February 11, 2020                                   448

| | | | |
|---|---|---|---|
| **decent** | 188:14, 188:15, | **deemed** | 23:16, 24:1, |
| 411:4 | 189:5, 205:8, | 185:18, 247:7, | 24:3, 24:6, |
| **decide** | 209:2, 209:9, | 402:5 | 71:16, 150:19, |
| 37:7, 186:3, | 209:15, 209:20, | **deep** | 151:1, 152:11, |
| 193:5, 275:5, | 210:17, 211:17, | 65:21, 78:6, | 152:18, 152:20, |
| 315:8 | 212:12, 213:17, | 352:18, 353:5 | 153:1, 170:10, |
| **decided** | 220:6, 221:15, | **deeply** | 219:20, 222:15, |
| 333:5 | 228:12, 229:1, | 82:5, 101:16, | 298:18, 365:6, |
| **deciding** | 230:10, 237:8, | 121:8, 123:3, | 371:5 |
| 224:22, 230:17, | 246:9, 252:4, | 168:6, 185:6, | **definitions** |
| 270:4 | 255:15, 256:13, | 213:5 | 21:12, 150:6, |
| **decimate** | 256:14, 268:14, | **deepwater** | 240:13, 305:12 |
| 100:11 | 268:17, 269:18, | 49:18 | **degette** |
| **decision-making** | 270:10, 304:4, | **deer** | 119:19, 120:2, |
| 10:17, 16:13, | 311:15, 313:21, | 72:11, 106:6, | 122:10 |
| 26:14, 58:3, | 323:13, 328:15, | 123:11 | **degradation** |
| 63:3, 64:7, | 329:10, 337:16, | **defeating** | 176:19, 222:10, |
| 89:12, 110:2, | 337:19, 340:1, | 169:20 | 222:20, 227:12, |
| 112:14, 144:22, | 359:4, 364:3, | **defect** | 275:8, 276:9, |
| 154:1, 155:4, | 366:20, 368:12, | 265:18 | 413:19, 415:9 |
| 237:2, 376:13, | 368:19, 384:9, | **defects** | **degrade** |
| 377:15 | 386:4, 407:15 | 203:8 | 167:1, 327:5 |
| **decisions** | **deck** | **defend** | **degrades** |
| 18:5, 20:13, | 93:10 | 207:8 | 165:5 |
| 21:17, 31:13, | **declares** | **defenders** | **degree** |
| 32:8, 38:7, | 94:19 | 82:3, 181:4, | 17:7, 60:10, |
| 38:12, 38:22, | **declaring** | 181:8, 181:12 | 66:10, 145:15, |
| 39:3, 39:5, | 176:12 | **defense** | 162:10, 334:1, |
| 47:19, 48:12, | **decline** | 249:9, 250:9, | 334:3 |
| 49:5, 49:6, | 88:4, 159:3, | 314:12, 407:1, | **deity** |
| 52:2, 57:13, | 183:3, 216:4, | 410:19 | 283:19 |
| 63:7, 63:20, | 381:1 | **deference** | **delay** |
| 64:5, 64:8, | **declined** | 243:5 | 32:8, 33:12, |
| 67:11, 68:5, | 163:15 | **deficiencies** | 52:3, 109:9, |
| 68:14, 69:5, | **declining** | 229:17 | 218:1, 220:12, |
| 69:14, 70:1, | 99:16, 342:19, | **define** | 242:17, 256:15, |
| 71:21, 73:8, | 380:5 | 21:13, 21:21, | 332:12, 332:18, |
| 74:2, 75:16, | **decrease** | 37:11, 126:5, | 375:1, 416:2 |
| 76:19, 77:17, | 285:8 | 150:7, 150:12, | **delayed** |
| 84:9, 84:13, | **decreased** | 196:14 | 235:17, 361:19 |
| 87:3, 88:21, | 63:13 | **defined** | **delaying** |
| 91:13, 91:14, | **decreases** | 151:8, 156:13, | 398:16 |
| 97:22, 112:2, | 172:18 | 230:3 | **delays** |
| 113:2, 139:20, | **decreasing** | **defines** | 17:12, 18:4, |
| 146:14, 149:8, | 44:7, 118:13 | 269:11 | 19:22, 32:7, |
| 150:11, 179:16, | **dedicated** | **defining** | 90:16, 131:9, |
| 182:9, 186:10, | 93:20, 181:6, | 302:13 | 145:21, 146:13, |
| 186:13, 188:8, | 412:13 | **definition** | 148:13, 161:4, |
| | | 22:6, 22:10, | |

Transcript of Public Hearing
Conducted on February 11, 2020                                                    449

171:15, 218:3,
218:6, 236:21,
237:5, 238:14,
243:4, 256:14,
259:20, 260:19,
301:1, 304:3,
307:18, 314:17,
360:18, 361:3,
363:13, 369:22,
374:6, 375:5,
397:18, 398:8
**delegate**
388:14
**delegated**
395:16
**delegations**
59:2
**delegitimizing**
376:16
**deliberate**
369:18, 388:14
**deliberately**
367:3
**deliberation**
332:13
**delight**
325:21, 326:6
**delivering**
333:13
**delivers**
394:3
**delivery**
300:16, 323:9,
360:12
**demand**
265:5, 303:2,
306:19, 323:6,
398:21, 400:4
**demands**
168:8, 307:10,
352:7, 405:16
**demerits**
262:7
**demise**
107:5, 326:12
**democracy**
40:6, 64:16,
77:13, 112:16,

185:6, 186:16,
202:4, 211:20,
229:6, 269:20,
338:4, 343:22,
406:16
**democratic**
90:15, 125:21,
181:15, 184:21,
195:1, 195:8,
228:17, 283:8,
336:14, 381:14
**democrats**
276:17
**demonstrates**
169:8
**dempsey**
50:1, 50:4,
50:5
**dene**
39:18, 281:15,
281:21, 283:16,
283:18, 283:20,
351:1
**denial**
337:4
**denies**
168:9
**denigrates**
275:1
**dents**
357:19
**denver**
1:11, 2:7,
79:12, 110:16,
193:22, 202:13,
204:14, 206:18,
218:20, 221:4,
228:3, 238:18,
239:7, 254:19,
264:22, 268:3,
300:4, 314:13,
315:12, 315:14,
320:9, 334:1,
354:6, 367:14,
368:9, 378:13,
382:9, 401:13,
402:18, 405:6,
412:10, 419:9

**denver's**
206:22, 380:13
**deny**
114:9
**denying**
340:10
**department**
12:19, 14:12,
22:4, 65:16,
65:17, 65:18,
70:20, 124:6,
141:7, 141:13,
141:14, 142:21,
143:1, 150:17,
158:1, 191:12,
192:14, 193:5,
197:19, 250:6,
255:16, 298:10,
351:9, 365:20,
365:21, 370:1
**departure**
296:22
**depend**
72:5, 130:9,
175:10, 182:2,
211:4, 313:15,
343:3, 356:17
**dependent**
36:9, 355:1
**depending**
67:22, 367:22
**depends**
47:17, 181:17,
252:3
**depiction**
142:21
**deplorable**
106:9
**deployment**
302:22
**deposit**
7:8, 49:21,
135:17
**deposits**
191:8
**depressed**
266:8
**depresses**
44:6

**deprioritize**
371:17
**deprive**
363:15
**deprives**
90:19
**depth**
73:17, 344:8
**deputy**
5:3, 254:21,
287:10, 414:13
**derail**
218:1
**derive**
385:10
**descendent**
265:2
**describe**
12:8, 39:4,
140:17
**described**
51:1, 194:3,
262:5
**describes**
37:18, 214:7
**descriptors**
36:22, 37:3
**desert**
35:11, 223:19,
230:12
**deserve**
64:11, 117:7,
169:5, 179:15,
338:19, 372:7
**deserves**
274:3, 327:11
**design**
24:13, 27:2,
31:15, 153:8,
155:14
**designate**
237:10
**designated**
128:17, 174:15
**designating**
215:22
**designation**
80:10

Transcript of Public Hearing
Conducted on February 11, 2020

450

designed
27:16, 52:7,
66:16, 67:18,
69:9, 87:2,
156:7, 179:11,
311:19, 377:8,
377:12
designs
182:15
desired
37:8, 37:18,
80:13
desk
5:16, 6:3,
7:10, 8:10,
134:5, 135:20,
136:19, 288:4
desperately
398:11
despite
17:11, 145:19,
174:20, 175:17
destabilize
175:3
destination
324:14, 324:21
destinations
95:17, 96:2,
250:22
destroy
58:12, 174:22,
282:21, 295:6
destroyed
124:8, 230:11,
281:2, 413:15
destroying
248:22
destruction
191:17, 198:19,
204:5, 230:18,
336:2
destructive
178:13, 199:8,
333:1
detail
26:13, 48:6,
137:18, 155:3,
280:8, 280:9,

377:6
detailed
12:2, 13:3,
140:12, 212:18,
262:6, 280:2,
333:10, 392:17
details
5:14, 134:3,
288:3
deteriorating
256:17, 343:3
determination
20:11, 53:20,
149:6, 408:22
determinations
24:21, 153:15,
260:17
determine
10:14, 139:5,
377:22, 398:18
determining
20:2, 148:16,
255:18, 255:22,
280:11
detractors
183:18
detrimental
176:20, 244:20,
319:12, 319:21,
380:10
devastate
335:7
devastating
60:11, 178:14,
192:4, 193:2,
265:9, 316:3
develop
86:5, 86:12,
183:22, 333:22,
352:18, 356:16,
384:3, 401:14
developed
38:2, 109:15,
224:4, 307:1,
334:13, 362:20,
390:6
developer
106:1, 106:11,

217:3
developers
300:22, 302:10,
302:21, 335:7,
396:20, 405:10
developing
19:18, 35:14,
37:7, 80:13,
81:5, 148:9,
178:21, 291:22,
334:7, 335:14
development
26:6, 28:11,
29:10, 36:17,
38:4, 47:4,
50:20, 58:1,
58:4, 62:16,
68:8, 68:13,
83:7, 88:16,
89:13, 91:16,
96:3, 100:19,
103:16, 105:21,
108:3, 148:10,
154:20, 156:22,
174:22, 195:19,
198:16, 209:15,
212:8, 237:22,
254:22, 257:1,
257:6, 257:9,
258:7, 295:17,
300:3, 312:14,
313:12, 361:4,
362:5, 368:13,
373:12, 376:6,
382:20, 382:21,
395:5, 398:13,
405:3, 407:14,
412:6, 420:5,
420:7
developmental
179:2
developments
256:1
deville
50:3, 55:22,
56:1, 59:4,
83:18, 87:8,
87:9, 87:11,

87:12
dia
405:5
diagnosed
204:17, 265:19
dialogue
160:19, 370:3
diana
119:19
diane
231:7, 231:12
dictate
95:15, 397:3
died
204:18, 388:3
diesel
159:14
difference
204:9, 211:17,
343:12
differences
253:21
different
16:2, 16:8,
16:15, 144:13,
145:2, 165:7,
201:21, 201:22,
219:16, 243:16,
262:17, 292:18,
295:1, 364:3,
389:10, 399:17,
399:18, 418:17
differently
243:10
difficult
31:12, 44:17,
103:4, 161:19,
170:13, 313:20,
349:1
digital
27:8, 155:21,
323:6
diligence
393:11
diligent
332:14
diminish
130:16, 187:12

Transcript of Public Hearing
Conducted on February 11, 2020                                    451

| | | | |
|---|---|---|---|
| **diminished** | 119:18, 133:7, | 111:2 | 252:17, 340:2 |
| 112:4, 381:20 | 173:20, 250:5, | **discredit** | **disregarded** |
| **diminishing** | 254:21, 274:17, | 37:4 | 185:16, 249:8 |
| 46:15, 419:19 | 278:3, 287:11, | **discretion** | **disrupt** |
| **dining** | 311:8, 314:11, | 190:12, 409:8 | 175:1 |
| 328:22 | 324:1, 330:8, | **discuss** | **disrupted** |
| **direct** | 333:20, 365:19, | 9:10, 138:2 | 72:8 |
| 18:18, 22:9, | 370:9, 414:13 | **discussion** | **disrupting** |
| 39:1, 53:20, | **directors** | 168:12 | 249:12 |
| 54:17, 64:3, | 65:16, 217:5 | **discussions** | **disruption** |
| 112:16, 118:7, | **directs** | 214:14, 216:19 | 319:19 |
| 121:5, 126:4, | 67:14 | **disease** | **disrupts** |
| 147:10, 150:22, | **dirk** | 57:6, 121:21, | 118:4 |
| 171:1, 193:13, | 231:9, 237:19 | 163:15, 178:14, | **distain** |
| 201:15, 223:8, | **dirt** | 265:22, 345:12, | 331:9 |
| 279:15, 279:17, | 294:11, 394:12 | 346:10 | **distant** |
| 313:1, 353:8, | **dirty** | **diseases** | 178:10 |
| 371:7, 380:19, | 56:19, 416:11 | 249:12, 354:22 | **distinct** |
| 385:11, 413:2 | **disadvantage** | **disgusting** | 305:1 |
| **directed** | 242:19 | 106:9 | **distinctive** |
| 9:8, 10:22, | **disadvantaged** | **disincentivize** | 59:17 |
| 15:1, 137:21, | 82:10, 246:12 | 302:6 | **distinguish** |
| 143:13 | **disagree** | **dismantle** | 322:18, 380:18 |
| **directing** | 41:13, 183:20 | 101:18, 227:18, | **distinguished** |
| 69:3 | **disasters** | 249:6, 316:1 | 188:22 |
| **direction** | 60:12, 404:4, | **dismantling** | **distracting** |
| 15:13, 17:12, | 405:18 | 99:13, 334:11, | 322:17 |
| 67:9, 76:18, | **disclose** | 335:6 | **distraught** |
| 107:4, 121:14, | 83:2, 182:12, | **dismissed** | 406:3 |
| 144:1, 145:20, | 193:6, 229:21, | 87:1 | **distressed** |
| 222:1, 240:4, | 230:9, 377:6 | **disorders** | 225:7 |
| 356:15, 365:4 | **disclosed** | 203:7 | **district** |
| **directions** | 129:3, 193:14 | **display** | 119:18, 281:19 |
| 364:4 | **disclosure** | 134:21 | **disturbed** |
| **directive** | 102:20, 230:7, | **displayed** | 86:2 |
| 60:2, 60:7 | 230:15, 230:21, | 14:15 | **disturbing** |
| **directives** | 297:8, 298:19, | **disposable** | 130:5, 246:19 |
| 235:12 | 376:2, 377:13, | 300:6 | **dive** |
| **directly** | 410:13 | **disproportionate** | 123:3 |
| 62:13, 102:16, | **disclosures** | 76:3, 369:2 | **diverse** |
| 109:20, 209:14, | 227:4 | **disproportionate-** | 50:13, 75:12 |
| 318:20, 325:8, | **disclude** | **ly** | **diversification** |
| 336:12, 368:4, | 78:6 | 63:12, 76:22, | 101:14 |
| 403:10 | **disconnect** | 82:11, 168:1 | **diversion** |
| **director** | 45:7 | **disputes** | 163:1 |
| 4:17, 5:3, | **disconnected** | 19:21, 148:12 | **diversity** |
| 65:13, 65:17, | 250:20 | **disregard** | 190:22, 228:2, |
| 70:19, 90:3, | **discovered** | 37:6, 54:20, | 231:3 |
| | 84:19, 85:5, | | |

Transcript of Public Hearing
Conducted on February 11, 2020

452

| | | | |
|---|---|---|---|
| **diverting** | 345:22, 377:14, | **doug** | **draper** |
| 225:22 | 402:2 | 197:17 | 231:9, 237:18, |
| **divide** | **dollars** | **down** | 237:19 |
| 27:8, 103:13, | 121:16, 171:16, | 8:17, 34:9, | **drastic** |
| 128:15, 128:18, | 233:21, 242:16, | 35:21, 59:6, | 216:4 |
| 130:4, 130:19, | 316:22, 337:11, | 74:11, 89:18, | **drastically** |
| 155:21 | 358:10, 364:7, | 92:22, 110:20, | 114:11, 261:19 |
| **division** | 393:22 | 163:8, 236:10, | **draw** |
| 90:4, 217:2 | **dolphins** | 260:17, 294:10, | 23:4, 151:18 |
| **docket** | 334:15, 334:16 | 304:7, 308:10, | **dreamed** |
| 7:3, 135:13 | **domain** | 346:21, 361:1, | 390:15 |
| **doctor** | 43:11, 85:6 | 363:10, 379:19, | **dredge** |
| 162:10, 345:11, | **domestic** | 389:15, 418:20, | 358:10 |
| 345:21 | 176:5 | 420:12 | **dresses** |
| **doctors** | **dominate** | **downstream** | 412:12 |
| 406:2 | 252:13 | 124:4, 124:14, | **drew** |
| **document** | **don** | 225:21, 225:22, | 312:13 |
| 25:12, 73:19, | 258:10 | 307:14, 405:18 | **drier** |
| 108:8, 142:7, | **donald** | **downtown** | 72:6, 175:4 |
| 154:4, 190:8, | 279:16, 414:19 | 233:19, 272:18, | **drill** |
| 213:3, 219:10, | **donated** | 379:5 | 280:20, 311:16, |
| 238:20, 384:9 | 406:8 | **dozen** | 313:5, 352:4, |
| **documentation** | **done** | 364:3 | 416:16 |
| 253:8 | 5:15, 62:17, | **dr** | **drilled** |
| **documents** | 79:18, 197:13, | 39:13, 162:8, | 352:13 |
| 17:9, 25:6, | 233:2, 239:6, | 340:14 | **drilling** |
| 28:12, 34:11, | 268:17, 269:7, | **draft** | 56:12, 67:6, |
| 35:4, 36:14, | 294:19, 332:22, | 15:22, 16:3, | 73:1, 88:4, |
| 37:7, 38:17, | 333:1, 333:3, | 21:8, 23:19, | 196:5, 196:16, |
| 38:18, 51:10, | 334:6, 360:4, | 26:6, 85:10, | 196:20, 215:20, |
| 109:9, 109:18, | 378:4, 389:12, | 102:22, 144:10, | 310:3, 310:5, |
| 145:17, 153:21, | 414:4 | 144:15, 150:3, | 351:17, 372:4 |
| 156:22, 170:17, | **door** | 152:14, 154:20, | **drillings** |
| 175:15, 188:22, | 76:10, 277:13 | 166:4, 166:8, | 265:16 |
| 189:4, 189:12, | **doors** | 166:15, 170:17, | **drink** |
| 189:20, 200:18, | 5:7, 5:10, | 176:7, 176:17 | 111:21, 178:1, |
| 210:10, 211:22, | 287:22, 400:4 | **drafted** | 185:4, 187:5, |
| 212:7, 214:15, | **dot** | 364:17, 384:22 | 232:14, 336:17, |
| 227:9, 228:9, | 219:12, 219:17 | **dragged** | 346:3 |
| 234:6, 236:17, | **double** | 349:10 | **drinking** |
| 242:4, 292:4, | 204:14, 245:15 | **dragging** | 174:12, 192:7, |
| 322:13 | **doubled** | 294:16 | 241:18, 246:13, |
| **doing** | 161:15, 309:13 | **drain** | 311:19 |
| 29:12, 83:10, | **doubt** | 32:10, 256:17 | **drive** |
| 196:17, 228:22, | 56:18, 305:7, | **dramatic** | 48:19, 355:5 |
| 268:18, 279:20, | 339:8 | 413:10 | **driven** |
| 284:15, 285:21, | **doubts** | **dramatically** | 126:2, 313:8, |
| 301:21, 345:7, | 419:1 | 66:5, 80:1 | 367:9 |

Transcript of Public Hearing
Conducted on February 11, 2020                                    453

| | | | |
|---|---|---|---|
| **driver** | **dumping** | **e-r** | **earnest** |
| 102:13 | 123:18, 295:22 | 187:19 | 302:15 |
| **drivers** | **dunes** | **e-r-i-c** | **earning** |
| 232:6, 343:18 | 338:12 | 278:2 | 375:7 |
| **drives** | **duplication** | **e-s-t-e-e** | **earth** |
| 224:11, 239:4 | 260:18, 350:14 | 323:22 | 40:7, 56:5, |
| **drone** | **duplicative** | **e-s-t-h-e-r** | 58:9, 58:10, |
| 233:7 | 28:19, 157:7, | 102:7 | 58:12, 87:17, |
| **drought** | 240:13 | **e-y** | 123:10, 194:1, |
| 63:14, 358:13 | **duration** | 311:7 | 203:21, 248:8, |
| **droughts** | 12:7, 140:15, | **e2** | 249:13, 273:20, |
| 48:17, 335:3, | 238:15, 238:21, | 47:5, 47:14 | 283:6, 285:4, |
| 357:8 | 245:3, 417:11 | **ea** | 285:5, 330:9, |
| **drummond** | **during** | 19:2, 19:4, | 343:18, 401:2, |
| 5:2, 287:10, | 7:18, 65:15, | 19:5, 20:7, | 401:22, 402:16, |
| 299:12, 299:16, | 72:13, 80:10, | 140:8, 147:16, | 411:14, 413:14, |
| 305:22, 308:17, | 104:2, 130:3, | 147:18, 147:19, | 414:5 |
| 320:5, 327:16, | 136:4, 219:11, | 148:21, 190:6, | **earth's** |
| 327:21, 328:1, | 238:5, 238:13, | 238:17 | 344:3 |
| 328:6, 336:4, | 244:10, 246:10, | **each** | **eas** |
| 344:12, 347:12, | 256:11, 292:7, | 91:8, 98:2, | 18:19, 19:8, |
| 347:15, 353:14, | 324:16, 380:19, | 105:14, 114:22, | 19:13, 98:11, |
| 353:19, 353:22, | 383:9, 398:9, | 194:17, 222:6, | 98:15, 140:9, |
| 354:3, 355:20, | 412:14 | 240:4, 248:18, | 147:11, 147:22, |
| 356:3, 359:6, | **dust** | 248:20, 280:18, | 148:5, 153:14 |
| 362:10, 365:16, | 294:11 | 305:5, 350:11, | **ease** |
| 370:5, 372:16, | **duty** | 356:17, 357:1, | 377:12 |
| 375:9, 382:4, | 20:15, 89:2, | 357:22, 387:13, | **easement** |
| 395:22, 399:10, | 114:6, 149:10, | 391:13, 407:14 | 291:17 |
| 414:6, 414:9, | 180:20, 187:9, | **eagle** | **easements** |
| 417:22, 418:9, | 229:21, 262:3, | 248:16 | 25:22, 154:14 |
| 420:18 | 334:18 | **ean** | **easier** |
| **dry** | **dwellings** | 353:16, 354:4 | 17:17, 117:2, |
| 307:22 | 338:9 | **earlier** | 146:5, 213:18, |
| **dual** | **dying** | 26:2, 108:15, | 323:1, 323:11, |
| 386:14 | 40:19 | 154:16, 233:12, | 416:15 |
| **due** | **dynacare** | 394:15, 400:12, | **easiest** |
| 31:18, 32:12, | 351:14 | 404:8 | 158:12 |
| 41:4, 41:10, | **dynamic** | **early** | **easily** |
| 48:17, 49:17, | 115:9 | 8:10, 21:1, | 80:3, 130:21, |
| 62:17, 77:4, | | 26:6, 113:10, | 260:8, 302:3, |
| 86:2, 201:18, | **E** | 132:8, 132:9, | 378:6 |
| 204:18, 300:17, | **e-a-n** | 136:8, 136:9, | **east** |
| 300:19, 325:12, | 354:5 | 136:18, 149:18, | 197:19, 351:20 |
| 374:15, 380:6, | **e-d** | 154:19, 179:2, | **eastern** |
| 387:8, 393:11, | 30:7 | 290:21, 301:15, | 351:6, 352:5, |
| 399:21, 406:6 | **e-m-i-l-y** | 301:19 | 405:7 |
| **dumped** | 299:18, 370:8 | **earned** | **easy** |
| 246:13 | | 283:6 | 319:5, 341:9 |

Transcript of Public Hearing
Conducted on February 11, 2020

454

eat
89:20
eaten
89:19
echo
113:10
echoing
330:16
ecoinclusive
246:1
ecological
41:7, 41:10,
41:12
ecologically
262:14
ecologist
36:7, 188:1,
200:17, 201:8
ecology
40:11
economic
10:5, 32:2,
32:11, 48:19,
50:19, 66:21,
84:18, 102:13,
102:15, 103:7,
109:13, 116:22,
138:18, 208:17,
217:13, 232:5,
235:4, 237:22,
254:21, 256:15,
256:18, 257:9,
257:15, 257:19,
257:22, 261:1,
265:10, 266:6,
266:13, 266:19,
267:12, 271:4,
304:19, 321:5,
354:10, 358:11,
360:1, 369:4,
398:20, 399:2
economically
21:15, 47:18,
81:18, 82:10,
150:9, 313:9
economics
283:10
economies
65:3, 72:16,

304:17, 309:6,
335:19, 343:5,
350:9
economy
32:11, 42:12,
47:7, 48:4,
66:6, 69:18,
85:17, 93:5,
100:18, 101:1,
104:22, 108:22,
123:22, 130:10,
175:10, 242:21,
251:2, 256:4,
256:18, 304:21,
306:16, 321:17,
323:5, 324:13,
360:6, 361:17,
362:2, 362:7,
365:13, 374:9,
374:17, 396:10
ecosystem
171:5, 175:2,
175:9, 342:14
ecosystems
72:4, 72:14,
73:3, 74:1,
93:18, 174:16,
207:5, 342:16,
343:2
ed
30:7, 200:10
edc
238:1
edge
374:8
edison
147:4, 151:21
editor
49:15, 123:1
educate
345:21
education
104:15, 104:19,
178:4, 246:2
educational
241:21
educator
410:22

edward
184:7
edwards
105:22
effect
22:12, 22:14,
63:16, 79:19,
151:3, 151:5,
175:2, 178:10,
213:19, 298:19,
320:4, 381:13
effective
16:21, 17:15,
51:4, 127:17,
145:8, 146:3,
161:1, 228:16,
242:4, 257:4,
258:6, 304:9,
399:6
effectively
35:21, 63:5,
67:9, 121:6,
167:4, 171:14,
176:17, 178:6,
304:22
effectiveness
171:10, 318:8
effects
11:13, 11:19,
12:1, 22:6,
22:16, 22:20,
23:6, 23:10,
23:16, 23:17,
24:4, 39:2,
43:20, 44:10,
46:13, 53:21,
67:14, 71:16,
72:22, 82:20,
83:3, 140:1,
140:7, 140:12,
150:19, 151:8,
151:12, 151:20,
151:22, 152:5,
152:11, 152:12,
152:21, 168:18,
169:9, 169:12,
169:13, 170:1,
170:5, 171:11,

173:8, 173:15,
178:8, 182:13,
183:2, 183:6,
193:6, 196:1,
196:2, 206:7,
221:15, 222:14,
222:16, 222:18,
223:8, 225:19,
225:20, 255:14,
283:11, 316:3,
319:10, 319:15,
319:18, 319:21,
327:9, 365:6,
368:20, 368:22,
369:2, 369:6,
371:4, 371:6,
371:7, 375:2,
380:3, 380:19,
380:21, 381:2,
397:5, 408:13,
408:14, 408:21,
409:9, 409:13,
413:4, 415:8
efficiencies
251:15, 253:1,
270:9, 382:16
efficiency
27:14, 28:8,
34:13, 41:11,
47:11, 75:18,
95:14, 156:5,
156:19, 171:10,
240:15, 301:8,
362:22
efficient
16:21, 17:15,
76:13, 145:8,
146:2, 161:1,
195:6, 202:5,
232:16, 234:3,
235:20, 240:9,
241:9, 242:5,
257:3, 258:5,
260:2, 302:5,
304:8, 344:2,
360:13, 361:20,
393:16, 399:6
efficiently
220:15, 233:9,

Transcript of Public Hearing
Conducted on February 11, 2020                              455

| | | | |
|---|---|---|---|

302:15
**effort**
4:13, 89:14,
101:18, 133:3,
176:22, 232:16,
287:3, 356:11,
393:12, 412:7
**efforts**
37:4, 79:16,
90:13, 122:11,
146:18, 188:18,
232:8, 236:19,
241:7, 308:9,
322:22, 356:9,
359:2, 363:6,
368:18, 382:14
**effrontery**
54:17
**egregious**
318:19
**eight**
16:6, 80:3,
144:17, 294:7,
306:1, 325:18,
411:8
**eileen**
386:7
**eilish**
180:6
**eis**
12:4, 12:7,
12:9, 12:10,
12:19, 12:21,
13:9, 13:17,
13:22, 14:13,
14:22, 15:10,
15:20, 16:4,
16:6, 16:10,
16:13, 18:22,
19:10, 20:6,
20:20, 21:7,
21:8, 25:10,
38:6, 80:11,
97:14, 140:16,
140:18, 140:19,
140:22, 141:6,
141:9, 141:12,
141:18, 142:1,

142:5, 142:10,
143:12, 143:19,
144:9, 144:15,
144:17, 144:19,
144:21, 147:14,
148:2, 148:20,
149:15, 150:2,
150:3, 154:3,
154:20, 165:22,
166:4, 166:8,
166:15, 170:17,
171:2, 190:7,
262:6, 262:10,
318:3, 318:21,
319:11, 360:17,
397:15
**eiss**
12:17, 13:5,
13:8, 14:6,
14:8, 14:12,
18:18, 19:7,
36:13, 79:22,
127:1, 141:3,
141:17, 142:16,
142:18, 143:1,
143:2, 147:10,
147:21, 153:13,
278:13, 352:12,
352:18
**either**
54:10, 108:16,
109:7, 158:20,
218:13, 269:13,
294:12, 408:7
**elder**
241:22
**elected**
276:20
**elective**
284:20
**electric**
47:12, 293:21
**electricity**
259:4
**electrification**
67:4
**electronic**
27:4, 27:5,

27:12, 155:16,
155:18, 156:2,
318:14, 318:16
**element**
185:7
**elements**
102:20, 260:14
**elephants**
334:15, 334:16
**elevation**
325:7
**elevations**
72:12
**eleven**
123:8, 123:14,
126:1
**eliminate**
33:11, 43:19,
48:10, 67:12,
67:18, 70:3,
87:2, 95:5,
124:20, 165:17,
170:8, 183:1,
191:2, 196:15,
229:20, 230:20,
241:12, 245:18,
298:22, 299:1,
318:5, 371:6,
384:22, 408:12
**eliminated**
98:13, 263:16
**eliminates**
91:4, 91:12,
173:7, 195:22,
225:19, 226:7,
299:3
**eliminating**
48:12, 98:9,
168:21, 172:9,
176:9, 176:15,
205:6, 226:4,
319:14
**elizabeth**
334:2
**elk**
72:11, 106:6,
106:16, 174:8,
419:18, 420:3,

420:13
**else**
131:20, 277:20,
325:8, 389:21,
390:15, 402:3,
420:19
**elsewhere**
229:20
**elwha**
97:14
**embedded**
76:11, 283:19
**embraced**
57:15
**embracing**
78:12
**emergency**
5:8, 133:20,
133:22, 287:20,
288:1
**emerging**
99:18
**emily**
299:17, 370:7
**emission**
67:2, 252:14
**emissions**
23:20, 45:20,
66:15, 66:17,
66:21, 67:6,
67:11, 67:20,
68:3, 68:19,
68:21, 69:7,
69:8, 69:10,
69:12, 91:6,
118:3, 152:15,
159:14, 159:17,
169:10, 196:4,
235:20, 252:12,
252:16, 285:8,
285:17, 368:1,
368:6, 368:16,
408:17, 410:13
**emitted**
368:4
**emitting**
385:12
**emotional**
115:19

Transcript of Public Hearing
Conducted on February 11, 2020

456

emphasis
36:8, 278:7,
345:11
emphasize
197:2
emphasizes
283:21, 331:12
employ
102:16, 111:15,
231:18
employed
392:4, 421:8
employee
170:21, 187:22
employees
189:3, 260:16
employer
232:22, 403:22
empower
183:15, 260:15
empowered
321:3
empowering
167:19, 284:1
empowerment
211:16
empowers
120:15
enable
305:7
enabled
105:17, 105:18
enabling
220:12
enacted
91:10, 208:14,
267:7, 307:5
enactments
268:8
encino
351:19
encompass
254:7
encourage
27:11, 28:18,
59:1, 96:13,
156:1, 157:6,
189:21, 257:9,

293:8, 293:22,
299:3, 323:16,
328:13, 377:9
encouraged
195:12, 320:14
encouraging
45:5, 195:20,
322:5, 375:18,
398:6
encroached
310:4
encroaching
60:12
encumbered
52:3, 254:5
end
8:1, 8:2, 8:5,
58:14, 82:14,
89:17, 107:6,
110:2, 135:2,
135:7, 136:8,
136:12, 159:20,
207:15, 207:16,
211:18, 219:15,
289:10, 290:13,
290:21, 326:4,
341:18, 416:17,
420:22
endangered
43:8, 44:10,
58:7, 111:1,
181:19, 181:21,
292:14
endangers
46:16, 165:4
ended
85:20
endemic
75:10, 75:21,
76:21
ending
161:14, 192:22
endless
301:1, 304:11,
364:2
endocrine
203:7
endorsed
383:16

ends
136:8
energy
32:22, 47:11,
57:22, 58:3,
65:13, 68:6,
79:14, 79:22,
89:13, 90:9,
92:19, 93:5,
103:3, 104:17,
108:1, 122:13,
223:18, 223:20,
235:16, 235:20,
249:9, 257:17,
298:10, 299:20,
300:12, 300:16,
301:3, 302:20,
309:4, 310:13,
320:8, 321:16,
323:14, 330:8,
335:17, 344:5,
360:14, 361:19,
362:3, 363:8,
363:18, 365:13,
382:19, 407:14
enforce
190:3
enforcement
203:10, 241:19,
413:13
enforces
82:18
enforcing
73:14
engage
63:6, 94:9,
108:2, 170:13,
186:5, 237:1,
253:12
engaged
329:7, 331:5
engagement
9:16, 138:8,
157:20, 158:3,
184:19, 246:2,
252:1, 266:21,
267:20, 297:5,
314:4, 315:17,

330:21, 417:10
engaging
115:20
engineering
31:15, 238:4
engineers
300:14
enhance
9:8, 15:1,
26:1, 28:14,
137:21, 143:13,
157:3, 296:10,
322:2, 350:12,
362:21
enhanced
96:11
enhancement
98:4
enhancements
394:22
enhances
58:17
enjoy
115:14, 125:19,
180:10, 248:19,
321:20, 322:7
enjoyed
321:1
enjoying
184:14
enjoyment
59:20, 97:20
enlargement
41:21
enlightened
321:3
enormous
74:2
enough
38:11, 82:8,
193:8, 203:10,
203:11, 247:7,
266:12, 311:1,
315:10, 358:17,
402:22, 405:11,
420:8
enrolled
56:1, 87:12

Transcript of Public Hearing
Conducted on February 11, 2020                                    457

| | | | |
|---|---|---|---|
| **ensure** 5:14, 11:14, 16:21, 19:16, 29:4, 47:19, 51:10, 52:6, 60:14, 64:8, 84:5, 84:9, 100:2, 116:20, 129:15, 131:2, 140:3, 145:8, 148:7, 157:14, 193:13, 197:3, 198:13, 214:17, 214:21, 215:10, 216:18, 227:2, 247:12, 249:4, 250:11, 257:3, 260:12, 262:12, 263:17, 269:6, 301:13, 308:13, 311:15, 322:3, 323:12, 341:4, 350:15, 374:8, 376:3, 378:3, 397:4, 399:5, 407:22, 416:22 **ensured** 62:11, 100:10, 100:20, 224:7, 338:17 **ensures** 10:14, 64:22, 100:17, 129:1, 139:5, 188:9, 372:11 **ensuring** 18:12, 57:9, 90:7, 97:18, 100:12, 147:1, 217:18, 258:5, 329:6, 332:15, 407:21 **enter** 49:14, 378:1 **entered** 6:7, 289:2 **enthusiastically** 323:14 | **enthusiasts** 94:1, 228:10, 341:2 **entire** 41:8, 129:13, 129:17, 180:2, 183:10, 193:15, 240:1, 262:15, 297:17, 339:6, 381:6, 407:11, 411:9, 411:11 **entirely** 153:9, 262:17, 263:11 **entirety** 200:21, 231:5, 366:22 **entities** 113:17, 295:10, 396:19 **entity** 217:9 **entomologist** 216:13 **environmentally** 31:7, 41:17, 42:6, 47:18, 90:10, 108:2, 125:1, 363:2, 409:20 **environments** 39:7, 66:13, 325:11 **envision** 116:16 **envisioned** 195:10, 250:10 **eo** 15:1, 143:13 **epa** 2:5, 7:18, 136:5, 137:4, 159:11, 163:17, 170:21, 172:6, 248:18, 268:21, 273:1, 285:11, 285:14, 290:17, 352:20, 353:5, | 399:4, 413:18 **epa's** 162:16, 319:13 **epidemics** 326:18 **equally** 29:20, 84:11, 158:10, 212:17 **equation** 346:15 **equipment** 31:16 **equitable** 53:19, 376:10 **equitably** 187:11 **equity** 167:21 **equivalency** 172:6 **equivalent** 43:3, 99:2 **era** 246:10, 323:4, 369:21 **eradication** 55:2 **eric** 277:22, 278:1 **eroded** 406:16 **erodes** 269:20 **eroding** 343:4 **erratic** 118:16, 358:19 **error** 35:8 **esoteric** 104:21 **especially** 36:10, 37:1, 38:18, 75:20, 83:3, 115:8, 120:18, 177:12, 178:19, 189:8, 208:20, 209:13, | 212:13, 292:7, 295:8, 319:6, 338:20, 349:15, 419:2 **espouses** 181:16 **essential** 64:22, 94:8, 198:11, 217:17, 220:14, 224:19, 261:21, 262:6, 280:13, 280:15, 383:20, 417:5 **essentially** 54:15, 70:3, 87:4, 165:12, 208:15, 281:2, 317:5, 320:22 **establish** 19:8, 25:2, 147:22, 153:16, 370:2 **established** 14:18, 18:7, 59:14, 143:8, 146:16, 304:5 **establishes** 18:21, 19:9, 147:13, 148:1, 175:21, 322:11 **establishing** 262:19, 398:5 **establishment** 262:20 **estate** 212:14, 255:21, 256:9, 257:21, 346:18, 350:22, 405:2, 405:3 **estates** 55:1 **estee** 323:21 **estep** 200:8 **estes** 324:2 **esther** 102:5 |

Transcript of Public Hearing
Conducted on February 11, 2020                                                    458

estimates
374:22
et
201:22, 328:21
eternally
187:10
ethic
41:10
ethical
376:15, 404:21
ethnic
127:4
ethnicities
396:8
ethnicity
392:8
evaluate
20:5, 25:11,
124:21, 148:19,
154:3, 182:8,
198:7, 226:9,
318:3, 397:4,
408:12
evaluated
199:21, 280:16
evaluating
223:12
evaluation
124:13, 188:4,
188:5
evaluations
39:1
even
13:17, 23:12,
41:2, 46:7,
60:12, 72:1,
73:1, 128:1,
129:13, 129:17,
131:13, 142:4,
152:6, 179:2,
179:21, 180:14,
194:19, 195:11,
203:19, 218:1,
222:16, 232:22,
233:10, 236:6,
245:9, 245:15,
259:11, 284:13,
293:21, 298:21,

307:19, 321:10,
321:19, 326:21,
356:15, 357:5,
358:16, 358:17,
364:15, 387:19,
388:4, 388:17,
388:19, 390:22,
397:16, 399:22,
410:7
evening
286:13, 291:10,
294:3, 296:15,
311:6, 317:8,
330:7, 336:5,
359:7, 362:12,
365:17, 386:6,
396:2, 399:9,
406:21, 410:20,
414:11, 418:2,
418:5, 420:20
event
4:12, 6:6,
51:17, 133:2,
136:21, 192:18,
229:9, 287:2,
290:19
events
7:16, 48:19,
136:2, 252:19,
290:8, 357:7
eventually
405:2
ever
31:18, 40:18,
63:19, 103:3,
105:14, 110:4,
122:8, 212:1,
285:5, 306:13,
321:7, 323:18,
325:6, 342:16,
343:4, 343:9,
357:15
every
33:3, 44:19,
45:21, 113:12,
116:2, 116:3,
126:18, 128:8,
167:17, 177:19,

185:1, 190:10,
212:22, 218:11,
255:6, 274:3,
274:4, 279:3,
279:5, 284:22,
338:1, 339:11,
339:21, 358:4,
358:15, 370:20,
383:20, 387:8,
388:22, 401:2,
401:17, 403:2,
411:12
everybody
132:15, 172:12,
207:18, 208:6,
284:21, 285:22,
286:13, 296:13,
329:22, 334:16,
402:13
everybody's
401:1
everyone
52:7, 74:13,
126:20, 202:4,
288:18, 329:6,
339:18, 372:12,
402:3, 418:3
everyone's
178:18, 330:1
everything
34:13, 127:18,
289:5, 294:17,
296:5, 403:4,
403:10, 403:11,
403:13
everywhere
405:12
evidentiary
175:15
evolution
385:3
evolutions
321:2
evolved
72:4
evolving
100:4, 323:4
exacerbate
39:11, 46:4,

49:9, 175:3
exact
76:20, 101:12
exactly
6:18, 91:10,
121:11, 121:14,
135:5, 179:17,
205:21, 306:11,
312:19
exaggeration
379:16
exam
377:21
examine
73:5, 264:2,
318:5
example
12:18, 18:17,
24:11, 37:10,
37:21, 44:17,
48:9, 68:15,
80:9, 98:9,
129:18, 141:6,
147:9, 153:6,
166:3, 173:3,
191:5, 215:21,
216:16, 233:14,
242:22, 245:1,
252:11, 254:5,
255:16, 255:21,
285:10, 292:13,
313:5, 343:6,
357:11, 394:17,
410:2, 413:3,
419:8, 419:10
examples
100:8, 103:12,
173:1, 195:13,
230:7, 233:12,
250:17, 307:17,
316:13, 383:1,
384:16, 394:4
exceed
80:1
exceedances
173:2, 173:6
exceeded
300:9

Transcript of Public Hearing
Conducted on February 11, 2020                                    459

| | | | |
|---|---|---|---|
| **excellent** | **exemplified** | 256:16, 259:18, | 36:15, 38:16, |
| 58:16 | 336:20 | 412:18, 412:21 | 71:20, 79:14, |
| **excellently** | **exempting** | **expands** | 97:5, 163:13, |
| 336:20 | 225:11 | 51:9, 409:7 | 164:18, 171:1, |
| **exceptional** | **exemption** | **expansion** | 171:15, 172:20, |
| 228:15 | 190:13 | 28:22, 68:16, | 189:13, 189:14, |
| **exceptions** | **exempts** | 100:21, 157:10, | 199:7, 203:2, |
| 91:22 | 114:13 | 166:4, 187:5, | 325:7, 326:6, |
| **excited** | **exercise** | 218:22, 232:9, | 357:2, 363:17, |
| 29:17 | 81:7, 182:14, | 321:15 | 366:2, 378:3, |
| **exciting** | 228:11, 318:1 | **expansions** | 397:17 |
| 312:5 | **exhaustion** | 100:10 | **experienced** |
| **exclude** | 383:3, 383:5 | **expect** | 199:19, 238:14, |
| 11:11, 63:10, | **exist** | 64:11 | 239:12, 298:1, |
| 139:22, 398:3 | 10:4, 111:5, | **expectation** | 312:2 |
| **excluding** | 271:3 | 395:4 | **experiences** |
| 178:8 | **existed** | **expectations** | 113:12, 338:13 |
| **exclusion** | 59:22 | 37:9 | **experiencing** |
| 11:15, 11:17, | **existence** | **expected** | 121:19, 310:12 |
| 24:21, 25:4, | 325:14 | 104:12, 245:15 | **expert** |
| 34:22, 49:18, | **existential** | **expecting** | 85:16, 342:17, |
| 140:4, 140:6, | 192:11 | 315:21, 418:15 | 365:4, 375:21, |
| 153:15, 153:18 | **existing** | **expedience** | 376:1, 377:5 |
| **exclusions** | 17:22, 35:4, | 54:2 | **expertise** |
| 11:8, 11:21, | 81:8, 146:10, | **expedient** | 29:2, 34:21, |
| 92:6, 172:14, | 166:1, 175:19, | 350:19 | 38:11, 157:12, |
| 172:15, 238:7, | 192:13, 201:4, | **expedite** | 171:17, 172:16, |
| 292:20, 292:22, | 215:2, 228:20, | 14:20, 40:10, | 209:7, 312:14 |
| 293:6, 383:19, | 307:20, 349:9, | 143:10, 160:3, | **experts** |
| 383:20, 384:1, | 382:15, 384:15, | 297:8, 387:6, | 61:8, 209:8, |
| 384:4, 398:8 | 385:17, 385:21, | 391:11 | 302:7, 378:2 |
| **excuse** | 398:7, 407:4 | **expediting** | **explain** |
| 122:13, 240:16 | **exists** | 176:19, 374:14 | 26:10, 26:18, |
| **execution** | 190:11, 195:2 | **expeditious** | 154:22, 155:8, |
| 131:2 | **exit** | 220:9, 302:5 | 263:14 |
| **executive** | 133:20, 290:16 | **expeditiously** | **explained** |
| 9:7, 10:20, | **exits** | 11:14, 140:3 | 386:19 |
| 14:17, 15:7, | 5:9, 133:22, | **expense** | **explains** |
| 16:16, 46:21, | 287:20, 288:1 | 40:11, 65:3, | 214:22 |
| 65:12, 65:15, | **exorbitant** | 80:21, 87:22, | **explanation** |
| 70:19, 90:3, | 215:17, 215:18 | 302:17 | 137:14, 263:17 |
| 97:8, 137:20, | **expand** | **expenses** | **explicit** |
| 143:8, 143:19, | 20:20, 24:17, | 300:7 | 17:11, 145:20 |
| 145:5, 171:5, | 132:4, 149:16, | **expensive** | **explicitly** |
| 171:13, 173:20, | 153:12, 413:19 | 67:1, 108:18, | 38:13, 81:16, |
| 250:5, 274:17, | **expanded** | 215:13 | 225:18, 226:1 |
| 278:3, 324:1, | 322:7 | **experience** | **exploitation** |
| 374:7, 374:13 | **expanding** | 36:7, 36:12, | 411:22, 412:2 |
| | 32:9, 129:20, | | |

Transcript of Public Hearing
Conducted on February 11, 2020

460

exploitative
412:5, 413:4
exploration
187:20
explore
115:20, 124:21,
182:11, 226:8,
341:7
exploring
125:1, 226:11
exponential
103:19, 300:2
exported
45:19
exports
176:4
exposed
168:1, 265:15,
341:16
express
42:17, 113:20,
120:6, 181:7,
339:7
expression
98:6, 278:18
extemporaneous
131:22
extend
132:1, 168:14,
233:15, 355:15
extended
161:4, 219:11
extending
300:2, 408:3
extension
98:21, 355:12
extensions
98:21
extensive
36:11, 218:1
extent
10:15, 94:16,
139:6, 205:19,
222:18, 244:10,
332:21
exterior
352:4
extinction
223:2, 248:17,

334:22, 343:8,
380:4
extinctions
336:1, 342:21
extra
136:21
extracted
45:12
extraction
176:6, 232:7,
341:14
extractive
312:22, 406:7
extreme
49:9, 178:14,
260:8, 349:3,
357:7, 358:19
extremely
35:10, 172:21,
173:16, 417:15
eye
60:5, 121:13
eyes
163:21, 195:11,
400:6

F

f-a-n-k-h-a-u-s--
e-r
392:4
f-i-x
83:21
f-u-l-t-o-n
158:17
face
40:5, 40:6,
47:10, 48:16,
246:6, 247:15,
319:16, 360:10
faced
325:6
faces
183:18, 282:13,
350:11
facets
90:5
facilitate
17:15, 69:13,

146:2, 196:4,
256:22, 321:18,
398:21, 408:17
facilitates
212:3
facilitating
167:18, 323:8
facilities
92:18, 257:17,
373:17, 373:18,
382:22, 407:16
facility
166:6
facing
118:11, 245:16,
247:18, 306:21
fact
4:20, 39:10,
41:17, 49:5,
103:5, 127:6,
131:12, 133:10,
159:15, 196:11,
206:22, 218:20,
275:21, 289:16,
298:15, 315:13,
319:15, 331:1,
331:5, 349:12,
371:16, 393:18,
394:21
factor
97:21
factored
253:20
factors
13:18, 13:20,
80:19, 84:7,
142:6, 142:8,
257:10, 343:19
facts
329:15, 401:6
fail
131:1, 264:2,
322:19
failed
85:21, 260:3
failing
88:12, 115:4,
227:14

fails
263:11
failure
175:18, 263:7,
367:16
fairly
80:1, 228:20,
290:14
fall
152:1, 412:3
fallen
105:12, 310:6
falling
359:20
fallout
83:11, 352:13,
352:16
falls
122:5, 314:7,
324:18
false
282:11, 282:12
familiar
162:14, 317:20
families
115:9, 116:20,
203:4, 203:6,
258:13, 266:18,
275:16, 301:8,
303:3, 327:12,
353:10, 359:11,
361:9, 372:15,
412:20, 415:7
family
43:4, 84:17,
85:4, 87:22,
88:19, 113:15,
116:3, 123:7,
165:4, 203:1,
204:6, 204:16,
208:8, 208:13,
211:3, 211:11,
266:4, 277:5,
303:8, 303:11,
316:5, 317:11,
325:21, 328:20,
344:19, 348:15,
394:5, 400:21,

Transcript of Public Hearing
Conducted on February 11, 2020                                          461

| | | | |
|---|---|---|---|
| 404:7, 411:6,<br>411:8, 411:14<br>**family's**<br>303:19, 356:7,<br>358:7<br>**famously**<br>214:5, 378:15<br>**fankhauser**<br>392:2, 392:3<br>**far**<br>48:2, 49:9,<br>74:21, 96:13,<br>109:22, 235:13,<br>266:9, 270:11,<br>300:9, 315:10,<br>351:20, 358:5,<br>380:14, 387:11,<br>420:1<br>**farce**<br>332:20<br>**farewell**<br>282:7<br>**farm**<br>44:2, 163:2,<br>258:12, 258:13,<br>284:11, 284:12,<br>317:11, 356:7,<br>357:12, 358:8,<br>358:19, 359:9,<br>405:1<br>**farmer**<br>306:20, 356:13<br>**farmers**<br>174:2, 211:12,<br>307:3, 356:16,<br>356:20<br>**farming**<br>42:20, 284:8,<br>284:9, 356:21,<br>359:11, 361:9<br>**farmland**<br>307:22<br>**farms**<br>174:6, 356:16<br>**fashion**<br>47:15, 395:9<br>**fast**<br>167:6, 331:6, | 341:8, 392:1<br>**faster**<br>316:16<br>**fatal**<br>263:8<br>**fate**<br>315:8<br>**father**<br>123:7, 266:9,<br>268:3, 283:6,<br>295:2, 315:21,<br>351:5<br>**father's**<br>350:22<br>**fatigued**<br>164:6<br>**fauna**<br>175:2<br>**favor**<br>40:9, 49:6,<br>50:8, 50:15,<br>306:5, 378:7<br>**favorable**<br>220:6<br>**favors**<br>311:3<br>**fax**<br>158:11<br>**fear**<br>125:22, 413:18<br>**feasibility**<br>21:20<br>**feasible**<br>21:15, 81:18,<br>150:9, 263:15,<br>313:10<br>**february**<br>1:12, 29:12,<br>55:13, 157:22,<br>421:16<br>**federally**<br>120:7, 244:14,<br>303:12, 303:14,<br>303:19<br>**federation**<br>113:9, 224:18,<br>225:6, 244:9,<br>340:16, 340:22 | **feds**<br>310:2<br>**fee**<br>242:9, 243:1<br>**feed**<br>307:7, 349:17<br>**feedback**<br>217:18<br>**feeds**<br>312:16<br>**feel**<br>131:11, 135:20,<br>180:12, 285:8,<br>290:11, 353:7<br>**feeling**<br>76:3, 106:13,<br>180:16<br>**fees**<br>242:16<br>**feet**<br>35:16, 110:18,<br>310:4<br>**felipe**<br>248:5, 249:18,<br>249:21<br>**fell**<br>310:9<br>**fellow**<br>70:21, 386:9,<br>386:15, 386:20<br>**felt**<br>326:21<br>**female**<br>283:19<br>**fence**<br>293:20, 293:21,<br>294:15, 349:10<br>**ferret**<br>181:19<br>**few**<br>8:3, 35:16,<br>56:10, 56:15,<br>63:15, 134:2,<br>195:13, 197:21,<br>200:21, 216:15,<br>233:7, 250:7,<br>287:14, 288:2,<br>288:10, 325:20, | 347:10, 357:13,<br>357:19, 358:8,<br>369:9, 370:20,<br>371:19, 378:17,<br>379:1, 383:1,<br>384:16<br>**fewer**<br>19:11, 148:3,<br>260:19<br>**fialca**<br>277:17<br>**fiduciary**<br>353:3<br>**field**<br>38:1, 44:4,<br>116:14, 312:10,<br>358:15, 389:10,<br>417:13<br>**fields**<br>111:4, 357:14,<br>358:16<br>**fifth**<br>43:2, 297:14<br>**fight**<br>276:17, 277:2,<br>342:3<br>**fighting**<br>43:9, 205:4,<br>404:13, 411:4<br>**figueroa**<br>333:19, 333:20<br>**figure**<br>172:12<br>**figured**<br>272:16<br>**fill**<br>136:22<br>**filled**<br>315:14, 339:11<br>**filling**<br>358:8<br>**final**<br>13:9, 16:6,<br>16:10, 19:4,<br>19:10, 21:8,<br>23:20, 29:10,<br>51:20, 141:18,<br>144:17, 144:19, |

Transcript of Public Hearing
Conducted on February 11, 2020                                    462

| | | | |
|---|---|---|---|
| 147:19, 148:2, 150:3, 152:15, 364:10 | 335:12, 378:16, 378:22, 382:1, 405:9 | **fisherman** 88:18 | 357:8 **floor** 86:1, 271:21 |
| **finalize** 93:3, 108:12, 110:11, 365:11 | **firm** 320:8 | **fishing** 100:22, 123:2, 123:20 | **flora** 175:3 **florida** 420:6 |
| **finalized** 323:17 | **firms** 238:4, 396:7 | **fits** 11:15, 140:3 | **flourish** 305:10 |
| **finalizing** 168:5 | **first** 3:3, 4:6, 4:7, 5:8, 8:15, 9:18, | **five** 54:10, 56:6, 56:7, 116:13, | **flow** 76:18 |
| **finally** 28:3, 80:17, 85:20, 156:14, 157:2, 170:6, 170:16, 254:1, 276:8, 278:14, 371:15, 373:12 | 29:11, 45:13, 51:17, 51:18, 65:5, 71:12, 77:8, 78:18, 80:7, 91:3, 122:13, 125:17, 132:19, 133:17, 133:19, 138:10, | 163:13, 202:16, 207:18, 218:16, 219:19, 225:9, 226:21, 236:5, 293:12, 293:13, 299:13, 299:14, 360:16, 376:11, 388:4 | **flowering** 380:8 **flowing** 110:21 **flows** 123:9, 405:20 **flycatcher** 181:21 |
| **financial** 9:22, 138:13, 227:4, 421:10 | 139:21, 140:18, 149:4, 157:21, 158:15, 168:17, 172:3, 194:9, | **fix** 83:18, 83:21, 87:7, 220:15, 345:14 | **focus** 11:22, 22:6, 22:11, 91:17, 115:3, 140:10, |
| **financing** 314:17, 416:6 | 195:14, 211:22, 212:21, 214:9, 219:3, 238:2, | **fixing** 349:8 | 150:19, 151:2, 176:22, 225:9, 229:18, 244:12, |
| **find** 96:5, 131:8, 184:17, 237:14, 274:21, 275:12, 333:2, 390:12, 404:20 | 238:17, 252:6, 261:12, 272:15, 280:3, 286:18, 287:18, 291:2, 294:5, 299:11, | **flag** 333:12, 339:18 **flagrant** 319:13 **flares** 88:6 | 255:5, 261:22, 285:7, 320:18, 322:14, 345:11, 367:13, 373:15, 408:10 |
| **finding** 20:8, 20:13, 148:22, 149:8, 192:19, 270:16 | 325:1, 330:16, 330:18, 333:7, 344:18, 347:17, 362:19, 371:3, | **flawed** 125:15, 168:6, 225:11 | **focusing** 35:3 **fod** 143:17 |
| **finds** 343:7 | 378:20, 389:22, 391:12, 408:11, 413:3 | **flaws** 168:17 | **fog** 163:10 |
| **finely** 110:5 | **firsthand** 95:3, 199:19, | **flex** 364:14 | **fogging** 163:8 |
| **fingers** 204:2 | 268:13, 270:10, 380:3 | **flexibility** 25:4, 27:1, 153:19, 155:13 | **folks** 74:22, 78:21, 107:3, 335:9 |
| **finish** 270:18 | **fish** 89:19, 238:3, | **flood** 225:22 | **follow** 17:18, 43:2, |
| **finished** 135:9 | 238:10, 291:21, 298:9, 308:2, | **flooded** 41:22 | 70:21, 78:1, 111:22, 115:6, |
| **finite** 53:15 | 341:6, 379:8, 402:15 | **flooding** 317:5, 337:12 | 133:20, 146:6, 222:1, 241:15, |
| **finley** 419:12 | **fisheries** 97:15, 97:16 | **floods** 48:18, 121:18, | |
| **fire** 34:17, 335:9, | | | |

Transcript of Public Hearing
Conducted on February 11, 2020

463

403:6
**followed**
39:14, 50:1,
83:18, 122:16,
167:9, 177:5,
184:7, 200:11,
220:20, 240:21,
254:13, 264:9,
309:17, 385:3
**following**
29:20
**fonsi**
383:10, 383:16
**food**
88:19, 178:15,
261:9, 343:5,
359:2, 380:10,
406:14
**footed**
181:19
**footprint**
251:4
**forage**
34:8
**force**
86:11, 116:15,
129:18, 129:21,
130:14, 210:1,
265:2, 343:20
**forces**
298:11, 420:5,
420:7
**fore**
341:9
**forecast**
61:16
**forecasts**
38:6
**foreclosing**
410:3
**forego**
218:15
**foregoing**
421:3
**foreign**
45:3
**foresee**
53:14

**foreseeable**
22:7, 109:19,
150:20
**foreseen**
130:21
**forest**
53:16, 73:2,
75:15, 76:15,
106:2, 106:13,
106:20, 112:9,
131:7, 215:22,
216:2, 216:3,
216:5, 216:7,
216:14, 232:3,
237:1, 244:11,
278:11, 292:11,
297:20, 298:6,
348:6, 372:1,
372:3
**forestalling**
32:11, 256:18
**forestry**
334:2, 334:3,
362:3
**forests**
45:11, 72:4,
206:14, 313:15,
348:11
**foretold**
309:14
**forever**
213:7, 284:3,
314:22
**forfeited**
86:19
**forget**
30:4, 259:8,
284:6, 346:6
**fork**
100:20, 173:22,
174:5, 174:13,
312:12, 313:3,
316:17, 372:5
**form**
99:7, 202:5,
251:22, 300:21,
349:2, 360:15
**formal**
57:17, 249:20,

253:18, 301:19
**formally**
59:14
**formatting**
322:1
**formed**
362:18, 368:2
**former**
51:15, 268:6,
274:15, 307:6
**fort**
56:4, 57:3,
57:4, 57:21,
58:2, 87:14,
87:16, 87:18,
344:19, 345:3
**forth**
9:21, 74:5,
138:11, 225:7,
301:18, 304:12,
374:1, 396:14,
400:2, 410:17
**forties**
345:9
**fortunate**
325:18
**fortunately**
345:10
**fortune**
105:16
**forum**
55:11, 186:5,
354:7
**forums**
168:13, 339:7
**forward**
33:16, 69:15,
70:12, 77:4,
109:6, 109:11,
122:9, 160:18,
161:20, 207:11,
213:9, 233:22,
234:7, 234:12,
237:12, 281:8,
291:9, 293:8,
293:16, 294:1,
301:12, 320:15,
384:19, 393:6,

393:9, 393:21,
395:9, 399:9,
416:2
**fossil**
67:1, 68:7,
68:13, 72:7,
175:16, 176:2,
176:6, 212:7,
313:19, 363:18,
412:6, 416:12
**foster**
10:2, 58:16,
138:14
**fosters**
100:3
**fought**
310:19, 388:5
**fouled**
275:11
**found**
12:16, 13:12,
21:18, 44:16,
141:3, 141:22,
169:2, 175:12,
179:3, 221:9,
222:22, 223:3,
308:5, 385:10,
390:3
**foundation**
9:19, 36:20,
107:7, 187:1,
225:4, 370:15,
406:17
**foundational**
59:15, 65:8,
282:21
**foundations**
343:4
**founder**
245:22
**founders**
343:22
**founding**
62:1, 93:16
**four**
24:6, 39:14,
65:14, 142:2,
153:1, 163:11,

Transcript of Public Hearing
Conducted on February 11, 2020

464

217:14, 226:13,
256:11, 265:1,
295:2, 299:13,
360:4
**four-and**
79:20
**four-and-a**
308:5, 349:13
**four-and-a-half**
13:14, 32:6,
308:10
**fourth**
43:2, 258:14
**fox**
319:2, 377:22
**frack**
352:13
**fracking**
296:2, 309:18,
310:6, 351:18
**fraction**
160:15
**fragile**
43:5, 175:1,
207:5
**fragility**
174:20
**fragmentation**
283:9
**frame**
18:22, 19:2,
73:20, 80:1,
147:14, 170:7,
253:18, 360:17
**frames**
109:17, 253:16,
361:1
**framework**
11:7, 139:20,
199:11, 199:12,
224:19, 251:7,
251:20, 303:3
**frankly**
202:21
**free**
135:20, 183:21,
290:11
**freezing**
110:21

**french**
162:9
**frequency**
118:18, 335:5
**frequent**
239:14, 357:10
**frequently**
365:22
**friends**
75:4, 165:5,
386:9, 404:11,
404:12
**front**
66:4, 78:7,
107:19, 275:9,
342:10, 367:15
**frontiers**
323:18
**frontline**
337:19, 352:7
**frontloading**
301:14
**frustrate**
410:15
**frustrated**
259:2
**frustrating**
35:10
**ftes**
171:16
**fucking**
355:19
**fuel**
67:1, 68:8,
68:13, 175:16,
176:2, 176:6,
212:7, 313:19,
412:6, 416:12
**fuels**
72:7
**fulbright**
334:4
**fulfill**
10:5, 61:14,
114:22, 138:17,
195:2, 222:6,
255:17, 270:13,
271:4

**fulfills**
97:19
**full**
35:17, 69:4,
77:5, 78:3,
83:2, 92:11,
112:4, 132:10,
169:17, 189:3,
205:19, 222:18,
278:18, 280:22,
366:18, 369:13,
371:14
**fullest**
94:16
**fully**
18:12, 129:3,
131:4, 147:2,
179:12, 270:3,
298:13, 352:17
**fulsome**
409:6
**fulton**
70:9, 158:15,
158:16, 158:17
**function**
393:1
**functional**
172:5
**functionally**
190:6
**functioning**
299:6
**functions**
229:6
**fund**
241:17, 407:1,
410:19
**fundamental**
64:8, 71:7,
74:4, 82:16,
114:6, 114:10,
124:22, 168:3,
184:21, 213:10,
226:10, 268:18,
270:2, 329:20
**fundamentally**
20:17, 31:22,
149:11, 217:20,

227:17, 250:18,
339:21, 410:16
**funded**
24:14, 153:9
**funding**
13:21, 24:9,
24:12, 104:16,
131:9, 142:9,
153:4, 153:8,
195:15, 218:5,
253:21, 256:6,
398:4
**funds**
24:15, 153:10,
397:1
**further**
23:8, 26:11,
39:11, 55:5,
69:13, 81:19,
91:15, 112:15,
142:20, 152:3,
155:2, 186:17,
218:8, 241:10,
253:18, 322:22,
409:13
**furthermore**
236:20, 263:12,
410:5
**future**
10:6, 40:12,
55:16, 59:21,
60:5, 60:22,
61:5, 61:9,
61:10, 61:15,
61:16, 77:18,
86:15, 93:6,
97:21, 100:3,
101:16, 101:20,
109:22, 114:1,
114:4, 115:5,
116:17, 127:19,
127:22, 138:19,
159:21, 164:8,
177:10, 177:19,
178:13, 178:15,
180:17, 180:21,
181:16, 181:19,
185:9, 185:18,

Transcript of Public Hearing
Conducted on February 11, 2020

465

187:4, 187:13,
194:18, 198:16,
205:2, 205:8,
247:17, 248:21,
249:14, 257:19,
267:6, 267:11,
267:15, 267:17,
271:5, 271:11,
273:7, 281:14,
284:18, 284:19,
285:22, 303:20,
306:21, 310:18,
315:19, 315:21,
320:1, 329:13,
329:21, 336:8,
341:5, 345:20,
346:19, 347:6,
349:19, 350:2,
357:3, 365:14,
371:10, 375:17,
398:13, 398:18,
399:2, 407:19,
409:14, 411:4

**G**

g-e-d-e-o-n
370:8
g-i-l-c-h-r-i-s-t
314:10
g-i-r-a-r-d
217:1
g-o-r-d-o-n
336:6
g-o-t-t-e-s-m-a-n
74:16
g-r-a
414:12
g-r-a-n-g-e-r
90:2
g-r-e-g
158:17
g-w-e-n
62:7
**gag**
341:19
**gain**
43:12, 282:14
**gale**
51:16

**game**
38:4, 72:14,
88:19, 100:17,
174:9, 303:9,
381:16
**gap**
239:8
**garcia**
127:7
**gardener**
389:16
**gardens**
232:9
**gas**
23:20, 38:4,
45:20, 53:18,
67:6, 68:19,
69:1, 69:6,
69:10, 81:9,
83:7, 88:3,
88:16, 90:5,
90:8, 91:6,
91:22, 92:20,
98:14, 100:19,
102:8, 102:12,
102:15, 103:8,
103:13, 103:15,
104:6, 104:7,
104:13, 104:16,
104:17, 108:3,
108:6, 109:14,
117:21, 124:8,
152:15, 169:10,
174:22, 196:16,
206:13, 209:15,
224:1, 234:20,
241:18, 266:11,
276:5, 280:18,
295:17, 309:19,
310:11, 311:1,
312:14, 316:16,
320:9, 321:13,
362:16, 363:9,
368:12, 410:13
**gases**
67:11, 67:21,
68:1, 169:4,
173:12, 319:19

**gatekeepers**
45:2
**gateway**
327:1
**gather**
123:16, 166:2,
225:3
**gathering**
325:22
**gave**
86:5, 300:14,
391:1
**gdp**
95:8
**geared**
55:4
**gedeon**
370:7, 370:8
**general**
10:2, 79:15,
138:15, 266:2
**generate**
37:5, 80:21,
102:15, 241:16,
352:11, 352:12,
360:13
**generates**
217:12
**generating**
285:17
**generation**
42:20, 43:3,
83:4, 115:1,
163:17, 194:17,
222:6, 258:14,
303:7, 374:4
**generationally**
55:15
**generations**
10:6, 40:12,
43:12, 43:22,
46:17, 54:1,
56:20, 59:21,
86:15, 97:21,
114:1, 114:4,
115:2, 127:20,
127:22, 129:11,
138:19, 162:18,

164:9, 180:17,
180:21, 194:18,
205:2, 222:8,
248:21, 249:14,
271:6, 271:11,
315:19, 329:21,
330:4, 338:14,
341:6, 355:7,
375:17, 387:4,
388:12, 403:17,
411:4, 411:7,
413:17
**genetically**
325:13
**genocide**
127:4, 265:2
**genocides**
58:12
**gentleman**
42:7, 42:8
**gentrification**
401:12
**genuinely**
314:1
**geographically**
22:21, 46:14,
67:16, 151:13,
168:19, 203:22,
233:16, 252:18,
326:10, 409:11
**geography**
206:12
**geologically**
174:19
**geologist**
164:17
**geology**
175:3
**george**
374:12
**geothermal**
92:20, 321:14
**get-go**
313:7
**getting**
47:15, 276:22,
358:5
**ghg**
252:12, 252:14,

Transcript of Public Hearing
Conducted on February 11, 2020

466

385:12
**gibbs**
70:18, 70:19
**gift**
60:15, 83:12,
310:17
**gila**
130:5
**gilchrist**
314:9, 314:10
**girard**
216:22, 217:1
**girls**
400:5, 413:2
**give**
65:6, 88:9,
98:15, 107:9,
147:8, 166:16,
191:5, 195:13,
228:21, 350:18,
365:2, 372:8,
387:18, 388:9,
394:3, 416:16
**given**
16:17, 37:4,
61:3, 70:13,
88:3, 108:4,
145:3, 183:17,
186:9, 189:8,
190:1, 259:14,
263:17, 264:5,
339:7, 340:20,
348:21, 358:20,
367:10, 408:5
**gives**
57:20, 58:1,
82:21, 125:5,
186:6, 226:16,
246:7, 246:16,
329:6, 415:11
**giving**
38:12, 58:5,
117:16, 336:3,
381:16
**glad**
295:11
**glenwood**
316:15

**global**
40:14, 41:9,
169:9, 341:12,
360:5, 409:15
**globally**
68:2, 286:1,
342:19, 409:14
**globeville**
277:6, 401:18
**glorious**
105:13
**go**
5:7, 5:10,
5:13, 9:1,
12:21, 18:8,
30:15, 32:17,
35:17, 45:20,
52:14, 67:8,
69:14, 70:16,
74:9, 84:21,
106:5, 106:15,
106:17, 107:4,
107:19, 109:11,
110:13, 113:5,
133:19, 133:21,
134:2, 136:8,
137:11, 160:9,
162:6, 163:7,
177:10, 180:10,
181:1, 198:17,
200:9, 215:6,
241:9, 267:1,
267:18, 271:18,
271:21, 277:12,
277:21, 282:4,
286:10, 287:17,
287:21, 299:16,
307:17, 320:4,
328:4, 345:6,
361:17, 373:20,
390:2, 401:11,
419:18
**goal**
15:6, 15:9,
15:10, 15:14,
15:18, 18:12,
58:15, 114:21,
143:18, 143:20,

143:22, 144:2,
144:6, 147:1,
190:6, 236:7,
253:15, 360:22
**goals**
9:11, 15:15,
18:3, 18:5,
32:1, 68:9,
69:16, 108:10,
138:2, 144:2,
146:12, 146:14,
194:16, 224:6,
246:21, 313:11,
410:7, 410:8
**god**
106:17
**goes**
86:21, 178:3,
196:10, 259:4,
309:5, 321:17
**going**
4:14, 6:3, 6:7,
6:10, 6:11,
8:15, 8:17,
8:19, 8:22, 9:5,
9:10, 9:13,
12:8, 29:11,
29:13, 35:12,
63:22, 79:4,
108:16, 109:6,
127:16, 131:21,
133:4, 134:21,
137:1, 137:10,
137:11, 137:18,
140:16, 147:8,
158:3, 158:7,
158:9, 197:21,
200:9, 201:11,
207:14, 273:8,
275:18, 276:7,
276:13, 277:1,
277:2, 280:10,
280:19, 285:6,
287:5, 289:2,
289:7, 289:8,
290:3, 290:21,
294:5, 294:10,
310:22, 332:5,

332:8, 333:5,
333:6, 344:15,
345:19, 346:12,
346:15, 346:16,
346:21, 346:22,
347:1, 355:9,
366:14, 386:17,
387:18, 402:16,
402:20
**gold**
284:10, 405:19
**golden**
93:15
**golf**
358:1
**gone**
92:10, 96:12,
180:4, 256:13,
267:10
**good**
30:6, 46:19,
47:7, 47:8,
48:14, 49:20,
50:4, 52:15,
64:13, 70:18,
74:12, 79:7,
79:10, 87:11,
90:1, 92:4,
92:7, 96:20,
97:22, 99:9,
102:2, 105:3,
105:16, 105:17,
107:21, 113:7,
116:10, 119:17,
126:11, 132:14,
164:7, 164:10,
167:11, 167:12,
171:11, 173:19,
177:6, 178:4,
180:11, 181:2,
184:8, 187:18,
197:17, 200:22,
201:2, 202:22,
208:3, 208:5,
211:9, 212:4,
216:22, 227:21,
231:11, 234:16,
241:2, 248:3,

Transcript of Public Hearing
Conducted on February 11, 2020                                    467

248:19, 250:4,
254:14, 261:7,
266:7, 268:1,
275:7, 286:13,
291:10, 294:3,
296:15, 311:6,
317:8, 320:6,
330:6, 336:5,
346:5, 354:20,
359:7, 362:12,
365:17, 369:11,
376:7, 386:6,
392:13, 396:2,
401:13, 406:21,
410:20, 414:11
**goods**
239:15
**gordon**
336:5, 336:6
**gosh**
406:3
**gotten**
34:11, 275:10
**gottesman**
74:12, 74:15,
78:15
**gov**
4:19, 7:13,
9:3, 29:14,
29:15, 29:22,
58:15, 133:9,
158:4, 158:8,
158:12, 289:18,
290:4
**governance**
92:4, 92:7
**government**
34:14, 38:10,
46:6, 46:9,
47:17, 48:10,
49:5, 49:13,
54:22, 57:13,
68:6, 80:6,
81:9, 82:19,
83:1, 83:6,
83:10, 89:2,
89:4, 94:17,
103:22, 111:17,

112:14, 113:2,
114:3, 114:11,
129:22, 130:20,
163:1, 163:6,
163:19, 164:2,
175:12, 175:16,
176:2, 177:17,
179:14, 182:7,
182:11, 186:10,
198:21, 202:5,
227:14, 228:17,
229:13, 231:2,
237:14, 243:12,
246:8, 248:13,
250:12, 268:12,
268:19, 269:2,
269:13, 269:18,
269:22, 270:4,
270:21, 270:22,
295:4, 301:11,
301:13, 302:9,
302:14, 310:14,
311:3, 313:13,
315:22, 336:13,
337:3, 337:4,
337:18, 339:22,
340:1, 353:1,
353:2, 354:21,
355:1, 389:1,
389:14, 389:18,
390:17, 391:1,
396:18, 405:13
**government's**
114:15, 120:21,
130:18, 175:22,
269:21, 271:9,
323:6
**government-to-go-**
**vernment**
54:18, 249:20
**governmental**
228:12, 241:17,
376:16
**governments**
29:5, 29:7,
62:12, 62:20,
64:14, 96:12,
157:15, 157:17,

184:21, 310:1,
310:11, 324:16,
355:11, 387:14
**governmentwide**
14:5, 142:15
**governor**
66:15, 307:6
**governor's**
334:6
**governors**
334:5
**governs**
359:17
**gps**
233:5
**grade**
377:20
**graders**
272:13
**graduate**
202:14, 345:17,
389:2, 389:7
**graduated**
379:4
**grainger**
90:2
**grand**
51:2, 191:7,
191:13, 191:22,
192:10, 193:16,
231:16, 308:20,
338:3
**grandchildren**
43:15, 44:1,
56:7, 128:5,
164:8, 273:4,
316:2, 403:16
**grandfather**
328:16, 329:2,
330:1, 357:16
**grandkids**
329:3
**grandmother**
294:8, 328:18
**grandpa**
389:6, 390:2,
390:5
**grandpas**
386:20

**grandson**
44:4
**grandsons**
43:2
**granger**
90:1
**granite**
123:12
**grant**
33:21
**granted**
98:22, 341:9
**grassroots**
56:4, 87:16,
173:21, 328:10,
342:7
**grateful**
74:19, 339:2,
339:3, 339:5
**gravatt**
414:8, 414:11,
414:12
**grave**
42:17, 113:21,
315:3, 342:21,
417:5
**gravest**
60:18
**graze**
72:13, 303:13,
350:4
**grazed**
303:12
**grazing**
34:4, 34:6,
90:18, 232:6,
348:5, 348:10,
349:21, 350:2,
394:14, 394:15
**great**
13:2, 30:6,
41:18, 50:2,
54:8, 55:9,
70:18, 70:22,
72:1, 82:3,
105:4, 105:18,
107:17, 164:5,
188:5, 282:6,

Transcript of Public Hearing
Conducted on February 11, 2020                              468

327:18, 330:6,
330:20, 338:10,
338:11, 345:7,
346:1, 357:16,
359:12, 379:20,
382:6, 389:3,
389:4, 392:10,
395:3
**greater**
27:1, 27:14,
28:18, 66:11,
68:20, 69:17,
69:22, 118:18,
155:13, 156:4,
156:5, 157:6,
223:21, 227:7,
230:13, 243:11,
301:7, 322:5,
351:12, 351:18,
352:14
**greatest**
253:1, 310:17,
325:5
**greatly**
202:7, 220:7,
244:20, 260:21,
261:4, 360:8,
409:7
**greed**
86:19, 354:16
**greeley**
122:20
**green**
117:3, 192:8,
321:16, 354:14
**greenhouse**
23:20, 45:19,
67:11, 67:21,
68:1, 68:19,
68:22, 69:6,
91:5, 152:15,
169:4, 169:10,
173:12, 319:19,
410:13
**greetings**
281:13, 282:8,
282:10
**greg**
70:8, 158:15,

158:17
**greta**
412:14
**grew**
99:10, 273:14,
283:3, 294:19,
303:14, 348:3,
405:2
**grid**
47:12, 361:20
**gripe**
277:7
**griping**
277:11
**grossly**
229:15
**ground**
75:17, 76:14,
111:7, 118:14,
192:15, 293:18,
294:18, 367:6,
367:14, 394:1
**grounded**
105:1
**grounds**
296:1
**groundwater**
192:17, 193:3
**group**
47:5, 87:16,
97:2, 217:2,
273:10, 278:4,
333:21, 340:22
**groups**
35:5, 50:15,
53:14, 56:4,
109:5, 124:10,
212:17, 228:9,
260:9, 300:21,
341:3, 342:10,
349:3
**grouse**
100:12, 291:15,
292:1
**groves**
316:18, 372:2
**grow**
114:8, 115:11,

177:21, 251:2,
358:17
**growing**
110:4, 273:13,
303:11, 306:13,
306:19, 306:22,
309:12, 360:10,
361:16
**grown**
72:16, 184:14,
277:5, 300:2
**growth**
32:2, 101:14,
235:4, 239:3,
256:15, 257:15,
261:1, 266:7,
266:13, 300:8,
304:19, 307:12,
308:14, 398:20,
399:2
**guarantee**
179:18, 209:3,
220:6
**guaranteed**
336:10
**guarantees**
311:14, 375:19
**guard**
319:2
**guardians**
330:9
**guess**
131:20, 132:7,
238:19, 419:2,
420:12
**guidance**
17:19, 21:16,
22:2, 23:19,
25:9, 121:3,
146:7, 146:8,
150:10, 150:14,
152:14, 154:2,
189:22, 297:2,
301:15, 318:21,
319:3, 365:3,
383:16, 384:3
**guide**
322:13, 357:2

**guided**
189:7
**guidelines**
10:19, 139:10,
198:8, 295:5,
305:6, 376:5
**guides**
188:11
**gulf**
45:17, 123:19
**gun**
176:17, 300:22
**gunnison**
99:11, 99:14,
99:19, 100:11,
101:2, 101:17,
174:14, 181:20,
230:13, 291:14,
291:22, 292:6,
293:5, 296:17,
296:18, 296:20,
297:12, 297:19,
298:4, 298:5,
298:12, 338:8,
372:2
**gut**
107:12, 281:4,
415:18
**guts**
337:17
**gutted**
89:1
**gutting**
56:16, 56:20,
89:14, 201:16
**guy**
345:4
**guys**
123:13, 285:9,
390:19, 420:5,
420:6
**gwen**
62:7

**H**
**h-a-g-g-s-t-r-o-m**
299:18
**h-a-m-b-u-r-g-e-r**
261:9

PLANET DEPOS
888.433.3767 | WWW.PLANETDEPOS.COM

Transcript of Public Hearing
Conducted on February 11, 2020                                   469

h-a-n-s-e-n
33:19
h-a-r-d-e-e
193:22
h-a-r-r-i-n-g-t--
o-n
46:20
h-e-r-s-c-h
418:14
h-i-l-a-r-y
399:13
h-o-l-l-o-r-a-n
36:6
h-o-u-s-t-o-n
113:8
habitat
34:17, 65:3,
72:11, 72:19,
106:6, 183:5,
191:17, 210:20,
230:12, 230:17,
244:13, 244:21,
308:2, 311:20,
312:17, 313:15,
325:10, 325:12,
341:11
habitats
36:11, 181:7,
183:13, 245:13,
282:22, 283:9,
381:9
habitually
61:15
haggstrom
299:15, 299:17,
299:18
hail
358:14
hailed
337:22, 360:5
hailstorm
357:12, 357:15
hailstorms
357:9
half
14:7, 142:4,
142:17, 160:16,
223:5, 251:6,

308:6, 349:14,
374:21
hall
287:18
hallmark
327:6
hallway
5:8, 133:20,
287:18
halt
184:3, 344:2,
374:21
halted
364:9
hamburger
261:7, 261:8
hand
7:20, 8:18,
125:11, 137:7,
282:14, 288:15,
354:21, 361:17,
420:8
hand-in-hand
403:9
handbook
241:15
handed
126:16
handful
91:13, 238:9,
388:4
handing
128:7
handout
416:10
handprints
412:15
hands
391:19
handwritten
233:1
hanging
412:12
hansen
33:17, 33:18
happen
23:12, 47:20,
55:12, 121:9,

126:1, 152:6,
264:15, 275:18,
277:1, 342:1,
345:19, 346:12,
346:21, 347:1,
357:5, 371:9,
392:20
happened
163:16, 193:1,
275:6, 275:22,
358:20, 392:18
happening
75:3, 75:8,
126:20, 275:8,
275:21, 276:18,
279:19, 284:16,
306:10
happens
57:3, 245:5,
275:4, 275:6,
405:12
happy
119:21, 136:6,
177:21, 192:22,
400:11
haps
352:16
hard
4:22, 40:4,
58:21, 93:17,
94:17, 101:13,
124:15, 133:12,
164:22, 180:7,
194:9, 284:13,
298:17, 304:15,
310:19, 348:16,
399:22, 402:22
hardee
193:21
harder
125:15, 180:4,
253:11, 270:14,
323:1, 323:11,
360:15
hardin
342:5, 344:14
hardships
131:13

hardworking
102:17
harm
68:10, 69:17,
113:2, 129:16,
165:18, 183:12,
223:13, 230:19,
230:22, 247:2,
268:17, 268:18,
269:3, 269:7,
270:17, 356:11,
358:11, 381:8,
381:21, 414:2,
414:3, 415:9
harmed
125:8, 226:19
harmful
49:6, 83:15,
163:20, 275:17,
326:17
harming
83:16, 378:8
harmony
10:4, 46:11,
138:17, 271:4
harms
48:14, 168:2,
193:11, 204:4,
230:1, 308:1
harrington
39:15, 46:19,
46:20
hasten
175:19
hate
259:4
haub
334:2
haul
85:8, 330:3
havasu
191:22, 192:9
havasupai
192:1, 192:7,
192:11
hawk
282:6
hay
325:22, 358:15,

Transcript of Public Hearing
Conducted on February 11, 2020                                        470

| | | | |
|---|---|---|---|
| 358:16, 358:17 | 343:2, 343:5, | 415:5, 416:22, | 146:22, 151:16, |
| **hazardous** | 345:22, 346:7, | 420:16, 420:17 | 175:14, 262:11, |
| 352:15, 366:3 | 347:9, 348:11, | **hearing** | 263:7, 279:2, |
| **hazards** | 348:17, 353:4, | 1:10, 2:1, 4:3, | 331:2, 351:9 |
| 204:19 | 354:9, 354:12, | 29:12, 50:13, | **hell** |
| **haze** | 365:20, 365:21, | 55:5, 75:1, | 106:16 |
| 367:6, 369:8 | 366:4, 366:6, | 132:15, 234:20, | **hello** |
| **he'll** | 366:19, 367:8, | 286:15, 291:9, | 55:22, 65:11, |
| 135:2 | 367:13, 369:1, | 292:12, 292:16, | 93:11, 110:15, |
| **head** | 369:20, 370:17, | 315:7, 331:6, | 128:12, 208:2, |
| 51:1, 90:22, | 370:19, 372:14, | 339:10, 396:13, | 245:21, 272:1, |
| 126:14, 217:2 | 373:4, 395:7, | 399:22, 402:20, | 272:4, 303:6, |
| **headed** | 395:9, 406:18, | 408:7, 417:13, | 323:21, 333:19, |
| 294:8 | 415:10, 415:21, | 418:3 | 342:5, 375:10, |
| **headquartered** | 416:5, 416:13 | **hearings** | 399:12, 403:18 |
| 317:13 | **healthcare** | 29:11, 85:9, | **help** |
| **headquarters** | 241:12, 346:9, | 157:21, 247:5, | 24:13, 48:4, |
| 2:5 | 369:3 | 261:18, 272:9, | 49:10, 50:19, |
| **heads** | **healthy** | 279:2, 315:6, | 93:4, 119:3, |
| 122:2, 195:12 | 72:5, 83:14, | 315:13, 318:13, | 171:21, 189:15, |
| **headwaters** | 115:9, 115:13, | 330:19, 331:2, | 210:1, 235:4, |
| 123:15, 297:21 | 116:2, 173:21, | 339:15, 402:18, | 260:21, 273:3, |
| **health** | 177:21, 181:11, | 417:12 | 285:22, 291:7, |
| 40:11, 56:20, | 185:2, 274:3, | **heart** | 301:5, 303:9, |
| 57:5, 62:18, | 313:15, 346:6 | 36:15, 57:6, | 321:19, 322:18, |
| 63:18, 64:4, | **hear** | 182:17, 262:5, | 333:3, 349:5, |
| 65:19, 66:5, | 50:13, 132:3, | 265:22, 333:17 | 365:8, 365:12, |
| 69:18, 73:2, | 188:16, 269:4, | **heartily** | 382:15, 383:5, |
| 82:6, 82:17, | 269:9, 269:13, | 183:20 | 383:6, 383:22, |
| 88:1, 88:21, | 272:2, 272:6, | **heat** | 384:17, 391:7, |
| 113:11, 113:13, | 326:1, 329:7, | 121:20, 259:16 | 398:18 |
| 113:18, 117:1, | 330:1, 400:11, | **heated** | **helped** |
| 117:9, 117:16, | 418:7, 418:18 | 329:1 | 371:19, 372:3, |
| 118:10, 118:15, | **heard** | **heatwaves** | 379:15, 390:11, |
| 121:19, 124:16, | 5:15, 5:22, | 357:8 | 415:6 |
| 163:16, 164:4, | 108:20, 134:4, | **heavier** | **helping** |
| 178:1, 178:2, | 134:11, 167:20, | 357:17 | 39:6, 137:5, |
| 178:18, 178:22, | 247:21, 249:11, | **heavily** | 228:9, 310:8, |
| 179:20, 180:11, | 250:12, 258:17, | 295:16, 394:9 | 323:17, 389:3 |
| 186:1, 186:14, | 267:18, 272:11, | **heavy** | **helps** |
| 187:3, 208:16, | 279:12, 285:11, | 118:4, 180:16 | 47:19, 101:19, |
| 225:2, 227:13, | 314:16, 316:13, | **heels** | 115:20, 115:22, |
| 246:9, 265:11, | 316:17, 318:1, | 323:5 | 126:5, 217:13, |
| 265:13, 267:12, | 328:14, 330:19, | **heirs** | 323:11, 359:19, |
| 283:10, 310:3, | 331:17, 358:3, | 105:13, 105:18 | 376:3, 415:4, |
| 313:22, 321:10, | 375:20, 386:16, | **held** | 415:12, 415:16 |
| 329:21, 330:12, | 390:21, 394:14, | 2:1, 18:10, | **hen** |
| 337:18, 340:18, | 399:15, 402:11, | 23:2, 139:4, | 319:2, 378:1 |

Transcript of Public Hearing
Conducted on February 11, 2020

471

| | | | |
|---|---|---|---|
| **herd**<br>294:20, 420:15<br>**hereby**<br>421:2<br>**heritage**<br>53:7, 105:13<br>**hersch**<br>418:13<br>**hi**<br>36:5, 59:9,<br>170:20, 202:11,<br>211:7, 314:9,<br>328:7, 348:2,<br>370:7, 378:11<br>**hickenlooper**<br>307:6<br>**hidatsa**<br>56:2, 87:13,<br>89:11<br>**hide**<br>169:21<br>**high**<br>27:7, 123:12,<br>155:20, 239:13,<br>257:10, 259:14,<br>281:19, 325:6,<br>340:5, 345:9,<br>345:17, 379:4,<br>404:11<br>**higher**<br>99:2, 104:2,<br>265:22<br>**highest**<br>60:9, 174:7,<br>340:16, 368:8<br>**highlight**<br>172:1, 371:1,<br>376:21, 412:10<br>**highlights**<br>315:15<br>**highly**<br>97:12, 229:9<br>**highway**<br>12:20, 31:1,<br>80:2, 106:3,<br>141:8, 160:8,<br>161:15, 174:9,<br>219:1, 219:7, | 238:11, 238:17,<br>239:21, 246:11,<br>255:19, 298:9<br>**highways**<br>56:12, 82:13,<br>90:18, 161:7,<br>187:5, 219:4,<br>250:22, 321:18,<br>399:1<br>**hike**<br>341:6<br>**hiked**<br>112:8<br>**hiker**<br>111:14, 112:7<br>**hiking**<br>338:6<br>**hilary**<br>399:12<br>**hinder**<br>361:3<br>**hindering**<br>307:15<br>**hinders**<br>374:2<br>**historic**<br>52:18, 53:6,<br>55:1, 60:15,<br>97:7, 127:7,<br>253:5<br>**historical**<br>58:6<br>**historically**<br>298:3<br>**history**<br>54:7, 59:16,<br>75:12, 102:20,<br>183:10, 250:15,<br>309:4, 342:20,<br>343:10, 381:6,<br>387:20, 391:12,<br>393:7<br>**hit**<br>357:12<br>**hold**<br>6:11, 81:8,<br>111:8, 122:8,<br>135:2, 295:10, | 295:19, 340:4,<br>387:5<br>**holder**<br>74:10<br>**holders**<br>174:3, 351:6,<br>353:2<br>**holding**<br>7:8, 23:9,<br>50:12, 135:16,<br>152:4, 234:19,<br>289:8, 354:21,<br>359:14, 385:14,<br>385:16<br>**holds**<br>6:15, 411:1<br>**holistically**<br>252:22<br>**holloman**<br>129:21<br>**holloran**<br>36:5, 36:6,<br>39:13<br>**holt**<br>42:21<br>**holy**<br>283:19, 283:20<br>**home**<br>43:1, 88:22,<br>106:3, 174:5,<br>179:18, 184:16,<br>187:6, 231:21,<br>357:7, 357:13,<br>411:7<br>**homebuilders**<br>396:4, 396:6,<br>397:14<br>**homebuilding**<br>397:7, 397:10<br>**homeland**<br>192:1<br>**homelands**<br>78:7, 295:22<br>**homes**<br>113:16, 121:17,<br>259:17, 388:1<br>**hometown**<br>162:21, 308:22, | 400:8<br>**hometowns**<br>78:10<br>**honestly**<br>334:19<br>**honor**<br>42:7, 105:11,<br>388:13, 411:11<br>**honorable**<br>388:7<br>**honored**<br>370:11<br>**honoring**<br>388:2<br>**hope**<br>61:19, 77:2,<br>77:3, 78:11,<br>86:16, 177:19,<br>210:22, 243:20,<br>247:16, 333:9,<br>333:16, 373:11,<br>386:16, 389:16<br>**hopeful**<br>373:13<br>**hopefully**<br>207:18, 288:17,<br>345:15, 347:8<br>**horizon**<br>49:18, 354:15<br>**horizontal**<br>351:17<br>**horizontally**<br>352:13<br>**horn**<br>72:11, 72:12<br>**horrible**<br>420:10<br>**horrors**<br>404:18<br>**horses**<br>328:18<br>**hospitals**<br>406:8<br>**host**<br>176:3<br>**hotter**<br>175:4<br>**hour**<br>355:5 |

Transcript of Public Hearing
Conducted on February 11, 2020                                   472

| | | | |
|---|---|---|---|
| **hours** | **413:3** | **id** | **404:4** |
| 44:19, 388:13 | **humanity** | 264:13, 264:18 | **illustrated** |
| **house** | 388:22, 389:11, | **idaho** | 46:12 |
| 249:15, 319:2, | 400:15 | 162:12, 162:13, | **illustration** |
| 378:1, 396:14, | **humans** | 162:17, 164:17, | 72:3, 219:2 |
| 400:17, 400:20, | 271:3, 283:21 | 165:1, 165:11 | **imagine** |
| 400:22 | **humbly** | **idea** | 245:5, 245:10, |
| **housekeeping** | 411:13 | 224:21, 378:1 | 280:17 |
| 5:5, 133:16, | **hundred** | **ideas** | **imagined** |
| 287:15 | 31:3, 130:1, | 337:22 | 322:15 |
| **houses** | 279:1, 419:14 | **identified** | **imaging** |
| 419:15 | **hundreds** | 277:21, 379:9 | 338:10 |
| **housing** | 76:1, 281:1, | **identify** | **immediate** |
| 195:19, 255:6, | 315:9, 355:10, | 62:5, 78:18, | 72:2, 73:7, |
| 256:1, 256:8, | 355:11 | 263:4 | 121:5, 252:20 |
| 257:11, 257:12, | **hunt** | **identities** | **immediately** |
| 396:11, 397:12, | 294:22, 341:6 | 127:5 | 129:22 |
| 397:21, 398:15, | **hunter** | **igniting** | **imminent** |
| 398:18, 398:21, | 88:18, 122:21 | 118:17 | 43:11, 85:6, |
| 399:3 | **hunters** | **ignorant** | 321:16 |
| **houston** | 341:1 | 401:5, 401:6 | **impact** |
| 113:7, 113:8 | **hunting** | **ignore** | 10:15, 11:10, |
| **hover** | 88:18, 100:18, | 114:5, 125:4, | 12:3, 12:6, |
| 367:21 | 105:18, 123:1, | 125:10, 183:11, | 12:13, 15:22, |
| **however** | 123:20, 303:9 | 183:15, 196:12, | 20:8, 24:18, |
| 12:16, 23:17, | **hurdle** | 205:18, 223:7, | 25:7, 26:7, |
| 39:4, 40:9, | 364:6 | 226:13, 226:15, | 32:4, 46:7, |
| 86:9, 130:2, | **hurt** | 247:6, 252:15, | 48:20, 51:6, |
| 152:12, 155:17, | 122:12, 361:7, | 313:13, 367:3, | 51:19, 51:21, |
| 158:8, 243:15, | 413:20 | 381:8 | 56:19, 58:19, |
| 251:10, 251:21, | **hurts** | **ignored** | 67:20, 69:7, |
| 252:14, 254:6, | 307:22 | 127:1, 267:1, | 73:22, 79:21, |
| 359:19, 360:14, | **husband** | 319:20 | 85:10, 88:2, |
| 376:14, 398:9, | 42:19, 56:6, | **ignores** | 88:10, 91:8, |
| 399:14, 400:2 | 380:1, 380:11 | 206:15, 271:8, | 106:18, 117:4, |
| **huge** | **hydrogeologist** | 271:10, 319:15 | 126:4, 130:4, |
| 106:19, 172:11, | 164:21 | **ignoring** | 139:6, 140:13, |
| 247:18 | **hydropower** | 48:13, 49:4, | 140:15, 144:11, |
| **human** | 92:20 | 49:12, 49:13, | 148:22, 153:22, |
| 26:22, 36:10, | **hyphenated** | 223:6, 319:21, | 167:20, 172:19, |
| 75:12, 93:21, | 208:4 | 337:9 | 172:20, 180:7, |
| 155:12, 162:10, | **há** | **ii** | 183:8, 186:13, |
| 205:21, 206:12, | 52:19 | 10:18, 139:11, | 191:19, 192:16, |
| 239:13, 342:20, | | 162:16, 173:4, | 193:2, 193:4, |
| 343:10, 369:19, | **I** | 295:3 | 197:12, 200:1, |
| 373:6, 380:6, | **iconic** | **ill** | 210:18, 211:17, |
| 381:13, 386:15, | 60:14, 66:12, | 85:19 | 211:22, 213:1, |
| 388:18, 391:16, | 69:18, 375:16 | **illness** | 228:7, 236:5, |
| | | 266:1, 355:2, | |

Transcript of Public Hearing
Conducted on February 11, 2020                                         473

238:8, 246:18,
254:8, 256:2,
256:7, 256:14,
280:11, 298:19,
305:1, 305:13,
310:1, 310:3,
317:2, 319:20,
322:9, 327:7,
336:16, 340:11,
341:15, 341:21,
352:10, 352:11,
352:16, 355:3,
368:2, 371:7,
377:3, 381:4,
384:12, 409:2
**impacted**
63:12, 76:19,
113:2, 124:4,
174:1, 185:15,
208:21, 209:14,
209:20, 295:17,
388:15, 407:9,
417:14
**impactful**
339:4, 353:6
**impacting**
117:15, 209:2,
218:8, 220:10,
313:22
**impair**
369:19
**impaired**
369:1, 369:9
**impairment**
367:7
**impede**
375:6
**imperfect**
175:7, 176:8
**imperiled**
181:22
**implement**
54:14, 77:10,
194:6, 224:12,
236:18, 305:2
**implementation**
9:6, 33:12,
47:22, 55:16,

64:13, 94:22,
137:19, 182:3,
185:14, 188:4,
224:4, 261:20,
324:5, 353:8,
395:15
**implemented**
10:19, 54:4,
61:12, 89:9,
98:18, 171:1,
229:7, 251:16,
295:4, 393:22
**implementing**
4:5, 10:12,
94:6, 132:17,
164:18, 190:2,
205:19, 243:3,
258:4, 284:17,
286:17, 352:9,
383:21, 399:5,
407:12, 414:20
**implications**
38:12, 48:7,
49:4, 113:22,
225:10
**importance**
159:22, 183:5,
263:2, 314:5,
323:1, 323:10,
374:15, 381:2
**important**
4:14, 27:12,
32:7, 33:1,
42:10, 47:13,
52:1, 63:19,
69:2, 72:14,
72:19, 77:6,
81:6, 81:14,
84:11, 95:17,
96:1, 97:7,
102:19, 104:7,
104:14, 117:13,
120:18, 133:4,
156:3, 183:5,
184:12, 186:20,
186:22, 188:7,
188:18, 190:10,
197:3, 209:3,

209:5, 209:13,
211:19, 218:4,
230:11, 244:13,
245:12, 252:4,
252:21, 253:3,
256:14, 259:22,
260:4, 267:11,
287:4, 312:5,
312:15, 324:10,
324:12, 341:21,
348:13, 359:17,
383:2, 383:11,
384:13, 384:14,
386:1, 397:22,
398:15, 403:3,
407:21, 410:15
**importantly**
185:5, 189:16,
283:22, 321:21,
322:11, 397:2,
411:2
**imports**
176:4
**impose**
71:19, 131:13,
369:20
**imposes**
63:4
**imposing**
73:10, 170:14
**imposition**
170:2, 369:18
**impossible**
304:13, 313:20
**impoverished**
413:6
**impression**
168:10
**improve**
14:21, 28:9,
33:2, 78:4,
92:18, 113:17,
115:18, 143:11,
156:20, 160:2,
160:20, 194:15,
220:7, 223:17,
233:20, 237:14,
240:14, 240:16,

257:11, 293:10,
334:20, 348:16
**improved**
33:10, 50:20,
160:22, 217:21,
235:5, 239:1,
257:15, 360:11,
383:17, 398:22
**improvement**
34:5, 34:17,
218:2, 239:5,
251:14, 323:2
**improvements**
159:4, 159:20,
159:21, 189:9,
218:7, 219:4,
240:6, 257:13,
261:3, 303:21,
321:18, 348:7,
349:5, 375:5
**improving**
47:21, 229:1,
314:1, 321:12,
322:1
**in-depth**
280:17
**in-hand**
361:18
**in-house**
38:11
**inaccessible**
417:14
**inaction**
176:1
**inadequacies**
300:15
**inadequate**
38:20, 120:20,
165:3, 166:10,
239:11, 299:9
**inapplicable**
20:14, 149:8
**inappropriate**
280:3
**incentivize**
91:15
**inch**
44:3, 51:20

Transcript of Public Hearing
Conducted on February 11, 2020

474

inches
357:22
include
13:20, 20:14,
23:10, 24:2,
24:7, 24:19,
25:20, 27:15,
66:7, 80:7,
142:8, 152:5,
152:19, 153:2,
153:14, 154:12,
156:6, 161:9,
170:6, 180:18,
222:12, 225:21,
256:4, 298:6,
326:16, 367:5,
383:3
included
38:5, 64:6,
278:13, 278:14,
312:11
includes
45:21, 51:10,
149:9, 181:18,
368:12
including
9:22, 15:3,
17:1, 21:17,
27:4, 46:13,
53:17, 62:19,
65:15, 72:11,
78:14, 91:14,
92:19, 97:13,
114:19, 118:13,
131:6, 138:13,
143:15, 145:11,
150:11, 155:16,
163:9, 171:16,
174:2, 176:3,
191:17, 206:13,
206:21, 214:13,
223:21, 236:9,
241:21, 242:8,
251:17, 251:19,
262:15, 317:20,
324:15, 362:16,
363:19, 367:19,
368:20, 372:12,

375:2, 379:12,
382:19, 396:18
inclusion
27:15, 156:5,
246:2
inclusive
77:16, 78:13,
247:16, 320:19
inclusivity
322:4
income
300:6
incompatible
69:16
incomplete
11:4, 139:17,
215:14
incomprehensible
339:14
inconsistencies
243:18
inconsistency
241:13
inconsistent
222:17, 366:21
inconvenience
259:22
inconveniences
259:9
incorporated
7:2, 135:12
incorporates
321:8, 323:3
incorporation
322:20
increase
33:9, 48:2,
49:8, 171:9,
218:13, 218:14,
243:5
increased
32:17, 118:3,
121:20, 167:3,
200:22, 238:15,
238:16, 337:12,
341:12, 369:3,
369:4, 381:21
increases
175:6, 263:21,

264:1
increasing
49:1, 64:17,
95:13, 223:2,
301:2, 306:14
increasingly
31:12, 44:16,
380:12
incredible
346:11
incredibly
104:14, 259:12,
259:16, 304:17,
339:4, 348:22
incrementally
252:9, 327:5
indeed
251:15, 336:13,
368:8
independent
234:17
independently
25:11, 154:3
index
204:14, 207:1
indian
198:6, 198:8,
198:9, 198:15,
198:20, 241:4,
241:10, 241:12,
242:9, 243:9,
351:8, 351:10,
352:21
indication
32:19
indigenous
39:21, 42:1,
58:6, 58:8,
265:4, 265:21,
281:15, 283:15,
283:17, 315:7,
354:8, 387:10,
389:21, 403:7,
404:5, 405:20,
411:3, 412:1,
412:8, 412:11,
412:19, 413:2,
417:18

indirect
22:10, 38:19,
39:1, 48:11,
53:20, 64:3,
67:13, 69:22,
71:13, 118:7,
151:1, 169:13,
191:4, 193:4,
193:6, 193:13,
196:1, 222:13,
223:8, 225:20,
229:22, 230:8,
230:15, 244:19,
245:8, 252:7,
255:21, 298:20,
319:14, 367:9,
368:2, 368:20,
371:6, 380:19,
385:11, 398:15,
408:13, 408:14,
408:21
indirectly
230:11, 399:3
individual
91:19, 140:2,
169:14, 186:18,
219:16, 242:9,
279:5, 280:18,
351:5, 351:8,
352:21, 364:21
individually
412:12
individuals
53:12, 113:1,
247:3, 248:13,
277:8, 293:18,
303:3, 304:14,
327:12, 342:1,
396:7, 412:17
indoors
118:21
industrial
56:13, 118:2,
174:21, 257:17,
265:13, 266:21,
341:16, 378:18,
407:16
industrialized
160:12, 281:2

Transcript of Public Hearing
Conducted on February 11, 2020                                    475

**industries**
63:17, 203:17,
266:10, 267:15,
295:9, 309:8,
309:10, 313:1,
406:7, 413:15
**industry**
66:8, 87:5,
90:6, 90:8,
91:21, 92:14,
95:7, 96:4,
102:9, 102:12,
104:7, 117:12,
126:2, 130:11,
159:1, 159:5,
159:13, 161:7,
166:7, 167:1,
167:7, 204:1,
217:11, 256:9,
295:19, 296:4,
296:13, 307:4,
309:4, 309:13,
310:2, 310:6,
311:1, 313:19,
362:16, 397:7,
397:10
**industry's**
313:8
**inefficiencies**
80:5, 80:7
**inefficiency**
375:3
**inefficient**
236:15
**inequality**
413:12
**inequities**
247:14, 266:19
**inequity**
413:12
**inevitable**
241:13
**inevitably**
99:4
**inexpensive**
67:2
**infamous**
219:1

**infant**
265:19
**infected**
126:17, 128:8
**infective**
127:17
**infill**
103:11, 103:13
**inflicted**
121:17
**influence**
13:19, 124:2,
142:7
**influences**
72:1
**influential**
94:22
**influx**
401:20
**inform**
27:17, 80:5,
80:20, 109:3,
110:7, 110:8,
134:8, 156:7,
215:4, 226:3,
252:3, 366:17
**information**
4:21, 7:1,
9:14, 10:17,
11:5, 12:7,
13:7, 14:15,
20:22, 21:2,
21:5, 21:10,
26:6, 26:9,
27:13, 28:4,
28:5, 37:6,
38:21, 58:21,
120:20, 133:11,
135:11, 138:6,
139:8, 139:18,
140:16, 141:16,
149:17, 149:19,
149:22, 150:5,
154:19, 154:22,
156:3, 156:15,
156:16, 169:6,
171:17, 186:20,
189:2, 194:11,

209:6, 212:9,
215:5, 215:12,
215:14, 215:16,
216:10, 221:18,
226:5, 227:7,
245:9, 283:12,
299:2, 301:17,
301:18, 322:18,
323:9, 329:15,
410:16, 415:4,
421:7
**informed**
18:13, 26:11,
36:19, 64:6,
71:22, 94:14,
100:5, 147:2,
155:1, 167:18,
181:18, 186:12,
228:17, 261:14,
263:5, 283:13,
311:17, 329:10,
370:18, 386:4
**informing**
51:12
**informs**
188:10, 213:3
**infrastructure**
13:22, 14:6,
14:8, 14:22,
24:14, 30:9,
30:22, 31:4,
31:13, 32:10,
32:21, 33:5,
47:13, 62:16,
68:7, 77:17,
88:10, 117:22,
119:2, 120:8,
121:18, 142:11,
142:18, 143:12,
153:8, 159:2,
161:11, 173:15,
198:21, 199:9,
199:17, 217:4,
220:14, 220:15,
233:18, 235:16,
237:15, 239:2,
239:4, 246:17,
250:18, 251:1,

254:20, 255:22,
256:12, 256:17,
257:1, 257:5,
257:14, 257:16,
258:7, 259:8,
259:18, 260:5,
260:12, 282:20,
300:9, 300:12,
300:14, 300:16,
306:15, 308:15,
317:3, 337:11,
349:9, 359:18,
359:22, 360:6,
361:4, 362:2,
364:9, 364:14,
373:15, 374:6,
374:7, 374:11,
374:15, 375:5,
376:5, 382:20,
382:21, 393:19,
394:22, 398:12,
398:17, 398:19,
398:22, 399:8,
407:17
**infrastructures**
31:6, 282:1,
413:11
**inhabit**
72:14
**inhabitants**
406:15
**inherent**
300:15
**inherently**
203:22, 344:1,
384:10
**inherit**
117:6, 187:7,
273:19
**inherited**
83:4
**inhibits**
304:8
**inholding**
105:22
**initial**
103:6
**initially**
10:19, 139:10

Transcript of Public Hearing
Conducted on February 11, 2020

476

| | | | |
|---|---|---|---|
| **initiated** | **insight** | 214:18 | **intentional** |
| 301:20 | 112:5 | **insurmountable** | 386:18, 392:16 |
| **initiatives** | **insignificant** | 364:6 | **intentions** |
| 73:18 | 409:17 | **intact** | 387:22 |
| **injection** | **insisting** | 65:9 | **interagency** |
| 162:17, 296:7 | 419:16 | **intangible** | 14:21, 28:9, |
| **injurious** | **inspirational** | 53:8 | 143:11, 156:20 |
| 53:22 | 375:16 | **integration** | **interchange** |
| **injury** | **inspire** | 302:22 | 238:20 |
| 266:17 | 311:10 | **integrities** | **interchanges** |
| **injustice** | **inspiring** | 42:10 | 246:11 |
| 185:17, 249:10, | 75:1 | **integrity** | **interconnected** |
| 413:6 | **installation** | 40:6, 41:7, | 121:9, 319:17 |
| **innovation** | 412:9 | 41:12, 48:21, | **interest** |
| 50:20, 235:5, | **installations** | 214:13, 214:14, | 25:21, 28:21, |
| 308:15, 334:13 | 412:22 | 215:10, 216:19, | 29:1, 36:1, |
| **input** | **instance** | 328:11, 373:3 | 45:6, 46:3, |
| 9:11, 21:6, | 162:15, 405:5 | **intend** | 52:22, 62:15, |
| 57:17, 62:19, | **instances** | 255:9 | 96:7, 105:5, |
| 63:5, 88:20, | 38:17, 39:10, | **intended** | 157:9, 157:11, |
| 101:11, 124:17, | 314:18 | 17:17, 29:4, | 170:18, 182:21, |
| 129:9, 129:15, | **instead** | 108:10, 109:3, | 187:15, 226:22, |
| 138:3, 150:1, | 47:21, 160:10, | 121:12, 146:4, | 227:3, 227:4, |
| 170:16, 178:7, | 167:4, 177:15, | 146:11, 157:14, | 242:2, 249:18, |
| 179:10, 180:1, | 205:4, 213:17, | 194:5, 194:14, | 279:4, 297:13, |
| 186:2, 186:16, | 216:9, 219:15, | 206:1, 236:13, | 315:15, 318:22, |
| 188:8, 201:8, | 236:17, 253:7, | 245:4, 301:6, | 319:12, 352:19, |
| 221:18, 225:3, | 277:11, 310:7, | 304:2, 392:21, | 376:2, 376:22, |
| 270:1, 301:14, | 343:15, 344:6, | 397:3 | 377:1, 377:7, |
| 314:20, 315:6, | 357:7, 381:13 | **intense** | 378:4, 378:7, |
| 322:14, 330:2, | **instigated** | 262:14 | 407:20, 410:9, |
| 335:21, 337:1, | 55:6 | **intensity** | 415:1, 416:8, |
| 339:9, 340:11, | **institute** | 335:4, 408:18 | 416:9, 421:9 |
| 342:17, 350:15, | 90:4, 261:10, | **intent** | **interested** |
| 371:17, 371:18, | 362:14 | 12:22, 13:13, | 17:4, 27:15, |
| 371:22, 372:3, | **instituting** | 15:19, 19:1, | 27:17, 145:14, |
| 372:8, 407:8 | 302:2 | 20:20, 21:6, | 156:5, 156:7, |
| **inquiries** | **institutionalize** | 23:4, 26:5, | 314:1, 320:13 |
| 18:11, 146:22 | 337:4 | 43:10, 91:10, | **interesting** |
| **insect** | **instrumental** | 141:10, 142:2, | 276:14 |
| 178:14, 380:9 | 291:22 | 144:8, 147:15, | **interests** |
| **insecurity** | **insult** | 149:15, 150:1, | 53:13, 89:7, |
| 178:15 | 266:17 | 151:18, 154:18, | 154:13, 280:12, |
| **inserting** | **insulted** | 168:11, 229:3, | 307:3, 322:10, |
| 36:22, 213:19 | 195:8 | 235:14, 297:6, | 407:5 |
| **inside** | **insurance** | 363:22, 366:21 | **interfere** |
| 33:21, 191:22, | 214:20 | **intention** | 317:22 |
| 326:22 | **insure** | 235:7, 401:9 | **intergenerational** |
| | 214:13, 214:16, | | 53:11 |

Transcript of Public Hearing
Conducted on February 11, 2020                                           477

| | | | |
|---|---|---|---|
| **intergovernmental** 342:12, 342:13 **interior** 51:16, 124:6, 158:1, 191:12, 192:14, 192:19, 193:3, 193:5, 351:9 **intern** 406:22 **international** 405:6, 412:8 **internationally** 334:5 **internet** 27:7, 155:20, 259:14 **interpretation** 189:6, 297:1, 297:3 **interpretations** 364:4 **interpreted** 37:20 **interrupt** 6:16, 135:3 **intersected** 35:16 **interstate** 31:1, 239:9, 255:19, 368:11 **interwoven** 53:8 **intimate** 112:5 **intricacies** 387:1, 387:13 **intricately** 53:8 **intrinsically** 53:7 **introduce** 96:6, 329:13 **introducing** 170:17 **introduction** 60:19 **inundated** 309:6 | **invaluable** 305:14, 321:4 **invariably** 320:14 **invasive** 60:12 **invest** 346:20 **investigate** 129:19, 131:4 **investigating** 38:19 **investigation** 278:18 **investigator** 238:6 **investing** 267:16 **investment** 30:12, 33:5, 91:16, 103:20, 257:19, 258:2, 364:10, 364:16, 373:13, 374:10, 375:22, 399:1 **investor** 48:21, 217:3 **investors** 31:14, 47:6, 47:9 **invitation** 44:14, 247:6 **invite** 23:17, 152:12, 169:16, 371:13 **invited** 136:16, 262:18 **involve** 14:14, 75:14, 143:2, 284:6 **involved** 46:15, 51:18, 52:8, 84:12, 84:16, 158:20, 171:7, 187:21, 208:11, 212:12, 219:8, 254:17, 268:10, 356:9, | 386:3, 405:4 **involvement** 24:8, 27:2, 78:2, 87:2, 98:1, 130:16, 153:3, 155:14, 195:16, 195:21, 210:4, 211:20, 253:14, 261:16, 270:9, 336:19, 338:17, 381:10, 398:4 **involving** 20:5, 68:16, 148:19, 307:2 **ipaa** 234:21, 237:12 **ironic** 274:21 **ironically** 360:4 **irrational** 319:11 **irreparable** 85:2 **irreplaceable** 174:16, 332:1 **irresponsible** 183:17, 315:1 **irrevocably** 378:8 **irrigate** 163:2 **irrigated** 163:3, 307:22 **irrigation** 174:12 **irrigator** 84:1 **irrigators** 86:7 **isabel** 127:11 **island** 127:11, 297:17 **isolated** 233:17, 259:16, 325:13, 411:16 | **isolation** 183:7, 381:3 **issuance** 19:1, 147:15 **issue** 13:5, 26:18, 148:21, 155:8, 229:18, 332:21, 385:22, 386:2, 400:13, 404:21, 404:22 **issued** 10:20, 12:9, 12:10, 12:11, 13:11, 14:17, 16:18, 17:19, 96:15, 102:22, 104:11, 139:10, 140:18, 140:19, 140:20, 141:20, 143:7, 145:4, 166:4, 374:13 **issues** 19:21, 34:7, 39:12, 45:22, 52:2, 69:15, 102:10, 148:13, 172:11, 188:9, 246:6, 260:16, 298:22, 317:19, 361:21, 363:19, 383:7, 383:8, 388:14, 392:18, 393:14, 411:21 **issuing** 94:19, 256:4 **items** 5:5, 95:20, 133:17, 287:15 **itself** 45:8, 80:17, 109:7, 176:13, 281:9 |
| | | | **J** |
| | | | **j-a-c-o-b** 110:16 **j-e-a-n** 200:16, 328:8 |

Transcript of Public Hearing
Conducted on February 11, 2020

478

j-e-a-n-n-e
42:16
j-i-l-l
74:15
j-i-m
311:7
j-o
224:16, 272:12
j-o-e-a-n-a
119:20
j-o-e-l
336:6
j-o-h-n
365:18
j-o-h-n-s-t-o-n
39:17
j-u-a-n
126:13
j-u-n-e
39:17
jacob
110:15
january
13:10, 102:22,
120:1, 141:19,
206:1
jason
372:17
jean
200:11, 200:12,
200:15, 328:7
jeanne
39:15, 42:15
jeff
200:6, 418:13
jemez
386:12, 389:17
jen
177:7
jenna
342:5
jennifer
177:4
jeopardize
60:22, 198:5
jeopardizes
198:15, 199:2
jeopardy
55:2

jeremy
330:7
jerk
215:11
jill
74:15
jim
311:7
jo
220:20, 220:21,
224:15, 224:16,
271:20, 271:21,
272:4, 272:12
joanna
200:13
job
1:20, 101:14,
137:5, 177:18,
180:18, 241:22,
345:21, 346:6,
373:5, 373:11
jobs
33:6, 90:20,
99:17, 99:21,
103:20, 217:15,
257:15, 266:7,
266:12, 360:15,
363:16, 373:17,
374:3, 396:9,
398:20
joe
205:14
joeana
119:18
joel
336:6
johanna
261:8
john
254:15, 307:6,
365:18
johnston
39:14, 39:16,
39:17
joined
287:9
joining
5:1, 133:14,

238:1, 312:6
joint
19:18, 20:7,
20:8, 148:10,
148:21, 148:22,
240:11
joke
344:16
jolena
200:11, 202:11
jonah
173:4
jorge
333:19
joseph
274:10, 274:15
jost
320:8, 323:14
journal
204:8
journey
123:16
journeyed
386:8
juan
126:12
judge
199:22
judicial
91:13, 176:11,
176:14, 189:6,
195:9, 229:10,
263:12, 263:20,
364:13
juliana
175:11, 176:16
july
111:5
jumped
274:2
junction
51:2, 231:16
june
12:11, 13:11,
39:14, 39:16,
140:20, 141:20,
378:16
junior
281:17

jurisdiction
72:18, 318:7
justice
55:4, 167:21,
194:1, 198:10,
249:7, 352:1,
354:13, 369:2,
411:5, 411:6,
417:19

K

k-a-s-i-e
348:3
k-a-s-s-i
339:2
k-a-t-h-l-e-e-n
79:11
k-u-r-t-h
128:13
k-u-r-z-e-l
268:2
kasie
348:2
kassi
339:1
kathleen
79:11
katie
79:6
kayaker
122:21
keenly
320:12
keep
5:20, 64:5,
65:8, 118:20,
134:10, 178:4,
214:1, 218:6,
260:3, 288:7,
288:19, 289:13,
306:9, 306:19,
347:5, 395:8,
402:16
keeping
6:11, 134:20,
158:3, 204:21,
316:20, 346:6
kept
339:9

Transcript of Public Hearing
Conducted on February 11, 2020                                    479

**key**
23:8, 97:21,
118:22, 152:3,
193:10, 215:5,
221:6, 229:18,
349:19, 364:5,
370:19
**keys**
420:8
**keystone**
46:2, 356:8
**kid**
180:8, 345:16
**kids**
113:13, 116:13,
177:10, 177:20,
178:16, 179:19,
180:9, 180:20,
390:22, 404:12
**killed**
127:22
**killing**
40:3, 203:17,
204:22, 373:22
**kind**
121:11, 124:12,
205:22, 245:11,
246:19, 259:8,
323:7, 330:16,
345:9, 346:19,
349:15, 350:5,
419:21
**kinds**
36:14, 37:14,
92:1, 201:21,
209:20, 257:14
**king**
284:10, 405:19
**kitchen**
273:18
**knee**
215:11
**knew**
163:20, 194:6
**knocked**
418:20
**knoll**
326:13

**know**
5:19, 6:14,
8:10, 9:18,
9:19, 11:6,
11:7, 44:22,
50:17, 70:7,
76:6, 76:20,
83:10, 88:9,
107:7, 115:7,
117:7, 126:19,
127:10, 127:21,
136:13, 136:17,
138:11, 177:9,
179:21, 181:10,
204:4, 210:17,
221:12, 221:18,
231:8, 245:1,
245:14, 246:16,
255:7, 270:6,
270:10, 272:8,
273:8, 275:20,
288:5, 288:15,
289:10, 303:18,
306:21, 316:5,
331:20, 339:6,
343:17, 346:9,
346:12, 347:18,
347:19, 348:20,
349:21, 355:17,
357:15, 361:16,
383:5, 386:19,
386:22, 387:1,
387:14, 387:15,
387:20, 387:22,
389:8, 390:19,
395:17, 400:14,
402:13, 406:4,
406:5
**knowing**
175:17, 246:14,
283:3, 356:21
**knowledge**
75:8, 76:12,
78:6, 112:5,
212:15, 360:7,
361:11
**knowledgeable**
76:7

**known**
22:2, 56:2,
87:13, 139:3,
150:14, 197:4,
206:19, 214:5,
216:6, 217:7,
265:3, 284:3
**knows**
184:19, 189:17,
269:22
**kurth**
128:12, 128:13
**kurzel**
268:1, 268:2
**kxl**
43:8, 44:2,
45:18
**kxl's**
46:7

### L

**l-a-c-h-e-l-t**
62:7
**l-a-u-r-e-n**
378:12
**l-a-u-r-i-e**
116:11
**l-e**
291:12
**l-e-g-e-r**
173:20
**l-e-s-l-i-e**
308:19
**l-e-w**
122:18, 250:4
**l-o-r-e-n-z**
272:13
**l-u-a-n-a**
403:19
**l-u-c-e-r-o**
254:15
**l-u-n-e-a-u**
96:18
**l-y-l-a**
39:17
**l-y-n-n**
90:2
**la**
62:10, 215:21,

216:14, 419:13
**lab**
345:14
**labarge**
103:11
**labor**
31:16, 50:14
**laboratorio**
333:21, 334:9
**lachelt**
62:6, 62:7
**lack**
131:9, 166:19,
171:16, 171:18,
190:9, 236:20,
237:2, 266:6,
266:7, 300:19,
326:19, 330:21,
411:19, 416:6
**lacked**
250:11
**lacking**
171:17, 215:5,
310:15
**lacks**
393:18
**laid**
270:2
**lake**
358:8, 390:4,
390:9
**lakes**
326:17
**land**
14:2, 25:21,
33:21, 35:12,
35:16, 39:19,
40:17, 43:4,
43:5, 43:6,
43:7, 43:11,
43:17, 44:6,
55:15, 61:9,
71:21, 72:20,
75:16, 76:9,
77:16, 83:7,
85:2, 86:14,
86:16, 89:7,
91:14, 112:10,

Transcript of Public Hearing
Conducted on February 11, 2020

124:2, 124:3,
126:7, 131:6,
131:8, 142:12,
163:2, 166:7,
196:17, 198:13,
198:15, 210:17,
210:21, 211:14,
230:10, 232:6,
236:16, 237:3,
242:6, 243:2,
244:11, 248:8,
248:10, 256:13,
259:19, 274:7,
275:11, 282:2,
291:17, 291:19,
296:4, 297:15,
297:19, 304:9,
312:8, 336:2,
338:11, 342:3,
348:20, 349:5,
349:22, 350:4,
350:16, 351:11,
351:15, 352:2,
366:5, 384:13,
401:14, 411:10,
411:20, 411:22,
419:13
**landholders**
352:22
**landmark**
315:8, 363:20
**landmarks**
196:21
**landowners**
43:9, 86:6,
174:4, 209:14,
211:11, 212:14
**landownership**
108:5, 242:8
**lands**
53:9, 59:17,
59:18, 63:7,
63:21, 68:8,
72:17, 79:15,
82:6, 84:8,
86:12, 92:16,
93:21, 94:10,
99:19, 99:20,

100:4, 101:4,
101:17, 102:6,
102:9, 112:2,
112:6, 112:19,
154:13, 164:20,
165:6, 174:10,
179:8, 182:1,
183:22, 184:16,
187:7, 191:7,
191:11, 198:8,
198:20, 201:21,
221:3, 221:6,
221:9, 221:13,
221:21, 229:11,
241:10, 241:11,
241:12, 242:8,
243:9, 243:10,
244:14, 244:22,
265:6, 278:7,
279:5, 279:7,
279:10, 297:18,
297:19, 297:20,
303:12, 303:14,
303:17, 303:19,
304:16, 304:19,
304:21, 305:3,
309:3, 310:18,
311:17, 311:21,
313:6, 313:17,
320:12, 321:6,
321:13, 322:8,
322:9, 327:14,
328:10, 328:12,
328:14, 332:17,
336:8, 336:17,
341:13, 372:7,
378:9, 381:20,
382:8, 390:19,
404:8, 405:20,
407:15
**landscape**
61:6, 61:10,
75:18, 100:14,
251:3, 291:16,
292:16, 351:12,
351:18, 352:14
**landscapes**
53:22, 69:19,

94:2, 193:16,
207:5, 250:14,
325:7, 334:10,
335:8, 417:2
**landslide**
174:18
**lane**
240:4
**lanes**
239:11
**language**
37:20, 44:11,
46:8, 67:17,
189:8, 224:5,
229:4, 282:16,
292:13, 304:12,
364:5, 387:2,
387:3, 389:10
**laramie**
208:7
**large**
13:22, 103:2,
118:1, 142:10,
195:18, 210:19,
216:17, 228:4,
253:21, 273:11,
278:11, 294:14,
306:9, 307:18,
323:13, 328:20,
376:8, 382:17,
394:11, 419:15
**largely**
14:3, 142:13,
376:9
**larger**
122:7, 252:10,
254:8
**largest**
174:6, 239:10,
252:12, 297:14
**last**
28:13, 32:14,
50:5, 50:17,
69:3, 70:7,
80:3, 89:18,
89:19, 103:2,
118:19, 119:4,
122:14, 140:20,

178:22, 205:11,
205:16, 206:22,
216:12, 223:5,
235:2, 245:3,
250:4, 258:11,
272:14, 276:1,
277:4, 277:16,
277:18, 286:11,
291:12, 300:1,
300:8, 342:12,
344:18, 349:11,
356:17, 357:2,
360:3, 374:9,
392:3, 412:2,
418:2
**lastly**
173:7
**late**
32:15, 197:5,
246:15
**lately**
315:20
**latent**
327:9
**later**
7:12, 73:13,
104:11, 111:1,
196:3, 212:5,
230:2, 234:4,
295:2, 302:17,
379:2
**latino**
354:7
**latinos**
354:8
**laudy**
396:2, 396:3
**laugh**
346:20
**lauren**
378:12
**laurie**
116:11
**law**
17:21, 24:5,
30:16, 31:8,
39:10, 47:19,
50:19, 57:8,

Transcript of Public Hearing
Conducted on February 11, 2020                                        481

57:11, 57:20,
59:15, 64:22,
65:8, 71:8,
86:1, 89:8,
101:10, 101:19,
102:21, 106:12,
106:15, 117:13,
125:5, 125:18,
129:1, 129:6,
146:7, 146:8,
152:22, 165:6,
165:16, 171:13,
176:8, 185:22,
188:11, 193:12,
199:13, 201:4,
201:7, 203:11,
204:7, 204:8,
204:9, 212:20,
213:13, 214:6,
225:8, 226:16,
227:18, 228:19,
235:4, 235:14,
241:19, 246:20,
250:10, 275:12,
276:2, 279:18,
281:5, 295:4,
297:2, 314:5,
320:8, 323:14,
332:4, 334:1,
334:2, 343:15,
343:20, 355:18,
359:17, 359:20,
370:17, 376:11,
385:4, 385:15,
385:17, 385:21,
389:21, 392:13,
415:1, 415:14
**laws**
57:15, 65:5,
65:6, 88:20,
126:8, 175:8,
204:5, 246:7,
253:4, 253:9,
261:21, 282:22,
311:18, 316:1,
344:4, 344:6,
361:10, 379:12,
392:22, 393:1,

405:10, 406:11,
419:21
**lawsuits**
269:14, 279:15,
279:18, 373:21
**lawyer**
188:2
**layer**
31:19, 206:19
**layers**
406:15
**lead**
14:3, 14:15,
15:20, 16:4,
16:10, 18:20,
19:17, 20:2,
66:2, 142:14,
143:5, 144:9,
144:15, 144:18,
147:12, 148:9,
148:16, 167:3,
171:3, 178:11,
178:12, 194:19,
220:2, 221:18,
237:11, 240:11,
252:6, 318:7,
341:11, 381:19
**leader**
56:3, 252:2
**leaders**
47:6, 47:9,
49:11, 64:5,
65:14, 390:12
**leadership**
248:22
**leaderships**
55:7
**leading**
175:4, 299:9,
299:20, 313:12
**leads**
182:14, 236:15,
236:21
**leadville**
128:14
**leaking**
88:6
**leaks**
44:6, 45:15

**leaky**
44:3
**leap**
208:15, 214:6,
214:8, 215:6,
415:17
**leaping**
215:6
**learn**
114:8, 115:11,
115:21, 167:19,
185:2, 389:9
**learned**
212:2, 212:10,
269:1, 387:13,
389:13
**lease**
81:9, 390:13
**leases**
176:6
**leasing**
83:7, 98:14,
124:8
**least**
168:15, 267:9,
270:17, 358:12
**leave**
7:3, 135:12,
136:18, 249:14,
273:16, 284:4,
315:19
**leaves**
54:22, 319:7
**leaving**
8:9, 44:4,
168:10, 300:4
**led**
120:2, 230:8,
413:10
**ledgers**
233:2
**left**
5:7, 6:14,
95:19, 105:18,
106:13, 110:20,
133:19, 134:22,
229:11, 269:12,
280:14, 282:1,

287:17, 294:11,
309:8, 365:4,
387:11, 387:16,
388:4, 390:1,
412:1, 418:8
**legacy**
53:3, 67:1,
366:14, 388:9,
388:21, 413:9
**legal**
120:21, 166:20,
219:19, 229:16,
264:3, 281:6,
362:13, 373:9,
375:22, 406:22,
412:20
**legally**
413:7, 413:21
**leger**
173:19, 173:20
**legislation**
60:2, 69:6,
69:7
**legislative**
23:4, 151:18
**legislators**
251:16
**legislature**
66:14, 69:3
**legitimacy**
377:15
**legitimate**
17:10, 145:19
**legitimizes**
376:12
**length**
12:6, 12:11,
12:19, 13:19,
16:17, 19:10,
73:19, 108:18,
108:21, 140:14,
140:20, 141:6,
142:7, 145:3,
148:2, 219:9,
238:20, 280:7,
349:13, 357:21
**lengths**
164:5

Transcript of Public Hearing
Conducted on February 11, 2020                          482

| | | | |
|---|---|---|---|
| **lengthy** | 99:2, 118:14, | 292:8, 315:18, | 19:13, 27:5, |
| 17:8, 22:22, | 139:21, 143:21, | 316:4, 341:8, | 28:20, 51:5, |
| 67:17, 145:17, | 206:11, 207:1, | 343:6, 343:18, | 78:5, 96:1, |
| 151:14, 168:20, | 266:14, 275:22, | 344:3, 358:14, | 109:16, 120:7, |
| 326:11, 409:12 | 314:3, 317:5, | 359:5, 378:19, | 125:7, 134:10, |
| **leonardo** | 367:6, 367:14, | 379:14, 388:9, | 148:1, 148:5, |
| 335:10 | 393:10, 393:16, | 391:22, 415:7, | 155:17, 157:8, |
| **leslie** | 393:17, 394:1, | 417:3 | 165:17, 226:18, |
| 308:18 | 394:11, 395:16, | **lifeblood** | 248:10, 248:12, |
| **less** | 397:12 | 174:14, 232:14 | 261:16, 289:14, |
| 12:14, 51:20, | **levels** | **lifelong** | 297:8, 298:16, |
| 56:21, 125:1, | 257:10, 319:9, | 380:12 | 298:19, 298:21, |
| 141:1, 161:3, | 364:21, 392:10 | **lifesaver** | 329:12, 344:9, |
| 166:9, 190:5, | **levenbach** | 184:1 | 377:8 |
| 195:8, 204:10, | 4:2, 4:9, | **lifetime** | **limitation** |
| 226:11, 229:13, | 29:15, 132:7, | 68:22, 178:22, | 262:21 |
| 229:14, 231:1, | 132:14, 132:21, | 326:5 | **limitations** |
| 239:16, 310:16, | 286:13, 286:21 | **lifetimes** | 13:21, 25:14, |
| 335:22, 354:15, | **lew** | 326:14 | 71:19, 73:10, |
| 409:20, 411:18, | 122:17, 250:3 | **lift** | 73:16, 73:20, |
| 413:18, 420:1 | **lewis** | 126:19 | 130:15, 154:6 |
| **lessening** | 382:9 | **lifts** | **limited** |
| 63:5 | **liability** | 90:19 | 11:22, 12:14, |
| **lesser** | 44:4, 220:8 | **light** | 18:10, 53:17, |
| 189:20 | **liaison** | 10:12, 117:3, | 140:10, 141:1, |
| **let's** | 255:4 | 139:3, 329:16 | 146:21, 216:11, |
| 107:11, 205:7, | **liberal** | **lightly** | 247:6, 269:9, |
| 245:20, 267:14, | 329:2 | 268:22 | 304:18, 318:16, |
| 277:12, 345:13 | **librarian** | **lights** | 331:6, 384:10, |
| **letter** | 216:12 | 259:5, 259:16 | 417:16 |
| 8:6, 49:15, | **library** | **likelihood** | **limiting** |
| 74:10, 74:11, | 113:16, 216:16 | 192:16, 196:6, | 131:3, 176:15, |
| 120:2, 131:18, | **licensed** | 263:22, 264:1 | 182:18, 182:19, |
| 131:20, 136:9, | 164:17 | **likely** | 222:14, 225:16, |
| 136:11, 200:10, | **lie** | 11:19, 82:14, | 234:4, 263:19, |
| 200:11, 200:12, | 351:20 | 82:15, 140:6, | 263:22, 303:18, |
| 205:16, 271:19, | **lies** | 140:11, 223:6, | 361:14, 409:18, |
| 274:13, 277:16, | 231:21, 329:14, | 223:11, 253:11, | 409:22 |
| 288:12, 288:13, | 351:7 | 253:17, 264:4, | **limits** |
| 288:15, 366:21, | **life** | 299:8, 312:20, | 19:7, 19:8, |
| 369:11 | 33:3, 39:7, | 325:12, 326:4, | 63:2, 63:4, |
| **letting** | 63:18, 66:6, | 342:22, 381:11 | 92:3, 95:11, |
| 89:11, 319:2, | 69:18, 89:15, | **liken** | 98:20, 98:22, |
| 335:9, 377:22 | 104:18, 111:9, | 233:3 | 114:15, 131:1, |
| **levalley** | 164:7, 177:11, | **likewise** | 131:12, 140:22, |
| 291:10, 291:12 | 203:4, 208:12, | 73:15 | 147:21, 147:22, |
| **level** | 211:14, 218:9, | **limit** | 170:3, 170:15, |
| 15:11, 68:20, | 270:14, 283:1, | 5:21, 19:10, | 172:3, 178:6, |

Transcript of Public Hearing
Conducted on February 11, 2020

483

190:4, 191:15,
201:6, 209:11,
210:6, 220:1,
240:12, 248:9,
269:10, 322:12,
398:5
**linchpin**
195:18, 262:9
**line**
23:5, 45:9,
45:15, 151:19,
166:20, 200:2,
390:6
**lineage**
386:11
**lined**
31:14, 379:6
**lines**
66:4, 78:8,
92:17, 226:21,
227:5, 274:2
**link**
294:15, 391:22
**linked**
166:14
**links**
368:5
**lisa**
50:2, 55:22
**list**
74:14, 125:12,
271:18, 277:20,
347:21, 353:16
**listed**
143:6
**listen**
8:13, 114:15,
287:12, 329:4,
344:16, 391:5,
403:14
**listened**
111:6
**listening**
202:12, 286:2
**literally**
86:10, 293:2
**literature**
133:12, 135:15,

165:22, 289:15,
289:19, 289:22
**litigated**
365:9, 393:16
**litigating**
363:19
**litigation**
52:4, 90:17,
167:4, 172:11,
263:22, 279:15,
363:14, 364:2,
369:22, 383:6,
383:8, 392:18,
394:3, 394:13
**litigious**
300:22, 301:22,
302:16
**little**
7:4, 8:4, 8:22,
79:18, 86:16,
98:15, 105:10,
106:15, 135:14,
137:17, 147:8,
160:16, 270:17,
290:10, 294:6,
300:5, 345:4,
392:11, 400:2
**livability**
233:20
**live**
46:11, 56:6,
74:18, 76:21,
86:7, 88:17,
114:8, 116:12,
138:16, 182:1,
185:1, 204:20,
208:7, 208:8,
259:1, 266:14,
277:9, 277:12,
304:18, 308:20,
314:12, 315:12,
326:22, 328:8,
349:16, 349:22,
350:10, 356:6,
378:13, 388:1,
401:17, 411:12,
420:6
**lived**
40:17, 68:2,

272:14, 358:4
**livelihood**
84:18, 208:13,
415:9
**livelihoods**
343:5
**lives**
87:3, 88:12,
88:17, 165:4,
204:6, 204:16,
211:17, 251:2,
315:10, 332:1,
340:18
**livestock**
35:13, 348:18
**living**
205:3, 210:16,
259:7, 300:4,
300:6, 318:17,
324:22, 341:15,
366:13, 378:16
**liz**
113:8
**liza**
208:2, 208:3,
208:6
**lizard**
111:8
**llc**
47:3
**lngs**
126:22, 127:15
**load**
272:22
**lobbyists**
179:6
**local**
24:15, 25:19,
28:17, 29:3,
49:16, 57:14,
62:12, 62:20,
64:5, 64:18,
65:3, 67:22,
72:15, 75:7,
75:15, 76:11,
100:4, 109:11,
117:14, 121:5,
124:2, 129:6,

130:10, 154:11,
157:5, 157:13,
175:10, 180:10,
206:21, 216:12,
228:9, 232:5,
232:11, 260:21,
270:21, 283:2,
296:11, 304:16,
305:10, 305:17,
310:1, 310:8,
310:9, 310:11,
324:13, 342:9,
350:8, 350:14,
352:22, 355:10,
406:6, 412:1,
412:19, 413:20,
415:15
**localities**
17:2, 28:15,
145:12, 157:4,
350:13
**locally**
124:14, 350:10
**located**
7:3, 135:13,
135:19, 287:19,
320:12
**location**
2:1, 76:20
**locations**
27:9, 155:21
**lock**
189:18
**lodge**
317:10
**log**
311:16, 313:5
**logging**
72:22, 100:13
**long**
12:18, 41:16,
42:5, 44:14,
68:1, 75:7,
75:12, 80:4,
90:14, 97:17,
103:9, 103:19,
104:10, 123:16,
141:4, 175:16,

Transcript of Public Hearing
Conducted on February 11, 2020

484

188:3, 201:16,
201:20, 202:3,
204:2, 210:10,
217:2, 218:19,
233:10, 242:17,
243:2, 265:3,
267:16, 270:14,
277:11, 308:7,
327:5, 330:3,
348:19, 356:19,
359:20, 361:8,
363:6, 364:20,
365:5, 387:8,
411:6, 413:9
**long-haul**
92:17
**long-term**
40:14, 72:21,
73:9, 80:20,
317:3
**longer**
12:17, 18:20,
32:5, 32:17,
63:13, 77:9,
80:4, 80:16,
141:4, 147:13,
168:17, 222:1,
236:7, 245:7,
253:11, 283:12,
299:9, 317:1,
326:3, 326:6,
380:21
**longstanding**
21:16, 24:16,
76:11, 150:10,
153:11, 249:16
**look**
5:9, 23:3,
33:16, 41:1,
53:6, 58:21,
61:4, 94:18,
109:22, 124:15,
136:6, 151:17,
159:19, 161:20,
164:2, 190:9,
194:9, 204:6,
208:15, 210:2,
214:6, 214:7,

250:15, 282:17,
285:15, 291:8,
292:17, 298:17,
355:18, 371:11,
388:15, 388:16,
388:17, 405:15,
415:17
**looked**
216:8, 358:1
**looking**
30:14, 79:1,
169:19, 183:6,
222:18, 240:20,
252:22, 254:12,
264:9, 269:6,
269:19, 271:15,
345:4, 381:2
**looks**
101:4, 264:14,
282:12, 288:8,
371:8
**loopholes**
37:5, 125:3,
226:13, 226:14,
279:9, 312:22
**loosening**
207:3
**lorenz**
271:20, 272:1,
272:4, 272:12
**lose**
57:2, 57:9,
113:3, 350:1
**losers**
270:15
**losing**
279:18
**loss**
45:11, 103:20,
104:3, 183:4,
283:10, 325:11,
369:3
**losses**
48:17, 48:19
**lost**
187:8, 264:14,
294:20, 404:13
**lot**
30:22, 105:16,

112:7, 127:13,
128:9, 162:22,
163:4, 201:19,
259:13, 284:12,
284:14, 295:9,
295:10, 295:21,
296:1, 314:16,
315:20, 330:17,
330:19, 332:11,
389:19, 399:15,
400:1
**lots**
316:13, 418:22
**loud**
118:3
**louis**
202:14, 203:2
**louisiana**
123:5
**love**
86:18, 126:7,
185:13, 274:7,
303:15, 380:1,
411:10
**lover**
111:14
**loves**
180:9, 334:16
**low**
92:19, 192:17,
258:18, 265:18
**low-income**
166:16, 167:21,
203:12, 283:11
**lower**
44:7, 72:12
**luana**
403:18
**lucero**
254:14, 254:15
**lucky**
74:11
**luneau**
93:11, 93:13,
96:18
**lung**
203:7
**lungs**
163:21, 178:21

**luxury**
106:3
**lyla**
39:14, 39:16
**lynn**
90:2
**lynx**
181:22

**M**

**m-a-n-c-i-a-s**
126:13
**m-a-r-i-o**
351:3
**m-a-t-h-i-e-u**
162:9
**m-a-t-t-h-e-w**
414:12
**m-c-c-a-i-n**
378:12
**m-i-d-d-l-e-t-o-n**
119:20
**m-i-l-l-e-t-t**
208:5
**m-o-l**
278:2
**m-o-r-t-i-m-e-r**
30:8
**m-o-w-r-y**
320:7
**made**
31:16, 34:12,
38:7, 64:5,
64:9, 71:8,
74:2, 105:8,
112:2, 159:12,
159:13, 161:1,
179:16, 197:4,
219:16, 228:12,
235:13, 266:8,
332:20, 338:4,
357:17, 364:11,
370:18, 379:20,
400:12
**magazine**
360:5
**maggie**
177:5, 181:1

Transcript of Public Hearing
Conducted on February 11, 2020

485

magna
120:13, 407:3
magnifying
67:3
magnitude
280:11
mail
158:11, 294:10
main
57:20
maintain
10:3, 46:10,
138:15, 245:13,
257:11, 271:2,
374:8
maintaining
38:13, 349:9,
373:3, 413:11
maintenance
32:9, 161:12,
256:16, 259:13,
349:8
major
24:1, 50:18,
51:14, 56:11,
66:7, 69:14,
90:14, 95:22,
114:12, 116:21,
124:16, 125:17,
129:7, 152:18,
168:16, 170:10,
172:8, 172:13,
186:2, 187:19,
190:10, 191:19,
198:12, 224:22,
225:10, 235:2,
250:13, 255:15,
282:20, 284:9,
297:9, 298:4,
320:1, 323:2,
339:17, 364:13,
371:20, 392:15,
407:16, 408:15,
410:11, 415:22
majority
9:12, 35:14,
138:4, 175:14,
261:13, 315:11,

415:22
make
5:7, 5:11,
17:17, 19:6,
23:5, 23:9,
38:22, 39:3,
49:3, 51:4,
62:15, 63:7,
63:19, 68:6,
71:21, 84:9,
87:4, 98:11,
115:17, 117:2,
125:14, 127:3,
131:17, 133:19,
134:7, 134:19,
146:4, 147:20,
151:19, 152:4,
170:12, 187:9,
191:3, 194:11,
195:5, 195:7,
195:14, 205:13,
209:5, 209:9,
211:16, 212:11,
214:18, 215:1,
241:7, 253:11,
254:4, 260:16,
263:5, 267:17,
268:14, 268:15,
270:14, 280:4,
282:16, 287:18,
287:22, 288:20,
296:12, 299:13,
313:19, 316:16,
324:20, 327:15,
328:14, 329:10,
331:14, 331:16,
333:3, 335:18,
340:6, 343:12,
344:15, 345:15,
347:22, 353:5,
361:19, 384:1,
386:3, 399:14,
401:2, 402:11,
403:4, 403:5,
415:5, 416:14,
416:21, 419:17,
420:9
makers
21:9, 51:12,

72:21, 73:7,
84:6, 109:4,
110:7, 150:4,
184:20, 188:21,
205:1, 376:4
makes
112:13, 182:9,
201:22, 235:10,
264:3, 269:21,
272:8, 304:13,
348:22, 383:17
making
10:11, 21:3,
25:9, 26:11,
36:18, 38:1,
44:15, 47:18,
49:2, 52:2,
52:9, 55:8,
70:4, 80:6,
80:20, 82:21,
88:13, 94:15,
97:22, 100:6,
101:7, 111:17,
114:5, 123:16,
124:13, 125:6,
129:14, 139:1,
139:9, 149:20,
155:2, 159:20,
167:18, 174:18,
181:11, 181:18,
182:7, 186:6,
188:6, 189:4,
194:15, 194:16,
194:22, 205:8,
209:13, 213:17,
221:19, 222:4,
226:17, 228:18,
237:7, 243:5,
244:19, 255:15,
261:15, 263:1,
263:21, 268:9,
268:10, 269:21,
283:8, 297:5,
301:1, 313:2,
323:1, 323:10,
324:8, 329:18,
336:11, 337:5,
338:17, 346:11,

358:18, 360:15,
366:17, 370:18,
376:15, 376:17,
381:15, 408:10,
410:3
mall
412:9
mammals
341:11
man
10:3, 46:10,
126:14, 138:16
manage
232:3, 303:9,
305:8
manageable
18:12, 23:4,
147:1, 151:18
managed
15:16, 59:19,
97:12, 144:4,
221:14, 244:14,
279:7, 303:12,
303:14, 303:19,
304:22, 351:10,
406:9
management
14:2, 15:16,
36:19, 36:20,
36:21, 61:18,
63:20, 72:20,
75:16, 76:9,
77:17, 100:6,
100:15, 112:10,
131:6, 131:8,
142:13, 144:4,
189:5, 189:11,
223:22, 230:10,
237:3, 241:19,
244:10, 244:11,
245:2, 245:6,
256:13, 278:12,
279:10, 304:4,
304:10, 312:8,
312:9, 346:10,
351:15
management's
352:2

Transcript of Public Hearing
Conducted on February 11, 2020

486

manager
59:11, 93:13,
189:4, 217:3,
372:18
managers
38:22, 71:22,
236:16
managing
97:6, 312:14,
348:20
mancias
126:11, 126:12,
126:13
mandan
56:1, 87:13,
89:11
mandate
60:9, 61:14,
194:6, 195:3,
208:19
mandated
54:19, 311:13,
346:4
mandates
53:4, 84:12,
94:14
mandating
241:14
mandatory
19:7, 147:21
manifestation
338:3
manner
10:1, 27:16,
59:19, 90:10,
138:14, 156:7,
218:8, 224:13,
242:5, 260:2,
260:13, 363:2,
376:7
mansion
106:3
manti
215:21, 216:14
manufacturing
362:4
many
14:13, 17:8,

29:9, 34:5,
34:18, 35:22,
36:13, 38:17,
39:10, 40:20,
41:16, 48:6,
65:20, 66:10,
84:16, 84:17,
89:5, 91:1,
100:8, 101:2,
110:19, 119:22,
129:12, 138:10,
145:16, 159:12,
162:18, 166:18,
171:21, 172:9,
183:2, 184:14,
186:4, 189:14,
191:16, 198:12,
208:11, 209:8,
209:21, 221:12,
230:4, 232:5,
247:14, 250:16,
251:15, 251:19,
256:6, 265:15,
266:14, 272:7,
272:10, 281:21,
284:8, 287:8,
290:9, 315:22,
318:15, 319:7,
319:8, 320:2,
320:21, 325:19,
330:4, 338:2,
343:9, 361:18,
362:16, 367:1,
370:13, 371:15,
380:22, 382:13,
387:2, 387:3,
390:10, 392:15,
392:17, 393:4,
393:6, 393:19,
394:18, 399:16,
408:9, 415:13,
416:20, 417:14
map
251:1
mapping
233:6
march
7:13, 29:21,

206:22
margaret
181:3
marginal
189:2
marginalize
416:7
marginalized
82:17, 400:14,
409:16, 413:6
marine
295:3, 341:11
mario
351:2
marisa
177:5, 184:6,
184:9
mark
83:18, 83:21,
251:8, 275:15
market
48:21, 80:15,
104:3, 334:7,
398:15
marketplace
159:8, 364:8
marquee
324:21
marveling
338:7
mary
4:11, 132:22,
214:4, 220:20,
220:21, 224:15,
271:20, 271:21,
272:1, 272:4,
272:12, 287:1,
311:7
mask
371:14
masks
169:16
mass
297:15
massive
60:10, 199:8,
259:6, 275:22,
373:15

master
124:7
match
166:12
material
4:22, 174:18,
227:8, 366:4
materialize
85:22
materials
246:13, 289:16,
414:2
mathematics
281:21
mathieu
162:1, 162:2,
162:5, 162:7,
162:8
matt
36:5, 99:10,
217:1
matter
44:12, 185:8,
245:4, 275:21,
297:13, 367:7,
369:8
matters
68:2, 208:20,
212:4, 212:5,
261:11, 263:2,
273:12, 345:20,
375:22
matthew
414:12
maybe
78:17, 107:16,
203:9, 203:11,
277:10, 388:4
mayors
255:1
mccain
378:11, 378:12
mccostlin
1:22, 421:2,
421:15
mcmullen
245:22
meal
335:10, 335:12

Transcript of Public Hearing
Conducted on February 11, 2020                                    487

mean
77:12, 136:20,
214:18, 227:14,
259:16, 388:7,
420:4
meaning
47:1, 85:6,
149:3, 214:19,
223:15
meaningful
168:12, 170:13,
210:12, 217:18,
260:16, 360:3,
361:5, 408:1
meaningfully
63:6, 75:6,
209:1, 337:15
meanings
302:11
means
9:22, 46:9,
52:20, 77:13,
104:19, 104:22,
138:12, 172:13,
177:21, 194:4,
262:17, 271:1,
283:4, 318:13,
327:8, 414:4,
419:3
meant
220:11, 236:14,
341:19, 388:8,
391:16
measurable
325:3
measure
92:7, 160:11
measured
18:22, 19:3,
147:14, 147:17
measures
9:22, 26:1,
69:9, 92:4,
138:12, 224:1,
251:17, 271:2,
383:15
measuring
160:6, 160:10

mechanism
97:18, 100:1,
208:21
media
27:4, 155:17
median
13:15, 142:3
medieval
335:5
meet
11:10, 27:3,
117:11, 155:15,
227:14, 302:22,
307:10, 307:13
meeting
90:9, 224:5,
419:3, 419:5
meetings
219:8, 318:13
meets
24:2, 152:19
melting
118:15
member
47:4, 56:1,
70:22, 84:3,
87:12, 87:15,
90:6, 158:20,
162:12, 217:5,
255:10, 317:12,
350:22, 359:10,
363:1, 375:12,
396:7
members
17:4, 47:14,
93:15, 97:3,
102:13, 108:2,
120:3, 124:5,
145:14, 181:13,
212:8, 213:21,
217:9, 221:11,
225:3, 241:21,
255:11, 294:21,
295:15, 311:22,
313:14, 355:11,
373:5, 375:7,
375:14, 398:11,
404:7, 414:17,

416:20
membership
396:6
membrane
345:5
memories
111:9
memory
54:6
men
102:17, 396:7,
413:14
mental
178:2, 180:11,
266:1
mention
5:4, 133:16,
263:11, 287:14
mentioned
38:15, 200:22,
229:19, 258:18,
404:8
merciless
402:6
mere
261:18
merely
48:1
merits
262:7
merriam-webster
214:17
mesa
231:18, 231:21,
338:10
messy
202:2, 344:1
met
399:19, 405:13,
406:1
methane
67:6, 68:22,
69:10, 88:6,
317:20
method
29:22, 80:13,
158:6
methodological
37:1

methodologies
247:9
methodology
37:12, 214:8
methods
27:11, 156:1,
414:1
metro
367:14
metropolitan
147:4, 151:21
mexicana
82:4
mexico
123:19, 129:21,
248:6, 281:14,
294:4, 351:4,
351:8, 386:8,
399:20, 400:6,
402:20
michael
5:2, 220:20,
220:21, 227:22,
231:6, 287:10,
289:7, 335:10
michigan
123:4
microclimates
75:21
microphone
289:4
middle
106:8, 343:16
middleton
119:15, 119:17,
119:18, 119:20
might
46:6, 183:20,
193:1, 200:22,
215:6, 215:12,
254:4, 272:15,
312:4, 333:16,
334:15, 358:12,
417:4, 418:14
migrant
412:11
migrate
72:12

Transcript of Public Hearing
Conducted on February 11, 2020

488

migrating
380:7
migration
419:18, 420:3,
420:14
mike
418:6
mile
123:8, 123:14,
126:1, 239:8
miles
83:22, 84:22,
100:14, 130:2,
216:15, 219:1,
231:22, 232:1,
297:16, 355:5,
357:14, 378:17
millard
410:21
millett
208:2, 208:7
million
104:10, 181:12,
191:14, 217:14,
219:12, 219:13,
219:18, 221:11,
232:3, 255:11,
285:6, 300:7,
324:8, 341:1,
343:7, 375:14,
414:16, 419:4
millions
44:8, 186:9,
233:21, 242:16,
315:10, 358:10,
373:17, 406:8,
417:14
mind
233:4, 316:14,
356:4
minded
246:3
mindful
134:1, 290:15
minds
329:5
mine
83:16, 85:9,

85:14, 85:20,
85:22, 86:4,
86:5, 86:13,
88:13, 117:20,
165:8, 169:3,
191:18, 196:7,
266:18, 284:10,
304:18, 310:10,
311:16, 313:6,
405:19, 420:16
mined
192:10
miner's
276:11
mineral
232:7, 242:20,
382:21
minerals
53:17, 53:18
mines
68:17, 165:1,
165:9, 165:12,
165:15, 191:20,
265:16
minimal
24:8, 153:3,
195:15, 195:21,
398:4, 417:12
minimis
254:6
minimize
173:14, 368:16
minimizing
101:11
minimum
168:12
mining
50:7, 50:15,
50:21, 73:1,
165:18, 187:20,
191:9, 191:10,
191:12, 191:15,
191:16, 192:20,
266:10, 266:11,
309:7
mining's
192:14
minor
35:8

minorities
82:17
minority
167:22, 203:13
minute
6:12, 134:22,
135:1, 289:9,
289:14, 355:21,
420:12
minutes
5:20, 44:18,
131:22, 134:9,
135:8, 180:4,
207:18, 229:15,
288:6, 288:7,
288:10, 288:19,
315:14, 339:12,
388:9, 408:5
miraculous
264:15
misconceptions
91:2
miscounted
327:22
misguided
122:11, 417:8
mispronounced
277:18
mispronunciation
70:10
missing
412:10, 412:13,
413:1
mission
60:19, 62:1,
97:19, 116:15,
211:15, 221:5,
221:7, 249:4,
270:13, 311:9,
315:18, 328:11
missions
172:16
mississippi
123:18
missouri
123:18
mistakes
34:12, 415:13

misuse
172:17
misused
359:21
mitigate
63:21, 66:18,
173:14, 210:1,
315:1, 342:7,
347:7, 395:1
mitigated
377:1, 383:10,
383:16
mitigation
165:4, 219:16,
223:22, 239:1,
283:13, 368:21,
383:15, 407:8
mixed
68:2
mobile
306:13
model
15:5, 166:2,
166:11
modeled
204:9
modeling
368:8
modern
17:21, 27:11,
146:9, 156:1,
201:1, 260:3,
305:2, 323:4,
340:9, 393:20,
399:4
modernity
323:19
modernization
47:12, 50:19,
220:5, 234:1,
235:3, 235:19,
258:22, 340:8,
392:20, 393:18,
393:19, 395:13
modernizations
305:20
modernize
9:9, 15:2,

Transcript of Public Hearing
Conducted on February 11, 2020                    489

17:14, 18:15,
30:14, 31:4,
31:8, 51:3,
96:10, 137:22,
143:14, 146:1,
146:19, 147:7,
195:4, 224:8,
231:14, 231:20,
232:22, 240:10,
256:21, 258:4,
343:14, 361:22,
363:6, 382:13,
393:8, 396:15,
418:18
**modernized**
33:1, 306:5
**modernizing**
30:21, 31:6,
220:13, 276:6,
276:7, 322:1,
361:13
**modicum**
190:12
**modifications**
71:6, 71:18,
235:13
**modify**
79:18, 170:9
**molvar**
277:22, 278:1
**mom**
116:13, 177:13,
177:17, 325:17,
403:2
**moment**
91:3, 251:9,
334:21, 334:22
**moms**
116:14, 177:8,
179:5, 179:18,
265:1
**money**
35:15, 89:20,
228:13, 248:11,
248:14, 317:6,
333:3, 389:1,
405:11, 405:16
**monitoring**
35:1, 69:12

**montana**
84:1, 84:2,
86:18, 162:21,
317:10, 317:14,
318:15, 356:7,
357:10, 402:19
**montana's**
85:12
**montana-wyoming**
84:21
**month**
205:16
**monthly**
294:9
**months**
16:1, 16:6,
16:14, 72:6,
72:13, 144:11,
144:17, 144:22,
166:9, 202:16,
379:1
**monumental**
168:8
**monuments**
196:21
**moral**
106:14, 404:22
**moreover**
59:18
**morgan**
167:9, 167:11,
167:12
**morning**
30:6, 50:4,
52:15, 70:18,
74:12, 74:13,
77:8, 79:7,
79:10, 87:11,
90:1, 90:11,
93:7, 96:20,
99:9, 102:2,
105:3, 107:21,
110:17, 113:7,
119:17, 126:11,
136:12, 136:22,
274:1, 330:19,
345:3
**morph**
190:7

**morphed**
188:15
**mortimer**
30:3, 30:6,
30:7
**mosquitoes**
162:22
**mosquitos**
163:4
**most**
9:18, 12:16,
17:6, 36:12,
61:16, 78:12,
91:18, 97:6,
101:10, 105:13,
108:5, 112:18,
119:7, 120:22,
122:22, 125:8,
141:3, 145:14,
174:9, 174:18,
184:11, 185:5,
185:15, 189:16,
203:3, 203:5,
204:6, 204:15,
206:4, 208:21,
209:3, 224:6,
226:19, 246:18,
248:12, 252:4,
252:5, 252:13,
261:21, 267:1,
283:22, 288:8,
302:18, 305:15,
318:19, 319:15,
324:4, 324:9,
325:12, 326:4,
327:2, 340:17,
342:15, 358:16,
365:1, 365:8,
372:12, 375:15,
381:11, 397:13,
409:13, 411:2,
413:13
**mostly**
203:12, 231:17
**mothballed**
31:17
**mother**
40:3, 40:7,

58:9, 58:10,
58:12, 265:1,
266:8, 273:14,
273:16, 283:5,
350:21, 351:5,
403:22, 411:2,
411:3
**motion**
227:15
**motivated**
374:2
**motivation**
331:13, 374:1
**motivations**
99:4
**motor**
158:18
**mountain**
93:17, 95:2,
110:21, 180:9,
232:7, 250:22,
259:13, 320:10,
324:1, 324:7,
324:20, 325:9,
326:15, 326:18,
338:7
**mountains**
82:2, 112:1,
303:15, 308:21
**mounting**
49:1
**mouths**
412:15
**move**
31:9, 33:1,
77:4, 107:4,
107:19, 108:20,
191:20, 207:10,
233:22, 234:7,
234:12, 293:8,
294:1, 301:12,
323:17, 352:9,
411:10, 416:1
**moved**
202:16, 203:2,
266:4, 300:7,
400:20
**movement**
110:4, 239:15,

Transcript of Public Hearing
Conducted on February 11, 2020

240:9
**movements**
247:17
**moves**
192:3
**moving**
33:16, 84:19,
109:2, 293:15,
308:8, 393:21,
395:9, 399:8
**mowry**
320:6, 320:7
**moxa**
103:10
**much**
6:14, 17:21,
35:20, 42:10,
42:13, 42:14,
70:5, 78:13,
81:19, 92:13,
93:6, 99:14,
103:20, 115:14,
125:15, 125:19,
137:6, 146:8,
200:14, 204:1,
207:13, 207:22,
218:2, 234:22,
240:18, 245:18,
245:19, 248:15,
274:14, 277:14,
289:10, 294:2,
296:14, 300:11,
304:7, 318:10,
319:3, 319:4,
323:19, 328:20,
335:16, 344:1,
347:11, 365:14,
372:15, 379:21,
382:3, 390:18,
391:19, 405:4,
416:2
**mule**
72:11
**multi**
156:22
**multi-agency**
28:12
**multi-decade**
335:3

**multi-generation-
al**
33:19, 394:5
**multiple**
20:6, 62:19,
68:11, 69:5,
69:9, 76:1,
148:20, 263:4,
322:21
**municipal**
379:11
**municipalities**
307:4
**murdered**
412:10, 413:1
**murdoch**
323:21, 323:22
**must**
15:9, 15:11,
18:11, 19:11,
21:9, 21:19,
23:3, 29:21,
42:9, 43:21,
45:10, 45:22,
52:8, 53:4,
55:13, 81:15,
81:17, 83:15,
84:13, 86:14,
86:20, 95:15,
105:14, 114:7,
114:12, 122:8,
143:18, 143:20,
146:22, 148:2,
150:4, 151:17,
168:6, 168:12,
182:11, 189:4,
197:12, 198:16,
198:22, 201:7,
201:17, 225:1,
249:13, 252:8,
255:17, 263:14,
282:15, 318:3,
353:4, 366:22,
409:20, 417:9
**mute**
112:22
**myriad**
131:4, 397:7,

397:10
**myself**
75:14, 111:8,
163:9, 344:20,
395:20, 401:4,
411:12

**N**

**n-a-d-a**
221:2
**n-e-g-u-s-e**
205:14
**n-e-i-l-l**
244:8
**n-i-e-l-s**
33:19
**n-o-r-r-i-s**
362:13
**nada**
220:19, 221:1
**named**
419:12
**nar**
256:20
**nar's**
257:8
**narrative**
413:1
**narrow**
170:11, 269:18,
298:15
**narrowed**
172:8
**narrowing**
222:15, 319:10
**narrowly**
196:14, 230:3,
269:11
**narrows**
62:21, 225:14
**nasa**
335:2
**natasha**
173:20, 177:3
**nation**
39:18, 41:3,
41:5, 42:2,
45:13, 56:2,

87:14, 105:15,
105:19, 107:5,
107:12, 114:3,
114:21, 124:12,
126:21, 160:14,
164:20, 249:10,
265:5, 265:12,
267:20, 281:13,
282:6, 282:8,
282:10, 283:17,
284:10, 285:10,
285:12, 285:14,
285:15, 294:5,
299:21, 330:4,
351:7, 351:21,
375:4, 387:9,
388:3
**nation's**
82:6, 90:9,
95:8, 161:7,
181:17, 217:10,
220:14, 220:15,
248:17, 310:17,
374:8, 375:15,
391:12, 407:5
**nation-to-nation**
55:14
**nationally**
93:15, 412:22
**nations**
39:22, 54:18,
54:22, 55:6,
55:13, 89:4,
160:13, 386:10,
386:12, 386:14,
388:17
**nationwide**
218:6
**native**
52:22, 54:18,
54:22, 55:6,
56:6, 56:10,
71:9, 88:14,
89:5, 97:15,
122:20, 181:6,
199:2, 216:5,
248:5, 249:4,
249:8, 273:19

Transcript of Public Hearing
Conducted on February 11, 2020

491

**natural**
53:18, 60:11,
61:1, 65:17,
66:6, 70:20,
71:21, 76:9,
90:5, 90:8,
92:20, 97:7,
100:19, 103:8,
103:13, 103:15,
108:3, 111:14,
115:13, 191:8,
206:13, 232:20,
241:18, 241:19,
251:3, 282:22,
305:9, 309:19,
310:11, 314:12,
324:11, 324:19,
324:21, 341:9,
348:17, 350:8,
362:16, 363:9
**naturally**
110:20
**nature**
10:4, 46:11,
109:21, 110:6,
113:12, 115:9,
115:16, 115:20,
138:16, 206:9,
271:3, 300:19,
342:19, 386:21
**naturopathic**
162:10
**navajo**
265:3, 265:4,
265:12, 284:10,
285:10, 285:12,
285:14, 285:15,
285:17, 294:5,
351:3, 351:6,
351:7, 351:21,
352:5, 352:22,
390:21, 405:17,
411:3
**navajos**
284:11
**navigate**
304:14, 309:16
**navigating**
60:10

**navy**
411:9
**nd**
378:16
**near**
98:14, 123:8,
196:20, 212:16,
356:7, 358:7,
371:10
**nearby**
215:20
**nearing**
104:9
**nearly**
72:17, 103:14,
104:15, 223:4,
228:19, 255:10,
256:10, 263:11,
300:7, 304:13,
360:16, 364:6
**nebraska**
42:21, 123:17,
273:15, 399:19
**necessarily**
127:16
**necessary**
15:4, 29:8,
50:16, 101:11,
118:20, 157:18,
194:11, 210:20,
220:16, 232:18,
260:10, 283:13,
297:10, 299:4,
343:13, 349:4,
362:1, 392:22,
395:1
**need**
20:3, 34:18,
47:11, 57:18,
78:17, 80:18,
81:4, 81:6,
81:11, 81:12,
81:14, 86:17,
89:6, 93:9,
96:5, 96:10,
115:9, 116:3,
119:6, 127:1,
127:2, 127:15,

133:18, 133:22,
148:17, 164:3,
171:14, 177:14,
177:22, 179:6,
182:19, 188:17,
193:5, 196:14,
199:19, 201:11,
210:8, 219:2,
221:6, 232:4,
232:10, 232:21,
233:9, 233:22,
234:7, 239:4,
247:12, 247:19,
247:20, 260:11,
260:22, 267:19,
278:17, 279:14,
280:1, 283:4,
285:20, 285:21,
285:22, 287:17,
288:1, 292:5,
293:6, 293:7,
301:10, 306:14,
315:16, 336:18,
342:3, 353:20,
360:11, 360:12,
374:5, 374:7,
384:22, 385:6,
387:6, 387:7,
393:17, 394:18,
395:13, 400:9,
406:10
**needed**
32:4, 66:18,
86:13, 90:18,
92:14, 101:12,
103:20, 199:5,
218:2, 226:5,
234:22, 242:17,
300:9, 300:12,
308:16, 310:16,
318:2, 351:15,
363:15, 364:8,
365:3, 375:5,
377:5, 378:3,
382:15, 398:11,
400:19
**needless**
230:18, 230:19,

232:4, 313:2,
374:19
**needs**
32:22, 55:5,
61:4, 90:9,
177:15, 179:12,
183:19, 199:16,
306:17, 307:13,
352:20, 360:6,
404:18
**negative**
57:22, 65:22,
118:11, 130:8,
173:5, 194:7,
255:8, 305:1
**negatively**
130:4
**neguse**
205:14
**neighbor**
184:22
**neighborhood**
86:21, 163:7,
251:4, 257:11,
257:12
**neighborhoods**
129:16, 246:12,
277:10, 310:4
**neighboring**
243:1
**neighbors**
75:4, 252:15,
405:8
**neither**
224:8, 388:10,
421:7
**nepa's**
4:8, 18:12,
57:7, 64:12,
73:4, 74:4,
95:13, 124:22,
132:20, 147:1,
194:5, 197:2,
212:20, 217:22,
218:3, 226:10,
247:9, 262:12,
281:3, 286:19,
320:13, 343:19,

Transcript of Public Hearing
Conducted on February 11, 2020                                                    492

| | | | |
|---|---|---|---|
| 379:18, 380:16,<br>407:12<br>**net**<br>309:16<br>**nets**<br>310:14<br>**network**<br>177:8<br>**networks**<br>257:18<br>**neumayr**<br>4:11, 132:22,<br>287:1<br>**neuroscience**<br>403:9<br>**neutral**<br>28:2, 156:13<br>**never**<br>173:13, 220:11,<br>233:4, 251:14,<br>266:12, 273:5,<br>285:11, 285:13,<br>348:21, 358:3,<br>364:16, 379:1,<br>387:4, 387:19,<br>390:7, 391:3,<br>413:20<br>**new**<br>18:21, 19:9,<br>20:10, 28:3,<br>31:6, 68:13,<br>82:22, 85:8,<br>87:4, 90:18,<br>90:20, 91:15,<br>91:21, 99:17,<br>100:14, 121:3,<br>129:21, 147:13,<br>148:1, 149:5,<br>156:14, 165:9,<br>165:14, 171:9,<br>183:10, 183:14,<br>191:15, 192:20,<br>201:11, 204:7,<br>215:3, 218:18,<br>219:14, 223:6,<br>225:13, 226:2,<br>227:5, 227:13,<br>235:22, 236:14, | 244:17, 245:6,<br>245:8, 248:6,<br>251:15, 255:18,<br>258:22, 260:11,<br>260:14, 281:14,<br>294:4, 295:4,<br>298:18, 299:1,<br>300:10, 303:3,<br>306:11, 306:14,<br>306:18, 307:7,<br>307:19, 307:21,<br>308:16, 321:19,<br>323:16, 323:18,<br>327:8, 349:10,<br>350:12, 350:18,<br>351:4, 351:7,<br>354:14, 359:18,<br>359:22, 360:11,<br>360:20, 361:4,<br>363:15, 365:7,<br>369:21, 377:17,<br>381:7, 386:8,<br>390:6, 399:20,<br>400:6, 402:19,<br>419:11, 419:22,<br>420:9<br>**newspaper**<br>272:7<br>**next**<br>39:14, 52:13,<br>59:5, 81:21,<br>83:17, 110:14,<br>116:7, 132:10,<br>137:15, 157:22,<br>161:22, 164:12,<br>169:11, 177:4,<br>197:15, 214:22,<br>220:19, 231:7,<br>356:20, 364:22,<br>374:3, 402:20,<br>403:16, 413:17<br>**nhpa**<br>53:5<br>**nichols**<br>330:6, 330:7<br>**niels**<br>33:18<br>**night**<br>178:5 | **nightclubs**<br>379:6<br>**nine**<br>44:19, 50:2<br>**ninth**<br>175:10<br>**nixon**<br>366:8, 387:20<br>**nixon's**<br>369:13<br>**noble**<br>392:15<br>**nobody**<br>403:20<br>**noise**<br>118:4<br>**nominated**<br>296:7<br>**non-attainment**<br>367:15<br>**non-discretionary**<br>20:15<br>**non-federal**<br>24:7, 153:2,<br>195:18, 230:5,<br>396:19, 398:3,<br>410:7<br>**non-informative**<br>36:22<br>**non-partisan**<br>47:5<br>**non-profit**<br>93:14, 128:15,<br>173:22, 181:5,<br>268:4, 274:18,<br>278:4, 325:2,<br>330:10<br>**non-profits**<br>355:12<br>**nonattainment**<br>118:14<br>**noncompliance**<br>173:1<br>**nondiscretionary**<br>149:10, 190:13<br>**none**<br>121:9<br>**nonexistent**<br>417:17 | **noon**<br>8:2<br>**norm**<br>98:17, 356:20<br>**normal**<br>356:14<br>**normally**<br>11:12, 12:14,<br>140:1, 141:1<br>**norris**<br>362:12, 362:13<br>**north**<br>45:16, 56:5,<br>74:19, 87:15,<br>97:16, 100:20,<br>105:22, 111:4,<br>173:22, 174:5,<br>174:13, 197:20,<br>223:1, 312:12,<br>313:3, 316:17,<br>358:3, 367:14,<br>372:5, 372:21,<br>372:22, 399:20,<br>401:18<br>**northeastern**<br>208:9<br>**northern**<br>41:19, 52:21,<br>52:22, 53:13,<br>53:14, 317:12<br>**northwest**<br>351:7<br>**norton**<br>51:16, 52:5<br>**note**<br>159:2, 159:9,<br>159:21, 161:13,<br>252:21, 417:9<br>**noted**<br>17:8, 26:2,<br>145:16, 151:22,<br>154:16, 160:7,<br>216:3, 320:21<br>**notes**<br>13:16, 142:4,<br>214:17, 224:2<br>**nothing**<br>35:8, 39:9, |

Transcript of Public Hearing
Conducted on February 11, 2020                                           493

98:5, 194:16,
322:18, 356:13,
357:1, 391:18,
418:16
**notice**
12:22, 13:8,
13:13, 15:19,
16:19, 19:1,
20:19, 21:6,
26:4, 141:9,
141:17, 142:2,
144:8, 145:6,
147:15, 149:14,
150:1, 154:18,
263:10, 407:10
**noticed**
29:14
**notices**
280:6
**notify**
136:19, 137:1
**noting**
168:4, 216:7
**notion**
21:19
**notoriously**
412:1
**novel**
364:4
**npca**
375:13
**npl**
103:15
**number**
6:2, 6:3, 6:18,
18:14, 23:22,
50:1, 50:2,
71:6, 72:1,
74:7, 79:2,
79:3, 79:5,
83:19, 93:9,
113:5, 116:8,
119:12, 122:15,
125:14, 128:10,
131:16, 134:12,
135:5, 147:6,
149:2, 152:17,
159:4, 171:4,

177:18, 182:19,
231:7, 231:8,
231:9, 240:21,
244:2, 254:12,
256:21, 257:3,
257:7, 262:19,
262:21, 263:19,
264:1, 264:9,
271:13, 271:16,
272:9, 291:3,
307:17, 337:20,
353:16, 397:19,
409:22, 417:12,
419:19
**numbers**
8:16, 59:7,
70:8, 101:22,
107:18, 116:8,
128:11, 134:14,
289:12, 291:5,
361:14
**numerous**
85:14, 178:17,
240:5, 311:20,
317:19, 317:21,
360:1
**nwf**
340:15, 341:2

---
                    O
---

**o'brien**
214:4
**o'neil**
244:8
**o'neill**
244:3, 244:7
**o-n**
211:8
**o-r-t-i-z**
248:4
**obama**
46:1, 374:5
**obey**
279:17
**object**
230:9, 330:14
**objective**
405:17

**objectively**
124:21, 226:9
**obligated**
83:1
**obligation**
78:1, 114:3,
114:15, 115:5,
212:22, 224:12,
227:15, 271:9,
271:10, 299:6,
402:16
**obligations**
20:16, 44:7,
120:21, 149:11
**obscure**
194:22, 213:7
**observation**
363:21
**observe**
95:3
**obsolete**
166:11
**obstacles**
60:14
**obstructing**
259:6
**obstructions**
35:5
**obtain**
214:19, 215:15,
226:5, 367:17
**obtaining**
215:12, 215:17
**obvious**
170:18
**obviously**
222:19
**occasionally**
358:2
**occasions**
317:19
**occupied**
338:11
**occur**
25:15, 154:7,
173:10, 192:3,
192:18, 196:3,
196:9, 216:6,

358:21
**occurring**
306:11
**occurs**
345:13
**ocean**
338:11, 341:12
**odds**
410:8
**ofd**
14:19, 15:8,
143:9
**offended**
400:2
**offensive**
402:17
**offer**
79:13, 93:12,
111:15, 117:17,
128:19, 131:21,
184:10, 324:3
**offered**
393:3
**offering**
74:14, 274:22
**offers**
123:19, 161:18
**office**
15:16, 38:1,
65:13, 144:4,
194:1, 276:20,
290:18, 312:10
**officer**
46:21
**offices**
98:12, 334:7
**official**
15:13, 16:1,
16:7, 16:14,
18:20, 19:9,
25:9, 99:1,
144:1, 144:12,
145:1, 147:12,
148:1, 154:2
**official's**
195:10
**officials**
58:20, 65:21

Transcript of Public Hearing
Conducted on February 11, 2020

494

**often**
32:12, 34:8,
34:12, 34:16,
35:6, 79:22,
81:10, 105:1,
109:5, 120:12,
131:9, 182:14,
186:7, 188:16,
194:3, 210:1,
245:2, 258:17,
259:7, 280:8,
280:9, 318:10,
320:17, 337:14,
349:2, 349:20,
375:19, 392:16,
394:3, 395:18,
409:12, 412:4
**ogallala**
43:6, 273:15
**oh**
87:9, 208:1,
208:3, 327:21,
347:18, 414:9
**ohio**
378:14
**oil**
38:4, 67:6,
69:10, 81:9,
83:7, 88:2,
88:16, 90:5,
90:8, 91:22,
98:14, 102:8,
102:11, 102:14,
104:6, 104:7,
104:13, 104:16,
108:2, 108:6,
109:14, 117:21,
124:8, 126:19,
174:21, 196:5,
196:16, 203:18,
206:13, 209:15,
224:1, 234:20,
265:16, 266:11,
276:5, 280:17,
295:17, 309:11,
309:22, 311:1,
312:14, 316:16,
320:9, 321:13,

362:16, 368:12
**okay**
8:8, 8:21,
50:1, 52:13,
62:4, 70:16,
74:9, 78:21,
79:3, 93:9,
96:19, 131:15,
131:17, 131:22,
132:6, 132:9,
136:11, 137:9,
137:11, 161:9,
170:19, 184:5,
184:6, 190:18,
200:4, 200:8,
200:9, 205:12,
207:15, 214:3,
234:13, 240:20,
240:21, 244:6,
245:19, 245:20,
254:12, 264:17,
264:20, 271:15,
271:19, 271:21,
274:10, 277:19,
281:11, 282:4,
286:8, 345:13,
347:15, 353:19,
354:4, 413:20,
414:2, 414:3,
414:9, 420:20
**old**
31:3, 41:2,
56:21, 79:17,
82:4, 82:8,
99:16, 216:2,
217:8, 266:15,
294:8, 300:11,
325:18, 345:5,
355:18, 359:10,
392:6, 400:5,
418:21, 419:10,
419:20
**old-growth**
76:15
**oliver**
264:12, 264:19,
264:21, 264:22,
267:22

**olympic**
97:15
**ombudsman**
411:9
**on-site**
299:4
**once**
6:16, 6:18,
11:2, 79:4,
110:5, 110:10,
120:5, 133:21,
135:3, 135:4,
139:14, 244:5,
289:11, 338:11,
339:10, 400:20
**oncology**
406:1, 406:2
**one-by-one**
248:22
**one-size-fits-all**
253:19
**one-third**
160:16
**onerous**
300:19
**ones**
316:14
**ongoing**
28:5, 156:16,
336:19, 364:22
**online**
4:18, 133:8,
300:17, 323:3,
323:8
**only**
11:2, 14:15,
24:13, 37:3,
41:6, 57:16,
60:5, 61:19,
62:21, 72:20,
82:7, 85:8,
88:20, 98:22,
109:18, 111:2,
115:3, 120:14,
121:4, 125:5,
129:6, 139:13,
143:5, 165:22,
172:6, 176:16,

180:1, 180:15,
186:4, 190:11,
191:21, 192:6,
207:4, 221:17,
226:16, 229:11,
235:7, 236:14,
246:7, 261:18,
268:15, 269:1,
271:8, 279:2,
280:5, 280:7,
283:16, 302:19,
307:22, 315:6,
315:12, 319:11,
320:1, 329:16,
331:1, 337:6,
337:14, 337:17,
357:13, 357:18,
360:15, 364:9,
378:21, 388:21,
391:21, 398:10,
402:17, 409:3,
415:14, 415:15,
417:13
**onset**
46:8
**onslaught**
236:12
**open**
8:12, 165:1,
180:10, 182:6,
279:8, 280:14,
319:8
**opened**
309:18, 339:10,
341:13
**opening**
195:10, 202:8
**operate**
33:20, 349:14
**operating**
74:3, 363:1
**operation**
34:2, 42:20,
43:1, 165:17,
208:8
**operational**
362:21
**operations**
34:15, 69:11,

Transcript of Public Hearing
Conducted on February 11, 2020

495

118:2
**operator**
35:11
**operators**
234:20, 320:9
**opinion**
173:12, 175:14,
209:4
**opinions**
316:8
**opponents**
235:6, 361:6
**opportunities**
9:16, 29:14,
56:11, 56:15,
57:12, 123:3,
138:8, 158:2,
168:7, 170:15,
179:20, 180:12,
241:22, 253:14,
308:3, 315:17,
321:19, 322:7,
341:5, 354:18,
355:17, 393:21,
408:4
**opportunity**
33:15, 33:18,
62:8, 63:2,
71:3, 74:13,
74:20, 93:6,
93:12, 98:7,
102:3, 107:2,
107:14, 117:17,
119:10, 126:3,
128:19, 129:7,
162:8, 184:10,
184:19, 200:15,
210:12, 227:22,
231:13, 243:20,
261:2, 278:21,
279:2, 299:22,
323:20, 324:3,
329:18, 331:4,
337:14, 339:3,
345:8, 365:14,
370:11, 370:14,
394:4, 395:18,
403:20, 408:1,

414:15, 415:11,
415:16
**oppose**
48:5, 56:8,
87:19, 95:21,
96:3, 116:18,
165:2, 165:19,
166:13, 200:20,
201:5, 202:16,
209:11, 211:1,
262:20, 265:6,
265:7, 271:7,
295:15, 333:14,
334:11, 356:10,
358:22
**opposed**
44:18, 109:6,
166:22, 327:2
**opposes**
122:10, 191:1,
410:19
**opposing**
43:13, 105:21,
120:3
**opposite**
67:8, 101:12,
179:17, 193:11,
213:19, 285:1,
369:18
**opposition**
44:15, 56:17,
94:3, 99:12,
128:20, 167:14,
181:8, 205:17,
261:22, 274:19,
314:14, 317:15,
324:4, 345:1,
353:12, 414:18
**optimization**
340:5
**option**
38:14, 54:3,
88:3, 279:21
**optional**
191:3, 244:19,
280:4
**options**
210:3, 263:6,

303:16, 313:7,
323:8, 410:4
**oral**
29:18, 158:10,
387:3
**orally**
136:2
**orchards**
312:17
**order**
6:4, 8:8, 9:4,
9:7, 10:21,
14:17, 15:7,
16:16, 22:11,
23:4, 52:4,
70:7, 79:1,
88:8, 114:8,
115:11, 131:17,
134:13, 136:13,
137:20, 143:8,
143:19, 145:5,
151:2, 151:18,
253:15, 267:20,
328:19, 329:9,
335:6, 340:5,
374:7, 374:13
**orders**
171:13
**ore**
166:5
**organic**
59:13, 60:1,
61:14, 174:6
**organization**
84:3, 128:16,
162:12, 181:5,
211:11, 213:5,
217:9, 231:17,
273:11, 274:19,
328:10, 330:11,
342:7, 351:13,
352:6, 354:7,
359:10, 362:19,
375:14, 392:6,
392:7, 392:9,
393:2
**organization's**
261:13

**organizational**
301:15
**organizations**
17:3, 30:13,
113:21, 145:12,
246:4, 271:1,
281:6, 302:20,
310:10, 342:2
**organize**
247:4
**organizer**
202:13, 265:1
**organizes**
354:8
**original**
18:3, 37:21,
37:22, 38:8,
146:12, 194:13,
235:14, 363:21
**originally**
119:5, 304:2,
318:10
**originates**
174:11
**originating**
326:20
**ortiz**
248:3, 248:4
**other**
10:5, 13:18,
14:14, 15:15,
16:12, 19:21,
24:19, 24:22,
26:21, 29:13,
42:8, 47:13,
48:18, 67:21,
69:6, 72:4,
73:2, 74:21,
91:22, 92:6,
92:15, 92:18,
95:20, 99:22,
104:20, 107:10,
113:17, 115:10,
122:1, 123:11,
138:18, 142:6,
143:3, 144:2,
144:21, 148:13,
155:11, 158:2,

Transcript of Public Hearing
Conducted on February 11, 2020

496

159:6, 160:12,
163:11, 163:15,
166:17, 168:1,
170:2, 172:14,
175:8, 178:3,
183:8, 189:9,
207:14, 209:17,
210:2, 211:12,
215:5, 222:10,
222:19, 223:10,
228:8, 233:6,
256:6, 257:18,
262:14, 265:17,
266:2, 270:22,
271:5, 272:7,
272:10, 275:17,
281:12, 289:16,
290:20, 301:17,
305:5, 311:20,
315:12, 320:11,
321:14, 333:2,
341:3, 343:2,
350:5, 353:14,
357:22, 358:4,
363:8, 364:19,
367:19, 368:13,
381:4, 382:22,
393:20, 400:11,
403:2, 405:16,
410:3, 416:12,
417:20, 420:17

**others**
47:6, 85:15,
92:4, 135:8,
159:5, 175:10,
209:14, 221:12,
229:18, 290:5,
371:15, 375:18,
387:16

**otherwise**
24:14, 41:22,
95:16, 118:21,
170:9, 193:15,
194:22, 421:10

**otter**
85:21, 86:5

**ought**
254:9

**ourselves**
122:8, 283:16,
391:3, 401:3,
402:2

**out**
5:7, 5:10,
5:18, 6:13,
14:10, 20:15,
35:12, 40:8,
40:19, 44:18,
51:21, 76:15,
92:16, 95:19,
99:17, 106:12,
107:16, 122:6,
126:16, 128:7,
128:20, 129:20,
133:19, 133:21,
134:7, 137:5,
149:9, 161:5,
163:9, 163:13,
172:12, 177:10,
178:12, 179:8,
180:1, 182:17,
183:11, 189:18,
201:17, 222:2,
222:5, 254:9,
259:4, 264:13,
269:12, 270:3,
272:16, 274:2,
279:10, 279:19,
287:21, 293:1,
294:14, 296:5,
308:14, 324:4,
329:11, 345:6,
346:20, 347:19,
357:12, 386:22,
387:11, 390:1,
390:3, 390:12,
400:6, 401:13,
403:1, 418:3,
419:3, 419:8,
420:21

**outages**
259:15

**outcome**
24:10, 125:3,
153:5, 313:1,
347:6, 364:16,

397:3, 421:10

**outcomes**
37:8, 37:18,
182:15, 235:11,
237:6, 266:1,
301:22, 322:4,
361:5, 376:12,
377:10

**outdated**
165:6, 166:10,
217:22, 235:9,
320:16, 321:22,
361:19, 413:15

**outdoor**
63:16, 93:19,
93:20, 94:1,
94:9, 94:12,
95:6, 95:18,
113:18, 115:10,
115:13, 116:2,
123:1, 123:3,
130:11, 177:11,
247:17, 316:11,
341:2

**outdoors**
112:8, 113:11,
184:16, 341:4

**outlast**
103:6

**outlined**
102:22, 370:21

**outlines**
129:1

**outrage**
106:9

**outreach**
417:17

**outset**
29:16

**outside**
72:1, 72:7,
73:6, 73:15,
115:15, 115:19,
191:7, 252:19,
253:18, 318:6,
326:20, 377:5,
399:15

**outstanding**
75:11

**outweigh**
84:10

**overall**
215:16

**overarching**
222:1

**overcome**
60:14

**overconsumption**
413:4, 414:1

**overdue**
90:14, 188:3,
359:21, 363:7,
387:8

**overhaul**
122:11, 182:5,
339:13, 340:7,
341:10

**overlook**
114:17

**overlooked**
76:16, 391:6

**overly**
17:8, 145:17,
269:8, 393:14

**overnight**
258:18

**overreach**
77:21

**overseas**
176:5

**overseeing**
299:8

**oversees**
268:8

**oversight**
113:1

**overstate**
180:7

**overstep**
281:5

**overtaken**
317:4

**overview**
8:19, 9:1,
137:8, 137:10,
137:12, 147:8,
287:6

Transcript of Public Hearing
Conducted on February 11, 2020

497

| | | | |
|---|---|---|---|
| **overweight**<br>345:10<br>**overwhelming**<br>315:15<br>**overwhelmingly**<br>120:12<br>**owe**<br>302:9, 302:10<br>**own**<br>40:3, 41:7,<br>45:5, 56:22,<br>78:7, 78:9,<br>96:4, 123:7,<br>186:21, 187:8,<br>189:22, 196:17,<br>203:1, 227:1,<br>233:10, 304:14,<br>352:12, 352:18,<br>354:19, 377:18,<br>377:21, 380:10,<br>381:17, 382:11,<br>388:5, 398:10,<br>404:12, 420:9<br>**owned**<br>45:17, 166:7,<br>232:2, 309:3,<br>338:1<br>**owner**<br>49:16, 317:11,<br>317:17, 403:22<br>**owners**<br>124:10<br>**ownership**<br>201:22<br>**oyáte**<br>52:20<br>**ozone**<br>118:14, 118:19,<br>173:6, 367:6,<br>367:14, 367:15,<br>367:17, 368:1,<br>368:9, 368:10<br>**P**<br>**p-a-r-k-s**<br>107:22<br>**p-e-r-r-y**<br>328:8 | **p-u-t-n-a-m**<br>365:18<br>**paced**<br>341:8<br>**pacific**<br>33:22<br>**padding**<br>340:12<br>**paddleboard**<br>379:10<br>**padre**<br>127:11<br>**pads**<br>88:6, 416:16<br>**page**<br>3:2, 19:7,<br>19:8, 19:9,<br>19:13, 71:19,<br>73:16, 92:3,<br>95:11, 98:19,<br>98:22, 140:22,<br>147:21, 147:22,<br>148:1, 148:5,<br>170:14, 190:3,<br>201:6, 220:1,<br>223:14, 238:20,<br>322:12, 361:14<br>**pages**<br>1:21, 12:14,<br>12:15, 12:20,<br>19:11, 19:14,<br>140:22, 141:1,<br>141:2, 141:8,<br>148:3, 148:5,<br>166:14, 189:2,<br>219:9, 234:6,<br>280:7<br>**paid**<br>35:15, 405:15<br>**pain**<br>285:9<br>**painted**<br>412:15<br>**paintings**<br>335:10, 335:11<br>**pales**<br>394:12<br>**pallid**<br>230:14 | **pandora's**<br>279:8<br>**panel**<br>5:2, 133:14,<br>287:9<br>**pang**<br>200:11, 202:11<br>**paper**<br>390:18<br>**paper-based**<br>27:22, 156:12<br>**papering**<br>52:3<br>**paperwork**<br>17:12, 18:4,<br>35:7, 145:21,<br>146:13, 304:3,<br>304:7, 304:11,<br>383:13<br>**paradoxically**<br>409:15<br>**paralysis**<br>301:21<br>**paramount**<br>348:10<br>**paraphrasing**<br>274:3<br>**parcel**<br>419:12<br>**parcels**<br>242:9<br>**parent**<br>177:20, 178:16,<br>267:4, 281:15<br>**parents**<br>117:7, 177:8,<br>178:4, 179:5,<br>180:13, 405:1,<br>406:3<br>**park**<br>59:14, 60:3,<br>60:8, 60:13,<br>60:17, 60:22,<br>61:4, 61:13,<br>61:21, 97:4,<br>97:11, 97:19,<br>100:13, 123:14,<br>123:19, 124:4, | **131:7, 191:8,**<br>192:1, 272:17,<br>298:7, 324:2,<br>324:7, 324:9,<br>324:20, 325:1,<br>325:5, 325:9,<br>325:15, 326:7,<br>326:15, 326:21,<br>326:22, 338:1,<br>338:7, 338:9,<br>338:10, 338:12,<br>390:5<br>**parker**<br>245:21<br>**parking**<br>418:21<br>**parks**<br>59:11, 59:22,<br>60:15, 97:2,<br>97:20, 97:22,<br>98:15, 98:16,<br>107:21, 107:22,<br>113:16, 115:10,<br>196:21, 268:7,<br>268:20, 291:20,<br>325:1, 336:8,<br>336:21, 338:3,<br>338:18, 338:21,<br>375:13<br>**parlance**<br>54:2<br>**part**<br>4:12, 10:10,<br>61:11, 71:16,<br>105:14, 123:21,<br>133:2, 138:22,<br>159:19, 191:1,<br>192:19, 198:11,<br>208:9, 210:5,<br>222:4, 228:4,<br>287:2, 301:19,<br>317:10, 395:4<br>**participants**<br>271:19, 322:13<br>**participate**<br>25:5, 25:10,<br>29:9, 33:15,<br>44:16, 75:6, |

Transcript of Public Hearing
Conducted on February 11, 2020

498

112:14, 153:20,
154:2, 181:10,
209:12, 210:9,
213:11, 318:18,
329:18, 341:20,
354:18, 359:4
**participated**
85:9, 317:18
**participates**
101:5
**participating**
85:12, 143:4
**participation**
26:2, 27:14,
51:9, 57:12,
63:3, 111:16,
111:19, 125:21,
132:12, 154:15,
156:4, 168:7,
176:15, 189:17,
210:13, 234:2,
269:17, 276:5,
322:5, 323:11,
338:19, 339:16,
344:9
**particular**
20:12, 22:14,
23:16, 28:15,
73:8, 149:7,
152:11, 251:21,
315:5, 319:18,
386:12, 387:9,
387:15
**particularly**
25:7, 68:5,
81:2, 81:6,
81:14, 95:4,
104:14, 153:22,
159:13, 182:22,
201:5, 201:9,
201:20, 210:6,
371:1
**particulate**
367:7, 369:8
**parties**
27:17, 156:7,
269:4, 270:1,
271:10, 377:6,

421:9
**partner**
42:19, 131:5,
159:11, 301:11,
302:14, 325:2
**partners**
93:19, 131:14,
311:22
**partnerships**
218:11, 255:3
**parts**
168:13, 259:10,
278:14, 367:19
**party**
334:17
**pass**
276:1, 356:8
**passed**
59:13, 84:5,
88:8, 120:11,
218:14, 246:10,
376:10, 379:2,
387:3
**passes**
259:13
**passing**
60:1, 229:4
**passion**
93:18
**passionate**
341:3
**past**
17:20, 24:6,
50:18, 54:12,
78:9, 84:15,
153:1, 205:3,
216:7, 227:19,
228:3, 229:7,
235:3, 235:12,
278:9, 309:6,
322:16, 325:20,
335:13, 357:2,
360:8, 366:11,
383:12
**pasture**
127:7
**path**
389:13

**pathway**
94:8
**patient**
386:18, 389:12
**patiently**
394:8
**patients**
345:21, 347:5
**patterns**
206:20
**pause**
407:6
**paved**
106:3
**pavilion**
246:3
**paw**
102:11, 102:18
**pay**
118:10, 247:12,
340:13, 340:18
**paycheck**
375:8
**paying**
33:6, 266:7,
300:6, 403:21
**pays**
366:11
**peaceful**
402:8
**peak**
100:11, 335:5
**peaks**
66:17, 111:4
**pediatric**
406:1
**peeled**
406:16
**peers**
205:2
**people's**
331:22
**peoples**
52:22, 55:1
**percent**
72:17, 95:7,
99:18, 102:14,
104:15, 159:17,

232:2, 284:11,
297:18, 297:20,
297:21, 309:3,
335:2, 368:10,
401:10
**perceptively**
357:6
**perfect**
136:11, 213:14
**perform**
171:14
**performing**
232:17, 349:4
**perhaps**
189:16, 325:8,
357:5, 357:20
**perils**
322:15
**period**
18:21, 137:16,
147:13, 168:14,
219:11, 238:5,
275:7, 335:5,
339:8, 355:13,
355:16, 359:15,
366:10, 383:9,
408:3, 417:12
**periods**
317:19
**permanent**
217:14
**permanently**
178:21
**permit**
92:5, 280:20,
348:21, 374:6,
377:18, 396:21
**permits**
25:20, 31:21,
34:4, 34:6,
176:4, 256:5,
349:21, 350:7,
352:4
**permitted**
120:8
**permittee**
350:11
**permitting**
31:9, 34:4,

Transcript of Public Hearing
Conducted on February 11, 2020                                                    499

34:10, 91:6,
136:17, 232:5,
232:18, 241:8,
257:5, 258:6,
362:7, 373:2,
374:19, 397:9,
397:11, 398:9,
398:16, 399:7
**perpetuate**
107:5
**perpetuating**
177:2
**perpetuity**
60:16
**perry**
327:20, 327:22,
328:5, 328:7
**persevering**
282:2
**persistent**
72:6
**person**
44:19, 79:2,
129:13, 185:1,
248:18, 248:20,
277:16, 281:12,
291:2, 388:8,
391:6, 402:5,
403:7, 418:7
**personal**
79:13, 162:19,
203:1, 212:15,
346:1
**personally**
75:13, 84:15,
165:7, 177:13,
204:4, 211:20,
238:13, 312:2
**persons**
27:15, 59:6,
156:6
**perspective**
30:21, 40:13,
40:14, 208:10,
209:7, 267:5,
268:6, 275:3,
353:5, 365:1
**perspectives**
328:13

**pertinent**
329:15
**pesticides**
163:7
**peter**
167:9, 167:12
**petition**
107:17, 333:13
**petroleum**
90:4, 102:6,
234:17, 362:14
**ph**
200:17
**phase**
24:13, 69:11,
153:8
**phil**
7:7, 7:19
**phillips**
356:7
**philosophy**
283:20
**phones**
5:6, 133:17
**phonetic**
200:9, 277:17,
281:15, 386:7
**phosphate**
165:8, 165:12,
165:15
**phrase**
29:3, 106:11,
157:13
**physical**
178:1, 180:11,
338:3
**physically**
115:17
**physician**
344:19
**physicians**
344:21
**pick**
355:22
**picking**
270:15
**pickups**
358:1

**picture**
183:12, 269:6,
269:19, 381:8
**pieces**
390:17
**pikas**
325:10, 325:19,
326:3, 326:13
**piles**
325:22
**pillar**
329:20
**pine**
173:6, 326:18
**pinedale**
173:3
**pings**
357:20, 357:21
**pink**
79:2
**pinned**
387:17
**pinu**
200:8
**pipeline**
43:8, 43:10,
44:3, 44:5,
195:19, 196:4,
199:7, 199:16,
199:21, 209:16,
356:8, 356:10
**pipelines**
56:12, 88:6,
91:22, 187:5,
401:20, 416:16
**pit**
165:1
**pitched**
112:9
**pitches**
329:22
**place**
27:6, 30:15,
73:15, 75:8,
75:13, 75:20,
76:12, 76:22,
89:6, 96:1,
123:8, 155:19,

179:13, 196:11,
200:3, 203:20,
214:1, 224:3,
234:9, 249:17,
267:8, 273:17,
299:11, 315:13,
319:3, 324:10,
332:4, 358:15,
379:9, 391:10,
394:13, 404:17
**placed**
248:9, 307:11
**placement**
232:8
**places**
75:22, 111:15,
123:10, 125:12,
126:1, 126:6,
185:13, 187:6,
212:21, 221:5,
250:17, 266:22,
311:11, 316:19,
330:12, 375:16,
394:19, 417:3
**placing**
191:14
**plains**
52:21, 52:22,
53:14, 54:8,
54:9, 55:9,
82:3, 300:3,
317:12
**plaintiff**
351:13
**plan**
15:21, 16:5,
16:10, 73:5,
77:9, 100:2,
101:20, 124:7,
144:10, 144:16,
144:19, 173:15,
185:18, 202:19,
216:2, 223:20,
223:22, 272:5,
292:1, 292:3,
307:1, 312:9,
315:13, 364:13,
381:16, 395:5

Transcript of Public Hearing
Conducted on February 11, 2020

500

planet
42:12, 47:2,
113:14, 183:18,
273:3
planet's
407:19
planetary
343:17
planned
57:7, 129:10,
266:17, 415:3
planner
129:22, 130:20,
238:2
planners
225:1
planning
9:17, 14:2,
60:21, 61:7,
76:9, 129:14,
238:4, 244:12,
245:6, 268:7,
310:15, 349:18,
351:17, 384:13
plans
31:17, 71:20,
245:2, 278:11,
278:12, 278:15,
284:18
plant
343:8, 356:22,
395:13
plants
67:1, 76:21,
82:13, 127:14,
201:9, 246:12,
265:16, 266:11,
380:7
plata
62:10
plates
189:3
platform
103:11, 329:4,
342:13
platforms
323:3
platte
123:9, 123:16,

123:17
play
163:9, 180:9,
185:2, 201:17,
396:10, 403:2
played
408:15
playgrounds
115:10
plays
111:17, 206:16,
324:12
pleading
296:9
please
5:5, 5:16,
5:18, 5:20, 6:5,
6:8, 6:20, 7:2,
8:10, 62:4,
65:8, 70:11,
70:17, 74:8,
107:19, 119:7,
133:17, 134:1,
134:4, 134:7,
134:10, 134:15,
135:6, 135:12,
135:17, 162:6,
164:9, 164:11,
179:8, 211:4,
274:8, 281:4,
286:4, 287:15,
288:4, 288:7,
288:18, 288:20,
289:3, 289:12,
290:10, 290:15,
298:12, 328:3,
347:20, 353:19,
379:18, 389:11,
391:11, 391:20,
403:12
pleased
90:21
pleasure
41:18
pledge
355:15
plenary
217:2

plenty
394:17, 405:15
plowed
294:22
plugged
345:14
plumber
105:4
plummeting
380:9
plus
200:17, 300:14
pocatello
164:16, 166:3
pocket
76:15
pockets
75:21, 340:12
podium
418:11
point
40:8, 76:15,
121:13, 161:14,
161:15, 172:7,
172:22, 195:1,
197:6, 364:1,
364:3, 390:17,
395:12, 409:6,
419:8
pointed
300:22
pointlessly
230:20
points
49:16, 197:22
poison
56:19, 163:10,
192:5
poisoned
89:19, 404:6,
404:16, 405:7
policies
23:3, 40:9,
47:7, 98:10,
151:17, 171:13,
205:5, 311:18,
334:8
policy
1:6, 4:5, 9:20,

9:21, 15:8,
18:6, 19:16,
30:20, 47:10,
48:14, 50:10,
56:9, 64:21,
68:9, 69:16,
71:5, 93:13,
94:7, 96:14,
102:19, 111:13,
116:19, 120:4,
120:14, 121:14,
124:1, 128:21,
132:18, 137:13,
138:12, 143:18,
146:16, 148:7,
175:19, 181:14,
184:12, 185:11,
202:18, 204:13,
205:20, 211:19,
221:3, 221:11,
222:5, 225:10,
228:5, 228:15,
229:5, 229:17,
231:15, 235:1,
236:4, 257:8,
259:1, 265:8,
267:7, 267:9,
268:6, 270:20,
274:1, 286:17,
303:22, 304:5,
305:21, 306:6,
315:9, 319:13,
324:6, 329:14,
329:18, 331:11,
332:10, 333:8,
336:9, 342:13,
348:8, 362:1,
366:9, 366:18,
369:11, 369:18,
376:3, 376:12,
379:3, 392:15,
396:16, 410:17,
414:21
political
99:3, 166:20,
202:9, 310:21,
374:1, 395:11,
404:21

Transcript of Public Hearing
Conducted on February 11, 2020

501

| | | | |
|---|---|---|---|
| **politically** | 266:16, 415:3 | 408:13 | 334:12, 358:6, |
| 328:21, 374:2 | **popular** | **post** | 391:2 |
| **politization** | 174:9 | 294:9, 419:9 | **powerline** |
| 392:19 | **population** | **posted** | 209:16 |
| **pollinating** | 66:11, 99:15, | 289:17 | **powers** |
| 380:8 | 101:13, 183:4, | **postponed** | 281:10 |
| **pollutants** | 216:4, 239:3, | 90:17, 363:14 | **practicable** |
| 67:21, 275:18, | 245:14, 266:3, | **postpones** | 46:9, 149:1, |
| 352:15 | 306:12, 306:22, | 360:18 | 271:1 |
| **pollute** | 307:12, 309:13, | **potent** | **practical** |
| 49:8, 175:1 | 323:5, 346:7, | 68:22, 169:3, | 9:21, 20:9, |
| **polluted** | 346:15, 360:11 | 367:13 | 138:12, 245:4, |
| 45:13, 203:3, | **populations** | **potential** | 340:6 |
| 203:5, 204:15, | 100:17, 100:22, | 26:19, 33:6, | **practically** |
| 229:12, 378:18 | 210:21, 325:13, | 38:3, 38:12, | 417:17 |
| **polluters** | 380:5, 380:9, | 58:21, 62:17, | **practice** |
| 83:12, 87:21, | 405:21 | 111:18, 111:20, | 17:22, 24:17, |
| 331:16, 354:19, | **port** | 113:3, 130:1, | 29:6, 146:9, |
| 416:11, 416:15 | 127:11 | 131:4, 155:9, | 153:12, 157:16, |
| **polluting** | **portions** | 169:3, 192:15, | 162:11, 255:5, |
| 117:2, 266:17, | 367:20 | 225:2, 262:22, | 297:2 |
| 381:16, 401:22, | **portneuf** | 297:11, 329:12, | **practices** |
| 415:2, 416:8 | 164:16 | 376:21, 377:7, | 36:20, 189:5, |
| **pollution** | **pose** | 377:10, 377:19, | 304:10, 305:3, |
| 45:14, 45:17, | 327:9, 416:4, | 378:6, 383:7, | 356:16, 382:15, |
| 82:12, 116:16, | 417:5 | 397:5 | 412:5 |
| 119:1, 119:9, | **position** | **potentially** | **practicing** |
| 121:20, 168:1, | 22:15, 52:14, | 73:13, 172:5, | 77:13, 228:4 |
| 178:11, 178:17, | 151:6, 151:7, | 193:2, 364:9, | **practitioner** |
| 192:5, 192:17, | 264:11, 344:22 | 410:11 | 97:10, 385:2 |
| 206:21, 225:21, | **positions** | **pound** | **practitioners** |
| 248:16, 265:15, | 370:21 | 111:7 | 17:4, 145:13, |
| 266:5, 276:18, | **positive** | **poverty** | 293:7, 293:17, |
| 285:16, 316:11, | 237:11, 320:18, | 266:14 | 334:18 |
| 326:20, 360:21, | 395:9 | **powder** | **pre-nepa** |
| 375:3, 407:18, | **possibilities** | 211:10 | 165:12, 165:18, |
| 411:16, 415:9 | 247:11, 322:15, | **power** | 309:10 |
| **ponca** | 330:2 | 67:1, 82:13, | **precedent** |
| 43:7 | **possible** | 87:16, 87:18, | 147:5, 263:12 |
| **pond** | 60:10, 64:10, | 112:5, 115:4, | **preceding** |
| 349:10 | 93:4, 94:16, | 186:12, 246:4, | 384:16 |
| **ponds** | 110:12, 125:13, | 259:15, 259:17, | **precious** |
| 45:13 | 270:17, 287:9, | 284:5, 298:11, | 43:6, 97:6, |
| **poor** | 312:21, 365:12, | 312:2, 378:6, | 305:15, 406:15 |
| 161:10, 171:17, | 407:7, 419:17, | 381:17, 420:8 | **precipice** |
| 204:14, 265:21, | 419:20 | **powered** | 41:9 |
| 282:13, 413:20 | **possibly** | 93:22 | **precisely** |
| **poorly** | 44:20, 61:21, | **powerful** | 67:19 |
| 57:6, 129:10, | | 126:8, 304:17, | |

Transcript of Public Hearing
Conducted on February 11, 2020

502

precision
322:2
preclude
195:17, 196:19
predate
165:8
predates
392:6
predict
129:14
predictability
33:9, 220:3
predictable
51:5, 257:4,
258:5, 399:6
predictions
166:11
predicts
326:3
predisposed
37:9
predominance
108:4
prefer
183:21
preferred
29:21, 158:6
prejudiced
313:6
premature
265:19, 266:2
premier
324:14
premise
252:16
premium
350:1
preparation
25:6, 25:10,
80:4, 80:11,
153:21, 154:3,
165:21, 190:8,
227:8, 240:2,
397:15
prepare
10:15, 11:17,
12:2, 15:11,
15:21, 19:4,

20:20, 139:6,
143:21, 144:10,
147:18, 149:15,
189:12, 197:12,
242:3, 318:21,
374:3, 377:18,
409:1
prepared
377:3, 418:16
preparing
13:5, 51:18,
61:15, 319:1
preregistered
5:17, 134:6
preschools
113:15
prescribe
182:5
presence
201:5
present
10:6, 55:1,
138:18, 163:12,
271:5, 321:9,
375:16
presentation
4:15, 4:18,
9:2, 9:4, 9:13,
133:5, 133:8,
138:4, 287:6,
293:1
presented
60:18, 166:12,
412:9
presenting
96:22
presents
192:10
preservation
98:4, 253:5
preserve
248:20, 249:6,
375:15, 383:6
preserved
338:4
preserves
248:10, 338:13
preserving
59:18, 316:19

president
14:18, 30:8,
46:21, 50:6,
102:5, 108:1,
143:7, 158:18,
221:2, 237:20,
246:1, 258:12,
279:16, 281:18,
299:19, 366:8,
369:13, 374:4,
374:12, 414:18
presidents
235:12
pressing
367:1
pressure
106:19
pressures
100:4, 245:16
presumptive
19:13, 148:5,
253:19, 262:19,
262:21, 398:5
prettiest
123:10
pretty
294:16, 328:20,
329:1, 403:9
prevent
23:11, 32:8,
33:12, 152:6,
173:9, 237:7,
256:15, 302:16,
394:19
prevented
239:15
preventing
176:11
prevention
34:18, 345:12
previous
201:11, 249:6,
304:12, 359:15
previously
72:9, 268:11
price
104:2, 108:22,
118:10, 191:9

prices
310:11, 349:22
primarily
67:22, 102:9,
200:19, 292:10
primary
102:12
primitive
40:15, 41:3
principle
129:8, 184:21,
238:6
principles
281:3
prior
54:19, 94:18,
97:9, 129:4,
147:5, 238:1,
255:15, 297:1,
312:5, 343:16,
393:5
priorities
52:9
prioritize
246:21
prioritizes
41:11
priority
90:15, 361:8
pristine
111:18, 127:12
private
24:15, 35:14,
35:15, 43:11,
124:9, 153:10,
166:7, 188:1,
209:18, 218:10,
238:4, 243:1,
246:21, 255:3,
255:5, 256:5,
256:6, 270:22,
291:19, 311:16,
336:7, 373:12,
378:7, 410:8
proactive
301:13
probably
172:11, 211:21,

Transcript of Public Hearing
Conducted on February 11, 2020                                          503

393:6, 395:16
**problem**
34:9, 37:15,
106:5, 121:12,
205:22, 252:10,
314:19, 332:19,
356:13, 415:22,
419:6
**problems**
57:5, 100:16,
171:21, 178:18,
178:22, 179:2,
196:22, 247:18,
346:13, 346:14,
376:20, 380:17
**procedural**
30:19, 194:3,
194:5
**procedure**
301:19, 352:9
**procedures**
25:3, 87:4,
97:17, 153:17,
217:22, 224:4
**proceed**
25:18, 110:9,
154:10, 186:3,
224:22, 247:13,
258:3, 270:5
**proceeding**
397:6
**proceedings**
421:4, 421:5
**proceeds**
124:18
**processed**
15:8, 143:17
**processes**
16:13, 41:15,
42:5, 60:21,
84:16, 114:5,
138:1, 139:1,
142:13, 179:7,
220:7, 228:21,
244:11, 244:12,
245:2, 245:6,
247:21, 251:18,
253:10, 254:17,

255:8, 255:20,
260:7, 282:19,
304:13, 305:7,
323:7, 349:11,
349:12, 349:19,
398:17
**processing**
166:6, 383:13
**produce**
12:18, 102:14,
141:5, 189:21,
384:7
**produced**
93:1, 363:12,
384:11
**produces**
360:21
**producing**
45:19, 130:7
**product**
67:16, 326:11,
368:5, 409:11
**production**
92:19, 235:21,
276:5, 308:1,
350:6
**productive**
10:4, 138:17,
271:3, 304:22
**productivity**
369:4
**products**
45:18, 103:3
**professional**
34:21, 164:17,
214:13, 325:16
**professionally**
238:14, 402:9
**professionals**
34:20, 76:7,
76:10, 333:21
**profit**
284:19, 387:18
**profits**
86:20, 347:10
**profound**
45:8
**program**
28:4, 59:11,

82:3, 88:4,
113:10, 156:15,
159:12, 330:8,
396:22
**programmatic**
364:20, 384:7
**programs**
65:18, 365:19,
397:9, 397:11,
397:12
**progress**
15:14, 144:2,
259:7, 260:10,
375:6, 404:9,
413:16
**progressed**
360:8
**progressively**
32:5
**prohibit**
86:2, 169:6,
408:20
**prohibited**
169:22
**prohibition**
170:4
**prohibits**
196:20
**project's**
72:2, 103:6,
125:2, 186:8,
226:12, 322:14
**projected**
66:7
**proliferation**
117:21
**prolonged**
375:3
**promise**
247:9
**promote**
10:2, 18:4,
26:11, 28:7,
128:16, 138:14,
146:14, 155:1,
156:18, 220:12,
304:3, 374:13,
383:22, 384:14

**promoted**
175:16
**promotes**
51:7, 167:21,
176:2, 211:19,
322:4
**promoting**
94:20, 297:4
**promulgate**
10:22
**promulgated**
139:12, 206:3
**prong**
72:12
**proof**
236:17
**propelled**
239:22
**proper**
299:10, 352:21,
400:3
**properly**
199:21, 305:8
**properties**
405:5
**property**
35:15, 85:7,
86:9, 86:11,
124:10, 212:16,
258:1, 317:17,
390:14
**prophesized**
391:14
**proponent**
80:12, 81:6,
189:16, 189:17,
189:18, 196:13,
215:20
**proponents**
79:14, 80:22,
81:2, 171:18,
215:8, 371:12,
382:16
**proposals**
12:15, 19:12,
20:5, 62:15,
100:19, 109:16,
141:2, 148:4,

Transcript of Public Hearing
Conducted on February 11, 2020

504

148:19, 224:7,
245:17, 247:4,
271:7, 313:5,
382:2, 382:14,
383:1, 384:19,
396:13, 409:3
**propose**
23:15, 152:10,
274:8
**proposes**
18:14, 20:10,
21:13, 21:21,
22:5, 22:9,
22:15, 22:19,
23:8, 23:22,
24:17, 25:1,
25:16, 26:8,
26:17, 27:20,
28:16, 29:2,
71:13, 147:6,
149:2, 149:4,
150:6, 150:12,
150:18, 150:22,
151:7, 151:11,
152:3, 152:17,
153:12, 153:16,
154:8, 154:20,
155:7, 156:10,
157:4, 157:12,
215:18, 254:1,
366:14, 384:5
**proposing**
28:14, 127:8,
157:2, 179:17,
179:21, 182:5,
196:16, 213:15,
234:22
**prosper**
107:10
**prosperity**
107:9, 283:17,
329:21, 354:10
**protect**
57:19, 60:4,
86:14, 86:16,
86:20, 93:17,
94:1, 96:13,
97:2, 97:22,

116:15, 119:3,
128:17, 163:19,
164:2, 164:3,
164:11, 164:21,
175:9, 177:18,
179:19, 180:18,
180:20, 187:14,
207:4, 208:12,
210:20, 211:4,
211:13, 216:11,
221:5, 236:13,
237:15, 247:21,
278:5, 282:22,
311:9, 311:19,
312:15, 316:1,
321:5, 328:11,
330:11, 333:6,
342:3, 344:6,
349:6, 349:17,
350:7, 359:19,
361:12, 366:5,
372:6, 372:9,
373:4, 375:15,
394:1, 404:18,
406:12, 406:18,
411:14, 412:19,
413:7, 413:14,
413:22, 415:7,
415:20
**protected**
184:16, 198:14,
417:4
**protecting**
82:16, 93:21,
94:20, 97:6,
119:8, 129:9,
177:11, 181:6,
191:13, 198:2,
217:17, 222:3,
223:21, 224:20,
315:16, 329:17,
361:7, 361:17,
362:8, 373:9
**protection**
32:2, 57:8,
89:6, 111:5,
171:6, 228:16,
240:18, 249:1,

273:2, 274:1,
274:18, 276:21,
305:14, 332:6,
332:7, 352:8,
369:7, 369:12,
372:11, 383:14,
412:21, 413:12
**protections**
43:16, 46:16,
50:21, 57:21,
187:2, 199:2,
207:8, 210:19,
225:5, 232:19,
235:6, 235:8,
236:2, 257:2,
265:5, 275:12,
275:14, 276:11,
301:9, 310:16,
354:17, 361:15,
370:16, 397:8,
411:18, 413:18,
415:19, 416:10,
417:5
**protective**
60:6, 161:3
**protectors**
56:4, 87:17
**protects**
58:6, 58:16,
224:13, 324:11,
372:11, 415:1
**protest**
249:19, 351:22
**proud**
184:13
**prove**
53:22
**proves**
49:5
**provide**
8:19, 8:22,
9:15, 11:7,
20:11, 21:5,
25:9, 26:12,
28:4, 32:13,
36:20, 38:21,
72:18, 85:16,
91:7, 104:17,

136:16, 137:10,
137:12, 138:6,
149:5, 149:22,
154:2, 155:3,
156:15, 166:20,
168:6, 179:10,
212:9, 214:19,
219:3, 256:19,
260:5, 293:2,
293:3, 302:4,
305:16, 306:7,
311:21, 313:17,
329:4, 335:17,
361:4, 369:17,
373:1, 381:15,
397:20, 408:1,
418:11
**provided**
7:16, 24:12,
38:6, 97:18,
136:2, 238:6,
251:6, 261:17,
291:18, 321:4
**provides**
57:11, 58:20,
117:14, 123:4,
124:11, 129:6,
153:7, 186:4,
188:7, 189:10,
189:11, 194:10,
199:10, 241:20,
292:9, 325:9,
415:14, 415:15
**providing**
99:21, 209:6,
256:5, 266:21,
329:8, 376:12,
382:14, 384:2,
396:11, 397:21,
408:4
**proving**
100:9
**provision**
24:17, 28:7,
139:16, 156:18,
172:17
**provisions**
28:16, 30:19,

Transcript of Public Hearing
Conducted on February 11, 2020

505

35:22, 51:10,
110:11, 153:12,
157:5, 176:4,
190:2, 194:5,
419:22
**proximate**
193:8
**proximity**
54:11
**psr**
344:20, 344:21,
344:22
**psychology**
403:8
**public's**
4:13, 73:12,
84:14, 86:20,
87:2, 133:3,
181:9, 209:11,
287:3, 314:20,
317:22, 331:10,
336:11, 371:18,
371:22, 416:8,
416:9
**publication**
19:4, 28:1,
147:19, 156:12
**publications**
123:2
**publicly**
232:2
**publish**
15:21, 16:6,
16:11, 27:12,
27:22, 144:10,
144:17, 144:19,
156:2, 156:12,
194:21
**published**
13:9, 14:4,
16:3, 16:18,
141:18, 142:15,
145:5, 249:3
**publishes**
15:19, 16:9,
20:19, 144:8,
144:14, 144:18,
149:14

**pueblo**
248:5, 248:7,
249:18, 249:21,
386:7, 386:10,
389:17
**pueblos**
405:17
**pull**
111:16, 390:12
**pumps**
389:1
**purchase**
258:1
**purity**
366:12
**purpose**
11:11, 20:3,
26:10, 51:11,
81:4, 81:5,
81:11, 81:12,
81:13, 96:5,
103:6, 125:1,
148:17, 154:22,
169:20, 170:8,
196:14, 197:3,
226:10, 226:12,
262:11, 270:2,
270:19, 339:9
**purposed**
171:9
**purposes**
69:5, 143:4,
168:3, 212:21,
213:8, 227:10,
258:2
**pursuant**
139:1, 145:4
**purview**
201:4
**push**
42:2, 169:15,
213:8, 253:17,
371:12
**pushback**
269:14
**pushing**
401:12
**put**
7:5, 35:11,

45:3, 51:16,
69:17, 74:5,
93:4, 107:11,
116:5, 126:22,
128:2, 135:14,
171:22, 200:3,
225:7, 250:22,
290:1, 290:2,
291:17, 315:2,
333:6, 340:15,
344:5, 365:12,
385:18, 404:17,
415:16, 420:2,
420:13
**putnam**
365:17, 365:18
**puts**
49:9, 269:10
**putting**
35:22, 193:10,
290:18, 393:9,
416:8

---
**Q**
---

**qualify**
170:12
**qualities**
130:6
**quality**
1:1, 26:21,
33:2, 50:12,
63:18, 65:4,
66:6, 69:8,
69:18, 75:5,
80:10, 85:16,
86:3, 94:21,
118:13, 155:11,
173:2, 173:5,
177:11, 189:20,
204:13, 207:1,
208:12, 211:14,
218:8, 234:19,
251:5, 257:10,
265:21, 274:22,
275:9, 275:10,
283:1, 285:18,
308:4, 328:12,
343:6, 359:14,

366:3, 367:18,
374:10, 379:18,
380:13, 381:20,
386:21, 396:15
**quality's**
4:3, 94:5,
132:16, 286:16,
331:9
**quantities**
407:18
**question**
315:21, 355:8
**questions**
7:17, 7:22,
22:2, 136:4,
136:7, 150:15,
290:9, 290:12,
293:13, 316:10,
365:9
**quick**
207:17, 248:14,
264:13
**quickbooks**
233:3
**quickly**
38:13, 118:16,
290:14, 323:17
**quintessentially**
334:12
**quite**
38:15, 206:11,
380:14, 386:19,
420:4
**quonset**
357:16, 357:22
**quote**
12:15, 58:14,
89:17, 97:19,
98:2, 105:11,
114:21, 141:2,
147:3, 192:16,
215:1, 342:19,
343:1, 366:11,
409:9

---
**R**
---

**r-a**
311:7

Transcript of Public Hearing
Conducted on February 11, 2020

506

r-e-e-d
99:10
r-h-o-d-d
52:17
r-i-l-e-y
359:8
r-i-v-e-r-a
323:22
r-o-b-b-i-e
291:12
r-o-b-e-r-t
375:11
r-o-b-i-n-s-o-n
308:19
r-u-b-i-n
403:19
race
388:16, 390:10,
391:8, 391:14,
391:15, 391:16,
400:13
races
392:8, 396:8
racism
411:21
racist
353:13
radioactive
166:5, 352:14
raft
132:10
railroad
33:22, 84:20,
85:5, 85:7,
85:11, 85:19,
86:8, 86:12
railroads
86:10
rain
111:6
rainfall
356:15
raise
7:20, 85:3,
163:2, 288:14,
415:6
raised
26:18, 122:20,

155:8, 303:11,
328:18, 383:8,
385:20
raises
313:2, 419:1
rambling
418:14
ramey
311:6, 311:7
ramp
92:21, 188:8,
363:10
rampant
53:15, 405:14
ran
111:4, 316:16
ranch
33:22, 84:18,
84:19, 85:1,
85:21, 211:3,
258:13, 303:9,
303:10, 329:1,
329:22, 330:3,
348:3, 350:2,
405:1
rancher
33:20, 84:1,
258:14, 303:7,
306:20, 307:4,
328:16
ranchers
174:2, 211:12,
348:9, 349:1,
349:3, 386:21
ranches
42:8, 312:17
ranching
42:20, 359:11,
361:9, 394:5
range
21:22, 34:4,
34:10, 34:17,
34:19, 77:5,
78:3, 150:13,
222:8, 222:14,
227:11, 251:17,
275:9, 278:17,
312:4, 316:9,

329:9, 342:10,
367:15, 396:17
range-wide
223:22, 292:1
ranger
325:1
ranging
238:9, 399:17,
407:14
raphael
335:11
rapid
239:3
rapidly
323:4, 343:3
rare
53:18, 174:16,
416:3
rarity
174:20
rash
310:21
rate
176:19, 300:2,
342:20, 380:6
rates
239:13, 249:12,
265:22, 334:22,
342:19
rather
22:13, 57:15,
70:2, 98:11,
151:4, 160:1,
160:5, 188:13,
196:10, 197:4,
220:12, 234:4,
237:5, 270:15,
297:4, 314:3,
347:9, 397:4
rationale
264:5
rationales
298:14
ratliff
382:7
raw
414:1
rawlins
33:20

reach
252:17, 253:15
reaching
270:11
react
77:7
reaction
368:3
read
17:18, 146:5,
189:1, 211:21,
273:22
readily
31:15
reading
158:9, 228:6
ready
30:1, 52:14,
162:5, 231:10,
237:13, 286:14,
391:13
real
17:10, 48:7,
124:13, 145:18,
223:15, 255:21,
256:9, 257:21,
263:5, 322:14,
346:18, 405:1,
405:3, 419:6
realities
49:3, 63:15,
253:20, 306:21
reality
206:15, 235:8,
306:12, 306:18,
337:9, 382:2
realize
89:20, 127:3,
393:7
realizing
104:3
really
31:3, 52:1,
70:21, 75:10,
76:18, 164:5,
172:2, 194:4,
195:7, 210:11,
245:12, 245:17,

Transcript of Public Hearing
Conducted on February 11, 2020

267:3, 273:10,
276:14, 278:15,
287:7, 331:12,
341:9, 345:21,
346:4, 386:8,
386:16, 386:17
**realtor**
255:10
**realtors**
254:16, 255:12,
257:21
**rearing**
292:7
**reason**
10:13, 41:15,
65:20, 126:17,
139:4, 171:15,
202:22, 264:16,
292:21, 390:3
**reasonable**
21:14, 21:21,
21:22, 106:12,
124:21, 150:7,
150:12, 150:13,
170:9, 187:2,
225:4, 226:9,
236:18, 263:6,
263:8, 264:2,
302:12, 312:4,
318:4, 370:15,
383:2
**reasonably**
22:7, 150:20
**reasons**
46:3, 73:18,
243:2, 263:17,
292:22, 320:15,
364:19, 374:1,
374:2, 410:18
**rebuild**
373:16
**rebuilding**
32:9, 256:16
**receive**
101:22, 109:12,
109:14, 158:11,
260:22
**received**
7:15, 16:22,

29:21, 59:7,
105:14, 136:1,
145:10, 290:7
**receives**
397:1
**receiving**
158:7
**recent**
91:13, 100:8,
179:3, 202:13,
222:22, 363:20
**recently**
111:2, 169:2,
309:18, 358:7,
367:16, 404:14
**recipe**
269:20
**recipient**
219:19
**reckless**
312:22, 417:8
**reclaiming**
366:12
**reclamation**
41:20, 298:7
**reclassified**
367:16
**recognition**
29:1, 96:11,
122:3, 157:11
**recognize**
49:11, 81:1,
81:4, 81:16,
115:4, 159:22,
190:6
**recognized**
18:9, 59:15,
112:6, 146:20,
248:18
**recognizes**
98:2, 209:5,
283:9, 322:22,
323:9, 374:5
**recognizing**
127:6, 241:10,
327:6
**recommend**
12:13, 140:22

**recommended**
15:17, 144:5,
144:7
**reconsider**
59:2, 333:17,
352:8
**reconsidered**
77:3
**reconsiders**
61:20
**record**
6:7, 7:2,
12:22, 13:5,
13:14, 16:11,
19:2, 20:7,
21:10, 44:6,
49:14, 49:20,
70:17, 74:8,
78:14, 78:22,
96:17, 104:11,
134:18, 135:12,
141:10, 142:2,
144:20, 147:16,
148:21, 150:5,
175:15, 175:21,
193:20, 197:16,
219:9, 234:14,
264:17, 286:5,
289:1, 289:3,
290:4, 322:20,
344:11, 421:4
**recorded**
421:4
**recording**
421:6
**records**
28:6, 55:19,
156:17
**recovering**
60:11
**recovery**
53:21, 292:3
**recreation**
63:16, 72:15,
73:1, 93:19,
93:22, 94:2,
94:9, 95:6,
95:17, 96:2,

99:21, 130:11,
316:11, 321:19,
324:19, 382:22
**recreational**
112:6, 307:5,
307:13, 308:2,
313:16
**red**
35:11, 259:21,
304:7, 317:10,
339:18, 412:12,
412:16
**redefines**
408:19
**redefining**
95:21, 176:10
**reduce**
18:4, 28:18,
35:4, 64:14,
66:21, 67:5,
69:10, 73:16,
115:21, 146:13,
157:7, 208:18,
229:20, 230:20,
235:22, 243:4,
257:8, 261:15,
269:17, 304:3,
350:14, 359:3,
360:20, 362:5,
368:21, 398:8
**reduced**
98:13, 159:17,
170:15, 230:22,
240:13
**reduces**
34:13, 114:11,
308:2, 383:13
**reducing**
17:12, 33:3,
68:21, 98:9,
145:20, 361:1,
374:5
**reductions**
66:17, 69:13,
159:14
**redundancy**
292:8, 293:4
**reed**
99:9, 99:10

Transcript of Public Hearing
Conducted on February 11, 2020

508

**refer**
14:19, 143:9
**reference**
34:22, 247:8,
371:6
**references**
225:20
**referred**
120:13, 351:11
**referring**
71:14
**refers**
212:20
**refineries**
45:18, 82:13
**refinery**
171:2
**reflect**
243:8, 251:9,
306:18
**reflected**
12:8, 17:21,
140:17, 146:8
**reflecting**
29:5, 157:15
**reform**
90:14, 161:18,
188:19, 235:1,
235:7, 236:7,
256:10, 359:21,
360:22, 361:6,
364:20
**reforming**
243:3
**reforms**
92:14, 219:2,
219:22, 256:20,
301:4, 301:7,
302:3, 365:2,
373:1, 373:8,
397:20, 398:10
**refused**
355:13
**regard**
13:3, 26:1,
154:15, 157:20,
385:4, 416:13
**regarding**
42:7, 42:9,

51:13, 53:1,
214:8, 265:10,
296:22, 367:12
**regardless**
117:3, 173:10,
334:17, 339:18,
385:17
**regards**
340:5, 341:14
**region**
2:5, 74:18,
75:9, 75:17,
137:4, 162:16,
191:14, 290:17,
320:10
**regional**
166:1, 324:13,
367:6, 368:4,
369:8, 375:12
**regionally**
49:17
**regions**
74:21
**register**
5:18, 261:12
**registered**
127:6
**registration**
5:16, 6:2,
7:10, 8:10,
134:5, 134:13,
135:20, 136:19,
288:4, 331:7
**regressing**
204:12
**regs**
192:13
**regular**
158:11
**regularly**
212:6
**regulated**
387:21
**regulation**
11:3, 26:8,
94:11, 132:20,
139:16, 189:10,
209:4, 214:10,

286:19, 377:17,
385:18
**regulation's**
145:20
**regulatory**
69:5, 80:8,
189:7, 189:11,
220:17, 235:13,
257:8, 264:6,
268:8, 268:12,
268:19, 270:6,
270:8, 300:18,
301:5, 303:2,
373:1, 384:3,
384:13
**rehabilitating**
307:20
**reign**
183:21, 373:8
**reintroductions**
394:10
**reinvent**
92:8
**reject**
74:5, 116:4,
227:16, 263:14,
317:7, 344:7
**rejected**
46:2, 68:17,
215:22, 314:16
**rejoiced**
111:7
**relate**
47:14
**related**
33:5, 34:7,
36:10, 48:18,
109:20, 209:15,
212:7, 365:7,
368:12, 404:4,
408:11, 421:8
**relates**
91:20
**relating**
28:6, 156:17,
411:5
**relationship**
22:8, 54:21,

75:13, 150:21,
179:4, 353:1,
353:3
**relative**
160:12
**release**
169:3
**released**
342:14
**releases**
407:17
**relegate**
280:5
**relentless**
236:12
**relevant**
20:22, 26:5,
38:6, 58:20,
71:15, 149:17,
154:19
**reliability**
292:5, 293:4
**reliable**
37:11, 37:13,
72:9, 215:2,
239:15
**reliant**
308:7
**relied**
298:5
**religions**
392:8
**relocation**
405:4
**rely**
85:3, 92:6,
116:20, 192:8,
201:11, 267:5,
295:8, 302:21,
349:7, 362:5,
362:9, 416:21,
416:22
**relying**
267:6, 349:16,
375:19
**remain**
18:11, 147:1,
159:5, 373:13

Transcript of Public Hearing
Conducted on February 11, 2020

509

remainder
261:21
remained
17:10, 59:20,
145:18
remaining
6:12, 408:6
remarks
5:20, 132:1,
134:10, 135:7,
225:9, 287:9,
288:7, 336:3
remediation
53:21, 171:6,
354:21
remedy
383:7
remember
249:16, 284:6
remembers
248:7
remind
202:3, 387:7,
391:9
reminding
270:18
reminds
418:19
remote
22:21, 43:20,
44:11, 46:13,
46:14, 67:15,
67:16, 130:7,
151:13, 168:18,
168:19, 203:22,
206:11, 252:18,
304:18, 322:15,
326:10, 409:10,
409:11
removal
97:14, 121:1,
206:5
remove
56:15, 71:13,
118:22, 169:11,
201:15, 267:2,
355:3, 371:3,
378:1, 384:15,

385:5, 385:6
removed
230:2
removes
121:6
removing
67:9, 206:8,
222:12, 224:6,
224:11, 314:19,
314:20, 318:22,
340:11
renee
410:21
renewable
92:16, 92:22,
223:18, 223:19,
302:22, 363:8,
363:11, 363:18,
382:19, 413:16
renewables
67:2, 321:15
renewal
418:20
renewals
34:8
renewed
349:22
renewing
34:4
repairs
219:13
repeatedly
393:17
repetitive
399:14
replace
156:10, 215:18,
366:16
replacement
409:5
replaces
214:16
replacing
11:3, 139:15
report
12:9, 12:11,
13:2, 13:16,
14:9, 140:18,

140:20, 141:12,
142:4, 222:22,
263:18, 342:15,
342:18, 343:7,
343:11
reporter
6:6, 134:17
reports
12:9, 69:7,
140:17, 258:18
represent
52:21, 90:5,
97:5, 174:1,
231:15, 273:10,
338:3, 383:2,
386:11, 396:8,
413:21
representation
336:14, 412:21
representative
274:16, 281:16,
281:17, 338:16
representatives
250:7, 307:5,
329:7
represented
76:12, 234:21,
400:9
representing
30:11, 62:10,
79:14, 113:10,
128:14, 164:15,
234:17, 258:13,
284:21, 296:17,
359:9, 386:10
represents
13:8, 14:11,
112:17, 141:17,
142:22, 217:10,
329:19, 341:1,
359:11, 362:15,
392:7
republican
90:15
republications
276:16
reputations
364:8

request
20:21, 49:14,
149:16, 351:22,
409:22
requested
355:12
requesting
16:20, 145:7,
249:20
requests
243:22
require
14:22, 26:3,
28:3, 69:22,
108:6, 120:9,
140:12, 143:12,
154:1, 154:17,
156:14, 169:2,
172:9, 182:7,
190:7, 193:12,
198:6, 198:8,
208:14, 211:2,
225:14, 242:6,
242:11, 242:14,
259:13, 317:1,
326:9, 369:13,
396:20
required
12:2, 17:9,
20:5, 21:5,
22:18, 25:8,
38:21, 46:6,
68:12, 108:19,
121:4, 140:13,
145:18, 148:19,
149:22, 151:9,
215:3, 215:15,
225:19, 226:2,
243:1, 245:7,
263:3, 282:19,
309:14, 337:17,
362:6, 383:15,
398:6
requirement
48:10, 67:9,
67:13, 121:2,
124:20, 169:12,
169:18, 178:7,

Transcript of Public Hearing
Conducted on February 11, 2020

510

206:6, 226:4,
226:8, 244:15,
244:17, 318:5,
319:14, 371:4,
385:7, 385:9,
385:11
**requirements**
10:6, 73:4,
91:5, 122:6,
125:14, 131:11,
138:18, 173:8,
222:13, 224:7,
227:6, 243:16,
253:6, 255:17,
271:5, 298:17,
299:1, 307:14,
336:22, 365:7,
366:4, 377:13,
383:5, 408:12
**requires**
10:8, 46:8,
46:12, 64:2,
69:11, 94:16,
124:14, 125:22,
138:20, 185:22,
194:20, 201:12,
255:13, 256:2,
302:7, 377:6,
409:1, 409:9,
411:13
**requiring**
69:6, 166:13,
227:4, 244:17,
312:3, 371:17,
383:8, 407:5,
408:15
**research**
36:6, 115:12,
215:4, 215:10,
226:3, 233:6,
244:18, 326:2,
340:3
**reservation**
87:14, 88:22,
242:7, 242:10,
242:11, 242:13,
242:21, 265:14,
265:17, 266:5,

266:15, 322:9
**reservations**
28:21, 54:13,
157:9, 401:19
**reserve**
72:6, 200:10,
309:11
**reserved**
315:7
**reservoir**
41:21, 394:12
**reservoirs**
232:10, 307:20,
309:18, 394:11
**reside**
102:10, 162:13
**resident**
110:16, 130:21,
202:12, 264:22,
268:2, 300:5
**residential**
118:5, 258:2,
396:20, 399:8
**residents**
68:10, 69:17,
228:10, 259:20,
261:2, 300:10
**resilience**
293:4
**resiliency**
292:8, 335:22
**resolve**
260:16
**resolving**
19:21, 148:12
**resource**
62:16, 71:21,
80:14, 84:3,
101:7, 162:13,
164:16, 189:5,
199:1, 211:10,
241:19, 245:2,
245:6, 278:11,
312:9, 317:13,
341:14
**resources**
11:22, 18:10,
22:12, 43:17,

52:19, 53:7,
53:9, 53:10,
53:15, 59:19,
60:4, 61:1,
61:11, 63:7,
65:17, 70:20,
75:11, 76:9,
91:17, 92:22,
97:7, 100:7,
130:9, 138:8,
140:10, 146:21,
151:3, 164:22,
166:20, 171:16,
197:19, 198:19,
199:3, 211:15,
212:16, 212:19,
215:2, 221:21,
233:6, 242:20,
260:5, 260:22,
280:9, 305:9,
305:15, 312:16,
314:12, 324:11,
348:13, 348:17,
349:6, 350:8,
350:16, 411:22,
413:5
**respect**
25:14, 41:5,
105:19, 154:6,
283:7, 303:16,
377:7
**respectfully**
241:14
**respond**
16:5, 114:16,
144:16, 323:7,
355:14
**responded**
290:5
**response**
16:16, 28:21,
36:9, 92:22,
157:9, 215:11
**responsibilities**
114:22, 222:6,
310:8
**responsibility**
24:4, 25:12,

64:9, 88:14,
89:3, 98:3,
98:7, 152:21,
154:5, 223:19,
243:9, 248:20,
249:16, 249:17,
268:13, 284:4,
344:22, 364:12,
402:14
**responsible**
19:18, 20:2,
23:6, 52:18,
63:20, 90:10,
108:2, 148:9,
148:16, 151:20,
175:13, 195:20,
274:4, 363:2
**ress**
406:21, 406:22
**rest**
111:9, 207:16,
261:5, 389:13,
389:14
**restaurants**
379:6
**restoration**
97:15, 369:9
**restore**
94:1, 278:5,
330:11
**restores**
58:17
**restoring**
181:6
**restrict**
130:17, 263:1
**restricted**
204:11, 269:8,
318:9
**restricting**
337:20
**restricts**
63:1
**restrooms**
5:6, 133:18,
287:16
**result**
22:22, 51:20,

Transcript of Public Hearing
Conducted on February 11, 2020

511

56:21, 71:9,
98:12, 108:16,
109:1, 114:16,
151:14, 168:19,
176:1, 188:17,
189:9, 197:10,
198:19, 208:20,
209:22, 223:9,
230:4, 252:19,
262:16, 275:15,
305:13, 354:20,
369:1, 397:15,
410:16
**resulted**
103:19, 118:2,
189:6, 230:16,
278:15, 374:19
**resulting**
49:8, 100:5,
131:10, 220:8,
230:21, 260:19
**results**
38:5, 189:19,
243:17, 257:22,
368:10, 383:14
**resume**
78:17, 286:10
**resuming**
207:17
**retain**
257:9
**rethink**
245:17
**retired**
42:18, 170:21,
170:22, 171:4,
272:14
**retirement**
97:9, 242:1
**return**
53:14, 249:13,
301:5
**revenue**
44:8, 44:9,
48:20, 103:21
**revenues**
90:20, 241:16,
363:16

**reverse**
366:14
**reverts**
356:20
**review**
9:9, 11:14,
15:2, 19:19,
25:16, 28:10,
32:3, 47:10,
49:7, 49:19,
51:13, 73:13,
73:17, 95:16,
101:11, 114:13,
117:18, 125:16,
137:22, 140:2,
143:14, 148:11,
154:8, 156:21,
165:22, 170:12,
170:22, 172:1,
176:12, 179:6,
186:1, 195:9,
198:11, 198:22,
199:17, 199:20,
210:11, 212:6,
212:10, 217:22,
218:17, 220:1,
220:9, 225:12,
225:15, 226:7,
229:10, 234:5,
237:10, 237:11,
242:3, 242:14,
242:22, 247:4,
252:1, 256:22,
263:21, 270:8,
302:4, 304:9,
311:13, 316:7,
318:21, 319:4,
320:14, 322:3,
323:12, 323:15,
337:21, 349:12,
349:13, 352:1,
364:13, 374:14,
380:20, 382:19,
385:1, 397:2,
397:13, 397:14,
398:3, 398:14,
409:1
**reviewed**
38:18, 140:7,

142:18, 162:15,
166:8, 225:17,
290:5, 298:16,
416:1
**reviewer**
171:3
**reviewing**
198:21, 301:16,
315:4, 365:3
**reviews**
14:20, 17:16,
19:17, 28:5,
28:7, 28:17,
28:19, 32:16,
45:5, 57:1,
71:15, 71:20,
73:11, 91:18,
92:2, 95:12,
96:5, 120:7,
143:10, 146:3,
148:8, 149:4,
156:16, 156:17,
157:6, 157:7,
167:5, 227:2,
236:6, 239:16,
240:3, 240:14,
247:2, 253:16,
302:8, 302:16,
305:14, 308:6,
316:21, 319:1,
323:1, 366:1,
381:18, 398:6
**revise**
26:8, 132:1,
154:21, 384:5
**revised**
98:10, 168:17,
169:11, 197:22
**revising**
37:17, 216:2,
278:20
**revisions**
17:16, 39:8,
60:20, 63:9,
65:7, 108:11,
112:3, 121:1,
146:4, 202:17,
206:5, 207:11,

222:12, 223:7,
223:9, 258:3,
317:15, 317:22,
318:12, 320:3,
320:13, 327:3,
330:15, 350:12,
382:17, 384:17,
399:4
**revive**
379:15
**revolution**
323:6
**revolves**
292:10
**revolving**
76:10
**rewriting**
279:21
**rhodd**
50:2, 52:15,
52:16, 55:18
**rhode**
297:17
**rich**
191:8
**ride**
272:17
**ridiculous**
355:19
**rifle**
308:21, 309:11,
309:19, 309:20,
310:13
**right**
5:7, 5:8, 5:10,
5:11, 70:15,
81:8, 83:10,
85:6, 86:20,
88:9, 93:2,
105:8, 106:8,
107:4, 114:10,
119:13, 132:5,
133:19, 133:21,
181:10, 181:11,
185:1, 197:15,
209:1, 218:20,
220:19, 228:11,
237:18, 240:19,

Transcript of Public Hearing
Conducted on February 11, 2020

246:8, 246:16,
248:19, 254:11,
264:12, 264:21,
274:7, 274:8,
275:21, 277:16,
279:19, 281:11,
282:17, 284:15,
284:22, 286:9,
287:18, 287:19,
287:21, 287:22,
296:3, 299:15,
311:4, 318:1,
332:4, 336:12,
341:20, 347:12,
355:15, 360:16,
363:12, 387:22,
389:20, 389:22,
391:11, 391:13,
391:20, 400:20,
403:15, 406:19,
414:7, 420:14,
420:18
**right-hand**
141:15
**right-of-ways**
56:13
**rightful**
387:7
**rights**
25:21, 29:1,
56:5, 82:17,
87:17, 89:16,
129:1, 157:11,
174:3, 185:22,
198:3, 198:5,
198:9, 359:3,
381:11, 383:6
**rights-of-way**
154:13
**rights-of-ways**
209:16
**rigid**
247:1
**rigor**
36:13, 38:16
**rigorously**
38:11, 124:20,
226:8

**riley**
359:7, 359:8
**rip**
182:17
**ripped**
404:9
**ripple**
175:2
**rise**
206:11, 277:2,
282:10, 317:5
**rising**
274:17, 337:12
**risk**
35:5, 48:2,
49:10, 49:11,
49:12, 64:18,
66:11, 69:17,
95:18, 96:2,
116:6, 175:6,
193:16, 196:4,
223:2, 227:12,
364:7, 367:22,
376:16, 412:2,
416:4
**risks**
48:14, 48:22,
49:12, 49:13,
126:6, 251:22,
299:4, 303:19,
341:17
**river**
38:1, 83:22,
84:2, 84:20,
85:11, 86:7,
123:9, 123:17,
174:14, 211:10,
297:22, 316:12,
378:15, 378:20,
378:21, 379:6,
379:14, 379:19,
382:1, 405:19,
405:21
**rivera**
323:22
**rivers**
54:5, 123:18,
330:12, 335:1

**rmps**
245:11
**road**
83:22, 100:14,
191:18, 217:6,
232:11, 294:11,
294:12, 317:4,
346:22, 419:17,
419:21, 420:2,
420:13
**roadblock**
101:8
**roadmap**
101:6
**roads**
118:5, 235:22,
250:20, 257:16,
259:12, 300:15,
313:12, 360:11,
360:20
**robbie**
291:11
**robert**
375:10
**robinson**
308:18
**robust**
38:22, 126:5,
168:9, 189:16,
373:12
**rock**
164:22, 197:18,
199:6, 199:18,
310:12
**rocky**
82:2, 320:10,
324:1, 324:7,
324:20, 325:9,
326:6, 326:15,
338:7
**rocky's**
325:20
**rod**
13:6, 13:11,
141:20
**rode**
272:17
**role**
73:12, 81:2,

206:16, 227:7,
250:1, 268:12,
268:19, 278:16,
324:12, 331:10,
341:9, 396:10,
403:2, 408:15
**roles**
249:5
**roll**
65:1, 275:19,
276:12, 328:1,
342:1, 372:10
**rollback**
59:3, 87:20,
95:8, 119:7,
246:20, 295:21,
352:9, 356:11,
359:1
**rollbacks**
56:9, 116:18,
184:11, 185:10,
186:11, 265:7,
265:8, 267:8,
267:19, 295:15,
331:13, 331:18,
333:14, 370:22,
414:19
**rolled**
57:14
**rolling**
117:1, 185:21,
207:8, 275:14,
354:17, 380:16
**room**
5:1, 7:4, 8:11,
49:22, 131:18,
133:13, 135:13,
243:15, 279:9,
290:16, 328:22,
346:20, 347:16,
394:8, 395:6,
395:21, 399:15,
400:9, 402:12
**roosevelt**
105:11, 105:16
**rooted**
75:8
**rose**
276:15, 276:17

Transcript of Public Hearing
Conducted on February 11, 2020

513

rosebud
52:16
rotate
291:5
rouge
49:15
rough
350:5
roughly
13:1, 147:3
round
286:14
route
111:22, 419:18,
420:3, 420:14
routinely
336:16
rubberstamp
319:5
rubin
403:18, 403:19
ruined
127:12
ruining
351:1
rule
4:4, 4:16,
4:21, 8:20,
9:14, 9:15,
10:12, 17:13,
18:17, 19:6,
21:4, 27:20,
29:4, 29:10,
30:18, 48:1,
48:5, 48:8,
48:9, 50:22,
53:1, 54:14,
54:16, 66:2,
76:4, 90:12,
91:2, 91:4,
91:6, 91:21,
92:5, 93:4,
98:18, 132:17,
133:6, 133:11,
137:8, 137:15,
138:5, 138:7,
139:3, 145:22,
146:1, 147:9,

147:20, 149:21,
156:10, 157:14,
167:16, 168:2,
168:5, 168:8,
168:16, 168:17,
169:11, 171:9,
171:20, 172:7,
176:7, 181:9,
198:15, 198:16,
198:18, 199:2,
199:14, 200:2,
200:20, 210:5,
229:2, 229:17,
230:19, 251:21,
265:9, 269:16,
286:16, 287:6,
289:19, 320:18,
321:7, 321:17,
321:21, 322:4,
322:11, 323:2,
323:16, 331:2,
363:4, 364:22,
365:12, 369:6,
369:17, 370:2,
377:11, 378:9,
382:17, 384:21,
384:22, 386:4,
410:19
ruled
199:22, 351:14
rulemaking
9:11, 16:19,
54:3, 76:5,
83:12, 92:11,
101:9, 137:13,
138:3, 145:6,
161:20, 162:14,
167:15, 176:22,
184:3, 191:1,
193:15, 251:11,
252:6, 263:10,
333:16, 336:19,
345:1, 407:10
rulemakings
14:2, 30:15,
142:12
rules
34:1, 54:4,

55:17, 64:13,
64:16, 83:1,
94:21, 102:22,
104:20, 117:2,
119:3, 164:3,
164:10, 164:11,
169:1, 171:12,
176:17, 190:1,
193:4, 196:18,
198:4, 213:6,
228:21, 234:9,
241:13, 243:17,
260:11, 275:5,
301:12, 302:2,
305:11, 317:20,
318:4, 318:22,
345:18, 356:11,
359:1, 366:7,
367:3, 367:4,
383:3, 414:20
ruling
155:6, 353:9
rulings
23:1, 26:15,
68:11, 151:15
run
111:21, 163:9,
270:15, 348:4,
349:1, 416:17
runner
111:14
running
43:1, 44:2,
294:13
runs
43:6, 43:7,
172:12
runway
233:15
ruptured
345:5
rural
27:8, 44:10,
74:18, 74:21,
99:10, 101:2,
155:21, 166:17,
167:22, 258:15,
259:10, 259:12,

259:14, 259:17,
259:20, 260:6,
261:4, 297:13,
304:21, 308:21,
318:14, 359:12,
405:4, 413:20
rushed
117:10, 129:10,
210:11, 415:3
rushing
386:17

### S

s-a-l-a-z-a-r
274:15
s-a-l-l-e-e
348:3
s-a-m
314:10
s-a-n-c-h-e-z
82:1
s-a-u-l
228:1
s-c-h-r-o-d-e-r
79:12
s-c-h-w-e-n-k-e
231:12
s-h-a-n-n-o-n
164:15, 211:8
s-h-a-w-c-r-o-f-t
258:11
s-h-o-s-h-a-n-a
250:4
s-i-k-o-r-s-k-i
356:6
s-m-i-t-h
339:2
s-u-s-a-n-n
317:9
s-u-z-a-n-n-e
244:8
sacred
42:1, 198:20,
248:8, 294:22,
334:10, 334:18,
335:7, 336:2,
404:8, 411:7
sacrifice
54:16, 387:21

Transcript of Public Hearing
Conducted on February 11, 2020

514

| | | | |
|---|---|---|---|
| sacrificing<br>220:16, 301:9<br>sadly<br>312:20, 320:16<br>safe<br>86:8, 90:9,<br>116:17, 184:15,<br>185:3, 185:4,<br>363:2<br>safeguarding<br>89:7<br>safeguards<br>220:17, 415:19<br>safer<br>240:8, 335:18<br>safety<br>48:3, 88:21,<br>117:16, 179:20,<br>219:3, 224:20,<br>227:13, 240:5,<br>309:16, 310:14,<br>321:10, 362:21,<br>372:14, 373:4,<br>373:10, 416:14<br>sage<br>100:11, 241:2,<br>241:3, 244:1,<br>291:14, 291:22,<br>294:3, 294:4,<br>295:2<br>sage-grouse<br>36:10, 181:20,<br>223:21, 230:13,<br>292:6, 293:5<br>sagebrush<br>36:9<br>said<br>8:22, 29:15,<br>51:16, 77:8,<br>135:18, 136:14,<br>162:19, 272:19,<br>272:20, 282:7,<br>377:19, 379:1,<br>390:2, 421:5<br>sake<br>270:9, 340:12,<br>404:9<br>sal<br>215:21, 216:14 | salazar<br>274:11, 274:12,<br>274:14, 274:15,<br>277:15<br>salient<br>395:12<br>sallee<br>348:2<br>sally<br>200:12, 200:13,<br>205:10, 205:12<br>sam<br>314:9<br>same<br>47:16, 92:1,<br>160:13, 160:17,<br>163:13, 173:13,<br>204:22, 214:10,<br>262:16, 282:5,<br>285:4, 292:22,<br>303:10, 303:14,<br>316:6, 321:5,<br>347:4, 369:5,<br>375:18, 409:8,<br>412:5<br>samuel<br>294:4<br>san<br>248:5, 249:18,<br>249:21<br>sanchez<br>81:21, 81:22,<br>82:1<br>sand<br>122:3, 195:12,<br>338:12<br>sandhill<br>43:5<br>sandoval<br>177:5, 184:6,<br>184:8, 184:9,<br>187:16<br>sands<br>45:12<br>sanity<br>406:17<br>santiago<br>340:15 | sarah<br>96:21<br>sat<br>330:18<br>saudi<br>45:17<br>sauk<br>282:6<br>saul<br>220:20, 220:21,<br>227:21, 228:1<br>savage<br>402:6<br>save<br>316:21<br>saves<br>253:9<br>savings<br>66:22<br>saw<br>46:1, 111:1,<br>272:6, 294:11,<br>389:13<br>say<br>30:5, 42:9,<br>62:12, 86:21,<br>87:6, 120:18,<br>126:17, 128:6,<br>132:1, 179:6,<br>185:8, 187:13,<br>216:17, 232:4,<br>235:7, 251:13,<br>274:20, 276:6,<br>277:4, 279:20,<br>282:8, 286:6,<br>309:1, 313:21,<br>328:18, 332:8,<br>332:10, 345:13,<br>350:16, 361:6,<br>372:13, 387:5,<br>390:18, 391:19,<br>400:3, 400:12,<br>403:13, 418:16,<br>420:9<br>saying<br>39:18, 77:11,<br>159:9, 161:16,<br>273:18, 289:6, | 321:17, 392:12<br>says<br>6:12, 195:4,<br>214:12, 273:19,<br>332:5<br>sb<br>69:3<br>scale<br>66:17, 75:18,<br>103:2, 118:2,<br>174:21, 210:17,<br>210:19, 278:11,<br>368:4, 378:7<br>scalpel<br>314:2<br>scam<br>333:9<br>scatterplot<br>253:10<br>scenery<br>59:16<br>scenic<br>130:6, 174:8,<br>312:18<br>schedule<br>15:18, 16:2,<br>16:8, 16:15,<br>19:19, 19:22,<br>144:13, 148:10,<br>148:14, 239:20,<br>403:1<br>scheduled<br>8:1, 78:16,<br>288:9, 290:13<br>schedules<br>15:11, 143:21,<br>220:3, 240:11<br>schemes<br>237:6<br>scholar<br>334:4, 385:3<br>school<br>116:13, 177:15,<br>281:18, 334:2,<br>334:3, 345:17,<br>379:4, 403:1,<br>404:11<br>schoolteacher<br>42:19 |

Transcript of Public Hearing
Conducted on February 11, 2020                                    515

| | | | |
|---|---|---|---|
| **schroder** | **seconds** | | **282:9, 317:21,** |
| 79:6, 79:7, | 304:11, 314:5, | 6:13, 134:22, | 331:7, 332:18, |
| 79:10, 79:11 | 331:2, 364:5, | 135:1 | 332:19, 340:9, |
| **schwenke** | 398:2 | **secrecy** | 345:16, 353:16, |
| 231:7, 231:11, | **scoping** | 184:1 | 354:14, 355:6, |
| 231:12 | 15:20, 20:18, | **secretary** | 376:5, 380:17, |
| **science** | 85:9, 144:9, | 51:15, 52:5, | 388:5, 401:16 |
| 37:4, 94:15, | 149:13, 280:6, | 99:1, 192:19, | **seeing** |
| 95:14, 166:10, | 301:15 | 308:22, 309:12 | 75:17, 76:11, |
| 203:4, 203:21, | **scrap** | **section** | 78:8, 161:5, |
| 212:4, 223:6, | 231:4 | 9:20, 10:8, | 218:7, 242:3, |
| 281:20, 292:2, | **scraped** | 18:7, 20:10, | 326:7, 357:7, |
| 311:18, 342:13, | 366:22 | 28:3, 37:11, | 380:3, 393:10 |
| 343:17 | **scraping** | 37:13, 71:18, | **seek** |
| **science-based** | 294:17 | 73:11, 130:7, | 4:13, 21:7, |
| 66:15, 278:10, | **scrutinize** | 138:11, 138:20, | 31:20, 133:3, |
| 381:14 | 263:16 | 139:1, 146:16, | 150:2, 160:1, |
| **scientific** | **scrutiny** | 149:5, 152:1, | 176:8, 268:15, |
| 36:13, 36:16, | 416:2 | 156:14, 166:15, | 287:3, 315:22, |
| 37:12, 38:16, | **sea** | 214:8, 215:13, | 337:1, 366:16 |
| 166:19, 169:9, | 206:11, 298:2, | 223:7, 223:10, | **seeking** |
| 212:18, 214:9, | 317:5, 402:15 | 229:19, 255:18, | 213:8, 223:13, |
| 214:14, 215:3, | **search** | 369:7, 374:18 | 236:16, 268:17, |
| 215:9, 215:10, | 415:21 | **sections** | 354:12 |
| 215:15, 216:10, | **seas** | 37:1, 292:18, | **seeks** |
| 216:18, 226:3, | 337:13 | 294:1 | 81:7, 252:6, |
| 226:5, 244:18, | **seasonable** | **sector** | 343:20 |
| 245:9, 247:8, | 325:4 | 14:6, 142:17, | **seem** |
| 301:16 | **seasonal** | 188:1, 257:21 | 40:13, 183:21 |
| **scientifically** | 72:9, 201:12 | **sectors** | **seemed** |
| 36:17 | **seasons** | 217:10, 362:2 | 309:21 |
| **scientist** | 63:14 | **secure** | **seeming** |
| 340:3, 388:22, | **seat** | 250:7, 335:22 | 331:9 |
| 403:8 | 179:15, 207:22 | **securing** | **seems** |
| **scientists** | **seats** | 256:12, 348:20 | 248:11, 319:4, |
| 124:11 | 8:12, 136:21, | **security** | 340:2 |
| **scope** | 220:22, 241:1, | 121:22, 264:14, | **seen** |
| 12:15, 18:11, | 291:6 | 321:5, 321:11, | 45:22, 118:11, |
| 19:12, 62:22, | **second** | 343:5, 359:2 | 160:9, 200:8, |
| 71:14, 72:2, | 3:4, 71:17, | **see** | 203:4, 230:6, |
| 73:7, 78:5, | 78:18, 81:1, | 7:18, 13:2, | 254:5, 264:13, |
| 96:1, 109:18, | 91:20, 195:22, | 34:16, 34:19, | 265:12, 275:8, |
| 110:1, 141:2, | 198:18, 213:2, | 35:6, 76:10, | 276:9, 325:2, |
| 146:22, 148:4, | 253:13, 280:15, | 90:21, 101:6, | 387:19, 393:15 |
| 149:4, 172:4, | 289:9, 408:19 | 205:2, 244:3, | **seeping** |
| 172:8, 172:18, | **secondary** | 245:20, 249:10, | 191:20 |
| 182:18, 225:14, | 368:3 | 259:5, 273:6, | **seeps** |
| 269:11, 269:18, | **secondly** | 274:8, 277:12, | 191:22 |
| | 172:18 | | |

Transcript of Public Hearing
Conducted on February 11, 2020

516

segmentation
169:16, 371:13
segments
362:15
seizing
66:21
self
243:11, 283:22
self-destructed
41:6
self-destructive
283:22
self-determinati-
on
243:11
sell
284:13, 379:18
selling
392:1
sellout
87:21
senate
69:11, 276:2,
276:3
senator
391:7
send
345:13
senior
4:10, 15:13,
16:1, 16:7,
16:14, 18:19,
19:9, 65:20,
99:1, 132:21,
133:15, 144:1,
144:12, 145:1,
147:11, 147:22,
167:13, 171:5,
221:3, 255:3,
286:22, 287:12,
320:7, 362:13
sense
92:2, 177:16,
193:12, 202:1,
221:17, 254:4,
372:10, 382:14,
383:18
sensible
383:12

sensitive
31:7, 196:20,
325:11
sentence
214:9, 215:1
sentences
166:15
sentiment
330:17, 340:10
sentinel
51:2
separate
22:10, 151:1,
219:19, 241:11
separation
281:10
series
312:22
serious
34:9, 96:6,
118:13, 121:19,
122:5, 163:14,
178:18, 192:16,
207:7, 327:10,
341:17, 367:16,
409:13
seriously
43:22, 44:5
servants
209:8
serve
30:10, 47:3,
51:11, 78:4,
97:8, 255:9,
335:16, 407:21
served
97:9, 119:3,
125:18, 125:20,
227:18, 407:4,
411:8
serves
45:2, 187:1,
253:2, 376:7
service
47:2, 55:20,
59:15, 60:3,
60:9, 60:13,
60:17, 60:22,

61:4, 61:22,
75:15, 97:4,
97:11, 97:19,
106:2, 106:3,
106:14, 106:20,
131:7, 232:3,
237:1, 238:3,
238:10, 244:11,
291:21, 297:20,
298:6, 298:8,
298:10, 372:1,
389:12
service's
61:13
services
63:8, 90:21,
241:17, 342:14,
363:16
serving
43:4, 254:22,
320:9
session
3:3, 3:4, 3:5,
4:15, 6:19, 8:1,
74:15, 133:5,
135:6, 136:7,
136:12, 136:22,
287:7, 290:13,
290:15, 347:17,
355:22, 356:1,
418:5
sessions
180:2, 180:15,
315:14, 330:18
set
51:5, 54:4,
214:1, 219:9,
220:2, 253:16,
304:12, 308:13,
330:6, 360:22,
373:14, 382:18,
396:13, 407:11,
410:17
sets
9:21, 122:6,
138:11, 222:2,
222:5
setting
362:19

seven
13:1, 50:1,
103:17, 141:10,
160:8, 164:9,
165:8, 218:16,
238:11, 294:7,
306:1, 328:19,
342:9, 355:7,
403:17, 413:17
seventh
272:13
several
85:9, 130:1,
194:10, 236:9,
278:22, 279:12
severe
63:14, 104:4,
218:22, 337:13,
357:10
severely
98:13, 130:15,
225:16, 247:6,
318:9, 329:12,
337:20
shadow
200:7
shake
282:14
shale
309:12, 309:22
shall
98:12, 214:13,
215:1
sham
333:9
shana
264:19, 264:20,
264:21
shannon
164:13, 164:14,
211:7, 211:8
shape
188:14, 250:19
shaped
309:3
shapes
81:14
shaping
94:22, 185:8

Transcript of Public Hearing
Conducted on February 11, 2020                    517

share
57:5, 93:18,
130:13, 160:13,
164:6, 258:21,
267:3, 287:8,
288:2, 305:18,
328:13, 336:3
shared
100:6, 101:7,
187:10, 214:20,
311:17
shasta
41:21
shawcroft
258:10, 261:6
sheds
312:18
sheep
72:11, 303:11
sheer
338:8
sheet
4:20, 133:10,
289:16
shelving
262:15
shendo
386:6, 386:7
shepherded
387:17
shift
73:12
shiprock
281:14, 281:19
shop
259:3
short
4:15, 61:17,
133:5, 174:13,
194:16, 229:16,
238:22, 253:16,
313:18, 314:7,
319:6, 324:18,
339:9, 358:18,
360:4, 417:11
short-sighted
41:4
shortcomings
39:9

shortcuts
251:22, 279:9
shortcutting
270:12
shorten
236:8, 291:7
shortening
203:15
shortens
165:20
shorter
63:13, 68:22
shortfalls
60:11
shortly
84:18, 139:10
shortness
367:10
shoshana
250:3
should
6:2, 8:6,
15:21, 16:4,
16:10, 16:20,
22:20, 23:18,
23:19, 26:12,
26:17, 54:4,
57:15, 59:19,
67:14, 87:1,
88:22, 91:8,
92:4, 105:6,
105:8, 110:9,
117:10, 123:13,
135:20, 144:9,
144:16, 144:19,
145:7, 151:12,
152:13, 152:14,
155:2, 155:7,
165:17, 179:14,
180:17, 185:8,
190:4, 190:5,
190:7, 190:13,
192:17, 199:13,
200:2, 215:9,
219:14, 220:5,
234:8, 241:9,
243:7, 251:8,
251:13, 252:17,

276:11, 279:6,
279:7, 279:8,
279:11, 284:17,
284:20, 284:21,
284:22, 285:7,
287:22, 288:17,
289:20, 310:6,
314:2, 314:8,
314:16, 322:19,
333:2, 339:17,
361:9, 384:18,
393:22, 409:9,
413:20, 414:4,
417:7, 420:16
shouldering
180:13
shoulders
219:6, 239:11,
310:9
shouldn't
57:14, 284:16,
304:15, 414:3
shout
264:13
show
105:15, 195:6,
261:3, 284:6,
326:16, 349:12,
368:9
showing
105:7, 132:11,
186:18, 300:15
shown
54:7, 239:5,
335:15
shows
115:12, 141:12,
172:20, 199:8
shroud
111:3
shudder
358:20
si
52:19
sic
345:1
sick
275:16, 276:22,

354:22
sickened
404:7
sicker
346:15
sickness
128:9
side
106:7, 141:15,
204:16, 285:1,
285:2, 339:18,
392:16
sides
285:3, 386:1
sidney
162:21
sierra
167:13, 370:9,
370:21, 414:14,
414:18
sighted
61:18
sign
6:11, 6:15,
107:16, 134:21,
135:1, 289:9,
289:10
sign-ups
339:10
signal
100:10
signature-7dmpd
421:13
signatures
333:13
signed
5:17, 120:2,
134:6, 366:8
significance
190:10, 409:6
significant
11:13, 11:19,
12:1, 20:8,
22:20, 24:5,
26:18, 58:6,
67:15, 71:9,
73:14, 86:2,
91:18, 101:3,

Transcript of Public Hearing
Conducted on February 11, 2020

518

114:14, 116:21,
140:1, 140:7,
140:11, 148:22,
151:12, 152:22,
155:8, 168:18,
171:22, 172:10,
172:17, 192:18,
196:9, 197:11,
212:22, 218:4,
237:5, 254:8,
296:22, 297:12,
298:17, 368:15,
381:12, 397:18,
409:10
**significantly**
12:17, 46:4,
111:12, 141:4,
170:11, 199:13,
226:6, 298:15,
364:15, 377:14,
408:20, 409:3,
410:2
**signing**
369:13
**signs**
5:9, 107:15,
133:21, 287:20,
289:8
**sikorski**
356:5, 356:6
**silence**
5:6, 112:21,
133:17, 287:15,
353:10
**silenced**
167:3, 185:17,
412:17
**silences**
125:7, 226:18,
337:19
**silencing**
176:14
**silent**
163:22
**silver**
130:9, 130:13,
130:17, 130:21,
309:7

**similar**
92:12, 204:8,
276:2
**similarly**
374:12
**simple**
45:10, 213:9,
224:21, 254:6,
293:19, 349:8
**simplify**
18:15, 146:19,
147:7, 161:18,
251:18
**simplifying**
305:11
**simply**
110:2, 129:14,
176:1, 196:12,
218:19, 302:6,
364:12, 371:17,
415:16, 417:20
**since**
16:17, 32:14,
67:19, 88:3,
93:16, 104:15,
145:3, 159:12,
180:14, 219:4,
221:7, 267:16,
347:21, 369:12,
376:10, 379:20
**single**
20:6, 20:7,
148:20, 148:21,
280:19, 284:22,
315:7, 322:20,
339:21
**sioux**
39:21, 52:17,
197:18, 199:6,
199:18
**sir**
36:4, 101:21,
137:9, 164:12,
271:12, 277:21
**sisters**
386:9
**sit**
8:17, 41:8,

52:14, 59:8,
70:12, 83:20,
93:10, 102:1,
200:13, 291:4,
291:6, 339:19
**site**
61:8, 61:10,
92:14, 127:7,
166:2, 166:6,
363:7, 384:8
**sited**
223:19
**sites**
42:1, 54:9,
56:13, 57:2,
58:7, 106:4,
127:8, 165:13,
191:18, 198:20,
294:22, 296:6,
309:9, 373:5,
401:11, 405:18
**siting**
85:22
**sits**
309:11, 338:12
**sitting**
259:2
**situation**
42:4, 159:16
**situations**
171:4, 254:3,
384:11
**six**
80:3, 104:9,
166:9, 299:14,
341:1, 345:4,
374:22
**size**
76:2, 297:17,
328:11
**sizes**
392:8
**ski**
66:8, 90:19,
382:22
**skier**
100:20
**skiers**
95:2

**skies**
86:18
**skills**
115:19
**skirt**
120:20, 406:9
**sky**
283:6, 359:20,
402:15
**skyrocketed**
285:17
**skyrocketing**
300:3
**slap**
40:5, 40:6
**sleep**
116:1, 118:4,
204:17
**slide**
14:10, 141:12,
142:22
**slope**
99:11, 309:2,
342:11, 367:21
**slot**
250:8, 339:11
**slots**
44:18, 408:7
**slow**
35:21, 259:4,
277:7, 300:17,
388:11
**slowed**
34:9
**slowing**
167:4
**slowly**
192:3, 357:5
**slows**
34:14
**small**
24:12, 153:7,
196:22, 216:16,
231:17, 253:22,
254:5, 290:18,
305:4, 386:8
**smaller**
230:4

Transcript of Public Hearing
Conducted on February 11, 2020                                          519

```
smallest              221:4, 246:6,         252:3, 264:15,       sorry
232:22                300:13, 311:9,         278:12, 278:13,      119:16, 167:11,
smallpox              312:6, 333:3,          289:15, 289:16,      177:9, 179:9,
126:17                333:5, 362:8,          289:19, 294:13,      202:20, 208:4,
smart                 413:17                 294:22, 295:5,       255:2, 282:3,
40:13, 47:7,          society's             296:6, 303:13,       332:9, 397:9
387:22, 388:8,        311:14                 329:3, 337:22,       sort
401:8                 soil                   341:16, 363:19,      27:21, 136:21,
smarter               43:5, 45:16            365:8, 374:22,       418:18, 419:1
107:11                soils                  379:20, 386:10,      sorts
smartway              85:16                  387:15, 394:4,       37:3
159:11                solace                 395:6, 395:15,       sound
smile                 184:17                 397:12, 418:7,       36:17, 36:18,
282:12                solar                  419:1, 419:4,        38:22, 39:3,
smith                 47:11, 92:15,          419:19, 419:21       42:6, 47:18,
339:1                 232:9, 302:21,         somebody             94:15, 111:6,
smog                  321:14, 363:8          131:18, 277:19       181:17, 262:14,
206:19                sold                   somehow              311:17, 312:5,
smoke                 44:18                  229:10               338:17, 340:6,
411:1                 solicit                someone              410:3
smoker                26:4, 154:17           288:22, 377:19,      sounds
345:10                soliciting             390:8                420:10
smoking               27:16, 156:6           something            source
176:17                solution               35:6, 77:7,          88:19, 186:20,
smooth                383:13, 415:21         125:22, 161:2,       191:21, 192:6,
282:15                solutions              267:4, 285:13,       252:14
snafu                 223:20, 237:14,        285:20, 355:6,       sources
35:7                  270:16, 333:22,        386:20, 387:19,      37:11, 173:12,
snow                  334:8, 335:14          389:9, 395:16,       206:21, 246:14,
111:4                 solve                  395:17, 418:17       247:8, 252:12,
snowpack              246:5                  sometime             292:6, 293:3,
63:13, 66:9,          solving                123:13               363:11, 368:16
72:5, 118:15          176:22                 sometimes            south
so-called             some                   31:18, 80:11,        45:16, 54:10,
404:9                 4:22, 7:20,            80:15, 160:15,       85:21, 103:14,
social                17:7, 21:12,           259:10, 332:10,      123:9, 123:14,
10:5, 68:19,          21:19, 39:10,          341:10, 389:18,      123:15, 123:19,
69:4, 115:18,         40:19, 48:6,           402:10, 413:11       124:4, 239:7,
116:22, 138:17,       70:13, 98:12,          son                  258:16, 399:20
271:4, 309:15,        105:7, 107:1,          43:1                 southeast
344:21, 411:5,        107:15, 123:19,        sons                 74:20, 165:1,
413:5, 413:10         127:14, 133:12,        411:3                165:11
socially              136:9, 136:20,         soon                 southeastern
328:21                137:14, 145:15,        64:1, 93:4,          84:2
societies             160:10, 161:13,        110:12, 203:1,       southern
40:16, 40:20          161:18, 189:5,         240:8, 365:12        74:18, 75:9,
society               209:7, 236:6,          sooner               129:21, 241:4,
74:17, 174:15,        238:19, 251:11,        118:16, 234:3        258:15, 405:22
```

Transcript of Public Hearing
Conducted on February 11, 2020

520

| | | | |
|---|---|---|---|
| **southwest** 103:16, 162:17, 173:22, 297:14, 375:12 **southwestern** 181:21 **sovereign** 29:1, 42:1, 157:11, 164:20, 386:12, 386:13 **sovereignty** 54:17 **sow** 224:9 **space** 129:20, 230:2, 272:19, 324:21 **spaces** 61:17, 113:18, 115:11, 115:13, 116:2, 180:10 **spare** 230:17 **sparing** 357:13 **spawned** 245:10 **speak** 5:17, 6:4, 6:9, 6:21, 8:4, 8:6, 8:7, 8:16, 40:2, 40:4, 44:20, 50:8, 59:8, 70:12, 74:14, 74:20, 75:2, 94:3, 107:2, 107:3, 128:20, 134:6, 135:8, 136:10, 136:14, 136:15, 164:4, 177:14, 200:7, 202:21, 227:22, 243:20, 250:8, 268:5, 272:5, 273:4, 273:7, 274:6, 278:22, 282:5, 288:18, 288:21, 289:3, | 289:4, 289:11, 290:22, 324:4, 329:5, 339:4, 340:20, 344:20, 386:2, 386:13, 387:2, 388:19, 390:2, 403:20, 403:21, 418:15, 420:15, 420:19 **speaker** 59:5, 62:4, 70:14, 77:8, 132:5, 158:15, 205:11, 271:14, 286:6, 286:11, 327:19, 328:3, 347:13, 347:14, 347:17, 355:21, 356:1, 356:4, 414:6, 418:2, 418:6 **speakers** 5:21, 6:1, 6:19, 6:20, 52:13, 70:7, 78:18, 132:10, 134:11, 134:12, 135:5, 135:7, 136:9, 200:10, 207:15, 207:16, 279:13, 288:14, 288:16, 289:13, 291:8, 299:12, 306:1, 327:17, 347:18, 353:15, 370:6, 382:4, 396:1, 399:10, 418:1 **speaking** 5:14, 55:3, 65:15, 134:3, 134:14, 135:9, 167:14, 202:19, 281:14, 284:21, 288:3, 295:13, 407:2, 408:7, 418:4, 420:21 **speaks** 216:16, 331:7 | **special** 278:6, 311:2, 324:10 **specialists** 386:21 **specialized** 366:2 **specie** 216:11 **species** 36:10, 58:8, 60:13, 75:10, 75:22, 111:2, 181:7, 183:2, 183:9, 183:12, 216:1, 216:11, 221:8, 283:10, 292:1, 292:15, 293:20, 325:14, 326:13, 336:1, 342:21, 343:3, 343:8, 379:8, 380:5, 380:22, 381:5, 381:9, 394:9 **specific** 14:5, 27:3, 125:10, 142:16, 155:15, 166:2, 166:14, 172:15, 182:6, 247:7, 292:13, 294:1, 307:17, 376:20, 384:8, 397:3 **specifically** 19:10, 26:4, 36:12, 91:20, 148:2, 154:17, 164:20, 165:19, 172:19, 173:11, 182:7, 218:10, 262:18, 292:16, 292:19, 377:12, 384:21 **specificity** 26:9, 154:21 **specifics** 293:14 | **specifies** 121:3 **spectacular** 110:19, 137:5 **spectrum** 263:6, 328:21 **speculative** 109:21, 110:3, 110:6 **speed** 27:7, 155:20, 259:14, 302:21 **speedier** 239:6 **speeding** 167:5 **spell** 6:5, 6:8, 30:4, 30:5, 52:17, 96:17, 134:15, 134:16, 193:19, 288:21, 289:4, 347:22, 353:20 **spelled** 50:5, 96:22, 102:7, 190:21, 217:1, 261:8 **spelling** 119:19, 162:9, 418:11 **spend** 112:7, 115:14, 203:11 **spending** 205:4 **spent** 77:20, 88:18, 115:19, 219:12, 219:14, 228:3, 228:6 **spill** 196:5, 405:19 **spilling** 413:5 **spills** 203:18 **spirituality** 411:13 |

Transcript of Public Hearing
Conducted on February 11, 2020                                    521

| | | | |
|---|---|---|---|
| **splashed**<br>110:21<br>**split**<br>212:14<br>**spoke**<br>42:7, 42:8,<br>44:19<br>**spoken**<br>108:15, 163:11<br>**spokesperson**<br>350:21<br>**sponsors**<br>25:5, 153:20,<br>364:6<br>**sporting**<br>123:21<br>**sportsmen**<br>124:11<br>**spot**<br>325:18, 325:21<br>**spray**<br>163:6<br>**spring**<br>163:22<br>**springs**<br>191:22, 237:21,<br>239:8, 367:20<br>**spur**<br>50:19, 235:4,<br>373:12<br>**square**<br>232:1<br>**squarely**<br>122:5, 126:7,<br>373:22<br>**squeaky**<br>326:1<br>**squelch**<br>273:13<br>**st**<br>13:10, 51:3,<br>141:19, 202:14,<br>203:2, 320:20<br>**stability**<br>266:8, 305:16<br>**stable**<br>116:17<br>**staff**<br>5:19, 7:18, | 7:19, 7:21,<br>38:8, 136:5,<br>211:9, 238:1<br>**staffed**<br>319:6<br>**staffing**<br>253:20<br>**stage**<br>54:5, 73:13<br>**stages**<br>292:7<br>**stake**<br>280:12, 332:1,<br>332:2<br>**staked**<br>191:10<br>**stakeholder**<br>307:2, 350:21<br>**stakeholders**<br>17:1, 62:19,<br>145:11, 217:19,<br>236:18, 305:7,<br>320:11, 322:6,<br>340:13, 370:3,<br>386:3, 417:20<br>**stakes**<br>74:2<br>**stale**<br>80:18<br>**stall**<br>260:4, 349:3<br>**stalled**<br>300:13<br>**stalling**<br>235:17<br>**stan**<br>50:1, 50:5<br>**stand**<br>56:17, 111:10,<br>181:9, 185:16,<br>187:11, 279:11,<br>353:10, 353:11,<br>354:11, 354:13,<br>402:4, 402:8,<br>420:1<br>**standard**<br>53:19, 91:7,<br>173:2, 190:5, | 302:13, 314:8,<br>362:18, 367:18<br>**standards**<br>122:9, 220:10,<br>362:20, 367:5,<br>367:21<br>**standby**<br>271:18<br>**standing**<br>39:19, 197:18,<br>199:6, 199:18,<br>373:19, 406:12<br>**stands**<br>352:6<br>**staple**<br>309:5<br>**stark**<br>306:21<br>**start**<br>9:5, 15:20,<br>30:2, 89:6,<br>105:10, 137:18,<br>144:8, 162:19,<br>205:7, 217:16,<br>292:12, 330:16,<br>346:11, 392:12<br>**started**<br>8:15, 123:5,<br>137:17, 180:1,<br>191:12, 200:6,<br>293:1<br>**starting**<br>161:14, 335:4,<br>375:1<br>**starts**<br>357:1<br>**state**<br>6:5, 6:8,<br>22:16, 25:19,<br>28:16, 29:3,<br>44:7, 65:14,<br>66:3, 66:16,<br>66:20, 67:7,<br>68:9, 69:8,<br>69:16, 70:16,<br>72:8, 74:3,<br>74:8, 85:12,<br>86:1, 103:21, | 104:8, 104:14,<br>112:11, 134:15,<br>134:16, 151:7,<br>153:10, 154:11,<br>157:5, 157:13,<br>158:21, 159:3,<br>164:19, 174:7,<br>174:10, 174:19,<br>193:19, 197:15,<br>204:11, 208:9,<br>210:16, 234:14,<br>239:18, 241:5,<br>263:13, 268:8,<br>270:21, 274:15,<br>274:16, 275:4,<br>275:7, 275:12,<br>276:1, 288:21,<br>297:17, 300:1,<br>307:8, 311:8,<br>316:9, 354:9,<br>355:10, 359:12,<br>363:13, 364:14,<br>367:11, 367:19,<br>368:17, 379:11,<br>385:15, 385:21,<br>387:12, 395:16,<br>414:17<br>**state's**<br>65:21, 71:10,<br>102:12, 102:14,<br>211:13, 300:8,<br>396:10<br>**stated**<br>22:17, 28:1,<br>216:5, 227:10,<br>270:19, 325:17,<br>365:5, 366:10<br>**statehood**<br>392:7<br>**statement**<br>7:1, 10:16,<br>12:2, 12:3,<br>12:13, 15:22,<br>26:7, 32:5,<br>51:19, 55:19,<br>79:22, 106:18,<br>135:10, 139:7,<br>140:12, 140:13, |

Transcript of Public Hearing
Conducted on February 11, 2020                                      522

144:11, 197:12,
205:13, 212:1,
236:5, 249:4,
269:22, 384:12,
409:2, 420:10
**statements**
11:10, 12:6,
24:19, 25:7,
51:6, 51:22,
58:19, 73:22,
85:11, 140:15,
153:22, 200:2,
228:7, 238:8,
305:13, 377:3,
397:16
**states**
17:2, 28:15,
41:1, 59:1,
98:1, 105:12,
114:21, 124:9,
125:18, 145:11,
157:3, 159:6,
174:17, 175:12,
203:3, 215:14,
225:18, 226:1,
238:12, 252:7,
258:19, 279:3,
279:4, 279:6,
285:15, 286:1,
296:12, 296:20,
306:12, 307:14,
324:9, 334:14,
338:2, 341:22,
348:13, 350:13,
351:10, 353:2,
369:21, 373:16,
386:15, 390:17,
390:22, 399:18,
419:3
**statewide**
177:8
**static**
320:22
**stating**
106:12, 217:16
**station**
285:18
**statistics**
401:7

**status**
54:21, 204:14
**statute**
11:11, 12:3,
95:1, 114:20,
194:4, 197:9,
220:11, 222:2,
270:3
**statute's**
224:5
**statutes**
120:15, 194:16,
195:2
**statutory**
20:16, 149:10,
189:8, 190:1,
364:5, 408:20
**stay**
267:7, 310:19,
361:10
**steamroll**
64:18
**steamrolling**
332:15, 332:16
**steel**
357:17
**stem**
385:8
**step**
5:18, 134:7,
237:11, 281:8,
364:22
**stepped**
390:11
**steps**
137:15, 194:8,
240:14, 269:4,
368:16
**sterilize**
391:1
**steve**
200:7, 200:8
**steward**
342:2
**stewarding**
327:14
**stewards**
43:4, 55:14,

221:20, 310:17
**stewardship**
53:12, 374:14
**stick**
122:2
**stifle**
168:11
**still**
42:2, 83:3,
111:5, 178:21,
194:13, 194:20,
212:5, 220:9,
234:1, 271:20,
284:12, 300:17,
308:14, 329:3,
343:11, 388:1,
389:15, 405:15,
418:16
**stimulate**
257:15, 398:20
**stipulations**
64:7
**stolen**
39:20
**stood**
111:11, 213:12
**stop**
6:15, 45:18,
83:15, 107:16,
135:2, 163:18,
188:15, 309:1,
311:4, 356:12,
372:1, 372:4
**stopped**
111:7, 284:11
**stops**
364:16
**storage**
92:18, 254:18,
307:7, 307:9,
307:16
**stories**
58:10, 75:2,
338:14, 400:8,
404:3, 404:6
**storm**
357:18, 357:21
**storms**
121:18, 178:15

**stormwater**
240:6
**story**
162:20, 183:2,
219:20, 294:6,
344:16, 380:22
**straight**
106:6
**stranger**
206:18
**strategies**
407:8
**stream**
89:19, 111:20
**streamline**
28:10, 156:20,
160:2, 161:19,
237:10, 256:21,
270:8, 282:19,
384:17, 418:22,
419:2
**streamlined**
32:3, 34:19,
76:13, 161:1,
232:17, 234:10,
260:20, 302:19
**streamlining**
34:3, 75:18,
243:14, 251:17,
252:2, 270:11,
419:6
**streams**
180:9
**street**
2:6, 107:15,
272:19, 272:21,
279:1, 354:14,
412:9
**streets**
163:8
**strength**
329:14
**strengthen**
69:21, 127:2,
406:10
**strengthened**
57:16, 89:1,
404:19

Transcript of Public Hearing
Conducted on February 11, 2020

523

strengthening
220:2, 344:5
strengthens
186:17
stress
115:22
stretch
219:7, 239:9
stretched
363:22
strict
190:3, 204:10,
295:9
stricter
63:4
strides
159:12, 159:13,
379:20
strike
22:9, 150:22,
412:14
striking
409:5
stringent
200:1
stripped
327:8
strive
45:7, 159:20
strived
282:1
striving
266:3
strong
56:17, 90:7,
98:1, 126:8,
178:2, 181:8,
182:2, 199:17,
199:19, 205:17,
267:20, 314:13,
359:10, 374:16,
389:8, 407:20,
414:18
stronger
115:17, 249:5,
250:1, 296:12
strongly
93:3, 96:13,

102:21, 108:11,
110:10, 249:19,
365:11, 372:9
structure
27:13, 156:4,
224:2, 301:6
structured
250:11
structures
293:20
struggle
380:12, 380:15
struggled
265:20, 266:18
struggling
100:15
stu
8:21, 29:15
stuart
4:9, 132:21,
286:21
stuck
361:10, 390:13
student
281:16, 281:17,
377:20
students
228:10, 273:1
studied
352:17
studies
179:3, 219:12,
245:9, 304:6,
309:14, 310:3,
326:15, 368:8,
377:18, 378:4
study
67:13, 179:12,
208:16, 223:3,
329:8, 377:8,
403:8
studying
36:7, 36:9,
228:6, 329:16,
377:9
stuff
106:19, 107:3,
128:2, 403:6

stupid
401:8
sturgeon
230:14
stymie
374:20
stymied
394:20
subdivided
14:6, 142:16
subject
24:3, 152:20,
195:16, 251:14,
263:12, 337:21,
382:18, 401:16
subjective
36:22, 37:13,
302:11
submissions
322:16
submit
7:7, 7:10,
7:11, 7:12,
20:22, 36:2,
49:20, 55:19,
62:1, 99:6,
149:17, 209:21,
212:17, 289:20,
344:10
submittal
55:8
submitted
7:16, 85:14,
136:2, 290:3,
290:8, 312:7
submitting
135:21, 333:10
subordinate
81:11
subsequent
384:8
subset
196:22
subsidies
176:5, 311:2
substantial
48:16, 175:14,
242:2

substantially
32:16
substantive
17:6, 84:14,
85:15, 145:15,
188:11, 190:1,
194:6, 195:3,
311:18
substantively
11:2, 139:14,
408:8
subsurface
53:16
suburban
300:2
subversion
193:9
succeeding
115:2, 222:7
success
42:11, 349:19,
357:3, 393:9
successes
303:20
successful
71:9, 72:20,
159:7, 237:6,
260:13, 264:3,
348:18, 369:12
successfully
239:7
sued
299:8
suffer
249:11
suffering
164:7, 203:6,
276:13, 413:9
sufficient
26:12, 155:3,
179:12, 419:5
sufficiently
23:13, 152:8
sugar
163:2
suggest
37:16, 38:13,
43:21, 99:4,

Transcript of Public Hearing
Conducted on February 11, 2020

524

127:10
**suing**
109:8
**suitable**
37:15
**summarize**
9:13, 21:6,
138:4, 145:22,
146:18, 150:1
**summary**
21:7, 150:2
**summer**
104:11, 140:20,
216:12
**summers**
325:20
**summit**
111:22
**suncor**
401:15
**sunning**
111:8
**sunrise**
110:18, 282:9
**superfund**
54:9, 164:19,
165:13, 166:6,
309:9, 405:18
**supervisor**
268:6, 279:16
**supplemental**
7:1, 135:11
**supplementary**
299:2
**supplies**
174:11, 294:10,
404:15, 406:13
**supply**
48:20, 66:9,
266:12, 307:11,
312:16, 321:16,
380:10, 382:21,
398:21, 406:14
**support**
25:18, 33:8,
37:8, 47:22,
52:6, 59:2,
73:19, 81:1,

81:16, 85:3,
90:12, 102:21,
108:10, 108:11,
109:16, 110:10,
119:5, 130:10,
154:10, 160:2,
223:18, 231:19,
238:7, 240:10,
241:5, 243:6,
243:10, 258:2,
258:21, 260:6,
260:14, 260:22,
261:3, 292:19,
292:21, 293:10,
300:10, 303:21,
304:16, 304:20,
305:19, 306:15,
308:8, 320:18,
323:15, 348:6,
350:12, 350:18,
354:17, 361:22,
363:3, 373:8,
378:19, 382:12,
393:2, 395:14,
398:10, 398:13,
399:4, 413:1
**supported**
17:6, 145:15,
263:18, 364:20,
393:4
**supporters**
181:13, 342:9,
414:17, 416:21
**supporting**
28:22, 117:22,
157:10, 344:3,
421:7
**supportive**
30:13, 161:17,
290:18, 331:18
**supports**
31:22, 44:9,
50:22, 102:18,
217:17, 232:15,
256:20, 373:1,
399:3
**supposed**
312:19, 333:1

**suppressing**
44:21
**supreme**
10:13, 17:20,
18:9, 21:17,
21:18, 22:3,
23:1, 23:2,
26:15, 139:4,
146:7, 146:20,
147:5, 150:10,
150:16, 151:15,
151:16, 151:22,
155:5, 385:14
**sure**
30:3, 52:9,
62:15, 111:17,
127:3, 134:7,
134:19, 187:9,
267:18, 268:9,
268:14, 268:16,
288:20, 316:16,
347:22, 354:2,
402:11, 403:4,
403:5, 404:19,
418:9, 419:22
**surface**
53:17, 192:2
**surgeons**
406:1
**surgically**
67:18
**surround**
336:17
**surrounded**
88:5, 174:10
**surrounding**
58:3, 61:6,
89:13
**survival**
106:7, 259:20
**survive**
86:17, 229:10,
292:10
**susann**
317:9
**suspect**
347:1
**suspicious**
418:19

**sustain**
39:6, 217:13,
242:20, 266:12
**sustainability**
362:22
**sustainable**
40:21, 46:22,
185:18, 413:16
**suzanne**
244:7
**swansea**
277:6
**sweeping**
74:5, 246:20,
321:1, 339:13,
340:6, 407:11
**swimming**
345:6
**symbol**
248:17
**sync**
257:7
**synchronicity**
163:12
**system**
15:16, 77:12,
109:8, 121:8,
144:3, 236:10,
241:8, 260:9,
325:6, 338:1,
338:13, 345:18,
346:9, 346:10,
347:8
**systems**
31:1, 31:2,
41:12, 113:16,
179:1, 240:7,
336:1, 344:3,
344:6

| T |
| --- |

**t-a-f-o-y-a**
354:5
**t-a-y-l-o-r**
96:18
**t-e-r-r-y**
392:3
**t-h-o-m-a-s**
354:5

Transcript of Public Hearing
Conducted on February 11, 2020

t-o-o-r
65:12
t-r-i-p-p
107:22
table
6:2, 59:8,
70:12, 83:20,
93:10, 102:1,
128:11, 134:13,
141:11, 141:16,
172:1, 179:16,
200:13, 220:22,
231:10, 241:1,
264:11, 299:13,
306:1, 313:7,
327:18, 328:22,
356:4, 362:11,
382:5
tackles
90:22
tactics
390:16
tafoya
353:17, 353:18,
353:20, 354:2,
354:4, 354:5
tailings
45:13
take
9:8, 12:17,
25:12, 27:6,
35:6, 41:15,
42:5, 43:22,
44:5, 44:17,
65:7, 73:14,
77:9, 78:16,
84:6, 91:3,
94:17, 108:14,
112:22, 121:15,
124:15, 137:21,
141:4, 154:4,
155:19, 179:13,
186:12, 192:2,
192:7, 194:8,
201:16, 202:3,
203:20, 205:11,
207:17, 220:21,
222:13, 233:10,

236:6, 240:22,
253:11, 273:3,
274:5, 274:7,
275:3, 298:17,
310:22, 315:13,
319:3, 332:5,
333:17, 341:9,
341:20, 345:16,
347:4, 355:17,
355:20, 371:18,
402:22, 403:12,
417:9
take-home
377:21
taken
104:9, 106:21,
118:1, 141:11,
170:1, 213:2,
245:8, 254:9,
268:21, 276:19,
336:15, 368:15,
410:10
takes
12:20, 32:15,
32:17, 72:21,
105:4, 118:6,
160:15, 189:19,
201:10, 218:16,
236:5, 308:5,
360:16, 394:13
taking
32:6, 43:10,
103:9, 127:5,
194:9, 201:19,
203:14, 267:21,
269:4, 277:8,
277:11, 283:5,
291:11, 309:1,
329:11, 368:17
tale
272:14
talk
76:17, 163:15,
197:21, 201:19,
203:1, 272:20,
279:13, 279:14,
284:8, 285:21,
293:11, 345:8,

346:8, 386:17,
388:2, 392:11
talking
51:22, 127:19,
185:20, 284:17,
292:15, 345:4,
394:7, 400:22
tangible
53:9, 53:10
tango
200:16
tap
405:8
tape
259:21, 304:7
tar
45:12
target
188:21
targeted
174:21, 287:7,
411:16
targets
66:16, 303:1
tate
200:11, 200:14,
200:15
taught
272:13, 273:14,
273:16, 389:5,
389:6, 389:9
tax
44:7, 90:20,
103:21, 176:3,
311:2, 363:16
taxes
104:16
taxpayer
91:17, 309:8,
316:22, 317:6,
337:11, 358:9
taxpayers
219:18, 302:17,
310:10
taylor
93:13, 96:16,
100:13
teach
115:18

teachings
283:18
team
113:14, 129:14,
239:17, 240:1
tears
43:7
technical
10:1, 13:18,
138:13, 142:6,
166:21, 189:2,
210:8, 212:18,
215:4, 215:9,
215:16, 226:3
technically
21:15, 81:17,
150:8
technologically
313:10
technologies
99:18
technology
28:1, 80:11,
108:21, 156:13,
201:1, 233:8,
321:2, 360:7
ted
4:16, 133:6,
190:20, 396:3
teddy
105:11, 105:16
telecommunication
257:18
tell
83:6, 124:6,
128:6, 272:14,
275:4, 284:2,
284:5, 294:5,
311:3, 355:16,
389:1, 389:17,
400:7, 403:14,
406:3
tells
203:21
temperatures
66:10, 325:4,
356:14
template
253:8

Transcript of Public Hearing
Conducted on February 11, 2020                                      526

| | | | |
|---|---|---|---|
| **temporal** | **terribly** | 364:2, 365:14, | 357:8, 387:5, |
| 38:3 | 236:15 | 370:6, 372:15 | 391:1, 394:16, |
| **ten** | **terrifying** | **that's** | 394:18, 418:17, |
| 44:15, 160:9, | 178:20 | 275:18 | 420:1 |
| 165:7, 285:6, | **terry** | **themselves** | **think** |
| 285:8, 300:1, | 392:2 | 27:5, 155:18, | 30:1, 40:4, |
| 335:13, 355:20, | **test** | 274:6, 277:3, | 77:19, 111:16, |
| 409:6 | 213:13 | 401:16, 413:8, | 123:10, 123:12, |
| **ten-year-old** | **testify** | 413:22 | 127:1, 158:14, |
| 177:13 | 71:3, 90:11, | **theoretically** | 160:7, 188:17, |
| **tenant** | 93:7, 119:11, | 219:13 | 200:21, 201:2, |
| 114:2 | 180:3, 299:22, | **thereby** | 203:9, 234:7, |
| **tenants** | 306:4, 323:20, | 170:11 | 241:9, 267:11, |
| 74:4, 125:20 | 363:3, 365:15 | **therefore** | 267:14, 267:15, |
| **tend** | **testifying** | 53:9, 80:14, | 279:13, 288:9, |
| 40:9, 156:11 | 112:20 | 169:7, 193:12, | 288:16, 291:1, |
| **tendency** | **testimony** | 242:12, 280:12, | 293:15, 328:1, |
| 270:7 | 55:5, 71:2, | 329:10, 397:19, | 331:12, 332:20, |
| **tens** | 85:16, 97:1, | 399:3 | 345:19, 346:19, |
| 406:8 | 122:19, 162:3, | **they'd** | 346:22, 347:6, |
| **tent** | 320:17, 331:17, | 346:20 | 357:4, 377:21, |
| 110:20, 111:6 | 399:14, 399:15, | **thick** | 386:1, 392:12, |
| **tents** | 408:5, 417:16 | 51:20 | 394:14, 394:16, |
| 112:10 | **testing** | **thickening** | 419:13, 419:15 |
| **term** | 310:3 | 31:19 | **thinking** |
| 21:14, 24:7, | **tests** | **thigh** | 95:13, 122:9, |
| 27:21, 27:22, | 129:20, 225:13 | 52:20 | 203:12, 204:21, |
| 37:13, 95:16, | **texas** | **thin** | 315:20, 320:15, |
| 150:7, 153:2, | 126:15, 126:21 | 189:8 | 346:21 |
| 217:3, 408:20 | **th** | **thing** | **third** |
| **termed** | 1:12, 7:13, | 164:10, 198:18, | 3:5, 42:20, |
| 388:12 | 29:12, 29:21, | 277:4, 311:4, | 78:18, 196:13, |
| **terminated** | 55:13, 103:1, | 388:21, 391:20, | 199:5, 240:4, |
| 35:21 | 110:17, 157:22, | 394:7, 395:6, | 287:7, 303:7, |
| **terminology** | 251:8, 412:9 | 403:15 | 324:8, 409:18 |
| 95:22 | **thankful** | **things** | **thirds** |
| **terms** | 101:5 | 8:2, 49:3, | 223:1 |
| 22:9, 28:2, | **thanking** | 105:6, 105:17, | **thirsty** |
| 41:7, 71:13, | 50:11 | 107:1, 112:12, | 405:21 |
| 149:3, 150:22, | **thanks** | 112:18, 126:18, | **thomas** |
| 156:10, 156:12, | 8:20, 71:1, | 127:9, 127:13, | 353:17, 354:5 |
| 156:13, 159:6, | 73:4, 86:6, | 178:3, 178:4, | **thoreau** |
| 160:22, 161:15, | 93:6, 137:5, | 179:10, 189:15, | 351:3, 351:4, |
| 224:6, 322:1, | 221:10, 224:13, | 200:21, 201:2, | 351:20 |
| 358:11 | 227:21, 239:17, | 225:21, 248:1, | **thorough** |
| **terrain** | 240:3, 245:18, | 272:15, 277:8, | 131:2, 220:9, |
| 350:5 | 291:8, 299:14, | 280:1, 290:20, | 302:6, 337:21, |
| **terrible** | 328:5, 354:3, | 295:1, 295:20, | 339:16, 352:1 |
| 347:6 | | | |

Transcript of Public Hearing
Conducted on February 11, 2020

527

thoroughly
129:3
thought
197:7, 294:12
thoughtfully
373:9
thoughtfulness
332:13
thousand
183:3, 390:20
thousands
40:17, 40:18,
40:21, 76:2,
104:18, 189:1,
234:20, 281:1
thpo
52:16, 52:18,
55:21
thpos
53:3
threat
122:4, 192:11,
325:5, 367:13
threaten
48:3, 120:17,
205:5, 314:22,
321:10, 359:2
threatened
100:11, 116:3,
181:20, 181:22,
291:16, 343:8
threatening
325:14
threatens
168:2, 251:11,
337:3, 337:10
threats
60:18, 66:7,
121:21, 325:7,
327:10, 417:6
three
5:20, 56:3,
70:7, 84:22,
87:13, 104:1,
126:22, 131:21,
134:9, 135:8,
163:14, 165:9,
165:14, 171:2,

207:1, 217:21,
223:3, 223:4,
226:6, 229:15,
254:22, 257:7,
278:9, 286:14,
288:6, 288:7,
288:19, 289:14,
295:1, 320:1,
334:6, 388:9,
389:16, 404:10,
410:2
three-and-a
142:3
three-and-a-half
13:15
threshold
38:2, 254:2,
254:6, 293:11
thresholds
169:16, 371:13
thrive
114:9, 115:11,
330:4, 333:4,
348:18, 388:5
thriving
335:19
through
5:13, 11:20,
15:15, 18:8,
24:15, 32:17,
35:17, 42:3,
58:18, 61:3,
77:9, 78:1,
87:6, 92:10,
103:10, 106:6,
106:8, 106:18,
106:22, 108:7,
108:16, 109:7,
109:8, 111:4,
112:16, 117:10,
123:9, 124:5,
130:10, 134:2,
136:8, 140:9,
144:3, 158:7,
189:7, 192:3,
198:17, 212:2,
218:22, 223:19,
235:19, 235:20,

246:11, 248:18,
250:19, 269:13,
293:13, 301:15,
307:2, 309:20,
312:11, 316:7,
316:15, 323:12,
329:16, 330:18,
344:4, 373:2,
375:17, 377:1,
380:2, 383:15,
392:18, 394:2,
405:20, 409:14,
410:22, 419:18,
420:2, 420:3,
420:14
throughout
27:20, 29:3,
33:7, 64:6,
156:10, 157:13,
171:7, 242:10,
296:11, 320:9,
331:17, 373:7,
392:20, 394:20
throwing
317:6
thunberg
412:14
thwart
213:7, 375:5
tickets
180:3, 180:5,
331:5
tied
34:6, 34:18,
35:17
tier
384:8, 384:10
tiering
384:5, 384:6,
384:12
ties
34:12, 411:6
tigers
334:15, 334:16
tight
170:14
tilting
49:6

tim
105:3
timber
53:16
timeline
12:9, 13:4,
13:17, 15:6,
15:17, 18:21,
44:8, 140:18,
141:12, 142:5,
144:5, 144:7,
145:2, 147:14,
147:16, 165:20,
220:8, 302:4
timelines
190:3, 247:1,
305:12
timeliness
171:10, 253:15
timely
16:21, 17:15,
19:17, 47:15,
51:4, 52:10,
125:11, 145:8,
146:3, 148:8,
218:7, 220:16,
237:7, 241:9,
260:2, 260:13,
304:9, 305:14
times
34:5, 80:4,
89:5, 111:11,
112:7, 207:1,
208:11, 218:8,
260:4, 293:21,
297:16, 380:7,
380:8
timing
13:19, 142:7
tiny
75:20, 76:15,
326:1, 418:14
tip
378:6
tipping
172:22
title
10:18, 139:11,

Transcript of Public Hearing
Conducted on February 11, 2020

528

325:16
**to-date**
158:5
**today's**
5:21, 49:15,
134:11, 158:9
**toes**
110:22
**together**
107:11, 124:6,
170:1, 276:17,
323:18, 347:8,
389:4, 404:20,
406:11, 406:12,
410:10
**told**
5:18, 134:7,
180:3, 273:5,
295:3, 346:18,
389:7, 404:3,
404:5, 406:2
**toll**
118:1
**tolling**
326:12
**tomorrow**
221:6, 345:7
**tongue**
83:22, 84:2,
84:20, 85:11,
86:7
**tonight**
296:20, 336:7,
363:3, 365:15,
370:10, 394:6,
403:21, 420:21
**tons**
389:1
**took**
13:4, 100:21,
103:14, 103:16,
103:19, 141:14,
219:7, 233:13,
233:17, 329:3,
388:13
**tool**
44:13, 57:8,
64:14, 64:15,

188:5, 188:13,
188:14, 211:19,
217:17, 228:15,
266:20, 334:12,
349:2, 383:17,
384:13
**toolbox**
383:12
**tools**
61:4, 61:7,
190:9, 233:5,
321:4, 321:8
**toor**
65:11, 65:12,
70:6, 70:21
**top**
183:14
**topics**
376:1
**tornados**
357:9, 358:3,
358:5, 358:12
**tortoise**
230:13
**toss**
183:10
**total**
5:19, 134:9,
297:15
**totally**
35:15, 109:6,
115:4
**tourism**
63:17, 232:8,
304:20, 305:17,
309:5
**touting**
340:7
**toward**
55:4
**towards**
15:14, 121:13,
144:2
**town**
258:16, 308:21,
358:7, 358:9
**toxic**
44:3, 44:5,

45:12, 82:13,
118:3, 166:5,
191:20, 246:13
**track**
233:8
**tracked**
15:15, 144:3
**tracking**
167:6
**tracks**
284:4, 374:22
**tracy**
59:5, 59:9
**trade**
17:3, 145:13,
257:20
**tradeoffs**
251:7
**trades**
372:19, 372:21,
372:22, 375:7
**trading**
166:6, 294:9
**traditional**
266:16, 302:20,
324:19, 402:7
**traffic**
118:5, 218:22,
233:16, 235:22,
259:2, 259:5,
259:15, 360:20
**trafficked**
412:4
**tragedy**
186:14
**tragically**
274:21
**trail**
43:7, 100:10,
111:21, 128:15,
128:18, 130:1,
130:5, 130:7,
130:19
**trails**
90:19, 232:7
**training**
166:19, 373:17,
373:18

**trajectory**
252:13
**transcanada**
45:4
**transcribed**
1:22, 29:19,
289:2, 421:5
**transcriber**
421:1
**transcribing**
6:6, 134:18,
158:8, 288:22
**transcript**
348:1, 354:1,
418:12, 421:3
**transcription**
132:2
**transform**
195:9
**transformation**
334:8
**transformative**
343:12
**transit**
259:19, 399:1
**transition**
67:4, 99:15
**transitioning**
99:17
**translates**
48:12
**translating**
161:2
**transmission**
92:17, 235:21,
382:20
**transmit**
360:14
**transparency**
28:8, 33:9,
64:12, 64:17,
64:22, 78:2,
156:19, 229:5,
231:1, 261:15,
297:4, 300:20,
366:17, 376:11,
377:9, 377:14,
381:10

Transcript of Public Hearing
Conducted on February 11, 2020                                529

**transparent**
36:16, 39:3,
124:13, 187:2,
225:5, 229:13,
302:3, 320:15,
369:14, 370:16,
376:10
**transport**
368:11
**transportation**
14:13, 22:4,
30:9, 32:22,
50:14, 65:16,
67:4, 68:7,
141:15, 143:2,
150:17, 201:19,
206:22, 217:6,
217:11, 218:2,
250:6, 250:16,
250:18, 251:1,
251:18, 252:9,
252:11, 254:3,
255:16, 361:21,
362:4, 368:13,
398:12, 398:17,
399:7, 407:17
**transportation's**
12:19, 141:7
**travel**
100:15, 218:8
**traveling**
218:6
**travels**
380:2
**treasured**
207:5, 327:13,
417:3
**treat**
243:9, 248:8
**treatment**
254:18
**treaty**
198:2, 198:5,
198:9, 198:13,
198:15
**tree**
89:18
**trembling**
164:6

**tremendous**
188:5, 392:14,
393:9
**tribal**
25:19, 28:17,
29:3, 29:5,
29:7, 55:9,
57:4, 57:17,
57:18, 88:4,
88:12, 89:4,
96:12, 126:21,
128:4, 154:11,
157:5, 157:13,
157:15, 157:17,
166:17, 171:2,
199:6, 199:10,
241:20, 242:8,
243:5, 243:11,
322:6, 322:8,
324:16, 387:13
**tribe**
41:19, 52:17,
126:14, 192:7,
197:19, 199:7,
199:18, 241:4,
241:5, 241:20,
242:2, 242:15,
242:18, 243:2,
248:6, 282:7
**tribe's**
241:5, 242:6,
243:21
**tribes**
17:2, 28:15,
28:21, 29:2,
56:3, 87:13,
124:9, 145:12,
157:3, 157:9,
157:12, 198:1,
198:12, 199:14,
249:5, 249:17,
249:22, 310:19,
311:22, 313:21,
332:16, 350:13,
417:18
**tries**
342:7
**trigger**
397:12, 397:14

**triggering**
397:16
**triggers**
176:10
**trillion**
375:4
**tripp**
107:22
**trips**
325:19
**troubled**
371:15
**troublesome**
98:21
**trout**
100:22, 123:11
**truck**
107:15, 118:4
**trucking**
158:21, 158:22,
161:7
**trucks**
159:14
**true**
110:7, 212:13,
212:17, 331:13,
403:7, 421:3
**truly**
54:3, 112:12,
387:17
**trump**
40:9, 50:8,
56:14, 83:14,
87:20, 94:4,
143:7, 198:3,
206:2, 234:21,
237:9, 279:16,
282:11, 282:18,
284:2, 414:19
**trump's**
46:5
**trust**
54:21, 88:14,
89:3, 89:5,
231:1, 242:8,
243:9, 351:9,
353:1, 353:3,
376:19

**trustee**
115:1, 194:17,
222:7
**trustees**
115:5
**truth**
390:19
**try**
126:19, 207:14,
207:15, 290:21,
295:19, 416:9
**trying**
35:11, 42:2,
56:14, 86:5,
172:12, 177:16,
199:12, 287:7,
331:14, 331:16,
347:5, 355:4,
358:17, 419:16
**tso**
70:9
**tuesday**
1:12
**tuned**
110:5
**turn**
39:5, 90:19,
137:3, 266:8,
291:2
**turning**
21:12, 121:12,
150:6
**twenties**
205:4
**twenty-five**
234:13
**twice**
79:4, 244:6
**twin**
212:20, 213:7
**two**
8:15, 8:16,
12:8, 16:14,
18:18, 44:18,
85:10, 88:7,
104:1, 133:8,
140:17, 144:22,
147:10, 157:21,

Transcript of Public Hearing
Conducted on February 11, 2020

530

172:2, 180:2,
180:15, 190:4,
190:5, 204:17,
216:15, 222:22,
224:16, 225:16,
228:3, 234:5,
236:8, 239:9,
239:10, 239:17,
245:3, 257:3,
261:18, 268:3,
278:9, 279:3,
280:7, 289:17,
291:3, 293:22,
294:14, 295:1,
308:11, 315:6,
330:18, 331:1,
339:7, 339:11,
339:15, 347:20,
355:17, 361:1,
368:5, 371:1,
376:20, 386:14,
388:4, 400:5,
402:18, 411:2,
420:5
**two-and-a-half**
297:16
**two-lane**
106:2
**two-year**
15:6, 15:9,
15:18, 51:5,
143:18, 144:6
**tympanic**
345:5
**type**
14:7, 22:14,
142:17, 151:5,
169:7, 248:1,
299:3, 403:6
**types**
225:11, 225:16,
256:7, 337:21,
392:8
**typically**
92:10, 140:7
**tyrone**
248:4

---
**U**
---

**ugly**
418:22

**ultimate**
58:15, 368:1
**ultimately**
42:6, 153:9,
186:11, 209:9,
218:14, 224:10,
230:16, 260:18,
301:2, 314:18,
315:2
**umbrella**
253:2
**unacceptable**
83:9, 167:7,
416:4, 417:10,
417:21
**unacceptably**
239:13
**unaccounted**
45:20
**unaffiliated**
276:16
**unavailable**
11:4, 139:17,
215:14
**unborn**
54:1
**uncertainties**
33:4, 218:3,
218:12
**uncertainty**
80:21, 91:12,
213:19, 348:22,
349:15, 364:15,
374:20
**uncivilized**
388:11
**unclear**
350:3
**uncles**
204:18, 386:20
**uncompahgre**
111:3, 312:10
**unconscionable**
176:16, 183:17
**unconventional**
351:17
**uncoordinated**
253:10

**under**
10:3, 15:7,
15:8, 15:18,
21:4, 31:21,
46:5, 46:10,
61:14, 71:15,
73:2, 73:11,
82:22, 109:15,
111:19, 112:3,
130:12, 138:16,
143:17, 144:6,
149:21, 151:9,
165:13, 165:16,
176:16, 182:10,
183:22, 185:12,
192:13, 193:1,
193:4, 194:12,
196:18, 199:13,
199:20, 201:3,
206:3, 206:7,
227:15, 228:5,
228:19, 236:4,
236:7, 240:4,
245:10, 252:16,
254:22, 266:14,
271:2, 280:19,
281:9, 282:20,
300:11, 312:21,
313:2, 332:5,
332:9, 336:22,
366:1, 367:3,
369:7, 375:19,
376:22, 377:11,
383:21, 409:19,
416:1, 419:20,
419:22
**undercut**
64:16, 182:5,
368:18
**undercuts**
101:9, 263:20
**underfunded**
319:7
**undergo**
92:1
**undergoing**
212:10
**undergone**
216:4

**underground**
296:5
**underlying**
23:3, 151:17,
171:21, 373:3
**undermine**
60:20, 65:2,
68:9, 71:7,
224:10, 240:17,
261:14, 321:9,
343:21, 359:2,
377:15, 381:10,
410:17
**undermines**
48:1, 124:22,
226:10, 270:1
**understaffing**
131:10
**understand**
17:18, 82:8,
91:1, 96:9,
101:19, 124:19,
146:5, 179:13,
181:16, 228:11,
232:21, 252:8,
268:12, 270:3,
284:7, 346:5,
350:10, 372:6,
394:7
**understanding**
169:9, 296:6,
306:8, 338:9
**understood**
302:3
**undertake**
215:3, 215:9,
226:2, 262:13,
396:21
**undertaken**
244:18, 298:4
**undertaking**
114:12
**underwent**
50:17, 235:2
**undesirable**
222:10, 222:20
**undisclosed**
369:19

Transcript of Public Hearing
Conducted on February 11, 2020

531

undo
199:12
undrinkable
54:6
unduly
262:22
uneconomical
301:2
unfit
350:5
unfortunately
31:11, 39:8,
47:21, 67:7,
221:21, 235:6,
304:6, 393:13,
402:17
unidentified
70:14, 132:5,
271:14, 286:6,
327:19, 328:3,
347:14, 418:6
unifying
55:3
unimpaired
59:20, 97:20
unimportant
185:19
unintelligent
40:15, 41:5
unintended
129:15, 130:8,
222:10, 222:21,
268:16, 269:2,
269:12, 392:19
union
33:21, 372:21,
372:22
unique
58:9, 60:6,
174:8, 209:7,
212:15, 350:11
uniquely
92:21, 338:13,
363:10
unit
174:9
unite
93:22

united
41:1, 59:1,
125:18, 174:17,
175:12, 203:3,
258:19, 279:3,
279:4, 279:6,
285:15, 286:1,
296:11, 306:12,
324:9, 334:14,
338:2, 351:10,
353:1, 373:16,
386:15, 390:17,
390:22
units
398:19
universally
330:20, 395:7
universities
389:2
university
202:14, 389:5,
389:7
unknown
126:2
unless
18:19, 19:8,
53:19, 147:11,
147:22, 327:22,
359:15, 417:22
unlike
67:21
unlikely
229:9
unlock
30:11, 31:12
unmistakable
168:10
unmitigated
53:15
unnecessarily
229:12, 247:2,
326:11
unnecessary
32:10, 33:11,
43:14, 213:15,
230:18, 230:22,
260:18, 314:15,
360:18, 375:2,

375:4
unprecedented
325:3, 334:22,
342:20, 380:6
unquestionable
222:2
unquote
97:21, 366:13
unreasonable
96:2, 215:19
unrelated
322:17
unsalvageable
370:2
unscrupulous
335:6
unsound
41:17
unstable
174:19
unsustainable
346:17
untangle
361:3
untellable
36:1
unthinkably
238:22
until
246:15, 272:6,
286:10, 345:12
untold
245:16
unusual
12:15, 19:12,
141:2, 148:4
unwarranted
262:22
unwise
43:13
unworkable
235:15
upcoming
6:20, 135:7,
180:5, 289:13
update
1:4, 4:4, 4:8,
28:16, 30:19,

50:9, 50:18,
79:16, 132:17,
132:19, 157:4,
164:11, 224:10,
235:2, 286:16,
286:19, 360:3,
396:15
updated
32:15, 80:18,
183:20, 243:8,
256:10, 306:5,
306:14, 306:17
updates
33:8, 43:18,
45:1, 45:2,
45:7, 258:22,
303:21, 305:15,
305:19, 321:21,
348:7, 349:4,
350:18, 383:2
updating
15:3, 17:7,
143:15, 145:16
upheld
60:9
uphold
61:22, 74:4,
89:3
upholding
60:18
upload
29:22
uploading
158:12
upper
54:8, 100:20
ups
295:10
upwind
368:7
uranium
53:18, 191:8,
191:9, 191:16,
191:20, 192:5,
192:9, 192:20,
265:16, 266:11,
309:7
urban
250:21, 259:7,

Transcript of Public Hearing
Conducted on February 11, 2020

532

260:6, 418:19
**urge**
69:20, 74:4,
93:3, 108:12,
110:11, 184:2,
187:13, 193:12,
207:10, 213:22,
227:16, 234:11,
243:7, 245:17,
247:21, 258:3,
317:6, 344:7,
365:11, 372:9,
378:9, 379:17,
407:22
**urged**
55:4
**urgency**
47:14
**urges**
231:4, 344:2,
370:1
**urging**
256:9, 296:9
**usa**
204:12
**use**
9:21, 11:20,
16:12, 27:11,
30:15, 31:8,
34:20, 34:21,
37:15, 46:9,
53:7, 63:21,
69:4, 72:20,
84:8, 87:5,
91:14, 106:13,
109:7, 109:9,
124:4, 131:17,
138:12, 140:9,
144:21, 156:1,
172:5, 173:13,
175:16, 176:2,
187:7, 198:1,
215:1, 241:16,
271:1, 288:1,
303:18, 319:14,
323:3, 384:1,
384:2, 384:15,
398:7

**useful**
301:17
**usefulness**
10:16, 139:7
**user**
303:17
**users**
221:20
**uses**
222:9, 227:12
**usher**
369:21
**using**
27:4, 44:11,
129:19, 155:16,
188:13, 201:1,
233:3, 242:19,
253:7, 375:17
**usually**
277:6, 358:14
**utah**
399:20
**ute**
39:21, 241:4,
310:18
**utilities**
241:18, 255:4
**utilization**
34:8, 58:18
**utilize**
198:12, 348:10,
350:7
**utilized**
60:21
**utilizing**
78:12, 304:16
**utter**
193:8

---
**V**
---

**vacate**
290:14
**vacation**
250:22
**vacuum**
121:10, 169:19,
371:11
**vail**
105:20

**valid**
81:7
**valle**
419:13
**valley**
86:1, 105:20,
173:22, 174:5,
174:14, 308:20,
312:12, 313:4,
316:17, 372:5,
419:13
**valleys**
312:17
**value**
35:8, 44:6,
100:9, 188:6,
228:14, 232:13,
248:11, 248:12,
387:4
**valued**
186:19
**values**
123:22, 181:15,
184:22, 185:12,
186:15, 251:12,
324:20, 332:2,
332:5, 332:7,
407:22
**vanished**
223:4
**variations**
356:18, 356:19
**varies**
14:1, 142:11
**variety**
17:1, 90:17,
145:11, 194:2,
253:3, 363:14,
376:19, 377:2,
417:20
**various**
317:19, 356:9,
392:10
**vary**
67:22, 142:5
**vast**
210:8, 304:11,
309:11, 315:11,

322:17, 407:17,
415:22
**vectors**
121:21
**vegetation**
294:19
**vehicle**
47:12, 129:8,
220:12
**vehicles**
159:18
**venting**
88:6
**venues**
364:3
**verde**
338:10
**vermont**
21:17, 26:16,
150:11, 155:6
**version**
214:12, 214:16
**versions**
214:11
**versus**
353:9
**vetted**
224:8
**vetting**
37:16
**via**
242:20
**viability**
47:16, 103:7,
348:11
**viable**
80:17, 90:8,
263:4, 322:19
**viaduct**
219:13
**viagra**
344:16
**vibrant**
210:20, 379:7
**vice**
30:8, 102:5,
107:22, 221:2,
246:1, 299:19

Transcript of Public Hearing
Conducted on February 11, 2020

533

vicinity
368:6
victims
82:11, 413:3
victor
278:2, 291:13,
414:13
view
73:15, 81:10,
92:3, 92:4,
259:6, 279:22,
312:18, 376:13
views
4:13, 133:3,
287:3
vigorous
353:11
vigorously
334:11
vineyards
174:7
vintners
174:2
violate
198:4
violation
176:13, 281:3,
319:13, 367:22
violations
285:19
violently
39:20
virtually
339:16
vision
78:5, 113:11
visit
123:13, 127:10,
294:9
visited
324:9, 405:17
visitors
324:8, 326:5
vital
43:17, 46:17,
111:16, 129:15,
251:7, 259:19,
283:12, 307:9,

321:15, 364:22,
379:18
vocs
88:7
voice
44:14, 44:22,
56:11, 57:2,
57:9, 58:2,
58:5, 65:2,
65:6, 65:8,
82:21, 89:12,
95:17, 99:12,
102:11, 106:22,
112:1, 112:4,
112:22, 113:4,
117:18, 124:12,
125:6, 166:16,
167:2, 186:6,
186:9, 202:6,
203:15, 226:17,
228:22, 247:10,
266:22, 273:12,
274:5, 279:6,
285:1, 313:4,
314:13, 316:4,
317:14, 329:6,
336:11, 337:19,
342:3, 370:11,
402:11, 402:12,
416:8
voiced
316:8
voices
5:15, 93:22,
124:2, 134:4,
185:7, 187:12,
246:22, 247:20,
247:22, 249:11,
250:12, 267:1,
267:18, 272:10,
309:1, 311:21,
328:14, 375:18,
375:20, 415:5,
416:22, 420:15
volumes
331:7
volunteer
341:2

vote
44:21, 56:6
voters
276:16
vp
47:4
vulnerable
61:17, 178:19,
186:7, 340:17,
372:12

W

w-a-d-e
356:6
w-a-g-n-e-r
102:8
w-a-r-d-r-i-p
372:18
w-i-l-l
65:12
w-i-l-l-i-a-m
234:16
wade
356:5
wagner
102:2, 102:5
wagon
276:8
wait
291:7, 308:7,
386:18
waited
293:2
waiting
74:14, 131:18,
293:5, 293:19,
345:12
waitlist
8:3, 8:5, 8:7,
8:12, 74:10,
136:10, 136:20,
288:13, 347:18,
347:19, 353:15,
418:1
waitlisted
131:19, 288:11,
288:16, 290:22
wake
403:5, 403:15

walk
265:3, 272:20,
400:4
walkability
233:20
walked
110:20, 216:13
wall
273:18
walls
123:12
walter
83:18, 87:12
want
5:4, 5:13, 7:6,
7:11, 30:17,
39:18, 40:1,
40:8, 42:7,
59:1, 77:7,
106:21, 107:9,
126:22, 131:20,
133:16, 134:2,
134:19, 137:2,
137:4, 164:5,
172:1, 177:20,
179:19, 204:20,
204:22, 220:14,
229:17, 231:13,
264:12, 270:7,
274:20, 275:3,
277:4, 282:21,
284:12, 285:14,
287:14, 288:2,
289:20, 290:17,
296:8, 299:21,
316:3, 316:6,
330:16, 331:19,
331:20, 331:21,
331:22, 333:12,
334:10, 341:4,
346:8, 354:15,
355:6, 373:19,
389:17, 399:13,
402:13, 416:11,
419:14
wanted
44:20, 58:14,
86:4, 233:14,

Transcript of Public Hearing
Conducted on February 11, 2020

534

268:5, 344:10,
370:22, 418:16,
419:8
**wanting**
258:1
**wants**
177:20, 178:16,
195:4, 195:7,
196:11, 282:18,
345:6, 416:14
**war**
295:3
**wardrip**
372:17
**warming**
341:13
**warned**
58:11
**warrant**
293:15
**washington**
29:13, 158:1,
202:14, 402:21
**waste**
56:13, 82:14,
166:5, 337:10
**wasteful**
413:15, 414:1
**wastes**
352:15
**wastewater**
296:1
**watched**
111:3, 400:5
**watching**
54:6, 380:11
**waters**
85:2, 93:21,
94:10, 124:3,
192:8, 225:22,
229:12, 265:6,
369:9, 381:20,
404:6, 407:15
**watershed**
76:17, 174:11,
367:7
**watersheds**
76:1, 278:3,

278:5
**waterways**
32:22, 257:16,
417:3
**waves**
121:20
**way**
25:22, 31:8,
37:14, 76:14,
86:11, 89:15,
104:18, 105:6,
112:17, 128:6,
173:5, 250:11,
260:9, 269:1,
280:10, 294:17,
298:1, 312:15,
341:8, 348:19,
364:12, 387:17,
390:12, 394:2,
405:16, 406:11,
411:12, 415:7,
420:2
**ways**
29:9, 39:7,
115:16, 176:3,
236:9, 266:16,
317:21, 333:2,
335:16, 335:17,
338:2, 360:13,
376:19, 392:17,
405:9, 417:3
**wayside**
387:16
**we'll**
8:5, 8:8,
78:17, 101:21,
132:7, 134:14,
207:15, 207:17,
231:10, 286:9,
286:10, 288:10,
291:4, 355:20,
355:22, 418:4
**we're**
4:14, 6:3, 6:6,
8:15, 9:10,
9:17, 30:1,
31:5, 41:2,
51:22, 63:15,

75:17, 76:2,
76:11, 77:13,
77:14, 77:15,
77:16, 78:16,
78:22, 106:13,
107:11, 128:2,
128:3, 132:3,
133:4, 136:6,
137:18, 158:3,
158:8, 158:9,
161:5, 200:9,
207:14, 233:3,
245:16, 286:14,
287:5, 287:12,
289:7, 290:21,
292:15, 296:9,
317:5, 330:3,
332:5, 332:8,
333:5, 333:6,
334:1, 380:3,
388:7, 388:8,
390:13, 391:2,
391:13, 391:14,
391:16, 391:17,
391:22, 393:10,
394:7, 396:4,
400:21, 400:22,
401:5, 401:13,
401:22, 402:9
**we've**
14:15, 108:20,
132:2, 132:10,
158:2, 159:11,
159:12, 159:15,
239:5, 251:19,
254:5, 279:12,
281:12, 314:16,
325:18, 333:5,
379:19, 388:12,
393:15, 394:9,
394:10, 403:13
**weaken**
43:16, 111:12,
127:2, 197:6,
235:8, 249:19,
344:8, 406:11,
416:10
**weakened**
309:22, 404:19

**weakening**
48:6, 206:3,
226:6, 265:7
**weakens**
253:13
**weaker**
88:13, 204:5
**wealth**
249:9
**wealthy**
419:16
**weaponized**
217:22, 300:21,
393:14
**weather**
49:9, 118:16,
206:20, 337:13,
357:7, 358:19
**website**
4:20, 133:10
**websites**
133:9, 156:18,
158:4, 289:17
**weekend**
51:2
**weese**
382:9
**weigh**
73:8, 117:15,
186:13, 186:22,
187:4, 208:22,
209:2, 212:9,
221:13, 228:11,
246:8, 246:15,
314:21, 337:15
**weight**
180:16, 265:18,
273:11
**welcome**
4:2, 83:19,
93:10, 101:22,
132:15, 240:22,
286:14
**welcomed**
251:19
**welcomes**
237:12
**weld**
317:11

Transcript of Public Hearing
Conducted on February 11, 2020

535

| | | | |
|---|---|---|---|
| **welfare**<br>10:2, 138:15,<br>164:4, 261:10<br>**well-being**<br>261:1, 265:10,<br>267:12<br>**wells**<br>117:22, 280:22,<br>296:7, 309:20,<br>352:13, 405:7<br>**went**<br>86:4, 87:6,<br>191:9, 272:18,<br>309:8, 309:20,<br>312:11, 331:6<br>**weren't**<br>193:8, 399:21<br>**west**<br>105:1, 108:3,<br>108:5, 120:1,<br>174:8, 278:6,<br>308:20, 310:16,<br>330:9, 330:13,<br>334:7, 334:10,<br>348:9, 394:20<br>**west's**<br>305:15<br>**western**<br>36:8, 38:2,<br>63:11, 74:19,<br>84:3, 99:11,<br>101:3, 108:1,<br>123:22, 215:22,<br>216:3, 216:5,<br>216:15, 231:22,<br>238:11, 278:3,<br>298:10, 303:8,<br>303:12, 309:2,<br>312:10, 314:11,<br>342:10, 348:4,<br>367:20<br>**whatever**<br>356:18, 388:11,<br>390:15<br>**whatsoever**<br>199:15<br>**wheat**<br>357:14 | **wheel**<br>92:9<br>**wheels**<br>276:8<br>**whenever**<br>259:3, 356:18,<br>400:3<br>**whereas**<br>194:9<br>**whether**<br>7:15, 10:14,<br>20:12, 22:12,<br>23:18, 60:10,<br>110:8, 136:1,<br>139:5, 149:6,<br>151:3, 152:13,<br>216:8, 225:13,<br>245:3, 255:18,<br>258:18, 268:20,<br>268:21, 280:12,<br>285:1, 290:7,<br>338:6, 385:18,<br>387:18, 408:22<br>**whirlwind**<br>294:13<br>**white**<br>38:1, 249:15,<br>391:14, 396:14<br>**whitehouse**<br>4:19, 9:3,<br>29:15, 133:9,<br>158:4, 289:18<br>**whites**<br>282:16<br>**whoever**<br>83:19<br>**whole**<br>45:22, 46:1,<br>204:1, 229:3,<br>247:19, 279:3,<br>284:10, 324:17,<br>353:13, 390:4,<br>420:15<br>**wholeheartedly**<br>41:13<br>**wholesale**<br>59:3<br>**wi-fi**<br>259:3 | **wide**<br>17:1, 90:17,<br>145:11, 218:21,<br>278:17, 316:8,<br>319:8, 330:10,<br>363:14<br>**wide-ranging**<br>129:12<br>**widely**<br>13:18, 142:5<br>**widespread**<br>57:22<br>**widest**<br>222:8, 227:11<br>**wife**<br>410:22<br>**wild**<br>88:19, 311:10,<br>316:19, 326:2,<br>328:9, 330:8,<br>330:9, 330:12<br>**wilderness**<br>74:16, 110:19,<br>130:5, 174:15,<br>310:20, 311:8,<br>311:9, 311:14,<br>312:6, 325:20,<br>406:14<br>**wildfire**<br>63:14, 175:6,<br>394:18, 394:19,<br>395:1, 395:2<br>**wildfires**<br>48:18, 66:12,<br>118:17, 121:19,<br>178:13<br>**wildlife**<br>35:12, 36:8,<br>59:16, 63:17,<br>65:3, 72:10,<br>72:19, 74:2,<br>75:4, 82:4,<br>82:5, 85:17,<br>99:22, 102:9,<br>105:5, 105:11,<br>107:8, 113:9,<br>123:11, 126:5,<br>129:16, 130:6, | 181:5, 181:12,<br>181:17, 182:1,<br>184:2, 191:17,<br>192:6, 193:6,<br>201:9, 210:21,<br>211:14, 224:17,<br>224:20, 225:6,<br>228:10, 230:12,<br>230:16, 233:8,<br>238:3, 238:10,<br>239:14, 240:6,<br>244:9, 244:13,<br>244:21, 245:13,<br>261:9, 268:7,<br>268:20, 278:6,<br>291:20, 291:21,<br>298:9, 308:1,<br>310:21, 311:20,<br>312:17, 313:15,<br>330:12, 340:16,<br>340:21, 367:12,<br>380:2, 380:22,<br>381:21<br>**wildlife's**<br>181:8<br>**willful**<br>169:8, 366:18,<br>367:4<br>**william**<br>234:15<br>**williams**<br>70:9, 382:9<br>**willing**<br>40:10, 281:8<br>**willow**<br>181:21<br>**wilson**<br>335:8<br>**wind**<br>47:11, 92:15,<br>224:1, 302:20,<br>321:14, 356:15,<br>363:8<br>**window**<br>183:11, 228:21<br>**winnemem**<br>41:19<br>**winners**<br>270:15 |

Transcript of Public Hearing
Conducted on February 11, 2020                                                        536

winter
72:5, 72:13,
106:7, 357:13
winters
63:13
wintu
41:19
wiping
357:12
wise
82:7, 189:4
wish
105:15, 131:22,
185:16, 370:13,
420:12
wishes
96:9
withdraw
83:15, 119:7,
370:1
withdrawn
103:9
withheld
393:21
within
13:17, 14:3,
15:22, 16:6,
16:13, 18:18,
18:19, 41:5,
72:7, 104:1,
104:21, 106:10,
122:5, 135:7,
140:4, 142:4,
142:14, 144:11,
144:17, 144:22,
147:10, 147:11,
152:1, 166:15,
182:1, 243:16,
286:1, 315:14,
326:13, 339:11,
343:9, 352:4,
357:22, 368:16,
408:5
without
23:12, 27:7,
38:8, 40:18,
56:18, 86:15,
112:22, 152:7,

155:20, 161:2,
161:5, 169:17,
199:9, 199:10,
210:8, 216:7,
220:10, 222:9,
222:17, 224:11,
227:12, 245:11,
246:14, 257:1,
259:6, 262:13,
269:22, 297:9,
301:8, 307:9,
321:17, 335:20,
335:21, 341:14,
365:4, 371:10,
409:5, 410:12,
416:2, 416:12
withstand
49:7, 52:4,
337:12
witness
405:9
witnessed
82:9, 405:7
woefully
314:7
woke
110:18
wolf
105:3
woman
265:4, 386:13,
400:12, 410:21,
411:1
women
102:17, 390:21,
396:7, 412:1,
412:4, 412:11,
412:13, 413:2,
413:14
won
391:8
wonder
310:18, 338:8
wonderful
70:21, 75:5,
325:22
wondering
272:7

word
37:10, 418:18,
418:22
wording
37:17, 361:14
words
75:17, 104:20,
214:18, 215:5,
223:14, 224:16,
275:15, 282:5,
388:11
work
43:21, 51:21,
52:7, 74:16,
76:8, 93:5,
99:10, 103:10,
108:8, 113:8,
123:2, 165:7,
176:17, 185:2,
208:8, 212:6,
212:8, 218:11,
230:6, 237:13,
240:3, 253:17,
259:5, 260:9,
260:18, 266:9,
268:4, 271:9,
273:9, 295:18,
296:11, 302:1,
303:4, 311:14,
312:20, 316:16,
331:14, 331:16,
350:15, 365:13,
373:20, 380:2,
393:15, 394:2,
394:12, 404:20,
405:13, 406:10
worked
85:15, 93:17,
97:3, 123:1,
194:1, 238:5,
240:1, 254:17,
254:20, 268:11,
291:14, 291:15,
291:19, 312:6,
335:13, 348:15,
348:16, 348:19,
355:18, 392:9,
394:9, 394:10,

412:3
worker
373:10
workers
373:18, 373:19,
374:4, 400:18,
401:20
workforce
255:6
working
41:18, 66:19,
67:5, 101:13,
128:16, 158:22,
164:21, 166:17,
179:15, 200:18,
201:9, 236:17,
247:3, 254:21,
261:11, 270:6,
278:8, 324:22,
329:22, 334:19,
345:3, 347:8,
375:7, 375:15,
394:17
works
113:14, 211:11,
278:5, 296:13,
330:11, 375:2
world
41:8, 48:7,
60:15, 159:7,
160:13, 174:8,
205:5, 295:3,
315:19, 342:22,
374:9, 388:22,
391:4
worldwide
343:6
worry
210:10, 381:15,
381:19, 381:21
worrying
75:19
worse
49:3, 207:1,
213:16, 235:11,
275:10, 275:11,
374:21, 412:2
worsening
380:13

Transcript of Public Hearing
Conducted on February 11, 2020

537

**worst**
11:3, 66:18,
83:3, 139:15,
357:14, 358:14
**worth**
59:18
**worthy**
105:15, 205:3
**wouldn't**
124:8, 279:18,
400:17
**woven**
385:21
**wow**
208:3
**wrap**
64:20
**write**
7:6, 247:5,
381:17
**writer**
123:1, 410:22,
419:12
**writing**
7:12, 7:16,
18:21, 36:12,
56:22, 136:2,
147:13, 190:15,
290:8
**written**
6:22, 7:5,
29:19, 36:2,
49:20, 49:21,
59:6, 99:7,
114:10, 135:10,
135:15, 135:21,
158:10, 278:9,
290:1, 296:21,
298:13, 351:21,
387:4, 408:3,
419:11
**wrong**
35:19, 120:20,
121:14, 215:6,
274:8, 282:17,
283:3, 284:15,
380:7, 380:8,
387:17

**wynkoop**
2:6
**wyoming**
33:20, 102:7,
102:10, 103:9,
103:14, 103:16,
104:8, 104:13,
173:4, 208:7,
210:17, 211:4,
211:13, 212:8,
213:22
**wyoming's**
102:11, 102:17,
104:15, 104:19

---
**X**
---
**xl**
46:2

---
**Y**
---
**yale**
334:3
**yankee**
21:18, 26:16,
150:11, 155:6
**yeah**
8:9, 8:14,
36:5, 87:9,
87:10, 208:3,
258:19, 271:20,
274:12, 327:21,
328:3, 328:6,
353:19, 418:9,
418:10
**year**
18:19, 44:8,
56:20, 69:3,
82:4, 103:1,
118:19, 147:11,
170:21, 190:5,
206:2, 216:2,
217:8, 242:6,
245:15, 272:15,
276:1, 300:11,
307:8, 308:10,
325:18, 345:5,
356:17, 357:1,
358:5, 359:9,

375:1, 390:13,
392:6, 400:5,
407:14, 412:18
**year-to-year**
356:18, 356:19
**yellow**
294:14
**yellowstone**
97:13
**yesterday**
51:17
**york**
204:7
**young**
41:3, 113:12,
113:19, 115:8,
115:12, 178:21,
389:16, 404:14,
411:8
**yourself**
58:13, 62:5,
135:21, 277:21
**youth**
204:1, 412:8

---
**Z**
---
**z-a-c-h**
359:8
**z-a-n-d-o-n**
303:6
**z-u-k-o-s-k-i**
190:21
**zach**
359:8
**zandon**
303:5, 303:6
**zero**
67:2
**zip**
203:5
**zone**
387:21
**zukoski**
184:7, 190:19,
190:20

---
**$**
---
**$1.2**
218:21

**$11.5**
396:9
**$3.5**
104:10
**$3.7**
375:4
**$30**
219:12
**$40**
219:12
**$450**
300:5
**$5**
102:15
**$500**
217:12
**$70**
161:8

---
**0**
---
**00**
136:8, 286:10,
286:11, 290:14

---
**1**
---
**1,000**
221:7, 310:4,
381:1
**1,161**
13:8, 141:17
**1.3**
232:3
**1.4**
255:11, 375:14
**1.7**
221:11
**1.8**
181:12
**10**
7:13, 29:21,
78:17, 103:1,
103:14, 162:16
**10,000**
191:10
**100**
43:3, 60:8,
66:10, 100:14,
118:19, 211:21,

Transcript of Public Hearing
Conducted on February 11, 2020                                              538

| | | | |
|---|---|---|---|
| 355:5, 355:13,<br>359:9, 362:19,<br>390:13<br>**100,000**<br>407:13<br>**101**<br>9:20, 18:7,<br>138:11, 139:1,<br>146:16<br>**102**<br>10:8, 138:20,<br>152:1<br>**11**<br>1:12, 59:7,<br>62:4<br>**11,000**<br>309:20<br>**110,000**<br>158:22<br>**115**<br>213:21<br>**118**<br>217:8<br>**12**<br>59:7, 219:1,<br>363:17, 410:22<br>**12,000**<br>110:18<br>**12,500**<br>16:22, 145:10<br>**120**<br>168:15<br>**13**<br>70:15, 219:7,<br>233:13, 233:17,<br>328:1<br>**132**<br>3:4<br>**133**<br>54:9<br>**13807**<br>9:7, 14:17,<br>15:1, 15:7,<br>16:17, 137:20,<br>143:8, 143:13<br>**14**<br>15:22, 70:16,<br>74:7, 74:9, | 79:2, 79:3,<br>144:11, 327:17,<br>327:19, 327:20<br>**140**<br>120:2, 219:15<br>**145**<br>342:16<br>**15**<br>6:13, 70:16,<br>74:8, 74:9,<br>79:3, 79:4,<br>103:2, 134:22,<br>135:1, 174:16,<br>272:22, 289:9,<br>297:21, 327:17,<br>327:19, 334:5,<br>400:5<br>**15,000**<br>100:12, 333:14<br>**150**<br>12:14, 19:11,<br>141:1, 148:3,<br>234:6<br>**1500**<br>174:1<br>**1501.1**<br>293:10<br>**1502**<br>71:18, 73:11<br>**1502.22**<br>11:5, 215:13<br>**1502.24**<br>37:12, 214:8,<br>223:7<br>**1508**<br>71:16<br>**1508.1**<br>223:10<br>**1508.8**<br>229:19<br>**153**<br>392:5<br>**1595**<br>2:6<br>**16**<br>79:5, 170:22,<br>171:7, 204:15,<br>400:5, 412:9 | **16,000**<br>219:9<br>**17**<br>165:11, 207:21,<br>208:1<br>**1700**<br>97:3<br>**18**<br>207:21, 347:13<br>**18,000**<br>102:16<br>**181**<br>69:11<br>**1832**<br>282:7<br>**19**<br>83:18, 106:3,<br>207:21, 347:13,<br>347:14, 347:15,<br>387:13<br>**19,000**<br>342:8<br>**1902**<br>93:16<br>**1916**<br>59:13<br>**19181**<br>276:2, 276:3<br>**1919**<br>362:18<br>**1930**<br>357:17<br>**1959**<br>123:8<br>**1960**<br>162:20, 379:20<br>**1964**<br>219:5<br>**1969**<br>84:5, 378:16<br>**1970**<br>10:20, 32:15,<br>139:12, 233:2,<br>248:15, 366:9<br>**1978**<br>11:1, 16:18,<br>18:3, 50:18,<br>139:13, 145:4, | 146:13, 150:11,<br>235:3, 360:4<br>**1980**<br>51:19<br>**1981**<br>22:1, 150:14<br>**1983**<br>147:4<br>**1990**<br>159:16<br>**1st**<br>13:10, 141:19<br><br>**2**<br><br>**2,000**<br>396:6<br>**2.2**<br>95:7<br>**20**<br>36:7, 83:19,<br>192:21, 212:2,<br>216:7, 216:8,<br>237:22, 238:13,<br>239:8, 347:13,<br>347:16, 353:16<br>**200**<br>127:7, 219:8<br>**2002**<br>374:13<br>**2004**<br>249:3<br>**2007**<br>159:12, 191:9<br>**2008**<br>367:17<br>**2009**<br>88:3<br>**2010**<br>1:12, 13:6,<br>13:10, 141:19<br>**2011**<br>170:22, 261:11,<br>383:16<br>**2012**<br>374:6<br>**2013**<br>44:18<br>**2015**<br>38:1 |

Transcript of Public Hearing
Conducted on February 11, 2020                                        539

**2017**
13:7, 13:10,
14:18, 141:20,
143:7, 251:20
**2018**
12:10, 13:11,
98:10, 140:19,
141:21
**2019**
12:11, 324:7
**2020**
159:16, 421:16
**2050**
245:15, 307:8,
335:4
**2099**
335:4
**21**
51:3, 93:9,
320:20, 347:13,
347:16
**22**
93:9, 97:10,
202:16, 378:16
**225**
238:18
**23**
93:10, 375:22
**23,000**
258:13, 359:10
**236**
69:3
**24**
101:22, 118:1,
231:7
**25**
29:12, 55:13,
84:15, 101:22,
157:22, 231:8,
239:8, 291:15,
356:3
**25,000**
93:15
**250**
41:2, 41:6,
221:8, 231:22
**26**
101:22, 231:9,

356:3
**27**
107:18, 110:17,
240:20, 240:21,
362:10
**28**
82:4, 82:7,
107:19, 113:5,
240:21, 240:22,
244:2, 244:4,
244:5, 362:11,
421:16
**286**
3:5
**287905**
1:20
**29**
107:19, 116:8,
240:21, 240:22,
244:3, 244:6,
370:6

---
**3**

**3,500**
280:17
**3.8**
414:16
**30**
1:13, 116:8,
119:12, 159:15,
164:18, 245:20,
255:10, 348:16,
355:22, 370:6
**30,000**
372:4
**300**
12:14, 19:11,
141:1, 148:3,
234:6, 372:4,
419:4
**303**
2:8
**31**
13:10, 116:8,
122:15, 141:19,
245:20
**310**
342:18

**312**
2:8
**32**
97:9, 122:16,
245:20
**3260**
297:16
**33**
122:16, 128:10,
170:21, 200:17,
254:12, 382:5
**3300**
232:1
**34**
128:11, 131:16,
254:13, 382:5
**35**
78:17, 128:11,
254:13, 396:1,
419:14
**350**
342:6, 344:2,
412:3
**3500**
280:22
**36**
44:3, 264:9,
264:10, 396:1,
399:11
**37**
264:9, 264:10,
271:13, 271:17,
399:11
**37,000**
231:18
**38**
264:10, 271:16,
271:17, 399:11
**39**
271:16, 271:17

---
**4**

**4**
136:8
**4.6**
324:8
**40**
4:9, 17:20,

22:2, 56:20,
79:17, 132:20,
150:15, 160:21,
162:11, 187:22,
189:13, 205:4,
216:2, 228:19,
271:17, 286:20,
300:11, 306:17,
320:22, 360:8,
414:6
**40,000**
97:5, 396:9
**400**
242:5
**400,000**
307:7
**401**
369:8, 374:18
**41**
414:7, 414:8,
414:9
**42**
272:13
**421**
1:21
**44**
30:12

---
**5**

**5**
286:10
**50**
31:1, 42:1,
44:1, 44:8,
62:11, 91:10,
119:4, 205:3,
219:18, 227:19,
251:8, 263:11,
328:17, 336:10,
342:17, 355:18,
364:17, 369:12,
404:17, 419:3
**584**
83:22

---
**6**

**6**
2:8, 355:22

Transcript of Public Hearing
Conducted on February 11, 2020

540

**60**
31:2, 204:18,
205:3, 261:18,
297:20, 309:2,
355:10, 379:8,
418:20
**600**
419:13
**6312**
2:8
**645**
12:20, 141:8
**65**
238:20, 368:9
**650**
158:19
**68**
72:17
**680**
105:22

---
**7**
---
**70**
104:15, 208:14,
218:20, 219:4,
219:20, 233:13,
277:5, 316:16,
361:10
**700**
362:20
**72**
232:1
**75**
19:13, 148:5,
368:10
**7th**
141:20

---
**8**
---
**8**
1:13, 286:11,
290:14
**8,000**
217:9
**80**
76:6, 99:18,
297:18, 335:2,
337:2

**80202**
2:7
**80216**
203:5

---
**9**
---
**9,000**
285:18
**90**
102:14
**900**
231:17
**97,000**
348:4
**98**
159:17
**99**
284:11
**9th**
206:1

Tab 19, Exhibit 11 to Declaration of Amy Coyle



# Volusia County
## FLORIDA

**County Manager**

**ED KELLEY**
*COUNTY CHAIR*

**DR. FRED LOWRY**
*VICE CHAIR*
*DISTRICT 5*

**BEN F. JOHNSON**
*AT-LARGE*

**BARBARA GIRTMAN**
*DISTRICT 1*

**BILLIE WHEELER**
*DISTRICT 2*

**DEBORAH DENYS**
*DISTRICT 3*

**HEATHER POST**
*DISTRICT 4*

**GEORGE RECKTENWALD**
*COUNTY MANAGER*

March 9, 2020

Council on Environmental Quality
730 Jackson Place NW
Washington, DC 20503

Re: Support for the Modernizing of NEPA Implementing Regulations

Dear Sirs:

I am writing in support of the initiative to review and modernize the NEPA Implementation Regulations. The current NEPA process creates a tremendous delay in the constructing of Federally funded projects. The Council on Environmental Quality (CEQ) study of 2018 shows that sixty-percent of Federal Highway projects are under Environmental review for more than 6 (six) years; with the average review period for highway projects being 7 (seven) years and FAA projects nearly 8 (eight) years.

As County Manager of the County of Volusia, I am in support of modernizing the 40-year old NEPA process in such a way as to create a more efficient process to replace the labyrinthine process that has existed for decades. I believe that with the technology available today, the removal of redundancy of studies and interagency coordination of cooperating agencies that the review policy could be streamlined to provide more effective and timely NEPA reviews.

Our county relies on our nature resources to generate eco-tourism and provide the quality of life that our residents have become accustomed. Yet, we understand that there needs to be a balance between environmental reviews, protection of natural resources, public input and providing the needed infrastructure investment to accommodate the growing population in our county.

I am hopeful that modernizing the regulations, will allow the permitting process for these projects to be decreased significantly.

Sincerely,

George Recktenwald
County Manager

---

123 West Indiana Avenue, Room 301 • DeLand, FL 32720-4612
Tel: 386-740-5133 • FAX: 386-943-7020

www.volusia.org

Tab 20, Exhibit 11 to Declaration of Amy Coyle

**Memo to Docket CEQ-2019-0003**
**Meeting on the Notice of Proposed Rulemaking titled, "Update to the Regulations**
**Implementing the Procedural Provisions of the National Environmental Policy Act."**

On Monday, March 2, 2020, CEQ participated in a meeting with representatives of San Bernardino County, CA.

**Topics Raised by Participants:**
- Participants expressed support and appreciation for efforts to update the regulations. They highlighted their support for establishing presumptive page and time limits, earlier coordination among agencies and Tribes, and the use of categorical exclusions across agencies.

**Attendees:**
- Robert Lovingwood, Supervisor, San Bernardino, CA
- Janice Rutherford, Second District Supervisor, San Bernardino County, CA
- Laurie Marsden, Chief of Staff, San Bernardino County, CA
- Dan Feliz, Potomac Partners DC
- Ted Boling, CEQ
- Kelly Collins, CEQ

**Attachments:**
- Letter from San Bernardino County to CEQ
- NEPA Reform Document

385 North Arrowhead Avenue, 5th Floor, San Bernardino, CA 92415-0120  |  Phone: 909.387.4821  Fax: 909.387.5430

www.SBCounty.gov



**County Administrative Office**
Governmental & Legislative Affairs

Josh Candelaria
Director

February 3, 2020

Mary Neumayr
Chair, White House Council on Environmental Quality
730 Jackson Place NW
Washington, D.C. 20503
Attn: Docket No. CEQ-2019-0003

**RE: NEPA Reform – SUPPORT**

Dear Chairwoman Neumayr:

The County of San Bernardino is pleased to support the revisions proposed for the National Environmental Policy Act by the White House Council on Environmental Quality in its Advance Notice of Proposed Rulemaking published January 10, 2020.

The County has a vast network of major infrastructure for which it is responsible, including roads, flood control facilities and hundreds of buildings. San Bernardino County is the largest in the contiguous United States at more than 20,000 square miles, stretching from Los Angeles and Orange counties on the west to the Arizona and Nevada borders on the east. The challenge to maintain and build infrastructure over such a vast area that includes mountains, deserts, rural and urban communities is significant, but also critical to keeping the public safe and the economy thriving.

Compliance with NEPA can be a slow, expensive and complex process that often delays crucial projects for years and increases costs dramatically. CEQ found that the average time to prepare an EIS is 4.6 years with some taking up to 6 years or more, when your guidance suggests an EIS shouldn't take longer than a year. Even routine maintenance projects can be subject to delay by lengthy, often unnecessary reviews, which can literally put lives at risk.

The proposed reforms would modernize, simplify and accelerate the NEPA process, set a time limit of two years to complete an EIS and one year for an Environmental Assessment,, enhance coordination with states, tribes and local jurisdictions by allowing the flexibility to use documents prepared under different statutes or by other jurisdictions, and allow applicants or contractors a greater role in preparing EISs under the supervision of an agency.

These commonsense measures will give more certainty to jurisdictions like ours, save taxpayer dollars, enhance public safety by allowing projects to be built in a timely fashion, and still protect the environment as required, not just by law, but by our moral obligation to future generations to be good stewards of our land, air and water.

**BOARD OF SUPERVISORS**

ROBERT A. LOVINGOOD        JANICE RUTHERFORD        DAWN ROWE        CURT HAGMAN        JOSIE GONZALES        Gary McBride
First District        Second District        Third District        Chairman, Fourth District        Vice Chair, Fifth District        Chief Executive Officer

For the above reasons, the County of San Bernardino is pleased to support CEQ's proposed revisions to NEPA. If you have any questions regarding the County's position, please do not hesitate to contact Josh Candelaria, Director of Governmental and Legislative Affairs at (909) 387-4821 or jcandelaria@sbcounty.gov.

Sincerely,

Curt Hagman
Fourth District Supervisor
Chairman, Board of Supervisors

Robert Lovingood
First District Supervisor
Board of Supervisors



**SAN BERNARDINO**
**COUNTY**

# NEPA REFORM

**Common Sense Reforms**

- Limit environmental impact statements and environmental assessment processing to two years. That's more than reasonable, even for relatively complex projects.

- Set regulatory time deadlines (not guidelines) for acceptance and approval of federal agency permit applications and/or review of reports/assessments submitted to federal agencies complying with NEPA.

- Outline distinct methodology to demonstrate compliance with an act such as the Endangered Species Act, the Clean Water Act or the Archaeological and Historic Preservation Act to provide consistency in interpretation and implementation of said Acts. Currently, the requesting agencies' staff and experts employ individual interpretations and requirements resulting in additional delays, costs and confusion.

- Expand the list of types of projects that are categorically excluded from NEPA.

- Enhance coordination with tribes, states, and local jurisdictions by allowing the flexibility to use documents prepared under different statutes or by other jurisdictions, and allow applicants or contractors a greater role in preparing environmental impact statements and environmental assessment under the supervision of an agency.

Exhibit 12 to Declaration of Amy Coyle



**Common Good Updates the Cost of US Infrastructure Delays**

**Costs Have Risen $200 Billion Over Five Years to Nearly $3.9 Trillion**

**May 2018** – In 2015, Common Good published a report, "Two Years, Not Ten Years," which concluded that delays associated with infrastructure permitting in the United States impose costs that are comparable to those required to upgrade the nation's infrastructure. As the United States struggles to determine how best to pay for infrastructure improvements, Common Good has updated our report, revealing that the costs have grown still further – an increase of nearly $200 billion in five years, or $40 billion per year.

The calculations in the 2015 report drew heavily on data provided by the 2012 "Infrastructure Report Card" of the American Society of Civil Engineers (ASCE). Since then, the ASCE has released a 2017 edition of the Report Card, with new cost estimates across most of the categories of infrastructure addressed in "Two Years, Not Ten Years." Common Good has, therefore, rerun many of our previous calculations to incorporate those more recent figures.

Though several categories have remained unchanged, in part because the ASCE did not produce newer numbers, others have shifted since 2012. Energy costs, for instance, which now reflect a combination of Transmission and Generation figures, have declined somewhat. The decline is due in large part to the burst of renewables development toward the end of the Obama administration.

However, costs for Roads and Bridges and for Water infrastructure have both increased since 2012, reflecting another half-decade in which decay outpaced investment. These increases more than matched the drop in Energy costs, leading us to conclude that, since the publication of our previous report, the cost of delay has risen from about $3.7 trillion to nearly $3.9 trillion. That's an increase of nearly $200 billion between 2012 and 2017. This overall total includes direct costs associated with construction delays plus economic and environmental costs of failing to upgrade America's dilapidated infrastructure. The total approaches in magnitude the entire US infrastructure backlog of $4.6 trillion.

It's important to note, in this regard, that the figures represented here do not take into account additional improvements required to prepare each category of infrastructure for the effects of climate change. As weather becomes increasingly erratic, for instance, power transmission and wastewater systems will be under increasing stress, as last year's hurricane season demonstrated. Each category of infrastructure will require substantial unique investment to prepare for these effects. While Common Good is not aware of any comprehensive cost estimates for climate change preparation, permitting delays will affect those costs, too, with commensurate consequences.

Though the figures have changed, the conclusion remains the same: permitting delays associated with infrastructure investment impose major costs, both financial and environmental, and make fixing US infrastructure increasingly challenging. Common Good has proposed a three-page legislative fix to streamline permitting by giving officials the authority and the responsibility to move projects forward and by returning the review to its original public-focused intent. Learn more at www.commongood.org.

Exhibit 13 to Declaration of Amy Coyle

# TWO YEARS NOT TEN YEARS

## REDESIGNING INFRASTRUCTURE APPROVALS

### PHILIP K. HOWARD


COMMON GOOD

**ABOUT THIS REPORT**

This report was written by Philip K. Howard, Chair of Common Good, with the help of Common Good staff members Matt Brown, Alex Keller, and Andrew Park.

Covington & Burling LLP provided the pro bono legal advice of E. Donald Elliott and Gary Guzy, each a former General Counsel of the Environmental Protection Agency.

James Maxeiner, a leading comparative international law scholar at the University of Baltimore School of Law, contributed important material as well.

**ABOUT COMMON GOOD**

Common Good is a nonpartisan reform coalition which believes individual responsibility, not mindless bureaucracy, must be the organizing principle of government. We present proposals to radically simplify government and restore the ability of officials and citizens alike to use common sense in daily decisions.

Common Good was founded in 2002 by Philip K. Howard. Our Advisory Board includes leaders from many areas of society, including former Senators Bill Bradley and Alan Simpson, former Governor Tom Kean, former Speaker Newt Gingrich, and Salk Institute President William Brody.



**COMMON GOOD**

One Metrotech Center, Suite 1703, Brooklyn, NY 11201
Phone 212.681.8199
www.commongood.org
Email commongood@commongood.org

September 2015

**Executive Summary**   **1**

**Two Years, Not Ten Years: Redesigning Infrastructure Approvals**   **3**

1  Redefining the Regulatory Goal: Two Years, Not Ten Years   5

2  Costs of Delay in Modernizing Infrastructure   6

3  Rethinking Legal Hurdles to Infrastructure Approvals   12

4  Comparison of Permitting in Other Countries   16

5  Reform Attempts in the US   18

6  Proposals to Create a Two-Year Approval Process in the US   22

   Conclusion   24

**Endnotes**   **25**

**Acknowledgements**   **34**

**About the Author**

Copyright ©2015 Philip K. Howard



COMMON GOOD

# EXECUTIVE SUMMARY

Rebuilding America's decrepit infrastructure requires a new permitting system. Approvals today can take a decade, sometimes longer. Delay dramatically adds to costs, and prevents projects from getting off the drawing board. Delay prolongs bottlenecks which waste time and energy, causing America to lag behind global competitors. Obsolete facilities continue to spew carbon into the air and waste into our waters.

Red tape is not the price of good government; it is the enemy of good government. Time is money: America could modernize its infrastructure, at half the cost, while dramatically enhancing environmental benefits, with a two-year approval process. Our analysis shows that a six-year delay in starting construction on public projects costs the nation over $3.7 trillion, including the costs of prolonged inefficiencies and unnecessary pollution. This is more than double the $1.7 trillion needed through the end of this decade to modernize America's infrastructure.

No one deliberately designed America's infrastructure approvals system. It is an accident of legal accretion over the past 50 years. Environmental review was supposed to highlight major issues, in 300 pages or less on complex projects, so that officials could make an informed decision. As practiced today, environmental review often harms the environment. America's antiquated power grid, for example, wastes the equivalent of 200 coal-burning power plants.

**OUR ANALYSIS SHOWS THAT A SIX-YEAR DELAY IN STARTING CONSTRUCTION ON PUBLIC PROJECTS COSTS THE NATION OVER $3.7 TRILLION, INCLUDING THE COSTS OF PROLONGED INEFFICIENCIES AND UNNECESSARY POLLUTION. THIS IS MORE THAN DOUBLE THE $1.7 TRILLION NEEDED THROUGH THE END OF THIS DECADE TO MODERNIZE AMERICA'S INFRASTRUCTURE.**

We propose a dramatic reduction of red tape so that infrastructure can be approved in two years or less, not, often, ten years. This can be accomplished by consolidating decisions within a simplified framework with deadlines and clear lines of accountability. The White House Council on Environmental Quality, for example, should have authority to draw lines on the scope of environmental review. To cut the Gordian knot of multiple permits, the White House needs authority to resolve disputes among bickering agencies.

The upside of rebuilding infrastructure is as rosy as the downside of delay is dire. America can enhance its competitiveness and achieve a greener footprint—with renewable power, modern transmission lines, new water treatment plants and pipes, updated ports, inland waterways, and air traffic control, and elimination of rail and highway bottlenecks. Upwards of two million jobs can be created. Public safety is enhanced. Economic and environmental benefits from modernized infrastructure will dramatically exceed the costs.

No one argues for leaving our nation's infrastructure in its current state of disrepair—typically 50- to 100-years-old and dangerously decrepit. Law is supposed to be the framework for a free society, not an impediment. To rebuild its infrastructure, America must first rebuild its legal infrastructure so that vital projects can move forward.

1

2

# TWO YEARS, NOT TEN YEARS:
# REDESIGNING INFRASTRUCTURE APPROVALS

Modernizing America's aging infrastructure is vital to our nation's future.

There are two components to this initiative: money and permits. This report focuses on America's paralytic permitting system. We propose a dramatic reduction of red tape so that infrastructure can be approved in two years or less, not, often, ten years. This can be accomplished by consolidating decisions within a simplified framework with deadlines and clear lines of accountability.

No one argues for leaving our nation's infrastructure in its current state of disrepair—typically 50- to 100-years-old and dangerously decrepit. Bottlenecks waste time and energy, causing America to lag behind global competitors. Unsafe bridges and flawed flood control systems risk lives. Obsolete facilities spew carbon into the air and waste into our waters.

The upside of rebuilding infrastructure is as rosy as the downside of delay is dire. Updating America's infrastructure offers transformational benefits. America can enhance its competitiveness and achieve a greener footprint—with renewable power, modern transmission lines, new water treatment plants and pipes, updated ports, inland waterways, and air traffic control, and elimination of rail and highway bottlenecks. Upwards of two million jobs can be created. Public safety is enhanced. Economic and environmental benefits from modernized infrastructure dramatically exceed the costs.

Delay is destructive, because it dramatically adds to costs and harms. Each year of delay perpetuates the bottlenecks and inefficiencies that impede competitiveness and cause pollution. Delays create uncertainties that drive up financing and construction costs, and sometimes prevent projects from getting off the drawing board. Multi-year approval processes are not the price of good government; they are the enemy of good government. Time is money: America could rebuild this infrastructure at about half the total cost, while dramatically enhancing environmental benefits, with a two-year approval process.

Funding is obviously critical for new infrastructure, but it's not sufficient. Even fully-funded projects have trouble moving forward.

In 2009, America had the money (over $800 billion in the economic stimulus package) but few permits. In its five-year report on the stimulus, released in February 2014, the White House revealed that a grand total of $30 billion (3.6 percent of the stimulus) had been spent on transportation infrastructure. No official, in the current legal quagmire, has authority to approve projects—not even the President. As he put it, "there's no such thing as shovel-ready projects." Even projects to repair or update existing infrastructure require years of process

**MULTI-YEAR APPROVAL PROCESSES ARE NOT THE PRICE OF GOOD GOVERNMENT; THEY ARE THE ENEMY OF GOOD GOVERNMENT.**

from multiple agencies. Decisions on new infrastructure, such as solar fields, wind farms, and transmission lines, sometimes require a decade for approval. Permitting the desalination plant in San Diego began in 2003 and was completed, after 14 legal challenges, in 2012. It will start producing fresh water this year—12 years later.

In some projects, the causes of delay border on the absurd. Raising the roadway of the Bayonne Bridge—a project that avoids the $3 billion of extra expense and the construction nightmare of building a new bridge or tunnel—was a boon both to neighbors and to the economic vitality of the region. Instead, the project had to trudge through a five-year process, with a 10,000-page environmental assessment, and an additional 10,000 pages of required permitting and regulatory materials.

Environmental review should be focused on material effects and alternatives, not diluted by a tidal wave of marginal detail. Many important projects have serious impacts that should be reviewed and mitigated before a final decision. It is useful, at the beginning of a project, to get input on both its desirability and possible alternatives. Spending five or ten years arguing about the details, however, rarely makes the project better—and never makes it cheaper. Large public works often get bogged down in micromanagement, driving up costs and giving undue influence to opponents whose agenda does not align with the broader public good.

Input from stakeholders and the public usually improves a project. But striving for consensus is futile, causes delays, and skews decisions towards the squeaky wheel instead of the public good. New infrastructure is unavoidably controversial. There is always an impact, and always a group that is affected more than others. A wind farm or transmission line spoils the view of nature and can affect bird populations. A desalination plant produces a briny byproduct. Modernizing a port will disturb the ocean floor and may increase traffic in nearby neighborhoods.

**THERE ARE NO CLEAR LINES OF AUTHORITY TO MAKE NEEDED DECISIONS—NO OVERARCHING AGENCY WHICH CAN BALANCE THE DEMANDS OF DIFFERENT REGULATORS SO A PROJECT CAN MOVE FORWARD.**

But not building new infrastructure, or failing to rehabilitate or replace existing infrastructure, can have far worse impacts. Transmission lines in America waste six percent of the electricity they transmit—the equivalent of 200 average-sized coal-burning power plants. Without desalination plants, the aquifers in California will be further depleted. An inefficient port reduces competitiveness and drives shipping elsewhere, requiring goods to be trucked longer distances.

How, then, can government make decisions to move forward? Today, permitting decisions are balkanized among dozens of different departments, at different levels of government. Environmental review has become a litigation quagmire, as supporters and opponents argue over thousands of pages of details. Opponents must be mollified—often by monetary payments having little to do with environmental effects of the project. Meanwhile, years go by and costs multiply.

What's missing in infrastructure approvals is basic: There are no clear lines of authority to make needed decisions—no overarching agency which can balance the demands of different regulators so a project can move forward. Instead, decisions are often a function of bureaucratic durability, as officials from multiple agencies eventually grow weary of the repetitive hearings and meetings, and collapse into an agreement that favors whoever is left standing. Environmental review is exhausting, with final decisions made by judges instead of responsible officials. This bureaucratic and judicial endurance contest is why infrastructure approvals can take a decade or longer.

No one deliberately designed America's infrastructure approvals system. It is an accident of legal accretion over the past 50 years. Environmental review was supposed to highlight major issues, in 300 pages or less on complex projects, so that officials could make an informed decision. Congress created no right to litigate, much less to transform review into a multi-year legal ordeal.

Multiple permits are similarly an accident of the growth of government. As government got bigger, it naturally organized itself into discrete silos, each with its own rules and territorial instincts. Overlapping jurisdiction by three or more levels of government further complicated the balkanization of authority. No one stopped to consider the implications of giving veto authority to any one of dozens of government departments.

4

No legitimate public goal is served by years of delays. We need new transmission lines, water treatment plants, renewable energy sources, port and river projects, and new bridges, roads, tunnels, and rail lines. Every dollar wasted as a result of delay is a dollar not available for other projects or public goods. Every ton of carbon released by aging infrastructure contributes to unnecessary pollution. See Section 2 below.

Competing countries in the global economy do not bog down projects in years of red tape. This competitive advantage of timely approvals is enjoyed not just by authoritarian countries such as China and Singapore, but by western democracies such as Germany and Canada, which generally grant permits for major infrastructure in two years or less, including environmental review. These competing western democracies can build infrastructure at a fraction of our cost.

Marginal improvements to America's infrastructure approvals system—say, reducing the process from ten years to eight years—should not be the goal. America's goal here is modernized infrastructure, not lots of legal hearings. Accomplishing our national needs requires remaking America's infrastructure approval procedures.

## 1.  REDEFINING THE REGULATORY GOAL: TWO YEARS, NOT TEN YEARS

How long should a rational approval process take? America's goal should be to keep pace with countries that do it quicker while protecting the environment, such as Germany and Canada. To keep up, America needs to invent a timeline that can conduct environmental review, make decisions, and issue permits within two years.

How do Germany and Canada achieve this? They have clear lines of authority, with consolidated decision-making on both environmental review and permitting. Lawsuits must be brought and resolved quickly, with jurisdiction limited to legal violations, not policy decisions. See Section 4 below.

What would be the benefits of a two-year process? Including opportunity costs of improved efficiency, reducing approval time from eight years to two years would reduce direct costs in power projects by 30 percent and achieve efficiency and environmental benefits that often exceed the total project cost. See Section 2 below.

How can America invent a two-year permitting process? Our suggestion is this:

i.   For environmental review, an environmental official, such as a politically accountable official at EPA or the Council on Environmental Quality (CEQ), should have responsibility to decide the scope and adequacy of review. The general principles for review should be disclosure of material facts sufficient to make a considered decision, with a focus on overall environmental impact of the project. The official should be accountable to the President, who should have the authority to step in, stop the delays, and get the project off dead center.

ii.  For permits, one agency should have overriding permitting authority, with the obligation to balance the concerns of other agencies and departments. Any disagreements should be heard by the White House or a department designated by it. Interstate projects should generally be approved by a federal agency; intrastate projects by a state agency. Lawsuits should be limited to claims of illegality, not generally quality of review, with expedited timetables. Instilling focus and time deadlines for environmental review can be achieved in large part by administrative and executive action. Standards for judicial review can also be clarified by executive order. See

Section 6 below. Creating a "one-stop shop" for permits on interstate projects, including state and local permits, could be addressed either by consent from states in exchange for federal funding consideration, or by other congressional action. See Section 6 below.

Consolidated decision-making on infrastructure has one political drawback: Each participant must give up its effective veto of projects. Today, any government department or NGO can unilaterally slow projects to a crawl. Just the prospect of a lawsuit has created a culture of focusing on immaterial detail and a lengthy quest for consensus among dozens of interested stakeholders. Striving to get approval from every agency and stakeholder is the main source of years of delay. All this time and detail does not generally improve projects; often projects are compromised in ways that satisfy one group over the common good. Delay itself is destructive of the common good—harming the environment and driving up costs, as set forth below.

Our society is confronted with a bureaucratic version of the tragedy of the commons: Only by creating a gatekeeper for approvals can we avoid destroying the common interest through each stakeholder's demands. The harm caused by bureaucratic delay far exceeds any conceivable benefits. Instead of ensuring better decisions, the current approval process generally guarantees bad decisions—causing waste and inefficiency and prolonging environmental damage.

## 2.  COSTS OF DELAY IN MODERNIZING INFRASTRUCTURE

The costs of delay include the direct costs (legal, administrative, and overhead), the opportunity costs of lost efficiencies during the years of delay, and the environmental costs of antiquated infrastructure during the delay. The uncertainties caused by delay raise financing costs, and can derail projects altogether. For large public projects, delay beyond election cycles can remove political incentives for large financial commitments. When withdrawing funding from a new rail tunnel under the Hudson River, Gov. Chris Christie reportedly quipped that the tunnel had been announced by a predecessor and would be opened by a successor.

Estimating these costs of delay is, at best, an exercise in approximating orders of magnitude. The simplest variable—how many years of delay—requires assumptions on actual delays, which is highly variable from project to project, and on how long approvals should take. Unless

**THE HARM CAUSED BY BUREAUCRATIC DELAY FAR EXCEEDS ANY CONCEIVABLE BENEFITS.**

stated otherwise, the following estimates assume that review and approvals should generally take no more than two years—the timeframe that reflects best practice in other western countries. Although large projects often take a decade or longer to permit, we assume that the avoidable delay on major projects is six years. There is ample anecdotal evidence of actual years of delay in the US for different types of infrastructure projects, but little cumulative data. The Federal Highway Administration estimated that the average time for approval of major highway projects was over six years.[1] Five to ten years is a common timeframe for interstate transmission lines, and for wind farms and solar fields on federal lands on either coast. Texas has expedited permitting of wind farms, with the result that it now enjoys over 12 MW of wind generation, more than double the wind capacity in California, where permitting is more difficult. Even replacement-in-kind infrastructure projects are negatively impacted by extensive regulatory delays.

COMMON GOOD

Estimating the delay costs attributable to continued inefficiencies and environmental damage can be done using studies by government agencies and industry groups. Estimating the increase in direct construction costs is more difficult. Project developers conservatively budget three percent inflation in "hard" construction costs and ten percent added overhead cost for each year of delay. As a rule of thumb, construction represents 70 percent of project costs and overhead 30 percent. Thus, we assume here that the total increase in direct cost from delay is five percent per year (70 percent times three percent = 2.1 percent, plus 30 percent times ten percent = three percent, for a total delay cost of 5.1 percent per year).

Caveat: These estimates are rough, and are readily adjustable with a change of assumptions. They are intended to provide a general order of magnitude of costs and lost efficiencies from delay.

**A. Electricity transmission.**

Approximately six percent of all energy generated for public consumption is wasted due to inefficiencies within the power grid.[2] That's nearly 240 billion kWh of the four trillion produced in 2014[3]—the output of 200 average-sized coal-burning power plants.[4] At an average price of 10.39 cents per kWh in 2015,[5] $25 billion is wasted every year by antiquated transmission and distribution infrastructure.[6]

The environmental costs of delay in modernizing transmission and distribution are correspondingly large. Six percent transmission and distribution loss equals 16 percent of total current coal power generation. Assuming that a modernized transmission grid would permit closure of that coal generation, the effect would be to avoid about 240 million tons of carbon dioxide emissions annually.[7] Federal agencies, including EPA, use a complicated modeling system to determine the social cost of carbon dioxide emissions.[8] Using the high-end estimate for 2015, a per-ton cost of $116, modernizing our transmission and distribution infrastructure would generate environmental savings of $27.8 billion per year. In addition, more dangerous byproducts of traditional power generation like mercury and arsenic would no longer be leached into our water.

The unreliability of America's antiquated power grid also causes disruptions, with attendant business and social costs. The US experiences 285 percent more blackouts annually than it did in 1985, with over 300 "significant" power interruptions in 2011.[9] The Department of Energy estimates that these interruptions cost businesses around $150 billion per year in lost productivity.[10] These blackouts are attributable in part to our aging power grid, according to a recent National Electric Manufacturers Association report, and in part to unreliable and insufficient generation infrastructure.[11] We assume here that half that lost productivity is attributable to the frailty of our power grid.

The delay in rebuilding transmission infrastructure also increases the cost of construction. The American Society of Civil Engineers (ASCE) estimates the total cost of rebuilding transmission and distribution infrastructure at $231.5 billion.[12] To estimate the cost of delay, we assume that 75 percent of transmission- and distribution-related infrastructure spending would be directly affected by environmental review or complex permitting requirements, meaning $173.6 billion of the total rebuilding cost is vulnerable to the direct costs of delay. As noted above, a general rule of thumb, which we apply here and below, is that delay will add a total of five percent per year to overall construction costs.

*Approximate costs of delay in rebuilding/upgrading transmission and distribution infrastructure:*

**Electricity losses:** $25 billion x six years = $150 billion

**Environmental losses:** Six percent lost electricity (assuming all from coal plants) = 240 million tons of $CO_2$ x $116 x six years = $167 billion

**Disruption losses:** 50 percent of $150 billion x six years = $450 billion

**Increase in rebuilding costs from six-year delay:** $173.6 billion x 30 percent = $52 billion

**Total costs of six-year delay in rebuilding transmission and distribution networks:** $819 billion

## B.  Power generation.

Power generation in the US produced over two billion tons of carbon dioxide emissions in 2014,[13] at a social cost of $232 billion. Coal and natural gas, which account for two-thirds of total power generation,[14] are responsible for 98 percent of energy-related emissions in the US.[15] Renewable energy sources like solar and wind, which generate negligible amounts of carbon dioxide,[16] comprise seven percent of America's total energy production portfolio.[17] Of the remaining "low-carbon" power sources, hydroelectric comprised an additional six percent, and nuclear 19 percent.[18] Germany, by contrast, produced nearly 23 percent of its power via renewable sources (not including hydroelectric or nuclear) in 2014.[19]

Recently, several nearly identical Senate bills, endorsed by environmental groups,[20] have attempted to establish a yearly federal renewable energy benchmark that would require US renewable energy production to reach 25 percent of total production by 2025.[21] In ten years, America would need to add enough capacity to provide another 18 percent of total power production. To the extent this is wind power, it is likely to be concentrated on the Great Plains of the Midwest, and require long distance power transmission lines to urban areas.

If these projects were initiated today, we assume that environmental review and permitting for these renewable sources and transmission lines would average eight years, or a six-year lag in meeting our renewables goal. Based on replacing a proportionate share of each carbon-emitting power source, delaying an additional six years the added 18 percent of renewable power results in 367 million tons of carbon dioxide released in each of those years—assuming the renewable sources replaced non-renewable sources in proportion to their current share of production.[22]

As noted above, power disruption losses are attributable to both inadequate generation as well as the antiquated grid, and total $150 billion per year. We assume here that half of those business disruption losses come from obsolete generation.

Delaying approvals by six years also increases construction costs of improving generation capacity by 30 percent. The total cost to update generation capacity through 2020 is $189 billion,[23] not including any additional potential costs imposed by adding an increased proportion of renewable energy sources to overall production. Here we assume that all new generation-related projects will require environmental review and complex permitting.

*Approximate costs of delay in introducing renewable energy sources and modernizing generation:*

**Environmental losses:** 367 million tons of $CO_2$ x $116/ton x six years = $255 billion

**Disruption losses:** 50 percent x $150 billion x six years = $450 billion

**Increase in rebuilding costs from six-year delay:** $189 billion x 30 percent = $56.7 billion

**Total costs of six-year delay in rebuilding and expanding generation:** $760 billion

## C.  Inland waterways.

America's outdated system of inland freight shipping networks, comprising thousands of miles of rivers and canals, and thousands of dams and locks, experienced 52 delays per day in 2009, and a total of 25 *years* worth of delay time in 2011.[24] A 2012 ASCE report estimated the cost of this delay at $33 billion in 2010, and speculated that this cost would increase to nearly $49 billion annually by 2020.[25]

These delays cause far more losses than the costs of new and rehabilitated infrastructure. A 2012 National Waterways Foundation study concluded that each year of construction delay for new projects resulted in lost efficiencies amounting to 37 cents for every dollar in the ultimate investment; six years of delay effectively triples the cost of the investment.[26]

The total cost to fully modernize and rehabilitate our inland waterways network is $18 billion.[27] Here we assume that the project mix, which primarily involves dredging and lock replacement or expansion, would involve environmental review or complex permitting requirements in nearly every case.

*Approximate costs of delay in rebuilding inland waterways:*

**Direct costs of delay:** $33+ billion per year x six years = $222 billion[28]

**Increase in rebuilding costs from six-year delay:** $18 billion x 30 percent = $5.4 billion

**Total costs of six-year delay in rehabilitating inland waterways:** $227.4 billion

## D.  Roads and bridges.

The ASCE's 2013 Infrastructure Report Card estimates that congestion on US roads costs motorists $101 billion annually from lost time and wasted fuel.[29] Of that, 45 percent is attributable to "recurrent" congestion sources, including inadequate capacity and poor signaling design that stem from infrastructure deficiencies.[30]

The degradation of America's bridge inventory is reaching a crisis point: Over ten percent of US bridges are structurally deficient, and nearly one in seven are functionally obsolete.[31] The average American bridge is 43-years-old, with a 50-year service life.[32] Delay in rebuilding bridges is dangerous, and further deterioration drives up costs. Because of decades of neglect and delay, the cost of repairing the Williamsburg Bridge in New York City ballooned tenfold to $800 million.

The fuel wasted by congestion imposes additional environmental costs. A 2012 Treasury Department report found that traffic congestion wasted 1.9 billion gallons of gasoline yearly.[33] At approximately 20 pounds of carbon dioxide per gallon,[34] 38 billion pounds of carbon dioxide (19 million tons) is emitted due to congestion, at a social cost of $2 billion annually.[35] As above, we assume 45 percent of this congestion-related pollution is due to deficient infrastructure.

Delay also increases direct construction costs. The Port Authority of New York and New Jersey concluded that five years of delay in replacing the Goethals Bridge could require $200 to $700 million in additional costs due to the need for interim deck repairs. To avoid these interim repairs, the Port Authority is rebuilding the Goethals Bridge with a private partner who is financing the project with its own equity, and a combination of low-interest TIFIA loans and Private Activity Bonds; the Port Authority will not begin paying the private partner until the bridge is near substantial completion, while accelerating construction of a new replacement bridge.[36]

The American Association of State Highway and Transportation Officials estimates an annual cost of $162 billion through 2020 to improve American roads to an acceptable level.[37] However, of that figure, $85 billion annually is required merely to repair the physical condition of existing roads[38]; these projects rarely implicate environmental review or complex permitting concerns, and are not counted here. The total cost to repair all needed bridges in the US is estimated at $121 billion.[39]

*Approximate costs of delay in rebuilding roads and bridges:*

**Congestion costs of delay:** 45 percent x $101 billion x six years = $270 billion

**Environmental losses:** 19 million tons of $CO_2$ x 45 percent x six years x $116 = $6 billion

**Increase in rebuilding costs from six-year delay:** $385 billion (roads) + $121 billion (bridges) x 30 percent = $151.8 billion

**Total costs of six-year delay in rebuilding roads and bridges:** $427.8 billion

**E.  Rail.**

Freight bottlenecks resulting from insufficient rail capacity cost the economy over $200 billion a year, according to the ASCE.[40] These costs will only increase as more freight is moved over US railways, and the Department of Transportation projects a 32 percent increase in rail-based freight tonnage by 2040.[41] Inadequate infrastructure compounds these problems in denser areas like Chicago, where the average freight train requires 30 hours to traverse the city.[42] Bottlenecks create a cascading effect of systemic slowdowns, further exacerbating the costs. According to a report from the Center for American Progress:

> Due to these inefficiencies, larger and larger numbers of trucks are forced to haul freight that rail cannot accommodate, producing ever-increasing congestion on a highway system that already robs American drivers of 4.8 billion hours in wasted time every year. Inadequate rail infrastructure forces passenger vehicles to share congested roads with 39,000 trucks from the ports of Los Angeles and Long Beach on a daily basis, while in New York City, port container traffic results in 13,000 truck trips per day on the highways in and around the city.[43]

Rail-based freight transportation is over four times as fuel efficient as truck-based transport, meaning these bottlenecks, and the diversion to trucks that they necessitate, create significant environmental impacts as well.[44]

Experts estimate the total cost of repairing America's rail infrastructure at $100 billion through 2020.[45] Here, we assume that 75 percent of projects, including adding extra rail lines, bridge rehabilitation, tunnel expansion, and port railyard improvements, would potentially involve environmental review and permitting delays.

COMMON GOOD

*Approximate costs of delay in rebuilding rail infrastructure:*

**Congestion costs of delay:** $200 billion x six years = $1.2 trillion

**Environmental losses:** not readily calculable

**Increase in rebuilding costs from six-year delay:** $75 billion x 30 percent = $22.5 billion

**Total costs of six-year delay in rebuilding rail infrastructure:** $1.22 trillion

## F.  Water.

America's water infrastructure, comprising both drinking water and wastewater, is collectively nearing the end of its service life. The majority of pipes currently in service were installed during population booms in the late 1800s, the 1920s, and the era immediately following World War II.[46] A report by the American Water Works Association put the total cost to replace and expand our water infrastructure at around $1.7 trillion between now and 2050.[47]

The costs of waiting are hard to quantify but potentially vast. Deteriorating water mains are subject to increased breaks and interruptions, which threaten public health (by compromising water quality), safety (by reducing firefighting flows), and property (by causing flooding and sinkholes).[48] A 2013 report by the Center for Neighborhood Technology estimated that leaky pipes and water mains waste as much as 2.1 trillion gallons of water per year.[49] On average, tap water costs around $2 per 1,000 gallons in the US,[50] meaning the yearly cost of wasted tap water alone is approximately $4.2 billion.

Water contamination represents another significant yearly cost. The CDC estimates that waterborne illnesses like cryptosporidiosis, which can enter the drinking water supply through deteriorated infrastructure,[51] cost the economy $500 million per year.[52] From a 2002 CBO report:

> Dramatic incidents in recent years have called attention to the importance of water infrastructure. In 1993, contamination of the Milwaukee water supply by cryptosporidium caused 400,000 cases of gastrointestinal illness and an estimated 50 to 100 deaths…. According to EPA's data, 880 publicly owned treatment works receive flows from 'combined sewer systems' which commingle storm water with household and industrial wastewater and frequently overload during heavy rain or snowmelt. EPA estimates that such overflows discharge 1.2 trillion gallons of stormwater and untreated sewage every year. Even 'sanitary' systems with separate sewers for wastewater can overflow or leak because of pipe blockages, pump failures, inadequate maintenance, or excessive demands. According to a draft EPA report, overflows from sanitary sewers alone result in a million illnesses each year.[53]

In a 2009 report, EPA found that large percentages of the waterways they surveyed were unfit for either human or wildlife use due to wastewater contamination cause by overflows like those described above.[54] Though the environmental effects of inadequate sewer infrastructure are extensive, we are not aware of any calculation of the dollar value of this damage.

A 2013 EPA report estimated that America's drinking water infrastructure would require $384.2 billion in replacement and rehabilitation expenditures to render it fully safe and functional.[55] However, of that cost, 64 percent involved projects related to transmission and distribution (primarily pipe and main replacement) which we here assume do not implicate significant environmental review or permitting concerns. This leaves $136.7 billion in drinking water-related construction costs that are vulnerable to review and permitting delay. For wastewater

11

infrastructure, EPA estimates $298.2 billion is required to fully restore and modernize our disposal systems nationwide.[56] However, of that, $82.7 billion is dedicated to pipe repair and replacement, which we do not count here.

*Approximate costs of delay in rebuilding water infrastructure:*

| | |
|---|---|
| **Water losses:** $4.2 billion x six years = $25.2 billion | |
| **Health losses:** $500 million x six years = $3 billion | |
| **Environmental losses from wastewater overflow:** N/A but orders of magnitude greater than direct costs | |
| **Increase in rebuilding costs from six-year delay:** $136.7 billion (drinking water) + $215.5 billion (wastewater) x 30 percent = $105.6 billion | |
| **Total costs of six-year delay in rebuilding drinking water and wastewater systems:** N/A | |

**G.  Total costs of delay on these infrastructure sectors.**

These estimates of six-year delay costs total over $3.7 trillion. The total cost of modernizing these categories of infrastructure, according to the ASCE, is $1.7 trillion over the next five years.[57] As a general order of magnitude, bureaucratic delays cause harms and increase costs in an amount that exceeds the total cost of modernizing America's infrastructure. These costs can be adjusted down by a factor of two or three without altering the conclusion that bureaucratic delay is irresponsibly costly, and, indeed, so environmentally harmful as to implicate questions of public morality.

**3.  RETHINKING LEGAL HURDLES TO INFRASTRUCTURE APPROVALS**

The convoluted legal apparatus to permit infrastructure projects has evolved over the last 50 years. Most of the legal requirements, viewed in isolation, are reasonable. Often, however, they are immaterial in the particular situation or actually conflict with other regulatory goals. Typically, they involve many different government departments, at federal, state, and local levels, each of which considers itself the keeper of the flame. In total, they are sometimes so onerous that they discourage projects altogether—a wind farm developer, for example, must decide whether to commit tens of millions of dollars with no assurance that the project will be approved.

There are two broad categories of permitting requirements, which are highly variable from project to project: i) environmental review; and ii) permits from relevant government departments—ranging from the Army Corps of Engineers to the Fish and Wildlife Service to local fire departments. Duplicative environmental reviews and permits are often required on the same project by federal, state, and local governments. A builder of infrastructure must seek approval not from "the government," but from a dozen or more different arms of the government.

**AS A GENERAL ORDER OF MAGNITUDE, BUREAUCRATIC DELAYS CAUSE HARMS AND INCREASE COSTS IN AN AMOUNT THAT EXCEEDS THE TOTAL COST OF MODERNIZING AMERICA'S INFRASTRUCTURE**

Rationalizing the infrastructure approval process requires new mechanisms to focus decisions on the ultimate public goals and avoid delay.

## A.  Focusing environmental review on key impacts.

The federal National Environmental Policy Act (NEPA) requires "agencies to undertake an assessment of the environmental effects of their proposed actions prior to making decisions."[58] The statute tasks agencies to use "all practicable means, consistent with other essential considerations of national policy, to...improve and coordinate Federal plans" so that "the Nation may...fulfill the responsibilities of each generation as trustee of the environment for succeeding generations...[and] achieve a balance between population and resource use[.]"[59] The statute created CEQ as an arm of the White House tasked with overseeing NEPA and resolving interagency disputes.

**IN PRACTICE, ENVIRONMENTAL REVIEW STATEMENTS OFTEN RUN A THOUSAND PAGES OR MORE. EVEN THE SHORT-FORM "ENVIRONMENTAL ASSESSMENT" CAN RUN TO SEVERAL THOUSAND PAGES.**

NEPA anticipated disclosure of major impacts, not dense academic analyses. One historian of NEPA reports that "[t]he earliest [environmental impact statements (EISs)] were less than ten typewritten pages in length. They were submitted to the Congress and went unchallenged."[60] CEQ regulations currently in effect contemplate that environmental reviews will be 150 pages, perhaps up to 300 pages for more complex projects.[61]

In practice, environmental review statements often run a thousand pages or more. Even the short-form "environmental assessment" (EA) can run to several thousand pages. Raising the roadway of the Bayonne Bridge, a project with virtually no environmental impact (it uses existing foundations and right-of-way), resulted in a 10,000-page EA.[62] Thousands more pages were required for the Bayonne Bridge by New York State's "Smart Growth" requirements, and by New York City's separate environmental review requirements. In total, including exhibits, the environmental reviews for raising the roadway of the Bayonne Bridge comprised about 20,000 pages.

There was no contemplation in the legislative history of NEPA that environmental review would significantly increase the time and costs of projects.[63] As it has evolved, however, environmental review often consumes five to ten years, and for controversial projects, even longer. The Bayonne Bridge permitting process, as noted, consumed five years. The Cape Wind project was subjected to two full environmental reviews, totaling seven years of work (not counting years of lawsuits that followed).[64] Dredging at the Port of Savannah has been stalled for almost 30 years; the environmental review alone took 14 years.[65]

The length and time of reviews have become progressively longer; a recent study calculated that every year, unsupplemented EISs take a month longer to complete than they did the previous year, while supplemented EIS completion time grows by an average of 110 days each year.[66] Few argue that the dense detail helps decision-making. In most projects, the environmental tradeoffs can be described in simpler analyses that can be completed in a year or less.

The detail and sluggish process of environmental review are driven by three factors.

i.   **Fear of litigation.** Former EPA General Counsel E. Donald Elliott estimates that 90 percent of the detail in environmental review statements is prompted by a desire to cover any issue anyone may complain about. The effect is similar to "defensive medicine"—any conceivable issue that might be raised in litigation is covered in the EIS. A 2006 Congressional report found that "agency concern regarding the threat of litigation still has an effect on the NEPA

process, particularly for complex or controversial projects. A project sponsor may be mindful of previous judicial interpretation when preparing NEPA documentation in an attempt to prepare a 'litigation-proof' EIS." [67] Voluminous detail doesn't seem to deter litigation, however, because the objectors are typically opposed to the project itself, whatever the quality of review. A lawsuit challenging approval of the Bayonne Bridge argues that review was inadequate, notwithstanding the 10,000-page federal EA. Objections to the quality of review are usually a surrogate for trying to stop the project or for exacting a concession, generally a monetary payment. For the proponent, paying off the objectors is generally less expensive than spending years needed to get to final judgment. Regulators sometimes encourage such payments, in the name of mitigation, to avoid further conflict. [68]

The power of a lawsuit challenging environmental review generally stems not from the merits of the claim but from the uncertainty caused by ongoing litigation—disrupting financing and schedules and putting the project in limbo. The mere possibility of a lawsuit can have that effect. The six-year statute of limitations (for challenges to regulatory decisions under the Administrative Procedure Act) hangs over projects like a sword of Damocles. Project proponents sometimes initiate litigation themselves, just to get the clock started. [69]

ii. **No decisionmaker.** The second factor contributing to lengthy environmental review is the void of authority: No environmental official has the job of deciding the scope and adequacy of review, or resolving other issues around review. In the case of the Bayonne Bridge project, picking the "lead agency" to conduct environmental review took six months. [70] Scoping meetings at the beginning of a project—to get ideas on what issues should be studied—took the better part of a year. [71] Because no one has authority to draw the line, decisions tend to descend to the lowest common denominator—any idea gets included in the environmental review.

iii. Finally, the **accretion of regulatory requirements** in every subdivision of government also contributes to lengthy review. In the case of the Bayonne Bridge, because of a state law, the EA included a study of possible effects on historic buildings—even though the project used the existing right-of-way and did not touch any private property or homes. [72] Often these regulatory requirements encompass issues that have immaterial impact in the particular project, but still must be studied. In the case of building replacements for the Tappan Zee and Bayonne Bridges, for example, the reviews had to include extensive traffic impact studies even though a bridge already exists and traffic will not materially change. [73]

Lack of focus on materiality is a core defect in the current practice of environmental review. Years are consumed overturning every pebble because of concerns about litigation, the void of anyone in charge, and the accumulation of regulatory requirements. It is true that environmental review as practiced today can be effective to kill a bad project, but it also delays (and sometimes kills) good projects.

America today, facing a crisis of crumbling infrastructure, needs to restore focus of environmental review to important effects, and not let arguments over details delay important projects.

For example, New York has a rail chokepoint coming into Penn Station from New Jersey, with two century-old rail tunnels. These Trans-Hudson tunnels are the only access for all Amtrak and NJ Transit trains into New York City, and provide service for approximately 25 trains per hour during peak periods. A third tunnel is needed to improve reliability and speed of train service. There's an

urgency to building this third tunnel because one of the existing rail tunnels under the Hudson was severely damaged by Hurricane Sandy and must be closed for repairs within a decade or so. Without the new tunnel, congestion will be horrific when the damaged tunnel is closed for repairs, costing untold billions in delays and extra pollution. The environmental benefits of getting the new tunnel approved and built will far exceed any negative impacts. Situations like these require giving an environmental official authority to focus and expedite environmental review. The goal is to do what's right for the environment, not to harm the environment by wallowing for years in immaterial details.

**B. Multiple permitting.**

With the growth of government to oversee common choices in a crowded society it is natural that many agencies and departments will have jurisdiction over some aspect of an infrastructure project. In the federal government, environmental protection, surface transportation, aviation, the corps of engineers, fish and wildlife, forest service, coast guard, energy, and communications are just examples of areas of an interconnected regulatory framework. Each of these areas has its own regulations, typically highly prescriptive, and leaving little room for balancing other regulatory concerns.

State and local governments have similar structures, with many jurisdictional subdivisions, each with its own highly prescriptive requirements. Some are unique to state and local government, such as fire codes and certain historic preservation laws. Often they are duplicative of federal requirements—for example, state and local decisions on the desirability of the project. An interstate transmission line carrying power from wind farms in Wyoming to the Pacific Northwest was required to get approval from each county in Idaho which it traverses. Sometimes there are dueling, duplicative environmental reviews. The Savannah River dredging project involved not only multiple federal reviews, but state reviews by both Georgia and South Carolina; after an adverse court ruling in South Carolina,[74] the Army Corps of Engineers had to appeal to the White House and Congress to try to avoid that state's review from scuttling the project.[75]

The overlay of multiple regulatory regimes makes compliance difficult, and sometimes impossible. In one apocryphal incident, a wetlands official suggested that a proposed road go through a nearby forest, while the forestry official suggested the road go through the wetlands. For a transmission line running from Minnesota to Iowa, Iowa insists that land be purchased *before* approvals will be granted, while Minnesota requires upfront approvals before land acquisition. This creates the very real possibility that a project proponent will be trapped by one state into choosing a path for a new line, only to find out that a neighboring state will not approve that path.

Viewed in isolation, most regulatory requirements seem reasonable, or at least plausible. The more detailed they are, however, the more likely it is that specific requirements will conflict with other requirements, or will impede the public interest in some way that could not have been anticipated when the regulation was created. The steady accretion of regulatory requirements means that getting a permit becomes progressively more difficult.[76]

What's missing is a coherent hierarchy of authority in which accountable officials can balance different regulatory interests. Whether to build a certain project ultimately requires a judgment on behalf of the public good. It makes no sense to block or delay an otherwise worthwhile infrastructure project because of noncompliance with a relatively insignificant requirement by one agency.

As will be described, other countries give one agency authority to issue a final permit. This responsibility includes a concept of balancing different regulatory interests. Just as it is impossible to satisfy every interest or concern, it is also virtually impossible to comply with thousands of detailed regulations that apply to a major infrastructure project. Here as well, the objective should be to satisfy major regulatory goals, not let regulatory flyspecking undermine the broader public purpose.

### 4. COMPARISON OF PERMITTING IN OTHER COUNTRIES

America's competitiveness in a global economy depends on many factors, including the efficiency of its infrastructure. Delays raise costs, harming our ability to compete. Competitors with authoritarian governments such as China have been selectively effective at garnering a competitive advantage through advanced infrastructure. But America's democratic competitors, who similarly value the concept of public participation in governmental decision-making, are also gaining a competitive advantage by redesigning approval processes so that permits for new infrastructure can be approved in less than two years. Germany's approval process is both simple and effective to air issues and get to final decisions. Canada recently overhauled its rules, with a clear path to a two-year process for certain federal projects, and delegation to provinces for most others. Australia is working on an overhaul now.

#### A. Germany.

German environmental review incorporates several key features that promote expediency without sacrificing the quality of the review itself. Scoping and review decisions are concentrated in a single authority, which typically has around six months to complete its review. The review itself is incorporated into a broader "administrative act" which grants or denies the project's application in its entirety, meaning that environmental questions are *not* eligible for independent court review. To the extent that the administrative act itself can be challenged, courts are largely limited to reviewing issues surrounding the limits of agency authority, not specific conclusions reached by agencies.[77] Furthermore, challenges are limited by relatively narrow standing rules and a one-month statute of limitations,[78] and are seen by expert judges of higher administrative courts who engage in their own fact-finding, ensuring speedy resolution of claims.[79] While the right to intervene via lawsuit is relatively narrow, robust public participation is instead fostered through extensive public involvement in initial project development.[80]

The "administrative act" system concentrates the entirety of the infrastructure approval process in a single competent authority; this effectively creates a "one-stop shop" for major projects.[81] For instance, all off-shore wind projects are the sole permitting responsibility of the Federal Maritime and Hydrographic Agency.[82] The designated administrative agency has responsibility for all administrative decisions connected with the approval regardless of which bodies, be they federal or state, would otherwise have responsibility for an individual decision. However, those entities that typically would have authority over the decision have the right to formal hearings to voice their opinions and concerns to the designated authority in the event of disagreement. In this way, Germany promotes expedient, coherent permitting while ensuring that agency expertise is not shut out of the decision-making process.

COMMON GOOD

## B. Canada.

In 2012, the Canadian government passed the Canadian Environmental Assessment Act, 2012 (CEAA),[83] a major reform to the country's federal environmental review regime. For certain projects, the new law shifted Canada to a consolidated model featuring rapid timelines (two years for most federal projects)[84] and ministerial control over ultimate approval.[85] It also significantly reduced the federal government's role in environmental review generally by narrowing the scope of impacts that trigger reviews in the first place. For projects not reviewed under the CEAA, the federal government merely adopts the environmental review (or decision to forgo review) of the relevant province. The new law also significantly narrowed the ability for public challenges to projects by limiting the right to intervene in regulatory hearings to parties "directly affected" by the proposed project.[86]

The federal government also passed reforms to the National Energy Board Act (NEB Act)[87] concurrently with its reforms to environmental review. These energy-permitting reforms vest exclusive federal permitting authority for pipeline projects in the National Energy Board (NEB), and allow the NEB to compel recalcitrant provincial and local jurisdictions to issue relevant permits for projects.[88] The NEB Act also grants federal ministers the authority to override the NEB's refusal to grant approval to projects.[89] These energy-related reforms were generally understood to stem in part from frustrations with the delay and costs surrounding pipeline projects like the Mackenzie Valley Gas Pipeline and the Northern Gateway Pipeline. Both projects required in excess of C$500 million in permitting and review costs alone,[90] and both took so long to permit that underlying market conditions changed and the pipelines were never built.[91] Because pipeline projects are relatively infrequent, the first project to utilize the new permitting regime is currently wending its way through the system.[92]

The reforms to the CEAA, and in particular the narrowing of the federal role in environmental review for most projects, has been controversial.[93] Following the passage of the new environmental laws, over 3,000 pending federal environmental assessments were immediately canceled,[94] and federal assessment numbers have been reduced since the reforms took effect.[95] However, despite criticisms from some observers,[96] several commentators have concluded that the reforms have reduced bureaucratic delay while maintaining robust environmental protections.[97]

Several provinces have also experimented with consolidated permitting systems for sector-specific projects. For example, the provinces of British Columbia and Alberta have consolidated regulatory decision-making for energy projects, with a single regulatory agency in each province. Historically, energy developments in these provinces required: i) operating approvals from one regulatory agency; ii) environmental permits from another agency or government department (e.g., permits for air emissions, water use, impacts on wildlife, and tree clearing); and iii) land rights for government-owned land from another government department. These separate processes often created inefficiency, delay, and uncertainty when the decisions of different agencies conflicted. To address these concerns, all these permits for oil and gas developments (as well as coalmines in Alberta) are now obtained from a single agency—the Oil and Gas Commission in British Columbia and the Alberta Energy Regulator in Alberta.[98] This consolidation allows companies to make a single integrated application to one regulator to obtain all necessary approvals for a project. Similarly, Ontario established a "one-stop shop" permitting authority for renewable energy projects in 2009.[99]

Though major pipeline projects now utilize a consolidated permitting system, the system for permitting most infrastructure projects is still somewhat balkanized. New bridges and rail lines can expect to require approvals from several different permitting authorities at the federal, provincial, and local level.

## C.  Australia.

Australia's Government Productivity Commission recently released a report on public infrastructure which examined, among other things, the role of regulation in the development and maintenance of infrastructure projects. The report concluded that environmental regulation and permitting regimes, while meant to advance worthy goals, were often "over-specified, duplicate existing requirements or are in other ways poorly designed, coordinated and/or administered."[100] According to one major developer, large projects sometimes have to navigate up to 100 approvals across three levels of government and "often have in excess of a thousand conditions."[101] The Port Philip channel-deepening project, for instance, had to comply with 79 federal and state approvals.[102] The project's developer estimated that the costs of environmental requirements have more than doubled since 2004, and that compliance related staffing expenses (not including the costs and price increases from delay) could account for as much as 11 percent of a project's overall cost.[103]

The Commission's many reform recommendations included: i) adopting a "one project, one assessment, one decision" system for environmental review and permitting; ii) increasing cooperation between federal and state/territorial agencies; iii) limiting the right of review of ministerial decisions; iv) establishing timelines for key decisions in the approval process; and v) requiring that agencies publish opinions justifying their approval decisions. As of December 2014, the Australian government indicated it would act on the Commission's report and begin introducing reforms to cut red tape and improve project delivery.[104]

## 5.  REFORM ATTEMPTS IN THE US

Various efforts have been made to streamline US infrastructure permitting in the last two decades. With one exception—the MAP-21 law which exempted from review highway projects within existing rights-of-way—the reforms have had only marginal impact. Useful elements of these reforms include shortening the statute of limitations, creating dashboards with time schedules, and designating point people to try to resolve disputes.

Two critical elements are missing from all these streamlining reforms to date, in our view: i) time deadlines are neither firm nor ambitious—i.e., they end up being a marginal improvement from the current tectonic processes; and ii) there is no action-forcing mechanism in the reforms. If one agency decides to drag its heels, then the project will just have to wait. No official has authority to draw lines and keep things moving.

## A.  Federal.

There have been numerous attempts since NEPA's passage to streamline both environmental review and federal infrastructure permitting processes.[105] Most, however, have addressed issues in isolation without attempting comprehensive reform.

COMMON GOOD

In the specific arena of transportation infrastructure, three significant pieces of streamlining legislation were enacted in the last 20 years: the Transportation Equity Act for the 21st Century (TEA-21) in 1998; the Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users (SAFETEA-LU) in 2005; and the Moving Ahead for Progress in the 21st Century Act (MAP-21) in 2012.[106]

The thrust of TEA-21[107] (1998) was innovative project financing.[108] While it also promised to cut process time, studies show that the average time to complete an EIS increased dramatically in the years following the bill's passage[109] (from 1998 to 2006).[110]

SAFETEA-LU[111] (2005) narrowed the statute of limitations for transportation projects to 180 days from the earlier six-year litigation window, delegated categorical exclusion authority to the states for a limited subset of project types,[112] and created a pilot project wherein five states were granted discretionary authority to assume the Department of Transportation's environmental review powers for highway projects.[113] These reforms proved too narrow to meaningfully affect project delivery timelines; a 2012 Federal Highway Administration study concluded that overall transportation project delay was not meaningfully affected by this legislation.[114]

MAP-21 (2012) expanded categorical exclusion authority to a much broader category of projects, such as those built within existing rights-of-way.[115] Though statistical evidence of MAP-21's effect is limited because the law is relatively new, anecdotal evidence suggests that this particular reform has sped up the review process dramatically for projects within existing rights-of-way. According to the Texas Department of Transportation's Director of Environmental Affairs, Carlos Swonke:

> A few years ago there was a project in Houston to widen an existing four-lane road to a six-lane road. No additional right-of-way was needed for the widening. At the time, a full NEPA analysis was needed and an Environmental Assessment was prepared. There were no unusual environmental circumstances about the project. There was no public opposition to the project. The Environmental Assessment took three years for review and approval. The cost to prepare the Environmental Assessment was $100,000. Today that project could be approved with a Categorical Exclusion in a fraction of that time and at a fraction of that cost.[116]

MAP-21 also expanded SAFETEA-LU's discretionary pilot project to all states, making it a permanent program under which any state can apply to assume environmental review authority from the Department of Transportation for highway projects.[117]

In 2011, President Obama issued a presidential memorandum creating the Federal Infrastructure Project Permitting Dashboard, which monitored major projects selected for presidential fast-tracking and also created a permit and approval inventory.[118] According to the Administration, "Federal agencies have expedited the review and permitting of more than 50 selected infrastructure projects, including 11 energy projects. Thirty-two of these projects have completed the Federal review process, 29 remain under active Federal review, and one project was denied. Estimated time savings range from several months to several years in many cases." [119] This initiative gives the White House a role in putting pressure on recalcitrant agencies, and responded to the plea for streamlined permitting by the President's Council on Jobs and Competitiveness. But the initiative is limited in scope, and, as with the statutes above, it lacks the action-forcing authority needed to substantially reduce the time required for permitting.[120]

Two bills aimed at speeding up non-transportation infrastructure approvals have been introduced in Congress recently: the Responsibly and Professionally Invigorating Development Act (RAPID Act) in 2012 (re-introduced in the Senate in 2014) and the Federal Permitting Improvement Act (FPIA) introduced by Sens. Portman and McCaskill in 2015.[121]

The RAPID Act seeks to remedy delay in federal environmental review generally, by narrowing the scope of review, setting hard deadlines for completion of review (18 months for an EA and 36 months for an EIS), and changing the statute of limitations from six years to 180 days for projects not covered under MAP-21.[122] It also establishes a "get-in or get-out" rule, forcing interested parties to get involved early in a project's review process to maintain standing to sue later on. Other useful ideas in the bill include allowing environmental reviews to adopt material from previously completed environmental reviews from the same geographic area. Somewhat controversially, the bill provides an action-forcing mechanism that deems a project approved if an agency has not acted within a definite timeframe. Most controversial is a provision that prohibits environmental review from considering the social costs of carbon dioxide emissions. The bill passed the House in March 2014 but has not moved forward beyond that.[123] President Obama has said he will veto the legislation.[124]

The Portman-McCaskill bill, which is supported by environmental and business groups and the White House, would lower the statute of limitations from six years to 150 days for all major projects across all sectors, and would additionally permit courts to consider economic harm in "weighing equitable considerations for injunctive relief." [125] The bill also creates a Chief Permitting Officer (CPO), to be appointed by the President, who would serve as the head of a new 16-agency Federal Permitting Improvement Council. However, the CPO does not have any actual authority to move projects along, and the bill's provisions regarding setting timelines and resolving disputes rely on complex processes that we believe are unlikely to significantly improve delivery timetables.

## B.  State reforms.

Thirty-seven states have adopted formal environmental review requirements based at least in part on NEPA. Of those, 16 have comprehensive environmental review statutes which affect a broad swath of state actions,[126] and several of these states have sought to reform their respective statutes in recent years in an effort to reduce project costs and delivery timelines. Below are two recent reforms that shed light on ways in which reforms can harm as well as help building of new infrastructure.

### i.  California

The California Environmental Quality Act (CEQA) mirrors NEPA's procedural requirements, but applies to a significantly larger swath of government actions, and adds a substantive component that requires full mitigation of significant project impacts, if feasible, regardless of whether mitigation would be required under any other environmental protection statute.[127] Its rigidity and complexity have made it a notorious tool for special interest groups to block disfavored projects, regardless of their value to the community as a whole.[128] A note in the *Stanford Law & Policy Review* explained that:

> In the past few years, CEQA has come under sweeping scrutiny. Critics allege that CEQA has only exacerbated California's dramatic recession, turning the battle for 'jobs and economic growth...into an agonizing test' as businesses bypass California for states with less burdensome environmental regulations. In addition, CEQA has been employed superfluously and invidiously. For example, one lawsuit delayed San Francisco's painting of new bike lanes by alleging that the lanes 'could cause pollution,' while other CEQA challenges were brought to squeeze out competitors or undesirable projects based on reasons 'unrelated to environmental impacts.'[129]

A variety of reform proposals have been advanced over the years, each focusing on a distinct aspect of CEQA's many problematic aspects, but until recently, none have been successfully enacted.[130] However, when the National Basketball Association's Sacramento Kings franchise threatened to leave for Seattle, California enacted a law to facilitate stadium development in Sacramento which contained two important limitations on the CEQA process.[131] First, it requires that litigation under CEQA be entirely resolved, including appeals, within 270 days of its filing, and compels the state's judicial council to enact rules to guarantee this timeline. Second, it scales back CEQA by eliminating impacts on aesthetics (including "scenic vista[s]"[132]) and parking from consideration as environmental impacts.[133]

### ii.  Washington

In 2012, the state of Washington passed a package of reforms aimed at modernizing its State Environmental Policy Act (SEPA). The statute[134] made a number of significant changes to the state's environmental review process, including creating flexible exemptions for small construction projects, full exemptions for projects whose purpose was environmental restoration, and several other concessions to flexibility and project-by-project process requirements. Moreover, the law grants significant authority to local governments to determine appropriate review levels on a per project basis. The law also created an advisory committee whose mandate is to advise the state's Department of Ecology on rulemaking related to SEPA, especially related to the creation of exemptions to the law.[135]

### 6.  PROPOSALS TO CREATE A TWO-YEAR APPROVAL PROCESS IN THE US

To rebuild America's infrastructure on an efficient and timely basis, America must first rebuild its outmoded and tangled legal infrastructure. The process of coming up with a coherent and responsible legal approvals system presumably should reflect the same values we want for other public choices: A public goal, a proposal to accomplish it, public debate and input, decisions by responsible public institutions, and accountability mechanisms to safeguard against mistakes.

The goal of reform should not be to tweak the current system but to invent a new system which provides essential review and final approvals within a review period that avoids the economic and environmental harm caused by years-long delays. That period for review and permitting should be no more than two years, except in unusual circumstances.

We propose four major changes in approach:

A.  To improve decisions, including getting ideas for alternatives, public comment should be solicited even before formal plans are finalized, as well as throughout the process. Public input should be informal, and largely through written submissions and informal meetings, not a matter of formal hearings and "building the record." The value should be in prompting broad public discussion to inform what ultimately should be politically accountable choices, not in providing procedural levers for special interests to delay decisions.

B.  The scope and adequacy of environmental review should be determined by a designated environmental official—probably at CEQ for federal projects. The flyspecking approach should be abandoned, so the review focuses on material issues of impact and possible alternatives, not details. Net overall impact should be the most important finding. Environmental review should generally be completed in no more than a year, and should not be longer than 300 pages, as set forth in current CEQ regulations. Some of these changes can be done by executive order. To avoid arguable jurisdictional conflicts with existing regulations, a new statute should clarify presidential authority over implementation of NEPA.

C.  It is also important to eliminate the fear of litigation that leads project proponents to practice a kind of "defensive medicine" that transforms EISs into multi-thousand page documents. These changes are best done by statute which would: i) require all claims challenging a project to be brought within 90 days of issuance of federal permits; ii) require credible allegations that the review is so inadequate as to be arbitrary or, for permits, that the project violates substantive law; and iii) require that impact be measured against the overall benefit of a project. By executive order, it is also possible to establish prudential guidelines for judicial review, boosting the presumption. Decisions on the wisdom of infrastructure should be made by the executive branch, not the judicial branch.

COMMON GOOD

D.  Multiple permitting must be replaced by a "one-stop shop." The current regulatory gauntlet at federal, state, and local levels drags approvals out for years and raises costs unnecessarily. Getting a permit from multiple agencies, often with conflicting goals, requires a process akin to negotiating an international treaty. Decisions about infrastructure require balancing of numerous regulatory considerations, and must be made on a timely basis to avoid social and economic harm. If America wants new infrastructure on a timely basis, approvals must be consolidated. This means that government entities must relinquish their veto power. A new statutory framework is required, comparable to the frameworks for federal projects in Germany and Canada. The new framework should preempt state law for interstate projects (similar to the Federal Energy Regulatory Commission's authority over new gas pipelines), and give the White House authority to designate a single agency to balance regulatory concerns and issue permits for an interstate project.

**Pilot projects.**

Often the resistance to changes in law is fear of "opening the floodgates" in ways that can never be fully anticipated. Any of the proposals set forth above can be done as pilot projects, or for limited categories of projects. For example, the expedited approvals could be available for a period of time (say, five years) and only for projects that CEQ concludes are likely to have a net positive environmental impact.

TWO YEARS, NOT TEN YEARS: REDESIGNING INFRASTRUCTURE APPROVALS

## CONCLUSION

The status quo is unacceptable. Decrepit infrastructure is dangerous, costly, and environmentally destructive. It drags down the economy.

A new process to modernize America's infrastructure is needed to avoid these costs, stimulate vital sectors of the economy, and create employment for upwards of two million Americans.

The main barrier to an infrastructure initiative is not financing, but an absurdly complex and lengthy permitting system. The legal procedures are haphazard and balkanized, without any coherent lines of authority. Even with funding, modernizing infrastructure is very difficult to achieve under the current system. Any objector can unilaterally delay a project for years.

What is the public benefit of the current process? Do Americans want to pay twice as much for the same projects? Do Americans want to endure inefficient and unsafe infrastructure built by our great-grandparents? Does the current system move the nation forward—or does it leave it languishing in the past? Who, indeed, is accountable in this bureaucratic quagmire? Nobody.

This approvals bureaucracy must be rebuilt, not tweaked. The core goals of environmental review and public participation remain as important as ever. But they must be paired with practical realities of time limits and budgetary constraints, and fit within a structure with clear lines of authority so that decisions can be made and responsible officials held accountable. America needs modern infrastructure, not years of legal process and bickering.

Creating a new approvals system is not hard. Environmental review should focus on material effects. Elected officials must have authority to balance competing interests. Litigation should be limited to claims of illegality, not second-guessing tough choices. Time limits must be honored; otherwise officials will use process as an excuse to avoid responsibility.

Breaking free of the status quo is the hard part. Understandable fears of the unknown make it easy to organize opposition. We cling to the vague hope that years of review and litigation will dictate correct results. But all those years of process mainly produce paralysis.

Responsible officials must be given the authority to make decisions. Those decisions can be checked by other officials, but there must be a clear hierarchy of authority, not a bureaucratic scrum. A free society requires red lights and green lights. Otherwise, as today, we get gridlock.

24

# ENDNOTES

1   USA, Department of Transportation, Federal Highway Administration, *Estimated Time Required to Complete the NEPA Process,* http://environment.fhwa.dot.gov/strmlng/nepatime.asp.

2   USA, Department of Energy, Energy Information Administration, *Frequently Asked Questions,* How Much Electricity Is Lost in Transmission and Distribution in the United States?, accessed May 8, 2015, http://www.eia.gov/tools/faqs/faq.cfm?id=105&t=3.

3   USA, Department of Energy, Energy Information Administration, *Frequently Asked Questions*, What Is U.S. Electricity Generation by Energy Source?, http://www.eia.gov/tools/faqs/faq.cfm?id=427&t=3.

4   Coal accounts for just shy of two trillion kWh of our total energy generation, but coal facilities differ substantially in terms of size and output. There are a total of 1,436 coal plants in the US, generating an average of 1.3 billion kWh per year. To generate 240 billion kWh, you would need about 200 "average" coal plants. See USA, Department of Energy, Energy Information Administration, *Electricity Data Browser*, accessed July 6, 2015, http://www.eia.gov/electricity/data/browser/.

5   USA, Department of Energy, Energy Information Administration, *Electricity Data Browser,* April 27, 2015, Average Retail Price of Electricity to Ultimate Customers by End-Use Sector, http://www.eia.gov/electricity/monthly/epm_table_grapher.cfm?t=epmt_5_6_a.

6   Transmission and distribution efficiency is dependent on a complex combination of physical and operational factors. Upgrades to transmission capacity, distribution technology, and demand responsiveness have the potential to substantially improve efficiency; likewise, upgrades to generation have the potential to ameliorate transmission losses, and are folded in to this calculation for the sake of simplicity. See, e.g., *Implementing EPA's Clean Power Plan: A Menu of Options*, National Association of Clean Air Agencies, May 21, 2015, http://www.4cleanair.org/NACAA_Menu_of_Options.

7   Coal-burning plants produce 39 percent of our total power, but emit 76 percent of the carbon dioxide associated with energy production, or over 1.5 billion tons per year. USA, Department of Energy, Energy Information Administration, *Frequently Asked Questions*, How Much of U.S. Carbon Dioxide Emissions Are Associated With Electricity Generation?, accessed May 8, 2015, http://www.eia.gov/tools/faqs/faq.cfm?id=77&t=11.

8   Note that even EPA's own fact sheet claims that these estimates "do not currently include all of the important physical, ecological, and economic impacts of climate change recognized in the climate change literature because of a lack of precise information on the nature of damages and because the science incorporated into these models naturally lags behind the most recent research," and therefore are likely too low. In fact, a 2015 Stanford research paper estimated that the social cost of carbon dioxide emissions is around $220 per ton, nearly twice the amount the federal government estimated. USA, Environmental Protection Agency, *Fact Sheet: Social Cost of Carbon,* November 2013, Background, http://www.epa.gov/climatechange/Downloads/EPAactivities/scc-fact-sheet.pdf. See also Frances C. Moore and Delavane B. Diaz, "Temperature Impacts on Economic Growth Warrant Stringent Mitigation Policy," *Nature Climate Change* 5 (January 12, 2015): pp. 127-131.

9   Meagan Clark, "Aging US Power Grid Blacks Out More Than Any Other Developed Nation," *International Business Times*, July 17, 2014, http://www.ibtimes.com/aging-us-power-grid-blacks-out-more-any-other-developed-nation-1631086.

10  USA, Department of Energy, *The Smartgrid: An Introduction*, prepared by Litos Strategic Communication, Section Two, accessed May 10, 2015, http://energy.gov/sites/prod/files/oeprod/DocumentsandMedia/DOE_SG_Book_Single_Pages%281%29.pdf.

11  *Modernizing America's Electrical Grid: Solutions for Transmission, Storage, Distribution & Resilience*, National Electrical Manufacturers Association, July 2014, http://www.nema.org/Policy/Documents/QER_Recommendations-for-Modernizing-Americas-Electrical-Grid.pdf.

12  The five-year investment gap in transmission and distribution spending is $94 billion, according to the ASCE. See *2013 Report Card for America's Infrastructure*, American Society of Civil Engineers, March 2013, Grade Sheet: America's Infrastructure Investment Needs, http://www.infrastructurereportcard.org/wp-content/uploads/2013ReportCardforAmericasInfrastructure.pdf. During that time, assuming current spending levels continue, actual annual investment in transmission and distribution infrastructure will total $137.5 billion. *Failure to Act: The Economic Impact of Current Investment Trends in Electricity Infrastructure*, American Society of Civil Engineers, 2011, Executive Summary, http://www.asce.org/electricity_report/. Thus, the total cost to "fix" our transmission and distribution system by 2020 is $231.5 billion.

13  USA, Department of Energy, Energy Information Administration, *Frequently Asked Questions,* How Much of U.S. Carbon Dioxide Emissions Are Associated with Electricity Generation?, accessed May 8, 2015, http://www.eia.gov/tools/faqs/faq.cfm?id=77&t=11.

14    USA, Department of Energy, Energy Information Administration, *Frequently Asked Questions,* What Is U.S. Electricity Generation by Energy Source?, accessed May 8, 2015, http://www.eia.gov/tools/faqs/faq.cfm?id=427&t=3.

15    Seventy-six percent of total carbon dioxide emissions came from coal-burning plants (producing 39 percent of power). USA, Department of Energy, Energy Information Administration, *Frequently Asked Questions,* How Much of U.S. Carbon Dioxide Emissions Are Associated with Electricity Generation?, accessed May 8, 2015, http://www.eia.gov/tools/faqs/faq.cfm?id=77&t=11.

16    USA, Environmental Protection Agency, *Clean Energy,* Air Emissions, accessed May 10, 2015, http://www.epa.gov/cleanenergy/energy-and-you/affect/air-emissions.html.

17    USA, Department of Energy, Energy Information Administration, *Frequently Asked Questions,* What Is U.S. Electricity Generation by Energy Source?, accessed May 8, 2015, http://www.eia.gov/tools/faqs/faq.cfm?id=427&t=3.

18    Ibid.

19    Germany, Federal Ministry of the Interior, Federal Statistical Office, *Energy,* Gross Electricity Production in Germany from 2012 to 2014, accessed May 10, 2015, https://www.destatis.de/EN/FactsFigures/EconomicSectors/Energy/Production/Tables/GrossElectricityProduction.html.

20    Natural Resources Defense Council, *NRDC Legislative Fact Sheet Act: The American Renewable Energy and Efficiency Act Is a Step to Building Our Clean Energy Future,* October 2013, http://www.nrdc.org/energy/files/american-renewable-energy-efficiency-act-FS.pdf.

21    See, e.g., American Renewable Energy and Efficiency Act, S. 1627, 113 Cong. (2013), https://www.congress.gov/113/bills/s1627/BILLS-113s1627is.xml. Note that these bills specifically exclude new, purpose-built hydroelectric facilities for inclusion in renewable energy sources that contribute to the total. Also note that these bills are aimed at retail power producers; smaller-scale local systems like rooftop solar, which have the potential to add substantial additional renewable capacity, are excluded from these benchmarks.

22    Carbon emissions from power generation in the US in 2014 totaled slightly more than two billion tons. USA, Department of Energy, Energy Information Administration, *Frequently Asked Questions,* How Much of U.S. Carbon Dioxide Emissions Are Associated with Electricity Generation?, accessed May 8, 2015, http://www.eia.gov/tools/faqs/faq.cfm?id=77&t=11. We calculate that an 18 percent reduction in overall non-renewables generation translates to a commensurate reduction in overall carbon dioxide emissions proportional to each carbon-emitting generation source's current share of production, for a total of 367 million tons of carbon dioxide annually. If renewables replaced coal exclusively, this figure jumps to 717 million tons of carbon dioxide annually.

23    Assuming an annual need of $37.8 billion through 2020. *Failure to Act: The Economic Impact of Current Investment Trends in Electricity Infrastructure,* American Society of Civil Engineers, 2011, Executive Summary, http://www.asce.org/electricity_report/.

24    *2013 Report Card for America's Infrastructure*, American Society of Civil Engineers, March 2013, Inland Waterways: Conditions & Capacity, http://www.infrastructurereportcard.org/a/#p/inland-waterways/conditions-and-capacity .

25    *Failure to Act: The Economic Impact of Current Investment Trends in Airports, Inland Waterways, and Marine Ports Infrastructure,* American Society of Civil Engineers, 2012, Section 4, http://www.asce.org/uploadedFiles/Issues_and_Advocacy/Our_Initiatives/Infrastructure/Content_Pieces/failure-to-act-ports-aviation-report.pdf.

26    Vijay Perincherry and Fang Wu, *Cost of Project Delays: An Estimate of Foregone Benefits and Other Costs Related to Schedule Delays of Inland Waterway Projects,* HDR, June 2012, Executive Summary, http://www.nationalwaterwaysfoundation.org/study/HDRstudy.pdf.

27    Total investment needed to fully rehabilitate inland waterways through 2033. See *2013 Report Card for America's Infrastructure,* American Society of Civil Engineers, March 2013, Inland Waterways: Investment & Funding, http://www.infrastructurereportcard.org/wp-content/uploads/2013ReportCardforAmericasInfrastructure.pdf.

28    Assuming a steady yearly increase of $1.6 billion (for a $16 billion increase over ten years), we calculate overall costs of ($33 billion + $34.6 billion + $36.2 billion + $37.8 billion + $39.4 billion + $41 billion =) $222 billion.

29    *2013 Report Card for America's Infrastructure,* American Society of Civil Engineers, March 2013, Roads: Conditions & Capacity, http://www.infrastructurereportcard.org/a/#p/roads/conditions-and-capacity . In their 2012 Urban Mobility Report, the Texas A&M Transportation Institute put the cost at $121 billion. *2012 Urban Mobility Report,* Texas A&M Transportation Institute, December 2012, http://d2dtl5nnlpfror.cloudfront.net/tti.tamu.edu/documents/mobility-report-2012.pdf.

30  USA, Department of Transportation, Federal Highway Administration, *Efficient Use of Highway Capacity Summary Report to Congress,* November 2010, Chapter 2, http://www.ops.fhwa.dot.gov/publications/fhwahop10023/fhwahop10023.pdf. Freight bottlenecks on roads cost nearly $8 billion a year to operators alone, according to the Federal Highway Administration, and will steadily worsen as economic growth outpaces necessary upgrades to road capacity. USA, Department of Transportation, Federal Highway Administration, *An Initial Assessment of Freight Bottlenecks on Highways,* prepared by Cambridge Systematics, October 2005, Executive Summary, http://www.fhwa.dot.gov/policy/otps/bottlenecks/bottlenecks.pdf. Additionally, degraded road conditions impose $67 billion in unnecessary wear and tear on vehicles each year. *2013 Report Card for America's Infrastructure*, American Society of Civil Engineers, March 2013, Roads: Conditions & Capacity, http://www.infrastructurereportcard.org/a/#p/roads/conditions-and-capacity . Crumbling roads are also a significant safety hazard; a 2009 study of US motor vehicle accidents concluded that more than half of all fatal vehicle crashes, and 38 percent of non-fatal crashes, were attributable at least in part to poor road conditions. The study estimated the yearly cost of these crashes at $217.5 billion. According to the study, poor road conditions are the single-most lethal contributing factor in fatal vehicle crashes, responsible either all or in part for 22,455 deaths in 2006 alone. Ted R. Miller and Eduard Zaloshnja, *On A Crash Course: The Dangers and Health Costs of Deficient Roadways*, Pacific Institute for Research and Evaluation, May 2009, Executive Summary, http://www.aednet.org/government/pdf-2009/AED-TCCSafetyStudy-20090701.pdf.

31  USA, Department of Transportation, Federal Highway Administration, *Deficient Bridges by State and Highway System 2014*, All Bridges, https://www.fhwa.dot.gov/bridge/nbi/no10/defbr14.cfm.

32  *Bridging the Gap: Restoring and Rebuilding the Nation's Bridges*, American Association of State Highway and Transport Officials, July 2008, ftp://ftp.mdt.mt.gov/research/LIBRARY/BTG-1-BRIDGING-GAP-AASHTO.PDF.

33  USA, Department of the Treasury, *A New Economic Analysis of Infrastructure Investment,* March 23, 2012, Executive Summary, http://www.treasury.gov/resource-center/economic-policy/Documents/20120323InfrastructureReport.pdf.

34  USA, Department of Energy, Office of Energy Efficiency & Renewable Energy, *Alternative Fuels Data Center—Fuel Properties Comparison*, accessed July 7, 2015, http://www.afdc.energy.gov/fuels/fuel_comparison_chart.pdf.

35  Frances C. Moore and Delavane B. Diaz, "Temperature Impacts on Economic Growth Warrant Stringent Mitigation Policy," *Nature Climate Change* 5 (January 12, 2015): pp. 127-131. See also *Stanford News*, "Estimated Social Cost of Climate Change Not Accurate, Stanford Scientists Say," news release, January 12, 2015, http://news.stanford.edu/news/2015/january/emissions-social-costs-011215.html.

36  Interview with John Ma, Chief of Staff to Port Authority Executive Director Patrick Foye, March 8, 2015.

37  *Surface Transportation Policy Recommendations for the National Surface Transportation Policy and Revenue Study Commission*, American Association of State Highway and Transportation Officials, March 2007, Chapter 1: Overview—Scale of Investment Required, http://financecommission.dot.gov/Documents/Background%20Documents/tif2-1.pdf.

38  *2013 Report Card for America's Infrastructure*, American Society of Civil Engineers, March 2013, Roads: Investment & Funding, http://www.infrastructurereportcard.org/wp-content/uploads/2013ReportCardforAmericasInfrastructure.pdf.

39  *2013 Report Card for America's Infrastructure*, American Society of Civil Engineers, March 2013, Bridges: Investment & Funding, http://www.infrastructurereportcard.org/wp-content/uploads/2013ReportCardforAmericasInfrastructure.pdf.

40  *2013 Report Card for America's Infrastructure*, American Society of Civil Engineers, March 2013, Rail: Conditions & Capacity, http://www.infrastructurereportcard.org/a/#p/rail/conditions-and-capacity .

41  Keith Miller, Kristina Costa, and Donna Cooper, *Getting America's Freight Back on the Move: A Plan for Investing in Our Freight Infrastructure*, Center for American Progress, August 14, 2012, Current Infrastructure Conditions, https://www.americanprogress.org/issues/technology/report/2012/08/14/11994/getting-americas-freight-back-on-the-move/.

42  John Schwartz, "Freight Train Late? Blame Chicago," *The New York Times*, May 7, 2012, http://www.nytimes.com/2012/05/08/us/chicago-train-congestion-slows-whole-country.html.

43  Keith Miller, Kristina Costa, and Donna Cooper, *Getting America's Freight Back on the Move: A Plan for Investing in Our Freight Infrastructure*, Center for American Progress, August 14, 2012, Current Infrastructure Conditions, https://www.americanprogress.org/issues/technology/report/2012/08/14/11994/getting-americas-freight-back-on-the-move/.

44  John Miller, "Can Switching Heavy Duty Trucks to Rail Transport Reduce Carbon Emissions?," The Energy Collective, July 13, 2013, http://www.theenergycollective.com/jemillerep/248811/can-switching-heavy-duty-trucks-rail-transport-substantially-reduce-us-carbon-emis.

45  *2013 Report Card for America's Infrastructure*, American Society of Civil Engineers, March 2013, Grade Sheet: America's Infrastructure Investment Needs, http://www.infrastructurereportcard.org/wp-content/uploads/2013ReportCardforAmericasInfrastructure.pdf.

46  USA, Library of Congress, Congressional Research Service, *Water Infrastructure Needs and Investment: Review and Analysis of Key Issues,* by Claudia Copeland and Mary Tiemann, December 21, 2010, Issues: Infrastructure Replacement, http://fas.org/sgp/crs/homesec/RL31116.pdf.

47  *Buried No Longer: Confronting America's Water Infrastructure Challenge*, American Water Works Association, 2011, Key Findings, http://www.awwa.org/Portals/0/files/legreg/documents/BuriedNoLonger.pdf.

48  Ibid.

49  *The Case for Fixing the Leaks: Protecting People and Saving Water While Supporting Economic Growth in the Great Lakes Region*, Center for Neighborhood Technology, 2013, Infrastructure Requires Attention, http://www.cnt.org/sites/default/files/publications/CNT_CaseforFixingtheLeaks.pdf.

50  USA, Environmental Protection Agency, Office of Water, *Water on Tap: What You Need to Know*, December 2009, How Can I Conserve Water?, http://water.epa.gov/drink/guide/upload/book_wateRontap_full.pdf.

51  USA, Centers for Disease Control and Prevention, Division of Foodborne, Waterborne, and Environmental Diseases, *Drinking Water Week*, May 4, 2015, The Future of Tap Water, http://www.cdc.gov/features/drinkingwater/.

52  USA, Centers for Disease Control and Prevention, Division of Media Relations, "Waterborne Diseases Could Cost over $500 Million Annually in U.S.," news release, July 14, 2010, http://www.cdc.gov/media/pressrel/2010/r100714.htm.

53  USA, United States Congress, Congressional Budget Office, *Future Investment in Drinking Water and Wastewater Infrastructure,* November 2002, The Need for Increased Investment, https://www.cbo.gov/sites/default/files/11-18-watersystems.pdf.

54  USA, Environmental Protection Agency, Office of Wetlands, Oceans, and Watersheds, *National Rivers and Streams Assessment 2008–2009*, February 28, 2013, http://water.epa.gov/type/rsl/monitoring/riverssurvey/upload/NRSA0809_Report_Final_508Compliant_130228.pdf .

55  USA, Environmental Protection Agency, Office of Water, *Drinking Water Infrastructure Needs Survey and Assessment: Fifth Report to Congress,* April 2013, Executive Summary, http://water.epa.gov/grants_funding/dwsrf/upload/epa816r13006.pdf.

56  EPA estimates a total cost of $298.2 billion for full rehabilitation and improvement of America's wastewater infrastructure. USA, Environmental Protection Agency, Office of Wastewater Management, *Clean Watersheds Needs Survey 2008: Report to Congress*, 2008, http://water.epa.gov/scitech/datait/databases/cwns/upload/cwns2008rtc.pdf.

57  *2013 Report Card for America's Infrastructure*, American Society of Civil Engineers, March 2013, Executive Summary, http://www.infrastructurereportcard.org/a/#p/overview/executive-summary .

58  USA, Executive Office of the President, Council on Environmental Quality, *A Citizen's Guide to NEPA: Having Your Voice Heard,* December 2007, History and Purpose of NEPA, http://energy.gov/sites/prod/files/nepapub/nepa_documents/RedDont/G-CEQ-CitizensGuide.pdf.

59  National Environmental Policy Act of 1969. 42 U.S.C. §§ 4321-4370h.

60  Daniel A. Dreyfus, "NEPA: The Original Intent of the Law," *Journal of Professional Issues in Engineering Education and Practice* 109, no. 4 (1983): pp. 252-3.

61  40 C.F.R. 1502.7. In a 2012 guidance memorandum for agency heads, CEQ reaffirmed that NEPA "encourages straightforward and concise reviews . . . [that] effectively convey the relevant considerations to the public and decisionmakers in a timely manner[.]" See USA, Executive Office of the President, Council on Environmental Quality, *Improving the Process for Preparing Efficient and Timely Environmental Reviews Under the National Environmental Policy Act*, March 6, 2012, https://www.whitehouse.gov/sites/default/files/microsites/ceq/improving_nepa_efficiencies_06mar2012.pdf.

62  USA, United States Coast Guard, First District, *Bayonne Bridge Navigational Clearance Program—Final Environmental Assessment,* May 2013, http://www.regulations.gov/#!documentDetail;D=USCG-2012-1091-0118 .

63  "[I]t is clear that the Act did not intend the [environmental impact statement (EIS)] process to be extraordinarily costly or time-consuming. Not only does the report of the Senate-House conferees caution against delay, but the Act included no appropriation authorization to pay for implementation." Daniel A. Dreyfus, "NEPA: The Original Intent of the Law," *Journal of Professional Issues in Engineering Education and Practice* 109, no. 4 (1983): pp. 252-3.

64  Tom Zeller, Jr., "Cape Wind: Regulation, Litigation and the Struggle to Develop Offshore Wind Power in the U.S.," The Huffington Post, February 23, 2013, http://www.huffingtonpost.com/2013/02/23/cape-wind-regulation-liti_n_2736008.html.

COMMON GOOD

65  Julia C. Muller, "Harbor Deepening Timeline of Events," *Savannah Morning News*, accessed May 7, 2015, http://savannahnow.com/harbor-deepening-timeline-events.

66  Piet DeWitt and Carole A. DeWitt, "How Long Does It Take to Prepare an Environmental Impact Statement?" *Environmental Practice* 10, no. 4 (December 2008): p. 164.

67  USA, Library of Congress, Congressional Research Service, *The National Environmental Policy Act: Streamlining NEPA*, by Linda Luther, February 13, 2006, The Role of Litigation in NEPA's Implementation, http://assets.opencrs.com/rpts/RL33267_20060213.pdf.

68  Mosaic, a mining company, "donated" an over 4,000 acre, $10 million ranch to the Sierra Club in exchange for the latter's agreement to suspend a lawsuit blocking Mosaic's expansion of a phosphate mine in Florida. Ernest Scheyder, "Mosaic Settles Lawsuit over Florida Mine Expansion," Reuters, February 21, 2012, http://www.reuters.com/article/2012/02/21/us-mosaic-idUSTRE81K1UJ20120221. Similarly, the Port of Los Angeles established a $100 million fund to combat greenhouse gas emissions in order to stave off lawsuits by environmental groups who opposed the port's expansion efforts. See USA, City of Los Angeles, Office of the Attorney General, *Memorandum of Understanding Between the State of California, the Office of the Mayor of the City of Los Angeles, and the City of Los Angeles Harbor Department Creating a Partnership to Reduce Greenhouse Gases and Support the Port of Los Angeles Clean Air Action Plan*, December 2007, http://ag.ca.gov/globalwarming/pdf/Port_of_Los_Angeles_Agreement.pdf. During the environmental review process for the Bayonne Bridge retrofit, environmental groups demanded the Port Authority establish a similar fund; when they refused, the groups sued to stop the project. Steve Strunsky, "For Newark's Ironbound, Bayonne Bridge Project Raises Health Concerns," *The Star-Ledger*, March 31, 2013, http://www.nj.com/news/index.ssf/2013/03/raising_a_bridge_and_health_co.html.

69  Tim Bradner, "Shell Files 'Pre-Emptive Strike,' Seeks Approval of Process on Spill Plan," *Alaska Journal of Commerce* (Anchorage), March 1, 2012, February ed., http://www.alaskajournal.com/Alaska-Journal-of-Commerce/AJOC-February-26-2012/Shell-files-pre-emptive-strike-seeks-approval-of-process-on-spill-plan/.

70  Philip K. Howard, *The Rule of Nobody: Saving America from Dead Laws and Broken Government* (New York: W.W. Norton, 2014), p. 2.

71  Ibid.

72  Ibid.

73  See, e.g., USA, Department of Transportation, Federal Highway Administration, *Tappan Zee Hudson River Crossing Project Final Environmental Impact Statement,* July 2012, Appendix B-8, http://www.newnybridge.com/documents/feis/.

74  "South Carolina Supreme Court Denies Approval on Savannah Harbor Dredging Project," *Cruise Ship Law Blog* (blog), November 9, 2012, http://www.lipcon.com/blog/south-carolina-supreme-court-denies-approval-on-savannah-harbor-dredging-project/.

75  Associated Press, "Attorneys Try to Settle Savannah Dredge Suit," *Savannah Morning News*, November 29, 2012, http://savannahnow.com/latest-news/2012-11-29/attorneys-try-settle-savannah-dredge-suit.

76  "There are 35 different U.S. agencies and rules involved, requiring a lot of time and compliance that brings redundancy, complexity and delays," he [Sen. Portman] added, citing an engineer for an Ohio coal company who showed him two thick notebooks of permitting documents, compared with a mere 11 pages the engineer recalled from decades ago." Sen. Rob Portman, as quoted in Charles S. Clark, "Senators: Feds 'Feel No Sense of Urgency' About Granting Permits for Job-Creating Projects," *Government Executive*, January 29, 2015, http://www.govexec.com/management/2015/01/senators-feds-feel-no-sense-urgency-about-granting-permits-job-creating-projects/104052/.

77  Peter Schütz, "§ 8 Rechtsschutz im Fachplanungsrecht," *Handbuch des Fachplanungsrecht: Grundlagen–Praxis–Rechtsschutz* 231 at 232-233 (2nd ed., Jan Ziekow, ed., 2014).

78  Ibid. at 254; Code of Administrative Court Procedure (Verwaltungsgerichtsordnung, VWGO) § 74(1).

79  These measures work to expedite the administration's judicial review. They do not, in themselves, deal with what has become a related issue (i.e., public comment, including on environmental grounds). This is a particularly hot issue that has been taken up in reform discussions. See *Handbuch des Fachplanungsrecht: Grundlagen—Praxis—Rechtsschutz* (2nd ed., Jan Ziekow, ed., 2014).

80  German commitment to citizen involvement in making infrastructure decisions (as well as in making law) is so strong that there is now a word in German for it, "Bürgerbeteiligung" ("citizen participation"). See, e.g., Jan Ziekow, Neue Formen der Bürgerbeteiligung? Planung und Zulassung von Projekten in der parlamentarischen Demokratie (2012) ("New Forms of Citizen Participation? Planning and Approval of Projects in Parliamentary Democracy").

TWO YEARS, NOT TEN YEARS: REDESIGNING INFRASTRUCTURE APPROVALS

81  German administrative law specifically ensures that "planning approval . . . [encompasses] all public interests affected thereby. No other . . . permissions, authorisations, agreements or planning approvals are required." Administrative Procedure Act (*Verwaltungsverfahrensgesetz,* VwVfG), § 75(1). ("Section 75: Legal Effects of Planning Approval"), http://www.iuscomp.org/gla/statutes/VwVfG.htm.

82  See Germany, Bundesamt Für Seeschifffahrt und Hydrographie, *Wind Farms: Approval Procedure,* http://www.bsh.de/en/Marine_uses/Industry/Wind_farms/Approval_Procedure.jsp.

83  Canadian Environmental Assessment Act, 2012, SC 2012, c 19, s 52.

84  Ibid. at § 54(2).

85  Ibid. at § 52.

86  Ibid. at § 2(2).

87  National Energy Board Act, RSC 1985 N-7.

88  Jobs, Growth and Long-Term Prosperity Act, SC 2012, c 19.

89  *Supra* note 87.

90  See Gary Park, "Northern Gateway Opens New Era as Regulatory Costs Nudge C$500M," *Petroleum News,* May 12, 2013, http://www.petroleumnews.com/pntruncate/371099623.shtml. In addition to the regulatory hurdles, Northern Gateway also attracted over 4,000 intervenors, many of whom were alleged by the Harper government to have been funded by American environmental groups. See, e.g., G. Bruce Doern, Michael J. Prince, and Richard Schultz, *Rules and Unruliness: Canadian Regulatory Democracy, Governance, Capitalism, and Welfarism* (Montreal: McGill Queens University Press, 2015), p. 136.

91  Mackenzie Valley was first proposed in the 1970s, but shelved until 2004, when the NEB began review. National Energy Board Hearing Order GH-1-2004. By the time the Certificate of Public Convenience and Necessity was issued, the collective cost of the permitting and review process was in excess of C$500 million, natural gas prices had taken a dramatic dive due to rising shale gas production in the US, and the market had disappeared. Consequently, the project was no longer commercially viable. Northern Gateway faced 11 years of review and legal challenges before final signoff was granted in 2013; the project's status remains uncertain, but there is widespread speculation that it will also not be built. See, e.g., Geoff Dembicki, "How First Nations Are Gearing Up for Legal Battle Against Gateway," *The Tyee,* January 30, 2012, http://thetyee.ca/News/2012/01/30/First-Nations-Gateway-Battle/ and Kai Nagata, "Is Northern Gateway Dead?" *The Tyee,* April 13, 2015, http://thetyee.ca/Opinion/2015/04/13/Northern-Gateway-Dead/. Prior to the CEAA's passage, Joe Oliver, Canada's Minister of Natural Resources, wrote a furious open letter in which he accused environmental groups of attempting to "hijack" the country's natural resources by blocking projects like Northern Gateway (which he declined to mention by name in the letter). "An Open Letter from the Honourable Joe Oliver, Minister of Natural Resources, on Canada's Commitment to Diversify Our Energy Markets and the Need to Further Streamline the Regulatory Process in Order to Advance Canada's National Economic Interest," letter from Joe Oliver, January 9, 2012, http://www.nrcan.gc.ca/media-room/news-release/2012/1/1909.

92  Kinder Morgan's Trans Mountain Expansion Project, carrying oil from Edmonton, AB to Burnaby, BC. The project is a "designated project" under CEAA because it will require 40 KM of new pipeline. The NEB is, therefore, the responsible authority for carrying out the environmental review and regulatory review under the new rules. The project has proceeded relatively smoothly through the review process thus far. See, e.g., Kinder Morgan, Trans Mountain: Regulatory Process, accessed August 8, 2015, http://www.transmountain.com/regulatory-process. However, there has been some measure of controversy surrounding the opportunity for public comment. See, e.g., Eugene Kung, "Investors Ask: Is Trans Mountain Becoming the New Keystone?," *West Coast Environmental Law* (blog), May 21 2014, http://wcel.org/resources/environmental-law-alert/investors-ask-kinder-morgan-transmountain-pipeline-new-keystone.

93  Some commentators have suggested that the broad grant of discretion afforded the Environmental Assessment Agency under the CEAA will *increase* the overall amount of environmental litigation due to the uncertainty created by this new system. Robert B. Gibson, "In Full Retreat: The Canadian Government's New Environmental Assessment Law Undoes Decades of Progress," *Impact Assessment and Project Appraisal* 30, no.1 (2012): p. 179.

94  Dennis Kirchhoff and Leonard J.S. Tsuji, "Reading Between the Lines of the 'Responsible Resource Development' Rhetoric: The Use of Omnibus Bills to 'Streamline' Canadian Environmental Legislation," *Impact Assessment and Project Appraisal* 32, no. 2 (2014): p. 110.

COMMON GOOD

95  From over 5,500 assessments in 2011 to just 96 in 2014. See Canada, Environmental Assessment Agency, accessed August 5, 2015, https://www.ceaa-acee.gc.ca/052/plus-eng.cfm. Note that while total assessments have dropped precipitously, the bulk of the drop is comprised of preliminary screenings; full assessments, and assessments referred to expert panels or mediation, have decreased more modestly.

96  See Jeffery L. Barnes and John Boyle, "The Weak Link in EIA Effectiveness: Challenges in Process Administration," presented at IAIA15: Impact Assessment in the Digital Era, Florence, Italy 2015.

97  See, e.g., Jeffery L. Barnes and George Hegmann, "It's Not the End of EA in Canada!," presented at IAIA13: Impact Assessment: The Next Generation, Calgary, Canada 2013.

98  See Canada, British Columbia Oil and Gas Commission, accessed August 5, 2015, https://www.bcogc.ca and Canada, Alberta Energy Regulator, accessed August 5, 2015, https://www.aer.ca.

99  See Canada, Ontario Ministry of Energy, Renewable Energy Facilitation Office, accessed August 5, 2015, http://www.energy.gov.on.ca/en/renewable-energy-facilitation-office/.

100  Australia, Productivity Commission, *Public Infrastructure: Inquiry Report Volume 1* (Canberra, 2014), http://www.pc.gov.au/__data/assets/pdf_file/0003/137280/infrastructure-volume1.pdf.

101  Australia, Productivity Commission, *Public Infrastructure*, *Inquiry Report Volume 2* (Canberra, 2014), http://www.pc.gov.au/__data/assets/pdf_file/0005/137282/infrastructure-volume2.pdf.

102  Ibid.

103  Ibid.

104  Australia, Minister for Infrastructure and Regional Development, "Fixing Australia's Infrastructure System," news release, December 1, 2014, http://minister.infrastructure.gov.au/jb/releases/2014/December/jb130_2014.aspx.

105  As far back as 1979, EPA attempted to consolidate its permitting regulations. Tony Kish, "EPA Consolidation of Permits Proposal-Regulatory Workhorse or Bureaucratic Nightmare?," *Journal (Water Pollution Control Federation)* 52, no. 2 (February 01, 1980): pp. 229-234. By 1983, however, EPA pulled the plug on the reform, citing increased confusion. Karl S. Coplan, "Of Zombie Permits and Greenwash Renewal Strategies: Ten Years of New York's So-Called Environmental Benefit Permitting Strategy," *Pace Environmental Law Review* 22, no. 1 (Spring 2005): n. 63: "The major amendments to the EPA permitting procedures were adopted in 1979, when EPA sought to combine the regulations for permitting for Resource Conservation and Recovery Act, 42 U.S.C. § 6925 and the Underground Injection Control (UIC) program with those for Clean Water Act permits, See 44 Fed. Reg. 32,854 (June 7, 1979), and again in 1983, when EPA 'deconsolidated' these regulations based on the confusion caused by the consolidated regulations. See 48 Fed. Reg. 14,146 (Apr. 1, 1983)."

106  The Transportation Equity Act for the 21st Century, Pub. L. No. 105-178 (1998). Safe, Accountable, Flexible, Efficient Transportation Equity Act: A Legacy for Users, Pub. L. No. 109-159 (2005). Moving Ahead for Progress in the 21st Century Act, Pub. L. No. 112-141 (2012). See also USA, Department of Transportation, Federal Highway Administration, *Environmetal Review Toolkit,* Program Overview, accessed April 2015, http://environment.fhwa.dot.gov/strmlng/index.asp#history .

107  USA, Department of Transportation, Federal Highway Administration, *Transportation Equity Act for the 21st Century,* April 5, 2011, A Summary—Protecting Our Environment, http://www.fhwa.dot.gov/tea21/sumenvir.htm.

108  TEA-21's primary purpose was to establish new financing programs such as Direct Federal Credit to encourage the private sector to play a larger role in transportation infrastructure delivery. USA, Department of Transportation, Federal Highway Administration, *Transportation Equity Act for the 21st Century,* April 5, 2011, A Summary—Rebuilding America's Infrastructure, http://www.fhwa.dot.gov/tea21/suminfra.htm.

109  American Council of Engineering Companies, "Engineers Praise the Successes of the Transportation Equity Act for the 21st Century (TEA-21)," news release, PR Newswire, http://www.prnewswire.com/news-releases/engineers-praise-the-successes-of-the-transportation-equity-act-for-the-21st-century-tea-21-73990682.html?$G1Ref.

110  Piet DeWitt and Carole A. DeWitt, "How Long Does It Take to Prepare an Environmental Impact Statement?," *Environmental Practice* 10, no. 4 (December 2008): p. 164.

111  28 U.S.C. § 2401(a).

112  Examples including landscaping, noise barrier installation, and construction of bike lanes. 23 C.F.R. 771.117(c).

113  USA, Department of Transportation, Federal Highway Administration, *Fact Sheets on Highway Provisions,* Environmental Review Process, accessed July 7, 2015, http://www.fhwa.dot.gov/safetealu/factsheets/enviroreview.htm.

114  USA, Department of Transportation, Federal Highway Administration, *Estimated Time Required to Complete the NEPA Process,* http://environment.fhwa.dot.gov/strmlng/nepatime.asp.

115  USA, Department of Transportation, Federal Highway Administration, *Moving Ahead for Progress in the 21st Century,* July 17, 2012, Accelerating Project Delivery, http://www.fhwa.dot.gov/map21/summaryinfo.cfm: "One area in particular that MAP-21 focuses on to speed up project delivery is expanded authority for use of categorical exclusions (CEs). 'Categorical exclusion' describes a category of actions that do not typically result in individual or cumulative significant environmental impacts. CEs, when appropriate, allow Federal agencies to expedite the environmental review process for proposals that typically do not require more resource-intensive Environmental Assessments (EAs) or Environmental Impact Statements (EISs). In addition to those currently allowed, MAP-21 expands the usage of CEs to a variety of other types of projects, including multi-modal projects, projects to repair roads damaged in a declared disaster, projects within existing operational right-of-way, and projects receiving limited Federal assistance. To assess the impact of the above changes, the Secretary will compare completion times of CEs, EAs and EISs before and after implementation."

116  Carlos Swonke, testimony before the House Subcommittee on Highways and Transit, *Case Studies of the Federal Environmental Review and Permit Process.* 113th Cong., 2nd sess., September 9, 2014, http://docs.house.gov/meetings/PW/PW12/20140909/102613/HHRG-113-PW12-Wstate-SwonkeC-20140909.pdf. Note, however, that in many urban areas, national environmental groups will strategically generate opposition to projects in an effort to obtain either precedent-setting court decisions or significant financial settlements, and the categorical exclusion review process is often avoided because it is more likely to generate grounds for environmental lawsuits than the fuller EA or EIS process. Interview with Joann Papageorgis, Program Director, Bayonne Bridge Navigational Clearance Program, The Port Authority of New York and New Jersey, June 2015.

117  USA, Department of Transportation, Federal Highway Administration, *Environmetal Review Toolkit,* Highlights of Environmental Provisions, accessed July 7, 2015, http://www.environment.fhwa.dot.gov/strmlng/es2safetealu.asp#sec_6005 . MAP-21's other significant reforms focus on the environmental review process by facilitating earlier coordination between stakeholders and authorities, and allowing for certain planning documents to be adopted in to the final environmental review document to avoid duplication. USA, Department of Transportation, Federal Highway Administration, *Moving Ahead for Progress in the 21st Century,* July 17, 2012, Accelerating Project Delivery, http://www.fhwa.dot.gov/map21/summaryinfo.cfm. The latter process has been described as "very complex." American Association of State Highway and Transport Officials, *Moving Ahead for Progress in the 21st Century Act,* MAP21: Accelerating Project Delivery, Report to the RSC, http://map21.transportation.org/Pages/Analysis.aspx. The legislation also creates mechanisms to set deadlines for decision-making within the process, and even creates a penalty structure for agencies which fail to adhere to the process; agencies can be fined tens of thousands of dollars per day for failing to render decisions within the established timeframes. American Association of State Highway and Transport Officials, *MAP-21: Overview of Project Delivery Provisions,* June 10 2014, http://map21.transportation.org/Documents/MAP-21_Overview-06-10-2014_FINAL.pdf. However, this provision is riddled with loopholes, and requires agencies to penalize *themselves* if they violate a deadline.  Additionally, MAP-21 further reduced the statute of limitations imposed by SAFETEA-LU, from 180 days to 150 days.

118  USA, White House, *Federal Infrastructure Projects Permitting Dashboard,* Permit Inventory, accessed January 25, 2015, http://www.permits.performance.gov/permit-inventory.

119  USA, White House, *Presidential Memorandum—Speeding Infrastructure Development Through More Efficient and Effective Permitting and Environmental Review,* August 31, 2011, https://www.whitehouse.gov/the-press-office/2011/08/31/presidential-memorandum-speeding-infrastructure-development-through-more.

120  Other executive initiatives to improve siting and permitting include new pre-application procedures for onshore electric transmission lines. In addition, the Department of the Interior and Department of Agriculture are reviewing the Western energy rights-of-way corridors. Interior is also reviewing its mitigation procedures. Other agency initiatives include: "(1) NEPAnode; (2) the Fish and Wildlife Service Information, Planning, and Conservation Tool; (3) the Environmental Protection Agency's NEPAssist; (4) the Eastern Interconnection States Planning Council Energy Zones Mapping Tool; (5) the Army Corps' Federal Support Toolbox; (6) the Western Governors' Associations' Crucial Habitat Assessment Tool; and (7) the National Oceanic and Atmospheric Administration's Social Vulnerability Index." USA, Department of Energy, Office of Energy Policy and Systems Analysis, *Quadrennial Energy Review: Energy Transmission, Storage, and Distribution Infrastructure,* April 2015, Chapter 9, http://energy.gov/sites/prod/files/2015/05/f22/QER%20Full%20Report_0.pdf.

121  Responsibly and Professionally Invigorating Development Act, H.R. Res. 4377, 112 Cong. (2012). Responsibly and Professionally Invigorating Development Act of 2014, S. 2641, 113 Cong. (2014). Regulatory Fairness Act of 2014, S. 2156, 113 Cong. (2014). Federal Permitting Improvement Act of 2015, S. 280, 114 Cong. (2015).

122 Responsibly and Professionally Invigorating Development Act of 2014, S. 2641, 113 Cong. (2014).

123 For a summary of the original legislation, see Office of US Rep. Dennis Ross, "Dennis Ross Supports a 'Balanced Approach'" news release, April 18, 2012, http://dennisross.house.gov/news/documentsingle.aspx?DocumentID=290656.

124 USA, Executive Office of the President, Office of Management and Budget, *Statement of Administration Policy,* March 5, 2014, https://www.whitehouse.gov/sites/default/files/omb/legislative/sap/113/saphr2641r_20140305.pdf.

125 Office of US Sen. Rob Portman, "Portman and McCaskill Introduce Federal Permitting Improvement Act of 2015," news release, January 28, 2015, http://www.portman.senate.gov/public/index.cfm/2015/1/portman-and-mccaskill-introduce-federal-permitting-improvement-act-of-2015.

126 USA, Executive Office of the President, Council on Environmental Quality, *State NEPA Contacts,* accessed July 15, 2015, http://energy.gov/sites/prod/files/2013/09/f2/States_NEPA_Like_22June2013.pdf. The remaining 21 states have environmental review requirements that are limited to specifically defined actions or project types.

127 Kevin T. Haroff, "California Revisits CEQA, the State's Controversial Environmental Review Statute," *Marten Law Newsletter*, January 28, 2013, http://www.martenlaw.com/newsletter/20130128-california-ceqa-statute-revisted.

128 Ibid.

129 Alexander J. Kasner, "Arena Development and Environmental Review Reform Under SB 743," *Stanford Law & Policy Review* 25, no. 203 (April 28, 2014): p. 204, http://journals.law.stanford.edu/sites/default/files/stanford-law-policy-review/print/2014/01/kasner_25_stan._l_poly_rev_203.pdf.

130 Gov. Jerry Brown famously described the political impossibility of CEQA reform, calling it "the Lord's work." *Supra* note 119. California *did* enact a statute (AB 900) granting fast-track review and litigation status to projects that were both environmentally sound and likely to create jobs, but a state judge ultimately ruled significant portions of the law unconstitutional. *Conservation League v. State of California*, No. RG1262904 (Alameda Sup. Ct. 2013).

131 Summer ParkerPerry, "Kings' Local CEQA Bill Felt Statewide," *Capitol Weekly*, October 31, 2013, http://capitolweekly.net/kings-ceqa-transit-infill/.

132 USA, California Resources Agency, *2012 California Environmental Quality Act: Statute and Guidelines,* January 1, 2012, Appendix G, http://resources.ca.gov/ceqa/docs/CEQA_Handbook_2012_wo_covers.pdf.

133 Within weeks of the bill's passage, California's Office of Planning and Research identified over 100 projects statewide that would be eligible for SB 743's streamlined CEQA process. *Supra* note 123. The city of San Francisco concluded that virtually every project within its borders would qualify. See *CEQA Update: Senate Bill 743 Summary–Aesthetics, Parking and Traffic*, Viktoriya Wise to San Francisco Planning Commission, November 26, 2013, http://sfmea.sfplanning.org/CEQA Update-SB 743 Summary.pdf.

134 Second Engrossed Substitute Senate Bill No. 6406 (chapter 1, Laws of 2012 1st sp. sess.), http://lawfilesext.leg.wa.gov/biennium/2011-12/Pdf/Bills/Senate Passed Legislature/6406-S.PL.pdf.

135 Ibid. There is very little commentary on or analysis of SB 6406's impact within Washington since its passage. However, what little there is shows significant promise. For instance, Snohomish County recently prepared an internal report analyzing SB 6406's grant of authority to local governments, and found that the law will "significantly reduce the duplication and administrative costs of environmental review while still providing protection of the environment and strong public participation during the permitting process." *SEPA Code Update Project*, Alison Bridges to Snohomish County Planning Commission, May 13, 2015, http://www.snohomishcountywa.gov/DocumentCenter/View/24814. Since 1970, the state has employed a "one-stop shop" system for siting and permitting of energy projects, via its Energy Facility Site Evaluation Council. See USA, State of Washington, Energy Facility Site Evaluation Council, accessed July 28, 2015, http://www.efsec.wa.gov/council.shtml.

# ACKNOWLEDGEMENTS

This report grew out of a May 2015 forum titled "Rethinking Infrastructure Approvals," hosted by Common Good, the National Association of Manufacturers, the Bipartisan Policy Center, and Covington & Burling LLP. The forum, and this report, were funded in part by a grant from The Bodman Foundation. We also thank the estate of Robert M. Weekley for its generous bequest.

We are grateful for the help and input of many experts and practitioners, particularly E. Donald Elliott and Gary Guzy of Covington & Burling, each a former General Counsel of the Environmental Protection Agency, who gave countless hours of their free time. We also received important insight and advice from: Shawn Denstedt Q.C. and Dan Kirby (Osler, Hoskin & Harcourt LLP); Patrick Foye, Joann Papageorgis, and John Ma (The Port Authority of New York and New Jersey); Robyn Boerstling (National Association of Manufacturers); Nick Malyshev (OECD); Don Ross and Rebecca Yergin (Covington & Burling); and Diana Mendes (AECOM).

Ron Faucheux (Clarus Research) and Henry Miller (Goodman Media International) were involved at every stage of development and acted as an informal editorial board. Ruth Giverin and Donna Thompson's planning and coordination work were invaluable. Our interns, Adam Macalister and Natalie Bennett, contributed important research.

Finally, we are thankful for the design work and production guidance provided by Ken Godat of Godat Design.

34

**ABOUT THE AUTHOR**

Philip K. Howard is a well-known leader of government and legal reform in America. His new book, *The Rule of Nobody*, has been praised by Fareed Zakaria as "an utterly compelling and persuasive book that, if followed, could change the way America works." He is also author of the bestseller *The Death of Common Sense* and *Life Without Lawyers*. He is Chair of Common Good, Senior Counsel at Covington & Burling LLP, and has advised two presidents and numerous public officials on legal and regulatory reform.

His TED Talk has been widely watched and distributed, and he has appeared on, among other shows, *NewsHour* and *The Daily Show with Jon Stewart*. Howard became active in government reform through his many years as a civic leader in New York.



One Metrotech Center, Suite 1703, Brooklyn, NY 11201
Phone 212.681.8199
www.commongood.org
Email commongood@commongood.org