IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF VIRGINIA

No. 3:20-cv-00045-JPJ-PMS

WILD VIRGINIA, VIRGINIA WILDERNESS
COMMITTEE, UPSTATE FOREVER, SOUTH
CAROLINA WILDLIFE FEDERATION, NORTH
CAROLINA WILDLIFE FEDERATION,
NATIONAL TRUST FOR HISTORIC
PRESERVATION, MOUNTAINTRUE, HAW
RIVER ASSEMBLY, HIGHLANDERS FOR
RESPONSIBLE DEVELOPMENT, DEFENDERS
OF WILDLIFE, COWPASTURE RIVER
PRESERVATION ASSOCIATION, CONGAREE
RIVERKEEPER, THE CLINCH COALITION,
CLEAN AIR CAROLINA, CAPE FEAR RIVER
WATCH, ALLIANCE FOR THE SHENANDOAH
VALLEY, and ALABAMA RIVERS ALLIANCE,

        Plaintiffs,

v.

COUNCIL ON ENVIRONMENTAL QUALITY
and MARY NEUMAYR IN HER OFFICIAL
CAPACITY AS CHAIR OF THE COUNCIL ON
ENVIRONMENTAL QUALITY,

        Defendants,

AMERICAN FARM BUREAU FEDERATION,
AMERICAN FUEL & PETROCHEMICAL
MANUFACTURERS, AMERICAN FOREST
RESOURCE COUNCIL, AMERICAN
PETROLEUM INSTITUTE, AMERICAN ROAD &
TRANSPORTATION BUILDERS ASSOCIATION,
CHAMBER OF COMMERCE OF THE UNITED
STATES OF AMERICA, FEDERAL FOREST
RESOURCE COALITION, INTERSTATE
NATURAL GAS ASSOCIATION OF AMERICA,
and NATIONAL CATTLEMEN'S BEEF
ASSOCIATION,

        Defendant-Intervenors.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**PLAINTIFFS' CORRECTED RESPONSE
IN OPPOSITION TO DEFENDANTS'
AND DEFENDANT-INTERVENORS'
MOTIONS TO DISMISS**

**Table of Contents**

INTRODUCTION ........................................................................................................... 1

BACKGROUND AND FACTS .................................................................................... 3

STANDARD OF REVIEW ......................................................................................... 10

ARGUMENT ............................................................................................................... 10

I.   The Conservation Groups' Claims Are Ripe ...................................................... 10

  A) The Conservation Groups' Claims Are Fit for Review ................................. 11

  B) The Conservation Groups Will Suffer Hardship Absent Prompt Review ....... 16

  C) Immediate Adjudication of the Rule Will Not Hinder Federal Agencies......... 19

II.  The Conservation Groups Have Established Standing Both as Organizations and on Behalf of
     Their Members................................................................................................... 20

  A) The Conservation Groups Have Representational Standing............................ 21

     i.   Defendants Misstate the Standards for Injury in Fact................................ 24

     ii.  Defendants Wrongly Claim that Only "Ground-disturbing" Harms Are Cognizable. 27

     iii. Defendants' Reliance on *Summers* is Misplaced. ..................................... 31

     iv.  Defendants' Attacks on Conservation Groups' Demonstration of Harm Are
          Unavailing................................................................................................... 32

  B) The Conservation Groups Have Organizational Standing to Challenge CEQ's Violations
     of Their Procedural Rights in this Rulemaking ............................................... 36

  C) The Conservation Groups Have Organizational and Representational Standing to
     Challenge CEQ's Violations of Their Rights to Information ............................ 38

     i.   The Conservation Groups Are Entitled to Information Under NEPA. ....... 38

     ii.  The Rule Deprives the Conservation Groups of This Information............. 40

     iii. The Conservation Groups Are Harmed by the Loss of This Information ... 41

III. The Court Has Jurisdiction to Enforce the APA Against CEQ's Defective Rulemaking ...... 44

CONCLUSION............................................................................................................. 45

## TABLE OF AUTHORITIES

**Cases**                                                                                    **Page(s)**

*1000 Friends of Maryland v. Browner,*
   265 F.3d 216 (4th Cir. 2001) ........................................................................ 20, 21, 23-24, 29

*Air All. Houston v. EPA,*
   906 F.3d 1049 (D.C. Cir. 2018) ........................................................................................15

*Am. Canoe Ass'n v. Murphy Farms, Inc.,*
   326 F.3d 505 (4th Cir.2003) ...........................................................................................27

*Am. Legal Foundation v. Federal Communications Comm'n,*
   808 F.2d 84 (D.C. Cir. 1987) ...........................................................................................37

*Am. Petroleum Inst. v. Johnson,*
   541 F. Supp. 2d 165 (D.D.C. 2008) .............................................................................27, 29

*Andrus v. Sierra Club,*
   442 U.S. 347 (1979)........................................................................................................19

*Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.,*
   462 U.S. 87 (1983)..........................................................................................................39

*Beck v. McDonald,*
   848 F.3d 262 (4th Cir. 2017) ......................................................................................11, 41

*Blum v. Yaretsky,*
   457 U.S. 991 (1982)........................................................................................................30

*CASA de Maryland v. Trump,*
   No. 19-2222, 2020 WL 4664820 (4th Cir. Aug. 5, 2020) ....................................................44

*Charter Fed. Sav. Bank v. Office of Thrift Supervision,*
   976 F.2d 203 (4th Cir. 1992) ...........................................................................................17

*Citizens to Pres. Overton Park, Inc. v. Volpe,*
   401 U.S. 402 (1971)........................................................................................................14

*City of Chicago v. Morales,*
   527 U.S. 41 (1999)..........................................................................................................14

*City of New York v. United States Dep't of Def.,*
   913 F.3d 423 (4th Cir. 2019) ...........................................................................................16

*Clapper v. Amnesty Intern. USA,*
   568 U.S. 398 (2013)........................................................................................................25

*Committee for Auto Responsibility v. Solomon*,
   603 F.2d 992 (D.C. Cir. 1979) ...................................................................39

*Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*,
   901 F.2d 107 (D.C. Cir. 1990) ...................................................................39

*Crutchfield v. Army Corps of Eng'rs*,
   192 F. Supp. 2d 444 (E.D.Va. 2001) .......................................................28

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004).....................................................................................39

*Doe v. Obama*,
   631 F.3d 157 (4th Cir. 2011) ....................................................................27

*Doe v. Pub. Citizen*,
   749 F.3d 246 (4th Cir. 2014) ....................................................................38

*Evans v. B.F. Perkins Co.*,
   166 F.3d 642 (4th Cir. 1999) ....................................................................10

*Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*,
   316 F.3d 357 (2d Cir. 2003)......................................................................10

*Friends of Animals v. Bernhardt*,
   961 F.3d 1197 (D.C. Cir. 2020) ..........................................................42, 43

*Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.*,
   204 F.3d 149 (4th Cir. 2000) .........................................................25, 27, 33

*Friends of the Earth v. Laidlaw Envt'l Servs.*,
   528 U.S. 167 (2000).....................................................................................28

*Fund for Animals, Inc. v. U.S. Bureau of Land Management*,
   460 F.3d 13 (D.C. Cir. 2006) ....................................................................15

*Gardner v. Toilet Goods Assn., Inc.*,
   387 U.S. 167 (1967).....................................................................................18

*Gen. Elec. Co. v. E.P.A.*,
   290 F.3d 377 (D.C. Cir. 2002) .............................................................12, 13

*Havens Realty Corp. v. Coleman*,
   455 U.S. 363 (1982).................................................................................38, 44

*Heartwood, Inc. v. U.S. Forest Service*,
   230 F.3d 947 (7th Cir. 2000) ................................................................28, 29

*Johnson v. Allsteel*,
 259 F.3d 885 (7th Cir. 2001) ...............................................................................23

*La Union del Pueblo Entero v. Ross*,
 353 F. Supp. 3d 381 (D. Md. 2018) .....................................................................42

*Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*,
 713 F.3d 187 (4th Cir. 2013) ...............................................................................11

*League of Conservation Voters v. Trump*,
 303 F. Supp. 3d 985 (D. Alaska 2018) ...........................................................25, 30

*Lee v. U.S. Citizenship & Immigration Servs.*,
 592 F.3d 612 (4th Cir. 2010) ...............................................................................14

*Lujan v. Defs. of Wildlife*,
 504 U.S. 555 (1992)...................................................................................... *passim*

*Lujan v. Nat'l Wildlife Fed.*,
 497 U.S. 871 (1990)..............................................................................................15

*Marsh v. Oregon Natural Resources Council*,
 490 U.S. 360 (1989)..............................................................................................28

*Merck & Co., Inc. v. U.S. Dep't of Health & Human Servs.*,
 385 F. Supp. 3d 81 (D.D.C. 2019) .......................................................................15

*Miller v. Brown*,
 462 F.3d 312 (4th Cir. 2006) ...............................................................................12

*Monsanto Co. v. Geertson Seed Farms*,
 561 U.S. 139 (2010)..............................................................................................30

*Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*,
 417 F.3d 1272 (D.C. Cir. 2005) ...........................................................................11

*Nat'l Audubon Soc'y v. Dep't of Navy*,
 422 F.3d 174 (4th Cir. 2005) .................................................................................4

*Nat'l Park Hospitality Ass'n v. Dep't of Interior*,
 538 U.S. 803 (2003)..............................................................................................11

*Nat'l Taxpayers Union, Inc. v. United States*,
 68 F.3d 1428 (D.C. Cir. 1995)..............................................................................43

*Nat'l Wildlife Fed'n v. Hodel*,
 839 F.2d 694 (D.C. Cir. 1988) .........................................................23, 29, 38, 41

*Natural Res. Def. Council v. EPA,*
　25 F.3d 1063 (D.C.Cir.1994) ...........................................................................30, 35

*New Jersey v. EPA,*
　626 F.2d 1038 (D.C. Cir. 1980) .................................................................................37

*New York v. U.S. Dep't of Labor,*
　363 F. Supp. 3d 109 (D.D.C. 2019) ............................................................................15

*Norton v. S. Utah Wilderness All.,*
　542 U.S. 55 (2004)......................................................................................................15

*NRDC v. Wheeler,*
　955 F.3d 68 (D.C. Cir. 2020) .............................................................................15, 35

*O'Shea v. Littleton,*
　414 U.S. 488 (1974).....................................................................................................23

*Ohio Forestry Ass'n, Inc. v. Sierra Club,*
　523 U.S. 726 (1988).............................................................................................13, 20

*Ohio Valley Envt'l Coal. v. Hurst,*
　604 F. Supp. 2d 860 (S.D.W.Va. 2009) ....................................................................29

*Ouachita Watch League v. Jacobs,*
　463 F.3d 1163 (11th Cir. 2006) .................................................................................20

*Pub. Citizen, Inc. v. FAA,*
　988 F.2d 186 (D.C. Cir. 1993)...................................................................................37

*Puget Soundkeeper All. v. Wheeler,*
　No. C15-1342-JCC, 2018 WL 6169196 (W.D. Wash. Nov. 26, 2018)...................30

*Reg'l Mgmt. Corp. v. Legal Servs.,*
　186 F.3 457, 465 (4th Cir. 1999) ...............................................................................20

*Reno v. Catholic Social Services, Inc.,*
　509 U.S. 43 (1993)......................................................................................................18

*Reno v. Flores,*
　507 U.S. 292 (1993) ...................................................................................................14

*Roanoke River Basin Ass'n v. Hudson,*
　940 F.2d 58 (4th Cir. 1991) .........................................................................................4

*Robertson v. Methow Valley Citizens Council,*
　490 U.S. 332 (1989).....................................................................................................22

*S. Envtl. Law Ctr. v. Council on Envtl. Quality*,
   446 F. Supp. 3d 107 (W.D. Va. 2020) ...................................................................16

*S.C. Coastal Conservation League v. Pruitt*,
   318 F. Supp. 3d 959 (D.S.C. 2018)......................................................................15

*Shays v. Fed. Election Comm'n*,
   414 F.3d 76 (D.C. Cir. 2005) ..............................................................................27

*Sierra Club v. Bosworth*,
   510 F.3d 1016 (9th Cir. 2007) ............................................................................14

*Sierra Club v. Marsh*,
   872 F.2d 497 (1st Cir. 1985)...........................................................22, 24, 25, 28

*South Carolina v. United States*,
   912 F.3d 720 (4th Cir. 2019) ..............................................................................15

*Spokeo, Inc. v. Robins*,
   136 S.Ct. 1540 (2016)..........................................................................................36

*State v. Bureau of Land Mgmt.*,
   No. 18-CV-00521-HSG, 2020 WL 1492708 (N.D. Cal. Mar. 27, 2020) ..............29

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)..............................................................................31, 32, 33, 37

*Susan B. Anthony List v. Driehaus*,
   573 U.S. 149 (2014)......................................................................................21, 25

*United Steel v. Mine Safety & Health Admin.*,
   925 F.3d 1279 (D.C. Cir. 2019) ..........................................................................15

*Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*,
   435 U.S. 519 (1978)..............................................................................................45

*Village of Bald Head Island v. U.S. Army Corps of Eng'rs*,
   714 F.3d 186 (4th Cir. 2013) ..............................................................................15

*Washington v. Glucksberg*,
   521 U.S. 702 (1997)..............................................................................................14

*Webster v. U.S. Dep't of Agric.*,
   685 F.3d 411 (4th Cir. 2012) ................................................................................4

*White Tail Park, Inc. v. Stroube*,
   413 F.3d 451 (4th Cir. 2005) .........................................................................36, 37

*Wilderness Soc., Inc. v. Rey*,
    622 F.3d 1251 (9th Cir. 2010) ...............................................................39

**Statutes and Regulations**

5 U.S.C. § 702 ..........................................................................................39

5 U.S.C. § 706 ..........................................................................................12

42 U.S.C. § 4331 et seq .............................................................................22

40 C.F.R. § 1500 et seq .................................................................... *passim*

**Other Authorities**

43 Fed. Reg. 55,978 (Nov. 29, 1978) .........................................................6

85 Fed. Reg. 43,304 (July 16, 2020) ...............................................3, 8, 40

Exec. Order No. 13927, 85 Fed. Reg. 35,165 (June 4, 2020) ....................5

Fed. R. Civ. P. 12(b)(1) ............................................................................10

The Plaintiffs ("Conservation Groups") hereby respond to the Motions to Dismiss filed by Defendants Council on Environmental Quality and Mary Neumayr ("CEQ"), Dkt. 52, and by Defendant-Intervenors (the "Business Associations").  Dkt. 56.

