# IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF VIRGINIA

No. 3:20-cv-00045-JPJ-PMS

| | |
|---|---|
| WILD VIRGINIA, VIRGINIA WILDERNESS COMMITTEE, UPSTATE FOREVER, SOUTH CAROLINA WILDLIFE FEDERATION, NORTH CAROLINA WILDLIFE FEDERATION, NATIONAL TRUST FOR HISTORIC PRESERVATION, MOUNTAINTRUE, HAW RIVER ASSEMBLY, HIGHLANDERS FOR RESPONSIBLE DEVELOPMENT, DEFENDERS OF WILDLIFE, COWPASTURE RIVER PRESERVATION ASSOCIATION, CONGAREE RIVERKEEPER, THE CLINCH COALITION, CLEAN AIR CAROLINA, CAPE FEAR RIVER WATCH, ALLIANCE FOR THE SHENANDOAH VALLEY, and ALABAMA RIVERS ALLIANCE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Plaintiffs, | ) ) |
| v. | ) ) ) |
| COUNCIL ON ENVIRONMENTAL QUALITY and MARY NEUMAYR IN HER OFFICIAL CAPACITY AS CHAIR OF THE COUNCIL ON ENVIRONMENTAL QUALITY, | ) ) ) ) ) |
| Defendants, | ) ) |
| AMERICAN FARM BUREAU FEDERATION, AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN FOREST RESOURCE COUNCIL, AMERICAN PETROLEUM INSTITUTE, AMERICAN ROAD & TRANSPORTATION BUILDERS ASSOCIATION, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, FEDERAL FOREST RESOURCE COALITION, INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA, and NATIONAL CATTLEMEN'S BEEF ASSOCIATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendant-Intervenors. | ) |

**MEMORANDUM IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

## **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................................... 1

LEGAL BACKGROUND ......................................................................................... 2

FACTUAL BACKGROUND ..................................................................................... 4

    THE 1978 NEPA REGULATIONS ....................................................................... 4

    CEQ'S RULEMAKING PROCESS ...................................................................... 6

    THE FINAL RULE ................................................................................................ 8

STANDARD OF REVIEW ....................................................................................... 9

ARGUMENT ........................................................................................................... 10

    I.   THE RULE IS ARBITRARY AND CAPRICIOUS ....................................... 12

        A) CEQ Failed to Consider Relevant Factors ................................................. 12

            1)  CEQ did not Adequately Consider how the Rule will Harm Environmental Quality ................................................................................................... 13

            2)  CEQ did not Adequately Consider how the Rule will Harm Environmental Justice ...................................................................................................... 17

        B) CEQ's Reversal of Longstanding Policy Was Irrational and Contrary to the Evidence Before the Agency ................................................................... 20

        C) CEQ Failed to Consider Reliance Interests ................................................. 25

    II.  THE RULE IS INCONSISTENT WITH NEPA ........................................... 31

        A) The Rule is not Entitled to Deference ....................................................... 31

        B) The Rule Unlawfully Eliminates Important Effects from the Required Evaluation... 35

        C) The Rule Unlawfully Limits Alternatives that must be Evaluated ............................ 37

CONCLUSION .......................................................................................................... 40

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Ad Hoc Metals Coal. v. Whitman*,
    227 F. Supp. 2d 134 (D.D.C. 2002) ...................................................................7

*Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*,
    719 F. Supp. 2d 26, 31 (D.D.C. 2010) ...........................................................32

*Am. Wild Horse Pres. Campaign v. Perdue*,
    873 F.3d 914 (D.C. Cir. 2017) ........................................................................20

*Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*,
    524 F. Supp. 2d 642 (D. Md. 2007) ................................................................39

*Bar MK Ranches v. Yuetter*,
    994 F.2d 735 (10th Cir. 1993) ..........................................................................7

*Burlington Truck Lines, Inc. v. United States*,
    371 U.S. 156 (1962) ........................................................................................10

*Calvert Cliffs' Coordinating Comm., Inc. v. U. S. Atomic Energy Comm'n*,
    449 F.2d 1109 (D.C. Cir. 1971) .....................................................3, 33, 34, 37

*Carlson v. Postal Regulatory Comm'n*,
    938 F.3d 337 (D.C. Cir. 2019) ........................................................................17

*Celotex Corp. v. Catrett*,
    477 U.S. 317 (1986) ..........................................................................................9

*Chevron, U.S.A., Inc. v. Natural Res. Def. Council*,
    467 U.S. 837 (1984) ...................................................................................32, 33

*Ctr. for Biological Diversity v. U.S. Dep't of Interior*,
    563 F.3d 466, 484 (D.C. Cir. 2009) ...............................................................34

*Defenders of Wildlife v. N.C. Dep't of Transp.*,
    762 F.3d 374 (4th Cir. 2014) ............................................................................6

*Dellinger v. Clarke*,
    172 F. Supp. 3d 898 (W.D. Va. 2016) ..............................................................9

*Dep't of Commerce v. New York*,
    139 S. Ct. 2551 (2019) ...............................................................................3, 20

*Dep't of Homeland Sec. v. Regents of the Univ. of Calif.*,
    140 S. Ct. 1891 (2020) ............................................................................ *passim*

*Dep't of Transp. v. Pub. Citizen*,
   541 U.S. 752 (2004) ............................................................................................3

*Encino Motorcars, LLC v. Navarro*,
   136 S. Ct. 2117 (2016) ................................................................................ *passim*

*Envtl. Def. Fund, Inc. v. Corps of Engineers of U.S. Army*,
   492 F.2d 1123 (5th Cir. 1974) ....................................................................39, 40

*FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009) ..........................................................................10, 12, 25, 31

*Food & Water Watch v. U.S. Dep't of Agric.*,
   325 F. Supp. 3d 39 (D.D.C. 2018) ....................................................................28

*Franklin v. Mass.*,
   505 U.S. 788, 796 (1992) ....................................................................................2

*Gerber v. Norton*,
   294 F.3d 173 (D.C. Cir. 2002) ..........................................................................13

*Getty v. Fed. Savs. & Loan Ins. Corp.*,
   805 F.2d 1050 (D.C. Cir. 1986) ..............................................................13, 17, 20

*Gresham v. Azar*,
   950 F.3d 93 (D.C. Cir. 2020) ............................................................................20

*Hanly v. Kleindienst*,
   471 F.2d 823 (2d Cir. 1972) ..............................................................................37

*Heartwood v. U.S. Forest Serv.*,
   73 F. Supp. 2d 962 (S.D. Ill. 1999), *aff'd*, 230 F.3d 947 (7th Cir. 2000) ................14

*Hughes River Watershed Conservancy v. Glickman*,
   81 F.3d 437 (4th Cir. 1996) ................................................................................6

*Int'l Ladies' Garment Workers' Union v. Donovan*,
   722 F.2d 795 (D.C. Cir. 1983) ..........................................................................30

*Kleppe v. Sierra Club*,
   427 U.S. 390 (1976) ..................................................................................3, 4, 37

*Lindeen v. SEC*,
   825 F.3d 646 (D.C. Cir. 2016) ..........................................................................13

*Lujan v. Defenders of Wildlife*,
   504 U.S. 555 (1992) ..........................................................................................11

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 29 (1983) ................................................................................... *passim*

*N.C. Growers' Ass'n v. United Farm Workers*,
  702 F.3d 755 (4th Cir. 2012) ................................................................................... 2

*Nat'l Audubon Soc'y v. Dept' of the Navy*,
  422 F.3d 174 (4th Cir. 2005) ................................................................................... 6

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
  545 U.S. 967 (2005) ................................................................................... 32

*Natural Res. Def. Council v. Callaway*,
  524 F.2d 79 (2d Cir. 1975) ................................................................................... 36, 37, 39

*Natural Res. Def. Council v. Morton*,
  458 F.2d 827 (D.C. Cir. 1972) ................................................................................... 39, 40

*New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*,
  565 F.3d 683 (10th Cir. 2009) ................................................................................... 3

*Organized Vill. of Kake v. U.S. Dep't. of Agric.*,
  795 F.3d 956 (9th Cir. 2015) ................................................................................... 10

*Res. Ltd., Inc. v. Robertson*,
  35 F.3d 1300 (9th Cir. 1994) ................................................................................... 39

*Roanoke River Basin Ass'n v. Hudson*,
  940 F.2d 58 (4th Cir. 1991) ................................................................................... 6

*Robertson v. Methow Valley Citizens Council*,
  490 U.S. 332 (1989) ................................................................................... 4, 33, 34

*SEC v. Chenery Corp.*,
  318 U.S. 80 (1943) ................................................................................... 2

*Sierra Club v. U.S. Dep't of the Interior*,
  899 F.3d 260 (4th Cir. 2018) ................................................................................... 17

*Thompson v. U.S. Dep't of Labor*,
  885 F.2d 551 (9th Cir. 1989) ................................................................................... 10

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
  933 F.3d 728 (D.C. Cir. 2019) ................................................................................... 14

*United States v. Home Concrete & Supply, LLC*,
  566 U.S. 478 (2012) ................................................................................... 33

*Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.,*
    435 U.S. 519 (1978) ................................................................38

*Webster v. U.S. Dep't of Agric.,*
    685 F.3d 411 (4th Cir. 2012) ..........................................6, 39

*White Tail Park, Inc. v. Stroube,*
    413 F.3d 451 (4th Cir. 2005) ...............................................11

**Federal Statutes**

5 U.S.C. § 706 ...........................................................................10

5 U.S.C. § 706(2)(A) ............................................3, 10, 14, 31

23 U.S.C. § 139(g)(2)(A) ........................................................22

42 U.S.C. § 4331(b) ...................................................................3

42 U.S.C. § 4331(C) .................................................................18

42 U.S.C. § 4332 ............................................................ *passim*

42 U.S.C. § 4332(2)(C) ................................................... *passim*

42 U.S.C. § 4332(2)(C)(iii) ................................................4, 39

42 U.S.C. § 4332(2)(E) ...............................................4, 38, 39, 40

42 U.S.C. § 4332(2)(F) .........................................................4, 36

42 U.S.C. § 4344(4) ...................................................................5

42 U.S.C. §§ 4370m to 4370m-12 .........................................30

**Federal and State Regulations**

36 C.F.R. Part 220 ...................................................................26

40 C.F.R. § 1500 et seq ..................................................... *passim*

1 N.C. Admin. Code 25.0402 .................................................29

**Other Authorities**

115 Cong. Rec. 40416 (1969) ...............................................3, 4

36 Fed. Reg. 7,724, 7,725 (Apr. 23, 1971) ...........................37

85 Fed. Reg. 43,304 (July 16, 2020) ................................................................1

85 Fed. Reg. 73,620 (Nov. 19, 2020) ..............................................................11

Exec. Order No. 11,991, 42 Fed. Reg. 26,967 (May 25, 1977) ........................5

