**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA**

| | |
|---|---|
| Wild Virginia, Virginia Wilderness Committee, Upstate Forever, South Carolina Wildlife Federation, North Carolina Wildlife Federation, National Trust for Historic Preservation, Mountaintrue, Haw River Assembly, Highlanders for Responsible Development, Defenders of Wildlife, Cowpasture River Preservation Association, Congaree Riverkeeper, The Clinch Coalition, Clean Air Carolina, Cape Fear River Watch, Alliance for the Shenandoah Valley, *and* Alabama Rivers Alliance,<br><br>*Plaintiffs*,<br><br>v.<br><br>Council on Environmental Quality *and* Mary Neumayr, in her official capacity as Chair of the Council on Environmental Quality,<br><br>*Defendants*,<br><br>American Farm Bureau Federation, American Forest Resource Council, American Fuel & Petrochemical Manufacturers, American Petroleum Institute, American Road & Transportation Builders Association, Chamber of Commerce of the United States of America, Federal Forest Resource Coalition, Interstate Natural Gas Association of America, *and* National Cattlemen's Beef Association,<br><br>*Defendants-Intervenors.* | Civ. No. 3:20-cv-45-JPJ<br><br>Hon. James P. Jones |

---

**BUSINESS ASSOCIATIONS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF THEIR CROSS-MOTION FOR SUMMARY JUDGMENT**

---

MICHAEL B. KIMBERLY*
JOSHUA D. ROGACZEWSKI
   *McDermott Will & Emery LLP*
   *500 North Capitol Street NW*
   *Washington, DC 20001*
   *(202) 756-8000*

*Attorneys for Defendants-Intervenors*

* *pro hac vice*

# TABLE OF CONTENTS

Table of Authorities ......................................................................................................... ii

Introduction ..................................................................................................................... 1

Background ...................................................................................................................... 2

    A.   Statutory and regulatory background ......................................................... 2

    B.   The 1978 regulations' definitions of key terms ........................................ 5

    C.   CEQ proposes to amend its regulations ................................................... 6

    D.   The NEPA Rule ........................................................................................ 7

    E.   Procedural History ................................................................................... 11

Standard of Decision .................................................................................................... 11

Argument ...................................................................................................................... 12

    A.   The NEPA Rule is not arbitrary or capricious. ....................................... 13

        1.   CEQ did not ignore relevant factors ........................................... 13

        2.   CEQ gave "good reasons" for its decision to change the regulations ...................... 17

        3.   Plaintiffs' argument concerning reliance interests is baseless ................................ 22

        4.   CEQ was not required to consider Plaintiffs' suggested alternatives ...................... 24

    B.   The NEPA Rule is consistent with the statutory text. ........................... 25

        1.   The proximate cause standard is the only permissible interpretation of the NEPA's "effects" language ........................ 26

        2.   The NEPA Rule's interpretation of "reasonable alternatives" is lawful ................ 30

Conclusion .................................................................................................................... 32

## TABLE OF AUTHORITIES

**Cases**

*Ad Hoc Shrimp Trade Action Comm. v. United States*,
  596 F.3d 1365 (Fed. Cir. 2010) ............................................................13

*AES Sparrows Point LNG v. Wilson*,
  589 F.3d 721 (4th Cir. 2009) ...............................................................13

*All. for Cmty. Media v. F.C.C.*,
  529 F.3d 763 (6th Cir. 2008) ...............................................................31

*Andrus v. Sierra Club*,
  442 U.S. 347 (1979) ..............................................................................3

*Audubon Naturalist Society v. U.S. Department of Transportation*,
  524 F. Supp. 2d 642 (D. Md. 2007) ......................................................32

*Balt. Gas & Elec. Co. v. NRDC*,
  462 U.S. 87 (1983) ................................................................................2

*Bank of Am. Corp. v. City of Miami*,
  137 S. Ct. 1296 (2017) ........................................................................28

*Bowen v. Georgetown Univ. Hosp.*,
  488 U.S. 204 (1988) .............................................................................23

*California Div. of Labor Standards Enforcement v. Dillingham Constr.*,
  519 U.S. 316 (1997) .............................................................................30

*Campbell v. U.S. Office of Pers. Mgmt.*,
  384 F. Supp. 2d 951 (W.D. Va. 2004) ..................................................12

*Center for Biological Diversity v. U.S. Army Corps of Engineers*,
  941 F.3d 1288 (11th Cir. 2019) ......................................................29, 30

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
  467 U.S. 837 (1984) .............................................................................14

*Citizens to Preserve Overton Park, Inc. v. Volpe*,
  401 U.S. 402 (1971) .............................................................................12

*City of Carmel-By-The-Sea v. U.S. Department of Transportation*,
  123 F.3d 1142 (9th Cir. 1997) ..............................................................32

*Cox v. United States Steel & Carnegie Pension Fund*,
  17 F.3d 1386 (11th Cir. 1994) ..............................................................28

*CSX Transp., Inc. v. McBride*,
  564 U.S. 685 (2011) .............................................................................27

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
  140 S. Ct. 1891 (2020) ...................................................................23, 25

*Department of Transportation v. Public Citizen*,
  541 U.S. 752 (2004) .......................................................................passim

*Encino Motorcars, LLC v. Navarro*,
  136 S. Ct. 2117 (2016) ...................................................................13, 23

**Cases—continued**

*FCC v. Fox Television Stations, Inc.*,
  556 U.S. 502 (2009) ............................................................................... *passim*

*Friends of Capital Crescent Trail v. Fed. Transit Admin.*,
  877 F.3d 1051 (D.C. Cir. 2017) ...................................................................19

*Friends of Capital Crescent Trail v. U.S. Army Corps of Engineers*,
  453 F. Supp. 3d 804 (D. Md. 2020) .............................................................18

*Gonzales-Veliz v. Barr*,
  938 F.3d 219 (5th Cir. 2019) .......................................................................13

*Good Samaritan Hosp. v. Shalala*,
  508 U.S. 402 (1993) .....................................................................................32

*Harman Mining Corp. v. Barnhart*,
  327 F. Supp. 2d 672 (W.D. Va. 2004) .........................................................11

*Hecht v. Commerce Clearing House, Inc.*,
  897 F.2d 21 (2d Cir. 1990) ..........................................................................28

*Helicopter Ass'n Int'l, Inc. v. FAA*,
  722 F.3d 430 (D.C. Cir. 2013) .....................................................................16

*Hemi Group, LLC v. City of New York*,
  559 U.S. 1 (2010) (plurality opinion) ..........................................................28

*Holmes v. Sec. Inv'r Prot. Corp.*,
  503 U.S. 258 (1992) .....................................................................................28

*International Ladies' Garment Workers' Union v. Donovan*,
  722 F.2d 795 (D.C. Cir. 1983) .....................................................................25

*Kleppe v. Sierra Club*,
  427 U.S. 390 (1976) .....................................................................................29

*Krichbaum v. Kelley*,
  844 F. Supp. 1107 (W.D. Va. 1994) ............................................................11

*Long Island Care at Home, Ltd. v. Coke*,
  551 U.S. 158 (2007) ...............................................................................13, 18

*Maracich v. Spears*,
  570 U.S. 48 (2013) .......................................................................................30

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
  460 U.S. 766 (1983) .....................................................................................27

*Miller v. Asensio & Co.*,
  364 F.3d 223 (4th Cir. 2004) .......................................................................28

*Morrison v. Nat'l Austl. Bank Ltd.*,
  561 U.S. 247 (2010) .....................................................................................26

*Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*,
  463 U.S. 49 (1983) .................................................................................24, 25

**Cases—continued**

*Nat'l Ass'n of Home Builders v. EPA*,
    682 F.3d 1032 (D.C. Cir. 2012) ........................................................... 15

*Nat'l Treasury Emps. Union v. Chertoff*,
    452 F.3d 839 (D.C. Cir. 2006) ............................................................. 14

*Nat'l Truck Equipment Ass'n v. Nat'l Highway Traffic Safety Admin.*,
    711 F. 3d 662 (6th Cir. 2013) .............................................................. 16

*NRDC v. Morton*,
    458 F.2d 827 (1972) ............................................................................. 32

*Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*,
    556 F.3d 177 (4th Cir. 2009) ............................................................... 13

*Our Country Home Enterprises, Inc. v. Comm'r of Internal Revenue*,
    855 F.3d 773 (7th Cir. 2017) ............................................................... 13

*Philip Morris USA, Inc. v. Vilsack*,
    736 F.3d 284 (4th Cir. 2013) ............................................................... 15

*Pub. Lands Council v. Babbitt*,
    167 F.3d 1287 (10th Cir. 1999) ........................................................... 14

*Robertson v. Methow Valley Citizens Council*,
    490 U.S. 332 (1989) ........................................................................... 2, 3

*Shenandoah Ecosystems Def. Grp. v. U.S. Forest Serv.*,
    144 F. Supp. 2d 542 (W.D. Va. 2001) ................................................. 11

*TCR Sports Broad. Holding, LLP v. FCC*,
    679 F.3d 269 (4th Cir. 2012) ............................................................... 12

*Trawler Diane Marie, Inc. v. Brown*,
    918 F. Supp. 921 (E.D. N.C. 1995), *aff'd* 91 F.3d 134 (4th Cir. 1996) ................................. 16

*United Keetoowah Band of Cherokee Indians in Okla. v. FCC*,
    933 F.3d 728 (D.C. Cir. 2019) ............................................................. 15

*Vt. Yankee Nuclear Power Corp. v. NRDC*,
    435 U.S. 519 (1978) ............................................................................... 2

*Weinberger v. Catholic Action of Hawaii*,
    454 U.S. 139 (1981) ............................................................................... 2

*Wilmot Psychiatric/Medicenter Tucson v. Shalala*,
    11 F.3d 1505 (9th Cir. 1993) ............................................................... 31

