**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF VIRGINIA
CHARLOTTESVILLE DIVISION**

| | | |
|---|---|---|
| WILD VIRGINIA, VIRGINIA WILDERNESS COMMITTEE, UPSTATE FOREVER, SOUTH CAROLINA WILDLIFE FEDERATION, NORTH CAROLINA WILDLIFE FEDERATION, NATIONAL TRUST FOR HISTORIC PRESERVATION, MOUNTAINTRUE, HAW RIVER ASSEMBLY, HIGHLANDERS FOR RESPONSIBLE DEVELOPMENT, DEFENDERS OF WILDLIFE, COWPASTURE RIVER PRESERVATION ASSOCIATION, CONGAREE RIVERKEEPER, THE CLINCH COALITION, CLEAN AIR CAROLINA, CAPE FEAR RIVER WATCH, ALLIANCE FOR THE SHENANDOAH VALLEY, and ALABAMA RIVERS ALLIANCE, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 3:20-cv-00045-JPJ-PMS **DEFENDANTS' MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND IN SUPPORT OF DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT** |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | |
| COUNCIL ON ENVIRONMENTAL QUALITY and MARY NEUMAYR IN HER OFFICIAL CAPACITY AS CHAIR OF THE COUNCIL ON ENVIRONMENTAL QUALITY, | ) ) ) ) ) | |
| Defendants, | ) ) ) | |
| and | ) ) | |
| AMERICAN FARM BUREAU FEDERATION, AMERICAN FOREST RESOURCE COUNCIL, AMERICAN FUEL & PETROCHEMICAL MANUFACTURERS, AMERICAN PETROLEUM INSTITUTE, AMERICAN ROAD & TRANSPORTATION BUILDERS ASSOCIATION, CHAMBER OF COMMERCE OF THE UNITED STATES OF AMERICA, FEDERAL FOREST RESOURCE COUNCIL, INTERSTATE NATURAL GAS ASSOCIATION OF AMERICA, and NATIONAL CATTLEMEN'S BEEF ASSOCIATION, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendant-Intervenors. | ) | |

# TABLE OF CONTENTS

INTRODUCTION ................................................................................................... 1

BACKGROUND ................................................................................................... 2

STANDARD OF REVIEW ................................................................................... 4

ARGUMENT ......................................................................................................... 6

    I.      The Court Lacks Jurisdiction Over Plaintiffs' Claims ............................. 6

    II.     The 2020 Rule Is a Reasonable Interpretation of NEPA. ....................... 8

        A.     CEQ's Interpretations of NEPA Are Entitled to Deference. ...................... 9

        B.     CEQ's Definition of "Environmental Effects" Is Consistent with NEPA. .................................................................................................... 12

        C.     The 2020 Rule's Approach to Alternatives Analysis Is Consistent with NEPA. ............................................................................................ 18

        D.     Amici's Statutory Interpretation Arguments Should Be Rejected........... 22

            1.     The 2020 Rule Properly Addresses Public Involvement. ............. 22

            2.     The 2020 Rule Does Not Allow Projects to Proceed in Violation of NEPA....................................................................... 24

    III.    CEQ Complied with the APA in Promulgating the 2020 Rule. ......................... 27

        A.     CEQ Considered All Relevant Factors. .................................................... 27

            1.     CEQ Considered the 2020 Rule's Impact on the Environment.................................................................................. 28

            2.     CEQ Considered the 2020 Rule's Impact on Environmental Justice....................................................................................... 31

        B.     CEQ Considered the Evidence Before It Regarding Paperwork and Delay. .................................................................................................... 34

        C.     CEQ Considered Reliance Interests........................................................ 41

            1.     Plaintiffs Have Not Identified Any Serious Reliance Interests. ................................................................................... 41

            2.     Even If Plaintiffs Could Identify Serious Reliance Interests, CEQ Provided the Requisite "More Detailed Explanation."........ 43

3.      CEQ Engaged in Proper Outreach During the Rulemaking Process. ........................................................................................ 47

4.      CEQ Properly Considered Alternatives to the 2020 Rule ............ 48

CONCLUSION ..................................................................................................................... 50

# TABLE OF AUTHORITIES

## Cases

*Advanced Micro Devices v. C.A.B.*,
   742 F.2d 1520 (D.C. Cir. 1984) ................................................................ 30

*Am. Fuel & Petrochemical Mfrs. v. EPA*,
   937 F.3d 559 (D.C. Cir. 2019) .................................................................. 42

*Anderson v. Edwards*,
   514 U.S. 143 (1995) ................................................................................... 6

*Andrus v. Sierra Club*,
   442 U.S. 347 (1979) ................................................................................... 9

*Appalachian Power Co. v. EPA*,
   251 F.3d 1026 (D.C. Cir. 2001) ................................................................ 24

*Buffalo River Watershed All. v. Dep't of Agric.*,
   No. 4:13-cv-450-DPM, 2014 WL 6837005 (E.D. Ark. Dec. 2, 2014) .................... 46

*Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*,
   449 F.2d 1109 (D.C. Cir. 1971) ................................................................ 11

*Canady v. Crestar Mortg. Corp.*,
   109 F.3d 969 (4th Cir. 1997) ..................................................................... 9

*Carlson v. Postal Regul. Comm'n*,
   938 F.3d 337 (D.C. Cir. 2019) .................................................................. 30

*Carter v. Lee*,
   283 F.3d 240 (4th Cir. 2002) ..................................................................... 9

*Casa De Md. v. U.S. Dep't of Homeland Sec.*,
   924 F.3d 684 (4th Cir. 2019) ................................................................... 27

*Chamber of Com. v. SEC*,
   412 F.3d 133 (D.C. Cir. 2005) .................................................................. 49

*Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*,
   467 U.S. 837 (1984) ................................................................................... 5

*Citizens Concerned About Jet Noise, Inc. v. Dalton*,
   48 F. Supp. 2d 582 (E.D. Va. 1999) ........................................................ 32

*City of Dallas v. Hall*,
   562 F.3d 712 (5th Cir. 2009) ..................................................................... 1

*City of New York v. United States*,
   337 F. Supp. 150 (E.D.N.Y. 1972) ........................................................... 11

*City of Olmsted Falls v. FAA*,
   292 F.3d 261 (D.C. Cir. 2002) .................................................................. 34

*Coastal Conservation League v. U.S. Army Corps of Eng'rs*,
No. 2:17-cv-3412, 2020 WL 858599 (D.S.C. Feb. 21, 2020) ................................................ 27

*Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*,
538 F.3d 1172 (9th Cir. 2008) ................................................ 11

*Ctr. for Env't Law & Pol'y v. Bureau of Reclamation*,
655 F.3d 1000 (9th Cir. 2011) ................................................ 26

*Ctr. for Sci. in the Pub. Int. v. Perdue*,
438 F. Supp. 3d 546 (D. Md. 2020) ................................................ 42

*Dep't of Com. v. New York*,
139 S. Ct. 2551 (2019) ................................................ 5, 31

*Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*,
140 S. Ct. 1891 (2020) ................................................ 39, 42, 49

*Dep't of Transp. v. Pub. Citizen*,
541 U.S. 752 (2004) ................................................ 2, 9, 15, 21, 24, 40

*Encino Motorcars, LLC v. Navarro*,
136 S. Ct. 2117 (2016) ................................................ 12, 41, 42, 43, 47

*Entergy Corp. v. Riverkeeper, Inc.*,
556 U.S. 208 (2009) ................................................ 5

*FCC v. Fox Television Stations, Inc.*,
556 U.S. 502 (2009) ................................................ 5, 6, 30, 34, 42, 43, 46, 50

*Fed. Commc'ns Comm'n v. Schreiber*,
381 U.S. 279 (1965) ................................................ 33

*Flint Ridge Dev. Corp. v. Scenic Rivers Ass'n*,
426 U.S. 776 (1976) ................................................ 10

*Friends for Ferrell Parkway, LLC v. Stasko*,
282 F.3d 315 (4th Cir. 2002) ................................................ 7

*Friends of Back Bay v. U.S. Army Corps of Eng'rs*,
681 F.3d 581 (4th Cir. 2012) ................................................ 4, 5

*Hanly v. Kleindienst*,
471 F.2d 823 (2d Cir. 1972) ................................................ 11, 17

*Idaho Sporting Cong., Inc. v. Rittenhouse*,
305 F.3d 957 (9th Cir. 2002) ................................................ 13

*Image of Greater San Antonio v. Brown*,
570 F.2d 517 (5th Cir. 1978) ................................................ 11

*Kleppe v. Sierra Club*,
427 U.S. 390 (1976) ................................................ 16

iv

*Laclede Gas Co. v. F.E.R.C.*,
    873 F.2d 1494 (D.C. Cir. 1989) ........................................................................ 48

*Los Alamos Study Grp. v. U.S. Dep't of Energy*,
    692 F.3d 1057 (10th Cir. 2012) ...................................................................... 26

*Los Alamos Study Grp. v. U.S. Dep't of Energy*,
    794 F. Supp. 2d 1216 (D.N.M. 2011) ............................................................ 25

*Lujan v. Defs. of Wildlife*,
    504 U.S. 555 (1992) .......................................................................................... 7

*Lujan v. Nat'l Wildlife Fed'n*,
    497 U.S. 871 (1990) .......................................................................................... 7

*Metropolitan Edison Co. v. People Against Nuclear Energy*,
    460 U.S. 766 (1983) ........................................................................................ 14

*Monsanto Co. v. Geertson Seed Farms*,
    561 U.S. 139 (2010) ........................................................................................ 25

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*,
    463 U.S. 29 (1983) ............................................ 2, 3, 4, 5, 24, 27, 31, 41, 50

*Muckleshoot Indian Tribe v. U.S. Forest Serv.*,
    177 F.3d 800 (9th Cir. 1999) .......................................................................... 13

*N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*,
    No. 2:19-CV-14-FL, 2020 WL 5044465 (E.D.N.C. Aug. 26, 2020) ....................... 27

*N.J. Dep't of Env't Prot. v. Nuclear Regul. Comm'n*,
    561 F.3d 132 (3d Cir. 2008) ........................................................................... 13

*Nat. Res. Def. Council v. Callaway*,
    524 F. 2d 79 (2d Cir. 1975) ............................................................................ 17

*Nat. Res. Def. Council v. Morton*,
    458 F.2d 827 (D.C. Cir. 1972) ........................................................................ 21

*Nat'l Audubon Soc'y v. Dep't of Navy*,
    422 F.3d 174 (4th Cir. 2005) .............................................................. 19, 25, 26

*Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*,
    545 U.S. 967 (2005) ........................................ 5, 6, 9, 10, 12, 17, 18, 21, 27, 50

*Nat'l Shooting Sports Found., Inc. v. Jones*,
    716 F.3d 200 (D.C. Cir. 2013) ........................................................................ 49

*Nat'l Treasury Emps. Union v. United States*,
    101 F.3d 1423 (D.C. Cir. 1996) ........................................................................ 7

*Native Ecosystems Council v. U.S. Forest Serv.*,
    428 F.3d 1233 (9th Cir. 2005) .............................................................. 19, 20

*Neighbors of Cuddy Mountain v. U.S. Forest Serv.*,
   137 F.3d 1372 (9th Cir. 1998) .................................................................. 14

*NLRB v. Bell Aerospace Co.*,
   416 U.S. 267 (1974)................................................................................. 43

*Oceana, Inc. v. Ross*,
   920 F.3d 855 (D.C. Cir. 2019).................................................................. 27

*Ohio Forestry Ass'n v. Sierra Club*,
   523 U.S. 726 (1998)................................................................................... 8

*Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*,
   No. ELH-16-1015, 2017 WL 3189446 (D. Md. July 27, 2017) ................ 27

*Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*,
   494 F.3d 188 (D.C. Cir. 2007).................................................................. 31

*Pleasant Valley Hosp. Inc. v. Shalala*,
   32 F.3d 67 (4th Cir. 1994) ....................................................................... 24

*Reno v. Flores*,
   507 U.S. 292 (1993)............................................................................. 6, 22

*Robertson v. Methow Valley Citizens Council*,
   490 U.S. 332 (1989)............................................................................. 2, 15

*San Luis Obispo Mothers for Peace v. Comm'n*,
   449 F.3d 1016 (9th Cir. 2006).................................................................. 13

*Schafer v. Astrue*,
   641 F.3d 49 (4th Cir. 2011) ....................................................................... 5

*Sherley v. Sebelius*,
   644 F.3d 388 (D.C. Cir. 2011).................................................................... 6

*Sierra Nevada Forest Prot. Campaign v. U.S. Forest Serv.*,
   166 F. App'x 923 (9th Cir. 2006).............................................................. 14

*Snyder v. Phelps*,
   580 F.3d 206 (4th Cir. 2009) .............................................................. 22, 23

*Summers v. Earth Island Inst.*,
   555 U.S. 488 (2009)................................................................................... 7

*Tafas v. Dudas*,
   530 F. Supp. 2d 786 (E.D. Va. 2008) ...................................................... 27

*Theodore Roosevelt Conservation P'ship v. Salazar*,
   616 F.3d 497 (D.C. Cir. 2010).................................................................. 33

*Thompson v. Clark*,
   741 F.2d 401 (D.C. Cir. 1984).................................................................. 30

*United States v. Salerno*,
   481 U.S. 739 (1987) ................................................................................ 6

*Vt. Yankee Nuclear Power v. Nat. Res. Def. Council*,
   435 U.S. 519 (1978) ................................................................ 24, 39, 49

*Watt v. Alaska*,
   451 U.S. 259 (1981) .............................................................................. 12

*Wetlands Water Dist. v. U.S. Dep't of Interior*,
   376 F.3d 853 (9th Cir. 2004) ............................................................... 19

*WildWest Inst. v. Bull*,
   547 F.3d 1162 (9th Cir. 2008) ............................................................. 25

