## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## CHARLOTTESVILLE  DIVISION

| | | |
|---|---|---|
| **WILD VIRGINIA,** | ) | |
| **VIRGINIA WILDERNESS COMMITTEE,** | ) | |
| **UPSTATE FOREVER,** | ) | |
| **SOUTH CAROLINA WILDLIFE FEDERATION,** | ) | |
| **NORTH CAROLINA WILDLIFE FEDERATION,** | ) | |
| **NATIONAL TRUST FOR HISTORIC** | ) | |
| **PRESERVATION,** | ) | |
| **MOUNTAINTRUE,** | ) | |
| **HAW RIVER ASSEMBLY,** | ) | |
| **HIGHLANDERS FOR RESPONSIBLE** | ) | |
| **DEVELOPMENT,** | ) | |
| **DEFENDERS OF WILDLIFE,** | ) | |
| **COWPASTURE RIVER PRESERVATION** | ) | |
| **ASSOCIATION,** | ) | |
| **CONGAREE RIVERKEEPER,** | ) | |
| **THE CLINCH COALITION,** | ) | |
| **CLEAN AIR CAROLINA,** | ) | |
| **CAPE FEAR RIVER WATCH,** | ) | |
| **ALLIANCE FOR THE SHENANDOAH** | ) | |
| **VALLEY, and** | ) | |
| **ALABAMA RIVERS ALLIANCE,** | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. |
| | ) | 3:20CV00045 |
| | ) | |
| **COUNCIL ON ENVIRONMENTAL QUALITY,** | ) | |
| **and** | ) | |
| **BRENDA MALLORY IN HER OFFICIAL** | ) | |
| **CAPACITY AS CHAIR OF THE** | ) | |
| **COUNCIL ON ENVIRONMENTAL** | ) | |
| **QUALITY,** | ) | |
| | ) | |
| Defendants, | ) | |

<table>
<tr><td>and</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
<tr><td>**AMERICAN FARM BUREAU FEDERATION,**</td><td>)</td></tr>
<tr><td>**AMERICAN FOREST RESOURCE COUNCIL,**</td><td>)</td></tr>
<tr><td>**AMERICAN FUEL & PETROCHEMICAL**</td><td>)</td></tr>
<tr><td>  **MANUFACTURERS,**</td><td>)</td></tr>
<tr><td>**AMERICAN PETROLEUM INSTITUTE,**</td><td>)</td></tr>
<tr><td>**AMERICAN ROAD & TRANSPORTATION**</td><td>)</td></tr>
<tr><td>  **BUILDERS ASSOCIATION,**</td><td>)</td></tr>
<tr><td>**CHAMBER OF COMMERCE OF THE UNITED**</td><td>)</td></tr>
<tr><td>  **STATES OF AMERICA,**</td><td>)</td></tr>
<tr><td>**FEDERAL FOREST RESOURCE COALITION,**</td><td>)</td></tr>
<tr><td>**INTERSTATE NATURAL GAS ASSOCIATION**</td><td>)</td></tr>
<tr><td>  **OF AMERICA, and**</td><td>)</td></tr>
<tr><td>**NATIONAL CATTLEMEN'S BEEF**</td><td>)</td></tr>
<tr><td>  **ASSOCIATION,**</td><td>)</td></tr>
<tr><td></td><td>)</td></tr>
</table>

Defendants-Intervenors.

# OPINION

ARGUED:  Kimberley Hunter, Senior Attorney,  SOUTHERN ENVIRONMENTAL LAW CENTER, Chapel Hill, North Carolina, for Plaintiffs; Clare M. Boronow, Trial Attorney, ENVIRONMENT AND NATURAL RESOURCES DIVISION, UNITED STATES DEPARTMENT OF JUSTICE, Denver, Colorado, for Defendants; Michael B. Kimberly, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Defendants-Intervenors. ON BRIEF: Sam Evans, Nicholas S. Torrey, Megan Kimball, and Kristin Davis, SOUTHERN ENVIRONMENTAL LAW CENTER, for Plaintiffs; Allen M. Brabender, Attorney, Steven W. Barnett, Attorney, Matthew R. Oakes, Senior Counsel, ENVIRONMENT AND NATURAL RESOURCES DIVISION, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., and Krista Consiglio Frith, Assistant United States Attorney, UNITED STATES ATTORNEY'S OFFICE, Roanoke, Virginia, for Defendants; Joshua D. Rogaczewski, MCDERMOTT WILL & EMERY LLP, Washington, D.C., for Defendants-Intervenors; Mark H. Churchill, HOLLAND & KNIGHT, LLP, David C. Smith, Director, Legal Department, SOUTHERN UTE INDIAN TRIBE, and Thomas H. Shipps, MAYNES, BARADFORD, SHIPPS & SHEFTEL LLP, for Amicus Curiae Southern Ute Indian Tribe; Isak Howell, Roanoke, Virginia, for Amici Curiae Former CEO

*Officials Dinah Bear, Nicholas C. Yost, Gary Widman, and Christy Goldfuss; Cale A. Jaffe, Environmental Law and Community Engagement Clinic, UNIVERSITY OF VIRGINIA SCHOOL OF LAW, Charlottesville, Virginia, Shaun Goho and Thomas Landers, Emmett Environmental Law & Policy Clinic, HARVARD LAW SCHOOL, Cambridge, Massachusetts, for Amici Curiae Members of Congress Thomas R. Carper, Peter A. DeFazio, and Raúl M. Grijalva; Evan Dimond Johns, APPALACHIAN MOUNTAIN ADVOCATES, Lewisburg, West Virginia, and John C. Ruple, S.J. QUINNEY COLLEGE OF LAW, UNIVERSITY OF UTAH, Salt Lake City, Utah, for Amici Curiae Law Professors.*

The plaintiffs in this case, various conservation groups, suing under the Administrative Procedure Act, challenge the Council on Environmental Quality's adoption of revised regulations implementing the National Environmental Policy Act (NEPA) following an allegedly defective notice-and-comment rulemaking process. Because I conclude that the plaintiffs' claims are not justiciable and the court is thus without jurisdiction, I will dismiss the action.

## I.

"Signed into law on January 1, 1970, NEPA establishes a 'national policy [to] encourage productive and enjoyable harmony between man and his environment,' and was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321). NEPA sets forth procedural requirements for federal projects to ensure that agencies fully consider the environmental effects of their actions before making decisions. NEPA requires federal agencies to:

include in every recommendation or report on proposals for legislation and other major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official on --

    (i) the environmental impact of the proposed action,

    (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,

    (iii) alternatives to the proposed action,

    (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and

    (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

    Prior to making any detailed statement, the responsible Federal official shall consult with and obtain the comments of any Federal agency which has jurisdiction by law or special expertise with respect to any environmental impact involved. Copies of such statement and the comments and views of the appropriate Federal, State, and local agencies, which are authorized to develop and enforce environmental standards, shall be made available to the President, the Council on Environmental Quality and to the public as provided by section 552 of Title 5, and shall accompany the proposal through the existing agency review processes[.]