## INTRODUCTION

CEQ argues it can roll back the controlling regulations for one of the most important environmental laws in the United States with impunity, because no one can challenge its rulemaking.  Despite the long history of challenges to rulemakings under the Administrative Procedure Act ("APA"), CEQ argues that no one can contest its July 16, 2020 final agency action issuing regulations ("the Rule") that eliminate longstanding requirements under the National Environmental Policy Act ("NEPA").  Instead, CEQ argues the only possible challenge is to a *second* final agency action applying the Rule to a particular project after the Rule has gone broadly into effect nationwide, and even then only if a plaintiff meets the impossible burden of proving with certainty that the agency would have reached a different outcome under different, lawful NEPA rules.  But CEQ's Rule reduces the applicability of NEPA significantly, meaning that for many projects there will be no additional final agency action.  And, even if such a second decision could be challenged, it would be too late to undo the harm—namely, the risk of unnecessary environmental destruction that occurs when bureaucratic decisionmaking processes ratchet forward with inadequate information, input, and accountability.

CEQ tries to paint the Rule as having uncertain effect, with much left to be determined by other federal agencies.  That is belied by the text of the Rule itself, which states plainly that it is binding on all Federal agencies as soon as it goes into effect, and which expressly prohibits agencies from going beyond the ceiling established by the Rule. The Rule applies immediately to all new projects and also purports to apply retroactively to projects already under review. Thus,

when the Rule goes into effect on September 14, 2020, it will instantly weaken the procedural safeguards that Conservation Groups are relying on to protect specific places and environmental resources.

CEQ has already caused the Conservation Groups procedural harm, by conducting its rulemaking without adequately considering public comments, reliance interests, or alternatives to its drastic rollback.  And the Conservation Groups have already begun the burdensome process of seeking information through other channels that would have been disclosed through NEPA but no longer will be.  In less than two weeks, the Conservation Groups will lose the benefit of information that they rely on to meet their organizational missions, and which heretofore has been disclosed under NEPA.  These harms do not exist "*in vacuo*" as CEQ argues; they are directly related to the risk of environmental harm caused by the rule, reducing Conservation Groups' ability or increasing their burden to mitigate that environmental risk.

Boiled down, CEQ's argument is that "risk" is not enough.  CEQ acknowledges that the Conservation Groups may be harmed in any number of ways by any number of decisions, including the projects identified in the Complaint and Declarations.  They argue, however, that the Conservation Groups cannot identify which projects will harm them, and how, until we have the benefit of hindsight.  But that is not the law.  An increase in risk is a harm, and it is precisely the harm that NEPA was designed to reduce or avoid.  This risk will increase for dozens of specifically identified projects beginning on September 14, 2020, when the Rule goes into effect. In addition, where the Conservation Groups and other environmental plaintiffs have previously sought relief by challenging deficient NEPA reviews, the Rule now dramatically alters the remedy available to them.

While the harm to the Conservation Groups is just beginning, the legal infirmities of the

2

rulemaking process that led up to the challenged Rule are already set in stone, and the Rule is unlawful no matter what set of circumstances it applies to.  Now is exactly the time to challenge a rulemaking process that has concluded and a Rule that is going into effect—before the harms become so severe that they cannot be unwound.   The stage is set for the Court to adjudicate the Conservation Groups' claims.[1]  The claims are ripe.  The Conservation Groups have standing.  This Court has jurisdiction.  The Motions to Dismiss have no merit and should be denied.

## BACKGROUND AND FACTS[2]

On July 16, 2020, CEQ finalized its rulemaking revising the regulations implementing NEPA and published it in the Federal Register.  *See* Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020).  The changes, made by APA rulemaking, constitute the most dramatic rewrite of environmental regulations attempted by the Trump administration.[3]  Trump cabinet members describe the change as "historic action to remove job-killing regulations" and "regulations plaguing the energy industry" that will "get government out of the way" and "unleash Americans

---

[1] The claims will be based on an Administrative Record that closed on the day the Rule was finalized.  As soon as CEQ provides this record the Court can begin its review.  No discovery or other material will be necessary.

[2] For a more detailed background on NEPA and its implementing regulations as well as the APA, *see* Compl. ¶¶ 413-535; Pls.' Br. in Supp. Mot. for Prelim. Inj. 9-25, Dkt. No. 30-1.

[3] *See* Remarks on Proposed National Environmental Policy Act Regulations (Jan. 9, 2020), *available at* https://www.whitehouse.gov/briefings-statements/remarks-president-trump-proposed-national-environmental-policy-act-regulations/ (Secretary of the Interior David Bernhardt noting, "[the] proposal affects virtually every significant decision made by the federal government that affects the environment.  And . . . will be the most significant deregulatory proposal [the Trump Administration] ultimately implement[s].").

from overly burdensome regulations."[4]  Altogether, at least twenty-three definitions were rewritten or deleted and the redline changes to the regulatory provisions ran to sixty-six pages.[5]

The existing rules, promulgated in 1978, have been in place for more than forty years and established a now-familiar set of requirements for environmental review of federal actions. Proving the success of the 1978 regulations, CEQ only made one minor substantive amendment prior to the rulemaking at issue in this case, noting at that time that the regulations were "working well."  In 1997, CEQ evaluated twenty-five years' worth of experience and again "[o]verall . . . found that NEPA is a success."

The prior regulations' success was due largely to their specific, concrete requirements and the large body of caselaw that built up around them.  This extensive body of law provided clarity through numerous examples, such as defining the significance threshold, *e.g.*, *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 62-65 (4th Cir. 1991), the responsibility to address cumulative impacts, *e.g.*, *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174, 197 (4th Cir. 2005), and how to consider alternatives, *e.g.*, *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 427 (4th Cir. 2012).  With so many cases illustrating the application of the statute to both routine and unusual circumstances, very few NEPA questions have been left unanswered.

Despite the successes of the 1978 Regulations, CEQ undertook an unprecedented overhaul and near-complete rewrite of the regulations with minimal time for public involvement.

---

[4] White House Press Release: CEQ Issues Final Rule to Modernize its NEPA Regulations, July 16, 2020, *available at* https://www.whitehouse.gov/wp-content/uploads/2020/01/20200716Final-NEPAPress-Release.pdf.

[5] *See* Council on Environmental Quality, *Redline of Final Revisions to the National Environmental Policy Act* (July 15, 2020), *available at* https://www.whitehouse.gov/wp-content/uploads/2020/01/Final-Rule-Redline-of-1978-CEQ-Regulations.pdf.

CEQ then rushed through reviewing the 1.1 million comments submitted and finalized the rulemaking only four months after the close of the public comment period.[6]

The Rule is set to take effect on September 14, 2020, *see* 40 C.F.R. § 1506.13 (2020), and, by its own terms, will immediately control the NEPA procedures of all federal agencies: "Where existing agency NEPA procedures are inconsistent with the regulations in this subchapter, the regulations in this subchapter shall apply[.]" *Id*. at § 1507.3(a). This provision applies on day one when the Rule goes into effect, and it requires every federal agency's NEPA procedures to conform to the Rule immediately. Within one year, the Rule requires these agencies to rewrite their own regulations to match the Rule: except in narrow circumstances, "agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in the regulations in this subchapter[.]" *Id. at* § 1507.3(b).

The Rule also expressly provides for application to NEPA reviews already in progress, making the harms even more immediate. "An agency may apply the regulations in this subchapter to ongoing activities and environmental documents begun before September 14, 2020." *Id.* at § 1506.13. And recent actions from the Trump administration make clear that it will be applied in this way. For example, President Trump recently issued an Executive Order requiring the heads of all federal agencies to identify actions that can be exempted from NEPA review or be authorized using recycled or abbreviated analyses.[7] Meanwhile, the Forest Service issued a memorandum expressly ordering staff to only conduct the minimum environmental review required by law—to "expedite[] environmental reviews" by "ensur[ing] environmental

---

[6] In order to review 1.1 million comments within the 89 work days between March 10, 2020 and July 14, 2020, CEQ staff would have had to review 12,359 comments per day, an implausible feat given CEQ's supposed staff shortages, which it claims hinders its ability to respond to Freedom of Information Act requests.

[7] Exec. Order No. 13927, Accelerating the Nation's Economic Recovery from the COVID-19 Emergency by Expediting Infrastructure Investments and Other Activities, 85 Fed. Reg. 35,165 (June 4, 2020).

reviews focus on analysis that is *required* by law and regulation"[8]—a mandated race to the bottom that draws no distinction between "future" projects and ongoing ones. This approach of limiting review to the minimum requirements of the Rule comports with Section § 1507.3(a) of the Rule, which overrides any "inconsistent" agency requirements on day one.

Among the most dramatic changes to the 1978 regulations is the severe narrowing of when NEPA will even apply. The Rule exempts broad categories of activities from NEPA review altogether.[9] And it reverses the longstanding regulation and CEQ's consistent position that if a proposed federal action significantly impacts the human environment, then it is a major federal action subject to NEPA review. *Compare* 40 C.F.R. §§ 1501.1(a)(4), 1508.1(q) (2020) *with* 43 Fed. Reg. 55,978, 55,989 (Nov. 29, 1978) ("any Federal action which significantly affects the quality of the human environment is 'major' . . . ."). In addition, the Rule deletes the "intensity factors" that have for decades ensured detailed review of projects impacting specific resources. *Compare* 40 C.F.R. §1508.27 (1978) *with* 40 C.F.R. § 1501.3 (2020).

The Rule's exclusions, some of which are black-and-white and others vague and ill-defined, mean that projects that previously required NEPA review and disclosure will now move forward with the public in the dark. *See* Compl. ¶¶ 505–09; *see also id.* at ¶¶ 21-410 (alleging harms to Conservation Groups and their members). This will immediately harm the

---

[8] Press Release, Secretarial Memorandum to the Chief of the Forest Service (June 12, 2020) (emphasis added), *available at* https://www.fs.usda.gov/news/releases/secretarial-memorandum-chief-forest-service. Two months after issuing this memorandum, the Secretary demanded that Regional Foresters identify actions they have taken or will take to implement the memorandum, with timelines, milestones, and metrics, *see* letter from Sonny Perdue, Secretary, U.S. Department of Agriculture, to Regional Forester (Aug. 10, 2020) (Dkt. No. 33-1), and at the same time posted all Regional Foresters' jobs as vacant, accepting applications from their potential replacements. Marc Heller and Scott Streater, *Perdue pressures forest managers on Trump agenda*, E&E News, Aug. 13, 2020, https://www.eenews.net/greenwire/stories/1063711613/ (Dkt. No. 33-2).

[9] Council on Envtl. Quality, *Regulatory Impact Analysis for the Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act*, RIN: 0331-AA03, 10 (June 30, 2020), *available at* https://www.whitehouse.gov/wp-content/uploads/2020/01/CEQ-NEPA-Regulations-RIA_Final.pdf (hereinafter "RIA") ("[C]ertain federal activities [will] no longer be[] subject to NEPA.").

Conservation Groups and their members, who rely on the NEPA process to become informed about proposed projects so they can advocate for communities, the environment, and important cultural and historical resources.[10]

In an attempt to make up for some of the information lost under the Rule, the Conservation Groups already have begun diverting resources to submit public information requests[11] and anticipate needing to hire experts and perform their own studies.[12] Information gathered through information requests and independent studies, however, is no substitute for the information developed through the NEPA process, and this fact-finding is expensive and time-intensive, placing the burden on the Conservation Groups and their members, who are non-profits and volunteers with very limited budgets.[13]

For federal actions not exempt under the Rule, other provisions significantly scale back environmental review, eliminating requirements for agencies to consider and disclose indirect and cumulative environmental effects and all reasonable alternatives, as well as dramatically

---

[10] For example, Bill Stangler, Congaree Riverkeeper, relies on NEPA "as an important source of information about what's going on in the [Congaree River] watershed," and testified, "[i]f not for NEPA's public noticing requirements, I might not learn about important projects in my area, which would harm my ability to do my job as Riverkeeper to protect the water." Stangler Decl. ¶5, Dkt. 30-23. *See also* Compl. ¶¶ 27, 39, 41, 44, 48, 66-71, 76, 81-82, 97, 105, 124, 126, 127, 138, 145, 150, 158, 165, 166, 169, 179, 181-83, 218, 223-24, 235, 237, 242, 246, 252, 282, 284, 288, 304, 306-307, 315, 324-26, 344, 348, 356, 362, 364, 367, 374, 381-83, 396-97, 402, 406, 409.