Exec. Order No. 12898, 59 Fed. Reg. 7,629 (Feb. 11, 1994) .........................18

Fed. R. Civ. P. 56(a) .........................................................................................9

S. Rep. No. 91-296 (1969) ................................................................................3

## **TABLE OF ACRONYMS**

| Acronym | Definition |
|---------|------------|
| ANPRM | Advance Notice of Proposed Rulemaking |
| APA | Administrative Procedure Act |
| AR | Administrative Record |
| BLM | Bureau of Land Management |
| CAFOs | Concentrated Animal Feeding Operations |
| CE | Categorical Exclusion |
| CEQ | Council on Environmental Quality |
| DACA | Deferred Action for Childhood Arrivals |
| EA | Environmental Assessment |
| EIS | Environmental Impact Statement |
| FONSI | Finding of No Significant Impact |
| NEPA | National Environmental Policy Act |

Pursuant to Fed. R. Civ. P. 56, Plaintiffs ("Conservation Groups") move for summary judgment in this challenge to the Council on Environmental Quality's ("CEQ") Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act, 85 Fed. Reg. 43,304 (July 16, 2020) (the "Rule").  The Conservation Groups respectfully request the Court vacate and set aside the Rule and reinstate the prior regulations.

## INTRODUCTION

Administrations come and go, each with different priorities, but while political tides may turn quickly, the United States has long recognized the importance of stable governance.  Thus, when a new administration wants to change the law, it must follow the rules.  The Administrative Procedure Act ("APA") establishes that to reverse a regulatory scheme, an agency must engage in a thoughtful, open, and receptive process.  The agency must take a hard look at the impacts of its policy reversal and must provide a reasoned justification that takes account both positive and negative effects of the change, including weighing the interests of those who have relied on the prior policy.  As Chief Justice Roberts recently explained in striking down a different policy reversal that failed to comply with these requirements, "the Government should turn square corners in dealing with the people."  *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1909 (2020) (internal quotation marks and citation omitted).

In this case, CEQ simply failed to follow the rules.  The Trump Administration took a sledgehammer to forty years of well-established, stable regulation implementing the National Environmental Policy Act ("NEPA").  Having won an election, the Administration was entitled to emphasize different policy priorities.  But it was not entitled to disregard the law.  Despite the clear strictures of the APA, CEQ implemented sixty-six full pages of redline edits without considering and disclosing the implications of the changes, offering a coherent justification for

the policy reversal, weighing reliance on prior regulations, or following the controlling statutory text.  This Court has a responsibility to preserve the system of stable regulation our country relies upon and place a check on arbitrary and capricious agency action by vacating the illegal Rule.

## LEGAL BACKGROUND

### The Administrative Procedure Act

Congress enacted the APA in 1946 to prevent "the abuse of administrative power."[1] Congress recognized a new administration may reverse a longstanding prior policy—but required that to do so, an agency must consider how the changes will impact people in the real world, disclose the good and the bad consequences of the changes, and justify its decisions based on the administrative record.  "If Congress established a presumption from which judicial review [of agency rulemaking] should start, that presumption . . . is . . . *against* changes in current policy that are not justified by the rulemaking record."  *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 42 (1983) (emphasis in original).

The APA "sets forth the procedures by which federal agencies are accountable to the public and their actions subject to review by the courts."  *Regents*, 140 S. Ct. at 1905 (quoting *Franklin v. Mass.*, 505 U.S. 788, 796 (1992)).  Agencies must accept and respond to public comments.  *See N.C. Growers' Ass'n v. United Farm Workers*, 702 F.3d 755, 769 (4th Cir. 2012).  In revising regulations agencies must rely on factors Congress intended; consider all important aspects of the issue; and support rulemaking by evidence.  *See State Farm,* 463 U.S. at 43.  Agencies must clearly state the rationale for a rulemaking in the administrative record.  *Id.*; *SEC v. Chenery Corp.*, 318 U.S. 80, 87–88, 92–95 (1943).  The rationale must be genuine: an agency cannot rely on a pretextual explanation in order to avoid legal or political accountability

---

[1] Roni A. Elias, *The Legislative History of the Administrative Procedure Act*, 27 Fordham Envtl. L. Rev. 207, 207-208 (2016).

for its actions.  *See Dep't of Commerce v. New York*, 139 S. Ct. 2551, 2575-76 (2019).

Moreover, an agency reversing policy must take into account the "serious reliance interests"

engendered by its prior position.  *See Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2126

(2016).  And it must consider alternative options "within the ambit of the existing policy[.]"

*Regents*, 140 S. Ct. at 1913.  Finally, the regulation must be "in accordance with law," including

the governing statute being implemented.  5 U.S.C. § 706(2)(A).

### The National Environmental Policy Act

NEPA, enacted in 1969, "takes the major step of requiring all federal agencies to consider

values of environmental preservation in their spheres of activity, and it prescribes certain

procedural measures to ensure that those values are in fact fully respected."  *Calvert Cliffs'*

*Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1111 (D.C. Cir.

1971).  NEPA's Section 101 sets out broad environmental policy goals, 42 U.S.C. § 4331(b), and

Congress gave effect to these goals through what it termed the "action-forcing" procedural

requirements of Section 102, *id.* § 4332(2)(C).  *See Kleppe v. Sierra Club*, 427 U.S. 390, 409,

n.18 (1976) (citing S. Rep. No. 91-296, at 9 (1969)); 115 Cong. Rec. 40,416, 40,419 (1969)).

NEPA has twin aims: informing decision-makers, and informing the public to stimulate

participation and ensure agency accountability.  *See Dep't of Transp. v. Pub. Citizen*, 541 U.S.

752, 768 (2004) (describing NEPA as intended to "provid[e] a springboard for public comment"

(alteration in original)); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683,

703 (10th Cir. 2009) ("By focusing both agency and public attention on the environmental

effects of proposed actions, NEPA facilitates informed decisionmaking by agencies and allows

the political process to check those decisions.").

Accordingly, NEPA's procedural requirements mandate that "to the fullest extent

possible . . . (2) all agencies of the Federal Government shall . . . (C) [prepare] a detailed statement by the responsible official on (i) the environmental impact of the proposed action, (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented, [and] (iii) alternatives to the proposed action," 42 U.S.C. § 4332.  Agencies must also, among other requirements, "study, develop, and describe appropriate alternatives to recommended courses of action in any proposal which involves unresolved conflicts concerning alternative uses of available resources," obtain input from any other federal agency "which has jurisdiction by law or special expertise with respect to any environmental impact involved," and "recognize the worldwide and long-range character of environmental problems" in their evaluation of a proposed action.  *Id.* §§ 4332(2)(C), (E), (F).

With these procedures, the statute requires "all agencies to assure consideration of the environmental impact of their actions in decisionmaking."  Conference Report on NEPA, 115 Cong. Rec. 40,416 (1969), *quoted in Kleppe*, 427 U.S. at 409.  NEPA also requires agencies to consider the alternative solutions to the need they intend to meet.  42 U.S.C. § 4332(2)(C)(iii). To ensure transparency and accountability, agencies must "provide for broad dissemination of relevant environmental information" to the public and other decisionmakers.  *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989).  NEPA does not compel particular substantive results but its "procedures are almost certain to affect the agency's substantive decision."  *Id*.

## FACTUAL BACKGROUND[2]

### THE 1978 NEPA REGULATIONS

NEPA established CEQ as an agency within the Executive Office of the President, with the duty to "develop . . . national policies to foster and promote the improvement of

---

[2] Citations to the administrative record (the "record") will be referenced as "AR [page number]."

environmental quality to meet the conservation, social, economic, health, and other requirements and goals of the Nation." 42 U.S.C. § 4344(4).  CEQ was made responsible for promulgating NEPA regulations by Executive Order 11,991, *see* 42 Fed. Reg. 26,967 (May 25, 1977), and in 1978 promulgated regulations that established general requirements for all agency NEPA evaluations and procedures.  *See* 40 C.F.R. § 1507.3(b) (1978).  Agencies were free to adopt "supplement[al]" procedures as needed "to ensure full compliance with the purposes and provisions of [NEPA]," but CEQ's regulations provided the underlying requirements that ensure the NEPA process is consistent across all federal agencies.  *Id.* § 1507.3 (1978) (requiring that other agencies' procedures "comply with" CEQ's regulations).

CEQ's 1978 regulations established a tiered approach to environmental review that varies depending upon the significance of expected environmental impacts.  If an action is likely to have significant impacts, a more in-depth Environmental Impact Statement ("EIS") is prepared to meet NEPA's "detailed statement" requirement.  40 C.F.R. § 1502 (1978).  At the other end of the spectrum, actions that do not individually or cumulatively have a significant effect can be authorized using a Categorical Exclusion ("CE"), with only cursory review to determine whether extraordinary circumstances require additional review.  *Id.* § 1508.4 (1978).  If an action is not categorically excluded but there is uncertainty about the significance of impacts, agencies prepare an Environmental Assessment ("EA"), which results in either a decision to prepare an EIS (if effects are potentially significant) or a Finding of No Significant Impact ("FONSI").  *Id.* § 1508.9 (1978).  Often, an agency will commit to measures that avoid or mitigate impacts to justify a FONSI and avoid an EIS.  The requirements for EAs are less stringent, but EAs still preserve the heart of the environmental analysis—the public comparison of alternatives.

CEQ reaffirmed the 1978 regulations repeatedly throughout their forty years of implementation.  Prior to the rulemaking at issue in this case, CEQ had made only one minor substantive amendment to a single regulation and noted at that time that the 1978 regulations were "working well."  AR 5998.  In 1997, CEQ reviewed twenty-five years' worth of experience and again "[o]verall . . . found . . . that NEPA is a success."  AR 5847.