**Statutes, Rules, and Regulations**

5 U.S.C. § 706(2)(A) ...................................................................................... 12

16 U.S.C. § 6591b ........................................................................................... 4

33 U.S.C. § 1362(7), (12) ............................................................................. 28

iv

**Statutes, Rules, and Regulations—continued**

42 U.S.C.

    § 4331(a) ............................................................................................2

    § 4332 ...........................................................................................3, 26

    § 4332(2)(C) ............................................................................... *passim*

    § 4332(2)(C)(iii) ............................................................................9, 30

    § 4332(2)(E) ....................................................................................31

    § 4342 ..............................................................................................3

    § 4344 ..............................................................................................3

47 U.S.C. § 319(d) ...............................................................................15

40 C.F.R.

    § 1501.4 (2020) .................................................................................3

    § 1501.4(a) (2020) ............................................................................4

    § 1501.4(b) (2020) ............................................................................4

    § 1501.4(e) (2018) ............................................................................4

    § 1501.5(a) (2020) ............................................................................4

    § 1501.5(f) ......................................................................................10

    § 1501.6(a) (2020) ............................................................................4

    § 1501.7 (2018) .................................................................................6

    § 1501.9(d) (2020) ............................................................................4

    § 1501.10 ........................................................................................10

    § 1502.3 (2020) .................................................................................4

    § 1502.7 (2018) ...........................................................................6, 10

    § 1502.7 ..........................................................................................10

    § 1502.9(b) (2020) ............................................................................5

    § 1502.14 (2018) .....................................................................5, 10, 31

    § 1502.14(b) (2020) ........................................................................31

    § 1502.14(c) (1978) ........................................................................31

    § 1502.16 (2018) ..............................................................................4

    § 1502.19 (2018) ..............................................................................4

    § 1503.1 (2018) .................................................................................5

    § 1505.2 (2018) .................................................................................5

    § 1505.2 (2020) .................................................................................5

    § 1506.3(d) .......................................................................................8

    § 1507.3 (2018) .................................................................................4

    § 1508.1(d) .......................................................................................8

    § 1508.1(g) ..................................................................................9, 28

    § 1508.1(g)(2) .............................................................................9, 17

    § 1508.1(q) .......................................................................................8

    § 1508.1(z) .................................................................................10, 31

    § 1508.4 (2018) .............................................................................3, 4

    § 1508.7 (2018) ...........................................................................5, 28

    § 1508.8 (2018) ...........................................................................5, 9

    § 1508.8(b) (2018) ..................................................................5, 27, 28

**Statutes, Rules, and Regulations—continued**

40 C.F.R.—continued

§ 1508.9 (2018)...........................................................................................4

§ 1508.13 (2018).........................................................................................4

§ 1508.18 (2018).......................................................................................5, 8

§ 1508.18(a) (2018).....................................................................................5

§ 1508.22 (2018).........................................................................................4

§ 1508.25(a)(1) (2018)................................................................................6

§ 1508.27 (2018).........................................................................................6

§ 1508.27(b)(4) (2018)................................................................................9

83 Fed. Reg. 28,591 (June 20, 2018) ..........................................................7

85 Fed. Reg. 1,684 (Jan. 10, 2020) .............................................................7

85 Fed. Reg. 43,304 (July 16, 2020)....................................................*passim*

Exec. Order 11,514, 35 Fed. Reg. 4,247 (Mar. 7, 1970) .............................3

Exec. Order 11,991, 42 Fed. Reg. 26,967 (May 24, 1977)..........................3

Exec. Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993) .......................16

Exec. Order 13,563, 76 Fed. Reg. 3,821 (Jan. 18, 2011)...........................16

**Other Authorities**

Amanda M.A. Miner et al., *Twenty Years of Forest Service National Environmental Policy Act Litigation*, 12 Envtl. Practice 116 (2010) ...............................20

*Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026 (Mar. 23, 1981) .....................10, 31

GAO, *National Environmental Policy Act*, GAO-14-370 (April 2014) ..........7

*Restatement (Third) of Torts: Liability for Physical and Emotional Harm* (2010)....................29

*Webster's Third New International Dictionary of the English Language* (1971) ........................32

**INTRODUCTION**

NEPA was enacted in 1970 to ensure that federal agencies consider environmental effects before undertaking major federal actions that will significantly impact the environment. The Council on Environmental Quality—established by NEPA to supervise the statute's implementation by federal agencies—promulgated its original regulations interpreting the statute in 1978. CEQ's original regulations have scarcely been modified in the intervening 42 years, and it shows. The regulations' definitions of key terms are out of step with more recent Supreme Court cases construing NEPA and, more generally, fail to reflect contemporary methods of statutory interpretation. Particularly litigious groups that oppose the use and development of land and natural resources have exploited the resulting confusion, using relentless lawsuits to transform NEPA review into an endless administrative process in which the principal concern is to avoid legal challenges. The result is an impenetrably complex regulatory program that applies in circumstances that Congress never could have intended, requires analyses that often serve no practical purpose, and results in endless litigation intended to obstruct and delay.

CEQ set out in 2018 to update, clarify, and simplify its NEPA regulations—an undertaking long overdue. It took and responded to two rounds of comments from the public, carefully considering the interests of stakeholders and its duties under the plain text of the statute and Supreme Court precedent. The agency's efforts culminated in a final regulation (which we call the NEPA Rule) that took effect on September 14, 2020.

Plaintiffs argue that the NEPA Rule is unlawful and claim that it must be vacated because it improperly narrows the scope of environmental reviews and weakens the standards applied in those reviews. But these sweeping assertions do not square with the actual changes that CEQ adopted or the legal landscape against which it acted. The Rule simply brings CEQ's interpretation of NEPA's text in line with Supreme Court precedent and modern methods of statutory interpretation. In so doing, it makes NEPA more efficient and administrable. Stated another way, it makes misuse of

NEPA as a tool for obstruction more difficult. CEQ's decision to adopt these changes was consistent with both NEPA's text and the Administrative Procedure Act, and it should be upheld by this Court.

## BACKGROUND

### A.     Statutory and regulatory background

**1.**  Congress enacted NEPA in 1970, establishing an express federal policy to "create and maintain conditions under which man and nature can exist in productive harmony," while "fulfill-[ing] the social, economic, and other requirements of present and future generations of Americans." 42 U.S.C. § 4331(a).

The centerpiece of this effort is a requirement that, for any "major Federal action[] significantly affecting the quality of the human environment," federal agencies prepare "a detailed statement" on "the environmental impact of the proposed action." 42 U.S.C. § 4332(2)(C). When an agency determines that an action will have a significant effect on the environment, an environmental impact statement (EIS) must be prepared. An EIS must contain information on "the environmental impact of the proposed action," "any adverse environmental effects which cannot be avoided should the proposal be implemented," and "alternatives to the proposed action." *Id.*

Critically, NEPA "does not mandate particular results, but simply prescribes the necessary process" agencies must follow when they propose major federal actions that may impact the environment. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 350 (1989). Nor does NEPA regulate primary conduct or outcomes, as do other environmental laws like the Clean Water Act, the Clean Air Act, or the Endangered Species Act—most of which are much longer and more detailed than NEPA. *See Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 97 (1983) (citing *Vt. Yankee Nuclear Power Corp. v. NRDC*, 435 U.S. 519, 553 (1978); *Weinberger v. Catholic Action of Hawaii*, 454 U.S. 139, 143 (1981)). As a purely procedural statute, NEPA requires only that the agency assess the environmental consequences of an action before proceeding with the action under review. Put another way, as long as "the adverse environmental effects of [a] proposed action are adequately

identified and evaluated, the agency is not constrained by NEPA from deciding that other values outweigh the environmental costs." *Robertson*, 490 U.S. at 350.

**2.**   NEPA is silent concerning the details of how environmental reviews are to be undertaken. Congress thus established CEQ within the Executive Office of the President to oversee federal agencies' compliance with the statute. 42 U.S.C. §§ 4342, 4344.

President Nixon issued Executive Order 11,514 shortly after NEPA's enactment, directing CEQ to "[i]ssue guidelines to Federal agencies for the preparation of" EISs "as required by [NEPA]." Exec. Order 11,514, 35 Fed. Reg. 4,247, 4,248 (Mar. 7, 1970). These guidelines "were advisory in nature, and were for the purpose of assisting federal agencies in complying with NEPA." *Andrus v. Sierra Club*, 442 U.S. 347, 356-357 (1979). "In 1977, however, President Carter, in order to create a single set of uniform, mandatory regulations" (*id.* at 357), issued Executive Order 11,991, which modified the grant of authority in E.O. 11,514 by directing CEQ to "[i]ssue regulations to Federal agencies for the implementation of the procedural provisions of [NEPA]." Exec. Order 11,991, 42 Fed. Reg. 26,967, 26,967 (May 24, 1977). Executive Order 11,991 requires that CEQ's regulations be "designed to make the [NEPA] process more useful to decisionmakers and the public; and to reduce paperwork and the accumulation of extraneous background data, in order to emphasize the need to focus on real environmental issues and alternatives." *Id.* It also directed federal agencies to "comply with the regulations issued by [CEQ]." *Id.* at 26,968.

**3.**   CEQ promulgated its original NEPA regulations in 1978. Under those regulations, when an agency concluded that a federal agency action may have a significant impact on the human environment, the agency was required to take a number of steps to determine whether an EIS is required. The overarching structure of the 1978 regulations remains in place today.