**Statutes**

5 U.S.C. § 704 ........................................................................................... 8

5 U.S.C. § 706(2)(A) ................................................................................. 4

42 U.S.C. § 4332 ............................................................................... 10, 14

42 U.S.C. § 4332(2)(C) ................................................................... passim

42 U.S.C. § 4332(C) ........................................................... 22, 23, 26

42 U.S.C. § 4332(C)(ii) .................................................................... 12, 15

**Regulations**

40 C.F.R. § 1500.1(a) .............................................................................. 22

40 C.F.R. § 1500.3(b)(2) (2020) ............................................................ 23

40 C.F.R. § 1500.5 (2020) ...................................................................... 38

40 C.F.R. § 1500.6 (2019) ...................................................................... 10

40 C.F.R. § 1501.3(b)(1) (2020) ............................................................ 17

40 C.F.R. § 1501.4(b) (2019) ................................................................. 45

40 C.F.R. § 1501.4 (2020) ................................................................. 3, 45

40 C.F.R. § 1501.5(e) (2020) ................................................................. 45

40 C.F.R. § 1501.6 (2020) ........................................................................ 3

40 C.F.R. § 1501.7-8 (2020) ................................................................... 38

40 C.F.R. § 1501.8 (2020) ...................................................................... 21

40 C.F.R. § 1501.9(e) (2020) ................................................................. 16

40 C.F.R. § 1501.9(e)(1) (2020) ............................................................ 21

40 C.F.R. § 1502.13-16 (2020) ................................................................ 3

40 C.F.R. § 1502.14(a), (c) (2019) ........................................................... 18

40 C.F.R. § 1502.15 (2020) ...................................................................... 17

40 C.F.R. § 1502.23 (2020) ...................................................................... 33

40 C.F.R. § 1502.3 (2020) ........................................................................ 31

40 C.F.R. § 1502.7 (2019) .............................................................. 4, 35, 41

40 C.F.R. § 1503.3 (2020) ........................................................................ 24

40 C.F.R. § 1503.3(a) (2020) .................................................................... 23

40 C.F.R. § 1503.3(b) (2020) .................................................................... 45

40 C.F.R. § 1503.4(a) (2020) .................................................................... 23

40 C.F.R. § 1506.1 (2020) ........................................................................ 26

40 C.F.R. § 1506.1(a) (2019) .................................................................... 25

40 C.F.R. § 1506.1(d) (2019) .................................................................... 25

40 C.F.R. § 1506.5(b)(2), (4) (2020) ......................................................... 26

40 C.F.R. § 1506.5(c) (2019) .................................................................... 26

40 C.F.R. § 1506.6(b), (c) (2020) .............................................................. 46

40 C.F.R. § 1508.1(g)(2) (2020) ............................................................... 40

40 C.F.R. § 1508.1(h) (2020) ...................................................................... 3

40 C.F.R. § 1508.1(z) (2020) .................................................................... 19

40 C.F.R. § 1508.7 .................................................................................... 17

40 C.F.R. § 1508.13 (2019) ........................................................................ 3

40 C.F.R. § 1508.4 (2019) ........................................................................ 45

40 C.F.R. § 1508.9 (2019) ................................................................... 3, 35

43 Fed. Reg. 25,230  (June 9, 1978) ........................................................ 48

43 Fed. Reg. 55,978 (Nov. 29, 1978) ......................................................... 2

85 Fed. Reg. 43,304 (July 16, 2020) ............................................. 3, 17, 28

## INTRODUCTION

The National Environmental Policy Act (NEPA) is a procedural statute.  It obligates federal agencies to consider environmental effects before committing to major federal actions, like building a highway or an airport.  Over time, the NEPA process became mired in an accretion of guidance documents, inconsistent agency interpretations, conflicting case law, and litigation.  As a result, the NEPA process can be lengthy and complex and national infrastructure and other important projects have been needlessly delayed.  NEPA became, in the words of one court, "the kiss of death to many a federal project."  *City of Dallas v. Hall*, 562 F.3d 712, 717 (5th Cir. 2009) (citation omitted).

In July, the Council on Environmental Quality (CEQ) acted to solve this problem.  It comprehensively updated the NEPA implementing regulations for the first time in over forty years.  The result of a deliberate and thorough two-year rulemaking under the Administrative Procedure Act (APA), CEQ's 2020 Rule clarifies and streamlines the NEPA process, not only to reduce delay, but also to promote more meaningful public participation and better decisions.

Rather than wait to see how the 2020 Rule operates when applied to on-the-ground proposals—as the Constitution's Article III case-or-controversy requirement dictates—Plaintiffs ask the Court to review the Rule on its face.  Plaintiffs speculate about what impacts future actions planned under the Rule *might* have.  This sort of abstract facial review falls well outside the Court's jurisdiction.  The Rule does not regulate Plaintiffs or other members of the public. The Rule simply establishes the procedures that other agencies follow as they analyze future actions.  Thus, Plaintiffs lack the certainly impending and non-speculative injury-in-fact required under the doctrines of ripeness and standing.

Plaintiffs' claims also fail on the merits.  The 2020 Rule is a reasonable interpretation of NEPA.  And, in developing the 2020 Rule, CEQ fully complied with its procedural obligations

1

under the APA, properly addressing public comments, and providing at every juncture a

"rational connection between the facts found and the choice made."  *Motor Vehicle Mfrs. Ass'n*

*v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (citation omitted).

Plaintiffs' motion for summary judgment should therefore be denied and Defendants'

cross-motion for summary judgment granted.

## BACKGROUND[1]

NEPA requires federal agencies to consider the environmental consequences of proposed

"major Federal actions significantly affecting the quality of the human environment."  42 U.S.C.

§ 4332(2)(C).  This requirement is procedural and not substantive: "NEPA itself does not

mandate particular results, but simply prescribes the necessary process."  *Robertson v. Methow*

*Valley Citizens Council*, 490 U.S. 332, 350 (1989).

To oversee implementation of this procedural obligation, Congress established CEQ, an

agency within the Executive Office of the President "with authority to issue regulations

interpreting" NEPA.  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 757 (2004).  In 1978, CEQ

issued regulations with the intent "[t]o reduce paperwork, to reduce delays, and at the same time

to produce better decisions [that] further the national policy to protect and enhance the quality of

the human environment."  AR 6160[2] (43 Fed. Reg. 55,978, 55,978 (Nov. 29, 1978)).

Under NEPA and the CEQ regulations, federal agencies fulfill their obligation to study

major federal actions in one of three ways.  For a major federal action that will have significant

environmental effects, the agency prepares an Environmental Impact Statement (EIS).  An EIS is

---

[1]  To avoid duplication, Defendants incorporate by reference the detailed background statements contained in their prior briefing.  Defs.' Corr. Br. in Supp. of Mot. to Dismiss 4-12, ECF No. 59 (Defs.' MTD); Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 3-6, ECF No. 75.

[2]  Citations to the administrative record use the prefix "AR" and the Bates number without the leading zeros.

a "detailed statement" that describes the purpose and need for the proposed action, alternatives to the action, the affected environment, and the environmental consequences of the proposed action and alternatives.  42 U.S.C. § 4332(2)(C); 40 C.F.R. §§ 1502.13-16 (2020) (AR 62-63); 40 C.F.R. §§ 1502.13-16 (2019).[3]  If it is not clear whether the proposal will have significant effects, the agency may prepare an Environmental Assessment (EA).  An EA is a "concise" analysis intended to assist the agency in determining if the proposed action requires an EIS.  40 C.F.R. § 1508.1(h) (2020) (AR 72); 40 C.F.R. § 1508.9 (2019).  If, based on the EA, the agency concludes that the proposed action will not significantly impact the environment, it issues a Finding of No Significant Impact (FONSI) in lieu of preparing an EIS.  40 C.F.R. § 1501.6 (2020) (AR 57-58); 40 C.F.R. § 1508.13 (2019).  Finally, Categorical Exclusions (CEs) are classes of actions that normally do not have significant effects on the environment and therefore do not require an EA or EIS.  40 C.F.R. §§ 1501.4, 1507.3(e)(2)(ii), 1508.1(d) (2020) (AR 57, 71); 40 C.F.R. §§ 1507.3(b)(2)(ii), 1508.4 (2019).

Since 1978, the complexity of the regulations and the accretion of conflicting judicial opinions, inconsistent agency interpretations, and CEQ guidance documents have turned NEPA into a quagmire, converting its simple mandate into the most litigated environmental statute in the United States.  *See* AR 1, 7 (85 Fed. Reg. 43,304, 43,310 (July 16, 2020)); AR 6 (*id.* at 43,309).  Agencies have responded to the uncertainty and litigation risk by producing NEPA documents that expansively catalog information but do little to promote informed decisionmaking and meaningful public input.

When it promulgated the 1978 regulations, CEQ envisioned that an EIS—the most

---

[3]  Defendants use the year "2020" to designate CEQ's new regulations, and "2019" to designate its old regulations.

complex form of NEPA document—would normally be less than 150 pages and take no more than 12 months to complete. *See* 40 C.F.R. § 1502.7 (2019); AR 6040 (Forty Questions, Question 35). Even an EIS for a proposal of "unusual scope or complexity" was not meant to exceed 300 pages. 40 C.F.R. § 1502.7 (2019). Today the average EIS is 661 pages long and takes 4.5 years to complete. AR 6 (85 Fed. Reg. at 43,309). Litigation often follows, further "slow[ing] or prevent[ing] the development of important infrastructure and other projects that require Federal permits or approvals, as well as rulemakings and other proposed actions." AR 2 (*id*. at 43,305). This delay has real-world impacts, as all manner of projects are stymied. AR 3 (*id.* at 43,306).

Against this backdrop, CEQ hit the reset button, and engaged in an open and transparent notice and comment rulemaking to update, revise, and clarify the NEPA regulations. On July 16, 2020, after two years of analysis, and two rounds of public comment that generated over one million comments, CEQ published its final rule. AR 1 (*id*. at 43,304). In addition to improving the readability of the regulations, the 2020 Rule clarifies regulatory requirements, codifies guidance and case law, and better reflects current technologies and practices. AR 3 (*id*. at 43,306). The result is a modern set of NEPA regulations that provide clarity for federal agencies, States, Tribes, localities, and the public, while simultaneously advancing the original goals of the 1978 CEQ regulations to reduce paperwork and delays and promote better decisions.

## STANDARD OF REVIEW

The Court reviews Plaintiffs' challenge to the 2020 Rule under the APA. *Friends of Back Bay v. U.S. Army Corps of Eng'rs*, 681 F.3d 581, 587 (4th Cir. 2012). The APA requires that the Rule be upheld unless it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). Review under this standard is narrow and

"highly deferential, with a presumption in favor of finding the agency action valid." *Friends of Back Bay*, 681 F.3d at 587 (citation omitted). A court "may not substitute [its] judgment for that of the [agency]," *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2569 (2019)*,* and must defer to the agency so long as the agency has shown a "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43 (citation omitted).

The Court reviews an agency's interpretations of law set forth in a rulemaking under the two-step approach outlined by the Supreme Court in *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837 (1984). At *Chevron* Step One the court asks "whether 'Congress has directly spoken to the precise question at issue.' If so, the agency is not free to counter Congress's command." *Schafer v. Astrue*, 641 F.3d 49, 53-54 (4th Cir. 2011) (internal citation omitted). If the relevant "statute is silent or ambiguous with respect to the specific issue," a reviewing court proceeds to *Chevron* Step Two and asks "whether the agency's answer is based on a permissible construction of the statute." *Id.* (internal citation omitted). To be "permissible," an interpretation need not be "the only possible interpretation, nor even the interpretation deemed *most* reasonable by the courts." *Entergy Corp. v. Riverkeeper, Inc.*, 556 U.S. 208, 218 (2009). Because interpreting ambiguous language "involves difficult policy choices," judicial deference is critical; "agencies are better equipped to make [such choices] than courts." *Nat'l Cable & Telecomms. Ass'n v. Brand X Internet Servs.*, 545 U.S. 967, 980 (2005).

The same standards of review apply to a change in the agency's prior policy or interpretation. *See id.* at 980-82 (applying *Chevron* to a changed agency position); *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) (applying APA arbitrary and capricious review to a changed agency position). Under *Chevron*, even a "court's prior judicial construction of a statute" does not "trump[] an agency construction otherwise entitled to *Chevron* deference"

unless "the prior court decision holds that its construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion." *Brand X*, 545 U.S. at 982.  As to APA "arbitrary and capricious" review, the agency need only acknowledge a policy change and show "that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better." *Fox*, 556 U.S. at 515.

Finally, review here is limited by Plaintiffs' decision to bring a facial challenge to the 2020 Rule.  As a result, they bear the burden of "establish[ing] that no set of circumstances exists under which the [regulation] would be valid." *Reno v. Flores*, 507 U.S. 292, 301 (1993) (citation omitted).  Plaintiffs cannot prevail by positing speculative situations where the rule might be applied in a manner that violates the law.  *See United States v. Salerno*, 481 U.S. 739, 745 (1987) (A facial challenge is "the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the [rule] would be valid.").[4]

## ARGUMENT

Plaintiffs' complaint fails at the threshold for lack of jurisdiction.  If the Court considers the merits, Plaintiffs' complaint fares no better.  CEQ's long-overdue revision of its regulations is legally sound.  The 2020 Rule is a reasonable interpretation of an ambiguous statute developed through a robust public rulemaking that met all the procedural obligations of the APA.

## I.    **The Court Lacks Jurisdiction Over Plaintiffs' Claims**.

Plaintiffs' facial challenge to the 2020 Rule is not justiciable.  As detailed in Defendants' motion to dismiss, the doctrines of ripeness and standing both obligate Plaintiffs to demonstrate that they face a certainly impending and non-speculative injury-in-fact from the 2020 Rule.  *See*

---

[4]  *See also Anderson v. Edwards*, 514 U.S. 143, 155 n.6 (1995) (holding plaintiffs "could not sustain their burden [of showing regulation facially invalid] even if they showed that a possible application of the rule . . . violated federal law"); *Sherley v. Sebelius*, 644 F.3d 388, 397 (D.C. Cir. 2011) (applying the "no set of circumstances" test to facial challenge to agency regulation).

Defs.' MTD; Defs.' Reply in Supp. of Mot. to Dismiss, ECF No. 90 (Defs.' MTD Reply); *see also Nat'l Treasury Emps. Union v. United States*, 101 F.3d 1423, 1427 (D.C. Cir. 1996) ("Ripeness . . . shares the constitutional requirement of standing that an injury in fact be certainly impending.").[5]  Because the 2020 Rule regulates only the internal procedures of other agencies, and because neither the APA nor NEPA provides for pre-enforcement review, Plaintiffs cannot demonstrate the required injury-in-fact absent a challenge to a site-specific application of the Rule that threatens imminent harm to one of the plaintiff groups or its members.  *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 891 (1990) (holding a challenge to a regulation is ordinarily not ripe until there is a "concrete action applying the regulation to the claimant's situation in a fashion that harms or threatens to harm him"); *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009) (holding plaintiffs lacked standing to challenge a procedural rule in the abstract "apart from any concrete application that threatens imminent harm to his interests").

As Defendants have previously noted, although Plaintiffs have submitted more than 600 pages in declarations, they fail to challenge a single application of the 2020 Rule.  Their claims of injury all rest on conjecture about how the Rule *may be* applied and could result in future final agency decisions that *might* harm the places of concern to Plaintiffs.  *See* Defs.' MTD Reply 19-20.  But the "injury-in-fact prong of the standing inquiry cannot be met by citizens hypothesizing about the speculative effects of" an agency action or lack thereof.[6]  *See Friends for Ferrell Parkway, LLC v. Stasko*, 282 F.3d 315, 322 (4th Cir. 2002).

---

[5]  On summary judgment, Plaintiffs can no longer rest on "mere allegations" but must set forth "specific facts" demonstrating jurisdiction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Because Plaintiffs cannot meet this heightened standard, Defendants reassert their jurisdictional challenges and incorporate their prior briefing by reference.

[6]  Nor is Plaintiffs' obligation to show injury-in-fact through a specific application of the 2020 Rule lessened by their claims of procedural or informational injury.  *See* Defs.' MTD 32-36.