42 U.S.C. § 4332(C).  In practice, an agency considering a proposed federal action first conducts an environmental assessment (EA) to determine whether the action is "major" and whether it will "significantly affect[]" the environment.  *Id.*  The EA either leads to a finding of no significant impact (FONSI) or the preparation of a more in-depth environmental impact statement (EIS).  *See* 40 C.F.R. § 1502.4.  NEPA does not mandate any particular outcome; rather, it requires federal agencies

to follow a process designed to ensure they consider the environmental effects of proposed projects before taking action. *Robertson v. Methow Valley Citizens Council*, 490 U.S. 332, 349–50 (1989).

Defendant Council on Environmental Quality (CEQ) is the federal agency charged with overseeing the implementation of NEPA. It promulgated the first NEPA regulations in 1978, and those regulations remained largely unchanged until 2020.

On June 20, 2018, CEQ issued an Advance Notice of Proposed Rulemaking (ANPRM) regarding NEPA's implementing regulations. The ANPRM sought feedback on 20 broad questions related to the NEPA process. The initial 30-day window for the public to respond to the ANPRM was extended by 31 days in response to public requests for more time. CEQ received more than 12,500 comments, most of which supported leaving the regulations as they were or making only minor changes. The plaintiff organizations submitted comments in response to the ANPRM in which they advocated for retaining the existing regulations and asked CEQ to provide data and analysis to justify any proposed changes.

The plaintiffs contend that CEQ did not meaningfully address the comments submitted in response to the ANPRM. CEQ failed to address many comments that raised concerns about the proposed changes and selectively responded to comments that supported the proposed changes.

CEQ then issued a Notice of Proposed Rule Making (NPRM) that gave the public 60 days to comment on a draft of proposed revisions to the NEPA implementing regulations.  It denied requests for additional time to comment, including the requests of 169 members of Congress.  CEQ held only two public hearings on the draft regulations.  Public registration for the hearings filled within 15 minutes of opening, and attendees wishing to comment on the proposed regulations were permitted to speak for only three minutes.  Several of the plaintiff organizations requested an additional hearing, but CEQ declined to hold one.

CEQ received more than 1.1 million public comments regarding the proposed regulations.  The majority of these comments opposed the changes that CEQ had proposed.  CEQ issued a response spanning approximately 600 pages, but again did not address many of the comments opposing the changes.  Despite significant public opposition to the revisions, CEQ finalized the new rule less than four months after the end of the comment period.  The final rule varied little from the proposed rule.

The Chair[1] of CEQ signed the new final rule, titled "Update to the Regulations Implementing the Procedural Provisions of the National Environmental Policy Act"

---

[1]  The new Chair of the CEQ, Brenda Malloy, is automatically substituted as a defendant in place of the former Chair who held office when the present suit was filed. Fed. R. Civ. P. 25(d).

("2020 Rule"), on July 9, 2020, and it went into effect on September 14, 2020.[2]  The

2020 Rule directs each federal agency to "develop or revise, as necessary, proposed

procedures to implement the regulations in this subchapter, including to eliminate

any inconsistencies with the regulations in this subchapter," within 12 months of

September 14, 2020.  40 C.F.R. § 1507.3.

The plaintiffs take issue with a number of aspects of the 2020 Rule.  The 2020

Rule allows, but does not require, agencies to apply it to activities and environmental

reviews that began prior to its effective date.  It exempts certain categories of

activities from the NEPA process entirely and potentially limits the kinds of projects

for which an EIS will be required.  It removes the requirement that an agency

evaluate *all* reasonable alternatives and reduces the extent to which an agency must

discuss alternatives.  It also removes the requirements that agencies assess indirect

and cumulative environmental effects of a proposed action.  It limits the so-called

scoping process to EISs rather than EAs, meaning that no scoping need be done

where no EIS is prepared.  The 2020 Rule allows applicants to acquire property or

otherwise invest in proposed projects before the completion of NEPA review.  It

---

[2]  The plaintiffs filed the instant lawsuit on July 29, 2020, after the 2020 Rule was finalize but before it took effect.

requires public comments to meet specificity requirements and provides that any objections not submitted in public comments shall be forfeited.[3]

The Complaint describes how each of the plaintiff organizations have used the NEPA process in the past to carry out their organizational missions.  In doing so, the plaintiffs suggest that without the requirements of the former NEPA regulations, they would not have been as successful in furthering their missions and the interests of their members.  The plaintiffs allege that they have been or will be harmed by the 2020 Rule in ways that fall into three general categories:  (1) CEQ did not consider the comments they submitted in opposition to the proposed regulatory changes, and the 2020 Rule will make it more difficult and likely more expensive for them to submit comments to other agencies during future NEPA reviews ("procedural injury"); (2) they fear they will receive less information from future NEPA reviews and will have to divert resources to obtaining from other sources information that previously would have come to light during the NEPA review process ("informational injury"); and (3) by applying the 2020 Rule and engaging in less rigorous analyses — and in some cases, no NEPA review at all — agencies may make uninformed decisions that harm the environment in ways that go against the

---

[3] The defendants and defendant-intervenors suggest that many of the regulatory revisions simply codify existing case law and do not substantively change the NEPA process.  The plaintiffs dispute this contention.  Because I do not reach the merits of the plaintiffs' claims, it is unnecessary for me to resolve this dispute.  I have summarized the 2020 Rule's changes according to the plaintiffs' view of them.

organizations' missions and the recreational, aesthetic, and other interests of their members ("environmental injury").

The Complaint asserts ten claims, captioned as follows:

(1)     Violation of the Administrative Procedure Act — Arbitrary and Capricious Policy Reversal;

(2)     Violation of the Administrative Procedure Act — Explanation that Runs Counter to the Evidence Before the Agency;

(3)     Violation of the Administrative Procedure Act — Unlawful Reliance on Factors not Intended by Congress;

(4)     Violation of the Administrative Procedure Act — Arbitrary and Capricious Failure to Consider Relevant Factors;

(5)     Violation of the Administrative Procedure Act — Arbitrary and Capricious Failure to Consider Reliance Interests;

(6)     Violation of the Administrative Procedure Act — Arbitrary and Capricious Failure to Respond to Relevant and Significant Comments;

(7)     Violation of the Administrative Procedure Act — Arbitrary and Capricious Failure to Consider Obvious Alternatives;

(8)     Violation of the Administrative Procedure Act — Retroactive Application of Notice and Comment Rulemaking;

(9)     Violation of the Administrative Procedure Act — Failure to Demonstrate that the New Policy is Consistent with the Governing Statute; and

(10)    Changes that are Outside CEQ's Lawful Authority.

Compl. 157–79, ECF No. 1.