[11] *See, e.g,.* Compl. ¶¶ 199, 224, 305, 368; Mayfield Decl. ¶¶ 27-28, Dkt. 30-22; Burdette Decl. ¶ 25, Dkt. 30-47; Chiosso Decl. ¶ 23, Dkt. 30-40; Stangler Decl. ¶ 18, Dkt. 30-23; Hunt Decl. ¶¶ 24-25, Dkt. 30-34.

[12] For example, "If [The Clinch Coalition] cannot obtain information through NEPA, it will need to use other methods . . . , which will require TCC to divert resources away from other activities central to its organizational mission and incur expenses outside the scope of its normal operational costs." S. Brooks Decl. ¶ 12, Dkt. 30-11. *See also* Compl. ¶¶ 47, 48, 82, 84, 101, 105, 127, 131, 132, 150-51, 173, 198-99, 224, 227, 236, 239, 245-46, 265-66, 282, 284, 288-90, 330-31, 348, 361, 367, 369, 385-86, 407-8.

[13] *See, e.g.,* Blotnick Decl ¶ 26, Dkt. 30-33 ("The FOIA process can be expensive and time-consuming . . . . Clean Air Carolina does not have extra resources to devote to additional fact-finding under FOIA."); Hutchinson Decl. ¶ 16, Dkt. 30-12 ("If we do not have access to as much information, we will need to file more FOIA requests and engage experts to help us learn information we normally obtained through NEPA. This could be very expensive. I personally cannot afford to do many FOIA requests or engage experts, and the Virginia Wilderness Committee has limited funding."). *See also* Compl. ¶¶ 199, 224, 305, 368.

weakening the requirements for evaluating alternatives.[14]  *See* Compl. ¶¶ 510-13, 516; 40 C.F.R.

§ 1508.1(g)(3) (2020) (removing the requirement that agencies consider indirect and cumulative

effects of their actions); *id.*at § 1502 (eliminating the requirements that agencies (1) "rigorously

explore and objectively" evaluate "all" reasonable alternatives, 40 C.F.R. § 1502.14(a) (1978).

These changes to the scope of environmental review pose immediate and concrete harm

to the Conservation Groups and their members.  For example, Plaintiff Alabama Rivers Alliance

challenged FERC's relicensing of seven hydroelectric dams along the Coosa River because the

agency failed to consider their cumulative effect on a biologically diverse area of fish and

freshwater mollusks, and the D.C. Circuit remanded the matter to FERC to evaluate the

relicensing's cumulative effects, as required under NEPA.  Compl. ¶¶ 398-403, 409; Lowry

Decl. ¶¶ 16-28, Dkt. 30-4; Stewart Decl. ¶¶ 12-16, Dkt. 30-3; Shaddix Decl. ¶¶ 17-25, Dkt. 30-5.

Now, however, Plaintiff Alabama Rivers Association and its members will suffer harm under the

Rule because it directs FERC to forgo consideration of cumulative effects, destroying the value

of the resources expended in reliance on the prior regulations.  *See* 85 Fed. Reg. at 43,344

("[NEPA] analyses are bound by the definition of effects as set forth in § 1508.1(g)(1) and (2)

and should not go beyond the definition of effects set forth in those two paragraphs.").

Similarly, where Conservation Groups are currently engaged in litigation founded on the 1978

regulations, such as Plaintiff North Carolina Wildlife Federation's litigation challenging review

of the proposed Mid-Currituck Bridge for insufficient analysis of indirect effects and

alternatives, *see* Compl. ¶¶ 144-45, Gestwicki Decl. ¶¶ 13-17, Dkt. 30-20, they now face the

---

[14] 40 C.F.R. § 1502 (eliminating 1978 requirements to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public," 40 C.F.R. § 1502.14 (1978) "devote substantial treatment to" each alternative considered, *id.* at § 1502.14(b); and "include reasonable alternatives not within the jurisdiction of the lead agency," *id.* at § 1502.14(c)).

prospect of no legal remedy or an order requiring a NEPA evaluation that is significantly less informative than what was required when litigation commenced.

The Rule's deletion of important definitions and requirements will also slow down important solar energy projects by miring them in uncertainty; Conservation Groups such as Upstate Forever, as well as solar companies, raised the concern that the Rule's counterproductive changes will actually delay development of new projects.  Compl. ¶¶ 16, 106, 443–44.

The Rule also allows applicants to invest resources in their proposed projects—including the acquisition of real property—before the NEPA process is complete.  40 C.F.R. § 1506.1(b) (2020).  This change threatens imminent harm to the Conservation Groups and their members by authorizing, for example, premature investments and development of a proposed master plan development in Chatham County, N.C., and the Mountain Valley Pipeline.  *See* Chisholm Decl. ¶ 13-14, Dkt. 30-35; Chiosso Decl. ¶¶ 15, 18, Dkt. 30-40.

Further, the Rule imposes heightened requirements on the specificity of comments from the public.  *See* Compl. ¶ 518; *see, e.g.,* 40 C.F.R. § 1503.3(a) (2020) (requiring commenters to, among other things, "propose specific changes . . . and include or describe the data sources and methodologies supporting the proposed changes."); *id.* at § 1503.3(b) (requiring commenters to "identify any additional alternatives, information, or analyses not included in the draft environmental impact statement" and "be as specific as possible.").  The Rule adds an exhaustion requirement for comments, stating that "comments or objections of any kind not submitted . . . shall be deemed forfeited as unexhausted," *id.* § 1500.3(b)(3).  This change poses immediate harm to the Conservation Groups and their members by making it more difficult to meaningfully

9

engage in public comment opportunities,[15] or requiring them to expend significant resources on their own information-gathering and experts, which may be prohibitively expensive.[16]

## STANDARD OF REVIEW

CEQ moves to dismiss under Fed. R. Civ. P. 12(b)(1) for lack of subject matter jurisdiction on the grounds of ripeness and standing; Intervenors move only as to standing.  At the pleading stage, the district court "assume[s] the truth of the facts alleged in plaintiffs' complaint, as well as those supplemented in plaintiffs' affidavits, and construe[s] the complaint in their favor."  *Fair Hous. in Huntington Comm. Inc. v. Town of Huntington, N.Y.*, 316 F.3d 357, 362 (2d Cir. 2003); *see also Evans v. B.F. Perkins Co.,* 166 F.3d 642, 647 (4th Cir. 1999) (the district court "may consider evidence outside the pleadings without converting the proceeding to one for summary judgment.").  "[G]eneral factual allegations of injury resulting from the defendant's conduct may suffice, for on a motion to dismiss we presume that general allegations embrace those specific facts that are necessary to support the claim."  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992) (citations omitted).[17]

## ARGUMENT

### I.     The Conservation Groups' Claims Are Ripe.

CEQ admits that the legally-deficient Rule at issue in this case "qualifies as final agency

---

[15] For example, National Trust for Historic Preservation member Cashion Drolet states "the requirements in the new regulations that require public comments to include technical expertise will make it difficult to effectively submit comments … without spending resources to retain support from expert consultants."  Drolet Decl. ¶ 6, Dkt. 30-46. These concerns are echoed across the Conservation Groups.  *See also* Compl. ¶¶ 47, 66-71, 101, 124, 147, 152, 169, 171, 183, 187, 194, 198, 218-19, 223-24, 226, 227, 244, 282, 283-84, 288, 305, 308-9, 327, 359, 361, 378.

[16] *See, e.g.* Adylett Decl. ¶ 14, Dkt. 30-52 ("[U]nder the Final Rule, it will be more difficult for me to participate in the NEPA process for [the Mid-Currituck Bridge project] moving forward. . . . I am not an expert and cannot afford to hire one to help me with my comments, but my input is important.").

[17] The Conservation Groups' burden to demonstrate subject matter jurisdiction at the motion to dismiss stage is lower than at summary judgment.  *See Lujan v. Defs. of Wildlife*, 504 U.S. at 561 ("[E]ach element [of standing] must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the

action" under the APA. Ex. 2 at 17.  Each one of the Conservation Groups' claims relate exclusively to that legally-deficient Rule and rulemaking process.  All the facts necessary to adjudicate the Conservation Groups' claims have occurred, and the claims cannot get any riper.[18]

"The ripeness doctrine is drawn from both Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction."  *Nat'l Park Hospitality Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (citations and quotations omitted).  To determine "whether administrative action is ripe for judicial review," courts "evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration."  *Id.* (citing *Abbott Labs. v. Gardner*, 387 U.S. 136, 149 (1967)).

**A)  The Conservation Groups' Claims Are Fit for Review.**

"With respect to the fitness criterion, it is settled that a case is fit for judicial decision when the issues are purely legal and when the action in controversy is final and not dependent on future uncertainties."  *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013) (citations omitted).  The issues in this case satisfy both requirements:  they are pure questions of law concerning the legality of a promulgated final rule and the rulemaking process that led to it.  *See Nat'l Ass'n of Home Builders v. U.S. Army Corps of Eng'rs*, 417 F.3d 1272, 1282 (D.C. Cir. 2005) ("[C]laims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues . . . . [A] purely legal claim in the context of a facial challenge . . . is presumptively reviewable." (citations

---

manner and degree of evidence required at the successive stages of the litigation."); *Beck v. McDonald*, 848 F.3d 262, 270 (4th Cir. 2017) (distinguishing burden on a motion to dismiss to that at the summary judgment stage).

[18] The Business Associations do not challenge the ripeness of the Conservation Groups' claims, and indeed, note in their motion for intervention their interest in "protecting the ability of nongovernmental organizations . . . to bring facial challenges to important federal regulations."  Dkt. 38 at 10.

and quotations omitted)).  *See also Miller v. Brown*, 462 F.3d 312, 319 (4th Cir. 2006).

CEQ does not dispute that the challenged Rule is final and that it marks the consummation of the agencies' decisionmaking process on how to "modernize" NEPA regulations.  Dkt. 53 at 10.  *See Gen. Elec. Co. v. E.P.A.*, 290 F.3d 377, 380 (D.C. Cir. 2002) ("In determining the fitness of an issue for judicial review we look to see whether," *e.g.*, "the agency's action is sufficiently final," "mark[ing] the consummation of the [agency's] decisionmaking process and [] determin[ing] [] rights and obligations." (citations omitted)).

Each of the Conservation Groups' claims is as ready as it will ever be for adjudication.  Claims 1 through 8 all relate to CEQ's rulemaking process, which concluded on July 16, 2020.  These claims include CEQ's failure to consider reliance interests and alternative, less burdensome solutions; to base its Rule on the evidence before it; to provide a reasoned explanation for its policy reversal; and to respond to relevant public comments.  Claim 9 relates to the fact that the Rule, on its face, is inconsistent with the NEPA statute.  Claim 10 relates to the lack of CEQ's legal authority.  All of these claims arise under the APA and will be judged on an administrative record that is now closed.  5 U.S.C. § 706.  CEQ's violations of the APA in issuing the Rule are not dependent on any future uncertainties.  The procedural violations have already occurred, as the administrative record will reflect.

CEQ claims "no one can say" when or how the Rule will be applied, calling its application a "black box."  Dkt. 53 at 22–23.  But the Rule itself says otherwise: by its own terms, the Rule immediately overrides any "existing agency NEPA procedures [that] are inconsistent with the regulations in this subchapter."  40 C.F.R. § 1507.3(a).  As soon as the Rule takes effect, the provisions of this governing Rule "shall apply" to all federal agencies' NEPA evaluations and accordingly, the Rule's plain text is ripe for review.

CEQ spends pages attempting to obscure the fact that the final agency action challenged in this case has already occurred and is thus ready for review.  Instead, CEQ attempts to misdirect the court towards secondary final agency actions that will occur in particular NEPA processes at a later date.  Dkt. 53 at 27–31.  But the action the Conservation Groups challenge is the *rulemaking itself*, not just one specific action under NEPA that will be finalized later in time.  It is the Rule itself that will harm the Conservation Groups and their members.  Indeed, because of the changes made in the Rule, many projects that the Conservation Groups care about will no longer be subject to NEPA, and will thus not result in additional final agency action to trigger judicial review.[19]  *See, e.g.*, 40 C.F.R. §§ 1501.1(a)(4), 1508.1(q) (2020).

Moreover, how the NEPA regulations are applied is irrelevant to resolution of the Conservation Groups' claims.  *See, e.g., Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 737 (1998)[20] (holding that a procedural claim is ripe "at the time the [procedural] failure takes place, for the claim can never get riper"); *Gen. Elec. Co.*, 290 F.3d at 381 ("[W]e do not think the Court's consideration would be aided by further application of the agency's position to particular facts. . . ." (quotations omitted)).  For example, the Conservation Groups' claim that CEQ did not consider the interests of parties who relied upon the Rule, Compl. at ¶¶ 596-606, will be evaluated by the Court using the Administrative Record that closed the day the Rule was

---

[19] The Rule also provides that it is CEQ's intention that judicial review not occur absent final agency action, thus eliminate any possibility of review.  *See* 40 C.F.R. § 1500.3(c).