Federal courts have built large body of case law around the 1978 regulations.  This extensive body of law provides clarity through numerous examples, such as defining the threshold for when a federal action significantly affects the environment and thus requires an environmental impact statement, *e.g.*, *Roanoke River Basin Ass'n v. Hudson*, 940 F.2d 58, 62-65 (4th Cir. 1991), the responsibility to address cumulative impacts, *e.g.*, *Nat'l Audubon Soc'y v. Dept' of the Navy*, 422 F.3d 174, 197 (4th Cir. 2005), the segmentation of larger actions into smaller, seemingly insignificant ones, *e.g.*, *Defenders of Wildlife v. N.C. Dep't of Transp.*, 762 F.3d 374, 396–98 (4th Cir. 2014), how to consider alternatives, *e.g.*, *Webster v. U.S. Dep't of Agric.*, 685 F.3d 411, 427 (4th Cir. 2012), and when to prepare a supplemental analysis, *e.g.*, *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437, 443 (4th Cir. 1996).  With so many cases illustrating the application of the statute to both routine and unusual circumstances, few NEPA questions have been left unanswered, or without some form of guidance.

### CEQ'S RULEMAKING PROCESS

On June 20, 2018, forty years after CEQ initially promulgated NEPA regulations, the agency, under leadership of a new administration, issued an Advance Notice of Proposed Rulemaking ("ANPRM"), signaling its intent to rewrite the NEPA regulations.  *See* AR 4417.  The ANPRM consisted of twenty broad questions.  *Id.*  After a brief window for public comment, CEQ received more than 12,500 comments—the majority of which supported leaving the existing regulations largely intact.  *See* AR 3204.

On January 10, 2020, CEQ issued a Notice of Proposed Rulemaking ("Proposed Rule") for the new NEPA regulations.  *See* AR 3197.  In it, CEQ summarily addressed comments to the ANPRM, asserting that the proposed changes were responsive to comments requesting changes to the regulations while ignoring comments that had opposed the changes.  *E.g.*, AR 3206 ("These proposed revisions are supported by many comments submitted in response to the ANPRM requesting revisions to promote more efficient and timely reviews under NEPA.").

Despite its breadth and scope—sixty–six full pages of redline edits altering almost every provision—CEQ allowed the public only sixty days to comment on the Proposed Rule and refused requests for additional time from the public, *see, e.g.*, AR 908365, 907902, states, *see, e.g.*, AR 1341085, and members of Congress, *see* AR 907868.  Despite requests for more, CEQ held only two public hearings regarding the Proposed Rule, registration for which filled within minutes.  CEQ received more than 1.4 million comments from a wide array of stakeholders.

On July 16, 2020, only four months after the close of the public comment period, CEQ published the Final Rule, which took effect on September 14, 2020.  *See* AR 1.  The sparse record contains fewer than fifty documents from the rulemaking period, other than external comments.[3]  CEQ held just thirteen meetings total and included few notes from each in the record.  *See* AR 1618, 1627, 1631, 1644, 2270, 2271, 2313, 2314, 2315, 2326, 2327, 2347, 3092.  There is no record evidence that CEQ considered or incorporated evidence submitted to them.  CEQ conducted no fact finding about how the Rule might impact matters on the ground.  It gave no consideration to the efficacy of streamlining programs already in process.  CEQ did not consult with concerned states or other parties that rely on NEPA.  CEQ did not investigate issues

---

[3] An administrative record must contain "all documents and materials directly or indirectly considered by the agency" in the decisionmaking process. *Bar MK Ranches v. Yuetter*, 994 F.2d 735, 739 (10th Cir. 1993); *see also Ad Hoc Metals Coal. v. Whitman*, 227 F. Supp. 2d 134, 139 (D.D.C. 2002) (Administrative record must include documents "referred to, considered by, or used by [an agency] before it issued its final rule").

and concerns raised during the public comment period.  CEQ entirely disregarded experts with decades of NEPA experience.  *See, e.g.*, AR 991535, 852926, 1089089, 852940, 1358859, 1045936, 845485, 1022402.

### THE FINAL RULE

The Final Rule is largely identical to the Proposed Rule.  Altogether, at least twenty three of the 1978 regulations' definitions were rewritten or deleted, and CEQ's redlined changes reflect that almost no provision of the 1978 regulations went untouched.  *See* AR 129.  As Secretary of the Interior David Bernhardt noted in his remarks on the Proposed Rule, "[the] proposal affects virtually every significant decision made by the federal government that affects the environment.  And . . . will be the most significant deregulatory proposal [the Trump Administration] ultimately implement[s]."  AR 960798.  Trump Administration cabinet members described the Rule as "historic action to remove . . . regulations plaguing the energy industry" that will "get government bureaucracy out of the way" and "unleash Americans from overly burdensome regulations."  AR 126-27.

Among the most dramatic changes is the severe narrowing of when NEPA will even apply.  The Rule exempts broad categories of activities from NEPA review altogether.  *See* AR 876 ("[C]ertain federal activities [will] no longer be[] subject to NEPA.").  In addition, the Rule deletes the "intensity factors" that for decades have ensured detailed review of projects impacting specific resources, and replaced them with a separate, new test.  *Compare* 40 C.F.R. § 1508.27 (1978), *with* 40 C.F.R. §§ 1501.3 (2020) (setting forth new standard), 1508.1 (deleting the definition of "significantly," which contained the previous intensity factors).

Other provisions significantly scale back environmental review where NEPA still applies, eliminating requirements to consider and disclose indirect and cumulative environmental effects, as well as dramatically weakening the requirements for evaluating alternatives.  *See* 40 C.F.R. §

1508.1(g)(3) (2020) (removing requirement that agencies consider indirect and cumulative effects); *id.* § 1502.14 (eliminating the requirements that agencies "rigorously explore and objectively" evaluate "all" reasonable alternatives, and eliminating the 1978 requirements to "sharply defin[e] the issues and provid[e] a clear basis for choice among options by the decisionmaker and the public," 40 C.F.R. § 1502.14 (1978), "devote substantial treatment to" each alternative considered, *id.* § 1502.14(b), and "include reasonable alternatives not within the jurisdiction of the lead agency," *id.* § 1502.14(c)); *see also id.* § 1502.23 (limiting scientific review to "existing data and resources").

The Rule controls the NEPA procedures of all federal agencies: "Where existing agency NEPA procedures are inconsistent with the regulations in this subchapter, the regulations in this subchapter shall apply[.]" 40 C.F.R. § 1507.3(a)(2020). Thus, every federal agency's NEPA procedures are required to conform to the Rule from now onwards, and, within one year, agencies also must rewrite their own regulations to match the Rule. Except in narrow circumstances, "agency NEPA procedures shall not impose additional procedures or requirements beyond those set forth in the regulations in this subchapter[.]" *Id.* § 1507.3(b). The Rule expressly allows for agencies to apply it to projects that were in progress before the Rule went into effect. *Id.* § 1506.13.

## **STANDARD OF REVIEW**

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). At summary judgment "a court must view the record as a whole and draw all reasonable inferences in the light most favorable to the nonmoving party." *Dellinger v. Clarke*, 172 F. Supp. 3d 898, 902 (W.D. Va. 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24 (1986)).

The APA requires agency actions to be set aside if they are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  5 U.S.C. § 706(2)(A).  An agency action is arbitrary and capricious where the agency: (1) has relied on factors which Congress has not intended it to consider; (2) failed to consider all important aspects of the problem; (3) offered an explanation for its decision that runs counter to the evidence before the agency; or (4) is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.  *See State Farm,* 463 U.S. at 43.  The regulation must also be permissible under the governing statute.  *See FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009).

A court reviews agency rulemakings under the APA based on the "whole record."  5 U.S.C. § 706.  The "whole record" includes everything that was before the agency pertaining to the merits of its decision.  *Thompson v. U.S. Dep't of Labor*, 885 F.2d 551, 555–56 (9th Cir. 1989).  Agencies may not ignore or countermand their earlier factual findings without a reasoned explanation, "even when reversing a policy after an election."  *Organized Vill. of Kake v. U.S. Dep't. of Agric.*, 795 F.3d 956, 968 (9th Cir. 2015); *see also Fox TV*, 556 U.S. at 537.  And the Court cannot accept the post hoc rationalizations of counsel.  *See State Farm*, 463 U.S. at 50; *Burlington Truck Lines, Inc. v. United States*, 371 U.S. 156, 168-69 (1962).

## **ARGUMENT**

CEQ violated the APA by failing to assess the impact of its policy reversal on the environment, justify its drastic changes based on the administrative record ("record"), weigh the interests of those who rely on a full NEPA evaluation of important projects in their communities, and consider less harmful alternatives to its rulemaking.  These failures all violate the standards set out by the Supreme Court in *State Farm*, and later associated cases.  Separately, CEQ

violated the APA because its Rule is inconsistent with the statutory requirements of NEPA and does not warrant deference. *Encino Motorcars*, 136 S. Ct. at 2125.

As has been briefed already, the Conservation Groups have standing to bring this suit to prevent concrete harms to their members and to their own interests. *See* Dkt. 77 at 20-44; *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). The Conservation Groups' members will be imminently injured because the Rule reverses longstanding protective policies that have protected their concrete interests. *See* Dkt. 77 at 21-36, 38-44; Dkt. 30-3 to 30-53 (declarations). And the Conservation Groups themselves are immediately harmed because the Rule impairs their rights to valuable information and participation, forcing them to divert their limited resources to mitigate these effects. *See* Dkt. 77 at 36-44; *White Tail Park, Inc. v. Stroube*, 413 F.3d 451, 458-59 (4th Cir. 2005) (applying *Lujan* to direct organizational standing). An order vacating the Rule would redress these injuries. The action is also ripe for review. This Court already denied CEQ's motion to dismiss on these points. *See* Dkt. 98; *see also* Dkt. 77.

Further confirming this Court's Article III jurisdiction, agencies have begun applying the Rule, directly affecting the Conservation Groups. For example, as detailed in a declaration from plaintiff Defenders of Wildlife, the Bureau of Land Management ("BLM") recently announced that it would apply the Rule to an application for seismic testing in the Arctic National Wildlife Refuge. *See* Exhibit 1. Notably, despite representations from counsel for CEQ during oral argument before this Court that the Rule is just "rules about rules," and that agency-specific regulations would have to be promulgated before the new Rule was applied, *see* Tr. 28, 33, 36-38, Dkt. 89-1, BLM has stated its intent to proceed under the new Rule before promulgating its own agency-specific regulations. *See* Exhibit 2. In addition, the U.S. Forest Service just published NEPA regulations grounded on the new Rule. 85 Fed. Reg. 73,620 (Nov. 19, 2020).