First, if a particular project is of a type determined categorically to have no significant environmental impacts, the agency is not required to complete an environmental assessment. 40 C.F.R. § 1508.4 (2018); 40 C.F.R. § 1501.4 (2020). Individual agencies may also identify classes of

actions that have no significant environmental impacts and are required to list, in their respective NEPA regulations, the categorical exclusions, or CEs, falling within their purview. 40 C.F.R. § 1507.3 (2018); 40 C.F.R. § 1501.4(a) (2020).[1] Agencies are required also to "provide for extra-ordinary circumstances in which a normally excluded action may have a significant environmental effect." 40 C.F.R. § 1508.4 (2018); 40 C.F.R. § 1501.4(b) (2020). In such extraordinary circumstances, an action covered by a CE will nonetheless require a NEPA review.

For projects not covered by a categorical exclusion, an agency begins its environmental review by preparing an environmental assessment (or EA), which determines whether impacts will be "significant" within the meaning of the statute. 40 C.F.R. § 1508.9 (2018); 40 C.F.R. § 1501.5(a) (2020). An EA includes a written description of the environmental impacts of the proposed action and alternatives, and a listing of agencies and persons consulted.

If the agency concludes in the EA that a proposed action will not have a significant impact on the environment, it issues a finding of no significant impact (FONSI) and is not required to prepare a more fulsome EIS. 40 C.F.R. §§ 1501.4(e), 1508.13 (2018); 40 C.F.R. § 1501.6(a) (2020). The FONSI must briefly explain the reasons why the agency has determined that the project will not have a significant impact.

If an agency determines at any time during the preparation of an EA that the environmental impacts of a "major federal action[]" *will* be "significant[]," it must prepare an EIS. 42 U.S.C. § 4332(2)(C); 40 C.F.R. § 1501.4(e) (2018); 40 C.F.R. § 1502.3 (2020). A notice of intent to prepare an EIS is published in the *Federal Register*, and the public is afforded a period of at least 45 days to comment. 40 C.F.R. § 1508.22 (2018); 40 C.F.R. § 1501.9(d) (2020). An EIS is then drafted detailing how the project will affect the environment; addressing comments from the public; and listing "all reasonable alternatives" to the proposed action and explaining why the alternatives were

---

[1]     In addition, certain types of projects are statutorily exempted from NEPA—some of which Congress specifically excluded in response to the problem of lengthy delays during NEPA review. *See, e.g.*, 16 U.S.C. § 6591b (exempting insect and disease treatment of federal forests from NEPA).

not taken. *See* 40 C.F.R. §§ 1502.14-.16, 1502.19 (2018); 40 C.F.R. §§ 1502.10-17 (2020). The agency must take additional public comment on the draft EIS. 40 C.F.R. § 1503.1 (2018); 40 C.F.R. § 1502.9(b) (2020). This is followed by a waiting period before the issuance of a Record of Decision (ROD) describing the agency's decision, the alternatives the agency considered, and the agency's plans for mitigation and monitoring, if necessary. 40 C.F.R. § 1505.2 (2018); 40 C.F.R. § 1505.2 (2020).

### B.     The 1978 regulations' definitions of key terms

NEPA calls for review of "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). Under the 1978 regulations, "Federal" actions are those potentially subject to federal control and responsibility, including "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies." 40 C.F.R. § 1508.18(a) (2018). Infrastructure and development projects involving federal lands, federal funding, or a federal permit are "Federal" actions.

And under the 1978 regulations, every federal action that was determined to "significantly" affect the environment was necessarily also deemed to be a "major" federal action. 40 C.F.R. § 1508.18 (2018). In other words, under the 1978 regulations, the word *major* "reinforces but does not have a meaning independent of" the separate concept of an action "significantly" affecting the environment. *Id.*

Under the 1978 regulations, "effects" and "impacts" were defined to include "aesthetic, historic, cultural, economic, social, or health" effects, "whether direct, indirect, or cumulative." 40 C.F.R. § 1508.8(b) (2018). "Indirect effects" were any effects that were "reasonably foreseeable" (*id.* § 1508.8), and "[c]umulative impact" was defined to mean "the impact on the environment which results from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of what agency (Federal or non-Federal) or person undertakes such other actions" (40 C.F.R. § 1508.7 (2018)). In evaluating the various kinds of effects, agencies

5

were required also to analyze the context of the effect (for example, whether the effect is local or regional) and the intensity of the effect (that is, the severity of the impact in light of its context). 40 C.F.R. § 1508.27 (2018).

As a matter of practice, these expansive definitions invited the unproductive commitment of private and public resources to decide how to categorize effects (as either direct, indirect, or cumulative), given the different standards that applied to each category. *See* 85 Fed. Reg. 43,304, 43,343 (July 16, 2020). This practice led, in turn, to rigidly compartmentalized analyses, rather than substantive evaluations of effects as a whole. *Id.*

Under both the 1978 regulations and the more recent NEPA Rule, the significance of a project's impact depends to a large degree on the determined "scope" of the project. The 1978 regulations thus provided for a "scoping" process "for determining the scope of issues to be addressed and for identifying the significant issues related to a proposed action." 40 C.F.R. § 1501.7 (2018). The scoping process ordinarily took place after the EA and publication of a notice of intent to prepare an EIS. *Id.* The 1978 regulations provided further that, in addition to the proposed action, agencies should consider within the scope of every review the environmental effect of "connected" actions that are (1) automatically triggered by the action under review, (2) prerequisites to the action under review, or (3) "interdependent parts of a larger action and depend on the larger action for their justification." 40 C.F.R. § 1508.25(a)(1) (2018).

### C.      CEQ proposes to amend its regulations

Due largely to the increasing risk of litigation and inconsistent judicial interpretations of key NEPA terms and requirements—including what constitutes an "effect" of a federal action—federal agencies have implemented progressively more complex and burdensome requirements under NEPA over the years. When CEQ's regulations were first promulgated more than 40 years ago, they stated that EISs normally should be less than 150 pages, with a maximum length of 300 pages for proposals of "unusual scope or complexity." 40 C.F.R. § 1502.7 (2018). Today, compliance with those limits is

the exception rather than the norm. The average length for a final EIS now exceeds 650 pages, and a quarter of all final statements exceed 750 pages, while the appendices add an additional 1,000 pages on average. *See* 85 Fed. Reg. at 43,305; Length of Environmental Impact Statements (2013-2018) at 3 (AR 1135). Similarly, CEQ originally recommended that the completion of an EIS should not take longer than one year; in reality, the average time now approaches five years. *Id.*; *accord* GAO, *National Environmental Policy Act*, GAO-14-370, at 14 (April 2014), perma.cc/9UTJ-3C4N.

More fundamentally, agencies undertaking NEPA reviews have, in recent years, gathered and analyzed boundless amounts of data and evidence concerning distantly indirect effects for use in analyses that have often been irrelevant to their decisionmaking processes—all to minimize the risk that a court will later find the record insufficient. Along the way, regulated entities have been required to produce redundant documents to multiple agencies participating in a largely uncoor-dinated process, while their projects languish. Yet this vast over-inclusion and repetition has not, in fact, reduced the risk of litigation, which has persisted in the face of unclear and inconsistent regulatory and judicial interpretations of terms.

To address these problems, CEQ published an advanced notice of proposed rulemaking on June 20, 2018 (83 Fed. Reg. 28,591) and a notice of proposed rulemaking (NPRM) on January 10, 2020 (85 Fed. Reg. 1,684) proposing to "modernize and clarify the CEQ regulations" and "to facilitate more efficient, effective, and timely NEPA reviews" by "simplifying regulatory requirements, codifying certain guidance and case law relevant to these proposed regulations, revising the regulations to reflect current technologies and agency practices, [and] eliminating obsolete provisions." *See* 85 Fed. Reg. at 1,685. CEQ received and considered more than 8,000 unique comments on the NPRM.

### D.   The NEPA Rule

CEQ published the final NEPA Rule on July 16, 2020, and it became effective September 14, 2020. The rule clarifies and simplifies the agency's regulations in numerous respects and aims to

7

bring the definitions of key terms and concepts more in line with the last 40 years of judicial precedent. The key provisions of the NEPA Rule include, as relevant here:

*Clarifying when NEPA review is required.* Again, NEPA calls for review of "major federal actions significantly affecting the quality of the human environment." 42 U.S.C. § 4332(2)(C). But CEQ's 1978 regulations rendered the word "major" superfluous, providing that the word *major* "reinforces but does not have a meaning independent of [the word] significantly." 40 C.F.R. § 1508.18 (2018).

The NEPA Rule restores independent meaning to the word "major," clarifying that it refers to the "type of action, including the role of the Federal agency and its control over any environmental impacts," rather than to the extent of the environmental impacts of a project (which is addressed by the word "significant"). *See* 85 Fed. Reg. at 43,345. Under the NEPA Rule, in order to qualify as a major federal action, an agency action must be "subject to Federal control and responsibility." *Id.* at 43,375 (new 40 C.F.R. § 1508.1(q)). Thus, for example, the Rule clarifies that NEPA does not apply to "[l]oans, loan guarantees, or other forms of financial assistance where the Federal agency does not exercise sufficient control and responsibility over the effects of such assistance," such as "farm ownership and operating loan guarantees by the [USDA] Farm Service Agency" or "business loan guarantees by the Small Business Administration." *Id.*

*Clarifying the proper use of categorical exclusions.* The Rule clarifies that a categorical exclusion is a "category of actions that the agency has determined, in its agency NEPA procedures. . . normally do not have a significant effect on the human environment." 85 Fed. Reg. at 43,374 (new 40 C.F.R. § 1508.1(d)). The NEPA Rule also improves efficiency in agencies' adoption of CEs by providing that one agency "may adopt another agency's determination that a categorical exclusion applies to a proposed action if the action covered by the original categorical exclusion determination and the adopting agency's proposed action are substantially the same." 85 Fed. Reg. at 43,370 (new 40 C.F.R. § 1506.3(d)).