With their summary judgment brief, Plaintiffs include yet another declaration, now asserting they have established jurisdiction because the Bureau of Land Management (BLM) recently announced it would follow the 2020 Rule in a decision about seismic testing in the Arctic National Wildlife Refuge.  Mem. in Supp. of Pls.' Mot. for Summ. J. 11, ECF No. 105-1 (Pls.' Br.).  But this announcement underscores Defendants' position.  Should BLM issue a final seismic testing decision utilizing the 2020 Rule, a challenge to that decision is the proper venue for an allegedly injured plaintiff to seek review.[7]  Indeed, Plaintiffs appear to be planning precisely such as-applied litigation once BLM makes a final decision.  *See* Pls.' Br., Ex. 2 at 2, ECF No. 105-3 (noting that environmental groups will sue when a seismic testing decision is made).  Plaintiffs' planned litigation against BLM once it issues a decision relying on the 2020 Rule clearly illustrates that they have an "adequate remedy in a court" without this abstract facial challenge.  5 U.S.C. § 704; *see Ohio Forestry Ass'n v. Sierra Club*, 523 U.S. 726, 734 (1998) (noting a site-specific challenge can include a challenge to the lawfulness of the plan on which the site-specific decision relies).

In sum, Plaintiffs have not shown the imminent and non-speculative injury-in-fact that the doctrines of ripeness and standing require, and their facial challenge should be dismissed.[8]

## II.     The 2020 Rule Is a Reasonable Interpretation of NEPA.

Plaintiffs claim that the 2020 Rule's definition of environmental effects and its approach

---

[7]  Despite Plaintiffs' claim to the contrary (*see* Pls.' Br. 11), Defendants have consistently taken the position that an as-applied challenge to a final decision relying on the 2020 Rule is the proper venue for Plaintiffs to seek review of the alleged deficiencies in the 2020 Rule.  *See, e.g.*, ECF No. 105-3 at 2 (stating the Assistant Attorney General argued that "facial challenges to the new rules should be dismissed but endorsed as-applied challenges to agency actions using the new NEPA regulation"); Tr. 34-35, ECF No. 89-1 ("When there is a particular final agency action, that final agency action, when it applies the CEQ new rules, then it can be challenged . . . .").

[8]  Amici Members of Congress's speculative claims that their constituents will be harmed by the 2020 Rule suffer these same defects.  *See* Members of Cong. Amicus Br. 13-15, ECF No. 107-2.

to alternatives are contrary to NEPA.  These claims fail.[9]  Congress created CEQ to aid the implementation of NEPA, and, in carrying out that duty, CEQ has promulgated regulations that are reasonable and fully consistent with the text of the statute and Congress's intent.

### A.    CEQ's Interpretations of NEPA Are Entitled to Deference.

NEPA is a sparse and ambiguous statute.  It did not come with instructions.  Instead, Congress entrusted CEQ "with authority to issue regulations interpreting" the statute.  *Pub. Citizen*, 541 U.S. at 757.  CEQ's interpretations of NEPA are therefore "entitled to substantial deference."  *Andrus v. Sierra Club*, 442 U.S. 347, 358 (1979).  The fact that CEQ's interpretations have changed, or may depart from previous judicial interpretations of NEPA's ambiguous statutory terms, does not lessen the deference to which the agency is entitled.

An agency's interpretation of a statute it administers is never "carved in stone."  *Brand X*, 545 U.S. at 981 (citation omitted).  To the contrary, an agency "must consider varying interpretations and the wisdom of its policy on a continuing basis."  *Id.* (citation omitted).  Thus, the fact that CEQ has changed its interpretation of some aspects of NEPA from the interpretation it proffered in 1978 is not surprising, and does not deprive its new interpretation of *Chevron* deference.  *See Brand X*, 545 U.S. at 981 ("[I]f the agency adequately explains the reasons for a reversal of policy, change is not invalidating, since the whole point of *Chevron* is to leave the discretion provided by the ambiguities of a statute with the implementing agency." (citation and

---

[9]  In their summary judgment brief, Plaintiffs abandon several of the claims in their Complaint.  *See* Compl. at Claim 9(C), ECF No. 1 (challenging definition of major federal action); Claim 9(D) (alleging 2020 Rule allows action to proceed during the NEPA process); Claim 9(E) (challenging 2020 Rule's treatment of federal loans and loan guarantees); Claim 9(F) (challenging 2020 Rule requirement that comments be as specific as possible); Claim 10 (claiming 2020 Rule's definitions of major federal action, presumption of NEPA compliance, and exhaustion requirements exceed CEQ's authority).  Plaintiffs' failure to pursue and brief these claims means that they are waived.  *Carter v. Lee*, 283 F.3d 240, 252 n.11 (4th Cir. 2002); *see Canady v. Crestar Mortg. Corp.*, 109 F.3d 969, 973-74 (4th Cir. 1997).

internal quotation marks omitted)).

Nor does a contrary judicial interpretation of an ambiguous statute foreclose an agency from reconsidering its own interpretation.  *Id.* at 982.  An agency's interpretation of a statute it administers is only foreclosed by a prior contrary judicial interpretation if that interpretation was made at *Chevron* Step One, *i.e.*, if the court's "construction follows from the unambiguous terms of the statute and thus leaves no room for agency discretion."  *Id.*; *see also id.* ("[A]llowing a judicial precedent to foreclose an agency from interpreting an ambiguous statute . . . would allow a court's interpretation to override an agency's.  *Chevron's* premise is that it is for agencies, not courts, to fill statutory gaps.").

Plaintiffs suggest that CEQ's interpretations of NEPA in the 2020 Rule are not subject to deference because the statute contains an allegedly unambiguous *Chevron* Step One mandate to comply with NEPA procedures to "the fullest extent possible."  Pls.' Br. 32, 33 (citing 42 U.S.C. § 4332).  *But an exhortation to comply with otherwise ambiguous procedures "to the fullest extent possible" does not render the underlying procedures any less ambiguous*.  Moreover, Plaintiffs misconstrue this statutory language.  Both the courts and CEQ have long recognized that the phrase "to the fullest extent possible" in Section 102 (codified as 42 U.S.C. § 4332) is meant to address statutory conflicts by requiring each federal agency to comply with Section 102 of NEPA "unless existing law applicable to the agency's operations expressly prohibits or makes compliance impossible."  40 C.F.R. § 1500.6 (2019); *see Flint Ridge Dev. Corp. v. Scenic Rivers Ass'n*, 426 U.S. 776, 788 (1976) ("[T]he language in section 102 is intended to assure that all agencies of the Federal Government shall comply with the directive set out in said section 'to the fullest extent possible' *under their statutory authorizations* and that no agency shall utilize an excessively narrow construction of its existing statutory authorizations to avoid compliance."

(citation omitted, emphasis added)); *Ctr. for Biological Diversity v. Nat'l Highway Traffic Safety Admin.*, 538 F.3d 1172, 1213 (9th Cir. 2008) ("NEPA's legislative history reflects Congress's concern that agencies might attempt to avoid any compliance with NEPA by narrowly construing *other statutory directives* to create a conflict with NEPA.  Section 102(2) of NEPA therefore requires government agencies to comply 'to the fullest extent possible.'" (citations omitted, emphasis added)).  Indeed, even the D.C. Circuit's *Calvert Cliffs* decision, on which Plaintiffs focus, explains that the phrase "to the fullest extent possible" is intended to address statutory conflicts, so that "no agency shall utilize an excessively narrow construction *of its existing statutory authorizations* to avoid compliance."  *Calvert Cliffs' Coordinating Comm., Inc. v. U.S. Atomic Energy Comm'n*, 449 F.2d 1109, 1115 (D.C. Cir. 1971) (citation omitted, emphasis added).  Plaintiffs overreach in attempting to turn a phrase intended to help resolve conflicts between the application of NEPA and other laws into a substantive standard that modifies the deference owed to CEQ's interpretation of the statute.[10]

Contrary to Plaintiffs' misplaced focus on a single phrase, courts have long acknowledged what is clear to any reader: NEPA is a strikingly ambiguous statute.  *See, e.g.*, *Image of Greater San Antonio v. Brown*, 570 F.2d 517, 522 (5th Cir. 1978) (NEPA's "language and legislative history [] are somewhat less than clear."); *Hanly v. Kleindienst*, 471 F.2d 823, 825 (2d Cir. 1972) (NEPA's language "has been characterized as 'opaque' and 'woefully ambiguous.'" (internal citations omitted)); *City of New York v. United States*, 337 F. Supp. 150, 159 (E.D.N.Y. 1972) (NEPA's provisions are framed in "broad, yet opaque" terms.).  Of particular importance, NEPA does not define any of the terms at issue here, including

---

[10]  Amici Former CEQ Officials' argument that NEPA's "to the fullest extent possible" language requires agencies to conduct new scientific and technical research fails for the same reason. Former CEQ Offs. Amicus Br. 14-15, ECF No. 106-1.

"environmental effects" and "alternatives."  42 U.S.C. § 4332(2)(C).  And, while there are judicial opinions that vary from the interpretations in the 2020 Rule, they rest either directly on CEQ's prior regulations or on ambiguous provisions of the statute itself.  In either event, they do not foreclose the reasonable interpretations proffered by CEQ in the 2020 Rule.  And they do not deprive those interpretations of judicial deference.[11]

**B.**     **CEQ's Definition of "Environmental Effects" Is Consistent with NEPA**.

Plaintiffs assert that the 2020 Rule's definition of "environmental effects" is contrary to NEPA.  Pls.' Br. 35.[12]  This claim fails.  Rather than define environmental effects or impacts, Congress entrusted that "difficult policy choice[]" to CEQ.  *Brand X*, 545 U.S. at 980.  CEQ made a reasonable choice: Having found the multi-part definition of effects it adopted in 1978 to be cumbersome and unnecessary, CEQ replaced it with a straightforward definition that focuses on effects that are reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives.  This reasonable interpretation of NEPA should be upheld.

The starting point for all statutory interpretation is the language of the statute.  *Watt v. Alaska*, 451 U.S. 259, 265 (1981).  NEPA requires that, when proposing a "major Federal action[] significantly affecting the quality of the human environment," an agency must prepare a "detailed statement" that addresses the "environmental impact of the proposed action" and any unavoidable "adverse environmental effects" of the proposed action.  42 U.S.C. § 4332(C)(ii).  But Congress did not define "environmental effects" or "environmental impact."  *See* AR 40 (85 Fed. Reg. at 43,343).

---

[11]  Plaintiffs also assert CEQ's statutory interpretations do not merit deference because the Rule is procedurally defective.  Pls.' Br. 32 (citing *Encino Motorcars, LLC v. Navarro*, 136 S. Ct. 2117, 2125 (2016)).  As set forth *infra*, CEQ abided by the APA's procedural requirements.

[12]  Amici repeat this claim.  *See* Members of Cong. Amicus Br. 3-4; Law Prof. Amicus Br. 7-9, ECF No. 109-1; Former CEQ Offs. Amicus Br. 7-9.

In its 1978 regulations, CEQ addressed the statutory ambiguity surrounding the definition of effects by categorizing effects as either direct, indirect, or cumulative. *Id.* Over time, this approach proved problematic. *Id.* In particular, CEQ found the terms "indirect effects" and "cumulative impacts" were being expansively and inconsistently interpreted, leading to lengthy EAs and EISs full of speculative information of little value to decisionmakers or the public. *Id.* And, while doing little to improve decisions, agency attempts to catalog effects only tangentially related to a proposal led to frequent litigation and inconsistent judicial approaches. *See* AR 734 (Response to Comments (RTC) at 465); *e.g.*, *compare San Luis Obispo Mothers for Peace v. Nuclear Regul. Comm'n*, 449 F.3d 1016 (9th Cir. 2006) (holding that NEPA requires the Nuclear Regulatory Commission (NRC) to consider the indirect environmental effects of a terrorist attack on a nuclear energy facility) *with N.J. Dep't of Env't Prot. v. Nuclear Regul. Comm'n*, 561 F.3d 132 (3d Cir. 2008) (holding that NEPA does not require the NRC to consider the indirect environmental effects of a terrorist attack on a nuclear energy facility).

Efforts to analyze cumulative effects have proven particularly problematic. These often "divert[ed] agencies from focusing their time and resources on the most significant effects." AR 41 (85 Fed. Reg. at 43,344). Despite multiple attempts by CEQ to clarify cumulative effects through guidance documents (*see* AR 5724, AR 5428), the term has remained problematic, with courts positing a bewildering array of approaches and interpretations. *See, e.g.*, *Idaho Sporting Cong., Inc. v. Rittenhouse*, 305 F.3d 957, 974 (9th Cir. 2002) (holding Forest Service erred in using species home range as the scale for cumulative effects in EIS, but did not err in using species home range as the scale in EA); *Muckleshoot Indian Tribe v. U.S. Forest Serv.*, 177 F.3d 800, 809-11 (9th Cir. 1999) (holding Forest Service EIS for a proposed land exchange with timber company failed to consider the cumulative effects of other *future* land sales and resultant

*future* environmental effects caused by *future* private land owners).[13]

To address this problem, in the 2020 Rule CEQ removed the "direct," "indirect," and "cumulative" subcategories.  CEQ then defined "effects" and "impacts" as "changes to the human environment" that are "reasonably foreseeable and have a reasonably close causal relationship to the proposed action or alternatives."  AR 72 (40 C.F.R. § 1508.1(g)).  Providing a single overarching definition allows agencies, courts, regulated communities, and the public to focus on NEPA's primary goal—identifying reasonably foreseeable environmental effects—rather than on sorting effects into different conceptual buckets.  It also comports with NEPA's purpose of informed decisionmaking, as "[i]t is not practicable and useful to agency decision making to analyze effects that are not reasonably foreseeable and do not have a reasonably close causal relationship to the proposed action."  *See* AR 548 (RTC at 279).

The definition in the 2020 Rule is also consistent with the Supreme Court's interpretation of NEPA, which requires effects to have a reasonably close causal relationship to the proposed action.  In *Metropolitan Edison Co. v. People Against Nuclear Energy*, the Court held:

> Our understanding of the congressional concerns that led to the enactment of NEPA suggests that the terms "environmental effect" and "environmental impact" in § 102 [42 U.S.C. § 4332] be read to include a requirement of a *reasonably close causal relationship* between a change in the physical environment and the effect at issue. This requirement is like the familiar doctrine of proximate cause from tort law.

460 U.S. 766, 774 (1983) (emphasis added).  The Court reaffirmed the analogy to proximate cause in tort law in *Public Citizen*.  It held that an agency is not required to evaluate an issue

---

[13]  Even the approach of individual judges can be inconsistent. *Compare Neighbors of Cuddy Mountain v. U.S. Forest Serv.*, 137 F.3d 1372, 1380 (9th Cir. 1998) (Fletcher, J.) ("Nor is it appropriate to defer consideration of cumulative impacts to a future date.") *with Sierra Nevada Forest Prot. Campaign v. U.S. Forest Serv.*, 166 F. App'x 923, 928 (9th Cir. 2006) (Fletcher, J., concurring) ("The cumulative impact . . . will necessarily be considered in the EIS or EA of the future project; that is the appropriate time for such cumulative impact analysis[.]").

over which it has no control, emphasizing that requiring there be "a reasonably close causal relationship" between the proposed action and an environmental effect provides a "manageable line" between the effects an agency should address and those it need not.  541 U.S. at 767 (citations omitted).