The plaintiffs have submitted more than 50 declarations in an effort to show that they have been or will be injured as a result of the 2020 Rule.  *See* Mem. Supp. Mot. Prelim. Inj. or Stay Ex. 1–51, ECF No. 30-3 – 30-53; Mem. Supp. Pls.' Mot. Summ. J. Ex. 1, ECF No. 105-2.  The following are representative examples of the facts set forth in the declarations:

(1)    Cindy Lowry is the Executive Director of Alabama River Alliance (ARA), which works to protect and restore Alabama's water resources.  She is also a member of ARA.  She swims and kayaks in the Coosa River.  In 2013, the Federal Energy Regulatory Commission (FERC) issued a license controlling the operation of dams on the Coosa.  The license allowed dissolved oxygen in the river to drop below the level that many aquatic organisms need to survive, and it did not provide for fish passage.  The license, according to Lowry, would have destroyed biodiversity in the Coosa River, negatively affecting her recreational, aesthetic, and environmental interests.  ARA sued to challenge the license, and in 2018, the Court of Appeals for the D.C. Circuit ordered FERC to prepare an EIS.  FERC is currently preparing the EIS, but ARA is concerned that FERC might apply the 2020 Rule and decide not to consider the cumulative effects of low oxygen saturation and the lack of fish passage.  If these effects are not considered in the EIS, ARA may need to divert resources to obtaining information about them in other ways.  Lowry contends that the 2020 Rule "threaten[s] to diminish the benefits ARA won with its legal

victory in the D.C. Circuit Court."  Pl.'s Mot. for Prelim. Inj. or Stay Ex. 2, Lowry Decl. ¶ 28, ECF No. 30-4.

(2)     Julie Mayfield is the co-Executive Director of MountainTrue, which "works on forest, water, land use/transportation, and energy issues" throughout the mountain region of North Carolina.  Pl.'s Mot. for Prelim. Inj. or Stay Ex. 20, Mayfield Decl. ¶ 7, ECF No. 30-22.  MountainTrue has used the NEPA process extensively to protect the Pisgah and Nantahela National Forests.  "MountainTrue critiques the accuracy and completeness of the information being relied on by the Forest Service, submits information from its own investigations and scientific analyses, shows where projects may have unacceptable or unlawful impacts, and mobilizes, recruits, and trains its own members and other citizens to participate in these processes."  *Id.* ¶ 8.  It is currently participating in the NEPA process for the Revised Forest Plan for the Nantahela-Pisgah National Forest, and it has devoted thousands of hours of staff time to submitting information as part of the NEPA process.  It plans to participate in NEPA processes for various specified projects in the coming years.  MountainTrue contends that the 2020 Rule will require it to spend more time and resources gathering information and preparing comments.  It "is concerned that under the Final Rule the Forest Service will not study the full range of environmental impacts that it currently studies and will not look at a range of alternative solutions," which will lead the Forest Service to "engage in uninformed

- 11 -

decisionmaking and make choices that are harmful to the resources MountainTrue cares about." *Id.* ¶ 12. The organization is concerned that "agencies will engage in scoping activities with project applicants prior to any notice to the public" and "the government will start its decision-making process prior to any opportunity for public engagement, and for MountainTrue and its members to participate." *Id.* ¶ 23. The 2020 Rule's "level of specificity required for public comment under the Final Rules will make it more difficult for the organization and its members to participate in the NEPA process." *Id.* ¶ 26. MountainTrue has also participated in NEPA reviews for highway projects, and it has members who "live in the path [of] planned highway projects and are concerned about how the development of transportation infrastructure will impact the history and culture of their communities as well as the wildlife, plant life, and streams in the path of these highways." *Id.* ¶ 14. MountainTrue operates by engaging early in NEPA processes and seeking to improve projects rather than preventing them altogether. It contends that the 2020 Rule will fundamentally change its approach because agencies will no longer be required to consider community solutions and all reasonable alternatives. It further expresses concern that NEPA documents produced under the 2020 Rule will not contain enough information to inform its advocacy. MountainTrue is also working to combat climate change, and it fears that under the 2020 Rule, NEPA reviews will not contain any information about climate change because agencies will consider it

an indirect and cumulative effect.  As a result, MountainTrue will have to divert resources from other projects to obtain this information in different ways.  It contends it will be required to submit frequent Freedom of Information Act (FOIA) requests, which is an expensive and time-consuming process.

(3)     William "Bill" Stangler is the Congaree Riverkeeper and the Executive Director of that organization.  Its mission "is to protect and improve water quality, wildlife habitat, and recreation on the Congaree, Broad, and Lower Saluda Rivers through advocacy, education, and enforcement of environmental laws."  Pl.'s Mot. for Prelim. Inj. or Stay Ex. 21, Stangler Decl. ¶ 3, ECF No. 30-23.  Congaree Riverkeeper has participated in the NEPA processes for several projects that affect the watershed.  The NEPA process is an important source of information, and without its public notice requirements, Stangler might not learn about projects in his area, which would affect his ability to do his job.  He is concerned that under the 2020 Rule, he will not learn about proposed projects until it is too late to do anything about them.  He believes that his one-employee organization will not have the resources to obtain adequate information from other sources.  Stangler is "also concerned that without reviewing a good range of environmental effects and alternatives the agencies will not engage in thoughtful decision-making and will make choices that lead to bad environmental outcomes."  *Id.* ¶ 6.  He worries that agencies will perform less-than-rigorous environmental reviews and cut the public

out of the process.  He fears that agencies will begin working on projects with applicants without notice to the public.  Stangler also notes that cumulative and indirect impacts are especially important in the context of water protection.  If agencies are not required to consider them, he believes the agencies will make environmentally harmful decisions.  He is specifically concerned that the new rule will lead the Nuclear Regulatory Commission (NRC) to conduct a less-than-robust review of the relicensing of a nuclear facility that has historically polluted the watershed in his area.  The scoping process is already underway for the EIS for this project.  Stangler fears the agency will decide to apply the 2020 Rule to this EIS and will not conduct a sufficiently thorough analysis.  He worries that as a result, the NRC will allow the facility to continue polluting groundwater and surface water.

(4)    Elaine Chiosso is Executive Director of Haw River Assembly, Inc. (HRA), which works to protect the Haw River and Jordan Lake.  HRA's "mission is to promote environmental education, conservation and pollution prevention; to speak as a voice for the river in the public arena; and to put into peoples' hands the tools and the knowledge they need to be effective guardians of the Haw River."  Pl.'s Mot. for Prelim. Inj. or Stay Ex. 38, Chiosso Decl. ¶ 6, ECF No. 30-40.  Its members use the Haw River and Jordan Lake for recreational and aesthetic purposes. Preventing contamination of these water bodies is also important to the local economy in which the organization's members live and work.  The Haw River was

badly polluted in the past but became much cleaner after the enactment of the Clean Water Act.  HRA members fear the river will become polluted again due to the 2020 Rule's changes to the NEPA process.   HRA has actively opposed the MVP Southgate pipeline and has participated in the NEPA process for that proposal, and it intends to continue to do so.  "HRA is concerned that under the new rule, agencies might begin to conduct advanced acquisition of property for this project before the NEPA process has been completed which would cause environmental harm, and bias the decisionmaking down the line." *Id.* ¶ 15.  HRA is concerned that under the 2020 Rule, agencies will not consider all reasonable alternatives, which it says is particularly important in selecting pipeline routes that minimize sediment disruption. HRA is also participating in the NEPA process for a major proposed development which is already negatively affecting the natural environment in the area.   HRA contends that the 2020 Rule will limit its "ability to provide its members with tools for protecting the river, such as meaningful public participation." *Id.* ¶ 22.  It is also concerned that it will receive less information than it otherwise would through the NEPA process and will have to divert resources to obtain that information from other sources.  It believes it will have to hire expert help to prepare and submit comments that meet the 2020 Rule's specificity requirements.  It further asserts that climate change will directly affect the Haw River watershed, and it is concerned that under the 2020 Rule, agencies will not be required to consider climate change.