[20] To this point, CEQ cites *Oh. Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1988) for the holding that a challenge to a U.S. Forest Service land management plan was unripe "where the plaintiff would have an opportunity to comment on and challenge any specific logging permit issued under the plan in the future."  Dkt. 53 at 15.  In that case, however, the plaintiff was concerned about tree cutting, and the challenged plan "d[id] not itself authorize the cutting of any trees."  *Oh Forestry*, 523 U.S. at 729.  By contrast, the harm complained of here is the loss of procedural safeguards that protect concrete interests, and the Rule causes this harm immediately.  In addition, the Rule expressly permits a number of new activities to proceed while the NEPA process is pending.  40 C.F.R. § 1506.1(b) (2020).  The Rule also imposes changes that will immediately diminish information available to the Conservation Groups and cause them to change conduct.  *See* discussion *infra*.

finalized.  *See Citizens to Pres. Overton Park, Inc. v. Volpe*, 401 U.S. 402, 420 (1971).

Application of the Rule will not make this question clearer.

CEQ's citation to *Reno v. Flores,* 507 U.S. 292 (1993), is therefore misplaced.  Dkt. 53 at

22.  Where CEQ notes that the Conservation Groups must establish that "no set of circumstances

exists under which the [Rule] would be valid", the Conservation Groups have done exactly that.

No set of circumstances exist where this illegally promulgated Rule could be valid, no future

application of the rule will allow CEQ to go back in time and do things right.[21]  *See Sierra Club*

*v. Bosworth*, 510 F.3d 1016, 1024 (9th Cir. 2007) (explaining that where plaintiffs have claims

related to agency non-compliance with procedure, the "no set of circumstances" test is without

additional meaning and is automatically met).

CEQ's appeal to cases where something other than a final agency rulemaking is at issue

does not advance its position.  For example, CEQ invokes *Lee v. Citizenship* for the proposition

that review under the APA is not unlimited.  Dkt. 53 at 19.  But that case involved a discrete

immigration enforcement action which Congress had *expressly made unreviewable* and not an

APA rulemaking, which courts frequently review.  In fact, the court in that case stated plainly

that "the APA embodies a basic presumption of judicial review."  *Lee v. U.S. Citizenship &*

*Immigration Servs.*, 592 F.3d 612, 619 (4th Cir. 2010).

Likewise, *Lujan v. Nat'l Wildlife Fed.*, relied upon repeatedly by CEQ, involved a broad

challenge to a number of actions made by the Bureau of Land Management under the Federal

---

[21] Even if the Conservation Groups could not make sure a showing, the Supreme Court has been clear that it is not required for facial challenges to rulemakings. *See City of Chicago v. Morales*, 527 U.S. 41, 55 n.22 (1999); *Washington v. Glucksberg*, 521 U.S. 702, 740 (1997).  Moreover, where the Immigration and Naturalization Service in *Reno v. Flores* had wide discretion on how to implement regulations governing the release of detained alien juveniles based on the application of particular facts, here there is there is no discretionary ability for federal agencies to decide how to implement the NEPA regulations based on the facts of a particular case, they are bound by the ceiling established by CEQ.

Land Policy and Management Act and NEPA.  497 U.S. 871 (1990).  But the challenged action

was not a notice and comment rulemaking like the one at issue in this case and the claims did not

involve the types of claims here, where the Conservation Groups focus only on the inadequacy of

the rulemaking process and the inconsistency between promulgated regulations and the

governing statute. [22]   The court noted expressly that the bundle of challenged practices were "not

. . . a single BLM order or regulation, or even . . . a completed universe of particular BLM orders

and regulations," and as such "not an 'agency action' within the meaning of § 702, much less a

'final agency action' within the meaning of § 704."  *Id.* at 873, 890.  Also off topic is *South

Carolina v. United States*, 912 F.3d 720, 731 (4th Cir. 2019), *cert. denied*, 140 S. Ct. 392 (2019),

which concerned a discrete decision to terminate a mixed oxide fuel fabrication facility project

on the Savannah River that would impact plaintiffs only through extremely attenuated causal

chain of events, not a final agency action concluding a rulemaking.

Other cited cases are equally irrelevant; indeed, many do not even discuss the issue of

ripeness.  *See, e.g.*, *Fund for Animals, Inc. v. U.S. Bureau of Land Management*, 460 F.3d 13

(D.C. Cir. 2006) (broad programmatic changes not conducted through rulemaking that were too

undeveloped for judicial review); *Village of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714

F.3d 186, 194 (4th Cir. 2013) (dredging project that did not constitute agency action, let alone

final agency action); *Norton v. S. Utah Wilderness All.*, 542 U.S. 55 (2004) (whether to prohibit

---

[22] Indeed, it is standard for courts to adjudicate facial challenges to rulemakings made pursuant to the APA when the claims brought are pure questions of law. *See, e.g.*, *NRDC v. Wheeler*, 955 F.3d 68 (D.C. Cir. 2020) (facial challenge to EPA's rule eliminating restrictions on the use of hydrofluorocarbons); *United Steel v. Mine Safety & Health Admin.*, 925 F.3d 1279 (D.C. Cir. 2019) (facial challenge to rule on mine safety inspections); *Merck & Co., Inc. v. U.S. Dep't of Health & Human Servs.*, 385 F. Supp. 3d 81 (D.D.C. 2019), *aff'd*, 962 F.3d 531 (D.C. Cir. 2020) (facial challenge to rule requiring drug manufacturers to post drug prices in TV ads); *New York v. U.S. Dep't of Labor*, 363 F. Supp. 3d 109 (D.D.C. 2019), *appeal filed* (D.C. Cir. 19-5125) (facial challenge to rule regarding association health plans); *S.C. Coastal Conservation League v. Pruitt*, 318 F. Supp. 3d 959 (D.S.C. 2018), *appeal dropped* (4th Cir. No. 18-1988) (facial challenge to suspension of Clean Water Rule); *Air All. Houston v. EPA*, 906 F.3d 1049 (D.C. Cir. 2018) (facial challenge to suspension of Chemical Disaster Rule).

off-road vehicles in certain wilderness study areas was not a discrete action that the agency was required to take, so failure to act was unreviewable); *City of New York v. United States Dep't of Def.,* 913 F.3d 423, 431 (4th Cir. 2019) (challenge is not to a discrete agency action, but to an "agency's compliance with [a] broad statutory mandate").

CEQ also fixates on the fact that, in a separate case, Judge Conrad of this district found that this court did not have jurisdiction under the Freedom of Information Act to place a halt on CEQ's rulemaking process pending production of documents that CEQ had failed to promptly produce. *See, e.g.,* Dkt. 53 at 10. CEQ mischaracterizes the proceeding,[23] which in reality supports the fact that the time for judicial review is now. Not only did Judge Conrad make clear in his opinion that "[t]he Administrative Procedure Act—and a robust body of case law—allows for enforcement mechanisms if agencies fail to comply with preliminary matters in rulemaking procedures," *S. Envtl. Law Ctr. v. Council on Envtl. Quality*, 446 F. Supp. 3d 107, 118 (W.D. Va. 2020), but CEQ made clear at oral argument in that case that "once there's a final rule . . . a challenge can be brought to that under the APA . . ." Transcript of Oral Argument at 26, Exhibit 1. In other words, in March CEQ asserted—and the court agreed—that the time for a legal challenge to the Rule was after it was finalized. That time is now.

**B) The Conservation Groups Will Suffer Hardship Absent Prompt Review.**

Turning to the hardship prong of the ripeness inquiry, it is plain that the Conservation Groups will suffer significantly if their ability to challenge the Rule is delayed. "The hardship prong is measured by the immediacy of the threat and the burden imposed on the [plaintiff]."

---

[23] Counsel for the Conservation Groups have vigorously moved to protect their clients' interest at each stage of this rulemaking process, and at each stage CEQ has done its utmost to conduct its business in secret. At the hearing in question, Judge Conrad noted that the time it had taken CEQ to comply with a FOIA request related to the rulemaking was "somewhat outrageous." Transcript of Oral Argument at 41, *S. Envtl. Law Ctr. v. Council on Envtl. Quality*, 446 F. Supp. 3d 107 (W.D. Va. 2020) (No. 3:18-cv-00113), attached hereto as Exhibit 1.

*Charter Fed. Sav. Bank v. Office of Thrift Supervision*, 976 F.2d 203, 208–09 (4th Cir. 1992). As discussed below, the threat and burden to the Conservation Groups in terms of both informational and environmental harm are significant.

And, indeed, despite CEQ's assertion that the Rule will not alter the primary conduct of the Conservation Groups, it will, and it will immediately. *See* Dkt. 53 at 15 (citing *Nat'l Park Hospitality Ass'n v. Dep't of the Interior*, 538 U.S. 803 (2003)).

First, contrary to CEQ's assertions, important provisions of the Rule regulate the Conservation Groups. *E.g.*, 40 C.F.R. §§ 1503.3(a)–(b); 1500.3(b)(3) (public comment and exhaustion provisions). To raise issues and protect their interests going forward, the Conservation Groups will be required to draft comments with a heightened degree of specificity and technical expertise—and in many cases will be forced to retain expert assistance at some expense or else forgo participation.[24] *See* 40 C.F.R. § 1503.3 (2020).[25] According to the Rule, failure to comply with these requirements will mean the Conservation Groups' claims are unexhausted and not subject to judicial review. 40 C.F.R. § 1500.3(b)(3) (2020).

In addition, the Rule directly affects the Conservation Groups' conduct. They have long relied on the NEPA process to provide information to pass along to their members and inform advocacy.[26] The Conservation Groups will now have to turn elsewhere to get even a small part

---

[24] *See, e.g.*, Miller Decl. ¶ 28, Dkt. 30-13 ("The new specificity requirements for comments mean that these members would likely be required to retain outside experts if they wished to file comments on projects impacting our forests, something many of our members do not have the resources to do. Effectively, this requirement will bar these members from being able to comment on projects which impact the wild places they enjoy making it all but impossible for them to bring their concerns and views to the Forest Service's attention.").

[25] *See also* Council on Environmental Quality, *Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, Rule Response to Comments*, at 328 (June 30, 2020), *available at* https://www.whitehouse.gov/wp-content/uploads/2020/01/CEQ-NEPA-Regulations-Final-Rule_Response-to-Comments_Final.pdf (hereinafter "Response to Comments") (In response to public concerns that this would shift NEPA's information-gathering and analytical responsibilities from agencies to members of the public, CEQ responded that commenters "are free to hire experts to present their comments.").

[26] For example, Megan Chase, employee and member of Plaintiff Upstate Forever, explains, "A large part of Upstate Forever's work includes serving as a source information for the public. We cannot keep the public informed of the

17

of the information that will be eliminated by the Rule.[27]  The Conservation Groups have relied

on the action-forcing process encompassed in NEPA to assist advocacy efforts on particular

projects—to inform decisionmakers about alternatives, to ensure that other environmental laws

are met, and to guarantee that communities are on notice of how projects may affect them.  The

changes to the NEPA process will immediately force the Conservation Groups to alter the way

they engage with federal decisionmakers about resources they value.

The implications of the Rule are thus distinguishable from *National Park Hospitality*

*Ass'n v. Department of the Interior*, 538 U.S. 803 (2003), which involved a "general statement of

policy" by the National Park Service which made a minor change that would have little impact

on the plaintiffs' conduct.  And it is unlike *Reno v. Catholic Social Services, Inc.*, where the

plaintiffs would have had to take a number of affirmative steps, and satisfy other criteria external

to the case before they could have suffered any impact from the challenged regulations.  509

U.S. 43 (1993).  Instead, the Rule is analogous to the facts of *Gardner v. Toilet Goods Assn.,*

*Inc.,* 387 U.S. 167 (1967), where the challenged regulations presented plaintiffs with the

immediate dilemma to choose between complying with newly imposed, disadvantageous

restrictions and risking serious penalties for violation.  Here, the Conservation Groups will have

to decide, for example, whether to comply with the Rule's arduous public participation

requirements or risk losing their right to legal claims in the future. Here also, the Conservation

---

environmental risks in our area [of Upstate South Carolina] if we ourselves are unaware of upcoming major projects and their potential impacts." *See* Chase Decl. ¶ 24, Dkt. 30-19.

[27] For example, Christian Hunt, employee and member of Plaintiff Defenders of Wildlife, "rel[ies] on this NEPA process not only to obtain information about the impacts of a proposed federal action in order to draft comments on the proposal but also to digest and disseminate such information to Defenders' members and to the general public." Hunt Decl. ¶ 15, Dkt. 30-34.  Under the Rule, he will have to use other methods to obtain information he "would have normally gotten directly through the NEPA process" and is "concerned that if I have to rely on the FOIA process to get the information I need to advocate for places like the Okefenokee, I will not get information in time to effectively comment on NEPA projects or do other advocacy work during the NEPA process, which will harm my ability to do my job." *Id.* at 25.

Groups will immediately lose access to a wide range of information they have long relied upon. And here, the Conservation Groups will immediately lose access to important procedural safeguards that have helped protect resources they care about.

If the Conservation Groups are forced to wait to challenge a second final agency action—rather than the one they actually contest is illegal—they will continue to suffer these harms in the interim.  Moreover, as noted above, they would be stuck in a Catch-22 because, due to the Rule's changes, many significant future events will no longer occasion a final agency action.

### C)  Immediate Adjudication of the Rule Will Not Hinder Federal Agencies.

CEQ's suggestion that immediate judicial review of the Rule would hinder efforts of federal agencies to refine their policies is equally unpersuasive.  Dkt. 53 at 20.  Unlike the cases cited by CEQ, the Rule does not leave policies for agencies to "crystallize."  In fact, effective immediately, the Rule expressly states that "[w]here existing agency NEPA procedures are inconsistent" with the Rule, the Rule "shall apply" instead.  40 C.F.R. § 1507.3(a) (2020), *see also Andrus v. Sierra Club,* 442 U.S. 347, 357 (1979).  Moreover, the Rule makes clear that its requirements are to be a ceiling beyond which other agencies cannot reach.  *Id*. § 1507.3(b) ("Except for agency efficiency . . . or as otherwise required by law, agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in [the Rule] . . .")