**I.      THE RULE IS ARBITRARY AND CAPRICIOUS**

The APA required CEQ to weigh the consequences of eliminating key provisions of the 1978 regulations, including the express requirement to analyze indirect and cumulative impacts, consider all reasonable alternatives, and ensure full public participation.  *Fox TV*, 556 U.S. at 514-15 (to support a policy change, agency must acknowledge the change and provide "good reasons" for it).  Instead, CEQ avoided accounting for the drastic changes in the Rule by refusing to acknowledge the changes it made by dismissing the public's concerns without examination.

The published administrative record illustrates the arbitrary nature of the rulemaking. The Rule overturns over forty years of stable policy, runs to sixty-six pages of redline edits, and alters almost every provision of the 1978 regulations.  Yet CEQ's record includes fewer than fifty documents showing any agency deliberation during the rulemaking period.  By contrast, the record reflects that the Rule prompted over 1.4 million public comments.  But there is no evidence in the record that CEQ considered the submitted information, the input of experts, or real world experience.  And indeed, the final Rule published after the landslide of public input remained barely changed from the original proposal.  The record confirms CEQ failed to consider the substantive comments and supporting evidence submitted, failed to pursue any fact-finding to consider the impact of the Rule, and failed to thoughtfully review impacts to interests that had long relied on the prior regulations.  No post hoc rationalizations can change that reality.

CEQ's failure to consider the impact of reversing key elements of the 1978 regulations violated the APA in multiple ways: it did not consider relevant factors, it failed to provide a reasoned, evidence-based justification for the reversal, and it did not address reliance interests.

**A)  CEQ Failed to Consider Relevant Factors**

Agency action is arbitrary and capricious if the agency "fail[s] to consider an important aspect of the problem" before it.  *State Farm*, 463 U.S. at 43.  "Merely referencing a requirement

is not the same as complying with that requirement.  And stating that a factor was considered—or found—is not a substitute for considering or finding it."  *Gerber v. Norton*, 294 F.3d 173, 185 (D.C. Cir. 2002) (internal citations omitted).  An agency must provide more than "conclusory statements" to demonstrate it "consider[ed] the [relevant] priorities."  *Getty v. Fed. Savs. & Loan Ins. Corp.*, 805 F.2d 1050, 1057 (D.C. Cir. 1986).  Relevant factors include any "factor the agency must consider under its organic statute."  *Lindeen v. SEC*, 825 F.3d 646, 657 (D.C. Cir. 2016) (quotation marks omitted).

Among other factors, NEPA instructs CEQ to consider environmental quality and environmental justice.  CEQ's anemic record demonstrates that it did not consider these factors. In briefing on the Conservation Groups' preliminary injunction, CEQ admitted that it did not consider information on these important factors submitted by the Conservation Groups and others.  Dkt. 75 at 51.  The rulemaking was arbitrary and capricious.

### 1) CEQ did not Adequately Consider how the Rule will Harm Environmental Quality

CEQ takes the remarkable position that drastically curtailing the regulations implementing our nation's bedrock environmental law across the entire federal government will result in no impact whatsoever to environmental quality.  *See* AR 277, 298.  Hundreds of thousands of comments disagreed, noting how limitations on environmental review, elimination of mandatory procedures, disregard of science, and diminution of public involvement would all lead to significant on-the-ground environmental consequences.  *See, e.g.*, AR 908433-82, 1100903-1039, 1117675-81, 1045585-98.  However, CEQ conducted no analysis of the potential environmental impacts and greeted all concerns with conclusory, non-responsive answers.

The only semblance of anything approaching an analysis of the Rule's environmental impact is in CEQ's thirty-two-page Regulatory Impact Analysis.  *See generally* AR 867-98.  In a

rational rulemaking, this analysis would evaluate the effects of CEQ's reversal of the 1978 regulations. Yet CEQ did not consider the four-decade regulatory status quo as the baseline for evaluating the environmental effects of the new Rule. Instead, to consider the impact of the new Rule, CEQ used as a baseline the "statutory requirements of NEPA and Supreme Court case law," AR 876, and its "analysis" simply assumed the prior regulations had no benefits. For example, CEQ stated that eliminating the 1978 requirement to consider "all reasonable alternatives" would have no impact "since analysis of *infeasible* alternatives is unlikely to improve environmental outcomes." AR 898 (emphasis added). In short, CEQ ignored four decades of on-the-ground results under the prior regulations.

By neglecting to consider how the rulemaking would affect environmental protection, CEQ failed to consider a relevant factor and violated the APA. *See* 5 U.S.C. § 706(2)(A), *State Farm*, 463 U.S. at 43. There is no dispute that the public's interest in environmental protection "must be considered as the underlying purpose" for procedural regulations promulgated under NEPA. *Heartwood v. U.S. Forest Serv.*, 73 F. Supp. 2d 962, 979 (S.D. Ill. 1999), *aff'd*, 230 F.3d 947 (7th Cir. 2000). And there is no dispute that CEQ was obligated to "adequately address the harms of deregulation or justify its portrayal of those harms as negligible" with regard to environmental protection. *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728, 740 (D.C. Cir. 2019).

Commenters raised highly specific concerns about the Rule's impact on environmental protection, supported by real-world examples illustrating the ways in which the 1978 regulations have worked to protect the environment for more than four decades.

For instance, commenters noted that without full disclosure of the environmental effects of proposals under NEPA—which allows communities to weigh in on decisions early—offshore

14

oil drilling may begin off the Southeastern coast, causing "harms to birds, fish, and marine mammals and their habitats, increased erosion and flood hazards, worsened saltwater intrusion" and more. AR 908375. Commenters noted that eliminating NEPA review for a variety of types of federal projects, like Concentrated Animal Feeding Operations ("CAFOs"), would result in less oversight and increased degradation to air and water quality. *See, e.g.*, AR 908470-75, 938066-70, 1082191-96. Commenters explained that limiting the types of alternatives that must be considered by federal agencies will mean those agencies miss options that cause significantly less damage to sensitive resources—like the alternative traffic calming measures that local citizens proposed to improve Route 50 in Virginia, saving the area from a more aggressive option that would have damaged the delicate ecosystems in the foothills of the Blue Ridge Mountains. *See* AR 908379.

Commenters noted that eliminating the requirement to consider the indirect and cumulative effects of a project is likely to lead to significant harms when those impacts are ignored in the decisionmaking process. For example, the impact of a terminal groin at Sea Island, Georgia cannot be properly understood without considering how sand and erosion patterns will interact with impacts from a nearby groin, and thus the planning process will fail to assess the true impact on turtles, shorebirds and their habitat. *See* AR 908401. Failure to consider the combined effects of multiple dam re-licensings on the Coosa River will mean that agencies will not consider the combined effects of the dams on fish passageways and dissolved oxygen levels, thus disregarding the true impact on the river's 147 fish species and large diversity of freshwater mollusks. *See* AR 908392. And, as thousands of commenters noted, the same changes will result in agencies no longer considering how projects contribute to climate change. *See, e.g.*, AR 1100961-1005, 854297-99, 1040435, 907600-601, 1040439, 0104084-85,

1081566-76, 1045585-98, 938051, 999175, 855024, 855030, 1038660-68, 1117676-78, 1117681.  The Conservation Groups provided CEQ with an appendix of thirty-six scientific studies showing the import of indirect and cumulative effects and detailing how review of these impacts helps to improve environmental outcomes.  *See* AR 862718-22, 862391-636, 866306-513, 866814-7016.

CEQ dismissed these concerns and supporting examples without analysis, stating the impact the Rule would have on on-the-ground outcomes would depend on projects' "particular factual records" and that "it is not possible to know whether a specific EIS would be analyzed differently under the final rule."  AR 736, 746.  In other words, CEQ frankly admits it failed to do the work legally required by the APA.  CEQ cannot excuse its failure simply because Commenters supported their concerns with facts.  CEQ could not understand how the Rule will affect environmental protection without considering how the Rule will impact projects on the ground.  Real-world examples with "particular factual records" gave CEQ the opportunity to make this inquiry.  CEQ's failure to investigate the impacts of its Rule, despite having an extensive factual documentation at its disposal, is arbitrary and capricious.

CEQ also illegally disregarded a mountain of evidence that shows how existing NEPA procedures have produced measurable environmental improvements in the aggregate.  A group of law professors gave CEQ two studies which demonstrating that preparation of EISs by the Department of the Interior enhanced environmental protection and reduced environmental impacts in a statistically significant way.  *See* AR 1045946 (describing how the 1978 NEPA regulations "contributed to statistically significant enhancements in surface use stipulations [protecting surface resources from the impacts of oil and gas drilling]" and "reduced all indicators of environmental impacts"); *see generally* AR 1045936-1045971.  Again, CEQ

dismissed these without analysis: stating blithely that it "does not anticipate [the changes] to have environmental impacts."  AR 897; *see also* AR 277 ("[T]he final rule will not have adverse environmental impacts.").

CEQ's conclusory statements do not satisfy the APA requirement that agencies consider relevant factors on the record.  *Getty*, 805 F.2d at 1057.  CEQ had a legal duty to "respond to significant points raised by the comments, especially when those comments challenge a fundamental premise" underlying the regulatory decision.  *Carlson v. Postal Regulatory Comm'n*, 938 F.3d 337, 345 (D.C. Cir. 2019) (agency action arbitrary and capricious for failing to adequately analyze three categories of public comments); *Sierra Club v. U.S. Dep't of the Interior*, 899 F.3d 260, 294 (4th Cir. 2018) (arbitrary and capricious failure to consider key factors, including whether drilling was consistent with agency's statutory mandate).

CEQ had an obligation to consider how the Rule would impact the environmental protections long engendered by the 1978 regulations.  The record demonstrates that CEQ violated its obligation to consider the Rule's impact on the documented environmental protections long engendered by the 1978 regulations.  In failing to consider this highly relevant factor, it acted arbitrarily and violated the APA.

### 2) CEQ did not Adequately Consider how the Rule will Harm Environmental Justice

CEQ has already admitted to this Court that it does not consider environmental justice "important or relevant" to NEPA.  Dkt. 75 at 53.  And the record makes clear that, like environmental protection, CEQ failed to consider the impact the Rule would have on environmental justice.

CEQ is wrong that environmental justice is not a "relevant factor" that should have been considered during the rulemaking.  NEPA's statutory language recognizes that "each person

should enjoy a healthful environment," 42 U.S.C. § 4331(C), and requires an EIS for actions that "significantly affect[] the quality of the *human* environment," *id*. § 4332(2)(C) (emphasis added). President Clinton's 1994 executive order directing federal agencies to make environmental justice part of their mission was accompanied by a memorandum specifically recognizing the importance of NEPA in identifying and addressing environmental justice concerns. Exec. Order No. 12,898, 59 Fed. Reg. 7,629 (Feb. 16, 1994). CEQ's subsequent Environmental Justice Guidance stated that the goals NEPA sets forth are wholly consistent with the attainment of environmental justice. *See* AR 5692.