*Clarifying which environmental "effects" must be considered.* Under the 1978 regulations, the process for identifying and reviewing an action's effects was highly complex. Those regulations directed agencies to analyze all "direct, indirect, or cumulative" impacts. 40 C.F.R. § 1508.8 (2018) (parenthetical omitted). Under this approach, agencies expended considerable resources classifying potential environmental effects according to the direct-indirect-cumulative trichotomy and analyzing potential effects whose causal connection to the proposed action would be remote at best.

The NEPA Rule replaces this tripartite framework for determining relevant environmental effects with a clearer standard based on the concept of proximate cause. The rule defines "effects" as "changes to the human environment from the proposed action or alternatives that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives." 85 Fed. Reg. at 43,375 (new 40 C.F.R. § 1508.1(g)). Drawing word-for-word from *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), the Rule clarifies that "[a] 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA" and that "[e]ffects do not include those effects that the agency has no ability to prevent due to its limited statutory authority or would occur regardless of the proposed action." 85 Fed. Reg. at 43,375 (new 40 C.F.R. § 1508.1(g)(2)).

The Rule also clarifies how agencies should determine when effects are "significant" within the meaning of NEPA. In particular, it removes a provision of the 1978 regulations that directed agencies to consider whether the effects of a project would be "highly controversial." 40 C.F.R. § 1508.27(b)(4) (2018). This provision had become, in effect, a heckler's veto allowing opponents of a project to prevent an agency from issuing a FONSI. Moreover, as the NEPA Rule explains, the provision made no sense because "the extent to which effects may be controversial is subjective and is not dispositive of effects' significance." 85 Fed. Reg. at 43,322.

*Defining the range of reasonable alternatives.* NEPA requires an EIS to analyze "alternatives to the proposed action" (42 U.S.C. § 4332(2)(C)(iii)), a requirement that CEQ's 1978 regula-

tions interpreted to mean "*all* reasonable alternatives" (40 C.F.R. § 1502.14 (2018) (emphasis added)). CEQ guidance, however, has long advised that agencies do not need to analyze every conceivable reasonable alternative, and that "[w]hen there are potentially a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS." *Forty Most Asked Questions Concerning CEQ's National Environmental Policy Act Regulations*, 46 Fed. Reg. 18,026, 18,027 (Mar. 23, 1981).

The NEPA Rule clarifies this standard by specifying that, rather than analyzing *all* reasonable alternatives, an agency's obligation is to analyze "a reasonable range of alternatives that are technically and economically feasible, meet the purpose and need for the proposed action, and, where applicable, meet the goals of the applicant." 85 Fed. Reg. at 43,376 (new 40 C.F.R. § 1508.1(z)). The rule also clarifies that an agency need not consider alternatives that are outside the agency's jurisdiction and thus beyond its power to implement, except when considering these alternatives is "necessary for the agency's decision-making process." *Id.* at 43,330.

***Setting length and scheduling guidelines for reviews.*** Finally, the NEPA Rule sets default page and time limits for EISs and EAs, in order to encourage agencies to prepare and finalize these documents expeditiously and to present them in a format that will be most helpful to agency decisionmakers. CEQ's 1978 regulations state that EISs should "normally" be no longer than 150 pages, or 300 pages in the case of proposals of unusual scope or complexity (40 C.F.R. § 1502.7 (2018)); the NEPA Rule makes this aspirational page limit a default requirement that can be exceeded only with a senior agency official's approval (85 Fed. Reg. at 43,364 (new 40 C.F.R. § 1502.7)). The rule also sets a default page limit of 75 pages for EAs. *Id.* at 43,360 (new 40 C.F.R. § 1501.5(f)). And with respect to the timing of EISs and EAs, the rule directs agencies to complete EAs within one year and EISs within two years—again allowing these time limits to be exceeded with a senior agency official's approval. *Id.* at 43,362-43,363 (new 40 C.F.R. § 1501.10).

### E.    Procedural History

Plaintiffs, a group of seventeen environmental organizations, filed this action in July 2020, alleging that the NEPA Rule violates the APA because it is inconsistent with NEPA, is arbitrary and capricious, and exceeds CEQ's statutory authority. Dkt. 1 ¶¶ 560-656. Several weeks later, Plaintiffs moved for a preliminary injunction against enforcement of the Rule. *See* Dkt. 30. The Court permitted the Business Associations—a group of nine national trade associations—to intervene as defendants (Dkt. 72), and both the Business Associations and the government defendants moved to dismiss the complaint (Dkt. 52, 56). After a hearing on the motions, the Court denied Plaintiffs' motion for a preliminary injunction. The Court explained that Plaintiffs had not made the clear showing of likelihood of success on the merits needed to obtain injunctive relief. Dkt. 92 at 11. In a subsequent order, the Court denied the motions to dismiss and set a briefing schedule for the parties' cross-motions for summary judgment. Dkt. 98 at 3.

### STANDARD OF DECISION

"When the court reviews an administrative agency's decision" on summary judgment, "'the administrative record provides the complete factual predicate for the court's review.'" *Shenandoah Ecosystems Def. Grp. v. U.S. Forest Serv.*, 144 F. Supp. 2d 542, 547 (W.D. Va. 2001) (quoting *Krichbaum v. Kelley,* 844 F. Supp. 1107, 1110 (W.D. Va. 1994)). "Because the factual record is closed, the plaintiff's burden on summary judgment is not materially different from his ultimate burden on the merits. Thus, to survive summary judgment, the plaintiff must point to facts in the administrative record—or to factual failings in that record—which can support his claims under the governing legal standard." *Id.* (cleaned up; citation omitted). "If the plaintiff[] cannot do so, then the [agency]'s decision stands." *Id.*

"Under the APA, this court may not set aside [an agency decision] unless it finds that [the] decision was 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'" *Harman Mining Corp. v. Barnhart*, 327 F. Supp. 2d 672, 674 (W.D. Va. 2004) (Jones, J.)

(quoting 5 U.S.C. § 706(2)(A)). The Court's task is to "determine whether the agency conformed with controlling statutes, and whether the agency has committed a clear error of judgment" (*TCR Sports Broad. Holding, LLP v. FCC*, 679 F.3d 269, 274 (4th Cir. 2012) (quotation marks omitted)), and in making that determination, the court may not "substitute its judgment for that of the agency." *Campbell v. U.S. Office of Pers. Mgmt.*, 384 F. Supp. 2d 951, 954 (W.D. Va. 2004) (quoting *Citizens to Preserve Overton Park, Inc. v. Volpe*, 401 U.S. 402, 416 (1971)).

## ARGUMENT

NEPA was originally intended to ensure that federal agencies gather information and conduct analyses necessary to understand the environmental impacts of their decisions and the practical alternatives to those decisions. Today, however, NEPA is more often used as a tool by opponents of development and land-use to obstruct and delay federal decisionmaking, rather than to inform it. Agencies are prompted to gather and consider boundless amounts of data and evidence in service of analyses that are very often irrelevant to their decisionmaking processes because they are either factually impractical or fall outside the agency's legal authority. This sclerotic review process— which is followed by drawn-out lawsuits almost as a matter of course—not only wastes agencies' time and resources but also delays economically beneficial projects of all sorts.

The NEPA Rule is a long overdue remedy to these problems. It will reduce the costs and delays that have become endemic to the NEPA process, bringing much-needed clarity and efficiency after decades of conflict and confusion. The Rule makes these critical improvements while continuing to ensure that potential environmental impacts from proposed projects are identified and thoroughly examined.

Plaintiffs have not shown and cannot show that these common-sense revisions to CEQ's regulations—many of which were prompted by judicial precedent—are inconsistent with NEPA or arbitrary and capricious under the APA. The government and the Business Associations or are accordingly entitled to summary judgment.

## A.     The NEPA Rule is not arbitrary or capricious.

Plaintiffs' principal challenge to the NEPA Rule is their contention that CEQ failed to consider "relevant factors" (SJ Mem. 17) before deciding to amend the 1978 regulations. *See generally* SJ Mem. 12-31. The Court should reject those challenges. As required by the APA, CEQ "provided an explanation of its decision that includes a rational connection between the facts found and the choice made"; thus, theCourt may not "substitute its judgment for that of the agency." *AES Sparrows Point LNG v. Wilson*, 589 F.3d 721, 733 (4th Cir. 2009) (quoting *Ohio Valley Envtl. Coal. v. Aracoma Coal Co.*, 556 F.3d 177, 192-193 (4th Cir. 2009)).

### 1.     *CEQ did not ignore relevant factors*

a.   Plaintiffs first argue that, before promulgating the NEPA Rule, CEQ was required—but failed—to "weigh the consequences of eliminating key provisions of the 1978 regulations." SJ Mem. 12 (citing *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 514-515 (2009)). Plaintiffs focus, in particular, on CEQ's supposed failure to consider comments that the NEPA Rule will harm the environment. SJ Mem. 13-17. But Plaintiffs do not explain why these purported practical impacts of the Rule constitute "relevant factors" (SJ Mem. 14) that CEQ was required by the APA to address.

When an agency acts to align its regulations with the best reading of the statutory text, it is obliged neither to evaluate nor to justify the practical impact of its decision. Instead, "an agency may justify its policy choice by explaining why that policy 'is more consistent with statutory language' than alternative policies," and leave it at that. *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2127 (2016) (quoting *Long Island Care at Home, Ltd. v. Coke*, 551 U.S. 158, 175 (2007)). This is not a controversial point. *See Gonzales-Veliz v. Barr*, 938 F.3d 219, 235 (5th Cir. 2019) (agency action upheld where the agency sufficiently explained that it was adopting a position "more faithful to the statutory text"); *Ad Hoc Shrimp Trade Action Comm. v. United States*, 596 F.3d 1365, 1372 (Fed. Cir. 2010) (where the agency explained why its new interpretation of a statute was the "better reading," its prior position was "no obstacle to its current interpretation"); *Our Country Home*

*Enterprises, Inc. v. Comm'r of Internal Revenue*, 855 F.3d 773, 787 (7th Cir. 2017) (with respect to agency interpretation of statutory text, the agency is not required to show that its "interpretation is the best interpretation from a . . . policy standpoint").