Unwilling to acknowledge that Congress delegated the task of defining environmental effects to CEQ, Plaintiffs try to tease an unambiguous *Chevron* Step One mandate out of a disjointed collection of statutory language.  Plaintiffs first assert that the statutory requirement that an EIS disclose "(i) the environmental impact of the proposed action," as well as "(ii) any adverse environmental effects which cannot be avoided should the proposal be implemented," signifies that Congress wanted agencies to disclose effects "*beyond* 'the environmental impact of the proposed action' itself."  Pls.' Br. 35-36 (citing 42 U.S.C. § 4332(2)(C)).  But nothing in Section 4332(2)(C)(ii) suggests—much less unambiguously demands—that an EIS examine impacts beyond those that are *reasonably foreseeable*.  To the contrary, the Supreme Court has made clear that Section 4332(2)(C)(ii) is not intended to expand the scope of the impacts examined.  Rather, that provision requires agencies, within the broader category of reasonably foreseeable impacts, to distinguish between *avoidable* and *unavoidable* adverse impacts.  *See Robertson*, 490 U.S. at 351-52 ("Implicit in NEPA's demand that an agency prepare a detailed statement on 'any adverse environmental effects which cannot be avoided should the proposal be implemented,' 42 U.S.C. § 4332(C)(ii), is an understanding that the EIS will discuss the extent to which adverse effects can be avoided.").

Plaintiffs next cherry-pick phrases from Sections 4332(2)(C) and 4332(2)(F).  But Section 4332(2)(C) only refers to consulting with other agencies with jurisdiction or expertise in the impacts as issue.  It is not an unambiguous mandate with regard to the scope of effects that

must be addressed in an EIS.  And Section 4332(2)(F) does not relate to the requirements of an EIS at all.  It speaks only to agencies "lend[ing] appropriate support to initiatives, resolutions, and programs designed to maximize international cooperation in anticipating and preventing a decline in the quality of mankind's world environment."  Despite Plaintiffs' creative efforts, Congress simply did not provide an unambiguous definition of "environmental effects."[14]

Plaintiffs' attempts to depict CEQ's definition of environmental effects as barred by—or inconsistent with—judicial interpretations of NEPA also fall short.  For example, Plaintiffs focus on *Kleppe v. Sierra Club*, 427 U.S. 390, 410 (1976).  Pls.' Br. 36-37.  But there is no clear conflict between *Kleppe* and the 2020 Rule.  In *Kleppe*, the Court upheld the agency's decision "not to prepare one comprehensive impact statement on all proposed [coal mining] projects in the region," but observed that a single EIS may be required for interrelated proposals "pending concurrently" before an agency.  *Kleppe*, 427 U.S. at 409-410.  The 2020 Rule would also likely require a single impact statement for such interrelated actions.  *See* 40 C.F.R. § 1501.9(e) (2020) (AR 59) (requiring connected actions to be considered in a single EIS); *id.* § 1502.4(a) (AR 61) ("Agencies shall evaluate in a single environmental impact statement proposals or parts of proposals that are related to each other closely enough to be, in effect, a single course of

---

[14]  Amici proffer additional disconnected statutory words and phrases, but none resolve the ambiguity inherent in Congress's decision not to define environmental effects or impacts.  For example, the Amici Members of Congress note that in Section 4331(a) Congress recognized the "*interrelationship of all* components of the natural environment," and that Section 4332(2)(B) obligates agencies to "identify and develop methods and procedures . . . which will insure that *presently unquantified environmental amenities and values* may be given appropriate consideration in decisionmaking."  Members of Cong. Amicus Br. 4.  But neither of these sections address the contents of the EIS required under Section 4332(2)(C), much less the definition of "environmental effects."  The Amici Law Professors emphasize the words "all" and "shall."  Law Prof. Amicus Br. 7.  But in Section 4332(2), "all" is used only to describe the agencies to which NEPA applies, not the scope of effects.  And while "shall" indicates an EIS must describe "the environmental impact of a proposed action," it does not inform the scope of the environmental effects or impacts that "shall" be described.

action.").  To the extent *Kleppe* suggests a broader possible reading of environmental effects, it did not do so based on an unambiguous textual mandate at *Chevron* Step One.  It thus does not preclude CEQ from adopting a different interpretation.

Nor does the Second Circuit's decision in *Hanly v. Kleindienst* find an unambiguous statutory mandate to include separate enumeration of "cumulative effects."  471 F.2d at 831.  In fact, *Hanly* begins with the observation that NEPA is "woefully ambiguous," so any statutory interpretations it offers are not made at *Chevron* Step One, and would not preclude CEQ from adopting a different interpretation.  Nonetheless, the *Hanly* Court does not interpret NEPA in a manner that conflicts with the 2020 Rule.  The *Hanly* Court notes the importance of setting when considering the significance of an impact:

> it must be recognized that even a slight increase in adverse conditions that form an existing environmental milieu may sometimes threaten harm that is significant. One more factory polluting air and water in an area zoned for industrial use may represent the straw that breaks the back of the environmental camel.

*Id.*  Consistent with that observation, the 2020 Rule recognizes that "[s]ignificance varies with the setting of the proposed action."  40 C.F.R. § 1501.3(b)(1) (2020) (AR 57).[15]  And CEQ revised the "affected environment" section to require agencies to consider reasonably foreseeable environmental trends and planned actions.  40 C.F.R. § 1502.15 (2020) (AR 62-63).[16]

---

[15]  Plaintiffs also cite *Natural Resources Defense Council v. Callaway*, 524 F. 2d 79, 88 (2d Cir. 1975), for the proposition that an assessment of cumulative effects is required.  Pls.' Br. 36.  But that decision rests on CEQ's early guidance.  *See Callaway*, 524 F. 2d at 88.  It is not a *Chevron* Step One holding that NEPA imposes an unambiguous obligation to address cumulative effects.  Thus, to the extent *Callaway* conflicts with the 2020 Rule, CEQ was free to adopt a different interpretation.  *See Brand X*, 545 U.S. at 982.

[16]  *See also* AR 28 (85 Fed. Reg. 43,331) ("This change responds to comments raising concerns that eliminating the definition of cumulative impact (40 CFR 1508.7) would result in less consideration of changes in the environment.  To the extent environmental trends or planned actions in the area(s) are reasonably foreseeable, the agency should include them in the discussion of the affected environment.  Consistent with current agency practice, this also may include non-Federal planned activities that are reasonably foreseeable.").

In sum, Congress left it to CEQ to define environmental effects or impacts.  CEQ's definition is a reasonable one—informed by the text of the statute, Supreme Court precedent, and over forty years of experience—and it should be upheld in this facial challenge.

    **C.**    **The 2020 Rule's Approach to Alternatives Analysis Is Consistent with NEPA**.

Plaintiffs' argument that the 2020 Rule violates the statutory requirement that agencies consider alternatives to proposed actions is meritless.  *See* Pls.' Br. 37-39.  The 2020 Rule provides a reasonable interpretation of NEPA's ambiguous text relating to alternatives analysis. Plaintiffs' speculation that CEQ's approach might produce less robust NEPA analyses does not provide grounds for facial invalidation of the Rule.[17]

With regard to the analysis of alternatives, NEPA provides only that agencies should prepare a "detailed statement" addressing "alternatives to the proposed action," and that agencies must "study, develop, and describe appropriate alternatives to recommended courses of action." 42 U.S.C. § 4332(2)(C), (E).  None of these terms is defined.  Thus, aside from the obligation to address "appropriate alternatives," the question of how agencies should address alternatives cannot be answered at *Chevron* Step One, and requires CEQ to undertake the "difficult policy choices" inherent in filling statutory gaps.  *Brand X*, 545 U.S. at 980.

The 1978 regulations implemented the requirement to consider alternatives by providing that an agency shall consider "all reasonable alternatives," and shall "include reasonable alternatives not within the jurisdiction of the lead agency."  40 C.F.R. § 1502.14(a), (c) (2019). In the 2020 Rule, CEQ modified Section 1502.14 by eliminating "all" before "reasonable alternatives" and by eliminating the requirement to consider alternatives outside the jurisdiction

---

[17]  Amici reiterate Plaintiffs' alternatives claim (*see* Members of Cong. Amicus Br. 5; Law Prof. Amicus Br. 11; Former CEQ Offs. Amicus Br. 9), but they also fail to show that CEQ's approach is unreasonable under *Chevron*.

of the agency.  AR 27 (85 Fed. Reg. at 43,330).  For the first time, CEQ defined "reasonable alternatives," providing that "*[r]easonable alternatives* means a reasonable range of alternatives that are technically and economically feasible, meet the purpose and need for the proposed action, and, where applicable, meet the goals of the applicant."  40 C.F.R. § 1508.1(z) (AR 73).

These changes easily meet the reasonableness requirement under *Chevron*.  First, CEQ explained that eliminating "all" from Section 1502.14 comports with the text of NEPA, which does not use the modifier "all."  CEQ thus makes clear that "an EIS need not include every available alternative where the consideration of a spectrum of alternatives allows for the selection of any alternative within that spectrum."  AR 27 (85 Fed. Reg. at 43,330).  For example, the Forest Service might consider a timber harvest of 1,000, 5,000, and 10,000 acres, but need not necessarily consider every permutation in between.  This change is not dramatic.  CEQ has long taken the position that, "[w]hen there are potentially a very large number of alternatives, only a reasonable number of examples, covering the full spectrum of alternatives, must be analyzed and compared in the EIS."  AR 6017 (Forty Questions, Question 1b).  That position has been upheld by the courts.  *See, e.g.*, *Wetlands Water Dist. v. U.S. Dep't of Interior*, 376 F.3d 853, 871 (9th Cir. 2004) (holding "NEPA does not require the EIS to have considered every conceivable permutation" between two endpoints).[18]  Thus, this change simply conforms the regulations to CEQ's own longstanding policy and underscores that "[t]he reasonableness of the analysis of alternatives in a final EIS is resolved not by any particular number of alternatives considered, but by the nature of the underlying agency action and by the inherent practical

---

[18]  *See also, e.g., Nat'l Audubon Soc'y v. Dep't of Navy,* 422 F.3d 174, 205-06 (4th Cir. 2005) ("To be sure, an agency's planning may focus most intently on a limited subset of all the possible alternatives available to it."); *Native Ecosystems Council v. U.S. Forest Serv.*, 428 F.3d 1233, 1249 (9th Cir. 2005) (holding the Forest Service was not required to consider alternatives substantially similar to other alternatives).

limitations of the decision-making process."  AR 27 (85 Fed. Reg. at 43,330).

Plaintiffs contend that eliminating "all" from Section 1502.14 will allow agencies to "ignore reasonable alternatives suggested by the public" by claiming that they fall within the endpoints of the spectrum of alternatives considered by the agency.  Pls.' Br. 38.  This is speculation.  Nowhere do the regulations *prohibit* the inclusion of any reasonable alternatives.  Nor do the regulations require the "endpoints on a spectrum of alternatives" approach.  Including only endpoint alternatives may be reasonable in some situations, but unreasonable in others.  Plaintiffs' speculation that the alternatives provision *could* be applied in *some* situations to violate the law does not provide a basis for facial invalidation of that provision as a whole.[19]

Nor does the case law cited by Plaintiffs demonstrate any facial infirmity in CEQ's interpretation.  Pls.' Br. 39.  While numerous courts have affirmed the importance of the consideration of alternatives to the NEPA process, Plaintiffs cite no case that interprets NEPA at *Chevron* Step One as compelling the consideration of "*all* reasonable alternatives" rather than consideration of "reasonable alternatives to the proposed action."

Plaintiffs' claim that the 2020 Rule violates NEPA by relieving agencies of the obligation to consider alternatives outside their jurisdiction also fails.  *Id.*  CEQ reasonably found that "it is not efficient or reasonable to require agencies to develop detailed analyses relating to alternatives outside the jurisdiction of the lead agency."  AR 27 (85 Fed. Reg. at 43,330).  This is precisely the type of "difficult policy choice[]"—balancing reasonableness and efficiency against the value of instructing agencies to analyze alternatives beyond their control and expertise—that "agencies

---

[19]  Contrary to Plaintiffs' speculation that agencies will use the new Rule to avoid reasonable alternatives suggested by the public, the preamble to the Rule explicitly directs agencies to consider "significant alternatives that are called to its attention by other agencies, organizations, communities, or a member of the public."  AR 27 (85 Fed. Reg. at 43,330).

are better equipped to make than courts." *Brand X*, 545 U.S. at 980.

Plaintiffs claim the elimination of this obligation violates NEPA because nearly fifty years ago the D.C. Circuit held that the Department of the Interior erred in excluding alternatives from an oil and gas leasing EIS that were outside the agency's jurisdiction. *Nat. Res. Def. Council v. Morton*, 458 F.2d 827 (D.C. Cir. 1972). There the court reasoned that a "proposed solution to a national problem, or a set of inter-related problems, may call for each of several departments or agencies to take [specific actions]," and therefore each involved agency should not be limited to analyzing alternatives within its own jurisdiction. *Id.* at 834-35. There is not, however, a clear facial conflict between the *Morton* court's reading of NEPA and the 2020 Rule. Under the 2020 Rule, if an interrelated problem would require action by multiple agencies, those agencies could address it by jointly preparing or cooperating on a single NEPA document that covers alternatives within the jurisdiction of each agency. 40 C.F.R. § 1501.8 (AR 58-59).[20]

Moreover, even if *Morton* could be read as requiring a single agency to evaluate alternatives outside of its jurisdiction—the Federal Aviation Administration proposing highway improvements so people will drive more as an alternative to a new airport, for example—that reading is superseded by the Supreme Court's holding in *Public Citizen*. It is now clear that an agency is *not* required to evaluate an issue over which it has no control. 541 U.S. at 765-69. Moreover, *Morton* is not a *Chevron* Step One interpretation of NEPA. It turned on the scope of a Presidential directive rather than any unambiguous text of NEPA. *Morton*, 458 F.2d at 834-35. Thus, to the extent it conflicts with the 2020 Rule, CEQ was not bound by its interpretation.

Finally, Plaintiffs speculate that, by eliminating open-ended phrases such as "rigorously

---

[20] Such interrelated actions might also be "connected actions" requiring consideration in a single EIS. *See* 40 C.F.R. § 1501.9(e)(1) (2020) (AR 59).

explore" and "devote substantial treatment to" from Section 1502.14, the 2020 Rule will lead to weaker analyses, contravening the statutory requirement that an EIS include a "detailed statement" of alternatives.  Pls.' Br. 40.  But again, this claim relies on speculation about how the regulations will be applied.  There is no facial conflict between the text of the 2020 Rule and the statutory obligation to provide a "detailed statement" on "alternatives."  42 U.S.C. § 4332(2)(C). To the contrary, the 2020 Rule explicitly provides that an EIS must be a "detailed statement" and requires that it include evaluation of alternatives.  40 C.F.R. § 1500.1(a) (2020) (AR 55). Plaintiffs' speculation that the 2020 Rule will result in weakened NEPA documents thus fails to meet their burden in this facial challenge.  *Reno*, 507 U.S. at 301.

In short, the 2020 Rule provides a reasonable interpretation of the NEPA obligation to analyze alternatives because it is consistent with NEPA's text, structure, and objectives, and is well supported and explained.  Plaintiffs' claim to the contrary should be rejected.