(5)     Kate Wofford is Executive Director of Alliance for the Shenandoah Valley (ASV), whose mission "is to maintain healthy and productive rural landscapes and communities, protect and restore natural resources, and strengthen and sustain the Shenandoah Valley region's agricultural economy."  Pl.'s Mot. for Prelim. Inj. or Stay Ex. 51, Wofford Decl. ¶ 5, ECF No. 30-53.  "ASV relies upon NEPA project notices to become aware of projects, including pipeline, transportation, and forestry management projects, and uses the NEPA comment process throughout the life cycle of projects to provide important community feedback to project designers and decision makers."  *Id.* ¶ 7.  ASV is currently involved in the NEPA process for an electric transmission line project.  Wofford fears that certain effects which she views as significant will be disregarded by the Forest Service as cumulative or indirect effects that need not be considered under the 2020 Rule, such as long-term impacts to water and soil quality, more sunlight reaching the forest floor, and reduced populations of Cow Knob Salamander.   She is also concerned that the Forest Service will not consider the alternate routes and mitigation measures ASV has suggested in its comments.   ASV also plans to participate in the NEPA process for the upcoming improvements to Interstate 81. ASV believes that because of the 2020 Rule, the NEPA documents for this project will not consider things like induced travel or induced land use because they are indirect effects, and ASV therefore will not have the information it needs to fully

advocate for its mission and inform its members and the community about the project. Wofford worries that ASV will have to divert resources from other projects in order to obtain information that will no longer be made available to it through the NEPA process. She further believes that ASV will have to hire experts to help it draft comments that satisfy the 2020 Rule's specificity requirements. In addition, she believes community members will be unable to effectively participate in NEPA reviews due to the specificity requirements, and promoting public participation in conservation efforts is a key part of ASV's mission. Wofford fears that without a robust NEPA process, agencies will be less likely to collaborate to come up with appropriate alternatives and ASV will instead have "to engage in lengthy and expensive formal challenges to agency decisions." *Id.* ¶ 15.

(6)    Nicole Whittington-Evans is the Alaska Program Director for Defenders of Wildlife (Defenders), which seeks "to protect all native animals and plants in their natural communities" and "prioritizes imperiled species and advocates for the sound management of our public lands." Mem. Supp. Pls.' Mot. Summ. J. Ex. 1, Whittington-Evans Decl. ¶ 5, ECF No. 105-2. Over the past several years, Defenders has been focused on protecting the Arctic Refuge with respect to oil leasing and drilling and has participated in related NEPA processes, preparing technical comments addressing effects on polar bears and other wildlife. Whittington-Evans describes in detail her many personal and professional

experiences in the Arctic Refuge and the aesthetic, recreational, and spiritual importance it holds for her.  If the areas she visited in the past were to "be industrialized by oil and gas exploration and development activities," she would be unable to re-create her past experiences and would no longer desire to visit those places.  *Id.* ¶ 23.  She intends to return to the Arctic Refuge for a backcountry wilderness trip in the next year or two.  The Bureau of Land Management (BLM) has stated, several months after the commencement of this lawsuit, that it intends to apply the 2020 Rule to a permit application for seismic exploration in the Arctic Refuge's Coastal Plain.  Whittington-Evans declares that Defenders "will not know whether public input will be meaningfully incorporated into the process or if scientific analyses of the project and its impacts will be thoroughly assessed or mitigated.  This will harm our ability to fully engage in the NEPA process to ensure against adverse impacts to polar bears or other resources of the Coastal Plain of the Arctic Refuge from an uninformed decisionmaking process on the seismic exploration permit."  *Id.* ¶ 53.  Applying the 2020 Rule to this application process "will undermine [Defenders'] ability to inform [its] members of the risks of the seismic exploration proposal and to facilitate their engagement in a public comment process designed to vindicate their interests."  *Id.* ¶ 54.  Like other plaintiffs, Defenders believes that the new regulation will prevent it from obtaining a full range of information, and the very short comment period for this particular process will

make it difficult for Defenders to obtain information through other means in time to prepare comments.   According to Whittington-Evans, "this will irremediably compromise our ability effectively to engage in the NEPA process for this particular permit." *Id.* ¶ 55.  Defenders is particularly concerned about "the harms that will befall the [Southern Beaufort Sea] stock of polar bears because BLM's eleventh-hour rush to review and approve the seismic exploration proposal will fail to take the fully-informed hard look at the proposal that NEPA requires." *Id.* ¶ 56.  "Seismic exploration activities have the potential not only to directly harm or kill species [Defenders'] members and [Whittington-Evans] enjoy but also to damage the vegetation and habitat of the Coastal Plain." *Id.* ¶ 58.

The plaintiffs in this case previously moved for a preliminary injunction to stop the 2020 Rule from taking effect, which I denied.  Op. & Order, Sept. 11, 2020, ECF No. 92.   The defendants and defendant-intervenors moved to dismiss the Complaint, and I denied those motions as well.  Order, Sept. 21, 2020, ECF No. 98. The parties have now filed cross-motions for summary judgment, which have been fully briefed and orally argued.

Following the change in Administration that resulted from the 2020 presidential election, the defendants have opted not to respond to the plaintiffs' Motion for Summary Judgment on the merits.  Instead, the defendants argue that the case must be dismissed because the plaintiffs' claims are unripe and the plaintiffs

lack standing.  The defendants have moved for remand without vacatur as well, to allow the presently-constituted CEQ to reconsider the 2020 Rule.  The defendant-intervenors also contend that the claims are not justiciable and alternatively support remand without vacatur.  The plaintiffs oppose any remand without vacating the 2020 Rule and instead seek a decision on the merits.  The defendant-intervenors further argue that should the court reach the merits of the plaintiffs' claims, the defendant-intervenors are entitled to judgment as a matter of law.

## II.

Because NEPA contains no judicial review provision, the plaintiffs bring their claims under the Administrative Procedure Act (APA).  The APA allows a party to challenge a final agency action, 5 U.S.C. § 704, which includes an agency rule, 5 U.S.C. §§ 701, 551(13).  *See Vill. of Bald Head Island v. U.S. Army Corps of Eng'rs*, 714 F.3d 186, 193–94 (4th Cir. 2013).  The parties here do not dispute that the 2020 Rule is a final agency action.