Furthermore, the majority of the changes in the Rule leave nothing for federal agencies to "crystallize."  The example used by CEQ at the recent status conference before Chief Judge Urbanski demonstrates this point.  Counsel for CEQ pointed to the change in the Rule that expressly exempts Farm Service Agency and Small Business Administration loan guarantees from NEPA review, stating that this would not cause immediate harm because the United States Department of Agriculture ("USDA") would first have to determine that the loans are not subject

to NEPA review and that decision could then be challenged as a secondary "final agency action." Transcript of Oral Argument at 39, *Wild Virginia v. CEQ*, No. 3:20-cv-00045 (W.D. Va. Aug. 24, 2020), Exhibit 2. But this account is simply not correct. First, the language of the Rule is black and white and provides no additional room for the USDA to make a determination about whether the loan guarantees trigger NEPA. 40 C.F.R. § 1507.3(b)(2020).[28] Second, because NEPA will no longer apply, there will be no additional "final agency action" to challenge.

Thus, unlike the cases cited by CEQ where additional time was needed for agencies to adjust the precise details of forest plans, *Ohio Forestry*, 523 U.S. at 735, or to develop policies on what legal documents to disclose to third parties, *Reg'l Mgmt. Corp. v. Legal Servs.*, 186 F.3 457, 465 (4th Cir. 1999), here there is nothing the federal agencies can do which will change the regulatory ceiling set in place by CEQ through this rulemaking or cure the deficiencies in CEQs rulemaking process. Accordingly, there is nothing the agencies can change which will impact in any way the viability of the Conservation Groups' claims.

## II.  The Conservation Groups Have Established Standing Both as Organizations and on Behalf of Their Members.

A court considering ripeness asks whether this is an appropriate *time* to bring a challenge; for standing, it asks whether this is an appropriate *party* to bring the challenge. *Ouachita Watch League v. Jacobs*, 463 F.3d 1163, 1174 (11th Cir. 2006). The Conservation Groups are the right parties to bring this suit to prevent concrete harms to their members and to their own interests.

---

[28] And indeed, in a press release when the rule was released. U.S. Secretary of Agriculture Sonny Perdue made clear that there is no room for movement on this issue noting he was "grateful to see the final rule includes a NEPA exemption for minor federal actions such as our FSA loan guarantees." Further, he expressed his belief that "President Trump has rightly recognized that the law does not contemplate a time-consuming, bureaucratic review process merely because of minimal federal involvement. This NEPA reform will help unleash Americans from overly burdensome regulations . . . ." White House Press Release, July 16, 2020, *available at* https://www.whitehouse.gov/wp-content/uploads/2020/01/20200716Final-NEPAPress-Release.pdf

The requirements of standing sort into three familiar prongs:  "a plaintiff must show (1) an injury in fact, (2) a sufficient causal connection between the injury and the conduct complained of, and (3) a likelihood that the injury will be redressed by a favorable decision." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (*quoting Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992)) (internal quotation marks and alterations omitted).  To establish standing, an association may show "'an injury to the organization in its own right or as the representative of its members who have been harmed.'"  *1000 Friends of Md v. Browner*, 265 F.3d 216, 225 (4th Cir. 2001) (*quoting Friends of the Earth, Inc. v. Gaston Copper Recycling Corp.,* 204 F.3d 149, 155 (4th Cir. 2000)).

The Conservation Groups have standing both to represent their members, who themselves would have standing as individuals, and in their organizational capacities.  First, the Conservation Groups' members will be imminently injured because the Rule mandates the use of inadequate procedures that will prejudice agency decisions affecting their concrete interests. Further, the Conservation Groups themselves are immediately harmed because they will lose valuable rights to information and participation, and will be forced to divert their limited resources to mitigate the effects of the Rule's weakened procedural safeguards.

**A)  The Conservation Groups Have Representational Standing.**

"Representational standing is established if '(1) at least one of [the organization's] members would have standing to sue in his own right; (2) the organization seeks to protect interests germane to the organization's purpose; and (3) neither the claim asserted nor the relief sought requires the participation of individual members in the lawsuit.'"  *1000 Friends*, 265 F.3d at 225 (*quoting Friends of the Earth,* 204 F.3d at 155) (alteration original).  CEQ's motion does not dispute either the second or third prongs, and Conservation Groups' allegations amply show

that they are met.  As framed by CEQ, then, the only issue for the Conservation Groups' representational standing is whether a single member would have standing as an individual. Because the Rule weakens or eliminates NEPA's safeguards for projects that affect individual members, the Conservation Groups have representational standing.

The Conservation Groups' members work to protect the forests, waters, and communities in the places where they live.[29]  NEPA was enacted to protect their interests in a "healthful, safe, and aesthetically and culturally pleasing" environment.  42 U.S.C. § 4331.  As a matter of law, the procedural safeguards put in place by NEPA increase the odds that agencies will make decisions with better environmental outcomes.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989) (stating that "these procedures are almost certain to affect the agency's substantive decision").  In other words, the process of gathering information and input, considering alternatives, and weighing effects, with public disclosure and dialogue, reduces "the *risk* to the environment."  *Sierra Club v. Marsh*, 872 F.2d 497, 500 (1st Cir. 1985) (emphasis in original).  The Conservation Groups have also shown that this is true as a matter of fact: their participation under the 1978 NEPA rules has steered agency decisionmakers toward demonstrably better environmental outcomes, both in individual projects[30] and in the

---

[29] For example, Jack and Mary Wilson live within the George Washington National Forest and own a diner on the Forest's edge.  They frequently participate in the NEPA process to protect the forest ecosystem and their community.  *See* J. Wilson Decl. ¶¶ 3-37, Dkt. 30-8; M. Wilson Decl. ¶¶ 3-39, Dkt. 30-9.  *See also* Compl. ¶¶ 21, 26, 53, 57, 90, 91, 108, 110-11, 136-37, 155-57, 177-79, 202-07, 230-31, 233-34, 250-51, 273-77, 293-97, 313-14, 334-40, 350-55, 372-73, 389-92.

[30] For example, Congaree Riverkeeper member John Tate used the prior NEPA process to comment on the Carolina Crossroads project in Columbia, South Carolina.  As a result of public comments, an alternative that improved the existing infrastructure to solve the traffic problems was chosen rather than an alternative that would have resulted in harm to the Saluda River.  *See* Tate Decl. ¶ 20, Dkt. 30-24.  *See also* Compl. ¶¶ 34, 74-75, 77-79, 99, 121-22, 140-42, 160, 188, 190-92, 254, 279, 298-99, 317-22, 341-42, 358, 377.

aggregate.[31]  *Cf. O'Shea v. Littleton*, 414 U.S. 488, 496 (1974) (holding that "past wrongs are evidence bearing on whether there is a real and immediate threat of repeated injury").

The lands, waters, and other environmental resources the Conservation Groups' members visit, enjoy, and depend on will be impacted by ongoing and upcoming decisionmaking processes subject to this unlawful Rule.[32]  The Rule removes key procedural safeguards from these decisions.  Some of the Rule's changes prohibit flatly agencies from offering such procedures,[33] while others remove mandatory requirements and replace them with discretion,[34] but both types of changes are equally injurious.  *See Johnson v. Allsteel*, 259 F.3d 885, 888 (7th Cir. 2001) ("the increased risk [of replacing assurance with discretion] is itself an injury"); *Nat'l Wildlife Fed'n v. Hodel*, 839 F.2d 694, 708 (D.C. Cir. 1988).  The Rule also allows money and other resources to be irretrievably committed to a particular project before the alternatives have been considered, prejudicing the consideration of alternatives.  40 C.F.R. § 1506.1(b) (2020); Compl. ¶¶ 639-41.  All of these changes apply as soon as the Rule takes effect, overriding any agency procedures that are inconsistent with the new Rule.  40 C.F.R. § 1507.3(a) (2020).

As a result, some projects affecting Conservation Groups will proceed with fewer opportunities for notice or comment,[35] some will proceed with no notice or analysis

---

[31] As alleged in the Complaint, the NEPA procedures provided by the Forest Service for Environmental Assessments (the standard type of review for logging projects in this region) have been very effective in avoiding harm.  The majority of projects change because of scoping (a procedure that would be prohibited for EAs under the Rule), and thousands of acres have been dropped from logging plans because of public input.  Compl. ¶¶ 30-33, 62-65, 184-87.

[32] *See* Compl. ¶¶ 39, 41-44, 66-67, 68, 70-73, 101, 123-24, 144-47, 164-66, 169-71, 181-83, 193-94, 212-22, 236, 237-41, 253-54, 256, 259-61, 280-81, 283-84, 300-03, 323-24, 343-45, 360-62, 377-78, 380, 382-83, 394-403.

[33] For example, the Rule limits the "scoping" process to EISs.  40 C.F.R. §§ 1501.9 (2020).  Currently, other agencies offer scoping for Environmental Assessments and Categorical Exclusions, *e.g.*, 36 C.F.R. § 220.4, but they would be prohibited from doing so by the Rule, 40 C.F.R. §1507.3.  *See also* 40 C.F.R. §§ 1502, 1508.1(g)(3) (2020) (generally prohibiting consideration of cumulative and indirect effects).

[34] *E.g.*, 40 C.F.R. § 1506.13 (agencies may apply Rule to ongoing projects).

[35] For example, the Environmental Assessment for the Greenbrier Southeast Project failed to include an appropriate analysis of the effect of the project on the endangered candy darter and other sensitive species.  Rick Webb, member

whatsoever,[36] and all of them will proceed with less thorough analysis of impacts that matter to Conservation Groups.[37]  It requires no speculation to conclude, as the Conservation Groups have thoroughly alleged, that the loss of these procedural safeguards establishes standing because it increases the risk of uninformed decisionmaking that affects their concrete environmental interests. As Justice Scalia explained,

> The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy.  Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Lujan*, 504 U.S. at 572 n.7.  As in *1000 Friends*, CEQ's Rule eliminates required NEPA evaluations, and thereby "open[s] the door" to injuries that an alternative rule would have prevented.  265 F.3d at 224-26.  "Moreover, to set aside the [decisions tainted by the unlawful procedures] at a later date will not necessarily undo the harm."  *Marsh*, 872 F.2d at 500.

### *i.  Defendants Misstate the Standards for Injury in Fact.*

Despite this simple, commonsense, and exhaustively supported description of harm, CEQ argues that the Conservation Groups have not shown an "injury in fact."

To begin, CEQ attempts to impose an artificially high bar for standing that is not consistent with the federal courts' obligation to hear cases within their jurisdiction.  CEQ distorts

---

of multiple Conservation Groups, is "concerned that under the new rules, we will never have an opportunity to comment on the impact of the Greenbrier Southeast Project on the candy darter," because such impacts will be considered indirect or cumulative and no longer require review.  Webb Decl. ¶ 23, Dkt. 30-36.

[36] *See, e.g.*, Compl. ¶¶ 30-33, 62-65, 184-87 (timber projects that would have undergone review during the scoping period and will no longer be evaluated because the Rule eliminates scoping), 325, 363 (Factory Farms that would have undergone review when federal loan guarantees were used to finance them and will no longer be subject to NEPA).

[37] *See, e.g.,* Lang Decl. ¶ 16 (under the Rule, the indirect and cumulative effects of a proposed spaceport on Little Cumberland Island "will not get appropriate study.").

24

a quote from the Supreme Court's *Summers v. Earth Island* decision to assert that a plaintiff's injury "must be actual and imminent [*i.e.*, **certainly impending**], not conjectural or hypothetical." Dkt. 53 at 32 (alteration in Defendants' brief, bolded for emphasis here). But a future injury need not be "certainly impend*ing*" to be "actual and imminent." Instead, "[a]n allegation of future injury may suffice if the threatened injury is 'certainly impending,' *or there is a 'substantial risk' that the harm will occur*." *Susan B. Anthony List*, 573 U.S. at 158 (quoting *Clapper v. Amnesty Intern. USA*, 568 U.S. 398, 414 n.5 (2013)) (emphasis added).

CEQ's omission of "substantial risk" from the standing injury test is material because risk is the currency of environmental standing. As the Fourth Circuit recognizes, "[t]hreatened environmental injury is by nature probabilistic," and an "increased risk thus constitutes cognizable harm." *Friends of the Earth*, 204 F.3d at 160. Nowhere is this more true than in the NEPA context, where the injury "consists of the added *risk* to the environment that takes place when governmental decisionmakers make up their minds without having before them an analysis (with prior public comment) of the likely effects . . . ." *Marsh*, 872 F.2d at 500 (emphasis original). The "substantial risk" test has been applied to circumstances closely paralleling these, *League of Conservation Voters v. Trump*, 303 F. Supp. 3d 985, 999 (D. Alaska 2018) (executive order to expedite processing of seismic survey permits), and it is particularly appropriate where, as here, the risk of harm prompts the plaintiff to "reasonably incur costs to mitigate or avoid that harm" (*see infra*, Sec. I), *Clapper*, 568 U.S. at 414 n.5.

CEQ also attempts to raise the standing bar by maintaining, without supporting analysis, that the Conservation Groups are not the "object of the government action or inaction [they] challenge[]," claiming this makes standing "substantially more difficult to establish." Dkt. 53 at 32. CEQ does not attempt to explain what it means to be the "object of government action or

25

inaction," but certainly the Conservation Groups and their members qualify.  *See supra* pp.17-19.