Despite this clear relevance—previously recognized by CEQ itself—the Regulatory Impact Analysis includes not a *single mention* of environmental justice, and the record is devoid of any meaningful consideration of this factor. Hundreds of thousands of commenters raised concerns about how changes in the Rule would impact environmental justice. *See, e.g.*, AR 908426-30, 876717-54, 854299-300. But just as with environmental protection, CEQ disregarded these comments.

Commenters noted that the "proposed revisions do not propose to enact any directives concerning environmental justice issues and will likely result in worse environmental justice outcomes." AR 845-46. For instance, "cumulative effects analysis under NEPA is one of the few tools available to agencies to consider exactly how a proposed project may contribute to past, present, and future pollution burdens" and "eliminating [it] will disproportionately impact and adversely affect [environmental justice] communities." AR 938132. Moreover, commenters noted that the heightened requirements for public participation in the NEPA process embodied in the Rule would raise a further barrier to inclusion of these under-resourced communities and thus exacerbate the chance they will suffer disproportionate harm. *See* AR 908412-30.

18

Commenters provided specific examples of the adverse effects the Rule would have on environmental justice.  They explained that the elimination of NEPA review for Farm Service Agency loan guarantees could lead to a lack of disclosure about CAFOs.  *See* AR 908470-75. They cited supporting evidence including complaints brought under Title VI of the Civil Rights Act of 1964, and federal and state agency analyses.  These underscored the disproportionate harms CAFOs impose on communities of color in North Carolina, such as polluted water, poor air quality, and overwhelming odor, leading to adverse effects on resident's physical and mental health.  *See* AR 908472-74, 917657-794, 917795-852, 905317-53, 905293-316.

Commenters explained how residents of the Phillips Community, established in 1875, and one of the largest intact settlements of formerly enslaved people in South Carolina, relied on the NEPA process to allow its residents to weigh in on a proposal to widen a stretch of Highway 41 that would severely affect them.  *See* AR 908373, 912163-66, 912156-62, 913884-89, 913303-415, 884144-74, 913695-99, 913658-63, 913654-57, 884130-33, 884119-29. Commenters demonstrated weakening requirements require agencies consider up-to-date scientific information could lead them to ignore emerging issues like toxic wastewater discharges that disproportionately impact the health of communities and families who depend on subsistence fishing.  *See* AR 908428-29.

In purporting to address these and many similar comments, CEQ failed to offer evidence-based reasoning, responding only with conclusory statements such as: "[t]he changes do not disadvantage or adversely impact low-income and minority communities," and "changes in [the] final rule . . . would not result in adverse environmental impacts."  AR 303.  CEQ supplied no documents in the record supporting its conclusions, violating the APA requirement to consider relevant factors.  "Nodding to concerns raised by commenters only to dismiss them in a

conclusory manner is not a hallmark of reasoned decisionmaking." *Gresham v. Azar*, 950 F.3d 93, 103 (D.C. Cir. 2020); *see also Am. Wild Horse Pres. Campaign v. Perdue*, 873 F.3d 914, 932 (D.C. Cir. 2017) (critiquing an agency for "brush[ing] aside critical facts" and not "adequately analyz[ing]" the consequences of a decision); *Getty*, 805 F.2d at 1055 (analyzing whether agency *actually* considered a concern or merely stated it had done so).

NEPA makes clear that environmental justice is a relevant factor that must be considered during any related rulemaking.  Its importance has been further emphasized by an executive order and specific guidance.  Environmental justice was one of the top issues raised during the public comment process.  CEQ's decision to ignore environmental justice as not "important or relevant," to disregard record evidence, and to forgo any meaningful response to abroad array of substantive comments render the Rule arbitrary and capricious.

### B)  CEQ's Reversal of Longstanding Policy Was Irrational and Contrary to the Evidence Before the Agency

CEQ further violated the APA when it failed to justify the policy reversals contained in the Rule and failed to confront the evidence in the record that undermined its stated objectives. When changing or reversing existing policies, agencies must "provide a reasoned explanation for the change."  *Encino Motorcars*, 136 S. Ct. at 2125.  This explanation must be genuine, and courts "cannot ignore [a] disconnect between the decision made and the explanation given." *Dep't of Commerce v. New York*, 139 S. Ct. at 2575.  Unreasoned, contrived, or pretextual justifications are insufficient to uphold agency action.  *See id.*; *State Farm*, 463 U.S. at 43 (stating that an agency rule is arbitrary and capricious if the agency "offered an explanation for its decision that runs counter to the evidence before the agency").

CEQ's stated justification for its regulatory overhaul—"to reduce paperwork and delays"—is not a reasoned explanation sufficient to uphold this rulemaking.  *E.g.*, AR 3197,

3198, 3204, 3205.  First, the record makes clear that NEPA is not a major source of project delay.  Second, the record demonstrates that the 1978 NEPA regulations made project review more efficient.  And third, the record shows the Rule will not improve project delivery times, but will slow them down by injecting significant new confusion and ambiguity into the NEPA process.  The evidence before CEQ was thus contrary to its stated justification.

The record establishes that NEPA is not a major source of project delay.  Reports from the Treasury Department and the Congressional Research Service explain that the primary causes of project delay are lack of funding, lack of consensus between various public and private actors, and issues surrounding how to accommodate affected stakeholders.  *See* AR 907732, 907767.  Even when a delay is related to environmental requirements, the sources of delay are generally statutes other than NEPA.  *See* AR 907647 ("[W]hen environmental requirements have caused project delays, requirements established under laws other than NEPA have generally been the source.").  Comments further emphasized this point, including those from bipartisan state legislators, AR 1085956, the American Sustainable Business Council, AR 1040842, and the American Association of State Highway and Transportation Officials, AR 1227492, all of which noted the many other sources of project delay CEQ failed to consider.  In addition, the Conservation Groups provided data showing that the length of time needed to analyze the effects a given number of acres for Forest Service projects is essentially identical, no matter whether the analysis is done with a CE, an EA, or an EIS.  The record before the agency establishes that factors other than NEPA are responsible for any delays.  *See* AR 908291-94.

Many comments demonstrated how the 1978 NEPA regulations in fact made project review more efficient.  A group of law professors noted that these regulations accelerated projects by providing an opportunity to identify and address issues early in the permitting

process, and by establishing a vehicle to harmonize permitting efforts and improve permitting efficiency.  *See* AR 1045944.  The Government Accountability Office similarly recognized that one of NEPA's benefits is "discovering and addressing the potential effects of a proposal in the early design stages to avoid problems that could end up taking more time and being more costly in the long run."  AR 5100.  And a 2018 Report from the National Association of Environmental Professionals noted that the experience of NEPA practitioners is that projects are delayed by a lack of resources, AR 3488, and that "streamlining for streamlining's sake" doesn't work.  AR 3490-92.  *See also* AR 4844.

In the relatively few instances where projects undergoing NEPA review are delayed, those delays do not result from NEPA's required procedures.  NEPA's public participation checkpoints under the 1978 regulations account for only a fraction of the time it takes to develop most projects.  Even a major highway project, for example, requires a maximum of sixty days for public comment.  *See* 23 U.S.C. § 139(g)(2)(A).  Other project work may continue during these short periods for public participation and agency coordination, that do not appreciably slow down project delivery.  The rest of the agencies' time is largely spent seeking and obtaining funding, reviewing projects, considering options, and thinking through how projects will comply with other laws—tasks agencies have to accomplish regardless of NEPA.  *See* AR 1045943-44.

CEQ not only largely ignored the fact that NEPA does not delay projects, but it also made no attempt to explain how its changes would speed project delivery.  In the Regulatory Impact Analysis, CEQ noted repeatedly it was imposing a new timeline on the NEPA process.  But CEQ did not explain how mere imposition of a timeline (without any additional support or resources) would help agencies to move projects forward more quickly without harming their ability to meet all the legal and practical necessities that accompany major project delivery.  Nor

22

did CEQ explain how agencies are supposed to meet the new timelines, when many are understaffed and underfunded.  *See* AR 3488.  The record contains no evidence that CEQ considered how agencies could meet the new timelines; that CEQ consulted with agencies about what resources they would need to speed up project delivery; or that CEQ considered what additional resources would be necessary and where the money could come from.

Likewise, the record makes plain that CEQ took no steps to evaluate the effectiveness (or lack thereof) of other systems already in place to address project delivery times.  Commenters noted, for example, that North Carolina's Merger process employs agency coordination similar to the Rule's requirements,[4] and yet the process has not resulted in faster delivery times— primarily because there is insufficient funding available for large infrastructure projects and agencies themselves remain under-funded.  *See* AR 908444 (suggesting that "[y]ears of experimentation can help inform CEQ what actually works to speed up 'efficiency' and what does not.").  However, while the President highlighted a North Carolina project from the Merger process as a reason the Rule was needed, *see* AR 960793 (President Trump discussing the Marc Basnight Bridge), the record makes clear that CEQ took no steps to evaluate why this process has failed to speed project delivery.  CEQ also did not examine how similar processes in its Rule would succeed where, as commenters explained, the Merger process has not.  *See* AR 908444.

CEQ also failed to address the mountains of record evidence that the proposed changes will lead to *more* project delay rather than less.  The Rule is vague, unclear, and inconsistent— which is certain to result in delay as agencies, contractors, project applicants, and government decisionmakers sort through a morass of new uncertainties.

---

[4] *See* AR 908444 ("[I]n 1997, North Carolina introduced a program that merges the NEPA and Clean Water Act Section 404 regulatory processes, when both are required for a project.  Under this program, the state transportation and environmental agencies, together with the Army Corps of Engineers and the Federal Highway Administration, screen transportation projects for potential overlapping permitting requirements; if there is overlap, this triggers a project to be placed into the Merger Process.").

The extensive definitional changes will cause particular problems.  To give just one example, the Rule states that the definition of environmental effects "may" include effects that are "later in time or farther removed in distance from the proposed action or alternatives," 40 C.F.R. § 1508.1(g) (2020), but then later *in the same definition* states "[e]ffects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy causal chain."  *Id.* § 1508.1(g)(2).  Thus, geographically and temporally remote effects "may" be considered but "should generally not be considered."  This "clarification" clarifies nothing.[5] Other changes—such as the replacement of long-established intensity factors with an entirely new test—likewise complicate more than clarify.  The result can only be more agency confusion.