That principle has special force in this case because CEQ amended its regulations to conform to *unambiguous* statutory text. Agencies must "give effect to the unambiguously expressed intent of Congress." *Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 843 (1984). It should go without saying that an agency need not give a policy-based explanation to justify conforming its regulations to the clear meaning of a statute; the agency has no power to do otherwise. *See, e.g.*, *Pub. Lands Council v. Babbitt*, 167 F.3d 1287, 1306 (10th Cir. 1999) ("[W]e need not decide whether reasoned analysis supports the agency's change where, as in this case, we determine that the statutory language at issue is unambiguous and that it supports the new regulation."). Simply put, neither an agency's nor private stakeholders' "policy preferences can[] trump the words of the statute." *Nat'l Treasury Emps. Union v. Chertoff*, 452 F.3d 839, 865 (D.C. Cir. 2006).

Many of the regulatory changes and clarifications in the NEPA Rule are explained on this ground. For example, Congress plainly meant for the word "major" to have meaning independent of "significantly affecting" (42 U.S.C. § 4332(2)(C))—a point that Plaintiffs appear no longer to challenge. Similarly, in light of the Supreme Court's decision in *Public Citizen*, there is no doubt that proximate causation is the appropriate framework for determining which environmental "effects" are relevant to a NEPA analysis. *See infra*, at pages 27-30. CEQ was not required to examine the policy consequences of updating its regulations to bring them into line with the statute's text or Supreme Court precedent interpreting that text.

Even with respect to those elements of the NEPA Rule that do not follow inexorably from the statutory text or Supreme Court precedent, CEQ's obligation was only to provide a "reasoned explanation for its action," by "show[ing] that there are good reasons for the new policy." *Fox Television*, 556 U.S. at 515. As the Supreme Court explained in *Fox Television*, an agency "need not

demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Id.*; *see also, e.g.*, *Philip Morris USA, Inc. v. Vilsack*, 736 F.3d 284, 290 (4th Cir. 2013) ("It is not the court's role to evaluate whether the agency's reasons for its new position are better than its reasons for the old one.").[2]

For this reason, Plaintiffs' citation (SJ Mem. 14) to *United Keetoowah Band of Cherokee Indians in Okla. v. FCC*, 933 F.3d 728 (D.C. Cir. 2019), is wide of the mark. That case concerned the Communications Act, which imposes a heightened burden on the FCC to show that certain regulations are justified by "public interest, convenience, and necessity." *United Keetoowah*, 933 F.3d at 740 (quoting 47 U.S.C. § 319(d)). The D.C. Circuit held only that the FCC had failed to meet the Communication Act's special burden in that case.

Here, by contrast, the APA imposes "no such heightened standard" on CEQ's decision to revise its regulations. *Fox Television*, 556 U.S. at 514. Rather, CEQ's obligation was to provide rational justification for its change. *See, e.g.*, *Nat'l Ass'n of Home Builders v. EPA*, 682 F.3d 1032, 1037 (D.C. Cir. 2012) (rejecting arbitrary-and-capricious challenge to amended rule because "petitioners acknowledge that, although they believe the original rule was better, the amended rule is permissible," and "[a]s *Fox [Television]* made clear, that suffices as far as the court is concerned") (quotation marks omitted). That is exactly what it did.[3]

---

[2]   The NEPA Rule makes certain procedural changes to the NEPA regulations—such as its clarifications regarding interagency coordination, and its presumptive page and time limits for EAs and EISs—that are not expressly required by NEPA's text. As to these changes, Plaintiffs do not point to any evidence before CEQ that the amendments to agency procedures would have environmental impacts. They refer to a comment letter from a group of law professors (SJ Mem. 16), but that letter simply referenced studies finding that EISs generally reduced the environmental impact of projects that underwent review. Given that EISs will still be prepared under the NEPA Rule, those studies do not call into question the procedural improvements made by the Rule.

[3]   The same goes for Plaintiffs' arguments concerning environmental justice. SJ Mem. 17-20.

**b.**   In the same vein, Plaintiffs take issue with CEQ's regulatory impact analysis (RIA), arguing that it used the incorrect "baseline" against which to compare the NEPA Rule, for purposes of understanding its practical impact. *See* SJ Mem. 14. They assert, in particular, that CEQ used "the 'statutory requirements of NEPA and Supreme Court case law,'" rather than the current regulations, as the baseline for evaluating the effects of the Rule. *Id.*

But as we explained in our opposition to the preliminary injunction motion (Dkt. 74 at 31), the supposed flaws in CEQ's RIA are not actionable. RIAs are prepared pursuant to Executive Orders 12,866 and 13,563, which instruct agencies to assess the impact of "significant regulatory actions." *See* Exec. Order 12,866, 58 Fed. Reg. 51,735 (Sept. 30, 1993); Exec. Order 13,563, 76 Fed. Reg. 3,821 (Jan. 18, 2011). Both executive orders state expressly that they "do[] not create any right or benefit, substantive or procedural, enforceable at law or equity by a party against the United States, its agencies or instrumentalities, its officers or employees, or any other person." 58 Fed. Reg. at 51,744; *see* 76 Fed. Reg. at 3,823 (similar).

Accordingly, the alleged RIA deficiency "does [not] provide a basis for rejecting final agency action." *Nat'l Truck Equipment Ass'n v. Nat'l Highway Traffic Safety Admin.*, 711 F. 3d 662, 670 (6th Cir. 2013); *see also, e.g.*, *Helicopter Ass'n Int'l, Inc. v. FAA*, 722 F.3d 430, 439 (D.C. Cir. 2013) (noting that Executive Order 12,866 does not "create[] private rights, nor is an agency's failure to comply with the[] order[] subject to judicial review"); *Trawler Diane Marie, Inc. v. Brown*, 918 F. Supp. 921, 932 (E.D. N.C. 1995), *aff'd* 91 F.3d 134 (4th Cir. 1996) (per curiam) ("[P]laintiff has no right of action to challenge the Secretary's compliance with E.O. 12866."). For that reason alone, Plaintiffs' arguments concerning cost-benefit analysis must be disregarded.

Again, we made this argument in the briefing on the preliminary injunction motion (Dkt. 74 at 31), but Plaintiffs declined then to respond in their reply, and they decline now to respond in their motion for summary judgment.

**c.**   In all events, Plaintiffs' assertion that CEQ did not consider the potential environmental impact of the NEPA Rule is wrong. CEQ considered the question and concluded that the Rule would not have environmental impacts because NEPA, as a procedural statute, does not dictate or control the outcomes of agencies' environmental reviews. *See, e.g.*, 85 Fed. Reg. at 43,354. Accordingly, CEQ reasonably concluded that its procedural changes would not have adverse substantive impacts on the environment.

Plaintiffs insist that CEQ failed to consider the possibility that the NEPA Rule will lead to adverse environmental impacts by "eliminat[ing]" analysis of indirect and cumulative effects. SJ Mem. 15. But Plaintiffs simply ignore the key aspects of CEQ's explanation. Their assertion, for example, that the rule "tells agencies not to evaluate" indirect or cumulative effects (SJ Mem. 35) is not correct. Although the Rule states that effects that are geographically, temporally, or causally remote from an action "should generally not be considered" under NEPA (85 Fed. Reg. at 43,375 (new 40 C.F.R. § 1508.1(g)(2))), CEQ explained that *all* effects will continue to be considered to the extent that they are required to be considered under the proximate cause framework mandated by *Public Citizen.* Response to Comments at 468-469 (AR 737-38). Supreme Court precedent requires no less.

### 2.   CEQ gave "good reasons" for its decision to change the regulations

The Supreme Court has rejected the notion that an agency's decision to change its regulations is subject to any "heightened standard" of review. *Fox Television*, 556 U.S. at 514. In general, a regulatory change is permissible as long as the agency "display[s] awareness that it *is* changing position" and "show[s] that there are good reasons for the new policy." *Id.* at 515. Plaintiffs do not (and cannot) contend that CEQ lacked "awareness" that it was modifying the 1978 regulations. They argue, instead, that CEQ's reason for adopting the NEPA Rule—*i.e.*, to reduce the administrative burdens and delays associated with NEPA reviews—"is not a reasoned explanation sufficient to uphold" the Rule. SJ Mem. 20. That is assuredly wrong.

17

a.  As an initial matter, even assuming CEQ were mistaken that the Rule will reduce administrative burden and delay, that was not CEQ's only reason for modifying the 1978 regulations: CEQ also sought to align the regulations with the best reading of the statutory text. That, by itself, is a good and sufficient reason for amending the regulations. *See, e.g.*, *Long Island Care at Home*, 551 U.S. at 175.

Beyond that, CEQ's conclusion that amending the regulations would shorten the NEPA process was supported by the evidence. CEQ found that the NEPA process took, on average, *years* longer than Congress ever could have intended; that most EISs had ballooned to an encyclopedic size that cannot usefully serve NEPA's purpose; and that disputes over the meaning of statutory and regulatory terms were frequently the cause of disruptive litigation. 85 Fed. Reg. at 43,305-43,306. It reasonably concluded that clarifying key terms and simplifying the overall NEPA process would help avoid obstructive delays of important federal decisions on projects.

The record was littered with examples of significant and vital projects held up in years or even decades of NEPA review and associated litigation. One notable example in the Fourth Circuit is the so-called Purple Line, a 16-mile light rail project to connect various parts of suburban Maryland outside Washington, D.C. The project will provide high-efficiency transit for an estimated 70,000 daily riders, leading to 17,000 fewer vehicles on local roads. Not only will the line help reduce emissions due to fewer cars and less congestion, it will also create thousands of jobs. *See* Comment of Am. Road & Transp. Builders Ass'n at 3 (AR 854229) ("ARTBA Comment"); Comment of Chamber of Commerce of the United States of America at 7 (AR 1045665) ("Chamber Comment").