### D. **Amici's Statutory Interpretation Arguments Should Be Rejected**.

Amici seek to pursue several arguments abandoned by Plaintiffs.  But amici cannot pursue legal claims not pursued by the parties.  These arguments should therefore be rejected. *See* Defs' Opp'n to Mots. for Leave to File Amicus Brs. 4-5 (ECF No. 126); *see also Snyder v. Phelps*, 580 F.3d 206, 216-17 (4th Cir. 2009) (refusing to consider issue raised only by amicus). Nonetheless, if the Court opts to consider Amici's new arguments, it will find them meritless.

### 1. **The 2020 Rule Properly Addresses Public Involvement**.

Amici claim the 2020 Rule limits public involvement in a manner contrary to NEPA, by requiring specificity in public comments and providing that issues not brought to an agency's attention are unexhausted and waived.  Members of Cong. Amicus Br. 6-7.  To the contrary, the 2020 Rule's public participation provisions are a reasonable effectuation of NEPA.

NEPA has twin aims: "to promote informed decision making" and "to inform the public about the agency's decision making." AR 11 (85 Fed. Reg. at 43,314). CEQ's mandate in implementing the statute includes designing regulations that "make the environmental impact statement process more useful to decision[]makers and the public." AR 4 (85 Fed. Reg. at 43,307). The 2020 Rule effectuates these goals by imposing reasonable obligations on both agencies and commenters. For their part, agencies must seek public input early in the NEPA process, both after publishing a Notice of Intent to prepare an EIS and after publishing a draft EIS. AR 11 (85 Fed. Reg. at 43,314).[21] To assist the public in tracking the process and ensure that agencies give timely consideration to comments, the 2020 Rule requires agencies to include in draft and final EISs a summary of public comments received. AR 11 (85 Fed. Reg. at 43,314); 40 C.F.R. §§ 1500.3(b)(2), 1502.17 (2020) (AR 55, 63). Reciprocally, the Rule requires commenters to make comments as "specific as possible," to "explain why the issues raised are important to the consideration of potential environmental impacts and alternatives to the proposed action," and to "describe the data sources and methodologies supporting" any changes they propose. 40 C.F.R. § 1503.3(a) (2020) (AR 64-65). The Rule promotes timely participation by providing that issues not presented in the comment periods are waived. *Id.*

Nothing in this process is contrary to NEPA. The statute's only mention of comments is a requirement to "consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved." 42 U.S.C. § 4332(2)(C). The call for comments to be "as specific as possible" is consistent with the 1978 regulations—which used the same language, 40 C.F.R. § 1503.3(a) (2019)—as well as with

---

[21] Amici suggest CEQ has removed the obligation to respond to comments. Law Prof. Amicus Br. 11. Not so. Under the 2020 Rule, agencies must consider all substantive comments and may respond to individual comments or groups of comments. 40 C.F.R. § 1503.4(a) (2020) (AR 65).

Supreme Court precedent that parties wishing to participate in the NEPA process must "structure their participation so that it is meaningful, so that it alerts the agency to the [parties'] position." *Vt. Yankee Nuclear Power v. Nat. Res. Def. Council*, 435 U.S. 519, 553-54 (1978).  The exhaustion provision simply codifies the Supreme Court's holding that issues not brought to an agency's attention in the comment process are waived.  *Pub. Citizen*, 541 U.S. at 764-65.[22]

Amici fear this approach will curtail public involvement.  Members of Cong. Amicus Br. 8.  This is speculation.  The 2020 Rule asks that commenters provide as much detail "as possible," 40 C.F.R. § 1503.3 (2020) (AR 64-65), but it does not set a threshold under which comments lacking detail will be excluded.  To the contrary, CEQ explicitly noted that "[n]othing in these revisions should be construed to limit public comment to those members of the public with scientific or technical expertise, and agencies should continue to solicit comment from all interested and affected members of the public."  AR 30 (85 Fed. Reg. at 43,333).  Rather than excluding public input, CEQ's revision is intended "to bring relevant comments, information, and analyses to the agency's attention, as early in the process as possible, to enable the agency to make maximum use of this information."  AR 11 (*id.* at 43,314).  Amici's speculation that the Rule may be applied to curtail public comment does not support its facial invalidation.

> **2.**     **The 2020 Rule Does Not Allow Projects to Proceed in Violation of NEPA**.

Amici also assert the 2020 Rule contravenes NEPA by allowing project proponents to undertake certain activities—such as buying rights-of-way—before the NEPA process is complete.  Members of Cong. Amicus Br. 8-9.  This allegation fails.  The Rule simply codifies

---

[22]  This provision is also consistent with "black-letter administrative law" that courts will not consider objections to an agency's actions that were not first presented to the agency. *Appalachian Power Co. v. EPA*, 251 F.3d 1026, 1036 (D.C. Cir. 2001); *Pleasant Valley Hosp. Inc. v. Shalala*, 32 F.3d 67, 70 (4th Cir. 1994).

longstanding agency practice and case law by barring pre-project activities that would have an adverse environmental impact or limit the choice of reasonable alternatives, but allowing preparatory activities that do not irreversibly and irretrievably commit the federal decisionmaker to a particular outcome.

The text of NEPA is silent as to what activities related to a proposal a proponent may undertake prior to the completion of the NEPA process.  In the 1978 regulations, CEQ provided that prior to a final NEPA decision "no action concerning the proposal may be taken which would: (1) Have an adverse environmental impact; or (2) Limit the choice of reasonable alternatives."  40 C.F.R. § 1506.1(a) (2019).  However, the 1978 regulations explicitly allowed "development by applicants of plans or designs or performance of other work necessary to support an application for Federal, State or local permits or assistance."  40 C.F.R. § 1506.1(d) (2019).  Over time, agency-specific NEPA regulations defined other allowable activities.  AR 626 (RTC at 357).  Similarly, judicial opinions also recognize that NEPA imposes no strict bar on all project-related activity prior to completion of NEPA analysis.  *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 145 (2010) ("Even if a particular agency proposal requires an EIS, applicable regulations allow the agency to take at least some action in furtherance of that proposal while the EIS is being prepared."); *Nat'l Audubon Soc'y*, 422 F.3d at 205-06 (holding Navy could purchase land for a project before completing the NEPA process).[23]

Consistent with this history, the 2020 Rule continues the prohibition on taking actions

---

[23] *See also, e.g.*, *WildWest Inst. v. Bull*, 547 F.3d 1162, 1169 (9th Cir. 2008) (holding Forest Service did not violate NEPA by marking trees to be cut before finishing NEPA analysis because "it clearly retained the authority to change course or to alter the plan it was considering implementing"); *Los Alamos Study Grp. v. U.S. Dep't of Energy*, 794 F. Supp. 2d 1216, 1228-29 (D.N.M. 2011) (finding agency did not violate NEPA in expending $210 million on project design and analysis before completion of NEPA analysis), *aff'd* 692 F.3d 1057 (10th Cir. 2012).

prior to completion of the NEPA process if those actions would have an adverse environmental impact or limit the choice of reasonable alternatives. 40 C.F.R. § 1506.1 (2020) (AR 67). The 2020 Rule also continues to allow "activities necessary to support an application for Federal, State, Tribal, or local permits or assistance." *Id.* To facilitate consistent implementation among agencies, the 2020 Rule provides examples—based on other agencies' regulations and case law—of activities an agency may authorize that would not limit the choice of alternatives or have adverse environmental impacts, such as "acquisition of interests in land . . . , purchase of long lead-time equipment, and purchase options made by applicants." *Id.* None of these limited activities "irreversibly and irretrievably" commits the federal decisionmaker to a particular outcome or causes environmental impacts. *Nat'l Audubon Soc'y*, 422 F.3d at 206 (noting Navy could resell land purchased before the NEPA decision if it ultimately decided on another site); *see also Ctr. for Env't Law & Pol'y v. Bureau of Reclamation*, 655 F.3d 1000, 1006 (9th Cir. 2011) (finding agency's entry into a memorandum of understanding and procurement of water use permits before completion of NEPA did not irretrievably commit the agency to a project). Amici's speculation that the Rule *could be* applied in a manner contrary to the statute does not provide grounds for holding it invalid on its face.[24]

***

---

[24] Amici also argue that the 2020 Rule violates NEPA by allowing a project proponent to prepare an EIS. Former CEQ Offs. Amicus Br. 12-14. Applicants were permitted to prepare EAs under the 1978 regulations; the 2020 Rule merely extends that allowance to EISs. AR 655 (RTC at 386). The 2020 Rule protects the integrity of the NEPA process by requiring agencies to "independently evaluate" an applicant-prepared EIS and take "responsib[ility] for its accuracy, scope, and contents," and applicant-preparers to disclose interests in the project. 40 C.F.R. § 1506.5(b)(2), (4) (2020) (AR 68). Amici's suggestion that NEPA's reference to a "detailed statement by the responsible official," 42 U.S.C. § 4332(2)(C), means only federal officials can draft an EIS is contrary to the 1978 regulations, which expressly allowed contractors to prepare EISs. 40 C.F.R. § 1506.5(c) (2019). And their assumption that allowing applicants to prepare EISs will result in biased outcomes—when CEQ has found no evidence of bias in applicant-prepared EAs, AR 656-57 (RTC at 387-88)—is pure speculation.

In sum, CEQ has made the "difficult policy choices" required to interpret and implement an ambiguous statute. *Brand X*, 545 U.S. at 980. While CEQ's interpretations may not be those that Plaintiffs or even this Court might choose to adopt, they are reasonable, and "*Chevron* requires a federal court to accept the agency's construction of the statute, even if the agency's reading differs from what the court believes is the best statutory interpretation." *Id.*

## III. CEQ Complied with the APA in Promulgating the 2020 Rule.

Plaintiffs argue that CEQ violated the APA by failing to consider (1) the impact of the 2020 Rule on the environment and environmental justice, (2) evidence allegedly contradicting its concerns about undue delay and paperwork, and (3) the reliance interests of various third parties. Because the record[25] demonstrates that CEQ thoroughly addressed each of these issues, Plaintiffs' claims fail. *See Casa De Md. v. U.S. Dep't of Homeland Sec.*, 924 F.3d 684, 703 (4th Cir. 2019) (Review under the APA is "highly deferential, with a presumption in favor of finding the agency action valid." (citation omitted)).

### A. CEQ Considered All Relevant Factors.

Plaintiffs accuse CEQ of failing to consider two factors relevant to the 2020 rulemaking: the impact of the 2020 Rule on the environment and on environmental justice. Because CEQ addressed both factors, it did not "entirely fail[] to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43, and therefore complied with the APA.

---

[25] Although Plaintiffs do not directly challenge the administrative record, they criticize it for lacking evidence showing CEQ's "deliberation during the rulemaking period." Pls.' Br. 7-8, 12-13. Internal deliberative documents, however, are not part of the administrative record. *Oceana, Inc. v. Ross*, 920 F.3d 855, 865 (D.C. Cir. 2019); *Tafas v. Dudas*, 530 F. Supp. 2d 786, 794 (E.D. Va. 2008); *N.C. Wildlife Fed'n v. N.C. Dep't of Transp.*, No. 2:19-CV-14-FL, 2020 WL 5044465, at *4 (E.D.N.C. Aug. 26, 2020); *S.C. Coastal Conservation League v. U.S. Army Corps of Eng'rs*, No. 2:17-cv-3412, 2020 WL 858599, at *3-4 (D.S.C. Feb. 21, 2020); *Outdoor Amusement Bus. Ass'n, Inc. v. Dep't of Homeland Sec.*, No. ELH-16-1015, 2017 WL 3189446, at *8 (D. Md. July 27, 2017).

### 1.      CEQ Considered the 2020 Rule's Impact on the Environment.

Plaintiffs claim that CEQ failed to consider the impact of the 2020 Rule on the environment. This is false. In the Regulatory Impact Analysis for the 2020 Rule (RIA), CEQ individually evaluated every provision of the 2020 Rule and determined that none will impact the environment. AR 876-98 (RIA at 10-32). As CEQ explained, even the 2020 Rule's exemption of certain types of agency actions from NEPA is unlikely to impact the environment because those actions were generally categorically excluded from NEPA under the 1978 regulations, and other statutes limit the environmental impact of those actions. AR 876-77 (*id.* at 10-11).

Rather than confront CEQ's analysis,[26] Plaintiffs resort to misrepresenting the RIA, alleging that CEQ failed to consider the 1978 regulations as part of the baseline for its analysis. Pls.' Br. 14. But as the RIA itself says under the heading "Baseline for the analysis," "[i]n evaluating the economic and environmental impacts, CEQ considered the NEPA statute and Supreme Court case law, *and the 1978 regulations*." AR 874 (RIA at 8) (emphasis added); *see also* AR 49 (85 Fed. Reg. at 43,352) (explaining that baseline includes 1978 regulations). Even the sentence that Plaintiffs rely on references the "changes" between the 1978 regulations and the 2020 Rule, evidencing CEQ's use of the 1978 regulations as a baseline. AR 876 (RIA at 10).

Unable to support their critique of the RIA, Plaintiffs move on to a laundry list of concerns raised by commenters about the Rule's impact on the environment. The list is

---

[26] Plaintiffs cite only one of CEQ's provision-specific analyses in their conclusory attack on the RIA: "CEQ stated that eliminating the 1978 requirement to consider 'all reasonable alternatives' would have no impact 'since analysis of *infeasible* alternatives is unlikely to improve environmental outcomes.'" Pls.' Br. 14 (quoting AR 898 (RIA at 32)). It is not clear what Plaintiffs find problematic here. CEQ's conclusion that limiting consideration of alternatives to those that are "technically and economically feasible" will not impact the environment is reasonable. After all, an infeasible alternative, no matter how environmentally beneficial, is unlikely to be implemented. *See supra* 18-22.

unpersuasive because (1) these concerns simply rehash Plaintiffs' statutory arguments regarding the consistency of the 2020 Rule with NEPA, (2) the concerns are all speculative, assuming without evidence that the 2020 Rule "will," when applied to a specific future agency action, produce certain harmful outcomes, and (3) CEQ addressed these concerns in the 2020 Rule and response to comments, which is all that the APA requires.  For example, commenters claimed that the elimination of indirect and cumulative effects will "lead to significant harms when those impacts are ignored in the decisionmaking process."  Pls.' Br. 15.  But as CEQ explained, the elimination of the separate categories of direct, indirect, and cumulative effects does not necessarily mean that impacts previously categorized as indirect or cumulative will no longer be considered under the 2020 Rule's single definition of environmental effects.  *Supra* 14-17; AR 277 (RTC at 8) (noting the requirement to consider all reasonably foreseeable effects that have a reasonably close causal relationship to the proposed action "does not eliminate consideration of any particular impacts").  Likewise, commenters alleged that the 2020 Rule's approach to alternatives will cause agencies to "miss options that cause significantly less damage to sensitive resources."  Pls.' Br. 15.  As CEQ explained, however, the 2020 Rule's elimination of "all" before "reasonable alternatives" and the requirement that alternatives be "technically and economically feasible" is consistent with longstanding case law.  *Supra* 18-20; AR 27-28, 48 (85 Fed. Reg. at 43,330-31, 43,351); AR 833 (RTC at 564).  Commenters also raised concerns about agencies' consideration of climate change under the 2020 Rule.  Pls.' Br. 15.  But as CEQ explained, nothing in the Rule prevents an agency from considering the effect of a proposed action on climate change so long as "it meets the definition of 'effect' set forth in § 1508.1(g)"— a definition which is consistent with Supreme Court case law.  AR 380, 391 (RTC at 111, 122); *see also supra* 14-15; AR 40-41 (85 Fed. Reg. at 43,343-44).  And while commenters took issue

29

with the 2020 Rule's exemption of certain loans and loan guarantees from NEPA, Pls.' Br. 15, CEQ thoroughly explained why, as a matter of law, it determined that such loans and loan guarantees are not "major Federal actions" subject to NEPA.  AR 793-98 (RTC 524-29); AR 45-46 (85 Fed. Reg. at 43,348-49).  In short, Plaintiffs' list of concerns raised by commenters is not a list of environmental impacts that CEQ ignored, but rather a list of allegations concerning the substantive operation of the 2020 Rule that CEQ responded to as required by the APA.