In order to pursue their claims in this court, the plaintiffs must establish both ripeness and standing.[4]  Federal courts are constitutionally unauthorized to review

---

[4] The defendants and defendant-intervenors argued at earlier stages of this litigation that the plaintiffs' claims were unripe and that the plaintiffs lacked standing.  While I allowed the case to proceed through the preliminary injunction and motions-to-dismiss phases, I now have the benefit of a more complete record, including additional briefing and oral argument by the parties, and have had more of an opportunity to fully consider these issues.  I have an obligation to ensure that plaintiffs have standing and assert ripe claims regardless of the stage of the litigation.

legislative or executive action except where necessary "to redress or prevent actual or imminently threatened injury to persons caused by private or official violation of law." *Summers v. Earth Island Inst.*, 555 U.S. 488, 492 (2009).  Plaintiffs must show standing and ripeness as to each claim they assert.  *South Carolina v. United States*, 912 F.3d 720, 726 (4th Cir.), *cert. denied*, 140 S. Ct. 392 (2019).   "At least one plaintiff must have standing to seek each form of relief requested in the complaint." *Town of Chester v. Laroe Ests., Inc.*, 137 S. Ct. 1645, 1651 (2017).  Justiciability is assessed based on the facts that existed as of the date the complaint was filed.  *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 569 n.4 (1992).

Ripeness and standing are related concepts that are not entirely distinct.  While standing generally concerns *who* may sue and ripeness concerns *when* they may sue, "in practice there is an obvious overlap between" the two doctrines.  *South Carolina*, 912 F.3d at 730 (internal quotation marks and citations omitted).

### A.  Ripeness.

In cases like this one, the purpose of the ripeness requirement is "to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."  *Id.* at 730 (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148–49 (1967)).  The ripeness

inquiry in this context asks "whether the issues tendered are appropriate for judicial resolution," and the extent to which there would be "hardship to the parties if judicial relief is denied at that stage." *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 162 (1967). In considering the fitness of the issues for judicial resolution, a court should ask "whether judicial intervention would inappropriately interfere with further administrative action" as well as whether further factual development would be beneficial. *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733 (1998).

"To be fit for judicial review, a controversy should be presented in a clean-cut and concrete form." *South Carolina*, 912 F.3d at 730 (internal quotation marks and citation omitted). The fact that the 2020 Rule is a final agency action does not necessarily mean that the plaintiffs' claims are ripe, nor is it conclusive that the plaintiffs' claims present purely legal questions. *See Toilet Goods Ass'n, Inc.*, 387 U.S. at 162–63. These points can be "outweighed by other considerations." *Id.* at 163. "[T]he test of ripeness . . . depends not only on how adequately a court can deal with the legal issue presented, but also on the degree and nature of the regulation's present effect on those seeking relief." *Id.* at 164. "Where an injury is contingent upon a decision to be made by a third party that has not yet acted, it is not ripe as the subject of decision in a federal court." *Doe v. Va. Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013).

*Ohio Forestry* counsels that this case is unripe.  There, the court considered conservation groups' claims that a Forest Service plan for a particular forest allowed too much logging and clearcutting.  The plan permitted logging but set a ceiling on how much logging could occur.  The plan "[did] not itself authorize the cutting of any trees." *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 729.  Rather, several additional procedural steps would have to occur before any specific logging would be permitted, including a NEPA review.  "Despite the considerable legal distance between the adoption of the Plan and the moment when a tree is cut, the Plan's promulgation nonetheless makes logging more likely in that it is a logging precondition; in its absence logging could not take place." *Id.* at 730.

In assessing the case's ripeness for review, the Court first found that delaying review would not pose significant hardship to the conservation groups because the pertinent provisions of the plan

> do not command anyone to do anything or to refrain from doing anything; they do not grant, withhold, or modify any formal legal license, power, or authority; they do not subject anyone to any civil or criminal liability; they create no legal rights or obligations.  Thus, for example, the Plan does not give anyone a legal right to cut trees, nor does it abolish anyone's legal authority to object to trees being cut.

*Id.* at 733.  Moreover, the plan did not at that time "inflict[] significant practical harm upon the interests that the [conservation groups] advance[]" due to the additional steps that would have to occur.  *Id.* at 733–34.  The Court found that the conservation groups would "have ample opportunity later to bring [their] legal challenge at a time

when harm is more imminent and more certain." *Id.* at 734.  Next, the Court found

that immediate judicial review "could hinder agency efforts to refine its policies"

either by revising the plan or in the form of specific proposals.  *Id.* at 735.

The Court further reasoned that reviewing the plan in the context of the

lawsuit at bar

> would require time-consuming judicial consideration of the details of
> an elaborate, technically based plan, which predicts consequences that
> may affect many different parcels of land in a variety of ways, and
> which effects themselves may change over time.  That review would
> have to take place without benefit of the focus that a particular logging
> proposal could provide.

*Id.* at 736.  "This type of review threatens the kind of abstract disagreements over

administrative policies that the ripeness doctrine seeks to avoid."  *Id.* (internal

quotation marks and citation omitted).  The Court thus found that it would benefit

from further factual development.  Finally, the Court noted that "Congress has not

provided for preimplementation judicial review of forest plans."  *Id.* at 737.

Plaintiffs make much of the Court's statement in *Ohio Forestry* that "a person

with standing who is injured by a failure to comply with the NEPA procedure may

complain of that failure at the time the failure takes place, for the claim can never

get any riper."  *Id.*  But the plaintiffs here are not challenging a failure to comply

with the NEPA procedure in preparation of an EIS, which is what the Court was

referencing.  Such a claim would take place further down the line, in the context of

a different federal agency considering a specific project proposal.[5]  The 2020 Rule is instead similar to the forest management plan at issue in *Ohio Forestry* because it does not directly regulate the plaintiffs, and additional procedural actions must occur before it impacts the consideration of any specific proposed project.  Additionally, NEPA does not provide for preimplementation judicial review.  The Court's analysis in *Ohio Forestry* applies with equal force to the plaintiffs' claims here, and the instant claims are likewise unripe.

The plaintiffs argue that the 2020 Rule directly regulates them in that it requires any comments they submit in future NEPA reviews to be as specific as possible and provides that any issues not timely raised will be waived.  But it will be up to the agencies applying these requirements, in accordance with their own yet-to-be-drafted NEPA procedures, to set a threshold below which comments will be deemed insufficiently specific.  Those agencies will have to decide whether a comment is too vague or imprecise and should be excluded from consideration.  They will also have to determine whether any later-raised issues are fairly encompassed by comments that were timely submitted.  The 2020 Rule's specificity and exhaustion requirements themselves can hardly be said to impose any consequences on the plaintiffs equivalent to those discussed in *Ohio Forestry*.

---

[5]  Furthermore, the quoted sentence speaks to a plaintiff "with standing," and the plaintiffs here do not have standing, as discussed below.