For one thing, the Rule directly applies to the Conservation Groups and their members by

requiring their comments be more specific and technical, with an exhaustion bar as the penalty.

40 C.F.R. §§ 1503.3(a)–(b); 1500.3(b)(3)(2020).  More important, the 1978 NEPA regulations,

and the NEPA statute itself, provided the Conservation Groups and their members with valuable

procedural benefits, as they were intended to do.  *See. id.* § 1500.2(d) (1978) ("Encourage and

facilitate public involvement in decisions which affect the quality of the human environment.").

But the Rule now deprives Conservation Groups and their members of those protections.  Loan

guarantees funding massive industrial feedlots are one example: the Rule exempts these actions,

eliminating NEPA procedures that would increase the odds of better environmental outcomes,

and at the very least promote transparency and accountability.  CEQ's new Rule takes away

many other procedural protections from which the Conservation Groups have long benefitted,

such as the requirement that agencies analyze indirect and cumulative effects like climate change

in their decisionmaking.[38]  In some cases, the Conservation Groups have engaged in litigation to

enforce the longstanding requirements of the prior regulations where agencies conducted

deficient NEPA analyses; some of these cases are currently pending and may be affected by the

weakened standards of the Rule (Compl. ¶¶ 144-45), and in other cases, the Conservation Groups

have won in court but they face the prospect that a fuller consideration under NEPA on remand

will be undermined by the weakened standards of the Rule.  Compl. ¶¶ 44, 171, 377, 398–403.

---

[38] For example, Plaintiffs Clean Air Carolina and Cape Fear River Watch are concerned that plans to expand the Wilmington Port will have significant indirect and cumulative effects that no longer require review under the Rule.  *See, e.g.,* Compl. ¶¶ 324, 332, 361; Wolfe Decl. ¶ 23, Dkt. 30-27; Burdette Decl. ¶¶ 14-15, Dkt. 30-47; Blotnick Decl. ¶¶ 24-25, Dkt. 30-33; Parr Decl. ¶¶ 19-27, Dkt. 30-21.

Accordingly, Conservation Groups are the "object" of the Rule, and their standing should be "self-evident."  *See Shays v. Fed. Election Comm'n*, 414 F.3d 76, 84-85 (D.C. Cir. 2005) ("[W]hen agencies adopt procedures inconsistent with statutory guarantees, parties who appear regularly before the agency suffer injury to a legally protected interest in 'fair decisionmaking.'"). *See also Am. Petroleum Inst. v. Johnson*, 541 F. Supp. 2d 165, 176-77 (D.D.C. 2008) (*citing South Coast Air Qual. Mgmt. Dist. v. EPA*, 472 F.3d 882 (D.C. Cir. 2006)).

The artificially high bar CEQ attempts to erect to block standing is not consistent with the law of this Circuit.  "[T]he claimed injury 'need not be large[;] an identifiable trifle will suffice.'"  *Friends of the Earth*, 204 F.3d at 156.  "The bar of standing must not be set too high, lest many regulatory actions escape review contrary to the intent of Congress."  *Doe v. Obama*, 631 F.3d 157, 163 (4th Cir. 2011).  Particularly "[i]n the environmental litigation context, [Article III's] standing requirements are not onerous."  *Am. Canoe Ass'n v. Murphy Farms, Inc.*, 326 F.3d 505, 517 (4th Cir. 2003).  As set out in the Complaint and their declarations, the Conservation Groups and their members easily clear this bar.

### ii.   *Defendants Wrongly Claim that Only "Ground-disturbing" Harms Are Cognizable.*

CEQ chiefly argues that the Conservation Groups lack standing because any harm to the environment would result from "hypothetical future projects."  Dkt. 53 at 33.  According to CEQ, "typically only concrete applications in the context of ground-disturbing actions have the potential to cause injuries in fact to a citizen's interests," and that such a "concrete application . . . is necessary to the Article III analysis."  Dkt. 53 at 34.  CEQ further argues that any harm would be mediated by the actions of other third-party agencies.  *Id.* at 36.  As a result, so the theory goes, any harm to the environment is speculative. *Id.*

27

First, CEQ wrongly focuses on harm to the *environment*, when standing is based on harm to the *plaintiff*.[39] *Friends of the Earth v. Laidlaw Envt'l Servs.*, 528 U.S. 167, 169 (2000) (explaining that insisting on a showing of environmental harm is too high a burden).  When agencies take shortcuts with procedures that are intended to protect the environment, the injury "consists of the added *risk* to the environment."  *Marsh*, 872 F.2d at 500 (emphasis original).  NEPA provides the paradigmatic example: NEPA focuses agency attention on a project's impact before "it is too late to correct"; it does not compel particular substantive results.  *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 371 (1989).  Thus, it would be impossible to prove environmental harm would be prevented by compliance with NEPA, and courts have refused to require such a showing.  *Lujan*, 504 U.S. at 572 n.7.

The risk to the environment caused by uninformed decisionmaking may result from the failure to follow NEPA's procedures in a particular project, *e.g.*, *Crutchfield v. Army Corps of Eng'rs*, 192 F. Supp. 2d 444, 454-55 (E.D. Va. 2001), or it may result from a rulemaking or policy decision to withhold NEPA analysis unlawfully, *e.g.*, *Heartwood, Inc. v. U.S. Forest Serv.*, 230 F.3d 947, 951–52 (7th Cir. 2000).  In either case, the result is the same.  Agency actions move forward without the required process, prejudicing the decision in a way that cannot be cured even if a court later finds the decision tainted, because

> the court, under NEPA, normally can do no more than require the agency to produce and consider a proper EIS. It cannot force the agency to choose a new course of action. Given the realities, the farther along the initially chosen path the agency has trod, the more likely it becomes that any later effort to bring about a new choice, simply by asking the agency administrator to read some new document, will prove an exercise in futility.

*Marsh*, 872 F.2d at 503.

---

[39] Intervenors make the same mistake, arguing that "effect on the environment is wholly uncertain at this time." Dkt. 57 at 5.

This is not to say that a plaintiff automatically has standing to challenge either a project or a rule that involves alleged violations of NEPA. A plaintiff still bears the burden to show that the increased risk of environmental harm is connected to that plaintiff's interests. *See State v. Bureau of Land Mgmt.*, No. 18-CV-00521-HSG, 2020 WL 1492708, at *6–7 (N.D. Cal. Mar. 27, 2020) (finding that some plaintiffs had not shown how the repeal of fracking regulations would harm their members' interests, but others had done so by showing it was "reasonably probable" that newly-allowed activities would harm species in which they had concrete interests). But it is simply not true that "procedural" rules under NEPA are inherently unchallengeable until the harm NEPA was designed to prevent (uninformed decisionmaking) has already occurred.

For example, in *Heartwood*, plaintiffs who used Forest Service lands had standing to bring a facial challenge against the Forest Service's new NEPA procedure (namely, a categorical exclusion) that would potentially be used to exclude projects affecting those lands from detailed analysis under NEPA. 230 F.3d at 951–52. Similarly, in *Hodel*, the court held that plaintiffs with an interest in participating in the NEPA process for mining plans had standing to challenge a federal agency's delegation to a state agency of its authority to approve such plans, because the state agency would not be obligated to prepare EISs. 839 F.2d 694 at 712.

The same is true for regulatory changes outside the NEPA context. In *Am. Petroleum Inst.*, one of the intervenors in this case was found obviously to have standing to challenge a change to the definition of "navigable waters," even in the absence of a concrete permitting process. 541 F. Supp. 2d at 176-77. In *Ohio Valley Environmental Coalition v. Hurst*, 604 F. Supp. 2d 860, 876 (S.D. W. Va. 2009), a plaintiff whose members "visit, live near, drive by and/or fly over areas of the state that are visibly harmed by valley fills, surface impoundments, and related surface mining activities" had standing to challenge issuance of a nationwide permit

authorizing those activities, because there was a "substantial probability" that local conditions would be affected, even though no authorizations had yet occurred under the new permit. And, in *1000 Friends*, the Fourth Circuit held that plaintiffs "with an interest in preventing ill-conceived transportation projects from increasing the level of vehicle emissions to which the members are exposed" had standing to challenge EPA approval of a generous emissions cap, even though the projects would be built not by EPA. 265 F.3d at 225–26.

Other cases are of a piece. *E.g.*, *Blum v. Yaretsky*, 457 U.S. 991, 1001 (1982) (patients who might be transferred to lower levels of care had standing to challenge procedures associated with such transfers, where threat of transfer was "quite realistic"); *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 154 (2010) (finding standing to challenge deregulation of genetically modified crops where "the risk of gene flow will cause [plaintiffs] to take certain measures to minimize likelihood of potential contamination"); *Natural Res. Def. Council v. EPA,* 25 F.3d 1063, 1067 (D.C. Cir. 1994) (plaintiff with members "in communities subject to incidents resulting from mismanagement of used oil" had standing to challenge EPA's failure to list used oils as a hazardous waste); *League of Conservation Voters*, 303 F. Supp. 3d at 997–1001 (plaintiffs with interests in areas at risk for oil and gas development had standing to challenge Executive Order "mandat[ing] expedited consideration of seismic survey permits"); *Puget Soundkeeper All. v. Wheeler*, No. C15-1342-JCC, 2018 WL 6169196, at *2 (W.D. Wash. Nov. 26, 2018) (finding standing to challenge rule narrowing Clean Water Act jurisdiction because of the "increased risks of pollution" to waters that were being excluded from regulation).

Notably, in many of these cases, the harm depended on the conduct of third parties or further agency process. So long as the plaintiff alleges a substantial risk of harm to a concrete interest from the challenged rule or policy, Article III's requirements are satisfied.

30

### *iii.   Defendants' Reliance on __Summers__ is Misplaced.*

CEQ leans heavily on cases that will not bear the weight.  CEQ invokes *Summers* no fewer than twenty times, so it is worth looking at in detail.  At issue in *Summers* were procedural regulations that, like CEQ's rule, weakened the procedural safeguards for Forest Service projects.  555 U.S. at 490-91.  The Forest Service used its new procedures to approve a project (the "Burnt Ridge Project") that otherwise would have been subject to requirements for notice, comment, and appeal.  *Id.* at 491.  Plaintiffs challenged the Burnt Ridge Project and the regulations that purportedly allowed it to bypass the normal process.  *Id.*  During the litigation, the Forest Service withdrew the Burnt Ridge Project.  *Id.*  The question presented was whether the plaintiff could maintain its challenge to the offending regulations even after the specific project was withdrawn.  *Id.* at 492.  The Court held that it could not:

> We know of no precedent for the proposition that when a plaintiff has sued to challenge the lawfulness of certain action or threatened action but has settled that suit, he retains standing to challenge the basis for that action (here, the regulation in the abstract), apart from any concrete application that threatens imminent harm to his interests. Such a holding would fly in the face of Article III's injury-in-fact requirement.

*Id.* at 494.

The Court went on to explain that the plaintiff could have shown a "likelihood" that a member's "specific and concrete plan … to enjoy the national forests" would be "affected by a project unlawfully subject to [the challenged] regulations," *id.* at 495, but its affidavits did not do so.  They came close:  one member "d[id] refer specifically to a series of projects in the Allegheny National Forest that are subject to the challenged regulations," but did not express any "firm intention to visit their locations."  *Id.* at 496.  In the end, the Court held that the plaintiff had not met the burden to show that "at least one identified member had suffered or would suffer harm."  *Id.* at 498.  The Court disclaimed any intent to create an insurmountable barrier,

however, noting that it would "surely not [be] a difficult task" to allege the requisite harm. Had late-filed affidavits been properly before the Court, establishing members' standing would, in fact, have been easy. *Id.* at 509-10 (Breyer, J., dissenting).

Here, by contrast, the Conservation Groups have shown that dozens of their members will suffer harm imminently when the Rule goes into effect from named, ongoing and upcoming projects that will negatively impact discrete areas in which they have recreational, aesthetic, and economic interests. For example, Andrew Young, of Plaintiff Cowpasture River Preservation, frequently hikes, camps, and mountain bikes at Laurel Fork Special Biological Area in George Washington National Forest and details how the proposed Greenbrier Southeast timber project currently undergoing NEPA review will harm the ecosystem he cares about, sensitive species like the endangered candy darter, and his advocacy. *See* Young Decl. ¶¶ 2, 7-24, Dkt. 30-16. Congaree Riverkeeper member Vi Hendley lives in Columbia, South Carolina, and explains how proposed projects, including the Assembly Street Railroad Separation Project, which will impact a creek and tributaries near her house, and the relicensing of the Westinghouse nuclear fuel fabrication facility, near the Congaree River which has polluted the area with radioactive waste, will harm her interests. *See* Hendley Decl. ¶¶ 7-9, 11, Dkt. 30-28. Mr. Young and Ms. Hendley represent only two of nearly fifty members who submitted declarations in support of the Conservation Groups' claims.

### iv. *Defendants' Attacks on Conservation Groups' Demonstration of Harm Are Unavailing.*

CEQ offers a number of arguments attacking the Conservation Groups' exhaustive showing of injury, all of which fail.

### 1.  Site-specific Applications

CEQ argues first that "Plaintiffs have not brought suit against any particular site specific application of the 2020 Rule."  Dkt. 53 at 35.  The Conservation Groups are challenging the Rule itself, which is final agency action reviewable under the APA.  CEQ cites no authority holding that a rule cannot be challenged without also challenging a project to which it has been applied.