CEQ compounds confusion with its stated intent to withdraw all guidance documents that have clarified and shaped the NEPA process for the last four decades.  *See* AR 35.  As many stakeholders with interests in expeditious project delivery commented, leaving this type of void in the regulatory landscape will only lead to "controversy, uncertainty, and delay."  AR 1040842; *see also, e.g.*, AR 1040435, 1040437, 1042346-47.  Moreover, record evidence makes clear the massive changes will inevitably lead to increased litigation.  *See, e.g.*, AR 908436, 908453, 908395, 908399, 908400, 1100945, 1100953, 1101024-28.  The Rule dislodges forty years of stable, established legal precedent.  The new definitions, inconsistencies, and other changes to well-established law will take years of litigation to clarify.  CEQ "entirely failed to consider [this] important aspect of the problem."  *State Farm*, 463 U.S. at 43.

Commenters also noted many instances where the plain language of the Rule increases administrative burdens on applicants by delegating more agency responsibilities to them.  *E.g.*, 40 C.F.R. § 1506.5(b) (2020).  As noted previously, the Rule places arbitrary page and time

---

[5] This internal inconsistency not only undercuts CEQ's rationale of faster project delivery, but also underscores the arbitrary and capricious nature of the Rule itself.

limits on the process that cannot be exceeded without approval from a senior agency official. *E.g.*, *id.* §§ 1501.10, 1502.7 (2020).  Trying to condense information into fewer pages is itself time consuming.  *See, e.g.*, AR 854310 (comments from state attorneys general), 907598 (comments from National Congress of American Indians).  As the American Society of Civil Engineers noted, the limits the Rule creates are often impracticable.  *See* AR 1116060.  For example, some biological data necessary for a complete NEPA review can only be compiled at certain times of the year because of a species' life cycle.  *See id.*  These and similar challenges may make a full environmental review within the tight time and page limits impossible, requiring the project to go through extra bureaucratic hoops to get necessary extensions.

CEQ failed to consider or explain away any of this evidence.  And it failed to provide a reasoned explanation of how the Rule would reduce project delays.  CEQ's justification for the Rule runs counter to the record evidence before it, and the Rule is arbitrary and capricious.

### C)  CEQ Failed to Consider Reliance Interests

CEQ illegally failed to consider four decades of reliance—by federal agencies, state and local government, citizen groups, and private applicants—on the stable framework provided by the 1978 regulations.  And it failed to consider alternatives to accomplish its stated goals that would have had far fewer drastic effects on those reliance interests.

When reversing a prior policy that "has engendered serious reliance interests," an agency must "provide a more detailed justification than what would suffice for a new policy created on a blank slate."  *Fox TV*, 556 U.S. at 515.  This necessitates a "reasoned explanation . . . for disregarding the facts and circumstances that underlay or were engendered by the prior policy."  *Id.* at 516.  Agencies are "required to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns."  *Regents*, 140 S. Ct. at 1915 (holding that agency arbitrarily terminated DACA program because

agency failed to consider reliance interests).  Like the agency action in *Regents*, CEQ's Rule reverses prior policy.  And unlike the relatively recent DACA program at issue there, the Rule upsets a regulatory framework the public has relied on for over forty years.

The record reflects that many parties have relied on the 1978 regulations in different ways.  Federal agencies tasked with conducting NEPA reviews have developed effective practices for analyzing environmental impacts.  *See, e.g.*, 36 C.F.R. Part 220 (Forest Service NEPA procedures).  Federal agencies also relied on the flexibility afforded by CEQ's prior rules (which operated as a floor, not a ceiling) to augment the CEQ rules with additional procedures.  *Compare* 40 C.F.R. § 1507.3 (1978) (requiring other agencies to adopt their own procedures to "comply with" and "supplement" CEQ's regulations), *with* 40 C.F.R. § 1507.3 (2020) (generally disallowing other agencies' "additional procedures or requirements beyond those set forth" in the new CEQ regulations).

Private applicants, along with federal agencies, relied on the stable interpretations of the prior rules to undertake projects with confidence and predictability.  *See, e.g.*, AR 1040842 ("The proposed rule overturns 50 years of precedence [sic] while triggering a rewrite of all NEPA agency guidelines and will impede new projects for years as stakeholders are forced to navigate a new and uncertain terrain.").  States relied on the backstop encompassed in the 1978 regulations, because state environmental protection acts frequently apply only if NEPA does not.  As a result, projects will now be subject to a watered-down NEPA review far weaker than the otherwise-applicable state law.  *See, e.g.*, AR 854317-20.

Citizens, including members of the Conservation Groups, relied on the 1978 regulations to ensure government transparency, obtain a wealth of data, and make their voices heard.[6]  As

---

[6] *See, e.g.*, AR 1800 (Wild Virginia' Russell Chisholm told CEQ: "I live . . . in a rural community that directly relied on protections under NEPA to try to prevent the now ongoing harms from the Mountain Valley Pipeline Project to

noted in comments, citizens relied on the 1978 regulations to ensure that government agencies reviewed and disclosed the consequences of environmentally harmful actions—a process that led to better, less-damaging outcomes.  *See, e.g.*, AR 908434-35, 908450-51, 908482, 908372-88, 908397-409, 908414-19, 908425-26.  Moreover, for decades the 1978 regulations provided the only complete source of information available to citizens on the cumulative and indirect impacts of a reasonable alternatives for federal projects.  Citizen participation in government decisionmaking was largely structured around the 1978 regulations.  *See generally* AR 908433-82, 908372-432.

Despite being well-documented in the record, CEQ failed to assess any of these reliance interests, failed to consider the disruption produced by its abandonment of forty years of consistent policy, and failed to weigh such effects against competing interests and alternative options.  Despite the rulemaking's enormous scope, CEQ held only about a dozen brief meetings with industry, environmental, and tribal groups (*see, e.g.*, AR 374179-293), but there is no evidence that the agency considered or incorporated any feedback into the final Rule.  The record shows that aside from a meeting with the Western Governors' Association, Alaska's Department of Natural Resources, and San Bernardino County (*see* AR 1627, 2271, 2326), CEQ did not consult with state and local governments, including the many states that objected to the changes.  *See*, *e.g.*, AR 854253; *see also* AR 907592.  CEQ failed to consider or address the long term reliance interests of government agencies at all levels.

---

farmland, streams, and a growing outdoor recreation economy."); AR 1235445 (Congaree Riverkeeper Bill Stangler commented "For 50 years, NEPA has served as a critical safeguard to keep communities like mine informed about the projects that will affect our landscape and our livelihoods.  It has served to open the planning process to public scrutiny, to improve proposals for better outcomes, and to level the playing field for lower-income communities too often asked to bear the brunt of massive construction projects."); AR 1227716 (Steve Brooks, The Clinch Coalition,: "Locally through NEPA we have been able to have constructive conversations with the USFS which has brought about significant changes to proposed projects. If this public option were to be ended the environment will suffer! FS planners are not perfect, they too make mistakes and normally welcome our comments and discussion of our concerns which result in changes to their plans.").

Commenters raised numerous specific concerns about losing central features of the 1978 regulatory scheme they have long relied on.  *See* AR 273-74.  For example, because the Rule exempts a variety of projects from NEPA review altogether, it deprives the Conservation Groups of vital information about projects that affect the environment.

Specifically, commenters raised concerns about the change that federal Farm Service Agency loan guarantees will no longer trigger NEPA compliance.  In the past, stakeholders have relied on NEPA to provide information about facilities like CAFOs.  Under the Rule this will no longer be available.  *See* AR 908470-75.  Rather than weigh these reliance interests, CEQ focused only on the legal question of whether NEPA's explicit terms demands that loan guarantees trigger NEPA compliance.  *See* AR 786-92.  CEQ suggested that even if NEPA were to apply "the outcome or environmental effects would remain the same."  AR 787.  First, this response is simply incorrect.  As commenters pointed out, *see, e.g.*, AR 908471, 938066-67, 998981-84, 1082192-93, the Farm Service Agency can attach binding environmental conditions to the loan guarantees, improving outcomes.  *See Food & Water Watch v. U.S. Dep't of Agric.*, 325 F. Supp. 3d 39 (D.D.C. 2018).  Second, the response fails to address what the APA required CEQ to do: consider how the policy reversal and subsequent loss of information will affect groups who have long relied upon the 1978 NEPA regulations to obtain information and ensure oversight.

The Conservation Groups also raised concerns about the Rule's changes to processes for public participation.  *See, e.g.*, AR 908434-36, 908439, 908405-409.  Rather than consider these concerns, CEQ responded blithely that the Rule will not curtail opportunities for public engagement because it "requires agencies to provide more information to and solicit input from the public earlier in the process."  AR 274.  This statement fails to acknowledge the many

changes in the Rule that will lessen public participation.  For example, the Rule prohibits agencies from offering notice and comment periods for decisions made using a CE or EA, as some agencies currently do.  *Compare* 40 CFR §§ 1501.4, 1501.5 (1978), *with* 40 C.F.R. § 1507.3(b) (2020).  It places higher burdens on commenters to make specific technical comments and devalues comments related to public preference.  *See* 40 C.F.R § 1503.3 (2020).  The Rule attempts to limit the public's right to judicial review, *id.*, and moves to take public hearings out of communities and place them online.  *Id.* § 1506.6.  CEQ's failure to address how these changes affect long-standing reliance interests is arbitrary and capricious.  An agency that fails even to acknowledge a significant change cannot evaluate its effect on reliance interests as required by the APA.  *See Encino Motorcars*, 136 S. Ct. 2126.

CEQ is equally blind when it comes to states' longstanding reliance on the federal backstop of NEPA and the 1978 regulations.  In several states, the federal NEPA statute acts in conjunction with state statutes.  For example, there is no requirement to prepare written assessments under the North Carolina Environmental Policy Act when NEPA either applies to a project or categorically excludes projects.  *See* 1 N.C. Admin. Code 25.0402.  The state scheme relies on the fact that NEPA will suffice for a robust consideration of impacts and alternatives without additional state requirements.  Under the new Rule, this reliance will be undone.

CEQ ignores this impact entirely, claiming incorrectly that "NEPA's procedural requirements do not affect the applicability of any underlying State, Tribal or local laws."  AR 799.  But this statement is simply incorrect.  A huge gap will be left in the regulatory landscape as a result of the policy reversals in the Rule, and states will likely need to revisit their laws and fill in what is missing.  CEQ should at the very least acknowledge such impacts.