The Federal Transit Administration and Maryland Transit Administration published a notice of intent and began preparing an EIS for the Purple Line in 2003. Remarkably, however, construction began just two years ago, and the line remains under construction today. That is principally because the NEPA process for the project took an astonishing *14 years* to conclude. The agencies involved spent five years evaluating endless "alternatives" to the project. *Friends of Capital*

*Crescent Trail v. U.S. Army Corps of Engineers*, 453 F. Supp. 3d 804, 809-810 (D. Md. 2020). By 2008, the agencies had narrowed the list of alternatives to eight; after receiving public comment, they issued a final EIS another *five years later*, in August 2013, designating the light rail option as the preferred alternative. *Id.* at 810. The ROD was finally issued in 2014, after which opponents of the project "promptly filed suit," "challenging the sufficiency of the NEPA analysis." *Id.* After two years of litigation, a district court in the District of Columbia determined that the ROD—as thorough as could be, and fully ten years in the making—was insufficient, and it vacated the ROD and ordered the agencies to prepare a supplemental EIS. That decision ultimately was reversed by a unanimous D.C. Circuit panel—but only after nearly another year and a half of litigation had passed. *Friends of Capital Crescent Trail v. Fed. Transit Admin.*, 877 F.3d 1051, 1066 (D.C. Cir. 2017).

The proposed expansion of Interstate 70 in Denver, Colorado, provides another striking example of the kinds of delays endemic to the pre-2020 NEPA process. The highway widening project—a $1.2 billion effort to alleviate severe traffic congestion in Denver by expanding 12 miles of highway—took more than 13 years to navigate the NEPA process, including over 200 public meetings and a record of almost 16,000 pages. During the NEPA process, the Colorado Department of Transportation (CDOT) spent $40 million on studies, and over $30 million on viaduct repairs that should have been spent on new construction. At the end of the NEPA process, despite the CDOT publicly making 148 different environmental mitigation commitments at an additional taxpayer cost of $50 million, the project was still the subject of five separate legal actions. *See* ARTBA Comment at 3 (AR 854229); Chamber Comment at 6 (AR 1045664).

These projects, although outliers in the extremity of the delays, are illustrative of the problems that are universal to NEPA reviews under the calcified 1978 regulations: Fear of litigation has encouraged ever more burdensome procedures and standards that only beget additional lawsuits filed by anti-development groups and unhappy "not in my back yard" litigants. As a result, NEPA reviews for actions such as federal grazing permits or timber sales average over seven years to complete,

with some reviews lasting a decade or more. Comment of Am. Farm Bureau Federation at 1 (AR 1086569). Federal-aid highway projects require an average of five-to-seven years of NEPA review. ARTBA Comment at 3 (AR 854229). And with respect to actions by the Forest Service, "[s]tudies have shown that litigation has remained relatively constant, even as the number of NEPA-analyzed projects and the acres they cover has declined." Comment of Am. Forest Resource Council at 3-4 (AR 1022394-95) (citing Amanda M.A. Miner et al., *Twenty Years of Forest Service National Environmental Policy Act Litigation*, 12 Envtl. Practice 116 (2010)). The NEPA Rule was a manifestly rational response to a federal regulatory scheme that had obviously lost its way.

**b.** Plaintiffs assert that CEQ had before it evidence suggesting that other factors are responsible for project delays. SJ Mem. 21. CEQ did not ignore those other factors, but it did conclude that "the frequency and consistency of multi-year review processes for EISs for projects across the Federal Government leaves no doubt that NEPA implementation and related litigation is a significant factor." 85 Fed. Reg. at 43,305. None of the comments or sources that Plaintiffs cite casts any doubt on that well-supported, rational conclusion:

- One Congressional Research Service study noted that "there is no consensus on the reasons for [highway] project delivery delay" and added that, although "delays are often due to non-environmental factors," "environmental review of a project can take a long time." *See* Accelerating Highway and Transit Project Delivery: Issues and Options for Congress 11-12 (Aug. 3, 2011) (AR 907742)).

- Another CRS study acknowledged that "the potential threat of litigation may result in an effort to prepare a 'litigation-proof' NEPA document," "particularly for projects that are costly, technically complex . . . or controversial." *See* The Role of the Environmental Review Process in Federally Funded Highway Projects: Background and Issues for Congress 28 (Apr. 11, 2012) (AR 1097611).

- The American Sustainable Business Council stated in passing in a three-page comment letter that the "key drivers of project delay includ[e] the capacity crisis within the government for conducting NEPA," without offering any deeper analysis. Comment of Am. Sustainable Business Council at 2 (AR 1040842).

- The American Association of State Highway and Transportation Officials was generally supportive of CEQ's effort to make the NEPA process more efficient; it simply noted that "there are other delay factors that are outside of NEPA," including agencies' need to

comply with the substantive environmental laws that Plaintiffs' motion downplays as a source of protection for environmental values. Comment of Am. Ass'n of State Highway and Transp. Officials at 5 (AR 1227492).

Plaintiffs also contend that there was evidence before CEQ that NEPA reviews may actually *speed* projects "by providing an opportunity to identify and address issues early in the permitting process." SJ Mem. 21-22. But the question before CEQ was not whether NEPA review has benefits for agency decision-making; rather, it was whether NEPA review could be made more efficient, allowing those benefits to be achieved with less delay. CEQ's answer to that question—*yes*—was supported by the record.

Plaintiffs assert that "[i]n the relatively few instances where projects undergoing NEPA review are delayed, those delays do not result from NEPA's required procedures," because "NEPA's public participation checkpoints under the 1978 regulations account for only a fraction of the time it takes to develop most projects." SJ Mem. 22. But focusing only on the time spent on required procedures such as comment periods misses the point. As CEQ explained, the key cause of delay in NEPA-covered projects is not mandatory steps like public comment periods, but *litigation*—and the inordinate amount of time that agencies waste performing the pointless analyses necessary to "litigation-proof" their EISs. *See* 85 Fed. Reg. at 43,308.

Indeed, even where a project is not ultimately challenged in court, CEQ found that the mere threat of litigation causes agencies to "generat[e] voluminous studies analyzing impacts and alternatives well beyond the point where useful information is being produced and utilized by decision makers." 85 Fed. Reg. at 43,305. CEQ reasonably concluded that delays attributable to litigation (and the bare threat of litigation) could be curbed by clarifying key terms in CEQ's regulations, ensuring that the regulations aligned with Supreme Court precedent, and setting clear standards for how comments and objections to projects are exhausted. Plaintiffs have no response to this reasoning, which is self-evidently rational.

Plaintiffs' assertion that the NEPA Rule "will lead to *more* project delay" because applicants and agencies will have to "sort through a morass of new uncertainties" related to implementation of the new regulations (SJ Mem. 23) is hard to take seriously. Any regulatory change entails these kind of "start-up" costs. CEQ reasonably concluded that these short-term costs should not stand in the way of the NEPA Rule because the Rule would lower agencies' administrative costs in the long run. 85 Fed. Reg. at 43,352. If Plaintiffs' contrary assertion were correct, regulations could never be changed. That is not the law. *See Fox Television*, 556 U.S. at 514-516.

For the same reason, Plaintiffs' argument that the changes in the NEPA Rule will "lead to increased litigation" (SJ Mem. 24) casts no doubt on the reasonableness of the NEPA Rule. Like any regulatory change, the NEPA Rule may initially make for new work by courts used to interpreting the old regulations. But by bringing uniformity and clarity to the meaning of key terms in the statute and regulations, the Rule will *reduce* litigation rather than increase it in the long run. *See, e.g.*, 85 Fed. Reg. at 43,343. Moreover, contrary to Plaintiffs' contentions, CEQ did not fail to consider the existence of what Plaintiffs call "forty years of stable, established legal precedent" under the 1978 regulations. SJ Mem. 24. CEQ acknowledged the "extensive body of case law" interpreting the prior regulations but found that this "accretion of cases ha[d] not necessarily clarified implementation of [NEPA]," in no small part because the insights of key cases such as *Public Citizen* have not been "codified in [the] regulations." 85 Fed. Reg. at 43,305. It was not arbitrary or capricious for CEQ to conclude that it should modernize its regulations, rather than leaving in place an ossified body of precedent that was inconsistent with the statutory text and invited time-consuming NEPA litigation because of that inconsistency.

### 3.     *Plaintiffs' argument concerning reliance interests is baseless*

Plaintiffs say that *Fox Television* required CEQ to consider the "serious reliance interests" associated with the 1978 regulations. SJ Mem. 25 (quoting *Fox Television*, 556 U.S. at 515). But Plaintiffs have not pointed to any cognizable reliance interests affected by the NEPA Rule.

The doctrine requiring agencies to consider "reliance interests" comes into play where an agency changes regulations that "alter[] future regulation in a manner that makes worthless substantial past investment incurred in reliance upon the prior rule." *Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 220 (1988) (Scalia, J., concurring). If an agency's change in regulations will impact the way that regulated parties have arranged their affairs—the investments they have made, the contracts they have entered, the real estate they have purchased—in reliance on former regulations, an agency must consider those sunk costs in deciding whether to adopt new regulations. *Id*.

Thus, for example, the Supreme Court recently held that the Department of Homeland Security was required to consider the impact of the rescission of the Deferred Action on Childhood Arrivals (DACA) program on DACA recipients who had enrolled in schools, purchased homes, and taken other significant actions based on the program. *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020). Similarly, in *Encino Motorcars*, the Court held that a new Department of Labor rule regarding auto service advisors was arbitrary and capricious because the agency had not considered the facts that "[d]ealerships and service advisors negotiated and structured their compensation plans" around the prior rule and that the new rule would require "systemic, significant changes" to those contractual arrangements. 136 S. Ct. at 2126.