Plaintiffs argue that CEQ should have gone further and considered the specific hypothetical scenarios posited by commenters.  Pls.' Br. 16.  But those scenarios are based not on currently known facts but on the assumed outcomes of future agency actions applying the 2020 Rule.  *See id.* at 14-15.  As CEQ correctly explained, it is not the agency's role to speculate about every possible future application of the 2020 Rule by other agencies.  AR 736 (RTC at 467) ("How examples provided by commenters would be analyzed under the final rule will depend on the particular factual records. . . . It is not possible to state affirmatively that a specific example would be analyzed differently under the final rule."); *see also Fox*, 556 U.S. at 519 (Under the APA, agencies need not "obtain[] the unobtainable."); *Advanced Micro Devices v. C.A.B.*, 742 F.2d 1520, 1546 (D.C. Cir. 1984) (refusing to assume that "parade of horribles" predicted by plaintiffs as a result of agency policy will come to pass and noting that, if it does, it can be "dealt with in future litigation").  Nor is CEQ obligated to respond to every scenario postulated by commenters.  *Carlson v. Postal Regul. Comm'n*, 938 F.3d 337, 344 (D.C. Cir. 2019) ("An agency need not discuss every item of fact or opinion included in the submissions made to it." (internal quotation marks and citation omitted)); *Thompson v. Clark*, 741 F.2d 401, 408 (D.C. Cir. 1984) (The APA "has never been interpreted to require the agency to respond to every comment, or to [analyze] every issue or alternative raised by the comments.").

Plaintiffs also accuse CEQ of ignoring "a mountain of evidence" that the 1978 regulations have "produced measurable environmental improvements." Pls.' Br. 16. To start, this "mountain" appears to consist of only two studies that evaluated only a small subset of EISs prepared by a single agency. *See id.* (citing AR 1045946). Moreover, Plaintiffs' asserted conclusion does not flow from their premise. Studies showing that EISs can reduce environmental impacts do not demonstrate that the 2020 Rule will increase impacts. After all, the 2020 Rule still requires the use of an EIS to evaluate "major Federal actions significantly affecting the quality of the human environment." *Compare* 40 C.F.R. § 1502.3 (2020) (AR 61) *with* 40 C.F.R. § 1502.3 (2019); *see* AR 736 (RTC at 467) ("The mere fact that a referenced EIS included the analysis of indirect or cumulative effects does not mean the analysis would exclude those same effects under the final rule.").

In sum, CEQ's evaluation of the "relevant data" regarding the environmental impacts of the 2020 Rule—that is, the non-speculative information and facts currently available—and its rational explanation for its decision satisfies the APA. *State Farm*, 463 U.S. at 43; *Dep't of Com.*, 139 S. Ct. at 2569. Plaintiffs' disagreement with CEQ's "policy balance" "does not reflect a failure to consider relevant factors." *Owner-Operator Indep. Drivers Ass'n, Inc. v. Fed. Motor Carrier Safety Admin.*, 494 F.3d 188, 211 (D.C. Cir. 2007).

### 2.      CEQ Considered the 2020 Rule's Impact on Environmental Justice.

Plaintiffs begin their argument on environmental justice by falsely accusing CEQ of "admit[ting] to this Court" that "it does not consider environmental justice 'important or relevant' to NEPA." Pls.' Br. 17. A quick perusal of the cited brief shows that Plaintiffs have taken a portion of a parenthetical quotation of a case out of context. That bold mischaracterization sets the tone for the remainder of Plaintiffs' argument.

Even if Plaintiffs' claim regarding environmental justice is reviewable,[27] it suffers from the same flaw as Plaintiffs' environmental impacts argument.  It merely rehashes their (unfounded) statutory arguments and assumes, without evidence, that the 2020 Rule "will" necessarily adversely impact environmental justice.  As CEQ explained in response to comments on environmental justice, "NEPA is a procedural statute that does not presuppose any particular substantive outcomes."  AR 53 (85 Fed. Reg. at 43,356).  The 2020 Rule merely "set[s] forth implementing regulations for NEPA; it is in the agency implementation of NEPA when conducting reviews of proposed agency actions where agencies can consider, as needed, environmental justice issues."  *Id.*  Yet here again Plaintiffs offer a laundry list of assumed harms (without evidence) flowing from hypothetical future agency actions.

For example, Plaintiffs again point to the elimination of cumulative effects as disproportionately impacting environmental justice communities.  Pls.' Br. 18.  Yet, CEQ repeatedly explained that the elimination of subcategories of effects "does not eliminate consideration of any particular impacts."  AR 277 (RTC at 8); *see also* AR 380-81 (*id.* at 111-12) ("The definition of 'effects' in § 1508.1(g) continues to include effects that are relevant to environmental justice communities, including ecological, aesthetic, historic, cultural, economic, social, and health impacts.").  Plaintiffs also again point to the 2020 Rule's treatment of loans and loan guarantees.  Pls.' Br. 19.  This ignores CEQ's extensive explanation of why those actions are not major federal actions subject to NEPA.  AR 793-98 (RTC 524-29); AR 45-46 (85

---

[27]  As Defendants previously explained, this claim is not reviewable because it is predicated on Executive Order 12,898, which does not "create any right to judicial review."  Defs.' Opp'n to Pls.' Mot. for Prelim. Inj. 53; *see Citizens Concerned About Jet Noise, Inc. v. Dalton*, 48 F. Supp. 2d 582, 604 (E.D. Va. 1999) (finding no jurisdiction to consider environmental justice claims because Executive Order 12,898 does not provide for judicial review and "NEPA does not require an environmental justice analysis"), *aff'd*, 217 F.3d 838 (4th Cir. 2000).

Fed. Reg. at 43,348-49).  Likewise, Plaintiffs argue that the 2020 Rule "weaken[s] requirements requir[ing] agencies consider up-to-date scientific information."  Pls.' Br. 19.  Not so.  Section 1502.23 requires agencies to "make use of reliable existing data and resources," and Section 1502.21(b) requires agencies to obtain otherwise incomplete information "essential" to their analyses so long as the "the overall costs of obtaining it are not unreasonable."  AR 63-64; *see also* AR 29 (85 Fed. Reg. at 43,332); AR 575-77, 581-87 (RTC at 306-08, 312-18).[28]

Plaintiffs also cite comments arguing that environmental justice communities will face "further barrier[s]" to participation in the NEPA process under the 2020 Rule.  Pls.' Br. 18.  But CEQ explained in its response to comments that the 2020 Rule retained the language in the 1978 regulations requiring comments to be "as specific as possible."  *See supra* 23-24; AR 596 (RTC at 327).  And the Rule's additional language derived from Supreme Court case law is intended "to guide commenters in providing information in a manner that is most useful for informed decision making, and not intended to limit public comment or preclude consideration of substantive comments."  *Id*.  CEQ also made changes to "improve public notification and involvement in the NEPA process," such as giving agencies greater flexibility and additional tools for engaging the public, that will assist in outreach to environmental justice communities.  AR 597, 665 (RTC at 328, 396); AR 53 (85 Fed. Reg. at 43,356).

---

[28]  Amici speculate that CEQ's decision not to require agencies to "undertake new scientific and technical research," 40 C.F.R. § 1502.23 (2020) (AR 64), "will . . . encourage agencies to make decisions without a full accounting of the facts."  Former CEQ Offs. Amicus Br. 14-15.  First, nothing in the 2020 Rule *prohibits* an agency from undertaking additional research, and Amici's assumption that agencies will make uninformed decisions in violation of NEPA violates the APA's presumption of regularity and the requirements of facial review.  *See Fed. Commc'ns Comm'n v. Schreiber*, 381 U.S. 279, 296 (1965) (Agencies are "entitled" to a "presumption . . . that they will act properly and according to law.").  Second, NEPA does not require agencies to constantly reevaluate their analyses in an effort to keep up with the "scientific cutting edge."  *Theodore Roosevelt Conservation P'ship v. Salazar*, 616 F.3d 497, 512 (D.C. Cir. 2010).

Plaintiffs accuse CEQ of failing "to offer evidence-based reasoning."  Pls.' Br. 19.  But it is Plaintiffs who have the burden to demonstrate that CEQ's decision was arbitrary and capricious.  *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002).  Yet Plaintiffs offer not facts and evidence—but pure speculation—about how the 2020 Rule might be applied to future agency actions.  In contrast, CEQ has complied with the APA by explaining why the 2020 Rule is unlikely to impact environmental justice and why commenters' specific concerns are misplaced in light of particular provisions of the 2020 Rule.  *See Fox*, 556 U.S. at 521 (holding agency's "predictive judgment" regarding effect of rule "merits deference").

### B.     CEQ Considered the Evidence Before It Regarding Paperwork and Delay.

Plaintiffs claim that "CEQ's stated justification for its regulatory overhaul—'to reduce paperwork and delays'"—is contrary to the evidence before the agency, which they allege demonstrates that "NEPA is not a major source of project delay."  Pls.' Br. 20-21.

To begin with, CEQ's justification for the 2020 Rule was not solely the reduction of paperwork and delays.  As the agency explained, the 2020 Rule "comprehensively updates, modernizes, and clarifies the regulations to facilitate more efficient, effective, and timely NEPA reviews."  AR 1 (85 Fed. Reg. at 43,304).  It also intended to "improve interagency coordination in the environmental review process, promote earlier public involvement, increase transparency, [] enhance the participation of States, Tribes, and localities," and "promote better decisions consistent with the national environmental policy set forth in section 101 of NEPA."  *Id.*  Plaintiffs' exclusive focus on just one of CEQ's reasons for the Rule improperly ignores the agency's many other stated justifications for its decision.

Even focusing on the delay and paperwork issues, CEQ identified ample evidence that agency efforts to comply with NEPA have resulted in increasingly time-consuming and

burdensome documents that do not serve NEPA's purpose of informing decision-makers.  AR 2 (85 Fed. Reg. at 43,305).  After compiling substantial data,[29] CEQ determined that, each year, federal agencies prepare approximately 176 final EISs, 10,000 EAs, and 100,000 CEs.  AR 868 (RIA at 2).  In 1981, CEQ estimated that an EIS should not take more than one year to complete. AR 6 (85 Fed. Reg. at 43,309).  Yet, it now takes an average of 4.5 years.  AR 869-70 (RIA at 3-4); *see also* AR 3467 (explaining that average time to prepare an EIS has increased since 2000 at an average rate of 39.5 days per year); AR 4979 ("[S]upplemented EIS completion time grows by an average of 110 days each year.").  Likewise, the 1978 regulations indicated final EISs should ordinarily be less than 150 pages, and even unusually complex EISs should be less than 300 pages.  AR 6 (85 Fed. Reg. at 43,309) (citing 40 C.F.R. § 1502.7 (2019)).  However, in recent years, the "average length of final EISs was 661 pages."  AR 871-72 (RIA at 5-6).  Amici accuse CEQ of focusing solely on EISs, Law Prof. Amicus Br. 2-3, but CEQ's data also demonstrates that EAs, which were intended to be "brief" and "concise" documents taking no more than three months to complete, 40 C.F.R. § 1508.9 (2019); AR 6040 (Forty Questions, question 35), can take up to 18 months.  AR 872 (RIA at 6); AR 5099 (average Department of Energy EA from 2003 to 2012 took 13 months; average Forest Service EA in 2012 took 18 months).  Even categorical exclusions can take up to 6 months.  AR 872 (RIA at 6); AR 5100.

CEQ's data was supported by numerous comments highlighting NEPA-related delays. *See, e.g.*, AR 1227488 (American Association of State Highway and Transportation Officials: The NEPA "process has grown increasing[ly] complicated and lengthy"); AR 1180192 (Women's Mining Coalition: "[T]he currently unwieldy NEPA process chills investment in the

---

[29]  CEQ's data on EISs is in the record in multiple spreadsheets.  AR 1176, 1178, 1179.  CEQ also prepared reports explaining its findings.  AR 1118 (Report on EIS timelines); AR 1133 (Report on the length of EISs (2013-2018)); AR 1146, 1147 (Fact sheets on EISs).

U.S. mineral sector[.]"); AR 845722 (County Manager of Volusia County, FL: noting

"labyrinthine" process has delayed highway projects); AR 374182 (County of San Bernardino,

CA: "Compliance with NEPA can be a slow, expensive, and complex process that often delays

crucial projects for years and increases costs dramatically."); AR 2789 (Chairman of South Ute

Indian Tribe: "NEPA compliance costs our tribe millions of dollars in consultant fees and

cause[s] long delay."); AR 1207537 (Elko County, NV: "[A] prolonged NEPA process is one of

the County's biggest hurdles to economic development.").

     Plaintiffs do not dispute this evidence.  It clearly demonstrates that the NEPA process

under the 1978 regulations had grown far more cumbersome than those regulations anticipated.

Instead, Plaintiffs raise three other arguments that they claim CEQ failed to consider.  They

contend that: (1) factors other than the NEPA process delay projects; (2) the 2020 Rule will not

reduce delays; and (3) the 2020 Rule will actually worsen delays.  All were considered by CEQ.

And CEQ had substantial evidence for the findings supporting its decision.

     First, Plaintiffs (and Amici) argue that factors other than NEPA, such as a lack of funding

or other statutory requirements, are the primary source of project delay.  Pls.' Br. 21; Law. Prof.

Amicus Br. 3.  As required by the APA, CEQ examined the information submitted by

commenters regarding delay.  CEQ acknowledged that "there can be many factors affecting the

timelines and length of EISs."  AR 6 (85 Fed. Reg. at 43,309); AR 279 (RTC at 10).  But the

existence of other factors does not mean that the 1978 regulations themselves are not also to

blame and cannot be improved.  AR 279-80, 288 (RTC at 10-11, 19).  As CEQ explained, many

of the studies that Plaintiffs and others cite to show that other factors cause delay are, in fact,

consistent with CEQ's findings.  For example, the Treasury report cited by Plaintiffs, Pls.' Br.