I agree with the defendants and defendant-intervenors that the plaintiffs' claims regarding the 2020 Rule are not appropriate for judicial resolution at this time. Delaying judicial review of the 2020 Rule until it can be considered in an as-applied challenge will not create a significant hardship for the plaintiffs. "This is not a situation in which primary conduct is affected — when contracts must be negotiated, ingredients tested or substituted, or special records compiled." *Toilet Goods Ass'n, Inc.*, 387 U.S. at 164. Courts have often reviewed challenges to an agency's failure to prepare an EIS and other claims seeking to compel an agency to fully comply with its NEPA obligations. *See, e.g.*, *Nat'l Audubon Soc'y v. Dep't of Navy*, 422 F.3d 174 (4th Cir. 2005); *Hughes River Watershed Conservancy v. Glickman*, 81 F.3d 437 (4th Cir. 1996); *New Mexico ex rel. Richardson v. Bureau of Land Mgmt.*, 565 F.3d 683 (10th Cir. 2009). When a particular agency renders a decision on a particular project following a procedure that, in the plaintiffs' view, does not meet the requirements of NEPA, the plaintiffs will then be able to pursue a legal challenge.[6] They need not wait until the project is underway and actively causing damage; they need only wait until there is a final agency action to challenge. *See* 5 U.S.C. § 551(13) (defining '"agency action"' to include "the whole or a part of an

---

[6] Defense counsel has assured the court and the plaintiffs that CEQ will not in the future contend that an as-applied challenge is unripe. Prelim. Inj. Hr'g Tr. 34–36, ECF No. 84.

agency rule, order, license, sanction, relief, or the equivalent or denial thereof, or failure to act"). [7]

The potential applications and outcomes of the regulatory changes adopted are simply too attenuated and speculative to allow for a full understanding and consideration of how they may impact the plaintiffs.  Before the 2020 Rule can be applied to any particular federal action, each federal agency must adopt its own NEPA procedures.  The deadline for doing so is still months away and was more than a year in the future, on the other side of a presidential election, when the plaintiffs filed this lawsuit.  Defense counsel has represented that following the change in Administrations, CEQ has directed agencies not to devote resources to establishing their own NEPA procedures because it expects to provide further guidance on the 2020 Rule, which it is actively reconsidering.  I am therefore

---

[7] The plaintiffs argue that with respect to projects exempted from the NEPA process entirely, there will be no final agency action under the APA for them to challenge in future litigation.  Given the broad statutory definition of "agency action," I find their contention unpersuasive.  The jurisprudence is replete with cases in which parties have challenged agencies' failure to produce an EIS when one was required or to comply with NEPA's other mandates.  The plaintiffs here will be able to do the same in the future if an agency, applying procedures promulgated under the 2020 Rule, deems an EA or EIS unnecessary and the plaintiffs disagree.  The plaintiffs further assert that they may never even learn about projects that are exempted from NEPA review entirely.  Again, I am unconvinced.  Certainly these plaintiff organizations, who closely monitor activities in their areas, will inevitably learn about projects even if no NEPA review is initially undertaken.  At that point, they can sue to enforce NEPA.  That an agency may proceed with a project without undergoing NEPA review does not mean there will be no final agency action subject to challenge under the APA.

concerned that judicial review of the plaintiffs' claims at this juncture could interfere with further administrative action. At the very least, defense counsel's representations create significant uncertainty as to the future application of the 2020 Rule.

While the plaintiffs have pointed to certain proposed projects that they predict will be reviewed less rigorously as a result of the 2020 Rule, at this time, one cannot say with anything close to certainty exactly how each agency will interpret the 2020 Rule and apply it to future project proposals. The plaintiffs' claims will be much easier to assess with respect to an agency's treatment of a particular proposal. As counsel for the defendants stated in oral argument, "A specific action will involve a specific set of environmental effects, a specific range of alternatives, and a full administrative record demonstrating how the agency came to those decisions, how it handled public involvement and public comments." Mot. Hr'g Tr. 47, ECF No. 154. "[J]udicial appraisal . . . is likely to stand on a much surer footing in the context of a specific application of this regulation than could be the case in the framework of the generalized challenge made here." *Toilet Goods Ass'n, Inc.*, 387 U.S. at 164.

My conclusion that review of the 2020 Rule would be more appropriate further down the line of implementation does not necessarily mean that conservation groups will be required to litigate every case in which an agency applies an abbreviated NEPA process or no NEPA process at all. There is no apparent reason

why a ruling made in one case would not apply to others based on preclusion principles. *See Ohio Forestry Ass'n*, *Inc.*, 523 U.S. at 734–35. In any event, while a "case-by-case approach . . . is understandably frustrating" to the plaintiffs, it "is the traditional, and remains the normal, mode of operation of the courts." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 894 (1990). The claims before me in the present case are not suitable for judicial review at this time.

## B. Standing.

Even if I were to conclude that the plaintiffs' claims were ripe, they would be nonjusticiable because the plaintiffs lack standing. "[F]or a federal court to have authority under the Constitution to settle a dispute, the party before it must seek a remedy for a personal and tangible harm. The presence of a disagreement, however sharp and acrimonious it may be, is insufficient by itself to meet Art. III's requirements." *Hollingsworth v. Perry*, 570 U.S. 693, 704 (2013) (internal quotation marks and citation omitted). There are three well-known parts to the constitutional standing inquiry:

(1)   An "injury in fact" suffered by the plaintiff that is both "(a) concrete and particularized and (b) actual or imminent, not conjectural or hypothetical;"

(2)   Causation, or a showing that "[t]he injury is fairly traceable to the challenged action of the defendant;" and

(3)   A likelihood "that the injury will be redressed by a favorable decision."

*South Carolina*, 912 F.3d at 726 (internal quotation marks and citation omitted).

As to the first element, the Supreme Court has clarified that concreteness and particularity are two separate requirements that must both be satisfied. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1548 (2016). To be concrete, an injury "must actually exist" — it must be "real, and not abstract." *Id.* (internal quotation marks and citation omitted). Intangible injuries can be concrete. *Id.* at 1549. "Congress' role in identifying and elevating intangible harms does not mean that a plaintiff automatically satisfies the injury-in-fact requirement whenever a statute grants a person a statutory right and purports to authorize that person to sue to vindicate that right." *Id.*

While a threatened injury can in some cases constitute an injury in fact, the plaintiffs "must establish a realistic danger of sustaining a direct injury." *South Carolina*, 912 F.3d at 726 (internal quotation marks and citations omitted). The injury has to be both qualitatively and temporally concrete. *Id.* "[A]n alleged harm is too speculative to support Article III standing when the harm lies at the end of a highly attenuated chain of possibilities." *Id.* at 727 (internal quotation marks and citation omitted).

Where, as here, the plaintiffs are environmental groups, associational standing rules apply.

> An association has standing to bring suit on behalf of its members when its members would otherwise have standing to sue in their own right,

> the interests at stake are germane to the organization's purpose, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.

*Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 US 167, 181 (2000).

In this case, the plaintiffs do not have standing under any theory because they have not established that the 2020 Rule has caused or imminently will cause them any concrete injury. While the standing question here is a close one, a party seeking judicial review bears the burden of establishing standing, and any doubt as to justiciability must therefore be resolved against the plaintiffs. *Clapper v. Amnesty Int'l U.S.A.*, 568 U.S. 398, 411–12 (2013). After careful consideration, I conclude that the harms the plaintiffs allege are too speculative to satisfy Article III's requirements.