### 2.  "Pending" Projects

Many of the projects offered as examples by the Conservation Groups have not yet reached a final decision but are nonetheless subject to the Rule's requirements.  CEQ misunderstands this issue; the *Summers* Court did not hold, as CEQ suggests, that a plaintiff cannot challenge unlawful procedures until project decisions are final.  *See* Dkt. 53 at 35 (arguing that a "pending project or decision" would not support jurisdiction).  To the contrary, the Court reaffirmed that a plaintiff need only show that a member "had suffered [past] or would suffer [future] harm."  555 U.S. at 498.  No rule of standing requires that a plaintiff suffer irremediable harm before being allowed into the courthouse.  "One does not have to await the consummation of threatened injury to obtain preventative relief."  *Friends of the Earth*, 204 F.3d at 160 (quoting *Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979)).  As noted above, the harm that NEPA is aimed at preventing—risk to the environment caused by uninformed decisionmaking—occurs before project decisions are finalized, as projects are developed without a hard look at their environmental impacts.  The Conservation Groups here seek to prevent those imminent harms, which have already begun and which will be cemented on September 14, 2020, when the Rule by its own terms overrides any agency procedures that are inconsistent with its new approach.  40 C.F.R. § 1507.3(a)(2020).  The Court does not need

jurisdiction over other agencies' decisionmaking processes in order to recognize the harm caused *by* this Rule *to* those decisionmaking processes.

### 3. Pending and Future Projects Have Not Yet Applied the Rule.

CEQ next argues that "none of these pending or future projects or decisions have applied the 2020 Rule," and as a result it is "speculati[ve]" how the Rule will affect those projects. Dkt. 53 at 35–36. Of course, the Rule's mandatory requirements and prohibitions are not speculative, and CEQ acknowledges that the Rule will narrow the scope of some reviews and exempt other projects from review entirely.[40]

CEQ nevertheless argues that, even under the new Rule, an agency (particularly the Forest Service) "may end up making the exact same substantive decisions as it would have under the prior CEQ regulations." Dkt. 53 at 36. *See also* Dkt. 57 at 6 ("the same outcomes could be obtained with or without the Rule."). Similarly, Intervenors fault the Conservation Groups for discussing their "concerns" about how the unlawful weakening of procedural safeguards will affect the quality of their immediate environments. Dkt. 57 at 6–7. Neither CEQ nor Intervenors locate this argument in any doctrine of standing, and in fact it is directly contrary to well-established standing doctrine as explained by the Supreme Court: "The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy" and need not "establish with any certainty" that the proper NEPA procedure would produce a different substantive outcome. *Lujan*, 504 U.S. at 572 n.7.

---

[40] Council on Envtl. Quality, Regulatory Impact Analysis for the Rule, Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, RIN: 0331-AA03, at 10 (June 30, 2020), available at https://www.whitehouse.gov/wp-content/uploads/2020/01/CEQ-NEPA-Regulations-RIA_Final.pdf (hereinafter "RIA") (noting that "certain federal activities [will] no longer be[] subject to NEPA."); Response to Comments at 467 ("There may be examples where the application of the new definition of effects will find some interactions not to be reasonably foreseeable or lacking in a reasonably close causal relationship to the proposed action.").

CEQ also argues that the Rule's new requirements are consistent with case law, and therefore the Conservation Groups cannot be harmed by a "fail[ure] to consider the impacts of … proposed projects, including their indirect and cumulative impacts," Dkt. 53 at 36, or a failure to "consider a full range of alternatives," *id.* at 37.  Similarly, CEQ argues that the Rule will speed up projects rather than causing delay and confusion, a concern that the Conservation Groups raised primarily to show the lack of a reasoned basis for the rule, not to establish their own harm. Dkt. 30-1 at 63–71.  All of these arguments confuse standing with the merits and deserve no further response here.  "[F]or purposes of standing, [courts] must assume that [plaintiffs] will prevail on the merits of their argument." *Nat. Res. Def. Council v. Wheeler*, 955 F.3d 68, 77 (D.C. Cir. 2020); *see also Nat. Res. Def. Council, Inc. v. U.S. EPA*, 25 F.3d 1063, 1067 (D.C. Cir. 1994); *State v. BLM*, 2020 WL 1492708, at *4.

CEQ also argues that even though loan guarantees to private parties will be excluded from NEPA review under the Rule, the Conservation Groups "cannot say when and even if any loan guarantee will be given to a private party that will cause any concrete harm to their interests." Dkt. 53 at 38.  But the Conservation Groups have alleged specific facts making clear that loan guarantees will be given to concentrated animal feeding operations ("CAFOs") in the watersheds they are working to protect from precisely that kind of pollution.  *See* Compl. ¶¶ 323, 325, 363–64, 462, 483, 506, 526; *see also* Burdette Decl. ¶¶ 16–26, Dkt 30-47.  CEQ pivots to argue that "[i]f any such concrete harm [*i.e.*, CAFOs] materializes in the future, Plaintiffs can bring an action" challenging the decision.  Yet this argument only proves the absurdity of CEQ's position: the Conservation Groups will receive no notice and disclosure through the NEPA process, because it will not exist.  More fundamentally, as noted above, CEQ's argument that

35

"Plaintiffs can bring an action" challenging a failure to apply NEPA to such a project is a fiction, because thanks to the Rule's exemption, there will be no "final agency action" to challenge.

Thus, the Conservation Groups do not offer mere "speculation about what … agencies might do or require someday in the future." *See* Dkt. 53 at 38.  It requires no speculation to understand that federal agencies will begin applying the new Rule according to their own terms and the directives of the administration on September 14, 2020.  *See* 40 C.F.R. § 1507.3(a)(2020) (where any agency procedures are inconsistent with the Rule, the Rule applies instead).  The Conservation Groups do not need to document exactly when physical, "ground disturbing" harms will begin, because the Conservation Groups may assert their procedural rights to protect their concrete interests now.  *See Defenders of Wildlife*, 504 U.S. at 572 n.7.

Finally, CEQ argues that the Conservation Groups are asserting "generalized" grievances held in common by all members of the public.  Dkt. 53 at 39.  "The fact that an injury may be suffered by a large number of people does not of itself make that injury a nonjusticiable generalized grievance."  *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 n.7 (2016).  Here, the Conservation Groups' alleged harms are personal to their members.  Underneath the Complaint and Declarations are real people who live, work, and play in the specific areas that they allege will be impacted by federal decisions, which decisions will now be less informed, less transparent, and less accountable.

### B) The Conservation Groups Have Organizational Standing to Challenge CEQ's Violations of Their Procedural Rights in this Rulemaking.

When organizations assert direct standing, they assert "injuries to the organizations themselves that are separate and distinct from the injuries" to their members.  *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 459 (4th Cir. 2005).  To establish direct standing, an organization, must show (1) that it suffers an injury in fact; (2) the injury is fairly traceable to the conduct of

the defendant; and (3) that the injury will likely be redressed by a favorable decision.  *Lujan*, 504 U.S. at 560–61; *White Tail Park*, 413 F.3d at 460 (applying *Lujan* to direct organizational standing).  To demonstrate injury in fact, the organizational plaintiff must allege "that discrete programmatic concerns are being directly and adversely affected by the challenged actions." *Am. Legal Found. v. Federal Communications Comm'n,* 808 F.2d 84, 92 (D.C. Cir. 1987).

Here, the Conservation Groups have programmatic interests in the robust NEPA process that has been in place since 1978.  They invested resources to participate in the promulgation of this Rule.  And they were injured by CEQ's illegally deficient rulemaking process.  A favorable decision vacating the Rule would remedy this organizational harm.

The APA is "designed to ensure that affected parties have an opportunity to participate in and influence agency decision making at an early stage, when the agency is more likely to give real consideration to alternative ideas."  *New Jersey v. EPA*, 626 F.2d 1038, 1049 (D.C. Cir. 1980).  "The requirement that agency action not be arbitrary or capricious includes a requirement that the agency . . . respond to 'relevant' and 'significant' public comments." *Pub. Citizen, Inc. v. FAA*, 988 F.2d 186, 197 (D.C. Cir. 1993) (quoting *FEC v. Rose*, 806 F.2d 1081, 1088 (D.C. Cir 1986)).  As the Conservation Groups set out in the Complaint, CEQ failed to do so, and as a result, did not consider relevant information and obvious alternatives to the Rule. Compl. ¶¶ 589–95; 615–19.

CEQ argues that the Conservation Groups cannot enforce the APA against these procedural violations.  Dkt. 53 at 32–33.  But this is simply incorrect: the Conservation Groups have alleged "concrete interest[s] that [are] affected by the deprivation" of meaningful agency responses to their comments on the rulemaking, and as a result have established standing to pursue this procedural injury.  *Summers*, 555 U.S. at 496.

As discussed above, the Rule, by its own terms, exempts projects from NEPA entirely, harming the Conservation Groups and their members,[41] and it drastically weakens the requirements for NEPA evaluations, including those in which the Conservation Groups and their members are currently participating.[42]  The Conservation Groups have documented that they and their members live, work, and recreate in specific places affected by specific projects subject to the Rule's weakened NEPA evaluations.

### C)  The Conservation Groups Have Organizational and Representational Standing to Challenge CEQ's Violations of Their Rights to Information.

"The Supreme Court consistently has held that a plaintiff suffers an Article III injury when he is denied information that must be disclosed pursuant to a statute . . . ."  *Doe v. Pub. Citizen*, 749 F.3d 246, 263 (4th Cir. 2014) (*citing Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21–25 (1998); *Havens Realty Corp. v. Coleman,* 455 U.S. 363, 373-74 (1982)).  The Conservation Groups qualify in their own right and on behalf of their members.

### i.  The Conservation Groups Are Entitled to Information Under NEPA.

Under NEPA, the Conservation Groups and their members are entitled to the NEPA evaluations and information that the Rule would eliminate.  NEPA "of its own force vests concerned organizations with a statutory right to information."  *Animal Legal Def. Fund, Inc. v. Espy*, 23 F.3d 496, 503 (D.C. Cir. 1994); *Hodel*, 839 F.2d at 712 (informational injury where agency rule meant an EIS would no longer be prepared for future approvals).

As the Supreme Court has explained, one of NEPA's "twin aims" is "inform[ing] the

---

[41] *See, e.g.*, Compl. ¶¶ 30-33, 62-65, 184-87 (timber projects that would have undergone review during the scoping period and will no longer be evaluated because the Rule eliminates scoping), 325, 363 (CAFOs that would have undergone review when federal loan guarantees were used to finance them and will no longer be subject to NEPA).

[42] *See, e.g.*, Wofford Decl. ¶¶ 8-11, Dkt. 30-53 (the Mt. Storm to Valley 500 kV Electric Transmission Line Replacement Project, which is currently undergoing environmental review, "poses a particular risk for cumulative impacts that likely would go unanalyzed under the Final Rule," as well as indirect impacts to sensitive species, including the endangered rusty patch bumble bee).

public" about environmental concerns in agency decisionmaking. *Baltimore Gas & Elec. Co. v. Nat. Res. Def. Council, Inc.*, 462 U.S. 87, 97 (1983); *accord Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 768 (2004) (describing "informational role" of impact statement and its purpose to "provid[e] a springboard for public comment" (alteration in original) (quoting *Robertson*, 490 U.S. at 349)).  NEPA's required public disclosures are in no way "incidental" to the statute's goals, as CEQ claims (Dkt. 53 at 36); instead, they are absolutely central.

Accordingly, organizations like the Conservation Groups working to protect their environmental interests have a right to this information.  To maintain a NEPA challenge, plaintiffs must show that they have been "adversely affected or aggrieved" under the APA, 5 U.S.C. § 702, meaning that "the challenged agency conduct has caused actual injury to an interest within the zone of interests protected by [NEPA]." *Committee for Auto Responsibility v. Solomon,* 603 F.2d 992, 997 (D.C. Cir. 1979) (citations omitted).  Here, as the D.C. Circuit has explained, there is "a right to specific information under NEPA" for standing purposes "when the information sought relates to *environmental* interests that NEPA was intended to protect." *Competitive Enter. Inst. v. Nat'l Highway Traffic Safety Admin.*, 901 F.2d 107, 123 (D.C. Cir. 1990) (emphasis in original).  CEQ's citation to a case concerning the Forest Service Decisionmaking and Appeals Reform Act—not NEPA—is misplaced.  Unlike NEPA, this statute created a mechanism to take comment *from* the public; it did not require information be provided *to* the public. *Wilderness Soc., Inc. v. Rey*, 622 F.3d 1251, 1259 (9th Cir. 2010).  A primary function of NEPA, in contrast, is providing information to the public to assure accountability. *New Mexico. ex rel. Richardson v. BLM*, 565 F.3d 683, 703 (10th Cir. 2009) ("By focusing both agency and public attention on the environmental effects of proposed actions, NEPA facilitates informed decisionmaking by agencies and allows the political process to check

those decisions."). There can be no question here that the Conservation Groups and their

members are entitled to the information provided by full and complete NEPA analyses.