In its haste to rewrite NEPA's implementing regulations, CEQ also failed to consider obvious alternatives to the Rule that would have achieved the agency's stated goals with fewer damaging consequences to longstanding reliance interests. "[W]hen an agency rescinds a prior policy its reasoned analysis must consider the 'alternatives' that are 'within the ambit of the existing policy.'" *Regents*, 140 S. Ct. at 1913 (quoting and interpreting *State Farm*, 463 U.S. at 51). An agency's "failure to consider such alternatives, and to explain why such alternatives were not chosen," renders its decision arbitrary and capricious. *Int'l Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983).

The record is full of alternatives that might have more effectively achieved CEQ's stated goals: additional funding and oversight of NEPA implementation, utilization of existing guidance documents, and promulgation of new guidance when needed, and revision of the regulations to address climate change. *See, e.g.*, AR 908434, 908437, 908439; *see also* AR 907873, 907879, 907896. But the record demonstrates CEQ failed to analyze whether any suggested alternatives would better protect long-standing reliance interests while also meeting CEQ's stated goals. Indeed, CEQ conceded as much in its recent briefing. Dkt 75 at 63-64. This failure violated the APA.

Likewise, CEQ failed to consider alternatives that might have met its aim of expediting project delivery without dismantling the 1978 regulations wholesale. For example, a Federal Infrastructure Permitting Dashboard was codified in FAST-41, 42 U.S.C. §§ 4370m to 4370m-12, to help speed up project review times and ensure better communication between agencies. Several other provisions of FAST-41 have been implemented and have begun to speed up project delivery. *See, e.g.*, 1219, 1222-57. Other elements have yet to be implemented. Rather than weigh these other options as less intrusive alternatives as the APA requires, however, CEQ only

mentions these schemes to note that FAST-41 has not yet been in place long enough to assess its effectiveness.  *See* AR 301.  This statement is at odds with CEQ's stated justification that the Rulemaking is building on other legislative efforts to improve efficiency.  *See* AR 275.  CEQ cannot rationally claim to build on the unknown.

The record demonstrates that CEQ failed to address reliance interests or consider alternative solutions "within the ambit of the existing policy."  *Regents*, 140 S. Ct. at 1913.  Instead, CEQ repeatedly fixated on what it attested was the minimum it need do to comply with the NEPA statute.  *See, e.g.*, AR 279, 324-25, 489.  CEQ misunderstands its responsibility under the APA.  Whether or not its changes are statutorily permissible, CEQ violated its obligation to examine and disclose how its policy reversal would affect longstanding reliance interests and to consider other less disruptive alternatives.  CEQ's failure to fulfill this obligation renders the rulemaking arbitrary and capricious.

## II.        THE RULE IS INCONSISTENT WITH NEPA

The APA requires CEQ to issue a rule that is consistent with the governing statute.  *See* 5 U.S.C. § 706(2)(A); *Fox TV*, 556 U.S. at 515 (rule must be "permissible under the statute").  By issuing a Rule that is inconsistent with NEPA's statutory mandates to fully evaluate environmental impacts and alternatives, CEQ violated the APA.

### A)  The Rule is not Entitled to Deference

Although the Rule undermines the core components of NEPA, CEQ claims the Court should defer to its weakened approach.  *See* Dkt. 75 at 11-15.  But the Rule is not entitled to deference under either *Chevron* or a "substantial deference" rubric: the text and legislative history, as confirmed by well-settled caselaw, make clear that NEPA requires a comprehensive evaluation of impacts and alternatives.  The Rule violates this clear congressional mandate, and instead imposes a blinkered approach that is plainly unreasonable.

First, courts cannot give deference to a rule resulting from a defective rulemaking process. Where "agency procedures . . . are defective, a court should not accord *Chevron* deference to the agency interpretation." *Encino Motorcars*, 136 S. Ct. at 2125. Because CEQ failed to provide reasoned explanations, failed to address comments, and otherwise violated the APA as explained above, the Rule is not a valid exercise of agency discretion.

In addition, CEQ's claim of deference fails under a *Chevron* analysis. Step one of the analysis asks whether the statute's plain terms "directly addres[s] the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council*, 467 U.S. 837, 843 (1984). "In determining whether Congress has directly spoken to the precise question at issue, the Court should use all the 'traditional tools of statutory construction,' including textual analysis, structural analysis, and (when appropriate) legislative history." *Air Transp. Ass'n of Am., Inc. v. Nat'l Mediation Bd.*, 719 F. Supp. 2d 26, 31 (D.D.C. 2010) (quoting *Chevron*, 467 U.S. at 843 n.9). Here, the Rule contravenes NEPA's clear mandate to evaluate impacts and alternatives to the fullest extent possible. If the statutory language is ambiguous, step two of the analysis requires the reviewing court to defer to the agency's interpretation only if the construction is "a reasonable policy choice for the agency to make." *Chevron*, 467 U.S. at 845. Here, the Rule adopts a patently unreasonable approach that allows agencies to ignore important effects and alternatives that are essential for a fully-informed decision.

Regarding step one, Supreme Court and appellate decisions have examined the statutory text and Congressional intent, and confirmed NEPA's mandate for a full, robust analysis. However, CEQ claims it can ignore the caselaw and adopt a dramatically weaker approach, citing *National Cable & Telecommunications Association v. Brand X Internet Services*, 545 U.S. 967 (2005). *See* AR 39, 295. That is wrong: as the Supreme Court has explained, where "there

is every reason to believe that [prior court decisions] thought that Congress had 'directly spoken to the question at hand,' and thus left '[no] gap for the agency to fill,'" an agency cannot ignore those decisions and rewrite the requirements. *United States v. Home Concrete & Supply, LLC*, 566 U.S. 478, 488-89 (2012) (quoting *Chevron*, 467 U.S. at 842-843). That is exactly the situation here. The decisions discussed below analyzing NEPA and its legislative history confirm the "unambiguously expressed intent of Congress," *Chevron*, 467 U.S. at 843, finding it is "absolutely clear," *Calvert Cliffs*, 449 F.2d at 1128, that the statute's procedural requirements regarding impacts and alternatives (discussed below) must be fulfilled "to the fullest extent possible," as the text states. 42 U.S.C. § 4332. Here, under the Supreme Court's *Chevron* step one and *Home Concrete* analyses, NEPA's requirements for a full analysis are clear and CEQ has no basis to claim deference for its dramatic weakening of these procedures.

In particular, the D.C. Circuit's *Calvert Cliffs* decision makes clear that CEQ's approach is impermissible. 449 F.2d 1109 (D.C. Cir. 1971). The Atomic Energy Commission had claimed broad discretion to rewrite NEPA's requirements and cited a "national power crisis" to justify its weaker approach, *id.* at 1127-28, just as today CEQ invokes "competitor nations like China blaz[ing] ahead." Dkt. 34 at 4. But the D.C. Circuit thoroughly analyzed NEPA's requirements and legislative history and rejected the Commission's approach as contrary to the "absolutely clear" mandate of the statute for a robust analysis, *id.* at 1128, as well as rejecting the agency's claim of discretion. *Id.* at 1114 n.10. Congress required NEPA's procedural duties to be carried out "to the fullest extent possible," 42 U.S.C. § 4332, and no agency has the discretion to undermine these requirements.

Similarly, CEQ ignored the instruction of *Robertson*, in which the Supreme Court examined a 1986 NEPA regulation to ensure it was consistent with "previously established

judicial interpretation of the statute."  490 U.S. at 355.  The regulations being replaced here codified longstanding caselaw, *see* AR 6165 ("all reasonable alternatives" requirement in 1978 regulation was already "firmly established in the case law."), yet CEQ erroneously ignored the caselaw and abandoned these well-settled requirements in violation of NEPA.

The Rule's dramatic rollbacks of the NEPA process are also simply unreasonable; because the Rule advances "a statutory interpretation that does not effectuate Congress' intent" it must also fail on *Chevron* step two grounds.  *Ctr. for Biological Diversity v. U.S. Dep't of Interior*, 563 F.3d 466, 484 (D.C. Cir. 2009).  The statute mandates that "the procedural duties of [NEPA] must be fulfilled to the 'fullest extent possible,'" *Calvert Cliffs*, 449 F.2d at 1114-15 (quoting 42 U.S.C. § 4332), and the comprehensive evaluation impacts and alternatives recognized by CEQ and the courts since NEPA was first implemented was certainly "possible" to implement, having been carefully developed and consistently implemented for well over four decades.  Moreover, it is common sense that to be effective decision-making tool, a NEPA evaluation must look comprehensively at all of a project's impacts and all reasonable alternatives to the proposed action.  It is not a close case that eliminating these central requirements is an unreasonable interpretation of NEPA.  The same is true for "additional procedures" currently employed by other agencies and now prohibited by CEQ's mandate that the new rules act as a ceiling.  40 C.F.R. § 1507.3 (2020).  Likewise, the Supreme Court recognized that NEPA regulations can receive "substantial deference" only if they are consistent with prior agency pronouncements and preexisting caselaw, and if the changes are supported by "good reason[s]," *Robertson*, 490 U.S. at 355-56, but none of those factors is satisfied here.  For all these reasons, the Rule's gutting of NEPA's core requirements, discussed below, warrants no deference.

**B)  The Rule Unlawfully Eliminates Important Effects from the Required Evaluation**

The Rule violates NEPA by eliminating the requirement to evaluate well-recognized environmental impacts such as suburban sprawl caused by a new highway or the combined effects of multiple projects on a sensitive habitat.  Including such impacts is essential for a comprehensive evaluation: indirect effects "are caused by the action and are later in time or farther removed in distance, but are still reasonably foreseeable," and include "growth inducing effects and other effects related to induced changes in the pattern of land use, population density or growth rate, and related effects on air and water and other natural systems, including ecosystems."  40 C.F.R. § 1508.8(b) (1978).  Cumulative effects are "the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions[.]"  *Id.* § 1508.7.  As CEQ itself explained over two decades ago, "[e]vidence is increasing that the most devastating environmental effects may result not from the direct effects of a particular action, but from the combination of individually minor effects of multiple actions over time."  AR 5733.  A NEPA evaluation must include these effects to be meaningful.