Plaintiffs have not pointed to any reliance interests of this kind. Their own asserted reliance interests are simply their interests in their preferred policies, which they think are better reflected in the 1978 regulations. They claim, for example, that they and other conservation advocates have used the 1978 regulations "to ensure government transparency, obtain a wealth of data, and make their voices heard." SJ Mem. 26. They fear that under the NEPA Rule, they will "los[e] central features of the 1978 regulatory scheme they have long relied on [*i.e.*, used]." SJ Mem. 28. But even if those fears were well-founded (they are not), these are not cognizable "reliance" interests; Plaintiffs do not identify commitments of resources that will lose value, or arrangements of affairs that will be

upended, or ongoing courses of conduct that they will have to abandon. CEQ was not required to give special solicitude to Plaintiffs' or others' mere preference to continue operating under the 1978 regulations because they liked them better.

Nor can Plaintiffs show a cognizable reliance interest by arguing that state environmental laws are meant to complement the 1978 regulations and that the changes in the NEPA Rule will accordingly leave a regulatory "gap" because NEPA will no longer provide the same "backstop" to state laws. SJ Mem. 29. Even if that were true, it would not show that States have a "reliance interest" in the 1978 regulations—it would show only that the States will have to adapt their own laws and regulations to the NEPA Rule, if need be. That is true of any change to federal regulation involving a program that touches on joint federal-state regulation, and it is no basis for invalidating the change. Plaintiffs' challenge to the NEPA Rule on this score accordingly lacks merit.

### 4.    CEQ was not required to consider Plaintiffs' suggested alternatives

Pointing to *State Farm*, Plaintiffs argue, finally, that CEQ was required to consider alternatives to its amendment to the regulations. SJ Mem. 24, 30-31. That is a bewildering claim, because *State Farm* in fact expressly confirms the opposite: courts must *not* "broadly require an agency to consider all policy alternatives in reaching decision." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 49, 51 (1983). That case involved a decision by the NHTSA to rescind its "passive restraint" rule, which required cars manufacturers to install automatic seatbelts or airbags. *Id*. at 36. The agency determined that "detachable automatic belts" would not be effective as originally determined because "many individuals will detach the mechanism" and decline to use a seatbelt at all. *Id*. at 47. At the same time, "the agency again acknowledged the life-saving potential of the airbag." *Id*. Yet it proceeded to rescind the entire rule, without considering whether it should simply alter the rule to require airbags alone. *Id*. The Supreme Court held that requiring airbags alone was not just any "policy alternative." *Id*. at 51. Rather, it was "a technological alternative within the ambit of the existing standard," which the NHTSA was required to consider. *Id*. In other

words, if a regulation requires regulated parties to do either A or B, and the agency determines that A is not effective after all, it must consider whether requiring B alone would be effective, before rescinding the entire rule. That is the same commonsense rationale that governed in the DACA case (*Regents*, 140 S. Ct. at 1913) and in *International Ladies' Garment Workers' Union v. Donovan*, 722 F.2d 795, 815 (D.C. Cir. 1983).

The NEPA Rule does not violate the principles recognized in these cases, because CEQ did not rescind or roll back the procedural framework through which it has implemented NEPA. Agencies undertaking major federal actions with a significant impact on the environment must still prepare environmental impact statements, and so forth. With the NEPA Rule, CEQ has simply clarified and simplified the terms in its regulations to improve the program's efficiency, while preserving its function of ensuring robust environmental review of federal actions.

Plaintiffs insist that CEQ nevertheless was required to identify and evaluate an array of their preferred policy alternatives for solving the problems that CEQ had identified—many of which, like lobbying for "additional funding and oversight of NEPA implementation" (SJ Mem. 30), are not regulatory in nature and would require Congressional action. Again, that is not the law; the APA does not "broadly require an agency to consider all policy alternatives in reaching decision." *State Farm*, 463 U.S. at 51. Here, CEQ's regulatory revisions were carefully considered and rationally justified. No more is required. *Fox Television*, 556 U.S. at 514-516.

## B.     The NEPA Rule is consistent with the statutory text.

Plaintiffs also argue that the NEPA Rule is inconsistent with the text of NEPA. *See* SJ Mem. 31-40. In the transition from Plaintiffs' motion for a preliminary injunction to their motion for summary judgment, this argument has tellingly moved from the front of Plaintiffs' briefing to the back. And for good reason: The argument is untethered from the statutory text itself.

As Plaintiffs see it, because the NEPA Rule breaks from past practice and from a handful of judicial decisions interpreting NEPA through the lens of the old regulations, the Rule cannot be

"consistent" with NEPA. SJ Mem. 31. But the only statutory language that Plaintiffs point to for support on that score is Congress's utterly generic direction that, "to the fullest extent possible[,] . . . the policies, regulations, and public laws of the United States shall be interpreted and administered in accordance with the policies set forth" in NEPA. 42 U.S.C. § 4332. From this boilerplate, Plaintiffs reason that their own policy preferences should override the most natural interpretations of other statutory text. In practical effect, they suggest that CEQ's 1978 regulations are etched in stone and can never be altered except (one supposes) to make them even more demanding.

That is not how statutory interpretation or agency rulemaking works. As *Fox Television* makes clear, agencies are free to change prior policy, either by rescinding or amending prior regulations. Neither special permission nor enhanced justification is needed. 556 U.S. at 514-516. As for this Court, its "function," in reviewing CEQ's revisions to the regulations, is "to give the statute the effect its language suggests, however modest that may be," and "not to extend it to [the] admirable purposes" that Plaintiffs would prefer the regulations "to achieve." *Morrison v. Nat'l Austl. Bank Ltd.*, 561 U.S. 247, 270 (2010).

In fact, the challenged provisions of the NEPA Rule are either permissible readings of the statute or *required* by the statute's plain meaning and binding Supreme Court precedent. Plaintiffs' claim that the NEPA Rule violates a "clear congressional mandate" (SJ Mem. 31) is therefore badly off base.

### 1. *The proximate cause standard is the only permissible interpretation of the NEPA's "effects" language*

**a.** Plaintiffs first assert that a NEPA review "must include" so-called indirect and cumulative effects "to be meaningful" and that the NEPA Rule's conclusion that such effects need not be considered conflicts with the "plain language of the statute." SJ Mem. 35. Citing 42 U.S.C. § 4332(2)(C), which directs agencies to evaluate "any adverse environmental effects" and "any environmental impact" of the proposed action, and that section's preamble ("to the fullest extent

possible"), Plaintiffs imply that CEQ cannot rationally interpret 42 U.S.C. § 4332(2)(C) to exclude consideration of indirect and cumulative effects. SJ Mem. 36.

That is obviously wrong. In *Department of Transportation v. Public Citizen*, 541 U.S. 752 (2004), the Supreme Court held that "a 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA." *Id*. at 767. Any interpretation of NEPA must "draw a manageable line between those causal changes that may make an actor responsible for an effect and those that do not." *Id*. (quoting *Metropolitan Edison Co. v. People Against Nuclear Energy*, 460 U.S. 766, 774 n.7 (1983)). Because "NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause," the Supreme Court "analogized this requirement to the 'familiar doctrine of proximate cause from tort law.'" *Id*. (quoting *Metropolitan Edison Co.*, 460 U.S. at 774).

For that reason, the NEPA Rule's elimination of the requirement to consider indirect effects is mandated by precedent. "The term 'proximate cause' is shorthand for a concept: Injuries have countless causes, and not all should give rise to legal liability." *CSX Transp., Inc. v. McBride*, 564 U.S. 685, 692 (2011) (emphasis omitted). One critical limitation inherent in proximate cause is *directness*. The 1978 regulations (40 C.F.R. § 1508.8(b) (2018)) required consideration of any "indirect effects" so long as they were "reasonably foreseeable." But it is well settled that "foreseeability alone does not ensure the close connection that proximate cause requires." *Bank of Am. Corp. v. City of Miami*, 137 S. Ct. 1296, 1306 (2017). "Rather, proximate cause" calls for "some direct relation between" the cause and the effect. *Id*. (quoting *Holmes v. Sec. Inv'r Prot. Corp*., 503 U.S. 258, 268 (1992)). "A link that is too remote, purely contingent, or indirect is insufficient," no matter how foreseeable it may be. *Hemi Group, LLC v. City of New York*, 559 U.S. 1, 9 (2010) (plurality opinion) (cleaned up) (quoting *Holmes*, 503 U.S. at 271, 274).

The prior version of Section 1508.8(b), which directed unbending consideration of wholly indirect effects, was therefore at odds with the concept of proximate cause and the Supreme Court's

holding in *Public Citizen*. The NEPA Rule—which requires "a reasonably close causal relationship to the proposed action or alternatives" (40 C.F.R. § 1508.1(g))—is, in contrast, appropriately tailored to the concept of proximate cause.

**b.**   Much the same goes for the NEPA Rule's elimination of mandatory consideration of cumulative effects. Under the 1978 regulations, agencies were required to consider cumulative effects (40 C.F.R. § 1508.8(b) (2018)), defined as effects that "result[] from the incremental impact of the action when added to other past, present, and reasonably foreseeable future actions regardless of [who] undertakes such other actions" (40 C.F.R. § 1508.7 (2018)). But because cumulative effects are not invariably required as part of the proximate cause analysis, the 1978 regulations' requirement that they inflexibly *always* be evaluated was inconsistent with *Public Citizen*.