21, found that NEPA was a "primary challenge to completion" of projects, AR 907771, and has

"extended the schedule and generally increased the cost of implementing major infrastructure projects." AR 289 (RTC at 20) (quoting AR 907772). The Treasury report also "notes that Federal Highway Administration (FHWA) studies show that the average time to complete a NEPA review has increased . . . from 2.2 years in the 1970s to 6.6 years in 2011." AR 289-90 (RTC at 20-21) (quoting AR 907772). The GAO report cited by both Plaintiffs and Amici explains that timeframes for the preparation of NEPA documents are often an underestimation because they do not account for the "large volume of up-front work." AR 5099. Other record documents reach similar conclusions. *See, e.g.*, AR 907747 (survey identified "the complexity . . . of NEPA" as a cause of delay); AR 907743 (survey identified "issues having to do with the human or natural environment" as a major cause of delay); AR 1359670 (comment from Lee County Port Authority noting that "[c]onfusing guidance" and "[a]n abundance of caution due to potential litigation" contribute to project inefficiencies).[30]

Plaintiffs also assume—without support or justification—that causes of delay such as a lack of funding or consensus are unrelated to NEPA. In fact, NEPA documents that are more than 600 pages long and take 4.5 years to prepare are expensive. AR 874-75 (RIA at 8-9) (explaining that, as of 2003, EISs "typically cost between $250,000 and $2 million," and shortening the time to complete an EIS could save the government approximately $83 million per year). Likewise, one of CEQ's goals in the 2020 Rule was to reduce delays by improving communication and coordination. "CEQ has determined that improvements to agency processes,

---

[30] Plaintiffs' argument that NEPA's public participation procedures do not delay projects is a red herring. Pls.' Br. 22. The time allowed for public comment (often 60 days for an EIS) is a tiny fraction of the total time an agency must spend developing an EIS. Contrary to Plaintiffs' blithe and unsupported statement that the "rest of the agencies' time" is spent on tasks unrelated to NEPA, *id.*, scoping, researching, and drafting more than 600 page analyses and meaningfully responding to thousands of public comments is a time-consuming process—which (per CEQ's undisputed data) takes an average of 4.5 years. AR 869-70 (RIA at 3-4).

such as earlier solicitation of information from States, Tribes, and local governments and the public, and improved coordination in the development of EISs, can achieve more useful and timely documents to support agency decision making." AR 6 (85 Fed. Reg. at 43,309). Treating these factors as separate issues ignores record evidence that they are all interrelated. *See also* 40 C.F.R. § 1500.5 (2020) (AR 56) (noting many different means of reducing delay).

Plaintiffs also argue that the 1978 regulations made NEPA review more efficient, Pls.' Br. 21, but fail to explain the second half of their comparison—more efficient than what? To the extent Plaintiffs are arguing that the 1978 regulations made NEPA review more efficient than it was prior to the existence of those regulations, the argument is irrelevant. CEQ has not simply scrapped its 1978 regulations entirely. To the extent Plaintiffs are arguing that projects subject to NEPA review proceed faster and result in better outcomes than those not subject to NEPA review—specifically critical habitat designation rules, *see id.* at 22-23 (citing AR 1045944)—the 2020 Rule does not alter the application of NEPA to such rules.[31]

Second, Plaintiffs posit that the 2020 Rule will not reduce delays. They question how the "mere imposition of a timeline" would speed project delivery. Pls.' Br. 22. But the 2020 Rule is not simply a changed timeline. It is a comprehensive revision of the 1978 regulations that makes NEPA compliance more efficient. *See, e.g.*, 40 C.F.R. § 1501.7-8 (2020) (AR 58-59) (clarifying agency roles to improve interagency coordination); § 1501.9 (AR 59) (giving agencies greater flexibility in how to conduct scoping); § 1506.2 (AR 67) (requiring cooperation with state, local,

---

[31] Amici Law Professors also cite studies they claim show that EISs contributed to improved environmental outcomes for oil and gas development decisions. Law Prof. Amicus Br. at 14. But, again, the 2020 Rule does not change the application of NEPA to such projects. In fact, Amici's reference to specific BLM decisions applying surface use stipulations to particular parcels confirms that Plaintiffs' and Amici's claims are entirely speculative at this stage and best reviewed in the context of specific final agency actions. *See supra* 6-8.

and tribal governments to reduce duplication).[32]  Plaintiffs argue CEQ should have accounted for agency funding and staffing which also affect timely NEPA compliance.  But as CEQ explained, it has no control over agency staff or budgets.  AR 290 (RTC at 21).  Nonetheless, because the 2020 Rule incorporates more efficiencies, "CEQ anticipates the final rule will lower the costs of administering agencies' NEPA programs."  *Id.*  At base, Plaintiffs contend CEQ should not have done anything because it lacks the ability to fix every issue that might delay a project.  But the APA does not require agency paralysis simply because it cannot address every possible problem.  *See Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 140 S. Ct. 1891, 1915 (2020) ("Agencies are not compelled to explore 'every alternative device and thought conceivable by the mind of man.'" (quoting *Vt. Yankee*, 435 U.S. at 551)).

Third, Plaintiffs argue that the 2020 Rule will increase delays because it is "vague, unclear, and inconsistent."  Pls.' Br. 23.  Their examples, however, are unpersuasive.  They first try to generate confusion in the 2020 Rule's definition of environmental effects.  The primary definition of "effects" in Section 1508.1(g) states that effects "may" include those "that are later in time or farther removed in distance from the proposed action or alternatives."  In a subsection, the 2020 Rule provides further guidance, explaining that a "'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA.  Effects should generally not be considered if they are remote in time, geographically remote, or the product of a

---

[32]  For this reason, Plaintiffs' comparison to the North Carolina Merger Process is inapt.  Pls.' Br. 23.  The North Carolina Merger Process merged the NEPA and Clean Water Act Section 404 regulatory processes.  AR 907880.  In comments, Plaintiffs said that while the merger process "may improve the quality of decisions . . . it is not necessarily faster."  *Id.*  The key difference between the merger process and the 2020 Rule is that the merger process did not attempt to improve the underlying NEPA (or Clean Water Act) regulatory processes; it merely coordinated the existing processes.  *See also* AR 719 (RTC at 450) (explaining that "[m]any MOUs or policy agreements" between agencies "are entered into for reasons other than NEPA").  In contrast, the 2020 Rule comprehensively revises the NEPA process to make it more efficient.

lengthy causal chain." 40 C.F.R. § 1508.1(g)(2) (2020) (AR 72).  Read together, these provisions clearly mean that an effect is not automatically excluded because it is removed in time and distance.  But, at a certain point, an effect becomes so remote that it can no longer be reasonably attributed to an action or alternative.  This approach is consistent with Supreme Court case law. *Pub. Citizen*, 541 U.S. at 767 ("[A] 'but for' causal relationship is insufficient to make an agency responsible for a particular effect under NEPA . . . . NEPA requires 'a reasonably close causal relationship' between the environmental effect and the alleged cause.").  It also leaves room for agency discretion "to reflect the fact that there may occasionally be a circumstance where an effect that is remote in time, geographically remote, or the product of a lengthy causal chain is reasonably foreseeable and has a reasonably close causal relationship to the proposed action." AR 40-41 (85 Fed. Reg. at 43,343-44).  CEQ's explanation satisfies the APA.

Plaintiffs next argue that CEQ's withdrawal of its more than 30 guidance documents issued over the past 40 years will itself generate confusion by leaving a "void in the regulatory landscape."  Pls.' Br. 24.  But CEQ is neither wholly repealing the 1978 regime nor leaving a void.  CEQ is replacing and consolidating a confusing morass of regulations and prior guidance documents with a single, comprehensive updated rule.  *See* AR 48 (85 Fed. Reg. at 43,351); AR 843-44 (RTC at 574-75).  Plaintiffs also argue the 2020 Rule will lead to more litigation.  Yet NEPA is already the most litigated environmental statute, and the clarifications contained in the 2020 Rule are reasonably crafted to reduce litigation over time.  AR 282, 291 (RTC at 13, 22); AR 2, 6-7 (85 Fed. Reg. at 43,305, 43,309-10); *see also* AR 4979-80 (describing how litigation substantially delayed projects under the 1978 regulations).  Plaintiffs claim the 2020 Rule increases burdens on applicants.  CEQ explained its conclusion otherwise.  Improved coordination with applicants will improve the efficiency of the NEPA process.  AR 655-56 (RTC

at 386-87).  And CEQ addressed Plaintiffs' allegation that the 2020 Rule's time and page limits

will cause delays.  Agencies had already begun to reduce page counts, enforcing the 1978

regulations' intended limits[33] will encourage agencies to focus on important issues, and the page

limits do not include appendices so agencies may include "necessary supporting information

without adding unnecessary bulk" to the EA or EIS.  AR 497-99 (RTC at 228-30); AR 21, 25 (85

Fed. Reg. at 43,324, 43,328).

In sum, Plaintiffs have not shown that CEQ "entirely failed to consider" relevant

evidence, but rather that CEQ considered it, had substantial evidence for its findings, and simply

reached conclusions that Plaintiffs disagree with.  Plaintiffs' disagreement with CEQ policy is

not an APA violation.  *State Farm*, 463 U.S. at 43.

### C.    CEQ Considered Reliance Interests.

Plaintiffs allege that CEQ failed to consider the reliance interests of people and

organizations that have operated under the 1978 regulations.  This argument fails.  First and

foremost, Plaintiffs have not identified any "serious reliance interests" that require special

consideration.  But, even if Plaintiffs could demonstrate serious detrimental reliance on the old

regulations, CEQ has provided the requisite "more detailed" explanation.

### 1.    Plaintiffs Have Not Identified Any Serious Reliance Interests.

Generally, "[a]gencies are free to change their existing policies as long as they provide a

reasoned explanation for the change."  *Encino*, 136 S. Ct. at 2125.  But if an agency's prior

policy "has engendered serious reliance interests," it must "provide a more detailed justification

---

[33]  Plaintiffs call the 2020 Rule's time and page limits "arbitrary," Pls.' Br. 24-25, but they are the very same limits that CEQ encouraged agencies to meet under the 1978 Regulations.  40 C.F.R. § 1502.7 (2019); AR 6040 (Forty Questions, Question 35).

than what would suffice for a new policy created on a blank slate." *Fox*, 556 U.S. at 515.

Plaintiffs simply assume that the interests they identify qualify as serious reliance interests requiring special consideration. Pls.' Br. 26-29. They are incorrect for two reasons. First, the requirement for special consideration "generally only applies to reliance interests of regulated parties." *Ctr. for Sci. in the Pub. Int. v. Perdue*, 438 F. Supp. 3d 546, 570 n.10 (D. Md. 2020). Because CEQ's NEPA regulations regulate only federal agencies, CEQ had no obligation to provide special consideration of the reliance interests of Plaintiffs and other third parties. Second, the types of reliance interests that require a "more detailed statement" are those that entail liability, fines, or other tangible damages. *See, e.g.*, *Encino*, 136 S. Ct. at 2126 (finding serious reliance interests when regulated auto industry could "face substantial FLSA liability" under the new regulations); *Regents*, 140 S. Ct. at 1906, 1913-15 (finding serious reliance interests where DACA program recipients received public benefits such as work authorization and Social Security and Medicare benefits and "enrolled in degree programs, embarked on careers, started businesses, purchased homes, and even married and had children, all in reliance" on the program). Plaintiffs fall far short of having those types of interests. Simply becoming accustomed to (or preferring) an existing regulatory scheme is not enough. *See Am. Fuel & Petrochemical Mfrs. v. EPA*, 937 F.3d 559, 577-78 (D.C. Cir. 2019) (holding renewable fuel producers did not have the kind of "reliance interests that merit special consideration," since "[n]either the [Clean Air Act] nor the EPA ever suggested that the [Renewable Fuel] Program's statutory applicable volumes would be enforced without modification").

In addition, Plaintiffs' alleged harms to their and others' reliance interests are speculative, based on a presumption that the 2020 Rule, when implemented, will necessarily "water[]-down" NEPA, reduce transparency, and otherwise disrupt NEPA review. Pls.' Br. 26-27. Speculative

concerns about the intangible challenges of adjusting to a new regulation are not serious reliance interests.  *See NLRB v. Bell Aerospace Co.*, 416 U.S. 267, 294 (1974) (rejecting "speculative" reliance interests).  Plaintiffs' position that adaptation to a preexisting regulatory scheme qualifies as a serious reliance interest would swallow the rule, rendering every agency policy change a situation engendering serious reliance interests and eviscerating the Supreme Court's admonition that "the mere fact of a policy change" does not itself demand more detailed justification.  *Encino*, 136 S. Ct. at 2126 (citation omitted).

### 2. Even If Plaintiffs Could Identify Serious Reliance Interests, CEQ Provided the Requisite "More Detailed Explanation."

Even if Plaintiffs had a sufficiently serious reliance interest—and they do not—CEQ provided the "more detailed justification" required to proceed with the 2020 Rule.  *Fox*, 556 U.S. at 515.  That standard is not intended to be particularly onerous, or preclude the agency from acting.  The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are better than the reasons for the old one."  *Id.* (emphasis omitted).  Rather, the agency must merely give "a reasoned explanation" for its decision in light of the "facts and circumstances that underlay or were engendered by the prior policy."  *Id.* at 516.  CEQ did so.

Here, CEQ acknowledged its "proposed changes would result in certain new expectations among impacted stakeholders."  AR 799 (RTC at 530).  However, after considering those stakeholder interests, CEQ determined that the net improvements in the 2020 Rule "outweigh any initial transition costs regarding implementation of the final rule."  *Id.*

First, Plaintiffs argue that private applicants, federal agencies, and others "relied on the stable interpretations of the prior rules."  Pls.' Br. 26.  But, as CEQ explained, interpretations of NEPA have been far from "stable."  Instead, federal agencies have long been frustrated by inconsistent holdings: "[C]ourts have interpreted key terms and requirements differently, adding

to the complexity of environmental reviews."  AR 7 (85 Fed. Reg. at 43,310); *see also* AR 734 (RTC at 465) ("Despite over 20 years of experience [with cumulative and indirect impacts], public comments . . . noted inconsistent interpretation by the courts and Federal agencies[.]"); AR 768-70 (RTC at 499-501) (discussing divergent judicial opinions on whether "major" has independent meaning from "significantly").

Second, Plaintiffs argue that States relied on the 1978 regulations.  Some state statutes apply only if NEPA does not.  Pls.' Br. 26, 29.  But even if Plaintiffs had standing to assert reliance interests of *States* (and they do not), CEQ carefully explained that the 2020 Rule "does not affect the applicability or requirements of other Federal, State, Tribal, and local laws that relate to environmental, historic, or other matters."  AR 279 (RTC at 10).  Plaintiffs speculate that States will need to redraft their laws to fill an alleged "huge gap" in the regulatory landscape.  This allegation presupposes that the 2020 Rule will fail to fulfill the purposes of NEPA.  As explained *supra*, that is not true.  *Supra* 8-27.  Moreover, "[u]nder the final rule, agencies will retain the discretion to consult with State, Tribal, and local agencies to reduce duplication between NEPA and State, Tribal, and local requirements."  AR 712 (RTC at 443).

Third, Plaintiffs argue that federal agencies relied on the 1978 regulations and the flexibility they afforded.  Pls.' Br. 26.  However, the record demonstrates that federal agencies heavily favored the 2020 Rule.  *See* AR 126-27, 3269-70.  Additionally, CEQ addressed concerns about agency flexibility, explaining that the 2020 Rule balances the need for agency-specific flexibility against the need for consistent government-wide approaches.  AR 435-38 (RTC at 166-69).