### 1. Environmental Injury.

The plaintiffs have submitted declarations of their members that purport to show how they will suffer recreational and aesthetic injuries at specific sites based on the predicted future application of the 2020 Rule to projects at or near those locations. While this kind of evidence is often sufficient to show harm in environmental cases, *see, e.g.*, *Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. at 181, the problem here is that such harm is neither imminent nor concrete. There are several steps that must take place between the time the plaintiffs filed this suit and

the anticipated future harms they fear, and those steps are too uncertain.  *See, e.g., Clapper*, 568 U.S. at 401 (holding that "respondents' theory of *future* injury is too speculative to satisfy the well-established requirement that threatened injury must be certainly impending") (internal quotation marks and citation omitted).

The *Summers* case is instructive.   There, environmental organizations challenged Forest Service regulations that, among other things, exempted certain projects from preparation of an EA or EIS, along with the Forest Service's failure to provide notice or solicit public comment as to one particular project.  555 U.S. at 490–91.  The parties settled their dispute as to the specific project, but the environmental groups continued their facial challenge of the regulations.  *Id.* at 491.  In concluding that the environmental groups could not establish an injury in fact, the Court found that the regulations being challenged "govern[ed] only the conduct of Forest Service officials engaged in project planning" and did not "require nor forbid any action on the part of respondents."  *Id.* at 493.

The Court noted that the groups' declarations had discussed past injuries suffered from development on Forest Service land but had not identified specific future projects to which the new regulations would apply.  The Court was thus "asked to assume not only that [the declarant] will stumble across a project tract unlawfully subject to the regulations, but also that the tract is about to be developed by the Forest Service in a way that harms his recreational interests, and that he would

have commented on the project but for the regulation." *Id.* at 496.  Such assumptions, the court held, could not establish a concrete and particularized injury in fact.

Like the regulations at issue in *Summers*, the regulatory changes promulgated in the 2020 Rule "neither require nor forbid any action on the part of" the plaintiffs. *Id.* at 493.  Instead, they govern the conduct of federal agencies considering whether to undertake certain actions.  And before the agencies can apply the 2020 Rule, they must adopt their own NEPA procedures.

Unlike in *Summers*, the declarations submitted by the plaintiffs in this case do point to specific project proposals that they contend will affect the recreational, aesthetic, and other interests of their members.  They cannot say, however, what the yet-to-be-written agency-specific procedures will require or permit, or how those procedures will be applied to the projects they identify, or that the application of the procedures to the identified projects will harm the declarants' interests.  In other words, the plaintiffs have not adduced harms that are certainly impending. [8]

---

[8]   Some of the declarants contend they will be harmed by pollution from concentrated animal feeding operations (CAFOs), which will be exempted from the NEPA process entirely, because those private operations are typically only subject to NEPA review when the Farm Service Agency (FSA) guarantees their loans, and the 2020 Rule exempts FSA loan guarantees from the NEPA process.  This alleged harm is even more attenuated than the others asserted.  Not all CAFOs are funded with loans that are guaranteed by the FSA, and the decision whether to seek such loan guarantees presumably rests with the nongovernmental third-party entities who aim to build the CAFOs.

The Fourth Circuit's recent decision in *South Carolina* also leads to the conclusion that the plaintiffs lack standing.  There, South Carolina sued the Department of Energy (DOE) and the National Nuclear Security Administration over their termination of a mixed-oxide fuel nuclear processing facility project in the state.  *South Carolina*, 912 F.3d at 720.  South Carolina's alleged harm was that it would become "the permanent repository of weapons-grade plutonium," with resulting environmental, health, and safety risks, because the DOE made its decision without complying with NEPA.  *Id.* at 727.  The Fourth Circuit concluded that this claim of harm "rest[ed] on a . . . highly attenuated chain of possibilities."  *Id.* at 728 (internal quotation marks and citation omitted).  This was so because in order for the injury to occur, the following would need to take place:

> (1) the proposed Dilute and Dispose method must fail; (2) the Department of Energy must fail to identify an alternative method for disposing of the nuclear material; and (3) the Department of Energy must breach its statutory obligation to remove the nuclear material from South Carolina, Congress must repeal that obligation, or the courts must refuse to enforce that obligation.

*Id.*  These necessary steps rendered the asserted harm too speculative.  The court further reasoned, "To confer standing on South Carolina at this juncture based on an alleged injury . . . that the political branches already have made written and legally binding commitments to forestall would improperly usurp the powers of the political branches."  *Id.* at 729 (internal quotation marks and citation omitted).

- 34 -

Here, the plaintiffs may have valid concerns about how the 2020 Rule will impact projects in their areas, but they simply do not know how each agency will interpret the 2020 Rule, taking into account any applicable CEQ guidance, or whether the 2020 Rule will be applied to pending NEPA reviews.  At the time this suit was commenced — the operative date for assessing standing — there were too many unknowns.  The plaintiffs themselves assert that the 2020 Rule contains provisions that are vague, ambiguous, and likely to create confusion.  *See* Pls.' Corrected Resp. Opp'n Defs' & Def.-Intervenors' Mot. Dismiss 6, ECF No. 77; Pls.' Reply Supp. Mot. Prelim. Inj. or Stay 13–14, ECF No. 89; Mem. Supp. Pls.' Mot. Summ. J. 23, ECF 105-1.  The plaintiffs anticipate that agencies conducting NEPA reviews in the future will deem certain effects to be cumulative or indirect and will not consider them, but that is pure speculation, and speculation cannot carry the day.  The Supreme Court has repeatedly voiced its reluctance "to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment." *Clapper*, 568 U.S. at 413.

### 2.  Procedural Injury.

The plaintiffs allege that they have suffered a procedural injury due to CEQ's alleged failure to adhere to the requirements of the APA with respect to notice-and-comment rulemaking.  They further contend that the 2020 Rule will procedurally

harm them in the future by making it more difficult to participate in NEPA reviews.

The Supreme Court has thus explained the concept of procedural injury:

> There is this much truth to the assertion that "procedural rights" are special: The person who has been accorded a procedural right to protect his concrete interests can assert that right without meeting all the normal standards for redressability and immediacy. Thus, under our case law, one living adjacent to the site for proposed construction of a federally licensed dam has standing to challenge the licensing agency's failure to prepare an environmental impact statement, even though he cannot establish with any certainty that the statement will cause the license to be withheld or altered, and even though the dam will not be completed for many years.

*Lujan v. Defs. of Wildlife*, 504 U.S. at 573 n.7.

A plaintiff cannot "allege a bare procedural violation, divorced from any concrete harm, and satisfy the injury-in-fact requirement of Article III." *Spokeo*, 136 S. Ct. at 1549. If plaintiffs fail "to establish that they will likely suffer a substantive injury, their claimed procedural injury — being denied the right to comment on the [proposed rule] — necessarily fails." *Sierra Club v. EPA*, 754 F.3d 995, 1002 (D.C. Cir. 2014) (citing *Summers*, 555 U.S. at 496).