### ii.   The Rule Deprives the Conservation Groups of This Information.

The Rule deprives the Conservation Groups and their members of this information by

expressly exempting new categories of activities from NEPA review outright, including

specifically exempting projects where the triggers for NEPA compliance are federal loans and

loan guarantees, such as those financing the large, environmentally damaging industrial feedlots

and waste lagoons known CAFOs.  40 C.F.R. § 1508.1(q)(1)(vii) (2020).  These federal actions

will now be excluded from NEPA entirely, so the notice and evaluation that the Conservation

Groups and their members previously would have received under NEPA will be eliminated by

the new Rule.  Compl. ¶¶ 325, 363, 462, 483, 506, 643.  No further action is required for this

informational harm to take effect.

Likewise, the Rule eliminates crucial parts of the required analysis for many other

projects.  For example, the Rule removes the requirement that agencies consider the indirect and

cumulative effects of proposed actions, and specifically prohibits consideration of effects like

climate change which are "remote in time, geographically remote, or the product of a lengthy

causal chain."  40 C.F.R. § 1508.1(g)(2), (3) (2020); *see also* 85 Fed. Reg. 43,304, 43,343.  And

the Rule eliminates the requirement that agencies "rigorously explore and objectively" evaluate

"all" reasonable alternatives, 40 C.F.R. § 1502.14(a) (1978).  By eliminating these requirements

going forward—and even evaluations already underway—the Rule deprives the Conservation

Groups and their members of vital information about the environmental consequences of

proposed projects and reasonable, less damaging alternatives.  Compl. ¶¶ 129; 397; 583–84; 594;

615–19.  For example, Alabama Rivers Alliance faces the prospect of a blinkered NEPA process

that ignores the cumulative effects of relicensing seven dams in one of the most biologically diverse areas of the United States.  *E.g.*, Lowry Decl. ¶¶ 15, 21–25, Dkt. 30-4.

CEQ's attempt to label the harms set out in the Complaint as merely "speculative" is without merit.  Dkt. 53 at 34.  First, on a motion to dismiss, the Conservation Groups' allegations must be taken as true.  Second, as discussed above, CEQ ignores the Rule's exemption of some federal actions from NEPA entirely.  And third, there can be no doubt that the Rule reduces the scope of agency evaluations; as the D.C. Circuit explained in upholding standing to challenge another regulation that removed minimum requirements, "[i]t strains credulity . . . to suggest that the Secretary, in abandoning minimum standards, sought to encourage mining concerns to exceed the previous regulatory floors. . . . [T]he paramount impact of the 1983 deletions is to position Industry to do less rather than more . . . ."  *Hodel*, 839 F.2d at 708.  So too here: CEQ's deletions position agencies to do less evaluation rather than more.

Accordingly, this situation does not resemble *Beck v. McDonald*, cited by CEQ, in which the Fourth Circuit found plaintiffs had not shown a sufficiently imminent risk that their identities would be stolen years after a data breach at a hospital.  848 F.3d 262 (4th Cir. 2017).  There is no need to speculate here; on the contrary, agencies deprive the Conservation Groups of crucial information simply by following the weakened requirements of the Rule—in addition to the deprivation wrought by the Rule exempting federal actions from NEPA entirely.

### iii.   The Conservation Groups Are Harmed by the Loss of This Information.

By depriving the Conservation Groups of the information they rely on, the Rule impedes their ability to accomplish their missions.  *See Hodel*, 839 F.2d at 712 (finding informational injury where agency rule meant that an EIS would no longer be prepared for future approvals).  The Conservation Groups rely on the information and analysis disclosed under NEPA to evaluate and oversee agency actions, collaborate with decisionmakers, advocate for protections, inform

41

their members and the public, and evaluate the efficacy of projects and their impact to the environment, natural resources, communities, and wildlife and their habitats.[43]  Individual members also rely on this information.[44]  But under the Rule, much of this information and analysis will be withheld, depriving the Conservation Groups and their members of a critical tool they need to do their work.

Where organizations assert injury on their own behalf, "it is enough for Plaintiffs to plead that there is 'a substantial risk that the harm will occur,'" prompting them to reasonably "divert resources to counteract Defendants' actions," or to plead "that the challenged actions would frustrate Plaintiffs' missions."  *La Union del Pueblo Entero v. Ross*, 353 F. Supp. 3d 381, 391–92 (D. Md. 2018) (quoting *Beck v. McDonald*, 848 F.3d 262, 275 (4th Cir. 2017)).  As the Complaint and the Conservation Groups' numerous declarations set out, the Groups and their members are engaged in ongoing NEPA processes for important projects in their communities where the Rule eliminates crucial information and analysis, impeding their ability to advocate for less-damaging alternatives and educate the public about these projects.[45]

Indeed, CEQ's own cited case, *Friends of Animals v. Bernhardt* (Dkt. 53 at 35), upheld Friends of Animals' standing based on a reduced flow of information that impeded its

---

[43] For example, Haw Riverkeeper Emily Sutton engages frequently in permit reviews, for which "it is critical that I have access to all relevant information on proposed projects well in advance in order to engage the communities who would be impacted."  Sutton Decl. ¶ 10, Dkt. 30-43.

[44] For example, John Wolfe, a member of Plaintiff Cape Fear River Watch, is a boat captain and a journalist in Wilmington, NC.  He writes articles about environmental issues in the area, and he relies on information disclosed through the NEPA process to inform the public of upcoming projects and public comment opportunities.  *See* Wolfe Decl. ¶¶ 9, 20-21, Dkt. 30-27.

[45] For example, South Carolina Wildlife Federation has been participating in NEPA review for a proposed seawall in Charleston.  Under the Rule, the Corps is no longer required to consider all reasonable alternatives, including alternatives proposed by SCWF in public comments, or indirect and cumulative effects like climate change, flooding from sea level rise, drainage problems, and impacts to communities.  *See* Green Decl. ¶¶ 13-20, Dkt. 30-50, Gilbert Decl. ¶¶ 12-15, Dkt. 30-45.  *See, also, e.g.,* Compl. ¶¶ 49 (Wild Virginia), 105 (Upstate Forever), 150 (N.C. Wildlife Federation), 173 (National Trust for Historic Preservation), 288 (Congaree Riverkeeper), 330 (Clean Air Carolina), 373 (Cape Fear River Watch).

"organizational interest in educating the public."  961 F.3d 1197, 1208 (D.C. Cir. 2020).  The

information gaps created by the Rule impede the Conservation Groups' efforts to evaluate and

educate the public about environmentally significant projects.  Thus, this is no mere "setback to

the organization's abstract social interests," as CEQ tries to argue, citing *Nat'l Taxpayers Union,*

*Inc. v. United States*, 68 F.3d 1428, 1433 (D.C. Cir. 1995).  Instead, the Rule removes vital

information and analysis that the Conservation Groups use, placing this injury squarely within

the well-established type of standing recognized by the Supreme Court in *Havens Realty*.

By harming the Conservation Groups in this way, the Rule also forces them to divert their

limited resources in an attempt to recover at least some of the information previously provided

through NEPA.  Indeed, the Conservation Groups have already been forced to divert resources to

submit and pursue FOIA requests, for example.[46]  *See Friends of Animals*, 961 F.3d at 1208

(standing where group "expended additional resources to access the necessary information").

The loss of information and analysis under the Rule will also force the Conservation Groups to

take other measures such as conducting their own investigations and site surveys,[47] or hiring

experts to provide analysis that NEPA would have provided previously.[48]

The necessity to reallocate scarce resources in order to compensate for the tools taken

away by the Rule prevents the Conservation Groups from advancing other aspects of their

---

[46] Multiple Conservation Groups have filed FOIA requests seeking information that they would normally receive through the NEPA process.  *See e.g.* Mayfield Decl. ¶¶ 27-28, Dkt. 30-22; Burdette Decl. ¶ 25, Dkt. 30-47; Chiosso Decl. ¶ 23, Dkt. 30-40; Stangler Decl. ¶ 18, Dkt. 30-23; Hunt Decl. ¶¶ 24-25, Dkt. 30-34.

[47] "Wild Virginia is further concerned that learning about project impacts will require it to … devote resources to conduct surveys of proposed locations for potentially harmful activities."  Sligh Decl. ¶ 28, Dkt. 30-10; *see also* Mayfield Decl. ¶ 9, Dkt. 30-22.

[48] Multiple Conservation Groups are concerned about the financial blow of having to hire outside experts to meaningfully participate in the NEPA process under the Rule. *See, e.g.,* Sligh Decl. ¶ 27, Dkt. 30-10; Hutchinson Decl. ¶ 16, Dkt. 30-12; Chase Decl. ¶ 12, Dkt. 30-19; Gestwicki Decl. ¶ 21, Dkt. 30-20; Nieweg Decl. ¶ 10, Dkt. 30-38; Chiosso Decl. ¶ 23, Dkt. 30-40; Lambert Decl. ¶ 13, Dkt. 30-49; Stangler Decl. ¶ 7, Dkt. 30-23; Blotnick Decl. ¶ 32, Dkt. 30-33; Burdette Decl. ¶ 25, Dkt. 30-47; Lowry Decl. ¶ 25, Dkt. 30-4; Green Decl. ¶ 22, Dkt. 30-50; Young Decl. ¶¶ 23-24, Dkt. 30-16; Hunt Decl. ¶¶ 15, 23, Dkt. 30-34.

missions.  *See Havens Realty*, 455 U.S. at 379.  Where a defendant's practices have "perceptibly impaired" a plaintiff's ability to carry out its organizational mission, "there can be no question that the organization has suffered an injury in fact" which "constitutes far more than simply a setback to the organization's abstract social interests."  *Id*.  Accordingly, this injury in no way resembles the shift in activities to educate members about the effects of a new rule that a divided panel of the Fourth Circuit recently rejected for standing.  *CASA de Maryland v. Trump*, No. 19-2222, 2020 WL 4664820, at *9 (4th Cir. Aug. 5, 2020).  Unlike in that case, the Rule deprives the Conservation Groups of essential tools that they need in order to continue evaluating environmentally harmful projects and educating the public and decisionmakers about them.  This information and analysis cannot be obtained in other ways, or only at significant cost, seriously hindering their ability to carry out their missions.

III.     **The Court Has Jurisdiction to Enforce the APA Against CEQ's Defective Rulemaking.**

In a last-ditch effort to evade judicial review of the Rule, CEQ attempts to portray this case as a challenge to proceedings of other agencies that have not yet occurred, which would be outside the Court's jurisdiction.  Dkt. 53 at 36-38.  But as plainly stated in the Complaint and explained above, this action challenges CEQ's final agency action of issuing the Rule without complying with the well-established requirements of the APA.

Likewise, CEQ tries to suggest in its brief that the Court lacks jurisdiction to hear this case, Dkt. 53 at 36, or rule on the motion for preliminary injunction, *id.* at 38, but these suggestions have no support, as CEQ conceded at the August 24th status conference:

> THE COURT: All right. So are you suggesting that the Court lacks the ability to assess whether or not the CEQ complied with the APA in issuing these new rules?
>
> MR. CLARK: No, Your Honor.

Ex. 1 at 20.  CEQ's argument in its brief that the Court is being asked to exceed its jurisdiction by "intervene[ing] in ongoing agency proceedings," Dkt. 53 at 38, is meritless.

It is certainly the case that other federal agencies will be affected by the Rule, but as the Conservation Groups explained in support of their Motion for Preliminary Injunction or Stay, that simply means that the public interest favors preliminary relief from the Court, in order to avoid the chaos that would result from the Rule forcing other agencies to abandon the prior regulations' longstanding approach to NEPA evaluations before the Court hears the merits of the Conservation Groups' claims.  Dkt. 30-1 at 7, 100–04.  Again, though, both the Complaint and the Motion for Preliminary Injunction make clear that the Conservation Groups are in no way asking the Court to interfere in any other agencies' proceedings.  They simply seek a rulemaking from CEQ that complies with the APA.

CEQ also makes an irrelevant argument that the Court "cannot impose its views 'on which procedures are "best,"'" Dkt. 53 at 37 (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 102 (2015)).  But the Conservation Groups are asking only that the Court apply the requirements of the APA to CEQ's final agency action.  *Vermont Yankee*, where the Supreme Court rejected an argument that the APA "merely establishes lower procedural bounds," is inapposite.  *Vermont Yankee Nuclear Power Corp. v. Nat. Res. Def. Council, Inc.*, 435 U.S. 519, 545 (1978).  The APA itself authorizes this suit to enforce the statute's requirements for reasoned rulemaking and to prevent the numerous concrete and imminent harms the Conservation Groups and their members face if the Rule is allowed to go into effect.

## CONCLUSION

For the forgoing reasons, the Court should deny the Motions to Dismiss.

Respectfully submitted, September 2, 2020.

SOUTHERN ENVIRONMENTAL LAW CENTER

/s/ Kimberley Hunter
N.C. Bar No. 41333
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516
khunter@selcnc.org
919-967-1450

/s/ Sam Evans
N.C. Bar No. 44992
48 Patton Ave
Suite 304
Asheville, NC 28801-3321
sevans@selcnc.org
828-258-2023

/s/ Nicholas S. Torrey
N.C. Bar No. 43382
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516
ntorrey@selcnc.org
919-967-1450

/s/ Megan Kimball
N.C. Bar No. 53837
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516
mkimball@selcnc.org
919-967-1450

/s/ Kristin Davis
VA. Bar No. 85076
201 West Main St.
Suite 14
Charlottesville, VA 22902-5065
kdavis@selcva.org
434-977-4090

**CERTIFICATE OF SERVICE**

I hereby certify that on September 2, 2020, I electronically filed the foregoing with the

Clerk of Court using the CM/ECF System, which will automatically send e-mail notification of

such filing to all counsel of record.


<u>/s/     Kimberley Hunter          </u>