Despite the plain language of the statute and legislative intent of NEPA, discussed below, the Rule eliminates these effects from the required analysis.  40 C.F.R. § 1508.1(g) (2020).  The Rule tells agencies not to evaluate indirect effects.  *Id.* § 1508.1(g)(2) ("Effects should generally not be considered if they are remote in time, geographically remote, or the product of a lengthy causal chain.").  And it makes the limited scope of its effects analysis clear by flatly stating: "Cumulative impact, defined in 40 CFR § 1508.7 (1978), is repealed."  *Id.* § 1508.1(g)(3).

NEPA's text requires that these effects be evaluated and disclosed: agencies must fully evaluate not only "(i) the environmental impact of the proposed action" itself, but also "(ii) any adverse environment effects which cannot be avoided should the proposal be implemented."  42

U.S.C. § 4332(2)(C).  This second requirement plainly reaches more broadly than just the immediate effects within a project's footprint and the limited requirements set out in the new Rule.  Instead, this section of the statute encompasses any other adverse environmental effects of implementing a proposed action *beyond* "the environmental impact of the proposed action" itself.  If the direct effects of a project were the only requirement for a NEPA evaluation, this second statutory provision would have no meaning.

Further confirming the statute's requirement of a broad, comprehensive evaluation of environmental effects, the evaluating agency must seek out other relevant agencies' expertise regarding "any environmental impact involved," and must "recognize the worldwide and long-range character of environmental problems," highlighting an agency's responsibility to evaluate beyond the immediate effects of the proposed action before it.  *Id.* §§ 4332(2)(C), (F).  Moreover, the evaluation is subject to the statutory requirement that agencies must evaluate the effects of a proposal "to the fullest extent possible."  *Id.* § 4332.

Legislative history confirms that Congress intended to include consideration of the very effects that the Rule removes from the required analysis: "NEPA was, in large measure, an attempt by Congress to instill in the environmental decisionmaking process a more comprehensive approach so that *long term and cumulative effects* of small and unrelated decisions could be recognized, evaluated and either avoided, mitigated, or accepted . . . ." *Natural Res. Def. Council v. Callaway*, 524 F.2d 79, 88 (2d Cir. 1975) (emphasis added).  Yet these long-term and cumulative effects are exactly the requirements that the Rule eliminates.

The Supreme Court has confirmed that, consistent with Congress's mandate that agencies use "all practicable means" to "assure consideration of the environmental impact of their actions in decisionmaking," NEPA requires consideration of cumulative effects: "[W]hen several

proposals for [] actions that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency, their environmental consequences must be considered together." *Kleppe,* 427 U.S. at 409-10. As the Supreme Court stated, NEPA requires "comprehensive consideration of pending proposals," *id.* at 410, and agencies cannot ignore the cumulative effects of their actions on the environment. *See id.* at n.20 & n.26 (NEPA evaluation includes effects of earlier actions). Likewise, long before any implementing regulations, the Second Circuit explained that NEPA requires evaluation of cumulative effects, for the simple reason that consideration of these effects is necessary to understand the true consequences of a proposed action: "One more factory polluting air and water in an area zoned for industrial use may represent the straw that breaks the back of the environmental camel." *Hanly v. Kleindienst*, 471 F.2d 823, 831 (2d Cir. 1972). Yet the Rule unlawfully allows agencies and the public to remain in the dark about a proposal's most significant environmental effects.

### C) The Rule Unlawfully Limits Alternatives that must be Evaluated

NEPA "seeks to ensure that each agency decision maker has before him and takes into proper account all possible approaches to a particular project[.]" *Calvert Cliffs*, 449 F.2d at 1114. The alternatives analysis long has been recognized as "the linchpin of the entire impact statement," and it is "absolutely essential to the NEPA process." *Callaway*, 524 F.2d at 92. This has been the consistent mandate of NEPA since the beginning: as CEQ explained early on, "a rigorous exploration and objective evaluation of alternative actions that might avoid some or all of the adverse effects is essential. . . . in order not to foreclose prematurely options which might have less detrimental effects." 36 Fed. Reg. 7,724, 7,725 (Apr. 23, 1971). The statute directs agencies to prepare a "detailed statement" evaluating the alternatives to a proposed project "to the fullest extent possible," 42 U.S.C. § 4332(2)(C), and reinforces this requirement by including

a second provision requiring agencies to "study, develop, and describe appropriate alternatives" any time there are unresolved resource conflicts. *Id.* § 4332(2)(E).

CEQ has violated NEPA's clear statutory directive by removing the requirements set out in the prior regulations to "[r]igorously explore and objectively evaluate all reasonable alternatives" to the proposed action, 40 C.F.R. § 1502.14(a) (1978), and the requirement to "[i]nclude reasonable alternatives not within the jurisdiction of the lead agency." *Id.* § 1502.14(c) (1978). CEQ's changes cut out what the agency itself, prior to the Trump Administration, recognized as the "heart" of the NEPA evaluation. *Compare* 40 C.F.R. § 1502.14 (1978) (emphasizing that the evaluation of alternatives "is the heart of the environmental impact statement") *with* 40 C.F.R. § 1502.14 (2020) (deleting this statement).

### 1) The Rule Unlawfully Eliminates the Requirement to Evaluate All Reasonable Alternatives

The Rule violates NEPA by removing the requirement that agencies evaluate all reasonable alternatives, replacing it with an ambiguous "reasonable range." 40 C.F.R. § 1508.1(z) (2020). As a practical matter, the Rule now allows agencies to ignore reasonable alternatives suggested by the public by claiming that two options represent the endpoints of a "range" and other reasonable alternatives need not be considered. CEQ has admitted in its earlier briefing in this case that its new, cramped interpretation of the statute allows agencies to get away with considering only "one alternative" to a proposed action. Dkt. 75 at 24 n.12.

While NEPA has never been understood to require evaluation of "every alternative device and thought conceivable by the mind of man," *Vt. Yankee Nuclear Power Corp. v. Natural Res. Def. Council, Inc.*, 435 U.S. 519, 551 (1978), it has consistently required evaluation of all reasonable alternatives. Indeed, CEQ explained in promulgating the prior regulation that by 1978 this requirement was already "firmly established in the case law." AR 6165.

For decades, courts have confirmed that NEPA requires agencies to consider all reasonable alternatives.  "The imperative directive is a thorough consideration of all appropriate methods of accomplishing the aim of the action, including those without the area of the agency's expertise and regulatory control as well as those within it." *Envtl. Def. Fund, Inc. v. Corps of Engineers of U.S. Army*, 492 F.2d 1123, 1135 (5th Cir. 1974) (citing 42 U.S.C. § 4332(2)(E)); *Callaway*, 524 F.2d at 92–93 ("the development and discussion of a wide range of alternatives to any proposed federal action is so important that it is mandated by NEPA when any proposal 'involves unresolved conflicts concerning alternative uses of available resources.'" (quoting 42 U.S.C. § 4332(2)(E))); *Natural Res. Def. Council v. Morton*, 458 F.2d 827, 837 (D.C. Cir. 1972) ("administrative difficulty" presented by some alternatives does not "undercut the duty of compliance 'to the fullest extent possible'" (quoting 42 U.S.C. § 4332)); *Webster*, 685 F.3d at 427 (citing 42 U.S.C. § 4332(2)(C)(iii) and evaluating whether agency considered "all reasonable alternatives").  Consequently, as one court in the Fourth Circuit explained, "[t]he 'existence of a viable but unexamined alternative renders an environmental impact statement inadequate.'" *Audubon Naturalist Soc'y of the Cent. Atl. States, Inc. v. U.S. Dep't of Transp.*, 524 F. Supp. 2d 642, 667 (D. Md. 2007) (quoting *Res. Ltd., Inc. v. Robertson*, 35 F.3d 1300, 1307 (9th Cir. 1994)).

### 2)  The Rule Unlawfully Excludes Alternatives within another Agency's Jurisdiction

The Rule also violates NEPA by removing the requirement set out in 40 C.F.R. § 1502.14(c) (1978) that environmental impact statements include "reasonable alternatives not within the jurisdiction of the lead agency."  *See* AR 27.  Before the 1978 regulations were drafted, the D.C. Circuit squarely addressed this issue based on the statute itself; the court rejected the government's argument that the alternatives to be evaluated are "limit[ed] to

measures the agency or official can adopt," holding instead that the impact statement must provide Congress and the President "with the environmental effects of both the proposal and the alternatives[.]"  *Morton*, 458 F.2d at 834-35; *accord Envtl. Def. Fund*, 492 F.2d at 1135 (explaining that 42 U.S.C. § 4332(2)(E) requires "thorough consideration of all appropriate methods of accomplishing the aim of the action, including those without the area of the agency's expertise and regulatory control").

The Rule also unreasonably weakens the requirements for the evaluation of alternatives. The Rule eliminates the requirement that agencies "rigorously explore and objectively" evaluate alternatives, and the requirement that agencies "devote substantial treatment to" each alternative. 40 C.F.R. § 1502.14 (1978).  These changes plainly weaken the required examination of alternatives, rather than setting forth the "detailed statement" of alternatives "to the fullest extent possible" that is required by NEPA's plain text.  42 U.S.C. § 4332.  Thus, the Rule would transform the rigorous evaluation and disclosure of all reasonable alternatives for the benefit of decisionmakers and the public into a narrow, cursory exercise in violation of the statute.

## CONCLUSION

For all of these reasons, the Court should grant summary judgment to Plaintiffs and vacate the Rule as arbitrary, capricious, and unlawful.

Respectfully submitted, November 19th, 2020.

SOUTHERN ENVIRONMENTAL LAW CENTER

/s/ Kimberley Hunter
N.C. Bar No. 41333
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516
khunter@selcnc.org
919-967-1450

/s/ Sam Evans
N.C. Bar No. 44992
48 Patton Ave
Suite 304
Asheville, NC 28801-3321
sevans@selcnc.org
828-258-2023

/s/ Nicholas S. Torrey
N.C. Bar No. 43382
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516
ntorrey@selcnc.org
919-967-1450

/s/ Megan Kimball
N.C. Bar No. 53837
601 West Rosemary Street
Suite 220
Chapel Hill, NC 27516
mkimball@selcnc.org
919-967-1450

/s/ Kristin Davis
VA. Bar No. 85076
201 West Main St.
Suite 14
Charlottesville, VA 22902-5065
kdavis@selcva.org
434-977-4090

**CERTIFICATE OF SERVICE**

I hereby certify that on November 19th, 2020, I electronically filed the foregoing Memorandum in Support of Plaintiffs' Motion for Summary Judgment with the Clerk of Court using the CM/ECF System, which will automatically send e-mail notification of such filing to all counsel of record.


/s/      Kimberley Hunter