Again, the NEPA Rule better aligns CEQ's regulations with the relevant Supreme Court precedent on this issue. Cumulative effects sometimes do inform the proximate cause inquiry. That is in part because proximate cause calls for consideration of all "substantial factor[s]." *Miller v. Asensio & Co.*, 364 F.3d 223, 232 n.6 (4th Cir. 2004) (Section 10(b) securities case) (quoting *Cox v. United States Steel & Carnegie Pension Fund*, 17 F.3d 1386, 1399 (11th Cir. 1994), in turn quoting *Hecht v. Commerce Clearing House, Inc.*, 897 F.2d 21, 23-24 (2d Cir. 1990)) (emphasis omitted). For example, the effect that a given "discharge of pollutants" may have on "waters of the United States" under the Clean Water Act (33 U.S.C. § 1362(7), (12)) will sometimes depend on whether the water feature has a low natural background or a high natural background. The distinction is a difference in the "cumulative" effect of the discharge with the background: A discharge that is cumulative with a high natural background is not likely to be a "substantial factor" in causing an environmental effect; with a low natural background, the opposite is true.

In addition, the Supreme Court has held that, when "several proposals . . . that will have cumulative or synergistic environmental impact upon a region are pending concurrently before an agency," it is reasonable for "their environmental consequences [to] be considered together." *Kleppe*

*v. Sierra Club*, 427 U.S. 390, 410 (1976). That is consistent with the *Restatement*, which provides that proximate cause may arise where "none of the alternative causes is sufficient by itself, but together they are sufficient." *Restatement (Third) of Torts: Liability for Physical and Emotional Harm* § 27 cmt. g. (2010); *see also id.* § 36 cmt. a (similar). In each of these contexts, proximate cause would call for consideration of cumulative effects—which the NEPA Rule permits.

In other scenarios, however, where cumulative effects are not implicated by the proximate cause analysis, they need not be considered. For example, proximate cause ordinarily will not extend responsibility for later, independent conduct not directly connected with the conduct at issue. Thus, for example, when the proposed federal action is the approval of a permit under Section 404 of the Clean Water Act to discharge fill material incidental to construction, proximate cause does not require evaluation of the environmental effects of the wholly separate activities that approving the permit might eventually make possible. That was the Eleventh Circuit's conclusion in *Center for Biological Diversity v. U.S. Army Corps of Engineers*, 941 F.3d 1288 (11th Cir. 2019), which held that, under the "proximate cause" standard set by the Supreme Court in *Public Citizen*, "NEPA and its regulations require agencies to consider only those effects caused by the agency's action" and not the "attenuated" effects caused by separate and subsequent activities. *Id*. at 1292, 1294. In that case, "the Corps' action [was] the issuance of a Section 404 permit authorizing the discharge of dredged and fill material into United States waters." *Id*. at 1294. "Only the effects caused by that change in the environment—here, the discharge into U.S. waters—is relevant under NEPA." *Id*.

**c.**   In addition, by eliminating the inflexible requirement to consider indirect and cumulative effects in all cases, the NEPA Rule eliminates the need for agencies to mechanically categorize effects as either cumulative or not. Under the prior NEPA regime, agencies often invested considerable effort in categorizing effects as direct, indirect, or cumulative, which "divert[ed] agencies from focusing their time and resources on the most significant effects." 85 Fed. Reg. at 43,344. In addition, "[c]umulative effects analysis has been interpreted so expansively as to

29

undermine informed decision making, and [to lead] agencies to conduct analyses to include effects that are not reasonably foreseeable or do not have a reasonably close causal relationship to the proposed action or alternatives." *Id*. The new Rule corrects this problem.

In this way, CEQ's alignment of its regulations with proximate cause is compelled not only by *Public Citizen*, but also by common sense. The Supreme Court time and again has said that the statutory concept of causation should not "be interpreted to its broadest reach." *Maracich v. Spears*, 570 U.S. 48, 59 (2013). All statutory phrases connoting cause-and-effect are "essentially indeterminate" because chains of causation, taken literally, "stop nowhere." *Id*. (cleaned up). Reading open-ended cause-and-effect provisions in an unlimited way—as did the 1978 regulations—is therefore "a project doomed to failure, since, as many a curbstone philosopher has observed, everything is related to everything else." *Id*. at 60 (quoting *California Div. of Labor Standards Enforcement v. Dillingham Constr.*, 519 U.S. 316, 335 (1997) (Scalia, J., concurring) (ERISA preemption)).

### 2. The NEPA Rule's interpretation of "reasonable alternatives" is lawful

Plaintiffs' other statutory argument (SJ Mem. 37-40) concerns NEPA's requirement that agencies consider "alternatives to the proposed action." 42 U.S.C. § 4332(2)(C)(iii). Under the prior regulations, agencies were required to "[r]igorously explore and objectively evaluate all reasonable alternatives" and "[d]evote substantial treatment to each alternative considered in detail." 40 C.F.R. § 1502.14 (2018). At the same time, CEQ guidance has provided all along that "[w]hen there are potentially a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS." 46 Fed. Reg. at 18,027.

The NEPA Rule harmonizes the regulations and guidance, requiring that agencies "[e]valuate reasonable alternatives to the proposed action," including "[d]iscuss[ing] each alternative considered in detail." 40 C.F.R. § 1502.14(b) (2020). It further defines "[r]easonable alternatives" as "a reasonable range of alternatives that are technically and economically feasible." 40 C.F.R. § 1508.1(z).

Plaintiffs complain that CEQ's new regulations no longer require consideration of "all" reasonable alternatives, "allow[ing] agencies to ignore reasonable alternatives." SJ Mem. 38. They note also that the regulations no longer mandate consideration of alternatives "not within the jurisdiction of the lead agency." SJ Mem. 39 (citing 40 C.F.R. § 1502.14(c) (1978)). These changes, Plaintiffs contend, "weaken[] the requirements for the evaluation of alternatives" and thus violate the preamble's "fullest extent possible" language. SJ Mem. 40.

Section 4332's generic language cannot transform Plaintiffs' policy arguments into textual ones. In fact, NEPA calls for consideration only of "alternatives to the proposed action" (42 U.S.C. § 4332(2)(C)(iii)), later specifying that the alternatives must be "appropriate alternatives" (*id*. § 4332(2)(E)). The statute conspicuously omits a definite article in front of "alternatives"—it does not say "*the* alternatives" or "*all* alternatives." It says only "alternatives," implying that some reasonable range of alternatives suffices.

In this way, the statute gives CEQ leeway to interpret what ought to be included within the range of "reasonable alternatives" that must be considered. *See All. for Cmty. Media v. F.C.C.*, 529 F.3d 763, 778 (6th Cir. 2008) ("the term 'reasonable' generally . . . engender[s] ambiguity," creating a statutory gap for the agency to fill); *Wilmot Psychiatric/Medicenter Tucson v. Shalala*, 11 F.3d 1505, 1507 (9th Cir. 1993) ("defer[ing] to a permissible interpretation" of the word "reasonable," as "espoused by the agency entrusted with [the statute's] implementation") (quoting *Good Samaritan Hosp. v. Shalala*, 508 U.S. 402, 414 (1993)).

The NEPA Rule is a permissible exercise of CEQ's interpretive discretion. The dictionary definition of "reasonable" is, among other things, "not extreme or excessive." *Webster's Third New International Dictionary of the English Language* (1971). It is common sense that a protracted and costly analysis of alternatives that cannot actually be implemented—whether because they are outside agencies' authority or because they are factually infeasible—is "excessive" and thus *un*reasonable. CEQ's determination in the NEPA Rule that agencies should not consider excessive

31

alternatives that they are legally or factually powerless to implement is therefore fully consistent with the statutory language; nothing in NEPA's text suggests that Congress intended for agencies or the public to spin their wheels endlessly on impossibilities.

The District of Maryland's decision in *Audubon Naturalist Society v. U.S. Department of Transportation*, 524 F. Supp. 2d 642 (D. Md. 2007), is not to the contrary. In fact, the court there confirmed that an agency undertaking a NEPA review "need *not* consider all of the possible alternative actions" and held that the defendants in that case had "considered a sufficient number of reasonable alternatives" to satisfy the statute, even though not all of them. *Id*. at 667 (emphasis added). An EIS, the court reasoned, "need not consider an infinite range of alternatives, only reasonable *and feasible* ones." *Id*. at 669 (emphasis added) (quoting *City of Carmel-By-The-Sea v. U.S. Department of Transportation*, 123 F.3d 1142, 1155 (9th Cir. 1997)). That holding supports CEQ, not Plaintiffs.

The same goes for the D.C. Circuit's nearly 50-year-old decision in *NRDC v. Morton*, 458 F.2d 827 (1972). There, contrary to Plaintiffs' reading, the court confirmed that "[t]he statute must be construed in the light of reason" and does not require evaluation of alternatives that are "not meaningfully possible," particularly given that agencies' and private parties' "resources of energy and research—and time . . . are not infinite." *Id*. at 837. That is exactly the premise underlying the NEPA Rule's change to the 1978 regulations.

## CONCLUSION

The Court should deny Plaintiffs' motion for summary judgment. Because the NEPA Rule is consistent with both NEPA and the APA, the Court should grant the Business Associations' cross-motion for summary judgment.

Dated: December 21, 2020                    Respectfully submitted,

                                            /s/ *Michael B. Kimberly*

                                            MICHAEL B. KIMBERLY*
                                            JOSHUA D. ROGACZEWSKI
                                                *McDermott Will & Emery LLP*
                                                *500 North Capitol Street NW*
                                                *Washington, DC 20001*
                                                *(202) 756-8000*
                                                *jrogaczewski@mwe.com*
                                                *mkimberly@mwe.com*

                                            *Attorneys for Defendants-Intervenors*

                                            *\*pro hac vice*

## CERTIFICATE OF SERVICE

I certify that on December 21, 2020, I electronically filed the foregoing with the Clerk of Court using the CM/ECF System, which will automatically send e-mail notification of such filing to all counsel of record.

                                            /s/ *Michael B. Kimberly*

33