Fourth, Plaintiffs claim that they relied on the 1978 regulations to participate in the NEPA process and obtain information.  Under this umbrella, they make a cluster of baseless

arguments.  Initially, they argue that the 2020 Rule will lessen participation by "prohibit[ing] agencies from offering notice and comment periods for decisions made using a CE or EA."  Pls.' Br. 29.  This is false.  The 2020 Rule retains the same language as the 1978 regulations regarding public participation in an EA: "Agencies shall involve the public, State, Tribal, and local governments, relevant agencies, and any applicants, to the extent practicable in preparing environmental assessments."  40 C.F.R. § 1501.5(e) (2020) (AR 57); *compare* 40 C.F.R. § 1501.4(b) (2019); *see also* AR 410-11 (RTC at 141-42) ("When preparing an EA, agencies retain the flexibility to structure public involvement based on the specific circumstances of the proposed action.").  Likewise, neither the 1978 regulations nor the 2020 Rule prohibit public involvement in a categorical exclusion.  *Compare* 40 C.F.R. § 1501.4 (2020) (AR 57) *with* 40 C.F.R. § 1508.4 (2019); *see also* AR 402 (RTC at 133) ("The public has an opportunity to participate in the development of an agency's CEs because agencies must establish CEs through their NEPA procedures, a process subject to public notice and comment. Additionally, some agencies do provide public notice regarding CE determinations in certain circumstances.").

In addition, Plaintiffs contend the 2020 Rule makes commenting more burdensome by requiring comments to be as specific as possible.  As explained above, CEQ noted that the changes were consistent with Supreme Court case law and clarified that "[n]othing in the final rule should be construed to limit public comment to those members of the public with scientific or technical expertise."  AR 340 (RTC at 71); *supra* 23-24, 33.

Plaintiffs also argue that the 2020 Rule limits judicial review and "moves to take public hearings out of communities and place them online."  Pls.' Br. 29.  But the 2020 Rule's provision that untimely comments are unexhausted and forfeited, 40 C.F.R. § 1503.3(b) (2020) (AR 65), merely codifies Supreme Court case law.  AR 344-45 (RTC at 75-76) (citing cases);

*supra* 24.  And the 2020 Rule expressly instructs agencies, "[w]hen selecting appropriate methods" for public notice and involvement," to "consider the ability of affected entities to access electronic media."  40 C.F.R. § 1506.6(b), (c) (2020) (AR 68).

Finally, Plaintiffs allege they relied on the NEPA process for information about concentrated animal feeding operations (CAFOs) and will lose that information under the 2020 Rule.  Pls.' Br. 28.  This allegation is entirely speculative.[34]  Nevertheless, CEQ explained why it determined certain loan guarantees issued by the Farm Service Agency (FSA) and Small Business Administration are not "major federal actions" subject to NEPA.  *See* AR 793-98 (RTC 524-29); AR 45-46 (85 Fed. Reg. at 43,348-49).  Loan guarantees are insufficiently "federal" because they "do not provide any Federal funding to the participating borrower; no Federal funds are expended unless the borrower defaults *and* the lender is unable to recover its costs through foreclosure of collateral.  AR 45 (85 Fed. Reg. at 43,348); AR 797-98 (RTC at 528-29).  Loan guarantees are also insufficiently "major" because the amounts are relatively small compared to other, non-federal sources of funding.  AR 45 (85 Fed. Reg. at 43,348).  While Plaintiffs may be disappointed in this "legal" explanation of CEQ's decision, Pls.' Br. 28, CEQ has no obligation or ability to bend the law to encompass Plaintiffs' alleged reliance interests.  CEQ's "reasoned explanation" satisfies the APA.  *Fox*, 556 U.S. at 515.[35]

Taken together, Plaintiffs' allegations regarding reliance interests misrepresent the text of the 2020 Rule and the record and fall far short of "overwhelm[ing]" CEQ's "good reasons for a

---

[34]  Defendants explained in their motion to dismiss why Plaintiffs' alleged loss of information under the 2020 Rule is speculative.  Defs.' MTD 34; Defs.' MTD Reply 26-27.

[35]  Plaintiffs claim exempting CAFO loan guarantees from NEPA eliminates FSA's ability to attach environmental conditions to those guarantees.  Pls.' Br. 28.  But to the extent FSA has authority to condition loan guarantees, that power is not derived from NEPA.  *See Buffalo River Watershed All. v. Dep't of Agric.*, No. 4:13-cv-450-DPM, 2014 WL 6837005, at *3-4 (E.D. Ark. Dec. 2, 2014); AR 796 (RTC at 527).

policy change." *Encino*, 136 S. Ct. at 2128 (Ginsburg, J., concurring).

### 3.      CEQ Engaged in Proper Outreach During the Rulemaking Process.

Plaintiffs allege CEQ failed to meet with state and local governments and to incorporate

feedback into the 2020 Rule.  Pls.' Br. 27.  This claim is refuted by the record.  CEQ met with a

wide range of state and local governments and organizations.  *See, e.g.*, AR 2271 (meeting with

Western Governors' Association); AR 1618 (meeting with twelve environmental organizations);

AR 1631 (meeting with National Environmental Justice Advisory Council); AR 1644, 2314,

2347 (meetings with tribal leaders); AR 1627 (meeting with representatives of San Bernardino

County, California).  Indeed, Plaintiffs' cherry-picking of the record ignores that "CEQ

circulated the proposal and invitations to comment to over 400 interested groups, including

States, localities, environmental organizations, trade associations, NEPA practitioners, and other

members of the public representing a broad range of diverse views."  AR 859, 864 (RTC at 590,

595).  It received comments from numerous state, local, and tribal governments beyond those

noted by Plaintiffs.[36]  And Plaintiffs ignore that many governments *supported* the 2020 Rule.[37]

Moreover, the 2020 Rule demonstrates that CEQ considered the feedback it received and

made changes to the final rule.  *See* AR 195 (redline comparing 1978 regulations, proposed 2020

Rule, final 2020 Rule); *see also, e.g.*, AR 14 (85 Fed. Reg. at 43,317) ("To address confusion

---

[36] *See, e.g.*, AR 853283, 853292 (South Dakota Department of Game, Fish, and Parks); AR 853357 (Scotts Valley Band of Pomo Indians); AR 853395, 853402 (State of Washington, Department of Ecology); AR 853423, 853426 (Quinault Indian Nation); AR 853492, 853502 (San Francisco Bay Conservation and Development Commission); AR 853509, 853514 (County of Erie); AR 853534, 853537 (Delaware Department of Transportation).

[37] *See, e.g.*, AR 939321 (State of Alaska); AR 845722 (County Manager, Volusia County, FL); AR 374182 (County of San Bernardino, CA); AR 2790 (Chairman of South Ute Indian Tribe); AR 1042766 (North Carolina Department of Transportation); AR 1022526 (State of Arizona); AR 999745 (Iowa Department of Transportation); AR 1120831 (Nebraska Department of Environment and Energy); AR 853569 (Port of Long Beach, CA); AR 1418127 (Miami-Dade County, FL).

expressed by some commenters, CEQ does not include this sentence in the final rule."); AR 700 (RTC at 431) ("CEQ revises §§ 1501.1(a)(5), 1506.9, and 1507.3 in response to comments."). In short, Plaintiffs' attacks on CEQ's outreach are misleading and misrepresent the record.[38]

### 4.    CEQ Properly Considered Alternatives to the 2020 Rule.

Finally, Plaintiffs claim that CEQ failed to consider alternatives to the 2020 Rule that could have achieved the agency's objectives "with fewer damaging consequences to longstanding reliance interests." Pls.' Br. 30. They identify four alternatives in particular: (1) additional funding and oversight; (2) utilization of existing guidance and promulgation of new guidance; (3) new regulations to address climate change; and (4) unidentified options similar to FAST-41. "[W]here a party raises facially reasonable alternatives . . . the agency must *either* consider those alternatives *or* give some reason, within its broad discretion . . . for declining to do so." *Laclede Gas Co. v. F.E.R.C.*, 873 F.2d 1494, 1498 (D.C. Cir. 1989). CEQ met this requirement by considering these four options and explaining its reasons for rejecting them. Plaintiffs' disagreement with CEQ's policy choice is, once again, not an APA violation.

First, CEQ rejected an alternative that would increase funding and oversight because CEQ lacks any authority over the budget or staffing of other agencies. AR 290 (RTC at 21).

---

[38] Amici tout the public outreach for the 1978 regulations. *See* Former CEQ Offs. Amicus Br. 2-3. But, as CEQ explained in its response to comments, "CEQ was able to reach many more people than in 1978." AR 858 (RTC at 589). In 1978, CEQ received about 300 responses to a questionnaire circulated only to select individuals and organizations, and about 500 written comments on the proposed rule. AR 857-58 (RTC at 588-89); AR 6193 (43 Fed. Reg. 25,230 25,231 (June 9, 1978)). In 2020, CEQ received over 12,500 comments on the Advanced Notice of Proposed Rulemaking and over 1.1 million comments on the proposed rule. AR 857-58 (RTC at 588-89). And unlike in 1978, when CEQ officials purposefully leaked the draft regulations to undermine the interagency review process, Nicholas C. Yost, *NEPA at 50*, 36 The Env't Forum 26, 29 (2019), *available at* https://www.eli.org/sites/default/files/docs/seminars/12_17_19_yost_nepa50tef.pdf, in 2020 CEQ abided by all applicable legal and process requirements. Amici's Monday morning quarterbacking of the rulemaking process is far from evidence of an APA violation.

Thus, this option is not a true, viable alternative "within the ambit of the existing [policy]" and CEQ had no obligation to consider it. *Regents*, 140 S. Ct. at 1913 (citation omitted); *Nat'l Shooting Sports Found., Inc. v. Jones*, 716 F.3d 200, 215 (D.C. Cir. 2013) ("[A]n agency must consider only 'significant and viable' and 'obvious' alternatives." (citations omitted)); *Chamber of Com. v. SEC*, 412 F.3d 133, 145 (D.C. Cir. 2005) (agency has no obligation to consider alternatives that are "frivolous" or "out of bounds").

Second, CEQ rejected the utilization of existing guidance and promulgation of additional guidance because the existing "layer cake" of more than 30 guidance documents had become confusing and unworkable. AR 733, 842-44 (RTC at 464, 573-75). Therefore, this alternative fails to achieve CEQ's goal of "enhanc[ing] the efficiency of the [NEPA] process," and in fact could worsen the very problem that CEQ set out to rectify. AR 3 (85 Fed. Reg. at 43,306).

Third, Plaintiffs propose revising the regulations to specifically address climate change, without explaining how such a revision would achieve CEQ's goals of efficiency and simplification. New regulations specific to climate change that do not address the myriad other issues that CEQ identified would suffer the same problems as additional guidance. They would merely add to the already confusing accretion of rules and guidelines. *See* AR 842-44 (RTC at 573-75). CEQ acted reasonably by choosing not to pursue such a narrow revision of its rules.

Fourth, Plaintiffs suggest that CEQ consider unidentified alternatives that might "expedit[e] project delivery without dismantling the 1978 regulations wholesale." Pls.' Br. 30. Because Plaintiffs do not explain what these alternatives might look like, CEQ had no obligation to consider them. *Vt. Yankee*, 435 U.S. at 553 ("[C]omments must be significant enough to step over a threshold requirement of materiality before any lack of agency response or consideration becomes of concern." (citation omitted)). To the extent that Plaintiffs are suggesting CEQ

should have specifically considered FAST-41 as an alternative to the 2020 Rule, the agency did so. FAST-41 only applies to a small subset of large infrastructure projects and is set to sunset in 2022. AR 7 (85 Fed. Reg. at 43,310); Members of Cong. Amicus Br. 11. Thus, FAST-41 is not a substitute for the 2020 Rule. Moreover, "[f]ewer than 50 projects have used the FAST–41 procedures, and fewer than 30 . . . have been completed." AR 301 (RTC at 32). "As a result, sufficient information is not available to assess the effectiveness of the FAST Act or FAST–41." *Id.*[39]

***

The record demonstrates CEQ explained its reasons for the 2020 Rule and why it believes the 2020 Rule is an improvement upon the 1978 Regulations. That is all the APA requires. Courts must defer to CEQ's reasonable, and substantially supported, policy choices. *Fox*, 556 U.S. at 515.

**CONCLUSION**

For foregoing reasons, the Court should deny Plaintiffs' motion for summary judgment and grant Defendants' cross-motion.

Respectfully submitted this 21st day of December, 2020,

---

[39] Amici argue *both* that FAST-41 and other statutes that modify NEPA in certain circumstances are not a replacement for comprehensive NEPA regulations *and* that CEQ should have further analyzed their effectiveness. Members of Cong. Amicus Br. 11-12. Plaintiffs argue that FAST-41 and other such statutes *are* sufficient to improve NEPA. Pls.' Br. 30. Plaintiffs and Amici both—without providing any evidence—claim CEQ erred in concluding it had insufficient data to assess the effectiveness of FAST-41. *Id.* at 30-31; Members of Cong. Amicus Br. 12. These inconsistent and unsupported positions demonstrate why the APA leaves the weighing of complicated policy choices to the expert agency. *Brand X*, 545 U.S. at 980.

Contrary to Amici's remaining arguments, CEQ did not rely on post-1978 statutes to "alter" NEPA's requirements. Members of Cong. Amicus Br. 10. CEQ surveyed post-1978 developments to better understand Congress's priorities, and noted that Congress had often acted to "improve coordination among agencies, integrate NEPA with other environmental reviews, and bring more transparency to the NEPA process." AR 7 (43 Fed. Reg. at 43,310). CEQ's unsurprising conclusion that these statutes reflect Congress's recognition "that the environmental review process can be more efficient and effective" is entirely reasonable. AR 9 (*id.* at 43,312).

DANIEL P. BUBAR
Acting United States Attorney

*/s/ Krista Consiglio Frith*
Assistant United States Attorney
Virginia Bar No. 89088
United States Attorney's Office
P.O. Box 1709
Roanoke, VA 24008
TEL (540) 857-2250
FAX (540) 857-2614
Krista.frith@usdoj.gov

JEFFREY BOSSERT CLARK
Assistant Attorney General
JONATHAN D. BRIGHTBILL
Principal Deputy Assistant Attorney General
PAUL E. SALAMANCA
Deputy Assistant Attorney General

*/s/ Barclay T. Samford*
BARCLAY T. SAMFORD
NM State Bar No. 12323
Senior Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1475
E-mail: clay.samford@usdoj.gov

ALLEN M. BRABENDER
Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Appellate Section
Post Office Box 7415
Washington, D.C. 20044
Tel: (202) 514-5316
E-mail: allen.brabender@usdoj.gov

STEVEN W. BARNETT
Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Law and Policy Section
Post Office Box 7415
Washington, D.C. 20044
Tel: (202) 514-1442
E-mail: steven.barnett@usdoj.gov

MATTHEW R. OAKES
Senior Counsel
U.S. Department of Justice
Environment and Natural Resources Division
Law and Policy Section
Post Office Box 7415
Washington, D.C. 20044
Tel: (202) 514-1442
E-mail: matthew.oakes@usdoj.gov

CLARE BORONOW
Trial Attorney
U.S. Department of Justice
Environment and Natural Resources Division
Natural Resources Section
999 18th Street, South Terrace, Suite 370
Denver, CO 80202
Tel: (303) 844-1362
clare.boronow@usdoj.gov