The plaintiffs here allege that CEQ has violated their procedural rights by undertaking a legally deficient rulemaking process with respect to the 2020 Rule, and they argue that the 2020 Rule itself will lead agencies to violate their procedural interests in future NEPA reviews. The environmental groups in *Summers* raised a similar argument, claiming that they were injured when they were not allowed to comment on certain Forest Service actions. 555 U.S. at 496. "But deprivation of a

procedural right without some concrete interest that is affected by the deprivation — a procedural right *in vacuo* — is insufficient to create Article III standing." *Id.* "Only a person who has been accorded a procedural right to protect *his concrete interests* can assert that right . . . ." *Id.* (internal quotation marks and citation omitted).

In *Summers*, the Court stated that as to the particular project that was no longer at issue due to settlement, the groups had made the requisite showing by "claiming that but for the allegedly unlawful abridged procedures they would have been able to oppose the project that threatened to impinge on their concrete plans to observe nature in that specific area." *Id.* at 497.  The plaintiffs' showing here at first glance seems much like the one that the Court indicated would be sufficient in *Summers*. The difference is that in this case, the plaintiffs do not mount an as-applied challenge of the 2020 Rule.  There are additional administrative actions that must occur before the 2020 Rule can be applied, and the steps yet to come involve some amount of discretion and interpretation by third parties – namely, other federal agencies.  This, again, renders the plaintiffs' anticipated injuries more conjectural than concrete and imminent.  While the plaintiffs unquestionably have real aesthetic, recreational, environmental, and other interests in the lands and waters discussed in their declarations, they have not shown that the 2020 Rule imminently threatens those interests.

It is true that the plaintiffs are not required to show that their ability to participate in future NEPA processes would make a difference in the outcome of those processes.  But they must show that the procedural injury itself is certainly impending, meaning that they must show that the 2020 Rule will be applied in a way that interferes with their procedural interests in future NEPA processes.  Given the additional procedural steps that must occur before the 2020 Rule is applied to any particular NEPA review, they cannot do so.

As to the allegation that CEQ already violated their procedural rights by not complying with the APA in adopting the 2020 Rule, I find that this asserted injury is not tied closely enough to the plaintiffs' concrete interests.  It is essentially a procedural injury *in vacuo*.  The alleged procedural injury arising from defects in the CEQ rulemaking would be actionable only if the plaintiffs were challenging an agency's application of the 2020 Rule that imminently threatened to affect their concrete interests.  It is not actionable in the context of the instant facial challenge to the 2020 Rule.  The plaintiffs therefore have not stated a cognizable procedural injury sufficient to establish standing.

### 3.    Informational Injury.

Finally, the plaintiffs contend that they will suffer harm as a result of the 2020 Rule because agencies applying the revised regulation to NEPA reviews will not consider certain information that is currently made available to the public as part of

the NEPA process.  The plaintiffs assert that they rely on this information to carry out their organizational missions and if they are unable to obtain it through NEPA, they will be forced to expend resources to acquire the information in other ways.

The Supreme Court has held that in certain circumstances, a plaintiff's inability to obtain information can constitute an injury in fact.  *Fed. Election Comm'n v. Akins*, 524 U.S. 11, 21 (1998).  In *Akins*, the Federal Election Commission (FEC) had determined that an organization was not subject to certain disclosure obligations required by a federal statute.  A group of voters opposed to the organization's views sued seeking judicial review of the FEC's decision.  In holding that the voters had standing, the Court noted that there was a statute that sought "to protect individuals such as respondents from the kind of harm they say they have suffered."  *Id.* at 22.  The voters claimed that the undisclosed information would help them evaluate candidates for public office and the role that funding from the organization might play in an election.  Based on this, the Court stated that the voters' injury "seem[ed] concrete and particular."  *Id.* at 21.

The Fourth Circuit has since clarified that "a constitutionally cognizable informational injury requires that a person lack access to information to which he is legally entitled *and* that the denial of that information creates a 'real' harm with an adverse effect."  *Dreher v. Experian Info. Sols., Inc.*, 856 F.3d 337, 345 (4th Cir. 2017) (quoting *Spokeo*, 136 S. Ct. at 1548).  "[A] plaintiff suffers a concrete

informational injury where he is denied access to information required to be disclosed by statute, *and* he suffers, by being denied access to that information, the type of harm *Congress sought to prevent* by requiring disclosure." *Id.* at 345 (internal quotation marks and citation omitted).

The plaintiffs argue that they have established an informational injury under *Akins* because one of NEPA's aims is to ensure "that the agency will inform the public that it has indeed considered environmental concerns in its decisionmaking process." *Balt. Gas & Elec. Co. v. Nat. Res. Def. Council*, 462 U.S. 87, 97 (1983). NEPA's publication requirement "guarantees that the relevant information will be made available to the larger audience that may also play a role in both the decisionmaking process and the implementation of that decision." *Robertson*, 490 U.S. at 349. Following the plaintiffs' argument to its logical conclusion, however, would mean that environmental organizations would virtually always have standing with respect to NEPA violations because any perceived failure in the NEPA process could arguably result in a loss of information to the environmental groups. *See Found. on Econ. Trends v. Lyng*, 943 F.2d 79, 84–85 (D.C. Cir. 1991) (explaining that "sustain[ing] an organization's standing in a NEPA case solely on the basis of 'informational injury' . . . would potentially eliminate any standing requirement in NEPA cases, save when an organization was foolish enough to allege that it wanted the information for reasons having nothing to do with the environment"). Surely

Article III requires a greater showing to invoke the federal courts' jurisdiction, particularly given NEPA's broad application.

Critically, once again, the plaintiffs cannot show any concrete harm to support their alleged informational injury.  This is because as of the filing of the Complaint — and as of the date of this Opinion, as far as the court knows — the plaintiffs have not actually been denied any information to which they are statutorily entitled, nor have they established any imminent unlawful failure to disclose information.  Their theory of informational injury is based on the assumption that non-party agencies will not issue EAs or EISs or will not include certain information in those documents when conducting future NEPA reviews.  Whether or not those anticipated facts will occur, as explained above, is anyone's guess.

To the extent the plaintiffs assert economic harm based on the increased expenses they expect to incur in submitting FOIA requests or otherwise obtaining information from sources outside the NEPA process, I find that those expenses do not amount to concrete injuries either.  *See Clapper*, 568 U.S. at 402 ("[R]espondents cannot manufacture standing by choosing to make expenditures based on hypothetical future harm that is not certainly impending."); *Beck v. McDonald*, 848 F.3d 262, 276–77 (4th Cir. 2017).  That some of the plaintiffs have "incurred certain costs as a reasonable reaction to a risk of harm is unavailing — because the harm [they] seek to avoid is not certainly impending."  *Clapper*, 568 U.S. at 416.

III.

I am mindful that courts must not set the bar of justiciability unnecessarily high.  *See Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. at 181.  Nevertheless, I am left with the firm conviction that the claims asserted in this case by these plaintiffs are not appropriate for judicial resolution at this time.  "That the [plaintiffs'] claims are not currently justiciable does not mean that they never will be so."  *South Carolina*, 912 F.3d at 731.  But whether because the claims are unripe or because the plaintiffs lack standing, the case before me is not presently justiciable.

A separate Order will be entered denying the pending motions as moot and dismissing the case without prejudice.

DATED:   June 21, 2021

/s/  JAMES P. JONES
United States District Judge